**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHERYL HALL FRAZIER,** | ) | |
| **individually and on behalf of a class** | ) | |
| **of similarly situated persons,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 1:08-cv-11-MHT** |
| | ) | |
| **ACCREDITED HOME LENDERS,** | ) | |
| **INC., d/b/a HOME FUNDS DIRECT,** | ) | |
| | ) | |
|     **Defendant** | ) | |

<u>**DEFENDANT ACCREDITED HOME LENDERS, INC.'S
MOTION FOR SUMMARY JUDGMENT**</u>

Defendant Accredited Home Lenders, Inc., (herinafter, "Accredited"), hereby moves the Court for entry of summary judgment in its favor and dismissal of this action in its entirety pursuant to Fed. R. Civ. P. 56. Accredited is entitled to judgment as a matter of law because the undisputed facts establish that it did not violate the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, or the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639.  In support of its Motion, Accredited shows this Court the following:

1.      Plaintiff's claim for statutory damages under TILA is barred by the one-year limitation period described at 15 U.S.C. § 1640(e).  Moreover, any alleged miscalculations Accredited may have made in disclosing to Plaintiff certain aspects of the transaction, including the finance charge, were nevertheless lawful and – in some instances – exceeded the requirements of TILA. Finally, Accredited did not violate any provision of HOEPA because Plaintiff's loan was not a "high cost" loan subject to HOEPA protections.  Accordingly, Plaintiff is not entitled to damages or rescission of her loan, and her claims must be dismissed.

2.      In further support of the Motion, Accredited submits the following exhibits:

Exhibit 1 –      Plaintiff's Truth in Lending Disclosure Statement,
Bates No. 0031;

Exhibit 2 –      Plaintiff's Good Faith Estimate, Bates No. 0032;

Exhibit 3 –      Plaintiff's HUD-1 Settlement Statement, Bates No. 0025-
26;

Exhibit 4 –      Deposition of Robert Dooley as representative for
Accredited (without exhibits);

Exhibit 5 –      Deposition of Greg Swafford as representative for
Swafford & Hays Settlement Services (without exhibits);

Exhibit 6 –      Deposition of Plaintiff, Cheryl Hall Frazier (without
exhibits);

Exhibit 7 –      Accredited's Closing Instructions, Bates No. 0034-39; and

Exhibit 8 –      Accredited's Response to Plaintiff's Second Set of
Interrogatories and Request for Production of Documents

3.      For the above-stated reasons, and based on the additional argument set forth in the
accompanying Memorandum of Law in Support of its Motion for Summary Judgment,
incorporated by reference herein, Accredited requests that this Court grant its Motion for
Summary Judgment and dismiss this action with prejudice.

WHEREFORE, Accredited respectfully requests that summary judgment be granted in its
favor as to all counts in Plaintiff's First Amended Complaint.


Respectfully submitted,

s/ J. DOUGLAS MINOR, JR.
_____

*Attorney for Defendant Accredited Home
Lenders, Inc.*

OF COUNSEL

J. Douglas Minor, Jr. (admitted *pro hac vice*)
J. William Manuel
Kathleen R. Shields
Bradley Arant Rose & White LLP
Suite 450, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Earl Price Underwood, Jr.**
Law Offices of Earl P. Underwood,Jr.
PO Box 969
Fairhope, AL 36533-0969
251-990-5558
Fax: 251-990-0626
Email: epunderwood@alalaw.com

**George Richardson Irvine, III**
Stone Granade & Crosby PC
PO Drawer 1509
Bay Minette, AL 36507-1509
251-626-6696
Fax: 251-626-2617
Email: GRI@SGCLAW.COM

**James Donnie Patterson**
Law Offices of Earl P Underwood
PO Box 969
Fairhope, AL 36533-0959

251-990-5558
Fax: 251-990-0626
Email: jpatterson@alalaw.com

**Kenneth Joseph Riemer**
166 Government Street, Suite 100
PO Box 1206
Mobile, AL 36633-1206
251-432-9212
Fax: 251-433-7172
Email: kjr@alaconsumerlaw.com

**Steven Leon Nicholas**
Cunningham, Bounds, Crowder, Brown and Breedlove, LLC
PO Box 66705
Mobile, AL 36660-6705
251-471-6191
Fax: 251-479-1031
Email: sln@cunninghambounds.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

NONE

Respectfully submitted,

s/ J. DOUGLAS MINOR, JR.

# FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| | **Date:** 03/25/2005     **Loan #:** 0503172917 |
| | **Loan Type:** Conventional |

**Borrower Address:**
105 TV ROAD
DOTHAN, AL 36301

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.975 % | $85,772.51 | $ 52,417.10 | $ 138,189.61 |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359<br>1 | $383.89<br>$373.10 | 05/01/2005<br>04/01/2035 | | | |

**DEMAND FEATURE:** [X] This loan does not have a Demand Feature.    [ ] This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:** [ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
105 TV ROAD
DOTHAN, AL 36301

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms [ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $170.00

**PROPERTY INSURANCE:** [X] Property hazard insurance in the amount of the lesser of the loan amount or replacement cost with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender.
Hazard insurance [ ] is [X] is not available through the lender at an estimated cost of N/A for N/A year term.

**LATE CHARGES:** If your payment is more than **10** days late, you will be charged a late charge of **5.000%** of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
[ ] may [X] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| _Signature_    3-25-05 | |
|---|---|
| Borrower      Date<br>CHERYL HALL | Borrower      Date |
| Borrower      Date | Borrower      Date |
| Borrower      Date | Borrower      Date |
| Borrower      Date | Borrower      Date |

**EXHIBIT**
tabbies

AHL/Frazier
0031

FINAL

**GOOD FAITH ESTIMATE**

Lender: Home Funds Direct
Address: 15090 Avenue of Science
San Diego, CA 92128
Applicant(s): CHERYL HALL

Loan Number: 0503172917
Sales Price: $0.00
Base Loan Amount: 56,000.00
Total Loan Amount: $$56,000.00
Type of Loan: Conventional Fixed
Date Prepared: March 25, 2005
Rate: 7.299   %Term: 360/360 mos

Property Address: 105 TV ROAD
DOTHAN, AL 36301

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates-the actual charges may be more or less. Your transaction may not involve a fee for every item listed.
The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1 A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 or HUD-1A | DESCRIPTION OF CHARGES | Lender | OTHER |
|---|---|---|---|
| 204 Lender Credit to Borr. | | $ | $ |
| 801 Origination Fee | | $ 1,960.00 | $ |
| 802 Discount Points | | $ | $ |
| 803 Appraisal Fee | | $ | $ 300.00 |
| 804 Credit Report Fee | | $ | $ |
| 805 Final Inspection/442 Fee | | $ | $ |
| 807 Application Fee | | $ | $ |
| 809 Yield Spread Premium (POC) / Rebate to Broker(POC) $  0.00 | | $ | $ |
| 810 Processing Fee | | $ 500.00 | $ |
| 811 Underwriting Fee | | $ 500.00 | $ |
| 813 Appraisal Review Fee | | $ 250.00 | $ |
| 815 Escrow Holdback Fee | | $ | $ |
| 816 Funding Fee | | $ | $ |
| 818 Courier Fee | | $ | $ |
| 825 Warehouse Fee | | $ | $ |
| 827 Reverif Fee | | $ | $ |
| 828 Flood Cert/Life of Loan Fee | | $ 9.50 | $ |
| 829 Tax Service Fee | | $ 66.00 | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | SUB-TOTALS | 3,285.50 | 300.00 |

| | | OTHER CHARGES | |
|---|---|---|---|
| 901 Interest for 2 days  @ $ 11.2 per day | | $ 22.40 | $ |
| 903 Hazard Insurance Premium | | $ | $ |
| 904 Flood Insurance Premium | | $ | $ |
| 1001 Hazard Insurance 4 month(s) @  $89.00 | | $ 356.00 | $ |
| 1003 City Property Tax 0 month(s) @  $0.00 | | $ | $ |
| 1004 County Property Tax 7 month(s) @  $44.75 | | $ 313.25 | $ |
| 1005 School Tax 0 month(s) @  $0.00 | | $ | $ |
| 1006 Flood Insurance 0 month(s) @  $0.00 | | $ | $ |
| 1008 Agg. Acctg. Adjustment | | $ -134.25 | $ |
| 1101 Settlement / Closing Agent Fee | | $ | $ 275.00 |
| 1102 Abstract/Title Search Fee | | $ | $ 200.00 |
| 1103 Title Examination Fee | | $ | $ 250.00 |
| 1104 Title Insurance Binder | | $ | $ |
| 1105 Closing Agent/Attorney Doc Fee | | $ | $ |
| 1106 Notary Fee | | $ | $ |
| 1107 Demand Fee | | $ | $ |
| 1108 Title Insurance Premium | | $ | $ 200.00 |
| 1201 Recording Fee - Deed/Mortgage | | $ | $ 120.00 |
| 1202 City/County Tax- Deed/Mortgage | | $ | $ |
| 1203 State Tax - Deed/Mortgage | | $ | $ 84.00 |
| 1204 Misc Recording Fee | | $ | $ 50.00 |
| 1205 Transfer Tax | | $ | $ |
| 1301 Survey Fee | | $ | $ |
| 1302 Pest Inspection | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

Lenders CFL License #

TOTAL ESTIMATED SETTLEMENT CHARGES                    $ 5,321.90

"P" designates - The Lender will require a particular provider from a lender-controlled or approved list. The specific provider and actual cost will appear on the HUD-1 or HUD-1A.
These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the Lender will take a first lien on the property. The undersigned acknowledges receipt of the booklet "Settlement Costs." and the Consumer Handbook on ARM Mortgages, if applicable.
☒ Use of a particular provider of service is required and the estimate is based on charges of the provider. Please see attached Addendum.

**THIS DOES NOT CONSTITUTE A LOAN COMMITMENT**

Borrower CHERYL HALL         Date 3-25-05      Borrower                    Date

Borrower                    Date      Borrower                    Date

Borrower                    Date      Borrower                    Date

Borrower                    Date      Borrower                    Date

EXHIBIT
2

AHL/Frazier
0032

(Printed on Mar 25, 2005 @ 16:19)    US Department of Housing and Urban Development    OMB No. 2502-0265

**A.**    **SETTLEMENT STATEMENT**

| B.  Type of Loan | | |
|---|---|---|
| 1. [ ] FHA  2. [ ] FmHA  3. [ ] Conv. Unins. | 6. File Number: | 7.  Loan Number: |
| 4. [ ] VA  5. [X] Conv. Ins. | 05-2813 | 0503172917    8.  Mortgage Ins. Case #: |

C. NOTE:  This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "POC" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

**D. NAME AND ADDRESS OF BORROWER/BUYER:**
Cheryl Hall 105 TV Road Dothan, AL 36301

**E. NAME AND ADDRESS OF SELLER:**

**F. NAME AND ADDRESS OF LENDER:**
Home Funds Direct 1130 Northchase Parkway, Suite 200 Marietta, GA 30067

**G. PROPERTY LOCATION (Brief Legal):**
105 TV Road Dothan, AL  36301

| H. SETTLEMENT AGENT: | PLACE OF SETTLEMENT: |
|---|---|
| Swafford and Hays Settlement Services, Inc.  865-539-1450 Contact: Janet Shelley | 9041 Executive Park Drive, Suite 400 Knoxville, TN  37923 |
| I.  SETTLEMENT DATE: 03/25/2005 | DISBURSEMENT DATE: 03/30/2005 |

| J. SUMMARY OF BORROWER(S) TRANSACTION | | K. SUMMARY OF SELLER(S) TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER : | | 400.  GROSS AMOUNT DUE TO SELLER : | |
| 101. Contract sales price | | 401.  Contract sales price | |
| 102. Personal Property | | 402.  Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 13,896.39 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by Seller in advance | | Adjustments for items paid by Seller in advance | |
| 106. City/town taxes | | 406.  City/town taxes | |
| 107. County taxes | | 407.  County taxes | |
| 108. Assessments | | 408.  Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross Amount Due From Borrower | 13,896.39 | 420.  Gross Amount Due Seller | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER : | | 500.  REDUCTIONS IN AMOUNT DUE TO SELLER : | |
| 201. Deposit or earnest money | | 501.  Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 56,000.00 | 502.  Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff of first mortgage loan | |
| 205. | | 505.  Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by Seller in advance | | Adjustments for items unpaid by Seller in advance | |
| 210. City/town taxes | | 510.  City/town taxes | |
| 211. County taxes | | 511.  County taxes | |
| 212. Assessments | | 512.  Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 56,000.00 | 520.  Total Reduction Amount Due Seller | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER : | | 600.  CASH AT SETTLEMENT TO/FROM SELLER : | |
| 301. Gross Amount due from borrower (line 120) | 13,896.39 | 601.  Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 56,000.00 | 602.  Less reductions in amt. due seller (line 520) | |
| 303.  Cash [ ] From  [X] To  Borrower | 42,103.61 | 603.  Cash [X] To  [ ] From  Seller | 0.00 |

SUBSTITUTION FORM 1099 SELLER STATEMENT: The information contained in Blocks E,G,H and I on line 401(or if 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER, you are required by law to provide the settlement agent with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

Seller(s):

EXHIBIT

tabbies™

3

AHL/Frazier
0025

(Printed on Mar 25, 2005 @ 16:19)    US Department of Housing and Urban Development    OMB No. 2502-0265
L.    **SETTLEMENT CHARGES**

| | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | |
| 701. Listing Realtor Commission | | |
| 702. Selling Realtor Commission | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee  To: Home Funds Direct | 1,960.00 | |
| 802. Loan Discount | | |
| 803. Appraisal Fee  To: Alabama Appraisal Service | 300.00 | |
| 804. Credit Report | | |
| 805. Lender's Inspection Fee | | |
| 806. Mortgage Insurance Application Fee | | |
| 807. Assumption Fee | | |
| 808. Processing Fee  To: Home Funds Direct | 500.00 | |
| 809. Underwriting fee  To: Home Funds Direct | 500.00 | |
| 810. Document Preparation Fee | | |
| 811. Zone Determination Fee  To: Home Funds Direct | 9.50 | |
| 812. Tax Service Fee  To: Home Funds Direct | 66.00 | |
| 813. Appraisal Review Fee  To: Home Funds Direct | 250.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest fromOdd Days  To: Home Funds Direct | 22.40 | |
| 902. Mortgage Insurance Premium for | | |
| 903. Hazard Insurance Premium for  To: State Farm | 1,068.00 | |
| 904. | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard insurance  To: Home Funds Direct | 356.00 | |
| 1002. Mortgage insurance | | |
| 1003. City property taxes | | |
| 1004. County property taxes  To: Home Funds Direct | 313.25 | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Accounting Adjustment  To: Home Funds Direct | -134.25 | |
| **1100. TITLE CHARGES** | | |
| 1101. Settlement or closing fee  To: Swafford and Hays Settlement Services, Inc. | 275.00 | |
| 1102. Abstract or title search  To: Swafford and Hays Settlement Services, Inc. | 200.00 | |
| 1103. Title examination  To: Swafford and Hays Settlement Services, Inc. | 250.00 | |
| 1104. Title insurance binder | | |
| 1105. Document preparation | | |
| 1106. Notary Fees | | |
| 1107. Attorney's Fees | | |
| (Includes above item numbers: ) | | |
| 1108. Title Insurance  To: Transnation Title Insurance Company | 200.00 | |
| (Includes above item numbers: ) | | |
| 1109. Lender's coverage$67,500.00  @  $200.00 | | |
| 1110. Owner's coverage @ 0.00 | | |
| 1111. Endorsements  To: Swafford and Hays Settlement Services, Inc. | 50.00 | |
| 1112. | | |
| 1113. Overnight Courier & Handling Fees | | |
| **1200. GOVT. RECORDING, TRANSFER, AND SERVICE FEES** | | |
| 1201. Recording fees and Service fees:  To: Clerk of the Court | 120.00 | |
| 1202. City/county tax/stamps: | | |
| 1203. State tax/stamps:  Deed $0.00  Mortgage $84.00  To: Clerk of the Court | 84.00 | |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey | | |
| 1302. Pest inspection | | |
| 1303. Payoff  To: Army Aviation Center F C U  good thru 4/24 | 4,594.49 | |
| 1304. | | |
| 1305. Payment  To: The CR STR/Providian | 785.00 | |
| 1306. Payment  To: Palisades | 694.00 | |
| 1307. Payment  To: Holloway Credit | 452.00 | |
| 1308. Payment  To: Small LNS | 399.00 | |
| 1309. Payment  To: Crdt MGT. | 182.00 | |
| 1310. Payment  To: Friedmans Jewelers | 400.00 | |
| 1311. | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | 13,896.39 | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.
BORROWER(S):                                          SELLER(S):

Cheryl Hall

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement

AHL/Frazier
0026

_Jane Carcello_ ●                    _05/28/08_ ●

Swofford and Hays Settlement Services, Inc.                    Date

NOTE: Taxes have been prorated based on taxes for the year. Any re-proration will be handled between the buyer and seller. All utility bills (water, sewer, electric, cable and maintenance fees) have been paid or will be paid upon receipt of final bills.
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

# FREEDOM COURT REPORTING

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3               SOUTHERN DIVISION
4
    CHERYL HALL FRAZIER,
5
            Plaintiff,
6
    vs.             CIVIL ACTION NO.:
7                   1:08-cv-11-MHT
    ACCREDITED HOME LENDERS, INC.,
8   d/b/a HOME FUNDS DIRECT,
9           Defendant.
    _____/
10
11
12
13  VIDEOTAPED DEPOSITION OF ROBERT B. DOOLEY
14      Taken at San Diego, California
15          Wednesday, June 25, 2008
16
17
18
19
20
21
22
23  Reported by Debbie L. Bloom - CSR
24
25  Certificate No. 7731
```

**3**

```
1        On Wednesday, June 25, 2008, commencing at the
2   hour of 9:14 a.m., at 15253 Avenue of Science,
3   Building 1, in the City of San Diego, County of
4   San Diego, State of California, before me, Debbie L.
5   Bloom, Certified Shorthand Reporter, in and for the
6   State of California, personally appeared:
7               ROBERT B. DOOLEY,
8   called as a witness by the plaintiff, who, being
9   by me first duly sworn, was thereupon examined and
10  testified in said cause.
11
12
13            APPEARANCES
14  FOR PLAINTIFF:
15     STONE, GRANADE & CROSBY
       BY: GEORGE IRVINE, ESQ.
16     7133 Stone Drive
       Daphne, Alabama 35626
17     (251) 433-7172
       gri@sgclaw.com
18
19  FOR DEFENDANTS:
20     BRADLEY ARANT ROSE & WHITE LLP
       BY: J. WILL MANUEL, ESQ.
21     Suite 450 One Jackson Place
       188 East Capitol Street
22     Jackson, Mississippi 39215
       (601) 948-8000
23     wmanuel@bradleyarant.com
24
25
```

**2**

```
1            I N D E X
2
    DEPOSITION OF: ROBERT B. DOOLEY
3   JUNE 25, 2008
4
    EXAMINATION                PAGE
5
    BY MR. IRVINE               5
6
7
8         INDEX OF EXHIBITS
9   FOR PLAINTIFF:             MARKED
10  1   Photocopy of Amended Notice of Taking    8
        Rule 30(b)(6) Deposition
11
    2   Photocopy of First Amended Complaint   103
12
    3   Photocopy of Answer and Defenses of    103
13      Accredited Home Lenders, Inc.
14  4   Photocopy of February 15, 2008 letter  103
15  5   Photocopy of various mortgage documents 103
16  6   Photocopy of Defendant's Response to    103
        First Set of Interrogatories Propounded
17      by Plaintiff, Cheryl Frazier
18  7   Photocopy of Defendant's Response to    103
        Plaintiff's Second Set of Interrogatories
19      and Request for Production
20  8   Photocopy of Accredited document        91
        headed Closing Agent Application
21
22
23
24  Witness signature page            109
25  Certificate/Stipulation page      110
```

**4**

```
1   SAN DIEGO, CALIFORNIA; WEDNESDAY, JUNE 25, 2008
2               9:14 A.M.
3
4        THE VIDEOGRAPHER: This begins Videotape
5   No. 1 in the deposition of Robert B. Dooley, in the
6   matter of Cheryl Hall Frazier versus Accredited Home
7   Lenders, Incorporated, doing business as Home Funds
8   Direct, Civil Action 1:08-cv-11-MHT, for the United
9   States District Court, for the Middle District of
10  Alabama, Southern Division.
11       We're on the record at 9:15 a.m., on
12  Wednesday, June 25, 2008. This deposition is taking
13  place at 15253 Avenue of Science, San Diego, California
14  92128.
15       My name is Kevin Montgomery, representing
16  Freedom Court Reporting.
17       Would all counsel please identify yourselves
18  and state whom you represent, starting with the
19  telephone.
20       MR. IRVINE: "Starting with the telephone," is
21  that what you said?
22       THE VIDEOGRAPHER: Yes, please.
23       MR. IRVINE: This is George Irvine of Stone,
24  Granade & Crosby, and I represent the plaintiff, Cheryl
25  Hall Frazier, in this action.
```

**EXHIBIT**
4

# FREEDOM COURT REPORTING

5

1    MR. MANUEL: My name is Will Manuel with
2  Bradley Arant, and I represent Accredited Home
3  Lenders.
4    THE VIDEOGRAPHER: The reporter today is
5  Debbie Bloom, and she will now swear in the witness.
6
7        ROBERT B. DOOLEY,
8    having been sworn, testified as follows:
9
10        EXAMINATION
11  BY MR. IRVINE:
12    Q.  Thank you.
13    Mr. Dooley, as we just introduced ourselves
14  over the telephone, my name is George Irvine, and I
15  represent Mrs. Frazier in this case.
16    Have you ever had your deposition taken
17  before?
18    A.  Yes, I have.
19    Q.  How many times, please, sir?
20    A.  One.
21    Q.  Was it recent?
22    A.  About nine months ago.
23    Q.  Was it in connection with your work for
24  Accredited or something personal?
25    A.  My work for Accredited.

6

1    Q.  What was the nature of the deposition, if
2  you wouldn't mind?
3    A.  It was involving an alleged fraud case.
4    Q.  Do you remember the plaintiff's name?
5    A.  No, I do not.
6    Q.  And were you the corporate representative
7  of Accredited?
8    A.  Yes, I was.
9    Q.  Where was that case filed?
10    A.  I don't recall.
11    Q.  Do you remember the lawyer's name for the
12  plaintiff?
13    A.  No, I don't.
14    Q.  In connection with that deposition, they
15  probably told you the ground rules, which are a little
16  bit different, I guess, when you're on the telephone
17  with respect to having to answer out loud. So since,
18  obviously, I can't see you, I can't tell if you're
19  nodding your head or shaking your head, but I'm going
20  to need "yeses" and "nos" and out-loud responses to my
21  questions.
22    Obviously, any time you need to take a break,
23  you've got your counsel there, and y'all just chime
24  right in. It's not an endurance contest.
25    I will endeavor to be clear, but sometimes my

7

1  questions may not be clear to you. And if they are not
2  clear to you, I would appreciate it if you would tell
3  me that they are not clear. Otherwise, I will have to
4  proceed on the understanding that my question was
5  clear, and that you understood it. Is that fair?
6    A.  Yes. That's fair.
7    Q.  Now, also, I knew Mrs. Hall before she got
8  married and became Mrs. Frazier, so I may say
9  "Hall" a lot instead of "Frazier" when I'm referring to
10  her, so don't let that confuse you.
11    Also in this case, the defendant is Accredited
12  Home Lenders, dba Home Funds Direct, and so at times I
13  may say "Accredited," and at other times I may say
14  "Home Funds" or "Home Funds Direct," and at other times
15  I may just say "you." And whenever I do that, will you
16  understand that I am referring to the defendant,
17  Accredited?
18    A.  Yes. That's understood.
19    Q.  Okay. And with all that, let me get
20  started. There should be some exhibits there on the
21  table in front of you.
22    A.  Okay.
23    Q.  Do you see the first one, Exhibit No. 1?
24    MR. MANUEL: Is it the Notice of Deposition,
25  George?

8

1    THE WITNESS: Now I have it, yes.
2    MR. IRVINE: Yes.
3    Q.  Is that the Amended Notice of Taking Rule
4  30(b)(6) Deposition?
5    A.  Yes.
6    MR. IRVINE: Could y'all mark -- it's already
7  marked as Exhibit No. 1. I'm going to attach this to
8  the deposition as Exhibit No. 1.
9    (Plaintiff's Exhibit 1 was marked.)
10  BY MR. IRVINE:
11    Q.  And you are the individual who has been
12  designated by Accredited to appear pursuant to this
13  notice?
14    A.  Yes.
15    Q.  In connection with appearing for this
16  notice of deposition today -- or for this deposition
17  today, have you seen this notice?
18    A.  Yes, I have.
19    Q.  All right. Did you -- I'm not asking for
20  anything that was discussed, but did you spend some
21  time with your counsel getting ready for this
22  deposition today?
23    A.  Yes, I did.
24    Q.  About how long?
25    A.  About two hours.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

9

1    Q. Did you review any documents?
2    A. Yes, we did.
3    Q. What documents did you review?
4    A. Documents from the loan file.
5    Q. Anything else?
6    A. A spreadsheet of business transactions
7    that Accredited and Home Funds Direct has done with
8    Swafford.
9         MR. MANUEL: And, George, let me just
10   interject for the record. We've got this spreadsheet,
11   but we're going to have to redact the names because of
12   some concerns about privacy, but we can talk about
13   that. He can talk about the number of loans that
14   they've done with Swafford, which I think you talked
15   about, but I think as far as the spreadsheet itself,
16   until we can get those names redacted and the privacy
17   information on it, we're going to need to produce that
18   after today. But he can talk about the number of loans
19   and the states that they did loans in with Swafford,
20   but as far as -- I mean, we're not hiding anything from
21   you. We don't want to violate any privacy concerns.
22        MR. IRVINE: I hear you. We can talk more
23   about that off the record.
24        MR. MANUEL: Okay.
25   BY MR. IRVINE:

10

1    Q. But suffice it to say, this is a document
2    that you reviewed, but it's not a document that you
3    brought today to produce?
4         MR. MANUEL: Correct.
5    Oh, you're asking me or are you asking him? I
6    guess you're asking him.
7         MR. IRVINE: It doesn't matter. But I got a
8    "correct" to that question, so I'm satisfied.
9    Q. Anything else that you've reviewed?
10   A. Well, just this Exhibit 1 that we're
11   looking at now, we went over that, and I believe that
12   was just about it.
13   Q. Okay. Well, let's talk a little bit about
14   the spreadsheet that you brought -- I'm sorry -- that
15   you reviewed. Can you generally -- let me ask you, do
16   you have it there?
17   A. No, sir.
18   Q. Okay. From your review of it, how is it
19   organized? How is it structured?
20   A. It's a list of loans with -- documenting
21   the loan number and the borrower's name. I believe it
22   had the closing date on it and the closing agent, which
23   was Swafford and their address, and it would indicate
24   whether the loan was closed through a wholesale office
25   of Accredited or the retail office of Home Funds

11

1    Direct, and that's it.
2    Q. Did it have any information on it like,
3    say, loan amount or any -- any information with respect
4    to fees or charges incurred in connection with the
5    closing of the loan?
6    A. I believe it had the loan amount, but
7    there were no fees on it.
8    Q. Any other information on it at all that
9    you can recall?
10   A. No, sir, I don't think so.
11   Q. How many loans were listed on it?
12   A. I don't remember the exact number, but it
13   was over a thousand.
14   Q. So would it be fair to say then that for
15   the period of time of the loans listed on that sheet,
16   that Swafford and Hays closed over a thousand loans for
17   Accredited?
18   A. That's correct.
19   Q. And did you tell me the period of time of
20   the loans listed on the sheet?
21   A. No, I didn't.
22   Q. Do you remember it?
23   A. It was dating back to September 2004.
24   Q. And what was the -- what through date, if
25   you will?

12

1    A. Through probably last month or -- you
2    know, maybe the month before. That's when I originally
3    requested the information. It was current up to a
4    couple months ago at least.
5    Q. Does Swafford still close loans for
6    Accredited?
7    A. I don't know.
8    Q. Let's just -- you know, the last loan that
9    was listed on the sheet -- let me strike that.
10   These loans listed on the sheet are loans that
11   were only closed by Swafford?
12   A. Yes.
13   Q. So I know that other settlement service
14   providers closed loans for Accredited, right?
15   A. Yes.
16   Q. Like, for instance, Lenders First Choice,
17   who we have in another lawsuit?
18   A. Yes.
19   Q. So none of the loans closed for Accredited
20   by other service providers are listed on this sheet?
21   A. That's correct.
22   Q. All right. So -- and the last loan that
23   you remember being on the sheet or the more -- the more
24   recent -- the most recent loan listed on the sheet that
25   was closed by Swafford was within the last couple

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

13

1  months?
2       A. Well, we went up to the last couple of
3  months searching the system.
4       Q. Okay.
5       A. I don't recall what the last closing date
6  was. It could have been 2007.
7       Q. That's fine. I'm just trying to
8  understand, since I'm not looking at the sheet, whether
9  the last loan was a couple of months ago or whether
10 the -- you've searched up through a couple of months
11 ago, and the last loan was somewhat further back in
12 time.
13      A. That would be a correct thought about the
14 spreadsheet, yes.
15      Q. All right. Turning back to Exhibit No. 1,
16 there are a number of categories of information listed
17 on the first and second page of the deposition. I want
18 to go through those with you briefly.
19      Now, have you done research with respect to
20 No. 1, the dates that Accredited has done business with
21 Swafford and Hays?
22      A. Yes, I have.
23      Q. So now are you the person most familiar at
24 Accredited with the information requested by No. 1
25 there?

14

1       A. Yes.
2       Q. Can you tell me the dates that Swafford
3  has done business -- I'm sorry -- that Accredited has
4  done business with Swafford and Hays?
5       A. We started doing business with them in
6  June of 2003. Definitely 2003. I believe the month
7  was June.
8       Q. All right. And through when?
9       A. 2007 possibly. I don't know if we've
10 closed any loans with them in 2008.
11      Q. All right. And did you look at it hard
12 enough to see whether there was any sort of frequency
13 information, an average number of loans closed per
14 month?
15      A. No, I didn't -- I haven't broken it down
16 that way.
17      Q. Would you be able to give me any sort of
18 an opinion or judgment about the number of loans
19 Swafford was closing for Accredited per month.
20      A. No, I would not know.
21      Q. Now, the -- No. 2 was the contractual
22 relationship between Swafford and Accredited.
23      Have you looked into that?
24      A. Yes, I have.
25      Q. Are you the person most familiar with that?

15

1       A. Yes.
2       Q. Is there a contractual relationship
3  between -- was there a contractual relationship between
4  Swafford and Accredited?
5       A. No. Accredited had no contractual
6  relationship with Swafford.
7       Q. All right. Now, apparently y'all found
8  and brought with you an application form?
9       A. Yes, sir.
10      Q. All right. Let me just skip over that,
11 when they've brought that to me -- let me skip over
12 that, and I'll come back to that -- this line of
13 questioning.
14      A. Okay.
15      Q. Are you the person now most familiar with
16 the services performed by Swafford as said services
17 relate to loans originated by Accredited?
18      A. Yes.
19      Q. Is that because you've investigated
20 that?
21      A. Well, I -- yes.
22      Q. Were you involved -- let me -- you know,
23 when Accredited was having Swafford close loans, were
24 you involved in the day-to-day process of loan closings
25 at all?

16

1       A. No, I was not.
2       Q. All right. Let me back up now and do what
3  I probably should have done right before we got started
4  and ask you what your job title is and get your
5  background there at Accredited.
6       A. My job title currently is paralegal.
7       Q. All right. And are you a trained,
8  certificated paralegal?
9       A. I'm currently enrolled in night school to
10 get my certificate.
11      Q. How long have you been employed by
12 Accredited?
13      A. Nine years.
14      Q. Can you tell me -- let's see. So this is
15 2008. When did you start?
16      A. June 1999.
17      Q. Did you start as a paralegal or did you
18 start in some other position?
19      A. No, I started in Post-Closing Department,
20 working as an assistant to capital markets, reviewing
21 loans that were destined for investors.
22      Q. Correct me if I'm wrong, but weren't just
23 about all the loans that Accredited did destined for
24 investors?
25      A. Yes.

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

17

1   Q. So, you started in post-closing. How
2   long did you stay in post-closing?
3       A. Six years -- a little over six years.
4   Q. Did you have different titles, I'll say,
5   in post-closing?
6       A. I was a scratch and dent manager, and then
7   later the title changed to investor sales support
8   manager.
9   Q. You know, I have to ask what a scratch and
10  dent manager is.
11      A. "Scratch and dent" is a common term in the
12  mortgage industry which would suggest that a loan
13  needed some type of maintenance or correction.
14  Q. Can you give me an example.
15      A. For example, if a loan was presented to an
16  investor and it was missing a document or if they
17  didn't understand something about it, it would be
18  rejected, and that would come to me, and I would review
19  it and either make any corrections that were necessary
20  or go to the investor and explain to them what their --
21  make them understand what their issue was all about.
22  Q. I see. All right. So, you didn't start
23  in the Post-Closing Department as a scratch and dent
24  manager, did you?
25      A. Yes, I did.

18

1   Q. You did?
2       A. Yes.
3   Q. Where did you work before Accredited?
4       A. I worked for -- two years before
5   Accredited I was with Advanta Mortgage.
6   Q. What did you do for Advanta?
7       A. I -- I've reviewed loans there, performed
8   due diligence for Advanta in buying loans, and then we
9   funded the loan pools if the loans were approved.
10  Q. All right. Before Advanta?
11      A. Before Advanta I was with -- I was a
12  supervisor at -- a policy processing supervisor at an
13  insurance company for about 2 1/2 years, doing
14  homeowners insurance, workers' comp and business
15  policies.
16  Q. And before that?
17      A. Before that I was with Citizens National
18  Mortgage where I did insuring and guarantee work in
19  the -- for FHA and VA loans. I was also a loan
20  processor. I did a little bit of underwriting, and I
21  was a docker/funder as well.
22  Q. And about how long --
23      A. Oh, I'm sorry. That was about two years.
24  Q. Okay. And before that?
25      A. Before that I was -- it was my

19

1   introduction with the mortgage industry where I worked
2   for a company named Bowest. It was a big loan
3   servicing company, and we -- I boarded loans onto their
4   system, new loans that came into the company that
5   needed servicing.
6   Q. How long there?
7       A. About a year and a half.
8   Q. Prior to that?
9       A. Prior to that, United States Navy for 21
10  years.
11  Q. Okay. What was your job in the Navy?
12      A. I was a chief radioman, retired as a chief
13  radioman, naval communications.
14  Q. Did you go into the Navy out of college or
15  high school or --
16      A. College.
17  Q. Let me ask you -- let me ask a better
18  question. Could you tell me about your educational
19  background, please.
20      A. I have -- went to college quite a number
21  of years ago at Indiana State University. I completed
22  three years of general-type curriculum. After I
23  graduated -- or retired from the Navy, I went to
24  community college and got an Associate's Degree in Real
25  Estate Services and Finance, and I've also completed

20

1   quite a number of -- maybe nine or ten courses through
2   the mortgage banking association curriculum, and I have
3   a real estate license and things of that nature. So I
4   have a good understanding of the real estate process.
5   Q. All right. Did -- and so you told me you
6   had three years of -- did you ever get your degree?
7       A. I didn't get my bachelor's degree, no.
8   Q. Then you went into the Navy and served in
9   the Navy for 21 years?
10      A. That's correct.
11  Q. And you retired, obviously, honorable
12  discharge from the Navy?
13      A. Of course.
14  Q. Can you tell me your personal address,
15  please, sir.
16      A. My personal address is 329 Quinoa --
17  that's Q-u-i-n-o-a -- Quinoa Court, Chula Vista,
18  California.
19  Q. Now, you -- you started with Accredited as
20  the scratch and dent manager, and you were that for
21  about six years, you said?
22      A. Yes.
23  Q. And then did you become a paralegal?
24      A. No. After six years I -- I changed
25  positions to -- my title was a loan fulfillment

5  (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

21

1  manager, with emphasis on docs and funding, and I
2  worked with, at that time, about 24 doc and funding
3  branches nationwide to assist them with training and
4  development and writing procedures that would help us
5  with our loan docking and funding systems. I also --
6        Q. You say you assisted in writing
7  procedures?
8        A. No. Assist -- no. I would -- I wrote a
9  lot of procedures that would assist them in the docking
10  and funding procedures throughout the company.
11        Q. I see. All right.
12        A. And I also worked -- actually throughout
13  the -- my time at Accredited with the regulatory
14  compliance counsel in the legal department to make sure
15  that our loans were funded within all the State and
16  Federal guidelines.
17        Q. I was coming to that. While you were
18  employed by Accredited, did you ever have any sort of
19  formalized training in compliance with consumer
20  protection laws, such as Truth in Lending or RESPA?
21        A. "Formalized" meaning sitting in a
22  classroom with a teacher?
23        Q. Yes, sir.
24        A. No.
25        Q. Anything like where you could show me a

22

1  certificate or something like that?
2        A. I have a Regulatory Compliance Certificate
3  issued by the Mortgage Banking Association for taking
4  their course.
5        Q. How did you get that?
6        A. I completed their coursework.
7        Q. Was it sort of a -- was it like a
8  correspondence course?
9        A. Yes.
10        Q. And you still have that certificate
11  somewhere handy, I'm sure?
12        A. I do.
13        Q. When did you get that?
14        A. Probably five, six years ago.
15        Q. Any other -- and I guess I may have
16  defined that coursework out of my definition of
17  formalized training, and I didn't intend to do that.
18        Do you have any other training that you can
19  tell me about in regulatory compliance?
20        A. Not formalized, no.
21        Q. Okay. How about informal?
22        A. Well, I've read a lot of different State
23  codes and statutes and regulations and Federal --
24  Federal guidelines and read all the books myself. And
25  when certain -- actually, when I was at Advanta

23

1  Mortgage, we did have some standup classroom training
2  while I was there. This would have been specific to
3  Federal -- Federal high-cost testing and things of that
4  nature.
5        Q. Okay.
6        A. But I -- I don't have a certificate or
7  anything from that. That was 12 years ago probably.
8        Q. All right. Now, I think I got myself off
9  the track a little bit. That was -- I think I had
10  asked you if you stayed -- what you did -- if you
11  became a paralegal after the six years that you were
12  the scratch and dent manager, and I don't remember what
13  you told me, frankly.
14        A. No, I was -- I moved to a position where I
15  was a loan fulfillment manager for docs and funding.
16        Q. Yes, sir.
17        A. Yes.
18        Q. And how long did you do that?
19        A. About one year and nine months.
20        Q. And then did you move to a paralegal?
21        A. Yes, sir.
22        Q. What are your duties as paralegal?
23        A. I assist the litigation attorney.
24        Q. And who would that be?
25        A. At Accredited, his name is Chase Bivin.

24

1        Q. And does Accredited have a legal staff?
2        A. Yes.
3        Q. And I -- let me just ask you this, get to
4  it. Is -- can you tell me how Accredited is currently
5  organized.
6        A. No, I cannot.
7        Q. Okay. Is there some reason?
8        A. Well, we've -- we're doing a lot of
9  reorganization at the moment due to new ownership, so a
10  lot of that's pending.
11        Q. I see. All right.
12        There is a legal department, however?
13        A. Yes, sir, there is.
14        Q. And you work for the legal department?
15        A. Yes, sir.
16        Q. Is Accredited still closing loans --
17  making loans? I'm sorry.
18        A. Yes, we are.
19        Q. And what group or division of Accredited
20  does that?
21        A. Well, we have a loan origination branch
22  here in San Diego, and we're doing wholesale loans and
23  retail loans.
24        Q. Are there other loan origination branches
25  around the country?

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

25

1    A.  Right now, I don't -- we just closed all
2  of them three weeks ago, so I don't think that they've
3  reopened anything except what's here in San Diego.
4    Q.  Was that San Diego branch closed and then
5  reopened?
6    A.  No.
7    Q.  So every branch other than the San Diego
8  branch got closed within the last three weeks?
9    A.  Yes.
10    Q.  When did -- did you tell me that
11  Accredited was under new ownership?
12    A.  Yes.
13    Q.  Who bought it?
14    A.  Lonestar.  It's a hedge fund out of
15  Dallas -- I believe they're out of Dallas, but I'm not
16  positive.
17    Q.  And did they -- did the new owners, I
18  guess, engage in some employee-reduction activities?
19    A.  Yes, they did.
20    Q.  Is that what happened to Mrs. Diaz?
21    A.  Yes.
22    Q.  Do you know?
23    A.  Yes.  Mrs. Diaz -- the branch that Alma
24  Diaz worked at closed about three to four weeks ago.
25    Q.  I see.  Are the post-closing activities of

26

1  Accredited done in a division or organization or branch
2  separately from the loan origination branch?
3    A.  Yes.
4    Q.  What would you call that branch?
5    A.  Post-Closing Department.
6    A.  Post-Closing Department.
7    Where is it physically located?
8    A.  It's physically located here in San Diego
9  at headquarters.
10    Q.  All right.  How many people work in
11  Post-Closing Department?
12    A.  Today?
13    Q.  Yes, sir.
14    A.  About five.
15    Q.  Can you tell me the duties of the people
16  in the Post-Closing Department.
17    A.  They receive trailing documents primarily
18  and send any trailing documents to any loan files or to
19  investors wherever they belong.  That's their primary
20  duty today.
21    Q.  Who does the -- there are some documents
22  that I got that I'll talk to you about at some point as
23  we go along, but for instance, there's a Refinance
24  Audit Checklist that's contained in the files for
25  Mrs. Hall that were produced.

27

1    A.  Okay.
2    Q.  There's a Section 32, Calculation Summary
3  document.  I was assuming that all of these documents
4  were prepared in post-closing.
5    A.  The Section 32, I -- the Section 32
6  document that you're talking about would have been
7  prepared in loan processing and then again in -- prior
8  to funding the loan.  And then the -- there's two
9  different types of audits, so I'm not sure which one
10  you're referring to.
11    Q.  Okay.  Well, we'll come back to that.  I'm
12  really trying to make sure I understand as best I can,
13  given the new ownership of Accredited, the
14  organization.
15    Was there a -- was there a loan processing
16  department or loan processing branch?
17    A.  Yes.
18    Q.  Was that part of the loan origination
19  branch?
20    A.  Yes.
21    Q.  So one of the functions of loan -- the
22  loan origination branch was loan processing?
23    A.  Yes.
24    Q.  There wasn't like a separate loan
25  processing division, was there?

28

1    A.  No.
2    Q.  There is also on the table, I think in
3  front of you, an Exhibit 6.  Can you find that please
4  sir.
5    A.  Sure.  Hold on.
6    Q.  Exhibit 5 is a loan file, a big fat thing,
7  and Exhibit 6 ought to be right behind it.
8    A.  I've got Exhibit 5.  It's farther down
9  below or --
10    MR. MANUEL:  Yes.
11  BY MR. IRVINE:
12    Q.  Exhibit 5, if you'll look at Exhibit 5,
13  the bottom right-hand corner there's some Bates
14  labeling, AHL/Frazier 0001.
15    Do you see that on Exhibit 5?
16    A.  Yeah, hold on.  I'll find it, but I'm
17  going to have to go through a lot of documents in
18  Exhibit 5 to get to it.
19    Q.  There are 163 pages of Exhibit 5.
20    A.  Okay.  That helps.  Thank you.
21    Q.  And if you look at the bottom right-hand
22  corner of each page --
23    A.  Right.
24    Q.  -- those things are numbered.
25    A.  Okay.  So I'm at -- I'm at page -- or

7  (Pages 25 to 28)

# FREEDOM COURT REPORTING

29

1  Bates No. -163 for Exhibit 5.
2      Q. Yeah, the next document should be
3  Exhibit 6.
4      MR. MANUEL: No.
5      THE WITNESS: I've got 7, so maybe -- wait. I
6  just saw it. It's out of place here. Hold on. Okay.
7  I've got No. 6.
8  BY MR. IRVINE:
9      Q. All right. Have you ever seen No. 6
10  before?
11      A. I have.
12      Q. In fact, as I look over, there's your
13  signature on it.
14      A. Yes.
15      Q. On page 11.
16      A. Okay.
17      Q. Let me make sure, is that your signature
18  on page 11 of that document?
19      A. Yes, it is.
20      Q. So you are the person that executed this
21  document on behalf of Accredited to verify the accuracy
22  of the responses to these interrogatories?
23      A. Yes, I did.
24      Q. Who is Kristopher Dillon?
25      A. I don't remember his exact title. He's an

30

1  employee at the Marietta branch that originated the
2  Hall Frazier loan.
3      Q. And the Marietta branch is now closed?
4      A. Yes, sir.
5      Q. That was Marietta, Georgia?
6      A. Yes.
7      Q. And is he no longer employed?
8      A. He's no longer employed.
9      Q. Do you know if Accredited, as part of any
10  sort of out-processing procedure or otherwise, has
11  maintained addresses and phone numbers for its former
12  employees?
13      A. Yes. The Human Resources Department has
14  last known contact information at the time employees
15  were laid off.
16      Q. All right. Have you made any effort to
17  obtain the last known address for any of those
18  individuals listed in the response to Interrogatory
19  No. 1?
20      A. I don't remember if I checked these or
21  not. I don't remember if I was asked to.
22      Q. Okay. I guess the answer is, you have
23  not made any effort, have you?
24      A. No, not on my own.
25      Q. All right. How about Kim Stevenson, who

31

1  is she?
2      A. Another employee that worked at the
3  branch, and her name was on the loan. I don't remember
4  her exact function, what she had to do with the loan.
5      Q. All right. You didn't remember
6  Mr. Dillon -- Kristopher Dillon's function with respect
7  to the loan either, do you?
8      A. No, I don't recall.
9      Q. Is Kim Stevenson still employed?
10      A. No. None of these people in the
11  Interrogatory No. 1 are still employed. And they
12  probably all got laid off -- I believe they all got
13  laid off in September of '07.
14      Q. How many employees does Accredited have
15  now?
16      A. I don't know the exact number. Maybe
17  around 4- to 500 Accredited/Home Funds Direct employees
18  are remaining on board. And we merged with another
19  company, but I don't want to include those.
20      Q. And that's down from how many?
21      A. Between 3500 and 4,000, about.
22      Q. Do you remember Clarence W. Wells?
23      A. Yeah. Clarence Wells was the
24  underwriter. I'm familiar with the Clarence Wells
25  name.

32

1      Q. Were all these people at the Marietta
2  branch?
3      A. Yes.
4      Q. How about Mike Simpson?
5      A. Yeah, he was an employee there at the
6  Marietta branch. I don't recall his exact position.
7      Q. You don't know his role with respect to
8  the Hall loan?
9      A. No. I -- I don't have it in my memory
10  bank here, no.
11      Q. All right. Verria Neal?
12      A. Same.
13      Q. Okay. Ken Harper?
14      A. Same.
15      Q. And Rita Dickerson?
16      A. Same. I know their names. I put them in
17  the interrogatory, in the response, and that's because
18  they were -- their names were located either in the
19  loan origination system or on the documents
20  themselves.
21      Q. All right. Now, the loan origination
22  system, is that that -- let me ask you it this way:
23  Are you aware of the fact that we took the deposition
24  of Mrs. Diaz in connection with the -- in connection
25  with the Edwards versus LLC and Accredited case?

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

33

1    A. Yes, sir, I am.
2    Q. Have you ever read her deposition?
3    A. Yes.
4    Q. How long ago did you read her deposition?
5    A. I read it yesterday.
6    Q. Did you read it in getting prepared for
7    this deposition?
8    A. Yes.
9    Q. Was there anything else you reviewed in
10   getting ready for this deposition?
11   A. You know what, wait a minute. Let me back
12   up. Maybe I read it a day before. Within the last
13   couple of days I read it.
14   Q. Okay. You know, I asked that question
15   earlier --
16   A. Well, let me explain that. I did read
17   it. When I met with the attorney here today and we
18   talked about the deposition today, we talked -- that's
19   when we talked about the documents and about deposition
20   procedures. I had read the deposition of Ms. Diaz on
21   my own at my desk.
22   Q. That's fine.
23   A. So.
24   Q. Was there anything else that you -- that
25   you read on your own to get prepared for the deposition

34

1    today?
2    A. The loan -- the loan documents.
3    Q. No, no. You told me about those already.
4    A. Yeah. No.
5    Q. But you didn't tell me about Ms. Diaz's
6    deposition. I'm just trying to jog your memory.
7    A. Yeah. No, I don't recall anything else.
8    Q. All right. Ms. Diaz testified in her
9    deposition about some software or software program that
10   Accredited used called LOIS.
11   Do you remember that?
12   A. Yes. It's Loan Origination Information
13   System that we affectionately call "LOIS."
14   Q. Was that -- do you know who the creator of
15   that was?
16   A. It's -- Empower is the commercial name.
17   LOIS is a pet name that Accredited assigned to Empower.
18   The software is called Empower. And the vendor, I
19   believe, is Fidelity National Title.
20   Q. Did Accredited have an IT department?
21   A. Yes, we do.
22   Q. And still does?
23   A. Yes.
24   Q. Who is the head of the IT department?
25   A. I don't know his name. That's part of the

35

1    reorganization.
2    Q. Who -- what does that mean, he's part of
3    the reorganization? Did the old one get terminated and
4    there's a new person that's been hired?
5    A. Yes. That's correct.
6    Q. Okay. And you don't know the new person's
7    name?
8    A. That's correct.
9    Q. Do you ever have occasion to use the LOIS
10   software?
11   A. I have, yes.
12   Q. If it breaks, who would you call?
13   A. We have a LOIS team, a team of programmers
14   and technicians that maintain LOIS.
15   Q. Who is their -- who is their boss or
16   supervisor?
17   A. Their boss was -- right now?
18   Q. Sure.
19   A. John Gisiger.
20   Q. Can you spell that for the court reporter
21   and myself.
22   A. Yes. John, J-o-h-n, Gisiger,
23   G-i-s-i-g-e-r.
24   Q. And that's currently, right?
25   A. Yes.

36

1    Q. Prior to the acquisition or
2    reorganization, who was it?
3    A. Well, we could -- John would still be --
4    John's been with the company for about ten years.
5    Q. Is he there in San Diego?
6    A. Yes.
7    Q. Let me go back to my notice for a
8    minute. Did -- did I -- did you investigate the
9    notice -- the notice is No. 1, Exhibit No. 1. Do you
10   have it?
11   A. Exhibit No. 1?
12   Q. Yes, sir.
13   A. The one we were looking at before?
14   Q. Yes, sir.
15   A. Yes, I'm -- yes, I did.
16   Q. No. 3 -- No. 3 on the notice asks for the
17   person who could talk to me about services performed by
18   Swafford and said services relate to loans originated
19   by Accredited.
20   A. Okay.
21   Q. Do you see that?
22   A. Yes.
23   Q. Are you the person with the most
24   knowledge about that at Accredited now?
25   A. Yes.

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

37

1    Q. And have you had to obtain your knowledge
2 by investigating that?
3    A. No.
4    Q. No. Then how did you obtain your
5 knowledge?
6    A. Well, Swafford would perform the same
7 services as any other closing settlement office would
8 for -- there wouldn't be anything any different.
9    Q. Okay. That's fine.
10    So your knowledge about the services performed
11 by Swafford is based upon your knowledge of the typical
12 services provided by all settlement service providers;
13 is that fair?
14    A. Yes.
15    Q. And is it also fair that the services
16 provided by Swafford in connection with closing loans
17 would be the same services as provided by all
18 settlement service providers?
19    A. Yes.
20    Q. How about No. 4, the manner and content
21 of instructions from Accredited to Swafford related to
22 such services, are you the person most familiar with
23 that information?
24    A. Yes.
25    Q. Is that because you've investigated or

38

1 because your knowledge is based upon your knowledge of
2 what the typical nature and content of instructions
3 from Accredited are to all settlement service
4 providers?
5    A. I'm just familiar in general with the
6 process, and that would be it, yes.
7    Q. Now, the process -- the process -- you
8 say "the process." We're talking about the process of
9 originating and closing loans?
10    A. Yes.
11    Q. And is it fair to say that Accredited's
12 process of originating and closing loans is a
13 standardized process?
14    MR. MANUEL: Object to the form.
15    But you can answer. You can answer. I'm
16 sorry.
17    THE WITNESS: Yeah, I'm not sure what you mean
18 by "standardized." It's --
19 BY MR. IRVINE:
20    Q. Well, does Accredited use the same process
21 all the time in connection with a closing -- closing
22 its loans?
23    A. Yes.
24    Q. And is it Accredited's intent to have the
25 process be a standardized process so that it works the

39

1 same way every time?
2    A. Yes.
3    Q. Okay. So in that regard, the manner and
4 content of instructions from Accredited to Swafford
5 ought to be the same as the manner and content of
6 instructions to all settlement service providers who
7 are closing loans for Accredited; is that right?
8    A. Yes.
9    Q. Are you the person -- No. 5, are you the
10 person with the -- most familiar with the degree of
11 control exercised over Swafford by Accredited regarding
12 time, place and manner Swafford performed any such
13 services?
14    A. Yes.
15    Q. Is that because you've investigated that
16 or because you just know based on your knowledge of the
17 process?
18    A. I just know based on my knowledge of the
19 process.
20    Q. No. 6, the number -- we already went over
21 the number of loans originated by Accredited in which
22 Swafford would perform some settlement-related service,
23 didn't we?
24    A. Yes.
25    Q. And that's that spreadsheet that you have,

40

1 right?
2    A. Yes.
3    Q. And there's over a thousand loans on that
4 spreadsheet?
5    A. Yes, that's correct.
6    Q. Were there more than 2,000?
7    A. No.
8    Q. Somewhere between -- do you have a closer
9 ballpark for me?
10    A. I'm thinking 1400, but I don't know if
11 it's 1400 or 1,040, but I just remember somewhere
12 around there. Close to 15-, say.
13    Q. Okay. And the services provided by
14 Swafford in closing those loans were the same for all
15 1400?
16    A. Yes.
17    Q. All right. No. 7 says the nature of
18 settlement services performed by Swafford related to
19 all such loans. You're the person most familiar with
20 that at Accredited?
21    A. Yes.
22    Q. Is that because you just know or because
23 you had to investigate it?
24    A. I just know.
25    Q. Is that because of the nature of the

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

41

1  settlement services performed by Swafford are the same
2  as the settlement services provided by all other
3  settlement service providers, like Lenders First Choice
4  and others?
5      A. Yes.
6      Q. Are you the person most familiar with
7  No. 8, the use by Swafford of third-party providers of
8  said services?
9      A. Yes.
10     Q. Is that because you just know or because
11 you had investigated it?
12     A. Because I just know.
13     Q. All right.  Let's talk about that for a
14 minute.  Do you know that Swafford uses third-party
15 providers for the services that it performs to get
16 Accredited's loans closed?
17     A. I don't know if they do or not.
18     Q. Okay.  So do you know if other settlement
19 service providers like Lenders First Choice or Inzura
20 or others use third-party providers?
21     A. Here again, I don't know if they do or
22 not.  I should say that it's not uncommon for a
23 settlement office such as Swafford or Lenders First
24 Choice or Inzura, as you've mentioned to, on occasion,
25 use third-party providers.

42

1      Q. Do you have any particularized knowledge
2  about those third-party providers?
3      A. Well, no, but the question is too vague,
4  Counselor.  What service are you talking about?
5      Q. That's fine.  That's fine.  Let's talk
6  specifics, since we're here.
7      If you would look at Exhibit 5, please, sir.
8      A. Okay.
9      Q. Now, remember how we talked about the
10 Bates label numbers on the bottom right-hand corner of
11 each page?
12     A. Yes.
13     Q. If you would look at page 0026.
14     A. Okay.
15     Q. Can you identify this document for me.
16     A. Yeah.  It looks like page 2 of the HUD-1
17 settlement statement.
18     Q. For Mrs. Frazier?
19     A. Yes.  Correct.
20     Q. You're familiar with this document, this
21 type of document; are you not?
22     A. Yes, I am.
23     Q. And I don't want to replow the sort of
24 ground that we plowed in the deposition of Mrs. Diaz,
25 but it's my understanding that the way this document

43

1  comes to be created is that Accredited sends the -- if
2  I mischaracterize them, please correct me.  But the
3  lender's instructions to Swafford and those lender's
4  instructions have certain fees listed in them, and that
5  Swafford puts those fees and other fees that will be
6  charged to the borrower in connection with the loan
7  closing on a HUD-1 like this form and sends it back to
8  Accredited for Accredited to approve.
9      A. Yes.
10     Q. Is that right?
11     A. Yes.
12     Q. And that happens every time, right?
13     A. I don't know that it happens --
14 procedurally, yes, that would be what should happen.
15     Q. Well, that's really my question.  That's
16 the standard procedure for the completion of the HUD-1
17 settlement statement in connection with the loans
18 closed by Swafford or any other settlement service
19 provider for Accredited.
20     A. Yes.
21     Q. And on this document, Number 26 on
22 page -- I'm sorry -- on this document on page -26,
23 there are a number of fees listed, correct?
24     A. Yes.
25     Q. Now, some of these fees come to Swafford

44

1  from Lenders First Choice -- I'm sorry -- from
2  Accredited, right?
3      A. Yes.
4      Q. And, in fact, that is essentially all of
5  the fees listed in the 800 block, right?
6      A. Yes.
7      Q. And the 900 block?
8      A. Yes.
9      Q. And the 1000 block?
10     A. Yes.
11     Q. And then the fees listed in the 1100 block
12 and the 1200 block come from Swafford, right?
13     A. Yes.
14     Q. I don't know about the 1300 block.  Where
15 do those fees come from?
16     A. Well, 1300 block comes from the title
17 company, or Swafford in this case would contact the
18 creditors that we're paying off to get updated payoff
19 statements.
20     Q. So they come from Swafford also?
21     A. Yes.
22     Q. Now, when Accredited receives this form
23 from Swafford, it understands that Swafford is going to
24 list all of these charges and collect these funds from
25 the borrower at settlement, right?

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

45

1　　A. Yes.
2　　Q. Now, it's my understanding, I think from
3　Mrs. Diaz's deposition, that Accredited doesn't inquire
4　into the amount of these fees in any regard.
5　　A. As long as they appear reasonable in cost,
6　no, we would not.
7　　Q. Okay. Well, when you say "as long as they
8　appear reasonable in cost," what would prompt
9　Accredited to inquire about a particular fee?
10　　A. It would basically be the -- based on the
11　experience of the person closing the loan. For
12　example, if Line 1101 on this Bates No. -026 was
13　$1,000, that would trigger a question to Accredited,
14　who's consistently closing loans in Alabama, that maybe
15　that -- you know, to ask, "Why is your closing fee so
16　much higher than it normally would be?" Because they
17　would usually be $200 or $300, depending on the agent.
18　　Q. Do you know of that ever happening?
19　　A. Have I seen that happen?
20　　Q. Yes.
21　　A. On -- yes, I have.
22　　Q. Can you tell me about it.
23　　A. Well, I've seen it happen, but not
24　normally.
25　　Q. When have you seen it happen?

46

1　　A. I've seen it happen over a period of time
2　for the last 17 years since I've been in the mortgage
3　business.
4　　Q. Well, at Accredited, do you recall that
5　ever happening?
6　　A. Yes.
7　　Q. Can you give me the specifics of that
8　instance.
9　　A. Well, I don't know what else -- what I can
10　say, other than, yes, I have seen charges from closing
11　agents that seemed to be higher than what they normally
12　were.
13　　Q. Is there some sort of manual guideline,
14　written statement of policy, that relates to
15　questioning fees charged by a settlement service
16　provider in connection with a closing?
17　　A. No. The policy is that people that review
18　the loans and the HUDs in particular should be alert to
19　any fee that would appear not to be reasonable in price
20　or a bona fide fee, depending on the state that you're
21　doing business in.
22　　Q. Is that a written or unwritten policy?
23　　A. Today it would be a written policy.
24　　Q. Do you have that written policy?
25　　A. Today?

47

1　　Q. Yes, sir.
2　　A. Not in front of me, no.
3　　Q. When you say today there would be a
4　written policy, does that mean that that policy was
5　recently written down?
6　　A. Yes. Well, it would have been -- some of
7　the written policies would have been -- that I just
8　referred to would have been after the Hall Frazier loan
9　closed.
10　　Q. That was getting ready to be my next
11　question. Was that a policy written down at the time
12　of Mrs. -- at the time Mrs. Hall's loan closed?
13　　A. I don't know if they -- well, it was not a
14　written policy and procedure, a corporate policy and
15　procedure, simply because they didn't have a lot of
16　those types of policies in a training development or
17　written at that time in the company's growth. That
18　doesn't mean that -- I don't know what Marietta,
19　Georgia, might have had written.
20　　Q. Did each branch have its own separate set
21　of policies?
22　　A. No. I don't know what each separate
23　branch had in 2005.
24　　Q. Okay. When did this policy get written
25　down?

48

1　　A. Well, in 2003, second quarter.
2　　Q. Okay. I'm talking about your last
3　answer.
4　　A. I'm sorry. 2005, second quarter.
5　　Q. Okay.
6　　A. Correction, yeah.
7　　Q. Okay. What do you call that policy?
8　　A. Well, the requirement to review fees
9　for -- to make sure they're bona fide or reasonable
10　actually comes from Truth in Lending Code, and that's
11　how it's always been taught to people. And we have
12　that specifically in an online training resource for
13　Truth in Lending Disclosure and HUD training.
14　　Q. So there is a written policy to review
15　those charges by the people at Accredited to make sure
16　that they are bona fide and reasonable.
17　　A. Yes.
18　　Q. And that policy was in writing in 2005?
19　　A. Yes.
20　　Q. And what --
21　　A. I believe they launched that course in the
22　second quarter.
23　　Q. All right. That's part of some
24　coursework?
25　　A. Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

49

1    Q. Is there any written policy that's
2  provided to people at Accredited or available for
3  people at Accredited that says that people at
4  Accredited involved in the closings of these loans
5  should review those HUDs?
6    A. Not to my knowledge, but it doesn't mean
7  that they weren't taught that.
8    Q. That wasn't my question.
9    A. Okay.
10    Q. My question was, was there a written
11  policy?
12    A. Not to my knowledge.
13    Q. And your testimony is that there's -- that
14  that is taught to employees of Accredited; that process
15  is taught to them in connection with some regulatory
16  compliance training?
17    A. Yes.
18    Q. All right.
19    A. And when they launch the course -- the
20  coursework, the people that were involved with
21  reviewing these loans were required to take that
22  course.
23    Q. All right. Is that coursework material
24  still available?
25    A. Yes.

50

1    Q. What do you call it?
2    A. "TILA Review," or words to that effect,
3  T-I-L-A.
4    Q. So then let's say that the person at
5  Accredited -- what do you call the person who reviews
6  this HUD-1?
7    A. It would be someone in the doc and funding
8  department.
9    Q. Do they have a particular title?
10    A. Well, they're either a docker, meaning
11  they draw documents, or a funder. And in most of the
12  branches, those would be interchangeable.
13    Q. So backing up a little bit, when Swafford
14  is engaged to close a loan, who engages Swafford to
15  close the loan?
16    A. The loan processor would contact Swafford
17  to schedule a closing.
18    Q. Okay. And I think I understood from
19  Mrs. Diaz's deposition that that's up to the discretion
20  of the loan closer -- loan processor?
21    A. Yes.
22    Q. Do they pick whoever they want?
23    A. Yes.
24    Q. They don't have a list or anything like
25  that?

51

1    A. No. You mean like a corporate list that
2  they go by?
3    Q. Yes, sir.
4    A. No.
5    Q. What is there -- do they have their own
6  personal list?
7    A. I don't know that they have a list. They
8  do business with who they have -- have gotten good
9  service from.
10    Q. All right. And then they select Swafford
11  as the closer for a particular loan. And how do they
12  notify Swafford that there's getting ready to be a loan
13  closing?
14    A. They would just simply call them.
15    Q. All right. And then -- and what is the
16  first document that Swafford gets?
17    A. Well, I guess that could depend. They're
18  going to -- Swafford might not get any documents until
19  the closing documents are sent to them.
20    Q. Okay.
21    A. I don't know why they would get any until
22  we send them the -- until we send them the closing docs
23  that we need the borrower to sign, unless there was
24  some particular question that they had and they needed
25  something.

52

1    Q. Isn't it that Swafford -- doesn't Swafford
2  get the lender's instructions?
3    A. Those -- those are -- those go in a
4  closing doc package, along with all the other
5  documents.
6    Q. How does Swafford know what fees to put on
7  the HUD that are the lender fees?
8    A. That would be discussed in the phone.
9    Q. Let me show you a Document No. -34 of
10  Exhibit 5.
11    A. Okay.
12    Q. I think these are -- this is all the way
13  over to Document No. -39 or -40.
14    A. Okay.
15    Q. Is it your testimony that these lender's
16  instructions are not provided to Swafford until
17  Swafford is provided with a completed loan package
18  ready for execution to close?
19    A. That's correct.
20    Q. And it's your testimony that the -- that
21  Swafford is provided the lender fees orally in the
22  phone call?
23    A. Yes.
24    Q. Who sends out the Good Faith Estimate?
25    A. The branch, the origination branch.

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

---

53

1    Q. Look over to Document No. -32 of
2 Exhibit 5.
3    A. Okay.
4    Q. Is that a copy of the Good Faith
5 Estimate?
6    A. That's a copy of a Good Faith Estimate and
7 format that is delivered to the closing office and the
8 final document package for the borrower to sign. The
9 purpose of this particular form is to itemize the Truth
10 in Lending Disclosure Statement, which is Bates
11 No. -31.
12    Q. And, in fact, this is -- this document
13 is -- this is a -- is this a copy of a document that's
14 previously been sent to the borrower?
15    A. The -- what you would really define as a
16 Good Faith Estimate is sent to the borrower within
17 three days of their loan application. So this may or
18 may not match identically to that.
19    Q. Okay. And at this point Accredited is
20 requiring the borrower to utilize the services of
21 Swafford as the closing agent?
22    A. I'm sorry?
23    Q. At this point Accredited is requiring the
24 borrower to utilize the services of Swafford and
25 Hays --

---

54

1    A. No. We don't require the borrower to use
2 Swafford and Hays, no, sir.
3    Q. Can you look down there at the bottom of
4 this form, right above the words, "This does not
5 constitute a loan commitment."
6    Do you see that, that language?
7    A. On -32?
8    Q. Yes, sir.
9    A. Yes.
10    Q. And would you agree with me that that
11 language says, "Use of a particular provider of service
12 is required, and the estimate is based on charges of
13 the provider"?
14    A. Okay. I can't read that. This copy is
15 not that clear.
16    Q. Sorry. That's the copy y'all produced to
17 me.
18    A. Okay. Well, I think I see it. "The
19 lender will require a particular provider from a lender
20 controlled or approved list." Yes, it says that.
21    Q. Okay. And isn't that, in fact, true that
22 at this point Accredited is requiring the borrower to
23 utilize the services of Swafford to get this loan
24 closed?
25    A. We would not require the borrower to use

---

55

1 Swafford. If the borrower had a different servicing or
2 closing agent that they wanted to use, we -- you know,
3 that's negotiable.
4    Q. Do you know if this -- do you see right to
5 the left of that there's a little square with an X in
6 it?
7    A. Yeah, very small.
8    Q. Yes, sir.
9    A. Yeah.
10    Q. Is it usual and customary for Accredited
11 to send out a Good Faith Estimate form on every loan
12 that it closes that tells the borrower by checking that
13 block that the use of a particular provider of service
14 is required?
15    A. Yes. This is a standardized form, so it
16 would say the same thing.
17    Q. Now, these -- this goes out from
18 Accredited, right?
19    A. Yes.
20    Q. Is this a document that Accredited uses to
21 prepare the TILA Disclosure?
22    A. Yes.
23    Q. So Accredited is not using the HUD page
24 that we were looking at earlier, page -26, to complete
25 the TILA Disclosure, right?

---

56

1    A. No. Because the HUD is an itemization of
2 what actually occurred at closing, so that hasn't
3 happened when the TILA is prepared.
4    Q. But you've got the completed HUD at the
5 time the TILA is prepared, don't you?
6    A. No, sir.
7    Q. You don't?
8    A. No.
9    Q. I don't mean executed HUD, I mean
10 completed HUD.
11    A. We would have the estimated HUD, yes, that
12 would be the procedure.
13    Q. And it would be completely filled out and
14 ready to send to Swafford to have executed, along with
15 all the other documents, right?
16    A. No, sir.
17    Q. That --
18    A. Accredited does not send a HUD to the
19 closing office. The HUD is prepared by the closing
20 office and sent to the loan origination branch.
21    Q. And then what happens to it?
22    A. It's reviewed.
23    Q. And it doesn't go back to Swafford?
24    A. No.
25    Q. How does Swafford know that it's

---

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

57

1  approved?
2  A. It would be approved over the telephone.
3  Q. And it's not included in the packet of
4  documents that Swafford gets to close the loan?
5  A. No.
6  Q. Do you know what is included in that
7  packet of documents?
8  A. Exhibit 5 probably -- most of the
9  documents in Exhibit 5, not all of them. The documents
10  that the borrower is required to sign, your -- you
11  know, your common -- your note and your mortgage and
12  Truth in Lending Disclosure and all the various
13  disclosures that are in the -- you know, common to a
14  loan file, those are sent to the closing -- those are
15  prepared by Accredited and sent to the closing office.
16  Q. The borrower is required to sign the HUD,
17  isn't she?
18  A. Right. But the HUD-1 is not a lender
19  document.
20  Q. So Swafford prepared -- let me make sure I
21  understand it. You're saying that Swafford prepares a
22  completed HUD-1 based on information it gets over the
23  phone and based on information that it already has,
24  like its -- its own charges and provides that completed
25  HUD-1 back to Accredited, and Accredited approves it

58

1  and sends out a loan package that does not include a
2  copy of the HUD-1 for execution?
3  A. That's correct. We couldn't. We e-mail
4  lender documents, and there's no way to capture a
5  HUD-1. It's not in our system.
6  Q. All right. So when Accredited gets the
7  completed HUD-1 that it approves, does it then run the
8  TILA Disclosure?
9  A. That's when they draw the final docs,
10  yes.
11  Q. So the TILA Disclosure is printed or
12  drawn, as you say, after Accredited has approved the
13  HUD-1 form?
14  A. They might have drawn the documents prior
15  to that, but if necessary, they would update the TILA
16  depending on what the HUD -- HUD said.
17  Q. You mean they might have created a TILA
18  Disclosure without the settlement service provider's
19  closing fee?
20  A. We would know what that is.
21  Q. You would know what that was?
22  A. Yes. There's correspondence and
23  communication going on with the loan processors and the
24  closing office. It's not a complete mystery.
25  Q. Flip over, if you will for me, please,

59

1  sir, to page -31 of Exhibit 5.
2  A. Okay.
3  Q. Can you identify the document for us.
4  A. Yeah. Final Truth-In-Lending Disclosure
5  Statement.
6  Q. All right. How is the -- how is the
7  finance charge computed on this document?
8  A. Empower calculates that in the loan
9  origination system.
10  Q. Do you know what goes into it?
11  A. Yes.
12  Q. Can you tell me.
13  A. The calculations are the -- based on the
14  fees charged on the loan and the interest rate, and
15  there's a time factor and some other complicated
16  calculations in accordance with Reg Z.
17  Q. All right. When you say "Empower
18  calculates it," is there a screen print or -- you know,
19  a process that you have to go through to have Empower
20  calculate this document?
21  A. Well, yeah. The process to calculate it
22  would simply be to enter all the fees that are going to
23  be charged and then basically hitting the enter button
24  and --
25  Q. Okay.

60

1  A. -- and the computer does the
2  calculations.
3  Q. That's what I assumed, but I don't know
4  until I ask you the question.
5  A. Yeah.
6  Q. All right. So, who is the person there at
7  Accredited whose job it is to enter all the fees into
8  the Empower software?
9  A. Well, that would be an ongoing process
10  from the beginning of the processor, who would
11  understand some of the fees initially, and then as it
12  gets through all the way to the doc and funding
13  department, then they would verify that all the fees
14  were final before they -- to the best of their ability
15  before they drew the final docs.
16  Q. All right. Let me -- so at this time
17  they're inputting fees into the Empower software based
18  upon the completed HUD-1?
19  A. If the completed HUD-1 -- you know, I
20  don't like this word "completed HUD-1." The HUD --
21  Q. Well, the --
22  A. The HUD-1 is completed when the borrower
23  signs it, and it could always change. So I want you to
24  understand that. I'm not -- when we get the -- when
25  Accredited gets the HUD-1, it's not completed. It's

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

61

1   what the closing agent says at that time is -- what
2   it's going to be, so --
3        Q. Once Accredited approves it and sends it
4   back, it then -- they can't change it, can they?
5        A. Well, they're not supposed to change it
6   without notifying us, that's true. That's in our
7   closing instructions.
8        Q. All right. All right. So, looking at the
9   Final Truth-In-Lending Disclosure Statement, Document
10  No. -31, about halfway down do you see the blank for
11  Filing/Recording Fees?
12       A. Right.
13       Q. $170?
14       A. Correct.
15       Q. Do you know if that was the filing and
16  recording fees for the Hall loan?
17       A. I can tell you that's what the estimate
18  was at the time that we drew the documents, what we
19  thought it was going to be. But because I know --
20  understand the nature of the lawsuit, I know that that
21  turned out not to be the exact fee or fees.
22       Q. So that it is -- with respect to Swafford,
23  it has turned out not to be the exact fee every time in
24  connection with every loan?
25       A. I haven't --

62

1        MR. MANUEL: Object to the form.
2        You can answer.
3        THE WITNESS: I have not reviewed all the
4   other Swafford loans.
5   BY MR. IRVINE:
6        Q. Okay. Does anybody check the recording
7   fee at Accredited to see whether it is bona fide?
8        A. No, sir. That's not a lender function.
9        Q. Is there any policy or process that would
10  cause -- in place with Accredited by which its
11  employees would check the recording fee?
12       A. No, sir. That's not a lender function.
13       Q. On the -- did you know, looking at the
14  Hall loan, where that 170 came from?
15       A. Yes.
16       Q. Where did it come from?
17       A. Well -- that was the sum if you --
18  if we had the print screens of -- or could look at the
19  loan origination system, that would be actually -- yes,
20  I can tell you, if you want to look at Bates No. -32.
21       Q. Yes, sir. Is it 120 plus 50?
22       A. Yeah. And I don't have -- let me kind of
23  do something here. I can't hardly see this. Line
24  1201, which is the "Recording Fee, Deed/Mortgage" for
25  120.

63

1        Q. Yes, sir.
2        A. And then go down to Line 1204 where it
3   says "Miscellaneous Recording Fee."
4        Q. Yes, sir.
5        A. $50. That -- our loan origination system,
6   LOIS, would calculate that -- that sum of those two
7   figures and populate 170 into the Truth-in-Lending
8   Disclosure Statement, Bates -31, that we're talking
9   about.
10       Q. All right. Now, who prepares this Good
11  Faith Estimate?
12       A. Accredited.
13       Q. And where did Accredited get $50 as a
14  miscellaneous recording fee for use on this Good Faith
15  Estimate?
16       A. Swafford.
17       Q. All right. Jump back with me back over to
18  page -26.
19       A. Okay.
20       Q. Do you see in the 1200 box anything that
21  would indicate a $50 miscellaneous recording fee?
22       A. No, I don't.
23       Q. And when you say "Swafford," does that
24  mean Swafford called Accredited and said, "For purposes
25  of your Good Faith Estimate, put $50 as a miscellaneous

64

1   recording fee on it"?
2        A. Well, that's probably what occurred. I
3   wasn't there, of course, to hear the conversation, but
4   that's --
5        Q. You don't know if Accredited maybe picked
6   up the $50 off of Line 1111, Endorsements, and included
7   it on the Good Faith Estimate as a miscellaneous
8   recording fee?
9        A. No. I don't know that they did that, no.
10       Q. You don't know where that number actually
11  came from really.
12       A. $50?
13       Q. Yes. I mean, you know it came from -- you
14  believe it came from Swafford.
15       A. I believe it would have come from
16  Swafford, yes.
17       Q. But you don't know that?
18       A. No.
19       Q. And is there any policy or process in
20  place at Accredited by which the people reviewing these
21  documents in closing this loan would look at this 120
22  recording fee and check it to make sure that it's bona
23  fide?
24       A. No, we wouldn't know how to determine what
25  the County Recorder charges, no. We rely on the

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | 65 |
|---|---|

1  settlement office to do that accurately.
2      Q. And if they saw 120 over and over and over
3  with -- in different counties all over the state of
4  Alabama and in other states, there's no policy in place
5  to induce the Accredited people to check that number?
6      A. No. Our policy is to rely on the closing
7  office to do it correctly.
8      Q. Okay.
9      A. That's part of their function.
10     Q. And that's a different policy from the
11 policy that says you need to check the settlement
12 service fee. If it looks like it's too big, you need
13 to inquire into it?
14     A. No. You said bona fide fee. If we have a
15 recording fee there of $800, that's unreasonable and
16 would be investigated, I think.
17     Q. And there is a written policy to that
18 effect -- I'm sorry. I'm trying to remember your prior
19 testimony. There's no written policy to that effect,
20 but there is something in some sort of training
21 materials that says you have to check that fee, right?
22     A. Not that particular fee. Any fee would be
23 checked to be -- make sure it's bona fide and
24 reasonable.
25     Q. Including the recording fee.

| | 66 |
|---|---|

1      A. Any fee, yes, sir.
2      Q. Okay. But Accredited doesn't check these
3  fees, does it?
4      A. The recording fee?
5      Q. Yeah.
6      A. Do they actually call the County Recorder
7  and verify that that fee is going to be exactly what
8  the closing office says?
9      Q. It doesn't do anything to check the fee,
10 does it?
11     A. No. We don't -- we have no way of
12 verifying what a recording fee is. We don't have any
13 kind of access to those types of charges at all.
14     Q. And so -- so Accredited doesn't, as a
15 matter of policy, try to look behind the -- this fee to
16 see whether it's been padded or marked up?
17     A. No. We rely on the closing office to do
18 those things on our behalf.
19     Q. The same is true, I guess, of the title
20 insurance premium?
21     A. That's correct.
22     Q. Accredited expects to get a title policy
23 in connection with this closing, doesn't it?
24     A. I'm sorry?
25     Q. Accredited expects to get a title policy

| | 67 |
|---|---|

1  in connection with this closing, doesn't it?
2      A. Yes.
3      Q. Isn't that a requirement of Swafford in
4  connection with closing this loan?
5      A. To deliver the policy to Accredited?
6      Q. Yes, sir.
7      A. Yes.
8      Q. And there's a commitment letter prepared
9  and delivered to Accredited in connection with this?
10     A. Yes.
11     Q. Does Accredited ever -- and that
12 commitment letter lets Accredited know who the carrier
13 is going to be, doesn't it?
14     A. Yes.
15     Q. Is Accredited generally familiar with the
16 requirement in a number of states, including Alabama,
17 that title policies -- title -- I'm sorry. Let me back
18 up.
19         Is Accredited familiar with the requirement in
20 Alabama and other states that title insurance agents,
21 when they issue policies, adhere to filed rates?
22     A. Accredited would rely on the settlement
23 agent to do these things. And our processors and
24 closers are not trained in insurance premiums, no.
25     Q. Okay. So then Accredited does not take

| | 68 |
|---|---|

1  any action at all to determine whether this title
2  insurance premium, for instance, shown here on
3  Document -32, is bona fide?
4      A. Well, title insurance by label is bona
5  fide, so that's pretty easy to determine.
6      Q. My question was the premium.
7      A. So the -- other than to view it from a
8  general bona fide and reasonable fee, which they would
9  be trained to do, they would not have details of what
10 a -- or access to or be required to check title
11 insurance premium per -- per unit charges or anything
12 of that nature. So -- and this --
13     Q. I -- I'm sorry.
14     A. In this case, where the title insurance
15 fee is $200 on Line 1108 of the HUD, if it were a
16 little bit less or more than that, in reality,
17 Accredited would not know that. We rely on the
18 settlement office to do those things.
19     Q. And so as I understand it, there's no
20 policy in place that would require any of the
21 Accredited employees to check into this fee?
22     A. Not -- not to that detail, no.
23     Q. And you think, just as a matter of
24 experience, if it looked really high, that's something
25 that they would inquire into?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

69

1    A. Yes.
2    Q. But Accredited doesn't take -- make any
3  effort to see if maybe this fee has been padded by $50,
4  say?
5    A. No, sir. They would not be required to
6  check that or even understand how to do it. It's not a
7  lender -- not part of the lender process.
8    Q. And the same is true, isn't it, of the
9  fees listed by Swafford and Hays in Line 1102 and 1103
10  for abstract or title search and title examination?
11    A. Correct.
12    Q. Does Accredited know that Swafford is
13  hiring an independent abstracter to obtain that
14  abstract or title search?
15    A. I don't know if Swafford did or not. And
16  nor would the --
17    Q. You don't know whether Accredited knows
18  that or not?
19    A. No. We would not know if -- some closing
20  offices might have access to public records or
21  themselves to be able to do an abstract or title
22  search, for example. So I don't know if they're
23  doing -- hiring a third-party vendor to do it.
24    Q. All right. So if Swafford, in fact, hired
25  some third party to obtain an abstract or title search

71

1    MR. MANUEL: Yes, sir.
2    MR. IRVINE: Let's take about a five- or
3  ten-minute break. We've been going for a while.
4    MR. MANUEL: Okay.
5    MR. IRVINE: It sounds to me like maybe that
6  Exhibit -- Exhibit 5, maybe some of the Bates pages got
7  out of order somehow.
8    MR. MANUEL: Yes, sir.
9    MR. IRVINE: These should be sequential -1 to
10  -163.
11    MR. MANUEL: Okay. We'll check into it and
12  see if we're missing anything.
13    MR. IRVINE: All right. I'll be here. Just
14  call me back.
15    MR. MANUEL: Okay. All right. Bye.
16    THE VIDEOGRAPHER: Stand by, please.
17    This concludes Video Recording No. 1 of
18  today's deposition on June 25, 2008. The time is
19  10:49 a.m.
20    We're going off the video record.
21    (Recess.)
22    THE VIDEOGRAPHER: This begins Videotape No. 2
23  of today's deposition of Robert B. Dooley on June 25,
24  2008. The time is 11:02 a.m.
25    We are on the video record.

70

1  and paid that third party $72 and listed a charge of
2  $200 here on the HUD, Accredited has no policy of
3  checking into that situation?
4    A. No.
5    Q. And Accredited wouldn't know whether
6  Swafford was padding that third-party charge or not?
7    A. No, we would not.
8    Q. And then the same is true for the title
9  examination? You know, if Swafford was already being
10  compensated for its services in reviewing a title
11  abstract by its commission and selling the title
12  insurance policy, Accredited wouldn't look into that
13  situation, would it?
14    A. No.
15    Q. Now, is it -- is it after the loan is --
16  let me ask it this way. Look over, if you will for me,
17  please, sir, to --
18    MR. MANUEL: Do you want to take a break?
19  BY MR. IRVINE:
20    Q. -- Document No. -78 and -79 and -80.
21    A. Okay. Hold on. -39. Bates number?
22    Q. Bates No. -78, -79 and -80.
23    A. I've got -80 -- I go from -39 to -80.
24    Oh, wait a minute. What the heck?
25    MR. IRVINE: Tell you what let's do, Will.

72

1    Proceed, Counsel.
2  BY MR. IRVINE:
3    Q. Mr. Dooley, before I get to those
4  documents that I asked you to find, I think I asked you
5  this. Let me make sure. Accredited requires there be
6  a title policy issued to it in connection with every
7  loan?
8    A. Yes.
9    Q. And Accredited requires that the mortgage
10  be recorded in connection with the closing of every
11  loan, doesn't it?
12    A. Yes.
13    Q. Okay. Look at Document No. -78.
14    Did you find it?
15    A. Yes.
16    Q. And Document -79?
17    A. Okay.
18    Q. Document -80?
19    A. Okay.
20    Q. All of Exhibit 5 -- I guess -- you know,
21  because I'm not looking at the original documents, and
22  since I'm here in Alabama, I don't know how Accredited
23  keeps these documents. Flip back to page -73 for me
24  real quick.
25    A. Okay.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

73

1  Q. What is this document?
2  A. That's -- in the electronic imaging
3  process of a file, this was generated for the -- as a
4  tab for the insurance section. It isn't a document
5  that Accredited would do, but the electronic imaging
6  process created this document.
7  Q. All right. And so I guess the stuff that
8  comes before -- some of the stuff that comes before
9  this document appears to be related to insurance.
10  A. Yes.
11  Q. Is Accredited paperless?
12  A. We try to be.
13  Q. Is there an actual physical loan file for
14  Ms. Frazier?
15  A. No longer, no.
16  Q. So to get her loan file, you had to call
17  it up off of the electronic storage system?
18  A. Yes, sir.
19  Q. Can you tell me what you call that
20  system.
21  A. Fastrieve, F-a-s-t-r-i-e-v-e.
22  Q. I guess, is there a mainframe or a -- you
23  know, a blade server or something located somewhere
24  that's got all the Accredited loans deposited in it?
25  A. Yes. Everybody -- or most employees have

74

1  access to Fastrieve, and practically every loan that
2  Accredited has originated has been copied over as an
3  image to Fastrieve system.
4  Q. Okay. Look down, if you will for me, the
5  insurance -- what do you call that? What do you
6  call -- did you call it a -- not a header. What did
7  you call it?
8  MR. MANUEL: Tab.
9  BY MR. IRVINE:
10  Q. Tab.
11  A. Looks like some sort of tab that was
12  created by Fastrieve to identify what is behind it.
13  Q. Turn down to Document No. -83.
14  A. Okay.
15  Q. Is that another tab for the documents that
16  come above it?
17  A. Yes. It's a transmittal tab.
18  Q. What does that mean?
19  A. The documents we put in the transmittal
20  are some types of internal correspondence, audit
21  sheets, things of that nature.
22  Q. They're not really transmitted -- are they
23  transmitted to anybody?
24  A. Not necessarily.
25  Q. Is there some reason they're called

75

1  "transmittal documents"?
2  A. Yeah, I don't know. It's been -- that --
3  when we had paper tabs or paper files, that transmittal
4  tab section goes back at least nine years when I first
5  started, so maybe in the old days things were
6  transmitted back and forth, and it just retained that
7  name, but I'm not positive.
8  Q. Okay. Let me take you up to Document
9  No. -74 real quick.
10  A. Okay.
11  Q. That document, is it headed "Closed Loan
12  Status"?
13  A. Yes.
14  Q. There's a large block with two smaller
15  blocks underneath it, and on the right it says, "For
16  Assistance Call."
17  Do you see that?
18  A. Right.
19  Q. Earlier I think I asked you about Kim
20  Stevenson and Kristopher Dillon, and I think you could
21  not remember what their functions were.
22  A. Yes.
23  Q. Does this refresh your recollection?
24  A. Yes.
25  Q. Can you tell me what their functions are.

76

1  A. Well, as it says, Kim Stevenson was the
2  loan specialist, and Kristopher Dillon was the account
3  executive.
4  Q. What are the duties of a loan specialist
5  with respect to the closing of a loan like Ms. Hall's?
6  A. Loan specialist is the -- also known as a
7  loan processor, and the loan processor will coordinate
8  with the borrower and closing agents and other people
9  perhaps and -- in an attempt to acquire the
10  documentation to underwrite and then close the loan,
11  and essentially their job is to document and verify
12  information in the file.
13  Q. All right. How about the account
14  executive, what is his job?
15  A. Account executive and retail, which is
16  what this is, is probably more of a -- called a loan
17  officer, but it defaults to account executive on this
18  form. His job is to originate originally -- initially
19  interview the borrower and identify the loan product
20  that Accredited might have to best suit the consumer's
21  needs and do all the basic evaluation of the
22  information and then give it a preapproval or
23  disapproval.
24  Q. Is Mrs. Stevenson the person who would
25  prepare the final TILA Disclosure?

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

77

1    A. No.
2    Q. Who was that? Do you know?
3    A. It would be one of the dockers or
4 funders.
5    Q. Is their name going to be on it? Let's --
6    A. It may not be on any of these documents.
7 I don't know.
8    Q. Okay.
9    A. It would be in the loan origination
10 system.
11    Q. Look at No. -78 for me.
12    A. Okay.
13    Q. What is this document?
14    A. These -- this is a print screen from the
15 loan origination system, and I don't even know why it
16 was printed unless somebody wanted to look at
17 something. Probably was -- somebody was looking at
18 impounds, but it's just a print screen from the
19 system.
20    Q. Is this document lost? I mean, was this
21 something that was printed contemporaneously?
22    A. Yes.
23    Q. I see down at the bottom left-hand corner
24 there's a date/time stamp on it, Thursday, March 24,
25 2005. This isn't something that has been created out

78

1 of the system, is it?
2    A. This is a print screen -- print screen
3 from LOIS, and I couldn't tell you why it's even part
4 of the loan file. It normally would not be.
5    Q. Okay. I saw -- your copy is probably as
6 hard to read as mine is.
7    A. Mm-hmm.
8    Q. But I see below the black line on what
9 looks like a -- you know, a pop-up screen that's got
10 the little minimized buttons on the right, there's a
11 black line. There's what looks like a button that says
12 "High Cost."
13    A. Okay.
14    Q. First I guess, does it say "High Cost"?
15    A. I'm looking for the actual words. Are we
16 still looking at Document -78?
17    Q. Yes, sir.
18    A. I see the little black lines. Are you --
19 where are you -- oh, "High Cost" tab. More toward the
20 top, yes.
21    Q. Yes, sir.
22    A. Yes.
23    Q. Can you tell me what that is.
24    A. That's a systems test that calculates fees
25 that are input to the system on each particular loan.

79

1 And each state, if it has specific high-cost testing,
2 is programmed to alert the processors and the dockers
3 and funders that they may or may not have exceeded the
4 high-cost testing allowance in a particular state. It
5 also would do Federal testing as well.
6    Q. Would that be the Section 32 Test?
7    A. Yes.
8    Q. All right. This -- is this a screen print
9 of somebody doing a Section 32 Test?
10    A. No.
11    Q. No. Do you know what this is a screen
12 print of?
13    A. It's a screen print of these HUD lines,
14 828 through 1008. As you can see, that -- where it
15 says "Fees For" -- it's kind of hard to read, as you
16 know. Where it says "Fees For," it's got the loan
17 number "05031729" something "Hall."
18    Q. Yes, sir.
19    A. That's a print screen that's over a
20 bigger screen. So for some reason or another somebody
21 opened that up and printed it, and I don't know -- I
22 don't know why they would do that unless they wanted to
23 maybe take it and show it to somebody and ask them a
24 question or something.
25    Q. All right. So -- but this is sort of a

80

1 visual representation of the way the fees are loaded,
2 or input into the system, for lack of a better word?
3    A. Yes, it is. That's -- it's a piece of
4 it, yes.
5    Q. This one seems to stop -- let me put it
6 this way. There are only certain fees that are here on
7 this screen.
8    A. That's right. It's only a piece of the
9 process.
10    Q. Okay. Is every fee loaded into LOIS?
11    A. Well, yes. That would be the procedure.
12    Q. Okay. Well, look over to the next sheet,
13 No. -79.
14    A. Okay.
15    Q. This is, I believe, entitled "Section 32
16 Calculation Summary."
17    A. Yes.
18    Q. And then underneath that block there's
19 something that says "Good Faith Estimate Summary."
20    A. Yes.
21    Q. And there are a number of fees over there
22 on the left.
23    A. Yes.
24    Q. But there are not all the fees shown on
25 the HUD listed there, are there?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

81

1    A. That's right.

2    Q. And out of the -- there's a space for the

3  closing agent fee, but there's no space for the

4  abstract or title search, the 1102, the 1103, the 1202

5  fees. There's no line for any of those fees.

6    A. That's correct.

7    Q. Is that because those fees are not loaded

8  into the system in connection with the Section 32

9  Test?

10    A. That's correct. By fee label, the fees

11  that you just talked about, the title, abstract, et

12  cetera, those are not defined by Section 32 to be part

13  of the Section 32 calculations. So that's why they

14  don't appear here.

15    Q. Is there any -- I don't know how to ask

16  it -- let me -- is there any place in LOIS where you

17  can load those fees in to do that calculation?

18    A. All of those fees are loaded into LOIS.

19  If not, then they would never appear on the Good Faith

20  Estimate.

21    Q. So all of the fees that we just talked

22  about, say Line 1102, 1103, 1108, 1111, all of those

23  fees are actually loaded into LOIS?

24    A. Correct.

25    Q. And -- but when somebody does the

82

1  Section 32 calculation, are they -- does the software

2  give them a choice to include those fees or not?

3    A. No.

4    Q. So they don't include those fees in the

5  Section 32 calculation. There's no way to -- let me

6  ask you: Is it fair to say there's no way to include

7  those fees in the computerized Section 32 calculation?

8    A. Which fee are you talking about?

9    Q. The 1102, 1103, 1108.

10    A. No.

11    Q. 1201?

12    A. 1101 would be included, yes.

13    Q. Yeah, I didn't say 1101.

14    A. Okay. 1102 would not be included.

15    Q. And my question was, is that because

16  there's no way in the LOIS software to include 1102,

17  1103, 1108?

18    A. The way our system is programmed, that

19  would be correct.

20    Q. And that's the same for every loan; is it

21  not?

22    A. There might be some variations depending

23  on the state and depending on what a particular state

24  defines to be part of their high-cost test.

25    Q. Do you know which states that might be?

83

1    A. There's -- as you may well know, there's

2  over 30 different high-cost states that have different

3  testings, so no, I wouldn't have the particulars of

4  it.

5    Q. Is there another sort of, let me say,

6  screen print calculation sheet that's done for

7  different states?

8    A. There would be if the state has a

9  high-cost test, state-specific.

10    Q. Okay. So -- and let me -- trick

11  question. Go to -87, Document -87.

12    A. Okay.

13    Q. Right-hand column, right above "Texas

14  Supplement," there's a thing that says

15  "State-Specific."

16    A. Yes.

17    Q. And that indicates -- correct me if I read

18  it wrong -- "All required state-specific documents are

19  present and have been reviewed," right?

20    A. Okay.

21    Q. And that's because this is an Alabama

22  loan, and there's not one, right?

23    A. I don't understand the question.

24    Q. Well, there's a check mark here that

25  indicates "All required state-specific documents are

84

1  present and have been reviewed," right?

2    A. Yes.

3    Q. And so that would tend to indicate that a

4  state-specific document is present and has been

5  reviewed.

6    A. Yes.

7    Q. Right?

8    A. Yes.

9    Q. But there's not any document that is

10  state-specific that's present here for an Alabama loan,

11  is there?

12    A. Well, the requirement for the auditor in

13  this particular audit and at this point in the audit

14  would be to refer to another state summary-type

15  reference, and it would tell them if there were any

16  special documents we wanted -- that Accredited wanted

17  the borrower or the auditor to look for.

18    Q. And am I understanding you to say that

19  the LOIS software would prompt --

20    A. No.

21    Q. No.

22    A. We have a -- we have a paper document

23  that's called a "State Summary."

24    Q. Yes, sir:

25    A. And on that "State Summary" it tells loan

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1  processors and the loan processing system people --
2  that outline certain requirements in documents and
3  things of that nature that Accredited considers to be
4  very important, and they want to make sure that we
5  comply with whatever those requirements are.
6      Q. Okay. You didn't bring a copy of that
7  with you today, did you?
8      A. I did not.
9      Q. Look at page -86.
10     A. Okay.
11     Q. Let me back up. Look at page -86, but --
12  what is this document?
13     A. Page -86?
14     Q. Yes, sir. -86 and -87.
15     A. That's a checklist for auditing a
16  refinance closed -- closed loan documents.
17     Q. And that's what Mrs. Hall's loan was.
18     A. Okay.
19     Q. Right? I mean --
20     A. Yes. Yes, as I recall.
21     Q. And is this document prepared in
22  connection with every loan?
23     A. Yes.
24     Q. When is it prepared?
25     A. Well, these are actually -- at the time

86

1  that this loan funded that we're talking about, this
2  was -- these refinance audit checklists were just
3  pieces of paper that people already had copies of in
4  blank. And when the -- when the closed -- or signed
5  documents came back to Accredited from the closing
6  office or settlement office, the auditor would then get
7  one of these checklists and then review the documents
8  according to the checklist here.
9      Q. Okay. Did that happen -- does that not
10  happen now?
11     A. Yes, it does happen now.
12     Q. Okay. So I think my question was, when is
13  this prepared?
14     A. After the loan closes.
15     Q. That's what I thought. I just didn't want
16  to suggest the answer to you.
17     At some point during the post-closing audit
18  process, this document is completed?
19     A. Yes.
20     Q. There's a lady who signed it, I believe
21  Rita Dickerson on the next page on page -87, and she's
22  listed in your response to Interrogatory No. 1.
23     Does this refresh your recollection about who
24  she is?
25     A. Yes. She would have been either a docker

87

1  or a funder or possibly both.
2      Q. Had she been the person to prepare the
3  TILA Disclosure Form?
4      A. Possibly.
5      Q. Do you know who prepared the -- the
6  Section 32 Form that we were looking at a minute ago,
7  page -79?
8      A. Well, I don't think their name appears on
9  this form, but one of the doc funders would be --
10  procedurally would do the final Section 32 calculation
11  summary.
12     Q. All right. And I don't want to -- this is
13  a two-page document, isn't it? -79 and -80 are both
14  parts of the same document, or am I wrong about that?
15     A. Yeah, it's a two-part document. One of
16  them is specific to Section 32, and the other one is
17  specific to a state. In this case, Alabama.
18     Q. I see.
19     A. Because, of course, they -- the
20  calculations might be different.
21     Q. I see. Okay.
22     I think I've asked this before, but let me
23  just make sure. The Line 1102 charge of $200 is not
24  included in any respect in the Section 32 high-cost
25  loan analysis?

88

1      A. No, it is not.
2      Q. The same is true in connection with
3  Mrs. Hall's loan for the charge shown on Line 1103 of
4  $250?
5      A. What was that fee label?
6      Q. "Title Examination," 1103.
7      A. No, sir, it would not be included in the
8  Section 32 test.
9      Q. The same is true of the $200 charge shown
10  on Line 1108, in any respect, in any part?
11     A. And 1108 was what fee label?
12     Q. "Title Insurance."
13     A. No, it would not be included.
14     Q. The same is true of the charge for $50
15  shown on Line 1111, which is labeled "Endorsements"?
16     A. Correct. Title endorsement would not be
17  included in the calculation.
18     Q. No part of the recording fee shown in
19  Line 1201 would be included?
20     A. Correct.
21     Q. And that's true for every loan that
22  Accredited closes; is that fair?
23     A. Well, it's true for Alabama, and I don't
24  know -- I can't recall any state that would require
25  those to be included in their high cost, but it's true

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

89

1  for any Alabama loan.
2      Q. And seeing as you can't recall a state
3  that would treat those -- would require those costs in
4  any part to be included?
5      A. No, not right offhand.
6      Q. Would it be fair to say that if those
7  charges were not bona fide, that they should be
8  included?
9      A. Yes.
10      Q. If you look on the Final Truth-in-Lending
11  Disclosure page statement, Document -31.
12      A. Okay. Hold on. Okay.
13      Q. Would it be fair to say that if some of
14  those charges were not bona fide and should have been
15  included in the Section 32 calculation, they also
16  should have included -- should have been included in
17  the calculation of the finance charge here on
18  Document -31?
19      MR. MANUEL: Object to the form.
20      But you can answer.
21      THE WITNESS: Can you restate the question,
22  sir.
23      MR. IRVINE: You know, it's going to be hard
24  for me to do, so let me ask the court reporter to read
25  it back, if she can.

90

1      (The record was read by the reporter.)
2      THE WITNESS: If -- if a charge or a fee was
3  not bona fide and reasonable, yes, it should have been
4  included in the Truth-in-Lending Disclosure.
5  BY MR. IRVINE:
6      Q. And that would be true with respect to
7  every loan closed by Swafford for Accredited?
8      A. Yes.
9      Q. And that would be true of every loan
10  closed by Lenders First Choice for Accredited?
11      A. Yes.
12      Q. And every settlement service provider for
13  Accredited?
14      A. Yes.
15      Q. If you hear me shuffling around, I'm
16  going through my notes, which is a good sign.
17      Did you know anything about the relationship
18  between Swafford and Hays and Accredited other than the
19  fact that Swafford and Hays closed loans?
20      A. No, sir, I do not.
21      Q. I'm looking at the documents that y'all
22  faxed over.
23      A. Okay.
24      MR. IRVINE: Let me go with mine and mark a
25  copy there of this document as Exhibit 8.

91

1      MR. MANUEL: Okay.
2      (Plaintiffs' Exhibit 8 was marked.)
3      THE WITNESS: All right, sir.
4  BY MR. IRVINE:
5      Q. Does Accredited normally have its closing
6  agents execute applications?
7      A. I would say that's normally the procedure,
8  yes.
9      Q. And then does this document form an
10  agreement with Accredited?
11      MR. MANUEL: Object to the form.
12      But you can answer.
13      THE WITNESS: You know, I don't -- I can't
14  answer that question.
15  BY MR. IRVINE:
16      Q. Well, let me tell you. The reason -- I'm
17  a little confused, because y'all faxed over two pages,
18  right?
19      A. Yes.
20      Q. The first page looks like the cover page
21  of an application, and the second page looks like the
22  signature page of an agreement.
23      A. Yes. I would agree.
24      Q. And, in fact, the second page picks up
25  with a No. 6.

92

1      A. Mm-hmm.
2      Q. And the first page leaves off with a
3  No. 3.
4      A. Yes. And -- I'm sorry. Go ahead.
5      Q. Do you think it's reasonable to believe
6  that there is actually an agreement between Accredited
7  and Swafford, and we only have the last page of it?
8      A. Yeah, that's a reasonable thought.
9      MR. MANUEL: That we have the last page of
10  whatever that document is?
11      THE WITNESS: And I think what might have
12  happened here was, when these -- when these documents
13  were uploaded to the imaging system, these were
14  transferred over from a paper file to -- and then
15  uploaded when we got the imaging system, and perhaps
16  something went wrong there.
17  BY MR. IRVINE:
18      Q. Yeah.
19      A. But I can -- I can check to make sure
20  that -- but yeah, obviously, there's -- the pages don't
21  match up.
22      Q. Yeah. Would it -- did Accredited -- was
23  it Accredited's policy to obtain contracts with the
24  settlement service providers it was going to use?
25      A. No, I don't -- I don't -- to my knowledge,

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

93

1  we did not have any contracts with settlement service
2  providers.
3      Q.  All right.  Maybe I should call them
4  "Approved Closing Agent Agreements."
5      Did Accredited typically obtain approved
6  closing agent agreements with the settlement service
7  providers it was going to utilize to close loans?
8      A.  We had a department that managed that.
9  It's called Broker Services Administration, and they
10  would probably be the ones to have to answer that
11  question.
12      Q.  Okay.  And -- so you don't know if, like,
13  for instance, there ought to be one of these approved
14  closing agent agreements between Accredited and LLC or
15  Accredited and ATM or other settlement service
16  providers that Accredited used?
17      A.  I can tell you that I have seen the
18  applications and the agreements with other settlement
19  offices.  Whether or not it was the mandatory
20  requirement that a broker services admin obtain one, I
21  don't know the answer to that.
22      Q.  It looks like it's fair to say that
23  Accredited had one with Swafford, though, wouldn't you
24  say?
25      A.  Well, we got page 2.

94

1      Q.  Or page whatever it is.
2      A.  Yeah.  The signed page, signature page.
3      Q.  And we know that at least the -- the
4  contract we're looking at here that's executed by
5  Swafford requires Swafford to close the mortgage loan
6  in compliance with all applicable laws and
7  regulations.
8      MR. MANUEL:  Object to the form.
9      But you can answer.
10      THE WITNESS:  That's what the Closing Agent
11  Agreement says, yes, sir.
12  BY MR. IRVINE:
13      Q.  And it requires Swafford to maintain E&O
14  coverage not less than $1,000 in a form issued by
15  carrier acceptable to Accredited.
16      A.  Mine says $1 million.
17      Q.  Yes, sir.  What did I say?
18      A.  A thousand.
19      Q.  Oh, I'm sorry.  One million.
20      A.  All right.  Yes, sir.  One million,
21  that's correct.
22      Q.  It's fair to say that, as a matter of
23  course, in connection with virtually all of the loan
24  closings that it had, that Accredited selected the
25  settlement service provider?

95

1      A.  Yes.
2      Q.  Do you know of any communication --
3  specifically, do you know of any communication between
4  Swafford and Hays and Accredited on any of the loans
5  that it closed with regard to the fees that were going
6  to be charged?
7      A.  No, sir, I do not know of any
8  communication like that.
9      Q.  Does Accredited use e-mail?
10      A.  Yes.
11      Q.  Would it be unusual for Accredited's loan
12  closers, processors, dockers, to communicate with
13  Swafford by e-mail?
14      A.  I don't know.
15      Q.  Do you know if there was any
16  communication with Swafford with respect to proper
17  charging of fees in the context of RESPA or TILA?
18      A.  Well, our closing instructions would
19  require that, but --
20      Q.  Yes, sir.
21      A.  -- if you're talking about any other
22  communication that may have occurred in verbal or
23  e-mail communication, I don't know.
24      Q.  I'm specifically talking about e-mail.  Do
25  you know if Accredited's e-mail is archived?

96

1      A.  It is.
2      Q.  Does it go all the way back to 2005?
3      A.  I'd have to confirm -- check with IT on
4  that.
5      Q.  Has anyone done any sort of a search of
6  the e-mail of Accredited for any communications by and
7  between Accredited and Swafford?
8      MR. MANUEL:  I'm going to object to the extent
9  that you're seeking any attorney-client privilege or
10  work product, but --
11  BY MR. IRVINE:
12      Q.  I think with those objections made, you
13  can answer the question.
14      MR. MANUEL:  If he individually has done any
15  searches?
16      MR. IRVINE:  Sure.
17      Q.  I think I said "Accredited."  Did I say
18  "Accredited" or --
19      MR. MANUEL:  You said "Accredited."
20  BY MR. IRVINE:
21      Q.  I meant "Accredited."  I'm not asking if
22  your lawyer has been over there looking for stuff.
23      MR. MANUEL:  So you're asking if he has.
24      MR. IRVINE:  Yes.
25      MR. MANUEL:  You can answer that.

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

97

1    THE WITNESS: I have not done any electronic
2  discovery on this particular case related to the
3  e-mail, no, sir.
4  BY MR. IRVINE:
5    Q. Okay. Is it fair to say that the fees
6  listed on Lines 1102, 1103, 1108, 1111 and 1201 of the
7  HUD are typically set by the settlement service
8  provider in connection with closings of loans for
9  Accredited?
10    A. Yes.
11    Q. Is it fair to say that those fees are
12  typically not included in the finance charge?
13    A. Yes.
14    Q. Is it fair to say that those fees
15  typically are not examined to determine whether they
16  are bona fide fees?
17    A. Yes.
18    Q. I think I lost one of my own exhibits
19  that my notes tell me to go look at. I'm trying to
20  find it.
21    Do you know if anybody at Accredited has ever
22  done a manual check of the TILA calculations? TILA
23  Disclosure calculations?
24    A. Yes. The Quality Control Department
25  sometimes does.

98

1    Q. Before or after the loans close?
2    A. After.
3    Q. Do you know if there's ever a manual
4  calculation done of the TILA Disclosure before the
5  loans close?
6    A. No, there is not.
7    Q. Is there any system in place at Accredited
8  to correct a fee that's listed on the HUD as one of
9  Swafford's fees if it's wrong?
10    A. You mean after a loan closing?
11    Q. No. Before. Oh, did you say "add"? I
12  thought you said "after."
13    A. Yes, I did. That's why I'm asking.
14    Q. No. If there's -- if a fee is wrong, you
15  know, there's a transposition of a number or it's just
16  wrong for some reason, is there any system in place to
17  catch and correct that there at Accredited?
18    A. Yes.
19    Q. What is that?
20    A. Well, prior to sending the documents over
21  for the -- preparing the final closing documents and
22  after we've received an advance HUD to check,
23  everything is checked on the system. If something is
24  not correct, then it could be caught then, and then it
25  would be corrected, yes.

99

1    Q. When you say everything is checked on the
2  system, do you mean the Accredited system?
3    A. Yes, LOIS. Mm-hmm.
4    Q. Okay. But like, for instance, if -- if
5  Swafford made a mistake and said, you know, that
6  there -- that closing fees -- let's say the title --
7  title examination fee, instead of it being $250, they
8  transposed the number, and it was $520. Is there any
9  system in place at Accredited to catch that error?
10    A. Yes. There's an audit process before
11  final documents are drawn.
12    Q. Okay. And is there a piece of paper in
13  the -- in the Exhibit 5 that reflects that audit
14  process?
15    A. Yes. There's one in there somewhere, but
16  it -- I'm not sure that it shows the title-type fees.
17  I'm looking for it here.
18    Q. Take your time.
19    A. Yeah, Document -84, Bates No. -84.
20    Q. Yeah.
21    A. Yeah. At this point, LOIS is checked for
22  accuracy, right before everything from the borrower's
23  name and address and all those sorts of things, the
24  loan terms and certain fees. The title-type fees would
25  not be indicated on this -- on this sheet.

100

1    Q. The only fees that are checked for
2  accuracy are the fees that are the lender fees?
3    A. Yeah, the fees that the lender would
4  normally consider to be TILA or Federal or State
5  applicable to Federal or high-cost State testing.
6    Q. So there's no system to catch an error in
7  a settlement service agent fee?
8    A. Not on an official audit, no.
9    Q. It's sort of a qualification. So does
10  that mean that there is one somewhere?
11    A. Not on a check sheet, no.
12    Q. Does that mean that there is one
13  somewhere?
14    A. Well, if I were reviewing a loan, sir, I
15  would check them. Whether or not this auditor did, I
16  don't know.
17    Q. Okay. There's no written policy that
18  provides for that, is there?
19    A. To check -- to verify the accuracy of the
20  title fees?
21    Q. Correct.
22    A. Other than to a broad process to -- of
23  recognizing whether they're bona fide and reasonable in
24  price, no.
25    Q. And that's the policy that you say that's

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

101

1  taught based on the classwork, but there's not a
2  written policy about that.
3      A. I don't believe so, no.
4      Q. On Exhibit No. 4, if you look at that real
5  quick, please.
6      A. Okay.
7      Q. Down at the bottom there's a name that's
8  not listed in the answer to Interrogatory No. 1,
9  "Audrey Williams."
10     MR. MANUEL: You mean Bates No. -4 or Exhibit
11 No. 4?
12     MR. IRVINE: Exhibit No. 4.
13     THE WITNESS: Oh, okay. Hold on.
14 BY MR. IRVINE:
15     Q. It's a letter on Bradley Arant
16 letterhead.
17     A. Okay. I have it here.
18     Q. Down at the bottom there's a name listed,
19 "Audrey Williams."
20     A. Okay.
21     Q. And that person is not listed on Exhibit 6
22 in the answer to Interrogatory No. 1, and so I was
23 wondering who that person is.
24     A. I'll find -- maybe I can tell here real
25 quick. Let me just look at some of these documents.

102

1      Q. Take your time.
2      A. She might be the review appraiser. Yeah,
3  Audrey Williams was Accredited's review appraiser.
4      Q. Did Accredited always review appraisals
5  done by third parties in connection with its loans?
6      A. Yes.
7      Q. So there's always a charge of -- it shows
8  up on the HUD for appraisal review fee?
9      A. If the State allows it, yes.
10     Q. And do you know what that lady does for
11 that $250 appraisal review fee?
12     A. She reviews the appraisal that the third
13 party did to verify that the market value of the
14 property is what the appraisal says it is. It's a
15 fraud prevention review, and they check other sites
16 and -- it's kind of an elaborate review, yes.
17     Q. All right. I was just curious about
18 that.
19     MR. IRVINE: I think that I am finished.
20     THE WITNESS: Okay.
21     MR. IRVINE: Let me -- before I actually quit,
22 let me say that I'd like to go on -- I know that I have
23 not used or talked about a couple of these exhibits,
24 but I don't know what I attached. Let me just attach
25 them all to the deposition.

103

1      MR. MANUEL: No problem.
2      (Plaintiff's Exhibits 2 through 7 were
3      marked.)
4      MR. IRVINE: And I don't think I need -- let
5  me -- why don't we take -- if you don't mind, let me
6  have about five minutes or so --
7      MR. MANUEL: Five seconds or minutes?
8      MR. IRVINE: Do what now?
9      MR. MANUEL: Five seconds or minutes? I
10 didn't hear what you said.
11     MR. IRVINE: About five minutes. Let me -- I
12 know that I did not go through the notice in its
13 entirety, but I think that I probably don't need to do
14 that.
15     MR. MANUEL: Okay.
16     MR. IRVINE: So let me have about five
17 minutes, and y'all call me back, and I think I'll be
18 done.
19     MR. MANUEL: All right. Thanks.
20     THE VIDEOGRAPHER: Stand by, please. The time
21 is 11:57 a.m.
22     We're going off the video record.
23     (Recess.)
24     THE VIDEOGRAPHER: The time is 12:03 p.m.
25     We are on the video record.

104

1  BY MR. IRVINE:
2      Q. Mr. Dooley, you testified earlier, I
3  think, that you had seen Exhibit No. 1, which was the
4  amended notice of taking this deposition.
5      A. Yes, I have.
6      Q. Did you see this -- the request on the
7  second to the last page that you bring with you today
8  four different categories of documents?
9      A. Yes, I see it.
10     Q. Did you bring with you today any and all
11 references, manuals and other writings, whether in
12 paper or electronic format, regarding compliance with
13 Federal law regulating consumer mortgage lending?
14     A. There's nothing for me to bring. The --
15 everything is programmed into the system to ensure that
16 the processors and funders comply with the laws.
17     Q. Didn't you tell me earlier that there's
18 some sort of training program, training manuals or
19 training documents that --
20     A. Not -- not when this loan funded, no,
21 sir.
22     Q. Not when this loan funded?
23     A. Right.
24     Q. When did all that training
25 documentation --

26  (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

105

1    A. Second quarter '05. There was a training
2 course developed for Truth in Lending.
3    Q. And you didn't bring any of those
4 documents?
5    A. No, sir.
6    Q. You don't see any sort of limitation in
7 this to documents in existence back in the first
8 quarter of '05, do you?
9    A. Say that again.
10    MR. MANUEL: Let me -- I'll object to the
11 question. The notice speaks for itself, and he's
12 testified that he didn't bring anything today besides
13 Exhibit 8, and we mentioned the spreadsheet that we
14 want to discuss off the record. I mean we can -- but
15 he didn't bring anything else besides Exhibit 8.
16    MR. IRVINE: All right.
17    Q. And so you also didn't bring anything that
18 fit the description in No. 2, did you?
19    A. No.
20    Q. And such documents do exist, don't they?
21    A. When this -- when the --
22    MR. MANUEL: I'm going to object to the form
23 of the question. But he's testified as to what the
24 training materials were and when they were developed,
25 and pursuant to that time limitation, you know, we

106

1 brought what we thought was relevant to what was in the
2 notice. And as far as any written materials, I think
3 he's testified as to written materials.
4    MR. IRVINE: So I guess I need him to answer.
5    MR. MANUEL: Okay.
6 BY MR. IRVINE:
7    Q. That these references, manuals or other
8 writings as listed in No. 2, they do exist, don't
9 they?
10    A. At the time this loan funded, no, they did
11 not.
12    Q. And they do exist now?
13    A. No, they do not.
14    Q. Okay.
15    A. Other than the fact that the loan
16 origination system is programmed to make sure that the
17 loan processors and dockers and funders make sure -- it
18 does the calculations for them, so there's not a whole
19 lot of school-type training. I will correct myself.
20 There is -- there has been an online school
21 corporate-developed course in Truth in Lending that's
22 available today that was not available when this loan
23 funded.
24    Q. And that's the thing that became available
25 in the second quarter of '05?

107

1    A. Yes, sir. I believe that's the time
2 frame, yes.
3    Q. All right. No. 3, you did bring with you
4 what you could find?
5    A. Yes.
6    Q. And No. 4, you didn't bring anything
7 related to No. 4, but I guess -- let me ask it this
8 way: Is there anything in -- that relates to the
9 request made of you by No. 4 that is different or in
10 addition to Exhibit No. 5?
11    A. No.
12    Q. To your knowledge, has Accredited ever
13 closed a loan using a settlement service provider
14 selected by the borrower?
15    A. Yes.
16    Q. Has that happened on many occasions or
17 only occasionally?
18    A. I -- it would not have happened in the
19 majority of cases, but I don't know how to define
20 "many." We've funded over a million loans since I've
21 been here, so I don't know what "many" is.
22    MR. IRVINE: Okay. Thank you very much.
23    THE WITNESS: Mm-hmm.
24    MR. MANUEL: Thanks, George.
25    MR. IRVINE: Yes, sir. I will call you. I

108

1 need to talk to you anyway -- tomorrow sometime.
2    MR. MANUEL: Let's go off the record first.
3    MR. IRVINE: I'm sorry. Off the record.
4    THE VIDEOGRAPHER: Stand by, please.
5    This concludes today's video deposition of
6 Robert B. Dooley on June 25, 2008. The total number of
7 recordings made was two.
8    We're now off the record at 12:10 p.m.
9    (Discussion held off the record.)
10    MR. MANUEL: George, is it fair to say that
11 in the conduct of this deposition, that we agreed to
12 the usual stipulations?
13    MR. IRVINE: This was my agreement.
14    - - -
15    (The deposition was concluded at 12:11 p.m.)
16
17
18
19
20
21
22
23
24
25

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

109

1
2      Declaration Under Penalty of Perjury
3
4
5      I, ROBERT B. DOOLEY, the witness herein,
6   declare under penalty of perjury that I have read the
7   foregoing in its entirety; and that the testimony
8   contained therein, as corrected by me, is a true and
9   accurate transcription of my testimony elicited at
10  said time and place.
11
12     Executed this _____ day of _____ 2008, at
13  _____, _____
14     (city)              (state)
15
16
17     _____
18     ROBERT B. DOOLEY
19
20
21
22
23
24
25

1      REPORTER'S CERTIFICATION
2
3      I, Debbie L. Bloom, Certified
4   Shorthand Reporter, in and for the State of
5   California, Certificate No. 7731, do hereby certify:
6
7      That the witness named in the foregoing
8   deposition was, before the commencement of the
9   deposition, duly administered an oath in accordance
10  with the Code of Civil Procedure Section 2094; that the
11  testimony and proceedings were reported
12  stenographically by me and later transcribed into
13  typewriting under my direction; that the foregoing is a
14  true record of the testimony and proceedings taken at
15  that time.
16
17     IN WITNESS WHEREOF, I have subscribed my name
18  this _____ day of _____, 2008.
19
20
21     _____
22     Debbie L. Bloom, CSR No. 7731
23
24
25

28  (Pages 109 to 110)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## A

ability 60:14
able 14:17 69:21
abstract 69:10
  69:14,21,25
  70:11 81:4,11
abstracter 69:13
acceptable
  94:15
access 66:13
  68:10 69:20
  74:1
account 76:2,13
  76:15,17
Accredited 1:7
  2:13,20 4:6 5:2
  5:24,25 6:7
  7:11,13,17
  8:12 9:7 10:25
  11:17 12:6,14
  12:19 13:20,24
  14:3,19,22
  15:4,5,17,23
  16:5,12,23
  18:3,5 20:19
  21:13,18 23:25
  24:1,4,16,19
  25:11 26:1
  27:13 29:21
  30:9 31:14
  32:25 34:10,17
  34:20 36:19,24
  37:21 38:3,20
  39:4,7,11,21
  40:20 43:1,8,8
  43:19 44:2,22
  45:3,9,13 46:4
  48:15 49:2,3,4
  49:14 50:5
  53:19,23 54:22
  55:10,18,20,23
  56:18 57:15,25
  57:25 58:6,12
  60:7,25 61:3

62:7,10 63:12
63:13,24 64:5
64:20 65:5
66:2,14,22,25
67:5,9,11,12
67:15,19,22,25
68:17,21 69:2
69:12,17 70:2
70:5,12 72:5,9
72:22 73:5,11
73:24 74:2
76:20 84:16
85:3 86:5
88:22 90:7,10
90:13,18 91:5
91:10 92:6,22
93:5,14,15,16
93:23 94:15,24
95:4,9 96:6,7
96:17,18,19,21
97:9,21 98:7
98:17 99:2,9
102:4 107:12
Accredited's
  38:11,24 41:16
  92:23 95:11,25
  102:3
Accredited/H...
  31:17
accuracy 29:21
  99:22 100:2,19
accurate 109:9
accurately 65:1
acquire 76:9
acquisition 36:1
action 1:6 4:8,25
  68:1
activities 25:18
  25:25
actual 73:13
  78:15
add 98:11
addition 107:10
address 10:23

20:14,16 30:17
  99:23
addresses 30:11
adhere 67:21
admin 93:20
administered
  110:9
Administration
  93:9
advance 98:22
Advanta 18:5,6
  18:8,10,11
  22:25
affectionately
  34:13
agent 2:20 10:22
  45:17 53:21
  55:2 61:1
  67:23 81:3
  93:4,6,14
  94:10 100:7
agents 46:11
  67:20 76:8
  91:6
ago 5:22 12:4
  13:9,11 19:21
  22:14 23:7
  25:2,24 33:4
  87:6
agree 54:10
  91:23
agreed 108:11
agreement
  91:10,22 92:6
  94:11 108:13
agreements 93:4
  93:6,14,18
ahead 92:4
AHL/Frazier
  28:14
Alabama 1:2
  3:16 4:10
  45:14 65:4
  67:16,20 72:22

83:21 84:10
87:17 88:23
89:1
alert 46:18 79:2
alleged 6:3
allowance 79:4
allows 102:9
Alma 25:23
amended 2:10
  2:11 8:3 104:4
amount 11:3,6
  45:4
analysis 87:25
answer 2:12
  6:17 30:22
  38:15,15 48:3
  62:2 86:16
  89:20 91:12,14
  93:10,21 94:9
  96:13,25 101:8
  101:22 106:4
anybody 62:6
  74:23 97:21
anyway 108:1
apparently 15:7
appear 8:12
  45:5,8 46:19
  81:14,19
APPEARAN...
  3:13
appeared 3:6
appearing 8:15
appears 73:9
  87:8
applicable 94:6
  100:5
application 2:20
  15:8 53:17
  91:21
applications
  91:6 93:18
appraisal 102:8
  102:11,12,14
appraisals 102:4

appraiser 102:2
  102:3
appreciate 7:2
approve 43:8
approved 18:9
  54:20 57:1,2
  58:12 93:4,5
  93:13
approves 57:25
  58:7 61:3
Arant 3:20 5:2
  101:15
archived 95:25
asked 23:10
  30:21 33:14
  72:4,4 75:19
  87:22
asking 8:19 10:5
  10:5,6 96:21
  96:23 98:13
asks 36:16
assigned 34:17
assist 21:3,8,9
  23:23
Assistance 75:16
assistant 16:20
assisted 21:6
Associate's
  19:24
association 20:2
  22:3
assumed 60:3
assuming 27:3
ATM 93:15
attach 8:7
  102:24
attached 102:24
attempt 76:9
attorney 23:23
  33:17
attorney-client
  96:9
audit 26:24
  74:20 84:13,13

# FREEDOM COURT REPORTING

86:2,17 99:10
99:13 100:8
**auditing** 85:15
**auditor** 84:12,17
86:6 100:15
**audits** 27:9
**Audrey** 101:9
101:19 102:3
**available** 49:2
49:24 106:22
106:22,24
**Avenue** 3:2 4:13
**average** 14:13
**aware** 32:23
**a.m** 3:2 4:2,11
71:19,24
103:21

**B**

**B** 1:13 2:2 3:7
4:5 5:7 71:23
108:6 109:5,18
**bachelor's** 20:7
**back** 11:23
13:11,15 15:12
16:2 27:11
33:11 36:7
43:7 56:23
57:25 61:4
63:17,17 67:17
71:14 72:23
75:4,6 85:11
86:5 89:25
96:2 103:17
105:7
**background**
16:5 19:19
**backing** 50:13
**ballpark** 40:9
**bank** 32:10
**banking** 20:2
22:3
**based** 37:11
38:1 39:16,18

45:10 54:12
57:22,23 59:13
60:17 101:1
**basic** 76:21
**basically** 45:10
59:23
**Bates** 28:13 29:1
42:10 45:12
53:10 62:20
63:8 70:21,22
71:6 99:19
101:10
**beginning** 60:10
**begins** 4:4 71:22
**behalf** 29:21
66:18
**believe** 10:11,21
11:6 14:6
25:15 31:12
34:19 48:21
64:14,15 80:15
86:20 92:5
101:3 107:1
**belong** 26:19
**best** 27:12 60:14
76:20
**better** 19:17
80:2
**big** 19:2 28:6
65:12
**bigger** 79:20
**bit** 6:16 10:13
18:20 23:9
50:13 68:16
**Bivin** 23:25
**black** 78:8,11,18
**blade** 73:23
**blank** 61:10
86:4
**block** 44:5,7,9
44:11,12,14,16
55:13 75:14
80:18
**blocks** 75:15

**Bloom** 1:23 3:5
5:5 110:3,22
**board** 31:18
**boarded** 19:3
**bona** 46:20 48:9
48:16 62:7
64:22 65:14,23
68:3,4,8 89:7
89:14 90:3
97:16 100:23
**books** 22:24
**borrower** 43:6
44:25 51:23
53:8,14,16,20
53:24 54:1,22
54:25 55:1,12
57:10,16 60:22
76:8,19 84:17
107:14
**borrower's**
10:21 99:22
**boss** 35:15,17
**bottom** 28:13,21
42:10 54:3
77:23 101:7,18
**bought** 25:13
**Bowest** 19:2
**box** 63:20
**Bradley** 3:20 5:2
101:15
**branch** 24:21
25:4,7,8,23
26:1,2,4 27:19
27:19,22 30:1
30:3 31:3 32:2
32:6 47:20,23
52:25,25 56:20
**branches** 21:3
24:24 50:12
**break** 6:22
70:18 71:3
**breaks** 35:12
**briefly** 13:18
**bring** 85:6 104:7

104:10,14
105:3,12,15,17
107:3,6
**broad** 100:22
**broken** 14:15
**broker** 93:9,20
**brought** 10:3,14
15:8,11 106:1
**Building** 3:3
**business** 4:7 9:6
13:20 14:3,4,5
18:14 46:3,21
51:8
**button** 59:23
78:11
**buttons** 78:10
**buying** 18:8
**Bye** 71:15

**C**

**calculate** 59:20
59:21 63:6
**calculates** 59:8
59:18 78:24
**calculation** 27:2
80:16 81:17
82:1,5,7 83:6
87:10 88:17
89:15,17 98:4
**calculations**
59:13,16 60:2
81:13 87:20
97:22,23
106:18
**California** 1:14
3:4,6 4:1,13
20:18 110:5
**call** 26:4 34:13
35:12 48:7
50:1,5 51:14
52:22 66:6
71:14 73:16,19
74:5,6,6,7
75:16 93:3

103:17 107:25
**called** 3:8 34:10
34:18 63:24
74:25 76:16
84:23 93:9
**capital** 16:20
**Capitol** 3:21
**capture** 58:4
**carrier** 67:12
94:15
**case** 5:15 6:3,9
7:11 32:25
44:17 68:14
87:17 97:2
**cases** 107:19
**catch** 98:17 99:9
100:6
**categories** 13:16
104:8
**caught** 98:24
**cause** 3:10 62:10
**certain** 22:25
43:4 80:6 85:2
99:24
**certificate** 1:25
16:10 22:1,2
22:10 23:6
110:5
**certificated** 16:8
**Certificate/Sti...**
2:25
**CERTIFICA...**
110:1
**Certified** 3:5
110:3
**certify** 110:5
**cetera** 81:12
**change** 60:23
61:4,5
**changed** 17:7
20:24
**charge** 59:7 70:1
70:6 87:23
88:3,9,14

# FREEDOM COURT REPORTING

113

89:17 90:2
97:12 102:7
charged 43:6
46:15 59:14,23
95:6
charges 11:4
44:24 46:10
48:15 54:12
57:24 64:25
66:13 68:11
89:7,14
charging 95:17
Chase 23:25
check 62:6,11
64:22 65:5,11
65:21 66:2,9
68:10,21 69:6
71:11 83:24
92:19 96:3
97:22 98:22
100:11,15,19
102:15
checked 30:20
65:23 98:23
99:1,21 100:1
checking 55:12
70:3
checklist 26:24
85:15 86:8
checklists 86:2,7
Cheryl 1:4 2:17
4:6,24
chief 19:12,12
chime 6:23
choice 12:16
41:3,19,24
44:1 82:2
90:10
Chula 20:17
Citizens 18:17
city 3:3 109:14
Civil 1:6 4:8
110:10
Clarence 31:22

31:23,24
classroom 21:22
23:1
classwork 101:1
clear 6:25 7:1,2
7:3,5 54:15
close 12:5 15:23
40:12 50:14,15
52:18 57:4
76:10 93:7
94:5 98:1,5
closed 10:24
11:16 12:11,14
12:19,25 14:10
14:13 25:1,4,8
25:24 30:3
41:16 43:18
47:9,12 54:24
75:11 85:16,16
86:4 90:7,10
90:19 95:5
107:13
closer 40:8
50:20 51:11
closers 67:24
95:12
closes 55:12
86:14 88:22
closing 2:20
10:22,22 11:5
13:5 14:19
24:16 37:7,16
38:9,12,21,21
39:7 40:14
43:7 45:11,14
45:15 46:10,16
50:17 51:13,19
51:22 52:4
53:7,21 55:2
56:2,19,19
57:14,15 58:19
58:24 61:1,7
64:21 65:6
66:8,17,23

67:1,4 69:19
72:10 76:5,8
81:3 86:5 91:5
93:4,6,14
94:10 95:18
98:10,21 99:6
closings 15:24
49:4 94:24
97:8
Code 48:10
110:10
codes 22:23
collect 44:24
college 19:14,16
19:20,24
column 83:13
come 15:12
17:18 27:11
43:25 44:12,15
44:20 62:16
64:15 74:16
comes 43:1
44:16 48:10
73:8,8
coming 21:17
commencement
110:8
commencing 3:1
commercial
34:16
commission
70:11
commitment
54:5 67:8,12
common 17:11
57:11,13
communicate
95:12
communication
58:23 95:2,3,8
95:16,22,23
communicatio...
19:13 96:6
community

19:24
comp 18:14
company 18:13
19:2,3,4 21:10
31:19 36:4
44:17
company's
47:17
compensated
70:10
Complaint 2:11
complete 55:24
58:24
completed 19:21
19:25 22:6
52:17 56:4,10
57:22,24 58:7
60:18,19,20,22
60:25 86:18
completely
56:13
completion
43:16
compliance
21:14,19 22:2
22:19 49:16
94:6 104:12
complicated
59:15
comply 85:5
104:16
computed 59:7
computer 60:1
computerized
82:7
concerns 9:12
9:21
concluded
108:15
concludes 71:17
108:5
conduct 108:11
confirm 96:3
confuse 7:10

confused 91:17
connection 5:23
6:14 8:15 11:4
32:24,24 37:16
38:21 43:6,17
46:16 49:15
61:24 66:23
67:1,4,9 72:6
72:10 81:8
85:22 88:2
94:23 97:8
102:5
consider 100:4
considers 85:3
consistently
45:14
constitute 54:5
consumer 21:19
104:13
consumer's
76:20
contact 30:14
44:17 50:16
contained 26:24
109:8
contemporane...
77:21
content 37:20
38:2 39:4,5
contest 6:24
context 95:17
contract 94:4
contracts 92:23
93:1
contractual
14:21 15:2,3,5
control 39:11
97:24
controlled 54:20
conversation
64:3
coordinate 76:7
copied 74:2
copies 86:3

# FREEDOM COURT REPORTING

114

copy 53:4,6,13
54:14,16 58:2
78:5 85:6
90:25
corner 28:13,22
42:10 77:23
corporate 6:6
47:14 51:1
corporate-dev...
106:21
correct 10:4,8
11:18 12:21
13:13 16:22
20:10 35:5,8
40:5 42:19
43:2,23 52:19
58:3 61:14
66:21 69:11
81:6,10,24
82:19 83:17
88:16,20 94:21
98:8,17,24
100:21 106:19
corrected 98:25
109:8
correction 17:13
48:6
corrections
17:19
correctly 65:7
correspondence
22:8 58:22
74:20
cost 45:5,8 78:12
78:14,19 88:25
costs 89:3
counsel 4:17
6:23 8:21
21:14 72:1
Counselor 42:4
counties 65:3
country 24:25
County 3:3
64:25 66:6

couple 12:4,25
13:2,9,10
33:13 102:23
course 20:13
22:4,8 48:21
49:19,22 64:3
87:19 94:23
105:2 106:21
courses 20:1
coursework
22:6,16 48:24
49:20,23
court 1:1 4:9,16
20:17 35:20
89:24
cover 91:20
coverage 94:14
created 43:1
58:17 73:6
74:12 77:25
creator 34:14
creditors 44:18
Crosby 3:15
4:24
CSR 1:23
110:22
curious 102:17
current 12:3
currently 16:6,9
24:4 35:24
curriculum
19:22 20:2
customary
55:10

_____

**D**

D 2:1
Dallas 25:15,15
Daphne 3:16
date 10:22 11:24
13:5
dates 13:20 14:2
date/time 77:24
dating 11:23

day 33:12
109:12 110:18
days 33:13
53:17 75:5
day-to-day
15:24
dba 7:12
Debbie 1:23 3:4
5:5 110:3,22
Declaration
109:2
declare 109:6
Deed/Mortgage
62:24
defaults 76:17
defendant 1:9
7:11,16
DEFENDANTS
3:19
Defendant's
2:16,18
Defenses 2:12
define 53:15
107:19
defined 22:16
81:12
defines 82:24
Definitely 14:6
definition 22:16
degree 19:24
20:6,7 39:10
deliver 67:5
delivered 53:7
67:9
dent 17:6,10,11
17:23 20:20
23:12
department
16:19 17:23
21:14 24:12,14
26:5,6,11,16
27:16 30:13
34:20,24 50:8
60:13 93:8

97:24
depend 51:17
depending
45:17 46:20
58:16 82:22,23
deposited 73:24
deposition 1:13
2:2,10 4:5,12
5:16 6:1,14
7:24 8:4,8,16
8:16,22 13:17
32:23 33:2,4,7
33:10,18,19,20
33:25 34:6,9
42:24 45:3
50:19 71:18,23
102:25 104:4
108:5,11,15
110:8,9
description
105:18
designated 8:12
desk 33:21
destined 16:21
16:23
detail 68:22
details 68:9
determine 64:24
68:1,5 97:15
developed 105:2
105:24
development
21:4 47:16
Diaz 25:20,23,24
32:24 33:20
34:8 42:24
Diaz's 34:5 45:3
50:19
Dickerson 32:15
86:21
Diego 1:14 3:3,4
4:1,13 24:22
25:3,4,7 26:8
36:5

different 6:16
17:4 22:22
27:9 37:8 55:1
65:3,10 83:2,2
83:7 87:20
104:8 107:9
diligence 18:8
Dillon 29:24
31:6 75:20
76:2
Dillon's 31:6
Direct 1:8 4:8
7:12,14 9:7
11:1 31:17
direction 110:13
disapproval
76:23
discharge 20:12
Disclosure 48:13
53:10 55:21,25
57:12 58:8,11
58:18 59:4
61:9 63:8
76:25 87:3
89:11 90:4
97:23 98:4
disclosures
57:13
discovery 97:2
discretion 50:19
discuss 105:14
discussed 8:20
52:8
Discussion
108:9
District 1:1,2
4:9,9
division 1:3 4:10
24:19 26:1
27:25
doc 21:2 50:7
52:4 60:12
87:9
docker 50:10

# FREEDOM COURT REPORTING

115

86:25
dockers 77:3
79:2 95:12
106:17
docker/funder
18:21
docking 21:5,9
docs 21:1 23:15
51:22 58:9
60:15
document 2:20
10:1,2 17:16
27:3,6 29:2,18
29:21 42:15,20
42:21,25 43:21
43:22 51:16
52:9,13 53:1,8
53:12,13 55:20
57:19 59:3,7
59:20 61:9
68:3 70:20
72:13,16,18
73:1,4,6,9
74:13 75:8,11
76:11 77:13,20
78:16 83:11
84:4,9,22
85:12,21 86:18
87:13,14,15
89:11,18 90:25
91:9 92:10
99:19
documentation
76:10 104:25
documenting
10:20
documents 2:15
9:1,3,4 26:17
26:18,21 27:3
28:17 32:19
33:19 34:2
50:11 51:18,19
52:5 56:15
57:4,7,9,9 58:4

58:14 61:18
64:21 72:4,21
72:23 74:15,19
75:1 77:6
83:18,25 84:16
85:2,16 86:5,7
90:21 92:12
98:20,21 99:11
101:25 104:8
104:19 105:4,7
105:20
doing 4:7 14:5
18:13 24:8,22
46:21 69:23
79:9
Dooley 1:13 2:2
3:7 4:5 5:7,13
71:23 72:3
104:2 108:6
109:5,18
draw 50:11 58:9
drawn 58:12,14
99:11
drew 60:15
61:18
Drive 3:16
due 18:8 24:9
duly 3:9 110:9
duties 23:22
26:15 76:4
duty 26:20
d/b/a 1:8

_____ E _____

E 2:1
earlier 33:15
55:24 75:19
104:2,17
East 3:21
easy 68:5
educational
19:18
Edwards 32:25
effect 50:2 65:18

65:19
effort 30:16,23
69:3
either 17:19
31:7 32:18
50:10 86:25
elaborate
102:16
electronic 73:2,5
73:17 97:1
104:12
elicited 109:9
emphasis 21:1
employed 16:11
21:18 30:7,8
31:9,11
employee 30:1
31:2 32:5
employees 30:12
30:14 31:14,17
49:14 62:11
68:21 73:25
employee-red...
25:18
Empower 34:16
34:17,18 59:8
59:17,19 60:8
60:17
endeavor 6:25
endorsement
88:16
Endorsements
64:6 88:15
endurance 6:24
engage 25:18
engaged 50:14
engages 50:14
enrolled 16:9
ensure 104:15
enter 59:22,23
60:7
entirety 103:13
109:7
entitled 80:15

error 99:9 100:6
ESQ 3:15,20
essentially 44:4
76:11
estate 19:25
20:3,4
estimate 52:24
53:5,6,16
54:12 55:11
61:17 63:11,15
63:25 64:7
80:19 81:20
estimated 56:11
et 81:11
evaluation 76:21
Everybody
73:25
exact 11:12
29:25 31:4,16
32:6 61:21,23
exactly 66:7
examination 2:4
5:10 69:10
70:9 88:6 99:7
examined 3:9
97:15
example 17:14
17:15 45:12
69:22
exceeded 79:3
execute 91:6
executed 29:20
56:9,14 94:4
109:12
execution 52:18
58:2
executive 76:3
76:14,15,17
exercised 39:11
Exhibit 7:23 8:7
8:8,9 10:10
13:15 28:3,6,7
28:8,12,12,15
28:18,19 29:1

29:3 36:9,11
42:7 52:10
53:2 57:8,9
59:1 71:6,6
72:20 90:25
91:2 99:13
101:4,10,12,21
104:3 105:13
105:15 107:10
exhibits 2:8 7:20
97:18 102:23
103:2
exist 105:20
106:8,12
existence 105:7
expects 66:22,25
experience
45:11 68:24
explain 17:20
33:16
extent 96:8
E&O 94:13
e-mail 58:3 95:9
95:13,23,24,25
96:6 97:3

_____ F _____

fact 29:12 32:23
44:4 53:12
54:21 69:24
90:19 91:24
106:15
factor 59:15
fair 7:5,6 11:14
37:13,15 38:11
82:6 88:22
89:6,13 93:22
94:22 97:5,11
97:14 108:10
Faith 52:24 53:4
53:6,16 55:11
63:11,14,25
64:7 80:19
81:19

# FREEDOM COURT REPORTING

familiar 13:23
14:25 15:15
31:24 37:22
38:5 39:10
40:19 41:6
42:20 67:15,19
far 9:15,20
106:2
farther 28:8
Fastrieve 73:21
74:1,3,12
fat 28:6
faxed 90:22
91:17
February 2:14
Federal 21:16
22:23,24 23:3
23:3 79:5
100:4,5 104:13
fee 45:9,15
46:19,20 58:19
61:21,23 62:7
62:11,24 63:3
63:14,21 64:1
64:8,22 65:12
65:14,15,21,22
65:22,25 66:1
66:4,7,9,12,15
68:8,15,21
69:3 80:10
81:3,10 82:8
88:5,11,18
90:2 98:8,14
99:7 100:7
102:8,11
fees 11:4,7 43:4
43:5,5,23,25
44:5,11,15
45:4 46:15
48:8 52:6,7,21
59:14,22 60:7
60:11,13,17
61:11,16,21
66:3 69:9

78:24 79:15,16
80:1,6,21,24
81:5,5,7,10,17
81:18,21,23
82:2,4,7 95:5
95:17 97:5,11
97:14,16 98:9
99:6,16,24,24
100:1,2,2,3,20
FHA 18:19
fide 46:20 48:9
48:16 62:7
64:23 65:14,23
68:3,5,8 89:7
89:14 90:3
97:16 100:23
Fidelity 34:19
figures 63:7
file 9:4 28:6
57:14 73:3,13
73:16 76:12
78:4 92:14
filed 6:9 67:21
files 26:18,24
75:3
filing 61:15
Filing/Recordi...
61:11
filled 56:13
final 53:8 58:9
59:4 60:14,15
61:9 76:25
87:10 89:10
98:21 99:11
finance 19:25
59:7 89:17
97:12
find 28:3,16
72:4,14 97:20
101:24 107:4
fine 13:7 33:22
37:9 42:5,5
finished 102:19
first 2:11,16 3:9

7:23 12:16
13:17 41:3,19
41:23 44:1
51:16 75:4
78:14 90:10
91:20 92:2
105:7 108:2
fit 105:18
five 22:14 26:14
71:2 103:6,7,9
103:11,16
Flip 58:25 72:23
follows 5:8
foregoing 109:7
110:7,13
form 15:8 38:14
43:7 44:22
53:9 54:4
55:11,15 58:13
62:1 76:18
87:3,6,9 89:19
91:9,11 94:8
94:14 105:22
formalized
21:19,21 22:17
22:20
format 53:7
104:12
former 30:11
forth 75:6
found 15:7
four 25:24 104:8
frame 107:2
frankly 23:13
fraud 6:3 102:15
Frazier 1:4 2:17
4:6,25 5:15 7:8
7:9 30:2 42:18
47:8 73:14
Freedom 4:16
frequency 14:12
front 7:21 28:3
47:2
fulfillment

20:25 23:15
function 31:4,6
62:8,12 65:9
functions 27:21
75:21,25
fund 25:14
funded 18:9
21:15 86:1
104:20,22
106:10,23
107:20
funder 50:11
87:1
funders 77:4
79:3 87:9
104:16 106:17
funding 21:1,2,5
21:10 23:15
27:8 50:7
60:12
funds 1:8 4:7
7:12,14,14 9:7
10:25 31:17
44:24
further 13:11
F-a-s-t-r-i-e-v-e
73:21
_____
G
general 38:5
68:8
generally 10:15
67:15
general-type
19:22
generated 73:3
George 3:15
4:23 5:14 7:25
9:9 107:24
108:10
Georgia 30:5
47:19
getting 8:21
33:6,10 47:10

51:12
Gisiger 35:19,22
give 14:17 17:14
46:7 76:22
82:2
given 27:13
go 13:18 17:20
19:14 26:23
28:17 36:7
51:2 52:3
56:23 59:19
63:2 70:23
83:11 90:24
92:4 96:2
97:19 102:22
103:12 108:2
goes 55:17 59:10
75:4
going 6:19 8:7
9:11,17 28:17
44:23 51:18
58:23 59:22
61:2,19 66:7
67:13 71:3,20
77:5 89:23
90:16 92:24
93:7 95:5 96:8
103:22 105:22
good 20:4 51:8
52:24 53:4,6
53:16 55:11
63:10,14,25
64:7 80:19
81:19 90:16
gotten 51:8
graduated 19:23
Granade 3:15
4:24
gri@sgclaw.c...
3:17
ground 6:15
42:24
group 24:19
growth 47:17

# FREEDOM COURT REPORTING

117

guarantee 18:18
guess 6:16 10:6
  22:15 25:18
  30:22 51:17
  66:19 72:20
  73:7,22 78:14
  106:4 107:7
guideline 46:13
guidelines 21:16
  22:24
G-i-s-i-g-e-r
  35:23

---

**H**

half 19:7
halfway 61:10
Hall 1:4 4:6,25
  7:7,9 26:25
  30:2 32:8 47:8
  61:16 62:14
  79:17
Hall's 47:12
  76:5 85:17
  88:3
handy 22:11
happen 43:14
  45:19,23,25
  46:1 86:9,10
  86:11
happened 25:20
  56:3 92:12
  107:16,18
happening
  45:18 46:5
happens 43:12
  43:13 56:21
hard 14:11 78:6
  79:15 89:23
Harper 32:13
Hays 11:16
  13:21 14:4
  53:25 54:2
  69:9 90:18,19
  95:4

head 6:19,19
  34:24
headed 2:20
  75:11
header 74:6
headquarters
  26:9
hear 9:22 64:3
  90:15 103:10
heck 70:24
hedge 25:14
held 108:9
help 21:4
helps 28:20
hiding 9:20
high 19:15 68:24
  78:12,14,19
  88:25
higher 45:16
  46:11
high-cost 23:3
  79:1,4 82:24
  83:2,9 87:24
  100:5
hired 35:4 69:24
hiring 69:13,23
hitting 59:23
hold 28:5,16
  29:6 70:21
  89:12 101:13
Home 1:7,8 2:13
  4:6,7 5:2 7:12
  7:12,14,14 9:7
  10:25
homeowners
  18:14
honorable 20:11
hour 3:2
hours 8:25
HUD 48:13 52:7
  55:23 56:1,4,9
  56:10,11,18,19
  57:16 58:16,16
  60:20 68:15

70:2 79:13
  80:25 97:7
  98:8,22 102:8
HUDs 46:18
  49:5
HUD-1 42:16
  43:7,16 50:6
  57:18,22,25
  58:2,5,7,13
  60:18,19,20,22
  60:25
Human 30:13

---

**I**

identically 53:18
identify 4:17
  42:15 59:3
  74:12 76:19
image 74:3
imaging 73:2,5
  92:13,15
important 85:4
impounds 77:18
include 31:19
  58:1 82:2,4,6
  82:16
included 57:3,6
  64:6 82:12,14
  87:24 88:7,13
  88:17,19,25
  89:4,8,15,16
  89:16 90:4
  97:12
including 65:25
  67:16
Incorporated
  4:7
incurred 11:4
independent
  69:13
INDEX 2:8
Indiana 19:21
indicate 10:23
  63:21 84:3

indicated 99:25
indicates 83:17
  83:25
individual 8:11
individually
  96:14
individuals
  30:18
induce 65:5
industry 17:12
  19:1
informal 22:21
information
  9:17 11:2,3,8
  12:3 13:16,24
  14:13 30:14
  34:12 37:23
  57:22,23 76:12
  76:22
initially 60:11
  76:18
input 78:25 80:2
inputting 60:17
inquire 45:3,9
  65:13 68:25
instance 12:16
  26:23 46:8
  68:2 93:13
  99:4
instructions
  37:21 38:2
  39:4,6 43:3,4
  52:2,16 61:7
  95:18
insurance 18:13
  18:14 66:20
  67:20,24 68:2
  68:4,11,14
  70:12 73:4,9
  74:5 88:12
insuring 18:18
intend 22:17
intent 38:24
interchangeable

50:12
interest 59:14
interject 9:10
internal 74:20
interrogatories
  2:16,18 29:22
interrogatory
  30:18 31:11
  32:17 86:22
  101:8,22
interview 76:19
introduced 5:13
introduction
  19:1
investigate 36:8
  40:23
investigated
  15:19 37:25
  39:15 41:11
  65:16
investigating
  37:2
investor 17:7,16
  17:20
investors 16:21
  16:24 26:19
involved 15:22
  15:24 49:4,20
involving 6:3
Inzura 41:19,24
Irvine 2:5 3:15
  4:20,23,23
  5:11,14 8:2,6
  8:10 9:22,25
  10:7 28:11
  29:8 38:19
  62:5 70:19,25
  71:2,5,9,13
  72:2 74:9
  89:23 90:5,24
  91:4,15 92:17
  94:12 96:11,16
  96:20,24 97:4
  101:12,14

# FREEDOM COURT REPORTING

118

102:19,21
103:4,8,11,16
104:1 105:16
106:4,6 107:22
107:25 108:3
108:13
**issue** 17:21
67:21
**issued** 22:3 72:6
94:14
**itemization** 56:1
**itemize** 53:9

### J

**J** 3:20
**Jackson** 3:21,22
**job** 16:4,6 19:11
60:7 76:11,14
76:18
**jog** 34:6
**John** 35:19,22
36:3
**John's** 36:4
**judgment** 14:18
**Jump** 63:17
**June** 1:15 2:3
3:1 4:1,12 14:6
14:7 16:16
71:18,23 108:6
**J-o-h-n** 35:22

### K

**keeps** 72:23
**Ken** 32:13
**Kevin** 4:15
**Kim** 30:25 31:9
75:19 76:1
**kind** 62:22
66:13 79:15
102:16
**knew** 7:7
**know** 12:2,7,8
12:13 14:9,20
15:22 17:9
25:22 30:9

31:16 32:7,16
33:11,14 34:14
34:25 35:6
39:16,18 40:10
40:22,24 41:10
41:12,14,17,18
41:21 43:13
44:14 45:15,18
46:9 47:13,18
47:22 51:7,21
52:6 55:2,4
56:25 57:6,11
57:13 58:20,21
59:10,18 60:3
60:19 61:15,19
61:20 62:13
64:5,9,10,13
64:17,24 67:12
68:17 69:12,15
69:17,19,22
70:5,9 72:20
72:22 73:23
75:2 77:2,7,15
78:9 79:11,16
79:21,22 81:15
82:25 83:1
87:5 88:24
89:23 90:17
91:13 93:12,21
94:3 95:2,3,7
95:14,15,23,25
97:21 98:3,15
99:5 100:16
102:10,22,24
103:12 105:25
107:19,21
**knowledge**
36:24 37:1,5
37:10,11 38:1
38:1 39:16,18
42:1 49:6,12
92:25 107:12
**known** 30:14,17
76:6

**knows** 69:17
**Kristopher**
29:24 31:6
75:20 76:2

### L

**L** 1:23 3:4 110:3
110:22
**label** 42:10 68:4
81:10 88:5,11
**labeled** 88:15
**labeling** 28:14
**lack** 80:2
**lady** 86:20
102:10
**laid** 30:15 31:12
31:13
**language** 54:6
54:11
**large** 75:14
**launch** 49:19
**launched** 48:21
**law** 104:13
**laws** 21:20 94:6
104:16
**lawsuit** 12:17
61:20
**lawyer** 96:22
**lawyer's** 6:11
**leaves** 92:2
**left** 55:5 80:22
**left-hand** 77:23
**legal** 21:14 24:1
24:12,14
**lender** 52:7,21
54:19,19 57:18
58:4 62:8,12
69:7,7 100:2,3
**Lenders** 1:7
2:13 4:7 5:3
7:12 12:16
41:3,19,23
44:1 90:10
**lender's** 43:3,3

52:2,15
**lending** 21:20
48:10,13 53:10
57:12 104:13
105:2 106:21
**letter** 2:14 67:8
67:12 101:15
**letterhead**
101:16
**let's** 10:13 12:8
16:14 41:13
42:5 50:4
70:25 71:2
77:5 99:6
108:2
**license** 20:3
**limitation** 105:6
105:25
**line** 15:12 45:12
62:23 63:2
64:6 68:15
69:9 78:8,11
81:5,22 87:23
88:3,10,15,19
**lines** 78:18
79:13 97:6
**list** 10:20 44:24
50:24 51:1,6,7
54:20
**listed** 11:11,15
11:20 12:9,10
12:20,24 13:16
30:18 43:4,23
44:5,11 69:9
70:1 80:25
86:22 97:6
98:8 101:8,18
101:21 106:8
**litigation** 23:23
**little** 6:15 10:13
17:3 18:20
23:9 50:13
55:5 68:16
78:10,18 91:17

**LLC** 32:25
93:14
**LLP** 3:20
**load** 81:17
**loaded** 80:1,10
81:7,18,23
**loan** 9:4 10:21
10:24 11:3,5,6
12:8,22,24
13:9,11 15:24
17:12,15 18:9
18:19 19:2
20:25 21:5
23:15 24:21,24
26:2,18 27:7,8
27:15,16,18,21
27:22,22,24
28:6 30:2 31:3
31:4,7 32:8,19
32:21 34:2,2
34:12 43:6
45:11 47:8,12
50:14,15,16,20
50:20 51:11,12
52:17 53:17
54:5,23 55:11
56:20 57:4,14
58:1,23 59:8
59:14 61:16,24
62:14,19 63:5
64:21 67:4
70:15 72:7,11
73:13,16 74:1
75:11 76:2,4,5
76:6,7,7,10,16
76:19 77:9,15
78:4,25 79:16
82:20 83:22
84:10,25 85:1
85:16,17,22
86:1,14 87:25
88:3,21 89:1
90:7,9 94:5,23
95:11 98:10

# FREEDOM COURT REPORTING

99:24 100:14
104:20,22
106:10,15,17
106:22 107:13
**loans** 9:13,18,19
10:20 11:11,15
11:16,20 12:5
12:10,10,14,19
14:10,13,18
15:17,23 16:21
16:23 18:7,8,9
18:19 19:3,4
21:15 24:16,17
24:22,23 36:18
37:16 38:9,12
38:22 39:7,21
40:3,14,19
41:16 43:17
45:14 46:18
49:4,21 62:4
73:24 90:19
93:7 95:4 97:8
98:1,5 102:5
107:20
**located** 26:7,8
32:18 73:23
**LOIS** 34:10,13
34:17 35:9,13
35:14 63:6
78:3 80:10
81:16,18,23
82:16 84:19
99:3,21
**Lonestar** 25:14
**long** 8:24 16:11
17:2 18:22
19:6 23:18
33:4 45:5,7
**longer** 30:7,8
73:15
**look** 14:11 28:12
28:21 29:12
42:7,13 53:1
54:3 62:18,20

64:21 66:15
70:12,16 72:13
74:4 77:11,16
80:12 84:17
85:9,11 89:10
97:19 101:4,25
**looked** 14:23
68:24
**looking** 10:11
13:8 36:13
55:24 61:8
62:13 72:21
77:17 78:15,16
87:6 90:21
94:4 96:22
99:17
**looks** 42:16
65:12 74:11
78:9,11 91:20
91:21 93:22
**lost** 77:20 97:18
**lot** 7:9 21:9
22:22 24:8,10
28:17 47:15
106:19
**loud** 6:17

_____

### M

**mainframe**
73:22
**maintain** 35:14
94:13
**maintained**
30:11
**maintenance**
17:13
**majority** 107:19
**making** 24:17
**managed** 93:8
**manager** 17:6,8
17:10,24 20:20
21:1 23:12,15
**mandatory**
93:19

**manner** 37:20
39:3,5,12
**manual** 46:13
97:22 98:3
**manuals** 104:11
104:18 106:7
**Manuel** 3:20 5:1
5:1 7:24 9:9,24
10:4 28:10
29:4 38:14
62:1 70:18
71:1,4,8,11,15
74:8 89:19
91:1,11 92:9
94:8 96:8,14
96:19,23,25
101:10 103:1,7
103:9,15,19
105:10,22
106:5 107:24
108:2,10
**March** 77:24
**Marietta** 30:1,3
30:5 32:1,6
47:18
**mark** 8:6 83:24
90:24
**marked** 2:9 8:7
8:9 66:16 91:2
103:3
**market** 102:13
**markets** 16:20
**married** 7:8
**match** 53:18
92:21
**material** 49:23
**materials** 65:21
105:24 106:2,3
**matter** 4:6 10:7
66:15 68:23
94:22
**mean** 9:20 35:2
38:17 47:4,18
49:6 51:1 56:9

56:9 58:17
63:24 64:13
74:18 77:20
85:19 98:10
99:2 100:10,12
101:10 105:14
**meaning** 21:21
50:10
**meant** 96:21
**memory** 32:9
34:6
**mentioned**
41:24 105:13
**merged** 31:18
**met** 33:17
**Middle** 1:2 4:9
**Mike** 32:4
**million** 94:16,19
94:20 107:20
**mind** 6:2 103:5
**mine** 78:6 90:24
94:16
**minimized**
78:10
**minute** 33:11
36:8 41:14
70:24 87:6
**minutes** 103:6,7
103:9,11,17
**miscellaneous**
63:3,14,21,25
64:7
**mischaracterize**
43:2
**missing** 17:16
71:12
**Mississippi** 3:22
**mistake** 99:5
**Mm-hmm** 78:7
92:1 99:3
107:23
**moment** 24:9
**Montgomery**
4:15

**month** 12:1,2
14:6,14,19
**months** 5:22
12:4 13:1,3,9
13:10 23:19
**mortgage** 2:15
17:12 18:5,18
19:1 20:2 22:3
23:1 46:2
57:11 72:9
94:5 104:13
**move** 23:20
**moved** 23:14
**mystery** 58:24

_____

### N

**N** 2:1
**name** 4:15 5:1
5:14 6:4,11
10:21 23:25
31:3,25 34:16
34:17,25 35:7
75:7 77:5 87:8
99:23 101:7,18
110:17
**named** 19:2
110:7
**names** 9:11,16
32:16,18
**National** 18:17
34:19
**nationwide** 21:3
**nature** 6:1 20:3
23:4 38:2
40:17,25 61:20
68:12 74:21
85:3
**naval** 19:13
**Navy** 19:9,11,14
19:23 20:8,9
20:12
**Neal** 32:11
**necessarily**
74:24

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

necessary 17:19
58:15
need 6:20,22
9:17 51:23
65:11,12 103:4
103:13 106:4
108:1
needed 17:13
19:5 51:24
needs 76:21
negotiable 55:3
never 81:19
new 19:4 24:9
25:11,17 27:13
35:4,6
night 16:9
nine 5:22 16:13
20:1 23:19
75:4
nodding 6:19
normally 45:16
45:24 46:11
78:4 91:5,7
100:4
nos 6:20
note 57:11
notes 90:16
97:19
notice 2:10 7:24
8:3,13,16,17
36:7,9,9,16
103:12 104:4
105:11 106:2
notify 51:12
notifying 61:6
number 9:13,18
10:21 11:12
13:16 14:13,18
19:20 20:1
31:16 39:20,21
43:21,23 64:10
65:5 67:16
70:21 79:17
80:21 98:15

99:8 108:6
numbered 28:24
numbers 30:11
42:10

_____

## O

oath 110:9
object 38:14
62:1 89:19
91:11 94:8
96:8 105:10,22
objections 96:12
obtain 30:17
37:1,4 69:13
69:25 92:23
93:5,20
obviously 6:18
6:22 20:11
92:20
occasion 35:9
41:24
occasionally
107:17
occasions
107:16
occurred 56:2
64:2 95:22
offhand 89:5
office 10:24,25
37:7 41:23
53:7 56:19,20
57:15 58:24
65:1,7 66:8,17
68:18 86:6,6
officer 76:17
offices 69:20
93:19
official 100:8
oh 10:5 18:23
70:24 78:19
94:19 98:11
101:13
okay 7:19,22
9:24 10:13,18

13:4 15:14
18:24 19:11
22:21 23:5
24:7 27:1,11
28:20,25 29:6
29:16 30:22
32:13 33:14
35:6 36:20
37:9 39:3
40:13 41:18
42:8,14 45:7
47:24 48:2,5,7
49:9 50:18
51:20 52:11,14
53:3,19 54:14
54:18,21 59:2
59:25 62:6
63:19 65:8
66:2 67:25
70:21 71:4,11
71:15 72:13,17
72:19,25 74:4
74:14 75:8,10
77:8,12 78:5
78:13 80:10,12
80:14 82:14
83:10,12,20
85:6,10,18
86:9,12 87:21
89:12,12 90:23
91:1 93:12
97:5 99:4,12
100:17 101:6
101:13,17,20
102:20 103:15
106:5,14
107:22
old 35:3 75:5
Once 61:3
ones 93:10
ongoing 60:9
online 48:12
106:20
opened 79:21

opinion 14:18
orally 52:21
order 71:7
organization
26:1 27:14
organized 10:19
24:5
original 72:21
originally 12:2
76:18
originate 76:18
originated 15:17
30:1 36:18
39:21 74:2
originating 38:9
38:12
origination
24:21,24 26:2
27:18,22 32:19
32:21 34:12
52:25 56:20
59:9 62:19
63:5 77:9,15
106:16
ought 28:7 39:5
93:13
outline 85:2
out-loud 6:20
out-processing
30:10
owners 25:17
ownership 24:9
25:11 27:13

_____

## P

package 52:4,17
53:8 58:1
packet 57:3,7
padded 66:16
69:3
padding 70:6
page 2:4,24,25
13:17 28:22,25
29:15,18 42:11

42:13,16 43:22
43:22 55:23,24
59:1 63:18
72:23 85:9,11
85:13 86:21,21
87:7 89:11
91:20,20,21,22
91:24 92:2,7,9
93:25 94:1,2,2
104:7
pages 28:19 71:6
91:17 92:20
paid 70:1
paper 75:3,3
84:22 86:3
92:14 99:12
104:12
paperless 73:11
paralegal 16:6,8
16:17 20:23
23:11,20,22
part 27:18 30:9
34:25 35:2
48:23 65:9
69:7 78:3
81:12 82:24
88:10,18 89:4
particular 45:9
46:18 50:9
51:11,24 53:9
54:11,19 55:13
65:22 78:25
79:4 82:23
84:13 97:2
particularized
42:1
particulars 83:3
parties 102:5
parts 87:14
party 69:25 70:1
102:13
paying 44:18
payoff 44:18
penalty 109:2,6

# FREEDOM COURT REPORTING

121

pending 24:10
people 26:10,15
    31:10 32:1
    46:17 48:11,15
    49:2,3,3,20
    64:20 65:5
    76:8 85:1 86:3
perform 37:6
    39:22
performed
    15:16 18:7
    36:17 37:10
    39:12 40:18
    41:1
performs 41:15
period 11:15,19
    46:1
perjury 109:2,6
person 13:23
    14:25 15:15
    29:20 35:4
    36:17,23 37:22
    39:9,10 40:19
    41:6 45:11
    50:4,5 60:6
    76:24 87:2
    101:21,23
personal 5:24
    20:14,16 51:6
personally 3:6
person's 35:6
pet 34:17
phone 30:11
    52:8,22 57:23
Photocopy 2:10
    2:11,12,14,15
    2:16,18,20
physical 73:13
physically 26:7
    26:8
pick 50:22
picked 64:5
picks 91:24
piece 80:3,8

99:12
pieces 86:3
place 3:21 4:13
    29:6 39:12
    62:10 64:20
    65:4 68:20
    81:16 98:7,16
    99:9 109:10
plaintiff 1:5 2:9
    2:17 3:8,14
    4:24 6:12
Plaintiffs 91:2
plaintiff's 2:18
    6:4 8:9 103:2
please 4:17,22
    5:19 19:19
    20:15 28:3
    42:7 43:2
    58:25 70:17
    71:16 101:5
    103:20 108:4
plowed 42:24
plus 62:21
point 26:22
    53:19,23 54:22
    84:13 86:17
    99:21
policies 18:15
    47:7,16,21
    67:17,21
policy 18:12
    46:14,17,22,23
    46:24 47:4,4
    47:11,14,14,24
    48:7,14,18
    49:1,11 62:9
    64:19 65:4,6
    65:10,11,17,19
    66:15,22,25
    67:5 68:20
    70:2,12 72:6
    92:23 100:17
    100:25 101:2
pools 18:9

populate 63:7
pop-up 78:9
position 16:18
    23:14 32:6
positions 20:25
positive 25:16
    75:7
possibly 14:9
    87:1,4
post-closing
    16:19 17:1,2,5
    17:23 25:25
    26:5,6,11,16
    27:4 86:17
practically 74:1
preapproval
    76:22
premium 66:20
    68:2,6,11
premiums 67:24
prepare 55:21
    76:25 87:2
prepared 27:4,7
    33:6,25 56:3,5
    56:19 57:15,20
    67:8 85:21,24
    86:13 87:5
prepares 57:21
    63:10
preparing 98:21
present 83:19
    84:1,4,10
presented 17:15
pretty 68:5
prevention
    102:15
previously 53:14
price 46:19
    100:24
primarily 26:17
primary 26:19
print 59:18
    62:18 77:14,18
    78:2,2 79:8,12

79:13,19 83:6
printed 58:11
    77:16,21 79:21
prior 19:8,9
    27:7 36:1
    58:14 65:18
    98:20
privacy 9:12,16
    9:21
privilege 96:9
probably 6:15
    12:1 16:3
    22:14 23:7
    31:12 57:8
    64:2 76:16
    77:17 78:5
    93:10 103:13
problem 103:1
procedurally
    43:14 87:10
procedure 30:10
    43:16 47:14,15
    56:12 80:11
    91:7 110:10
procedures 21:4
    21:7,9,10
    33:20
proceed 7:4 72:1
proceedings
    110:11,14
process 15:24
    20:4 38:6,7,7,8
    38:8,12,13,20
    38:25,25 39:17
    39:19 49:14
    59:19,21 60:9
    62:9 64:19
    69:7 73:3,6
    80:9 86:18
    99:10,14
    100:22
processing
    18:12 27:7,15
    27:16,22,25

85:1
processor 18:20
    50:16,20 60:10
    76:7,7
processors
    58:23 67:23
    79:2 85:1
    95:12 104:16
    106:17
produce 9:17
    10:3
produced 26:25
    54:16
product 76:19
    96:10
Production 2:19
program 34:9
    104:18
programmed
    79:2 82:18
    104:15 106:16
programmers
    35:13
prompt 45:8
    84:19
proper 95:16
property 102:14
Propounded
    2:16
protection 21:20
provided 37:12
    37:16,17 40:13
    41:2 49:2
    52:16,17,21
provider 43:19
    46:16 54:11,13
    54:19 55:13
    90:12 94:25
    97:8 107:13
providers 12:14
    12:20 37:12,18
    38:4 39:6 41:3
    41:7,15,19,20
    41:25 42:2

# FREEDOM COURT REPORTING

92:24 93:2,7
93:16
provider's 58:18
provides 57:24
100:18
public 69:20
purpose 53:9
purposes 63:24
pursuant 8:12
105:25
put 32:16 52:6
63:25 74:19
80:5
puts 43:5
p.m 103:24
108:8,15

**Q**

qualification
100:9
Quality 97:24
quarter 48:1,4
48:22 105:1,8
106:25
question 7:4
10:8 19:18
33:14 42:3
43:15 45:13
47:11 49:8,10
51:24 60:4
68:6 79:24
82:15 83:11,23
86:12 89:21
91:14 93:11
96:13 105:11
105:23
questioning
15:13 46:15
questions 6:21
7:1
quick 72:24 75:9
101:5,25
Quinoa 20:16,17
quit 102:21

quite 19:20 20:1
Q-u-i-n-o-a
20:17

**R**

radioman 19:12
19:13
rate 59:14
rates 67:21
read 22:22,24
33:2,4,5,6,12
33:13,16,20,25
54:14 78:6
79:15 83:17
89:24 90:1
109:6
ready 8:21
33:10 47:10
51:12 52:18
56:14
real 19:24 20:3,4
72:24 75:9
101:4,24
reality 68:16
really 27:12
43:15 53:15
64:11 68:24
74:22
reason 24:7
74:25 79:20
91:16 98:16
reasonable 45:5
45:8 46:19
48:9,16 65:24
68:8 90:3 92:5
92:8 100:23
recall 6:10 11:9
13:5 31:8 32:6
34:7 46:4
85:20 88:24
89:2
receive 26:17
received 98:22
receives 44:22

Recess 71:21
103:23
recognizing
100:23
recollection
75:23 86:23
record 4:11 9:10
9:23 71:20,25
90:1 103:22,25
105:14 108:2,3
108:8,9 110:14
recorded 72:10
Recorder 64:25
66:6
recording 61:16
62:6,11,24
63:3,14,21
64:1,8,22
65:15,25 66:4
66:12 71:17
88:18
recordings
108:7
records 69:20
redact 9:11
redacted 9:16
refer 84:14
reference 84:15
references
104:11 106:7
referred 47:8
referring 7:9,16
27:10
refinance 26:23
85:16 86:2
reflects 99:13
refresh 75:23
86:23
Reg 59:16
regard 39:3 45:4
95:5
regarding 39:11
104:12
regulating

104:13
regulations
22:23 94:7
regulatory
21:13 22:2,19
49:15
rejected 17:18
relate 15:17
36:18
related 37:21
40:18 73:9
97:2 107:7
relates 46:14
107:8
relationship
14:22 15:2,3,6
90:17
relevant 106:1
rely 64:25 65:6
66:17 67:22
68:17
remaining 31:18
remember 6:4
6:11 11:12,22
12:23 23:12
29:25 30:20,21
31:3,5,22
34:11 40:11
42:9 65:18
75:21
reopened 25:3,5
reorganization
24:9 35:1,3
36:2
replow 42:23
reported 1:23
110:11
reporter 3:5 5:4
35:20 89:24
90:1 110:4
REPORTER'S
110:1
Reporting 4:16
represent 4:18

4:24 5:2,15
representation
80:1
representative
6:6
representing
4:15
request 2:19
104:6 107:9
requested 12:3
13:24
require 54:1,19
54:25 68:20
88:24 89:3
95:19
required 49:21
54:12 55:14
57:10,16 68:10
69:5 83:18,25
requirement
48:8 67:3,16
67:19 84:12
93:20
requirements
85:2,5
requires 72:5,9
94:5,13
requiring 53:20
53:23 54:22
research 13:19
resource 48:12
Resources 30:13
RESPA 21:20
95:17
respect 6:17
11:3 13:19
31:6 32:7
61:22 76:5
87:24 88:10
90:6 95:16
response 2:16
2:18 30:18
32:17 86:22
responses 6:20

# FREEDOM COURT REPORTING

123

29:22
restate 89:21
retail 10:25
  24:23 76:15
retained 75:6
retired 19:12,23
  20:11
review 9:1,3
  10:18 17:18
  46:17 48:8,14
  49:5 50:2 86:7
  102:2,3,4,8,11
  102:15,16
reviewed 10:2,9
  10:15 18:7
  33:9 56:22
  62:3 83:19
  84:1,5
reviewing 16:20
  49:21 64:20
  70:10 100:14
reviews 50:5
  102:12
right 6:24 8:19
  12:14,22 13:15
  14:8,11 15:7
  15:10 16:2,3,7
  17:22 18:10
  20:5 21:11
  23:8 24:11
  25:1 26:10
  28:7,23 29:9
  30:16,25 31:5
  32:11,21 34:8
  35:17,24 39:7
  40:1,17 41:13
  43:10,12 44:2
  44:5,12,25
  48:23 49:18,23
  51:10,15 54:4
  55:4,18,25
  56:15 57:18
  58:6 59:6,17
  60:6,16 61:8,8

61:12 63:10,17
  65:21 69:24
  71:13,15 73:7
  75:15,18 76:13
  78:10 79:8,25
  80:8 81:1
  83:13,19,22
  84:1,7 85:19
  87:12 89:5
  91:3,18 93:3
  94:20 99:22
  102:17 103:19
  104:23 105:16
  107:3
right-hand
  28:13,21 42:10
  83:13
Rita 32:15 86:21
Robert 1:13 2:2
  3:7 4:5 5:7
  71:23 108:6
  109:5,18
role 32:7
ROSE 3:20
Rule 2:10 8:3
rules 6:15
run 58:7

―――― S ――――
sales 17:7
San 1:14 3:3,4
  4:1,13 24:22
  25:3,4,7 26:8
  36:5
satisfied 10:8
saw 29:6 65:2
  78:5
saying 57:21
says 40:17 49:3
  54:11,20 61:1
  63:3 65:11,21
  66:8 75:15
  76:1 78:11
  79:15,16 80:19

83:14 94:11,16
  102:14
schedule 50:17
school 16:9
  19:15 106:20
school-type
  106:19
Science 3:2 4:13
scratch 17:6,9
  17:11,23 20:20
  23:12
screen 59:18
  77:14,18 78:2
  78:2,9 79:8,11
  79:13,19,20
  80:7 83:6
screens 62:18
search 69:10,14
  69:22,25 81:4
  96:5
searched 13:10
searches 96:15
searching 13:3
second 2:18
  13:17 48:1,4
  48:22 91:21,24
  104:7 105:1
  106:25
seconds 103:7,9
section 27:2,5,5
  73:4 75:4 79:6
  79:9 80:15
  81:8,12,13
  82:1,5,7 87:6
  87:10,16,24
  88:8 89:15
  110:10
see 6:18 7:23
  14:12 16:14
  17:22 21:11
  24:11 25:25
  28:15 36:21
  54:6,18 55:4
  61:10 62:7,23

63:20 66:16
  69:3 71:12
  75:17 77:23
  78:8,18 79:14
  87:18,21 104:6
  104:9 105:6
seeing 89:2
seeking 96:9
seen 8:17 29:9
  45:19,23,25
  46:1,10 93:17
  104:3
select 51:10
selected 94:24
  107:14
selling 70:11
send 26:18
  51:22,22 55:11
  56:14,18
sending 98:20
sends 43:1,7
  52:24 58:1
  61:3
sent 51:19 53:14
  53:16 56:20
  57:14,15
separate 27:24
  47:20,22
separately 26:2
September
  11:23 31:13
sequential 71:9
served 20:8
server 73:23
service 12:13,20
  37:12,18 38:3
  39:6,22 41:3
  41:19 42:4
  43:18 46:15
  51:9 54:11
  55:13 58:18
  65:12 90:12
  92:24 93:1,6
  93:15 94:25

97:7 100:7
  107:13
services 15:16
  15:16 19:25
  36:17,18 37:7
  37:10,12,15,17
  37:22 39:13
  40:13,18 41:1
  41:2,8,15
  53:20,24 54:23
  70:10 93:9,20
servicing 19:3,5
  55:1
set 2:16,18 47:20
  97:7
settlement 12:13
  37:7,12,18
  38:3 39:6
  40:18 41:1,2,3
  41:18,23 42:17
  43:17,18 44:25
  46:15 58:18
  65:1,11 67:22
  68:18 86:6
  90:12 92:24
  93:1,6,15,18
  94:25 97:7
  100:7 107:13
settlement-rel...
  39:22
shaking 6:19
sheet 11:15,20
  12:9,10,20,23
  12:24 13:8
  80:12 83:6
  99:25 100:11
sheets 74:21
Shorthand 3:5
  110:4
show 21:25 52:9
  79:23
shown 68:2
  80:24 88:3,9
  88:15,18

# FREEDOM COURT REPORTING

shows 99:16
102:7
shuffling 90:15
sign 51:23 53:8
57:10,16 90:16
signature 2:24
29:13,17 91:22
94:2
signed 86:4,20
94:2
signs 60:23
simply 47:15
51:14 59:22
Simpson 32:4
sir 5:19 10:17
11:10 15:9
20:15 21:23
23:16,21 24:13
24:15 26:13
28:4 30:4 33:1
36:12,14 42:7
47:1 51:3 54:2
54:8 55:8 56:6
56:16 59:1
62:8,12,21
63:1,4 66:1
67:6 69:5
70:17 71:1,8
73:18 78:17,21
79:18 84:24
85:14 88:7
89:22 90:20
91:3 94:11,17
94:20 95:7,20
97:3 100:14
104:21 105:5
107:1,25
sites 102:15
sitting 21:21
situation 70:3
70:13
six 17:3,3 20:21
20:24 22:14
23:11

skip 15:10,11
small 55:7
smaller 75:14
software 34:9,9
34:18 35:10
60:8,17 82:1
82:16 84:19
somebody 77:16
77:17 79:9,20
79:23 81:25
somewhat 13:11
sorry 10:14 14:3
18:23 24:17
38:16 43:22
44:1 48:4
53:22 54:16
65:18 66:24
67:17 68:13
92:4 94:19
108:3
sort 14:12,17
21:18 22:7
30:10 42:23
46:13 65:20
74:11 79:25
83:5 96:5
100:9 104:18
105:6
sorts 99:23
sounds 71:5
Southern 1:3
4:10
space 81:2,3
speaks 105:11
special 84:16
specialist 76:2,4
76:6
specific 23:2
79:1 87:16,17
specifically
48:12 95:3,24
specifics 42:6
46:7
spell 35:20

spend 8:20
spreadsheet 9:6
9:10,15 10:14
13:14 39:25
40:4 105:13
square 55:5
staff 24:1
stamp 77:24
Stand 71:16
103:20 108:4
standard 43:16
standardized
38:13,18,25
55:15
standup 23:1
start 16:15,17
16:18 17:22
started 7:20
14:5 16:3,19
17:1 20:19
75:5
starting 4:18,20
state 3:4,6 4:18
19:21 21:15
22:22 46:20
65:3 79:1,4
82:23,23 83:8
84:14,23,25
87:17 88:24
89:2 100:4,5
102:9 109:14
110:4
statement 42:17
43:17 46:14
53:10 59:5
61:9 63:8
89:11
statements
44:19
states 1:1 4:9
9:19 19:9 65:4
67:16,20 82:25
83:2,7
state-specific

83:9,15,18,25
84:4,10
Status 75:12
statutes 22:23
stay 17:2
stayed 23:10
stenographica...
110:12
Stevenson 30:25
31:9 75:20
76:1,24
stipulations
108:12
Stone 3:15,16
4:23
stop 80:5
storage 73:17
Street 3:21
strike 12:9
structured
10:19
stuff 73:7,8
96:22
subscribed
110:17
suffice 10:1
suggest 17:12
86:16
suit 76:20
Suite 3:21
sum 62:17 63:6
summary 27:2
80:16,19 84:23
84:25 87:11
summary-type
84:14
supervisor
18:12,12 35:16
Supplement
83:14
support 17:7
supposed 61:5
sure 21:14 22:11
27:9,12 28:5

29:17 35:18
38:17 48:9,15
57:20 64:22
65:23 72:5
85:4 87:23
92:19 96:16
99:16 106:16
106:17
Swafford 9:8,14
9:19 10:23
11:16 12:5,11
12:25 13:21
14:2,4,19,22
15:4,6,16,23
36:18 37:6,11
37:16,21 39:4
39:11,12,22
40:14,18 41:1
41:7,14,23
43:3,5,18,25
44:12,17,20,23
44:23 50:13,14
50:16 51:10,12
51:16,18 52:1
52:1,6,16,17
52:21 53:21,24
54:2,23 55:1
56:14,23,25
57:4,20,21
61:22 62:4
63:16,23,24
64:14,16 67:3
69:9,12,15,24
70:6,9 90:7,18
90:19 92:7
93:23 94:5,5
94:13 95:4,13
95:16 96:7
99:5
Swafford's 98:9
swear 5:5
sworn 3:9 5:8
system 13:3 19:4
32:19,22 34:13

# FREEDOM COURT REPORTING

125

| | | | | |
|---|---|---|---|---|
| 58:5 59:9 | **team** 35:13,13 | 107:24 | 100:4 | **top** 78:20 |
| 62:19 63:5 | **technicians** | **thing** 28:6 55:16 | **time** 6:22 8:21 | **total** 108:6 |
| 73:17,20 74:3 | 35:14 | 83:14 106:24 | 11:15,19 13:12 | **track** 23:9 |
| 77:10,15,19 | **telephone** 4:19 | **things** 20:3 23:3 | 21:2,13 30:14 | **trailing** 26:17,18 |
| 78:1,25 80:2 | 4:20 5:14 6:16 | 28:24 66:18 | 38:21 39:1,12 | **trained** 16:7 |
| 81:8 82:18 | 57:2 | 67:23 68:18 | 43:12 46:1 | 67:24 68:9 |
| 85:1 92:13,15 | **tell** 6:18 7:2 | 74:21 75:5 | 47:11,12,17 | **training** 21:3,19 |
| 98:7,16,23 | 11:19 14:2 | 85:3 99:23 | 56:5 59:15 | 22:17,18 23:1 |
| 99:2,2,9 100:6 | 16:14 19:18 | **think** 9:14,15 | 60:16 61:1,18 | 47:16 48:12,13 |
| 104:15 106:16 | 20:14 22:19 | 11:10 23:8,9 | 61:23 71:18,24 | 49:16 65:20 |
| **systems** 21:5 | 24:4 25:10 | 25:2 28:2 45:2 | 85:25 99:18 | 104:18,18,19 |
| 78:24 | 26:15 34:5 | 50:18 52:12 | 102:1 103:20 | 104:24 105:1 |
| | 45:22 59:12 | 54:18 65:16 | 103:24 105:25 | 105:24 106:19 |
| **T** | 61:17 62:20 | 68:23 72:4 | 106:10 107:1 | **transactions** 9:6 |
| **tab** 73:4 74:8,10 | 70:25 73:19 | 75:19,20 86:12 | 109:10 110:15 | **transcribed** |
| 74:11,15,17 | 75:25 78:3,23 | 87:8,22 92:5 | **times** 5:19 7:12 | 110:12 |
| 75:4 78:19 | 84:15 91:16 | 92:11 96:12,17 | 7:13,14 | **transcription** |
| **table** 7:21 28:2 | 93:17 97:19 | 97:18 102:19 | **title** 16:4,6 17:7 | 109:9 |
| **tabs** 75:3 | 101:24 104:17 | 103:4,13,17 | 20:25 29:25 | **transferred** |
| **take** 6:22 49:21 | **tells** 55:12 84:25 | 104:3 106:2 | 34:19 44:16 | 92:14 |
| 67:25 69:2 | **ten** 20:1 36:4 | **thinking** 40:10 | 50:9 66:19,22 | **transmittal** |
| 70:18 71:2 | **tend** 84:3 | **third** 69:25 70:1 | 66:25 67:17,17 | 74:17,19 75:1 |
| 75:8 79:23 | **ten-minute** 71:3 | 102:5,12 | 67:20 68:1,4 | 75:3 |
| 99:18 102:1 | **term** 17:11 | **third-party** 41:7 | 68:10,14 69:10 | **transmitted** |
| 103:5 | **terminated** 35:3 | 41:14,20,25 | 69:10,14,21,25 | 74:22,23 75:6 |
| **taken** 1:14 5:16 | **terms** 99:24 | 42:2 69:23 | 70:8,10,11 | **transposed** 99:8 |
| 110:14 | **test** 78:24 79:6,9 | 70:6 | 72:6 81:4,11 | **transposition** |
| **talk** 9:12,13,18 | 81:9 82:24 | **thought** 13:13 | 88:6,12,16 | 98:15 |
| 9:22 10:13 | 83:9 88:8 | 61:19 86:15 | 99:6,7 100:20 | **treat** 89:3 |
| 26:22 36:17 | **testified** 3:10 5:8 | 92:8 98:12 | **titles** 17:4 | **trick** 83:10 |
| 41:13 42:5 | 34:8 104:2 | 106:1 | **title-type** 99:16 | **trigger** 45:13 |
| 108:1 | 105:12,23 | **thousand** 11:13 | 99:24 | **true** 54:21 61:6 |
| **talked** 9:14 | 106:3 | 11:16 40:3 | **today** 5:4 8:16 | 66:19 69:8 |
| 33:18,18,19 | **testimony** 49:13 | 94:18 | 8:17,22 9:18 | 70:8 88:2,9,14 |
| 42:9 81:11,21 | 52:15,20 65:19 | **three** 19:22 20:6 | 10:3 26:12,20 | 88:21,23,25 |
| 102:23 | 109:7,9 110:11 | 25:2,8,24 | 33:17,18 34:1 | 90:6,9 109:8 |
| **talking** 27:6 | 110:14 | 53:17 | 46:23,25 47:3 | 110:14 |
| 38:8 42:4 48:2 | **testing** 23:3 79:1 | **Thursday** 77:24 | 85:7 104:7,10 | **Truth** 21:20 |
| 63:8 82:8 86:1 | 79:4,5 100:5 | **TILA** 50:2 | 105:12 106:22 | 48:10,13 53:9 |
| 95:21,24 | **testings** 83:3 | 55:21,25 56:3 | **today's** 71:18,23 | 57:12 105:2 |
| **taught** 48:11 | **Texas** 83:13 | 56:5 58:8,11 | 108:5 | 106:21 |
| 49:7,14,15 | **Thank** 5:12 | 58:15,17 76:25 | **told** 6:15 20:5 | **Truth-In-Len...** |
| 101:1 | 28:20 107:22 | 87:3 95:17 | 23:13 34:3 | 59:4 61:9 63:7 |
| **teacher** 21:22 | **Thanks** 103:19 | 97:22,22 98:4 | **tomorrow** 108:1 | 89:10 90:4 |

# FREEDOM COURT REPORTING

try 66:15 73:12
trying 13:7
  27:12 34:6
  65:18 97:19
Turn 74:13
turned 61:21,23
Turning 13:15
two 8:25 18:4,23
  27:8 63:6
  75:14 91:17
  108:7
two-page 87:13
two-part 87:15
type 17:13 42:21
types 27:9 47:16
  66:13 74:20
typewriting
  110:13
typical 37:11
  38:2
typically 93:5
  97:7,12,15
T-I-L-A 50:3

——— U ———
uncommon
  41:22
underneath
  75:15 80:18
understand 7:16
  13:8 17:17,21
  27:12 57:21
  60:11,24 61:20
  68:19 69:6
  83:23
understanding
  7:4 20:4 42:25
  45:2 84:18
understands
  44:23
understood 7:5
  7:18 50:18
underwrite
  76:10

underwriter
  31:24
underwriting
  18:20
unit 68:11
United 1:1 4:8
  19:9
University 19:21
unreasonable
  65:15
unusual 95:11
unwritten 46:22
update 58:15
updated 44:18
uploaded 92:13
  92:15
use 35:9 38:20
  41:7,20,25
  54:1,11,25
  55:2,13 63:14
  92:24 95:9
uses 41:14 55:20
usual 55:10
  108:12
usually 45:17
utilize 53:20,24
  54:23 93:7

——— V ———
VA 18:19
vague 42:3
value 102:13
variations 82:22
various 2:15
  57:12
vendor 34:18
  69:23
verbal 95:22
verify 29:21
  60:13 66:7
  76:11 100:19
  102:13
verifying 66:12
Verria 32:11

versus 4:6 32:25
video 71:17,20
  71:25 103:22
  103:25 108:5
VIDEOGRAP...
  4:4,22 5:4
  71:16,22
  103:20,24
  108:4
Videotape 4:4
  71:22
VIDEOTAPED
  1:13
view 68:7
violate 9:21
virtually 94:23
Vista 20:17
visual 80:1
vs 1:6

——— W ———
W 31:22
wait 29:5 33:11
  70:24
want 9:21 13:17
  31:19 42:23
  50:22 60:23
  62:20 70:18
  85:4 86:15
  87:12 105:14
wanted 55:2
  77:16 79:22
  84:16,16
wasn't 27:24
  49:8 64:3
way 14:16 32:22
  39:1 42:25
  52:12 58:4
  60:12 66:11
  70:16 80:1,6
  82:5,6,16,18
  96:2 107:8
Wednesday 1:15
  3:1 4:1,12

weeks 25:2,8,24
Wells 31:22,23
  31:24
went 10:11 13:2
  19:20,23 20:8
  39:20 92:16
weren't 16:22
  49:7
we'll 27:11
  71:11
we're 4:11 9:11
  9:17,20 10:10
  24:8,22 38:8
  42:6 44:18
  63:8 71:12,20
  86:1 94:4
  103:22 108:8
we've 9:10 14:9
  24:8 71:3
  98:22 107:20
WHEREOF
  110:17
WHITE 3:20
wholesale 10:24
  24:22
Williams 101:9
  101:19 102:3
witness 2:24 3:8
  5:5 8:1 29:5
  38:17 62:3
  89:21 90:2
  91:3,13 92:11
  94:10 97:1
  101:13 102:20
  107:23 109:5
  110:7,17
wmanuel@br...
  3:23
wondering
  101:23
word 60:20 80:2
words 50:2 54:4
  78:15
work 5:23,25

18:3,18 24:14
  26:10 96:10
worked 18:4
  19:1 21:2,12
  25:24 31:2
workers 18:14
working 16:20
works 38:25
wouldn't 6:2
  37:8 64:24
  70:5,12 83:3
  93:23
writing 21:4,6
  48:18
writings 104:11
  106:8
written 46:14,22
  46:23,24 47:4
  47:5,7,11,14
  47:17,19,24
  48:14 49:1,10
  65:17,19
  100:17 101:2
  106:2,3
wrong 16:22
  83:18 87:14
  92:16 98:9,14
  98:16
wrote 21:8

——— X ———
X 2:1 55:5

——— Y ———
yeah 28:16 29:2
  31:23 32:5
  34:4,7 38:17
  42:16 48:6
  55:7,9 59:4,21
  60:5 62:22
  66:5 75:2
  82:13 87:15
  92:8,18,20,22
  94:2 99:19,20
  99:21 100:3

# FREEDOM COURT REPORTING

127

102:2
**year** 19:7 23:19
**years** 16:13 17:3
17:3 18:4,13
18:23 19:10,21
19:22 20:6,9
20:21,24 22:14
23:7,11 36:4
46:2 75:4
**yeses** 6:20
**yesterday** 33:5
**y'all** 6:23 8:6
15:7 54:16
90:21 91:17
103:17

**Z**

**Z** 59:16

**$**

**$1** 94:16
**$1,000** 45:13
94:14
**$170** 61:13
**$200** 45:17
68:15 70:2
87:23 88:9
**$250** 88:4 99:7
102:11
**$300** 45:17
**$50** 63:5,13,21
63:25 64:6,12
69:3 88:14
**$520** 99:8
**$72** 70:1
**$800** 65:15

**0**

**0001** 28:14
**0026** 42:13
**026** 45:12
**05** 105:1,8
106:25
**05031729** 79:17
**07** 31:13

**1**

**1** 2:10 3:3 4:5
7:23 8:7,8,9
10:10 13:15,20
13:24 30:19
31:11 36:9,9
36:11 71:9,17
86:22 101:8,22
104:3
**1,040** 40:11
**1/2** 18:13
**1:08-cv-11-M...**
1:7 4:8
**10:49** 71:19
**1000** 44:9
**1008** 79:14
**103** 2:11,12,14
2:15,16,18
**109** 2:24
**11** 29:15,18
**11:02** 71:24
**11:57** 103:21
**110** 2:25
**1100** 44:11
**1101** 45:12
82:12,13
**1102** 69:9 81:4
81:22 82:9,14
82:16 87:23
97:6
**1103** 69:9 81:4
81:22 82:9,17
88:3,6 97:6
**1108** 68:15
81:22 82:9,17
88:10,11 97:6
**1111** 64:6 81:22
88:15 97:6
**12** 23:7
**12:03** 103:24
**12:10** 108:8
**12:11** 108:15
**120** 62:21,25
64:21 65:2

**1200** 44:12
63:20
**1201** 62:24
82:11 88:19
97:6
**1202** 81:4
**1204** 63:2
**1300** 44:14,16
**1400** 40:10,11
40:15
**15** 2:14 40:12
**15253** 3:2 4:13
**163** 28:19 29:1
71:10
**17** 46:2
**170** 62:14 63:7
**188** 3:21
**1999** 16:16

**2**

**2** 2:11 14:21
18:13 42:16
71:22 93:25
103:2 105:18
106:8
**2,000** 40:6
**2003** 14:6,6 48:1
**2004** 11:23
**2005** 47:23 48:4
48:18 77:25
96:2
**2007** 13:6 14:9
**2008** 1:15 2:3,14
3:1 4:1,12
14:10 16:15
71:18,24 108:6
109:12 110:18
**2094** 110:10
**21** 19:9 20:9
**24** 21:2 77:24
**25** 1:15 2:3 3:1
4:1,12 71:18
71:23 108:6
**251** 3:17

**26** 43:21,22
55:24 63:18

**3**

**3** 2:12 36:16,16
92:3 107:3
**30** 83:2
**30(b)(6)** 2:10 8:4
**31** 53:11 59:1
61:10 63:8
89:11,18
**32** 27:2,5,5 53:1
54:7 62:20
68:3 79:6,9
80:15 81:8,12
81:13 82:1,5,7
87:6,10,16,24
88:8 89:15
**329** 20:16
**34** 52:9
**3500** 31:21
**35626** 3:16
**39** 52:13 70:21
70:23
**39215** 3:22

**4**

**4** 2:14 31:17
37:20 101:4,10
101:11,12
107:6,7,9
**4,000** 31:21
**40** 52:13
**433-7172** 3:17
**450** 3:21

**5**

**5** 2:5,15 28:6,8
28:12,12,15,18
28:19 29:1
39:9 42:7
52:10 53:2
57:8,9 59:1
71:6 72:20
99:13 107:10

**50** 62:21
**500** 31:17

**6**

**6** 2:16 28:3,7
29:3,7,9 39:20
91:25 101:21
**601** 3:22

**7**

**7** 2:18 29:5
40:17 103:2
**7133** 3:16
**73** 72:23
**74** 75:9
**7731** 1:25 110:5
110:22
**78** 70:20,22
72:13 77:11
78:16
**79** 70:20,22
72:16 80:13
87:7,13

**8**

**8** 2:10,20 41:7
90:25 91:2
105:13,15
**80** 70:20,22,23
70:23 72:18
87:13
**800** 44:5
**828** 79:14
**83** 74:13
**84** 99:19,19
**86** 85:9,11,13,14
**87** 83:11,11
85:14 86:21

**9**

**9:14** 3:2 4:2
**9:15** 4:11
**900** 44:7
**91** 2:20
**92128** 4:14

# FREEDOM COURT REPORTING

**948-8000** 3:22

VIDEOTAPED DEPOSITION OF GREGORY A. SWAFFORD

May 19, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
-------------------------------------
CHERYL H. FRAZIER,                    )
                                      )
          Plaintiff,                  )
                                      ) Case No.
vs.                                   ) 2:07mc3379-MHT
                                      )
ACCREDITED HOME LENDERS, INC., d/b/a  )
HOME FUNDS DIRECT,                    )
                                      )
          Defendant.                  )
-------------------------------------
```

APPEARANCES:

          FOR THE PLAINTIFF:

          EARL P. UNDERWOOD, JR., ESQ.
          (VIA TELEPHONE)
          21 South Section Street
          Fairhope, Alabama 36532


          FOR THE DEFENDANT:

          J. DOUGLAS MINOR, ESQ.
          BRADLEY ARANT ROSE & WHITE LLP
          188 East Capital Street, Suite 450
          Jackson, Mississippi 39215-1789

ALSO PRESENT:

          Ernie Tracy, Videographer

EXHIBIT
5

2 (Pages 2 to 5)

## Page 2

INDEX

Examinations                          Page

GREGORY A. STAFFORD

EXAMINATION BY MR. MINOR:                4
EXAMINATION BY MR. UNDERWOOD:           80
CONTINUED EXAMINATION BY MR. MINOR:    119
CONTINUED EXAMINATION BY MR. UNDERWOOD: 121

EXHIBITS

No.       Description            Page

Exhibit 1 - folders labeled Exhibits 1-36    4
containing documents bearing Bates
production numbers Frazier v AHL Swafford
0001-84.
Exhibit 2 - documents bearing Bates         97
production numbers Swafford0001-183.
Exhibit 3 - document entitled Amendment No.  97
2 Transnation Title Insurance Company Title
Insurance Premium Charges Revised October
28, 2002.
Exhibit 4 - document entitled Re-Notice of  117
Taking Rule 30(b)(6) Deposition.

## Page 3

S T I P U L A T I O N

The deposition of GREG SWAFFORD, called as a witness at the instance of the Defendant, taken pursuant to all rules applicable to the Federal Rules of Civil Procedure by notice on the 19th day of May, 2008, at the law office of Hunton & Williams, 900 South Gay Street, Suite 2000, Knoxville, Tennessee, before Thomas J. Dorsey, Registered Professional Reporter and Notary Public, pursuant to stipulation of counsel.

It being agreed that Thomas J. Dorsey, Registered Professional Reporter and Notary Public, may report the deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections except as to the form of the questions are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, et cetera, including the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

## Page 4

THE VIDEOGRAPHER: Okay. We're on the record. You may swear the witness.

GREGORY A. STAFFORD, having first been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. MINOR:

(Exhibit 1 - folders labeled Exhibits 1-36 containing documents bearing Bates production numbers Frazier v AHL Swafford 0001-84.)

Q.    Mr. Swafford, my name is Doug Minor, and I am counsel for Accredited Home Lenders, Inc. in a lawsuit that's been filed against it by Cheryl Hall Frazier. Present on the speakerphone is Mr. Earl Underwood who represents Ms. Frazier. Also in the action, Mr. Underwood has requested that he be designated as the attorney for a class of individuals who would be represented by Ms. Frazier in an action that's been filed in the Middle District of Alabama.

First let me begin by saying -- by asking you to give me your full name.

A.    Gregory Alan Swafford.

Q.    And, Mr. Swafford, it's correct that you are not represented here by any attorney; is that correct?

A.    That is correct.

## Page 5

Q.    Okay. Have you been deposed before?

A.    I have.

Q.    Okay. How many times have you been deposed?

A.    Around four, I don't know the exact number.

Q.    Okay.

A.    Probably about four.

Q.    Have you been deposed recently?

A.    I have.

Q.    Okay. So you're familiar with the protocol?

A.    I am.

Q.    Okay. Well, as you know, I'm going to ask you a series of questions, Mr. Underwood will likely ask you a series of questions. The questions are going to go to the claims and defenses in the Frazier lawsuit. You understand that you're not a defendant in the lawsuit?

A.    I do.

Q.    The questions will be designed to get information that you know about our lawsuit, but none of them are designed in any way to place any sort of blame on you with respect to this particular lawsuit.

A.    Okay.

Page 6

1  Q.  Because Swafford and Hays acted as the
2  settlement agent, you obviously have some information
3  about the transaction that underlies this lawsuit, and
4  that's what we're trying to get some information about
5  here today.
6  A.  Okay.
7  Q.  I have looked back through the documents
8  that Swafford and Hays has produced. I'm going to ask
9  you about some of those documents, not all of them. If
10  I ask you an unclear question, please let me know, I'll
11  do my best to clarify it. If I ask you a question that
12  assumes something that is inaccurate, please let me
13  know that there is an inaccurate premise in my
14  question.
15  A.  Okay.
16  Q.  If you think of anything after we move on
17  from a particular subject that you want to incorporate
18  in a previous answer or add to it, change it, this is
19  very informal, just let me know, and when we finish
20  that particular line of questioning that we're on, we
21  can go back to that particular issue.
22       If you need to take a break, I don't
23  anticipate going all day long, so feel free to take a
24  break to stretch your legs or to use the bathroom or
25  anything of that nature.

Page 7

1       Do you have any questions about the
2  process here today?
3  A.  No.
4  Q.  Okay. Tell me, have you done anything to
5  prepare for this deposition?
6  A.  I glanced over the file.
7  Q.  Okay. Did you meet with any attorneys?
8  And I'm not asking you about what you said, but did you
9  meet with any attorneys in preparation for this
10  deposition?
11  A.  No.
12  Q.  Does the Baker Donelson firm serve as
13  counsel for you with respect to your service here
14  today?
15  A.  Not at this time.
16  Q.  Okay. Tell me what your address is.
17  A.  9530 Hickory Knoll Lane, Knoxville,
18  Tennessee 37931.
19  Q.  And how long have you lived there?
20  A.  Four and a half years.
21  Q.  Are you married?
22  A.  I am.
23  Q.  What's your wife's name?
24  A.  Shelly Swafford.
25  Q.  And do you have any children?

Page 8

1  A.  I do.
2  Q.  And how many children do you have?
3  A.  Four.
4  Q.  Okay. How long have you been married?
5  A.  15 years in June.
6  Q.  Okay. What's your birth date?
7  A.  3/31/72.
8  Q.  Okay. Now, where were you born?
9  A.  In Maryland, Prince George County.
10  Q.  Did you go to grade school in Maryland?
11  A.  I did not. I moved to Tennessee when I
12  was four.
13  Q.  To Knoxville?
14  A.  Yeah. Well, Oak Ridge.
15  Q.  Oak Ridge; okay. Is that where you did
16  your grade schooling?
17  A.  Yes.
18  Q.  Did you graduate from high school there?
19  A.  Yes.
20  Q.  And what year was that?
21  A.  1990.
22  Q.  You said Oak Ridge?
23  A.  Uh-huh.
24  Q.  Is that a suburb of Knoxville?
25  A.  It is not.

Page 9

1  Q.  How far from here is that?
2  A.  Probably about 20 minutes.
3  Q.  Okay. Do you have any college?
4  A.  I do.
5  Q.  Where did you go?
6  A.  University of Tennessee.
7  Q.  And what years were you there?
8  A.  Well, from '90 through -- I think I
9  graduated in '96.
10  Q.  Okay. What was your major?
11  A.  Majored in economics and minored in
12  accounting.
13  Q.  And did you continue your schooling or go
14  to work in '96?
15  A.  I worked through college and continued
16  after.
17  Q.  Okay. Where were you working?
18  A.  In '96?
19  Q.  Yes.
20  A.  At Oak Ridge Associated Universities.
21  Q.  What's that?
22  A.  It's a government contractor.
23  Q.  What kind of business did it do?
24  A.  Various things. But I was in their
25  accounting department.

Page 10

```
 1      Q.    Okay.  Just kind of give me generally
 2   what their business model was.
 3      A.    Well, they're a government contractor for
 4   the Department of Energy.  They did stipends which they
 5   did research for labs, they did research overseas,
 6   things of that nature.
 7      Q.    Okay.  And what was your title there?
 8      A.    I was in the pay master's office.  We did
 9   auditing of payrolls, the stipend payrolls, all
10   accounts payable, accounts receivable.
11      Q.    Okay.  So was it your charge to make sure
12   that the disbursements from Oak Ridge were consistent
13   with all the federal guidelines that apply to federal
14   contractors?
15      A.    Correct.
16      Q.    Did you work at Oak Ridge Associated
17   while you were in college?
18      A.    I did.
19      Q.    Okay.  Do you know when you started
20   working with them?
21      A.    When I was 17 as a stipend -- as a co-op
22   student.
23      Q.    Okay.  So you pretty much worked for them
24   from '90 through '96?
25      A.    It was about eight years, yeah.
```

Page 11

```
 1      Q.    Did your title change there?
 2      A.    It did.
 3      Q.    To what?
 4      A.    I don't remember all the titles.  I was
 5   assistant pay master when I left.
 6      Q.    Okay.  And what year did you leave?
 7      A.    I think it would either have been later
 8   in '96 or '97.
 9      Q.    Okay.  Did you receive any on-the-job
10   training at Oak Ridge Associated outside of your
11   schooling, formal training?
12      A.    Formal training?  Nothing that would have
13   any type of certificate or degree or anything.
14      Q.    No classes outside of the workday or
15   anything?
16      A.    No.
17      Q.    And what did you do after you left
18   Oak Ridge Associated?
19      A.    I went to work for Ameriquest Mortgage.
20      Q.    Where?
21      A.    In Knoxville.
22      Q.    And what did you do there?
23      A.    I started as a loan officer.
24      Q.    And what were your job duties there?
25      A.    As a loan officer, I was to telemarket or
```

Page 12

```
 1   bring in applications.
 2      Q.    Primarily over the phone?
 3      A.    Yes.
 4      Q.    How did you find that job?
 5      A.    Through the business day at UT where the
 6   different companies come in and interview graduates.
 7      Q.    Had you worked in any capacity in the
 8   mortgage or lending industry prior to going to work at
 9   Ameriquest?
10      A.    No, I had not.
11      Q.    How long did you stay at Ameriquest?
12      A.    About four or five years, I believe.
13      Q.    Did your title change there?
14      A.    It did.
15      Q.    To?
16      A.    I went from loan officer to account
17   executive.  From account executive to branch manager.
18   And from branch manager to area manager.
19      Q.    As branch manager, you were in charge of
20   a particular branch of Ameriquest?
21      A.    Yes.
22      Q.    And where was that branch?
23      A.    It was on North Peters in Knoxville.
24      Q.    And you had loan officers under you?
25      A.    I did.
```

Page 13

```
 1      Q.    How many?
 2      A.    Typically eight, and two processors.
 3      Q.    How long would you have worked as a loan
 4   officer before you became the branch manager?
 5      A.    I'd say a year or so.
 6      Q.    Okay.
 7      A.    I might be incorrect on that.  That's an
 8   estimate.
 9      Q.    Okay.  And you received promotion of
10   branch manager?
11      A.    I did.
12      Q.    And going from branch manager to area
13   manager was a promotion as well?
14      A.    Correct.
15      Q.    And do you know what year you became area
16   manager?
17      A.    I do not.
18      Q.    As area manager, you had multiple
19   branches under you?
20      A.    I did.
21      Q.    How many?
22      A.    Five.
23      Q.    And what geographical area was covered by
24   those branches?
25      A.    Knoxville, two in Nashville, and two in
```

Page 14

```
 1   Louisville, Kentucky.
 2       Q.    Okay.  How long did you serve as the area
 3   manager?
 4       A.    I would say less than a year.
 5       Q.    Okay.  Why did you quit?
 6       A.    I didn't quit, they closed down several
 7   branches in several states, and Tennessee and Kentucky
 8   were two of the states they stopped doing business in.
 9       Q.    I'm sorry, I may have already asked you
10   this.  What year was this that you stopped serving as
11   area manager?
12       A.    It would have been in early 2000 or late
13   '99.  But I think it was early 2000.
14       Q.    Okay.  Did you have any ownership
15   interest in Ameriquest when you were there?
16       A.    I did not.
17       Q.    Did you have any ownership interest in
18   Oak Ridge Associated while you were there?
19       A.    I did not.
20       Q.    Had you started any businesses prior to
21   leaving Ameriquest?
22       A.    No.
23       Q.    Did you own any business as an LLC or
24   sole proprietorship prior to that time?
25       A.    No.
```

Page 15

```
 1       Q.    Tell me what you did after you left
 2   Ameriquest Mortgage.
 3       A.    I worked for a title company called Title
 4   Specialists out of Alabama for a short period of time,
 5   or Title Services, excuse me.
 6       Q.    What city in Alabama?
 7       A.    Birmingham.
 8       Q.    Did you move to Birmingham?
 9       A.    No, I actually worked in Knoxville.
10       Q.    And what did you do for Title Services?
11       A.    I was hired as their operations manager
12   to try to clean up improper processes that were in
13   place, try to get it back in line.
14       Q.    Did you do that?
15       A.    I was not able to, no.
16       Q.    And why is that?
17       A.    They were so far behind on bank
18   reconciliations and things were in such disarray, there
19   was no possible way to clean it up.
20       Q.    Okay.  When did you leave there?
21       A.    In either November or December of --
22   probably November -- no, excuse me, I'm sorry.
23   Somewhere in the late 2000.
24       Q.    Okay.  And where did you go?
25       A.    That's when I started Swafford
```

Page 16

```
 1   Settlement -- or Swafford and Hays Settlement Services.
 2       Q.    And tell me how you made the decision to
 3   start Swafford and Hays?
 4       A.    Well, basically I met my partner, which
 5   was Gary Hays, he also, he was a marketer at Title
 6   Services.  And I guess I was -- he mentioned it to me
 7   and I liked the idea, and so I went with it.
 8       Q.    He mentioned to you that he thought that
 9   there was a need for a settlement agency in this area?
10       A.    Right.  He thought that we could do a
11   good job with starting our own.
12       Q.    Had he worked at a settlement agent or
13   worked as a settlement agent at any time prior to
14   starting a business?
15       A.    I don't believe he had ever been a
16   settlement agent, but he had worked in the title
17   business for a while as a marketer.
18       Q.    Okay.  Were you familiar with the title
19   business and the settlement agent business prior to
20   starting Swafford and Hays?
21       A.    Just through my knowledge of it as being
22   in the mortgage business.
23       Q.    Okay.  What was the -- well, let me first
24   make sure we're clear on our terminology.  When I say
25   "settlement agent," are you kind of viewing that as
```

Page 17

```
 1   part and parcel of title agent?
 2       A.    I am.
 3       Q.    Okay.  Who served as the settlement agent
 4   or title agent for Ameriquest when you were the branch
 5   manager and loan -- and area manager there?
 6       A.    We used different title companies in
 7   Knoxville.
 8       Q.    Okay.  Do you remember the names of any
 9   of them?
10       A.    I think Title Enterprises was one of the
11   primary ones.
12       Q.    Did you have a familiarity with their
13   operations in your capacity as branch manager and area
14   manager?
15       A.    I did, because we closed our own loans
16   and processed our own loans once we got the title work.
17       Q.    I'm sorry, say that again?
18       A.    Well, meaning that I understood -- I had
19   that knowledge from the capacity that we did not ask
20   them to be a full service title company.  Once they
21   produced the title commitment, we cleaned up any
22   outstanding liens on the title commitment, got payoffs
23   from them, closed the actual loan closing, funded the
24   loan, et cetera.
25       Q.    Okay.  So what you're saying is you
```

Page 18

1  actually or Ameriquest under your supervision actually
2  did some of the duties traditionally performed by a
3  settlement agent?
4  A.  Yes.
5  Q.  What was the breakdown in ownership
6  between Mr. Hays and you?
7  A.  I believe at the time we were 30 percent
8  and 30 percent.
9  Q.  And who owned the other 40?
10  A.  James Swafford owned 20 percent, and
11  there were two individuals that I cannot even recall
12  their name, it was relatives of Gary's that owned 10
13  percent and 10 percent.
14  Q.  And what's James Swafford's relationship
15  to you?
16  A.  It's my father.
17  Q.  Okay.  Did Mr. Hays' relatives or James
18  Swafford have any connection to the business other than
19  funding it?
20  A.  No.
21  Q.  Do you remember what the total amount of
22  money that was put forward to fund Swafford and Hays
23  was?
24  A.  It's -- I think it was 40,000.
25  Q.  Okay.  And it was funded by the

Page 19

1  individuals you just mentioned based on the percentages
2  you just gave me?
3  A.  Correct.
4  Q.  What did you do when you funded it?  Tell
5  me what you purchased, where you were located, what
6  employees if any you hired.
7  A.  We started out with Gary as the marketer
8  and myself and another employee that we hired an
9  operations manager or branch manager.  So there was
10  just the three of us in the beginning.  And we worked
11  off of South Peters.  We rented the space.  We
12  purchased computers, printers, things of that nature,
13  and some office furniture and rented some office
14  furniture.
15  Q.  What did you do to advertise your new
16  business?
17  A.  Strictly marketing, word of mouth through
18  Gary.
19  Q.  And was he marketing to lenders?
20  A.  He was.  Well, either lenders or brokers
21  that funded their own loans, so they were lenders or
22  brokers who referred loans out to lenders.
23  Q.  Okay.  Did you do any -- I guess you
24  didn't do any business with Ameriquest because they
25  were no longer here?

Page 20

1  A.  Correct.  At that time.
2  Q.  Leading up until the formation of
3  Swafford and Hays, had you taken any classes, received
4  any certifications?  I'm just talking about from the
5  moment you graduated from Tennessee forward.
6  A.  I took classes, but nothing through
7  universities and nothing that received certifications.
8  Q.  Okay.  Well, just tell me generally what
9  kind of classes.
10  A.  I don't remember exactly what they were,
11  but I know when I worked for Ameriquest, we were
12  constantly being told to take different training
13  courses, but ones that they offered.
14  Q.  Okay.
15  A.  And, of course, I later became a title
16  agent myself.
17  Q.  And when did you do that?
18  A.  It's been a few years.  I don't remember
19  the exact year.
20  Q.  Do you think it would have been shortly
21  after the formation of Swafford and Hays?
22  A.  No.  It was at least probably three years
23  later if not four.
24  Q.  Okay.  Would you consider yourself
25  familiar with the provisions of TILA and RESPA?

Page 21

1  A.  I'm sorry, repeat the question.
2  Q.  Would you consider yourself to be
3  familiar with the provisions of TILA and RESPA?
4  A.  Some, yes.
5  Q.  And would you have gained the knowledge
6  that you have in your capacity as branch manager and
7  area manager and loan officer at Ameriquest?
8  A.  Some, yes.
9  Q.  Okay.  Have you ever taken any classes
10  involving any of those federal statutes?
11  A.  Nothing formal, no.
12  Q.  And did you study them when you were in
13  school?
14  A.  No, I did not.
15  Q.  If someone were to ask you in 2000 what
16  Swafford and Hays did, how would you have answered that
17  question?
18  A.  We were a full service title company.  We
19  take the application from title from inception all the
20  way through the final policy.
21  Q.  Is Swafford and Hays still in existence?
22  A.  They -- Swafford Settlement Services is
23  in existence, which is the same company.
24  Q.  Did you buy Mr. Hays out?
25  A.  We did.

Page 22

```
1     Q.    And when was that?
2     A.    I believe it was late 2003.
3     Q.    Okay.
4     A.    Or early 2003.
5     Q.    You said "we," was that you and your
6  father?
7     A.    Yes.
8     Q.    Okay.  At its peak, how many employees
9  did Swafford and Hays have?
10    A.    I believe the highest number was 65.
11    Q.    And how many employees does it have now?
12    A.    Three.
13    Q.    Okay.  Did it have any offices outside of
14 Knoxville at any time?
15    A.    There are some states that were licensed
16 and that required a physical address, but we are not
17 physically located there.
18    Q.    Okay.  Do you know how many states you
19 were licensed in at the height?
20    A.    I don't believe we ever topped the upper
21 20s.
22    Q.    Okay.  And when you say licensing, do you
23 mean registering to do business with like a Secretary
24 of State?
25    A.    Correct.
```

Page 23

```
1     Q.    Did you have any additional licensure
2  responsibilities?
3     A.    I'm sorry?
4     Q.    I mean, do settlement agents have to
5  register with any other entity other than a Secretary
6  of State in a state?
7     A.    It varies per statement.  Typically not,
8  but it does vary per state.  And the requirements vary.
9  Some have, you have to be appointed by the underwriter,
10 some you have to register as the agent and agency, some
11 just the agency.  It varies.
12    Q.    And were you licensed to do business in
13 Alabama in 2005?
14    A.    Yes.
15    Q.    Would you say you were licensed to do
16 business in Alabama for the majority of the time that
17 Swafford's been in existence?
18    A.    Yes.  Oh, well, I say "yes," I don't know
19 when the actual beginning date was.
20    Q.    Okay.  Did you do a lot of business in
21 Alabama?
22    A.    I don't know the ratios.  I know we did
23 quite a few, yes.
24    Q.    Would you be able to estimate for me how
25 many different lenders you served as a settlement agent
```

Page 24

```
1  for?
2     A.    Oh, wow.  Probably not.  I was more
3  familiar at the time with the brokers than I was the
4  actual lenders, but I don't know.  I would say ten to
5  20, somewhere in that range probably.
6     Q.    Was there a particular broker or lender
7  that was a substantial portion of your business?
8     A.    Yes.
9     Q.    And who was that?
10    A.    Homeowners Loan.
11    Q.    Homeowners Loan?
12    A.    Uh-huh.
13    Q.    And where are they based out of?
14    A.    They were based out of Atlanta, Georgia.
15    Q.    Okay.  Did you have a legal agreement
16 with them?
17    A.    I did not.
18    Q.    Was it common for you not to have a legal
19 agreement with the lenders and mortgage brokers that
20 you did business with?
21    A.    That is correct.
22    Q.    You were able to agree on what
23 responsibilities you were to carry out orally with
24 them?
25    A.    Correct.
```

Page 25

```
1     Q.    Did you regularly call on these lenders?
2  Did you make visits to their office for purposes of
3  marketing?
4     A.    Not myself personally, but, yes, our
5  company did.
6     Q.    Okay.  Did you have someone who was
7  charged to do that on a regular basis?
8     A.    Yes.
9     Q.    Did that person in the course of those
10 visits play a role in ensuring that you were doing what
11 these lenders and brokers wanted you to do?
12    A.    As far as if there was any concerns, they
13 brought them to their attention, yes.
14    Q.    The things that you did, were they pretty
15 standard across lenders and brokers?
16    A.    Yes.
17    Q.    Okay.  So if someone called you up and
18 asked you to perform a particular -- to be settlement
19 agent on a particular loan, I guess, I take it that
20 you're telling me a written agreement would not be
21 necessary because you would understand that everyone in
22 the industry would understand what it is you were to
23 do?
24    A.    Well, the primary reason for not having a
25 written agreement is most brokers and lenders do not
```

Page 26

1  want to be obligated to use one title company, or if
2  they're not happy with your service, they want to be
3  able to use other title companies. So there's --
4  contracts where they're locked into using you as a
5  title company are not that common in our industry.
6      Q.    Got you.
7          I asked you a question a moment ago about
8  any other businesses you had started up until a
9  particular time, I believe the year 2000.
10         Have you started any other businesses
11 since then?
12     A.    No. We have the Swafford Settlement
13 Services, and we have Swafford Title Services which is
14 still basically the same company, but you have to have
15 an individual entity name for the State of Alabama.
16     Q.    Okay. And does that sort of separate
17 company have any additional employees?
18     A.    No.
19     Q.    Does it have a physical office in
20 Alabama?
21     A.    It has a physical address with a
22 registered agent, I believe, yes.
23     Q.    Okay. And I'm not trying to tie you to a
24 particular number, but as you sit here, do you have any
25 understanding of what percentage of your business was

Page 27

1  through Home Funds Direct around the period of 2005?
2      A.    I don't know any percentages. I know
3  that they were next to Homeowners one of our good --
4  one of our primary brokers.
5      Q.    Do you know about how many states you
6  would have worked for Home Funds in?
7      A.    No. Because it would have depended on
8  whenever their fliers went out, what states they were
9  going to telemarket or market that at that time.
10 Because that's typically how we came to go in other
11 states. When one of our brokers or lenders was going
12 to start doing business in another state, a lot of
13 times they would ask us if we were willing to get
14 licensed in that state so we could be their title
15 company.
16     Q.    Did you ever have any individual dealings
17 with anyone at Home Funds Direct?
18     A.    Me personally?
19     Q.    Yes.
20     A.    I'm sure I may have, I don't remember the
21 names or anything.
22     Q.    Okay. If you did, in what capacity would
23 you have done it? Would it have been in marketing or a
24 direct responsibility for a particular loan?
25     A.    Typically if I had any contact myself

Page 28

1  with a broker or lender, it was over anything that they
2  would post closing or they go to apartments or what
3  have you, would want to make sure what we were doing
4  for them.
5      Q.    Do you ever recall any loans that Home
6  Funds Direct expressed disapproval of your company's
7  tasks with respect to that loan?
8      A.    Not offhand, no.
9      Q.    Was there a person at Swafford and Hays
10 that was assigned as a point person for Home Funds
11 Direct, someone who dealt with Home Funds calls?
12     A.    At our largest, we had particular
13 individuals in the offices that were -- or office that
14 was key contacts for different brokers and lenders, but
15 I don't know who would have been Home Funds.
16     Q.    Okay. You had an employee named is it
17 Jane Carcello?
18     A.    Janey Carcello.
19     Q.    What was her job duty?
20     A.    I believe -- I know that she was in post
21 closing at one point. I don't know if she worked at
22 any other departments.
23     Q.    Okay. Have you had an opportunity at any
24 time to review the Swafford file for the Cheryl Frazier
25 loan?

Page 29

1      A.    I have, yes.
2      Q.    Do you recall who at Swafford was
3  responsible for facilitating that loan at Swafford?
4      A.    No.
5      Q.    How many people would typically carry out
6  all the responsibilities inherent in being a settlement
7  agent at Swafford?
8      A.    It would be numerous. Because there was
9  numerous departments and numerous people in each
10 department.
11     Q.    The method that you were paid as
12 settlement agent, was that standard across the brokers
13 and lenders that you dealt with?
14     A.    Yes.
15     Q.    And how were you paid?
16     A.    We were paid off of the HUD settlement
17 statement. Is that what you mean?
18     Q.    Well, I guess that's kind of a broad
19 question.
20         The HUD settlement statement that you
21 just referenced has a line on it that says, is it
22 settlement agent fee?
23     A.    I believe so.
24     Q.    Just a moment, I'll see if I can find it.
25     A.    Fees and services or something to that

Page 30

1  nature.
2      MR. UNDERWOOD: Doug, I think it's 131
3  and 132.
4      MR. MINOR: Okay. Yeah, I see it here.
5  131, 132.
6      Earl, it is also Exhibit 16 on my list
7  beginning Bates number page 68. That's the
8  version that came from Swafford.
9      MR. UNDERWOOD: Okay.
10 BY MR. MINOR:
11     Q.    This is a document that will be marked as
12 Exhibit 16. And I'm showing the witness Bates numbered
13 pages Frazier versus AHL Swafford 0068 to 0069.
14     A.    Okay.
15     Q.    And can you tell me, point to me the line
16 that shows how Swafford was paid?
17     A.    There are multiple lines.
18     Q.    Okay. For purposes of this question, I
19 want to focus on -- let me ask it this way.
20     A.    Okay.
21     Q.    You both received payment directly and
22 you also received fees for particular tasks that you
23 performed, correct?
24     A.    I'm sorry, ask the question again.
25     Q.    Let me see this.

Page 31

1      A.    It's the first part that I missed.
2      Q.    Okay. All right. I'm going to ask it
3  this way: Line 1101 on the settlement statement, tell
4  me what that is.
5      A.    1101 says, "settlement or closing fee to
6  Swafford and Hays Settlement Services."
7      Q.    Okay. And what is that fee?
8      A.    That would have been for us facilitating
9  the closing. It would have been for the notary to go
10 out and do the closing. And anything involved
11 basically in the closing.
12     Q.    Okay. So is that -- that was
13 compensation that was paid directly to Swafford for the
14 tasks that Swafford completed?
15     A.    Correct.
16     Q.    Okay. I'm going to get to some of the
17 other fees in a second.
18     A.    Okay.
19     Q.    Has Swafford ever had any investigations
20 against it by any state licensing entities, attorney
21 generals, secretaries of state?
22     A.    Well, we have our annual CRESPA audit
23 which the State of Virginia requires. Besides that, I
24 don't remember anything that's ever been -- anything
25 like that, no.

Page 32

1      Q.    That was an annual audit, it wasn't -- or
2  was it the result of a particular finding?
3      A.    No, that's something that they require it
4  be done. And then, of course, our underwriters do
5  annual audits.
6      Q.    Outside of audits, were there any
7  administrative investigations or criminal
8  investigations against Swafford at any time?
9      A.    No.
10     Q.    Did you advertise in any journals or
11 trade publications?
12     A.    Not to my knowledge, no.
13     Q.    Was Swafford a member of any trade
14 associations, national organizations of settlement
15 agents?
16     A.    No. There is -- there was something we
17 were a member of in Nashville, and I can't even
18 remember what it was now, but it was not national. And
19 I don't believe it was for the purpose of getting any
20 future business.
21     Q.    Can you tell me who your competitors were
22 in this area, your primary competitors?
23     A.    Well, we have not really done much local
24 business, ours is usually regional. So our largest
25 competitor was Nations Title.

Page 33

1      Q.    Based in?
2      A.    I believe they're based in -- were based
3  in Baton Rouge, Louisiana, I believe. That was one of
4  their offices. They had offices in several locations.
5      Q.    Okay. Did you bring any documents with
6  you today?
7      A.    I did not.
8      Q.    Outside of your attorney, have you spoken
9  to anyone about the Frazier lawsuit?
10     A.    I don't believe so, no.
11     Q.    Have you seen the complaint in the
12 Frazier lawsuit?
13     A.    I have.
14     Q.    Okay. Was that given to you by your
15 attorney?
16     A.    I don't remember how I got it. I
17 think -- I don't remember how I got it.
18     Q.    Have you looked at it recently?
19     A.    No.
20     Q.    Do you know whether you looked at the
21 amended complaint that was recently filed in the case
22 just in the last couple weeks?
23     A.    No, I don't know that.
24     Q.    You don't know if that's the one that you
25 saw?

Page 34

1   A.   Right.
2   Q.   Have you ever met Mr. Underwood?
3   A.   I have.
4   Q.   Has he deposed you before?
5   A.   He has.
6   Q.   Would that have been in a case entitled
7   Dempsey?  Was the plaintiff Dempsey?
8   A.   I don't know which case it would have
9   been.
10  Q.   Has he deposed you more than once?
11  A.   I believe so, yes.
12  Q.   Okay.  The four depositions that I
13  believe you told me you had participated in, were they
14  all relating to lawsuits against Swafford and Hays?  I
15  want to separate out any personal.
16  A.   Right.  No, they were not.
17  Q.   They were not all related to that?
18  A.   No.
19  Q.   Some of them have to do with a car
20  accident or --
21  A.   Yeah, I had a personal, it was a car
22  accident.
23  Q.   Okay.  So you've been deposed three times
24  involving Swafford and Hays actions and various loans?
25  A.   Right.  Three or four.  I don't remember,

Page 35

1   I think it's three.
2   Q.   Did Mr. Underwood depose you each time?
3   A.   No.
4   Q.   Okay.  Do you recall what other attorneys
5   deposed you?
6   A.   No, I do not.
7   Q.   Did all the depositions take place in
8   Knoxville?
9   A.   No.
10  Q.   Where were the other depositions taken?
11  A.   Somewhere in Alabama.  And one was in
12  Mississippi.
13  Q.   Have you reviewed your transcripts from
14  those, from those depositions?
15  A.   I did when I was having to sign off on
16  them.
17  Q.   Okay.  And you would have reviewed each
18  one of them?
19  A.   Yes.
20  Q.   Were you represented by counsel at those
21  depositions?
22  A.   I was.
23  Q.   And was that counsel the Baker Donelson
24  firm?
25  A.   Yes.

Page 36

1   Q.   And was it Ms. Borden or Ms. Floyd that
2   was there?
3   A.   Not in all cases.
4   Q.   Okay.  Do you remember which Baker
5   Donelson attorneys were at which depositions?
6   A.   Eric Hospodore was at one in Mississippi.
7   Lisa Borden was at one, I believe, or two, I don't
8   remember.
9   Q.   Have all those actions been resolved?
10  A.   Most of them.
11  Q.   But not all?
12  A.   No.  Not a final, no.
13  Q.   Do you know when you first started doing
14  work with Home Funds Direct?
15  A.   I do not.
16  Q.   Do you know when you last did work with
17  Home Funds Direct?
18  A.   Not exactly.  I would guess it would have
19  been 2 -- I don't know, I'm sorry.
20  Q.   Okay.  Did Home Funds ever ask you to
21  deviate from your normal standard with respect to your
22  responsibilities and duties as a settlement agent?
23  A.   Not me personally.
24  Q.   Do you know if they ever asked anyone at
25  Swafford and Hays to do so?

Page 37

1   A.   No, I don't.
2   Q.   Did you have any personal involvement
3   with the Frazier loan?
4   A.   I don't believe so.
5   Q.   You were telling me earlier the rationale
6   for brokers or lenders not entering into settlement
7   agreements with settlement agents.  Have you ever
8   entered into an agreement with such a lender or broker?
9   A.   Not a written agreement.
10  Q.   Were you ever asked to enter into one?
11  A.   By a --
12  Q.   By a broker or lender.
13  A.   For guaranteed business, you mean?
14  Q.   Or just to set out exactly what each
15  side's duties and responsibilities were?
16  A.   Yes.
17  Q.   And you refused to do so?
18  A.   No.  We have done that before.
19  Q.   Okay.  Yeah, putting aside the guaranteed
20  business component --
21  A.   Right.
22  Q.   -- was Swafford ever party to an
23  agreement with a broker or lender which delineated
24  terms such as compensation?
25  A.   What they expect.

Page 38

1    Q.    And what they expected, yes.
2    A.    I don't believe compens -- and
3 compensation, but what they expected, yes.
4    Q.    And what broker or lenders can you
5 remember doing so with?
6    A.    Homeowners Loan.
7    Q.    Okay. Was that a long agreement?
8    A.    I don't remember how lengthy it was.
9    Q.    Were you a signatory to the agreement?
10   A.    I believe so.
11   Q.    Did you have counsel advise you with
12 respect to the terms of that agreement, whether to sign
13 it, et cetera?
14   A.    I don't think so.
15   Q.    Okay. Did you require -- I asked you
16 about training that you've had, classes, et cetera.
17 Did you require that the employees of Swafford and Hays
18 attend any classes or obtain any certifications?
19   A.    We did have -- nothing for the
20 certifications, no. We did have some classes, yes.
21   Q.    And where were those classes?
22   A.    We had some that were in our office. We
23 had some that were offered by our underwriter, I
24 believe they were in Nashville. And there may have
25 been a couple in Atlanta.

Page 39

1    Q.    Okay. What can you recall being the
2 subjects of those classes?
3    A.    I don't remember all the subjects. I
4 know that the ones with the underwriters I believe
5 bankruptcy, some things of that nature were in one or
6 two of them, but I don't remember all the different
7 subjects.
8    Q.    Okay. Do you recall whether any of the
9 subjects included TILA or RESPA?
10   A.    I do not.
11   Q.    Would you have any attorneys employed at
12 Swafford and Hays?
13   A.    We did at one time.
14   Q.    And who was that person?
15   A.    Holly Sayne.
16   Q.    And what were her job responsibilities?
17   A.    To review our file -- she actually had
18 anything that could be a potential claim or a claim
19 that would come in. She also was to review various
20 processes to make sure that we were in compliance. And
21 she also researched different state requirements to
22 make sure we were in state requirements.
23   Q.    Okay.
24         MR. MINOR: Earl, can we take a
25 five-minute break?

Page 40

1         MR. UNDERWOOD: Yeah, sure.
2    (Recess taken.)
3         THE VIDEOGRAPHER: We're back on the
4 record.
5         MR. MINOR: Okay. Are you there, Earl?
6 Ready?
7         MR. UNDERWOOD: Yeah. I'm ready if you
8 guys are.
9         MR. MINOR: Okay. Earl, I'm going to
10 hand Mr. Swafford my Exhibit 28 which begins at
11 Bates numbered page 98 and goes through 175.
12        MR. UNDERWOOD: Okay.
13 BY MR. MINOR:
14   Q.    Okay. Mr. Swafford, as I hand this to
15 you, I want to represent to you that it -- that the
16 first few pages are the lender's instructions, and the
17 remainder of it is a portion of the loan file.
18   A.    Okay.
19   Q.    I'd like for you to take a look at the
20 first few pages and confirm for me what those pages
21 are.
22   A.    It's the lender's instructions of what
23 they require for the loan.
24   Q.    Okay. Was it common for Swafford and
25 Hays to receive a set of lender's instructions from a

Page 41

1 broker or lender for each loan?
2    A.    From the lender, yes.
3    Q.    Okay. The provisions of the lender's
4 instructions, were they largely standard across
5 lenders?
6    A.    Typically, yes.
7    Q.    Sitting here, can you think of any
8 significant difference between or among the
9 instructions of the various brokers and lenders you did
10 business with?
11   A.    No, I can't think of any.
12   Q.    They all pretty much asked you to fill
13 out the paperwork the way that they requested, they
14 asked you not to change any of the fees without their
15 prior consent? Is that standard?
16   A.    Yes, it does sound like that, yes.
17   Q.    Okay. Do you know if you've ever seen
18 this particular set of instructions before?
19   A.    I may have when I glanced through the
20 file, yes.
21   Q.    Okay. The -- we might have different
22 numbers. No, we don't. The top of the Bates numbered
23 page 100.
24   A.    Uh-huh.
25   Q.    That information there for Swafford and

Page 42

1 Hays and its address and telephone number, is all that
2 information accurate?
3    A.    No.  Not any longer, no.
4    Q.    Okay.  Was it accurate as of March 25,
5 2005?
6    A.    Yeah, I believe so, yes.
7    Q.    Okay.  And that James W. Swafford is your
8 father?
9    A.    I also had a James W. Swafford which was
10 my brother who was the marketer.
11    Q.    Okay.
12    A.    So it probably was his name.
13    Q.    Okay.  The fees that are listed here
14 under B beginning with origination fee, these are fees
15 that Home Funds Direct was directing you to collect and
16 indicate on the HUD-1 at the closing, correct?
17       MR. UNDERWOOD:  I'm going to object to
18    the form of that question, Doug.
19       MR. MINOR:  Okay.
20    Q.    Do you understand my question?
21    A.    Yes.
22    Q.    Can you tell me, what are the fees that
23 are listed here under B?
24    A.    Okay.  And, by the way, I was saying yes,
25 I understand the question.

Page 43

1    Q.    Yes.  I'm going to try to fix Earl's
2 objection.
3    A.    Okay.  Now, what are you asking me?  I'm
4 sorry.
5    Q.    Just tell me what these fees are under
6 paragraph B.
7    A.    Just read them, is that what you mean?
8    Q.    No, tell me what -- can you characterize
9 what these fees are?
10    A.    These are lender fees.
11    Q.    And by "lender fees," these are fees that
12 are paid directly to the lender at closing?
13    A.    Correct.
14    Q.    Okay.  You receive the amount of these
15 fees from the lender?
16    A.    Unless they do a POC or they do a net
17 wire.
18    Q.    Okay.  Were either of those done in this
19 particular instance?
20    A.    I don't know.
21    Q.    Okay.  But you don't know what amount to
22 charge for these fees unless you get that information
23 from the lender, correct?
24    A.    Yes.
25       MR. UNDERWOOD:  Doug, I'm going to object

Page 44

1    to the form of that question as well.  You let the
2    one before that slip by me, but if you would try
3    not to lead him so I won't have to keep doing
4    that, Doug.
5    Q.    There would be no way for you to know
6 what amounts of money to put on the HUD-1 at closing
7 except for what you receive here from the lender,
8 correct?
9       MR. UNDERWOOD:  Object to the form of
10    that question.
11       THE REPORTER:  Excuse me, I need to go
12    off the record.
13       MR. MINOR:  Okay.  Hold on just a second,
14    Earl, the court reporter needs to go off the
15    record.
16    (Recess taken.)
17       THE VIDEOGRAPHER:  We're back on the
18    record.
19 BY MR. MINOR:
20    Q.    Okay.  The document we've been looking at
21 Bates numbered page 100, paragraph B says, "The
22 following lender items have been deducted from our
23 check draft to you"; correct?
24    A.    Yes.  So that was net funded.
25    Q.    And by "net funded," you mean?

Page 45

1    A.    They kept their fees when they sent the
2 money to us to disburse.
3    Q.    Okay.  And they determined those fees,
4 correct?
5    A.    Yes.
6    Q.    All right.  Now, I want to direct your
7 attention back to Exhibit 16 that we looked at earlier.
8 Keep that there because we may look back at it.
9    A.    Okay.
10    Q.    What's the Bates numbered pages at the
11 bottom there?
12    A.    68.
13    Q.    Okay.  What is the document that begins
14 at Bates numbered page 68?
15    A.    The HUD settlement statement.
16    Q.    Okay.  On the second page of the
17 settlement statement, there are several fees that are
18 listed.
19    A.    Yes.
20    Q.    It is correct, is it not, that the fees
21 listed at 1102, 1103, 1108, 1111 and 1201 are fees that
22 Swafford and Hays charge?
23       MR. UNDERWOOD:  Object to the form of
24    that question.
25    Q.    You can answer.

Page 46

1    A.    Those are fees that we put on the HUD
2  settlement statement, yes.
3    Q.    Okay.  Home Funds Direct had no role in
4  calculating those fees or charging those fees, correct?
5    A.    No.
6    Q.    In fact, you communicated to Home Funds
7  the amount of those fees, "you" as in Swafford and
8  Hays?
9    A.    Yes.
10   Q.    Okay.  I want to ask you some questions
11 about each of these fees.  I want to first ask you
12 about 1101.
13        1101 was money that was paid directly to
14 Swafford and Hays for the tasks that Swafford and Hays
15 performed, correct?
16   A.    Yes.
17   Q.    Those tasks except as otherwise set forth
18 below were all performed by Swafford and Hays?
19   A.    What do you mean by "set forth"?
20   Q.    Here's what I'm trying to ask:  I know
21 that there were some tasks that you received money for
22 as set forth here that other people performed some or
23 all of the task?
24   A.    1101 would have been at one of those
25 cases that you just mentioned.

Page 47

1    Q.    It would have been one of those?
2    A.    Yes.  It's for fees -- it's for acts that
3  we performed and the notary.
4    Q.    Okay.  Any other acts?
5    A.    You mean any other third parties?
6    Q.    Any other third parties, I'm sorry.
7    A.    No.
8    Q.    And what was the notary's name?
9    A.    I'll have to see if it's in this, this
10 piece of paperwork I have.  I doubt it is.  I would
11 have to see the deed of trust or something like that.
12   Q.    Okay.  Let me take a moment here to see
13 if I can find it.
14   A.    Probably the next page.
15   Q.    Diane Hilson, does that sound familiar?
16   A.    Yes.
17   Q.    Okay.  And was Diane Hilson a Swafford
18 and Hays employee?
19   A.    No, she was not.
20   Q.    She's an independent contractor?
21   A.    Yes.
22   Q.    Did she receive a set amount of money for
23 each loan that she served as notary for?
24   A.    Yes, she would have.
25   Q.    Okay.  So looking at this $275, are you

Page 48

1  able to tell me how much of that that went to
2  compensate her?
3    A.    No, because I don't know what her charge
4  was.
5    Q.    Okay.  All right.  So you've told me
6  about 1101.  Now I want to ask you about 1102.  What
7  fee is represented by 1102?
8    A.    1102 is when we access Swafford perform
9  when receiving an order and the abstractor themselves
10 when they go out, which is a third party.
11   Q.    Kind of in layman's terms if you were
12 just telling this to a jury, what is done in the course
13 of this abstract and title search?
14   A.    From the time we get -- you mean what do
15 we do, or what does the whole process involve?
16   Q.    The whole process.
17   A.    We receive the order, we confirm the
18 order with the loan officer who's sent it, we put it
19 into our database.  A lot of times they'll leave the
20 county and stuff off, we have to search to find out
21 what county it is in.  Then we find an abstractor in
22 that county and send them the order.  We monitor the
23 order to make sure it comes back within 48 hours,
24 because that's what most brokers and lenders require,
25 typically brokers, rather.  And once it comes back, it

Page 49

1  would have then been handed over -- it would have been
2  reviewed to make sure that everything was there, all
3  copies of deeds, mortgages, legal description that was
4  legible, judgments, things of that nature.  It then
5  would have been handed over to the commitment
6  department.  But what I just told you would entail
7  1102.
8    Q.    Okay.  And were there third parties that
9  performed some of those tasks?
10   A.    Yes.
11   Q.    Do you know who those third parties were
12 for this loan?
13   A.    I think I just saw it in the paperwork,
14 if you'd like me to -- Southern Land & Title, SLNT I
15 think is what that stood for.
16        MR. UNDERWOOD:  What page are you looking
17 at?
18   Q.    What page were you looking at?
19   A.    I'm sorry, it's 79.  And I'm looking at
20 the fax header at the bottom that just says "SL&T."
21   Q.    Oh, I see.  And what's that stand for?
22   A.    Actually, if you look at 77, it's
23 Southern Land & Title.
24   Q.    Was that a company that you frequently
25 did business with?

Page 50

1    A.    I believe so.
2    Q.    Any other third parties, would there have
3  been any other third parties that performed any of the
4  tasks represented by 1102?
5    A.    I don't believe so, no.
6    Q.    Sitting here now, can you tell me whether
7  the $200 figure that is indicated for 1102 was paid in
8  full to SLT?
9    A.    I don't believe so, no.
10   Q.    Okay. Do you know how much of it was
11 paid to SLT?
12   A.    No, I do not.
13   Q.    Okay. But do I understand from your
14 answer that some amount less than the full $200 was
15 paid to SLT?
16   A.    Yes.
17   Q.    I'm sorry, what is the settlement at the
18 bottom of the settlement statement?
19   A.    68.
20   Q.    Are you aware that some plaintiffs have
21 made the allegation that it was improper for Swafford
22 and Hays to charge an amount of money for title search
23 and abstracting in excess of what it paid the third
24 party to perform it?
25   A.    I am now, yes.

Page 51

1    Q.    From any source, have you learned how
2  much the discrepancy is between the $200 and how much
3  was paid to the third party?
4    A.    On this file?
5    Q.    Yes.
6    A.    No, I do not know.
7    Q.    Okay. Did that fee change, or was it
8  standard, the $200?
9    A.    I believe it was standard.
10   Q.    Okay. And when you say "standard," do
11 you mean across all Swafford and Hays, all loans for
12 which Swafford and Hays served as the settlement agent?
13   A.    Yes.
14   Q.    Okay. All right. I now want to ask you
15 about 1103. Please tell me in as close to lay terms as
16 you can as though you were explaining it to people who
17 knew nothing about what you did.
18   A.    Okay.
19   Q.    What task is represented by 1103?
20   A.    Title examination would have been once
21 the abstractor sent the search back over, and like I
22 said before, once the abstracting department, our
23 abstracting department made sure that everything was in
24 the search, it would have been given to the commitment
25 department. And the commitment department would have

Page 52

1  analyzed the information that came from the courthouse
2  and put it in the form of a commitment.
3        But basically when it says "title
4  examination," that could have also included the
5  processing department that we had, meaning that once
6  the commitment went over to the broker or lender, if
7  they stated that the borrower claimed that some of the
8  judgments showing or some of the liens showing were not
9  theirs or had been satisfied prior, our processing
10 department would have cleared that up for them. They
11 would have called and verified that, gotten releases to
12 be recorded. If it had been released, gotten proof of
13 social security numbers if it wasn't our borrower.
14 Things of that nature.
15   Q.    Okay. The commitment department at
16 Swafford and Hays and the processing department at
17 Swafford and Hays?
18   A.    Primarily, yes.
19   Q.    Would any third parties have been paid
20 any of that $250?
21   A.    No.
22   Q.    Okay.
23   A.    I don't believe so.
24   Q.    Give me one second.
25        Do you know how you arrived at the $200

Page 53

1  figure for the -- excuse me, the $250 figure for the
2  title examination?
3    A.    Do I know how? I believe it was a
4  standard fee.
5    Q.    And when you say "standard fee," tell me
6  what you mean.
7    A.    Fee that was typically charged for our
8  services to perform the acts I mentioned to you.
9    Q.    Okay. So what you mean is it was
10 standard across loans?
11   A.    Correct.
12   Q.    That Swafford and Hays handled?
13   A.    Typically, I believe so.
14   Q.    Do you know who came up with that amount
15 of money to cover those particular tasks?
16   A.    Typically when we went to brokers, they
17 had standard fees that they were willing to pay title
18 companies. And basically if we did more work than
19 that, we pretty much had to eat it.
20   Q.    Okay. So is it your testimony that you
21 arrived at the $250 figure because you thought it was
22 the standard industry fee for title examinations?
23        MR. UNDERWOOD: Object to form of the
24 question.
25   A.    I'm sorry, repeat the question.

Page 54

1    Q.    Sure.
2          I'm trying to see if I understand from
3    your answer that the $250 was your understanding of
4    what the standard fee for title examination fees were.
5          MR. UNDERWOOD: The same objection.
6    A.    Yes.
7    Q.    Would you have had exposure to the fee
8    for that work in your capacities at Ameriquest?
9    A.    Yes. But, like I said, we did a lot of
10   the work ourselves, so the title companies would not
11   have charged as much.
12   Q.    Okay. And I just want to make sure I'm
13   clear. I may have asked you this before. But none of
14   that money was paid to anyone, to any entity outside of
15   Swafford and Hays?
16   A.    For title examination?
17   Q.    Yes.
18   A.    No, I don't believe so.
19   Q.    Okay. I want to direct your attention to
20   line 1108. And as before, tell me what fee is
21   represented there.
22   A.    It would be an insurance -- excuse me,
23   insurance premium for the lender's coverage. Sorry.
24   Q.    And what's that? What's an insurance
25   premium for the lender's coverage as though you're

Page 55

1    explaining it to a layperson?
2    A.    Oh. It's the -- well, we charge for the
3    commitment or the final policy. And, you know, I
4    mentioned we issue a commitment. A commitment tells
5    the lender what they have to do to be insured. Once
6    the loan closes, if they've met those requirements,
7    then we issue a policy which is ensuring the lender
8    that they're in first lien position or whatever lien
9    position they've asked for. And that's the insurance.
10   Q.    And did you have a relationship with a
11   particular insurance company?
12   A.    We've had a relationship with more than
13   one, yes. On this one, it says "Transnation" which...
14   Q.    I want to direct your attention to --
15         MR. MINOR: Earl?
16         MR. UNDERWOOD: Yes.
17         MR. MINOR: In my documents, it's
18   Exhibit 30 and 31, they're separated, but
19   Exhibit 30 Bates numbered 177 is the first page,
20   and then the remainder of the document picks up at
21   Exhibit 31 and page 178.
22         MR. UNDERWOOD: Okay.
23   BY MR. MINOR:
24   Q.    Would you please look at that and tell me
25   what that is?

Page 56

1    A.    It's the agreement between the
2    underwriter and Swafford and Hays Settlement Services.
3    Q.    Okay. So is this the agreement that
4    would govern the title insurance that was provided
5    pursuant to line 1108?
6    A.    Yes.
7    Q.    You can put that back in there just to
8    keep up with it.
9    A.    Oh, okay.
10   Q.    The fee listed there for title insurance
11   on Bates numbered page 69 --
12   A.    Okay.
13   Q.    -- is $200?
14   A.    The fee listed there is $200, yes.
15   Q.    Yes.
16         MR. MINOR: Can we go off the record for
17   a second?
18         THE VIDEOGRAPHER: Sure.
19   (Discussion off the record.)
20         THE VIDEOGRAPHER: All right. We're back
21   on the record.
22   BY MR. MINOR:
23   Q.    Mr. Swafford, how is that $200 figure
24   arrived at?
25   A.    We have charts that we use.

Page 57

1    Q.    And where do you get those charts from?
2    A.    The underwriter.
3    Q.    And is that a chart that takes the loan
4    amount and applies some sort of percentage and arrives
5    at the premium?
6    A.    Correct.
7    Q.    Okay. Would that chart be with the
8    agreement that we just looked at?
9    A.    No, it would not.
10   Q.    Okay. Is that chart not something that
11   would be made a part of an individual borrower's file?
12   A.    No. In fact, I believe that with this
13   underwriter, it's on line, it was something that our
14   closing department had to log into and get it through
15   the computer.
16   Q.    Okay. Did Swafford and Hays add any
17   amount of money to the figure that was represented from
18   the chart that you just told me about?
19   A.    I don't know. I don't believe so. I
20   don't know.
21   Q.    Okay. But you would know if there was
22   any sort of standard practice to add a set amount of
23   money to that premium?
24   A.    Right, right.
25   Q.    And, to your knowledge, was there?

Page 58

1    A.    On this file, I don't believe so, no.
2    Q.    No, I don't mean on this file, I just
3  mean in general.
4    A.    No.  We don't have that practice.
5    Q.    Okay.  And the premium that -- would you
6  receive a premium from the sale of this particular
7  policy -- excuse me, would you receive a commission
8  from the sale of a policy like this?
9    A.    We received a percentage, yes.
10   Q.    Okay.  And that would be from the $200,
11 correct, not added to the $200?
12   A.    That is correct.
13   Q.    Okay.  So the borrower would pay $200,
14 that premium was remitted to the title insurer, and
15 then your commission came subsequent to that from the
16 title insurer?
17   A.    No, we typically keep our percentage and
18 remit their portion to them.
19   Q.    Okay.  So some amount of money less than
20 $200 would go to the title insurer because you would
21 retain your commission?
22   A.    That is correct.
23   Q.    Would your commission be reflected on the
24 chart that you just told me about?
25   A.    Would my commission be -- no.

Page 59

1    Q.    Okay.  The premium that you were to
2  charge would be reflected on the chart, but not your
3  commission?
4    A.    Correct.
5    Q.    So how would you know how much of a
6  commission to retain from what you remitted to the
7  insurer?
8    A.    Based upon my agreement with the insurer.
9    Q.    Okay.  And that would be a standard
10 percentage, or was it a set amount of money?
11   A.    A standard percentage.
12   Q.    Okay.  Do you recall what it would have
13 been for Transnation at this time in 2005?
14   A.    Different states could vary, but I
15 believe in Alabama, it was 30 percent.
16   Q.    Okay.  So you would have retained about
17 $60, and $140 would have been remitted to the title
18 insurer?
19   A.    No, the 30 percent would have been to the
20 title insurer, I believe.
21   Q.    Oh, okay.
22   A.    I can look at the agreement and tell you
23 in a minute if you want me to.
24   Q.    Yes, please do.
25   A.    Okay.  Do you want me to tell you the

Page 60

1  page?
2    Q.    Yes.
3    A.    Page 184 says that the agent shall retain
4  70 percent of the states that were listed unless
5  otherwise specifically shown, and Alabama doesn't show
6  anything different.
7    Q.    Okay.  Do you know whether the premium
8  rates for title insurance were set by the Alabama
9  Department of Insurance?
10   A.    Versus the underwriter -- versus the
11 insurer selecting them and then filing them with it?
12 Is that what you mean?
13   Q.    Yeah.  Let me rephrase that question.
14       Is it your understanding that the title
15 insurer had to receive permission from a state
16 insurance department such as the Alabama Department of
17 Insurance to charge a particular premium?
18   A.    Yes.
19   Q.    Okay.  Did you rely on the title insurer
20 to reflect the approved premium rate in its chart
21 submitted to you, or did you go back and verify that
22 rate was in fact approved by the Alabama Department of
23 Insurance?
24   A.    I relied upon --
25       MR. UNDERWOOD:  Object to the form of the

Page 61

1  question.
2    A.    We relied upon the underwriter.
3    Q.    Was that a standard practice for you to
4  do that, to rely on the underwriter to indicate rates
5  that had been approved by the state regulatory bodies?
6    A.    Yes.
7    Q.    Have you learned from any source that any
8  of the title insurance premiums that you charged the
9  borrowers you serviced were not approved by a state
10 insurance department?
11   A.    You mean did we use incorrect amounts at
12 times, or --
13   Q.    Have you learned from any source that you
14 used an amount that was not approved by a state
15 Department of Insurance?
16   A.    I do know that we have at times made
17 mistakes on the amounts, yes.
18   Q.    Okay.  And what's your understanding --
19 let me rephrase the question.
20       Was it a mistake on behalf of a title
21 insurer, or a mistake on behalf of Swafford?
22   A.    I don't know if they were all just
23 Swafford or if some of them were the title insurer, I
24 don't know that.
25   Q.    Okay.  And would you characterize this as

Page 62

1    being an isolated instance, or across larger groups of
2    borrowers?
3         A.    I believe it was isolated, I'm just not
4    sure.
5         Q.    I just want to understand.  Are you
6    saying that someone typed in 15 instead of 17, or are
7    you saying --
8         A.    That -- I'm sorry.
9         Q.    -- or are you saying that -- or are you
10   saying that Swafford had a policy that resulted in an
11   inaccurate charge to numerous borrowers?
12        A.    More of a clerical type error.
13        Q.    Okay.  And from what source did you learn
14   of those errors?
15        A.    I don't remember now.
16        Q.    Did Swafford do anything to correct those
17   errors?
18        A.    For future loans?
19        Q.    Or for any loan.
20        A.    Yes, I believe we did.
21        Q.    For future loans you did?
22        A.    Yes.
23        Q.    All right.  I want to take you further
24   down on page 69 going back to the HUD-1.
25              I'm sorry, but before we go off that, I

Page 63

1    just want to make sure, absolutely sure, of the $200
2    for title insurance, outside of the amounts you just
3    told me you paid, that were paid as a commission and
4    the amounts that were remitted to the title insurance
5    company, no other entity received any of that money; is
6    that correct?
7         A.    That is correct.
8         Q.    Okay.  Next I want to direct you to
9    endorsements at line 1111.
10        A.    Uh-huh.  Correct.
11        Q.    Please tell me using simple terms for a
12   layperson what task was performed as represented by
13   that fee.
14        A.    The endorsement fee, there are specific
15   endorsements that are added to a policy usually
16   required by the lender, the list what they want, what
17   endorsements they want, and then there is a fee for
18   that.
19        Q.    When you say the policy, are you talking
20   about the title insurance policy?
21        A.    Yes.
22        Q.    Okay.  Are you able to look at a
23   particular loan file and determine what endorsements
24   are added?
25        A.    I might be able to.  That is not

Page 64

1    something I typically do.
2         Q.    Okay.  Where would that information be
3    found?
4         A.    It could be primarily on the instructions
5    from the lender.
6         Q.    Okay.  Do you have that still in front of
7    you?
8         A.    I do.  If I can remember which one it was
9    in.
10        Q.    I think it was --
11        A.    It was this one.
12        Q.    What's the Bates numbered page here so I
13   can find it?
14        A.    100.
15        Q.    Do you see it?
16        A.    Uh-huh.
17        Q.    Okay.  Where?
18        A.    I'm sorry.
19        Q.    I'm sorry, I thought you were looking --
20        A.    No, page 101.
21        Q.    Okay.  Okay.  Where on 101?
22        A.    It would be under Title Policy
23   Requirements.
24        Q.    Uh-huh.
25        A.    I know that they would also look at the

Page 65

1    deed of trust or the mortgage and see if there was any
2    riders attached.
3         Q.    Okay.  So where in the title policy
4    requirements?
5         A.    Would it state if there was -- I don't
6    know, I'll have to look through them real fast.  I
7    don't know if this was the case, but I know nine says
8    that restrictions and building lines of record provide
9    that the policy contains an endorsement covering any
10   violation, I don't know if that would have been the
11   case.  The following endorsements, number 15, if that
12   applied.
13        Q.    When you say "if that applied," what do
14   you mean?
15        A.    It says, the following endorsement must
16   be included in the mortgage policy if there's an ARM
17   with no negative amortization or if there's a condo or
18   a P.U.D. and if applicable to EPA.  I don't know if
19   this was an ARM or negative amortization or condo or
20   anything like that.
21        Q.    So I think I understand.  There was
22   someone at Swafford who would take the lender's
23   instruction and in a particular loan determine whether
24   there was anything additional that needed to be
25   included in the title insurance policy?

Page 66

1   A.   That is correct.
2   Q.   Do you know who that person was?
3   A.   Not at this time, no.
4   Q.   So there would be HUD-1s for borrowers
5 that Swafford acted as settlement agent for that will
6 have no amount of money indicated in the endorsements
7 blank?
8   A.   Uh-huh. I mean, yes.
9   Q.   Did any third party receive any of the
10 $50 that was charged for endorsements?
11   A.   The underwriter would have been, would
12 have received money.
13   Q.   And how would that have broken down?
14 Would they have received all of it?
15   A.   I believe it's based on the same
16 percentage as the insurance.
17   Q.   Okay. Is there a language in the --
18   A.   Contract?
19   Q.   -- contract that sets out the procedure
20 for endorsements that you just described?
21   A.   I don't see one, no.
22   Q.   Okay. So would that have been something
23 that was industry practice?
24   A.   It would have been something our
25 underwriter would have specifically told us.

Page 67

1   Q.   Orally?
2   A.   Yes. I assume so since I don't see it in
3 here.
4   Q.   Okay. All right. Looking back to the
5 HUD-1 statement, tell me again the page, 100?
6   A.   68.
7   Q.   68. On 69, directing your attention to
8 the line 1201.
9   A.   Uh-huh.
10   Q.   Tell me in layman's terms what task is
11 represented by the fee that's charged there.
12   A.   The cost of us recording the mortgage
13 riders with anything that needed to be recorded at the
14 courthouse.
15   Q.   And this would be the courthouse
16 encompassing the district where the property was
17 located?
18   A.   Correct.
19   Q.   Okay. How was that fee determined?
20   A.   I believe we had -- you know, I don't
21 know exactly how that one was determined. I know we
22 used Ernst which is a company that's on line.
23   Q.   E-R-N-S-T?
24   A.   Uh-huh. E-R-N-S-T, yes. That would give
25 you up to date recorded information. We didn't always

Page 68

1 know how many pages the mortgage was going to have or
2 if there was going to be any riders included once we
3 got the package. The HUD had to be done prior to that
4 in many cases.
5   Q.   So typically that charge at least in part
6 is tied to the number of pages in the deed?
7   A.   Yes.
8   Q.   Okay. Do you know what else is typically
9 included in that charge?
10   A.   If there's a quitclaim deed, if there's a
11 warranty deed, any riders that are with the mortgage.
12   Q.   So are you saying that the fee would be
13 different if there was a quitclaim versus a warranty
14 deed?
15   A.   Right, which we would have known that,
16 but we don't know how many riders are going to be with
17 the mortgage. Unfortunately the mortgages are not
18 always standard as far as how many pages they are.
19   Q.   I see.
20 Is there any other third party besides
21 Ernst that would have received a portion of the $120
22 indicated for the recording?
23   A.   Ernst would not have received that.
24   Q.   Oh, I'm sorry, I thought you said that.
25   A.   No. That's who we used, but we don't

Page 69

1 actually pay them from the HUD.
2   Q.   Okay. So who would have received that
3 money?
4   A.   Just Swafford or the courthouse.
5   Q.   Okay. Did you hire someone to physically
6 go to the courthouse?
7   A.   At times. Not with every loan. And we
8 would use UPS to ship them if we did not hire someone
9 to physically go to the courthouse.
10   Q.   Okay. So that $120, whatever ended up
11 being the exact amount charged by the Court was paid to
12 the Court, and any remainder was money that was
13 retained by Swafford and Hays?
14   A.   On this file, yes.
15   Q.   The information you just gave me about
16 these fees, 1102, 1103, 1108, 1111 and 1201, we've just
17 gone through each and you described to me how the fee
18 was determined and who may have received a portion of
19 the money.
20 The description you just gave me, that is
21 not reduced to writing in anywhere, is it?
22   A.   No.
23   Q.   And isn't it true that because it was not
24 reduced to writing, no one at Home Funds Direct would
25 have received any document detailing the summary you

Page 70

1  just gave me?
2       MR. UNDERWOOD: Object to the form of
3  that question.
4       A.    That is correct.
5       Q.    Okay. Do you have any knowledge --
6       A.    Well, let me correct that. I don't know
7  that when we first started doing business with Home
8  Funds that they didn't ask us to put it like in e-mail
9  writing, like, you know, correspondence, but I don't
10  know of any particular document that went to them, no.
11      Q.    And you don't have any specific
12  recollection of them asking for it?
13      A.    No.
14      Q.    Do you have any knowledge of anyone at
15  Swafford and Hays providing that information to anyone
16  at Home Funds in any form?
17      A.    I do not have specific knowledge of that,
18  no.
19      Q.    Okay. There's no way for Home Funds to
20  know what third parties Swafford may have retained to
21  perform some of the tasks referenced by these fees,
22  correct?
23      MR. UNDERWOOD: Object to the form of
24  that question.
25      A.    Not without asking Swafford, no.

Page 71

1       Q.    And it was not Swafford's practice to
2  provide any of the invoices or any of the checkstubs
3  that were paid to title insurers or SLT to the
4  particular lender involved in the transaction, was it?
5       A.    No.
6       MR. UNDERWOOD: The same objection.
7       Q.    And it's correct that Home Funds Direct
8  never received any of the money represented by these
9  fees, correct?
10      MR. UNDERWOOD: The same objection.
11      A.    Correct.
12      Q.    Home Funds Direct was not affiliated in
13  any way with you or Swafford and Hays Settlement
14  Services, was it?
15      A.    No.
16      Q.    And by "affiliated," I mean, it was not
17  an affiliated company, no common ownership, no
18  agreements --
19      A.    No.
20      Q.    -- that you haven't told me about?
21      A.    No.
22      MR. MINOR: Go off the record for a
23  second.
24      (Discussion off the record.)
25      (Recess taken.)

Page 72

1       THE VIDEOGRAPHER: Okay. We're back on
2  the record.
3  BY MR. MINOR:
4       Q.    Okay. Let's wrap up a few things,
5  Mr. Swafford.
6       A.    Okay.
7       Q.    Looking back at Bates numbered pages 68
8  and 69, does Swafford and Hays receive any money at the
9  closing beyond the charges you and I just discussed?
10      A.    No.
11      THE VIDEOGRAPHER: Mr. Minor, do you have
12  your microphone on?
13      MR. MINOR: Do I need to repeat that, or
14  did you get it?
15      THE VIDEOGRAPHER: You're okay. Thank
16  you.
17  BY MR. MINOR:
18      Q.    And you reviewed the lender's
19  instructions a moment ago?
20      A.    Uh-huh. I mean, yes.
21      Q.    I'd like to ask you to take a moment and
22  look through a composite set of all the exhibits and
23  tell me if you see any other lender's instructions
24  besides the instructions we just discussed beginning at
25  Bates numbered page --

Page 73

1       A.    98.
2       Q.    Okay.
3       A.    So look through this and this, or just
4  this?
5       Q.    Just this. This is a full set of all the
6  exhibits, and just take a moment to look through. And
7  my question to you after you've looked through is
8  whether the lender's instructions beginning at 98 are
9  the only lender's instructions?
10      A.    In the file?
11      Q.    Yes, in the file that you produced to us.
12  If you want to take that clip off, you can.
13      A.    There are some on page 42.
14      Q.    Okay.
15      A.    But it's titled Loan Status. I just
16  noticed while I was flipping through, it says,
17  "standard closing requirements" listed on that as well.
18      Q.    Okay.
19      A.    Do I need to wait until you get there, or
20  can I keep going?
21      Q.    No, keep going.
22      A.    Okay. Same thing on page 53. Same thing
23  on 95.
24      Q.    Okay.
25      A.    I don't know if it's the exact same set.

Page 74

1    I'm at a set on page 100, and it's actually lender's
2    instructions. And it goes through 106.
3        Q.    I think that's the same set.
4        A.    Okay. Sorry, it's a thick stack.
5        Q.    No, no, that's fine. Take your time.
6        A.    Page 158 gives some instructions.
7        Q.    Okay.
8        A.    And I believe that is all.
9        Q.    Okay. Pass those to me. I just want to
10   glance at 95 and 158.
11       A.    Oh, okay. Take that then.
12       Q.    Okay. Now, Mr. Swafford, I'm going to
13   ask you a question about the plaintiff's claims in this
14   particular case. I'm going to read from the complaint
15   in this particular case. Paragraph 29 says: "The fact
16   that the charges reflected in lines 1102, 1103, 1108,
17   1111 and 1201 exceeded the actual costs of the services
18   actually provided was unknown to plaintiff. The fact
19   that these charges were marked up, illegal, excessive
20   and otherwise improper, was unknown to and unknowable
21   by plaintiff because the actual costs for providing or
22   obtaining the services were not available to or
23   discoverable by her. And defendant actively deceived
24   plaintiff about who was providing these services and
25   the fact that she was being defrauded. The unknown and

Page 75

1    inherently unknowable nature of the unlawful charges
2    did not give plaintiff any reason to inquire,
3    investigate or discover the wrongdoing. As a practical
4    reality, it was impossible for plaintiff to detect
5    defendant's unlawful lending law violations."
6        Now, my question to you is this: Is
7    there any evidence in the file that you have reviewed
8    or in your recollection that Home Funds Direct was
9    provided any information about the charges on the HUD-1
10   that we've discussed --
11       MR. UNDERWOOD:  I'll object to the form
12   of that question.
13       MR. MINOR:  You hadn't even let me finish
14   it. You've got to at least wait until I finish
15   before you object, Earl.
16       MR. UNDERWOOD:  Okay. I thought you were
17   finished. Sorry.
18   BY MR. MINOR:
19       Q.    Is there any evidence in the file that
20   you've reviewed or pursuant to your recollection of the
21   events that Home Funds Direct received any information
22   about the charges in 1102, 1103, 1108, 1111 and 1201
23   that was not provided to Ms. Frazier?
24       MR. UNDERWOOD:  I'll object to form of
25   that question.

Page 76

1        Q.    Do you understand my question?
2        A.    I believe.
3        Q.    Okay.
4        A.    Are you asking -- are you asking me is
5    there anything that the lender would have known that
6    Mrs. Frazier did not know?
7        Q.    About those charges, correct.
8        MR. UNDERWOOD:  The same objection.
9        Q.    11 -- I'm sorry.
10       A.    I just want to make sure I'm correct
11   before I answer it.
12       Q.    No, absolutely, you should do that. Go
13   ahead.
14       A.    Are you meaning did Swafford provide any
15   information from Swafford, or do you mean in general?
16       Q.    I mean from Swafford.
17       You have given me in this deposition
18   information about your charges in 1102, 1103, 1108,
19   1111 and 1201 including who may have received some of
20   the money, et cetera. And my question to you is, was
21   any of that information -- any information provided to
22   Home Funds Direct relating to those charges that was
23   not provided by Swafford that was not provided to
24   Ms. Frazier?
25       A.    No, I don't believe so.

Page 77

1        Q.    You told me earlier in this deposition
2    that some of the litigation against Swafford had been
3    settled but not all of it?
4        A.    Correct.
5        Q.    Do you know if the Dempsey matter has
6    been settled?
7        A.    I know that sounds awful, but the names
8    run together. I believe Dempsey may have.
9        Q.    Okay. And Mr. Underwood is counsel in
10   the Dempsey matter, correct?
11       A.    Yes.
12       Q.    Have you signed any releases settling or
13   resolving any of your litigation against Swafford?
14       A.    I have signed settlements on some of the
15   litigation with Swafford.
16       Q.    Do you know how many releases you've
17   signed?
18       A.    I believe four.
19       Q.    Okay. Has Swafford paid money to settle
20   these cases?
21       A.    Yes.
22       Q.    Was it paid by Swafford or by insurance
23   companies?
24       A.    By Swafford.
25       Q.    Okay. And how much money has Swafford

Page 78

1  paid?
2      A.    I don't know the grand total.  I'm still
3  making payments on some of them.
4      Q.    Okay.  Do you remember the total for any
5  particular case, any one case?
6      A.    I don't remember the names.  I believe
7  that a couple of them settled for like 15,000 or
8  something to that nature.
9      Q.    Would you say that the payments that have
10  been made to date are more or less than a hundred
11  thousand dollars?
12      A.    Less.
13      Q.    Have you settled any cases that you
14  understood to be class actions?
15      A.    Those are the ones that I believe are
16  still in the process of settling.
17      Q.    Okay.  Did the releases that you sign --
18  in those releases, did you agree to provide any
19  assistance or help to the plaintiffs' counsel in any
20  other litigation?
21      A.    On behalf -- you -- meaning that I would
22  help him if he would agree to settle?
23      Q.    Yes.
24      A.    I don't believe so.
25      Q.    Do the terms of any of those releases

Page 79

1  call for you to provide any more information to the
2  plaintiffs continuing past the resolution, the
3  settlement of the case?
4      A.    I don't believe so.
5      Q.    Do you know if you assigned any of your
6  rights in any of these releases that you signed?
7      A.    I don't know.  I don't think so.
8      Q.    Did the Baker Donelson firm represent
9  you --
10      A.    Yes.
11      Q.    Let me finish my question.
12      A.    I'm sorry.
13      Q.    Did they represent you in the course of
14  drafting and negotiating the terms of those releases?
15      A.    Yes.
16      Q.    Did Swafford admit any liability in any
17  of those releases?
18      A.    No.
19      MR. MINOR:  Let me look back through my
20  notes.  I may be finished.
21      (Pause.)
22  BY MR. MINOR:
23      Q.    Have there been any judgments against
24  Swafford?  I'm not talking about settlements, but
25  rulings by a court or a jury that Swafford was liable

Page 80

1  for any civil violation?
2      A.    No.
3      MR. MINOR:  That's all the questions I
4  have at this time.
5      MR. UNDERWOOD:  Okay.  Let me ask the
6  reporter a question.  I sent up a package of
7  exhibits.  Do you have them?
8      THE REPORTER:  Yes.  They're right here.
9      MR. UNDERWOOD:  Okay.  And there should
10  be a stack of documents numbered 1 through 183 and
11  also another document that's about four pages
12  long.  Is that what you have?  Let's see how many
13  pages.  Eight pages.
14      THE REPORTER:  I've got two renotices of
15  taking deposition, amendment number 2,
16  Transnational Title Insurance company, and then
17  I've got the Bates document you're talking about.
18      MR. UNDERWOOD:  All right.  Great.
19      Do you guys want to take a break, or get
20  started?
21      MR. MINOR:  We're ready.
22      MR. UNDERWOOD:  Okay.
23  EXAMINATION BY MR. UNDERWOOD:
24      Q.    Greg, I want you to do something -- may I
25  call you Greg?

Page 81

1      A.    Sure.
2      Q.    I want you to do something.  I want you
3  to start with what you did in Birmingham and just walk
4  us through how everything that you guys do in one of
5  these transactions.
6      And the first question I would ask you is
7  this:  How would Swafford and Hays know that Ms. Cheryl
8  Frazier in Dothan, Alabama needed a loan closed?
9      A.    The broker or lender would send us an
10  order asking for us to issue a commitment for insurance
11  on that loan.
12      Q.    And how would that be received by
13  Swafford now?
14      A.    Via e-mail or fax.
15      Q.    And what's the next thing that would
16  happen then?
17      A.    We would then order an abstract search by
18  an abstractor or third party to go to the courthouse
19  and search that property's records and that borrower's
20  records.
21      Q.    All right.  And who was the abstractor in
22  this transaction that we're here about today?
23      A.    It looks like it was Southern Land &
24  Title.
25      Q.    Now, Mr. Minor may have asked you this,

Page 82

```
 1   but do you know what their charge was in this
 2   transaction?
 3      A.    No, I do not.
 4      Q.    Do you know what their typical charge
 5   was?
 6      A.    I'm sorry, no, I don't.
 7      Q.    All right.  Where is that information
 8   available?
 9      A.    It would be in accounting records at my
10   office.
11      Q.    That was the typical charge and the
12   charge for Ms. Frazier's work?
13      A.    Yes.
14      Q.    You didn't bring that with you today?
15      A.    No, I did not.
16      Q.    What's the next thing that would happen
17   after receipt -- well, after order for the abstract?
18      A.    The abstract would come back, we would
19   make sure that all the documentation was there, copies
20   of all the judgements, legal description, deeds of
21   trust, mortgages.  We would then issue a commitment for
22   insurance and send that to the broker or lender.
23      Q.    Now, physically, who would do that in
24   your office?
25      A.    There were departments that would do it.
```

Page 83

```
 1   It could have been -- varied number of people.
 2      Q.    Can you look at this file and tell us who
 3   it was?
 4      A.    Not with the information I have, no.
 5      Q.    And there were four that you received
 6   from Southern Land Title, is that document -- first
 7   off, has the reporter given you the documents I have
 8   sent up there?
 9      A.    He has not yet.
10            MR. UNDERWOOD:  Okay.  If you would hand
11      those documents to the witness, Mr. Reporter.  And
12      there should be a copy there for Mr. Minor as
13      well.
14            THE WITNESS:  Okay.  I have them.
15      Q.    Let me direct your attention to page 77.
16      A.    Okay.
17      Q.    What is that document, please, sir?
18      A.    It is the write-up sheet from the
19   abstractor on this property.
20      Q.    And what would your employee do when they
21   receive this write-up sheet?
22      A.    This is the sheet that they would have
23   used to make sure that all the appropriate copies and
24   backup documentation was attached.
25      Q.    All right.  And would they transfer this
```

Page 84

```
 1   information over to the title policy?
 2      A.    Title commitment, yes, they would.
 3      Q.    And then what's the next thing that would
 4   happen?
 5      A.    The commitment would be sent to the
 6   broker or lender, and we would wait for instructions
 7   from them.
 8      Q.    And what would be the next instructions
 9   you would typically receive?
10      A.    It varies per file, but typically they'll
11   let us know if there's any borrowers that need to be
12   removed, added via quitclaim or warranty deed.  They
13   would tell us if they did payoffs on any of the taxes
14   or any of the liens or judgments that we gave them
15   information for.  If there was anything that they
16   thought was improper on title, meaning that it wasn't
17   actually the borrower's lien or judgment or something
18   had been paid in the past, we would research that for
19   them.
20      Q.    All right.  And, of course, all that
21   information is included on page 78 and 79, isn't it?
22      A.    What do you mean by "all that information
23   is included"?
24      Q.    Well, whether or not there are judgments,
25   taxes owing and that type of thing.
```

Page 85

```
 1      A.    Right.
 2      Q.    And that's part of the abstractor's job,
 3   was to get that information for you; is that a fair
 4   statement?
 5      A.    Yes, to get us copies of that
 6   information.
 7      Q.    All right.  And assume for me that the
 8   lender wanted to go ahead with the loan.  What's the
 9   next thing then that would happen?
10      A.    It varies per lender how it comes to us,
11   but they would send us over a HUD request or
12   instructions to close or sometimes they would just call
13   us and tell us they'd like us to go ahead and schedule
14   a closing on a certain date.  But they would let us
15   know at that point that they're ready to close.
16      Q.    All right.  Back in 2005, who was
17   Swafford Settlement Services' biggest customer?
18      A.    I believe it was Homeowners Loans still
19   in 2005.
20      Q.    All right.  And who would have been the
21   second largest customer?
22      A.    Home Funds very well may have been the
23   second, I'm not sure at that time.
24      Q.    Is it fair to say that Swafford
25   Settlement Services would have closed hundreds of loans
```

Page 86

1  for Home Funds Direct?
2        MR. MINOR: Object to the form.
3     A.    I'm not sure about hundreds, quite a few.
4     Q.    All right. Let me ask it this way: Do
5  you have an opinion about how many loans Swafford
6  Settlement Services has closed for Home Funds Direct?
7     A.    No, I do not.
8     Q.    Would it be more or less than a hundred?
9     A.    My guess would be more than a hundred.
10    Q.    Are you familiar with the -- well, let me
11 ask it this way. All right. I believe you told me
12 that when the broker or lender wanted to go ahead with
13 the transaction after receipt of the title commitment,
14 was the HUD-1 prepared, is that what you said?
15    A.    You mean if they wanted to proceed with
16 closing? Yes, a HUD-1 statement was prepared.
17    Q.    All right. And if you would, describe
18 the process for doing that with regard to Accredited
19 loans or Home Funds Direct loans.
20    A.    They would have instructed us as to what
21 their fees would be. We would put those fees, our
22 fees, any payoffs of judgments, liens, et cetera, plus
23 any creditors that weren't on title that they wanted to
24 pay in addition, that they would instruct us to pay.
25 And then we would send the HUD over for approval.

Page 87

1     Q.    And typically how was that done?
2     A.    Via e-mail. Is that what you mean?
3     Q.    Yes.
4     A.    Okay. Yeah, via e-mail. And, you know,
5  depending on the company, it would either be their
6  closing department or underwriters that would approve
7  it.
8     Q.    And where would you get the fees that
9  Home Funds Direct would be charging?
10    A.    They would give them to us.
11    Q.    In what form?
12    A.    I believe Home Funds Direct had closing
13 instructions which was actually where they were listed.
14    Q.    All right. Is that document 100?
15    A.    Yes, it is.
16    Q.    Once your fees are added to the HUD-1
17 settlement statement, what's the next step in the
18 process?
19    A.    Well, that's -- like I said before,
20 that's joined in with adding their fees, our fees,
21 everything that's supposed to be paid off, and we send
22 it for approval.
23    Q.    It's sent to Home Funds Direct for
24 approval?
25    A.    Yes.

Page 88

1     Q.    And what happens after that?
2     A.    They either approve it and send over a
3  closing package that we can go ahead and send to the
4  notary or attorney, or someone on staff if it's a local
5  closing. Or they tell us that they need us to amend
6  the fees or the payoffs in some way.
7     Q.    All right. Let me ask you to assume that
8  it's approved. What's the next step?
9     A.    We send the HUD and all of the documents
10 to the notary or attorney for closing.
11    Q.    And how is that done?
12    A.    Typically via e-mail. If not e-mail,
13 fax.
14    Q.    And did you say it's not e-mailed back?
15    A.    No, I said if not e-mail, then we do it
16 via fax.
17    Q.    I see; okay.
18          All right. And then after the -- well,
19 let me back up a little bit and let me ask you this:
20 How do you locate a notary in Dothan, Alabama?
21    A.    There would have been several different
22 options we would have had. People we've used before in
23 Alabama. Notary Rotary. There's different websites
24 that you can go to to find notaries that are approved
25 in that area.

Page 89

1     Q.    And I believe you already told us that
2  you don't know what the notary charged in this
3  transaction; was that right?
4     A.    That is correct.
5     Q.    All right. And where is that information
6  available?
7     A.    We would have paid her, I believe, out of
8  QuickBooks. It would be in our accounting records.
9     Q.    And is that information still available?
10    A.    From 2005? It should be.
11    Q.    All right. You didn't bring it with you
12 today, did you?
13    A.    No.
14    Q.    All right. After the loan is closed by
15 the notary, what happens next?
16    A.    They overnight the loan package back to
17 us, and we put it in a specific order. Each lender has
18 their own particular order that they prefer it to be
19 in. We verify signatures, dates for accuracy. We make
20 sure everything that needs to be notarized is
21 notarized. There are things, forms that the lender has
22 in there that we have to follow step by step. And then
23 we sign our own names to verifying accuracy, verifying
24 everything that's in the file. And then we send it to
25 the lender for funding approval via overnight.

Page 90

1    Q.    All right. And what happens after that?
2    A.    They would give us the wire and a funding
3  approval to fund the loan.
4    Q.    Has the mortgage -- how is the mortgage
5  sent for recording?
6    A.    It's not sent for recording until the
7  loan funds and checks are disbursed, and then we would
8  send it for recording. And there is usually someone on
9  staff that calls that courthouse and asks for specific
10  instructions to see if there's -- because each
11  courthouse is different to know what they require.
12    Q.    Someone on you staff calls the
13  courthouse?
14    A.    Yes.
15    Q.    Do they get the amount of the recording
16  fee from the courthouse?
17    A.    Either from the courthouse or from Ernst
18  Publishing. It's usually verified with the courthouse
19  though.
20    Q.    And where is the -- physically the
21  original mortgage at the time that a person would call
22  the courthouse to verify the recording fees?
23    A.    It's in Swafford's possession.
24    Q.    All right. And does someone count the
25  number of pages in the mortgage so that they can

Page 91

1  accurately compute the recording fee for the mortgage?
2    A.    That is correct.
3    Q.    And how long has that been Swafford's
4  practice?
5    A.    To count the pages before we send it out
6  for recording?
7    Q.    Yes, sir.
8    A.    Since the day that we opened, I believe.
9    Q.    All right. I thought you said earlier
10  that many times you didn't know how many pages were in
11  the mortgage when you sent it for recording.
12    A.    No, I said we don't -- when we do the HUD
13  settlement statement, we don't know how many pages are
14  in the mortgage.
15    Q.    Thank you.
16    A.    You're welcome.
17        MR. MINOR: Is that all you have, Earl?
18        MR. UNDERWOOD: No, no, it's not all I
19  have.
20        MR. MINOR: Oh.
21        MR. UNDERWOOD: Not by a long shot.
22        MR. MINOR: Oh, okay.
23  BY MR. UNDERWOOD:
24    Q.    Mr. Swafford, was there a time that
25  Swafford and Hays or Swafford Settlement Services was

Page 92

1  losing money on recording fees?
2    A.    Yes.
3    Q.    And about when was that, please, sir?
4    A.    I would guess 2001 through 2002, possibly
5  2003.
6    Q.    All right. And was there some sort of
7  change in the procedure for the determination of the
8  recording fee at that time?
9    A.    Yes.
10    Q.    And if you would, tell us about that.
11    A.    We started calculating the recording fee
12  with the maximum number of pages charged that could possibly be
13  sent to that courthouse, meaning that we allowed for
14  the largest deed of trust we had ever recorded,
15  endorsements -- not endorsements, but riders, things of
16  that nature.
17    Q.    And is it fair to say for Alabama loans
18  that that fee was $120 typically?
19    A.    Yes. I believe so.
20    Q.    And how long was that practice in place?
21    A.    I do not know the exact amount of time.
22  Maybe a couple years, three years, I'm not sure.
23    Q.    All right. And during that time period,
24  were there occasions where Swafford would charge more
25  for the recording fee than was actually required for

Page 93

1  the recording of the mortgage?
2    A.    Yes.
3    Q.    And what would happen to the difference
4  between the recording fee that was charged on the HUD-1
5  as opposed to what was actually charged by the
6  recording by the probate court?
7    A.    For a period of time it was retained by
8  Swafford.
9    Q.    And did that happen with regard to
10  Ms. Frazier's file?
11    A.    I believe so.
12    Q.    And do you know how much recording fee
13  was retained by Swafford with regard to Ms. Frazier?
14    A.    I do not know. I do not know what the
15  original recording fee was, and I don't know what -- if
16  we had recorded any releases or anything afterwards, so
17  I'm not sure.
18    Q.    Now, your company keeps a ledger for each
19  file and that sort of thing; does it not?
20    A.    Yes, it does.
21    Q.    Okay. And did you bring any of those
22  documents with you today?
23    A.    No. I thought the ledger was in here,
24  but I don't know if it is.
25    Q.    All right. Well, in any event, let me

Page 94

1  ask you to look at page 31.
2      A.    Okay.
3      Q.    Okay. Do you see -- well, first off,
4  tell us what that is.
5      A.    It's a legal description, it's Exhibit A.
6      Q.    And there's some small print down toward
7  the bottom of the page. Do you know what that is?
8      A.    It looks like what their recording fee
9  and mortgage tax fee were for this file from the
10 courthouse.
11     Q.    Okay. And is there more than one
12 component of the total recording cost for a mortgage?
13     A.    It appears that in Alabama, yes, there's
14 a mortgage tax and the recording fee.
15     Q.    All right. And if you would, let me ask
16 you to look over to page 132.
17     A.    Okay.
18     Q.    And if you'd look at line 1201.
19     A.    Yes.
20     Q.    How much was Ms. Hall charged for
21 recording fee according to that HUD-1?
22     A.    $120.
23     Q.    And how much was that recording fee
24 according to document number 31?
25     A.    For mortgage, it was for $56.

Page 95

1      Q.    And so did Swafford retain the $64
2  difference?
3      A.    Yes.
4      Q.    Now, let me ask you if you would to flip
5  over to page 3.
6      A.    Okay.
7      Q.    And what is that document, please, sir?
8      A.    It is a remittal form where we remit to
9  our underwriter.
10     Q.    It says "Commonwealth" at the top,
11 doesn't it?
12     A.    Yes.
13     Q.    Was that the underwriter that was used --
14 when you say "underwriter," do you mean the title
15 insurance company?
16     A.    Yes.
17     Q.    Was that the title insurance company that
18 was used in this transaction?
19     A.    Basically. Commonwealth was like the
20 parent company.
21     Q.    All right. And there's a -- well, first
22 off, it says the loan amount. What is the loan amount?
23     A.    56,000.
24     Q.    And in the next column next to that, it
25 says "gross premium" --

Page 96

1      A.    Right.
2      Q.    -- "$126"; is that right?
3      A.    That's correct.
4      Q.    Where does that figure come from?
5      A.    The person sending the final policy and
6  the remittal would have calculated from sheets
7  that are provided or on line, rates that are provided
8  by the underwriter.
9      Q.    All right. And let me ask you if you
10 would to take a look at the other --
11         MR. UNDERWOOD:  Reporter?
12         THE REPORTER:  Yes.
13         MR. UNDERWOOD:  Would you mark the other
14 document? The Amendment No. 2, Transnation Title
15 Insurance Rates. Let's go ahead and mark these.
16 Mark these Bates stamped ones, Plaintiff's
17 Exhibit 1 and mark this other one as Plaintiff's
18 Exhibit 2.
19         MR. MINOR:  Do you want to just do them
20 consecutively, Earl, or just do one -- make mine 1
21 and yours 2 and 3?
22         MR. UNDERWOOD:  That will be fine.
23         MR. MINOR:  Okay.
24         MR. UNDERWOOD:  Wait a minute, what are
25 we marking as 1?

Page 97

1          MR. MINOR:  You know, I gave him at the
2  beginning of my deposition all of my exhibits, and
3  I just was going to do them a composite 1.
4          MR. UNDERWOOD:  Yeah, sure, that's the
5  easiest way to do it. All right. Just mark mine
6  2 and 3, that will be fine.
7          MR. MINOR:  Okay.
8      (Exhibit 2 - documents bearing Bates production
9      numbers Swafford0001-183.)
10     (Exhibit 3 - document entitled Amendment No. 2
11     Transnation Title Insurance Company Title
12     Insurance Premium Charges Revised October 28,
13     2002.)
14         THE REPORTER:  Okay. They're marked.
15         MR. UNDERWOOD:  Give the witness Exhibit
16 No. 3, please.
17         THE WITNESS:  I have it.
18 BY MR. UNDERWOOD:
19     Q.    Have you seen a document like this
20 before?
21     A.    Yes.
22     Q.    Just tell us what it is.
23     A.    It appears to be the rates from
24 Transnation Title.
25     Q.    And is that the company that was used to

Page 98

1  write title insurance for the transaction we're here
2  about this afternoon?
3      A.    It was.
4      Q.    And if you would, take a look and review
5  it for me. You're familiar with these documents,
6  aren't you?
7      A.    Fairly familiar.
8      Q.    And take a look at it and tell us which
9  one of these rates would apply to Mrs. Frazier's
10 transaction.
11     A.    Okay. It would have been number 3.
12     Q.    And if you would, Greg, tell us how you
13 would compute using number 3 the premium for
14 Mrs. Hall's transaction.
15     A.    Well, up to a hundred thousand, you would
16 have done $2.25 per thousand. Anything else additional
17 in the loan amount above a hundred thousand up to
18 500,000 would have been $1.75 per thousand.
19     Q.    Okay. How much was her loan?
20     A.    I think we said 56, so it would have been
21 56 times $2.25.
22     Q.    Well, I get $126. Is that what you get?
23     A.    I don't have a calculator.
24     Q.    Okay. Well, can you take a minute, and
25 maybe you can figure it out longhand and see what you

Page 99

1  get.
2      A.    Sure.
3            MR. MINOR: Do you want a piece?
4            THE WITNESS: Yeah, if you don't care.
5            MR. MINOR: Sure.
6      A.    In longhand, I came up with 136, but
7  maybe I made a mistake.
8      Q.    Well, if -- double-check it.
9      A.    Yeah, yeah.
10     Q.    Okay. Go ahead. What did you get?
11     A.    126.
12     Q.    All right. So if you flip back over to
13 page number 3, that was the charge on the Commonwealth
14 remittal form; is that right?
15     A.    Right.
16     Q.    Now, let me ask you, let's look back at
17 page 132. And if you would look at line 1109. And do
18 you see the figure there of $67,500?
19     A.    Yeah.
20     Q.    Do you know why that's there instead of
21 the 56,000 that we talked about earlier?
22     A.    I have no clue.
23     Q.    All right. And this is the form that
24 went to Home Funds Direct, isn't it?
25     A.    Yes.

Page 100

1      Q.    The one that they approved?
2      A.    Yes.
3      Q.    And on to line 1108, can you tell us
4  again why the charge was $200 instead of 126?
5      A.    I don't know. It looks like -- I don't
6  know if this calculates up, but it looks like they were
7  using 67,500 in error.
8      Q.    Well, would you do that calculation for
9  me and tell me what you get?
10     A.    Sure.
11           THE WITNESS: I gave you your pen back
12 already. Sorry.
13           MR. MINOR: Oh.
14     Q.    I get 151,750. Is that what you get?
15     A.    750. Yeah.
16     Q.    So you'd round that up to 152, wouldn't
17 you?
18     A.    Probably, yes.
19     Q.    So that's still $1300, isn't it?
20     A.    Yes.
21     Q.    All right. And do you have any other
22 explanation for the difference?
23     A.    I do not.
24     Q.    Now, if you would, drop down to -- well,
25 let me ask you this: Isn't it true that for a period

Page 101

1  of time that Swafford and Hays and/or Swafford and Hays
2  Settlement Services had a minimum charge for title
3  insurance of $200?
4      A.    I don't know. I believe we might have.
5  We didn't have any kind of policy about that, but I
6  believe that the closing department did do that.
7      Q.    For what time period did that take place?
8            THE WITNESS: Oh, I'm sorry.
9      A.    I don't know.
10     Q.    Was that policy in effect at the time of
11 Ms. Frazier's loan?
12     A.    I don't know for sure, but it appears
13 like it was.
14     Q.    All right. Who would have that
15 information about when that policy was in effect?
16     A.    I don't think there would be anything
17 that I could produce for any time, specific period of
18 time.
19     Q.    All right. Let me ask you about line
20 111.
21     A.    Uh-huh.
22     Q.    Or 1111, I'm sorry. There's a $50 charge
23 in there for an endorsement; is that right?
24     A.    Yes.
25     Q.    Now, what endorsement was that for?

Page 102

1      A.    I'm not sure.
2      Q.    Okay. Well, you have the closing package
3  there, don't you? Can you not look through it and tell
4  us what endorsement was required by the lender that
5  Ms. Hall was charged $50 for?
6      A.    Do you remember what page the lender's
7  instructions are?
8      Q.    Let's see.
9          MR. MINOR:  It might not be numbered the
10  same in his.
11          MR. UNDERWOOD:  I think they're the same
12  numbers.
13          MR. MINOR:  Okay. Was it 98 or a
14  hundred?
15          THE WITNESS:  I found it.
16          MR. MINOR:  99.
17  BY MR. UNDERWOOD:
18      Q.    If you flip over to page 101, I believe
19  you said earlier that it had something to do with
20  number 15 on page 101 close to the bottom?
21      A.    Right. It would have either been number
22  9 or number 15.
23      Q.    Okay. Now, was this a standard
24  residential policy or commercial policy?
25      A.    This would have been residential.

Page 103

1      Q.    If you would, let me get you to look at
2  Exhibit No. 3.
3      A.    Okay.
4      Q.    All right. Flip over to the -- do this
5  for me, have the reporter do this on the record so
6  we'll be straight. I need the pages for this exhibit
7  numbered. I should have done that before I sent it to
8  you guys. I've got eight pages.
9      A.    Okay. He's done that and given it back
10  to me.
11      Q.    All right. Let me ask you to look at
12  page 4.
13      A.    Okay.
14      Q.    All right. And the last paragraph. If
15  you would, start with the line endorsement charges and
16  read that sentence for me.
17      A.    The one that says, "all commercial
18  endorsements"?
19      Q.    No, the next sentence.
20      A.    Okay.
21      Q.    Starting with "endorsement charges."
22      A.    "There will be no charge for the standard
23  residential endorsements."
24      Q.    Now, well, according to that then, there
25  shouldn't have been any charge for any other

Page 104

1  endorsement on a standard residential policy; isn't
2  that right?
3      A.    You are correct.
4      Q.    Now, do you know that -- whether or not
5  Swafford ever adopted a policy of refunding some of
6  these recording fees that were charged on 1201?
7      A.    Yes, we did.
8      Q.    And do you know when that was?
9      A.    I don't know the specific date, no.
10      Q.    And do you remember why that was done?
11      A.    We felt like we should not be retaining
12  the recording fees if they were not used for the actual
13  recording of the mortgage or future releases, et
14  cetera.
15      Q.    Who is Bill Long?
16      A.    Bill Long is -- was an attorney that
17  worked for Homeowners Loan.
18      Q.    And did he bring it to your attention
19  that charging more than the recording fee might be a
20  RESPA violation?
21      A.    I believe he might have, yes.
22      Q.    And wasn't that when the policy changed?
23      A.    Probably so, yes, that sounds right.
24      Q.    And do you recall a series of e-mails
25  between you and Bill Long regarding the charge on line

Page 105

1  1111, the endorsement fee?
2      A.    I do not.
3      Q.    Well, do you have any knowledge of the
4  endorsement fee being charged in lieu of the additional
5  recording charge?
6      A.    An endorsement fee being charged in lieu
7  of what?
8      Q.    Of the additional recording charge.
9      A.    No, I do not.
10      Q.    Well, isn't this what happened, didn't
11  you start -- Swafford start refunding recording fees
12  after learning from Mr. Long that that might be a RESPA
13  violation and then just start charging the $50
14  endorsement fee to make up the difference?
15      A.    I think there was a fee that we did -- we
16  were charging, but I don't believe it was an
17  endorsement fee.
18      Q.    Now, if you would, Mr. Swafford, can you
19  look at the documents there in front of you and tell us
20  what service that Mrs. Frazier would have gotten for
21  this $50 on the endorsement fee on line 1111?
22      A.    On endorsement fee doesn't have any
23  service other than endorsements.
24      Q.    Okay. And -- well, if she got an
25  endorsement, wouldn't it be -- would that be attached

Page 106

1 to the title policy?
2    A.    To the title, the final policy, yes.
3    Q.    All right. And is that -- look at
4 document number 5.
5    A.    Okay.
6    Q.    Is that the final policy?
7    A.    It appears to be, yes.
8    Q.    And can you look at it and tell me what
9 endorsements there were on the policy?
10    A.    Environmental protection lien endorsement
11 is the only one that I see.
12    Q.    And is that a standard residential
13 endorsement?
14    A.    I'm not sure. I believe it probably is.
15    Q.    Show me what page, tell me what page that
16 you saw the environmental endorsement.
17    A.    Page 9.
18    Q.    And is that an endorsement form 8.1?
19    A.    Yes.
20    Q.    And what does ALTA stand for?
21    A.    American Land Title Association.
22    Q.    And let me direct your attention again
23 now to page 4 of Exhibit No. 3.
24    A.    Okay. Okay.
25    Q.    All right. Let me ask you if you would

Page 107

1 to look at that last paragraph. And I want you to
2 come -- do you see the word "minerals" that would be
3 the last word on the left if you go down?
4    A.    Yes.
5    Q.    All right. Do you see ALTA 8.1 right
6 above that?
7    A.    Yes.
8    Q.    Environmental lien?
9    A.    Yes.
10    Q.    This is the same form as is in this
11 endorsement that's on page 9, isn't it?
12    A.    Yes.
13    Q.    And it's already included in the base
14 premium according to the Alabama rate, isn't it?
15    A.    According to this page 4, yes.
16    Q.    So it would be -- is it true then
17 Mrs. Frazier would have already paid for it in the base
18 premium?
19    A.    Yes.
20    Q.    There wasn't any other endorsement or
21 anything else she could have received in exchange for
22 that $50 that she was charged on 1111?
23    A.    Not that I can see, no.
24    Q.    Let me ask you if you would to look at
25 page 13.

Page 108

1    A.    Okay.
2    Q.    And if you would, tell us what that is,
3 please, sir.
4    A.    It's the on-line calculator for loan
5 premiums.
6    Q.    And what was the occasion, or how was
7 this document generated?
8    A.    It doesn't have any reference to it, so
9 I'm assuming that it was generated for this loan. I'm
10 not sure.
11    Q.    Is this something that's usually in your
12 closing file?
13    A.    I don't know if we always print it off,
14 but it would be standard, yeah, it would be something
15 that you would see in files.
16    Q.    Now, does Transnation ever audit Swafford
17 and Hays to make sure that they're getting the proper
18 amount of premium?
19    A.    Yes, all -- well, I shouldn't say "all,"
20 every underwriter we've ever had has had regular
21 audits.
22    Q.    Sure. And how is it that they do that?
23    A.    They come into the office and look at
24 random -- they pull files at random and audit the
25 files.

Page 109

1    Q.    And do you know how they -- what
2 calculations they go through to make sure that they're
3 getting paid what she should be receiving?
4    A.    No, I'm sorry, I don't. I'm not sure
5 what -- what is entailed in their audits.
6    Q.    All right. What other title insurance
7 companies have you done business with since Swafford
8 and Hays or Swafford Settlement Services has been in
9 business?
10    A.    American Pioneer is what we originally
11 were with, which became Ticor. And we've done business
12 with the Commonwealth family, which is Commonwealth,
13 Transnation and Lawyer's Title.
14    Q.    And do you still do business with Ticor
15 anymore?
16    A.    I do not.
17    Q.    Why is that?
18    A.    We went strictly with Commonwealth.
19    Q.    Didn't they terminate your agency?
20    A.    No, they did not.
21    Q.    Did you ever have any conversations with
22 anyone from Ticor about -- with regard to charging more
23 than the legal rate for title insurance?
24    A.    I don't remember. No, I don't believe
25 so, but I don't remember.

Page 110

1    Q.    Was that an issue with Ticor?
2    A.    I don't recall them ever bringing that to
3  my attention.
4    Q.    Now, Mr. Minor asked you some questions
5  about -- let me see, let me find the page. Sorry,
6  guys, just a little clumsy doing this over the phone.
7    A.    That's fine.
8    Q.    If you would, let me get you to turn over
9  to page 131. And we're in Exhibit 2.
10   A.    Okay.
11   Q.    I think what I need is on the next page,
12 page 132.
13        Now, this charge on line 801, where did
14 that come from?
15   A.    801 would be given to us from Home Funds
16 Direct.
17   Q.    And what about line 803?
18   A.    The same.
19   Q.    Was there an appraisal done in this file?
20   A.    I would not know. We don't normally get
21 the appraisals. We don't order them.
22   Q.    Did you order them for Homeowners Loan
23 Corporation?
24   A.    No, to my knowledge, we've never ordered
25 an appraisal for any lender.

Page 111

1    Q.    Let me ask you to look at line 903.
2  Do you know where that figure came from, hazard
3  insurance?
4    A.    It would -- it would be from the lender.
5    Q.    What about line 1004?
6    A.    That would be a calculation that -- it
7  can come from the lender, it can come from us, but
8  typically that's just to set up an escrow account for
9  the lender, and it's so many months' worth of property
10 tax.
11   Q.    How would we tell in this transaction if
12 it was something that was figured by Swafford
13 Settlement Services or if it came from the lender?
14 Would it be on the closing instructions?
15   A.    Yeah, let me flip there real fast. It
16 appears that it was calculated by Home Funds, it's on
17 their closing instructions.
18   Q.    All right. What line is that on? I just
19 want to get there.
20   A.    It's on page 100, and it's line 1001,
21 hazard insurance, four months.
22   Q.    Okay, thank you.
23   A.    Oh, wait, wait, wait, I'm sorry. Yes,
24 that's it. Are we on -- yeah, are we talking about 101
25 still? I'm sorry.

Page 112

1    Q.    Yes, yes.
2    A.    Okay.
3    Q.    Now, did Home Funds Direct require the
4  use of Swafford Settlement Services to close this loan?
5    A.    The borrower?
6    Q.    Yes.
7    A.    Not my knowledge. They had more than one
8  title company.
9    Q.    Well, do you know if they sent the loan
10 package to any other title company for closing?
11   A.    I wouldn't have any way of knowing that.
12   Q.    Okay. Let's go back to page 132 if you
13 would.
14   A.    Okay.
15   Q.    I think you testified earlier that there
16 were a number of services done by, this says, "Swafford
17 and Hays Settlement Services." Were you doing business
18 as Swafford and Hays back then if it says so on here?
19   A.    Probably so, yes.
20   Q.    And that there were a number of services
21 performed by Swafford and Hays Settlement Services
22 including notary service for that charge on line 1101?
23 That was your earlier testimony, right?
24   A.    That is correct.
25   Q.    And were each of those services required

Page 113

1  by Home Funds Direct?
2    A.    Everything that we would have done would
3  have been something that they required, yes.
4    Q.    You didn't do anything on line 1101 that
5  they didn't require, did you?
6    A.    No.
7    Q.    All right. I mean, a notary was
8  required?
9    A.    Correct.
10   Q.    All right. Now, what about on line 1102,
11 were those services also required by Home Funds Direct?
12   A.    Yes.
13   Q.    And would the same be true of the
14 services on line 1103?
15   A.    Yes.
16   Q.    And did they also require title
17 insurance? When I say "they," I mean Home Funds
18 Direct.
19   A.    Yes, they did.
20   Q.    And did they also require that the
21 mortgage be recorded?
22   A.    Yes, they did.
23   Q.    And I believe you said this already, but
24 did they require each of the charges that were rendered
25 on the document, page 132?

Page 114

1    A.    Yes.
2    Q.    Let me ask you if you would to turn over
3    to page 134.
4    A.    Okay.
5    Q.    And are you familiar with that document?
6    A.    Truth in lending, yes.
7    Q.    Who prepares that document?
8    A.    The lender.
9    Q.    Do you know why it would have recording
10   fees, $170 on it?
11   A.    I do not.
12   Q.    Do you see that down in about the middle
13   of the page?
14   A.    I do.
15   Q.    Was there anything unusual about
16   Mrs. Frazier's loan?
17   A.    Not that I know of.
18   Q.    Was it typical of the loans that you had
19   closed for Home Funds Direct?
20   A.    I believe so, yes.
21        MR. UNDERWOOD: You guys want to take
22   about ten minutes? I don't have a whole lot more,
23   I don't think.
24        MR. MINOR: Okay.
25        MR. UNDERWOOD: And are you going to call

Page 115

1    back, or do you want me to call?
2         MR. MINOR: We'll call.
3         MR. UNDERWOOD: Why don't you call then
4    at, I've got 11:20 right now, at 11:30.
5         MR. MINOR: Okay.
6         MR. UNDERWOOD: Okay. All right.
7    Thanks.
8         (Recess taken.)
9         MR. UNDERWOOD: I have just a few more
10   questions and I'll be finished. Just let me know
11   when we're back on the record.
12        THE VIDEOGRAPHER: We're back on the
13   record.
14        MR. UNDERWOOD: All right.
15   BY MR. UNDERWOOD:
16   Q.    Greg, if you would, let me ask you to
17   take a look at page number 37 -- well, 36 and 37.
18   A.    Of Exhibit 2, right?
19   Q.    Yes, that's right, thank you.
20   A.    Okay.
21   Q.    And -- well, let's go back one more page
22   to page 35.
23   A.    Okay.
24   Q.    And if you would, tell me what that is.
25   A.    It's a fax from Home Funds Direct saying

Page 116

1    that our HUD was approved and giving -- and asking us
2    to get it signed along with a flood zone notice that
3    they must have included in the fax.
4    Q.    Okay. And it says on there regarding
5    Hall. Is that the same transaction we're here about?
6    A.    I think so. I think -- I believe -- I
7    don't know if she had a maiden name or not, but I know
8    in our files at the office -- Cheryl Hall Frazier is
9    what it is.
10   Q.    Okay. All right. Thank you.
11        If you would, take a look at the next
12   page, number 36.
13   A.    Okay.
14   Q.    And up at the top, it has something
15   written in there in someone's handwriting. Do you know
16   what that is?
17   A.    It says, "approved."
18   Q.    And who would have written that on there?
19   A.    It would have been someone at Home Funds
20   and their initials, but I don't know who that is.
21   Q.    Is this the process that you described
22   earlier where the figures on the HUD-1 are approved by
23   a lender?
24   A.    Yes.
25   Q.    And is this typical of the way that's

Page 117

1    done on the Home Funds loan?
2    A.    I believe so, yes. It was either by fax
3    or e-mail, yes.
4    Q.    All right. And what about the next page,
5    37?
6    A.    That's just a second page to the HUD that
7    she approved or he.
8    Q.    Okay.
9    A.    Oh, it appears to be Brita Dickerson, BD,
10   because that's who's on the fax cover sheet.
11   Q.    I'm sorry, say that one more time.
12   A.    You asked who did it, and I just realized
13   that the initials BD on page 36 are probably for Brita
14   Dickerson, because that's the name on page 35.
15   Q.    Okay. All right. Thank you very much.
16        MR. UNDERWOOD: Let me ask the reporter
17   to mark the deposition notice from my office as
18   the next exhibit. It would be Exhibit 4.
19        (Exhibit 4 - document entitled Re-Notice of
20   Taking Rule 30(b)(6) Deposition.)
21        THE WITNESS: Okay. I have it.
22   BY MR. UNDERWOOD:
23   Q.    All right. And if you would,
24   Mr. Swafford, let me get you to turn over to the third
25   page. They're not numbered.

Page 118

```
 1      A.    Okay.
 2      Q.    And let me direct your attention to
 3 numbered paragraph 4.
 4      A.    Okay.
 5      Q.    Before I ask this question, let me ask
 6 you if you've seen this document before, this
 7 deposition notice?
 8      A.    I believe so, yes.
 9      Q.    All right.  Did you receive it with a
10 subpoena?
11      A.    I believe so, yes.
12      Q.    All right.  And in paragraph 4, it asks
13 you to bring copies of canceled checks, ledger entries,
14 accounting, truth-in-lending disclosures, and title
15 insurance forms.  And we have some of those forms, but
16 did you bring any canceled checks?
17      A.    No.  We don't actually get canceled
18 checks back with our bank statements.
19      Q.    And did you bring any ledger entries or
20 accounting entries?
21      A.    No.
22      Q.    And are those available at your place of
23 business?
24      A.    Yes.
25      Q.    Where is your place of business address?
```

Page 119

```
 1      A.    It is 9530 Hickory Knoll Lane.
 2      Q.    Is that your home?
 3      A.    It is.
 4            MR. UNDERWOOD:  Okay.  I believe those
 5 are all the questions I have right now.
 6            MR. MINOR:  All right.  I just have a few
 7 followups.
 8 CONTINUED EXAMINATION BY MR. MINOR:
 9      Q.    Would you turn to page 132 on Exhibit 2?
10            THE VIDEOGRAPHER:  Mr. Minor, your
11 microphone, please.
12      Q.    Got it?
13      A.    Yes.
14      Q.    Mr. Underwood questioned you about line
15 1109.  Do you see that?
16      A.    Yes.
17      Q.    Isn't it true that there's no charge
18 listed under Paid from Borrower's Funds at Settlement
19 out from line 1109?
20      A.    That is true.
21      Q.    Mr. Underwood also asked you some
22 questions about Bill Long at Home --
23      A.    Homeowners Loan.
24      Q.    Homeowners Loan.  And the questioning he
25 asked you, the questioning was about communications
```

Page 120

```
 1 from Mr. Long about refunding endorsement fees, your
 2 need to refund endorsement fees.  Do you recall that
 3 testimony?
 4      A.    Yeah, about title insurance, yes.
 5      Q.    Yes.
 6            Did you ever convey to anyone at Home
 7 Funds Direct Mr. Long's opinion about refunding those
 8 monies?
 9      A.    Not to my knowledge, no.
10      Q.    Do you recall what year you had that
11 conversation with Mr. Long?
12      A.    No, I don't.
13      Q.    Do you know one way or the other whether
14 it was before or after 2005?
15      A.    Actually, if I had to estimate, it would
16 be 2005, I just don't know when.
17      Q.    Okay.  Mr. Underwood also asked you
18 whether it was true that Home Funds Direct required the
19 fee charges listed on the HUD-1.  Do you recall that
20 testimony?
21      A.    Yes.
22      Q.    Isn't it true though that at no time did
23 Home Funds Direct require that any fees be marked up on
24 any amount?
25      A.    Yes.
```

Page 121

```
 1      Q.    Yes, that's a correct statement?
 2      A.    That's a correct statement.
 3            MR. MINOR:  That's all I have.
 4            MR. UNDERWOOD:  I do just have one, maybe
 5 one more, two more questions I should have asked a
 6 while ago.
 7 CONTINUED EXAMINATION BY MR. UNDERWOOD:
 8      Q.    Mr. Minor had asked you, Mr. Swafford, if
 9 there was any way that Home Funds Direct could have
10 looked at these figures, and they're on page 132, and
11 determined who they were paid for.  Do you remember
12 that question?
13      A.    I do.
14            MR. MINOR:  I'm going to object to the
15 form.  But go ahead.
16      Q.    Do you remember what your answer was?
17      A.    I don't remember his exact question, but
18 I thought I remember -- excuse me.  I remember it as
19 being something to the effect of was there any way that
20 they could -- that they would have known what the
21 actual or what charges were from other third parties,
22 something to that effect, and I thought I said no.
23      Q.    Right.  And what was your answer?
24      A.    No.
25      Q.    All right.  Was there any way that
```

Page 122

1    Mrs. Hall could have looked at these and known what the
2    third-party charges were?
3         A.    Well, in actuality, his question directed
4    it as far as did Swafford provide that information,
5    and, no, Swafford did not. But recording fees and
6    things of that nature are public record, if that's what
7    you're asking. So, I mean, there's ways that they all
8    could have known, but did Swafford provide that
9    information, no.
10        Q.    Let me ask it a little better. I'm doing
11   a clumsy job asking the question.
12             Did Swafford provide any information to
13   Mrs. Hall about who was -- about what portions of these
14   fees were being paid to third parties?
15        A.    No, I don't believe so.
16             MR. UNDERWOOD: Okay. That's all I have.
17             THE WITNESS: Okay.
18             MR. MINOR: No further questions.
19             FURTHER THIS DEPONENT SAITH NOT.
20
21
22
23
24
25

Page 123

1                    C E R T I F I C A T E

2     STATE OF TENNESSEE

3

4     COUNTY OF KNOX

5          I, Thomas J. Dorsey, Registered Professional

6     Reporter and Notary Public, do hereby certify that I

7     reported in machine shorthand the deposition of GREGORY

8     A. SWAFFORD, called as a witness at the instance of the

9     Defendant, that the said witness was duly sworn by me;

10    that the reading and subscribing of the deposition by

11    the witness was waived; that the foregoing pages were

12    transcribed under my personal supervision and

13    constitute a true and accurate record of the deposition

14    of said witness.

15          I further certify that I am not an attorney or

16    counsel of any of the parties, nor an employee or

17    relative of any attorney or counsel connected with the

18    action, nor financially interested in the action.

19          Witness my hand and seal this the 22nd day of

20    May, 2008.

21                              _____

22                              Thomas J. Dorsey, RPR
                                Certified Shorthand Reporter
                                and Notary Public
23                              My Commission Expires:
                                August 3, 2008

24

25

Case 1:08-cv-00011-MHT-SRW    Document 37-7    Filed 07/10/2008    Page 1 of 16

FRAZIER v. ACREDITED, et al.
CV08-11-MHT

CHERYL HALL FRAZIER
June 9, 2008

Page 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CHERYL HALL FRAZIER,
individually and on behalf of a
class of similarly situated
persons,

                CIVIL ACTION NO.:

    Plaintiff,

                1:08-CV-11-MHT

VS.

                JURY TRIAL DEMANDED

ACCREDITED HOME LENDERS, INC.,
d/b/a HOME FUNDS DIRECT,

                CLASS ACTION

    Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The deposition of CHERYL HALL FRAZIER,
taken at the law offices of Earl P.
Underwood, Jr., 21 South Section Street,
Fairhope, Alabama, on June 9, 2008,
commencing at approximately 1:05 p.m.

EXHIBIT

6

*FRAZIER v. ACREDITED, et al.*
*CV08-11-MHT*

*CHERYL HALL FRAZIER*
*June 9, 2008*

A P P E A R A N C E S
FOR THE PLAINTIFF:
   JAMES D. PATTERSON, ESQUIRE
   EARL P. UNDERWOOD, JR. LAW FIRM
   ATTORNEYS AT LAW
   21 SOUTH SECTION STREET
   FAIRHOPE, ALABAMA 36532
   251-990-5558

FOR THE DEFENDANT:
   ROBERT E. POUNDSTONE, IV, ESQUIRE
   BRADLEY, ARANT, ROSE & WHITE, LLP
   ATTORNEYS AT LAW
   ALABAMA CENTER FOR COMMERCE
   401 ADAMS AVENUE, SUITE 780
   MONTGOMERY, ALABAMA 36104
   334-956-7700

COURT REPORTER:
   KAREN T. McDONALD, CCR

Page 2

1        S T I P U L A T I O N
2        It is stipulated and agreed by and
3   between the parties hereto, through their
4   respective counsel, that the deposition of
5   CHERYL HALL FRAZIER may be taken before Karen
6   T. McDonald, Notary Public for the State at Large,
7   at the law offices of Earl P. Underwood, Jr., 21
8   South Section Street, Fairhope, Alabama, on June 9,
9   2008.
10       It is further stipulated and agreed that
11  this deposition is taken pursuant to the Federal
12  Rules of Civil Procedure. The provisions of Rule
13  32(d)(3) dealing with waiver of errors and
14  irregularities as to the taking of the deposition
15  apply fully to this deposition.
16       Notice of the deposition and any errors
17  or irregularities therein [Rule 32(d)(1)] and any
18  objections to the qualifications of the officer
19  before whom this deposition is taken [Rule 32(d)
20  (2)] are waived.
21       The submission of the deposition to the
22  witness for reading to or by her and the signing of
23  the deposition by her [Rule 30(e)] is waived.

Page 4

I N D E X
EXAMINATION
By Mr. Poundstone - page 6

INDEX OF EXHIBITS
Defendant's Exhibit Number 1 - page 36
   Lenders Instructions

Defendant's Exhibit Number 2 - page 37
   Addendum to Lenders Instructions
Defendant's Exhibit Number 3 - page 38
   NOTE, dated March 25, 2005

Defendant's Exhibit Number 4 - page 39
   MORTGAGE
Defendant's Exhibit Number 5 - page 40
   SETTLEMENT STATEMENT

Defendant's Exhibit Number 6 - page 47
   FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
Defendant's Exhibit Number 7 - page 49
   NOTICE OF RIGHT TO CANCEL

Defendant's Exhibit Number 8 - page 50
   HIGH COST LOAN SUMMARY
Defendant's Exhibit Number 9 - page 52
   DISBURSEMENT SHEET

Page 3

1        Filing of the original of the transcript
2   of this deposition [Rule 30(f)(1)] is waived.
3        Any other technicality or defect in the
4   taking of this deposition not otherwise covered by
5   the terms of this stipulation is waived.
6
7             * * * * * * * *
8
9
10
11       I, Karen T. McDonald, Commissioner and
12  Court Reporter, certify that on this date, as
13  provided by the Federal Rules of Civil Procedure
14  and the foregoing stipulation of counsel, there
15  came before me at the law offices of Earl P.
16  Underwood, Jr., 21 South Section Street,
17  Fairhope, Alabama, on June 9, 2008,
18  commencing at approximately 1:05 p.m.
19  CHERYL HALL FRAZIER, witness in the above cause,
20  for oral examination, whereupon the following
21  proceedings were had:
22
23

Page 5

2 (Pages 2 to 5)

1     CHERYL HALL FRAZIER
2         was sworn and testified as follows:
3     THE WITNESS: I do.
4         EXAMINATION
5  BY MR. POUNDSTONE:
6     Q   Would you state your full name for the
7  record, please?
8     A   My name is Cheryl Hall Frazier.
9     Q   Mrs. Frazier, what's your date of birth?
10    A   7/5/59.
11    Q   What is your current address?
12    A   105 TV Road, Dothan, Alabama. The zip
13 code is 36301.
14    Q   Okay. Is that the residence that is the
15 subject of the mortgage --
16    A   Yes, sir.
17    Q   -- that is the subject of this lawsuit?
18    A   Yes, sir.
19    Q   Have you ever had your deposition taken
20 before?
21    A   No.
22    Q   I'll just give you a few ground rules
23 that will help us move through this process today.

Page 6

1         As you see, there's a court reporter here
2  taking your testimony.
3     A   Yes.
4     Q   She has a hard time dealing with nods of
5  the head yes and no or uh-huhs and huh-uhs --
6     A   Right.
7     Q   -- and also us talking at the same time.
8  I have to work on things, but if you could, try to
9  remember to answer your questions in words rather
10 than in gestures or nods of the head. And also try
11 to remember to wait until I get through asking a
12 question before you provide me with an answer.
13    A   Understood.
14    Q   Is there any reason sitting here today
15 that you can't understand my questions and answer
16 them truthfully?
17    A   No.
18    Q   You're not on any kind of medication that
19 would affect your ability to understand my
20 questions?
21    A   No.
22    Q   Would you agree for me today to only
23 answer questions that you understand?

Page 7

1     A   Yes.
2     Q   If you don't understand a question, would
3  you agree to ask me to repeat it so that you do
4  understand it?
5     A   Yes.
6     Q   Okay. Would you tell me a little bit
7  about your educational history?
8     A   I'm a high school graduate.
9     Q   Where did you go to high school?
10    A   Barringer High School in Newark,
11 New Jersey.
12    Q   What town is that?
13    A   Newark.
14    Q   Newark?
15    A   Uh-huh (positive response).
16    Q   Did you have any post-high school
17 education?
18    A   No.
19    Q   Now, how did you get in Dothan?
20    A   My husband was dying of cancer. He was
21 an only child and he wanted to be put to rest in
22 Dothan. We decided to come here; that's what made
23 us move here.

Page 8

1     Q   Okay. Your deceased husband was from
2  Dothan?
3     A   Right.
4     Q   Do you have any blood relatives in
5  Dothan?
6     A   Yes.
7     Q   What blood relatives do you have in
8  Dothan?
9     A   My three children.
10    Q   What are their names?
11    A   Her first name is Kevina, K-E-V-I-N-A,
12 her brother, Kevin, and my baby son is Michael.
13    Q   Are those your only blood relatives in
14 Dothan?
15    A   I have two nephews also that are there.
16    Q   What are their names?
17    A   Steven and Douglas.
18    Q   What is Steven and Douglas's last name?
19    A   Hall.
20    Q   Hall. How about your children's last
21 name?
22    A   Dixon, D-I-X-O-N.
23    Q   Was your late husband's last name Dixon?

Page 9

3 (Pages 6 to 9)

FRAZIER v. ACREDITED, et al.                                          CHERYL HALL FRAZIER
CV08-11-MHT                                                                    June 9, 2008

| | |
|---|---|
| 1   A  His last name was Jones. My three | 1   Q  Okay. What do they do? |
| 2  children are from my first marriage. | 2   A  Actually they're a company that makes |
| 3   Q  Okay. Any other blood relatives that you | 3  cigars, Phillies Blunt cigars, all types of cigars. |
| 4  have in Dothan? | 4   Q  How long did you work there? |
| 5   A  No. | 5   A  Two years before becoming disabled. |
| 6   Q  How about anywhere else in Alabama? | 6   Q  So in '95 or so is when you started |
| 7   A  No. | 7  working there? |
| 8   Q  How many times have you been married? | 8   A  Yes. |
| 9   A  Three. | 9   Q  Where did you work before that? |
| 10   Q  Okay. Are you currently married? | 10   A  Before that I was a housewife. |
| 11   A  Yes. | 11   Q  I'm sorry, you may have already said |
| 12   Q  What's your husband's name? | 12  this. What year did you move to Dothan? |
| 13   A  Vincent Frazier. | 13   A  I moved to Dothan in '95. |
| 14   Q  How long have you been married to | 14   Q  Have you ever been convicted of a crime? |
| 15  Mr. Frazier? | 15   A  No. |
| 16   A  Five years. | 16   Q  Any arrests? |
| 17   Q  Were you married to Mr. Frazier at the | 17   A  No. Maybe a speeding ticket or something |
| 18  time you took out the loan at issue? | 18  like that. |
| 19   A  No. | 19   Q  Okay. Have you ever been involved in any |
| 20   Q  What does Mr. Frazier do for a living? | 20  other lawsuits? |
| 21   A  He's a counselor at a behavioral center. | 21   A  No. |
| 22   Q  What's the name of the behavioral center? | 22   Q  Just so we're clear, you've never sued |
| 23   A  Laurel Oaks. | 23  anyone else before? |
| Page 10 | Page 12 |
| 1   Q  Is that in Dothan? | 1   A  Let me go back. I had a lawsuit |
| 2   A  Yes. I just want to correct myself on | 2  against the highrise where I stayed at in East |
| 3  one of the questions. | 3  Newark, New Jersey. Someone had left something on |
| 4   Q  Sure. | 4  the steps and I had just had my son, Michael, and I |
| 5   A  That loan was taken out in 2005, so I was | 5  slipped down the stairs. |
| 6  married at that time. | 6   Q  Okay. |
| 7   Q  You were married? | 7   A  So I do remember that, but it was many |
| 8   A  Yes. | 8  years ago. |
| 9   Q  Okay. | 9   Q  Any other lawsuits that you've brought? |
| 10   A  But I purchased the house before marrying | 10   A  No. |
| 11  him. | 11   Q  Have you ever been sued before? |
| 12   Q  Is your husband a co-owner of the home | 12   A  No. |
| 13  today? | 13   Q  My understanding is you filed for |
| 14   A  No. | 14  bankruptcy, though; right? |
| 15   Q  Are you employed? | 15   A  Yes. |
| 16   A  No, I'm disabled. | 16   Q  When did you file for bankruptcy? |
| 17   Q  How long has it been since you worked? | 17   A  2007. |
| 18   A  1997. | 18   Q  Do you know what chapter it was? |
| 19   Q  What did you do prior to 1997? | 19   A  13. |
| 20   A  I was working at a company called General | 20   Q  What is the status of that bankruptcy? |
| 21  Cigar, and I was a machine operator there. | 21   A  It's dismissed. |
| 22   Q  Where was that located? | 22   Q  Tell me how you came to take out a loan |
| 23   A  It's in Dothan. | 23  with Accredited Home Lenders. Home Funds Direct |
| Page 11 | Page 13 |

4 (Pages 10 to 13)

*FRAZIER v. ACREDITED, et al.*
*CV08-11-MHT*

*CHERYL HALL FRAZIER*
*June 9, 2008*

1 may be the phrase you know them as.
2    A  Okay. Well, my house was bought in cash.
3 My son bought the house for me as a gift. And I
4 decided to do some things to help out my niece; she
5 has Down Syndrome.
6     My sister passed away of cancer in 2003,
7 so I just wanted to make the house more comfortable
8 and convenient for her condition. We're both
9 disabled.
10    Q  And you wanted to, I take it, use the funds
11 to make improvements to the home?
12    A  For her, yes.
13    Q  How did you specifically come to take out
14 the loan with Home Funds Direct as opposed to
15 somebody else?
16    A  My son went online for me to seek out
17 someone to do my refinancing and they responded.
18    Q  Do you know what web site it was?
19    A  No, I don't.
20    Q  Okay. Which son helped you?
21    A  Kevin.
22    Q  Kevin. Did you ever speak with anyone at
23 Home Funds Direct?

Page 14

1    A  Yes, I spoke with a gentleman by the name
2 of Chris. I believe his name was Chris. He's the
3 one that walked me through this mortgage.
4    Q  You don't remember Chris's last name?
5    A  No.
6    Q  What do you remember about your
7 conversation with Chris?
8    A  Well, I was trying to explain to him what
9 I was trying to do, and he was there to help me.
10    Q  Do you remember any specifics of the
11 conversation?
12    A  No, none other than him asking me
13 questions about what type of loan I was looking for
14 and telling me about the type of interest rates he
15 could probably get for me. And I told him the
16 house was already paid for in full; I wasn't
17 looking to get into any serious debt.
18    Q  How many times did you speak with Chris?
19    A  Probably about four times.
20    Q  Were all those times that you spoke with
21 him prior to closing?
22    A  Yes.
23    Q  Is there anybody else at Home Funds

Page 15

1 Direct that you recall speaking with?
2    A  No, just him, because he was the one that
3 was handing the loan.
4    Q  Do you know specifically who Chris worked
5 for?
6    A  Home Funds.
7    Q  Did he tell you that he was with Home
8 Funds?
9    A  Yes, because every time he called, that's
10 what came up on my I.D. also.
11    Q  How about the closing company, Swafford
12 and Hays, did you have any communications with
13 anyone from that company?
14    A  Not until my closing.
15    Q  Who did you speak with at Swafford and
16 Hays at your closing?
17    A  I'm not sure of the lady's name; she came
18 up to my home.
19    Q  Do you know if that was actually an
20 employee of Swafford, or could it have been a
21 notary that they obtained?
22    A  She was a notary.
23    Q  Was her name Diane Hilson?

Page 16

1    A  I'm not sure.
2    Q  Was she only the one that was present for
3 your closing?
4    A  Yes.
5    Q  There wasn't anyone from Home Funds
6 Direct at your closing?
7    A  Nobody else but her.
8    Q  Do you remember the substance of any
9 communications that you had with the notary?
10    A  No, none other than her explaining each
11 section of my closing and me signing.
12    Q  And you said the closing took place at
13 your home?
14    A  Yes.
15    Q  I know you said that the notary and you
16 were the only people present. Did anybody attend
17 the closing via telephone?
18    A  No.
19    Q  If you would -- and this is kind of in
20 your words kind of thing -- tell me what you
21 remember taking place at the closing.
22    A  Well, she called my home the day before.
23 I also spoke with the gentleman who did my loan,

Page 17

5 (Pages 14 to 17)

1  and he had informed me what time she was coming
2  over there the next day for my closing.
3      Q    What do you recall happening when she got
4  there?
5      A    Well, when she got there, I made her
6  comfortable because she had a lot of papers and
7  things with her. We sat down and she started going
8  over my closing.
9      Q    She went over the documents?
10     A    Right.
11     Q    And then had you sign them?
12     A    Right. She was basically just telling me
13 what each paper was for and then asking for my
14 signature.
15     Q    You said the gentleman on the phone told
16 you what time she was coming or what time the
17 closing would be?
18     A    Well, actually what he did was tell me
19 that he gave her the phone number. He gave her my
20 phone number and said she would be contacting me
21 and letting me know exactly what time she would be
22 available.
23     Q    Okay. Was that Chris or somebody else?

Page 18

1      A    It was the guy that -- it was Chris, the
2  guy that did the loan. It was him calling me every
3  time.
4      Q    And Chris said, I've given this lady your
5  phone number; she's going to contact you?
6      A    Right, she's going to come and do the
7  closing. But he did mention the company, Swafford
8  and Hays, that that's where she would be coming
9  from, through that company.
10     Q    Did you have an opportunity to read the
11 documents that were being presented at the closing?
12     A    Yes.
13     Q    And did you get a copy of the documents
14 at the closing?
15     A    Yes.
16     Q    Do you have any personal knowledge of the
17 instructions that Home Funds Direct provided to
18 Swafford and Hays concerning your loan and its
19 closing?
20     A    Could you repeat that question?
21     Q    Yes. Do you have any personal knowledge
22 of what closing instructions, if any, Home Funds
23 Direct provided to Swafford and Hays?

Page 19

1      A    No. I'm still not understanding your
2  question.
3      Q    Okay. And all I want to know is do you
4  have any personal knowledge of any communications
5  that took place between Home Funds Direct and --
6      A    And Swafford, no.
7      Q    -- Swafford as to how they ought to go
8  about closing the loan?
9      A    No. All I know is that he called me and
10 told me it was Swafford and Hays that was going to
11 be doing the settlement.
12     Q    I assume -- and just so we're clear on
13 the record -- you never participated in any
14 discussions between Home Funds Direct and Swafford
15 and Hays?
16     A    No.
17     Q    Are you personally aware of any evidence
18 that would show that Home Funds Direct had
19 knowledge of what you were charged for title
20 insurance?
21     A    Well, I guess they would have had
22 knowledge of what was charged. She did the closing
23 and all the fees were there.

Page 20

1      Q    Right. But my question is: Do you
2  personally have any evidence that Home Funds Direct
3  had knowledge of what you were charged for title
4  insurance?
5      A    No.
6      Q    Are you personally aware of any evidence
7  that would show that Home Funds Direct ever
8  received any commission or other funds from the
9  title insurance on the loan?
10     A    No.
11     Q    Do you know what the TILA is?
12     A    That's for home lending.
13     Q    Okay. Do you understand that TILA is the
14 Truth-in-Lending Act?
15     A    Yes, it's the lending act. Yes, I do.
16     Q    Okay. Do you personally know how it is
17 that you're alleging that Home Funds Direct
18 violated TILA?
19     A    Well, they violated TILA by overcharging
20 me some fees.
21     Q    Do you know what fees?
22     A    Well, I'm not quite sure about all of
23 them because there's more than one.

Page 21

6 (Pages 18 to 21)

*FRAZIER v. ACREDITED, et al.*
*CV08-11-MHT*

*CHERYL HALL FRAZIER*
*June 9, 2008*

| | |
|---|---|
| 1    Q    Do you know what the HOEPA is? | 1         MR. PATTERSON:  Just so I know. |
| 2    A    No. | 2      That's fine. |
| 3    Q    I assume then that you don't personally | 3    BY MR. POUNDSTONE: |
| 4  know how it is in this lawsuit you're alleging that | 4       Q    And you understand that if you do |
| 5  Home Funds Direct violated HOEPA? | 5    rescission, then the borrower would be responsible |
| 6    A    Well, the only way I -- are you asking me | 6    for returning the principal and the lender would be |
| 7  about my lawsuit? | 7    responsible for returning any financing fees or |
| 8    Q    Yes. | 8    anything like that; correct? |
| 9    A    Well, it came through Swafford and Hays, | 9       A    Yes. |
| 10  that's how I found out. | 10      Q    Now, my understanding is that your loan |
| 11    Q    Tell me what you mean by it came through | 11   is paid off; correct? |
| 12  Swafford and Hays. | 12      A    Yes. |
| 13    A    Well, Swafford and Hays is the one that | 13      Q    Do you recognize that if you pursue |
| 14  did the settlement.  That's how I got in touch with | 14   rescission claims on behalf of the class that some |
| 15  my attorney because my name came up.  I sent them | 15   of the members of the class will not have paid off |
| 16  the packet of my closing and that's when we came up | 16   their loan? |
| 17  with I was overcharged. | 17      A    Yes. |
| 18    Q    Okay.  You said your name came up.  What | 18      Q    Would you also acknowledge that some of |
| 19  do you mean by that? | 19   those class members then are going to have to go |
| 20    A    On Swafford and Hays, they had something | 20   out and find alternative financing if they're |
| 21  against Swafford and Hays and my name came into | 21   required to return the loan proceeds through |
| 22  play with that.  That's how my attorney got in | 22   rescission? |
| 23  touch with me. | 23      A    Yes. |
| Page 22 | Page 24 |

| | |
|---|---|
| 1    Q    Okay.  Did you get some kind of class | 1       Q    Would you agree that that might not |
| 2  action notice or something like that? | 2    necessarily be in somebody's best interest? |
| 3    A    Yes. | 3         MR. PATTERSON:  I'm going to object |
| 4    Q    And just so we're clear, you don't | 4      to the form of that question.  That's a legal |
| 5  personally know -- just you sitting here today | 5      conclusion, but you can go ahead and answer it |
| 6  personally know -- how it is you're alleging that | 6      if you can. |
| 7  Home Funds Direct violated HOEPA? | 7       A    Oh, yes. |
| 8    A    No. | 8    BY MR. POUNDSTONE: |
| 9    Q    Are you aware that you're seeking | 9       Q    For instance, someone's credit may have |
| 10  rescission in this lawsuit? | 10   changed and they may no longer be able to get |
| 11    A    Yes. | 11   financing? |
| 12    Q    Do you know what rescission is? | 12      A    Understood. |
| 13    A    Rescinding the loan. | 13      Q    And that's a possibility you would |
| 14    Q    In layman's terms, do you understand that | 14   recognize? |
| 15  that means the loan would be undone? | 15      A    Yes. |
| 16    A    I understand that. | 16      Q    You mentioned that there was a previous |
| 17    Q    Okay.  And do you understand that the | 17   lawsuit against Swafford and Hays. |
| 18  purpose of rescission is to return parties to the | 18      A    Yes.  They had sent me something in the |
| 19  status quo? | 19   mail about the class action of some years before. |
| 20    A    Uh-huh (positive response).4:51 PM 6/19/2008 | 20      Q    Okay.  And this is all I'm going to ask; |
| 21         MR. PATTERSON:  Was that a yes? | 21   were you a named plaintiff in the class action |
| 22         THE WITNESS:  That was a yes, I'm | 22   against Swafford and Hays, or were you just a |
| 23   sorry. | 23   member of the class? |
| Page 23 | Page 25 |

*ISBELL & ASSOCIATES, REGISTERED PROFESSIONAL REPORTERS*
*910 GOVERNMENT STREET, MOBILE, AL  36604  251-432-DEPO*

FRAZIER v. ACREDITED, et al.
CV08-11-MHT

CHERYL HALL FRAZIER
June 9, 2008

1    A    Just a member of the class.
2    Q    Tell me what if anything you've done to
3 personally investigate your claims in this lawsuit?
4    A    Well, me investigate, no. I haven't done
5 anything. I hired an attorney, and that's what I
6 did.
7    Q    So any investigation that's been done
8 wouldn't have been done by you?
9    A    No.
10    Q    It would have been done by your
11 attorneys?
12    A    Yes, sir.
13    Q    And to follow up on that, what if
14 anything have you personally done to investigate
15 the claims of the class members you seek to
16 represent?
17    A    None. The attorneys are taking care of
18 that.
19    Q    Okay. Any investigation into the class
20 members' claims would have been done by the
21 attorneys?
22    A    That's right.
23    Q    Do you recall when you paid off the Home
                                        Page 26

1 Funds Direct loan?
2    A    I believe it was somewhere in '06, but I
3 don't know the exact date.
4    Q    Okay. Are you aware that there are
5 several attorneys from several different law firms
6 representing you in this case?
7    A    Yes.
8    Q    Have you met all of your attorneys?
9    A    No, sir.
10    Q    Which of your attorneys have you met?
11    A    My attorney to my right and Mr.
12 Underwood.
13    Q    So the only attorneys that you've
14 personally met are the attorneys in Mr. Underwood's
15 office?
16    A    Yes.
17    Q    As a follow-up, have you ever used any of
18 the attorneys representing you for other legal
19 matters?
20    A    Never.
21    Q    Did you have any personal involvement in
22 the decision to bring other plaintiffs' attorneys
23 into this case?
                                        Page 27

1    A    No.
2    Q    Do you have any knowledge of your
3 attorneys' experience in handling class actions?
4    A    None other than what I've read online.
5    Q    Where have you been to read online?
6    A    I had my niece look it up for me.
7    Q    What's your niece's name?
8    A    Her name is Kim, K-I-M, last name is
9 Hall.
10    Q    Okay. Do you know where on the internet
11 Kim went?
12    A    No, I don't.
13    Q    Tell me what she told you she saw on the
14 internet.
15    A    I was asking her to look up Earl
16 Underwood.
17    Q    When did that take place?
18    A    Over two years ago.
19    Q    Do you remember what information she
20 relayed to you?
21    A    She was telling me -- informed me -- what
22 type of an attorney he was.
23    Q    What type of work he did?
                                        Page 28

1    A    Right.
2    Q    How about any of the other attorneys,
3 have you ever looked into their experience --
4    A    No.
5    Q    -- in handling class actions?
6    A    No, I haven't.
7    Q    How about any of your attorneys'
8 experience handling TILA claims, have you looked
9 into that?
10    A    No, I haven't.
11    Q    Have you looked into that the addition of
12 additional attorneys representing you in this case
13 might cost more attorneys' fees in this matter?
14    A    Yes.
15    Q    Okay. Tell me what, if anything, you
16 know about that.
17    A    Well, like I said I have not met the
18 other attorneys and I haven't heard anything from
19 them, so I really don't know.
20    Q    You don't know whether more attorneys
21 being involved --
22    A    Right.
23    Q    -- will lead to more or less attorneys'
                                        Page 29

8 (Pages 26 to 29)

*FRAZIER v. ACREDITED, et al.*
*CV08-11-MHT*

*CHERYL HALL FRAZIER*
*June 9, 2008*

| | |
|---|---|
| 1 fees? | 1    A   Yes. |
| 2    A   Correct. | 2    Q   Have you ever received any recovery -- |
| 3    Q   Have you spent any of your personal money | 3    A   No. |
| 4 in pursuing this case? | 4    Q   -- from that lawsuit? |
| 5    A   None other than coming here. | 5    A   No. |
| 6    Q   Just the price of gas to get here? | 6    Q   And she's trying to keep up, so let's |
| 7    A   Yes. | 7 make sure that we don't talk over each other. |
| 8    Q   Do you plan to spend any of your personal | 8    A   Okay. |
| 9 money in pursuing this case? | 9    Q   Do you intend to make any personal |
| 10    A   No. | 10 decisions concerning how this case is prosecuted? |
| 11    Q   Would you be willing to spend personal | 11    A   No. |
| 12 money if you needed to in pursuing this case? | 12    Q   Are you going to leave it all up to your |
| 13    A   Yes. | 13 lawyers? |
| 14    Q   Do you have an idea of how much you'd be | 14    A   Yes. |
| 15 willing to spend? | 15    Q   Did you have any involvement in deciding |
| 16    A   Well, I couldn't answer that. I am | 16 how the class you seek to represent would be |
| 17 disabled, so I'm on a fixed income. | 17 defined? |
| 18    Q   Would it be fair to say it would be a | 18    A   No. |
| 19 fairly nominal amount; it wouldn't be very much? | 19    Q   Do you know what the definition is of the |
| 20    A   Right, it wouldn't be very much. | 20 class you seek to represent? |
| 21    Q   When did you decide to pursue this case | 21    A   Somewhat. Repeat the question. |
| 22 as a class action? | 22    Q   Do you know what class you seek to |
| 23    A   About -- well, at least two years ago. | 23 represent, who is included in that class? |
| Page 30 | Page 32 |

| | |
|---|---|
| 1    Q   Do you recognize that you didn't | 1    A   It's a lot of the homeowners like myself. |
| 2 initially file this as a class action? | 2    Q   Do you know precisely what the definition |
| 3    A   Yes, understood. | 3 of the class is? |
| 4    Q   But if I understand your testimony | 4    A   No. |
| 5 correctly, even though you didn't initially file it | 5    Q   Were you involved in coming up with that |
| 6 as a class action, at least two years ago you | 6 definition? |
| 7 contemplated this as a class action? | 7    A   No. |
| 8    A   Yes. | 8    Q   Do you personally know how many people |
| 9    Q   What made you decide to become a class | 9 are in the class you seek to represent? |
| 10 representative? | 10    A   No, I don't. |
| 11    A   Because I wanted everybody to be | 11    Q   Do you know how the members of the class |
| 12 recovered that's been damaged by this action just | 12 would be notified? |
| 13 as well as myself. | 13    A   No, I don't. |
| 14    Q   Did you receive any settlement proceeds | 14    Q   If there are costs associated with |
| 15 from Swafford and Hays? | 15 notifying the class, do you know who is going to |
| 16    A   No. | 16 pay for that? |
| 17    Q   You never received anything from Swafford | 17    A   No. |
| 18 and Hays? | 18    Q   Do you plan to pay for that? |
| 19    A   No, not except for the settlement, when | 19    A   No. |
| 20 they settled my closing. | 20    Q   Are you aware that TILA provides for |
| 21    Q   Okay. What I'm asking is, you said that | 21 limitations on amounts that can be recovered for a |
| 22 you were a member of the class in a lawsuit against | 22 class action? |
| 23 Swafford and Hays? | 23    A   Yes. |
| Page 31 | Page 33 |

9 (Pages 30 to 33)

FRAZIER v. ACREDITED, et al.
CV08-11-MHT

CHERYL HALL FRAZIER
June 9, 2008

1    Q    Are you personally willing to take less
2  than you could receive if you were pursuing your
3  case individually if TILA's damage cap makes you
4  recover an amount less under a class action?
5    A    No.
6    Q    You're not willing to take less?
7    A    No.
8    Q    Have you talked to any members of the
9  class you seek to represent?
10    A    No.
11    Q    Are you expecting to receive any extra
12  recovery because you are serving as a class rep?
13    A    Yes.
14    Q    That's something you expect?
15    A    Sure.
16    Q    What is your understanding as to what
17  your responsibilities as a class rep are?
18    A    That part right there we have to do some
19  research on.
20    Q    Okay.  Sitting here today you don't have
21  any feeling personally as to what your duties as a
22  class rep are?
23    A    Right.

Page 34

1    Q    Have you reviewed any of the filings in
2  this case?
3    A    No.
4    Q    Did you review the complaint?
5    A    Yes.
6    Q    Have you reviewed the amended complaint?
7    A    Yes.
8    Q    Other than the complaints, are there any
9  other filings you've reviewed in this case?
10    A    No.
11    Q    Are you prepared to sit through the trial
12  of this matter?
13    A    Yes.
14    Q    Even if it takes three weeks?
15    A    Yes.
16    Q    Do you personally know any details
17  concerning loans that potential class members took
18  out with Home Funds Direct?
19    A    No.
20        MR. POUNDSTONE:  Any time you want a
21  break, just let me know.
22        THE WITNESS:  I'd like to have one,
23  just a little one.

Page 35

1        MR. POUNDSTONE:  Absolutely.
2        (Brief recess.)
3    A    On one question that you asked me about
4  if I would take less money, the answer is yes to
5  that question.
6  BY MR. POUNDSTONE:
7    Q    Okay.
8    A    And to the other question as
9  understanding my position as a rep for the class
10  action, I do understand some of my duties, such as
11  doing depositions and the trial, so the answer is
12  yes.
13        (Defendant's Exhibit Number 1 was received
14    and marked for identification.)
15  BY MR. POUNDSTONE:
16    Q    Okay.  I'm going to show you what I've
17  marked as Exhibit 1.  I'll give you some time to
18  take a look at each page of that and let me know
19  when you're ready.
20    A    Some of these numbers are very blurry; I
21  don't have my glasses.  I think I'm ready.
22    Q    Okay.  Have you seen that document
23  before?

Page 36

1    A    Yes.
2    Q    It's your understanding that these are
3  the closing instructions that Accredited Home
4  Lenders or Home Funds Direct provided to Swafford
5  and Hays?
6    A    Yes.
7    Q    And if you'd look just at the last page,
8  does that contain your signature?
9    A    Yes.
10    Q    And if you look on the pages before that,
11  there are initials on each of those pages down at
12  the bottom?
13    A    Yes.
14    Q    Are those your initials, CH?
15    A    Yes.
16    Q    You received and signed this document at
17  closing?
18    A    Yes, I did.
19        (Defendant's Exhibit Number 2 was received
20    and marked for identification.)
21  BY MR. POUNDSTONE:
22    Q    Hold that just a second.  I'm going to
23  show you what I'm going to mark as Exhibit 2.  I'll

Page 37

10 (Pages 34 to 37)

1  let you take a look at that document.
2      A    Okay.
3      Q    Have you seen that document before?
4      A    Yes.
5      Q    And do you understand that it is the
6  Addendum to Accredited Home Lenders, Home Funds
7  Direct's instructions to Swafford and Hays?
8      A    Yes.
9      Q    Did you receive this at closing?
10     A    Yes.
11     Q    And does it contain you signature?
12     A    Yes.
13     Q    Other than what I've marked as Exhibit 1
14 and Exhibit 2, are you aware of any other closing
15 instructions that Accredited Home Lenders or Home
16 Funds Direct provided to Swafford and Hays?
17     A    No.
18         **(Defendant's Exhibit Number 3 was received**
19         **and marked for identification.)**
20 **BY MR. POUNDSTONE:**
21     Q    I'll show you what I've marked as Exhibit
22 3.
23     A    Okay.

Page 38

1      Q    Have you seen that document before?
2      A    Yes.
3      Q    Is that a copy of the note for the loan
4  at issue in this lawsuit?
5      A    Yes.
6      Q    Does it contain your signature on the
7  last page?
8      A    Yes.
9      Q    And does it also contain your initials on
10 the two pages before that?
11     A    Yes.
12     Q    Did you sign this document at closing?
13     A    Yes.
14     Q    And you were given a copy of it at
15 closing; correct?
16     A    Yes.
17         **(Defendant's Exhibit Number 4 was received**
18         **and marked for identification.)**
19 **BY MR. POUNDSTONE:**
20     Q    I'm going to show you what I've marked as
21 Exhibit 4. Have you seen this document before?
22     A    Yes.
23     Q    Is that the mortgage for the loan that's

Page 39

1  the subject of this lawsuit?
2      A    Yes.
3      Q    Does it contain your signature on the
4  second to last page?
5      A    Yes.
6      Q    Okay. Do your initials appear on the
7  remaining pages?
8      A    Yes.
9      Q    Did you sign this document at closing?
10     A    Yes.
11     Q    I assume you received a copy of it at
12 closing.
13     A    Yes.
14         **(Defendant's Exhibit Number 5 was received**
15         **and marked for identification.)**
16 **BY MR. POUNDSTONE:**
17     Q    I'm going to show you what I've marked as
18 Exhibit 5. Take a look at that and just let me
19 know when you're ready.
20     A    Okay.
21     Q    Have you seen that document before?
22     A    Yes.
23     Q    Is that a copy of your Hud 1 Settlement

Page 40

1  Statement?
2      A    Yes.
3      Q    Does it contain your signature on the
4  second page?
5      A    Yes.
6      Q    And do you acknowledge receiving this at
7  your closing?
8      A    Yes.
9      Q    In your complaint you indicated that
10 Swafford and Hays obtained a title search and
11 abstract from another company. Do you know what
12 company they obtained that from?
13     A    No.
14     Q    Do you acknowledge that Accredited Home
15 Lenders or Home Funds Direct were not responsible
16 for performing the title search and abstract?
17     A    Yes, understood.
18     Q    If you would, look on the second page,
19 line 1102.
20     A    Uh-huh, I see it.
21     Q    It says, "Abstract or Title Search." You
22 were charged $200 for an abstract or title search;
23 correct?

Page 41

FRAZIER v. ACREDITED, et al.
CV08-11-MHT

CHERYL HALL FRAZIER
June 9, 2008

1    Q    I assume that you don't have any evidence
2   that Accredited Home Lenders or Home Funds Direct
3   made the decision to use Transnation?
4    A    No.
5    Q    And I assume also that you're not aware
6   of any evidence that shows Home Funds Direct or
7   Accredited Home Lenders had any involvement in
8   determining the amount that would be charged for
9   title insurance?
10    A    No.
11    Q    Are you personally aware of any evidence
12   that shows that Accredited Home Lenders or Home
13   Funds Direct knew how much Transnation actually
14   charged for title insurance?
15    A    No.
16    Q    Are you contending that any of the title
17   insurance funds went to Home Funds Direct or
18   Accredited Home Lenders?
19    A    No.
20    Q    Have you personally had any discussions
21   with anyone at the Alabama Department of Insurance
22   concerning the amount of title insurance you were
23   charged?

Page 46

1   a look at that.
2    A    Okay.
3    Q    Have you seen that document before?
4    A    Yes, I have.
5    Q    Is it your understanding that that is the
6   Final Truth-in-Lending Disclosure Statement in
7   connection with your loan?
8    A    Correct.
9    Q    Does your signature appear on that
10   document?
11    A    Yes.
12    Q    And do you acknowledge receiving this at
13   closing?
14    A    Yes.
15    Q    If you would, look in the box that says,
16   "Prepayment."
17    A    Yes.
18    Q    Now, the disclosure statement indicates
19   that there is no prepayment penalty; correct?
20    A    Yes.
21    Q    Your complaint on the other hand alleges
22   that there was a prepayment penalty. Are you aware
23   of any prepayment penalty?

Page 48

1    A    No.
2    Q    If you look on line 1111, that indicates
3   that you were charged $50 for Endorsements;
4   correct?
5    A    Correct.
6    Q    And the Hud 1 indicates that that fee
7   went to Swafford and Hays; correct?
8    A    Correct.
9    Q    Are you personally aware of any evidence
10   that either Home Funds Direct or Accredited Home
11   Lenders had any involvement in determining the
12   amount that would be charged for endorsements?
13    A    No.
14    Q    Do you have any personal knowledge of any
15   evidence to suggest that Accredited Home Lenders or
16   Home Funds Direct received the fees for
17   endorsements?
18    A    No.
19        (Defendant's Exhibit Number 6 was received
20        and marked for identification.)
21   BY MR. POUNDSTONE:
22    Q    I'm going to show you what I'm going to
23   mark as Exhibit 6. I'll give you a chance to take

Page 47

1    A    No.
2    Q    Are you contending that there was a
3   prepayment penalty?
4    A    No.
5    Q    Do you have any idea why your complaint
6   contended there was a prepayment penalty?
7    A    I'm not sure.
8        (Defendant's Exhibit Number 7 was received
9        and marked for identification.)
10   BY MR. POUNDSTONE:
11    Q    I'm showing you what I'm going to mark as
12   Exhibit 7.
13        MR. POUNDSTONE: Somehow I'm short a
14        copy of that.
15        MR. PATTERSON: That's okay.
16   BY MR. POUNDSTONE:
17    Q    Have you seen that document before?
18    A    Yes, I have.
19    Q    Is that the Notice of Right to Cancel
20   that you received in connection with your loan?
21    A    Yes.
22    Q    And is that your signature on that
23   document?

Page 49

13 (Pages 46 to 49)

FRAZIER v. ACREDITED, et al.
CV08-11-MHT

CHERYL HALL FRAZIER
June 9, 2008

| | |
|---|---|
| 1   A   Yes.<br>2   Q   And if you look at the next line down,<br>3   line number 1103, you were charged $250 for title<br>4   examination; correct?<br>5   A   Yes.<br>6   Q   And the Hud 1 indicates that both of<br>7   these fees went to Swafford and Hays; correct?<br>8   A   I don't know.  Yes.<br>9   Q   Do you see that where it says to Swafford<br>10   and Hays Settlement Services?<br>11   A   Yes.<br>12   Q   And you don't dispute that's where those<br>13   funds went, do you?<br>14   A   No, I don't.<br>15   Q   And you don't have evidence that<br>16   Accredited Home Lenders or Home Funds Direct<br>17   received any of those fees?<br>18   A   No, I don't.<br>19   Q   Are you personally aware of any evidence<br>20   that Home Funds Direct or Accredited Home Lenders<br>21   had any involvement in determining the amount that<br>22   would be charged for those fees?<br>23   A   No.<br><div align="right">Page 42</div> | 1   question.<br>2   BY MR. POUNDSTONE:<br>3   Q   The Hud 1 indicates that the $120 went to<br>4   the clerk of court; correct?<br>5   A   Correct.<br>6   Q   You don't have any evidence that Home<br>7   Funds Direct or Accredited Home Lenders had any<br>8   involvement in determining how much was charged for<br>9   that fee, do you?<br>10   A   No, I don't.<br>11   Q   Are you aware personally of any evidence<br>12   that would show that Home Funds Direct or<br>13   Accredited Home Lenders knew how much Swafford and<br>14   Hays actually paid for recording?<br>15   A   No, I don't.<br>16   Q   Do you contend that any of the recording<br>17   fees went to Accredited Home Lenders or Home Funds<br>18   Direct?<br>19   A   I don't know.<br>20   Q   You don't have any evidence to show that<br>21   it went there, do you?<br>22   A   No.<br>23   Q   You allege in your complaint that you were<br><div align="right">Page 44</div> |
| 1   Q   Are you personally aware of any evidence<br>2   that Home Funds Direct or Accredited Home Lenders<br>3   knew how much Swafford and Hays had actually paid<br>4   the company who performed those services?<br>5   A   No, I don't.<br>6   Q   In your complaint, you indicated the<br>7   actual cost for the title and abstract was less<br>8   than $125.  What evidence do you have to support<br>9   that contention?<br>10   A   None.<br>11   Q   If you look on line 1201, do you see the<br>12   Recording fees and Service fees?<br>13   A   Yes.<br>14   Q   You were charged $120 for the recording<br>15   fee; correct?<br>16   A   Yes.<br>17   Q   The Hud 1 indicates that that fee went to<br>18   Swafford and Hays; correct?<br>19   A   Yes.<br>20   MR. PATTERSON:  Are you talking<br>21   about 1201?<br>22   MR. POUNDSTONE:  1201.  I'm sorry,<br>23   it went to the clerk of court.  Strike that<br><div align="right">Page 43</div> | 1   charged $221 for title insurance.  But if you would<br>2   look on line 1108, the Hud 1 shows that you were<br>3   charged $200 for title insurance?<br>4   A   I see it.<br>5   Q   Correct?<br>6   A   I see it, yes.<br>7   Q   That's what the Hud 1 says?<br>8   A   Yes.<br>9   Q   Do you have any evidence or are you aware<br>10   of any evidence that would show you were actually<br>11   charged $221 for title insurance?<br>12   A   No.<br>13   Q   The Hud 1 indicates that the title<br>14   insurance fee went to Transnation Title Insurance<br>15   Company; correct?<br>16   A   I don't know.<br>17   Q   If you look on line 1108, the Hud 1<br>18   indicates that it went to Transnation Title<br>19   Insurance Company; correct?<br>20   A   Correct, yes.<br>21   Q   Do you have any knowledge of who chose<br>22   Transnation as the title insurance company?<br>23   A   No.<br><div align="right">Page 45</div> |

<div align="right">12 (Pages 42 to 45)</div>

1   A   Yes, it is.
2   Q   Do you acknowledge receiving that at
3   closing?
4   A   Yes.
5   Q   And just so we're clear, you also
6   acknowledge receiving the Truth-in-Lending
7   Disclosure Statement and the Hud 1 at closing?
8   A   Yes.
9   Q   And would you acknowledge that you did
10  not cancel this loan within three days of March 25,
11  2005?
12  A   Yes.
13  Q   You did not do that; correct?
14  A   I did not do it.
15      (Defendant's Exhibit Number 8 was received
16      and marked for identification.)
17  BY MR. POUNDSTONE:
18  Q   I'm showing you what I'm going to mark as
19  Exhibit 8. Have you seen that document before?
20  A   I'm not sure.
21  Q   You don't recall one way or the other?
22  A   Right.
23  Q   Do you understand that your attorneys
                                              Page 50

1   produced this to us in the course of this
2   litigation?
3   A   Yes.
4   Q   Are you aware of them getting documents
5   concerning your loan from any other source than
6   you?
7   A   Excuse me?
8   Q   Do you know if they obtained documents
9   concerning your loan from any other source other
10  than you?
11  A   No.
12  Q   Do you dispute that you received this?
13  A   No.
14  Q   You just don't remember or recall one way
15  or the other?
16  A   Right.
17  Q   And sitting here I know you said you
18  don't recall seeing that before, but you recognize
19  sitting here that it's a High Cost Loan Summary for
20  your loan; correct?
21  A   Yes.
22  Q   If you would, look at the line right
23  there that says, "Prepayment Penalty."
                                              Page 51

1   A   Yes.
2   Q   Would you acknowledge that this document
3   also indicates there was no prepayment penalty for
4   your loan?
5   A   Yes, I see it.
6       (Defendant's Exhibit Number 9 was received
7       and marked for identification.)
8   BY MR. POUNDSTONE:
9   Q   I'm showing you what I'm going to mark as
10  Exhibit 9. I'll give you a chance to take a look
11  at that.
12      MR. PATTERSON: Can we go off the
13  record for just a second?
14      MR. POUNDSTONE: Sure.
15      (Off-the-record discussion.)
16  BY MR. POUNDSTONE:
17  Q   Have you seen that document before?
18  A   Yes.
19  Q   Tell me where you've seen it.
20  A   I believe this sheet might have been at
21  my closing, but I'm not sure.
22  Q   Okay. You think it might have been in
23  your closing packet, but you don't know for certain
                                              Page 52

1   one way or the other?
2   A   I'm not sure. I just don't remember
3   sheet by sheet, you know.
4   Q   Sure. Do you recall whether you had that
5   in your possession before you turned over documents
6   to your attorney?
7   A   I believe it was, but, again, I'm not
8   sure.
9   Q   You're not certain one way or the other
10  of where it came from?
11  A   Right.
12  Q   Sitting here today and looking at that
13  document, you understand that it shows the parties
14  who actually received loan proceeds?
15  A   Yes.
16  Q   Okay.
17  A   I'm sorry. After carefully looking, I
18  believe that it was in my packet.
19  Q   You think it was in the packet that you
20  received at closing?
21  A   Yes, I believe so.
22  Q   Okay. If you would, look on the line
23  that corresponds with Hud 1 line 1103, and it says,
                                              Page 53

14 (Pages 50 to 53)

FRAZIER v. ACREDITED, et al.                                    CHERYL HALL FRAZIER
CV08-11-MHT                                                              June 9, 2008

1   "Title Examination."
2       A   Yes.
3       Q   $250; correct?
4       A   Yes.
5       Q   This Disbursement Sheet shows that that
6   $250 went to Swafford and Hays; correct?
7       A   Yes.
8       Q   And you don't dispute that that's where
9   it went?
10      A   No.
11      Q   If you'll look at the next entry down, it
12  corresponds to Hud 1 line 1111, "Endorsements?"
13      A   Yes.
14      Q   $50.  The Disbursement Sheet also shows
15  that those funds went to Swafford and Hays;
16  correct?
17      A   Correct.
18      Q   And you don't dispute that that's where
19  they went?
20      A   No.
21      Q   If you look at the next line, there's an
22  entry that corresponds to Hud 1 line 1108, and it
23  says, "Title Insurance."  It shows $140; correct?
                                              Page 54

1   show that Accredited Home Lenders or Home Funds
2   Direct ever knew how much of that $200 was paid by
3   Swafford and Hays to Transnation?
4       A   No.
5       Q   If you look right here, the second
6   grouping down, the second column, the fee that
7   corresponds to line 1102 in the Hud 1, "Abstract or
8   Title Search" --
9       A   Yes.
10      Q   -- and you see $200; correct?
11      A   Correct.
12      Q   And it indicates that that money went to
13  Swafford and Hays; correct?
14      A   Correct.
15      Q   And you don't dispute that that's where
16  it went?
17      A   No.
18      Q   If you look at the last column where it
19  says, "Recording fees and Service fees, $56," do
20  you see that?
21      A   Yes.
22      Q   It indicates that those funds went to the
23  Houston County Judge of Probate; correct?
                                              Page 56

1       A   Correct.
2       Q   And that shows that that money went to
3   Swafford and Hays; correct?
4       A   Correct.
5       Q   And you don't dispute that they received
6   that?
7       A   No.
8       Q   If you'll look two sections down --
9       A   Recording fee?
10      Q   -- there's another line for title
11  insurance that corresponds with Hud 1 line 1108,
12  and it's $60; correct?
13      A   Correct.
14      Q   And the Disbursement Sheet shows that
15  those funds also went to Swafford and Hays.  You
16  don't dispute that, do you?
17      A   No.
18      Q   In looking at this Disbursement Sheet,
19  there's no indication on here how much of the $200
20  that went towards title insurance was actually paid
21  to Transnation, is there?
22      A   No.
23      Q   Are you aware of any evidence that would
                                              Page 55

1       A   Correct.
2       Q   And you don't dispute that that's where
3   those funds went, do you?
4       A   No, I don't.
5       Q   There's another entry that corresponds
6   with that same Hud 1 line.  It's one, two, three,
7   four columns down, where it says, "Recording fees
8   and Service fee, $64."
9       A   Yes.
10      Q   And that indicates that those funds went
11  to Swafford and Hays; correct?
12      A   Correct.
13      Q   And you don't dispute that that's where
14  those funds went?
15      A   No, I don't.
16          MR. POUNDSTONE:  We can take about
17  five minutes, and I may be done.
18          (Brief recess.)
19  BY MR. POUNDSTONE:
20      Q   I have just two sort of catch-all
21  questions I want to ask you that have already been
22  specifically dealt with, but just so we're clear.
23          You don't have any personal knowledge of
                                              Page 57

15 (Pages 54 to 57)

FRAZIER v. ACREDITED, et al.
CV08-11-MHT

CHERYL HALL FRAZIER
June 9, 2008

```
 1   any evidence that Accredited Home Lenders or Home
 2   Funds Direct knew anything about the overcharges
 3   that are alleged in your complaint, do you?
 4       A   No, I don't.
 5       Q   And you don't have any personal knowledge
 6   of any evidence that would show that they received
 7   any funds from those overcharges, do you?
 8       A   No, I don't.
 9           MR. PATTERSON:  And I'll just object
10   to those two, asked and answered.
11           MR. POUNDSTONE:  Sure.  We're done.
12   Thank you.
13   (The deposition concluded at 2:23 p.m.)
14
15
16
17
18
19
20
21
22
23
```

Page 58

C E R T I F I C A T E

STATE OF ALABAMA)
COUNTY OF BALDWIN)

     I do hereby certify that the above and
foregoing transcript of proceedings in the matter
aforementioned was taken down by me in machine
shorthand and the questions and answers thereto
were reduced to writing under my personal
supervision, and that the foregoing represents
a true and correct transcript of the proceedings
given by said witness upon said hearing.
     I further certify that I am neither of
counsel nor of kin to the parties to the action,
nor am I in anywise interested in the result of
said cause.

                  _____
                  KAREN T. McDONALD, AL-CCR-40
                  COURT REPORTER, NOTARY PUBLIC
                  STATE OF ALABAMA AT LARGE

My Commission expires: 4/28/2012

Page 59

16 (Pages 58 to 59)

OUR LOAN NO 0503172917



CLOSING DATE  March 25, 2005

# LENDERS' INSTRUCTIONS

ISSUE DATE  March 25, 2005

IF THE LOAN DOES NOT CLOSE AS SCHEDULED PLEASE NOTIFY OUR OFFICE IMMEDIATELY (DO NOT USE OUR FUNDS IF YOU CANNOT COMPLY WITH ALL OF THE INSTRUCTIONS ON PAGES 2, 3, & 4 AND ADDITIONAL INSTRUCTIONS)

CLOSING AGENT  SWAFFORD & HAYES SETTLEMENT SERVICES INC  ATTENTION  JAMES W SWAFFORD
CLOSING AGENT ADDRESS  9041 EXECUTIVE PARK DRIVE, KNOXVILLE, TN 37923
CLOSING AGENT PHONE NUMBER  (865)934-0466  CLOSING AGENT FAX NUMBER  (865)934-0215
LOAN PURPOSE  Refi Cash Out  LIEN TYPE  1st  LOAN TYPE  Fixed
MTGE AMT. $  56,000.00  INTEREST RATE  7.299  % INITIAL RATE  7.299%  MARGIN  0.000  %
TERM  360/360  MUST CLOSE BY  04/05/2005  DOCUMENT EXPIRE ON  04/05/2005
MORTGAGOR(S) NAME(S)  CHERYL HALL
PROPERTY ADDRESS  105 TV ROAD, DOTHAN, AL 36301
TITLE COMPANY  SWAFFORD & HAYES SETTLEMENT SERVICES INC
TITLE NUMBER  05-2813  PHONE NUMBER  (865)934-0466

A. ENCLOSED ARE THE FOLLOWING DOCUMENTS PERTAINING TO THE MORTGAGE CLOSING:

( X ) DEED / MORTGAGE                          ( ) ORIGINAL POWER OF ATTORNEY - RETURN TO DESIGNEE

( ) RIDER(S), ADDENDUM, ALLONGE #_____     ( X ) TAX FORM # 4506 OR 8821

( X ) NOTE                                     ( ) _____

( X ) RIDER(S) ATTATCHED SCHEDULES #_____   ( ) _____

( X ) TRUTH INLENDING FINAL (REG Z)            ( ) _____

( X ) W-9                                      ( ) _____

( X ) INFORMATIONAL DISCLOSURES                ( ) _____

( X ) RIGHT TO CANCEL - 3 COPIES PER BORROWER  ( ) _____
      -RETURN 1 EACH

B. THE FOLLOWING LENDER ITEMS HAVE BEEN DEDUCTED FROM OUR CHECK/DRAFT TO YOU:

| FEE ITEMS: HUD-1 # | LENDER FEES | N/A | LENDER POC | TOTAL FEES |
|---|---|---|---|---|
| 801 Origination Fee | 1,960.00 | | | 1,960.00 |
| 802 Discount Points | | | | |
| 803 Appraisal Fee | | | | 300.00 - excluded 226.4 (c)(7)(6) |
| 804 Credit Report Fee | | | | |
| 805 Final Inspection/442 Fee | | | | |
| 807 Application Fee | | | | |
| 810 Processing Fee | 500.00 | | | 500.00 |
| 811 Underwriting Fee | 500.00 | | | 500.00 |
| 813 Appraisal Review Fee | 250.00 | | | 250.00 |
| 815 Escrow Holdback Fee | | | | |
| 816 Funding Fee | | | | |
| 818 Courier Fee | | | | |
| 825 Warehouse Fee | | | | |
| 827 Reverif Fee | | | | |
| 828 Flood Cert/Life of Loan Fee | 9.50 | | | 9.50 |
| 829 Tax Service Fee | 66.00 | | | 66.00 |
| 901 Interest for 2 days @ $ 11.2 per day | 22.40 | | | |
| 1001 Hazard Insurance 4 month(s) @ $89.00 | 356.00 | | | 356.00 |
| 1003 City Property Tax 0 month(s) @ $0.00 | | | | |
| 1004 County Property Tax 7 month(s) @ $44.75 | 313.25 | | | 313.25 |
| 1005 School Tax 0 month(s) @ $0.00 | | | | |
| 1006 Flood Insurance 0 month(s) @ $0.00 | | | | |
| 1008 Agg. Acctg. Adjustment | -134.25 | | | -134.25 |
| 1301 Survey Fee | | | | |

TOTALS  3,842.90   0.00   0.00   4,120.50

PAID BY LENDER

204  LENDER CREDIT TO BORROWER  $ 0.00
809  YIELD SPREAD TO BROKER (POC)  $ 0.00
1203 STATE TAX/STAMPS  $                    NET CHECK / DRAFT $  52,157.10

For all Dry-Funding States and Refinances in Wet-Funding States:
ALL DOCUMENTS MUST BE IN OUR OFFICE TWO (2) BUSINESS DAYS PRIOR TO DISBURSEMENT OF LOAN FUNDS
C. POLICY OF THE TITLE INSURANCE REQUIREMENTS ARE SET FORTH ON PAGE 2 AND OUR LIEN MUST BE SUBJECT ONLY TO EXCEPTION NUMBERS  B1)1-9 B2)1-7
SHOWN ON THE PRELIMINARY REPORT /COMMITMENT DATED  March 18, 2005  AS

Initial CH

**EXHIBIT**

tabbies

AHL/Frazier
0034



# LENDERS' INSTRUCTIONS

**INITIAL CLOSING INSTRUCTIONS**

DO NOT CLOSE THIS LOAN IF:

1. We have not received and approved Preliminary Commitment for Title Insurance.
2. You are past the expiration date of our legal papers.
3. We have not received and approved an Estimated Closing Statement.
4. You have not given signed copy of these instructions plus any amendments to the borrowers.
5. If there has been any change to the original sales contract which we have not approved in writing.
6. If we have not received and accepted/approved:
   a. Security instruments conformed and certified plus two copies.
   b. Note plus two certified copies.
   c. Any other items sent for execution and/or notary in the numbers sent. We will not accept witnessed acknowledgments on notarized items.
7. We have not received an acceptable hazard insurance binder.
8. All conditions of our loan commitment have not been met.
9. SIGNATURES Please insure that the Borrowers sign ALL loan documents <u>EXACTLY AS THEIR NAMES ARE TYPED ON THE DOCUMENTS, EVEN IF THIS IS NOT THEIR USUAL SIGNATURE.</u> Please pay special attention to middle initials and middle names, and Junior and Senior. You should review the signature on each document <u>CAREFULLY. IF THERE IS ANY QUESTION AS TO THE READABILITY OF THE SIGNATURE OF AN INDIVIDUAL, YOU SHOULD OBTAIN A NOTARIZED SIGNATURE AFFIDAVIT</u> and return it with the other documents.
10. TAX CERTIFICATION This form must be completed and signed by YOU and have the LEGAL DESCRIPTION ATTACHED OR ENTERED AT THE BOTTOM OF THE FORM. Please be <u>sure</u> that ALL information is complete and correct and that you show an amount of taxes next due, even an estimated amount.
11. REVIEW All documents MUST be in our office for review PRIOR to recording. We request that documents be received a MINIMUM of <u>ONE DAY PRIOR TO THE DAY YOU WISH TO RECORD.</u> Please include THREE (3) CERTIFIED COPIES EACH OF THE NOTE AND DEED OF TRUST and provide copies of all other executed documents for recording such as Warranty Deed, Excise Affidavit, Quit Claim Deed, Buyer or Seller Power of Attorney, etc. Please direct the title company to forward take-off copies of ALL pages of ALL recorded documents as soon as possible.
12. Sales price is other than $00.00

**TITLE POLICY REQUIREMENTS**

1. The title policy must insure the mortgage as a good and valid lien of the type shown on Page 1 in accordance with your Preliminary Commitment for Title Insurance. We must have the original and two copies of the policy.
2. THERE MUST BE NO OTHER LIENS AGAINST THE PROPERTY OTHER THAN THOSE SHOWN ON PAGE 1, unless approved by us in writing.
3. No past-due taxes or special assessments are to be shown as exceptions. The title policy must show current year's taxes "not yet due and payable," or current half paid.
4. In examining the title, if you find any violations of restrictions, easements, or encroachments, secure our approval prior to the closing.
5. Vestee name spelling(s) must be identical to mortgage/deed of trust.
6. Marital status must be shown.
7. We require two copies of conditions, covenants, and restrictions and of any recorded exceptions not covered by FHA/VA/FNMA/FHLMC General Waivers.
8. The mortgage transaction must include the proper execution and recording of all necessary instruments to assure the issuance of a Mortgagee Title Policy, without exceptions except as shown on Page 1.
9. This Policy must be in the loan amount or maximum principal balance to be reached if negative amortization is involved (not to exceed 125%) insuring **Home Funds Direct** and its successors and/or assigns, and subject only to the following: Restrictions and building lines of record provided that the policy contains an Endorsement covering any violation.
10. Any lien for financing subordinate to ours and approved by us must be listed on the title policy and the policy must expressly provide that such lien is subordinate to that of our mortgage lien.
11. Property address must be shown as a part of the policy or by endorsement in states where possible.
12. Plat or survey must show correct street name or road name in full; must show all reference points used in legal description.
13. Protection of insured must be provided in the case of any unlocated easements, rights of way, encroachments, etc.
14. Protection of improvements including landscaping, must be provided if water, oil, gas, or mineral reservations exist and allow the right of surface entry.
15. The following endorsements must be included in the Mortgagee policy: 100, 116, 8.1, 6.2 if ARM with no negative amortization, condominium or P.U.D., if applicable, and EPA
16. Have title company forward owners policy to borrowers at property or mailing address.
17. Have Mortgagees policy delivered to lender's address on page 4 of these instructions within <u>three</u> days of closing.
18. Title Policy to read as follows:
    Home Funds Direct
    Its Successors and/or assigns
19. Lender does not accept limited coverage title policies for loans more than $50,000.00
20. Lender requires that the final title policy insure the lien shown on page 1 of the Closing Instructions independent of any other lien closed concurrently. A final title policy insuring a combination of multiple liens is unacceptable.

AHL/Frazier

0035

 

 

## LENDERS' INSTRUCTIONS

**CLOSING PACKAGE REQUIREMENTS**

1. HUD 1 & Addendum showing both buyer and seller sides and including addresses of all parties to the escrow - 3 certified copies.
2. Policy of title insurance - see Requirements.
3. Policy(s) of hazard insurance.
4. Copy of Conveyance Instrument(s) and Excise Affidavits.
5. Copy of your Closing Order to title company.
6. Copy of your Escrow Instructions - signed.

**HUD-1 REQUIREMENTS**

Comply with all provisions of RESPA, as amended, in preparing this form.
Must be typed.

**DOCUMENT REQUIREMENTS**

1. Be certain that all papers which were not dated when received are dated by the person(s) who are to sign them.
2. Be certain that if we send one or more copies of a document, that EACH is returned with original signature(s).
3. INTERIM INTEREST - It is REQUIRED that the HUD-1 be amended (if necessary) to show the correct date and amount, and it is also REQUIRED that all totals on the HUD-1 be amended to reflect the correct amount. DO NOT SIMPLY CROSS OUT THE AMOUNT AND WRITE A NEW ONE ABOVE IT!
4. DO NOT SHOW ANY CREDITS FROM SELLER TO BUYER WITHOUT CONSULTING OUR OFFICE.
5. Make NO changes on the papers without our permission. Call for instructions.
6. If we give permission to make changes on the papers, all changes MUST be initialed by ALL SIGNATORIES to the documents.
7. Do not use Power of Attorney unless prior approved by us.
8. If we allow the use of a Power of Attorney, the person using that authority must sign as, for example, "Jane Doe by John Doe, her attorney-in-fact."
9. If notice of Right to Rescind is enclosed, have it signed and dated, concurrently with the Note, by all borrowers.
10. We assume no liability as to the identity of any person executing or acknowledging any instruments or documents delivered to you in connection with this transaction.
11. ALL DOCUMENTS MUST BE SIGNED EXACTLY AS TYPED NAMES APPEAR.

**HAZARD INSURANCE**

A Hazard Insurance binder must be furnished at the time of closing in an amount not less than the loan amount, or replacement cost of the structure, whichever is less.  (Combined Loan Amount)

1. The policy must meet the following requirements:
   a. Original policy or facsimile signed by an authorized agent.
   b. Minimum one year term with coverage equal at least to full replacement cost of the improvements, or loan amount, whichever is less.    (Minimum remaining term of 6 months for Purchase or Refinance is acceptable.)
   c. Full, correct borrower(s) names.
   d. Full, correct property address.
   e. Premium amount must be indicated on the policy.
   f. Agent name and address.
   g. Our loan number MUST be indicated on the policy.
   h. Paid receipt for first year premium attached or shown on HUD-1 as paid in closing.
   i. Earthquake insurance (if required) use same, identifying criteria as for Flood Insurance.
   j. Insurer must have rating in Best's Insurance Guide of at least Class VI.
   k. FLOOD INSURANCE (if required): Standard policy issued by member of National Flood Insurers Association for not less than our loan amount or the maximum amount available under National Flood Insurance program, whichever is less. The name(s) of the buyer(s), legal description, street address, city, state, county and zip code of security property on these policies must be identical to those of the loan instruments.
   l. On condominiums, we must have an individual endorsement meeting the criteria above.
   m. Loss Payable Clause to: Home Funds Direct
      A Division of Accredited Home Lenders, Inc.
      A California Corporation,
      It's successors and/or assigns
      P.O. Box 10436
      Van Nuys, CA 91410-0436

**CLOSER REQUIREMENTS**

For all Dry-Funding States and Refinances in Wet-Funding States:
ALL DOCUMENTS MUST BE IN OUR OFFICE TWO (2) BUSINESS DAYS PRIOR TO DISBURSEMENT OF LOAN FUNDS
LENDER REQUIRES CONFIRMATION OF DISBURSEMENT OF FUNDS WITHIN 48 HOURS OF FUNDING.
DO NOT MAKE ANY CHANGES TO LOAN DOCUMENTS WITHOUT PRIOR LENDER AUTHORIZATION.
ALL FEES SHOWN ON THE HUD - 1   MUST MATCH EXACTLY THE FEES LISTED IN OUR CLOSING INSTRUCTIONS  i. e. :  FEE ITEMS - HUD DESCRIPTION AND DOLLAR AMOUNTS.
ALL PAYOFF CHECKS MUST BE SENT DIRECTLY TO THE CREDITOR.   DO NOT GIVE ANY CHECKS TO THE BORROWER.

LENDERS' INSTRUCTIONS

AHL/Frazier 0036



# LENDERS' INSTRUCTIONS

**BUYER COST REQUIREMENTS**

1. DOWNPAYMENT IN CASH FROM BORROWER(S) MUST TOTAL AMOUNT SHOWN ON PAGE 1.
2. BORROWERS CANNOT PAY THE FOLLOWING:

**VA LOANS**

1. PHOTOS & INSPECTION FEE MORE THAN ALLOWED BY VA
2. MESSENGER SERVICE
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED/DEED OF TRUST AND ANY ATTACHMENTS THERETO
4. ESCROW FEES
5. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
6. TERMITE INSPECTION
7. TAX SERVICE FEE
8. SETTLEMENT OR CLOSING FEE

**FHA LOANS**

1. TAX SERVICE/REGISTRATION FEE
2. MESSENGER SERVICE UNLESS AUTHORIZED BY BORROWER IN WRITING
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED OF TRUST/DEED AND ANY ATTACHMENTS THERETO
4. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
5. INSPECTION FEES - NOT MORE THAN ALLOWED BY FHA
6. DOCUMENT PREPARATION

**DISBURSEMENT**

1. It shall be the responsibility of the Closing Agent to request proceeds from the lender at such time as the Closing Agent is prepared to comply with all the terms and conditions of the Purchase/Sale Agreement and /or our Escrow Instructions. SUCH A REQUEST, BY THE CLOSING AGENT, FOR FUNDS SHALL BE DEEMED TO BE A CERTIFICATION (LENDER) THAT ALL TERMS AND CONDITIONS HAVE BEEN MET AND THAT THE DOCUMENTS WILL BE PROPERLY RECORDED NOT LATER THAN THE NEXT BUSINESS DAY AFTER THE DAY THE CLOSING AGENT HAS RECEIVED THE PROCEEDS CHECK. In the event that the documents are not recorded within 24 hours, the Closing Agent will immediately return the funds to the sender in accordance with the sender's instructions.

2. HUD SETTLEMENT DATE

GOVERNMENT LOANS: The HUD-1 settlement date MUST be the date on which the lender disburses proceeds to the Closing Agent and NOT the date on which proceeds are disbursed to the seller. These two dates may be the same day.

CONVENTIONAL LOANS: The settlement date on the HUD-1 statement may reflect the date on which the closing Agent disburses the proceeds, which would usually be the day after the Agent received loan proceeds from the lender.

**ADDITIONAL INSTRUCTIONS:**

1. Undertaking to close this loan and acceptance of the lender's funds for disbursement shall constitute an undertaking to close this loan and disburse such funds in accordance with these Closing Instructions, whether or not these instructions are executed or delivered by the Closing Agent. Closing Agent will be responsible for any losses incurred by lender as a result of Closing Agent's failure to comply fully with these Closing Instructions.

2. Lender reserves the right to cancel or amend the loan or these instructions at any time prior to closing.

3. Closing Agent represents, warrants, and covenants that it is not an affiliate of or otherwise controlled by any party to this transaction.

4. From the time Closing Agent receives closing funds until the loan documents are sent to the lender, Closing Agent shall hold all loan documents for the benefit of the sender of the closing funds.

**E-MAIL:**

-Handling of E-Mail and Closing Documents. If Closing Agent is willing to receive Closing Documents via e-mail, Closing Agent's e-mail address is set forth below, and Closing Agent shall be responsible for ensuring that all Closing documents received via e-mail are properly printed and otherwise handled in accordance with the Closing Documents handling requirements set forth above.
Closing Agent's Email Address: kimc@hfsincorporated.com

---

THE UNDERSIGNED BORROWER(S)

1. DIRECT THAT THE LOAN PROCEEDS BE PAYABLE TO THE ORDER OF THE SETTLEMENT AGENT.
2. ACKNOWLEDGE 1ST PAYMENT DATE OF 05/01/2005
3. ACKNOWLEDGE THAT THE LENDER MAY CANCEL OR AMEND THESE INSTRUCTIONS WITHOUT MY/OUR APPROVAL.
4. ACKNOWLEDGE ESTIMATED MONTHLY PAYMENTS OF:

| | | |
|---|---|---|
| PRINCIPAL & INTEREST | $ | 383.89 |
| TAXES (BONDS) | | 44.75 |
| INSURANCE | | 89.00 |
| MTGE. INS. PREMIUM | | |
| | | |
| TOTAL | $ | 517.64 |

3-25-05 _____ CHERYL HALL
DATE

_____
DATE

_____
DATE

_____
DATE

---

## PLEASE RETURN DOCS TO:

Home Funds Direct
1130 Northchase Parkway
Suite 200
Marietta, GA 30067-6420

Ken Harper
CLOSER/FUNDER NAME

(866) 539-7025
TELEPHONE NUMBER

THE UNDERSIGNED AGREES TO CLOSE THIS LOAN IN ACCORDANCE WITH ALL OF THE INSTRUCTIONS AND CONDITIONS CONTAINED IN THE CLOSING INSTRUCTIONS.

SWAFFORD & HAYES SETTLEMENT SERVICES
SETTLEMENT AGENT

BY: _Jane Carcille_
SIGNATURE

SWAFFORD & HAYES SETTLEMENT SERVICES
TYPED NAME

(865) 934-0466
TELEPHONE NUMBER

03/28/05
DATE

---

LENDERS' INSTRUCTIONS
Closing Instructions

HALL
Page 4 of 4

AHL/Frazier
0037

## ADDENDUM TO LENDERS INSTRUCTIONS

BORROWER'S CHERYL HALL

LOAN #    0503172917                                    ESCROW #  05-2813

**ATTENTION CLOSING AGENTS: BY DISBURSING THIS LOAN YOU ARE GUARANTEEING DELIVERY OF THE FINAL HUD-1 WITHIN 24 HOURS OF CLOSING TO Home Funds Direct. PLEASE REMEMBER TO INCLUDE THE ACTUAL "DISBURSEMENT DATE" ON THE HUD-1 AND FAX TO THE ASSIGNED FUNDER INDICATED ON THE LENDER'S INSTRUCTIONS.**

## ** WE MUST HAVE THESE ITEMS IN AND APPROVED BEFORE FUNDING **

1. __X__ Home Funds Direct
   IN 1st    LIEN POSITION AT TIME OF FUNDS.

2. __X__ INSURED CLOSING PROTECTION LETTER FROM TITLE AGENT OR COPY OF ERRORS AND OMISSION POLICY FROM CLOSING AGENT.

3. _____ COPY OF SURVEY OF PROPERTY OR NON-IMPROVEMENT AFFIDAVIT.

4. __X__ CERTIFIED COPY OF ESTIMATED AND/OR FINAL HUD-1.

5. _____ CERTIFIED COPY OF ESCROW INSTRUCTIONS WITH CORRECT RATE, TERMS & LENDER SIGNED BY ALL PARTIES.

6. __X__ COPY OF ALL BORROWER(S) PHOTO ID.

7. __X__ COMPLETED CORRECT TYPED 1003 SIGNED BY BORROWER(S) AND INTERVIEWER.

8. __X__ HAZARD INSURANCE POLICY & FLOOD INSURANCE POLICY (IF REQUIRED) WITH MINIMUM 6 MONTHS REMAINING & CONVERAGE OF THE LESSER OF:
   A.  THE COMBINED LOAN AMOUNT(S) OR    $56,000.00         OR
   B.  GAURANTEED REPLACEMENT COST OR    $0.00              OR
   C.  TOTAL ESTIMATED NEW COST ON APPRAISAL.
   MORTGAGE / LOSS PAYEE CLAUSE:
   Home Funds Direct
   A Division of Accredited Home Lenders, Inc.
   A California Corporation,
   It's successors and/or assigns
   P.O. Box 10436
   Van Nuys, CA 91410-0436

9. __X__ TITLE POLICY TO READ AS FOLLOWS:
   Home Funds Direct
   IT'S SUCCESSORS AND/OR ASSIGNS

10. _____ BORROWER IS IN A SECTION 32 - MUST SIGN SECTION 32 NOTICE AND GO THROUGH 2 DAY RESCISSION PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

11. _____ BORROWER TO PROVIDE ORIGINAL SECTION 32 NOTICE SIGNED AND DATED PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

12. __X__ ALL LOAN DOCUMENTS MUST BE EXECUTED AT ESCROW OR CLOSING AGENT OFFICE.

13. __X__ LENDER DOES NOT ACCEPT LIMITED COVERAGE TITLE POLICIES FOR LOANS GREATER THAN $50,000.00.

14. __X__ COPY OF WIRE INSTRUCTIONS TO BE SUBMITTED WITHIN 24 HOURS OF FUNDING.
   FAX NUMBER (866) 539-7026

15. _____ LENDER TO COLLECT AND PAY LIFE INSURANCE PREMIUM AT CLOSE OF ESCROW.

16. __X__ POWER OF ATTORNEY IS PROHIBITED WITHOUT PRIOR AUTHORIZATION FROM LENDER.

17. __X__ PROVIDE THREE CERTIFIED COPIES OF THE MORTGAGE/DEED OF TRUST WITH ALL RIDERS & THE NOTE WITH ALL RIDERS.

AHL/Frazier
0038

## ADDENDUM TO LENDERS INSTRUCTIONS, Continued

18. Hazard Insurance Policy - If not impounded, requires 6 mo. coverage from loan date for refinances and 12 mo. for purchases. Mortgagee Clause: Accredited Home Lenders, Inc., A California Corporation, ISAOA P.O. Box 10436 Van Nuys, CA 91410-0436

19. Pay the following in full at closing (payoff must show on est/final HUD1):

        Payoff Amount: THE CR STR/PROVIDIAN,     $785.00
        Payoff Amount: PALISADES,    $694.00
        Payoff Amount: HOLLOWAY CREDIT,    $452.00
        Payoff Amount: SMALL  LNS,    $399.00
        Payoff Amount: CRDT MGT,    $182.00
        Payoff Amount: FRIEDMANS JEWELERS,     $400.00
        Payoff Amount: ARMY AVIATION CENTER FCU,  $4,594.49
        Payoff Amount: ALABAMA APPRAISAL SERVICES,    $300.00
        Payoff Amount: State Farm Insurance,  $1,068.00

        Total Amount:  $8,874.49

20. AHL to be insured in 1st lienhold position with clear title

21. Corrected original 1003, pages 1-4, to be fully completed and signed by borrowers and broker.

22. Certified copy of Final HUD1

23. Funds to be wired to the title company only.

24. Provide detailed cash-out letter from borrower.

### *** NO FURTHER CONDITIONS ON THIS LOAN

THE UNDERSIGNED BORROWER(S) AND CLOSING OFFICER ARE HEREBY AWARE AND UNDERSTAND THAT THIS LOAN IS APPROVED SUBJECT TO THE APPROVAL OF THE CONDITIONS LISTED ON THIS ADDENDUM PAGE.  THE CONDITIONS MUST BE REVIEWED AND APPROVED BY THE FUNDER AND/OR UNDERWRITER AT Home Funds Direct,

THE BORROWER(S) ARE AWARE THAT IN THE EVENT ANY OF THE ABOVE CONDITIONS ARE NOT ACCEPTABLE BY
Home Funds Direct,

THIS LOAN APPROVAL MAY BE RESCINDED AT THE SOLE DISCRETION AND OPTION OF
Home Funds Direct,

| | | |
|---|---|---|
| Borrower  3-25-05 | Date | Borrower | Date |
| CHERYL HALL | | |

| Borrower | Date | Borrower | Date |

| Borrower | Date | Borrower | Date |

| Borrower | Date | Borrower | Date |

Closing Officer    Date

MIN # 100176105031729174          HALL          Loan#   0503172917
AHL 610022-F.UFF                  Page 2

AHL/Frazier
0039

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL HALL FRAZIER | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO.: |
| | ) | 1:08CV11-MHT |
| ACCREDITED HOME LENDERS, INC. | ) | |
| | ) | |
| DEFENDANT. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF
## INTERROGATORIES AND REQUEST FOR PRODUCTION

**COMES NOW** Defendant Accredited Home Lenders, Inc. ("AHL") by and through its

counsel of record, and hereby responds to Plaintiff's Second Set of Interrogatories and Request

for Production as follows:

### GENERAL OBJECTIONS

1.      Defendant objects to the Interrogatories and the Requests for Production, and to

the "Instructions" preceding them, as unduly burdensome to the extent that they purport to

impose obligations in addition to those imposed by the Federal Rules of Civil Procedure and this

Court's Local Rules.

2.      Defendant objects to the "Instructions" preceding the Interrogatories and Request

for Production to the extent they include definitions that are overbroad, mischaracterized or

inaccurately define certain terms, or require Defendant to make a legal conclusion.

EXHIBIT
tabbies
8

3. Defendant objects to each Interrogatory and Request for Production as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond the scope of this litigation.

4. Defendant objects to each Interrogatory and Request for Production to the extent it expressly or impliedly seeks information protected by the attorney-client privilege, the work product doctrine, self-analysis privilege, joint defense or common interest privilege, or any other applicable privilege or similar reason for non-production. Inadvertent disclosure of privileged information is not intended to be, and may not be construed as, a waiver of any applicable privilege.

5. Defendant objects to each Interrogatory and Request for Production to the extent it seeks information (i) that is not within Defendant's possession, custody, or control; or (ii) that is within the possession, custody, or control of corporate affiliates of Defendant that are not controlled by Defendant; or (iii) that is in the possession, custody, or control of Defendant's attorneys or former attorneys; or (iv) that is in the possession, custody, or control of or concern the activities of subservicers, of predecessor or successor servicers or subservicers, of master servicers for whom Defendant provided subservicing, or of investors on the loans at issue.

6. By making these responses, Defendant does not concede that the information given is properly discoverable or admissible. To the contrary, Defendant reserves the right to object to further discovery regarding the subject matter of the Interrogatories and Request for Production and to object to the introduction into evidence of statements made and documents produced in response to these Interrogatories and Request for Production.

7. Each response to these Interrogatories and Requests for Production is made to the best of Defendant's knowledge at the present time, based upon its investigation to date. Where

appropriate, Defendant's responses are made upon information and belief based on that investigation. Defendant states that its investigation is ongoing and Defendant specifically reserves the right to supplement and amend these responses when and if it becomes necessary.

8.    These General Objections are incorporated into each of the specific responses to these Interrogatories and Request for Production and shall be deemed continuing as to each Interrogatory and Request for Production, and are not waived, or in any way limited by the specific responses.

<div align="center"><b><u>INTERROGATORIES</u></b></div>

**<u>INTERROGATORY NO. 1:</u>**

Identify each person or persons participating in the preparation of these your answers to these interrogatories giving their full name address and job title.

**<u>RESPONSE TO INTERROGATORY NO. 1:</u>**

AHL objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work product immunity doctrine. Subject to and without waiver of this objection and the General Objections, AHL states that various individuals in its Legal Department assisted with the preparation of these interrogatory responses.

**<u>INTERROGATORY NO. 2</u>**

Identify each charge included in the calculation of the "amount financed" regarding the transaction at issue herein.

**<u>RESPONSE TO INTERROGATORY NO. 2:</u>**

AHL objects to this Interrogatory on the grounds that it is ambiguous and inconsistent with the method prescribed by federal law for calculating the Amount Financed. Subject to and

without waiver of this objection and the General Objections, AHL states that the Amount

Financed disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL/Frazier

0031) was calculated by subtracting the Prepaid Finance Charge ($3,582.90) referenced in

AHL's Response to Interrogatory No. 3 from the Principal Loan Amount ($56,000.00).

**INTERROGATORY NO. 3:**

Identify charge included in the calculation of the "finance charge" regarding the

transaction at issue herein.

**RESPONSE TO INTERROGATORY NO. 3:**

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, and

inconsistent with the method prescribed by federal law for calculating the "finance charge."

Subject to and without waiver of this objection and the General Objections, AHL states that the

"finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement

(AHL/Frazier 0031) included the sum of (1) the Prepaid Finance Charge, which totaled

$3,582.90, consisting of the Origination Fee ($1,960.00), the Processing Fee ($500.00), the

Underwriting Fee ($500.00), the Appraisal Review Fee ($250.00), Flood Zone Determination

Fee ($9.50), the Tax Service Fee ($66.00), the Per Diem interest fee ($22.40) and the

Settlement/Closing fee ($275.00), as disclosed on the Final Good Faith Estimate (AHL 0032);

plus (2) Interest during the term of the loan ($82,189.61), which is calculated by subtracting the

Principal Loan Amount ($56,000.00) from the Total of Payments ($138,189.61).

**INTERROGATORY NO. 4:**

Identify the methodology and describe the step by step process by which the APR

(Annual Percentage Rate) was calculated regarding the instant transaction.

## RESPONSE TO INTERROGATORY NO. 4:

AHL objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This interrogatory seeks information about calculations based on amounts that were included in the "finance charge" disclosure on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states that the APR was calculated by entering the loan amount, interest rate, and other charges into a software program called Empower® provided by Fidelity Information Services. The Empower software, which is a calculation tool used in good faith by AHL within the meaning of Regulation Z, 12 C.F.R. § 226.22(a)(1) n.45d, then used these amounts to calculate the APR, as provided in Appendix J to Regulation Z, 12 C.F.R. pt. 226 app. J.

## INTERROGATORY NO. 5:

Describe in detail each and every service performed, giving full names of the persons or entities performing such services, the regarding the transaction at issue in exchange for your "Origination Fee."

## RESPONSE TO INTERROGATORY NO. 5:

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The Origination Fee was included in the "finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states that the Origination Fee is revenue collected in exchange for originating a loan and covers

a wide variety of AHL's operational expenses, including employee compensation, facilities, overhead, etc.

## INTERROGATORY NO. 6:

Describe in detail each and every service performed, giving full names of the persons or entities performing such services, the regarding the transaction at issue in exchange for your "Processing Fee," "Underwriting Fee," "Flood Zone Determination Fee," "Tax Service Fee," "Tax Service Fee" and "Appraisal Review Fee."

## RESPONSE TO INTERROGATORY NO. 6:

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The "Processing Fee," "Underwriting Fee," "Flood Zone Determination Fee," "Tax Service Fee" and "Appraisal Review Fee" fees were included in the "finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and are, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states as follows:

- the "Processing Fee" is revenue collected for various processing functions, including but not limited to ordering and reviewing the borrower's credit report, documentation of the borrower's income, and assembling various components of the file for the purpose of data entry into the loan origination system;

- the "Underwriting Fee" is revenue collected for reviewing the file to determine compliance with company lending policies and procedures, identifying compensating factors that support the loan decision, reviewing the borrower's credit risk, evaluating the property for clear title, reviewing the file to identify and prevent fraud, validating data integrity and determining the salability of the loan in the secondary mortgage market;

- the "Flood Zone Determination Fee" is revenue collected for obtaining information regarding whether the property was in a Special Flood Hazard Area and for monitoring the property in the event map revisions result in the restructuring of the lender's insurance requirements;

- the "Tax Service Fee" is revenue collected for monitoring the property real estate taxes after loan closing; and

- the "Appraisal Review Fee" is revenue collected for an in-house appraiser's review of the appraisal report to verify the adequacy and completeness of the report, and to verify that the property value meets the minimum guidelines for the loan program.

## INTERROGATORY NO. 7:

For each service in referred to in interrogatories 5 and 6 above that was performed in whole or part by a third party, identify that third party, itemize all third party charges and describe the service(s) performed by such third party.

## RESPONSE TO INTERROGATORY NO. 7:

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This interrogatory seeks information about calculations based on amounts that were included in the "finance charge" disclosure on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states that First American Flood Data Services and First American Tax Services performed certain functions in connection with the flood zone determination fee and the tax service fee. See Response to Interrogatory No. 6 above.

## REQUEST FOR PRODUCTION OF DOCUMENTS

## REQUEST NO. 1:

All documents identified in response to the foregoing interrogatories.

## RESPONSE TO REQUEST NO. 1:

Subject to and without waiving its general and specific objections, AHL states that it will produce all non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Interrogatories.

## REQUEST NO. 2

All documents, including any information stored in electronic form, regarding or in any way relating to the calculation of the terms of the TILA disclosure at issue herein.

**RESPONSE TO REQUEST NO. 2:**

AHL objects to this Request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection and the General Objections, AHL states that it has already produced non-privileged, responsive documents in response to this Request. AHLfurther states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

**REQUEST NO. 3:**

Each and every document, including any information stored in electronic form, regarding the services performed in exchange for your charges reflected on the Plaintiff's HUD-1 settlement statement.

**RESPONSE TO INTERROGATORY NO. 3:**

AHL objects to this request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This Request seeks documents regarding fees that were included in the finance charge" disclosure on the Edwards' Final Truth in Lending Disclosure Statement (AHL 00003) and is, therefore, beyond the scope of this litigation. AHL states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

## VERIFICATION AS TO RESPONSES TO INTERROGATORIES

I, Alma Diaz, am duly authorized by Accredited Home Lenders, Inc. to execute the foregoing responses to interrogatories under oath on its behalf. The information set forth in these responses was collected by others and such information is not necessarily within my personal knowledge. However, on behalf of Accredited Home Lenders, Inc., I verify under penalty of perjury under the laws of the United States of America that the foregoing responses to interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated: April 30 , 2008.

_____
Alma Diaz

9

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Responses to Plaintiffs' First Set of Interrogatories on counsel of record by placing same in the United States mail, postage prepaid and properly addressed to:

Earl P. Underwood, Jr.
Law Offices of Earl P. Underwood, Jr.
P.O. Box 969
21 South Section Street
Fairhope, AL 36533-0969

on this the ___ day of May, 2008.

Respectfully submitted,

J. DOUGLAS MINOR, JR. [MSB #10045]

AS TO OBJECTIONS:

_____
J. DOUGLAS MINOR, JR. [MSB #10045]
Attorney for Defendant Accredited Home
Lenders, Inc.

OF COUNSEL

J. Douglas Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701