IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL HALL FRAZIER, | * | |
| Plaintiff, | * | |
| vs. | * | CIVIL NUMBER: 1:08-cv-11-MHT |
| ACCREDITED HOME LENDERS, INC., d/b/a HOME FUNDS DIRECT, | * | |
| | * | |
| Defendant | | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

COMES NOW the Plaintiff and submits the following Memorandum in Support of Motion for Class Certification:

## I.    INTRODUCTION

Plaintiff seeks certification of a class under Rules 23(a)(1)-(4), (b)(2) and (b)(3) of the *Federal Rules of Civil Procedure* of a class asserting claims against Defendant Accredited Home Lenders, Inc. ("AHL") under the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* ("TILA") and the Home Ownership Equity Protection Act ("HOEPA") 15 U.S.C. § 1602(aa). The Plaintiff seeks certification of a class defined as follows:

> All individuals who obtained a mortgage loan from AHL and who were charged for settlement services, as reflected on the HUD settlement statement, more than the actual costs of the service, or duplicative charges for services performed by others, so that the charge was not reasonable and bona fide, and which charges were not disclosed as finance charges in connection with the TILA disclosures ("Class");

Within the TILA class, Plaintiff proposes the following two subclasses:

All individuals from who obtained a mortgage loan from AHL and who were charged for settlement services, as reflected on the HUD settlement statement, more than the actual costs of the service, or duplicative charges for services performed by others, so that the charge was not reasonable and bona fide, and which charges were not disclosed as finance charges in connection with the TILA disclosures such that they are entitled to rescind their loans pursuant to 15 U.S.C. § 1935(c), and whose statutory rescission rights had not expired as of April 25, 2005 ("Rescission Class");

All individuals who obtained a non-purchase money mortgage from Defendant AHL, and who were charged for settlement services, as reflected on the HUD settlement statement, more than the actual cost of the service, so that the charge was not reasonable and bona fide, and which charges were not included in the point and fee calculation, but when considered a point and fee, the mortgage was a high cost loan as defined by HOEPA ("HOEPA Class");

Plaintiff's claims are based on the loan closing practices of AHL. Plaintiff alleges that AHL has engaged in a systematic program of misstating and misallocating settlement fees their borrowers incurred, and thereby incorrectly disclosing the amount financed, finance charges, and annual percentage rates ("APR's") on the subject loans. Those misstatements cause violations of both TILA, and for certain class members, HOEPA. The violations mean class members possess damage claims as well as the right to rescind their loans in some cases.

The disclosures a creditor must make at the time it extends credit to a consumer are governed by TILA and its implementing regulation, Regulation Z. See 15 U.S.C.§ 1601; 15 U.S.C. § 1638; 12 C.F.R. § 226. The Federal Reserve Board publishes official staff commentary to Regulation Z that is dispositive in TILA cases unless the commentary is demonstrably irrational. See *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980).

The purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). Because TILA is a remedial consumer protection statute, it "should be construed liberally in favor of the consumer." *Bragg v. Bill Heard*

*Chevrolet Inc.,* 374 F.3d 1060 (11th Cir. 2004); *Fairley v. Turan-Foley Imps, Inc.,* 65 F.3d 475, 482 (5th Cir. 1995) ("The TILA is to be enforced strictly against creditors and construed liberally in favor of consumers. . . .").

TILA requires that the finance charge and the corresponding interest rate be accurately disclosed. 15 U.S.C. § 1638(a)(4). Improper disclosure of the annual percentage rate and finance charge is a material violation which allows the borrower to seek statutory damages, and rescission if the omission exceeds certain amounts. 15 U.S.C. §§ 1602(u), 1640; Reg. Z § 226.23 n.48. *Nash v. First Financial Savings & Loan Assn.,* 703 F.2d 233, 237 (7th Cir. 1983).

Finance charges are broadly defined under TILA as "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 15 U.S.C. § 1605 (a); 12 C.F.R. § 226.4(a). There are two exceptions to this broad definition at issue in this case. First, TILA provides that a recording fee is not a finance charge, so long as that fee is the actual amount paid to a governmental entity to record the instrument. 15 U.S.C. § 1605(d)(1). Thus, any "recording fee" that exceeds the **actual** fee paid to record the instrument is a finance charge. *Payton v. New Century Mortg. Corp.,* 2003 WL 22349118 (N.D. Ill. 2003).

Second, certain real property related closing costs, including title insurance premiums, abstracts and examinations, are permitted by 15 U.S.C. § 1605(e) to be excluded from the calculation of the finance charge. However, the exclusion only applies "if the fees are bona fide and reasonable in amount." Reg. Z § 226.4(c)(7). The "bona fide and reasonable" standard is included to prevent lenders from padding fees or adding charges without disclosing the additional expense as a finance charge.

-3-

Fees charged for title insurance are not bona fide or reasonable where the fee exceeds the amount allowed to be charged under state law. *In re Strong*, 2005 WL 1463245 (E.D. Pa. 2005) (title insurance charge which exceeds the maximum amount allowed by state law is not reasonable or bona fide); *Stump v. WMC Mortg. Corp.*, 2005 WL 645238 (E.D. Pa. 2005); *In re Fields*, 2006 WL 2191342 (E.D. Pa. 2006) (title insurance fee unreasonable if plaintiff qualified for reissue rate mandated by filed-rate). Likewise the fee is not bona fide and reasonable if it exceeds a published rate. Therefore, any title insurance premium charged in excess of the applicable published or filed rate is a finance charge and should have been disclosed as such by AHL. *Johnson v. Know Financial Group, LLC*, 2004 WL 1179335 at *6 n. 5 (E.D. Pa. 2004) (where a rate manual exists, it is the relevant market rate to test reasonableness); *In re Glauser*, 365 B.R. 531, 535 (Bankr. E. D. Pa. 2007) (same).

A similar analysis applies to inflated title abstract and examination fees. In order to be bona fide as defined under the statute, the fee must be for the service that was actually rendered. *In re Fields*, 2006 WL 2191342 (E.D. Pa. 2006) (to be bona fide the service must actually be performed for the fee); *Cowles v. Bank West*, 476 Mich. 1, 35, 719 N.W. 2d 94, 113 (Mich. 2006) (fee not bona fide if it includes charges for items other than those stated); *Therrien v. Resource Financial Group, Inc.*, 704 F. Supp. 322, 327 (D. N.H. 1989) (double charges are neither bona fide nor reasonable and must be included in the finance charge); *Postow v. Oriental Building Assoc.*, 390 F. Supp. 1130, 1134 n. 4 (D.D.C. 1975). Thus, marked up charges for another's title search are not bona fide, particularly when a separate charge is added for title examination, and another charge for title insurance. The markup of work done by others is neither bona fide nor reasonable.

Because the correct finance charge and interest rate are required disclosures under TILA, the

-4-

manner in which the creditor must make the disclosure is governed by Regulation Z and its commentary. Regulation Z requires that "[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously." 12 C.F.R. § 226.17(a). The purpose of TILA is to assure "meaningful" disclosures. 15 U.S.C. § 1601. Consequently, the creditor must not only disclose the required terms, it must do so accurately. The accuracy demanded excludes not only literal falsities, but also misleading statements. *Smith v. Chapman*, 614 F.2d 968, 977 (5th Cir. 1980) ("A misleading disclosure is as much a violation of TILA as a failure to disclose at all.").

AHL customarily utilized a "final" good faith estimate of certain of the settlement fees as opposed to disclosing the actual amount of the fees. (See Dooley Deposition at p. 53, Joint Record at 1594). AHL's practice violates TILA in several critical respects. First, estimated disclosures may be given only when accurate information is unknown to the creditor "at the time the disclosures are made." 12 C.F.R. § 226.17(c)(2). If AHL's settlement agent had accurate information on the day of closing when the final TILA disclosures are provided to the borrower, the accurate numbers must be used. *In re Madel*, 2004 WL 4055247 (Bankr. E.D. Wisc. 2004); *Hickey v. Great Western Mortg. Corp.*, 1995 WL 153372 (N.D. Ill. 1995); *In re Mitchell*, 75 B.R. 593, 596 (Bankr. E.D. Pa. 1987).

Second, if the creditor uses a system whereby it relies on estimated numbers, the disclosure must be clearly labeled as an estimate. See 12 C.F.R. § 226.17(c)(2)(I); see also *Cardenas v. Classic Chevrolet, Inc.* 2000 WL 1672317 (N.D. Ill. 2000) (certifying class where estimate not disclosed); *Rose v. SLM Financial Corp.*, 2007 WL 674319 (W.D.N.C. 2007).

An accurate characterization of the settlement charges imposed on the borrower in connection with non-purchase money mortgages is also required under HOEPA. Generally, HOEPA was enacted to provide market regulation over "high cost" loans. See *Bryant v. Mortgage Capital*

*Resources Corp.*, 197 F. Supp. 2d 1357, 1360, n.5 (N.D. Ga. 2002) (through the enactment of HOEPA, Congress intended to force the high cost mortgage market to police itself).

HOEPA does not impose any closing cost or interest rate caps on loans. Instead, it imposes special disclosure requirements on creditors if the loan meets one of two alternative HOEPA "triggers:" (1) an APR more than ten points greater than the prevailing treasury rate; or (2) closing fees greater than 8% of the "total loan amount" (gross loan amount minus the fees) (15 U.S.C. § 1602(aa)). Required disclosures include the correct disclosure of the true Annual Percentage Rate ("APR") and the monthly payments in an advance notice that must be delivered at least three business days before closing. 15 U.S.C. § 1639(a)(2)(A). When the inflated and/or marked up charges are included in the finance charge, in some instances the amount of the recalculated points and fees will be enough to push the subject loan over HOEPA's "high cost" threshold. It is undisputed that no HOEPA disclosures were made to any class member. Therefore, AHL not only violated TILA, it also violated HOEPA.

TILA and HOEPA claims have long been considered as appropriate for class certification. *See Goldman v. First Nat. Bank of Chicago*, 532 F.2d 10, 14 (7th Cir. 1976), *citing Haynes v. Logan Furniture Mart*, 503 F.2d 1161 (7th Cir. 1974). Indeed, the section of TILA and HOEPA that provides Plaintiff with her causes of action speaks specifically to class actions. *See* 15 U.S.C. § 1640(a)(2)(b). The Plaintiff's claims are premised on conduct perpetrated by AHL through its settlement agents on a large number of victims, which conduct by its nature was standardized to the class. Moreover, the documents which establish Plaintiff's claims are standard forms mandated by federal law. Indeed, RESPA mandates the form and content of the Settlement Statement, and TILA mandates the form and content of the disclosures that were required to be made to the class

-6-

members. *See, e.g.*, 12 U.S.C. § 2603, 15 U.S.C. §§ 1631, 1632, 1638 and 1639; 12 C.F.R. §§

226.17, 226.18 and 226.32; and at 24 C.F.R. § 3500.8. Because of the standardized documents and

forms used by AHL and the uniform conduct at issue, it is clear that the class members' claims are

proved using the same types of evidence. *See Hickey*, 158 F.R.D. at 610 ("TILA actions for

inadequate disclosure arising from a creditor's standardized procedures or forms are particularly

appropriate for class prosecution."). The statutory claims presented in the complaint are particularly

well suited for class treatment and present this Court with an opportunity to manage the litigation

in the most effective and efficient manner possible, and to determine the legality of Defendant's

practices on a nationwide basis.


### III.    STATEMENT OF FACTS

#### A.    AHL and its Practices

AHL is one of the nation's largest sub-prime lenders and originates loans in several states.

AHL does not close the loans it originates with its own employees, instead it contracts out the

closings to third party settlement service providers  AHL closed the Frazier loan through its closing

agent, Swafford Settlement Services ("Swafford"). (Dooley Deposition at p. 54, Joint Record at

1595). AHL utilizes a uniform system to close its loans.  AHL processes the loan application,

gathers basic title information and designates a settlement agent for use as to that loan.  The agent

is selected by the AHL loan officer from a list of agents approved by AHL.  AHL gathers amounts

of the fees to be charged from the designated settlement agent and uses those fees to generate the

preliminary disclosures required by RESPA (i.e. the "good faith estimate"). (Diaz Deposition, pp.

11-22,  Joint Record at 391-402).  AHL does nothing to insure that the fees imposed by the

settlement agent are accurate: it simply "trusts what the company gives us." (*Id.* pp. 27-28, 39-40, Joint Record at407-408,419-420). The settlement agent determines the amount to be charged for recording fees and AHL takes no steps to make sure that those fees are the actual fees paid to record the mortgage. (*Id.*, p. 51, Joint Record at 431).

In fact, AHL never prepares the HUD Settlement Statement. The HUD is prepared by the settlement agent which plugs in its own fees (Lines 1101 though 1205) as well as the fees imposed by AHL (Lines 800 through 811). (*Id.*, pp. 39-40, Joint Record at 419-420 ). AHL does not include any portion of the recording fee in the calculation of the finance charge used in its TILA disclosures.

For each AHL loan, a lender's title insurance policy is required to be purchased and the premium is charged to the borrower as a title insurance premium reflected on Line 1108 of the HUD Settlement Statement (Dooley Deposition. at p. 72 , Joint Record at 1599). The amount charged for title insurance is calculated by the settlement agent, which also serves as the title insurance company's agent, and that amount is adopted by AHL without any scrutiny. (Diaz Deposition at pp. 27-28, 39-40, Joint Record at 407-408, 419-420). AHL does not include any portion of the "title insurance" premium in the finance charge disclosed to its borrowers. This is consistent with AHL's practice of excluding these charges in its calculation of finance charge and other TILA disclosures.

AHL does not provide a separate itemization of the TILA disclosure, instead relying on the good faith estimate prepared in advance of closing (Dooley Deposition. at p. 53, Joint Record at 1594). Nothing in AHL's TILA disclosure indicates that the fees shown are based on estimates.

AHL requires the use of a settlement company selected by AHL, and requires the borrower to pay certain fees to that settlement company. (Dooley Deposition at p. 53, Joint Record at 1594). All of the services performed by the settlement company are required by AHL, as well as all of the

-8-

charges associated with the closing (Swafford Deposition pp. 113-114, Joint Record at 1342-1343).

### B.    The Plaintiff's Loan and Transactions.

Plaintiff closed her mortgage transaction with AHL on March 25, 2005. Plaintiff's loan was a typical closing of an AHL loan. (Swafford Deposition at p. 114-115, Joint Record at 1343-1344). At closing, Frazier was given a HUD Settlement Statement ("HUD 1") which by law must reflect all of the loan fees paid at or before closing. (See HUD Settlement Statement, Joint Record at 34-36).

The Plaintiff was charged the following fees in connection with her loan:

| | |
|---|---|
| Origination Fee | $1,960.00 |
| Tax Service Fee | 66.00 |
| Processing Fee | 500.00 |
| Zone Determination Fee | 9.50 |
| Appraisal Review Fee | 250.00 |
| Settlement Fee | 275.00 |
| Abstract Fee | 200.00 |
| Title Examination Fee | 250.00 |
| Title Insurance | 200.00 |
| Title Service Fee | 50.00 |
| Recording Fee | 120.00 |

The recording fee represented to Plaintiff was false. The actual recording fee was only $56.00. (See Swafford Ledger Card, Joint Record at 79). The remaining $64.00 was retained by Swafford. (Swafford Deposition at 101, Joint Record at 901). Likewise the title insurance fee disclosed to Frazier exceeded the legal maximum rate by $74.00. Ms. Frazier was charged $200.00 for the title policy, plus a $50.00 title service fee/endorsement. The maximum legal rate was $126.00 (Rate Manual, Joint Record at 2847-2854).

Finally, Swafford charged Frazier for title related services that were not performed. As part

of a scheme to collect hidden profits. Swafford padded the title work it contracted out for others to perform. Swafford did not usually conduct its own abstract of title. (Swafford Deposition 51-53. Joint Record at 889-890). Swafford would contract with third parties to conduct the work to create the abstract, and then mark up the work to add another profit. (*Id.*). In connection with the Frazier loan, Swafford hired Southern Land Title to prepare the abstract, and Southern charged Swafford $72.00 (See Southern Response to subpoena, Joint Record at 378-313). Swafford in turn billed Frazier $200.00 for the abstract. On top of the profit from the abstract, Swafford added an additional $200.00 charge for title examination, although it performed no additional work for the fee. (See HUD Settlement Statement, Joint Record at 34-36)

In connection with this loan, AHL provided Frazier with required TILA disclosure documents. Those disclosure documents excluded from the pertinent calculations the charges for recording fees, title insurance and title examination. (See AHL Responses to Interrogatories, No. 3, Joint Record at 515). When the inflated charges are included in the TILA calculations, the disclosures made are false.

When the inflated charges are properly included in the TILA calculations, the amount of the points and fees charged to Ms. Frazier qualifies her loan as a "high cost" loan under HOEPA. The following chart demonstrates the false nature of the disclosures.

Frazier Loan

| | | |
|---|---|---|
| Loan Amount | $56,000.00 | |
| | As Disclosed | Actual |
| Amount Financed | $52,417.10 | $51,597.10 |
| Prepaid Finance Charge | $3,582.90 | $4,402.90 |
| Origination fee | $1,960.00 | $ 1960.00 |
| Underwriting fee | $  500.00 | $  500.00 |
| Appraisal review fee | $  250.00 | $  250.00 |
| Processing fee | $  500.00 | $  500.00 |
| Tax Serv. fee | $   66 .00 | $   66.00 |
| Flood cert. fee | $    9.50 | $    9.50 |
| Interest | $  22.40 | $  22.40 |
| Settlement fee | $  275.00 | $  275.00 |
| Title abstract | | $  200.00 |
| Title exam | | $  250.00 |
| Title Insurance | | $  200.00 |
| Title service fee | | $   50.00 |
| Recording fee | _____ | $  120.00 |
| | $3,582.90 | $4,402.90 |
| Points and Fee % | 6.835% | 8.489% |

## C.    Swafford and Other Settlement Companies

Swafford is a Florida corporation with its principal place of business in Knoxville, Tennessee. (Swafford Deposition. at p. 23, Joint Record at 882). Swafford was incorporated in December of 2000, and began doing business in January of 2001. (Swafford Deposition. at pp. 74-75, Joint Record at 895). It does business primarily in the Eastern United States and has done

business in at least the following states: Alabama, Arkansas, Florida, Georgia, Tennessee, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina and South Carolina. (Swafford Deposition, at pp. 24-25, Joint Record at 885). Swafford served as a settlement agent for AHL and other lenders. From 2004 to 2007, Swafford closed at least 1000 loans as agent for AHL. (Dooley Deposition at p. 40, Joint Record at 1591).

Swafford performs a variety of settlement services for various lenders including accepting orders for title insurance, preparation of HUD settlement statements, closing loans in its own office if the loans are local, and hiring others to assist in the closings of the loans if the loans are not local. (Swafford Deposition at 33, Joint Record at 884). Swafford prepared the HUD settlement statements subject to the lender's approval. (Swafford Deposition pp 35-36, Joint Record at 885). Swafford would occasionally prepare deeds but, other than the HUD settlement statements, all other documents in the closing come from the lender involved. (Swafford, Deposition pp 38-39, Joint Record at 886).

After the documents are finalized and approved by the lenders they are emailed to Swafford which forwards them, again by email, to a notary for closing. (Swafford Deposition pp 63-64, Joint Record at 892). As part of its services Swafford subcontracts out title abstracting work and uses the work of others to prepare the title insurance policy. Swafford charges for the title insurance, and is paid a commission. Swafford charges the borrower a settlement fee. Swafford's customers, lenders like AHL, limited the amount Swafford could charge as a settlement fee. Instead AHL required Swafford to charge fees for title work even though third party abstractors performed that title work. (Swafford Dep. at pp. 246-248, Joint Record at 938)

The amount which Swafford could charge for title insurance (including commissions) was

limited in two ways. First, each title insurer issued a rate book which established the premium to be charged based on the size of the mortgage loan. Second, many states, like Alabama regulate premiums by requiring a filed rate be charged. Thus, for the Frazier loan, Swafford was limited to the rates filed with and approved by the Alabama Department of Insurance ("DOI"). Ala. Code §§ 27-25-1 through 10. By operation of the filed-rates and/or the rate book, the premium amount depends on the amount of the loan. The higher the loan, the higher the premium.

Despite these clear legal limitations, Swafford engaged in a uniform practice of charging rates for title insurance in excess of the applicable rates. Evidence in the record in this case demonstrates that the title insurance fee charged by Swafford on loans closed for AHL routinely exceeded the legal rate. Counsel for Plaintiff obtained a three month sample of loan files closed by Swafford for AHL. The sample consisted of 163 loans, and the information produced allowed analysis for 130 files. Of the 130 files, 32 showed evidence of at least a $50 overcharge of the title insurance premium. All but 4 of the 130 files also reflected that Swafford charged a duplicative $50 title service fee/endorsement in connection with the title insurance policy. (See Summary of Closing Charges, Joint Record at 1841-1846)

Swafford also routinely inflated the recording fees which were supposed to be paid to governmental entities in connection with loan closings. The $120 charge imposed in connection with Ms. Frazier's loan for "recording fees" reflected Swafford's uniform policy of charging a $120 minimum as a "recording fee," an amount which significantly exceeds the recording fees actually paid.

Beginning in late 2003 or early 2004 Swafford began a procedure by which it collected a flat fee for mortgage recording from consumers rather than the actual cost of the recording.

(Swafford Deposition at 98, Joint Record at 901). This procedure was instituted because, previously, Swafford often did not collect enough money to pay the recording fees for some mortgages resulting in losses to the company. (Swafford Deposition pp 99-101, Joint Record at 901). Any monies that were collected in excess of the consumers' actual recording fees were placed in Swafford's operating account. (Swafford Deposition at 101, Joint Record at 901).

In the sample period, in 129 of the 130 loans closed by Swafford for AHL, the borrower was charged a recording fee in excess of the actual cost incurred in recording the mortgage.

An excerpt of the summary of Swafford's recording fee and title insurance overcharge practice is shown below. The full summary of the recording fee overcharges and title insurance overcharges is at Joint Record at 1841-1846.

| | A | B | C | M | S |
|---|---|---|---|---|---|
| | Settlement Date | State | Loan # | Title Insurance Overcharge | Recording Fee Over-Charge |
| 1 | | | | | |
| 2 | 03/18/05 | NJ | 0503023330 | $187.00 | 66.00 |
| 3 | 03/22/05 | IN | 0502234121 | $168.75 | 105.00 |
| 4 | 03/23/05 | NJ | 502235006 | $135.00 | 6.00 |
| 5 | 01/26/05 | GA | 501192651 | $125.00 | 97.00 |
| 6 | 03/12/05 | GA | 0503035159 | $125.00 | 98.00 |
| 7 | 01/26/05 | GA | 501258903 | $125.00 | 98.00 |
| 8 | 01/11/05 | NJ | 6365028-7893 | $125.00 | 30.00 |
| 9 | 01/05/05 | TN | 412157277 | $121.50 | 66.00 |
| 10 | 03/22/05 | AR | 501136967 | $110.00 | 67.00 |
| 11 | 01/26/05 | GA | 501136039 | $109.50 | 74.00 |
| 12 | 02/28/05 | FL | 502246227 | $100.00 | 159.00 |
| 13 | 02/08/05 | GA | 501315249 | $100.00 | 98.00 |
| 14 | 01/15/05 | GA | 501067053 | $100.00 | 92.00 |
| 15 | 01/18/05 | GA | 501100062 | $95.00 | 98.00 |

| | A | B | C | M | S |
|---|---|---|---|---|---|
| 1 | Settlement Date | State | Loan # | Title Insurance Overcharge | Recording Fee Over-Charge |
| 16 | 03/15/05 | MA | 502166478 | $92.50 | 75.00 |
| 17 | 03/18/05 | VA | 0503079177 | $92.16 | 129.00 |
| 18 | 02/24/05 | MA | 502111752 | $90.00 | 5.00 |
| 19 | 02/16/05 | ME | 501248176 | $80.00 | 105.00 |
| 20 | 01/20/05 | FL | 412022463 | $76.00 | 48.50 |
| 21 | 01/26/05 | MO | 412091591 | $77.50 | 21.00 |
| 22 | 03/07/05 | GA | 0502245786 | $75.60 | 74.00 |
| 23 | 01/26/05 | NH | 412202391 | $75.00 | 69.00 |
| 24 | 03/22/05 | MO | 05-1027 | $75.00 | 78.00 |
| 25 | 03/11/05 | SC | 0502030823 | $74.60 | 82.00 |
| 26 | 03/24/05 | VA | 05031116153 | $69.52 | 96.00 |
| 27 | 02/22/05 | AR | 502097182 | $63.00 | 67.00 |
| 28 | 03/22/05 | IN | 0503080568 | $61.00 | 106.00 |
| 29 | 03/25/05 | AR | 0503035160 | $49.00 | 52.00 |

The evidence also demonstrates that these practices extend well beyond just those loans closed by Swafford. Another closing agent used by AHL, Lender's First Choice ("LFC"), engaged in a similar practice of charging rates for title insurance which exceed the applicable legal rates. (See Petruccelli Depo. I , pp. 113-129; 148-49, Joint Record at 643, 647-652). The testimony of LFC confirms it also engaged in a recording fee markup practice. (See Petruccelli Depo. I pp. 87 - 88, 152- 157, 199 - 200, Joint Record at 637, 653-654,695, and Petruccelli Depo. II p. 37, Joint Record at 800-802).

## III.   ARGUMENT

### A.   The Court's Rule 23 Determination Is a Two-Step Procedural Analysis.

The trial court "has broad discretion in determining whether to certify a class." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). The Court's discretion is guided by Rule 23(a) of the Federal Rules of Civil Procedure, which sets out the prerequisites to be met in order to proceed with a class action: (1) the class must be so numerous that joinder is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the class representative must be typical of the claims or defenses of the class; and (4) the class representative must be able to fairly and adequately protect the interests of the class. These four prerequisites are commonly referred to as numerosity, commonality, typicality and adequacy. The prerequisites are designed to limit the class claims to those fairly encompassed by the named Plaintiff's claims. *Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2000); *Briggs v. Countrywide Funding Corp.*, 188 F.R.D. 645 (M.D. Ala. 1999).

Once the prerequisites of Rule 23(a)(1)-(4) are met, an action may be maintained as a class action if the proposed class meets at least one of the criteria set out in Rule 23(b). *Sikes v. Teleline*

*Inc.*, 281 F.3d 1350 (11th Cir. 2002); *Rutstein v. Avis Rent A Car Systems, Inc.*, 211 F.3d 1238 (11th Cir. 2000). Plaintiff seeks to certify the class under both Rule 23(b)(2) and under Rule 23(b)(3) to obtain declaratory relief that the class members have certain rescission rights based on the Defendants' unlawful conduct and to recover damages.[1]

Before certifying a class action, the trial court must conduct a rigorous analysis to determine whether the proposed class has met the requirements of Rule 23. *General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982). However, a plaintiff seeking to represent a class need not prove its case in order to satisfy the requirements of Rule 23 and the allegations of the complaint may be accepted as true. *Washington*, 959 F.2d at 1570, n. 11; *see also Braxton v. Farmer's Ins. Group*, 209 F.R.D. 654, 657 (N.D. Ala. 2002); *Taylor v. Flagstar Bank, FSB*, 181 F.R.D. 509, 512 (M.D. Ala. 1998) ("[t]he question of class certification is a procedural one distinct from the merits of the action."). In fact, "[s]ometimes the issues are plain enough from the pleadings" in deciding a certification question. *General Telephone Co.*, 457 U.S. at 160 (1982).

In any event, the court should "not properly reach the merits of a claim when determining whether class certification is warranted." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984). *See also Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005) ("The closer any dispute at the class certification stage comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would

---

[1] Under Rules 23(b)(2) and (b)(3), a class action is appropriate where "(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(2) and (b)(3).

require."): *Chiang v. Veneman*, 385 F.3d 256, 270 (3rd Cir. 2004) ("The claims therefore can not be prejudged to deny certification."): *In re Catfish Antitrust Litigation*, 826 F. Supp. 1019 (N.D. Miss. 1993) (court's "peek into the merits at this stage is very premature and wholly inappropriate."). The Plaintiff is required to prove her case at trial, not at certification. The Court's inquiry into the merits is proper only to determine whether Plaintiff is capable of proving her case on a classwide basis, not whether she has done so.

## B.    The Requirements of Rule 23(a)(1)-(4) Are Satisfied.

### 1.    The Class Is So Numerous That Joinder of Its Members Is Impracticable.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Impracticability does not mean impossibility. *Bradley v. Harrelson*, 151 F.R.D. 422, 426 & n.5 (N.D. Ala. 1993); *Noletto v. NationsBanc Mortgage Corp.*, 281 B.R. at 36, 41 (Bankr. S.D. Ala. 2000). In assessing impracticability, "courts should take a common-sense approach which takes into account the objectives of judicial economy and access to the legal system." *Id.* at 426. "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). *See also Alabama v. Chevron U.S.A., Inc.*, 29 Fed. R. Serv. 2d 1048 (M.D. Ala. 1980) (court held that 38 to 113 potential plaintiffs was sufficient to render joinder impractical). *See, e.g., Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n. 9 (7th Cir. 1969) (class of 40); *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319-20 (9th Cir.) (class of

39). *vacated on other grounds*, 459 U.S. 810 (1982); *Afro Am. Patrolmens League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974) (class of 35); *Riordan v. Barney*, 113 F.R.D. 60, 62 (N.D.Ill. 1986) (class of 29); *Basile v. Merrill Lynch, Pierce, Fenner & Smith*, 105 F.R.D. 506, 508 (S.D.Ohio 1985) (class of 23); *Arkansas Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971) (class of 20); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967 (class of 18).

Two other factors also favor a finding of numerosity in this case. The statutory damages sought here are too small to warrant undertaking individual actions. *Swanson*, 415 F.2d at 1333 n. 9. Second, the potential class members reside in many states. Because they are in several other judicial districts, this increases the impracticability of joinder. See *Allen v. Isaac*, 99 F.R.D. 45, 53, *amended in non-pertinent part*, 100 F.R.D. 373 (N.D.Ill. 1983). *Cf. Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56 (N.D.Ill. 1996) ("[T]he more geographically separated the proposed members are, the more joinder becomes impracticable.").

The numerosity requirement of Rule 23(a)(1) is satisfied in this action. The proposed TILA damage class consists of hundreds of AHL borrowers who were overcharged for settlement services and whose TILA disclosures were inaccurate because of the overcharges. For the period 2004 to 2007, AHL generated over 1,040 mortgages closed by Swafford alone. (See Dooley Depo. at p. 40, Joint Record at 1591 and List of Swafford Closed Loans, Joint Record at 3071-3090). While the Swafford portfolio alone would contain enough class members to meet numerosity, Swafford was not the only settlement service provider guilty of fraudulent and inflated charges. Other settlement companies closing AHL loans were guilty of the same wrongdoing. Clearly, numerosity exists for the TILA class.

The rescission class consists of a subset of the TILA damage class. A review of the sample

portfolio discloses that approximately 25% of the loans evidence undisclosed finance charges in excess of one-half of one per cent of the note amount such that the loans are rescindable. Based on a conservative estimate of the total portfolio of 1,040, some 250 class members are estimated to have rescindable loans. (See Summary of Closing Charges, Joint Record at 1841-1846).

Further, the HOEPA subclass consists of class members whose points and fees increased because of the overcharges such that they were in excess of the triggers set out in that statute. While the size of the HOEPA subclass is smaller, it is sufficiently numerous to support certification. Plaintiff has identified 15 HOEPA qualifying loans from the limited review of the a three month sample of the Swafford portfolio. (See Summary of Closing Charges, Joint Record at 1841-1846). Extrapolating to the entire portfolio would suggest there are at least 130 HOEPA loans. It is possible to identify the class members in each subclass from the closing agent's records.

Individual adjudication of the claims of each class member would take many years, and would drastically increase the legal expenses of the parties, and the time and resources of the Court. Additionally, joinder of all class plaintiffs into one proceeding would not only create a litigation hardship for class members, but would be expensive, time-consuming, and unfeasible.

## 2. There Are Questions of Law and Fact Common to the Class.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. Proc. 23(a)(2). The threshold for commonality, however, is not high. *See Taylor*, 181 F.R.D. at 516. *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 240 (D. Ariz. 2001) ("The standard for commonality is minimal because 'all that is required is a common issue of law or fact.'") Rule 23(a)(2) requires only that resolution of the common questions affect all or a substantial number of the class members. *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). Rule 23(a)(2) does not

require that **all** questions of law or fact raised in the litigation be common. rather, there need only be substantial issues common to the members of the class. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U.S. 883 (1986); *Powers v. Stuart James Co.*, 707 F. Supp. 499, 502 (M.D. Fla. 1989).

Traditionally, commonality refers to the group characteristics of the class as a whole. *Piazza*, 273 F.3d at 1346. As a general rule, common questions exist when a plaintiff asserts a common course of conduct arising out of a "common nucleus of operative facts." *See, e.g., Jefferson v. Security Pacific Financial Services*, 161 F.R.D. 63, 67 n.9 (N.D. Ill. 1995). The action must involve issues that are susceptible of classwide proof. *Murray v Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). In this case, Plaintiff's factual allegations clearly describe a common nucleus of facts which may be proven on a classwide basis.

The questions of fact and law common to the class arise from Defendant's uniform course of conduct which does not vary from class member to class member. Plaintiff alleges that Defendant AHL, because of the activities of its closing contractors, illegally and improperly understated the finance charges and actually misrepresented certain charges to the class members in connection with closing their loans. Specific items on the settlement statement were represented to be bona fide third party costs, when in fact those charges were inflated well above the actual costs to include hidden profits. Because of the overcharges, some or all of the tainted charges should have been construed as finance charges and disclosed as such. Because the charges were misrepresented and hidden, AHL's TILA disclosures were inaccurate. In some instances, the amount of the overcharge also causes the loan to be a "high cost" loan as defined by HOEPA.

All of those claims are capable of classwide proof. The amount of each overcharge is capable of proof by reviewing the records of AHL and/or its settlement agent, and the remaining

elements of proof are derived from mathematical calculations.

There are several overriding common issues in this litigation as it relates to the TILA and HOEPA claims:

(1)   Were the settlement charges imposed on the class impermissibly inflated or were they bona fide and reasonable?

(2)   When the charges are properly treated as finance charges and, were the TILA disclosures inaccurate?

(3)   Did the unreasonable overcharges cause certain class member's loans to be "high cost" loans as defined by HOEPA?

(4)   Did the Defendants comply with the disclosure requirements contained in HOEPA for the loans which were high cost loans as defined therein?

(5)   Whether the Plaintiff class members who closed their loans less than three years before this action are entitled to a declaration that they have the right to rescind their loans?

(6)   What are the nature and extent of the remedies available to the Plaintiff class members under TILA and HOEPA?

The above common questions of law and fact, which are by no means an exhaustive list of "common" facts and issues of law, easily satisfy the commonality requirement of Rule 23(a)(2). Because the answers to these common questions will be the same for all class members, the commonality requirement of Rule 23(a)(2) is satisfied.

Commonality is met when one or more common issues are capable of proof by generalized evidence applicable to the class as a whole; conversely, an issue is not "common" when it must be decided on individualized proof with respect to each class member. *Nichols v. Mobile Bd. of*

*Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982). The practices employed by AHL, through its settlement agents, to inflate the imposed settlement charges are part of a systematic and uniform scheme. Further, application of the applicable federal consumer protection statutes to AHL's practices may be applied to the class as a whole based on the same classwide evidence.

Finally, any remedies can be applied on a common classwide basis. Should Plaintiff prevail, the remedies available to her under federal law can be applied equally to the class. No damages are claimed for each class member which would require individualized proof. Plaintiff is not seeking actual damages distinct from the statutory remedies provided by federal law.

The fact that this action is brought exclusively under the federal consumer protection statutes supports a finding of commonality as there is no need to engage in a choice of law analysis, or apply varying state laws. There is **no** choice of law analysis for this Court to undertake. The fact that other courts may have decided cases based on different facts in different ways creates no impediment to this Court entertaining a nationwide class action. Because this case is brought pursuant to federal law, cases such as *In re Rhone-Poulenec Rorer Inc.*, 51 F.3d. 1293 (7th Cir.), *cert. denied*, 516 U.S. 867 (1995), and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), which refused certification because the trial court was asked to apply divergent **state** tort laws from every state, simply do not apply.

### 3.    The Claims of the Representative Plaintiff Is Typical of the Claims of the Class.

Rule 23(a)(3) provides that a class action may be maintained if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The essence of the typicality requirement is that the relationship between the injury to the class

representative and the conduct affecting the entire class of plaintiffs must be the same. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985).

> Typicality, along with the related requirement of commonality, focuses on whether a sufficient nexus exists between the legal claims of the named class representatives and those of the individual class members to warrant class certification.

*Piazza*, 273 F.3d at 1346.

In other words, the claims actually litigated in the suit must simply be those fairly represented by the named plaintiff. *Cox*, 784 F.2d at 1557 (11th Cir.) Further, individual differences concerning the exact nature of the closings and inflated fees at issue does not defeat typicality. *Bradley*, 151 F.R.D. at 426. *See also Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985) (typicality not defeated by the varying fact patterns and degrees of injury.) In fact the "typicality requirement may be satisfied despite substantial factual differences, however, when there a 'strong similarity of legal theories.'" *Murray*, 244 F.3d at 811, *quoting Appleyard*.

Factually, "a sufficient nexus is established if the claims or defenses of the class and the representative arise from the same event or pattern of practice, and are based on the same legal theory." *Kornberg*, 741 F.2d at 1337. Plaintiff's claims arise from the same alleged course of conduct, and are based on the same legal theories as those of the class members. Plaintiff, like all class members, was charged for settlement services which were misrepresented, were not bona fide, and should have been treated as finance charges. The issues presented in the case are the legal consequences of those charges and the corresponding lack of accurate disclosure. There are no distinct aspects of Plaintiff's claims, or unique defenses to her claims, that defeat typicality.

### 4.    **The Representative Plaintiff and Her Counsel Will Fairly and**

## Adequately Represent the Class.

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine the adequacy of representation, the Court should examine two factors: "(1) whether the class representative has any conflict of interest with respect to the common issues raised on behalf of the class and (2) whether the plaintiff's counsel will vigorously prosecute the litigation on behalf of the class." *Kirkpatrick v. J. C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988); *see also Piazza*, 273 F.3d at 1346. In establishing their ability to prosecute the litigation, plaintiff's counsel must be qualified, experienced and generally able to conduct the litigation.

Both prerequisites of adequacy of representation are met in this case. As discussed above, Plaintiff's interests are coextensive and not in conflict with the interests of the class members. Ms. Frazier shares with the class members an interest in establishing that AHL engaged in the wrongful practice of charging bogus, inflated and non bona fide fees. Proof of those practices, and a determination of the legal impact of those practices, including damages, will benefit all class members equally.

Further, Plaintiff's counsel possess extensive experience in class action litigation, and have extensive experience in prosecuting cases like the present one. Plaintiff's counsel have been found to be able and experienced advocates in class actions, including actions similar to the instant action. (See Affidavits of Counsel, Joint Record at 2839-2846) Plaintiff and her counsel satisfy the requirements of Rule 23(a)(4).

As shown above, each of the Rule 23(a) elements are easily met in this action. Certification is therefore appropriate if the criteria of either Rule 23(b)(2) or Rule 23(b)(3) are met. In this case,

both are met, and the case should be certified under both rules.

## C.    The Requirements of Rule 23(b)(2) Are Satisfied.

Rule 23(b)(2) allows a case to be maintained as a class action if the party opposing the class has acted in a manner generally applicable to the entire class, thus making entry of final injunctive relief or corresponding declaratory relief appropriate. Fed. R. Civ. P. 23(b)(2). *Taylor*, 181 F.R.D. at 512. Because the Defendant has acted on grounds generally applicable to the entire class, declaratory relief which will establish certain class members' right to rescind their loans is appropriate under Rule 23(b)(2).

Plaintiff and the proposed class are seeking declaratory relief to establish the nature of the charges imposed on them, the accuracy of the TILA disclosures, the necessity of HOEPA disclosures, and the legal consequences of AHL's acts and omissions and inaccurate disclosures. Even though monetary relief is also sought in this action, certification under Rule 23(b)(2) is appropriate.

"Injunctive and declaratory relief are available under TILA." *In re Consolidated Non-Filing Ins. Fee Litigation*, 195 F.R.D. 684, 692 (M.D. Ala. 2000); 28 U.S.C. §§ 2201, 2202. Rescission is available for three business days following the finalization of the mortgage transaction. If the creditor fails to make all material disclosures, or fails to make them accurately, then consumer's ability to rescind is extended for up to three years. 15 U.S.C. § 1635(a); 12 C.F.R. §§ 226.23(a)(3), 226.32(d)(6) and (7). Plaintiff and the members of the class seek a declaration that AHL violated TILA and HOEPA as set forth above, and thus under 15 U.S.C. § 1635(a), those class members whose loans were consummated within three years of the date of filing this action are entitled to assert claims for rescission against any assignee or holder of their notes and mortgages.

The resolution of Plaintiff's rescission claim necessarily involves a determination which affects the class members within the specified time frame, and is appropriate for class certification. *See Williams v. Empire Funding Corp.*, 183 F.R.D. 428, 436 (E.D. Pa. 1998) ("The Court finds that there is nothing in the language of TILA which precludes the use of the class action mechanism provided by Rule 23 to obtain a judicial declaration whether an infirmity in the documents, common to all members of the class, entitles each member of the class individually to seek rescission."); *Hickey v. Great Western Mortg. Corp.*, 158 F.R.D. 603, 613 & n. 5 (N.D. Ill. 1994) (certifying claims for rescission).

In *James v. Home Const. Co.*, 621 F.2d 727, 730-31 (5th Cir. 1980), the court held that rescission was a purely personal right, and inappropriate for class treatment. However, the *James* class sought actual rescission of the class members' loans; and the former Fifth Circuit held that the decision to actually rescind a loan which violates TILA should be made by each individual class member. The relief requested here is not for the Court to rescind all of the class members' loans, but to declare that the right to rescind still exists because of the wrongful conduct of the Defendants. Such relief is appropriate under the law, and appropriate for certification.

The court in *In re Ameriquest Mortgage Co. Lending Practices Litigation*, 2007 WL 1202544 (N.D. Ill.2007), recognized the distinction in certifying a declaratory class under TILA. Distinguishing *James*, as well as *McKenna v. First Horizon Loan Corp.*, 475 F.3d 418 (1st Cir. 2007), the *Ameriquest* court noted:

> While we recognize that actual rescission is a personal remedy, we find nothing in TILA precluding declaratory relief authorizing class members to individually request rescission where they are legally entitled to do so. As the *McKenna* court acknowledged, plaintiffs "may pursue rescission claims on their own -- a course of action that the TILA facilitates." *McKenna*, 474 F.3d at 426. A declaration to that effect does no violence to the text or purpose of the TILA.

-28-

> Plaintiffs are not seeking class-wide rescission in this action: any order granting the declaration they request will come at no direct cost to defendants or the integrity of the TILA damages cap. *See Andrews*, 2007 WL 112568, at *9 ("[t]here is no reason why a plaintiff who alleges that a defendant has violated TILA and caused widespread injuries should not be able to bring a class action. Denial of class action status would reward defendants who may have committed wrongs and leave victims who may have been wronged uncompensated."). Plaintiffs are simply seeking a declaration to facilitate their respective pursuits of an individual remedy, and neither the plain language of TILA nor *Fed. R. Civ. P. 23* prohibits plaintiffs from doing so on a class-wide basis.

*Ameriquest*, slip op at *_____.

The First Circuit in *McKenna* extended *James* well beyond its holding in determining declaratory relief was not available to determine the class rescission rights. Plaintiff respectfully submits *McKenna* extended *James* too far, and is wrong. As a district court recently held:

> With all due respect to the First Circuit, nothing in the text of TILA supports the proposition that TILA bars courts from certifying classes whose members may seek rescission. Moreover, in concluding that TILA bars certification of such classes, the *McKenna* court used legislative intent and legislative history in a way that the Seventh Circuit has condemned.

*Andrews v. Chevy Chase Bank*, 474 F. Supp. 2d 1006, 1007 (E.D. Wisc. 2007).

The declaratory class as sought in this case is well within the statutory parameters of TILA, and should be certified.

The fact that some class members will also receive damages is not an impediment to Rule 23(b)(2) certification, as certification of a class under Rule 23(b)(2) is proper in cases where monetary relief is sought in addition to injunctive or declaratory relief. The Eleventh Circuit has joined the majority of courts adopting the decision of the Fifth Circuit Court of Appeals in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), which specifically authorizes monetary relief in a (b)(2) class action so long as individualized damage inquiries do not overwhelm the

declaratory aspect of the case. *Murray v Auslander,* 244 F.3d 807,812 (11th Cir. 2001). The court in *Allison* concluded that in an action where both injunctive and monetary relief are sought, only where there is an inherently individualized determination of damages, certification under Rule 23(b)(2) is inappropriate. The *Allison* court further held that in cases where the requested monetary damages "flow directly from" the requested injunctive relief, certification under Rule 23(b)(2) remains available:

> By incidental, we mean damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief. Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established . . . . Moreover, such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on any intangible, subjective differences of each class member's circumstances.

*Allison,* 151 F.3d at 415. *See also Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 976 (5th Cir., Oct. 27, 2000) ("Damages may be incidental when they are 'capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.'")

The present case is a classic case of how damages flow from a determination of the same facts on which the declaratory relief is based. In this case, the focus of the litigation is the nature and amount of the marked up and unreasonable charges. Once it is determined whether the overcharges occurred, the legal effect of those charges can be determined by applying the statutes at issue. Depending on the amount of the disputed charge, each class member will have certain recoveries under TILA or HOEPA . No additional damages beyond statutory damages are sought in the case. Hence, once the existence and amount of the overcharge is determined, all damages will flow incidentally.

**D.**    <u>The Requirements of Rule 23(b)(3) Are Satisfied</u>.

Rule 23(b)(3) requires that two findings be made: (1) that common questions of law or fact predominate over individual issues (the "predominance" requirement); and (2) that a class action is superior to other forms available for the fair and efficient adjudication of the controversy (the "superiority" requirement). For the reasons stated below, both the predominance and superiority requirements are satisfied in this case.

**1.**    <u>Common Issues of Fact and Law Predominate Over Any Questions Affecting Only Class Members.</u>

Class certification is appropriate when questions of law and fact common to all class members predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). The existence of some individual issues does not preclude certification of a class action. *See, e.g., Perry v. Household Retail Services, Inc.*, 180 F.R.D. 423, 436-37 (M.D. Ala. 1998); *Partain v. First Nat'l Bank of Montgomery*, 59 F.R.D. 56, 59 (M.D. Ala. 1973) ("Predominance... does not mean that the common questions be dispositive of the entire litigation.")

The (b)(3) requirement of predominance is more demanding than any of the 23(a) requirements. In order to satisfy the (b)(3) threshold, there must be issues in the class action that are subject to generalized proof and applicable to the class as a whole. Also, these generalized issues must predominate over issues subject to individual proof. *Kerr v. City of West Palm Beach*, 875 F.3d 1546, 1557 (11th Cir. 1989); *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982).

In determining whether common questions will predominate, the Court should examine the causes of action asserted in the complaint, and determine whether resolution of legal issues on a

classwide basis will benefit each class member's underlying claim. *Rutstein*, 211 F.3d at 1234.

Plaintiff in this case assert causes of action governed by federal consumer protection laws which should be interpreted and applied in a uniform manner. As noted above, no federal common law or state law claims are made in this litigation. Thus, it is fair and equitable that the class as a whole share equally in any recovery if Plaintiff prevails in this action. As outlined above, all of the pertinent facts are capable of proof on a classwide basis.

As set out in detail in the Statement of Facts, AHL, through its settlement agents, engaged in a uniform practice of charging and collecting from its borrowers inflated and fraudulent fees. The fact of the inflated charge can be proven by reference to documents readily available. While the type and amount of the fraudulent fees varied, the variation makes no material difference. Each of the legal theories advanced by the Plaintiff is capable of classwide proof based on existing documents, and these issues of fact strongly predominate over any individual issues.

Each class member seeks recovery for the same injury with respect to the same practice of the Defendant, and class members' damages can be mathematically determined from the Defendant's own accounting records.

Common issues of law also dominate this case. The central issue in this litigation is the uniform practice and scheme of marking up settlement fees and failing to properly disclose the charges as finance charges. The central issue will be whether AHL's practices, through its agents, is lawful under applicable law. Only federal law will be applied to resolve this action on a classwide basis, and the issues of law will be identical for each class member. Once it is determined whether the fees were marked up and inflated, the legal impact of that fact may be determined by the uniform application of the consumer protection laws asserted in the complaint. No divergent laws are at issue, and no legal issues are focused on any individual aspect of each class member's closing.

Here, Plaintiff alleges that AHL violated TILA on every loan where a markup of the charges occurred by their failure to make accurate disclosures of the finance charge and APR under 15 U.S.C. §§ 1638 and 1639. Clearly, Rule 23(b)(3) is satisfied as to this claim. While the existence of the alleged markups and inflated fees will have to be proven, those charges may be proven on a classwide basis. Once the true nature of the charges is known, the existence of a TILA violation is a matter of arithmetic proof.

Plaintiff has alleged, and can prove for the class as a whole, that certain charges set forth on each of the class members' settlement statements were inflated and thus were neither bona fide nor reasonable. Specifically, the class was charged more than the premium for title policies, and were charged inflated amounts for abstract work, recording fees, and other charges. The most glaring and easily proved violations are for recording fees and title insurance.

Certification of a class is particularly appropriate where determination of a class member's claim "may be determinable by conducting simple arithmetic computations on certain figures obtained from the face of each loan's TILA Disclosure Statement." *In re Community Bank*, 418 F.3d at 306; *see also Hickey*, 158 F.R.D. at 612 ("The determination of whether the challenged fees were improperly included in the 'amount financed' or excluded from the 'finance charge' in individual transactions is a simple ministerial task.").

## 2.    Class Treatment of Plaintiff's Claims Is Superior to Individual Actions.

By consolidating these potential individual actions into one proceeding, the class action device will enable this Court to manage this litigation effectively and efficiently, and serve the economies of time, effort and expense for the litigants and the court system. *See Perry*, 180 F.R.D. at 436 ("efficiency and consistency concerns weigh strongly in favor of allowing all class members

to challenge the legality of defendant's practices, rather than forcing each class member to wage his or her own legal battle against the defendants"), *quoting Benion v. Bank One, Dayton, N.A.,* 1996 WL 242994, *5 (N.D. Ill. 1996). The superiority requirement of Rule 23(b)(3) is satisfied.

No manageability issues exist which should overcome the superior approach of class certification. While the class is large, it is not so large as to create manageability issues based on its size alone. The close nexus of class members' claims and the ability to calculate damages on a classwide basis do not suggest any problems with handling this matter on a classwide basis. No choice of law issues are present as only federal law applies to this case.

## IV.    CONCLUSION

The proposed class satisfies all of the prerequisites for certification under Rules 23(a) and 23(b)(2)&(3). Class treatment of this action will provide the best opportunity for all class members to  litigate their claims, promote judicial economy, streamline litigation and result in the fair and consistent adjudication of common issues. Accordingly, this Court should exercise its discretion to manage this litigation in the only effective and efficient manner possible and grant Plaintiff's motion to certify the class.

STEVEN L. NICHOLAS  (NICHS2021)
CUNNINGHAM BOUNDS, LLC
Post Office Box 66705
Mobile, Alabama  36660
251-471-6191

EARL P. UNDERWOOD, JR.  (UNDEE9591)
Post Office Box 969

-34-

Fairhope. Alabama  36533
251-990-5558

KENNETH J. RIEMER  (RIEMK8712)
Post Office Box 1206
Mobile, Alabama  36633
251-432-9212

GEORGE R. IRVINE, III  (IRVIG4725)
STONE, GRANADE & CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama  36526
251-626-6696
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I do hereby certify that on the 18 day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record.

Robert E. Poundstone, IV
Bradley Arant Rose & White. LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, Alabama  36104

James D. Minor, Jr.
Bradley Arant Rose & White, LLP
One Jackson Place, Suite 450
188 East Capitol Street
Post Office Box 1789
Jackson, Mississippi  39215-1789

STEVEN L. NICHOLAS

-35-