0020

1    A.   My people wouldn't, but I would just -- I would

2    use it, let's say -- depending on the type of loan.  If

3    it was a refi, no cash out, it will tell me there you

4    are only allowed a certain amount of money or you are

5    allowed to have this type of loan, certain LTD, if you

6    have this FICO score.  So I always had in hand, because

7    I -- I used them as a senior loan specialist.

8    Q.   I see, okay.  Now, do you have a big stack of

9    documents in front of you there?

10    A.   Yes.

11    Q.   All right.  You know we are going to go through

12    every page of those?

13    A.   Okay.

14    Q.   Just kidding.  We are going to go through some

15    of them, but some of them we may or may not use.  But I

16    will direct your attention to the first one, Exhibit 1.

17    A.   Okay.

18    Q.   And before I go into that exhibit, let me ask

19    you what you did before your deposition today.

20    A.   I viewed these documents.  I met with the

21    lawyers here, and that's about it.

22    Q.   Okay.  I don't want you to tell me anything

23    that they told you or that you talked about with your

24    lawyers, but how much time did you spend with them?

25    A.   Like four hours.

0021

1   Q. This morning?

2   A. Um, no, yesterday.

3   Q. All right. And what documents did you review?

4   A. All the exhibits provided here.

5   Q. Anything else?

6   A. That's it.

7   Q. All right. The Exhibit No. 1, did you have a

8  chance to read it?

9   A. Not word for word, but I did see it.

10   Q. Okay. Let me ask you if you would pick it up

11  and flip over to the third page of it.

12   A. Okay.

13   Q. And do you see the paragraph numbered No. 2,

14  down close to about -- about halfway down the page?

15   A. Yes.

16   Q. Okay. It requests you to bring any manuals,

17  references or other documents, either in electronic or

18  paper format, that you would use in calculating the APR,

19  the amount financed and the amount charged. Did you

20  bring anything with you?

21   A. Um, well, this -- the APR, amount financed and

22  finance charge is -- well, we -- I think we have a -- it

23  is calculated by our LOIS system.

24   Q. Yes, ma'am.

25   A. And I think that was provided to you.

0022

1      MR. JENSEN:  I think he is asking about whether

2  you brought anything with you today.

3      THE WITNESS:  With this, myself, no.  It is

4  just the exhibits that are here.

5  BY MR. UNDERWOOD:

6    Q.  Okay.  All right.  Well, we are going to go

7  through -- like I said, not all of those, but a lot of

8  them.  But you did not bring anything with you today?

9    A.  No.

10    Q.  Okay.  Are there any other documents that you

11  know of that would be compliant with Paragraph No. 4,

12  that asks about documents touching or relating to the

13  Edwards loan?

14    A.  I believe all of that was provided, so I didn't

15  bring anything.

16    Q.  All right.  Does Accredited maintain, for

17  example, copies of cancelled checks?

18    A.  Um, cancelled checks of what?  I'm sorry.

19    Q.  Well, cancelled checks regarding the Edwards

20  loan.

21    A.  All of that is given to the title company.

22    Q.  Okay.  All right.  I understand.  All right.

23  Well, let me get you, if you would, then, to flip over

24  to -- well, I will tell you what I think I want you to

25  do.  I want you to describe for me, if you would,

0023

1   please, the process for the intake and the completion of

2   the documents required for a loan.

3        And if you would, let me ask you this, how does

4   Accredited know that a person is interested in having a

5   loan through Accredited?

6      A.   Well, that's in the servicing -- in the front

7   end, and I don't really know much of the front end, but

8   I do know one part is that they do get referrals, leads,

9   that are bought, and that's how the loan officers call

10   the borrowers.

11      Q.   All right.  And once a -- once a borrower has

12   initiated an interest in a loan, what happens?

13      A.   Um, the loan officer takes the application and

14   gets the permission to run credit, they run credit, and

15   initial disclosures are mailed out to the borrower.  And

16   then once that's done, it's given to the branch

17   processor, who then opens title, orders appraisal,

18   contacts the borrower for income documentation, any

19   documentation they may need to put a package together.

20   Once that's done, it is submitted to the underwriting

21   processing team -- well, before it is sent there, they

22   call the title company to get their fees.

23      Q.   Okay.  Well, let's back up.

24      A.   Okay.

25      Q.   I want to make sure I got this process down

0024

1   right.  All right.

2       The first thing that happens is the loan

3   officer takes an application?

4   A.  Yes.

5   Q.  And then runs a credit check?

6   A.  Yes.

7   Q.  All right.  Now, suppose the person has a FICO

8   score of 200, or any other FICO score that wouldn't

9   qualify for a loan, what would happen at that point?

10  A.  At that point, if it doesn't qualify, they

11  decline the loan and process a declined form, which is

12  sent to the borrower and let them know they don't

13  qualify.

14  Q.  Sure.  Okay.  All right.  Now, the next thing

15  that would happen then, if they pass that test -- or I

16  guess it would happen anyway, you say disclosures are

17  mailed to the borrower.  Is that a good faith estimate?

18  A.  Yes.

19  Q.  Let me ask you this while I am thinking about

20  it.  This is done over the telephone; is that correct?

21  A.  Yes.

22  Q.  And was Accredited -- or did Accredited ever

23  take loan applications, though, over the internet, or

24  was it all over the telephone?

25  A.  I am not sure.  Um, from what I know, they take

0025

1   them over the phone.

2      Q.   Okay.  All right.  So after the good faith

3   estimate is mailed to them, what was the next step?

4      A.   The file is given to the branch processor.

5      Q.   Branch processor?

6      A.   Yes.

7      Q.   And what does a branch processor do?

8      A.   They contact the borrower for their

9   documentations that they will need to complete a file.

10  They open title work.  They call a title company and

11  open a title.  They call the appraiser to order

12  appraisal.

13     Q.   Now, let me ask you to stop right there, if you

14  would.

15     A.   Okay.

16     Q.   And let's talk about opening title work.  Did

17  you just say that the branch processor would call a

18  title company?

19     A.   Yes.

20     Q.   And that would be a company such as Lender's

21  First Choice?

22     A.   Correct.

23     Q.   And how would the branch processor know to call

24  a certain title company over another title company?

25     A.   They either have a relationship with that title

0026

1    company or because of the state that they are lending in

2    and if that title company provides that service in that

3    certain state.

4       Q.  All right.  Well, let's say, for example, a

5    borrower was in the state of Alabama.  How would the

6    branch processor go about selecting a title company to

7    close a loan in Alabama?

8       A.  I am not sure.  They have their own title

9    companies that they have set up and they know what title

10   companies provide for whatever state.

11      Q.  All right.  And is this -- where is that

12   information stored?  Is it on a computer terminal or how

13   would they access that information?

14      A.  Um, I -- I don't know.  They just -- they work

15   in their office and they either have it in writing or

16   they have it in their computer.  I have no idea how they

17   organize themselves.

18      Q.  All right.  Who would know about that, please,

19   ma'am?

20      A.  A branch processor.

21      Q.  All right.  Do you know the name of one?

22      A.  Um, Millicent Vinarao.

23      Q.  Can you spell that for me.

24      A.  Her first name is M-i-l-l-i-c-e-n-t.

25      Q.  Okay.

0027

1    A.  Her last name is V-i-n-a-r-a-o.

2    Q.  Okay.  All right.  Thank you, ma'am.

3    A.  Um-hum.

4    Q.  All right.  So after the title company is

5  chosen, then what happens?

6    A.  They get their settlement closing fees, title

7  insurance fees, all the fees that the title company is

8  going to charge, and they input them into the system,

9  into our --

10    Q.  Okay.  Tell me how that's done.

11    A.  Over the phone.  They give them a call and

12  these fees are given to them and --

13    Q.  By whom?

14    A.  By the settlement closing agents.

15    Q.  Does -- or did Accredited, to your knowledge,

16  promulgate a price list for closing fees?

17    A.  Can you rephrase that question?

18    Q.  Okay.  Has or did Accredited ever, to your

19  knowledge, promulgate a price list for settlement or

20  closing fees?

21    A.  You said a processor list?

22    Q.  A price list, I'm sorry.

23    MR. JENSEN:  A price list.

24    THE WITNESS:  A price list.  Oh, sorry.  Did we

25  create a price list for settlement?  No, we didn't.  The

0028

1  fees are just given by the settlement company on each

2  individual loan.  Each individual loan is different.

3  BY MR. UNDERWOOD:

4      Q.   Well, let me ask the question this way, how

5  would Accredited -- or would Accredited know if a

6  settlement company was trying to overcharge or charge

7  too much for their settlement or closing fee?

8      A.   We would have no idea.  We trust what the

9  company gives us.

10     Q.   Was there any competition between -- well, let

11  me ask it this way, can you describe for me any

12  competition between the settlement companies for

13  Accredited's business.  In other words, I guess I am

14  asking did some companies offer a better price on the

15  settlement as opposed to other companies?

16     A.   I would not know that.

17     Q.   All right.  Who would know about that sort of

18  thing?

19     A.   Maybe the branch processor would be able to

20  tell you that, since they are the ones that dealt with

21  different title companies.

22     Q.   All right.  And that would be Millicent again?

23     A.   Correct.

24     Q.   All right.  Was there someone there who was the

25  supervisor of the branch processors?

0029

1    A.   Well, each branch had their own processors.

2    Millicent currently was the branch processor -- manager,

3    sorry.

4    Q.   Okay.  Is Millicent still with Accredited?

5    A.   Yes.

6    Q.   Okay.  All right.  So what's now -- a call is

7    made to the title company and fees are ascertained.

8    Tell me what happens next.

9    A.   Once the fees are given, the branch processor

10   enters them into our LOIS system, which then makes a

11   check.  It -- our system makes sure that it doesn't go

12   to Section 32, high-cost limitations.

13    Q.   Okay.  Now, will you tell me the name of that

14   system again.

15    A.   LOIS.

16    Q.   LOIS, okay.

17    A.   So once it passes, and the branch processor has

18   all of that information, moves on to the processing

19   unit, to the underwriting department.

20    Q.   All right.  Let me ask you this, did you ever

21   know of Accredited to make Section 32 loans?

22    A.   When I first started with the company --

23    Q.   Uh-huh.

24    A.   -- probably we -- I remember doing one or two,

25   where we had extra steps that we had to take.  I don't

0030

1  remember clearly exactly what we did, but we did do

2  them, and we just stopped.

3      Q.  Do you know when that stopped, to your

4  knowledge?

5      A.  It was back in 2001.

6      Q.  Okay.  All right.  Now, I interrupted you.  You

7  were telling me -- you were describing to me what

8  happened after the processor got the charges from the

9  settling company.

10     A.  Okay.

11     Q.  They -- I believe you told me they were entered

12  into the LOIS system.  Then what happens after that?

13     A.  After everything happens, it goes to the

14  underwriting department, which then reviews and does a

15  risk analysis of the file, make sure that it qualifies

16  for the program that it was submitted for.  They also

17  review the fee screen in our LOIS system, where our

18  branch processor enters those fees.  It makes sure that

19  all the fees look good and that it did pass our system.

20          Once that's completed, it goes to our corporate

21  underwriting.  The corporate underwriter also does a

22  check, a thorough check, of the file, the credit file,

23  and they also review the fees.  Once it passes that

24  department, it goes to the doc and funding department.

25  The document processor verifies all of the borrower's

0031

1    information, the borrower's name, the spelling, the

2    borrower's property address, do some minor entries into

3    the system and checks the fees, makes sure that

4    everything looks good, and process the closing

5    documents, and then e-mails them to the title company,

6    to be executed.

7        Once the loan is executed, the title company

8    then returns it to the doc funding department, the

9    funder -- who could be the same person as a docker, but

10   it could also be a different person -- does a

11   post-closing check.  They check all the closing

12   documents, make sure all the signatures that are there,

13   the dates, and they review the H.U.D., the final H.U.D.

14   that the borrowers sign, make sure all the fees are

15   there and that they didn't go over what was disclosed to

16   the borrower in the T.I.L., and prepare the file to

17   fund, once it is past the post-closing check.

18      Q.   Okay.  All right.  And then tell me what the

19   steps are with regard to funding the loan and how that's

20   done.

21      A.   Well, after the documents have been reviewed

22   and -- the documents are reviewed, the T.I.L.'s well is

23   disclosed, well, and the H.U.D. is in compliance.  We

24   set up -- do some minor entry into our system with

25   signing dates and just enter dates when the documents

0032

1    were signed, when the rescission is over, we go ahead

2    and click a button in our system that's -- let's our

3    cash management department know that it is ready to go

4    ahead and disburse the money to a title company.

5        Q.   And how is the money actually disbursed?

6        A.   Well, that's a cash management function, and

7    from what I know, it is wired to the title company.

8        Q.   All right.  Can you tell me from what bank it

9    is wired from?

10       A.   I believe it is from -- well, we have different

11   banks, so it depends what -- I don't -- I don't know how

12   they choose which bank they are going to send the money

13   from.  But I know a list can be provided.  I don't know.

14       Q.   All right.  Who would know about that?

15       A.   That's our cash management department.

16       Q.   Do you know someone's name who I can ask about

17   that if I wanted to?

18       A.   Well, the cash management manager would be

19   Helen Bonihevert.

20       Q.   How do you spell that?

21       A.   H-e-l-e-n.

22       Q.   Okay.

23       A.   Her last name, I believe, is

24   B-o-n-i-h-e-v-e-r-t.

25       Q.   Thank you, ma'am.

0033

1    A.  Um-hum.

2    Q.  All right.  And then what's the next thing that

3  would happen?

4    A.  Our file from our office is sent to our

5  post-closing department, and that's the last we see of

6  it.  The post-closing department then --

7    Q.  Okay.  Do you know what happens to it after it

8  gets there?

9    A.  I believe they prepare for the investor, to

10  sell to the investor.

11    Q.  All right.  Yes, ma'am.  And who would know

12  about -- and who would have knowledge about how a file

13  is prepared and how the investors are dealt with?

14    A.  It would be the post-closing manager.

15    Q.  All right.  Do you know his or her name?

16    A.  Cynthia Walker -- I mean, Cynthia Pacheco,

17  sorry.

18    Q.  Could you spell that for me and the court

19  reporter?

20    A.  It's -- her first name, Cynthia.

21    Q.  Okay.

22    A.  C-y-n-t-h-i-a.

23    Q.  Okay.

24    A.  Last name is Pacheco, P-a-c-h-e-c-o.

25    Q.  Thank you.

0034

1     A.   Um-hum.

2     Q.   All right.  Now, if you would, just to save

3   some time, let me get you to look at that stack of

4   documents in front of you there.

5     A.   Okay.

6     Q.   And let's just skip most of the beginning

7   exhibits and go down to the -- to Exhibit No. 6.  It has

8   a number of AHL, No. 1.

9     A.   Okay.

10    Q.   And we are going to go through some of these

11  documents, or most of them.  I probably -- it won't

12  take -- I will try to move along.  It won't take too

13  long.  Do you see the first document there?

14    A.   Yes, it's the H.U.D.

15    Q.   Yes, ma'am.  And it looks like it's been signed

16  by the Edwards --

17    A.   Correct.

18    Q.   And by someone from Lender's First Choice?

19    A.   Right.

20    Q.   All right.  If you would, let me ask you,

21  now -- ask you about, up at the top, it says, "Certified

22  to be a true and correct copy."  Whose signature is

23  that?

24    A.   That would be the closing agent.

25    Q.   All right.  It would have been someone under

0035

1   your supervision?

2      A.   No.  That is in the title company.

3      Q.   I see.  Okay.  And -- all right.  If you would,

4   let me ask you to take a look at the next document, and

5   that's document No. 2.

6      A.   Right.

7      Q.   And I want to ask you about some of these fees.

8   Now, if you would look at line No. 1101 on document No.

9   1, the H.U.D. settlement statement.

10      A.   Um-hum.

11      Q.   It says that the settlement of closing fee that

12   was paid to Lender's First Choice was $450.  Do you see

13   that?

14      A.   Right.  Yes.

15      Q.   And over on the good faith estimate, it has a

16   fee of $605.  Do you know why those are different?

17      A.   All I can say is it was probably a figure that

18   was given to the branch processor at the time that they

19   called, and this is an amount that we use to prepare the

20   closing documents.

21      Q.   Okay.  In other words, the amount on the good

22   faith estimate --

23      A.   Yeah.

24      Q.   -- was the amount used by Accredited?

25      A.   Yes.

0036

1    Q.   All right.  The next charge on the H.U.D. 1,

2   under the settlement of closing fees, is a fee for

3   abstract or title search.

4    A.   Um-hum.

5    Q.   And that's the same, isn't it, on the H.U.D.

6   1 -- I mean, on the good faith estimate, $175?

7    A.   It looks like it.  It is a pretty bad copy, but

8   it looks like it is.

9    Q.   Yeah, I apologize for that.  These were

10   produced by your lawyers, so you can blame him for it.

11       All right.  The next fee is -- on the H.U.D. 1

12   is line 1105, for document preparation of $50.

13    A.   Um-hum.

14    Q.   And that is listed as $60 on the good faith

15   estimate.  Do you know why that's different?

16    A.   It was just an estimate that was given to the

17   branch processor.  But this figure is also the figure

18   that we use for the T.I.L.

19    Q.   Yes, ma'am.  Okay.  Now, if you would drop

20   down, the next figure, 1108, to Lender's First Choice,

21   for title insurance.  And that's the same on the good

22   faith estimate?

23    A.   Correct.

24    Q.   Is that right?

25    A.   Yes.

0037

1   Q.   Okay.  And the next line where there is a

2   charge is Line 1111.

3   A.   Um-hum.

4   Q.   A wire fee.

5   A.   Um-hum.

6   Q.   And I don't see that charge on the good faith

7   estimate.  Did you see it on there?

8   A.   We don't have a H.U.D. line called wire fee, so

9   sometimes these fees are lumped together with a

10  different one.

11  Q.   Yes, ma'am.  Well, would that be included in

12  the Line 1101, the settlement or closing fee?

13  A.   I could -- most likely, yes.

14  Q.   All right.  And what about the next fee?

15  A.   The same thing.

16  Q.   On 1112, the delivery fee, I didn't see a fee.

17  A.   Yeah, our system doesn't have a H.U.D. line for

18  that, so it would be lumped together with another fee.

19  Q.   All right.  And would that also be in the Line

20  1101, the settlement or closing fee?

21  A.   Yes.

22  Q.   All right.  Do you know physically how this --

23  how these fees get entered into this good faith

24  estimate?  Can you describe that for me?

25  A.   These fees are entered into our LOIS system.

0038

1    Q.  Okay.

2    A.  By our branch processor.

3    Q.  All right.  And I believe you told me that they

4  would get these numbers from the -- for example,

5  Lender's First Choice, over the telephone, is that how

6  it happens?

7    A.  Yes.

8    Q.  All right.  And would they -- was there a

9  similar procedure -- let's say, for example, Accredited

10  was dealing with such -- for settlement services, would

11  the procedure be any different in that instance?

12    A.  No.

13    Q.  And did you tell me that the LOIS system did

14  not have a -- lines for these wire fees and delivery

15  fees?

16    A.  Correct.

17    Q.  All right.  Now, the next line is recording

18  fee, $88.

19    A.  Correct.

20    Q.  That's on Line 1201.

21    A.  Um-hum.

22    Q.  And that looks like that's the same on both

23  documents, is that --

24    A.  Yes.

25    Q.  Am I looking at that right?

0039

1       Okay.  And then the next fee is for a recording

2    tax or tax stamps.

3       A.  Um-hum.

4       Q.  And it looks like that is 97.50; is that right?

5       A.  Yes.

6       Q.  All right.  Now, what's -- there is another fee

7    on here, it says, "Miscellaneous."  What -- do you know

8    what that fee was for?  I am talking about now on the

9    good faith estimate.

10      A.  No.  I wouldn't be able to tell you what it's

11   for.  Just probably a miscellaneous fee that was given

12   to the processor.

13      Q.  Okay.

14      A.  And that's a non-APR fee, so it is probably --

15   I don't know.

16      Q.  Okay.  Now, with -- with regard to document No.

17   1, who prepares that document?

18      A.  The title company.

19      Q.  All right.  And is that always true?

20      A.  Yes.

21      Q.  H.U.D. 1s are never prepared by Accredited?

22      A.  Correct.

23      Q.  And I don't know, you may have told me this

24   already, but can you tell me how these figures get on

25   the H.U.D. 1?  How is that determined and how does --

0040

1    well, just tell me how those fees are determined, as far

2    as you know.

3        A.   On the H.U.D. 1?

4        Q.   Yes, ma'am.

5        A.   Well, the title company gets our lender fees

6    from our closing instructions, and that's how they input

7    those fees.  The title company knows their title fees,

8    so they would input those fees.  They would also input

9    the payouts that are listed on our addendum to lender's

10   instructions.  And that basically covers all of the fees

11   listed here.

12       Q.   Okay.  All right.  We will get to the closing

13   instructions in a few minutes, but -- all right.  If you

14   would, let's jump over to the next -- this would be

15   document No. 3.

16       A.   Okay.

17       Q.   Can you tell us what that document is?

18       A.   This is a truth in lending.

19       Q.   All right.  And is it the final truth in

20   lending or is it a preliminary?

21       A.   This is the final truth in lending.

22       Q.   And do you see there in the middle of it where

23   it says a filing/recording fee?  Is that $183 or 163?

24       A.   It looks like 163 to me.

25       Q.   All right.  And do you know where that figure

0041

1  came from?

2    A.  It comes from the fees that we input into the

3  system.  And by looking at these fees, it is the total

4  of the $88 recording fee and the miscellaneous recording

5  fee of $75, which equals to 163.

6    Q.  All right.  And is this a document -- this

7  document -- is this document prepared by Accredited?

8    A.  Yes.

9    Q.  Okay.  Okay.  Let me get you, if you would --

10  let's skip all the way over to document No. 27.

11    A.  Okay.

12    Q.  And can you tell me what this document is,

13  please, ma'am.

14    A.  This is a wire detail form that is printed when

15  we are ready to fund a loan, and it describes the fees

16  that we would withhold from our wire, so it gives you

17  the loan amount, minus our lender fees.

18    Q.  Okay.

19    A.  And the total wire amount is what's sent out to

20  the title company.  So you can tell that we only held

21  the dis- -- the points and the AHL, other fees, which is

22  the $50 and the 7.80.

23    Q.  Yes, ma'am.  And was there a discount on this

24  loan?

25    A.  I believe there is an origination fee, but all

0042

1  discount points, origination points, are listed in that

2  H.U.D. line.  There's no discounts on this one.  Just an

3  origination fee.

4    Q.  All right.  Now, does it work this way, this

5  amount of -- down at the bottom, where it says total

6  wire, plus tax amount, 61,665.90.  Is that the amount

7  that actually goes to -- that actually went to Lender's

8  First Choice in this case?

9    A.  Correct.

10    Q.  All right.  And so let me ask you if this is

11  correct, Accredited -- the fees that Accredited charges,

12  it just retains them from the 65,000 loan amount, is

13  that the way it works?

14    A.  Yes.

15    Q.  In other words, a $65,000 check doesn't go out

16  to the closing --

17    A.  No.

18    Q.  -- agent and they write checks back to

19  Accredited.  Accredited just retains that --

20    A.  Right.

21    Q.  -- from the wire sent; is that right?

22    A.  That's correct.

23    Q.  And who is this lady down here, Delia Iniguez?

24  Is that someone that you knew?

25    A.  Delia Iniguez?

0043

1    Q.  Yes, ma'am.

2    A.  No, I don't know that person.

3    Q.  Okay.  Can you tell what loan -- what office

4  this loan originated from, by looking at this?

5    A.  It came from our Sacramento office.

6    Q.  How can you tell that?

7    A.  Where you see -- do you see where it says

8  region on the top, 322?

9    Q.  Yes, ma'am.

10    A.  And then -SCR, that's Sacramento.

11    Q.  Okay.  I see.

12        All right.  Thank you, ma'am.

13    A.  Um-hum.

14    Q.  All right.  Now, let's go over to document No.

15  29.

16    A.  Okay.

17    Q.  And if you would, tell us what that document

18  is, please, ma'am.

19    A.  These are their lender's instructions that

20  print what are our closing documents.

21    Q.  All right.  And down at the bottom, it says 1

22  of 4.  Do you see that at the bottom right-hand corner?

23    A.  Yes.

24    Q.  And is that the usual number of pages for the

25  closing instructions?

0044

1     A.  Yes.

2     Q.  All right.  Now, I believe you told me earlier

3   that Lender's First Choice got the figures to go on the

4   H.U.D. 1 from the closing instructions.  Is that what

5   you told me?

6     A.  Yes.

7     Q.  Now, at what point of the loan process does

8   that -- does that happen that -- that the closing

9   instructions will be sent to Lender's First Choice for

10  preparation of the H.U.D. 1?

11    A.  When the closing documents are sent, the

12  complete package is sent to the title company.  These

13  are sent along with them.  It is part of the package.

14    Q.  Okay.  Okay.  Now, if you would, I want you to

15  tell me a little bit more about what happens after the

16  title company gets the lend- -- the closing

17  instructions, and just describe for me that process in

18  detail a little more.

19    A.  Okay.

20      MR. JENSEN:  Objection to the form of the

21  question.

22      If you understand the question, you can answer.

23      THE WITNESS:  Well --

24      MR. JENSEN:  If you understand it.

25

0045

1   BY MR. UNDERWOOD:

2       Q.   Well, let me ask it this way, once this -- the

3   instructions are -- well, strike that.

4          I will just start right here.  How are these

5   instructions sent to the title company?

6       A.   They are part of the closing package.

7       Q.   Okay.

8       A.   So they are e-mailed to them.

9       Q.   Okay.  E-mailed?

10      A.   Um-hum.

11      Q.   All right.  And after they are e-mailed to the

12  title company, what's the next thing that would happen

13  in a typical closing?

14      A.   Um, it's the title company's function to

15  execute these documents, coordinate a time with the

16  borrower to get these forms executed, and when they

17  receive this closing instructions, they prepare the

18  H.U.D. 1, to go along with the closing package.

19      Q.   All right.  And does the title company send a

20  copy or a draft of the H.U.D. 1 back to Lender's

21  First -- I mean, to Accredited to review?

22      A.   Yes, they do.

23      Q.   All right.  And tell me who reviews that and

24  how that process works.

25      A.   The person who drew the documents would review

0046

1   the H.U.D. and make sure that the amount disclosed in

2   the T.I.L. was not underdisclosed.  If it is the same

3   figure, or a little bit overdisclosed, we are okay with

4   it, we approve it, and they move on with the closing.

5       Q.   And is this something that the LOIS software

6   does as well, or how is that done?

7       A.   The only thing the LOIS software does is make

8   sure that the fees are -- are -- don't go over a high

9   cost limitation or state limitations.  The person who

10  drew the docs is going to visually see that and manually

11  calculate all of the APR fees and make sure that what

12  was disclosed to the borrower is correct and not under.

13      Q.   Okay.  All right.  And how do they do that?  Do

14  they use a handheld calculator and a piece of paper, or

15  do they use some sort of software, or if you would, just

16  tell me how that's done.

17      A.   We use a handheld calculator.

18      Q.   And is there any record kept -- kept of that?

19      A.   No.  It's just adding our lender's fees and

20  title settlement closing fees, our APR fees, and if --

21  and if it's good, um, under the amount financed that we

22  disclosed, then we just approve it via a phone call,

23  e-mail, or however they contacted the title company.

24      Q.   Okay.  All right.  And so once it's approved,

25  what's the next thing that happens?

0047

1    A.   The title company moves forward and executes

2   the documents with the borrower.

3    Q.   All right.  Now, let's look at document No. 29,

4   and let's look at that first fee, the origination fee.

5   And it's on the Line 801, originations to the discount

6   points, on this document, isn't it?

7    A.   Yes, it is an origination fee.

8    Q.   Yes, ma'am.  And if there were discount points,

9   would it be on the next line?

10    A.   Yes.

11    Q.   And this Line 803, appraisal fee, was that

12   something that was paid by Accredited?

13    A.   No.  It is paid by the borrower.  It could be

14   either paid by the lender or the borrower.

15    Q.   All right.  Can you tell me what happened with

16   regard to this loan?

17    A.   Let me look at the H.U.D. 1.  This tells me

18   that the -- I would -- well, in most cases -- I can't

19   tell you exactly on this loan, because it doesn't

20   specify on the H.U.D. if the borrower paid for it or the

21   lender, but it was paid outside of closing.

22    Q.   Okay.  All right.  Is that usually just paid by

23   the borrower?

24    A.   Yes.

25    Q.   And what about this Line 828, what does that

0048

1    represent?

2      A.   That's a flood certificate that was pulled on

3    this loan.

4      Q.   And tell me about what that means and how that

5    process works, of obtaining a flood certificate.

6      A.   It is ordered through Inzura Settlement

7    Services, and we see a certificate that tells me the

8    property is in a flood zone or not.

9      Q.   Okay.  If you would, just tell me physically

10   how it is done.  Do you do it on a computer?  Do you --

11   someone call up Inzura and order a flood certificate?

12   If you would, tell me how that's done.

13     A.   It is ordered through the computer, through

14   the -- through their website.

15     Q.   Yes, ma'am.

16     A.   And it pulls all of the -- you just type in the

17   borrower's name and address, and it comes up in a matter

18   of minutes or seconds.

19     Q.   All right.  Well -- so in other words, let me

20   see if I can describe it right.  Would the loan

21   processor log into -- is there a website that you type

22   in that information that you just described for me, is

23   that how it's done?

24     A.   Well, I am not sure if in this year, 2006, they

25   either go into the flood -- well, for Inzura, our

0049

1   system, in our empower LOIS system, there is a --

2       Q.  Yes, ma'am.

3       A.  -- flood button that you click on and it takes

4   you directly to their website, and it pulls

5   automatically the borrower's information, so we don't

6   have to do manual typing, and it prints this certificate

7   right there and then.

8       Q.  I see.  Okay.  So it is all done in one step,

9   it sounds like?

10      A.  Yes.

11      Q.  And what about the next one, the tax service

12  fee?

13      A.  That's a fee that's provided by Inzura.

14      Q.  All right.  And what is done for that fee?

15      A.  I am not sure what Inzura does for this.

16      Q.  Okay.

17      A.  I think it is provided here somewhere, step by

18  step, what they do.

19      Q.  Okay.  All right.  And let's go to the next

20  line, 901, the interest for 15 days.  Is that something

21  that is calculated by the LOIS system?

22      A.  Yes.

23      Q.  And how do you know how many days -- does the

24  operator know how many days interest to put into the

25  system?

0050

1    A.  They don't.  The system tells you how many

2   days.  It depends -- it goes off the funding date.  So

3   from the funding date, to the end of the month, the

4   system automatically calculates the dates remaining.

5    Q.  Okay.  All right.  Let's go up to the top of

6   it, of the document.  Let me ask you a few questions

7   about that.  For example, it says on there -- there is

8   a -- one blank, it says, "Must close by 7-5-2006."  Do

9   you see that?

10    A.  Yes.

11    Q.  All right.  And does it work this way, does the

12   operator put that date in, and then the interest on that

13   Line 901 is calculated and appears on that line, or how

14   does that work?

15    A.  No, it is not -- it doesn't go off that date.

16   That date only tells you that these documents that were

17   produced can -- will expire after July 5th, so they can

18   no longer use this set of documents.

19    Q.  All right.  What date does that go off then?

20    A.  The interest?

21    Q.  Yes, ma'am.

22    A.  It goes off from the funding date, till the

23   first of the following month.

24    Q.  Okay.

25    A.  To July 1st, in this case.

0051

1    Q.   I see.  So it will go off this June 12th date

2    that is up at the top?

3    A.   That is the closing date.

4    Q.   The closing date?

5    A.   And then three days after that, the 13th, 14th,

6    the 15th.  The loan funds on the 16th, I believe.

7    Q.   Okay.  All right.  I understand.

8    A.   So from the 16th, to the first of the month,

9    those are 15 days.

10    Q.   I see.  Okay.  And the 801 origination fee, how

11    is that figure arrived at, do you know?

12    A.   That is a figure that the loan officer inputs.

13    Q.   Okay.  Do you know how the loan officer arrives

14    at that fee?

15    A.   I don't.

16    Q.   Okay.  All right.  If you would, flip over to

17    the next page for me of the closing instructions.  And I

18    don't believe I have any questions about that page.  Go

19    ahead and flip over to Page 31.

20    A.   Okay.

21    Q.   Do you see the heading, it looks like the

22    second one down, it says H.U.D. 1 requirements?

23    A.   Um-hum.

24    Q.   Yes, ma'am.  It says, "Comply with all

25    provisions of RESPA, as amended, in preparing this

0052

1  form."  Is that what that says?

2      A.  Yes.

3      Q.  And what did -- I know you described a lot of

4  things that go on with the closing, and it goes to

5  different departments and they double check it and that

6  sort of thing.  If you will, I want to ask you

7  specifically what Accredited did at the time of the

8  Edwards loan to ensure that the settlement agent was

9  complying with the Real Estate Settlement Procedures

10  Act.

11      A.  Well, when we look at a H.U.D. 1, we just

12  looked at that, all of our fees are there and this --

13  that title fees don't go over what we disclose to the

14  borrower, and what we disclose to the borrower has

15  already been checked by our system.

16      Q.  Yes, ma'am.  All right.  Well, is there any

17  auditing or any check that goes beyond that?  Well, let

18  me ask -- that is not a very good question.  Let me ask

19  it this way, does Accredited ever check, for example, to

20  see if the recording fee on the H.U.D. 1 is actually

21  what's the recording fee should be?

22      A.  No.  We trust what the company tells us what

23  the fee is.

24      Q.  All right.  And does -- okay.  Never mind.

25          Whose job is it to check these H.U.D. 1s for

0053

1  compliance?

2     A.  Um, like I said, just -- all we check is that

3  our fees are there and that we -- it is not disclosing

4  more than what we disclose to the borrower, but that's

5  all we do on our side.

6     Q.  Okay.  And if you would, let me just look down

7  near the bottom of that page, on Page 31, there's a

8  statement, "All fees shown on the H.U.D. 1 must match

9  exactly the fee listed in our closing instructions."

10     A.  Okay.

11     Q.  Is that -- has that always been Accredited's

12  policy?

13     A.  To match our close -- our lender fees, yes.

14     Q.  Well --

15     A.  Because in our closing instructions, we are

16  telling them what our lender fees are.

17     Q.  Yes, ma'am.

18     A.  So that's all they are getting, and they have

19  to match our fees on their H.U.D.

20     Q.  Okay.  They don't have to match what's on the

21  good faith estimate?

22     A.  No.  Because this is telling them they have to

23  match what's in the closing instructions, and the

24  closing instructions only has our lender's fees.

25     Q.  Now, if a change is necessary on the H.U.D.

0054

1  settlement statement, tell me how that -- how that would

2  happen.

3      A.  What type of change?

4      Q.  Well, let's say, for example, a payoff had to

5  change on a debt, how would the -- a settlement company

6  like Lender's First Choice, for example, handle that, if

7  that sort of issue came up at a closing?

8      A.  A payoff, they would normally -- they would

9  require the addendum to lender's instructions, with new

10  instructions giving the corrected amounts.

11      Q.  Okay.  And then is the H.U.D. 1 -- how does

12  the -- is the H.U.D. 1 modified after that to reflect a

13  change, or if you would tell me how that would work --

14      A.  Yes.  They would have to modify it and send it

15  back to us for our approval.

16      Q.  All right.  Now, let's see, we have looked at

17  these closing instructions.  We have looked at a couple

18  of pages of them, but let me just go back to -- if you

19  would, to Page 29.  Let's see, we got closing

20  instructions.  We got 29, 30, 31 and 32.

21      A.  Okay.

22      Q.  All right.  Is there anything unusual about

23  these instructions?

24      A.  Not that I can see.

25      Q.  All right.  And is this the formal closing

0055

1   instructions that Accredited always uses, to your

2   knowledge?

3      A.  Yes.

4      Q.  Since you have been with Accredited, did it

5   ever use a different form of closing instructions?

6      A.  No.

7      Q.  And are these instructions generated by some

8   sort of software?

9      A.  Yes.

10     Q.  And is it the LOIS program that you told me

11  about earlier?

12     A.  Yes.

13     Q.  All right.  Now, if you would, let's go over to

14  the next form.  It is 33, the next document.  And can

15  you tell me what that document is?

16     A.  It is the addendum to the lender's

17  instructions.  This tells them -- further tells the

18  title company what the open conditions are, what the

19  payoffs are, and things that they must do.

20     Q.  All right.  Now, in -- now, we were going

21  through a sequence of events that had to happen in order

22  to get one of these loans closed.  And where is this

23  form used with regard to the events you have been

24  describing for me?

25     A.  This is also pulled with the closing documents,

0056

1   so --

2     Q.   So it would have been sent with these documents

3   that we just went through?

4     A.   Yes.

5     Q.   And there's a statement up at the top, it says,

6   "We must have these documents" -- excuse me, "these

7   items in and approved before funding."

8     A.   Um-hum.  Yes.

9     Q.   Okay.  And I noticed that some of the -- some

10  of the blanks are not checked.  How -- who completes

11  this form and makes sure that the title company's work

12  conforms to these instructions?

13    A.   It's computer-generated and it has to go by

14  what the loan terms are.  We don't manually check these

15  boxes.

16    Q.   All right.  Well, for example, on this one, on

17  No. 3, it looks like a survey was not required; is that

18  correct?

19    A.   Correct.

20    Q.   And how would a person know that a survey was

21  not required?

22    A.   It's usually on, um, a per state.  Like Texas

23  would require a survey.  There's very few.

24    Q.   All right.  Who makes -- who made the Xes in

25  the boxes out here, I guess is one of the things I need

0057

1   to know?

2      A.   The computer.

3      Q.   Okay.  And so when -- are those populated when

4   the state then is entered into the -- does -- LOIS fills

5   this format as well?

6      A.   Yes, LOIS does this.

7      Q.   For example, I think you said that Texas would

8   require a survey.  If this were a loan in Texas, would

9   an X automatically be put on that blank in the No. 3

10  there?

11     A.   Yes.

12     Q.   All right.  Now, if you would, I want to ask

13  you a question about No. 7.  It says, "Completed and

14  typed form 1033 signed by borrowers and interviewers."

15     A.   Um-hum.

16     Q.   Is that -- a 1033, is that a loan application?

17     A.   That's a loan application, correct.

18     Q.   All right.  And when does the borrower sign a

19  loan application?

20     A.   Um, along with the -- it is sent along with the

21  closing documents.

22     Q.   And we talked earlier about section 32.

23  What -- can you tell me what you understand a section 32

24  loan to be.

25     A.   My understanding is anything over 8 percent of

0058

1  the loan amount would be section 32.

2    Q.  All right.  Are you familiar with an APR that

3  would require a section 32 disclosure?

4    A.  No.  The -- I am not.  The system pulls the APR

5  for us, so -- and the system would tell us.  If it is a

6  section 32, it wouldn't allow us to print docs.

7    Q.  Okay.  Now, what about that No. 12, what does

8  that mean, "All loan documents are supposed to be

9  executed at escrow or closing agent's office"?

10    A.  This whole package that we are reviewing --

11    Q.  Yes, ma'am.

12    A.  -- is the closing package, and it needs to be

13  signed at the escrow or closing agent's office.

14    Q.  All right.  And are you aware that -- of loans

15  being closed at people's homes, a notary going out to

16  people's homes and closing the loan?

17    A.  Yeah, they do that too.

18    Q.  All right.  So is that -- is that a requirement

19  that's not followed sometimes, to your knowledge?

20    A.  They would tell us if they set up a notary or

21  not.

22    Q.  All right.  Do you know if a notary was used in

23  this transaction?

24    A.  I do not know.

25    Q.  How would we know that?

0059

1    A.  Well, I can check the seal of the person who

2    notarized it, but, I mean, if it's not the closing

3    officer's name, I wouldn't know.  Because I don't know

4    who works at the title company or who -- or what notary

5    was used.

6    Q.  Okay.

7    A.  We would have to -- that's something a title

8    company would have to confirm.

9    Q.  Okay.  All right.  Let's go over to the next

10   page, if you would, please, ma'am, Page 34.

11   A.  Okay.

12   Q.  I don't believe I have any questions about that

13   page.  Let's go to -- what's the next one, it says,

14   "Additional requirement form," Page 35?

15   A.  Um-hum.  This is the additional requirement

16   form.

17   Q.  Yes, ma'am.

18   A.  It is just a document telling them that we

19   don't -- to fax these items once they're signed, these

20   four -- six items.

21   Q.  Okay.  And what's the reason for that?

22   A.  Um, we use -- in my case particularly, we use

23   these for purchases, where they require the funds the

24   same day, so they wouldn't be able to give it -- the

25   executed documents that same day, FedEx them to us, so

0060

1  they would have to fax these items to us so we can

2  verify they were executed properly and --

3      Q.  I see.  That wouldn't apply to a refinance --

4      A.  No.

5      Q.  -- would it?

6          What about the next form, 35?

7      A.  It's the same form.

8      Q.  Okay.  All right.  And are those -- well, then

9  those are not all the closing instructions.  We still

10  have a few more to look over.  We got Page 36 through --

11  well, I guess through 36, 37.  Can you tell us what

12  those are?

13      A.  Um, this is telling them how to complete a

14  right to cancel notice.

15      Q.  Okay.

16      A.  And it gives them a sample as how to complete

17  it.

18      Q.  All right.  38 is --

19      A.  The actual --

20      Q.  -- a cancelled form?

21      A.  Yes.

22      Q.  39 is one for Ms. Edwards, isn't it?

23      A.  Um-hum.

24      Q.  Okay.  Let's skip over to document No. 58.  I

25  told you I was going to skip some of these.

0061

1    A.    Okay.  Good.

2    Q.    We won't go through every page.

3    A.    Thank you.

4    Q.    If you would tell us what that form is, please.

5    A.    You said Page 58?

6    Q.    Yes, ma'am.

7    A.    This is a tax certification provided by the

8    title company.

9    Q.    All right.  Now, that was going to be my

10    question, was:  Who provided this?  And is this

11    something that was done by Lender's First Choice or

12    Inzura?

13    A.    This was done by Lender's First Choice.

14    Q.    And so -- and Inzura is not -- let me ask it

15    this way, is Inzura involved in verifying this type of

16    tax?

17    A.    This form itself, no.

18    Q.    Okay.  Well, what about property taxes in

19    general?

20    A.    I am not sure exactly what Inzura's function is

21    as to tax certifications.

22    Q.    Okay.  All right.  But this was done, as far as

23    you know, by Lender's First Choice and not Inzura?

24    A.    Correct.

25    Q.    Now, if you would flip over to the next

0062

1   document, 59.

2       A.   Okay.

3       Q.   And I wanted to ask you what that document was.

4       A.   It is an incomplete H.U.D. 1, an estimated

5   settlement statement.

6       Q.   All right.  And do you know what the purpose of

7   it was and where it would fall in this chain of events

8   that -- or steps that you have to go through to close

9   one of those loans?

10      A.   No, I don't know why this would be in the file.

11      Q.   Okay.

12      A.   Or what point it was given to them, I don't

13   know.

14      Q.   All right.  And if you would, may I ask you to

15   look at the next document, document No. 60.

16      A.   Okay.

17      Q.   And just tell us what that one is, please.

18      A.   This is a title report, preliminary title

19   report, from Lender's First Choice.

20      Q.   All right.  And does it show that -- what

21   policy -- what's the amount of the policy that's

22   proposed?

23      A.   65,000.

24      Q.   All right.  And what -- at what -- do you know

25   the general title insurance company?

0063

1    A.   Yeah.  It's from United Title Insurance

2   Company, yes.

3    Q.   All right.  And this was also -- was this also

4   issued by Lender's First Choice?

5    A.   It was provided to us by Lender's First Choice.

6    Q.   And if you would, let me ask you to take a look

7   at document No. 64.

8    A.   Okay.

9    Q.   And can you tell me what that document is?

10    A.   It looks like it's a recording information

11   that's part of the commitment.

12    Q.   All right.  And do you know why Accredited

13   would have that in its file?

14    A.   It's just part of the title commitment.

15    Q.   Do you see, under the bold lines across almost

16   in the middle, it says, "Basic recording fees"?

17    A.   Yes.

18    Q.   And do you know what those -- what those fees

19   are for and what they reflect?

20    A.   Well, the deed of trust, mortgage, that's our

21   mortgage.  It is 15.50 for the first page.  Okay.

22    Q.   Yes, ma'am.

23    A.   Amendment and modification, I don't know why

24   they would use that or what it's for.  Assignment, I

25   don't know what that's for.  I mean, those are title

0064

1   terminology, which I don't know.

2    Q.   All right.  Well, do you know if that

3   information could be used to calculate what the

4   recording fees are for a mortgage in Mobile County,

5   Alabama?

6    A.   Well, this is -- tells us what the fees are.

7    Q.   Yes, ma'am.

8    A.   The total fee is given to us by the title

9   company.

10    Q.   All right.  And does anyone from Lender's --

11   from Accredited ever -- I believe you already told me

12   that they never checked the fees to see if they are --

13   what it actually takes to record the mortgage.  Was that

14   what you said?

15    A.   Right.

16    Q.   All right.  And as far as you know, no one ever

17   took this document to see if the Edwards' recording fee

18   was calculated correctly?

19    A.   Correct.  Because we don't know if they add any

20   other stuff, because we don't know that terminology.

21    VIDEO OPERATOR:  Counsel, I am sorry to

22   interrupt.  We are down to five minutes of video.

23    MR. UNDERWOOD:  Okay.  Do you guys want to take

24   a break?

25    MR. JENSEN:  Sure.

0065

1        THE WITNESS:  Okay.

2        MR. UNDERWOOD:  Why don't we take about a

3   ten-minute break and -- well, if you will just take 15

4   minutes and start back at a quarter till.

5        MR. JENSEN:  That sounds good.

6        MR. UNDERWOOD:  Okay.  All right.  I will call

7   you guys back at a quarter till -- what time is it out

8   there?

9        THE WITNESS:  10:30.

10       MR. PREVIN:  I don't know that we need 15

11   minutes.

12       MR. UNDERWOOD:  Okay.

13       MR. PREVIN:  How about just five minutes?  Five

14   minutes.

15       MR. UNDERWOOD:  Well, let's take ten.

16       MR. PREVIN:  All right.  We'll take ten.

17       MR. UNDERWOOD:  Okay.  I will call back at 20

18   till.

19       MR. PREVIN:  All right.

20       MR. UNDERWOOD:  Okay.  All right.  Bye.

21       MR. PREVIN:  Bye.

22       VIDEO OPERATOR:  Off the record at 10:32.  And

23   the end of video No. 1.

24       (Recess)

25       VIDEO OPERATOR:  On the record at 10:45 a.m.

0066

1  Beginning of video No. 2.

2  BY MR. UNDERWOOD:

3     Q.  Miss, if I can ask you, if you would, let me

4  get you to go over to document No. 72 now.

5     A.  Okay.

6     Q.  And if you would, tell me what that is.

7     A.  This is the flood certificate.

8     Q.  And is that what you -- I believe you described

9  that for me earlier.  That's provided by Inzura?

10    A.  Correct.

11    Q.  And is document No. 73, is that part of it, or

12  how is that document generated?

13    A.  It is the second page to this document.

14    Q.  And let's go down to document 76, if you would.

15  Tell me what that document is.

16    A.  This is the closed loan status.

17    Q.  And what is it used for?

18    A.  The underwriters is -- this is what they print

19  when they approve the loan.

20    Q.  Okay.  Is this document generated before or

21  after the closing?

22    A.  This one in particular was generated, it looks

23  like, after they satisfied all of the conditions.

24    Q.  Okay.  And let me get you now to skip over to

25  document No. 80.

0067

1    A.  Okay.

2    Q.  And what is that document, please, ma'am?

3    A.  This is the risk analysis.

4    Q.  All right.  Is this one of the steps you

5    described for me earlier?

6    A.  Yes.  This is something the underwriter

7    provides.  This is something the underwriter prints out.

8    It's an overview of the whole loan file.

9    Q.  And what is it used for?

10    A.  Um, it's for underwriting.

11    Q.  And if you would, let's go over to document No.

12    82 now.

13    A.  Okay.

14    Q.  What is -- what's this document?

15    A.  This is a funding refinance audit checklist.

16    That's done after -- when doing the post-closing.

17    Q.  All right.  And what -- what is it exactly used

18    for?

19    A.  It is an audit to -- that the funder completes

20    as they are reviewing the documents, the signed closing

21    documents.

22    Q.  And if you would, tell me how the funder

23    completes this document.  Is it done on the computer, or

24    if you would just describe for me how that's done.

25    A.  They have the spreadsheet on their computer and

0068

1  they man- -- manually check every box that applies to

2  this loan.

3      Q.   All right.  And let me ask you, if you would,

4  to look on the column on the right, at the top.

5      A.   Um-hum.

6      Q.   The second box, it says, "Fees on H.U.D. match

7  fees on final good faith estimate."  Can you tell me

8  what that means?

9      A.   It's -- when they do this, they make sure that

10  the lender fees match to what's in the final good faith

11  estimate.

12      Q.   They don't check the other fees?

13      A.   The other fees, what they do -- what they check

14  is that they're not over what was disclosed to the

15  borrower.

16      Q.   All right.  And what about is the same, I

17  guess, true under the heading, "Final good faith

18  estimate/itemization"?

19      A.   Okay.

20      Q.   Is the same true in that regard, it says, "Fees

21  match H.U.D."?

22      A.   Correct.

23      Q.   And is there a document or a manual or

24  something of that nature that a person would use to --

25  so they could tell when to check one of these boxes or

0069

1     not check one of them?

2     A.   No.  It's just -- we just have this checklist.

3     Q.   Yes, ma'am.  Say, for example, you just told me

4     that fees on H.U.D. 1 match fees on good faith

5     estimate/itemization, and you just told me that only the

6     lender fees are checked.  How would a person know that?

7     A.   What do you mean how -- how would a person know

8     what?  Sorry.

9     Q.   Well, to me, that would say that all the fees

10    should match the good faith estimate, but you tell me

11    that it doesn't mean that.  And now my question -- and I

12    am not doing a very good job of asking it, but my

13    question is, how would the person who is filling this

14    out know that that's what the -- that that only meant

15    the lender's fees?

16    A.   Well, the person -- when -- we know that when

17    we are checking the good faith and compare it to the

18    H.U.D., it is just making sure that whatever is in the

19    H.U.D. is not over what is disclosed on the good faith

20    and the T.I.L.

21    Q.   And is that policy written down somewhere?

22    A.   No.

23    Q.   And it is not in one of these manuals that you

24    told me about earlier?

25    A.   No.

0070

1    Q.  So that's just something -- is that just

2  something that someone would learn on the job then?

3    A.  Yes.

4    Q.  Okay.  And on document 83, it looks like this

5  reviewer was a lady named Delia Iniguez; is that right?

6    A.  Delia Iniguez, yes.

7    Q.  Yes, ma'am.  Does she still work for

8  Accredited?

9    A.  No.

10    Q.  Do you know her?

11    A.  No.

12    Q.  What would her position, her job title to have

13  been if she was completing this form?

14    A.  Funder.  Doc funder or manager, it depends,

15  either one.

16    Q.  Yes, ma'am.  All right.  And document No. 84.

17    A.  Um-hum.

18    Q.  Is this the high cost check form that you told

19  me about earlier?

20    A.  Yes.  This is something the system pulls, and

21  it tells you there that it didn't fail the state test.

22    Q.  Now, if you would look down at the heading that

23  says APR.

24    A.  Okay.

25    Q.  And right under there, it says, "T-bill rate."

0071

1    A.   Okay.

2    Q.   Do you know how that rate is calculated, where

3   it comes from?

4    A.   It has to come from our system, because we

5   don't input it.

6    Q.   Okay.  Is this figure by the LOIS software?

7    A.   Yes.

8    Q.   And if you would look at the next page, 85.

9    A.   Okay.

10    Q.   And what -- what's this document used for?

11    A.   This is the section 32 calculation, the final

12   one, and it tells you if it -- if you failed the section

13   32 or not.

14    Q.   Okay.  Let me ask you, if you would, to look at

15   document 87 now.

16    A.   Okay.

17    Q.   And what is that document, please, ma'am?

18    A.   This is the closing department document audit

19   sheet that's printed before the closing documents are

20   sent out.

21    Q.   And what's it used for?

22    A.   To audit all the information that was inputted

23   into the system, making sure everything is okay, the

24   spelling of the borrower's name, the vesting, the

25   property address, and that the fees are there, lender

0072

1   fees.

2      Q.   Okay.  Let me get you now -- let's move over to

3   document 92.

4      A.   Okay.

5      Q.   Is that the form 1003 I asked you about before?

6      A.   That is correct.

7      Q.   And I always wondered about this, maybe you can

8   enlighten me on it, why does a borrower sign a

9   residential loan application at the closing, instead of

10   at the beginning of the process?

11      A.   There -- well, this is the final residential

12   loan application, so they are agreeing to everything

13   that is on this 1003, after all the -- they have gone

14   through the whole process.

15      Q.   All right.  Do any of these documents that we

16   have been going through today, do they actually show the

17   date that the Edwards actually applied for the loan?

18      A.   Um, you can tell by the loan application

19   number.

20      Q.   Uh-huh.

21      A.   At the bottom left-hand corner.

22      Q.   Yes, ma'am.

23      A.   That will tell you the year, 2006.

24      Q.   Okay.

25      A.   05 is the month of May.

0073

1    Q.   All right.

2    A.   And the 30 is May 30th, is when they applied

3    for the loan.

4    Q.   I see.  Okay.  Now, let me ask you, if you

5    would, to look at document No. 159.

6    A.   Just give me one second.

7         Okay.  I'm there.

8    Q.   And I want you to, if you would, compare it,

9    for me, to a document that we looked at earlier.  I

10   believe it's going to be No. 3.  Yes, ma'am.  If you

11   would, just compare it to document No. 3.  And the

12   amount financed is a little different.  Do you know why

13   that would be?

14   A.   Um, I would have to look at the es- -- the good

15   faith estimate, to see what fee changed.  There might be

16   a slight difference somewhere.

17   Q.   All right.  And what is this -- what does this

18   document, 159, is this something that went out with the

19   good faith estimate?

20   A.   This is a preliminary one.  And it was given to

21   the borrower.  And yes, it did go out with the good

22   faith estimate.  It's an initial one.

23   Q.   Would it have gone out with the next document,

24   160?

25   A.   Yes.

0074

1    Q.   And what is the next document, 161?

2    A.   161, affiliated business arrangement

3   disclosure, letting the borrower know that we are

4   affiliated with Inzura.

5    Q.   Does Inzura ever close loans for Accredited?

6    A.   Yes.

7    Q.   And are the disclosures done any different if

8   Inzura is closing the loan, or is it the same process

9   that you described apply to them as well?

10    A.   Same process.

11    Q.   Ma'am, if you would, let me get you to look at

12   document No. 185.

13    A.   Okay.

14    Q.   And what is that document, please, ma'am?

15    A.   This is the preliminary truth in lending

16   disclosure.

17    Q.   All right.  And it has yet another amount

18   financed, doesn't it?

19    A.   Yes.

20    Q.   And do you -- do you know why it is different

21   from the other two?

22    A.   This one is the first set of RESPAs,

23   preliminary truth in lending that was sent out when the

24   loan application was taken.

25    Q.   Yes, ma'am.

0075

1    A.  So all the figures are estimate figures.  And

2  you will see that on the next page.

3    Q.  On 186?

4    A.  Yes.

5    Q.  All right.  Do you know what this Page 186,

6  reflecting a settlement or closing fee of 450 --

7    A.  It reflects 450, right.

8    Q.  Yes, ma'am.  Do you know why it doesn't reflect

9  the 600-some-odd dollars that the other one did?

10    A.   Well, at this point, it was just an estimate,

11  and I don't believe the loan officer knew what the fees

12  were going to be.  They are just estimates, and it's

13  what's -- what's defaulted in the system, I guess.  But

14  it is not the actual title fees given from the title

15  company.  It is just an initial estimate.

16    Q.  All right.  Let me get you now to look at

17  document No. 209.

18    A.  Okay.

19    Q.  If you would, just tell us what this document

20  is, please, ma'am.

21    A.  This is a mortgage.

22    Q.  Do you notice, at the top, it has the recording

23  information?

24    A.  Okay.  I see that.

25    Q.  All right.  Can you tell me what step in this

0076

1   process we have been going through about closing a loan

2   that Accredited gets this document No. 209?

3      A.   This is -- this document, after it has been

4   recorded, it is way after the loan closes.  It is sent

5   to the post-closing department.  We never see this.  And

6   how far into the time, it depends on the county, how

7   long it takes them.  Each county is different.

8      Q.   All right.  Does Accredited always get a copy

9   of the recorded -- of the recorded mortgage like this?

10     A.   Yes.

11     Q.   So would it have a copy then with each of the

12   loans that it's made -- it has made, a copy of the

13   recorded mortgage?

14     A.   Um, Accredited should have them.

15     Q.   It is the policy of Accredited to obtain a copy

16   of the recorded mortgage, to document the consumer's

17   file, is that a fair statement?

18     A.   Can you repeat the question?  Sorry.

19     Q.   Sure.  Is it the policy of Accredited to try to

20   get a copy of the recorded mortgage for each loan that

21   it closes?

22     A.   Yes.

23     Q.   Okay.  Let's move on then to document No. 229.

24     A.   Okay.

25     Q.   And let's see, I believe that's several pages.

0077

1    I am not -- it looks like it is seven pages.  I just

2    want to know what that document is.  I don't think I

3    have any questions about it.

4       A.   This document is just showing the history of

5    the borrower's payments.

6       Q.   All right.  And on the next page, what are

7    those notations about?

8       A.   Let's see, I am not sure what this is.

9       Q.   Okay.  All right.  Well, let's go on to Page

10   237.

11      A.   Okay.

12      Q.   And can you tell me what that document is?

13      A.   It's a printout of the customer service --

14   servicing department, where they -- it tells you who

15   this loan was sold to and when.

16      Q.   All right.  And was it sold to Saxon Mortgage

17   Services?

18      A.   According to this, it looks like it.

19      Q.   All right.  Who could tell me more about that?

20      A.   It would be our servicing department.  And who,

21   I have no idea.

22      Q.   Okay.  Where is the servicing department

23   located?

24      A.   It is in our corporate office in San Diego.

25      Q.   In San Diego?

0078

1    A.   Um-hum.

2    Q.   Thank you, ma'am.  And what is the next

3  document?

4    A.   238?

5    Q.   Yes, ma'am.

6    A.   Let me see, I don't know where this will come

7  from.  It --

8    Q.   Okay.  Let me get you then -- let's go on to

9  document 243.

10   A.   Okay.

11   Q.   And I -- it looks like we have 13 pages there.

12  Are you familiar with this list of -- well, first off,

13  can you tell me what this 13-page document is?

14   A.   This is a list of settlement agents used from

15  the period 3-1-06 through 12-31-07.

16   Q.   All right.  And do you know what geographic

17  area that these agents were used in?

18   A.   Um, they were used for the Alabama loan.

19   Q.   All right.  Did you have a -- did you take part

20  in compiling this list?

21   A.   No.

22   Q.   All right.  Do you know who did?

23   A.   Someone in Accredited.  I believe it is -- I

24  have no idea, but someone in Accredited who provided

25  this list.

0079

1    Q.  All right.  Do you know what it represents?

2    A.  From what I can tell, it is the number of loans

3    closed through each settlement agent from this time

4    period in the state of Alabama.

5    Q.  And with regard to this list of settlement

6    agents, would the same general procedure have been used

7    with each one of these that you have described for me

8    that was used with Lender's First Choice and the Edwards

9    loan?

10    A.  Yes.

11    Q.  All right.  Well, I believe I am through with

12    those documents.  I just want to ask you a few questions

13    about another one.

14    A.  Okay.

15    Q.  And let's go to Exhibit No. 4.

16    A.  Okay.

17    Q.  Have you seen this document before?

18    A.  Yes.

19    Q.  And did you take part in its preparation?

20    A.  I -- not in preparing it, but I did read it,

21    and I agreed with it.

22    Q.  All right.  You signed it on Page 21?

23    A.  Correct.

24    Q.  And what did you do to verify the information

25    that's in it?

0080

1    A.  Well, most of the information is information

2    that was provided by our -- by our company.

3    Specifically, what question are you speaking about?

4    Q.  Well, I am not -- I am just talking about in

5    general.  I asked you what you -- you signed it under

6    oath that it was accurate, so I am just asking you what

7    you did to verify the accuracy of the information in it,

8    if anything.

9    A.  Well, as far as providing, um -- um, loans and

10   all of that, I know it is in our system, and I -- I know

11   the legal -- our legal department got all of this

12   information for us.

13   Q.  Yes, ma'am.  But did you personally do anything

14   to verify the information?

15   A.  No.  Anything that pertained to my role or what

16   we do, I agree with it.

17   Q.  Let me ask you to take a look at Page 11.

18   A.  Okay.

19   Q.  In response to question No. 12, and there is a

20   list of people there, do you know if any of those people

21   are still employed at Accredited?

22   A.  None of them are.

23   Q.  Do you know any of them -- do you know where

24   any of them are employed?

25   A.  I do not know where they are currently

0081

1  employed.  All I know is that they work for the

2  Sacramento office, and I do not know any of these

3  people.

4     Q.  Do you know if Accredited has any insurance

5  that would cover any of the claims made in this lawsuit?

6     A.  No, I do not know.

7     Q.  Has anyone told you whether or not Accredited

8  has any insurance that would cover the claims?

9     A.  As far as I know, we don't.

10    Q.  Who would have knowledge about insurance that

11  Accredited would have?

12    A.  Um, someone in our corporate office.

13    Q.  Well, can you give me a name?

14    A.  You can ask Robert Duley (phonetic).

15    Q.  Robert Duley?

16    A.  Um-hum.

17    Q.  What's his job title?

18    A.  Currently, he's a paralegal.

19    Q.  Who is his supervisor?

20    A.  I don't know.  But, I mean, I am pretty sure he

21  can give you the right person to talk to.

22    Q.  Is all the information in Exhibit 4 accurate?

23    A.  Exhibit 4?

24       MR. JENSEN:  This document (indicating).

25

0082

1   BY MR. UNDERWOOD:

2       Q.   Yes, ma'am, the one we were just looking at.

3       A.   Yes.  Um-hum.

4       Q.   And are you relying on -- what are you relying

5   on when you tell me that it's accurate?

6       A.   Well, for example, the question that we just

7   went over --

8       Q.   Yes, ma'am.

9       A.   -- with the people listed, I verified that in

10  our system on this specific loan, and it does tell me

11  that Nick was the loan officer, Corina was the loan

12  specialist, and it tells me who underwrote the loan, so

13  I verified that information.

14      Q.   What about the remainder of the information?

15      A.   Let me see, the other information, I trusted

16  the legal department gathered all of the correct

17  information.  Um, let's see, department did that --

18  yeah, all of this is data that is stored in our system,

19  so I trust that all of this information was pulled

20  correctly.

21      Q.   All right.  Let me ask you now to take a look

22  at Exhibit No. 8.

23      A.   Okay.

24      Q.   And I want to ask you just a few questions

25  about it.

0083

1    A.  Okay.  I have it.

2    Q.  And you see your signature, Ms. Diaz, on Page

3  8?

4    A.  Correct.

5    Q.  All right.  And I want to ask you the same

6  question about this.  What did you do to verify that

7  this information was accurate?

8    A.  Well, in this one, it is asking regarding the

9  amount financed and regarding the finance charge and the

10  APR.  All of this is recorded in our system, so I did

11  check that all of this was in our system.  It's pulled

12  by our system, so I know it is accurate.

13    Q.  All right.  Now, what about attached to that,

14  there is a document No. 3099.

15    A.  Yes.

16    Q.  All right.  Do you know what that document is?

17    A.  It's tax service escrow functions, the

18  functions that Inzura does to provide this service.

19  It's a list of things they do.

20      MR. UNDERWOOD:  Okay.  All right.  Guys, let's

21  take about ten minutes.  I might be just about finished.

22      MR. JENSEN:  Okay.

23      THE WITNESS:  Okay.

24      MR. UNDERWOOD:  Any problem with that?  And I

25  will call back in at 20 after.

0084

1        MR. PREVIN:  All right.

2        MR. JENSEN:  Great.

3        MR. PREVIN:  Thanks.

4        THE WITNESS:  Thank you.

5        VIDEO OPERATOR:  Off the record at 11:15 a.m.

6        (Recess)

7        VIDEO OPERATOR:  On the record at 11:26 a.m.

8  BY MR. UNDERWOOD:

9    Q.  All right.  Ms. Diaz?

10    A.  Yes.

11    Q.  I have just one or two more questions.  And my

12  first one is this:  How does a settlement agent get

13  approved to close loans for Accredited?

14    A.  They have this loan agreement form that they

15  sign.

16    Q.  Yes, ma'am.

17    A.  And it's given to our cash management

18  department, where they verify -- where -- they are the

19  ones that approve them and put them into our system.

20    Q.  All right.  And do you know who is in charge of

21  that?

22    A.  You can ask Helen Bonihevert.

23    Q.  All right.  And I think you told me that

24  they -- a title company or settlement agent is -- when I

25  use those terms, you know -- I am using those

0085

1   interchangeably.  Do you understand that?

2   A.  Yes.

3   Q.  When a title company is selected, did you tell

4   me that it depends on what state the loan is?

5   A.  Correct.

6   Q.  And does Accredited maintain a list of approved

7   title companies?

8   A.  Yes.

9   Q.  And are those selected under your supervision,

10  the title companies?

11  A.  No.

12  Q.  Well, when I say that, I mean the title

13  companies used on a particular loan, are those selected

14  under your supervision?

15  A.  As far -- do you mean do we select the title

16  company for that particular loan, is that your question?

17  Q.  No, ma'am, just in general.  Who selects the

18  title company?  Let me ask it this way, well,

19  Accredited -- is Accredited making loans anymore?

20  A.  We are.

21  Q.  You are?

22  A.  Yes.

23  Q.  All right.  Let's suppose someone called up

24  today from Alabama and wanted a loan through Accredited.

25  How would the settlement agent or the title company be

0086

1  chosen?

2     A.   The branch processor would contact the title

3  company, and they would have their list of title

4  companies they use.  Each branch uses their own title

5  companies.

6     Q.   Okay.  And so it is the branch processor's

7  choice --

8     A.   Yes.

9     Q.   -- with regard to what title company is used?

10     A.   Yes.

11     Q.   All right.  And suppose a title company, for

12  example, said that they wanted to charge $2,000 for a

13  settlement or closing fee, would that -- would that

14  title company -- could it be chosen to close the loan?

15     A.   That would bring a red flag as being a high

16  fee.  A branch processor would probably call around to

17  get another title company.

18     Q.   All right.  And, you know, I had asked you a

19  little bit about that before.  Is there any sort of

20  price list or guidelines with regard to what should be

21  charged for a settlement or closing fee that a branch

22  processor would consult?

23     A.   No, there is no list.

24     Q.   Well, how would a branch processor know whether

25  a fee quoted by a title company was -- was reasonable or

0087

1    was excessive?

2      A.   Um, by -- by experience, I would say, dealing

3    with title companies.  They are usually not that high.

4    It's just using common sense, making -- you know, make

5    sure it is reasonable.  I am not sure if it is their

6    common practice to call a different title company and

7    compare.  I don't know.  You would have -- a branch

8    processor would have to answer that.

9      Q.   All right.  And do you know if there is someone

10   at Accredited who would be the supervisor for the branch

11   processors, that they would report to?

12     A.   Each branch had their own processors and --

13   well, right now, we only have one branch, so Millicent

14   was a processor and a -- the branch processor

15   supervisor, until recently.

16     Q.   Okay.  Did you tell me she was still with

17   Accredited?

18     A.   Yes.

19       MR. UNDERWOOD:  All right.  Well, thank you,

20   ma'am.  I believe those are all the questions I have

21   then.

22       THE WITNESS:  Okay.  Well, then thank you.

23       MR. UNDERWOOD:  And we want to offer all of

24   these exhibits as exhibits to the deposition.

25       MR. PREVIN:  Earl, do you mean the ones you

0088

1   discussed or all of the ones that were --

2       MR. UNDERWOOD:  No, I would like to offer all

3   of them.

4       MR. PREVIN:  All of them.  Okay.

5       MR. UNDERWOOD:  I believe I have eight of them.

6       MR. JENSEN:  Nine.

7       MR. PREVIN:  We have nine.

8       MR. UNDERWOOD:  Nine, I'm sorry.

9       MR. JENSEN:  All right.  Well, we have no

10   further questions.

11       VIDEO OPERATOR:  Off the record, Counsel?

12       MR. PREVIN:  Yes.

13       MR. UNDERWOOD:  All right.  Well, thanks guys.

14       THE WITNESS:  Thank you.

15       MR. UNDERWOOD:  All right.  Bye-bye.

16       VIDEO OPERATOR:  This concludes today's

17   deposition of Alma L. Diaz.  The master videotape will

18   be retained by Freedom Court Reporting.  We are off the

19   video record at 11:32 a.m.

20       (The deposition was concluded at 11:32 a.m.)

21

22

23

24

25

Hall-Frazier
Record - 000469

0089

1      DECLARATION UNDER PENALTY OF PERJURY

2

3          I, ALMA LUZ DIAZ, the witness herein,

4   declare under penalty of perjury that I have read the

5   foregoing in its entirety; and that the testimony

6   contained therein, as corrected by me, is a true and

7   accurate transcription of my testimony elicited at said

8   time and place.

9

10      Executed this _____ day of _____ 2008, at

11   _____, _____.

12      (City)          (State)

13

14

15

16

17          _____

18          ALMA LUZ DIAZ

19

20

21

22

23

24

25

0090

1   STATE OF CALIFORNIA

2   COUNTY OF SAN DIEGO

3

4        I, Elana Zucconi, Certified Shorthand

5   Reporter, in and for the State of California,

6   Certificate No. 9651, Registered Professional Reporter

7   and Certified Realtime Reporter, do hereby certify:

8        That prior to being examined, the witness

9   named in the foregoing deposition was by me first duly

10  sworn to testify to the truth, the whole truth, and

11  nothing but the truth;

12        That said deposition was taken before me

13  pursuant to notice, at the time and place therein set

14  forth, and taken down by me in shorthand and thereafter

15  transcribed into typewriting under my direction and

16  supervision;

17        I further certify that I am neither counsel

18  for, nor related to, any party to said action, nor in

19  any way interested in the outcome thereof.

20

21  Dated: _____

22

23

24        _____

25        Elana Zucconi, CSR No. 9651, RPR, CRR

0091

1         DEPOSITION ERRATA SHEET

2

3  RE:      Paulson Reporting & Litigation Services

4  File No.12639

5  Case Caption: JONATHAN AND SHARRON EDWARDS, et al.

6  vs. ACCREDITED HOME LENDERS

7  Deponent: ALMA LUZ DIAZ

8  Deposition Date:  May 6, 2008

9  To the Reporter:

10  I have read the entire transcript of my Deposition taken

11  in the captioned matter or the same has been read to me.

12  I request that the following changes be entered upon the

13  record for the reasons indicated.  I have signed my name to

14  the Errata Sheet and the appropriate Certificate and

15  authorize you to attach both to the original transcript.

16

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  Page No._____Line No._____Change to:_____

24  _____

25  Reason for change:_____

0092

1    Deposition of  ALMA LUZ DIAZ

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21

22

23

24    SIGNATURE:_____DATE:_____

25                        ALMA LUZ DIAZ

**Hall-Frazier**
**Record - 000473**

_____EXHIBIT____ _i_
DEPO OF:____DIAZ____
DATE:____5-6-08____
**ELANA K. ZUCCONI**
_5 pages_

# EX 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

JONATHAN AND SHARRON EDWARDS,           )
individually and on behalf of all similarly  )
situated individuals,                                        )
                                                                          )
Plaintiffs,                                                          )
                                                                          )
v.                                                                        ) Case No. 1:07-cv-00160-KD-C
                                                                          )
ACCREDITED HOME LENDERS, INC.;         )
LENDER'S FIRST CHOICE AGENCY, INC.;  )
LENDER'S FIRST CHOICE AGENCY OF        )
ALABAMA, INC.                                            )
                                                                          )
Defendants.                                                      )

### RE-NOTICE OF TAKING RULE 30(b)(6) VIDEO DEPOSITION

TO:    **Matthew P. Previn**
         **Buckley Kolar LLP**
         **1250 24th Street NW Ste 700**
         **Washington DC 20037**

NOW COME Plaintiffs and notice the deposition of Accredited Home Lenders, Inc. (referred to herein Accredited) and pursuant to the provision of FRCP 30(b)(6) said corporation is requested to designate such person or persons as are competent to testify with regard to the following subject matter(s):

1. The dates that Accredited has done business with the Lenders First Choice.

2. The contractual relationship between the Lenders First Choice and Accredited.

3. The identity of other settlement agents that have closed loans for Accredited in Alabama during the class period.

4. The practice and procedures followed in the promulgation of closing instructions to the settlement agents.

5. The nature of services performed by said settlement agents.

6. The services performed by Lenders First Choice as said services relate to loans originated by Accredited.

7. The manner and content of instructions from Accredited to Lenders First Choice related to such services.

8. The degree of control exercised over Lenders First Choice by Accredited regarding the time, place and manner Lenders First Choice performs any such services.

9. The number of loans originated by Accredited in which the Lenders First Choice performed some related settlement service.

10. The number of loans originated in Alabama during the putative class period.

11. The nature of settlement services performed by Lenders First Choice related all such loans.

12. The use by Lenders First Choice of third party providers of said services.

13. The geographical areas in which Accredited does business.

14. The goods and services provided and the charges for such goods and services regarding the real estate transactions of Jonathan and Sharron Edwards.

15. The amount paid by Lenders First Choice for and such goods and services relating to the named plaintiffs, Jonathan and Sharron Edwards and the "sample" of loans produced by Accredited in this litigation.

16. The identity of all third party service providers used by Lenders First Choice.

17. Accredited' compliance with all federal laws regulating consumer mortgage lending.

18. The calculation of "APR", "Amount Financed", and "Finance Charge" by Accredited on loans that it originates in general and specifically regarding the Edwards transaction and loans included in the "sample."

### DEPOSITION SUBPOENA DUCES TECUM

On behalf of Requesting Party Accredited is directed to **BRING WITH YOU** and produce at the time and place and date aforestated - certain **ORIGINAL** records, books, papers, documents, tangible things, etc., and to permit inspection and copying of designated things to be used as evidence, to-wit:

### DEFINITIONS:

2

**Hall-Frazier**
**Record - 000475**

The term documents means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation records of serial numbers, books of account, books of records, bookkeeping records, ledgers, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations, telephone calls, meetings or other invoices, worksheets, and all drafts, alternations, modifications, changes and amendments of any of the foregoing). The term document shall also include any and all other means by which information is recorded or transmitted, including but not limited to microfilms and other film records or impressions, tape recordings and other recordings used in data processing, together with the programming instructions and other written material necessary to understand or use such punch cards, computer cards or printouts, tapes or other recordings. Writings shall include, without limitation, printed, typed, or other readable papers, correspondence, memos, reports, including without limitation, contracts, drafts, both initial and subsequent, diaries, logbooks, minutes, notes, studies, surveys and forecasts.

1.  Any and all references, manuals and other writings whether in paper or electronic format regarding compliance with federal law regulating consumer mortgage lending.

2.  Any and all references, manuals and other writings whether in paper or electronic format regarding the disclosures required by the Federal Truth-in-Lending Act the calculation of. The "APR", "Amount Financed" and "Finance Charge."

3.  Any and all contracts between Lenders First Choice and Accredited.

4.  Any and all documents touching on or relating to the loan of June 12, 2006 to Jonathan and Sharron Edwards including but not limited to any instructions for closings, copies of cancelled checks, ledger entries, accounting, Truth-in-Lending disclosures and title insurance forms.

**PLEASE NOTE THAT WE ARE NOT SEEKING THE PRODUCTION OF ANY DOCUMENTS THAT ARE SUBJECT TO ATTORNEY CLIENT PRIVILEGE.**

The deposition shall be taken on the **6th day of May, 2008**, beginning at **10:30**

3

**a.m. P.D.T.** at the offices of Accredited and shall continue to completion.


Earl P. Underwood, Jr. (UNDEE6591)
Attorney for Plaintiffs
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969
251-990-5558
251-990-0626 (facsimile)
epunderwood@alalaw.com

4

**Hall-Frazier**
**Record - 000477**

## CERTIFICATE OF SERVICE

I hereby certify that a copy hereof has been personally hand-delivered or mailed, properly addressed, first class postage prepaid, to counsel of all parties or parties pro se to the addresses shown below, on this the 28th day of April, 2008.

| | |
|---|---|
| Gregory C. Cook<br>Jennifer Blair Hoover<br>Balch & Bingham<br>1710 6th Ave N<br>P.O. Box 306<br>Birmingham AL 35201-0306 | George R. Irvine, III<br>Stone, Granade & Crosby, P.C.<br>7133 Stone Dr.<br>Daphne AL 36526 |
| John T. Crowder, Jr.<br>Steven L. Nicholas<br>Cunningham, Bounds, Crowder, Brown &<br>Breedlove<br>1601 Dauphin Street<br>Mobile AL 36604 | Jeffery J. Hartley<br>Helmsing, Leach, Herlong<br>P.O. Box 2767<br>Mobile, AL 36652 |
| Kenneth J. Riemer<br>Kenneth J. Riemer, Attorney at Law<br>P.O. Box 1206<br>166 Government St.<br>Mobile AL 36633 | Kirk D. Jensen<br>Matthew P. Previn<br>Buckley Kolar LLP<br>1250 24th Street NW Ste 700<br>Washington, DC 20037 |

Earl P. Underwood, Jr.

Hall-Frazier
Record - 000478

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

EX. 2

| | |
|---|---|
| JONATHAN AND SHARRON EDWARDS, **individually and on behalf of all similarly situated individuals,** ) ) ) ) | __EXHIBIT_2 DEPO OF: _DIAZ_ DATE: _5-6-08_ ELANA K. ZUCCONI 20 pages |
| **Plaintiffs,** ) | |
| v. ) ) | **CASE NUMBER: 07-160** |
| **ACCREDITED HOME LENDERS, INC.; LENDER'S FIRST CHOICE, LENDER'S FIRST CHOICE OF ALABAMA, INC. and UNITED GENERAL TITLE INSURANCE COMPANY** ) ) ) ) ) ) | |
| **Defendants.** ) | |

## AMENDED CLASS ACTION COMPLAINT

NOW COME the Plaintiffs and as their Complaint against the above-named Defendants aver as follows:

### SUMMARY OF CLAIMS

These claims arise from a real estate loan transaction resulting in mortgage upon Plaintiffs' home in Mobile, Alabama. Specifically, Plaintiffs' claims against Defendant Accredited Home Lenders, Inc. ("Accredited") arise under the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. Plaintiffs also assert claims against Defendants Lenders' First Choice, Lender's First Choice of Alabama, Inc. (Collectively "LFC") and United General Title Insurance Company ("United"), for violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, in connection with the title insurance premiums imposed on Plaintiffs in connection with this loan. Plaintiffs assert each of their claims individually and on behalf of a class of similarly situated individuals.

## THE PARTIES

8.      Plaintiffs Jonathan and Sharron Edwards, husband and wife, are both individuals of full age of majority and are resident citizens of the State of Alabama.

9.      Defendant Accredited Home Lenders, Inc. ("Accredited"), is a California corporation which does business in Mobile County, Alabama. Defendant Accredited extends and acquires residential mortgage loans under other names, including Home Funds Direct.

10.      Defendant Lender's First Choice of Alabama, Inc. is, upon information and belief, an Alabama corporation which does business in Mobile County, Alabama. Defendant Lender's First Choice is, upon information and belief, a Florida corporation and controlling parent of Lender's First Choice of Alabama, Inc. These two defendants are collectively referred to herein as "LFC."

11.      Defendant United General Title Insurance Company ("United") is a Colorado corporation.

## FACTS

12.      On or about June 16, 2006, Plaintiffs obtained a real estate mortgage loan with Defendant Accredited, doing business as Home Funds Direct, in the amount of $65,000. Said loan was a consumer credit transaction as that term is used at 15 U.S.C. § 1635(a). Accredited is a residential real estate lender based in California.

13.      LFC acted as the closing agent for the Plaintiffs' loan and at all relevant times acted as agent for Accredited.

14.      Defendant United issued the title insurance policy underwritten in connection with the Plaintiffs' loan. At all relevant times, LFC acted as agent for United with respect to the issuance

-2-

of that policy, as well as the calculation, imposition and collection of the charge reflected on Line 1108 of Plaintiffs' HUD Settlement Statement.

15.    Plaintiffs were charged $275 for the cost of the title insurance policy issued by United through its agent, LFC. This charge is reflected on Line 1108 of the Plaintiffs' HUD Settlement Statement.

16.    The legal rate, as determined by Alabama state law, for that policy was $155.

17.    Plaintiffs were also charged $88 for "recording fees." This charge is reflected on Line 1201 of the HUD Settlement Statement. The actual cost for recording the mortgage was $53.

18.    Accredited was required to provide Plaintiffs certain disclosures pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA") and its implementing regulations, 12 C.F.R Part 226 ("Reg. Z"). Under TILA and Reg. Z, Accredited is required to clearly and conspicuously disclose the "amount financed" and the "finance charge," among other things, in connection with each loan.

19.    The TILA disclosures provided to the Plaintiffs in connection with their loan stated the total finance charge in the amount of $84,409.33.

20.    The $275 "title insurance" charge listed on Line 1108 and the $88 "recording fee" charge listed on Line 1201 of the HUD Settlement Statement were excluded from the finance charges disclosed to Plaintiffs. However, both of those charges are finance charges and should have been disclosed as such.

21.    Under TILA and Reg. Z, fees relating to title insurance and other "title charges" may be excluded from the finance charge only if such charges are *bona fide* and reasonable. Otherwise, they are finance charges and must be disclosed as such. See Reg. Z, § 226.4(c)(7).

03

22. The $275 charge imposed on Plaintiffs for title insurance premium was not *bona fide* or reasonable because that amount exceeds the amount allowed by the Alabama Department of Insurance (DOI) by at least $120 and therefore exceeds the value of the insurance provided. Pursuant to the rate filed and approved by the DOI the charge was, by operation of law, illegal, marked-up, non-*bona fide* and was, therefore, a fee incident to the extension of credit and an unearned payment for other than services performed. Also, upon information belief, the $275 charge exceeded the charge which could have been collected as a title insurance premium pursuant to the agreement between LFC and the insurance company for who it served as agent. LFC was compensated for the tasks it actually performed in connection with the issuance of the title insurance policy through other fees imposed upon the Plaintiffs, including but not limited to the closing fee ($450), "abstract" fee ($175) and the commission LFC received as title insurance agent. Therefore, the Line 1108 charge, or at least a portion thereof, constituted a charge other than a fee for services actually performed within the meaning of 12 U.S.C. § 2607(b).

23. Under TILA, charges for fees associated with the recording of mortgages may be excluded from the computation of finance charge only if the amount is the actual amount paid to the government entity. If those charges exceed the amount actually paid to record the mortgage, then they are finance charges and must be disclosed as such. 15 U.S.C. § 1605(d).

24. Upon information and belief, LFC's practice is to charge $275 as a "title insurance premium" without regard to the amount of the coverage, the amount of the loan or the actual cost of the policy. As a result, LFC engages in a pattern and practice of charging fees, ostensibly for "title insurance," which are in excess of the actual amount of the insurance and services actually performed.

-4-

25.     Upon information and belief, LFC's practice is also to charge a flat rate for "recording fee" without regard to the actual cost associated with recording the mortgage instrument.   As a result, LFC engages in a pattern and practice of charging fees, ostensibly for "recording fee," which are in excess of the actual amount of the insurance and services actually performed.   At all material times relating to the actions alleged herein, Defendant Lender's First Choice so controlled and or dominated the affairs of Defendant Lender's First Choice of Alabama, Inc., and each and every other like subsidiary lender, so that it is the alter ego of each said subsidiary, and is liable for the all of the alleged wrongful actions of each said subsidiary.

26.     The fact that the title insurance charge was marked up and exceeded the costs or value of the services actually provided or performed was unknown to Plaintiffs and members of the class. The fact that those charges were marked up, illegal, excessive and otherwise improper, was unknown to, and unknowable by, Plaintiffs and members of the class.

27.     Accredited retained a security interest in real estate which is used by Plaintiffs as their principal dwelling.

28.     Defendants were in sole possession of the information regarding the cost of the settlement services charged to borrowers, and actively misled Plaintiffs and the class by disseminating fraudulent HUD-1 settlement statements that were calculated to deceive Plaintiffs and the class regarding: 1) who was providing the services related to the abstracts and title searches; 2) how the fee for those services was truly being allocated; 3) to whom payments for recordation of mortgages was being made; and 4) in what amounts.

29.     The fact that the charges imposed on Plaintiffs for "title insurance" and "recording fees" were marked up, was unknown to, and essentially unknowable by Plaintiffs and the proposed

class members because Defendants' costs for providing or obtaining the insurance were not available to or discoverable by Plaintiffs and the proposed class members. Defendants actively deceived Plaintiffs and the class about who was providing title insurance and the fact that borrowers were being charged illegal marked-up premiums. The unknown and inherently unknowable nature of Defendants' unlawful charges did not give Plaintiffs any reason to inquire, investigate or discover Defendants' wrongdoing. As a practical reality, it was impossible for persons closing on residential loans to detect Defendants' unlawful violations.

     30.      Defendants' scheme and misconduct was, by design and in practice, inherently self-concealing. Defendants knew Plaintiffs and the proposed class members could not determine whether or not the premiums they were charged were marked up.

     31.      Plaintiffs and the proposed class members have acted with due diligence with respect to their rights. The facts that support Plaintiffs' causes of action were not knowable to Plaintiffs or proposed class members until shortly before the filing of the Complaint in this action.

     32.      Specifically, Plaintiffs reviewed all relevant loan documents and actively participated in all aspects of the loan transaction at issue but nonetheless did not discover, and could not reasonably have been expected to discover, that some of the information set forth in the HUD-1's relating to fees paid for "title insurance" and "recording fees" was false and misleading as stated above.

## COUNT I
## TILA VIOLATIONS BY ACCREDITED

     33.      Plaintiffs reallege all the preceding allegations referenced as if set out here in full.

     34.      This count asserts claims against Defendant Accredited.

     35.      Accredited is a "creditor" as that term is defined at 15 U.S.C. 1602(f).

06

36.    The disclosures issued by Accredited with respect to the Plaintiffs' loan violated the requirements of TILA and Reg. Z by failing to include in the finance charge the amount charged for "title insurance" and the amount charged for "recording fees." Both charges were payable by Plaintiffs incident to the extension of credit as required by 15 U.S.C. § 1605 and Reg. Z § 226.18. Those amounts should have been included in the finance charge disclosed to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and Accredited, and further request the following relief:

A)    Statutory damages of $2,000.00 as provided in 15 U.S.C. § 1640(a);

B)    Actual damages in an amount to be determined at trial;

C)    An award of reasonable attorney fee and costs; and

D)    Such other relief at law or equity as this Court may deem just and proper; and

E)    Such other relief at law or equity as this Court may deem just and proper.

### COUNT II
### VIOLATION OF RESPA SECTION 8(b)
### BY DEFENDANT LFC

37.    Plaintiffs reallege all the preceding allegations referenced as if set out here in full.

38.    This count asserts a claim against Defendants Lender's First Choice and Lender's First Choice of Alabama, Inc., collectively referred to herein as "LFC."

39.    Plaintiffs' loan is a federally related mortgage loan within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq.

40.    The "title insurance" charge and the "recording fee" charge paid by the Plaintiffs in connection with their loan were charges imposed in connection with the providing of a real estate

07

settlement service within the meaning of 12 U.S.C. § § 2602(3) and 2607(b), as well as 24 C.F.R. § 3500.2(b).

41.    The $275 charge imposed on Plaintiffs for title insurance premium exceeded the maximum allowed premium set by the Alabama Department of Insurance pursuant to Alabama law. Upon information and belief, the $275 charge also exceeded the charge which could have been collected as a title insurance premium pursuant to the agreement between LFC and United, for whom LFC served as agent. Therefore, the Line 1108 charge, or a portion thereof, constituted a charge other than a fee for services actually performed within the meaning of 12 U.S.C. § 2607(b).

42.    The $88 "recording fee" charge was in excess of the actual amount of the recording fee paid to the recording office and, therefore, constituted a charge other than a fee for services actually performed within the meaning of 12 U.S.C. § 2607(b).

43.    LFC violated 12 U.S.C. § 2607(b) and related federal regulations and interpretations, by giving and/or accepting a portion of charges made or received for a real estate settlement service other than for services actually rendered.

44.    In connection with Plaintiffs' loan, LFC did accept a portion, split or percentage of a charge other than for services actually performed.

WHEREFORE, Plaintiffs demand judgment against LFC for violation of Section 8(b) of RESPA awarding Plaintiffs the remedies provided under that statute, including but not limited to treble damages as provided for in 12 U.S.C. § 2607(d)(2), actual damages, attorneys fees and all costs of this litigation and all other just, general and equitable relief.

08

**COUNT III**
**VIOLATION OF RESPA SECTION 8(b)**
**BY DEFENDANT UNITED**

45. Plaintiffs reallege all the preceding allegations referenced as if set out here in full.

46. This count asserts a claim against Defendant United.

47. Plaintiffs' loan is a federally related mortgage loan within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq.

48. The "title insurance" charge paid by the Plaintiffs in connection with their loan was a charge imposed in connection with the providing of a real estate settlement service within the meaning of 12 U.S.C. § § 2602(3) and 2607(b), as well as 24 C.F.R. § 3500.2(b).

49. The $275 charge imposed on Plaintiffs for title insurance premium exceeded the maximum allowed premium set by the Alabama Department of Insurance pursuant to Alabama law applicable to the policy issued by United in connection with Plaintiffs' loan. Upon information belief, the $275 charge also exceeded the charge which could have been collected as a title insurance premium pursuant to the agreement between LFC and United, for whom LFC served as agent. Therefore, the Line 1108 charge, or a portion thereof, constituted a charge other than a fee for services actually performed within the meaning of 12 U.S.C. § 2607(b). The Line 1108 charge was split between United and LFC.

50. In connection with Plaintiffs' loan, United did accept a portion, split or percentage of a charge other than for services actually performed.

51. Defendant United violated 12 U.S.C. § 2607(b) and related federal regulations and interpretations, by giving and/or accepting a portion of charges made or received for a real estate settlement service other than for services actually rendered.

-9-

WHEREFORE, Plaintiffs demand judgment against Defendant United for violation of Section 8(b) of RESPA awarding Plaintiffs the remedies provided under that statute, including but not limited to treble damages as provided for in 12 U.S.C. § 2607(d)(2), actual damages, attorneys fees and all costs of this litigation and all other just, general and equitable relief.

## CLASS CLAIMS
### A. INTRODUCTION

52.    In addition to the individual claims asserted in the foregoing paragraphs, Plaintiffs, on behalf of borrowers similarly situated, bring the following class claims against the Defendants arising from the marking up and splitting of title insurance premiums in violation of RESPA. Because the insurance premiums charged to Plaintiffs and similarly situated borrowers also constitute violations of TILA, to the extent those charges were not disclosed as finance charges, Plaintiffs assert claims on behalf of a class of similarly situated borrowers for TILA violation.

### B.    CLASS DEFINITION - RESPA VIOLATIONS

53.    These claims are brought on behalf of residential mortgage borrowers who are described as follows:

A)    In connection with the settlement of a residential mortgage loan;

B)    As to which (1) settlement services were provided by Defendant LFC as title insurance agent, without regard to the title insurance provider; and/or (2) as to which Defendant United received any portion of a charge represented as costs of title insurance, without regard to which company acted as its agent;

C)    Involving real estate located in the State of Alabama or any other state as to which maximum title insurance rates are set by an insurance regulating body; and

-10-

D)    As to which the amount for title insurance charged, as reflected on the applicable

HUD Settlement Statement, exceeded the filed rate approved by the Alabama

Insurance Department or, for non-Alabama loans, the applicable regulating entity.

The scope of this class definition, including its temporal scope, will be further refined after

discovery of Defendants' books and records.

### C.    CLASS ALLEGATIONS - RESPA VIOLATIONS

54.    Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

55.    Defendants Lender's First Choice, Lender's First Choice of Alabama, Inc.

(collectively, "LFC") and United have engaged in a uniform, systematic pattern and practice of

charging borrowers, in connection with the settlement of a residential mortgage loan, an amount for

title insurance which exceeded the filed rate approved by the Alabama Insurance Department and/or

other regulating authorities.  Defendant Lender's First Choice implements this pattern and practice

directly and/or through subsidiaries created and controlled by Lender's First Choice to operate in the

various states in which Lender's First Choice provides settlement services, so that it is liable for the

actions of each of said subsidiaries.

56.    The identities of the class members are readily identifiable through computer records

and paper records, regularly maintained in Defendants' course of business.

57.    The Class is so numerous as to make it impracticable to bring all members of the

Class before the Court.  It is believed that the Class includes thousands of members.  In some

instances, such persons may be unaware that claims exist on their behalf.  To the extent that Class

members have knowledge of their claims, their damages are in such amounts that when taken

individually, they may be too small to justify the expense of a separate lawsuit.

-11-

11

58.    The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class. Plaintiffs were charged an amount for settlement services which included the same excessive, unearned and illegal fees imposed upon each and every Class member in connection with "title insurance" charges and "recording fee" charges charged by Defendants LFC and United.

59.    The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. Each Plaintiff's interest in this action is antagonistic to the interest of the Defendants, and each will vigorously pursue the claim of the Class.

60.    The representative Plaintiffs have retained counsel who are competent and experienced in consumer fraud class action litigation, and have successfully represented consumers in complex class actions.

61.    Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

62.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include, but are not limited to, the following:

a)    Did Defendants LFC and United mark-up the costs of settlement services, recording fees and/or title insurance without themselves providing actual, necessary, and distinct services in violation of RESPA?

b)    What measure of damages is appropriate?

c)    What declaratory or injunctive relief is appropriate?

-12-

12

63.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the class are identical and will require evidentiary proof of the same kind and application of the same law.

64.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed class members to prosecute their claims individually. Trial of Plaintiffs' claims is manageable. Unless a class is certified, Defendants will retain excessive and unearned fees improperly accepted from class members.

65.    Unless a class-wide injunction is issued, Defendants may continue to commit violations against residential mortgage borrowers.

**COUNT IV**
**CLASS CLAIM FOR VIOLATIONS OF RESPA - SECTION 8(b)**

66.    Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

67.    Plaintiffs assert the allegations and claims set out in Counts II and III above on behalf of the class of similarly situated borrowers as described above in Paragraph 53.

WHEREFORE, Plaintiffs for themselves and on behalf of the class of borrowers described above, demand judgment be entered against Defendants Lender's First Choice and Lender's First Choice of Alabama, Inc. and the following relief:

A)    An order certifying that this action may be maintained as a class action, as defined above, under Fed.R.Civ.R. 23(a) and 23(b)(3);

B)    An order appointing Plaintiffs as representatives of the class;

-13-

13

C)    An order appointing the undersigned counsel as class counsel pursuant to Fed.R.Civ.R. 23;

D)    An order directing that reasonable notice of the class action be provided to all members of the class at the appropriate time;

E)    For violating RESPA, an order and judgment finding that the Defendants are liable as a matter of law to each member of the class for treble damages as provided pursuant to 12 U.S.C. § 2607(d)(2);

F)    Declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein;

G)    An award of reasonable attorneys' fees as provided by law and statute;

H)    An award of pre-and-post judgment interest as provided by law in an amount according to proof at trial;

I)    All other relief prayed for in Counts II and III if not specifically described herein;

J)    An award of costs and expenses incurred in this action; and

K)    An award for such other relief as the court may deem just and proper.

## D.    CLASS DEFINITION - TILA VIOLATIONS

68.    These claims are brought on behalf of residential mortgage borrowers who:

A.    In connection with the settlement of a residential mortgage loan;

B.    As to which the original creditor was Defendant Accredited;

B.    Involving real estate located in the State of Alabama;

C.    Were charged an amount for title insurance, as reflected on the applicable HUD Settlement Statement, which exceeded the filed rate approved by the Alabama

-14-

Insurance and/or were charged an amount for "recording fees" which exceeded the actual amount paid to record the mortgage; and

D.    In connection with the loan either said charge for "title insurance" or "recording fee" was not included in the finance charge disclosed by Accredited.

The scope of this class definition, including its temporal scope, will be further refined after discovery of Defendant's books and records.

### E.    CLASS ALLEGATIONS - TILA VIOLATIONS

69.    Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

70.    Defendant Accredited has engaged in a uniform, systematic pattern and practice of charging borrowers, in connection with the settlement of a residential mortgage loan, (1) an amount for "title insurance" which exceeded the value of the services as established by the filed rate approved by the Alabama Insurance Department and/or other regulating authorities, and/or the agreement between the title insurer and its agent; and (2) an amount for "recording fees" in excess of the actual cost of recording the mortgage instrument.

71.    Upon information and belief, Defendant Accredited fails to disclose the "title insurance" fee as a finance charge on each of the loans it extends as to which the borrower is charged an amount for title insurance.

72.    Defendant Accredited also fails to disclose the "recording fee" charge as a finance charge on each of the loans it extends as to which the borrower is charged an amount for title insurance.

73.    The identities of the class members are readily identifiable through computer records and paper records, regularly maintained in Defendants' course of business.

-15-

74.    The Class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed that the Class includes thousands of members. In some instances, such persons may be unaware that claims exist on their behalf. To the extent that Class members have knowledge of their claims, their damages are in such amounts that when taken individually, they may be too small to justify the expense of a separate lawsuit.

75.    The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class. Plaintiffs were charged an amount for settlement services which included the same excessive, unearned and illegal fees imposed upon each and every Class member in connection with title insurance premiums paid.

76.    The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. Each Plaintiff is aware that he cannot settle this action without Court approval. Each Plaintiff's interest in this action is antagonistic to the interest of the Defendant, and each will vigorously pursue the claim of the Class.

77.    The representative Plaintiffs have retained counsel who are competent and experienced in consumer fraud class action litigation, and have successfully represented consumers in complex class actions. Counsel have agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court.

78.    Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

79.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include:

-16-

a)    Were the charges imposed for "title insurance" and for "recording fees" finance charges within the meaning of TILA and its implementing regulations;

b)    If so, did Defendant Accredited fail to properly disclose either of those charges as a finance charge;

c)    Is the TILA violation apparent on the face of the loan documents?

d)    What measure of damages is appropriate?

e)    What declaratory or injunctive relief is appropriate?

80.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the class are identical and will require evidentiary proof of the same kind and application of the same law.

81.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed class members to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

82.    Unless a class-wide injunction is issued, Defendant may continue to commit violations against residential mortgage borrowers.

83.    The representative Plaintiffs will seek to identify all class members through discovery as may be appropriate and will provide to the class such notice of this action as the Court may direct.

**COUNT V**
**CLASS CLAIM FOR VIOLATIONS OF TILA**

84.    Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

85.    Plaintiffs assert the allegations and claims set out in Count I above on be half of the class of similarly situated borrowers as described in Paragraph 68 above.

-17-

WHEREFORE, Plaintiffs for themselves and on behalf of the class of borrowers described above, demand judgment be entered against Defendant Accredited as to all class members and award the following relief:

A)      An order certifying that this action may be maintained as a class action, as defined above, under Fed.R.Civ.R. 23(a) and 23(b)(3);

B)      An order appointing Plaintiffs as representatives of the class;

C)      An order appointing the undersigned counsel as class counsel pursuant to Fed.R.Civ.R. 23;

D)      An order directing that reasonable notice of the class action be provided to all members of the class at the appropriate time;

E)      For violating TILA, an order and judgment finding that the Defendants are liable as a matter of law to each member of the class for treble damages as provided pursuant to 15 U.S.C. § 1640(a);

F)      Declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein;

G)      An award of reasonable attorneys' fees as provided by law and statute;

H)      An award of pre-and-post judgment interest as provided by law in an amount according to proof at trial;

I)      All other relief prayed for in Count I if not specifically described herein;

J)      An award of costs and expenses incurred in this action; and

K)      An award for such other relief as the court may deem just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

-18-

18

CUNNINGHAM, BOUNDS, CROWDER,
BROWN AND BREEDLOVE, L.L.C.
Post Office Box 66705
Mobile, Alabama 36660
(251) 471-6191


STEVEN L. NICHOLAS (NICHS2021)
One of the Attorneys for Plaintiffs


KENNETH J. RIEMER  (RIEMK8712)
One of the Attorneys for Plaintiffs
Post Office Box 1206
Mobile, Alabama 36633-1206
Telephone:   (251)  432-9212
Facsimile:    (251)  433-7172


EARL P. UNDERWOOD, JR.  (UNDEE6591)  (By KJR w/par.)
One of the Attorneys for Plaintiffs
Post Office Box 969
Fairhope, Alabama 36533
Telephone:   (251)  990-5558
Facsimile:    (251)  990-0626


GEORGE R. IRVINE, III  (IRVIG4725)  (By KJR w/par.)
One of the Attorneys for Plaintiffs


OF COUNSEL:

STONE, GRANADE and CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama  36526
(251) 626-6696

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record

s/Kenneth J. Riemer
KENNETH J. RIEMER  (RIEMK8712)

**DEFENDANTS LENDER'S FIRST CHOICE, LENDER'S FIRST CHOICE AGENCY OF ALABAMA, INC. AND UNITED GENERAL TITLE INSURANCE COMPANY SERVED BY CERTIFIED MAIL AT THE FOLLOWING ADDRESSES:**

Lender's First Choice
3850 Royal Avenue
Simi Valley, CA 93063

Lender's First Choice Agency of Alabama, Inc.
c/o The Corporation Company
2000 Interstate Park Dr., Ste 204
Montgomery, AL 36109

United General Title Insurance Agency
c/o John Matthews, Reg. Agent
2000 Interstate Pk, Suite 204
Montgomery, AL 36109

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

# EX 3

JONATHAN and SHARON EDWARDS,
individually and on behalf of all similarly
situated individuals,

        Plaintiffs,

        v.

ACCREDITED HOME LENDERS, INC.,
et al.,

        Defendants.

Case No. 07-160

___EXHIBIT _3_
DEPO OF: _Diaz_
DATE: _5-6-08_
ELANA K. ZUCCONI
_13 pages_

---

**DEFENDANT, ACCREDITED HOME LENDERS, INC'S.**
**ANSWER TO AMENDED CLASS ACTION COMPLAINT**

    Defendant Accredited Home Lenders, Inc. ("Accredited"), by way of its Answer

to Plaintiffs' Amended Class Action Complaint ("Complaint"), states as follows:

**FIRST DEFENSE**

**"SUMMARY OF CLAIMS"**

    1.    With respect to the first, second, and fourth sentences of the Summary of

Claims, Accredited admits that Plaintiffs' claims arise from a real estate loan transaction

and that Plaintiffs purport to bring a claim against Accredited under the Truth in Lending

Act ("TILA"), but Accredited denies that it is liable under TILA and denies that a class

should be certified in this case. The allegations in the third sentence of this paragraph do

not concern Accredited and, therefore, do not require a response; to the extent a response

is required, Accredited denies the allegations.

    2.    [Omitted because the Complaint does not contain a paragraph 2.]

3.    [Omitted because the Complaint does not contain a paragraph 3.]

4.    [Omitted because the Complaint does not contain a paragraph 4.]

5.    [Omitted because the Complaint does not contain a paragraph 5.]

6.    [Omitted because the Complaint does not contain a paragraph 6.]

7.    [Omitted because the Complaint does not contain a paragraph 7.]

**"THE PARTIES"**

8.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 8.

9.    Admitted.

10.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations paragraph 10.

11.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 11.

**"FACTS"**

12.    Accredited admits that Plaintiffs obtained a real estate mortgage loan in the amount of $65,000 with Accredited, doing business as Home Funds Direct, but states that such loan closed on June 12, 2006. Accredited admits that it is a real estate lender based in California. Accredited denies the remaining allegations in paragraph 12.

13.    Accredited admits that LFC acted as the closing agent for the Plaintiffs' loan, but denies that LFC is generally an agent for Accredited.

14.    Accredited admits the allegations in the first sentence of paragraph 14. For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in the second sentence of paragraph 14.

2

02

15.    Admitted.

16.    The allegations in paragraph 16 are conclusions of law that require no response and they are vague as to what statute, law and/or regulation was allegedly violated, but to the extent a response is required, they are denied.

17.    Accredited admits the allegations in the first and second sentences of paragraph 17. For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in the third sentence of paragraph 17.

18.    Admitted.

19.    Admitted.

20.    Accredited admits that the $275 title insurance fee and the $88 recording fee were excluded from the finance charges disclosed to Plaintiffs, but denies that these were finance charges and denies that they should have been disclosed as finance charges.

21.    The allegations in paragraph 21 are conclusions of law that require no response.

22.    Accredited denies that the charge for title insurance premium was not bona fide or reasonable. Because this allegation is vague as to what law, statute and/or regulation was allegedly violated, and for a general lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the remaining allegations in paragraph 22.

23.    The allegations in paragraph 23 are conclusions of law that require no response. To the extent a response is required, Accredited denies the allegations.

24.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 24.

3

03

25.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 25.

26.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 26.

27.    Accredited admits that it has a security interest in the property that secured the loan at issue in this lawsuit, but is without knowledge or information sufficient to form a belief as to the truth of the allegation that the Plaintiffs use this property as their principal dwelling.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Accredited lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiffs reviewed all loan documents and actively participated in all aspects of the loan transaction, and therefore denies the allegation. Accredited denies the remaining allegations and specifically denies that the HUD-1 was false or misleading.

### "COUNT I"
### "TILA VIOLATIONS BY ACCREDITED"

33.    Accredited hereby incorporates its responses to paragraphs 1 through 32.

34.    Accredited admits that Plaintiffs purport to bring this count against Accredited.

35.    Admitted.

36.    Denied.

4

With respect to the prayer for relief set forth following paragraph 36,

Accredited denies that Plaintiffs are entitled to the requested relief.

## "COUNT II"
## "VIOLATION OF RESPA SECTION 8(b) BY DEFENDANT LFC"

37.     Accredited hereby incorporates its responses to paragraphs 1 through 36.

38.     Accredited admits that Plaintiffs purport to bring this count against Lender's First Choice and Lender's First Choice of Alabama.

39.     The allegations in paragraph 39 are conclusions of law that require no response.

40.     The allegations in paragraph 40 are conclusions of law that require no response, but to the extent a response is required, they are denied.

41.     The allegations in the first and third sentences of paragraph 41 are conclusions of law that require no response, but to the extent a response is required, they are denied. For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in the second sentence of paragraph 41.

42.     For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 42.

43.     The allegations in paragraph 43 are conclusions of law that require no response, but to the extent a response is required, they are denied.

44.     For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 44.

With respect to the prayer for relief set forth following paragraph 44, Accredited states that no response is required because the prayer does not seek relief

05

against Accredited. To the extent a response is required, Accredited denies that Plaintiffs are entitled to the requested relief.

**"COUNT III"**

**"VIOLATION OF RESPA SECTION 8(b) BY DEFENDANT UNITED"**

45.    Accredited hereby incorporates its responses to paragraphs 1 through 44.

46.    Accredited admits that Plaintiffs purport to bring this count against United.

47.    The allegations in paragraph 47 are conclusions of law that require no response.

48.    The allegations in paragraph 48 are conclusions of law that require no response, but to the extent a response is required, they are denied.

49.    The allegations in the first and third sentences of paragraph 41 are conclusions of law that require no response, but to the extent a response is required, they are denied. For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in the second and fourth sentences of paragraph 49.

50.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 50.

51.    The allegations in paragraph 51 are conclusions of law that require no response, but to the extent a response is required, they are denied.

With respect to the prayer for relief set forth following paragraph 51, Accredited states that no response is required because the prayer does not seek relief against Accredited. To the extent a response is required, Accredited denies that Plaintiffs are entitled to the requested relief.

06

## "CLASS CLAIMS"

52.    Accredited admits that Plaintiffs purport to bring claims on behalf of a class or classes of borrowers, but denies that any class certification is appropriate in this case. Accredited also denies that it violated the Real Estate Settlement Procedures Act or TILA.

53.    Accredited admits that Plaintiffs purport to bring claims on behalf of a class of borrowers, but denies that any class certification is appropriate in this case.

54.    Accredited hereby incorporates its responses to paragraphs 1 through 54.

55.    For lack of knowledge or information sufficient to form a belief as to their truth, Accredited denies the allegations in paragraph 55. Accredited specifically denies that class certification is appropriate in this case.

56.    Denied.

57.    Denied.

58.    Denied.

59.    Denied.

60.    Denied.

61.    Denied.

62.    Denied.

63.    Denied.

64.    Denied.

65.    Denied.

## "COUNT IV"
## "CLASS CLAIM FOR VIOLATIONS OF RESPA – SECTION 8(b)"

66.    Accredited hereby incorporates its responses to paragraphs 1 through 65.

07

67.    Accredited admits that Plaintiffs purport to bring claims on behalf of a class of borrowers, but denies that any class certification is appropriate in this case.

With respect to the prayer for relief set forth following paragraph 67, Accredited states that no response is required because the prayer does not seek relief against Accredited. To the extent a response is required, Accredited denies that Plaintiffs are entitled to the requested relief.

68.    Accredited admits that Plaintiffs purport to bring claims on behalf of a class of borrowers, but denies that class certification is appropriate in this case.

69.    Accredited hereby incorporates its responses to paragraphs 1 through 68.

70.    Denied.

71.    Accredited admits that the $275 title insurance fee was excluded from the finance charge disclosed to Plaintiffs, but denies that it was a finance charge and denies that it should have been disclosed as a finance charge. Accredited denies the remaining allegations in paragraph 71.

72.    Accredited admits that the $88 recording fee was excluded from the finance charge disclosed to Plaintiffs, but denies that it was a finance charge and denies that it should have been disclosed as a finance charge. Accredited denies the remaining allegations in paragraph 72.

73.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

8

78.    Denied.

79.    Denied.

80.    Denied.

81.    Denied.

82.    Denied.

83.    Denied.

84.    Accredited denies that class certification is appropriate in this case and denies that notice to the putative class will be appropriate or necessary.

## "COUNT V"
## "CLASS CLAIM FOR VIOLATIONS OF TILA"

85.    Accredited hereby incorporates its responses to paragraphs 1 through 83.

86.    Accredited admits that Plaintiffs purport to bring claims on behalf of a class of borrowers, but denies that class certification is appropriate in this case.

With respect to the prayer for relief set forth following paragraph 85, Accredited denies that Plaintiffs are entitled to the requested relief.

With respect to the jury demand, Accredited denies that Plaintiffs or the putative class are entitled to a trial by jury as to some or all of the claims made in their Complaint

## SECOND DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## THIRD DEFENSE

This Court lacks subject matter and personal jurisdiction and venue over some or all of the persons and claims of the putative class.

09

## FOURTH DEFENSE

Plaintiffs' Complaint is barred by reason of Accredited's compliance with all applicable statutes, laws, and regulations.

## FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of unclean hands, waiver, unjust enrichment, accord and satisfaction, ratification, compromise, release, voluntary payment and/or other equitable doctrines or concepts.

## SIXTH DEFENSE

Plaintiffs' claims are barred because Accredited acted in good faith, at all times.

## SEVENTH DEFENSE

The claims of Plaintiffs and putative class members are barred, in whole or in part, by the applicable statutes of limitation and/or by laches.

## EIGHTH DEFENSE

Some or all of the claims raised by the Plaintiffs or on behalf of the putative class are barred by principles of estoppel, *res judicata*, collateral estoppel, release, claim preclusion, waiver and/or similar doctrines or concepts.

## NINTH DEFENSE

The claims of Plaintiffs and putative class members are barred under TILA's "tolerances for accuracy," 15 U.S.C. § 1605(f).

## TENTH DEFENSE

The claims of Plaintiffs or putative class members are barred, in whole or in part, to the extent that any arbitration agreements govern their loans with Accredited.

10

### ELEVENTH DEFENSE

Accredited has engaged in no conduct entitling Plaintiffs to attorneys' fees.

### TWELFTH DEFENSE

Any injury or damage to Plaintiffs and/or putative class members is offset by amounts owed by them to Accredited and/or its successors or assigns.

### THIRTEENTH DEFENSE

Plaintiffs' request for treble damages, punitive damages and/or sanctions is not allowed statutorily or pursuant to applicable regulation, and any actual amounts awarded are barred or limited by the Constitution of the State of Alabama and the United States.

### FOURTEENTH DEFENSE

This case may not be certified as a class action pursuant to Federal Rule of Civil Procedure 23.

### FIFTEENTH DEFENSE

Accredited hereby gives notice that it intends to and will rely upon all defenses that it may have as to any of the absent members of the putative class if a class is certified.

### SIXTEENTH DEFENSE

Accredited reserves the right to assert counterclaims against any of the absent members of the putative class if a class is certified in order to preserve its rights.

### SEVENTEENTH DEFENSE

Accredited is not liable or responsible for any of the alleged acts or omissions of the other defendants in this case.

Case 1:07-cv-00160-C     Document 12     Filed 04/23/2007     Page 12 of 13

**EIGHTEENTH DEFENSE**

Accredited hereby gives notice that it intends to and will rely upon such other and further defenses as may become apparent during the course of this action.  Accredited states that its investigation continues.

WHEREFORE, Accredited prays that the Complaint and every claim therein against it be dismissed with prejudice, that judgment be entered in Accredited's favor in all respects, and that Accredited be awarded its costs, expenses, attorney's fees, and such other relief in Accredited's favor as the Court may deem equitable and just.

/s/ Jeffery J. Hartley
HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama  36652
Telephone (251) 432-5521
Facsimile (251) 432-0633
Email:  jjh@helmsinglaw.com

Matthew P. Previn (pro hac vice pending)
Kirk D. Jensen (pro hac vice pending)
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
Tel.:  (202) 349-8000
Fax:  (202) 349-8080
Email:  mprevin@buckleykolar.com
        kjensen@buckleykolar.com

*Attorneys for Defendant Accredited Home Lenders, Inc*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of April, 2007, I have served a copy of the foregoing document on the following, either electronically or by placing same in the U.S. Mail, postage prepaid and properly addressed as follows:

Earl P. Underwood
P.O. Box 969
Fairhope, Alabama 36533-0969

George R. Irvine, III
7133 Stone Drive
Daphne, Alabama 36526

Kenneth J. Riemer
166 Government Street, Suite 100
Mobile, Alabama 36602

Steven L. Nicholas
Cunningham, Bounds, Crowder,
        Brown & Breedlove, LLC
Post Office Box 66705
Mobile, Alabama 36660-6705

/s/Jeffery J. Hartley
Jeffery J. Hartley

13

Hall-Frazier
Record - 000511

___EXHIBIT_ *4*
DEPO OF:___*DIAZ*___
DATE:___*5-6-08*___
ELANA K. ZUCCONI
*80 pages*

# EX 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| JONATHAN AND SHARRON EDWARDS, individually and on behalf of all similarly situated individuals<br><br>Plaintiffs,<br><br>v.<br><br>ACCREDITED HOME LENDERS, INC.; LENDER'S FIRST CHOICE AGENCY, INC.; and LENDERS FIRST CHOICE AGENCY OF ALABAMA, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No: 07-160-KD-C<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT ACCREDITED HOME LENDERS, INC.'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Accredited Home Lenders, Inc. ("Accredited" or "Defendant"), by and through its undersigned attorneys, hereby provides the following responses to Plaintiffs' First Set of Interrogatories and Request for Production of Documents to Accredited:

## GENERAL OBJECTIONS

1.    Defendant objects to the Interrogatories and to the "Instructions" preceding the Interrogatories as unduly burdensome to the extent that they purport to impose obligations in addition to those imposed by the Federal Rules of Civil Procedure and this Court's Local Rules. In particular, but without limitation, Defendant objects to each Interrogatory that requests the production of documents. In addition to being outside the scope of Fed. R. Civ. P. 33, such requests are an improper attempt to circumvent the limitation on documents requests.

2.    Defendant objects to the "Instructions" preceding the Interrogatories to the extent they include definitions that are overbroad, mischaracterize or inaccurately define certain terms, or require Defendant to make a legal conclusion.

3.    Defendant objects to each Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond the scope of this litigation.

4.    Defendant objects to each Interrogatory to the extent it expressly or impliedly seeks information protected by the attorney-client privilege, the work product doctrine, self-analysis privilege, joint defense or common interest privilege, or any other applicable privilege or similar reason for non-production.  Inadvertent disclosure of privileged information is not intended to be, and may not be construed as, a waiver of any applicable privilege.

5.    Defendant objects to each Interrogatory to the extent it seeks information (i) that is not within Defendant's possession, custody, or control; or (ii) that is within the possession, custody, or control of corporate affiliates of Defendant that are not controlled by Defendant; or (iii) that is in the possession, custody, or control of Defendant's attorneys or former attorneys; or (iv) that is in the possession, custody, or control of or concern the activities of subservicers, of predecessor or successor servicers or subservicers, of master servicers for whom Defendant provided subservicing, or of investors on the loans at issue.

6.    Defendant objects to each Interrogatory to the extent that it would require Defendant to search for and/or provide information from individual loan files (other than those concerning Plaintiffs' loans that Defendant understands to be at issue in this case),

2

Hall-Frazier
Record - 000513

invoices, or payment records, or to provide answers about individual loans (other than

Plaintiffs' loans) as overbroad, unduly burdensome, and neither relevant nor reasonably

calculated to lead to the discovery of admissible evidence, and as premature, because no

class has been certified in this case.

7.    Defendant objects to each Interrogatory to the extent it expressly or

impliedly seeks information concerning the name, address, or other personal or financial

information relating to Defendant's customers (other than Plaintiffs).  Such documents

and information are protected from disclosure and will only be produced pursuant to an

appropriate protective order, where such production would be otherwise consistent with

applicable federal and state law (see, e.g., 15 U.S.C. § 6802(a)).

8.    Defendant objects to each Interrogatory to the extent it seeks information

about fees or charges not of the type charged to or paid by Plaintiffs, on the grounds that

such discovery is overly broad, unduly burdensome, and not likely to lead to the

discovery of evidence admissible in this case.

9.    By making these responses, Defendant does not concede that the

information given is properly discoverable or admissible.  To the contrary, Defendant

reserves the right to object to further discovery regarding the subject matter of the

Interrogatories and to object to the introduction into evidence of statements made and

documents produced in response to these Interrogatories.

10.    Each of Defendant's responses to these Interrogatories is made to the best

of Defendant's knowledge at the present time, based upon its investigation to date.

Where appropriate, Defendant's responses are made upon information and belief based

on that investigation.  Defendant states that its investigation is ongoing and Defendant

3

03

Hall-Frazier
Record - 000514

specifically reserves the right to supplement and amend these responses when and if it becomes necessary.

11.    These General Objections are incorporated into each of the specific responses to these Interrogatories and shall be deemed continuing as to each Interrogatory, and are not waived, or in any way limited by the specific responses.

## INTERROGATORIES

1.    Identify each person or persons participating in the preparation of these your answers to these interrogatories giving their full name address and job title.

**RESPONSE:**

Accredited objects to this Interrogatory to this interrogatory to the extent that it seeks information protected from disclosure by the attorney-client and/or work product doctrines. Subject to and without waiver of this objection, Accredited states that various individuals in its Legal Department participated in the preparation of these interrogatory responses.

2    Identify by borrowers' name, property address and date of closing, the loans originated by you as lender which were closed from the period June 16, 2001 to present.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome. The Interrogatory is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information specific to individual borrowers other than the named plaintiffs,

4

although no class has been certified. Additionally, this Interrogatory seeks information about borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint. That this litigation has been pleaded as a putative class action does not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

Accredited also objects to this Interrogatory on the grounds that it seeks disclosure of "nonpublic personal information" of third-party consumers that is protected from disclosure under the Gramm-Leach-Bliley Act, 15 U.S.C. § 1608 et seq. and consumers' general right to privacy.

Subject to and without waiver of these and all General Objections, Accredited states that is has already produced the loan files for the mortgage taken by the named Plaintiffs in this action. See AHL 00001 – 00228.

3.    Identify each and every settlement service provider that has closed loans for you during the period June 16, 2001 to present, giving their full name and address.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome. The Interrogatory is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information specific to individual borrowers other than the named plaintiffs, although no class has been certified. Additionally, this Interrogatory seeks information about borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint. That this litigation has been pleaded as a putative class action does

5

not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

Subject to and without waiver of these and all General Objections, Accredited will identify the names and addresses of the settlement companies that have closed loans for Accredited in Alabama during the period of March 1, 2006 to December 31, 2007. See AHL 00243 - 00255.

4    Identify and describe each and every audit, valuation, study or examination performed by you or on your behalf regarding the services provided by all the service providers listed in response to the preceding interrogatory.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague and ambiguous., Accredited further objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome.  Subject to and without waiver of these and all General Objections, Accredited states that it does not generally perform audits, valuations, studies or examinations of settlement companies.

5.    As to each settlement service provider listed in response to interrogatory Number 3 state the number of loans closed for you by each during each of the years 2001, 2002, 2003, 2004, 2004, 2006 and 2007.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome. The Interrogatory is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it

6

seeks information about borrowers other than the named plaintiffs, although no class has

been certified. Additionally, this Interrogatory seeks information about borrowers

outside the scope of the proposed class defined in the Amended Class Action Complaint.

That this litigation has been pleaded as a putative class action does not allow Plaintiffs to

cast the discovery net to allow a fishing expedition in search of additional potential

plaintiffs or claims that could be brought.

Subject to and without waiver of these and all General Objections, Accredited

will identify the number of loans closed for Accredited by each settlement company that

has closed a loan for Accredited in Alabama during the period of March 1, 2006 to

December 31, 2007. See AHL 00243 - 00255.

6.    Identify each and every person whom you expect to call as an expert

witness at the trial of this case and state the subject matter on which each is expected to

testify, the substance of the facts and opinions to which each expert is expected to testify,

and a summary of the grounds for each opinion.

**RESPONSE:**

Accredited has not yet determined whether to call an expert witness to testify at

the trial of this case. Accredited reserves the right to call any expert to testify

affirmatively or to rebut any expert report or testimony offered by Plaintiffs.

7.    Identify (by insurer, agent and policy number) each and every insurance

agreement under which any person carrying on an insurance business may be liable to

provided a defense or to satisfy part or all of a judgment which may be entered against

you on the claims asserted in this action or to indemnify or reimburse you for payments

07

made to satisfy any judgment which may be obtained on the claims asserted in this lawsuit.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is incomprehensible. Subject to and without waiver of this and all General Objections, Accredited states that, at this time, it is not aware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part of all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment. Accredited reserves the right to supplement this response in the future should it become necessary.

8.    State the number of loans originated by you as lender during each of the last ten (10) years preceding the filing of this action.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome. The Interrogatory is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information about loans other than those of the named plaintiffs, although no class has been certified. Additionally, this Interrogatory seeks information related to borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint. That this litigation has been pleaded as a putative class action does not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

8

Subject to and without waiver of these and all General Objections, Accredited has originated 1178 mortgage loans in the State of Alabama during the period of March 1, 2006 to December 31, 2007.

9.    Identify the states in which loans originated by you as lender were closed within the last ten (10) years prior to the filing of this action.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome. The Interrogatory is not appropriately limited geographically or temporally -- the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information about loans other than those of the named plaintiffs, although no class has been certified. Additionally, this Interrogatory seeks information related to borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint. That this litigation has been pleaded as a putative class action does not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

Subject to and without waiver of these and all General Objections, Accredited has originated mortgage loans in all fifty states and the District of Columbia during the period of March 1, 2006 to December 31, 2007.

10.    Identify all actions taken by you in connection with the closing of the Edwards Loan to ensure compliance [sic] federal and state lending laws.

9

09

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague and ambiguous. Subject to and without waiver of these and all General Objections, Accredited states that after a loan is accepted for funding, the application is sent to the processing department to conduct an initial underwriting review and preliminary risk analysis. The potential loan is then reviewed by the corporate underwriting department, which conducts a further risk analysis and also conducts quality control regarding, for example, the fees scheduled to be imposed. The corporate underwriting department then forwards the file to the documents/funding department, which prepares the closing documents and reviews the loan for compliance with certain federal and state laws. After the loan closes, the loan is reviewed yet again in a post-closing audit.

11.    Identify all persons employed or consulted by you, within the last ten (10) years prior to the filing of this action, who were responsible for monitoring, evaluating or ensuring compliance with federal and state lending laws and regulations.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague and ambiguous. Accredited further objects on the grounds that it is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Accredited further objects on the grounds that it calls for information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiver of these and all General Objections, Accredited's Legal and Compliance Departments are responsible for ensuring that loans are made in compliance with federal and state lending laws and regulations. The following persons are Accredited lawyers

10

10

Hall-Frazier
Record - 000521

11

12

**Hall-Frazier**
**Record - 000523**

13

Hall-Frazier

Record - 000524

14

15

1 6

1 7

**Hall-Frazier**
**Record - 000528**

and compliance officers responsible for monitoring, evaluating or ensuring compliance with federal and state lending laws and regulations: Mark Solomon (Regulatory Compliance Manager), MJ Moran (Regulatory Compliance Counsel), David Hertzel (General Counsel).

12.    Identify each and every employee, agent, servant or independent contractor with, or whom you believe has any knowledge of the services rendered in connection with the origination and/or the closing of the Edwards Loan. In your answer give the full name, last known address and phone number of each person identified and state whether the person identified is currently employed by you.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague and ambiguous. Subject to and without waiver of these and all General Objections, Accredited states that the following persons may have discoverable information regarding the origination and/or closing of the plaintiffs' loan: Nick Skrabo (Loan Officer), Corina Blaylock (Loan Specialist), Jack Byram (Underwriter), Ernie Martin (Branch Credit Manager), Laura Osborne (Documents and Funding Manager) and Gavin Brady (Site Director). None of these individuals is currently employed by Accredited.

13.    Identify each and every individual whom you believe has any knowledge regarding the assessment of the charges and fees reflected on the Settlement Statement generated in connection with the Edwards Loan, a copy of which are attached hereto as Exhibits "A" (hereinafter referred to as the "Settlement Statement"). In your answer give the full name, last known address and phone number of each person identified and state whether the person identified is currently employed by you.

11

18

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague and ambiguous. Subject to and without waiver of these and all General Objections, Accredited states that the following persons may have discoverable information regarding the assessment of the charges and fees reflected on Plaintiffs' Settlement Statement: Nick Skrabo (Loan Officer), Corina Blaylock (Loan Specialist), Jack Byram (Underwriter), Ernie Martin (Branch Credit Manager), Laura Osborne (Documents and Funding Manager). None of these individuals is currently employed by Accredited.

14.     Identify each and [sic] person or entity who received compensation, in any form whatsoever paid, in connection with the closing of the Edwards Loan. As to each person or entity, state the following:

(A)     the amounts paid in connection with the settlement of Edwards Loan;

(B)     The services or goods, in any, rendered in exchange for each charge:

(C)     Identify the check or other form of payment made;

(D)     As to any checks written to such person or entity, stat the date of the check, the amount, and identify the account from which each check was written;

(E)     The name and address of the entity to which the payment was made; and

(F)     The goods or services, if any, rendered in exchange for each payment.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague and ambiguous. Subject to and without waiver of these and all General Objections, Accredited states that certain compensation was paid to Accredited employees, such as

12

19

the loan officer, in connection with the closing of the Edwards Loan. With respect to

payments made to third parties, such payments are reflected on the Plaintiffs' Settlement

Statement.

15.    Identify each and every documents received by you relating to the

Edwards Loan.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague and

ambiguous. Subject to and without waiver of these and all General Objections,

Accredited states that it has previously produced the Edwards' loan file, which includes

the loan application.

16.    List the assignee(s) of the Edwards Loan, giving them full names and

addresses of said entities.

**RESPONSE:**

The loan was sold to IXIS Real Estate Capital, Inc. on August 18, 2006.


**REQUESTS FOR PRODUCTION OF DOCUMENTS**

1    Any and all correspondence, contracts, draft contracts or documents,

whether in paper of electronic format, exchanged between you, any other party herein

and any of your agents or employees touching on or related to the subject matter of this

suit. (We are not seeking anything anywhere herein that is subject to attorney-client

privilege. We do, however, request a log of such materials in which a privilege is being

claimed pursuant to FRCP 26(b)(5).)

20

**RESPONSE:**

Accredited objects to this request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. Accredited does not understand what documents Plaintiffs are requesting. Accredited will attempt to comply with this request upon Plaintiffs' counsel's clarification of the request.

2.     Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment and all correspondence with said insurers regarding this suit of coverage for the claims made herein.

**RESPONSE:**

Accredited objects to this request on the grounds that it has previously indicated (in its Initial Disclosures) that it is not aware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part of all of a judgment which may be entered in this action or to indemnify or reimburse for payment made to satisfy the judgment.

3.     Loan files and other documents relating to the loans originated by you for the period June 16, 2001 to present.

**RESPONSE:**

Accredited objects to this request on the grounds that it is overbroad and unduly burdensome. The request is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks

14

21

information specific to individual borrowers other than the named plaintiffs, although no class has been certified. Additionally, this request seeks information about borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint. That this litigation has been pleaded as a putative class action does not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

Accredited also objects to this request on the grounds that it seeks disclosure of "nonpublic personal information" of third-party consumers that is protected from disclosure under the Gramm-Leach-Bliley Act, 15 U.S.C. § 1608 et seq. and consumers' general right to privacy.

Subject to and without waiver of these and all General Objections, Accredited states that is has already produced the loan files for the mortgage taken by the named Plaintiffs in this action. See AHL 00001 – 00228.

4.    Any and all documents, in any form, which identifies the borrower for loans originated by you for the period June 16, 2001 to present.

**RESPONSE:**

Accredited objects to this request on the grounds that it is overbroad and unduly burdensome. The request is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information specific to individual borrowers other than the named plaintiffs, although no class has been certified. Additionally, this request seeks information about borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint.

15

Hall-Frazier
Record - 000533

That this litigation has been pleaded as a putative class action does not allow Plaintiffs to

cast the discovery net to allow a fishing expedition in search of additional potential

plaintiffs or claims that could be brought.

Accredited also objects to this request on the grounds that it seeks disclosure of

"nonpublic personal information" of third-party consumers that is protected from

disclosure under the Gramm-Leach-Bliley Act, 15 U.S.C. § 1608 et seq. and consumers'

general right to privacy.

Subject to and without waiver of these and all General Objections, Accredited

states that is has already produced the loan files for the mortgage taken by the named

Plaintiffs in this action.  See AHL 00001 – 00228.

5.     Each and every document and record of communication, including any

information stored in electronic form, regarding Plaintiffs.

**RESPONSE:**

Accredited objects to this request to the extent it seeks documents protected from

discovery by the attorney-client and/or work product doctrines.  Subject to and without

waiving its general and specific objections, Accredited states that it has previously

produced all documents it can locate through reasonable diligence regarding the

Plaintiffs.

6.     All documents identified in response to the foregoing interrogatories.

**RESPONSE:**

Subject to and without waiving its general and specific objections, Accredited

states that it will produce all non-privileged, responsive documents in its possession,

23

custody or control that it can locate through reasonable diligence identified in response to the foregoing interrogatories.

7.    All documents including any information stored in electronic form, regarding or in any way used, referenced, reviewed or consulted in response to the foregoing interrogatory.

**RESPONSE:**

Accredited objects to this request on the grounds that it is vague and ambiguous. Accredited does not understand what documents Plaintiffs are requesting. Accredited will attempt to comply with this request upon Plaintiffs' counsel's clarification of the request.

8.    Any and all documents related to any agreement between you and the entities listed in response to interrogatory number 3 relating to the provision of settlement services related to the loans of putative class members or the payment therefore.

**RESPONSE:**

Accredited objects to this request on the grounds that it is overbroad and unduly burdensome. The request is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information about settlement companies that are not parties to this lawsuit and that have no relevance to the Edwards loan. That this litigation has been pleaded as a putative class action does not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

24

9.    Any and all documents relating to the determination of the amount of fees charged to Plaintiffs in connection with the closing of their mortgage loan.

**RESPONSE:**

Accredited objects to this request on the grounds that it seeks information that is neither relevant nor material to the issues in this action, and is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving its general and specific objections, Accredited states that it will produce all non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence relating to the recording fee and/or title insurance fee charged in connection with Plaintiffs' loan.

10.    Any and all documents, including any information stored in electronic form, regarding the contractual relationship between you and any entity who received any of the funds reflected as charges on the Settlement Statements.

**RESPONSE:**

Accredited objects to this request on the grounds that it is vague, ambiguous, overbroad and unduly burdensome.  The request is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information about fees other than the recording fee and title insurance fee.  Subject to and without waiver of these and all General Objections, Accredited states that it has not located any documents regarding the relationship between Accredited and any entity that received funds from the recording fee or title insurance fee charged in connection with the Edwards loan.

18

25

11.    Your entire list, database or other compilation listing all of the data maintained by you regarding the loans of putative class members.

**RESPONSE:**

Accredited objects to this request on the grounds that it is vague and ambiguous. Accredited further objects to this request on the grounds that it is overbroad and unduly burdensome. The request is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information specific to individual borrowers other than the named plaintiffs, although no class has been certified. Additionally, this request seeks information about borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint. That this litigation has been pleaded as a putative class action does not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

Accredited also objects to this request on the grounds that it seeks disclosure of "nonpublic personal information" of third-party consumers that is protected from disclosure under the Gramm-Leach-Bliley Act, 15 U.S.C. § 1608 et seq. and consumers' general right to privacy.

Subject to and without waiver of these and all General Objections, Accredited states that is has already produced the loan files for the mortgage taken by the named Plaintiffs in this action. See AHL 00001 – 00228.

12.    Your entire list, database or other compilation that contains the identities of putative class members, the dates of their loans and the assignees of their loans.

26

**RESPONSE:**

Accredited objects to this request on the grounds that it is vague and ambiguous. Accredited further objects to this request on the grounds that it is overbroad and unduly burdensome. The request is not appropriately limited geographically or temporally – the Truth in Lending Act has a one-year statute of limitations – and is not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information specific to individual borrowers other than the named plaintiffs, although no class has been certified. Additionally, this request seeks information about borrowers outside the scope of the proposed class defined in the Amended Class Action Complaint. That this litigation has been pleaded as a putative class action does not allow Plaintiffs to cast the discovery net to allow a fishing expedition in search of additional potential plaintiffs or claims that could be brought.

Accredited also objects to this request on the grounds that it seeks disclosure of "nonpublic personal information" of third-party consumers that is protected from disclosure under the Gramm-Leach-Bliley Act, 15 U.S.C. § 1608 et seq. and consumers' general right to privacy.

Subject to and without waiver of these and all General Objections, Accredited states that is has already produced the loan files for the mortgage taken by the named Plaintiffs in this action. See AHL 00001 – 00228.

13      All documents, emails, manuals or records related to compliance with state and federal laws.

27

**RESPONSE:**

Accredited objects to this request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. The only law at issue in this lawsuit is the Truth in Lending Act. Subject to and without waiving its general and specific objections, Accredited states that it will produce all non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence relating to compliance with the Truth in Lending Act.

## VERIFICATION AS TO RESPONSES TO INTERROGATORIES

I, Alma Diaz, am duly authorized by Accredited Home Lenders, Inc. to execute the foregoing responses to interrogatories under oath on its behalf. The information set forth in these responses was collected by others and such information is not necessarily within my personal knowledge. However, on behalf of Accredited Home Lenders, Inc., I verify under penalty of perjury under the laws of the United States of America that the foregoing responses to interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated: February 28, 2008          _____
                                            Alma Diaz

21

28

AS TO OBJECTIONS TO INTERROGATORIES AND RESPONSES AND
OBJECTIONS TO DOCUMENT REQUESTS:

Matthew P. Previn
Kirk D. Jensen
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
Tel.: (202) 349-8000
Fax: (202) 349-8080
Email:  mprevin@buckleykolar.com
        kjensen@buckleykolar.com

Jeffrey J. Hartley
HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama  36652
Tel.: (251) 432-5521
Fax: (251) 432-0633
Email:  JJH@helmsinglaw.com

*Attorneys for Defendant Accredited
Home Lenders, Inc.*

22

29

Hall-Frazier
Record - 000540

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of February, 2008, I caused a copy of the foregoing document to be served via email and U.S. Mail, postage prepaid and properly addressed, on the following:

Earl P. Underwood
Law Offices of Earl P. Underwood, Jr.
P.O. Box 969
Fairhope, Alabama 36533-0969
*Counsel for Plaintiffs*

Kenneth J. Riemer
166 Government Street, Suite 100
Mobile, AL 36602
*Counsel for Plaintiffs*

George R. Irvine, III
Stone, Granade & Crosby, P.C.
7133 Stone Dr.
Daphne, AL 36526
*Counsel for Plaintiffs*

John T. Crowder, Jr.
Richard Edwin Lamberth
Steven L. Nicholas
Cunningham, Bounds, Crowder, Brown,
   & Breedlove, LLC
P.O. Box 66705
Mobile, AL 36660
*Counsel for Plaintiffs*

Gregory C. Cook
Jennifer Hoover Clark
Balch & Bingham
P.O. Box 306
Birmingham, AL 35201
*Counsel for Defendant Lenders First*
*Choice Agency, Inc. and Lender's First*
*Choice Agency of Alabama, Inc.*

Matthew P. Previn

30





# EX 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JONATHAN AND SHARRON EDWARDS, )
individually and on behalf of all similarly )
situated individuals )
 )
Plaintiffs, )
 ) Case No: 07-160
v. )
 )
ACCREDITED HOME LENDERS, INC.; )
LENDER'S FIRST CHOICE AGENCY, INC.; )
and LENDERS FIRST CHOICE AGENCY )
OF ALABAMA, INC., )
 )
Defendants. )

## DEFENDANT ACCREDITED HOME LENDERS, INC.'S
## INITIAL DISCLOSURES

Defendant Accredited Home Lenders, Inc. ("Accredited"), by its attorneys and

pursuant to Fed. R. Civ. P. 26(a)(1), makes the following initial disclosures. Accredited

reserves the right to supplement or modify these disclosures at any time based on

continued investigation and discovery.

 1. Below are the names and last known address and telephone number of

each individual likely to have discoverable information that Accredited may use to

support its defenses, unless solely for impeachment.

 A. Jonathan and Sharron Edwards
  11460 Henderson Camp Road
  Grand Bay, AL 36541
  *Knowledge as Plaintiffs*

 B. Lender's First Choice Agency, Inc.
  Lender's First Choice Agency of Alabama, Inc.
  c/o Gregory C. Cook, Esq.
  Balch & Bingham LLP

P.O. Box 306
Birmingham, AL 35201-0306
205-251-8100
*Knowledge as to settlement company policies and procedures*

C.    United General Title Insurance Company
c/o C. Lee Reeves, Esq.
Sirote & Permutt, P.C.
2311 Highland Avenue South
P.O. Box 55727
Birmingham, AL 35205
205-930-5183
*Knowledge as to title insurance policies and procedures*

D.    Arthur Knaus
Division Credit Manager
Accredited Home Lenders, Inc.
15253 Avenue of Science
San Diego, CA 92128
(As an employee of Defendant Accredited, this individual may be
contacted only through the undersigned counsel.)
*The corporate representative can testify concerning policies and
procedures germane to this litigation and authenticate Accredited's
records.*

Accredited states that employees other than Mr. Knaus may have discoverable

information that Accredited may use to support its defenses, but that it has not yet

identified these employees, to the extent that they exist. Accredited will disclose any

such employees when and if they are identified.

2.    Below is a description by category and location of documents in

Accredited's possession, custody, or control that it may use to support its defenses, unless

solely for impeachment.

A.    Plaintiffs' loan file, produced on September 7, 2007 and labeled
AHL 00001 – 00228.

B.    Documents related to Plaintiffs' loan with Accredited. Accredited
directs Plaintiffs' attention to the documents produced herewith
and stamped AHL 00229 – 00238.

C.   Documents related to Lender's First Choice Agency.  Accredited directs Plaintiffs' attention to the documents produced herewith and stamped AHL 00239 – 00242.

3.   Rule 26(a)(1)(C) is inapplicable as Accredited has not asserted any counterclaims to date and is therefore not claiming damages at this time.

4.   Defendant states that, at this time, it is not aware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part of all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

Respectfully submitted,

/s Matthew Previn
Matthew P. Previn (pro hac vice)
Kirk D. Jensen (pro hac vice)
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
Tel.: (202) 349-8000
Fax: (202) 349-8080
Email: mprevin@buckleykolar.com
          kjensen@buckleykolar.com

Jeffrey J. Hartley
HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama 36652
Tel.: (251) 432-5521
Fax: (251) 432-0633
Email: JJH@helmsinglaw.com

*Attorneys for Defendant Accredited*
*Home Lenders, Inc.*

03

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of November, 2007, I caused a copy of the foregoing document to be placed in the U.S. Mail, postage prepaid and properly addressed, and served on the following:

Earl P. Underwood
P.O. Box 969
Fairhope, Alabama 36533-0969
*Counsel for Plaintiffs*

Gregory **C**. Cook
Jennifer Blair Hoover
Balch & Bingham
P.O. Box 306
Birmingham, AL 35201
*Counsel for Defendant Lender's First
Choice Agency of Alabama, Inc.*

/s Matthew Previn___
Matthew P. Previn

08-23-04    09:02PM    FROM-Home Funds Direct         818-678-1744         T-888  P.002/003  F-523

**ACORD. CERTIFICATE OF LIABILITY INSURANCE**

DATE (MM/DD/YY) 08/23/04

| PRODUCER | |
|---|---|
| Diversified Insurance Brokers of Utah 136 E. South Temple, Ste 2300 Salt Lake City UT 84111 Phone: 801-325-5000   Fax:801-532-2304 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| Mercury Companies, Inc. and all subsidiaries 1615 Arapahoe Street Tower I, Suite 1400 Denver, CO 80202 | INSURER A: American Int. Specialty Lines | |
| | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

**COVERAGES**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADDL INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| | | GENERAL LIABILITY | | | | EACH OCCURRENCE | $ |
| | | ☐ COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | ☐ CLAIMS MADE ☐ OCCUR | | | | MED EXP (Any one person) | $ |
| | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | GENERAL AGGREGATE | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $ |
| | | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | |
| | | AUTOMOBILE LIABILITY | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ☐ ANY AUTO | | | | | |
| | | ☐ ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | | ☐ SCHEDULED AUTOS | | | | | |
| | | ☐ HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | ☐ NON-OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ☐ ANY AUTO | | | | OTHER THAN EA ACC | $ |
| | | | | | | AUTO ONLY: AGG | $ |
| | | EXCESS/UMBRELLA LIABILITY | | | | EACH OCCURRENCE | $ |
| | | ☐ OCCUR ☐ CLAIMS MADE | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | ☐ DEDUCTIBLE | | | | | $ |
| | | ☐ RETENTION $ | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | | | ☐ WC STATU-TORY LIMITS ☐ OTH-ER | | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E.L. EACH ACCIDENT | $ |
| | | If yes, describe under SPECIAL PROVISIONS below | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | OTHER PROFESSIONAL LIABILITY/MISC | 001634829 | 05/08/04 | 05/08/05 | EA. CLAIM | $10,000,000 |
| | | | | | | AGGREGATE | $10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Evidence of Insurance for Lenders First Choice, 2321 W. March Lane, Suite 210, Stockton, CA 95207, a subsidiary of Mercury Companies, Inc.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| LH28FIRS Evidence of Insurance | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL **30** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)                                                    © ACORD CORPORATION 1988

AHL 00241

17

**Hall-Frazier**
**Record - 000546**

05-10-04  03:42PM  FROM-Home Funds Direct          916-978-1744      T-633  P 002  F-941

**ACCREDITED**
HOME LENDERS

Closing/Title Agent Application

## PLEASE COMPLETE ALL INFORMATION

Business Name: Lenders First Choice
Business Address: 2321 W. March Lane #210
City, State, Zip: Stockton, CA 95307
Phone No: 209-475-6300    Fax No: 209-954-4137
Corporation  X    Partnership _____    Sole proprietorship _____
Are you a subsidiary of another company?  X
If yes, name
Mercury Companies

Principals of Company:

| Name | Title |
| --- | --- |
| Bill Mordy | President |
| Jdm Chedan | Sr. Vice President |

1. Please provide one of the following:
- Copy of E&O policy (minimum $1,000,000 coverage). Policy must have a valid start and expiration date and list all locations and entities that are covered. Exceptions to coverage must never be lower than the loan amount and must be approved by the AHL Divisional Credit Manager.
- Copy of Fidelity Bond (minimum $1,000,000 coverage). Policy must have a valid start and expiration date and list all locations and entities that are covered. Exceptions to coverage must never be lower than the loan amount and must be approved by the AHL Divisional Credit Manager.
- Closing Protection Letter from the Title Company where agent is approved (addressed specifically to AHL). Letter must be dated within 90 days of closing, specify valid time frame of coverage and list all agent locations covered.
2. References of companies where agent currently closes loans.
3. Copy of licensing verification for each location requesting approval.

*ATTENTION Approved Closing Agents: Would you like the convenience and speed of printing Closing Documents directly at your office? After our review and approval of your package, you may become an Approved Closing Agent within our electronic closing group!*

The undersigned certifies the above information to be true and correct

| Closing Agent Signature | Print or Type Name and Title |
| --- | --- |
| Karla Hoehne | Karla Hoehne - Closing Signature |

Send your package to:
Attention: Broker Administration - 15030 W. Bernardo Dr. Suite 1  San Diego, CA 92127  or Fax 858 597 1999
Closing doc Revised 4/19/2004

AHL 00242

18

Hall-Frazier
Record - 000547

__EXHIBIT_ 7

DEPO. OF: _DWZ_

DATE: _5-6-08_

ELANA K. ZUCCONI

24 pages

# EX 7

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JONATHAN AND SHARRON EDWARDS, | ) | |
| individually and on behalf of all similarly | ) | |
| situated individuals, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CASE NUMBER: 07-160** |
| | ) | |
| ACCREDITED HOME LENDERS, INC.; | ) | |
| LENDER'S FIRST CHOICE, LENDER'S | ) | |
| FIRST CHOICE OF ALABAMA, INC. and | ) | |
| UNITED GENERAL TITLE INSURANCE | ) | |
| COMPANY | ) | |
| | ) | |
|     Defendants. | ) | |

### (SECOND) AMENDED CLASS ACTION COMPLAINT

NOW COME the Plaintiffs and amend their Complaint against the above-named Defendants

so that it reads as follows:

### "IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JONATHAN EDWARDS, SHARRON EDWARDS | ) | |
| AND VILMA HALL, individually and on behalf of all | ) | |
| similarly situated individuals, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CASE NUMBER: 07-160** |
| | ) | |
| ACCREDITED HOME LENDERS, INC.; | ) | |
| LENDER'S FIRST CHOICE AND LENDER'S FIRST | ) | |
| CHOICE OF ALABAMA, INC.[1] | ) | |

---

[1]Plaintiffs have omitted from this amended complaint their claims against United General Title Insurance Company ("United"). Those claims were dismissed, over Plaintiffs' objections. The omission of the claims against United reflects that dismissal but is not intended as a waiver

Hall-Frazier
Record - 000548

|   |   |
|---|---|
| Defendants. | ) |
|   | ) |

### (SECOND) AMENDED CLASS ACTION COMPLAINT

NOW COME the Plaintiffs and amend their Second Amended Complaint against the above-named Defendants aver as follows:

### SUMMARY OF CLAIMS

These claims arise from two real estate loan transactions resulting in mortgages upon the Plaintiffs' homes in Mobile, Alabama. As to Jonathan and Sharron Edwards' loan, the lender was Defendant Accredited Home Lenders, Inc. ("Accredited"). The Edwardses assert claims against Accredited arising under the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. The Edwardses also assert claims against Defendants Lenders' First Choice, Lender's First Choice of Alabama, Inc. (Collectively "LFC"), the company that served as the closing agent and title insurance agent with respect to their loan. LFC likewise served as the closing agent and title insurance agent with respect to Plaintiff Vilma Hall's loan. Each of the Plaintiffs asserts claims against LFC for violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, in connection with the certain marked-up charges imposed on them, including charges purportedly for title insurance and recording fees. Plaintiffs assert each of their claims individually and on behalf of a class of similarly situated individuals.

---

of any of Plaintiffs' objections to and opposition of that dismissal. Plaintiffs reserve all of their rights with respect to the appeal of that dismissal order.

002

Hall-Frazier
Record - 000549

## THE PARTIES

8.      Plaintiffs Jonathan and Sharron Edwards, husband and wife, are both individuals of full age of majority and are resident citizens of the State of Alabama. Plaintiff Vilma Hall is an individual of full age of majority and a resident citizen of the State of Alabama.

9.      Defendant Accredited Home Lenders, Inc. ("Accredited"), is a California corporation which does business in Mobile County, Alabama. Defendant Accredited extends and acquires residential mortgage loans under other names, including Home Funds Direct.

10.     Defendant Lender's First Choice of Alabama, Inc. is, upon information and belief, an Alabama corporation which does business in Mobile County, Alabama. Defendant Lender's First Choice is, upon information and belief, a Florida corporation and controlling parent of Lender's First Choice of Alabama, Inc. These two defendants are collectively referred to herein as "LFC."

## FACTS

**The Edwardses' Loan**

11.     On or about June 16, 2006, Jonathan and Sharron Edwards obtained a real estate mortgage loan with Defendant Accredited, doing business as Home Funds Direct, in the amount of $65,000. Said loan was a consumer credit transaction as that term is used at 15 U.S.C. § 1635(a). Accredited is a residential real estate lender based in California.

12.     LFC acted as the closing agent for the Edwardses' loan and at all relevant times acted as agent for Accredited.

13.     LFC collected from the Edwardses a "closing fee" in the amount of $450 as compensation for the services it provided in connection with the loan.

003