14.    A title insurance policy was issued in connection with the Edwardses' loan by United

General Title Insurance Company ("United").    Defendant LFC acted as agent for United with

respect to the issuance of that policy, as well as the calculation, imposition and collection of the

charges reflected on the Edwardses' HUD Settlement Statement.

15.    The legal rate, as determined by Alabama state law, for that policy was $155. This

was also the premium amount, established by the agreement which existed between United and LFC

as the total fee which was to be charged to the borrower for issuance of the policy.

16.    The Edwardses were charged $275 for the cost of the title insurance policy issued by

United through its agent, LFC.  This charge is reflected on Line 1108 of the Plaintiffs' HUD

Settlement Statement.  Under its agreement with United and by operation of Alabama law, LFC

earned and was paid a commission from the $155 legal rate collected as part of the $275 flat "title

insurance" fee. This commission compensated LFC for all the tasks it performed in connection with

the issuance of the policy.  As stated more fully below, LFC also collected, in addition to legal rate

and the commission paid from the legal rate, a tacked-on surcharge which was not compensation for

any service actually performed.  This tacked-on surcharge was split by LFC with the insurance

provider.

17.    The Edwardses were also charged $88 for "recording fees." This charge is reflected

on Line 1201 of the HUD Settlement Statement.  The actual cost for recording the mortgage was

$53.

**Vilma Hall's Loan**

18.      Plaintiff Vilma Hall obtained a real estate loan from Ameriquest Mortgage Company on or about June 29, 2006 in the amount of $79,250.  Said loan was a consumer credit transaction as that term is used at 15 U.S.C. § 1635(a).

19.      As with the Edwards loan, LFC collected from Ms Hall a "closing fee" in the amount of $450 as compensation for the services it provided in connection with the loan.

20.      As with the Edwardses' loan, LFC acted as the closing agent and acted as the title insurance agent for United, which issued a title insurance policy in connection with Ms Hall's loan. Defendant LFC acted as agent for United with respect to the issuance of that policy, as well as the calculation, imposition and collection of the charges reflected on Ms Hall's HUD Settlement Statement.

21.      The legal rate, as determined by Alabama state law, for that policy was $163.50.  This was also the premium amount, established by the agreement which existed between United and LFC as the total fee which was to be charged to the borrower for issuance of the policy.

22.      Ms Hall was charged $275 for the cost of the title insurance policy issued by United through its agent, LFC.  This charge is reflected on Line 1108 of the Plaintiff's HUD Settlement Statement.  Under its agreement with United and by operation of Alabama law, LFC earned and was paid a commission from the $163.50 legal rate collected as part of the $275 flat "title insurance" fee. This commission compensated LFC for all the tasks it performed in connection with the issuance of the policy.  As stated more fully below, LFC also collected, in addition to legal rate and the commission paid from the legal rate, a tacked-on surcharge which was not compensation for any service actually performed.  This tacked-on surcharge was split by LFC with the insurance provider.

-5-

**Hall-Frazier**
**Record - 000552**

23.    Ms Hall, like the Edwardses, was charged $88 for "recording fees." This charge is reflected on Line 1201 of the HUD Settlement Statement. The actual cost for recording the mortgage was $55. In addition to the $88 flat rate "recording fee" charge, Ms Hall was charged an additional $35 "recording service fee," as reflected on Line 1205 of her HUD Settlement Statement.

**The Marking up of Settlement Charges**

24.    The $275 charge imposed on the Plaintiffs for title insurance premium exceeded the amount allowed by the Alabama Department of Insurance (DOI) and therefore exceeded the true cost and actual value of the insurance provided. Pursuant to the rate filed and approved by the DOI the charge was, by operation of law, illegal, marked-up, non-*bona fide* and was, therefore, a fee incident to the extension of credit and an unearned payment for other than services performed. The $275 charge also exceeded the charge which could have been collected as a title insurance premium pursuant to the agreement between LFC and United. Upon information and belief, the agreements between LFC and other insurance providers for whom LFC acts as an agent likewise establish the applicable legal rate as the rate to be charged for the premium and require LFC to charge that rate. LFC routinely charges borrowers amounts for title insurance which exceed the applicable legal rate.

25.    LFC was fully compensated for all services that it performed or arranged regarding the Plaintiffs' loans through the settlement or closing fee charged to the Plaintiffs. LFC was fully compensated for the tasks performed in connection with the issuance of the title insurance policies through the portion of the legal rate associated with each policy paid as a title agent commission.

26.    It is LFC's practice is to routinely charge $275, or some other flat rate, as a "title insurance premium" without regard to the amount of the coverage, the amount of the loan, the actual cost of the policy, the applicable rate or the rate it is required to collect under its agreement with the

-6-

Hall-Frazier
Record - 000553

insurance provider. Even where LFC does not apply a flat rate, it consistently tacks on to the legal rate a surcharge. As a result, LFC engages in a pattern and practice of charging fees, ostensibly for "title insurance," which are in excess of the actual cost or value of the insurance and the services actually performed and which constitute fees other than for services actually performed.

27.     The $275 flat fee charged to Plaintiffs exceeded the applicable rate and true cost of the insurance provided and, therefore, included a surcharge of at least $120, with respect to the Edwardses' loan; and at least $111 with respect to Ms Hall's loan. These surcharges were collected by LFC and, with respect to both loans, were fees for which no goods or services were actually provided.

28.     In addition to the collection of the title insurance surcharge, LFC also, upon information and belief, marked up the "abstract" fee ($175) by tacking on a surcharge to the actual cost of the abstract service actually performed by a third party and without performing any compensable service for the tacked-on surcharge for which it was not already compensated through other fees or the title agency commission allowed by law and by the contract with the insurance provider.

29.     The title insurance surcharge and the abstract surcharge were unearned and duplicative of the other fees collected by LFC.

30.     With respect to both loans, LFC charged Plaintiffs a flat rate for "recording fee" which exceeded the actual cost associated with recording the mortgage instrument. It is LFC's practice to charge $88, or some other flat rate, for "recording fee" which exceeds the actual cost associated with recording the mortgage instrument and which includes a tacked-on surcharge which is not compensation for any compensable service actually performed. As stated above, LFC was

007

fully compensated for all the tasks it actually performed in connection with the Plaintiffs' loans, including tasks associated with the recording of the mortgage, through the $450 settlement fee charged to the Plaintiffs and the portion of the legal rate for the insurance policy it collected as a commission. In addition to the closing fee and its title agency commission, LFC also collected the "title insurance" surcharge, the "recording fee" surcharge and, upon information and belief, the "abstract" surcharge from Plaintiffs. With respect to Ms Hall and similarly situated borrowers, LFC also collected a "recording service fee" in the amount of $35. LFC was fully compensated for all services provided in connection with the recording of the mortgages through the other fees collected by LFC including, but not limited to, the settlement fee and the title agency commission. These surcharges and fees were collected by LFC and, with respect to both loans, were fees for which no goods or services were actually provided. The recording fee surcharge and the "recording service fee" were unearned and duplicative charges. The surcharge tacked on to the actual fee paid to record the Plaintiffs' mortgage, and included in the sum described on each of the Plaintiffs' HUD Settlement Statement as a "recording fee," was a charge other than a fee for services actually performed. The "recording service fee" collected was a charge other than a fee for services actually performed.

31.    LFC collected fees, including but not limited to the title insurance surcharge, the recording fee surcharge, the recording fee service fee and, upon information and belief, the abstract fee surcharge, which were unearned. Said fees were not compensation for any service actually performed. Said fees were fees for which no or nominal services were performed by LFC and said fees were duplicative of other fees collected by LFC.

-8-

Hall-Frazier
Record - 000555

32.     Accredited was required to provide the Edwardses certain disclosures pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA") and its implementing regulations, 12 C.F.R Part 226 ("Reg. Z").  Under TILA and Reg. Z, Accredited is required to clearly and conspicuously disclose the "amount financed" and the "finance charge," among other things, in connection with each loan.

33.     The TILA disclosures provided to the Edwardses in connection with their loan stated the total finance charge in the amount of $84,409.33.

34.     Under TILA, charges for fees associated with the recording of mortgages may be excluded from the computation of finance charge only if the amount is the actual amount paid to the government entity.  If those charges exceed the amount actually paid to record the mortgage, then they are finance charges and must be disclosed as such.  15 U.S.C. § 1605(d).

35.     Under TILA and Reg. Z, fees relating to title insurance and other "title charges" may be excluded from the finance charge only if such charges are *bona fide* and reasonable.  Otherwise, they are finance charges and must be disclosed as such.  See Reg. Z, § 226.4(c)(7).

36.     The marked-up settlement charges, including but not limited to, the $275 "title insurance" charge, the $88 "recording fee" charge and the $175 "Abstract" charge were excluded from the finance charges disclosed to the Edwardses.  However, these charges are finance charges and should have been disclosed as such.

37.     The $275 charge imposed on the Plaintiffs for title insurance premium was not *bona fide* or reasonable because that amount exceeded the amount allowed by the Alabama Department of Insurance (DOI) by at least $120 and therefore exceeded the true cost and actual value of the insurance provided.  Pursuant to the rate filed and approved by the DOI the charge was, by operation

-9-

of law, illegal, marked-up, non-*bona fide* and was, therefore, a fee incident to the extension of credit and an unearned payment for other than services performed. The $275 charge also exceeded the charge which could have been collected as a title insurance premium pursuant to the agreement between LFC and United. Upon information and belief, the agreements between LFC and other insurance providers for whom LFC acts as an agent likewise establish the applicable legal rate as the rate to be charged for the premium and require LFC to charge that rate. LFC routinely charges borrowers amounts for title insurance which exceed the applicable legal rate.

38. At all material times relating to the actions alleged herein, Defendant Lender's First Choice so controlled and or dominated the affairs of Defendant Lender's First Choice of Alabama, Inc., and each and every other like subsidiary, so that it is the alter ego of each said subsidiary, and is liable for the all of the alleged wrongful actions of each said subsidiary.

39. The fact that the settlement charges collected at closing included charges which were marked up, exceeded the costs or value of the services actually provided or performed and included surcharges which were not compensation for any service actually performed was unknown to Plaintiffs and members of the class. The fact that those charges were marked up, illegal, excessive and otherwise improper, was unknown to, and unknowable by, Plaintiffs and members of the class.

40. Accredited retained a security interest in real estate which is used by the Edwardses as their principal dwelling.

41. Defendants were in sole possession of the information regarding the cost of the settlement services charged to borrowers, and actively misled Plaintiffs and the class by disseminating fraudulent HUD-1 settlement statements that were calculated to deceive Plaintiffs and the class regarding: 1) who was providing the services related to the abstracts and title searches; 2)

-10-

Hall-Frazier
Record - 000557

how the fee for those services was truly being allocated; 3) to whom payments for recordation of mortgages was being made; and 4) in what amounts.

42.     The fact that the charges imposed on Plaintiffs, including but not limited to the "title insurance" charge and "recording fees" charge, were marked up and included surcharges which were charges other than compensation for services actually performed, was unknown to, and essentially unknowable by Plaintiffs and the proposed class members because Defendants' costs for providing or obtaining the insurance were not available to or discoverable by Plaintiffs and the proposed class members. Defendants actively deceived Plaintiffs and the class about who was providing title insurance and the fact that borrowers were being charged illegal marked-up premiums. The unknown and inherently unknowable nature of Defendants' unlawful charges did not give Plaintiffs any reason to inquire, investigate or discover Defendants' wrongdoing. As a practical reality, it was impossible for persons closing on residential loans to detect Defendants' unlawful violations.

43.     Defendants' scheme and misconduct was, by design and in practice, inherently self-concealing. Defendants knew Plaintiffs and the proposed class members could not determine whether or not the premiums they were charged were marked up.

44.     Plaintiffs and the proposed class members have acted with due diligence with respect to their rights. The facts that support Plaintiffs' causes of action were not knowable to Plaintiffs or proposed class members until shortly before the filing of the Complaint in this action.

45.     Specifically, Plaintiffs reviewed all relevant loan documents and actively participated in all aspects of the loan transaction at issue but nonetheless did not discover, and could not reasonably have been expected to discover, that some of the information set forth in the HUD-1's

-11-

011

relating to fees paid for "title insurance" and "recording fees" was false and misleading as stated above.

## COUNT I
## TILA VIOLATIONS BY ACCREDITED

46.     Plaintiffs reallege all the preceding allegations referenced as if set out here in full.

47.     This count asserts claims against Defendant Accredited on behalf of Plaintiffs Jonathan and Sharron Edwards.

48.     Accredited is a "creditor" as that term is defined at 15 U.S.C. 1602(f).

49.     The disclosures issued by Accredited with respect to the Plaintiffs' loan violated the requirements of TILA and Reg. Z by failing to include in the finance charge the marked-up settlement charges, including but not limited to the "title insurance" charge, the "abstract" charge, and the "recording fee" charges. These charges were payable by Plaintiffs incident to the extension of credit as required by 15 U.S.C. § 1605 and Reg. Z § 226.18. Those amounts should have been included in the finance charge disclosed to Plaintiffs.

WHEREFORE, Plaintiffs Jonathan and Sharron Edwards respectfully request that this Court enter judgment in their favor and against Defendant Accredited, and further request the following relief:

A)     Statutory damages of $2,000.00 as provided in 15 U.S.C. § 1640(a);

B)     Actual damages in an amount to be determined at trial;

C)     An award of reasonable attorney fee and costs; and

D)     Such other relief at law or equity as this Court may deem just and proper; and

E)     Such other relief at law or equity as this Court may deem just and proper.

## COUNT II

-12-

012

## VIOLATION OF RESPA SECTION 8(b)
## BY DEFENDANT LFC

50.    Plaintiffs reallege all the preceding allegations referenced as if set out here in full.

51.    This count asserts a claim against Defendants Lender's First Choice and Lender's First Choice of Alabama, Inc., collectively referred to herein as "LFC," on behalf of each of the Plaintiffs.

52.    Each of the Plaintiffs' loans is a federally related mortgage loan within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq.

53.    The "title insurance" charge and the "recording fee," as well as the other charges reflected on their HUD Settlement Statements, were charges paid by the Plaintiffs in connection with their loan and were charges imposed in connection with the providing of a real estate settlement service within the meaning of 12 U.S.C. § § 2602(3) and 2607(b), as well as 24 C.F.R. § 3500.2(b).

54.    LFC splits the $275 "title insurance" charge, including the surcharge, it collected in connection with each of the Plaintiffs' loans with United.   The title insurance surcharge is an unearned and duplicative fee which was not compensation for any service actually performed.  That surcharge is a fee charged "other than for services actually performed" within the meaning of 12 U.S.C. § 2607(b).  LFC split the title insurance surcharge with United.  It is LFC's practice to split the title insurance surcharge with United and the other insurance providers for whom it acts as agent.

55.    LFC charged Plaintiffs a flat rate for "recording fee" which exceeded the actual cost associated with recording the mortgage instrument.  The "recording fee" charge imposed on Plaintiffs included a surcharge which is not compensation for any service actually performed.  The recording fee surcharge is an unearned and duplicative fee which was not compensation for any

-13-

service actually performed. That surcharge is a fee charged "other than for services actually performed" within the meaning of 12 U.S.C. § 2607(b).

56.    With respect to Ms Hall's loan, LFC imposed a $35 charge as a "recording service fee." This fee is not compensation for any service actually performed. The "recording service fee" is an unearned and duplicative fee which was not compensation for any service actually performed. The "recording service fee" is a fee charged "other than for services actually performed" within the meaning of 12 U.S.C. § 2607(b).

57.    LFC violated 12 U.S.C. § 2607(b) and related federal regulations and interpretations, by giving and/or accepting a portion of charges made or received for a real estate settlement service other than for services actually rendered.

58.    In connection with Plaintiffs' loans, LFC did accept a portion, split or percentage of a charge other than for services actually performed.

WHEREFORE, Plaintiffs demand judgment against LFC for violation of Section 8(b) of RESPA awarding Plaintiffs the remedies provided under that statute, including but not limited to treble damages as provided for in 12 U.S.C. § 2607(d)(2), actual damages, attorneys fees and all costs of this litigation and all other just, general and equitable relief.

## CLASS CLAIMS
### A. INTRODUCTION

59.    In addition to the individual claims asserted in the foregoing paragraphs, Plaintiffs, on behalf of borrowers similarly situated, bring the following class claims against the Defendants arising from the marking up and splitting of settlement charges, including but not limited to the "title insurance" charge and the "recording fee" charge in violation of RESPA. Because the charges paid

-14-

by the Edwardses and similarly situated borrowers also constitute violations of TILA, to the extent those charges were not disclosed as finance charges, the Edwardses assert claims against Accredited on behalf of a class of similarly situated borrowers for TILA violation.

## B.    CLASS DEFINITION - RESPA VIOLATIONS

60.    These claims are brought on behalf of nationwide class of residential mortgage borrowers, similarly situated with the Plaintiffs, as to whose loans LFC served as closing and title agent and who were charged settlement services fees, including but not limited to the "title insurance" charge, "recording fee" and other fees as described above, by LFC which constitute charges other than for services actually performed.

61.    The scope of this class definition, including its temporal scope, will be further refined after discovery of Defendant's books and records.

## C.    CLASS ALLEGATIONS - RESPA VIOLATIONS

62.    Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

63.    Defendants Lender's First Choice, Lender's First Choice of Alabama, Inc. (collectively, "LFC") have engaged in a uniform, systematic pattern and practice of charging borrowers, in connection with the settlement of a residential mortgage loan, the marked-up and padded fees as described herein above in violation of 12 U.S.C. § 2607(b). Lender's First Choice implements the patterns and practices described herein directly and/or through subsidiaries created and controlled by Lender's First Choice to operate in the various states in which Lender's First Choice provides settlement services, so that it is liable for the actions of each of said subsidiaries.

64.    The identities of the class members are readily identifiable through computer records and paper records, regularly maintained in Defendants' course of business.

-15-

65.	The Class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed that the Class includes thousands of members. In some instances, such persons may be unaware that claims exist on their behalf. To the extent that Class members have knowledge of their claims, their damages are in such amounts that when taken individually, they may be too small to justify the expense of a separate lawsuit.

66.	The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class. Plaintiffs were charged an amount for settlement services which included the same excessive, unearned and illegal fees imposed upon each and every Class member.

67.	The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. Each Plaintiff's interest in this action is antagonistic to the interest of the Defendants, and each will vigorously pursue the claim of the Class.

68.	The representative Plaintiffs have retained counsel who are competent and experienced in consumer fraud class action litigation, and have successfully represented consumers in complex class actions.

69.	Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

70.	There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include, but are not limited to, the following:

-16-

016

Hall-Frazier
Record - 000563

    a)     Did LFC mark-up the costs of settlement services, including but not limited to the recording fees and/or title insurance without themselves providing actual, necessary, and distinct services in violation of RESPA?

    b)     What measure of damages is appropriate?

    c)     What declaratory or injunctive relief is appropriate?

71.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the class are identical and will require evidentiary proof of the same kind and application of the same law.

72.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed class members to prosecute their claims individually. Trial of Plaintiffs' claims is manageable. Unless a class is certified, Defendants will retain excessive and unearned fees improperly accepted from class members.

73.    Unless a class-wide injunction is issued, Defendants may continue to commit violations against residential mortgage borrowers.

<div align="center">

**COUNT III**
**CLASS CLAIM FOR VIOLATIONS OF RESPA - SECTION 8(b)**

</div>

74.    Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

75.    Plaintiffs assert the allegations and claims set out in Count II above on behalf of the class of similarly situated borrowers as described above.

WHEREFORE, Plaintiffs for themselves and on behalf of the class of borrowers described above, demand judgment be entered against Defendants Lender's First Choice and Lender's First Choice of Alabama, Inc. and the following relief:

<div align="center">-17-</div>

A)    An order certifying that this action may be maintained as a class action, as defined above, under Fed.R.Civ.R. 23(a) and 23(b)(3);

B)    An order appointing Plaintiffs as representatives of the class;

C)    An order appointing the undersigned counsel as class counsel pursuant to Fed.R.Civ.R. 23;

D)    An order directing that reasonable notice of the class action be provided to all members of the class at the appropriate time;

E)    For violating RESPA, an order and judgment finding that the Defendants are liable as a matter of law to each member of the class for treble damages as provided pursuant to 12 U.S.C. § 2607(d)(2);

F)    Declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein;

G)    An award of reasonable attorneys' fees as provided by law and statute;

H)    An award of pre-and-post judgment interest as provided by law in an amount according to proof at trial;

I)    All other relief prayed for in Counts II and III if not specifically described herein;

J)    An award of costs and expenses incurred in this action; and

K)    An award for such other relief as the court may deem just and proper.

### D.    CLASS DEFINITION - TILA VIOLATIONS

76.    The Edwardses bring these claims on behalf of residential mortgage borrowers in Alabama who obtained a residential mortgage loan from Defendant Accredited and were charged settlement fees, including but not limited to the marked-up fees described herein above, which

-18-

018

exceeded the actual cost or value of the services provided such that those fees constitute "finance charges" within the meaning of TILA, and as to which loans said fees were not included in the computation of the disclosed finance charge, resulting in an understatement of the finance charge of at least $100.00.

77.     The scope of this class definition, including its temporal scope, will be further refined after discovery of Defendants' books and records.

### E.     CLASS ALLEGATIONS - TILA VIOLATIONS

78.     Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

79.     Defendant Accredited has engaged in a uniform, systematic pattern and practice of charging borrowers, in connection with the settlement of a residential mortgage loan, the marked-up charges described herein above.

80.     As to the loans obtained by member of the class described in Paragraph 76, Defendant Accredited fails to disclose, as part of the finance charge, the marked-up charges described herein above.

81.     The identities of the class members are readily identifiable through computer records and paper records, regularly maintained in Defendants' course of business.

82.     The Class is so numerous as to make it impracticable to bring all members of the Class before the Court.  It is believed that the Class includes thousands of members.  In some instances, such persons may be unaware that claims exist on their behalf.  To the extent that Class members have knowledge of their claims, their damages are in such amounts that when taken individually, they may be too small to justify the expense of a separate lawsuit.

-19-

019

83.     The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class. Plaintiffs were charged an amount for settlement services which included the same excessive, unearned and illegal fees imposed upon each and every Class member.

84.     The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. Each Plaintiff is aware that he cannot settle this action without Court approval. Each Plaintiff's interest in this action is antagonistic to the interest of the Defendant, and each will vigorously pursue the claim of the Class.

85.     The representative Plaintiffs have retained counsel who are competent and experienced in consumer fraud class action litigation, and have successfully represented consumers in complex class actions. Counsel have agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court.

86.     Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

87.     There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include:

a)     Were the charges described herein, including but not limited to the charges imposed for "title insurance," "recording fees" and "abstract" fees finance charges within the meaning of TILA and its implementing regulations;

b)     If so, did Defendant Accredited fail to properly disclose either of those charges as a finance charge;

c)     Is the TILA violation apparent on the face of the loan documents?

d)     What measure of damages is appropriate?

e)     What declaratory or injunctive relief is appropriate?

-20-

020

88.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the class are identical and will require evidentiary proof of the same kind and application of the same law.

89.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed class members to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

90.    Unless a class-wide injunction is issued, Defendant may continue to commit violations against residential mortgage borrowers.

91.    The representative Plaintiffs will seek to identify all class members through discovery as may be appropriate and will provide to the class such notice of this action as the Court may direct.

<div align="center">

**COUNT IV**
**CLASS CLAIM FOR VIOLATIONS OF TILA**

</div>

92.    Plaintiffs reallege all the preceding allegations by reference as if set out here in full.

93.    Plaintiffs assert the allegations and claims set out in Count I above on be half of the class of similarly situated borrowers as described in Paragraph 76 above.

WHEREFORE, Plaintiffs for themselves and on behalf of the class of borrowers described above, demand judgment be entered against Defendant Accredited as to all class members and award the following relief:

A)    An order certifying that this action may be maintained as a class action, as defined above, under Fed.R.Civ.R. 23(a) and 23(b)(3);

B)    An order appointing Plaintiffs as representatives of the class;

<div align="center">-21-</div>

C)    An order appointing the undersigned counsel as class counsel pursuant to Fed.R.Civ.R. 23;

D)    An order directing that reasonable notice of the class action be provided to all members of the class at the appropriate time;

E)    For violating TILA, an order and judgment finding that the Defendants are liable as a matter of law to each member of the class for treble damages as provided pursuant to 15 U.S.C. § 1640(a);

F)    Declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein;

G)    An award of reasonable attorneys' fees as provided by law and statute;

H)    An award of pre-and-post judgment interest as provided by law in an amount according to proof at trial;

I)    All other relief prayed for in Count I if not specifically described herein;

J)    An award of costs and expenses incurred in this action; and

K)    An award for such other relief as the court may deem just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE."**

CUNNINGHAM, BOUNDS, CROWDER,
BROWN AND BREEDLOVE, L.L.C.
Post Office Box 66705
Mobile, Alabama 36660
(251) 471-6191


STEVEN L. NICHOLAS (NICHS2021)
One of the Attorneys for Plaintiffs


-22-

022

KENNETH J. RIEMER  (RIEMK8712)
One of the Attorneys for Plaintiffs
Post Office Box 1206
Mobile, Alabama 36633-1206
Telephone:    (251)  432-9212
Facsimile:    (251)  433-7172


EARL P. UNDERWOOD, JR.  (UNDEE6591)
One of the Attorneys for Plaintiffs
Post Office Box 969
Fairhope, Alabama 36533
Telephone:    (251)  990-5558
Facsimile:    (251)  990-0626


GEORGE R. IRVINE, III  (IRVIG4725)
One of the Attorneys for Plaintiffs

OF COUNSEL:

STONE, GRANADE and CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama  36526
(251) 626-6696

-23-

023

## CERTIFICATE OF SERVICE

     I hereby certify that on February 22, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record

<div align="center">

s/Kenneth J. Riemer
KENNETH J. RIEMER (RIEMK8712)

</div>

-24-

024

**Hall-Frazier**
**Record - 000571**



__EXHIBIT__ _8_
DEPO OF: _DIAZ_
DATE: _5-6-08_
ELANA K. ZUCCONI
_96 pages_

# EX 8

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| JONATHAN AND SHARRON EDWARDS, individually and on behalf of all similarly situated individuals )<br><br>Plaintiffs, )<br><br>v. )<br><br>ACCREDITED HOME LENDERS, INC.; LENDER'S FIRST CHOICE AGENCY, INC.; and LENDERS FIRST CHOICE AGENCY OF ALABAMA, INC., )<br><br>Defendants. ) | Case No: 07-160-KD-C |

### DEFENDANT ACCREDITED HOME LENDERS, INC.'S RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Accredited Home Lenders, Inc. ("Accredited" or "Defendant"), by and through

its undersigned attorneys, hereby provides the following responses to Plaintiffs' Second Set of

Interrogatories and Request for Production of Documents to Accredited:

### GENERAL OBJECTIONS

1.    Defendant objects to the Interrogatories and the Requests for Production, and to

the "Instructions" preceding them, as unduly burdensome to the extent that they purport to

impose obligations in addition to those imposed by the Federal Rules of Civil Procedure and this

Court's Local Rules.

2.    Defendant objects to the "Instructions" preceding the Interrogatories and Requests

for Production to the extent they include definitions that are overbroad, mischaracterize or

inaccurately define certain terms, or require Defendant to make a legal conclusion.

3.     Defendant objects to each Interrogatory and Request for Production as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond the scope of this litigation.

4.     Defendant objects to each Interrogatory and Request for Production to the extent it expressly or impliedly seeks information protected by the attorney-client privilege, the work product doctrine, self-analysis privilege, joint defense or common interest privilege, or any other applicable privilege or similar reason for non-production. Inadvertent disclosure of privileged information is not intended to be, and may not be construed as, a waiver of any applicable privilege.

5.     Defendant objects to each Interrogatory and Request for Production to the extent it seeks information (i) that is not within Defendant's possession, custody, or control; or (ii) that is within the possession, custody, or control of corporate affiliates of Defendant that are not controlled by Defendant; or (iii) that is in the possession, custody, or control of Defendant's attorneys or former attorneys; or (iv) that is in the possession, custody, or control of or concern the activities of subservicers, of predecessor or successor servicers or subservicers, of master servicers for whom Defendant provided subservicing, or of investors on the loans at issue.

6.     By making these responses, Defendant does not concede that the information given is properly discoverable or admissible. To the contrary, Defendant reserves the right to object to further discovery regarding the subject matter of the Interrogatories and Requests for Production and to object to the introduction into evidence of statements made and documents produced in response to these Interrogatories and Requests for Production.

7.     Each of Defendant's responses to these Interrogatories and Requests for Production is made to the best of Defendant's knowledge at the present time, based upon its

2

002

investigation to date.  Where appropriate, Defendant's responses are made upon information and

belief based on that investigation.  Defendant states that its investigation is ongoing and

Defendant specifically reserves the right to supplement and amend these responses when and if it

becomes necessary.

8.     These General Objections are incorporated into each of the specific responses to

these Interrogatories and Requests for Production and shall be deemed continuing as to each

Interrogatory and Request for Production, and are not waived, or in any way limited by the

specific responses.

## INTERROGATORIES

1.     Identify each person or persons participating in the preparation of these your

answers to these interrogatories giving their full name, address and job title.

**RESPONSE:**

Accredited objects to this Interrogatory to the extent that it seeks information protected

from disclosure by the attorney-client and/or work product doctrines.  Subject to and without

waiver of this objection and the General Objections, Accredited states that various individuals in

its Legal Department participated in the preparation of these interrogatory responses.

2.     Identify each charge included in the calculation of the "amount financed"

regarding the transaction at issue herein.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is ambiguous and

inconsistent with the method prescribed by federal law for calculating the Amount Financed.

Subject to and without waiver of this objection and the General Objections, Accredited states

that the Amount Financed disclosed on the Edwards' Final Truth in Lending Disclosure

3

Statement (AHL 00003) was calculated by subtracting the Prepaid Finance Charge ($3,999.10)

referenced in Accredited's Response to Interrogatory No. 3 from the Principal Loan Amount

($65,000).

3.      Identify each charge included in the calculation of the "finance charge" regarding

the transaction at issue herein.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague, ambiguous, and

inconsistent with the method prescribed by federal law for calculating the "finance charge."

Subject to and without waiver of this objection and the General Objections, Accredited states.

that the "finance charge" disclosed on the Edwards' Final Truth in Lending Disclosure Statement

(AHL 00003) included the sum of (1) the Prepaid Finance Charge, which totaled $3,999.10,

consisting of the Origination Fee ($3,022.50), the Flood Certification Fee ($7.80), the Tax

Service Fee ($50.00), Prepaid Interest ($253.80), the Settlement/Closing Fee ($605.00), and the

Document Preparation Fee ($60.00), as disclosed on the Final Good Faith Estimate (AHL

00002); plus (2) Interest during the term of the loan ($80,410.23), which is calculated by

subtracting the Principal Loan Amount ($65,000) from the Total of Payments ($145,410.23).

4.      Identify the methodology and describe the step by step process by which the APR

(Annual Percentage Rate) was calculated regarding the instant transaction.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is overbroad, unduly

burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence.

This interrogatory seeks information about calculations based on amounts that were included in

the "finance charge" disclosure on the Edwards' Final Truth in Lending Disclosure Statement

4

(AHL 00003) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, Accredited states that the APR was calculated by entering the loan amount, interest rate, and other charges into a software program called Empower® provided by Fidelity Information Services. The Empower software, which is a calculation tool used in good faith by Accredited within the meaning of Regulation Z, 12 C.F.R. § 226.22(a)(1) n.45d, then used these amounts to calculate the APR, as provided in Appendix J to Regulation Z, 12 C.F.R. pt. 226 app. J.

     5.    Describe in detail each and every service performed, giving full names of the persons or entities performing such services, regarding the transaction at issue in exchange for your "Origination Fee."

     **RESPONSE:**

     Accredited objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The Origination Fee was included in the "finance charge" disclosed on the Edwards' Final Truth in Lending Disclosure Statement (AHL 00003) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, Accredited states that the Origination Fee is revenue collected in exchange for originating a loan and covers a wide variety of Accredited's operational expenses, including employee compensation, facilities, overhead, etc.

     6.    Describe in detail each and every service performed, giving full names of the persons or entities performing such services, regarding the transaction at issue in exchange for your "Flood Cert." and "Tax Service" fees.

     **RESPONSE:**

<div align="center">5</div>

Accredited objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The "Flood Cert." and "Tax Service" fees were included in the "finance charge" disclosed on the Edwards' Final Truth in Lending Disclosure Statement (AHL 00003) and are, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, Accredited states that its affiliate Inzura Settlement Services performed certain functions in connection with the Flood Certification and Tax Service fees. First American Flood Data Services also performed certain functions in connection with the Flood Certification fee, and First American Real Estate Tax Service performed certain functions in connection with the Tax Service fee. See documents marked AHL 03099- 03101 produced with these Responses.

7.    For each service referred to in interrogatories 5 and 6 above that was performed in whole or part by a third party, identify that third party, itemize all third party charges and describe the service(s) performed by such third party.

**RESPONSE:**

Accredited objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory seeks information about fees that were included in the "finance charge" disclosure on the Edwards' Final Truth in Lending Disclosure Statement (AHL 00003) and are, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, Accredited states that First American Flood Data Services and First American Real Estate Tax Service performed certain functions in connection

6

with the flood certification fee and the tax service fee. See Response to Interrogatory No. 6 above and documents marked AHL 03099- 03101 produced with these Responses.

### REQUESTS FOR PRODUCTION OF DOCUMENTS

    1.    All documents identified in response to the foregoing interrogatories.

**RESPONSE:**

    Subject to and without waiving its general and specific objections, Accredited states that it will produce all non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Interrogatories.

    2.    All documents, including any information stored in electronic form, regarding or in any way relating to the calculation of the terms of the TILA disclosure at issue herein.

**RESPONSE:**

    Accredited objects to this Request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection and the General Objections, Accredited states that it has already produced non-privileged, responsive documents in responsive to this Request. Accredited further states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

    3.    Each and every document, including any information stored in electronic form, regarding the services performed in exchange for your charges reflected on the Plaintiff's HUD-1 settlement statement.

**RESPONSE:**

Hall-Frazier
Record - 000578

Accredited objects to this Request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This Request seeks documents regarding fees that were included in the "finance charge" disclosure on the Edwards' Final Truth in Lending Disclosure Statement (AHL 00003) and is, therefore, beyond the scope of this litigation. Accredited states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

## <u>VERIFICATION AS TO RESPONSES TO INTERROGATORIES</u>

I, Alma Diaz, am duly authorized by Accredited Home Lenders, Inc. to execute the foregoing responses to interrogatories under oath on its behalf. The information set forth in these responses was collected by others and such information is not necessarily within my personal knowledge. However, on behalf of Accredited Home Lenders, Inc., I verify under penalty of perjury under the laws of the United States of America that the foregoing responses to interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated: April 13, 2008

Alma Diaz

8

008

Hall-Frazier
Record - 000579

AS TO OBJECTIONS TO INTERROGATORIES AND RESPONSES AND
OBJECTIONS TO DOCUMENT REQUESTS:

Matthew P. Previn
Kirk D. Jensen
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, DC 20037
Tel.: (202) 349-8000
Fax: (202) 349-8080
Email: mprevin@buckleykolar.com
        kjensen@buckleykolar.com

Jeffrey J. Hartley
HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama 36652
Tel.: (251) 432-5521
Fax: (251) 432-0633
Email: JJH@helmsinglaw.com

*Attorneys for Defendant Accredited
Home Lenders, Inc.*

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of April, 2008, I caused a copy of the foregoing document to be served via email and U.S. Mail, postage prepaid and properly addressed, on the following:

Earl P. Underwood
Law Offices of Earl P. Underwood, Jr.
21 South Section Street
P.O. Box 969
Fairhope, Alabama 36533-0969
*Counsel for Plaintiffs*

Kenneth J. Riemer
166 Government Street, Suite 100
Mobile, AL 36602
*Counsel for Plaintiffs*

George R. Irvine, III
Stone, Granade & Crosby, P.C.
7133 Stone Dr.
Daphne, AL 36526
*Counsel for Plaintiffs*

Steven L. Nicholas
Cunningham, Bounds, Crowder, Brown,
 & Breedlove, LLC
P.O. Box 66705
Mobile, AL 36660
*Counsel for Plaintiffs*

Gregory C. Cook
Jennifer Hoover Clark
Balch & Bingham
P.O. Box 306
Birmingham, AL 35201-0306
*Counsel for Defendant Lenders First
Choice Agency, Inc. and Lender's First
Choice Agency of Alabama, Inc.*

Matthew P. Previn

10

010

**Hall-Frazier**
**Record - 000581**

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

CASE NO.  01:05-CV-669-KD-M


DAWN SAUCIDA and JOHNNY SAUCIDA,

          Plaintiffs,

     vs.

SWAFFORD & HAYS SETTLEMENT SERVICES, INC.,

          Defendant.



IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

CIVIL ACTION NO. CV-04-1696


MARY GIBBS and PEARLIE FINCH,

          Plaintiffs,

     vs.

SWAFFORD & HAYS SETTLEMENT SERVICES, INC.,

          Defendant.


                    DEPOSITION OF

                    WILLIAM LONG

                  June 29th, 2006

                4501 Circle 75 Parkway

                  Atlanta, Georgia

| | APPEARANCES OF COUNSEL |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | On behalf of the Plaintiffs: |
| 6 | EARL P. UNDERWOOD, JR., Esq. |
| 7 | 21 South Section Street |
| 8 | P. O. Box 969 |
| 9 | Fairhope, Alabama 36533 |
| 10 | (251) 990-5558 |
| 11 | |
| 12 | KENNETH J. RIEMER, Esq. |
| 13 | 166 Government Street |
| 14 | Suite 100 |
| 15 | Mobile, Alabama 36602 |
| 16 | (251) 432-9212 |

INDEX TO EXAMINATIONS

| | Examination | Page |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | Cross-Examination by Mr. Underwood | 7 |
| 6 | Cross-Examination by Ms. Dover | 114 |
| 7 | Recross-Examination by Mr. Underwood | 120 |

Page 3

| | APPEARANCES OF COUNSEL (Cont'd) |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | On behalf of the Defendant: |
| 6 | Homeowners Loan Corporation |
| 7 | RIK S. TOZZI, Esq. |
| 8 | Starnes & Atchison |
| 9 | Seventh Floor, 100 Brookwood Place |
| 10 | P. O. Box 598512 |
| 11 | Birmingham, Alabama 35259-8512 |
| 12 | (205) 868-6000 |
| 13 | |
| 14 | |
| 15 | |
| 16 | On behalf of the Defendant: |
| 17 | Swafford & Hays Settlement Services |
| 18 | ELLEN H. DOVER, Esq. |
| 19 | Baker, Donelson, Bearman, Caldwell & |
| 20 | Berkowitz |
| 21 | 1600 SouthTrust Tower |
| 22 | 420 20th Street North |
| 23 | Birmingham, Alabama 35203 |
| 24 | (205) 250-8339 |
| 25 | |

Page 5

INDEX TO EXHIBITS

Plaintiff's

| | Exhibit | Description | Page |
|---|---|---|---|
| 1 | 1 | 6/27/06 Letter | 6 |
| 2 | 2 | Trailing Documents | 32 |
| 3 | 3 | 9/7/04 Handwritten Document | 90 |
| 4 | 4 | Series of Faxes | 92 |
| 5 | 5 | 9/8/04 Fax | 95 |
| 6 | 6 | Motion to Compel Arbitration | 110 |

Defendant's

| | Exhibit | | Page |
|---|---|---|---|
| 1 | Closing Instructions | | 115 |

(Original Plaintiff's exhibits 1 through 6 have been attached to the original transcript. Original Defendant's exhibit 1 has been attached to the original transcript.)

1    (Disclosure pursuant to OCGA 9-11-28
2  (d): The party taking this deposition will
3  receive the original and one copy based on our
4  standard and customary per page charges.
5  Copies to other parties will likewise be
6  furnished at our customary page rate.
7  Incidental direct expenses of production may be
8  added to either party where applicable.)
9    (Plaintiff's Exhibit 1 was marked for
10  identification.)
11    MR. TOZZI: Just real quick. Rik
12  Tozzi for Homeowners Loan. We've produced
13  2,500 plus pages of documents. There's an
14  agreement with counsel that a protective order
15  will be entered in the case. Counsel has
16  executed the agreed protective order today.
17  We'll take care of filing that next week.
18    The agreement is that all documents
19  produced will be treated as if they've been
20  designated confidential until either counsel
21  otherwise, which will be in the next week or
22  two. We do not expect that we'll designate
23  many, if any, of these documents as
24  confidential under the terms of the protective
25  order, but the agreement, for the record, is

Page 7

1  they will be treated that way until I get the
2  letter out in the next week for all counsel,
3  and with that we'll go forward.
4    MR. UNDERWOOD: Thank you, Rik.
5    WILLIAM LONG,
6  having been first duly sworn, was examined and
7  testified as follows:
8    CROSS-EXAMINATION
9  BY MR. UNDERWOOD:
10    Q.  Is it all right if I call you Bill?
11    A.  Yes.
12    Q.  My name is Earl Underwood. I'm here
13  representing the Saucidas and Ms. Gibbs and Ms.
14  Finch in this litigation that's been filed in
15  Alabama.
16    I'm going to be asking you some
17  questions this morning. I've been doing this
18  for twenty years, but sometimes I'm not real
19  good at asking questions. I might ask you a
20  question that doesn't make sense, or I might
21  ask a compound question, or you just may not
22  understand my question.
23    If that happens, if you would just
24  stop and say, "Mr. Underwood, I didn't
25  understand any of that, that doesn't make any

1  sense"; or "Earl," my name's Earl, "that didn't
2  make any sense, would you rephrase the
3  question," and I will.
4    However, if you don't I'm going to
5  assume that you understood the question and
6  you're answering fully and truthfully. Is that
7  fair?
8    A.  Yes.
9    Q.  If you would just state your name for
10  the record, please, sir, and tell us where
11  you're employed.
12    A.  William Long. I'm employed by
13  Homeowners Loan Corp.
14    Q.  All right.
15    MR. TOZZI: Earl, the usual
16  stipulations?
17    MR. UNDERWOOD: That's fine with me.
18    MR. TOZZI: Okay. I just want to
19  make sure we got that agreement, not to
20  interrupt. I'm sorry.
21  BY MR. UNDERWOOD:
22    Q.  If you would give us just a brief
23  rundown of your background and tell us when you
24  came to work at Homeowners Loan.
25    A.  I came to work for Homeowners Loan

Page 9

1  Corp on October 1st of 2001. My background is
2  that I am an attorney. I graduated law school
3  in 1985 from the University of Tennessee.
4  After that I was in private practice as a
5  litigator in Tennessee with a couple of
6  different law firms, until 1999 when I took a
7  job in-house with a company in Greenville,
8  South Carolina, as their general counsel. The
9  company's name was Homegold, Inc.,
10  H-O-M-E-G-O-L-D. I was with that company for
11  three years, two-and-a-half years, something
12  like that, and left that company, came to
13  Homeowners Loan Corp.
14    Q.  What did you do at Homegold, Inc.?
15  You said you were in-house counsel. What were
16  your day-to-day duties?
17    A.  I was their general counsel. I was
18  in charge of, among other things, the state
19  licensing, the compliance with federal and
20  state lending laws, ran the Quality Control
21  Department, looked at the loan files, gauged
22  their quality. I also managed the Human
23  Resources Department for some of my tenure
24  there, as well.
25    Q.  Did you leave there in about 2002?

Page 10

1    A.   No, sir. I left in June of 2001.
2    Q.   What was your position when you first
3  went to work with Homeowners?
4    A.   I was hired as the vice president of
5  secondary marketing.
6    Q.   What were your duties?
7    A.   The title is somewhat misleading
8  because I did a lot more than the secondary
9  marketing.
10    Q.   Well, that was going to be my next
11  question. What were your duties when you were
12  first hired with Homeowners?
13    A.   When I was hired with Homeowners my
14  duties were to manage the secondary marketing
15  department. That would be the sale of the
16  loans originated on the secondary market. I
17  managed the funding department. I managed the
18  closing department. I managed the underwriting
19  department. I managed the legal department,
20  and I set up and then managed the quality
21  control department and the compliance
22  department. I believe that's everything.
23    Q.   Okay. I hate to ask you to do this,
24  but I'd like to know what you did with each one
25  of these hats on. If you would, just tell us

Page 11

1  briefly what you did as the secondary mortgage
2  department manager.
3    A.   Homeowners Loan Corp originates --
4    Q.   Excuse me, secondary market
5  department manager.
6    A.   Right. Homeowners Loan Corp
7  originates mortgage loans in its own name,
8  holds the loan for a time, then sells the loans
9  to other companies on the secondary market
10  after the loans are closed. That process is
11  secondary marketing, and it involves receiving
12  the loan packages, making sure they're correct,
13  and then offering them for sale to purchasers,
14  much larger companies, on the secondary market.
15    Q.   Let me go ahead and do something I
16  should have done before we got into maybe some
17  of this stuff. Let me show you what we've
18  marked as Plaintiff's exhibit number 1.
19        MS. DOVER:   Earl, can I see that just
20  real quickly so I know what the witness is
21  testifying about?
22        MR. UNDERWOOD:   That's the whole
23  thing.
24        MR. TOZZI:   There's a second letter
25  attached. I don't know if you meant to do

Page 12

1  that.
2        MR. UNDERWOOD:   I really didn't.
3  Let's take that second letter off.
4  BY MR. UNDERWOOD:
5    Q.   Let me show you what we've marked as
6  Plaintiff's exhibit number 1, and ask if you've
7  seen that before?
8        MR. TOZZI:   That's my letter, Bill.
9        THE WITNESS:   Yes. Mr. Tozzi showed
10  this document to me yesterday.
11  BY MR. UNDERWOOD:
12    Q.   All right. You understand that
13  you're being proffered this morning not
14  personally but as the corporate representative
15  of Homeowners Loan Corporation?
16    A.   Yes, sir, I understand that.
17    Q.   Do you also understand that exhibit
18  number 1 is the agreement between your lawyer,
19  Mr. Tozzi, and myself, about the areas that you
20  would testify in this morning?
21    A.   Yes, sir, I do.
22    Q.   Before I got off on that little
23  tangent, something I should have done to start
24  with, you were telling me what you did as
25  secondary mortgage market manager.

Page 13

1    A.   Right.
2    Q.   Did you finish?
3    A.   I believe so, yes.
4    Q.   What about as funding department
5  manager, what did you do with that hat on?
6    A.   That is essentially the process
7  whereby we access our company's lines of credit
8  -- at the time, line of credit, to wire money
9  to title companies, such as Swafford and Hays,
10  to actually fund our company's loans.
11        So the process would be we would
12  instruct the other lender to wire money to
13  Swafford and Hays, or other title companies'
14  accounts, and then the title companies, such as
15  Swafford and Hays, would utilize that money to
16  cut checks to the borrowers, the borrower's
17  creditors, and for other fees associated with
18  the closing as reflected on the HUD-1 or HUD-1A
19  settlement statements.
20    Q.   Okay, we'll get into that process
21  later.
22    A.   But the funding was -- what was
23  involved is when we would access the warehouse
24  line of credit, we would do so with the
25  understanding that the loan which that wire

1 funded would be pledged as collateral until
2 that advance was repaid to the other lender.
3       So it was essentially a paper-flow
4 issue to where we would say access the line of
5 credit for $100,000 to fund a loan, we had an
6 agreement with that lender that they would get
7 the promissory note from that loan within a
8 certain number of days previously agreed on to
9 hold as collateral until that loan was sold on
10 the secondary market. Then the money from the
11 sale of the loan would be used to retire that
12 portion of the line with any excess coming to
13 Homeowners as profit.
14    Q. All right.
15    A. That was the funding department.
16    Q. Did Homeowners ever keep any of the
17 loans long enough to start collecting the
18 monthly payments?
19    A. Occasionally, and that evolved over
20 time. When I was first hired the goal was to
21 sell the loans on the secondary market as
22 quickly as possible. I was managed to
23 accomplish that within an average of five days
24 from the date of the closing of the loan.
25       Over time, however, we elected to

Page 15

1 hold the loans a bit longer and earn interest
2 for Homeowners on the coupon rate of the loan,
3 and the difference between what we were paying
4 in interest to the warehouse lender and what we
5 were earning on the coupon, or the spread,
6 would be income to Homeowners for the time that
7 we held the loan.
8       We then moved into a bulk model where
9 we were no longer selling the loans as quickly
10 as we originated them, we were actually holding
11 them for a month or two, and then selling them
12 in much larger chunks, 5, 10, $20 million
13 dollars.
14       So that was kind of the continuum of
15 how the treatment of holding the loans for
16 resale occurred over time.
17    Q. You said you were also manager of the
18 closing department. What was that?
19    A. The closing department took
20 instructions from the underwriting department
21 as to what the terms of the loan would be, and
22 then handled creation of the loan documents and
23 e-mailing those loan documents to title
24 companies for closing.
25       They were also in charge of receiving

1 the HUD-1 or HUD-1A settlement statements from
2 the title companies once the title companies
3 prepared them to reconcile them with our loan
4 documents, including the Truth-In-Lending
5 statement, to make sure that the charges
6 reflected on the HUD were accurately treated in
7 our Truth-In-Lending statements so that the
8 APRs and payment streams would be accurate and
9 consistent between the HUD, which was prepared
10 by the title company, and the rest of the
11 documents which were prepared by Homeowners
12 Loan Corp.
13    Q. We'll go through that whole process.
14    A. Those docs were then e-mailed to the
15 title companies for use at closing.
16    Q. All right.
17    A. That's what the closing department
18 did.
19    Q. What does the underwriting department
20 do, and what did you do as the manager of the
21 underwriting department?
22    A. The underwriting department looks at
23 the borrower's credit profile upon receipt of
24 an application and determines what products we
25 had that the customer might be eligible for and

Page 17

1 the terms under which we would make a loan to
2 the customer, in terms of fees, interest rates,
3 things of that nature.
4    Q. All right.
5    A. And loan terms.
6    Q. In other words, they made the
7 ultimate decision over whether that person got
8 a loan or not, and under what terms the loan
9 was made; is that a fair characterization?
10    A. Yes.
11    Q. Okay. What about the legal
12 department?
13    A. The legal department handled a garden
14 variety of legal issues, such as contract
15 review, and any legal matter that would arise
16 within the company.
17       We also handled consumer complaints,
18 consumer inquiries, consumer issues. We
19 handled litigation, both by the company and
20 against the company, and provided support for
21 the compliance department relative to any legal
22 aspects of compliance.
23    Q. I was going to ask you what was the
24 difference between the legal department and the
25 compliance department?

1      A.  The compliance department is pure
2   compliance with state and federal lending laws,
3   as well as generation of our good faith
4   estimate disclosures, and review of our adverse
5   actions.
6          When a customer is denied a loan
7   there are certain requirements as to how
8   they're denied and whether or not the reasons
9   are appropriate, and the compliance department
10  was in charge of making sure that that occurred
11  properly.
12     Q.  We skipped over quality control.
13  What did the quality control department do?
14     A.  The quality control department at the
15  end of each month would review a sample, ten
16  percent sample, of the loans originated during
17  the previous month against certain criteria we
18  had established to measure the quality of the
19  loan.
20         We knew that the quality of the loan
21  or the loans was good because the secondary
22  market was purchasing them.  However, for our
23  own we wanted to make sure that we were at
24  least as diligent, if not more so, than the
25  secondary market that reviewed our loans.

1          So we set up the quality control
2   department to look at a ten percent sample
3   based upon all sorts of different measures of
4   quality; whether or not the documents were
5   signed properly, whether or not the APR
6   guidelines that we had established were
7   followed, whether or not there were any
8   underwriting errors, whether or not the
9   appraisals were of acceptable quality, things
10  of that nature.
11     Q.  The sample of ten percent, how would
12  that be selected?
13     A.  Random.
14     Q.  Is that once a month?
15     A.  Yes.
16     Q.  The persons in the quality control
17  department, did they have some sort of
18  checklist that they would go by?
19     A.  Yes.
20     Q.  Would they use the closing
21  instructions or did they have something in
22  addition?
23     A.  Well, it was much broader than the
24  closing instructions.
25     Q.  Would they check for things like to

1   make sure all the documents were properly
2   signed?
3      A.  Yes.  Typically that wouldn't make it
4   to the quality control department.  Things like
5   that were discovered and resolved in secondary
6   marketing.  I don't know that I can recall an
7   instance where the quality control department
8   reported that a document wasn't signed
9   properly.
10     Q.  Hopefully someone would catch it
11  before it got along that far?
12     A.  Well, either in our post-closing
13  department, which was part of secondary
14  marketing, we would check these before we would
15  offer them for sale, or if not by us the
16  independent secondary market purchaser would
17  notice the document's not signed properly, this
18  asset needs to be repaired before we buy it,
19  would be the response.
20     Q.  Did your position change with
21  Homeowners at any time or has it always been
22  the same?
23     A.  Well, the title changed a few times.
24  After I was vice president of secondary
25  marketing I became vice president of

1   operations.  That was more of a name change
2   than a functionality change.
3      Q.  Sounds like it.
4      A.  I then became the vice president of
5   risk management.  Oh, I left something off.
6   Excuse me, I apologize.  I also set up and
7   managed the imaging department.  I left that
8   out because there wasn't an imaging department
9   when I first came to the company.  I set that
10  up in 2003, something like that.
11     Q.  What does the imaging department do?
12     A.  Each loan that we originate, before
13  we sell it on the secondary market we capture
14  an electronic copy of it and store it under the
15  borrower's name, social security number,
16  property address, and several other indicators
17  that are searchable, and we maintain our
18  records in that manner rather than have a
19  warehouse full of boxes of documents.  Over
20  time we moved more and more records storage
21  into the imaging system.
22         They worked with, for example, the
23  compliance department in the generation of the
24  good faith estimates.  The process there was to
25  have the compliance department generate the

1  good faith estimate, imaging would image it,
2  then it would be mailed out, similar to other
3  notices required.
4       So, over time virtually everything
5  generated in connection with lending operations
6  at some point went through the imaging
7  department and an electronic copy of it was
8  captured without the need for paper storage.
9     Q.  Okay.
10    A.  Back to answer your other question
11  before I interrupted you on the imaging
12  department.  As vice president of risk
13  management I no longer have responsibility for
14  secondary marketing, underwriting, closing, and
15  funding.  The funding department moved to the
16  accounting department, which made more sense
17  anyway.  The underwriting and secondary
18  marketing department went to other gentlemen
19  who were more specialized in those areas.
20       As the company made the transition to
21  bulk where we would pool the loans and sell
22  them in bigger chunks, that required a higher
23  level of sophistication in secondary marketing
24  than I possessed, so we hired a person to do
25  that.

1     Q.  All right.  Now, do you know when the
2  company was founded?
3     A.  It was here when I got here, so I
4  believe 1996, '97, something like that.
5     Q.  And you got here in 2001?
6     A.  Yes.
7     Q.  Do you have a judgment during your
8  tenure here about how many loans that
9  Homeowners would make per month or per year?
10    A.  It changed over time.
11    Q.  Let's start in 2001.
12       MR. TOZZI:  You mean the company as a
13  whole, not with any particular --
14       MR. UNDERWOOD:  Yes.
15       THE WITNESS:  I did not come prepared
16  to talk about that.  I can provide that
17  information as a supplement, but as soon as I
18  start speculating I'm going to be wrong about
19  that.
20  BY MR. UNDERWOOD:
21    Q.  All right.
22    A.  I will tell you at our peak we
23  originated around 1,000 a month.
24    Q.  1,000 per month?
25    A.  (Witness nods head affirmatively.)

1     Q.  When was that?
2     A.  It would have been in late '04, early
3  '05, 900 to 1,000 a month.
4     Q.  I don't want you to speculate, but
5  let me ask you this, and if you can't answer
6  that's fine.  In '01 would the company have
7  been doing over 100 loans per month?
8     A.  Yes, but I wouldn't want you to go,
9  "Okay, how about 200?  How about 300?"
10    Q.  That's fair enough.
11    A.  Yes, it would have been more than
12  100.
13    Q.  What about in '02?
14    A.  Yes, more than 100 a month.
15    Q.  And then what about in '03?
16    A.  Yes.
17    Q.  In any of these years if you could
18  give me a little better figure just jump in
19  there, but, I mean, if you can't that's fine,
20  too.
21    A.  It's my best recollection that in
22  2004 we originated 1.2 billion in loans.
23       MR. TOZZI:  That's a dollar figure,
24  not a number?
25       THE WITNESS:  Dollar figure, not a

1  number, correct.
2  BY MR. UNDERWOOD:
3     Q.  What about 2005?
4     A.  2005 was not as good a year.  It
5  began declining in mid 2005.
6     Q.  Still more than 100 per month; is
7  that fair to say?
8     A.  Yes.  I would say so, yes.
9     Q.  All right.  Can you tell me when
10  Homeowners started doing business with Swafford
11  and Hays Settlement Services?
12    A.  I'm unclear as to the exact date.  I
13  do know that when I came to the company it's my
14  recollection that they were already doing
15  business with us or began doing business
16  shortly after that.
17       Choice of title companies, when I
18  first came to the company and for the first few
19  months I was here, was left up to the
20  production staff.  So we in secondary market
21  would find out about title companies as we were
22  asked to fund loans and as we received packages
23  from closed loans.
24    Q.  All right.  Now, let me ask you about
25  the production staff.  What were their duties

Hall-Frazier
Record - 000588

1  and what department did they belong to?
2      A.  Well, I used the word production to
3  describe the loan officers, the people that
4  spoke with the customers by telephone, took
5  loan applications, ascertained the customers'
6  needs, and presented that information to
7  underwriting for determination as to whether or
8  not we could make loans to the customers.
9      Q.  Okay.
10     A.  So the production staff's job was
11 sales function.  They would take down the
12 customers' information by telephone, ascertain
13 the customers' needs, and present a product to
14 the customer, which the customer would then
15 either say they wanted the loan and proceed
16 further or they didn't want the loan.
17     Q.  Where did the production staff or the
18 loan officers get their prospects?  I mean
19 Homeowners is doing a lot of business and
20 really I've never heard of it, so. . . .
21     A.  The bulk of our business came from
22 direct mail leads.  Prospective customers would
23 receive a mailer, and if interested the
24 customer would call the number on the mailer
25 which would be directed, depending upon the

Page 27

1  geographical location of the customer, to one
2  of several operation centers.
3      Q.  Did Homeowners do business in all 50
4  states?
5      A.  Not all of them.  At its peak around
6  46.
7      Q.  Does it have offices in other states
8  other than in Georgia?
9      A.  It did, yes.  It does not now.
10     Q.  How many offices did it have?  We
11 won't go through all of them, but just can you
12 tell me how many offices Homeowners had at its
13 peak?
14     A.  At its peak it had two here in
15 Georgia, one in Baton Rouge, two in Arizona,
16 and one in Indianapolis.
17     Q.  I got off on a rabbit trail.  You
18 were telling me about that the production staff
19 or the loan officers picked the title
20 companies?
21     A.  Yes.
22         MR. TOZZI:  Objection.  I think
23 that's what he said when he first got here.
24         MR. UNDERWOOD:  Yes.
25         MR. TOZZI:  In the year 2001.

1          THE WITNESS:  Yes.
2  BY MR. UNDERWOOD:
3      Q.  Did that practice change?
4      A.  Yes and no.  The loan officers and
5  production staff always had the ability to
6  determine who they would order title from.
7  However, over time we began implementation of
8  more and more controls as to who we would allow
9  them to pick from.  We narrowed the field to
10 make the approved list of title companies a bit
11 smaller to where there wasn't unfettered
12 discretion to pick whoever they wanted to.
13         It would have to be from an approved
14 list, and that list was maintained by my
15 department, and each of those title companies
16 had to go through a due diligence process to
17 where we could ensure that these companies were
18 appropriate to handle our business.
19     Q.  To be certain what they were doing?
20     A.  Right.
21     Q.  These are complex transactions even
22 on a single family home; aren't they?
23         MR. TOZZI:  Object to the form.  You
24 can answer.
25         MS. DOVER:  Object to the form.

Page 29

1          THE WITNESS:  I don't know.  I think
2  that's a relative term.
3          MR. UNDERWOOD:  I think so, too.
4  BY MR. UNDERWOOD:
5      Q.  Okay.  When did you start using this
6  approved list of vendors to do your closings?
7      A.  I think we did that pretty early on.
8  It would have been 2001, 2002.
9      Q.  It was one of the first things you
10 did when you were in the manager position?
11     A.  I can't say that.  As you can see
12 from the list I had quite a lot to do.
13     Q.  Sounds like it.  Do you have a
14 judgment about what percentage Swafford and
15 Hays had of Homeowners' closing business in the
16 year 2001?
17     A.  We have records from which I could
18 give you pretty good numbers as far as each
19 month how much of our business they got, and it
20 did change over time.
21         Initially they started as a small
22 company only authorized to do business in a
23 handful of states, maybe two or three, and then
24 over time they expanded and became approved in
25 more and more states, and they began closing

Page 30

1  loans in more and more states as they got
2  approved.
3      Q.  Okay.
4      A.  I know that didn't exactly answer
5  your question. I don't know in 2001. It was
6  small.
7      Q.  Well, maybe I could ask the question
8  this way. Could you tell me about the history
9  of Homeowners' business with Swafford and Hays
10 with regard to volume of loans made from 2001
11 up through 2005?
12     A.  I could give you a very high view of
13 it.
14     Q.  Okay.
15     A.  The high view would be they started
16 as a small company closing a small percentage
17 of our loans, and through a combination of
18 providing good service to the production staff
19 and providing loan packages for the most part
20 on time and for the most part correct, got more
21 and more of our business, I would say pretty
22 steadily, up through the time when our business
23 began declining in 2005.
24     In 2005 we were not taking business
25 away from Swafford and Hays. We just didn't

Page 31

1  have that much business in the second half of
2  2005 for anybody.
3      Q.  Do you have a judgment during that
4  time about what percentage of the closing
5  business that Homeowners was involved in that
6  Swafford and Hays was handling?
7      MS. DOVER:  Object to the form.
8      MR. TOZZI:  You want him to try to do
9  it yearly?
10     MR. UNDERWOOD:  Yes, if he could.
11     THE WITNESS:  My response would be
12 the same as before. My sense was it increased
13 over time. I can't tell you exactly how much.
14     Can we take a short break?
15     MR. UNDERWOOD:  Sure.
16     (Whereupon, a discussion was had off
17 the record.)
18 BY MR. UNDERWOOD:
19     Q.  Now, have you told me all of your job
20 titles while you were with Homeowners?
21     A.  No, there's one more.
22     Q.  Okay.
23     A.  After, say, the fourth quarter of
24 2005 I became the vice president of compliance
25 and internal controls, but my job duties

Page 32

1  remained the same. That's my current title.
2      Q.  Thank you. Does that mean that you
3  are running the compliance department?
4      MS. DOVER:  Object to the form.
5      THE WITNESS:  At all times since I've
6  been with the company I've been responsible for
7  management of the compliance department.
8      (Plaintiff's Exhibit 2 was marked for
9  identification.)
10     MR. TOZZI:  Can we read into the
11 record what he's marked as Plaintiff's exhibit
12 2 are documents Bates stamped SAU/HLO 00355
13 through and including 00622.
14 BY MR. UNDERWOOD:
15     Q.  Let me show you what I've marked as
16 Plaintiff's exhibit number 2, and it's entitled
17 Trailing Documents. Can you tell us what that
18 term means?
19     A.  The cover page with the sticker
20 Plaintiff's exhibit 2 on it, Bates stamped
21 number 00355, is a cover page generated by our
22 trailing documents department and is not part
23 of the loan documents itself.
24     In order for a system to be
25 retrievable in our imaging system we need to

Page 33

1  have, in advance of the document imaged, an
2  electronic marker or placeholder that is
3  searchable.
4      This document, 00355, is a document
5  generated by our system that enables a user to
6  search for this document, and everything imaged
7  along with it, through the use of the search
8  terms contained on the document, such as loan
9  number 10151457, borrower name, Pearlie Finch,
10 borrower's social, property address, primary
11 meaning it's a first mortgage, fixed meaning
12 it's a fixed loan as opposed to an adjustable
13 rate loan, originated through our Atlanta
14 branch with a loan officer named John McDaniel.
15     Q.  Okay.
16     A.  Because we receive documents from
17 closed loans at various times, each time we get
18 something in it needs to have associated with
19 it a sheet like this for imaging. Even though
20 they're not imaged at the same time, if we were
21 to ask the system to produce all loan documents
22 relative to this particular loan number, this
23 particular borrower, this particular property
24 address, when we make such a request the system
25 will pull everything with a cover sheet,

Page 34

1  looking like this, and produce it in the
2  aggregate to constitute the loan file.
3      This particular sheet labeled
4  Trailing Documents is what we call the
5  documents that come into us after the closing
6  occurred, in this instance the recorded
7  mortgage back from the Register's Office
8  bearing the recording stamp at the bottom of
9  page 00356.
10      Other documents which could be
11  included in trailing documents are the title
12  policy, which in this case also appears under
13  the tab beginning at page 00364.
14  Q.  All right.  Is this something that's
15  used as part of your quality control or
16  compliance or both?
17      MR. TOZZI:  Object to the form.
18      MS. DOVER:  Object to the form.
19      THE WITNESS:  Well, I don't know how
20  to answer that.  This is the function of our
21  trailing documents department, which is part of
22  our imaging department, to track the documents
23  that were owed relative to all loans closed by
24  all title companies and follow up until we get
25  recorded mortgages and title policies.

Page 35

1      It is an issue if we don't get them,
2  but I don't know that I would characterize it
3  as something that's tracked by our quality
4  control department.  I do this directly with
5  another group of people.
6  BY MR. UNDERWOOD:
7  Q.  All right.  If you would, would you
8  describe in a little more detail what the
9  compliance department does with regard to a
10  loan like Mrs. Finch's?
11  A.  Beginning in the first instance the
12  compliance department would have sent to Ms.
13  Finch her good faith estimate, I believe.  The
14  compliance department assumed that role over
15  time.  They weren't doing that when I got here.
16  Q.  Okay.
17  A.  And I'm not exactly sure when all
18  offices made the switch.
19  Q.  Let me do this.  I didn't mean to
20  interrupt you.  Let me ask the question this
21  way.  This might be the easiest way to do this.
22      If you would, let me ask you to take
23  exhibit number 2 and sort of walk me through
24  the process, if you can, of Mrs. Finch applying
25  for a loan, and then you guys finally getting

Page 36

1  it back and selling it to secondary market.
2  Would that be all right?
3      MR. TOZZI:  Can you do that from the
4  documents that would be in it?  Does he need to
5  refer to specific documents for your question,
6  or can he just walk you through it kind of in a
7  rogue chronology?
8      MR. UNDERWOOD:  Well, I'd like for
9  him, if he could, to look at the specific
10  documents.  Maybe he can and maybe he can't do
11  that.  I don't want everybody to sit here all
12  day looking at 300 documents.
13      MR. RIEMER:  While he looks through
14  that, let me just take a minute with you,
15  Earl.
16      (Whereupon, a short break was taken.)
17      MR. TOZZI:  He's looked through it.
18  Give him a chance to answer your question.
19  BY MR. UNDERWOOD:
20  Q.  Okay.
21  A.  You'll recall earlier I described to
22  you that the files come in in pieces, not
23  necessarily at the same time, to the imaging
24  department.
25      The tab labeled Credit, or the sheet

Page 37

1  labeled Credit which appears at Bates stamp
2  number 00449, represents the underwriting file,
3  basically the files that the underwriters had
4  to review in approving Ms. Finch's loan.
5      The documents following the cover
6  sheet labeled Legal at Bates stamp 00373
7  generally speaking are the documents signed at
8  closing that we receive back from the title
9  company.
10      The documents under the tabs Trailing
11  Documents appearing at Bates stamp 00355 are
12  the documents that followed closing as the
13  mortgage was recorded and the title policy
14  issued.
15      And then under another tab we have
16  with respect to this particular file, and I'm
17  referring to the word tab which is what we call
18  the cover sheets, it's the functional
19  equivalent of a tab sticking up out of a book
20  where you can use your thumb and go right to
21  the document.  I'm in the habit of calling them
22  tabs even though it probably is more accurate
23  to call it a cover sheet.
24      The second cover sheet labeled
25  Trailing Documents at Bates stamp 00371 is a

1    purchase advice from the purchaser of Ms.
2    Finch's loan documenting the sale of Ms.
3    Finch's loan, it appears to Countrywide, and
4    the money we received in return for Ms. Finch's
5    loan as it was sold.
6      Q.   All right.  Why don't we do this
7    since they're really not in chronological order
8    then.  If you would, could you walk me through
9    the process of taking an application, making a
10   loan, and then finally selling the loan on the
11   secondary market?
12     A.   Sure.  I'll do my best, realizing
13   that there are likely a lot of duplicates here,
14   so I'll use examples as I flip through the file
15   --
16     Q.   Okay.
17     A.   -- to demonstrate what I'm talking
18   about; but because there's multiple copies of
19   things, something I refer to may or may not
20   have been the one actually used in the
21   transaction.  Do you see what I'm saying?
22     Q.   Yes, sir.  Fair enough.
23     A.   The process with respect to the
24   borrowers would start with the taking of an
25   application over the telephone.  The

1    application would have been done on the
2    computer screen electronically by the loan
3    officer.  If printed, the application would
4    look something like the document beginning at
5    Bates stamp 00560.  That is the type of
6    information collected from the
7    borrower/applicant at the time of the first
8    phone call.
9      During the phone call the loan
10   officer would have also asked for permission to
11   access the borrower's credit report.  Upon
12   receiving that permission the credit report
13   would have been accessed and printed.  A copy
14   of Ms. Finch's credit report begins at Bates
15   stamp number 00462.
16     Q.   Okay.
17     A.   The loan officer would, on the basis
18   of the credit report and the information a
19   borrower supplied over the telephone, would
20   call the customer back and based upon the loan
21   officer's review of the products available
22   would suggest a product to the borrower and
23   determine whether or not there was an interest
24   in proceeding with the loan transaction.
25     Q.   All right.  What's the next step then

1    after that?
2     A.   I see here that this file contains
3    another cover sheet which I neglected to
4    mention before labeled Disclosures.  That tells
5    me that this file was created at a point in
6    time after our compliance department took over
7    responsibility for mailing out to customers our
8    good faith estimates.
9      Based upon information in the system,
10   on day two following the application and credit
11   pull date, the compliance department here in
12   Atlanta would run a report, see that Ms. Finch
13   had made an application and was due a good
14   faith estimate.
15      They would then print the
16   documentation here under Disclosures beginning
17   at Bates stamp 00533 and mail to Ms. Finch
18   copies of the documents beginning at 00537,
19   including certain disclosures and the good
20   faith estimate.  Prior to mailing they would
21   have them imaged under a cover sheet such as
22   appears here.
23      The loan officer and loan processor
24   would set about to collect documentation
25   necessary to present to underwriting for the

1    loan.  Those documents would include ordering a
2    title from a title company such as Swafford and
3    Hays, ordering payoffs in connection with the
4    debts to be paid with the loan proceeds, and
5    addressing any instances where the credit
6    report reflected a debt still owed from the
7    customer perhaps disputed or said they had
8    already paid.
9     Q.   All right.  Now, what about things
10   like verifying employment, that sort of thing?
11     A.   That would also be done by the loan
12   officers and processors.  They would make
13   contact with the employer listed on the
14   application and verify employment, income, and
15   things like that.
16     Q.   All right.  Once that's finished
17   what's the next step in the process?
18     A.   Once all documentation was received
19   the loan would then be presented to
20   underwriting for approval, and the underwriting
21   approval form appears at 00451.  It appears the
22   loan was approved under the terms contained on
23   this document by underwriting on 12/29 of '03.
24      It also appears that we showed the
25   loan to Countrywide in advance of the closing

Page 42

1  to ensure that they would purchase the loan
2  once it was originated.
3      Q.  That's the process you were
4  describing earlier --
5      A.  Correct.
6      Q.  -- with the sale in the secondary
7  market?
8      A.  Correct.  At this stage in the
9  company's history we sold the loans under a
10 flow model, meaning we would sell the loans as
11 quickly as we originated them, and to further
12 minimize the risk to the company we would show
13 the loans to the secondary market purchasers
14 before we even made them to ensure that we had
15 a take-out commitment from them.
16         It wasn't a formal commitment as
17 such, but it was an indicator that if the loan
18 was made according to the terms presented they
19 would buy it.
20     Q.  Okay.
21     A.  We moved from the flow model to a
22 bulk model I believe in April of 2004.
23     Q.  All right.  Now, once it comes back
24 to underwriting with an approval what's the
25 next step in the process?

Page 43

1      A.  Well, if underwriting approved it
2  with no stipulations then it would go to
3  closing.  If the customer approved the terms
4  offered, looked like we had a deal, there would
5  be prepared a Document Order Form.
6      Q.  Were there stipulations on this loan,
7  Ms. Finch's?
8      A.  I don't think so because it says
9  final approval.
10     Q.  Okay.  All right.
11     A.  You can see next to the requirements
12 checked underwriter's initials showing that the
13 underwriter had verified that each of the
14 stipulations with a check mark had been
15 verified as received.
16     Q.  Okay.
17         MR. RIEMER:  Can you identify the
18 Bates number you're referring to?
19         THE WITNESS:  00451.  It looks like
20 the underwriter in this case was Lamont
21 Curry, and you see the initials LC next to each
22 of the X's that had been stipulations for this
23 loan.
24         Various versions of this approval
25 would exist in the file as the loan was

Page 44

1  originally approved, and then the stipulations
2  were met.  This one is marked final approval
3  because it looks like everything had been
4  done.
5  BY MR. UNDERWOOD:
6      Q.  All right.  Can you tell me the next
7  step in the process once that had occurred?
8      A.  There would be preparation of a
9  Document Order Form in the form which appears
10 at Bates stamp 00522.
11     Q.  What's the purpose of that form?
12     A.  It's an instruction by the
13 underwriter to the closing department as to
14 what the terms of the loan should be for use by
15 the closing department in creating the loan
16 documents.
17         A copy of this is also sent to the
18 title company at this stage in the process so
19 that the title company can generate the HUD-1
20 or HUD-1A settlement statement for use at
21 closing.
22     Q.  Was Swafford and Hays the title
23 company in this transaction?
24     A.  Yes.
25     Q.  How can you tell that from looking at

Page 45

1  the document you're looking at?
2      A.  Well, Swafford and Hays's name would
3  appear at various points, beginning in the
4  first instance with the commitment to issue
5  title insurance that was received shortly after
6  title was ordered around the time the loan
7  application was made.
8      Q.  Okay.
9      A.  Here on this form Bates stamp number
10 00522 the name Swafford and Hays appears under
11 the title company field under Third Party
12 Information in the middle of the Document Order
13 Form.
14     Q.  Did the loan officer make the choice
15 to use Swafford and Hays, or how was Swafford
16 and Hays selected?
17         MS. DOVER:  Object to the form.
18         THE WITNESS:  I do not know for
19 sure.
20 BY MR. UNDERWOOD:
21     Q.  Okay, fair enough.
22     A.  Typically that would be the loan
23 officer's choice at the time title was ordered
24 sometime before this.
25     Q.  All right.  Is this the document

1 that's used to order a title history on a
2 property, is that the first thing that goes to
3 the title company that will be providing the
4 service?
5     A.   Yes.  Viewed from the position of the
6 title company, the first that the title company
7 knows that a loan closing might occur is
8 receipt of the Title Order Form from the loan
9 officer.
10    Q.   How is that typically done, e-mail?
11    A.   E-mail or fax, depending upon our
12 branch and depending upon the title company.
13    Q.   So what's the next step then in the
14 process?
15    A.   From the creation of the Document
16 Order Form?
17    Q.   Yes.
18    A.   Okay.  The title company is
19 responsible for taking the information on our
20 Document Order Form, including it on the HUD-1
21 or HUD-1A settlement statement, along with the
22 fees to be charged by the title company and
23 sending it back to the loan officers and to our
24 closing department for reconciliation with the
25 Truth-In-Lending statement and other loan

1 documents.
2     Q.   All right.
3     A.   Once it's apparent that everybody has
4 their fees on the HUD, and our closing
5 department runs a check on all the fees for
6 compliance with state and federal high cost
7 rules, the title company's informed that the
8 HUD is final and can't be changed, because at
9 that point the closing department is generating
10 the Truth-In-Lending statement which would be
11 out of balance with the HUD if the HUD changed
12 after that fact.
13         So the signal that everything is in
14 balance, we're going to proceed, is the signal
15 to the title company not to change anything
16 else on the HUD, because the closing department
17 is going to generate the loan documents,
18 including the Truth-In-Lending statement, which
19 won't match up with the HUD if any further
20 changes are made.
21    Q.   So is it fair to say that the
22 Truth-In-Lending statement and the other
23 closing documents are prepared after they
24 receive the HUD-1 back from the title company?
25    A.   Yes.

1     Q.   All right.
2     A.   The HUD-1 has to be final before the
3 Truth-In-Lending statement can be finalized.
4     Q.   Okay.  All right.  What's the next
5 step then in the process?
6     A.   The documents that are prepared by
7 Homeowners Loan Corp are e-mailed to the title
8 company, and there is a dialogue among the loan
9 officer, the title company, and the borrower as
10 to when and where the actual signing will
11 occur.
12         The title company's responsible for
13 choosing the notary or attorney.  They will
14 actually sit with the borrower and have the
15 documents signed, and that is a kind of a
16 planning process involving the loan officer,
17 customer and the title company.
18    Q.   Okay.
19    A.   And the title company then has to
20 negotiate with the notary and arrange for the
21 notary to be at the place agreed upon.
22    Q.   All right.  I left something out.  I
23 meant to ask you where in this process does the
24 borrower learn that the loan has been approved
25 and the terms of the loan?

1     A.   The loan officer calls the borrower
2 and says, "Your loan is finally approved.
3 We're ready to close.  When and where do you
4 want the closing to occur?"
5     Q.   All right.
6     A.   The loan officer also at that time
7 reviews all the terms with the borrower to make
8 sure that this is what the borrower wants.
9     Q.   This is done over the telephone?
10    A.   Correct.
11    Q.   All right.  Then tell me what the
12 next step then after the package goes to the --
13 well, first off, let me ask you this.  Tell me
14 exactly what -- maybe you can or can't tell me
15 this.  What all goes to the title company?
16 What does the package consist of?
17    MR. TOZZI:  You mean from Homeowners
18 to the title company?
19    MR. UNDERWOOD:  Right.
20    MS. DOVER:  Object to the form.  I'm
21 trying to figure when, Earl, before or after
22 the final closing documents?  Is that what
23 you're talking about?
24 BY MR. UNDERWOOD:
25    Q.   Yes.

**Hall-Frazier**
**Record - 000594**

A.   When the loan is ready to close after
the HUD is finalized, the documentation
e-mailed to the title company for use at the
closing is, generally speaking, the documents
under the Legal tab beginning at document
number 00373.  I will tell you that there are a
few stray documents in here that I can see
right away weren't e-mailed to Swafford and
Hays but were included in this package at a
later date.
      For example, this very first document
under the Legal tab, document number 00374, is
a document generated by our secondary
market/post-closing department, would not have
gone to Swafford and Hays.
   Q.   Okay.  Generally what would the
documents be?  I assume it would be a mortgage,
note, Truth-In-Lending disclosure?
   A.   Sure.  These first few documents are
from our post-closing department whereby they
received the package, this is our checklist of
what they would look for in the package to make
sure that it was there before the package was
imaged and forwarded on to the
investor/secondary market purchaser.

Page 51

   Q.   Okay.  The checklist, what's the
Bates number there?
   A.   The checklist of what the
post-closing department would look for is Bates
stamp number 00376.
   Q.   All right.  Thank you.
      MS. DOVER:  What's that Bates number
again?  I'm sorry.
      MR. TOZZI:  00376.
BY MR. UNDERWOOD:
   Q.   All right.
   A.   The first document I see that would
have been part of the documentation e-mailed to
Swafford and Hays and signed at closing is the
Note which is beginning at Bates stamp 00384.
This is the document evidencing the amount of
the loan and the borrower's promise to repay
the loan under the terms stated in the Note.
   Q.   Okay.
   A.   There's a rider to the Note appearing
at 00386.
      Continuing on through the package
there's a Mortgage beginning at Bates stamp
00387 whereby the borrower, here Ms. Finch, was
pledging as collateral for the loan the real

property described in the mortgage.
   Q.   All right.  With regard to mortgages,
is there a great variation between the number
of pages in the mortgage forms that were used
by Homeowners during the period that we
described from 2001 up through 2005?
   A.   Great is a relative term, so I don't
know how to answer that other than to say
they're not all the same.  There could be a
page or two difference, and there could be more
than that depending upon the state.
      The documentation generated in
connection with each loan was a function of two
things; what the secondary market required in
order to resell the loan, and what the state
and federal legal requirements were relative to
disclosures to the customers.
      So if a state required that a
mortgage have additional language or additional
things attached to it, we would have included
those and it would have lengthened the
document.
   Q.   All right.  Let me ask you this.
Maybe you can answer with regard to Ms. Finch's
loan.  How long would Homeowners have known in

Page 53

advance of the loan how many pages the mortgage
would be?
      MR. TOZZI:  You mean in advance of
the closing?
BY MR. UNDERWOOD:
   Q.   Yes.
   A.   I can't say that we set about to
count the pages.  We had approved mortgage
forms for use in Alabama and would have
generated this likely on the day the loan
closed.  I don't think our settlement or our
closing department counted the pages of this
mortgage or any other.
   Q.   All right.  If you would, let's just
finish describing the documents in the closing
package for me, if you will.
   A.   This Mortgage document would have
been, I believe, the only document we would
have gotten back from the title company that
was a copy.  All other documents would have
been the original.  We would have only gotten a
copy of the mortgage back because the original
mortgage hopefully was on its way to the
Registers Office through transmission from the
title company to the Registers Office which we

would later get back and image under the Trailing Documents tab.

Q. Okay.

A. The next document in the stack appearing at Bates stamp 00395 is the Loan Application.

Q. Let me ask you one more question about the mortgage, if I could. I should have asked it a little earlier. Would it be fair to say, maybe it's not an accurate statement, that the same form would be used for all Alabama mortgages?

MR. TOZZI: Object to the form. You can answer.

THE WITNESS: I believe that is correct. However, there may be different mortgage forms depending upon the type of loan, whether it was an adjustable rate or a fixed loan. Some states I believe require different mortgages to match up with the different types of notes, but for the most part I think we would have one 30-year fixed mortgage that would be used all the time.

I think there's some attachments concerning legal descriptions which may, from time-to-time, be one or two pages or even more.

BY MR. UNDERWOOD:

Q. All right. You were describing the Loan Application for me when I interrupted you.

A. Yes. The Loan Application in its final form is generated and provided to the borrower at the closing for review and signature to ensure that all the information on it is correct, and to have a signed representation from the borrower in the loan file to the accuracy of the information provided over the telephone. That document begins at Bates stamp number 00395.

Beginning at document number 00399 is the HUD-1A Settlement Statement executed by Ms. Finch reflecting the disbursements from her loan proceeds.

Q. Could you tell us right quick the difference between the regular HUD-1 and the HUD-1A?

A. HUD-1 is the form suitable for use in purchase transactions. The HUD-1A is the form suitable for use in refinance transactions, the

difference being that 1A has room for more payees. Most of our transactions were refinances, but from time-to-time we did have a purchase.

Q. That was going to be my next question. Do you have a judgment about percentages of transactions that were refinances as opposed to purchase during your tenure with Homeowners?

MR. TOZZI: I'm going to object. My only objection is time period.

THE WITNESS: Historically it's always been about one percent purchasers, ninety-nine percent refinance.

BY MR. UNDERWOOD:

Q. All right. I interrupted you again. You were describing the documents in the closing package for us.

A. Yes. 00399 is the HUD Settlement Statement executed by Ms. Finch and by someone on behalf of Swafford and Hays prior to its return to us.

Document number 00401 is the Truth-In-Lending Disclosure Statement which discloses to the borrower the cost associated with the loan expressed in terms of annual percentage rate.

Q. All right.

A. Document number 00403 is an Affidavit of Common Identity. This is typically utilized where the borrower perhaps was known by more than one name. It appears in our documentation to catch a circumstance where the borrower has more than one name.

Here Ms. Finch has always been Pearlie Finch, so it probably wasn't necessary but included anyway. It does say, though, that she does own the property listed in Exhibit A, which is the property which served as collateral for the loan.

Q. Okay.

A. Document number 00405 is the Notice of Right to Cancel evidencing that Ms. Finch was provided with three days in which to consider the loan transaction and the ability to cancel the transaction at no obligation to her before midnight on January 2nd, 2004. The borrowers receive a copy of this at each closing, and we have multiple copies of this document, and the borrower leaves the

Hall-Frazier
Record - 000596

1  transaction table with a copy of this.
2        THE WITNESS:  Could we go off the
3  record for a minute?
4        MR. UNDERWOOD:  Sure.
5        (Whereupon, a discussion was had off
6  the record.)
7  BY MR. UNDERWOOD:
8     Q.  Go ahead.
9     A.  Let's see.  Document number 00407 is
10  a Request for Taxpayer Identification Number
11  and Certification certifying by Ms. Finch that
12  this is her social security number.
13        Document number 00409 are the Closing
14  Instructions from Homeowners Loan to the title
15  company concerning the terms under which the
16  loan should be closed.  This document is not
17  one that would have been supplied to the
18  customer.  This was for the title company and
19  it is signed by -- it looks like the notary.
20  Perhaps this is something from Swafford and
21  Hays.  It was meant for the title company, not
22  for the notary.
23        The next document is 00412, Cash Out
24  Letter, whereby Ms. Finch is certifying what
25  she's using the proceeds of the loan for.

Page 58

1        Document number 00413 is an
2  Identification Affidavit whereby Ms. Finch is
3  attesting to -- I take that back, I apologize.
4  This is where the closing attorney verified Ms.
5  Finch's identity through use of her driver's
6  license.
7        Document number 00414 is an Agreement
8  for Arbitration of Disputes signed by Ms. Finch
9  and by a representative of our secondary market
10  department.
11     Q.  Is that the standard arbitration
12  agreement that Homeowners has used during the
13  time it was in business?
14        MS. DOVER:  Object to form.
15        THE WITNESS:  Yes.  This is our
16  standard arbitration agreement.
17  BY MR. UNDERWOOD:
18     Q.  Was there more than one used or do
19  you know?
20     A.  No, we used the same one.
21     Q.  All right.
22     A.  The next is 00417 entitled Homeowners
23  Loan Corp Privacy Statement, providing the
24  borrower the disclosure concerning our use of
25  the borrower's personal information, which Ms.

1  Finch signed agreeing to her receipt of that
2  statement.
3        The next document 00418 is the First
4  Payment Notice advising Ms. Finch of the amount
5  of her first payment and where it should be
6  paid.
7        Document number 00419 is the First
8  Payment Letter providing Ms. Finch with her
9  initial payment coupon stating how much she
10  owes, when it is to be paid and where it is to
11  be paid.
12     Q.  Okay.
13     A.  Document number 00420 is our ECOA
14  Notice to Ms. Finch which she signed evidencing
15  her receipt of it.
16     Q.  Is that your standard notice?
17     A.  Correct.
18     Q.  Is that the one Homeowners has always
19  used?
20     A.  Yes, it appears to be.
21     Q.  Okay.
22     A.  Document number 00421 is the Escrow
23  Waiver document whereby Ms. Finch acknowledged
24  that she is not authorizing collection of
25  amounts for escrows of taxes and insurance.

Page 60

1        Document number 00422 is a disclosure
2  relative to the appraisal performed in
3  connection with the transaction.
4        Document number 00423 is a Signature
5  and Name Affidavit.
6        Document number 00424 is an Address
7  Certification signed by Ms. Finch.
8        Document number 00425 is the
9  Disclosure Statement whereby we advise, as
10  required by law, Ms. Finch of our historical
11  track record relative to the sale of our loans
12  on the secondary market.
13        Document number 00426 is an agreement
14  we request the borrowers to sign entitled
15  Compliance Agreement whereby the borrower
16  agrees to cooperate with us in the event any
17  errors in documentation occurred to assist us
18  in correcting those errors.
19        Document number 00427 is an Affidavit
20  signed by Ms. Finch certifying that she owns
21  and occupies -- she occupies the property
22  serving as security for the loan.
23        Document number 00428 is a document
24  entitled First Lien/Title Clearance Letter
25  whereby it looks like Swafford and Hays is

Page 61

certifying that the property covered by the
title commitment has been closed and cleared as
the first mortgage loan.
        The next document is 00429. It's
entitled Disbursement and Flood Insurance
Authorization.
    Q.  Let me ask you this with regard to
the document that you just looked at.  Was
Swafford and Hays required to go back to the
courthouse and certify that the mortgage indeed
was the first lien before this document was
executed?
        MR. TOZZI:  For the record this
document's 428.
        THE WITNESS:  It appears that 428 was
executed on January 4th, a few days after the
closing.  As far as whether or not they were
required to do that, I don't know what they
did.  They do insure against intervening liens,
meaning liens that arise from the effective
date of their commitment through the time our
mortgage is recorded.
BY MR. UNDERWOOD:
    Q.  Okay.
    A.  That is called Gap coverage, and we

Page 63

had it on all our loans to protect us against
intervening liens.
    Q.  Okay, thank you.
    A.  Document number 00429 is a disclosure
relative to the necessity of flood insurance or
the lack of necessity for flood insurance
relative to the property.
        Document number 040430 deals with the
same issue entitled Flood Hazard Notice.
        Document number 00432 is entitled
Statement of Anti-Coercion.  This is a document
signed by the borrower in connection with their
choice of insurance companies.  Here,
Nationwide Insurance Agency.
        Document number 00433 is a statement
provided by the borrower concerning the
accuracy of the employment information provided
on the loan application, accuracy of the debts
stated, and again that they occupy the property
on which the mortgage is being placed.
        Document number 00434 is an
Acknowledgment of Receipt of Disclosures and
Copies of Documents Signed at Closing, whereby
the borrower is acknowledging that they
received a copy of the good faith estimate

through the mail, along with an adjustable rate
mortgage disclosure to aid the consumer in
determining whether they wanted a fixed or an
ARM rate loan.  In this document the borrower
is also certifying or agreeing that they
received a copy of all documents that they
signed at closing.
        It looks like that document number
00435 is another acknowledgment that the
borrower received copies of all the documents
signed at closing.
        Document number 00436 is a document
signed by the borrower to authorize our quality
control department to reverify the information
provided by the borrower and verified initially
by our underwriting department.  This would be
the documentation utilized by our quality
control department to verify again employment,
verify again the debts, and ask basically the
same questions that the underwriters asked when
approving the loans.
        Document number 00437 is the Quality
Control Release authorizing again the quality
control department to reverify credit,
employment, bank accounts, et cetera.

Page 64

        Document number 00438 is a Borrower
Acknowledgment whereby a borrower agrees that
during the loan application no one from
Homeowners Loan Corp recommended to or
encouraged them to default in any of their
existing obligations in anticipation of
receiving a loan through Homeowners Loan.
        Document number 00439 is entitled
Hardship Letter and is utilized in
circumstances where the first payment on their
new loan is less than thirty days from the date
of the closing.  I don't know whether that was
appropriate in this case or not, but it is
printed along with our forms.
    Q.  Okay.
    A.  Document number 00440 is a document
not prepared by Homeowners but prepared by
Swafford and Hays.  In it, the title company
asks the borrower to certify that the
borrower's not aware of any pending matters
that would give rise to a lien that might be
superior in priority to the mortgage to be
recorded from Homeowners Loan, and also that
there are no unrecorded special assessments or
liens which might affect the title to the

property.
It looks like document number 00441 is another such document. This is not our form. This would have been something that the title company required.
It looks like document number 00442 is the Flood Certification stating that the borrower's property is in a flood zone.
Document number 00443 is the Notice relative to flood insurance.
Document number 00444 is Evidence of Property Insurance through Nationwide.
It looks like document number 00445 is a duplicate of that, Evidence of Property Insurance.
MR. TOZZI: Earl, you want him to keep going through this page-by-page?
BY MR. UNDERWOOD:
Q. I think we're almost done.
A. The rest of the documents contained under this Legal tab do not appear to be documents that would have gone with our closing package. They are beginning at document number 00446, would have been documents supplied to our underwriting department.

Q. All right. Now, let me ask you this. Of the documents you just described, would the typical closing package consist of all or most of those documents?
MS. DOVER: Object to the form.
THE WITNESS: Yes, sir, it would.
MR. UNDERWOOD: Did you guys want to take a lunch?
MR. TOZZI: No, because he's got the childcare issue.
MS. DOVER: I do need to take a short restroom break, though.
MR. UNDERWOOD: All right. Why don't we do that now.
(Whereupon, a short break was taken.)
BY MR. UNDERWOOD:
Q. Can you just walk me through the closing up to the point where you were finished with the consumer, and if you would, please, sir, could you describe for me the rest of the process up until the loan is sold in the secondary market?
A. The documentation that I went through that the consumer signed would be checked by our post-closing department --

Q. All right.
A. -- against that checklist I identified previously.
Q. How does that get back to Homeowners?
MS. DOVER: Object to the form.
THE WITNESS: The documentation signed by the customer in the presence of a notary or an attorney, depending upon the state, would be overnighted to the title company who would, in turn, overnight it to Homeowners.
BY MR. UNDERWOOD:
Q. In this case Swafford and Hays?
A. Correct.
Q. All right.
A. Each day our post-closing department would receive packages from all over the country for loans that would have closed during the previous few days.
Q. All right.
A. Those packages were reviewed, and if acceptable sent to imaging, copied by imaging, and then shipped out under our flow model immediately to secondary market purchasers for review and purchase.

Under the bulk model later on the files were kept in a safe area until they were to be shown to purchasers in bulk.
Q. All right. Now, could you describe to me under the flow model exactly how the mortgage was assigned to the purchaser?
A. The purchaser of the loan under the flow model would look at the package quickly, advise us of any missing or incorrect items.
Then once the package was deemed acceptable, sometimes in the first instance, other times after some additional work needed to be performed, we would receive over the fax a document which we referred to as a Purchase Advice which would evidence a wire from the purchaser to our warehouse lender to pay for the loan.
Q. Okay.
A. The transaction would be then complete from our perspective. It's a little more complicated because we haven't discussed transfer of the actual Note from our warehouse lender to the purchaser, but I'm not sure that's relevant.
Q. All right. With regard to the

mortgage itself, is there an Assignment of
Record recorded?

A.  In this file marked as exhibit 2
there's an assignment prepared by our secondary
marketing department and forwarded to the
purchaser along with the package.

Q.  All right.  Who would pay for the
recording of that assignment?

A.  I believe that our secondary market
purchaser would pay for the recording of the
assignment.  I will tell you that it varied
based upon the time we're talking about and the
identity of the company that purchased.

Some of the companies, as a matter of
practice, would not record assignments unless
and until the loan went into default and there
was a need to foreclose.  Others recorded them
promptly.  Even all of that changed once
companies began using MERS more and more.

Q.  I was about to ask you about that,
but before I get into MERS I want to ask you
did Homeowners ever call on Swafford and Hays
to have to pay recording fees for an assignment
regarding a mortgage that was sold, like you
just described?

A.  My recollection is somewhat fuzzy on
that.  I seem to recall a long time ago we were
required by some of the purchasers to record
assignments, in which case we would have asked
the title company to do that, but as I got out
of the secondary market business I became less
and less familiar with those issues.

Q.  All right.  Well, do you have a
judgment about how often that would happen,
that Homeowners would have been -- or any title
company would have been called upon to record
an assignment for a mortgage?

MS. DOVER:  Object to form.

THE WITNESS:  Anything I would tell
you would be speculation.  I apologize.  I'm
not going to help you very much on that one.

BY MR. UNDERWOOD:

Q.  Who would know about that?

A.  My sense is that sometimes the
purchasers of the loans would call upon the
title company directly to do that, so I would
think the best evidence of that would be at
Swafford and Hays.  They would be able to show
an assignment associated with a particular loan
that required an expenditure.

Q.  I take it that's not something that
Homeowners was usually involved in; is that
fair to say?

A.  Well, the assignment would have had
to have been executed somehow by Homeowners, so
we would have been involved to the extent we
had to sign the assignment.

Q.  Sure.

A.  But I don't believe that we took
responsibility for recording, for the most
part.

Q.  Do you have any knowledge about
whether or not the purchaser would pay for the
recording?

A.  My sense is that for the most part
the purchasers paid for the recording.  Some of
them might have charged us for it in connection
with the sale of the loan, some of them might
have just paid it.

Q.  All right.

A.  I do know that even now we get from
time-to-time requests for execution of
assignments by the holders of our loans.  We
still get them.  As I said, they wait until a
mortgage is in need of pay off or foreclosure
or something like that, and then get us to sign
the assignment and send it to them at that
point.

Q.  All right.  Now, can you tell me what
MERS is and when that became a process that was
used by Homeowners?

A.  During the time period where we moved
to be a participant in MERS I was not managing
secondary marketing.  That was handled by
others, primarily, so I can't be very specific
about when we moved to it.

However, MERS in general is a
national record system whereby evidence of
assignments from one lender to another are
documented within the national MERS system and
not through use of traditional assignments
recorded at the county level.

What you will have on a
MERS-ready-loan is a mortgage generated with a
MIN number, M-I-N, which is a signal that that
mortgage is going to be assigned through MERS
once it's recorded.  The public records will
reflect a mortgage with a MIN number and an
assignment to MERS.  Someone interested in
determining who the holder of the loan would

have to, at that point, go to MERS to determine
within its system who the true holder of the
loan was. The true holder is not documented at
the county level at that point for MERS loans.
    Q. Is there a charge for that service?
    A. I believe there is, yes.
    Q. Is that something that the purchaser
of the mortgage would generally pay for, or was
that something that Homeowners would pay for?
    A. I believe Homeowners paid for it, but
I'm not a hundred percent sure. I don't recall
any charges being made to the customer for
MERS, if that's your question.
    Q. Okay.
    A. At any point.
    Q. Who could we speak to about whether
or not there were charges for MERS?
    A. I would have to investigate it and
get back to you. None of the people that were
involved in that are with the company any
longer.
    Q. Okay.
    A. I don't think MERS was in any way
involved in Ms. Finch's loan.
    Q. All right.

    A. That would have predated our entry
into the MERS situation.
    Q. Could you tell me about when that
took place?
    A. My sense is it was probably 2005 or
late 2004.
    Q. All right. Fair enough. I wanted to
ask you some questions now about the HUD-1 and
Ms. Finch, and what services were performed for
the charges that are on there. Would you be
able to answer those questions?
    A. Yes.
    MR. UNDERWOOD: Let's go off the
record for just a second.
    (Whereupon, a discussion was had off
the record.)
BY MR. UNDERWOOD:
    Q. Let me show you what's been Bates
stamped 00399, and if you would just identify
the document for us, please, sir.
    A. This document is part of collective
exhibit 2 and was the HUD Settlement Statement
prepared and signed in connection with Ms.
Finch's loan transaction.
    Q. All right. If you would, please,

sir, I would appreciate you going through each
charge and just giving us a brief description
of what services were done and who did those
services with respect to those charges.
    MR. TOZZI: Are you talking about
just line items for which this borrower was
charged?
BY MR. UNDERWOOD:
    Q. Right.
    A. Lines in the 800 series, lines 801
through 811, are fees charged by and payable to
Homeowners Loan Corp, including its origination
fee appearing at line 801.
    Q. Okay. Now, let me ask you what is
done for the origination fee?
    MR. TOZZI: I'm going to object to
the form, or I'm going to let you go. I'm
starting to question why questions about what
Homeowners' charges are are relevant to the
lawsuit, but I'm going to see where this goes,
but go ahead and answer.
BY MR. UNDERWOOD:
    Q. Go ahead and answer.
    A. This is the compensation to
Homeowners in return for which it made the

loan, along with these other items. This is
what it would cost the borrower to receive the
loan from Homeowners broken down into these
various categories.
    Q. Sure. Well, now, you've described
the application process and all the steps and
the work that Homeowners had to do to get the
paperwork ready and all that sort of thing. Is
that charge in part for those things that you
described earlier?
    A. Well, yes. All the work that we have
done to collect the documentation, review the
documentation, underwrite the loan, and prepare
the loan documents are included in the lines on
the 800 series.
    Q. Sure. All right. Is it a one
percent origination fee in this?
    A. That would have to be a math problem.
    Q. All right. No problem. All right.
Let's go down to the next one in the 800
series.
    A. Well, stop at line 804.
    Q. Okay.
    A. That is a credit report fee, but it's
listed as paid outside of closing. That's paid

by the lender and not charged to the borrower.
Our credit report that we accessed on Ms. Finch
cost us $8.50. We show that as an amount which
was incurred but not charged to the borrower.
    Q.   Sure, so it's not in this column.
    A.   So just continuing on, there is no
lender inspection fee, there's no mortgage
insurance, there's no assumption fee.
        The next line on which a charge
appears is 808, the processing underwriting
fee. That's payable to Homeowners in the
amount of $390.
        The next fee 809 is the funding fee
payable to Homeowners in the amount of $365.
    Q.   Okay.
    A.   The next document is the
administration fee appearing at line 810 in the
amount of $295, and then the final fee payable
to Homeowners appears at line 811 as the
document preparation fee in the amount of
$195. These fees should tie to the Document
Order Form referenced earlier.
    Q.   All right. Does that vary from loan
to loan?
    A.   The charges for processing, funding,

administration, and document prep do not vary
from loan to loan unless there is a state that
does not allow any one or all of those fees, in
which case we don't charge them.
        In states where they are allowed,
those fees are the same. What does vary is the
origination fee typically based upon the size
of the loan.
    Q.   So, in other words, the document
preparation fee is not based on the number of
pages or anything?
    A.   That's correct.
    Q.   All right. What's the next charge?
    A.   The next items in the 900 series are
the charges payable to third parties for
insurance.
        Line number 903 is payable to Tucker
and Associates for $370 to ensure that the
property owned by Ms. Finch is adequately
covered by flood insurance.
        Line number 904 -- I take that back.
I apologize. I reversed them. Line number 903
is the hazard insurance line payable to Tucker
and Associates for $370 to ensure that the
property serving as collateral for the loan has

hazard insurance.
        The next line 904 is the flood
insurance charge to Nationwide Insurance in the
amount of $583. Those fees are paid to third
parties not associated with either Homeowners
or Swafford and Hays, and we receive no part of
that.
    Q.   Okay.
    A.   As I said, on this loan there are no
escrows, so the 1000 series lines are blank.
    Q.   Let me ask you are there escrows on
some of the loans?
    A.   Yes. A small portion of borrowers do
ask for escrows to be set up, and if that is
the case then an amount appears in those lines
is deducted from the proceeds and is held as
escrow for payment of hazard insurance or
taxes, by agreement.
    Q.   All right.
    A.   The charges in the 1100 series are
charges payable to Swafford and Hays. Those
are the fees charged by the title company for
the services that they rendered, including line
1101 for settlement, line 1102 for abstract or
title search, line 1103 for title examination,

line 1108 for title insurance. Those fees are
payable to Swafford and Hays.
        Line number 1200 are fees payable to
the Clerk of the Court and the State to have
the mortgage recorded. Those are lines 1201
and 1203. Those fees are not payable to
Homeowners, and Homeowners gets no part of
those. Those fees are not payable to Swafford
and Hays either.
        The final thing on this column is the
flood determination appearing at line 1303.
That is reflected as paid outside of closing.
That's a charge paid by Homeowners and not
charged back to the borrower in the amount of
$9.50.
    Q.   All right. Now, with regard to these
fees that are in the 1100 series, does
Homeowners share in any of those fees?
    A.   No, sir.
    Q.   Can you describe for me what it is
that Swafford and Hays are asked by Homeowners
to do for each of the fees in the 1100 series?
    A.   Swafford and Hays, on this and all
other loans that they close for us, just like
all of our other title companies, would perform

1    an initial title search for us and let us know
2    the current status of the title and what, if
3    any, matters exist that are affecting the
4    title.
5        Q.   And that's done back when you first
6    sent -- what was the name of the form?
7        A.   Title Order Form.
8        Q.   I thought there was another form that
9    you --
10       A.   There was a Document Order Form which
11   would be contemporaneously with the preparation
12   of the HUD.
13       Q.   All right.
14       A.   But the first touch to the title
15   company would be the Title Order Form whereby
16   we would provide the name and address of the
17   borrower and ask for a current status of the
18   title relative to the property identified.
19       Q.   All right.  Did we have a Title Order
20   Form in here?
21       A.   I don't know.  That's typically
22   generated by the loan officer and faxed to the
23   title company and doesn't make it into closing
24   or underwriting, so it's likely we don't have a
25   copy of that form.

1        Q.   Okay.  Well, that's fine.  I was just
2    wondering.
3        A.   We do, however, have a copy of the
4    Title Commitment which Homeowners received in
5    return, and that appears in the credit file.
6        Q.   Was that a commitment from a title
7    insurance company?
8        A.   Bear with me a moment.  In response
9    to making the Title Order, Homeowners would
10   receive something that looks like the
11   documentation beginning at Bates number 00511.
12   It's a Commitment by Swafford and Hays as agent
13   for either American Pioneer or TICOR, who they
14   would refer to as their underwriter, to issue
15   title insurance for the property described upon
16   satisfaction of the contingencies or
17   requirements listed in Schedule B.
18       Q.   Now, let me ask you this.  Suppose
19   the loan didn't go through.  Suppose the
20   commitment came back, or they wouldn't make a
21   commitment.  What would happen then?  Who would
22   pay for the title examination in that case?
23       A.   The arrangement between Homeowners
24   and Swafford and Hays, as was the arrangement
25   with all of our title companies, is that there

1    was no cancellation fee.  If a title was
2    ordered and the loan did not close, Homeowners
3    would be billed nothing and the borrower would
4    be billed nothing.
5        Q.   All right.  Fair enough.  Let's go
6    back to the HUD-1 statement.
7        A.   You were asking me to describe the
8    services performed by Swafford and Hays, and I
9    was trying to do that chronologically beginning
10   with the first thing they did.
11       Q.   All right.
12       A.   That would be to provide us with a
13   Title Commitment.
14       Q.   Okay.
15       A.   They would then assist Homeowners in
16   the processing of the loan, meaning to verify
17   that the liens were valid, and if things
18   appeared on the title that were not supposed to
19   be there, assist in clearing those from the
20   title.
21            From time-to-time they were also
22   called upon to prepare certain deeds of
23   conveyance in connection with the closing, as
24   well.
25       Q.   All right.  I think that I had asked

1    you what specifically they were required to do
2    for each one of these charges that are listed
3    in this 1100 series section.
4        A.   I mean generally speaking we would
5    ask the title companies what they would charge
6    to do the services that I articulated to you
7    earlier that all of the title companies did for
8    us, and they would come back to us and say,
9    "These are our fees."  That was the case here
10   with Swafford and Hays, with one qualifier.
11           At some point in time, I believe it
12   was in 2004, as we continued to grow I looked
13   at all of the fees charged by all of our title
14   companies, and felt like it was important for
15   customer service reasons to try to standardize
16   them.
17           For example, I didn't want our
18   customer to be disadvantaged because a loan
19   officer picked Company A over Company B.  The
20   customer ought to be charged roughly the same
21   thing, and that shouldn't be controlled by the
22   choice of title company, all other things being
23   equal.
24           So what we did is we looked at
25   historical averages from all of our companies

and did the best job we could by averaging them
all and coming up with some middle ground of
what we felt, based on what we perceived to be
the market, was reasonable for each of these
fees.

    Now, obviously some fees, to the
extent they were loan-amount dependent,
couldn't be standardized, like title insurance
coverage, and recording fees. Those couldn't
be standardized either, but fees for settlement
services could be, and that's what we sought to
standardize.

    Q. Okay.

    A. So we sent out a matrix of what we
would pay in each state based upon historical
data and averages from all of our title
companies, and we said, "Going forward you
can't charge any more than this for these
particular services." That schedule is in the
documentation that I produced.

    Q. Okay. I believe I've seen that. So
from the date of that document forward is when
that policy was in force; is that a correct
statement?

    A. Correct. And we still would not

include those fees in our instructions to the
title company, but our closing department would
check the fees that the title company put on
the HUD against that matrix to make sure that
nobody charged more than what we said was
reasonable.

    Q. All right.

    A. Unless there was some extraordinary
amount of work that we could feel comfortable
had actually been done.

    Q. Sure. All right. What about with
regard to recording fees?

    A. The directive to the title companies
concerning recording fees was always that those
were the fees that were pass-throughs and
payable to the Registers Office in some cases,
or the Court in other cases, depending upon the
jurisdiction.

    Q. All right. Now, did there come a
time when you learned that Swafford and Hays
was retaining a portion of the recording fees
in some transactions?

    MS. DOVER: Object to form.

    THE WITNESS: Yes.

BY MR. UNDERWOOD:

    Q. When was that, please, sir?

    A. I believe that was in late 2004. I
have documentation on that.

    MR. UNDERWOOD: Do you all want to
take a break before we --

    MR. TOZZI: Yeah, absolutely.

    MR. UNDERWOOD: All right.

    (Whereupon, a short break was taken.)

BY MR. UNDERWOOD:

    Q. Bill, before we went on a break I had
asked you if you learned at some point that
Swafford and Hays was retaining a portion of
the filing fees, and you were going to tell me
about how you learned that.

    A. I did become aware that they had done
that, and my investigation revealed when I -- I
can't remember the specific instance, but I did
have my compliance officer check the recording
stamp on a mortgage against the recording fee
charged on a HUD and noticed the disparity, and
then I raised it, I believe with Greg. This
has been a while ago, but I believe I would
have raised it with Greg Swafford.

    Q. And what was his explanation for
that?

    A. He told me that they retained a
portion of it as compensation to Swafford and
Hays.

    Q. All right.

    A. The portion I was referring to being
the difference between the actual charge
payable to the recorder and then the amount
charged on the HUD Settlement Statement.

    Q. Did you and he have any discussions
about that?

    A. Yes, we did.

    Q. What do you remember about those
discussions?

    A. I told him to cease the practice
immediately.

    Q. And what was his reply to that?

    A. His reply was that he agreed to do
that, and noted that his underwriter had
discovered that Swafford and Hays was doing
that as well, and had advised them, in his
words, that it was a gray area.

    They also, they being Swafford and
Hays, also began charging another fee reflected
on the HUD as payable to Swafford and Hays
following the decision to charge only actual

1  recording fees reflected on the HUD.
2      Q.  All right.  Did you ever have any
3  discussion with him with regard to charges for
4  abstract and title search?
5      A.  No, other than in connection with the
6  standardization for such fees.
7          (Plaintiff's Exhibit 3 was marked for
8      identification.)
9  BY MR. UNDERWOOD:
10     Q.  All right.  Let me show you what I've
11  marked as Plaintiff's exhibit number 3, and ask
12  you, if you would, identify that for the record
13  for us, please, sir.
14     A.  Plaintiff's exhibit 3 --
15         MR. TOZZI:  For the record it's 1451
16  stamped.
17         THE WITNESS:  -- stamped 01451 is a
18  handwritten note from my file relative to
19  Swafford and Hays dated September 7th, 2004.
20  BY MR. UNDERWOOD:
21     Q.  What was the occasion of making the
22  handwritten note?
23     A.  This was a handwritten record of my
24  activities on or around September 7th relative
25  to this issue, the first being my conversation

1  with Mr. Swafford over the issue, then
2  documenting my advising each of the heads of
3  production for each of our operating centers of
4  the change to the way Swafford and Hays would
5  be charging fees, and then at the bottom is
6  documentation of the conversation which I
7  referenced earlier about Greg telling me that
8  according to his underwriter it was a gray
9  area, but that they would comply with our
10  request that recording fees only be fees
11  payable to the recorder.
12     Q.  All right.  Did you agree with him
13  that it was a gray area?
14         MR. TOZZI:  Object to the form.
15         MS. DOVER:  Object to the form.
16         MR. TOZZI:  The testimony, I don't
17  think, was that Mr. Swafford said it was a gray
18  area.  It's that the underwriter had told Mr.
19  Swafford it was a gray area.
20         MR. UNDERWOOD:  Well, then let me
21  rephrase the question.
22  BY MR. UNDERWOOD:
23     Q.  Do you agree that it's a gray area?
24     A.  I told Mr. Swafford that I was
25  concerned that the practice violated Real

1  Estate Settlement Procedures Act or RESPA.
2      Q.  All right.  Did you and he exchange
3  some e-mails in that regard?
4      A.  There were e-mails about it.  I can't
5  honestly recall at this point whether it was
6  involving Greg or Jimmy Swafford, but it was
7  with their company, about the issue.
8      Q.  Who is Jimmy Swafford?
9      A.  Jimmy Swafford, my understanding, is
10  Greg's brother.
11     Q.  All right.
12     A.  Also a principal of Swafford and
13  Hays.
14         (Plaintiff's Exhibit 4 was marked for
15      identification.)
16  BY MR. UNDERWOOD:
17     Q.  Let me show you what I've now marked
18  as Plaintiff's exhibit number 4, and it's Bates
19  numbered 1448 through 1450, and ask you to
20  identify those for the record, please, sir.
21     A.  Okay.  Plaintiff's exhibit 4 is more
22  than one e-mail.
23     Q.  Yes, sir.
24     A.  What would you like for me to do
25  relative to them?

1      Q.  Well, just identify those for the
2  record, the e-mails.  Did you send them, and is
3  that a true and accurate copy of them?
4      A.  The first page of Plaintiff's exhibit
5  4 bearing Bates number 01448 are two e-mails.
6  The first from Jimmy Swafford to each of the
7  heads of our production office, with copies to
8  some people within Swafford and Hays, as well
9  as me, Subject is fees, dated September 8th.
10         The second e-mail reflected on this
11  page is my e-mail back to Jimmy clarifying my
12  recollection of the conversation.
13     Q.  Okay.
14     A.  The second page Bates stamped 01449,
15  and the following page 01450, are an e-mail
16  from Jimmy Swafford to the heads of production,
17  with a copy to me, which I believe is the same
18  e-mail referenced on the first page of the
19  exhibit.
20     Q.  Okay.
21     A.  The second e-mail copied on Bates
22  number 01449 is my e-mail to our head of
23  production, Tracy Jones, asking how his
24  conversation with the heads of production went
25  concerning these fees.

The third e-mail on Bates number
01449 is Tracy's e-mail to Mr. Swafford, with
copies to me and all the heads of production,
again clarifying why the change was necessary.
    Q.  All right.  Why was the change
necessary?
        MS. DOVER:  Object to the form.
        THE WITNESS:  I instructed the change
because it was my concern that the practice
violated RESPA.  There was need for
clarification because Jimmy Swafford's e-mail
indicated that the change was necessary because
of a policy instituted by me and my department.
BY MR. UNDERWOOD:
    Q.  All right.  Is that one of the
e-mails you have there?
    A.  Yes, sir.
    Q.  Which one was it?
    A.  The e-mail from Mr. Swafford dated
September 8th, 2004 at 1:59 p.m. states that,
"In order to comply with an HOLC policy
instituted by your Risk Management Department,
Swafford and Hays will increase fees by $75,"
and then it continues on to indicate that any
recording fee overages will be returned to the

borrower.
    Q.  All right.  Now, did you have any
discussion with Swafford and Hays regarding the
length of time they had been retaining a
portion of the recording fees?
        MS. DOVER:  Object to the form.
        THE WITNESS:  If I did I don't recall
them.  My memory's not that great, so that's
why I write everything down.
BY MR. UNDERWOOD:
    Q.  Okay.
    A.  That's not in my notes, so I don't
have a recollection about that.
        (Plaintiff's Exhibit 5 was marked for
identification.)
BY MR. UNDERWOOD:
    Q.  All right.  Let me just show you
Plaintiff's exhibit 5.  I guess that's just
another copy of that e-mail?
        MR. TOZZI:  It's the same e-mail.
        THE WITNESS:  It's the same e-mail
that appears at the beginning or at the bottom
of the e-mail strands in Plaintiff's exhibit 4.
        MS. DOVER:  Could you tell me the
Bates number for exhibit 5, please?

        MR. TOZZI:  1447.
BY MR. UNDERWOOD:
    Q.  All right.  I believe you may have
told me this already, but how was it that you
first became aware that Swafford and Hays was
retaining a portion of the recording fees?
        MS. DOVER:  Object to the form.
        THE WITNESS:  I've thought about
that, and I can't honestly recall for sure.  It
may have been in response to a customer inquiry
concerning their noticing the disparity between
the amount of the recording stamp and the
amount reflected on a HUD.
    I can't recall for sure, but there
was an incident of some sort that brought it to
my attention, and I looked into it.
BY MR. UNDERWOOD:
    Q.  All right.  Did you ever become aware
of any litigation that Swafford and Hays was
involved in regarding the recording fees?
        MR. TOZZI:  Separate from this case?
        MR. UNDERWOOD:  No.
        MR. TOZZI:  I'm sorry.  I'm not quite
sure I understand the question.
        MR. UNDERWOOD:  Okay.  Let me ask it

again.
BY MR. UNDERWOOD:
    Q.  Did you ever become aware that
Swafford and Hays was involved in litigation
regarding these charges for recording fees?
    A.  Yes, but my knowledge about it
evolved over time.
    Q.  Okay.
    A.  I believe my first inkling that this
litigation, or others like it had been filed,
was when we received a subpoena for the loan
files, and that was quite sometime ago.  I
noted that the lawsuit was against Swafford and
Hays, and I believe I called them and said,
"What is this about," and I was told generally
speaking what the lawsuit was about.
    Q.  All right.  Do you recall if the
subpoena was from a federal court or a state
court?
    A.  I don't recall.
    Q.  Do you know about when that was you
received a subpoena?
    A.  No, sir, I don't.
    Q.  Who would know about that?
    A.  I could check my records.  It would

1    be me.  I just haven't -- I didn't look at
2    that.  I would assume the subpoena would have
3    been issued by you guys.
4         MR. TOZZI:  Yeah, that's what I don't
5    get.  He's not talking about any other cases
6    other than the two we're here on today.
7         MR. UNDERWOOD:  I don't know of any.
8         MR. TOZZI:  That's what I'm telling
9    you.  So whatever subpoenas he's testifying to
10   are the series, you know, when we said earlier
11   you subpoenaed him and then you resubpoenaed
12   for the convenient date.
13        THE WITNESS:  It was Gibbs and or
14   Finch, that lawsuit.  It wasn't another one.
15   BY MR. UNDERWOOD:
16        Q.  Okay.  Now, are you aware that
17   Swafford and Hays is taking the position that
18   part of the filing fee that it was retaining
19   was to be used for the recording of future
20   assignments?
21        MS. DOVER:  Object to the form.
22        THE WITNESS:  I have learned that
23   that is one of the positions that they're
24   taking, yes.
25   BY MR. UNDERWOOD:

                                        Page 99

1         Q.  All right.  Did Homeowners ever call
2    on Swafford and Hays to pay for recording of a
3    future assignment?
4         A.  I don't know the answer to that.  I
5    apologize.  That would have been a secondary
6    market responsibility in secondary marketing,
7    and I have a vague recollection that from
8    time-to-time a purchaser required us to record
9    an assignment.
10        I don't recall Swafford and Hays
11   paying for that.  However, they should have
12   accounting records indicating what assignments
13   they paid for and what loans they were
14   chargeable against, I would hope, but I don't
15   have a specific recollection of that one way or
16   the other.
17        Q.  All right.  And you've already
18   described for us, haven't you, the way that the
19   secondary market, the assignments worked with
20   regard to transactions that you know about?
21        A.  Yes.
22        Q.  Let me ask you what all did you do to
23   prepare for this deposition?
24        A.  I reviewed the scope of my Rule
25   30(b)(6) deposition.  I had an opportunity to

1    review the Complaint filed in this case.  I had
2    an opportunity to review the Motion to Compel
3    Arbitration filed by Swafford and Hays, and
4    then finally I had an opportunity to review the
5    deposition of Mr. Swafford.
6         Q.  All right.  Now, let me ask you
7    this.  Did you read anything in the deposition
8    of Mr. Swafford that you disagreed with?
9         MS. DOVER:  Object to the form.
10        MR. TOZZI:  I'm going to object and
11   ask that you be a little more specific.  I'm
12   not quite sure he can honestly and accurately
13   answer that question without something a little
14   more specific being posed to him.
15        MR. UNDERWOOD:  Well, you can't blame
16   me for trying.
17   BY MR. UNDERWOOD:
18        Q.  Let me ask it this way.  We went over
19   in pretty good detail about who prepared what
20   documents and the way that the closing
21   documents were prepared.
22        Was there anything in that type of
23   testimony that you saw in his deposition that
24   you disagreed with?
25        A.  With respect to that particular

                                        Page 101

1    aspect of the process I did see something that
2    I did disagree with, yes.
3         Q.  What was that, please?
4         A.  The notion that Homeowners put title
5    company fees on the HUD I don't believe is
6    entirely accurate.
7         As I described the process,
8    Homeowners would supply the title companies
9    with the Document Order Form containing the
10   lender fees and maybe the insurance for hazard
11   and flood.  I believe that's what the form
12   would bear out.  The form did not contain
13   settlement service fees or title insurance or
14   abstract or recording fees.  Those fees were
15   put on, along with the taxes, by the title
16   company and sent back to us on the HUD prepared
17   by the title company --
18        Q.  All right.  Well, let me ask you
19   this.
20        A.  -- for reconciliation with the
21   Truth-In-Lending Statement prior to
22   finalization of the documents.
23        Q.  Well, Homeowners wouldn't know what
24   many of those fees would be until the title
25   company really finished its work; isn't that

fair to say?

MS. DOVER: Object to form.

THE WITNESS: Yes, that is a true statement, except to the extent once we went to the fee standardization model we knew what they shouldn't exceed as to the fees covered by the matrix.

BY MR. UNDERWOOD:

Q. All right. Now, do you recall Mr. Swafford's testimony regarding losing money or having to come out of their operating account to pay for recording fees?

MR. TOZZI: Object to the form. You can answer.

MS. DOVER: Object to the form.

MR. TOZZI: You can answer to the extent you can.

THE WITNESS: I recall portions of the deposition testimony wherein Mr. Swafford indicated that their internal investigation revealed they were losing money and attributed that to recording fees in part.

BY MR. UNDERWOOD:

Q. Do you recall that he said that the cause of that was the fact that they did not

Page 103

know how many pages that the mortgage was going to be until they received the final package after the preparation of the final HUD-1?

MS. DOVER: Object to the form and, Earl, I'm just going to object to the extent -- if you're going to continue asking him questions with respect to whether he agreed or disagreed, I don't have any objection, but if you just keep, "Do you remember when he said this," I'm going to object to the form.

THE WITNESS: I remember his testimony being that one of the problems was they didn't know how many pages the mortgage would be, or what the true extent of the fees would be, and were undercharging on the HUD requiring Swafford and Hays to come out-of-pocket in order to get the mortgages recorded, resulting in a loss relative to that line item.

Is that fair? I mean, that's what I remember.

BY MR. UNDERWOOD:

Q. Sure. All right. Isn't it true, though, that the mortgages from state-to-state only varied by one or two pages, like you told

us earlier?

MS. DOVER: Object to the form.

MR. TOZZI: Object to the form. You can answer.

THE WITNESS: I believe what I said earlier when asked about whether or not it was a lot of pages or not, I said that's relative. I don't know what a lot means. I don't know whether it's one or two pages, or four or five, or ten or twenty. I'd have to look at all of the states and all of the documents.

We offered different products in different states. We had a 228 ARM, we had a 327 ARM, we had a fifteen-year balloon, we had a thirty-year fixed, and I believe some of those states required the mortgage documentation to be different for each.

But as between a thirty-year mortgage in Alabama in one transaction and a thirty-year mortgage in Alabama on another transaction, the only difference should have been the legal description.

BY MR. UNDERWOOD:

Q. Okay. Now, during your tenure with Homeowners how many other title companies did

Page 104

you deal with other than Swafford and Hays?

A. I would say twenty or so, not all in one time, but in and out I would say a total of twenty, twenty five, something like that.

Q. Did Swafford and Hays ever complain to you about this problem with the number of pages with the documents to be recorded?

MS. DOVER: Object to the form.

THE WITNESS: Can I see my notes from the conversation again?

MS. DOVER: Which exhibit is that?

MR. TOZZI: That's 1451.

THE WITNESS: Plaintiff's exhibit 3.

MS. DOVER: Okay.

THE WITNESS: I don't recall that coming up in this context. I recall a general statement that the amount over and above the actual recording fee was necessary because they would be unprofitable otherwise, but he didn't, he being Greg, didn't get into why that was to the same degree as I saw in the deposition.

He did say, "We have to do it or else we won't be profitable," and I do recall him talking about one of the reasons was our cancellation rate, as I've recorded here in the

memo.
BY MR. UNDERWOOD:
    Q. Did you ever have that type of
complaint or complaint regarding not being able
to determine filing fees because of variation
in the number of pages in the mortgage from any
of your other title companies?
        MS. DOVER: Object to the form.
        THE WITNESS: No. I don't recall
that, no.
        MR. UNDERWOOD: Let's take just a
five-minute break. I don't think I have a
whole lot more. I believe we're almost
finished.
        (Whereupon, a short break was taken.)
        MR. UNDERWOOD: Okay. Let's go back
on the record.
BY MR. UNDERWOOD:
    Q. I want to ask you a question or two
about Plaintiff's exhibit number 3. Did Jimmy
Swafford propose to go up -- does this note
here indicate that he proposed to go up on
their fees by $75?
        MS. DOVER: Object to the form.
        THE WITNESS: Yes. Referring to

references a fellow named Eric Jones?
    A. Correct.
    Q. Who is he and what was his role in
this conversation?
    A. Eric Jones was the head of the
production office located here in Atlanta.
    Q. Did you discuss this proposal with
him?
    A. Yes.
    Q. And what was his reaction to it?
        MS. DOVER: Object to the form.
        THE WITNESS: All of the VP's of
production, including Eric, agreed that the
proposed arrangement was not objectionable.
They didn't have an issue with the additional
charge proposed by Swafford and Hays.
BY MR. UNDERWOOD:
    Q. Did you have an issue with it?
    A. Well, I had an issue with inclusion
in the recording fee of fees not payable to the
recorder, and if the company told me they could
not be profitable without charging the fee, and
it was clearly disclosed as a fee to them, then
I did not have an objection to it either.
    Q. All right. Now, it's true, isn't it,

exhibit 5 --
        MR. TOZZI: Exhibit 3.
        THE WITNESS: Exhibit 3, I apologize,
my recollection is that to compensate for the
removal of the retained portion of the
recording fee which had been charged
previously, the proposal was to add $75 as a
separate line item reflected as payable to
Swafford and Hays to the HUD, in addition to
all the other fees that were already there.
BY MR. UNDERWOOD:
    Q. All right. Well, couldn't they just
go up on this $200 fee that's line 1101?
        MR. TOZZI: Object to the form.
        MS. DOVER: Object to the form.
        THE WITNESS: I don't know the answer
to that.
BY MR. UNDERWOOD:
    Q. Well, let me ask it this way: Was
there some reason that they couldn't go up on
the line 1101, as far as you know?
        MS. DOVER: Object to the form.
        THE WITNESS: I don't know.
BY MR. UNDERWOOD:
    Q. This next line in the exhibit

and you've told us, that there is some
variation in the number of pages to mortgages
regarding some of these transactions?
        MS. DOVER: Object to the form.
        MR. TOZZI: Object to the form.
        THE WITNESS: I've said that.
BY MR. UNDERWOOD:
    Q. Several times?
    A. Yes.
    Q. Sure. How do the other title
companies that you have done business with deal
with that problem?
        MS. DOVER: Object to the form.
        THE WITNESS: I don't know how they
deal with it, other than to say they appear to
be able to tell what the recording fee is and
charge what the recording fee is.
BY MR. UNDERWOOD:
    Q. Did you have occasion, after you
learned that Swafford and Hays was retaining a
portion of the recording fee, to raise that
with your other title companies?
        MS. DOVER: Object to the form.
        THE WITNESS: I believe once this
came up we notified all of the title companies

1 that they needed to be sure that they were only
2 collecting for the actual charges, and that if
3 any amounts were collected over the actual
4 charges, upon finalization of the recording
5 transaction and determination of what was
6 actually owed, they needed to refund the
7 balance to the consumer.
8 BY MR. UNDERWOOD:
9     Q.  Okay.
10     A.  I believe I did that with respect to
11 all the companies following this.
12     Q.  Yes, sir.
13     A.  Just to make sure.
14     Q.  Do you know whether or not any of the
15 other companies were charging more than the
16 actual recording fee?
17         MS. DOVER:  Object to the form.
18         THE WITNESS:  I don't know as we sit
19 here.  I know I didn't get any response back
20 saying no other company would adhere to the
21 request.
22         (Plaintiff's Exhibit 6 was marked for
23         identification.)
24 BY MR. UNDERWOOD:
25     Q.  All right.  Now, let me show you what

Page 111

1 I've marked as Plaintiff's exhibit number 6.
2         MS. DOVER:  Could you identify that
3 for me?
4         MR. UNDERWOOD:  That's the Motion to
5 Compel Arbitration.
6         MS. DOVER:  All right.
7 BY MR. UNDERWOOD:
8     Q.  I believe you told me earlier that
9 you had reviewed that in preparation for your
10 deposition; is that right?
11     A.  Yes, sir.
12     Q.  Were there any statements in that
13 motion that you disagreed with?
14         MS. DOVER:  Object to the form.
15         MR. TOZZI:  Objection to the form.
16 Same objection as before.  You can ask specific
17 questions.
18         MR. UNDERWOOD:  Well, he may have
19 something in mind that he can answer it if he
20 wants, if he can.
21         MR. TOZZI:  I'm not going to let him
22 testify to any legal statements in there.  For
23 instance, he's not going to testify as to
24 whether 9 U.S.C et 1 requires certain things.
25 That's a legal conclusion.

1         MR. UNDERWOOD:  All right.  Let me
2 ask it this way.
3         MR. TOZZI:  Yeah, just ask him
4 specifically.  I'm not trying to hold you up.
5 BY MR. UNDERWOOD:
6     Q.  Was there any statement in the Motion
7 to Compel Arbitration with regard to the
8 relationship between Swafford and Hays and
9 Homeowners Loan Corporation that you would
10 disagree with?
11         MS. DOVER:  Object to the form.
12         THE WITNESS:  In paragraph 3 on page
13 3.
14         MR. TOZZI:  Actually, it looks like
15 it should be page 2, because page 1 is 2.  It
16 doesn't matter, just so the record's clear.
17 Just identify the paragraph.
18         THE WITNESS:  Paragraph 3 says that
19 Swafford and Hays was the agent of lender,
20 presumably Homeowners Loan Corp, and I would
21 not agree with that statement.
22 BY MR. UNDERWOOD:
23     Q.  All right.  Why not?
24         MS. DOVER:  I'm going to object to
25 the form.  It calls for a legal conclusion.

1         MR. TOZZI:  I'm going to let him
2 testify just to -- we've already agreed per my
3 letter he's not testifying as a legal capacity
4 for the company.  He's the corporate rep, but
5 he's not giving legal conclusions here.
6         THE WITNESS:  My view was that
7 Swafford and Hays was a third-party vendor
8 hired to perform settlement services per the
9 written closing instructions, and that their
10 agency relationship was with their underwriter.
11 BY MR. UNDERWOOD:
12     Q.  Was there any other contract between
13 Homeowners and Swafford and Hays, other than
14 the closing instructions?
15         MS. DOVER:  Object to the form.
16         THE WITNESS:  In fairness I would
17 have to say, yes, there was a course of
18 dealing, which was adhered to.  However, the
19 primary important points of the relationship
20 were documented in the written closing
21 instructions as they evolved over time.
22         The closing instructions appearing in
23 Ms. Finch's file continued to evolve over time
24 as we began getting stricter and stricter about
25 what title companies should and could do

1  relative to our loans.
2  BY MR. UNDERWOOD:
3      Q.  Yes, sir.  Okay.
4      A.  To ensure the consistency of the
5  product generated and to minimize the clean-up
6  work done by our post-closing department after
7  the loans closed.
8          MR. UNDERWOOD:  Okay.  I believe
9  those are all the questions I have right now.
10  I may have a few follow-up questions.
11         MS. DOVER:  If you'll give me about
12  five minutes now to review documents.
13         (Whereupon, a short break was taken.)
14              CROSS-EXAMINATION
15  BY MS. DOVER:
16      Q.  Mr. Long, I'm Ellen Dover.  I'm
17  representing Swafford and Hays in these two
18  lawsuits that are currently pending.  I don't
19  think I have very many questions, but I want to
20  follow-up on a couple of things that you
21  testified about.
22         You mentioned just towards the end of
23  your last testimony that the closing
24  instructions that you would give to the title
25  companies have evolved over time?

1      A.  Correct.
2      Q.  Would you explain what you meant by
3  that?
4      A.  Based upon feedback we got from the
5  secondary marketing department and from our
6  loan purchasers, we were always looking for
7  ways to improve and standardize the product
8  generated as a result of our loan closings.
9         If the packages had fewer errors or
10  follow-up items, then we didn't need as many
11  people to correct all the mistakes.  So one of
12  my charges was to manage the relationships with
13  all of the title companies and get them to do
14  the loan closings properly.
15         As we saw errors on a consistent
16  basis, we would incorporate them into written
17  closing instructions to tell the companies what
18  to do and what not to do relative to those
19  particular items.
20         (Defendant's Exhibit 1 was marked for
21  identification.)
22  BY MS. DOVER:
23      Q.  Let me show you what I've marked as
24  Defendant's exhibit 1, and have you also, at
25  the same time, look at exhibit 2, page number

1  409, or document 409.
2      A.  Okay.
3      Q.  I believe Bates number 409 is the
4  Closing Instructions for Ms. Finch's file; is
5  that correct?
6      A.  409 are the Closing Instructions
7  relative to the Finch loan.
8      Q.  And in Defendant's exhibit 1, which
9  was just produced recently, and if you would
10  identify it by Bates number so the record's
11  clear.
12      A.  Defendant's exhibit 1, Bates stamped
13  beginning 00670, I believe is the final or most
14  current version of the Closing Instructions as
15  the process evolved.
16      Q.  And could you tell me -- it looks
17  like the names of the borrowers have been
18  redacted; is that true?
19         MR. TOZZI:  Well, I'll answer that.
20  They have been.
21  BY MS. DOVER:
22      Q.  Okay.  And just so we know, because I
23  can't tell exactly what was redacted, were the
24  fees that were associated then on the closing
25  document also redacted, the first page?

1      A.  Let me answer that this way.
2         MR. TOZZI:  This one may have been a
3  blank one.
4         THE WITNESS:  This could be just a
5  blank one, the form.
6         MR. TOZZI:  I think that's right.  I
7  will confirm in an e-mail to you all, but I
8  don't believe Defendant's 1 was, in fact,
9  redacted.
10         MS. DOVER:  Okay.
11         MR. TOZZI:  I think that's just a
12  blank one.
13  BY MS. DOVER:
14      Q.  But that would be the final version
15  of what the closing instructions were for
16  Homeowners?
17      A.  Yes.
18         MR. TOZZI:  By final do you mean most
19  recent?
20  BY MS. DOVER:
21      Q.  Most recent?
22      A.  Yes.
23      Q.  When you would send the closing
24  instructions to the title company, like you did
25  in Ms. Finch's case, would there have been

1  numbers or fees associated in the bottom of the
2  first page of Defendant's exhibit 1?
3      A.  Yes, to the extent there were fees.
4  For example, if there was no escrows there
5  would be no fee or charge associated with
6  hazard insurance premium or flood insurance
7  premium.
8      Q.  But if there were certain fees
9  associated with that particular transaction
10 those would be reflected --
11     A.  Correct.
12     Q.  -- in the closing instructions?
13     A.  Falling within these categories,
14 yes.
15         MR. TOZZI:  Can I interrupt something
16 and let's go off the record?
17         (Whereupon, a discussion was had off
18 the record.)
19         MR. TOZZI:  Back on the record.  Rik
20 Tozzi for Homeowners.  It looks like on
21 Defendant's exhibit 1, 670 through 675
22 inclusive, there may have been a copying error
23 where certain portions of the document were cut
24 off.  So I'll take a look at that and just
25 produce it, make sure we produce it and recopy

1  it if, in fact, that was the case.
2  BY MS. DOVER:
3      Q.  During the time that the most recent
4  version of the Closing Instructions was
5  finalized, were you involved in the process of
6  modifying the Closing Instructions?
7      A.  I'm not sure I understand the
8  question.
9      Q.  You mentioned that while you were
10 working with title companies, and you saw
11 errors come in, you would modify the Closing
12 Instructions to make sure that the title
13 companies didn't have the same sort of errors?
14     A.  Right.
15     Q.  This final version, were you
16 personally involved in the creation of that
17 final version?
18     A.  Yes.
19     Q.  What percentage of the loans, or the
20 transactions that Homeowners closes, actually
21 are resold?
22     A.  One hundred percent.
23         MR. TOZZI:  Just so the record's
24 clear, we no longer close loans.
25         MS. DOVER:  Did you close, yes, in

1  the past.
2  BY MS. DOVER:
3      Q.  In order to resell the loan would you
4  agree that it was important that all the
5  closing documents be fully executed and
6  accurate?
7      A.  Yes.
8      Q.  And in order for you to get the
9  closing documents that you'd need to make that
10 next transaction, you got Swafford and Hays to
11 do some of the work; is that correct?
12     A.  Yes.  Swafford and Hays and other
13 title companies performed the work that I
14 described leading up to the closing.
15     Q.  And that work was necessary in order
16 for the closing to actually happen?
17     A.  Correct, and the recording of the
18 mortgage, and the issuance of the title policy
19 afterward.
20         MS. DOVER:  I believe that's all I
21 have.
22         MR. UNDERWOOD:  I just have one or
23 two follow-up questions.
24         RECROSS-EXAMINATION
25 BY MR. UNDERWOOD:

1      Q.  Let me ask you with regard to
2  Defendant's exhibit 1 in number 2, it's
3  entitled Recording Fees?
4      A.  Yes.
5      Q.  Would you state for us what the
6  policy of Homeowners is with regard to
7  recording fees?
8         MS. DOVER:  Object to the form.
9         THE WITNESS:  The policy is as stated
10 in the Closing Instructions in paragraph 2
11 under paragraph B, that the consumer shall only
12 be charged for the actual recording fees, and
13 in the event there is any overcharge that
14 amount needs to be refunded to the consumer.
15 BY MR. UNDERWOOD:
16     Q.  All right.  How long has that been
17 the policy of Homeowners Loan Corporation?
18     A.  Well, it's always been the policy of
19 Homeowners, but it made its way into the
20 Closing Instructions as these evolved.  I'm not
21 sure.  There were several versions of this over
22 time.
23     Q.  Has Homeowners ever authorized any
24 title company, to your knowledge, to retain a
25 portion of recording fees?

1    A.  No, they have not.
2    Q.  Let me direct your attention back to
3  the same Closing Instructions, and this time
4  let's look at Bates number 00672.  This
5  paragraph number 2. I want to ask you if that's
6  an accurate statement of Homeowners' policy
7  regarding its disbursement of loan proceeds by
8  settlement service agents?
9        MS. DOVER:  Object to the form.
10        THE WITNESS:  Yes, that's correct.
11 BY MR. UNDERWOOD:
12    Q.  How long has that been Homeowners'
13  policy?
14    A.  That's always been the policy.
15    Q.  Now, in paragraph number 3 on the
16  prior page 671, the paragraph's entitled Third
17  Party Participation, what types of third
18  parties are contemplated by that paragraph?
19    A.  If a title company took an order in a
20  state that they weren't authorized to conduct
21  title services in, or underwrite title
22  insurance in, it's my recollection we had a
23  problem with a company doing that and
24  subcontracting the work out to another company
25  who we had never heard of, and it made it

1  difficult to enforce the Closing Instructions
2  as to a party that we had no privity with.  So
3  I did not want to have a situation where we
4  were dealing with Title Company A, and Title
5  Company B was actually issuing title insurance
6  and performing settlement services.
7    Q.  All right.
8    A.  Unless I was notified about it in
9  advance and had the opportunity to conduct due
10  diligence on this other company.
11    Q.  Yes, sir.  Is Homeowners' policy the
12  same with regard to services such as title
13  searches and abstracts?
14        MS. DOVER:  Object to the form.
15        THE WITNESS:  I don't think so.  I'm
16  aware that title companies, from time-to-time,
17  had relationships with other companies that
18  were invisible to Homeowners, who actually go
19  to the courthouse or check the electronic
20  records and actually do the legwork, but
21  ultimately I wanted privity of contract with
22  the company that underwrote our title
23  insurance.
24 BY MR. UNDERWOOD:
25    Q.  All right.

1    A.  Did that answer your question?
2    Q.  It did.  I thank you.  I want to ask
3  you one more question about Plaintiff's exhibit
4  3. I've highlighted this statement here, "Will
5  not put in writing."  Would you tell me what
6  the source of that statement is?
7    A.  I was recording Mr. Swafford's
8  comments to me about the stance taken by the
9  underwriter.
10    Q.  Well, was his comment to you that the
11  underwriter would not put the -- well, let me
12  ask it this way.  What led you to write, "Will
13  not put in writing"?
14    A.  I was recording what he told me
15  during the telephone conversation.
16    Q.  In what context did he tell you that?
17    A.  In response to my statement
18  concerning my belief about the treatment of the
19  practice under RESPA, Mr. Swafford stated that
20  his underwriter had told him in their mind it
21  was a gray area.  I asked if I could see in
22  writing the underwriter's opinion about that,
23  and the response was that they would not put it
24  in writing, because I could have been wrong.  I
25  was asking for guidance, if they had some other

1  authority of which I wasn't aware, I was
2  willing to consider it.
3    Q.  One more question about this
4  paragraph number 3. If a title company used an
5  outside notary should they disclose that on the
6  HUD?
7    A.  No.  Well, the use of an outside
8  notary was not contemplated by paragraph 3 on
9  document Bates stamp number 00671 because
10  third-party notaries were contracted in every
11  single transaction that didn't involve a
12  third-party attorney.
13        MR. UNDERWOOD:  I believe that's all
14  the questions I have for you.
15        (Whereupon, the deposition was
16  concluded at 2:30 p.m.)
17
18
19
20
21
22
23
24
25

WILLIAM LONG

INSTRUCTIONS TO THE WITNESS

PLEASE READ YOUR DEPOSITION OVER
CAREFULLY BEFORE YOU SIGN IT. YOU SHOULD MAKE
ALL YOUR CHANGES ON THE ATTACHED ERRATA SHEET.
PLEASE DO NOT MARK ON THE ORIGINAL DEPOSITION.
AFTER MAKING ANY CHANGES WHICH YOU
HAVE NOTED ON THE ATTACHED ERRATA SHEET, SIGN
YOUR NAME ON THE ERRATA SHEET AND DATE IT,
THEN SIGN YOUR DEPOSITION AT THE END
OF YOUR TESTIMONY IN THE SPACE PROVIDED. YOU
ARE SIGNING IT SUBJECT TO THE CHANGES YOU HAVE
MADE ON THE ERRATA SHEET, WHICH WILL BE
ATTACHED TO THE DEPOSITION.
RETURN THE ORIGINAL ERRATA SHEET AND
TRANSCRIPT TO ATLANTA LEGALINK, 400 COLONY
SQUARE, SUITE 200, 1201 PEACHTREE STREET, N.E.,
ATLANTA, GEORGIA, 30361.
ACCORDING TO THE RULES OF CIVIL
PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS FROM
THE DATE YOU RECEIVE THIS DEPOSITION IN WHICH
TO READ, SIGN AND RETURN YOUR DEPOSITION TO THE
ABOVE OFFICE. IF YOU FAIL TO DO SO, YOU

AUTOMATICALLY WAIVE YOUR RIGHT TO MAKE ANY
CORRECTIONS TO YOUR DEPOSITION.
PURSUANT TO RULE 30(E) OF THE FEDERAL
RULES OF CIVIL PROCEDURE AND/OR THE OFFICIAL
CODE OF GEORGIA ANNOTATED 9-11-30(E), BOTH OF
WHICH READ IN PART: ANY CHANGES IN FORM OR
SUBSTANCE WHICH YOU DESIRE TO MAKE SHALL BE
ENTERED UPON THE DEPOSITION...WITH A STATEMENT
OF THE REASONS GIVEN...FOR MAKING THEM.
ACCORDINGLY, TO ASSIST YOU IN EFFECTING
CORRECTIONS, PLEASE USE THE FORM BELOW:

PAGE    LINE    EXPLANATION

DEPONENT'S SIGNATURE

DATE

SIGNATURE PAGE OF WITNESS

I HEREBY ACKNOWLEDGE THAT I HAVE READ
THE FOREGOING DEPOSITION AND THAT THE SAME IS A
TRUE AND CORRECT TRANSCRIPTION OF THE ANSWERS
GIVEN BY ME TO THE QUESTIONS PROPOUNDED, EXCEPT
FOR THE CHANGES, IF ANY, NOTED ON THE ATTACHED
ERRATA SHEET.

SIGNATURE:

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS THE    DAY OF    , 2006.

NOTARY PUBLIC
MY COMMISSION EXPIRES:

C E R T I F I C A T E

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing
transcript was taken down, as stated in the
caption, and the questions and answers thereto
were reduced to the written page under my
direction; that the foregoing pages 1 through
128 represent a true, complete, and correct
transcript of the evidence given upon said
Deposition. I further certify that I am not of
kin or counsel to the parties in the case; am
not in the regular employ of counsel for any of
said parties; nor am I in any way financially
interested in the result of said case.
This, the 10th day of July, 2006

MARY KAY ASHLEY, CCR-B-792

Hall-Frazier
Record - 000614

# Deposition Transcript

# Witness:  William R. Petruccelli

**Date Taken: February 28, 2008**

**Case: Edwards v. Accredited Home Lenders, et al**

Barlow & Associates
Phone: (251) 476-0685
Fax: (251) 471-2266
Email: barlowreporting@bellsouth.net
Internet: www.barlowreporting.com

**Hall-Frazier**
**Record - 000615**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

JONATHAN and SHARRON          *
EDWARDS, individually and     *
On behalf of others           *
Similarly situated,           *
                              *
          Plaintiffs,         *
                              *
VS.                           *    CASE NUMBER
                              *    1:07-cv-00160 KD-C
ACCREDITED HOME LENDERS,      *
INC. and LENDER'S FIRST       *
CHOICE; and LENDER'S FIRST    *
CHOICE AGENCY OF ALABAMA,     *
INC.,                         *
                              *
          Defendants.         *

ORAL TESTIMONY OF
WILLIAM R. PETRUCCELLI

          The deposition of WILLIAM R.

PETRUCCELLI, taken at law offices of Kenneth

Riemer, 166 Government Street, Suite 100, Mobile,

Alabama, on the 28th day of February, 2008,

commencing at approximately 9:05 a.m.

APPEARANCES

FOR THE PLAINTIFFS:
KENNETH J. RIEMER, ESQ.
166 Government Street, Suite 100
Mobile, AL 36602

GEORGE R. IRVINE, III, ESQ.
Stone, Granade & Crosby
7133 Stone Drive
Daphne, AL 36526

EARL P. UNDERWOOD, JR., ESQ.
21 South Section Street
Fairhope, AL 36533

FOR THE DEFENDANTS- Lender's First Choice:
GREGORY C. COOK, ESQ.
Balch & Bingham
1901 South Avenue North, Suite 1500
Birmingham, AL 35203

JANICE DEMPSTER, ESQ.
Lender's First Choice

FOR THE DEFENDANT - ACCREDITED HOME LENDERS:
JEFFREY J. HARLEY, ESQ.
Helmsing, Leach, Herlong, Newman
& Rouse
P. O. Box 2767
Mobile, AL 36652

SHERRY J. BARLOW, RPR CSR

---

1    It is stipulated that the original
2    transcript will be delivered to Kenneth J.
3    Riemer, Esq.
4        It is further stipulated and agreed
5    that the witness hereto waives his right to read
6    and sign said deposition as provided for by said
7    Federal Rules of Civil Procedure.
8
9            * * * * * * * *
10
11
12
13        I, Sherry J. Barlow, Commissioner and
14    Court Reporter, certify that on this date, as
15    provided by the Federal Rules of Civil Procedure
16    and the foregoing stipulation of counsel, there
17    came before me at the law offices of Kenneth
18    Riemer, 166 Government Street, Suite 100, Mobile,
19    Alabama, on the 28th day of February, 2008,
20    commencing at 9:05 a.m., WILLIAM R. PETRUCCELLI,
21    witness in the above cause, for oral examination,
22    whereupon the following proceedings were had:
23

Page 3

---

1        STIPULATION
2        It is stipulated by and between the
3    parties hereto that the deposition of WILLIAM R.
4    PETRUCCELLI may be taken before Sherry J. Barlow,
5    Commissioner, Notary Public for the State at
6    Large, and that the said deposition shall be
7    taken in accordance with the provisions of the
8    applicable sections of the Federal Rules of Civil
9    Procedure.
10        It is further stipulated that all
11    notices provided for by said applicable sections
12    of the Federal Rules of Civil Procedure are
13    waived, as is the signing and certification of
14    said Sherry J. Barlow and all other requirements
15    and technicalities of every sort regarding the
16    taking and filing of the deposition, except as
17    hereinafter set out:
18        All objections save as to the form of
19    questions asked are reserved until the time of
20    trial in accordance with the applicable
21    provisions of the said Federal Rules of Civil
22    Procedure.
23

---

1        WILLIAM R. PETRUCCELLI,
2        the witness, having first been duly
3    sworn to tell the truth, the whole truth, and
4    nothing but the truth, was examined and testified
5    as follows:
6            EXAMINATION
7    BY MR. RIEMER:
8    Q    Would you state your full name for us
9    and for the record, please?
10   A    Sure. It's William R. Petruccelli.
11   Q    Okay. Mr. Petruccelli, we've met off
12   record here. My name is Ken Riemer, and I
13   represent the Edwardses in this case.
14        (Plaintiff's Exhibit 1 was
15        marked for identification.)
16   BY MR. RIEMER:
17   Q    I'm going to mark as Plaintiff's
18   Exhibit 1 the notice of deposition that we're
19   here for this morning. Have you ever seen that?
20   A    Yes, I have.
21   Q    Okay. And you understand that you are
22   here as a designated representative to give
23   testimony on behalf of the defendants, Lender's

Page 5

Page 6

1  First Choice and Lender's First Choice of
2  Alabama; right?
3  A     Yes, I do.
4  Q     Okay.  Have you ever given a
5  deposition before?
6  A     No, sir.
7  Q     Okay.  Well, let me briefly explain
8  sort of the procedure here.  I am going to ask
9  you a series of questions.  And I will do my best
10 to ask clear questions.  But I can tell you,
11 after over eighteen years of doing this, that I
12 do not always do that.
13       Now, if you don't understand a
14 question, just stop me and ask me to repeat it or
15 rephrase it and I'll be happy to do that.  But
16 the way this works is, if you don't stop me and
17 you endeavor to answer the question, the record
18 is going to assume you understood the question
19 that you're answering.  Do you understand that?
20 A     Yes, sir.
21 Q     Okay.  The other thing is that we have
22 to communicate verbally because the court
23 reporter is taking down what we say to each

Page 7

1  other.
2        And another thing I like to remind
3  folks of is this is not an endurance test.  Any
4  time you feel like you need to take a break, just
5  let us know and we'll be happy to accommodate
6  you.
7  A     Okay.
8  Q     Have you ever given any trial
9  testimony before?
10 A     No, sir.
11 Q     Okay.  Tell us who you are employed
12 by.
13 A     Lender's First Choice.
14 Q     Okay.  And where is your office?
15 A     In Longwood, Florida.
16 Q     Tell us where Lender's First Choice
17 main headquarters is, if you will.
18 A     Simi Valley, California.
19 Q     Okay.  And what is in Longwood?
20 A     A closing office with closers.
21 Q     Okay.  What is your position with
22 Lender's First Choice?
23 A     Closing supervisor.

Page 8

1  Q     How long have you been with Lender's
2  First Choice?
3  A     It was three years in December.
4  Q     Okay.  Tell me your position again.
5  A     Closing supervisor.
6  Q     Three years this past December?
7  A     Correct.
8  Q     Okay.  So that would have been
9  December '04?
10 A     Correct.
11 Q     What did you do before that?
12 A     I was a manager of a title company in
13 Longwood.
14 Q     What's the name of that company?
15 A     Professional Title & Escrow.
16 Q     Does that title company have national
17 breadth or just --
18 A     No, sir.
19 Q     Just local?
20 A     Right.
21 Q     Okay.  Well, how long have you been in
22 the title business?
23 A     I was with Professional Title about

Page 9

1  two years, so it would be a little over five.
2  Q     Okay.  So with Professional Title and
3  Lender's First Choice, those are the only two
4  jobs you've had in the title insurance business?
5  A     That's correct.
6  Q     And what did you do before that?
7  A     A couple of things.  Real estate
8  broker, mortgage broker, and I spent twenty-five
9  years in IT.
10 Q     Information technology?
11 A     Correct.
12 Q     Okay.  So let's just take the real
13 estate related jobs.
14 A     Okay.
15 Q     If you go back and -- and I'm not
16 going to go and get you to give us, you know,
17 details year by year, but give us an idea of how
18 many years you spent in the real estate business,
19 real estate related business.
20 A     Since 1991.
21 Q     And so that would be on the mortgage
22 side?
23 A     1991 was also when I started mortgages

Page 10

1  as well.
2  Q      Okay.  What did you do in the mortgage
3  business?
4  A      I was a loan officer, mortgage broker.
5  Q      Who did you work for?
6  A      There were many different broker
7  offices I worked for.
8  Q      And these are local brokers?
9  A      Yes, sir.
10 Q      Did you ever work for any
11 national-based lender?
12 A      No, sir.
13 Q      But I take it as a broker you worked
14 with national lenders?
15 A      The broker had national lenders that
16 he placed the loans with.
17 Q      Okay.
18 A      Yes.
19 Q      And you worked with the origination of
20 the loans?
21 A      That's correct.
22 Q      And closing, too?
23 A      I don't understand the question.

Page 11

1  Q      Well, in your work with the brokers
2  were you involved in the loan closing process?
3  A      No.
4  Q      Okay.  How long have you been closing
5  supervisor?
6  A      Since I joined that company three and
7  a half years ago.
8  Q      Okay.  You were hired as closing
9  supervisor?
10 A      That's correct.
11 Q      Is the Longwood, Florida office, is
12 that part of a -- well, let me back up.  We have
13 two entities involved here, Lender's First Choice
14 and Lender's First Choice of Alabama.
15        Is there a local corporation or a
16 local entity formed under the Lender's First
17 Choice umbrella, if you will, for Florida?
18 A      Not that I'm aware of.
19 Q      Okay.  So your office is actually
20 doing work for the Lender's First Choice national
21 entity?
22 A      That's my understanding.
23 Q      Okay.  All right.  And these are basic

Page 12

1  questions that I ask witnesses.
2         Have you ever been a defendant in any
3  lawsuit?
4  A      Yes.
5  Q      What kind?  What was the general
6  nature of the lawsuit?
7  A      When I worked for Professional Title &
8  Escrow, we are a defendant, both Professional
9  Title & Escrow and myself.  The person said that
10 he sent the notice to cancel but we never
11 received it.
12 Q      Okay.  What was the name of that --
13 the plaintiff in that suit?
14 A      Benson.
15 Q      B-e-n-s --
16 A      O-n.
17 Q      -- o-n.  And that was filed in
18 Florida?
19 A      That's correct.
20 Q      Was it in Federal Court?
21 A      I don't know that.
22 Q      How did that lawsuit resolve itself?
23 A      It's not.

Page 13

1  Q      It's still pending?
2  A      That's correct.
3  Q      Okay.  So Mr. Benson claimed he sent a
4  notice of -- he filled out the notice to cancel?
5  A      Uh-huh.  He did send it, but the
6  address was incorrect on it.
7  Q      Okay.  Is that the only other lawsuit
8  you've been a defendant on?
9  A      Yes, sir.
10 Q      Okay.  Have you ever been convicted of
11 a crime?
12 A      No, sir.
13 Q      Okay.  Can you tell me how many
14 employees the national entity Lender's First
15 Choice has?
16 A      Don't know for sure.  My guess is
17 around five hundred.
18 Q      Okay.  Do you know if Lender's First
19 Choice of Alabama has employees that are not also
20 employed by the national company?
21 A      I do not.
22 Q      Do you know if Lender's First Choice
23 has an office in Alabama?

Page 14

1    A        I do not.
2    Q        Okay. How many employees are in your
3    office in Longwood?
4    A        Currently eight.
5    Q        Eight. Okay. Does it oversee a
6    territory that includes Alabama?
7    A        No, sir.
8    Q        Okay. In your office in Longwood you
9    just close Florida loans?
10   A        No, sir.
11   Q        Okay. Tell me what you do there in
12   Longwood.
13   A        We have specific customers. And
14   wherever they're doing their loans, that's where
15   we'll do our title work from.
16   Q        Okay. What customers do you service
17   out of Longwood?
18   A        Countrywide, Lenox Financial,
19   MorEquity, Flagstar, Surety Lender Services,
20   Greentree, and there may be some other brokers I
21   can't think of off the top of my head.
22   Q        What about Home Funds Direct?
23   A        They were customers, the one out of

Page 16

1    office, a closing office.
2    Q        They handled, on a multistate basis,
3    loans for certain customers?
4    A        That's correct.
5    Q        And by customers, we're talking about
6    lenders?
7    A        That's correct.
8    Q        Okay. Well, this loan was closed in
9    June of 2006. And at that time was the Stockton,
10   California office handling loans for Home Funds
11   Direct?
12   A        Yes.
13   Q        Okay. Well, all of Lender's First
14   Choice activities with respect to the Edwards
15   loan emanated from the Stockton office?
16   A        Would you repeat that again?
17   Q        The activity that we're going to spend
18   time talking about today with regard to the
19   Edwards loan, the activities performed by
20   Lender's First Choice, did that emanate from the
21   Stockton, California office?
22   A        Yes.
23   Q        Okay.

Page 15

1    Atlanta.
2    Q        Okay. And is that your connection
3    with this suit, is that this -- the closing here
4    for the Edwards loan -- well, let's back up and
5    just lay some groundwork here.
6            You submitted an affidavit in this
7    case; correct?
8    A        Yes, sir.
9    Q        All right. So you're basically
10   familiar with the Edwards transaction?
11   A        Yes, sir.
12   Q        Okay. Was the closing of the Edwards
13   loan done under the supervision of the Longwood,
14   Florida office?
15   A        No.
16   Q        Okay. What office was it performed
17   under?
18   A        Stockton, California.
19   Q        What is in Stockton, California?
20   A        There was an office there.
21   Q        Okay. What did they do there while
22   they there --
23   A        I believe they were like the Longwood

Page 17

1            MR. COOK: Emanate's a little
2    bit vague. I mean, their corporate
3    headquarters may have done
4    something, too.
5            MR. RIEMER: Yeah, okay. Well,
6    I'm --
7            MR. COOK: That's fine.
8    BY MR. RIEMER:
9    Q        But the folks in Stockton, California
10   are the ones that primarily handled the Edwards
11   loan. Is that a fair statement?
12   A        That would be a fair statement.
13   Q        Okay. Have you ever worked in the
14   Stockton office?
15   A        No, sir.
16   Q        Have you talked to anybody -- well,
17   let me back up. You said the Stockton office no
18   longer exists. Did I get that right?
19   A        My understanding is that they've
20   closed, yes.
21   Q        Okay. Do you know when they closed?
22   A        My guess is right around December.
23   Q        Okay. December of '07?

Page 18

1   A       '07.
2   Q       All right.  So here just recently.
3   Now, when they closed their office in '07, did
4   the Longwood, Florida office, your office, assume
5   the closings that would otherwise be handled by
6   Stockton?
7   A       No, sir.
8   Q       Okay.  Do you know why the Stockton
9   office closed?
10  A       No, sir.
11  Q       Okay.  Did you have any connection at
12  all with the Edwards loan prior to closing?
13  A       No.
14  Q       Okay.  And let me preface this by
15  saying that I am not entitled to nor am I asking
16  for you to divulge anything you've communicated
17  with your attorneys about.  Okay?  Or the
18  Lender's First Choice attorneys.
19          Do you know why it was that you were
20  designated to speak on behalf of Lender's First
21  Choice with respect to this loan?
22  A       My understanding is that I have been
23  working with the attorneys on other situations

Page 19

1   and I feel I have a good understanding of how the
2   company works and our operation and procedures.
3   I think that's why I was selected.
4   Q       Okay.  By other situations, do you
5   mean other lawsuits?
6   A       Yes.
7   Q       Okay.  Which ones?
8   A       There are some from the State of
9   Alabama.
10  Q       Other than this one?
11  A       That's correct.
12  Q       Okay.  Do you know the names of those
13  suits?
14  A       I can't recall.
15  Q       Do you know where in Alabama that they
16  were filed?
17  A       No.
18  Q       Okay.  You never worked in the
19  Stockton office; right?
20  A       Correct.
21  Q       Who at the time, say in June of '06,
22  who was in charge of the Stockton office?
23  A       Carla Hohne.

Page 20

1   Q       How do you spell her last name?  Is it
2   H-u-n-e, is that what it is?
3   A       Yes.  It's K-u-h-n-e, I believe.
4           MR. COOK:  I think on our
5   interrogatory answers we put
6   H-o-h-n-e.
7           THE WITNESS:  Okay.
8   BY MR. RIEMER:
9   Q       Okay.  Have you received any training
10  from Lender's First Choice in loan closings since
11  you arrived there in December of '04?
12  A       Yes, sir.
13  Q       How did Lender's First Choice train
14  you?
15  A       We have corporate trainers that work
16  in both Frisco, Texas and Simi Valley,
17  California.  They would come to our office and
18  give us training.
19  Q       Okay.  And when you started work in
20  December of '04 you were right off the bat
21  supervising the other folks working in the
22  office?
23  A       That's correct.

Page 21

1   Q       And a person from the main office came
2   to you and showed you how they do things and how
3   to run the office.  Is that a fair statement?
4   A       They came and trained us how to use
5   the software and how the procedures were at
6   Lender's First Choice.
7   Q       Okay.  And the software program that
8   you mentioned in the affidavit is something
9   called GATOR?
10  A       That's correct.
11  Q       Is that the same program you used
12  going back to December '04?
13  A       That's correct.
14          MR. COOK:  Actually I think
15  it's plural.  I think it's GATORS.
16          MR. RIEMER:  GATORS?
17          MR. COOK:  Yeah.
18  BY MR. RIEMER:
19  Q       Okay.  Well, I intend to ask you
20  questions about loan processing and closings and
21  the procedures.  Let me ask you this.  Are the
22  procedures that you're familiar with in running
23  the Longwood, Florida office, are those the same

1 procedures that you would expect to have been
2 followed in the Stockton office?
3 A     Yes.
4 Q     Okay. And so the folks that run the
5 Stockton office were trained in the same ways, as
6 far as you understand it, as you were; right?
7 A     Yes.
8 Q     Okay. Now, I forgot what you said
9 about how many people work in Longwood. Did you
10 say eight?
11 A     Yes.
12 Q     Okay. Now, you used the term --
13          MR. COOK: That was present
14      tense.
15          MR. COOK: Present tense.
16      Okay.
17 BY MR. RIEMER:
18 Q     Eight now?
19 A     That's correct.
20 Q     Do you know how many folks worked in
21 the Stockton office around the time of the loan,
22 June of '06?
23 A     No, I do not.

Page 23

1 Q     Okay. Do you know, well, how many
2 people worked there when it closed?
3 A     I do not.
4 Q     Okay. Is it your understanding that
5 the Stockton office is bigger or smaller than the
6 Longwood office, or was before it closed down?
7 A     My understanding is that we were about
8 the same. At times they were closing a little
9 bit more and sometimes we were.
10 Q     Okay.
11 A     So a little bit of a competition
12 thing.
13 Q     Okay. See who could close the most
14 loans per month, is that --
15 A     Yeah.
16 Q     Okay. Now, you mention in your
17 affidavit the term "recording department". And
18 my question is, I mean, are the individual
19 offices divided up into departments?
20 A     They were.
21 Q     They were. For what period of time?
22 A     Well, the Simi Valley office and the
23 Frisco office are divided up into departments.

1 The Longwood office was divided up into
2 departments when I arrived in '04. We have since
3 centralized some departments back into Frisco,
4 Texas from the Longwood office. So we are
5 strictly a closing group now.
6 Q     Okay. But when you were
7 departmentalized locally how many employees did
8 you have?
9 A     I believe we were at the peak about
10 thirty-five.
11 Q     Okay. And when was the switch? When
12 was the transition to what you have now?
13 A     There wasn't any specific date. It
14 was a gradual move of different departments. I'd
15 say it probably started about a year ago.
16 Q     Okay. And did the Stockton office
17 while it existed, did it undergo the same kind of
18 transition or more stuff being done centrally?
19 A     I believe so.
20 Q     Who owns Lender's First Choice?
21 A     My understanding is we're part of the
22 Mercury Companies.
23 Q     Okay. So that Mercury, and I forget

Page 25

1 the name of the entity, but I've seen it in the
2 production, it's your understanding that you're a
3 subsidiary of the Mercury Company?
4 A     That's my understanding.
5 Q     Okay. Do you know if Mercury is a
6 publicly traded company?
7 A     I do not.
8 Q     How many states does Lender's First
9 Choice operate in?
10 A     Forty-two, I believe.
11 Q     Okay. Let me -- I'm going to mark
12 this as Plaintiff's Exhibit Number 2. It's
13 something that I pulled from your web site.
14          (Plaintiff's Exhibit 2 was
15          marked for identification.)
16 BY MR. RIEMER:
17 Q     Have you seen that map before?
18 A     Yes, sir.
19 Q     Okay. I don't want to spend a lot of
20 time on this, but from my understanding there is
21 about forty-two states I guess, maybe a little
22 bit more than that, colored in. And then there's
23 a light color for, what does it say, non-insured

1  services? Tell me what the difference is between
2  the services provided in the full colored states
3  and the lightly colored states, if you know?
4  A    My understanding is that we don't do
5  loans in the unshaded or light shaded --
6  Q    Okay. But for the darker colored
7  states you provide loan closing services as
8  closing agent for lenders and as title agent for
9  title insurance companies; right?
10  A    To the best of my knowledge, yes,
11  that's correct.
12  Q    Okay. You also used the term
13  "closers" in your affidavit. What does that
14  refer to?
15  A    The closer job description is someone
16  who has direct responsibility to take care of a
17  customer or numerous customers. Might be also
18  called account executive, someone that deals
19  directly with the customer and takes
20  responsibility. Also produces the HUD-1
21  settlement statement and then will disburse the
22  loan.
23  Q    Okay. So is it fair to say that the

1  closers shepherd the loan from the beginning of
2  the process to the end of the process from the
3  local office?
4  A    No.
5  Q    Okay.
6  A    I don't think we'd say that.
7  Q    All right. Well, let me back up. The
8  closers, are they folks in the local offices or
9  are the closers in the national office?
10  A    I have closers in my office.
11  Q    Okay. Well, how many closers do you
12  have, let's just say of the eight folks that work
13  for you now, just to give me an idea?
14  A    Eight.
15  Q    Okay. So the eight folks working
16  there are closers?
17  A    That's correct.
18  Q    So there's you, the supervisor, and
19  eight closers?
20  A    That's correct.
21  Q    All right. Now, are there closers in
22  the national office?
23  A    Yes.

1  Q    Okay. But do the closers in the
2  national office work on loans that are handled by
3  your office?
4  A    Closers do not work on my orders, no,
5  from other offices.
6  Q    Okay. They --
7  A    Let me just go back and say, unless we
8  needed help for some reason. But on a normal
9  day, no, they do not touch our loans, other
10  closers.
11  Q    Okay. So a loan that comes into your
12  office, a closer handles it in your office.
13  Well, the closer assigned to that loan is in your
14  office?
15  A    That's correct.
16  Q    Okay. Now, when your office was
17  departmentalized is that the way it worked or did
18  it work some other way?
19  A    The same way.
20  Q    Okay. Well, were there some closers
21  in the recording department at that time?
22  A    No, sir.
23  Q    I mean, who worked in the recording

1  department?
2  A    Recording specialists.
3  Q    Did you have a recording specialist in
4  your office?
5  A    Yes, I did.
6  Q    Okay. More than one or --
7  A    Yes, I did.
8  Q    All right. How many folks would you
9  have in your office that were recording
10  specialists?
11  A    I think there were two probably at
12  peak.
13  Q    Okay. When your office was
14  departmentalized how many other departments were
15  there?
16  A    We had postclosing and scheduling.
17  Q    So recording, postclosing, and
18  scheduling and that's it?
19  A    Yes, but processing was also part of
20  the closing supervisor's responsibilities at that
21  time.
22  Q    Okay. So would processing be a
23  separate department?

1   A      It is now.
2   Q      It is now the way the national office
3   is configured?  Because you don't have
4   departments in your office now.
5   A      That's correct.
6   Q      Okay.  Back, you know, when you had
7   these departments a closer would work on a file,
8   but they would be in what department?
9   A      The closer?
10  Q      Yes.
11  A      Closing department.
12  Q      The closing department.
13  A      (Witness nods head affirmatively.)
14  Q      Was all this set out in any kind of
15  manual or procedure book?
16  A      Yes, sir.
17  Q      Okay.  Because you didn't mention a
18  closing department, I don't think.  Maybe you
19  did.  But there's a closing department, recording
20  department --
21  A      I thought you meant other than my
22  department, which was the closing department.
23  Q      Okay.

1   A      I was the supervisor of the closing
2   department, supervisor of scheduling, supervisor
3   of postclosing.
4   Q      And recording?
5   A      Combined, postclosing and recording
6   supervisor.  In my department, in my office.
7   Q      In your office.  Okay.  And back then,
8   when you had these departments, your job title
9   was closing supervisor; right?
10  A      Correct.
11  Q      And is that what it is now?
12  A      That's correct.
13  Q      All right.  I asked you in your
14  previous employment with your other title
15  companies, Professional Title, were you involved
16  in closing, you said no.  Were the closings done
17  by a Notary when --
18  A      I don't think you asked me that for
19  Professional Title.
20  Q      Okay.
21  A      You asked me that as a mortgage
22  broker.
23  Q      Oh, okay.  You're right.  You're

1   right, as a mortgage broker.  Well, were you
2   involved in closings in your job with
3   Professional Title?
4   A      Yes, I was.
5   Q      Okay.  And the closings happened in
6   the office there?
7   A      Some did.
8   Q      Okay.  What about others?
9   A      Mostly people's homes.
10  Q      Okay.  Now, what about Lender's First
11  Choice, were loans closed mostly in people's
12  homes?
13  A      That's correct.
14  Q      Okay.  Well, I use the term "mostly".
15  Did any loans close at your Lender's First Choice
16  offices in Longwood?
17  A      We have had closings in our office in
18  Longwood.
19  Q      Okay.  What's the ratio there?  I
20  mean, is that rare?
21  A      Minuscule, yes.
22  Q      Okay.  For the most part the loans are
23  closed in the borrower's home?

1   A      Yes, sir.
2   Q      Okay.  With a Notary that's sent out
3   to the house to get the signatures; right?
4   A      That's correct.
5   Q      Now, as far as the Longwood office is
6   concerned, does someone that's employed by you
7   perform those services or is that done by an
8   independent Notary?
9   A      Independent Notary.
10  Q      Okay.  Always?
11  A      I would think so, but I don't know
12  that for a hundred percent fact.
13  Q      Okay.  Is that the way it worked out
14  of the Stockton office?
15  A      I would say it was.
16  Q      Is that generally Lender's First
17  Choice practices?
18  A      Yes, sir.
19  Q      Okay.  All right.  Why don't you walk
20  me through the loan process and let's focus on
21  the process as it existed in your office in June
22  of '06.  Because if I understand what you're
23  saying, you would expect it to be the same from

1  the Stockton office in June of '06.
2  A    Okay.
3  Q    All right. What's the first thing
4  that happens? How are you notified that there is
5  a loan that you are going to handle?
6  A    At the time in 2006, when we had a
7  closer and a processor together, it would show up
8  on the processor's screen as a new order ready to
9  be processed.
10 Q    Okay. And how would that be
11 initiated? Would that come from the lender?
12 A    The lender, for the most part, would
13 log on to our website and place the order
14 electronically.
15 Q    Okay. Let me ask you a little bit
16 more about this. I asked you a question about
17 how the procedures are written down, whether they
18 were written down in any way. Is there some type
19 of manual that the employees use?
20 A    Yes, there's something called an SOP.
21 Q    Standard operating procedures?
22 A    Standard operating procedures for each
23 and every function, each and every department.

1  Every time we do something we form an SOP.
2  Q    Okay. Now, is that in written form or
3  is it on a computer somewhere or both?
4  A    Both.
5  Q    And this is something that the
6  employees have readily available to tell them how
7  to do their job?
8  A    Yes, sir.
9  Q    Okay. Now, are there separate SOPs
10 for each department or is there just one
11 overarching SOP?
12 A    Separate SOPs for each department.
13 Q    Okay. Are they combined in one sort
14 of bound procedure or are they separate
15 documents?
16 A    I'm sure they're bound somewhere as
17 one document, but they're usually isolated by the
18 functional area.
19 Q    Okay. Well, when you made this
20 transition from being departmentalized to the way
21 you are now, did the SOPs change?
22 A    Yes, sir.
23 Q    And these SOPs, I mean, they're

1  available to you in your office; right?
2  A    That's correct.
3  Q    Okay. So making copies of them is not
4  a difficult thing physically to do; right?
5  A    No, sir.
6  Q    What about the SOPs as they existed in
7  '06, would you have access to that?
8  A    An aged SOP you mean?
9  Q    Yes.
10 A    Prior to the way it looks today?
11 Q    Right.
12 A    I would say no, I don't. I only keep
13 a current SOP.
14 Q    Okay. So things change --
15 A    Yes.
16 Q    -- and new versions are issued?
17 A    That's correct.
18 Q    Okay. When there's a change in an
19 SOP, do -- and I assume that comes from the
20 central office?
21 A    For the most part, yes.
22 Q    Okay. And by that, is that the Simi
23 Valley office?

1  A    Yes. Either Simi Valley or Frisco
2  will initiate the SOP.
3  Q    Okay. And when they make changes do
4  they -- and this may sound like a stupid
5  question, but when they make changes do they just
6  tell you what the changes are and you implement
7  those or you supplement your existing manual or
8  do they send out brand new manuals when there are
9  changes?
10 A    Brand new manuals.
11 Q    Are the manuals generated every year
12 so that you have a 2006 SOP, 2007 SOP, et cetera?
13 A    Not that I'm aware of, no.
14 Q    It's just a continuing revamping?
15 A    Update.
16 Q    Okay. So the practice is, if they're
17 updating a particular section concerning some
18 aspect of your procedure, they'll issue a whole
19 new manual?
20 A    The term "manual", I'm not sure that's
21 correct.
22 Q    Well, the SOP.
23 A    Yes.

1  Q      Okay.  Now, other than the SOPs you've
2  told me about, is there any other procedural
3  resource or resource for employees to look to see
4  how they're supposed to do various things?
5  A      Yes.
6  Q      What would that be?
7  A      Underwriting guidelines, maybe.
8  Q      Okay.  Underwriting guidelines would
9  come from the title insurers?
10 A      Yes, sir.
11 Q      We'll get to that.
12 A      Well, also our own internal people
13 will do some guidelines.
14 Q      Okay.  In written form?
15 A      Yes.
16 Q      And is there a department in the home
17 office that deals with the title insurance
18 underwriting aspect of the process?
19 A      Uh-huh, yes.
20 Q      What's that department called?
21 A      Title.
22 Q      Title.  Title department?
23 A      Uh-huh.

Page 39

1            MR. COOK:  You need to say
2  yeah.
3  A      Yes.
4            THE WITNESS:  I'm sorry.
5            MR. RIEMER:  That's the another
6  thing, that drives us crazy with
7  uh-huhs and uh-uhs.  I have a habit
8  of doing that myself.
9  BY MR. RIEMER:
10 Q      Now, back when you had departments in
11 your office and at Stockton, was there a title
12 department in your office or the title department
13 was always in a central office?
14 A      Title department was always in a
15 central office.
16 Q      Okay.  Other than underwriting
17 guidelines that would come from the title
18 department and the SOPs, anything else as far as
19 a resource employees could use?
20 A      Yes, there is.  There's something
21 called -- I'm not sure of the exact terminology
22 for it, but it's what we call a function key, a
23 hot key on the computer that when you're in a

Page 40

1  certain area, you hit that function key and it'll
2  bring in display information for you regarding
3  certain aspects of that field.  For example, what
4  you might have to provide when you're sending a
5  deed or something to that effect.
6  Q      Okay.  Is that part of the GATORS
7  program?
8  A      Yes.
9  Q      All right.  So there's an aspect of
10 GATORS that would bring up instructions on how to
11 perform a task?
12 A      Yes, sir.
13 Q      Okay.  And those instructions I guess
14 are inputted by someone in the main lender's
15 office?
16 A      My understanding is that there's a
17 person by the name of Bob Lohr who handles that,
18 but I also understand that GATORS has some
19 updates done for the customers as well.
20 Q      Okay.  All right.  So one of your
21 customer lenders places an order through the
22 website.  I think that's what you were telling me
23 before.  Is that the only way orders come in?

Page 41

1  A      No, sir.
2  Q      What other way?
3  A      Fax, they could fax an order in.
4  Q      Okay.  And when an order comes in,
5  what information is provided by the lender?
6  A      It's the name, address of the
7  borrower, that's usually it.
8  Q      Okay.  At the point where the order is
9  made, are there any documents that are already
10 prepared for the lender?  I'm sorry, prepared by
11 the lender at the time it comes into your office?
12 A      I don't understand the question.
13 Q      Well, let's back up.  You're familiar
14 with the good faith estimates?
15 A      I am.
16 Q      All right.  Okay.  And loan
17 applications?
18 A      Yes, sir.
19 Q      Okay.  And it's a part of, you know,
20 your standard loan procedure.  A borrower calls
21 in, does an application, GFEs are issued.
22 A      (Witness nods head affirmatively.)
23 Q      All right.  At what point in that

1 process would you receive the order?
2 A    That's different by lender and their
3 procedures.
4 Q    Okay. Is it ever the case where
5 Lender's First Choice is charged with -- or where
6 you have to actually generate the good faith
7 estimate documents? Is that something y'all ever
8 do?
9 A    No, sir.
10 Q    Okay. Maybe this is the same question
11 I had before, but is it always the case that the
12 good faith estimates have been generated by the
13 time you get the order or is that what you said
14 varies from lender to lender?
15 A    You know, I can't speak for what the
16 lender does. But my understanding would be that
17 the good faith estimate has already taken place.
18 They've taken an application. Whether they send
19 the order after that loan has been approved or
20 just when that portion has taken place, it
21 depends on the lender.
22 Q    Okay. Do you know what was the case
23 with respect to Home Funds Direct? At what point

1 in the process would Home Funds Direct make an
2 order?
3 A    I don't know if they had any hard and
4 fast rules when they would send an order in.
5 Q    Okay. So going back to your answer,
6 you get the order, you get the borrower's name
7 and address. Do you get the amount of the loan?
8 A    Yes.
9 Q    Okay. And what happens at that point?
10 A    That goes to our open orders
11 department and they --
12 Q    Well, that's a different -- I don't
13 think you mentioned that department. Is that --
14 A    It's not a department. I just --
15 Q    Okay.
16 A    -- gave you what was in my office at
17 the time of '06.
18 Q    Okay. Fair enough. I'm glad -- so
19 the open office -- the open order department is
20 something that was handled in the national
21 office?
22 A    In the Frisco, Texas office for my
23 office.

1 Q    Okay. But would the order pop up on
2 the screen in your office when it's first made?
3 A    Not at that point, sir, no.
4 Q    Okay. At this point in time that
5 we're talking about, the June '06 period of time,
6 the order is made and it appears in the Frisco
7 office?
8 A    That's correct.
9 Q    Okay. And then what -- and the open
10 order department, some people out in Frisco, do
11 something?
12 A    That's correct.
13 Q    Okay. What do they do?
14 A    They send the order in to get an
15 abstract done for full title. And depending on
16 the customer and the procedure for that customer,
17 may send it over to request a payoff of the
18 existing loan.
19 Q    Okay. So the order for an abstract is
20 done out -- for your office in '06 was done out
21 of the Frisco office?
22 A    For the most part. There may have
23 been some out of Simi Valley depending on the

1 geographical location, but --
2 Q    But not in the local office?
3 A    Never in the local office.
4 Q    Is it in the local office now, is that
5 what --
6 A    No, sir.
7 Q    Well, from the Stockton office do you
8 know who would have handled a title abstract
9 order at that time, June of '06?
10 A    I would believe it was the same as
11 mine. Most of them from Frisco, with some coming
12 through Simi Valley.
13 Q    Okay.
14 A    I'm not aware of them ever having a
15 title department in Stockton, California.
16 Q    Okay. Where do you get your knowledge
17 of what was happening in the Stockton -- your
18 knowledge of how the Stockton office did
19 business?
20 A    Through my manager who would go to --
21 I think back then it was quarterly meetings with
22 the other vice presidents and discuss those type
23 of things. He'd bring that back as a meeting to

1  us.
2  Q      Okay.  And you say your manager, this
3  was someone in the main office that oversaw --
4  A      No.  At the time there was a person
5  that was called an SVP, senior vice president, of
6  the Longwood office when these other departments
7  were there.
8  Q      Okay.
9  A      So he had those departments reporting
10  up to him, including mine.
11  Q      Okay.  So you had a boss in the
12  Longwood office at that time?
13  A      That's correct.
14  Q      And then when y'all reconfigured,
15  that's no longer the case?
16  A      That's correct.
17  Q      Okay.  And do you have someone that
18  supervises your office that is in the national
19  office?
20  A      Yes, I do.
21  Q      Okay.  Who is that?
22  A      I report to Dan Gaudro, G-a-u-d-r-o.
23  Q      Who was the manager in Longwood at

Page 47

1  that time, you know, before the reconfiguration?
2  A      There's been two in that office, so
3  I'm not sure exactly what the time frame was.
4  Jeff Harvey was the first senior vice president
5  of the office, and then that was followed by
6  Corey Hulbert, H-u-l-b-e-r-t.
7  Q      Okay.  Now, Ms. Hohne, was she a
8  senior vice president at Stockton?
9  A      No, I believe she was not.
10  Q      She was closing department?
11  A      I think she was a closing vice
12  president.
13  Q      Vice president.  Do you know who the
14  SVP in Stockton was in June of '06?
15  A      My understanding is that Carla
16  reported to John Corrado in the Simi Valley
17  office as the senior vice president.
18  Q      Okay.  He was not in the Stockton
19  office?
20  A      That's correct.
21  Q      Okay.  Getting back to the title
22  abstract order.  Now, Lender's First Choice
23  doesn't actually perform the title abstract

services, does it?
2  A      It does.
3  Q      It does?
4  A      In some cases.
5  Q      In some cases.  In most cases it
6  performs the abstracting or in most cases it does
7  it through vendors?  How does that work?
8  A      It's state by state, depending on
9  what's available I believe on-line.
10  Q      Okay.  In the Stockton office in '06,
11  did they perform their own title abstracting, if
12  you know?
13  A      I would think not.
14  Q      They used vendors?
15  A      They used our Frisco office or our
16  Simi Valley office, the same way we did.
17  Q      Well, how did that work?  Explain
18  that.  What were you using them for?
19  A      The title department is responsible
20  for providing abstract.
21  Q      Okay.
22  A      Whether they do it themselves or they
23  farm it out to an abstractor.  And that would

Page 49

1  depend, I would think, mostly on resources at the
2  Frisco office and state by state availability of
3  data on-line.
4  Q      Okay.  What's the end product?  Is the
5  end product a written title abstract?
6  A      That's correct.
7  Q      Okay.  That gets transmitted to the
8  local office?
9  A      The abstract gets uploaded into the
10  GATOR system and is available to my office,
11  correct, to look at.
12  Q      Okay.  If it's a vendor that performs
13  the abstract, does the vendor generate a paper
14  abstract?
15  A      Yes.
16  Q      Okay.  And that's -- in that case
17  that's sent to the local office; right?
18  A      It's scanned in --
19  Q      Okay.
20  A      -- and uploaded to the GATORS file,
21  yes, sir.
22  Q      All right.  And that abstract would
23  have the abstract information, but also would

1  have the name of the vendor and the other
2  information?
3  A      The abstract would have the name of
4  who performed the abstract, that's correct.
5  Q      Okay. Now, is it your understanding
6  that in states where there's title information
7  available on-line that lenders would do -- that
8  the title department would do its own
9  abstracting, is that what you're saying?
10 A      Yes, sir.
11 Q      Okay. Now, with respect to the
12 Edwards loan that you're familiar with, was an
13 abstract performed in-house or through a vendor?
14 A      I don't recall.
15 Q      Well, we'll look at that. What would
16 you see in a file? How would you be able to tell
17 in a file whether the abstract was performed
18 in-house or through a vendor?
19 A      When I've looked at abstracts that
20 come from vendors, the first page is the vendor
21 order to that abstract.
22 Q      The first page of the abstract?
23 A      Abstract is our request to them.

1  Q      Okay. Is there a difference in the
2  title abstract fee that appears on the HUD
3  between the ones that are done in-house and the
4  ones that are done through a vendor?
5  A      Not that I'm aware of, no.
6  Q      Now, if the vendor performs the
7  abstract, who handles paying the vendor for that?
8  Is that something that's done by the local
9  office? And I'm talking about the period of time
10 June '06.
11 A      No, sir.
12 Q      That's done through one of the
13 national offices?
14 A      Yes, sir.
15 Q      Okay. After the abstract is ordered
16 what happens? What's the next thing that
17 happens?
18 A      If that customer requires us to get a
19 payoff, we would try to get a payoff on that loan
20 at that point.
21 Q      That would be for a refinance?
22 A      That's correct.
23 Q      Okay. But your work is not restricted

1  to refinance. You do purchases, too; right?
2  A      Correct.
3  Q      So you would work to get the payoff.
4  A      (Witness nods head affirmatively.)
5  Q      What else would you do?
6  A      At that point we're just waiting for
7  the abstract to come back.
8  Q      Okay. At that time, at the time the
9  order is made, is there a closing date scheduled?
10 A      It's possible.
11 Q      Sometimes yes, sometimes no?
12 A      Yeah.
13 Q      What does it depend on?
14 A      The loan officer predicts when they
15 want to close.
16 Q      Okay. Is there communication between
17 the closer at LFC and the lender during this
18 process?
19 A      That process, I don't think I have
20 visibility to the order being there yet, unless
21 it's a special situation --
22 Q      Okay.
23 A      -- where they said, I'm sending this

1  order in, you need to do something about it.
2  Q      Okay. So where we are here in the
3  process is still being conducted in the national
4  office?
5  A      That's correct.
6  Q      Okay. Well, if a payoff is needed,
7  that's obtained. What's the next thing that
8  happens?
9  A      That abstract report will become
10 available.
11 Q      Okay. And then what?
12 A      Then the abstract is examined and
13 turned into a commitment.
14 Q      And is that something that LFC does,
15 is generate the -- because a commitment is a
16 document; right?
17 A      That's correct.
18 Q      All right. And that's something that
19 LFC does?
20 A      That's correct.
21 Q      Okay. And I noticed that LFC, at
22 least in Alabama, is licensed to write title
23 insurance for two companies, United General and

1  First American. Is that the way it is in other
2  states as well?
3  A      I believe so, yes.
4  Q      All right. And at what point is it
5  decided on which insurer will be issuing the
6  policy?
7  A      I don't really know the answer to
8  that. It's not done by the closing supervisor,
9  it's done, I believe, somewhere in title.
10  Q      Okay. Do you know how it's decided as
11  to whether a loan's going to be underwritten
12  through First American versus United General?
13  A      My understanding is that we are trying
14  to use United General whenever possible, and
15  there may be some states where it's preferred to
16  go to First American. That's not a fact. I
17  don't know for sure.
18  Q      Okay.
19  A      I think that's the way it works.
20  Q      Okay. Do you know why that is?
21  A      No, sir, I don't.
22  Q      When we use the term "abstract", tell
23  me what your understanding of what an abstract

1  is.
2  A      It's the chronological order of events
3  that have happened to a particular parcel,
4  mortgages, deeds --
5  Q      Okay.
6  A      -- easements.
7  Q      A title history?
8  A      Title history, yeah.
9  Q      Okay. And that's gathered by someone
10  who examines the records for that particular
11  piece of property?
12  A      Correct.
13  Q      Okay. With the commitment generated
14  from the abstract -- you're telling me, I think,
15  that's prepared by someone in one of the national
16  offices?
17  A      Yes, sir.
18  Q      For you at that time it was the Frisco
19  office?
20  A      That's correct.
21  Q      And what's the next stage? What
22  happens then?
23  A      Well, at that point we have visibility

1  to it as a processing function, which in '06 was
2  handled in our office.
3  Q      Okay. So that's the first time the
4  local office would hear about an order?
5  A      Back in '06 we may have been the
6  people that ordered the payoffs. I'm not sure.
7  So we may have had it at that point. It's done
8  by what's called a process point. So a process
9  point is set that we need to order a payoff. So
10  at that point it may have come to the processor's
11  screen to order payoff.
12  Q      Okay. But that would have been your
13  only involvement prior to --
14  A      I would say so, yes.
15  Q      Okay. All right. Leaving that aside,
16  I mean after the commitment from the national
17  the national office, you say it becomes visible;
18  right?
19  A      The process point is set so that the
20  processor will clear title at that point. Again,
21  it will show up on their screen as a 20, which
22  says waiting to clear title or demand, so ...
23  Q      Show up on the local screen?

1  A      On the processor's screen that is
2  managing that account.
3  Q      Okay. When you say processor, you're
4  talking about somebody in the local office?
5  A      It was in '06.
6  Q      In '06, yeah. And that's what we're
7  going to talk about for a while, just to avoid --
8  A      Okay.
9  Q      -- confusion. So the processor is
10  somebody in the local office?
11  A      Yes.
12  Q      All right. And the code 20 means
13  they're waiting for title?
14  A      It means that that particular loan is
15  waiting for our processors to clear it.
16  Q      Okay.
17  A      Make sure it's clear.
18  Q      And then they don't do anything until
19  it's clear, is that -- the processor?
20  A      The processor clears it.
21  Q      Clears it. Okay.
22  A      Yes, starts working on clearing title.
23  Q      Oh, okay. So the clearing title from

1  that period of time is done in the local office?
2  A      Yes.
3  Q      And by clearing title, does that mean
4  taking care of whatever requirements are in the
5  commitment?
6  A      That's correct.
7  Q      All right.  Because a commitment
8  document would specify requirements for the
9  issuance of the title; right?
10  A      That's correct.
11  Q      And what Lender's First Choice does as
12  title agent is to make sure those requirements
13  are met?
14  A      That's correct.
15  Q      Okay.  Now, for whatever reason, I
16  don't see what I would think is a commitment for
17  the Edwards files.  I don't think it was included
18  in what was provided to us, but I have something
19  I wanted to show you.
20         And this will be Plaintiff's Exhibit
21  Number 3.
22              (Plaintiff's Exhibit 3 was
23              marked for identification.)

1         MR. COOK:  He did want to
2  clarify about Alabama offices.  Go
3  ahead.
4         MR. RIEMER:  Okay.
5         THE WITNESS:  Yeah.  I guess
6  there are offices -- there's no
7  offices in Alabama, the offices are
8  in Longwood, Frisco, Texas and Simi
9  Valley, California at this point.
10  So we don't have one in Alabama.
11  BY MR. RIEMER:
12  Q      But back in '06 there were more
13  offices than just those ones you just mentioned;
14  right?
15  A      There was the Stockton office.
16  Q      Okay.
17  A      As far as I know.  Those were the ones
18  that I dealt with.
19  Q      All right.  So in '06 the Stockton
20  office and the Simi Valley office, the main
21  office, would be the only offices that would be
22  connected with this loan?
23  A      Yes.

1  BY MR. RIEMER:
2  Q      Well, tell me what -- and that's for a
3  different loan.
4         MR. HARTLEY:  Excuse me, what
5  was Plaintiff's Exhibit Number 2?
6         MR. RIEMER:  That was the map,
7  coverage map.
8  BY MR. RIEMER:
9  Q      I don't mean to rush you, but --
10  because you can take your time to look at that.
11  But my question is, what type of document is
12  that?
13  A      It looks like a commitment.
14  Q      Okay.  So when you use the term
15  "commitment", that's the form document you're
16  talking about?
17  A      Yes.
18  Q      Okay.
19         MR. COOK:  Is that a complete
20  document, the best you can tell?
21         THE WITNESS:  Best I can tell
22  it's a complete commitment.
23         (Short break.)

1  Q      Okay.  All right.  All right.
2  A      Wait, excuse me.  Because the title
3  work might have been done out of the Frisco
4  office.
5  Q      Okay.  All right.
6         MR. COOK:  And also, I don't
7  think that Frisco and -- which was
8  the one in California?
9         MR. RIEMER:  Simi.
10         MR. COOK:  I don't think they
11  are -- I don't think either one of
12  them is what you would call the
13  headquarters.  I think they just
14  have offices in different time
15  zones.
16         THE WITNESS:  We're set up for
17  time zones, is really what we're set
18  up for.  And the president of our
19  company sits in Simi, so that's --
20  BY MR. RIEMER:
21  Q      So there is no designated headquarters
22  office?
23  A      Not that I'm aware of, no.

1    Q        Okay.
2            MR. COOK:  But Frisco and Simi
3        are the larger offices and so
4        sometimes have more functions.
5    BY MR. RIEMER:
6    Q        All right.  Is there an office in
7    Dallas?
8    A        Frisco is outside of Dallas.
9    Q        Okay.  I'm not up on my Texas
10    geography.
11    A        Yeah, yeah.  Frisco --
12    Q        Okay.  Frisco and Dallas are the same.
13    A        Yeah.
14    Q        Okay.  All right.  Well, before we
15    took a break I asked you about loans that were
16    closed with or without outside vendors and you
17    said that it depends on how much information is
18    available on the internet on title and I think
19    you told me that sometimes Lender's does its own
20    abstracting.
21    A        That is correct.
22    Q        Do I have that right?
23    A        That's correct.

Page 63

1    Q        As far as Alabama goes, do you know if
2    that was a state in '06 where Lender's did its
3    own abstracting or --
4    A        No, I do not.
5    Q        You don't know one way or the other?
6    A        No, I do not.
7    Q        All right.  But you are familiar with
8    an abstractor's report?
9    A        Yes.
10    Q        What you get from an abstractor;
11    right?
12    A        Yes.
13    Q        And we talked a little bit about that.
14    A        Yes.
15    Q        And what you get from the abstractor
16    is everything you need to know about the title
17    history of that property; right?
18    A        Yes.
19    Q        Okay.  And you take that information
20    and generate the commitment?
21    A        That's correct.
22    Q        Okay.  Let me show you a document I'll
23    mark as Plaintiff's Number 4.

1            (Plaintiff's Exhibit 4 was
2            marked for identification.)
3    BY MR. RIEMER:
4    Q        Have you seen that?
5            MR. COOK:  This doesn't have
6        one of our Bate's numbers on it.
7            MR. RIEMER:  No, this is not
8        from what you sent us.
9            MR. COOK:  Okay.
10    A        Will you repeat the question?
11    BY MR. RIEMER:
12    Q        Have you ever seen that before?
13    A        No.
14    Q        Okay.  It's my understanding that this
15    is a statement of Lender's requirements for
16    abstracting vendors that want to do business with
17    Lender's.  Would you agree with that?
18            MR. COOK:  Well, he has not
19        seen it before.
20    BY MR. RIEMER:
21    Q        Is that what it appears to be to you?
22    A        It appears to be that, yes.
23    Q        Okay.  Well, look on page 3.  The

Page 65

1    pages aren't numbered, but it's the third page.
2    And just is this consistent with your
3    understanding of what Lender's requires in an
4    abstracting report?
5    A        You were asking about the first set of
6    questions?
7    Q        Yeah, under the standard search.
8    A        And your question is?
9    Q        Is that consistent with your
10    understanding of what Lender's First Choice
11    requires from its abstractors when they generate
12    a report?
13    A        I would say yes.
14    Q        Okay.  Now, two paragraphs -- I guess
15    it's the third paragraph says, recording the
16    mortgage.  It discusses what they do with they're
17    doing the recording.  Is it true that in some
18    instances the abstractor will do the recording of
19    the mortgage?
20    A        It's my understanding in certain
21    states we that have that mortgage walked in by an
22    abstractor to be recorded.
23    Q        Walked into the Probate Court?

1    A        If that's what it's called in that
2    particular state.
3    Q        The recording office.
4    A        That's correct.
5    Q        As opposed to mailing it in?
6    A        We never mail, we Fed-Ex.
7    Q        Fed-Ex.  Okay.  But as opposed to
8    communicating with the recording office by
9    Fed-Ex.
10   A        That's correct.
11   Q        All right.  Are those the only two
12   ways that Lender's First Choice submits a
13   document for recording?
14   A        Fed-Ex and walking it in?
15   Q        Yes.
16   A        As far as I know.
17   Q        Okay.  In Alabama do you know what the
18   practice is, or at least was in '06?  Was it to
19   use the abstractors to walk in a mortgage to be
20   recorded or --
21   A        No, I'm not aware of that being the
22   case.
23   Q        Okay.  Your understanding is it was

                                            Page 67

1    done through Fed-Ex?
2    A        That would be my understanding.
3    Q        Okay.  Do you know if Lender's First
4    Choice charges a different amount on the HUD for
5    recording fee for instances where the
6    recording -- the instrument to be recorded is
7    walked through by an abstractor to the Probate
8    Court versus mailed in through Fed-Ex?
9    A        I've never seen that done, where we've
10   charged extra money to do that.
11   Q        Okay.  It's always the same?
12   A        Exactly.
13   Q        Okay.  In the abstracting process does
14   the SOP discuss this process of the information
15   to be gathered from the abstractor?
16   A        The SOPs are specific to a procedure,
17   so I don't really do abstracting nor do I have
18   the responsibility for abstracting.  So I don't
19   really know what their SOP says.
20   Q        Okay.  You think there's an SOP for
21   abstracting but you have not seen it?
22   A        I would think there was one but I have
23   not seen it.

1    Q        Okay.  Would that be separate from the
2    SOP regarding the title insurance aspect of it or
3    is it the same thing?
4    A        Title insurance aspect of it
5    meaning --
6    Q        Well, is there a separate SOP for
7    title insurance?
8             MR. COOK:  If you know.
9    A        I don't know.
10   BY MR. RIEMER:
11   Q        Is there something in the SOP that
12   talks about how much can be paid to an abstractor
13   for the third party for its work as a vendor?
14   A        I have no idea.
15   Q        Have you ever seen any kind of price
16   schedule for payment of that third party
17   abstractors?
18            MR. COOK:  Well, I'll let him
19            answer that question.  You know, I
20            objected about fees that are not an
21            issue in the case.  And I'm, of
22            course, letting him talk about what
23            he knows about the procedure.  But

                                            Page 69

1    to the extent you want to get into
2    abstracting fees, that's beyond the
3    fees that are still in this case.
4             MR. RIEMER:  Well, I'm going to
5             ask him about abstracting fees.
6             MR. COOK:  Okay.  Well, I'll
7             object.
8             MR. RIEMER:  Okay.
9             MR. COOK:  Do you know?  Go
10            ahead, answer the question.
11   BY MR. RIEMER:
12   Q        Well, let's see, what was my question.
13   Yeah.  Have you ever seen a schedule of fees to
14   be paid to abstractors?
15   A        No, I have not.
16   Q        Okay.  Now, I know we've talked about
17   the process as it existed in June of '06 and
18   before this reconfiguration that you've told me
19   about.  But let's skip for a second to the way it
20   runs now.  Does your office deal directly with
21   third party abstractors?
22   A        No.
23   Q        No.  It's still done in one of the

1  national offices?
2  A     It's done in the Frisco, Texas office.
3  Q     Okay.
4  A     For the most part.
5  Q     And --
6  A     May I clarify about this national
7  office? Because I don't want to --
8  Q     That's my term.
9  A     Yeah, and --
10  Q     And I know that may be confusing, but
11  I don't know what else to call them.
12  A     Okay.
13  Q     You tell me. I mean, what's the
14  better term for that?
15  A     Well, I'm just saying, I'm a national
16  office we do. I mean, I do closings in all
17  those states as well. So, I mean, that's the
18  terminology we use for national, is that we're
19  not just a local office doing Florida deals, we
20  will do other states.
21  Q     And you said that you're organized in
22  time zones. So is it fair to say that the
23  Longwood office is the eastern standard?

Page 71

1  A     That's correct.
2  Q     Okay. And then Frisco would be
3  central?
4  A     Right.
5  Q     And Stockton -- well, not Stockton
6  anymore, but Simi would be pacific?
7  A     That's correct.
8  Q     Is there a mountain office?
9  A     I believe we have one in Denver now
10  through a reorganization, but I can't tell you
11  who is it or what it is.
12  Q     Okay. There is a person listed in
13  Exhibit Number 4. I think you've given -- you
14  may have mentioned his name, Jack Kozak. It says
15  VP national title operations.
16  A     (Witness nods head affirmatively.)
17  Q     Is he a Lender's employee?
18  A     My understanding is Jack's no longer
19  with the company.
20  Q     Okay. Do you know when it was that he
21  left the company?
22  A     Recently.
23  Q     Within a month, within a year? What

1  does recent mean to you?
2  A     Within a month or two.
3  Q     Okay. Matt Morris, national vendor
4  manager?
5  A     That's correct.
6  Q     Okay. He's still with Lender's First?
7  A     As far as I know Matt's still in the
8  Frisco, Texas office.
9  Q     Okay. And was Kozak also in the
10  Frisco, Texas office?
11  A     That's correct.
12  Q     Is that the 214 area code?
13  A     That would be correct.
14  Q     So it looks from this document that
15  the engagement of outside vendors, if a vendor
16  wants to do work with Lender's First, it has to
17  go through this Frisco office?
18  A     To my understanding, yes.
19  Q     They're the ones that make the
20  decision on who to hire?
21  A     To my understanding, yes.
22  Q     Okay. Now, has it ever been the case
23  that your office handles the payments of the fees

Page 73

1  to any third party abstractor?
2  A     Not that I'm aware of that we would
3  pay those fees.
4  Q     Okay. I will tell you, and we can
5  look at some HUDs if need be, but the Lender's
6  First -- well, the abstracting fee charged to the
7  Edwards was $175.
8      MR. RIEMER: Let's go ahead and
9  mark the HUD. We're at number 5.
10      (Plaintiff's Exhibit 5 was
11  marked for identification.)
12  BY MR. RIEMER:
13  Q     Okay. I marked as number 5 what was
14  produced -- part of what was produced to us by
15  your lawyers, or LFC's lawyer, and what I
16  understand to be the signed HUD, final HUD for
17  the Edwards loan. Is that your understanding?
18  A     That's right.
19  Q     Okay. And the amount charged for the
20  abstracting with respect to the Edwards loan was
21  $175. Do you see that?
22  A     I do.
23  Q     What is that, is that 1102?

A       That's correct.
Q       Okay. Well, do you know how much was paid to the third party vendor for abstracting for the Edwards loan?
A       I do not.
Q       Okay. Do you have any knowledge regarding the fees paid to third party abstractors?
A       Not specifically, no.
Q       All right. Well, getting back to where -- my first question in this line was -- I will tell you that it appears to me that $175 is the standard charge LFC places on that line for abstracting. Would you agree with that?
        MR. COOK: Wait, wait, wait. Standard, you mean --
        MR. RIEMER: Common.
        MR. COOK: You're saying beyond this loan? You're saying it's on a bunch of other loans?
        MR. RIEMER: Yes.
        MR. COOK: If you know.
A       I've seen that charge on other loans, yes.

BY MR. RIEMER:
Q       Okay. Is it your understanding that that is the charge that is placed as a matter of practice by Lender's First Choice on that line as the charge for abstracting?
A       I can't answer that because it's --
        MR. COOK: Wait, wait, wait. I want to talk to my witness for a second. Okay?
        MR. RIEMER: Well, wait. Now, I've got --
        MR. UNDERWOOD: No, you can't coach the witness.
        MR. COOK: All right. I'm not trying to coach the witness, I'm trying to avoid unnecessary objections.
        MR. RIEMER: Okay. And that's --
        MR. COOK: If you want me to just object, I'll object.
        MR. RIEMER: No. But what

we're not going to have is a break between a question and an answer.
        MR. COOK: That's fine. That's fine. I understand.
BY MR. RIEMER:
Q       All right. And I stumbled on that question, so let me do a better job.
        Is it your understanding that the $175 charge for abstracting is the standard charge that Lender's First Choice imposes on the loans it closes?
        MR. COOK: Objection. It's not a fee that's an issue in this case.
        MR. RIEMER: There's no speaking objections. You made your objection.
        MR. COOK: I object and I instruct him not to answer.
        MR. RIEMER: All right. I'm going to read this statement, and then I'm going to ask you a question.
        Rule 30 says that a person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).
        Now, do you continue to instruct him not to answer?
        MR. COOK: I told my -- I objected on paper and said that we weren't going to testify about the fees that were not an issue in this case.
        MR. RIEMER: And we never agreed that we were only going to conduct an examination on the recording fee. That was not an agreement that was in place.
        MR. COOK: I agree, you did not agree to my limitation. What you did is you scheduled a deposition even though I told you that I was going to take the position that was consistent with the position I had

Page 78

```
1   taken on the written discovery.
2       MR. RIEMER:  There's been no
3   motion for a protective order.
4       MR. COOK:  There is a pending
5   motion to compel on the scope of
6   discovery.
7       MR. RIEMER:  Our motion.
8       MR. COOK:  Your motion.
9       MR. RIEMER:  There's no motion
10  for a protective order filed by
11  Lender's First Choice.
12      MR. COOK:  That's right.
13      MR. RIEMER:  That's right.
14  Okay.  And that would be a motion
15  under Rule 30(d)(3).  So I just want
16  to clarify here, the rules do not
17  allow you to instruct your witness
18  not to answer a question on grounds
19  of relevancy, Greg, they don't.  But
20  if that's what you want to do, I
21  believe the Judge is available and
22  we can do that.
23      MR. COOK:  Let me talk to my
```

Page 79

```
1   counsel and my witness about the
2   issue.
3       MR. RIEMER:  Okay.  I think
4   that's fair.  You talk to them and
5   we'll take a five minute break.
6   (Off-the-record discussion.)
7       MR. RIEMER:  Let me put
8   something on the record real quick
9   before we go.
10      MR. COOK:  Sure.  Go ahead.
11      MR. RIEMER:  I know you know
12  this, but let's -- for the record, I
13  fully intend all day long to ask him
14  about every fee on that HUD.
15      MR. COOK:  Uh-huh.
16      MR. RIEMER:  Okay.  All right.
17  Thank you.
18  (Short break.)
19  BY MR. RIEMER:
20  Q    Mr. Petruccelli, one thing I needed to
21  ask you in part of that colloquy before we took a
22  break is, you've been instructed not to answer by
23  LFC's attorney, and do you choose not to answer
```

```
1   that question that I asked you?
2   A    Yes.
3   Q    Okay.  And that's based on the
4   instructions from counsel?
5   A    Yes.
6   Q    All right.  Getting back to this
7   process that you were describing for us in taking
8   the abstracting information that you get from an
9   abstractor and putting into a commitment.  I had
10  showed you -- an example is Exhibit 3 of what we
11  agreed was the title commitment document; right?
12  A    Yes.
13  Q    And this has specific requirements
14  that you as title agent are to make sure are
15  satisfied; right?
16  A    That's correct.
17  Q    And let me just go over a couple of
18  these with you and make sure I understand.  On
19  the B-1 requirements --
20  A    Uh-huh.
21  Q    -- number 1 --
22      MR. COOK:  You need to say yes.
23  A    Yes.  I'm sorry.
```

Page 81

```
1   BY MR. RIEMER:
2   Q    Okay.  Number 1 is instruments in
3   insurable form which must be executed, delivered,
4   and duly filed of record.  Do you see that?
5   A    Yes.
6   Q    And below that is -- in this
7   particular case it's a mortgage for the borrower,
8   Arthur Walker.  You see that?
9   A    Yes.
10  Q    Doesn't this mean that it's your duty
11  as the title agent to make sure that that
12  mortgage gets recorded?
13  A    Yes.
14  Q    And make sure that the proper fee is
15  paid to the recording office for the instrument
16  to be recorded?
17  A    Yes.
18  Q    Okay.  Does it also mean that you need
19  to make sure that what actually gets recorded is
20  every page of the mortgage and that there's no
21  pages missing?  Isn't that one of the things you
22  do?
23      MR. COOK:  Do as title agent,
```

1       is that what you're asking him?
2  BY MR. RIEMER:
3  Q       Well, that Lender's First Choice does.
4  A       Yes.
5  Q       Okay. And that's one of the
6  requirements that has to be done as per the
7  instructions from the title insurance company;
8  right?
9  A       To meet the requirement, yes.
10 Q       The requirement for issuing the
11 policy?
12 A       That's correct.
13 Q       All right. Now, there's a number 4,
14 pay all taxes. You see where that statement
15 starts, pay all taxes, and then it continues?
16 A       Yes.
17 Q       The taxes referenced in the Schedule
18 B-1 requirements, those are the taxes that the
19 probate office imposes and collects upon
20 recording of the mortgage; right?
21 A       Yes. But also it could be other taxes
22 as well besides that.
23 Q       If property taxes are owed?

Page 83

1  A       Yes.
2  Q       Okay. Other taxes that have to be
3  paid in order to make sure clean title gets
4  transferred; right? Isn't that what that means?
5  A       That's correct?
6  Q       Okay. And a lot of these things,
7  Mr. Petruccelli, you've been in the business a
8  long time and I know a little bit about real
9  estate, so you and I probably know the answer but
10 we've got to get it on the record.
11 A       I understand.
12 Q       So if my questions sound kind of
13 silly, just bear with me.
14         Now, you see 6, paragraph 6, LFC can
15 get the documents to the county recorder who is
16 in a position to record in a timely manner.
17 That's something LFC does, right, make sure that
18 the documents to be recorded get to the recording
19 office in a timely manner?
20 A       Yes.
21 Q       Okay. And you said earlier that you
22 do that through Fed-Ex?
23 A       In most cases we do.

1  Q       Okay. Sometimes you have the
2  abstractor or a local person walk it through?
3  A       That's correct.
4  Q       Okay. But we're talking about the
5  same process that you described earlier and
6  that's described here at 6(b), getting the
7  documents in a timely manner to the recording
8  office for recording; right?
9  A       You need to repeat that.
10 Q       Well, I think you answered it. I
11 think that was probably an overkill question.
12         Now, let me call your attention to,
13 let's see, page 5 of the commitment and let me
14 ask you this. Is this something that's typically
15 included in the commitment documents?
16 A       Yes.
17 Q       Okay. Tell me at what point in the
18 process this commitment document is generated.
19 A       The commitment states -- I guess I
20 don't understand your question. Abstract,
21 examine, typing, commitment is produced.
22 Q       Okay. But it's produced prior to
23 closing?

Page 85

1  A       Yes, sir.
2  Q       Okay. On page A -- I'm sorry, page 1,
3  it's on schedule A, it says commitment date,
4  December 22nd, '06. Is that the date that this
5  document on this particular loan is generated?
6  A       I'm not sure where they picked that
7  date up, sir.
8  Q       Okay. And I can tell you that the
9  closing, this particular closing was January 23,
10 '07. So about a month after the commitment date.
11 Is that the typical interval between the issuance
12 of the commitment and a closing?
13 A       I don't know if I can use the word
14 "typical" or not. Some lenders work a lot faster
15 than others, sometimes it takes longer. I don't
16 know if there's a typical time frame for that.
17 Q       Okay. Well, Lender's First Choice
18 physically generates the title commitment
19 document; right?
20 A       That's correct.
21 Q       It doesn't come from the title
22 insurance company.
23 A       That's correct.

1    Q        All right.  It has the requirements,
2    but it's something that you all generate.
3    A        Right.
4    Q        And it's generated prior to closing?
5    A        Correct.
6    Q        It's generated after the abstract is
7    produced; correct?
8    A        Correct.
9    Q        And it's after the abstract is
10   reviewed or before the abstract is reviewed?
11   A        After.
12   Q        Okay.  All right.  And at what
13   stage -- and I may be skipping ahead of our
14   sequence here, but at what stage of this process
15   do you receive the mortgage to be signed, the
16   final version of the mortgage document to be
17   signed by the borrower?
18   A        When the package is delivered to us.
19   Q        Okay.  And is that before or after the
20   commitment is issued?
21   A        After.
22   Q        Okay.  So when you receive the package
23   from the lender, you have generated a document

Page 87

1    like the one that's shown as Plaintiff's Exhibit
2    3 that includes this recording information on
3    page 5; right?
4    A        That's correct.
5    Q        And it tells you what fees are charged
6    by the local recording office for recording the
7    mortgage on page 5?
8    A        That's correct.
9    Q        All right.  Is it true that the only
10   thing you would need in addition to the
11   information printed on page 5 of Exhibit 3 to
12   calculate the exact recording fee required for
13   the mortgage would be the number of pages that
14   the mortgage has?
15   A        That would be one thing we'd need to
16   have.
17   Q        What else would you need?
18   A        You need to know what else has to be
19   recorded.
20   Q        Well, I'm just talking about the
21   mortgage.  And I understand that if there's
22   another instrument to be recorded, then there
23   would be another recording fee.  But as far as

1    knowing what the recording fee was for the
2    mortgage, all you would need to know is the
3    number of pages of the mortgage and the
4    information on page 5; right?
5    A        To record just the mortgage we would
6    need the pages of the mortgage.  That's correct.
7    Q        All right.  And you could use this
8    information to figure out what the recording fee
9    would be for just the mortgage?
10   A        That's correct.
11   Q        Okay.  Look at page 7 for me real
12   quick.  It's called -- well, let me back up.  I
13   don't how quick this is going to be.  Privacy
14   policy of Mercury Companies, Inc.  That's the
15   name of Lender's parent company; right?
16   A        Yes.
17   Q        All right.  It says here, we are
18   committed to safeguarding customer information.
19   As used here, is the customer meant to mean the
20   borrower?
21   A        I don't know.
22   Q        Okay.  Does Mercury Companies, Inc.
23   also own a title insurance company?

Page 88

1    A        I'm not aware of that.
2    Q        Do you know if they are affiliated in
3    any way to First American?
4    A        Do you mean an underwriter?  Is that
5    what you mean --
6    Q        Yeah.
7    A        -- when you say title insurance
8    company?
9    Q        Yeah.
10   A        I don't know what the affiliation is
11   between Mercury and any underwriter.
12   Q        Okay.  Do you know if they have an
13   affiliation with First American?
14   A        I don't know that as a fact, no.
15   Q        What do you mean, don't know it as a
16   fact?  Is there some other understanding you
17   have?
18   A        I thought I heard someone say that
19   there was a relationship, but I don't know what
20   it is.
21   Q        What about with United General?
22   A        I don't know what that relationship
23   is.  I thought that First American had a

1 relationship with UGT, but I don't know for a
2 fact.
3 Q    UGT is United General Title?
4 A    Yes.
5 Q    Okay. You said you heard something
6 about the affiliation with First American. Who
7 did you hear that from?
8 A    I don't remember that, just ...
9 Q    Just hearsay?
10 A    Hearsay.
11 Q    Is it the closer's job on their loans
12 assigned to them to make sure that the
13 requirements set out in the commitment are met?
14 A    Yes.
15 Q    Okay. In your explanation of our
16 process here we've got the abstracting
17 information and someone reviews the abstracting
18 information. Is that what your testimony is?
19 A    That's correct.
20 Q    All right. Who is it that does that
21 reviewing?
22 A    I would say it was the title
23 examiners, is probably their title.

1 Q    Okay. Is that a title that goes with
2 an employee at Lender's First?
3 A    I'm pretty sure, yes.
4 Q    Okay. All right. So is it your
5 testimony that there are folks at Lender's First
6 that have the position title examiner?
7 A    That's my understanding, that's
8 correct.
9 Q    All right. And what they do is they
10 review abstract information from vendors? Is
11 that what they do?
12 A    They review abstract information. I'm
13 not sure if it's just from a vendor. I don't --
14 Q    But if a vendor sends in -- if a
15 vendor is employed or retained to generate
16 abstract -- a title abstract, it's the title
17 examiner that reviews it?
18 A    That's my understanding.
19 Q    Have you ever had a title examiner
20 work in the Longwood office?
21 A    No, we have not.
22 Q    Okay. Where do the title examiners
23 work?

1 A    Frisco, Texas.
2 Q    Would that be under this guy Kozak's
3 position or department? I know he doesn't work
4 there anymore, but when he did.
5 A    As far as I know, yes.
6 Q    Okay. Do you know why and the
7 circumstances surrounding his departure?
8 A    I think he just went to another
9 company for a better job.
10 Q    Okay. Do you know what company?
11 A    I do not.
12        MR. RIEMER: All right. Greg?
13        MR. COOK: Uh-huh.
14        MR. RIEMER: This is a stack of
15    the documents you produced minus --
16    I think I took out the liability
17    policy just because --
18        MR. COOK: Okay. Yeah.
19        MR. RIEMER: Rather than attach
20    this as an exhibit, if we do a good
21    job of referencing the Bate's
22    numbers, can we just do that?
23        MR. COOK: Yeah, that's fine.

1        MR. RIEMER: Okay. I extracted
2    from this stack these transactional
3    notes.
4 BY MR. RIEMER:
5 Q    Mr. Petruccelli, let me hand you some
6 documents that are part of what LFC's lawyers
7 have produced, and it's Bate's stamped 22 through
8 29. Can you tell us what those are?
9 A    These are the notes in the closing
10 module of GATORS.
11 Q    Okay. Does this document everything
12 that the closer does on the loan?
13 A    Unfortunately, no.
14 Q    Okay. Is there another place where
15 activities are documented?
16 A    This is where all the notes are
17 supposed to be at. I think your question was, is
18 it everything. You know, if the person doesn't
19 put it in, it doesn't get there, I guess is what
20 I'm saying.
21 Q    Okay. All right. So they're supposed
22 to put everything in but that doesn't always
23 happen.

A    That's correct.

Q    Do closers keep handwritten notes on what they do?

A    Lender's First Choice is paperless, so we do not have paper files.

Q    Okay. So they're not supposed to keep notes. There should not be any --

A    No, this is notes.

Q    Okay. These documents are the notes. All right. Look on page 26 for me at the bottom.

A    Did you say 6 or 26?

        MR. COOK: 26.

        MR. RIEMER: 26.

        MR. COOK: 26. That's 27.

        MR. RIEMER: Yeah, those are those --

        THE WITNESS: Where are you seeing that?

        MR. RIEMER: Yeah, those are the LFC/Edwards 0026.

        THE WITNESS: I've got it. I see.

BY MR. RIEMER:

Page 95

Q    Okay. At the bottom there's a notation, order was assigned to abstractor 9688. Is that a number that's associated with an outside vendor?

A    That's what it appears to be, yes.

Q    Okay. And you're familiar with the practice of LFC assigning numbers to vendors, vendor numbers?

A    Yes.

Q    Okay. How would one determine what vendor that number went with?

A    Through our system you would put in a vendor number and -- in a screen and it would bring up that vendor's name and address and telephone number.

Q    And that's easy enough to do; right?

A    I would say so.

Q    Okay. Just a matter of a couple of clicks on the system of the mouse and it would pop up?

A    I've never done it for an abstractor, so I really don't know for sure. But to pull up a vendor, other vendors, it's that simple.

Q    Okay. I'm sorry, it's --

A    It's that simple for other vendors. I'm not sure about an abstractor because I don't pull up abstract venders.

Q    Okay. Do you know what vendor this particular abstract number goes with?

A    No, sir, I do not.

Q    K. Phanth, is that the name of a person, K. P-h-a-n-t-h?

A    Yeah, that would be the person that put the note in, so ...

Q    Who is that?

A    I don't know who that is.

Q    Is that someone in the Stockton office or --

A    If this is the Stockton order, I would say it probably is. Or this could be done by either -- no, it looks like either Simi or Frisco getting an abstractor to pull the abstract.

Q    Okay. Well, these are the notes on the Edwards loan which I think you said was processed through the Stockton office.

A    The processing closing function

Page 97

happened in the Stockton office, that's correct. This is not the processing closing function you're looking at. This is getting an abstractor.

Q    Okay. So this is a note that's taken obviously before the abstract is produced?

A    Correct.

Q    Okay. Do the notes talk about or reflect who reviewed the abstract?

        MR. COOK: You can turn to the next page, if you want.

        MR. RIEMER: Yeah.

        MR. COOK: There are other pages.

A    That's correct.

        MR. COOK: You can go to any of the pages.

A    Yeah, that's right. I'm just -- I guess this is out of sequence a little bit it looks to me like, but this isn't in a recording module, this is in a closing module that these notes are coming out of.

BY MR. RIEMER:

1  Q      What page are you on, Mr. Petruccelli?
2  A      I'm on the one that says 26, where you
3  asked me about the abstractor.
4  Q      Okay. Yes, sir.
5  A      And your question is again? I'm sorry
6  about this.
7  Q      Well, you were describing for me the
8  steps in getting the abstract information and
9  then getting it reviewed, and I asked you about
10 this abstractor number, but I also wanted to see
11 if the process of having the abstract reviewed is
12 documented here.
13 A      See, if you look at this page --
14 Q      What --
15          MR. COOK:  Page 28.
16 BY MR. RIEMER:
17 Q      28. Okay. Yes.
18 A      This is where I believe that the
19 abstractor for title was done.
20 Q      All right. What particular notes?
21 A      First place where it says title on the
22 left-hand corner, when you first --
23 Q      Yes. Okay.

1  A      Okay.
2  Q      Then it says 6/2/06?
3  A      Yeah. Those are notes coming out of
4  the title module where you would expect the
5  abstract to be performed. And if you look at the
6  date, that's more like where the abstract would
7  be.
8  Q      Which is about ten days before the
9  closing of the loan. Is that about right? The
10 loan was closed on the 12th.
11 A      6/12.
12 Q      I'm sorry. My question was, is that
13 about the normal interval, like the abstracting
14 is performed about ten days before the loan, or
15 does it matter?
16 A      It just depends on a lot of different
17 issues as far as the state that you're doing the
18 abstract in and how busy it is, what time of
19 month it's ordered in.
20 Q      Okay.
21 A      It's just a tremendous amount of
22 different things that can affect that.
23 Q      All right. Well, this note under

1  title says, order assigned to abstractor, and
2  then there's another number different from what
3  was listed on 26. Do you have any idea why that
4  would be?
5  A      I do not.
6  Q      Okay. All right. So back in our
7  process. The abstract information is reviewed
8  and the commitment document is prepared and you
9  get a package from the lender at some point in
10 this process; correct?
11 A      Yes.
12 Q      Okay. What is in the package?
13 A      Well, again, that would depend on the
14 lender. But a package could consist of closing
15 instructions and the documents that need to be
16 signed by the individual.
17 Q      Okay.
18 A      The mortgage, the right to cancel,
19 whatever the package consists of from that
20 lender.
21 Q      With respect to Home Funds Direct,
22 what documents does Lender's First Choice
23 prepare, if any?

1  A      We would prepare the HUD-1 settlement
2  statement, what we call our escrow docs. And if
3  there was a request to do a deed, we would
4  outsource that deed to be taken care of.
5  Q      What are the escrow docs?
6  A      That's where docs are -- compliance
7  agreement and the owner's affidavit.
8  Q      Okay. All right. And I'm trying to
9  break this down chronologically. Would you
10 receive the lender's documentation after
11 preparing the commitment or before?
12 A      Commitment is done prior to getting a
13 package.
14 Q      Okay. What else does Lender's First
15 Choice do other than what you've already
16 described in connection with preparing the
17 commitment prior to getting the package from the
18 lender, if anything?
19 A      The commitment has to be cleared. The
20 requirements have to be cleared.
21 Q      The same requirements we talked about
22 when we looked at Plaintiff's Exhibit Number 3?
23 A      Well, those would be one, but there's

1  requirements on B-2 that have to be cleared.
2  Q    But those are in the same document.
3  The Schedule B-1s and the Schedule B-2s have to
4  be cleared before you get the package from the
5  lender?
6  A    Yes.
7  Q    Okay. And do you communicate to the
8  lender that that's been cleared?
9  A    We have to send them a clear
10 commitment. Normally a commitment has to be
11 reviewed by their underwriter.
12 Q    By the lender's underwriter?
13 A    Correct.
14 Q    You're not talking about the title
15 insurance company?
16 A    No, sir.
17 Q    You're talking about the loan
18 underwriter with the lender?
19 A    Yes, sir.
20 Q    All right. So are they presented with
21 a commitment document?
22 A    Yes, sir.
23 Q    All right. So the lender, at the end

1  of the process that you described and before you
2  get the package, the lender gets sent a document
3  like what we see at Plaintiff's Number 3?
4  A    They get that when it gets generated
5  initially, yes.
6  Q    Okay. And before they send you the
7  package?
8  A    The final package before that.
9  Q    All right. This is the green light to
10 send you the package?
11 A    Well, I guess I want to clarify that.
12 That could be -- that could have requirements on
13 it that need to be cleared. So they'll send out
14 the original one, and then there may be
15 conversation between the lender and us regarding
16 clearing old mortgages or something off of that
17 title. That's the process that's called
18 processing of the lender.
19 Q    All right. And are the lender's
20 instructions contained in the package that you
21 get from them or is that something you get
22 before?
23 A    It comes both ways. Sometimes you'll

1  get the instructions you need to perform a HUD-1
2  settlement statement, get the HUD-1 approved
3  before they'll send you a package.
4  Q    Isn't it the case that Lender's always
5  prepares a HUD-1?
6  A    There are some customers of ours that
7  provide their own HUD-1. But for the most part,
8  we are the ones that perform the HUD-1s also.
9  Q    Okay. Does Lender's First Choice
10 prepare the truth in lending disclosure?
11 A    Absolutely not.
12 Q    Okay. And not the GFEs?
13 A    No.
14 Q    And not the mortgage; right?
15 A    That's correct, do not.
16 Q    You do not. You do not prepare the
17 note either?
18 A    No, sir.
19 Q    The loan closing documents you
20 prepare, as far as what the client signs at
21 closing, are the good faith estimate and the
22 compliance document you mentioned?
23 A    Not the good faith estimate.

1  Q    I'm sorry. I'm sorry, I misspoke.
2  The HUD.
3  A    We produce the HUD and what we call
4  escrow docs, which are compliance, owner's
5  affidavit. There may be another document that
6  says how do they want the funds disbursed to
7  them, whether they want it in a check or a wire
8  or something like that.
9  Q    Okay. Okay. You receive the package
10 from the lender. What do you do with the
11 package? First of all, does it come through the
12 mail or is it generated through GATORS?
13 A    No. The package comes to us usually
14 by e-mail or we go to the website and pull it
15 down.
16 Q    Okay. By e-mail, these are image
17 documents that somebody e-mails?
18 A    That's correct.
19 Q    And then are printed out?
20 A    That's correct.
21 Q    All right. And then what is done with
22 the package when you receive it from the lender?
23 A    The package is printed out and escrow

1  docs are added to it, the HUD-1 settlement
2  statement is added to it, and it is uploaded to
3  our system for a Notary to download and go get
4  the signing taken care of.
5  Q    Okay. So the Notary assigned to that,
6  he or she has access to the system and downloads
7  what needs to be signed?
8  A    They go to a website that we post it
9  on that's secure to pull down those. They have a
10 user ID and password to get to those documents.
11 Q    Okay. But Lender's First Choice
12 uploads those documents?
13 A    Correct.
14 Q    Okay. And what the Notary pulls off
15 the system is exactly what the borrower is
16 supposed to sign at closing?
17 A    That's correct.
18 Q    Okay. And those documents are exactly
19 what gets recorded after the signature?
20 A    That's correct.
21 Q    All right. So when Lender's First
22 Choice uploads these documents for the Notary,
23 that's prior to closing obviously; right?

1  A    That's correct.
2  Q    How far in advance typically is that
3  available to the Notary before closing?
4  A    Anywhere from a day to ten minutes
5  before he has to run out the door.
6  Q    Okay. But obviously at the point in
7  time that Lender's uploads the mortgage it knows
8  how many pages are going to be in the mortgage;
9  right?
10 A    If there is time to count pages in a
11 mortgage, then they would know that. They have
12 it, so they would know that.
13 Q    Well, the mortgage itself is uploaded
14 on the system; right? Didn't you just tell me
15 that it's uploaded on a system that is then
16 pulled by the Notary? Right?
17 A    The whole package.
18 Q    The whole package?
19 A    Yeah.
20 Q    So at that point in the process
21 somebody at Lender's First Choice can view the
22 mortgage; right?
23 A    Yes.

1  Q    It's on the system. They could go
2  through from page 1 to page whatever?
3  A    Uh-huh.
4  Q    Okay.
5  A    Yes.
6  Q    And that would be the case for the
7  entire period of time between the time the
8  package is received by the lender and when it's
9  uploaded on the system for access by the Notary;
10 right? It can be viewed by a Lender's First
11 Choice employee?
12 A    Yes.
13 Q    In its final form?
14 A    Yes.
15 Q    Okay. How are the notaries selected
16 for a particular loan?
17 A    We have a scheduling department. And
18 we have a database of notaries by county, state
19 and county. And they are rated by how well a job
20 they do. And then they are selected and asked if
21 they could do it at this time and this place.
22 And if they do, they get an order of
23 confirmation.

1  Q    Okay. And are the notaries paid a
2  standard fee or does it fluctuate?
3  A    It fluctuates, as far as I know.
4  Q    Does your office deal with the payment
5  to the notaries?
6  A    No, sir.
7  Q    Does your office negotiate with the
8  notaries as to what -- or tell the notaries what
9  they're going to be paid?
10 A    No, sir.
11 Q    Who handles that?
12 A    The scheduling department.
13 Q    And where is that?
14 A    Frisco, Texas and Simi Valley,
15 California.
16 Q    Okay. You no longer have a scheduling
17 department at Longwood?
18 A    That's correct.
19 Q    Okay. When the Notary is charged with
20 going and -- well, the Notary's job is to take
21 the package that he or she has downloaded from
22 the system and go to the borrower's home and get
23 the signature; right?

Page 110

```
 1   A       Print two copies of the package, go to
 2   the borrower's house, explain the documents, have
 3   them sign in the right place, notarize the
 4   documents, send them back to us.
 5   Q       Does the borrower get a copy of the
 6   signed documents?
 7   A       At that point they do not.  They are
 8   getting a copy of the documents that they are
 9   signing right there.
10   Q       Okay.  When the Notary leaves their
11   house, the borrower does not have a signed copy
12   of any of the documents they just signed?
13   A       They have a complete copy of the
14   documents that they just signed.
15   Q       But they don't have a copy of their
16   signature obviously.
17   A       That's correct.  Unless they sign both
18   packages.
19   Q       All right.  And then what does the
20   Notary do with those documents?
21   A       In some cases he has to fax back what
22   we call critical docs, and then he has to ship
23   them back to us in a Fed-Ex package.
```

Page 112

```
 1   Q       In some cases.  What cases would he
 2   have to fax the critical docs?
 3   A       Some lenders want to see critical docs
 4   as soon as the loan closes or so many hours
 5   after.  And there may be a possibility in a case
 6   where it is not homesteaded property and they
 7   want to fund the loan before those docs get back
 8   to us, they'll fund them off the critical docs
 9   that are faxed in.
10   Q       Oh, homestead.  In other words,
11   there's not a right of rescission?
12   A       Correct.
13   Q       Okay.  All right.  I'm with you.
14   A       Sorry.
15   Q       No, no, that's okay.  In this process,
16   as far as the title insurance goes, and let's
17   break this down from when you have a title
18   binder generate -- commitment generated and the
19   closing, is there any communication between
20   Lender's First Choice and the insurance company
21   that it's acting as agent for?
22   A       If there is something on that
23   commitment that we felt we needed to talk to an
```

Page 111

```
 1   underwriter about, then we would do so.
 2   Q       But unless there's something unusual,
 3   there would be no reporting back during that
 4   period of time; right?
 5   A       I would say that's correct.
 6   Q       Okay.  And the package is returned by
 7   the Notary to Lender's First Choice office.  Then
 8   what happens there?
 9   A       It would go through a postclosing
10   department.
11   Q       In '06, in June of '06, was that done
12   at Stockton, the postclosing department?
13   A       I don't know for sure.  I would think
14   so, but I don't know for sure.
15   Q       All right.  In your office was it done
16   in Longwood or --
17   A       In '06, yes, I believe it was.  It was
18   done at postclosing.
19   Q       And the postclosing department,
20   they're also using these notes that are generated
21   on GATOR to document what they do; right?
22   A       That's correct.
23   Q       So what's typically done at
```

Page 113

```
 1   postclosing?  Explain to me the process.
 2   A       Package received, they had a checklist
 3   of items that they would be reviewing looking for
 4   signatures in the proper places, the dates that
 5   are correct, Notary stamps.
 6   Q       Okay.
 7   A       They take the recordable docs,
 8   separate them out of the package, deliver them to
 9   the recording department, and then the original
10   package, if it's clean, goes back to the lender.
11   Sometimes there's a copy package made for a
12   broker.  Upload the packet -- the whole file gets
13   uploaded into our system as a signed package.
14   Q       Okay.  Let's back up a second.  When
15   the HUD-1 is prepared, as far as the fees that
16   appear on the 800 series --
17   A       Uh-huh.
18   Q       -- those are fees that are dictated by
19   the lender; right?
20   A       That's correct.
21   Q       All right.  And does the lender also
22   tell you about the prorated interest to charge?
23   A       That's correct.
```

Page 114

1    Q      All right.  And then the rest of the
2    fees here -- well, the fees in the 1100 and
3    1200s, those are fees that are filled in by
4    Lender's First Choice; right?
5    A      Correct.
6    Q      Okay.  And the fee charged for title
7    insurance for the Edwards loan is a $275 fee.
8    How was that determined?
9           Well, let me ask you this.  Lender's
10   First Choice decides what number goes in there;
11   right?
12   A      Goes in where?
13   Q      1108 for title insurance.
14   A      Yes.
15   Q      Okay.  And that $275, how was that
16   determined?
17   A      It was determined by GATORS.
18   Q      Okay.
19   A      Calculation in GATORS.
20   Q      All right.  Who puts that information
21   in GATORS?
22   A      My understanding is that the company
23   that we get GATORS from has a certain amount of

Page 116

1    responsibility to update our system with proper
2    fees.  And we also have a group in Simi Valley,
3    California that monitors and enters updates and
4    changes into the system.
5    Q      What's the name of that group?
6    A      I'm going to say it's integrations,
7    but I guess I could be wrong.
8    Q      Integrations?
9    A      Integrations.
10   Q      Okay.  And what's the name of the
11   company that you said is responsible for keeping
12   updated information in GATORS?
13   A      GATORS.
14   Q      GATORS is the name of a company?
15   A      Yes, and a product.  I take that back.
16   GATORS is the name of the product.  I don't know
17   the name of the company that manages GATORS or
18   wrote GATORS or sold us the GATORS.
19   Q      Okay.  All right.  Does the title
20   insurance company provide a manual that instructs
21   you on how to calculate title insurance premiums?
22   A      Yes.
23   Q      Okay.  Is that a printed document?

Page 115

1    A      I've seen it in Adobe format, a soft
2    copy.
3    Q      But it's available to folks that are
4    working on these loans at Lender's First Choice;
5    right?
6    A      Closers use the system GATORS to
7    calculate title insurance.
8    Q      Okay.  But the title insurance, it
9    tells you in the manual what it -- the amount of
10   premium that it is instructing you to charge.
11   That's in the manual; right?
12   A      The manual says that, correct.
13   Q      Okay.  And you've been in the title
14   agent business enough to know that title
15   insurance is in many states governed by filed
16   rates?
17   A      I understand that.
18   Q      Okay.  And including title insurance
19   written in Alabama for United General Insurance
20   Company; right?
21   A      That's a filed rate state, is that
22   your question?
23   Q      Well, yeah.  Isn't it true that

Page 117

1    Alabama is a filed rate state?
2    A      My understanding is yes, that's true.
3    Q      And United General has a rate filed
4    with the State of Alabama for title insurance;
5    right?
6    A      My understanding.
7    Q      And at what point in the process, if
8    ever, does someone at LFC refer to the manual to
9    determine what the filed rate is going to be for
10   that particular policy?
11   A      I don't know the answer to that.
12   Q      They look on GATORS for whatever the
13   number is on GATORS; right?
14   A      Our closers use GATORS to calculate
15   title insurance, you know, costs, yes.
16   Q      Okay.  Without respect to what the
17   calculation might be for the -- under the filed
18   rate that applies to that loan; right?  They just
19   put whatever GATORS generates?
20   A      We rely on GATORS to give us the
21   proper amount.
22   Q      Okay.
23          MR. RIEMER:  And it's almost

```
 1        12:00.  This would be a good time to
 2     take a lunch break.  There are
 3     places real close, so you won't need
 4     more than an hour, I wouldn't think,
 5     unless for some reason you want
 6     that.
 7        MR. COOK:  No.
 8        (Lunch break.)
 9  BY MR. RIEMER:
10  Q     All right.  Before we took a break we
11  talked a bit about the manual.  You used the term
12  "manual" as far as something that was provided by
13  the insurance company?
14  A     (Witness nods head affirmatively.)
15  Q     Does the manual set out what the legal
16  rates are and how they are to be calculated for a
17  particular policy?
18  A     I think that I've seen them say X
19  amount of dollars per thousand.
20  Q     Okay.
21  A     But what I normally will do is go to a
22  chart, if I'm looking for a refinance rate, and
23  come down to the loan amount and it will tell you
```

```
 1  what the rate is for that.  And it will also tell
 2  you what the reissue rate would be.
 3  Q     What chart?  Tell me about the chart.
 4  Where is it and who generates it?
 5  A     It's a UGT rate manual.
 6  Q     Okay.  All right.  And that's
 7  available at your office; right?
 8  A     It is.
 9  Q     And it's available to anybody
10  closing --
11  A     No, no.  It's available to me because
12  what happens is a customer will call me and ask
13  for a quote that I might give them.  So, you
14  know, instead of -- in GATORS you have to be
15  inside the file to get the quote, whereas I can
16  go to the manual.  So the closers don't use the
17  manual, they use GATORS.
18  Q     But you do as the manager of the
19  office?
20  A     Yes.
21  Q     Now, before you had this
22  reconfiguration, when you had these departments
23  in your office, it was the same way then, right,
```

```
 1  you had access to the manual?
 2  A     I've always had access to the manuals
 3  as supervisor.
 4  Q     This is something that's on paper or
 5  is it on-line somewhere?
 6  A     I have an Adobe file.
 7  Q     Okay.  Well, let me show you this.
 8  Now, the Adobe file you have, is it by state?
 9  A     Yes.
10  Q     Okay.  So you can look up the rate
11  manual or the rate, I guess, schedule for
12  Alabama?
13  A     Yes.
14        (Plaintiff's Exhibit 6 was
15        marked for identification.)
16  BY MR. RIEMER:
17  Q     Okay.  I'm going to hand you what I've
18  marked as Plaintiff's Number 6.  And I'll tell
19  you that that's what we -- my pages are a little
20  bit out of order, I think.
21        Mr. Petruccelli, let me get that.
23  this.  All right.  I'm going to just put an X on
```

```
 1  this and I'll mark the first page.
 2        Okay.  Take a look at this number 6
 3  here.  Is that the manual you're talking about?
 4  A     This is like what I'm talking about.
 5  I don't know if this is the exact same document
 6  that I look at.
 7  Q     Okay.
 8  A     I don't think mine says 2001, I think
 9  it said 2007, but I don't know for sure.
10  Q     Okay.
11  A     But that's similar, yes.
12  Q     Okay.  This is what we received in
13  response to our request from the Department of
14  Insurance.  But you were talking about so many
15  dollars per one thousand.
16  A     Correct.  Well, you know, I'm not sure
17  if it's State of Alabama.  I was looking at
18  Pennsylvania the other day and it had stuff like
19  this, and then it also had starting at, say,
20  $10,000 would cost you $5 in title insurance, you
21  know.
22  Q     They had it broken down by per
23  thousand?
```

1  A      Broken down based on a refinance or a
2  reissue rate.
3  Q      Okay.  And going to page 2, it's page
4  number 2, it's actually the third page of the
5  exhibit because of the title page, it says,
6  original loan rate -- original rate for loan
7  policies.  That term "loan policy", that's a
8  lender -- that's the same as a lender's policy
9  like the one that was issued in the Edwards file;
10 right?
11 A      Original rate for loan policies, first
12 mortgages.  I would say my understanding is that
13 would be correct.
14 Q      Okay.  And what the Edwards paid for
15 was issued to Home Fund Direct is a lender's
16 insurance policy covering the amount of the loan;
17 right?
18 A      Correct.
19 Q      Okay.  And there is a chart here and
20 divided up in Zones 1 and 2.
21 A      Uh-huh.
22 Q      And there's an explanation of that on
23 the first page.  And it looks to me from reading

1  issued on the '01 loan, they'd be entitled to the
2  reissue rate, wouldn't they?
3  A      I don't believe so.
4  Q      Why not?
5  A      I don't believe it works off a
6  lender's policy.  I think you're talking about an
7  owner's policy.  There's a difference.
8  Q      Well, so your understanding is the
9  reissue rate doesn't apply to lender's policies?
10 A      Well, it says here, reissue rate for
11 owner's or leasehold policies, if I'm reading the
12 right paragraph.
13 Q      On what page?
14 A      I guess it's page 1.  Where it says
15 State of Alabama and we've picked out Mobile.
16 Q      Right.  But look at page 2.  I
17 was referring to page 1 because of the Zone 1 and
18 2.  But page 2 is a description of the rates that
19 apply for loan policies; right?
20 A      Okay.
21 Q      And there is a paragraph in the middle
22 of the page that is entitled reissue rates for
23 loan policies.

1  that that Mobile is in Zone 2, Mobile County.
2  You'd agree with me on that, wouldn't you?
3  A      That's what this says.
4  Q      Okay.  Then there is an explanation of
5  the reissue rate that also appears on that page.
6  Do you see that?
7  A      I do.
8  Q      And just paraphrasing that, and tell
9  me if you agree, but a loan would qualify for the
10 reissue rate if there was another title policy
11 written for the same borrower within the last ten
12 years.  Is that your understanding?
13 A      I read this that there is a reissue
14 rate available to borrowers if they have a policy
15 that's not ten years old.  No older than ten
16 years.
17 Q      Okay.  So, for instance, the Edwards
18 here, and you've seen the file, you probably know
19 this, had an Ameriquest loan back in '01 that
20 actually this loan refinanced.
21 A      Uh-huh.
22 Q      And they were charged for a title
23 policy for the '01 loan.  So if a policy was

1  A      Okay.
2  Q      And that's what I'm reading to --
3  A      Okay.  I was reading the other one.
4  Q      All right.
5  A      I would think so, that it would --
6  Q      Okay.
7  A      -- be the reissue rate on it.
8  Q      And --
9        MR. COOK:  Well, I mean, just
10 to interpret the document, it says,
11 provided the company is advised of
12 certain things.
13       MR. RIEMER:  Okay.  Let me get
14 his testimony.
15       MR. COOK:  You're asking him to
16 interpret a document.
17       MR. RIEMER:  Yeah.  But he
18 testified earlier that he would
19 review these to determine -- to look
20 at the reissue rates to give quotes
21 for customers.
22       MR. COOK:  Right.
23       MR. RIEMER:  And also to the

1  regular rates. So my --
2  THE WITNESS: No, I didn't say
3  that. I said I would give them a
4  refinance rate. I said the chart
5  was broken down into two columns,
6  one was a refinance rate and one was
7  a reissue rate.
8  BY MR. RIEMER:
9  Q    Okay. So you would agree that it
10  appears that they would qualify for the reissue
11  because they had a loan within the last ten years
12  where a policy was issued on that loan?
13  A    Yes, that would be my interpretation
14  of this.
15  Q    Okay. And it's true, isn't it, that
16  in the process of Lender's First Choice obtaining
17  the information regarding the title and the title
18  abstract, that you can tell from the information
19  you had whether there was a previous loan or
20  previous mortgage issued within the last ten
21  years; right?
22  A    Yes.
23  Q    Okay. Now, you say you have a -- that

1  you may have another version of this in your --
2  well, I think to be precise, you weren't sure if
3  what's been marked as Exhibit Number 6 is exactly
4  the right -- is the same version that you have in
5  your office.
6  A    No, I'm absolutely not sure of that at
7  all.
8  Q    Okay. So you don't know if the
9  version that you have has the same rates here.
10  $2.50 for the first fifty, et cetera?
11  A    No idea.
12  Q    Is that manual that you're talking
13  about, it's available to you in your office?
14  A    Right.
15  Q    As of today?
16  A    Yes.
17  Q    Okay. Is there any part of this
18  process you were describing for me whereby
19  somebody from Lender's First Choice pulls out the
20  legal rate and calculates what the legal rate is
21  for a policy for a particular loan?
22  MR. COOK: Would you read that
23  question back to me?

1  COURT REPORTER: Sure.
2  (Reading) "Is there any part
3  of this process you were describing
4  for me whereby somebody from
5  Lender's First Choice pulls out the
6  legal rate and calculates what the
7  legal rate is for a policy for a
8  particular loan."
9  MR. COOK: Asked and answered.
10  BY MR. RIEMER:
11  Q    Go ahead.
12  MR. COOK: In other words, I'm
13  objecting to the form of the
14  question. It's the same question as
15  before.
16  A    I guess -- yeah. Are you asking --
17  may I ask you how you're asking the question? I
18  mean, I don't understand it, I guess.
19  BY MR. RIEMER:
20  Q    I was asking you, is there a point --
21  you were describing to me the process and we
22  tried to go bit by bit what Lender's First Choice
23  does in preparing a loan for closing. And my

1  question was, is there any point in that process
2  where somebody is to pull out the rate manual and
3  calculate the legal rate for title insurance?
4  A    No, sir.
5  Q    I think you told us earlier that the
6  Lender's First Choice employees rely on what
7  prints in GATORS; right?
8  A    That's correct.
9  Q    Is the $275 amount, is this an amount
10  that is commonly -- well, commonly comes up in
11  GATORS as the amount to charge for insurance?
12  A    Commonly? No, I don't --
13  Q    Well, is that $275 rate -- how is that
14  calculated by GATORS? I mean, how is that -- do
15  you know? Do you know how $275 is arrived at?
16  A    No.
17  Q    Have you seen $275 as the charge for
18  other loans other than the Edwards?
19  A    I may have, yes.
20  Q    You may have or you haven't? I mean,
21  or you don't remember?
22  A    Well, I don't know. I don't -- I
23  don't know.

Page 130

1  Q     Okay. Well, I'm going to show you
2  something that has been produced by Lender's
3  attorneys in this case as Exhibit Number 7.
4          (Plaintiff's Exhibit 7 was
5          marked for identification.)
6          MR. RIEMER: And, Greg, correct
7  me if I'm wrong, but I think this is
8  the list of -- a list of loans or
9  selected information from loans that
10  were closed by Lender's First Choice
11  where Home Funds Direct was the
12  lender within a certain period of
13  time, going back to '03; right?
14          MR. COOK: Yeah, in Alabama.
15          MR. RIEMER: In Alabama.
16          MR. COOK: These are Alabama
17  Home Funds Direct's loans.
18          MR. RIEMER: Right.
19          MR. COOK: And, in fact, I
20  think these are all the Alabama Home
21  Funds Direct loans.
22  BY MR. RIEMER:
23  Q     Okay. And tell me the page -- what

Page 131

1  page number does that start out with?
2  A     317 in the right-hand corner.
3  Q     Okay.
4          MR. COOK: That's the Bate's
5  stamp.
6          MR. RIEMER: That's the Bate's
7  number, right.
8  BY MR. RIEMER:
9  Q     So you see the list here, title
10  insurance charged, over towards the right-hand
11  side?
12  A     Yes, uh-huh.
13  Q     And you see where $275 is a
14  recurring charge but then there's also some other
15  charges?
16  A     Uh-huh.
17          MR. COOK: He's looking at the
18  title insurance column.
19  BY MR. RIEMER:
20  Q     Do you see that?
21  A     Uh-huh.
22  Q     I guess my question is, do you know
23  how -- do you know why $275 is a rate that's

Page 132

1  applied to some loans but not to others?
2  A     Based on the loan amount, would be my
3  guess.
4  Q     That would be your guess. But you
5  don't really know how these numbers are assigned?
6  A     Well, I see that $275 is here.
7          MR. COOK: He wants to know why
8  it was $275 when the UGT manual
9  filed with the State seems to
10  indicate that it should be less than
11  that.
12  A     I would say that was just an error,
13  then. It was set up wrong.
14  BY MR. RIEMER:
15  Q     That GATORS was set up wrong?
16  A     Correct.
17  Q     Do you have any information in terms
18  of why or how Lender's First Choice selects the
19  charges for title insurance other than that's
20  just the number that pops up in GATORS?
21          MR. COOK: I think he has
22  already answered. Go ahead.
23  A     No, I do not know any other way other

Page 133

1  than it's in GATORS. Now, how it got there I
2  don't know.
3  BY MR. RIEMER:
4  Q     Okay.
5          MR. COOK: I mean, he already
6  told you that it comes with the
7  software and then Bob Lohr's group
8  can modify it. So ...
9          MR. RIEMER: Okay. Can we get
10  whatever manual he has? I mean --
11          MR. COOK: Yes.
12          MR. RIEMER: Okay.
13          MR. COOK: I was unaware of
14  that manual. We will produce it
15  promptly.
16          MR. RIEMER: Okay.
17          MR. COOK: It may not be -- I
18  don't know we have an '06. So we'll
19  look for an '06. If we don't, we'll
20  just give you what we've got now.
21          MR. RIEMER: Let's go off the
22  record just for a second.
23          (Off-the-record discussion.)

Page 134

1  BY MR. RIEMER:
2  Q    I think that was number 6. Wasn't
3  Exhibit 6 the --
4  A    7 was the --
5  Q    Yeah. Let's go back to the manual.
6  A    This?
7  Q    Yes, sir.
8  A    Okay.
9  Q    Yeah. If I could just get you to walk
10 through with me the calculation of the rates.
11 And I know that the manual that you have in your
12 office may have different numbers. But for the
13 purpose of this exercise, let's just assume that
14 the numbers that apply are the ones in Exhibit
15 Number 6. And since you've done this calculation
16 I want to make sure that the way I do it is
17 consistent with the way you think it should be
18 done.
19       Okay. For a policy like the Edwards,
20 a lender's policy on a mortgage, we go to the
21 chart on page 2 for Zone 2. Is that --
22 A    Okay.
23 Q    You would agree with me so far; right?

Page 135

1  And that means that the rate would be $2.50 per
2  thousand up to fifty thousand.
3  A    Right.
4  Q    And if you do the math, two fifty
5  times fifty is a hundred and twenty-five. Okay.
6  This is a $65,000 policy. So you would have to
7  then apply the $2.00 rate in the next line down
8  to the next fifteen thousand; right?
9  A    That's correct.
10 Q    So two times fifteen gets you $30.
11 Thirty plus one twenty is one fifty-five. You
12 would agree with me on that?
13 A    I'd agree with that --
14 Q    Okay.
15 A    -- calculation you just did, yes.
16 Q    Okay. Now, if the reissue rate
17 applies, there is another chart there on page 3
18 that has a rate of one fifty per first fifty
19 thousand. Do you see that?
20 A    I see that.
21 Q    Okay. But it also explains that the
22 reissue rate is sixty percent of the original
23 loan policy rate; right?

Page 136

1  A    Uh-huh.
2  Q    Okay. So to get the reissue rate you
3  can multiply one fifty times .60 -- one
4  fifty-five times .60 and you get $93. Okay?
5       MR. COOK: I didn't follow that
6       last one. Explain that to me.
7       MR. RIEMER: Well, I think the
8       witness and I agree that the reissue
9       rate, if it applies, you get
10      basically a forty percent reduction.
11      THE WITNESS: Uh-huh.
12 BY MR. RIEMER:
13 Q    Sixty percent -- reissue rate shall be
14 sixty percent of the original rate. And sixty
15 percent of one fifty-five is --
16 A    Well, I think they're talking about
17 the original policy when it was generated. Not
18 this exercise, but the one before you're getting
19 sixty percent of, I believe.
20 Q    Okay.
21 A    The former policy.
22 Q    Okay. Let's make sure we're
23 reading --

Page 137

1  A    I don't know what the calculation was
2  when they did that policy.
3  Q    Okay. Well, let's make sure we're
4  reading in the same places. I think the reissue
5  rate description for lender's policy is --
6  appears on top of page 3. Well, it starts on the
7  bottom of page two, but the sixty percent
8  discount is described -- forty percent discount
9  is described at the top of page 3. Wait a
10 minute.
11 A    Your numbers are different than mine,
12 I think.
13 Q    Uh-huh.
14 A    The page I'm looking at is 2, but it
15 looks like your 3.
16 Q    Let me see something. Okay. Huh. I
17 see what I did. Okay. So you read that to mean
18 that it's sixty percent of the original -- the
19 rate on the previous policy that was issued;
20 right? Am I understanding you correctly?
21 A    That's correct.
22 Q    Okay.
23 A    You have to be provided that policy.

Q    The number of the former policy and the amount; right?  Is that what you're reading from?

A    That's what it says here, yes.

Q    Okay.  Now, your lawyer's provided us some information, and the purpose of this is maybe to skip through a line of questions, that indicates that the portion of the $275 collected in connection with the Edwards loan that was submitted to the insurance company, United General, was ten percent of that, $27.50.  Is that your understanding?

A    Yes.

Q    Okay.  And that's consistent with the agreement with -- well, that's consistent with a ninety percent commission that Lender's First Choice earns on the title insurance; right?

A    In this particular situation.

Q    Okay.  So for the $275 collected in connection with the Edwards loans, Lender's First Choice retained ninety percent as its commission earned as the title agent and then ten percent was remitted to United; right?

A    Correct.

Q    Okay.  Is that ninety percent commission rate effective, for example, in Florida?

A    I don't know what exactly Lender's First Choice commission splits are in every state, but Florida is -- usually the remittance is not ten percent.

Q    It's --

A    It's a different percentage.

        MR. RIEMER:  Let me mark another document that's been provided by LFC's lawyers, and that would be Exhibit Number 8.

        (Plaintiff's Exhibit 8 was marked for identification.)

BY MR. RIEMER:

Q    And that's entitled underwriting agreement?

A    Uh-huh.  Yes.

Q    Have you ever seen that before?

A    I saw this last night.

Q    Okay.  And would you agree that this document is a statement of the agreement between Lender's First Choice and United General?  That's what this is, right, title insurance?

A    That's what it says, yes.

Q    Let me ask you, the manual you were describing for me that's in your office that you've referred to on occasion, do you also have one for First American?

A    I don't think so.  I would have to look, I'm not sure.

Q    Okay.

A    I've been using the UGT one for sometime, so ...

Q    Okay.  Do you know of any affiliation between UGT and First American?

A    To my understanding there is one, but I don't know what it is.

Q    All right.  Let me ask you a couple of questions about this because the terminology is a little bit different.  Let me make sure I understand.

        Look at the bottom of page 1.  The last paragraph says, agent and company have entered into this underwriting agreement in order to enable agent to issue company title reports, et cetera.

        Now, the term "title reports", is that synonymous with the document that appears here at number 3?

A    I would assume that.  In fact, in 3.2 it says that that's what it is, that report.

Q    Okay.  Yeah, it's kind of a -- yeah, it has different terminology, too, but it also includes commitments and policy endorsements.  I just wanted to make sure we're talking about the same thing.

        Continuing on that paragraph, it goes to number -- the next page.  After title reports it says, and to provide related services economically and expeditiously based on determinations of insurability performed by agent.  And I think that the term "determination of insurability" is discussed in paragraph 5.1.

        Now, you described for us a process by which somebody at Lender's First Choice orders an abstract, takes the abstracting information and

1 generates a commitment, and make sure that the
2 requirements listed in schedules -- both the
3 schedules in the commitment letter are complied
4 with.
5         And my question is, and this may be
6 one of those obvious ones, is whether that's the
7 same process that's described here as
8 determination of insurability.
9         MR. COOK: Could you read that
10        question back?
11        MR. RIEMER: Well, I'll
12        rephrase it if he doesn't understand
13        it.
14 A    I didn't know where you read that
15 from, so I lost you on that.
16 BY MR. RIEMER:
17 Q    Okay.
18 A    Where were you reading that last part.
19 I thought you said it was right underneath the
20 title report, but I've got the word "loss" on
21 the --
22 Q    Well, okay. It's mentioned in that
23 paragraph we were reading. But let's skip to

Page 143

1 page 5.1. I mean paragraph 5.1.
2 A    Okay.
3 Q    Okay. Determination of insurability.
4 Okay. Agent shall cause a determination of
5 insurability to be made with respect to the
6 subject real property. I mean, in plain English
7 I read that to mean you make sure that the
8 requirements for issuing a title insurance policy
9 are met; right?
10 A    I would say that's correct.
11 Q    Okay. And again, this may be one of
12 those obvious questions that I have to clarify,
13 but this process you described earlier today
14 whereby Lender's First Choice orders an abstract,
15 reviews the abstract information, compiles it
16 into a commitment, and assures that the
17 requirements in Schedules B-1 and B-2 are met,
18 that's the same process that you're required to
19 do to determine insurability under your agreement
20 with United; right?
21        MR. COOK: Objection to form.
22 BY MR. RIEMER:
23 Q    You can answer.

1 A    Oh.
2 Q    Yeah. He's just posing an objection.
3 A    Yes.
4 Q    There's not some separate process out
5 there that you haven't described; right? I mean,
6 we're talking about the same task?
7        MR. COOK: Objection to form.
8 A    I would believe that's what we're
9 talking about, yes.
10 BY MR. RIEMER:
11 Q    Okay. Now, look at paragraph 5.3
12 where it lists one of the things that LFC has to
13 do as agent is provide the company with a list of
14 closing vendors. Does LFC do that? Has it
15 provided United General with a list of the
16 vendors it uses in connection with title
17 insurance?
18 A    I have no idea.
19 Q    You would suspect if it did, it would
20 be controlled by some other office?
21 A    Yeah. I have no dealings with UGT
22 like this at all.
23 Q    Okay. And look at paragraph 8.1. My

Page 145

1 question is, and you can read it over, but would
2 you agree with me that that paragraph requires
3 that LFC calculate the premium to be charged for
4 a policy in accordance with the filed rate?
5 A    Yes.
6 Q    Okay. Now, just a couple more
7 questions and we'll leave this. But look at
8 Schedule 1. Do you see that?
9 A    Yes.
10 Q    Okay. This is the list of agent's
11 commissions by state?
12 A    Yes.
13 Q    Have you ever seen this?
14 A    I saw this last night.
15 Q    Okay. But before last night you'd
16 never seen this?
17 A    No.
18 Q    Okay. But these percentages govern
19 how much of the funds collected at closing for
20 title premium go to the insurance company and how
21 much of that is retained by LFC; right?
22 A    Correct.
23 Q    And is this calculation inputted into

GATORS? I mean, does GATORS tell you how much of
the title insurance premium is going to stay at
LFC?

A    I don't see that breakout --

Q    Okay.

A    -- in my GATORS. I mean --

Q    You just see the overall fee?

A    I see the fee.

Q    How are the funds remitted to the
title insurance? Does the title insurance
company get a check every time a loan is closed
or do they get one check at the end of the month
for the closings for that month or some other
way?

A    I don't have any knowledge on how
Lender's First Choice does that.

Q    That's not something you're involved
in?

A    No, sir.

Q    Okay. Are you aware of any instance
where Lender's First Choice has issued some type
of refund to the borrower for overcharge relating
to title insurance?

Page 147

1    A    Do you mean on a case basis, like a
2    one time thing, or do you mean something
3    different?
4    Q    Well, no. Do you know of any instance
5    whereby Lender's First Choice has refunded to a
6    borrower money it collected as a title insurance
7    premium because it collected too much?
8    A    Not that I can recall, no.
9    Q    Do you know of any occasion whereby
10   United General has notified Lender's First Choice
11   that it's charging the wrong amount for title
12   insurance?
13   A    I have no knowledge of that at all.
14   Q    Okay. Is there a provision of the SOP
15   of any -- any of the SOPs that relates to the
16   calculation of insurance premiums, title
17   insurance premiums?
18   A    I would only think that there would be
19   a reference to -- for that, that they would use
20   GATORS for that calculation, if there's anything
21   at all.
22   Q    Okay. And this process that you
23   described for us, the reliance on GATORS in

1    determining what goes into that line on the HUD,
2    just to be sure, we were talking about a process
3    that took place back around the time of the
4    Edwards loan, in June of '06. Is that the way it
5    happens right now? I mean, as of today is that
6    the same process for determining how much is
7    charged for the title insurance?
8    A    Yes.
9         MR. COOK: Can I talk to the
10        witness for a second?
11        MR. RIEMER: Sure. I mean,
12        we're between questions so I don't
13        think there's anything inappropriate
14        about that.
15        (Off-the-record discussion.)
16        THE WITNESS: May I clarify
17        something?
18        MR. RIEMER: Okay.
19        THE WITNESS: Okay.
20   A    When you asked if that was the same
21   process that we do today to get title insurance,
22   I'm aware that we have changed GATORS to reflect
23   the right amount in Alabama from the mistake that

Page 148

1    was there.
2    BY MR. RIEMER:
3    Q    Okay. But that's not what you said
4    before.
5         MR. COOK: No, he said the
6         process was the same.
7         MR. RIEMER: The process is the
8         same. Okay. All right.
9    A    You asked me if the process was the
10   same. It is. We use GATORS for our calculation.
11   BY MR. RIEMER:
12   Q    But if you were to go to GATORS right
13   now and look at the screen, it would have the
14   filed rate pop up as opposed to the $275, is that
15   what you're saying?
16   A    That's correct.
17   Q    Okay. When did that change?
18   A    I believe it was changed as soon as we
19   were made aware that there was a problem.
20   Q    And were you made aware there was a
21   problem because of the filing of the lawsuit?
22   A    I believe so.
23   Q    Okay. But you don't know of any

Hall-Frazier
Record - 000653

1 policy that LFC has to go back in time and refund
2 any amounts that they collected over the filed
3 rate?
4 A      I'm not aware of that.
5          MR. COOK: For title insurance.
6          MR. RIEMER:  Yeah, for title
7      insurance.
8 BY MR. RIEMER:
9 Q      But you would agree with me that the
10 way the filed rates are calculated, the premium
11 goes up proportionately with the amount of the
12 loan.  The higher the loan, the higher the amount
13 of the insurance premium; right?  Title insurance
14 premium.
15 A      For the most part that's true.  There
16 are some places where just because it goes up,
17 it's still the same, like minimum rate.
18 Q      Okay.
19 A      I guess for the most part that's
20 correct.
21 Q      Okay.  Unless there's some minimum
22 rate provided in the manual and the loan amount
23 is less than that?

Page 151

1 A      Yes.
2 Q      Okay.  Do you know what the minimum
3 rate is under the UGT policy?
4 A      I know Florida.
5 Q      What is it for Florida?
6 A      The minimum is $100.
7 Q      $100.  Okay.  That's for United?
8 A      No.  I don't know.  I know Florida law
9 says that you have to charge --
10 Q      Okay.  It's not the Florida filed rate
11 for United, it's just --
12 A      Florida doesn't have a filed rate.
13 Florida law says you cannot charge less than
14 $100.  They had a lot of promulgations, so
15 it's ...
16 Q      Okay.  So there's not a filed rate.
17 But there is a provision in Florida law that
18 tells you you can't charge less than $100?
19 A      That's correct.
20 Q      Okay.  Do you know the name of a
21 current Lender First Choice employee who would be
22 most knowledgeable about the title insurance
23 rates and what was charged?

1 A      What was charged --
2 Q      Well, that would be most knowledgeable
3 about Lender's First Choice's policies with
4 regard to calculation of title insurance
5 premiums.
6 A      My guess would be that integrations
7 team headed by Bob Lohr.
8 Q      Okay.  And he's a current employee?
9 A      He is a current employee.
10 Q      And where is he located?  Is he in the
11 Simi office?
12 A      Correct.
13 Q      All right.  Let's talk a little bit
14 about the Edwards loan.  Where's the HUD?  It's
15 probably right here.
16          Okay.  I'm going to show you Exhibit
17 5.  That's the HUD.  Can you tell me what the
18 Bate's number of that is again?  Is it 167?
19 A      No.  The 0231 number?
20 Q      I see.  Yeah, okay.  It appears
21 several places, I just want to make sure we're
22 looking at the same document.
23          All right.  The $88 recording fee.

Page 153

1 A      Yes, sir.
2 Q      How was that calculated?
3 A      It's calculated based on a thirty page
4 recording of a mortgage.
5 Q      Okay.  Is that a flat fee that is
6 applied across the board by Lender's First
7 Choice?
8 A      The fee is not a flat fee.  The
9 calculation of thirty pages is standard for us.
10 Q      Okay.  I mean, I've seen other HUDs
11 and many other HUDs have the $88 fee.
12 A      That would be usual, unless you're
13 talking about Alabama.  And this --
14 Q      Okay.
15 A      Yeah.  But, I mean, Florida would not
16 be that $88.
17 Q      Okay.  What would it be in Florida?
18 A      It's $10.50 for the first page, $8 for
19 the second, you'd calculate that up times thirty.
20 Q      Well, this thirty page -- okay.
21 A      $200.
22 Q      All right.  What you're saying is it's
23 Lender's First Choice policy to charge an

Page 154

```
 1   estimated rate based on the assumption there's
 2   going to be thirty pages on a mortgage.  It might
 3   be $88 and it might be some other amount
 4   depending on the rates in a particular
 5   jurisdiction, is that what you're saying?
 6   A       That's what I'm saying.
 7   Q       Okay.
 8   A       Preliminary HUD comes out with that.
 9   Q       Okay.  At what point is the
10   preliminary HUD generated?
11   A       As soon as the order is placed, within
12   four hours.
13   Q       Okay.  And the $88 -- well, the thirty
14   page estimate is put in the preliminary HUD?
15   A       Correct.
16   Q       All right.  And then at what point
17   does the HUD become final?
18   A       Final HUD is when it gets approval
19   from the investor and broker.
20   Q       Okay.  And that's prior to closing?
21   A       Prior to closing.
22   Q       Okay.  So when the borrower sits down
23   and is presented by the Notary all these
```

Page 155

```
 1   at their kitchen table --
 2   A       Uh-huh.
 3   Q       -- so to speak.
 4   A       Uh-huh.  Yes.
 5   Q       But Ms. Rajas -- yeah.  Ms. Rajas is
 6   not at the kitchen table, she's back in Stockton
 7   or wherever; right?
 8   A       That's correct.
 9   Q       Okay.  So when this HUD is brought
10   back from the Edwards's house, it's signed by the
11   Edwards but not by anybody else from Lender's
12   First Choice, and it's submitted to the Stockton
13   office?
14   A       That's correct.
15   Q       Okay.  And she signs it?
16   A       That's correct.
17   Q       And then what happens to the HUD at
18   that point?  Is it put in the file?
19   A       It goes to postclosing.
20   Q       Okay.  But $88 is not the actual
21   recording fee that was paid to record the
22   mortgage in this case, was it?
23   A       That's correct.
```

Page 156

```
 1   documents to sign, included in the documents
 2   should be the final HUD?
 3   A       Correct.
 4   Q       And that comes after, obviously, the
 5   loan package has been received from the lender?
 6   A       Correct.
 7   Q       And the commitment prepared?
 8   A       The HUD?
 9   Q       Well, the HUD and the --
10   A       Yes.
11   Q       Okay.  Look back on page 5 -- I mean,
12   at Plaintiff's Exhibit Number 5, and you'll see
13   the $88 flat rate appears on the HUD that's
14   signed by the Edwards and the LFC representative.
15   Do you see that?
16   A       I do.
17   Q       Okay.  Now, it's signed by Gloria --
18   is that Rojas?
19   A       That's correct.
20   Q       And she's an LFC employee; right?
21   A       She was.  I don't think she's still
22   employed.
23   Q       Okay.  But the Edwards signed the HUD
```

Page 157

```
 1   Q       Okay.  As of June 2006 was it Lender's
 2   First Choice policy ever to refund the overage
 3   collected, if there was one, on a recording fee?
 4   In other words, if the amount in line 1201
 5   exceeded what was actually paid to record the
 6   mortgage.
 7   A       Absolutely.
 8   Q       There would be a refund?
 9   A       Absolutely.
10   Q       And that was the policy as of June of
11   2006?
12   A       Absolutely.
13   Q       All right.  Was that the policy when
14   you came to work for the company in December of
15   '04?
16   A       Absolutely.
17   Q       Okay.  And when the refund is made,
18   tell me how that works.  Does the borrower
19   receive a check?
20   A       Yes.
21   Q       And is this procedure or this policy
22   to send back a refund, is that something that's
23   stated in the SOP?
```

1   A      I would believe so.
2   Q      All right. What does the consumer get
3 other than a check?
4   A      They should get a check and a letter
5 saying this is the return of a overage under
6 recording fees.
7   Q      Okay. Do they get a revised HUD?
8   A      Yes, they do.
9   Q      They do?
10   A      They should.
11   Q      They should.
12   A      Yeah.
13   Q      Is that the policy that's stated in
14 the SOP, that they are to receive a check and a
15 corrected HUD?
16   A      I believe so. I believe so. I don't
17 know for sure.
18   Q      Okay. But the SOP would tell us if we
19 had it?
20   A      Yes.
21   Q      Are the borrowers provided with a
22 corrected truth in lending disclosure?
23   A      No, sir.

Page 159

1   Q      No. At least Lender's First Choice
2 doesn't send that with the refund?
3   A      We do not do anything with truth in
4 lending.
5   Q      Okay. How is the amount of the refund
6 calculated?
7   A      After the document is recorded, the
8 balance is returned to the borrower, whatever is
9 left.
10   Q      Okay. But at that point, though, a
11 check for the correct amount of the recording fee
12 had already been cut and paid to the probate
13 office or whatever the recording office is;
14 right?
15   A      Yes.
16   Q      How soon after closing does that check
17 get cut?
18   A      It should be almost the same day. I
19 mean, it could be the next. It depends on when
20 the file came back and a lot of variations, but
21 very close.
22   Q      Okay. And is it your testimony that
23 Lender's First Choice has a policy to always

1 refund recording fee overages to its customers?
2   A      Yes.
3   Q      And that's the policy today?
4   A      Yes.
5   Q      You calculate the refund based on the
6 estimated charge minus the check that was
7 actually written to the recording office, is that
8 how it's done?
9   A      Correct.
10   Q      Who does that calculation? Is that
11 something that GATORS does?
12   A      Recording. The recording people do
13 it.
14   Q      Okay. So when you had a recording
15 department in your office, it was somebody in the
16 recording department?
17   A      That's correct.
18   Q      What did they review to make that
19 calculation?
20   A      They review the cost at that county
21 per page and do a calculation.
22   Q      Okay. And then is the check cut out
23 of the local office or does it come out of one of

Page 161

1 the national offices?
2   A      When we had recording, we disbursed
3 that check from our office.
4   Q      Okay. What about now?
5   A      Checks are being cut out of Frisco or
6 Simi office.
7   Q      Okay. Are there occasions where the
8 HUD would be changed from its -- well, backing up
9 towards the beginning of this process, you said
10 that the preliminary HUD is issued right around
11 the time the order is made or it's prepared right
12 around the time the order is made. But changes
13 to the HUD can be made throughout that process up
14 to the point in time where the documents are made
15 available for the Notary; right?
16   A      We don't do anything else with that
17 preliminary HUD until the closing instructions
18 come in to prepare a HUD.
19   Q      Okay. But that would be before you
20 provide the documents for the Notary to take to
21 the --
22   A      That's correct.
23   Q      So, for instance, if there was a

1  difference in the payoff amount --
2  A      Yes, sir.
3  Q      -- you could go back and the Lender's
4  First Choice person could make adjustments in the
5  HUD before it went out to the Notary; right?
6  A      If the payoff comes in with the
7  closing instructions.
8  Q      Okay.
9  A      It's not done prior.  It's not on the
10 preliminary HUD.
11 Q      Oh, it's not.  Okay.  It's added
12 later?
13 A      Correct.
14 Q      But, I mean, it's not unusual for
15 numbers to change while you're processing the
16 loan between the time of the preliminary HUD
17 preparation and the time it goes up to the
18 Notary.  I mean, you could have differences in
19 all kinds of things, couldn't you, like credit
20 card balances that are to be paid off or other
21 things?
22 A      Just so I make it clear, it's not from
23 that point to that point.  It's from the point

1  where the closing instructions come in until the
2  time they go to the Notary there are changes
3  made.
4  Q      Changes.
5  A      Yes, sir.
6  Q      Okay.  All right.  I'm just doing a
7  bad job of describing it.  But what I want to
8  make sure I understand is, in the GATOR system
9  and in your whole process, the closing agent,
10 whoever is in charge of this loan, can access the
11 system and make adjustments to the HUD during
12 that period of time.
13 A      That's correct.
14 Q      And if they were inclined, if the
15 closing agent was inclined to calculate the
16 actual recording fee, that person could input it
17 into the system and it would be printed on the
18 final HUD; right?
19 A      That's correct.
20 Q      And at the time the final HUD is
21 uploaded to the system for the Notary you know
22 how many pages are going to be in the mortgage,
23 right, because you've already prepared a final

1  mortgage to be signed?
2  A      That's correct.
3  Q      You know what the recording fee
4  structure is from the particular jurisdiction
5  because that's included in the title binder that
6  has already been generated; right?
7  A      That's correct.
8  Q      Okay.  But it's Lender's First Choice
9  policy, nevertheless, to put in this estimate to
10 the final HUDs before they go to the Notary?
11        MR. COOK:  Objection to form.
12 A      No, that's not the policy.  If we have
13 an opportunity to correct it and fix it, we do
14 so --
15 Q      Okay.
16 A      -- with the right number.
17        (Plaintiff's Exhibit 9 was
18        marked for identification.)
19 BY MR. RIEMER:
20 Q      I'm going to hand you some HUDs that
21 I'm just going to staple together and mark as
22 Plaintiff's Exhibit 9.  And based on your
23 knowledge in the industry and knowledge of

1  Lender's First Choice procedures, I want you to,
2  if you can, tell me which of these HUDs reflects
3  a nonestimated recording fee.  And you, of
4  course, can take all the time you want.  But my
5  question with those HUDs at this point only
6  relates to the recording fee.
7        MR. COOK:  And these are HUDs
8  for other people's loans?
9        MR. RIEMER:  Yes.
10        MR. COOK:  Which we didn't
11 produce.
12        MR. RIEMER:  Correct.
13        MR. COOK:  So this witness has
14 never seen these before?
15        MR. RIEMER:  Presumably.
16        MR. HARTLEY:  Are they all from
17 Alabama?
18        MR. IRVINE:  I'm not sure.
19        THE WITNESS:  The ones I've
20 seen so far are Alabama.
21        MR. RIEMER:  Most of them
22 should be from Alabama, there may be
23 a stray or two.

Page 166

MR. HARTLEY: Yeah, this is Flomaton.

A    Would you repeat your question?

BY MR. RIEMER:

Q    Yeah. Can you identify any one of those or any HUDs in that stack where it appears that there is not an estimated recording fee listed as opposed to an actual recording fee?

MR. COOK: Objection to the form.

A    This one possibly. It's got $63. That was in Mobile, Alabama.

BY MR. RIEMER:

Q    Okay. So you think the $63 might be the actual recording fee?

A    Well, it's not $88.

Q    Okay. And it's not $111.

A    Yeah.

Q    Okay. I think there may be another $63 in there.

A    There is.

Q    Okay. So that's two.

A    I don't know what that number is.

Page 167

Maybe it's the $88, I guess. I don't -- I can't read it. I think this might be $88, I'm not sure. I can't read it, it's kind of smudged. This lender is Ameriquest?

Q    Is that the last page?

A    No. Almost every one of these are Ameriquest.

Q    Oh, okay. Yes, yes.

A    These are ours. We never saw the package from Ameriquest. We have no idea what the mortgage amounts were. That's what is prompting some of that stuff, I believe.

Q    Well, I notice in your affidavit you said that certain lenders, including Ameriquest, have different procedures, and I was going to get into that. But, I mean, I do see the $88 here.

Before we get into the Ameriquest stuff, though, I mean, I gathered from your earlier response to my question that in your mind it would be unusual for an estimated amount for the recording fee to end up in the final HUD.

A    No, sir.

Q    Okay. Then I just misunderstood you?

Page 168

A    Yes, sir.

Q    Okay. Would that be the most common practice, would be for an estimate --

A    Yes, sir.

Q    -- to end up in the final HUD signed by the borrower?

A    Yes, because of the time constraints we have to get the final HUD to the Notary. The timing of the package coming to us and the amount of time we have to deal with that package to get to the Notary, yes.

Q    Okay. Just not enough time to count the pages and to calculate the actual --

A    No, sir.

Q    What is that time frame, typically?

A    It could be late. You know, I mean, it could be --

Q    Last minute?

A    Yes. Most times when you're dealing with refinances and brokers, it's a push.

Q    Okay.

A    You're running late. Very rarely do you get a package a day ahead of time to work it.

Page 169

Very, very rarely.

Q    Okay. But it can fluctuate. It can be last minute or within a day or so or --

A    Yes, sir. Be hours, yeah.

Q    Okay. With respect to the calculation of the recording fee, how does the Ameriquest -- Ameriquest loans, hoe do they operate differently?

A    Well, we didn't see the package until after the fact, after it was signed.

Q    Okay. Does the package go directly to the Notary from Ameriquest?

A    That's correct.

Q    Okay.

A    So you had no idea how many pages were in the mortgage or if there were riders and so on to go with that.

Q    In the Ameriquest loans, does Ameriquest tell you the number to put on the recording fee line?

A    No.

Q    All right. What about Home Funds Direct, is that part of the closing instructions?

1  A      I believe they do have it on there.
2  but I would guess they get it from our
3  preliminary HUD, so ...
4  Q      Oh, okay.  But that would be the $88
5  estimate?
6  A      Yeah.
7  Q      In the Ameriquest loans, do you also
8  prepare the HUDs or --
9  A      We do prepare the HUDs based on
10 closing instructions.
11 Q      Okay.  Well, if the Notary is getting
12 the package directly from Ameriquest and you're
13 preparing the HUDs, how is the Notary getting the
14 HUDs?
15 A      Ameriquest.  We prepare it, but it has
16 to be approved and finalized by Ameriquest.  So
17 they send us instructions, we prepare the HUD,
18 and we sent them the HUD and they followed
19 through with it.  And sometimes we sent it to the
20 Notary, it just depended.  It was usually their
21 notaries, they selected them.
22 Q      Okay.  So this process that you
23 described -- well, in the Ameriquest loans you're

1  getting the package back from the Notary after
2  the signature; right?
3  A      Yes.
4  Q      Okay.  But not before?
5  A      That's correct.
6  Q      Now, the process you described for me
7  about getting the abstract information and
8  compiling it or taking that and generating a
9  commitment, is that the same with the Ameriquest
10 loans or does it operate differently?
11 A      No, the process is the same.
12        MR. COOK:  Would you read that
13 question back to me?
14        COURT REPORTER:  "Question:
15 Now, the process you described for
16 me about getting the abstract
17 information and compiling it or
18 taking that and generating a
19 commitment, is that the same with
20 the Ameriquest loans or does it
21 operate differently?"
22        MR. COOK:  Thank you.
23        MR. RIEMER:  Did he already

1         answer?
2         MR. COOK:  Did you ever answer?
3         COURT REPORTER:  Yes.
4         MR. RIEMER:  Okay.
5         MR. COOK:  I just want to be
6  sure he got it right.
7         MR. RIEMER:  All right.
8         THE REPORTER:  "No, the process
9  is the same."
10 BY MR. RIEMER:
11 Q      Your reference in your affidavit to
12 different procedures for Ameriquest, the only
13 difference you're talking about is what you just
14 described with respect to the recording fee
15 calculation?
16 A      No.  No, sir.
17 Q      What other differences?
18 A      Scheduling.
19 Q      How so?
20 A      They scheduled.
21 Q      They scheduled the closing?
22 A      Yes.  And there may be even more
23 differences with Ameriquest than I know of.  I

1  dealt with Ameriquest branches.  Matter of fact,
2  in the State of Alabama and Tennessee were my
3  biggest customers.  But our company did a lot
4  with their fulfillment centers and there was, I
5  belive, different procedures with them as well.
6  Q      Do y'all choose the notaries, select
7  the notaries that go and perform the closing
8  services for Ameriquest the same way you
9  described for the other lenders, or is that
10 different?
11 A      No, we didn't choose the Ameriquest
12 notaries, they did.
13 Q      They did.  And it's Ameriquest, then,
14 that is giving the instructions directly to the
15 notaries as to how to deal with the papers and
16 what to get signed and what to bring back, et
17 cetera?
18 A      Yes.
19 Q      Okay.  Now, where is our HUD?  The
20 settlement closing fee listed at 1101, $450, is
21 that standard for all the Home Funds Direct
22 closings?
23 A      I don't know.

1  Q      You don't know.  Do you know how
2  that's calculated?
3  A      It's not calculated.  It's I believe a
4  negotiated item between the lender and Lender's
5  First Choice.  That's my guess.
6  Q      Okay.  Do the lenders restrict how
7  much money you can charge as a closing fee in
8  closings?
9  A      Restrict how?  I mean, won't give you
10 the business, I guess.
11 Q      Well, suppose that there was a file
12 that for whatever reason entailed more work than
13 lenders anticipated, problem with the title work
14 or some other complication, and you decided,
15 instead of charging $450, to get paid for this
16 extra work and bump it up to $600 or some other
17 amount.  Could you do that in accordance with
18 your agreement with the lender?
19 A      I don't think so.  I would think that
20 we wouldn't do that.  I mean, I think we look at
21 averages and stuff, so...
22 Q      Okay.  And that's the fee you earned
23 for your services as the closing -- services on

1  behalf of the lender as the closing agent; right?
2              MR. COOK:  Objection to form.
3  A      That among other things.  I mean, it's
4  the whole process, I believe.
5  BY MR. RIEMER:
6  Q      Okay.  What do you mean by the whole
7  process?
8  A      Well, I think you just said it's what
9  we do on behalf of the agent.  The agency, is
10 that what you meant?
11 Q      No, on behalf of the lender.
12 A      Lender?
13 Q      As your lender's agent, as the closing
14 agent.
15 A      Oh, okay.
16             MR. COOK:  Same objection.
17 A      Repeat it please, I'm sorry.
18 BY MR. RIEMER:
19 Q      Okay.  Well, I'm just clarifying that
20 this closing fee is what you collect as
21 compensation for the things you do as the closing
22 agent for the lender.
23             MR. COOK:  Objection to form.

1  A      Yes.
2  BY MR. RIEMER:
3  Q      Yes.  Okay.  And you also have the
4  role as title agent, right, in closings?
5  A      That's correct.
6  Q      You sort of wear two hats.  You're an
7  agent for the lender, the closing agent for the
8  lender, and you are also the agent for the
9  underwriter under the title insurance; right?
10 A      Yes.
11 Q      Okay.  And you get compensated for all
12 those things we talked about that you have to do
13 under your underwriting agreement with United,
14 you get compensated for those things through your
15 ninety percent commission for the title
16 insurance; right?
17             MR. COOK:  Objection to form.
18 A      Yes.
19             MR. RIEMER:  Okay.  All right.
20             MR. COOK:  Time for a break?
21             MR. RIEMER:  Yeah, this would
22 be a great time for a break.
23             (Short break.)

1        MR. RIEMER:  Before we go into
2  this, let's try to deal with our
3  dispute here.
4        MR. COOK:  Yeah.
5        MR. RIEMER:  I have lines of
6  questions prepared basically or
7  intended to ask him basically
8  whether they get paid on the
9  abstract search and for the other
10 fees, other than recording fees or
11 title fees, an amount that exceeds
12 the amount paid to an outside
13 vendor.
14       And it's my understanding from
15 talking to you that you fully intend
16 to instruct him not to testify in
17 response to any of those questions;
18 right?
19       MR. COOK:  Yeah.  And I'll
20 explain that I believe you've gone
21 ahead and gotten the testimony to
22 the one question I did instruct him
23 not to answer.

1      MR. RIEMER:  Which one was
2  that?  Well, on the abstract.  But I
3  was not allowed --
4      MR. COOK:  Well, it was
5  standard.  I understand.  I'm going
6  to affirm that what you said is
7  essentially correctly, I just wanted
8  the record to be clear that in
9  passing you managed to get that
10  question answered.
11      Regardless, yeah, the cost for
12  the -- the costs to Lender's First
13  for those other fees are something
14  that I was going to object to.  And,
15  you know, I understand that I'm not
16  letting him testify to those
17  particular costs for those other
18  fees other than title insurance and
19  recording fees.  And we have an
20  existing dispute on that and I have
21  agreed to make him available one way
22  or the other if the Judge grants
23  your motion to compel on that scope

1      MR. COOK:  Yes.
2      MR. RIEMER:  -- then I'll skip
3  those.
4      MR. COOK:  Uh-huh.
5      MR. RIEMER:  I'm not going to
6  ask and we're not going to go
7  through this colloquy.
8      MR. COOK:  Yeah, we don't need
9  to repeat that.
10      MR. RIEMER:  Because he's got a
11  5:00 plane.  I don't want him to
12  miss that, so I'll just forge ahead.
13      MR. COOK:  And just so I make
14  myself clear, I would hope that we
15  could do that by a telephone
16  deposition instead of having to make
17  him come here or you go there.  I
18  understand you're not necessarily
19  agreeing to that at this point, but
20  that would be my request and I may
21  or may not push that issue.
22      MR. RIEMER:  Okay.  All right.
23  BY MR. RIEMER:

1  and let him answer those questions.
2      MR. RIEMER:  Okay.  And that
3  would include identification of the
4  vendors --
5      MR. COOK:  Yes.
6      MR. RIEMER:  -- who preformed
7  these because we're not --
8      MR. COOK:  It would include
9  that.  Because once the issue has
10  been ruled relevant by the Judge,
11  then obviously you might be entitled
12  conceptually to send them subpoenas
13  or something.  Not that I would
14  agree they're valid or that you need
15  to, but certainly you would need
16  their names if you were going to
17  subpoena them.
18      MR. RIEMER:  Okay.  All right.
19  Well, then let's -- with that
20  understanding that you won't oppose
21  the efforts to continue the
22  deposition for that specific
23  purpose --

1  Q      We talked a bit about the $450
2  settlement fee.  I have a question about that.
3  Is that fee one of the fees that's listed on
4  GATORS?
5  A      I don't really know.
6  Q      Okay.
7  A      I can tell you it comes out on the
8  preliminary HUD.
9  Q      All right.
10  A      So it may be a template that it comes
11  from more so than GATORS itself.
12  Q      Okay.  And we'll get to that.  Let me
13  ask you another question.  Does the SOP have any
14  provisions for that?  I mean, are those
15  negotiated closing fees stated in the SOPs?
16  A      No.
17  Q      Okay.  Now, this process that you are
18  describing with regard to recording fees assumes,
19  if I understand it right, that at some point
20  somebody at Lender's First Choice cuts a check to
21  the Probate Court for the actual amount.
22  A      Yes.
23  Q      Okay.  And the Probate Court, at least

1  in Mobile, won't accept an overpayment or an
2  underpayment, they have to have the exact amount.
3  Is that your experience?
4  A    That's my experience, yes, sir.
5  Q    Okay. Well, first of all, who does
6  the calculation of the actual amount and the
7  writing of the check?
8  A    Two different functions.
9  Q    Okay.
10 A    The calculation is done by the
11 recording specialist and the cutting of the check
12 is done by a disbursement person.
13 Q    In the '06 time frame were both of
14 those functions performed in the, for lack of a
15 better term, local office?
16 A    Well, I can't answer for Stockton,
17 whether they -- my understanding is that Simi
18 Valley did their recording. So they would -- the
19 recording specialist would have been in Simi
20 Valley, California.
21 Q    Okay. Well, the recording specialist,
22 that's the person that calculates the amount to
23 be disbursed?

1  A    Right.
2  Q    Are they using GATORS?
3  A    Yes.
4  Q    And is it GATORS that gives them the
5  amount to write the check for?
6  A    Yes.
7  Q    Okay. That information on GATORS, is
8  that the same part of the GATORS system that the
9  closer has access to while they're processing the
10 loan?
11 A    I don't believe closers have access to
12 the recording module. The recording module is
13 not even open at that point.
14 Q    And the recording module, is that the
15 description of the part of GATORS that has the
16 recording fee information?
17 A    Yes.
18 Q    And it's not open --
19 A    But I'm not saying -- I didn't mean to
20 say that the closing module does not have that
21 information. You asked me if it was the same. I
22 don't think it's the same. The recording
23 specialist uses a recording module, closers use a

1  closing module in GATORS.
2  Q    Okay. Can the recording specialist
3  access the closing module?
4  A    Yes, I believe so.
5  Q    And can the closing agent access the
6  recording module?
7  A    I believe so.
8  Q    Okay. And is the information that is
9  inputted into the recording module -- well, at
10 what point is that information inputted into the
11 recording module?
12 A    By county, you mean?
13 Q    No, I mean for a particular loan.
14 A    A particular loan. Okay. It's in the
15 GATORS system. When that particular loan comes
16 across, they tell them how many pages, they do a
17 calculation on-line in the system, and it tells
18 them $75.50.
19 Q    All right. Who tells them how many
20 pages?
21 A    The recording specialist has it in his
22 hands or her hands.
23 Q    Okay. At what --

1  A    Because it's a document at this point.
2  Q    Okay. And at what point in the
3  closing process is this?
4  A    Recording.
5  Q    Which was before --
6  A    After postclosing.
7  Q    Oh, after closing.
8  A    Yes.
9  Q    Okay. And then that's when the actual
10 number would be inputted, the actual --
11 A    The actual check would be asked to be
12 cut and the package goes out to the recording
13 office.
14 Q    Okay. When the documents are uploaded
15 for the Notary, are they in individual PDF files
16 or is it some other format?
17 A    The PDF files, they are usually in two
18 sections, legal and letter. Because some
19 notaries can't have their printers distinguish
20 that, so ...
21 Q    Okay. And so it would be one PDF per
22 section? In other words, one PDF would have a --
23 A    Letter, legal.

Q     Okay.  So one PDF file would have all the specific documents in there?

A     Well, one PDF file would have all the specific legal documents, legal size documents --

Q     Okay.

A     -- and one would be for letters.

Q     All right.

A     In most cases.  Some lenders don't care how it comes out and we just upload it in one file.

Q     Okay.  But there wouldn't be separate PDFs for mortgage PDF, note PDF, HUD PDF?

A     Specifically back in December of '06, definitely not.  I think we're starting to move forward to that type of breakdown now.

Q     Okay.  Let's see.  I'm going to go back to our stack of Edwards documents.  And this is not going to be marked as an exhibit but we'll just refer to the Bate's numbers at the bottom there.

Now, the document starting 01, I mean, those are the lender instructions for the Edwards loan; right?  Will you just confirm that for me?

A     Uh-huh.  Yes.

Q     Okay.  And there's some handwritten instructions or handwritten notes down here.  Do you know where those came from?

A     No.

Q     All right.  All right.  But would it be unusual for a closer at Lender's First Choice to make some handwritten notes on instructions as they're processing the loan?

A     No.  I would think that the request was to the lender to add that to the closing instructions.

Q     That a deed is needed to --

A     Yes.

Q     Okay.  And so that would be communication back to the lender.  And then if that request was followed, they would issue revised lender instructions?  Is that what happens?

A     It looks like she just wrote it on there so she wouldn't have to redo the closing instructions --

Q     Oh, okay.

A     -- is what it appears to me.

Q     And this is one of those obvious questions that we've got to get out of the way here.  But the directions in the lender's instructions --

A     Uh-huh.

Q     -- those are things that the lender requires you to do as part of preparing a loan for closing; right?

A     Yes.

Q     Okay.  Now, going to page 05 -- and there are checks on some of these items.  Do you see that, a checklist?

A     Yes.

Q     Who supplies the checks?  Does that come from the lender?

A     Yes.

Q     All right.  And it says, addendums to lender's instructions.  Is that a document that's typically generated as part of the loan?

A     Yes.

Q     Now, page 12 is borrower's compliance agreement.  Is that part of the -- I think you called that the escrow documents?

A     That's correct.

Q     All right.  Now, do you know if the Notary went out to the Edwards to get their signatures more than one time?

A     From what I gathered in the notes, they went back out for a resign of a deed.  We had to pay a Notary for the first time to go out there, and then I saw an indication that the Notary had to be paid again to go out there.  And there's no fee for the Notary on this HUD at all.

Q     Well, okay.  Had to go out to get a signature for the deed.  Well, look at number 15.  Maybe that will solve the mystery.

A     Okay.

Q     There's a notarized signature of the Edwardses there, but this is dated June 13th.  And what they're signing is an owner's affidavit and indemnification agreement.

A     Okay.

Q     Would you agree that that's what she went out to have the Edwards sign?

A     No, sir.

Q     It's not?

A     You mean the second time?

Q     Yeah, the second time.

A     No, sir.  It was a deed.

Q     Okay.  Why is this dated June 13th and not June 12th, which is the date of the closing?

A     I have no idea.

Q     Okay.

A     Unless she forgot it the first time and took it when she went to do the deed.  The specific request was to have them go back out and resign a deed, is what I thought I saw somewhere.

Q     Okay.  Would you look on page 20 for me?  Is that a copy of the check that was written to Probate Court?

A     Mobile County, Judge of Probate.

Q     Is it?

A     Yes.

Q     That's what that is.  Okay.  All right.  And then there's another one on page 21; is that right?  And that's for $75.50?

A     That's correct.

Q     Okay.  Does that include the recording

fee for both the mortgage and the deed, $75.50?

A     There's no way for me to tell by just looking at the check.  I'd have to calculate it out.

Q     Okay.  But you haven't done that in your review of this file to figure out exactly how it was calculated?

A     No.  I saw where the actual cost was -- to record the mortgage was $75.50.

Q     Okay.

A     Okay.  That's the mortgage tax.

Q     Okay.  $97.50 is the --

A     Is the mortgage tax, yeah.

Q     Okay.

A     It goes to the same place.

Q     And the $75.50 would have been --

A     Recording fees.  If you look in the ledger, it tells you it's a recording fee.

Q     Okay.  All right.  Let me ask you a question I meant to ask you about the lender's instructions.  Go back to page 2 for me, Mr. Petruccelli.

A     Uh-huh.

Q     And look at number 11.  And it says, review.  All documents must be in our office for review prior to recording.

Does this mean that Lender's First returns the signed documents to the lender for their review before they are forwarded to the Probate Court?

A     Yes.

Q     All right.  So in addition to whatever you do to review the recorded documents, the lender also does the same thing or also reviews the documents to be recorded?

A     Yes, because they have to have the documents back there before they'll fund the loan.  So until a disbursement takes place there's no recording being done.  We have no money at that point.

Q     Okay.  And does the lender make sure that everything is signed that's supposed to be signed?

        MR. COOK:  Objection to form.

A     They do.

BY MR. RIEMER:

Q     All right.  And they're making sure there's no pages that are skipped and things like that; right?

        MR. COOK:  Objection to form.

A     I would guess that's what they're doing, uh-huh.

BY MR. RIEMER:

Q     Okay.  And look at number 4.  It says, in examining the title if you find any violations of restrictions, easements, et cetera.  Do you see that?

A     No, sir.

Q     You don't?  I'm sorry, it's under the title policy requirements.  Because they --

A     Okay.

Q     The numbers start over again.

A     Okay.

Q     All right.  That's a task that the lender is requiring you to do, is to review -- is to examine the title and let them know if you see any violations of any restrictions, et cetera; right?

A     Correct.

Hall-Frazier
Record - 000664

1  Q      All right.  And the same would be true
2  for all the tasks that are described under the
3  title policy requirements; right?
4  A      I'll read them.
5  Q      I mean, you can read them if you want.
6  But, I mean, my question, I just want you to
7  confirm that that describes what you're doing
8  with respect to the title policy at the request
9  of the lender.
10 A      Yes, their instructions to us.
11 Exactly.
12 Q      The lender wants to make sure that
13 this policy that's being issued for their
14 protection is valid and is going to provide the
15 protection that's been paid for; right?
16 A      Yes.
17 Q      All right.  It's your understanding,
18 isn't it, that as far as the notice of the
19 borrower's right to cancel, a signed and dated
20 notice has to be provided to the borrower in
21 order to trigger the rescission period; right?
22 They have to have a signed -- they have to have a
23 dated notice of right to rescind.  Is that your

Page 195

1  understanding?
2          MR. COOK:  You're asking him to
3      tell you what he thinks the law is?
4          MR. RIEMER:  Well, no.  His
5      understanding of what the
6      requirements are in a loan closing.
7      What they require as part of the
8      documents to be provided to the
9      borrower.
10         MR. COOK:  I mean, I'll go
11     ahead and let him answer the
12     question.  I'm not quite sure what I
13     see as the relevance to the claims
14     in the lawsuit.
15         You know, if you know.
16 A      Yes.
17 BY MR. RIEMER:
18 Q      All right.  And what does Lender's do,
19 if anything, to make sure that that is complied
20 with?
21 A      It's checked in postclosing to make
22 sure it's been signed properly.
23 Q      Okay.  That Lender's First, in their

1  own file, has a copy of the signed and dated
2  notice of right to cancel?
3  A      Absolutely.
4  Q      Does Lender's First Choice do anything
5  to make sure that the Notary left with the
6  borrowers a signed and dated copy of the notice?
7  A      We give them instructions to print two
8  copies of the entire package and to leave one
9  copy with the borrower.  And it's on their
10 checklist that they have done so.
11 Q      Okay.  Now, is it in the instructions
12 in the checklist specifically to make sure that
13 the borrower gets a dated copy with the deadline
14 for a rescission period?
15 A      Dated is hard coded, hard printed when
16 the package comes to us.
17 Q      Okay.
18 A      For the most part.  Very, very rarely
19 do we have to put that in there.
20 Q      Okay.  That's something that the
21 lender supplies?
22 A      Yes.
23 Q      In your review of the Edwards loan

Page 197

1  documents did you see any evidence of a corrected
2  HUD being provided to the Edwards postclosing
3  that reflects the actual recording fee paid to
4  probate?
5  A      I don't recall seeing that, no.
6  Q      Okay.  Because I don't either.  Just
7  want to make sure I'm not missing anything.
8          But your testimony, if I understand
9  it, is that the policy of Lender's First Choice
10 is to send a corrected HUD with the check, with
11 the refund check?  Did I hear that right?
12 A      I think it is policy to whenever you
13 send a check to the borrower and it's a change to
14 the HUD, you should send the HUD back to them.
15 That would be my policy.  I'm not sure it was a
16 Lender's First Choice policy.  I would instruct
17 my closers to do that.
18 Q      Is that in the SOP?
19 A      I don't know that, I would have to
20 check that part.  But I would -- you know, we
21 have -- in the check you may have what it's for,
22 you know, in the --
23 Q      Like the reference line?

1  A      Yeah, return of overage for recording
_  fee. So...
3  Q      Have you ever seen an actual refund
4  check for a recording fee?
5  A      Yeah, I believe I have.
6  Q      Have you ever seen an actual amended
7  HUD?
8  A      You know, no, I would not have seen
9  that.
10 Q      Now, I think you mentioned earlier
11 that it's Lender's First Choice policy to send
12 some type of correction letter explaining why
13 they're getting -- did I hear that right?
14 A      Yeah. If we're refunding money to
15 them, it's always a good practice to -- on your
16 letterhead to say, you know, we've done this and
17 this is what we're doing.
18 Q      Okay. Have you ever seen copies --
19 A      I've seen those letters, yes.
20 Q      Okay. Did you see one of those
21 letters in the Edwards file?
22 A      I did not.
23 Q      I'm sorry?

Page 199

1  A      I did not.
2  Q      Look for me on page 49 in that stack.
3  Towards the top it says, attention closing
4  agents. By disbursing this loan you are
5  guaranteeing delivery of the final HUD.
6          MR. COOK: Wait a minute.
7          MR. RIEMER: I'm sorry.
8          MR. COOK: We need to find the
9      page.
10         MR. RIEMER: Oh, I'm sorry.
11 A      Okay.
12 BY MR. RIEMER:
13 Q      I'm just reading that all cap language
14 there.
15 A      Okay.
16 Q      Rather than read it myself here, let
17 me ask you this question. The delivery of the
18 final HUD that you are guaranteeing within
19 twenty-four hours, is that the HUD for the
20 Edwards loan, Plaintiff's Exhibit 5, that still
21 has the $88 on it?
22         MR. COOK: I'm not sure I
23     understand the question.

BY MR. RIEMER:
2  Q      Well, that language there clarifies
3  that by disbursing this loan you're guaranteeing
4  that the final HUD will be delivered to Home
5  Funds Direct within twenty-four hours. And I
6  want to make sure that I understand that that's
7  not referring to whatever corrected HUD you might
8  issue later with the right recording fee; right?
9  A      I would think not.
10 Q      Okay. The final HUD within the terms
11 of this language is Exhibit 5, the HUD that's
12 signed at closing?
13 A      That's my understanding.
14 Q      Okay. Turn to page 60 for me. This
15 is a vendor's order form?
16 A      Uh-huh.
17 Q      Is there a form that sort of looks
18 like this for every vendor that's hired in
19 connection with a loan?
20 A      This is the one I'm familiar with, I
21 don't know about the others.
22 Q      Well, this particular vendor is for
23 the Notary?

Page 201

1  A      Right.
2  Q      But if a vendor is hired for the
3  abstract service, is there a closing vendor order
4  that looks like this generated?
5  A      I don't know, I don't see those.
6  Well, yes, I have seen those. There is one for
7  abstractors that comes from the title side of the
8  house, yes.
9  Q      Okay. And this particular document
10 we're looking at, number 60, is included in the
11 loan documents that were produced. Are the
12 vendor orders relating to abstractors, are those
13 kept by Lender's First Choice as part of their
14 file?
15 A      Yes.
16 Q      Okay.
17 A      In the title module.
18 Q      In the title module?
19 A      Yes.
20 Q      In GATORS?
21 A      Yes.
22 Q      And since y'all are paperless --
23 A      Yes.

1  Q    -- the file exists in PDF form?
2  A    Yes, sir.
3  Q    Is it difficult to print out from the
4  title module the files that are imaged?
5  A    No, sir.
6  Q    Go to page 64, just because that's the
7  copy of the HUD that's closest to us here, and
8  see 1105.
9       MR. RIEMER:  I don't know if
10      this is something that falls into
11      your objection category or not,
12      Greg, but I'm going to ask it
13      anyway.
14 BY MR. RIEMER:
15 Q    What documents are prepared that you
16 charge the $50 for?
17 A    In this particular case I believe
18 there was a warranty deed generated.
19 Q    Okay.  So that charge appears whenever
20 there's an extra document to be prepared?
21 A    That's my understanding.
22 Q    Like a quitclaim deed or a warranty,
23 something like that?

Page 202

1  A    Yeah.  Yes, sir.
2       MR. COOK:  See how reasonable I
3  am?
4       MR. RIEMER:  Yes, very, very,
5  especially when it gets closer to
6  the flight time.
7  BY MR. RIEMER:
8  Q    Okay.  Skip ahead to number 72 for me,
9  please.  And that looks to me to be the final
10 truth in lending disclosure statement.
11 A    Correct.
12 Q    It's got final --
13 A    It's not signed, but...
14 Q    Okay.  My only question goes to this
15 recording fee of $163.  Is this something that is
16 calculated by the lender?
17 A    We do not touch a truth in lending
18 statement.  We do not do anything with a truth in
19 lending statement.  We don't generate it, we
20 don't put fees into it.
21 Q    So you wouldn't have any knowledge as
22 how that was calculated or where it came from?
23 A    No, sir.

1  Q    Okay.  Your answer is probably going
2  to be the same, but turn to 118, which is the
3  good faith estimate.  Do you see where it says
4  1101, settlement closing fee $605, and then
5  abstract $175?
6  A    Yes, sir.
7  Q    Do you know where the lender gets
8  those fees?
9  A    No idea.
10 Q    By the time they generate this good
11 faith estimate has Lender's First Choice been
12 selected as the closing agent for that file?
13 A    Don't know the answer to that.
14 Q    All right.  Now, on 147 you mentioned
15 postclosing documents and postclosing department.
16 I just want to make sure that this postclosing
17 checklist -- is this something that is prepared
18 by the postclosing department you described?
19 A    Yes.
20 Q    And do you know who Karen is, what her
21 last name is?
22 A    No, I do not.
23 Q    Would she be someone who worked in the

Page 204

1  Stockton office?  Would that be a good guess?
2  A    I believe they did their own
3  postclosing there, so I would say yes.
4  Q    Okay.  On the mailing -- I use the
5  term "mailing", but I understand you use Fed-Ex.
6  But in Fed-Ex'ing the documents to Probate Court,
7  that's just done once.  I mean, there's only one
8  package that gets Fed-Ex'd to Probate Court, and
9  then Probate Court Fed-Ex's it back?  Is that how
10 it works?
11 A    No.
12 Q    All right.  Tell me.
13 A    We will Fed-Ex to the Probate Court
14 and usually put a self-addressed stamped envelope
15 to get it back.
16 Q    Okay.
17 A    We're not really in a hurry to get it
18 back.
19 Q    Okay.
20 A    You know, on a mortgage we have to get
21 it there to get it recorded, so ...
22 Q    What's the time frame for getting it
23 recorded?

A        As soon as possible.

Q        As soon as possible.  Is it generally
done within a couple of days?

A        Yes.

Q        Okay.

A        I mean, it's sent.  I can't tell you
when they actually do it, though.

Q        Okay.  The delivery fee on 112 (sic),
does that reference or does that relate to the
Fed-Ex charge?  Is that what that's there for?

A        Partially.

Q        What else?

A        Other Fed-Ex charges.

Q        Okay.  So all the Fed-Ex charges go
into 112 or 1112?

A        I would think that's what it's for,
mailing, Fed-Ex, you know.

Q        All right.  I just need you to look
quickly at 260 and just confirm for me that
that's the HUD from the earlier finance or the
earlier mortgage by the Edwards.  That's what it
looks like to me.

A        It's not my -- it says Joe Nathan
Edwards and address.

Q        Okay.  Well, I mean, it looks to me
that this -- that's Jonathan Edwards, the same --
you know, the Edwards for the loan we're here for
is Jonathan Edwards, Jonathan and Sharron.  Is it
unusual for the Lender's First Choice file to
include a HUD from a previous mortgage by the
same borrower?

A        We sometimes will get the previous HUD
to prove that something was paid off in the last
refinance, use it as a clearing document.

Q        Okay.  If there's something on the
credit report that shouldn't be there because it
was paid off before, something like that?

A        We don't clear based on -- we don't
clear credit reports, we clear titles.  So if
there's something like this, maybe Citi Financial
was a second mortgage for $26,000 and it showed
up on our title --

Q        Okay.

A        -- and to get it cleared we got a copy
of this.

Q        Where do you get a copy of the HUD

from the previous lender?

A        We try to get it from the borrower or
from the title company that did the previous
closing.  Wherever we can get it from.

Q        Okay.  All right.  Let's put that
aside for the moment.  I think what I'll do is
I'm going to mark as Plaintiff's Exhibit 10 your
affidavit that was previously filed.

                (Plaintiff's Exhibit 10 was
                marked for identification.)

BY MR. RIEMER:

Q        And what I've done is I've separated
out the attachments.  We just need to keep them
together.  We can staple them if you want.  I
just have a few questions on this.

                You're the person that signed this
affidavit; right?

A        I did sign an affidavit, yes.

Q        All right.  And is the affidavit you
signed reproduced there as Plaintiff's Number 10?

A        Yes, sir.

Q        Okay.  Let me ask you this.  On
paragraph 2 it says, one of the settlement
services offered by Lender's First is the
recording of mortgages.

                Is there some place that Lender's
First lists all the services that it offers for
lenders?  We've seen the lending instructions.
So, I mean, I guess my question goes to anything
other than that, anything on the website or
anywhere else?

A        Not that I'm aware of, no, sir.

Q        Well, the mortgage form that's used by
these lenders is, more or less, the same.  In
other words, a Home Funds Direct mortgage form
looks the same from borrower to borrower
basically; right?  And each lender uses its own
form?

A        Pretty much.

Q        Okay.

A        I mean, unless there is, you know,
like a balloon mortgage or something different in
the mortgage they might use a different one.

Q        Do you know of any lender that uses a
mortgage form that's thirty pages long?

A        Not specifically, but I do know that

1 with the mortgage and with numerous writings you
2 can easily get to thirty pages. I'll put it that
3 way.
4 Q    Okay. And you've seen that happen
5 before?
6 A    Oh, yes.
7 Q    Some of this stuff we've already
8 covered.
9      Okay. You described a process whereby
10 Lender's First Choice, someone at Lender's First
11 Choice reviews the mortgage, every page, and
12 makes certain that there's nothing stricken and
13 everything is legible. I just want to make sure.
14 I mean, that's the same process you and I have
15 been talking about today. I mean, that happens
16 in connection with the processing of the loan
17 that you've described for me today. I guess, in
18 other words, there's no separate event whereby
19 this same thing is done twice?
20 A    Postclosing is done once, and it is
21 the function of the postcloser to do what you
22 said, go through each page and make sure it's
23 correct.

1 Q    Okay.
2 A    Of the final signed docs.
3 Q    All right. Before it's submitted to
4 be recorded?
5 A    That's correct.
6      MR. RIEMER: All right. Greg,
7      I think the most efficient thing to
8      do --
9      MR. COOK: Uh-huh.
10     MR. RIEMER: -- is to take like
11     a five minute -- are you going to
12     have any questions, Jeff?
13     MR. HARTLEY: Uh-uh.
14     MR. RIEMER: Let's just take a
15     few minutes and let me gather
16     myself, and then I can do some
17     mopping up and then 3:30 may be
18     doable.
19     MR. COOK: Good. Fantastic.
20     (Short break.)
21 BY MR. RIEMER:
22 Q    Generally speaking, going back to this
23 process of refunding the part of the recording

1 fee that's in excess of what was actually paid.
2 A    Yes, sir.
3 Q    How long does that process take?
4 A    The money is put into a trust account.
5 So what happens is we try to review that trust
6 account on a monthly basis.
7 Q    Okay.
8 A    It's called running your trial
9 balance. And normally in the beginning of the
10 month when it's not as busy as the end of the
11 month we'll, you know, instruct the closers work
12 your trial balance. I mean, go through there,
13 whatever monies you can refund, go ahead and do
14 so. Because you have holdbacks there for other
15 reasons besides overage.
16 Q    Okay.
17 A    So you have to go through each one and
18 figure out whether it's just an overage and needs
19 to go back or if there's something we need to be
20 holding it for. So it's time consuming if your
21 trial balance is a good size.
22 Q    Okay. But from what you've told me,
23 it's the standard practice to charge a thirty

1 page estimated fee for a recording fee.
2      MR. COOK: He did not say it
3      was standard practice. He said it
4      happens. He said it happens the
5      other way, too.
6      MR. RIEMER: Well, no, let's be
7      clear. He said, I thought that
8      GATORS generates a recording fee
9      based on a thirty page estimate in
10     the system.
11     MR. COOK: For a preliminary
12     HUD.
13     MR. RIEMER: For a preliminary.
14     Right. And then that gets placed in
15     the final HUD. And then a refund is
16     made if that amount is over what was
17     actually paid.
18 BY MR. RIEMER:
19 Q    Isn't that what you told me the
20 practice was?
21     MR. COOK: He also said that if
22     they had time, they'll change it.
23 A    If you could fix it, you could.

BY MR. RIEMER:

Q    Okay. All right. But we looked at --
okay. All right. Well, so in a best case
scenario, you're saying if they have time, they
will within the next month review the trial
balance, review the escrow balance, and then
process the refund? Is that what you're saying?

A    I'm saying that that's the process
that they should be doing, is going through their
trial balance at the beginning of the month and
start working their trial balance. I don't know
how far they get, it depends on how busy they
are.

Q    Okay. As a manager do you keep up
with how long it takes to process these refunds?

A    I work the trial balance along with my
closers, so I work the trial balance making sure
that my group and my closers are keeping up with
their trial balance.

Q    Okay. Would it be usual for a refund,
the process to last, say, four or five months,
between the closing and when there's a refund?

A    Yeah, that's possible.

Q    Okay. What about a year?

A    No, it shouldn't happen. It shouldn't
be that long, no.

Q    But that's what happened in this case;
right?

A    Yeah, it did. And I think what we've
done is -- to try to alleviate that from
happening, is we created a program that would run
and generate a list of files that are out there
in trial balance that were overages for
recording.

Q    Is that a procedure you put in place
as a result of this case?

A    No, sir.

Q    All right. You describe in your
affidavit a change in the procedure that happened
in November of '06. Is that what you're talking
about?

A    Yes.

Q    Other than this file have you ever
heard of a refund generated over a year after the
closing?

A    No.

Q    This is the only case?

A    It's the only one I've heard of.

Q    Was the refund generated -- because
I'll tell you that just before the refund was
generated -- well, back up. In between the
closing and the generation of the refund,
Lender's First Choice got sued in this case. Did
it issue a refund because it got sued?

A    I think the lawsuit made them aware
that there was money in the balance, but I don't
think they did it because they're being sued, is
my understanding.

Q    Do you have any personal knowledge as
to why the Edwards refund was generated in
October 2007?

A    Why it was generated?

Q    Well, did you have any personal
involvement in the generation of the Edwards
refund check?

A    No, sir.

Q    Did you even know about it until you
were asked to provide testimony in this case?

A    When I was informed that we were to
look at this file because I'd be giving
testimony, that is when I understood what had
happened.

Q    Okay. Let me get this back in front
of you. This would be one of the attachments,
and it's the same GATORS notes that we've been
looking at before.

A    Uh-huh.

Q    Let me ask you, though, something I
meant to. Those GATORS notes that are in the
file that start at 22, are those all of the notes
from the GATORS program referencing this file
that you know of?

A    As far as I know.

Q    Okay. Do you know -- on page 25,
where it says in the middle 10/23/07, and then
there's the name Hohne, which I think is the same
lady's name that we talked about earlier today;
is that right?

A    Yes.

Q    Okay. It says redacted. Do you know
what was redacted here?

A    No, sir.

1   Q        Do you know --
2             MR. COOK:  Counsel redacted
3        that based upon attorney-client
4        privilege.
5             MR. RIEMER:  Okay.
6   BY MR. RIEMER:
7   Q        A couple of entries above that,
8   4/9/07, K. Little, what is -- do you know who
9   that person is?
10  A        Yes, I do.
11  Q        And who --
12  A        Karen Little is the manager of
13  accounting.
14  Q        Okay.  And is she one of the folks
15  that is in charge of issuing the refunds?
16  A        She is the manager of the people who
17  do the disbursements, cut the checks.
18  Q        Okay.  Have you been made aware of the
19  date that Lender's was served with this lawsuit?
20  A        No, I do not recall.
21  Q        I know I'm skipping around.  But on
22  page 22 of your affidavit -- paragraph 22 of your
23  affidavit you make reference to staffing issues

Page 218

1   when you're trying to close loans and the time
2   frame to go back and do cleanup work is usually
3   not there.
4   Q        Okay.  You used the term "trust
5   account", we used the term "escrow account",
6   which is where the recording fee overage amounts,
7   but it's the same concept; right?
8   A        Yes, sir.  Trust account is the name
9   of the department and escrow, nonoperating bank
10  account.
11  Q        Okay.  Does it refer to an actual bank
12  account that's maintained?
13  A        Yes, sir.
14  Q        Okay.  Not just an internal accounting
15  mechanism?
16  A        No, it's a bank account.
17  Q        And what bank is that account held in?
18  A        I believe it's Commercia.
19  Q        Commercia?
20  A        I believe that's the name of it.
21  Q        Is that the same bank that Lender's
22  First Choice has its operating accounts and other
23  accounts?

Page 220

1   and press of other business.  I'll just read the
2   whole sentence.  Because of staffing issues and
3   the press of other business, the overage was not
4   yet refunded until the suit was filed, but was
5   held in escrow and not taken into income.
6        Is that something that you had
7   personal knowledge of or did you get that
8   information from somebody else?
9   A        I know that there's staffing issues in
10  2006, and that it was in an open refinance time,
11  so it was very busy.  I did not know -- someone
12  told me that the overage was refunded when they
13  found out about this through a lawsuit.
14  Q        Okay.  What were the staffing issues?
15  A        Just extremely busy.  You know, the
16  numbers were very busy during that time.
17  Q        Okay.  More work than you had staff to
18  handle, is that what you're saying?
19  A        Yes.
20  Q        Okay.  What's the other business that
21  was pressing as referenced there, to your
22  understanding?
23  A        Well, I guess what I meant by that was

Page 219

1   A        I don't know where their operating
2   accounts are.
3   Q        Okay.  And is it your understanding
4   that the overages on the recording fees get
5   actually deposited into this account held at that
6   bank?
7   A        All the money goes into that account.
8   The money that gets paid out leaves, the rest of
9   it stays as a holdback.
10  Q        Is that the account that the
11  funding -- the loan funds go into --
12  A        That's my understanding.
13  Q        -- and get disbursed from?
14  A        Correct.
15  Q        And then everything else is a
16  holdback?
17  A        Yes.
18  Q        Okay.  So that's the same as escrow
19  account that's used in closing loans?
20  A        Yes.
21  Q        All right.  Is it an interest-bearing
22  account?
23  A        Don't know.

Page 221

1  Q     Do you know if it's in Lender's name,
2  the account is?
3  A     Don't know.
4  Q     Is it Lender's that writes
5  disbursement checks from that account?
6  A     Yes.
7  Q     Okay.  So Lender's has check writing
8  authority on that account, obviously?
9  A     Yes.
10 Q     All right.  Anybody other than
11 Lender's First Choice have control over what --
12 over disbursements made from that account?
13 A     I'm not aware of anything like that,
14 no.
15 Q     But Lender's has control over that
16 account, it's not held by some third party escrow
17 agent; right?
18 A     Not that I'm aware of, no.
19 Q     And does it occur that -- well, let me
20 back up.  In this file the refund check was
21 listed as void because it wasn't negotiated, the
22 check that was sent to the Edwards.  Did you see
23 that?

1        MR. COOK:  Where are you
2  talking about?
3        MR. RIEMER:  Well, I can find
4  it.  I was kind of hoping for
5  brevity sake he saw that.
6  BY MR. RIEMER:
7  Q     While he's looking for that, do you
8  know what happens to the money that's not
9  claimed?  In other words, if Lender's First
10 Choice sends checks to borrowers and for whatever
11 reason it doesn't get negotiated, what happens to
12 that money?
13 A     My understanding is that we take three
14 attempts to try to locate a borrower if we're
15 trying to send money back to them and can't find
16 them.  It goes back to trust accounting and they
17 do -- there's a name of something that they do
18 and they give it to the state.  That's what I
19 heard, I don't know the exact --
20       MR. COOK:  Escheat?
21 A     Yeah.
22 BY MR. RIEMER:
23 Q     Okay.  Well, who handles that part of

1  it; is that accounting?
2  A     Yes.
3  Q     Do you know how long the money stays
4  in before it escheats to the state?
5  A     No.
6  Q     All right.  Let me ask you about the
7  calculation of these recording fees.
8        (Plaintiff's Exhibit 11 was
9        marked for identification.)
10 BY MR. RIEMER:
11 Q     Okay.  I'm going to mark as Exhibit
12 Number 11 the front page of the Edwards recorded
13 mortgage.
14 A     Okay.
15 Q     You see that?
16 A     Uh-huh.
17 Q     And there's the calculation of the
18 recording fees charged towards the top there?
19 A     Yes.
20 Q     Okay.  And I just want to walk through
21 to make sure I understand.  I may have to look
22 over your shoulder.  But if I understand it, you
23 take out the mortgage tax.  The rest of that fee

1  is $53.  Do you see that?  Forty-one, plus ten,
2  plus two?
3  A     Yes.
4  Q     Okay.  And that would have been the
5  nontax part of the money that was owed to Probate
6  Court to record the mortgage; right?
7  A     That's what it looks like it is, yeah.
8  Q     Okay.  Now, let me show you what I'm
9  going to mark as Number 12, which I believe is
10 the deed that you've testified about as having
11 had to have been recorded as part of the closing.
12       (Plaintiff's Exhibit 12 was
13       marked for identification.)
14 BY MR. RIEMER:
15 Q     Do you see that?
16 A     Uh-huh.
17 Q     All right.  And it looks like aside
18 from the tax -- well, that you paid $23.50 to
19 record that, and that includes fifty cents in
20 tax; right?
21 A     Deed tax is fifty cents, uh-huh.
22 Q     Okay.
23 A     Total $23.50.

1  Q      All right.  If you add $23.50 to $53,
2  you get $76.50.  And it's my understanding that
3  the total amount actually paid to probate was
4  $75.50.  But it's just driving us crazy.  Do you
5  know why that discrepancy is there?
6  A      No, I don't.
7  Q      But you would agree with me that the
8  check written to Probate Court should be the
9  filing fee on the mortgage, minus the tax, plus
10 what you paid for the recording of the deed;
11 right?
12 A      That's usually the way it works.
13 Q      Okay.
14        MR. COOK:  But he's not an
15     expert on Alabama recording fees.
16     He knows what our check -- what
17     check we cut to the Probate Court.
18        MR. RIEMER:  Well, I didn't
19     know if there was like a dollar
20     missing somewhere that he knew about
21     or a dollar calculation --
22 A      No, I don't know.
23 BY MR. RIEMER:

1  Q      All right.  On page 16 of the big
2  stack, which I have here, this is a document
3  that's entitled closing HUD ledger?
4  A      Yes, sir.
5  Q      And it looks like to me it documents
6  disbursements made out of the escrow account.
7  A      Yes, sir.
8  Q      Is that right?
9  A      That's correct.
10 Q      But there seems to me to be some
11 disbursements that are missing.  Does this
12 purport to be all of the disbursements made from
13 the proceeds on the Edwards loan?  In other
14 words -- well --
15 A      It's page 1 of 2, 2 of 2.  I would
16 say, yeah.
17 Q      Okay.  What's missing from this to me
18 are the disbursements made to whatever third
19 parties, like the Notary, the abstractor, those
20 type disbursements are not listed here.
21 A      No, they go -- they roll up into
22 Lender's First Choice and then they're paid
23 differently.  They're not paid off the HUD.  You

1  have to have an invoice to be paid off the HUD.
2  You have to have a line item.
3  Q      Okay.
4  A      So they're not paid that way.
5  Q      And is it Lender's First Choice
6  practice in the HUD to not identify in the HUD
7  the recipient of these fees, of these fees that
8  are paid to third parties?
9  A      Well, we normally put the vendor that
10 does the signing on there and pay them on the
11 HUD.  This one, there was no -- you know, there
12 was $175 paid to a Notary that came out of our
13 fees.
14 Q      $125.
15        MR. COOK:  No, it's $175,
16     actually.
17 A      So out of these fees that we have
18 here, $175 was paid to a Notary.  And there
19 was a -- so...
20 BY MR. RIEMER:
21 Q      Okay.
22 A      So that vendor is usually on our
23 HUD-1s, yes.

1  Q      All right.  So your HUD-1 would
2  identify the Notary and the amount paid to the
3  Notary?
4  A      This says --
5        MR. COOK:  Well, probably not
6     in Ameriquest.
7  A      Yeah.  No, not in Ameriquest.
8        MR. COOK:  Because we don't
9     know who they are.
10 A      But it either says attorney fee or
11 signing fee.
12 BY MR. RIEMER:
13 Q      Okay.  Either 1106 or 1107?
14 A      Right.
15 Q      Okay.  But is it Lender's First
16 practice not to identify third parties that are
17 paid parts of the fee?  For example, if Lender's
18 First Choice paid an amount, a portion of the
19 $175 for abstract title search to a third party,
20 does it identify that third party and the amount
21 paid to the third party on the HUD?
22        MR. COOK:  Objection to form.
23 A      Not that I'm aware of.

BY MR. RIEMER:

2 Q    You've never seen that?

3 A    I have not seen that.

4 Q    But it is a practice of Lender's First
5 Choice to pay a portion of the $175 to a third
6 party vendor?

7    MR. COOK: Objection to form.
8    I think we've covered this topic
9    before.

10    MR. RIEMER: I was just making
11    sure you're awake.

12    MR. COOK: I am.

13    MR. RIEMER: And you're going
14    to instruct him not to answer that
15    question? Is that part of your
16    objection?

17    MR. COOK: Yeah, it is. By the
18    way, I think you probably already
19    got it anyway, so...

20    We're past the time, but go
21    ahead.

22 BY MR. RIEMER:

23 Q    All right. Let me ask this while

---

1 you're here, and then I think that'll be all I
2 have.

3    In doing closings have you seen it
4 where, for whatever reason, Lender's First Choice
5 will not charge a closing fee or will charge a
6 less closing fee and then adjust the other
7 charges on the HUD? And I'll show you one of
8 these.

9 A    I'll say yes, that's happened.

10 Q    Okay. But why does that --

11 A    Just a request by the lender to change
12 the fees.

13 Q    Okay. That was my next question. And
14 this is I think an example of that. That's a HUD
15 that's within that stack of HUDs we identified
16 and was an exhibit. What exhibit number is this?

17    MR. HARTLEY: Who's the lender
18    in that?

19    MR. RIEMER: Yeah, I'll try to
20    identify it that way. It's part of
21    Exhibit 9, and this is a HUD for --
22    it's an Ameriquest HUD for Willie
23    Golston. And there's a settlement

---

1    fee of $50 and then a title
2    examination fee of $400.

3 BY MR. RIEMER:

4 Q    So this is done as an adjustment
5    that's requested by the lender?

6 A    If they're closing instructions came
7 over and broke that down differently, then we
8 might adhere to that, yes.

9 Q    Okay. But it wouldn't change the
10 things that -- the process that you just
11 explained to me, that you described to me today
12 about the things you do for the loan, for
13 processing the loan. That stays the same; right?

14    MR. COOK: Depending on what's
15    required of the loan.

16 A    I mean, I don't know what this
17 specific transaction was, what happened in that
18 specific transaction.

19    MR. RIEMER: All right. We're
20    at 3:40. All right. Well, subject
21    to our agreement, that's all I have.
22    And I'll --

23    MR. COOK: Thank you.

---

1    MR. RIEMER: I'll pass.

2    MR. HARTLEY: I have no
3    questions at this time.

4    MR. COOK: I have two or three
5    real quick questions.

6    EXAMINATION

7 BY MR. COOK:

8 Q    Do you have any personal knowledge
9 whether or not a revised HUD or a letter is sent
10 out when we send out a recording fee refund?

11 A    No.

12 Q    What is the reason why Lender's First
13 doesn't have enough time to revise the HUD
14 sometimes for the recording fee before a closing
15 occurs?

16    MR. RIEMER: Asked and
17    answered. He can try to answer it
18    again.

19 A    It is because of a time constraint.
20 And when you change the number on the HUD, it has
21 to go back to the lender to be approved, and that
22 could cause us to be late.

23 BY MR. COOK:

1 Q      Typically, what is required for a
2 reissue rate to apply?  Is there something that
3 the borrower has to do?
4           MR. RIEMER:  Asked and
5      answered, and object to form.
6 BY MR. COOK:
7 Q      What is required for a reissue rate to
8 apply?
9           MR. RIEMER:  Same objection.
10      You can answer.
11 A      We have to have the actual document,
12 the original policy.  A request for having a
13 reissue and then have the policy.
14 BY MR. COOK:
15 Q      And who provides those things, the
16 request and the reissue?
17 A      Either the loan officer or the
18 borrower himself.
19           MR. COOK:  Thank you.
20           EXAMINATION
21 BY MR. RIEMER:
22 Q      But it's true, isn't it, that it's
23 your job as title agent to calculate the

1 appropriate premium for issuing a policy?  And
2 that's stated in that agreement we just saw;
3 isn't that right?
4 A      Yes.
5           MR. RIEMER:  Okay.  That's all.
6
7 The deposition of William R. Petruccelli was
8 adjourned at 3:43 p.m.

C E R T I F I C A T E

STATE OF ALABAMA)
COUNTY OF MOBILE)

I do hereby certify that the above and
foregoing transcript of the deposition of WILLIAM
R. PETRUCCELLI was taken down by me in machine
shorthand, and the questions and answers thereto
were reduced to writing under my personal
supervision, and that the foregoing represents a
true and correct transcript of the proceedings.
I further certify that I am neither of
counsel nor of kin to the parties to the action,
nor am I in anywise interested in the result of
said cause.


_____
SHERRY J. BARLOW, RPR, CCR
Notary Public, State at Large
My Commission Expires 4/12/11
Alabama CCR #293

I N D E X

Examinations              Page
BY MR. RIEMER:              5
BY MR. COOK:              233
BY MR. RIEMER:            234

E X H I B I T S

Description               Page
Plaintiff's Exhibit 1      5
Plaintiff's Exhibit 2      25
Plaintiff's Exhibit 3      58
Plaintiff's Exhibit 4      64
Plaintiff's Exhibit 5      73
Plaintiff's Exhibit 6      120
Plaintiff's Exhibit 7      130
Plaintiff's Exhibit 8      139
Plaintiff's Exhibit 9      164
Plaintiff's Exhibit 10     208
Plaintiff's Exhibit 11     224
Plaintiff's Exhibit 12     225

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JONATHAN and SHARRON EDWARDS,    *
individually and on behalf of others
similarly situated,    *

      Plaintiffs,    *    CASE NUMBER: 1:07-cv-00160 KD-C

v.    *

ACCREDITED HOME LENDERS, INC.    *
and LENDERS' FIRST CHOICE; and
LENDER'S FIRST CHOICE AGENCY    *
OF ALABAMA, INC.,    *

      Defendants.    *

               *

NOTICE OF DEPOSITION(S)
PURSUANT TO RULE 30(b)(6), FEDERAL RULES OF CIVIL PROCEDURE,
TO DEFENDANTS LENDER'S FIRST CHOICE
AND LENDER'S FIRST CHOICE AGENCY OF ALABAMA, INC.

---

TO:        Jeffrey J. Hartley
        Helmsing, Leach, Herlong, Newman & Rouse
        Post Office Box 2767
        Mobile, Alabama  36652

        Kirk D. Jensen
        Matthew P. Previn
        Buckley Kolar LLP
        1250 24th Street N.W., Suite 700
        Washington, DC  20037

        Gregory C. Cook
        Jennifer B. Hoover
        Balch & Bingham LLP
        Post Office Box 306
        Birmingham, Alabama  35201-0306



PLAINTIFF'S
EXHIBIT

DATE:            February 28, 2008

TIME:            9:00 A.M.

LOCATION:        Offices of Cunningham Bounds LLC
                 1601 Dauphin Street
                 Mobile, Alabama 36604

Please take notice at a time and location to be determined, the Plaintiffs will take the deposition(s) of **Lender's First Choice and Lender's First Choice Agency of Alabama, Inc.,** beginning at 9:00 a.m., upon oral examination pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure before an officer duly authorized to take depositions and swear witnesses. The oral examination will continue from day to day until completed and you are invited to attend and cross-examine. Pursuant to the provisions of Rule 30(b)(6), Federal Rules of Civil Procedure, said deponent shall designate to testify on its behalf the person or persons most knowledgeable about the categories listed on the attached Exhibit "A."

STEVEN L. NICHOLAS (NICHS2021)
CUNNINGHAM BOUNDS, LLC
Post Office Box 66705
Mobile, Alabama 36660
251-471-6191
251-479-1031 (Facsimile)
sln@cunninghambounds.com

2

## CERTIFICATE OF SERVICE

I do hereby certify that on the February 18, 2008, I electronically filed the foregoing with the
1250 24th Street N.W., Suite 700
Washington, DC  20037
kjensen@buckleykolar.com
mprevin@buckleykolar.com

Gregory C. Cook
Jennifer B. Hoover
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama  35201-0306


STEVEN L. NICHOLAS  (NICHS2021)

**EXHIBIT A**

The person or persons most knowledgeable about the following and duces tecum to bring with them documents or things which comply with the following categories:

1.    Your policies and procedures regarding the calculation and collection of recording fees on loans closed by you.

2.    Your policies and procedures regarding the collection, retention, or refund of any excess recording fees or costs charged by you.

3.    Your policies and procedures for the calculation and charging of all of your settlement services for loans closed by you.

4.    Your policies and procedures regarding the calculation of the amounts charged for title insurance premiums issued by you.

5.    Any guidelines, restrictions or instructions given to you by lenders relating to the amount of your charges for settlement services provided by you.

6.    The method, manner and meaning of the preparation of and meaning of documents produced in this matter.

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| JONATHAN AND SHARRON EDWARDS, individually and on behalf of all similarly situated individuals, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) CASE NO. 1:07-cv-00160-KD-C |
| ACCREDITED HOME LENDERS, INC.; LENDER'S FIRST CHOICE AGENCY, INC.; LENDER'S FIRST CHOICE AGENCY OF ALABAMA, INC., | ) ) ) ) ) |
| Defendants. | ) ) |

**AFFIDAVIT OF BILL PETRUCCELLI**

State of Florida          )

Orange County          )

Before me, the undersigned, a Notary Public in and for said County in said State, personally appeared Bill Petruccelli, who, after being by me first duly sworn, did depose and state as follows:

1.    My name is Bill Petruccelli.  I am over the age of twenty-one and of sound mind and am fully competent to make this affidavit.  I am a closing

954393.1





supervisor for Lender's First Choice which means, among other things, I supervise the employees who are "closers" for Lender's First Choice. I have held this position for three years. I make this affidavit based upon my personal knowledge and based upon the business records of Lender's First Choice that are kept in the ordinary course of business and are under my custody or control.

2.     One of the settlement services offered by Lender's First is the recording of mortgages. The process for arranging for the recording of a mortgage requires the services of Lender's First's employees, its computers, its equipment, and its resources.

3.     Because the amount for recording fees varies tremendously across the country and even across Alabama and because such fees can change from time to time and even based upon details such as numbers of pages, Lender's First's policy is to collect the amount for a recording fee based on its best understanding of the correct fee and then refund any overage. If Lender's First charges too little, it does not collect the deficiency from the borrower.

4.     Prior to the closing, Lender's First uses a program called "GATORS" to calculate recording fees. Obtaining and maintaining the GATORS system is an expense to Lender's First. When an order is opened in Lender's First's system through GATORS, the average mortgage fee for each state is automatically calculated for the preliminary HUD statement based on a 30-page mortgage

Hall-Frazier
Record - 000681

document. This is normally done by the "closer" in the Lender's First office that is assigned to the specific loan.

5.     The lender will then prepare the majority of documents that are used in closing a loan. These include, for instance, the mortgage, the note, various mortgage riders, certain affidavits, Truth in Lending disclosures, among many. Lender's First Choice refers to these documents as a "package." The lender will also prepare "closing instructions." Lender's First will revise the HUD Settlement Statement based upon the closing instructions. The lender will provide the "package" to Lender's First Choice before closing but often after the closing instructions. If the "package" is provided in sufficient time before the scheduled closing, Lender's First Choice will examine the mortgage for information that might be relevant to the recording fee, including for instance, number of pages. Then Lender's First will enter the relevant information into GATORS to determine an exact amount of recording fees and revise the HUD Settlement Statement accordingly. The procedures described above are different for a few, specific lenders who have requested different procedures (for example, Ameriquest), but such lenders were not involved in this loan.

6.     In this case, the records kept in the ordinary course of Lender's First's business (for instance, the "Notes" attached as Exhibit 1 hereto) indicate that the "package" was not received in sufficient time to revise the HUD Settlement

3

Hall-Frazier
Record - 000682

Statement. The Notes indicate that the signing agent downloaded such package (and additional documents provided by Lender's First Choice) on June 12, 2006 and the original signing of documents with the borrower occurred on the same date.

7.    After the closing (at least for loans which were not through those few lenders with different procedures, as noted in paragraph 5), Lender's First receives the signed documents from the signing agent. The closer, who is assigned to the specific loan from Lender's First, normally recalculates the recording fee based on the actual documents that need to be recorded.

8.    All monies received from any source (for instance, the loan funds received from the lender or fees received at closing and returned by the signing agent) are placed into an escrow account at Lender's First.

9.    As a part of arranging for recording, Lender's First (the Post Closing Department) reviews every page to make certain there are no notations, nothing is stricken, and every page is legible. Further, as a part of such arranging, Lender's First must individually review the documents before recording for information that might be relevant to the recording fee, including types of documents, number of pages, etc. This is done by the Recording Department. They will also use the same GATORS computer system to calculate the amount to use for the check to applicable government office (here, the Mobile County Probate Court). These are

PS4393.1                                        4

the standard procedures of Lender's First, except for a few specific lenders who have requested different procedures, but such lenders were not involved in this loan.

10.    Also, in arranging for recording, the Recording Department will then print the Federal Express label. They will then obtain a self-addressed envelope. They will manually place the mortgage and/or other documents (such as a deed to be recorded), clipped to a check, in the Federal Express envelope along with the self-addressed envelope and will place the envelope in the appropriate Federal Express pickup. These are the standard procedures of Lender's First, except for a few specific lenders who have requested different procedures, but such lenders were not involved in this loan.

11.    After the documents are sent, Lender's First often fields phone calls from the applicable government recording office regarding the documents. It is also not uncommon for the government recording office (for instance the probate court in Alabama) to reject the recording by Lender's First because of changes in the recording fees or other clerical issues. In such cases, Lender's First does not collect the deficiency from the borrower. Further in such case, Lender's First must again review the documents, cut a check, change its computer system information for future checks, and go through the procedure explained above again, except for

Hall-Frazier
Record - 000684

a few specific lenders who have requested different procedures, but such lenders were not involved in this loan.

12.    In addition to the services normally performed by Lender's First in arranging for the recording of the mortgage or other documents (as described above), Lender's First had to perform additional services here.  For instance, the business records of Lender's First (including Exhibit 1) indicate that Lender's First had to arrange, in this matter, for a corrective deed to be drafted, signed, reviewed and recorded in the same manner discussed above because of a naming problem on the title of the property.

13.    In fact, the extra services of Lender's First in arranging for recording went even further here because the first extra deed was not correct, and therefore, after the original closing, yet another deed had to be prepared and another visit by the signing agent.   Therefore, Lender's First had to arrange for the drafting, reviewing and recording in the same manner discussed above for a third time. These services in arranging for the recording of the mortgage and deed here included those listed in paragraphs 9, 10, 12 and 13 and were services actually performed in connection with recording the mortgage and such recording fee.

14.    This extra visit to correct the deed appears to have caused a disruption in the normal procedure of Lender's First.   In most cases, the Recording Department will act on the same day as disbursement is done by the closer.

Hall-Frazier
Record - 000685

15.    Disbursement is the procedure whereby Lender's First will pay the various parties who are receiving funds from the closing (for instance, a prior mortgagee, the borrower if they are receiving cash out, the title insurer, etc.). Such funds are paid out of the escrow account described above. Disbursement occurred here on June 16, 2006. In other words, disbursement occurred before the closer had the final documents; therefore, the closer did not adjust the recording fee for what was actually to be filed with the Mobile County Probate Court. The closer received the signed, extra deed on June 19, 2006 and forwarded it to Recording Department on the same day. The Recording Department followed the procedure laid out above and sent them to the Probate Court on June 23, 2006.

16.    With respect to the Edwards' recording, two documents were recorded: a mortgage and a deed. The mortgage was sixteen pages, and the deed was three pages. The actual recording fee for the Edwards' mortgage was $75.50 and Lender's First paid the Mobile County Probate court $75.50. *See* Ex. 2 (copy of check issued by Lender's First Choice to Mobile County Judge of Probate).

17.    The Edwards initially paid $88.00 in connection with recording.

18.    Lender's First Choice held the $12.50 overage in said escrow account and never took such money into income and did not accept such money.

19.    As mentioned above, all monies received from any source are placed into an escrow account, pending disbursement. If the amount charged to the

borrower is more than the amount paid to the probate court, then the overage stays in such escrow account to be refunded to the borrower. It has always been Lender's First's policy to refund any overages for recording fees to the borrower.

20.    It is the policy of Lender's First to review all escrow accounts when staffing permits the opportunity to review such accounts. When such a review shows that an escrow account contains an overage ("trial balance"), this amount is refunded to the borrower. Attached hereto is a true and correct copy of the computer ledger for the Edwards loan, which shows that this money was kept in escrow. *See* Ex. 3.

21.    For loans closed prior to November 2006, the closer of the loan had the responsibility to review any escrow balances and issue refunds of such balance. Beginning in November 2006, Lender's First has an automated feature in its system that is triggered once the recorded document is returned. The system automatically triggers Lender's First's disbursement department to refund any overages to the borrower.

22.    Because the Edwards loan closed before the automated feature was in use at Lender's First, the closer or the accounting department needed to personally review the file and issue the refund. Because of staffing issues and the press of other business, the overage was not yet refunded until this suit was filed, but was held in escrow and not taken into income.

934293.1                                          8

Hall-Frazier
Record - 000687

23.    The $12.50 overage was refunded to the Edwards around April 2007.

*See* Ex. 4 (copy of FedEx receipt signed by Mr. Edwards).  The check has not been

negotiated.

Further Affiant sayeth not.

_____
Bill Petruccelli

Sworn to and subscribed before me this the

___5th___ day of _Feb_, 2008.

_____
Notary Public
My Commission Expires: _1/18/09_

JEFFRIE ANN YOUNGER
MY COMMISSION # DD387500
EXPIRES: January 18, 2009
1-800-3-NOTARY     FL Notary Discount Assoc. Co.

9

*Edwards v. Accredited; Lender's First*
Case No. 1:07-cv-00160-KD-C

Affidavit of Bill Petruccelli

# EXHIBIT 1

"Notes"

Hall-Frazier
Record - 000689

*Edwards v. Accredited; Lender's First*
Case No. 1:07-cv-00160-KD-C

Affidavit of Bill Petruccelli

# EXHIBIT 2

"Check – Lender's First Choice to Mobile County Judge of Probate"

*Edwards v. Accredited; Lender's First*
Case No. 1:07-cv-00160-KD-C

Affidavit of Bill Petruccelli

# EXHIBIT 3

"Computer Ledger for Edwards Loan"

2006048225  Book-5995 Page-1678
Total Number of Pages: 16

Return To:

~~Home Funds Direct~~
~~Attn: Post Closing Dept.~~
~~16550 West Bernardo Dr.  Bldg 1~~
~~San Diego, CA 92127-1870~~

**RECORDING DEPT**
**Lenders First Choice**
**3850 Royal Avenue**
**Simi Valley, CA 93063**
36- 735507/

41.00
97.50
138.53
10.00
148.53
2.00
150.50

State of Alabama-Mobile County
I certify this instrument was filed on:
June 28, 2006 @   3:09:55 PM

| | |
|---|---|
| MORTGAGE TAX | $97.50 |
| S.R. FEE | $2.00 |
| SURCHARGE | $10.00 |
| RECORDING FEES | $41.00 |
| TOTAL AMOUNT | $150.50 |

2006048225
Don Davis, Judge of Probate

2011712

———————— [Space Above This Line For Recording Data] ————————

# MORTGAGE

MIN 100176106053043916

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **June 12, 2006**,
together with all Riders to this document.
**(B) "Borrower"** is **JONATHAN EDWARDS AND SHARRON W. EDWARDS, HIS WIFE, AS JOINT
TENANTS WITH THE RIGHT OF SURVIVORSHIP.**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

0605304391

ALABAMA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS         Form 3001 1/01

-6A(AL) (0005).03
Page 1 of 15                    Initials:

VMP MORTGAGE FORMS - (800)521-7291

PLAINTIFF'S
EXHIBIT

71

Hall-Frazier
Record - 000692

2006048224  Book-5995  Page-1674
Total Number of Pages: 4

State of Alabama-Mobile County
I certify this instrument was filed on:
June 28, 2006 @  3:08:53 PM

| | |
|---|---|
| DEED TAX | $0.50 |
| S.R. FEE | $2.00 |
| SURCHARGE | $10.00 |
| RECORDING FEES | $11.00 |
| TOTAL AMOUNT | $23.50 |

2006048224
Don Davis, Judge of Probate

---

## RECORDING COVERSHEET
## (ALABAMA)

**DOCUMENT TYPE:**     WARRANTY DEED

**PREPARED BY:**     LENDERS FIRST CHOICE
3850 ROYAL AVENUE
SIMI VALLEY, CA 93063

**RETURN TO:**     LENDERS FIRST CHOICE
RECORDING DEPT.
3850 ROYAL AVENUE
SIMI VALLEY, CA  93063

**DEAL #:**     36-7355071

PLAINTIFF'S
EXHIBIT
12

Hall-Frazier
Record - 000693

2011712-AL

**WARRANTY DEED**

This instrument was prepared by:

Lenders First Choice
2321 W. March Lane, Suite 210
Stockton, CA 95207
Phone: (209) 475-6200

THE STATE OF ALABAMA

Mobile ~~MADISON~~ COUNTY

Know All Men by These Presents: That in consideration of $10.00 to the undersigned grantor (whether one or more), in hand paid by the grantee herein, the receipt where is acknowledged, I or we, JONATHAN EDWARDS AND SHARRON W. EDWARDS WHO ACCQUIRED TITLE AS  JOE NATHAN EDWARDS AND SHARON W. EDWARDS (herein referred to as grantor, whether one or more), grant, bargain, sell and convey unto JONATHAN EDWARDS AND SHARRON W EDWARDS ., HIS WIFE, AS JOINT TENANTS WITH RIGHTS OF SURVIVORSHIP (herein referred to as grantee, whether one or more), the following described real estate, situated in Madison County, Alabama, to-wit:

**See Legal Description shown as Exhibit "A" attached hereto and made a part hereof.**

**More Commonly Known As: 11460 HENDERSON CAMP RD GRAND BAY, AL 36541-6712**

To Have and to Hold to the said grantee, his, her or their heirs and assigns forever. And I (we) do, for myself (ourselves) and for my (our) heirs, executors and administrators, covenant with said grantee, his, her or their heirs and assigns, that I am (we are) lawfully seized in fee simple of said premises; that they are free from all encumbrances, unless otherwise stated above; that I (we) have a good right to sell and convey the same as aforesaid; that I (we) will, and my (our) heirs, executors and administrators shall warrant and defend the same to the said grantee, his, her or their heirs and assigns forever, against the lawful claims of all persons.

In Witness Whereof, I (we) have hereunto set my (our) hand(s) and seal(s) this _12_ day of _June_, 20_06_

_____

_Jonathan Edwards_ (signature)
JONATHAN EDWARDS

_Sharron W. Edwards_ (signature)
SHARRON W. EDWARDS

THE STATE OF ALABAMA

Mobile ~~MADISON~~ COUNTY

al-wrnty.doc  rev.5/15/2006  Page 1 of 2

I, _Neely Courtney_ a Notary Public, in and for said County in said State, hereby certify that _Jonathan Edwards + Sharron W._, whose name is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he executed the same voluntarily on the day the same bears date.

Given under my hand this the _12_ day of _June_, 20 _06_

_Neely Courtney_

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Dec 8, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

al-warty.doc  rev.5/15/2006  Page 2 of 2

Hall-Frazier
Record - 000695

EXHIBIT "A"

THE FOLLOWING DESCRIBED LAND LYING IN THE COUNTY OF MOBILE, STATE
OF ALABAMA, TO-WIT:

TO FIND THE POINT OF BEGINNING: COMMENCE AT THE CENTER OF SECTION
12, TOWNSHIP 7 SOUTH, RANGE 4 WEST;

THENCE RUN EAST 2600 FEET TO A POINT; BEING LOCATED IN THE CENTER
OF HENDERSON CAMP ROAD;

THENCE RUN NORTH 555 FEET TO A POINT, FOR THE POINT OF BEGINNING;

THENCE CONTINUE NORTH 110 FEET TO A POINT;

THENCE RUN WEST 244 FEET TO A POINT;

THENCE RUN SOUTH 110 FEET TO A POINT; THENCE RUN EAST 244 FEET TO
THE POINT OF BEGINNING. PROPERTY LINES ON THE WEST SIDE OF
HENDERSON CAMP ROAD, AND IS LOCATED IN MOBILE COUNTY, ALABAMA.

FOR INFORMATIONAL PURPOSES ONLY: THE APN IS SHOWN BY THE COUNTY
ASSESSOR AS R024501120000041; SOURCE OF TITLE IS BOOK 1650, PAGE
0221 (RECORDED 11/24/76)

Links | Site Map

Search

Home | Our Story | Our Commitment | Events | Media Center | Employment | Contac

:· Executive Team

:· Sales Team

:· Coverage Map

LFC - Come Join Our Family... More

Learn why everyone wants to work at LFC.

Client Login

user name:

password:

Log In

Notary Enrollment Click Here

Abstractor Enrollment Click Here

# Our Story · Coverage Map

LFC operates nationally providing closing and settlement services to regional and national len

Full Service Areas

Services Available For Non-Insured Product Only

Web Site Developed By Enlightened Technology Group, Inc.

Privacy Policy

PLAINTIFF'S EXHIBIT 2



TPOL OTHER

LENDERS FIRST CHOICE

## UNITED GENERAL TITLE INSURANCE COMPANY

**Commitment Number:** 36-02186514

### *SCHEDULE A*

1. Commitment Date: December 22, 2006 at 8:00 a.m.

2. Policy (or Policies) to be issued:

   (a)ALTA OWNER'S POLICY 10-17-92   Policy Amount
   Proposed Insured:

   (b)ALTA LOAN POLICY 10-17-92   Policy Amount $60,000.00
   Proposed Insured: AMERIQUEST MORTGAGE COMPANY
   its successors and/or its assigns

   (c)
   Policy Amount
   Proposed Insured:
   its successors and/or its assigns

3. Fee Simple Interest in the land described in this Commitment is owned, at the Commitment Date by:

   ARTHUR WALKER

4. The land referred to in this Commitment is described as follows:

   (SEE ATTACHED EXHIBIT A)
   COMMONLY KNOWN AS: 4364 BINGHAMTON DR
                       MOBILE AL 36619-1806

**PLAINTIFF'S
EXHIBIT**

3

This commitment is valid and binding for a period of 180 days from the date hereof. Thereafter it is void and of no effect.

Issued by:      **LENDERS FIRST CHOICE**          Countersigned:      LENDERS FIRST CHOICE
                3803 PARKWOOD BLVD.
                SUITE 100
                FRISCO, TX 75034
                PHONE: (866) 775-3377  FAX: (866) 221-0282
Agent for:      **UNITED GENERAL TITLE INSURANCE COMPANY**     Reviewed By:      CHARLES BROWN

**Hall-Frazier**
**Record - 000698**

*LENDERS FIRST CHOICE*

**Commitment for Title Insurance - No.** 36-02186514                                    **Page 2**

## SCHEDULE B-I
### (Requirements)

THE FOLLOWING REQUIREMENTS MUST BE MET:

The following requirements are to be complied with to the satisfaction of the Title Insurance Company:

1.     Instruments in insurable form which must be executed, delivered and duly filed of record:

A proper Mortgage/Deed of Trust from:ARTHUR WALKER

2.     Proof of positive satisfactory ID at closing.

3.     If any mortgages on Schedule B-II show the mortgage to be an individual, LFC requires a copy of a properly executed Satisfaction of Mortgage to remove the mortgage from the final title policy. If any mortgages on Schedule B-II are Open End or Credit Line Mortgages, LFC requires a payoff letter signed by the borrowers authorizing the closing of the account.

4.     Pay all taxes, charges, assessments, levied and assessed against subject premises, which are due and payable.

5.     LFC must be notified in writing the name of anyone not referred to in this Commitment who will get an interest in the subject premises or who will make a loan on the subject premises. We may then make additional requirements or exceptions.

6.     The Company, as defined, hereby assures the proposed that: (a) LFC is operational to the extent that we can process the loan closing and disburse funds, and (b) LFC can get the documents to the county recorder who is in a position to record in a timely manner.

7. According to the Public Records, There are no Conveyances of the land within a period of  twenty-four months prior to the date of this report, except as follows:
Grantor:LANE-WALDING, L.L.C.
Grantee:ARTHUR WALKER
Recorded Date:09/03/2003 book 5448 page 411

---

This commitment is valid and binding for a period of 180 days from the date hereof. Thereafter it is void and of no effect.

| | | |
|---|---|---|
| **Issued by:** | **LENDERS FIRST CHOICE**<br>3803 PARKWOOD BLVD.<br>SUITE 100<br>FRISCO, TX 75034<br>PHONE: (866) 775-3377  FAX: (866) 221-0282 | Countersigned:    LENDERS FIRST CHOICE |
| **Agent for:** | **UNITED GENERAL TITLE INSURANCE COMPANY** | Reviewed By:    CHARLES BROWN |

*LENDERS FIRST CHOICE*

**Commitment for Title Insurance - No.** 36-02186514        **Page 3**

SCHEDULE B-II

The following matters will appear as exceptions from coverage on your title insurance policy unless disposed of to the satisfaction of the company.

1.    Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the publics records or attaching subsequent to the effective date hereof but prior to the date of the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.    Encroachments, overlaps, boundary line disputes, shortages in area, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

3.    Any disputes as to boundaries caused by a change in the location of any water body within or adjacent to the land prior to the date of policy, and any adverse claim to all or part of the land, that is at Date of Policy, or was previously under water.

4.    Any fact, rights, interest or claims which are not shown by the public record but which could be ascertained by an accurate survey of the land or by making inquiry of persons in possession thereof.

5.    Rights or claims of parties in possession not shown by the public records.

6.    Any lien or right to lien, for services, labor or material imposed by law and not shown by public record.

7.    Covenants, conditions, restrictions, easements, leases, servitudes, grants or reservations of minerals or mineral rights retained by prior owners, if any appearing in the public record.

8.    Taxes or special assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public record. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or the public record.

9.    Taxes as references on the attached "Tax Sheet."

---

This commitment is valid and binding for a period of 180 days from the date hereof. Thereafter it is void and of no effect.

**Issued by:**     LENDERS FIRST CHOICE
            3803 PARKWOOD BLVD.
            SUITE 100
            FRISCO, TX 75034
            PHONE: (866) 775-3377  FAX: (866) 221-0282
**Agent for:**   UNITED GENERAL TITLE INSURANCE COMPANY

**Countersigned:**    LENDERS FIRST CHOICE

**Reviewed By:**     CHARLES BROWN