*LENDERS FIRST CHOICE*

**Commitment for Title Insurance - No.** 36-02186514                    **Page 4**

## SCHEDULE B- II
(Exceptions)

1. Mortgage in the amount of $35000.00, together with any other obligations secured thereby.
Mortgagor(s): ARTHUR WALKER
Mortgagee(s): HOMECOMINGS FINANCIAL NETWORK, INC.
Dated 08/27/2003, recorded 09/03/2003, in 5448-458, Official Records of MOBILE, AL

2. Type of Lien: CERTIFICATE OF JUDGMENT
Debtor: ARTHUR E. WALKER
In favor of: DISCOVER BANK       *See p/o STMT*
Amount: $7126.44
Court name/no.: ALABAMA JUDICIAL DATA CENTER MOBILE COUNTY
Dated: 04/22/2005
Recorded: 05/22/2005
In: 5775-1271, Official Records of said County
Address of Debtor: 4364 BINGHAMPTON FR MOBILE, AL 36619-1806

This commitment is valid and binding for a period of 180 days from the date hereof. Thereafter it is void and of no effect.

| | | |
|---|---|---|
| Issued by: | **LENDERS FIRST CHOICE**<br>3803 PARKWOOD BLVD.<br>SUITE 100<br>FRISCO, TX 75034<br>PHONE: (866) 775-3377  FAX: (866) 221-0282 | Countersigned:     LENDERS FIRST CHOICE |
| Agent for: | **UNITED GENERAL TITLE INSURANCE COMPANY** | Reviewed By:     CHARLES BROWN |

**Hall-Frazier**
**Record - 000701**

*LENDERS FIRST CHOICE*

Commitment for Title Insurance - No.  36-02186514                                    **Page 5**

---

RECORDING INFORMATION

AL    Mobile County                                          id: 52-AL056-01097-08-00

Address:

| US Postal Service Delivery | Courier Delivery |
|---|---|
| Attn: Real Estate Recording | Attn: Real Estate Recording |
| Mobile County Judge of Probate | Mobile County Judge of Probate |
| P.O. Box 7 | 304 Government Street |
| Mobile, AL  36601 | Mobile, AL  36602 |

Phone:   (CST) 251-574-8490                        Fax: 251-690-4939

Make Checks Payable To:    Mobile County Judge of Probate

Courthouse Hours:    8AM-5PM

---

Basic Recording Fees:

Deed/Deed of Trust/Mortgage $15.50 for the first page
 Amendment/Modification $5.50 for the first page
Assignment $5.50 for the first page
Release/Satisfaction $4.00 for the first page

Additional Recording Fees:

 Additional pages and attachments  $2.50 per additional page
 Indexing fee  $1.00 per name over two for each party (note 1)
 Multiple releases on one document  $1.00 per reference after first

Transfer and Financing Fees/Taxes:

Deed Tax 0.5 per $500 or fraction thereof of consideration
Mortgage Tax 0.15 per $100 or fraction thereof financed
Before recording a deed, obtain a slip showing value of property from Revenue
Commissioner to use in tax computation.

Searches, Copies and Certification:

 Certification  $2.00 per document

---

This commitment is valid and binding for a period of 180 days from the date hereof.  Thereafter it is void and of no effect.

| Issued by: | LENDERS FIRST CHOICE | Countersigned: | LENDERS FIRST CHOICE |
|---|---|---|---|
| | 3803 PARKWOOD BLVD. | | |
| | SUITE 100 | | |
| | FRISCO, TX 75034 | | *James Brady* |
| | PHONE: (866) 775-3377  FAX: (866) 221-0282 | | |
| Agent for: | UNITED GENERAL TITLE INSURANCE COMPANY | Reviewed By: | CHARLES BROWN |

**Hall-Frazier**
**Record - 000702**

*LENDERS FIRST CHOICE*

Commitment for Title Insurance - No. 36-02186514                                    **Page 6**

**Document/Recording Notes:**

Blanket assignments are accepted. Blanket releases are accepted.
Document numbering system: Book & Page. Example:
Original document returned.
A self addressed stamped envelope is requested.
No additional fee for first two grantors and two grantees, first two mortgagors and
mortgagees, etc. The additional fee of $1each applies to names above two in either
category on all instruments.
Round up to nearest 100 for Mortgage tax (never round down)
In additional recording fees please add $1 if it is a MERS account for recording fees.
Also in additional recording fees please add $1 for Source of Title for recording fees.
Deed Tax must be paid in the state of Alabama unless the deed is just a correction
All deeds that are being transferred between spouses are tax exempt.
Legal description required only with deeds and mortgages (trust deeds).

We have made every effort to insure the accuracy of this recording information.
However, due to the frequency with which courthouses revise their fees and other
specifications, we cannot assume liability for any discrepancy in recording fees or
taxes.  Please call the courthouse at the above number to verify amounts prior to
closing.  In the event that amounts have changed, please notify us so that we may update
our records.

**Document Format:**

Paper Quality: White, 20lb
Page Size: 8 1/2" X 11" or 8 1/2" x 14"
First Page: 3 1/2" top margin, right hand 5" blank; name and address of preparer and
return to address in left hand 3 1/2". 1" other margins.
Other Pages:  1" all margins

Print: Typed or computer generated, at least 10 point in black ink.

Title or Description: Include a description stating the nature of the instrument
Legibility Standard: Photographically reproducible

Issued by:      LENDERS FIRST CHOICE                          Countersigned:    LENDERS FIRST CHOICE
                3803 PARKWOOD BLVD.
                SUITE 100
                FRISCO, TX 75034
                PHONE: (866) 775-3377  FAX: (866) 221-0282
Agent for:      UNITED GENERAL TITLE INSURANCE COMPANY         Reviewed By:      CHARLES BROWN

**Hall-Frazier**
**Record - 000703**

with certain information. We understand that you may be concerned about what we will do with such information – particularly any personal or financial information. We agree that you have a right to know how we will utilize personal information you provide to us.

### Applicability
This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity.

### Types of Information
Depending upon which of our services you are utilizing, the types of nonpublic personal
· Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
· Information about your transactions with us, our affiliated companies, or others; and
· Information we receive from a consumer-reporting agency.

### Use of Information
The information you provide us is for our own legitimate business purposes and not for the benefit of any affiliated or nonaffiliated party. Therefore, we will not release your information to affiliated and nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

### Former Customers
Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

### Confidentiality and Security
We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities that need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

---

This commitment is valid and binding for a period of 180 days from the date hereof. Thereafter it is void and of no effect.

Issued by:  **LENDERS FIRST CHOICE**
 3803 PARKWOOD BLVD.
 SUITE 100
 FRISCO, TX 75034
 PHONE: (866) 775-3377  FAX: (866) 221-0282

Agent for:  **UNITED GENERAL TITLE INSURANCE COMPANY**

Countersigned:  **LENDERS FIRST CHOICE**

Reviewed By:  **CHARLES BROWN**

Hall-Frazier
Record - 000704

EXHIBIT "A"

ALL OF THAT CERTAIN PARCEL OF REAL PROPRETY SITUATED IN THE STATE
OF ALBAMA, COUNTY OF MOBILE, AND MORE PARTICULARLY DESCRIBED AS
FOLLOWS, VIZ:

LOT 30, SUBURAN HEIGHTS, UNIT ONE, ACCORDING TO THE PLAT THEREOF
RECORDED IN MAP BOOK 11, PAGE 196 OF THE RECORDS IN THE OFFICE OF
THE JUDGE OF PROBATE, MOBILE COUNTY, ALABAMA.

FOR INFORMATIONAL PURPOSES ONLY: THE APN IS SHOWN BY THE COUNTY
ASSESSOR AS R023305211002003; SOURCE OF TITLE IS BOOK 5448, PAGE
0411 (RECORDED 09/03/03)

Hall-Frazier
Record - 000705

## Lenders First Choice, Inc. Abstractor Enrollment Material
### Application For Approval as an Independent Fee Paid Abstractor

Name: _____

Mailing Address: _____

_____

Courier Address: _____

_____

Contact Information:

Office: _____        Cell Phone: _____

Home: _____         Fax: _____

Pager: _____        Other: _____

Courthouse: _____   Email: _____

How do you prefer to receive work orders?    Fax    or    Email

Is your company Incorporated?        Yes    or    No

Do you carry E&O Insurance?          Yes    or    No

Please submit a copy of declarations page(s).

Do you file mortgages?               Yes    or    No    (Exclusions? List below)

_____

# of Orders your office can accept daily and return within 8 business hours:    _____

Although Lender's First Choice, Inc. (Hereinafter referred to as LFC) requires very quick time frames, we continue to expect high quality abstracts. We understand there will be times when an abstract assignment may require extra time due to its complexity. LFC requires that you keep us informed of such instances in as timely a manner as possible. By doing so, we keep our lenders informed and happy.

By signing below, you agree that all work assigned to you by LFC, or by any LFC employee will be completed by you as an independent contractor. As an independent contractor for LFC, you will not attempt to collect any fees with respect to such work from any LFC client, borrower or any party other than LFC. Our billing procedures have been discussed with you and you are aware of our billing time frames.

You also certify that you and/or your employees are licensed or certified by the state that you perform searches in (if applicable) and that you accept and agree to the terms in this agreement.

Signature: _____        Date: _____

*Return documents to Matt Morris via email at mmorris@lendersfc.com or via fax at 888.899.6231. If any questions please call at 214.618.7824. Lenders First Choice, 3803 Parkwood Blvd, Suite 100, Frisco, TX, 75034*

PLAINTIFF'S EXHIBIT
4

**Hall-Frazier**
**Record - 000706**

# General Requirements

Thank you for your time and consideration during our recent telephone conversation. We look forward to working with you. I have attached a Lenders First Choice (LFC) application along with a W-9 Form for your completion. This information must be received by LFC immediately to expedite payment on completed assignments. All abstractors within your company MUST attach the following documents as verification to items in their application or as additional information.

1. Complete Application with W-9 attached
2. Copies of Resume (which must include 2 verifiable references) or state business license/certification
3. Copies of diplomas/certificates received and designations held (individuals only)

## Format For Searches

Every title search must be completed on an LFC abstract report or must contain all the equivalent information. The abstract report must be typed or neatly hand written. We require a copy of the current vesting deed with each search. We require copies of liens and judgments, if detected. We do not require copies of mortgages. We require at least a 24 month chain of title on all searches. See search requirements page for additional information.

## Service Level Expectations

You must confirm any order sent to you within 2 hours of receipt. When orders are completed, you can call email or fax it back to us. Reports must be completed and returned to LFC within 8 business hours of being ordered. If you have any problem with the order, please call LFC immediately.

## Billing

You must send in all completed searches with a copy of the work order as page number one of the search. Any applicable copy cost should be noted on that work order. We will adjust the fee schedule for each completed search when received based upon that work order. We auto-pay every two weeks for all completed searches. There is no need to send in a monthly invoice detailing all searches done. Please call if you experience any delay in payment.

## Changes

If information such as phone or fax numbers, addresses, or service areas change please notify LFC as soon as possible so that we can update your records. Fee change requests must be submitted to LFC in writing 15 days prior to the change so that we can update your fee schedule. (If your fee schedule is not accurate you may experience delays in payment) Fee increases may take up to 30 days for approval.

## Approval

When you submit an application for approval and are added to LFC's approved abstractor list you are approved by all LFC offices. You do not need to apply to all offices. When your file is approved by LFC You will receive an approval letter.

Please feel free to contact LFC if you have any questions or concerns. Listed below are the numbers for all appropriate LFC contacts:

a. Office Number:                            866-775-3377 / 214-618-5100
b. Jack M. Kozak, Esq.
   VP/Director Nat'l Title Operations:   866-775-3377, x5003 / 214-618-5003
c. Matt Morris
   National Vendor Manager:          866-775-3377, x7824 / 214-618-7824

*Return documents to Matt Morris via email at mmorris@lendersfc.com or via fax at 888.899.6231. If any questions please call at 214.618.7824. Lenders First Choice, 3803 Parkwood Blvd, Suite 100, Frisco, TX, 75034*

## Lenders First Choice Specific Search Requirements

### Standard Search (Current Owner) Should Include the Following Information:

- We require that you return the LFC work order as page number one of your completed search.
- We require at least a 24-month chain of title on all current owner title searches.
- We require a completed abstract report with every search.  See attached LFC report for required information.
- The current source information must be an insured cash deed. (If the current deed is was an assumption or a divorce type transfer, then you will need to go back to the original deed for money).  ** Please note – credit unions, finance companies and individuals are not good purchase money mortgages.  If you detect a quit claim deed, land contract, and/or contract for deed we need you to report the previous insured deed.
- A copy of the current vesting deed with a complete legal description (include out conveyances for "Less and Except"…) is required with every search.  Please provide copies of all deeds forward of the cash deed.
- Report the current "Effective" or "Through" date of the public records.
- Check all names on the instruments, if not signed exactly as deeded, please report the difference.
- Report Taxes, report next tax due date, indicate Tax ID # or Parcel # on the prescribed tax form provided by LFC.
- Report the current assessment.
- Show all open mortgages/deeds of trust, and state whether they are closed ended, open ended or credit lines.
- Check for and send copies of all open UCC and Financing Statements (Report only the those that attach to the real estate, if you are unsure if it secures real estate, please report it).
- Check for and send copies of Judgments on all parties with interest in the real estate for the full term in which judgments can be enforced in your state. ** Report all possible judgments found even if they do not attach, LFC's Title Underwriters will determine to report them or not.
- Check for Probates, Wills or lists of heirs when the Grantee(s) or Grantor(s) are assumed to be deceased (In VA, recitation in deeds of a death is sufficient).

### Property Report

Other names are O & E report or Owner & Encumbrance Report – Must include all of the same information included in the Standard search.

### Recording the Mortgage or Deed(s)

If you do recordings and are asked to record a mortgage/deed of trust for LFC prior to recording, you must do a brief update from the through date or as of date of your last search to ensure that there are no intervening liens. If upon the update you find an intervening lien, you must contact LFC immediately and prior to recording. When you receive a mortgage/deed of trust to be recorded, you should have received a phone call from someone here in our office to let you know that it was coming to you and when it would have needed to be recorded. Be sure that the document is recorded by the date requested and call the LFC recording information. The Mortgage /deed of trust should then be overnighted back to the LFC office, if applicable.

### Purchase Search or Full Search

Will include all of the information in the Standard search, but will comply with State requirements for length of search. If there is no specified time frame, you will search back a minimum of 30 years. In addition, all easements, restrictions and covenants affecting the property will also be listed. You will be required to run all buyers and sellers for judgments and bankruptcies also.

# Vendor Fee Schedule and Coverage Area

Please attach an additional sheet if you have different fees for different counties. Please note that the descriptions listed here for each product are general and that a cover letter follows each order that further describes what is needed for the order. Fees must be listed by county. These fees must be flat fees (we do not pay hourly rates) and if there is any additional cost for making copies, please include these in the flat rate. These fees must be the only fees you charge up until the point that a written fee increase request is submitted and subsequently approved. Only under special and pre-approved circumstances may you deviate from this schedule.

Counties Covered - _____ ____, _____, _____, _____

Update Only – Update the entire search from the date of your last search to
ensure that there are no intervening liens.................................................... $ _____

Recording Only – record the
document..................................................................................... $ _____

Standard Search – (One Owner, Current Owner) – Search from
The current deed holder forward (must be a valid purchase money deed), must
Include all the required Standard search information and copies......................... $ _____

Purchase Search or Full Search – Search all buyers and sellers for the
Full statutory period required by your state (30 year minimum), must also
Include all required copies as stated in the Standard search as well as bankruptcies
and all Easements, restrictions and covenants that affect the property.................. $ _____

Certified Tax Search – obtain a Tax Certificate or tax search for the property.
Your fee must include a copy of the tax record.............................................. $ _____

UCC Search – Obtain any and all UCC or Financing statements only for a certain
Property..................................................................................... $ _____

Judgment Search Only – Obtain any and all judgment information against
Any individual or on a certain property..................................................... $ _____

Bankruptcy Search Only – Obtain any and all Bankruptcy information
Against an individual....................................................................... $ _____

Other Searches Performed – Please provide a list of other searches that you perform along with the fees for those searches. (Please attach a separate sheet for these searches along with a definition of what they include).

Signature: _____ _____ _____ _____ _____

Please Print Name: _____ _____ _____

Date: _____ _____ _____ _____

Return documents to Matt Morris via email at mmorris@lendersfc.com or via fax at 888.899.6231. If any questions please call at 214.618.7824. Lenders First Choice, 3803 Parkwood Blvd, Suite 100, Frisco, TX, 75034

Hall-Frazier
Record - 000709



Current Service Areas

**Hall-Frazier**
**Record - 000710**

## Lenders First Choice Abstractor Report

Search Fee (including copy costs) $_____

C Order #_____    Search Date_____    Effective Date_____

## Deed Information

ntor (exactly as shown on deed)    Deed book_____    Page_____    Recorded_____

t Name_____    Middle Name_____    Last Name_____

t Name_____    Middle Name_____    Last Name_____

iitional_____    _____

ntee (exactly as shown on deed)    Deed book_____    Page_____    Recorded_____

: Name_____    Middle Name_____    Last Name_____

: Name_____    Middle Name_____    Last Name_____

itional_____    _____

## Mortgage Information

ortgage Holder_____    Dated_____    Recorded_____    Book_____    Page_____    $_____

ssigned to _____    Dated_____    Recorded_____    Book_____    Page_____

ortgage Holder_____    Dated_____    Recorded_____    Book_____    Page_____    $_____

ssigned to _____    Dated_____    Recorded_____    Book_____    Page_____

Mortgage Holder_____    Dated_____    Recorded_____    Book_____    Page_____    $_____

ssigned to _____    Dated_____    Recorded_____    Book_____    Page_____

nents, Tax Liens or UCC's:    Yes or No (please circle)    If yes, please supply copies of each.

nformation_____

dentification Number (APN)_____

e list any special comments here_____

*ictor report.doc*                                                                *J Bertrand 07/22/04*

Hall-Frazier
Record - 000711



TO : ALL ABSTRACTORS

FROM: LENDERS FIRST CHOICE VENDOR COORDINATION
      214-618-7740 – JAMES BERTRAND

GOOD MORNING TO ALL ABSTRACTORS:

EFFECTIVE IMMEDIATELY, LENDERS FIRST CHOICE IS REQUIRING OUR ABSTRACTORS TO PROVIDE THE FOLLOWING TAX INFORMATION WITH YOUR SEARCH (SEE BELOW).

    A. COUNTY TAXES
    B. CITY/TOWN (WHERE APPLICABLE)
    C. SCHOOL (WHERE APPLICABLE)
    D. MISC. TAXES

REQUIRED INFORMATION FROM ALL AGENCIES:

    1. CURRENT TAX YEAR:
    2. TAX DUE DATES:
    3. CURRENT TAX YEAR AMOUNTS: PAID, OPEN, DELIQUENT AND THE AMOUNTS:
    4. AMOUNT OF TAXES PAID FOR LAST YEAR:
    5. DELIQUENT TAXES: YEAR, AMOUNT AND GOOD THROUGH DATE

THE SEARCH WITH TAX INFORMATION IS DUE BACK IN OUR OFFICE WITHIN 8 BUSINESS HOURS OF YOUR RECEIPT OF OUR ORDER. PLEASE USE ATTACHED FORMS WHEN REMITTING SEARCH BACK TO LFC.

YOUR SEARCH SHOULD BE FAXED TO 866-221-0282.

IF YOU HAVE ANY QUESTIONS ABOUT THIS SMALL CHANGE IN PROCEDURE OR YOU ARE UNABLE TO PROVIDE THE ABOVE REQUESTED INFORMATION, PLEASE FEEL FREE TO CALL EITHER:

CALL – JAMES BERTRAND (214-618-7740)
E-MAIL – JBERTRAND@LENDERSFC.COM

THANK YOU VERY MUCH,

LENDERS FIRST CHOICE VENDOR COORDINATION



3803 Parkwood Blvd., Suite 100, Frisco, TX 75034 ◆ ph 214-618-5100 ◆ fax 214-618-4998



## TAX REPORT FORM

COUNTY _____          CITY/TOWN _____          SCHOOL _____

CURRENT TAX YEAR: 20_____ - 20_____          APN: _____

CURRENT TAX AMOUNTS: ANNUAL _____ DUE _____ PAID _____

SEMI – ANNUAL - 1ST ½ _____ DUE _____ PAID_____
2ND ½ _____ DUE _____ PAID _____

QUARTERLY –   1ST ¼ _____ DUE _____ PAID_____
2ND ¼ _____ DUE _____ PAID _____
3RD ¼ _____ DUE _____ PAID _____
4TH ¼ _____ DUE _____ PAID _____

TAX DUE DATES (FIRST DAY TAXES CAN BE PAID): ANNUAL _____

SEMI-ANNUAL 1ST ½ _____
2ND ½ _____

QUARTERLY   1ST ¼ _____
2ND ¼ _____
3RD ¼ _____
4TH ¼ _____

TAX DUE DATES (LAST DAY TAXES CAN BE PAID): ANNUAL _____

SEMI-ANNUAL 1ST ½ _____
2ND ½ _____

QUARTERLY   1ST ¼ _____
2ND ¼ _____
3RD ¼ _____
4TH ¼ _____

DELIQUENT TAXES:   AMOUNT DUE: _____   GOOD THRU: _____

3803 Parkwood Blvd., Suite 100, Frisco, TX 75034   ◆   ph 214-618-5100   ◆   fax 214-618-4998



UNITED GENERAL TITLE
INSURANCE COMPANY

ALABAMA RATE MANUAL

October 1, 2001

PLAINTIFF'S
EXHIBIT

6

APPROVED        EFFECTIVE

SEP 13 '01        OCT  1 '01

Alabama Dept of Insurance

·THE STATE OF ALABAMA shall be split into two zones. Zone 2 shall consist of the following counties: Baldwin, Clarke, Coffee, Conecuh, Covington, Dale, Escambia, Geneva, Henry, Houston, Mobile, Monroe, and Washington. Zone 1 shall consist of any county not in Zone 2.

### ORIGINAL RATE FOR OWNER'S OR LEASEHOLD OWNER'S POLICIES

An owner's policy, insuring a fee simple estate, shall not be issued for less than the full value of the premises. An owner's policy, insuring a leasehold estate, shall not be issued for less than the full value of the insurable interest of the lessee.

The premium charge for original owner's and leaseholder's insurance shall be:

| | Rate Per $1,000 or Fraction Thereof | |
|---|---|---|
| | Zone 1 | Zone 2 |
| Up to and including $50,000 | $ 4.00 | $ 3.50 |
| Over $50,000 to $100,000 add | $ 4.00 | $ 3.00 |
| Over $100,000 to $1,000,000 add | $ 3.00 | $ 2.00 |
| Over $1,000,000 to $5,000,000 add | $ 2.00 | $ 2.00 |
| Over $5,000,000 to $10,000,000 add | $ 2.00 | $ 1.75 |
| Over $10,000,000 add | $ 1.50 | $ 1.50 |
| | | |
| Minimum Premium | $50.00 | $50.00 |

### REISSUE RATE FOR OWNER'S OR LEASEHOLD POLICIES

A Reissue Rate is a credit given to purchasers of title policies who qualify under the conditions specified below. Reissue rates apply up to the face amount of the previous original policy. If more insurance is desired than was written in the previous policy, the coverage must be computed at the original rate in the applicable bracket or brackets.

A purchaser or lessee of real estate from one whose title thereto as owner has been insured within ten years prior to the application for a new policy shall be entitled to a reissue rate for owner's insurance, provided this Company is advised of the number of the owner's policy and its amount.

The reissue rate shall be sixty percent (60%) of the original rate as follows:

| | Rate Per $1,000 or Fraction Thereof | |
|---|---|---|
| | Zone 1 | Zone 2 |
| Up to and including $50,000 | $ 2.40 | $ 2.10 |
| Over $50,000 to $100,000 add | $ 2.40 | $ 1.80 |
| Over $100,000 to $1,000,000 add | $ 1.80 | $ 1.20 |
| Over $1,000,000 to $5,000,000 add | $ 1.20 | $ 1.20 |
| Over $5,000,000 to $10,000,000 add | $ 1.20 | $ 1.05 |
| Over $10,000,000 add | $ .90 | $ .90 |
| | | |
| Minimum Premium | $50.00 | $50.00 |

An owner who is the mortgagor in an outstanding loan shall be entitled to the reissue rate up to the amount of the loan policy upon application for an owner's policy on the same property as that covered by the loan policy; provided, however, the application for the owner's policy is within ten years of the loan policy.

APPROVED    EFFECTIVE
SEP 13 '01    OCT 1 '01
Alabama Dept of Insurance

Alabama Rates – Effective 10-1-01

## ORIGINAL RATE FOR LOAN POLICIES (FIRST MORTGAGES)

A first mortgage policy cannot be issued for an amount less than the full principal debt. A policy can, however, be issued for an amount up to 20% in excess of the principal debt to cover interest, foreclosure costs, etc.

Mortgage insurance expires with the payment or the satisfaction of the mortgage described in the policy, except when satisfied by foreclosure or other lawful means of acquiring title in settlement of the mortgage debt. A new mortgage given to renew an old mortgage debt which was originally covered by insurance is a new transaction, creating new liability, and, if insured, carries the original mortgage rate, unless it falls within the classification of "Reissue Title Insurance Rates for Loan Policies (First Mortgages)" or "Title Insurance Rates for Substitution Loans".

The premium charge for original first mortgage title insurance shall be:

|  | Rate Per $1,000 or Fraction Thereof | |
|---|---|---|
|  | Zone 1 | Zone 2 |
| Up to and including $50,000 | $ 3.00 | $ 2.50 |
| Over $50,000 to $100,000 add | $ 3.00 | $ 2.00 |
| Over $100,000 to $500,000 add | $ 2.50 | $ 1.75 |
| Over $500,000 to $1,000,000 add | $ 2.50 | $ 1.50 |
| Over $1,000,000 to $10,000,000 add | $ 1.50 | $ 1.50 |
| Over $10,000,000 add | $ 1.25 | $ 1.25 |
| Minimum Premium | $50.00 | $50.00 |

## REISSUE RATES FOR LOAN POLICIES (FIRST MORTGAGES)

The reissue rate is applicable when, within ten years prior to the application for the loan policy, a policy has been issued on the identical property,

a.      to the mortgagor as owner, or

b.      to a mortgagee for the same mortgagor.

Provided this Company is advised of the number of the former policy and its amount, the reissue rates on such mortgage insurance up to the original face amount of such policy shall be sixty percent (60%) of the original loan policy rate as follows:

|  | Rate Per $1,000 or Fraction Thereof | |
|---|---|---|
|  | Zone 1 | Zone 2 |
| Up to and including $50,000 | $ 1.80 | $ 1.50 |
| Over $50,000 to $100,000 add | $ 1.80 | $ 1.20 |
| Over $100,000 to $500,000 add | $ 1.50 | $ 1.05 |
| Over $500,000 to $1,000,000 add | $ 1.50 | $ .90 |
| Over $1,000,000 to $10,000,000 add | $ .90 | $ .90 |
| Over $10,000,000 add | $ .75 | $ .75 |
| Minimum Premium shall be no less than: | $50.00 | $50.00 |

APPROVED                    EFFECTIVE

SEP 1 2 '01                    OCT 1 '01

If the amount of insurance desired under the new loan policy is in excess of the previous policy, the excess shall be computed at the original rates in the applicable bracket or brackets.

Alabama Dept of Insurance

Alabama Rates – Effective 10/1/01

2

Hall-Frazier
Record - 000716

## RATES FOR LOAN POLICIES (SECOND MORTGAGES)

The rates for title insurance on second mortgage transactions will be the same as on first mortgage transactions, provided that the first mortgage has been insured. Where the first mortgage has not been insured, the premium for second mortgage insurance shall be computed at rates equivalent to **Original Title Insurance Rates for Owner's or Leaseholder's Policies.**.

## SIMULTANEOUS ISSUANCE OF OWNER'S/LEASEHOLDER'S AND LOAN POLICIES

When an owner's or leaseholder's policy and a loan policy covering the identical property are issued simultaneously, the rates applicable for the owner's policy shall be the regular owner's rates. The premium for the loan policy (first mortgage policy only) so simultaneously issued shall be **$30.00** for the amount of insurance not in excess of the owner's or leaseholder's policy. The premium on the amount of the loan policy, if any, exceeding the owner's or leaseholder's policy is figured at the regular original title insurance rates for "first mortgages" in the applicable bracket or brackets.

In all cases, the owner's or leaseholder's policy shall be issued for not less then the full value of the premises, if insuring a fee simple estate, or not less than the insurable interest of the lessee, if insuring a leasehold estate. The title must be certified down to a date which will include the filing for record of both the deed or lease and the mortgage itself. Both policies must bear the same effective date and the owner's and leaseholder's policy must show the mortgage as an exception. It is not essential that the fee simple or leasehold estate be acquired simultaneously with the issuance of owner's or leaseholder's loan policies.

The simultaneous rate **does not** apply to simultaneous first and second mortgage transactions.

## SIMULTANEOUS ISSUANCE OF TWO OWNER'S POLICIES INSURING THE FEE TITLE

When two owner's policies covering identical property are issued simultaneously to different insureds, the regular owner's rates shall apply to the policy in the larger amount and the premium on the other policy shall be computed at 30% of the original owner's rates with a minimum premium of $30.00 for each policy.

## SIMULTANEOUS ISSUANCE OF OWNER'S AND LEASEHOLDER'S POLICIES

When owner's and leaseholder's policies covering identical property are issued simultaneously, the rates for the owner's policy shall be the regular owner's rates. The rates for the leaseholder's policy shall be 30% of the rates for the owner's policy up to the amount of the owner's policy with a minimum premium of $30.00

The premium on the amount of the leaseholder's policy, if any, exceeding the owner's policy shall be computed at the regular owner's rates in the applicable bracket or brackets. Both policies must bear the same effective date and the owner's or leaseholder's policy must show the loan as an exception.

EFFECTIVE

SEP 13 '01          OCT 1 '01

Alabama Rates – Effective 10/1/01

## CONSTRUCTION OR LAND DEVELOPMENT LOAN POLICY, BINDER OR COMMITMENT RATES

A.   Construction or Land Development Loan Binder or Commitment

The Company will, upon request, issue an interim title insurance binder or commitment good for a period not to exceed two years in connection with a temporary construction loan at the following rate:

|  | Rate Per $1,000 or fraction thereof Zones 1 & 2 |
|---|---|
| Up to and including $100,000 | $ 2.00 |
| Over $100,000 | $ 1.00 |
| Minimum Premium | $30.00 |

The construction loan binder or commitment will be issued only in connection with a temporary and short term loan for the financing of construction or land development secured by a temporary mortgage or deed of trust as distinguished from a permanent mortgage or deed of trust securing a permanent loan and must contain the following exception under Schedule B:

"Any lien or right to a lien for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records."

If the particular policy committed for under the temporary construction or land development loan binder or commitment is requested, premium therefore will be at the applicable rates for loan policies. However, after computing the premium at the applicable rates for loan policies, credit will be allowed for the lesser of (1) one-half of the premium upon the permanent policy, or (2) the premium paid for the construction or land development loan binder or commitment.

B.   Construction or Land Development Loan Policy

When a policy, rather than a binder or commitment, is issued in connection with a temporary construction or land development loan, the rate shall be the regular rate for loan policies.

When such policy is followed by a loan policy upon a mortgage or deed of trust securing a permanent loan, and there is no change in the mortgagor, there shall be credited against the premium upon the permanent policy the lesser of (1) one-half of the premium upon the permanent policy or (2) one-half of the premium (but not of any endorsement charges) upon the construction or land development loan policy.

When the insured mortgagee under a prior policy of title insurance acquires title to a one-to-four family residence by foreclosure or by voluntary conveyance in extinguishment of debt and transfers the residence to any governmental or private agency in connection with a claim arising out of the agency's business of insuring or guaranteeing the repayment of mortgage loans and the agency has acquired the residence for immediate resale, this

Alabama Rates – Effective 10/1/01

EFFECTIVE
SEP 1 5 '01     OCT 1 '01

Alabama Dept. of Insurance

**Hall-Frazier**
**Record - 000718**

Company will issue its interim binder or commitment good for twenty-four months, committing for an owner's policy in favor of the agency or its resale purchaser, at a rate of $1.50 per thousand of liability ($30.00 minimum). The owner's policy committed for shall be issued at the reissue rate set forth on Pages 1 and 2. No credit shall be given for the amount paid for the interim binder or commitment whether the policy is issued to the agency or its purchaser.

The rates set out for the issuance of the binder/commitment and/or the policy of insurance are exclusive of customary search, abstracting, attorney's fee or other charges incurred in the preparation of the title for insurance.

Alabama Rates – Effective 10/1/01

APPROVED          EFFECTIVE

SEP 13 '01          OCT 1 '01
                    5
Alabama Dept of Insurance

## UNITED GENERAL TITLE INSURANCE COMPANY

### MASTER LOAN POLICY FOR RESIDENTIAL HOME EQUITY MORTGAGES

The following rate shall apply to the Master Loan Policy Declaration Certificate for amounts of insurance (not to exceed $250,000):

| | |
|---|---|
| $0 to $100,000 of liability written the rate is: | $45.00 |
| $101,000 to $250,000 of liability written the rate is: | $65.00 |

**NOTICE:** This is not a standard ALTA Loan Policy. This is a special policy designed specifically for junior priority loans providing limited protections concerning only those matters specifically defined in the Insuring Provisions set forth within the Master Loan Policy.

APPROVED            EFFECTIVE

JUN 1 6 '04         JUN 0 1 '04

ALABAMA DEPT OF INSURANCE

ALABAMA (Effective date for use      )

THE STATE OF ALABAMA shall be split into two zones. Zone 2 shall consist of the following counties: Baldwin, Clarke, Coffee, Conecuh, Covington, Dale, Escambia, Geneva, Henry, Houston, Mobile, Monroe, and Washington. Zone 1 shall consist of any county not in Zone 2.

## ORIGINAL RATE FOR OWNER'S OR LEASEHOLD OWNER'S POLICIES

An owner's policy, insuring a fee simple estate, shall not be issued for less than the full value of the premises. An owner's policy, insuring a leasehold estate, shall not be issued for less than the full value of the insurable interest of the lessee.

An additional 20% will be charged for the Homeowner's policy as reflected in the chart below.

The premium charge for original owner's and leaseholder's insurance shall be:

| | Rate Per $1,000 or Fraction Thereof | | | |
|---|---|---|---|---|
| | Owner's Policy | | Homeowners | |
| | Zone 1 | Zone 2 | Zone 1 | Zone 2 |
| Up to and including $50,000 | $ 4.00 | $ 3.50 | $ 4.80 | $4.20 |
| Over $50,000 to $100,000 **add** | $ 4.00 | $ 3.00 | $ 4.80 | $3.60 |
| Over $100,000 to $1,000,000 **add** | $ 3.00 | $ 2.00 | $ 3.60 | $2.40 |
| Over $1,000,000 to $5,000,000 **add** | $ 2.00 | $ 2.00 | $ 2.40 | $2.40 |
| Over $5,000,000 to $10,000,000 **add** | $ 2.00 | $ 1.75 | $ 2.40 | $2.10 |
| Over $10,000,000 **add** | $ 1.50 | $ 1.50 | $ 1.80 | $1.80 |
| | | | | |
| Minimum Premium | $50.00 | $50.00 | $60.00 | $60.00 |

## REISSUE RATE FOR OWNER'S OR LEASEHOLD POLICIES

A Reissue Rate is a credit given to purchasers of title policies who qualify under the conditions specified below. Reissue rates apply up to the face amount of the previous original policy. If more insurance is desired than was written in the previous policy, the coverage must be computed at the original rate in the applicable bracket or brackets.

A purchaser or lessee of real estate from one whose title thereto as owner has been insured within ten years prior to the application for a new policy shall be entitled to a reissue rate for owner's insurance, provided this Company is advised of the number of the owner's policy and its amount.

The reissue rate shall be sixty percent (60%) of the original rate as follows:

| | Rate Per $1,000 or Fraction Thereof | | | |
|---|---|---|---|---|
| | Owner's Policy | | Homeowners | |
| | Zone 1 | Zone 2 | Zone 1 | Zone 2 |
| Up to and including $50,000 | $ 2.40 | $ 2.10 | $2.88 | $2.52 |
| Over $50,000 to $100,000 **add** | $ 2.40 | $ 1.80 | $2.88 | $2.16 |
| Over $100,000 to $1,000,000 **add** | $ 1.80 | $ 1.20 | $2.16 | $1.44 |
| Over $1,000,000 to $5,000,000 **add** | $ 1.20 | $ 1.20 | $1.44 | $1.44 |
| Over $5,000,000 to $10,000,000 **add** | $ 1.20 | $ 1.05 | $1.44 | $1.26 |
| Over $10,000,000 **add** | $ .90 | $ .90 | $1.08 | $1.08 |
| | | | | |
| Minimum Premium | $50.00 | $50.00 | $60.00 | $60.00 |

Alabama Rates                                                                                           1

An owner who is the mortgagor in an outstanding loan shall be entitled to the reissue rate up to the amount of the loan policy upon application for an owner's policy on the same property as that covered by the loan policy; provided, however, the application for the owner's policy is within ten years of the loan policy.

### ORIGINAL RATE FOR LOAN POLICIES (FIRST MORTGAGES)

A first mortgage policy cannot be issued for an amount less than the full principal debt. A policy can, however, be issued for an amount up to 20% in excess of the principal debt to cover interest, foreclosure costs, etc.

Mortgage insurance expires with the payment or the satisfaction of the mortgage described in the policy, except when satisfied by foreclosure or other lawful means of acquiring title in settlement of the mortgage debt. A new mortgage given to renew an old mortgage debt which was originally covered by insurance is a new transaction, creating new liability, and, if insured, carries the original mortgage rate, unless it falls within the classification of "Reissue Title Insurance Rates for Loan Policies (First Mortgages)" or "Title Insurance Rates for Substitution Loans".

An additional 20% will be charged for the Expanded Loan Policy as reflected in the chart below.

The premium charge for original first mortgage title insurance shall be:

|  | Rate Per $1,000 or Fraction Thereof | | | |
|  | Loan Policy | | Expanded Loan | |
|  | Zone 1 | Zone 2 | Zone 1 | Zone 2 |
|---|---|---|---|---|
| Up to and including $50,000 | $ 3.00 | $ 2.50 | $3.60 | $3.00 |
| Over $50,000 to $100,000 **add** | $ 3.00 | $ 2.00 | $3.60 | $2.40 |
| Over $100,000 to $500,000 **add** | $ 2.50 | $ 1.75 | $3.00 | $2.10 |
| Over $500,000 to $1,000,000 **add** | $ 2.50 | $ 1.50 | $3.00 | $1.80 |
| Over $1,000,000 to $10,000,000 **add** | $ 1.50 | $ 1.50 | $1.80 | $1.80 |
| Over $10,000,000 **add** | $ 1.25 | $ 1.25 | $1.50 | $1.50 |
|  |  |  |  |  |
| Minimum Premium | $50.00 | $50.00 | $60.00 | $60.00 |

### REISSUE RATES FOR LOAN POLICIES (FIRST MORTGAGES)

The reissue rate is applicable when, within ten years prior to the application for the loan policy, a policy has been issued on the identical property,

      a.    to the mortgagor as owner, or
      b.    to a mortgagee for the same mortgagor.

Provided this Company is advised of the number of the former policy and its amount, the reissue rates on such mortgage insurance up to the original face amount of such policy shall be sixty percent (60%) of the original loan policy rate as follows:

| | Rate Per $1,000 or Fraction Thereof | | | |
|---|---|---|---|---|
| | Loan Policy | | Expanded Loan | |
| | Zone 1 | Zone 2 | Zone 1 | Zone 2 |
| Up to and including $50,000 | $1.80 | $1.50 | $2.16 | $1.80 |
| Over $50,000 to $100,000 add | $1.80 | $1.20 | $2.16 | $1.44 |
| Over $100,000 to $500,000 add | $1.50 | $1.05 | $1.80 | $1.32 |
| Over $500,000 to $1,000,000 add | $1.50 | $.90 | $1.80 | $1.08 |
| Over $1,000,000 to $10,000,000 add | $.90 | $.90 | $1.08 | $1.08 |
| Over $10,000,000 add | $.75 | $.75 | $.90 | $.90 |
| | | | | |
| Minimum Premium: | $50.00 | $50.00 | $60.00 | $60.00 |

If the amount of insurance desired under the new loan policy is in excess of the previous policy, the excess shall be computed at the original rates in the applicable bracket or brackets.

### RATES FOR LOAN POLICIES (SECOND MORTGAGES)

The rates for title insurance on second mortgage transactions will be the same as on first mortgage transactions, provided that the first mortgage has been insured. Where the first mortgage has not been insured, the premium for second mortgage insurance shall be computed at rates equivalent to **Original Title Insurance Rates for Owner's or Leaseholder's Policies.**

### SIMULTANEOUS ISSUANCE OF OWNER'S/LEASEHOLDER'S AND LOAN POLICIES

When an owner's or leaseholder's policy and a loan policy covering the identical property are issued simultaneously, the rates applicable for the owner's policy shall be the regular owner's rates. The premium for the loan policy (first mortgage policy only) so simultaneously issued shall be **$30.00** for the amount of insurance not in excess of the owner's or leaseholder's policy. The premium on the amount of the loan policy, if any, exceeding the owner's or leaseholder's policy is figured at the regular original title insurance rates for "first mortgages" in the applicable bracket or brackets.

In all cases, the owner's or leaseholder's policy shall be issued for not less then the full value of the premises, if insuring a fee simple estate, or not less than the insurable interest of the lessee, if insuring a leasehold estate. The title must be certified down to a date which will include the filing for record of both the deed or lease and the mortgage itself. Both policies must bear the same effective date and the owner's and leaseholder's policy must show the mortgage as an exception. It is not essential that the fee simple or leasehold estate be acquired simultaneously with the issuance of owner's or leaseholder's loan policies.

The simultaneous rate **does not** apply to simultaneous first and second mortgage transactions.

Hall-Frazier
Record - 000723

**SIMULTANEOUS ISSUANCE OF TWO OWNER'S POLICIES INSURING THE FEE TITLE**

When two owner's policies covering identical property are issued simultaneously to different insureds, the regular owner's rates shall apply to the policy in the larger amount and the premium on the other policy shall be computed at 30% of the original owner's rates with a minimum premium of $30.00 for each policy.

**SIMULTANEOUS ISSUANCE OF OWNER'S AND LEASEHOLDER'S POLICIES**

When owner's and leaseholder's policies covering identical property are issued simultaneously, the rates for the owner's policy shall be the regular owner's rates. The rates for the leaseholder's policy shall be 30% of the rates for the owner's policy up to the amount of the owner's policy with a minimum premium of $30.00.

The premium on the amount of the leaseholder's policy, if any, exceeding the owner's policy shall be computed at the regular owner's rates in the applicable bracket or brackets. Both policies must bear the same effective date and the owner's or leaseholder's policy must show the loan as an exception.

**CONSTRUCTION OR LAND DEVELOPMENT LOAN POLICY,
BINDER OR COMMITMENT RATES**

A.    Construction or Land Development Loan Binder or Commitment

The Company will, upon request, issue an interim title insurance binder or commitment good for a period not to exceed two years in connection with a temporary construction loan at the following rate:

|  | Rate Per $1,000 or fraction thereof Zones 1 & 2 |
|---|---|
| Up to and including $100,000 | $ 2.00 |
| Over $100,000 | $ 1.00 |
| Minimum Premium | $30.00 |

The construction loan binder or commitment will be issued only in connection with a temporary and short term loan for the financing of construction or land development secured by a temporary mortgage or deed of trust as distinguished from a permanent mortgage or deed of trust securing a permanent loan and must contain the following exception under Schedule B:

"Any lien or right to a lien for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records."

If the particular policy committed for under the temporary construction or land development loan binder or commitment is requested, premium therefore will be at the applicable rates for loan policies. However, after computing the premium at the applicable rates for loan policies, credit will be allowed for the lesser of (1) one-half of the premium upon the permanent policy, or (2) the premium paid for the construction or land development loan binder or commitment.

Hall-Frazier
Record - 000724

B.     Construction or Land Development Loan Policy

When a policy, rather than a binder or commitment, is issued in connection with a temporary construction or land development loan, the rate shall be the regular rate for loan policies.

When such policy is followed by a loan policy upon a mortgage or deed of trust securing a permanent loan, and there is no change in the mortgagor, there shall be credited against the the agency or its resale purchaser, at a rate of $1.50 per thousand of liability ($50.00 minimum). The owner's policy committed for shall be issued at the reissue rate set forth on Pages 1 and 2. No credit shall be given for the amount paid for the interim binder or commitment whether the policy is issued to the agency or its purchaser.

The rates set out for the issuance of the binder/commitment and/or the policy of insurance are exclusive of customary search, abstracting, attorney's fee or other charges incurred in the preparation of the title for insurance.

# UNITED GENERAL TITLE INSURANCE COMPANY

## MASTER LOAN POLICY FOR RESIDENTIAL HOME EQUITY MORTGAGES

The following rate shall apply to the Master Loan Policy Declaration Certificate for amounts of insurance (not to exceed $250,000):

| | |
|---|---|
| $0 to $100,000 of liability written the rate is: | $45.00 |
| $101,000 to $250,000 of liability written the rate is: | $65.00 |

**NOTICE:** This is not a standard ALTA Loan Policy. This is a special policy designed specifically for junior priority loans providing limited protections concerning only those matters specifically defined in the Insuring Provisions set forth within the Master Loan Policy.

APPROVED          EFFECTIVE

JUN 1 6 '04      JUN 0 1 '04

ALABAMA DEPT OF INSURANCE

ALABAMA (Effective date for use     )·

**US Department of Housing and Urban Development**
(Printed on Jan 18, 2008 @ 12:46)                                                                OMB No 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

File Number: 36-01885785   Loan Number: 0143441640   Mortgage Ins. Case #:

NAME AND ADDRESS OF BORROWER: DERREL W. POWELL, LYNDA B. POWELL, 47 OAK AVE SATSUMA AL 36572-2627

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE - MOBILE 2 1 SAINT LOUIS ST STE 1002 MOBILE, AL 36602-3925

PROPERTY LOCATION: 47 OAK AVE SATSUMA AL 36572-2627

SETTLEMENT AGENT: LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 260 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL,32779

SETTLEMENT DATE:         DISBURSEMENT DATE:

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection With Loan | | 1501. TAXES DUE | |
| 801. Loan Origination Fee | | MOBILE COUNTY | $175.12 |
| 802. Loan Discount 2.329% TO AMERIQUEST | $1,979.65 | 1502. PAYOFF | |
| 803. Appraisal Fee /PROP VAL FEE REIMBURSED TO LENDER | $450.00 | GREEN TREE | $79,289.01 |
| 804. Credit Report | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. APPLICATION FEE TO AMERIQUEST | $360.00 | | |
| 808. TAX SERVICE FEE TO AMERIQUEST | $70.00 | 1505. | |
| 809. FLOOD SEARCH FEE TO AMERIQUEST | $9.00 | | |
| 810. LENDERS PROCESSING FEE TO AMERIQUEST | $626.00 | 1506. | |
| 811. ADMIN FEE TO AMERIQUEST | $239.00 | | |
| 900. Items Required By Lender To Be Paid in Advance | | 1507. | |
| 901. Interest from 01/26/2008 TO 02/01/2008 @$23.99/DAY | $143.94 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515 | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516 | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $250.00 | | |
| 1107. Attorney's Fees | | 1518 | |
| (Includes above item numbers: ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1519 | |
| (Includes above item numbers: ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $79,464.13 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: | $88.00 | 1600. Loan Amount | $85,000.00 |
| 1202. City/county tax/stamps: | $127.50 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $5,298.09 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $79,464.13 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $237.78 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $5,298.09 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____   X_____   X_____
LENDERS FIRST CHOICE        DERREL W. POWELL           LYNDA B. POWELL

**PLAINTIFF'S EXHIBIT**


PROPERTY LOCATION: 71 CARTER DRIVE FLOMATON AL, 36441

SETTLEMENT AGENT:    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:  3850 ROYAL AVE. SIMI VALLEY CA,93063

| SETTLEMENT DATE: | | DISBURSEMENT DATE: | |
|---|---|---|---|
| **L. SETTLEMENT CHARGES** | | **M. DISBURSEMENT TO OTHERS** | |
| **800. Items Payable In Connection With Loan** | | 1501. CREDITOR PAYMENT | |
| 801. Loan Origination Fee | | RBS NB CC | $1,925.00 |
| 802. Loan Discount TO AMC 2.962% OF $108,000.00 | $3,198.96 | 1502. CREDITOR PAYMENT | |
| 803. Appraisal Fee TO REIMBURSE TO LENDER | $450.00 | CBUSA | $1,870.00 |
| 804. Credit Report | | 1503. CREDITOR PAYMENT | |
| 805. Lender's Inspection Fee | | CHASE | $1,703.00 |
| 806. Mortgage Insurance Application Fee | | 1504. PAYOFF 1ST MORTGAGE - ESTIMATED | |
| 807. Tax Related Service Fee to Ameriquest Mortgage | $35.00 | AMC MORTGAGE SERVICES / 35959998 | $73,464.99 |
| 808. Flood Search Fee to Ameriquest Mortgage | $9.00 | 1505. CREDITOR PAYMENT | |
| 809. Lender's Processing Fee to Amerquest Mortgage | $626.00 | DELL FNCL | $1,211.00 |
| 810. Admin to Ameriquest Mortgage | $239.00 | 1506. | |
| 811. Application Fee to Ameriquest Mortgage | $360.00 | | |
| **900. Items Required By Lender To Be Paid In Advance** | | 1507. | |
| 901. Interest from 03/25/2006 TO 04/01/2006 @$21.90/DAY | $153.30 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| **1000. Reserves Deposited With Lender** | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | 1517. | |
| 1106. Signing Fee TO VITAL SIGNING | $160.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers:    ) | | | |
| 1108. Title insurance LENDERS FIRST CHOICE | $275.00 | 1519. | |
| (Includes above item numbers:    ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $80,173.99 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | **N. Net Settlement** | |
| 1113. Alta 6,8.1, 9 TO LENDERS FIRST CHOICE | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording fees: ESTIMATED | $91.00 | 1600. Loan Amount | $108,000.00 |
| 1202. ESTIMATED Mortgage Tax | $162.00 | | |
| 1203. | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. Recording Service Fee LENDERS FIRST CHOICE | $35.00 | 1602. Minus total settlement charges | $6,474.26 |
| **1300. Additional Settlement Charges** | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $80,173.99 |
| 1302. Pest inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $21,351.75 |
| 1304. | | | |
| 1305. | | | |
| **1400. Total settlement charges (enter on line 1602)** | $6,474.26 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ret RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

(Printed on Jan 18, 2006 @ 12:48)                 US Department of Housing and Urban Development                          OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 36-01885785 | Loan Number: 0143441640 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER   DERREL W. POWELL  LYNDA B. POWELL, 47 OAK AVE SATSUMA AL  36572-2627

NAME AND ADDRESS OF LENDER:  AMERIQUEST MORTGAGE - MOBILE 2 1 SAINT LOUIS ST STE 1002 MOBILE  AL  36602-3925

PROPERTY LOCATION  47 OAK AVE SATSUMA AL  36572-2627

SETTLEMENT AGENT:    LENDERS FIRST CHOICE
  PLACE OF SETTLEMENT:  260 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL,32779

| SETTLEMENT DATE: | DISBURSEMENT DATE: |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501 TAXES DUE | |
| 801. Loan Origination Fee | | MOBILE COUNTY | $175.12 |
| 802. Loan Discount 2.329% TO AMERIQUEST | $1,979.65 | 1502. PAYOFF | |
| 803. Appraisal Fee /PROP VAL FEE REIMBURSED TO LENDER | $450.00 | GREEN TREE | $79,289.01 |
| 804. Credit Report | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. APPLICATION FEE TO AMERIQUEST | $360.00 | | |
| 808. TAX SERVICE FEE TO AMERIQUEST | $70.00 | 1505. | |
| 809. FLOOD SEARCH TO AMERIQUEST | $9.00 | | |
| 810. LENDERS PROCESSING FEE TO AMERIQUEST | $626.00 | 1506. | |
| 811. ADMIN FEE TO AMERIQUEST | $239.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 01/26/2008 TO 02/01/2008 @$23.99/DAY | $143.94 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $250.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers:    ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1519. | |
| (includes above item numbers:    ) | | | |
| 1109. Lender's coverage | | 1520 TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $79,464.13 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: | $88.00 | 1600 Loan Amount | $85,000.00 |
| 1202. City/county tax/stamps: | $127.50 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $5,298.09 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603 Minus total Disbursements to | $79,464.13 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $237.78 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $5,298.09 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____        X_____        X_____
LENDERS FIRST CHOICE            DERREL W. POWELL                LYNDA B. POWELL

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE COMPANY 10000 WHITE ROCK ROAD - 95670-6032

PROPERTY LOCATION: 16050 JOHN BAUER RD SUMMERDALE AL, 36580-4139

SETTLEMENT AGENT:   LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 2321 W. MARCH LANE SUITE 210 STOCKTON CA,95207
SETTLEMENT DATE: 12/15/2006          DISBURSEMENT DATE: 12/20/2006

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection With Loan | | 1501. CREDITOR CHECK | |
| 801. Loan Origination Fee | | GFAC | $2,671.00 |
| 802. Loan Discount 0.500% OF $136,000.00 | $680.00 | 1502. PAYOFF ** EST **verf updated payoff** | |
| 803. Appraisal Fee | $375.00 | AMERICAS SERVICING CO | $115,401.44 |
| 804. Credit Report | | 1503. CREDITOR CHECK | |
| 805. Lender's Inspection Fee | | CITIFINANCIAL | $9,291.00 |
| 806. Mortgage Insurance Application Fee | | 1504. TAXES ** EST | |
| 807. Tax Related Service Fee to Ameriquest Mortgage | $70.00 | BALDWIN COUNTY TAX COLLECTOR | $405.24 |
| 808. Flood Search Fee to Ameriquest Mortgage | $7.15 | 1505. | |
| 809. Lender's Processing Fee to Ameriquest Mortgage | $626.00 | | |
| 810. Admin to Ameriquest Mortgage | $239.00 | 1506. | |
| 811. Application Fee to Ameriquest Mortgage | $360.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 12/22/2006 TO 01/01/2007 @$36.33/DAY | $363.30 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for AGGRESSIVE INSURANCE | $2,384.00 | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard insurance 1 month @ $198.67 per month | $198.67 | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes 2 months @ $33.77 per month | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | 1515. | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title Insurance binder | | | |
| 1105. Document preparation | | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $200.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers:   ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $288.00 | 1519. | |
| (includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $127,768.68 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | N. Net Settlement | |
| 1113. Alta 6,8.1, 9 TO LENDERS FIRST CHOICE | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: **EST | $100.00 | 1600. Loan Amount | $136,000.00 |
| 1202. City/county tax/stamps: | $204.00 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. Recording Service Fee to LENDERS FIRST CHOICE | $35.00 | 1602. Minus total settlement charges | $6,877.66 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $127,768.68 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $1,353.66 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $6,977.66 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge this HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

US Department of Housing and Urban Development
**SETTLEMENT STATEMENT (Transactions Without Sellers)**

OMB No: 2502-0491

(Printed on Jan 12, 2006 @ 19:55)

| File Number: 35-01885169 | Loan Number: 0143461887 | Mortgage Ins Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER   VENUS M. ROBBIN, JAMES DAVID ROBBINS JR., 2150 2ND CREEK DRIVE MOBILE AL, 36695

NAME AND ADDRESS OF LENDER:   AMERIQUEST MORTGAGE - MOBILE 2 1 SAINT LOUIS ST STE 1002 MOBILE, AL, 36602-3925

PROPERTY LOCATION: 2150 2ND CREEK DRIVE MOBILE AL, 36695

SETTLEMENT AGENT:    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:  260 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL 32779

| SETTLEMENT DATE: | | DISBURSEMENT DATE: | |
|---|---|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1601. CREDITOR PAYMENT | |
| 801. Loan Origination Fee | | AUTOMTD COLLECTION | $1,701.00 |
| 802. Loan Discount 3.181% TO AMERIQUEST | $5,442.37 | 1602. PAYOFF | |
| 803. Appraisal Fee | | MORTGAGE SERVICE CENTER | $137,330.26 |
| 804. Credit Report | | 1603. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1604. | |
| 807. APPLICATION FEE TO AMERIQUEST | $360.00 | | |
| 808. TAX SERVICE FEE TO AMERIQUEST | $70.00 | 1605. | |
| 809. FLOOD SEARCH FEE TO AMERIQUEST | $9.00 | | |
| 810. LENDERS PROCESSING FEE TO AMERIQUEST | $626.00 | 1606. | |
| 811. ADMIN FEE TO AMERIQUEST | $239.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 01/19/2006 TO 02/01/2006 @$39.14/DAY | $508.82 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006 | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $250.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers:   ) | | | |
| 1108. Title insurance LENDERS FIRST CHOICE | $374.00 | 1519. | |
| (Includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1620. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $139,031.26 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | N. Net Settlement | |
| 1113. | | | |
| 1200. Government Recording and Transfer Charges | | 1600. Loan Amount | $171,000.00 |
| 1201. Recording fees: | $88.00 | | |
| 1202. City/county tax/stamps: | $256.50 | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1203. State tax/stamps: | | | |
| 1204 | | | |
| 1205 | | 1602. Minus total settlement charges | $9,228.69 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603 Minus total Disbursements to | $139,031.26 |
| 1302. Pest inspection | | Others (line 1520) | |
| 1303. PROP / VAL FEE REIMBURSED TO LENDER | $325.00 | 1604. Equals disbursements to borrower | $22,740.05 |
| 1304 | | | |
| 1305 | | | |
| 1400. Total settlement charges (enter on line 1602) | $9,228.69 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____    X_____    X_____
LENDERS FIRST CHOICE    VENUS M. ROBBIN    JAMES DAVID ROBBINS JR.

SETTLEMENT AGENT:   LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 3850 ROYAL AVE. SIMI VALLEY, CA. 93063

| SETTLEMENT DATE: | | DISBURSEMENT DATE: | |
|---|---|---|---|
| **L. SETTLEMENT CHARGES** | | **M. DISBURSEMENT TO OTHERS** | |
| 800. Items Payable In Connection With Loan | | 1601. PAYOFF | |
| 801. Loan Origination Fee | | AMERIQUEST MORTGAGE COMPANY | $123,418.13 |
| 802. Loan Discount 0.900% | $1,166.40 | 1502. CREDITOR PAYMENT | |
| 803. Appraisal Fee PROP VAL TO BORDEN DALE STRICKLAND | $450.00 | MOBILE COUNTY DELIQUENT | $855.31 |
| 804. Credit Report | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. Tax Related Service Fee to Ameriquest Mortgage | $35.00 | | |
| 808. Flood Search Fee to Ameriquest Mortgage | $3.00 | 1505. | |
| 809. Lender's Processing Fee to Ameriquest Mortgage | $525.00 | | |
| 810. Admin to Ameriquest Mortgage | $339.00 | 1506. | |
| 811. Application Fee to Ameriquest Mortgage | $360.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 02-09-06 TO 03-01-06 AT $28.58 | $571.60 | | |
| 902. Mortgage Insurance Premium | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance 2 MONTHS AT $95.42 | $190.84 | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes 4 MONTHS AT $52.50 | $210.00 | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title Insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | $50.00 | 1517. | |
| 1106. Signing Fee VITAL SIGNING | $200.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers:    ) | | | |
| 1108. Title insurance LENDERS FIRST CHOICE | $303.00 | 1519. | |
| (includes above item numbers:    ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $124,053.44 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | **N. Net Settlement** | |
| 1113. | | | |
| 1200. Government Recording and Transfer Charges | | 1600. Loan Amount | $129,600.00 |
| 1201. Recording fees: | $53.00 | | |
| 1202. City/county tax/stamps: | $202.50 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $5,356.34 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $124,053.44 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. | | 1504. Equals disbursements to borrower | $190.22 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $5,356.34 | | |

The undersigned hereby acknowledges receipt of a completed copy of the statement. To the best of my knowledge the HUD-1A the RESPA Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X _____    X _____    X _____
LENDERS FIRST CHOICE                LEE JACKSON                        TARONYA JACKSON



(Printed on Oct 31, 2005 @ 16:55)

US Department of Housing and Urban Development

OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 35-02128755 | Loan Number: 0153339148 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER: VERLETTA GAY DONALD, 610 DRAPER ST MOBILE AL, 36617-3407

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE COMPANY 10600 WHITE ROCK ROAD AREA 93 RANCHO CORDOVA, CA, 95670-6032

PROPERTY LOCATION: 610 DRAPER ST MOBILE AL, 36617-3407

SETTLEMENT AGENT:  LENDERS FIRST CHOICE
      PLACE OF SETTLEMENT: 3850 ROYAL AVE. SIMI VALLEY CA,93063

| SETTLEMENT DATE: 11/01/2006 | DISBURSEMENT DATE: 11/08/2006 |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection With Loan | | 1501. CREDITOR | |
| 801. Loan Origination Fee | | J & J FURN & VERLETTA GAY DONALD | $374.00 |
| 802. Loan Discount 1.597% OF $75,500.00 | $1,205.74 | 1502. CREDITOR | |
| 803. Appraisal Fee | $325.00 | APPLD CRD BK & VERLETTA GAY DONALD | $317.00 |
| 804. Credit Report | | 1503. MORTGAGE PAYOFF **EST** | |
| 805. Lender's Inspection Fee | | AMC MORTGAGE P/O 0140117326 | $61,485.01 |
| 806. Mortgage Insurance Application Fee | | 1504. TAXES **EST** DUE 12/31 | |
| 807. Tax Related Service Fee to Ameriquest Mortgage | $35.00 | MOBILE COUNTY TAX COLLECTOR | $265.74 |
| 808. Flood Search Fee to Ameriquest Mortgage | $7.15 | 1505. | |
| 809. Lender's Processing Fee to Ameriquest Mortgage | $626.00 | | |
| 810. Admin to Ameriquest Mortgage | $239.00 | 1506. | |
| 811. Application Fee to Ameriquest Mortgage | $360.00 | | |
| 900. Items Required by Lender To Be Paid in Advance | | 1507. | |
| 901. Interest from 11/08/2006 TO 12/01/2006 @$16.29/DAY | $374.67 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for NATIONAL SECURITY | $187.50 | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation DEED | $65.00 | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $200.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers:   ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1519. | |
| (includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $62,441.75 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | N. Net Settlement | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. Alta 8.1, 9 TO LENDERS FIRST CHOICE | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: Mortgage/ Deed Filing Fee | $111.00 | 1600. Loan Amount | $75,500.00 |
| 1202. City/county tax/stamps: | $113.25 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. Recording Service Fee to LENDERS FIRST CHOICE | $35.00 | 1602. Minus total settlement charges (Line 1400) | $4,839.31 |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey | | 1603. Minus total Disbursements to Others (line 1520) | $62,441.75 |
| 1302. Pest Inspection | | | |
| 1303. | | 1604. Equals disbursements to borrower | $8,218.94 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $4,839.31 | | |

The undersigned hereby acknowledges receipt of a completed copy of the statement. To the best of my knowledge this HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X _____          X _____
LENDERS FIRST CHOICE                  VERLETTA GAY DONALD

Hall-Frazier
Record - 000733

(Printed on Oct 13, 2005 @ 17:52)

US Department of Housing and Urban Development

OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 35-01792890 | Loan Number: 0509276269 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER:  BARBARA H.  BAKER, 3011 FARCOTT ST MOBILE AL, 36606-2834

NAME AND ADDRESS OF LENDER:  HOME FUNDS DIRECT 3870 ROSIN CT STE 150 SACRAMENTO, CA, 95634-1647

PROPERTY LOCATION: 3011 FARCOTT ST MOBILE AL, 36606-2834

SETTLEMENT AGENT:     LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:  2321 W. MARCH LANE SUITE 210 STOCKTON CA,95207

| SETTLEMENT DATE: 10/14/2005 | DISBURSEMENT DATE: 10/19/2005 |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501. MORTGAGE PAYOFF LOAN # 9000045172 | |
| 801. Loan Origination Fee TO HOME FUNDS | $1,305.00 | EVERHOME MORTAGE COMPANY | $39,463.78 |
| 802. Loan Discount | | 1502. ACCOUNT PAYMENT | |
| 803. Appraisal Fee  POC $300.00 | | GEMB / JCP | $131.00 |
| 804. Credit Report | | 1503. TAXES | |
| 805. Origination Fee Payable to HOME FUNDS DIRECT | | MOBILE COUNTY TAX COLLECTOR | $273.36 |
| 806. Processing Fee to HOME FUNDS DIRECT | $800.00 | 1504. | |
| 807. Underwriting Fee to HOME FUNDS DIRECT | $500.00 | | |
| 808. Flood Cert\Life of Loan to HOME FUNDS DIRECT | $9.50 | 1505. | |
| 809. Tax Service Fee  to HOME FUNDS DIRECT | $66.00 | | |
| 810. Doc Prep Fee to HOME FUNDS DIRECT | | 1506. | |
| 811. Appraisal Review Fee to HOME FUNDS DIRECT | | | |
| 900. Items Required By Lender To Be Paid in Advance | | 1507. | |
| 901. Interest from 10/19/2005 TO 11/01/2005 @$13.51/DAY | $175.63 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance 3 months @ $115.70 per month | $347.15 | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes 2 months @ $22.78 per month | $45.58 | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $-115.73 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | $50.00 | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers:   ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1519. | |
| (includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $39,868.14 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: | $63.00 | 1600. Loan Amount | $49,300.00 |
| 1202. City/county tax/stamps: | $87.75 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $4,289.86 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $39,868.14 |
| 1302. Pest inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $5,142.00 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $4,289.86 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____          X_____
LENDERS FIRST CHOICE                 BARBARA H.  BAKER

Hall-Frazier
Record - 000734

(Printed on Oct 14, 2005 @ 09:59)

US Department of Housing and Urban Development

**SETTLEMENT STATEMENT (Transactions Without Sellers)**

OMB No. 2502-0491

| File Number: 36-01792890 | Loan Number: 0509276269 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER:  BARBARA H. BAKER, 3011 FARCOTT ST MOBILE AL, 36608-2834

NAME AND ADDRESS OF LENDER:  HOME FUNDS DIRECT 3570 ROSIN CT STE 150 SACRAMENTO, CA, 95834-1647

PROPERTY LOCATION: 3011 FARCOTT ST MOBILE AL, 36608-2834

SETTLEMENT AGENT:    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:  2321 W. MARCH LANE SUITE 210 STOCKTON CA,95207

| SETTLEMENT DATE: 10/14/2005 | DISBURSEMENT DATE: 10/19/2005 |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection With Loan | | 1501. MORTGAGE PAYOFF LOAN # 9000045172 | |
| 801. Loan Origination Fee TO HOME FUNDS | $1,306.45 | EVERHOME MORTGAGE COMPANY | $39,463.78 |
| 802. Loan Discount | | 1502. ACCOUNT PAYMENT | |
| 803. Appraisal Fee  POC $300.00 | | GEMB / JCP | $131.00 |
| 804. Credit Report | | 1503. TAXES | |
| 805. Origination Fee Payable to HOME FUNDS DIRECT | | MOBILE COUNTY TAX COLLECTOR | $273.36 |
| 806. Processing Fee to HOME FUNDS DIRECT | $800.00 | 1504. | |
| 807. Underwriting Fee to HOME FUNDS DIRECT | $500.00 | | |
| 808. Flood Cert(Life of Loan to HOME FUNDS DIRECT | $3.50 | 1505. | |
| 809. Tax Service Fee  to HOME FUNDS DIRECT | $56.00 | | |
| 810. Doc Prep Fee to HOME FUNDS DIRECT | | 1506. | |
| 811. Appraisal Review Fee to HOME FUNDS DIRECT | | | |
| 900. Items Required By Lender To Be Paid in Advance | | 1507. | |
| 901. Interest from 10/19/2005 TO 11/01/2005 @$13.51/DAY | $175.63 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance 3 months @ $115.70 per month | $347.15 | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes 2 months @ $22.78 per month | $45.56 | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $-115.73 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title Insurance binder | | | |
| 1105. Document preparation | $50.00 | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers:   ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1519. | |
| (Includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $39,868.14 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: | $83.00 | 1600. Loan Amount | $49,300.00 |
| 1202. City/county tax/stamps: | $87.75 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $4,290.31 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $39,868.14 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $5,141.55 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $4,290.31 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement.  To the best of my knowledge the HUD-1A nd, RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____    X_____
LENDERS FIRST CHOICE         BARBARA H. BAKER

Hall-Frazier
Record - 000735

US Department of Housing and Urban Development
OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 13-00018660 | | Loan Number: 0101611122 | | Mortgage Ins. Case #: |
|---|---|---|---|---|

NAME AND ADDRESS OF BORROWER: VILMA HALL, 2382 ROOSEVELT ST MOBILE AL, 36617-2308

NAME AND ADDRESS OF LENDER: AMERICA'S MORTGAGE COMPANY 1088 WHITE ROCK ROAD SUITE 200-25 RANCHO CORDOVA, CA, 95670-6032

PROPERTY LOCATION: 2382 ROOSEVELT ST MOBILE AL, 36617-2308

SETTLEMENT AGENT:   LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:  3655 ROYAL AVE, SIMI VALLEY CA,93065
SETTLEMENT DATE:                         DISBURSEMENT DATE:

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection With Loan | | 1301. CREDITOR | |
| 801. Loan Origination Fee | | HSBC NV & VILMA HALL | $300.00 |
| 802. Loan Discount 2.000% OF $78,250.00 | $1,297.31 | 1302. CREDITOR | |
| 803. Appraisal Fee | $400.00 | CAPITAL 1 BK & VILMA HALL | $717.00 |
| 804. Credit Report | | 1303. CREDITOR | |
| 805. Lender's Inspection Fee | | CBUSA/SEARS & VILMA HALL | $1,353.00 |
| 806. Mortgage Insurance Application Fee | | 1304. CREDITOR | |
| 807. Tax Related Service Fee to AMC Mortgage Services, Inc. | $70.00 | GMAC & VILMA HALL | $11,364.00 |
| 808. Flood Search Fee AMC Mortgage Services, Inc. | $9.00 | 1305. CREDITOR | |
| 809. Lender's Processing Fee AMC Mortgage Services, Inc. | $826.00 | CHASE & VILMA HALL | $3,704.00 |
| 810. Admin AMC Mortgage Services, Inc. | $233.00 | 1306. CREDITOR | |
| 811. Application Fee AMC Mortgage Services, Inc. | $360.00 | MIDNIGHT & VILMA HALL | $55.00 |
| 900. Items Required By Lender To Be Paid In Advance | | 1307. PAYOFF | |
| 901. Interest from 08/25/2005 TO 07/01/2005 @$19.84/DAY | $49.84 | OPTION ONE MORTGAGE | $56,535.73 |
| 902. Mortgage Insurance Premium for | | 1308. CREDITOR | |
| 903. Hazard Insurance Premium for | | ASSOCIATES & VILMA HALL | $738.00 |
| 904. | | 1309. CREDITOR | |
| 905. | | DISCOVER FIN SVCS LLC & VILMA HALL | $615.00 |
| 1000. Reserves Deposited With Lender | | 1310. | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | 1311. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1312. | |
| 1005. Annual assessments | | | |
| 1006. | | 1313. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | | 1314. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $400.00 | 1315. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1316. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | 1317. | |
| 1106. Closing Fee LDX | $225.00 | | |
| 1107. Attorney's Fees | | 1318. | |
| (includes above item number:       ) | | | |
| 1108. Title insurance LENDERS FIRST CHOICE | $275.00 | 1319. | |
| (includes above item number:       ) | | | |
| 1109. Lender's coverage | | 1320. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $74,391.73 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $20.00 | N. Net Settlement | |
| 1113. Alta 8.8.1, 9 TO LENDERS FIRST CHOICE | | | |
| 1200. Government Recording and Transfer Charges | | 1600. Loan Amount | $79,250.00 |
| 1201. Recording fees: | $55.00 | | |
| 1202. City/county tax/stamps | $118.95 | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1203. State tax/stamps | | | |
| 1204. | | | |
| 1205. Recording Service Fee LENDERS FIRST CHOICE | $35.00 | 1602. Minus total settlement charges (line 1400) | $4,813.20 |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey | | 1603. Minus total disbursements to | $74,391.73 |
| 1302. Pest Inspection | | Others (line 1530) | |
| 1303. | | 1604. Equals disbursements to Borrower | $45.97 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $4,813.20 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1/.1A/. RESPA Settlement Statement is a true and accurate account of the funds received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X _____
LENDERS FIRST CHOICE

X _____
VILMA HALL

(Printed on Jun 12, 2006 @ 09:53)

US Department of Housing and Urban Development

OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 36-02011712 | Loan Number: 0605304391 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER: JONATHAN EDWARDS, SHARRON W. EDWARDS, 11460 HENDERSON CAMP RD GRAND BAY AL, 36541-6712

NAME AND ADDRESS OF LENDER: HOME FUNDS DIRECT 3870 ROSIN CT STE 150 SACRAMENTO, CA, 95834-1647

PROPERTY LOCATION: 11460 HENDERSON CAMP RD GRAND BAY AL, 36541-6712

SETTLEMENT AGENT:    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 2321 W. MARCH LANE SUITE 210 STOCKTON CA,95207

| SETTLEMENT DATE: 06/12/2006 | DISBURSEMENT DATE: 06/16/2006 |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection With Loan | | 1521. MORTGAGE PAYOFF LOAN # 0030640557 | |
| 801. Loan Origination Fee | | AMC MORTGAGE | $44,426.85 |
| 802. Loan Discount | | 1522. ACCOUNT PAYMENT | |
| 803. Appraisal Fee  POC $350.00 | | J & J FURNITURE | $715.00 |
| 804. Credit Report | | 1503. | |
| 805. Origination Fee Payable to HOME FUNDS DIRECT | $3,022.50 | 1504. | |
| 806. Processing Fee to HOME FUNDS DIRECT | | | |
| 807. Underwriting Fee to HOME FUNDS DIRECT | | | |
| 808. Flood Cert/Life of Loan to Inzura Settlement Services | $7.80 | 1505. | |
| 809. Tax Service Fee  to Inzura Settlement Services | $50.00 | | |
| 810. Doc Prep Fee to HOME FUNDS DIRECT | | 1506. | |
| 811. Appraisal Review Fee to HOME FUNDS DIRECT | | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 06/16/2006 TO 07/01/2006 @$16.92/DAY | $253.80 | 1508. | |
| 902. Mortgage Insurance Premium for | | | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | $50.00 | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers:   ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1519. | |
| (includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $45,141.85 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | N. Net Settlement | |
| 1113. ALTA 8.1,9,116 | | | |
| 1200. Government Recording and Transfer Charges | | 1600. Loan Amount | $65,000.00 |
| 1201. Recording fees: | $88.00 | | |
| 1202. City/county tax/stamps: | $97.50 | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1203. State tax/stamps: | | | |
| 1204. | | 1602. Minus total settlement charges | $4,524.80 |
| 1205. | | (Line 1400) | |
| 1300. Additional Settlement Charges | | 1603. Minus total Disbursements to | $45,141.85 |
| 1301. Survey | | Others (line 1520) | |
| 1302. Pest inspection | | 1604. Equals disbursements to borrower | $15,333.55 |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $4,524.80 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement.  To the best of my knowledge the HUD-1A nat. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____    X_____    X_____
LENDERS FIRST CHOICE          JONATHAN EDWARDS              SHARRON W. EDWARDS

(Printed on Jan 24, 2006 @ 11:21)

US Department of Housing and Urban Development                                OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 39-01885436 | Loan Number: 01423596680 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER:  WILLIE MAE GOLSTON, SIMON GOLSTON, 1282 SKYVIEW DR MOBILE AL, 36693-4325

NAME AND ADDRESS OF LENDER:  AMERIQUEST MORTGAGE - MOBILE 2 1 SAINT LOUIS ST STE 1002 MOBILE, AL, 36602-3925

PROPERTY LOCATION: 1282 SKYVIEW DR MOBILE AL, 36693-4325

SETTLEMENT AGENT:   LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:  280 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL,32779

| SETTLEMENT DATE: | DISBURSEMENT DATE: |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501. CREDITOR PAYMENT | |
| 801. Loan Origination Fee | | STATE OF MICHIGAN | $4,503.54 |
| 802. Loan Discount 3.577% TO AMERIQUEST | $4,654.08 | 1502. PAYOFF | |
| 803. Appraisal Fee /PROP VAL FEE REIMBURSED TO LENDER | $450.00 | ACCEPTANCE | $10,451.78 |
| 804. Credit Report | | 1503. TAXES DUE - ESTIMATE | |
| 805. Lender's Inspection Fee | | MOBILE COUNTY TAX COLLECTOR | $625.84 |
| 806. Mortgage Insurance Application Fee | | 1504. PAYOFF | |
| 807. APPLICATION FEE TO AMERIQUEST | $360.00 | NEW SOUTH FEDERAL | $102,369.87 |
| 808. TAX SERVICE FEE TO AMERIQUEST | $70.00 | 1505. | |
| 809. FLOOD SEARCH FEE TO AMERIQUEST | $9.00 | | |
| 810. LENDERS PROCESSING FEE TO AMERIQUEST | $625.00 | 1506. | |
| 811. ADMIN FEE TO AMERIQUEST | $230.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 01/31/2006 TO 02/01/2006 @$28.67/DAY | $28.67 | 1508. | |
| 902. Mortgage Insurance Premium for | | | |
| 903. Hazard Insurance Premium for | | 1509. | |
| 904. | | | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | 1515. | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $350.00 | | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination LENDERS FIRST CHOICE | $400.00 | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers:  ) | | | |
| 1108. Title insurance LENDERS FIRST CHOICE | $304.00 | 1519. | |
| (Includes above item numbers:  ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $118,051.11 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | N. Net Settlement | |
| 1113. | | | |
| 1200. Government Recording and Transfer Charges | | 1600. Loan Amount | $130,950.00 |
| 1201. Recording fees | $68.00 | | |
| 1202. City/county tax/stamps: | $198.50 | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1203. State tax/stamps: | | | |
| 1204. | | 1602. Minus total settlement charges | $7,735.25 |
| 1205. | | (Line 1400) | |
| 1300. Additional Settlement Charges | | 1603. Minus total Disbursements to | $118,051.11 |
| 1301. Survey | | Others (line 1520) | |
| 1302. Pest Inspection | | 1604. Equals disbursements to borrower | $5,163.64 |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $7,735.25 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A nof RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X _____          X _____          X _____
LENDERS FIRST CHOICE                    WILLIE MAE GOLSTON                     SIMON GOLSTON

(Posted on Nov 22, 200 @ 09:54)

US Department of Housing and Urban Development

**SETTLEMENT STATEMENT (Transactions Without Sellers)**

OMB No. 2502-0491

| File Number: 36 |  |  | 2148413 | Loan Number: 0153567722 |  | Mortgage Ins. Case #: |  |
|---|---|---|---|---|---|---|---|
| NAME AND ADDRESS OF BORROWER: ERWIN GRAYSON, LILLIAN GRAYSON, 8311 PINEBOUGH AVE MOBILE AL, 36695-9189 |  |  |  |  |  |  |  |

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE COMPANY 10600 WHITE ROCK ROAD AREA 94 RANCHO CORDOVA, CA, 95670-6032

PROPERTY LOCATION: 8311 PINEBOUGH AVE MOBILE AL, 36695-9189

SETTLEMENT AGENT:    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:
SETTLEMENT DATE: 11/22/2006                         DISBURSEMENT DATE: 11/28/2006

| L. SETTLEMENT CHARGES |  | M. DISBURSEMENT TO OTHERS |  |
|---|---|---|---|
| 800. Items Payable in Connection With Loan |  | 1501. PAYOFF FIRST = ESTIMATE |  |
| 801. Loan Origination Fee |  | AMC MORTGAGE SERVICES | $107,052.15 |
| 802. Loan Discount 1.350% OF $119,520.00 | $1,613.52 | 1502. PAY TAXES - ESTIMATE |  |
| 803. Appraisal Fee |  | MOBILE COUNTY TAX COLLECTOR | $343.31 |
| 804. Credit Report |  | 1503. CREDITOR PAYMENT |  |
| 805. Lender's Inspection Fee |  | CRDT FIRST | $442.00 |
| 806. Mortgage Insurance Application Fee |  | 1504. CREDITOR PAYMENT |  |
| 807. Tax Related Service Fee to Ameriquest Mortgage | $35.00 | AMEX/ LILLIAN AND ERWIN GRAYSON | $2,436.00 |
| 808. Flood Search Fee to Ameriquest Mortgage | $7.15 | 1505. CREDITOR PAYMENT |  |
| 809. Lender's Processing Fee to Ameriquest Mortgage | $826.00 | HSBC/PARIS AND LILLIAN AND ERWIN GRAYSON | $163.00 |
| 810. Admin to Ameriquest Mortgage | $239.00 | 1506. CREDITOR PAYMENT |  |
| 811. Application Fee to Ameriquest Mortgage | $360.00 | GEMB/WALMART AND LILLIAN AND ERWIN GRAYS | $790.00 |
| 900. Items Required By Lender To Be Paid in Advance |  | 1507. CREDITOR PAYMENT |  |
| 901. Interest from 11/28/2006 TO 12/01/2006 @$24.58/DAY | $73.58 | CAPITL 1 FSB AND LILLIAN AND ERWIN GRAYSON | $1,930.00 |
| 902. Mortgage Insurance Premium for |  | 1508. CREDITOR PAYMENT |  |
| 903. Hazard Insurance Premium for |  | DAIMLERCHRYS AND LILLIAN AND ERWIN GRAYS | $925.00 |
| 904. |  | 1509. CREDITOR PAYMENT |  |
| 905. |  | GEMB/JCP AND LILLIAN AND ERWIN GRAYSON | $332.00 |
| 1000. Reserves Deposited With Lender |  | 1510. CREDITOR PAYMENT |  |
| 1001. Hazard Insurance |  | HSBC NV AND LILLIAN AND ERWIN GRAYSON | $100.00 |
| 1002. Mortgage Insurance |  | 1511. |  |
| 1003. City property taxes |  |  |  |
| 1004. County property taxes |  | 1512. |  |
| 1005. Annual assessments |  |  |  |
| 1006. |  | 1513. |  |
| 1007. |  |  |  |
| 1008. Aggregate Adjustment | $0.00 | 1514. |  |
| 1100. Title Charges |  |  |  |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. |  |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 |  |  |
| 1103. Title examination |  | 1516. |  |
| 1104. Title Insurance binder |  |  |  |
| 1105. Document preparation |  | 1517. |  |
| 1106. Signing Fee LENDERS FIRST CHOICE | $200.00 |  |  |
| 1107. Attorney's Fee |  | 1518. |  |
| (Includes above item numbers:  ) |  |  |  |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1519. |  |
| (Includes above item numbers:  ) |  | 1520. TOTAL DISBURSED (enter on line 1603) |  |
| 1109. Lender's coverage |  |  | $114,515.47 |
| 1110. Owner's coverage |  |  |  |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 |  |  |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | N. Net Settlement |  |
| 1113. Alta 6,8.1, 9 TO LENDERS FIRST CHOICE |  |  |  |
| 1200. Government Recording and Transfer Charges |  | 1600. Loan Amount | $119,520.00 |
| 1201. Recording fees: | $88.00 |  |  |
| 1202. |  | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1203. Mortgage Tax/Mortgage Tax | $179.40 |  |  |
| 1204. |  | 1602. Minus total settlement charges (Line 1400) | $4,411.75 |
| 1205. Recording Service Fee to LENDERS FIRST CHOICE | $35.00 |  |  |
| 1300. Additional Settlement Charges |  | 1603. Minus total disbursements to Others (line 1520) | $114,515.47 |
| 1301. Survey |  |  |  |
| 1302. Pest Inspection |  | 1604. Equals disbursements to borrower | $592.78 |
| 1303. |  |  |  |
| 1304. |  |  |  |
| 1305. |  |  |  |
| 1400. Total settlement charges (enter on line 1602) | $4,411.75 |  |  |

The undersigned hereby acknowledge receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A red. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____
LENDERS FIRST CHOICE

X_____
ERWIN GRAYSON

X_____
LILLIAN GRAYSON

**Hall-Frazier**
**Record - 000739**

1/11/00

US Department of Housing and Urban Development
**SETTLEMENT STATEMENT (Transactions Without Sellers)**
OMB No. 2502-0491

| File Number: 38-01678806 | Loan Number: 0142627464 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER: SHEILA F JACKSON, MICHAEL D GARITY, 3425 LAKEWIND DR MOBILE AL, 36695-4208

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE - MOBILE 3 1 SAINT LOUIS ST STE 1902 MOBILE AL, 36602-3226

PROPERTY LOCATION: 3425 LAKEWIND DR MOBILE AL, 36695-4208

SETTLEMENT AGENT: LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 260 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL, 32779
SETTLEMENT DATE:                    DISBURSEMENT DATE:

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501. CREDITOR PAYMENT | |
| 801. Loan Origination Fee | | NATIONAL AUTO FINANCE | $12,545.00 |
| 802. Loan Discount 3.629% TO AMERIQUEST | 96,724.30 | 1502. CREDITOR PAYMENT | |
| 803. Appraisal Fee | | CBUSA / SEARS | $814.00 |
| 804. Credit Report | | 1503. CREDITOR PAYMENT | |
| 805. Lender's Inspection Fee | | NUVELL CREDIT | $23,571.00 |
| 806. Mortgage Insurance Application Fee | | 1504. CREDITOR PAYMENT | |
| 807. Assumption Fee | | CAPITAL ONE BANK | $303.00 |
| 808. LENDERS PROCESSING FEE TO AMERIQUEST | $929.00 | 1505. CREDITOR PAYMENT | |
| 809. ADMIN FEE TO AMERIQUEST | $239.00 | CITIFINANCIAL | $0,494.00 |
| 810. APPLICATION FEE TO AMERIQUEST | $360.00 | 1506. CREDITOR PAYMENT | |
| 811. | | GEMB / JCP | $134.00 |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. CREDITOR PAYMENT | |
| 901. Interest from 01/14/2005 TO 02/01/2005 @$44.93/DAY | $844.74 | CAPITAL ONE BANK | $2,114.00 |
| 902. Mortgage Insurance Premium for | | 1508. PAYOFF | |
| 903. Hazard Insurance Premium for | | WALTER MORTGAGE COMPANY | $125,963.86 |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | $50.00 | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $250.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers:  ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $409.00 | 1519. | |
| (includes above item numbers:  ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $175,008.86 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees | $88.00 | 1600. Loan Amount | $190,544.00 |
| 1202. City/county tax/stamps | $285.00 | | |
| 1203. State tax/stamps | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $10,681.94 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $175,008.86 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. PROPERTY VAL FEE REIMBURSED TO LENDER | $325.00 | 1604. Equals disbursements to borrower | $4,853.15 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $10,681.94 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A and RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____    X_____    X_____
LENDERS FIRST CHOICE          SHEILA F JACKSON              MICHAEL D. GARITY

Hall-Frazier
Record - 000740

Printed on Mar 21, 2006 @ 16:40                    U.S. Department of Housing and Urban Development

## SETTLEMENT STATEMENT (Transactions Without Sellers)

OMB No. 2502-0491

File Number: 36-01544884    Loan Number: 0148317008    Mortgage Ins. Case #

NAME AND ADDRESS OF BORROWER: ROBERT POLNCY  ROSIE POOLE POLNCY  361 TUTTLE AVE MOBILE AL  36604-1528

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE COMPANY 10660 WHITE ROCK ROAD SUITE 205-18 RANCHO CORDOVA, CA  95670-4032

PROPERTY LOCATION: 361 TUTTLE AVE MOBILE AL  36604-1528

SETTLEMENT AGENT: LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 3810 ROYAL AVE. SIMI VALLEY CA 93063

SETTLEMENT DATE:                    DISBURSEMENT DATE:

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection With Loan | | 1501 PAYOFF 1ST ESTIMATE | |
| 801. Loan Origination Fee | | AMC 0074180505 | 592,034.56 |
| 802. Loan Discount 1.884% TO AMC | $1,479.69 | 1502 | |
| 803. Appraisal Fee | | | |
| 804. Credit Report | | 1503 | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504 | |
| 807. Tax Related Service Fee to Ameriquest Mortgage | $25.00 | | |
| 808. Flood Search Fee to Ameriquest Mortgage | $9.00 | 1505 | |
| 809. Lenders Processing Fee to Ameriquest Mortgage | $825.00 | | |
| 810. Admin to Ameriquest Mortgage | $239.00 | 1506 | |
| 811. Application Fee to Ameriquest Mortgage | $360.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507 | |
| 901. Interest from 03/28/2006 TO 04/01/2006 @$22.70/DAY | $68.12 | | |
| 902. Mortgage Insurance Premium for | | 1508 | |
| 903. Hazard Insurance Premium for LFC SCOTTSDALE INS CO f | $1,054.05 | 1509 | |
| 904. | | | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510 | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511 | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512 | |
| 1005. Annual assessments | | | |
| 1006. | | 1513 | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514 | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515 | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516 | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | 1517 | |
| 1106. Signing Fee VITAL | $150.00 | | |
| 1107. Attorney's Fees | | 1518 | |
| (includes above item numbers: ) | | | |
| 1108. Title insurance LENDERS FIRST CHOICE | $275.00 | 1519 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's coverage | | 1520 TOTAL DISBURSED (enter on line 1603) | 592,034.56 |
| 1110. Owner's coverage | | | |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | N. Net Settlement | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. A to 6 & 1, 9 TO LENDERS FIRST CHOICE | | 1600 Loan Amount | 373,645.00 |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees | $66.00 | 1601 Plus Check/Cash from Borrower | $0.00 |
| 1202. City/county tax stamps: Mortgage Tax | $147.50 | | |
| 1203. State tax stamps | | 1602 Minus total settlement charges | 18,684.19 |
| 1204. | | (Line 1400) | |
| 1205. Recording Service Fee LENDERS FIRST CHOICE | $26.00 | 1603 Minus total disbursements to | 592,034.56 |
| 1300. Additional Settlement Charges | | Others (line 1520) | |
| 1301. Survey | | 1604 Equals disbursements to borrower | $10,921.25 |
| 1302. Pest inspection | | | |
| 1303. | | | |
| 1304. | | | |
| 1305. PROP VAL FEE REIMBURSED TO LENDER | $325.00 | | |
| 1400. Total settlement charges (enter on line 1602) | 18,684.19 | | |

The undersigned hereby acknowledges receipt of a true and correct copy of a settlement statement...

X _____        X _____        X _____
LENDERS FIRST CHOICE                ROBERT POLNCY                    ROSIE POOLE POLNCY

Hall-Frazier
Record - 000741

SETTLEMENT STATEMENT (Transactions Without Sellers)

File Number: 06-01306064    Loan Number: 0145124723    Mortgage Ins. Case #

NAME AND ADDRESS OF BORROWER:  CHRISTOPHER WILSON, SHANNON WILSON 7716 JOELLA RD, ENT, MOBILE AL, 366393721

NAME AND ADDRESS OF LENDER:  AMERIQUEST MORTGAGE 1 MOBILE 1 1 GRANT ENSLEY SITE 1100 MOBILE, AL 36602-0000

PROPERTY LOCATION: 7716 JOELLA RD ENT, MOBILE AL, 366393721

PROPERTY AGENT    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT    3650 ROYAL AVE SIMI VALLEY CA 93063
SETTLEMENT DATE: 02/14/2006    DISBURSEMENT DATE: 02/14/2006

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 600. Items Payable in Connection With Loan | | 1501 PAYOFF | |
| 801. Loan Origination Fee | | REGIONS MORTGAGE | $50,877.37 |
| 802. Loan Discount 2.651% TO AMERIQUEST | $2,941.27 | 1502 | |
| 803. Appraisal Fee /PROP VAL FEE REIMBURGED TO LENDER | $450.00 | | |
| 804. Credit Report | | 1503 | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504 | |
| 807. APPLICATION FEE TO AMERIQUEST | $360.00 | | |
| 808. TAX SERVICE FEE TO AMERIQUEST | $70.00 | 1505 | |
| 809. FLOOD SEARCH FEE TO AMERIQUEST | $9.00 | | |
| 810. LENDERS PROCESSING FEE TO AMERIQUEST | $625.00 | 1506 | |
| 811. ADMIN FEE TO AMERIQUEST | $239.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507 | |
| 901. Interest from 02/14/2006 TO 03/01/2006 @ $19.83/DAY | $297.45 | | |
| 902. Mortgage Insurance Premium for | | 1508 | |
| 903. Hazard Insurance Premium for | | | |
| 904 | | 1509 | |
| 905 | | | |
| 1000. Reserves Deposited With Lender | | 1510 | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511 | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512 | |
| 1005. Annual assessments | | | |
| 1006 | | 1513 | |
| 1007 | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514 | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | | 1515 | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination LENDERS FIRST CHOICE | $201.76 | 1516 | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1517 | |
| 1106. Signing Fee Clearners & Notary | $250.00 | | |
| 1107. Attorney's Fees | | 1518 | |
| (includes above item numbers:   ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $271.00 | 1519 | |
| (includes above item numbers:   ) | | | |
| 1109. Lenders coverage | | 1520 TOTAL DISBURSED (also enter on line 1603) | |
| 1110. Owner's coverage | | | $50,877.37 |
| 1111. Wire Fee LENDERS FIRST CHOICE | | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $50.00 | N. Net Settlement | |
| 1113 | | | |
| 1200. Government Recording and Transfer Charges | | 1601 Loan Amount | $77,000.00 |
| 1201. Recording fees | $16.50 | | |
| 1202. City/county tax/stamps | $115.50 | | |
| 1203. State tax/stamps | | 1602 Plus Check/Cash from Borrower | $0.00 |
| 1204. RECORDING SERVICE FEE TO LENDERS FIRST CHOICE | $28.00 | | |
| 1205 | | 1603 Minus total settlement charges | $6,607.79 |
| 1300. Additional Settlement Charges | | (line 1400) | |
| 1301. Survey | | 1603 Minus total disbursements to | $50,877.37 |
| 1302. Pest inspection | | Others (line 1520) | |
| 1303 | | 1603 Equals disbursements to borrower | $19,514.65 |
| 1304 | | | |
| 1305 | | | |
| 1400. Total settlement charges (enter on line 1602) | $6,607.79 | | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

X _____    X _____    X _____
LENDERS FIRST CHOICE                CHRISTOPHER WILSON              SHANNON WILSON

SETTLEMENT AGENT: LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 3550 ROYAL AVE. SIMI VALLEY, CA. 93063

| SETTLEMENT DATE: | | DISBURSEMENT DATE: | |
|---|---|---|---|
| **L. SETTLEMENT CHARGES** | | **M. DISBURSEMENT TO OTHERS** | |
| 800. Items Payable in Connection With Loan | | 1501. PAYOFF | |
| 801. Loan Origination Fee | | AMERIQUEST MORTGAGE COMPANY | $123,418.13 |
| 802. Loan Discount 0.8001% | $1,195.40 | 1502. CREDITOR PAYMENT | |
| 803. Appraisal Fee PROP VAL TO BORDEN DALE STRICKLAND | $450.00 | MOBILE COUNTY DELIQUENT | $535.31 |
| 804. Credit Report | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. Tax Related Service Fee to Ameriquest Mortgage | $35.00 | | |
| 808. Flood Search Fee to Ameriquest Mortgage | $9.00 | 1505. | |
| 809. Lender's Processing Fee to Ameriquest Mortgage | $825.00 | | |
| 810. Admin to Ameriquest Mortgage | $239.00 | | |
| 811. Application Fee to Ameriquest Mortgage | $360.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 02-06-06 TO 03-01-06 AT $28.58 | $571.60 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance 2 MONTHS AT $95.42 | $190.84 | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes 4 MONTHS AT $52.50 | $210.00 | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | $50.00 | 1517. | |
| 1106. Signing Fee VITAL SIGNING | $200.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (includes above item numbers: ) | | | |
| 1108. Title insurance LENDERS FIRST CHOICE | $303.00 | 1519. | |
| (includes above item numbers: ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $124,053.44 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | **N. Net Settlement** | |
| 1113. | | | |
| 1200. Government Recording and Transfer Charges | | 1600. Loan Amount | $128,000.00 |
| 1201. Recording fees: | $53.00 | | |
| 1202. City/county tax/stamps: | $202.50 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $3,356.34 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $124,053.44 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $190.22 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $3,356.34 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A incl RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.



LENDERS FIRST CHOICE    X _____ LEE JACKSON    X _____ TARONYA JACKSON

(Printed on Jan 12, 2006 @ 15 50)

US Department of Housing and Urban Development

OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 36-01880138 | Loan Number: 0142574946 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER: GWENDOLYN J. WILCOX, 1864 SUMMER PLACE DR E MOBILE AL 36618-3200

NAME AND ADDRESS OF LENDER: AMERIQUEST MORTGAGE - MOBILE 2 1 SAINT LOUIS ST STE 1002 MOBILE, AL, 36602-3925

PROPERTY LOCATION: 1864 SUMMER PLACE DR E MOBILE AL, 36618-3200

SETTLEMENT AGENT:    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT: 250 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL,32779

| SETTLEMENT DATE: | DISBURSEMENT DATE: |
|---|---|

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501. PAYOFF | |
| 801. Loan Origination Fee | | GREEN TREE | $61,859.75 |
| 802. Loan Discount .762% TO AMERIQUEST | $542 54 | 1502. CREDITOR PAYMENT | |
| 803. Appraisal Fee /PROP VAL FEE REIMBURSED TO LENDER | $450 00 | CITIFINANC | $2,578.00 |
| 804. Credit Report | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. APPLICATION FEE TO AMERIQUEST | $360 00 | | |
| 808. TAX SERVICE FEE TO AMERIQUEST | $70 00 | 1505. | |
| 809. FLOOD SEARCH FEE TO AMERIQUEST | $9 00 | | |
| 810. LENDERS PROCESSING FEE TO AMERIQUEST | $626 00 | 1506. | |
| 811. ADMIN FEE TO AMERIQUEST | $239 00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 01/19/2006 TO 02/01/2006 @$23.31/DAY | $303 03 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0 00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450 00 | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175 00 | | |
| 1103. Title examination | | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1517. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $250 00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers:    ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275 00 | 1519. | |
| (Includes above item numbers:    ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $64,437.75 |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25 00 | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30 00 | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: | $88 00 | 1600. Loan Amount | $71,200.00 |
| 1202. City/county tax/stamps: | $106 80 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $3,999.37 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $64,437.75 |
| 1302. Pest Inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $2,762.88 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $3,999 37 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A and RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____    X_____
LENDERS FIRST CHOICE            GWENDOLYN J. WILCOX

**Hall-Frazier**
**Record - 000744**

PROPERTY LOCATION: 2662 BURKLAWN MONTGOMERY AL, 36111

SETTLEMENT AGENT:   LENDERS FIRST CHOICE
PLACE OF SETTLEMENT:  260 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL,32779

SETTLEMENT DATE:     DISBURSEMENT DATE:

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501. PAYOFF | |
| 801. Loan Origination Fee | | COUNTRYWIDE HOME LOANS | $111,580.16 |
| 802. Loan Discount 2,822% TO AMERIQUEST | $3,887.31 | 1502. | |
| 803. Appraisal Fee | | | |
| 804. Credit Report | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. Application Fee to Ameriquest | $360.00 | | |
| 808. | | 1505. | |
| 809. | | | |
| 810. Lenders Processing Fee to Ameriquest | $626.00 | 1506. | |
| 811. Admin Fee to Ameriquest | $239.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 04/19/2006 to 05/01/2006 @$32.46/DAY | $389.52 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | | 1515. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | | |
| 1103. Title examination LENDERS FIRST CHOICE | $450.00 | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1517. | |
| 1106. Signing Fee THE CHEATHAM GROUP | $250.00 | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers:   ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $395.00 | 1519. | |
| (Includes above item numbers:   ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $111,580.16 |
| 1111. Wire Fee LENDERS FIRST CHOICE | | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $55.00 | | |
| 1113. | | N. Net Settlement | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: | $110.00 | 1600. Loan Amount | $137,750.00 |
| 1202. City/county tax/stamps: | $206.70 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges | $7,143.53 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $111,580.16 |
| 1302. Pest inspection | | Others (line 1520) | |
| 1303. | | 1604. Equals disbursements to borrower | $19,026.31 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $7,143.53 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

(Printed on Jan 03, 2006 @ 20 20)

US Department of Housing and Urban Development    OMB No. 2502-0491

## SETTLEMENT STATEMENT (Transactions Without Sellers)

File Number: 36-01871993  Loan Number: 0142086768  Mortgage Ins. Case #

NAME AND ADDRESS OF BORROWER  KEITH A TAYLOR HELEN T TAYLOR, 23000 VAUGHN RD ROBERTSDALE AL, 36567-2519

NAME AND ADDRESS OF LENDER  AMERIQUEST MORTGAGE - MOBILE 2 1 SAINT LOUIS ST STE 1002 MOBILE AL, 36602-3925

PROPERTY LOCATION  23000 VAUGHN RD ROBERTSDALE AL, 36567-2519

SETTLEMENT AGENT    LENDERS FIRST CHOICE
PLACE OF SETTLEMENT  260 WEKIVA SPRINGS ROAD SUITE 3000 LONGWOOD FL 32779

SETTLEMENT DATE:                      DISBURSEMENT DATE

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1501. CREDITOR PAYMENT | |
| 801. Loan Origination Fee | | CAPITAL ONE FSB | $562.00 |
| 802. Loan Discount 3.740% TO AMERIQUEST | $8,344.76 | 1502. CREDITOR PAYMENT | |
| 803. Appraisal Fee \PROP VAL FEE REIMBURSED TO LENDER | $450.00 | GEMB / SAMS CLUB | $456.00 |
| 804. Credit Report | | 1503. CREDITOR PAYMENT | |
| 805. Lender's Inspection Fee | | COUNTY COURT | $555.00 |
| 806. Mortgage Insurance Application Fee | | 1504. CREDITOR PAYMENT | |
| 807. APPLICATION FEE TO AMERIQUEST | $360.00 | GOODY'S | $522.00 |
| 808. TAX SERVICE FEE TO AMERIQUEST | $70.00 | 1505. CREDITOR PAYMENT | |
| 809. FLOOD SEARCH FEE TO AMERIQUEST | $9.00 | AMSOUTH BANK NA | $16,805.00 |
| 810. PROCESSING FEE TO AMERIQUEST | $626.00 | 1506. CREDITOR PAYMENT | |
| 811. ADMIN FEE TO AMERIQUEST | $239.00 | DISCOVER FIN SVS LLC | $2,123.00 |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. CREDITOR PAYMENT | |
| 901. Interest from 01/10/2006 TO 02/01/2006 @$47.99/DAY | $1,055.78 | GEMB / HOME | $339.00 |
| 902. Mortgage Insurance Premium for | | 1508. CREDITOR PAYMENT | |
| 903. Hazard Insurance Premium for | | CBUSA / SEARS | $1,725.00 |
| 904. | | 1509. CREDITOR PAYMENT | |
| 905. | | PREFERRED CREDIT | $926.00 |
| 1000. Reserves Deposited With Lender | | 1510. CREDITOR PAYMENT | |
| 1001. Hazard insurance | | UNITED BK | $716.00 |
| 1002. Mortgage insurance | | 1511. CREDITOR PAYMENT | |
| 1003. City property taxes | | TNBTGTVISA | $1,334.00 |
| 1004. County property taxes | | 1512. TAXES DUE | |
| 1005. Annual assessments | | BALDWIN COUNTY TAX COLLECTOR | $305.56 |
| 1006 | | 1513. PAYOFF | |
| 1007 | | OPTION ONE MORTGAGE | $183,403.56 |
| 1008. Aggregate Adjustment | $0.00 | 1514 | |
| 1100. Title Charges | | 1515. | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | $450.00 | | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | $175.00 | 1516. | |
| 1103. Title examination | | | |
| 1104. Title insurance binder | | 1517. | |
| 1105. Document preparation LENDERS FIRST CHOICE | $50.00 | | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $250.00 | 1518. | |
| 1107. Attorney's Fees | | | |
| (Includes above item numbers: ) | | 1519. | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $467.00 | | |
| (Includes above item numbers: ) | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1109. Lender's coverage | | | $209,772.12 |
| 1110. Owner's coverage | | | |
| 1111. Wire Fee LENDERS FIRST CHOICE | $25.00 | N. Net Settlement | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $30.00 | | |
| 1113. | | | |
| 1200. Government Recording and Transfer Charges | | 1600. Loan Amount | $223,122.00 |
| 1201. Recording fees: | $100.00 | | |
| 1202. City/county tax/stamps: | $334.80 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204 | | | |
| 1205 | | 1602. Minus total settlement charges | $13,036.34 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $209,772.12 |
| 1302. Pest inspection | | Others (line 1520) | |
| 1303 | | 1604. Equals disbursements to borrower | $313.54 |
| 1304 | | | |
| 1305 | | | |
| 1400. Total settlement charges (enter on line 1602) | $13,036.34 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____    X_____    X_____
LENDERS FIRST CHOICE    KEITH A TAYLOR    HELEN T. TAYLOR

**Hall-Frazier**
**Record - 000746**

SETTLEMENT DATE

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| 800. Items Payable In Connection With Loan | | 1601. PAYOFF | |
| 801. Loan Origination Fee | | WACHOVIA MORTGAGE | $72,733.20 |
| 802. Loan Discount 2.947% TO AMERIQUEST | $2,652.30 | 1602. PAYOFF | |
| 803. Appraisal Fee \PROP VAL FEE REIMBURSED TO LENDER | $450.00 | OAK FOREST HOA | $422.00 |
| 804. Credit Report | | 1603. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1604. | |
| 807. Application Fee to Ameriquest | $360.00 | | |
| 808. Tax Service Fee to Ameriquest | $70.00 | 1605. | |
| 809. Flood Search Fee to Ameriquest | $9.00 | | |
| 810. Lenders Processing Fee to Ameriquest | $626.00 | 1606. | |
| 811. Admin Fee to Ameriquest | $239.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1607. | |
| 901. Interest from 03/14/2006 TO 04/01/2006 @$24.41/DAY | $439.38 | | |
| 902. Mortgage Insurance Premium for | | 1608. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1609. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1610. | |
| 1001. Hazard Insurance | | | |
| 1002. Mortgage Insurance | | 1611. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1612. | |
| 1005. Annual assessments | | | |
| 1006. | | 1613. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $0.00 | 1614. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee LENDERS FIRST CHOICE | | 1615. | |
| 1102. Abstract or title search LENDERS FIRST CHOICE | | | |
| 1103. Title examination TO LENDERS FIRST CHOICE | $625.00 | 1616. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation LENDERS FIRST CHOICE | | 1617. | |
| 1106. Signing Fee LENDERS FIRST CHOICE | $250.00 | | |
| 1107. Attorney's Fees | | 1618. | |
| (Includes above item numbers:     ) | | | |
| 1108. Title Insurance LENDERS FIRST CHOICE | $275.00 | 1619. | |
| (Includes above item numbers:     ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $73,155.20 |
| 1111. Wire Fee LENDERS FIRST CHOICE | | | |
| 1112. Delivery Fee LENDERS FIRST CHOICE | $55.00 | N. Net Settlement | |
| 1113. | | | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: | $88.00 | 1600. Loan Amount | $90,000.00 |
| 1202. City/county tax/stamps | $135.00 | | |
| 1203. State tax/stamps | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. RECORDING SERVICE FEE TO LENDERS FIRST CHOIC | $35.00 | | |
| 1205. | | 1602. Minus total settlement charges | $6,308.68 |
| 1300. Additional Settlement Charges | | (Line 1400) | |
| 1301. Survey | | 1603. Minus total Disbursements to | $73,155.20 |
| 1302. Pest inspection | | Others (line 1620) | |
| 1303. | | 1604. Equals disbursements to borrower | $10,536.12 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $6,308.68 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A int RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____     X_____
**LENDERS FIRST CHOICE**              WILLET L. NOON

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| JONATHAN AND SHARRON EDWARDS, individually and on behalf of all similarly situated individuals, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. 1:07-cv-00160-KD-C ) |
| ACCREDITED HOME LENDERS, INC.; LENDER'S FIRST CHOICE AGENCY, INC.; LENDER'S FIRST CHOICE AGENCY OF ALABAMA, INC., | ) ) ) ) ) |
| Defendants. | ) ) |

<u>**AFFIDAVIT OF BILL PETRUCCELLI**</u>

State of Florida          )

Orange County          )

Before me, the undersigned, a Notary Public in and for said County in said State, personally appeared Bill Petruccelli, who, after being by me first duly sworn, did depose and state as follows:

1.      My name is Bill Petruccelli.  I am over the age of twenty-one and of sound mind and am fully competent to make this affidavit.  I am a closing

954393.1


PLAINTIFF'S
EXHIBIT


EXHIBIT
A

supervisor for Lender's First Choice which means, among other things, I supervise the employees who are "closers" for Lender's First Choice. I have held this position for three years. I make this affidavit based upon my personal knowledge and based upon the business records of Lender's First Choice that are kept in the ordinary course of business and are under my custody or control.

2.     One of the settlement services offered by Lender's First is the recording of mortgages. The process for arranging for the recording of a mortgage requires the services of Lender's First's employees, its computers, its equipment, and its resources.

3.     Because the amount for recording fees varies tremendously across the country and even across Alabama and because such fees can change from time to time and even based upon details such as numbers of pages, Lender's First's policy is to collect the amount for a recording fee based on its best understanding of the correct fee and then refund any overage. If Lender's First charges too little, it does not collect the deficiency from the borrower.

4.     Prior to the closing, Lender's First uses a program called "GATORS" to calculate recording fees. Obtaining and maintaining the GATORS system is an expense to Lender's First. When an order is opened in Lender's First's system through GATORS, the average mortgage fee for each state is automatically calculated for the preliminary HUD statement based on a 30-page mortgage

Hall-Frazier
Record - 000749

document. This is normally done by the "closer" in the Lender's First office that is assigned to the specific loan.

    5.    The lender will then prepare the majority of documents that are used in closing a loan. These include, for instance, the mortgage, the note, various mortgage riders, certain affidavits, Truth in Lending disclosures, among many. Lender's First Choice refers to these documents as a "package." The lender will also prepare "closing instructions." Lender's First will revise the HUD Settlement Statement based upon the closing instructions. The lender will provide the "package" to Lender's First Choice before closing but often after the closing instructions. If the "package" is provided in sufficient time before the scheduled closing, Lender's First Choice will examine the mortgage for information that might be relevant to the recording fee, including for instance, number of pages. Then Lender's First will enter the relevant information into GATORS to determine an exact amount of recording fees and revise the HUD Settlement Statement accordingly. The procedures described above are different for a few, specific lenders who have requested different procedures (for example, Ameriquest), but such lenders were not involved in this loan.

    6.    In this case, the records kept in the ordinary course of Lender's First's business (for instance, the "Notes" attached as Exhibit 1 hereto) indicate that the "package" was not received in sufficient time to revise the HUD Settlement

3

Hall-Frazier
Record - 000750

Statement. The Notes indicate that the signing agent downloaded such package (and additional documents provided by Lender's First Choice) on June 12, 2006 and the original signing of documents with the borrower occurred on the same date.

7.    After the closing (at least for loans which were not through those few lenders with different procedures, as noted in paragraph 5), Lender's First receives the signed documents from the signing agent. The closer, who is assigned to the specific loan from Lender's First, normally recalculates the recording fee based on the actual documents that need to be recorded.

8.    All monies received from any source (for instance, the loan funds received from the lender or fees received at closing and returned by the signing agent) are placed into an escrow account at Lender's First.

9.    As a part of arranging for recording, Lender's First (the Post Closing Department) reviews every page to make certain there are no notations, nothing is stricken, and every page is legible. Further, as a part of such arranging, Lender's First must individually review the documents before recording for information that might be relevant to the recording fee, including types of documents, number of pages, etc. This is done by the Recording Department. They will also use the same GATORS computer system to calculate the amount to use for the check to applicable government office (here, the Mobile County Probate Court). These are

954393.1                                    4

the standard procedures of Lender's First, except for a few specific lenders who have requested different procedures, but such lenders were not involved in this loan.

10.    Also, in arranging for recording, the Recording Department will then print the Federal Express label. They will then obtain a self-addressed envelope. They will manually place the mortgage and/or other documents (such as a deed to be recorded), clipped to a check, in the Federal Express envelope along with the self-addressed envelope and will place the envelope in the appropriate Federal Express pickup. These are the standard procedures of Lender's First, except for a few specific lenders who have requested different procedures, but such lenders were not involved in this loan.

11.    After the documents are sent, Lender's First often fields phone calls from the applicable government recording office regarding the documents. It is also not uncommon for the government recording office (for instance the probate court in Alabama) to reject the recording by Lender's First because of changes in the recording fees or other clerical issues. In such cases, Lender's First does not collect the deficiency from the borrower. Further in such case, Lender's First must again review the documents, cut a check, change its computer system information for future checks, and go through the procedure explained above again, except for

5

Hall-Frazier
Record - 000752

a few specific lenders who have requested different procedures, but such lenders were not involved in this loan.

12.    In addition to the services normally performed by Lender's First in arranging for the recording of the mortgage or other documents (as described above), Lender's First had to perform additional services here. For instance, the business records of Lender's First (including Exhibit 1) indicate that Lender's First had to arrange, in this matter, for a corrective deed to be drafted, signed, reviewed and recorded in the same manner discussed above because of a naming problem on the title of the property.

13.    In fact, the extra services of Lender's First in arranging for recording went even further here because the first extra deed was not correct, and therefore, after the original closing, yet another deed had to be prepared and another visit by the signing agent. Therefore, Lender's First had to arrange for the drafting, reviewing and recording in the same manner discussed above for a third time. These services in arranging for the recording of the mortgage and deed here included those listed in paragraphs 9, 10, 12 and 13 and were services actually performed in connection with recording the mortgage and such recording fee.

14.    This extra visit to correct the deed appears to have caused a disruption in the normal procedure of Lender's First. In most cases, the Recording Department will act on the same day as disbursement is done by the closer.

15.    Disbursement is the procedure whereby Lender's First will pay the various parties who are receiving funds from the closing (for instance, a prior mortgagee, the borrower if they are receiving cash out, the title insurer, etc.). Such funds are paid out of the escrow account described above. Disbursement occurred here on June 16, 2006. In other words, disbursement occurred before the closer had the final documents; therefore, the closer did not adjust the recording fee for what was actually to be filed with the Mobile County Probate Court. The closer received the signed, extra deed on June 19, 2006 and forwarded it to Recording Department on the same day. The Recording Department followed the procedure laid out above and sent them to the Probate Court on June 23, 2006.

16.    With respect to the Edwards' recording, two documents were recorded: a mortgage and a deed. The mortgage was sixteen pages, and the deed was three pages. The actual recording fee for the Edwards' mortgage was $75.50 and Lender's First paid the Mobile County Probate court $75.50. *See* Ex. 2 (copy of check issued by Lender's First Choice to Mobile County Judge of Probate).

17.    The Edwards initially paid $88.00 in connection with recording.

18.    Lender's First Choice held the $12.50 overage in said escrow account and never took such money into income and did not accept such money.

19.    As mentioned above, all monies received from any source are placed into an escrow account, pending disbursement. If the amount charged to the

borrower is more than the amount paid to the probate court, then the overage stays in such escrow account to be refunded to the borrower. It has always been Lender's First's policy to refund any overages for recording fees to the borrower.

20.    It is the policy of Lender's First to review all escrow accounts when staffing permits the opportunity to review such accounts. When such a review shows that an escrow account contains an overage ("trial balance"), this amount is refunded to the borrower. Attached hereto is a true and correct copy of the computer ledger for the Edwards loan, which shows that this money was kept in escrow. *See* Ex. 3.

21.    For loans closed prior to November 2006, the closer of the loan had the responsibility to review any escrow balances and issue refunds of such balance. Beginning in November 2006, Lender's First has an automated feature in its system that is triggered once the recorded document is returned. The system automatically triggers Lender's First's disbursement department to refund any overages to the borrower.

22.    Because the Edwards loan closed before the automated feature was in use at Lender's First, the closer or the accounting department needed to personally review the file and issue the refund. Because of staffing issues and the press of other business, the overage was not yet refunded until this suit was filed, but was held in escrow and not taken into income.

934293.1                                         8

23. The $12.50 overage was refunded to the Edwards around April 2007.

*See* Ex. 4 (copy of FedEx receipt signed by Mr. Edwards). The check has not been

negotiated.

Further Affiant sayeth not.

_____
Bill Petruccelli

Sworn to and subscribed before me this the

___5th___ day of __Feb__, 2008.

_____
Notary Public
My Commission Expires: _1/18/09_

JEFFRIE ANN YOUNGER
MY COMMISSION # DD387500
EXPIRES: January 18, 2009
1-800-3-NOTARY     FL Notary Discount Assoc. Co.

9

Hall-Frazier
Record - 000756

*Edwards v. Accredited; Lender's First*
Case No. 1:07-cv-00160-KD-C

Affidavit of Bill Petruccelli

# EXHIBIT 1

"Notes"

*Edwards v. Accredited; Lender's First*
Case No. 1:07-cv-00160-KD-C

Affidavit of Bill Petruccelli

# EXHIBIT 2

"Check – Lender's First Choice to Mobile County Judge of Probate"

Hall-Frazier
Record - 000758

*Edwards v. Accredited; Lender's First*
Case No. 1:07-cv-00160-KD-C

Affidavit of Bill Petruccelli

# EXHIBIT 3

"Computer Ledger for Edwards Loan"

2006048225  Book-5995  Page-1678
Total Number of Pages: 16

Return To:

~~Home Funds Direct~~
~~Attn: Post Closing Dept.~~
~~16550 West Bernardo Dr. Bldg 1~~
~~San Diego, CA 92127-1870~~

**RECORDING DEPT**
**Lenders First Choice**
**3850 Royal Avenue**
**Simi Valley, CA 93063**
36- 735507/

41.00
97.52
138.53
10.00
148.53
2.00
150.5

State of Alabama-Mobile County
I certify this instrument was filed on:
June 28, 2006 @  3:09:55 PM

| | |
|---|---|
| MORTGAGE TAX | $97.50 |
| S.R. FEE | $2.00 |
| SURCHARGE | $10.00 |
| RECORDING FEES | $41.00 |
| TOTAL AMOUNT | $150.50 |

2006048225
Don Davis, Judge of Probate

201712

------------------[Space Above This Line For Recording Data]------------------

# MORTGAGE

MIN 100176106053043916

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **June 12, 2006** , together with all Riders to this document.
**(B) "Borrower"** is **JONATHAN EDWARDS AND SHARRON W. EDWARDS, HIS WIFE, AS JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP.**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

0605304391

ALABAMA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3001 1/01

VMP®-6A(AL) (0005).03
Page 1 of 15                    Initials:
VMP MORTGAGE FORMS - (800)521-7291

**PLAINTIFF'S EXHIBIT**

71

Hall-Frazier
**Record - 000760**

2006048224  Book-5995  Page-1674
Total Number of Pages: 4

State of Alabama-Mobile County
I certify this instrument was filed on:
June 28, 2006 @   3:08:53 PM

| | |
|---|---|
| DEED TAX | $0.50 |
| S.R. FEE | $2.00 |
| SURCHARGE | $10.00 |
| RECORDING FEES | $11.00 |
| TOTAL AMOUNT | $23.50 |

2006048224
Don Davis, Judge of Probate

---

## RECORDING COVERSHEET
## (ALABAMA)

**DOCUMENT TYPE:**          WARRANTY DEED

**PREPARED BY:**            LENDERS FIRST CHOICE
                           3850 ROYAL AVENUE
                           SIMI VALLEY, CA 93063

**RETURN TO:**              LENDERS FIRST CHOICE
                           RECORDING DEPT.
                           3850 ROYAL AVENUE
                           SIMI VALLEY, CA 93063

**DEAL #:**                 36-7355071

PLAINTIFF'S
EXHIBIT

12

Hall-Frazier
Record - 000761

2011712-AL

**WARRANTY DEED**

This instrument was prepared by:

Lenders First Choice
2321 W. March Lane, Suite 210
Stockton, CA 95207
Phone: (209) 475-6200

THE STATE OF ALABAMA

Mobile ~~MADISON~~ COUNTY

Know All Men by These Presents: That in consideration of $10.00 to the undersigned grantor (whether one or more), in hand paid by the grantee herein, the receipt where is acknowledged, I or we, JONATHAN EDWARDS AND SHARRON W. EDWARDS WHO ACCQUIRED TITLE AS  JOE NATHAN EDWARDS AND SHARON W. EDWARDS (herein referred to as grantor, whether one or more), grant, bargain, sell and convey unto JONATHAN EDWARDS AND SHARRON W EDWARDS ., HIS WIFE, AS JOINT TENANTS WITH RIGHTS OF SURVIVORSHIP (herein referred to as grantee, whether one or more), the following described real estate, situated in Madison County, Alabama, to-wit:

**See Legal Description shown as Exhibit "A" attached hereto and made a part hereof.**

**More Commonly Known As:  11460 HENDERSON CAMP RD GRAND BAY, AL 36541-6712**

To Have and to Hold to the said grantee, his, her or their heirs and assigns forever. And I (we) do, for myself (ourselves) and for my (our) heirs, executors and administrators, covenant with said grantee, his, her or their heirs and assigns, that I am (we are) lawfully seized in fee simple of said premises; that they are free from all encumbrances, unless otherwise stated above; that I (we) have a good right to sell and convey the same as aforesaid; that I (we) will, and my (our) heirs, executors and administrators shall warrant and defend the same to the said grantee, his, her or their heirs and assigns forever, against the lawful claims of all persons.

In Witness Whereof, I (we) have hereunto set my (our) hand(s) and seal(s) this 12 day of June , 20 06

_____

_Jonathan Edwards_
JONATHAN EDWARDS

_Sharron W. Edwards_
SHARRON W. EDWARDS

THE STATE OF ALABAMA

Mobile ~~MADISON~~ COUNTY

al-wrnty.doc rev.5/15/2006  Page 1 of 2

**Hall-Frazier**
**Record - 000762**

I, _Neely Courtney_ a Notary Public, in and for said County in said State, hereby certify that _Jonathan Edwards + Sharron w._ whose name is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he executed the same voluntarily on the day the same bears date.

Given under my hand this the _12_ day of _June_ , 20 _06_

_Neely Courtney_

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Dec 8, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

al-warty.doc  rev.5/15/2006  Page 2 of 2

Hall-Frazier
Record - 000763

EXHIBIT "A"

THE FOLLOWING DESCRIBED LAND LYING IN THE COUNTY OF MOBILE, STATE
OF ALABAMA, TO-WIT:

TO FIND THE POINT OF BEGINNING: COMMENCE AT THE CENTER OF SECTION
12, TOWNSHIP 7 SOUTH, RANGE 4 WEST;

THENCE RUN EAST 2600 FEET TO A POINT; BEING LOCATED IN THE CENTER
OF HENDERSON CAMP ROAD;

THENCE RUN NORTH 555 FEET TO A POINT, FOR THE POINT OF BEGINNING;

THENCE CONTINUE NORTH 110 FEET TO A POINT;

THENCE RUN WEST 244 FEET TO A POINT;

THENCE RUN SOUTH 110 FEET TO A POINT; THENCE RUN EAST 244 FEET TO
THE POINT OF BEGINNING. PROPERTY LINES ON THE WEST SIDE OF
HENDERSON CAMP ROAD, AND IS LOCATED IN MOBILE COUNTY, ALABAMA.

FOR INFORMATIONAL PURPOSES ONLY: THE APN IS SHOWN BY THE COUNTY
ASSESSOR AS R024501120000041; SOURCE OF TITLE IS BOOK 1650, PAGE
0221 (RECORDED 11/24/76)

```
1              IN THE UNITED STATES DISTRICT COURT FOR THE
                    SOUTHERN DISTRICT OF ALABAMA
2                         SOUTHERN DIVISION

3                              CASE NO.: 1:07-cv-00160 KD-C
   JONATHAN and SHARRON EDWARDS,
4  individually and on behalf of others
   similarly situated,
5
                   Plaintiffs,
6
   vs.
7
   ACCREDITED HOME LENDERS, INC.,
8  and LENDERS' FIRST CHOICE; and
   LENDER'S FIRST CHOICE AGENCY
9  OF ALABAMA, INC.,

10                 Defendants.

11 * * * * * * * * * * * * * * * * * * * * * * * * *

12 DEPOSITION OF:       WILLIAM R. PETRUCCELLI

13 DATE TAKEN:          May 12, 2008

14 TIME:                10:00 a.m.

15 PLACE:               260 Wekiva Springs Road
                        Longwood, Florida
16
   REPORTED BY:         Jan L. O'Steen, Court Reporter
17                      Notary Public

18
   * * * * * * * * * * * * * * * * * * * * * * * * *
19

20

21

22

23

24

25
```

*First-Choice Reporting Services, Inc.*                2

```
 1    APPEARANCES:

 2
         Appearing on behalf of the Plaintiffs:
 3
            KENNETH J. RIEMER, ESQUIRE
 4          166 Government Street
            Mobile, Alabama  36633
 5          (251) 432-9212

 6    Appearing on behalf of the Defendant, Lenders First Choice
      and Lender's First Choice Agency of Alabama, Inc.
 7
            GREGORY C. COOK, ESQUIRE
 8          Balch & Bingham, L.L.P.
            1901 Sixth Avenue North
 9          Birmingham, Alabama  35203
            (205) 251-8100
10
         Appearing on behalf of the Defendant, Accredited
11       Home Lenders, Inc.:

12          MATTHEW P. PREVIN, ESQUIRE
            Buckley Kolar, L.L.P.
13          1250 24th Street N.W.
            Suite 700
14          Washington, D.C.  20037
            (202) 349-8000
15          (Present via telephone.)

16

17

18

19

20

21

22

23

24

25
```

1

                          I N D E X

2

TESTIMONY OF WILLIAM R. PETRUCCELLI

3

        Direct Examination by Mr. Riemer. . . . . . . 4

4

        Cross-Examination by Mr. Cook . . . . . . . . 85

5

        Redirect Examination by Mr. Riemer. . . . . . 95

6

        Recross-Examination by Mr. Cook . . . . . . .108

7

8    CERTIFICATE. . . . . . . . . . . . . . . . . .111

9    CERTIFICATE OF OATH . . . . . . . . . . . . .112

10   EXHIBITS. . . . . . . . . . . . . . . . . ATTACHED

11                    S T I P U L A T I O N S

12       It is hereby agreed and so stipulated by and between

13   the parties hereto, through their respective counsel,

14   that the reading and signing of the transcript is

15   expressly waived by the Deponent.

16

17

18                     E X H I B I T S

19   Plaintiffs' Exhibit No. 13 . . . . . . . . . . . .25

20   Plaintiffs' Exhibit No. 14 . . . . . . . . . . . .27

21   Plaintiffs' Exhibit No. 15 . . . . . . . . . . . .67

22

23

24

25

*First-Choice Reporting Services, Inc.*                    **4**

```
 1   WHEREUPON,

 2            The following proceedings were had,

 3               WILLIAM R. PETRUCCELLI,

 4   a witness herein, having first been duly sworn, was

 5   examined, and testified as follows:

 6                  DIRECT EXAMINATION

 7   BY MR. RIEMER:

 8      Q    Mr. Petruccelli, you understand that this

 9   is the continuation of the deposition we started in

10   Mobile, I believe it was February 28?

11      A    I do.

12      Q    Okay.  Well, it's good to see you again.

13   And I'm going to start with some questions that kind

14   of clarify some of the matters we talked about, just

15   to make sure I understood -- I understood things.

16   And let's just go ahead and get started here.

17            Now, if I understood you right on the

18   abstracting, you told us that the abstractor -- the

19   abstract is uploaded to the GATOR system, right?

20      A    That's true.

21      Q    Okay.  And the abstract is sent to the

22   local office and updated -- I mean, uploaded to

23   GATORS?  Is that how it works?

24      A    No.  The abstract is sent to Frisco,

25   Texas, where the title department is, and gets
```

*First-Choice Reporting Services, Inc.*                    **5**

```
 1    uploaded to GATORS from there.

 2         Q    Okay.  And is it the -- is it the -- and

 3    we use the term central office, but I understand

 4    that you-all are set in time zones.  Is it the title

 5    department in the Texas office that decides which

 6    abstractor to use on a particular file?

 7         A    Yes.

 8         Q    Okay.  So the first -- the first

 9    interaction with abstracting from the local level is

10    to view it as it's uploaded on the GATORS screen; is

11    that right?

12         A    Are you referring to this office would

13    look at an abstract?

14         Q    Well, the office that is going to be

15    processing the order.

16         A    Yes.

17         Q    Okay.  Now, there was some question in

18    your mind, I believe, as to the files that Lenders

19    First Choice does abstracting in-house versus the

20    files that they use an outside vendor for.  And I

21    believe you said that your understanding was that

22    where the abstracting information was available

23    on-line, that the in-house folks in the title

24    department might perform the abstracting.

25              Am I remembering that right?
```

*First-Choice Reporting Services, Inc.*                    6

```
 1        A    Yes.  They might.  If it was on-line, they

 2   might do it that way, yes.

 3        Q    And then I had asked the question about

 4   the Alabama -- I believe I asked whether or not you

 5   could say that the Alabama loans were all done

 6   through a vendor, and I believe you said you didn't

 7   know.  But let me keep going, and I will tell you

 8   what my question is.

 9             It seems that between February 28th and

10   now, we've seen a lot more documents from Lenders

11   First Choice.  So my question is, can you say now

12   that for Alabama loans, that Lenders First

13   Choice has used outside vendors on those loans

14   versus doing it in-house?

15        A    "Those loans" referring to all of Alabama?

16        Q    Yes, let's stay with Alabama.  Right.

17        A    Okay.  I don't know if I can answer that.

18   I know that the one is an abstract report done from

19   an outside vendor.

20        Q    Yes, the Edwards loan.

21        A    Correct.

22        Q    Correct.  And the other individual file

23   we're going to talk about is the Vilma Hall file,

24   and that was also an outside vendor performed

25   abstract, right?
```

*First-Choice Reporting Services, Inc.*                    7

```
 1        A     That's right.

 2        Q     You're familiar with the sample files that

 3    have been produced by Lenders First Choice, right?

 4        A     Yes, I am.

 5        Q     In my viewing of those -- I may be

 6    wrong -- but it appeared that every -- on every one

 7    of those it was an outside vendor that performed the

 8    abstract.

 9        A     I didn't review every single one of them.

10    There were many with outside abstractors.

11        Q     Okay.  Is it your understanding now that

12    the usual process for Lenders First Choice generally

13    is to use outside vendors, that that's more the case

14    than not?

15             MR. COOK:  Are you saying across the

16        country or just in Alabama?

17             MR. RIEMER:  Well, let's say across the

18        whole country.

19             THE WITNESS:  Can you repeat the question?

20    BY MR. RIEMER:

21        Q     Sure.  Nationwide, is it -- is it more

22    often the case that Lenders First Choice uses an

23    outside vendor versus performing the abstracting

24    in-house?

25        A     I guess the best way I can answer that is,
```

1    I think there is a tremendous amount of using

2    outside abstractors, but when there is a case where

3    we can do it on-line, we may choose to do that.

4         Q    Okay.  And in your own office, your own

5    practice, have you seen files where the abstracting

6    was done in-house?

7         A    Yes.

8         Q    Okay.  From the files that you've seen,

9    can you give me a percentage of that occurrence?  Is

10   it ten percent, less than ten percent?

11        A    No idea.  I sure can't.

12        Q    All right.  Now, is the answer the same if

13   I would ask you for a percentage of nationwide files

14   in-house versus using a vendor for abstracting?

15   Would you be able to give me a percentage?

16        A    No, sir.

17        Q    Let me clarify this.  Is it -- isn't it

18   true that with respect to Lenders First

19   Choice's nationwide practice that the title

20   insurance company that is used is either First

21   American or United?

22        A    UGT, correct.

23        Q    UGT.  Okay.

24             Back in February we talked about the

25   process of physically recording the mortgage, and I

*First-Choice Reporting Services, Inc.*                                              9

```
 1   understood you to say that it's either done with

 2   you-all transmitting to the recording office

 3   versus -- via Federal Express, or in some cases the

 4   abstractor will actually walk the document into the

 5   recording office and get it recorded.  Do I remember

 6   that right?

 7       A     That's correct.

 8       Q     Okay.  Now -- and we've now seen a fair

 9   number of HUDs, and there are HUDs with the -- with

10   a line item for Federal Express charges.  I believe

11   it's usually about $30, or exactly $30.

12             Is it safe to say that for -- that for the

13   HUDs that reflect that Federal Express charge, that

14   that tells us that the -- the instrument to be

15   recorded in that file was transmitted by Federal

16   Express to the recording office versus the

17   abstractor walking it to the office?

18       A     No, sir.  I think the $30 that's on there

19   for Fed Ex or mail is throughout the whole file, so

20   there's numerous items get Fed-Ex'd and mailed out.

21   So it's not specific to sending the recording, so --

22       Q     Okay.  Does Lenders First Choice always

23   charge the Federal Express charge for $30?

24       A     Yes, for the most part.  Uh-huh.

25       Q     We confirmed, didn't we, that for the
```

```
 1   Edwards file the instrument was recorded by
 2   sending -- by Lenders First Choice sending from --
 3   by Federal Express to the --
 4       A    I believe we did see the Fed Ex charge in
 5   the system, that that took place.
 6       Q    Now, skipping over --
 7            MR. COOK:  Well, to be precise, I think
 8       it's entitled delivery fee on --
 9            THE WITNESS:  Yes.
10   BY MR. RIEMER:
11       Q    But that's not my -- my question has to do
12   with how the Edwards instruments were actually
13   recorded.  Lenders First Choice sent them through
14   Federal Express to the probate office, right?
15       A    Yes.
16       Q    All right.  Now, skipping ahead to Hall,
17   and we'll talk about her file, but before I forget
18   about it, is it the same with Hall?  I mean, was the
19   Hall instrument sent to the probate court?
20       A    No, sir.
21       Q    Or how did that work?
22       A    The Hall file was an Ameriquest file, and
23   Ameriquest used a third party called U.S. Recording
24   to do that process.
25       Q    And does Ameriquest pay U.S. Recording out
```

*First-Choice Reporting Services, Inc.*                                    11

1    of their own money to do that, or is that something

2    that Lenders First Choice has to pay?

3        A    The agreed amount of money was $35 to put

4    on the HUD as a fee that, my understanding, was a

5    combination of the fee going to U.S. Recording to do

6    that service and possibly a portion of that fee

7    going to Lenders First Choice for changing our

8    process to do it the Ameriquest way with U.S.

9    Recordings.

10       Q    Okay.  Does Lenders First Choice pay U.S.

11   Recordings directly in Ameriquest files?

12       A    My understanding is that the U.S.

13   Recordings sent an invoice, and Lenders First

14   Choice paid the invoice.

15       Q    In the Hall case?

16       A    Correct.

17       Q    Is that the case in all the Ameriquest

18   files?

19       A    Not all, because we closed Ameriquest

20   files before U.S. Recordings existed, so there was a

21   process change when they brought up U.S. Recordings.

22       Q    Does Ameriquest -- well, whether or not

23   it's U.S. Recordings, does Ameriquest always engage

24   this -- this outside entity to actually record their

25   mortgages?

```
 1      A    When we started using U.S. Recordings, it
 2  was done that way.  Prior to that, it wasn't.
 3      Q    Okay.  What is the time frame on the
 4  shift?
 5      A    I don't know.
 6      Q    And in 2006 -- beginning of 2006, how did
 7  the process work with Ameriquest?
 8      A    It just appears, from looking at the HUD-1
 9  settlement statement on the Hall loan, that it was
10  in place to use U.S. Recordings.
11      Q    Okay.  So at some point prior to the Hall
12  loan there was a different system in place?
13      A    Yes.
14      Q    And was that system the same that you-all
15  used with other lenders where you-all handled the
16  transmittal of the --
17      A    Yes, recording.  Yes.
18           MR. COOK:  For recording?
19           THE WITNESS:  Yes.
20  BY MR. RIEMER:
21      Q    For recording?
22      A    Yes.
23      Q    Okay.  And when the system changed, from
24  what you're saying, you-all get an invoice from U.S.
25  Recordings that you're paid -- that you pay, and
```

1  then you collect a $35 -- is that the recording

2  service charge?

3      A    Yes, sir.

4      Q    And part of that money goes to paying U.S.

5  Recordings; is that correct?

6      A    My understanding was that they would

7  charge a fee to invoice us to pay the recordings,

8  and that's what the $35 was for.

9      Q    "They" being Ameriquest?

10     A    Oh, I'm sorry.  U.S. Recordings.

11     Q    All right.  What would be the amount that

12 U.S. Recordings would charge you?

13     A    I don't know.

14     Q    Is that reflected in the Hall file?

15     A    No, sir.  It is not reflected in the file.

16     Q    What documents would reflect that?

17     A    My guess would be the invoice.

18     Q    Right.  Which you said -- which you said

19 you received from U.S. Recordings?

20     A    My understanding is that an invoice was

21 passed through our accounting department to pay

22 those recording fees via an invoice.

23     Q    And that's what -- that's not unique to

24 the Hall file, right?

25     A    No, sir.

1       Q    That's what happens in the Ameriquest

2   files after they switched over to using this U.S.

3   Recording entity?

4       A    That's correct.

5       Q    All right.  Now, what happens -- when you

6   say invoice, I'm assuming there's a paper invoice

7   that you receive?

8       A    It's not something I've ever seen.

9       Q    Okay.  Does it appear on GATORS?

10      A    I've not seen it in the GATOR files, no,

11  sir.

12      Q    How would you find -- I mean, how would

13  you view the invoice?  What would you have to do to

14  actually look at the invoice for a particular file?

15      A    I don't have vision to that, sir.  I have

16  no idea.

17      Q    Okay.  Is the invoice sent to the local

18  office, or was it sent to another office?

19      A    Another office.

20      Q    Which office?

21      A    My understanding would be it would be Simi

22  Valley, because it was an accounting function and

23  that's where accounting is.

24      Q    Okay.  So U.S. Recordings sends invoices

25  to the accounting office in Simi Valley, to someone

*First-Choice Reporting Services, Inc.*                15

```
 1    in Simi Valley?

 2         A    (Nods head.)

 3         Q    Now, you said that part of this $35 goes

 4    to compensate Lenders First Choice for changing

 5    their system over.  I don't mean to put words in

 6    your mouth.  Do I have that right?

 7         A    That's --

 8              MR. COOK:  He said possibly.

 9              THE WITNESS:  Possibly.  I'm not a hundred

10         percent sure.  I've never been involved in that

11         process.  But I just know that there was a fee

12         that we put on the Ameriquest files when we

13         started using U.S. Recordings, and I think that

14         was agreed upon because there was costs

15         involved in doing that.  It was a change in the

16         process.

17    BY MR. RIEMER:

18         Q    Okay.  Where do you get that knowledge

19    from?

20         A    Received that knowledge because at the

21    time that switch took place, we were doing

22    Ameriquest files out of this office from a branch

23    level, and, you know, there was a discussion that,

24    here's what's going to happen.  This is how you get

25    the files to U.S. Recording, and the charge to HUD
```

```
 1   was -- we needed to know that, since we prepared the

 2   HUDs.

 3        Q    Okay.

 4        A    But as far as the dividing of that $35, I

 5   have no idea.

 6        Q    Can you say one way or the other -- well,

 7   can you say for sure that whatever the invoice

 8   amount from U.S. Title -- U.S. Recordings, it's less

 9   than $35?

10        A    I don't know the answer to that.

11        Q    Okay.  Do you have any knowledge as to

12   exactly what Lenders First Choice had to do to

13   change their system over to the system that uses the

14   U.S. Recording?

15        A    Well, I just know that it didn't follow

16   the normal procedure of Fed-Exing the document to

17   the appropriate recording office, or in cases where

18   we had to have it walked in by an abstractor, it --

19   it wasn't that process.  So I don't remember exactly

20   what the process was, but it was different.

21        Q    Okay.  Would there be someone at the Simi

22   Valley office that would know more about that?

23        A    Well, possibly people that are still here

24   that worked that a little bit more than I did, let's

25   say.
```

1      Q     Could you give me a name of someone you

2   think would have more knowledge about that?

3      A     About the cost or the process?

4      Q     Well, let's talk about the process, the

5   shifting-over process.  What -- what was really

6   entailed in that?

7      A     It's a post-closing recording function, in

8   that when a document came back from the signing,

9   what steps it would go through to get to a

10  recording.  So that would have been accepted in by a

11  post-closing person, and then shifted to recording.

12  The recordable docs would go through recording, and

13  what took place there would probably be a recording

14  supervisor and a post-closing supervisor --

15     Q     Okay.

16     A     -- in those other offices.

17     Q     And the -- there would be such individuals

18  in a Texas office?

19     A     There's post-closing people in the Texas

20  office, yes.

21     Q     Okay.  So let's -- well, let me clarify.

22  You said earlier that before this change, you dealt

23  with Ameriquest on the branch level.  That means you

24  communicated with the local branch of Ameriquest and

25  got the documents and information you needed, right?

```
 1        A    That's correct.

 2        Q    Okay.  So if we -- let me make sure I

 3   understand this.  The things that were -- the things

 4   that Lenders First Choice did on Ameriquest files

 5   that were different than other files were, A, you

 6   received an invoice from U.S. Recordings that had to

 7   be paid, and B, there was a trans -- a -- you had to

 8   change your system, your way of doing things for

 9   Ameriquest files, to deal with this -- with the U.S.

10   Recording entity?

11        A    Correct.

12        Q    Is there anything else that Lenders First

13   Choice had to do different for Ameriquest files?

14             MR. COOK:  You mean, anywhere in the

15        process or just for recording?

16             MR. RIEMER:  Just for recording.

17             THE WITNESS:  Oh, okay.  For recording, I

18        would say, not that I'm aware of.

19   BY MR. RIEMER:

20        Q    Okay.  Now, I believe you testified

21   earlier that Ameriquest files were different because

22   they actually hired a notary.  Did I get that right?

23        A    That's correct.  Most often they would do

24   their own -- hire their own notary, yes.

25        Q    And that's a function that in other files
```

*First-Choice Reporting Services, Inc.*                    19

```
 1   you-all did?

 2        A    For the most part, that's correct.

 3        Q    Okay.  So that's one thing less that you

 4   had that Lenders First Choice had to do on

 5   Ameriquest loans, right?

 6        A    Well -- that's correct.  We didn't have to

 7   find a notary.  They would provide one.  That's

 8   correct.

 9        Q    And you didn't have to correspond with the

10   notary either, did you?

11        A    At times we did, because at the times we

12   had the package that had to get to the notary and

13   the HUD had to get to the notary.  So there was

14   definitely correspondence between Lenders First

15   Choice and the notary, and then the product should

16   come back to us.  I'm not sure if it did in all

17   cases from Ameriquest, but usually the package from

18   the notary comes back to us.

19        Q    Okay.  But in the normal case in

20   Ameriquest files, Ameriquest identifies a notary to

21   use, and, in most cases, they would send their

22   package directly to the notary.  Do I have that

23   right?

24        A    In most cases, they would send the package

25   directly to the notary, that's correct.
```

```
 1        Q    But if something unusual came up, you may
 2   have to also deal with the notary directly prior to
 3   closing?
 4        A    That's correct.
 5        Q    Okay.  But in most cases, the notary would
 6   be engaged by Ameriquest, would go to the person's
 7   house, get the package signed, and then would return
 8   that to you --
 9        A    That's correct.
10        Q    -- to do the recording?
11        A    That's correct.  Post-closing.
12        Q    Post-closing, with the aid of U.S.
13   Recordings?
14        A    When that process became in place, yes.
15        Q    Okay.  All right.  Back in February, we
16   talked a good bit about the things that Lenders
17   First Choice -- the tasks that Lenders First
18   Choice performed as title agent for the title
19   company.  And I don't really want to rehash all
20   that, but I just want to make sure I understand.
21   And I'm going to list things that you -- that I
22   believe you testified you did, and it may not be a
23   complete list, but I want you to tell me if there's
24   something on the list that shouldn't be in terms of
25   tasks that you performed as title agent.
```

```
 1              And that would include locate -- and by
 2    "you," I mean Lenders First Choice as an entity, not
 3    just the local office.
 4        A    And are you referring to as -- strictly as
 5    the title agent for title insurance purposes, escrow
 6    officers in closing functions or --
 7        Q    This would be tasks that you perform to
 8    comply with your duties as title agent to the title
 9    insurance company.
10        A    Okay.
11        Q    All right.  Would be locating or
12    identifying an abstractor to use on a particular
13    file, and then receiving the abstract from the
14    abstractor, reviewing the abstract, generating a
15    commitment, making sure that the -- that the
16    requirements listed in the commitment are satisfied.
17    And then that would include the post-closing
18    procedures regarding getting the instruments
19    recorded.
20              Is there anything on that list that
21    shouldn't be on that list?
22              MR. COOK:  Objection to form.
23              THE WITNESS:  I still answer?
24              MR. COOK:  Yes.  When I object to the
25         form, what it means is that I believe the
```

```
 1          question is improper in some way.
 2               MR. RIEMER:  But you can try to answer.
 3               MR. COOK:  But you can try to answer it.
 4               THE WITNESS:  I think all of those items
 5          that you're listing are part of being a title
 6          agent.
 7     BY MR. RIEMER:
 8          Q    Okay.
 9          A    I'm not sure we've got them all, but . . .
10          Q    Okay.  I wasn't sure either.  There may be
11     some others.  I just wanted to make sure that I
12     understood -- that I understood that those items
13     were included, or that I understood that correctly,
14     I should say.
15               Now, on the charge that is imposed on the
16     borrower for abstracting services that's reflected
17     in line 1102 -- and maybe we can cut through this,
18     but I have now seen 30 HUDs.  Lenders First
19     Choice has probably more than that.  And in all the
20     ones I've seen, there is a $175 charge in line 1102.
21     So can you confirm for me this morning that that is
22     the standard charge that Lenders First Choice
23     includes on that line item?
24          A    It's state specific, but yes.
25          Q    Well, now, I've seen HUDs from other
```

1    states.  Tell me how it --

2         A    Some states don't allow you to have an

3    abstracting fee, I believe.

4         Q    Okay.  What does Lenders First Choice do

5    in those states?

6         A    They don't charge an abstracting fee.

7         Q    Okay.  Do they -- do they charge a higher

8    closing fee?

9         A    No, sir.

10        Q    You just eat the abstracting fee?

11        A    I would guess.

12             MR. COOK:  Well, objection to form.  It

13        assumes facts not in evidence.  The title

14        insurance premium may be higher in those

15        states.

16   BY MR. RIEMER:

17        Q    Well, I'm -- okay.  Well, I was talking

18   about the abstracting charge.  All right.

19             So you told me that you didn't know if the

20   closing fee was increased to cover that.  Is the

21   title insurance -- is that included in title

22   insurance premiums for the state?

23        A    I don't know, sir.

24        Q    You don't know.  All right.

25             Can you tell me which states do not allow

1    for the separate charge for abstracting?

2        A    I believe, Arizona.  I'm not sure about

3    California.  That's the only two that come off the

4    top of my head.  I'm sure there are others.

5        Q    Definitely Arizona, maybe California?

6        A    Yes.

7        Q    And maybe others.

8            About how many fall into that category?

9        A    Well, I only know about states that were

10    licensed then and -- there's a handful, I would say,

11    that don't allow that.

12        Q    Like, less than five?

13        A    Yeah, I think so.  Something like that.

14        Q    And I'm only talking about the states that

15    you-all do business in.

16            Okay.  So other than those handful of

17    states that do not allow a separate item or separate

18    charge for abstracting, $175 is the standard charge

19    that Lenders First Choice imposes, right?

20        A    Yes.

21        Q    And that's true going back to the 2006

22    period?

23        A    Yes.

24        Q    Well, that avoids a lot of other

25    questions.

First-Choice Reporting Services, Inc.                    25

 1            MR. RIEMER:  All right.  Let's look at

 2       some of the documents that have been produced

 3       since -- since we were last together.  I'm

 4       going to mark this -- let's see.  I think,

 5       let's go off the record for just a second.

 6            (Plaintiffs' Exhibit No. 13 was marked

 7       for identification.)

 8  BY MR. RIEMER:

 9       Q    Just for the record, I'm marking it as 13,

10  and then I put in parentheses FLA to remind us this

11  was marked in the second installment of this

12  deposition, second and last.

13            And it is documents that are Bates stamped

14  FLC/Edwards 976 through 1001.  And, Mr. Petruccelli,

15  I don't have another copy of this, but I think I can

16  do it without my copy.  Can you identify what those

17  documents are?

18       A    This is a screen shot of a -- the title

19  commitment module for the abstractor.

20       Q    For one loan?

21       A    For one loan for one abstractor.

22       Q    Okay.  And then I believe those are the

23  documents -- that each page is the same screen shot

24  for different loans and those cover the loans -- the

25  sample loans that were produced.  Is that your

*First-Choice Reporting Services, Inc.*                                    26

```
 1   understanding?

 2        A    It appears to be the same ones, yes.

 3        Q    Okay.  And so on that screen, there is --

 4   pardon my reach here -- there is a box that shows

 5   projected cost and actual cost, and in this

 6   particular one, Bates 976, both of those fees are

 7   $55?

 8        A    That's correct.

 9        Q    Okay.  Now, does the actual cost, does

10   that reflect the amount of the check or -- or the

11   amount that was actually paid to the -- to the

12   abstracting vendor?

13        A    The actual cost is -- would be -- my

14   guess, that's what it would be, yes.

15        Q    And there may be some differences between

16   the projected cost and the actual cost if something

17   comes up during the closing or the pre-closing

18   activity, right?

19        A    I think what happens is that there's a

20   cost associated with doing the abstract, and then

21   there's additional add-ons to that abstract that's

22   not known up front when the projected cost is put in

23   there.

24        Q    But in those circumstances, the actual

25   cost -- and this is obvious, but the actual cost
```

First-Choice Reporting Services, Inc.                    27

1    would be greater than the projected cost, right?

2        A    I would assume that would be correct, yes.

3        Q    I just wanted you to confirm that what

4    we're looking at is what we think we're looking

5    at --

6        A    Yes.

7        Q    -- which is, if we want to determine the

8    exact -- the actual amount that was paid to each of

9    those vendors and each of those files, we would look

10   at that box called Actual Cost; is that right?

11       A    That's my understanding, yes.

12            MR. RIEMER:  Okay.  All right.  I'm going

13       to mark another set of exhibits -- or set of

14       documents as Exhibit 14 (Fla).

15            (Plaintiffs' Exhibit No. 14 was marked for

16       identification.)

17   BY MR. RIEMER:

18       Q    And I believe this is -- those are

19   documents -- or those documents are the abstractor

20   documents relating to the Edwards files.  Would you

21   agree with me on that?

22       A    Yes.

23       Q    Let's read the Bates numbers, and here, I

24   will do this faster.  Just for the record, 14 --

25   Exhibit 14 is Lenders First Choice, 1120 through

1    1128.

2              And those documents reflect, do they not,

3    that a company called Sand Dollar Title Research

4    performed the abstracting for the Edwards loan; is

5    that right?

6         A    Yes.  Barry Ferguson d/b/a Sand Dollar

7    Title Research.

8         Q    Okay.  And the charge -- Sand Dollar's

9    charge for that service was $36; is that right?

10        A    Vendor charge, one owner, $36.

11        Q    Then there are -- let's see.  Is -- that

12   $36 charge, is that the actual amount that was paid

13   to Mr. Ferguson's company?

14        A    I don't know the answer to that based on

15   this.  This is an order.

16        Q    Okay.

17        A    So I don't know -- without finding this

18   screen shot for this file, I guess we wouldn't know

19   that (indicating).

20        Q    Well, I don't know.  You're the expert

21   here.  So you would rely on the screen shot as the

22   indication of exactly what was paid as opposed to

23   that order form; is that fair?

24        A    Yeah.  Because this is -- this is an

25   order -- an abstract order that we gave to someone,

```
 1   and we may have agreed on the $36 price, and that

 2   might have changed based on what we needed to do as

 3   far as making copies and so on.

 4           MR. RIEMER:  Take a look at that document.

 5               (Off-the-record discussion.)

 6           MR. COOK:  This is a ledger for a

 7       different closing.

 8           MR. RIEMER:  You're right.  You know, I'm

 9       giving you my Bates number.  It's -- I may have

10       it.  I wish you wouldn't have done that,

11       because it confuses me.  It's actually your

12       Bates number 736.

13           MR. COOK:  376.

14           MR. RIEMER:  I'm sorry.  763.

15           MR. COOK:  763.  Okay.  Screen shot?

16           MR. RIEMER:  Right.

17           (Off-the-record discussion.)

18   BY MR. RIEMER:

19       Q    All right.  So the -- does the second box

20   here on this document, does it -- is that the screen

21   shot you were looking for?

22       A    Yes.

23       Q    Okay.  So we can now say that the actual

24   cost that was incurred by Lenders First Choice in

25   terms of the payment to Sand Dollar was $42?
```

```
 1        A     That's correct.
 2        Q     Now, the $42 charge -- and just backing up
 3   a second, you know, you've been in this -- the real
 4   estate business from various angles for a long time.
 5   I remember your testimony earlier.  Is a $42
 6   abstract charge for -- for a husband and wife
 7   abstract service, such as the one that was performed
 8   by Sand Dollar here, is that the charge that was
 9   prevailing in the market at that time?
10        MR. COOK:  Objection to form.
11        THE WITNESS:  I think it's more based on
12           the geographical area and the competition and
13           things like that.  You know, to say that's a
14           good price in that area, I don't know.
15   BY MR. RIEMER:
16        Q     Well, I mean, that's what I'm asking.  I
17   mean, is that consistent with the abstracts that
18   were being performed in Alabama around that time?
19   Is that -- was that in line with the prices that you
20   were seeing from abstractors?
21        A     I would say 40 to $70 is probably what I
22   see.
23        Q     Okay.
24        A     But I don't look at that quite often,
25   because it's not something that goes with my job as
```

1    a closing manager.

2         Q    Okay.  But anything outside of that 40 to

3    70 range you would regard as being an unusual charge

4    either one way or the other, less than 40 or over

5    70; is that fair?

6         A    In Alabama?

7         Q    Yes, sir.

8         A    I would say that's safe to say, yes.

9         Q    Certainly, you haven't seen a situation

10   where an abstractor would charge -- in Alabama, at

11   least, would charge $175 for performing the same

12   services that Sand Dollar performed?

13        A    I've not seen that.

14        Q    Okay.  Have you seen that in any other

15   state?

16        A    Not that I recall.

17        Q    Okay.  The other charges that you

18   remember, the charges from the vendors would be

19   significantly less than 175, right?

20             MR. COOK:  Wait.  You mean, from the

21        abstractors?

22             MR. RIEMER:  From the abstractors, yes,

23        abstractor vendors.

24             THE WITNESS:  I would say it's less than

25        175, yes.

*First-Choice Reporting Services, Inc.*                     32

```
 1   BY MR. RIEMER:

 2       Q    Okay.  The SOPs -- let's go off for a

 3   second.

 4            (Off-the-record discussion.)

 5   BY MR. RIEMER:

 6       Q    Mr. Petruccelli, I just want you to

 7   identify some documents first, anyway, for us before

 8   we get into these SOPs.  But will you look at the

 9   document that starts LFC/Edwards 765, and tell me

10   what that is?

11       A    This is the amounts of money that we will

12   accept in certain forms.

13       Q    Wait, wait, wait.  Let's back up and be

14   more basic.  Is this one of the documents that you

15   described for us in the earlier deposition as an

16   SOP, or standard operating procedure?

17       A    Yes.

18       Q    And where -- is this -- what's the name or

19   what subject is this particular SOP addressing?

20       A    This procedure, the first one, 765, is

21   addressing acceptable forms of money received from a

22   borrower and a signee for different amounts.

23       Q    All right.  And then there are other

24   subjects that are addressed as we go through these

25   documents, right?
```

**First-Choice Reporting Services, Inc.**                    33

1        A    Yes.

2        Q    Now, these SOPs that were produced, are

3    these the SOPs that are currently in place or are

4    these the SOPs as they existed in the 2006

5    framework?

6        A    Are these the ones I provided you?  I took

7    them directly off our internet that were in place

8    the time I did that.

9        Q    Okay.  Which would have been earlier this

10   year?

11       A    Right up through our meeting.

12       Q    Okay.  Sometime in March of this year,

13   right?

14       A    Correct.

15       Q    Okay.  Now, do you have any information

16   regarding how -- what, if any, differences there are

17   in the SOPs that you produced to your lawyer and

18   those that were in place in 2006?

19       A    Specific one or --

20       Q    Well, is there any way to go back and

21   compare the two?

22            MR. COOK:  I think that's too general of a

23       question.  I think you ought to ask him

24       about --

25            MR. RIEMER:  The specific SOPs?

*First-Choice Reporting Services, Inc.*                    **34**

```
  1              MR. COOK:  The particular ones, and then I
  2       think he can say, well, this was in place and
  3       I'm not sure if that one was in place.
  4              MR. RIEMER:  That's fair enough.  That's
  5       fair enough.
  6   BY MR. RIEMER:
  7       Q    All right.  Let's go to Bates number
  8   698 -- I'm sorry.  I'm reading the wrong one again.
  9   844.  844.  Do you see that it is entitled,
 10   Evaluating Abstracting Vendors?
 11       A    Yes, sir.
 12       Q    Now, this process of evaluating abstract
 13   vendors, is this something that's performed at the
 14   local level or something performed in one of the
 15   regional offices?
 16       A    Regional offices.
 17       Q    Okay.  What -- what department is that
 18   handled within?
 19       A    This is title department, vendor
 20   management type thing.
 21       Q    Okay.  And if I understand this, it looks
 22   like that that department ranks the abstractors that
 23   it might possibly use in accordance with the
 24   criteria that are listed here; is that right?
 25       A    That's correct.
```

1      Q    And then -- and then it picks -- or

2   chooses the abstractors as the orders come in from

3   that ranking; is that fair to say?

4      A    I would say so, yes.

5      Q    Okay.  And is it -- is it fair to say,

6   from this -- from this document, that an

7   abstractor -- and I'm paraphrasing this, you tell me

8   if I'm wrong -- but an abstractor that charges more

9   than $100 as a fee is going to be removed from

10  what's designated as the auto assigned?

11     A    That's what it appears to say, yes.

12     Q    Okay.  So an abstractor charging $100 is

13  not going to be in that list that the computer or --

14  or that the system selects as orders come in, right?

15     A    That's correct.

16     Q    All right.  And it looks to me like the

17  abstractor -- for every dollar the abstractor is

18  charging over $45, it is reducing its chance of

19  being selected from the system to perform an

20  abstract; is that right?

21     A    Yes, sir.

22     Q    Okay.  Now, that -- this system that --

23  that's described in this page and the next one, 845,

24  do you know if -- if this has changed at all since

25  the 2006 period?

```
 1        A    I have no knowledge about this one, sir.

 2        Q    Okay.  Do you know if this -- this

 3   generates a situation where the abstractor -- the

 4   most common abstractor fee is around that $45 range?

 5             MR. COOK:  Objection to form.

 6   BY MR. RIEMER:

 7        Q    If you know.

 8        A    I'm sorry.  Say it again.

 9        Q    Is the result of this system that the

10   abstractor fees that are generally charged among the

11   abstractors that are listed in the auto assign queue

12   are around the $45 range?

13             MR. COOK:  How is he going to know that?

14             MR. RIEMER:  I don't know.  If he does, he

15        does.  If he doesn't, he doesn't.

16             THE WITNESS:  I don't know that.

17             MR. COOK:  You asked him earlier.

18             MR. RIEMER:  All right.  Well, you know,

19        he can always say he doesn't know something,

20        Greg.  You don't have to tell him that he

21        doesn't know.

22   ***

23   BY MR. RIEMER:

24        Q    All right.  Let's -- we're going to skip

25   around a little bit, but let's stay with this
```

```
 1   document.  Would you go to Bates number 855, please?

 2       A    (Witness complies.)

 3       Q    And let me do this first.  Look at the

 4   next page, 856.

 5       A    (Witness complies.)

 6       Q    Let me ask you this question,

 7   Mr. Petruccelli.  Petru-celli.  It's Petru-chelli

 8   (pronouncing phonetically), right?

 9       A    Either is fine.

10       Q    Okay.  We talked about, earlier in

11   February, the recording fee, and you said your

12   understanding is that the recording fee, at least in

13   the Edwards' case, was based on a -- taking the

14   applicable rate per page and assuming a 30-page

15   mortgage or recording instrument; is that right?

16       A    That's correct.

17       Q    And that's where the $88 came from?

18       A    The 30-page number comes from what could

19   possibly be recorded, not just the mortgage.

20       Q    Okay.  All right.  Fair enough.

21       A    Okay.

22       Q    And then when I asked you about the

23   practice in general, I believe you said --

24            (Brief interruption.)

25
```

```
 1   BY MR. RIEMER:

 2        Q    Okay.  This 30-page calculation, I believe

 3   after you explained what had happened with respect

 4   to the Edwards loan, I asked you, well, is that the

 5   way it's done across the board by Lenders First

 6   Choice?  And you said you didn't know if that was

 7   done in every case.

 8             But does -- does this statement in the box

 9   here on top of page -- I'm sorry, 856, does that

10   indicate that in -- that in all cases, at least the

11   default for the recording fee is based on that

12   30-page estimate?

13        A    Yes.

14        Q    Okay.

15             MR. COOK:  Would you read that question

16        back to me?  I'm sorry.

17             (Whereupon, the question was read back by the

18        court reporter.)

19             MR. RIEMER:  Okay?

20             MR. COOK:  Uh-huh.

21   BY MR. RIEMER:

22        Q    So GATORS -- in all cases, GATORS would,

23   at least as an initial matter, calculate the

24   recording fee to be whatever the local rate is per

25   page and assuming a 30-page document?
```

1      A      That's my understanding, yes.

2      Q      And that is the amount that gets produced

3   in the preliminary HUD, right?

4      A      That's correct.

5      Q      And unless there are any changes, that's

6   what's in the final HUD, right?

7      A      That's correct.

8      Q      All right.  Let me ask a question that I

9   meant to about abstracting before we get too far

10  from it.

11          For the loans, other than the ones that

12  the HUDs have been produced for, other than the

13  sample loans, it would be simply a matter of looking

14  at that screen that shows the actual shot -- actual

15  cost of the abstractor to determine what was

16  actually paid to the abstractors, right?

17     A      That's where the amount should be, yes.

18     Q      Okay.  And that data is retained by

19  Lenders First Choice historically?  In other words,

20  we could go back to every 2006 loan and pull up that

21  screen and see what was paid to the abstractor,

22  right?

23     A      Should be able to.

24     Q      Okay.  Now, getting back to this part

25  of -- or this SOP that's reflected at Bates 855, and

1   it -- it goes -- it's entitled, Holdbacks at

2   Closing.  And I remember that holdback was a term

3   you used when describing the process of determining

4   what, if anything, was left over after a loan was

5   closed.

6       A    When the disbursement takes place, if

7   there's something you don't want to disburse at that

8   time, you put it on holdback.

9       Q    Okay.  And is that process what's being

10  described in this SOP?

11      A    This is the holdback procedure for

12  recording fees and county tax stamps and state

13  transfer taxes.

14      Q    And does this SOP cover the process that

15  you described earlier of refunding overages charged

16  for recording fees?

17      A    It does reference holding back that money

18  for release in the future, but I believe there is a

19  different SOP that tells you to release it.

20      Q    Okay.  And that's -- that's probably the

21  SOP that Mr. Cook referred to earlier, 462.

22          MR. COOK:  (Tenders document.)

23  BY MR. RIEMER:

24      Q    Okay.  Let me -- I'm not going to mark it,

25  but let me just get you to confirm that this

 1    document, that starts at 462 and ends at 469, is the

 2    SOP for the recording fee releases (tendering)?

 3        A    (Reviewing document.)  Yes, sir.

 4        Q    Okay.  Now, getting back to the other SOP

 5    and going to page 859, can you -- there's a sentence

 6    there that starts, rule of thumb, proceed --

 7    proceeds wire pay should be treated the same as if

 8    it were a check being issued and the party was

 9    trying to process it.

10            What does that refer to?

11        A    I believe it's -- it's talking about that

12    you should have signatures for both parties on the

13    proceeds letter if you are going to do a wire, just

14    like you would a, you know, check being endorsed by

15    both parties on the check.

16        Q    Okay.  So you can confirm that it's been

17    accepted by the right people?

18        A    That's correct, or that both people want

19    it to be wired.

20        Q    Okay.  And I hate to skip back and forth,

21    but let me ask you another question about this

22    recording fee release SOP there.

23            There are a number of sample print screens

24    toward the back of that policy.  Does that mean that

25    there -- that where there is a refund check issued,

1    that that should be recorded or reflected in the

2    screen shots on that particular file?

3         A    Adding an issue is like, you know, setting

4    that file up for something to happen to it.  So they

5    set an issue that they're recording -- that there is

6    a recording overage that needs to be sent back to

7    the borrower.  So that's what they're doing in that

8    screen shot, setting an issue.  Now, you can assign

9    issues to people.  So they're assigning this issue

10   to a recording disburser to disburse that check back

11   out to the borrower.

12        Q    And that process is documented in the --

13   in the screen shots in GATORS?

14        A    The process is?

15        Q    Let me ask it this way.  This is easier.

16             Could you determine, by looking on --

17   looking on the GATORS system for a particular loan,

18   whether or not a refund had been issued to that

19   borrower for recording fees?

20        A    Can I look at -- yes, I can.  I can look

21   at the GATOR system and see that there was a check

22   reissued back to the borrower for an overage and

23   recording fees.

24        Q    Okay.  Is there a way to -- other than

25   going to each individual file and looking for that

Hall-Frazier
Record - 000806

*First-Choice Reporting Services, Inc.* 43

```
 1    information, is there a listing or other source of

 2    information that would tell us how many -- which

 3    borrowers received refund checks?

 4         A    Not to my knowledge, but we did institute

 5    software that sweeps that database now looking for

 6    that occurrence and refunding it in an automatic way

 7    now instead of manually going through the unbalanced

 8    accounts.

 9         Q    Okay.  So it sweeps through the entire

10    database and identifies the borrowers that are

11    entitled to a refund or that -- did I say that

12    right?

13         A    I believe it sweeps and finds unbalanced

14    accounts where there's an overage, and then a

15    determination is made whether it's a recording

16    overage or something else.

17         Q    Well, if I were to try to determine -- or

18    identify the borrowers who had been issued a

19    recording fee refund check at any time since, say,

20    January 1, 2006, would the GATOR system be able to

21    produce that information?

22         A    In a report?

23         Q    Yes.

24         A    I don't know the answer to that.  The

25    information is there.  I assume someone could get at
```

*First-Choice Reporting Services, Inc.*                44

```
 1   it in a report somehow.  I don't know.

 2        Q    You just don't know.

 3             Is there a -- does Lenders First

 4   Choice have an IT department?

 5        A    Absolutely.

 6        Q    And I guess the folks in this department

 7   are knowledgeable about how the GATOR system works

 8   and what information could be gathered through the

 9   GATOR system?

10        A    I would say yes.

11        Q    And would those be the folks that you

12   would direct me to for an answer to the question I

13   just asked you?

14        A    If there isn't one already, yes.  I mean,

15   there could possibly be that report that accounting

16   uses.  I just don't know the answer to that.

17        Q    All right.  Let's go back to the other set

18   of documents, and I just had a couple of quick

19   questions about 867, where it discusses the in-house

20   closing audit.

21        A    Yes, sir.

22        Q    Do these -- these monthly audits, do they

23   take place back in the 2006 period?

24        A    I think that's when they did take place,

25   but I can't be 100 percent sure.
```

*First-Choice Reporting Services, Inc.*        45

```
 1        Q     Did -- do they not take place now?

 2        A     I'm not aware of these taking place, no.

 3              MR. COOK:  Just so you-all don't talk over

 4        each other, okay, he testified about the trial

 5        balances that were run once a month.  And then

 6        this SOP is about in-house audits that were

 7        separate transactions, and so they're --

 8        really, this SOP is not addressing what you

 9        think it's addressing, I don't think.

10              MR. RIEMER:  That was my next line of

11        questioning, was to try to relate it to the

12        trial balance discussion we had before.

13   BY MR. RIEMER:

14        Q     Would you agree with that,

15   Mr. Petruccelli, that this process that's described

16   in this SOP at 867 is separate than the

17   trial balance process --

18        A     Absolutely separate.  Absolutely.

19        Q     Okay.  Because you were telling us earlier

20   about the trial balance report you would ask your

21   employees to go through every month when they --

22   when things were getting slow?

23        A     Yes, that's unbalance -- the report has

24   nothing to do with this process here at all.

25        Q     Well, what is being audited in this
```

1    process reflected in 867?

2        A    My understanding was that this was an

3    internal project to see how we were doing, and we

4    were taking -- and the only reason I'm aware of it

5    is because a small part of this, the post-closing

6    part of this was done in this office, because at the

7    time we had a post-closing department.  And that

8    supervisor was less busy than some of the others,

9    and took on the task of going through the files and

10   making sure we were doing our proper performance of

11   those files.

12       Q    And is this process one of the things

13   that -- that dropped off when the business

14   contracted, the last 12 months or so?

15       A    I'm not sure if that's the case.  I'm not

16   aware of this going on now.

17       Q    Okay.

18            MR. COOK:  Just for the record, you might

19       want to look at the empty cubicles in this

20       office, and they just go on for as far as you

21       can see.

22            MR. RIEMER:  Let's just go off for a

23       second.

24            (Off-the-record discussion.)

25

```
 1   BY MR. RIEMER:
 2       Q    Okay.  Let me just confirm a couple of
 3   things here, please.  Go to 870, and this is another
 4   screen shot.  You see there it says, refund to
 5   borrowers $25 on --
 6       A    Uh-huh.
 7       Q    Where it says --
 8       A    Uh-huh.
 9       Q    The screen shot you were telling me that
10   you would look to to determine if a borrower got a
11   refund for recording fees, just to confirm the
12   screen shot would tell you that not only they got a
13   refund but it would tell you the amount of the
14   refund check that was issued, right?
15       A    Uh, yes.  It's not where I would look, but
16   not to say it's not a correct place -- it's not the
17   place I would look, but not to say it isn't a
18   correct place to look.
19       Q    Now, earlier I believe you testified that
20   you thought that the -- that the refund checks went
21   with a letter.  That there was a cover letter that
22   went with the checks.  We didn't see one in the
23   Edwards file.  Do you see anything in the SOP
24   regarding -- or that we're looking at here,
25   regarding these refunds that talks about a letter?
```

```
 1        A    I have not seen anything in the SOP that
 2   says you should send a letter with the check.
 3        Q    Okay.  And you hadn't seen that in any of
 4   the SOPs you've seen, right?
 5        A    No, sir.
 6        Q    Okay.  This disclosure that's on 872 --
 7   yeah, you've got it right there -- is that something
 8   that's generated as a part of the closing documents?
 9             MR. COOK:  I frankly don't know what this
10        is, Ken.  And I don't know how this ended up in
11        the production, so . . .
12             MR. RIEMER:  Okay.  Well, at least I can
13        take some solace that I'm not the only one that
14        was confused by it.
15             MR. COOK:  You can answer the question if
16        you think you know what it is.
17             THE WITNESS:  Well, I think, now that I'm
18        seeing Attorney Kania's name in here.  In North
19        Carolina, we have an attorney who reviews our
20        commitment -- our abstract and our commitment.
21        I think it's possibly a new law there in North
22        Carolina.  I think that's what this disclosure
23        is, that he's reviewed that for us.
24   BY MR. RIEMER:
25
```

1   Q    Okay.  So this is not part of the SOP?

2   A    No.  I don't know how that got in there.

3   Q    All right.  Would you turn to 879, and

4   there's another subject addressed called Opening a

5   Recording Order.  And I just want to confirm that

6   the processes described here, they're all the

7   same -- it's the same basic process that you've

8   testified to back in February and this morning about

9   selecting an abstractor and reviewing the abstract

10  and going through the steps to make sure it's

11  recorded?  I mean, it's the same process, right?

12  There's not a separate process, is there?

13           MR. COOK:  Objection to form.

14           THE WITNESS:  I don't understand the

15      question.  I guess it is a different process

16      than ordering an abstract.  This is opening a

17      recording order, which is a module with --

18      inside of GATORS.  There's a closing module, a

19      title module, and a recording module.  And this

20      is the recording people opening up a recording

21      order.

22  BY MR. RIEMER:

23  Q    Okay.  Well, fair enough.  And what I'm

24  trying to do is make sure I understand the tasks

25  that Lenders First Choice performs in the process of

1    closing a loan.  And I just want to make sure I'm

2    not missing anything, because I believe you gave a

3    pretty comprehensive description earlier.

4            But even though this is a different

5    module, they're not selecting a new ab -- an

6    abstractor that's different from the abstractor that

7    perform the title abstract, are they?

8        A    This has nothing to do with ordering an

9    abstract, this 879.

10        Q    Okay.  It is -- all right.

11        A    I mean -- well, wait a second.  Let

12    me . . . (Reviewing document.)

13            This is the procedure to open up a

14    recording -- recording module inside of GATORS that

15    is linked to a title order and a closing order.

16        Q    Okay.

17        A    It's called a deal.  Each -- every deal

18    number has a closing module, a title module, and

19    recording module.

20        Q    Okay.  So when -- when this list of tasks

21    that starts, number two, complete the abstractor

22    tab, and you go back down there and it says, select

23    new abstractor, it's -- they aren't selecting an

24    abstractor separate from the abstractor that

25    performed the title abstract, are they?

**First-Choice Reporting Services, Inc.**                    **51**

1    A    Not that I'm aware of, no.

2    Q    If my understanding is right, this

3  describes a process of ordering or, basically,

4  telling the abstractor that it is to record the

5  instruments; is that fair?

6    A    (Reviewing document.)  If it is a

7  recording that needs an abstractor to go do the

8  actual physical recording, yes.  I guess I do

9  apologize.  You're correct.  That's what it is.

10    Q    All right.  So this relates to those

11  situations, that you testified earlier to, that

12  occur where rather than Fed-Exing the documents to

13  the recording offices, you're actually asking the

14  abstractor to walk it over?

15    A    Walk it in, yes.

16    Q    All right.  I just had a question or two

17  on this post-closing checklist that's reflected at

18  898.  Let me know when you have it.

19    A    (Reviewing documents.)  Okay.

20    Q    Now, the post-closing checklist, is this

21  something that differs with the Ameriquest files?

22    A    This would be a checklist that the

23  post-closing specialist would use when a package was

24  returned from the notary.

25    Q    Okay.  So Ameriquest files, in the normal

*First-Choice Reporting Services, Inc.*                               **52**

1    circumstance, the package is returned from the

2    notary to Ameriquest, so it would be Ameriquest that

3    would be the entity that's going to this

4    post-closing procedure, not Lenders First Choice; is

5    that right?

6          A     No.

7          Q     Okay.

8          A     I think the files from Ameriquest came

9    back here for post-closing.

10         Q     Okay.

11         A     They weren't here up front, you know.  We

12   would just get closing instructions, produce the

13   HUD, and the package was sent directly to the

14   notary.  We would send our HUD to it.  The package

15   would come back to Lenders First Choice for

16   post-closing and recording, and the difference would

17   be -- post-closing would be instead of sending the

18   recording modules to our recording department, they

19   would be set up to go to U.S. Recordings.

20         Q     Okay.  So someone at Lenders was --

21   Lenders First Choice was going through this

22   post-closing checklist with respect to the

23   Ameriquest loans, just like it did for the other

24   Lenders loans?

25         A     I would say yes.

1      Q    Okay.  On the second to last set of boxes,

2   on the notice of right to cancel, is that

3   something -- does this mean that Lenders First

4   Choice looks at the copy of the notice of right to

5   cancel that's in the file to make sure that there's

6   a signed copy or there's a copy that's signed by the

7   borrower?

8      A    Yes, sir.

9      Q    All right.  And then as far as the date,

10  the expiration date, does Lenders First

11  Choice calculate the third date and make sure it

12  matches the document that was actually signed by the

13  borrower?

14     A    The date is on the document where we are

15  making sure that it's correct.

16     Q    Okay.  Now, on the right to cancel, you

17  would agree with me that the -- that particular

18  document has to be left in a completed form with the

19  borrower, right?

20     A    That's correct.

21          MR. COOK:  Objection to form.

22  BY MR. RIEMER:

23     Q    What, if anything, does Lenders do to make

24  sure that the borrower, at the end of the closing,

25  has a completed and signed copy of the notice of

```
 1   right to cancel?

 2          MR. COOK:  Objection to form.

 3          THE WITNESS:  We instruct our notaries to

 4      leave two copies of the right to cancel with

 5      each person, with each borrower.

 6   BY MR. RIEMER:

 7      Q    With a date on it?

 8      A    With the date on it.

 9      Q    With the expiration date written on it,

10   right?

11      A    The expiration date comes preprinted on

12   the form, for the most part.  Some do hand write

13   them in, you're right.

14      Q    Okay.  But for even the ones, the

15   handwriting, the borrower should be left with two

16   copies of the handwritten date?

17          MR. COOK:  Objection to form, vague and

18      ambiguous.

19   BY MR. RIEMER:

20      Q    Did you understand my question?

21          MR. COOK:  He said "should."

22          THE WITNESS:  Uh . . .

23          MR. COOK:  Do you know what the law is?

24          MR. RIEMER:  Well, he knows about closing,

25      Greg.  I mean, he's been testifying about what
```

```
 1          typically happens and what should happen.  So

 2          let me rephrase my question.

 3   BY MR. RIEMER:

 4      Q    In terms of your understanding of the

 5   process and the way the process is properly

 6   performed -- I believe you've already said this.  I

 7   just want to make sure I understand it -- where

 8   there are notice of right to cancel forms that call

 9   for handwritten date -- or starts out with a blank

10   box and somebody fills in a box, either handwritten

11   or typed, that at the end of the closing, the

12   borrower should have retained a copy or two copies

13   of the notice of right to cancel with the date

14   filled in, right?

15              MR. COOK:  Objection to form.

16              THE WITNESS:  They're supposed to leave

17          two copies of the form.

18   BY MR. RIEMER:

19      Q    Okay.  And that's what you instruct the

20   notaries to do?

21      A    That's what you instruct the notaries,

22   yes.

23      Q    And in what form are the notaries -- in

24   what form do the notaries receive that instruction?

25      A    I would believe they're on the
```

First-Choice Reporting Services, Inc.                    56

```
 1   confirmation that we send to the notary for the
 2   order that we're giving them.
 3        Q    Okay.  So it's a cover sheet that -- or a
 4   cover letter that goes with the loan package?
 5        A    Yes.
 6        Q    Is there a -- is there an SOP that covers
 7   that, if you know?
 8        A    I don't think so, no.
 9        Q    All right.  And you haven't seen in these
10   documents produced, or have you, a sample letter
11   that provides instructions to the notary?
12        A    I have not.
13             MR. COOK:  Just so the record is clear,
14        that would be for non-Ameriquest loans.
15             MR. RIEMER:  Okay.  Good point.
16   BY MR. RIEMER:
17        Q    So for Ameriquest loans, you're not --
18   Ameriquest is providing the instructions to the
19   notary, not Lenders First Choice?
20        A    If they chose a notary, correct.
21        Q    Okay.  But that's what normally happens,
22   weren't you saying, in Ameriquest files?
23        A    Usually the case, yes.
24        Q    Can you turn for me, please, to 936?
25             (Off-the-record discussion.)
```

*First-Choice Reporting Services, Inc.*                    57

1   BY MR. RIEMER:

2       Q     All right.  This is entitled Recording and

3   then non-sister companies, and there's -- a couple

4   of pages over there's another document for recording

5   and sister companies and then there's Alliance

6   Financial and Investors Title.

7            So my first question is, are Alliance --

8   the companies Alliance Financial and Investor Title,

9   are they sister companies to Lenders?

10      A     I don't think they're in business anymore.

11  I don't really know, to tell you the truth.

12      Q     Well, by sister companies, does this

13  describe companies that are also owned by the

14  Mercury Finance Group?

15      A     That was my understanding of sister

16  companies, yes.

17      Q     All right.  Why -- do you have an

18  understanding of why the recording process would

19  change depending on whether you were dealing with a

20  sister company?

21      A     I don't think the recording process

22  changed.  The -- when you were sending an issue to

23  legal, an underwriter may have changed.  I think

24  this is what this is referring to, not just a

25  recording process.  It's when you had a problem

1    recording something and we escalate it to legal or

2    to an underwriter.

3        Q    With respect to whether a -- whether the

4    underwriter used on a particular file is UTG versus

5    First American, would that depend on whether a

6    sister company was involved?

7        A    I don't know the answer to that.

8        Q    A quick question on 946, where -- this is

9    the document that addresses something called a

10   loss/overcall.  And my question is, is this overcall

11   term, is that the same as the process of -- that you

12   described to us as an overage, where you have money

13   left over?

14       A    No.

15       Q    Tell me how -- tell me what the overcall

16   is.

17       A    Overcall is when you are calling back our

18   fees that we charged for, let's say, a shortage

19   maybe.  Would call back our fees to pay something

20   that should have been paid out of the borrower's

21   proceeds.  We made a mistake possibly and are

22   pulling back part of that 450, our fee, to pay for

23   it.

24       Q    Okay.  Has this -- has this occurred in

25   closings that you've been involved in?

First-Choice Reporting Services, Inc.                    59

```
 1        A    Oh, absolutely.

 2        Q    Okay.  Well, how does -- how does that --

 3    I know the policy speaks for itself, but just so I

 4    can understand, how is that different from what's

 5    described here as a loss?

 6        A    A loss is -- there's two kinds of losses.

 7    There's a recoverable loss and a nonrecoverable

 8    loss.  A recoverable loss is when you need money up

 9    front to do something, pay up front for a survey or

10    a homeowners association estoppel letter, something

11    that has to be done prior to us preparing a HUD and

12    collecting money.

13             We would take a recoverable loss for, say,

14    a hundred dollars for a survey.  When the HUD gets

15    generated, you put the hundred dollars on the HUD

16    for the survey and get back your money.

17        Q    From the proceeds of the loan?

18        A    Correct.  Nonrecoverable loss is if

19    someone makes a mistake and doesn't have enough

20    money for the recording of a mortgage, collected

21    less, then that closer takes a loss.  You send the

22    loss up and you ask for $50 to be put into the

23    ledger.  It gets dropped into the ledger and you

24    finish off paying the recording.

25        Q    Okay.  And how does that process relate to
```

```
 1    the overcall?

 2         A    It's -- it's done on the same form.  You

 3    can own -- I think you can overcall if you catch it,

 4    you know, in a quick enough time; otherwise, it

 5    becomes a loss.  The loss is counted against the

 6    closer.  Monetarily, if there's a bonus to be got

 7    that month and you have X amount of losses, that

 8    would offset your bonus.

 9              MR. RIEMER:  Okay.  This is a good time

10         for a break.

11              (Whereupon, a recess was had.)

12    BY MR. RIEMER:

13         Q    Let's talk about the Hall file to the

14    extent we haven't already.  Let me just confirm a

15    couple of things here -- well, a few things.  Let me

16    hand you a set of documents that's been produced,

17    and it's been Bates numbered 1002 through 1119

18    (tendering), and see if you can confirm for me that

19    those documents are the documents associated with

20    Vilma Hall's file?

21         A    (Reviewing document.)  Okay.

22         Q    The first question, it is my understanding

23    that as far as the documents that were recorded with

24    Ms. Hall's file, it was just the mortgage.  There

25    wasn't another instrument that needed to be
```

```
 1    recorded.  Can you confirm that for me?

 2         MR. COOK:  Ken, do you have a copy of the

 3    recording mortgage from Ms. Hall?

 4         MR. RIEMER:  I was just about to look at

 5    that.  Probably on my system, but not handy.

 6         MR. COOK:  I ask that question because we

 7    don't, because we didn't do the recording.

 8         MR. RIEMER:  Well, I've looked at enough

 9    Ameriquest mortgages to be willing to bet that

10    it was somewhere between $53 and $59.

11         THE WITNESS:  (Reviewing document.)

12         MR. COOK:  I would also say, I think he

13    can testify he doesn't see anything that

14    indicates another instrument, but that we can't

15    be certain.

16         THE WITNESS:  Yeah, without going through

17    the whole -- every piece of paper, the

18    mortgage -- the second page of the mortgage

19    does not indicate that there's any balloons or

20    riders or anything that goes with it.  There's

21    no indication on the HUD-1 settlement statement

22    that there was a deed or anything like that

23    performed, so . . .

24 BY MR. RIEMER:

25         Q    Was there any indication in the -- in the
```

1   GATOR system that Lenders First Choice paid a

2   recording fee other than the fee paid to record the

3   mortgage?

4        A    The HUD-1 settlement statement on Vilma

5   Hall showed a $35 recording service fee --

6        Q    Right.

7        A    -- collected -- I mean -- I'm sorry.

8        Q    Because that's an Ameriquest loan?

9        A    That's correct.

10       Q    All right.  But that wasn't -- that $35 --

11  your previous testimony, the $35 relates to the

12  amount of money paid to the United Recording

13  Company?

14       A    My understanding is that there is a

15  service fee that they charged us to record and

16  Ameriquest to record.

17       Q    But that doesn't indicate that there was

18  another instrument that was recorded, does it?

19       A    No, sir, that does not.

20       Q    Okay.  Of course, the probate records

21  would be the ultimate --

22            MR. COOK:  Right.

23  BY MR. RIEMER:

24       Q    -- documentation of that, but you don't

25  see anything in your file to indicate that there was

*First-Choice Reporting Services, Inc.*                    63

```
 1   another instrument that was recorded?

 2       A    That's correct.

 3       Q    Okay.  I did not see any reference to any

 4   refund check issued to Mrs. Hall.  Did you?

 5       A    I did not.  When I looked at the ledger, I

 6   did not.

 7       Q    Okay.  So as far as Lenders First

 8   Choice documents go, there is no evidence that

 9   Mrs. Hall received a refund or was issued a refund

10   check for any overage and recording fee?

11       A    There was nothing that I saw to say that

12   she did, no.

13            MR. COOK:  And just so it's clear, at this

14       point, we don't know if Lenders First had any

15       overage.  In other words, all of the money may

16       well have gone to U.S. Recording.

17            MR. RIEMER:  Okay.

18   BY MR. RIEMER:

19       Q    Does the -- does Lenders First --

20            MR. COOK:  We don't know the answer.

21   BY MR. RIEMER:

22       Q    -- system reflect how much money was paid

23   to U.S. Recordings with respect to this particular

24   file?

25       A    I did not see anything in the file to
```

```
 1   reflect that.

 2       Q    Okay.  Well, you spoke earlier of an

 3   invoice from U.S. Recordings.  Would that be

 4   maintained at some central office at Lenders?

 5       A    I would assume that's the case.  That

 6   there was an invoice to an accounting department

 7   that would maintain that invoice.

 8       Q    Okay.  When -- I assume you were involved

 9   in compiling the Hall documents to be produced in

10   this case.  Is that a correct assumption?

11       A    No.

12       Q    Okay.  So do you know if whoever was

13   compiling those documents, if - if the accounting

14   department was consulted as far as whatever

15   documents they might have pertaining to this

16   particular form?

17       A    I personally called the accounting

18   department, when I saw the $35 service fee on here,

19   and wanted to know what the process was with U.S.

20   Recordings.  And the information I got back was that

21   there was an invoice sent to collect the money from

22   us to U.S. Recordings, and there was a service fee

23   paid each time they did that.  That's all I really

24   got out of the process.

25       Q    Okay.  You didn't get a specific invoice.
```

1    All right.  So in order to determine whether there

2    was a recording fee -- we'll just use the term

3    overage for now.  Whether the actual cost of

4    recording was less than the $88 charged, we would

5    have to know the actual amount charged by a probate

6    court to record the mortgage, right?

7         A    (Nods head.)  Yes.

8         Q    And then the amount that was actually paid

9    to U.S. Recordings?

10        A    Yes.

11        Q    Now, do you have any reason to believe

12   that someone in accounting couldn't ultimately tell

13   us, if we got to the right person, how much was paid

14   to U.S. Recordings?

15        A    I have no idea how they operate.

16        Q    You haven't been told that the information

17   was purged or that there was some other reason

18   why --

19        A    No, I was not told that.

20        Q    Okay.  Would you go to Bates number 1106?

21   I hope I'm using the right Bates numbers.

22        A    1106.

23             MR. COOK:  I'm not sure it goes that high.

24        Yeah, it does go that high.  I'm sorry.  At the

25        very end.

```
 1              MR. RIEMER:  Yes.

 2    BY MR. RIEMER:

 3         Q    Let's see.  That's an invoice from a

 4    company called AlaDocs, Inc.  Is that the company

 5    that performed the abstracting service in connection

 6    with Ms. Hall's file?

 7         A    That's what it looks like.

 8         Q    Okay.  And does that show the amount that

 9    was charged for those abstract services?

10         A    It does.

11         Q    What was that?

12         A    It was a total abstracting charge of $100

13    and total copying charges of $6; total, $106.

14         Q    Okay.  There was a reference I saw in

15    these documents to a rush order for abstracting in

16    this file.  Do you recall that?

17         A    No.

18         Q    Do -- the documents that were produced for

19    Ms. Hall, do they include the screen shots similar

20    to the ones we were talking about earlier that

21    showed the actual cost?

22         A    I haven't seen them.

23              (Off-the-record discussion.)

24    BY MR. RIEMER:

25         Q    Can I see that for a second, please?
```

*First-Choice Reporting Services, Inc.*                67

```
 1        A    (Tenders document.)

 2             MR. COOK:  Go ahead and mark that as

 3        Exhibit 15, too, please.

 4             (Plaintiffs' Exhibit No. 15 was marked for

 5        identification.)

 6   BY MR. RIEMER:

 7        Q    All right.  I marked the two documents

 8   that were produced at the deposition as 15 FLA,

 9   which is, I believe, what you're referring to as a

10   ledger from Mrs. Hall's file.

11             Let me ask a general question about this,

12   the ledger.  In cases -- files where there has been

13   a refund check issued post-closing, would that be

14   reflected in a document like that?

15        A    Yes, sir.

16        Q    Okay.  And would it be reflected at the

17   bottom where it talks about holdbacks and --

18        A    Yes, sir.

19        Q    All right.  And you don't see any

20   indication of a refund check?

21        A    No, sir.

22        Q    Okay.  Does that -- does that ledger

23   reflect how much money was paid to the abstractor?

24        A    No, sir.

25        Q    All right.  Do the ledgers that are
```

1    generated by Lenders First Choice, do they -- would

2    they typically include the payment -- actual payment

3    to the abstractor?

4        A    No, sir, it wouldn't.

5        Q    Okay.

6        A    This is a reflection of the HUD-1.

7        Q    Okay.  Of the disbursement of the proceeds

8    of the loan?

9        A    That's correct.

10        Q    Okay.  Now, there should be a -- there

11    should be a screen shot for Mrs. Hall's file,

12    similar to the one we talked about earlier, that

13    shows the actual cost of the abstractor, right?

14        A    There should be.

15        Q    The Ameriquest loans weren't treated

16    separately in that regard?

17        A    Not that I'm aware of, no.

18        Q    And is it common for the abstractor to

19    charge a higher rate if it's a rush job?

20        A    I don't know if that's common or not.  I

21    know we -- I know I've been involved where we paid

22    more to get a rush job, so -- I've heard the

23    terminology "pay more, get it quicker."

24        Q    Is that one of the ways that the projected

25    cost can differ from the actual cost, if, for

1    whatever reason, they had to do a rush job for

2    the --

3         A    I would say yes.

4         Q    Okay.  Can we confirm that Mrs. Hall's

5    title insurance policy or the -- or Ameriquest's

6    title insurance policy for the Hall loan was

7    underwritten by United General?  Would you agree

8    with that?

9         A    I don't see that here, but . . .

10        Q    Well --

11        A    If the commitment is in the package --

12             MR. COOK:  That's it, minus the notes.

13        You should stick them back in so they're in

14        order.

15             MR. RIEMER:  Give me a minute to look at

16        this.  (Reviewing document.)

17   BY MR. RIEMER:

18        Q    I see the name Shannon handwritten on

19   these closing instructions.  Is that an LFC

20   employee, do you know?

21        A    I have no idea.

22             (Whereupon, a luncheon recess was had.)

23   BY MR. RIEMER:

24        Q    Just a few things to finish up here with.

25   Would you look at document number 1086?  Doesn't

1   that confirm that United Title was the company that

2   formed --

3        A    Yes.

4        Q    They're the underwriter of Ms. Hall's

5   file?

6        A    Yes.

7        Q    Okay.  In the title insurance charge,

8   generally, I asked you a series of questions back in

9   February about that.  And, again, I'm not trying to

10  put words in your mouth, but I want to try to get us

11  back to that line of testimony.

12            We talked about the $275 charge, and you

13  said that Lenders put the amount on the HUD that was

14  generated by the GATOR system; do you remember that?

15       A    That's correct.

16       Q    And I asked you if -- if at any point

17  someone within Lenders actually did the calculation

18  using the filed rate to come up with that number,

19  and I believe you said no.

20       A    I don't know how they came up with this,

21  but --

22       Q    And that is part of my question, is,

23  between February and today, do you have any more

24  knowledge about how that rate is calculated?

25       A    Well, because when I called Bob Lohr, who

1   I believe I told you in deposition I thought did

2   those things, he does, but this one, this 275 was

3   done before his time.  That's as far as I got with

4   it.

5       Q    All right.  Now, there are other charges

6   in the set of information that's been provided to

7   us.  On other files there are other charges other

8   than 275, some higher and some lower.  Do you have

9   any knowledge about how that was calculated by

10  Lenders First Choice other than just bringing it off

11  of whatever GATOR says?

12      A    No.  I would say it came out from whatever

13  GATOR said.

14      Q    Do you have any knowledge about how GATORS

15  went about calculating the title insurance premium?

16      A    I don't think I understand the question.

17      Q    Do you know what GATORS does to generate

18  the premium number that's produced on the system?

19      A    Not exactly, no.

20      Q    What do you know about that?

21      A    My understanding is that somebody puts the

22  rates into the system so that GATORS can calculate

23  it correctly.

24      Q    Okay.  Do you have any knowledge about any

25  kind of minimum fee that GATORS generates?

*First-Choice Reporting Services, Inc.*                72

```
 1        A    No.

 2        Q    You would agree with me that it would

 3   be -- in order to calculate what the -- what the

 4   actual rate, premium rate, should be under the filed

 5   rate -- filed rate manual, it would just be a manner

 6   of taking the loan and applying the calculations set

 7   out in the manual, right?

 8        A    To manually do it?

 9        Q    Yes.

10        A    Yes.

11        Q    Okay.  On the recording fee refunds, you

12   told me -- well, I asked you if it was Lenders First

13   Choice's policy to send a corrected HUD with the

14   refund checks, and I believe you said you didn't

15   know.  Do I have that right?

16        A    I don't know if it's a Lenders First

17   Choice policy.  I personally instructed closers to

18   send the HUD with a check.

19        Q    Those would be for files that were closed

20   in your office where refund checks were issued?

21        A    Correct.

22        Q    But you see nothing in Lenders First

23   Choice policy nationwide about sending a --

24        A    I did not see that anywhere, no.

25        Q    Have you talked with anybody or gathered
```

*First-Choice Reporting Services, Inc.*                73

```
 1   any information as to whether that was done on a

 2   company-wide basis?

 3        A    No, I did not.

 4        Q    And we know that the Edwards didn't

 5   receive a corrected HUD, right?

 6        A    Not that I know of.

 7        Q    Now, do you -- do you have any reason to

 8   believe that a corrected truth in lending statement

 9   or disclosure was sent with the refund?

10        A    I have no idea.

11        Q    Have you ever seen that?

12        A    No, I have not.

13        Q    Have you ever seen referenced in any SOP

14   or any other policy document by Lenders that

15   evidences that a corrected truth in lending

16   disclosure would be issued with a refund check?

17        A    No, I have not.

18             (Off-the-record discussion.)

19   BY MR. RIEMER:

20        Q    Okay.  With respect to the trial balance

21   procedure that you described for us back in

22   February, you -- I asked you what happens for the

23   unclaimed funds, the funds that if you write a check

24   and the check is never negotiated, and you told us

25   that you believe that the -- that those funds
```

```
 1   escheat to the state?

 2       A     That's correct.

 3       Q     Now, I have not seen any reference in any

 4   of the SOPs that were produced about that escheating

 5   process.  Did I miss something?  Is there something

 6   in there about it?

 7       A     I thought I saw it in the SOP.  The one

 8   with the blue -- the color printer, said he sent the

 9   check out six months and then twelve months and then

10   escheat.

11       Q     Okay.  I just want to ask the question.

12   I'm fully capable of missing something.  I might not

13   have been the only one that missed it either.

14       A     (Reviewing documents.)  Do you know what

15   number that is, by any chance?

16           MR. RIEMER:  Let us go off the record.

17           (Off-the-record discussion.)

18   BY MR. RIEMER:

19       Q     All right.  Well, you had a chance to look

20   through the SOPs that have been produced here and

21   you did not see a reference to the escheating

22   process, right?

23       A     I did not just now, no.

24       Q     Tell me what you recall as the stated

25   policy on that.
```

1    A    Well, if a check was returned, we would

2   try two more attempts to send a check to the

3   borrower and a third attempt, we would escheat to

4   the state.

5    Q    Now -- and you recall seeing that in

6   writing or was that just something that you've

7   developed --

8    A    I thought I saw it in writing, yes.

9    Q    Okay.  Now, over what course of time are

10   these attempts made?

11    A    I believe it said six months and then

12   twelve months and then escheat.

13    Q    Now -- well, what about the time frame

14   between the second attempt and the escheating, would

15   that be another twelve months, according to your

16   memory?

17    A    It didn't say.

18        MR. COOK:  That would be based on state

19    law.  In other words, wherever the money came

20    from, whatever that state law states --

21        MR. RIEMER:  Okay.

22   BY MR. RIEMER:

23    Q    Well, then that's my next question, is,

24   which state?  Would it escheat to the state in which

25   the borrower was located or the property was

```
 1    located?

 2        A     That was my understanding, where the

 3    property was located.

 4        Q     All right.  And do -- all the states that

 5    Lenders First Choice does business in, do they all

 6    accept escheated funds under those circumstances?

 7        A     I don't know the answer to that.

 8        Q     Do you know what department within Lenders

 9    First Choice handles this escheating process?

10        A     Yes.  It is general accounting, I believe.

11        Q     Now, you've used the term accounting

12    department before, and now you're saying general

13    accounting.  Are there two different --

14        A     There's a trust accounting and general

15    accounting.  There may even be more, but those are

16    two.

17        Q     Okay.  The folks that deal with non-trust

18    accounts?

19        A     Yes.

20        Q     Okay.

21        A     Like -- if it was stop pay, I talked to

22    trust accounting on a check.

23        Q     Now, do you know if the states to which

24    this -- these funds are purportedly escheated,

25    do the states have a claims procedure for claiming
```

1    for a borrower if the borrower decides to claim

2    those funds?  Do you know one way or the other?

3         A    No, sir.

4         Q    What documents are generated in connection

5    with the escheating system?

6         A    I have no idea, sir.

7         Q    Have you ever seen an example of a cover

8    letter addressed to somebody in a state budget

9    office or something?

10        A    No.

11        Q    Okay.  Other than what you think you saw

12   in a -- in a document somewhere about this procedure

13   you just described, have you seen anything in

14   writing over the entire course of your employment at

15   Lenders First Choice that reflected on or related to

16   this escheating process?

17        A    Not that I can recall.  I know I've had

18   verbal conversations with the process of trying to

19   return the money multiple times and then escheating.

20        Q    Okay.  Of the loans that were -- of all

21   the loans that were closed in your office, the

22   Longwood office, did any of those -- were funds

23   escheated back to Florida -- well, not to Florida,

24   but escheated back to the applicable state with

25   respect to any of those funds -- those loans?

**First-Choice Reporting Services, Inc.**                78

```
 1      A     I'm not aware of us actually escheating

 2   back to the state on anything.

 3      Q     Okay.

 4      A     Just that that's what would happen.

 5      Q     Okay.  But let me make sure I've got this

 6   down here.  As to all -- all the loans, within your

 7   experience, just the loans that your office has

 8   closed, do you know if any of those loans had money

 9   escheating back to the state?

10      A     My answer would be yes.  I know we have

11   set them up to be escheated to a state.  I don't

12   know what that practice is.  I just know I've not

13   been able to return money to a borrower.  It sat in

14   the ledger and is going to be escheated, is what I

15   was told.

16      Q     Okay.  And as far as you're concerned,

17   that was handled by somebody else in some other

18   office?

19      A     That's right.

20            MR. COOK:  And just so you will realize

21      this, Ken, Lenders First has only been in

22      business since 2003.

23            MR. RIEMER:  Okay.

24            MR. COOK:  You get the number of years?

25            MR. RIEMER:  Yeah.
```

```
 1  BY MR. RIEMER:
 2      Q    Yeah, I see what you're saying.  You
 3  wouldn't get there yet --
 4      A    Right.
 5      Q    -- on a lot of documents or a lot of
 6  files.  I understand.
 7           Now, the -- before the escheating process,
 8  so it would be in between the time that the trial
 9  balance is performed, and we'll just use the term
10  overage is -- is identified, where does -- do those
11  funds sit?  What kind of account are they sitting
12  in?
13      A    Escrow account.
14      Q    An escrow account?
15      A    Trust account.
16      Q    So when you use the term escrow account
17  and trust account, you're talking about the same,
18  right?
19      A    Yes, sir.
20      Q    Yes?
21      A    Yes, sir.
22      Q    Okay.  Is -- somewhere after that process,
23  is the escrow account ever reconciled?  Is there a
24  separate reconciling or auditing process that's
25  performed on the escrow account?
```

First-Choice Reporting Services, Inc.                    80

```
 1        A     After what?

 2        Q     Well, you told us about the trial balance

 3   process, and the trial balance, if I understand

 4   right, identifies if there's an overage, right?

 5        A     Yes.

 6        Q     And I guess my question is, on the account

 7   that's holding the overages, is that ever audited to

 8   determine how much of that is -- accounts for these

 9   overages?

10        A     I can tell you that we do get notification

11   that -- from accounting saying, this overage has

12   been sitting there for X time, try to push it back

13   out either by, you know, doing research to try to

14   find where that borrower is, if he's not accepting

15   it at the principal location.  So they expect to

16   close or to go through a process to try to get that

17   money back, and they will send an e-mail to that

18   closer and copy me on it.

19        Q     Okay.  So from that, that tells you that

20   there's somebody in accounting that is, on a

21   periodic basis, looking at the funds in this account

22   and tracking how many have been disbursed or how

23   much of those funds have been disbursed and how much

24   is still sitting there; is that -- do you

25   understand --
```

*First-Choice Reporting Services, Inc.*                    81

```
 1        A    I don't know if they're tracking how much

 2   has been disbursed.  They know there's money sitting

 3   in there.  It appears that way, anyway, by the memo

 4   that's sent.

 5        Q    And that comes from the trust account --

 6        A    It comes from general accounting.  Well, I

 7   really don't know who -- where she is.

 8        Q    Okay.  Is there a person identified?

 9        A    Yes.

10        Q    Who is that?

11        A    Karen Little.

12        Q    And is Ms. Little still with the company?

13        A    Yes.  She may be over both accounting, so

14   maybe that's why I'm a little confused on it.

15        Q    Okay.  And is she somebody that's been

16   with Lenders going back to, say, '06?

17        A    Yes.

18        Q    Would she -- would she know, other than

19   just the -- the accounting memos that you're -- and

20   e-mails you described, would she be familiar, do you

21   think, with the escheating process?

22        A    I would think so.

23             MR. COOK:  Here's maybe a simpler

24        question.  Who did you talk to about the

25        process of what happened to this trust account?
```

THE WITNESS: His name is Feme (ph.). He works for Karen Little. He's in the trust accounting department in Texas.

MR. COOK: You also spoke with --

THE WITNESS: I spoke to Robert Schwartz regarding the --

MR. COOK: Did you speak to the -- to Mr. Davidson?

THE WITNESS: Oh, yes. I'm sorry.

MR. COOK: Okay. Good. Finally got there.

BY MR. RIEMER:

Q What's his first name?

A Raymond.

Q Raymond. I think we may have mentioned him before.

A I'm sorry. Yes. We went through a whole process of discussing the differences between our trust accounting and our operating accounts, separate banks, no commingling, that type of thing.

Q Okay.

MR. COOK: And what is Mr. Davidson's position with the company?

THE WITNESS: He's vice-president of finance, CFO.

First-Choice Reporting Services, Inc.                83

1    BY MR. RIEMER:

2        Q    So your knowledge of the way these funds

3    are handled comes from your discussion with

4    Mr. Davidson?

5        A    Yes.  Among other people, yes.  Most

6    recently, Mr. Davidson.

7        Q    And the funds are in this trust account,

8    which, as you said, is separate -- separate from the

9    operating or the accounts that are used by Lenders

10   First Choice in its operations, right?

11       A    Yes, sir.

12       Q    Is there any -- under any circumstances

13   over time, has -- any of the money that is in those

14   trust accounts representing recording fee overages,

15   is it ever made accessible to Lenders First

16   Choice to use in the operation of its business?

17       A    No, sir.

18       Q    Is that a question that -- well, do you

19   get that from your discussions with -- with

20   Mr. Davidson?

21       A    Mr. Davidson said we do not commingle the

22   funds, and that the trust accounts are separate from

23   the operating accounts.

24       Q    Now, the -- just, you know, for my

25   purposes, did -- Mr. Davidson, does he have, as far

*First-Choice Reporting Services, Inc.*                84

1    as you can tell, personal knowledge of this, or did

2    he have to do research himself on this?

3        A    Same personal knowledge of it.

4        Q    He did?

5        A    Yes.

6        MR. RIEMER:  Matthew, do you have any

7    questions?

8        MR. PREVIN:  I do not.

9        MR. COOK:  Do you want me to ask a few?

10        MR. RIEMER:  If you have some, yeah.  This

11    would be good.

12        ':  Do you want -- Mr. Petruccelli, would

13    you want to get your notes about your

14    conversations with Mr. Davidson so we can go

15    ahead and be sure that the testimony on that is

16    precise?

17        THE WITNESS:  Sure.

18        (Off-the-record discussion.)

19            CROSS-EXAMINATION

20    BY MR. COOK:

21        Q    And what is Mr. Davidson's position with

22    the company?

23        A    Vice president of finance, chief financial

24    officer, I believe.

25        Q    Okay.  And where is the bank account where

1    this -- where this Edwards escrow was kept?

2         A    Commercial -- Comerica account was in

3    California.

4         Q    Do you have an account number?

5         A    I do.

6         Q    What's that?

7         A    189-21-06905.

8         Q    Okay.  And is interest paid on this

9    account?

10        A    No interest.  Non-interest bearing.

11        Q    Okay.  And what else did you learn from --

12        A    I learned that we have our operating

13   accounts in Wells Fargo currently and will be moving

14   to U.S. Bank shortly.  We have multiple escrow

15   accounts, one per office.

16             Also talked about the flow of a

17   disbursement, how many people actually had to touch

18   a disbursement before the wire was sent or the check

19   was sent, and the procedure and how that works.

20        Q    How many people have to touch it before

21   you can have it --

22        A    It is two in accounting plus our closer.

23   Our closer will set up the file to be disbursed.  It

24   goes through a disbursement officer who checks it

25   for balance, and then it goes to trust accounting to

*First-Choice Reporting Services, Inc.*                    86

```
 1    actually wire the funds out.

 2        Q    Okay.  Did you learn anything else from

 3    Mr. Davidson?

 4        A    He also said it would -- it would be our

 5    policy not to offset an overage with an underage

 6    without getting something in writing.

 7             MR. RIEMER:  Something in writing from

 8        whom?

 9             THE WITNESS:  From the borrower.

10    BY MR. COOK:

11        Q    Has that happened on loans that have been

12    within your area?

13        A    I have seen that happen in our area, yes.

14             MR. RIEMER:  How -- okay.

15             Let me know when you're done, Greg.  I

16        will follow up.

17    BY MR. COOK:

18        Q    Now, earlier in response to Mr. Riemer's

19    question, you agreed with him that a certain list of

20    activities were a part of being a title agent.  Do

21    you remember that question?

22        A    Yes.

23        Q    Why do you think they're part of being a

24    title agent?

25        A    Because you need to do those things,
```

```
 1   because title agents need to do those things.

 2        Q    Those are things title agents do, right?

 3        A    Correct.

 4        Q    Are -- and are title searches things that

 5   title agents do?

 6        A    Yes.

 7        Q    Are there states that allow you to charge

 8   separately for title searches?

 9        A    Yes, there are.

10        Q    Is Alabama one of those states?

11        A    Yes, it is.

12        Q    Are there tasks here on this Edwards loan

13   that were done before the issuance of the title

14   insurance policy?

15        A    Yes, there was.

16        Q    Tell me some of those tasks that were done

17   that -- by Lenders First Choice in connection with

18   title searching and in connection with the title

19   issues on this loan before the issuance of the title

20   policy?

21        A    You have to enter the order into the

22   system and check the correct address.  You have to

23   locate an abstractor if auto assign doesn't take

24   place.  If there is no abstractor in that location,

25   physical location, you have to recruit one.  When
```

*First-Choice Reporting Services, Inc.*                                      88

1    you do find the abstractor, he could possibly do a

2    no-find, he can't find anything on that property.

3    So then you would have to get another abstractor

4    involved.

5            And then when -- if the abstract is

6    complete, it goes to typing.  It gets typed into --

7    into a commitment format, gets examined by an

8    examiner to see if there's enough data in there to

9    produce the commitment.  And if that person says it

10   is not enough data, they send another abstractor

11   back out to do more research.  And then you produce

12   a commitment.

13           And then there's also a possibility that

14   you will have a date -- a situation where that

15   commitment sits there 30 days without closing the

16   transaction.  Then you have to basically start the

17   procedure all over again.

18      Q    Now, what about taxes?  Who checks on the

19   taxes in connection with the taxes that are due for

20   property insurance, or other kind of taxes, property

21   taxes?  Well, stop.  Let me start that whole

22   question over.  It's a terrible question.

23           At Lenders First Choice, assuming you got

24   an abstractor who's doing an abstracting and

25   collecting things, who does checks on the taxes in

```
 1    regards to the property?

 2         A    Lenders First Choice does all the checks

 3    on property taxes and taxes -- municipal taxes.

 4    Even if the abstractor provides that, we still do it

 5    ourselves in our own inside department.

 6         Q    What department is that?

 7         A    Taxes.

 8         Q    And where are they located?

 9         A    Frisco, Texas.

10         Q    Who is doing this examination of the

11    abstract for --

12         A    They're called title examiners in Frisco,

13    Texas.

14         Q    They're located in Frisco, Texas, you

15    said.  What department are these title examiners

16    located in?

17         A    Title department.

18         Q    Who pays them?

19         A    Lenders First Choice.

20         Q    Do you know who the title examiner

21    employees report to?

22         A    I think they report to the vice president

23    of title, which is Jay Ison.

24         Q    Is it their full-time job to examine

25    abstracts?
```

 1        A    Yes, sir.

 2        Q    The abstract that comes back from the

 3    abstractor -- from the abstractor, is that simply

 4    just a Xerox of the things that are in the title

 5    chain?

 6        A    For the most part, they're copies of what

 7    they're finding in the title chain.  Sometimes they

 8    will put together a run list of what they found.

 9        Q    Does the abstractor provide any analysis

10    of whether or not those things in the title chain

11    are current, or whether they are liens, or whether

12    they have to be cleared, or anything like that?

13        A    No.  They identify what's out there, but

14    they don't tell you they have to be cleared or not.

15        Q    Mr. Riemer asked you about -- in regards

16    to refund checks that would have been sent for

17    overages.  For those that were after November of

18    2006, that would have been done by this computer

19    program you told us about, right?

20        A    That's correct.

21        Q    But the ones that were before November of

22    2006, those were done by individual closers, right?

23        A    That's correct.

24        Q    And would those closers have always used

25    the same description on the ledgers for what a

1    recording fee overage refund would be?

2        A    Say the exact same thing, you mean?

3        Q    Right.

4        A    Probably not.

5        Q    So here I've put in front of you some of

6    the ledgers from the samples that we produced.  So

7    I'm at Bates number 671.  On this first one here,

8    we've got something entitled check recording

9    overage, do you see that?

10       A    Yes.

11       Q    What does that line appear to be?

12       A    Reporting overage of 11.50 to Jimmy

13   Merritt, Jr.

14            MR. RIEMER:  Can you read us the loan

15       number so we can reference that?

16            MR. COOK:  Sure.  Do you want the account

17       or order number?

18            MR. RIEMER:  Just a name or number.

19            MR. COOK:  Jimmy Merritt, M-E-R-R-I-T-T.

20            MR. RIEMER:  All right.

21   BY MR. COOK:

22       Q    And does that appear to be -- that 11.50

23   appear to be a check to Mr. Barrett for his

24   recording overage?

25       A    Yes, sir.

1        Q     And flipping to the next loan, which

2   appears to be Joan/Shirley, which is Bates number

3   674.   Again, this particular closer has used the

4   term recording overage for $36.25; is that right?

5        A     That's correct.

6        Q     And does that entry reflect a refund check

7   for $36.25?

8        A     Yes, sir.

9        Q     Flipping to Bates number 680, which is the

10  Frazier/Louise loan, on this one there is an entry

11  entitled, recording fee overage refund.  Do you see

12  that?

13       A     Yes.

14       Q     $13.20 check?

15       A     That's right.

16       Q     So it's a different description, right?

17       A     Yes.

18       Q     So does that confirm your assumption that

19  they would be different descriptions?

20       A     Yes.

21       Q     So --

22       A     There's no standard description.

23       Q     Do you know of any way to use the computer

24  to go through and determine on each loan, for the

25  ones prior to November of 2006, which of those loans

1    had recording fee refunds and what that amount was?

2        A    No, I don't know.

3        Q    But if you looked, got a manual and looked

4    at them, you might be able to do that?

5        A    Yes, the manual would tell you.  The

6    30-page rule defaults.

7        Q    Rule defaults.  Do you have a judgment as

8    to when that began at Lenders First?

9        A    I don't know when it started.  I know it

10   started after I came to work here.

11       Q    Okay.  So sometime after December of 2004?

12       A    Right.  Probably close to December 2005, I

13   would think.

14       Q    Okay.  Sitting here today, of your

15   personal knowledge and having looked at the

16   documents, do you know whether Ms. Hall got a refund

17   on any recording overage, or not?

18       A    Repeat that.

19       Q    Ms. Hall, Vilma Hall, do you know whether

20   or not -- personally, whether she got a refund or

21   not?

22       A    No, I do not.

23       Q    Do you personally know whether there was

24   an overage or not?

25       A    I do not.

*First-Choice Reporting Services, Inc.*                                    94

```
 1        Q    If -- on title insurance, are there

 2   different title insurance rates based upon certain

 3   endorsements that are added to the policy?

 4        A    There's add-on charges endorsements, and

 5   those are different by endorsement and state.

 6        Q    So if you looked at a loan without pulling

 7   the actual title insurance policy, would you be able

 8   to tell what the rate was?

 9        A    No.

10        Q    Because you would have to see the policy

11   and see which endorsement got added to that policy,

12   right?

13        A    Yes.

14        Q    Do you know anywhere on the file where

15   that would be documented other than pulling the

16   actual policy?

17        A    What endorsements were on that file?

18        Q    Right.

19        A    The HUD-1 would reflect endorsements on

20   there.

21        Q    It would?

22        A    Yes.

23        Q    Okay.  We're sitting in your office today,

24   right, in your conference room in your office here

25   in Longwood, Florida, correct?
```

1      A    Yes.

2      Q    And there are -- I've looked out there and

3  there are empty cubicles as far as I could see on

4  this floor.  You have the whole floor; is that

5  right?

6      A    That's correct.

7      Q    And how many cubicles are filled on this

8  floor?

9      A    About thirteen.

10     Q    About thirteen?

11     A    Uh-huh.

12     Q    And how many cubicles are there on the

13  floor?

14     A    Two hundred and fifty-seven.

15          MR. COOK:  Thank you very much.

16                REDIRECT EXAMINATION

17  BY MR. RIEMER:

18     Q    Mr. Petruccelli, you told us before,

19  confirmed for us that in most states -- there were a

20  couple of exceptions, but in most states the

21  commission that Lenders First Choice earns as title

22  agent is 90 percent of the insurance premium.  Do

23  you remember that?

24     A    By state, there are certain splits with

25  the underwriter, yes.

*First-Choice Reporting Services, Inc.*                    96

```
 1        Q    Okay.  There was a -- I don't want to have

 2   to go through it, but I will if you don't remember.

 3   But there was -- in some of the documents you

 4   produced, at least with respect to United, there was

 5   a ledger, a list of all the states, and most of

 6   those had 90 percent interest; do you remember that?

 7        A    Yes.

 8        Q    Okay.  And you told us -- you confirmed

 9   for us what those -- that United General document

10   said, which was that your duty as a title insurance

11   agent is to determine the insurability of a piece of

12   property with respect to the loan proposed, right?

13             MR. COOK:  Objection to form.

14             THE WITNESS:  Can you repeat the question,

15        please?

16   BY MR. RIEMER:

17        Q    Yes.  You're required, as an agent on

18   behalf of the company, to determine the insurability

19   of the property, to make sure the requirements for

20   insurance are met, right?

21             MR. COOK:  Objection to form.

22   BY MR. RIEMER:

23        Q    You still can't answer my question?  Are

24   you having trouble?

25        A    Yeah.
```

```
 1      Q    All right.  Let's just look -- let's just
 2  look at this.  Exhibit No. 8, which was marked in
 3  your previous deposition, is -- read the title of
 4  that document for us.
 5      A    Underwriting Agreement.
 6      Q    And that's a United -- that's a UTG
 7  document, right?
 8      A    I mean, I don't know.  It doesn't say that
 9  it is.
10      Q    All right.
11      A    It's signed by UGT and Lenders First
12  Choice.
13      Q    And we're covering ground that we've
14  covered before, but I need to do it.  Now, look at
15  paragraph 5.1.
16      A    Okay.
17      Q    All right.  You see where it says that the
18  agent shall cause determination of insurability to
19  be made?
20      A    Yes, sir.
21      Q    Okay.  Now, we went over this before, and
22  you told us that the determination -- the
23  determining of insurability included all those
24  things that you just described, getting an abstract,
25  examining the abstract, producing the commitment,
```

*First-Choice Reporting Services, Inc.*                           98

```
 1   making sure all the requirements stated in the

 2   commitment are met, that all that was included in

 3   the overall task of ensuring the insurability of the

 4   subject property.  Now, is that not your testimony

 5   this morning?

 6        A    No.  I --

 7             MR. COOK:  Objection to form.

 8             THE WITNESS:  I think that that's a true

 9        statement.

10   BY MR. RIEMER:

11        Q    Okay.  So all those things are things that

12   you do to earn -- that Lenders First Choice does to

13   earn the 90 percent commission?

14             MR. COOK:  Objection to form.

15             THE WITNESS:  As far as I know.

16   BY MR. RIEMER:

17        Q    I mean, you get paid as an agent from the

18   title insurance or from the title insurance premium

19   at the rate of 90 percent, at least with respect to

20   most states, right?

21        A    That's true.

22        Q    Okay.  And to earn that fee, you do the

23   things that's required for you to do under this

24   agreement that we've been looking at, at least with

25   respect to United; is that right?
```

*First-Choice Reporting Services, Inc.*                    99

```
 1        A     That's correct.

 2        Q     Okay.  And the overall system works the

 3   same way with the First American underwritten

 4   policies, right?

 5        A     That's correct.

 6        Q     Now, the endorsements that you testified

 7   about earlier, are -- are you aware that in some

 8   states you're not allowed -- or under the -- under

 9   the filed rate -- rates applicable in some states

10   you're not allowed to charge separately for

11   endorsements?

12        A     I don't know the answer to that.

13        Q     But the filed rate is what controls what

14   should be charged for insurance premiums, right?

15        A     The filed rate state, yes.

16        Q     So in a filed rate state, if the filed

17   rate says you cannot charge separately for

18   endorsements, you shouldn't be charging separately

19   for endorsements, should you?

20        A     That's a --

21        Q     In a filed rate state, if the filed rate

22   says that you should not -- that the rate includes

23   any endorsements, in other words, you should not be

24   separately charging for endorsements, then you

25   shouldn't be separately charging for endorsements,
```

 1   right?

 2        A    Yes.

 3        Q    Okay.  And if you did, that would be a

 4   violation of the filed rate?

 5        A    I would assume, yes.

 6        Q    Does -- the title insurance company, other

 7   than producing its rate manual, does it give you any

 8   instruction with respect to what to do with

 9   endorsements?

10        A    I believe the manual has what you can do

11   with endorsements and charges you can have with

12   endorsements, yes.

13        Q    Okay.  And I just want to make sure

14   there's not some separate instrument of instruction,

15   separate mechanism of instruction you're getting

16   from the title insurance company on endorsements.

17        A    No, sir.

18        Q    Okay.  Whatever is in the manual is what

19   controls?

20        A    I would say yes.

21        Q    All right.  Now, you told us about the

22   things that you do with an abstract, examining it --

23   well, identifying the abstractor, dealing with the

24   abstractor, and getting the abstract report.  But

25   for those files where a vendor is used to produce an

1    abstract, Lenders First Choice is not performing the

2    abstract services, are they?

3            MR. COOK:  Objection to form, vague and

4        ambiguous.

5            THE WITNESS:  I guess you would have to

6        define that, because the abstract is getting to

7        a commitment, not just the raw pieces of paper

8        on a copy.

9    BY MR. RIEMER:

10       Q    Okay.  Lenders First Choice is not

11   researching title where --

12       A    Where they send an abstractor out there,

13   you mean?

14       Q    Right.

15       A    No.  No, they are not.

16       Q    And they are not compiling documents from

17   the public record?

18       A    No, they are not.

19       Q    Okay.  And they are not compiling the

20   abstract document that you then take to make a

21   commitment, right?

22       A    That's correct.

23       Q    Okay.

24       A    With the exception of taxes.

25       Q    Okay.  Now, when -- and that's good,

```
 1   because that -- that's -- that's what I wanted to

 2   ask you about next.

 3           With respect to the taxes, we're talking

 4   about property and recording taxes, right?

 5       A    Property taxes.

 6       Q    Property taxes.  And the reason --

 7       A    City taxes, municipal taxes.

 8       Q    The kinds of taxes that the nonpayment of

 9   which can result in a lien against the property,

10   right?

11       A    That's right.

12       Q    And that's why the taxes are important,

13   aren't they, because it can encumber title if

14   they're not taken care of?

15       A    That's correct.

16       Q    And isn't that one of the things that you

17   have to do in order to make sure that the property

18   is insurable, is that there are no problems with the

19   taxes that might encumber the title?

20       A    That would be true.

21       Q    So that's part of your duty, as title

22   insurance agent, that you owe to the title insurance

23   company that you get paid a premium -- a commission

24   for, isn't it?

25           MR. COOK:  Objection to form, compound,
```

```
 1          ambiguous, vague.
 2    BY MR. RIEMER:
 3          Q    Well, let's break it up.  That's part of
 4    your duties you owe to the title insurance company
 5    as title insurance agent, isn't it?
 6               MR. COOK:  Objection to form.
 7               THE WITNESS:  Can you repeat the question?
 8    BY MR. RIEMER:
 9          Q    Sure.  The tasks that you perform, that
10    you just described for us in response to Mr. Cook's
11    questions, that have to do with taxes and making
12    sure that the taxes -- the correct amount is paid so
13    that there are no problems with the title emerging
14    for nonpayment of taxes, those are tasks that are
15    part of your duties that you owe the title insurance
16    company as their agent; isn't that correct?
17          A    That's correct.
18               MR. COOK:  Objection to form.
19    BY MR. RIEMER:
20          Q    And those are part of the overall duties
21    we were describing for which you are paid your
22    90 percent commission?
23               MR. COOK:  Objection to form, vague and
24          ambiguous.
25               THE WITNESS:  We get paid a premium to do
```

1          those tasks, yes.

2     BY MR. RIEMER:

3          Q    Okay.  Now, the -- the abstracting and the

4     things you do -- well, let me back up.  Let me start

5     over again.

6               The title insurance policies we've been

7     talking about, those are title insurance policies

8     that insure the lender, correct?

9          A    They're lenders' policies that ensure the

10    lender that things will happen correctly, yes.

11         Q    Right.  And it's rare that a closing would

12    involve a policy issue for the owner's protection,

13    right?  Most of these are lenders' policies, aren't

14    they?

15         A    In a refinance transaction.  In a purchase

16    transaction, there's a simultaneous issue of both.

17         Q    Okay.  Well, in a refinance, which is both

18    of the files we're here for -- in the refinance, the

19    lender -- part of what the lender is requiring you

20    to do as their agent is to make sure that there is

21    a -- will be a policy in place that insures their

22    interest, right?

23         A    That's right.  And the insurance to the

24    borrower too, I guess.

25         Q    Where there's an owner?

*First-Choice Reporting Services, Inc.*                105

```
 1         A    When there's a -- even a refinance.  I

 2   mean, we have to ensure that the mortgage is going

 3   to get recorded, and that's to the borrower's -- I

 4   would think, to their interest as well.

 5         Q    Well, I would -- I would -- aside from

 6   that, though, I mean, the policy itself -- let me

 7   make sure I understand -- the policy itself is a

 8   lender's policy?

 9         A    It is.  It is.  I'm sorry.

10         Q    Okay.  Now, you described for Mr. Cook

11   this aspect of your discussion with Mr. Davidson

12   having to do with offsetting an overage with an

13   underage?

14         A    Uh-huh.

15         Q    Tell me how that would work, I mean, what

16   that is, in plain English.

17         A    Well, an example would be, is if the

18   borrowers needed to -- if they were short some

19   amount of money on that HUD-1 settlement statement,

20   instead of them sending in the additional money, we

21   could -- if we had additional money, let's say, an

22   overage in recording, that we can offset that.  We

23   would get an approval from the buyer to say, okay,

24   instead of you sending us $50, we will use $50 that

25   we already have in your account.
```

```
 1        Q    Oh, okay.  All right.  I understand it

 2   now.

 3             MR. RIEMER:  Well, I had another question

 4        but I can't read my handwriting, so you're off

 5        the hook on that one.  All right.  That's all I

 6        have.

 7             MR. COOK:  Just one second.  I may have a

 8        question.  I don't know.  (Reviewing

 9        documents.)  No, I don't have anything else.

10   BY MR. RIEMER:

11        Q    Okay.  I just needed to confirm that there

12   was a rush order with respect to Mrs. Hall's

13   abstract, and, actually, it's called super rush.  It

14   says:  I -- This is a super rush.  I need it ASAP

15   today.  I will pay extra to get it.  Thanks so much

16   for your help.

17             That's on page 1005 (tendering).  Do you

18   see that?

19        A    (Reviewing document.)  Yeah.  It looked

20   like the order was cancelled out because something

21   happened and then came back out again and was put in

22   as a rush.

23        Q    Okay.  Well, I just confirmed -- it's

24   probably obvious.  When we talked about how much

25   money was paid to the abstractor in connection with
```

1    Mrs. Hall's loan, it was 106, or a figure around

2    there, which was a good bit higher than the other

3    figures we had seen in other files.

4            Is it safe to say that the reason that

5    number is higher than, say, the 45 range is because

6    of the super rush?

7        A    It's a good possibility.

8        Q    Was there any other explanation that you

9    know of?

10       A    No, sir.

11       Q    Okay.  And agents are authorized to do

12   that, I mean, your closing agents are?  If they need

13   it, then they're authorized to contract for rush

14   rate even if it means a little bit more money?

15       A    Yes, sir.

16           MR. RIEMER:  All right.  That's all I

17       have.  Thanks for your time.

18           MR. COOK:  I do have one follow-up

19       question, and I am trying to find a piece of

20       paper to help me with it.

21                   RECROSS-EXAMINATION

22   BY MR. COOK:

23       Q    On the Edwards loan, the HUD-1 does not

24   show a fee for the notary; is that right?

25       A    I believe that's true.

1    Q    And do you know how much Lenders First

2    Choice had to pay the notary in the Edwards loan?

3         MR. RIEMER:  Didn't we establish that

4    before?

5         MR. COOK:  I don't think so.  I think

6    there was -- something indicated 125, and they

7    had to pay them a second time to go out there.

8         THE WITNESS:  They went twice, because

9    they went back out and did the deed, right?

10   BY MR. COOK:

11   Q    That's right.  They had to go out there a

12   second time to get a corrected date?

13   A    It was 175 or 125.

14   Q    That's right.

15        MR. RIEMER:  Let's go off for a second.

16        (Off-the-record discussion.)

17   BY MR. COOK:

18   Q    I've given you a piece of paper,

19   Mr. Petruccelli.  Can you tell us what number is on

20   the bottom of that piece of paper?

21   A    LFC/Edwards 0258.

22   Q    Okay.  And what does that show was paid to

23   the notary in this case?

24   A    One hundred and seventy-five dollars.

25   Q    And did Lenders First recover any of that

*First-Choice Reporting Services, Inc.*    109

```
 1    money in this closing from the HUD-1?

 2        A    No, sir.

 3             MR. COOK:  Thank you very much.

 4             MR. RIEMER:  That's all.

 5             THE COURT REPORTER:  Are you ordering

 6        this?

 7             MR. RIEMER:  Yes.

 8             THE COURT REPORTER:  Did you wish to order

 9        a copy?

10             MR. COOK:  Yes.

11             THE COURT REPORTER:  Did you wish to order

12        a copy?

13             MR. PREVIN:  Yes, I would, please.

14             THE COURT REPORTER:  Does anyone want an

15        ASCII or E-tran?

16             MR. RIEMER:  ASCII.

17             MR. COOK:  E-tran.

18             MR. PREVIN:  Just the transcript is fine.

19             MR. COOK:  Reading and signing means that

20        if you want to read the deposition and see if

21        there are any typos that she has, like people's

22        names, that sort of thing.  You can't change

23        the substance of your testimony, but if

24        there's -- maybe she's got a "not" in there or

25        didn't put a "not" in there or something.  But,
```

*First-Choice Reporting Services, Inc.*          *110*

1          generally, most people waive reading and

2          signing unless it is a scientific kind of

3          deposition.

4                  THE WITNESS:  I will waive it.

5                  (Whereupon, the deposition was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                          CERTIFICATE

 3
     STATE OF FLORIDA)
 4   COUNTY OF ORANGE)

 5

 6        I, Jan L. O'Steen, Professional Court Reporter, and

 7   Notary Public, do hereby certify that I was authorized

 8   to and did stenographically report the foregoing

 9   deposition of William R. Petruccelli, that a review of

10   the transcript was not requested; and that the foregoing

11   transcript, pages 1 through 110, is a true record of my

12   stenographic notes.

13        I FURTHER CERTIFY that I am not a relative,

14   employee, attorney, or counsel of any of the parties'

15   attorneys or counsel connected with the action, nor

16   am I financially interested in the action.

17        DATED this 26th day of May, 2008, at Orlando, Orange

18   County, Florida.

19

20

21        _____

22        JAN L. O'STEEN, NOTARY PUBLIC, AND
          COURT REPORTER

23

24

25
```

Hall-Frazier
Record - 000875

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA)
      COUNTY OF ORANGE)
 4

 5         I, JAN L. O'STEEN, Professional Court

 6    Reporter, Notary Public, State of Florida, certify

 7    that William R. Petruccelli personally appeared before

 8    me on the 12th day of May, 2008, and was duly sworn.

 9
           WITNESS my hand and official seal this 25th
10
      day of May, 2008.
11

12

13                     _____
                       JAN L. O'STEEN, COURT REPORTER
14                     Notary Public - State of Florida
                       COMMISSION NO. DD0354303
15                     EXPIRES: 9/2/2008

16

17

18

19

20

21

22

23

24

25
```

# LEGALINK, A MERRILL COMPANY
## Court Reporting * Legal Videography * Trial Services

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

       SOUTHERN DIVISION

CASE NUMBER:     CV-05-669

DAWN SAUCIDA and JOHNNY SAUCIDA,

individually and on behalf of

all similarly situated individuals,

       Plaintiffs,

VS.

SWAFFORD & HAYS SETTLEMENT

SERVICES, INC.,

       Defendants.

     * * * * * * * * *

S T I P U L A T I O N

    IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the deposition of GREG SWAFFORD

may be taken before Kelly Gray, CSR., at the law

a7f3f0e1-70d2-485b-aa2e-e19d35381532

## LEGALINK, A MERRILL COMPANY
### Court Reporting * Legal Videography * Trial Services

Page 2

1  offices of Baker, Donelson, Bearman, Caldwell &
2  Berkowitz, P.C., 420 20th Street North, Suite
3  1600, Birmingham, Alabama 35203, on the 19th day
4  of May, 2006.
5       IT IS FURTHER STIPULATED AND AGREED that
6  the signature to and the reading of the
7  deposition by the witness is hereby not waived,
8  the deposition to have the same force and effect
9  as if full compliance had been had with all laws
10  and rules of Court relating to the taking of
11  depositions.
12       IT IS FURTHER STIPULATED AND AGREED that
13  it shall not be necessary for any objections to
14  be made by counsel to any questions except as to
15  form or leading questions, and that counsel for
16  the parties may make objections and assign
17  grounds at the time of the trial, or at the time
18  said deposition is offered in evidence, or prior
19  thereto.
20       IT IS FURTHER STIPULATED AND AGREED that
21  the notice of filing of the deposition by the
22  Court Reporter is waived.
23

Page 4

1       E X H I B I T S:
2
3  PLAINTIFF'S 13..............................199
4  PLAINTIFF'S 14..............................200
5  PLAINTIFF'S 15..............................201
6  PLAINTIFF'S 16..............................205
7  PLAINTIFF'S 17..............................212
8  PLAINTIFF'S 18..............................213
9  PLAINTIFF'S 19..............................214
10  PLAINTIFF'S 20..............................214
11  PLAINTIFF'S 21..............................215
12  PLAINTIFF'S 22..............................216
13  PLAINTIFF'S 23..............................216
14  PLAINTIFF'S 24..............................218
15  PLAINTIFF'S 25..............................221
16  PLAINTIFF'S 26..............................223
17  PLAINTIFF'S 27..............................224
18  PLAINTIFF'S 28..............................224
19  PLAINTIFF'S 29..............................225
20  PLAINTIFF'S 30..............................226
21  PLAINTIFF'S 31..............................227
22  PLAINTIFF'S 32..............................231
23  PLAINTIFF'S 33..............................233

Page 3

1       I N D E X
2
3  WITNESS:  GREG SWAFFORD
4
5  DIRECT EXAMINATION BY MR. UNDERWOOD..........7
6
7  CERTIFICATE PAGE............................274
8
9
10       E X H I B I T S:
11
12  PLAINTIFF'S 1.................................9
13  PLAINTIFF'S 2................................26
14  PLAINTIFF'S 3..............................122
15  PLAINTIFF'S 4..............................142
16  PLAINTIFF'S 5..............................155
17  PLAINTIFF'S 6..............................167
18  PLAINTIFF'S 7..............................181
19  PLAINTIFF'S 8..............................183
20  PLAINTIFF'S 9..............................185
21  PLAINTIFF'S 10..............................186
22  PLAINTIFF'S 11..............................195
23  PLAINTIFF'S 12..............................197

Page 5

1       E X H I B I T S:
2
3  PLAINTIFF'S 34..............................239
4  PLAINTIFF'S 35..............................240
5  PLAINTIFF'S 36..............................243
6  PLAINTIFF'S 37..............................243
7  PLAINTIFF'S 38..............................244
8  PLAINTIFF'S 39..............................250
9  PLAINTIFF'S 40..............................251
10  PLAINTIFF'S 41..............................256
11  PLAINTIFF'S 42..............................256
12  PLAINTIFF'S 43..............................257
13  PLAINTIFF'S 44..............................257
14  PLAINTIFF'S 45..............................258
15
16
17
18
19
20
21
22
23

2 (Pages 2 to 5)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

**Page 6**

1       A-P-P-E-A-R-A-N-C-E-S:
2
3    For the Plaintiff:  ATTORNEY AT LAW
4                 By:  Mr. Earl Underwood, Jr.
5                 21 South Section Street
6                 Fairhope, AL 36533
7
8    For the Plaintiff:  ATTORNEY AT LAW
9                 By:  Mr. Kenneth J. Riemer
10                166 Government Street
11                Suite 100
12                Mobile, AL 36602
13
14   For the Defendant:  BAKER, DONELSON, BEARMAN
15                CALDWELL & BERKOWITZ, P.C.
16                By:  Ms. Patricia Clotfelter
17                420 20th Street North
18                Suite 1600
19                Birmingham, AL 35203
20
21
22
23

---

**Page 7**

1        I, KELLY GRAY, a Court Reporter of
2    Birmingham, Alabama, acting as Commissioner,
3    certify that on this date, as provided by the
4    Alabama Rules of Civil Procedure and the
5    foregoing stipulations of counsel, there came
6    before me at the Law Offices of BAKER, DONELSON,
7    BEARMAN, CALDWELL & BERKOWITZ, 420 20th Street
8    North, Suite 1600, Birmingham, Alabama 35203,
9    beginning at 9:00 a.m., GREG SWAFFORD, witness
10   in the above cause, for oral examination,
11   whereupon the following proceedings were had:
12
13            GREG SWAFFORD
14   a witness, being produced, sworn and examined on
15   behalf of the plaintiff, testified as follows:
16
17       BY THE REPORTER:  Usual stipulations?
18       BY MR. UNDERWOOD:  That's fine.
19       BY MS. CLOTFELTER:  We would like to read
20   and sign the transcript.
21
22       DIRECT EXAMINATION
23   BY MR. UNDERWOOD:

---

**Page 8**

1    Q      If you would, state your name, please,
2    sir.
3    A      Greg Swafford.
4    Q      And, Mr. Swafford, my name is Earl
5    Underwood and I'm going to be asking you some
6    questions today.  Of course, I represent the
7    Saucidas in a case that we filed against
8    Swafford & Hays Settlement Services,
9    Incorporated.
10   A      Okay.
11   Q      Sometimes I'm not real good at asking
12   questions.  I've been doing this for twenty
13   years, but I'm still not real good at it, I'm
14   afraid, and I may ask you a question that
15   doesn't make any sense or I may ask you a
16   compound question or you just may not understand
17   my question.  And if I do that or you don't
18   understand the question, I would just ask you,
19   if you would, to just stop me and just say,
20   "Well, Mr. Underwood, can you rephrase that," or
21   "I don't understand the question," or something
22   like that, whatever's appropriate.
23   A      Okay.

---

**Page 9**

1    Q      However, if you don't, I'm going to
2    assume that you understood the question and that
3    you're answering truthfully; is that fair?
4    A      That is fair.
5    Q      Okay.  Now, you understand that you're
6    not -- you understand you're not here personally
7    as --
8    A      I do.
9    Q      Well, tell me what you understand that
10   your capacity is testifying here this morning.
11   A      To tell the truth about the facts of the
12   company.
13       BY MS. CLOTFELTER:  He's here as a
14   30(b)(6) representative of Swafford.
15
16   REPORTER'S NOTE:  (At this point, instrument was
17   marked for identification by the Reporter as
18   Plaintiff's Exhibit Number 1, after which, the
19   deposition continued, as follows:)
20
21   Q      (continued by Mr. Underwood)  Okay.  And
22   let me show you what I've marked as Plaintiff's
23   Exhibit Number 1 and ask you if you've seen that

---

3  (Pages 6 to 9)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 10 | Page 12 |
|---|---|

**Page 10**

1  before.
2  A    I have.
3  Q    All right.  And when did you first see
4  the Amended Deposition Notice?
5  A    I'm not sure of the exact date.
6  Q    All right.
7  A    It's probably been a couple of weeks.
8  Q    All right.  Did you bring any documents
9  with you this morning?
10  A    No, sir, I did not.
11  Q    All right.  Well, let's talk about those
12  right quick.  If you would, turn over to page
13  number 3.  And does Swafford have any reference
14  manuals, writings or other papers that would be
15  compliant to our request number 1?
16      BY MS. CLOTFELTER:  Are you on page 2?
17      BY MR. UNDERWOOD:  Page 3 of the
18  Deposition Notice.
19      BY MS. CLOTFELTER:  Let me just state,
20  before you go through this with him, that on
21  behalf of the company, we have produced all of
22  the documents that have been requested thus far
23  that are responsive, and he doesn't have

**Page 11**

1  anything additional with him today other than
2  what we've already produced.  But we don't -- we
3  didn't bring into the room today everything that
4  we've already provided you and already produced.
5      BY MR. UNDERWOOD:  Okay; all right.
6  Q    (continued by Mr. Underwood)  You can
7  still answer the question.
8  A    Okay.  I'm sorry.  Can you repeat the
9  question?
10  Q    All right.  Let me see if I can.  I asked
11  you if Swafford has any references -- reference
12  manuals, writings or other things electronic or
13  paper format regarding compliance with the Real
14  Estate Settlement Procedures Act.
15  A    We do have references and manuals in our
16  office.  They're provided by the underwriter.
17  They're state-specific.  We do have some that
18  we've gotten from the state specifically.  I do
19  not recall if they have sections about RESPA,
20  but that is what we rely upon is all of our
21  information from our underwriter.
22  Q    All right.  And where are those this
23  morning?

**Page 12**

1  A    They're in my office.
2  Q    And where is that?
3  A    In Knoxville, Tennessee.
4  Q    Okay.  And you saw this Notice before
5  this morning; is that right?
6  A    Correct.
7  Q    Is there some reason why you didn't bring
8  those things with you?
9      BY MS. CLOTFELTER:  The reason for that
10  is -- and I think we've already responded to
11  this -- they are voluminous.  There are, you
12  know, numerous, numerous manuals.  You can go
13  there and look at them, if you want to, but
14  they're too voluminous to bring in here and, you
15  know, produce all of them for all of the states
16  and from different sources.  It's a library of
17  documents.
18      BY MR. UNDERWOOD:  Well, I understand
19  that, but there was no objection to the request.
20  And so, you know, perhaps if we had known that,
21  we could have gone up there and maybe taken the
22  deposition up there at his office so we could
23  have examined those things.  So I'm going to go

**Page 13**

1  ahead.
2  Q    (continued by Mr. Underwood)  What about
3  with regard to number 2?  Is that --
4  A    Once again, it would be the same answer.
5  Q    It would be the same answer?
6  A    Uh-huh.
7  Q    All right.  Now, what about contracts
8  between Swafford -- and I mean Swafford & Hays
9  Settlement Service, Incorporated -- and any
10  third party service providers?
11  A    We do not have contracts with our --
12  actually, we do have contracts with our
13  notaries, but we do not have contracts with
14  our -- excuse me.  I'm sorry.  We have contracts
15  with our abstracters.  We do not have contracts
16  with the notaries.  The notaries receive a
17  document that tells them specifically what
18  they're required to do, but they're not
19  obligated to sign that document.
20  Q    Okay.  Is that -- is that also called
21  "closing instructions?"
22  A    No, it's not.  We do have closing
23  instructions, but that's not the document I'm

4 (Pages 10 to 13)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 14

1  referring to.
2  Q    Okay.  We'll go through some of the deals
3  and maybe we'll get to some of those documents.
4  All right.  What you've told me so far about
5  manuals and references and the like, is that
6  also true with regard to number 5?
7  A    No.  We do not mark up filing or
8  recording fees.
9  Q    Okay.  And I skipped number 4
10 accidentally.  Do you have anything with regard
11 to number 4, any documents or manuals?
12 A    No, we do not.  And we do not actually
13 mark them up, but we do not have any manuals
14 about that.
15 Q    Okay.  Now, without me going through all
16 of them, let's look at the first page and start
17 with number 1.  And if you would, let's -- can
18 you tell me -- look at number 1 through number
19 18, and are you here and able to testify about
20 all those areas of inquiry this morning?
21 A    Yes.
22 Q    Okay; all right.  You've already told us
23 your name.  Where are you employed, please, sir?

---

Page 15

1  A    At Swafford Settlement Services in
2  Knoxville, Tennessee.
3  Q    Okay.  And if you would, please, sir,
4  just give me a brief rundown of your educational
5  background and your work history up until you
6  began --
7  A    With Swafford?
8  Q    -- with Swafford, yes.
9  A    Okay.  I have a degree in economics and
10 accounting.  That's from the University of
11 Tennessee.  Prior to that degree, I was an
12 auditor for a government contractor in Oak
13 Ridge, Tennessee.  After that degree, I was
14 hired as a loan officer with a mortgage company
15 where I was then promoted to manager and was
16 there for five years.
17 Q    Okay.  Let me ask you to slow down a
18 little bit.
19 A    Okay.  I'm sorry.
20 Q    You got the degree in economics from
21 where?
22 A    Economics and accounting from the
23 University of Tennessee.

---

Page 16

1  Q    What year was that?
2  A    '96.
3  Q    Okay.  Are you a CPA?
4  A    No.
5  Q    All right.  And you were an auditor for a
6  government contractor?  Who was that?
7  A    ORAU.  It's stands for Oak Ridge
8  Associated Universities.
9  Q    Okay.  And then --
10 A    And I was actually there for eight years.
11 I started out as a co-op student in high school.
12 Q    Okay.  And what did you do after ORAU?
13 A    I went into mortgage lending.
14 Q    Okay.
15 A    I was hired as a loan officer.  And after
16 several promotions, I was an area manager.
17 Q    And who were you with then?
18 A    Ameriquest Mortgage.
19 Q    How long were you with Ameriquest?
20 A    Approximately, five years.
21 Q    Okay.  I know you said you were an
22 auditor, but can you tell me a little bit more
23 about what your job entailed?

---

Page 17

1  A    What types of things I audited?
2  Q    Yes.
3  A    Payrolls, stipend employees.  We had
4  people coming from other countries to work for
5  the government.  I audited their files and their
6  pay.  It was more of accounting-type procedures,
7  but I was auditing the accounting departments.
8  Q    Okay; all right.  And tell me what you
9  did as a loan officer in the mortgage lending
10 industry with Ameriquest.
11 A    As the loan officer, I actually talked to
12 different borrowers trying to solicit business.
13 As the account executive, which was my next
14 position, I helped approve those loans and put
15 together packages that would benefit the
16 borrower.  I was then promoted to branch
17 manager, and I managed the -- all the account
18 executives and loan officers in that branch and
19 processing team.  And then I was promoted to
20 area manager over several branches.
21 Q    Okay.  What branch were you the manager
22 over?
23 A    Knoxville, Tennessee.

5 (Pages 14 to 17)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 18

1  Q    And does Ameriquest Mortgage, does it
2  have a brick and mortar office there where
3  borrowers could come in?
4  A    I believe they just reopened.  We had an
5  office there, yes.  But the reason I left there
6  was because they downsized and they shut down
7  their branches in several states and Tennessee
8  was one of them.
9  Q    All right.
10 A    But I've heard advertisements lately, so
11 I think they're back in Tennessee.
12 Q    All right.  And what did you do as a
13 branch manager?
14 A    Pretty much just helped train the account
15 executives and loan officers and oversaw their
16 production.  The chief role of the branch
17 manager was to oversee production.
18 Q    All right.  And then tell me what you did
19 as area manager.
20 A    Pretty much the same thing, but over all
21 the branches.
22 Q    Okay.  And what area -- what area were
23 you over?

Page 19

1  A    Kentucky and Tennessee.  And just to make
2  sure you understand, we did not actually have a
3  final underwriting approval on those.  They went
4  to our underwriting office in California for
5  approval.
6  Q    And that was the Ameriquest loans?
7  A    Uh-huh.
8  Q    Okay; all right.  Now, what I wanted to
9  ask you was, did any of your time with
10 Ameriquest, was lending law compliance ever a
11 part of your duties?
12 A    That was in California.
13 Q    Okay; all right.
14 A    They actually sent all of our
15 truth-in-lending and everything from that
16 office.  So they complied with all regulations.
17 Q    All right.  And then did -- let's see
18 now.  We talked about loan officers and account
19 executives.  Which one of these persons would be
20 the person that would actually sit down and do a
21 closing with an Ameriquest customer?
22 A    It would be the account executive.
23 Q    The account executive.  What was the loan

Page 20

1  officer's --
2  A    Telemarketing, primarily.
3  Q    Okay.  And did Ameriquest close its own
4  loans?
5  A    Uh-huh.  Well, some of them.  It depended
6  on the location.  If it was a local to
7  Knoxville, then the account executive would
8  close it at the branch.  If it was outside of
9  Knoxville, we would ask title companies to close
10 it.  We didn't travel.
11 Q    All right.  Fair enough.  And you closed
12 a number of those loans yourself, I assume?
13 A    I did.
14 Q    Okay.  And did you also close loans as a
15 branch manager?
16 A    Maybe once or twice.  It was rare.
17 Q    Okay.  And then -- okay.  While you were
18 with Ameriquest, did you have any training with
19 regard to lending law compliance?
20 A    No, I did not.
21 Q    Okay.  Where did you go to work after
22 Ameriquest?
23 A    Title Source America.

Page 21

1  Q    All right.
2  A    It was owned by Title Source, which is
3  here and actually in Birmingham, and it was a
4  Knoxville branch they were opening up.
5  Q    Okay.  What did you do there?
6  A    I was actually hired to try -- well, they
7  hired me because of my mortgage lending
8  background and because of my accounting
9  background and my auditing experience.  They had
10 some issues in their -- with their bank
11 reconciliations and with their procedures and
12 they hired me to come in as an operations
13 manager to try to clean up their procedures.
14 Q    What was the nature of their business?
15 A    A title company.
16 Q    Okay.  And how long --
17 A    They offered full title services.
18 Q    Okay.  But did they close loans?
19 A    They did.
20 Q    Okay.  And so it was --
21 A    I, however, did not close any loans for
22 them.
23 Q    Okay.  But was it part of your job with

6  (Pages 18 to 21)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

**Hall-Frazier**
**Record - 000882**

# LEGALINK, A MERRILL COMPANY
## Court Reporting * Legal Videography * Trial Services

Page 22

1  them to audit their bank account records and
2  that sort of thing?
3  A      To try to catch up on their bank
4  reconciliations.  It was several months behind
5  when I was hired, but I was not able to do it.
6  After about six months, I realized that all the
7  things that they had problems with were not
8  rectifiable, and that's when I chose to start my
9  own title company.
10  Q      I see.  So were you with them about six
11  months?
12  A      About six months.
13  Q      All right.  And then did you start your
14  own title company after that?
15  A      I did.  I met Gary Hays, which is why it
16  was Swafford & Hays in the beginning --
17  Q      All right.
18  A      -- and we started a title company
19  together.  Gary Hays also worked for Title
20  Source and he was their marketer.
21  Q      Okay.  And where was Swafford & Hays's
22  office initially located?
23  A      In Knoxville.

Page 23

1  Q      All right
2  A      We were a Florida corporation, though,
3  and Gary Hays was located in Florida.  We were a
4  Florida corporation doing business in Tennessee
5  with its office located in Tennessee.
6  Q      Does it have more than one office?
7  A      No.
8  Q      All right.
9  A      We have an office located in Florida, but
10  with no employees there.  We have an agent there
11  solely, and his sole responsibility is to sign
12  policies and to keep a copy of all files there,
13  which is a state regulation.
14       BY MS. CLOTFELTER:  Let me just clarify,
15  were you asking about Swafford & Hays initially
16  or are you asking about now?
17       BY MR. UNDERWOOD:  Well, I was asking
18  about now.
19       BY MS. CLOTFELTER:  Okay.  I just wanted
20  to be sure it's clear.
21  A      This is two offices.
22  Q      (continued by Mr. Underwood)  Okay.
23  A      We're in multiple states.  So some states

Page 24

1  require you have an address, but you're able to
2  hire what they call a resident agent.  It's not
3  actually an employee of Swafford.  They're just
4  there to be served if there's ever -- if they
5  ever have that purpose.
6  Q      Okay; all right.  Well, I guess that gets
7  me to my next question.  I wanted to ask you
8  about what states Swafford & Hays does business
9  in.
10  A      It does fluctuate.  We have been licensed
11  in as many as twenty-eight to twenty-nine
12  states.  I'm not sure of the final number, I
13  apologize.  Right now we primarily do Tennessee
14  -- do you want me to actually list them for you?
15  Q      If you don't mind.
16  A      Okay.  Tennessee, Florida, Georgia,
17  Louisiana, Alabama, Arkansas, North and South
18  Carolina, New York, New Jersey, Massachusetts,
19  Missouri.  And now I'm starting to draw a blank.
20  Q      Michigan?
21  A      We do Michigan, yes.
22  Q      All right.
23  A      It's primarily east-based states.  But

Page 25

1  like I said, we fluctuate, because it depends on
2  each month what the lenders -- most of our
3  lenders actually send out fliers and
4  solicitations and they target different states
5  different months.  It's whatever the companies
6  they hire to do their marketing, wherever they
7  send the fliers that month.  But we're already
8  licensed in those states, so it varies what
9  state we're actually practicing in that month.
10  Q      I see.
11  A      That's just the most -- that's just the
12  most common states for us to do business in.
13  Q      Okay.  And I understand that there might
14  be more.
15  A      There might be others that we've done, a
16  couple of others, one here and there.
17  Q      And I wanted to ask you -- my next
18  question, I guess, is, can you tell me the
19  lenders that you've done business with?
20  A      Probably not all of them, no.
21  Q      Okay.
22  A      Primarily because Homeowner's Loan was
23  our primary lender, and when they chose to go

7 (Pages 22 to 25)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 26

1  out of business a few months ago, we started
2  looking for other business and we've landed
3  several different clients. But I don't actually
4  do the marketing myself, so I don't know the
5  name of all the new clients.
6  Q    All right.
7
8        REPORTER'S NOTE:  (At this point, instrument was
9  marked for identification by the Reporter as
10  Plaintiff's Exhibit Number 2, after which, the
11  deposition continued, as follows:)
12
13        BY MR. UNDERWOOD:  Let me show
14  you that, Pat. That's our next exhibit. It
15  wasn't a trick question or anything. I just
16  wanted to ask him --
17        BY MS. CLOTFELTER:  Here.
18  Q    (continued by Mr. Underwood) Okay.
19  I've handed you a document that we've marked as
20  Plaintiff's Exhibit 2 and it's been produced in
21  one of the -- I believe the Gibbs' state court
22  case. Is that an accurate list of the states
23  where you do business?

---

Page 27

1        BY MS. CLOTFELTER:  And you're referring
2  to page 2 of that exhibit?
3        BY MR. UNDERWOOD:  Right.
4        BY MS. CLOTFELTER:  It's in response to
5  question number 20.
6  A    I would assume so. I don't have anything
7  in front of me. I mean, all of our files are
8  there, as far as what states. It's like when I
9  told you twenty-seven or twenty-eight, that's
10  the reason my number varied. I don't know. I
11  don't actually do the licensing; my father does.
12  Q    I understand.
13  A    But I'm sure if I signed this before that
14  it was accurate.
15  Q    Probably accurate at that time?
16  A    But I can't tell you just by looking at
17  the states.
18  Q    You may have added some or lost some
19  since that time?
20  A    Correct.
21  Q    I understand. Okay. No problem. Is a
22  license required in each state?
23  A    No. It depends. Some states require

---

Page 28

1  licensing, your agency be licensed. Some states
2  require the agency and the agent be licensed.
3  Some are actually based on being an insurance
4  agent. Some are just as the corporation doing
5  business in that state. The requirements are
6  drastically different in each state.
7  Q    I see. Okay. Before we got off on that,
8  you were telling me about lenders. Did you tell
9  me your primary lender was Homeowners?
10  A    Uh-huh.
11  Q    All right. And I understand that
12  Homeowners has gone out of business. Is that
13  what you understand as well?
14  A    Uh-huh.
15        BY MS. CLOTFELTER:  You need to answer
16  out loud.
17  A    I'm sorry. Yes.
18  Q    (continued by Mr. Underwood) Okay. And
19  when did they notify you that they weren't
20  making any more loans, if they did?
21  A    I think the day they actually shut their
22  doors, which probably was -- as far as doing
23  business, I believe to be October or November of

---

Page 29

1  last year.
2  Q    All right.
3  A    Or maybe it was January of this year. I
4  can't remember. We started losing business from
5  them and we kept asking them, but they didn't
6  actually confirm that they were going out of
7  business until several months later.
8  Q    Okay. Let me ask you this. How did you
9  first start doing business with Homeowners?
10  A    A mutual acquaintance of mine that also
11  Gary Hays knew. He worked at Ameriquest with
12  me. He was also a branch manager in Atlanta,
13  and I found out he had gone to Homeowners when
14  he left. So I called him and he started sending
15  new business to us.
16  Q    I see. Okay. Now, can you tell me a few
17  other companies you do business with, other than
18  Homeowners?
19  A    Home Funds Direct, Nova Star.
20  Q    Okay.
21  A    A branch or two of Wells Fargo.
22  Q    Okay.
23  A    That's probably two or three of the

---

8  (Pages 26 to 29)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

Hall-Frazier
Record - 000884

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 30

1  largest ones.  We have several small brokers and
2  lenders, but I am not sure of all their
3  different names.
4  Q     I understand.  And there may even be some
5  that maybe you've only done one loan for; is
6  that --
7  A     Right.  And actually there is several
8  more than that that we've done several loans
9  for.  It's just that we've done it in the last
10  couple of months and I don't know all the names.
11  Q     Okay; all right.
12  A     Those are just lenders we've had for a
13  while, in addition to Homeowners, prior to us
14  having to market other lenders.
15  Q     Okay.  The records regarding those, they
16  would be where?
17  A     In our office.
18  Q     In Knoxville?
19  A     Yes, sir.
20  Q     And these lenders, are they in various
21  states?
22  A     They are.
23  Q     I guess they are.

Page 31

1  A     Uh-huh.  And most of them do business in
2  various states, whether from that same location
3  or different locations.
4  Q     All right.  Now, is it fair to say that
5  Swafford & Hays -- well, is Swafford & Hays
6  Settlement Services still doing business?
7  A     No.  Swafford Settlement Services is
8  doing business.  It's the same corporation, but
9  it was just a name change.
10  Q     Okay.  Did Mr. Hays leave the company?
11  A     He did.
12  Q     And can you tell me about when that
13  happened?
14  A     In late 2003 to early -- no, I'm sorry.
15  Late 2002 to early 2003, somewhere in that time
16  frame.
17  Q     Now, is the company, Swafford & Hays
18  Settlement Services, Inc., now, is it d/b/a
19  Swafford Settlement Service or --
20  A     Like I said, it's just a name change.  So
21  we actually -- there is no Swafford & Hays.
22  What we did is we changed our name, the
23  corporation name, and then we had to go into

Page 32

1  each state and do a name change.  So actually
2  every state sees us as Swafford Settlement
3  Services now, but it's the same corporation that
4  was Swafford & Hays.  It was just a name change.
5  Q     I see.  So you've got the same tax ID
6  number and --
7  A     I believe so, yes.
8  Q     Okay.  And I think I asked you the
9  question about when Mr. Hays left.  When was the
10  name change done?
11  A     That was much more recent, and I don't
12  know what date to tell you on that.  Maybe late
13  2004, early 2005.
14  Q     Okay.  Now, was it -- would it be fair to
15  describe Swafford Settlement Services as a title
16  company?
17  A     Yes, as a title or settlement service
18  company, but we are a full service company.  We
19  provide several services.
20  Q     And that was going to be my next question
21  was -- if you would, just sort of outline for me
22  what it is that Swafford does and what services
23  it provides.

Page 33

1  A     Okay.  We accept title orders, orders for
2  resulting in a policy, an insurance policy.  We
3  will do anything from a current owner search to
4  a full thirty year search if it's a purchase.
5  It depends on what the lender requests or asks
6  us to do.  We, then, put it in the form of a
7  commitment for insurance.  After the lender
8  reviews the commitment, we will process -- what
9  we call process the commitment for them.  If
10  they say that there are mortgages on the
11  commitment that are no longer owing, we research
12  that for them.  Or with judgments, which entails
13  several different things.  It depends upon the
14  state and the requirements.  We will actually do
15  the settlement services for them, which means we
16  actually close it if it's in our office.  If
17  not, we hire a notary for them.  We actually
18  print out the package to get it to the closing
19  for them.  And then when it's returned, we check
20  it for valid signatures.  Am I going too fast
21  for you?
22  Q     Yeah, a little bit.
23  A     I'm sorry.

9  (Pages 30 to 33)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

Hall-Frazier
Record - 000885

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 34

1  Q    I meant to ask you to slow down. Let me
2  make sure I hadn't missed anything. You said
3  you take orders for title policies and title
4  insurance.
5  A    Uh-huh.
6  Q    You do title searches.
7  A    Correct.
8  Q    Commitments for title insurance.
9  A    Uh-huh.
10  Q    Process those commitments. What does
11  that mean?
12  A    Processing -- like I said, the
13  commitment, a lot of times we're relaying to
14  them exactly what it shows at the courthouse
15  that's on record for that file or that person.
16  A lot of times a person will have judgments
17  against them, but, say, it's a John Smith, but
18  there's no such security number referenced. We
19  have to list them because it's John Smith. If
20  they come back and say that's not their John
21  Smith, we try to research it, call the attorneys
22  who are listed on the judgments, try to track
23  down whether it's our borrower or not. If it's

Page 35

1  a lien, then we have to go back to the statutes
2  in that state. We get all of those requirements
3  from our underwriter. We have manuals. Then we
4  try to find out if it's met its statutory
5  period. If not, we call the actual lender and
6  find out if it's still owed, how much is owed,
7  that kind of processing. We also get payoffs on
8  current liens that are actually owed, things of
9  that nature.
10  Q    Okay.
11  A    Anything that their processing staff
12  doesn't have time to do, we become an extension
13  of them and we process it for them.
14  Q    When you say "their processing staff,"
15  you're referring to the lender?
16  A    Uh-huh.
17  Q    Okay. So in other words, you help the
18  lender -- in that case, you help the lender make
19  sure it has a good title?
20  A    Correct.
21  Q    Okay. Now -- all right, we got down to
22  settle services, and you said sometimes they
23  close in the office.

Page 36

1  A    Rarely. We don't have very many
2  Knoxville, Tennessee loans.
3  Q    Okay.
4  A    But if they do, we do close them in the
5  office with a notary that's in our office. If
6  not, we hire notaries.
7  Q    Okay. And where do those notaries close
8  the loans?
9  A    Just wherever the borrower -- if they
10  have an office in their office, if they can go
11  to the borrower's home, in a public place,
12  wherever they choose. But it's basically what
13  also the lender's requirements are. If the
14  lender prefers it not be closed in a home, it's
15  not closed in the home. And in some states we
16  use attorneys. It depends on what the state
17  regulations are for that.
18  Q    All right. And tell me what
19  settlement -- what's entailed in settlement
20  services, that term that you used?
21  A    It varies from finding a notary for them
22  or an attorney for them, preparing a HUD
23  Settlement Statement for them. Either preparing

Page 37

1  or having an attorney prepare, depending on the
2  state regulations, a warranty deed, a quitclaim
3  deed, a subordination agreement. Our
4  underwriters don't allow us to prepare powers of
5  attorney or things of that nature, but we will
6  find attorneys that will prepare them for them.
7  We offer to fund their loans for them, if they
8  choose to have us do that, using their
9  requirements and restrictions and regulations.
10  We also have -- we also put all of the fees on
11  the HUD based upon what they request, though.
12  They always dictate the fees to us, and then
13  that has to be approved by the lender.
14  Q    Okay. Now, I didn't quite understand
15  what you meant by that. You said they always
16  dictate the fees to us, and then it has to be
17  approved by the lender.
18  A    Right. Their fees or -- they tell us
19  what fees they want to charge on the HUD. They
20  tell us what loans they want to pay off on the
21  HUD. And then, of course, our fees go on the
22  HUD. But then after we've done it, it doesn't
23  go directly to closing, from the notary to the

10 (Pages 34 to 37)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

Hall-Frazier
Record - 000886

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 38

1  attorney.  It always goes back to the lending
2  company and they give us final approval prior to
3  closing.
4  Q    Okay.  So Swafford prepares the HUD-1?
5  A    Uh-huh.
6  Q    Totals everything up, and then sends that
7  back to the lender for approval; is that
8  correct?
9  A    Correct.
10 Q    And then after it's approved, then what
11 happens?
12 A    Then it actually goes to the notary or to
13 the attorney for closing.
14 Q    Okay.  Now, what about all the other
15 documents, the mortgage and title insurance and
16 all that business, who does all of that?
17 A    We don't prepare the actual closing
18 documents, except for the ones I listed, deeds
19 and the actual HUD.  We would prepare not deeds
20 of trust, but like warranty deeds, quitclaim
21 deeds.  Everything else comes from the lender.
22 Q    Okay.  So the only doc -- let me make
23 sure I'm clear on that.  The only documents

Page 39

1  actually prepared by Swafford would either be
2  like --
3  A    Settlement documents.
4  Q    Yeah.  Would be HUD-1 --
5  A    Uh-huh.
6  Q    -- and a deed.  Is that it?
7  A    Typically, yes.  I mean, like I said,
8  there's times for subordination agreements,
9  powers of attorney, things of that nature, and
10 we get all that information together for an
11 attorney to prepare, and then we send it to the
12 lender once it's done.
13 Q    Okay.  Now, when you say your underwriter
14 won't let you write powers of attorney, who do
15 you mean?
16 A    Ticor, our underwriter.
17 Q    All right.
18 A    We're actually an agent for the
19 underwriter.  We don't actually provide the
20 insurance.
21 Q    And when you say that Swafford will fund
22 loans, is that a table funding type of
23 arrangement?

Page 40

1  A    Typically, no, because the majority of
2  our business is refinances.  So it's not
3  actually done at the table.  It's done after the
4  right of cancel is -- the rescission period is
5  complete.  So typically on the fourth day after
6  the closing.  And they will wire the funds into
7  our bank as long as the loan officer did not --
8  I mean, the borrower did not cancel the loan,
9  and then we will fund the loan.  But once again,
10 that's typically all within the closing
11 instructions or there's an additional document
12 sent to us, and then we fund from the HUD
13 Settlement Statement.
14 Q    Well, I'm not sure what -- what's the
15 definition of funding a loan?
16 A    Actually cutting the check or wiring the
17 funds to the borrower or the payoffs that are on
18 the HUD Settlement Statement.  And it can vary
19 from net funding to gross funding, which means
20 sometimes we actually get the lender's broker's
21 fees and we cut it back to the broker and
22 lender.  Sometimes they net fund, which means
23 they keep their fees, and we just disburse

Page 41

1  everyone else's fees and payoffs and the
2  borrower's funds, things of that nature.
3  Q    All right.
4  A    It's all at the discretion of the lender,
5  and each lender varies.
6  Q    Okay.  Now, I've been looking at ledger
7  cards on a lot of these transactions, and would
8  it be fair to say that in most of them that
9  Swafford & Hays wrote the checks for the --
10 well, funded the loans?
11 A    Yes.
12 Q    Okay.
13 A    We have had two companies in our past
14 that funded their our loans, and then some
15 companies will get miscellaneous companies that
16 will fund their loans.  But the majority of
17 loans, yes, we do fund.
18 Q    Okay.  Now, let me ask you this now, with
19 regard to some of these settlement services,
20 you've already told me that Swafford hires a
21 person that you referred to as notaries.
22 A    Uh-huh.
23 Q    I've seen references in some of the

11 (Pages 38 to 41)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 42

1  documents to persons referred to as "closers."
2  Is that an interchangeable --
3  A    Yes, a closing agent, a notary, attorney,
4  depending on the -- yes, it is, depending on
5  what the lender calls it, depending on the state
6  if we have to use an attorney or a notary.
7  Q    Sure; okay.  Probably would almost have
8  to have a notary on any of these deals, wouldn't
9  you?
10 A    Almost always a notary, but some states
11 require an attorney close the loan.
12 Q    Okay.  Well, let's see, I'm getting a
13 little ahead of myself.  I meant to ask you a
14 little earlier about how Swafford would
15 initially get a loan.  In other words, how would
16 you know that Ms. Jones in Birmingham needed a
17 loan closed?
18 A    Okay.  And before I answer that, did you
19 want me to finish the prior answer on the
20 services we provide?
21 Q    Oh, yes, please.
22 A    Okay.  We also offer the recording of the
23 mortgage or any legal document that they want

Page 43

1  recorded.  And we, of course, offer the final
2  policy itself.
3  Q    See, I told you I'm not too good at this.
4  I'm getting ahead of myself.  I thought we had
5  finished that question, but we were only about
6  halfway through.  Okay, the recording of the
7  mortgage, and then the --
8  A    Final policy.
9  Q    Final policy.
10 A    And then requesting and recording
11 releases.
12 Q    All right.
13 A    And recording of assignments if they sell
14 their loan, which the majority of lenders do
15 now.
16 Q    Okay.  Would it be fair to -- again, I've
17 reviewed several of these transactions.  Would
18 it be fair to say that Swafford has someone
19 record the majority of these mortgages?
20 A    What do you mean by "has someone record?"
21 Q    Well, I mean, someone actually has to
22 take it down to the courthouse.
23 A    It depends on the state and the

Page 44

1  courthouse.  Some -- some courthouses we
2  actually send it to a courier.  Typically an
3  abstract company or a notary, and they will
4  hand-walk it in.  Some states and counties are
5  so easy to get it recorded in and they're so
6  up-to-date that we will actually overnight it
7  directly to that registrar's office and they
8  record it.
9  Q    All right; okay.  I'm going to come back
10 to some of that in a minute, but I wanted to --
11     BY MS. CLOTFELTER:  Did you finish the
12 listing?
13     THE WITNESS:  I believe so.  We've jumped
14 around, so I --
15     BY MR. UNDERWOOD:  I'm sorry.
16     BY MS. CLOTFELTER:  I just wanted to be
17 sure.
18     BY MR. UNDERWOOD:  That's my fault.
19 A    I think I have.  I know we provide more
20 services than that, but they're all under the
21 umbrella of each category I've told you about.
22 Q    (continued by Mr. Underwood)  Okay.
23 We'll go through several transactions and you

Page 45

1  can describe them to me in a little more detail.
2  A    Okay.
3  Q    I'm just trying to get a general idea
4  about what you guys do.  And so I wanted to ask
5  you next was how do you know that Ms. Jones in
6  Birmingham needs a loan closed?
7  A    The lender will tell us when it's ready
8  to close.
9  Q    And how does Swafford receive that
10 notification, is it e-mailed, do they mail you a
11 package or do you call them up every day or --
12 A    A fax or an e-mail.  And that fax or
13 e-mail will contain a request for a HUD -- a
14 preliminary HUD Settlement Statement, and they
15 will tell us the date that they want to close
16 it, typically.
17 Q    Well, that brings another thing to mind.
18 Who prepares the good faith estimate?  Is that
19 done by the lender?
20 A    The lender does.
21 Q    And is that part of the notification?
22 A    No, we never see -- we don't see the
23 actual truth-in-lending until we actually get

12  (Pages 42 to 45)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 46

1  the final package, the loan documents that have
2  actually been signed.  We never see the
3  preliminary truth-in-lending, but we do see the
4  final one that goes out with the package.
5  Q    Okay.  Let me ask you about Homeowners,
6  for example.  How did you receive a notification
7  from them, was it by fax or e-mail or --
8  A    Theirs was always by fax or e-mail,
9  depending on the loan officer.  But it was
10  always what they called a HUD request.  It gave
11  us all the fees and the payoffs and things of
12  that nature.
13  Q    Okay.  Now, if you would, just sort of
14  walk me through the process of what happened.
15  Let's say you'd get a fax or an e-mail from
16  Homeowners -- well, first, let me ask you this
17  before we get into what you do with it.  Do you
18  get it from a loan officer, or what person would
19  you get that from Homeowners?
20  A    It varies.  Oh, from Homeowners
21  themselves?
22  Q    Yeah.
23  A    It came from the loan -- well, that

---

Page 47

1  varied, also.  It depended on the branch.  It
2  was either the loan officer or the processor,
3  depending on which branch it was.
4  Q    All right.
5  A    And that was only the original
6  preliminary HUD.  We sent the -- once we had it
7  complete, we sent it to their closing
8  department.  And if the closing department had
9  any issues or wanted corrections made, then it
10  came from the closing department to have the
11  change made.
12  Q    Okay.
13  A    Because they were the ones that gave the
14  final approval, not the loan officer or the
15  processor.  They just initiated the steps.
16  Q    Okay.  And who gave the final approval?
17  A    The closing department.
18  Q    And with regard to these other lenders
19  you've named and done business with, do they
20  have a similar type process?
21  A    Not really.  Each one's different.  There
22  are lenders who will send us just their fees and
23  they want a HUD with just their fees on it and

---

Page 48

1  that's the way they start the process.  Some
2  lenders request their fees our fees, recording
3  fees, all the payoffs we listed on the HUD to
4  start the process.  It just varies.  And whether
5  it comes from the loan officer, the broker, the
6  lender, closing department, it all varies by
7  lender.
8  Q    All right.  Well, we've got several of
9  these.  Right now, I'm probably just going to
10  refer mostly to Homeowners, since that's who you
11  did the bulk of your business with.
12  A    Okay.
13  Q    All right.  So you get a HUD request from
14  Homeowners.  Tell me what happens next.
15  A    We just actually take the information off
16  of the HUD settlement request and put it in the
17  National HUD Settlement Statement.
18  Q    In the HUD request, tell me what
19  information is in that.
20  A    I have never actually done a closing, so
21  I'm going to tell you what I believe to be in
22  it.
23  Q    Okay.

---

Page 49

1  A    I know that they list all the payoffs of
2  who they want paid.  Whether it be liens on
3  title or whether it be miscellaneous credit card
4  debt or what have you.  It lists all of their
5  basic fees.  It lists our fees.  The only thing
6  it does not -- well, actually, it will list
7  appraiser's fees, insurance finder fees.  The
8  only -- tax payoffs for property taxes.  The
9  only thing it will not list is the recording
10  fees, but they request that to be in our
11  preliminary HUD.  So we use Ernst Publishing to
12  get those fees.
13  Q    Okay; all right.  Now, what about --
14  well, would it be fair to say that it lists all
15  the lender's fees, and then Swafford would plug
16  in the fees for its services?
17  A    No, that's not right.
18  Q    Okay.
19  A    It actually lists our fees.  All of our
20  fees are listed on their preliminary HUD
21  Homeowners, except -- actually all the fees that
22  come to us are listed.  The only fees that they
23  don't list are, like I said, the recording fees.

---

13 (Pages 46 to 49)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 50

1  Q    All right.  Well, how do they know what
2  the fees are going to be in advance?
3  A    Because they told us what we could and
4  could not charge to each borrower.  The same
5  fees were charged to each borrower.  The only
6  time they varied is if they told us they wanted
7  us to lower our fees.
8  Q    I see.  So Homeowners would give you a
9  schedule of fees?
10  A    Uh-huh.
11      BY MS. CLOTFELTER:  Is that "yes?"
12  A    Yes.  I'm sorry.
13  Q    (continued by Mr. Underwood)  Is that
14  true of the other lenders as well?
15  A    Almost every lender will ask us what our
16  fees are going to be to each borrower and we
17  charge the -- yes, I guess, is the easy answer.
18  Q    Okay.
19  A    Yes, as far as knowing the fees for each
20  borrower; no, as far as them being on their
21  preliminary HUD request.
22  Q    All right.
23  A    Not every lender list our fees for us.

---

Page 51

1  Q    Okay.  I noticed, after reviewing some of
2  the transactions, that it appeared that the fees
3  on the Homeowners's loans were higher than some
4  of the other lenders.  Is that your
5  understanding?
6  A    I guess so, yes.  I do know that they are
7  higher than some lenders.  I don't know that
8  they're the highest fees.
9  Q    And when I say the fees, I mean --
10  A    Like our base fees --
11  Q    I noticed that Swafford's fees were
12  higher on the Homeowners' loans than some of the
13  other loans.  Is that your understanding?
14  A    Right.  Typically, a lot of times the
15  fees that -- yes, that is my understanding.
16  Q    Why were they higher?
17  A    Our fees a lot of times are based upon
18  how much work they ask us to do on their behalf.
19  A lot of lenders will process their own files.
20  Meaning that we will get the abstract done and
21  put it in the commitment and we never do
22  anything again for them until we actually do the
23  HUD Settlement Statement.  For Homeowners, we

---

Page 52

1  were truly a full processing company.  We got
2  all payoffs for them, tax payoffs for them.  We
3  cleared all of their judgments, liens, anything
4  that should not be on title but was still
5  showing on title at the courthouse, we did all
6  of that for them.
7  Q    All right.  And also funded the loan?
8  A    And also funded every loan.
9  Q    All right.  Funded every loan for
10  Homeowners?
11  A    Uh-huh.
12  Q    All right.  So when you would get --
13  A    I'm sorry.  Yes.
14  Q    Okay.  Well, let me ask you with regard
15  to the fees that were charged.  What about fees
16  for third party services?  It's true that
17  sometimes you would not know ahead of time what
18  those fees were going to be; is that fair to
19  say?
20  A    Actually, part of doing the
21  preliminary -- yes, it is fair to say.  But part
22  of doing the preliminary HUD was to actually
23  call and book a notary and we would get an idea

---

Page 53

1  of what that notary fee was going to be.  And it
2  was also to get their preliminary recording
3  fees.  But the notary fee, yes, we typically
4  very rarely knew what the actual fee was going
5  to turn out to be.  And we also very rarely knew
6  what the actual recording fees were going to
7  turn out to be.
8  Q    All right.  I got a little ahead of
9  myself, because what I really wanted to ask you
10  next, before I got into that was, I wanted you
11  to tell me about third parties that Swafford
12  would hire to perform these services.
13  A    Okay.
14  Q    And I guess we could start with notaries
15  or closers.  And tell me what -- how Swafford
16  would locate notaries and closers and what their
17  qualifications had to be.
18  A    Notaries -- for every notary that we
19  used, they had to provide a current bond and a
20  copy of their current notary license.  So they
21  had to be bonded notaries.
22  Q    Okay.  Any other requirements?
23  A    Like I said earlier in a prior question,

---

14 (Pages 50 to 53)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 54

1  we have a list of requirements. Many of those
2  requirements come from the lenders, as far as
3  how they want the loans closed, because
4  basically we're just an extension of the lender
5  at that point. But they didn't actually sign a
6  contract with us, no.
7  Q    Okay. Did Homeowners have a list that
8  they would require notaries to meet?
9  A    They have an extensive list of what they
10 require and met at their closings.
11 Q    And would that be true of these other
12 lenders?
13 A    Some do, some don't.
14 Q    Some do and some don't. Okay. And would
15 you perform any kind of background check or
16 anything?
17 A    On notaries? No. And you asked me where
18 they came from. They come from various
19 locations. Sometimes you can actually go online
20 on the internet and find a list of the licensed
21 notaries in each county. Sometimes we would
22 actually call a notary company, which is just a
23 company that has a listing of notaries in that

---

Page 55

1  county. Sometimes we would call their
2  underwriter and got different agents that are --
3  that they were using as an underwriter as well
4  that had -- and we can ask for their names. We
5  would call that agency and we ask what notaries
6  they use.
7  Q    Okay.
8  A    And sometimes the lender has used
9  notaries and attorneys before that they like to
10 use and they tell us those names.
11 Q    All right. And that was going to be my
12 next question was, for example, if you wanted to
13 close a loan in Perdido, Alabama, how would you
14 locate someone to do that?
15 A    I don't know specifically. Like I said,
16 I've never actually closed a loan, but my staff
17 knows where to find Perdido.
18 Q    So someone on your staff would get on the
19 internet or look it up --
20 A    Depending on -- yeah. We've been open
21 long enough now that we have a pretty extensive
22 list of notaries that have always done a good
23 job, depending on the county and state. So

---

Page 56

1  that's the first place we go to, because we know
2  that they're reputable and we know they've done
3  a good job. But if we can't find one in those
4  areas, what I just told you is what we do.
5  Q    All right. What about persons who do
6  some of the other services? For example, title
7  searches and abstracts.
8  A    Abstracters have to have an E&O policy
9  and they do sign a contract. And the contract
10 basically states what they are required to list
11 in the abstract report, to either provide a
12 current owner -- like I said, the lender
13 dictates to us what they want. If they want a
14 current owner search, which means they only
15 search the borrower who owns the property now,
16 they only go back to the most valid warranty
17 deed or last purchase loan. Or if they want a
18 thirty year search, where they go back thirty
19 years. It depends on what the lender wants.
20 Q    Okay. Are there any other persons that
21 Swafford would hire to do a third party search
22 with regard to a closing, other than a notary
23 and the abstracter?

---

Page 57

1  A    If we hire an attorney to prepare like a
2  power of attorney or things of that nature,
3  sometimes it will be affiliated through -- not
4  affiliated, but handled through us. The lender
5  will actually ask us to send the information to
6  the attorney, get it, and then they'll send us
7  the bill and it's put on the HUD. Sometimes
8  they bill the lender directly. It just depends
9  per lender on how they like to handle it. So
10 sometimes, yes, we do use an attorney directly
11 to get those documents and we're the ones
12 handling it.
13 Q    Okay; all right. Let's see. Now, I
14 think we got to the point where Swafford has
15 gotten a loan from Homeowners, and then you
16 walked me through the process of doing the
17 HUD-1. Was there anything else that we need
18 to -- did we cover that?
19     BY MS. CLOTFELTER: The preliminary HUD?
20     BY MR. UNDERWOOD: Yeah.
21 A    I think so, because I told you about them
22 sending fees over, putting them on the HUD.
23 Q    (continued by Mr. Underwood) Right.

---

15 (Pages 54 to 57)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 58

1  A    That's when you're getting a preliminary
2  fee from Ernst for recording.  And then I start
3  trying to find a notary, but that doesn't change
4  our fees later.
5  Q    Okay.
6  A    So that really -- at that point, we don't
7  know what they're going to charge, but that
8  doesn't change our fee later, anyway.
9  Q    Okay.  Now, tell me what Ernst -- what
10 information you get from Ernst.
11 A    That is county-specific, but we always
12 get the cost to record the mortgage, the
13 warranty deed, the quitclaim deed, whatever's --
14 the subordination agreement, whatever documents
15 we're recording.  It's what tells us per page
16 what it's going to cost.  But depending on the
17 state, there's other things that tells you, too.
18 For instance, in New York, you pay school taxes.
19 In Florida, you pay intangible taxes.  Each
20 county, each state has different types of fees
21 and taxes that are affiliated with their
22 recording, and you have to send all of those
23 fees at once --

Page 59

1  Q    All right.
2  A    -- to get the mortgage recorded.
3  Q    Okay.  And Ernst has a database that's
4  current that keeps up with all those charges?
5  A    Uh-huh.
6       BY MS. CLOTFELTER:  Is that "yes?"
7  A    I'm sorry.  Yes.
8  Q    (continued by Mr. Underwood)  All right.
9  So you can get the information from Ernst, for
10 example -- well, first off, let me strike that
11 and ask the question this way.  Is it your
12 understanding that a recording fee, for example,
13 a mortgage -- let's use Alabama, because I'm
14 more familiar with Alabama.  There's several
15 components of that -- of the total costs for
16 recording a mortgage; is that fair to say?
17 A    Yes, there is.
18 Q    All right.  And would one of those be
19 just like, say, a flat fee, like $10.00 for
20 recording the first page?
21 A    Yes.
22 Q    And then is there also a per page charge;
23 is that correct, too?

Page 60

1  A    Typically, yes.
2  Q    All right.  And then on top of that,
3  there's a tax?
4  A    I don't know personally in Alabama,
5  because I don't actually do the recording fees
6  myself on Ernst.  But if that county and that
7  state has one, then, yes.
8  Q    All right.  So those are -- and that's --
9  is that typical of all states?
10 A    To have those specific things, yes.
11 Q    Yeah.  And some states call them deed tax
12 or mortgage stamps and things like that, but
13 it's a tax?
14 A    Correct.  And then there's additional
15 taxes, in addition to what you're mentioning, in
16 some states, also.
17 Q    Yeah, some states may have a school tax
18 or some other type --
19 A    In addition to the taxes you just
20 mentioned, yes.
21 Q    Okay.  But it's fair to say that they're
22 different in every -- in every state where
23 Swafford does business, is it fair to say that

Page 61

1  there are different components of the cost for
2  recording the mortgage?
3  A    Yes, that is fair to say.
4  Q    Okay.  And is it true that Ernst would --
5  you would be able to get all of that information
6  from Ernst?
7  A    Yes.  And Ernst is -- you asked me if it
8  was up-to-date.
9  Q    Yes.
10 A    It is up-to-date, but it's always going
11 to be behind any changes.  I mean, you know,
12 they're not going to know the instant something
13 changes.  So there are times that a county
14 raises their fees.  Especially in January.
15 That's a typical month for that.  And when we
16 send the recording off, sometimes it's rejected
17 for a shortage and we have to add a fee.  You
18 know, an additional amount to get it recorded.
19 Q    Okay; all right.
20 A    And there are also times where they'll
21 change their document requirements.  Like New
22 York does that on a regular basis.  They'll
23 decide that they want to use a different

16 (Pages 58 to 61)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 62

1  document.  Well, the document we used was two
2  pages.  Now there's a new one that's got three
3  pages, and that will change the cost of the
4  recording.  So Ernst is up-to-date as any
5  company can be considering the fact that there's
6  always regular changes in courthouses.
7  Q    Okay.  Thank you.  Now, let's see.  Let's
8  see, I went down another rabbit trail.  Swafford
9  has got -- has prepared a HUD-1 for Homeowners.
10 A    Yes.
11 Q    All right.  What happens to it then?
12 A    The preliminary HUD we send to the loan
13 officer or processor which forwards it to the
14 closing department for approval.
15 Q    All right.  It's approved.  Then what
16 happens?
17      BY MS. CLOTFELTER:  You're talking about
18 Homeowners?
19 A    You're talking about Homeowners
20 specifically?
21 Q    (continued by Mr. Underwood)  Yeah,
22 Homeowners.
23 A    And then they would send us the actual

Page 63

1  package once it's approved.
2  Q    Okay.  How is that -- physically, how is
3  that done?
4  A    Through e-mail.
5  Q    It's e-mailed?
6  A    Uh-huh.
7  Q    All right.  And then what happens after
8  that?
9  A    They're sending it to us so that we can
10 forward it to the notary or to the attorney,
11 along with our HUD Settlement Statement, any
12 warranty deed or quitclaim that we had to
13 prepare, or any other legal document change, you
14 know, that handles vesting.  As you can tell
15 from the documents I told you earlier that we
16 prepare, they all involve vesting.  Meaning that
17 person who's vested on title.  So any documents
18 we prepare like that, plus the HUD, we send
19 along with that package to the notary.  We also
20 have some other documents our underwriter
21 required -- our underwriter requires to be
22 signed, and then we send those documents as
23 well.  That's why they don't send the package

Page 64

1  directly to the notary, because it would be
2  missing our documents.
3  Q    Okay.
4  A    But we don't actually open up the
5  package.
6  Q    Okay.  I guess preliminary drafts of
7  these documents, that's passed back and forth by
8  e-mail?
9  A    Preliminary draft of what document?
10 Q    Well, let's say like, for example, the
11 HUD-1, once you do a draft of the HUD-1, is that
12 then e-mailed to the lender for approval?
13 A    Typically.  I mean, there are companies
14 that still use faxes.  There are antiquated
15 companies, so it just depends.
16 Q    Okay; all right.  How does the package
17 then get from Swafford & Hays to the closer or
18 the notary?
19 A    E-mail.
20 Q    The notary then -- let me ask you this.
21 Does the notary have any checks?
22 A    No.  Notaries do not disburse.
23 Q    Okay.  Is all that done from Swafford's

Page 65

1  office?
2  A    Yes, it is.
3  Q    If it's one that's funded by Swafford?
4  A    Yes, it is.  There are rare cases where
5  the lender has, say, a land contract and they're
6  treating it as a refinance -- it's kind of hard
7  to explain this, but, say, it's a land contract,
8  the new owners have lived in there for a year,
9  so they've got vested interest, so Homeowners is
10 treating it as -- or any other lender -- is
11 treating it as a refinance, it still has a right
12 to cancel period.  But at the end of that
13 period, you're exchanging a final warranty deed
14 for a check, just like you would in a purchase.
15 That is one case we will use an attorney or a
16 notary to actually deliver the check, because we
17 won't let them release that check until they
18 have a signed and executed warranty deed.
19 Because we would be in trouble if we delivered
20 the funds without the title changing hands.
21 Q    Sure.
22 A    So there are times we use a notary to do
23 that for us, but that's one of the very few

17 (Pages 62 to 65)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO
a7f3f0e1-70d2-485b-aa2e-e19d35381532

Hall-Frazier
Record - 000893

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 66 | Page 68 |
|---|---|
| 1  times they actually do the actual disbursement<br>2  of funds. But they're actually not cutting the<br>3  check. We do, and we deliver it to them to be<br>4  delivered to the borrower.<br>5  Q    Okay. Now, that brings me up to this<br>6  question, and that's about the checks for<br>7  recording fees for the documents.<br>8  A    Uh-huh.<br>9  Q    Does the notary get those?<br>10  A    No. Well, not unless we have a notary<br>11  that walks it in for us, but they don't get it<br>12  at the time of the closing.<br>13  Q    All right. Tell me about how the --<br>14  well, first off, let me -- I'm getting ahead of<br>15  myself again. Okay, after a loan is closed,<br>16  then what happens?<br>17  A    You mean once we get -- once the notary<br>18  or attorney actually closes the physical<br>19  package?<br>20  Q    Sure; yeah.<br>21  A    They send it back to our office, and the<br>22  lender always has their own specific what they<br>23  call stacking order of how they want the | 1  Q    Sure.<br>2  A    And some lenders are very specific with<br>3  that and they don't -- even if it's what they<br>4  call a junk doc, not one that's a<br>5  truth-in-lending, not a right to cancel, not<br>6  anything important, they still don't want that<br>7  with a middle initial. So that might delay<br>8  funding. If it does, then we have to send out<br>9  another -- that extra document to be resigned or<br>10  what have you. We facilitate all of that for<br>11  them, also.<br>12  Q    Okay; all right. Now, how does the --<br>13  how do the signed documents get from the notary<br>14  back up to Homeowners to start that process you<br>15  just described?<br>16  A    The actual notary overnights it to us.<br>17  Q    Okay; all right. And then they're<br>18  overnighted from Homeowners to the --<br>19  A    No, from us to Homeowners.<br>20  Q    I'm sorry. Yeah, from Swafford to<br>21  Homeowners. Okay.<br>22  A    Right.<br>23  Q    Okay. And I guess there's a similar |

| Page 67 | Page 69 |
|---|---|
| 1  documents and we're just pretty much an<br>2  extension of them. We stack the file as if<br>3  we're there in their office per their<br>4  instructions on how they want it, and then we<br>5  deliver -- at that point, we also do make sure<br>6  that the vesting is correct; that there's not<br>7  been any issues; that they're meeting all the<br>8  requirements on the commitment for insurance.<br>9  And then we ship that package back to the lender<br>10  overnight, and then at that point -- do you want<br>11  me to keep on going or did you just want to know<br>12  that one step?<br>13  Q    No. Go ahead.<br>14  A    Okay. At that point, then they review<br>15  the package, and then they send us the wire to<br>16  fund the loan as long as it meets all the<br>17  requirements.<br>18  Q    Okay.<br>19  A    The notary and the attorney are supposed<br>20  to make sure everything's signed accurately.<br>21  But there are times where, you know, a<br>22  signature, they add a middle initial or what<br>23  have you. | 1  process with these other lenders?<br>2  A    Yes.<br>3  Q    Okay.<br>4  A    The processes vary, but the one thing<br>5  that is similar is that the packages always come<br>6  to us prior to going to the lender.<br>7  Q    Okay. And how is the lender, then,<br>8  protected from someone coming in with a judgment<br>9  or a lien or another mortgage before its<br>10  mortgage gets recorded?<br>11  A    Well, there's a Gap coverage. It's<br>12  automatically on every insurance policy. The<br>13  underwriter covers the period between the<br>14  closing date and the date of recording.<br>15  Q    Okay. Well, Homeowners doesn't run down<br>16  and have someone check the title before it's<br>17  funded or --<br>18  A    They don't ask for that, no.<br>19  Q    Okay. That's one of the services you<br>20  provide?<br>21  A    If they ask for it, yes.<br>22  Q    If they ask for it, because I think you<br>23  told us about that other. But in lieu of doing |

18 (Pages 66 to 69)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

## LEGALINK, A MERRILL COMPANY
### Court Reporting * Legal Videography * Trial Services

Page 70

1  that, there's an insurance coverage?
2  A    Uh-huh.
3  Q    Who pays for that?
4  A    Gap coverage is actually -- there's not
5  actually a charge for Gap coverage. It's
6  something that we actually -- it's all in our
7  fees.
8  Q    That's a coverage that Swafford has?
9  A    What do you mean? I guess I'm not
10  following you. I apologize.
11  Q    All right. You said there's a --
12  A    When I say "Gap coverage," it's an actual
13  coverage that covers them, but it's not an
14  actual insurance policy, per se, like a final
15  policy they're waiting to get to get to the
16  insured. That's just something that the lender
17  is insured from. It's basically like a line
18  that's stated somewhere within the commitment or
19  the body of the commitment.
20  Q    Oh, is it part of the title insurance?
21  A    Right. It's all encompassed in one body.
22  Q    I see.
23  A    There's also an insured closing letter

Page 71

1  that goes out to each lender when they ask us to
2  close a file, and that insured closing letter
3  tells them the responsibility of the underwriter
4  and what they will cover.
5  Q    Okay.
6  A    So they automatically cover from the time
7  of closing until the time it's recorded.
8  Q    All right. And how many days are they
9  covered for?
10  A    Up to forty-five. Over forty-five, we
11  have to do an update.
12  Q    Okay. I think we got to the point where
13  the lender was going to fund the loan, and then
14  what happens after that?
15  A    The lender was going to fund the loan.
16  The lender sends us the wire.
17  Q    Okay.
18  A    Once we have received it in our account
19  and we verify that it's there, then we actually
20  have a funding department that funds the loan
21  and disburses the checks.
22  Q    All right.
23  A    Or wires the -- or wires them, depending

Page 72

1  on what that lender wants.
2  Q    All right. And what the borrower needs,
3  I guess, as well?
4  A    Right.
5  Q    And in the limited case that you
6  described for me, you might send a check to the
7  notary to --
8  A    Not from there. Our notaries are paid
9  out of our operating account, not from the
10  actual escrow account that this wire comes into.
11  Q    All right. And the -- is that the
12  account with Bank of America?
13  A    Uh-huh.
14       BY MS. CLOTFELTER:  Which account? I'm
15  sorry. Can you clarify?
16  A    I'm sorry. I said, yes.
17       BY MR. UNDERWOOD:  The escrow account.
18       BY MS. CLOTFELTER:  The escrow account.
19  A    We have multiple escrow accounts. But,
20  yes.
21  Q    (continued by Mr. Underwood) As far as
22  the actual delivery of the documents to the
23  courthouse for recording, is that done by Fed-Ex

Page 73

1  or --
2  A    It can be UPS. But like I said earlier,
3  sometimes our UPS actually takes it to a courier
4  who then turns and takes it to the courthouse.
5  Q    And that's not something that notaries
6  usually do?
7  A    Typically, no. We usually use
8  abstracters, but we have had notaries that do
9  both. Some abstracters are also notaries. So
10  it depends.
11  Q    I take it, though, it's the usual
12  practice of that to be sent by Fed-Ex or UPS or
13  some other carrier?
14  A    We always use UPS.
15  Q    From Swafford's office in Knoxville to
16  whatever --
17  A    Recordings never go directly.
18  Q    Okay. But it goes to whatever courthouse
19  for recording from Swafford's office usually?
20  A    No. Like I said, it usually goes
21  directly to the recording office or to the
22  courier who takes it to the recording office.
23  So to say directly would not be accurate.

19 (Pages 70 to 73)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 74

1  Q     Okay.
2  A     So if we have a courier hand-walk it in,
3  it's not going to the recorder's office. It's
4  going to their office and they're hand-walking
5  it in.
6  Q     All right. Let me see if I've got this
7  straight now. It comes from the notary -- once
8  the document's assigned, they go back to
9  Swafford's office in Knoxville?
10 A     Correct.
11 Q     All right. And then from there --
12 A     Now, I'm sorry. We were talking about a
13 package earlier. Specifically if you're talking
14 about just the mortgage or any other vesting
15 document, those are not sent back to a lender.
16 A copy of them are sent to the lender. They
17 don't leave our possession until the day of
18 funding, and then they go out to the courthouse
19 or to the courier. When I say a package goes
20 back to the lender, I'm talking about the entire
21 loan package as a whole. But vesting documents,
22 they never want sent to them, because we have to
23 have them in our possession on the funding day

Page 75

1  to send them to the recording office.
2  Q     To get them recorded? Okay; all right
3  A     Does that clear it up?
4  Q     Yeah. Thank you. Yeah, I believe I've
5  got that straight now. I meant to ask you
6  earlier -- you may have already told me when
7  Swafford & Hays started doing business. Late
8  2002 and early 2003? No, that's the name
9  change. When did Swafford & Hays first start
10 doing business?
11 A     We were incorporated in December of 2000,
12 but we didn't actually open our doors until
13 January of 2001.
14 Q     Okay.
15       BY MS. CLOTFELTER: Can we take just a
16 quick break?
17       BY MR. UNDERWOOD: Sure.
18
19 REPORTER'S NOTE: (At this point, a brief recess
20 was taken, after which, the deposition
21 continued, as follows:)
22
23 Q     (continued by Mr. Underwood) I think we

Page 76

1  got to the point where you were telling me about
2  how the documents finally get recorded.
3  A     Right.
4  Q     And I want to go into some of these
5  transactions, but I wanted to ask you a few more
6  preliminary questions before we got into that.
7  I believe I went over a little bit the founding
8  of Swafford & Hays Settlement Services, but I
9  never did ask you what your position is now with
10 the company and was.
11 A     Always has been President and CEO.
12 Q     Okay. And tell me what you do on a
13 day-to-day basis with regard to Swafford & Hays.
14 A     Most of my job is in what I call the
15 legal department. I typically handle claims
16 and I handle -- if there's a lien being removed
17 and it's not just plain black and white, there's
18 some gray area, we don't know exactly how to
19 remove it or what have you, I'll deal with the
20 underwriters in trying to get exceptions and
21 trying to get it approved.
22 Q     All right. And tell me how you learned
23 to do that. Is that something you learned at

Page 77

1  Ameriquest?
2  A     A lot of that was. As far as removing
3  liens and who to call and how to do that, yeah,
4  I learned that at Ameriquest.
5  Q     All right. And did you have any training
6  at Ameriquest specifically about --
7  A     How to remove liens? No, I had to learn
8  on my own.
9  Q     And did Ameriquest have any kind of
10 training program with regard to compliance or
11 anything of that nature?
12 A     No, not that I can recall.
13 Q     Okay.
14 A     The branch manager meetings I went to, I
15 don't remember ever going over any of that.
16 Q     All right. Now, I had asked you
17 another -- I'm skipping around a little bit,
18 because I'm trying to ask you some stuff I
19 should have asked you earlier. I had asked you
20 about the closing charges for Homeowners.
21 A     Uh-huh.
22 Q     And I had told you I had observed that
23 they appeared to be higher than most of the

20 (Pages 74 to 77)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 78

1   other lenders, and you told me, I think, that
2   more services were provided for Homeowners?
3   A    That is true, yes.
4   Q    Okay. And can you tell me what those
5   services are that are usually provided on a
6   Homeowners' loan as opposed to one that has a
7   lower fee on it.
8   A    I think we talked about that already, but
9   it's where we actually process everything for
10  them, gettings payoffs for them, getting payoffs
11  for taxes, clearing liens, things of that
12  nature.
13  Q    All right.
14  A    I mean, we do that for other lenders as
15  well, but not -- not usually as full of an
16  extent as we did for Homeowners.
17  Q    Okay. And is there a schedule for these
18  services that Swafford would give to potential
19  lenders? I mean, let's say a lender called up
20  and said --
21  A    Actually, no. What we pretty much found
22  from lenders is they typically tell us what
23  they're used to getting charged and what we

Page 79

1   charge. Unfortunately, there's not a lot of
2   room in the market or in the industry right now
3   for us to actually go in and say, "This is what
4   our fees are going to be." In fact, towards the
5   end, and I don't remember a specific date,
6   Homeowners actually dictated to all of their
7   title companies what the fees were going to be
8   and they regulated us to where all of our fees
9   were identical. In the beginning that was
10  something that they told us to charge. But in
11  the end evidently their title companies had
12  started charging different amounts, and we were
13  actually not the highest title company.
14  Q    Okay. You mean in the beginning with
15  Homeowners?
16  A    In the beginning, yes, we were. But then
17  afterwards, we're the same as other title
18  companies.
19  Q    Okay.
20  A    But now, we don't even do business with
21  them.
22  Q    All right. And I didn't understand where
23  the Gap coverage came from. You said, "It was

Page 80

1   included in our fee," I think you said. Is that
2   actually included in the fee --
3   A    When I say it's included in our fee, it's
4   not like it's actually built-in and there's a
5   charge for it. There's not a charge for Gap
6   coverage. I just mean -- when I told you it was
7   included in our fee, I just mean there isn't an
8   additional fee anywhere for that.
9   Q    Okay. Is it part of the title insurance
10  policy itself?
11  A    If they request it -- if they actually
12  ask for a Gap coverage document. And that has
13  to be done if you go past the time lapse that
14  they allow for Gap coverage.
15  Q    You mean the forty-five five days?
16  A    Right. And that forty-five days is
17  actually what we -- that's not actually an
18  underwriting thing. That's a Swafford
19  Settlement Services thing, because each state
20  and county can be specific and it can fluctuate
21  past that in other areas. But it's easier for
22  our commitment department to just do an update
23  past forty-five days.

Page 81

1   Q    Okay. Well, let me ask you this, then.
2   Let's say that --
3   A    And our abstracter will charge us -- I'm
4   sorry to interrupt you -- but our abstracter
5   will charge us if we have to do an update past
6   the forty-five days, but we don't add that into
7   the cost. We absorb that.
8   Q    All right. Well, let's say, for example,
9   a loan closed on Thursday, and then Friday a
10  judgment got recorded against the borrower.
11  A    That is not something a lender would have
12  to cover.
13       BY MS. CLOTFELTER: Would have to what?
14  A    That is not something the lender would
15  have to cover.
16  Q    (continued by Mr. Underwood) Okay. And
17  then maybe a week later the mortgage got
18  recorded. Now, how would the Gap coverage come
19  into effect in that scenario?
20  A    The only time it would actually matter
21  would be if our lender went to foreclose and
22  we're not in first lien position, because that
23  judgment was still there. It may not even

21 (Pages 78 to 81)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 82 |
|---|
| 1  matter anyway, because our -- the underwriter |
| 2  typically will not pay out something unless |
| 3  they're actually at a loss.  So if the lender |
| 4  gets recorded on the 5th of May and somebody |
| 5  took a loan out after ours but got it recorded |
| 6  prior to us on the first of May, no, they're not |
| 7  in first lien position, but what we're simply |
| 8  doing is insuring in our first lien position. |
| 9  Meaning if they ever need to collect upon that |
| 10  insurance policy, then we would have to pay the |
| 11  intervening lien off and allow them to be in |
| 12  first lien position. |
| 13  Q    Okay.  In other words, Homeowners would |
| 14  have to pay, or does Homeowners have some |
| 15  insurance that would pay? |
| 16  A    No.  When I say "they," I mean, the |
| 17  underwriter would actually have to pay it. |
| 18  Q    And I'm saying "Homeowners."  I -- |
| 19  A    Ticor. |
| 20  Q    I mean, Swafford? |
| 21  A    No, not Swafford, but Ticor. |
| 22  Q    Ticor would have to pay that? |
| 23  A    Right. |

| Page 83 |
|---|
| 1  Q    So that's part of the title insurance? |
| 2  A    Correct.  In that aspect, yes, it is. |
| 3  Q    Okay.  Or is that some overall insurance |
| 4  that Swafford has with Ticor? |
| 5  A    No.  That's part of what Ticor offers. |
| 6  It would be offered through any agent. |
| 7  Q    Okay.  Can you point -- |
| 8  A    I don't know that I'm actually answering |
| 9  your questions.  I'm sorry. |
| 10  Q    Well, I was going to ask you to -- |
| 11  A    I probably cannot answer it any better |
| 12  than that, because I'm not in the commitment -- |
| 13       BY MS. CLOTFELTER:  Just let him ask |
| 14  another question. |
| 15  Q    (continued by Mr. Underwood)  I was going |
| 16  to ask you if you could show me something to |
| 17  that effect in some of these title policies |
| 18  maybe when we're going through some of these |
| 19  individual -- |
| 20  A    I will try, yes. |
| 21  Q    Okay.  And do you get a manual from the |
| 22  title insurance companies, too, that tell you |
| 23  what to look out for with regard to the abstract |

| Page 84 |
|---|
| 1  and title and that sort of thing?  Is that true? |
| 2  A    What do you mean to look out for? |
| 3  Q    Well, that probably wasn't a very good |
| 4  question.  Do you get any kind of manual from |
| 5  the title insurance companies that tell you how |
| 6  to issue a commitment for title insurance? |
| 7  A    I am not sure that we have an actual |
| 8  manual that tells you how to issue a commitment, |
| 9  no.  I know we have manuals that tell you how to |
| 10  use their software system and how to actually do |
| 11  a commitment.  And I know that they do full |
| 12  audits.  So they see our commitments.  I don't |
| 13  know that we have a manual that tells you that. |
| 14  They offer services to come in and train your |
| 15  staff, and we have had people come in and sit |
| 16  with our staff.  Like I said, they do full |
| 17  audits.  To be an agent of any underwriter, you |
| 18  are always continually having full audits and |
| 19  they go through every file with a fine-tooth |
| 20  comb.  That's anywhere from finding to the |
| 21  commitments, to the abstracts.  So we rely |
| 22  heavily on an underwriter, because we're an |
| 23  agent for them, to make sure that we are doing |

| Page 85 |
|---|
| 1  things properly. |
| 2  Q    All right.  And they do supply you with |
| 3  some sort of list or something like that that |
| 4  you have to go by before you issue a commitment; |
| 5  isn't that true? |
| 6  A    A list of steps to take? |
| 7  Q    Sure. |
| 8  A    I don't know that I have a list of steps |
| 9  to take before I issue a commitment.  I'm sure |
| 10  that's in their basic ones, but I can't tell you |
| 11  that it is. |
| 12  Q    All right. |
| 13  A    I've never had to use it, because I knew |
| 14  how to do that.  But I'm sure that it probably |
| 15  is in there. |
| 16  Q    Okay. |
| 17  A    My staff has probably used it, if there |
| 18  is. |
| 19  Q    Okay.  I think you mentioned, too, that |
| 20  occasionally you have to record a future |
| 21  assignment? |
| 22  A    Yes. |
| 23  Q    Okay.  Tell me how that comes about. |

22  (Pages 82 to 85)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

## LEGALINK, A MERRILL COMPANY
### Court Reporting * Legal Videography * Trial Services

Page 86

1  A    We receive an assignment from the broker
2  or the lender, who is then assigning it to
3  another lender, and they ask us to record it for
4  them.  And it's overnighted to the courthouse
5  for recording.
6  Q    All right.  And does that usually happen
7  right after the loan is closed or do you --
8  A    No.  Typically, it can be months out.
9  Q    All right.  And is there an additional
10  charge for that?
11  A    There's an additional charge we have to
12  pay.  They don't send the recording fee when
13  they send that.  We have to pay that out of our
14  operating account.
15  Q    Would you have to pay that on the
16  lender's behalf?
17  A    Uh-huh.
18      BY MS. CLOTFELTER:  Is that "yes?"
19  A    Yes.  When you say "on the lender's
20  behalf," I don't ever get refunded from the
21  lender.
22  Q    (continued by Mr. Underwood)  All right.
23  A    I am paying it on their behalf to get it

Page 87

1  recorded on their behalf, but I don't, in turn,
2  invoice them at that point.  I don't ever
3  receive funds from them for that.
4  Q    Okay.  Can you give me some kind of --
5  give me your best judgment on how many
6  transactions you have recorded a future
7  assignment?
8  A    You want my best guess, because that's
9  exactly what it would be.
10  Q    Sure, your best judgment or percentage of
11  the --
12      BY MS. CLOTFELTER:  If you have a
13  judgment, that's fine.  If you don't have a
14  judgment, don't just make a random guess.
15  A    Okay.  Well, it actually would be a
16  guess, because that's all I have.  I'm sorry.  I
17  don't -- I don't approve recordings.  I have a
18  recording department.  So at this point in time,
19  I don't know how many assignments they receive.
20  I know they get them, because I see them coming
21  back recorded, because recorded documents come
22  back to us, but I don't know what percentage of
23  our files that would be.

Page 88

1  Q    (continued by Mr. Underwood)  All right.
2  You would have those records in your recording
3  department?
4  A    It would be scanned into each file.
5  There's not any kind of spreadsheet or any kind
6  of database you can go into and find out how
7  many files we recorded assignments on.  You
8  would have to go through every file we've ever
9  closed to see if it had one in it.
10  Q    Okay.  You told me that's an expense to
11  Swafford?
12  A    Yes, it is.
13  Q    All right.  And that's not something that
14  you could -- that you looked at and try to
15  control?
16  A    We haven't found a way to control that,
17  no.
18  Q    And what kind -- I meant to ask you
19  earlier, too.  Were there other -- are you a
20  shareholder of Swafford & Hays?
21  A    Yes, I am.
22  Q    Of Swafford Settlement Services?
23  A    Yes, I am.

Page 89

1  Q    Are there other shareholders?
2  A    Yes, there is.
3  Q    Who are they?
4  A    James Swafford, I; James Swafford, II;
5  and Dana Tampas.
6  Q    Dana Tampas?
7  A    Uh-huh.
8  Q    Okay.  Let's see.  It would be fair to
9  say, then, with regard to future assignments,
10  that there's not one on every loan; is that --
11  A    That is fair to say.
12  Q    All right.  Would it be as many as one
13  out of ten loans would have a future --
14  A    Actually, let me correct that.
15  Q    Okay.
16  A    It's probably not fair to say that
17  there's not one in every loan.  I don't know if
18  there's one in every loan.  I know that we are
19  not asked to record one on behalf of the lender
20  on every loan.
21  Q    Okay; all right.  That's fair enough.
22  A    Okay.
23  Q    Are you asked to record one in as many as

23 (Pages 86 to 89)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

Hall-Frazier
Record - 000899

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 90

1    one out of ten loans?
2    A      Like I said earlier, that would be a
3    guess if I told you that.  I don't know how many
4    we do that on.
5    Q      Okay.  Well, I think someone in your
6    recording department would have that
7    information.
8    A      They wouldn't have a specific, but they
9    would have a better idea as to the percentage.
10   Q      All right.  Who is that person?
11   A      Brenda Cooper.
12   Q      Swafford would write a check for that
13   recording fee?
14   A      Uh-huh.
15   Q      Is that "yes?"
16   A      Yes.  I'm sorry.
17   Q      And does Swafford use a software that
18   codes checks to certain expense accounts and
19   that sort of thing?
20   A      No.  We use Quick Books.  So our
21   accountant has to manually do it.  And it just
22   shows as a recording expense, but anything that
23   is paid for recording shows a recording expense.

Page 91

1    Meaning if there's a recording shortage, we
2    didn't collect enough, that shows a recording
3    expense, also.
4    Q      All right.
5    A      If there's a release, it shows a
6    recording expense, also.
7    Q      Okay.
8    A      So they're all lumped into one fee as a
9    recording expense.
10   Q      All right.  Well, let me ask you this,
11   then.  Are they paid out of the escrow account?
12   A      For that, no.
13   Q      Okay.  And is it paid out of an operating
14   account?
15   A      Yes, it is.
16   Q      Now, is it true that the fees for
17   recording a mortgage would be paid out of the
18   escrow account; is that true?
19   A      Yes, it is.
20   Q      What other --
21   A      Actually, you just jogged my mind.  If we
22   still have -- we haven't gotten into this yet.
23   I'm sure you will go there -- but if we still

Page 92

1    have the -- a check for any amount that wasn't
2    used for recording, that we're holding to wait
3    to send to the borrower when the mortgage comes
4    back recorded, those funds would be used for the
5    assignment or for the release or what have you,
6    or for any shortage we get.  But if we've
7    already returned it to the borrower, then it
8    comes out of the operating account.
9    Q      Okay.
10   A      And that is our current procedure.
11   Q      Okay.  Now, out -- well, we'll get to
12   that in a minute.  Okay.  Out of the operating
13   account, would there be any other recording, any
14   other checks written for recording fees, other
15   than for future assignments?
16   A      Out of the operating account?
17   Q      Yeah.
18   A      Like I said, if there's not -- if we
19   can't take it from the borrower's -- any funds
20   go back to the borrower, then it would be for
21   releases, assignments, any kind of shortage from
22   the recording.  But typically, that won't happen
23   anymore, because we have the funds for that.

Page 93

1    But there are times where the shortage is so
2    great, yes, it comes from that account.
3    Q      Okay.  So could we look at the operating
4    account and it would include as a subset of
5    checks written for recording fees, a subset of
6    that would be checks written for future
7    assignments; is that an accurate statement?
8    A      I don't know what you mean by "subset,"
9    but it would show you what checks were cut and
10   what amounts they were cut for.  I don't know
11   that it would tell you if it was an assignment,
12   a release or a shortage.
13   Q      Yeah.  But out of the whole -- the whole
14   world of checks written out of the operating
15   account for recording fees, that's a set.  And
16   then a subset of that would be checks written
17   for recording of future assignments; is that an
18   accurate statement?
19        BY MS. CLOTFELTER:  Object to the form.
20   If you understand the question, go ahead and
21   answer.
22   A      A portion of that, yes, is for
23   assignments.  But if you're asking me can you

24 (Pages 90 to 93)

a7f3f0e1-70d2-485b-aa2e-e19d35381532