LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 94

1  tell which ones are assignments, I don't know
2  that you can know.
3  Q    (continued by Mr. Underwood)  Okay.
4  A    And that's not all assignments.  Because
5  like I said, sometimes we still have the funds
6  for the borrower for additional recording fees
7  and that's what we take that from, because
8  that's what that can be used for.
9  Q    Okay.  And in that instance are they paid
10  out of the escrow account?
11  A    Yes, they are.  And that does not have
12  any kind of code or -- it's file-specific.
13  There's not any kind of report you can run on
14  that.
15  Q    Okay.  Well, I guess -- I was going to
16  get into that later, but since we're talking
17  about that now, how do you do your accounting on
18  monies in the escrow account that are held there
19  for the benefit of borrowers for paying future
20  assignments?
21  A    We only keep those funds until the actual
22  mortgage or quitclaim deed, warranty deed, that
23  basic group of legal documents that were signed

Page 95

1  at closing, we only keep those additional funds
2  until that comes back recorded.  Because those
3  funds are used to pay for any assignments,
4  releases or any recording shortages if it gets
5  rejected from the courthouse.  Once those come
6  back recorded, we actually refund the additional
7  monies to the borrower at that time.  So if
8  there's anything after that, unfortunately, it
9  has to come from us.
10  Q    All right.
11  A    And we have not found a way to recoup
12  those funds, if that's --
13  Q    Okay.  Well, I was going to ask you how
14  you did the accounting for that.
15  A    It's a loss.
16  Q    Well --
17  A    Oh, how do we actually keep up with the
18  borrower's funds?
19  Q    Sure.
20  A    At the time that we cut -- after the
21  closing, when we actually fund the loan, we cut
22  the check to the recorder's office then using
23  Ernst once again.  Because at the time we did

Page 96

1  the preliminary Ernst -- remember when we talked
2  about pre-HUDs -- we didn't know how many pages
3  the mortgage would be, how many writers there
4  would be, et cetera.  So once we get the actual
5  mortgage back signed with all the writings from
6  the borrower that was in the actual physical
7  package, then we know the actual number of
8  pages.  So we go in and run Ernst again.  And
9  that's the recording department that does that.
10  They cut the actual check and send it overnight
11  to either the courier or to the courthouse and
12  cut an additional check to the borrower which is
13  kept in a filing cabinet -- a locked filing
14  cabinet.  Once the mortgage comes back recorded,
15  they go to that check and they physically pull
16  it out and send it to the borrower.
17  Q    All right.  Now, I think you indicated
18  that there had been some change in that
19  procedure recently, and if you would --
20  A    That is the current procedure.  But, yes,
21  there was a change.
22  Q    All right.  What was the procedure before
23  the current procedure that you just described?

Page 97

1  A    If there was any overage at all of
2  recording at the time that was sent to the
3  recording office, it just went to the operating
4  account to cover future expenses.
5  Q    All right.  And when was that procedure
6  changed?
7  A    It varies.  Our largest lender,
8  Homeowners, we changed it first.  And then we
9  ended up changing it for the rest of the lenders
10  later.  Homeowners, to the best of my
11  recollection, was early 2005, maybe January.
12  Any then other miscellaneous lender, to the best
13  of my recollection, was August or September of
14  2005.  I believe we've provided those dates
15  before, and I'm not -- so I'm not sure that I'm
16  giving you accurate dates now.  I'm actually
17  trying to remember what we provided before and
18  we actually used our system to try to figure it
19  out.
20  Q    Okay; all right.  Well, we'll go through
21  those documents in a minute.
22  A    Okay.
23  Q    And what was the reason for making that

25 (Pages 94 to 97)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 98

1  change?
2  A    We actually found that was the best way
3  to handle the recordings.  Prior to that,
4  unfortunately, we ate a lot more -- we changed
5  the system twice.
6  Q    Okay.
7  A    That was the second change.
8  Q    Okay.  Well, go back and tell me how it
9  was done originally.
10 A    It's always been done -- prior to that,
11 it was always done through the operating
12 account.  But up until 2 -- I want to guess --
13 not guess, but estimate early 2004.
14 Q    Okay.
15 A    We never collected -- we hardly ever
16 collected enough.  We were paying shortages left
17 and right on recordings and it was -- in
18 thousands and thousands per year.
19 Q    All right.
20 A    We grew too rapidly is what happened, and
21 my father stepped in on the financial end and
22 he's the one that realized how much we were
23 losing on recordings, because we were eating it

Page 99

1  ourselves.  So then we started --
2  Q    Let me stop you right there and let me
3  ask you this question, then.  I thought you told
4  me earlier that there was no way you could track
5  that.
6  A    What do you mean?
7  Q    Well, I had asked you about --
8  A    I can track a grand total of what we lost
9  in a year, but I don't know what it was derived
10 from, whether it was affidavits, releases or
11 shortages.  But the majority of that at that
12 point would have been shortages, because we had
13 shortages on files sometimes that were $1,000.00
14 apiece.
15 Q    Okay.
16 A    And affidavits and releases never -- or a
17 summons and releases never cost $1,000.00.
18 Q    All right.  So you didn't -- for example,
19 expense for recording future assignments, you
20 don't have an account in your Quick Books
21 accounting that would -- so you could look back
22 at the end of the year and say, "Well, heck, you
23 know, we lost $10,000.00 on recording future

Page 100

1  assignments?"
2  A    No.  I can tell you how much we lost in
3  recordings.
4  Q    Total?
5  A    Total.
6  Q    Okay.  I'm sorry.  I didn't mean to
7  interrupt you.  You were telling me that prior
8  to early 2004 that the company was losing
9  $1,000.00 per year for recording fees,
10 showing --
11 A    Yeah, it was either late 2003 or early
12 2004.  I believe early 2004, but that's an
13 estimate.  When we began to -- we realized a lot
14 of it was because we were getting more writers
15 and larger mortgages than what we thought we
16 would have.  It turned out loan officers were
17 not typically aware of how many pages the
18 mortgages were going to have and how many
19 writers it would contain.  So that's when we
20 realized that we needed to take the largest
21 number of pages that we thought we could
22 possibly have and that would be what we would
23 use for the pre-HUD.  But at that point, when we

Page 101

1  did the final on Ernst and we sent the check off
2  for recording, if there was any additional
3  funds, it was put in the operating account for
4  future expenses.
5  Q    Well, were they segregated in a balance
6  in the operating account for future expenses or
7  just put in the regular operating account?
8  A    Put in the regular operating account.
9  Q    Okay.  Let's use, for example, let's say
10 Ms. Gibbs, for example.  If there was an overage
11 on what Ms. Gibbs was charged for recording
12 fees, would there be any record?  In other
13 words, would Ms. Gibbs have a credit in that
14 operating account that she's owed $10.00 for
15 that, or is it just in the operating account and
16 commingled with other operating funds?
17 A    There is a way you could figure it out,
18 but not from the operating account.  You would
19 have to go into each file, particularly in the
20 escrow account.  So you could go into the escrow
21 side, where we actually have our database, and
22 look at Ms. Gibbs's file, see what the actual
23 charge ended up being for recording, and then

26  (Pages 98 to 101)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

**Hall-Frazier**
**Record - 000902**

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 102 | Page 104 |
|---|---|

Page 102

1  see if there was any type of overage on that or
2  additional funds. If there was -- well, at that
3  point, I don't know that I could tell you if it
4  was ever used for an assignment or a release.
5  That was the problem at that point.
6  Q    Okay. Well, that leads me, I guess, to
7  this question. Quick Books -- and I've been
8  using Quick Books for twenty -- ever since it's
9  been out. I'm kind of familiar with it, too.
10 A    Right.
11 Q    It lets you assign -- when you write a
12 check, it lets you assign that check as an
13 expense to a certain person or entity; isn't
14 that true?
15 A    Assign it to a certain person? I'm
16 sorry, I don't use the quick book, so -- I have
17 an accountant that's on staff.
18 Q    Okay; all right. You don't use the Quick
19 Books at all?
20 A    Just to be able to look up bank balances
21 and to look up very basics.
22 Q    Okay.
23 A    That is why we had to hire an accountant.

Page 104

1  A    Now, she might be referencing -- and you
2  said there's a way to reference a file or
3  whatever. Maybe she is doing that. And if she
4  is, then we could.
5  Q    All right. We would need to ask her
6  about that?
7  A    Right.
8  Q    Okay. Fair enough. Now, can you give
9  me -- I'm kind of shifting gears here again.
10 In your judgment -- I think you started your
11 business in 2001, and one of your biggest was
12 Homeowners?
13 A    Not when we started the business, but
14 they were. When we started the business, we
15 were closing very few loans a month.
16 Q    All right.
17 A    And we actually started only in Tennessee
18 and Florida and I believe Arkansas.
19 Q    Okay. When did you start -- when did
20 Homeowners become one of your best customers?
21 A    Well, actually when they came on board,
22 even closing just a few loans a month, they were
23 probably our best customer --

Page 103

1  Q    Okay. Well, I thought you told me you
2  had an accounting degree.
3  A    Well, having an accounting degree and
4  using Quick Books can be two different things.
5  Q    That's true. Who is your accountant?
6  A    Allison Witt.
7  Q    Webb?
8  A    Witt, W-I-T-T.
9  Q    Is she on staff there?
10 A    She's on staff. And we also have a CPA
11 that does our returns who's off-site.
12 Q    Okay. And have you always used Quick
13 Books at Swafford Settlement Services?
14 A    I believe so. I believe we've always
15 used Quick Books, yes.
16 Q    Okay. But as far as you know, there's no
17 way we could go back and look at your -- look at
18 your operating account and see if there was a
19 check written for a future assignment with
20 regard to Ms. Gibbs's loan?
21 A    I don't know that I -- I don't think we
22 can.
23 Q    Okay.

Page 105

1  Q    All right.
2  A    -- because we were so small. But I don't
3  recall when that was. It was either late '01,
4  early '02, I believe.
5  Q    Okay. Well, do you have a judgment about
6  how many loans you would have closed during '01?
7  A    I don't think we -- no. I know we
8  didn't -- it was less than a hundred. But at
9  some point, there was some months we closed five
10 to ten in the beginning. It was just stair
11 steps throughout the years. We didn't start
12 going backwards until '05 when they started
13 going downhill and started going out of
14 business, and then that was the first time we
15 actually started seeing leads and strides the
16 opposite direction. But we -- every month it
17 fluctuated from '01 all the way through '05.
18 Q    Okay. What about '02, did you do a lot
19 of business with Homeowners that year?
20 A    A lot more than '01, if we were even with
21 them in '01. Like I say, it was either late '01
22 or early '02. It was somewhere in that --
23 Q    All right. Well, during the year of '02,

27 (Pages 102 to 105)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 106

1  you know you were with them.
2  A    Yes, I do know that.
3  Q    All right.  And did you close more or
4  less than a hundred loans for Homeowners that
5  year?
6  A    I know that when we actually -- there was
7  a company we started using to find our notaries
8  at one point called Phath Signings.  They helped
9  us find notaries for a while.  And I don't know
10  if that was in '02 or '03, but I know when we
11  started actually asking for help, it was
12  because we were overwhelmed with our staff level
13  and we were just crossing a hundred at that
14  point.  And that would have been either mid to
15  late '02 or early '03.
16  Q    Okay.
17  A    Actually I take that back.  It was
18  definitely early to mid '02.
19  Q    Okay?
20  A    I do know that.
21  Q    All right.  Now, what about in 2003, do
22  you have a --
23  A    I know in the beginning of '03, it was

Page 107

1  somewhere in the three hundred range.  Now, are
2  you asking for Homeowners specifically?
3  Q    Yeah.  And I'm going to go back and ask
4  you --
5  A    I'm sorry.  I was telling you what our
6  total monthly closings were.
7  Q    Well, let's just go through those first,
8  then.
9  A    We were starting to close over
10  three-hundred loans a month in early '03.
11  Q    Okay.  Per month.  All right.  And then
12  in '02, were you a closing about a hundred per
13  month?
14  A    We crossed a hundred at some point.
15  Q    Okay.  And then during '03, it would have
16  been less than a hundred per month?
17  A    Oh, no, not '03.  It would have been
18  somewhere around --
19  Q    I mean -- I'm sorry, '01.
20  A    '01 would have been less than a hundred,
21  yes.
22  Q    Okay.  And then '03 was greater than a
23  hundred per month?

Page 108

1  A    '02 was greater than a hundred per month.
2  '03 was greater than three-hundred a month.
3  Q    Three-hundred.  Okay.  And what about
4  '04?
5  A    '04 was probably -- probably from there
6  on, it's about another hundred, because we got
7  to the point that in '05, late '04, early '05,
8  we were closing over five-hundred loans a month
9  as a company until Homeowners went backwards.
10  Q    Okay.  And maybe this will be the easiest
11  way to do it.  In '01, do you have a judgment
12  about what your percentage of business with
13  Homeowners was?
14  A    No.  Actually from there on out, I can't
15  tell you percentages.  I can tell you that
16  Homeowners -- once we got Homeowners, they were
17  always between sixty and ninety percent of our
18  business.
19  Q    Okay.  Fair enough.  Let's see, I got off
20  down a rabbit trail about the number of
21  transactions that you would do in a month when I
22  had been asking you about how the records were
23  kept in the Quick Books.  And I meant to ask you

Page 109

1  this, do you know if they're kept on Quick
2  Books -- and when I say "they're kept," I'm
3  talking about the operating account as opposed
4  to the escrow account.  Were they kept on
5  separate companies?
6      BY MS. CLOTFELTER:  Separate companies?
7  A    Well, the escrow -- we don't actually
8  do -- use Quick Books for escrow.
9  Q    (continued by Mr. Underwood)  Okay.
10  A    That's out of our title software.
11  Q    Okay.  I see.  All right.  And so what
12  kind of title software do you use?
13  A    We used Aptitude, which is a software
14  provided by American Pioneer.  And then when
15  American Pioneer was bought by Ticor, they
16  discontinued -- discontinued that.  And so in
17  January of this year, we started using SoftPro.
18  Q    All right.  And does it generate the
19  HUD-1 and all that?
20  A    Yeah.
21  Q    It does?
22  A    Yeah.
23  Q    And writes the checks and the whole

28 (Pages 106 to 109)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 110

1  business?
2  A    Right.
3  Q    And keeps an accounting of it?
4  A    Yes, it does.
5  Q    Okay; all right.  And what was the name
6  of that again?
7  A    The one we use now is SoftPro, just like
8  it sounds.
9  Q    Okay.
10  A    And the one before that was Aptitude.
11  Q    Okay; all right.  So that's just
12  completely separate and apart from the
13  accounting that's done in Quick Books?
14  A    Uh-huh.
15  Q    All right.  Thank you.
16  A    Yeah.
17  Q    And that's also your accountant, Alicia
18  (sic)?
19  A    Allison.
20  Q    Allison.  I can't read my own writing.
21  A    I was trying to think of when she came,
22  but I think that was also in early '02 or early
23  '03, also, somewhere in that period of time.

---

Page 111

1  Q    All right.  And is that something she's
2  familiar with also?
3  A    She's also familiar with the -- she's
4  familiar with the escrow system and with Quick
5  Books.
6  Q    Okay.
7  A    And we actually use Quick Books
8  Enterprise, I believe.  We got so large that the
9  system could not even hold anything longer than
10  a year, so we had to go to a larger system.
11  Q    Okay; all right.  What does Swafford &
12  Hays do to make sure it's in compliance with
13  federal and state lending laws and regulations?
14  A    The largest thing -- well, there's
15  several things we do.  Like I said, we have our
16  underwriters that come in and do the audits, and
17  we use their underwriting manuals.  We -- they
18  have toll free numbers to different locations
19  around the United States, depending on where the
20  state we're lending at that time, and we can
21  call the underwriters actually in those
22  branches, attorneys in those branches, and ask
23  any questions that we have.

---

Page 112

1  Q    Okay.
2  A    The biggest thing it falls back on is the
3  audits, because if there's anything we've missed
4  that we're not in tuned to, that's why they do
5  the full audits.  They audit files and
6  everything.
7  Q    Okay.
8  A    And they actually do all of our bank
9  reconciliations for us.
10  Q    Okay.  And is it -- bank reconciliations
11  on the --
12  A    Escrow side.
13  Q    -- escrow account?
14  A    Uh-huh.
15  Q    And is it Ticor that does that?
16  A    Uh-huh.
17  Q    All right.
18  A    But when they do bank reconciliation
19  audits, we also provide our operating accounts
20  to them as well.  They don't reconcile them, but
21  they audit -- they have to look through them.
22  Q    They also audit your Quick Books
23  operating accounts?

---

Page 113

1  A    Uh-huh.
2  Q    Okay.
3  A    I know that they -- I'm almost
4  ninety-nine percent sure they do.  There's two
5  accounts I know they do.  And I believe they do
6  them all.
7  Q    Okay.  Now, tell me when quick -- well,
8  excuse me -- when Ticor comes in to audit a
9  file, tell me exactly what it is that they look
10  at and what it is that they do.
11  A    It depends on which audit they're doing.
12  If they do a bank reconciliation audit --
13  Q    Okay?
14  A    -- when they do that, they're looking
15  at -- I really don't know everything they do.
16  But I know that they request the file; they look
17  at the HUD request; they look at our final HUDs;
18  they look at our disbursement worksheets; they
19  look at the actual physical checks and they
20  report from the bank.  They basically track
21  everything from the time they ask us to put on
22  the HUD, all of our fees, all their fees, all
23  the payoffs all the way through funding.  It's

---

29 (Pages 110 to 113)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 114

1  all the financial standpoint of the audit.  And
2  then when they do the other audit, they audit
3  all of the documentation in the file, the
4  abstracter report, the commitments; how we
5  process the liens, if we remove them properly,
6  if we didn't; how we handled it.  They do all of
7  what I call a true title audit.
8  Q     All right.  Now, what about in the other
9  audits you referred to and the bank audit, do
10 they check for lending law and regulation
11 compliance?
12 A     I would assume so, since they -- since we
13 are an agent for them and they have to be
14 regulated by that.
15 Q     Okay.
16 A     I know that they do one particular audit
17 in Virginia called a CRESPA audit.
18 Q     Called a what?
19 A     CRESPA.
20 Q     How do you spell that?
21 A     It's RESPA with a "C" in the front.
22 Q     Okay.
23 A     And that's the only state that requires

---

Page 116

1  truth-in-lending statements, whether it be at
2  the beginning of the application process,
3  because we don't even know when they took the
4  application.  We just know whenever it's with
5  us.  Or whether it be the final truth-in-lending
6  that goes out with the closing.
7  Q     (continued by Mr. Underwood)  All right.
8  And all that's done by the lender, the various
9  lenders?
10 A     Uh-huh.
11 Q     Okay.  And the various lenders also
12 approve the HUD-1 statement like you told me
13 earlier?
14 A     Yes, they do.
15 Q     Okay.
16 A     I believe there was one lender that we
17 did a set of purchases for.  I don't -- it would
18 have been, I think, in '05, maybe late '04, that
19 we typed documents, other than the HUD, and I
20 would have to -- I don't know exactly what
21 documents it was.  I think it was the note.  I
22 still don't think we did any truth-in-lending.
23 I think we completed the note.

---

Page 115

1  that.
2  Q     And what state requires that?
3  A     Virginia.
4  Q     Virginia.  All right.
5  A     I guess my final answer, to sum it up,
6  would be, since we're acting on their behalf as
7  an agent, we rely heavily on them to audit us
8  when they come in and do those audits, and
9  that's why they provide us with the underwriting
10 manuals and why they provide us with toll free
11 numbers.
12 Q     All right.  Now, with regard to
13 truth-in-lending and stuff like that --
14 A     We don't actually --
15       BY MS. CLOTFELTER: Object to the form.
16 Hang on just a minute.  First, ask your
17 question, and then let me make an objection.
18 Q     (continued by Mr. Underwood)  With regard
19 to -- with regard to truth-in-lending, I believe
20 you told me that the lender does all that, as
21 far as checking for compliance; is that true?
22       BY MS. CLOTFELTER: No objection.
23 A     Yes.  We don't -- we don't prepare the

---

Page 117

1  Q     Okay.
2  A     But I just wanted to say that, because
3  I'm not sure exactly what we typed for them.
4  But it was one lender that we don't even do
5  business with anymore.
6  Q     All right.  Now, one other thing I didn't
7  quite finish covering, too, that we were talking
8  about was about the procedures for handling
9  the -- the overage for the charge for recording
10 fees.
11 A     Uh-huh.
12 Q     And tell me what -- you told me -- I
13 believe you told me that early in 2004, I think
14 you said you guys were paying shortages left and
15 right.  I believe that's what you said.
16 Is that right?
17 A     Up to that point.  I mean, it was either
18 late 2003, early 2004.  Up to that point, we
19 were paying a lot of it.
20 Q     Okay.  Now, tell me what was going on in
21 late 2003, early 2004 that was causing you to
22 have to pay these shortages.
23 A     Well, up to that point, when Homeowners

---

30 (Pages 114 to 117)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

**Page 118**

1  was growing rapidly, we were growing rapidly,
2  and I guess I didn't have proper accounting
3  procedures in place and my company started
4  losing money and we didn't -- and so my dad
5  stepped in, because he also had an accounting
6  background, but he actually has practiced
7  accounting, and he stepped in to find out
8  exactly where we were losing money.  That's when
9  we got CPAs involved and everything and we
10  realized on a regular basis we weren't charging
11  for enough pages to be recorded.  So we were
12  constantly having to pay those.
13  Q    Okay.  Now, I've noticed in a number of
14  these transactions that there's a flat $120.00
15  fee.  On some of them maybe it's $130.00 --
16  A    Yes.
17  Q    -- that's charged for recording fees.
18  A    That's where we went in after that and we
19  realized in addition -- we always had to do the
20  maximum number it could be.  So a lots of
21  we'll -- that's why they came up with those
22  figures in those states.
23  Q    Okay.  Now, who came up with the 120 or

---

**Page 119**

1  $130.00 figure?
2  A    I believe we relied pretty much on our
3  closing staff and our recording staff, because
4  they are the ones that dealt with those fees and
5  saw the rejected mortgages coming in and saw
6  that we weren't collecting for it.  And they see
7  the actual packages when they come back and they
8  have to stamp them.
9  Q    Okay.
10  A    So that's how they knew how many pages
11  there were.
12  Q    Okay.  But someone made the decision to
13  put the $120.00 or $130.00 charge on there, and
14  who was it that made that decision?
15  A    I don't know.  I think it was more of a
16  collective thought pattern.
17  Q    Okay.  But in any event, did that
18  practice start in late 2003 or early 2004?
19        BY MS. CLOTFELTER:  Object to the form.
20  What practice are you --
21        BY MR. UNDERWOOD:  The practice that we
22  were just talking about, the charge of the 120
23  or the $130.00 flat fee for the recording fee.

---

**Page 120**

1  A    To the best of my knowledge, yes.  We may
2  have -- I mean, maybe we started a little bit
3  earlier than that, but I think it was late 2003
4  or early 2004.
5  Q    (continued by Mr. Underwood)  And I
6  noticed on some of them it was $130.00, and on
7  some of the transactions, it was $120.00.  Can
8  you tell me the distinction between the two?
9  A    I would think it would the recording cost
10  in those states.
11  Q    All right.  And are those the only two
12  figures that are entered on that line on the HUD
13  ones or --
14  A    Which line?
15  Q    Well, let me see.  The line 1201,
16  recording fees.
17  A    Can I see it?
18  Q    I'm sorry.  Probably the one attached is
19  not marked up.
20  A    You know, I don't know, because I've
21  never run Ernst myself.  So I don't know if
22  there's any states that have a basic fee or
23  anything on top of that.

---

**Page 121**

1  Q    Okay.
2  A    I don't know.  I'm sorry.
3  Q    Okay.  I didn't mean to make that a trick
4  question.  I notice on this one it says -- it's
5  $225.00, and I wasn't -- I realize that it may
6  be different on some of these other ones.
7  A    I know that -- I do know that some states
8  it's going to be higher than that, because
9  there's other things involved.  But I don't
10  know -- I guess what I'm trying to say is, I
11  don't know when it comes to all these taxes and
12  these different fees that different states and
13  different counties charge, I'm not sure if some
14  of them fall on 1201 or if they all fall on
15  different lines.  That's why I don't know how to
16  answer that question.
17  Q    Okay.  I see.
18  A    I know that they're within the recording
19  fees box, but I don't know how they're broken
20  down by line.
21  Q    Okay.  While we're talking about it and
22  we've got this document out, let's --
23  let me just mark this as our next exhibit.

---

31 (Pages 118 to 121)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 122

1 REPORTER'S NOTE: (At this point, instrument was
2 marked for identification by the Reporter as
3 Plaintiff's Exhibit Number 3, after which, the
4 deposition continued, as follows:)
5
6 Q    (continued by Mr. Underwood)  Let me show
7 you what I've marked as Plaintiff's Exhibit 3.
8 On this one, on line 1201, it shows a charge of
9 $225.00.  Do you know where that figure would
10 have came from?
11 A    Well, like I said, we use Ernst, but I
12 don't know how many pages or what would have
13 been put in there to get that figure.
14 Q    Okay.
15 A    And I believe that it -- I believe
16 it's -- I believe it's a higher number of pages
17 put in.  I don't believe there's a set amount on
18 top of that.
19 Q    Okay.  Well, this -- on the next line,
20 the line 1202, does that come from Ernst?
21 A    Everything in 1,200 comes from Ernst.
22 Q    Okay.  And does someone at Swafford make
23 a decision about what to put on this -- the

Page 123

1 line -- the line 1201?
2 A    Our closing department does.
3 Q    All right.  And do they have a list or
4 something that they go by so they know -- like,
5 for example, for Louisiana -- I believe this one
6 is from Louisiana -- to put on line 1201 for a
7 loan that's closed in Louisiana?
8 A    At some point there might have been a
9 list.  But at this point, I know it's the same
10 people that have been there for a while.  They
11 just know what to put in, depending on the
12 state.
13 Q    All right.  And who is it that knows what
14 to put on the line 1201?
15 A    The best person would be Betsy Johnson.
16 She's been in that department the longest.
17 Q    What's her job title?
18 A    It's actually changed several times since
19 she's been with us, but she's in the closing
20 department.  So probably Director of Closing at
21 this point, because she's over closing.
22 Q    All right.  Now with --
23 A    I want to add something, too, on the 1201

Page 124

1 question.
2 Q    All right.
3 A    At one point we realized we needed to use
4 a higher number of -- the reason I also wasn't
5 sure where they got that number was they always
6 used Ernst.  But as far as -- like I said, I
7 don't know if they use a number of pages or not.
8 At one point when we raised the amount, it was
9 based upon the fact that we needed to get a
10 larger number of pages to make sure we didn't
11 ever have a shortage.  Now, over time, when they
12 got used to what state that amount was probably
13 going to be based on those number of pages, I
14 don't know if -- if there was more shortages
15 that came through for some reason or another,
16 they may have raised that amount, so -- and
17 that might not have been done by pages.  That
18 might have been done based upon shortages they
19 were trying to avoid.  That's where I -- it's a
20 gray area to me.  I don't know if it's still a
21 specific number of pages.
22 Q    Okay.  Well, would it be fair to say that
23 this figure that's on line 1201 is just an

Page 125

1 estimate?
2 A    Yes, that is fair to say.
3 Q    Okay.  And on all of the loans it's just
4 an estimate; is that also true?
5 A    Yes.  I don't believe we ever know the
6 actual number of pages at the time we do that.
7 Q    Okay.  Fair enough.  And I think you told
8 me that -- let's say, for example, on this
9 Exhibit 3 that if the recording fee was only
10 $100.00 and the customer had been charged --
11 well, let me ask you this.  Who is your customer
12 when you're doing one of these closings?
13 A    Who is our customer?
14 Q    Yes.
15 A    Well, it depends on what terms you're
16 referring to.  The borrower is the customer of
17 the lender.
18 Q    Okay.
19 A    And we're working on behalf of the
20 lender.
21 Q    Okay.  So the lender's your customer --
22    BY MS. CLOTFELTER: Object to the form.
23 Q    (continued by Mr. Underwood) -- is that

32 (Pages 122 to 125)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 126

1  true?
2      BY MS. CLOTFELTER: He just answered. I
3  mean, that's different from what he said.
4  A    No. The borrower is the customer.
5  Q    (continued by Mr. Underwood) Okay.
6  A    The borrower has -- for instance, the
7  borrower doesn't pick the title company, but
8  every lender has more than one title company,
9  and they utilize us and the borrower has the
10 right to ask for a different title company. So
11 the borrower is the customer.
12 Q    All right. I'll use the term "customer,"
13 then. Let's say, for example, in this Exhibit 3
14 that the recording -- the actual recording fee
15 was only $100.00. Now, I think you told me at
16 one time the additional $125.00 would just --
17 was just paid over into the operating account;
18 is that -- did I understand that testimony
19 correctly?
20 A    Yes. When we -- at one time when we cut
21 the check for recording with the actual number
22 of pages, anything that was not needed to send
23 at that point was put in the operating account.

Page 127

1  Q    All right. And you told me that the
2  procedure for that changed at some point. I
3  believe you told me in early 2004, mid 2004?
4  A    Well, there was two changes. We never --
5  we only covered one of the changes.
6  Q    Okay. Well, I thought that we -- okay.
7  We got to the point where we -- I think you said
8  your father realized that you guys were losing a
9  lot of money for having to pay recording fee
10 shortages and you went -- what did you do at
11 that -- what change did you make at that point?
12 I think I've gotten myself --
13 A    Okay. That's what we're talking about
14 now, when we realized we needed to do --
15 because, see, we had the point -- we had the
16 point where we were losing money. That was the
17 first step. Then the second step was where we
18 started doing this. And then the third step is
19 where we are now, which is where the additional
20 funds go back to the borrower.
21 Q    Okay; all right. And when you say "doing
22 this," let's --
23 A    That is when we started realizing we

Page 128

1  needed to estimate the original -- the higher
2  number of pages.
3  Q    Under line 1201?
4  A    I would assume it was just 1201, yes, but
5  it's all within the recording of 1200.
6  Q    All right.
7  A    I don't believe that the '03 and '04,
8  when you're talking about those, I think -- I
9  believe that is truly generated just by the loan
10 amount. So I don't think those would vary. I
11 don't believe they would. I don't know. I
12 don't run Ernst.
13 Q    Well, and I think you're right, and I've
14 looked at some -- looked at a number of these
15 transactions and it appears that '02 and '03 are
16 just --
17 A    What they are.
18 Q    -- what they are.
19 A    That's what I'm of the understanding of.
20 Q    And 1201 is just an estimate; is that
21 your --
22 A    Because of the pages, yes.
23 Q    Okay; all right. Now, tell me again when

Page 129

1  you made the change of paying the balance back
2  to the borrower.
3  A    When? I'm sorry. You're asking me when?
4  Q    Yeah.
5  A    It was two different dates.
6  Q    Okay.
7  A    With Homeowners, it was -- like I said
8  earlier, I believe it was early '01, maybe
9  January. I mean, '05. Excuse me.
10 Q    Okay.
11 A    And then the rest of the lenders were, I
12 believe, September of '05.
13 Q    Okay. And was there some reason why you
14 did it sooner with Homeowners than the other
15 lenders?
16 A    One of their on-staff attorneys said that
17 they would prefer to be able to track where
18 recording overages or billing -- or if there is
19 an overage or if there's a shortage or what have
20 you, so that was the only way we knew how to do
21 it. And we still -- we still can't show all
22 shortages that are coming out of our operating
23 account, but at least they know everything that

33 (Pages 126 to 129)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 130

1  comes off of the HUD, where it's going.
2  Q    Okay. And that was one of the attorneys
3  from Homeowners?
4  A    Uh-huh.
5  Q    Did he send you any kind of
6  correspondence about that?
7  A    It was a conference call.
8  Q    Were there any e-mails in that regard?
9  A    I don't recall.
10  Q    What was that attorney's name?
11  A    Bill Long.
12  Q    Bill long?
13  A    Bill Long.
14  Q    And is he in Atlanta?
15  A    Uh-huh.
16  Q    And was he on staff for Homeowners?
17  A    Uh-huh.
18  Q    Do you know his job title?
19  A    I know it has attorney in it. I'm not
20  sure.
21  Q    Okay. And let me be clear about this
22  now. Was there any written correspondence or
23  memoranda at all about this, or you just

Page 131

1  don't --
2  A    I know there was no memorandum or a
3  letter or anything, but I'm -- I don't know if
4  there was any e-mails. I don't know if he
5  called and requested a conference call or if he
6  put it in writing he wanted a conference call.
7  Q    All right. And do you know what prompted
8  him to call and -- about that? Did he tell you?
9  A    Well, his role there was like a
10  compliance for the lender, and anytime that they
11  wanted something changed, he would call me and
12  ask me to change it. Typically, it involved
13  things that he wanted us to help him do for
14  their company. In this particular instance, it
15  was something he wanted us to do for our
16  company.
17  Q    All right. And when you got that call
18  from Mr. Long, did you create any memoranda or
19  e-mails to employees or closers or anything like
20  that about the change?
21  A    I would say that there probably would be
22  an e-mail. I typically ninety-nine percent of
23  the time do e-mails. I don't usually do

Page 132

1  memorandums or letters.
2  Q    All right. And do those e-mails still
3  exist?
4  A    Hopefully so if they're in my sent items.
5  But I have an IT Director that after it gets so
6  large, it cleans it out. But I'm thinking if
7  it's '05, then it should still be there.
8  Q    Okay. Who's your IT Director?
9  A    Joe Filipowizz.
10  Q    Is he still with you?
11  A    Yes, he is. That's F-I-L-I-P-O-W-I-Z-Z.
12  Q    Okay. Thanks. And then what was the
13  reason for changing that procedure with the
14  other lenders, other than Homeowners?
15  A    It was working very well with Homeowners,
16  so we decided to do it with other lenders as
17  well. And we weren't -- I don't recall that
18  Bill ever told us the reasons for his concern
19  with that, but we felt if it was a concern with
20  him, then it was going to be a concern across
21  the board. So we did that across the board.
22  Q    All right. Well, did Bill express to you
23  that that might be a violation of any kind of

Page 133

1  lending law or regulation?
2  A    I don't believe so.
3  Q    All right. Did you learn at some point
4  that that might be a violation of a lending law
5  or --
6  A    No.
7  Q    And I'm not asking you anything that your
8  lawyers have told you, but --
9  A    No, I don't believe I ever did.
10  Q    All right. Well --
11  A    I was -- no. I mean, I was told at one
12  point by our underwriter that it was a gray
13  area, but I was never told that it was a legal
14  issue.
15  Q    Okay. I was going to ask you -- that was
16  going to be one of the next things I was going
17  to ask you, if the underwriter ever brought that
18  up --
19  A    They thought it was a gray area, because
20  of whether it's payable to Swafford or didn't
21  say it, and some of our systems did. But then
22  there was the AIM system that dropped it and it
23  stopped sending it again. But they never told

34 (Pages 130 to 133)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 134 | Page 136 |
|---|---|

**Page 134**

1  us to stop doing it and they never told us that
2  we were violating any kind of law.
3  Q    All right.  And that was someone from
4  Ticor?
5  A    Ticor and actually any kind of -- any
6  other underwriter.  We applied with two other
7  underwriters.  Both did extensive audits of us.
8  Q    All right.
9  A    Neither one had an issue with it.  One of
10  the two we elected to go with, which was
11  Commonwealth, and they said pretty much the same
12  thing Ticor did, that it was a gray area that --
13  and it was pretty much just for disclosure
14  purposes as to where that money was going, as
15  far as whether it was going to be kept by
16  Swafford or not.  But they never said we were
17  violating any law.
18  Q    Okay.  Now, did Ticor give you any kind
19  of written memorandum, or is this -- I suppose
20  the audit results were in writing.
21  A    Right.  I don't know if that was one of
22  the findings.  Usually the things they looked at
23  is findings or things that they definitely want

**Page 136**

1  with Homeowners and other lenders, that was
2  because we chose to, not because our
3  underwriters dictated it.
4  Q    All right.  And who was the underwriter
5  that you sat down with and they told you that
6  that was a gray area?
7  A    Both did.  Commonwealth, when we applied
8  with them, and Ticor had -- had within that same
9  parameter of time when they did their audit.
10  But they were already our underwriter.  And mind
11  you when I say "Ticor," that encompasses
12  American Pioneer, because I'm not -- I don't
13  remember exactly when American Pioneer was
14  bought by Ticor.  We still deal with the same
15  staff, though.
16  Q    Now, we talked about your training and
17  on-the-job experience a little earlier, and I
18  wanted to ask you a little more about that.
19  Have you ever had any training with regard to
20  the Real Estate Settlement Procedures Act?
21  A    No, I've never actually taken any courses
22  or done any kind of training.
23  Q    All right?

**Page 135**

1  us to change.
2  Q    Uh-huh.
3  A    So I can't -- I don't know if it was in a
4  memorandum or not.
5  Q    Okay.
6  A    I doubt that it would be --
7  Q    Okay.
8  A    -- because it wasn't a finding that they
9  were requiring us to do something about.
10  Q    All right.
11  A    But if it was, it would be in the
12  memorandum.
13  Q    Well, how did you know they had any
14  concern about it at all?  I mean --
15  A    We always sit down with the auditors when
16  they're done with the audit and they go over the
17  findings that they require us to change, and
18  then any other things that they just want to
19  recommend and bear witness to.  And that was one
20  of the recommendations, was not to stop doing
21  it, but make it payable to Swafford.
22  Q    Okay.
23  A    When we chose to stop doing it in '05

**Page 137**

1  A    My training has only been from
2  underwriters coming in and making
3  recommendations and doing audits and sitting
4  down -- in other words, I don't remember -- I
5  know there was not a course in the beginning
6  when we were approved by Ticor, which was our
7  very first underwriter, and they came in and set
8  us up as an agency, which was American Pioneer
9  at that time.  But I do know we didn't have any
10  kind of written formal courses or anything.  It
11  was strictly them coming in and telling us how
12  to get things going.
13  Q    All right.  And you don't have anyone on
14  staff, either, that's trained in these lending
15  laws and regulations, or do you?
16  A    No.  Like I said, we rely on all the
17  attorneys that are on the underwriter staff.
18  Q    Okay.  Now, at some point, did you become
19  aware of a complaint of Ms. Gibbs and Ms. Finch?
20  A    Yes, I did.
21  Q    Okay.  When was that?
22  A    I don't remember the date when I first
23  received the notification that they were going

35 (Pages 134 to 137)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 138

1  to bring a complaint or a suit against us.
2  Q      All right.  And you don't remember the
3  date that you received that paperwork?
4  A      No.  I know it's been going on for a
5  while.  I want to think it was probably two
6  years before the Saucida began, and I don't even
7  remember when Saucida began.
8  Q      Okay.  And I guess my next question is
9  this, did the Gibbs and Finch complaint, did it
10 have anything to do with the change in your
11 procedure with regard to these charges for the
12 filing fees that we were just talking about?
13 A      No, I don't believe it did.  If I
14 remember correctly, it was either Gibbs or Finch
15 didn't even have any type of extra funds or
16 overage left after the recording.
17 Q      All right.
18 A      And the other one did, but it was very,
19 very minimal.
20 Q      All right.
21        BY MR. UNDERWOOD:  Well, it's almost
22 11:30.  Let's go off.
23

Page 139

1  REPORTER'S NOTE:  (At this point, a lunch recess
2  was taken, after which, the deposition
3  continued, as follows:)
4
5  Q      (continued by Mr. Underwood)  While we
6  were on lunch a question occurred to me about
7  the reason why these line 1201 charges are
8  estimated and that's this, why is it that when
9  you get the package from the lender, you can't
10 open that up and see what the number of pages
11 is, and then just put down the exact charge for
12 the filing fees?
13 A      Typically, the lenders we deal with are
14 sub-prime.  Meaning B, C lending.  It's not A,
15 paper lending.  So everything they do is in a
16 hurry.  They tend to always want everything done
17 tomorrow.  They don't allow us to take the time,
18 like a lot of other banks do, where we can take
19 five to six weeks to close.  So anyway, a lot of
20 their things from the time that they get an
21 application to the day they close only takes a
22 week to two weeks at the most.  So a lot of
23 times when they send us a HUD request, the

Page 140

1  preliminary, it's the day of the closing.  And
2  they don't actually send us the package a lot of
3  times until thirty minutes before the closing is
4  supposed to occur.  So if we took the time to
5  open it up and change the HUD, we would have to
6  get the HUD re-approved at that point and it
7  would completely ruin the cancellation and we
8  would have to reschedule it for the next day.
9  Not cancellation but closing, and we would have
10 to reschedule for the next day.  So they don't
11 allow us the time to go through the entire
12 procedure, because we can't make any changes on
13 our HUD prior to closing without them
14 re-approving the HUD.
15 Q      Okay.  What is it about the sub-prime
16 loans that causes them to be so urgent, I guess
17 is the term I could use?
18 A      I really don't know, to be quite honest.
19 It's not like there's a set reason.  It's just
20 that.  A lot of times sub-prime lending -- and I
21 shouldn't say it's all sub-prime lending,
22 because we do a lot of prime lending, too.  But
23 like for Homeowners, they were pretty much a

Page 141

1  sub-prime lender.  They're usually helping
2  people who have less than perfect credit.  A lot
3  of times they're already delinquent on their
4  mortgage.  So the borrower is going to someone
5  saying, "Look, I'm getting reminder notices.
6  I'm scared I'm going to go into Foreclosure.  I
7  need you to hurry up and refinance this mortgage
8  to save my house."  Even if it's not that
9  extreme, they're behind on credit cards.  Maybe
10 it doesn't even relate to the house, but they're
11 behind on credit cards or what have you.  Very
12 rarely does someone have perfect credit with
13 their sub-prime lender, because they have no
14 reason to.
15 Q      All right.
16 A      And there's no reason for them to have an
17 urgency.  They can take two months, if they need
18 to, to close their house loan, because all the
19 payments are current; they don't have any --
20 they're not worried about their credit, you
21 know, being ruined; they're not really worried
22 about their mortgage hurting or anything like
23 that.  The sub-prime lenders' borrowers are

36  (Pages 138 to 141)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 142

1  very -- typically very conscious of how long it
2  takes, and they're typically pushing their loan
3  officers so that they don't go to another
4  mortgage company who can close them faster.
5
6  REPORTER'S NOTE:  (At this point, instrument was
7  marked for identification by the Reporter as
8  Plaintiff's Exhibit Number 4, after which, the
9  deposition continued, as follows:)
10
11  Q    (continued by Mr. Underwood) Let me show
12  you what I have marked now as Plaintiff's
13  Exhibit Number 4.
14  A    Okay.
15  Q    I would just ask if you could identify
16  that for the record for us?
17  A    It appears to be a Settlement Statement
18  for Johnny Saucida.
19  Q    All right.  And is it one that your
20  company prepared?
21  A    Prepared, yes.
22  Q    All right.  And how can you tell that?
23  A    It says "prepared by."

Page 143

1  Q    All right.
2  A    Oh, no.  It says "Settlement Agent."  I'm
3  sorry.
4  Q    Okay.  And the number up in the upper
5  left-hand corner, what's the significance of
6  that?
7  A    That's my filing number.
8  Q    Okay.  And I wanted to go through these
9  charges on here and get you to tell me what you
10  know about them and what they're for.  And I
11  guess we'll start with line 980.
12  A    Okay.
13  Q    And it's called "origination fee."  Can
14  you tell us what that's for or your
15  understanding?
16  A    Actually, I'm going to jump ahead, but I
17  can tell you that the entire 800 section are
18  one-hundred percent the lender fees, the
19  mortgage lender.  So I don't know what they
20  represent on their side.  I just know that
21  that's the fees they charge to their borrowers.
22  Q    Okay.  And do you get -- in the 800
23  block, do you get all these figures -- did you

Page 144

1  call it the initial HUD-1?
2  A    Uh-huh.
3  Q    Is that right?
4  A    Some lenders are -- see, Homeowners is --
5  they don't deal with a broker/lender.  They are
6  the lender.  They sell all their loans, but they
7  sell it after the time of closing.  So in this
8  case, those fees are on the preliminary HUD.
9  Q    All right.  And then let's drop down to
10  903.  Is that a figure that you have to supply?
11  A    Not unless they're asking us to figure
12  the escrows for them.  And Homeowners typically
13  doesn't even have an escrow account.  And if
14  they do, they calculate it themselves and ask us
15  just to put it on the HUD.
16  Q    Okay.
17  A    So we don't supply the number for
18  Homeowners.
19  Q    All right.  So this would be something
20  that they've already got from the borrower,
21  then?
22  A    Not from the borrower.  They've
23  calculated it.

Page 145

1  Q    Okay; all right.
2  A    The funds are still collected from us
3  through the HUD, but we don't calculate that for
4  Homeowners.
5  Q    All right.
6  A    I'm being very careful to say Homeowners,
7  because every lender is different in almost
8  every area that you're going to ask me about on
9  this HUD.
10  Q    All right.  Fair enough.  Now, line 1101,
11  settlement or closing fee.  Now is that
12  something that's placed on the initial HUD-1 by
13  Homeowners?
14  A    Uh-huh.
15  Q    Is that right?
16  A    Well, it's on their doc request, their
17  HUD request, and it is put on their preliminary
18  HUD by us.
19  Q    Okay.
20  A    But our fees appear on their doc request
21  typically, yes.
22  Q    All right.  And is this the -- is that
23  the standard Homeowners' fee or is that -- or do

37 (Pages 142 to 145)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 146

1   they all have $200.00 on them?
2   A      No.  Like I said, they changed it at one
3   point when they started telling us what we could
4   charge in each state.  And it was by state, and
5   all the title companies charge the exact amount
6   in that state.  So I don't remember if this loan
7   closed after or before, but it would be standard
8   to all Homeowners' closings.  I don't know how
9   to answer that.  There would be standard -- yes,
10  it is a standard fee, and yes, it would be
11  charged across the board.  But if it was prior
12  to Homeowners having us do that, all borrowers
13  had the same fee.  After Homeowners having us do
14  that, it would depend on the state.
15  Q     Okay; all right.  Now, what about -- is
16  that standard with other borrowers?  I mean,
17  excuse me, other lenders?
18  A      Whether it is on their preliminary --
19  Q     No, the $200.00.
20  A      Oh, the $200.00?
21  Q     Yeah.
22  A      Oh, I don't know.
23  Q     Okay; all right.

---

Page 147

1   A      I'm sorry, I don't know.
2   Q     Okay.  We'll look at some of these other
3   ones and see, then.  All right.  What about this
4   line 1102?
5   A      The same thing, and 1103.  Those are
6   three standard fees with Homeowners.
7   Q     Okay; all right.
8   A      Homeowners would not allow us to charge
9   things such as a courier fee or abstract -- or
10  like an overnight fee.  They wanted all of the
11  fees all built into these three fees.
12  Q     Okay.
13  A      Our basic settlements.
14  Q     Okay.  Well, let's see, I'll get to that
15  in a minute, but -- on line 1102 -- well, first
16  off, on line 1101, Homeowners writes -- I mean,
17  Swafford & Hays writes itself a check for
18  $200.00?
19  A      We would collect our own fees, yes.  They
20  don't go to any other parties' hands.
21  Q     Okay.  And then with regard to line 1102,
22  the same thing is true?
23  A      Yes.  All fees within the 113 -- I mean,

---

Page 148

1   within the 1100 section, all fees in there would
2   be cut to Swafford.  Now, once the -- once the
3   policy is issued -- the reason we've got
4   American Title Insurance Company on Number 1108
5   is because they will receive a portion of that
6   fee, but not until we issue the final policy.
7   We don't -- they request -- we don't pay them
8   the premium until we issue the policy.
9   Q     Okay.  And what's line 111?
10      BY MS. CLOTFELTER:  1111?
11      BY MR. UNDERWOOD:  Yes, 1111.  I'm
12  sorry.
13  A      That is for any -- that's also basically
14  with Homeowners, and it's for any additional
15  service fees such as -- like that's where we
16  could put our courier fee, things of that
17  nature.
18  Q     (continued by Mr. Underwood)  Okay.  But
19  let's talk about this loan specifically, this
20  file number 0411332, the Saucida loan.  Can you
21  tell me what services were performed for --
22  let's start with line 1101?
23      BY MS. CLOTFELTER:  Object to the form of

---

Page 149

1   the question.  I'm not sure what you're asking.
2   Q     (continued by Mr. Underwood)  Okay.
3   Well, you can still answer the question, unless
4   you don't understand the question.
5   A      You asked me earlier in the deposition
6   what services we performed.
7   Q     Uh-huh.
8   A      Every service we perform, the expense of
9   what we do -- that we incur, whether it be in
10  salaries or what have you, are covered by 1101
11  through 1103.  And sometimes they overlap.  The
12  processors may work for final policy; they might
13  work for a closing.  It's very difficult to tell
14  you exactly -- our entire company's fees are
15  within those three fees.
16  Q     Okay.  Well, it's called settlement or
17  closing fee and --
18  A      So the settlement closing fee would --
19  Q     Well, let me ask -- let me finish asking
20  the question.  You described for me earlier what
21  you did for a closing with Homeowners.
22  A      Right.
23  Q     And are those the -- those things you

---

38 (Pages 146 to 149)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 150

1    described, is that what the $200.00 fee is for?
2    A    For a portion of those, yes.
3    Q    Okay.  Which ones?
4    A    Since it says "settlement or closing," it
5    would be anything to do with that.  So it would
6    be to book the notary.  The notary cost is
7    within that.  Preparing the HUD Settlement
8    Statement, quitclaims, warranty deeds, things of
9    that nature.
10   Q    Okay; all right.  And then the next
11   charge is title search.  Is that --
12   A    Well, it's abstract or title search.
13   Q    Okay.  That's line 1102, and what's --
14   what service is provided there?
15   A    That's receiving the order; farming it
16   out to the abstracter; paying the abstracter and
17   examining what the abstracter has sent back.
18   Q    All right.
19   A    And then doing any type of legal action
20   we need on that, such as requesting further
21   documentation, tax payoffs.  Because we actually
22   put the actual tax amounts owed on our
23   commitments and all that stuff.

Page 151

1    Q    But I'm talking about line 1102.  So all
2    that's covered by 1102, title -- abstract or
3    title search?
4    A    Yes.
5    Q    All right.  Well, then, what's done
6    for -- what services are performed for line
7    1103?
8    A    1103, title examination?  That's when we
9    examine the title, the commitment.  That's
10   processing.
11   Q    All right.
12   A    And then we also have to go back and
13   examine that title after the closing to make
14   sure that HUD meets the requirements on the
15   commitment to make sure a final policy can be
16   issued.
17   Q    Who is it that goes back and does the
18   title examination under 110 -- or who -- let me
19   ask it this way.  With regard to the Saucida
20   transaction, who was it that went back and
21   examined the title?
22   A    In every case, it's Swafford Settlement
23   Services.

Page 152

1    Q    Well, with all due respect, Swafford is
2    in Knoxville, Tennessee and this is down in
3    Mobile County, Alabama.  Someone had to go and
4    look at it and that's --
5    A    Well, you asked me who examines the
6    title.  It's us.  If you're asking me who goes
7    to the courthouse and actually finds what's on
8    the records, that's the abstracter.  That's two
9    different things.
10   Q    Okay; all right.  Thank you.  Now, was
11   there a charge from the abstracter for going
12   back to the courthouse again?
13   A    They don't typically go back to the
14   courthouse.
15   Q    Okay.  Well, what is it they typically do
16   for the charge on line 1103?
17   A    I told you 1102 encompassed the
18   abstracter.
19   Q    Okay; all right.  Well, I'm getting
20   myself mixed up then.  You told me that under --
21   I believe that under line 1103, that part of
22   that charge was for someone to go --
23   A    Was to examine -- go back and examine the

Page 153

1    commitment.  Not go back to the courthouse; go
2    back to our original commitment we issued for
3    insurance.
4    Q    Uh-huh.
5    A    And make sure that every requirement was
6    fulfilled at the time of the settlement -- or by
7    the settlement so a final policy can be issued.
8    That's all done in-house.
9    Q    Okay; all right.  I think I understand
10   now.  Do any of these lenders ever require you
11   to go back to the courthouse and make sure that
12   they've got a valid first lien, I guess?
13   A    No.  They just require the recorded
14   mortgage or quitclaim or warranty deed be sent
15   to them with the final policy.
16   Q    And they don't worry about it because of
17   this insurance that we were talking about?
18   A    Well, basically the insurance policy says
19   that they're insured in first lien position.  So
20   they don't worry about it, because if they find
21   out they're not, we have to rectify the issue.
22   Q    Okay.
23   A    Now, the forty-five day thing that we

39 (Pages 150 to 153)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 154

1  talked about earlier, that's our requirement.
2  So we'll send -- if they order a closing after
3  forty-five days, we automatically send an
4  abstracter back out that day and ask them to
5  review it.
6  Q    All right.
7  A    But that -- we don't raise our fees
8  because of that.
9  Q    Now, the line 1201 on Exhibit 4 reflects
10  the $120.00.  That's a fee that's charged for
11  the -- to reflect the filing and the number of
12  pages of the mortgage.  That's the estimated fee
13  we were talking about, in general, earlier; is
14  that right?
15  A    Estimated recording fees, yes.
16  Q    Okay.  And then line 1203, that's the
17  actual tax --
18  A    In Alabama some counties have state tax
19  stamps, and that's what that is.
20  Q    All right.  And you get both of those
21  from Ernst?
22  A    Correct.
23  Q    Now, can you tell me whether or not on

---

Page 155

1  all of the Alabama transactions there would be
2  $120.00 charged on line 1201?
3  A    No, I can't, because I don't know for
4  sure that that is the amount that we originally
5  came up with and it never changed the amount,
6  uh, any of the time period that we've done
7  business.
8  Q    All right.  And that would be -- the
9  person that could tell us that is that lady that
10  you mentioned earlier.  I don't recall her name
11  that's in your --
12  A    Brenda Cooper?
13  Q    I believe that's the name.
14  A    Betsy Johnson would have a good idea of
15  that.
16  Q    Okay.
17  A    Yes.
18
19  REPORTER'S NOTE:  (At this point, instrument was
20  marked for identification by the Reporter as
21  Plaintiff's Exhibit Number 5, after which, the
22  deposition continued, as follows:)
23

---

Page 156

1  Q    (continued by Mr. Underwood)  Let me show
2  you what I've marked as Exhibit 5.  If you
3  would, just identify that for the record for us.
4  A    Closing instructions from Homeowners Loan
5  Corp.
6  Q    Regarding the Saucida transaction that we
7  were just talking about, the HUD-1?
8  A    Yes, John Saucida.
9  Q    And is this the format that you get those
10  in?  You told me earlier that you got these in
11  an e-mail.
12  A    Actually, this comes with the closing
13  package.  This is not what we get for the
14  preliminary HUD.
15  Q    Okay; all right.  What do you get for the
16  preliminary HUD?  Do you just get like a HUD-1
17  form that's not completely filled out?
18  A    No.  It's called a "doc order."
19  Q    I think I've seen that.
20  A    Yeah, it was in all the files we sent to
21  you.
22  Q    We'll get to it.
23  A    We don't actually see this until the

---

Page 157

1  package comes across and it's on its way to the
2  notary.  This is something we have to make sure
3  has been fulfilled before the package goes back
4  into the Homeowners loan.
5  Q    All right.  But you don't look at any of
6  this before it goes to the notary, because --
7  A    Because the HUD has already been
8  approved.
9  Q    And because you're in a hurry like you
10  were talking --
11  A    No.  It's because the doc order is what
12  they want us to use their fees for, and the
13  HUD's already been approved.  This makes sure --
14  or we have a post-closing department that takes
15  the package and makes sure that --
16  Q    Well, this goes to the closer, doesn't
17  it, to the notary?
18  A    Yes.
19  Q    Okay.
20      BY MS. CLOTFELTER:  When you say "this,"
21  you're referring to Exhibit 5?
22  A    I'm sorry.  Are we referring to Exhibit
23  5?

40 (Pages 154 to 157)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 158

1  Q     (continued by Mr. Underwood) Yes. If
2  you would, look at the incomes page of that
3  exhibit.
4  A     Can I point something out real quick
5  before --
6  Q     Yeah, please do.
7  A     If you notice on "B" on the first page of
8  Exhibit 5, it said -- you had asked me this
9  earlier -- and it says, "The Settlement
10 Statements must be sent via e-mail and approved
11 by HLC's Closing Department before closing." I
12 just wanted to point that out to you.
13 Q     All right. Yeah. Then it goes on to say
14 that if it's changed for any reason, you got to
15 resubmit it. So --
16 A     Right.
17 Q     So that's the problem that you were
18 describing to me earlier about changing it when
19 you knew the actual number of the pages for the
20 mortgage?
21 A     They prefer us to handle it the way we're
22 handling it, which is where -- if there's any
23 change -- as long as it's not going to result in

---

Page 159

1  a shortage, then they know the borrower is going
2  to end up with any excess recording fees anyway.
3  Q     Okay; all right. Now, what are these
4  figures about on the next page of that document?
5  It's Bates numbered 18.
6  A     It should just be the basics, I guess,
7  that are on the HUD's Homeowners statement. It
8  almost looks like an addendum to a HUD, but it
9  doesn't say that.
10 Q     Okay. Is that something that you usually
11 get from Homeowners Loan that's usually in the
12 package?
13 A     I don't recall seeing this one, but I'm
14 sure if it was in this one, it should be
15 standard.
16 Q     Okay. It reflects a recording fee of, I
17 believe, $200.00. Do you know --
18         BY MS. CLOTFELTER: Where are you
19 looking?
20         BY MR. UNDERWOOD: Under "Title
21 Insurance." No. Maybe I'm looking at that
22 wrong.
23 A     I don't see recording fees on here. It

---

Page 160

1  stops at "Title Examination." The city, county
2  tax stamps is not filled in. And I don't see
3  even anything about a -- what's it called on
4  here? Recording fees? I don't even see
5  recording fees on here.
6  Q     (continued by Mr. Underwood) Now, isn't
7  that under "closing fee?" Or right under "Title
8  Insurance," rather?
9         BY MS. CLOTFELTER: Let me object for a
10 moment. I mean, I don't have any problem with
11 your asking him to look at something. But he's
12 testified that he doesn't know what this is. So
13 I object to you asking him to interpret it if he
14 doesn't know what it is.
15 Q     (continued by Mr. Underwood) It says
16 "document," and I'm trying to get him to tell me
17 what -- here's what I'm looking at (indicating).
18 A     Closing fee? I don't know what that is.
19 Q     Okay. Next to the last thing there, it
20 says, "Discount fee percent of loan amount." Do
21 you know what that -- what that means?
22 A     No. A discount fee with many lenders is
23 almost like a -- I don't know, actually.

---

Page 161

1         BY MS. CLOTFELTER: Well, don't guess, if
2  you don't know.
3  A     Yeah, I don't know. It's not one of
4  Swafford's fees.
5  Q     (continued by Mr. Underwood) Well, one
6  of the reasons I'm asking that is, this number 1
7  on the first page of the exhibit, it says that
8  the Settlement Statement has to have all those
9  charges and disbursements and no others. And
10 then it has this list over here and I didn't see
11 anything called "loan discount" on the HUD-1.
12 A     Well, that says "zero" anyway. Discount
13 fee, it says "zero" next to it. The title
14 service says 390.
15 Q     I see. Well, I don't see that on HUD-1,
16 either.
17         BY MS. CLOTFELTER: Well, you know, just
18 wait for a question.
19 Q     (continued by Mr. Underwood) Is that on
20 the HUD-1, the 390, title service fee?
21 A     I see one that says "underwriting fee"
22 for 390.
23 Q     What line is that on?

---

41 (Pages 158 to 161)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 162

1   A    808.
2   Q    Okay; all right. Let's go to the next
3   page. Now, what about with regard to
4   instruction number 2? It says that, "You are
5   required to ensure that the amount of the
6   recording fees and other assessments to perfect
7   the lien is the exact amount required by the
8   recorder, clerk or other appropriate government
9   official."
10        BY MS. CLOTFELTER: What's the question?
11  Hang on just a second. What was the question?
12  Q    (continued by Mr. Underwood) And I
13  thought you said earlier that Homeowners knew
14  that the fee on line 1201 was only an estimate,
15  and they wanted you to do it that way so you
16  could get the loans closed faster. I think
17  that's what you said; is that correct?
18  A    Yes.
19  Q    All right.
20  A    However, this is for the entire loan in
21  its entirety. And Saucida, if you look at the
22  disbursement sheet, which we have not gotten to,
23  got a refund for anything over the actual

---

Page 163

1   recording cost. So that was -- so we complied
2   with number 2.
3   Q    Okay. I see. And flip over, if you
4   would, to, I guess, the next page, page 20. And
5   can you tell me who that --
6   A    Jane Carcello?
7   Q    Yeah. Who is she?
8   A    She was an employee in our closing
9   department.
10  Q    All right. And what is her role in this
11  transaction?
12  A    She was the one that reviewed these
13  closing procedures and the package to make sure
14  everything was kosher.
15  Q    All right. Before it was sent back to
16  the lender?
17  A    Correct.
18  Q    Okay. And is she still with you?
19  A    No, she's not.
20  Q    All right. What happened -- why did she
21  leave your employ, if you know?
22  A    I don't know. We had a few layoffs. I
23  don't know if she was laid off or she resigned.

---

Page 164

1   I know she wasn't terminated. So it's one of
2   the two.
3   Q    All right. And then the next page, 21,
4   can you tell us what that is, what that
5   represents?
6   A    It says it's an "Addendum A (Payoffs).
7   So it should be the payoffs that are on the HUD
8   Settlement Statement.
9   Q    Okay. And then you had mentioned -- the
10  next page, 22, you had mentioned "stacking
11  order."
12  A    Uh-huh.
13  Q    Is this what you were referring to?
14  A    Yes.
15  Q    And is this an instruction from
16  Homeowners that they want their package
17  presented back to them in that order?
18  A    Uh-huh.
19  Q    Is that correct?
20  A    Yes. I'm sorry.
21  Q    And then was it Jane's job to go through
22  there and check off each one of these and make
23  sure that --

---

Page 165

1   A    It was more detailed than that. That was
2   her basic job.
3   Q    Okay.
4   A    She also checked to make sure signatures
5   were accurate; every document was dated;
6   signatures matched vesting. Because this is
7   just a basic thing that Homeowners requires.
8   There are other things that our underwriter
9   required; there's other things that we required
10  all compiled into that one department.
11  Q    I'm sorry?
12  A    All compiled into that one department.
13  Q    Okay.
14  A    But this is, yes, the order of the
15  documents. That is one component.
16  Q    Okay; all right. And is there -- so is
17  there some other checklist or something that
18  Jane was supposed to follow to make sure that
19  she met all the requirements? Or is this the
20  only one?
21  A    From Homeowners?
22  Q    Well, just in doing her job with regard
23  to this file.

---

42 (Pages 162 to 165)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 166

1  A    We do not have a desktop procedure
2  manual, if that's what you're asking.
3  Q    Okay. Well, you told me that she had to
4  do not only these things that are on this list
5  from Homeowners, but some other things. So how
6  did she know what other things to do?
7  A    She was trained. She had on-the-job
8  training.
9  Q    All right. But there's no checklist or
10 anything like that for her to go by; she just
11 has to know what to do?
12      BY MS. CLOTFELTER: Other than the one
13 that --
14 A    Yeah. I don't know that there was a
15 checklist. I know that there's no procedures
16 manual. So if there is a checklist, I am not
17 real familiar with it.
18 Q    (continued by Mr. Underwood) Okay. So
19 she just has to memorize these other things that
20 she's supposed to do with regard to --
21 A    Well, hopefully she was -- she was able
22 to take good notes and everything. I mean, I'm
23 sure she -- you know, we require more of our

Page 167

1  employees than just to memorize things.
2  Q    Okay.
3
4  REPORTER'S NOTE: (At this point, instrument was
5  marked for identification by the Reporter as
6  Plaintiff's Exhibit Number 6, after which, the
7  deposition continued, as follows:)
8
9  Q    (continued by Mr. Underwood) All right.
10 Let me show you Plaintiff's Exhibit Number 6. I
11 think you had mentioned a ledger card earlier.
12 Let me see if you can identify that for us.
13 A    Do you want me to identify it?
14 Q    Yeah, please do.
15 A    It's a ledger card from the Saucida file.
16 Q    Okay. I know it's a ledger card, but
17 tell me what -- what's the significance of it
18 and what does it reflect?
19 A    The significance of a ledger card is it
20 shows every -- it shows the entire wire amount
21 that we receive from the lender.
22 Q    Okay. Where is that?
23 A    The $58,203.00.

Page 168

1  Q    Okay.
2  A    Under "deposits."
3  Q    All right. That's the first -- okay,
4  first line on here.
5  A    And then it shows every check that was
6  ever cut on that file, which is the second group
7  labeled "checks."
8  Q    Okay.
9  A    And then it shows under "voids" any of
10 those checks that were voided. And then it
11 shows what the balance of the file is.
12 Q    All right. Now, is this something that's
13 generated by that software from the title
14 company you were describing for us earlier?
15 A    Yes.
16 Q    I've looked at a number of these and all
17 or most of them seem to have checks that had
18 been voided.
19 A    Right.
20      BY MS. CLOTFELTER: Well, let him ask his
21 question.
22 A    Sorry.
23 Q    (continued by Mr. Underwood) Well, that

Page 169

1  was going to be my question, why does it have --
2  why are there voided checks on almost all of
3  these transactions?
4  A    Every file will have a recorded -- a
5  voided recording check under the new procedure.
6  Q    All right. And why is that?
7  A    Because the original -- when the funders
8  fund the loan -- we had different departments.
9  So once the file goes to funding and receives
10 the wire, they cut the check directly from the
11 HUD. The system does it for them, the computer
12 system, the software system. Then the mortgage,
13 the original mortgage, and every other legal
14 document that needs to be recorded, is given to
15 the recording department with that check. I
16 know it sounds redundant, but that's how we do
17 it. And then that person in recording then goes
18 into Ernst to see what the true and accurate
19 recording is. Then at that point, they void the
20 check and cut it for the correct amount. Plus,
21 the closing department doesn't always know the
22 exact -- like Clerk of Court, Judge of Probate
23 recorder, those are basic recordings for the

43 (Pages 166 to 169)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 170

1  payees for each county, but a lot of counties
2  get more specific. Like I noticed this one was
3  Clerk of Court, but once they called Ernst, they
4  found out it was Mobile County, Judge of
5  Probate. Then our recording department is
6  required to know in each county who to make the
7  check payable to.
8  Q   All right. And these checks are -- does
9  the software generate these from the HUD-1? The
10 information that's on the HUD-1 statement, is
11 that --
12 A   Yes.
13 Q   All right; okay.
14 A   Well, that's where these come from
15 (indicating). We don't manually have to type
16 all of these, if that's what you're asking.
17        BY MS. CLOTFELTER: "These" meaning what?
18        THE WITNESS: The checks. I mean, we
19 don't have to --
20        BY MS. CLOTFELTER: You're indicating on
21 Exhibit 6?
22        BY MR. UNDERWOOD: Yeah.
23 Q   (continued by Mr. Underwood) And does

---

Page 171

1  the software work this way -- in other words,
2  you fill out this HUD-1. And we've looked at
3  that. I think that's Exhibit 4.
4  A   Yes.
5  Q   And you enter the figures in on the
6  HUD-1, and then it automatically generates these
7  checks based on this information that's in the
8  HUD-1; is that how it works?
9  A   They begin that way.
10 Q   Okay. Well, tell me how it works, then.
11 A   The funder has to go into -- our funder
12 has to go into the system and make any changes
13 that have to be made. For instance, I told you
14 that our underwriter receives a portion of
15 the -- what do they call them -- the title
16 insurance, line 1108. So they go in and they --
17 that's what they call a split, the system offers
18 you to do a split.
19 Q   All right.
20 A   So they don't actually cut that in with
21 the primary check going to Swafford Settlement
22 Services, because it goes into a separate
23 Swafford account that we hold those funds in

---

Page 172

1  until we disburse them to the underwriter.
2  Q   In this case, Pioneer, American Pioneer?
3  A   Correct. The check is still made payable
4  to Swafford, because it goes into a Swafford
5  account, and we can't make it payable to
6  American Pioneer. But it's cut out of that
7  account to American Pioneer.
8  Q   Okay. Now, these -- looking at the
9  HUD-1, these sections in the 800 section, these
10 charges in the 800 section, Swafford never
11 received those funds; is that correct?
12 A   No. Those are Homeowners' net funds.
13 Q   Okay. In other words, Homeowners deducts
14 its charges from the check before it's ever sent
15 to Swafford; is that the way it works?
16 A   It deducts any checks payable to
17 Homeowners from the wire.
18 Q   Okay. And that includes the insurance in
19 this case, the line 903?
20 A   Right. It has us disburse all of its
21 agents' fees, such as ours, the appraiser,
22 things of that nature.
23 Q   All right. And so those would start at

---

Page 173

1  line 1101?
2  A   Right.
3  Q   All right. And so should there be a
4  check on here --
5  A   What did you say, 1101?
6        BY MS. CLOTFELTER: What was started on
7  1101?
8  A   No, not necessarily, because the
9  appraiser fee, I believe is higher. The
10 appraisal fee is actually in the 800 section as
11 well.
12 Q   (continued by Mr. Underwood) Okay. And
13 that's something that's paid for by
14 Homeowners -- I mean, by Swafford?
15 A   No.
16 Q   Okay. Well, let me start over, then.
17 A   Now, not paid for by Swafford, but
18 Swafford cuts the check to the appraiser.
19 Q   All right.
20 A   Yes.
21 Q   Okay. So there are some in the 800 block
22 that would -- well, for example, 803, Dinkins
23 Appraisal Group, is there a check reflected on

---

44 (Pages 170 to 173)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 174 |
| --- |

1  the ledger card for $300.00 to Dinkins Appraisal
2  Group?
3  A    There is.
4  Q    Which one is it?
5  A    Check number 2912, reference number 2912.
6  Q    Oh, I see. Okay. You're right. There
7  is also one to AllState reflected on line 903,
8  wasn't there?
9  A    Yes.
10  Q    Okay. There's -- the first check is --
11  okay, that's -- I'm getting myself all mixed up.
12  scratch all that. Let's look at the first one,
13  $213.75, check number 2906.
14  A    That was voided.
15  Q    That means it's voided?
16  A    Correct.
17  Q    Okay. And it would have went through
18  that process that you described to me earlier;
19  is that --
20  A    That is correct.
21  Q    In other words, it would have gone to
22  your recording department; they would have
23  looked up the actual recording fees?

| Page 175 |
| --- |

1  A    Right.
2  Q    And then does the check go back to the
3  bookkeeping department to be voided, or how does
4  that take place?
5  A    They can actually void it there. They
6  can't actually physically sign it. They don't
7  have signing capabilities. It has to go to an
8  authorized signer on the account. I referred to
9  Glenda Cooper, who's in the recording
10  department. Now, she actually can physically
11  void the check and reissue it for the correct
12  amount.
13  Q    Okay. And she --
14  A    And then she takes it to an authorized
15  signer who verifies that the amount of the check
16  voided and that they have the physical check in
17  their hand and that the new check's added to
18  that amount. They sign off on it, and then she
19  takes the check to the borrower over to the
20  final policy department who holds it until the
21  mortgage comes back recorded, and she takes the
22  check to the recording clerk and either sends it
23  to a courier or to the recorder's office

| Page 176 |
| --- |

1  directly.
2  Q    Okay.
3  A    And 2906 is voided, but 3471, 3472 and
4  12254 add up for that amount.
5  Q    Okay. We'll get to those in just a
6  minute.
7  A    Okay.
8  Q    What was the next one before the 2907 to
9  Swafford & Hays for $740.00?
10  A    I believe that is the 808 -- not 808.
11  Excuse me. That is 1101 through 1103, I
12  believe.
13  Q    Have you -- have you had a chance to look
14  at that (indicating)?
15  A    Well, I have. I don't -- I don't recall
16  why we have the policy split this way, because
17  they're all payable to Swafford. Our funding
18  department would know that. But checks 2907, 08
19  and 09 add up to our 1100 fees. And 2910 is
20  added in there also. I'm sorry.
21  Q    Okay. What did you say that Swafford was
22  paid in fees on this case, $1,100?
23  A    500, 700 -- there was a 100 -- $1,075.00

| Page 177 |
| --- |

1  worth of funds that went to Swafford.
2  Q    Okay. And that's the sum of --
3  A    All of the 1100 section. And checks 2907
4  through 2910 represent those.
5  Q    Okay. The next check number 2911, was
6  that -- that was loan proceeds that went to the
7  Saucidas; is that correct?
8  A    Yes, sir.
9  Q    We already talked about Dinkins Appraisal
10  Group and AllState. And number 2914, that's --
11  that's the line 1502, isn't it, the property
12  taxes?
13  A    Yes, 1502.
14  Q    And then 2915 is the payoff of the
15  mortgage?
16  A    Correct.
17  Q    Then the next one, 12254 --
18  A    Uh-huh.
19  Q    -- is that the refund of the filing fee
20  to the Saucidas?
21  A    It is.
22  Q    All right. And I noticed that it's dated
23  January 31 of '05, and all the -- or most of

45 (Pages 174 to 177)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 178

1  the -- the check -- the actual check to the
2  Clerk of the Court was written on November the
3  30th. Do you know why there's such a time gap
4  between the two checks?
5  A    Well, it's because it was staledated when
6  it came back recorded, so we had to void the
7  check we were holding for them and reissue it.
8  Q    Say that again.
9  A    Staledated. Our escrow checks are only
10 good for so long. If it's not cashed, we have
11 to reissue them, because the bank won't honor
12 them.
13 Q    Okay. Well, why didn't you write a check
14 at the same time that the actual recording fee
15 was --
16 A    We did.
17 Q    Okay.
18 A    The date that shows up next to 3470 that
19 has the "V" next to it, that's the date it was
20 voided.
21 Q    Okay.
22 A    That clear date. Over to the left, if
23 you notice, it was actually cut on November 2004

---

Page 179

1  when all the recording fees were cut.
2  Q    Okay.
3  A    And it was reissued on January of 2005,
4  because it was stale dated, so we had to void it
5  and reissue it.
6  Q    All right.
7  A    The check was no longer good, because we
8  were holding it that entire time waiting for the
9  mortgage to come back recorded.
10 Q    Okay. I understand now. It shows a
11 clear date of 1/31 of '05 on that, but it was
12 cleared by being voided?
13 A    Correct.
14 Q    Okay. So what happened in the Saucida's
15 transaction was that there was a difference
16 between the recording fee and the $120.00 that
17 they were charged?
18 A    Yes.
19 Q    The difference, though, was held by
20 Swafford & Hays until you got the final recorded
21 mortgage back; is that what you're telling me?
22 A    To ensure that there was no difference
23 once it got to the recorder's office.

---

Page 180

1  Q    Well, were they paid any kind of interest
2  during that period?
3  A    Paid any kind of interest?
4  Q    The Saucidas.
5  A    By us, no.
6  Q    And all these checks were written on the
7  escrow account; is that correct?
8  A    Correct.
9  Q    Is the escrow account an interest drawing
10 account?
11 A    No, it's not.
12 Q    Is your escrow account, is it -- are
13 those funds ever swept offshore during the
14 evening times and back into the account?
15 A    We do not do that.
16 Q    Okay. This check 3471, which is the next
17 one, that reflects the tax on the -- payment for
18 the tax on the mortgage, correct?
19 A    Yes, sir.
20 Q    All right. And the next one, that's the
21 actual recording fee that the Saucidas were
22 charged the $120.00?
23 A    Per page, yes.

---

Page 181

1  Q    Okay.
2
3  REPORTER'S NOTE: (At this point, instrument was
4  marked for identification by the Reporter as
5  Plaintiff's Exhibit Number 7, after which, the
6  deposition continued, as follows:)
7
8  Q    (continued by Mr. Underwood) Let me show
9  you what I've marked as Plaintiff's Exhibit
10 Number 7. If you would, just identify that for
11 the record for us.
12 A    It's a truth-in-lending disclosure from
13 the Saucidas file.
14 Q    All right. Involving the same
15 transaction we've been talking about?
16 A    Yes, I would assume so.
17 Q    Let me ask you to look over on the second
18 page. It would be Saucida page 83. And if you
19 would, I would ask you to look at line 1201
20 under the heading "Prepaid Finance Charge."
21 A    Okay.
22 Q    And that reflects the $120.00, doesn't
23 it?

46 (Pages 178 to 181)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 182 |
|---|
| 1  A    It does. |
| 2  Q    Okay.  That's really not accurate, is it? |
| 3  A    That is accurate as to what was charged |
| 4  on the HUD. |
| 5  Q    But it doesn't reflect the true recording |
| 6  fee; isn't that right? |
| 7  A    In this case, no, it does not. |
| 8  Q    All right. |
| 9  A    It was an estimate.  But the |
| 10  truth-in-lending discloses the itemization of |
| 11  what they financed.  And that full fee was |
| 12  financed, because that is in their loan. |
| 13  Q    Under line 1102, you would agree with me |
| 14  that although it does reflect a $375.00 charge |
| 15  for abstract or title search, it doesn't reveal |
| 16  to who that's paid to; isn't that right? |
| 17      BY MS. CLOTFELTER:  That form? |
| 18  A    This form does not show who that is paid |
| 19  to. |
| 20  Q    (continued by Mr. Underwood)  All right. |
| 21  And the same would be true with regard to title |
| 22  examination? |
| 23  A    Number 1103? |

| Page 183 |
|---|
| 1  Q    Yes. |
| 2  A    They did not fill in who it was paid to. |
| 3  Q    I think you told me, though, that this is |
| 4  a form that really Swafford has very little, if |
| 5  anything, to do with? |
| 6  A    We have nothing to do with it. |
| 7  Q    All right.  And it comes to you like this |
| 8  from -- or came to you like this from |
| 9  Homeowners? |
| 10  A    I noticed this is not a signed copy.  So |
| 11  I would assume this is the one that came to us. |
| 12  But, yes. |
| 13 |
| 14  REPORTER'S NOTE:  (At this point, instrument was |
| 15  marked for identification by the Reporter as |
| 16  Plaintiff's Exhibit Number 8, after which, the |
| 17  deposition continued, as follows:) |
| 18 |
| 19  Q    (continued by Mr. Underwood)  And let me |
| 20  show you what I have marked now as Exhibit |
| 21  Number 8.  Again, is that another Homeowners' |
| 22  document? |
| 23  A    Yes, it is. |

| Page 184 |
|---|
| 1  Q    With regard to this same loan that we're |
| 2  talking about? |
| 3  A    Yes, it is. |
| 4  Q    And is that the form that Homeowners |
| 5  always uses in these transactions? |
| 6  A    I'm not real familiar with all of the |
| 7  documents.  I know that this is a document that |
| 8  I've seen in their packages before.  But as far |
| 9  as if this is the exact body, I don't know. |
| 10  Q    Okay; all right.  Who would be familiar |
| 11  with that? |
| 12  A    Bill Long. |
| 13  Q    Bill Long? |
| 14  A    Are you talking about with Homeowners? |
| 15  Q    No, with Swafford. |
| 16  A    This particular document is just one that |
| 17  we have to make sure is there.  I don't believe |
| 18  any Swafford employee has probably ever taken |
| 19  the time to read it in its detail. |
| 20  Q    Okay. |
| 21  A    So Bill Long with Homeowners would be the |
| 22  one that could tell you if it's in every package |
| 23  relating to this. |

| Page 185 |
|---|
| 1  Q    Okay. |
| 2 |
| 3  REPORTER'S NOTE:  (At this point, instrument was |
| 4  marked for identification by the Reporter as |
| 5  Plaintiff's Exhibit Number 9, after which, the |
| 6  deposition continued, as follows:) |
| 7 |
| 8  Q    (continued by Mr. Underwood)  Let me show |
| 9  you what I've marked as Plaintiff's Exhibit 9. |
| 10  You may or may not have ever seen that document, |
| 11  and you may or may not be familiar with it.  Are |
| 12  you? |
| 13  A    I don't know that I've ever seen it |
| 14  before, but it appears to be an appraisal |
| 15  invoice on their file. |
| 16  Q    All right.  I think you told me earlier |
| 17  that's really not something Homeowners is |
| 18  involved in.  That's not paid by Homeowners, |
| 19  correct? |
| 20  A    No, not paid by Swafford you mean? |
| 21  Q    Swafford. |
| 22  A    Yes, Swafford does not contract out the |
| 23  appraiser. |

47 (Pages 182 to 185)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 186

1   Q    All right.
2   A    Homeowners does directly.
3   Q    Swafford, however, did write the check
4   for that, but it's based on the information that
5   came from --
6   A    Homeowners.
7   Q    -- from Homeowners?
8   A    Yes.
9   Q    Okay.
10
11  REPORTER'S NOTE:  (At this point, instrument was
12  marked for identification by the Reporter as
13  Plaintiff's Exhibit Number 10, after which, the
14  deposition continued, as follows:)
15
16  Q    (continued by Mr. Underwood)  Let me show
17  you what I've marked as Exhibit Number 10.
18  A    Okay.
19  Q    You're familiar with those documents,
20  aren't you?
21  A    I am.
22  Q    All right.  And tell us what it is for
23  the record.

Page 187

1   A    When we ask an abstracter to go and
2   search a property at a courthouse, this is one
3   example of what comes back from the abstracter.
4   Every abstracter uses a different format.  But
5   this is A&B's format.
6   Q    All right.  You're talking about A&B
7   Abstracts?
8   A    Yes.
9   Q    All right.  And Homeowners -- I mean,
10  Swafford uses them a lot; is that fair to say?
11  A    I don't know if they're in more than
12  Alabama.  I believe -- I know we've used them a
13  lot in Alabama.  I don't know if they cover more
14  than one state.  Some companies do.
15  Q    Okay.  And let me ask you, if you would,
16  to turn to the next page.  It's A&B 00004.  And
17  are you familiar with how A&B bills Swafford &
18  Hays for its services?
19  A    I'm familiar with how, yes.
20  Q    Okay.  Tell us how it is that they --
21  A    They send an invoice, such as this, to
22  our accountant, but all of -- our accountant
23  requires monthly statements from all of our

Page 188

1   abstracters, and then she pays monthly.
2   Q    Okay; all right.  Now, A&B provided the
3   abstract for the Saucida closing; is that true?
4   A    I would assume so, unless there was
5   another one ordered, but I don't -- I have not
6   seen another one.
7   Q    Okay.  Well, can you look at any of the
8   documents that are here today and tell us
9   whether or not A&B did the only title search for
10  the Saucida closing?
11  A    Not unless you have an entire file with
12  you.
13  Q    All right.
14  A    But it's a rare occurrence that we use
15  more than one abstracter.
16  Q    Okay.  Well, would that be reflected on
17  the ledger card or disbursement sheet?
18  A    No, it would not.
19  Q    How would you tell if there were more
20  than one appraisal?  I mean, more than one title
21  search done on a file?
22  A    Well, we scan every single document that
23  we have in a file into our system.  So if there

Page 189

1   was more than one report, it would be in the
2   file.  But like I said, it's rare.  But you
3   asked me can I, you know, assure you of that.  I
4   can't assure you of that, but I feel very
5   confident that, yes, this is the only abstracter
6   that we used.  It's usually only if they have
7   problems finding documents, and then we'll ask
8   another abstracter to go out and look and
9   sometimes they can find it.
10  Q    Okay.  Well, you would have to pay the
11  other abstracter, wouldn't you?
12  A    Yes, we would.
13  Q    All right.  So why wouldn't that be on --
14  reflected on the ledger card?
15  A    Because that's a cost of us doing
16  business.  If we choose -- if we use an
17  abstracter that can't fulfill their obligation
18  to us and we find another abstracter that can,
19  then we used a faulty abstracter and that's
20  something that we choose to pay out of our own
21  pocket.
22  Q    Okay.  And what was the charge for that
23  abstract in this file?

48 (Pages 186 to 189)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 190

1  A    $125.00.
2  Q    And is that a standard charge from A&B,
3  or do you know?
4  A    I do not know.  I noticed that it says,
5  "Back 2 owners to obtain 24 month chain."  So
6  that would definitely be more of a current owner
7  price.  That would not be what they would charge
8  for a full thirty year search.
9  Q    All right.  And do you have any sort of
10 price list from A&B Abstracts?
11 A    I'm sure the lady who handles our
12 abstracts would.
13 Q    What other abstracters do you use?
14 A    Multitudes.
15 Q    All right.
16 A    Because a lot of abstracters are
17 state-specific and county-specific.  So you
18 might have one abstracter in Alabama that covers
19 three counties and have to use another one for
20 another three counties and so on until you cover
21 all the states that we're in.
22 Q    And you have a price list from each of
23 those abstracters, I would assume; is that fair

---

Page 191

1  to say?
2  A    We have what we call a generic price
3  list.  It's their basic.  But they vary if
4  there's problems.  If there's additional copy
5  charges, if there's multitudes of things they
6  have to make copies of, it can vary.
7  Q    All right.  Now, let's go back and look
8  at the HUD-1 statement that we -- I believe it's
9  Exhibit 5.  It's Exhibit 4.  And I don't see any
10 payment on here for the -- to A&B Abstracts.
11 And can you tell us why that is?
12 A    We pay the abstracters out of our
13 operating account.
14 Q    Okay.  So on line 1201 where it says --
15 is that -- excuse me -- on line 1102, is that
16 reflected on line 1102?
17 A    Yes.
18 Q    Says, "Payment for abstract or title
19 search."
20 A    Yes.  It's within that cost.
21 Q    Okay; all right.  In other words, on line
22 1102, it says, "Abstract or title search," the
23 actual cost for the abstract or title search was

---

Page 192

1  only $125.00 in this transaction; isn't that
2  true?
3  A    The actual cost from A&B Abstracts was
4  $125.00.  The actual abstract or title search
5  was more than that, because our employees were
6  involved in it, too.
7  Q    All right.
8  A    A&B was the contract employee.  And I
9  have to cover costs of all my employees, whether
10 it be contract on-site.
11 Q    Okay.  In what way were your employees
12 involved in it?
13 A    They have to actually -- what comes over
14 from A&B has to be examined and put into our
15 system to issue a commitment.  They actually
16 verify the -- they go through all the warranty
17 deeds and we will make copies of the most
18 current deed of trust, most current warranty
19 deeds, any assignments, things of that nature.
20 And our staff actually reviews them all to make
21 sure that they're -- they have all the legals
22 attached; that they've been recorded; that's
23 there's no deficiencies in the documents.

---

Page 193

1  Q    Okay.  But you got paid for that under
2  line 1103, though, didn't you?
3  A    No.  Like I told you earlier, title
4  examination is from the -- it can be examining
5  the commitment to the HUDs, and making sure that
6  we've fulfilled all the requirements and issuing
7  the policy.
8  Q    All right.
9  A    Title refers to the entire -- title can
10 be anything in the entire process.
11 Q    All right.  Then tell me again what
12 Swafford did to earn the fees under line 1101.
13 A    1101 is settlement or closing fees.  So
14 that's preparing the HUD Settlement Statement,
15 booking the notary or the attorneys, sending the
16 package out, uh, if there's quitclaims involved,
17 warranty deeds involved.
18 Q    Were there quitclaim deeds or warranty
19 deeds involved in this transaction of the
20 Saucidas?
21 A    I don't believe so, because it says the
22 grantee is already Johnny Saucida and Dawn
23 Saucida, which is -- who our borrowers are.

---

49 (Pages 190 to 193)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 194

1 Q All right. And so then was -- under line
2 1101, then, was the only thing that was done was
3 the settlement package was mailed out?
4 A Correct. No. 1101? No. We had to do
5 the HUD Settlement Statements. We had to stuff
6 the package; we had to send the package to the
7 notary. All of the shipping overnight costs are
8 in that, too, for doing those processes.
9 Q Okay. Who performed those services at
10 Swafford & Hays under line 1101?
11 A It would be our post-closing employees
12 and our closing employees. And also the notary.
13 Q Is there any way you can look at these
14 documents and tell who the employees were that
15 actually did the work on it?
16 A No. We saw where Jane Carcello signed
17 the one document. So she obviously stacked the
18 package in post-closing. As far as what closer,
19 I couldn't tell by these documents. I couldn't
20 even tell you the notary, because these are not
21 the signed documents.
22 Q Okay.
23

---

Page 195

1 REPORTER'S NOTE: (At this point, instrument was
2 marked for identification by the Reporter as
3 Plaintiff's Exhibit Number 11, after which, the
4 deposition continued, as follows:)
5
6 Q (continued by Mr. Underwood) Let me show
7 you my Exhibit Number 11. Let's go over it.
8 A Okay.
9 Q And what is it, for the record, please,
10 sir?
11 A This is the disbursement worksheet on the
12 Johnny Saucida closing, and it's another format
13 of the ledger card.
14 Q All right.
15 A But it gives you more information as to
16 what each check contains.
17 Q Let me ask you a question about the HUD-1
18 again. Back on line 1106, it has a place for
19 notary fees, and I noticed that there wasn't
20 anything, and we know that there was a notary
21 used on this. Why were there no notary fees on
22 line 1106?
23 A When there's an attorney involved, we

---

Page 196

1 have to list the attorney. But when there's a
2 notary involved, we can pay that through our
3 settlement and closing fee. And that's just per
4 our underwriter.
5 Q Okay. And is that the usual practice?
6 A Yes, it is.
7 Q That the notary's paid out of fees
8 collected on line 1101?
9 A Yes.
10 Q Okay.
11 A I think that's been our -- always been
12 our practice. But I know it's the typical
13 practice now, that's how we do it.
14 Q Okay. The typical practice on all of
15 your loans is that the notary -- if it's closed
16 by a notary, they're paid out of fees collected
17 on line 1101?
18 A Right.
19 Q How much did the notary charge in this
20 transaction; do you know?
21 A No, I do not know.
22 Q And do you have a schedule of fees that
23 you pay to notaries?

---

Page 197

1 A No. It's whatever they charge us for
2 that transaction, depending on how far they're
3 driving, where the closing takes place. It
4 varies per file.
5 Q And this disbursement sheet, again, is
6 that something that's generated by the software
7 that prepares the closings for you?
8 A Yes.
9 Q Okay.
10
11 REPORTER'S NOTE: (At this point, instrument was
12 marked for identification by the Reporter as
13 Plaintiff's Exhibit Number 12, after which, the
14 deposition continued, as follows:)
15
16 Q (continued by Mr. Underwood) I'll just
17 ask you to identify Exhibit 12.
18 A Exhibit 12 is a check to Mobile County
19 Judge of Probate, and it appears to be the
20 cleared check.
21 Q Okay.
22 A And it references our filing for the
23 Saucidas.

---

50 (Pages 194 to 197)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

**Hall-Frazier**
**Record - 000926**

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 198

1  Q    All right.  And are those all the checks
2  that were written for the Saucida's closing?
3  A    All this (indicating)?
4  Q    Yeah.  There are a number of them in
5  there.
6        BY MS. CLOTFELTER:  On Exhibit 12.
7        BY MR. UNDERWOOD:  Yes.
8  A    Let me see.  Yes, it appears -- yes.
9  Q    (continued by Mr. Underwood)  All right.
10  Again, there's no check in there to an
11  abstracter or to a notary; isn't that right?
12  A    That is correct.
13  Q    Okay.
14        BY MR. UNDERWOOD:  Do you all want to
15  take a break for a minute?
16        BY MS. CLOTFELTER:  Sure.
17
18  REPORTER'S NOTE:  (At this point, a brief recess
19  was taken, after which, the deposition
20  continued, as follows:)
21
22  REPORTER'S NOTE:  (At this point, instrument was
23  marked for identification by the Reporter as

---

Page 199

1  Plaintiff's Exhibit Number 13, after which, the
2  deposition continued, as follows:)
3
4  Q    (continued by Mr. Underwood)  Okay.  Let
5  me show you what I've marked now as Defendant's
6  Exhibit 13.  Just identify that for the record
7  for us.
8  A    It's a Pearlie Finch Settlement
9  Statement.
10  Q    All right.  And do you understand that to
11  be the same Pearlie Finch that filed the suit
12  down in Mobile County Circuit Court?
13  A    Yes.
14  Q    And let's go through it right quick.
15  Let's see, we've got the items in the 800 block.
16  And again, those are all supplied to you by
17  Homeowners in this case as well?
18  A    Right.
19  Q    And this is another Homeowners' loan; is
20  that right?
21  A    Yes, it is.
22  Q    Okay.  And lines 1101 through 1103,
23  they're the same as in the Saucida closing; is

---

Page 200

1  that right?
2  A    I assume.  I think they are.  Yes.
3  Q    All right.  And same charge on line 1201;
4  is that correct?
5  A    Yes.
6        BY MS. CLOTFELTER:  1201?  Okay.
7  Q    (continued by Mr. Underwood)  And then
8  line 1203, that's the actual tax on the deed; is
9  that right?
10  A    Uh-huh.
11  Q    All right.
12
13  REPORTER'S NOTE:  (At this point, instrument was
14  marked for identification by the Reporter as
15  Plaintiff's Exhibit Number 14, after which, the
16  deposition continued, as follows:)
17
18  Q    (continued by Mr. Underwood)  Let me show
19  you what I've marked as Plaintiff's Exhibit 14.
20  It's headed "Closing Instructions."  Is that
21  with regard to the --
22  A    Pearlie Finch?
23  Q    Ms. Finch's loan?

---

Page 201

1  A    Yes, it is.
2  Q    All right.
3
4  REPORTER'S NOTE:  (At this point, instrument was
5  marked for identification by the Reporter as
6  Plaintiff's Exhibit Number 15, after which, the
7  deposition continued, as follows:)
8
9  Q    (continued by Mr. Underwood)  I'm going
10  to go ahead and mark the next exhibit.  It's
11  something I'm curious about.  It looks like
12  there were two sets of closing instructions with
13  regard to that loan.  Do you know why there
14  would be two sets of closing instructions?
15  A    No.  It could be several situations.  It
16  could be that we attempted to close the loan and
17  something didn't occur.  It didn't occur for one
18  reason or another, so we rescheduled it for a
19  different day.  It could be that she objected to
20  fees and we had to redo fees.  Anything that
21  would cause it to change, it would cause a
22  different set to come through.
23  Q    Okay.  Well, can you -- can you look at

---

51 (Pages 198 to 201)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

## Page 202

1  them and tell us what the problem was, if there
2  was one?  They're in completely different
3  formats, too.  Is there any significance to
4  that?
5  A    I don't know.
6       BY MS. CLOTFELTER:  Don't guess, if you
7  don't know.
8  A    Yeah.  I just plain don't know, because
9  neither one of these are the doc order that we
10  get.  So that's not the reason.  They're both
11  the same dates.  So I do not know, unless they
12  had two sets in this one.  But why they would
13  have two sets, I don't know.
14  Q    All right.
15  A    It would have had to have come over in
16  their closing package.  But why they have two
17  sets with two different sets of orders, I don't
18  know.
19  Q    All right.  Let's look at Exhibit 15.
20  Down there there's -- it says, "Loan Closer:
21  Kiva Hicks."  Do you know who that is?
22  A    "Loan closer: Kiva Hicks."  You're on
23  15?

## Page 203

1  Q    Yeah, we're on Exhibit 15.
2  A    That's the loan officer that works for
3  Homeowners Loan.
4  Q    Okay; all right.  That's not the notary?
5  A    No, that is not the notary.
6  Q    Okay.  And I meant to ask you a couple of
7  questions about the -- if we could go back to
8  Ms. Gibbs's HUD-1 form and I just wanted you to
9  verify --
10  A    Did you mean to say Ms. Finch rather
11  than --
12  Q    Yeah, Ms. Finch's HUD-1 form.
13  A    Okay.
14  Q    I just wanted you to verify for me that
15  there's no charge on that form either for a
16  notary or for an abstracter; isn't that true?
17  A    There is no charge payable to the
18  abstracter or the notary on this HUD.
19  Q    Okay.  Did A&B do this abstract on this
20  transaction as well?
21  A    I don't know.
22  Q    Okay.  Look on, if you would, on Exhibit
23  15, page 43.  It's the next page.  And do you

## Page 204

1  know who that person is that signed as
2  Settlement Officer?
3  A    Eric Hart.
4  Q    All right.  And who is she?
5  A    She was also in our post-closing
6  department.
7  Q    Okay.  And what's the significance of her
8  signing this document?
9  A    That means that she was the one who
10  actually stacked it and checked on the
11  documents.  The same thing that Jane Carcello
12  did on the other file.
13  Q    I see.  And look at 14.  There are some
14  initials down here in the bottom corner.  Do you
15  know -- on 14.
16  A    Oh, Exhibit 14?
17  Q    Yeah.  Yeah, there's some initials down
18  there at the bottom.  Do you know whose those
19  are?
20  A    It looks like PF.  Pearlie Finch,
21  probably.
22  Q    All right.  And what about these over
23  here in the margin?

## Page 205

1  A    MD?
2  Q    Yeah.
3  A    That would -- that should be -- I don't
4  know.  I guess that would be one of our
5  employees.
6  Q    I mean --
7  A    But they didn't sign it as settlement
8  agent, so I don't know who that would be.
9  Q    Okay.  Well, the borrower usually doesn't
10  see these closing instructions, or do they?
11  A    It goes -- it's in the package that's
12  sent to the notary.  So if the notary allows
13  them to view it, then they initial it.
14  Q    I see.  Okay.
15  A    So I guess they did see it in this case.
16
17  REPORTER'S NOTE:  (At this point, instrument was
18  marked for identification by the Reporter as
19  Plaintiff's Exhibit Number 16, after which, the
20  deposition continued, as follows:)
21
22  Q    (continued by Mr. Underwood)  Okay.
23  Exhibit 16, is that the ledger card for the

52 (Pages 202 to 205)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

## LEGALINK, A MERRILL COMPANY
### Court Reporting * Legal Videography * Trial Services

Page 206

1  Finch transaction?
2  A    Yes.
3  Q    And can you look at it and tell was it
4  generated by the same software that we've been
5  talking about, or was it the predecessor to the
6  one that you're using now?
7  A    It appears to be the same software.  When
8  was this closed?  Yes, in '04.  This was
9  Aptitude.
10      BY MS. CLOTFELTER:  It was Aptitude?
11      THE WITNESS:  Uh-huh.
12  Q    (continued by Mr. Underwood) All right.
13  And it has voided checks down at the bottom of
14  it as well, and would it have been subject to
15  the same procedure that you described for me
16  before with regard to the Saucida transaction?
17  A    What do you mean "subject to the same
18  procedure?"
19  Q    Well, where a check was written for the
20  filing fee, and then later voided in your
21  recording department?
22  A    The 37723 would be the same procedure
23  where we voided it in the recording department.

Page 207

1  It appears that the 37727 was because Ms. Finch
2  ended up asking us to wire her funds, because
3  you'll notice a wire at the bottom of the
4  checks.
5  Q    All right.
6  A    So we must have voided the physical check
7  and wired them.
8  Q    No, I don't see that.  Show me what
9  you're talking about.
10  A    Her check was voided, and then the very
11  last one up here, right under --
12  Q    I see.
13  A    It says "wire" instead of "check number."
14  Q    All right.  Those are the funds that were
15  paid to Ms. Finch at the closing?
16  A    Correct.
17  Q    Okay.  But now check number 37723 was
18  voided?
19  A    Uh-huh.
20      BY MS. CLOTFELTER:  Yes?
21      THE WITNESS:  Yes.  I'm sorry.
22  Q    (continued by Mr. Underwood)  And can you
23  look at the ledger card and tell us what the

Page 208

1  actual recording fee, less the tax, for Ms.
2  Finch's transaction?
3      BY MS. CLOTFELTER:  Less the tax?
4  Q    (continued by Mr. Underwood)  Is it this
5  $33.00 that's reflected by check 38610?
6  A    I don't know, because there's a 3809 for
7  69 as well.
8  Q    All right.  But we can see that on the
9  HUD-1.  That's for the tax, isn't it?
10  A    Yes.
11  Q    All right.
12  A    That should be for the tax, yes.
13  Q    All right.  So, in other words, is it
14  accurate to say that Ms. Finch was charged
15  $120.00 for a charge that was really on the 33?
16  A    Yes, it appears so.
17  Q    Okay.  And is it also true that this
18  is -- this happened before you changed your
19  policy and started refunding the difference back
20  to the borrowers; is that right?
21  A    Yes, sir.
22  Q    All right.  And there's been no refund to
23  Mrs. Finch?

Page 209

1  A    Now, since this is prior, I can't tell
2  you that, because if anybody -- we -- if
3  someone -- if a borrower ever called and
4  requested a refund, we did refund the funds to
5  them if we saw that they were still on our
6  account.  I don't know that she ever called and
7  requested one.  But according to this, there
8  wasn't one at this time.
9  Q    All right.  Have you ever had a borrower
10  call and request a refund of overage on the
11  projected recording fee?
12  A    Yes, I have.
13  Q    How many times?
14  A    Very few.
15  Q    Less than ten?
16  A    Probably so.
17  Q    Now, you qualified that statement by
18  saying if you still had the funds, you would
19  refund them to the borrower, didn't you?
20  A    Yes, I did.
21  Q    All right.  And if you didn't still have
22  the funds, you would not refund the borrower;
23  isn't that right?

53 (Pages 206 to 209)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 210

1  A    Well, actually, we always had the funds
2  when they asked for it. So I shouldn't have
3  even said it that way. But, yes. I was
4  thinking if we hadn't used them for assignments
5  or releases. But back then, we didn't even know
6  when we had used those. So it would have been,
7  yes, we did that.
8  Q    All right. And you weren't -- and it's
9  true, too, back at this point in time you were
10  not holding the funds in trust for the
11  borrowers; you would just put them in your
12  general operating account; isn't that right?
13  A    Yes, sir.
14  Q    And the same is true, too, with regard to
15  the charges from A&B Abstracts with the
16  Saucida's transaction, isn't it?
17       BY MS. CLOTFELTER: Object to the form,
18  unless you specify what you're talking about.
19  Q    (continued by Mr. Underwood) You can
20  answer, if you understood my question. If you
21  didn't, I'll rephrase it.
22  A    Well, the way I understood your question,
23  the answer would be no.

Page 211

1       BY MS. CLOTFELTER: Well, state how you
2  understood it just so the record's clear.
3  A    We never held any funds for an abstracter
4  on behalf of the borrower.
5  Q    (continued by Mr. Underwood) Okay.
6  Well, let me ask the question this way. On line
7  1102 on the Saucida transaction, it reflects,
8  does it not, a fee for abstract or title search;
9  isn't that true?
10  A    Yes, it does.
11  Q    All right. And we looked at the invoice
12  for that, and the actual charge for that from
13  A&B Abstracts was $125.00, correct?
14  A    Yes, it is.
15  Q    All right. And the rest of those funds
16  were retained by Swafford?
17  A    For doing the abstract and title search,
18  yes.
19  Q    Well, the rest of those funds were
20  retained by Swafford; isn't that true?
21  A    Yes, it is, for doing the abstract and
22  title search.
23  Q    Okay. But Swafford didn't do the title

Page 212

1  search, did it? That was done by A&B.
2  A    We didn't actually physically go to the
3  courthouse, no.
4  Q    All right.
5  A    Well, our contract employee did.
6  Q    And the charges reflected on the HUD-1,
7  it's a markup of the charge made by the
8  contracting employee; isn't that true?
9  A    That is not true. We don't mark up our
10  fees.
11  Q    Well --
12  A    That is the cost for us doing that.
13  Q    Yeah. Well, you marked it up to cover
14  those costs; isn't that right?
15  A    There's no markup if that is the actual
16  cost.
17
18  REPORTER'S NOTE: (At this point, instrument was
19  marked for identification by the Reporter as
20  Plaintiff's Exhibit Number 17, after which, the
21  deposition continued, as follows:)
22
23  Q    (continued by Mr. Underwood) And if you

Page 213

1  would, just identify these for the record. And
2  I would ask you, if you would, to just check
3  those off and make sure they're all there and
4  all written for the Finch transaction.
5  A    They're all of the actual physical checks
6  that are covered here, yes.
7  Q    All right.
8  A    The wire, of course, there's no
9  confirmation for that.
10  Q    Sure. I understand.
11
12  REPORTER'S NOTE: (At this point, instrument was
13  marked for identification by the Reporter as
14  Plaintiff's Exhibit Number 18, after which, the
15  deposition continued, as follows:)
16
17  Q    (continued by Mr. Underwood) And this is
18  Exhibit 18. Is that the disbursement sheet of
19  the Finch transaction?
20  A    Yes, it is.
21  Q    And that's generated by the same software
22  we've been talking about, correct?
23  A    Correct.

54 (Pages 210 to 213)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 214

1  REPORTER'S NOTE: (At this point, instrument was
2  marked for identification by the Reporter as
3  Plaintiff's Exhibit Number 19, after which, the
4  deposition continued, as follows:)
5
6  Q    (continued by Mr. Underwood) And just
7  tell us, for the record, what Exhibit 19 is.
8  A    It's a Homeowners' form. It says "ECOA
9  Notice."
10 Q    And that's with regard to Ms. Finch's
11 transaction also?
12 A    Yes, it is.
13 Q    And is it just like the one that was in
14 the Saucida transaction? You don't have to read
15 it word-for-word. Just compare them and see if
16 it looks like the same form, if you would, for
17 me.
18 A    It appears to be the same basic form,
19 yes.
20
21 REPORTER'S NOTE: (At this point, instrument was
22 marked for identification by the Reporter as
23 Plaintiff's Exhibit Number 20, after which, the

---

Page 215

1  deposition continued, as follows:)
2
3  Q    (continued by Mr. Underwood) All right.
4  Is this the HUD-1 from the Gibbs transaction?
5       BY MS. CLOTFELTER: Is that Exhibit 20?
6       BY MR. UNDERWOOD: Yes.
7  A    Yes, it is. It's from the Gibbs
8  transaction.
9  Q    (continued by Mr. Underwood) And it
10 reflects the same 1101 through 1103 charges as
11 the other two transactions; is that right?
12 A    Yes, sir.
13 Q    And it's the same $120.00 recording fee
14 for the mortgage?
15 A    Oh, yes, sir.
16
17 REPORTER'S NOTE: (At this point, instrument was
18 marked for identification by the Reporter as
19 Plaintiff's Exhibit Number 21, after which, the
20 deposition continued, as follows:)
21
22 Q    (continued by Mr. Underwood) And Exhibit
23 21, are those the closing instructions?

---

Page 216

1  A    These are closing instructions for this
2  file, yes, for the Mary Gibbs file.
3
4  REPORTER'S NOTE: (At this point, instruments
5  were marked for identification by the Reporter
6  as Plaintiff's Exhibits Numbered 22 & 23, after
7  which, the deposition continued, as follows:)
8
9  Q    (continued by Mr. Underwood) Okay.
10 Exhibit 22, can you tell us what that is?
11 A    It is a file ledger for James Gibbs.
12 Q    All right.
13 A    This is not the same -- yes, it's a file
14 ledger for Gibbs.
15 Q    Okay. Is that a different -- that's a
16 different format. Was that the predecessor
17 software or --
18 A    It looks like it might be Aptitude. I
19 mean, not Aptitude, but -- it was before
20 Aptitude. We have three software systems.
21 Q    All right. You can use that to check to
22 make sure these are all the cancelled checks
23 that ended up on that transaction.

---

Page 217

1       BY MS. CLOTFELTER: Exhibit 23 is the
2  checks.
3  A    Oh, yeah. There's two checks missing in
4  this one (indicating).
5  Q    (continued by Mr. Underwood) Which
6  checks are missing?
7  A    34080 and 34377.
8  Q    And what are those checks for?
9  A    Looks like the 26 -- Baldwin County Judge
10 of Probate was that one. It looks like it's
11 probably the tax check. I don't know what that
12 one's for. Part of recording, obviously. The
13 other one was to Swafford for fifteen cents. I
14 don't know what that is.
15 Q    Well, let me ask you this now. Can you
16 look at those and tell me what the actual
17 recording fee, less the tax, was in the Gibbs
18 transaction?
19 A    Oh, actually, yes, I can. That's what
20 the fifteen cents was for. The actual total
21 cost was $263.35.
22 Q    But which portion of that was for the --
23 was for the recording as opposed to the tax?

55 (Pages 214 to 217)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 218

1  A    I can't tell by looking at this.
2  Q    All right.
3  A    It's not separated.
4
5  REPORTER'S NOTE:  (At this point, instrument was
6  marked for identification by the Reporter as
7  Plaintiff's Exhibit Number 24, after which, the
8  deposition continued, as follows:)
9
10  Q    (continued by Mr. Underwood) Okay. Let
11  me show you this Exhibit Number 24 and ask you
12  if you can tell me based on that. Is that the
13  amount that it actually was, $86.00?
14  A    I don't know that. I can't find where
15  the --
16  Q    Well, let me ask you --
17      BY MS. CLOTFELTER:  Take as long as you
18  need to look at it.
19  Q    (continued by Mr. Underwood) Well, we'll
20  do it this way, we'll take that line 1201, which
21  is $120.00, and then we add the line 1203 and
22  that gives us $349.50.
23  A    Uh-huh.

Page 219

1  Q    How much was the actual check written to
2  the Baldwin County Probate Court?
3  A    How much was the actual check written
4  for?
5  Q    Yes.
6  A    $263.50. What I do know about Gibbs and
7  Finch, though, is that one of these two, the
8  check -- these checks came back short and we had
9  to pay it out of the operating account, and it
10  was for the exact amount we had charged on the
11  HUD to begin with. And I do not know if that
12  was Gibbs or Finch, but it's in the
13  documentation we sent to you earlier.
14  Q    All right.
15  A    So when you asked me to tell you if
16  that's the actual amount of recording, that's
17  the actual amount we sent on Gibbs and that's
18  the actual amount we sent on Finch. That
19  doesn't mean that was the actual amount that it
20  took to record those mortgages, because that was
21  prior to holding out the borrower's extra funds.
22  So it would have been taken from our operating
23  account.

Page 220

1  Q    Okay. Well, do you have some documents
2  with you this afternoon that would reflect what
3  you've just told me?
4  A    No, but everything has been sent to you,
5  because we printed out Ernst for you on both
6  files and sent it to you showing you what the
7  actual costs were.
8  Q    The actual costs would be something
9  different than what's shown on the disbursement
10  sheet?
11  A    The actual cost is what was on the HUD.
12  Whoever funded that loan made a mistake.
13  Q    Well, why don't I -- let me ask you to do
14  this, let me give you this calculator and if you
15  would, just based on the disbursement sheet and
16  the HUD-1, I want to ask you if Swafford
17  retained any -- let me ask it this way. Please
18  take the calculator and tell me based on the
19  HUD-1 disbursement sheets sitting in front of
20  you this afternoon, it appears that Swafford
21  retained any money out of that -- those monies
22  for recording fees.
23      BY MS. CLOTFELTER:  Object to the form as

Page 221

1  to what it appears. I think he's just explained
2  to you what he believed actually happened. I
3  object to asking him to speculate about what it
4  appears to be as opposed to what it is
5      BY MR. UNDERWOOD:  Well, I'm not asking
6  him to speculate. I'm asking him to use a
7  calculator and just add it up and tell us if --
8  A    Swafford deposited some of the recording
9  fees on both files into their operating account.
10  But in one of those cases those funds were used
11  later to pay the shortage, because it was done
12  as a mistake.
13  Q    (continued by Mr. Underwood) All right.
14  Now, if you would, please, sir, please take the
15  documents in front of you and maybe you can tell
16  us how much Swafford retained in its account
17  with regard to the Gibbs transaction.
18  A    $86.00.
19  Q    Okay.
20
21  REPORTER'S NOTE:  (At this point, instrument was
22  marked for identification by the Reporter as
23  Plaintiff's Exhibit Number 25, after which, the

56 (Pages 218 to 221)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 222

1   deposition continued, as follows:)
2
3   Q      (continued by Mr. Underwood)  And Exhibit
4   25, is that the truth-in-lending disclosure with
5   regard to the Gibbs transaction?
6   A      Yes, it is.
7   Q      All right.
8   A      It is one of them.  I'm reluctant to tell
9   you one-hundred percent sure on any of these
10  documents, because you're giving me the unsigned
11  copies instead of the signed copies.  And we may
12  get more than one version if the one doesn't
13  close the same day; if anything is changed
14  between the borrower and the lending company.
15  But based upon what you're giving to me, I see
16  no reason that these are not the ones that were
17  used at closing.
18       BY MR. UNDERWOOD:  Okay.  Let's take a
19  quick break.
20
21  REPORTER'S NOTE:  (At this point, a brief recess
22  was taken, after which, the deposition
23  continued, as follows:)

---

Page 223

1   Q      (continued by Mr. Underwood)  We just
2   took a break and I obtained some more copies of
3   the Gibbs documents, and were you able to
4   compare the unsigned HUD-1 that we already had
5   with one of the signed copies?
6   A      Yes, I have.
7   Q      Do they appear to be the same thing?
8   A      Yes, and so does the truth-in-lending.
9   Q      All right.
10
11  REPORTER'S NOTE:  (At this point, instrument was
12  marked for identification by the Reporter as
13  Plaintiff's Exhibit Number 26, after which, the
14  deposition continued, as follows:)
15
16  Q      (continued by Mr. Underwood)  And let me
17  show you what I've marked as Exhibit 26.  We may
18  have already talked about that.  Would you
19  identify that for the record for us?
20  A      This is the Gibbs ECOA Notice that comes
21  from Homeowners.
22  Q      Okay.
23

---

Page 224

1   REPORTER'S NOTE:  (At this point, instrument was
2   marked for identification by the Reporter as
3   Plaintiff's Exhibit Number 27, after which, the
4   deposition continued, as follows:)
5
6   Q      (continued by Mr. Underwood)  And we have
7   another Exhibit, 27.  Would you identify that
8   for the record for us?
9   A      27 is the Defendant's Responses to
10  Discovery which has the Gibbs closing package in
11  it that's signed.
12  Q      All right.
13
14  REPORTER'S NOTE:  (At this point, instrument was
15  marked for identification by the Reporter as
16  Plaintiff's Exhibit Number 28, after which, the
17  deposition continued, as follows:)
18
19  Q      (continued by Mr. Underwood)  And let me
20  show you what I'm marking as Exhibit 28.  And if
21  you would, identify that for the record for us.
22  A      This is A&B's abstract invoice for Mary
23  Gibbs's file.

---

Page 225

1   Q      All right.  And is the same thing true
2   with regard to line 1102 on the Gibbs HUD-1?
3   That's the line that says abstract or title
4   search to Swafford & Hays, $375.00.  For the
5   actual abstract or title search, $90.00 was paid
6   to A&B by Swafford & Hays, and the remainder of
7   the charges on that line were retained?
8   A      All funds on that line were retained into
9   Swafford's account, and Swafford paid A&B as one
10  of their expenses for that.
11  Q      Okay.  Thank you.
12
13  REPORTER'S NOTE:  (At this point, instrument was
14  marked for identification by the Reporter as
15  Plaintiff's Exhibit Number 29, after which, the
16  deposition continued, as follows:)
17
18  Q      (continued by Mr. Underwood)  And let me
19  show you what I've marked as Exhibit 29.  If you
20  would, just identify that for the record, if you
21  would.
22  A      Closing instruction for Mary Gibbs.
23

---

57 (Pages 222 to 225)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

---

**Page 226**

1 REPORTER'S NOTE: (At this point, instrument was
2 marked for identification by the Reporter as
3 Plaintiff's Exhibit Number 30, after which, the
4 deposition continued, as follows:)
5
6 Q     (continued by Mr. Underwood) Let me show
7 you what I've marked as Exhibit 30 and ask you
8 if you've ever seen that document.
9 A     I don't believe I've ever seen that, but
10 it appears to be their basic price list.
11      BY MS. CLOTFELTER: Whose basic price
12 list?
13 A     For A&B Abstracts.
14 Q     (continued by Mr. Underwood) All right.
15 And do you know if those are the charges that
16 A&B has charged Swafford & Hays for the
17 abstracts that it's done?
18 A     I don't know that, but --
19 Q     Who would know that?
20 A     Mazet Mattingley.
21 Q     All right.
22
23 REPORTER'S NOTE: (At this point, instrument was

---

**Page 227**

1 marked for identification by the Reporter as
2 Plaintiff's Exhibit Number 31, after which, the
3 deposition continued, as follows:)
4
5 Q     (continued by Mr. Underwood) And let me
6 ask you to identify Exhibit 31.
7 A     This is the Abstracter Agreement that we
8 use with our abstracters. This one is with A&B
9 Abstracts.
10 Q     And is there any other agreement or price
11 list between Swafford and A&B Abstracts, other
12 than Exhibits 30 and 31?
13      BY MS. CLOTFELTER: Object to the form.
14 He hasn't identified 30 as being between him and
15 A&B Abstracts or as a relevant price list.
16 Q     (continued by Mr. Underwood) Well, I'll
17 just repeat the question. Is there any other
18 price list or contract between Swafford & Hays
19 and A&B Abstracts, other than what I've shown
20 you in 30 and 31?
21      BY MS. CLOTFELTER: Object to the form of
22 the question. It still misstates his testimony.
23      BY MR. UNDERWOOD: I don't think it does.

---

**Page 228**

1 Q     (continued by Mr. Underwood) You can go
2 ahead and answer.
3 A     The only agreement that I know of between
4 A&B Abstracts and myself is Number 31.
5 Q     Okay; all right. And you don't have any
6 other price lists, other than the one that I
7 showed you? And when I -- and I'm not asking --
8 I'm not implying that you have that price list.
9 Do you know of any other price lists in the
10 position of Swafford & Hays?
11 A     No. But unfortunately, I didn't even
12 know about this one, so --
13 Q     All right; okay. Let me show you what we
14 marked earlier as Plaintiff's Exhibit Number 3.
15 If you would, please, sir, I would like for you
16 to take Plaintiff's Exhibit Number 3 and see if
17 you can tell us if -- with regard to this file
18 number 051031 there were any monies retained by
19 Swafford & Hays with regard to the line 1201
20 recording fees.
21 A     No, there was not.
22 Q     I'm sorry, there was not?
23 A     No.

---

**Page 229**

1 Q     All right. Can you tell me why there
2 appeared to me that there was?
3 A     If you look at line 1202, which is for
4 $294.00, that amount -- let me make sure I'm
5 looking at this right. That amount was cut in
6 check number 25357. If you look at line item
7 1203 for $514.50, that was cut in check number
8 25358. If you look at the recording fees for
9 1201, that was cut and voided. The original
10 check was for 25319. It was then voided and
11 $45.00 went to Traci Durrance, and the remaining
12 $180.00 went to Hillsborough County Clerk in
13 25359.
14 Q     Let me ask it this way. Let me ask you
15 isn't this true, that the money was retained,
16 but then later refunded to Traci Durrance,
17 $45.00?
18 A     The $45.00 was never deposited into any
19 Swafford settlement account. It was always cut
20 to Traci Durrance.
21 Q     All right.
22 A     Because -- well, the check was
23 immediately voided after it was cut for the

---

58 (Pages 226 to 229)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 230

1  wrong amount to the Clerk's office, but it was
2  never cut to Swafford.
3  Q    Well, isn't this like the Saucida
4  transaction where it was refunded?
5  A    Was the Saucida -- it's like the Saucida
6  transaction in that we cut a check to the
7  borrowers, yes, and that was the refund. But
8  those funds to the Saucidas never went into the
9  Swafford account, either. It went into our
10  escrow account.
11  Q    Other than the escrow account --
12  A    But it never went into our operating
13  account.
14  Q    Right, right. And in both the Saucida
15  transaction and this Durrance transaction, what
16  we've been talking about is true, isn't it, that
17  the 1201 -- line 1201 filing fees were only an
18  estimate?
19  A    Correct.
20  Q    All right. Now, I'm going to run
21  through -- I'm going to run through just a
22  sample of these transactions and see if you can
23  tell me -- let's see. And if you want to use

---

Page 231

1  the calculator, there it is.
2
3  REPORTER'S NOTE: (At this point, instrument was
4  marked for identification by the Reporter as
5  Plaintiff's Exhibit Number 32, after which, the
6  deposition continued, as follows:)
7
8  Q    (continued by Mr. Underwood) Let me show
9  you what I've marked as Exhibit 32. I would ask
10  you if Swafford retained any funds with regard
11  to that transaction?
12  A    Yes, we did.
13  Q    All right. And how much was it?
14  A    It appears to be $85.50.
15  Q    And I'm sorry, was that the Franklin
16  transaction?
17  A    Jack Franklin.
18  Q    Yeah. Okay. I had another question.
19  BY MS. CLOTFELTER: What's the date?
20  THE WITNESS: July of '04.
21  BY MS. CLOTFELTER: Okay.
22  Q    (continued by Mr. Underwood) And that
23  money just went over into -- the overage just

---

Page 232

1  went over into Swafford's general operating
2  account like you described for us before?
3  A    Yes, sir.
4  Q    Okay. Would you tell me what line 1111
5  represents on that Settlement Statement for that
6  transaction?
7  A    Endorsement -- there was some type of an
8  endorsement, whether it be a mobile home
9  endorsement. It's an additional -- endorsements
10  are additional coverages that some lenders will
11  require up and above the normal coverage. Such
12  as -- if it's a mobile home, they have to have
13  an additional one. That's the one that's
14  popping into my head.
15  Q    Okay. And the same is true with regard
16  to this transaction, too, with regard to the
17  payment for abstract or notary, that there are
18  no -- there are no payments disclosed directly
19  to an abstract or a notary on this transaction;
20  isn't that true?
21  A    Let me make sure. Yes, there is no
22  notary and no abstracter listed on the HUD
23  Settlement Statement.

---

Page 233

1  Q    Okay; all right.
2
3  REPORTER'S NOTE: (At this point, instrument was
4  marked for identification by the Reporter as
5  Plaintiff's Exhibit Number 33, after which, the
6  deposition continued, as follows:)
7
8  Q    (continued by Mr. Underwood) Okay. Let
9  me show you Exhibit 33. I believe it's the
10  Robert McDaniel transaction. I would ask you if
11  there were any funds retained by Swafford with
12  regard to that transaction?
13  A    Yes, there were.
14  Q    And can you tell us how much?
15  A    Yeah. In the amount of $66.50.
16  Q    All right. Which line are you looking
17  at?
18  A    When I tell you the amount?
19  Q    Yes.
20  A    It's typically grouped. If you look at
21  the checks on the ledger card and you look to
22  see what the correct payees and the amounts are,
23  it's almost always right above it, whether it be

---

59 (Pages 230 to 233)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 234

1  the borrower or us.
2  Q    Okay.  I see.
3  A    Yeah.
4  Q    The $66.50?
5  A    Uh-huh.
6  Q    All right.  And is the same true of this
7  one, that there's no --
8  A    Appraiser or notary?
9  Q    There's no appraiser or notary paid on
10 this transaction?
11       BY MS. CLOTFELTER:  Object to the form.
12 Go ahead and answer the question.
13 A    There is no appraiser or notary listed on
14 the HUD Settlement Statement.
15 Q    All right.  Let me ask you this.  Maybe I
16 won't have to ask you on all of these.  Does
17 Swafford ever have a charge on any of these
18 HUD-1s for an appraiser or a notary that was
19 paid directly --
20 A    Oh, I said appraiser, too, and neither
21 one of us is saying the right thing.  The
22 abstracter and notary are not listed.
23 Q    You're right.  That's what I mean, the

---

Page 235

1  abstracter and notary.
2  A    Because the appraiser is listed.
3  Q    Right.
4  A    But we don't hire the appraiser.
5  Q    It's getting late in the afternoon.
6  A    Abstracter and notary, is there ever?
7  There should not be.  I can't give -- I don't
8  look at every package.  So if one of my
9  employees made a mistake and listed one, that's
10 not the typical policy, unless it's an attorney.
11 Q    Okay.  The typical policy is that the
12 lines 1101 and 1102 reflect just a gross payment
13 of those funds to Swafford & Hays, and then out
14 of those funds, Swafford & Hays pays the notary
15 and the abstracter?
16 A    Correct.
17 Q    Okay.
18 A    We pay off of the HUD any agent that they
19 hire.  They being the lender.  And if the
20 appraiser hires someone else or we hire someone
21 else or whatever, that's paid directly from the
22 appraiser and us.  It's not shown on the HUD.
23 Q    All right.  Well, then, that brings up

---

Page 236

1  this question.  Who hires the notary and the
2  abstracter?
3  A    We do.
4  Q    Okay.
5  A    We hire them, but they have the right to
6  refuse them.  And we have had plenty of notaries
7  that they don't like and they refused them.
8       BY MS. CLOTFELTER:  They who?
9  A    I'm sorry.  They being the lender.  The
10 lender dictates to us if we're not allowed to
11 use a notary.
12 Q    (continued by Mr. Underwood)  That brings
13 up something else I meant to ask you earlier.
14 With regard to the amount of control that
15 Homeowners has over your closings, does
16 Homeowners, do they dictate, other than what
17 you've just told me, who does the closing, when
18 and how it's done?
19 A    Yes, they do.
20 Q    Okay.  And tell me in what manner they do
21 that.
22 A    They tell us what day it's going to
23 close; what time it's going to close; where it's

---

Page 237

1  going to close.  And we choose the notary or
2  attorney, but if they don't like the one we've
3  chosen, they tell us that we can not use them.
4  Q    All right.  Well, do you have -- do you
5  have a list of notaries or attorneys that you
6  use in, say, the Mobile, Alabama area; is that
7  true?
8  A    Yes.
9  Q    All right.  And does Homeowners have any
10 influence over which of those --
11 A    Only if we tell them we're going to use
12 "X, Y, Z notary and they tell us, "No.  We've
13 used X, Y, Z before.  We prefer you not use
14 them," and we don't use them.
15 Q    All right.
16 A    Basically they always know -- our lenders
17 always know, prior to the closing, what notary
18 or attorney we've hired.  So they always have
19 the right to tell us they don't want to use that
20 one.
21 Q    All right.  Well, with regard to
22 Homeowners, I'm sure that Swafford has a list of
23 the attorneys and notaries that Homeowners will

---

60  (Pages 234 to 237)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 238

1  approve of; is that true?
2  A    We have a list of all attorneys and
3  notaries, and what we do is, there's a -- if I'm
4  correct, because I don't --  well, I know
5  they've switched how they do it -- but we used
6  to have a note section under each notary and
7  attorney.  And, say, Home Funds doesn't like X,
8  Y, Z, but Homeowners does, then we would never
9  use X, Y, Z for Home Funds, but we would use it
10  for Homeowners.
11  Q    Sure.  That's what I mean.
12  A    Yes.
13  Q    But with regard to the ones that
14  Homeowners will use, it doesn't make any
15  difference to Homeowners, does it?  I mean,
16  Swafford can pick one out of the ones that
17  Homeowners does use?
18  A    Yes, we can.
19  Q    Okay.
20  A    I mean, like loan officers will at times
21  request specific notaries because they like
22  them.  But if they don't tell us we can't use
23  one and they don't specifically request one,

Page 239

1  then anywhere in between we can pick it.
2  Q    Right.  And the way it really works is
3  you try to find one that can do it on the date
4  that it needs to be done and that's how you --
5  that's how they get picked; isn't that true?
6  A    Yes.
7  Q    Okay.
8  A    And if we can't find one that they
9  like --
10  Q    You try to get a different one approved?
11  A    Well, then we go back and we ask -- if we
12  go through the whole line and if there's nobody
13  that can do it that day, then we have to ask
14  Homeowners if they want us to -- if they have
15  some notaries that they know of or if they want
16  us to switch it to a different date.
17  Q    Okay.
18
19  REPORTER'S NOTE:  (At this point, instrument was
20  marked for identification by the Reporter as
21  Plaintiff's Exhibit Number 34, after which, the
22  deposition continued, as follows:)
23

Page 240

1  Q    (continued by Mr. Underwood)  Okay.  Let
2  me ask you with regard to Exhibit 34.  It's the
3  Casey transaction.  How much, if any, funds were
4  retained and how much?
5  A    Looks to be $73.50 for recording fees.
6  Q    It's not $83.50?
7  A    There's a transfer fee noted.  I don't
8  even know what that $10.00 is, but it does look
9  like we kept $83.50.
10  Q    Okay.  So it's either $83.50 or $73.50?
11  A    Yeah, and I'm not sure which.  I'm not
12  sure what the $10.00 is.
13  Q    All right.  Fair enough.  And I won't ask
14  you about the abstracter or the --
15  A    Notary?
16  Q    -- notary, because we've already got that
17  straight, I think.
18
19  REPORTER'S NOTE:  (At this point, instrument was
20  marked for identification by the Reporter as
21  Plaintiff's Exhibit Number 35, after which, the
22  deposition continued, as follows:)
23

Page 241

1  Q    (continued by Mr. Underwood)  Let me show
2  you what I've marked as Plaintiff's Exhibit 35.
3  It's the McDonald transaction.
4  A    Are you asking me to do the same thing on
5  35?
6  Q    Right.  I was going to ask you if
7  Swafford retained any funds with regard to that
8  transaction.
9  A    No, we did not.
10  Q    All right.  But it's another one like
11  Saucida and the Exhibit Number 3 that we looked
12  at where there was an estimated charge for the
13  recording fee, and it looks like $67.00 was
14  refunded; is that right?
15  A    Yes, sir.
16  Q    And this falls in that third tier of how
17  you handle that recording fee like we talked
18  about?
19  A    Yeah.  I've been watching the dates and,
20  yes, everyone that we've refunded has been after
21  the date.  And it looks like January of '05 must
22  have been the correct date for Homeowners,
23  because the two you gave me, I believe, were in

61 (Pages 238 to 241)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 242

1  January and they both show refunds to Homeowners
2  for customers.
3  Q    Right. There's another document in that
4  transaction I want you to look at. It's
5  probably the last page.
6  A    Okay.
7  Q    And would you identify that page, for the
8  record, for us?
9  A    It's an A&B Abstracts invoice.
10  Q    All right. And it reflects a charge of
11  $90.00; is that correct?
12  A    Yes, sir.
13  Q    All right. And the same thing is true
14  that we've been talking about about the line
15  1202, that $375.00 was paid to Swafford and
16  $90.00 paid for the abstract or title search to
17  A&B, and the remainder of that was retained?
18  A    That is correct, but it's 1102, not 1202.
19  Q    I stand corrected.
20  A    Okay.
21
22  REPORTER'S NOTE: (At this point, instrument was
23  marked for identification by the Reporter as

---

Page 243

1  Plaintiff's Exhibit Number 36, after which, the
2  deposition continued, as follows:)
3
4  Q    (continued by Mr. Underwood) And let me
5  show you Exhibit 36, the Linda Johnson
6  transaction.
7  A    Okay.
8  Q    And was $98.00 retained by Swafford in
9  that transaction?
10  A    It appears so, yes.
11  Q    Okay.
12
13  REPORTER'S NOTE: (At this point, instrument was
14  marked for identification by the Reporter as
15  Plaintiff's Exhibit Number 37, after which, the
16  deposition continued, as follows:)
17
18  Q    (continued by Mr. Underwood) All right.
19  We're on the Sterling transaction, Plaintiff's
20  Exhibit Number 37. And was the retainage by
21  Swafford the $86.50 in that one?
22  A    It appears so.
23  Q    Okay.

---

Page 244

1  REPORTER'S NOTE: (At this point, instrument was
2  marked for identification by the Reporter as
3  Plaintiff's Exhibit Number 38, after which, the
4  deposition continued, as follows:)
5
6  Q    (continued by Mr. Underwood) Let me show
7  you what I've marked as Exhibit 38.
8  A    Okay.
9  Q    I believe that's the Collins transaction.
10  And what was the retainage in that transaction?
11  A    It looks to be $73.00.
12  Q    All right. Now, can you tell me --
13  that's a different -- that's not a Homeowners'
14  loan, is it?
15  A    It's Home Funds.
16  Q    All right. And I noticed that the --
17  some of the fees are different. Do you know why
18  the --
19  A    1101, 1102 and 1103 would once again be
20  fees that the lender tells us we can charge when
21  we start doing business with them. Is that the
22  fees that you're referring to?
23  Q    Right. Now, what's the difference

---

Page 245

1  between the closing? Was there less work or
2  more work done for this closing than one of the
3  Homeowners' closings?
4  A    I don't know how much work was done on
5  this particular file.
6  Q    All right.
7  A    So I don't know if more work was done or
8  less work was done.
9  Q    Okay. Well, don't know if this lender
10  uses the full service like you described to me?
11  A    Home Funds does request some processing
12  be done for them, yes.
13  Q    And is the same amount of work done for
14  this lender as you were doing for --
15  A    In many cases, yes. In some cases, no.
16  It's filed by file-specific. Homeowners always
17  has us process their file. And Home Funds, it
18  depends on the file at times.
19  Q    Okay. But --
20  A    But once again, it's almost become like
21  an industry thing. They tell us this is what we
22  can charge and what we can charge on each loan.
23  I mean, we don't -- they don't just charge --

62 (Pages 242 to 245)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 246

1  they don't just tell us we can charge 800 or 900
2  or a 1000. They tell us you can charge this,
3  and you can't charge these fees if you have
4  overnight expenses or whatever. It all has to
5  be built within these three keys, and this is
6  what is standard for us on our HUDs. And we
7  have to either say, no, we can't afford to do
8  business with you or yes, we can.
9  Q    Well, look at the Sterling transaction,
10  the one that I handed you before that.
11  A    Okay.
12  Q    It shows an abstract or title search fee
13  of $375.00, right?
14  A    Uh-huh.
15  Q    And then this one shows an abstract or
16  title search fee of $200.00. Can you tell me
17  why is the charge for abstract and title search
18  fee, the difference between the two of them?
19  A    Because Homeowners told us that we could
20  charge $375.00 there and Home Funds would have
21  told us that we could charge $200.00 here. But
22  hopefully if we cannot recoup all our costs on
23  that line, then we would be able to in our total

---

Page 247

1  fees. Because our cost of doing business per
2  file, a lot of times, can be very similar, but
3  it doesn't necessarily mean that it's going to
4  break down on the same lines, the same amounts.
5  And it's very hard to segregate exactly what we
6  spent on each line. We use many of the same
7  employees for different functions. Same office
8  equipment and everything.
9  Q    Okay. Well, let me ask you this. This
10  is something I've been wondering about since I
11  first looked at this file. Why don't you just
12  have settlement or closing fee to Swafford &
13  Hays of $600.00, and then just reflect the
14  actual cost of what the abstract cost and the
15  title examination cost? I'm sorry. The notary
16  cost and what the abstract costs?
17  A    This is how -- I don't know. That's --
18  how we do it is pretty much industry standard.
19  This is how typically the title company does it
20  and this is how the lenders require it. We
21  can't just break down those fees however we want
22  to.
23  Q    Well, I'm not asking you to break them

---

Page 248

1  down the way you want to. I'm asking --
2  A    No. I mean --
3  Q    Wait just a minute now.
4      BY MS. CLOTFELTER: Both of you are
5  talking at once. Let him finish, then you
6  answer.
7  Q    (continued by Mr. Underwood) Here's what
8  I'm trying to ask you. Why don't you tell these
9  borrowers exactly what's being paid for these
10  fees? In other words, why don't you -- why
11  isn't there a line on here that says "settlement
12  services from Swafford & Hays, $600.00," and
13  then abstracter or title search, ninety bucks,
14  or whatever it was, and et cetera?
15  A    Because we know on Home Funds that this
16  is what we can charge for our total fees. We
17  know on average what we would spend on fees.
18  But if we go over that, that's something we have
19  to eat and we choose to do that. I mean, if we
20  don't raise our fees for borrowers because we
21  spend more on their files. We know what the
22  average cost of doing business is per file, and
23  it's very hard to break it down which file costs

---

Page 249

1  more. We have to have a very intense system for
2  wages, for hour -- I mean, each employee would
3  have to go in every five to ten minutes and
4  implement what file they're working on, what
5  they've touched. So we know overall what the
6  cost is per file. If that file goes over, then
7  we have to eat it.
8  Q    Okay. So in other words, instead of
9  putting on there just a lump sum charge of what
10  you need to charge to make money -- you're
11  trying to make money closing these loans, right?
12  A    We have to make a profit, because we're
13  not a nonprofit organization.
14  Q    Sure you do.
15  A    Right.
16  Q    And so is it -- let me ask you this. Is
17  it the lenders won't let you put your actual
18  charges on there, what you -- in other words,
19  what you need to charge to make money on these
20  files?
21      BY MS. CLOTFELTER: Object to the form.
22  Q    (continued by Mr. Underwood) Is that --
23  is that true, a true statement?

63 (Pages 246 to 249)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 250

1  A    The lenders prefer to see our fees the
2  way you see them on the HUDs.
3  Q    All right.  In other words, the lenders
4  prefer you to mark up these other fees to
5  include enough money so you can make a profit on
6  them; isn't that right?
7       BY MS. CLOTFELTER:  Object to the form.
8  That totally misstates what he said before.
9  Q    (continued by Mr. Underwood)  You can
10  answer.
11  A    We don't mark up our fees, just like I
12  stated before.
13  Q    Okay.
14  A    This is the cost of us doing business.
15  Q    Okay.  Well, let me ask it a different
16  way.  I think what you're telling me is that
17  the -- well, never mind.  I'll just go on to
18  something else.
19
20  REPORTER'S NOTE:  (At this point, instrument was
21  marked for identification by the Reporter as
22  Plaintiff's Exhibit Number 39, after which, the
23  deposition continued, as follows:)

---

Page 251

1  Q    (continued by Mr. Underwood)  Let me show
2  you what I've marked as Exhibit 39.  And that's
3  the Hayden transaction.  I would ask you if
4  there's any retainage on that transaction?
5  A    Yes, there was.
6  Q    And can you tell us how much it was?
7  A    It appears to be $66.50.
8  Q    Okay.
9
10  REPORTER'S NOTE:  (At this point, instrument was
11  marked for identification by the Reporter as
12  Plaintiff's Exhibit Number 40, after which, the
13  deposition continued, as follows:)
14
15  Q    (continued by Mr. Underwood)  And Exhibit
16  40, is there any retainage on that transaction?
17  A    No.  It appears that $60.00 was refunded
18  to Alma Jones.
19  Q    Okay.  And this is another one.  It's in
20  your third method of handling the line 1201
21  filing?
22  A    Yes.
23  Q    Okay.  And you -- I meant to ask you

---

Page 252

1  something earlier when we were talking about
2  these 1100 series fees.  Did you say earlier,
3  when we were talking earlier today, that you had
4  relied on Ticor and their auditors and another
5  title company -- I forgot -- was it
6  Plantation --
7  A    No.  Commonwealth is the one we were
8  using.
9  Q    -- with regard to whether or not those
10  were -- it was legal to charge the customers in
11  that fashion?
12       BY MS. CLOTFELTER:  Object to the form.
13  You can answer, if you can.
14  A    We relied on our -- we rely, as far as
15  whether we're doing business correctly, when our
16  underwriters come in and do our audits and they
17  give us all of our pamphlets, our binders and
18  everything.  We rely on all their information.
19  It derives from all of that to know if we're
20  doing things correctly.  When they come in and
21  they do an entire audit, an in-depth audit, if
22  they do not tell us our HUD Settlement
23  Statements are improper, we believe that they

---

Page 253

1  are proper, because we're acting on behalf of
2  them as an agent.
3  Q    Okay; all right.  Have you ever had any
4  training with regard to the Real Estate
5  Settlement Procedures Act?
6  A    I don't believe so.
7  Q    All right.  Have you ever read the RESPA
8  statute?
9  A    No, I don't believe I have.
10  Q    Have you ever read regulation "X", which
11  is the implementing HUD regulation for the RESPA
12  statute?
13  A    I don't know.  I don't believe I have.
14  Q    Okay.  Have you ever read the
15  instructions for filling out a HUD-1 statement
16  that's promulgated by HUD?
17  A    That, I may have.  Some of these I may
18  have read.  The course of mortgage and title
19  lending, I don't know specifically what I have
20  and have not read.
21  Q    Okay.  Well, now, did you take a course
22  in mortgage lending?
23  A    No.  I said in my history of mortgage

---

64 (Pages 250 to 253)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 254

1  lending.
2  Q    Oh, okay. I see. Yeah, I knew I had
3  asked you about it and you didn't -- you didn't
4  tell me you had any training.
5  A    No, I've had a separate course.
6  Q    Okay. Well, have you had any course with
7  regard to mortgage --
8  A    Just to become a title agent.
9  Q    Okay. Well, tell me about that. I don't
10  think you mentioned that before.
11  A    I am a title agent.
12  Q    Okay. I know that. You told me that,
13  but you didn't tell me you had a course that
14  enabled you to --
15  A    Well, no. I mean, you know we are a
16  title agent. I'm an actual agent myself.
17  Q    Okay.
18  A    It varies per year. In the State of
19  Tennessee you have to take a course every year
20  to renew your license to be an agent.
21  Q    All right.
22  A    Most states accept that, except for in
23  our case, Arkansas. And we have to fly there

---

Page 255

1  each year to take an additional one to two hours
2  that they require, because they don't accept
3  Tennessee's credits. But those tests can vary.
4  I mean, they -- you can renew your license every
5  year. It's just an insurance license, and they
6  know what type of an agent you are, but
7  sometimes the test itself might not even cover
8  anything on real estate.
9  Q    Okay. But you have to go every year and
10  take continuing education; is that what you're
11  telling me?
12  A    No, sir. It's mailed to me. I don't
13  actually go somewhere. But, yeah.
14  Q    All right. Does it ever touch on the
15  Real Estate Settlement Procedures Act or
16  mortgage lending?
17  A    I don't know if it ever has.
18  Q    All right. Is it more about how to tell
19  if a title's recorded properly and --
20  A    No. Even when it touches on real estate,
21  it's more like you can't do coercion; you can't
22  do things of that nature with insurance. It's
23  more about how to sell the insurance properly.

---

Page 256

1  Q    Okay. The title insurance itself?
2  A    Uh-huh.
3  Q    All right. We'll go through the rest of
4  these transaction and --
5
6  REPORTER'S NOTE: (At this point, instrument was
7  marked for identification by the Reporter as
8  Plaintiff's Exhibit Number 41, after which, the
9  deposition continued, as follows:)
10
11  Q    (continued by Mr. Underwood) See if you
12  can tell me about the retainage in that one, if
13  any.
14  A    Okay. Looks like $47.00.
15  Q    All right.
16
17  REPORTER'S NOTE: (At this point, instrument was
18  marked for identification by the Reporter as
19  Plaintiff's Exhibit Number 42, after which, the
20  deposition continued, as follows:)
21
22  Q    (continued by Mr. Underwood) Here's
23  another one.

---

Page 257

1  A    It looks like $80.00.
2  Q    Okay.
3
4  REPORTER'S NOTE: (At this point, instrument was
5  marked for identification by the Reporter as
6  Plaintiff's Exhibit Number 43, after which, the
7  deposition continued, as follows:)
8
9  Q    (continued by Mr. Underwood) All right.
10  This is Exhibit 43.
11  A    Looks like $90.00.
12
13  REPORTER'S NOTE: (At this point, instrument was
14  marked for identification by the Reporter as
15  Plaintiff's Exhibit Number 44, after which, the
16  deposition continued, as follows:)
17
18  Q    (continued by Mr. Underwood) Exhibit 44.
19  A    I see no money going back to Swafford for
20  recordings. It went to the borrower for $87.00.
21  Q    And is that one that's in the new -- the
22  period where you're using your present --
23  A    Well, the period must have started

---

65 (Pages 254 to 257)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

| Page 258 | Page 260 |
|---|---|
| 1 before. I knew Homeowners was before the other<br>2 lenders, but it must have been before January of<br>3 '05, because this is an October settlement.<br>4     BY MS. CLOTFELTER: Of '04?<br>5 A   I'm sorry. Of '04. But they may have<br>6 just -- I don't know if this was one of those<br>7 earlier ones that I told you about that the<br>8 borrower might have requested it. I don't know.<br>9<br>10 REPORTER'S NOTE: (At this point, instrument was<br>11 marked for identification by the Reporter as<br>12 Plaintiff's Exhibit Number 45, after which, the<br>13 deposition continued, as follows:)<br>14<br>15 Q   (continued by Mr. Underwood) Okay. I'll<br>16 show you Exhibit 45.<br>17 A   It actually wasn't cut until December of<br>18 '04. I'm vague on the dates on that one.<br>19 Q   Let me see that one.<br>20 A   Looks like $62.00 went back to the<br>21 borrowers.<br>22 Q   Okay. And then that's in your new --<br>23 your current procedure? | 1 have been a collective thing, because we would<br>2 have talked to the closing department and<br>3 everybody else to figure out what's the most you<br>4 ever see in this state or county so we don't<br>5 keep on undercharging.<br>6 Q   Okay. Now, what about with regard to the<br>7 procedure you're using now with refunding the<br>8 overage back to the consumer?<br>9 A   That would be me, because I talked to<br>10 Bill Long with Homeowners and he's the one that<br>11 asked me to do it with Homeowners. And after<br>12 that, when it started working and we really<br>13 weren't seeing many, if any, shortages that<br>14 would occur after the mortgage was recorded,<br>15 meaning releases or affidavits or whatever,<br>16 that's when we decided to do it for all<br>17 companies, and I decided that.<br>18 Q   Okay. Now, did you make any change at<br>19 all -- or did anyone make any change at all at<br>20 Swafford & Hays as a result of the Gibbs and<br>21 Finch lawsuit?<br>22 A   I don't believe so.<br>23 Q   All right. |

| Page 259 | Page 261 |
|---|---|
| 1 A   That's our current, yes, sir.<br>2     BY MR. UNDERWOOD: All right. Let's take<br>3 a quick break. I don't have a whole lot more.<br>4<br>5 REPORTER'S NOTE: (At this point, a brief recess<br>6 was taken, after which, the deposition<br>7 continued, as follows:)<br>8<br>9 Q   (continued by Mr. Underwood) I want to<br>10 follow up on the changes in the procedure with<br>11 regard to the -- I believe it's the line 1201<br>12 fees.<br>13 A   Okay.<br>14 Q   And whose decision was it to change that<br>15 procedure?<br>16 A   As far as charging more money, that would<br>17 have been -- I would have been involved in that,<br>18 and so would my father.<br>19 Q   Okay.<br>20 A   Because we realized we were undercharging<br>21 in almost all recordings.<br>22 Q   Okay.<br>23 A   As far as how much to charge, it would | 1 A   I mean, I remember making the underwriter<br>2 aware of it.<br>3 Q   What did the underwriter tell you about<br>4 the Gibbs and Finch lawsuit?<br>5 A   They really haven't given me much of an<br>6 opinion. I mean, they haven't -- I guess they<br>7 really haven't offered much of a defense,<br>8 because we're -- we have to defend ourselves,<br>9 so -- I don't recall making any changes due to<br>10 that.<br>11 Q   Okay.<br>12 A   I'm sure that when Homeowners suggested<br>13 it, that's probably one of the reasons between<br>14 Homeowners and that, they decided that this is<br>15 going to work this way anyway, why don't we just<br>16 go ahead and do it across the board.<br>17 Q   Right.<br>18     BY MS. CLOTFELTER: Well, don't speculate<br>19 about what Homeowners is thinking or saying.<br>20 Q   (continued by Mr. Underwood) Well, that<br>21 was going to be my next question. Did<br>22 Homeowners know about the Gibbs and Finch<br>23 litigation? |

66 (Pages 258 to 261)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 262

1　A　I don't believe so, unless they were
2　notified by the attorneys that notified me of
3　the lawsuit.
4　Q　Okay.  Did you have any discussion with
5　Homeowners about the Gibbs and Finch litigation?
6　A　No.  Well, I don't believe so prior to
7　us.  I don't know if you all requested any
8　documentation from them or --
9　　　BY MS. CLOTFELTER:  Well, you don't have
10　to testify about anything your lawyers have told
11　you.
12　A　I'm sorry.  No, I haven't told them.
13　Q　(continued by Mr. Underwood)  Have you
14　had any conversations with Homeowners regarding
15　the --
16　A　Let me take a step back.
17　Q　Okay.
18　A　I think I do remember one time telling
19　Bill Long about that possibly.
20　　　BY MS. CLOTFELTER:  About what?
21　A　The Gibbs and Finch lawsuit in passing,
22　but I don't think it was any big to-do.
23　Q　(continued by Mr. Underwood)  But you did

Page 263

1　discuss it with your underwriter?
2　A　I believe so, yeah, at the time.
3　Q　And did you discuss with them the fact
4　that they had told you and you had relied on
5　their information -- or information you had
6　gotten from them in making the charges that you
7　made in the Gibbs and Finch files?
8　A　I don't believe -- no, I didn't get that
9　forthright with them, no.
10　Q　All right.  But it's true, isn't it, that
11　you relied on information that you had gotten
12　from them during audits, et cetera?
13　A　That's a hundred percent true.
14　Q　Okay.  And in making those charges?
15　A　Because if it is point blank wrong to do,
16　I did rely on them to tell me, "Do not do this
17　anymore."  Because I did not know it was wrong.
18　Q　All right.  And as far as you know, you
19　had their expressed approval the way that the
20　Gibbs and Finch files were handled?
21　A　I'm sorry.  Repeat the question.
22　Q　It's late in the afternoon.
23　A　I just missed the first three words.

Page 264

1　It's not like I didn't understand it.  I just
2　missed part of the question.
3　Q　Okay.  Is it true that the way that the
4　line 1201 charges were handled with Gibbs and
5　Finch at least had the past approval of your
6　underwriter?
7　A　The way -- that process the underwriters
8　never told us to stop doing.  Now, whether they
9　picked Gibbs's and Finch's files, obviously I
10　don't know.  But that process you see on Gibbs
11　and Finch that we seem to be doing on every
12　other file prior to our change date, they did
13　see other files, yes.
14　Q　All right.
15　A　And they didn't tell us to stop doing it.
16　They simply said, like I said earlier, that it
17　was suggested to make it payable to Swafford,
18　because it was a gray area, but that's all I was
19　told.
20　Q　All right.  Now, I wanted to ask you
21　another question, too, about the
22　truth-in-lending disclosure.  Now, you
23　realize -- well, you're familiar with

Page 265

1　truth-in-lending, at least.  Well, tell me what
2　your familiarity is with truth-in-lending
3　disclosures.
4　A　All I remember was -- truth-in-lending I
5　mainly dealt with when I was in mortgage
6　lending, which was years ago.  But when I did
7　it, I remember that they required us to put our
8　applications in immediately because
9　truth-in-lending had to go out within, I believe
10　it was, three days, the preliminary one.
11　Q　Right.
12　A　And then, of course, it was under what
13　they called their legal five docs that we had to
14　have signed under no circumstances at closing.
15　It was not one that could be messed up on or
16　mismanaged or what have you.
17　Q　Right.
18　A　And the fees from the HUD derived the
19　truth-in-lending.
20　Q　And you've closed many of these loans
21　yourself and explained truth-in-lending
22　disclosures to consumers; isn't that true?
23　A　Yes.

67 (Pages 262 to 265)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

---

Page 266

1  Q    All right. Does the consumer ever ask
2  you why is my annual percentage rate different
3  from my rate on my note?
4        BY MS. CLOTFELTER:  Object to the form.
5  When? I mean, are you talking about in his past
6  history?
7        BY MR. UNDERWOOD:  Yeah.
8        BY MS. CLOTFELTER:  I don't understand
9  what you're asking.
10        BY MR. UNDERWOOD:  Pat, I just asked
11  him -- I just asked him, "It's true you closed
12  plenty of these loans?  "Yes." And then I asked
13  him, "Did the consumer ever ask you" --
14        BY MS. CLOTFELTER:  You said, "Does the
15  consumer." That's what confused me. You said,
16  "Does the consumer ever" --
17  Q    (continued by Mr. Underwood) Let me just
18  ask it again. It's true, isn't it, that you've
19  closed many of these loans and explained
20  truth-in-lending disclosures to consumers?
21  A    Yes. I used to do that, yes.
22  Q    All right. Did a consumer ever ask you
23  why is my note rate and my APR rate different?

---

Page 267

1  A    Yes, they did.
2  Q    All right. And what would you tell the
3  consumer in that case?
4  A    If I remember correctly --
5  Q    Yeah.
6  A    -- the APR was the cost of doing business
7  the first year and had your fees included in
8  that. It was built into the APR. That was the
9  cost of your interest rate, plus your fees
10  involved in it. And that's a rough summary,
11  because it's been so long since I've closed one.
12  I would have to refresh myself before I could
13  actually explain it.
14  Q    Sure. And the APR contains -- the APR
15  contains things other than just the interest
16  rate; isn't that true?
17  A    Yes, it does.
18  Q    All right. As a matter of fact, it
19  contains all these items that are under this
20  prepaid -- or above this prepaid finance charge
21  total; isn't that true?
22  A    I don't know that, but I would assume so.
23        BY MS. CLOTFELTER:  Don't assume, if you

---

Page 268

1  don't know.
2  A    I don't know that. I don't know what
3  fees on there specifically derive the APR.
4  Q    (continued by Mr. Underwood) Okay.
5  A    I don't actually close the loans for
6  these lenders, and it's been a long time since
7  I've done it myself.
8  Q    Sure. And so you don't recall or have
9  any recollection of --
10  A    I just remember there were fees off the
11  HUD. There were certain fees were not on the
12  HUD, were not in the APR, and certain fees were,
13  but I don't remember which ones. I know that
14  the mortgage lenders were always in there. I
15  mean, most of those funding fees were in there,
16  but that's all I can remember.
17  Q    Okay; all right. Well, you don't know
18  whether or not the fees that are listed on this
19  discloser is a prepaid finance charge or part of
20  the APR or --
21  A    That's when I said I would assume so,
22  because they're on here with it. So I would
23  assume so. But like I said, I don't know -- I'm

---

Page 269

1  not going to tell you for sure I do know,
2  because I don't know. I would have to read it
3  and understand it.
4  Q    All right. Well, let me ask you this, if
5  you could look at these charges that are below
6  that line and tell me if that's in the amount
7  financed. In other words, if these charges are
8  in the amount that are going to be paid by the
9  lender over the -- I mean, paid by the borrower
10  over the life of the loan.
11  A    The prepaid finance charges?
12  Q    No, the ones that are below that line.
13  A    Yes, some of them are.
14  Q    All right
15  A    Because the settlement, the abstract,
16  those fees are in the loan amount.
17  Q    Sure. All the fees that are below that
18  line, it says, "Prepaid finance charge," right?
19  A    Except for the ones that were paid
20  outside of closing. Then they say "paid."
21  Q    Sure. Yeah, I would agree with that
22  statement.
23  A    That's why I said that.

68 (Pages 266 to 269)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

## LEGALINK, A MERRILL COMPANY
### Court Reporting * Legal Videography * Trial Services

---

**Page 270**

1 Q    All right.  And so all of these charges
2 that are out here in this -- in this column in
3 the Saucida truth-in-lending disclosure, all of
4 these are paid over the life of the loan; isn't
5 that correct?
6 A    Yes, I would assume so.
7 Q    All right.  And that's also true of the
8 $120.00 that they paid for the filing fee; isn't
9 that right?
10 A    Yes, that would be so, unless they got a
11 refund.
12 Q    Well, why wouldn't they -- what would be
13 the difference?  Why wouldn't that still be in
14 the amount financed?
15 A    Oh, it would be in the amount financed,
16 yes.
17 Q    Even if they did get a refund; isn't that
18 true?
19 A    Yes.
20 Q    All right.  Because the money wasn't paid
21 to the lender to reduce the amount financed, was
22 it?
23 A    No, it was not.

**Page 271**

1 Q    All right.  And so for whatever the
2 overage was on the Saucida transaction -- in
3 other words, whatever was refunded to them, it's
4 true that they'll pay interest on that amount
5 for the life of the loan, isn't it?
6 A    Yes, it is.  Unless they choose to pay
7 off the loan, yes.
8 Q    Right; okay.
9 A    Which they have the right to do.
10 Q    Sure; yeah.  Does the borrower ever see
11 any of the checks that are written for any of
12 the closings, or are those retained at Swafford?
13 A    If we ever had a wet funding, which means
14 funds at the table, which would only be a
15 purchase, which is rare, and it would only be if
16 it was in Knoxville, because we would have to
17 fund it right then.
18 Q    Okay.
19 A    Typically, most of the lenders that we
20 deal with that are out-of-state and they're
21 asking us to close it outside of state, it would
22 have to be a dry closing, because it's going
23 to -- the funds aren't going to be there the day

**Page 272**

1 of closing.
2 Q    All right.  And the checks that are
3 voided, are those checks actually ever signed?
4 A    I don't know if they're stamped prior to
5 voids being stamped on them or not.
6      THE COURT??????  You mean signed prior to
7 being stamped?
8 A    Yes.  I'm sorry.
9 Q    (continued by Mr. Underwood)  Yeah,
10 they're stamped signed.  Is that how they're
11 signed?
12 A    No, no.  It depends on the person.  We
13 have several authorized signers.  Some people
14 prefer a stamp, some people do not.
15 Q    Okay.
16 A    At this point, no one uses a stamp,
17 because I don't like stamps.
18 Q    All right.
19 A    Because I don't like the security of
20 them.
21 Q    Are the checks actually stamped or marked
22 void?
23 A    They should be stamped or marked, yes.

**Page 273**

1 They're either written on it or stamped.
2 Q    Okay.  Are they retained or are they
3 shredded or --
4 A    They're retained.
5 Q    All right.  Do you keep copies of them?
6 A    I believe so.  I know all of our checks
7 now are on disc, but I think we also keep the
8 hardcopy voided ones.  But once we scan them in
9 the system -- in the files, since it was a
10 voided check, we may not.
11 Q    All right.  Who would know about that?
12 A    Our accountant, Allison Witt.
13      BY MR. UNDERWOOD:  I believe that's all I
14 have.
15
16      (END OF PROCEEDINGS)
17
18
19
20
21
22
23

69 (Pages 270 to 273)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

## LEGALINK, A MERRILL COMPANY
### Court Reporting * Legal Videography * Trial Services

Page 274

1        C E R T I F I C A T E
2
3    STATE OF ALABAMA  )
4              )
5    JEFFERSON COUNTY  )
6
7        I hereby certify that the above and
8    foregoing deposition was taken down by me in
9    stenotype and the questions and answers thereto
10   were transcribed by means of computer-aided
11   transcription, and that the foregoing represents
12   a true and correct transcript of the testimony
13   given by said witness upon said hearing.
14
15       I further certify that I am neither
16   counsel, nor of kin to the parties to the
17   action, nor am I in any way interested in the
18   result of said cause.
19
20
21
22           Kelly J. Gray, C.S.R.
23

Page 275

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

70 (Pages 274 to 275)

a7f3f0e1-70d2-485b-aa2e-e19d35381532

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

DAWN SAUCIDA and JOHNNY )
SAUCIDA, individually and on behalf )
of all similarly situated individuals, )
                                  )
      Plaintiffs, )
                                    )
v.                                ) CASE NUMBER: 05-669
                                    )
SWAFFORD & HAYS SETTLEMENT )
SERVICES, INC., )
                                    )
      Defendant. )

## AMENDED NOTICE OF TAKING VIDEOTAPED DEPOSITION
## UNDER RULE 30(b)(6)

TO:    Patricia Clotfelter
           Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
           Wachovia Tower
           420 20th Street North, Suite 1600
           Birmingham, Alabama 35203

NOW COMES Plaintiff and notices the deposition of Defendant (referred to herein Swafford

or defendant) and pursuant to the provision of FRCP 30(b)(6) said corporation is requested to

designate such person or persons as are competent to testify with regard to the following subject

matter(s):

1. The date Swafford started doing business.

2. The geographical areas in which it does business.

3. The nature of services it performs.

4. Its compliance with RESPA.


PLAINTIFF'S
EXHIBIT
1

1

*AU 11 PA26*

5. The goods and services provided and the charges for such goods and services regarding the real estate transactions of the named plaintiffs herein, Mary Gibbs and Pearlie Finch.

6. The amount paid by Swafford for and such goods and services relating to the named plaintiffs, Mary Gibbs and Pearlie Finch.

7. Its use of third party providers of said services.

8. The identity of all third party service providers used by Swafford.

9. The contractual relationship between Swafford any and all third party service providers.

10. The cost of the services provided by said third party providers.

11. The amount consumers are charged for the services performed by third party providers.

12. Any markup of third party services.

13. Swafford's policy regarding the markup of real estate settlement services provided by third parties.

14. The number of consumer transactions in which consumers were charged more than the actual cost of said third party services.

15. The calculation and charges to consumers related to recording and filing fees.

16. The number of consumer transactions in which consumers were charged more than the actual cost of said recording or filing fee.

17. Swafford's policy regarding the markup of filing and/or recording fees.

18. Any changes and the dates thereof in Swafford's policies regarding the mark-up of filing fees, recording fees and/or services provided by third parties.

## DEPOSITION SUBPOENA DUCES TECUM

On behalf of Requesting Party Swafford is directed to **BRING WITH YOU** and produce at the time and place and date aforestated - certain **ORIGINAL** records, books, papers, documents, tangible things, etc., and to permit inspection and copying of designated things to be used as

2

evidence, to-wit:

## DEFINITIONS:

The term documents means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation records of serial numbers, books of account, books of records, bookkeeping records, ledgers, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations, telephone calls, meetings or other invoices, worksheets, and all drafts, alternations, modifications, changes and amendments of any of the foregoing). The term document shall also include any and all other means by which information is recorded or transmitted, including but not limited to microfilms and other film records or impressions, tape recordings and other recordings used in data processing, together with the programming instructions and other written material necessary to understand or use such punch cards, computer cards or printouts, tapes or other recordings. Writings shall include, without limitation, printed, typed, or other readable papers, correspondence, memos, reports, including without limitation, contracts, drafts, both initial and subsequent, diaries, logbooks, minutes, notes, studies, surveys and forecasts.

1.  Any and all references, manuals and other writings whether in paper or electronic format regarding Swafford's compliance with RESPA.

2.  Any and all references, manuals and other writings whether in paper or electronic format regarding the provision of real estate settlement services to consumers.

3.  Any and all contracts between Swafford and third party service providers.

4.  Any and all references, manuals, and other writings whether in paper or electronic format regarding any markup of third party services.

5.  Any and all references, manuals, and other writings whether in paper or electronic format regarding any markup of filing and/or recording fees.

Hall-Frazier
Record - 000949

**PLEASE NOTE THAT WE ARE NOT SEEKING THE PRODUCTION OF ANY DOCUMENTS THAT ARE SUBJECT TO ATTORNEY CLIENT PRIVILEGE.**

The deposition shall be taken on the **19th day of May, 2006**, beginning at **9:00 a.m.** at the law offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC., Wachovia Tower, 420 20th Street North, Suite 1600, Birmingham, Alabama 35203, and shall continue to completion.

                                 Earl P. Underwood, Jr.
                                 Attorney for Plaintiffs

**OF COUNSEL:**
**Law Offices of Earl P. Underwood, Jr.**
**Post Office Box 969**
**21 South Section Street**
**Fairhope, AL 36533-0969**
**251-990-5558**
**251-990-0626 (facsimile)**
**epunderwood@alalaw.com**

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy hereof has been personally hand-delivered or mailed, properly addressed, first class postage prepaid, to counsel of all parties or parties pro se to the addresses shown below, on this the 24th day of April, 2006.

Patricia Clotfelter
Ellen H. Dover
Baker, Donelson, Bearman, Caldwell & Berkowitz
1600 Wachovia Tower
420 20th Street North
Birmingham, Alabama 35203
205-328-0480
pclotfelter@bakerdonelson.com
ehenderwon@bakerdonelson.com

George R. Irvine, III
Stone, Grenade & Crosby, P.C.
7133 Stone Dr.
Daphne AL 36526
334-626-6696
gri@sgclaw.com

Kenneth J. Riemer
166 Government Street, Suite 100
Mobile, AL 36602
251-432-9212
kriemer@bntech.net

_____
Earl P. Underwood, Jr.

5

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

MARY GIBBS and PEARLIE FINCH,          *

     Plaintiffs,          *          CIVIL ACTION NO.

vs.          *          CV-<u>2004-1696</u>

SWAFFORD AND HAYS          *
SETTLEMENT SERVICES, INC.,

     Defendant.          *          KJR WORK COPY

### SUPPLEMENT RESPONSE OF DEFENDANT TO DISCOVERY

     Swafford and Hays Settlement Services, Inc., Defendant in this cause, for further response to plaintiffs' first set of interrogatories and request for production pursuant to the court's order of July 22, 2005, says as follows:

     9.     Identify each and every borrower located in the state of Alabama who was charged any amount for "state tax/stamps" as described on Line 1203 of the HUD-1 form.

     **Response:**     See attached lists identifying borrowers with disbursement dates from January 1, 2001 through December 31, 2003.

     18.     Identify each and every borrower located in the state of Alabama for whom you have provided settlement services over the last ten (10) years.

     **Response:**     See response to 9.

     19.     State the number of borrowers for whom you have provided settlement services within the last 10 years.

     **Response:**     7,702.

     20.     State whether you provide settlement services for customers located in states other


PLAINTIFF'S EXHIBIT


2

than Alabama. If your answer is yes, identify each and every such state.

Response:        Yes. Arkansas, Connecticut, Delaware, Florida, Georgia, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Rhode Island, South Carolina, Tennessee, Vermont, Virginia and West Virginia.

SWAFFORD AND HAYS SETTLEMENT SERVICES, INC.

By:    _____

GREG SWAFFORD
It's President

COUNTY OF KNOX
STATE OF TENNESSEE

Personally appeared before me the undersigned Notary Public in and for said County and said State, Greg Swafford, who is known to me and who, after having been first duly sworn, doth depose and say that the foregoing answers to Interrogatories are true and correct to the best of his knowledge, information and belief, and that he executes the same as President of Swafford and Hays Settlement Services, Inc. on this _____ day of August 2005.

_____
NOTARY PUBLIC
My Commission Expires: _____

PLAINTIFF'S
EXHIBIT
2

_____
JOHN N. LEACH (LEA006)
LOUISA L. STOCKMAN (LON040)
Attorneys for Defendant Swafford and Hays
Settlement Services, Inc.

Hall-Frazier
Record - 000953

Of Counsel:
HELMSING, LEACH, HERLONG,
    NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, Alabama 36652
(251) 432-5521
(251) 432-0633 (Fax)


## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing on the following parties or counsel by placing

a copy of same in the United States mail, first class postage prepaid and properly addressed on this

_____ day of August, 2005.


George R. Irvine, III, Esquire
Stone, Granade & Crosby, P.C.
7133 Stone Drive
Daphne, AL 36526

Kenneth J. Riemer, Esquire
P. O. Box 1206
Mobile, AL 36633-1206


OF COUNSEL

(Printed on Mar 22, 2005 @ 18:14)

US Department of Housing and Urban Development

OMB No. 2502-0265

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 05-1031 | Loan Number: 20204206 | Mortgage Ins. Case #: |
|---|---|---|

**NAME AND ADDRESS OF BORROWER/BUYER:**
Traci R. Durrance 1015 Redbud Circle Plant City, Fl. 33563

**NAME AND ADDRESS OF LENDER:**
Homeowners Loan Corp. 3854 American Way Suite A-5 Baton Rouge, LA

**PROPERTY LOCATION (Brief Legal):**
1015 Redbud Circle Plant City , FL. 33563

| SETTLEMENT AGENT:  Swafford and Hays Settlement Services, Inc.  865-539-1450 Contact: Shannon Odom | PLACE OF SETTLEMENT:  9041 Executive Park Drive, Suite 400 Knoxville, TN 37923 |
|---|---|
| SETTLEMENT DATE:  03/23/2005 | DISBURSEMENT DATE:  03/28/2005 |

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| **800. Items Payable In Connection With Loan** | | 1501. Payoff Acct# 268928-1 Good Thru 4/01/0 | |
| 801. Loan Origination Fee    To: Homeowners Loan Corp. | 1,387.43 | To: National City Mortgage | 123,090.07 |
| 802. Loan Discount | | 1502. Payment | |
| 803. Appraisal Fee  POC $300.00    To: Nicole Dufala | 50.00 | To: Citi | 16,744.00 |
| 804. Credit Report  Credit Report POCL $8.50 | | 1503. Payment | |
| 805. Lender's Inspection Fee | | To: Texaco/Citi | 779.00 |
| 806. Mortgage Insurance Application Fee | | 1504. Payment | |
| 807. Assumption Fee | | To: HSBC/BSBUY | 703.00 |
| 808. Processing\Underwriter Fee    To: Homeowners Loan | 390.00 | 1505. Payment | |
| 809. Funding Fee    To: Homeowners Loan | 365.00 | To: Pier 1 | 220.00 |
| 810. Administration Fee    To: Homeowners Loan | 295.00 | 1506. | |
| 811. Document Preparation Fee    To: Homeowners Loan | 195.00 | | |
| 812. Tax Service Fee    To: Land America | 63.00 | 1507. | |
| **900. Items Required By Lender To Be Paid In Advance** | | 1508. | |
| 901. Interest from | | | |
| 902. Mortgage Insurance Premium for | | 1509. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1510. | |
| 905. | | | |
| **1000. Reserves Deposited With Lender** | | 1511. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1512. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1513. | |
| 1005. Annual assessments | | | |
| 1006. | | 1514. | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment | | 1515. | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee    To: Swafford and Hays Settle | 200.00 | | |
| 1102. Abstract or title search    To: Swafford and Hays Settleme | 375.00 | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1103. Title examination    To: Swafford and Hays Settlement Se | 225.00 | | 141,536.07 |
| 1104. Title insurance binder | | N. Net Settlement | |
| 1105. Document preparation | | | |
| 1106. Notary Fees | | 1600. Loan Amount | 147,000.00 |
| 1107. Attorney's Fees | | | |
| (Includes above item numbers:  ) | | 1601. Plus Check/Cash from Borrower | |
| 1108. Title Insurance    To: American Pioneer Title Insurance Co | 810.00 | | |
| (Includes above item numbers:  @ 810.00 | | 1602. Minus total settlement charges | 5,463.93 |
| 1109. Lender's coverage 147,000.00 @ 810.00 | | (Line 1400) | |
| 1110. Owner's coverage  @ 0.00 | | 1603. Minus total Disbursements to | 141,536.07 |
| 1111. Title Service Fee    To: Swafford and Hays Settlement Serv | 75.00 | Others (line 1520) | |
| 1112. | | 1604. Equals disbursements to borrower | |
| 1113. Overnight Courier & Handling Fees | | | |
| **1200. Govt. Recording, Transfer, and Service Fees** | | | |
| 1201. Recording fees:    To: Clerk of the Court | 225.00 | | |
| 1202. City/county tax/stamps:    Mortgage $294.00   To: Clerk o | 294.00 | | |
| 1203. State tax/stamps:    Deed $0.00  Mortgage $514.50   To: Cl | 514.50 | | |
| 1204. | | | |
| 1205. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Survey | | | |
| 1302. Pest inspection | | | |
| 1303. Flood Determination POCL $9.50 | | | |
| 304. | | | |
| 1305. | | | |
| **1400. Total settlement charges (enter on line 1602)** | 5,463.93 | | |

The undersigned hereby acknowledge receipt of a completed copy of this statement. To the best of my knowledge, the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and which will be disbursed by the undersigned as part of the settlement of this transaction.

x Brenda Coon _____
Swafford and Hays Settlement Services, Inc.

x Traci R. Durrance _____
Traci R. Durrance

**PLAINTIFF'S EXHIBIT**

3

**Hall-Frazier**
**Record - 000955**

Date Printed: Tuesday, March 28, 2006 10:30:37 AM

## Disbursement Sheet

| Order #: 05-1031 | Settlement Date: 03/23/2005 | | Disbursement Date: 03/28/2005 |
|---|---|---|---|
| Buyer: | Traci R. Durrance, a single person | Money Out: | $144,304.57 |
| Seller: | | Money In: | $144,304.57 |
| Property: | 1015 Redbud Circle Plant City , FL  33563 | Difference: | $0.00 |
| Lender: | Homeowners Loan Corp. | | |
| Loan #: | 20204206 | | |

### Money Out

| Ref# | Date | Name | Hud | Detail | | Amount |
|---|---|---|---|---|---|---|
| 00025320 | 3/28/2005 11:26:27 AM | Swafford and Hays Settlement Services, Inc. | 1102 | | | |
| | | | 1103 | Abstract or title search | | $375.00 |
| | | | 1108 | Title examination | | $225.00 |
| | | | | Title Insurance | | $567.00 |
| | | | | | Total: | $1,167.00 |
| 00025321 | 3/28/2005 11:26:27 AM | Swafford and Hays Settlement Services, Inc. | 1101 | Settlement or closing fee | | $200.00 |
| | | | | | Total: | $200.00 |
| 00025322 | 3/28/2005 11:26:27 AM | Swafford and Hays Settlement Services, Inc. | 1111 | Title Service Fee | | $75.00 |
| | | | | | Total: | $75.00 |
| 00025323 | 3/28/2005 11:26:27 AM | Swafford and Hays Settlement Services, Inc. | 1108 | Title Insurance | | $243.00 |
| | | | | | Total: | $243.00 |
| 00025356 | 3/29/2005 11:34:12 AM | Traci R. Durrance | 1201 | Recording fees: | | $45.00 |
| | | | | | Total: | $45.00 |
| 00025324 | 3/28/2005 11:26:27 AM | Nicole Dufala | 803 | Appraisal Fee  POC $300.00 | | $50.00 |
| | | | | | Total: | $50.00 |
| 00025325 | 3/28/2005 11:26:27 AM | National City Mortgage | 1501 | Payoff Acct# 268928-1 Good Thru 4/01/05 | | $123,090.07 |
| | | | | | Total: | $123,090.07 |
| 00025326 | 3/28/2005 11:26:27 AM | Citi | 1502 | Payment | | $16,744.00 |
| | | | | | Total: | $16,744.00 |
| 00025327 | 3/28/2005 11:26:27 AM | Texaco/Citi | 1503 | Payment | | $779.00 |
| | | | | | Total: | $779.00 |
| 00025328 | 3/28/2005 11:26:27 AM | HSBC/BSBUY | 1504 | Payment | | $703.00 |
| | | | | | Total: | $703.00 |
| 00025329 | 3/28/2005 11:26:27 AM | Pier 1 | 1505 | Payment | | $220.00 |
| | | | | | Total: | $220.00 |
| 00025357 | 3/29/2005 11:34:12 AM | HILLSBOROUGH COUNTY CLERK OF THE CIRCUIT COURT | 1202 | City/county tax/stamps:    Mortgage $294.00 | | $294.00 |
| | | | | | Total: | $294.00 |
| 00025358 | 3/29/2005 11:34:12 AM | HILLSBOROUGH COUNTY CLERK OF THE CIRCUIT COURT | 1203 | State tax/stamps:   Deed $0.00 Mortgage $514.50 | | $514.50 |
| | | | | | Total: | $514.50 |
| 00025359 | 3/29/2005 11:34:12 AM | HILLSBOROUGH COUNTY CLERK OF THE CIRCUIT COURT | 1201 | Recording fees: | | $180.00 |
| | | | | | Total: | $180.00 |

### Money In

| Ref# | Date | Name | Hud | Detail | | Amount |
|---|---|---|---|---|---|---|
| 05-1031/Lender/1 | 03/29/2005 | Homeowners Loan Corp. | | | | |
| | | | 808 | Processing\Underwriter Fee | | ($390.00) |
| | | | 809 | Funding Fee | | ($365.00) |
| | | | 810 | Administration Fee | | ($295.00) |
| | | | 811 | Document Preparation Fee | | ($195.00) |
| | | | 801 | Loan Origination Fee | | ($1,387.43) |
| | | | 1600 | Loan Amount | | $147,000.00 |
| | | | 812 | Tax Service Fee | | ($63.00) |
| | | | | | Total: | $144,304.57 |

**Hall-Frazier**
**Record - 000956**

Date Printed: Tuesday, March 28, 2006  10:30:20 AM

## LEDGER CARD

Order #: 05-1031
Buyer/Borrower : Traci R. Durrance
Seller :
Lender Name : Homeowners Loan Corp.
Loan Number : 20204206
Property Address : 1015 Redbud Circle, Plant City , FL  33563

## POSTED ESCROWS

| ID# | Bank Name | Account # | Address | City | State | Balance |
|-----|-----------|-----------|---------|------|-------|---------|
| fl | Bank of America - FL | 005489521503 | | | | 0.00 |

### DEPOSITS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 03/29/2005 | funding wire | alisonw | 03/31/2005 | Homeowners Loan Corp. | 144,304.57 |
| **\*TOTAL DEPOSITS** | | | | | **144,304.57** |

### CHECKS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 03/28/2005 | 00025319v | m.lay | 03/31/2005 | Clerk of the Court | (1,033.50) |
| 03/28/2005 | 00025320 | m.jerger | 03/31/2005 | Swafford and Hays Settlement Services, Inc. | (1,167.00) |
| 03/28/2005 | 00025321 | m.jerger | 03/31/2005 | Swafford and Hays Settlement Services, Inc. | (200.00) |
| 03/28/2005 | 00025322 | m.jerger | 03/31/2005 | Swafford and Hays Settlement Services, Inc. | (75.00) |
| 03/28/2005 | 00025323 | m.jerger | 03/31/2005 | Swafford and Hays Settlement Services, Inc. | (243.00) |
| 03/28/2005 | 00025324 | m.jerger | 04/30/2005 | Nicole Dufala | (50.00) |
| 03/28/2005 | 00025325 | m.jerger | 04/30/2005 | National City Mortgage | (123,090.07) |
| 03/28/2005 | 00025326 | m.jerger | 04/30/2005 | Citi | (16,744.00) |
| 03/28/2005 | 00025327 | m.jerger | 04/30/2005 | Texaco/Citi | (779.00) |
| 03/28/2005 | 00025328 | m.jerger | 04/30/2005 | HSBC/BSBUY | (703.00) |
| 03/28/2005 | 00025329 | m.jerger | 04/30/2005 | Pier 1 | (220.00) |
| 03/29/2005 | 00025356 | m.lay | 06/30/2005 | Traci R. Durrance | (45.00) |
| 03/29/2005 | 00025357 | m.lay | 04/30/2005 | HILLSBOROUGH COUNTY CLERK OF THE CIRCUIT COURT | (294.00) |
| 03/29/2005 | 00025358 | m.lay | 04/30/2005 | HILLSBOROUGH COUNTY CLERK OF THE CIRCUIT COURT | (514.50) |
| 03/29/2005 | 00025359 | m.lay | 04/30/2005 | HILLSBOROUGH COUNTY CLERK OF THE CIRCUIT COURT | (180.00) |
| **\*TOTAL CHECKS** | | | | | **(145,338.07)** |

### VOIDS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 03/28/2005 | 00025319 | m.lay | 03/31/2005 | Clerk of the Court | 1,033.50 |
| **\*TOTAL VOIDS** | | | | | **1,033.50** |

| **\*\*TOTALS FOR: fl** | **0.00** |
|---|---|

**\*\*\*POSTED TOTAL**      **0.00**

## PENDING ESCROWS

**\*\*\*\*TOTAL(POSTED + PENDING)**      **0.00**

**Hall-Frazier**
**Record - 000957**

| File Number: 04-11332 | Loan Number: 10241506 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER/BUYER:
Johnny Saucida 7154 San Marino Drive Theodore, AL 36582
Dawn Saucida ,

NAME AND ADDRESS OF LENDER:
Homeowners Loan 4501 Circle 75 Parkway Suite F6300 Atlanta, GA 30339

PROPERTY LOCATION (Brief Legal):
7154 San Marino Drive Theodore, AL  36582

PLAINTIFF'S EXHIBIT
4

SETTLEMENT AGENT:
Swafford and Hays Settlement Services, Inc.  865-539-1450 Contact: Danny Moore

PLACE OF SETTLEMENT:
9041 Executive Park Drive, Suite 400 Knoxville, TN  37923

SETTLEMENT DATE:
11/19/2004

DISBURSEMENT DATE:
11/24/2004

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| **800. Items Payable In Connection With Loan** | | 1501. Payoff good thru 12/4 | |
| 801. Loan Origination Fee    To: Homeowners Loan | 2,989.00 | To: Harold & Edna Tillman | 46,134.7 |
| 802. Loan Discount | | 1502. 04 Taxes | |
| 803. Appraisal Fee    To: Dinkins Appraisal Group | 300.00 | To: Mobile County Tax Collector | 235.6 |
| 804. Credit Report Credit Report POCL $8.50 | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. Assumption Fee | | | |
| 808. Processing\Underwriter Fee    To: Homeowners Loan | 390.00 | 1505. | |
| 809. Funding Fee    To: Homeowners Loan | 365.00 | | |
| 810. Administration Fee    To: Homeowners Loan | 295.00 | 1506. | |
| 811. Document Preparation Fee    To: Homeowners Loan | 195.00 | | |
| 812. Tax Service Fee    To: Homeowners Loan | 63.00 | 1507. | |
| **900. Items Required By Lender To Be Paid In Advance** | | 1508. | |
| 901. Interest from | | | |
| 902. Mortgage Insurance Premium for | | 1509. | |
| 903. Hazard Insurance Premium for    To: AllState | 1,226.30 | | |
| 904. | | | |
| 905. | | 1510. | |
| **1000. Reserves Deposited With Lender** | | | |
| 1001. Hazard insurance | | 1511. | |
| 1002. Mortgage insurance | | | |
| 1003. City property taxes | | 1512. | |
| 1004. County property taxes | | | |
| 1005. Annual assessments | | 1513. | |
| 1006. | | | |
| 1007. | | 1514. | |
| 1008. Aggregate Accounting Adjustment | | | |
| **1100. Title Charges** | | 1515. | |
| 1101. Settlement or closing fee    To: Swafford and Hays Settle | 200.00 | | |
| 1102. Abstract or title search    To: Swafford and Hays Settleme | 375.00 | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1103. Title examination    To: Swafford and Hays Settlement Se | 225.00 | | 46,370.3 |
| 1104. Title insurance binder | | N. Net Settlement | |
| 1105. Document preparation | | | |
| 1106. Notary Fees | | 1600.  Loan Amount | 62,500.0 |
| 1107. Attorney's Fees | | | |
| (Includes above item numbers:  ) | | 1601.  Plus Check/Cash from Borrower | |
| 1108. Title Insurance    To: American Pioneer Title Insurance Co | 200.00 | | |
| (Includes above item numbers:  ) | | 1602.  Minus total settlement charges | 7,112.0 |
| 1109. Lender's coverage  @ | | (Line 1400). | |
| 1110. Owner's coverage  @ 0.00 | | 1603.  Minus total Disbursements to | 46,370.3 |
| 1111. Title Service Fee    To: Swafford and Hays Settlement Serv | 75.00 | Others (line 1520) | |
| 1112. | | 1604.  Equals disbursements to borrower | 9,017.6 |
| 1113. Overnight Courier & Handling Fees | | | |
| **1200. Govt. Recording, Transfer, and Service Fees** | | | |
| 1201. Recording fees:    To: Clerk of the Court | 120.00 | | |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps:  Deed $0.00  Mortgage $93.75  To: Cle | 93.75 | | |

PLAINTIFF'S
EXHIBIT
5



4501 Circle 75 Parkway, Suite D-4100  Atlanta, Georgia  30339
(770) 850-6800 - Office  (770) 850-8423 - Fax

## Closing Instructions

**Lender:** HOMEOWNERS LOAN CORP.
4501 CIRCLE 75 PARKWAY, SUITE D4100
ATLANTA, GA 30339

**Borrower(s):** JOHNNY SAUCIDA

**Loan Closer:** Jordan, Tammy

**Phone:** (770) 850-6800
(770) 812-8314

**Property Address:**
7154 SAN MARINO DR
THEODORE, AL 36582

**Closing Date:** 11/19/2004

| | |
|---|---|
| **Loan Number:** | 3000004187 |
| **Loan Amount:** | $ 62,500.00 |
| **Loan Type:** | Conventional |
| **Loan Term:** | 360 months |
| **Interest Rate:** | 10.250% |
| **Funding Date:** | 11/24/2004 |

**Vesting:** JOHNNY SAUCIDA AND DAWN SAUCIDA, AS TENANTS IN COMMON WITH
EQUAL INTERESTS DURING THEIR JOINT LIVES, AND UPON THE DEATH
OF EITHER OF THEM TO THE SURVIVOR OF THEM

**A. GENERAL:** These are the Closing Instructions with which you, as Settlement Agent, must comply in closing the loan described above for Homeowners Loan Corp. ("HLC"). Enclosed are the loan documents for execution. **Strict compliance with these instructions is required, and a fine of $50 will be imposed for each failure to follow these Closing Instructions in closing this loan.**

**B. PREPARATION AND APPROVAL OF SETTLEMENT STATEMENT:** You are responsible for the preparation of the Settlement Statement. HLC requires the use of the HUD-1A form for all refinances and the HUD-1 for all purchases. The Settlement Statement must be sent by e-mail to, and approved by, HLC's Closing Department before closing. Once approved, the Settlement Statement may not be changed for any reason without the written approval of HLC's Closing Department.

    1. The Settlement Statement approved for use by HLC's Closing Department must contain the following charges and disbursements, and no others:

Swafford/Saucida

SWA 000017

| DESCRIPTION | | BORROWER | SELLER |
|---|---|---|---|
| Loan Amount | | 62,500.00 | |
| Lender Paid Closing Costs | | | |
| Origination Fee | | 2,969.00 | |
| Inspection Fee | | | |
| Commitment Fee | | | |
| Administration Fee | | 295.00 | |
| Underwriting Fee | | | |
| Tax Service Fee | | 83.00 | |
| Processing/Underwriting Fee | | 390.00 | |
| Funding Fee | | 385.00 | |
| Doc Prep Fee | | 195.00 | |
| Processing Fee to | | 390.00 | |
| Credit Report (POC-L) | | | |
| Flood Determination (POC-L) | | | |
| Total Payoffs (Addendum A Attached) | | 47,596.85 | |
| 1st Year Hazard Ins Prem | | | |
| 1st Year Flood Ins Prem | | | |
| Closing Fee | | 200.00 | |
| Title Insurance | | 200.00 | |
| Recording Fees | | 120.00 | |
| State Tax/Stamps | | | |
| Hazard | Mos. @ | | |
| Property Tax | Mos. @ | | |
| Flood Insurance | Mos. @ | | |
| Aggregate Adjustment | | | |
| Appraisal Fee DINKINS APPRAISAL GROUP | | 300.00 | |
| Credit Report Fee | | | |
| Prepaid Interest | | | |
| Doc Prep Fee | | | |
| Attorney Fee | | 200.00 | |
| Abstract or Title Search | | 375.00 | |
| Title Examination Swafford & Hays | | 225.00 | |
| City/County/Tax/Stamps | | | |
| Survey | | | |
| Pest Inspection | | | |
| Property Inspection | | | |
| Loan Proceeds To | | | |
| Discount Fee | % (of Loan Amount) | 0.00 | |
| Title Service | | 390.00 | |
| | | | |
| | | | |
| MORTGAGE/DOT TAX | | 93.75 | |
| | | | |
| PAYOFFS | | 47,596.85 | |

Swafford/Saucida

SWA_000018

Hall-Frazier
Record - 000960

2.    Recording Fees - You are required to ensure that the amount of recording fees and other assessments necessary to perfect HLC's lien is the exact amount required by the recorder, clerk or other appropriate government official, but shall not include any additional fees or charges. If a Loan is closed and the amount withheld is erroneous, you shall make complete monetary restitution to either the Borrower(s), HLC and/or appropriate government official for the amount of the error and provide the Borrower and HLC with all necessary corrective documents.
3.    Required Information.  The Settlement Statement must contain HLC's loan number, the title commitment number, the closing date and the projected disbursement date.
4.    Third Party Participation.  If there is a third party involved in the Loan transaction (other than the buyer and seller), the type and nature of the third-party participation must be approved in writing by HLC's Vice President of Risk Management and disclosed on the Settlement Statement.

C.    CLOSING THE LOAN:  The following rules apply to all closings:

1.    You must verify that the individuals signing any documents are the proper parties by all means available, including obtaining copies of driver's licenses with photographs and any other identification available
2.    Each Borrower must sign all documents in blue ink exactly as their name appears, and only where their name appears, and must initial each page of each document where indicated.  The Borrower(s) may not omit to sign any document on which their typewritten name appears.
3.    All documents must be witnessed and/or notarized where indicated, and the notary seal must be visible.  Where required by state law, an attorney must be present at the closing.
4.    Both the Settlement Agent and the Borrower(s) must sign the Settlement Statement.
5.    If execution of a quitclaim or warranty deed is required in connection with the closing, the deed must be executed by all parties either at or before the closing, and the original of the deed must be delivered to you in order for the closing to proceed.
6.    If the Settlement Statement reflects that the Borrower(s) must bring money to the closing, the closing agent must collect these funds prior to allowing execution of the Settlement Statement and the loan documents.
7.    The Receipt of Notice of Right To Cancel must be signed and dated by each Borrower or other person having the right to rescind the Loan.
8.    At the closing, you must provide each Borrower with copies of all documents (and two copies of the Notice of Right to Cancel if a refinance), and obtain from the Borrower(s) a signed acknowledgement of receipt of copies of all documents.
9.    Any changes to documents or forms must be authorized in writing by HLC's Closing Department and initialed by all signatories.
10.    No Loan may close using a Power of Attorney for any signatory without the prior written approval of an HLC underwriter.
11.    There can be no faxed documents used at closing.
12.    You must be licensed to close loans in the state where the property serving as security for the Loan is located, and the Loan must be closed in accordance with all municipal, state and federal statutes, laws, regulations, and/or ordinances of the specific jurisdiction in which the property is located.
13.    All executed documents must be received by HLC via overnight courier (10:00 am only) no later than the fourth day following the Closing Date, including Saturdays, but excluding Sundays and all bank holidays.

D.  DELIVERY OF EXECUTED LOAN DOCUMENTS:  The executed Loan Documents, except for the original Mortgage, Deed of Trust or Security Instrument, and any Warranty Deed or Quitclaim Deed executed in connection with the closing, must be delivered within the time period stated above in the following stacking order specified on Addendum B attached. You must send the original Mortgage, Deed of Trust or Security Instrument and any Deed of Conveyance, to the appropriate county register's office or courthouse for recording as soon as practical following the closing.

E.  FUNDING AND DISBURSEMENT OF LOAN PROCEEDS:  The following procedures will apply to the funding of the Loan Proceeds from HLC to the Settlement Agent, and to the disbursement of the Loan Proceeds from the Settlement Agent for the benefit of the Borrower(s) according to the Settlement Statement:

1.    Funding the Loan to the Settlement Agent - The following documents must be faxed to the HLC's Funding Specialist no later than one day prior to the Fund Date. As detailed in the separate Funding Authorization Process, which is incorporated by reference into these Closing Instructions, the Loan will be funded by HLC to the Settlement Agent only after the Funding Specialist has received the following signed Loan documents by fax, e-mail or overnight courier the day prior to the Funding Date, and reviewed them for completeness and accuracy: (a) Note; (b) 1st and Signature pages of Mortgage, Deed of Trust or Security Instrument; (c) Settlement Statement (HUD 1 or HUD 1A); (d) TIL; and (e) Right To Cancel. If the executed Loan Documents are also received and reviewed by HLC prior to funding, the funding may be stopped for missing or inaccurate Loan Documents discovered in HLC's full package review.
2.    Disbursement of the Loan Proceeds for the benefit of the Borrower(s) - Once the funds are received by the Settlement Agent, they must be disbursed for the benefit of the Borrower immediately exactly as stated on the executed Settlement Statement. No disbursement is permitted except as agreed on the Settlement Statement without the written consent of a Vice President of HLC. Upon disbursement of the loan proceeds, you must send a copy of the disbursement ledger by fax to HLC's Post Closing Department at (770) 850-1455.
3.    Secured Lien Payoffs and Hazard Insurance Checks - Disbursement checks to lien holders and to the hazard insurance company, if applicable, must be delivered by the Settlement Agent to the Payee.  For lien holders, the Settlement Agent is responsible for verifying the Payee's address and for obtaining all necessary releases, cancellations, re-conveyances or satisfactions of encumbrances from the Payee. The Settlement Agent should send all remaining disbursement checks to the Borrower(s).

Swafford/Saucida

SWA  000019

4.   Delays in Disbursement - If the Loan proceeds to do not disburse to the Borrower within 24 hours of your receipt of the funds from HLC, you must return the funds to HLC immediately in the same manner as received.
5.   Rights of Rescission - If a Loan is subject to a right to rescind the transaction until midnight of the third business day following the signing of all Loan Documents, the Settlement Agent shall not disburse any Loan proceeds until the 3-day rescission period has expired without rescission by the borrower(s)/mortgagors.  The rescission period may not be waived.  If you become aware that anyone with a right to rescind elects to rescind the transaction, immediately notify HLC's Funding Department and immediately return the loan proceeds in the same manner as received.  Unless required by state law, you are not authorized to accept a rescission on behalf of HLC.

**F.  TITLE POLICY AND RECORDED MORTGAGE DELIVERY REQUIREMENTS:** As soon as practical, but in no event in more than 55 days following the Closing Date (except as noted in paragraph 5 below), you must deliver to HLC the original recorded Mortgage, Deed of Trust or Security Instrument and an original Title Insurance Policy conforming to these requirements:

1.   HLC requires a current standard American Land Title Association ("ALTA") Title Policy in the amount stated as "Loan Amount" above insuring "Homeowners Loan Corp., its successors and/or assigns."
2.   Title should be vested and all endorsements included, as stated in the most current Title Commitment issued in connection with the Loan.
3.   The title policy must insure first and/or second lien position in favor of HLC, as appropriate, and must insure over all exceptions which would jeopardize the marketability of title.  No other liens or encumbrances will be permitted without the express prior written approval of HLC, except for: (a) Easements of record and any unrecorded easements of which we have knowledge; (b) Taxes which are not yet due and payable; (c) Restrictions which are not violated and insurance that future violations will not cause a forfeiture or reversal of title; and (d) General survey exceptions.
4.   No Loan may close with subordinate liens without the written approval of an HLC underwriter. If you learn of any subordinate liens or secondary financing transactions other than those previously approved by HLC, **DO NOT CLOSE THE LOAN.**
5.   If the Mortgage, Deed of Trust or Security Instrument is to be recorded in a county that does not return recorded documents within a time frame to allow you to comply with the 55 day deadline for return of recorded documents, you must notify HLC of this fact in writing when returning the executed loan documents, and state in this notice the projected date that the recorded document will be delivered.

**G.  STATE LAW:** If state law prohibits or restricts any provision contained within these Closing Instructions, the law of the state where the property serving as security for the Loan is located will apply in lieu of the provisions as stated herein. Further, closings in certain states require execution by the Borrower(s) of attorney preference disclosures or other acknowledgments.  If you are conducting this closing for HLC in one of these states, there will be additional separate closing instructions that shall supplement these Closing Instructions, to insure adherence to all applicable state law.

**H.  PROTECTION OF CUSTOMER INFORMATION:** You shall not provide any information regarding any HLC customer to a third party not necessary to facilitate the closing of the Borrower's / Customer's loan transaction, the processing of documents, or the execution of all subsequent functions necessary to complete the loan transaction.  In addition, by accepting this engagement to close this Loan, you agree to ensure that all documents and/or files (hard paper or electronic) containing any customer information are protected against intrusion from third parties and physical damage, such as fire or natural disaster.  This provision shall survive any termination of the business relationship between you and HLC.

**Settlement Agent acknowledges receipt of these Closing Instructions and, by the signature of the authorized representative below, agrees and understands that it will be the responsibility of Settlement Agent to close any and all loans referred to it by HLC in compliance with these Closing Instructions as they may hereafter be modified, amended or supplemented in writing, signed by an authorized officer of HLC.**

_Jane Carcello_
Settlement Agent

Date: _11/23/04_

Swafford/Saucida

SWA 000020

Hall-Frazier
**Record - 000962**

ADDENDUM A
(PAYOFFS)

| | |
|---|---|
| Harold & Edna Tillman | $ 46,134.71 |
| property taxes | $ 235.64 |
| ALLSTATE | $ 1,226.30 |

TOTAL DEBTS TO BE PAID OFF:    $ 47,596.65

Swafford/Saucida

SWA 000021

ADDENDUM B
(Stacking Order)
**Please return these closing Instructions to HLC with documents delivered checked off from this list.**

Original Note & Riders to the Note, plus **2 Certified True Copies**

**2 Certified True Copies of Mortgage/Deed of Trust/Security Instrument and Riders w/Legal Description Attached.**

Title Insurance Commitment

Final Signed and initialed 1003(Loan Application)

Original Settlement Statement & **1 Certified True Copy**

Truth in Lending Disclosure Statement

Affidavit of Common Identity

Notice of Right to Cancel

Requests for Taxpayer W-9, 4506 & 8821

Closing Instructions

Cash Out Letter

Identification Affidavit

Privacy Policy

First Payment Letter

ECOA Notice - Fair Credit Reporting Act Information

Escrow Waiver/Initial Escrow Account Disclosure Statement

Appraisal Disclosure

Signature/Name Affidavit

Address Certification

Disclosure Statement

State Disclosures

Compliance Agreement

Affidavit of Occupancy

1st Lien/Title Clearance Letter

Flood Ins. Cert./ Disb / Flood Ins Authorization & Flood Hazard Notice

False Statement/Employment/Occupancy Form/Borrower's Certification

Document Copy Policy/Receipt Acknowledgement

Borrower Certification & Quality Control Authorization

Miscellaneous

Swafford/Saucida

SWA 000022

**Hall-Frazier**
**Record - 000964**

## LEDGER CARD

Date Printed: Friday, February 24, 2006 9:13:36 AM

Order #: 04-11332
Buyer/Borrower : Johnny Saucida and Dawn Saucida
Seller :
Lender Name : Homeowners Loan
Loan Number : 10241506
Property Address : 7154 San Marino Drive, Theodore, AL  36582

Swafford/Saucida

SWA  000023

## POSTED ESCROWS

| ID# | Bank Name | Account # | Address | City | State | Balance |
|-----|-----------|-----------|---------|------|-------|---------|
| tn2 | Bank of America- TN (New) | 003786809771 | | | | 0.00 |

### DEPOSITS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 11/29/2004 | funding wire | alisonw | 11/30/2004 | Homeowners Loan | 58,203.00 |
| **\*TOTAL DEPOSITS** | | | | | **58,203.00** |

### CHECKS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 11/24/2004 | 00002906v | m.lay | 11/30/2004 | Clerk of the Court | (213.75) |
| 11/24/2004 | 00002907 | a.smith | 12/31/2004 | Swafford and Hays Settlement Services, Inc. | (740.00) |
| 11/24/2004 | 00002908 | a.smith | 12/31/2004 | Swafford and Hays Settlement Services, Inc. | (200.00) |
| 11/24/2004 | 00002909 | a.smith | 12/31/2004 | Swafford and Hays Settlement Services, Inc. | (75.00) |
| 11/24/2004 | 00002910 | a.smith | 12/31/2004 | Swafford and Hays Settlement Services, Inc. | (60.00) |
| 11/24/2004 | 00002911 | a.smith | 11/30/2004 | Johnny Saucida and Dawn Saucida | (9,017.60) |
| 11/24/2004 | 00002912 | a.smith | 12/31/2004 | Dinkins Appraisal Group | (300.00) |
| 11/24/2004 | 00002913 | a.smith | 12/31/2004 | AllState | (1,226.30) |
| 11/24/2004 | 00002914 | a.smith | 12/31/2004 | Mobile County Tax Collector | (235.64) |
| 11/24/2004 | 00002915 | a.smith | 11/30/2004 | Harold & Edna Tillman | (46,134.71) |
| 1/12/2005 | 00012254 | daynat | 01/31/2005 | Johnny Saucida | (57.00) |
| 11/29/2004 | 00003470v | daynat | 01/31/2005 | Johnny Saucida | (57.00) |
| 11/29/2004 | 00003471 | m.lay | 12/31/2004 | Mobile County Judge of Probate | (93.75) |
| 11/29/2004 | 00003472 | m.lay | 12/31/2004 | Mobile County Judge of Probate | (63.00) |
| **\*TOTAL CHECKS** | | | | | **(58,473.75)** |

### VOIDS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 11/24/2004 | 00002906 | m.lay | 11/30/2004 | Clerk of the Court | 213.75 |
| 11/29/2004 | 00003470 | daynat | 01/31/2005 | Johnny Saucida | 57.00 |
| **\*TOTAL VOIDS** | | | | | **270.75** |

| **\*\*TOTALS FOR: tn2** | **0.00** |
|---|---|

**\*\*\*POSTED TOTAL**                                   **0.00**

**PENDING ESCROWS**



PLAINTIFF'S
EXHIBIT

6

**\*\*\*\*TOTAL(POSTED + PENDING)**                    **0.00**

# TRUTH-IN-LENDING DISCLOSURE (REAL ESTATE)

**LENDER (Creditor)**
HOMEOWNERS LOAN CORP.
4501 CIRCLE 75 PARKWAY, SUITE D4100
ATLANTA, GA 30339

Words, numbers or phrases preceded by a ☐ are applicable only if the ☒ is marked.
☐ Preliminary  ☒ Final

Borrower(s) Name(s): JOHNNY SAUCIDA
DAWN SAUCIDA

Date:  11/19/2004

Address: 7154 SAN MARINO DR
THEODORE, AL 36582
Property Address: 7154 SAN MARINO DR , THEODORE, AL 36582

Loan No.:  3000004187

Loan Type: Adjustable Rate Mortgage

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 12.592% | $170,778.77 | $57,928.00 | $228,706.77 |

| | NO. OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|---|
| YOUR PAYMENT SCHEDULE WILL BE: | 24 | 560.07 | 12/24/2004 |
| | 335 | 640.68 | 12/24/2006 |
| | 1 | 637.29 | 11/24/2034 |

**VARIABLE RATE:**
☒  This transaction is subject to a variable rate feature. Variable Rate disclosures have been provided at an earlier time.

**PAYABLE ON DEMAND:**
☒ This obligation is payable on demand.
☐ The disclosures are based on an assumed maturity of one year.

**SECURITY:**
You are giving a security interest in the property located at:
7154 SAN MARINO DR , THEODORE, AL 36582

**LATE CHARGE:**
If you are more than 15 days late in making any payment, you will pay a late charge of: $28.00 / 5.000 % of the overdue payment.

**INSURANCE:**
You may obtain property insurance from anyone acceptable to the Lender.

**FILING/RECORDING FEE:**
☒ $ 120.00

**PREPAYMENT:**
If you payoff early, you
☒ may  ☐ will not  have to pay a penalty.
☐ may  ☒ will not  be entitled to a refund of part of the finance charge.

**ASSUMPTION:**
Someone buying your dwelling,
☒ cannot assume the remainder of the mortgage on the original terms.
☐ may, subject to conditions, be allowed to assume the remainder of the mortgage on the original terms.

**REQUIRED DEPOSIT:**
☐ A deposit balance is required. The Annual Percentage Rate does not take into account your required deposit.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties and creditor's policy regarding assumption of the obligation.

☐  Please refer to the "Good Faith Estimate" for an Itemization of Amount Financed.    "e" means estimate.

"ITEMIZATION OF AMOUNT FINANCED"

Lender: HOMEOWNERS LOAN CORP.
Loan Number: 3000004187
Borrower: JOHNNY SAUCIDA          Date: 11/19/2004
          DAWN SAUCIDA            Note Rate: 10.250 %
                                  P & I Payment: $ 560.07

| | Loan Amount | | Prepaid Finance Charges | | | Amount Financed |
|---|---|---|---|---|---|---|
| $ | 62,500.00 | $ | 4,572.00 | = | $ | 57,928.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 801 | Loan Origination Fee due Lender | @ | 0.000% | | $ | 2,989.00 |
| 802 | Discount Fee | | % (of Loan Amount) | | $ | 0.00 |
| 901 | Prepaid Interest _____ days @ $ _____ | | | | $ | |
| 902 | Private Mortgage Insurance Premium | | | | $ | |
| 1002 | PMI/MMI Impounds _____ months X $ _____ per month | | | | $ | |
| 805 | Lender's Inspection Fee | | | | $ | |
| 806 | Mortgage Insurance Application Fee | | | | $ | |
| 807 | Assumption Fee | | | | $ | |
| 808 | Tax Service Contract | | | | $ | 63.00 |
| 809 | Underwriting Review Fee | | | | $ | |
| 810 | Administration Fee | | | | $ | 295.00 |
| 811 | Application Fee | | | | $ | |
| 812 | Commitment Fee | | | | $ | |
| 813 | Warehouse Fee / Interest Differential | | | | $ | |
| 814 | Yield Spread Premium _____ % $ _____ P.O.C. * | | | | $ | |
| 815 | Service Release Premium _____ % $ _____ P.O.C. * | | | | $ | |
| 816 | Origination Fee Due Broker | | | | $ | |
| 817 | FHA Upfront MIP / VA Funding Fee | | | | $ | |
| 818 | PROCESSING/UNDERWRITING FEE | | | | $ | 390.00 |
| 819 | FUNDING FEE | | | | $ | 365.00 |
| 820 | DOC PREP FEE | | | | $ | 195.00 |
| 821 | Title Service | | | | $ | 75.00 |
| 822 | _____ | | | | $ | |
| 823 | _____ | | | | $ | |
| 824 | _____ | | | | $ | |
| 825 | _____ | | | | $ | |
| 1101 | Settlement or Closing Fee To: Swafford & Hays | | | | $ | 200.00 |
| 1107 | Attorney Fee To: _____ | | | | | |
| | Lender Paid: _____ | | $ _____ | | | |
| | Broker Paid: _____ | | $ _____ | | | |
| | * Compensation to Broker not paid out of Loan Proceeds (P.O.C. Fees) | | | | | |

| PREPAID FINANCE CHARGE | | | | | $ | 4,572.00 |
|---|---|---|---|---|---|---|
| | Property Insurance Premiums to Insurance Agency: | | | | $ | |
| 903 | First Year Hazard Insurance Premium | | | | $ | |
| 904 | First Year Flood Insurance Premium | | | | $ | |
| 803 | Appraisal Fee To: DINKINS APPRAISAL GROUP | | Paid | | $ | 300.00 |
| 804 | Credit Reporting Fees To: TRANS UNION | | Paid | | $ | |
| 1101 | Settlement or Closing Fee To: _____ | | | | $ | |
| 1102 | Abstract or Title Search To: _____ | | | | $ | 375.00 |
| 1103 | Title Examination To: _____ | | | | $ | 225.00 |
| 1104 | Title Insurance Binder To: _____ | | | | $ | |
| 1105 | Document Preparation Fee To: _____ | | | | $ | |
| 1106 | Notary Fee To: _____ | | | | $ | |
| 1107 | Attorney Fee To: _____ | | | | $ | |
| 1108 | Title Insurance Premium To: Swafford & Hays | | | | $ | 200.00 |
| 1111 | Endorsement To: _____ | | | | $ | |
| 1112 | _____ | | | | $ | |
| 1201 | Recording Fee to County Clerk | | | | $ | 120.00 |
| 1202 | City / County / Tax / Stamps | | | | $ | |
| 1203 | State Tax / Stamps | | | | $ | |
| 1204 | MORTGAGE/DOT TAX | | | | $ | 93.75 |
| 1301 | Survey To: _____ | | | | $ | |
| 1302 | Termite / Pest Inspection | | | | $ | |
| 1303 | Property Inspection To: _____ | | | | $ | |
| 1304 | Photo Fee To: _____ | | | | $ | |
| 1305 | _____ | | | | $ | |
| 1306 | _____ | | | | $ | |
| 1307 | _____ | | | | $ | |
| 1308 | PAYOFFS | | | | $ | 47,596.65 |
| 1309 | _____ | | | | $ | |
| 1310 | _____ | | | | $ | |
| 1311 | _____ | | | | $ | |
| 1312 | _____ | | | | $ | |
| | Lender Paid: _____ | | $ _____ | | | |
| | Broker Paid: _____ | | $ _____ | | | |
| | Loan Proceeds To: _____ | | | | $ | (9,017.60) |

| AMOUNT PAID TO OTHERS ON YOUR BEHALF | | | | | $ | 48,910.40 |
|---|---|---|---|---|---|---|
| 1001 | Hazard Insurance Impounds _____ months X $ _____ per month | | | | $ | |
| 1003 | City Property Taxes _____ months X $ _____ per month | | | | $ | |
| 1004 | County Property Tax _____ months X $ _____ per month | | | | $ | |
| 1005 | Annual Assessments _____ months X $ _____ per month | | | | $ | |
| 1006 | Flood Insurance Impounds _____ months X $ _____ per month | | | | $ | |
| 1007 | _____ months X $ _____ per month | | | | $ | |
| 1008 | _____ months X $ _____ per month | | | | $ | |
| 1009 | Aggregate Analysis Adjustment | | | | | |

Hall-Frazier
**Record - 000967**



PLAINTIFF'S
EXHIBIT

# E C O A NOTICE

Loan Number:   3000004187

Date: November 19, 2004

Lender: HOMEOWNERS LOAN CORP.
        4501 CIRCLE 75 PARKWAY, SUITE D4100
        ATLANTA, GA 30339

## EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of age, race, color, religion, national origin, sec, marital status, receipt of income from public assistance programs, or the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency which administers compliance with this law concerning this Lender is: Federal Trade Commission, Sixth & Pennsylvania, Washington, DC 20580.

## FAIR CREDIT REPORTING ACT NOTICE

In connection with your application for a loan, please be advised that we will order a credit report regarding your credit experience. This report may contain information on your character, general reputation, personal characteristics or mode of living, in addition to your actual credit experience from persons or firms with which you have done business, your credit worthiness, your credit standing and credit capacity. You have a right given by Federal law to know the nature and scope of the information given in this report if you make a written request for the information. In the event we deny your application or raise the cost of your credit based on this information, you have a right within sixty (60) days to make a written request that we disclose the name and address of the reporting agency used.

## FAIR LENDING NOTICE

It is illegal to discriminate in the provision of or in the availability of financing assistance because of the consideration of:

1.    Trends, characteristics or conditions in the neighborhood or geographic area surrounding a housing accommodation, unless the financial institution can demonstrate in the particular case that such consideration is required to avoid an unsafe business practice.

or

2.    Race, color, religion, sex, marital status, national origin, or ancestry.

It is illegal to consider the racial, ethnic, religious or national origin composition of neighborhood or geographic area surrounding a housing accommodation or whether or not such composition is undergoing change, or is expected to undergo change. In appraising a housing accommodation or in determining whether or not, or under what terms and conditions, to provide financial assistance.

These provisions govern financial assistance for the purpose of the purchase, construction, rehabilitation or refinancing of one to four family residences by the owner and for the purpose of the home improvement of any one to four unit family residence.

If you have any questions about your rights or if your wish to file a complaint, contact the management of this financial institution.

November 19, 2004
_____
Date

_____
Borrower JOHNNY SAUCIDA                          _____
                                                 Date

_____
Borrower                                         _____
                                                 Date



PLAINTIFF'S
EXHIBIT

9

Swafford/Saucida

SWA 000024

# A & B Abstracts, Inc.

| 2725 Calhoun Drive<br>Abbeville, Al. 36310 | Phone: 334-687-4846<br>Fax:   334-687-1027<br>Email: ginapeacock@eufaula.rr.com |
|---|---|

*A & B ABSTRACTS, Inc*
*Covering Counties in Alabama,*
*Georgia and Mississippi,*

A&B# 11257

| NAME:  Johnny Saucida | ADDRESS:    7154 San Marino Drive<br>Theodore, AL  36582<br>COUNTY:    Mobile |
|---|---|

**CURRENT DEED:  Venders Lien Deed w/survivorship**

**GRANTOR:  Harold Tillman and Edna M. Tillman, husband and wife**

**GRANTEE:  Johnny Saucida and Dawn Saucida**

**DATED:** 10/1/03
**FILED:** 10/15/03
**BOOK:** 5475
**PAGE:** 1380

**NOTE:  See exceptions listed on Deed**

**PREVIOUS DEEDS:**

5405p1972 WD Brian C. Brown and Barbara C. Brown, husband and wife to Harold Tillman and Edna M. Tillman Date: 6/26/03 Filed: 7/10/03

5405p1952 Vendor's Lien Deed Harold Tillman and Edna M. Tillman, husband and wife to Brian C. Brown  and Barbara C. Brown Date: 3/11/96 Filed: 7/10/03

3461p728 WD Sylvia Maddox McCarver, single to Harold Tillman and Edna M. Tillman Date: 8/10/89 Filed: 8/14/89

**NOTE:  Copies of previous deeds, available upon request.**

---

**TAX INFORMATION**

PARCEL ID #  R02-39-03-01-0-007-073
Key # 01275523

| YEAR: 2002 | Status: Paid |
|---|---|
| YEAR: 2003 | Status: Paid |
| YEAR: 2004 | Amount: $235.64 |
| | Status: Due 10/1/04 |
| | (Delinquent after 12/31/04) |

Assessed  Value: $6,240.00

Legal Description:

See Deed

---

**FIRST  MORTGAGE**     **Amt: $47,000.00**

Date of Mtg.: 10/1/03     Date Filed: 10/15/03

Book:  5475     Page:  1380

Mortgagee:    Harold Tillman and Edna M. Tillman, husband and wife

Assigned:

Mortgagor:    Johnny Saucida and Dawn Saucida

---

| LIENS: | None of Record for ten (10) years, prior to effective date |
|---|---|
| JUDGMENTS: | None of Record for ten (10) years, prior to effective date |
| EASEMENTS: | Subject to R-O-W, Setback Lines, and Easements of Record |
| UCC: | RP 5033p895 Secured Party:  Alabama Power Company; Debtor:  Brian C. Brown and Barbara C. Brown $2,131.03 Head Pump Mod # RPKA030JAZ, Ser # 5345MI19612992 |

Hall-Frazier
Record - 000970

A & B Abstracts, Inc.

2725 Calhoun Drive
Abbeville, AL 36310

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/8/2004 | 11257 |

| Bill To |
|---------|
| Swafford and Hays Settlement Services<br>9041 Executive Park Drive<br>Suite 400<br>Knoxville, Tn. 39723 |

| P.O. No. | Terms | Due Date | Ship Date | Ship Via |
|----------|-------|----------|-----------|----------|
| 04-11332 | Net 30 | 12/8/2004 | 11/8/2004 | email |

| Item | Description | Qty | Rate | Amount |
|------|-------------|-----|------|--------|
| Two Owner Search | Johnny Saucida-7154 San Marino Drive-Mobile Cty, AL. ( back 2 owners to obtain 24 month chain) | 1 | 125.00 | 125.00 |

SCO

| | |
|---|---|
| Total | $125.00 |
| Payments/Credits | $0.00 |
| **Balance Due** | $125.00 |

548

400
150
7050
8300
1050
9300
200
95.00

STATE OF ALABAMA )

COUNTY OF MOBILE )

2009082375 Book-5472 Page-1200
Total Number of Pages: 4

KNOW ALL MEN BY THESE PRESENTS, That HAROLD TILLMAN and EDNA M. TILLMAN, husband and wife, the grantors, for and in consideration of the sum of Forty-eight Thousand, Five Hundred and no/100 Dollars ($48,500.00) of which the sum of One Thousand Five Hundred and no/100 Dollars ($1,500.00) is hereby acknowledged to have been paid to said grantors by JOHNNY SAUCIDA and DAWN SAUCIDA, the grantees, do hereby GRANT, BARGAIN, SELL AND CONVEY unto the said grantees, as tenants in common with equal interests during their joint lives, and upon the death of either of them to the survivor of them, subject to the provisions hereinafter contained, all that real property in the County of Mobile, State of Alabama, described as follows, to-wit:

Lot 30, Block 9, SAN MARINO ESTATES, according to the plat thereof recorded in Map Book 9, Page 242, of the records in the Office of the Judge of Probate, Mobile County, Alabama.

Together with all and singular the rights, privileges, tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining; TO HAVE AND TO HOLD the same unto the said grantees, as tenants in common with equal interests during their joint lives, and upon the death of either of them to the survivor of them, forever.

This conveyance is made subject to reservations, rights of way, restrictive covenants and easements, if any, applicable to said property of record in the said Probate Court Records.

And, except as to the above, and the taxes hereafter falling due, the said grantors, for themselves and for their heirs and assigns, do hereby covenant with the said grantees, their heirs and assigns, that they, the grantors, are seized of an indefeasible estate in fee simple in and to said property, that said property is free and clear of all encumbrances and that they do hereby WARRANT AND WILL FOREVER DEFEND the title to said property and the possession thereof, unto the said grantees, and the survivor of them, and the heirs of such survivor, against the lawful claims of all persons, whomsoever.

The unpaid balance of said purchase money, to-wit: The sum of Forty-seven Thousand and no/100 Dollars ($47,000.00) and to secure the payment of which a lien upon the property above

described is hereby reserved, is evidenced by that certain Promissory Note hereinafter described, of an even date herewith, made by the grantees, and payable to said grantors or order, at viz:

Due and payable in monthly installments of $475.00 each, principal and interest, commencing on the 1st day of November, 2003, and continuing on the 1st day of each consecutive month thereafter until paid in full.

By accepting this conveyance the grantees do hereby agree and bind themselves and their heirs and assigns, so long as any part of said purchase price, or the interest thereon, remains unpaid, as follows:

1. To pay said Note and the installments of principal and interest thereon when they respectively fall due.
2. To keep any buildings or other improvements now or which may hereafter be erected upon said property in good repair and insured against fire and lightning, and, if required by the grantor(s), also insured against wind storms, tornadoes and cyclones, by policies issued by good and solvent insurance companies selected by the grantor(s), which policies shall be deposited with the grantor(s) and shall provide loss, if any, shall be payable to the grantor(s) as the grantors' interest may appear; such policies to be in such amounts, not exceeding the insurable value of the said building or other improvements, as may be required by the grantor(s).
3. To pay before the same become delinquent all taxes, assessments, liens or other charges and encumbrances which may be or become effective against said property, or any portion thereof, together with all penalties, costs and other expenses incurred, or which may accrue in connection therewith.
4. That if grantor(s) upon the happening of any default hereunder shall foreclose this lien either by sale under the power herein contained or by court proceedings or shall otherwise resort to litigation for the recovery of the sums hereby secured, or employ an attorney to collect said sums, the grantee(s) will pay all reasonable costs of bringing down from date of this deed to date of foreclosure sale hereunder, abstract of title to property hereinabove described, and said costs, expenses and attorney's fee, and any other sum or sums due the said grantor(s), by virtue of any of the special liens herein declared, may be included in any judgment or decree rendered in connection with said litigation.
5. That if the grantor(s) should fail to perform any of the duties and obligations herein specified to be performed or done by grantee(s), then grantor(s) may perform the same, but shall not be under any duty to do so, and for any sum expended by the grantor(s) in this behalf, together with interest thereon at the rate of ____ 19 % ____ per cent annum, the grantor(s) shall have an additional lien secured by these presents on said property. The grantee(s) agree to pay the grantor(s) any sum or sums so expended by the grantor(s), with interest thereon, within ten (10) days after the mailing of written notice from the grantor(s) to the grantee(s) at the grantees' place of business last known to the grantor(s) of the expenditure of said sum or sums together with demand for payment thereof.
6. That upon the happening of a default in the payment of the said principal note, or any installment of principal and interest thereon or upon any default in the performance of any of the obligations herein imposed on the grantee(s), the grantor(s) shall have the right to sell said property for cash, at public outcry in front of the entrance to the Court House of Mobile County, Alabama to the highest bidder, after notice of the time, place and terms of sale by an advertisement published once a week for three (3) consecutive weeks in a newspaper published in Mobile County, Alabama to make proper conveyance to the purchaser; and the proceeds of sale to apply, first, to the payment of the costs of said sale, including a reasonable attorney's fee; second, to the payment of the amount of said principal note, whether due or not, with the unpaid interest thereon to the date of sale, and any amount that may be due the grantor(s) by virtue of any of the special liens herein described; and third, the balance, if any, to be paid over to the said grantee(s).
7. That at any sale under the powers herein, the grantor(s) may bid for and purchase said property like a stranger hereto, and in the event the grantor(s) should become the

purchaser of said sale, either the auctioneer conducting the sale or the grantor(s) may execute a deed to the grantor(s) in the name of the grantee(s).

8. That the word "grantor" wherever herein used, is intended to include also the heirs, successors and assigns of the grantor(s).

9. Wherever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

10. Grantee(s) herein shall not sell or transfer title to the property described herein, nor allow or make any change in the possession, or character of possession thereof without the written approval of the grantor(s), and any violation of this provision shall constitute a default hereunder, and at the option of the grantor, all amounts secured by the lien retained in this deed shall become due and payable forthwith.

11. Grantee(s) hereby agree to pay all Ad Valorem Taxes and Assessments accruing on said property after the date hereof. Grantee(s) shall, on or before December 15, of each year, furnish grantor(s) herein with a copy of a paid receipt for such taxes. Should grantor(s) fail to pay taxes and assessments such failure shall constitute a default hereunder.

12. Grantor(s) shall maintain in force a policy or policies of insurance providing fire and extended coverage insurance on the improvements on the hereinabove described premises with a loss payable endorsement in favor of grantor(s), and the grantee(s) shall provide grantor(s) with a paid receipt evidencing payment of the annual premiums on such policy or policies of insurance at least thirty (30) days prior to the renewal date or anniversary date of said policy or policies of insurance. Should grantor(s) fail to pay such insurance premium or premiums as they become due or fail to furnish a paid receipt or paid receipts evidencing the payment of same such failure shall constitute a default hereunder.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands and seals on

this the 1st day of October, 2003.

_Harold B. Tillman_ (SEAL)        _Johnny Semcida_ (SEAL)
Harold Tillman                     Johnny Semcida
Grantor                            Grantee

_Edna M. Tillman_ (SEAL)          _Dawn Semcida_ (SEAL)
Edna M. Tillman                    Dawn Semcida
Grantor                            Grantee

STATE OF ALABAMA    )
COUNTY OF MOBILE    )

I, the undersigned, a Notary Public in and for said State and County, hereby certify that Harold Tillman and Edna M. Tillman, whose names are signed to the foregoing conveyance and who are known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, they executed the same voluntarily on the day the same bears date.

Given under my hand and notarial seal on this the 1st day of October, 2003.

My commission expires:                    _____
                                          NOTARY PUBLIC
8-28-04

STATE OF ALABAMA  )
COUNTY OF MOBILE  )

    I, the undersigned, a Notary Public in and for said State and County, hereby certify that Johnny Saucida and Dawn Saucida, whose names are signed to the foregoing conveyance and who are known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, they executed the same voluntarily on the day the same bears date.

    Given under my hand and notarial seal on this the 1st day of October, 2003.

My commission expires:

8-28-04

_____
NOTARY PUBLIC

THIS INSTRUMENT PREPARED BY:

Sidney M. Harrell, Jr.
Attorney at Law
2496 Government Boulevard
Mobile, Alabama 36606

The current address for the grantee is:

7154 Dan Y Merino Drive
Theodore AL 36582

☐ The Debtor is a transmitting utility as defined in ALA CODE 7-9-105m.

No. of Additional Sheets Presented:

This FINANCING STATEMENT is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code.

THIS SPACE FOR USE OF FILING OFFICER
Date, Time, Number & Filing Office

1. Return copy or recorded original to:
Alabama Power Company
600 North 18th Street
Birmingham, Alabama 35291

Attention: Beth Taylor

Pre-paid Acct. #

2. Name and Address of Debtor    (Last Name First if a Person)
Brown, Brian C.
7154 San Marino Dr.
Theodore, AL  36582

Social Security/Tax ID #

2A. Name and Address of Debtor    (If Any)    (Last Name First if a Person)
Brown, Barbara C.
7154 San Marino Dr.
Theodore, AL  36582

Social Security/Tax ID #

☐ Additional debtors on attached UCC-E

5. SECURED PARTY (Last Name First if a Person)
Alabama Power Company
600 North 18th Street
Birmingham, Alabama 35291

Social Security/Tax ID #

☐ Additional secured parties on attached UCC-E

2001056112  Book-5032  Page-0895
Total Number of Pages: 2

State of Alabama - Mobile County
I certify this instrument was filed on:

Tue, Sep-11-2001 @ 2:15:05PM
MORTGAGE TAX        3.30
SURCHARGE          10.60
S. R. FEE           2.00
RECORDING FEE      15.00
TOTAL AMOUNT      $30.30

X    2001056112  20010900138
Don Davis, Judge of Probate

8A q8.

# Note
No termination
of record.
#

4. ASSIGNEE OF SECURED PARTY    (If Any)    (Last Name First if a Person)

6. This Financing Statement Covers the Following Types (or Items) of Property:
The heat pump(s) and all related materials, parts, accessories and replacements therein,
located on the property described on Schedule A attached hereto.

Mod #RPKA030JAZ, Ser#5345M119612992

Md #RBHA17J10NFDAI, Ser#M139601840

For value received, Debtor hereby grants a security interest to Secured Party in the
foregoing collateral.

Record Owner of Property:    Debtors    Cross Index in Real Estate Records

9A. Enter Code(s) From Back of Form That Best Describes The Collateral Covered By This Filing:
200
600

Check X if covered: ☐ Products of Collateral are also covered.

7. Complete only when filing with the Judge of Probate.
The initial indebtedness secured by this financing statement is $ 2,131.03

Mortgage tax due (15¢ per $100.00 or fraction thereof) $ 3.30+15%×10¹²

☐ This financing statement covers timber to be cut, crops, or fixtures and is to be cross indexed in the real estate mortgage records (Describe real estate and if debtor does not have an interest of record, give name of record owner in Box 5)

Signature(s) of Secured Party(ies) required only if filing is not with a Judge of Probate - see Box 6)

Alabama Power Company
Type Name of Individual or Business

3 FILING OFFICER COPY — ALPHABETICAL    2 FILING OFFICER COPY — ACKNOWLEDGEMENT    STANDARD FORM — UNIFORM COMMERCIAL CODE — FORM UCC-1
3 FILING OFFICER COPY — NUMERICAL    4 FILE COPY — SECOND PARTY(S)    (5) FILE COPY DEBTOR(S)    Approved by The Secretary of State of Alabama



**Hall-Frazier**
**Record - 000977**

*Swafford & Hays Services, Inc*
*"Professionalism With Integrity"*
*9041 Executive Park Dr. / Suite 400/ Knoxville, TN 37923*
*Phone: 1-888-272-2915  Fax: 1-865-539-1483*
*Toll Free Fax:  1-888-272-2916*

File Number: 04-11332

Date: 11/3/2004

SHSS Contact: Abstract Department

Abstractor: A&B Abstracts        Phone: 334-687-4846      Fax: 334-687-1027

Please do Current Owner Search on the following: MUST INCLUDE A 24 MONTH CHAIN OF TITLE
(If borrower has not been vested on title for 24 months, MUST include a copy of previous deed).

Borrower: Johnny Saucida            S.S. #

Co-Borrower:            S.S. #:

Address: 7154 San Marino Drive

City: Theodore    State: AL    Zip: 36582

County: Mobile

Comments:

*The Following is required on each order:*

- Signature at the bottom confirming receipt of order within 2 hours along with fee that will be charged.
- Search to be **COMPLETED**  within 24 hours or call placed to SHSS contact listed above with status.
- Weekly statements **MUST** be sent via U.S. Mail, ATTN: Accounting

*DOCUMENTS NEEDED WITH SEARCH:*

- Need *COMPLETE* Copies of Current Vesting Deed ( see above for 24 month requirement), ALL Open Mortgages, ALL Judgments, ALL Liens, Easements, Rights of Ways, Agreements, Assignments, etc. *[MUST INCLUDE FIRST TWO PAGES AND LAST TWO PAGES OF MORTGAGES, AND ALL COPIES OF RELEVANT OTHER DOCUMENTS].*
- Copies of Probates, Wills, Bankruptcies and Final Judgments of Divorce, if found.
- Copies of Trust if found , especially in Vesting
- Tax Bill and *ALL* amounts of Taxes and Dates they are Due. ALL delinquent taxwes must also be included.
- Effective date *MUST* be on the abstractors write-up report.
- (NO EXCEPTIONS)

**THE SEARCH MUST BE TO US IN 48 HOURS OR A CALL PLACED.  ALL TAX
INFORMATION AND COPIES OF LIENS MUST BE PROVIDED. IF NOT WE WILL
DOC THE INVOICE BY 50% (Per Contract).**

Received by:_____        Date / Time:_____

Fee for Search:_____

Hall-Frazier
Record - 000978

11/05/2004  02:20    12513406514        HILDRETH ABSTRACTING        PAGE  01

RUSH

1q8

## ABSTRACTOR WORKSHEET

DATE __11_ / _5_ / _04_          CUSTOMER __A & B__

NAME _Johnny Saucida & Dawn Saucida_          ORDER # __11257 - c/o.__

ADDRESS _7154 San Marino Dr._  CITY _Theodore_  COUNTY _Mobile_  STATE _AL_

DEED TYPE:    W.D        S.W.D.    (V.L.D.)    Q.C.D.    OTHER _____

TITLE VESTED IN: _Johnny Saucida and Dawn Saucida_

TITLE RECEIVED FROM: _Harold Tillman and Edna M. Tillman, H/w._

BOOK _5475_      PAGE _1380_      DATED _10-1-2003_      FILED _10-15-2003_

LIFE ESTATE RESERVED YES OR (NO)    JTWROS YES OR NO    PRIOR DEED YES OR (NO)

### MORTGAGE INFORMATION

"1" MORTGAGE

BOOK _5475_      PAGE _1380_      DATED _10-1-2003_      FILED _10-15-2003_

LENDER _Harold Tillman and Edna M. Tillman, H/w._

AMOUNT $ _47,000._      OPEN END YES OR (NO)    MAXIMUM AMOUNTS ___0___

ASSIGNED TO _N/A_

　　　BOOK_____ PAGE_____ DATED_____ FILED_____

BORROWER _Johnny Saucida and Dawn Saucida_

　　　RE-RECORDING: YES OR (NO)

　　　BOOK_____ PAGE_____ DATED_____ FILED_____

　　　MODIFICATION ON FILE: YES OR (NO)

　　　BOOK_____ PAGE_____ TO AMEND_____

"2ND MORTGAGE

BOOK_____ PAGE_____ DATED_____ FILED_____

LENDER_____

AMOUNT $_____ OPEN END YES OR NO    MAXIMUM AMOUNTS_____

ASSIGNED TO_____

　　　BOOK_____ PAGE_____ DATED_____ FILED_____

BORROWER_____

　　　RE-RECORDING: YES OR NO

　　　BOOK_____ PAGE_____ DATED_____ FILED_____

　　　MODIFICATION ON FILE: YES OR NO

　　　BOOK_____ PAGE_____ TO AMEND_____

Hall-Frazier
**Record - 000979**

11/05/2004  02:28   12513406514          HILDRETH ABSTRACTING          PAGE  02

*148*

**\*\*\*3\*\* MORTGAGE**

**BOOK**_____**PAGE**_____**DATED**_____**FILED**_____

**LENDER**_____

**AMOUNT $**_____   **OPEN END  YES OR  NO   MAXIMUM AMOUNT $**_____

**ASSIGNED TO**_____
     **BOOK**_____**PAGE**_____**DATED**_____**FILED**_____

**BORROWER**_____
     **RE-RECORDING: YES OR NO**
     **BOOK**_____**PAGE**_____**DATED**_____**FILED**_____
     **MODIFICATION ON FILE: YES OR NO**
     **BOOK**_____**PAGE**_____**TO AMEND**_____

**\*JUDGMENTS/ UCC LIENS- THE FOLLOWING LIENS WILL BE ATTACHED WITH THIS REPORT IF APPLICABLE.**

_See the UCC in RP 5033-895- Copy Attached-_

**NOTES**_____
_____
_____
_____
_____
_____

**ADDITIONAL INFORMATION**_____
_____

¢ _2002 taxes were paid in the amount of $ 205.15 on 3-6-02._
¢ _2003 taxes were paid in the amount of $ 194.19 on 2-18-04_

**\*TAXES:**

**PARCEL #** _R02-39-03-01-0-007-093_        **KEY #** _01275525_

**YEAR OF ASSESSMENT** _'04_    **PAID / DUE**   **AMOUNT $** _235.64_

**HOMESTEAD** (Y) / N

**\*LAND** _9,000._   **\*BUILDING** _49,500._   **\*FEATURES** _3,800._

**\*MARKET VALUE** _62,300._   **\*ASSESSED VALUE** _6,240._

**ASSESSED NAME** _Johnny & Dawn Faucita_        **RECORDS THRU** _10 / 29 / 04_

**ABSTRACTOR SIGNATURE** _Darrish Research_      **FEE** — **COPIES** — **TOTAL**___

AS A CONDITION TO ACCESSING AND RELYING ON THE INFORMATION CONTAINED IN THIS ABSTRACTOR WORKSHEET, YOU AGREE THAT THE LIABILITY OF THE ABSTRACTOR ON ACCOUNT OF ERRORS IN PERTINENT INFORMATION CONTAINED IN THE WORKSHEET OR OMISSIONS OF PERTINENT INFORMATION FROM THE WORKSHEET WILL NOT EXCEED THE AMOUNT YOU PAY FOR THE SERVICES PREFORMED. YOU AGREE THAT ALABAMA LAW APPLIES.

_Thanks!_

11/05/2004  02:28   12513406514              HILDRETH ABSTRACTING                    PAGE  04

*Hg8*

## CHAIN OF TITLE

---

Deed Type: _Warranty Deed_

Grantor: _Sylvia Maddax McCarver, Single_

Grantee: _Harold Tillman and Edna M. Tillman_

Dated: _8-10-1989_  Filed: _8-14-1989_

Book _3461_  Page _728_ / Instrument # ___—___  Consideration $ _1.ºº_
Additional Comments:

---

Deed Type: _Vendor's Lien Deed_

Grantor: _Harold Tillman and Edna M. Tillman, H/w._

Grantee: _Brian C. Brown and Barbara C. Brown_

Dated: _3-11-1996._  Filed: _7-10-2003._

Book _5405_  Page _1952_ / Instrument # ___—___  Consideration $ _25,000ºº_
Additional Comments: _Vendor's Lien is released in RP 5405-1961._

---

Deed Type: _Warranty Deed_

Grantor: _Brian C. Brown and Barbara C. Brown, H/w._

Grantee: _Harold Tillman and Edna M. Tillman_

Dated: _6-26-2003_  Filed: _7-10-2003._

Book _5405_  Page _1972_ / Instrument # ___—___  Consideration $ _10.ºº_
Additional Comments:

---

_(See Current Deed)_

**Hall-Frazier**
**Record - 000982**

## Disbursement Sheet



Order #: 04-11332          Settlement Date: 11/19/2004          Disbursement Date: 11/24

| | |
|---|---|
| | Johnny Saucida and Dawn Saucida, as tenants in common with equal interests during their joint lives, and upon the death of either of them to the survivor of them |
| Buyer: | |
| Seller: | |
| Property: | 7154 San Marino Drive Theodore, AL 36582 |
| Lender: | Homeowners Loan |
| Loan #: | 10241506 |

Money Out: $58,203.00
Money In: $58,203.00
Difference: $0.00

Swafford/Saucida

**PLAINTIFF'S EXHIBIT**

11

### Money Out

SWA 000016

| Ref# | Date | Name | Hud | Detail | Amount |
|---|---|---|---|---|---|
| 00002907 | 11/24/2004 9:10:50 AM | Swafford and Hays Settlement Services, Inc. | 1102 1103 1108 | Abstract or title search Title examination Title Insurance | $375.00 $225.00 $140.00 |
| | | | | Total: | $740.00 |
| 00002908 | 11/24/2004 9:10:50 AM | Swafford and Hays Settlement Services, Inc. | 1101 | Settlement or closing fee | $200.00 |
| | | | | Total: | $200.00 |
| 00002909 | 11/24/2004 9:10:50 AM | Swafford and Hays Settlement Services, Inc. | 1111 | Title Service Fee | $75.00 |
| | | | | Total: | $75.00 |
| 00002910 | 11/24/2004 9:10:50 AM | Swafford and Hays Settlement Services, Inc. | 1108 | Title Insurance | $60.00 |
| | | | | Total: | $60.00 |
| 00012254 | 1/12/2005 1:51:55 PM | Johnny Saucida | 1201 | Recording fees: | $57.00 |
| | | | | Total: | $57.00 |
| 00002911 | 11/24/2004 9:10:50 AM | Johnny Saucida and Dawn Saucida | 303 | Cash [ ]From [X]To Borrower | $9,017.60 |
| | | | | Total: | $9,017.60 |
| 00002912 | 11/24/2004 9:10:50 AM | Dinkins Appraisal Group | 803 | Appraisal Fee | $300.00 |
| | | | | Total: | $300.00 |
| 02913 | 11/24/2004 9:10:50 AM | AllState | 903 | Hazard Insurance Premium for | $1,226.30 |
| | | | | Total: | $1,226.30 |
| 00002914 | 11/24/2004 9:10:50 AM | Mobile County Tax Collector | 1502 | 04 Taxes | $235.64 |
| | | | | Total: | $235.64 |
| 00002915 | 11/24/2004 9:10:50 AM | Harold & Edna Tillman | 1501 | Payoff good thru 12/4 | $46,134.71 |
| | | | | Total: | $46,134.71 |
| 00003471 | 11/29/2004 2:17:46 PM | Mobile County Judge of Probate | 1203 | State tax/stamps: Deed $0.00 Mortgage $93.75 | $93.75 |
| | | | | Total: | $93.75 |
| 00003472 | 11/29/2004 2:17:46 PM | Mobile County Judge of Probate | 1201 | Recording fees: | $63.00 |
| | | | | Total: | $63.00 |

### Money In

| Ref# | Date | Name | Hud | Detail | Amount |
|---|---|---|---|---|---|
| 04-11332/Lender/1 | 11/29/2004 | Homeowners Loan | | | |
| | | | 808 | Processing\Underwriter Fee | ($390.00) |
| | | | 809 | Funding Fee | ($365.00) |
| | | | 810 | Administration Fee | ($295.00) |
| | | | 811 | Document Preparation Fee | ($195.00) |
| | | | 801 | Loan Origination Fee | ($2,989.00) |
| | | | 812 | Tax Service Fee | ($63.00) |
| | | | 1600 | Loan Amount | $62,500.00 |
| | | | | Total: | $58,203.00 |

**Hall-Frazier**
**Record - 000983**

PLAINTIFF'S
EXHIBIT

_12_

Bank of America

Bank of America

Capture Date: 20041206 Sequence #: 0400430772

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee

003471

Date
11/29/04

Pay  Ninety three and 75/100 Dollars                                    $**93.75

To  Mobile County Judge of Probate

Void After 90 Days

Memo:
File: 04-11332

_Sandy Nelson_

⑈0000347⑈ ⑆064000020⑆ 003785809771⑈    ⑆000000937 5⑈

REGIONS BANK R062005604
70 BAGBY DRIVE 12/03/44
BIRMINGHAM AL

57158014

No Electronic Endorsements Found

Swafford/Saucida

SWA 000181

Hall-Frazier
Record - 000984

Bank of America ◢◤◢◤                    Bank of America

Capture Date: 20041129 Sequence #: 1000550671

Swafford and Hays                              Bank of America - Tennessee
Settlement Services, Inc.                                          002911
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923                                        Date
(865) 539-1450                                            11/24/04

Pay  Nine thousand seventeen and 60/100 Dollars            $***9,017.60

To  Johnny Saucida and Dawn Saucida
    7154 San Marino Drive
    Theodore, AL  36582

                                                  Void After 90 Days
Memo:
File: 04-11332                              Alison Witt

⑈⑈0002911⑈⑈   ⑈064000020⑈   003786809771⑈   ⑈000090176⑈⑈

No Electronic Endorsements Found

Swafford/Saucida

SWA 000182

**Hall-Frazier**
**Record - 000985**

**Bank of America**

Bank of America

Capture Date: 20041129 Sequence #: 1200339348

---

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee

**002915**

Date
**11/24/04**

Pay **Forty six thousand one hundred thirty four and 71/100 Dollars**

$**46,134.71

To  Harold & Edna Tillman

Void After 90 Days

Memo:
File: 04-11332

⑈000029 15⑈ ⑆064000020⑈ 003786809971⑈    ⑈00046134371⑈

---

0150122537
Compass Bank
Birmingham, AL
11/26/04  50620071866

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

No Electronic Endorsements Found

Swafford/Saucida

SWA 000183

Page 2 of 2
TS_ADJUSTMENTS_TPA
MAR 02 2006 11:53

Batch Fax Req. # 4856908

Thu Mar 02 10:37:30 CST 2006

BankofAmerica SF002A      PAGE.02

**Bank of America**

Bank of America

Capture Date: 20041201 Sequence #: 1000857467

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1430

Bank of America -Tennessee

002912

Date
11/24/04

Pay    Three hundred and 00/100 Dollars                    $**300.00

To  Dinkins Appraisal Group

Void After 90 Days

Memo:
File: 04-13332

⑆0000 29 12⑆ ⑉0640000 20⑉ 003786809771⑆    ⑈000000 30000⑈

No Electronic Endorsements Found

Page 2 of 2
TS_ADJUSTMENTS_TPA
MAR 02 2006 11:55

Batch Fax Req. # 4856894

Thu Mar 02 08:44:35 PST 2006

BankofAmerica SF082A        PAGE.02

Swafford/Saucida

SWA 000184

Hall-Frazier
Record - 000987

Bank of America

Bank of America

Capture Date: 20041206 Sequence #: 0400430771

Swafford and Hays
Settlement Services, Inc.                    Bank of America -Tennessee
Escrow Account
9041 Executive Park Drive Suite 400                        003472
Knoxville, TN 37923
(865) 539-1450                                              Date
                                                          11/29/04

Pay  Sixty three and 00/100 Dollars · · · · · · · · · · · · · · · ·    $**63.00

To  Mobile County Judge of Probate

                                                    Void After 30 Days
Memo:
File: 04-11332                                      _Sandy Nelson_

⑈000003472⑈ ⑆064000020⑆ 0037868097710 ⑈0000006300⑈

No Electronic Endorsements Found

Swafford/Saucida

SWA 000185

**Hall-Frazier**
**Record - 000988**

Bank of America 

Bank of America

Capture Date: 20041201 Sequence #: 0400465791

---

Swafford and Mays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 329-1450

Bank of America -Tennessee

002913

Date
11/24/04

Pay    One thousand two hundred twenty six and 30/100 Dollars                $**1,226.30

To  Allstate

Void After 90 Days

Memo:
File: 04-11332

*Alison Witt* (signature)

⑆000002913⑆ ⑆064000020⑆ 003786809771⑆    ⑆00001226320⑆

---

No Electronic Endorsements Found

Swafford/Saucida

SWA 000186

Batch Fax Req. # 4856896

Thu Mar 02 08:44:08 PST 2006

BankofAmerica SF002R        PAGE.02

**Bank of America** ≡

Bank of America

Capture Date: 20041202 Sequence #: 0800545260

Swafford and Hays
Settlement Services, Inc.
Escrow Account
8041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 339-1450

Bank of America -Tennessee          002910

Date
11/24/04

Pay   Sixty and 00/100 Dollars                          $**60.00

To  Swafford and Hays Settlement Services, Inc.
    8041 Executive Park Drive, Suite 400
    Knoxville, TN 37923

Void After 90 Days

Memo:
File: 04-11332                              Alison Witt

⑈0000 2910⑈ ⑆0640000 20⑆ 0037866097 74 ⑈          ⑆000000 6000⑆

BANK OF AMERICA/NA ATL
PP6 10000524 21696 01 P01
12/02/04
0800545260

PAY TO THE ORDER OF
BANK OF AMERICA
... ...
SWAFFORD & HAYS SETTLEMENT SERVICES, INC.
...

No Electronic Endorsements Found

Swafford/Saucida

SWA 000187

Page 2 of 2
TS_ADJUSTMENTS_TPA
MAR 02 2006 11:54

Batch Fax Req. #4856882

Thu Mar 02 10:31:38 CST 2006

BankofAmerica SF002A          PAGE.02

Bank of America

Bank of America

Capture Date: 20041202 Sequence #: 0800545392

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37911
(865) 539-1450

Bank of America -Tennessee

002909

Date
11/24/04

Pay    Seventy five and 00/100 Dollars

$**75.00

To  Swafford and Hays Settlement Services, Inc.
    9041 Executive Park Drive, Suite 400
    Knoxville, TN  37923

Memo:
File: 04-13332

Void After 90 Days

Alison Witt

⑈000290⑈ ⑈06400020⑈ 00378680977⑈ ⑈000000?500⑈

0800545392

No Electronic Endorsements Found

Swafford/Saucida

SWA 000188

Page 2 of 2
TS_ADJUSTMENTS_TPA
MAR 02 2006 11:41

Batch Fax Req. # 4856876

Thu Mar 02 08:30:35 PST 2006

BankofAmerica SF002A      PAGE.02

Bank of America

Bank of America

Capture Date: 20041202 Sequence #: 0800646084

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee

002907

Date
11/24/04

Pay   Seven hundred forty and 00/100 Dollars                    $**740.00

To  Swafford and Hays Settlement Services, Inc.
    9041 Executive Park Drive, Suite 400
    Knoxville, TN 37923

Void After 90 Days

Memo:
File: 04-11332                                    Alison Witt

⑈000002907⑈ ⑆064000020⑆ 003786809771⑈      ⑈0000074000⑈

BANK OF AMERICA,NA ATL
MO61N000324 I 1656 02 003
12/02/04
0800545084

PAY TO THE ORDER OF
BANK OF AMERICA
02/02/04
FOR DEPOSIT ONLY
SWAFFORD/HAYS
SETTLEMENT SERVICES, INC.
0037868099

No Electronic Endorsements Found

Swafford/Saucida

SWA 000189

**Hall-Frazier**
**Record - 000992**

Bank of America

Bank of America

Capture Date: 20041202 Sequence #: 0800545489

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee

002908

Date
11/24/04

Pay  Two hundred and 00/100 Dollars                    $**200.00

To  Swafford and Hays Settlement Services, Inc.
    9041 Executive Park Drive, Suite 400
    Knoxville, TN  37923

Memo:
File: 04-11332

Void After 90 Days

Alisa Witt

⑈0002908⑈ ⑆064000020⑆ ⑉0037868⑈77⑈ ⑈00000 20000⑈

BANK OF AMERICA NA
PAYMENTS 11696 03 F01
12/02/04
0800545489

PAY TO THE ORDER OF
BANK OF AMERICA
FOR DEPOSIT ONLY
SWAFFORD & HAYS SETTLEMENT SERVICES
DEPOSIT INTO ACCOUNT
003703018408

No Electronic Endorsements Found

Swafford/Saucida

SWA 000190

**Bank of America**

Bank of America

Capture Date: 20041208 Sequence #: 0200004052

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1430

Bank of America -Tennessee

002914

Date
11/24/04

Pay    Two hundred thirty five and 64/100 Dollars                    $**235.64

To   Mobile County Tax Collector

Void After 90 Days

Alison Witt

Memo:
File: 04-11332

1275523

⑈000029l4⑈ ⑆064000020⑆ 003786809771⑈          ⑈00000235.64⑈

ALA SOUTHTRUST
2062000080<
340351494 5087 6087 120704 08

BANK OF AMERICA #47
POS 200X05X (SNC) 04 PA
12/08/44
0200004052

No Electronic Endorsements Found

Swafford/Saucida

SWA 000192

Page 2 of 2
TS_ADJUSTMENTS_TPA
MAR 02 2006 12:07

Batch Fax Req. # 4856904

Thu Mar 02 08:49:24 PST 2006

BankofAmerica SF002A          PAGE.02

3/6/2006 8:43:31 AM

Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee

012254

Date
01/12/05

Pay Fifty seven and 00/100 Dollars $**57.00

To Johnny Saucida
7154 San Marino Drive
Theodore, AL 36582

Void After 90 Days

Memo: excess recording funds
File: 04-11332

⑈000012254⑈ ⑆064000020⑆ 003786809771⑈ ⑈0000005700⑈

ENDORSE HERE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

The security features listed below, as well as those not listed, exceed industry guidelines.

Security Features: Results of document alteration:
Microprint Signature Line • Small type in signature line appears as dotted line when photocopied
Chemical Protection • Stains or spots appear with chemical alteration
Erasure Protection • White mark appears when erased
Security Screen • Absence of "Original Document" verbiage on back of check

• FEDERAL RESERVE BOARD OF GOVERNORS

AMSOUTH BANK 01/25/05
⑈062000019⑈
5000856493

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3786809771 | 12254 | $57.00 | | 1/26/2005 | 1200916439 |

| Customer Data | Bank # | GL Category | CD VoID/CIMS Key | CD Label |
|---|---|---|---|---|
| | 0 | 000000000000 | 20050203051001 | 20050203051001 |

Process Control

Swafford/Saucida

SWA 000191

**Hall-Frazier**
**Record - 000995**

## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 03-8042 | Loan Number: 10151457 | Mortgage Ins. Case #: |
|---|---|---|

**NAME AND ADDRESS OF BORROWER/BUYER:**
Pearlie Finch 1716 Perch Drive Mobile, AL 36605

**NAME AND ADDRESS OF LENDER:**
Homeowners Loan 4501 Circle 75 Parkway Suite F6300 Atlanta, GA 30339

**I ⌐PERTY LOCATION (Brief Legal): Lot Lot 152 Gulf Manor**
1716 Perch Drive Mobile, AL 36605

| **SETTLEMENT AGENT:** | **PLACE OF SETTLEMENT:** |
|---|---|
| Swafford and Hays Settlement Services, Inc. 865-539-1450 Contact: Joshua Hall | 9041 Executive Park Drive, Suite 400 Knoxville, TN 37923 |
| **SETTLEMENT DATE:** 12/29/2003 | **DISBURSEMENT DATE:** 01/05/2004 |

| L. SETTLEMENT CHARGES | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|
| **800. Items Payable In Connection With Loan** | | 1501. Payoff | |
| 801. Loan Origination Fee    To: Homeowners Loan | 1,942.00 | To: Baird Properties | 36,634.72 |
| 802. Loan Discount | | 1502. 2003 Taxes | |
| 803. Appraisal Fee | | To: Mobile County Tax Collector | 171.04 |
| 804. Credit Report Credit Report POCL $8.50 | | 1503. | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | 1504. | |
| 807. Assumption Fee | | | |
| 808. Processing\Underwriter Fee   To: Homeowners Loan | 390.00 | 1505. | |
| 809. Funding Fee   To: Homeowners Loan | 365.00 | | |
| 810. Administration Fee    To: Homeowners Loan | 295.00 | 1506. | |
| 811. Document Preparation Fee   To: Homeowners Loan | 195.00 | | |
| **900. Items Required By Lender To Be Paid In Advance** | | 1507. | |
| 901. Interest from | | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for   To: Tucker & Associates | 370.00 | | |
| 9   Flood Insurance Premium for:   To: Nationwide Insurance | 583.00 | 1509. | |
| 90 | | | |
| **1000. Reserves Deposited With Lender** | | 1510. | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment | | 1514. | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee    To: Swafford and Hays Settlem | 200.00 | 1515. | |
| 1102. Abstract or title search   To: Swafford and Hays Setttleme | 375.00 | | |
| 1103. Title examination   To: Swafford and Hays Setttlement Se | 225.00 | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1104. Title insurance binder | | | 36,805.76 |
| 1105. Document preparation | | **N. Net Settlement** | |
| 1106. Notary Fees | | | |
| 1107. Attorney's Fees | | 1600. Loan Amount | 46,000.00 |
| (Includes above item numbers:   ) | | | |
| 1108. Title Insurance    To: Swafford and Hays Settlement Servi | 200.00 | 1601. Plus Check/Cash from Borrower | |
| (Includes above item numbers:   ) | | | |
| 1109. Lender's coverage 46,000.00 @ 200.00 | | 1602. Minus total settlement charges | 5,329.00 |
| 1110. Owner's coverage  @ 0.00 | | (Line 1400) | |
| 1 | | 1603. Minus total Disbursements to | 36,805.76 |
| 11 | | Others (line 1520) | |
| 1113. Overnight Courier & Handling Fees | | 1604. Equals disbursements to borrower | 3,865.24 |
| **1200. Govt. Recording, Transfer, and Service Fees** | | | |
| 1201. Recording fees:    To: Clerk of the Court | 120.00 | | |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps:  Deed $0.00 Mortgage $69.00  To: Mo | 69.00 | | |

Hall-Frazier
Record - 000996

Homeowners Loan Corp.
Closing Instructions

DECEMBER 29, 2003

To:
SWAFFORD & HAYS
224 SOUTH PATERS ROAD
KNOXVILLE, TN 37923

Loan No. 10151457

Borrower(s): PEARLIE FINCH

Property Address:    1716 PERCH DRIVE
MOBILE, AL  36605

ENCLOSED ARE INSTRUCTIONS AND CLOSING DOCUMENTS IN CONNECTION WITH THE LOAN
DESCRIBED BELOW. STRICT COMPLIANCE WITH THESE INSTRUCTIONS IS REQUIRED. In
performing the closing service for Homeowners Loan Corp. ("HLC"), you agree to abide by, and be bound by,
all provisions of these closing instructions, unless modified in writing by HLC's Vice President of Operations or
Assistant Vice President of Secondary Marketing. A FINE OF $50 WILL BE IMPOSED FOR EACH FAILURE
TO FOLLOW THE INSTRUCTIONS STATED BELOW.

Initial:

_____ (1)    The final HUD-1A (in refinance transactions) and HUD-1 (in purchase transactions) must be
faxed to HLC's Closing Department at (770) 818-9877 for review and approval prior to signing
or e-mail. Form HUD-1A Settlement Statement must be used for all closings except purchase
money transactions. No changes to any fees can be made to the Settlement Statement without
written consent of the Vice President of Operations at (770) 989-8739 or the Assistant Vice
President of Secondary Marketing at (770) 541-8898.

_MD_ (2)    Each Borrower must sign the documents (preferably in blue ink) exactly as their name appears,
and only where their name appears.

_MD_ (3)    All documents must be witnessed and/or notarized where indicated, and the notary seal must be
visible.

_MD_ (4)    The identity of each Borrower must be verified through a review of a photo ID prior to signing
the loan documents, and an Affidavit of Identity completed. The returned package should NOT
contain a copy of the photo ID.

_MD_ (5)    The 1003 Loan Application must be signed and the Borrower(s) must initial each page. The
closing agent should verify that the information on the 1st page of the 1003 is accurate. If the
information is not accurate, the closing agent should mark through the information, put the
correct information in the field, and have the Borrower(s) initial the change.

_MD_ (6)    Neither the closing agent nor any Borrower(s) or additional signatory should mark through any
dates, or any other printed information.

hm:closees                                    Page 1 of 2

PLAINTIFF'S
EXHIBIT

14

PF
12.12

PF 0008

LOAN NO.: 10151457

_____ (7)  If, after obtaining written consent from HLC for modification of any information, handwritten modification(s) occur, all modifications must be initialed by all persons signing the document modified.

_____ (8)  If the Settlement Statement reflects that the Borrower(s) must bring money to the closing, the closing agent must collect these funds prior to allowing execution of the Settlement Statement and the loan documents.

_____ (9)  There can be no faxed documents used at closing without the prior written consent of the Vice President of Operations or the Assistant Vice President of Secondary Marketing.

_____ (10)  ALL documents must be signed. The Borrower(s) cannot omit to sign any document without the written consent of the Vice President of Operations or the Assistant Vice President of Secondary Marketing.

_____ (11)  The closing agent must provide the Borrower(s) with one copy of each document signed, and obtain from the Borrower(s) a signed acknowledgement of receipt of copies of all documents.

_____ (12)  Each Borrower and any other person with a right to rescind under Reg. Z must sign and retain 2 copies of the Notice of Right to Cancel, 1 copy of the Truth in Lending Statement, and the acknowledgement of receipt of Good Faith Estimate and if applicable, the ARM Disclosure.

_____ (13)  Borrower(s) must sign a prepayment penalty rider, if included in package. Indicate here "yes" or "no" as to whether it is included. If included, was it signed? _____

_____ (14)  Borrower(s) must sign the Arbitration Agreement included in the package.

_____ (15)  All executed documents returned to HLC must be accompanied by a Transaction Specific Closing Protection Letter in a form pre-approved by HLC.

_____ (16)  If the closing agent notes any problems with the documents or the manner in which the documents were executed by the Borrower(s) and, if appropriate, and additional signatories, the documents must nevertheless be returned to HLC within the time specified in these instructions.

_____ (17)  All executed documents and this completed checklist must be sent by overnight courier (10:00 am delivery) the same day you receive the executed documents. If you use outside closers for the signing, those closers must return executed documents to you by the first available overnight courier pickup following the closing, for delivery to you by 10:00 am following the closing.

The same day the funds are disbursed to the borrower, you must fax to HLC a copy of the disbursement ledger to fax # (770) 850-1455.

Please complete this checklist, sign where indicated below, and return the completed document with the package sent to HLC.

_____
Settlement Agent

Page 2 of 2

HALCLOSE2

## CLOSING INSTRUCTIONS

Lender: HOMEOWNERS LOAN CORP.
4501 CIRCLE 75 PARKWAY, SUITE D4300
ATLANTA, GA 30339

Loan Closer: KIVA HICKS
(770) 850-680
504-291-3007

Closing Agent:
Phone: ( ) 888-272-2915
Reference No.:

Vesting: PEARLIE FINCH

Mailing Address: 1716 PERCH DRIVE
MOBILE, AL. 36605

Seller(s): REFINANCE
Property Address: 1716 PERCH DRIVE
MOBILE, AL 36605

Payment: $ 429.41
Loan Type: CONVENTIONAL
Document Date: 12/29/03
1st Payment Date: 02/05/04
Last Payment Date: JANUARY 5, 2034
Sales Price:
Loan Amount: 46,000.00
Interest Rate: 10.750
Term: 360
Loan No.: 10151457
This loan must fund by: 01/05/04

All documents must be in our office within twenty-four hours of closing. The Borrower(s) are not to be charged any delivery charge (Fedex, UPS, etc.) without prior written consent of lender.
Please make sure all the documents listed on page 2 of this escrow instructions are completed at the time funds are requested.

| DESCRIPTION | BORROWER | SELLER |
|---|---|---|
| LOAN AMOUNT | 46,000.00 | |
| LENDER PAID CLOSING COSTS | | |
| YIELD SPREAD PREMIUM PAID TO BROKER -- P.O.C. | | |
| ORIGINATION FEE | 1,942.00 | |
| DISCOUNT POINTS | | |
| ORIGINATION FEE TO BROKER | | |
| PER DIEM INTEREST 0 DAYS @ $ 13.74 | | |
| INSPECTION FEE | | |
| COMMITMENT FEE | | |
| ADMINISTRATION FEE | 295.00 | |
| UNDERWRITING FEE | | |
| TAX SERVICE FEE | | |
| PROCESSING/UNDERWRITING FEE | 390.00 | |
| FUNDING FEE | 365.00 | |
| DOC PREP FEE | 195.00 | |
| TOTAL PAYOFFS (See Addendum to Closing Instructions) | 37,758.7 | |
| 1ST YEAR HAZARD INS PREM | | |
| 1ST YEAR FLOOD INS PREM | | |
| CLOSING FEE SWAFFORD & HAYS | 200.00 | |
| TITLE INSURANCE | 200.00 | |
| RECORDING FEES | 120.00 | |
| STATE TAX/STAMPS | 69.00 | |
| HAZARD MOS. @ | | |
| PROPERTY TAXES MOS. @ | | |
| FLOOD INSURANCE MOS. @ | | |
| MOS. @ | | |
| MOS. @ | | |
| AGGREGATE ADJUSTMENT | | |
| APPRAISAL FEE JAMES WILLIAMS | | |
| CREDIT REPORT FEE | | |
| TITLE | 225.00 | |
| ABSTRACT | 375.00 | |

BI-CLOSE

Page 1 of 2



PF 0042

**Hall-Frazier**
**Record - 000999**

All original forms (excluding the original mortgage) must be sent to Homeowners Loan Corp. Please include the following forms:

X : NOTE: Return original and 2 certified copies to the lender.
X : DEED OF TRUST and all applicable Riders: Return 3 certified copies to the lender.
X : HUD-1: Pages 1 and 2 to be completed. Two certified copies must be forwarded within 24 Hours after completion.

| | | | | |
|---|---|---|---|---|
| X : | TIL/Itemization | X : | Tax Information Sheet | : |
| X : | Closing Instructions | X : | Identity Affidavit | : |
| X : | Flood Notice | X : | Compliance Agreement | : |
| X : | Flood Hazard Determination | X : | Borrower Certs - | : |
| X : | First Lien/Clear Title | X : | Occupancy Affidavit | : |
| X : | Payment Info Letter | X : | RESPA Servicing Disc | : |
| X : | Rescission Notice | X : | Arbitration Agreement | : |
| X : | IRS W-9 - all borrowers | X : | | : |
| X : | Initial Escrow Acct Disc. | X : | | : |
| X : | Impound Acct Agreement | X : | | : |
| X : | Escrow Waiver Request | X : | | : |
| X : | Hazard Ins Authorization | : | | : |

**IMPORTANT NOTE:**
Settlement Agent must fax the following documents to Union Planters Bank at (901) 580-9620 prior to releasing funds.
    -Executed Mortgage Note        - Executed Deed of Trust/Mortgage/Security Deed

On the day the loan is funded, the Settlement Agent must fax to HLC's Accounting Department (fax 770-850-1309) the signed final HUD-1 settlement statement used to fund the loan.

ALTA policy must contain endorsements                                with liability in
the amount of       46,000.00        on property described herein. Issue said form of policy showing the title
vested as on page 1.
ISSUE SAID FORM OF POLICY FREE FROM ENCUMBRANCES, EXCEPT ITEM(S):
OF PRELIMINARY REPORT DATED

**Additional Items:**
Note: Items below MUST be followed or the closing must be stopped and the Loan Officer should be called.  If the following instructions are not followed the Title Company will be held accountable and may be penalized.
1) BORROWERS SHOULD SIGN ONLY WHERE PRINTED NAMES APPEAR.
2) THE CLOSER OR THE BORROWER SHOULD MARK THROUGH NO DATES.
3) THE BORROWERS SHOULD INITIAL ANY HANDWRITTEN INFORMATION ON THE DOCUMENTS.
4) THE 1003 APPLICATION MUST BE SIGNED AND EACH PAGE MUST BE INITIALED BY THE BORROWER(S).
5) THE CLOSER SHOULD VERIFY THAT THE INFORMATION ON THE 1ST PAGE OF THE 1003 IS ACCURATE.  IF THE INFORMATION IS NOT ACCURATE, THE CLOSER SHOULD MARK THROUGH THE INFORMATION, PUT THE CORRECT INFORMATION IN THE FIELD AND HAVE THE BORROWER INITIAL THE CHANGE.
6) ALL DOCUMENTS THAT REQUIRE NOTARIZATION MUST BE NOTARIZED AND THE NOTARY SEAL MUST BE VISIBLE.
7) LINE 804 OF HUD1-A SHOULD SHOW A CREDIT REPORT FEE OF $8.50 AS "POCL."
8) LINE 1303 OF HUD1-A SHOULD SHOW A FLOOD DETERMINATION FEE OF $9.50 AS "POCL."

Closing Agent Certification:

_____
Settlement Officer

FR.CLOSE

Page 2 of 2

PF 0043

Hall-Frazier
Record - 001000

Lender: HOMEOWNERS LOAN CORP.
Loan Number: 10151457
Borrower: FINCH

## ADDENDUM TO CLOSING INSTRUCTIONS

### DEBT PAYOFF SUMMARY

You are hereby instructed to pay-off the following debts at the close of escrow:

| Payable To: | Amount |
|---|---|
| BAIRD PROPERTIES | $ 36,634.72 |
| MOBILE COUNTY | $ 171.04 |
| TUCKER & ASSOCIATES | $ 370.00 |
| NATIONWIDE INSURANCE | $ 583.00 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

**TOTAL DEBTS TO BE PAID OFF:** $ 37,758.76

I/We hereby acknowledge that the above debts are being paid from the proceeds of our loan from the above named Lender.

_Pearlie Finch_                    _12/29/03_
Borrower PEARLIE FINCH             Date

_____            _____
Borrower                           Date

_____            _____
Borrower                           Date

_____            _____
Borrower                           Date

DEBT

PF 0044

**Hall-Frazier**
**Record - 001001**

# LEDGER CARD

Order #: 03-8042
Buyer/Borrower : Pearlie Finch
Seller :
Lender Name : Homeowners Loan
Loan Number : 10151457
roperty Address : 1716 Perch Drive, Mobile, AL  36605



PLAINTIFF'S
EXHIBIT

16

## POSTED ESCROWS

| ID# | Bank Name | Account # | Address | City | State | Balance |
|-----|-----------|-----------|---------|------|-------|---------|
| tn | Bank of America- TN | 003786777421 | | | | 0.00 |

### DEPOSITS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 01/05/2004 | funding wire | alisonw | 01/31/2004 | Homeowners Loan | 42,813.00 |
| *TOTAL DEPOSITS | | | | | 42,813.00 |

### CHECKS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 01/08/2004 | 00038608 | ronl | 01/31/2004 | Swafford and Hays Settlement Services, Inc. | (87.00) |
| 01/08/2004 | 00038609 | ronl | 01/31/2004 | Mobile County Judge of Probate | (69.00) |
| 01/08/2004 | 00038610 | ronl | 01/31/2004 | Mobile County Judge of Probate | (33.00) |
| 01/05/2004 | 00037723v | ronl | 01/31/2004 | Clerk of the Court | (189.00) |
| 01/05/2004 | 00037724 | bj | 01/31/2004 | Swafford and Hays Settlement Services, Inc. | (740.00) |
| 01/05/2004 | 00037725 | bj | 01/31/2004 | Swafford and Hays Settlement Services, Inc. | (200.00) |
| 01/05/2004 | 00037726 | bj | 01/31/2004 | Swafford and Hays Settlement Services, Inc. | (60.00) |
| 01/05/2004 | 00037727v | alisonw | 01/31/2004 | Pearlie Finch | (3,865.24) |
| 01/05/2004 | 00037728 | bj | 01/31/2004 | Mobile County Tax Collector | (171.04) |
| 01/05/2004 | 00037729 | bj | 01/31/2004 | Tucker & Associates | (370.00) |
| 01/05/2004 | 00037730 | bj | 01/31/2004 | Nationwide Insurance | (583.00) |
| 01/05/2004 | 00037731 | bj | 01/31/2004 | Baird Properties | (36,634.72) |
| 01/05/2004 | wire # 2226046 | alisonw | 01/31/2004 | Pearlie Finch | (3,865.24) |
| * TAL CHECKS | | | | | (46,867.24) |

### VOIDS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 01/05/2004 | 00037723 | ronl | 01/31/2004 | Clerk of the Court | 189.00 |
| 01/05/2004 | 00037727 | alisonw | 01/31/2004 | Pearlie Finch | 3,865.24 |
| *TOTAL VOIDS | | | | | 4,054.24 |

| **TOTALS FOR: tn | 0.00 |
|-------------------|------|

## ***POSTED TOTAL                                        0.00

## PENDING ESCROWS

## ****TOTAL(POSTED + PENDING)                             0.00

10/5/2005    4:20:18 PM



| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3786777421 | 37724 | $740.00 | | 1/6/2004 | 1200373086 |
| **Customer Data** | **Bank #** | **GL Category** | **CD VolID/CIMS Key** | **CD Label** | | |
| | 0 | 000000000000 | 20040202030701 | 20040202030701 | | |
| **Process Control** | | | | | | |


PLAINTIFF'S
EXHIBIT

10/5/2005    4:20:42 PM



Swafford and Hays          Bank of America -Tennessee
Settlement Services, Inc.
Escrow Account                                         037725
9041 Executive Park Drive Suite 400
Knoxville, TN 37923                               Date
(865) 539-1450                                   01/05/04

Pay   Two hundred and 00/100 Dollars                   $**200.00

To   Swafford and Hays Settlement Services, Inc.
    9041 Executive Park Drive, Suite 400
    Knoxville, TN 37923

                                               Void After 90 Days

Memo:
File: 03-8042                               Dayna Tampas

⑆00037725⑆ ⑈064000020⑈ 003786777421⑆ ⑆00000 20000⑈



| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3786777421 | 37725 | $200.00 | | 1/6/2004 | 1200373249 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label |
|---------------|--------|-------------|-------------------|----------|
| | 0 | 000000000000 | 20040202030701 | 20040202030701 |

Process Control

---

10/5/2005    4:20:34 PM





| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3786777421 | 37726 | $60.00 | 1/5/2004 | 1/6/2004 | 1200373186 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
|---|---|---|---|---|---|---|
| | 0 | 000000000000 | 20040202030701 | 20040202030701 | | |

Process Control

10/5/2005    4:24:29 PM



Swafford and Hays                          Bank of America -Tennessee
Settlement Services, Inc.                                    037728
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923                                          Date
(865) 539-1450                                           01/05/04

Pay   One hundred seventy one and 04/100 Dollars            $**171.04

To  Mobile County Tax Collector

                                              Void After 90 Days
Memo:  998503 GM
File: 03-8042                                   Dayne Tampas

⑆00037728⑆ ⑇064000020⑇ 003786777421⑆          ⑈0000017104⑈

---

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3786777421 | 37728 | $171.04 | | 1/12/2004 | 700812437 |
| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
| | 0 | 000000000000 | 20040202030701 | 20040202030701 | | |
| Process Control | | | | | | |

10/5/2005    4:24:12 PM





| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|-----------|-----------|----------|
| CD | 3786777421 | 37729 | $370.00 | | 1/14/2004 | 600741637 |
| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
| | 0 | 000000000000 | 20040202030701 | 20040202030701 | | |

Process Control

**Hall-Frazier**
**Record - 001007**

10/5/2005    4:24:20 PM



Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee
037730

Date
01/05/04

Pay  Five hundred eighty three and 00/100 Dollars

$**583.00

To  Nationwide Insurance

Void After 90 Days

Memo:
File: 03-8042

Dayne Tampas

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3786777421 | 37730 | $583.00 | | 1/14/2004 | 600741638 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label |
|---------------|--------|-------------|-------------------|----------|
| | 0 | 000000000000 | 20040202030701 | 20040202030701 |

Process Control

---

10/5/2005    4:24:38 PM



Swafford and Hays
Settlement Services, Inc.                    Bank of America -Tennessee
Escrow Account                                                    037731
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450                                                          Date
                                                                    01/05/04

Pay Thirty six thousand six hundred thirty four and 72/100 Dollars          $**36,634.72

To  Baird Properties

                                                              Void After 90 Days
Memo:
File: 03-8042                                          Dayne Tampas

⑈00037731⑈ ⑈064000020⑈ 003786777421⑈         ⑈0003663472⑈

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3786777421 | 37731 | $36,634.72 | 1/13/2004 | | 800600602 |
| **Customer Data** | **Bank #** | **GL Category** | **CD VolID/CIMS Key** | **CD Label** | | |
| | 0 | 000000000000 | 20040202030701 | 20040202030701 | | |
| **Process Control** | | | | | | |

10/5/2005    4:21:16 PM



Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee

038608

Date
01/08/04

Pay  Eighty seven and 00/100 Dollars                        $**87.00

To  Swafford and Hays Settlement Services, Inc.
    9041 Executive Park Drive, Suite 400
    Knoxville, TN  37923

Void After 90 Days

Memo:
File: 03-8042

⑆000038608⑆ ⑆064000020⑆ 003786777421⑆       ⑈0000008700⑈

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3786777421 | 38608 | $87.00 | | 1/16/2004 | 300892453 |
| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
| | 0 | 000000000000 | 20040202030701 | 20040202030701 | | |

**Process Control**

10/5/2005    4:21:58 PM





| Location | Acct # | | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|---|
| CD | 3786777421 | | 38609 | $69.00 | | 1/16/2004 | 1600322838 |
| **Customer Data** | **Bank #** | **GL Category** | | **CD VolID/CIMS Key** | | **CD Label** | |
| | 0 | 000000000000 | | 20040202030701 | | 20040202030701 | |
| **Process Control** | | | | | | | |

10/5/2005   4:21:45 PM



Swafford and Hays
Settlement Services, Inc.
Escrow Account
9041 Executive Park Drive Suite 400
Knoxville, TN 37923
(865) 539-1450

Bank of America -Tennessee

038610

Date
01/08/04

Pay  Thirty three and 00/100 Dollars

$**33.00

To  Mobile County Judge of Probate

Void After 90 Days

Memo:
File: 03-8042

⑈000386⑈0⑈ ⑆064000020⑆ 003786777421⑈             ⑈0000003300⑈

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3786777421 | 38610 | $33.00 | | 1/16/2004 | 1100652187 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
|---------------|--------|-------------|-------------------|----------|--|--|
| | 0 | 000000000000 | 20040202030701 | 20040202030701 | | |

Process Control

---

**Hall-Frazier**
**Record - 001012**

## Disbursement Sheet

| Order #: 03-8042 | Settlement Date: 12/29/2003 | Disbursement Date: 01/05/2004 |
|---|---|---|

| | | | |
|---|---|---|---|
| Buyer: | Pearlie Finch | Money Out: | $42,813.00 |
| Seller: | | Money In: | $42,813.00 |
| Property: | 1716 Perch Drive Mobile, AL 36605 | Difference: | $0.00 |
| Lender: | Homeowners Loan | | |
| I   #: | 10151457 | | |

### Money Out

| Ref# | Date | Name | Hud | Detail | | Amount |
|---|---|---|---|---|---|---|
| 00037724 | 1/5/2004 10:37:00 AM | Swafford and Hays Settlement Services, Inc. | 1102 | Abstract or title search | | $375.00 |
| | | | 1103 | Title examination | | $225.00 |
| | | | 1108 | Title Insurance | | $140.00 |
| | | | | | Total: | $740.00 |
| 00037725 | 1/5/2004 10:37:00 AM | Swafford and Hays Settlement Services, Inc. | 1101 | Settlement or closing fee | | $200.00 |
| | | | | | Total: | $200.00 |
| 00037726 | 1/5/2004 10:37:00 AM | Swafford and Hays Settlement Services, Inc. | 1108 | Title Insurance | | $60.00 |
| | | | | | Total: | $60.00 |
| 00038608 | 1/8/2004 5:50:33 PM | Swafford and Hays Settlement Services, Inc. | 1201 | Recording fees: | | $87.00 |
| | | | | | Total: | $87.00 |
| wire #  2226046 | 1/5/2004 5:51:59 PM | Pearlie Finch | 303 | Cash [ ]From [X]To Borrower | | $3,865.24 |
| | | | | | Total: | $3,865.24 |
| 00037728 | 1/5/2004 10:37:00 AM | Mobile County Tax Collector | 1502 | 2003 Taxes | | $171.04 |
| | | | | | Total: | $171.04 |
| C   /729 | 1/5/2004 10:37:00 AM | Tucker & Associates | 903 | Hazard Insurance Premium for | | $370.00 |
| | | | | | Total: | $370.00 |
| 00037730 | 1/5/2004 10:37:00 AM | Nationwide Insurance | 904 | Flood Insurance Premium for: | | $583.00 |
| | | | | | Total: | $583.00 |
| 00037731 | 1/5/2004 10:37:00 AM | Baird Properties | 1501 | Payoff | | $36,634.72 |
| | | | | | Total: | $36,634.72 |
| 00038609 | 1/8/2004 5:50:33 PM | Mobile County Judge of Probate | 1203 | State tax/stamps:   Deed $0.00 Mortgage $69.00 | | $69.00 |
| | | | | | Total: | $69.00 |
| 00038610 | 1/8/2004 5:50:33 PM | Mobile County Judge of Probate | 1201 | Recording fees: | | $33.00 |
| | | | | | Total: | $33.00 |

### Money In

| Ref# | Date | Name | Hud | Detail | | Amount |
|---|---|---|---|---|---|---|
| 03-8042/Lender/1 | 01/05/2004 | Homeowners Loan | | | | |
| | | | 808 | Processing\Underwriter Fee | | ($390.00) |
| | | | 809 | Funding Fee | | ($365.00) |
| | | | 810 | Administration Fee | | ($295.00) |
| | | | 811 | Document Preparation Fee | | ($195.00) |
| | | | 801 | Loan Origination Fee | | ($1,942.00) |
| | | | 1600 | Loan Amount | | $46,000.00 |
| | | | | | Total: | $42,813.00 |

PLAINTIFF'S

# E C O A NOTICE

Date: DECEMBER 29, 2003
Lender: HOMEOWNERS LOAN CORP.

Loan No.: 10151457

### EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of age, race, color, religion, national origin, sex, marital status, receipt of income from public assistance programs, or the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency which administers compliance with this law concerning this Lender is: Federal Trade Commission, Sixth & Pennsylvania, Washington, DC 20580.

### FAIR CREDIT REPORTING ACT NOTICE

In connection with your application for a loan, please be advised that we will order a credit report regarding your credit experience. This report may contain information on your character, general reputation, personal characteristics or mode of living, in addition to your actual credit experience from persons or firms with which you have done business, your credit worthiness, your credit standing and credit capacity. You have a right given by Federal law to know the nature and scope of the information given in this report if you make a written request for the information. In the event we deny your application or raise the cost of your credit based on this information, you have a right within sixty (60) days to make a written request that we disclose the name and address of the reporting agency used.

### FAIR LENDING NOTICE

It is illegal to discriminate in the provision of or in the availability of financing assistance because of the consideration of:

1. Trends, characteristics or conditions in the neighborhood or geographic area surrounding a housing accommodation, unless the financial institution can demonstrate in the particular case that such consideration is required to avoid an unsafe business practice.

or

2. Race, color, religion, sex, marital status, national origin, or ancestry.

It is illegal to consider the racial, ethnic, religious or national origin composition of neighborhood or geographic area surrounding a housing accommodation or whether or not such composition is undergoing change, or is expected to undergo change. In appraising a housing accommodation or in determining whether or not, or under what terms and conditions, to provide financial assistance.

These provisions govern financial assistance for the purpose of the purchase, construction, rehabilitation or refinancing of one to four family residences by the owner and for the purpose of the home improvement of any one to four unit family residence.

If you have any questions about your rights or if you wish to file a complaint, contact the management of this financial institution.

DECEMBER 29, 2003
Date


_____ (Seal)
PEARLIE FINCH             - Borrower

_____ (Seal)
                          - Borrower

_____ (Seal)
                          - Borrower

PLAINTIFF'S
EXHIBIT
19

2/27/03 9:18 AM

| Settlement Statement | U.S. Department of Housing | |
|---|---|---|
| Transactions without Sellers | and Urban Development | OMB Approval No. 2502-0491 |

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| James C. Gibbs, 155 Bayview Dr., Daphne, AL 36526 | HomeOwners Loan Corporation |
| Mary L. Gibbs | 4501 Circle 75 Parkway |
| | Suite F6300 |
| | Atlanta, GA 30339 |
| Property Location : | Settlement Agent: Swafford and Hays Settlement Services, Inc. (86... |
| 155 Bayview Dr., Daphne, AL 36526 | |
| | Place of Settlement:    TIN: 59-3684300 |
| Loan Number: | 224 S. Peters Road, Ste. 205, Knoxville, TN 37923 |
| Title Number: 11649 | Settlement Date: 02/27/2003 |

| L. | Settlement Charges | | M. | Disbursement to Others | |
|---|---|---|---|---|---|
| 800 | Items payable in connection with loan | | | | |
| 801 | Loan origination fee  to HomeOwners Loan Corporation | 4,150.00 | | | |
| 802 | Loan discount | 0.00 | 1501 | Payoff  to Chase Manhattan | 98,735.50 |
| 803 | Appraisal fee | 0.00 | | | |
| 804 | Credit report to .   POCL 8.50 | 0.00 | 1502 | Payment  to First USA | 8,508.00 |
| 805 | Lender's inspection fee | 0.00 | | | |
| 806 | Mortgage insurance application fee | 0.00 | 1503 | Payment  to Sears | 9,226.00 |
| 807 | Assumption fee | 0.00 | | | |
| 808 | Underwriting Fee Processing Fee  to HomeOwners Loan Co | 390.00 | 1504 | Payment  to MBNA | 20,210.00 |
| 809 | Funding Fee  to HomeOwners Loan Corporation | 385.00 | | | |
| 810 | Administration Fee  to HomeOwners Loan Corporation | 295.00 | 1505 | Payment  to MBNA | 8,950.00 |
| 811 | Document Preparation Fee  to HomeOwners Loan Corporat | 195.00 | | | |
| 900 | Items required by lender to be paid in advance | | 1506 | | 0.00 |
| 901 | Interest from | 0.00 | | | |
| 902 | Mortgage insurance premium for | 0.00 | 1507 | | 0.00 |
| 903 | Hazard insurance premium for | 0.00 | | | |
| 904 | Flood Insurance Premium | 0.00 | 1508 | | 0.00 |
| 1000 | Reserves deposited with lender | | 1509 | | 0.00 |
| 1001 | Hazard insurance | 0.00 | | | |
| 1002 | Mortgage insurance | 0.00 | 1510 | | 0.00 |
| 1003 | City property taxes | 0.00 | | | |
| 1004 | County property taxes | 0.00 | 1511 | | 0.00 |
| 1005 | Annual assessments (maint.) | 0.00 | | | |
| 1006 | | 0.00 | 1512 | | 0.00 |
| 1007 | Aggregate Accounting Adjustment | 0.00 | | | |
| 1008 | | 0.00 | 1513 | | 0.00 |
| 1100 | Title charges | | | | |
| 1101 | Settlement or closing fee  to Swafford and Hays Settlement | 200.00 | 1514 | | 0.00 |
| 1102 | Abstract or title search  to Swafford and Hays Settlement Se | 375.00 | | | |
| 1103 | Title examination  to Swafford and Hays Settlement Services | 225.00 | 1515 | | 0.00 |
| 1104 | Title insurance binder | 0.00 | | | |
| 1105 | Document preparation | 0.00 | 1516 | | 0.00 |
| 1106 | Notary fees | 0.00 | | | |
| 1107 | Attorney's fees to | 0.00 | 1517 | | 0.00 |
| | Includes above items no.: | | | | |
| 1108 | Title insurance  to Swafford and Hays Settlement Services, | 519.00 | 1518 | | 0.00 |
| | Includes above items no.: | | | | |
| 1109 | Lender's coverage  $152,875.00  $519.00 | | 1519 | | 0.00 |
| 1110 | Owner's coverage | | | | |
| 1111 | Endorsements | 0.00 | | | |
| 1112 | Recording Fees Payable To | 0.00 | | | |
| 1113 | Swafford & Hays | 0.00 | 1520 | Total Disbursed | 146,629.50 |
| 1200 | Government recording and transfer charges | | | | |
| 1201 | Recording fees:    Mortgage $120.00 | 120.00 | N. | Net Settlement | |
| 1202 | City/county tax/stamps: | 0.00 | | | |
| 1203 | State tax/stamps:   Mortgage $229.50 | 229.50 | | | |
| 1204 | Florida Intangible Tax | 0.00 | 1600 | Loan Amount | 152,875.00 |
| 1205 | GA Mortgage Tax | 0.00 | | | |
| 1300 | Additional settlement charges | | 1601 | Plus Check/Cash from Borrower | 0.00 |
| 1301 | Survey | 0.00 | 1602 | Minus total settlement charges | 7,063.50 |
| 1302 | Pest inspection | 0.00 | | (line 1400) | |
| 1303 | Flood Determination  to .   POCL 9.50 | 0.00 | 1603 | Minus Total Disbursements to Others | 146,629.50 |
| 1304 | | 0.00 | | (line 1520) | |
| 1305 | | 0.00 | | | |
| 1306 | | 0.00 | 1604 | Equals disbursements to borrower | |
| 1307 | | 0.00 | | (after expiration of any applicable | |
| 1400 | Total settlement charges (enter on line 1602) | 7,063.50 | | rescission period required by law) | 182.00 |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

**Hall-Frazier**
**Record - 001015**

# CLOSING INSTRUCTIONS

Lender: **HOMEOWNERS LOAN CORP.**
      **4501 CIRCLE 75 PARKWAY, SUITE D4300**
      **ATLANTA, GA   30339**

Loan Closer: **JENNIFER BARON**
          **(770) 850-680**
          **504-291-3007**

Closing Agent:
Phone: (    ) **888-272-2915**
Reference No.:

Vesting: **MARY L. GIBBS**

Mailing Address: **155 BAYVIEW DRIVE**
                **DAPHNE, AL 36526**

Seller(s): **REFINANCE**
Property Address: **155 BAYVIEW DRIVE**
               **DAPHNE, AL 36526**

Payment: $ **1,135.10**
Loan Type: **CONVENTIONAL**
Document Date: **02/27/03**
1st Payment Date: **04/04/03**
Last Payment Date: **MARCH 4, 2033**
Sales Price:
Loan Amount: **152,875.00**
Interest Rate: **8.125**
Term: **360**
Loan No.: **10065888**
This loan must fund by: **03/04/03**


PLAINTIFF'S EXHIBIT 27

All documents must be in our office within twenty-four hours of closing. The Borrower(s) are not to be charged any delivery charge (Fedex, UPS, etc.) without prior written consent of lender.
Please make sure all the documents listed on page 2 of this escrow instructions are completed at the time funds are requested.

| DESCRIPTION | BORROWER | SELLER |
|---|---|---|
| LOAN AMOUNT | 152,875.00 | |
| LENDER PAID CLOSING COSTS | | |
| YIELD SPREAD PREMIUM PAID TO BROKER -- P.O.C. | | |
| | | |
| ORIGINATION FEE | 4,150.00 | |
| DISCOUNT POINTS | | |
| ORIGINATION FEE TO BROKER | | |
| PER DIEM INTEREST   **0**   DAYS @ $ **34.50** | | |
| INSPECTION FEE | | |
| COMMITMENT FEE | | |
| **ADMINISTRATION FEE** | 295.00 | |
| UNDERWRITING FEE | | |
| TAX SERVICE FEE | | |
| **PROCESSING/UNDERWRITING FEE** | 390.00 | |
| **FUNDING FEE** | 365.00 | |
| **DOC PREP FEE** | 195.00 | |
| | | |
| | | |
| TOTAL PAYOFFS (See Addendum to Closing Instructions) | 145,629. | |
| | | |
| 1ST YEAR HAZARD INS PREM | | |
| 1ST YEAR FLOOD INS PREM | | |
| CLOSING FEE   **SWAFFORD & HAYS** | 200.00 | |
| TITLE INSURANCE | 519.00 | |
| RECORDING FEES | 120.00 | |
| STATE TAX/STAMPS | 229.50 | |

All original forms (excluding the original mortgage) must be sent to Homeowners Loan Corp.  Please include the following forms:

X :  NOTE: Return original and 2 certified copies to the lender.
X :  DEED OF TRUST and all applicable Riders: Return 3 certified copies to the lender.
X :  HUD-1: Pages 1 and 2 to be completed.  Two certified copies must be forwarded within 24 Hours after completion.

| | | | | |
|---|---|---|---|---|
| X : | TIL/Itemization | X : | Tax Information Sheet | : |
| X : | Closing Instructions | X : | Identity Affidavits | : |
| X : | Flood Notice | X : | Compliance Agreement | : |
| X : | Flood Hazard Determination | X : | Borrower Certs | : |
| X : | First Lien/Clear Title | X : | Occupancy Affidavit | : |
| X : | Payment Info Letter | X : | RESPA Servicing Disc | : |
| X : | Rescission Notice | X : | Arbitration Agreement | : |
| X : | IRS W-9 - all borrowers | X : | | : |
| X : | Initial Escrow Acct Disc. | X : | | : |
| X : | Impound Acct Agreement | X : | | : |
| X : | Escrow Waiver Request | X : | | : |
| X : | Hazard Ins Authorization | : | | : |

IMPORTANT NOTE:
Settlement Agent must fax the following documents to Union Planters Bank at (901) 580-9620 prior to releasing funds.
        -Executed Mortgage Note                  - Executed Deed of Trust/Mortgage/Security Deed

On the day the loan is funded, the Settlement Agent must fax to HLC's Accounting Department (fax 770-850-1309) the signed final HUD-1 settlement statement used to fund the loan.

ALTA policy must contain endorsements                                                with liability in
the amount of        **152,875.00**        on property described herein.  Issue said form of policy showing the title
vested as on page 1.
ISSUE SAID FORM OF POLICY FREE FROM ENCUMBRANCES, EXCEPT ITEM(S):
OF PRELIMINARY REPORT DATED

Additional Items:
Note: Items below MUST be followed or the closing must be stopped and the Loan Officer should be called.  If the following instructions are not followed the Title Company will be held accountable and may be penalized.

1) **BORROWERS SHOULD SIGN ONLY WHERE PRINTED NAMES APPEAR.**
2) **THE CLOSER OR THE BORROWER SHOULD MARK THROUGH NO DATES.**
3) **THE BORROWERS SHOULD INITIAL ANY HANDWRITTEN INFORMATION ON THE DOCUMENTS.**
4) **THE 1003 APPLICATION MUST BE SIGNED AND EACH PAGE MUST BE INITIALED BY THE BORROWER(S).**
5) **THE CLOSER SHOULD VERIFY THAT THE INFORMATION ON THE 1ST PAGE OF THE 1003 IS ACCURATE.  IF THE INFORMATION IS NOT ACCURATE, THE CLOSER SHOULD MARK THROUGH THE INFORMATION, PUT THE CORRECT INFORMATION IN THE FIELD AND HAVE THE BORROWER INITIAL THE CHANGE.**
6) **ALL DOCUMENTS THAT REQUIRE NOTARIZATION MUST BE NOTARIZED AND THE NOTARY SEAL MUST BE VISIBLE.**
7) **LINE 804 OF HUD1-A SHOULD SHOW A CREDIT REPORT FEE OF $8.50 AS "POCL."**
8) **LINE 1303 OF HUD1-A SHOULD SHOW A FLOOD DETERMINATION FEE OF $9.50 AS "POCL."**

**Hall-Frazier**
**Record - 001017**

05 Oct 2005
04:46 PM

# File 11549 Ledger

## File Status : Open

Page 1

**Escrow Unit -**   1 - Swafford & Hays Settlement Services, Inc

**Escrow Officer -**

**Seller -**
**Buyer -** James Gibbs

| Unit | Bank | C/I | Date | Posted | Paid | Deposit | TT | ST | SC | Trans No | Dep No | Debit | Credit | Balance | Name or Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/05/03 | | CK | | C | 34080 | | (263.50) | | (263.50) | Baldwin County Judge of Probate |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34081 | | (98,735.50) | | (98,999.00) | Chase Manhattan |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34082 | | (8,508.00) | | (107,507.00) | First USA |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34083 | | (182.00) | | (107,689.00) | James C. Gibbs |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34084 | | (20,210.00) | | (127,899.00) | MBNA |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34085 | | (8,950.00) | | (136,849.00) | MBNA |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34086 | | (40.00) | | (136,889.00) | Phaith Signings, Inc. |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34087 | | (75.00) | | (136,964.00) | Phyllis L. Bordelon |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34088 | | (9,226.00) | | (146,190.00) | Sears |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34089 | | (848.30) | | (147,038.30) | Swafford and Hays Settlement Servic |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34090 | | (86.00) | | (147,124.30) | Swafford and Hays Settlement Servic |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34091 | | (155.70) | | (147,280.00) | Swafford and Hays Settlement Servic |
| 1 | BOA1 | C | 03/04/03 | 03/04/03 | 03/31/03 | | CK | | C | 34092 | | (200.00) | | (147,480.00) | Swafford and Hays Settlement Servic |
| 1 | BOA1 | C | 03/05/03 | 03/05/03 | 03/05/03 | | IW | | M | 6026 | | | 147,480.00 | 0.00 | Funding wire |
| 1 | BOA1 | C | 03/05/03 | 03/05/03 | 03/05/03 | | CK | C | M | 34080 | | | 263.50 | 263.50 | Cancel |
| 1 | BOA1 | C | 03/05/03 | 03/05/03 | 03/31/03 | | CK | | E | 34377 | | (0.15) | | 263.35 | SWAFFORD & HAYS |
| 1 | BOA1 | C | 03/05/03 | 03/05/03 | 03/31/03 | | CK | | E | 34378 | | (263.35) | | 0.00 | BALDWIN COUNTY JUDGE OF PORBATE |
| | | | | | | | | | | | | (147,743.50) | 147,743.50 | 0.00 | Totals |



PLAINTIFF'S EXHIBIT

22

10/5/2005    4:30:02 PM





| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3781815100 | 134081 | $98,735.50 | | 3/6/2003 | 300556942 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label |
|---------------|--------|-------------|-------------------|----------|
| | 0 | 000000000000 | 20030402026501 | 20030402026501 |

**Process Control**

---

10/5/2005    4:30:54 PM



Acct 4325-1592-0418-4646

**Swafford and Hays**
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830

1-34082
87-226/640

Date
3/4/2003

Pay    Pay Eight Thousand Five Hundred Eight and 00/100 Dollars    $ ****$8,508.00

To The Order    First USA

(1309) Payment - $8,508.00
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

Void after 90 days

4325159204184646  0850800
0323859

⑈134082⑈ ⑈064000020⑈ 003781815100⑈ ⑈00008508000⑈



---

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3781815100 | 134082 | $8,508.00 | | 3/10/2003 | 1100701883 |
| **Customer Data** | **Bank #** | **GL Category** | **CD VolID/CIMS Key** | **CD Label** | | |
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | | |

**Process Control**

---

10/5/2005 4:29:46 PM

Swafford and Hays
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830

1-34083
87-228/640

Date 3/4/2003

Pay Pay One Hundred Eighty Two and 00/100 Dollars $ ******$182.00

To The Order Of
James C. Gibbs
Mary L. Gibbs
155 Bayview Dr.
Daphne, AL 36526

Void after 90 days

(303) Cash to buyer - $182.00
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

⑈134083⑈ ⑆064000020⑆ 003781815100⑈ ⑉0000018200⑉

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3781815100 | 134083 | $182.00 | | 3/7/2003 | 100178081 |

| Customer Data | Bank # | GL Category | CD VoIID/CIMS Key | CD Label |
|---|---|---|---|---|
| | 0 | 000000000000 | 20030402026501 | 20030402026501 |

Process Control

10/5/2005 4:30:20 PM

Acct No. 5490-3500-7606-7615

Swafford and Hays
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830

1-34084
87-226/640

Date 3/4/2003

Pay Pay Twenty Thousand Two Hundred Ten and 00/100 Dollars $ ***$20,210.00

To The Order Of MBNA

Void after 90 days 3534 0002

(1311) Payment - $20,210.00
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

⑈134084⑈ ⑆064000020⑆ 0037818151OO⑈ ⑈0002021000⑈

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3781815100 | 134084 | $20,210.00 | | 3/10/2003 | 1000865983 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label |
|---|---|---|---|---|
| | 0 | 000000000000 | 20030402026501 | 20030402026501 |

**Process Control**

**Hall-Frazier**
**Record - 001022**

10/5/2005    4:30:28 PM





| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3781815100 | 134085 | $8,950.00 | | 3/10/2003 | 1000865989 |
| Customer Data | Bank # | GL Category | CD VoiID/CIMS Key | CD Label | | |
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | | |
| Process Control | | | | | | |

**Hall-Frazier**
**Record - 001023**

10/5/2005    4:30:10 PM





| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3781815100 | 134086 | $40.00 | | 3/10/2003 | 1000861816 |
| **Customer Data** | **Bank #** | **GL Category** | **CD VolID/CIMS Key** | **CD Label** | | |
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | | |

**Process Control**

---

**Hall-Frazier**
**Record - 001024**

10/5/2005    4:31:29 PM



Swafford and Hays
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830          1-34087
87-228/640

Date
3/4/2003

Pay    Pay Seventy Five and 00/100 Dollars                    $ *******$75.00

To
The
Order
Of    Phyllis L. Bordelon

Void after 90 days

(1101) Mary Gibbs Closing - $75.00
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

⑈134087⑈ ⑆064000020⑆ 003781815100⑈ ⑉0000007500⑉



| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3781815100 | 134087 | $75.00 | | 3/6/2003 | 1200125341 |

| Customer Data | Bank # | GL Category | CD VoIID/CIMS Key | CD Label | |
|---|---|---|---|---|---|
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | |

**Process Control**

10/5/2005    4:29:54 PM





| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3781815100 | 134088 | $9,226.00 | 3/4/2003 | 3/11/2003 | 300513543 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | |
|---------------|--------|-------------|-------------------|----------|--|
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | |

**Process Control**

10/5/2005    4:17:41 PM



**Swafford and Hays**
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830

1-34089
87-228/640

Date
3/4/2003

Pay    Pay Eight Hundred Forty Eight and 30/100 Dollars                    $******$848.30

To The Order Of    Swafford and Hays Settlement Services, Inc.

Void after 90 days

(1101) Settlement or closing fee - $200.00
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

⑈134089⑈ ⑆064000020⑆ 003781815100⑈ ⑈00000084830⑈

| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3781815100 | 134089 | $848.30 | | 3/6/2003 | 300679071 |
| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | | |
| Process Control | | | | | | |

10/5/2005    4:17:17 PM



**Swafford and Hays**
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830

1-34090
87-226/640

Date
3/4/2003

Pay        Pay Eighty Six and 00/100 Dollars                    $ *******$86.00

To
The
Order        Swafford and Hays Settlement Services, Inc.

(1201) Recording Refund - $86.00
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

Void after 60 days

⑈134090⑈ ⑆064000020⑆ 003781815100⑈ ⑆0000008600⑈



| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3781815100 | 134090 | $86.00 | | 3/5/2003 | 200591784 |
| **Customer Data** | **Bank #** | **GL Category** | **CD VolID/CIMS Key** | **CD Label** | | |
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | | |

**Process Control**

10/5/2005   4:17:33 PM



**Swafford and Hays**
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830

1-34091

87-228/840

Date
3/4/2003

Pay      Pay One Hundred Fifty Five and 70/100 Dollars                    $ ******$155.70

To The Order        Swafford and Hays Settlement Services, Inc.

(1109) Title Insurance Premium - $155.70
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

Void after 90 days

⑈134091⑈ ⑈064000020⑈ 003781815100⑈ ⑈000000155 70⑈



| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3781815100 | 134091 | $155.70 | | 3/5/2003 | 200591825 |
| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | | |

Process Control

**Hall-Frazier**
**Record - 001029**

10/5/2005    4:17:25 PM



Swafford and Hays
Settlement Services, Inc.
Escrow Account
224 S. Peters Road, Ste 110
Knoxville, TN 37923
(865) 539-1450

Bank of America - TENNESSEE
OAK RIDGE, Tennessee 37830

1-34092
87-226/640

Date
3/4/2003

Pay      Pay Two Hundred and 00/100 Dollars                    $ *******$200.00

To
The
Order
Of      Swafford and Hays Settlement Services, Inc.

Void after 90 days

(1103) Title Search Fee - $200.00
File : 11549
Buyer : James C. Gibbs; Mary L. Gibbs

⑈134092⑈ ⑆064000020⑆ 003781815100⑈ ⑈00000 20000⑈



| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|---|---|---|---|---|---|---|
| CD | 3781815100 | 134092 | $200.00 | | 3/5/2003 | 200591807 |
| **Customer Data** | **Bank #** | **GL Category** | **CD VolID/CIMS Key** | | **CD Label** | |
| | 0 | 000000000000 | 20030402026501 | | 20030402026501 | |

**Process Control**

10/5/2005    4:16:39 PM





| Location | Acct # | Check # | Amount | Issue Date | Paid Date | Sequence |
|----------|--------|---------|--------|------------|-----------|----------|
| CD | 3781815100 | 134378 | $263.35 | | 3/11/2003 | 200509850 |

| Customer Data | Bank # | GL Category | CD VolID/CIMS Key | CD Label | | |
|---------------|--------|-------------|-------------------|----------|---|---|
| | 0 | 000000000000 | 20030402026501 | 20030402026501 | | |

**Process Control**

Disbursement Worksheet                          10/5/05 4:46 PM
File 11549

## Swafford and Hays Settlement Services, Inc. (865) 539-1450

## Disbursement Worksheet

| | |
|---|---|
| Seller(s) | |
| Buyer(s) | James C. Gibbs, 155 Bayview Dr., Daphne, AL 36526<br>Mary L. Gibbs |
| Lender | HomeOwners Loan Corporation, 4501 Circle 75 Parkway, Suite F6300, Atlanta, GA 30339 |
| Property | 155 Bayview Dr., Daphne, AL 36526 |
| Closing date | 2/27/2003                          Proration date   3/4/2003 |
| Bank | BOA1 - Bank of America - TENNESSEE |
| Escrow Unit | 1 - Swafford & Hays Settlement Services, Inc |
| Escrow Officer | |

### Receipts

| Date | Reference # | Item # | Description | Amount |
|------|-------------|--------|-------------|--------|
| | | (01) | HomeOwners Loan Corporation<br>4501 Circle 75 Parkway<br>Suite F6300<br>Atlanta, GA 30339 | |
| | | (202) | Principal amount of new loan(s) | 152,875.00 |
| | | (801) | Loan origination fee | (4,150.00) |
| | | (811) | Document Preparation Fee | (195.00) |
| | | (810) | Administration Fee | (295.00) |
| | | (809) | Funding Fee | (365.00) |
| | | (808) | Underwriting Fee Processing Fee | (390.00) |
| | | | Total : | 147,480.00 |
| | | | Receipt Total: | 147,480.00 |

### Disbursements

| Date | Reference # | Item # | Description | Amount |
|------|-------------|--------|-------------|--------|
| 3/4/2003 | 1-34080 | (01) | Baldwin County Judge of Probate | |
| | | (1201) | Recording fees | 120.00 |
| | | (1201) | Split Disbursements | (86.00) |
| | | (1203) | State tax/stamps | 229.50 |
| | | | Total : | 263.50 |
| 3/4/2003 | 1-34081 | (02) | Chase Manhattan | |
| | | (1308) | Payoff Loan #30-1995232677-532 | 98,735.50 |
| 3/4/2003 | 1-34082 | (03) | First USA | |
| | | (1309) | Payment | 8,508.00 |
| 3/4/2003 | 1-34083 | (04) | James C. Gibbs<br>Mary L. Gibbs<br>155 Bayview Dr.<br>Daphne, AL 36526 | |
| | | (303) | Cash to buyer | 182.00 |

Page 1

Hall-Frazier
Record - 001032

**Disbursement Worksheet**
File 11549

10/5/05 4:46 PM

| | | | | | |
|---|---|---|---|---|---|
| 3/4/2003 | 1-34084 | (05) | | MBNA | |
| | | (1311) | | Payment | 20,210.00 |
| 3/4/2003 | 1-34085 | (06) | | MBNA | |
| | | (1312) | | Payment | 8,950.00 |
| 3/4/2003 | 1-34086 | (07) | | Phaith Signings, Inc. | |
| | | (1101) | | closing | 40.00 |
| 3/4/2003 | 1-34087 | (08) | | Phyllis L. Bordelon | |
| | | (1101) | | Mary Gibbs Closing | 75.00 |
| 3/4/2003 | 1-34088 | (09) | | Sears | |
| | | (1310) | | Payment | 9,226.00 |
| 3/4/2003 | 1-34089 | (10) | | Swafford and Hays Settlement Services, Inc. | |
| | | (1101) | | Settlement or closing fee | 200.00 |
| | | (1101) | | Split Disbursements | (40.00) |
| | | (1101) | | Split Disbursements | (75.00) |
| | | (1102) | | Abstract or title search | 375.00 |
| | | (1103) | | Title examination | 225.00 |
| | | (1103) | | Split Disbursements | (200.00) |
| | | (1109) | | Lender's coverage- | 519.00 |
| | | (1109) | | Split Disbursements | (155.70) |
| | | | | Total : | **848.30** |
| 3/4/2003 | 1-34090 | (11) | | Swafford and Hays Settlement Services, Inc. | |
| | | (1201) | | Recording Refund | 86.00 |
| 3/4/2003 | 1-34091 | (12) | | Swafford and Hays Settlement Services, Inc. | |
| | | (1109) | | Title Insurance Premium | 155.70 |
| 3/4/2003 | 1-34092 | (13) | | Swafford and Hays Settlement Services, Inc. | |
| | | (1103) | | Title Search Fee | 200.00 |

Disbursement Total:    147,480.00

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (MADE IN COMPLIANCE WITH FEDERAL LAW)

Lender: **HOMEOWNERS LOAN CORP.**

Loan No.: **10065888**                                    Date: **02/27/03**

Borrower(s):   **MARY L. GIBBS AND JAMES C. GIBBS**

Property Address: **155 BAYVIEW DRIVE**
**DAPHNE, AL  36526**

[ ] Initial Disclosure estimated at time of application      [X] Final Disclosure based on contract terms

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you assuming the annual percentage rate does not change. | The amount of credit provided to you or on your behalf as of loan closing. | The amount you will have paid after you have made all payments as scheduled assuming the annual percentage rate does not change. |
| **8.979 %** | $ **282059.60** | $ **147280.00** | $ **429339.60** |

### YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 36 | 1135.10 | 04/04/2003 | | | |
| 324 | 1199.00 | 04/04/2006 | | | |

PLAINTIFF'S
EXHIBIT

25

* Includes mortgage insurance premiums, excludes taxes, hazard insurance or flood insurance.

[ ] **DEMAND FEATURE:** This loan transaction   [ ] does   [X] does not   have a demand feature.

[X] **VARIABLE RATE FEATURE:** The annual percentage rate may increase during the term of your loan if the index used to set the Note interest rate increases. A new index may be substituted under certain circumstances, and substitution of the new index may also increase the rate. The index at the beginning of your loan is described below: **THE AVERAGE OF INTERBANK OFFERED RATES FOR 6 MONTH U.S. DOLLAR-DENOMINATED DEPOSITS IN THE LONDON MARKET ("LIBOR"), AS PUBLISHED IN THE WALL STREET JOURNAL.          DISCLOSURES ABOUT THE VARIABLE RATE FEATURE OF YOUR LOAN HAVE BEEN PROVIDED TO YOU SEPARATELY.**

**SECURITY INTEREST:** You are giving a security interest in:
[ ] the goods or property being purchased.   [X] real property you already own.

**FILING OR RECORDING FEES** **120.00**

**LATE CHARGE:** If a payment is more than   **15**   days late, you will be charged $   **56.75**   /   **5**        % of the principal and interest past due.

**PREPAYMENT:** If you pay off your loan early, you
[X] may   [ ] will not   have to pay a penalty.
[ ] may   [X] will not   be entitled to a refund of part of the finance charge.

**INSURANCE:** Credit life, accident, health or loss of income insurance is not required in connection with this loan. This loan transaction requires the following insurance:
[X] Hazard Insurance   [ ] Flood Insurance   [ ] Private Mortgage Insurance   [ ] Mutual Mortgage Insurance
Borrower(s) may obtain insurance through any person of his/her choice, provided said carrier meets the requirements of the Lender. If Borrower desires Property Insurance to be obtained through the Lender's designated agency, the cost will be set forth in a separate insurance statement furnished by the Lender.

**ASSUMPTION:** Someone buying your h

**Hall-Frazier**
**Record - 001034**

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### "ITEMIZATION OF AMOUNT FINANCED"

| | |
|---|---|
| Lender: **HOMEOWNERS LOAN CORP.** | |
| Loan Number: **10065888** | Date **02/27/03** |
| Borrower: **MARY L. GIBBS** | Note Rate: **8.125** % |
| **JAMES C. GIBBS** | P & I Payment: $ **1135.10** |

| Loan Amount | Prepaid Finance Charges | | Amount Financed |
|---|---|---|---|
| $ **152875.00** | $ **5595.00** | = | $ **147280.00** |

| | | Amount |
|---|---|---|
| | Loan Origination Fee due Lender @ % | $ 4150.00 |
| 802 | Discount Fee @ % | $ |
| 901 | Prepaid Interest _____ days @ $ **34.50** | $ |
| 902 | Private Mortgage Insurance Premium | $ |
| 1002 | PMI/MMI Impounds _____ months X $ _____ per month | $ |
| 805 | Lender's Inspection Fee | $ |
| 806 | Mortgage Insurance Application Fee | $ |
| 807 | Assumption Fee | $ |
| 808 | Tax Service Contract | $ |
| 809 | Underwriting Review Fee | $ |
| 810 | Administration Fee | $ 295.00 |
| 811 | Application Fee | $ |
| 812 | Commitment Fee | $ |
| 813 | Warehouse Fee/ Interest Differential | $ |
| 814 | Yield Spread Premium _____ % $ _____ P.O.C. * | $ |
| 815 | Service Release Premium _____ % $ _____ P.O.C. * | $ |
| 816 | Origination Fee Due Broker | $ |
| 817 | FHA Upfront MIP/VA Funding Fee | $ |
| 818 | **PROCESSING/UNDERWRITING FEE** | $ 390.00 |
| 819 | **FUNDING FEE** | $ 365.00 |
| 820 | **DOC PREP FEE** | $ 195.00 |
| 821 | | $ |
| 822 | | $ |
| 823 | | $ |
| 824 | | $ |
| 825 | | $ |
| 1101 | Settlement or Closing Fee To: **SWAFFORD & HAYS** | $ 200.00 |
| 1107 | Attorney Fee To: | $ |

Lender Paid: _____ $ _____
P Paid: _____ $ _____
* Compensation to Broker not paid out of Loan Proceeds (P.O.C. Fees)

| PREPAID FINANCE CHARGE | | $ 5595.00 |
|---|---|---|
| | Property Insurance Premiums to Insurance Agency: | $ |
| 903 | First Year Hazard Insurance Premium | $ |
| 904 | First Year Flood Insurance Premium | $ |
| 803 | Appraisal Fee To: H & H APPRAISERS (LYONLL) Paid | $ |
| 804 | Credit Reporting Fees To: TRANS UNION Paid | $ |
| 1101 | Settlement or Closing Fee To: | $ |
| 1102 | Abstract or Title Search To: | $ |
| 1103 | Title Examination To: | $ |
| 1104 | Title Insurance Binder To: | $ |
| 1105 | Document Preparation Fee To: | $ |
| 1106 | Notary Fee To: | $ |
| 1107 | Attorney Fee To: | $ |
| 1108 | Title Insurance Premium To: **SWAFFORD & HAYS** | $ 519.00 |
| 1111 | Endorsement To: **TITLE EXAMINATION** | $ 225.00 |
| 1112 | **ABSTRACT OR TITLE SEARCH** | $ 375.00 |
| 1201 | Recording Fee to County Clerk | $ 120.00 |
| 1202 | City/County/Tax/Stamps | $ |
| 1203 | State Tax/Stamps | $ 229.50 |
| 1204 | | $ |
| 1301 | Survey To: | $ |
| 1302 | Termite/Pest Inspection | $ |
| 1303 | Property Inspection To: | $ |
| 1304 | Photo Fee To: | $ |
| 1305 | | $ |
| 1306 | | $ |
| 1307 | | $ |
| 13__ | **PAYOFFS** | $ 145629.50 |
| L Paid: _____ $ _____ | | |
| Br Paid: _____ $ _____ | | |
| Loan Proceeds To: | | (182.00) |

| AMOUNT PAID TO OTHERS ON YOUR BEHALF | | $ 147098.00 |
|---|---|---|
| 1001 | Hazard Insurance Impounds _____ months X $ _____ per month | |
| 1003 | City Property Taxes _____ months X $ _____ per month | |

Hall-Frazier
Record - 001035

# E C O A NOTICE

Date: **FEBRUARY 27, 2003**
Lender: **HOMEOWNERS LOAN CORP.**

Loan No.: **10065888**

EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of age, race, color, religion, national origin, sex, marital status, receipt of income from public assistance programs, or the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency which administers compliance with this law concerning this Lender is: Federal Trade Commission, Sixth & Pennsylvania, Washington, DC 20580.

FAIR CREDIT REPORTING ACT NOTICE

In connection with your application for a loan, please be advised that we will order a credit report regarding your credit experience. This report may contain information on your character, general reputation, personal characteristics or mode of living, in addition to your actual credit experience from persons or firms with which you have done business, your credit worthiness, your credit standing and credit capacity. You have a right given by Federal law to know the nature and scope of the information given in this report if you make a written request for the information. In the event we deny your application or raise the cost of your credit based on this information, you have a right within sixty (60) days to make a written request that we disclose the name and address of the reporting agency used.

FAIR LENDING NOTICE

It is illegal to discriminate in the provision of or in the availability of financing assistance because of the consideration of:

1. Trends, characteristics or conditions in the neighborhood or geographic area surrounding a housing accommodation, unless the financial institution can demonstrate in the particular case that such consideration is required to avoid an unsafe business practice.

or

2. Race, color, religion, sex, marital status, national origin, or ancestry.

It is illegal to consider the racial, ethnic, religious or national origin composition of neighborhood or geographic area surrounding a housing accommodation or whether or not such composition is undergoing change, or is expected to undergo change. In appraising a housing accommodation or in determining whether or not, or under what terms and conditions, to provide financial assistance.

These provisions govern financial assistance for the purpose of the purchase, construction, rehabilitation or refinancing of one to four family residences by the owner and for the purpose of the home improvement of any one to four unit family residence.

If you have any questions about your rights or if your wish to file a complaint, contact the management of this financial institution.

**FEBRUARY 27, 2003**
Date

_____ (Seal)
MARK L. GIBBS                    - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

ECOA

PLAINTIFF'S
EXHIBIT

26



# DEFENDANT'S RESPONSES TO DISCOVERY

LENDER:  HOMEOWNERS LOAN CORP.

IDENTIFICATION OF TRANSACTION:  REFINANCE                    LOAN NUMBER: 10065888

## NOTICE OF RIGHT TO CANCEL

### YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home.  You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is  02/27/03                    ; or
(2) The date you received your Truth in Lending disclosures; or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also canceled.  Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been canceled, and we must return to you any money or property you have given us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value.  You may offer to return the property at your home or at the location of the property.  Money must be returned to the address below.  If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us via fax toll free at (866) 862-4410 and/or in writing at:

HOMEOWNERS LOAN CORP.
ATTN: FUNDING DEPARTMENT
4501 CIRCLE 75 PARKWAY, SUITE A1225
ATLANTA, GA  30339

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below.  Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of  03/03/03      (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above).  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address or fax number no later than that time.

**I WISH TO CANCEL**

_____          _____
CONSUMER'S SIGNATURE                              DATE

*Although you may mail or otherwise deliver this notice to us, in order to prevent a possible funding error we kindly request that you fax this notice to us toll free at (866) 862-4410.*

I am/We are the only person(s) who (1) have an ownership interest in the property and (2) occupy it as a principal dwelling.  The exercise of this right by one borrower shall be effective as to all borrowers.

I/We Acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL.

_Mary L. Gibbs_                          2-27-03
Borrower  (MARY L. GIBBS)                    Date

_James C. Gibbs_                          2-27-03
Borrower  JAMES C. GIBBS                      Date

_____          _____
Borrower                                          Date

_____          _____
Borrower                                          Date

901 78144A-G (12/93)
CANCEL1

MG 0001

**Hall-Frazier**
**Record - 001038**

LENDER: **HOMEOWNERS LOAN CORP.**

IDENTIFICATION OF TRANSACTION: **REFINANCE**          LOAN NUMBER: **10065888**

## NOTICE OF RIGHT TO CANCEL

### YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is  **02/27/03**            ; or
(2) The date you received your Truth in Lending disclosures; or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also canceled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been canceled, and we must return to you any money or property you have given us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without obligation.

---
**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us via fax toll free at (866) 862-4410 and/or in writing at:

    **HOMEOWNERS LOAN CORP.**
    **ATTN: FUNDING DEPARTMENT**
    **4501 CIRCLE 75 PARKWAY, SUITE A1225**
    **ATLANTA, GA  30339**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of    **03/03/03**         (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address or fax number no later than that time.

**I WISH TO CANCEL**


_____          _____
CONSUMER'S SIGNATURE                       DATE

*Although you may mail or otherwise deliver this notice to us, in order to prevent a possible funding error we kindly request that you fax this notice to us toll free at (866) 862-4410.*

---

I am/We are the only person(s) who (1) have an ownership interest in the property and (2) occupy it as a principal dwelling. The exercise of this right by one borrower shall be effective as to all borrowers.

I/We Acknowledge receipt of two copies of this NOTICE OF RIGHT TO CANCEL.


Borrower  **MARY L. GIBBS**          2-27-03  Date

Borrower  **JAMES C. GIBBS**         2-27-03  Date

_____          _____
Borrower                                    Date

_____          _____
Borrower                                    Date

901 78144A-0 (12/93)
CANCELJ

MG 0002

The County Locator

Page 1 of 1



If the PDF document you have selected comes up blank, please click the Refresh/Reload button on your browser.

**Mortgage Recording Estimator (MRE)™**

**Computation for Baldwin County, AL ( AL006)**

Amount of Mortgage: **$152,875.00**
Mortgage rounded to **$152,900.00** for calculation
The estimated Mortgage recording fee for Baldwin County is: **$85.00**
Estimated mortgage tax and financing fees for Baldwin County is: **$229.35**

Notes displayed on the results page are intended to have been applied/contemplated in the calculation results. For further clarification of a note, please reference the appropriate state or county in The Real Estate Recording Guide.

**Calculation Assumptions/Recording Notes:**

- THERE ARE TWO OR FEWER GRANTORS AND TWO OR FEWER GRANTEES ON THE DOCUMENT.
- NOTE MARITAL STATUS OF INDIVIDUAL GRANTORS ON DEEDS AND MORTGAGES

**Recording Notes:**

- No additional fee for first two grantors and two grantees, first two mortgagors and mortgagees, etc. The fee applies to names above two in either category on deeds and mortgages only.

**Tax Notes:**

- Before recording a deed, obtain a slip showing value of property from Revenue Commissioner to use in tax computation.

To change the computation of the estimated Mortgage recording fee, you may adjust the number of pages in the Mortgage to be recorded then click the Recompute button

Estimated number of pages in Mortgage: 25

 Recompute    Choose Another County

**HUD-1 (fillable)**

Please note that in order to view text documents such as state summaries or statutes, you will need to have Adobe's Acrobat Reader installed on your system. This software is free.



Also, some problems have been experienced while trying to view Acrobat files with early versions of Internet Explorer or Netscape. We recommend downloading the latest version of your favorite browser. We've created links to Microsoft and Netscape browser download pages.

MG 0003

HOMETOWNERS LOAN    Fax:770-612-8314    Feb 26 2003  16:47    P.04

Chase Manhattan Mortgage Corporation

February 15, 2003

CMMC LOAN  998-1995823437-838

REQUESTOR:

ATTN:MIKE

FAX:8003340787

BORROWER NAME AND PROPERTY ADDRESS:

JAMES E. CLAPP SR.
MARY L. SIPES
195 BAYVIEW DRIVE
DAPHNE, AL 36526

BREAKDOWN OF AMOUNT OWED

PRINCIPAL BALANCE        $  97,891.31    RECORDING FEE          7.00
INTEREST FROM 12/01/2002        949.84
        TO 03/01/2003

TOTAL AMOUNT SECURED BY THE MORTGAGE 03/01/2003 / ...........  $ 98,459.19

TOTAL AMOUNT OWED INCLUDING SERVICE FEES ..............  $ 98,459.19

INTEREST RATE        6.87500%
PER DIEM        18.44

18.44 x 15 = 276.60

98735.50
Good Thru
3/15

Good Through
3-15-03
$98,735.75 (AC)

MG 0004



FROM :GULF COPY & PORTA          FAX NO. :251 947 3634          F    27 2003 05:36PM  P3

2/27/03 8:18 AM

U.S. Department of Housing
and Urban Development

Settlement Statement
Transactions without Sellers

OMB Approval No. 2502-0491

Name & Address of Borrower:
James C. Obba, 150 Bayview Dr., Fairfax, AL 36000
Mary L. Obba

Name & Address of Lender:
HomeOwners Loan Corporation
4001 Circle 75 Parkway
Bldg. 1000
Atlanta GA 30339

Property Location:
150 Bayview Dr., Fairfax, AL 36000

Settlement Agent: Beanford and Hays Settlement Services, Inc. (PR

Loan Number: 112400

Place of Settlement:
524 S. Peters Road, Ste. 206, Knoxville, TN 37922

Settlement Date: 02/27/2003

| | | | | |
|---|---|---|---|---|
| 801 Loan Origination Fee to HomeOwners Loan Corporation | 4,199.00 | 1901 Payoff to Chase Manhattan | 99,726.93 |
| 808 Loan Discount | 0.00 | | |
| 805 Appraisal Fee | 0.00 | 1903 Payment to First USA | 3,404.00 |
| 809 Credit Report to POOL 5.90 | 0.00 | | |
| 812 Lender's Inspection Fee | 0.00 | 1905 Payment to Shell | 3,320.00 |
| 813 Mortgage Insurance Application Fee | 0.00 | | |
| 820 Application Fee | 0.00 | | |
| 809 Underwriting Fee / Processing Fee to HomeOwners Loan Co | 395.00 | 1934 Payment to MBNA | 20,213.00 |
| 810 Funding Fee to HomeOwners Loan Corporation | 695.00 | | |
| 811 Administration Fee to HomeOwners Loan Corporation | 395.00 | 1908 Payment to MBNA | 5,582.00 |
| 811 Document Preparation Fee to HomeOwners Loan Corporation | 295.00 | | |
| | | 1906 | 0.00 |
| 901 Interest from | 0.00 | | |
| 902 Mortgage Insurance premium for | 0.00 | 1907 | 0.00 |
| 903 Hazard Insurance premium for | 0.00 | | |
| 904 Flood Insurance Premium | 0.00 | 1908 | 0.00 |
| 1001 Hazard Insurance | 0.00 | 1909 | 0.00 |
| 1002 Mortgage Insurance | 0.00 | | |
| 1003 City property taxes | 0.00 | 1910 | 0.00 |
| 1004 County property taxes | 0.00 | | |
| 1005 Annual assessments (maint.) | 0.00 | 1911 | 0.00 |
| 1006 | 0.00 | | |
| 1007 Aggregate Accounting Adjustment | 0.00 | 1912 | 0.00 |
| 1008 | 0.00 | | |
| | | 1913 | 0.00 |
| 1101 Settlement or closing fee to Beanford and Hays Settlement | 250.00 | | |
| 1105 Document or title search to Beanford and Hays Settlement | 0.00 | 1914 | 0.00 |
| 1103 Title examination to Beanford and Hays Settlement Services | 225.00 | | |
| 1104 Title Insurance Binder | 0.00 | 1915 | 0.00 |
| 1105 Document preparation | 0.00 | | |
| 1106 Notary fees | 0.00 | 1916 | 0.00 |
| 1107 Attorney's fees to | 0.00 | | |
| (Includes above items No.) | | 1917 | 0.00 |
| 1108 Title insurance to Beanford and Hays Settlement Services, | 575.00 | | |
| (Includes above items No.) | | 1918 | 0.36 |
| 1109 Lender's coverage $155,576.00 $519.09 | | | |
| 1110 Owner's coverage | 0.00 | 1919 | 0.00 |
| 1111 Government | 0.00 | | |
| 1112 Recording Fees Payable To | 0.00 | | |
| 1113 Beanford & Hays | 0.00 | | 143,700.29 |
| 1201 Recording fees   Mortgage $120.00 | 120.00 | | |
| 1202 City/County tax/stamps | 0.00 | 1000 Loan Amount | 158,576.00 |
| 1203 State tax/stamps   Mortgage $258.00 | 258.00 | | |
| 1204 Florida Intangible Tax | 0.00 | 1600 Deposit/Cash from Borrower | 0.00 |
| 1305 FDA Mortgage Fee | 0.00 | 1602 Minus Total Settlement Charges | 7,245.00 |
| 1301 Survey | 0.00 | (line 1400) | |
| 1302 Pest Inspection | 0.00 | 1700 Minus Total Disbursements to Others | 143,534.44 |
| 1303 Flood Determination to POOL 9.50 | 0.00 | (line 1800) | |
| 1304 | 0.00 | | |
| 1305 | 0.00 | 1604 Loan disbursements to borrower | |
| 1306 | 0.00 | (after expiration of any applicable | |
| | 7,245.00 | rescission period required by law) | 795.06 |

Borrower

James C. Obba

Mary L. Obba    Borrower

X _____  Borrower

X _____  Borrower

Beanford and Hays Settlement Services, Inc. (BH) 525-1400
Settlement Agent
Form HUD-1A of HUD-1 (3/94)

MG 0006

**Hall-Frazier**
**Record - 001043**

2/27/03 9:15 AM

| Settlement Statement | U.S. Department of Housing | |
|---|---|---|
| Transactions without Sellers | and Urban Development | OMB Approval No. 2502-0491 |

Name & Address of Borrower:
James C. Gibbs, 155 Bayview Dr., Daphne, Al. 36526
Mary L. Gibbs

Name & Address of Lender:
HomeOwners Loan Corporation
4601 Circle 75 Parkway
Suite F6300
Atlanta, GA 30339
Settlement Agent: Swafford and Hays Settlement Services, Inc. (86-

Property Location:
155 Bayview Dr. Daphne, AL 36526

Place of Settlement:
224 S. Peters Road, Ste. 205, Knoxville, TN 37923

Loan Number:
File Number: 11849

TIN: 59-3634306

Settlement Date: 02/27/2003

| L. | Settlement Charges | | K. | Summary of Borrower's Transaction | |
|---|---|---|---|---|---|
| 800 | Items payable in connection with loan | | 1500 | | |
| 801 | Loan origination fee  to HomeOwners Loan Corporation | 4,150.00 | 1501 | Payoff to Chase Manhattan | 98,735.50 |
| 802 | Loan discount | 0.00 | | | |
| 803 | Appraisal fee | 0.00 | 1502 | Payment to First USA | 8,508.00 |
| 804 | Credit report to.  POCL 8.50 | 0.00 | | | |
| 805 | Lender's inspection fee | 0.00 | 1503 | Payment to Sears | 9,228.00 |
| 806 | Mortgage insurance application fee | 0.00 | | | |
| 807 | Assumption fee | 0.00 | 1504 | Payment to MBNA | 20,210.00 |
| 808 | Underwriting Fee Processing Fee to HomeOwners Loan Co | 390.00 | | | |
| 809 | Funding Fee to HomeOwners Loan Corporation | 385.00 | 1505 | Payment to MBNA | 8,960.00 |
| 810 | Administration Fee to HomeOwners Loan Corporation | 295.00 | | | |
| 811 | Document Preparation Fee  to HomeOwners Loan Corporat | 195.00 | | | |
| 900 | Items required by lender to be paid in advance | | 1506 | | 0.00 |
| 901 | Interest from | 0.00 | | | |
| 902 | Mortgage insurance premium for | 0.00 | 1507 | | 0.00 |
| 903 | Hazard insurance premium for | 0.00 | | | |
| 904 | Flood insurance Premium | 0.00 | 1508 | | 0.00 |
| 1000 | Reserves deposited with lender | | | | |
| 1001 | Hazard insurance | 0.00 | 1509 | | 0.00 |
| 1002 | Mortgage insurance | 0.00 | 1510 | | |
| 1003 | City property taxes | 0.00 | | | 0.00 |
| 1004 | County property taxes | 0.00 | 1511 | | |
| 1005 | Annual assessments (maint.) | 0.00 | | | 0.00 |
| 1006 | | 0.00 | | | |
| 1007 | Aggregate Accounting Adjustment | 0.00 | 1512 | | 0.00 |
| 1008 | | 0.00 | | | |
| 1100 | Title charges | | 1513 | | 0.00 |
| 1101 | Settlement or closing fee  to Swafford and Hays Settlement | 200.00 | | | |
| 1102 | Abstract or title search  to Swafford and Hays Settlement Se | 375.00 | 1514 | | 0.00 |
| 1103 | Title examination  to Swafford and Hays Settlement Services | 225.00 | | | |
| 1104 | Title insurance binder | 0.00 | 1515 | | 0.00 |
| 1105 | Document preparation | 0.00 | | | |
| 1106 | Notary fees | 0.00 | 1516 | | 0.00 |
| 1107 | Attorney's fees to | 0.00 | | | |
| | includes above items no.: | | 1517 | | 0.00 |
| 1108 | Title insurance  to Swafford and Hays Settlement Services, I | 519.00 | | | |
| | includes above items no.: | | 1518 | | 0.00 |
| 1109 | Lender's coverage  $152,675.00 $519.00 | | | | |
| 1110 | Owner's coverage | | 1519 | | 0.00 |
| 1111 | Endorsements | 0.00 | | | |
| 1112 | Recording Fees Payable To | 0.00 | | | |
| 1113 | Swafford & Hays | 0.00 | | | 145,629.50 |
| 1200 | Government recording and transfer charges | | | | |
| 1201 | Recording fees:  Mortgage $120.00 | 120.00 | | | |
| 1202 | City/county tax/stamps: | 0.00 | | | |
| 1203 | State tax/stamps:  Mortgage $229.50 | 229.50 | 1600 | Loan Amount | 152,675.00 |
| 1204 | Florida Intangible Tax | 0.00 | | | |
| 1205 | GA Mortgage Tax | 0.00 | 1601 | Plus Check/Cash from Borrower | 0.00 |
| 1300 | Additional settlement charges | | 1602 | Minus total settlement charges | 7,083.50 |
| 1301 | Survey | 0.00 | | (line 1400) | |
| 1302 | Pest inspection | 0.00 | 1603 | Minus Total Disbursements to Others | 145,629.50 |
| 1303 | Flood Determination to .  POCL 9.50 | 0.00 | | (line 1520) | |
| 1304 | | 0.00 | | | |
| 1305 | | 0.00 | 1604 | Equals disbursements to borrower | |
| 1306 | | 0.00 | | (after expiration of any applicable | |
| 1307 | | 0.00 | | rescission period required by law) | 152.00 |
| 1400 | Total settlement charges (enter on line 1602) | 7,083.50 | | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge this HUD-1A ref. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Swafford and Hays Settlement Services, Inc. (865) 539-1450
Settlement Agent

Form HUD-1A ref. RESPA (3/94)

x _____  Borrower
James C. Gibbs

x _____  Borrower
Mary L. Gibbs

x _____  Borrower
                              0

x _____  Borrower
        #NAME?

MG 0007

Hall-Frazier
Record - 001044

HOMEOWNERS LOAN    Fax:770-612-8314    Feb 26 2003  16:47    P.02

Borrower Name: GIBBS

HLO DOCUMENT ORDER FORM

## GENERAL INFORMATION

| | |
|---|---|
| Date: 02/26/03 | Loan Number: 10045899 |
| Borrower: MARY GIBBS | Originator: Michael Swetell |
| Co-Borrower: | Processor: NISLA TAYLOR |
| Property Address: 135 BAYVIEW DRIVE | Underwriter: |
| DAPHNE, AL 36526 | Closing Date: 02/27/03 |
| Property County: BALDWIN | Closing Time: |
| Mailing Address: 135 BAYVIEW DRIVE | Document Delivery: E-MAIL |
| BALDWIN, AL 36526 | Taxes Needed: 8210 |

## LOAN INFORMATION

| | |
|---|---|
| Loan Amount: $ 153,000.00 | Property Type: SFR |
| Appraised Value: $ 180,000.00 | Grade: A4 |
| Sales Price: $ | First Payment Date: 04/04/03 |
| Seller Name: REFINANCE | Prepayment Penalty: YES |
| Interest Rate: 9.250 % | Property Family Description: 2/6 MONTHS |
| Loan Term: 360/ | Escrows (Y/N): |
| Payment: $ 1,258.70 | Hazard Premium: $ |
| Loan Type: ARM 2/28 | Hazard Insurance Exp. Date: |
| Margin: % | Flood Required (Y/N): |
| Index: % | Participating Community (Y/N): |
| Lien Position: FIRST | Flood Premium: $ |
| Loan Purpose: REFINANCE | Flood Insurance Exp. Date: |
| Estimated Cash to Customer: $ 220.50 | Property Tax/Assessment Information |
| Owner Occupancy: YES | |
| Insurer: RTC/GMAC | |

| | Amount Due | Date Due and Paid Thru |
|---|---|---|
| 1st Paid: $ | | |
| 2nd Paid: $ | | |
| 3rd Paid: $ | | |
| 4th Paid: $ | | |

Property Rate Type:  ☐ Condo  ☐ Mobile Home
☐ PUD  ☐ 1-4 Family/Non-Owner
☐ Second Home/ Non-Owner

All Delinquent Taxes Must Be Paid At Closing

Name of Condo or PUD:

## THIRD PARTY INFORMATION

| | |
|---|---|
| Title Co: SWAFFORD AND HAYS | Hazard Insurance Agent: FARMERS |
| Contact: JOSH | Telephone: 251-621-1822 |
| Telephone: 888-272-2915 | Fax: |
| Fax: 865-539-2442 | Flood Insurance Agent: |
| Appraiser: H & H APPRAISERS (LYONLL) | Telephone: |
| Telephone: 251-438-1620 | |

## CLOSING COSTS

| | | | | | |
|---|---|---|---|---|---|
| Origination Fee | $ 4,050.00 | MORTGAGE/DOT TAX | $ | 270.00 |
| Discount Points | $ | PROCESSING/UNDERWRITING FEE | $ | 390.00 |
| Origination Fee to Broker | $ | FUNDING FEE | $ | 363.00 |
| Inspection Fee | $ | DOC PREP FEE | $ | 155.00 |
| Administration Fee | $ 295.00 | | $ | |
| Tax Service Fee | $ | | $ | |
| Appraisal Fee | $ 350.00 | | $ | |
| Attorney Fee | $ | | $ | |
| Title Insurance Premium | $ 612.00 | TOTAL PREPAID FINANCE CHARGES | $ 5,495.00 |
| Recording Fee | $ 80.00 | Amount Financed | $ 147,505.00 |
| State Tax Stamps | $ | Total % of Fees | 3.725 % |
| Title Exam Fee | $ 360.00 | APR | % |
| Abstract/Title Search Fee | $ 200.00 | APR Exemption (Y/N) | NO |
| SETTLEMENT FEE | $ 200.00 | Section 32 Loan (Y/N) | NO |

## PAYOFFS

| Liens - Judgement - Taxes | Balance | Liens - Judgement - Taxes | Balance |
|---|---|---|---|
| CHASE MANHATAN | $ 98,735.50 | | $ |
| FIRST USA | $ 8,509.00 | | $ |
| SEARS | $ 5,009.00 | | $ |
| MBNA | $ 29,210.00 | | $ |
| MBNA | $ 8,950.00 | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |

Total Payoffs $ 145,413.50

UNDERWRITER SIGNATURE

MG 0008

HOMEOWNERS LOAN    Fax:770-612-8514    Feb 26 2003 16:47    P.03

Borrower Name: GIBBS

INCLUDE THE FOLLOWING DOCUMENTS IN THE FOLLOWING ORDER, AFTER THE DOC ORDER FORM
(PLACE CHECK MARK IF PRESENT):

| | | | |
|---|---|---|---|
| [ ] 1. INVESTOR APPROVAL | | [ ] 8. HUD (If Received) | |
| [ ] 2. FLOOD CERTIFICATE | | [ ] 9. TITLE COMMITMENT | |
| [ ] 3. HAZARD INSURANCE | | [ ] 10. 1003 | |
| [ ] 4. FLOOD INSURANCE (IF APPLICABLE) | | [ ] 11. CREDIT BUREAU (Include Mortgage Payoff) | |
| [ ] 5. INITIAL GOOD FAITH ESTIMATE | | [ ] 12. FIRST TWO PAGES OF APPRAISAL | |
| [ ] 6. GFE PROVIDER LIST | | [ ] 13. PURCHASE CONTRACT (IF APPLICABLE) | |
| [ ] 7. INITIAL SERVICING DISCLOSURE | | [ ] 14. APR EXCEPTION LETTER (IF APPLICABLE) | |
| | | [ ] 15. VERIFICATION OF EMPLOYMENT | |

UNDERWRITER TO FAX ITEMS 1-6 ABOVE TO DOCUMENT DEPARTMENT WITH THIS ORDER FORM

### BORROWER INFORMATION

| | | Says All Does | Says Property Zone ONLY |
|---|---|---|---|
| Borrower #1: MARY L. GIBBS | SSN: 251-621-0446 | [X] | [ ] |
| Borrower #2: JAMES C. GIBBS | SSN: | [ ] | [X] |
| Borrower #3: | SSN: | [ ] | [ ] |
| Borrower #4: | SSN: | [ ] | [ ] |
| Borrower #5: | SSN: | [ ] | [ ] |
| Borrower #6: | SSN: | [ ] | [ ] |

Identity Affidavit Borrower #1:
MARY GIBBS

Identity Affidavit Borrower #2:

Identity Affidavit Borrower #3:

Identity Affidavit Borrower #4:

Identity Affidavit Borrower #5:

Identity Affidavit Borrower #6:

Vesting:

### ADDITIONAL COMMENTS:

### REPRINT COMMENTS:

UNDERWRITER SIGNATURE

MG 0009

HOMEOWNERS LOAN    Fax:770-612-8314    Feb 26 2003  16:20  P.01

## HOMEOWNERS LOAN

*Helping Homeowners Achieve Their Dreams*

### *Fax Cover Sheet*

**Date:** 02/26/03
**To:** JOSH
**Company:** SWAFORD AND HAYS
**Phone:**
**Fax:** 865-539-2442

**From:** HOMEOWNERS LOAN CORP.
**Attn:** MICHAEL
**Phone:** 888-985-1119
**Fax:** 251-438-4933
**Number of Pages:** 3

### Comments

PLEASE EMAIL HUD TO TEAM 10- THANKS

NOTICE OF CONFIDENTIALITY
All documents/information contained in this facsimile are confidential and are legally privileged and  intended only for the person or entity named above.  If you are not the intended recipient BE ADVISED that ANY disclosure, copying, distribution or use of the contents of this information is PROHIBITED.  If you have received this facsimile in error, please notify us by return telephone or facsimile immediately so that we can arrange the retrieval of the original documents at no cost to you.

MG 0010

HOMEOWNERS LOAN     Fax:770-612-6314     Feb 26 2003  16:20   P.02

Borrower Name: GIBBS

INCLUDE THE FOLLOWING DOCUMENTS IN THE FOLLOWING ORDER, AFTER THE DOC ORDER FORM
(PLACE CHECK MARK IF PRESENT):

| | |
|---|---|
| [ ] 1. INVESTOR APPROVAL | [ ] 8. HUD (If Required) |
| [ ] 2. FLOOD CERTIFICATE | [ ] 9. TITLE COMMITMENT |
| [ ] 3. HAZARD INSURANCE | [ ] 10. 1003 |
| [ ] 4. FLOOD INSURANCE (IF APPLICABLE) | [ ] 11. CREDIT BUREAU (Inside the Mortgage Report) |
| [ ] 5. INITIAL GOOD FAITH ESTIMATE | [ ] 12. FIRST TWO PAGES OF APPRAISAL |
| [ ] 6. QPS PROVIDER LIST | [ ] 13. PURCHASE CONTRACT (IF APPLICABLE) |
| [ ] 7. INITIAL SERVICING DISCLOSURE | [ ] 14. APR EXCEPTION LETTER (IF APPLICABLE) |
| | [ ] 15. VERIFICATION OF EMPLOYMENT |

UNDERWRITER TO FAX ITEMS 1-8 ABOVE TO DOCUMENT DEPARTMENT WITH THIS ORDER FORM

BORROWER INFORMATION

| | | Sign All Docs | Sign Property Docs ONLY |
|---|---|---|---|
| Borrower #1: MARY L. GIBBS | SSN: 251-621-0446 | [X] | [X] |
| Borrower #2: JAMES C. GIBBS | SSN: | [ ] | [ ] |
| Borrower #3: | SSN: | [ ] | [ ] |
| Borrower #4: | SSN: | [ ] | [ ] |
| Borrower #5: | SSN: | [ ] | [ ] |
| Borrower #6: | SSN: | [ ] | [ ] |

Identity Affidavit Borrower #1:
MARY GIBBS

Identity Affidavit Borrower #2:

Identity Affidavit Borrower #3:

Identity Affidavit Borrower #4:

Identity Affidavit Borrower #5:

Identity Affidavit Borrower #6:

Vesting:

ADDITIONAL COMMENTS:

REPRINT COMMENTS:

UNDERWRITER SIGNATURE

MG 0011

HOMEOWNERS LOAN          Fax:770-612-8314          Feb 26 2003  16:45    P.01

# HOMEOWNERS LOAN

*Helping Homeowners Achieve Their Dreams*

## *Fax Cover Sheet*

|  |  |
|---|---|
| Date: | 02/26/03 |
| To: | JOSH |
| Company: | SWAFORD AND HAYS |
| Phone: |  |
| Fax: | 865-539-2442 |

|  |  |
|---|---|
| From: | HOMEOWNERS LOAN CORP. |
| Attn: | MICHAEL |
| Phone: | 888-986-1119 |
| Fax: | 251-438-4933 |
| Number of Pages: | 3 |

**Comments**

PLEASE EMAIL HUD TO TEAM 10- THANKS

NOTICE OF CONFIDENTIALITY

All documents/information contained in this facsimile are confidential and are legally privileged and  intended only for the person or entity named above.  If you are not the intended recipient BE ADVISED that ANY disclosure, copying, distribution or use of the contents of this information is PROHIBITED.  If you have received this facsimile in error, please notify us by return telephone or facsimile immediately so that we can arrange the retrieval of the original documents at no cost to you.

MG 0012

**Hall-Frazier**
**Record - 001049**

| Date | Name | Comments |
| --- | --- | --- |
|  |  |  |

Abstract Coordinator:

Date Order Received From Lender: _____

Name Of Lender: _____

Date Ordered With Abstractor: _____

Name of Abstractor: _____

Abstractor Fee: _____

Commitment Analyst: _____

Date Abstract Returned: _____

Date Commitment Faxed: _____

Quitclaim or Warranty Deed?    Y  or  N
If yes, specify which: _____

Arrangement: _____

Liens Removed?    Y  or  N
If yes, see original commitment for documentation.

Processor / Shipper: _____

File Still Open?    Y  or  N

Estimated Closing Date: _____

Any Special Requirements?    Y  or  N
If yes, see processing log.

Date Package Received: _____

Date Package Shipped: _____

Closer / Frazier: _____

Date Closed: _____

Date Funded: _____

Closing Company Contacted: _____

Closing Fee: _____

Wire Received?    Y  or  N

MG 0013

Prepared by:
Steve Goulbourne
-Steve Goulbourne
HOMEOWNERS LOAN CORP.
4501 CIRCLE 75 PARKWAY, STE F6300
ATLANTA, GA 30339
LOAN NO. 10065888

AFTER RECORDING RETURN TO:
SWAFFORD & HAYS SETTLEMENT SERVICES
234 S. PETERS ROAD SUITE 205
KNOXVILLE, TN 37923
#11649

[Space Above This Line For Recording Data]

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on **FEBRUARY 27, 2003** . The grantor is
**JAMES C. GIBBS AND MARY L. GIBBS, AS JOINT TENANTS WITH RIGHT OF
SURVIVORSHIP,** HUSBAND AND WIFE
155 BAYVIEW DR DAPHNE AL 36526                          ("Borrower").
This Security Instrument is given to **HOMEOWNERS LOAN CORP.,
A DELAWARE CORPORATION**

, which is organized
and existing under the laws of     **DELAWARE**                         , and whose address is
**4501 CIRCLE 75 PARKWAY, SUITE F6300
ATLANTA, GA 30339**                                    ("Lender").
Borrower owes Lender the principal sum of   **ONE HUNDRED FIFTY-TWO THOUSAND EIGHT HUNDRED
SEVENTY-FIVE AND 00/100**
Dollars (U.S. $   **152,875.00**   ). This debt is
evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on     **MARCH 4, 2033**              .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all
renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under
paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and
agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and
convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in
**BALDWIN**                 County, Alabama:
**SEE ATTACHED EXHIBIT "A"**

714320

which has the address of     **155 BAYVIEW DRIVE, DAPHNE**
                                              [Street]                              [City]
**Alabama     36526**                ("Property Address");
          [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all
the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter
a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing
is referred to in this Security Instrument as the "Property."

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FNMA3001                                                                    Initials J.C.G  M.S.G.
                              Page 1 of 7

State of Alabama, Baldwin County
I certify this instrument was filed
and taxes collected on:

2003 March    -6 12:59PM

Instrument Number: 714320  Pages 10-
Recording : 20.00 Mortgage   229.35
Deed.           Min Tax
Index           DP            1.00
Archive        3.00
Harold L. Johns, Judge of Probate

MG 0014

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FORM3001

Initials: *J.C.A. M.F.B.*

Page 2 of 7

MG 0015

lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FM3.0001

Initials: _C.H. M.J. J._

Page 3 of 7

Instrument 714320 Page 3of 10

Hall-Frazier
Record - 001053

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Severable Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FNMA3001

Page 4 of 7

Initials: *G.C.A.  M.J.B.*

MG 0017

**Hall-Frazier**
**Record - 001054**

refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 9/90

Page 5 of 7

Initials J.C.B.  M.F.H.

Instrument  714320  Page  5of 10

MG 0018

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in    BALDWIN                County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess the person or persons legally entitled to it.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

24. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Planned Unit Development Rider |
| [ ] 1-4 Family Rider | [ ] Graduated Payment Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [x] Other(s) [specify] LEGAL DESCRIPTION | | |

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FORM3001                                    Page 6 of 7                                    Initials J.C.A.  M.P.H

Instrument  71A320 Page 6 of 10

MG  0019

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____    _James C. Gibbs_____ (Seal)
                            JAMES C. GIBBS                 - Borrower

_____    _Mary L Gibbs_____ (Seal)
                            MARY L. GIBBS                  - Borrower

                           _____ (Seal)
                                                           - Borrower

                           _____ (Seal)
                                                           - Borrower

[Space Below This Line For Acknowledgment]

STATE OF ALABAMA,          _BALDWIN_ County ss:

The foregoing instrument was acknowledged before me   FEBRUARY 27, 2003
                                                        (date)
by  JAMES C. GIBBS AND MARY L. GIBBS, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP

                                        (person acknowledging)

My Commission expires:

                                        _Phillip S Baldwin_
                                                Notary Public

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 5, 2005
BONDED THRU NOTARY PUBLIC UNDERWRITERS

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Page 7 of 7
FNMA3001

Instrument  2143290 Page 7 of 10

MG 0020

**Hall-Frazier**
**Record - 001057**

LOAN NO. 10065888

## ADJUSTABLE RATE RIDER
(LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **27TH**  day of  **FEBRUARY, 2003**
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to
**HOMEOWNERS LOAN CORP.,**
**A DELAWARE CORPORATION**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**155 BAYVIEW DRIVE**
**DAPHNE, AL 36526**
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  **8.125**  %. The Note provides for changes
in the interest rate and the monthly payments, as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on **MARCH 4, 2006**  , and on that day every
**6th**  month thereafter.  Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average
of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as
published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the
month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable
information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
**SEVEN AND ONE QUARTER**  percentage point(s)
(  **7.250** %) to the Current Index. The Note Holder will then round the result of this addition up to
the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this
rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the
unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate
in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR 6 MO INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) - Single Family - FNMA Uniform Instrument
FORM3138

Page 1 of 2

Instrument 714320 Page

MG 0021

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.125** % or less than **8.125** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE**

percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **14.125** %, nor less than **8.125** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Mary L. Gibbs_ (Seal)
**MARY L. GIBBS** -Borrower

_James C. Gibbs_ (Seal)
**JAMES C. GIBBS** -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR 6 MO INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) - Single Family - FNMA Uniform Instrument
FHMA3138

Page 2 of 2

Instrument 714320 Page 9 of 10

MG 0022

File No.: 11549

## EXHIBIT A

Situated in Baldwin County, Alabama, to-wit:

Lot 40, Lake Forest, Unit 7, as recorded in Map Book 7, Page 94, in the Office of the Judge of Probate, Baldwin County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

BEING the same property conveyed to James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship, by deed from Daya Builders, Inc., dated June 24, 1994 and recorded July 6, 1994, in Book 582 at page 1207, in the Office of the Judge of Probate of Baldwin County, Alabama.

Instrument

MG 0023

**Hall-Frazier**
**Record - 001060**

POLICY NO.
LP-27-1796-w11549SH

LOAN POLICY EXTENDED COVERAGE:
FOR A ONE-TO-FOUR FAMILY RESIDENCE

ISSUED BY

# AMERICAN PIONEER
## TITLE INSURANCE COMPANY

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, AMERICAN PIONEER TITLE INSURANCE COMPANY, a Florida corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding one hundred twenty-five percent (125%) of the Amount of Insurance stated in Schedule A, sustained or incurred by the Insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of pedestrian and vehicular access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material arising from an improvement or work related to the land, whether or not
   (a)  the statutory lien or liens arise prior to or after the Date of Policy; or
   (b)  the improvement or work is contracted for or commenced prior to or after Date of Policy;
8. Any assessments for street improvements under construction or completed at Date of Policy which have now gained or hereafter may gain priority over the lien of the insured mortgage;
9. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens;
10. The invalidity or unenforceability of the lien of the insured mortgage upon the title based upon a violation of the usury laws of the state where the land is located;
11. The failure of the land to have the street address set forth in Schedule A;
12. The failure of the land to contain a one-to-four family residential structure or, if stated in Schedule A, a condominium;
13. The failure of the land to be zoned to permit a one-to-four-family residential structure or, if stated in Schedule A, a condominium;
14. The failure of the land to be a lawfully created parcel according to state statutes governing subdivision of land and local ordinances adopted pursuant thereto;
15. Failure of the existing residential structure, any portion thereof, or a modification thereto or replacement thereof constructed after Date of Policy, to have been constructed with a valid building permit from the appropriate local government issuing office or agency;
16. Matters insured against by ALTA Form 9 endorsement, as if they were stated herein in their entirety;
17. Any encroachment, overlap, overhang, prescriptive easement or adverse claim of title based upon possession or use which would be disclosed by an accurate survey of the land as of Date of Policy not otherwise covered by insuring provision 16;
18. The inability to use the existing residential structure or any replacement thereof constructed after Date of Policy for residential purposes because that use violates a restriction set forth in Schedule B;
19. Encroachment onto the land of an improvement constructed after Date of Policy by someone other than, and without consent of, the then owner of the estate or interest referred to in Schedule A;
20. Damage to improvements, or to the lawn, shrubbery or trees, constructed or planted after Date of Policy as a modification to or replacement of the existing improvements, or lawn, shrubbery or trees, as a result of the future exercise of any right to use the surface of the land for the extraction or development of minerals or water;

Items 21-24 are continued on page 2.

*IN WITNESS WHEREOF:* AMERICAN PIONEER TITLE INSURANCE COMPANY has caused this policy to be signed and sealed as of the Date of Policy shown in Schedule A, the policy to become valid when countersigned by an authorized signatory.

ISSUED BY:                                          **AMERICAN PIONEER TITLE INSURANCE COMPANY**

Swafford  &  Hays Title Services, Inc.
224 S. Peters Rd.  #205
Knoxville, TN 37923

By: *Ray W. Lassiter*

President

Attest: *George P. Daniels*

Secretary

THIS POLICY SUBJECT TO ARBITRATION  PROVISIONS

LP-27 (7/99)

MG  0024

## LOAN FORM

### Schedule A

State: AL County: Baldwin

| File Number 11549sh | Policy Number LP-27-1796-wf11549SH | Effective Date March 6, 2003 | Effective Time 12:59 P.M. | Amount of Policy $152,875.00 |
|---|---|---|---|---|
| Commitment #: | Simultaneous #: | | Reinsurance #: | |

1. Name of Insured:

   HomeOwners Loan Corporation, its successors and/or assigns as their interest may appear

2. The estate or interest referred to herein is at Date of Policy vested in:

   James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship

3. The estate or interest in the land described or referred to in this Schedule A and which is encumbered by the insured mortgage is:

   Fee Simple

4. The mortgage, herein referred to as the insured mortgage, and the assignments thereof, if any, are described as follows:

   Mortgage executed by James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship, husband and wife, in favor of HomeOwners Loan Corporation dated February 27, 2003, filed March 6, 2003, in the original principal amount of $152,875.00, in instrument number 714320, among the land records of Baldwin County, AL.

5. The land referred to herein is described as follows:

   Lot 40, Lake Forest, Unit 7, as recorded in Map Book 7, Page 94, in the Office of the Judge of Probate, Baldwin County, Alabama.

Issued By:1796 *11549sh
Swafford & Hays Title Services, Inc.
224 S. Peters Rd. #205
Knoxville, TN 37923

_James W. Swafford II_
Countersigned Authorized Signatory

Note: This Policy consists of insert pages labeled Schedule A and B. This policy is of no force and effect unless all pages are included along with any added pages incorporated by reference.

MG 0025

## LOAN FORM

### Schedule B - Part 1

This policy does not insure against loss or damage by reason of the following exceptions:

1. Defects, leins, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. Rights or claims of parties in possession not shown by the public records.

3. Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

4. Easements or claims of easements not shown by the public records.

5. Taxes or special assessments which are not shown as existing liens by the public records.

6. Taxes and assessments for the year 2003 and subsequent years.

**\*\*\*The following items, as listed above, are hereby deleted: 1, 2, 4, and 5.\*\*\***

7. Subject to any restrictions, easements, setback lines, etc., as shown on plat record in Map Book 7, Page 94, in the Office of the Judge of Probate of Baldwin County, Alabama.

8. Subject to all rights in connection therewith by Lake Forest, Inc. to Diamondhead Corporation by Instrument dated January 20, 1972 and recorded in Deed Book 421, Page 703.

9. Subject to agreement of parties between Baldwin County, Alabama and Lake Forest Property Owners Association, Inc., dated April 15, 1986 and recorded in Real Property Book 251, Page 389.

10. Subject to Declaration of Restrictions, Conditions, Easements, Covenants, Agreements, Lien and Charges of Lake Forest Inc., Unit 7, as contained in instrument by Lake Forest, Inc., dated June 14, 1971 and recorded in Miscellaneous Book 22, Page 691, and as amended thereto.

11. Subject to the Lake Forest Property Owners Association, Inc., By Laws, as amended October 10, 1988 and recorded in Miscellaneous Book 63, Page 931, By Laws of Lake Forest Property Owner's Association, Inc., dated July 27, 1971 and recorded in Corporate Book 18, Page 595, and amended in Real Property Book 251, Page 389.

12. Subject to restrictions, easements, setback lines, Declarations, etc., as shown on Warranty Deed Book 582 at page 1207, in the Office of the Judge of Probate of Baldwin County, Alabama.

Policy #:LP-27-1795-w111549SH                    2                    File #: 11549sh

Note: This Policy consists of insert pages labeled Schedule A and B. This policy is of no force and effect unless all pages are included along with any added pages incorporated by reference.

MG 0026

**Hall-Frazier**
**Record - 001063**

# L O A N   F O R M

## Schedule B - Part 2

In addition to the matters set forth in Part 1 of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company insures that such matters are subordinate to the lien or charge of the insured mortgage upon said estate or interest:

**NONE SHOWN**

Policy #:LP-27-1796-wi11549SH                 3                 File #: 11549sh

Note:  This Policy consists of insert pages labeled Schedule A and B. This policy is of no force and effect unless all pages are included along with any added pages incorporated by reference.

MG  0027

**Hall-Frazier**
**Record - 001064**

ME-2

### ENDORSEMENT MASTER LIST

Attached to and forming a part of
Loan Policy No. LP-27-1796-wl11549SH
ISSUED BY

# AMERICAN PIONEER
## TITLE INSURANCE COMPANY

The endorsements marked with an "X" below are deemed incorporated by reference into the above-referenced loan policy.

( ) ALTA Endorsement Form 4 (Condominium) (Rev. 3-27-92)

( ) ALTA Endorsement 4.1 (Condominium) (Rev. 10-17-92)

( ) ALTA Endorsement Form 5 (PUD) (Rev. 3-27-92)

( ) ALTA Endorsement Form 5.1 (PUD) (Rev. 10-17-92)

(X) ALTA Endorsement Form 6 (Variable Rate Mortgage) (Rev. 6-1-87)

( ) ALTA Endorsement Form 6.1 (Variable Rate Mortgage - Regulations) (Rev. 6-1-87)
      Statutory Regulations:

( ) ALTA Endorsement Form 6.2 (Variable Rate Mortgage- Negative Amortization) (Rev. 6-1-87)

( ) ALTA Endorsement Form 7 (Manufactured Housing Unit) (Rev. 6-1-87)

(X) ALTA Endorsement Form 8.1 (Environmental Protection Lien) (Rev. 3-12-88)
    ☐ No Statutory Regulations
    X  Statutory Regulations: Alabama

(X) ALTA Endorsement Form 9 (Restrictions, Easements, Minerals) (Rev. 10-19-98)
    (Exceptions to coverage, if any, are set forth in Schedule B of the policy)

( ) Balloon Mortgage Endorsement (APTIC #EN-24)

The above endorsements as indicated are made a part of the policy and are subject to all of the terms and provisions thereof and any prior endorsements thereto. Except to the extent expressly stated, they neither modify any of the terms and provisions of the policy and any prior endorsements, nor do they extend the effective date of the policy and any prior endorsements, nor do they increase the face amount thereof. This endorsement is not to be attached to the ALTA Master Residential Loan Certificate or to the ALTA Short Form Residential Loan Policy.

American Pioneer Title Insurance Company

Dated this March 06, 2003
Issued By: 1796*11549sh
Swafford & Hays Title Services, Inc.
224 S. Peters Rd. #205
Knoxville, TN 37923

*James W. Swafford II*
Authorized Signatory

Note: This endorsement shall not be valid or binding until countersigned by an authorized signatory.

ME-2 Endorsement Master List (7/00)

MG 0028

Hall-Frazier
Record - 001065

CONDITIONS AND STIPULATIONS – CONTINUED

(c) Amount of Insurance. The amount of insurance after the acquisition or after the conveyance shall be neither greater nor less than the least of:

(i) one-hundred twenty-five percent (125%) of the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the Indebtedness secured by the insured mortgage at Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest or the lien of the insured mortgage, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

**5. PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after date of policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of One Hundred Twenty-Five Percent (125%) of the Amount of Insurance or to Purchase the Indebtedness.

(i) To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) To purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefore.

Upon the exercise by the Company of either of the options provided for in paragraphs (a)(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) To pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) To pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**7. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) one-hundred twenty-five percent (125%) of the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy; provided, however, that the Section 7(a)(iii) shall not apply where the defect, lien, encumbrance or other matter insured against by this policy results in a total failure of the lien of the insured mortgage to attach to the insured estate or interest.

(b) In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

MG  0029

COMMITMENT
FOR
TITLE INSURANCE

COMMITMENT NO.

CM-1-1581-9460

ISSUED BY

# AMERICAN PIONEER
## TITLE INSURANCE COMPANY

AMERICAN PIONEER TITLE INSURANCE COMPANY, a Florida corporation, herein called the Company, for a valuable consideration, hereby commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby in the land described or referred to in Schedule A, upon payment of the premiums and charges therefor; all subject to the provisions of Schedules A and B and to the Conditions and Stipulations hereof.

The Commitment shall be effective only when the identity of the proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A hereof by the Company, either at the time of the issuance of this Commitment or by subsequent endorsement.

This Commitment is preliminary to the issuance of such policy or policies of title insurance and all liability and obligations hereunder shall cease and terminate six (6) months after the effective date hereof or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue such policy or policies is not the fault of the Company.

This Commitment shall not be valid or binding until Schedule A has been countersigned by either a duly authorized agent or representative of the Company and Schedule B has been attached hereto.

*IN WITNESS WHEREOF,* AMERICAN PIONEER TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed and by these presents to be signed in facsimile under authority of its by-laws, effective as of the date of Commitment shown in Schedule A.

Issued by:

AMERICAN PIONEER TITLE INSURANCE COMPANY

Swafford & Hays Settlement
Services, Inc.
224 South Peters Road
Suite 110
Knoxville, TN 37923



By: _Roy W. Lassiter_
President

Attest: _George P. Daniels_
Secretary

CM-1 2/93

ALTA COMMITMENT - 1966 - THIS FORM IS EQUIVALENT TO CLTA CM-1 COMMITMENT FORM (9-19-74)

MG 0030

**Hall-Frazier**
**Record - 001067**

## COMMITMENT

### SCHEDULE A

| STATE ABBREVIATION | | | |
|---|---|---|---|
| AL | | | |
| AGENCY OR BRANCH FILE NUMBER | AGENCY/BRANCH NUMBER | REINSURANCE NUMBER | LOAN AMOUNT |
| 11549 | 1581 | | $152,875.00 |
| COMMITMENT NUMBER | EFFECTIVE DATE & TIME | | OWNERS AMOUNT |
| CM-1-1581-9460 | February 7, 2003 at 8:00 AM | | |
| | | | OTHER AMOUNT |

1. Policy or Policies to be issued:

   ALTA LOAN POLICY
   Proposed Insured: HomeOwners Loan Corporation
   its successors and/or assigns, as their interest may appear

   ALTA OWNER'S POLICY
   Proposed Insured: James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship

   Other: NONE
   Proposed Insured:

2. The estate or interest in the land described or referred to in the Commitment and covered herein is:
   Fee Simple

   and is at the effective date hereof vested in:

   James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship

3. The land is described as follows:
   NOTE: For informational purposes only, the property address is: 155 Bayview Dr., Daphne, AL 36526

   **SEE ATTACHED EXHIBIT "A"**

COUNTERSIGNED AUTHORIZED SIGNATORY

| Issued by: |
| --- |
| Swafford and Hays Settlement Services, Inc. |
| 224 S. Peters Road, Ste. 205 |
| Knoxville, TN 37923 |

NOTE: This Commitment consists of insert pages labeled in Schedule A, Schedule B - Section 1, and Schedule B - Section 2. This Commitment is of no force and effect unless all schedules are included, along with any Rider pages incorporated by reference in the insert pages.

SC-16 (REV. 9/94)

MG 0031

**Hall-Frazier**
**Record - 001068**

## COMMITMENT

### SCHEDULE A

| STATE ABBREVIATION | | | | |
|---|---|---|---|---|
| AL | | | | |
| AGENCY OR BRANCH FILE NUMBER | AGENCY/BRANCH NUMBER | | REINSURANCE NUMBER | LOAN AMOUNT |
| 11549 | 1581 | | | $152,875.00 |
| COMMITMENT NUMBER | | EFFECTIVE DATE & TIME | | OWNERS AMOUNT |
| CM-1-1581-9460 | | February 7, 2003 at 8:00 AM | | |
| | | | | OTHER AMOUNT |

### EXHIBIT "A"

Situated in Baldwin County, Alabama, to-wit:

Lot 40, Lake Forest, Unit 7, as recorded in Map Book 7, Page 94, in the Office of the Judge of Probate, Baldwin County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

BEING the same property conveyed to James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship, by deed from Daya Builders, Inc., dated June 24, 1994 and recorded July 6, 1994, in Book 582 at page 1207, in the Office of the Judge of Probate of Baldwin County, Alabama.

NOTE: This Commitment consists of insert pages labeled in Schedule A, Schedule B - Section 1, and Schedule B - Section 2. This Commitment is of no force and effect unless all schedules are included, along with any Rider pages incorporated by reference in the insert pages.

SC-16 (REV. 9/94)

MG 0032

Hall-Frazier
Record - 001069

# COMMITMENT

### SCHEDULE B - Section 1

Commitment Number: CM-1-1581-9460

File Number: 11549

#### Requirements

The following are the requirements to be complied with:

1.  Instrument(s) creating the estate or interest to be insured must be approved, executed and filed for record, to wit:

    a.  Mortgage executed by James C. Gibbs and Mary L. Gibbs, securing HomeOwners Loan Corporation, must be properly executed and recorded.

2.  Payment of the full consideration to, or for the account of, the grantors or mortgagors.

3.  Payment of all taxes, charges, assessments, levied and assessed against subject premises, which are due and payable.

4.  Satisfactory evidence should be had that improvements and/or repairs or alterations thereto are completed; that contractor, subcontractors, labor and materialmen are all paid.

5.  Exceptions 3 and 4 of Schedule B - Section 2 of this commitment may be amended in or deleted from the policy to be issued if a survey, satisfactory to Company, is furnished to Company.

6.  Affidavit to be executed by James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship, stating:  1) There are no matters pending against the affiant(s) that could give rise to a lien that would attach to the property between February 7, 2003 and the recording of the interest to be insured.  2) That the affiant(s) have not and will not executed any instruments that would adversely affect the interest to be insured.  3) That there are no unrecorded special assessments liens or unrecorded liens arising by virtue of ordinances, unrecorded agreements as to impact or other development fees, or unpaid waste fees payable to the county or municipality.

7.  Satisfy and release mortgage executed by James C. Gibbs and Mary L. Gibbs, husband and wife, dated March 5, 2002 and recorded March 12, 2001, in Instrument No. 586279, in the Office of the Judge of Probate of Baldwin County, Alabama, securing SouthTrust Mortgage Corporation, in the principal amount of $100,000.00.

8.  Tax ID# 05-32-09-32-0-005-003.000

9.  2002 property taxes were exempt.

10. 2003 property taxes are exempt.

SC-2 (REV. 2/93)

MG  0033

**COMMITMENT**

**SCHEDULE B - Section 2**

Commitment Number: CM-1-1581-9460

File Number: 11549

**Exceptions**

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company.

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. Rights or claims of parties in possession not shown by the public records.

3. Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

4. Easements or claims of easements not shown by the public records.

5. Taxes or special assessments which are not shown as existing liens by the public records.

6. Taxes and assessments for the year 2003 and subsequent years.

7. Subject to restrictions, easements, setback lines, etc., as shown on plat of record in Map Book 7, Page 94, in the Office of the Judge of Probate of Baldwin County, Alabama.

8. Subject to all rights in connection therewith by Lake Forest , Inc. to Diamondhead Corporation by instrument dated January 20, 1972 and recorded in Deed Book 421, Page 703.

9. Subject to agreement of parties between Baldwin County, Alabama and Lake Forest Property Owners Association, Inc., dated April 15, 1986 and recorded in Real Property Book 251, Page 389.

10. Subject to Declaration of Restrictions, Conditions, Easements, Covenants, Agreements, Lien and Charges of Lake Forest Inc., Unit 7, as contained in instrument by Lake Forest, Inc., dated June 14, 1971 and recorded in Miscellaneous Book 22, Page 691, and as amended thereto.

11. Subject to the Lake Forest Property Owners Association, Inc., By Laws, as amended October 10, 1988 and recorded in Miscellaneous Book 63, Page 931, By Laws of lake Forest Property Owner's Association, Inc., dated July 27, 1971 and recorded in Corporate Book 18, Page 595 and amended in Real Property Book 251, Page 389.

12. Subject to restrictions, easements, setback lines, Declarations, etc., as shown on Warranty Deed Book 582 at page 1207, in the Office of the Judge of Probate of Baldwin County, Alabama.

SC-3 (REV. 2/93)

MG 0034

Hall-Frazier
Record - 001071

## CLOSING INSTRUCTIONS

Lender: **HOMEOWNERS LOAN CORP.**
**4501 CIRCLE 75 PARKWAY, SUITE D4300**
**ATLANTA, GA  30339**

Loan Closer: **JENNIFER BARON**
**(770) 850-680**
**504-291-3007**

Closing Agent:
Phone: (    )  888-272-2915
Reference No.:

Vesting:  **MARY L. GIBBS**

Mailing Address: **155 BAYVIEW DRIVE**
**DAPHNE, AL 36526**

Seller(s): **REFINANCE**
Property Address: **155 BAYVIEW DRIVE**
**DAPHNE, AL 36526**

Payment: $ **1,135.10**
Loan Type:  **CONVENTIONAL**
Document Date: **02/27/03**
1st Payment Date: **04/04/03**
Last Payment Date:  **MARCH 4, 2033**
Sales Price:
Loan Amount:  **152,875.00**
Interest Rate:    **8.125**
Term:    **360**
Loan No.:  **10065888**
This loan must fund by: **03/04/03**

All documents must be in our office within twenty-four hours of closing.  The Borrower(s) are not to be charged any delivery charge (Fedex, UPS, etc.) without prior written consent of lender.
Please make sure all the documents listed on page 2 of this escrow instructions are completed at the time funds are requested.

| DESCRIPTION | BORROWER | SELLER |
|---|---|---|
| LOAN AMOUNT | 152,875.00 | |
| LENDER PAID CLOSING COSTS | | |
| YIELD SPREAD PREMIUM PAID TO BROKER -- P.O.C. | | |
| ORIGINATION FEE | 4,150.00 | |
| DISCOUNT POINTS | | |
| ORIGINATION FEE TO BROKER | | |
| PER DIEM INTEREST    0    DAYS @ $  34.50 | | |
| INSPECTION FEE | | |
| COMMITMENT FEE | | |
| ADMINISTRATION FEE | 295.00 | |
| UNDERWRITING FEE | | |
| TAX SERVICE FEE | | |
| PROCESSING/UNDERWRITING FEE | 390.00 | |
| FUNDING FEE | 365.00 | |
| DOC PREP FEE | 195.00 | |
| TOTAL PAYOFFS (See Addendum to Closing Instructions) | 145,629. | |
| 1ST YEAR HAZARD INS PREM | | |
| 1ST YEAR FLOOD INS PREM | | |
| CLOSING FEE    SWAFFORD & HAYS | 200.00 | |
| TITLE INSURANCE | 519.00 | |
| RECORDING FEES | 120.00 | |
| STATE TAX/STAMPS | 229.50 | |
| HAZARD              MOS. @ | | |
| PROPERTY TAXES      MOS. @ | | |
| FLOOD INSURANCE     MOS. @ | | |
|                     MOS. @ | | |
|                     MOS. @ | | |
| AGGREGATE ADJUSTMENT | | |
| APPRAISAL FEE    H & H APPRAISER | | |
| CREDIT REPORT FEE    TRANS UNION | | |
| TITLE EXAMINATION | 225.00 | |
| ABSTRACT OR TITLE SEARCH | 375.00 | |

RE-CLOSE

Page 1 of 2

MG 0035

All original forms (excluding the original mortgage) must be sent to Homeowners Loan Corp.  Please include the following forms:

| | | | |
|---|---|---|---|
| X : | NOTE: Return original and 2 certified copies to the lender. | | |
| X : | DEED OF TRUST and all applicable Riders: Return 3 certified copies to the lender. | | |
| X : | HUD-1: Pages 1 and 2 to be completed.  Two certified copies must be forwarded within 24 Hours after completion. | | |
| X : | TIL/Itemization | X : | Tax Information Sheet : |
| X : | Closing Instructions | X : | Identity Affidavits : |
| X : | Flood Notice | X : | Compliance Agreement : |
| X : | Flood Hazard Determination | X : | Borrower Certs : |
| X : | First Lien/Clear Title | X : | Occupancy Affidavit : |
| X : | Payment Info Letter | X : | RESPA Servicing Disc : |
| X : | Rescission Notice | X : | Arbitration Agreement : |
| X : | IRS W-9 - all borrowers | X : | : |
| X : | Initial Escrow Acct Disc. | X : | : |
| X : | Impound Acct Agreement | X : | : |
| X : | Escrow Waiver Request | X : | : |
| X : | Hazard Ins Authorization | X : | : |

**IMPORTANT NOTE:**
Settlement Agent must fax the following documents to Union Planters Bank at (901) 580-9620 prior to releasing funds.
            -Executed Mortgage Note            - Executed Deed of Trust/Mortgage/Security Deed

On the day the loan is funded, the Settlement Agent must fax to HLC's Accounting Department (fax 770-850-1309) the signed final HUD-1 settlement statement used to fund the loan.

ALTA policy must contain endorsements                                      with liability in
the amount of        152,875.00          on property described herein.  Issue said form of policy showing the title
vested as on page 1.
ISSUE SAID FORM OF POLICY FREE FROM ENCUMBRANCES, EXCEPT ITEM(S):
OF PRELIMINARY REPORT DATED

Additional Items:
Note:  Items below MUST be followed or the closing must be stopped and the Loan Officer should be called.  If the following instructions are not followed the Title Company will be held accountable and may be penalized.

   1) BORROWERS SHOULD SIGN ONLY WHERE PRINTED NAMES APPEAR.
   2) THE CLOSER OR THE BORROWER SHOULD MARK THROUGH NO DATES.
   3) THE BORROWERS SHOULD INITIAL ANY HANDWRITTEN INFORMATION ON THE
      DOCUMENTS.
   4) THE 1003 APPLICATION MUST BE SIGNED AND EACH PAGE MUST BE INITIALED
      BY THE BORROWER(S).
   5) THE CLOSER SHOULD VERIFY THAT THE INFORMATION ON THE 1ST PAGE OF THE
      1003 IS ACCURATE.  IF THE INFORMATION IS NOT ACCURATE, THE CLOSER
      SHOULD MARK THROUGH THE INFORMATION, PUT THE CORRECT INFORMATION IN
      THE FIELD AND HAVE THE BORROWER INITIAL THE CHANGE.
   6) ALL DOCUMENTS THAT REQUIRE NOTARIZATION MUST BE NOTARIZED AND THE
      NOTARY SEAL MUST BE VISIBLE.
   7) LINE 804 OF HUD1-A SHOULD SHOW A CREDIT REPORT FEE OF $8.50 AS "POCL."
   8) LINE 1303 OF HUD1-A SHOULD SHOW A FLOOD DETERMINATION FEE OF $9.50 AS
      "POCL."

Closing Agent Certification:

_____
Settlement Officer

HLC.CLOSE                                           Page 2 of 2

MG 0036

Hall-Frazier
Record - 001073

Lender: **HOMEOWNERS LOAN CORP.**
Loan Number: **10065888**
Borrower: **GIBBS**

## ADDENDUM TO CLOSING INSTRUCTIONS

### DEBT PAYOFF SUMMARY

You are hereby instructed to pay-off the following debts at the close of escrow:

| Payable To: | Amount |
|---|---|
| CHASE MANHATTAN | $ 98,735.50 |
| FIRST USA | $ 8,508.00 |
| SEARS | $ 9,226.00 |
| MBNA | $ 20,210.00 |
| MBNA | $ 8,950.00 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

TOTAL DEBTS TO BE PAID OFF: $ 145,629.50

I/We hereby acknowledge that the above debts are being paid from the proceeds of our loan from the above named Lender.

_Mary L. Gibbs_                    _2-07-03_
Borrower: MARY L. GIBBS            Date

_____            _____
Borrower                           Date

_____            _____
Borrower                           Date

_____            _____
Borrower                           Date

D487

MG 0037

| Settlement Statement | 2/27/03 8:13 AM | |
|---|---|---|
| Transactions without Sellers | U.S. Department of Housing and Urban Development | OMB Approval No. 2502-0491 |

Name & Address of Borrower:
James C. Gibbs, 155 Bayview Dr , Daphne, AL 36526
Mary L. Gibbs

Name & Address of Lender:
HomeOwners Loan Corporation
4601 Circle 75 Parkway
Suite F6300
Atlanta, GA 30339
Settlement Agent: Swafford and Hays Settlement Services, Inc. (888)

Property Location:
155 Bayview Dr., Daphne, AL 36526

Place of Settlement:
224 S. Peters Road, Ste. 209, Knoxville, TN 37923
Settlement Date: 02/21/2003

Loan Number: 11949
File Number: 11949

| | | | | | |
|---|---|---|---|---|---|
| 801 | Loan origination fee to HomeOwners Loan Corporation | 4,100.00 | 1501 | Payoff to Chase Manhattan | 96,735.00 |
| 802 | Loan discount | | | | |
| 803 | Appraisal fee | 0.00 | 1502 | Payment to First USA | 8,504.00 |
| 804 | Credit report to   POCL 8.50 | 0.00 | | | |
| 805 | Lender's inspection fee | 0.00 | 1503 | Payment to Sears | 9,206.00 |
| 806 | Mortgage insurance application fee | 0.00 | | | |
| 807 | Assumption fee | 0.00 | 1504 | Payment to MBNA | 20,370.00 |
| 808 | Underwriting Fee Processing Fee to HomeOwners Loan Co | 200.00 | | | |
| 809 | Funding Fee to HomeOwners Loan Corporation | 395.00 | 1505 | Payment to MBNA | 8,950.00 |
| 810 | Administration Fee to HomeOwners Loan Corporation | 296.00 | | | |
| 811 | Document Preparation Fee to HomeOwners Loan Corporat | 195.00 | 1506 | | |
| | | | 1507 | | 0.00 |
| 901 | Interest from | | 1508 | | 0.00 |
| 902 | Mortgage insurance premium for | 0.00 | | | |
| 903 | Hazard insurance premium for | 0.00 | 1507 | | 0.00 |
| 904 | Flood Insurance Premium | 0.00 | 1508 | | 0.00 |
| | Hazard insurance | 0.00 | 1509 | | 0.00 |
| 1001 | Hazard insurance | 0.00 | | | |
| 1002 | Mortgage insurance | 0.00 | | | |
| 1003 | City property taxes | 0.00 | 1810 | | 0.00 |
| 1004 | County property taxes | 0.00 | | | |
| 1005 | Annual assessments (maint.) | 0.00 | 1811 | | 0.00 |
| 1006 | | 0.00 | | | |
| 1007 | Aggregate Accounting Adjustment | 0.00 | 1512 | | 0.00 |
| 1008 | | 0.00 | | | |
| | | | 1513 | | 0.00 |
| 1101 | Settlement or closing fee to Swafford and Hays Settlement | 200.00 | | | |
| 1102 | Abstract or title search to Swafford and Hays Settlement Se | 375.00 | 1514 | | 0.00 |
| 1103 | Title examination to Swafford and Hays Settlement Services | 225.00 | | | |
| 1104 | Title insurance binder | 0.00 | 1515 | | 0.00 |
| 1105 | Document preparation | 0.00 | | | |
| 1106 | Notary fees | 0.00 | 1516 | | 0.00 |
| 1107 | Attorney's fees to | 0.00 | | | |
| | Includes above Items no.: | | 1517 | | 0.00 |
| 1108 | Title Insurance to Swafford and Hays Settlement Services, | 519.00 | | | |
| | Includes above Items no.: | | 1518 | | 0.00 |
| 1109 | Lender's coverage - $152,375.00 $519.00 | | | | |
| 1110 | Owner's coverage | | 1519 | | 0.00 |
| 1111 | Endorsements | 0.00 | | | |
| 1112 | Recording Fees Payable To | 0.00 | | | |
| 1113 | Swafford & Hays | 0.00 | | | 141,829.00 |
| | | | | | |
| 1201 | Recording fees:  Mortgage $120.00 | 120.00 | | | |
| 1202 | City/county tax/stamps: | 0.00 | | | |
| 1203 | State tax/stamps:  Mortgage $229.90 | 229.90 | 1600 | Loan Amount | 152,975.00 |
| 1204 | Florida Intangible Tax | 0.00 | | | |
| 1205 | IDA Mortgage Tax | 0.00 | 1601 | Plus Check/Cash from Borrower | 0.00 |
| | | | 1602 | Minus total settlement charges (line 1400) | 7,049.90 |
| 1301 | Survey | 0.00 | | | |
| 1302 | Pest inspection | 0.00 | 1603 | Minus Total Disbursements to Others (line 1520) | 145,829.00 |
| 1303 | Flood Determination to   POCL 8.50 | 0.00 | | | |
| 1304 | | 0.00 | | | |
| 1305 | | | 1604 | Equals disbursements to borrower (after expiration of any applicable rescission period required by law) | 152.00 |
| 1306 | | 0.00 | | | |
| 1307 | | | | | |
| | | 7,049.90 | | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A ret. RESPA Settlement Statement is a true and
accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Swafford and Hays Settlement Services, Inc. (888) 839-1460
Settlement Agent
Form HUD-1A ret. RESPA (8/94)

James C. Gibbs                                    Borrower
Mary L. Gibbs                                     Borrower

x _____   Borrower

x _____   Borrower
#NAME?

MG 0038

**Homeowners Loan Corp.**
**FEBRUARY 27, 2003** · **Closing Instructions**

To:                                                    Loan No. **10065888**

**SWAFFORD & HAYS**
**224 SOUTH PETERS ROAD**
**KNOXVILLE, TN 37923**

Borrower(s): **MARY L. GIBBS**

Property Address: **155 BAYVIEW DRIVE**
**DAPHNE, AL 36526**

ENCLOSED ARE INSTRUCTIONS AND CLOSING DOCUMENTS IN CONNECTION WITH THE LOAN
DESCRIBED BELOW.    STRICT COMPLIANCE WITH THESE INSTRUCTIONS IS REQUIRED. In
performing the closing service for Homeowners Loan Corp. ("HLC"), you agree to abide by, and be bound by,
all provisions of these closing instructions, unless modified in writing by HLC's Vice President of Operations or
Assistant Vice President of Secondary Marketing.  A FINE OF $50 WILL BE IMPOSED FOR EACH FAILURE
TO FOLLOW THE INSTRUCTIONS STATED BELOW.

Initial:

 (1)     The final HUD-1A (in refinance transactions) and HUD-1 (in purchase transactions) must be
faxed to HLC's Closing Department at (770) 818-9877 for review and approval prior to signing
or e-mail. Form HUD-1A Settlement Statement must be used for all closings except purchase
money transactions. No changes to any fees can be made to the Settlement Statement without
written consent of the Vice President of Operations at (770) 989-8739 or the Assistant Vice
President of Secondary Marketing  at (770) 541-8898.

 (2)     Each Borrower must sign the documents (preferably in blue ink) exactly as their name appears,
and only where their name appears.

 (3)     All documents must be witnessed and/or notarized where indicated, and the notary seal must be
visible.

 (4)     The identity of each Borrower must be verified through a review of a photo ID prior to signing
the loan documents, and an Affidavit of Identity completed.  The returned package should NOT
contain a copy of the photo ID.

 (5)     The 1003 Loan Application must be signed and the Borrower(s) must initial each page. The
closing agent should verify that the information on the 1st page of the 1003 is accurate.  If the
information is not accurate, the closing agent should mark through the information, put the
correct information in the field, and have the Borrower(s) initial the change.

(6)     Neither the closing agent nor any Borrower(s) or additional signatory should mark through any
dates, or any other printed information.

HLC.LOAN2                                    Page 1 of 2

MG 0039

**Hall-Frazier**
**Record - 001076**

LOAN NO.: 10065888

(7)   If, after obtaining written consent from HLC for modification of any information, handwritten modification(s) occur, all modifications must be initialed by all persons signing the document modified.

(8)   If the Settlement Statement reflects that the Borrower(s) must bring money to the closing, the closing agent must collect these funds prior to allowing execution of the Settlement Statement and the loan documents.

(9)   There can be no faxed documents used at closing without the prior written consent of the Vice President of Operations or the Assistant Vice President of Secondary Marketing.

(10)   ALL documents must be signed. The Borrower(s) cannot omit to sign any document without the written consent of the Vice President of Operations or the Assistant Vice President of Secondary Marketing.

(11)   The closing agent must provide the Borrower(s) with one copy of each document signed, and obtain from the Borrower(s) a signed acknowledgement of receipt of copies of all documents.

(12)   Each Borrower and any other person with a right to rescind under Reg. Z must sign and retain 2 copies of the Notice of Right to Cancel, 1 copy of the Truth in Lending Statement, and the acknowledgement of receipt of Good Faith Estimate and if applicable, the ARM Disclosure.

(13)   Borrower(s) must sign a prepayment penalty rider, if included in package. Indicate here "yes" or "no" as to whether it is included.  If included, was it signed? ____

(14)   Borrower(s) must sign the Arbitration Agreement included in the package.

(15)   All executed documents returned to HLC must be accompanied by a Transaction Specific Closing Protection Letter in a form pre-approved by HLC.

(16)   If the closing agent notes any problems with the documents or the manner in which the documents were executed by the Borrower(s) and, if appropriate, and additional signatories, the documents must nevertheless be returned to HLC within the time specified in these instructions.

(17)   All executed documents and this completed checklist must be sent by overnight courier (10:00 am delivery) the same day you receive the executed documents.  If you use outside closers for the signing, those closers must return executed documents to you by the first available overnight courier pickup following the closing, for delivery to you by 10:00 am following the closing.

The same day the funds are disbursed to the borrower, you must fax to HLC a copy of the disbursement ledger to fax # (770) 850-1455.

Please complete this checklist, sign where indicated below, and return the completed document with the package sent to HLC.

_____
Settlement Agent

HLC-L0082                        Page 2 of 2

MG 0040

LOAN NO. 10065888

## ADJUSTABLE RATE NOTE

(LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)

THE ATTACHED PREPAYMENT PENALTY RIDER IS MADE A PART OF THIS INSTRUMENT

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

FEBRUARY 27, 2003                    DAPHNE,                    AL
                                        [City]                   [State]

155 BAYVIEW DRIVE
DAPHNE, AL  36526
                [Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **152,875.00** (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **HOMEOWNERS LOAN CORP., A DELAWARE CORPORATION**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **8.125** %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the **4TH** of each month beginning on **APRIL 4, 2003**

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on **MARCH 4, 2033**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **4501 CIRCLE 75 PARKWAY, SUITE A1225, ATLANTA, GA  30339** or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **1,135.10**. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on **MARCH 4, 2006**, and on that day every **6th** month thereafter. Each date on which my adjustable interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR 6 MONTH INDEX  (AS PUBLISHED IN THE WALL STREET JOURNAL)
FE043189 (06/94)

Page 1 of 3                                                          Initials: MEH

MG 0041

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **SEVEN AND ONE QUARTER** percentage point(s) ( **7.250** %) to the Current Index. The Note Holder will then round the result of this addition up to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.125** % or less than **8.125** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **14.125** %, nor less than **8.125** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR 6 MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)
FNMA3520 (06/96)

Initials M.S.H.

MG 0042

Hall-Frazier
Record - 001079

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

THIS LOAN IS MADE UNDER THE LAWS OF THE STATE OF    **ALABAMA**    , EXCEPT TO THE EXTENT PREEMPTED BY THE DECLARATION THAT THIS LOAN IS AN ALTERNATIVE MORTGAGE TRANSACTION WITHIN THE MEANING OF THE ALTERNATIVE MORTGAGE TRANSACTION PARITY ACT OF 1982, 12 UNITED STATES CODE SECTION 3801 AND FOLLOWING, AS AMENDED, THE APPLICABLE FEDERAL REGULATIONS ADOPTED PURSUANT THERETO, AS AMENDED.

Important Notice to Borrower:  If you do not meet your contract obligations, you may lose your house.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_Mary L. Gibbs_____ (Seal)            _____ (Seal)
MARY L. GIBBS                - Borrower                                    - Borrower


_____ (Seal)            _____ (Seal)
                         - Borrower                                    - Borrower

*[Sign Original Only]*

MULTISTATE  ADJUSTABLE RATE NOTE - LIBOR 6 MONTH INDEX  (AS PUBLISHED IN THE WALL STREET JOURNAL)
FNMA3520 (04/94)

MG  0043

**Hall-Frazier**
**Record - 001080**

## RIDER TO NOTE

THIS RIDER TO NOTE (the "Note Rider") is made this **27TH** day of **FEBRUARY, 2003**, and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") payable to

**HOMEOWNERS LOAN CORP.**,

(the "Lender") and dated as of even date herewith (the "Note"). I understand that the Lender may transfer the Note, the related security instrument (the "Security Instrument") and this Note Rider. The Lender or anyone who takes the Note, the Security Instrument, and this Note Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

In consideration of the Lender's agreement to provide the loan evidenced by the Note and as a material inducement to the Lender to grant such loan and the terms set forth in the Note, the undersigned agrees that the following provision shall be effective, and that the Note shall contain and be subject to the following provision, notwithstanding any provision to the contrary contained in the Note, the security instrument securing the Note, or other loan document:

## PREPAYMENT PENALTY:

Payments of Principal prior to the time they are due are known as "Prepayments." When I make a Prepayment, I will notify the Note Holder in writing that I am doing so.

During the first **THIRTY-SIX** ( **36** ) months of my loan, I will be charged a PREPAYMENT PENALTY in an amount equal to six (6) months' interest (at the rate in effect at the time Prepayment occurs) on any Prepayment I make in excess of twenty percent (20%) of the original principal balance in any twelve (12) month period. If neither blank above is filled in, 36 months will be deemed to be filled in.

The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. [If this Note provides for an adjustable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the Payment Change Date if my partial Prepayment occurs prior to the Payment Change Date. However, any reduction in the amount of my monthly payment due to my partial Prepayment may be offset by an interest rate increase.]

Any foregoing provision to the contrary notwithstanding, such prepayment penalty shall not exceed in amount, and the right to charge such prepayment penalty shall not remain in effect contrary to or beyond, any limitations imposed by applicable law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note Rider.

_____ (Seal)
MARY L. GIBBS                      - Borrower

_____ (Seal)
                                   - Borrower

_____ (Seal)
                                   - Borrower

_____ (Seal)
                                   - Borrower

[Sign Original Only.
Do Not Sign If Blanks In Text Are Not Filled In.]

SAXONPP

MG 0044

**Hall-Frazier**
**Record - 001081**

WHEN RECORDED RETURN TO:
HOMEOWNERS LOAN CORP.
4501 CIRCLE 75 PARKWAY, STE F6300
ATLANTA, GA  30339
LOAN NO. 10065888          [Space Above This Line For Recording Data]

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on    **FEBRUARY 27, 2003**    . The grantor is
**JAMES C. GIBBS AND MARY L. GIBBS, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP**

("Borrower").

This Security Instrument is given to    **HOMEOWNERS LOAN CORP.,**
**A DELAWARE CORPORATION**

, which is organized
, and whose address is
and existing under the laws of    **DELAWARE**
**4501 CIRCLE 75 PARKWAY, SUITE F6300**
**ATLANTA, GA 30339**                                ("Lender").
Borrower owes Lender the principal sum of    **ONE HUNDRED FIFTY-TWO THOUSAND EIGHT HUNDRED**
**SEVENTY-FIVE AND 00/100**          Dollars (U.S. $  **152,875.00**  ). This debt is
evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on  **MARCH 4, 2033**
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all
renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under
paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and
agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and
convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in
**BALDWIN**                        County, Alabama:
**SEE ATTACHED EXHIBIT "A"**

which has the address of    **155 BAYVIEW DRIVE, DAPHNE**
                                                 [Street]                                    [City]
Alabama    **36526**              ("Property Address");
              [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all
the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter
a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing
is referred to in this Security Instrument as the "Property."                    Initials: J.C.G.  ML.G.
ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FNMA3001

Page 1 of 7

MG 0045

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating

ALABAMA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FNMA3001

Page 2 of 7                                    Initials _____

Hall-Frazier
Record - 001083

lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FNMA3001

Page 3 of 7                                                  Initials: J.C.B. M.S.D.

Hall-Frazier
Record - 001084

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FNMA3001

Initials _G.C.A._ _M.S.Y._

Page 4 of 7

MG 0048

refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FNMA3001

Page 5 of 7

Initial J.C.B. M.S.B.

Hall-Frazier
Record - 001086

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in **BALDWIN** County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

24. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Planned Unit Development Rider |
| [ ] 1-4 Family Rider | [ ] Graduated Payment Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [x] Other(s) [specify] LEGAL DESCRIPTION | | |

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
FORM 3001 9/90

Page 6 of 7

Initials: _G.C.H._ _M.E.H._

MG 0050

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____    _James C. Gibbs_____ (Seal)
                            JAMES C. GIBBS                - Borrower

_____    _Mary L. Gibbs_____ (Seal)
                            MARY L. GIBBS                - Borrower

                           _____ (Seal)
                                                         - Borrower

                           _____ (Seal)
                                                         - Borrower

[Space Below This Line For Acknowledgment]

STATE OF ALABAMA,          *BALDWIN* County ss:

The foregoing instrument was acknowledged before me    **FEBRUARY 27, 2003**
                                                              (date)
by   **JAMES C. GIBBS AND MARY L. GIBBS, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP**

                                              [person acknowledging]

My Commission expires:

                                        _Phillip S. Buckler_____
                                                  Notary Public

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 3, 2005
BONDED THRU NOTARY PUBLIC UNDERWRITERS

ALABAMA - Single Family Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
F00SAL2003                                    Page 7 of 7

MG 0051

LOAN NO. 10065888

## ADJUSTABLE RATE RIDER

(LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **27TH** day of **FEBRUARY, 2003**
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to
**HOMEOWNERS LOAN CORP.,**
**A DELAWARE CORPORATION**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**155 BAYVIEW DRIVE**
**DAPHNE, AL 36526**
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **8.125** %. The Note provides for changes
in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on **MARCH 4, 2006** , and on that day every
**6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average
of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as
published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the
month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
**SEVEN AND ONE QUARTER** percentage point(s)
( **7.250** %) to the Current Index. The Note Holder will then round the result of this addition up to
the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this
rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the
unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate
in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR 6 MO INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) - Single Family - FNMA Uniform Instrument
FN04A3130

Page 1 of 2

*[handwritten signatures]*

MG 0052

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **11.125** % or less than **8.125** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **14.125** %, nor less than **8.125** %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
**MARY L. GIBBS**          - Borrower

_____ (Seal)
**JAMES C. GIBBS**          - Borrower

_____ (Seal)
                           - Borrower

_____ (Seal)
                           - Borrower

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR 6 MO INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) - Single Family - FNMA Uniform Instrument
FNMA3138

Page 2 of 2

MG 0053

File No.: 11549

## EXHIBIT A

Situated in Baldwin County, Alabama, to-wit:

Lot 40, Lake Forest, Unit 7, as recorded in Map Book 7, Page 94, in the Office of the Judge of Probate, Baldwin County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

BEING the same property conveyed to James C. Gibbs and Mary L. Gibbs, as joint tenants with right of survivorship, by deed from Days Builders, Inc., dated June 24, 1994 and recorded July 6, 1994, in Book 582 at page 1207, in the Office of the Judge of Probate of Baldwin County, Alabama.

MG 0054

Hall-Frazier
Record - 001091

## ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

Lender: **HOMEOWNERS LOAN CORP.**

Loan No.: **10065888**

Title Company: **SWAFFORD & HAYS**
                    **224 SOUTH PETERS RD STE. 110**
                    **KNOXVILLE   37923**

Escrow No.:

Borrower(s): **MARY L. GIBBS**

Property Address: **155 BAYVIEW DRIVE**
                     **DAPHNE, AL   36526**

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

BUYER(S)

_Mary L. Gibbs_ _____    _2-27-03_____
Borrower **MARY L. GIBBS**               Date

_____    _____
Borrower                               Date

_____    _____
Borrower                               Date

_____    _____
Borrower                               Date

SELLER

_____    _____
Seller **REFINANCE**                       Date

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____    _5-7-07_____
Settlement Agent                            Date

[The certifications contained herein may be obtained from the respective parties at different times or may be obtained on separate addenda.]

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details, see: Title 18 U.S.C. Sections 1001 and 1010.

CVHUDAPD

MG 0055

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (MADE IN COMPLIANCE WITH FEDERAL LAW)

Lender: **HOMEOWNERS LOAN CORP.**

Loan No.: **10065888**

Borrower(s): **MARY L. GIBBS AND JAMES C. GIBBS**    Date: **02/27/03**

Property Address: **155 BAYVIEW DRIVE**
**DAPHNE, AL 36526**

☐ Initial Disclosure estimated at time of application    ☒ Final Disclosure based on contract terms

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you assuming the annual percentage rate does not change. | Amount Financed The amount of credit provided to you or on your behalf as of loan closing. | Total of Payments The amount you will have paid after you have made all payments as scheduled assuming the annual percentage rate does not change. |
|---|---|---|---|
| **8.979** % | $ **282059.60** | $ **147280.00** | $ **429339.60** |

**YOUR PAYMENT SCHEDULE WILL BE:**

| NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 36 | 1135.10 | 04/04/2003 | | | |
| 324 | 1199.00 | 04/04/2006 | | | |

* includes mortgage insurance premium, excludes taxes, hazard insurance or flood insurance.

☐ **DEMAND FEATURE:** This loan transaction ☐ does ☒ does not have a demand feature.

☒ **VARIABLE RATE FEATURE:** The annual percentage rate may increase during the term of your loan if the index used to set the Note interest rate increases. A new index may be substituted under certain circumstances, and substitution of the new index may also increase the rate. The index at the beginning of your loan is described below:
**THE AVERAGE OF INTERBANK OFFERED RATES FOR 6 MONTH U.S. DOLLAR-DENOMINATED DEPOSITS IN THE LONDON MARKET ("LIBOR"), AS PUBLISHED IN THE WALL STREET JOURNAL.**    DISCLOSURES ABOUT THE **VARIABLE RATE FEATURE OF YOUR LOAN HAVE BEEN PROVIDED TO YOU SEPARATELY.**

**SECURITY INTEREST:** You are giving a security interest in:
☐ the goods or property being purchased.    ☒ real property you already own.

**FILING OR RECORDING FEES** $ **120.00**

**LATE CHARGE:** If a payment is more than **15** days late, you will be charged $ **56.75** / **5** % of the principal and interest past due.

**PREPAYMENT:** If you pay off your loan early, you
☒ may ☐ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.

**INSURANCE:** Credit life, accident, health or loss of income insurance is not required in connection with this loan. This loan transaction requires the following insurance:
☒ Hazard Insurance ☐ Flood Insurance ☐ Private Mortgage Insurance ☐ Mutual Mortgage Insurance
Borrower(s) may obtain insurance through any person of his/her choice, provided said carrier meets the requirements of the Lender. If Borrower desires Property Insurance to be obtained through the Lender's designated agency, the cost will be set forth in a separate insurance statement furnished by the Lender.

**ASSUMPTION:** Someone buying your house
☐ may ☐ may, subject to conditions, ☒ may not assume the remainder of your loan on the original terms.

See your contract documents for additional information regarding nonpayment, default, right to accelerate the maturity of the obligation, prepayment rebates and penalties, and the Lender's policy regarding assumption of the obligation.

☐ all dates and numerical disclosures except late payment disclosures are estimates.    means an estimate.

"The undersigned hereby acknowledge receiving and reading a completed copy of this disclosure along with copies of the documents provided. The delivery and signing of this disclosure does not constitute an obligation on the part of the lender to make, or the Borrower(s) to accept, the loan as identified."

Read, acknowledged and accepted this **27th** day of **Feb. 2003**

*(signature)* Mary L Gibbs    (Borrower)    _____ (Borrower)
**MARY L. GIBBS**

*(signature)* James C Gibbs    (Borrower)    _____ (Borrower)
**JAMES C. GIBBS**

Boxes are checked if applicable.

1993 Contour Software, Inc.
All Rights Reserved
REG2H (02/95)  Page 1 of 2

MG 0056

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### "ITEMIZATION OF AMOUNT FINANCED"

Lender: **HOMEOWNERS LOAN CORP.**
Loan Number: **10065888**
Borrower: **MARY L. GIBBS**
**JAMES C. GIBBS**

Date **02/27/03**
Note Rate: **8.125** %
P & I Payment: $ **1135.10**

| Loan Amount | | Prepaid Finance Charges | | Amount Financed |
|---|---|---|---|---|
| $ 152875.00 | $ 5595.00 | | $ 147280.00 |

| | | | | |
|---|---|---|---|---|
| 801 | Loan Origination Fee due Lender | @ % | $ | 4150.00 |
| 802 | Discount Fee | @ % | $ | |
| 901 | Prepaid Interest | days @ $ 34.50 | $ | |
| 902 | Private Mortgage Insurance Premium | | $ | |
| 1002 | PMI/MIP Impounds | months X $ per month | $ | |
| 805 | Lender's Inspection Fee | | $ | |
| 806 | Mortgage Insurance Application Fee | | $ | |
| 807 | Assumption Fee | | $ | |
| 808 | Tax Service Contract | | $ | |
| 809 | Underwriting Review Fee | | $ | |
| 810 | Administration Fee | | $ | 295.00 |
| 811 | Application Fee | | $ | |
| 812 | Commitment Fee | | $ | |
| 813 | Warehouse Fee/ Interest Differential | | $ | |
| 814 | Yield Spread Premium | % $ P.O.C. * | $ | |
| 815 | Service Release Premium | % $ P.O.C. * | $ | |
| 816 | Origination Fee Due Broker | | $ | |
| 817 | FHA Upfront MIP/VA Funding Fee | | $ | |
| 818 | PROCESSING/UNDERWRITING FEE | | $ | 390.00 |
| 819 | FUNDING FEE | | $ | 365.00 |
| 820 | DOC PREP FEE | | $ | 195.00 |
| 821 | | | $ | |
| 822 | | | $ | |
| 823 | | | $ | |
| 824 | | | $ | |
| 825 | | | $ | |
| 1101 | Settlement or Closing Fee To: SHAFFORD & HAYS | | $ | 200.00 |
| 1107 | Attorney Fee To: | | $ | |
| | Lender Paid: | $ | | |
| | Broker Paid: | $ | | |
| | * Compensation to Broker not paid out of Loan Proceeds (P.O.C. Fees) | | | |

### PREPAID FINANCE CHARGE
$ 5595.00

| | | | |
|---|---|---|---|
| | Property Insurance Premium to Insurance Agency: | | $ |
| 903 | First Year Hazard Insurance Premium | | $ |
| 904 | First Year Flood Insurance Premium | | $ |
| 803 | Appraisal Fee To: H & H APPRAISERS (LYONLL) | Paid | $ |
| 804 | Credit Reporting Fee To: TRANS UNION | Paid | $ |
| 1101 | Settlement or Closing Fee To: | | $ |
| 1102 | Abstract or Title Search To: | | $ |
| 1103 | Title Examination To: | | $ |
| 1104 | Title Insurance Binder To: | | $ |
| 1105 | Document Preparation Fee To: | | $ |
| 1106 | Notary Fee To: | | $ |
| 1107 | Attorney Fee To: | | $ |
| 1108 | Title Insurance Premium To: SHAFFORD & HAYS | | $ 519.00 |
| 1111 | Endorsement To: TITLE EXAMINATION | | $ 225.00 |
| 1112 | ABSTRACT OR TITLE SEARCH | | $ 375.00 |
| 1201 | Recording Fee to County Clerk | | $ 120.00 |
| 1202 | City/County/Tax/Stamps | | $ |
| 1203 | State Tax/Stamps | | $ 229.50 |
| 1204 | | | $ |
| 1301 | Survey To: | | $ |
| 1302 | Termite/Pest Inspection | | $ |
| 1303 | Property Inspection To: | | $ |
| 1304 | Photo Fee To: | | $ |
| 1305 | | | $ |
| 1306 | | | $ |
| 1307 | | | $ |
| 1308 | PAYOFFS | | $ 145629.50 |
| | Lender Paid: | $ | |
| | Broker Paid: | $ | |
| | Loan Proceeds To: | | (182.00) |

### AMOUNT PAID TO OTHERS ON YOUR BEHALF
$ 147098.00

| | | | |
|---|---|---|---|
| 1001 | Hazard Insurance Impounds | months X $ per month | $ |
| 1003 | City Property Taxes | months X $ per month | $ |
| 1004 | County Property Tax | months X $ per month | $ |
| 1005 | Annual Assessments | months X $ per month | $ |
| 1006 | Flood Insurance Impounds | months X $ per month | $ |
| 1007 | | months X $ per month | $ |
| 1008 | | months X $ per month | $ |
| | Aggregate Analysis Adjustment | | $ |

### AMOUNT PAID ON YOUR ACCOUNT
$

### AMOUNT GIVEN TO YOU DIRECTLY
$ 182.00

"The undersigned hereby acknowledge receiving and reading a completed copy of this disclosure along with copies of the documents provided. The delivery and signing of this disclosure does not constitute an obligation on the part of the Lender to make, or the Borrower(s) to accept, the loan as identified."

☐ all dates and numerical disclosures are estimates

Read, acknowledged and accepted this ___ day of __Feb.__ 20__5__

_Mary L. Gibbs_ Borrower
MARY L. GIBBS

_James Gibbs_ Borrower
JAMES C. GIBBS

HEMS, Inc. REG2942 (3/99)

_____ Borrower

_____ Borrower

MG 0057

Hall-Frazier
Record - 001094

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (MADE IN COMPLIANCE WITH FEDERAL LAW)

Lender: **HOMEOWNERS LOAN CORP.**

Loan No.: **10065888**

Borrower(s): **MARY L. GIBBS AND JAMES C. GIBBS**    Date: **02/27/03**

Property Address: **155 BAYVIEW DRIVE**
**DAPHNE, AL   36526**

☐ Initial Disclosure estimated at time of application    ☒ Final Disclosure based on contract terms

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you assuming the annual percentage rate does not change. | Amount Financed The amount of credit provided to you or on your behalf as of loan closing. | Total of Payments The amount you will have paid after you have made all payments as scheduled assuming the annual percentage rate does not change. |
|---|---|---|---|
| **8.979 %** | $ **282059.60** | $ **147280.00** | $ **429339.60** |

## YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | * AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 36 | 1135.10 | 04/04/2003 | | | |
| 324 | 1199.00 | 04/04/2006 | | | |

* Includes mortgage insurance premiums, excludes taxes, hazard insurance or flood insurance.

☐ **DEMAND FEATURE:** This loan transaction ☐ does ☒ does not have a demand feature.

☒ **VARIABLE RATE FEATURE:** The annual percentage rate may increase during the term of your loan if the index used to set the Note interest rate increases. A new index may be substituted under certain circumstances, and substitution of the new index may also increase the rate. The index at the beginning of your loan is described below:
**THE AVERAGE OF INTERBANK OFFERED RATES FOR 6 MONTH U.S. DOLLAR-DENOMINATED DEPOSITS IN THE LONDON MARKET ("LIBOR"), AS PUBLISHED IN THE WALL STREET JOURNAL.** DISCLOSURES ABOUT THE VARIABLE RATE FEATURE OF YOUR LOAN HAVE BEEN PROVIDED TO YOU SEPARATELY.

**SECURITY INTEREST:** You are giving a security interest in:
☐ the goods or property being purchased.    ☒ real property you already own.

**FILING OR RECORDING FEES 120.00**

**LATE CHARGE:** If a payment is more than 15 days late, you will be charged $ 56.75 / 5 % of the principal and interest past due.

**PREPAYMENT:** If you pay off your loan early, you
☒ may ☐ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.

**INSURANCE:** Credit life, accident, health or loss of income insurance is not required in connection with this loan. This loan transaction requires the following insurance:
☒ Hazard Insurance ☐ Flood Insurance ☐ Private Mortgage Insurance ☐ Mutual Mortgage Insurance
borrower(s) may obtain insurance through any person of his/her choice, provided said carrier meets the requirements of the Lender. If Borrower desires Property Insurance to be obtained through the Lender's designated agency, the cost will be set forth in a separate insurance statement furnished by the Lender.

**ASSUMPTION:** Someone buying your home
☐ may ☐ may, subject to conditions, ☒ may not assume the remainder of your loan on the original terms.

See your contract documents for additional information regarding nonpayment, default, right to accelerate the maturity of this obligation, prepayment rebates and penalties, and the Lender's policy regarding assumption of this obligation.

☐ all dates and numerical disclosure except late payment disclosures are estimates.    means an estimate.

"The undersigned hereby acknowledge receiving and reading a completed copy of this disclosure along with copies of the documents provided. The delivery and signing of this disclosure does not constitute an obligation on the part of the Lender to make, or the Borrower(s) to accept, the loan as identified."

Read, acknowledged and accepted this ___27th___ day of ___Feb. 2003___

_Mary L. Gibbs_ (Borrower)    _____ (Borrower)
**MARY L. GIBBS**

_James C. Gibbs_ (Borrower)    _____ (Borrower)
**JAMES C. GIBBS**

Boxes are checked if applicable.    1993 Concur Software, Inc. All Rights Reserved
RED234 (02-98) Page 1 of 2

MG 0058

**Hall-Frazier**
**Record - 001095**

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### ITEMIZATION OF AMOUNT FINANCED

Lender: **HOMEOWNERS LOAN CORP.**
Loan No: **10065888**                                    Date: **02/27/03**
Borrower: **MARY L. GIBBS**                              Note Rate: **8.125** %
**JAMES C. GIBBS**                                       P & I Payment: $ **1135.10**

| Loan Amount | Prepaid Finance Charges | Amount Financed |
|---|---|---|
| $ **152875.00** | $ **5595.00** | $ **147280.00** |

| | | | | Amount |
|---|---|---|---|---|
| 801 | Loan Origination Fee due Lender | @ | % | $ 4150.00 |
| 802 | Discount Fee | @ | % | $ |
| 901 | Prepaid Interest | days @ $ **34.50** | | $ |
| 902 | Private Mortgage Insurance Premium | months X $ | per month | $ |
| 1002 | PMI/MMI Impounds | months X $ | per month | $ |
| 805 | Lender's Inspection Fee | | | $ |
| 806 | Mortgage Insurance Application Fee | | | $ |
| 807 | Assumption Fee | | | $ |
| 808 | Tax Service Contract | | | $ |
| 809 | Underwriting Review Fee | | | $ |
| 810 | Administration Fee | | | $ 295.00 |
| 811 | Application Fee | | | $ |
| 812 | Commitment Fee | | | $ |
| 813 | Warehouse Fee/ Interest Differential | | | $ |
| 814 | Yield Spread Premium | % $ | P.O.C. * | |
| 815 | Service Release Premium | % $ | P.O.C. * | |
| 816 | Origination Fee Due Broker | | | $ |
| 817 | FHA Upfront MIP/VA Funding Fee | | | $ |
| 818 | PROCESSING/UNDERWRITING FEE | | | $ 390.00 |
| 819 | FUNDING FEE | | | $ 365.00 |
| 820 | DOC PREP FEE | | | $ 195.00 |
| 821 | | | | $ |
| 822 | | | | $ |
| 823 | | | | $ |
| 824 | | | | $ |
| 825 | | | | $ |
| 1101 | Settlement or Closing Fee To: **SWAFFORD & HAYS** | | | $ 200.00 |
| 1107 | Attorney Fee To: | | | $ |

Lender Paid: $
Broker Paid: $
* Compensation to Broker not paid out of Loan Proceeds (P.O.C. Fees)

| | PREPAID FINANCE CHARGE | | | $ 5595.00 |
|---|---|---|---|---|
| | Property Insurance Premium to Insurance Agency: | | | |
| 903 | First Year Hazard Insurance Premium | | | $ |
| 904 | First Year Flood Insurance Premium | | | $ |
| 803 | Appraisal Fee To: **H & H APPRAISERS (LYONLL)** | Paid | | $ |
| 804 | Credit Reporting Fee To: **TRANS UNION** | Paid | | $ |
| 1101 | Settlement or Closing Fee To: | | | $ |
| 1102 | Abstract or Title Search To: | | | $ |
| 1103 | Title Examination To: | | | $ |
| 1104 | Title Insurance Binder To: | | | $ |
| 1105 | Document Preparation Fee To: | | | $ |
| 1106 | Notary Fee To: | | | $ |
| 1107 | Attorney Fee To: | | | $ |
| 1108 | Title Insurance Premium To: **SWAFFORD & HAYS** | | | $ 519.00 |
| 1111 | Endorsement To: **TITLE EXAMINATION** | | | $ 225.00 |
| 1112 | **ABSTRACT OR TITLE SEARCH** | | | $ 375.00 |
| 1201 | Recording Fee to County Clerk | | | $ 120.00 |
| 1202 | City/County/Tax/Stamps | | | $ |
| 1203 | State Tax/Stamps | | | $ 229.50 |
| 1204 | | | | $ |
| 1301 | Survey To: | | | $ |
| 1302 | Termite/Pest Inspection | | | $ |
| 1303 | Property Inspection To: | | | $ |
| 1304 | Photo Fee To: | | | $ |
| 1305 | | | | $ |
| 1306 | | | | $ |
| 1307 | | | | $ |
| 1308 | **PAYOFFS** | | | $ 145629.50 |

Lender Paid: $
Broker Paid: $
Loan Proceeds To: (182.00)

| | AMOUNT PAID TO OTHERS ON YOUR BEHALF | | | $ 147098.00 |
|---|---|---|---|---|
| 1001 | Hazard Insurance Impounds | months X $ | per month | $ |
| 1003 | City Property Taxes | months X $ | per month | $ |
| 1004 | County Property Tax | months X $ | per month | $ |
| 1005 | Annual Assessments | months X $ | per month | $ |
| 1006 | Flood Insurance Impounds | months X $ | per month | $ |
| 1007 | | months X $ | per month | $ |
| 1008 | | months X $ | per month | $ |
| | Aggregate Analysis Adjustment | | | $ |

| | AMOUNT PAID ON YOUR ACCOUNT | | | $ |
|---|---|---|---|---|
| | AMOUNT GIVEN TO YOU DIRECTLY | | | $ 182.00 |

*The undersigned hereby acknowledge receiving and reading a completed copy of this disclosure along with copies of the documents provided. The delivery and signing of this disclosure does not constitute an obligation on the part of the Lender to make, or the Borrower(s) to accept, the loan. The loan as identified.*

☐ all dates and numerical disclosures are estimates    means estimate

Read, acknowledged and accepted this **27th** day of **Feb. 2003**

_Mary L. Gibbs_ Borrower
MARY L. GIBBS

_James C. Gibbs_ Borrower
JAMES C. GIBBS

HOMEOWNERS LOAN CORP., Inc.
(1)(859)370-1700 www.scriocram.com REDZ942 (2/99)

Borrower

Borrower

MG 0059

**Hall-Frazier**
**Record - 001096**

## ESCROW WAIVER

Loan No.:  **10065888**

Date:  **02/27/03**

Lender:  **HOMEOWNERS LOAN CORP.**
**4501 CIRCLE 75 PARKWAY, SUITE F6300**
**ATLANTA, GA  30339**

Lender hereby provides a notice of waiver to collect insurance under Section two (2) of the Mortgage securing the property at:  **155 BAYVIEW DRIVE**
**DAPHNE, AL  36526**

It will be the responsibility of the Borrower(s) to insure that yearly insurance is being paid as assessed.  Proof of payments made may be requested by Lenders.

**02/27/03**
Date

Acknowledged:

_____ (Seal)
MARY L. GIBBS                    - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

_____ (Seal)
                                 - Borrower

ILESCWV2

MG 0060

Loan Number:  **10065888**

Lender:  **HOMEOWNERS LOAN CORP.,**
**A DELAWARE CORPORATION**
**4501 CIRCLE 75 PARKWAY, SUITE F6300**
**ATLANTA, GA 30339**
(hereinafter "Lender").

## AGREEMENT FOR THE ARBITRATION OF DISPUTES

Maintaining good relationships with our loan applicants and borrowers is very important to us. The above named Lender ("we," "our" or "us"), requests the person(s) named below ("you" or "your") to contact us immediately if you have a problem with a loan application or loan transaction with us. Often a telephone call to us will resolve the matter amicably and as quickly as possible. However, if you and we are not able to resolve our differences informally, you and we agree that any dispute, regardless of when it arose, shall be settled, at your option or ours, by arbitration in accordance with this Agreement. Judgment on the arbitrator's award may be entered in any court having jurisdiction. Except as otherwise expressly provided by applicable law, there is no right of judicial review of any award by the arbitrator.

This Agreement is made in consideration of our processing of your inquiry or application for a loan secured by the property identified below ("loan") and is also made in further consideration of our funding of the loan at the interest rate(s) and terms referenced in the loan documents. This Agreement is effective and binding on both you and your heirs, successors and assigns and us when it is signed by both parties. This Agreement shall also apply to any dispute with us or our corporate parents, affiliates, subsidiaries, agents, employees, officers, directors, successors and assigns. If you have any questions, you should consult your own lawyer before you sign this Agreement.

Dispute:  For purposes of this Agreement, a "dispute" is any claim, controversy, disagreement or lawsuit of any nature whatsoever arising out of or in any way related to the loan; the arranging of the loan; any application, inquiry or attempt to obtain the loan; the closing and funding of the loan; the terms of the loan; any loan documents; the servicing, collecting and enforcing of the loan; or any other aspect of the loan transaction. It includes, but is not limited to, federal or state contract, tort, statutory, regulatory, common law and equitable claims.

Examples of disputes that are governed by this Agreement include, but are not limited to, those involving:

* The Equal Credit Opportunity Act and Regulation B;
* The Real Estate Settlement Procedures Act and Regulation X;
* The Truth in Lending Act and Regulation Z;
* State insurance, usury, and lending laws; fraud or misrepresentation, including claims for failing to disclose material facts;
* Any other federal or state consumer protection statute or regulation;
* Any party's execution of this Agreement and/or willingness to be bound by its terms and provisions; or
* Any dispute about application for, closing, funding, servicing, collecting, or enforcing the loan.

A "dispute" does not include those items described in the paragraph labeled "Exceptions To Arbitration", below.

Agreement to Arbitrate:  Arbitration is a means of having an independent third party resolve a dispute. Either you or we can request that a dispute be submitted to arbitration. Either you or we can do this before a lawsuit (which is usually initiated by the filing of a "complaint") has been served or within sixty (60) days after a complaint, an answer, a counterclaim or an amendment to a complaint has been served. Either J*A*M*S/Endispute, Inc. ("JAMS") or the National Arbitration Forum ("NAF") shall serve as the arbitration administrator ("Administrator"). In order to submit a dispute to arbitration, you must submit a written request for arbitration to either JAMS or NAF according to the applicable rules of the Administrator. You may find out how to submit a dispute to arbitration and obtain a copy of the arbitration rules by calling JAMS at (800) 448-1660 or NAF at (800) 474-2371.    Disputes shall be resolved by binding arbitration in

HLARB1
Homeowners Loan Arbitration Agreement - Form 1

Page 1 of 3

*J.C.H.*
*M.R.B.*

Hall-Frazier
Record - 001098

accordance with (i) the Federal Arbitration Act, (ii) this Agreement, and (iii) either the Streamlined Arbitration Rules and Procedures of JAMS, or the Code of Procedure of NAF, depending on which party serves as the Administrator. Any party to this Agreement may bring an action, including a summary or expedited proceeding, to compel arbitration of any dispute, and/or to stay or enjoin the litigation of any dispute pending arbitration in any court having jurisdiction. Any arbitration under this Agreement shall be conducted within the federal judicial district in which you live or at another reasonable location acceptable to you.

If either party, you or we, fails to submit to arbitration following a proper demand to do so, that party shall bear all costs and expenses, including reasonable attorney's fees, incurred by the other party compelling arbitration. In all other situations, each party, you and we, shall bear its own costs and expenses, including attorney's fees, that that party incurs with respect to the arbitration.

Only disputes involving you and us may be addressed in the arbitration. The arbitration may not address any dispute on a "class action" basis. This means that the arbitration may not address disputes involving other persons which may be similar to the disputes between you and us and you may not join with other borrowers to bring claims in the same arbitration proceeding, unless all of the borrowers are parties to the same loan.

The arbitrator shall resolve all disputes according to federal law and, where federal law is not applicable, the laws of the state where the property identified below is located (the "State"). The arbitrator shall have the authority to award any remedy or relief that a court in the State could order or grant. The arbitrator, however, is not authorized to change or alter the terms of this Agreement or to award injunctive, declaratory or other equitable relief which would extend to any dispute other than your own.

Exceptions To Arbitration: The following are not "disputes" subject to this Agreement and are not subject to arbitration under this agreement: (1) any judicial or non-judicial foreclosure proceeding against the property that serves as collateral for the loan, whether by the exercise of any power of sale under any deed of trust, mortgage or other security agreement or instrument under applicable law, (2) any action by us to take possession of the property securing the loan, including repossession or unlawful detainer action, or any action to obtain a deficiency judgment against you and enforce same pursuant to applicable law, or (3) any action to obtain or transfer title to the property being foreclosed or to otherwise exercise our legal rights in the property or to dispose of the property pursuant to the terms of the instruments evidencing the loan and any security instrument relating thereto and/or pursuant to applicable law. This means that nothing in this agreement shall limit our right or your right to take any of these actions. The institution and/or maintenance of any action or remedy described in this paragraph shall not constitute a waiver of our right or your right to arbitrate any dispute subject to this Agreement. This Agreement shall not be construed to prevent or limit your use of bankruptcy law nor shall it be construed to limit your right to exercise rights to reinstate under the terms of any mortgage, deed of trust or other security agreement.

Costs: The cost of any arbitration proceeding shall be divided as follows:

* The party requesting the arbitration proceeding shall pay to the Arbitrator the amount of $125.00 when the demand for arbitration is made.
* We will pay to the Arbitrator all other costs for the arbitration proceeding up to a maximum of one day (eight hours) of hearings.
* All costs of the arbitration proceeding that exceed one day of hearings will be paid by the non-prevailing party.
* In the case of an appeal, the appealing party will pay the cost of filing an appeal. The non-prevailing party shall pay all costs, fees, and expenses of the appeal proceeding and, if applicable, shall reimburse the prevailing party for the cost of filing an appeal.
* Each party shall pay his/her own attorney, expert, and witness fees and expenses, unless otherwise required by law.

Statutes of Limitations: All statues of limitations that are applicable to any dispute shall apply to any arbitration between you and us.

SLA051
Homeowners Loan Arbitration Agreement - Form I

Page 2 of 3

MG 0062

Hall-Frazier
Record - 001099

Severability: If any provisions of this Agreement or the application of any provision of this Agreement to any person, place or circumstance shall be determined to be invalid, unenforceable or void, the remainder of this Agreement, and the remainder of those provisions of this Agreement as applied to other persons, places and circumstances, shall remain in full force and effect.

SPECIAL ACKNOWLEDGMENTS: You understand and acknowledge by signing your name to this Agreement that: (i) a court and/or jury will not hear or decide any dispute governed by this Agreement, (ii) the funding for your loan will come in whole or in part from sources outside this state, which will constitute interstate commerce within the meaning of the United States Arbitration Act, 9 U.S.C. §§1-9, (iii) discovery in an arbitration proceeding can be much more limited than in a court proceeding, (iv) the arbitrator may not give written reasons for his/her award, (v) rights to appeal an arbitration award are very limited, and (vi) the rights of the parties hereunder may not be exactly mutual in all respects.

155 BAYVIEW DRIVE
DAPHNE, AL 36526
(Property Address)

READ THE ABOVE ARBITRATION AGREEMENT CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO OBTAIN REDRESS THROUGH COURT ACTION.

Borrower  MARY L. GIBBS                     Date  2-27-03

Borrower  JAMES C. GIBBS                    Date  2-27-03

Borrower                                    Date

Borrower                                    Date

Lender:  HOMEOWNERS LOAN CORP.

By:

    SHARON LEE

Its:  ASSISTANT VICE PRESIDENT

Date:  FEBRUARY 27, 2003

HLARM
Homeowners Loan Arbitration Agreement - Form 3          Page 3 of 3

MG 0063