1          THE VIDEOGRAPHER:  Okay.  We're back on

2     the record.

3   BY MR. MINOR:

4     Q.     Okay.  Let's wrap up a few things,

5   Mr. Swafford.

6     A.     Okay.

7     Q.     Looking back at Bates numbered pages 68

8   and 69, does Swafford and Hays receive any money at the

9   closing beyond the charges you and I just discussed?

10     A.     No.

11          THE VIDEOGRAPHER:  Mr. Minor, do you have

12     your microphone on?

13          MR. MINOR:  Do I need to repeat that, or

14     did you get it?

15          THE VIDEOGRAPHER:  You're okay.  Thank

16     you.

17   BY MR. MINOR:

18     Q.     And you reviewed the lender's

19   instructions a moment ago?

20     A.     Uh-huh.  I mean, yes.

21     Q.     I'd like to ask you to take a moment and

22   look through a composite set of all the exhibits and

23   tell me if you see any other lender's instructions

24   besides the instructions we just discussed beginning at

25   Bates numbered page --

1    A.    98.

2    Q.    Okay.

3    A.    So look through this and this, or just

4    this?

5    Q.    Just this.  This is a full set of all the

6    exhibits, and just take a moment to look through.  And

7    my question to you after you've looked through is

8    whether the lender's instructions beginning at 98 are

9    the only lender's instructions?

10    A.    In the file?

11    Q.    Yes, in the file that you produced to us.

12    If you want to take that clip off, you can.

13    A.    There are some on page 42.

14    Q.    Okay.

15    A.    But it's titled Loan Status.  I just

16    noticed while I was flipping through, it says,

17    "standard closing requirements" listed on that as well.

18    Q.    Okay.

19    A.    Do I need to wait until you get there, or

20    can I keep going?

21    Q.    No, keep going.

22    A.    Okay.  Same thing on page 53.  Same thing

23    on 95.

24    Q.    Okay.

25    A.    I don't know if it's the exact same set.

1    I'm at a set on page 100, and it's actually lender's

2    instructions.  And it goes through 106.

3        Q.    I think that's the same set.

4        A.    Okay.  Sorry, it's a thick stack.

5        Q.    No, no, that's fine.  Take your time.

6        A.    Page 158 gives some instructions.

7        Q.    Okay.

8        A.    And I believe that is all.

9        Q.    Okay.  Pass those to me.  I just want to

10    glance at 95 and 158.

11        A.    Oh, okay.  Take that then.

12        Q.    Okay.  Now, Mr. Swafford, I'm going to

13    ask you a question about the plaintiff's claims in this

14    particular case.  I'm going to read from the complaint

15    in this particular case.  Paragraph 29 says:  "The fact

16    that the charges reflected in lines 1102, 1103, 1108,

17    1111 and 1201 exceeded the actual costs of the services

18    actually provided was unknown to plaintiff.  The fact

19    that these charges were marked up, illegal, excessive

20    and otherwise improper, was unknown to and unknowable

21    by plaintiff because the actual costs for providing or

22    obtaining the services were not available to or

23    discoverable by her.  And defendant actively deceived

24    plaintiff about who was providing these services and

25    the fact that she was being defrauded.  The unknown and

1  inherently unknowable nature of the unlawful charges

2  did not give plaintiff any reason to inquire,

3  investigate or discover the wrongdoing.  As a practical

4  reality, it was impossible for plaintiff to detect

5  defendant's unlawful lending law violations."

6           Now, my question to you is this:  Is

7  there any evidence in the file that you have reviewed

8  or in your recollection that Home Funds Direct was

9  provided any information about the charges on the HUD-1

10  that we've discussed --

11           MR. UNDERWOOD:  I'll object to the form

12    of that question.

13           MR. MINOR:  You hadn't even let me finish

14    it.  You've got to at least wait until I finish

15    before you object, Earl.

16           MR. UNDERWOOD:  Okay.  I thought you were

17    finished.  Sorry.

18  BY MR. MINOR:

19    Q.    Is there any evidence in the file that

20  you've reviewed or pursuant to your recollection of the

21  events that Home Funds Direct received any information

22  about the charges in 1102, 1103, 1108, 1111 and 1201

23  that was not provided to Ms. Frazier?

24           MR. UNDERWOOD:  I'll object to form of

25    that question.

1    Q.    Do you understand my question?

2    A.    I believe.

3    Q.    Okay.

4    A.    Are you asking -- are you asking me is

5    there anything that the lender would have known that

6    Mrs. Frazier did not know?

7    Q.    About those charges, correct.

8         MR. UNDERWOOD:  The same objection.

9    Q.    11 -- I'm sorry.

10    A.    I just want to make sure I'm correct

11    before I answer it.

12    Q.    No, absolutely, you should do that.  Go

13    ahead.

14    A.    Are you meaning did Swafford provide any

15    information from Swafford, or do you mean in general?

16    Q.    I mean from Swafford.

17         You have given me in this deposition

18    information about your charges in 1102, 1103, 1108,

19    1111 and 1201 including who may have received some of

20    the money, et cetera.  And my question to you is, was

21    any of that information -- any information provided to

22    Home Funds Direct relating to those charges that was

23    not provided by Swafford that was not provided to

24    Ms. Frazier?

25    A.    No, I don't believe so.

1    Q.    You told me earlier in this deposition

2    that some of the litigation against Swafford had been

3    settled but not all of it?

4    A.    Correct.

5    Q.    Do you know if the Dempsey matter has

6    been settled?

7    A.    I know that sounds awful, but the names

8    run together.  I believe Dempsey may have.

9    Q.    Okay.  And Mr. Underwood is counsel in

10   the Dempsey matter, correct?

11   A.    Yes.

12   Q.    Have you signed any releases settling or

13   resolving any of your litigation against Swafford?

14   A.    I have signed settlements on some of the

15   litigation with Swafford.

16   Q.    Do you know how many releases you've

17   signed?

18   A.    I believe four.

19   Q.    Okay.  Has Swafford paid money to settle

20   these cases?

21   A.    Yes.

22   Q.    Was it paid by Swafford or by insurance

23   companies?

24   A.    By Swafford.

25   Q.    Okay.  And how much money has Swafford

1  paid?

2      A.    I don't know the grand total.  I'm still

3  making payments on some of them.

4      Q.    Okay.  Do you remember the total for any

5  particular case, any one case?

6      A.    I don't remember the names.  I believe

7  that a couple of them settled for like 15,000 or

8  something to that nature.

9      Q.    Would you say that the payments that have

10  been made to date are more or less than a hundred

11  thousand dollars?

12      A.    Less.

13      Q.    Have you settled any cases that you

14  understood to be class actions?

15      A.    Those are the ones that I believe are

16  still in the process of settling.

17      Q.    Okay.  Did the releases that you sign --

18  in those releases, did you agree to provide any

19  assistance or help to the plaintiffs' counsel in any

20  other litigation?

21      A.    On behalf -- you -- meaning that I would

22  help him if he would agree to settle?

23      Q.    Yes.

24      A.    I don't believe so.

25      Q.    Do the terms of any of those releases

1    call for you to provide any more information to the

2    plaintiffs continuing past the resolution, the

3    settlement of the case?

4        A.    I don't believe so.

5        Q.    Do you know if you assigned any of your

6    rights in any of these releases that you signed?

7        A.    I don't know.  I don't think so.

8        Q.    Did the Baker Donelson firm represent

9    you --

10        A.    Yes.

11        Q.    Let me finish my question.

12        A.    I'm sorry.

13        Q.    Did they represent you in the course of

14    drafting and negotiating the terms of those releases?

15        A.    Yes.

16        Q.    Did Swafford admit any liability in any

17    of those releases?

18        A.    No.

19            MR. MINOR:  Let me look back through my

20        notes.  I may be finished.

21            (Pause.)

22    BY MR. MINOR:

23        Q.    Have there been any judgments against

24    Swafford?  I'm not talking about settlements, but

25    rulings by a court or a jury that Swafford was liable

1    for any civil violation?

2        A.    No.

3            MR. MINOR:  That's all the questions I

4    have at this time.

5            MR. UNDERWOOD:  Okay.  Let me ask the

6    reporter a question.  I sent up a package of

7    exhibits.  Do you have them?

8            THE REPORTER:  Yes.  They're right here.

9            MR. UNDERWOOD:  Okay.  And there should

10    be a stack of documents numbered 1 through 183 and

11    also another document that's about four pages

12    long.  Is that what you have?  Let's see how many

13    pages.  Eight pages.

14            THE REPORTER:  I've got two renotices of

15    taking deposition, amendment number 2,

16    Transnational Title Insurance company, and then

17    I've got the Bates document you're talking about.

18            MR. UNDERWOOD:  All right.  Great.

19            Do you guys want to take a break, or get

20    started?

21            MR. MINOR:  We're ready.

22            MR. UNDERWOOD:  Okay.

23    EXAMINATION BY MR. UNDERWOOD:

24        Q.    Greg, I want you to do something -- may I

25    call you Greg?

1    A.    Sure.

2    Q.    I want you to do something.  I want you

3    to start with what you did in Birmingham and just walk

4    us through how everything that you guys do in one of

5    these transactions.

6         And the first question I would ask you is

7    this:  How would Swafford and Hays know that Ms. Cheryl

8    Frazier in Dothan, Alabama needed a loan closed?

9    A.    The broker or lender would send us an

10   order asking for us to issue a commitment for insurance

11   on that loan.

12   Q.    And how would that be received by

13   Swafford now?

14   A.    Via e-mail or fax.

15   Q.    And what's the next thing that would

16   happen then?

17   A.    We would then order an abstract search by

18   an abstractor or third party to go to the courthouse

19   and search that property's records and that borrower's

20   records.

21   Q.    All right.  And who was the abstractor in

22   this transaction that we're here about today?

23   A.    It looks like it was Southern Land &

24   Title.

25   Q.    Now, Mr. Minor may have asked you this,

1   but do you know what their charge was in this

2   transaction?

3       A.    No, I do not.

4       Q.    Do you know what their typical charge

5   was?

6       A.    I'm sorry, no, I don't.

7       Q.    All right.  Where is that information

8   available?

9       A.    It would be in accounting records at my

10  office.

11      Q.    That was the typical charge and the

12  charge for Ms. Frazier's work?

13      A.    Yes.

14      Q.    You didn't bring that with you today?

15      A.    No, I did not.

16      Q.    What's the next thing that would happen

17  after receipt -- well, after order for the abstract?

18      A.    The abstract would come back, we would

19  make sure that all the documentation was there, copies

20  of all the judgements, legal description, deeds of

21  trust, mortgages.  We would then issue a commitment for

22  insurance and send that to the broker or lender.

23      Q.    Now, physically, who would do that in

24  your office?

25      A.    There were departments that would do it.

1    It could have been -- varied number of people.

2        Q.    Can you look at this file and tell us who

3    it was?

4        A.    Not with the information I have, no.

5        Q.    And there were four that you received

6    from Southern Land Title, is that document -- first

7    off, has the reporter given you the documents I have

8    sent up there?

9        A.    He has not yet.

10            MR. UNDERWOOD:  Okay.  If you would hand

11        those documents to the witness, Mr. Reporter.  And

12        there should be a copy there for Mr. Minor as

13        well.

14            THE WITNESS:  Okay.  I have them.

15        Q.    Let me direct your attention to page 77.

16        A.    Okay.

17        Q.    What is that document, please, sir?

18        A.    It is the write-up sheet from the

19    abstractor on this property.

20        Q.    And what would your employee do when they

21    receive this write-up sheet?

22        A.    This is the sheet that they would have

23    used to make sure that all the appropriate copies and

24    backup documentation was attached.

25        Q.    All right.  And would they transfer this

1   information over to the title policy?

2       A.      Title commitment, yes, they would.

3       Q.      And then what's the next thing that would

4   happen?

5       A.      The commitment would be sent to the

6   broker or lender, and we would wait for instructions

7   from them.

8       Q.      And what would be the next instructions

9   you would typically receive?

10      A.      It varies per file, but typically they'll

11  let us know if there's any borrowers that need to be

12  removed, added via quitclaim or warranty deed.  They

13  would tell us if they did payoffs on any of the taxes

14  or any of the liens or judgments that we gave them

15  information for.  If there was anything that they

16  thought was improper on title, meaning that it wasn't

17  actually the borrower's lien or judgment or something

18  had been paid in the past, we would research that for

19  them.

20      Q.      All right.  And, of course, all that

21  information is included on page 78 and 79, isn't it?

22      A.      What do you mean by "all that information

23  is included"?

24      Q.      Well, whether or not there are judgments,

25  taxes owing and that type of thing.

1    A.    Right.

2    Q.    And that's part of the abstractor's job,

3    was to get that information for you; is that a fair

4    statement?

5    A.    Yes, to get us copies of that

6    information.

7    Q.    All right.  And assume for me that the

8    lender wanted to go ahead with the loan.  What's the

9    next thing then that would happen?

10    A.    It varies per lender how it comes to us,

11    but they would send us over a HUD request or

12    instructions to close or sometimes they would just call

13    us and tell us they'd like us to go ahead and schedule

14    a closing on a certain date.  But they would let us

15    know at that point that they're ready to close.

16    Q.    All right.  Back in 2005, who was

17    Swafford Settlement Services' biggest customer?

18    A.    I believe it was Homeowners Loans still

19    in 2005.

20    Q.    All right.  And who would have been the

21    second largest customer?

22    A.    Home Funds very well may have been the

23    second, I'm not sure at that time.

24    Q.    Is it fair to say that Swafford

25    Settlement Services would have closed hundreds of loans

1  for Home Funds Direct?

2  　　　MR. MINOR:  Object to the form.

3  　A.　I'm not sure about hundreds, quite a few.

4  　Q.　All right.  Let me ask it this way:  Do

5  you have an opinion about how many loans Swafford

6  Settlement Services has closed for Home Funds Direct?

7  　A.　No, I do not.

8  　Q.　Would it be more or less than a hundred?

9  　A.　My guess would be more than a hundred.

10  　Q.　 Are you familiar with the -- well, let me

11  ask it this way.  All right.  I believe you told me

12  that when the broker or lender wanted to go ahead with

13  the transaction after receipt of the title commitment,

14  was the HUD-1 prepared, is that what you said?

15  　A.　 You mean if they wanted to proceed with

16  closing?  Yes, a HUD-1 statement was prepared.

17  　Q.　 All right.  And if you would, describe

18  the process for doing that with regard to Accredited

19  loans or Home Funds Direct loans.

20  　A.　 They would have instructed us as to what

21  their fees would be.  We would put those fees, our

22  fees, any payoffs of judgments, liens, et cetera, plus

23  any creditors that weren't on title that they wanted to

24  pay in addition, that they would instruct us to pay.

25  And then we would send the HUD over for approval.

1    Q.    And typically how was that done?

2    A.    Via e-mail.  Is that what you mean?

3    Q.    Yes.

4    A.    Okay.  Yeah, via e-mail.  And, you know,

5    depending on the company, it would either be their

6    closing department or underwriters that would approve

7    it.

8    Q.    And where would you get the fees that

9    Home Funds Direct would be charging?

10    A.    They would give them to us.

11    Q.    In what form?

12    A.    I believe Home Funds Direct had closing

13    instructions which was actually where they were listed.

14    Q.    All right.  Is that document 100?

15    A.    Yes, it is.

16    Q.    Once your fees are added to the HUD-1

17    settlement statement, what's the next step in the

18    process?

19    A.    Well, that's -- like I said before,

20    that's joined in with adding their fees, our fees,

21    everything that's supposed to be paid off, and we send

22    it for approval.

23    Q.    It's sent to Home Funds Direct for

24    approval?

25    A.    Yes.

1    Q.    And what happens after that?

2    A.    They either approve it and send over a

3  closing package that we can go ahead and send to the

4  notary or attorney, or someone on staff if it's a local

5  closing.  Or they tell us that they need us to amend

6  the fees or the payoffs in some way.

7    Q.    All right.  Let me ask you to assume that

8  it's approved.  What's the next step?

9    A.    We send the HUD and all of the documents

10  to the notary or attorney for closing.

11    Q.    And how is that done?

12    A.    Typically via e-mail.  If not e-mail,

13  fax.

14    Q.    And did you say it's not e-mailed back?

15    A.    No, I said if not e-mail, then we do it

16  via fax.

17    Q.    I see; okay.

18        All right.  And then after the -- well,

19  let me back up a little bit and let me ask you this:

20  How do you locate a notary in Dothan, Alabama?

21    A.    There would have been several different

22  options we would have had.  People we've used before in

23  Alabama.  Notary Rotary.  There's different websites

24  that you can go to to find notaries that are approved

25  in that area.

1      Q.      And I believe you already told us that

2   you don't know what the notary charged in this

3   transaction; was that right?

4      A.      That is correct.

5      Q.      All right.  And where is that information

6   available?

7      A.      We would have paid her, I believe, out of

8   QuickBooks.  It would be in our accounting records.

9      Q.      And is that information still available?

10      A.      From 2005?  It should be.

11      Q.      All right.  You didn't bring it with you

12   today, did you?

13      A.      No.

14      Q.      All right.  After the loan is closed by

15   the notary, what happens next?

16      A.      They overnight the loan package back to

17   us, and we put it in a specific order.  Each lender has

18   their own particular order that they prefer it to be

19   in.  We verify signatures, dates for accuracy.  We make

20   sure everything that needs to be notarized is

21   notarized.  There are things, forms that the lender has

22   in there that we have to follow step by step.  And then

23   we sign our own names to verifying accuracy, verifying

24   everything that's in the file.  And then we send it to

25   the lender for funding approval via overnight.

1    Q.    All right.  And what happens after that?

2    A.    They would give us the wire and a funding

3    approval to fund the loan.

4    Q.    Has the mortgage -- how is the mortgage

5    sent for recording?

6    A.    It's not sent for recording until the

7    loan funds and checks are disbursed, and then we would

8    send it for recording.  And there is usually someone on

9    staff that calls that courthouse and asks for specific

10    instructions to see if there's -- because each

11    courthouse is different to know what they require.

12    Q.    Someone on you staff calls the

13    courthouse?

14    A.    Yes.

15    Q.    Do they get the amount of the recording

16    fee from the courthouse?

17    A.    Either from the courthouse or from Ernst

18    Publishing.  It's usually verified with the courthouse

19    though.

20    Q.    And where is the -- physically the

21    original mortgage at the time that a person would call

22    the courthouse to verify the recording fees?

23    A.    It's in Swafford's possession.

24    Q.    All right.  And does someone count the

25    number of pages in the mortgage so that they can

1    accurately compute the recording fee for the mortgage?

2        A.    That is correct.

3        Q.    And how long has that been Swafford's

4    practice?

5        A.    To count the pages before we send it out

6    for recording?

7        Q.    Yes, sir.

8        A.    Since the day that we opened, I believe.

9        Q.    All right.  I thought you said earlier

10   that many times you didn't know how many pages were in

11   the mortgage when you sent it for recording.

12       A.    No, I said we don't -- when we do the HUD

13   settlement statement, we don't know how many pages are

14   in the mortgage.

15       Q.    Thank you.

16       A.    You're welcome.

17            MR. MINOR:  Is that all you have, Earl?

18            MR. UNDERWOOD:  No, no, it's not all I

19   have.

20            MR. MINOR:  Oh.

21            MR. UNDERWOOD:  Not by a long shot.

22            MR. MINOR:  Oh, okay.

23   BY MR. UNDERWOOD:

24       Q.    Mr. Swafford, was there a time that

25   Swafford and Hays or Swafford Settlement Services was

1  losing money on recording fees?

2      A.    Yes.

3      Q.    And about when was that, please, sir?

4      A.    I would guess 2001 through 2002, possibly

5  2003.

6      Q.    All right.  And was there some sort of

7  change in the procedure for the determination of the

8  recording fee at that time?

9      A.    Yes.

10     Q.    And if you would, tell us about that.

11     A.    We started calculating the recording fee

12  with the maximum number of pages that could possibly be

13  sent to that courthouse, meaning that we allowed for

14  the largest deed of trust we had ever recorded,

15  endorsements -- not endorsements, but riders, things of

16  that nature.

17     Q.    And is it fair to say for Alabama loans

18  that that fee was $120 typically?

19     A.    Yes.  I believe so.

20     Q.    And how long was that practice in place?

21     A.    I do not know the exact amount of time.

22  Maybe a couple years, three years, I'm not sure.

23     Q.    All right.  And during that time period,

24  were there occasions where Swafford would charge more

25  for the recording fee than was actually required for

1   the recording of the mortgage?

2       A.      Yes.

3       Q.      And what would happen to the difference

4   between the recording fee that was charged on the HUD-1

5   as opposed to what was actually charged by the

6   recording by the probate court?

7       A.      For a period of time it was retained by

8   Swafford.

9       Q.      And did that happen with regard to

10  Ms. Frazier's file?

11      A.      I believe so.

12      Q.      And do you know how much recording fee

13  was retained by Swafford with regard to Ms. Frazier?

14      A.      I do not know.  I do not know what the

15  original recording fee was, and I don't know what -- if

16  we had recorded any releases or anything afterwards, so

17  I'm not sure.

18      Q.      Now, your company keeps a ledger for each

19  file and that sort of thing; does it not?

20      A.      Yes, it does.

21      Q.      Okay.  And did you bring any of those

22  documents with you today?

23      A.      No.  I thought the ledger was in here,

24  but I don't know if it is.

25      Q.      All right.  Well, in any event, let me

1    ask you to look at page 31.

2    A.    Okay.

3    Q.    Okay.  Do you see -- well, first off,

4    tell us what that is.

5    A.    It's a legal description, it's Exhibit A.

6    Q.    And there's some small print down toward

7    the bottom of the page.  Do you know what that is?

8    A.    It looks like what their recording fee

9    and mortgage tax fee were for this file from the

10   courthouse.

11   Q.    Okay.  And is there more than one

12   component of the total recording cost for a mortgage?

13   A.    It appears that in Alabama, yes, there's

14   a mortgage tax and the recording fee.

15   Q.    All right.  And if you would, let me ask

16   you to look over to page 132.

17   A.    Okay.

18   Q.    And if you'd look at line 1201.

19   A.    Yes.

20   Q.    How much was Ms. Hall charged for

21   recording fee according to that HUD-1?

22   A.    $120.

23   Q.    And how much was that recording fee

24   according to document number 31?

25   A.    For mortgage, it was for $56.

1    Q.    And so did Swafford retain the $64

2  difference?

3    A.    Yes.

4    Q.    Now, let me ask you if you would to flip

5  over to page 3.

6    A.    Okay.

7    Q.    And what is that document, please, sir?

8    A.    It is a remittal form where we remit to

9  our underwriter.

10    Q.    It says "Commonwealth" at the top,

11  doesn't it?

12    A.    Yes.

13    Q.    Was that the underwriter that was used --

14  when you say "underwriter," do you mean the title

15  insurance company?

16    A.    Yes.

17    Q.    Was that the title insurance company that

18  was used in this transaction?

19    A.    Basically.  Commonwealth was like the

20  parent company.

21    Q.    All right.  And there's a -- well, first

22  off, it says the loan amount.  What is the loan amount?

23    A.    56,000.

24    Q.    And in the next column next to that, it

25  says "gross premium" --

1    A.    Right.

2    Q.    -- "$126"; is that right?

3    A.    That's correct.

4    Q.    Where does that figure come from?

5    A.    The person sending the final policy and

6    the remittal would have calculated that from sheets

7    that are provided or on line, rates that are provided

8    by the underwriter.

9    Q.    All right.  And let me ask you if you

10   would to take a look at the other --

11        MR. UNDERWOOD:  Reporter?

12        THE REPORTER:  Yes.

13        MR. UNDERWOOD:  Would you mark the other

14   document?  The Amendment No. 2, Transnation Title

15   Insurance Rates.  Let's go ahead and mark these.

16   Mark these Bates stamped ones, Plaintiff's

17   Exhibit 1 and mark this other one as Plaintiff's

18   Exhibit 2.

19        MR. MINOR:  Do you want to just do them

20   consecutively, Earl, or just do one -- make mine 1

21   and yours 2 and 3?

22        MR. UNDERWOOD:  That will be fine.

23        MR. MINOR:  Okay.

24        MR. UNDERWOOD:  Wait a minute, what are

25   we marking as 1?

1          MR. MINOR:  You know, I gave him at the

2     beginning of my deposition all of my exhibits, and

3     I just was going to do them a composite 1.

4          MR. UNDERWOOD:  Yeah, sure, that's the

5     easiest way to do it.  All right.  Just mark mine

6     2 and 3, that will be fine.

7          MR. MINOR:  Okay.

8     (Exhibit 2 - documents bearing Bates production

9          numbers Swafford0001-183.)

10     (Exhibit 3 - document entitled Amendment No. 2

11          Transnation Title Insurance Company Title

12          Insurance Premium Charges Revised October 28,

13          2002.)

14          THE REPORTER:  Okay.  They're marked.

15          MR. UNDERWOOD:  Give the witness Exhibit

16     No. 3, please.

17          THE WITNESS:  I have it.

18  BY MR. UNDERWOOD:

19     Q.     Have you seen a document like this

20  before?

21     A.     Yes.

22     Q.     Just tell us what it is.

23     A.     It appears to be the rates from

24  Transnation Title.

25     Q.     And is that the company that was used to

1   write title insurance for the transaction we're here

2   about this afternoon?

3       A.      It was.

4       Q.      And if you would, take a look and review

5   it for me.  You're familiar with these documents,

6   aren't you?

7       A.      Fairly familiar.

8       Q.      And take a look at it and tell us which

9   one of these rates would apply to Mrs. Frazier's

10   transaction.

11       A.      Okay.  It would have been number 3.

12       Q.      And if you would, Greg, tell us how you

13   would compute using number 3 the premium for

14   Mrs. Hall's transaction.

15       A.      Well, up to a hundred thousand, you would

16   have done $2.25 per thousand.  Anything else additional

17   in the loan amount above a hundred thousand up to

18   500,000 would have been $1.75 per thousand.

19       Q.      Okay.  How much was her loan?

20       A.      I think we said 56, so it would have been

21   56 times $2.25.

22       Q.      Well, I get $126.  Is that what you get?

23       A.      I don't have a calculator.

24       Q.      Okay.  Well, can you take a minute, and

25   maybe you can figure it out longhand and see what you

1   get.

2       A.    Sure.

3           MR. MINOR:  Do you want a piece?

4           THE WITNESS:  Yeah, if you don't care.

5           MR. MINOR:  Sure.

6       A.    In longhand, I came up with 136, but

7   maybe I made a mistake.

8       Q.    Well, if -- double-check it.

9       A.    Yeah, yeah.

10      Q.    Okay.  Go ahead.  What did you get?

11      A.    126.

12      Q.    All right.  So if you flip back over to

13  page number 3, that was the charge on the Commonwealth

14  remittal form; is that right?

15      A.    Right.

16      Q.    Now, let me ask you, let's look back at

17  page 132.  And if you would look at line 1109.  And do

18  you see the figure there of $67,500?

19      A.    Yeah.

20      Q.    Do you know why that's there instead of

21  the 56,000 that we talked about earlier?

22      A.    I have no clue.

23      Q.    All right.  And this is the form that

24  went to Home Funds Direct, isn't it?

25      A.    Yes.

1     Q.     The one that they approved?

2     A.     Yes.

3     Q.     And on to line 1108, can you tell us

4  again why the charge was $200 instead of 126?

5     A.     I don't know.  It looks like -- I don't

6  know if this calculates up, but it looks like they were

7  using 67,500 in error.

8     Q.     Well, would you do that calculation for

9  me and tell me what you get?

10     A.     Sure.

11          THE WITNESS:  I gave you your pen back

12     already.  Sorry.

13          MR. MINOR:  Oh.

14     Q.     I get 151,750.  Is that what you get?

15     A.     750.  Yeah.

16     Q.     So you'd round that up to 152, wouldn't

17  you?

18     A.     Probably, yes.

19     Q.     So that's still $1300, isn't it?

20     A.     Yes.

21     Q.     All right.  And do you have any other

22  explanation for the difference?

23     A.     I do not.

24     Q.     Now, if you would, drop down to -- well,

25  let me ask you this:  Isn't it true that for a period

1  of time that Swafford and Hays and/or Swafford and Hays

2  Settlement Services had a minimum charge for title

3  insurance of $200?

4      A.    I don't know.  I believe we might have.

5  We didn't have any kind of policy about that, but I

6  believe that the closing department did do that.

7      Q.    For what time period did that take place?

8          THE WITNESS:  Oh, I'm sorry.

9      A.    I don't know.

10     Q.    Was that policy in effect at the time of

11 Ms. Frazier's loan?

12     A.    I don't know for sure, but it appears

13 like it was.

14     Q.    All right.  Who would have that

15 information about when that policy was in effect?

16     A.    I don't think there would be anything

17 that I could produce for any time, specific period of

18 time.

19     Q.    All right.  Let me ask you about line

20 111.

21     A.    Uh-huh.

22     Q.    Or 1111, I'm sorry.  There's a $50 charge

23 in there for an endorsement; is that right?

24     A.    Yes.

25     Q.    Now, what endorsement was that for?

1    A.    I'm not sure.

2    Q.    Okay.  Well, you have the closing package

3  there, don't you?  Can you not look through it and tell

4  us what endorsement was required by the lender that

5  Ms. Hall was charged $50 for?

6    A.    Do you remember what page the lender's

7  instructions are?

8    Q.    Let's see.

9        MR. MINOR:  It might not be numbered the

10    same in his.

11        MR. UNDERWOOD:  I think they're the same

12    numbers.

13        MR. MINOR:  Okay.  Was it 98 or a

14    hundred?

15        THE WITNESS:  I found it.

16        MR. MINOR:  99.

17  BY MR. UNDERWOOD:

18    Q.    If you flip over to page 101, I believe

19  you said earlier that it had something to do with

20  number 15 on page 101 close to the bottom?

21    A.    Right.  It would have either been number

22  9 or number 15.

23    Q.    Okay.  Now, was this a standard

24  residential policy or commercial policy?

25    A.    This would have been residential.

1     Q.     If you would, let me get you to look at

2  Exhibit No. 3.

3     A.     Okay.

4     Q.     All right.  Flip over to the -- do this

5  for me, have the reporter do this on the record so

6  we'll be straight.  I need the pages for this exhibit

7  numbered.  I should have done that before I sent it to

8  you guys.  I've got eight pages.

9     A.     Okay.  He's done that and given it back

10  to me.

11     Q.     All right.  Let me ask you to look at

12  page 4.

13     A.     Okay.

14     Q.     All right.  And the last paragraph.  If

15  you would, start with the line endorsement charges and

16  read that sentence for me.

17     A.     The one that says, "all commercial

18  endorsements"?

19     Q.     No, the next sentence.

20     A.     Okay.

21     Q.     Starting with "endorsement charges."

22     A.     "There will be no charge for the standard

23  residential endorsements."

24     Q.     Now, well, according to that then, there

25  shouldn't have been any charge for any other

1  endorsement on a standard residential policy; isn't

2  that right?

3      A.    You are correct.

4      Q.    Now, do you know that -- whether or not

5  Swafford ever adopted a policy of refunding some of

6  these recording fees that were charged on 1201?

7      A.    Yes, we did.

8      Q.    And do you know when that was?

9      A.    I don't know the specific date, no.

10     Q.    And do you remember why that was done?

11     A.    We felt like we should not be retaining

12  the recording fees if they were not used for the actual

13  recording of the mortgage or future releases, et

14  cetera.

15     Q.    Who is Bill Long?

16     A.    Bill Long is -- was an attorney that

17  worked for Homeowners Loan.

18     Q.    And did he bring it to your attention

19  that charging more than the recording fee might be a

20  RESPA violation?

21     A.    I believe he might have, yes.

22     Q.    And wasn't that when the policy changed?

23     A.    Probably so, yes, that sounds right.

24     Q.    And do you recall a series of e-mails

25  between you and Bill Long regarding the charge on line

1    1111, the endorsement fee?

2        A.    I do not.

3        Q.    Well, do you have any knowledge of the

4    endorsement fee being charged in lieu of the additional

5    recording charge?

6        A.    An endorsement fee being charged in lieu

7    of what?

8        Q.    Of the additional recording charge.

9        A.    No, I do not.

10        Q.    Well, isn't this what happened, didn't

11    you start -- Swafford start refunding recording fees

12    after learning from Mr. Long that that might be a RESPA

13    violation and then just start charging the $50

14    endorsement fee to make up the difference?

15        A.    I think there was a fee that we did -- we

16    were charging, but I don't believe it was an

17    endorsement fee.

18        Q.    Now, if you would, Mr. Swafford, can you

19    look at the documents there in front of you and tell us

20    what service that Mrs. Frazier would have gotten for

21    this $50 on the endorsement fee on line 1111?

22        A.    On endorsement fee doesn't have any

23    service other than endorsements.

24        Q.    Okay.  And -- well, if she got an

25    endorsement, wouldn't it be -- would that be attached

1    to the title policy?

2        A.    To the title, the final policy, yes.

3        Q.    All right.  And is that -- look at

4    document number 5.

5        A.    Okay.

6        Q.    Is that the final policy?

7        A.    It appears to be, yes.

8        Q.    And can you look at it and tell me what

9    endorsements there were on the policy?

10        A.    Environmental protection lien endorsement

11    is the only one that I see.

12        Q.    And is that a standard residential

13    endorsement?

14        A.    I'm not sure.  I believe it probably is.

15        Q.    Show me what page, tell me what page that

16    you saw the environmental endorsement.

17        A.    Page 9.

18        Q.    And is that an endorsement form 8.1?

19        A.    Yes.

20        Q.    And what does ALTA stand for?

21        A.    American Land Title Association.

22        Q.    And let me direct your attention again

23    now to page 4 of Exhibit No. 3.

24        A.    Okay.  Okay.

25        Q.    All right.  Let me ask you if you would

1   to look at that last paragraph.  And I want you to

2   come -- do you see the word "minerals" that would be

3   the last word on the left if you go down?

4        A.    Yes.

5        Q.    All right.  Do you see ALTA 8.1 right

6   above that?

7        A.    Yes.

8        Q.    Environmental lien?

9        A.    Yes.

10       Q.    This is the same form as is in this

11   endorsement that's on page 9, isn't it?

12       A.    Yes.

13       Q.    And it's already included in the base

14   premium according to the Alabama rate, isn't it?

15       A.    According to this page 4, yes.

16       Q.    So it would be -- is it true then

17   Mrs. Frazier would have already paid for it in the base

18   premium?

19       A.    Yes.

20       Q.    There wasn't any other endorsement or

21   anything else she could have received in exchange for

22   that $50 that she was charged on 1111?

23       A.    Not that I can see, no.

24       Q.    Let me ask you if you would to look at

25   page 13.

1    A.    Okay.

2    Q.    And if you would, tell us what that is,

3    please, sir.

4    A.    It's the on-line calculator for loan

5    premiums.

6    Q.    And what was the occasion, or how was

7    this document generated?

8    A.    It doesn't have any reference to it, so

9    I'm assuming that it was generated for this loan.  I'm

10   not sure.

11   Q.    Is this something that's usually in your

12   closing file?

13   A.    I don't know if we always print it off,

14   but it would be standard, yeah, it would be something

15   that you would see in files.

16   Q.    Now, does Transnation ever audit Swafford

17   and Hays to make sure that they're getting the proper

18   amount of premium?

19   A.    Yes, all -- well, I shouldn't say "all,"

20   every underwriter we've ever had has had regular

21   audits.

22   Q.    Sure.  And how is it that they do that?

23   A.    They come into the office and look at

24   random -- they pull files at random and audit the

25   files.

1    Q.    And do you know how they -- what

2    calculations they go through to make sure that they're

3    getting paid what she should be receiving?

4    A.    No, I'm sorry, I don't.  I'm not sure

5    what -- what is entailed in their audits.

6    Q.    All right.  What other title insurance

7    companies have you done business with since Swafford

8    and Hays or Swafford Settlement Services has been in

9    business?

10    A.    American Pioneer is what we originally

11    were with, which became Ticor.  And we've done business

12    with the Commonwealth family, which is Commonwealth,

13    Transnation and Lawyer's Title.

14    Q.    And do you still do business with Ticor

15    anymore?

16    A.    I do not.

17    Q.    Why is that?

18    A.    We went strictly with Commonwealth.

19    Q.    Didn't they terminate your agency?

20    A.    No, they did not.

21    Q.    Did you ever have any conversations with

22    anyone from Ticor about -- with regard to charging more

23    than the legal rate for title insurance?

24    A.    I don't remember.  No, I don't believe

25    so, but I don't remember.

1    Q.    Was that an issue with Ticor?

2    A.    I don't recall them ever bringing that to

3    my attention.

4    Q.    Now, Mr. Minor asked you some questions

5    about -- let me see, let me find the page.  Sorry,

6    guys, just a little clumsy doing this over the phone.

7    A.    That's fine.

8    Q.    If you would, let me get you to turn over

9    to page 131.  And we're in Exhibit 2.

10    A.    Okay.

11    Q.    I think what I need is on the next page,

12    page 132.

13    Now, this charge on line 801, where did

14    that come from?

15    A.    801 would be given to us from Home Funds

16    Direct.

17    Q.    And what about line 803?

18    A.    The same.

19    Q.    Was there an appraisal done in this file?

20    A.    I would not know.  We don't normally get

21    the appraisals.  We don't order them.

22    Q.    Did you order them for Homeowners Loan

23    Corporation?

24    A.    No, to my knowledge, we've never ordered

25    an appraisal for any lender.

1      Q.      Let me ask you to look at line 903.

2   Do you know where that figure came from, hazard

3   insurance?

4      A.      It would -- it would be from the lender.

5      Q.      What about line 1004?

6      A.      That would be a calculation that -- it

7   can come from the lender, it can come from us, but

8   typically that's just to set up an escrow account for

9   the lender, and it's so many months' worth of property

10   tax.

11      Q.      How would we tell in this transaction if

12   it was something that was figured by Swafford

13   Settlement Services or if it came from the lender?

14   Would it be on the closing instructions?

15      A.      Yeah, let me flip there real fast.  It

16   appears that it was calculated by Home Funds, it's on

17   their closing instructions.

18      Q.      All right.  What line is that on?  I just

19   want to get there.

20      A.      It's on page 100, and it's line 1001,

21   hazard insurance, four months.

22      Q.      Okay, thank you.

23      A.      Oh, wait, wait, wait, I'm sorry.  Yes,

24   that's it.  Are we on -- yeah, are we talking about 101

25   still?  I'm sorry.

1    Q.    Yes, yes.

2    A.    Okay.

3    Q.    Now, did Home Funds Direct require the

4    use of Swafford Settlement Services to close this loan?

5    A.    The borrower?

6    Q.    Yes.

7    A.    Not my knowledge.  They had more than one

8    title company.

9    Q.    Well, do you know if they sent the loan

10   package to any other title company for closing?

11   A.    I wouldn't have any way of knowing that.

12   Q.    Okay.  Let's go back to page 132 if you

13   would.

14   A.    Okay.

15   Q.    I think you testified earlier that there

16   were a number of services done by, this says, "Swafford

17   and Hays Settlement Services."  Were you doing business

18   as Swafford and Hays back then if it says so on here?

19   A.    Probably so, yes.

20   Q.    And that there were a number of services

21   performed by Swafford and Hays Settlement Services

22   including notary service for that charge on line 1101?

23   That was your earlier testimony, right?

24   A.    That is correct.

25   Q.    And were each of those services required

1    by Home Funds Direct?

2        A.    Everything that we would have done would

3    have been something that they required, yes.

4        Q.    You didn't do anything on line 1101 that

5    they didn't require, did you?

6        A.    No.

7        Q.    All right.  I mean, a notary was

8    required?

9        A.    Correct.

10       Q.    All right.  Now, what about on line 1102,

11   were those services also required by Home Funds Direct?

12       A.    Yes.

13       Q.    And would the same be true of the

14   services on line 1103?

15       A.    Yes.

16       Q.    And did they also require title

17   insurance?  When I say "they," I mean Home Funds

18   Direct.

19       A.    Yes, they did.

20       Q.    And did they also require that the

21   mortgage be recorded?

22       A.    Yes, they did.

23       Q.    And I believe you said this already, but

24   did they require each of the charges that were rendered

25   on the document, page 132?

1    A.    Yes.

2    Q.    Let me ask you if you would to turn over

3  to page 134.

4    A.    Okay.

5    Q.    And are you familiar with that document?

6    A.    Truth in lending, yes.

7    Q.    Who prepares that document?

8    A.    The lender.

9    Q.    Do you know why it would have recording

10  fees, $170 on it?

11    A.    I do not.

12    Q.    Do you see that down in about the middle

13  of the page?

14    A.    I do.

15    Q.    Was there anything unusual about

16  Mrs. Frazier's loan?

17    A.    Not that I know of.

18    Q.    Was it typical of the loans that you had

19  closed for Home Funds Direct?

20    A.    I believe so, yes.

21        MR. UNDERWOOD:  You guys want to take

22      about ten minutes?  I don't have a whole lot more,

23    I don't think.

24        MR. MINOR:  Okay.

25        MR. UNDERWOOD:  And are you going to call

1    back, or do you want me to call?

2        MR. MINOR:  We'll call.

3        MR. UNDERWOOD:  Why don't you call then

4    at, I've got 11:20 right now, at 11:30.

5        MR. MINOR:  Okay.

6        MR. UNDERWOOD:  Okay.  All right.

7    Thanks.

8      (Recess taken.)

9        MR. UNDERWOOD:  I have just a few more

10    questions and I'll be finished.  Just let me know

11    when we're back on the record.

12        THE VIDEOGRAPHER:  We're back on the

13    record.

14        MR. UNDERWOOD:  All right.

15    BY MR. UNDERWOOD:

16    Q.    Greg, if you would, let me ask you to

17    take a look at page number 37 -- well, 36 and 37.

18    A.    Of Exhibit 2, right?

19    Q.    Yes, that's right, thank you.

20    A.    Okay.

21    Q.    And -- well, let's go back one more page

22    to page 35.

23    A.    Okay.

24    Q.    And if you would, tell me what that is.

25    A.    It's a fax from Home Funds Direct saying

1  that our HUD was approved and giving -- and asking us

2  to get it signed along with a flood zone notice that

3  they must have included in the fax.

4      Q.    Okay.  And it says on there regarding

5  Hall.  Is that the same transaction we're here about?

6      A.    I think so.  I think -- I believe -- I

7  don't know if she had a maiden name or not, but I know

8  in our files at the office -- Cheryl Hall Frazier is

9  what it is.

10      Q.    Okay.  All right.  Thank you.

11            If you would, take a look at the next

12  page, number 36.

13      A.    Okay.

14      Q.    And up at the top, it has something

15  written in there in someone's handwriting.  Do you know

16  what that is?

17      A.    It says, "approved."

18      Q.    And who would have written that on there?

19      A.    It would have been someone at Home Funds

20  and their initials, but I don't know who that is.

21      Q.    Is this the process that you described

22  earlier where the figures on the HUD-1 are approved by

23  a lender?

24      A.    Yes.

25      Q.    And is this typical of the way that's

1  done on the Home Funds loan?

2      A.     I believe so, yes.  It was either by fax

3  or e-mail, yes.

4      Q.     All right.  And what about the next page,

5  37?

6      A.     That's just a second page to the HUD that

7  she approved or he.

8      Q.     Okay.

9      A.     Oh, it appears to be Brita Dickerson, BD,

10  because that's who's on the fax cover sheet.

11      Q.     I'm sorry, say that one more time.

12      A.     You asked who did it, and I just realized

13  that the initials BD on page 36 are probably for Brita

14  Dickerson, because that's the name on page 35.

15      Q.     Okay.  All right.  Thank you very much.

16          MR. UNDERWOOD:  Let me ask the reporter

17      to mark the deposition notice from my office as

18      the next exhibit.  It would be Exhibit 4.

19        (Exhibit 4 - document entitled Re-Notice of

20        Taking Rule 30(b)(6) Deposition.)

21          THE WITNESS:  Okay.  I have it.

22  BY MR. UNDERWOOD:

23      Q.     All right.  And if you would,

24  Mr. Swafford, let me get you to turn over to the third

25  page.  They're not numbered.

1    A.    Okay.

2    Q.    And let me direct your attention to

3  numbered paragraph 4.

4    A.    Okay.

5    Q.    Before I ask this question, let me ask

6  you if you've seen this document before, this

7  deposition notice?

8    A.    I believe so, yes.

9    Q.    All right.  Did you receive it with a

10  subpoena?

11    A.    I believe so, yes.

12    Q.    All right.  And in paragraph 4, it asks

13  you to bring copies of canceled checks, ledger entries,

14  accounting, truth-in-lending disclosures, and title

15  insurance forms.  And we have some of those forms, but

16  did you bring any canceled checks?

17    A.    No.  We don't actually get canceled

18  checks back with our bank statements.

19    Q.    And did you bring any ledger entries or

20  accounting entries?

21    A.    No.

22    Q.    And are those available at your place of

23  business?

24    A.    Yes.

25    Q.    Where is your place of business address?

1  A.    It is 9530 Hickory Knoll Lane.

2  Q.    Is that your home?

3  A.    It is.

4      MR. UNDERWOOD:  Okay.  I believe those

5  are all the questions I have right now.

6      MR. MINOR:  All right.  I just have a few

7  followups.

8  CONTINUED EXAMINATION BY MR. MINOR:

9  Q.    Would you turn to page 132 on Exhibit 2?

10     THE VIDEOGRAPHER:  Mr. Minor, your

11  microphone, please.

12  Q.    Got it?

13  A.    Yes.

14  Q.    Mr. Underwood questioned you about line

15  1109.  Do you see that?

16  A.    Yes.

17  Q.    Isn't it true that there's no charge

18  listed under Paid from Borrower's Funds at Settlement

19  out from line 1109?

20  A.    That is true.

21  Q.    Mr. Underwood also asked you some

22  questions about Bill Long at Home --

23  A.    Homeowners Loan.

24  Q.    Homeowners Loan.  And the questioning he

25  asked you, the questioning was about communications

1    from Mr. Long about refunding endorsement fees, your

2    need to refund endorsement fees.  Do you recall that

3    testimony?

4        A.    Yeah, about title insurance, yes.

5        Q.    Yes.

6            Did you ever convey to anyone at Home

7    Funds Direct Mr. Long's opinion about refunding those

8    monies?

9        A.    Not to my knowledge, no.

10       Q.    Do you recall what year you had that

11   conversation with Mr. Long?

12       A.    No, I don't.

13       Q.    Do you know one way or the other whether

14   it was before or after 2005?

15       A.    Actually, if I had to estimate, it would

16   be 2005, I just don't know when.

17       Q.    Okay.  Mr. Underwood also asked you

18   whether it was true that Home Funds Direct required the

19   fee charges listed on the HUD-1.  Do you recall that

20   testimony?

21       A.    Yes.

22       Q.    Isn't it true though that at no time did

23   Home Funds Direct require that any fees be marked up on

24   any amount?

25       A.    Yes.

1    Q.    Yes, that's a correct statement?

2    A.    That's a correct statement.

3         MR. MINOR:  That's all I have.

4         MR. UNDERWOOD:  I do just have one, maybe

5    one more, two more questions I should have asked a

6    while ago.

7    CONTINUED EXAMINATION BY MR. UNDERWOOD:

8    Q.    Mr. Minor had asked you, Mr. Swafford, if

9    there was any way that Home Funds Direct could have

10   looked at these figures, and they're on page 132, and

11   determined who they were paid for.  Do you remember

12   that question?

13   A.    I do.

14        MR. MINOR:  I'm going to object to the

15   form.  But go ahead.

16   Q.    Do you remember what your answer was?

17   A.    I don't remember his exact question, but

18   I thought I remember -- excuse me.  I remember it as

19   being something to the effect of was there any way that

20   they could -- that they would have known what the

21   actual or what charges were from other third parties,

22   something to that effect, and I thought I said no.

23   Q.    Right.  And what was your answer?

24   A.    No.

25   Q.    All right.  Was there any way that

1    Mrs. Hall could have looked at these and known what the

2    third-party charges were?

3        A.    Well, in actuality, his question directed

4    it as far as did Swafford provide that information,

5    and, no, Swafford did not.  But recording fees and

6    things of that nature are public record, if that's what

7    you're asking.  So, I mean, there's ways that they all

8    could have known, but did Swafford provide that

9    information, no.

10       Q.    Let me ask it a little better.  I'm doing

11   a clumsy job asking the question.

12           Did Swafford provide any information to

13   Mrs. Hall about who was -- about what portions of these

14   fees were being paid to third parties?

15       A.    No, I don't believe so.

16           MR. UNDERWOOD:  Okay.  That's all I have.

17           THE WITNESS:  Okay.

18           MR. MINOR:  No further questions.

19           FURTHER THIS DEPONENT SAITH NOT.

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF TENNESSEE

3

4    COUNTY OF KNOX

5        I, Thomas J. Dorsey, Registered Professional

6    Reporter and Notary Public, do hereby certify that I

7    reported in machine shorthand the deposition of GREGORY

8    A. SWAFFORD, called as a witness at the instance of the

9    Defendant, that the said witness was duly sworn by me;

10   that the reading and subscribing of the deposition by

11   the witness was waived; that the foregoing pages were

12   transcribed under my personal supervision and

13   constitute a true and accurate record of the deposition

14   of said witness.

15        I further certify that I am not an attorney or

16   counsel of any of the parties, nor an employee or

17   relative of any attorney or counsel connected with the

18   action, nor financially interested in the action.

19        Witness my hand and seal this the 22nd day of

20   May, 2008.

21        _____
           Thomas J. Dorsey, RPR
22          Certified Shorthand Reporter
           and Notary Public
23          My Commission Expires:
           August 3, 2008

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHERYL HALL FRAZIER,                )
                                    )
        PLAINTIFF,                  )
                                    )
V.                                  )       CIVIL ACTION NO.:
                                    )       1:08-cv-11-MHT
ACCREDITED HOME LENDERS,            )
INC., d/b/a HOME FUNDS DIRECT       )
                                    )
        DEFENDANT.                  )

## AMENDED NOTICE OF TAKING RULE 30(b)(6) DEPOSITION

TO:   **James D. Minor, Jr.**
      **Bradley Arant Rose & White LLP**
      **Suite 450 One Jackson Pl**
      **188 East Capitol St**
      **PO Box 1789**
      **Jackson MS 39215-1789**

NOW COMES Plaintiff and notices the deposition of Accredited Home Lenders,

Inc. (referred to herein Accredited) and pursuant to the provision of FRCP 30(b)(6) said

corporation is requested to designate such person or persons as are competent to testify

with regard to the following subject matter(s):

1. The dates that Accredited has done business with the Swafford and Hays
   Settlement Service ("Swafford").

2. The contractual relationship between the Swafford and Accredited.

3. The services performed by Swafford as said services relate to loans originated
   by Accredited.

4. The manner and content of instructions from Accredited to Swafford related
   to such services.

5. The degree of control exercised over Swafford by Accredited regarding the
   time, place and manner Swafford performs any such services.

6. The number of loans originated by Accredited in which the Swafford performed some related settlement service.

7. The nature of settlement services performed by Swafford related all such loans.

8. The use by Swafford of third party providers of said services.

9. The geographical areas in which Accredited does business.

10. The goods and services provided and the charges for such goods and services regarding the real estate transactions of Cheryl Hall Frazier.

11. The amount paid by Swafford for and such goods and services relating to the named plaintiff, Cheryl Hall Frazier.

12. The identity of all third party service providers used by Swafford.

13. Accredited' compliance with all federal laws regulating consumer mortgage lending.

14. The calculation of "APR", "Amount Financed", and "Finance Charge" by Accredited on loans that it originates in general and specifically regarding the Cheryl Hall Frazier transaction.

## DEPOSITION SUBPOENA DUCES TECUM

On behalf of Requesting Party Accredited is directed to **BRING WITH YOU** and produce at the time and place and date aforestated - certain **ORIGINAL** records, books, papers, documents, tangible things, etc., and to permit inspection and copying of designated things to be used as evidence, to-wit:

### DEFINITIONS:

The term documents means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation records of serial numbers, books of account, books of records, bookkeeping records, ledgers, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations, telephone calls, meetings or other invoices, worksheets, and all drafts,

alternations, modifications, changes and amendments of any of the foregoing). The term document shall also include any and all other means by which information is recorded or transmitted, including but not limited to microfilms and other film records or impressions, tape recordings and other recordings used in data processing, together with the programming instructions and other written material necessary to understand or use such punch cards, computer cards or printouts, tapes or other recordings. Writings shall include, without limitation, printed, typed, or other readable papers, correspondence, memos, reports, including without limitation, contracts, drafts, both initial and subsequent, diaries, logbooks, minutes, notes, studies, surveys and forecasts.

1.    Any and all references, manuals and other writings whether in paper or electronic format regarding compliance with federal law regulating consumer mortgage lending.

2.    Any and all references, manuals and other writings whether in paper or electronic format regarding the disclosures required by the Federal Truth-in-Lending Act the calculation of. The "APR", "Amount Financed" and "Finance Charge."

3.    Any and all contracts between Lenders First Choice and Accredited.

4.    Any and all documents touching on or relating to the loan of March 25, 2005 to Cheryl Hall Frazier including but not limited to any instructions for closings, copies of cancelled checks, ledger entries, accounting, Truth-in-Lending disclosures and title insurance forms.

**PLEASE NOTE THAT WE ARE NOT SEEKING THE PRODUCTION OF ANY DOCUMENTS THAT ARE SUBJECT TO ATTORNEY CLIENT PRIVILEGE.**

The deposition shall be taken at the Law Offices of Earl P. Underwood, Jr. at a 9:00 a.m. C.D.T. on June 27th 2008 and shall continue to completion.

Earl P. Underwood, Jr. (UNDEE6591)
Attorney for Plaintiff
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969
251-990-5558
251-990-0626 (facsimile)
epunderwood@alalaw.com

**Hall-Frazier**
**Record - 001355**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy hereof has been personally hand-delivered or mailed, properly addressed, first class postage prepaid, to counsel of all parties or parties pro se to the addresses shown below, on this the 13th day of June, 2008.

Robert E. Poundstone, IV
Bradley Arant Rose & White, LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

James D. Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450 One Jackson Pl
188 East Capitol St
PO Box 1789
Jackson MS 39215-1789

Earl P. Underwood, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHERYL HALL FRAZIER, individually and on behalf of a class of similarly situated persons, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) |
| ACCREDITED HOME LENDERS, INC., d/b/a HOME FUNDS DIRECT | ) ) |
| | ) |
| Defendant. | ) |

CIVIL ACTION NO.:
1:08-cv-11-MHT

JURY TRIAL DEMANDED

CLASS ACTION

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, CHERYL HALL FRAZIER and for complaint against Defendant asserts as follows:

### INTRODUCTION

1. This complaint is filed under the Truth-In-Lending Act (TILA) 15 U.S.C. §§ 1601 et seq. ("TILA" and "HOEPA") to enforce the plaintiff's right to rescind a consumer credit transaction, to void the Defendant's security interest in the Plaintiff's home, and to recover statutory damages, enhanced HOEPA damages, reasonable attorney's fees and costs by reason of the Defendant's violations of the Act and Regulation Z, 12 C.F.R. § 226 (hereinafter called "Regulation Z"). This amended complaint also asserts the right of a class of similarly situated persons defined below.

### JURISDICTION AND VENUE

2. Jurisdiction is conferred on this Court by 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331.

1

**PARTIES**

3.    The Plaintiff, Cheryl H. Frazier, is a natural person, residing at 105 TV Road, Dothan, Alabama.

4.    The Defendant, Accredited Home Lenders, Inc. d/b/a Home Funds Direct, ("Accredited" or "Defendant") is a California corporation that does business in this district.

5.    Accredited is a "creditor" as that term is defined at 15 U.S.C. § 1602(f).

6.    The Defendant, Accredited Home Lenders, Inc. will be served by mailing a copy of the summons and complaint to their registered agent at Paracorp Incorporated, 2724 10th Ave., Huntsville, AL 35805.

7.    At all times relevant hereto, Accredited, in the ordinary course of business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or by written agreement which is payable in more than four installments.

**FACTUAL ALLEGATIONS**

8.    On March 25th 2005, Plaintiff entered into a consumer transaction with Defendant in which it extended consumer credit that was subject to a finance charge and which was payable to Defendant.

9.    As part of this consumer credit transaction, the Defendant retained a security interest in 105 TV Road, Dothan AL 36301, which is used as the principal dwelling of the Plaintiff.

10.    Accredited is a sub-prime mortgage lender based in California which originates sub-prime mortgage loans in several states, including Alabama. Accredited uses various settlement agents to close its loans.

2

11.     At all times relevant herein the settlement agents were, on information and belief, acting at the direction of or were the agents of Accredited.

12.     The settlement agent performed a variety of settlement services for Accredited for which is was paid a closing fee by the Plaintiff. This fee is dictated by Accredited in its closing instructions and is passed along to the borrower as part of the closing costs. The closing fee is disclosed for TILA purposes as part of the "Finance Charge." The fee paid to the settlement agent for its services is disclosed, pursuant to federal law, on Line 1101 of the applicable HUD Settlement Statement. Additionally the settlement agent is a title insurance agent for Transnation. With regard to the Plaintiff's loan, the settlement agent sold title insurance on behalf of Transnation and was paid a commission on the same.

13.     For loans such as the Plaintiff's loan, the settlement agent does not hold closings in its office, or any other office traditionally used for closings. The closings are administered by a notary hired by the settlement agent whose only role is to deliver the necessary documents to the borrowers and obtain the appropriate signatures.

14.     Under applicable federal law, Defendant is allowed to pass along the fees paid to third parties who are hired to perform settlement services, provided those costs are *bona fide*, reasonable, necessary and clearly and conspicuously disclosed and itemized on the HUD Settlement Statement. Settlement costs associated with title services must be set out on Lines 1101 through 1113 of the Settlement Statement.

15.     Furthermore the settlement agent and Accredited are required by the Real Estate Services Act (RESPA) and TILA to separately list and itemize each of these charges including any commission earned for the sale of title insurance and services provided in connection therewith.

16.     For each loan, Accredited prepares and provides to the settlement agent "Closing Instructions" which set out the amounts to be included in the HUD-1 Settlement Statement for the various fees. Many of these fees are marked up or padded in violation of the RESPA. Each of the padded fees included on the Settlement Statement prepared by the settlement agent were dictated and required by the Closing Instructions promulgated by Accredited.

**Title Search and Abstracting**

17.     The settlement agent and Accredited, through its Closing Instructions, as a matter of course charge borrowers fees for title searching, abstracting, and title examination in excess of the amounts actually paid to third parties for those services in violation of applicable federal law.

**Title Insurance Premiums and Recording Fees**

18.     Pursuant to federal law, the amount paid by a borrower for title insurance required by the lender must be reflected on Line 1108 of the Settlement Statement.  The amount that may be charged in premium for title insurance, including any commission, is set by the Alabama Insurance Department and other agencies for non-Alabama loans. The charges for title insurance premiums can not exceed the filed rate. The amounts actually charged its customers for title insurance are dictated by Accredited in its Closing Instructions.

19.     The Plaintiff's settlement statement did not itemize all charges imposed on her or list or disclose the payment of a sales commission on the title insurance as required by 12 U.S.C. § 2603 and 24 C.F.R. § 3500, Appendix A.

20.     On information and belief, the amount charged for title insurance in the instant transaction exceeded the filed rate approved by the Alabama Insurance Department and is another illegal markup.

Hall-Frazier
Record - 001360
Case 1:08-cv-00011-MHT-SRW     Document 54     Filed 07/21/2008     Page 61 of 201
Case 1:08-cv-00011-MHT-SRW     Document 20     Filed 04/29/2008     Page 5 of 19

21.     Federal law allows the recording costs to be passed along to the borrower, provided those costs are clearly and conspicuously reflected in the Settlement Statement and do not exceed the amounts actually paid to the government entity for recording.  Those charges must be set out in Lines 1201 and 1202 of the HUD-1.

22.     The recording fee charge herein was excessive as shown below.

**<u>The Plaintiff's' Loan</u>**

23.     On March 25th 2005, Plaintiff's loan was closed and Plaintiff executed all those documents necessary to obtain the loan and refinance the debt then due and owing and secured by her home.

24.     In connection with Plaintiff's loan, the settlement agent obtained a title search and abstract from a separate company which upon information and belief rendered a full title report. The amount charged to Plaintiff for those services was $200.00 for "Abstract or Title Search" (Line 1102) plus $250.00 for "Title Examination" (Line 1103). Upon information and belief, the actual costs of these services did not exceed $125, but in any event were much lower than the $450 amount charged for those services.

25.     Plaintiff's Settlement Statement also reflected, in Line 1201, a charge of $120. The recording fee actually incurred was $55.50. Therefore, Plaintiff was charged $64.50 above what was actually paid to the probate court for recording fees.

26.     Plaintiff was charged $221.00 for title insurance, as reflected on Line 1108 of the Settlement Statement.  However, upon information and belief, the true cost of the insurance and the amount mandated by the Alabama Department of Insurance was $161.00

27.     Plaintiff was also charged, on Line 1111, $50.00 for "endorsements." Upon information and belief, this charge does not relate to any separate service, is completely

5

unearned, should have been included in the Settlement Fee reflected in Line 1101 and included in the "finance charge."

28.     The fee for "endorsements is also duplicative because the title insurance rate includes all of the standard residential endorsements at no extra charge.

29.     The fact that the charges reflected in Lines 1102, 1103, 1108, 1111, and 1201 exceeded the actual costs of the services actually provided was unknown to Plaintiff.  The fact that those charges were marked up, illegal, excessive and otherwise improper, was unknown to, and  unknowable by, Plaintiff because the actual costs for providing or obtaining the services were not available to or discoverable by her and Defendant actively deceived Plaintiff about who was providing these services and the fact that she was being defrauded. The unknown and inherently unknowable nature of the unlawful charges did not give Plaintiff any reason to inquire, investigate or discover the wrongdoing. As a practical reality, it was impossible for Plaintiff to detect Defendant's unlawful lending law violations.

30.     Plaintiff has acted with due diligence with respect to her rights. The facts that support her causes of action were not knowable to her until shortly before the filing of the Complaint in this action.

### TILA, and Reg. Z

31.     As part of the documents which must be presented to borrowers before closings, Accredited is required by the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA") and its implementing regulations ("Reg. Z") to prepare certain written disclosures to be provided before closing. Under TILA and Reg. Z, Accredited is required to clearly and conspicuously disclose the "amount financed" and the "finance charge," among other things, in connection with each loan.

32.     Pursuant to TILA and Reg. Z, lenders may exclude from the disclosed finance charge fees paid for title examination, title abstracting and title insurance only if those charges are "*bona fide*" and "reasonable." Reg. Z, § 226.4(c)(7).

33.     TILA also allows lenders to exclude fees paid for the recording of mortgages and other instruments, but only if those fees are actually paid to the governmental offices for recording. 15 U.S.C. § 1605(d)(1).

34.     Accredited was required to include as part of the finance charge the charge listed on Line 1201 on Plaintiff's Settlement Statement because it exceeds the amount that is actually paid to the government entity. However, the finance charge disclosed by Accredited did not include any portion of the "recording fee" charge.

35.     The charges listed on Lines 1102, 1103 and 1111 were also not included as part of the finance charge disclosed by Accredited. This is in violation of TILA and Reg. Z. Those charges, purportedly for "Abstract or Title Search" and "Endorsements," were neither *bona fide* nor reasonable. Those charges were marked-up and/or split in violation of federal law. Therefore, those charges should have been included as part of the finance charge disclosed by Accredited.

36.     Likewise, the charge listed in Line 1108, purportedly for "Title Insurance" was not *bona fide* or reasonable because it exceeded the actual cost of the insurance and the amount allowed by state law. Therefore, Accredited was required by TILA and Reg. Z to include that charge as part of the disclosed finance charge but failed to do so.

37.     At all relevant times, Accredited, in the ordinary course of its business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

## POLICIES AND PRACTICES COMPLAINED OF

7

38.    Plaintiff's loan was subject to TILA and RESPA and, on information and also qualified as a "high-cost" or HOEPA loan as specified under the qualification "triggers" at 15 U.S.C. § 1602(aa) and Regulation Z, at 12 C.F.R. § 226.32, by virtue of having met the fee and cost trigger or the annual percentage rate trigger or both.

39.    HOEPA imposes special disclosure requirements on creditors when either HOEPA trigger is satisfied. HOEPA requires a special *advance* notice (15 U.S.C. § 1639, Regulation Z § 226.32) to prospective borrowers that must be received at least three business days *before* closing that must contain, since October 1, 2002, an advance disclosure of the loan's APR, Finance Charges, Amount Financed, Total of Payments and Monthly Payments. These so-called "Section 32" pre-closing notices were never sent to the Plaintiff or class members.

40.    The specific claims made by Plaintiff are as follows:

(a)    *Violations of TILA and HOEPA for Inaccurate Finance Disclosures and Material Misstatements.* The predatory lending and mark-up scheme of Accredited violated TILA and HOEPA because of inaccurate disclosures of the APR, Finance Charges and the Amount Financed on the Plaintiff's loan and the loans of others. These inaccurate disclosures were material and give rise to actions for damages and loan rescission under TILA and HOEPA because the loan did not have the disclosures required by law. The loan violated TILA and gives rise to damages and rescission under TILA, HOEPA and Regulation Z.

(b)    *Violations of TILA and HOEPA for untimely or non-existent HOEPA notices.* HOEPA requires lenders to give certain notices at least three business days prior to the closing of the loan. On information and belief, Defendant failed to give any such notice on any HOEPA loans.

**EQUITABLE ESTOPPEL, EQUITABLE**

8

## TOLLING AND CLASS ACTION
## TOLLING OF LIMITATIONS PERIOD

41.    Defendant knowingly and actively misled the Plaintiff and the class from pursuing their claims by, among other things:

(a)    Engaging in a scheme that was by its nature and design "self-concealing";

(b)    Knowingly and actively mischaracterizing and misrepresenting, *inter alia*, actual amounts paid for abstracts, title search, title examinations, notary fees, endorsement fees, title insurance and recording charges such that such non-bona fide and illegal charges were wrongfully excluded from the Finance Charges and Amount Financed used to calculate the Annual Percentage Rate ("APR"), thereby materially misrepresenting these disclosures as well materially understating the APR;

(c)    Knowingly and actively misrepresenting the Finance Charges, the Amount Financed and APR's on the TILA Disclosure Statements provided to Plaintiff and all by, among other things, failing to include in its calculations all of the required disclosures (described above) that were not bona fide, reasonable, lawful and/or not paid to true third parties.

42.    Plaintiff and class members exercised reasonable consumer diligence during their loan transactions and dealings with Defendant and in reviewing of their loan documentation, they could not have, nor have been reasonably expected to, uncover the true facts.

## COUNT I

43.    Plaintiff realleges the relevant paragraphs above in support of this count.

44.    The consumer credit transaction complained of herein was subject to the Plaintiff's right of rescission as described by 15 U.S.C § 1635 and Regulation Z § 226.23 (12 C.F.R § 226.23).

45.     In the course of this consumer credit transaction, the Defendant failed to deliver all "material" disclosures required by the TILA and Regulation Z, including the by the following:

a.     failing to properly and accurately disclose the "amount financed" using that term in violation of Regulation Z §§226.18, 226.23(b) and 15 U.S.C § 1638;

b.     failing to clearly and accurately disclose the "finance charge" using that term in violation of Regulation Z § 226.4 and 226.18(d) and 15 U.S.C § 1638(a)(3);

c.     failing to clearly and accurately disclose the "annual percentage rate" using that term in violation of Regulation Z § 226.18(e) and 15 U.S.C § 1638(a)(4);

d.     failing to disclose that the loan was a high cost or HOEPA loan as defined by 15 U.S.C. § 1602(aa);

e.     failing to make the other disclosures required by HOEPA; and

f.     otherwise violating HOEPA by including in the mortgage terms prohibited by HOEPA.

46.     The Plaintiff has a continuing right to rescind the transaction pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

47.     On November 1st 2006, the Plaintiff rescinded the transaction by sending to the Defendant at 15090 Avenue of Science, San Diego, CA 92128 and by U.S. Mail, postage prepaid, certified mail, return receipt requested, a notice of rescission.

48.     More than 20 calendar days have passed since the Defendant received a copy of the Plaintiff's notice of rescission.

49.     The Defendant has failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction, including the security interest

described in Paragraph 8, as required by 15 U.S.C. § 1635(b) and Regulation Z 226.23(d)(2).

50.    The Defendant has failed to return to the Plaintiff any money or property given by the Plaintiff to anyone, including the Defendant, as required by 15 U.S.C. § 1635(b) and Regulation Z 226.23(d)(2).

51.    As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a) and 1640(a), Defendant is liable to Plaintiff for:

a.    Rescission of this transaction,

b.    Termination of any security interest in Plaintiff's property created under the transaction,

c.    Return of any money or property given by the Plaintiff to anyone, including the Defendant, in connection with this transaction.

d.    Twice the finance charge in connection with this transaction, but not less than $200 nor more than $2000.00.

e.    The right to retain proceeds to vest in plaintiff.

f.    Actual damages in an amount to be determined at trial.

g.    A reasonable attorney's fee.

**PRAYER FOR RELIEF**

**WHEREFORE**, it is respectfully prayed that this Court:

A. Assume jurisdiction of this case;

B. Rescind the transaction of March 25th 2005 between the Plaintiff and Defendant.

C. Order Defendant to take all action necessary to terminate any security interest in Plaintiff's property created under the transaction and that the Court declare all such security interests void, including but not limited to the mortgage related to

the transaction of March 25th 2005 between the Plaintiff and Defendant;

D. Order the return to the Plaintiff of any money or property given by the Plaintiff to anyone, including the Defendant, in connection with the transaction;

E. Award the Plaintiff twice the finance charge in connection with this transaction, but not less than $200 or more than $2,000 and all other damages available as provided under 15 U.S.C. § 1640(a);

F. Order that the right to retain proceeds vests in plaintiff;

G. Award actual damages in an amount to be established at trial;

H. Award the Plaintiff costs and a reasonable attorney's fee as provided under 15 U.S.C. § 1640(a);

I. Award such other and further relief as the Court deems just and proper.

## <u>COUNT II</u>

## <u>HOEPA VIOLATIONS</u>

68.     Plaintiff realleges all the preceding allegations referenced as if set out here in full.

69.     As a consequence of the marking up and splitting of the charges reflected in Lines 1102, 1105, 1106, 1108, 1201, 1204 and/or 1301 those charges are "points and fees," by operation of Reg. Z, 24 C.F.R. 226.32(b), as defined under HOEPA.

70.     The Plaintiff's loan is a high cost mortgage within the meaning of HOEPA, 15 U.S.C. § 1602(aa), because the total points and fees charge in connection with that loan exceeded 8 percent of the total loan amount.

71.     Because Plaintiff's loan meets the HOEPA definition of a high rate mortgage, the transaction was subject to additional disclosure requirements that must be provided three days in advance of the consummation of the transaction. 15 U.S.C. § 1639(b).

12

72.     Defendant did not furnish the required HOEPA disclosures to Plaintiff three days prior to their settlement or at any other time.

73.     Defendant's failure to provide the required HOEPA disclosures was material.

74.     Defendant's failure to give Plaintiff the disclosures required by HOEPA three days prior to settlement violates 15 U.S.C. § 1639(a) and (b), entitling Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a).  In addition, such failure to provide those disclosures extends Plaintiff's right to rescind the transaction until up to three years after its consummation.

75.     Plaintiff's loan also includes a pre-payment penalty imposed by Defendant which is prohibited by operation of 15 U.S.C.§ 1639(c).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant rescinding the transaction, for damages and fees pursuant to 15 U.S.C. 1635(b) and (g); and, pursuant to 15 U.S.C. §§ 1639(j), and 1640(a), award statutory damages of as provided in 15 U.S.C. § 1640(a)(4) in the amount of all finance charges and fees paid by Plaintiff for each substantive HOEPA violation; reasonable attorney fees and costs and such other relief at law or equity as this Court may deem just and proper.

## COUNT III

## CLASS ALLEGATIONS - TILA VIOLATIONS

76.     Plaintiff realleges all the preceding allegations by reference as if set out here in full.

77.     The identities of the class members are readily identifiable through computer records and paper records, regularly maintained in Defendant's course of business.

78.     The Class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed that the Class includes thousands of members. In all instances, such persons are unaware that claims exist on their behalf.

79.     The representative Plaintiff's claims are typical of, if not identical to, the claims of the Class.

80.     The representative Plaintiff will fairly and adequately represent the members of the Class and has no interests which are antagonistic to the claims of the Class. The Plaintiff is aware that she cannot settle this action without Court approval. The Plaintiff's interest in this action is antagonistic to the interest of the Defendant, and will vigorously pursue the claims of the Class.

81.     The representative Plaintiff has retained counsel who are competent and experienced in consumer class action litigation, and who have successfully represented consumers in complex class actions. Counsel has agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court.

82.     Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

83.     There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include:

a)      Is the TILA violation apparent on the face of the loan documents;

b)      Are the loans subject to HOEPA;

c)      What measure of damages is appropriate;

14

d)    What declaratory or injunctive relief is appropriate?

84.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiff and the class are identical and will require evidentiary proof of the same kind and application of the same law.

85.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed class members to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

86.    Unless a class-wide injunction is issued, Defendant may continue to commit violations against residential mortgage borrowers.

87.    The representative Plaintiff will seek to identify all class members through discovery as may be appropriate and will provide to the class such notice of this action as the Court may direct.

## COUNT IV

## RESCISSION AND DECLARATORY JUDGMENT

88.    Plaintiff re-alleges and adopts by reference all of the foregoing facts and allegations as set forth herein above.

89.    Plaintiff and the Plaintiff's Class bring this action pursuant to Rules 23(b)(2) and 57 of the Federal Rules of Civil Procedure in that an actual controversy exists between the parties concerning their right to rescind their mortgage loans under 15 U.S.C. § 1635.

90.    As a result of the Defendant's aforesaid violations of TILA and HOEPA all

Plaintiff and Class Members have retained their right to rescind (as to loans that closed within three years *prior* to the filing of the complaint herein and as to properties not sold during such period) their loans under 15 U.S.C. § 1635. Accordingly, Plaintiff and Class Members pray for a declaratory judgment recognizing and authorizing rescission by Plaintiff and Class Members, this declaratory judgment count giving notice to Defendant and assignees of Plaintiff's and Class Members' demands for rescission, subject to the individual choice of withdrawing this notice of rescission after their rights are declared.

### Prayer for Relief

WHEREFORE, on all asserted causes of action against Defendant, Plaintiff prays for judgment against Defendant as follows:

a.     For an Order certifying that this action may be maintained as class action as under Fed. R. Civ. P. 23(b)(3);

b.     For an Order appointing the Plaintiff to act as a representative of the Class;

c.     For an Order appointing the undersigned counsel to act as interim Class Counsel pursuant to Fed. R. Civ. P. 23 to act on behalf of the putative Class before the determination of whether to certify the Class under Fed. R. Civ. P. 23(b)(3) is made;

d.     For an Order appointing the undersigned counsel as Class Counsel;

e.     For an Order directing that reasonable notice of this Class action be given to all members of the Class at the appropriate time;

f.     For violating the HOEPA and TILA, a declaration that Class Members whose loans were closed, within the three-year preceding the filing of this case, remain entitled to rescind their loans and by this complaint have given notice of rescission subject to withdrawal of same after determination of their rights, and that Defendant be prohibited from foreclosing on the

Plaintiffs' and Class Members' mortgages pending such declaration;

g.    For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, an Order finding Defendant liable as a matter of law, pursuant to §§ 1640 and 1641(d), and for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (5) an amount equal to five times the sum of all, finance charges and fees paid by the Class Members for five substantive violations of HOEPA, one disclosure violation under TILA,; plus pre-judgment interest; and attorney fees;

h.    For violating the TILA's disclosure requirements an Order finding Defendant liable as a matter of law, pursuant to §§ 1640 and 1641(a), to the Plaintiff and Class Members for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1640 and 1641(a), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; plus prejudgment interest and attorneys fees;

i.    For violations of the above laws a finding of assignee liability under the provisions of HOEPA and TILA pursuant to §§ 1641(d) and 1641(a);

j.    For a permanent injunction enjoining Defendant, together with their officers, directors, employees, agents, partners or representatives, successors and any and all persons acting in concert with them or by agreement with them from directly or indirectly engaging in the wrongful acts and practices described above, all for the benefit of the Class Members; and

k.    For reasonable attorneys' fees as provided by law and statute;

l.    For pre-and-post judgment interest as provided by law in amount according to proof at trial;

m.    For an award of costs and expenses incurred in this action; and

n.    For such other and further relief as the Court may deem necessary and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted April 29th 2008.

/s/ Earl P. Underwood, Jr.
EARL P. UNDERWOOD, JR. (UNDEE6591)
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969
Telephone:    251-990-5558
Facsimile:    251-990-0626
Email: epunderwood@alalaw.com

/s/ Kenneth J. Riemer
KENNETH J. RIEMER (RIEMK8712)
One of the Attorneys for Plaintiffs
Post Office Box 1206
Mobile, Alabama   36633-1206
Telephone:    (251)432-9212
Facsimile:    (251)   433-7172
Email:          kjr@consumerlaw

/s/ George R. Irvine, III
GEORGE R. IRVINE, III (IRVIG4725)
One of the Attorneys for Plaintiffs
STONE, GRANADE and CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama   36523
Telephone:    (251) 626-6696
Facsimile:    (251) 626-2617
Email:          gri@sgclaw.com

/s/ Steven L. Nicholas
STEVEN L. NICHOLAS (NICHS2021)
Cunningham, Bounds, LLC
1601 Dauphin Street
Mobile AL 36604
Telephone:    (251) 471-6191
Facsimile:    (251) 479-1031
Email:          sln@cbcbb.com

18

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on April 29th 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert E. Poundstone, IV
Bradley, Arant Rose & White, LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

James D. Minor, Jr.
Bradley, Arant Rose & White LLP
Suite 450 One Jackson Pl
188 East Capitol St
PO Box 1789
Jackson MS 39215-1789

                                             <u>/s/ Earl P. Underwood, Jr.</u>
                                             Earl P. Underwood, Jr.

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL H. FRAZIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO: |
| | ) | 1:08-cv-11-MHT |
| ACCREDITED HOME LENDERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### ANSWER AND DEFENSES OF ACCREDITED HOME
### LENDERS, INC. TO PLAINTIFF'S AMENDED COMPLAINT

**COMES NOW** Defendant Accredited Home Lenders, Inc. ("AHL") by and through its counsel of record, and hereby answers each numbered paragraph of the Plaintiffs' First Amended Complaint ("Amended Complaint"). Except to the extent expressly, specifically and unambiguously admitted herein, AHL denies each and every allegation contained in the Amended Complaint and demands strict proof thereof. AHL answers the allegations of the Amended Complaint, paragraph by paragraph, as follows:

### FIRST DEFENSE

The Plaintiff's Amended Complaint has failed to state a claim upon which relief may be granted, and, therefore, these allegations should be dismissed with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### SECOND DEFENSE

AHL generally denies all of the averments contained in the Amended Complaint, and each paragraph and subparagraph thereof, except such designated averments, paragraphs, or

1/1700110.1

subparagraphs, as are expressly set forth to the contrary more fully herein below pursuant to Rule 8(b) of the Federal Rules of Civil Procedure.

### THIRD DEFENSE

AHL includes, alleges, and incorporates each and every defense available to it as set forth in Fed. R. Civ. P. 12(b)(1)-(7), and on account thereof demands that the action herein against it be dismissed.

### FOURTH DEFENSE

Without waiving any of the above-referenced or foregoing defenses, AHL denies each and every allegation contained in the Amended Complaint, unless specifically admitted hereafter, as follows, to-wit:

1.

AHL states that the nature of the allegations made and relief sought by Plaintiff does not require a response from AHL. AHL specifically denies that it has committed any of the violations alleged by Plaintiff in Paragraph 1 of the Amended Complaint and denies that Plaintiff is entitled to any of the relief she seeks.

### JURISDICTION AND VENUE

2.

AHL admits that jurisdiction is conferred by 28 U.S.C. § § 1331 and 1334, and denies the remaining allegations contained in Paragraph 2 of the Amended Complaint.

### PARTIES

3.

AHL is without sufficient information or knowledge to admit or deny the allegations regarding the Plaintiff's residence, and, therefore denies the same.

4.

AHL admits the allegations contained in Paragraph 4 of the Amended Complaint.

5.

AHL admits the allegations contained in Paragraph 5 of the Complaint.

6.

AHL lacks sufficient information to admit or deny how Plaintiff will serve it with the Amended Complaint and, therefore, denies Paragraph 6 of the Amended Complaint.

7.

AHL admits the allegations in Paragraph 7 of the Amended Complaint.

## FACTUAL ALLEGATIONS

8.

AHL admits the allegations contained in Paragraph 8 of the Amended Complaint.

9.

AHL is without sufficient information or knowledge to admit or deny the allegations regarding whether 105 TV Road, Dothan AL 36301 is the Plaintiff's principal dwelling, and, therefore, denies the same.  AHL admits the remaining allegations contained in Paragraph 9 of the Amended Complaint.

10.

AHL admits that it is a mortgage banker based in California which operates in several states including Alabama.  AHL further admits that attorneys or settlement agents close its mortgage loans.  Except as expressly admitted herein, AHL denies all remaining allegations in Paragraph 10 of the Amended Complaint.

11.

AHL denies the allegations contained in Paragraph 11 of the Amended Complaint.

12.

AHL admits upon information and belief that the settlement agent was paid a fee by the plaintiff, and that the fee is disclosed on Line 1101 of the HUD Settlement Statement. AHL further admits the allegations contained in the fifth and sixth sentences of Paragraph 11. Except to admit that it made the disclosures required by TILA, AHL denies the remaining allegations contained in Paragraph 12 of the Amended Complaint.

13.

AHL is without sufficient information or knowledge to admit or deny the allegations contained in Paragraph 13 of the Amended Complaint, and, therefore denies the same.

14.

AHL admits the allegations contained in Paragraph 14 of the Amended Complaint.

15.

Paragraph 15's reference to unspecified "charges" is vague and ambiguous. AHL is therefore unable to admit or deny the allegations contained in Paragraph 15 of the Amended Complaint, and therefore denies the same.

16.

Except to admit that it provides settlement agents and/or closing attorneys with "Lender's Instructions," AHL denies all remaining allegations contained in Paragraph 16 of the Amended Complaint.

**TITLE SEARCH AND ABSTRACTING**

17.

AHL denies the allegations contained in Paragraph 17 of the Amended Complaint.

**TITLE INSURANCE PREMIUMS AND RECORDING FEES**

18.

Except to admit that federal law and/or Alabama law relating to title insurance speaks for itself, AHL denies all remaining allegations contained in Paragraph 18 of the Amended Complaint.

19.

AHL denies the allegations contained in Paragraph 19 of the Amended Complaint.

20.

AHL denies the allegations contained in Paragraph 20 of the Amended Complaint.

21.

Except to admit that federal law relating to recording costs speaks for itself, AHL denies all remaining allegations contained in Paragraph 21 of the Amended Complaint.

22.

AHL denies the allegations contained in Paragraph 22 of the Amended Complaint.

**PLAINTIFF'S LOAN**

23.

AHL is without sufficient information to admit or deny the allegations concerning the date on which the plaintiff executed the referenced documents, and, therefore, denies Paragraph 23 of the Amended Complaint.

24.

AHL admits the allegations contained in the first and second sentences of Paragraph 24, but denies all remaining allegations in Paragraph 24 of the Amended Complaint.

25.

AHL admits the allegations contained in the first sentence of Paragraph 25, but denies all remaining allegations in Paragraph 25 of the Amended Complaint.

26.

AHL admits the allegations contained in the first sentence of Paragraph 26, but denies all remaining allegations in Paragraph 26 of the Amended Complaint.

27.

AHL admits the allegations contained in the first sentence of Paragraph 27, but denies all remaining allegations in Paragraph 27 of the Amended Complaint.

28.

AHL denies the allegations contained in Paragraph 28 of the Amended Complaint.

29.

AHL denies the allegations contained in Paragraph 29 of the Amended Complaint.

30.

AHL denies the allegations contained in Paragraph 30 of the Amended Complaint.

**TILA, AND REG. Z**

31.

AHL admits the allegations contained in Paragraph 31 of the Amended Complaint.

32.

Except to admit that Reg. Z speaks for itself, AHL denies all remaining allegations contained in Paragraph 32 of the Amended Complaint.

33.

Except to admit that TILA speaks for itself, AHL denies all remaining allegations contained in Paragraph 33 of the Amended Complaint.

34.

AHL denies the allegations contained in Paragraph 34 of the Amended Complaint.

35.

AHL denies the allegations contained in Paragraph 35 of the Amended Complaint.

36.

AHL denies the allegations contained in Paragraph 36 of the Amended Complaint.

37.

AHL admits the allegations contained in Paragraph 37 of the Amended Complaint.

## POLICIES AND PRACTICES COMPLAINED OF

38.

Except to admit that aspects of the plaintiff's loan are governed by TILA and RESPA, AHL denies all remaining allegations contained in Paragraph 38 of the Amended Complaint.

39.

Except to admit that the provisions of 15 U.S.C. § 1639 and Regulation Z § 226.32 speak for themselves, AHL denies all remaining allegations contained in Paragraph 39 of the Amended Complaint.

1/1700110.1

7

40.

AHL denies the allegations contained in Paragraph 40 of the Amended Complaint, including subparagraphs (a) and (b), and specifically demands strict proof thereof.

## EQUITABLE ESTOPPEL, EQUITABLE TOLLING

41.

AHL denies the allegations contained in Paragraph 41 of the Amended Complaint, including subparagraphs (a) – (c), and specifically demands strict proof thereof.

42.

AHL denies the allegations contained in Paragraph 42 of the Amended Complaint.

## COUNT I

43.

AHL incorporates its denials and responses in the preceding paragraphs.

44.

Except to admit that 15 U.S.C. § 1635 and Regulation Z § 226.23 speak for themselves, AHL denies all remaining allegations contained in Paragraph 44 of the Amended Complaint.

45.

AHL denies the allegations contained in Paragraph 45 of the Amended Complaint, including subparagraphs (a) – (f), and demands strict proof thereof.

46.

AHL denies the allegations contained in Paragraph 46 of the Amended Complaint.

47.

AHL denies the allegations contained in Paragraph 47 of the Amended Complaint.

48.

AHL denies the allegations contained in Paragraph 48 of the Amended Complaint.

49.

AHL admits that it has not taken any action to terminate its security interest, but specifically denies that it has failed to satisfy any requirements set forth in 15 U.S.C § 1635(b) and/or Regulation Z 226.23(d)(2). Accordingly, except as expressly admitted herein, AHL denies all remaining allegations in Paragraph 49 of the Amended Complaint.

50.

AHL admits it has not returned any money to the Plaintiff, but specifically denies that it has failed to satisfy any requirements set forth in 15 U.S.C § 1635(b) and/or Regulation Z 226.23(d)(2). Accordingly, except as expressly admitted herein, AHL denies all remaining allegations in Paragraph 50 of the Amended Complaint.

51.

AHL denies the allegations contained in Paragraph 51 of the Amended Complaint, and specifically denies that has committed and/or is liable for any of the allegations in subparagraphs (a) – (g).

## PRAYER FOR RELIEF

AHL denies the allegations contained in the Paragraph of the Amended Complaint beginning "Prayer for Relief", and denies that the plaintiff is entitled to any relief whatsoever.

52-67

There are no Paragraphs numbered 52 through 67 in the Amended Complaint, and accordingly, no response is necessary from AHL.

## COUNT II – HOEPA VIOLATIONS

68.

AHL incorporates its denials and responses in the preceding Paragraphs.

69.

AHL denies the allegations contained in Paragraph 69 of the Amended Complaint.

70.

AHL denies the allegations contained in Paragraph 70 of the Amended Complaint.

71.

AHL denies the allegations contained in Paragraph 71 of the Amended Complaint.

72.

The allegations contained in Paragraph 72 do not specify or detail the disclosures the plaintiff contends were not provided to her. AHL is therefore without sufficient information to admit or deny the allegation, and, therefore, denies Paragraph 72 of the Amended Complaint.

73.

The allegations contained in Paragraph 73 do not specify or detail the disclosures the plaintiff contends were not provided to her. AHL is therefore without sufficient information to admit or deny the allegation, and, therefore, denies Paragraph 73 of the Amended Complaint.

74.

AHL denies the allegations contained in Paragraph 74 of the Amended Complaint.

75.

AHL denies the allegations contained in Paragraph 75 of the Amended Complaint. Further, AHL denies the allegations contained in the unnumbered Paragraph beginning "WHEREFORE", and specifically denies that the Plaintiff is entitled to any relief whatsoever.

<u>**COUNT III**</u>

<u>**CLASS ALLEGATIONS – TILA VIOLATIONS**</u>

76.

AHL incorporates its denials and responses in the preceding Paragraphs.

77.

AHL denies the allegations contained in Paragraph 77 of the Amended Complaint.

78.

AHL denies the allegations contained in Paragraph 78 of the Amended Complaint.

79.

AHL denies the allegations contained in Paragraph 79 of the Amended Complaint.

80.

AHL denies the allegations contained in Paragraph 80 of the Amended Complaint.

81.

AHL is without sufficient information to admit or deny Paragraph 81 of the Amended Complaint and, therefore, denies the same.

82.

AHL denies the allegations contained in Paragraph 82 of the Amended Complaint.

83.

AHL denies the allegations contained in Paragraph 83 of the Amended Complaint, including a specific denial of subparagraphs (a) through (d).

84.

AHL denies the allegations contained in Paragraph 84 of the Amended Complaint.

85.

AHL denies the allegations contained in Paragraph 85 of the Amended Complaint.

86.

AHL denies the allegations contained in Paragraph 86 of the Amended Complaint.

87.

AHL is without sufficient information to admit or deny Paragraph 87 of the Amended Complaint and, therefore, denies the same.

**COUNT IV**

88.

AHL incorporates its denials and responses in the preceding Paragraphs.

89.

Except to admit that Rule 23 (b) (2) and 57 of the Federal Rules of Civil Procedure and 15 U.S.C. § 1635 speak for themselves, AHL denies all remaining allegations in Paragraph 89 of the Amended Complaint.

90.

AHL denies the allegations contained in Paragraph 90 of the Amended Complaint. Further, AHL denies the allegations contained in the unnumbered paragraph labeled "Prayer for Relief" and specifically denies subparagraphs (a) through (n) thereto. Further, AHL specifically

denies that Plaintiff and the purported class she seeks to represent are entitled to any relief whatsoever.

### FIFTH DEFENSE

The damages allegedly suffered by Plaintiff, if any, were the result of the failure of Plaintiff to use reasonable diligence in performing acts and duties required of her.

### SIXTH DEFENSE

The facts not having been developed, AHL adopts the following affirmative defenses: accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge and bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, parole evidence, statute of limitations, waiver, ratification and any other matter constituting an avoidance or affirmative defense as may be shown by the facts in this cause.

### SEVENTH DEFENSE

AHL asserts that any alleged conduct or omission on its part was not the cause of any injury alleged by Plaintiff.

### EIGHTH DEFENSE

AHL asserts that any recovery by Plaintiff is barred or must be reduced as a result of Plaintiff's own fault.

### NINTH DEFENSE

AHL asserts that the Complaint fails to state a claim upon which exemplary or punitive damages may be awarded.

## TENTH DEFENSE

Plaintiff's claims against AHL are barred in whole or in part, because Plaintiff's injuries, if any, were caused by an independent intervening cause(s) which AHL did not control, have a right to control, or have any influence over.

## ELEVENTH DEFENSE

Plaintiff did not take action to mitigate her damages.

## TWELFTH DEFENSE

The care and treatment rendered by AHL to Plaintiff was at all times in conformity or exceeded the applicable minimally acceptable standard of care, whether fiduciary or otherwise, which would be rendered by a reasonably prudent lender providing services of the type rendered to the Plaintiff under the same or similar circumstances.

## THIRTEENTH DEFENSE

AHL denies any liability for the acts of other entities under a theory of respondeat superior, vicarious liability, agency, or otherwise.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred because they are not ripe for adjudication or are otherwise nonjusticiable.

## FIFTEENTH DEFENSE

To the extent the Complaint seeks to make Defendants liable for punitive damages, AHL adopts by reference the defenses, criteria, limitations, standards and constitutional protections mandated or provided by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). *Cooper Indus., Inc. v. Leatherman Tool Group*, 532 U.S. 923 (2001), and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

### SIXTEENTH DEFENSE

To award punitive damages against AHL in this case would violate the Contracts Clause of Article I, Section 10 of the United States Constitution, as an award of punitive damages would impair the contractual obligations of any contracts involving Plaintiff and AHL.

### SEVENTEENTH DEFENSE

Any award of punitive damages in this case must comply with the Commerce Clause of the United States Constitution. Specifically, to award punitive damages against AHL in this case would violate the Commerce Clause by chilling and impeding AHL from engaging in interstate commerce. Any portion of a punitive damages award based on conduct outside the State of Mississippi would violate the Commerce Clause.

### EIGHTEENTH DEFENSE

Some or all of Plaintiff's claims may be barred by the applicable statute of limitations.

### NINETEENTH DEFENSE

AHL reserves the right to affirmatively plead any and all other defenses and affirmative defenses available to it which may become applicable through discovery and during the trial of this cause.

### TWENTIETH DEFENSE

AHL affirmatively pleads all right afforded to it pursuant to 15 U.S.C. 1605(f).

### TWENTY-FIRST DEFENSE

This action is not appropriate to proceed as a class action because the requirements for class certification are not satisfied.

**TWENTY-SECOND DEFENSE**

Plaintiff's claims fail to satisfy the requirements for proceeding as a class action pursuant to the provisions of *Fed. R. Civ. P.* 23

**TWENTY-THIRD DEFENSE**

Plaintiff's class claims are barred because rescission and declaratory relief are not available in a class action.

**TWENTY-FOURTH DEFENSE**

This Court lacks subject matter and personal jurisdiction and venue over some or all of the persons and claims of the putative class.

**TWENTY-FIFTH DEFENSE**

Some or all of the claims raised by the Plaintiffs or on behalf of the putative class are barred by principles of estoppel, *res judicata*, collateral estoppel, release, claim preclusion, waiver and/or similar doctrines or concepts.

**TWENTY-SIXTH DEFENSE**

The claims of Plaintiffs and putative class members are barred under TILA's "tolerances for accuracy," 15 U.S.C. § 1605(f).

**TWENTY-SEVENTH DEFENSE**

The claims of Plaintiffs or putative class members are barred, in whole or in part, to the extent that any arbitration agreements govern their loans with AHL.

**TWENTY-EIGHTH DEFENSE**

Any injury or damage to Plaintiffs and/or putative class members is offset by amounts owed by them to AHL and/or its successors or assigns.

### TWENTY-NINTH DEFENSE

AHL hereby gives notice that it intends to and will rely upon all defenses that it may have as to any of the absent members of the putative class if a class is certified.

### THIRTIETH DEFENSE

AHL reserves the right to assert counterclaims against any of the absent members of the putative class if a class is certified in order to preserve its rights.

### THIRTY-FIRST DEFENSE

WHEREFORE, PREMISES CONSIDERED, AHL respectfully requests that this Answer be received and deemed sufficient and that a Judgment be entered in its favor denying the relief requested by Plaintiff and dismissing this action against AHL with prejudice with costs being assessed against Plaintiff. AHL also prays for any general relief which the Court may deem appropriate in the premises.

Because the Complaint is cast in conclusory terms, AHL cannot fully anticipate all affirmative defenses that may be applicable to this action. Accordingly, AHL reserves the right to assert additional affirmative defenses, if and to the extent that such defenses are applicable, and to otherwise supplement and/or amend its answer and defenses herein.

Respectfully submitted,

s/ Robert E. Poundstone, IV
Robert E. Poundstone, IV
One of the Attorneys for Defendant
Accredited Home Lenders Inc.

OF COUNSEL

Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780

1/1700110.1

17

Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

J. Douglas Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Earl P. Underwood, Jr.
Law Offices of Earl P. Underwood, Jr.
P.O. Box 969
21 South Section Street
Fairhope, AL 36533-0969

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

None.

Respectfully submitted,

s/ Robert E. Poundstone, IV
Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: bpoundstone@bradleyarant.com



**Bradley Arant**

BRADLEY ARANT ROSE & WHITE LLP

ALABAMA CENTER FOR COMMERCE
401 ADAMS AVENUE, SUITE 780
MONTGOMERY, AL 36104
334.956.7700   FAX 334.956.7701
WWW.BRADLEYARANT.COM

Robert E. Poundstone IV

Direct Dial: 334.956.7645
Direct Fax: 334.956.7845
bpoundstone@bradleyarant.com

February 15, 2008


Earl Underwood, Esq.
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
21 South Section Street
Fairhope, Alabama 36533-0969

        RE:    Frazier v. Accredited Home Lenders

Dear Earl:

        I am writing to provide you with my clients' initial disclosures pursuant to the Federal Rules of Civil Procedure.  Pursuant to Rule 26 (a) (1) (A), the following people may have discoverable information relevant to this lawsuit:

        Cheryl Frazier
        Plaintiff

        Diane Holson
        Notary Public

        Janet Shelley
        Settlement Agent for Swafford and Hays Settlement Services, Inc.

        James Swafford
        Closing Agent for Swafford and Hays Settlement Services, Inc.

        Jane Carcello
        Swafford and Hays Settlement Services, Inc.

        Verria Neal
        Home Funds Direct

        Clarence Wells
        Home Funds Direct

        Audrey Williams
        Accredited Home Lenders

Earl Underwood, Esq.
February 15, 2008
Page 2

       Brita Dickerson
       Home Funds Direct

       Ken Harper
       Home Funds Direct

       Kim Stephenson
       Home Funds Direct

       Kristopher Dillon
       Home Funds Direct

       Mike Thimsen
       Home Funds Direct

The contact information for the Swafford and Hayes employees, upon information and belief, is:

       Swafford and Hays Settlement Services, Inc.
       9041 Executive Park Drive
       Suite 400
       Knoxville, Tennessee 37923
       (865) 539-1450

Please let me know if you need to contact any of my clients' employees or former employees.

Further, pursuant to Rule 26 (a) (1) (B) of the Federal Rules of Civil Procedure, I am enclosing relevant documents. As you can see, the documents have been BATES numbered AHL Frazier 0001 through 0163. Finally there is no insurance policy which might satisfy part or all of any judgment rendered in this case.

As always, should you need any additional information or otherwise need to speak with me, please do not hesitate to call Doug Minor or me.

       Sincerely,

       Robert E. Poundstone IV

REPIV/jlm

cc:    Doug Minor, Esq.

1/1669806.1

## SIGNATURE / NAME AFFIDAVIT

DATE:         03/25/2005

LOAN #:       0503172917

BORROWER:     HALL, CHERYL

THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW.
(This signature must exactly match signatures on the Note and Mortgage or Deed of Trust.)

CHERYL HALL
_____          _____
(Print or Type Name)                     Signature

If applicable, complete the following:
I AM ALSO KNOWN AS:

CHERYL R. HALL
_____          _____
(Print or Type Name)                     Signature

CHERYL H. FRAZIER
_____          _____
(Print or Type Name)                     Signature

_____          _____
(Print or Type Name)                     Signature

_____          _____
(Print or Type Name)                     Signature

I FURTHER CERTIFY THAT ALL THE ABOVE LISTED NAMES ARE ONE AND THE SAME PERSON.

State of _Alabama_

County of _Houston_

Subscribed and sworn (affirmed) before me
this _25_ day of _March_ _2005_

_Diane L. Hilson_
Notary Public Name (printed)

_Diane L. Hilson_
Notary Public in and for
the State of _Alabama_
County of _Houston_
My Commission Expires: _2-06-06_

**Diane L. Hilson**
Alabama State
at Large

MIN # 100178109031729174          HALL
610007.UFF                        Page 1 of 1

AHL/Frazier
0001

Return To:
Home Funds Direct
Attn: Post Closing Dept.
16550 West Bernardo Dr. Bldg 1
San Diego, CA 92127-1870

THIS IS A TRUE AND EXACT COPY
OF THE ORIGINAL DOCUMENT.

CERTIFIED BY
ACCREDITED HOME LENDERS
Y: _Anita Dickerson_  3/29/05

───────────── [Space Above This Line For Recording Data] ─────────────

# MORTGAGE

MIN 100176105031729174

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 25, 2005
together with all Riders to this document.
(B) "Borrower" is CHERYL HALL

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

100176105031729                                    0503172917

ALABAMA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3001 1/01

-6A(AL) (0005).01

Page 1 of 15        Initials: _CH_

VMP MORTGAGE FORMS - (800)521-7291

FINAL CERTIFIED COPY
SWAFFORD et al

Hall-Frazier
Record - 001397

(D) "Lender" is Home Funds Direct

Lender is a Corporation
organized and existing under the laws of the State of California
Lender's address is 15090 Avenue of Science
San Diego, CA 92128
(E) "Note" means the promissory note signed by Borrower and dated March 25, 2005
The Note states that Borrower owes Lender fifty-six thousand and 00/100

Dollars

(U.S. $56,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.
(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

100176105031729                                          0503172917

-6A(AL) (0008).03                        Page 2 of 15                        Form 3001 1/01

AHL/Frazier
0003

Hall-Frazier
Record - 001398

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

County                           of           HOUSTON                           :
    [Type of Recording Jurisdiction]                           [Name of Recording Jurisdiction]
See Legal Description Addendum Page Attached

Parcel ID Number: 10-09-31-4-003-001.007                           which currently has the address of
105 TV ROAD                                                                          [Street]
DOTHAN                                                    [City] , Alabama 36301                    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

100176105031729                           0503172917

-6A(AL) (0005).03                           Page 3 of 18                           Form 3001 1/01

AHL/Frazier
0004

Hall-Frazier
Record - 001399

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

100176105031729                    0503172917

-6A(AL) (0005).03                Page 4 of 18        Initials: ___    Form 3001 1/01

AHL/Frazier
0005

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

100176105031729                                    0503172917

-6A(AL) (0005).01                    Page 6 of 18                         Form 3001 1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

100176105031729                    0503172917

-6A(AL) 0005.03            Page 8 of 15        Initials [signature]        Form 3001 1/01

AHL/Frazier
0007

Hall-Frazier
Record - 001402

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspection of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

100176105031729                 0503172917

-6A(AL) 0008.02                Page 7 of 16        Initials: [signature]        Form 3001 1/01

AHL/Frazier
0008

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

100176105031729                                              0503172917

-6A(AL) (0005).03                    Page 9 of 15                    Form 3001 1/01

Hall-Frazier
Record - 001404

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

100176105031729                                        0503172917

-6A(AL) (0005.03)              Page 9 of 15                        Form 3001 1/01

AHL/Frazier
0010

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

100176105031729                                          0503172917

-6A(AL) (0005).03                    Page 10 of 16       Initials:_____       Form 3001 1/01

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

10017610503172 9                    0503172917

-6A(AL) (0005).05          Page 11 of 15          Initials: _____          Form 3001 1/01

Hall-Frazier
Record - 001407

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

100176105031729                    0503172917

-6A(AL) (0008).03              Page 13 of 16              Form 3001 1/01

AHL/Frazier
0013

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in Section 15. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in HOUSTON
County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

25. Attorneys' Fees. Wherever this Security Instrument authorizes the Lender to collect reasonable attorneys' fees following default, such reasonable attorneys' fees shall not exceed fifteen percent (15%) of the unpaid debt after default and referral of the Security Instrument to an attorney who is not a salaried employee of Lender.

100176105031729                                        0503172917

-6A(AL) (0005).03                Page 13 of 15        Initials: C.H.        Form 3001 1/01

**BY SIGNING BELOW**, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
CHERYL HALL                                          -Borrower

_____

_____ (Seal)
                                                    -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower

100176105031729                            0503172917

-6A(AL) (0005).02              Page 14 of 15              Form 3001 1/01

AHL/Frazier
0015

STATE OF ALABAMA,                                      County ss: *Houst*

On this      25      day of *March , 2005*      , I,
*DIANE L. Hilson*
a Notary Public in and for said county and in said state, hereby certify that CHERYL HALL,

whose name(s) is/are signed to the foregoing conveyance, and who is/are known to me, acknowledged
before me that, being informed of the contents of the conveyance, he/she/they executed the same
voluntarily and as his/her/their act on the day the same bears date.

Given under my hand and seal of office this      25      day of *Mar*

My Commission Expires:

My Commission
Expires 3-06-06

_____
Notary Public

Diane L. Hilson
Alabama State
at Large

Prepared By:
Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

100176105031729                    0505172917

(D) -6A(AL) (0708).03          Page 15 of 15          Form 3001 1/01

AHL/Frazier
0016

## LEGAL DESCRIPTION ADDENDUM

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| | Loan #: 0503172917 |

**Property Address:**
105 TV ROAD
DOTHAN, AL 36301

**Legal Description:**
**SEE ATTACHED LEGAL DESCRIPTION**

Initial: _____

MIN # 100176105031729174            HALL                Loan #    0503172917
AHL 61010LUFF                        Page 1 of 1

AHL/Frazier
0017

**EXHIBIT A**

Situated in Dothan, Houston County, State of AL and being described as follows:

Lot 2, Block "C", of the Third Addition to Television Heights Subdivision in the City of Dothan, Alabama, as found recorded in Plat book 7, Page 23, in the Office of the Judge of Probate, Houston County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

Parcel #10-09-31-4-003-001.007

BEING the same property conveyed to Louis E. Sowers and Fay Sowers, as joint tenants with express right of survivorship and to the survivor's heirs and assigns, by deed from Samuel B. Pierce, Jr., Secretary of Housing and Urban Development of Washington, D.C., acting by and through the Office of Assistant Secretary for Housing - Federal Housing Commissioner, dated 07-19-85, recorded 07-26-85, in Book 311, page 324, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Kevin Lorenzo Dixon, II, by deed from Louis E. Sowers and wife, Fay Sowers, dated 04-02-03, recorded 04-03-03, in Book 598, page 34, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Cheryl Hall, by deed from Kevin Lorenzo Dixon, II, a unmarried man, dated 03-02-05, recorded 03-11-05, in Book 622, page 443, in the Office of the Judge of Probate of Houston County, AL.

This Derivation Clause represents a 24 month Chain of Title.

The above information is to be used for reference purposes only and not to be relied on as evidence of title and/or encumbrances. Accordingly, said information is furnished at a reduced rate, and the Company's liability shall in no event exceed the amount paid for said information.

105 TV Road, Dothan, AL  36301

AHL/Frazier
0018





★ N O T E S / D E E D S ★





★ N E W D O C ★





★ N E W D O C ★



★ N E W D O C ★

AHL/Frazier
0019

## HARDSHIP NOTICE

| Borrower Name(s):<br>CHERYL HALL | Lender:<br><br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 25, 2005 |

I/We are aware that my/our first payment is due on May 1, 2005 and I/we will make a full payment on that date. I/We realize that my/our first payment is less than thirty (30) days from the date of funding and this does not create a financial hardship on me/us.

| Borrower      Date<br>CHERYL HALL | Borrower      Date |
|---|---|
| Borrower      Date | Borrower      Date |
| Borrower      Date | Borrower      Date |
| Borrower      Date | Borrower      Date |

MIN # 1001761050031728174      HALL      Loan # 0503172917
HRDSHNTC.UFF      Page 1 of 1

# NOTE

March 25, 2005                          DOTHAN
[Date]                                    [City]

105 TV ROAD
DOTHAN, AL 36301
[Property Address]



## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $56,000.00         (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is  Home Funds Direct

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of        7.299 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st      day of each month beginning on May 1, 2005              . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on April 1, 2035          , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at                    P.O. Box 502480 San Diego, CA  92150-2480
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 383.89

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MIN# 100176105031729174                                           0503172917
MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-6N (0307).01                Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                   Initials: _____

AHL/Frazier
0021



**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 10     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees. Reasonable attorneys' fees shall not exceed 15% of the unpaid debt after default and referral of this Note to an attorney who is not a salaried employee of the Note Holder.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MIN# 100176105021729174        0503172917

5N 97207L01      Page 2 of 3      Form 3200 1/01

AHU/Frazier
0022

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
CHERYL HALL                     -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                      -Borrower

*[Sign Original Only]*

MIN# 100176108031729174                        0503172917

-6N (0207).01                 Page 3 of 3                  Form 3200 1/01

AHL/Frazier
0023

Loan No: 0503172917

Mortgagee: CHERYL HALL

Address:    105 TV ROAD
            DOTHAN, AL 36301

Loan Amount:$ 56,000.00

## ALLONGE TO NOTE

PAY TO THE ORDER OF:

WITHOUT RECOURSE

Clarence W Wells
Assistant Secretary
Home Funds Direct

MIN # 100176195031729174          HALL              Loan # 0503172917
AHL 670017.UFF                    Page 1 of 1

AHL/Frazier
0024

Pv
7

(Printed on Mar 25, 2005 @ 16:19)

US Department of Housing and Urban Development

OMB No. 1502-0265

### SETTLEMENT STATEMENT

| B. Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1. [ ] FHA   2. [ ] FmHA   3. [ ] Conv. Unins. | | | 6. File Number: | 7. Loan Number: | 8. Mortgage Ins. Case #: |
| 4. [ ] VA   5. [X] Conv. Ins. | | | 05-2813 | 9503172917 | |
| C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "POC" were paid outside the closing; they are shown here for informational purposes and are not included in the totals. | | | | | |

| D. NAME AND ADDRESS OF BORROWER/BUYER: |
|---|
| Cheryl Hall 105 TV Road Dothan, AL 36301 |

| E. NAME AND ADDRESS OF SELLER: |
|---|
| |

| F. NAME AND ADDRESS OF LENDER: |
|---|
| Home Funds Direct 1130 Northchase Parkway, Suite 200 Marietta, GA 30067 |

| G. PROPERTY LOCATION (Brief Legal): |
|---|
| 105 TV Road Dothan, AL 36301 |

| H. SETTLEMENT AGENT: | PLACE OF SETTLEMENT: |
|---|---|
| Swafford and Hays Settlement Services, Inc.  865-539-1450 Contact: Janet Shelley | 9041 Executive Park Drive, Suite 400 Knoxville, TN 37923 |

| I. SETTLEMENT DATE: | DISBURSEMENT DATE: |
|---|---|
| 03/25/2005 | 03/30/2005 |

| J. SUMMARY OF BORROWER(S) TRANSACTION | | K. SUMMARY OF SELLER(S) TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER :** | | **400. GROSS AMOUNT DUE TO SELLER :** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 13,896.39 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by Seller in advance** | | **Adjustments for items paid by Seller in advance** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 13,896.39 | **420. Gross Amount Due Seller** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER :** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER :** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 56,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by Seller in advance** | | **Adjustments for items unpaid by Seller in advance** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 56,000.00 | **520. Total Reduction Amount Due Seller** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER :** | | **600. CASH AT SETTLEMENT TO/FROM SELLER :** | |
| 301. Gross Amount due from borrower (line 120) | 13,896.39 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 56,000.00 | 602. Less reductions in amt. due seller (line 520) | |
| 303. Cash [ ] From [X]To Borrower | 42,103.61 | 603. Cash [X]To [ ] From Seller | 0.00 |

SUBSTITUTION FORM 1099 SELLER STATEMENT: The information contained in blocks E,G,H and I on line 401(or if 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER, you are required by law to provide the settlement agent with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

Seller(s):

AHL/Frazier
0025

(Printed on Mar 23, 2005 @ Mr18)

US Department of Housing and Urban Development
**SETTLEMENT CHARGES**

OMB No. 2502-0265

L.

| | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | |
| 701. Listing Realtor Commission | | |
| 702. Selling Realtor Commission | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | |
| 801. Loan Origination Fee  To: Home Funds Direct | 1,960.00 | |
| 802. Loan Discount | | |
| 803. Appraisal Fee  To: Alabama Appraisal Service | 300.00 | |
| 804. Credit Report | | |
| 805. Lender's Inspection Fee | | |
| 806. Mortgage Insurance Application Fee | | |
| 807. Assumption Fee | | |
| 808. Processing Fee  To: Home Funds Direct | 500.00 | |
| 809. Underwriting fee  To: Home Funds Direct | 500.00 | |
| 810. Document Preparation Fee | | |
| 811. Zone Determination Fee  To: Home Funds Direct | 9.50 | |
| 812. Tax Service Fee  To: Home Funds Direct | 66.00 | |
| 813. Appraisal Review Fee  To: Home Funds Direct | 250.00 | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | |
| 901. Interest from Odd Days  To: Home Funds Direct | 22.40 | |
| 902. Mortgage Insurance Premium for | | |
| 903. Hazard Insurance Premium for: State Farm | 1,068.00 | |
| 904. | | |
| 905. | | |
| 1000. RESERVES DEPOSITED WITH LENDER | | |
| 1001. Hazard Insurance  To: Home Funds Direct | 356.00 | |
| 1002. Mortgage Insurance | | |
| 1003. City property taxes | | |
| 1004. County property taxes  To: Home Funds Direct | 313.25 | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Accounting Adjustment  To: Home Funds Direct | -134.25 | |
| 1100. TITLE CHARGES | | |
| 1101. Settlement or closing fee  To: Swafford and Hays Settlement Services, Inc. | 275.00 | |
| 1102. Abstract or title search  To: Swafford and Hays Settlement Services, Inc. | 200.00 | |
| 1103. Title examination  To: Swafford and Hays Settlement Services, Inc. | 250.00 | |
| 1104. Title insurance binder | | |
| 1105. Document preparation | | |
| 1106. Notary Fees | | |
| 1107. Attorney's Fees | | |
| (Includes above item numbers: ) | | |
| 1108. Title Insurance  To: Transnation Title Insurance Company | 200.00 | |
| (Includes above item numbers: ) | | |
| 1109. Lender's coverage $67,500.00  @  $200.00 | | |
| 1110. Owner's coverage @ 0.00 | | |
| 1111. Endorsements  To: Swafford and Hays Settlement Services, Inc. | 50.00 | |
| 1112. | | |
| 1113. Overnight Courier & Handling Fees | | |
| 1200. GOVT. RECORDING, TRANSFER, AND SERVICE FEES | | |
| 1201. Recording fees and Service fees:  To: Clerk of the Court | 120.00 | |
| 1202. City/county tax/stamps: | | |
| 1203. State tax/stamps:  Deed $0.00  Mortgage $84.00 To: Clerk of the Court | 84.00 | |
| 1204. | | |
| 1205. | | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | |
| 1301. Survey | | |
| 1302. Pest Inspection | | |
| 1303. Payoff  To: Army Aviation Center F C U  good thru 4/24 | 4,594.49 | |
| 1304. | | |
| 1305. Payment  To: The CR STR/Providian | 785.00 | |
| 1306. Payment  To: Palisades | 694.00 | |
| 1307. Payment  To: Holloway Credit | 452.00 | |
| 1308. Payment  To: Small LNS | 399.00 | |
| 1309. Payment  To: Crdt MGT. | 182.00 | |
| 1310. Payment  To: Friedmans Jewelers | 400.00 | |
| 1311. | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | 13,896.39 | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

BORROWER(S):                                                    SELLER(S):

Cheryl Hair

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

AHL/Frazier
0026

Hall-Frazier
Record - 001421

_Jane Carcello_                                    05/28/03

Buyer(s) and Keys Settlement Services, Inc.                    Date
NOTE: Taxes have been prorated based on taxes for the year. Any re-proration will be handled between the buyer and seller. All utility bills (water, sewer, electric, cable and maintenance fees) have been held or will be paid upon receipt of final bills.
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

AHL/Frazier
0027

| WIRE DETAILS |
|:---:|

| | | | |
|---|---|---|---|
| Warehouse: IXIS | | Target Funding Date: 03/30/2005 | |
| Loan #: 0503172917 | | Origination Type: AHL Retail | |

| | | | |
|---|---|---|---|
| Borrower: CHERYL HALL | | Region: 351 351 - ATL001 | |
| Broker Name: | | Broker ID #: 0 | |
| Broker Address: | | Status: | |
| | | Vendor ID #: | |

| | | | |
|---|---|---|---|
| Loan Amount: | 56,000.00 | Impound Amount: | $669.25 |
| Broker Front Points: | $0.00 | Aggregate Adjustment: | $134.25 |
| Broker Process Fee: | $0.00 | Net Impound: | $535.00 |
| Broker Other Fees: | $0.00 | | |
| GA Per Loan Fee: | $0.00 | | |
| AHL Discount Points: | $1,960.00 | | |
| AHL Underwriting Fee: | $500.00 | | |
| AHL Rev Appraisal Fee: | $250.00 | | |
| AHL Doc Fee: | $0.00 | | |
| AHL Funding Fee: | $0.00 | Broker Fees: | $0.00 |
| AHL Other Fees: | $575.50 | Broker Rebate Points: | $0.00 |
| Prepaid Interest: | $22.40 | Wire To Broker: | $0.00 |
| days: | 2 | Broker Amt Withheld: No | $0.00 |
| $/Day: | $11.20 | Total AHL Lender Fees: | $3,285.50 |
| Wire To Title: | $52,157.10 | Tax Amount: | $0.00 |
| Total Wire: | $52,157.10 | | |

| | |
|---|---|
| Total Wire + Tax Amount: | $52,157.10 |

Wire Approved By:

Wire Entered By: Ken Harper          Wire Released By: britad

Creation Date: 03/29/2005

Creation Time: 10:47AM

MIN # 100176106031729174          HALL          Loan # 0503172917
WIREDTLS.UFF                      Page 1 of 1

AHL/Frazier
0028

# HUD AUDIT/CHECKLIST

**BORROWER** Cheryl Hall    **LOAN NUMBER** 0503172917

**IF ORIGINAL** – SIGNED BY BORROWERS   YES ✓ NO_____

    - COMPLETE WITH ALL ATTACHMENTS YES ✓NO_____

**IF COPY** – CERTIFIED TRUE BY CLOSING AGENT YES ✓ NO_____

    - CLEAR AND LEGIBLE YES ✓ NO_____

    - COMPLETE WITH ALL ATTACHMENTS YES ✓ NO_____

**PAYOFFS** – DO PAYOFFS MATCH CLOSING INSTRUCTIONS YES✓ NO___

**FEES** – DO FEES MATCH CLOSING INSTRUCTIONS YES ✓NO_____

    - ARE ALL APPLICABLE APR RELATED BROKER/LENDER/ESCROW
FEES/PREPAID INTEREST DISCLOSED IN THE TIL YES ✓ NO .

    - ARE ALL FEES DISBURSED OR HELD IN ESCROW ACCORDING TO OUR CLOSING
INSTRUCTIONS YES ✓ NO_____

    - DO BROKER/LENDER FEES EQUAL WIRE SUMMARY YES ✓ NO_____

    - DOES PREPAID INTEREST EQUAL WIRE SUMMARY YES___ ✓NO

    - IF YIELD SPREAD PREMIUM, IS IT DISCLOSED YES____ NO ✓

    - ARE THERE DUAL BROKER/LENDER FEES YES____ NO ✓

**COMPLIANCE** - ARE SETTLEMENT AND DISBURSEMENT DATES
CONSISTENT WITH DOC SIGNING AND APPLICABLE
RESCISSION PERIOD YES_____ NO_____

**IMPOUNDS** – IF IMPOUNDED, DOES IT EQUAL ESCROW IMPOUND
DISCLOSURE WITH AGGREGATE ADJUSTMENT YES ✓NO___

    - IS ESCROW IMPOUND DISCLOSURE ATTACHED YES ✓NO_____

**PURCHASE TRANSACTION** – BOTH BUYER AND SELLER SIDE YES ✓NO___

PURCHASE PRICE MATCHES PURCHASE AGREEMENT OR ESCROW INSTRUCTIONS
YES ✓NO_____

**LOAN AUDITOR NAME** B Dickerson **PHONE** 770-541-5854

# COMPLIANCE AGREEMENT

| Borrower Name(s):<br>CHERYL HALL | Lender:<br><br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 25, 2005 |

The undersigned borrower(s), in consideration of lender disbursing loan proceeds for the purchase or refinance of, or construction of improvements on the aforementioned property, agree(s), if requested by the lender or someone acting on behalf of said lender, to fully co-operate in adjusting for clerical errors, mistakes by the lender or by the broker, and all loans closing documentation deemed necessary or desirable, in the reasonable discretion of lender, to enable lender to sell, convey its interest in, seek guaranty of, or market said loan to any entity, including but not limited to, a secondary investor, the Federal National Mortgage Association (FNMA), the Federal Home Loan Mortgage Corporation (FHLMC), Department of Housing and Urban Development (HUD), the Department of Veterans Affairs (VA), or any Municipal Bonding Authority.

The undersigned borrower(s) agree(s) to sign or initial any original or new document requested by lender to correctly reflect the terms of said loan. This shall be done within a reasonable time of request by the lender to do so and failure or refusal to sign or initial any documents requested is an event of default allowing lender to take any action necessary to collect said loan.

In order to assure that the loan documentation executed this date will conform and be acceptable in the market place in the instance of transfer, sale, or the conveyance by lender of its interest in and to the above mentioned property evidenced by said loan documentation, the undersigned borrower(s) do hereby so agree and covenant as aforesaid herein.

DATED effective this _25_ day _March_ , _2005_

_____ _3-26-05_     _____
Borrower     Date     Borrower     Date
CHERYL HALL

_____ _____
Borrower     Date     Borrower     Date

_____ _____
Borrower     Date     Borrower     Date

_____ _____
Borrower     Date     Borrower     Date

STATE OF _Alabama_

COUNTY OF _Houston_ } SS

On _3-25-2005_ before me, _DIANE L. Hilson_
                                              Notary Public Name (printed)

personally appeared CHERYL HALL

☐ personally known to me -OR-     ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

                                             Diane L. Hilson
                                             Alabama State
My Commission                                         at Large
Expires 3-06-06     Signature of Notary

MIN # 100176105631729174                                            Loan #:   0503172917
CMPLAGRT.UFF                 Page 1 of 1                                  Rev. 10/04

## FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>16090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| | Date: 03/25/2005    Loan #: 0503172917 |
| | Loan Type: Conventional |

Borrower Address:
105 TV ROAD
DOTHAN, AL 36391

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.975 % | $85,772.51 | $ 52,417.10 | $ 138,189.61 |

### PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359<br>1 | $383.89<br>$373.10 | 05/01/2005<br>04/01/2035 | | | |

**DEMAND FEATURE:** [X] This loan does not have a Demand Feature. [ ] This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:** [ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
105 TV ROAD
DOTHAN, AL 36301

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms [ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $170.00

**PROPERTY INSURANCE:** [X] Property hazard insurance in the amount of the lesser of the loan amount or replacement cost with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender. Hazard insurance [ ] is [X] is not available through the lender at an estimated cost of N/A for N/A year term.

**LATE CHARGES:** If your payment is more than 10 days late, you will be charged a late charge of 5.000% of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
[ ] may [X] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| Borrower _____ Date _____<br>CHERYL HALL | Borrower _____ Date _____ |
|---|---|
| Borrower _____ Date _____ | Borrower _____ Date _____ |
| Borrower _____ Date _____ | Borrower _____ Date _____ |
| Borrower _____ Date _____ | Borrower _____ Date _____ |

MIN # 100176100031729174       HALL       Loan # 0503172917
TFTHLND.UFF       Page 1 of 1       Rev 12/04

FINAL

Lender: Home Funds Direct
Address: 15090 Avenue of Science
San Diego, CA 92128
Applicant(s): CHERYL HALL

Property Address: 166 TV ROAD
DOTHAN, AL 36301

**GOOD FAITH ESTIMATE**

Loan Number: 0503172917
Sales Price: $0.00
Base Loan Amount: $66,000.00
Total Loan Amount: $396,000.00
Type of Loan: Conventional Fixed
DatePrepared: March 25, 2005
Rate: 7.399  %Term: 360/360 mos

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates-the actual charges may be more or less. Your transaction may not involve a fee for every item listed.
The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 or HUD-1A | DESCRIPTION OF CHARGES | Lender | OTHER |
|---|---|---|---|
| 204 | Lender Credit to Borr. | $ | $ |
| 801 | Origination Fee | $ 1,960.00 | $ |
| 802 | Discount Points | $ | $ |
| 803 | Appraisal Fee | $ | $ 300.00 |
| 804 | Credit Report Fee | $ | $ |
| 805 | Final Inspection/442 Fee | $ | $ |
| 807 | Application Fee | $ | $ |
| 809 | Yield Spread Premium (POC) / Rebate to Broker(POC) $  0.00 | $ | $ |
| 810 | Processing Fee | $ 500.00 | $ |
| 811 | Underwriting Fee | $ 500.00 | $ |
| 812 | Appraisal Review Fee | $ 250.00 | $ |
| 815 | Escrow Holdback Fee | $ | $ |
| 816 | Funding Fee | $ | $ |
| 818 | Courier Fee | $ | $ |
| 825 | Warehouse Fee | $ | $ |
| 827 | Berutif Fee | $ | $ |
| 828 | Flood Cert/Life of Loan Fee | $ 9.50 | $ |
| 829 | Tax Service Fee | $ 66.00 | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  | SUB-TOTALS | 3,285.50 | 300.00 |

|  |  | OTHER CHARGES | |
|---|---|---|---|
| 901 | Interest for 2 days  @ @ 11.2 per day | $ 22.40 | $ |
| 903 | Hazard Insurance Premium | $ | $ |
| 904 | Flood Insurance Premium | $ | $ |
| 1001 | Hazard Insurance 4 month(s) @  $89.00 | $ 356.00 | $ |
| 1003 | City Property Tax 0 month(s) @  $0.00 | $ | $ |
| 1004 | County Property Tax 7 month(s) @  $44.75 | $ 313.25 | $ |
| 1005 | School Tax 0 month(s) @  $0.00 | $ | $ |
| 1006 | Flood Insurance 0 month(s) @  $0.00 | $ | $ |
| 1008 | Agg. Acctg. Adjustment | -134.25 | $ |
| 1101 | Settlement / Closing Agent Fee | $ | $ 275.00 |
| 1102 | Abstract/Title Search Fee | $ | $ 200.00 |
| 1103 | Title Examination Fee | $ | $ 250.00 |
| 1104 | Title Insurance Binder | $ | $ |
| 1105 | Closing Agent/Attorney Doc Fee | $ | $ |
| 1106 | Notary Fee | $ | $ |
| 1107 | Demand Fee | $ | $ |
| 1108 | Title Insurance Premium | $ | $ 200.00 |
| 1201 | Recording Fee - Deed/Mortgage | $ | $ 120.00 |
| 1202 | City/County Tax- Deed/Mortgage | $ | $ |
| 1203 | State Tax - Deed/Mortgage | $ | $ 84.00 |
| 1204 | Misc Recording Fee | $ | $ 50.00 |
| 1205 | Transfer Tax | $ | $ |
| 1301 | Survey Fee | $ | $ |
| 1302 | Pest Inspection | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  | Lenders CPL License # | $ | $ |
|  | TOTAL ESTIMATED SETTLEMENT CHARGES | | $ 5,321.90 |

"*" designates - the Lender will require a particular provider from a lender-controlled or approved list. The specific provider and actual cost will appear on the HUD-1 or HUD-1A.
Where estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property. The itemized homeowner receipt of the booklet "Settlement Costs," and the Consumer Handbook on ARM Mortgages, if applicable.

$ Use of a particular provider of service is required and the estimate is based on charges of the provider. Please see attached Addendum.

**THIS DOES NOT CONSTITUTE A LOAN COMMITMENT**

Borrower CHERYL HALL _____  Date 3-25-05     Borrower _____  Date _____

Borrower _____  Date _____     Borrower _____  Date _____

Borrower _____  Date _____     Borrower _____  Date _____

Borrower _____  Date _____     Borrower _____  Date _____

MIN # 100176105031729174     HALL     Loan # 0503172917
AHL GFE-C.UFF     Page 1 of 1

AHL/Frazier
0032

# Initial Escrow Account Disclosure Statement

Date: 03/25/2005    Loan Number: 0503172917    Case Number:

Servicer's Name and Address:
Accredited Home Lenders
Escrow Administration
15090 Avenue of Science 200
San Diego, CA 92128

Borrowers:
CHERYL HALL

Toll Free Number: 877-683-4466

Property Address:
105 TV ROAD
DOTHAN, AL 36301

Mailing Address:
105 TV ROAD
DOTHAN, AL 36301

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made from your account.

| Month (for Period) | Payments to Escrow Account | Payments from Escrow Account | Description | Escrow Account Balance |
|---|---|---|---|---|
| Initial Deposit: | | | | 535.00 |
| Jun 05 | 133.75 | 0.00 | | 668.75 |
| Jul 05 | 133.75 | 0.00 | | 802.50 |
| Aug 05 | 133.75 | 0.00 | | 936.25 |
| Sep 05 | 133.75 | 0.00 | | 1,070.00 |
| Oct 05 | 133.75 | 0.00 | | 1,203.75 |
| Nov 05 | 133.75 | 0.00 | | 1,337.50 |
| Dec 05 | 133.75 | 537.00 | County Prop. Tax | 934.25 |
| Jan 06 | 133.75 | 0.00 | | 1,068.00 |
| Feb 06 | 133.75 | 0.00 | | 1,201.75 |
| Mar 06 | 133.75 | 1,068.00 | Hazard Ins. Impounds | 267.50 |
| Apr 06 | 133.75 | 0.00 | | 401.25 |
| May 06 | 133.75 | | | 535.00 |

(PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE ESCROW ACCOUNTING COMPUTATION YEAR.) Cushion selected by servicer: $        267.50

[x] Your monthly        mortgage payment for the coming year will be $ 517.64        of which $383.89 will be for principal and interest and $ 133.75        will go into your escrow account, and $0.00 will be for discretionary items (such as life insurance, disability insurance) that you chose to be included with your monthly payment.

[ ] Your first        mortgage payment for the coming year will be $        of which $        will be for principal and interest and $        will go into your escrow account, and $        will be for discretionary items (such as life insurance, disability insurance) that you chose to be included with your monthly payment. The terms of your loan may result in changes to the monthly principal and interest payments during the year.

503X (0002).01    2/98
VMP MORTGAGE FORMS - (800)521-7291

AHL/Frazier
0033

OUR LOAN NO 0503172917

# LENDERS' INSTRUCTIONS

CLOSING DATE  March 25, 2005

ISSUE DATE March 25, 2005

IF THE LOAN DOES NOT CLOSE AS SCHEDULED PLEASE NOTIFY OUR OFFICE IMMEDIATELY (DO NOT USE OUR FUNDS IF YOU CANNOT COMPLY WITH ALL OF THE INSTRUCTIONS ON PAGES 2, 3, & 4 AND ADDITIONAL INSTRUCTIONS)

CLOSING AGENT   SWAFFORD & HAYES SETTLEMENT SERVICES INC   ATTENTION  JAMES W SWAFFORD
CLOSING AGENT ADDRESS   9041 EXECUTIVE PARK DRIVE, KNOXVILLE, TN 37923
CLOSING AGENT PHONE NUMBER   (865)934-0466   CLOSING AGENT FAX NUMBER  (865)934-0215
LOAN PURPOSE  Refi Cash Out                    LIEN TYPE  1st              LOAN TYPE Fixed
MTGE AMT. $  56,000.00    INTEREST RATE   7.299    % INITIAL RATE 7.299%    MARGIN   0.000    %
TERM   360/360    MUST CLOSE BY   04/05/2005    DOCUMENT EXPIRE ON   04/05/2005
MORTGAGOR(S) NAME(S)    CHERYL HALL
PROPERTY ADDRESS    105 TV ROAD, DOTHAN, AL 36301
TITLE COMPANY  SWAFFORD & HAYES SETTLEMENT SERVICES INC
TITLE NUMBER   05-2813         PHONE NUMBER  (865)934-0466

A. ENCLOSED ARE THE FOLLOWING DOCUMENTS PERTAINING TO THE MORTGAGE CLOSING:

( X ) DEED / MORTGAGE                              ( ) ORIGINAL POWER OF ATTORNEY - RETURN TO DESIGNEE

( ) RIDER(S), ADDENDUM, ALLONGE #_____        ( X ) TAX FORM # 4506 OR 8821

( X ) NOTE                                         ( ) _____

( X ) RIDER(S) ATTATCHED SCHEDULES #_____     ( ) _____

( X ) TRUTH INLENDING FINAL (REG Z)               ( ) _____

( X ) W-9                                          ( ) _____

( X ) INFORMATIONAL DISCLOSURES                   ( ) _____

( X ) RIGHT TO CANCEL - 3 COPIES PER BORROWER     ( ) _____
       -RETURN 1 EACH

B. THE FOLLOWING LENDER ITEMS HAVE BEEN DEDUCTED FROM OUR CHECK/DRAFT TO YOU:

| FEE ITEMS: HUD-1 # | LENDER FEES | N/A | LENDER POC | TOTAL FEES |
|---|---|---|---|---|
| 801 Origination Fee | 1,960.00 | | | 1,960.00 |
| 802 Discount Points | | | | |
| 803 Appraisal Fee | | | | 300.00 |
| 804 Credit Report Fee | | | | |
| 805 Final Inspection/442 Fee | | | | |
| 807 Application Fee | | | | |
| 810 Processing Fee | 500.00 | | | 500.00 |
| 811 Underwriting Fee | 500.00 | | | 500.00 |
| 813 Appraisal Review Fee | 250.00 | | | 250.00 |
| 815 Escrow Holdback Fee | | | | |
| 816 Funding Fee | | | | |
| 818 Courier Fee | | | | |
| 825 Warehouse Fee | | | | |
| 827 Reverif Fee | | | | |
| 828 Flood Cert/Life of Loan Fee | 9.50 | | | 9.50 |
| 829 Tax Service Fee | 66.00 | | | 66.00 |
| 901 Interest for 2 days   @ $ 11.2 per day | 22.40 | | | |
| 1001 Hazard Insurance 4 month(s) @   $89.00 | 356.00 | | | 356.00 |
| 1003 City Property Tax 0 month(s) @   $0.00 | | | | |
| 1004 County Property Tax 7 month(s) @   $44.75 | 313.25 | | | 313.25 |
| 1005 School Tax 0 month(s) @   $0.00 | | | | |
| 1006 Flood Insurance 0 month(s) @   $0.00 | | | | |
| 1008 Agg. Acctg. Adjustment | -134.25 | | | -134.25 |
| 1301 Survey Fee | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTALS | 3,842.90 | 0.00 | 0.00 | 4,120.50 |

PAID BY LENDER
204  LENDER CREDIT TO BORROWER      $ 0.00
809  YIELD SPREAD TO BROKER (POC)  $ 0.00
1203 STATE TAX/STAMPS             $                    NET CHECK / DRAFT $  52,157.10

For all Dry-Funding States and Refinances in Wet-Funding States:
ALL DOCUMENTS MUST BE IN OUR OFFICE TWO (2) BUSINESS DAYS PRIOR TO DISBURSEMENT
OF LOAN FUNDS
C. POLICY OF THE TITLE INSURANCE REQUIREMENTS ARE SET FORTH ON PAGE 2 AND OUR LIEN MUST BE SUBJECT
ONLY TO EXCEPTION NUMBERS   B1)1-9 B2)1-7                                      AS
SHOWN ON THE PRELIMINARY REPORT /COMMITMENT DATED   March 18, 2005
                                        Initial_____

Page 1 of 4
AHL G635-AHL.UFF

AHL/Frazier
0034

## LENDERS' INSTRUCTIONS

**INITIAL CLOSING INSTRUCTIONS**

DO NOT CLOSE THIS LOAN IF:

1. We have not received and approved Preliminary Commitment for Title Insurance.
2. You are past the expiration date of our legal papers.
3. We have not received and approved an Estimated Closing Statement.
4. You have not given signed copy of these instructions plus any amendments to the borrowers.
5. If there has been any change to the original sales contract which we have not approved in writing.
6. If we have not received and accepted/approved:
   a. Security instruments conformed and certified plus two copies.
   b. Note plus two certified copies.
   c. Any other items sent for execution and/or notary in the numbers sent. We will not accept witnessed acknowledgments on notarized items.
7. We have not received an acceptable hazard insurance binder.
8. All conditions of our loan commitment have not been met.
9. SIGNATURES Please insure that the Borrowers sign ALL loan documents EXACTLY AS THEIR NAMES ARE TYPED ON THE DOCUMENTS, EVEN IF THIS IS NOT THEIR USUAL SIGNATURE. Please pay special attention to middle initials and middle names, and Junior and Senior. You should review the signature on each document CAREFULLY. IF THERE IS ANY QUESTION AS TO THE READABILITY OF THE SIGNATURE OF AN INDIVIDUAL, YOU SHOULD OBTAIN A NOTARIZED SIGNATURE AFFIDAVIT and return it with the other documents.
10. TAX CERTIFICATION This form must be completed and signed by YOU and have the LEGAL DESCRIPTION ATTACHED OR ENTERED AT THE BOTTOM OF THE FORM. Please be sure that ALL information is complete and correct and that you show an amount of taxes next due, even an estimated amount.
11. REVIEW All documents MUST be in our office for review PRIOR to recording. We request that documents be received a MINIMUM OF ONE DAY PRIOR TO THE DAY YOU WISH TO RECORD. Please include THREE (3) CERTIFIED COPIES EACH OF THE NOTE AND DEED OF TRUST and provide copies of all other executed documents for recording such as Warranty Deed, Excise Affidavit, Quit Claim Deed, Buyer or Seller Power of Attorney, etc. Please direct the title company to forward take-off copies of ALL pages of ALL recorded documents as soon as possible.
12. Sales price is other than $00.00

**TITLE POLICY REQUIREMENTS**

1. The title policy must insure the mortgage as a good and valid lien of the type shown on Page 1 in accordance with your Preliminary Commitment for Title Insurance. We must have the original and two copies of the policy.
2. THERE MUST BE NO OTHER LIENS AGAINST THE PROPERTY OTHER THAN THOSE SHOWN ON PAGE 1, unless approved by us in writing.
3. No past-due taxes or special assessments are to be shown as exceptions. The title policy must show current year's taxes "not yet due and payable," or current half paid.
4. In examining the title, if you find any violations of restrictions, easements, or encroachments, secure our approval prior to the closing.
5. Vestee name spelling(s) must be identical to mortgagee/deed of trust.
6. Marital status must be shown.
7. We require two copies of conditions, covenants, and restrictions and of any recorded exceptions not covered by FNA/VA/FNMA/FHLMC General Waivers.
8. The mortgage transaction must include the proper execution and recording of all necessary instruments to assure the issuance of a Mortgagee Title Policy, without exceptions except as shown on Page 1.
9. This Policy must be in the loan amount or maximum principal balance to be reached if negative amortization is involved (not to exceed 125%) insuring Home Funds Direct
   and its successors and/or assigns, and subject only to the following:
   Restrictions and building lines of record provided that the policy contains
   an Endorsement covering any violation.
10. Any lien for financing subordinate to ours and approved by us must be listed on the title policy and the policy must expressly provide that such lien is subordinate to that of our mortgage lien.
11. Property address must be shown as a part of the policy or by endorsement in states where possible.
12. Plat or survey must show correct street name or road name in full; must show all reference points used in legal description.
13. Protection of insured must be provided in the case of any unlocated easements, rights of way, encroachments, etc.
14. Protection of improvements including landscaping, must be provided if water, oil, gas, or mineral reservations exist and allow the right of surface entry.
15. The following endorsements must be included in the Mortgagee policy: 100, 115, 8.1, 8.2 if ARM with no negative amortization, condominium or P.U.D., if applicable, and EPA.
16. Have title company forward owners policy to borrowers at property or mailing address.
17. Have Mortgagee policy delivered to lender's address on page 4 of these instructions within three days of closing.
18. Title policy to read as follows:
    Home Funds Direct
    Its successors and/or assigns
19. Lender does not accept limited coverage title policies for loans more than $50,000.00
20. Lender requires that the final title policy insures the lien shown on page 1 of the Closing Instructions independent of any other liens closed concurrently. A final title policy insuring a combination of multiple liens is unacceptable.

AHL/Frazier
0035




## LENDERS' INSTRUCTIONS

**CLOSING PACKAGE REQUIREMENTS**

1. HUD 1 & Addendum showing both buyer and seller sides and including addresses of all parties to the escrow - 3 certified copies.
2. Policy of title insurance - see Requirements.
3. Policy(s) of hazard insurance.
4. Copy of Conveyance Instrument(s) and Excise Affidavits.
5. Copy of your Closing Order to this company.
6. Copy of your Escrow Instructions - signed.

**HUD-1 REQUIREMENTS**

Comply with all provisions of RESPA, as amended, in preparing this form.
Must be typed.

**DOCUMENT REQUIREMENTS**

1. Be certain that all papers which were not dated when received are dated by the person(s) who are to sign them.
2. Be certain that if we send one or more copies of a document, that EACH is returned with original signature(s).
3. INTERIM INTEREST - It is REQUIRED that the HUD-1 be amended (if necessary) to show the correct date and amount, and it is also REQUIRED that all totals on the HUD-1 be amended to reflect the correct amount. DO NOT SIMPLY CROSS OUT THE AMOUNT AND WRITE A NEW ONE ABOVE IT!
4. DO NOT SHOW ANY CREDITS FROM SELLER TO BUYER WITHOUT CONSULTING OUR OFFICE.
5. Make NO changes on the papers without our permission. Call for instructions.
6. If we give permission to make changes on the papers, all changes MUST be initialed by ALL SIGNATORIES to the documents.
7. Do not use Power of Attorney unless prior approved by us.
8. If we allow the use of a Power of Attorney, the person using that authority must sign as, for example, "Jane Doe by John Doe, her attorney-in-fact."
9. If notice of Right to Rescind is enclosed, have it signed and dated, concurrently with the Note, by all borrowers.
10. We assume no liability as to the identity of any person executing or acknowledging any instruments or documents delivered to you in connection with this transaction.
11. ALL DOCUMENTS MUST BE SIGNED EXACTLY AS TYPED NAMES APPEAR.

**HAZARD INSURANCE**

A Hazard Insurance binder must be furnished at the time of closing in an amount not less than the loan amount, or replacement cost of the structure, whichever is less. (Combined Loan Amount)

1. The policy must meet the following requirements:
   a. Original policy or facsimile signed by an authorized agent.
   b. Minimum one year term with coverage equal at least to full replacement cost of the improvements, or loan amount, whichever is less. (Minimum remaining term of 6 months for Purchase or Refinance is acceptable.)
   c. Full, correct borrower(s) names.
   d. Full, correct property address.
   e. Premium amount must be indicated on the policy.
   f. Agent name and address.
   g. Our loan number MUST be indicated on the policy.
   h. Paid receipt for first year premium attached or shown on HUD-1 as paid in closing.
   i. Earthquake insurance (if required) use same, identifying criteria as for Flood insurance.
   j. Insurer must have rating in Best's Insurance Guide of at least Class VI.
   k. FLOOD INSURANCE (if required): Standard policy issued by member of National Flood Insurers Association for not less than our loan amount or the maximum amount available under National Flood Insurance program, whichever is less. The name(s) of the buyer(s), legal description, street address, city, state, county and zip code of security property on these policies must be identical to those of the loan instruments.
   l. On condominiums, we must have an individual endorsement meeting the criteria above.
   m. Loss Payable Clause to: Home Funds Direct
      A Division of Accredited Home Lenders, Inc.
      A California Corporation,
      It's successors and/or assigns
      P.O. Box 10436
      Van Nuys, CA 91410-0436

**CLOSER REQUIREMENTS**

For all Dry-Funding States and Refinances in Wet-Funding States:
ALL DOCUMENTS MUST BE IN OUR OFFICE TWO (2) BUSINESS DAYS PRIOR TO DISBURSEMENT OF LOAN FUNDS
LENDER REQUIRES CONFIRMATION OF DISBURSEMENT OF FUNDS WITHIN 48 HOURS OF FUNDING.
DO NOT MAKE ANY CHANGES TO LOAN DOCUMENTS WITHOUT PRIOR LENDER AUTHORIZATION.
ALL FEES SHOWN ON THE HUD - 1 MUST MATCH EXACTLY THE FEES LISTED IN OUR CLOSING INSTRUCTIONS i. e. 1 : FEE ITEMS - HUD DESCRIPTION AND DOLLAR AMOUNTS.
ALL PAYOFF CHECKS MUST BE SENT DIRECTLY TO THE CREDITOR. DO NOT GIVE ANY CHECKS TO THE BORROWER.

LENDERS' INSTRUCTIONS

AHL/Frazier
0036

# LENDERS' INSTRUCTIONS

**BUYER COST REQUIREMENTS**

1. DOWNPAYMENT IN CASH FROM BORROWER(S) MUST TOTAL AMOUNT SHOWN ON PAGE 1.
2. BORROWERS CANNOT PAY THE FOLLOWING:

**VA LOANS**

1. PHOTOS & INSPECTION FEE MORE THAN ALLOWED BY VA
2. MESSENGER SERVICE
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED/DEED OF TRUST AND ANY ATTACHMENTS THERETO
4. ESCROW FEES
5. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
6. TERMITE INSPECTION
7. TAX SERVICE FEE
8. SETTLEMENT OR CLOSING FEE

**FHA LOANS**

1. TAX SERVICE/REGISTRATION FEE
2. MESSENGER SERVICE UNLESS AUTHORIZED BY BORROWER IN WRITING
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED OF TRUST/DEED AND ANY ATTACHMENTS THERETO
4. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
5. INSPECTION FEES - NOT MORE THAN ALLOWED BY FHA
6. DOCUMENT PREPARATION

**DISBURSEMENT**

1. It shall be the responsibility of the Closing Agent to request proceeds from the lender at such time as the Closing Agent is prepared to comply with all the terms and conditions of the Purchase/Sale Agreement and /or our Escrow Instructions. SUCH A REQUEST, BY THE CLOSING AGENT, FOR FUNDS SHALL BE DEEMED TO BE A CERTIFICATION (LENDER) THAT ALL TERMS AND CONDITIONS HAVE BEEN MET AND THAT THE DOCUMENTS WILL BE PROPERLY RECORDED NOT LATER THAN THE NEXT BUSINESS DAY AFTER THE DAY THE CLOSING AGENT HAS RECEIVED THE PROCEEDS CHECK. In the event that the documents are not recorded within 24 hours, the Closing Agent will immediately return the funds to the sender in accordance with the sender's instructions.

2. HUD SETTLEMENT DATE

   GOVERNMENT LOANS: The HUD-1 settlement date MUST be the date on which the lender disburses proceeds to the Closing Agent and NOT the date on which proceeds are disbursed to the seller. These two dates may be the same day.

   CONVENTIONAL LOANS: The settlement date on the HUD-1 statement may reflect the date on which the closing Agent disburses the proceeds, which would usually be the day after the Agent received loan proceeds from the lender.

**ADDITIONAL INSTRUCTIONS:**

1. Undertaking to close this loan and acceptance of the lender's funds for disbursement shall constitute an undertaking to close this loan and disburse such funds in accordance with these Closing Instructions, whether or not these Instructions are executed or delivered by the Closing Agent. Closing Agent will be responsible for any losses incurred by lender as a result of Closing Agent's failure to comply fully with these Closing Instructions.

2. Lender reserves the right to cancel or amend the loan or these instructions at any time prior to closing.

3. Closing Agent represents, warrants, and covenants that it is not an affiliate of or otherwise controlled by any party to this transaction.

4. From the time Closing Agent receives closing funds until the loan documents are sent to the lender, Closing Agent shall hold all loan documents for the benefit of the sender of the closing funds.

**E-MAIL:**

Handling of E-Mail and Closing Documents. If Closing Agent is willing to receive Closing Documents via e-mail, Closing Agent's e-mail address is set forth below, and Closing Agent shall be responsible for ensuring that all Closing documents received via e-mail are properly printed and otherwise handled in accordance with the Closing Documents handling requirements set forth above.
Closing Agent's Email Address: hfmc@hfvincorporated.com

---

THE UNDERSIGNED BORROWER(S)

1. DIRECT THAT THE LOAN PROCEEDS BE PAYABLE TO THE ORDER OF THE SETTLEMENT AGENT.
2. ACKNOWLEDGE 1ST PAYMENT DATE OF 05/01/2005
3. ACKNOWLEDGE THAT THE LENDER MAY CANCEL OR AMEND THESE INSTRUCTIONS WITHOUT MY/OUR APPROVAL.
4. ACKNOWLEDGE ESTIMATED MONTHLY PAYMENTS OF:

| | |
|---|---|
| PRINCIPAL & INTEREST $ | 393.89 |
| TAXES (BONDS) | 44.75 |
| INSURANCE | 89.00 |
| MTGE. INS. PREMIUM | |
| **TOTAL $** | **517.64** |

3-25-05
DATE

CHERYL HALL

DATE

DATE

DATE

10017610503172917 4
-635  §3306.01

HALL
Page 4 of 4

**PLEASE RETURN DOCS TO:**

Home Funds Direct
1130 Northchase Parkway
Suite 200
Marietta, GA 30067-6420

Ken Harper
CLOSER/FUNDER NAME

(866) 539-7025
TELEPHONE NUMBER

THE UNDERSIGNED AGREES TO CLOSE THIS LOAN IN ACCORDANCE WITH ALL OF THE INSTRUCTIONS AND CONDITIONS CONTAINED IN THE CLOSING INSTRUCTIONS.

SWAFFORD & HAYES SETTLEMENT SERVICES
SETTLEMENT AGENT

BY: Jane Carcello
SIGNATURE

SWAFFORD & HAYES SETTLEMENT SERVICES
TYPED NAME

(865) 934-0466
TELEPHONE NUMBER

03/28/05
DATE

LENDERS' INSTRUCTIONS
Closing Instructions

AHL/Frazier
0037

**Hall-Frazier**
**Record - 001432**

# ADDENDUM TO LENDERS INSTRUCTIONS

BORROWER'S CHERYL HALL

LOAN # 0503172917                                ESCROW # 05-2813

**ATTENTION CLOSING AGENTS: BY DISBURSING THIS LOAN YOU ARE GUARANTEEING DELIVERY OF THE FINAL HUD-1 WITHIN 24 HOURS OF CLOSING TO Home Funds Direct. PLEASE REMEMBER TO INCLUDE THE ACTUAL "DISBURSEMENT DATE" ON THE HUD-1 AND FAX TO THE ASSIGNED FUNDER INDICATED ON THE LENDER'S INSTRUCTIONS.**

## ** WE MUST HAVE THESE ITEMS IN AND APPROVED BEFORE FUNDING **

1. __X__  Home Funds Direct
        IN 1st    LIEN POSITION AT TIME OF FUNDS.

2. __X__  INSURED CLOSING PROTECTION LETTER FROM TITLE AGENT OR COPY OF ERRORS AND OMISSION POLICY FROM CLOSING AGENT.

3. _____  COPY OF SURVEY OF PROPERTY OR NON-IMPROVEMENT AFFIDAVIT.

4. __X__  CERTIFIED COPY OF ESTIMATED AND/OR FINAL HUD-1.

5. _____  CERTIFIED COPY OF ESCROW INSTRUCTIONS WITH CORRECT RATE, TERMS & LENDER SIGNED BY ALL PARTIES.

6. __X__  COPY OF ALL BORROWER(S) PHOTO ID.

7. __X__  COMPLETED CORRECT TYPED 1003 SIGNED BY BORROWER(S) AND INTERVIEWER.

8. __X__  HAZARD INSURANCE POLICY & FLOOD INSURANCE POLICY (IF REQUIRED) WITH MINIMUM 6 MONTHS REMAINING & COVERAGE OF THE LESSER OF:
        A.  THE COMBINED LOAN AMOUNT(S) OR    $56,000.00    OR
        B.  GAURANTEED REPLACEMENT COST OR    $0.00    OR
        C.  TOTAL ESTIMATED NEW COST ON APPRAISAL.
        MORTGAGE / LOSS PAYEE CLAUSE:
        Home Funds Direct
        A Division of Accredited Home Lenders, Inc.
        A California Corporation,
        it's successors and/or assigns
        P.O. Box 10436
        Van Nuys, CA 91410-0436

9. __X__  TITLE POLICY TO READ AS FOLLOWS:
        Home Funds Direct
        ITS SUCCESSORS AND/OR ASSIGNS

10. _____  BORROWER IS IN A SECTION 32 - MUST SIGN SECTION 32 NOTICE AND GO THROUGH 2 DAY RESCISSION PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

11. _____  BORROWER TO PROVIDE ORIGINAL SECTION 32 NOTICE SIGNED AND DATED PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

12. __X__  ALL LOAN DOCUMENTS MUST BE EXECUTED AT ESCROW OR CLOSING AGENT OFFICE.

13. __X__  LENDER DOES NOT ACCEPT LIMITED COVERAGE TITLE POLICIES FOR LOANS GREATER THAN $50,000.00.

14. __X__  COPY OF WIRE INSTRUCTIONS TO BE SUBMITTED WITHIN 24 HOURS OF FUNDING. FAX NUMBER(866) 539-7026

15. _____  LENDER TO COLLECT AND PAY LIFE INSURANCE PREMIUM AT CLOSE OF ESCROW.

16. __X__  POWER OF ATTORNEY IS PROHIBITED WITHOUT PRIOR AUTHORIZATION FROM LENDER.

17. __X__  PROVIDE THREE CERTIFIED COPIES OF THE MORTGAGE/DEED OF TRUST WITH ALL RIDERS & THE NOTE WITH ALL RIDERS.



KIN # 100176105031721174          HALL          Loan # 0503172917
ARL 610032-1.UFF                  Page 1

AHL/Frazier
0038

## ADDENDUM TO LENDERS INSTRUCTIONS, Continued

18. Hazard Insurance Policy - If not impounded, requires 6 mo. coverage from loan date for refinances and 12 mo. for purchases. Mortgagee Clause: Accredited Home Lenders, Inc., A California Corporation, ISAOA P.O. Box 10436 Van Nuys, CA 91410-0436

19. Pay the following in full at closing (payoff must show on est/final HUD1):

    Payoff Amount: THE CR STR/PROVIDIAN,    $785.00
    Payoff Amount: PALISADES,  $694.00
    Payoff Amount: HOLLOWAY CREDIT,    $452.00
    Payoff Amount: SMALL LNS,    $399.00
    Payoff Amount: CRDT MGT,    $182.00
    Payoff Amount: FRIEDMANS JEWELERS,    $400.00
    Payoff Amount: ARMY AVIATION CENTER FCU,  $4,594.49
    Payoff Amount: ALABAMA APPRAISAL SERVICES,    $300.00
    Payoff Amount: State Farm Insurance,  $1,058.00

    Total Amount: $8,874.49

20. AHL to be insured in 1st lienhold position with clear title

21. Corrected original 1003, pages 1-4, to be fully completed and signed by borrowers and broker.

22. Certified copy of Final HUD1

23. Funds to be wired to the title company only.

24. Provide detailed cash-out letter from borrower.

### *** NO FURTHER CONDITIONS ON THIS LOAN

THE UNDERSIGNED BORROWER(S) AND CLOSING OFFICER ARE HEREBY AWARE AND UNDERSTAND THAT THIS LOAN IS APPROVED SUBJECT TO THIS APPROVAL OF THE CONDITIONS LISTED ON THIS ADDENDUM PAGE.  THE CONDITIONS MUST BE REVIEWED AND APPROVED BY THE FUNDER AND/OR UNDERWRITER AT Home Funds Direct,

THE BORROWER(S) ARE AWARE THAT IN THE EVENT ANY OF THE ABOVE CONDITIONS ARE NOT ACCEPTABLE BY
Home Funds Direct,

THIS LOAN APPROVAL MAY BE RESCINDED AT THE SOLE DISCRETION AND OPTION OF
Home Funds Direct,

_____  3-23-05        _____
Borrower                    Date          Borrower                    Date
CHERYL HALL


_____               _____
Borrower                    Date          Borrower                    Date


_____               _____
Borrower                    Date          Borrower                    Date


_____               _____
Borrower                    Date          Borrower                    Date


_____
Closing Officer             Date

MIN # 100178105031729174               HALL          Loan #    0503172917
AHL 010022-F.UFF                       Page 2

AHL/Frazier
0039

Hall-Frazier
Record - 001434

# ADDITIONAL REQUIREMENT FORM

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 25, 2005 |

### Fax all items per item 5 below
### if original loan documents are not with lender

1. Closing agent in receipt of original handwritten & typed 1003's with correct loan amount & interest rate. Government Monitoring & Interviewer section to be completed.

2. Insured Closing Protection Letter - if applicable to your state - (fax if possible)

3. HUD to be a certified copy of the true original, must show all pay offs & fees paid to correct parties and all fees must match our loan documents.

4. HUD to be a certified copy of the true original, must show all pay offs & fees paid to correct parties and all fees must match our loan documents.

5. The day of disbursement (if loan package is not returned to lender during the rescission period) please fax a copy of the following fully executed items to:
   **(866) 539-7026**

   A. TRUTH IN LENDING
   B. NOTICE OF RIGHT TO CANCEL - ONE FOR EACH BORROWER (IF APPLICABLE
   C. OUTSTANDING CONDITIONS THAT MAY BE REQUIRED TO MEET OUR LOAN APPROVAL
   D. CERTIFIED COPY OF FINAL HUD-1 EXECUTED BY ALL
   E. FIRST PAGE AND SIGNATURE PAGE OF MORTGAGE AND ALL RIDERS
   F. COMPLETE NOTE WITH ALL RIDERS

Upon receipt & approval of above items, we will provide you written authorization to release funds.

You may not release funds on this transaction until you are in receipt of written authorization from the lender.

| _Jane Cascello_ | _05/28/05_ |
|---|---|
| Closing Officer | Date of Transaction |

| _Cheryl Hall_  3-25-05 | Date | Borrower | Date |
|---|---|---|---|
| CHERYL HALL | | | |

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

MIN # 10017810503172917 4
ADDLRQFM.UFF

HALL
Page 1 of 1

Loan # 0503172917

AHL/Frazier
0040

### NOTICE OF RIGHT TO CANCEL

Loan No: 0503172917                              Date: March 25, 2005
Borrower: CHERYL HALL

Property Address: 105 TV ROAD
                 DOTHAN, AL 36301

**YOUR RIGHT TO CANCEL:**
You are entering into transaction that will result in a mortgage, lien, or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is        March 25, 2005          , or
2. the date you received your Truth-in-Lending disclosures; or
3. the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or the property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing at:

Name of Creditor: Home Funds Direct
                  1130 Northchase Parkway, Suite 200
                  Marietta, GA 30067-6420

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or by telegram, you must send the notice no later than midnight of    March 29, 2005

(or midnight of the third business day following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____        _____
Consumer's Signature                    Date
CHERYL HALL

I THE UNDERSIGNED HEREBY ACKNOWLEDGE, THAT, ON THE DATE SET FORTH BELOW, I RECEIVED TWO (2) COPIES (IN ADDITION TO THIS COPY) OF THIS NOTICE OF RIGHT TO CANCEL, ADVISING ME OF MY RIGHT TO CANCEL THE TRANSACTION TO WHICH THIS NOTICE RELATES AND ONE COPY OF THE FEDERAL TRUTH IN LENDING DISCLOSURE STATEMENT.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective to all borrowers/owners.

_____        3-25-05
Consumer's Signature                    Date
CHERYL HALL

610005.uff

AHL/Frazier
0041

Hall-Frazier
Record - 001436

# PRIVACY POLICY

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 25, 2005 |

The trust of our customers is very important to Home Funds Direct. Keeping non public personal information about our customers in a secure environment and using that information only in accordance with this Privacy Policy is our top priority.

This Privacy Policy includes examples of the types on non public personal information Home Funds Direct collects. The provisions of this Policy apply to all our customers and consumers.

Home Funds Direct collects non public personal information about you from the following sources:

* Information we receive from you on applications or other forms;
* Information about your transactions with us or others; and
* Information we receive from a consumer reporting agency.

We do not disclose any nonpublic personal information about you to anyone, except as permitted by law. If you decide to pay off your loans (s), we will adhere to the privacy policies and practices as described in this notice.

Home Funds Direct restricts access to your personal and account information to those employees who need to know that information to provide products or services to you. Home Funds Direct maintains electronic and procedural safeguards that comply with federal regulations to guard your nonpublic information.

We may disclose all of the information we collect, as described above, to companies that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements.

Home Funds Direct sells its mortgage loans into securitizations from time to time and, as permitted by law, disclosure of nonpublic information could result from such activity.

Home Funds Direct does not disclose nonpublic information about former customers or customers with inactive accounts, except in accordance with this privacy policy.

| | |
|---|---|
| Borrower __3-25-03__<br>CHERYL HALL       Date | Borrower       Date |
| Borrower       Date | Borrower       Date |
| Borrower       Date | Borrower       Date |
| Borrower       Date | Borrower       Date |

| MIN # 100176105031728174 | HALL | Loan # 0503172917 |
|---|---|---|
| PRVYPLCY.UFF | Page 1 of 1 | Rev. 6/1/03 |

AHL/Frazier
0042

**Hall-Frazier**
**Record - 001437**

## GENERAL AUTHORIZATION AND BORROWER'S CERTIFICATION

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 38301 | Date:<br>March 25, 2005 |

### CERTIFICATION

The Undersigned certify the following:

1. I/We have applied for a mortgage loan from Lender. In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information.

2. I/We understand and agree that in the event the loan is processed under a reduced documentation program, Lender reserves the right to change the mortgage loan review process to a full documentation program. This may include verifying the information provided on the application with the employer and/or the financial institution.

3. I/We fully understand that it is a Federal crime punishable by fine, or imprisonment, or both to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

### AUTHORIZATION TO RELEASE INFORMATION

To Whom It May Concern:

1. I/We have applied for a mortgage loan from Lender. As part of the application process, Lender may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2. I/We authorize you to provide to Lender, and to any investor to whom Lender may sell my mortgage, any and all information and documentation that they request. Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; and copies of income tax returns.

3. Lender or any investor that purchases the mortgage may address this authorization to any party named in the loan application.

4. A copy of this authorization may be accepted as an original.

5. Your prompt reply to Lender or the investor that purchased the mortgage is appreciated.

Privacy Act Notice: This information is to be used by the agency collecting it in determining whether you qualify as a prospective mortgagor under the program. It will not be disclosed outside the agency without your consent as required and permitted by law, you do not have to give us this information, but if you do not your approval as a prospective mortgagor may be delayed or rejected. The information requested in this form is authorized by Title 38, U.S.C. Chapter 37 (if VA); By 12 U.S.C., Section 1701 et., seq. if (HUD/FHA); and Title 42

| Borrower<br>CHERYL HALL | Date<br>3-25-05 | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

MIN # 100178105031729174          HALL          Loan # 0503172917
GNATBRCT.UFF                      Page 1 of 1

AHL/Frazier
0043

**Hall-Frazier**
**Record - 001438**

## RESPA SERVICING DISCLOSURE

0503172917

Lender: Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

**NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGEMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.**

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you about the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains these procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days  after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer  your questions.  During the 60-day period following the effective date of the transfer of the  loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new servicer  as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, *whether or not your loan servicing is transferred.* If you send a "qualified written request" to your servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days  after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you  with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day in which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where  servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates**

1.  The following is the best estimate of what will happen to the servicing of your mortgage loan:

   [X] We may assign, sell or transfer the servicing of your loan while the loan is outstanding. [X] We are able to service your loan and we [ ] will  [ ] will not  [X] haven't decided whether to service your loan.

   OR

   [ ] We do not service mortgage loans, [ ] and we have not serviced mortgage loans in the past three years.

   [ ] We presently intend to assign, sell or transfer the servicing of your mortgage loan.  You will be informed about your servicer.

   [ ] We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors.  For the program you have applied for, we expect to:

     [ ] sell all of the mortgage servicing  [ ] retain all of the mortgage servicing

     [ ] assign, sell or transfer _____ % of the mortgage servicing

2.   For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of mortgage loans for which we will transfer servicing is between:

_____ [0 to 25%] or [NONE]  _____ 26 to 50%  _____ 51 to 75%  __x__ [76 to 100%] or [ALL]

This estimate [X] does [ ] does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may effect our future transferring decisions.

3.  [X] We have previously assigned, sold or transferred the servicing of federally related mortgage loans.

   OR

   [ ] This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

| Year | Percentage of Loans Transferred (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
|------|---|
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |

This information [X] does [ ] does not include assignments, sales or transfers to affiliates or subsidiaries.

March 25, 2005                                    Home Funds Direct
Date                                                            Present Servicer or Lender

**ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT**
I/We have read this disclosure form and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.

Applicant  CHERYL HALL         3-25-05          Applicant                          Date
                                    Date

Applicant                          Date          Applicant                          Date

-552R (9808).01          VMP MORTGAGE FORMS - (800)521-7291          12/94

0503172917

AHU/Frazier
0044

Hall-Frazier
Record - 001439

## DISCLOSURE NOTICES

| Applicant(s) | Lender: |
|---|---|
| CHERYL HALL | Home Funds Direct |
| | 15090 Avenue of Science |
| | San Diego, CA 92128 |
| | Date: March 25, 2005 |

Property Address
105 TV ROAD
DOTHAN, AL 36301

### AFFIDAVIT OF OCCUPANCY

O
C
C
U
P
A
N
C
Y

The Applicant(s) hereby certify and acknowledge that, upon taking title to the real property described above, their occupancy status will be as follows:

[X] Primary Residence - Occupied by Applicant(s) within 60 days of closing.

[ ] Secondary Residence - To be occupied by Applicant(s) at least 15 days yearly, as second home (vacation, etc.), while maintaining
principal residence elsewhere. (Please check this box if you plan to establish it as your primary residence at a future date (i.e., retirement)).

[ ] Investment Property - Not owner occupied. Purchased as an investment to be held or rented.

The Applicant(s) acknowledge it is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning this loan application as applicable under the provisions of Title 18, United States Code, Section 1014.

### FAIR CREDIT REPORTING ACT

F
C
R
A

An investigation will be made as to the credit standing of all individuals seeking credit in this application. The nature and scope of any investigation will be furnished to you upon written request made within a reasonable period of time. In the event of denied credit due to an unfavorable consumer report, you will be advised of the identity of the Consumer Reporting Agency making such report and of right to request within sixty (60) days the reason for the adverse action, pursuant to provisions of Section 615(b) of the Fair Credit Reporting Act. You have the right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency if an adverse action is taken on your loan application. Under Section 612 of the Fair Credit Reporting Act you have the right to obtain within 60 days of an adverse action a free copy of the report from the consumer reporting agency. You also have the right to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer reporting agency.

### EQUAL CREDIT OPPORTUNITY ACT

E
C
O
A

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on a basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Income which you receive as alimony, child support or separate maintenance need not be disclosed to this creditor unless you choose to rely on such sources to qualify for the loan. Income from these and other sources, including part-time or temporary employment, will not be discounted by this lender because of your sex or marital status. However, we will consider very carefully the stability and probable continuity of any income you disclose to us. The Federal Agency that administers compliance with this law concerning this creditor is:

FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY
ROOM 4037
WASHINGTON, D.C. 20580

| MIN # 100176195031729174 | HALL | Loan # 0903172917 |
|---|---|---|
| AHL.DISCNTC1.UFF | Page 1 of 3 | Rev. 05/04 |

AHL/Frazier
0045

## DISCLOSURE NOTICES

### GOVERNMENT LOANS ONLY

**L O A N S**

RIGHT TO FINANCIAL PRIVACY ACT OF 1978 - This is notice to you as required by the Right to Financial Privacy Act of 1978 that the Department of Housing and Urban Development or Department of Veterans Affairs has a right of access to financial records held by a financial institution in connection with the consideration of administration of assistance to you. Financial records involving your transaction will be available to the Department of Housing and Urban Development or Department of Veterans Affairs without further notice or authorization but will not be disclosed or released to another Government agency or Department without your consent except as required or permitted by law.

### EMPLOYMENT CERTIFICATION

**E M P L O Y**

An approval for a loan is based upon employment, income and obligations as shown on the loan application. At closing, the applicant and co-applicant/spouse, if applicable, are required to execute a sworn statement affirming that they are currently working as previously reported, have not received notice of layoff nor have knowledge of pending layoff, and that outstanding obligations are substantially the same as reported on the application. Should a change occur in your employment or financial status prior to loan closing, immediately notify your loan officer, as it will be necessary to obtain approval of any changes.

### ANTI-COERCION STATEMENT

**I N S U R A N C E**

The lender may not require the applicant to take insurance through any particular insurance agent or company to protect the mortgaged property. The applicant, has the right to have the insurance placed with an insurance agent or company of his choice, provided the company meets the requirements of the lender. The lender has the right to designate reasonable financial requirements as to the company and the adequacy of the coverage.

I have read the foregoing statement, and understand my rights and privileges and those of the lender relative to the placing of such insurance.

I have selected the following agencies to write the insurance covering the property described above:

EUGENE MCGRIFF-STATE FARM FIRE AND
| Insurance Company Name | Agent |

PO BOX 1185, DOTHAN AL, 36302
| Agent's Address | Agent's Telephone Number |

### FLOOD INSURANCE NOTIFICATION

**S T A T E M E N T**

Federal regulations require us to inform you that the property used as security for this loan is located in an area identified by the Federal Emergency Management Agency (FEMA) as having special flood hazards and that in the event of damage to the property caused by flooding in a Federally-declared disaster, Federal disaster relief assistance, if authorized, will be available for the property. At the closing you will be asked to acknowledge your receipt of this information. If you have any questions concerning this notice, kindly contact your loan officer.

IMPORTANT: Please notify your insurance agent that the "loss payable" clause for the mortgagee on both the hazard and flood insurance must read as follows, unless otherwise advised:

AHL/Frazier
0046

## DISCLOSURE NOTICES

I/We hereby certify that I/we have read the Notices set forth above and fully understand all of the above. In addition to these Notices, I/we the applicant(s) certify that I/we have received the "Settlement Cost Booklet" and the "Consumer Handbook on Adjustable Rate Mortgages" (CHARM booklet), if applicable.

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| CHERYL HALL  3-26-05 | | | |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

N O T I F I C A T I O N

MIN # 100178105031729174
AHL DISCNTC3.UFF

HALL
Page 3 of 3

Loan # 0503172917
Rev. 05/04

AHL/Frazier
0047

**Hall-Frazier**
**Record - 001442**

## ALABAMA
### Choice of Insurance Notice

| Loan Number<br>0503172917 | Date<br>March 25, 2005 |
|---|---|

| Borrower<br>CHERYL HALL | |
|---|---|

| Property Address<br>105 TV ROAD<br>DOTHAN, AL 36301 | Lender<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|

The AL Code Section 5-19-20(e) requires that you receive written notification of your right to select insurance of your choice, when hazard insurance is required by the lender as a condition of the loan.

**Home Funds Direct**
shall not require that you, upon financing the purchase of real property or lending money on the security of real property, as a condition precedent, concurrent or subsequent to financing the purchase of such property or renewal or extension to lending money upon the security of a mortgage thereon, negotiate any policy of insurance or renewal thereof through a particular insurer, agent, solicitor or broker.

The lender reserves the right to approve or disapprove an insurer selected based on reasonable standards, such as financial soundness, services of insurer and required coverage.

Your acknowledgment below signifies that written notice was provided to you pursuant to the state statute.

_____
CHERYL HALL

_____

_____          _____

_____          _____

_____          _____

-1035(AL) (0103)          VMP MORTGAGE FORMS - (800)521-7291          9/01

0503172917

AHL/Frazier
0048

Hall-Frazier
Record - 001443

## APPRAISAL DISCLOSURE

| Borrower Name(s): | Lender: |
|---|---|
| CHERYL HALL | Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128<br><br>0503172917 |

| Property Address: | Date: |
|---|---|
| 105 TV ROAD<br>DOTHAN, AL 36301 | March 25, 2005 |

You have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please write to us at the mailing address we have provided. We must hear from you no later than 90 days after we notify you about the action taken on your credit application or you withdraw your application.

Contact:   Customer Service

Lender/Broker:  Home Funds Direct

Address:   Attention: Post Closing

     16550 West Bernardo Dr. Bldg 1

     San Diego, CA 92127-1870

Telephone:  (877) 683-4466

In your letter, give us the following information:

    Your Name

    Your Address

    Your Telephone Number

| Borrower CHERYL HALL | Date 3-25-05 | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

10017610503172917 174            0503172917

8240-122 (0004).01        VMP MORTGAGE FORMS - (800)521-7291        12/93

AHL/Frazier
0049

**Hall-Frazier**
**Record - 001444**

## CREDIT SCORE NOTICE

| Borrower Name(s): CHERYL HALL | Lender: Home Funds Direct 15090 Avenue of Science San Diego, CA 92128 (866) 487-4350 |
|---|---|
| | Date: March 25, 2005 |

### NOTICE TO THE HOME LOAN APPLICANT

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan, contact the lender.

One or more of the following consumer reporting agencies will provide the credit score:

| Experian | Equifax Credit Information Services | Trans Union |
|---|---|---|
| P.O. Box 2002 | P.O. Box 740241 | P.O. Box 4000 |
| Allen, TX 75013 | Atlanta, GA 30374 | Chester, PA 19016 |
| 1-888-397-3742 | 1-800-685-1111 | 1-866-887-2673 |

Your acknowledgment below signifies that this written notice was provided to you.

| Borrower CHERYL HALL        Date 3-25-05 | Borrower        Date |
|---|---|
| Borrower        Date | Borrower        Date |
| Borrower        Date | Borrower        Date |
| Borrower        Date | Borrower        Date |

100176105031729174      0503172917

-140 (9408)      VMP Mortgage Solutions, Inc. (800)521-7291      10/04

AHL/Frazier
0050



**★ L E N D E R   N O T I C E S ★**

  

**★ N E W D O C ★**

 

**★ N E W D O C ★**      **★ N E W D O C ★**

## EXHIBIT A

Situated in Dothan, Houston County, State of AL and being described as follows:

Lot 2, Block "C", of the Third Addition to Television Heights Subdivision in the City of Dothan, Alabama, as found recorded in Plat book 7, Page 23, in the Office of the Judge of Probate, Houston County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

Parcel #10-09-31-4-003-001.007

BEING the same property conveyed to Louis E. Sowers and Fay Sowers, as joint tenants with express right of survivorship and to the survivor's heirs and assigns, by deed from Samuel B. Pierce, Jr., Secretary of Housing and Urban Development of Washington, D.C., acting by and through the Office of Assistant Secretary for Housing - Federal Housing Commissioner, dated 07-19-85, recorded 07-26-85, in Book 311, page 324, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Kevin Lorenzo Dixon, II, by deed from Louis E. Sowers and wife, Fay Sowers, dated 04-02-03, recorded 04-03-03, in Book 598, page 34, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Cheryl Hall, by deed from Kevin Lorenzo Dixon, II, a unmarried man, dated 03-02-05, recorded 03-11-05, in Book 622, page 443, in the Office of the Judge of Probate of Houston County, AL.

This Derivation Clause represents a 24 month Chain of Title.

The above information is to be used for reference purposes only and not to be relied on as evidence of title and/or encumbrances. Accordingly, said information is furnished at a reduced rate, and the Company's liability shall in no event exceed the amount paid for said information.

105 TV Road, Dothan, AL 36301



★ TITLE ★





★ NEWDOC ★





★ NEWDOC ★



★ NEWDOC ★

Title

Hall-Frazier
Record - 001448

**Swafford & Hays Settlement Services, Inc.**
**Privacy Policy**

Borrower Name(s):  Cheryl Hall

Date 3-25-05

The trust of our customers is very important to Swafford & Hays Settlement Services, Inc.  Keeping non-public personal information about our customers in a secure environment and using that information only in accordance with the Privacy Policy is our top priority.

This Privacy Policy includes examples of the types on non-public personal information Swafford & Hays Settlement Services, Inc. collects.  The provisions of this Policy apply to all our customers and consumers.

We do no disclose any nonpublic personal information about you to anyone, except as permitted by law.

Swafford & Hays Settlement Services, Inc. restricts access to your personal and account information to those employees who need to know that information to provide service to you.  Swafford & Hays Settlements Services, Inc. maintains electronic and procedural safeguards that comply with federal regulations to guard your nonpublic information.

We may disclose all of the information we collect to companies that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements.

3-25-05

| Borrower Signature | Date | Borrower Signature | Date |

AHL/Frazier
0054

Hall-Frazier
Record - 001449

File No: 05-2813

### AFFIDAVIT

The undersigned affiant(s) do hereby state the following:

1. That there are no matters pending against the affiant(s) that could give rise to a lien that would attach to the property between 03/25/2005 and the recording of the interest to be insured.

2. That the affiant(s) have not and will not executed any instruments that would adversely affect the interest to be insured.

3. That there are no unrecorded special assessment liens or unrecorded liens arising by virtue of ordinances, unrecorded agreements as to impact or other development fees, or unpaid waste fees payable to that county or municipality.

The real estate and improvements referred to herein are situated in the County of Houston, State of AL, and described as follows, to-wit:

105 TV Road, Dothan, AL  36301

3-25-05
Date

Cheryl Hall

STATE OF AL

COUNTY OF Houston

Sworn to and subscribed before me this  .

My Commission expires: My Commission Expires 3-06-06

Diane L. Hilson
Alabama State
at Large

AHL/Frazier
0055

File No: 05-2813

# AFFIDAVIT AS TO LIENS AND ENCUMBRANCES

On this, before me personally appeared Cheryl Hall, Owner of property and/or General Contractor, to me personally known, who, being duly sworn on (his/their) oath(s), did say that all of the persons, firms and corporations, including the general contractor and all subcontractors who have furnished services, labor or materials according to the plans and specifications, or extra items, used in the constructions or repair of buildings and improvements on the real estate hereinafter described, have been paid in full and that such work has been fully completed and accepted by the owner.

Affiant further says that no proceedings in bankruptcy or receivership have been instituted by or against him/them.

Affiant further says that no claims have been made to affiant by, nor is any suit now pending on behalf of any contractor, subcontractor, laborer or materialmen, and further that not chattel mortgages, conditional bills of sale, retention of title agreements, security agreements, financing statements, or personal property leases have been given or are outstanding as to any fixtures, appliances, or equipment which are now installed in or upon said real property, or in the improvements thereon.

Affiant further says that there are no outstanding deeds of trusts, mortgages, judgement liens, mechanic's or materialmen's liens filed of record or unfilled claims or any other liens or encumbrances or any form of taxes, (including, property, real property, county, city, village, township or water/sewer) of any kind expect as follows:

Affiant on behalf of said Owner of Property and/or General Contractor does for a valuable consideration hereby agree and guarantee to hold None (by reason of the fact that it has issued its title insurance policies), harmless against any liens, claims or suit of or by any general contractor, subcontractor, mechanic or materialmen, and against chattel mortgages, conditional bills of sales, retention of title agreements, security agreements, financing statements, or personal property leases in connection with the construction, repair or sale of such building or improvements on said real estate.

The real estate and improvements referred to herein are situated in the County of Houston, State of AL, and are described as follows, to-wit:

105 TV Road, Dothan, AL 36301

_3-25-05_
Date

_Cheryl Hall_

STATE OF AL
COUNTY OF Houston

Sworn to and subscribed before me this .

_Diane L. Hilson_
Notary Public

My Commission
Expires 3-06-06

Diane L. Hilson
Alabama State
at Large
Loan No: 0503172917

# LOAN POLICY OF TITLE INSURANCE

### Issued by **Transnation Title Insurance Company**



*Transnation Title Insurance Company is a member of the LandAmerica family of title insurance underwriters.*

**POLICY NUMBER**

F52-1069870

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, TRANSNATION TITLE INSURANCE COMPANY, an Arizona corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, TRANSNATION TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Policy to become valid when countersigned by an authorized officer or agent of the Company.

**TRANSNATION TITLE INSURANCE COMPANY**

Attest:

*Whitker Powell*
Secretary



By:

*Theodore L. Chandler*
President

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulations (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy. (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters: (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (a) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (i) to timely record the instrument of transfer; or
      (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

NM 2        PA 20
ALTA Loan Policy (10/17/92)
**Form 1191-54B**

**ORIGINAL**

Valid only if Schedules A and B are attached

AHL/Frazier
0057



**Transnation Title Insurance Company**



POLICY NUMBER

F52-1069870

### LOAN POLICY OF TITLE INSURANCE
### (10/17/92)

Gross Premium: $ _____                    Rate Code: _____

| REISSUE OR SUBSTITUTION INFORMATION. | |
|---|---|
| Liability Cr. $ | |
| Premium Cr. $ | |
| Policy No. | |

| STATISTICAL STATES ONLY | | | | |
|---|---|---|---|---|
| POLICY TYPE | TITLE SOURCE | PROPERTY TYPE | STATE REPORT CODE | RATE RULE |
| | | | | |

<u>COMMENTS TO UNDERWRITER:</u>

AHL/Frazier
0058

| NOTICE |
|---|
| THIS PAGE MUST BE REMITTED TO UNDERWRITER WITH POLICY SCHEDULES. |

Form 1191-54B                          **AGENCY SERVICE CENTER**



## CONDITIONS AND STIPULATIONS
(continued)

Upon the exercise by the Company of either of the options provided for in paragraphs (a)(i) or (a)(ii), all liability and obligations to the Insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an Insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the Insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the Insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the Insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**7. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent here described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time of loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the Insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8. LIMITATION OF LIABILITY.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date to Policy were secured by the insured mortgage and which the Insured was and continued to be obligated to advance at and after Date of Policy.

**9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

**10. LIABILITY NONCUMULATIVE.**

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is hereafter executed by an Insured and which is a charge or lien on the estate

or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

**11. PAYMENT OF LOSS.**

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**12. SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the Insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the Insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Insured claimant shall permit the Company to sue, compromise or settle in the name of the Insured claimant and to use the name of the Insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the Insured claimant, the Company shall be subrogated to all rights and remedies of the Insured claimant after the Insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the Insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the Insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1 (a)(i) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1 (a)(i) of these Conditions and Stipulations.

**13. ARBITRATION.**

Unless prohibited by applicable law, either the Company or the Insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the Insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**15. SEVERABILITY.**

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**16. NOTICES, WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to: Consumer Affairs Department, P.O. Box 27567, Richmond, Virginia 23261-7567.

Hall-Frazier
Record - 001454

## EXHIBIT A

Situated in Dothan, Houston County, State of AL and being described as follows:

Lot 2, Block "C", of the Third Addition to Television Heights Subdivision in the City of Dothan, Alabama, as found recorded in Plat book 7, Page 23, in the Office of the Judge of Probate, Houston County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

Parcel #10-09-31-4-003-001.007

BEING the same property conveyed to Louis E. Sowers and Fay Sowers, as joint tenants with express right of survivorship and to the survivor's heirs and assigns, by deed from Samuel B. Pierce, Jr., Secretary of Housing and Urban Development of Washington, D.C., acting by and through the Office of Assistant Secretary for Housing - Federal Housing Commissioner, dated 07-19-85, recorded 07-26-85, in Book 311, page 324, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Kevin Lorenzo Dixon, II, by deed from Louis E. Sowers and wife, Fay Sowers, dated 04-02-03, recorded 04-03-03, in Book 598, page 34, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Cheryl Hall, by deed from Kevin Lorenzo Dixon, II, a unmarried man, dated 03-02-05, recorded 03-11-05, in Book 622, page 443, in the Office of the Judge of Probate of Houston County, AL.

This Derivation Clause represents a 24 month Chain of Title.

The above information is to be used for reference purposes only and not to be relied on as evidence of title and/or encumbrances. Accordingly, said information is furnished at a reduced rate, and the Company's liability shall in no event exceed the amount paid for said information.

105 TV Road, Dothan, AL 36301

AHL/Frazier
0060

Hall-Frazier
Record - 001455

## COMMITMENT

State: AL County: Houston

Order #: 05-2813

| Plant #: | Commitment #: F52-1969970 | Effective Date & Time: March 18, 2005 @ 8:00am | Reinsurance #: | Agent #: 05-2813 |
|---|---|---|---|---|

## Schedule A

1.  Policy or Policies to be issued:
    ALTA LOAN (10-17-92)
    Proposed Insured Loan:                                        Amount

        Home Funds Direct, ISAOA, ATIMA                          $56,000.00

    2nd Proposed Insured Loan:                                   Amount


    ALTA OWNER'S (10-17-92)
    Proposed Insured Owners:                                     Amount

        Cheryl Hall

2.  The estate or interest in the land described or referred to in the Commitment and covered herein is:

        Fee Simple

    and is at the effective date hereof vested in:

        Cheryl Hall

3.  The land is described as follows:

                    105 TV Road, Dothan, AL  36301


Issued By: *05-2813
Swafford and Hays Settlement Services, Inc.
9041 Executive Park Drive, Suite 400
Knoxville, TN 37923

_____
Countersigned Authorized Signatory

NOTE: This Commitment consists of Insert pages labeled in Schedule A, Schedule B-Section 1, and Schedule B-Section 2. This commitment is of no force and effect unless all schedules are included, along with any Rider pages incorporated by reference in the insert pages.

Underwriter: Transnation Title Insurance Company

AHL/Frazier
0061

Hall-Frazier
Record - 001456

## COMMITMENT

## Schedule B - Section 1

The following are the requirements to be complied with:

1. Instrument(s) creating the estate or interest to be insured must be approved, executed and filed for record to wit:

a. Deed of Mortgage to be executed by Cheryl Hall, and spouse if any, securing Home Funds Direct, must be properly executed and recorded.

2. Payment of the full consideration to, or for the account of, the grantors or mortgagors.

3. Payment of all taxes, charges, assessments, levied and assessed against subject premises, which are due and payable.

4. Satisfactory evidence should be had that improvements and/or repairs or alterations thereto are completed; that contractor, subcontractors, labor and materialmen are all paid.

5. Exceptions 3 and 4 of Schedule B - Section 2 of this commitment may be amended in or deleted from the policy to be issued if a survey, satisfactory to the Company, is furnished to Company.

6. Affidavit to be executed by Cheryl Hall, stating: 1) There are no matters pending against the affiant(s) that could give rise to a lien that would attach to the property between 03-18-05 and the recording of the interest to be insured. 2) That the affiant(s) have not and will not executed any instruments that would adversely affect the interest to be insured. 3) That there are no unrecorded special assessments liens or unrecorded liens arising by virtue of ordinances, unrecorded agreements as to impact or other development fees, or unpaid waste fees payable to the county or municipality.

7. A search failed to discover any open mortgages of record as of 03-18-05 for the last 12 months.

8. Satisfy and release Judgement in favor of Army Aviation Center F C U, dated 06-15-98, recorded 07-02-98, in book 89, page 185, in the Office of the Judge of Probate of Houston County, AL , against Cheryl R. Hall, in the principal amount of $3,558.26, plus costs and fees. *NOTE: The payoff amount is $4,594.49 good thru 4-24-05.*

9. TAX ID # 10-09-31-4-003-001.007
   2004 Taxes in the amount of $534.23 are paid in full.
   2005 Taxes in the estimated amount of $537.00 will be out 10-1-05 and due by 12-31-05.

NOTE: This Commitment consists of insert pages labeled in Schedule A, Schedule B-Section 1, and Schedule B-Section 2. This commitment is of no force and effect unless all schedules are included, along with any Rider pages incorporated by reference in the insert pages.

Commitment #: F62-1069870                                          File #: 05-2813

AHL/Frazier
0062

Hall-Frazier
Record - 001457

# COMMITMENT

## Schedule B - Section 2

**Exceptions**
Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company.

1.  Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.  Rights or claims of parties in possession not shown by the Public Records.

3.  Encroachments, overlaps, boundary lines disputes, and other matters which would be disclosed by an accurate survey and inspection of the premises.

4.  Easements or claims of easements not shown by the Public Records.

5.  Taxes or special assessments which are not shown as existing liens by the public records.

6.  Taxes and assessments for the year 2005 and subsequent years, which are not yet due and payable.

7.  Subject to any restrictions, easements, setback lines, etc., as shown of record in Plat book 7, page 23, in the Office of the Judge of Probate of Houston County, AL.

NOTE: This Commitment consists of insert pages labeled in Schedule A, Schedule B-Section 1, and Schedule B-Section 2. This commitment is of no force and effect unless all schedules are included, along with any Rider pages incorporated by reference in the insert pages.

Commitment #: F62-1069670                                                    File #: 05-2813

AHL/Frazier
0063

**Hall-Frazier**
**Record - 001458**

MAR-24-05 THU 3:16 PM GENE MCGRIFF STATE FARM    FAX NO. 334 712 1158    P. 2



**DECLARATIONS**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

| Coverage afforded by this policy is provided by: |
| STATE FARM FIRE AND CASUALTY COMPANY |
| PO BOX 2661 |
| BIRMINGHAM AL 35297 |
| A Stock Company with Home Offices in Bloomington, Illinois. |

01-GP-2037-2    **Policy Number**

**Named Insured and Mailing Address**
HALL, CHERYL
105 TV RD
DOTHAN, AL 36301

The Policy Period begins and ends at 12:01 a.m. Standard Time at the residence premises.

03-24-2005 **Effective Date**
12 months-**Policy Period**
03-24-2006 **Expiration of Policy Period**

**Limit of Liability - Section 1**

$ 106,200 Coverage A. Dwelling

**Policy Type**
Homeowners Policy
Dwell Repl Cost - Similar Construction
Option ID - Increase Dwlg Up to $21,240

**Location of Premises**

Same as mailing address

**Automatic Renewal** - If the Policy Period is shown as 12 months, this policy will be renewed automatically subject to the premiums, rules and forms in effect each succeeding policy period. If this policy is terminated, we will give you and the Mortgagee/Lienholder written notice in compliance with the policy provisions or as required by law.

**Deductibles - Section 1** $500
ALL LOSSES  In case of loss under this policy, the deductible will be applied per occurrence and will be deducted from the amount of the loss.  Other deductibles may apply - refer to your policy.

**Policy Premium** $1,068.00

**Forms & Endorsements**

**Mortgagee**
HOME FUNDS DIRECT
PO BOX 10436
VAN NUYS, CA 94741-0436

Loan Number: 0503172917

**Agent Name & Address**
MCGRIFF, EUGENE G
P O BOX 1185
DOTHAN, AL
36302-1185  (334)793-7618

Countersigned: March 24, 2005    By *Gene McGriff*    1599
                                        Agent    Agent's Code
559-916.2 Rev. 4-96                              MORTGAGEE COPY

AHL/Frazier
0064

**Hall-Frazier**
**Record - 001459**

MAR-24-05 THU 3:17 PM GENE MCGRIFF STATE FARM    FAX NO. 334 712 1158    P. 3



PREMIUM NOTICE
STATE FARM INSURANCE COMPANIES
AGENT ISSUED DECLARATIONS

559-916.4

| POLICY NUMBER | BILLING PERIOD | AGENT CODE |
| 01-GP-2037-2 | FROM 03-24-2005 | TO 03-24-2006 | 1599 |

LOCATION (If other than Named Insured's mailing address)

INSURED
HALL, CHERYL
105 TV RD
DOTHAN, AL 36301

PREMIUM $ 1,068.00

AMOUNT PAID $    .00

AMOUNT DUE $ 1,068.00

DATE DUE 03-24-2005

MORTGAGEE
HOME FUNDS DIRECT
PO BOX 10436
VAN NUYS, CA 94741-0436

AGENT NAME & ADDRESS
MCGRIFF, EUGENE G
P O BOX 1185
DOTHAN, AL
36302-1185    (334)793-7618

Loan Number: 0503172917

This is the only notice you will receive.  Please make check payable
to STATE FARM and return it with this notice to the address shown below.
Your canceled check is your receipt.  Thanks for letting us serve you.

STATE FARM INSURANCE COMPANIES

AL-MISS REGIONAL OFFICE
PO BOX 2661
BIRMINGHAM AL  35297

559-916.4

AHL/Frazier
0065

MAR-24-05 THU 3:16 PM    GENE MCGRIFF STATE FARM      FAX NO. 33 712 1158           P. 1



> GENE MCGRIFF,
> AGENT
> STATE FARM
> INSURANCE
> DOTHAN, ALABAMA
> 36301

# Facsimile transmittal

To: *Kim Stevenson*          Fax: *1-866-50L-300L*

From: GENE MCGRIFF 01-1599          Date:

Re: *Cheryl Hall*          Pages: *3*

CC:

☑ Urgent    X For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

*Have a good ☺ day!*
*Debbie*

Notes

GENE MCGRIFF, AGENT

AHL/Frazier
0066

**Hall-Frazier**
**Record - 001461**

## Insurance Processor Certification

Borrower(s): Cheryl Hall                          Purchase ☐    Refi ☑

Loan Number: 0503172917

Property Address: 105 TV Rd.
Dothan AL 36301

**Coverage Type:**

Homeowners Insurance    ☑

Flood Insurance          ☐

Insurance Company: State Farm    Phone: 334-793-7618

Agent/Representative: Eugene McGruff    Fax: _____

Agency Address: PO Box 1185  Dothan AL 36302

Policy #: 01-BP-2037-2  Policy Period: from 3/24/05 to 3/24/06

Policy Paid Through Date: 3/24/06  Premium Amount: $ 1068 /YR
*(Note: 6 months required)*

**Coverage:** Combined Loan Amount $ 56,000
Total Estimated Cost New $ 106,200
*(Note: Coverage must be equal to or greater than the lesser to the two.)*

20% $ 106,200    Dwelling
$ 21,240    Extended/Guaranteed Replacement *(if applicable)*
$ 127,440    Total Coverage

Endorsement # _____ *(if applicable)*

Comments: _____

Loan Specialist _____    Date 3/29/05

## REQUEST FOR LOSS PAYABLE ENDORSEMENT

| To: Agent or Broker | Insured's Name & Address |
|---|---|
| Name EUGENE MCGRIFF-STATE FARM FIRE | Name CHERYL HALL |
| Add. PO BOX 1185 | Add. 105 TV ROAD |
| DOTHAN, AL 36302 | DOTHAN, AL 36301 |

This letter is to advise you that I/we have, on March 25, 2005 granted a security interest on the property listed below, to the company listed as LENDER. Please issue your standard mortgage loss payable endorsement as instructed below. Mail the original endorsement and a copy of the policy to the lender named, at the address below.

The agent listed above is my/our voluntary selection of agents, as my/our choice and whose selection was not a condition precedent to this loan. Said designation may be revoked hereafter by written notice to the party named.

Property Add. 105 TV ROAD
DOTHAN, AL 36301
Lender: Home Funds Direct                      Indebtedness $56,000.00
1130 Northchase Parkway
Marietta, GA 30067-6420                         Term: 360                Months

EUGENE MCGRIFF-STATE FARM FIRE AND CASUA PO BOX 1185
Insurance Company: DOTHAN, AL 36302

Phone No. _____ Policy No. 01-GP-2037-2

Endorsement should show lender as:    See mortgage loss payable endorsement below

[x] First    [ ] Second    [ ] Third    [ ] Other _____ Mortgage

Lender as a condition of the loan in addition to the fire and casualty protection [ ] Requires [x] Does not require a Flood insurance policy in the amount of the indebtedness covering the real property listed above.

If I/we fail to furnish a valid insurance policy or written evidence from an insurance company for all the required coverages within 15 days, I/we hereby agree to pay LENDER or its assignees any earned premium and costs for any policy they may have to place to comply with this requirement.

Thank you in advance for your prompt attention.

**Mortgagee loss payable endorsement**
Home Funds Direct
A Division of Accredited Home Lenders, Inc.
A California Corporation,
It's successors and/or assigns
P.O. Box 10436
Van Nuys, CA 91410-0436

Signatures:

_____
CHERYL HALL

_____

_____       _____

-696 (0002)          HALL          VMP MORTGAGE FORMS - (800)521-7291          3/00
0503172917

AHL/Frazier
0068

**Hall-Frazier**
**Record - 001463**

FloodCert/Certificate                                                                                    Page 1 of 2

| FEDERAL EMERGENCY MANAGEMENT AGENCY **STANDARD FLOOD HAZARD DETERMINATION** | See The Attached Instructions | O.M.B. No. 3067-0264 Expires October 31, 2005 |
|---|---|---|

**SECTION I - LOAN INFORMATION**

| 1. LENDER NAME AND ADDRESS | 2. COLLATERAL (Building/Mobile Home/Personal Property) PROPERTY ADDRESS (Legal Description may be attached) |
|---|---|
| Accredited Home Lenders 15090 Avenue of Science #200 San Diego, CA 92128 AHL: Home Funds Direct BRANCH: 351 REQUESTED BY: kimat | 105 TV RD DOTHAN, AL 36301 Borrower: HALL, CHERYL |

| 3. LENDER ID. NO. AHL-203634 | 4. LOAN IDENTIFIER 0503172917 | 5. AMOUNT OF FLOOD INSURANCE REQUIRED $ |
|---|---|---|

**SECTION II**

**A. NATIONAL FLOOD INSURANCE PROGRAM (NFIP) COMMUNITY JURISDICTION**

| 1. NFIP Community Name | 2. County(ies) | 3. State | 4. NFIP Community Number |
|---|---|---|---|
| DOTHAN, CITY OF | HOUSTON | AL | 010104 |

**B. NATIONAL FLOOD INSURANCE PROGRAM (NFIP) DATA AFFECTING BUILDING/MOBILE HOME**

| 1. NFIP Map Number or Community-Panel Number (Community Name, if not the same as "A") | 2. NFIP Map Panel Effective/ Revised Date | 3. LOMA/LOMR | 4. Flood Zone | 5. No NFIP Map |
|---|---|---|---|---|
| 01069C 0228E | 11/21/02 | ☐ Yes ___ Date | X | |

**C. FEDERAL FLOOD INSURANCE AVAILABILITY (Check all that apply)**

1. ☒ Federal Flood Insurance is available (community participates in NFIP).  ☒ Regular Program  ☐ Emergency Program of NFIP

2. ☐ Federal Flood Insurance is not available because community is not participating in the NFIP

3. ☐ Building/Mobile Home is in a Coastal Barrier Resources Area (CBRA) or Otherwise Protected Area (OPA), Federal Flood Insurance may not be available.    CBRA/OPA designation date: _____

**D. DETERMINATION**

**IS BUILDING/MOBILE HOME IN SPECIAL FLOOD HAZARD AREA (ZONES CONTAINING THE LETTERS "A" OR "V")? ☐ YES  ☒ NO**

If yes, flood insurance is required by the Flood Disaster Protection Act of 1973.
If no, flood insurance is not required by the Flood Disaster Protection Act of 1973.

**E. COMMENTS (Optional):**

THIS FLOOD DETERMINATION IS PROVIDED TO THE LENDER PURSUANT TO THE FLOOD DISASTER PROTECTION ACT.    IT SHOULD NOT BE USED FOR ANY OTHER PURPOSE.

This determination is based on examining the NFIP map, any Federal Emergency Management Agency revisions to it, and any other information needed to locate the building/mobile home on the NFIP map.

**F. PREPARER'S INFORMATION**

| NAME, ADDRESS, TELEPHONE NUMBER (if other than Lender) | DATE OF DETERMINATION |
|---|---|
| First American Flood Data Services 11902 Burnet Road Austin, TX 78758 1-800-447-1772 | 03/18/05 at 12:39 PM CST FloodCert #: 0503844472 *** LIFE-OF-LOAN *** |

FEMA Form 81-93, OCT 02                                    AHL-203634

AHL/Frazier 0069

03/28/2011 16:08 FAX                                                    @005/005

FloodCert/Certificate                                                    Page 2 of 2

## NOTICE TO BORROWER
### *NOT IN*
### SPECIAL FLOOD HAZARD AREA

Borrower: **HALL, CHERYL**                          Loan #: 0503172917

Property Location: **105 TV RD**
**DOTHAN, AL 36301**

National Flood Insurance Program Community: **DOTHAN, CITY OF**

This Notice Date is as of: **03/18/05**

Attached is the completed Standard Flood Hazard Determination Form that indicates that the improved real estate or mobile home securing your loan is not located in an area designated by the Director of the Federal Emergency Management Agency ("FEMA") as a Special Flood Hazard Area ("SFHA"). As a result of this determination, you will not be required to obtain mandatory flood insurance in connection with the making of your loan.

However, your home may be near a SFHA. As such you, or your lender, may want to consider the advisability of obtaining flood insurance at reduced rates. You should check with your insurance agent or company as to the coverage types and amounts available to you and make your own determination as to whether you desire any such coverage.

If, however, at any time during the term of your loan the improved real estate or mobile home securing your loan is, due to re-mapping by FEMA or otherwise, located in an area that has been identified by the Director of FEMA as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Program, you will be so notified and advised that you must obtain an appropriate amount of flood insurance coverage. If, within 45 days after we send you such notification, you fail to purchase such flood insurance in an amount not less than the amount we advise you is necessary, we shall purchase such flood insurance on your behalf at your expense, as we are authorized to do in accordance with the provisions of the Flood Disaster Protection Act of 1973, as amended.

I/We, the undersigned borrower(s)/applicant(s), hereby understand and agree to all the above.

| | | | |
|---|---|---|---|
| Borrower/Applicant | Date | Borrower/Applicant | Date |
| Borrower/Applicant | Date | Borrower/Applicant | Date |
| Borrower/Applicant | Date | Borrower/Applicant | Date |

https://www.floodcert.com/main/findorder.do?printable=1&floodCertNum=0503844472          3/18/2005

AHL/Frazier
0070

Hall-Frazier
Record - 001465

## HAZARD INSURANCE AUTHORIZATION & REQUIREMENTS

Lender: Home Funds Direct

Date: March 25, 2005
Loan Number: 0503172917
Escrow Number: 05-2813

Escrow Company: SWAFFORD & HAYES SETTLEMENT SERVICES INC
9041 EXECUTIVE PARK DRIVE, KNOXVILLE, TN, 37923

Borrower Name(s): CHERYL HALL

Property Address: 105 TV ROAD
DOTHAN, AL 36301

AN ACCEPTABLE HAZARD INSURANCE POLICY, WITH ENDORSEMENTS AND/OR ASSIGNMENTS, MUST BE IN
LENDER'S OFFICE BEFORE THIS LOAN CAN BE FUNDED; OTHERWISE, LENDER MAY BE FORCED TO PLACE
INTERIM COVERAGE ON THE PROPERTY AT AN ADDITIONAL COST TO THE BORROWER(S).

Your Lender may require that you or your Insurance Agency provide the "ORIGINAL POLICY", but
generally, a "Binder" or a "Certificate of Evidence of Insurance" is acceptable. Ask your
Lender which they will accept. Please forward all policies, assignments and/or endorsements
to Lender at the above address, "ATTENTION: LOAN PROCESSING."

Listed below are your Lender's policies and procedures, and minimum requirements, for Hazard
Insurance coverage.

1. The amount of coverage provided by the policy must be no less than the lesser of: 1) the
replacement value of the improvements on the above referenced property as established by the
insurance company providing coverage, or 2) an amount equal to the sum of this loan amount
plus the balances of all other existing liens.
2. The insurance company providing coverage must have a "B+" rating or better in the latest
edition of "Best's Insurance Guide", must be licensed to do business in the state in which
property is located, and must be licensed to transact the lines of insurance required.
3. The Policy must provide at least "Broad Form" coverage on properties of one to four units,
and at least "Vandalism & Malicious Mischief" on properties with over four units, WITH NO
DEVIATION. Home owners policies must provide coverage equal to "HO3" form.
4. Deductibles may not be greater than the lesser of 1) $1,000.00 or 2) one percent (1.0%) of
the coverage amounts determined using the guidelines in Requirement #1 above (This limit
applies for loans secured by residential properties of 1 to 4 units which may be sold to or
originated for either Federal National Mortgage Association, Federal Home Loan Mortgage
Corporation, FHA or VA). Your Lender's deductible requirements may be more stringent; if so,
you will be notified of your Lender's requirements prior to funding.
5. The Policy must provide coverage for a term of at least one year. Premiums may be paid on
an annual installment basis only if the policy provides that the Lender will be notified in
writing of cancellation 30 days prior to expiration of coverage, for any cause.
6. If a policy of coverage is already "in force" (typical in refinance transactions) which
expires within six months from the date of the recording of this loan, Lender may require
renewal of said policy for a term as required in #5 above.
7. All forms and endorsements pertaining to the Lender's requirements must appear on the
"Declaration Page" of policy.
8. For loans which have Hazard Insurance premiums impounded by the Lender, when notifying
Lender of any new policy or changes of Insurance Carrier, said notification must be
accompanied by a signed "Broker of Record Authorization".
9. Verification of renewal of insurance policies must be in lender's office at least thirty
days prior to the expiration date of the
policy. If this requirement is not met, LENDER OR ITS SUCCESSORS AND/OR ASSIGNS MAY AT THEIR
OPTION, BUT WITHOUT THE OBLIGATION TO DO SO, PROVIDE COVERAGE TO REPLACE ANY EXPIRING POLICIES
WHICH HAVE NOT BEEN PROPERLY RENEWED. Premiums for such coverage shall be remitted promptly
by the undersigned, or Lender may charge borrower's account for the cost thereof.
10. Lender's Loss Payable Endorsement 438 BFU for the 1st    Trust Deed to be affixed to
policy in favor of:   Home Funds Direct
A Division of Accredited Home Lenders, Inc.
A California Corporation,
it's successors and/or assigns
P.O. Box 18438
Van Nuys, CA 91416-0436

RE: LOAN NO: 0503172917

11. The property address and the insured's names must be designated on the policy exactly as
on the ALTA Title Policy.
12. The Lender's loan number must appear on the policy and on any subsequent endorsements.
13. The effective date of new policies, endorsements, and/or assignments shall be as of, or
prior to, the date of recording of this loan.
14. Please notify your agent to forward future premium notices directly to you.
15. If the security property is a condominium, the Master Policy must contain a minimum of
$1,000,000.00 coverage for "Directors & Officers" liability. A copy of the Master Policy, or
a certificate showing proof of coverage for both the Homeowners Association and the
Condominium unit owner, must be submitted to the Lender prior to funding.

BY SIGNING BELOW, each of the undersigned acknowledges that he or she has read, understands
and accepts the foregoing provisions and insurance requirements. This authorization shall
remain irrevocable for the undersigned as owner(s) of the property, and for any assignee(s),
for as long as this loan remains on the subject property.

Borrower CHERYL HALL                          Borrower

Borrower                                      Borrower

Borrower                                      Borrower

Borrower                                      Borrower

AHL/Frazier
0071

610030.UFF

Hall-Frazier
Record - 001466

AHL/Frazier
0072





\* I N S U R A N C E \*





\* N E W D O C \*





\* N E W D O C \*



\* N E W D O C \*

Hall-Frazier
Record - 001468



### Home Funds DIRECT

1130 Northchase Parkway Suite 200
Marietta, GA. 30067-6420
Telephone:(866) 539-7025
Fax:     (866) 539-7026

## Closed Loan Status

Borrower: HALL, CHERYL
Co-Borrower:
Loan Number: 0503172917
Team: 351 - ATL001
Underwriter: Clarence Wells
Date: 03/30/2005 6:52 am

| Subject Property: | | Type: | SFR - Detached | Doc Type: | Full |
|---|---|---|---|---|---|
| 105 TV ROAD | | Occupancy: | Owner Occupied | Purpose: | Refi Cash Out |
| DOTHAN, AL. 36301 | | Appraised Value: | $90,000.00 | Lien Pos: | 1st |
| | | Final Value: | $90,000.00 | | |
| Broker: | | Program: B Fixed Fall Doc | | Term: | 360/360 |
| Contact: | | | | Pre-Pay Term: | None |
| Phone: | | LTV/CLTV: | 62.22% / 62.22% | Orig. Fee | 3.5 |
| Fax: | | Loan Amount: | $56,000.00 | Discount Pts. | 0 |
| | | Fixed Rate: | 7.299% | Special Product Code: N/A |

Appraisal: Original

| Decision: | Approved | Date: | 03/24/2005 | For Assistance Call: | |
|---|---|---|---|---|---|
| | *Approval expires 15 days from Decision Date, and is subject to requirements listed below.* | | | Loan Specialist: | Kira Stevenson |
| | *Any Change in Rate and/or Margin requires re-underwriting.* | | | Account Executive: | Kristopher Dillen |

*Note: If any of these requirements are not met to our satisfaction, HomeFunds Direct reserves the right to cancel funding/purchase of this loan. All documentation is subject to re-verification prior to funding. Loan approval is made subject to the following conditions:*

**Standard Closing Requirements**

HFD to phone verify employment.
Property taxes to be paid current.
Flood Insurance if applicable.
Copy of photo I.D. all borrowers.
Total broker/lender fees not to exceed 7% of amount financed unless subject to state High Cost Loan test.
Approval is issued as shown provided the loan does not exceed the property state's High Cost Loan test for APR and Points & Fees.

HFD to update credit report if more than 60 days old on date of loan docs.
Section 32 loans not allowed.

Copies of invoices for third-party appraisal and credit report fees charged to borrower.

**Loan Conditions**

Appraisal Review Ordered: 3/21/2005      Due: 3/21/2005      Received: 3/24/2005

| Amended | Added | Satisfied | By | F/P | D.P.T. | Condition |
|---|---|---|---|---|---|---|
| | 03/24/2005 | 03/24/2005 | audreyw | | Approval | 1. Complete original appraisal |
| | 03/24/2005 | 03/30/2005 | clarencew | | Approval | 2. Hazard Insurance Policy - If not impounded, requires 6 mo. coverage from loan date for refinances and 12 mo. for purchases. Mortgagee Clause: Accredited Home Lenders, Inc., A California Corporation, ISAOA P.O. Box 10436 Van Nuys, CA 91410-0436 |
| | 03/24/2005 | 03/24/2005 | clarencew | | Approval | 3. ALTA Preliminary Title Report |
| | 03/24/2005 | 03/24/2005 | clarencew | | Approval | 4. Payoff Statements (must show date next payment due, existing liens must be current for A, A- Grades) for: |
| | | | | | | ARMY AVIATION CENTER FCU    $4,594.49 |
| | | | | | | ALABAMA APPRAISAL SERVICES    $300.00 |
| | | | | | | State Farm Insurance    $1,068.00 |
| | | | | | | Total:    $5,962.49 |
| | 03/24/2005 | 03/24/2005 | audreyw | | Approval | 5. Flood Certification (AHL to provide) |
| | 03/24/2005 | 03/24/2005 | audreyw | | Approval | 6. Satisfactory appraisal review (AHL to provide) |
| | 03/24/2005 | 03/24/2005 | audreyw | | Approval | 7. Copies of invoices for any third-party fees charged to borrower (i.e. appraisal, credit, courier, escrow, etc.) |
| | 03/24/2005 | 03/24/2005 | clarencew | | Approval | 8. Copy of SSI/Pension awards letter with copy of most recent check or bank statement, if direct deposit. |
| | 03/24/2005 | 03/30/2005 | clarencew | | Funding | 9. Pay the following in full at closing (payoff must show on est/final HUD1): |
| | | | | | | ARMY AVIATION CENTER FCU    $4,594.49 |
| | | | | | | ALABAMA APPRAISAL SERVICES    $300.00 |
| | | | | | | State Farm Insurance    $1,068.00 |
| | | | | | | Total:    $5,962.49 |
| | | | | | | THE CR STR/PROVIDIAN    $785.00 |
| | | | | | | PALISADES    $694.00 |
| | | | | | | HOLLOWAY CREDIT    $452.00 |
| | | | | | | SMALL LNS    $399.00 |
| | | | | | | CRDT MGT    $182.00 |
| | | | | | | FRIEDMANS JEWELERS    $400.00 |
| | | | | | | Total:    $2,912.00 |

AHL/Frazier
0074



**Home Funds**
D I R E C T
1130 Northchase Parkway Suite 200
Marietta, GA. 30067-6420
Telephone:(866) 539-7025
Fax:     (866) 539-7026

## Closed Loan Status

Borrower: **HALL, CHERYL**
Co-Borrower:
Loan Number: **0503172917**
Team: **351 - ATL601**
Underwriter: **Clarence Wells**
Date: **03/30/2005 6:52 am**

**Loan Conditions**

Appraisal Review Ordered:   3/21/2005     Due: 3/21/2005     Received: 3/24/2005

| Amended | Added | Satisfied | By | E/P | D.P.T. | Condition |
|---------|-------|-----------|-----|-----|--------|-----------|
| | 03/24/2005 | | | | Funding | 10. AHL to be insured in 1st lienhold position with clear title |
| | 03/24/2005 | 03/30/2005 | clarencew | | Funding | 11. Corrected original 1003, pages 1-4, to be fully completed and signed by borrowers and broker. |
| | 03/24/2005 | 03/30/2005 | clarencew | | Funding | 12. Certified copy of Final HUD1 |
| | 03/24/2005 | 03/30/2005 | clarencew | | Funding | 13. Funds to be wired to the title company only. |
| | 03/24/2005 | 03/30/2005 | clarencew | | Funding | 14. Provide detailed cash-out letter from borrower. |

**Broker Notes**

AHL/Frazier
0075



**Home Funds**
d i r e c t

1130 Northchase Parkway Suite 200
Marietta, GA. 30067-6420
Telephone:(866) 539-7025
Fax:      (866) 539-7026

## File Summary

Borrower:     HALL, CHERYL
Co-Borrower:
Loan Number:   0503172917
Team:         351 ~ ATL001
Underwriter:  Clarence Wells
Date:         03/30/2005 6:52 am

**File Notes**

| Category | File Notes |
|---|---|
| Income | 03/24/2005 01:28:28 PM Kim Stevenson<br>5799X12.9%~733.75+579=$1302.75 |
| Decision | |
| Summary | 03/30/2005 06:51:32 AM Clarence Wells<br>575 fico, < 65% LTV, cleaning up credit, providing borrower with cash-out to<br>make home more handicap friendly because of disabled resident. |

AHL/Frazier
0076

Hall-Frazier
Record - 001471



## Home Funds
### D I R E C T
1130 Northchase Parkway Suite 200
Marietta, GA. 30067-6420
Telephone: (866) 539-7025
Fax:      (866) 539-7026

## Loan Status

Borrower:  **HALL, CHERYL**
Co-Borrower:
Loan Number:  0503172917
Team:  351 - ATL001

Date:  03/30/2005 6:54 am

| | | | | |
|---|---|---|---|---|
| Subject Property:<br>105 TV ROAD<br>DOTHAN, AL. 36301 | Type:<br>Occupancy:<br>Appraised Value:<br>Final Value: | SFR - Detached<br>Owner Occupied<br>$90,000.00<br>$90,000.00 | Doc Type:<br>Purpose:<br>Lien Pos: | Full<br>Refi Cash Out<br>1st |
| Broker:<br>Contact:<br>Phone:<br>Fax: | Program: B Fixed Full Doc<br><br>LTV/CLTV:   62.22% / 62.22%<br>Loan Amount: $55,000.00<br>Fixed Rate:   7.399% | | Term:<br>Pre-Pay Term:<br>Orig. Fee<br>Discount Pts.<br>Special Product Code: | 360/360<br>None<br>3.5<br>0<br>N/A |
| Appraisal:  Original | | | Credit Score: | Std: 575 Avg: 564 |

| | | |
|---|---|---|
| Decision:   Approved          Date:  03/24/2005<br>*Approval expires 15 days from Decision Date,*<br>*and is subject to requirements listed below.*<br>*Any Change in Rate and/or Margin requires re-underwriting.* | For Assistance Call:<br>Loan Specialist:<br>Account Executive: | Kim Stevenson<br>Kristopher Dillon |

*Note: If any of these requirements are not met to our satisfaction, HomeFunds Direct reserves the right to cancel funding/purchase of this loan. All documentation is subject to re-verification prior to funding. Loan approval is made subject to the following conditions:*

### Standard Closing Requirements

HFD to phone verify employment.              HFD to update credit report if more than 60 days old on date of loan docs.
Property taxes to be paid current.            Section 32 loans not allowed.
Flood Insurance if applicable.
Copy of photo I.D. all borrowers.            Copies of invoices for third-party appraisal and credit report fees charged to borrower.
Total broker/lender fees not to exceed 7% of amount financed unless subject to state High Cost Loan test.
Approval is issued as shown provided the loan does not exceed the property state's High Cost Loan test for APR and Points & Fees.

### Loan Conditions
Appraisal Review Ordered:      3/21/2005          Due:   3/21/2005          Received:   3/24/2005

| Amended | Added | Due<br>Prior To | Condition |
|---|---|---|---|
| | 03/24/2005 | Funding | 10. AHL to be insured in 1st lienhold position with clear title |

Conditions 1,2,3,4,5,6,7,8,9,11,12,13,14 have been satisfied

**Broker Notes**

AHL/Frazier
0077



Date:          March 25, 2005          02:56PM

Stage:         60 - 60 - docs drawn stage

Borrower:      CHERYL HALL

Loan Number:   0503172917                                    FINAL

---

SECTION 32 CALCULATION
SUMMARY

Section32:              No

Purpose:                REFI, CASH-OUT

Occupancy:              Owner Occupied

Loan Term / Balloon Term:   360  / 360

PrePayment Penalty:     No

Total DTI:              39.734%

Doc Type:               Full

APR:                    7.975

T-Bill Rate:            4.550%

Max Rate w/o Sec32:     12.550%

Amount Financed:        $52,417.10

Sec32 Pts/Fees:         $3,560.50

Max Fees w/o Sec32:     $4,193.37

---

GOOD FAITH ESTIMATE
SUMMARY

HUD-1 or
HUD-1A DESCRIPTION OF CHARGES

| | | Lender | | OTHER |
|---|---|---|---|---|
| 801 | ORIGINATION FEE | $ 1,960.00 | $ | 0.00 |
| 802 | DISCOUNT FEE | $ 0.00 | $ | 0.00 |
| 807 | APPLICATION FEE | $ 0.00 | $ | 0.00 |
| 810 | PROCESSING FEE | $ 500.00 | $ | 0.00 |
| 811 | UNDERWRITING FEE | $ 500.00 | $ | 0.00 |
| 812 | DOCUMENT PREPARATION FEE | $ | $ | |
| 813 | APPRAISAL REVIEW FEE | $ 250.00 | $ | 0.00 |
| 814 | REDRAW FEE | $ | $ | |
| 815 | ESCROW HOLDBACK FEE | $ 0.00 | $ | 0.00 |
| 816 | FUNDING FEE | $ 0.00 | $ | 0.00 |
| 819 | COURIER FEE | $ 0.00 | $ | 0.00 |
| 825 | WAREHOUSE FEE | $ 0.00 | $ | 0.00 |
| 827 | RE-VERIFICATION FEE | $ 0.00 | $ | 0.00 |
| 828 | ZONE DETERMINATION FEE | $ 9.50 | $ | 0.00 |
| 829 | TAX SERVICE FEE | $ 66.00 | $ | 0.00 |
| 830 | LENDER SERVICE FEE | $ | $ | |
| | | $ | $ | |
| 804 | CREDIT REPORT FEE | $ 0.00 | $ | 0.00 |

| | | | | OTHER |
|---|---|---|---|---|
| 1101 | CLOSING AGENT FEE | $ | $ | 275.00 |
| 1105 | CLOSING AGENT DOCUMENT FEE | $ | $ | 0.00 |
| 1107 | DEMAND FEE | $ | $ | 0.00 |
| 1112 | COURIER FEE - CLO | $ | $ | |

|  | | | |
|---|---|---|---|
| INDIVIDUAL SUB-TOTALS | $ 3,285.50 | $ | 275.00 |
| COMBINED SUB-TOTAL | | $ | 3,560.50 |
| 901  ODD DAYS INTEREST | | $ | 22.40 |
| TOTAL | | $ | 3,582.90 |

Loan Amount:   56,000.00

Rate:          7.299%

Margin:        0.000%

f00068.uff

AHL/Frazier
0079

Hall-Frazier
Record - 001474



Date:       March 25 , 2006           02:56PM
Stage:      60 - 60 - docs drawn stage
Borrower:   CHERYL HALL

Loan Number:   0503172917                              FINAL

## HIGH COST LOAN SUMMARY

| | |
|---|---|
| State Test Failed: | No |
| State: | AL |
| | |
| Lien Position: | 1st |
| Purpose: | REFI, CASH-OUT |
| Occupancy: | Owner Occupied |
| Property Type: | SFR - Detached |
| # of Units: | 1 |
| Doc Type: | Full |
| Interest Rate: | 7.299 |
| Loan Term / Balloon Term: | 360/360 |
| Loan Amount: | 56,000.00 |
| Prepayment Penalty: | No |
| | |
| APR: | 7.975 |
| T-Bill Rate: | 4.550% |
| Max Rate: | 0.000% |
| Reduce APR By: | 0.000% |
| | |
| Amount Financed: | $52,417.10 |
| State Pts/Fees: | $0.00 |
| Max Fees: | $0.00 |
| Reduce Fees By: | $0.00 |

MIN # 100176108031729174                  HALL                  Loan #    0503172917
HICTLNSM.UFF                            Page 1 of 1

AHL/Frazier
0080



**Home Funds** D I R E C T
1130 Northchase Parkway Suite 200
Marietta, GA. 30067-6420
Telephone:(866) 539-7025
Fax:      (866) 539-7026

# Risk Analysis

Borrower:  HALL, CHERYL
Co-Borrower:
Loan Number:  0503172917
Team:  351 - ATL001
Underwriter:  Clarence Wells
Date:  03/30/2005 6:52 am

| Subject Property: | Type: | SFR - Detached | Doc Type: | Full |
| 105 TV ROAD | Occupancy: | Owner Occupied | Purpose: | Refi Cash Out |
| DOTHAN, AL 36301 | Appraised Value: | $90,000.00 | Lien Pos: | 1st |
| | Final Value: | $90,000.00 | Original Purchase: Date: | |
| Decision: Approved | Decision Date: | 03/24/2005 | Price: | $80,000.00 |

| Requested Loan | Subject Loan | | | Grade |
| Program: Fixed | Program: Fixed | Orig. Fee 3.5 Disn. Pts. 0 | Mortgage | B |
| | | Term: 360 / 360 | Consumer | C- |
| LTV: 82.54% | B Fixed Full Doc | Pre-Pay: None | Overall Grade: | B |
| Amount: $85,000.00 | LTV/CLTV: 62.22% / 62.22% | Taxes: $44.75 | | |
| Rate: 8.000% | Loan $56,000.00 | Insurance $89.00 | Spec Prod Code: | N/A |
| | Fixed Rate: 7.599% | | Total DTI: | 39.73% |
| | | | Vacancy | 75% |

## Subject Property Liens (Current Scenario)
Occupancy: Owner Occupied

| Lien Position and Creditor | Status | Current Balance | Current Payment | Payoff/ Paydown | 30 | 60 | 90 | 120 | 150 | 180+ | Frclsr | NOD | NOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0. ARMY AVIATION CENTER FCU | | $4,594.49 | | Payoff | 0 | 0 | 0 | 0 | 0 | 0 | No | No | No |
| 0. ALABAMA APPRAISAL SERVICES | | $300.00 | | Payoff | 0 | 0 | 0 | 0 | 0 | 0 | No | No | No |
| 0. State Farm Insurance | | $1,068.00 | | Payoff | 0 | 0 | 0 | 0 | 0 | 0 | No | No | No |
| Taxes and Insurance | | | $133.75 | | | | | | | | | | |
| Totals | | $5,962.49 | $133.75 | | 0 | 0 | 0 | 0 | 0 | 0 | No | No | No |

## Subject Property Liens (Proposed Scenario)
Occupancy: Owner Occupied

| Lien Position and Creditor | Proposed Balance | Proposed Payment |
|---|---|---|
| 1. Subject Loan | $56,000.00 | $383.89 |
| Taxes and Insurance | | $133.75 |
| Totals | $56,000.00 | $517.64 |

**No Current Non-Subject Property**

**No Current Non-Subject Property Liens**

## Consumer Debts

| Creditor | Note | Current Status | 12 Mo Status | 24 Mo Status | Current Balance | Current Payment | Payoff/ Paydown | Utilized Balance | Utilized Payment |
|---|---|---|---|---|---|---|---|---|---|
| THE CR STR/PROVIDIAN | | Collection | Collection | Current | $785.00 | | Payoff | $0.00 | $0.00 |
| PALISADES | | Collection | Collection | Current | $694.00 | | Payoff | $0.00 | $0.00 |
| HOLLOWAY CREDIT | | Collection | Collection | Current | $452.00 | | Payoff | $0.00 | $0.00 |
| SMALL LNS | | Charge Off | Charge Off | Current | $399.00 | | Payoff | $0.00 | $0.00 |
| CRDT MGT | | Collection | Collection | Current | $182.00 | | Payoff | $0.00 | $0.00 |
| FRIEDMANS JEWELERS | | Collection | Collection | Current | $400.00 | | Payoff | $0.00 | $0.00 |
| Totals | | | | | $2,912.00 | $0.00 | | $0.00 | $0.00 |

## Consumer Credit Analysis
Bankruptcy Filed:                    Discharged/Dismissed:

| | Current | 30 | 60 | 90+ | Collection | Charge-Off | In BK Now | NOD Now | BK/NOD 12 Months |
|---|---|---|---|---|---|---|---|---|---|
| 12 Months | 0 | 0 | 0 | 0 | 0 | 0 | No | No | No |
| 24 Months | 0 | 0 | 0 | 0 | 0 | 0 | | | |

## Income

| Borrower | Age | Employer/Source | Position | Job Type | Mo. Income | Yr | Mo |
|---|---|---|---|---|---|---|---|
| HALL, CHERYL R | 0 | SOCIAL SECURITY | | Fixed | $1,302.75 | | |

Page:  1 of 2

AHL/Frazier
0081



Home Funds
d i r e c t

1130 Northchase Parkway Suite 200
Marietta, GA. 30067-6420
Telephone:(866) 539-7025
Fax:      (866) 539-7026

**Risk Analysis**

Borrower:      HALL, CHERYL
Co-Borrower:
Loan Number:   8503172917
Team:          351 - ATL001
Underwriter:   Clarence Wells
Date:          03/30/2005 6:52 am

| | | | | | | Totals | | | | | $1,302.75 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Underwriter Grade Notes**

03/17/2005 02:08:38 PM Clarence Wells
no mtg (property deeded to borrower 3/2/05)
Mortgage (CO)

03/17/2005 02:08:38 PM Clarence Wells
doesn't meet minimum trade requirement
Consumer (C-)

03/17/2005 02:08:38 PM Clarence Wells
575 fico, no bk or fc
Overall (A)

| Debt Ratios | Current | Proposed |
|---|---|---|
| Income | $1,302.75 | $1,302.75 |
| Positive Cash Flow | $0.00 | $0.00 |
| Total Income | $1,302.75 | $1,302.75 |
| Housing Cost | $133.75 | $517.64 |
| Housing DTI | 10.27% | 39.73% |
| Consumer Payments | $0.00 | $0.00 |
| Negative Cash Flow | $0.00 | $0.00 |
| Total Payments | $133.75 | $517.64 |
| Total DTI | 10.27% | 39.73% |

| | |
|---|---|
| Credit Score - Std. | 575 |
| Credit Score - Avg. | 564 |
| Time In Residence | 2 yrs 0 mos |
| # Dependents | 0 |
| Saves Monthly | ($383.89) |
| Gross Disposable | $785.11 |
| Real Estate Payoffs | $5,962.49 |
| Consumer Payoffs | $2,912.00 |
| Total Payoffs | $8,874.49 |

**Justification Comments and Summary Describing Compensating Factors which Mitigate Risk AHL is taking:**

| Category | Justification | Approved By | Entered By |
|---|---|---|---|
| Collateral | Comp. Factors | Mike Thimsen | clarencew |
| Credit | Comp. Factors | Mike Thimsen | clarencew |

| Exception Notes |
|---|
| 03/24/2005 03:20:52 PM Audrey Williams<br>EXCEPTIONS<br>1) DISPOSABLE INCOME OF $785.11<br>2) Minimum tradelines<br>3) 12 month seasoning<br><br>COMP FACTORS:<br>1) Borrower has a roommate that pays cash ($300 per month, unprovable)<br>2) Providing cash to borrower to renovate and accommodate disabled dependent<br>3) very attractive subject property |

**Net Benefits**

☐ Purchase Money transaction with new housing cost reasonable compared to current housing.
☐ Purchase Money transaction; new housing cost substantially increased compared to current housing cost, but DTI is 45% or less; or there is substantial discretionary income to support the transaction.
☐ Refinance transaction with borrower's total monthly payments reduced by 5% or more.
☐ Refinance transaction with a new lower interest rate, but total monthly payments reduced less than 5%.
☑ Refinance transaction to payoff delinquent debt and leave any remaining debt current.
☐ Refinance transaction to payoff a loan with a balloon payment.
☑ Refinance transaction with cash to borrower exceeding 10% of the loan amount or $10,000.
☐ Refinance transaction to pay off existing adjustable rate loan into new fixed rate loan.
☐ Refinance transaction to change title vesting or ownership in subject property




**\* T R A N S M I T T A L \***




**\* N E W D O C \***




**\* N E W D O C \***


**\* N E W D O C \***

## CLOSING DEPARTMENT DOCUMENT AUDIT SHEET

**LENDER INFO**
Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

(866) 539-7025

ATL-HFD
App #: 0503172917
Closer: Ken Harper
Team: 351 - ATL001
AE: Kristopher Dillon

**LOAN TERM INFO**

| | | | | |
|---|---|---|---|---|
| Program: | B Fixed Full | Doc Date: | 03/25/2005 | Loan Number: 0503172917 |
| Purpose: | REFI, CASH-OUT | Doc Exp Date: | 04/05/2005 | Final Appraised Value: $90,000.00 |
| Reason for 2nd: | N/A | Disbursement Date: | 03/30/05 | Sales Price: $ 0.00 |
| 2nd Mortgage Flag: | No | End Rescision Date: | 03/29/2005 | Interest Rate: 7.299% |
| Rescision Required: | Yes | Loan Amount: $ | 86,000.00 | Late Charge Factor: 5.000 |
| Title Calc: | Loan Amount | Subordinate Amt: | $0.00 | Late Charge Grace Days: 15 |
| Property Type: | SFR - Detached | P & I Payment: $ | 383.89 | Maturity Date: April 1, 2035 |
| Occupancy: | Owner Occupied | 1st Pymt Date: | 05/01/2005 | |
| Amort Term(mos): | 360 mos | Prepaid Int w/1st Pymt: | No | |
| Balloon Term(mos): | | Prepay Penalty: | No | |
| | | Prepay Term(mos): | None | |

**ARM INFO**

| | | | | |
|---|---|---|---|---|
| Margin: | 0.000 | 1st Payment Change: | N/A | Initial Cap: 0.000 |
| Index: | 0.000% | Subsequent Payment Change: | 0 | Subsequent Cap: 0.000 |
| Floor: | 0.000 | 1st Rate Change Date: | N/A | Ceiling: 0.000 |

**IMPOUND INFO**
Impounds: [X]

| Description | Amount | # Pmts | Due Date | Cushion |
|---|---|---|---|---|
| County Prop. Tax Impounds | $ 537.00 | 1 | 12/01/05 | 2 |
| Hazard Ins. Impounds | $ 1,068.00 | 1 | 03/24/06 | 2 |
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |
| | $ | | | |

**BORROWER INFO**

Vesting CHERYL HALL

| | |
|---|---|
| 1.CHERYL HALL    Unmarried | 5. |
| 2. | 6.    ☐ Proforma |
| 3.    ☐ Proforma | 7.    ☐ Proforma |
| 4.    ☐ Proforma | 8.    ☐ Proforma |

Mailing Address
105 TV ROAD
DOTHAN, AL 36301

**PROPERTY INFO**
Address
105 TV ROAD
DOTHAN, AL 36301

County: HOUSTON
Name of Condo/PUD: TELEVISION HEIGHTS
Flood Zone: No
Parcel Number: 10-09-31-4-003-001.007
Escrow Holdback: No
Legal Desc: See Legal Description Addendum attached

6100581o.aff                          HALL                          0503172917

AHL/Frazier
0084



## CLOSING DEPARTMENT DOCUMENT AUDIT SHEET

| SETTLEMENT INFO | TITLE INFO |
|---|---|
| SWAFFORD & HAYES SETTLEMENT | SWAFFORD & HAYES SETTLEMENT |
| 9041 EXECUTIVE PARK DRIVE SUITE 400 | 9041 EXECUTIVE PARK DRIVE SUITE 400 |
| KNOXVILLE, TN 37923 | KNOXVILLE, TN 37923 |
| (865) 934-0466 | (865) 934-0466 |

| | |
|---|---|
| Agent: JAMES W SWAFFORD | Agent: JAMES W SWAFFORD |
| File/Esc #: 05-2813 | Title/Order #: 05-2813 |
| Report Date: 03/18/2005 | Approved Items: B1)1-9 B2)1-7 |
| Trustee Name: SWAFFORD & HAYES SETTLEMENT | Special Endorsement: EPA |

| FEE ITEMS:<br>HUD-1 # | LENDER<br>FEES | N/A | LENDER<br>POC | TOTAL<br>FEES |
|---|---|---|---|---|
| 801 Origination Fee | 1,960.00 | | | 1,960.00 |
| 802 Discount Points | | | | |
| 803 Appraisal Fee | | | | 300.00 |
| 804 Credit Report Fee | | | | |
| 805 Final Inspection/442 Fee | | | | |
| 807 Application Fee | | | | |
| 810 Processing Fee | 500.00 | | | 500.00 |
| 811 Underwriting Fee | 500.00 | | | 500.00 |
| 813 Appraisal Review Fee | 250.00 | | | 250.00 |
| 815 Escrow Holdback Fee | | | | |
| 816 Funding Fee | | | | |
| 818 Courier Fee | | | | |
| 825 Warehouse Fee | | | | |
| 827 Reverif Fee | | | | |
| 828 Flood Cert/Life of Loan Fee | 9.50 | | | 9.50 |
| 829 Tax Service Fee | 66.00 | | | 66.00 |
| 901 Interest for 2 days @ $ 11.2 per day | 22.40 | | | |
| 1001 Hazard Insurance 4 month(s) @ $89.00 | 356.00 | | | 356.00 |
| 1003 City Property Tax 0 month(s) @ $0.00 | | | | |
| 1004 County Property Tax 7 month(s) @ $44.75 | 313.25 | | | 313.25 |
| 1005 School Tax 0 month(s) @ $0.00 | | | | |
| 1006 Flood Insurance 0 month(s) @ $0.00 | | | | |
| 1008 Agg. Acctg. Adjustment | -134.25 | | | -134.25 |
| 1301 Survey Fee | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTALS | 3,842.90 | 0.00 | 0.00 | 4,120.50 |

**PAID BY LENDER**

| | |
|---|---|
| 204  LENDER CREDIT TO BORROWER | $ 0.00 |
| 809  YIELD SPREAD TO BROKER (POC) | $ 0.00 |
| 1203 STATE TAX/STAMPS | $ |

** Verified total Broker/Lender points and fees does not exceed 10% of the loan amount

initial

610058ZN.uff

0503172917        HALL



# REFINANCE AUDIT CHECKLIST

**LEFT SIDE OF FILE:**

✓ WARE INSTRUCTIONS.

### NOTES/DEEDS

✓ **NOTE**
✓ DATED AT TOP (MUST MATCH DEED)
✓ PROPERTY ADDRESS
✓ LOAN AMOUNT
✓ INTEREST RATE
✓ MATURITY DATE
✓ 1ST PAYMENT DATE
✓ SIGNED & DATED
IF ADJ RATE, AUDIT THE FOLLOWING:
✓ FIRST CHANGE DATE
✓ MARGIN
✓ START/FLOOR RATE CORRECT
✓ LIFE CAP
✓ SIGNED & DATED
✓ **PREPAY RIDER**
✓ ATTACHED & TERM CORRECT
✓ SIGNED & DATED
✓ **BALLOON RIDER**
✓ SIGNED & DATED.
✓ **DEED OF TRUST/MORTGAGE**
✓ CERTIFIED COPY (NO ORIGINALS)
✓ TRUSTEE NAME CORRECT
✓ LEGAL CORRECT OR AFF ATTACHED
✓ SIGNED & DATED BY BORROWER
✓ NOTARY COMPLETED & SIGNED
✓ CORRECT RIDER BOXES X'D
✓ ALL PAGES RECEIVED & INITIALED
✓ CORRECTIONS INITIALED BY BWRS
✓ **ADJ RATE RIDER (ARM)**
✓ ADJUSTMENTS MATCH NOTE
✓ SIGNED & DATED
✓ **CONDO / PUD RIDER**
✓ PROJECT NAME CORRECT
✓ SIGNED & DATED
✓ **1-4 FAMILY RIDER (REQUIRED ON ALL NON-OWNER & MULTI UNITS)**
✓ SIGNED & DATED
✓ **SECOND HOME RIDER**
✓ SIGNED & DATED
✓ **AKA (SIGNATURE/NAME AFFIDAVIT)**
✓ **POWER OF ATTORNEY**
✓ **ARM DISCLOSURE**
✓ SIGNED & DATED
✓ **HARDSHIP LETTER/NOTICE**
✓ (ONLY IF FUNDING INTO THE MONTH)

### LENDER NOTICES

✓ **HUD-1**
✓ ALL FEES SHOW & MATCH DOCS (PAID TO CORRECT PARTY)
✓ TOTAL BRKR & LNDR FEES LESS THAN 6%
✓ DAILY INTEREST CORRECT
✓ SHOWS CORRECT BROKER COMPANY
✓ REBATE APPEARS (POC)
✓ ALL PAYOFFS APPEAR ON HUD-1
✓ CORRECT ITEMS ON TITLE
✓ HAZARD INSURANCE PREMIUM PAID
✓ IS CASH OUT PERMITTED? (IF NOT, NO MORE THAN $1K ALLOWED)
✓ TITLE ALTA AMOUNT CORRECT
✓ ARE TAXES DUE TO BE PAID?
✓ DISBURSEMENT DATE SHOWS
✓ SIGNED & DATED
✓ **TRUTH-IN-LENDING (TIL)**
✓ SIGNED & DATED
✓ ALL BOXES COMPLETE
✓ **COMPLIANCE AGREEMENT**
✓ SIGNED & NOTARIZED
✓ **INITIAL ESCROW ACCT DISCLOSURE (REQUIRED ON ALL IMPOUND ACCTS)**
✓ **GOOD FAITH ESTIMATE ITEMIZATION**
✓ SIGNED & DATED

Rev 11/11/04

### LENDERS / CLOSING INSTRUCTIONS

✓ SIGNED & DATED BY BORROWERS
✓ SIGNED & DATED BY ESCROW AGENT
✓ FEES MATCH LOAN DOC REQUEST
✓ **ADDEND TO LENDER/CLOSING INSTRNS**
✓ SIGNED & DATED BY BORROWERS
✓ SIGNED & DATED BY AGENT
✓ **ADDITIONAL REQUIREMENT FORM**
✓ SIGNED & DATED
✓ **NOTICE OF RIGHT TO CANCEL**
✓ DATED CORRECTLY (SEE SCHEDULE)
✓ SIGNED & DATED ON BOTTOM LINE (DATE ON SIGNATURE LINE MUST MATCH "DATE OF TRANSACTION" AT TOP OF FORM AND NOTARY DATE)
✓ **RESPA & SERVICING**
✓ SIGNED & DATED
✓ **NON-IMPOUND NOTICE OR CA IMPOUND DISCLOSURE/WAIVER**
✓ SIGNED & DATED
✓ **PRIVACY POLICY**
✓ SIGNED & DATED
✓ **DISCLOSURE NOTICES**
✓ SIGNED & DATED (TOP & BOTTOM)
✓ **APPRAISAL DISCLOSURE**
✓ SIGNED & DATED
✓ **GENERAL AUTH & BWR'S CERT**
✓ SIGNED & DATED
✓ **FAIR LENDING NOTICE**
✓ SIGNED & DATED

### TITLE

✓ **PRELIM TITLE REPORT & SUPPLEMENTS**
✓ VESTING MATCHES DOCS/GRANT DEED
✓ ADDRESS MATCHES DOCS, APPRAISAL
✓ ALL ITEMS CLEARED ON HUD-1
✓ TAXES PAID CURRENT
✓ **GRANT/QUIT CLAIM/WARRANTY DEED**
✓ ONLY REQUIRED IF THE VESTING ON THE DEED OF TRUST IS DIFFERENT FROM THE CURRENT VESTING ON TITLE (MUST MATCH THE DEED OF TRUST EXACTLY)
✓ SIGNED & DATED BY ALL PARTIES
✓ CURRENTLY ON TITLE
✓ NOTARY COMPLETE & SIGNED
✓ INTER-SPOUSAL GRANT DEED REQUIRED?
✓ **CLOSING PROTECTION LETTER**
✓ ISSUED BY AN APPROVED AGENCY
✓ CANNOT BE MORE THAN 30 DAYS OLD
✓ MUST REFERENCE OUR TITLE CO

### INSURANCE

✓ **HAZARD INSURANCE DEC PAGE**
✓ BWR'S NAMES SHOW SAME AS ON DOCS
✓ PROPERTY ADDRESS CORRECT
✓ DWELLING HAS ENOUGH COVERAGE (EQUALS TOTAL LOAN AMOUNT (IS THERE A 2ND?) OR TOTAL ESTIMATED COST NEW ON APPRAISAL OR VERIFIED
✓ GUARANTEED REPLACEMENT)
✓ EFFECTIVE DATE IS NO LATER THAN FUNDING DATE
✓ EXPIRATION DATE (6 MONTHS MIN)
✓ PAID RECEIPT
✓ SHOWS CORRECT LOSS PAYEE CLAUSE (IF PIGGYBACK, MUST SHOW 1ST & 2ND POSITION)

REVIEWER'S INITIALS   BD

## REFINANCE AUDIT CHECKLIST (continued)

*[handwritten: no flood required]*

**FLOOD INSURANCE DEC PAGE**
- BWR'S NAMES SHOW SAME AS ON DOCS
- PROPERTY ADDRESS CORRECT
- DWELLING HAS ENOUGH COVERAGE (EQUALS TOTAL LOAN AMOUNT (IS THERE A 2ND?) OR TOTAL ESTIMATED COST NEW ON APPRAISAL OR VERIFIED GUARANTEED REPLACEMENT)
- EFFECTIVE DATE IS NO LATER THAN FUNDING DATE
- EXPIRATION DATE (6 MONTHS MIN)
- PAID RECEIPT
- SHOWS CORRECT LOSS PAYEE CLAUSE (IF PIGGYBACK, MUST SHOW 1ST &/OR 2ND POSITION)
- PROCESSOR CERTIFICATION CONFIRM COVERAGE IS ENOUGH
- ✓ FLOOD CERTIFICATE ADDRESS CORRECT
- ✓ FLOOD INSURANCE REQUIRED ?
- ✓ HAZARD INS AUTH & REQUIREMENTS SIGNED & DATED
- ✓ FLOOD ZONE NOTICE SIGNED & DATED

**RIGHT SIDE OF FILE:**
- ✓ 1008
- ✓ SECTION 32 CALC WORKSHEET
- ✓ FINAL SECTION 32 DISCLOSURE
- ✓ SECTION 32 WORKSHEET / ANALYSIS
- ✓ AFFIDAVIT (COMPLETED BY BROKER)
- NOTICE (COMPLETED BY BORROWER — WATCH 3-DAY PERIOD)

**APPLICATION**
- ✓ 1003 (TYPED / HANDWRITTEN) LOAN AMOUNT, RATE, TERM, PROGRAM
- ✓ PAGES 1-4 INITIALED & SIGNED
- ✓ INCOME MATCHES APPROVAL SHEET ON ALL STATED INCOME
- ✓ GOVERNMENT MONITORING INFO COMPLETE
- ✓ BROKER SIGNED
- ✓ W-9 ONE FOR EACH BORROWER
- ✓ SIGNED & DATED
- ✓ IRS FORM 4506 (REQUIRED ON FULL/LITE DOC LOANS) SIGNED (NOT DATED)
- ✓ PHOTO ID
- ✓ CREDIT
- ✓ CERTIFIED COPY OF SUBORDINATE / SENIOR LIENS (NOTE & DEED/MTG)

**PROPERTY**
- ✓ APPRAISAL ORIGINAL SIGNATURES & PHOTOS
- ✓ NO MORE THAN 120 DAYS OLD
- ✓ ESCROW HOLDBACK AGREEMENT ALL WORK REQUIRED LISTED ON FORM
- ✓ SIGNED & DATED BY BORROWERS / ESCROW
- ✓ DATE WORK MUST BE COMPLETED
- ✓ $250 FEE ON INSTRUCTIONS / HUD-1
- ✓ BORROWERS SIGNED & DATED
- ✓ CLOSER SIGNED & DATED
- ✓ ESCROW INSTRUCTIONS CERTIFIED / SIGNED BY BORROWERS
- ✓ LENDER, LOAN AMOUNT, RATE & TERM CORRECT

**NOTICES**
- ✓ COPY OF INITIAL DISCLOSURES (MAY NOT BE SIGNED)
- ✓ BROKER'S GOOD FAITH ESTIMATE

**OTHER**
- ✓ ALL SIGNATURES ARE CONSISTENT THROUGHOUT FILE

**STATE-SPECIFIC**
- ✓ ALL REQUIRED STATE-SPECIFIC DOCUMENTS ARE PRESENT AND HAVE BEEN REVIEWED. NOTE: FOR TEXAS LOANS, USE ADDITIONAL TEXAS SUPPLEMENT BELOW.

**TEXAS SUPPLEMENT**
- STATEMENT FOR SERVICES
- NOTICE OF INVOICE ADDRESS
- TX HOME EQ CLOSING INSTR ADDND
- CHECKLIST AS TRANSMITTAL LETTER
- ASSIGNMENT OF DEED OF TRUST
- ADDEND TO HUD SETTLEMENT STMT
- LOAN AGREEMENT NOTICE
- ALLONGE TO NOTE (CASH OUT)
- TX HOME EQ SEC INST (CASH OUT)
- TX HOME EQ AFF & AGMT (CASH OUT)
- ACK AS TO FAIR MKT VALUE (CASH OUT)
- NTC EXTENSIONS OF CREDIT (CASH OUT)
- OWNERS AFF OF COMPLIANCE (CASH OUT)
- TX HOME EQ REQ OF COPIES (CASH OUT)
- TX HOME EQ CERTIFICATE (CASH OUT)
- TX HOME EQ ELECT/RESCIND (CASH OUT)
- CERT NON-CANCEL OF LOAN (CASH OUT)
- PAYMENT LETTER
- ATTY REPRESENTATION & FEE LETTER
- BORROWER'S CERT/A AUTHORIZATION
- INSURANCE CERTIFICATION
- COLLATERAL PROTECTION INS NOTICE
- FLOOD INSURANCE AUTHORIZATION
- SURVEY ACKNLGMENT HOLD HARMLESS
- SURVEY ACCEPTANCE LETTER
- TAX INFO SHEET
- NOTICE OF ASSIGN/SALE/TRANSFER
- DELETION OF ARBITRATION PROVISION
- ESCROW WAIVER AGREEMENT
- COMPLIANCE AGREEMENT (NON-AHL)
- HOUSING FINANCIAL DISCRIM ACT NOTICE
- ECOA NOTICE
- LAST PAGE NOTICE
- TRANSMITTAL SUMMARY
- HIGH COST LOAN SUMMARY
- DOC ORDER FORM
- APPRAISER NAME WARNING
- AFFIDAVIT OF FAIR MARKET VALUE
- CUSTOMER SURVEY

REVIEWER'S NAME (print)  *Rita Dickerson*

REVIEWER'S SIGNATURE  *Rita Dickerson*



* A P P L I C A T I O N *





* N E W D O C *





* N E W D O C *



* N E W D O C *

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☒ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA ☐ FHA | ☐ Conventional ☒ Other (explain): USDA/Rural Housing Service | Agency Case Number | Lender Case Number |
|---|---|---|---|---|

| Amount $56,000.00 | Interest Rate 7.299 % | No. of Months 360 | Amortization Type: | ☒ Fixed Rate ☐ GPM | ☐ Other (explain): ☐ ARM (type): |
|---|---|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) 105 TV ROAD, DOTHAN, AL 36301 | No. of Units 1 |
|---|---|

| Legal Description of Subject Property (attach description if necessary) SEE TITLE | Year Built 0 |
|---|---|

| Purpose of Loan | ☐ Purchase ☒ Refinance | ☐ Construction ☐ Construction-Permanent | ☐ Other (explain): | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |
|---|---|---|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

Complete this line if this is a refinance loan.

| Year Acquired 2002 | Original Cost $80,000.00 | Amount Existing Liens $ 0.00 | Purpose of Refinance Cash-Out/Home Improve | Describe Improvements ☐ made ☐ to be made Cost: $ 0.00 |
|---|---|---|---|---|

| Title will be held in what Name(s) CHERYL HALL | Manner in which Title will be held Individual | Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) EQUITY | | |
|---|---|---|

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | CHERYL HALL | |
| Social Security Number | Home Phone (incl. area code) (334) 792-3682 | DOB (MM/DD/YYYY) 07/01/1959 | Yrs. School 12 | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |

| ☐ Married ☒ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Co-Borrower) no. 0 | ☐ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Borrower) no. |
|---|---|---|---|

| Present Address (street, city, state, ZIP) ☐ Own ☒ Rent No. Yrs. 2 105 TV ROAD DOTHAN, AL 36301 | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer DISABILITY , AL | ☐ Self Employed | Yrs. on this job 3 | Name & Address of Employer | ☐ Self Employed | Yrs. on this job |
| | | Yrs. employed in this line of work/profession 3 | | | Yrs. employed in this line of work/profession |
| Position/Title/Type of Business | Business Phone (incl. area code) (334) 792-3682 | | Position/Title/Type of Business | | Business Phone (incl. area code) |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer | ☐ Self Employed | Dates (from – to) | Name & Address of Employer | ☐ Self Employed | Dates (from – to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from – to) | Name & Address of Employer | ☐ Self Employed | Dates (from – to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | | Business Phone (incl. area code) |

0503172917

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04
Page 1 of 4

Initials: C.H.

-21N (0309)   VMP Mortgage Solutions (800)521-7291

AHL/Frazier
0089

Hall-Frazier
Record - 001484

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income * | 1,302.75 | | 1,302.75 | Rent | 0.00 | //////// |
| Overtime | 0.00 | | 0.00 | First Mortgage (P&I) | 0.00 | 383.86 |
| Bonuses | 0.00 | | 0.00 | Other Financing (P&I) | 0.00 | 0.00 |
| Commissions | 0.00 | | 0.00 | Hazard Insurance | 89.00 | 0.00 |
| Dividends/Interest | 0.00 | | 0.00 | Real Estate Taxes | 44.75 | 0.00 |
| Net Rental Income | 0.00 | | 0.00 | Mortgage Insurance | 0.00 | 0.00 |
| Other (before completing, see the notice in "describe other income," below) | 0.00 | 0.00 | 0.00 | Homeowner Assn. Dues | 0.00 | 0.00 |
| | | | | Other: | 0.00 | 0.00 |
| Total | 1,302.75 | | 1,302.75 | Total | 133.75 | 383.86 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income   Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | | Monthly Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.   Completed [ ] Jointly [x] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ 0.00 | LIABILITIES | | |
| | | Name and address of Company | $ Payment/Months | |
| List checking and savings accounts below | | *** SEE ADDENDUM *** | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| FIRST UNION | | | | |
| | | Acct. no. | | |
| Acct. no. | 250.00 | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) /0 | $ 0.00 | | | |
| | | Acct. no. | | |
| Life insurance net cash value | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Face amount: $ 0.00 | | | | |
| Subtotal Liquid Assets | $ 250.00 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 0.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| HONDA ACCORD | 15,000.00 | Acct. no. | | |
| Other Assets (itemize) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| OTHER | 3,000.00 | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | 0.00 | |
| Total Assets a. | $ 18,250.00 | Net Worth (a minus b) $ 18,250.00 | Total Liabilities b. | $ 0.00 |

0503172917

Page 2 of 4

MP-21N (0305)

Freddie Mac Form 65 01/04
Fannie Mae Form 1003 01/04

AHU/Frazier
0090

## VI. ASSETS AND LIABILITIES (cont.)

Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Totals | | 0 | 0 | 0 | 0 | 0 | 0 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | 0.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 0.00 |
| e. Estimated prepaid items | 1,960.00 |
| f. Estimated closing costs | 3,361.90 |
| g. PMI, MIP, Funding Fee | 0.00 |
| h. Discount (if Borrower will pay) | 0.00 |
| i. Total costs (add items a through h) | 5,321.90 |
| j. Subordinate financing | 0.00 |
| k. Borrower's closing costs paid by Seller | 0.00 |
| l. Other Credits (explain) | |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 56,000.00 |
| n. PMI, MIP, Funding Fee financed | 0.00 |
| o. Loan amount (add m & n) | 56,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -50,678.10 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes / No | Co-Borrower Yes / No |
|---|---|---|
| a. Are there any outstanding judgments against you? | X | X |
| b. Have you been declared bankrupt within the past 7 years? | X | X |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | X | X |
| d. Are you a party to a lawsuit? | X | X |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | X | X |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | X | X |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | X | X |
| h. Is any part of the down payment borrowed? | X | X |
| i. Are you a co-maker or endorser on a note? | X | X |
| j. Are you a U.S. citizen? | X | X |
| k. Are you a permanent resident alien? | X | X |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | X |
| m. Have you had an ownership interest in a property in the last three years? | X | X |
| (1) What type of property did you own – principal residence (PR), second home (SH), or investment property (IP)? | PR | |
| (2) How did you hold title to the home – solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 3-25-05 | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

**BORROWER** ☐ I do not wish to furnish this information.

| Ethnicity: | ☐ Hispanic or Latino   X Not Hispanic or Latino |
|---|---|
| Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   X White |
| Sex: | X Female   ☐ Male |

**CO-BORROWER** ☐ I do not wish to furnish this information.

| Ethnicity: | ☐ Hispanic or Latino   ☐ Not Hispanic or Latino |
|---|---|
| Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☐ White |
| Sex: | ☐ Female   ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | ERIN DYLLON | Homo Funds Direct |
| ☐ Face-to-face interview | Interviewer's Signature        03/17/2005 | 1130 Northchase Parkway |
| ☐ Mail | | Suite 200 |
| X Telephone | Interviewer's Phone Number (incl. area code) | Marietta, GA 30067-6420 |
| ☐ Internet | | |

03031721027
21N (page)        Page 3 of 4        Freddie Mac Form 65 01/04 / Fannie Mae Form 1003 01/04

AHL/Frazier
0091

Hall-Frazier
Record - 001486

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: HALL, CHERYL | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X | Date 3-25-08 | Co-Borrower's Signature: X | Date |
|---|---|---|---|

0503172917
-21N (0005)

Page 4 of 4

Freddie Mac Form 05 01/04
Fannie Mae Form 05/03 01/04

AHL/Frazier
0092

Form **W-9**
(Rev. January 2003)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer**
**Identification Number and Certification**

Give form to the requester.
Do not send to the IRS.

Name
CHERYL HALL

Business name, if different from above

Check appropriate box:  ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership  ☐ Other ▶ _____   ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
105 TV ROAD, ,

City, state, and ZIP code
DOTHAN, AL 36301

List account number(s) here (optional)

Requester's name and address (optional)
Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note: If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
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

Employer identification number

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here   Signature of U.S. person ▶ _____   Date ▶ 03/25/05

### Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

Note: If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Foreign person. If you are a foreign person, use the appropriate Form W-8 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

Nonresident alien who becomes a resident alien. Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exemption contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

100176105031729174                                       0503172917

W9D-8030 (0308).01        Form **W-9**   (Rev. 1-2003)
VMP Mortgage Solutions (800)521-7291

Page 1 of 4

AHL/Frazier
0093

Form W-9 (Rev. 1-2003)

Example. Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

What is backup withholding? Persons making certain payments to you must under certain conditions withhold and pay to the IRS 30% of such payments (29% after December 31, 2003; 28% after December 31, 2005). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Penalties

Failure to furnish TIN. If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

Civil penalty for false information with respect to withholding. If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

Criminal penalty for falsifying information. Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

Misuse of TINs. If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

Specific Instructions

Name

If you are an individual, you must generally enter the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first and then circle, the name of the person or entity whose number you entered in Part I of the form.

Sole proprietor. Enter your individual name as shown on your social security card on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

Limited liability company (LLC). If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line.

Other entities. Enter your business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

Note: You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

Note: If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

Exempt payees. Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2);

2. The United States or any of its agencies or instrumentalities;

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities;

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities; or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation;

7. A foreign central bank of issue;

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States;

10017610503172917 4    0503172917

Page 3 of 4

Form W-9 (Rev. 1-2003)

9. A futures commission merchant registered with the Commodity Futures Trading Commission;

10. A real estate investment trust;

11. An entity registered at all times during the tax year under the Investment Company Act of 1940;

12. A common trust fund operated by a bank under section 584(a);

13. A financial institution;

14. A middleman known in the investment community as a nominee or custodian; or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| If the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045f, even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a Federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see Limited liability company (LLC) on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

Note: See the chart on page 4 for further clarification of name and TIN combinations.

How to get a TIN. If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form on-line at www.ssa.gov/online/ss5.html. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can get Forms W-7 and SS-4 from the IRS by calling 1-800-TAX-FORM (1-800-829-3676) or from the IRS Web Site at www.irs.gov.

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note: Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.


AHL/Frazier
0095

Hall-Frazier
Record - 001490

Form W-9 (Rev. 1-2003)

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 3, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see Exempt from backup withholding on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA or Archer MSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
|    b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name, but you may also enter your business or "DBA" name. You may use either your SSN or EIN (if you have one).

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA or Archer MSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, and the District of Columbia to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, or to Federal and state agencies to enforce Federal nontax criminal laws and to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 30% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

10017610503172917 4    0503172917

8030 (ER0405.01)    Page 4 of 4

AHL/Frazier
0096

Form **4506-T**
(January 2004)

**Request for Transcript of Tax Return**

Department of the Treasury
Internal Revenue Service

▶ Do not sign this form unless all applicable parts have been completed.
Read the instructions on page 2.

▶ Request may be rejected if the form is incomplete, illegible, or any required part was blank at the time of signature.

OMB No. 1545-1872

**Tip:** Use new Form 4506-T to order a transcript or other return information free of charge. See the product list below. You can also call 1-800-829-1040 to order a transcript. If you need a copy of your return, use Form 4506, Request for Copy of Tax Return. There is a fee to get a copy of your return.

| 1a Name shown on tax return. If a joint return, enter the name shown first. | 1b First social security number on tax return or employer identification number (see instructions) |
|---|---|
| CHERYL HALL | 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 |
| 2a If a joint return, enter spouse's name shown on tax return | 2b Second social security number if joint tax return |

3  Current name, address (including apt., room, or suite no.), city, state, and ZIP code

CHERYL HALL
105 SW ROAD , DOTHAN, AL 36301

4  Address, (including apt., room, or suite no.), city, state, and ZIP code shown on the last return filed if different from line 3

5  If the transcript or tax information is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number. The IRS has no control over what the third party does with the tax information.

Home Funds Direct
15090 Avenue of Science San Diego, CA 92128

**CAUTION:** Lines 6 and 7 must be completed if the third party requires you to complete Form 4506-T. Do not sign Form 4506-T if the third party requests that you sign Form 4506-T and lines 6 and 7 are blank.

6  Product requested. Most requests will be processed within 10 business days. If the product requested relates to information from a return filed more than 4 years ago, it may take up to 30 days. Enter the return number here and check the box below. ▶

a **Return Transcript,** which includes most of the line items of a tax return as filed with the IRS. Transcripts are generally available for the following returns: Form 1040 series, Form 1065, Form 1120, Form 1120A, Form 1120H, Form 1120L, and Form 1120S. Return transcripts are available for the current year and returns processed during the prior 3 processing years ........................ ☐

b **Account Transcript,** which contains information on the financial status of the account, such as payments made on the account, penalty assessments, and adjustments made by you or the IRS after the return was filed. Return information is limited to items such as tax liability and estimated tax payments. Account transcripts are available for most returns ........................ ☐

c **Record of Account,** which is a combination of line item information and later adjustments to the account. Available for current year and 3 prior tax years ........................ ☐

d **Verification of Nonfiling,** which is proof from the IRS that you did not file a return for the year ........................ ☐

e **Form W-2, Form 1099 series, Form 1098 series, or Form 5498 series transcript.** The IRS can provide a transcript that includes data from these information returns. State or local information is not included with the Form W-2 information. The IRS may be able to provide this transcript information for up to 10 years. Information for the current year is generally not available until the year after it is filed with the IRS. For example, W-2 information for 2003, filed in 2004, will not be available from the IRS until 2005. If you need W-2 information for retirement purposes, you should contact the Social Security Administration at 1-800-772-1213 ........................ ☐

**CAUTION:** If you need a copy of Form W-2 or Form 1099, you should first contact the payer. To get a copy of the Form W-2 or Form 1099 filed with your return, you must use Form 4506 and request a copy of your return, which includes all attachments.

7  Year or period requested. Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than four years or periods, you must attach another Form 4506-T.

Signature of taxpayer(s). I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax information requested. If the request applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506-T on behalf of the taxpayer.

Telephone number of taxpayer on line 1a or 2a
(334) 792-3682

**Sign Here**

Signature (see instructions)   Date 3-25-05

Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature   Date

For Privacy Act and Paperwork Reduction Act Notice, see page 2.      Cat. No. 37667N      Form **4506-T** (1-2004)

10017610503172917 4      0503172917

VMP-3046T (0402).01      Page 1 of 2      VMP Mortgage Solutions (800)521-7291

Form 4506-T (1-2004)                                                                                                    Page 2

## A Change To Note

• New Form 4506-T. Request for Transcript of Tax Return, is used to request tax return transcripts, tax account transcripts, W-2 information, 1099 information, verification of non-filing, and a record of account. Form 4506, Request for Copy of Tax Return, is now used only to request copies of tax returns.

## Instructions

**Purpose of form.** Use Form 4506-T to request tax return information. You can also designate a third party to receive the information. See line 5.

**Where to file.** Mail or fax Form 4506-T to the address below for the state you lived in when that return was filed. There are two address charts: one for individual transcripts (Form 1040 series) and one for all other transcripts.

**Note:** If you are requesting more than one transcript or other product and the chart below shows two different service centers, mail your request to the service center based on the address of your most recent return.

### Chart for individual transcripts (Form 1040 series)

| If you lived in and filed an individual return: | Mail or fax to the Internal Revenue Service at: |
|---|---|
| Maine, Massachusetts, New Hampshire, New York, Vermont | RAIVS Team 310 Lowell St. Stop 679 Andover, MA 01810 978-691-9859 |
| Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, West Virginia, Rhode Island | RAIVS Team 4800 Buford Hwy. Stop 91 Chamblee, GA 30341 678-530-5326 |
| Arkansas, Colorado, Kentucky, Louisiana, New Mexico, Oklahoma, Tennessee, Texas | RAIVS Team 3651 South Interregional Hwy. Stop 6716 Austin, TX 78741 512-460-2272 |
| Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, Wyoming | RAIVS Team Stop 37106 Fresno, CA 93888 559-253-4992 |
| Delaware, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, South Dakota, Wisconsin | RAIVS Team Stop 38101 Kansas City, MO 64999 816-823-7667 |
| Ohio, Virginia | RAIVS Team 5333 Getwell Rd. Stop 2829 Memphis, TN 38118 901-546-4176 |

| Connecticut, District of Columbia, Maryland, New Jersey, Pennsylvania, a foreign country, or A.P.O. or F.P.O. address | RAIVS Team DP SE 135 Philadelphia, PA 19255-0695 215-516-2931 |

### Chart for all other transcripts

| If you lived in: | Mail to the Internal Revenue Service at: |
|---|---|
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Utah, Washington, Wyoming | RAIVS Team Mail Stop 6734 Ogden, UT 84201  801-620-6922 |
| Connecticut, Delaware, District of Columbia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia, Wisconsin | RAIVS Team P.O. Box 145500 Stop 2800F Cincinnati, OH 45250  859-669-3592 |

**Line 1b.** Enter your employer identification number if your request relates to a business return. Otherwise, enter the first social security number (SSN) shown on the return. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Signature and date.** Form 4506-T must be signed and dated by the taxpayer listed on line 1a or 2a. If you completed line 5 requesting the information be sent to a third party, the IRS must receive Form 4506-T within 60 days of the date signed by the taxpayer or it will be rejected.

**Individuals.** Transcripts of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506-T exactly as your name appeared on the original return. If you changed your name, also sign your current name.

**Corporations.** Generally, Form 4506-T can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested to by the secretary or other officer.

**Partnerships.** Generally, Form 4506-T can be signed by any person who was a member of the partnership during any part of the tax period requested on line 7.

**All others.** See section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

**Documentation.** For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the Letters Testamentary authorizing an individual to act for an estate.

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to establish your right to gain access to the requested tax information under the Internal Revenue Code. We need this information to properly identify the tax information and respond to your request. Sections 6103 and 6109 require you to provide this information, including your SSN or EIN. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, and the District of Columbia for use in administering their tax laws. We may also disclose this information to Federal and state agencies to enforce Federal nontax criminal laws and to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file Form 4506-T will vary depending on individual circumstances. The estimated average time is: Learning about the law or the form, 10 min.; Preparing the form, 11 min.; and Copying, assembling, and sending the form to the IRS, 20 min.

If you have comments concerning the accuracy of these estimates or suggestions for making Form 4506-T simpler, we would be happy to hear from you. You can write to the Tax Products Coordinating Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001. Do not send the form to this address. Instead, see Where to file on this page.

100176105031729174                    Page 2 of 2                    0503172917

VID 9045T 1040EL.01                                                  Initial C.H.

AHL/Frazier
0098

Hall-Frazier
**Record - 001493**

# IRS FORM 4506-T CONSENT

### *** Attention Borrower(s) and Closing Agent ***

The attached form, Request for Transcript of Tax Return (IRS FORM 4506-T),

## should not be dated.

Form 4506-T allows the lender and its assigns to request IRS records for the purpose of comparing the IRS' information to the information submitted to the lender in connection with underwriting and approving the loan. By signing Form 4506-T, each borrower agrees to the foregoing and authorizes the lender and its assigns to date the form at the time it is desired to be submitted to the IRS.

Each borrower hereby acknowledges and agrees to the foregoing.

3-25-05

Borrower CHERYL HALL                                    Date

MIN #  100178105031729174           HALL                    0503172917

610091.uff                          Page 1 of 1              Rev 10/04

AHL/Frazier
0099

Addendum for Loan # : 0503172917 - HALL, CHERYL

--- LIABILITIES ---

| | | |
|---|---|---|
| Creditor | :Subject Loan | Acct. # : |
| Address | : | Balance : $0.00 |
| | | Payment : [$0.00] |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Mortgage | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :THE CR STR/PROVIDIAN | Acct. # : |
| Address | : | Balance : *$785.00 |
| | | Payment : [$0.00] |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Installment | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :PALISADES | Acct. # : |
| Address | : | Balance : *$694.00 |
| | | Payment : [$0.00] |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Installment | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :HOLLOWAY CREDIT | Acct. # : |
| Address | : | Balance : *$452.00 |
| | | Payment : [$0.00] |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Installment | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :SMALL LNS | Acct. # : |
| Address | : | Balance : *$399.00 |
| | | Payment : [$0.00] |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Installment | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :CRDT MGT | Acct. # : |
| Address | : | Balance : *$182.00 |
| | | Payment : [$0.00] |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Installment | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :FRIEDMANS JEWELERS | Acct. # : |
| Address | : | Balance : *$400.00 |
| | | Payment : *$0.00 |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Installment | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :ARMY AVIATION CENTER FCU | Acct. # : |
| Address | : | Balance : *$4,594.49 |
| | | Payment : *$0.00 |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Mortgage | |
| In Name Of | : | |

| | | |
|---|---|---|
| Creditor | :ALABAMA APPRAISAL SERVICES | Acct. # : |
| Address | : | Balance : *$300.00 |
| | | Payment : *$0.00 |
| C/S/Z | : | Rem. Term : 0 |
| Acct. Type | :Mortgage | |
| In Name Of | : | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date: | Co-Borrower's Signature: | Date: |
|---|---|---|---|
| X | 3-25-05 | X | |

Addendum for Loan # : 0503173917 - HALL, CHERYL

--- LIABILITIES ---

| | |
|---|---|
| Creditor | :State Farm Insurance |
| Address | : |
| C/S/Z | : |
| Acct. Type | :Mortgage |
| In Name Of | : |

| | |
|---|---|
| Acct. # | : |
| Balance | : *$1,068.00 |
| Payment | : *$0.00 |
| Rem. Term | : 0 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date: | Co-Borrower's Signature: | Date: |
|---|---|---|---|
| X | | X | |

AHL/Frazier
0101

Hall-Frazier
Record - 001496



**\* C R E D I T \***





**\* N E W D O C \***





**\* N E W D O C \***



**\* N E W D O C \***

Credit

AHL/Frazier
0102

```
11-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02
DCO Instant Merge Credit Report          Acct: 129719
Prepared for: ACCREDITED HOME LENDERS-SD IA    Notes: 351
Requested: EFX, XPN, TUC - I             Delivered: EFX, XPN, TUC

App: HALL, CHERYL R                                        Ssn: 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
Curr Addr: 105 TV RD, DOTHAN, AL 36301
```

## INSTANT MERGE SUMMARY

### ACCOUNT DISTRIBUTION

| Account Type | Count | Balance | Payments | CURRENT STATUS (tradelines) Curr | Clsd | Uart | 30 | 60 | 90+ |
|---|---|---|---|---|---|---|---|---|---|
| Real Estate | 0 | $0 | $0 | - | - | - | - | - | - |
| Installment | 20 | $458 | $181 | - | 18 | - | - | - | 2 |
| Revolving | 1 | $0 | $0 | - | 1 | - | - | - | - |
| Other | 11 | $3,273 | $1,479 | - | - | - | - | - | 11 |
| Total | 32 | $3,731 | $1,660 | - | 19 | - | - | - | 13 |

### INQUIRIES

| | | PUBLIC RECORDS | | HISTORICAL DELINQUENCIES (count) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6 Month Total | 16 | EFX | N/A | Account Type | LastDlq | 30 | 60 | 90+ | |
| Elim. same day | - 9 | XPN | N/A | Real Estate | | - | - | - | |
| Adjusted Total | 7 | TUC | N/A | Installment | 12/03 | 12 | 8 | 38 | |
| New Trades(6 mon) | 0 | Last 2yrs | N | Revolving | 11/98 | 1 | 1 | 4 | |
| | | | | Other | | - | - | 11 | |
| Oldest Trd: 03/98 | | On File: 06/95 | | Total | | 13 | 9 | 53 | |

Only Applicant/Co-applicant information included in the Summary.

## BUREAU SCORE INFORMATION

```
EFX BEACON 5.0              (APP)=  525 Factor: 00038, 00014, 00018, 00020
  00038 SERIOUS DELINQUENCY, AND DEROGATORY PUBLIC RECORD OR COLLECTION FILED
  00014 LENGTH OF TIME ACCOUNTS HAVE BEEN ESTABLISHED
  00018 NUMBER OF ACCOUNTS WITH DELINQUENCY
  00020 LENGTH OF TIME SINCE DEROGATORY PUBLIC RECORD OR COLLECTION IS TOO
        SHORT
  I Number of Inquiries Adversely Affected the Score

XN FICO-II                 (APP)=  592 Factor:   38,   18,   33,   16
  38 SERIOUS DELINQUENCY AND PUBLIC RECORD OR COLLECTION FILED
  18 NUMBER OF ACCOUNTS DELINQUENT
  33 PROPORTION OF CURRENT LOAN BALANCE TO ORIGINAL LOAN AMOUNT
  16 INSUFFICIENT OR LACK OF REVOLVING ACCOUNT INFORMATION

TUC FICO Classic 98        (APP)=  575 Factor:   038,  018,  016,  002
  038 SERIOUS DELINQUENCY, AND PUBLIC RECORD OR COLLECTION FILED
  018 NUMBER OF ACCOUNTS WITH DELINQUENCY
  016 LACK OF RECENT REVOLVING ACCOUNT INFORMATION
  002 LEVEL OF DELINQUENCY ON ACCOUNTS
  I Number of Inquiries Adversely Affected the Score
```

AHL/Frazier
0103

Hall-Frazier
Record - 001498

End of Decision Maker Report

REF:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02
OCO Instant Merge Credit Report                    Acct: 129719
Prepared for: ACCREDITED HOME LENDERS-SD IA        Notes: 351
Requested: EFX, XPN, TUC - I                       Delivered: EFX, XPN, TUC

App: HALL, CHERYL R                                        Ssn:
Curr Addr: 105 TV RD, DOTHAN, AL 36301

Account Name/Number (Sources)                                      Past due    Last
        Open      High   Payment   Balance MOP  Status   Rptd  30 60 90+ MR D1q

Joint Accounts:

  1. PEOPLES BK/395330300XXXX (EFX-4208B000341,TUC1)
     J 06-99    7303      0            CLOSED I-5 DEL 12O  03-02 08 05 07  33 03-02
     Hist: 03-02 31454443324322211322322                   JNT
     Ctgy: AUTO
     AUTO LOAN
     CLOSED

Accounts under Applicant:

  2. THE CR STR/PROVIDIAN-940XXXX (EFX-616FY000111)
     I N/A      672      785          785 O-9 COLL/P&L 10-02 00 00 00   5
     Hist: 10-02 9----                                      APP
     Ctgy: COLLECTION                         Term: REV
     ACCT SUBMITTED TO COLLECTION
     PAST DUE PAST $785

  3. PALISADES/HEILI-3HEILIG297XXXX (EFX-444FY000001)
     I N/A      694      694          694 O-9 COLL/P&L 02-05 00 00 00  20
     Hist: 02-05 9-------------------               APP
     Ctgy: COLLECTION                         Term: REV
     ACCT SUBMITTED TO COLLECTION
     PAST DUE PAST $694

  4. PALISADES COLLECTION L/PALHEILIG297XXXX (XPN-YC19839221,TUC1)
     I 01-03    694   N/A            694 Y-9 COLL/P&L 02-05  - - -  23
     Hist: 02-05 99999-999999999-9--99-9            APP
     Ctgy: COLLECTION                         Term: REV
     CN: HEILIG MEYERS
     ACCT SUBMITTED TO COLLECTION COLL 04-03
     PAST DUE PAST $694

  5. HOLLOWAY CREDIT SOLUTI/724XXXX (EFX-420YA000161,XPN1,TUC1)
     I 03-03    452   N/A            452 Y-9 COLL/P&L 12-04  - - -   1
     Hist: 12-04 9                                  APP
     Ctgy: COLLECTION                         Term: REV
     CN: WIREGRASS ELECT
     UNPAID
     ACCT SUBMITTED TO COLLECTION COLL 12-04
     PAST DUE PAST $452

AHL/Frazier
0104

Page  of 8

REF:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02

count Name/Number (Sources)                                    Past due      Last
Open      High    Payment  Balance MOP  Status  Rptd  30 60 90+ MR Dlq

Accounts under Applicant (continued):
------------------------------------------------------

6. SMALL LNS/7804 XXXX (EFX-420FP002611)
   I 01-02    399      91      399 I-9  COLL/P&L 02-05 01 01 14  38 12-03
     Hist: 02-05 9111111111111155555555155              APP
     ACCT SUBMITTED TO COLLECTION COLL 02-05
     CHARGE OFF CHRG $399 CHRG 02-05
     PAST DUE PAST $399
     PAID - CREDIT LINE CLOSED

7. HOLLOWAY CREDIT SOLUTI/474XXXX (EFX-420YA000001,XPN!,TUC!)
   I 04-01    187    N/A      187 Y-9  COLL/P&L 12-04  -  -  -   1
     Hist: 12-04 9                                      APP
     Ctgy: COLLECTION                       Term: REV
     CN: MEDICAL PAYMENT DATA
     UNPAID
     MEDICAL
     ACCT SUBMITTED TO COLLECTION COLL 12-04
     PAST DUE PAST $187

8. CRDT MGT/2674XXXX (EFX-682YC055531,TUC!)
   I 03-04    182    N/A      182 Y-9  COLL/P&L 04-04  -  -  -   1
     Hist: 04-04 9                                      APP
     Ctgy: COLLECTION                       Term: REV
     CN: COMCAST DOTHAN
     UNPAID
     ACCT SUBMITTED TO COLLECTION COLL 04-04

9. HOLLOWAY CREDIT SOLUTI/526XXXX (EFX-420YA000001,XPN!,TUC!)
   I 10-01     93    N/A       93 Y-9  COLL/P&L 12-04  -  -  -   1
     Hist: 12-04 9                                      APP
     Ctgy: COLLECTION                       Term: REV
     CN: MEDICAL PAYMENT DATA
     UNPAID
     MEDICAL
     ACCT SUBMITTED TO COLLECTION COLL 12-04
     PAST DUE PAST $93

10. HOLLOWAY CREDIT SOLUTI/519XXXX (EFX-420YA000001,XPN!,TUC!)
    I 09-01     93    N/A       93 Y-9  COLL/P&L 12-04  -  -  -   1
      Hist: 12-04 9                                     APP
      Ctgy: COLLECTION                      Term: REV
      CN: MEDICAL PAYMENT DATA
      UNPAID
      MEDICAL
      ACCT SUBMITTED TO COLLECTION COLL 12-04
      PAST DUE PAST $93

Page 7 of 8

```
CF:1-01966-27474-0000 03/17/2005        TID:1-01966-27474 03/17/2005 08:35:02
-----------------------------------------------------------------------------
Account Name/Number (Sources)                             Past due    Last
    Open      High    Payment  Balance MOP Status  Rptd  30 60 90+ MR Diq
-----------------------------------------------------------------------------

Accounts under Applicant (continued):
-------------------------------------

11. HOLLOWAY CREDIT SOLUTI/832XXXX (EFX-420YA00000I,XPN!,TUC!)
    I 11-03    93    N/A       93 I-9 COLL/P&L 12-04  -  -  -   1
    Hist: 12-04 9                                   APP
    Ctgy: COLLECTION                     Term: REV
    CN: MEDICAL PAYMENT DATA
    UNPAID
    MEDICAL
    ACCT SUBMITTED TO COLLECTION COLL 12-04
    PAST DUE PAST $93

12. SMALL LNS/7804 XXXX (EFX-420FP002611)
    I 03-02    90      90       59 I-9 COLL/P&L 02-05 01 01 15  36 12-03
    Hist: 02-05 9111111111111155555155        APP
    ACCT SUBMITTED TO COLLECTION COLL 02-05
    CHARGE OFF CHRG $59 CHRG 02-05
    PAST DUE PAST $59
    PAID - CREDIT LINE CLOSED

13. HOLLOWAY CREDIT SOLUTI/357XXXX (EFX!,XPN-YC1984893I,TUC!)
    I 10-99   255    N/A      -0-  Y-9 COLL/P&L 12-04  -  -  -   3
    Hist: 12-04 9-9                                 APP
    Ctgy: COLLECTION                     Term: REV
    CN: GRACEBA TOTAL COMMUNICATIONS
    PAID
    ACCT SUBMITTED TO COLLECTION COLL 12-04
    CHARGE OFF: PAID CHRG 12-04 PAID 12-04
    ACCT SUBMITTED TO COLLECTION; PAID COLL 12-04

14. HOLLOWAY CREDIT SOLUTI/265XXXX (EFX!,XPN-YC1984893I)
    I 06-99    38    N/A      N/A  Y-9 COLL/P&L 12-04  -  -  -   3
    Hist: 12-04 9-9                                 APP
    Ctgy: COLLECTION                     Term: REV
    CN: MEDICAL PAYMENT DATA
    PAID
    MEDICAL
    ACCT SUBMITTED TO COLLECTION COLL 12-04

15. FARMERS FURN/9950127812230XXXX (TUC-H052SR0021)
    I 12-99   892      0     CLOSED I-9 COLL/P&L 10-03 00 00 00  46
    Hist: 10-03 9------------------        APP
    Ctgy: INSTALLMENT SALES CONTRACT
    PAST DUE PAST $154
    CHARGE OFF CHRG $154 CHRG 10-01
    CLOSED
```

AHL/Frazier
0106