**Hall-Frazier**
**Record - 001500**

Page  of 8

```
F:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02
```

| Account Name/Number (Sources) | | | | | | | Past due | | | Last |
|---|---|---|---|---|---|---|---|---|---|---|
| Open | High | Payment | Balance | MOP | Status | Rptd | 30 60 90+ | | MR | Diq |

Accounts under Applicant (continued):

13. HOLLOWAY CREDIT SOLUTI/832XXXX (EFX-420YA000001,XPN!,TUC!)
    I 11-03    93   N/A        93 I-9 COLL/P&L 12-04  - - -  1
    Hist: 12-04 9                                     APP
    Ctgy: COLLECTION                         Term: REV
    CN: MEDICAL PAYMENT DATA
    UNPAID
    MEDICAL
    ACCT SUBMITTED TO COLLECTION COLL 12-04
    PAST DUE PAST $93

12. SMALL LNS/7804 XXXX (EFX-420FP002651)
    I 03-02    90        90   59 I-9 COLL/P&L 02-05 01 01 15  36 12-03
    Hist: 02-05 9111111111111555555155             APP
    ACCT SUBMITTED TO COLLECTION COLL 02-05
    CHARGE OFF CHRG $59 CHRG 02-05
    PAST DUE PAST $59
    PAID - CREDIT LINE CLOSED

13. HOLLOWAY CREDIT SOLUTI/357XXXX (EFX!,XPN-YC19848931,TUC!)
    I 10-99    255   N/A       -0-  Y-9 COLL/P&L 12-04  - - -  3
    Hist: 12-04 9-9                                  APP
    Ctgy: COLLECTION                         Term: REV
    CN: GRACEBA TOTAL COMMUNICATIONS
    PAID
    ACCT SUBMITTED TO COLLECTION COLL 12-04
    CHARGE OFF; PAID CHRG 12-04 PAID 12-04
    ACCT SUBMITTED TO COLLECTION; PAID COLL 12-04

14. HOLLOWAY CREDIT SOLUTI/265XXXX (EFX!,XPN-YC19848931)
    I 06-99    38   N/A       N/A  Y-9 COLL/P&L 12-04  - - -  3
    Hist: 12-04 9-9                                  APP
    Ctgy: COLLECTION                         Term: REV
    CN: MEDICAL PAYMENT DATA
    PAID
    MEDICAL
    ACCT SUBMITTED TO COLLECTION COLL 12-04

15. FARMERS FURN/9950127812230XXXX (TUC-H052SR0021)
    I 12-99    892      0   CLOSED I-9 COLL/P&L 10-03 00 00 00  46
    Hist: 10-03 9-------------------------         APP
    Ctgy: INSTALLMENT SALES CONTRACT
    PAST DUE PAST $154
    CHARGE OFF CHRG $154 CHRG 10-01
    CLOSED
```

AHL/Frazier
0106

Page ● of 8

------------------------------------------------------------------
●:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02
------------------------------------------------------------------
Account Name/Number (Sources)                          Past due      Last
     Open       High   Payment   Balance MOP Status  Rptd 30 60 90+ MR Dlq
------------------------------------------------------------------

Accounts under Applicant (continued):
----------------------------------------
  16. FARMERS FURN/117812230XXXX (TUC-H0528R002)
      I 09-99     640      0          CLOSED I-0 UNRATED 02-01 00 00 00   17
        Hist: 02-01 11111111111111111                         APP
        Ctgy:  INSTALLMENT SALES CONTRACT
        CLOSED

  17. FRIEDMANS JEWELERS/561821004XXXX (EFX!,XPN!,TUC-J01V88001!)
      I 12-01     400      0          CLOSED I-9 COLL/P&L 03-05 01 01 01  39 07-02
        Hist: 03-05 9-9999999999-999999-9999                  APP
        Ctgy:  INSTALLMENT SALES CONTRACT
        ACCT SUBMITTED TO COLLECTION COLL 01-05
        CHARGE OFF CHRG $400 CHRG 08-02
        PAST DUE PAST $400

  18. PROVIDIAN FINANCIAL/050077XXXX (EFX-163B8253121,XPN!,TUC!)
      I 03-98     805      0          CLOSED R-9 COLL/P&L 07-02 01 01 04  53 11-98
        Hist: 07-02 9---9999999999999999999                   APP
                                                  Term: REV
        ACCT SUBMITTED TO COLLECTION COLL 07-02
        CHARGE OFF CHRG $671 CHRG 05-98
        CLOSED BY CREDITOR
        PAST DUE PAST $659
        ACCT TRANSFERRED
        ACCT PURCHASED BY ANOTHER LENDER

  19. SMALL LNS/7804 XXXX (EFX-420FP00261)
      I 02-02      90      0          CLOSED I-1 CURRENT  05-02 00 00 00   4
        Hist: 05-02 1111                                      APP
        PAID - CREDIT LINE CLOSED

  20. SMALL LNS/7804 XXXX (EFX-420FP00261)
      I 12-01      88      0          CLOSED I-1 CURRENT  03-02 00 00 00   4
        Hist: 03-02 1111                                      APP
        PAID - CREDIT LINE CLOSED

  21. SMALL LNS/7804 XXXX (EFX-420FP00261)
      I 11-01      88      0          CLOSED I-1 CURRENT  02-02 00 00 00   3
        Hist: 02-02 111                                       APP
        PAID - CREDIT LINE CLOSED

  22. SMALL LNS/7804 XXXX (EFX-420FP00261)
      I 10-01      88      0          CLOSED I-1 CURRENT  01-02 00 00 00   4
        Hist: 01-02 1111                                      APP
        PAID - CREDIT LINE CLOSED

Hall-Frazier
Record - 001502

Page __ of 8

F:1-01966-27474-0000 03/17/2005        TID:1-01966-27474 03/17/2005 08:35:02

| Account Name/Number (Sources) | | | | | | | Past due | | | Last |
|---|---|---|---|---|---|---|---|---|---|---|
| Open | High | Payment | Balance | MOP | Status | Rptd | 30 | 60 | 90+ | MR Dlq |

Accounts under Applicant (continued):

23. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 09-01    88    0        CLOSED I-1 CURRENT 12-01 00 00 00    4
      Hist: 12-01 1111                                    APP
      PAID - CREDIT LINE CLOSED

24. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 08-01    88    0        CLOSED I-1 CURRENT 10-01 00 00 00    3
      Hist: 10-01 111                                     APP
      PAID - CREDIT LINE CLOSED

25. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 07-01    88    0        CLOSED I-1 CURRENT 10-01 00 00 00    4
      Hist: 10-01 1111                                    APP
      PAID - CREDIT LINE CLOSED

26. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 06-01    88    0        CLOSED I-1 CURRENT 09-01 00 00 00    4
      Hist: 09-01 1111                                    APP
      PAID - CREDIT LINE CLOSED

27. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 04-01    88    0        CLOSED I-1 CURRENT 07-01 00 00 00    4
      Hist: 07-01 1111                                    APP
      PAID - CREDIT LINE CLOSED

28. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 11-00    247    0       CLOSED I-1 CURRENT 05-01 00 00 00    7
      Hist: 05-01 1111111                                 APP
      PAID - CREDIT LINE CLOSED

29. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 10-00    86    0        CLOSED I-1 CURRENT 01-01 00 00 00    4
      Hist: 01-01 1111                                    APP
      PAID - CREDIT LINE CLOSED

30. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 08-00    173    0       CLOSED I-1 CURRENT 01-01 00 00 00    5
      Hist: 01-01 11111                                   APP
      PAID - CREDIT LINE CLOSED

31. SMALL LNS/7804XXXX (EFX-420FP00261)
    I 12-99    173    0       CLOSED I-1 CURRENT 05-00 00 00 00    6
      Hist: 05-00 111111                                  APP
      PAID - CREDIT LINE CLOSED

32. SMALL LNS/7804 XXXX (EFX-420FP002611)
    I 03-00    173    0       CLOSED I-2 DEL 30  09-00 01 00 00    7 09-00
      Hist: 09-00 2------                                 APP

AHL/Frazier
0108

Page __ of 8

REF:1-01966-27474-0000 03/17/2005        TID:1-01966-27474 03/17/2005 08:35:02
----------------------------------------------------------------------------

**Identification Information:**
--------------------------------
1. HILL, CHERLY  Ssn: ▓▓▓▓▓       Age:45  (EFX)
2. HALL, CHERYL  Ssn: ▓▓▓▓▓       (XPN)
3. HALL, CHERYL R  ▓▓▓▓▓▓ 09 Dob: 07-01-59 (TUC)

**Inquiries made in the last 180 days:**
------------------------------------------
1. 03-17-05 FAC  (TUC-E05635118) (APP)
2. 03-16-05 TRANSUNION  (EFX-6662B05471) (APP)
3. 03-16-05 TRANSUNION RESID CR SO  (XPN-ZC19T2538) (APP)
4. 03-16-05 TU MRTG DPT  (TUC-K00005270) (APP)
5. 03-10-05 LANDSAFE  (EFX-1802B07577) (APP)
6. 03-10-05 LANDSAFE CRT  (TUC-207183223) (APP)
7. 03-10-05 LANDSAFECREDIT  (XPN-FR3970658) (APP)
8. 03-08-05 DITECH  (EFX-180FM10442) (APP)
9. 03-08-05 GMAC MORTGAGE  (XPN-FM8909276) (APP)
10. 03-08-05 GMAC MTG  (TUC-N01201031) (APP)
11. 03-08-05 LEWIS BRAC  (EFX-420YC00105) (APP)
12. 03-04-05 FA CREDCO  (EFX-1612B03724) (APP)
13. 03-04-05 FA CREDCO  (TUC-F01207015) (APP)
14. 03-04-05 FIRST AMER CR SVCS INC  (XPN-FR3988260) (APP)
15. 12-14-04 DTHN LOAN  (EFX-420FP01087) (APP)
16. 09-26-04 1ST PREMIER  (TUC-B00020123) (APP)

**Address Information:**
-------------------------
1. 295 MALIBU ST
   KINSEY, AL 36303 7761 Rptd 04-95  (XPN) (APP)
2. 295 MALIBU ST
   DOTHAN, AL 36303 Rptd 02-98  (TUC) (APP)
3. 302 TRIM ST
   DOTHAN, AL 36301 Rptd 02-05  (EFX) (APP)
4. 105 TV RD
   DOTHAN, AL 36301 5333 Rptd 08-04  (XPN) (APP)
5. 105 TV RD
   DOTHAN, AL 36301 Rptd 04-04  (TUC) (APP)
6. 541 WALNUT ST #A5
   ELIZABETH, NJ 07201 1126 Rptd 09-94  (XPN) (APP)

**AKA Information:**
---------------------
1. CHERYL, R HALL  (XPN) (APP)
2. DIXON, CHERYL R  (XPN) (APP)
3. DIXON, CHERYL, R  (TUC) (APP)
4. FRAZIER, CHERYL  (TUC) (APP)
5. HILL, CHERLY, R  (TUC) (APP)

**Employment Information:**
----------------------------
1. DISABLED
   OCCUPATION UNKNOWN  (EFX) (APP)

Page 6 of 8

REF:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02

Employment Information (continued):
--------------------------------------
    2. EBONY EXPRESSIONS E ORANGE, NJ
       OCCUPATION UNKNOWN Rptd 09-94  (XPN) (APP)
    3. GENERAL CIGAR
       OCCUPATION UNKNOWN  (EFX) (APP)
    4. GENERAL CIGAR DOTHAN, AL
       MACH OPERATOR Rptd 08-95  (TUC) (APP)
    5. UNEMPLOYED
       OCCUPATION UNKNOWN  (EFX) (APP)

Miscellaneous Information:
-----------------------------
    1. Variation between Inquiry and Onfile address  (EFX) (APP)
    2. Variation between Inquiry and Onfile address  (XPN) (APP)

Decode Directory Information:
--------------------------------
    1. FIRST AMER CR SVCS INC (XPN-3988260)
       (516)832-3400, 333 EARLE OVINGTON BLVD, UNIONDALE, NY 11553
    2. FRIEDMANS JEWELERS (XPN-1318660)
       (800)545-9033, 171 CROSSROADS PKWY, SAVANNAH, GA 31408
    3. GMAC MORTGAGE (XPN-8909276)
       (714)800-5871, 3200 PARK CENTER DR STE, COSTA MESA, CA 92626
    4. HOLLOWAY CREDIT SOLUTI (XPN-1984093)
       BY MAIL ONLY, PO BOX 6441, DOTHAN, AL 36302
    5. LANDSAFECREDIT (XPN-3970658)
       (818)583-1962, 155 N LAKE AVE, PASADENA, CA 91101
    6. PALISADES COLLECTION L (XPN-1983922)
       (800)991-9367, 210 SYLVAN AVE, ENGLEWOOD, NJ 07632
    7. PROVIDIAN FINANCIAL (XPN-3206450)
       BY MAIL ONLY, PO BOX 9180, PLEASANTON, CA 94566
    8. TRANSUNION RESID CR SO (XPN-1972538)
       (866)871-0390, PO BOX 31423, INDEPENDENCE, OH 44131

Public Record Information:
-----------------------------
No Public Record Information found

Consumer Referral Information:
---------------------------------
EFX - EQUIFAX INFORMATION SVCS, PHONE: (800) 685-1111
      P.O. BOX 740241, ATLANTA, GA 30374
XPN - EXPERIAN, PHONE: (888) 397-3742
      P.O. BOX 2002, ALLEN, TX 75013
TUC - TRANS UNION, PHONE: (800) 916-8800
      P.O. BOX 34012, FULLERTON, CA 92834

Prepared By: First American CREDCO
             12395 First American Way
             Poway, CA 92064-6895
             Contact: 800 368 8891    Fax: 866 510 5762

REF:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02

This report contains information supplied by the repositories named above. Its
contents have not been verified by First American CREDCO and may contain
duplicate information. While this report is being used for some real estate
lending purposes, it is not a Residential Mortgage Credit Report as defined by
FNMA, FHLMC, and FHA/VA guidelines.

!!!!!! END OF INSTANT MERGE REPORT !!!!!!

End of Credit Report

AHL/Frazier
0111

I Cheryl Hall am borrowing against my home for home improvement reasons, as I am the caretaker of a disabled individual residing permanently at my residence. Improvements will be made to add easy access and comfort throughout the home.

```
***  REC 2005069  09405 61922B0 C1AV  CIPQYA7  7  (F-C1A )  ***
```

SOCIAL SECURITY ADMINISTRATION

Date: March 10, 2005
Claim Number: ███████

CHERYL H FRAZIER
105 TV RD
DOTHAN AL 36301-5333

You asked us for information from your record. The information that you
requested is shown below. If you want anyone else to have this information, you
may send them this letter.

Information About Supplemental Security Income Payments

Beginning April 2005, the current
Supplemental Security Income payment is...............$ 579.00

This payment amount may change from month to month if income or
living situation changes.

Supplemental Security Income Payments are paid the month they are due. (For
example, Supplemental Security Income Payments for March are paid in March.)

```
          0· C
          0· C
      579·00 ×
      125· 1
      723·75 *
```

06/28/2001 18:52   1-687-527-8383   ROBERT LOUCKS JR   PAGE 05

AHL/Frazier
0113

SOCIAL SECURITY
1778 WHATLEY DRIVE
DOTHAN AL 36303

**Social Security Administration**
**Supplemental Security Income**
Notice of Change in Payment
Date: November 28, 2004
Claim Number: 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 DI

628   B066,M,6E,647,491491      600091491 91 MB      0.349

CHERLY H FRAZIER
FOR MALIKA E ISMAIL
105 TV RD
DOTHAN AL 36301-6333

We are writing to tell you about changes in MALIKA E. ISMAIL's
Supplemental Security Income payments. The rest of this letter will tell you
more about this change.

We explain how we figured the monthly payment amounts shown below on the
last page of this letter. The explanation shows how her income, other than any
SSI payments, affects her SSI payment. It also shows how we decided how
much of her income affects her payment amount. We include explanations only
for months where payment amounts change.

**Information About MALIKA E. ISMAIL's Payments**

- The amount due her beginning January 2005 will be $579.00.

- The amount due her is being raised because the law provides for an
  increase in Supplemental Security Income payments in January 2005 if
  there was an increase in the cost of living during the past year.

**You Can Review The Information in MALIKA E. ISMAIL's Case**

The decisions in this letter are based on the law. You have a right to review
and get copies of the information in our records that we used to make the
decisions explained in this letter. You also have a right to review and copy
the laws, regulations and policy statements used in deciding her case. To do
so, please contact us. Our telephone number and address are shown under the
heading "If You Have Any Questions."

SSA-L8151                          See Next Page

AHL/Frazier
0114

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                        ●                    ●            Page 3 of 4

11/28/2004

- **Informal Conference.** You'll meet with the person who decides your case. You can tell that person why you think you're right. You can give us more facts to help prove you're right. You can bring other people to help explain your case.

### If You Want Help With Your Appeal

You can have a friend, lawyer or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it.

### If You Have Any Questions

For general information about SSI, visit our website at www.socialsecurity.gov on the Internet. There, you will also find the law and regulations about SSI eligibility and SSI payment amounts.

For general questions about SSI or specific questions about MALIKA E. ISMAIL's case, you may call us toll-free at 1-800-772-1213, or call your local Social Security office toll free at 800-962-8726. Our lines are busiest early in the week and early in the month, so if your business can wait, it's best to call at other times. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:

> SOCIAL SECURITY
> 1778 WHATLEY DRIVE
> DOTHAN AL 36303

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Jo Anne B. Barnhart
Commissioner
of Social Security

AHL/Frazier
0115

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                    ●                    ●         Page 4 of 4

11/28/2004

## HOW WE FIGURED MALIKA E. ISMAIL'S PAYMENT FOR January 2005 ON

### Her Payment Amount

| | |
|---|---|
| The most SSI money the law allows us to pay | $579.00 |
| We didn't subtract (-) any income from SSI money | = 0.00 |
| **Total Monthly SSI Payment for January 2005 on** | $579.00 |

AHL/Frazier
0116



SOCIAL SECURITY ADMINISTRATION

Date: March 21, 2005
Claim Number: 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DI

CHERLY H FRAZIER
FOR MALIKA B ISMAIL
105 TV RD
DOTHAN AL 36301-5333

You asked us for information from your record. The information that you
requested is shown below. If you want anyone else to have this information, you
may send them this letter.

Other Important Information

SOCIAL SECURITY FOUND MS ESMAIL TO BE DISABLED AS OF 03/76. WE STILL CONSIDER
HER TO BE DISABLED AS OF THIS DAY.

If You Have Any Questions

If you have any questions, you may call us at 1-800-772-1213, or call your
local Social Security office at 800-962-8726. We can answer most questions
over the phone. You can also write or visit any Social Security office. The
office that serves your area is located at:

SOCIAL SECURITY
1778 WHATLEY DRIVE
DOTHAN, AL 36303

If you do call or visit an office, please have this letter with you. It will
help us answer your questions.

OFFICE MANAGER

TOTAL P.01

AHL/Frazier
0117



\* I N C O M E \*





\* N E W D O C \*







AHL/Frazier
0118

**Hall-Frazier**
**Record - 001513**



* A S S E T S *





* N E W D O C *





* N E W D O C *



* N E W D O C *

Assets

**Hall-Frazier**
**Record - 001514**



* D I V O R C E *





* N E W D O C *





* N E W D O C *



* N E W D O C *

AHL/Frazier
0120

Divorce

**APPRAISAL OF REAL PROPERTY**

**LOCATED AT:**
CHERYL R. HALL
105 TV ROAD
DOTHAN, ALABAMA 36301-5333

**FOR:**
HOME FUNDS DIRECT
1130 NORTHCHASE PARKWAY
MARIETTA, GEORGIA 30067

**AS OF:**
MARCH 21, 2005

**BY:**
SPENCER L. MOORE
ALABAMA APPRAISAL SERVICES
POST OFFICE BOX 517
DOTHAN, ALABAMA 36302
(334) 793-8449
JMoore59@comcast.net

Moore Appraisals

Form GA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

AHL/Frazier
0121

Moore Appraisals

**Page #2**

**Summary Appraisal Report**
Property Description

# UNIFORM RESIDENTIAL APPRAISAL REPORT    File No.

| | | | |
|---|---|---|---|
| Property Address 105 TV ROAD | City DOTHAN | State AL | Zip Code 36301-5333 |
| Legal Description LOT 2, BLOCK "C" OF THE THIRD ADDITION TO TELEVISION HEIGHTS SUBDIVISION | | County HOUSTON | |
| Assessor's Parcel No. 10-09-31-4-003-001.007 | Tax Year 2004 | R.E. Taxes $ 498.82 | Special Assessments $ 0.00 |
| Borrower CHERYL R. HALL | Current Owner CHERYL R. HALL | Occupant ☒ Owner ☐ Tenant ☐ Vacant | |
| Property rights appraised ☒ Fee Simple ☐ Leasehold | Project Type ☐ PUD ☐ Condominium (HUD/VA only) | HOA $ NONE | /Mo. |
| Neighborhood or Project Name TELEVISION HEIGHTS | Map Reference PLAT BOOK 7, PAGE 23 | Census Tract 0409.00 | |
| Sale Price $ N/A | Date of Sale N/A | Description and $ amount of loan charges/concessions to be paid by seller N/A | |
| Lender/Client HOME FUNDS DIRECT | Address 1130 NORTHCHASE PARKWAY, MARIETTA, GEORGIA 30067 | | |
| Appraiser SPENCER L. MOORE | Address POST OFFICE BOX 517, DOTHAN, ALABAMA 36302 | | |

| Location | ☐ Urban ☒ Suburban ☐ Rural | Predominant occupancy | Single family housing | Present land use % | Land use change |
|---|---|---|---|---|---|
| Built up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | ☒ Owner | PRICE ($000) / AGE (yrs) | One family 75 | ☒ Not likely ☐ Likely |
| Growth rate | ☐ Rapid ☒ Stable ☐ Slow | ☒ Tenant 10 | 25 Low 15 | 2-4 family | ☐ In process |
| Property values | ☐ Increasing ☒ Stable ☐ Declining | | 100 High 45 | Multi-family | To: |
| Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply | ☒ Vacant (0-5%) | Predominant | Commercial | |
| Marketing time | ☐ Under 3 mos. ☒ 3-6 mos. ☐ Over 6 mos. | ☐ Vac.(over 5%) | 75 25 | VAC LAND 24 | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: BOUND ON THE NORTH BY ROSS CLARK CIRCLE, ON THE SOUTH BY MIMOSA, ON THE WEST BY THIRD AVENUE EXTENDED, AND ON THE EAST BY COTTONWOOD HIGHWAY.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): TELEVISION HEIGHTS IS AN OLDER DEVELOPMENT IN THE SOUTHEASTERN PART OF THE CITY JUST OUTSIDE THE CIRCLE AND WITHIN EASY ACCESS AND CONVENIENCE TO MAJOR SUPPORT FACILITIES VIA COTTONWOOD HIGHWAY, THIRD AVENUE AND ROSS CLARK CIRCLE. WIDE RANGING AGES, VALUES, SIZES, ETC. - TYPICAL OF OLDER, OUTLYING AREAS OF THE CITY. SUBJECT IS AT THE UPPER END OF SIZE AND VALUE RANGE FOR NEIGHBORHOOD BUT NOT CONSIDERED AN OVER IMPROVEMENT. DOTHAN EAST SUBDIVISION HAS NEWER, SMALLER HOMES. COMMERCIAL PROPERTIES ALONG ROSS CLARK CIRCLE, COTTONWOOD HIGHWAY, AND THIRD AVENUE - NO ADVERSE EFFECT.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): INTEREST RATES MOVING UP AND DOWN WITH AVERAGE 30 YEAR TERM RATES AROUND 5.95%. IT IS NOT UNCOMMON FOR SELLER TO CONTRIBUTE TO CLOSING COSTS/DISCOUNT POINTS. NO KNOWN REO PROPERTIES ON MARKET THAT WOULD ADVERSELY IMPACT PROPERTY VALUES. LIMITED SUPPLY/DEMAND BUT BALANCED. MARKETING TIME RANGES FROM 3 TO 4 MONTHS AND LONGER IF PROPERTY NOT PRICED REASONABLY. SUBJECT CONFORMS TO THE NEIGHBORHOOD.

| Project Information for PUDs (if applicable) - Is the developer/builder in control of the Home Owners' Association (HOA)? | | ☐ Yes ☐ No N/A |
|---|---|---|
| Approximate total number of units in the subject project N/A | Approximate total number of units for sale in the subject project N/A | |
| Describe common elements and recreational facilities: N/A | | |

| | | | |
|---|---|---|---|
| Dimensions 59' X 191.66' X 67.72' X 194.7' | | Topography AT GRADE/SLIGHT SLOPE | |
| Site area 16,461+- SF / 0.34 ACRES | Corner Lot ☐ Yes ☒ No | Size TYPICAL/CONFORMING | |
| Specific zoning classification and description RESIDENTIAL | | Shape MOSTLY RECTANGULAR | |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | Drainage APPEARS ADEQUATE | |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) N/A | | View AVERAGE / HOUSES | |
| Utilities Public Other | Off-site Improvements Type Public Private | Landscaping AVERAGE / CONFORMING | |
| Electricity ☒ | Street ASPHALT PAVED ☒ | Driveway Surface CONCRETE | |
| Gas ☐ NONE | Curb/gutter CONCRETE ☒ | Apparent easements TYPICAL/UTILITY | |
| Water ☒ | Sidewalk NONE ☐ | FEMA Special Flood Hazard Area ☐ Yes ☒ No | |
| Sanitary sewer ☒ | Street lights VAPOR/MERCURY ☒ | FEMA Zone X Map Date 11/21/2002 | |
| Storm sewer ☒ | Alley NONE | FEMA Map No. 01069C0226E | |
| Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): SUBJECT SITE CONFORMS TO NEIGHBORHOOD IN ALL RESPECTS. NO KNOWN OR OBSERVED ADVERSE UNFAVORABLE CONDITIONS. LOT SIZE/LEGAL FROM TAX OFFICE. | | | |

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units ONE | Foundation CONC SLAB | Slab YES | Area Sq. Ft. NONE | Roof ☐ |
| No. of Stories ONE | Exterior Walls BRICK/VINYL | Crawl Space NONE | % Finished N/A | Ceiling ☒ |
| Type (Det./Att.) DETACHED | Roof Surface ASPHALT | Basement NONE | Ceiling N/A | Walls ☒ |
| Design (Style) RANCH | Gutters & Dwnspts. YES/YES | Sump Pump N/A | Walls N/A | Floor ☐ |
| Existing/Proposed EXISTING | Window Type DB-HG/WOOD | Dampness NONE OBS | Floor N/A | None ☐ |
| Age (Yrs.) 32 YEARS | Storm/Screens NO/YES | Settlement NONE OBS | Outside Entry N/A | Unknown ☐ |
| Effective Age (Yrs.) 10-15 YRS | Manufactured House NO | Infestation NONE OBS | | OWNER VERIFIED |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | 1 | 1 | 1 | 1 | | | | 3 | 2 | X | SUN ROOM | 1,624 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains: 8 Rooms; 3 Bedroom(s); 2 Bath(s); 1,624 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | KITCHEN EQUIP. | ATTIC | AMENITIES | CAR STORAGE: CAR SHED |
|---|---|---|---|---|---|---|
| Floors | CPT-VYL/AVG | Type HT PMP | Refrigerator ☐ | None ☐ | Fireplace(s) # (1) ☒ | None ☐ |
| Walls | SR-PAN/AVG | Fuel ELEC | Range/Oven ☒ | Stairs ☐ | Patio 9 SF SLAB ☒ | Garage # of cars |
| Trim/Finish | WOOD/AVG | Condition GOOD | Disposal ☐ | Drop Stair ☐ | Deck NONE ☐ | Attached ☒ |
| Bath Floor | VINYL/AVG | COOLING | Dishwasher ☒ | Scuttle ☐ | Porch 224 SF ☒ | Detached DET 2-CAR |
| Bath Wainscot | FIBERGLASS/AVG | Central HT PMP | Fan/Hood ☐ | Floor ☐ | Fence CLF ☒ | Built-in ☐ |
| Doors | WOOD/HOLLOW | Other NONE | Microwave ☐ | Heated ☐ | Pool NONE ☐ | Carport CAR SHED |
| | | Condition GOOD | Washer/Dryer ☐ | Finished ☐ | | Driveway CONCRETE |

Additional features (special energy efficient items, etc.): AVERAGE CONSTRUCTION QUALITY. GARAGE CONVERTED TO LIVING AREA. HEAT PUMP. WOOD BURNING FIREPLACE. COVERED PORCH. CAR SHED. DETACHED 24' X 24' GARAGE/WORK SHOP. CLF REAR YARD.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: SUBJECT IS IN GOOD CONDITION WITH NO NOTED MAJOR DEFERRED MAINTENANCE/NEEDED REPAIRS. SUBJECT HAS ADEQUATE FLOOR PLAN/TRAFFIC PATTERN. NO OBSERVED FUNCTIONAL INADEQUACY. NO KNOWN OR OBSERVED ADVERSE EXTERNAL CONDITIONS THAT WOULD NEGATIVELY IMPACT PROPERTY VALUE.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: NO KNOWN OR OBSERVED ADVERSE ENVIRONMENTAL CONDITIONS PRESENT AND/OR WITHIN CLOSE PROXIMITY. HOWEVER, THE APPRAISER IS NOT AN EXPERT IN THIS VERY SPECIALIZED FIELD.

| Freddie Mac Form 70 6/93 | PAGE 1 OF 2 | Fannie Mae Form 1004 6/93 |
|---|---|---|

Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

AHL/Frazier
0122

**Hall-Frazier**
**Record - 001517**

[Page #3]

## UNIFORM RESIDENTIAL APPRAISAL REPORT    File No.

| Valuation Section | | |
|---|---|---|
| ESTIMATED SITE VALUE | = $ | 7,500 |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | |
| Dwelling 1,824 Sq. Ft. @ $ 45.00 = | 82,244 | |
| 233 Sq. Ft. @ $ 12.50 = | 2,913 POR/SLAB | |
| HP/ FP/ APPL/ SPEC FEA/ DET GAR/SHOP = | 19,788 | |
| Garage/Carport 102 Sq. Ft. @ $ 12.50 = | 1,275 CAR COVER | |
| Total Estimated Cost New = $ | 106,200 | |
| Less Physical Functional External | | |
| Depreciation 17,704 6,140 = $ | 23,844 | |
| Depreciated Value of Improvements = $ | 82,356 | |
| "As-is" Value of Site Improvements = $ | 2,600 | |
| INDICATED VALUE BY COST APPROACH (R) $92,000 = $ | 82,356 | |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property:  MARSHALL-SWIFT COST MANUAL
LIVING AREA CALCULATIONS - SEE ATTACHED SKETCH
ACTUAL AGE: 25 YEARS    EFFECTIVE AGE: 10-15 YEARS
DEFERRED MAINTENANCE/REPAIRS: NONE NOTED
FUNCTIONAL OBSOLESCENCE: NONE APPLIED
EXTERNAL OBSOLESCENCE: NONE APPLIED
LAND VALUE: $7,500
LAND IMPROVEMENTS: INCLUDES DRIVEWAY, LAND-
SCAPING, UTILITY HOOK-UPS, FENCE, ETC.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 106 TV ROAD DOTHAN, ALABAMA | 503 DEXTER STREET DOTHAN, ALABAMA | | 302 PINE HILLS DOTHAN, ALABAMA | | 701 CIRCLEVIEW DOTHAN, ALABAMA | |
| Proximity to Subject | | 0.96 miles | | 0.78 miles | | 1.08 miles | |
| Sales Price | $ N/A | $ | 97,500 | $ | 79,000 | $ | 76,700 |
| Price/Gross Living Area | $ | $ 49.12 | | $ 45.43 | | $ 47.58 | |
| Data and/or | FIELD | PUBLIC RECORDS/ | | PUBLIC RECORDS/ | | PUBLIC RECORDS/ | |
| Verification Source | INSPECTION | MLS/42 DAYS ON MARKET | | MLS/269 DAYS ON MARKET | | MLS/145 DAYS ON MARKET | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjust. | DESCRIPTION | +(-)$ Adjust. | DESCRIPTION | +(-)$ Adjust. |
| Sales or Financing | | CONVENTIONAL | 0 | CONVENTIONAL | 0 | CONVENTIONAL | 0 |
| Concessions | | CONCESS/$2,619 | 0 | CONCESSIONS | 0 | CONCESSIONS | 0 |
| Date of Sale/Time | | 07/22/2004 | 0 | 09/14/2004 | 0 | 03/11/2004 | 0 |
| Location | DOTHAN SE | DOTHAN SE | 0 | DOTHAN SE | 0 | DOTHAN SE | 0 |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | 0 | FEE SIMPLE | 0 | FEE SIMPLE | 0 |
| Site | 0.36 AC/AVG | 0.30 AC/AVG | 0 | 0.50 AC/AVG | 0 | 0.32 AC/AVG | 0 |
| View | AVG / HOUSES | AVG/EQUAL | 0 | AVG/EQUAL | 0 | AVG/EQUAL | 0 |
| Design and Appeal | 1-ST-RAN/AVG | 1-ST-RAN/AVG | 0 | 1-ST-RAN/AVG | 0 | 1-ST-RAN/AVG | 0 |
| Quality of Construction | BRK-VYL/AVG | BRK-ALUM/AVG | 0 | BRK-VYL/AVG | 0 | BRK-VYL/AVG | 0 |
| Age | 25 YRS / 10 EFF | 20 YRS / 10 EFF | 0 | 22 YRS / 10 EFF | 0 | 20 YRS/5 EFF | +2,500 |
| Condition | GOOD | GOOD | 0 | GOOD | 0 | GOOD | 0 |
| Above Grade | Total : Bdrms : Baths | Total : Bdrms : Baths | | Total : Bdrms : Baths | | Total : Bdrms : Baths | |
| Room Count | 8 : 3 : 2 | 8 : 3 : 2 | 0 | 8 : 4 : 2 | 0 | 8 : 3 : 2 | 0 |
| Gross Living Area | 1,824 Sq. Ft. | 1,985 Sq. Ft. | -3,220 | 1,739 Sq. Ft. | +1,700 | 1,612 Sq. Ft. | +4,240 |
| Basement & Finished | NONE | NONE | 0 | NONE | 0 | NONE | 0 |
| Rooms Below Grade | NONE | NONE | 0 | NONE | 0 | NONE | 0 |
| Functional Utility | AVERAGE | AVG/EQUAL | 0 | AVG/EQUAL | 0 | AVG/EQUAL | 0 |
| Heating/Cooling | HEAT PUMP | HEAT PUMP | 0 | CENT/CENT | 0 | HEAT PUMP | 0 |
| Energy Efficient Items | STANDARD | TYPICAL/EQUAL | 0 | TYPICAL/EQUAL | 0 | TYPICAL/EQUAL | 0 |
| Garage/Carport | 2-DET GAR/1-CP | 2-DET GAR/SHOP | +1,000 | 1-ATT CP | +2,500 | 2-DET GAR | 0 |
| Porch, Patio, Deck, | PORCH | EQUAL | 0 | NONE | +1,500 | FIREPLACE | 0 |
| Fireplace(s), etc. | FIREPLACE | FIREPLACE, $FRK | -1,000 | NONE | +1,500 | FENCE | 0 |
| Fence, Pool, etc. | CLF | CLF | 0 | CLF | 0 | | 0 |
| MISCELLANEOUS | APPL/ SPEC FEA | APPL/ EQ APPL | 0 | APPL/ EQ APPL | 0 | APPL/ EQ FEA | 0 |
| Net Adj. (total) | | + X - $ | 3,220 | X + - $ | 6,700 | X + - $ | 6,740 |
| Adjusted Sales Price | | Net 3.3 % | | Net 7.2 % | | Net 8.8 % | |
| of Comparable | | Gross 5.4 % $ | 94,280 | Gross 7.2 % $ | 84,700 | Gross 8.8 % $ | 83,440 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.):  SALE #2 AND SALE #4 - ABOVE GROUND POOLS -
NO VALUE CONTRIBUTION.  SUBJECT AND ALL 4 SALES LOCATED IN THE SOUTHEASTERN PART OF CITY AND ALL ARE SIMILAR AND
COMPARABLE TO SUBJECT IN CONSTRUCTION QUALITY, DESIGN, AND APPEAL AS WELL AS OTHER PHYSICAL CHARACTERISTICS.  SALE #4
ADDED FOR SUPPORT - SLIGHTLY OLDER THAN 12 MONTHS OLD BUT GOOD VALUE INDICATOR.  NOT POSSIBLE IN A CITY OF THIS SIZE TO HAVE
SALES OF 6 MONTHS OLD OR LESS.  THE SALES USED ARE THE BEST KNOWN SALES AVAILABLE AND THE MARKET APPROACH IS WELL
SUPPORTED AND A GOOD VALUE INDICATOR FOR SUBJECT.  (SEE "ADDITIONAL SALES" PAGE FOR FURTHER COMMENTS)

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | SOLD 04/02/2003 FOR $80,000 / LISTED $89,900 | NO SALE AND/OR LISTING IN PAST 12 MONTHS EXCEPT AS NOTED IN ABOVE GRID | NO SALE AND/OR LISTING IN PAST 12 MONTHS EXCEPT AS NOTED IN ABOVE GRID | NO SALE AND/OR LISTING IN PAST 12 MONTHS EXCEPT AS NOTED IN ABOVE GRID |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:
ACCORDING TO BOOK 586, PAGE 34, CURRENT OWNER ACQUIRED SUBJECT PROPERTY 04/02/2003 FOR $80,000.  BASED ON TAX RECORDS AND
MLS DATA, THERE HAVE BEEN NO OTHER OWNERSHIP CHANGES AND/OR LISTING ON MARKET IN PAST 36 MONTHS.

| INDICATED VALUE BY SALES COMPARISON APPROACH | | | | $ | 90,000 |
|---|---|---|---|---|---|
| INDICATED VALUE BY INCOME APPROACH (If Applicable) | Estimated Market Rent $ | N/A | /Mo. x Gross Rent Multiplier | N/A | = $ N/A |

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans & specifications.
Conditions of Appraisal:  THIS IS A COMPLETE APPRAISAL AND COMMUNICATED BY A SUMMARY REPORT.  THERE WAS INADEQUATE MARKET/RENTAL
DATA AVAILABLE TO FORMULATE A GRM FOR USE OF THE INCOME APPROACH TO VALUE.
Final Reconciliation:  COST APPROACH: $92,000    MARKET APPROACH: $90,000    INCOME APPROACH: N/A    THE MARKET APPROACH BEST
REFLECTS THE ACTIONS OF BUYERS AND SELLERS IN THE MARKET PLACE AND IS THE BEST VALUE INDICATION IN THIS CASE.  THE MARKET
APPROACH IS WELL SUPPORTED BY THE COST APPROACH.  THIS IS AN E-MAILED REPORT WITH ELECTRONIC SIGNATURES.
The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent
and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/FNMA Form 1004B (Revised    06/93    )
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF    MARCH 21, 2005
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $    90,000

| APPRAISER: | | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|---|
| Signature | James Moore | Signature | James M. Moore |
| Name SPENCER L. MOORE | | Name JAMES H. MOORE, SRA | ☒ Did ☐ Did Not Inspect Property |
| Date Report Signed  March 24, 2005 | | Date Report Signed  March 24, 2005 | |
| State Certification # | State AL | State Certification # G 00202 | State AL |
| Or State License #  T 01416 | State AL | Or State License # | State |

Freddie Mac Form 70  6/93    Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE    Fannie Mae Form 1004  6-93

AHL/Frazier
0123



Page #4

# UNIFORM RESIDENTIAL APPRAISAL REPORT
## MARKET DATA ANALYSIS

These recent sales of properties are most similar and proximate to subject and have been considered in the market analysis. The description includes a dollar adjustment, reflecting market reaction to those items of significant variation between the subject and comparable properties. If a significant item in the comparable property is superior to, or more favorable than, the subject property, a minus (–) adjustment is made, reducing the indicated value of the subject. If a significant item in the comparable is inferior to, or less favorable than, the subject property, a plus (+) adjustment is made, thus increasing the indicated value of the subject.

| ITEM | SUBJECT | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 105 TV ROAD DOTHAN, ALABAMA | 1431 COE DAIRY ROAD DOTHAN, ALABAMA | | | | | |
| Proximity to Subject | | 0.49 miles | | | | | |
| Sales Price | $ N/A | $ 89,900 | | $ | | $ | |
| Price/Gross Living Area | $ | $ 50.03 | | $ | | $ | |
| Data and/or Verification Sources | FIELD INSPECTION | PUBLIC RECORDS/ MLS/165 DAYS ON MARKET | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(–)$ Adjust. | DESCRIPTION | +(–)$ Adjust. | DESCRIPTION | +(–)$ Adjust. |
| Sales or Financing | | FHA | 0 | | | | |
| Concessions | | CONCESS/$1,542 | 0 | | | | |
| Date of Sale/Time | | 03/05/2004 | 0 | | | | |
| Location | DOTHAN SE | DOTHAN SE | 0 | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | 0 | | | | |
| Site | 0.38 AC/AVG | 0.27 AC/AVG | 0 | | | | |
| View | AVG / HOUSES | AVG / HOUSES | 0 | | | | |
| Design and Appeal | 1-ST-RAN/AVG | 1.5 ST-TRAD/AVG | 0 | | | | |
| Quality of Construction | BRK-VYL/AVG | VYL SID/AVG | 0 | | | | |
| Age | 26 YRS/ 10 EFF | 29 YRS/15 EFF | +2,500 | | | | |
| Condition | GOOD | GOOD | 0 | | | | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 6 3 2 | 8 4 2 | 0 | | | | |
| Gross Living Area | 1,824 Sq. Ft. | 1,797 Sq. Ft. | +540 | Sq. Ft. | | Sq. Ft. | |
| Basement & Finished | NONE | NONE | 0 | | | | |
| Rooms Below Grade | NONE | NONE | 0 | | | | |
| Functional Utility | AVERAGE | AVERAGE/EQUAL | 0 | | | | |
| Heating/Cooling | HEAT PUMP | CENT/CENT | 0 | | | | |
| Energy Efficient Items | STANDARD | TYPICAL/EQUAL | 0 | | | | |
| Garage/Carport | 2-DET GAR/1-CP | 1-ATT GAR; UTIL | +1,000 | | | | |
| Porch, Patio, Deck | PORCH | EQUAL | 0 | | | | |
| Fireplace(s), etc. | FIREPLACE | FIREPLACE | 0 | | | | |
| Fence, Pool, etc. | CLF | CLF | 0 | | | | |
| MISCELLANEOUS | APPL; SPEC FEA | APPL- EQ FEA | 0 | | | | |
| Net Adj. (total) | | ☒ + ☐ – $ | 4,040 | ☐ + ☐ – $ | | ☐ + ☐ – $ | |
| Adjusted Sales Price of Comparable | | Net 4.5 % | | Net % | | Net % | |
| | | Gross 4.5 % $ 93,940 | | Gross % $ | | Gross % $ | |
| Date, Price and Data Source for prior sales within year of appraisal | SOLD 04/02/2003 FOR $80,000 / LISTED $89,900 | NO SALE AND/OR LISTING IN PAST 12 MONTHS EXCEPT AS NOTED IN ABOVE GRID | | | | | |

Comments: (SALES DISCUSSION - CONTINUED)

IT IS NOT POSSIBLE IN A CITY THIS SIZE TO USE COMPARABLES ALL LOCATED WITHIN A CERTAIN AREA SUCH AS ON THE SAME SIDE OF HIGHWAY AND ON SAME SIDE OF RAILROAD TRACKS. SALES #1 AND #4 LOCATED ACROSS ROSS CLARK CIRCLE FROM SUBJECT. HOWEVER, NEIGHBORHOOD IS VERY COMPARABLE TO SUBJECT AND EQUAL IN LOCATION. SALES #1 AND #3 LOCATED ON OPPOSITE SIDES OF RAILROAD TRACK THAN SUBJECT. THERE ARE LIMITED SALES AVAILABLE. THE APPRAISER DID A 2 YEARS SALES SEARCH. THE SALES USED WERE THE BEST SALES AVAILABLE AND GOOD VALUE INDICATORS. THE RAILROAD TRACK AND HIGHWAY DO NOT KEEP THESE SALES FROM BEING GOOD COMPARABLE SALES.

Market Data Analysis 6-93

Form UA2 (AC) — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

AHL/Frazier
0124

**Location Map**

| Borrower/Client | CHERYL R. HALL | | | | |
|---|---|---|---|---|---|
| Property Address | 105 TV ROAD | | | | |
| City | DOTHAN | County | HOUSTON | State | AL |
| Lender | HOME FUNDS DIRECT | | | Zip Code | 36301-5333 |



Hall-Frazier
Record - 001520



**Building Sketch (Page - 1)**

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | CHERYL R. HALL | | | | | |
| Property Address | 105 TV ROAD | | | | | |
| City | DOTHAN | County | HOUSTON | State | AL | Zip Code 36301-5333 |
| Lender | HOME FUNDS DIRECT | | | | | |

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 1824.0 | 1824.0 |
| P/P | Porch | 222.8 | |
| | Slab | 9.0 | 232.8 |
| CAR | Car Shed | 101.7 | 101.7 |
| OTH | Detached Garage | 576.0 | 576.0 |
| Net LIVABLE Area | (Rounded) | | 1824 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 24.8 x 28.8 | | 714.2 |
| 20.8 x 31.9 | | 663.5 |
| 14.0 x 33.5 | | 357.0 |
| 4.0 x 22.3 | | 89.2 |
| 4 Items | (Rounded) | 1824 |

AHL/Frazier
0126



| Page #7 |

### Subject Photo Page

| Borrower/Client | CHERYL R. HALL | | | |
|---|---|---|---|---|
| Property Address | 106 TV ROAD | | | |
| City | DOTHAN | County HOUSTON | State AL | Zip Code 36301-5333 |
| Lender | HOME FUNDS DIRECT | | | |



**Subject Front**

| | |
|---|---|
| 106 TV ROAD | |
| Sales Price | N/A |
| Gross Living Area | 1,824 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | DOTHAN SE |
| View | AVG / HOUSES |
| Site | 0.38 AC/AVG |
| Quality | BRK-VYL/AVG |
| Age | 25 YRS / 10 EFF |



**Subject Rear**



**Subject Street**

AHL/Frazier
0127

Form PIC3x5.SR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE



**PHOTOGRAPH ADDENDUM**

| Borrower/Client | CHERYL R. HALL | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 105 TV ROAD | | | | | |
| City | DOTHAN | County | HOUSTON | State | AL | Zip Code | 36301-5323 |
| Lender | HOME FUNDS DIRECT | | | | | |



LIVING ROOM



DEN



GUN ROOM



**PHOTOGRAPH ADDENDUM**                                              Page #8

| Borrower/Client | CHERYL R. HALL | | | |
| Property Address | 105 TV ROAD | | | |
| City DOTHAN | County HOUSTON | State AL | Zip Code 36301-5333 |
| Lender | HOME FUNDS DIRECT | | | |



KITCHEN



DINING



DETACHED GARAGE/WORK SHOP
24' X 24'

Form GPIC3X5 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE





## Comparable Photo Page

| | | | | |
|---|---|---|---|---|
| Borrower/Client | CHERYL R. HALL | | | |
| Property Address | 105 TV ROAD | | | |
| City DOTHAN | County HOUSTON | | State AL | Zip Code 36301-5333 |
| Lender HOME FUNDS DIRECT | | | | |



### Comparable 1

603 DEXTER STREET
Prox. to Subject 0.96 miles
Sale Price 97,500
Gross Living Area 1,965
Total Rooms 8
Total Bedrooms 3
Total Bathrooms 2
Location DOTHAN SE
View AVG/EQUAL
Site 0.30 AC/AVG
Quality BRK-ALUM/AVG
Age 20 YRS / 10 EFF



### Comparable 2

302 PINE HILLS
Prox. to Subject 0.76 miles
Sale Price 79,000
Gross Living Area 1,739
Total Rooms 8
Total Bedrooms 4
Total Bathrooms 2
Location DOTHAN SE
View AVG/EQUAL
Site 0.50 AC/AVG
Quality BRK-VYL/AVG
Age 22 YRS / 10 EFF



### Comparable 3

701 CIRCLEVIEW
Prox. to Subject 1.09 miles
Sale Price 76,700
Gross Living Area 1,612
Total Rooms 6
Total Bedrooms 3
Total Bathrooms 2
Location DOTHAN SE
View AVG/EQUAL
Site 0.32 AC/AVG
Quality BRICK/AVG
Age 29 YRS/15 EFF

Form PIC3x5.CR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

AHL/Frazier
0130

## Comparable Photo Page

| Borrower/Client | CHERYL R. HALL | | | | |
|---|---|---|---|---|---|
| Property Address | 106 TV ROAD | | | | |
| City | DOTHAN | County | HOUSTON | State | AL | Zip Code | 36301-5333 |
| Lender | HOME FUNDS DIRECT | | | | |



### Comparable 4

| | |
|---|---|
| 1431 COE DAIRY ROAD | |
| Prox. to Subject | 6.49 miles |
| Sale Price | 89,900 |
| Gross Living Area | 1,797 |
| Total Rooms | 6 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2 |
| Location | DOTHAN SE |
| View | AVG / HOUSES |
| Site | 0.27 AC/AVG |
| Quality | VYL SID/AVG |
| Age | 29 YRS/15 EFF |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

[ Page #12 ]

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**  The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it.  The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title.  The property is appraised on the basis of it being under responsible ownership.

2.  The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5.  The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value.  These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6.  The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal.  Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent  conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7.  The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8.  The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10.  The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent.  The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Page #13

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 105 TV ROAD, DOTHAN, ALABAMA 36301-5333

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: _James Moore_ | Signature: _James H. Moore_ |
| Name: SPENCER L. MOORE | Name: JAMES L. MOORE, SRA |
| Date Signed: March 24, 2005 | Date Signed: March 24, 2005 |
| State Certification #: | State Certification #: G 00202 |
| or State License #: T 01416 | or State License #: |
| State: ALABAMA | State: ALABAMA |
| Expiration Date of Certification or License: 09/30/2005 | Expiration Date of Certification or License: 09/30/2005 |

☒ Did    ☐ Did Not Inspect Property

FROM:
ALABAMA APPRAISAL SERVICES
POST OFFICE BOX 517
DOTHAN, ALABAMA 36302



| Page #14 |

| INVOICE | DATE 03/24/2005 | REFERENCE |
| --- | --- | --- |

TO:
HOME FUNDS DIRECT
1130 NORTHCHASE PARKWAY
MARIETTA, GEORGIA

| DESCRIPTION | AMOUNT |
| --- | --- |
| APPRAISAL OF HOUSE AND LOT LOCATED AT 105 TV ROAD IN DOTHAN, ALABAMA | 300.00 |
| OWNER/BORROWER: CHERYL HALL | |
| ATTN: KIM STEVENSON | |
| | |
| Subtotal | $  300.00 |
| Late Fee | $ |
| TOTAL | $  300.00 |

**ACCREDITED**
HOME LENDERS

## APPRAISAL DATA

| | | | |
|---|---|---|---|
| Borrower: CHERYL HALL | Loan #: 0503172917 | | Team: 351 - ATL351 |
| Property Address: 105 TV ROAD | | | |
| City: DOTHAN | State: AL | Zip Code: 36301 | County: HOUSTON |
| LTV: 86% | CLTV: 86% | | Loan Classification: A/FIXED/FUL DOC |

Is the appraiser on the Watch List?    Yes ☐    No ☒

**NEIGHBORHOOD**

| | |
|---|---|
| Location: | Suburban |
| Property Values: | Stable |
| Predominant Value: | 75 |

**SITE**

| | |
|---|---|
| Zoning Classification: | Residential |
| Zoning Compliance: | |
| Site Area: | 16,461 |
| FEMA Special Flood Hazard Area: | No |

**IMPROVEMENTS**

| | |
|---|---|
| Effective Age: | 15 |
| Physical Depreciation %: | 0.01% |
| Foundation: | Slab |
| Interior Floors: | Average |
| Interior Walls: | Average |
| Interior Trim/Finish: | Average |
| Doors: | Average |
| Bath Floor: | Average |
| Bath Wainscot: | Average |
| Heating: | FWA |
| Condition of Property: | Average |
| Infestation: | None |
| No. of Bedrooms: | 3 |
| No. of Bathrooms: | 2 |
| List Price $ | N/A |
| Days On Market: | N/A |
| Last Sale Price of Subject: | N/A |
| Last Sale Date of Subject: | N/A |

**SALES COMPARISON**

| | Comp. 1 | Comp. 2 | Comp. 3 | Comp. 4 | Comp. 5 | Comp. 6 |
|---|---|---|---|---|---|---|
| Proximity: | 0.96 MILES | 0.76 MILES | 1.08 MILES | | | |
| Date of Sale: | 7/28/2004 | 5/14/2004 | 5/11/2004 | | | |
| Site Size: | 0.30 ACRES | 0.50 ACRES | 0.32 ACRES | | | |
| No. of Bedrooms: | 3 | 4 | 3 | | | |
| Gross Adjustment %: | 5.4% | 7.2% | 8.8% | | | |

☒ Use Appraisal Data to Complete Review Analysis

This form was produced on the ACI Development RightPrism system (800)234-8727    AHLORG

Hall-Frazier
Record - 001530

**ACCREDITED** HOME LENDERS

### INTERNAL DESK REVIEW FORM

| | | |
|---|---|---|
| Borrower: CHERYL HALL | Loan #: 0503172917 | Team: 351 - ATL351 |
| Property Address: 105 TV ROAD | | |
| City: DOTHAN | State: AL    Zip Code: 36301 | County: HOUSTON |
| LTV: 86% | CLTV: 86% | Loan Classification: A/FIXED/FUL DOC |

Purchase ☐   Refi ☒   2nd ☐

Is the appraiser on the Watch List?   Yes ☐   No ☒

### Review Analysis

| | Yes | No | N/A |
|---|---|---|---|
| **Neighborhood** | | | |
| 1. Is the area described as urban or suburban? | ☒ | ☐ | ☐ |
| 2. Is the local market increasing or stable? | ☒ | ☐ | ☐ |
| 3. Is the appraised value less than the predominant value? | ☐ | ☒ | ☐ |
| **Site** | | | |
| 4. Is the property zoning residential? | ☒ | ☐ | ☐ |
| 5. Is the subject site 5 acres or less? | ☒ | ☐ | ☐ |
| 6. Is the zoning compliance stated as legal? | ☒ | ☐ | ☐ |
| 7. Is property not in a flood zone? | ☒ | ☐ | ☐ |
| **Improvements** | | | |
| 8. Is the property owner occupied? | ☒ | ☐ | ☐ |
| 9. Is the effective age under 30 years? | ☒ | ☐ | ☐ |
| 10. Is the physical depreciation calculated under 40%? | ☒ | ☐ | ☐ |
| 11. Is the foundation slab, crawl space, basement or post & pier? | ☒ | ☐ | ☐ |
| 12. Does the interior materials/condition indicate good or average? | ☒ | ☐ | ☐ |
| 13. Does the heating section indicate a permanent heat source? | ☒ | ☐ | ☐ |
| 14. Does sketch provide all exterior dimensions and rooms? | ☒ | ☐ | ☐ |
| 15. Is the condition of the property described as average or better? | ☒ | ☐ | ☐ |
| 16. Does the infestation section indicate none observed or noticed? | ☒ | ☐ | ☐ |
| **Sales Comparison** | | | |
| 17. Are the comps 1 mile or less from the subject? | ☐ | ☒ | ☐ |
| 18. Are the comps sales date within 6 mo. of the date of the appraisal? | ☐ | ☒ | ☐ |
| 19. Are the gross adjustments less than 25% of the comps sales price? | ☒ | ☐ | ☐ |
| 20. Was the last sale of the subject over 1 year ago or N/A? | ☐ | ☐ | ☒ |
| 21. Do the comps have the same bedroom count as the subject? | ☐ | ☒ | ☐ |
| 22. If the subject is a sale, is the list price and days on market stated? | ☐ | ☐ | ☒ |
| 23. If the subject is a refinance, is the previous sales history addressed? | ☐ | ☐ | ☒ |
| 24. If the subject has a view, is there a photo & description of the view? | ☐ | ☐ | ☒ |
| 25. If Functional or External obsolescence are present, is it described? | ☒ | ☐ | ☐ |
| 26. Does the report state the site size for both subject and comps? | ☒ | ☐ | ☐ |
| **Reconciliation** | | | |
| 27. Is the report less than 120 days old? (If over 120 days require appraisal update with a minimum of 2 comps) | ☒ | ☐ | ☐ |
| 28. Is the appraisal less than 180 days old? (If over 180 days old the report is unacceptable. Need new appraisal) | ☒ | ☐ | ☐ |

All the above numbered items should reflect a Yes or N/A. If the items reflect a No the appraisal report is nonconforming and requires additional comments or a detailed review from the AHL staff review appraiser.

Comments: THE VALUE IS SUPPORTED BY APPRAISAL INFORMATION.

Sales Price: $ _____    Appraiser's Value: $ 90,000    Recommended: $ 90,000

The only authorized reviewer of this form is an AHL Review Appraiser, Div. Credit Mgr., Underwriting Mgr. or Div. Manager. Sales Personnel are not approved to sign off on this form. This review cannot be delegated to a subordinate. The individual signing below has carefully read each question and has addressed each issue as it applies to the property.

Reviewer's Signature: _Audrey C. Williams_    Date: 03/24/2005

Clearly Print your name: Audrey Williams

Hall-Frazier
Record - 001531

0503172917

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well-informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

**SCOPE OF REVIEW:** The scope of this review is limited to the information being provided by the original appraiser; form an opinion as to the apparent adequacy and relevance of the data and the propriety of any adjustments to the data; form an opinion as to the appropriateness of the appraisal methods and techniques used and develop the reasons for any disagreement; form an opinion as to whether the analyses, opinions, and conclusions in the report under review are appropriate and reasonable, and develop the reasons for any disagreement.

## CERTIFICATION AND STATEMENT OF LIMITING CONDITIONS

**CERTIFICATION:** The Reviewer certifies and agrees that, to the best of his/her knowledge and belief:

1. The facts and data reported by the Reviewer and used in the review process are true and correct.

2. The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, unbiased professional analyses, opinions, and conclusions.

3. Unless stated elsewhere, I have no present or prospective interest in the property that is the subject of this report and I have no personal interest or bias with respect to the parties involved.

4. My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use of, this review report.

5. My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

6. Unless stated elsewhere in this report, I did not personally inspect the subject property, either interior or exterior, of the report under review.

7. No one provided significant professional assistance to the person signing this review report.

**CONTINGENT AND LIMITING CONDITIONS:** The certification of the Reviewer appearing in the review report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Reviewer in the review report.

1. The Reviewer assumes no responsibility for matters of a legal nature affecting the property which is the subject of this review or the title thereto, nor does the Reviewer render any opinion as to the title, which is assumed to be good and marketable.

2. The Reviewer is not required to give testimony or appear in court because of having made the review, unless arrangements have been previously made therefor.

3. The Reviewer assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The Reviewer assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

4. Information, estimates, and opinions furnished to the Reviewer, and contained in the review report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished the Reviewer can be assumed by the Reviewer.

5. Disclosure of the contents of the report is governed by the Uniform Standards of Professional Appraisal Practice and the Bylaws and Regulations of the professional appraisal organizations with which the appraiser is affiliated.

6. Neither all, nor any part of the content of the review report, or copy thereof (including the conclusions of the review, the identity of the Reviewer, professional designations, reference to any professional appraisal organizations, or the firm with which the Reviewer is connected), shall be used for any purposes by anyone but the client specified in the review report, it successors and assigns, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent and approval of the Reviewer.

7. No change of any item in the review report shall be made by anyone other than the Reviewer and the Reviewer shall have no responsibility for any such unauthorized change.

Reviewer: _Audrey C. Williams_
          Audrey Williams
Date: 03/24/2005
Reviewer's Certificate number: _____    State: _____
Reviewer Cert Expiry Date: _____

AHL/Frazier
0137

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
★ P R O P E R T Y ★




★ N E W D O C ★





‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
★ N E W D O C ★

AHL/Frazier
0138

Property

**Hall-Frazier**
**Record - 001533**



* N O T I C E S *





* N E W D O C *





* N E W D O C *



* N E W D O C *

AHL/Frazier
0139

**Hall-Frazier**
**Record - 001534**



**Home Funds.**
D I R E C T

# BORROWER COVER LETTER

March 17, 2005

CHERYL R HALL
105 TV ROAD
DOTHAN, AL 36301

RE: Residential Mortgage
Application # 0503172917

Dear CHERYL R HALL,

We are very pleased that you have submitted a loan application to Home Funds Direct for our review and consideration. We received your application on March 17, 2005.

Home Funds Direct , a licensed mortgage lender, is required under certain Federal Statutes to provide you the following disclosures for your review.

** Truth-In-Lending Disclosure Statement - Preliminary
** Good Faith Estimate of Loan Closing Costs & Special Information Booklet
** Mortgage-Servicing Transfer Disclosure
** Notice of Availability of Real Estate Appraisal
** Disclosure Notices

** Credit Score Notice and Credit Score Disclosure
** Provider of Service Addendum

The following disclosures will be included if applicable to your application.

** Notice to Customer Required by Federal Law - Federal Reserve - Regulation Z
** Variable Rate Loan Program Disclosure
   (applicable if ARM loan is desired initially or subsequently)
** Consumer Handbook on Adjustable Rate Mortgages

If you have any questions, please feel free to contact us at (866) 539-7025 .

Thanks again!
Kristopher Dillon
Home Funds Direct

Item 351 - ATL001
Home Funds Direct
1130 Northchase Parkway Suite 200, Marietta, GA 30067-6420
T (770) 984-2999    F(866) 539-7026

BORRCVLT.UFF

AHL/Frazier
0140

**Hall-Frazier**
**Record - 001535**

# PRELIMINARY TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

NOTE: All numerical disclosures except the late payment disclosure are estimates.

| Borrower Name(s): | Lender: |
|---|---|
| CHERYL R HALL | Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |

| | Date: 03/17/2005 | Loan #:0503172917 |
|---|---|---|
| | Loan Type: Conventional | |

Borrower Address:
105 TV ROAD
DOTHAN, AL 36301

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 8.681 % | $144,813.22 | $79,718.61 | $224,531.83 |

### PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $623.70 | 06/01/2005 | | | |
| 1 | $623.53 | 05/01/2035 | | | |

**DEMAND FEATURE:** [X] This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:** ☐ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
105 TV ROAD
DOTHAN, AL 36301

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms ☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $60.00

**PROPERTY INSURANCE:** [X] Property hazard insurance in the amount of the lesser of the loan amount or replacement cost with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender.
Hazard insurance ☐ is [X] is not available through the lender at an estimated cost of N/A for N/A year term.

**LATE CHARGES:** If your payment is more than 10 days late, you will be charged a late charge of 5.000% of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
☐ may [X] will not have to pay a penalty.
☐ may [X] will not be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| Borrower<br>CHERYL R HALL | Date | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

MIN # 100176105031729174
TRIPRELND.UFF

HALL
Page 1 of 1

Loan # 0503172917
Rev 12/04

AHL/Frazier
0141

**INITIAL**

Lender: Home Funds Direct
Address: 15090 Avenue of Science
San Diego, CA 92128
Applicant(s): CHERYL R HALL

Property Address: 206 TV ROAD
DOTHAN, AL 36301

**GOOD FAITH ESTIMATE**

Loan Number: 0503172917
Sales Price: $0.00
Base Loan Amount: $5,000.00
Total Loan Amount: $885,000.00
Type of Loan: Conventional Fixed
DatePrepared: March 17, 2005
Rate: 8.000     %Term: 360/360 mos

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates—the actual charges may be more or less. Your transaction may not involve a fee for every item listed.
The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1 A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 or HUD-1A | DESCRIPTION OF CHARGES | Lender | OTHER |
|---|---|---|---|
| 204.Lender Credit to borr. | | $ | $ |
| 801 Origination Fee | | 2,975.00 | $ |
| 802 Discount Points | | $ | $ |
| 803 Appraisal Fee | | $ | 300.00 |
| 804 Credit Report Fee | | $ | $ |
| 805 Final Inspection/442 Fee | | $ | $ |
| 807 Application Fee | | $ | $ |
| 809 Yield Spread Premium (POC) / Rebate to Broker(POC) (04-2%) | | $ | $ |
| 810 Processing Fee | | $ | $ |
| 811 Underwriting Fee | | 500.00 | $ |
| 813 Appraisal Review Fee | | 500.00 | $ |
| 815 Escrow Holdback Fee | | 500.00 | $ |
| 816 Funding Fee | | $ | $ |
| 818 Courier Fee | | $ | $ |
| 825 Warehouse Fee | | $ | $ |
| 827 Reverif Fee | | $ | $ |
| 828 Flood Cert/Life of Loan Fee | | 9.50 | $ |
| 829 Tax Service Fee | | 66.00 | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | SUB-TOTALS | 4,550.50 | 300.00 |

| | | | OTHER CHARGES |
|---|---|---|---|
| 901 Interest for 3 days @ @ 18.63 per day | | $ 55.89 | $ |
| 903 Hazard Insurance Premium | | $ | $ |
| 904 Flood Insurance Premium | | $ | $ |
| 1001 Hazard Insurance 0 month(s) @ $0.00 | | $ | $ |
| 1003 City Property Tax 0 month(s) @ $0.00 | | $ | $ |
| 1004 County Property Tax 0 month(s) @ $0.00 | | $ | $ |
| 1005 School Tax 0 month(s) @ $0.00 | | $ | $ |
| 1006 Flood Insurance 0 month(s) @ $0.00 | | $ | $ |
| 1008 Agg. Acctg. Adjustment | | $ | $ |
| 1101 Settlement / Closing Agent Fee | | $ | 550.00 |
| 1102 Abstract/Title Search Fee | | $ | $ |
| 1103 Title Examination Fee | | $ | $ |
| 1104 Title Insurance Binder | | $ | $ |
| 1105 Closing Agent/Attorney Doc Fee | | $ | 50.00 |
| 1106 Notary Fee | | $ | $ |
| 1107 Demand Fee | | $ | 75.00 |
| 1108 Title Insurance Premium | | $ | $ |
| 1201 Recording Fee - Deed/Mortgage | | $ | 60.00 |
| 1202 City/County Tax - Deed/Mortgage | | $ | $ |
| 1203 State Tax - Deed/Mortgage | | $ | $ |
| 1204 Misc Recording Fee | | $ | $ |
| 1205 Transfer Tax | | $ | $ |
| 1301 Survey Fee | | $ | $ |
| 1302 Pest Inspection | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| Lenders CFL License # | TOTAL ESTIMATED SETTLEMENT CHARGES | $ | 5,641.39 |

THIS GOOD FAITH ESTIMATE MAY DESCRIBE A LOAN WITH A PREPAYMENT PENALTY. YOU MAY ALSO REQUEST A REVISED ESTIMATE FOR LOAN TERMS THAT DO NOT INCLUDE SUCH A PENALTY.

"T" designates - The lender will require a particular provider from a lender-controlled or approved list. The specific provider and actual cost will appear on the HUD-1 or HUD-1A.
These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property. The undersigned acknowledges receipt of the booklet "Settlement Costs" and the Consumer Handbook on ARM mortgages, if applicable.
T Use of a particular provider of service is required and the estimate is based on charges of the provider. Please see attached Addendum.

**THIS DOES NOT CONSTITUTE A LOAN COMMITMENT**

| | | | |
|---|---|---|---|
| Borrower CHERYL R HALL | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

Hall-Frazier
Record - 001537

## PROVIDER OF SERVICE ADDENDUM

| Date:<br>March 17, 2005 | Loan Number:<br>0503172917 |
|---|---|

Lender Name:
Home Funds Direct

Lender Address:
15090 Avenue of Science
San Diego, CA 92128

Borrower(s) Name:
CHERYL R HALL

Property Address:
105 TV ROAD
DOTHAN, AL 36301

| ITEM NUMBER | NAME & ADDRESS OF PROVIDER | TELEPHONE NUMBER | NATURE OF RELATIONSHIP |
|---|---|---|---|
| 828 | First American Flood Data Services<br>11902 Burnet Road, Suite 400<br>Austin, TX 78758-2902 | (800) 447-1772 | First American Flood Data Services performs 100% of Flood Determinations |
| 829 | First American Real Estate Tax<br>100 Bayview Circle, Suite #2020<br>Newport Beach, CA 92660 | (800) 486-4829 | First American Real Estate Tax Service performs 100% of Tax Service Fee |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Borrower CHERYL R HALL | Date | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

GMD-377 (8301).02     1/99
VMP MORTGAGE FORMS - (312)293-8100 - (800)521-7291        0503172917

AHL/Frazier
0143

# RESPA SERVICING DISCLOSURE

0503172917

Lender: Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, whether or not your loan servicing is transferred. If you send a "qualified written request" to your servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day in which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates**

1. The following is the best estimate of what will happen to the servicing of your mortgage loan:

   [X] We may assign, sell or transfer the servicing of your loan while the loan is outstanding.    [X] We are able to service your loan and we [ ] will    [ ] will not    [X] haven't decided whether to service your loan.

   **OR**

   [ ] We do not service mortgage loans, [ ] and we have not serviced mortgage loans in the past three years.

   [ ] We presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed about your servicer.

   [ ] We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors. For the program you have applied for, we expect to:

   [ ] sell all of the mortgage servicing    [ ] retain all of the mortgage servicing
   [ ] assign, sell or transfer ____ % of the mortgage servicing

2. For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of mortgage loans for which we will transfer servicing is between:

   ____ [0 to 25%] or [NONE]    ____ 26 to 50%    ____ 51 to 75%    X    [76 to 100%] or [ALL]

This estimate [X] does [ ] does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. [X] We have previously assigned, sold or transferred the servicing of federally related mortgage loans.

   **OR**

   [ ] This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

   | Year | Percentage of Loans Transferred   (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
   |------|------|
   | _____ | _____ % |
   | _____ | _____ % |
   | _____ | _____ % |

This information [X] does [ ] does not include assignments, sales or transfers to affiliates or subsidiaries.

March 17, 2005                                Home Funds Direct
Date                                          Present Servicer or Lender

**ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT**

I/We have read this disclosure form and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.

Applicant  CHERYL R HALL _____    Date ____    Applicant _____    Date ____

Applicant _____    Date ____    Applicant _____    Date ____

552R (9910).01    VMP MORTGAGE FORMS - (800)521-7291    12/94

0503172917

AHL/Frazier
0144

## DISCLOSURE NOTICES

| Applicant(s)<br>CHERYL R HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| | Date: March 17, 2005 |

Property Address
105 TV ROAD
DOTHAN, AL 36301

### AFFIDAVIT OF OCCUPANCY

The Applicant(s) hereby certify and acknowledge that, upon taking title to the real property described above, their occupancy status will be as follows:

[X] Primary Residence - Occupied by Applicant(s) within 60 days of closing.

[ ] Secondary Residence - To be occupied by Applicant(s) at least 15 days yearly, as second home (vacation, etc.), while maintaining
principal residence elsewhere. (Please check this box if you plan to establish it as your primary residence at a future date (i.e., retirement)).

[ ] Investment Property - Not owner occupied. Purchased as an investment to be held or rented.

The Applicant(s) acknowledge it is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning this loan application as applicable under the provisions of Title 18, United States Code, Section 1014.

### FAIR CREDIT REPORTING ACT

An investigation will be made as to the credit standing of all individuals seeking credit in this application. The nature and scope of any investigation will be furnished to you upon written request made within a reasonable period of time. In the event of denied credit due to an unfavorable consumer report, you will be advised of the identity of the Consumer Reporting Agency making such report and of right to request within sixty (60) days the reason for the adverse action, pursuant to provisions of Section 615(b) of the Fair Credit Reporting Act. You have the right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency if an adverse action is taken on your loan application. Under Section 612 of the Fair Credit Reporting Act you have the right to obtain within 60 days of an adverse action a free copy of the report from the consumer reporting agency. You also have the right to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

### EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on a basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Income which you receive as alimony, child support or separate maintenance need not be disclosed to this creditor unless you choose to rely on such sources to qualify for the loan. Income from these and other sources, including part-time or temporary employment, will not be discounted by this lender because of your sex or marital status. However, we will consider very carefully the stability and probable continuity of any income you disclose to us. The Federal Agency that administers compliance with this law concerning this creditor is:
FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY
ROOM 4037
WASHINGTON, D.C. 20580

MIN# 100176105031729174
AHL DISCNTC1.UFF

HALL
Page 1 of 3

Loan# 0503172917
Rev. 05/04

AHL/Frazier
0145

Hall-Frazier
Record - 001540

# DISCLOSURE NOTICES

## GOVERNMENT LOANS ONLY

RIGHT TO FINANCIAL PRIVACY ACT OF 1978 - This is notice to you as required by the Right to Financial Privacy Act of 1978 that the Department of Housing and Urban Development or Department of Veterans Affairs has a right of access to financial records held by a financial institution in connection with the consideration of administration of assistance to you. Financial records involving your transaction will be available to the Department of Housing and Urban Development or Department of Veterans Affairs without further notice or authorization but will not be disclosed or released to another Government agency or Department without your consent except as required or permitted by law.

## EMPLOYMENT CERTIFICATION

An approval for a loan is based upon employment , income and obligations as shown on the loan application. At closing, the applicant and
co-applicant/spouse, if applicable, are required to execute a sworn statement affirming that they are currently working as previously reported, have not
received notice of layoff nor have knowledge of pending layoff, and that outstanding obligations are substantially the same as reported on the application. Should a change occur in your employment or financial status prior to loan closing, immediately notify your loan officer, as it will be necessary to obtain approval of any changes.

## ☐ ANTI-COERCION STATEMENT

The lender may not require the applicant to take insurance through any particular insurance agent or company to protect the mortgaged property. The applicant, has the right to have the insurance placed with an insurance agent or company of his choice, provided the company meets the requirements of the lender. The lender has the right to designate reasonable financial requirements as to the company and the adequacy of the coverage.

I have read the foregoing statement , and understand my rights and privileges and those of the lender relative to the placing of such insurance.

I have selected the following agencies to write the insurance covering the property described above:

| Insurance Company Name | Agent |
|---|---|

| Agent's Address | Agent's Telephone Number |
|---|---|

## ☐ FLOOD INSURANCE NOTIFICATION

Federal regulations require us to inform you that the property used as security for this loan is located in an area identified by the Federal Emergency Management Agency (FEMA) as having special flood hazards and that in the event of damage to the property caused by flooding in a Federally-declared disaster, Federal disaster relief assistance, if authorized, will be available for the property.
At the closing you will be asked to acknowledge your receipt of this information. If you have any questions concerning this notice, kindly contact your loan officer.
IMPORTANT: Please notify your insurance agent that the "loss payable" clause for the mortgagee on both the hazard and flood insurance must read as follows, unless otherwise advised:

AHL/Frazier
0146

**Hall-Frazier**
**Record - 001541**

## DISCLOSURE NOTICES

I/We hereby certify that I/we have read the Notices set forth above and fully understand all of the above. In addition to these Notices, I/we the applicant(s) certify that I/we have received the "Settlement Cost Booklet" and the "Consumer Handbook on Adjustable Rate Mortgages" (CHARM booklet), if applicable.

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| CHERYL R HALL | | | |

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| | | | |

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| | | | |

| Borrower | Date | Borrower | Date |
|---|---|---|---|
| | | | |

MIN# 100176105031729174              HALL              Loan# 0503172917
AHL DISCNTC3.UFF                 Page 3 of 3              Rev. 05/04

AHL/Frazier
0147

## APPRAISAL DISCLOSURE

| Borrower Name(s): | Lender: |
|---|---|
| CHERYL R HALL | Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128<br><br>0503172917 |

| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 17, 2005 |

You have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please write to us at the mailing address we have provided. We must hear from you no later than 90 days after we notify you about the action taken on your credit application or you withdraw your application.

```
Contact:        Verria Neal
Lender/Broker:  Home Funds Direct
Address:        1130 Northchase Parkway
                Suite 200
                Marietta, GA 30067-6420
Telephone:      (866) 539-7025
```

In your letter, give us the following information:

```
Your Name
Your Address
Your Telephone Number
```

| Borrower CHERYL R HALL | Date | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

100176105031729174                                    0503172917

VMP-122 (0004).02            VMP MORTGAGE FORMS - (800)521-7291            12/93

AHL/Frazier
0148

## Borrower's Certification & Authorization

### Certification

0503172917

The undersigned certify the following:

1. I/We have applied for a mortgage loan from Home Funds Direct
   *(lender)*. In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information.

2. I/We understand and agree that Home Funds Direct
   *(lender)* reserves the right to change the mortgage loan review process to a full documentation program. This may include verifying the information provided on the application with the employer and/or the financial institution.

3. I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

### Authorization to Release Information

To Whom It May Concern:

1. I/We have applied for a mortgage loan from Home Funds Direct
   *(lender)*. As part of the application process, Home Funds Direct
   *(lender)* may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2. I/We authorize you to provide to Home Funds Direct
   *(lender)*, and to any investor to whom Home Funds Direct
   *(lender)* may sell my/our mortgage, any and all information and documentation that they request. Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; and copies of income tax returns.

3. Home Funds Direct
   *(lender)* or any investor that purchases the mortgage may address this authorization to any party named in the loan application or disclosed by any consumer credit reporting agency or similar source.

4. A copy of this authorization may be accepted as an original.

5. Your prompt reply to Home Funds Direct
   *(lender)* or the investor that purchased the mortgage is appreciated.

**NOTICE TO BORROWERS:** This is notice to you as required by the Right to Financial Privacy Act of 1978 that HUD/FHA has a right of access to financial records held by financial institutions in connection with the consideration or administration of assistance to you. Financial records involving your transaction will be available to HUD/FHA without further notice or authorization but will not be disclosed or released by this institution to another Government Agency or Department without your consent except as required or permitted by law.

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

| (Borrower's Signature) CHERYL R HALL | (Date) | (Social Security Number) |
|---|---|---|
| (Borrower's Signature) | (Date) | (Social Security Number) |

## ALABAMA
### Choice of Insurance Notice

| Loan Number 0503172917 | Date March 17, 2005 |
|---|---|

Borrower
CHERYL R HALL

| Property Address 105 TV ROAD DOTHAN, AL 36301 | Lender Home Funds Direct 15090 Avenue of Science San Diego, CA 92128 |
|---|---|

The AL Code Section 5-19-20(e) requires that you receive written notification of your right to select insurance of your choice, when hazard insurance is required by the lender as a condition of the loan.

**Home Funds Direct**
shall not require that you, upon financing the purchase of real property or lending money on the security of real property, as a condition precedent, concurrent or subsequent to financing the purchase of such property or renewal or extension to lending money upon the security of a mortgage thereon, negotiate any policy of insurance or renewal thereof through a particular insurer, agent, solicitor or broker.

The lender reserves the right to approve or disapprove an insurer selected based on reasonable standards, such as financial soundness, services of insurer and required coverage.

Your acknowledgment below signifies that written notice was provided to you pursuant to the state statute.

CHERYL R HALL

_____    _____

_____    _____

_____    _____

VMP-1039(AL) (0105)        VMP MORTGAGE FORMS - (800)521-7291                    5/01

0503172917

AHL/Frazier
0150

Hall-Frazier
Record - 001545

# Variable Rate Mortgage Loan Program Disclosure

*(This is neither a contract nor a commitment to lend.)*

Date: March 17, 2005                                     Loan No.: 0503172917

In this Variable Rate Loan Program Disclosure (this "Disclosure"), the words YOU, YOUR, and YOURS refer to each and all of those who borrow for a real estate loan. The words WE, US, or OUR refer to:
Home Funds Direct

(the "Lender").

This Disclosure describes the features of the following adjustable rate mortgage ("ARM") loan programs you are considering or may consider. Each ARM loan program is available for a loan term of 30 years only. Information on other ARM programs, if any, is available upon request. Except for provisions of this Disclosure that are specifically identified to a particular loan program, the provisions of this Disclosure apply to all of the loan programs listed below:
- 2/28 fixed/adjustable hybrid ARM, with an interest-only option (the "2/28 Program").
- 3/27 fixed/adjustable hybrid ARM, with an interest-only option (the "3/27 Program").
- 5/25 fixed/adjustable hybrid ARM, with an interest-only option (the "5/25 Program").
- 6-Month ARM (the "6-Month Program").

An ARM is a type of loan that permits changes in the loan interest rate. Such changes are generally based on changes in an index and normally would result in an increase or decrease in the regular monthly loan payment.

This is not a commitment or an offer to make a loan. We reserve the right to make changes at any time with regard to any matter in this Disclosure as a result of a change in policy, law, regulation, or otherwise.

The 2/28, 3/27 and 5/25 Programs that include an interest-only feature have an interest-only payment for the first five years of the loan term, with fully amortizing payments over the remaining twenty-five years of the loan term.

**A.    HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED**

1.    Your interest rate will be based on an index plus a margin. Ask us for our current interest rate and margin.

2.    The index is the average of the London Interbank Offered rates for six-month dollar deposits in the London market based on quotations at five major banks (LIBOR), as set forth in the "Money Rates" section of the Wall Street Journal, Western Edition, or, if the Money Rates section ceases to be published or becomes unavailable for any reason, then as set forth on a comparable publication selected by the Lender. The most recent index figure available as of the first business day of the month immediately preceding the month in which the Change Date (defined in paragraph B.1 below) occurs is called the "Current Index".

3.    On any Change Date, your interest rate will equal the Current Index plus your margin unless the interest rate "caps" for your loan limit the amount of change in the interest rate.

4.    For the loan programs without an interest-only feature, your monthly (principal and interest) payment will be based on the interest rate, loan balance, and loan term.

       For the 2/28, 3/27 and 5/25 Programs with an interest-only feature, during the first sixty (60) months of your loan term, your monthly payment will be calculated to pay interest only and will be based on the interest rate and loan balance. After the first sixty (60) months, your monthly (principal and interest) payment will be based on the interest rate, loan balance, and remaining loan term.

5.    The initial interest rate for your loan may be a discounted or premium rate, and therefore, may not be based on the index used to make later adjustments. The initial interest rate is established by the Lender based upon existing market conditions. Because the interest rate in effect during the term of your loan can never be lower than the initial interest rate in effect at the time your loan was originated (referred to herein as the "Lifetime Interest Rate Floor"), even if the index decreases during the term of your loan, the interest rate applied to your loan cannot decrease below the level of the Lifetime Interest Rate Floor, and, during that time, will not be based on the Current Index plus margin.

6.    Before each Change Date, the servicer of your loan will calculate the new interest rate by adding the margin to the Current Index. The servicer will then round the result of this addition to the nearest one-eighth of one percentage point 0.125%. Subject to the interest rate "caps" for your loan, this rounded amount will be the new interest rate until the next Change Date. This does not necessarily indicate how the index will change in the future.

**B.    HOW YOUR INTEREST RATE CAN CHANGE**

1.    For the 2/28 Program, the initial interest rate will be fixed for the first twenty-four scheduled payment dates, and may adjust effective with the twenty-fifth scheduled monthly payment date and every six months thereafter. For the 3/27 Program, the initial interest rate will be fixed for the first thirty-six scheduled payment dates, and may adjust effective with the thirty-seventh scheduled monthly payment date and every six months thereafter. For the 5/25 Program, the initial interest rate will be fixed for the first sixty scheduled payment dates, and may adjust effective with the sixty-first scheduled monthly payment date and every six months thereafter. For the 6-Month Program, the interest rate may adjust effective with the seventh scheduled monthly payment date and every six months thereafter. Each date on which your interest rate can change is called a "Change Date".

2.    For the 2/28, 3/27, and 5/25 Programs, your interest rate cannot increase or decrease more than 1.500% on any interest rate Change Date. For the 6-Month Program, your interest rate cannot increase or decrease more than 1.000% on any interest rate Change Date.

3.    For the 2/28, 3/27, and 5/25 Programs, your interest rate cannot increase more than 7.000% above the initial interest rate and cannot decrease below the Lifetime Interest Rate Floor. For the 6-Month Program, your interest rate cannot increase more than 6.000% above the initial interest rate and cannot decrease below the Lifetime Interest Rate Floor.

**C.    HOW YOUR PAYMENT CAN CHANGE**

1.    For the 2/28, 3/27 and 5/25 Programs, your monthly payment can change based on a change in the interest rate after the initial fixed-rate period (two years, three years and five years respectively) and once every six months thereafter.

2.    For the 6-Month Program, your payment can change once every six months based on changes in the interest rate.

Your monthly payment can increase or decrease substantially based on semi-annual changes in the interest rate. Under no circumstances will your interest rate be less than your initial interest rate.

3.    Examples:

Loan programs that do not include an interest-only feature:

**2/28 Program Example: Thirty-year Fully Amortized Loan**
On a $10,000.00, 30-year loan with an initial interest rate of 8.000% in effect in March 2005 the maximum amount that the interest rate can rise under this program is 7%, to 15.000%, and the monthly payment can rise from a first-year payment of $73.38 to a maximum of $124.08 in the fifth year. To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000.00 would be $60,000.00 divided by $10,000 = 6; 6 x $73.38 = $440.28 per month.)

**3/27 Program Example: Thirty-year Fully Amortized Loan**
On a $10,000.00, 30-year loan with an initial interest rate of 8.000% in effect in March 2005 the maximum amount that the interest rate can rise under this program is 7%, to 15.000%, and the monthly payment can rise from a first-year payment of $73.38 to a maximum of $123.09 in the sixth year. To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000.00 would be $60,000.00 divided by $10,000 = 6; 6 x $73.38 = $440.28 per month.)

**5/25 Program Example: Thirty-year Fully Amortized Loan**
On a $10,000.00, 30-year loan with an initial interest rate of 8.000% in effect in March 2005 the maximum amount that the interest rate can rise under this program is 7%, to 15.000%, and the monthly payment can rise from a first-year payment of $73.38 to a maximum of $120.94 in the eighth year. To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000.00 would be $60,000.00 divided by $10,000 = 6; 6 x $73.38 = $440.28 per month.)

**6-Month Program Example: Thirty-year Fully Amortized Loan**
On a $10,000.00, 30-year loan with an initial interest rate of 8.000% in effect in March 2005 the maximum amount that the interest rate can rise under this program is 6%, to 14.000%, and the monthly payment can rise from a first-year payment of $73.38 to a maximum of $117.39 in the fourth year. To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000.00 would be $60,000.00 divided by $10,000 = 6; 6 x $73.38 = $440.28 per month.)

MIN # 100176105031729174          HALL                          Loan # 0503172917
AHL 6000012.UFF                   Page 2 of 3                    Rev 07/04

AHL/Frazier
0152

For loan programs that include an interest-only feature:

**2/28 Program Example:  Thirty-year Fully Amortized Loan**
On a $10,000.00, 30-year loan with an initial interest rate of 8.000% in effect in, March 2005 the maximum amount that the interest rate can rise under this program is 7%, to 15.000%, and the monthly payment can rise from a first-year payment of $66.67 to a maximum of $128.08 in the sixth year.  To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount.  (For example, the monthly payment for a mortgage amount of $60,000.00 would be $60,000.00 divided by $10,000 = 6; 6 x $66.67= $400.02 per month.)

**3/27 Program Example:  Thirty-year Fully Amortized Loan**
On a $10,000.00, 30-year loan with an initial interest rate of 8.000%, in effect in, March 2005 the maximum amount that the interest rate can rise under this program is 7%, to 15.000%, and the monthly payment can rise from a first-year payment of $66.67 (interest only) to a maximum of $128.08 (principal and interest) in the sixth year.  To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount.  (For example, the monthly payment for a mortgage amount of $60,000.00 would be $60,000.00 divided by $10,000 = 6; 6 x $66.67 = $400.02 per month.)

**5/25 Program Example:  Thirty-year Fully Amortized Loan**
On a $10,000.00, 30-year loan with an initial interest rate of 8.000%, in effect in March 2005 the maximum amount that the interest rate can rise under this program is 7%, to 15.000%, and the monthly payment can rise from a first-year payment of $66.67 (interest only) to a maximum of $120.94 (principal and interest) in the eighth year.  To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount.  (For example, the monthly payment for a mortgage amount of $60,000.00 would be $60,000.00 divided by $10,000 = 6; 6 x $66.67 = $400.02 per month.)

You will be notified in writing at least 25 days before the due date of a payment at a new level.  This notice
4.  will contain information about your current and prior interest rate, your payment amount, and loan balance.

I/We acknowledge receiving and reading this Variable Rate Mortgage Loan Program Disclosure.

Borrower _____ Date      Borrower _____ Date
CHERYL R HALL

Borrower _____ Date      Borrower _____ Date

Borrower _____ Date      Borrower _____ Date

Borrower _____ Date      Borrower _____ Date

MIN # 100176105031729174       HALL        Loan #  0503172917
AHL 600013.UFF                 Page 3 of 3          Rev 07/04

AHL/Frazier
0153

## DISCLOSURE OF CREDIT SCORE INFORMATION

| Borrower Name:<br>HALL, CHERYL R | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 17, 2005 |

We are providing the following credit score information in connection with your loan application.

| | | | |
|---|---|---|---|
| **Credit Score Provider** | | | |
| **Current/Most Recent Credit Score** | | | |
| **Key Factors Adversely Affecting Score** | | | |
| **Range of Possible Credit Scores** | | | |
| **Date of Credit Score** | | | |

Please see the attached Credit Report for the credit score information in connection with your loan application.


VMP-139 (0411)

100176105031729174
VMP Mortgage Solutions, Inc. (800)521-7291

0503172917
11/04

AHL/Frazier
0154

**BEGINREPORT**03/17/2005 11:34:54 AM 0 CBR-TEXT

REF:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02
CREDCO Instant Merge Credit Report              Acct: 129719
Prepared for: ACCREDITED HOME LENDERS-SD IA     Notes: 351
Requested: EFX, XPN, TUC - I               Delivered: EFX, XPN, TUC
--------------------------------------------------------------------
App: HALL, CHERYL R                              Ssn: ██████████
Curr Addr: 105 TV RD, DOTHAN, AL 36301
--------------------------------------------------------------------

INSTANT MERGE SUMMARY
---------------------

| ACCOUNT DISTRIBUTION | | | CURRENT STATUS(tradelines) | | | | | |
| Account Type | Count | Balance | Payments | Curr | Clsd | Unrt | 30 | 60 | 90+ |
| Real Estate | 0 | $0 | $0 | - | - | - | - | - | - |
| Installment | 20 | $458 | $181 | - | 18 | - | - | - | 2 |
| Revolving | 1 | $0 | $0 | - | 1 | - | - | - | - |
| Other | 11 | $3,273 | $1,479 | - | - | - | - | - | 11 |
| Total | 32 | $3,731 | $1,660 | - | 19 | - | - | - | 13 |

| INQUIRIES | | PUBLIC RECORDS | | HISTORICAL DELINQUENCIES(count) | | | |
| 6 Month Total | 16 | EFX | N/A | Account Type | LastDlq | 30 | 60 | 90+ |
| Elim. same day - | 9 | XPN | N/A | Real Estate | | | | |
| Adjusted Total | 7 | TUC | N/A | Installment | 12/03 | 12 | 8 | 38 |
| New Trades(6 mon) | 0 | Last 2yrs N | | Revolving | 11/98 | 1 | 1 | 4 |
| | | | | Other | | | - | 11 |
| Oldest Trd: 03/98 | | On File: 06/95 | | Total | | 13 | 9 | 53 |

--------------------------------------------------------------------
Only Applicant/Co-applicant information included in the Summary.

BUREAU SCORE INFORMATION
------------------------

EFX BEACON 5.0          (APP)=  525 Factor: 00038, 00014, 00018, 00020
  00038 SERIOUS DELINQUENCY, AND DEROGATORY PUBLIC RECORD OR COLLECTION FILED
  00014 LENGTH OF TIME ACCOUNTS HAVE BEEN ESTABLISHED
  00018 NUMBER OF ACCOUNTS WITH DELINQUENCY
  00020 LENGTH OF TIME SINCE DEROGATORY PUBLIC RECORD OR COLLECTION IS TOO
        SHORT
  ! Number of Inquiries Adversely Affected the Score

XPN FICO-II            (APP)=  592 Factor:   38,    18,    33,    16
  38 SERIOUS DELINQUENCY AND PUBLIC RECORD OR COLLECTION FILED
  18 NUMBER OF ACCOUNTS DELINQUENT
  33 PROPORTION OF CURRENT LOAN BALANCE TO ORIGINAL LOAN AMOUNT
  16 INSUFFICIENT OR LACK OF REVOLVING ACCOUNT INFORMATION

TUC FICO Classic 98    (APP)=  575 Factor:  038,   018,   016,   002
  038 SERIOUS DELINQUENCY, AND PUBLIC RECORD OR COLLECTION FILED
  018 NUMBER OF ACCOUNTS WITH DELINQUENCY
  016 LACK OF RECENT REVOLVING ACCOUNT INFORMATION
  002 LEVEL OF DELINQUENCY ON ACCOUNTS
  ! Number of Inquiries Adversely Affected the Score


End of Decision Maker Report
--------------------------------------------------------------------
REF:1-01966-27474-0000 03/17/2005          TID:1-01966-27474 03/17/2005 08:35:02
CREDCO Instant Merge Credit Report              Acct: 129719
Prepared for: ACCREDITED HOME LENDERS-SD IA     Notes: 351
Requested: EFX, XPN, TUC - I               Delivered: EFX, XPN, TUC
--------------------------------------------------------------------
App: HALL, CHERYL R                              Ssn: ██████████
Curr Addr: 105 TV RD, DOTHAN, AL 36301
--------------------------------------------------------------------

Account Name/Number (Sources)                              Past due    Last
   Open    High  Payment   Balance MOP  Status  Rptd  30 60 90+ MR Dlq
--------------------------------------------------------------------

**Hall-Frazier**
**Record - 001550**

```
  ----------------
  1. PEOPLES BK/395330300XXXX (EFX-●0BB00034!,TUC!)
   J 06-99     7303     0      CLOSED I-5 DEL 120  03-02 08 05 07  35 03-02
     Hist: 03-02 5145444332432222111322322                JNT
     Ctgy:  AUTO
     AUTO LOAN
     CLOSED

Accounts under Applicant:
  ---------------------------
  2. THE CR STR/PROVIDIAN-940XXXX (EFX-616FY00011!)
   I N/A      672     785       785 O-9 COLL/P&L 10-02 00 00 00   5
     Hist:  10-02 9---                                   APP
     Ctgy:  COLLECTION                         Term: REV
     ACCT SUBMITTED TO COLLECTION
     PAST DUE PAST $785

  3. PALISADES/HEILI-3HEILIG297XXXX (EFX-444FY00080!)
   I N/A      694     694       694 O-9 COLL/P&L 02-05 00 00 00  20
     Hist:  02-05 9--------------------         APP
     Ctgy:  COLLECTION                         Term: REV
     ACCT SUBMITTED TO COLLECTION
     PAST DUE PAST $694

  4. PALISADES COLLECTION L/PAL3HEILIG297XXXX (XPN-YC19839221,TUC!)
   I 01-03    694     N/A       694 Y-9 COLL/P&L 02-05  - - -   23
     Hist:  02-05 99999-999999999-9--99-9        APP
     Ctgy:  COLLECTION                         Term: REV
     CN: HEILIG MEYERS
     ACCT SUBMITTED TO COLLECTION COLL 04-03
     PAST DUE PAST $694

  5. HOLLOWAY CREDIT SOLUTI/724XXXX (EFX-420YA000161,XPN!,TUC!)
   I 03-03    452     N/A       452 Y-9 COLL/P&L 12-04  - - -    1
     Hist:  12-04 9                              APP
     Ctgy:  COLLECTION                         Term: REV
     CN: WIREGRASS ELECT
     UNPAID
     ACCT SUBMITTED TO COLLECTION COLL 12-04
     PAST DUE PAST $452
```

Page 1 of 8

```
-----------------------------------------------------------------------
REF:1-01966-27474-0000 03/17/2005      TID:1-01966-27474 03/17/2005 08:35:02
-----------------------------------------------------------------------
Account Name/Number (Sources)                          Past due    Last
      Open     High    Payment    Balance MOP  Status  Rptd  30 60 90+ MR Dlq

Accounts under Applicant (continued):
  --------------------------------------
  6. SMALL LNS/7804 XXXX (EFX-420FY002611)
   I 01-02    399     91        399 I-9 COLL/P&L 02-05 01 01 14  38 12-03
     Hist:  02-05 9111111111111115555555155     APP
     ACCT SUBMITTED TO COLLECTION COLL 02-05
     CHARGE OFF CHRG $399 CHRG 02-05
     PAST DUE PAST $399
     PAID - CREDIT LINE CLOSED

  7. HOLLOWAY CREDIT SOLUTI/474XXXX (EFX-420YA000001,XPN!,TUC!)
   I 04-01    187     N/A       187 Y-9 COLL/P&L 12-04  - - -    1
     Hist:  12-04 9                              APP
     Ctgy:  COLLECTION                         Term: REV
     CN: MEDICAL PAYMENT DATA
     UNPAID
     MEDICAL
     ACCT SUBMITTED TO COLLECTION COLL 12-04
     PAST DUE PAST $187

  8. CRDT MGT/2674XXXX (EFX-682YC05551!,TUC!)
   I 03-04    182     N/A       182 Y-9 COLL/P&L 04-04  - - -    1
     Hist:  04-04 9                              APP
```

```
        Ctgy:  COLLECTION                      Term: REV
        CN: COMCAST DOTHAN
        UNPAID
        ACCT SUBMITTED TO COLLECTION COLL 04-04

    9. HOLLOWAY CREDIT SOLUTI/526XXXX (EFX-420YA00000!,XPN!,TUC!)
    I 10-01      93   N/A           93 Y-9 COLL/P&L 12-04  -  -  -  1
        Hist: 12-04 9                                     APP
        Ctgy:  COLLECTION                      Term: REV
        CN: MEDICAL PAYMENT DATA
        UNPAID
        MEDICAL
        ACCT SUBMITTED TO COLLECTION COLL 12-04
        PAST DUE PAST $93

   10. HOLLOWAY CREDIT SOLUTI/519XXXX (EFX-420YA00000!,XPN!,TUC!)
    I 09-01      93   N/A           93 Y-9 COLL/P&L 12-04  -  -  -  1
        Hist: 12-04 9                                     APP
        Ctgy:  COLLECTION                      Term: REV
        CN: MEDICAL PAYMENT DATA
        UNPAID
        MEDICAL
        ACCT SUBMITTED TO COLLECTION COLL 12-04
        PAST DUE PAST $93


                          Page 2 of 8

    ----------------------------------------------------------------
    REF:1-01966-27474-0000 03/17/2005      TID:1-01966-27474 03/17/2005 08:35:02
    ----------------------------------------------------------------
    Account Name/Number (Sources)                       Past due   Last
        Open    High  Payment   Balance MOP  Status Rptd 30 60 90+ MR Dlq
    ----------------------------------------------------------------

    Accounts under Applicant (continued):
    ------------------------------------

   11. HOLLOWAY CREDIT SOLUTI/832XXXX (EFX-420YA00000!,XPN!,TUC!)
    I 11-03      93   N/A           93 Y-9 COLL/P&L 12-04  -  -  -  1
        Hist: 12-04 9                                     APP
        Ctgy:  COLLECTION                      Term: REV
        CN: MEDICAL PAYMENT DATA
        UNPAID
        MEDICAL
        ACCT SUBMITTED TO COLLECTION COLL 12-04
        PAST DUE PAST $93

   12. SMALL LNS/7804 XXXX (EFX-420FP00261!)
    I 03-02      90       90        59 I-9 COLL/P&L 02-05 01 01 15  36 12-03
        Hist: 02-05 9111111111111115555555155             APP
        ACCT SUBMITTED TO COLLECTION COLL 02-05
        CHARGE OFF CHRG $59 CHRG 02-05
        PAST DUE PAST $59
        PAID - CREDIT LINE CLOSED

   13. HOLLOWAY CREDIT SOLUTI/357XXXX (EFX!,XPN-YC19848931,TUC!)
    I 10-99     255   N/A          -0-   Y-9 COLL/P&L 12-04  -  -  -  3
        Hist: 12-04 9-9                                   APP
        Ctgy:  COLLECTION                      Term: REV
        CN: GRACEBA TOTAL COMMUNICATIONS
        PAID
        ACCT SUBMITTED TO COLLECTION COLL 12-04
        CHARGE OFF; PAID CHRG 12-04 PAID 12-04
        ACCT SUBMITTED TO COLLECTION; PAID COLL 12-04

   14. HOLLOWAY CREDIT SOLUTI/265XXXX (EFX!,XPN-YC19848931)
    I 06-99      38   N/A          N/A   Y-9 COLL/P&L 12-04  -  -  -  3
        Hist: 12-04 9-9                                   APP
        Ctgy:  COLLECTION                      Term: REV
        CN: MEDICAL PAYMENT DATA
        PAID
        MEDICAL
        ACCT SUBMITTED TO COLLECTION COLL 12-04
```

15. FARMERS FURN/9950127812230XXXX (TUC-H0528R002!)
    I 12-99     892     0          CLOSED I-9 COLL/P&L 10-03 00 00 00
    Hist:  10-03 9--------------------------------        APP
    Ctgy:  INSTALLMENT SALES CONTRACT
    PAST DUE PAST $154
    CHARGE OFF CHRG $154 CHRG 10-01
    CLOSED

---

Page 3 of 8
--------------------------------------------------------------------
REF:1-01966-27474-0000 03/17/2005        TID:1-01966-27474 03/17/2005 08:35:02
--------------------------------------------------------------------
Account Name/Number (Sources)                          Past due     Last
    Open        High    Payment   Balance MOP  Status  Rptd  30 60 90+ MR Dlq
--------------------------------------------------------------------

Accounts under Applicant (continued):
--------------------------------------------------------------------
16. FARMERS FURN/117812230XXXX (TUC-H0528R002)
    I 09-99     640     0          CLOSED I-U UNRATED  02-01 00 00 00  17
    Hist:  02-01 11111111111111111               APP
    Ctgy:  INSTALLMENT SALES CONTRACT
    CLOSED

17. FRIEDMANS JEWELERS/561821004XXXX (EFX!,XPN!,TUC-J01VB8001!)
    I 12-01     400     0          CLOSED I-9 COLL/P&L 03-05 01 01 01  39 07-02
    Hist:  03-05 9-9999999999-999999-9999          APP
    Ctgy:  INSTALLMENT SALES CONTRACT
    ACCT SUBMITTED TO COLLECTION COLL 01-05
    CHARGE OFF CHRG $400 CHRG 08-02
    PAST DUE PAST $400

18. PROVIDIAN FINANCIAL/050077XXXX (EFX-163BB253121,XPN!,TUC!)
    I 03-98     805     0          CLOSED R-9 COLL/P&L 07-02 01 01 04  53 11-98
    Hist:  07-02 9---9999999999999999999           APP
                                        Term: REV
    ACCT SUBMITTED TO COLLECTION COLL 07-02
    CHARGE OFF CHRG $671 CHRG 05-98
    CLOSED BY CREDITOR
    PAST DUE PAST $659
    ACCT TRANSFERRED
    ACCT PURCHASED BY ANOTHER LENDER

19. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 02-02     90      0          CLOSED I-1 CURRENT  05-02 00 00 00  4
    Hist:  05-02 1111                             APP
    PAID - CREDIT LINE CLOSED

20. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 12-01     88      0          CLOSED I-1 CURRENT  03-02 00 00 00  4
    Hist:  03-02 1111                             APP
    PAID - CREDIT LINE CLOSED

21. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 11-01     88      0          CLOSED I-1 CURRENT  02-02 00 00 00  3
    Hist:  02-02 111                              APP
    PAID - CREDIT LINE CLOSED

22. SMALL LNS/7804 XXXX (EFX-420FP00261)
    I 10-01     88      0          CLOSED I-1 CURRENT  01-02 00 00 00  4
    Hist:  01-02 1111                             APP
    PAID - CREDIT LINE CLOSED

---

Page 4 of 8
--------------------------------------------------------------------
REF:1-01966-27474-0000 03/17/2005        TID:1-01966-27474 03/17/2005 08:35:02
--------------------------------------------------------------------

```
 8. 03-08-05 DITECH   (EFX-180FM10442) (APP)
 9. 03-08-05 GMAC MORTGAGE  (XPN-89909276) (APP)
10. 03-08-05 GMAC MTG   (TUC-N01201731) (APP)
11. 03-08-05 LEWIS BRAC   (EFX-420YC00105) (APP)
12. 03-04-05 FA CRECCO   (EFX-181ZB03724) (APP)
13. 03-04-05 FA CRECCO   (TUC-F012070015) (APP)
14. 03-04-05 FIRST AMER CR SVCS INC   (XPN-FR3988260) (APP)
15. 12-14-04 DTHN LOAN  (EFX-420FP01087) (APP)
16. 09-26-04 1ST PREMIER  (TUC-B00020123) (APP)
```

Address Information:
------------------------
```
1. 295 MALIBU ST
   KINSEY, AL 36303 7761 Rptd 04-95   (XPN) (APP)
2. 295 MALIBU ST
   DOTHAN, AL 36303 Rptd 02-98   (TUC) (APP)
3. 302 TRIM ST
   DOTHAN, AL 36301 Rptd 02-05   (EFX) (APP)
4. 105 TV RD
   DOTHAN, AL 36301 5333 Rptd 08-04   (XPN) (APP)
5. 105 TV RD
   DOTHAN, AL 36301 Rptd 04-04   (TUC) (APP)
6. 541 WALNUT ST #A5
   ELIZABETH, NJ 07201 1126 Rptd 09-94   (XPN) (APP)
```

AKA Information:
------------------------
```
1. CHERYL, R HALL   (XPN) (APP)
2. DIXON, CHERYL R   (XPN) (APP)
3. DIXON,CHERYL,R  (TUC) (APP)
4. FRAZIER,CHERYL  (TUC) (APP)
5. HILL,CHERLY,R  (TUC) (APP)
```

Employment Information:
------------------------
```
1. DISABLED
   OCCUPATION UNKNOWN  (EFX) (APP)
```

Page 6 of 8
```
1-01966-27474-0000 03/17/2005    TID:1-01966-27474 03/17/2005 08:35:02
```

Employment Information (continued):
------------------------
```
2. EBONY EXPRESSIONS E ORANGE, NJ
   OCCUPATION UNKNOWN Rptd 09-94   (XPN) (APP)
3. GENERAL CIGAR
   OCCUPATION UNKNOWN   (EFX) (APP)
4. GENERAL CIGAR DOTHAN, AL
   MACH OPERATOR Rptd 08-95   (TUC) (APP)
5. UNEMPLOYED
   OCCUPATION UNKNOWN  (EFX) (APP)
```

Miscellaneous Information:
------------------------
```
1. Variation between Inquiry and Onfile address   (EFX) (APP)
2. Variation between Inquiry and Onfile address   (XPN) (APP)
```

Decode Directory Information:
------------------------
```
1. FIRST AMER CR SVCS INC (XPN-3988260)
   (516)832-3400, 333 EARLE OVINGTON BLVD, UNIONDALE, NY 11553
2. FRIEDMANS JEWELERS (XPN-1318660)
   (800)545-9033, 171 CROSSROADS PKWY, SAVANNAH, GA 31408
3. GMAC MORTGAGE (XPN-89092761)
   (714)800-5871, 3200 PARK CENTER DR STE, COSTA MESA, CA 92626
4. HOLLOWAY CREDIT SOLUTI (XPN-1984893)
   BY MAIL ONLY, PO BOX 6441, DOTHAN, AL 36302
5. LANDSAFECREDIT (XPN-3970658)
   (818)583-1962, 155 N LAKE AVE, PASADENA, CA 91101
6. PALISADES COLLECTION L (XPN-1983922)
   (800)991-9367, 210 SYLVAN AVE, ENGLEWOOD, NJ 07632
7. PROVIDIAN FINANCIAL (XPN-3206450)
```

```
        BY MAIL ONLY, PO BOX 9180, PLEASANTON, CA 94566
     8. TRANSUNION RESID CR SO (XPN-1  538)
        (866)871-0390, PO BOX 31423, INDEPENDENCE, OH 44131
```

blic Record Information:
------------------------
No Public Record Information found

Consumer Referral Information:
------------------------------
EFX - EQUIFAX INFORMATION SVCS, PHONE: (800) 685-1111
      P.O. BOX 740241, ATLANTA, GA 30374
XPN - EXPERIAN, PHONE: (888) 397-3742
      P.O. BOX 2002, ALLEN, TX 75013
TUC - TRANS UNION, PHONE: (800) 916-8800
      P.O. BOX 34012, FULLERTON, CA 92834

Prepared By: First American CREDCO
             12395 First American Way
             Poway, CA 92064-0495
             Contact: 800 368 8891    Fax: 866 510 5762

                            Page 7 of 8
--------------------------------------------------------------------
REF:1-01966-27474-0000 03/17/2005      TID:1-01966-27474 03/17/2005 08:35:02
--------------------------------------------------------------------

This report contains information supplied by the repositories named above. Its
contents have not been verified by First American CREDCO and may contain
duplicate information. While this report is being used for some real estate
lending purposes, it is not a Residential Mortgage Credit Report as defined by
FNMA, FHLMC, and FHA/VA guidelines.

             !!!!!! END OF INSTANT MERGE REPORT !!!!!!

AHL/Frazier
0161

End of Credit Report

**ENDREPORT**

AHL/Frazier
0162

## CREDIT SCORE NOTICE

| Borrower Name(s):<br>CHERYL R HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128<br><br>(866) 487-4350 |
| --- | --- |
| | Date:<br>March 17, 2005 |

### NOTICE TO THE HOME LOAN APPLICANT

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan, contact the lender.

One or more of the following consumer reporting agencies will provide the credit score:

| Experian | Equifax Credit Information Services | Trans Union |
| --- | --- | --- |
| P.O. Box 2002 | P.O. Box 740241 | P.O. Box 4000 |
| Allen, TX 75013 | Atlanta, GA 30374 | Chester, PA 19016 |
| 1-888-397-3742 | 1-800-685-1111 | 1-866-887-2673 |

Your acknowledgment below signifies that this written notice was provided to you.

| Borrower CHERYL R HALL | Date | Borrower | Date |
| --- | --- | --- | --- |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

100176105031729174                                    0503172917

-140 (0410)                    VMP Mortgage Solutions, Inc. (800)521-7291                    10/04

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL HALL FRAZIER | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO.: |
| | ) | 1:08CV11-MHT |
| ACCREDITED HOME LENDERS, INC. | ) | |
| | ) | |
| DEFENDANT. | ) | |

## DEFENDANT'S RESPONSE TO FIRST SET OF INTERROGATORIES
## PROPOUNDED BY PLAINTIFF, CHERYL FRAZIER

**COMES NOW** Defendant Accredited Home Lenders, Inc. ("AHL") by and through its

counsel of record, and hereby responds to Plaintiff's First Set of Interrogatories as follows:

### INTERROGATORY NO. 1:

Give the name and, if known, the address and telephone number of each individual likely

to have discoverable information that you may use to support your claims or defenses identifying

the subject(s) of the information.

### RESPONSE TO INTERROGATORY NO. 1:

The following individuals are former employees of Home Funds Direct. AHL will make

an effort to obtain the last known addresses for these individuals:

Kristopher Dillon
Kim Stevenson
Clarence W. Wells
Mike Thimsen
Verria Neal
Ken Harper
Rita Dickerson

Other yet-to-be identified employees/agents of AHL

4/113525.10

Additionally, the following individuals may have discoverable information relating to AHL's claims or defenses in this matter:

Diane L. Hilson (address unknown);

Jane Carcello (address unknown) and other unidentified employees and agents of Swafford & Hayes Settlement Services, Inc.;

Plaintiff Cheryl Hall Frazier

This response may be supplemented upon the discovery of additional information.

**INTERROGATORY NO. 2**

Identify each person or persons participating in the preparation of these your answer to these interrogatories giving their full name address and job title.

**RESPONSE TO INTERROGATORY NO. 2:**

Robert Dooley, a senior paralegal with AHL's legal department, assisted undersigned counsel in the preparation of these interrogatory responses.

**INTERROGATORY NO. 3:**

Is the defendant properly named in the complaint? If not please give the full name of the correct or proper entity.

**RESPONSE TO INTERROGATORY NO. 3:**

At all times pertinent to the allegations in this complaint Home Funds Direct was a division of AHL.

**INTERROGATORY NO. 4:**

Give a description by category and location of, all documents, data compilations, and tangible things that are in your possession, custody, or control of that you may use to support your claims or defenses herein.

**RESPONSE TO INTERROGATORY NO. 4:** See AHL's responses to the plaintiff's first request for production of documents.

**INTERROGATORY NO. 5:**

Identify each and every employee, agent, servant or independent contractor with, or whom you believe has any knowledge of the services rendered in connection with the origination and/or the closing of the Plaintiff's mortgage loan. In your answer give the full name, last known address and phone number of each person identified and state whether the person identified is currently employed by you.

**RESPONSE TO INTERROGATORY NO. 5:**

AHL objects to Interrogatory No. 5 on grounds that its failure to indentify an employer or principal renders it vague and impossible to respond to. Subject to and without waiving this objection, and to the extent Interrogatory no. 5 seeks the identity of employers or agents of AHL, AHL incorporates its responses to Interrogatory No. 1.

**INTERROGATORY NO. 6:**

Identify each and every individual whom you believe has any knowledge regarding the assessment of the charges and fees reflected on the Settlement Statement, a copy of which are attached hereto as Exhibit "A" and "B" (hereinafter referred to as the "Settlement Statement"). In your answer give the full name, last known address and phone number of each person identified and state whether the person identified is currently employed by you.

**RESPONSE TO INTERROGATORY NO. 6:**

AHL objects to Interrogatory No. 6 on grounds that it is vague and overly broad. Subject to and without waiving these objections, AHL responds that agents and/or representatives of Swafford & Hayes, including but not limited to Diane Hilson and/or Jane Carcello, completed

the Settlement Statement and determined the assessment of the charges and fees complained of in the Complaint. These individuals would have knowledge of the charges and fees reflected therein. AHL further responds that no AHL employee determined the amount of the fees and charges complained of in the Complaint.

## INTERROGATORY NO. 7:

Itemize the cost to you for each of the items charged to the Defendants and listed in the Settlement Statements giving the method of calculating your cost.

## RESPONSE TO INTERROGATORY NO. 7:

AHL objects to Interrogatory No. 7 on grounds that it is vague and confusing. The items listed in the Settlement Statement were charged to the borrower – not to AHL. Subject to and without waiving these objections, AHL responds that all of the money AHL received pursuant to Ms. Frazier's closing resulted from charges clearly and conspicuously listed and disclosed in the Settlement Statement. Further, AHL responds that none of the charges complained of in the complaint were paid to AHL, but were instead paid to the individuals/entities listed in Section 1100 Title Charges and Section 1200 Govt. Recording, Transfer and Service Fees of the Settlement Statement.

## INTERROGATORY NO. 8:

Identify each and person or entity who received compensation, in any form whatsoever paid, in connection with the closing of Plaintiff's loan which is the subject of this action. As to each person or entity, state the following:

a)      The amounts paid in connection with the settlement of Plaintiff's loan;

b)      The services or goods, if any, rendered in exchange for each charge;

c)      Identify the check or other form of payment made;

d)      As to any checks written to such person or entity, state the date of the check, the amount, and identify the account from which each check was written;

e)      The name and address of the entity to which the payment was made; and

f)      The goods or services, if any, rendered in exchange for each payment.

**RESPONSE TO INTERROGATORY NO. 8:**

AHL objects to Interrogatory No. 8 on grounds that it is overly broad, and that it seeks information that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections AHL responds that it has no knowledge of any compensation or other payments to anyone associated with Ms. Frazier's closing other than the payments and recipients listed in the Settlement Statement. Further, AHL responds that it did not receive any portion of the charges complained of in the complaint.

**INTERROGATORY NO. 9:**

Describe in detail each and every task performed by you in connection with the Plaintiff's loan. In your answer identify the individuals who performed each task and identify all related documents.

**RESPONSE TO INTERROGATORY NO. 9:**

Clarence W. Wells (Executed the Allonge to Note and served as underwriter);

Ken Harper (Entered the wire transfer and served as closer);

Rita Dickerson (Signed the HUD Audit/Check list and signed Refinance Audit Check List;

Kim Stevenson (Received facsimile transmission form Gene McGriff, State Farm agent);

Mike Thinsen (Approved compensating factors reflected in Risk Analysis);

Kristopher Dillon (Account Executive, took Plaintiff's application via telephone);

Audrey Williams (Reviewed the appraisal); and

Verria Neal (listed as contact on Appraisal Disclosure)

**INTERROGATORY NO. 10:**

Identify each and every document received by you relating to the Plaintiff's loan.

**RESPONSE TO INTERROGATORY NO. 10:**

The entire loan file for Ms. Frazier's loan is being produced in response to her first request for production of documents. This file comprises all of the documentation in AHL's possession relating to Ms. Frazier's loan.

**INTERROGATORY NO. 11:**

Explain in detail the basis of and the circumstances surrounding each of the charges reflected in the Settlement Statements and the services provided in connection with that charged in your answer. In your answer identify the following:

    a)    Each and every person and/or entity involved in the performing of each service;

    b)    Each and every person and/or entity that received any part of the charges;

    c)    Identify each and every document related to the services or the charges.

**RESPONSE TO INTERROGATORY NO. 11:**

AHL objects to Interrogatory No. 11 on grounds that its reference to "the circumstances surrounding each of the charges reflected in the Settlement Statements" is vague and ambiguous. Subject to and without waiving these objections, AHL responds that with respect to the charges complained of in the complaint, Swafford & Hayes calculated the amount to be charged to Ms. Frazier, and Swafford & Hayes provided the indicated services and/or was responsible for securing the indicated services.

4/113525.10

**INTERROGATORY NO. 12:**

Identify each and every settlement service provider that has closed loans for you during the class period giving their full name and address.

**RESPONSE TO INTERROGATORY NO. 12:**

AHL objects to Interrogatory No. 12 on grounds that the "class period" is erroneous and confusing. AHL further objects on grounds that Interrogatory No. 12 is overly broad and not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 13:**

Identify and describe each and every audit, evaluation, stuffy or examination performed by you or on your behalf regarding the services provided by all the service providers listed in response to interrogatory number 11.

**RESPONSE TO INTERROGATORY NO. 13:**

AHL objects to Interrogatory No. 13 on grounds that Interrogatory No. 11 did not request the identity of any service providers, and AHL is therefore unable to respond. To the extent Interrogatory No. 13 seeks the identity of service providers sought in Interrogatory No. 12, AHL incorporates its objections to the preceding interrogatory.

**INTERROGATORY NO. 14:**

As to each settlement service provider listed in response to interrogatory Number 11 state the number of loans closed for you by each during each of the preceding 5 years.

**RESPONSE TO INTERROGATORY NO. 14:**

AHL objects to Interrogatory No. 14 on grounds that Interrogatory No. 11 did not request the identity of any service providers, and AHL is therefore unable to respond. To the extent

Interrogatory No. 14 seeks the identity of service providers sought in Interrogatory No. 12, AHL

incorporates its objections to the preceding two interrogatories.

**INTERROGATORY NO. 15:**

Identify each and every person whom you expect to call as an expert witness at the trial

of this case and state the subject matter on which each is expected to testify, the substance of the

facts and opinions to which each expert is expected to testify, and a summary of the grounds for

each opinion.

**RESPONSE TO INTERROGATORY NO. 15:**

AHL has not yet made a decision regarding whether it will retain expert witnesses to

testify in this matter, and if so, who it will retain. This interrogatory response may be

supplemented.

**INTERROGATORY NO. 16:**

Identify (by insurer, agent and policy number) each and every insurance agreement under

which any person carrying on an insurance business may be liable to provide a defense or to

satisfy part of all of a judgment which may be entered against you on the claims asserted in this

action or to indemnify or reimburse you for payments made to satisfy any judgment which may

be obtained on the claims asserted in this lawsuit.

**RESPONSE TO INTERROGATORY NO. 16:**

None.

**INTERROGATORY NO. 17:**

List each and every individual, firm or other entity that assisted or participated in any

way to the preparation of tax returns for you over the last five (5) years.

4/113525.10                                    8

**RESPONSE TO INTERROGATORY NO. 17:**

AHL objects to Interrogatory No. 17 on grounds that it is unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 18:**

State the number of loans originated by you as lender during each of the last five (5) years preceding the filing of this action.

**RESPONSE TO INTERROGATORY NO. 18:**

AHL objects to Interrogatory No. 18 on grounds that it is unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 19:**

Identify the states in which loans originated by you as lender were closed within the last five (5) years prior to the filing of this action.

**RESPONSE TO INTERROGATORY NO. 19:**

AHL objects to Interrogatory No. 19 on grounds that it is unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 20:**

Identify and describe stating exactly what services were performed for each and every item of remuneration, regardless of how it is characterized, which you received, in connection with the closing of the mortgage loan which is the subject of this action.

**RESPONSE TO INTERROGATORY NO. 20:**

The only remuneration paid to AHL in the Plaintiff's closing are the amounts listed in Section 800 Items Payable in Connection with Loan in the Settlement Statement. The services

AHL performed are listed in Section 800 of the Settlement Statement.    Further, AHL incorporates its responses to Interrogatories Nos. 7 and 8.

**INTERROGATORY NO. 21:**

Identify all actions taken in connection with the closing of Plaintiff's mortgage loan to ensure compliance with federal and state lending laws.

**RESPONSE TO INTERROGATORY NO. 21:**

AHL complies with all federal and state lending laws, and instructs its settlement agents to do so as well.

**INTERROGATORY NO. 22:**

Identify all persons employed or consulted by this defendant who were responsible for monitoring, evaluating or ensuring compliance with federal and state lending laws and regulations.

**RESPONSE TO INTERROGATORY NO. 22:**

All AHL employees are responsible for complying with federal and state lending laws and regulations, as are the settlement agents AHL selects to close its loans.  Additionally, Mark Solomon is AHL's compliance manager.

**INTERROGATORY NO. 23:**

List the assignees of the loan of the Plaintiff giving the full names and addresses of said entities.

4/113525.10                                        10

## RESPONSE TO INTERROGATORY NO. 23:

AHL sold the Frazier loan to Morgan Stanley on May 20, 2005, and Countrywide began servicing the loan effective July 1, 2005.

## INTERROGATORY NO. 24:

Give a full accounting of all moneys charged and paid by the plaintiff herein, regarding the loan at issue, including all closing costs and all moneys paid to you by her for what ever reason.

## RESPONSE TO INTERROGATORY NO. 24:

All moneys charged to and paid by the plaintiff are reflected in the Settlement Statement attached to the complaint.

RESPECTFULLY SUBMITTED, this, the ~~14th~~ 15th day of February, 2008.

_Robert Dooley_

ROBERT DOOLEY

## ACKNOWLEDGMENT

State of California
County of _San Diego_                    )

On _February 15, 2008_ before me, _Nell Williams, Notary Public_
(insert name and title of the officer)

personally appeared _Robert Dooley_                    ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Nell Williams_                    (Seal)

NELL WILLIAMS
Commission # 1765784
Notary Public - California
San Diego County
My Comm. Expires Oct 3, 2011

4/113525.10                    11

Hall-Frazier
Record - 001568

AS TO OBJECTIONS:

_____

J. DOUGLAS MINOR, JR. [MSB #10045]
Attorney for Defendant Accredited Home
Lenders, Inc.

OF COUNSEL

J. Douglas Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

4/113525.10                                    12

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Responses to Plaintiffs' First Set of Interrogatories on counsel of record by placing same in the United States mail, postage prepaid and properly addressed to:

> Earl P. Underwood, Jr.
> Law Offices of Earl P. Underwood, Jr.
> P.O. Box 969
> 21 South Section Street
> Fairhope, AL 36533-0969

on this the 14th day of February, 2008.

Respectfully submitted,

J. DOUGLAS MINOR, JR. [MSB #10045]

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHERYL HALL FRAZIER          )
                             )
    PLAINTIFF,               )
                             )
V.                           )          CIVIL ACTION NO.:
                             )          1:08CV11-MHT
ACCREDITED HOME LENDERS, INC.  )
                             )
    DEFENDANT.               )

### DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION

**COMES NOW** Defendant Accredited Home Lenders, Inc. ("AHL") by and through its counsel of record, and hereby responds to Plaintiff's Second Set of Interrogatories and Request for Production as follows:

### GENERAL OBJECTIONS

1.      Defendant objects to the Interrogatories and the Requests for Production, and to the "Instructions" preceding them, as unduly burdensome to the extent that they purport to impose obligations in addition to those imposed by the Federal Rules of Civil Procedure and this Court's Local Rules.

2.      Defendant objects to the "Instructions" preceding the Interrogatories and Request for Production to the extent they include definitions that are overbroad, mischaracterized or inaccurately define certain terms, or require Defendant to make a legal conclusion.

4/113525.10

Hall-Frazier
Record - 001571

3.     Defendant objects to each Interrogatory and Request for Production as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond the scope of this litigation.

4.     Defendant objects to each Interrogatory and Request for Production to the extent it expressly or impliedly seeks information protected by the attorney-client privilege, the work product doctrine, self-analysis privilege, joint defense or common interest privilege, or any other applicable privilege or similar reason for non-production. Inadvertent disclosure of privileged information is not intended to be, and may not be construed as, a waiver of any applicable privilege.

5.     Defendant objects to each Interrogatory and Request for Production to the extent it seeks information (i) that is not within Defendant's possession, custody, or control; or (ii) that is within the possession, custody, or control of corporate affiliates of Defendant that are not controlled by Defendant; or (iii) that is in the possession, custody, or control of Defendant's attorneys or former attorneys; or (iv) that is in the possession, custody, or control of or concern the activities of subservicers, of predecessor or successor servicers or subservicers, of master servicers for whom Defendant provided subservicing, or of investors on the loans at issue.

6.     By making these responses, Defendant does not concede that the information given is properly discoverable or admissible.  To the contrary, Defendant reserves the right to object to further discovery regarding the subject matter of the Interrogatories and Request for Production and to object to the introduction into evidence of statements made and documents produced in response to these Interrogatories and Request for Production.

7.     Each response to these Interrogatories and Requests for Production is made to the best of Defendant's knowledge at the present time, based upon its investigation to date.  Where

appropriate, Defendant's responses are made upon information and belief based on that investigation. Defendant states that its investigation is ongoing and Defendant specifically reserves the right to supplement and amend these responses when and if it becomes necessary.

8.      These General Objections are incorporated into each of the specific responses to these Interrogatories and Request for Production and shall be deemed continuing as to each Interrogatory and Request for Production, and are not waived, or in any way limited by the specific responses.

<div align="center">

**INTERROGATORIES**

</div>

**INTERROGATORY NO. 1:**

Identify each person or persons participating in the preparation of these your answers to these interrogatories giving their full name address and job title.

**RESPONSE TO INTERROGATORY NO. 1:**

AHL objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work product immunity doctrine. Subject to and without waiver of this objection and the General Objections, AHL states that various individuals in its Legal Department assisted with the preparation of these interrogatory responses.

**INTERROGATORY NO. 2**

Identify each charge included in the calculation of the "amount financed" regarding the transaction at issue herein.

**RESPONSE TO INTERROGATORY NO. 2:**

AHL objects to this Interrogatory on the grounds that it is ambiguous and inconsistent with the method prescribed by federal law for calculating the Amount Financed. Subject to and

without waiver of this objection and the General Objections, AHL states that the Amount

Financed disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL/Frazier

0031) was calculated by subtracting the Prepaid Finance Charge ($3,582.90) referenced in

AHL's Response to Interrogatory No. 3 from the Principal Loan Amount ($56,000.00).

**INTERROGATORY NO. 3:**

Identify charge included in the calculation of the "finance charge" regarding the

transaction at issue herein.

**RESPONSE TO INTERROGATORY NO. 3:**

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, and

inconsistent with the method prescribed by federal law for calculating the "finance charge."

Subject to and without waiver of this objection and the General Objections, AHL states that the

"finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement

(AHL/Frazier 0031) included the sum of (1) the Prepaid Finance Charge, which totaled

$3,582.90, consisting of the Origination Fee ($1,960.00), the Processing Fee ($500.00), the

Underwriting Fee ($500.00), the Appraisal Review Fee ($250.00), Flood Zone Determination

Fee ($9.50), the Tax Service Fee ($66.00), the Per Diem interest fee ($22.40) and the

Settlement/Closing fee ($275.00), as disclosed on the Final Good Faith Estimate (AHL 0032);

plus (2) Interest during the term of the loan ($82,189.61), which is calculated by subtracting the

Principal Loan Amount ($56,000.00) from the Total of Payments ($138,189.61).

**INTERROGATORY NO. 4:**

Identify the methodology and describe the step by step process by which the APR

(Annual Percentage Rate) was calculated regarding the instant transaction.

4/113525.10                                    4

**RESPONSE TO INTERROGATORY NO. 4:**

AHL objects to this Interrogatory on the grounds that it is overbroad, unduly

burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence.

This interrogatory seeks information about calculations based on amounts that were included in

the "finance charge" disclosure on Ms. Frazier's Final Truth in Lending Disclosure Statement

(AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver

of this objection and the General Objections, AHL states that the APR was calculated by entering

the loan amount, interest rate, and other charges into a software program called Empower®

provided by Fidelity Information Services. The Empower software, which is a calculation tool

used in good faith by AHL within the meaning of Regulation Z, 12 C.F.R. § 226.22(a)(1) n.45d,

then used these amounts to calculate the APR, as provided in Appendix J to Regulation Z, 12

C.F.R. pt. 226 app. J.

**INTERROGATORY NO. 5:**

Describe in detail each and every service performed, giving full names of the persons or

entities performing such services, the regarding the transaction at issue in exchange for your

"Origination Fee."

**RESPONSE TO INTERROGATORY NO. 5:**

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad

and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible

evidence. The Origination Fee was included in the "finance charge" disclosed on Ms. Frazier's

Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of

this litigation. Subject to and without waiver of this objection and the General Objections, AHL

states that the Origination Fee is revenue collected in exchange for originating a loan and covers

a wide variety of AHL's operational expenses, including employee compensation, facilities, overhead, etc.

**INTERROGATORY NO. 6:**

Describe in detail each and every service performed, giving full names of the persons or entities performing such services, the regarding the transaction at issue in exchange for your "Processing Fee," "Underwriting Fee," "Flood Zone Determination Fee," "Tax Service Fee," "Tax Service Fee" and "Appraisal Review Fee."

**RESPONSE TO INTERROGATORY NO. 6:**

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The "Processing Fee," "Underwriting Fee," "Flood Zone Determination Fee," "Tax Service Fee" and "Appraisal Review Fee" fees were included in the "finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and are, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states as follows:

- the "Processing Fee" is revenue collected for various processing functions, including but not limited to ordering and reviewing the borrower's credit report, documentation of the borrower's income, and assembling various components of the file for the purpose of data entry into the loan origination system;

- the "Underwriting Fee" is revenue collected for reviewing the file to determine compliance with company lending policies and procedures, identifying compensating factors that support the loan decision, reviewing the borrower's credit risk, evaluating the property for clear title, reviewing the file to identify and prevent fraud, validating data integrity and determining the salability of the loan in the secondary mortgage market;

- the "Flood Zone Determination Fee" is revenue collected for obtaining information regarding whether the property was in a Special Flood Hazard Area and for monitoring the property in the event map revisions result in the restructuring of the lender's insurance requirements;

- the "Tax Service Fee" is revenue collected for monitoring the property real estate taxes after loan closing; and

- the "Appraisal Review Fee" is revenue collected for an in-house appraiser's review of the appraisal report to verify the adequacy and completeness of the report, and to verify that the property value meets the minimum guidelines for the loan program.

## INTERROGATORY NO. 7:

For each service in referred to in interrogatories 5 and 6 above that was performed in whole or part by a third party, identify that third party, itemize all third party charges and describe the service(s) performed by such third party.

## RESPONSE TO INTERROGATORY NO. 7:

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This interrogatory seeks information about calculations based on amounts that were included in the "finance charge" disclosure on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states that First American Flood Data Services and First American Tax Services performed certain functions in connection with the flood zone determination fee and the tax service fee. See Response to Interrogatory No. 6 above.

## REQUEST FOR PRODUCTION OF DOCUMENTS

## REQUEST NO. 1:

All documents identified in response to the foregoing interrogatories.

## RESPONSE TO REQUEST NO. 1:

Subject to and without waiving its general and specific objections, AHL states that it will produce all non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Interrogatories.

## REQUEST NO. 2

**Hall-Frazier**
**Record - 001577**

All documents, including any information stored in electronic form, regarding or in any way relating to the calculation of the terms of the TILA disclosure at issue herein.

**RESPONSE TO REQUEST NO. 2:**

AHL objects to this Request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection and the General Objections, AHL states that it has already produced non-privileged, responsive documents in response to this Request. AHLfurther states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

**REQUEST NO. 3:**

Each and every document, including any information stored in electronic form, regarding the services performed in exchange for your charges reflected on the Plaintiff's HUD-1 settlement statement.

**RESPONSE TO INTERROGATORY NO. 3:**

AHL objects to this request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This Request seeks documents regarding fees that were included in the finance charge" disclosure on the Edwards' Final Truth in Lending Disclosure Statement (AHL 00003) and is, therefore, beyond the scope of this litigation. AHL states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

## VERIFICATION AS TO RESPONSES TO INTERROGATORIES

I, Alma Diaz, am duly authorized by Accredited Home Lenders, Inc. to execute the

foregoing responses to interrogatories under oath on its behalf.  The information set forth in these

responses was collected by others and such information is not necessarily within my personal

knowledge.  However, on behalf of Accredited Home Lenders, Inc., I verify under penalty of

perjury under the laws of the United States of America that the foregoing responses to

interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated: April **30** , 2008.

_____
Alma Diaz

CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Responses to Plaintiffs' First Set of Interrogatories on counsel of record by placing same in the United States mail, postage prepaid and properly addressed to:

Earl P. Underwood, Jr.
Law Offices of Earl P. Underwood, Jr.
P.O. Box 969
21 South Section Street
Fairhope, AL 36533-0969

on this the ___ day of May, 2008.

Respectfully submitted,

J. DOUGLAS MINOR, JR. [MSB #10045]

AS TO OBJECTIONS:

_____

J. DOUGLAS MINOR, JR. [MSB #10045]
Attorney for Defendant Accredited Home
Lenders, Inc.

OF COUNSEL

J. Douglas Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

CHERYL HALL FRAZIER,

      Plaintiff,

   vs.                     CIVIL ACTION NO.:
                                1:08-cv-11-MHT
ACCREDITED HOME LENDERS, INC.,
d/b/a HOME FUNDS DIRECT,

      Defendant.
_____/

VIDEOTAPED DEPOSITION OF ROBERT B. DOOLEY

Taken at San Diego, California

Wednesday, June 25, 2008

Reported by Debbie L. Bloom - CSR

Certificate No. 7731

Page 2

I N D E X

DEPOSITION OF: ROBERT B. DOOLEY
JUNE 25, 2008

EXAMINATION                          PAGE

BY MR. IRVINE                        5

      INDEX OF EXHIBITS
FOR PLAINTIFF:                       MARKED
  1    Photocopy of Amended Notice of Taking    8
       Rule 30(b)(6) Deposition

  2    Photocopy of First Amended Complaint    103

  3    Photocopy of Answer and Defenses of    103
       Accredited Home Lenders, Inc.
  4    Photocopy of February 15, 2008 letter    103
  5    Photocopy of various mortgage documents  103
  6    Photocopy of Defendant's Response to    103
       First Set of Interrogatories Propounded
       by Plaintiff, Cheryl Frazier
  7    Photocopy of Defendant's Response to    103
       Plaintiff's Second Set of Interrogatories
       and Request for Production
  8    Photocopy of Accredited document    91
       headed Closing Agent Application

Witness signature page           109
Certificate/Stipulation page     110

Page 3

1       On Wednesday, June 25, 2008, commencing at the
2   hour of 9:14 a.m., at 15253 Avenue of Science,
3   Building 1, in the City of San Diego, County of
4   San Diego, State of California, before me, Debbie L.
5   Bloom, Certified Shorthand Reporter, in and for the
6   State of California, personally appeared:
7               ROBERT B. DOOLEY,
8   called as a witness by the plaintiff, who, being
9   by me first duly sworn, was thereupon examined and
10  testified in said cause.
11
12
13              APPEARANCES
14  FOR PLAINTIFF:
15      STONE, GRANADE & CROSBY
        BY: GEORGE IRVINE, ESQ.
16      7133 Stone Drive
        Daphne, Alabama 35626
17      (251) 433-7172
        gri@sgclaw.com
18
19  FOR DEFENDANTS:
20      BRADLEY ARANT ROSE & WHITE LLP
        BY: J. WILL MANUEL, ESQ.
21      Suite 450 One Jackson Place
        188 East Capitol Street
22      Jackson, Mississippi 39215
        (601) 948-8000
23      wmanuel@bradleyarant.com
24
25

Page 4

SAN DIEGO, CALIFORNIA; WEDNESDAY, JUNE 25, 2008
                   9:14 A.M.

        THE VIDEOGRAPHER: This begins Videotape
No. 1 in the deposition of Robert B. Dooley, in the
matter of Cheryl Hall Frazier versus Accredited Home
Lenders, Incorporated, doing business as Home Funds
Direct, Civil Action 1:08-cv-11-MHT, for the United
States District Court, for the Middle District of
Alabama, Southern Division.
        We're on the record at 9:15 a.m., on
Wednesday, June 25, 2008. This deposition is taking
place at 15253 Avenue of Science, San Diego, California
92128.
        My name is Kevin Montgomery, representing
Freedom Court Reporting.
        Would all counsel please identify yourselves
and state whom you represent, starting with the
telephone.
        MR. IRVINE: "Starting with the telephone." is
that what you said?
        THE VIDEOGRAPHER: Yes, please.
        MR. IRVINE: This is George Irvine of Stone,
Granade & Crosby, and I represent the plaintiff, Cheryl
Hall Frazier, in this action.

Page 5

1       MR. MANUEL: My name is Will Manuel with
2   Bradley Arant, and I represent Accredited Home
3   Lenders.
4       THE VIDEOGRAPHER: The reporter today is
5   Debbie Bloom, and she will now swear in the witness.
6
7           ROBERT B. DOOLEY,
8       having been sworn, testified as follows:
9
10          EXAMINATION
11  BY MR. IRVINE:
12      Q. Thank you.
13      Mr. Dooley, as we just introduced ourselves
14  over the telephone, my name is George Irvine, and I
15  represent Mrs. Frazier in this case.
16      Have you ever had your deposition taken
17  before?
18      A. Yes, I have.
19      Q. How many times, please, sir?
20      A. One.
21      Q. Was it recent?
22      A. About nine months ago.
23      Q. Was it in connection with your work for
24  Accredited or something personal?
25      A. My work for Accredited.

Q. What was the nature of the deposition, if you wouldn't mind?

A. It was involving an alleged fraud case.

Q. Do you remember the plaintiff's name?

A. No, I do not.

Q. And were you the corporate representative of Accredited?

A. Yes, I was.

Q. Where was that case filed?

A. I don't recall.

Q. Do you remember the lawyer's name for the plaintiff?

A. No, I don't.

Q. In connection with that deposition, they probably told you the ground rules, which are a little bit different. I guess, when you're on the telephone with respect to having to answer out loud. So since, obviously, I can't see you, I can't tell if you're nodding your head or shaking your head, but I'm going to need "yeses" and "nos" and out-loud responses to my questions.

Obviously, any time you need to take a break, you've got your counsel there, and y'all just chime right in. It's not an endurance contest.

I will endeavor to be clear, but sometimes my

Page 7

questions may not be clear to you. And if they are not clear to you, I would appreciate it if you would tell me that they are not clear. Otherwise, I will have to proceed on the understanding that my question was clear, and that you understood it. Is that fair?

A. Yes. That's fair.

Q. Now, also, I knew Mrs. Hall before she got married and became Mrs. Frazier, so I may say "Hall" a lot instead of "Frazier" when I'm referring to her, so don't let that confuse you.

Also in this case, the defendant is Accredited Home Lenders, dba Home Funds Direct, and so at times I may say "Accredited," and at other times I may say "Home Funds" or "Home Funds Direct," and at other times I may just say "you." And whenever I do that, will you understand that I am referring to the defendant, Accredited?

A. Yes. That's understood.

Q. Okay. And with all that, let me get started. There should be some exhibits there on the table in front of you.

A. Okay.

Q. Do you see the first one, Exhibit No. 1?

MR. MANUEL: Is it the Notice of Deposition, George?

THE WITNESS: Now I have it, yes.

MR. IRVINE: Yes.

Q. Is that the Amended Notice of Taking Rule 30(b)(6) Deposition?

A. Yes.

MR. IRVINE: Could y'all mark -- it's already marked as Exhibit No. 1. I'm going to attach this to the deposition as Exhibit No. 1.

(Plaintiff's Exhibit 1 was marked.)

BY MR. IRVINE:

Q. And you are the individual who has been designated by Accredited to appear pursuant to this notice?

A. Yes.

Q. In connection with appearing for this notice of deposition today -- or for this deposition today, have you seen this notice?

A. Yes, I have.

Q. All right. Did you -- I'm not asking for anything that was discussed, but did you spend some time with your counsel getting ready for this deposition today?

A. Yes, I did.

Q. About how long?

A. About two hours.

Page 8

Q. Did you review any documents?

A. Yes, we did.

Q. What documents did you review?

A. Documents from the loan file.

Q. Anything else?

A. A spreadsheet of business transactions that Accredited and Home Funds Direct has done with Swafford.

MR. MANUEL: And, George, let me just interject for the record. We've got this spreadsheet, but we're going to have to redact the names because of some concerns about privacy, but we can talk about that. He can talk about the number of loans that they've done with Swafford, which I think you talked about, but I think as far as the spreadsheet itself, until we can get those names redacted and the privacy information on it, we're going to need to produce that after today. But he can talk about the number of loans and the states that they did loans in with Swafford, but as far as -- I mean, we're not hiding anything from you. We don't want to violate any privacy concerns.

MR. IRVINE: I hear you. We can talk more about that off the record.

MR. MANUEL: Okay.

BY MR. IRVINE:

Page 11

1    Q. But suffice it to say, this is a document
2  that you reviewed, but it's not a document that you
3  brought today to produce?
4    MR. MANUEL: Correct.
5    Oh, you're asking me or are you asking him? I
6  guess you're asking him.
7    MR. IRVINE: It doesn't matter. But I got a
8  "correct" to that question, so I'm satisfied.
9    Q. Anything else that you've reviewed?
10    A. Well, just this Exhibit 1 that we're
11  looking at now, we went over that, and I believe it
12  was just about it.
13    Q. Okay. Well, let's talk a little bit about
14  the spreadsheet that you brought -- I'm sorry -- that
15  you reviewed. Can you generally -- let me ask you, do
16  you have it there?
17    A. No, sir.
18    Q. Okay. From your review of it, how is it
19  organized? How is it structured?
20    A. It's a list of loans with -- documenting
21  the loan number and the borrower's name. I believe it
22  had the closing date on it and the closing agent, which
23  was Swafford and their address, and it would indicate
24  whether the loan was closed through a wholesale office
25  of Accredited or the retail office of Home Funds

Page 12

1  Direct, and that's it.
2    Q. Did it have any information on it like,
3  say, loan amount or any -- any information with respect
4  to fees or charges incurred in connection with the
5  closing of the loan?
6    A. I believe it had the loan amount, but
7  there were no fees on it.
8    Q. Any other information on it at all that
9  you can recall?
10    A. No, sir, I don't think so.
11    Q. How many loans were listed on it?
12    A. I don't remember the exact number, but it
13  was over a thousand.
14    Q. So would it be fair to say then that for
15  the period of time of the loans listed on that sheet,
16  that Swafford and Hays closed over a thousand loans for
17  Accredited?
18    A. That's correct.
19    Q. And did you tell me the period of time of
20  the loans listed on the sheet?
21    A. No, I didn't.
22    Q. Do you remember it?
23    A. It was dating back to September 2004.
24    Q. And what was the -- what through date, if
25  you will?

Page 13

1    A. Through probably last month or -- you
2  know, maybe the month before. That's when I originally
3  requested the information. It was current up to a
4  couple months ago at least.
5    Q. Does Swafford still close loans for
6  Accredited?
7    A. I don't know.
8    Q. Let's just -- you know, the last loan that
9  was listed on the sheet -- let me strike that.
10    These loans listed on the sheet are loans that
11  were only closed by Swafford?
12    A. Yes.
13    Q. So I know that other settlement service
14  providers closed loans for Accredited, right?
15    A. Yes.
16    Q. Like, for instance, Lenders First Choice,
17  who we have in another lawsuit?
18    A. Yes.
19    Q. So none of the loans closed for Accredited
20  by other service providers are listed on this sheet?
21    A. That's correct.
22    Q. All right. So -- and the last loan that
23  you remember being on the sheet or the more -- the more
24  recent -- the most recent loan listed on the sheet that
25  was closed by Swafford was within the last couple

Page 13

1  months?
2    A. Well, we went up to the last couple of
3  months searching the system.
4    Q. Okay.
5    A. I don't recall what the last closing date
6  was. It could have been 2007.
7    Q. That's fine. I'm just trying to
8  understand, since I'm not looking at the sheet, whether
9  the last loan was a couple of months ago or whether
10  the -- you've searched up through a couple of months
11  ago, and the last loan was somewhat further back in
12  time.
13    A. That would be a correct thought about the
14  spreadsheet, yes.
15    Q. All right. Turning back to Exhibit No. 1,
16  there are a number of categories of information listed
17  on the first and second page of the deposition. I want
18  to go through those with you briefly.
19    Now, have you done research with respect to
20  No. 1, the dates that Accredited has done business with
21  Swafford and Hays?
22    A. Yes, I have.
23    Q. So now are you the person most familiar at
24  Accredited with the information requested by No. 1
25  there?

Page 14

1    A. Yes.
2    Q. Can you tell me the dates that Swafford
3 has done business -- I'm sorry -- that Accredited has
4 done business with Swafford and Hays.
5    A. We started doing business with them in
6 June of 2003. Definitely 2003. I believe the month
7 was June.
8    Q. All right. And through when?
9    A. 2007 possibly. I don't know if we've
10 closed any loans with them in 2008.
11    Q. All right. And did you look at it hard
12 enough to see whether there was any sort of frequency
13 information, an average number of loans closed per
14 month?
15    A. No. I didn't -- I haven't broken it down
16 that way.
17    Q. Would you be able to give me any sort of
18 an opinion or judgment about the number of loans
19 Swafford was closing for Accredited per month.
20    A. No, I would not know.
21    Q. Now, the -- No. 2 was the contractual
22 relationship between Swafford and Accredited.
23    Have you looked into that?
24    A. Yes, I have.
25    Q. Are you the person most familiar with that?

Page 15

1    A. Yes.
2    Q. Is there a contractual relationship
3 between -- was there a contractual relationship between
4 Swafford and Accredited?
5    A. No. Accredited had no contractual
6 relationship with Swafford.
7    Q. All right. Now, apparently y'all found
8 and brought with you an application form?
9    A. Yes, sir.
10    Q. All right. Let me just skip over that,
11 when they've brought that to me -- let me skip over
12 that, and I'll come back to that -- this line of
13 questioning.
14    A. Okay.
15    Q. Are you the person now most familiar with
16 the services performed by Swafford as said services
17 relate to loans originated by Accredited?
18    A. Yes.
19    Q. Is that because you've investigated
20 that?
21    A. Well, I -- yes.
22    Q. Were you involved -- let me -- you know,
23 when Accredited was having Swafford close loans, were
24 you involved in the day-to-day process of loan closings
25 at all?

Page 16

1    A. No, I was not.
2    Q. All right. Let me back up now and do what
3 I probably should have done right before we got started
4 and ask you what your job title is and get your
5 background there at Accredited.
6    A. My job title currently is paralegal.
7    Q. All right. And are you a trained,
8 certificated paralegal?
9    A. I'm currently enrolled in night school to
10 get my certificate.
11    Q. How long have you been employed by
12 Accredited?
13    A. Nine years.
14    Q. Can you tell me -- let's see. So this is
15 2008. When did you start?
16    A. June 1999.
17    Q. Did you start as a paralegal or did you
18 start in some other position?
19    A. No, I started in Post-Closing Department,
20 working as an assistant to capital markets, reviewing
21 loans that were destined for investors.
22    Q. Correct me if I'm wrong, but weren't just
23 about all the loans that Accredited did destined for
24 investors?
25    A. Yes.

Page 17

1    Q. So, you started in post-closing. How
2 long did you stay in post-closing?
3    A. Six years -- a little over six years.
4    Q. Did you have different titles, I'll say,
5 in post-closing?
6    A. I was a scratch and dent manager, and then
7 later the title changed to investor sales support
8 manager.
9    Q. You know, I have to ask what a scratch and
10 dent manager is.
11    A. "Scratch and dent" is a common term in the
12 mortgage industry which would suggest that a loan
13 needed some type of maintenance or correction.
14    Q. Can you give me an example.
15    A. For example, if a loan was presented to an
16 investor and it was missing a document or if they
17 didn't understand something about it, it would be
18 rejected, and that would come to me, and I would review
19 it and either make any corrections that were necessary
20 or go to the investor and explain to them what their --
21 make them understand what their issue was all about.
22    Q. I see. All right. So, you didn't start
23 in the Post-Closing Department as a scratch and dent
24 manager, did you?
25    A. Yes, I did.

Page 18

Q. You did?
A. Yes.
Q. Where did you work before Accredited?
A. I worked for -- two years before Accredited I was with Advanta Mortgage.
Q. What did you do for Advanta?
A. I -- I've reviewed loans there, performed due diligence for Advanta in buying loans, and then we funded the loan pools if the loans were approved.
Q. All right. Before Advanta?
A. Before Advanta I was with -- I was a supervisor at -- a policy processing supervisor at an insurance company for about 2 1/2 years, doing homeowners insurance, workers' comp and business policies.
Q. And before that?
A. Before that I was with Citizens National Mortgage where I did insuring and guarantee work in the -- for FHA and VA loans. I was also a loan processor. I did a little bit of underwriting, and I was a docker/funder as well.
Q. And about how long --
A. Oh, I'm sorry. That was about two years.
Q. Okay. And before that?
A. Before that I was -- it was my

Page 19

introduction with the mortgage industry where I worked for a company named Bowest. It was a big loan servicing company, and we -- I boarded loans onto their system, new loans that came into the company that needed servicing.
Q. How long there?
A. About a year and a half.
Q. Prior to that?
A. Prior to that, United States Navy for 21 years.
Q. Okay. What was your job in the Navy?
A. I was a chief radioman, retired as a chief radioman, naval communications.
Q. Did you go into the Navy out of college or high school or --
A. College.
Q. Let me ask you -- let me ask a better question. Could you tell me about your educational background, please.
A. I have -- went to college quite a number of years ago at Indiana State University. I completed three years of general-type curriculum. After I graduated -- or retired from the Navy, I went to community college and got an Associate's Degree in Real Estate Services and Finance, and I've also completed

Page 20

quite a number of -- maybe nine or ten courses through the mortgage banking association curriculum, and I have a real estate license and things of that nature. So I have a good understanding of the real estate process.
Q. All right. Did -- and so you told me you had three years of -- did you ever get your degree?
A. I didn't get my bachelor's degree, no.
Q. Then you went into the Navy and served in the Navy for 21 years?
A. That's correct.
Q. And you retired, obviously, honorable discharge from the Navy?
A. Of course.
Q. Can you tell me your personal address, please, sir.
A. My personal address is 329 Quinoa -- that's Q-u-i-n-o-a -- Quinoa Court, Chula Vista, California.
Q. Now, you -- you started with Accredited as the scratch and dent manager, and you were that for about six years, you said?
A. Yes.
Q. And then did you become a paralegal?
A. No. After six years I -- I changed positions to -- my title was a loan fulfillment

Page 21

manager, with emphasis on docs and funding, and I worked with, at that time, about 24 doc and funding branches nationwide to assist them with training and development and writing procedures that would help us with our loan docking and funding systems. I also --
Q. You say you assisted in writing procedures?
A. No. Assist -- no. I would -- I wrote a lot of procedures that would assist them in the docking and funding procedures throughout the company.
Q. I see. All right.
A. And I also worked -- actually throughout the -- my time at Accredited with the regulatory compliance counsel in the legal department to make sure that our loans were funded within all the State and Federal guidelines.
Q. I was coming to that. While you were employed by Accredited, did you ever have any sort of formalized training in compliance with consumer protection laws, such as Truth in Lending or RESPA?
A. "Formalized" meaning sitting in a classroom with a teacher?
Q. Yes, sir.
A. No.
Q. Anything like where you could show me a

1 certificate or something like that?
2      A. I have a Regulatory Compliance Certificate
3 issued by the Mortgage Banking Association for taking
4 their course.
5      Q. How did you get that?
6      A. I completed their coursework.
7      Q. Was it sort of a -- was it like a
8 correspondence course?
9      A. Yes.
10     Q. And you still have that certificate
11 somewhere handy, I'm sure?
12     A. I do.
13     Q. When did you get that?
14     A. Probably five, six years ago.
15     Q. Any other -- and I guess I may have
16 defined that coursework out of my definition of
17 formalized training, and I didn't intend to do that.
18         Do you have any other training that you can
19 tell me about in regulatory compliance?
20     A. Not formalized, no.
21     Q. Okay. How about informal?
22     A. Well, I've read a lot of different State
23 codes and statutes and regulations and Federal --
24 Federal guidelines and read all the books myself. And
25 when certain -- actually, when I was at Advanta

1 Mortgage, we did have some standup classroom training
2 while I was there. This would have been specific to
3 Federal -- Federal high-cost testing and things of that
4 nature.
5      Q. Okay.
6      A. But I -- I don't have a certificate or
7 anything from that. That was 12 years ago probably.
8      Q. All right. Now, I think I got myself off
9 the track a little bit. That was -- I think I had
10 asked you if you stayed -- what you did -- if you
11 became a paralegal after the six years that you were
12 the scratch and dent manager, and I don't remember what
13 you told me, frankly.
14     A. No, I was -- I moved to a position where I
15 was a loan fulfillment manager for docs and funding.
16     Q. Yes, sir.
17     A. Yes.
18     Q. And how long did you do that?
19     A. About one year and nine months.
20     Q. And then did you move to a paralegal?
21     A. Yes, sir.
22     Q. What are your duties as paralegal?
23     A. I assist the litigation attorney.
24     Q. And who would that be?
25     A. At Accredited, his name is Chase Bivin.

1      Q. And does Accredited have a legal staff?
2      A. Yes.
3      Q. And I -- let me just ask you this, get to
4 it. Is -- can you tell me how Accredited is currently
5 organized.
6      A. No, I cannot.
7      Q. Okay. Is there some reason?
8      A. Well, we've -- we're doing a lot of
9 reorganization at the moment due to new ownership, so a
10 lot of that's pending.
11     Q. I see. All right.
12         There is a legal department, however?
13     A. Yes, sir, there is.
14     Q. And you work for the legal department?
15     A. Yes, sir.
16     Q. Is Accredited still closing loans --
17 making loans? I'm sorry.
18     A. Yes, we are.
19     Q. And what group or division of Accredited
20 does that?
21     A. Well, we have a loan origination branch
22 here in San Diego, and we're doing wholesale loans and
23 retail loans.
24     Q. Are there other loan origination branches
25 around the country?

1      A. Right now, I don't -- we just closed all
2 of them three weeks ago, so I don't think that they've
3 reopened anything except what's here in San Diego.
4      Q. Was that San Diego branch closed and then
5 reopened?
6      A. No.
7      Q. So every branch other than the San Diego
8 branch got closed within the last three weeks?
9      A. Yes.
10     Q. When did -- did you tell me that
11 Accredited was under new ownership?
12     A. Yes.
13     Q. Who bought it?
14     A. Lonestar. It's a hedge fund out of
15 Dallas -- I believe they're out of Dallas, but I'm not
16 positive.
17     Q. And did they -- did the new owners, I
18 guess, engage in some employee-reduction activities?
19     A. Yes, they did.
20     Q. Is that what happened to Mrs. Diaz?
21     A. Yes.
22     Q. Do you know?
23     A. Yes. Mrs. Diaz -- the branch that Alma
24 Diaz worked at closed about three to four weeks ago.
25     Q. I see. Are the post-closing activities of

1  Accredited done in a division or organization or branch
2  separately from the loan origination branch?
3       A. Yes.
4       Q. What would you call that branch?
5       A. Post-Closing Department.
6       Q. Post-Closing Department.
7       Where is it physically located?
8       A. It's physically located here in San Diego
9  at headquarters.
10      Q. All right. How many people work in
11  Post-Closing Department?
12      A. Today?
13      Q. Yes, sir.
14      A. About five.
15      Q. Can you tell me the duties of the people
16  in the Post-Closing Department.
17      A. They receive trailing documents primarily
18  and send any trailing documents to any loan files or to
19  investors wherever they belong. That's their primary
20  duty today.
21      Q. Who does the -- there are some documents
22  that I got that I'll talk to you about at some point as
23  we go along, but for instance, there's a Refinance
24  Audit Checklist that's contained in the files for
25  Mrs. Hall that were produced.

Page 27

1       A. Okay.
2       Q. There's a Section 32, Calculation Summary
3  document. I was assuming that all of these documents
4  were prepared in post-closing.
5       A. The Section 32, I -- the Section 32
6  document that you're talking about would have been
7  prepared in loan processing and then again in -- prior
8  to funding the loan. And then the -- there's two
9  different types of audits, so I'm not sure which one
10  you're referring to.
11      Q. Okay. Well, we'll come back to that. I'm
12  really trying to make sure I understand as best I can,
13  given the new ownership of Accredited, the
14  organization.
15      Was there a -- was there a loan processing
16  department or loan processing branch?
17      A. Yes.
18      Q. Was that part of the loan origination
19  branch?
20      A. Yes.
21      Q. So one of the functions of loan -- the
22  loan origination branch was loan processing?
23      A. Yes.
24      Q. There wasn't like a separate loan
25  processing division, was there?

1       A. No.
2       Q. There is also on the table, I think in
3  front of you, an Exhibit 6. Can you find that please,
4  sir.
5       A. Sure. Hold on.
6       Q. Exhibit 5 is a loan file, a big fat thing,
7  and Exhibit 6 ought to be right behind it.
8       A. I've got Exhibit 5. It's farther down
9  below or --
10      MR. MANUEL: Yes.
11  BY MR. IRVINE:
12      Q. Exhibit 5, if you'll look at Exhibit 5,
13  the bottom right-hand corner there's some Bates
14  labeling, AHL-Frazier 0001.
15      Do you see that on Exhibit 5?
16      A. Yeah, hold on. I'll find it, but I'm
17  going to have to go through a lot of documents in
18  Exhibit 5 to get to it.
19      Q. There are 163 pages of Exhibit 5.
20      A. Okay. That helps. Thank you.
21      Q. And if you look at the bottom right-hand
22  corner of each page --
23      A. Right.
24      Q. -- those things are numbered.
25      A. Okay. So I'm at -- I'm at page -- or

Page 29

1  Bates No. -163 for Exhibit 5.
2       Q. Yeah, the next document should be
3  Exhibit 6.
4       MR. MANUEL: No.
5       THE WITNESS: I've got 7, so maybe -- wait. I
6  just saw it. It's out of place here. Hold on. Okay.
7  I've got No. 6.
8  BY MR. IRVINE:
9       Q. All right. Have you ever seen No. 6
10  before?
11      A. I have.
12      Q. In fact, as I look over, there's your
13  signature on it.
14      A. Yes.
15      Q. On page 11.
16      A. Okay.
17      Q. Let me make sure, is that your signature
18  on page 11 of that document?
19      A. Yes, it is.
20      Q. So you are the person that executed this
21  document on behalf of Accredited to verify the accuracy
22  of the responses to these interrogatories?
23      A. Yes, I did.
24      Q. Who is Kristopher Dillon?
25      A. I don't remember his exact title. He's an

1  employee at the Marietta branch that originated the
2  Hall Frazier loan.
3      Q.  And the Marietta branch is now closed?
4      A.  Yes, sir.
5      Q.  That was Marietta, Georgia?
6      A.  Yes.
7      Q.  And is he no longer employed?
8      A.  He's no longer employed.
9      Q.  Do you know if Accredited, as part of any
10  sort of out-processing procedure or otherwise, has
11  maintained addresses and phone numbers for its former
12  employees?
13      A.  Yes.  The Human Resources Department has
14  last known contact information at the time employees
15  were laid off.
16      Q.  All right.  Have you made any effort to
17  obtain the last known address for any of those
18  individuals listed in the response to Interrogatory
19  No. 1?
20      A.  I don't remember if I checked these or
21  not.  I don't remember if I was asked to.
22      Q.  Okay.  I guess the answer is, you have
23  not made any effort, have you?
24      A.  No, not on my own.
25      Q.  All right.  How about Kim Stevenson, who

Page 31

1  is she?
2      A.  Another employee that worked at the
3  branch, and her name was on the loan.  I don't remember
4  her exact function, what she had to do with the loan.
5      Q.  All right.  You didn't remember
6  Mr. Dillon -- Kristopher Dillon's function with respect
7  to the loan either, do you?
8      A.  No, I don't recall.
9      Q.  Is Kim Stevenson still employed?
10      A.  No.  None of these people in the
11  Interrogatory No. 1 are still employed.  And they
12  probably all got laid off -- I believe they all got
13  laid off in September of '07.
14      Q.  How many employees does Accredited have
15  now?
16      A.  I don't know the exact number.  Maybe
17  around 4- to 500 Accredited/Home Funds Direct employees
18  are remaining on board.  And we merged with another
19  company, but I don't want to include those.
20      Q.  And that's down from how many?
21      A.  Between 3500 and 4,000, about.
22      Q.  Do you remember Clarence W. Wells?
23      A.  Yeah.  Clarence Wells was the
24  underwriter.  I'm familiar with the Clarence Wells
25  name.

1      Q.  Were all these people at the Marietta
2  branch?
3      A.  Yes.
4      Q.  How about Mike Simpson?
5      A.  Yeah, he was an employee there at the
6  Marietta branch.  I don't recall his exact position.
7      Q.  You don't know his role with respect to
8  the Hall loan?
9      A.  No.  I -- I don't have it in my memory
10  bank here, no.
11      Q.  All right.  Verria Neal?
12      A.  Same.
13      Q.  Okay.  Ken Harper?
14      A.  Same.
15      Q.  And Rita Dickerson?
16      A.  Same.  I know their names.  I put them in
17  the interrogatory, in the response, and that's because
18  they were -- their names were located either in the
19  loan origination system or on the documents
20  themselves.
21      Q.  All right.  Now, the loan origination
22  system, is that that -- let me ask you it this way:
23  Are you aware of the fact that we took the deposition
24  of Mrs. Diaz in connection with the -- in connection
25  with the Edwards versus LLC and Accredited case?

Page 33

1      A.  Yes, sir, I am.
2      Q.  Have you ever read her deposition?
3      A.  Yes.
4      Q.  How long ago did you read her deposition?
5      A.  I read it yesterday.
6      Q.  Did you read it in getting prepared for
7  this deposition?
8      A.  Yes.
9      Q.  Was there anything else you reviewed in
10  getting ready for this deposition?
11      A.  You know what, wait a minute.  Let me back
12  up.  Maybe I read it a day before.  Within the last
13  couple of days I read it.
14      Q.  Okay.  You know, I asked that question
15  earlier --
16      A.  Well, let me explain that.  I did read
17  it.  When I met with the attorney here today and we
18  talked about the deposition today, we talked -- that's
19  when we talked about the documents and about deposition
20  procedures.  I had read the deposition of Ms. Diaz on
21  my own at my desk.
22      Q.  That's fine.
23      A.  So.
24      Q.  Was there anything else that you -- that
25  you read on your own to get prepared for the deposition

1  today?
2      A. The loan -- the loan documents.
3      Q. No. no. You told me about those already.
4      A. Yeah. No.
5      Q. But you didn't tell me about Ms. Diaz's
6  deposition. I'm just trying to jog your memory.
7      A. Yeah. No. I don't recall anything else.
8      Q. All right. Ms. Diaz testified in her
9  deposition about some software or software program that
10  Accredited used called LOIS.
11      Do you remember that?
12      A. Yes. It's Loan Origination Information
13  System that we affectionately call "LOIS."
14      Q. Was that -- do you know who the creator of
15  that was?
16      A. It's -- Empower is the commercial name.
17  LOIS is a pet name that Accredited assigned to Empower.
18  The software is called Empower. And the vendor, I
19  believe, is Fidelity National Title.
20      Q. Did Accredited have an IT department?
21      A. Yes, we do.
22      Q. And still does?
23      A. Yes.
24      Q. Who is the head of the IT department?
25      A. I don't know his name. That's part of the

1  reorganization.
2      Q. Who -- what does that mean, he's part of
3  the reorganization? Did the old one get terminated and
4  there's a new person that's been hired?
5      A. Yes. That's correct.
6      Q. Okay. And you don't know the new person's
7  name?
8      A. That's correct.
9      Q. Do you ever have occasion to use the LOIS
10  software?
11      A. I have, yes.
12      Q. If it breaks, who would you call?
13      A. We have a LOIS team, a team of programmers
14  and technicians that maintain LOIS.
15      Q. Who is their -- who is their boss or
16  supervisor?
17      A. Their boss was -- right now?
18      Q. Sure.
19      A. John Gisiger.
20      Q. Can you spell that for the court reporter
21  and myself?
22      A. Yes. John, J-o-h-n, Gisiger,
23  G-i-s-i-g-e-r.
24      Q. And that's currently, right?
25      A. Yes.

1      Q. Prior to the acquisition or
2  reorganization, who was it?
3      A. Well, we could -- John would still be --
4  John's been with the company for about ten years.
5      Q. Is he there in San Diego?
6      A. Yes.
7      Q. Let me go back to my notice for a
8  minute. Did -- did I -- did you investigate the
9  notice -- the notice is No. 1, Exhibit No. 1. Do you
10  have it?
11      A. Exhibit No. 1?
12      Q. Yes, sir.
13      A. The one we were looking at before?
14      Q. Yes, sir.
15      A. Yes, I'm -- yes, I did.
16      Q. No. 3 -- No. 3 on the notice asks for the
17  person who could talk to me about services performed by
18  Swafford and said services relate to loans originated
19  by Accredited.
20      A. Okay.
21      Q. Do you see that?
22      A. Yes.
23      Q. Are you the person with the most
24  knowledge about that at Accredited now?
25      A. Yes.

1      Q. And have you had to obtain your knowledge
2  by investigating that?
3      A. No.
4      Q. No. Then how did you obtain your
5  knowledge?
6      A. Well, Swafford would perform the same
7  services as any other closing settlement office would
8  for -- there wouldn't be anything any different.
9      Q. Okay. That's fine.
10      So your knowledge about the services performed
11  by Swafford is based upon your knowledge of the typical
12  services provided by all settlement service providers;
13  is that fair?
14      A. Yes.
15      Q. And is it also fair that the services
16  provided by Swafford in connection with closing loans
17  would be the same services as provided by all
18  settlement service providers?
19      A. Yes.
20      Q. How about No. 4, the manner and content
21  of instructions from Accredited to Swafford related to
22  such services, are you the person most familiar with
23  that information?
24      A. Yes.
25      Q. Is that because you've investigated or

Page 38

1  because your knowledge is based upon your knowledge of
2  what the typical nature and content of instructions
3  from Accredited are to all settlement service
4  providers?
5      A.  I'm just familiar in general with the
6  process, and that would be it, yes.
7      Q.  Now, the process -- the process -- you
8  say "the process."  We're talking about the process of
9  originating and closing loans?
10     A.  Yes.
11     Q.  And is it fair to say that Accredited's
12  process of originating and closing loans is a
13  standardized process?
14     MR. MANUEL:  Object to the form.
15     But you can answer.  You can answer.  I'm
16  sorry.
17     THE WITNESS:  Yeah, I'm not sure what you mean
18  by "standardized."  It's --
19  BY MR. IRVINE:
20     Q.  Well, does Accredited use the same process
21  all the time in connection with a closing -- closing
22  its loans?
23     A.  Yes.
24     Q.  And is it Accredited's intent to have the
25  process be a standardized process so that it works the

Page 39

1  same way every time?
2      A.  Yes.
3      Q.  Okay.  So in that regard, the manner and
4  content of instructions from Accredited to Swafford
5  ought to be the same as the manner and content of
6  instructions to all settlement service providers who
7  are closing loans for Accredited; is that right?
8      A.  Yes.
9      Q.  Are you the person -- No. 5, are you the
10 person with the -- most familiar with the degree of
11 control exercised over Swafford by Accredited regarding
12 time, place and manner Swafford performed any such
13 services?
14     A.  Yes.
15     Q.  Is that because you've investigated that
16 or because you just know based on your knowledge of the
17 process?
18     A.  I just know based on my knowledge of the
19 process.
20     Q.  No. 6, the number -- we already went over
21 the number of loans originated by Accredited in which
22 Swafford would perform some settlement-related service,
23 didn't we?
24     A.  Yes.
25     Q.  And that's that spreadsheet that you have,

Page 40

1  right?
2      A.  Yes.
3      Q.  And there's over a thousand loans on that
4  spreadsheet?
5      A.  Yes, that's correct.
6      Q.  Were there more than 2,000?
7      A.  No.
8      Q.  Somewhere between -- do you have a closer
9  ballpark for me?
10     A.  I'm thinking 1400, but I don't know if
11 it's 1400 or 1,040, but I just remember somewhere
12 around there.  Close to 15-, say.
13     Q.  Okay.  And the services provided by
14 Swafford in closing those loans were the same for all
15 1400?
16     A.  Yes.
17     Q.  All right.  No. 7 says the nature of
18 settlement services performed by Swafford related to
19 all such loans.  You're the person most familiar with
20 that at Accredited?
21     A.  Yes.
22     Q.  Is that because you just know or because
23 you had to investigate it?
24     A.  I just know.
25     Q.  Is that because of the nature of the

Page 41

1  settlement services performed by Swafford are the same
2  as the settlement services provided by all other
3  settlement service providers, like Lenders First Choice
4  and others?
5      A.  Yes.
6      Q.  Are you the person most familiar with
7  No. 8, the use by Swafford of third-party providers of
8  said services?
9      A.  Yes.
10     Q.  Is that because you just know or because
11 you had investigated it?
12     A.  Because I just know.
13     Q.  All right.  Let's talk about that for a
14 minute.  Do you know that Swafford uses third-party
15 providers for the services that it performs to get
16 Accredited's loans closed?
17     A.  I don't know if they do or not.
18     Q.  Okay.  So do you know if other settlement
19 service providers like Lenders First Choice or Inzura
20 or others use third-party providers?
21     A.  Here again, I don't know if they do or
22 not.  I should say that it's not uncommon for a
23 settlement office such as Swafford or Lenders First
24 Choice or Inzura, as you've mentioned to, on occasion,
25 use third-party providers.

Q. Do you have any particularized knowledge about those third-party providers?

A. Well, no, but the question is too vague. Counselor. What service are you talking about?

Q. That's fine. That's fine. Let's talk specifics, since we're here.

If you would look at Exhibit 5, please, sir.

A. Okay.

Q. Now, remember how we talked about the Bates label numbers on the bottom right-hand corner of each page?

A. Yes.

Q. If you would look at page 0026.

A. Okay.

Q. Can you identify this document for me.

A. Yeah. It looks like page 2 of the HUD-1 settlement statement.

Q. For Mrs. Frazier?

A. Yes. Correct.

Q. You're familiar with this document, this type of document; are you not?

A. Yes, I am.

Q. And I don't want to replow the sort of ground that we plowed in the deposition of Mrs. Diaz, but it's my understanding that the way this document

Page 43

comes to be created is that Accredited sends the -- if I mischaracterize them, please correct me. But the lender's instructions to Swafford and those lender's instructions have certain fees listed in them, and that Swafford puts those fees and other fees that will be charged to the borrower in connection with the loan closing on a HUD-1 like this form and sends it back to Accredited for Accredited to approve.

A. Yes.

Q. Is that right?

A. Yes.

Q. And that happens every time, right?

A. I don't know that it happens -- procedurally, yes, that would be what should happen.

Q. Well, that's really my question. That's the standard procedure for the completion of the HUD-1 settlement statement in connection with the loans closed by Swafford or any other settlement service provider for Accredited.

A. Yes.

Q. And on this document, Number 26 on page -- I'm sorry -- on this document on page -26, there are a number of fees listed, correct?

A. Yes.

Q. Now, some of these fees come to Swafford

from Lenders First Choice -- I'm sorry -- from Accredited, right?

A. Yes.

Q. And, in fact, that is essentially all of the fees listed in the 800 block, right?

A. Yes.

Q. And the 900 block?

A. Yes.

Q. And the 1000 block?

A. Yes.

Q. And then the fees listed in the 1100 block and the 1200 block come from Swafford, right?

A. Yes.

Q. I don't know about the 1300 block. Where do those fees come from?

A. Well, 1300 block comes from the title company, or Swafford in this case would contact the creditors that we're paying off to get updated payoff statements.

Q. So they come from Swafford also?

A. Yes.

Q. Now, when Accredited receives this form from Swafford, it understands that Swafford is going to list all of these charges and collect these funds from the borrower at settlement, right?

Page 44

A. Yes.

Q. Now, it's my understanding, I think from Mrs. Diaz's deposition, that Accredited doesn't inquire into the amount of these fees in any regard.

A. As long as they appear reasonable in cost, no, we would not.

Q. Okay. Well, when you say "as long as they appear reasonable in cost," what would prompt Accredited to inquire about a particular fee?

A. It would basically be the -- based on the experience of the person closing the loan. For example, if Line 1101 on this Bates No. -026 was $1,000, that would trigger a question to Accredited, who's consistently closing loans in Alabama, that maybe that -- you know, to ask, "Why is your closing fee so much higher than it normally would be?" Because they would usually be $200 or $300, depending on the agent.

Q. Do you know of that ever happening?

A. Have I seen that happen?

Q. Yes.

A. On -- yes, I have.

Q. Can you tell me about it.

A. Well, I've seen it happen, but not normally.

Q. When have you seen it happen?

A. I've seen it happen over a period of time
for the last 17 years since I've been in the mortgage
business.
Q. Well, at Accredited, do you recall that
ever happening?
A. Yes.
Q. Can you give me the specifics of that
instance.
A. Well, I don't know what else -- what I can
say, other than, yes, I have seen charges from closing
agents that seemed to be higher than what they normally
were.
Q. Is there some sort of manual guideline,
written statement of policy, that relates to
questioning fees charged by a settlement service
provider in connection with a closing?
A. No. The policy is that people that review
the loans and the HUDs in particular should be alert to
any fee that would appear not to be reasonable in price
or a bona fide fee, depending on the state that you're
doing business in.
Q. Is that a written or unwritten policy?
A. Today it would be a written policy.
Q. Do you have that written policy?
A. Today?

Page 47

Q. Yes, sir.
A. Not in front of me, no.
Q. When you say today there would be a
written policy, does that mean that that policy was
recently written down?
A. Yes. Well, it would have been -- some of
the written policies would have been -- that I just
referred to would have been after the Hall Frazier loan
closed.
Q. That was getting ready to be my next
question. Was that a policy written down at the time
of Mrs. -- at the time Mrs. Hall's loan closed?
A. I don't know if they -- well, it was not a
written policy and procedure, a corporate policy and
procedure, simply because they didn't have a lot of
those types of policies in a training development or
written at that time in the company's growth. That
doesn't mean that -- I don't know what Marietta,
Georgia, might have had written.
Q. Did each branch have its own separate set
of policies?
A. No. I don't know what each separate
branch had in 2005.
Q. Okay. When did this policy get written
down?

A. Well, in 2003, second quarter.
Q. Okay. I'm talking about your last
answer.
A. I'm sorry. 2005, second quarter.
Q. Okay.
A. Correction, yeah.
Q. Okay. What do you call that policy?
A. Well, the requirement to review fees
for -- to make sure they're bona fide or reasonable
actually comes from Truth in Lending Code, and that's
how it's always been taught to people. And we have
that specifically in an online training resource for
Truth in Lending Disclosure and HUD training.
Q. So there is a written policy to review
those charges by the people at Accredited to make sure
that they are bona fide and reasonable.
A. Yes.
Q. And that policy was in writing in 2005?
A. Yes.
Q. And what --
A. I believe they launched that course in the
second quarter.
Q. All right. That's part of some
coursework?
A. Yes.

Page 49

Q. Is there any written policy that's
provided to people at Accredited or available for
people at Accredited that says that people at
Accredited involved in the closings of these loans
should review those HUDs?
A. Not to my knowledge, but it doesn't mean
that they weren't taught that.
Q. That wasn't my question.
A. Okay.
Q. My question was, was there a written
policy?
A. Not to my knowledge.
Q. And your testimony is that there's -- that
that is taught to employees of Accredited; that process
is taught to them in connection with some regulatory
compliance training?
A. Yes.
Q. All right.
A. And when they launch the course -- the
coursework, the people that were involved with
reviewing these loans were required to take that
course.
Q. All right. Is that coursework material
still available?
A. Yes.

Page 50

1    Q. What do you call it?
2    A. "TILA Review," or words to that effect.
3    T-I-L-A.
4    Q. So then let's say that the person at
5    Accredited -- what do you call the person who reviews
6    this HUD-1?
7    A. It would be someone in the doc and funding
8    department.
9    Q. Do they have a particular title?
10    A. Well, they're either a docker, meaning
11    they draw documents, or a funder. And in most of the
12    branches, those would be interchangeable.
13    Q. So backing up a little bit, when Swafford
14    is engaged to close a loan, who engages Swafford to
15    close the loan?
16    A. The loan processor would contact Swafford
17    to schedule a closing.
18    Q. Okay. And I think I understood from
19    Mrs. Diaz's deposition that's up to the discretion
20    of the loan closer -- loan processor?
21    A. Yes.
22    Q. Do they pick whoever they want?
23    A. Yes.
24    Q. They don't have a list or anything like
25    that?

Page 51

1    A. No. You mean like a corporate list that
2    they go by?
3    Q. Yes, sir.
4    A. No.
5    Q. What is there -- do they have their own
6    personal list?
7    A. I don't know that they have a list. They
8    do business with who they have -- have gotten good
9    service from.
10    Q. All right. And then they select Swafford
11    as the closer for a particular loan. And how do they
12    notify Swafford that there's getting ready to be a loan
13    closing?
14    A. They would just simply call them.
15    Q. All right. And then -- and what is the
16    first document that Swafford gets?
17    A. Well, I guess that could depend. They're
18    going to -- Swafford might not get any documents until
19    the closing documents are sent to them.
20    Q. Okay.
21    A. I don't know why they would get any until
22    we send them the -- until we send them the closing docs
23    that we need the borrower to sign, unless there was
24    some particular question that they had and they needed
25    something.

Page 52

1    Q. Isn't it that Swafford -- doesn't Swafford
2    get the lender's instructions?
3    A. Those -- those are -- those go in a
4    closing doc package, along with all the other
5    documents.
6    Q. How does Swafford know what fees to put on
7    the HUD that are the lender fees?
8    A. That would be discussed in the phone.
9    Q. Let me show you a Document No. -34 of
10    Exhibit 5.
11    A. Okay.
12    Q. I think these are -- this is all the way
13    over to Document No. -39 or -40.
14    A. Okay.
15    Q. Is it your testimony that these lender's
16    instructions are not provided to Swafford until
17    Swafford is provided with a completed loan package
18    ready for execution to close?
19    A. That's correct.
20    Q. And it's your testimony that the -- that
21    Swafford is provided the lender fees orally in the
22    phone call?
23    A. Yes.
24    Q. Who sends out the Good Faith Estimate?
25    A. The branch, the origination branch.

Page 53

1    Q. Look over to Document No. -32 of
2    Exhibit 5.
3    A. Okay.
4    Q. Is that a copy of the Good Faith
5    Estimate?
6    A. That's a copy of a Good Faith Estimate and
7    format that is delivered to the closing office with the
8    final document package for the borrower to sign. The
9    purpose of this particular form is to itemize the Truth
10    in Lending Disclosure Statement, which is Bates
11    No. -31.
12    Q. And, in fact, this is -- this document
13    is -- this is a -- is this a copy of a document that's
14    previously been sent to the borrower?
15    A. The -- what you would really define as a
16    Good Faith Estimate is sent to the borrower within
17    three days of their loan application. So this may or
18    may not match identically to that.
19    Q. Okay. And at this point Accredited is
20    requiring the borrower to utilize the services of
21    Swafford as the closing agent?
22    A. I'm sorry?
23    Q. At this point Accredited is requiring the
24    borrower to utilize the services of Swafford and
25    Hays --

1     A. No. We don't require the borrower to use
2 Swafford and Hays, no, sir.
3     Q. Can you look down there at the bottom of
4 this form, right above the words, "This does not
5 constitute a loan commitment."
6     Do you see that, that language?
7     A. On -32?
8     Q. Yes, sir.
9     A. Yes.
10     Q. And would you agree with me that that
11 language says, "Use of a particular provider of service
12 is required, and the estimate is based on charges of
13 the provider"?
14     A. Okay. I can't read that. This copy is
15 not that clear.
16     Q. Sorry. That's the copy y'all produced to
17 me.
18     A. Okay. Well, I think I see it. "The
19 lender will require a particular provider from a lender
20 controlled or approved list." Yes, it says that.
21     Q. Okay. And isn't that, in fact, true that
22 at this point Accredited is requiring the borrower to
23 utilize the services of Swafford to get this loan
24 closed?
25     A. We would not require the borrower to use

1     A. No. Because the HUD is an itemization of
2 what actually occurred at closing, so that hasn't
3 happened when the TILA is prepared.
4     Q. But you've got the completed HUD at the
5 time the TILA is prepared, don't you?
6     A. No, sir.
7     Q. You don't?
8     A. No.
9     Q. I don't mean executed HUD, I mean
10 completed HUD.
11     A. We would have the estimated HUD, yes, that
12 would be the procedure.
13     Q. And it would be completely filled out and
14 ready to send to Swafford to have executed, along with
15 all the other documents, right?
16     A. No, sir.
17     Q. That --
18     A. Accredited does not send a HUD to the
19 closing office. The HUD is prepared by the closing
20 office and sent to the loan origination branch.
21     Q. And then what happens to it?
22     A. It's reviewed.
23     Q. And it doesn't go back to Swafford?
24     A. No.
25     Q. How does Swafford know that it's

Page 56 / Page 57

1 Swafford. If the borrower had a different servicing or
2 closing agent that they wanted to use, we -- you know,
3 that's negotiable.
4     Q. Do you know if this -- do you see right to
5 the left of that there's a little square with an X in
6 it?
7     A. Yeah, very small.
8     Q. Yes, sir.
9     A. Yeah.
10     Q. Is it usual and customary for Accredited
11 to send out a Good Faith Estimate form on every loan
12 that it closes that tells the borrower by checking that
13 block that the use of a particular provider of service
14 is required?
15     A. Yes. This is a standardized form, so it
16 would say the same thing.
17     Q. Now, these -- this goes out from
18 Accredited, right?
19     A. Yes.
20     Q. Is this a document that Accredited uses to
21 prepare the TILA Disclosure?
22     A. Yes.
23     Q. So Accredited is not using the HUD page
24 that we were looking at earlier, page -26, to complete
25 the TILA Disclosure, right?

1 approved?
2     A. It would be approved over the telephone.
3     Q. And it's not included in the packet of
4 documents that Swafford gets to close the loan?
5     A. No.
6     Q. Do you know what is included in that
7 packet of documents?
8     A. Exhibit 5 probably -- most of the
9 documents in Exhibit 5, not all of them. The documents
10 that the borrower is required to sign, your -- you
11 know, your common -- your note and your mortgage and
12 Truth in Lending Disclosure and all the various
13 disclosures that are in the -- you know, common to a
14 loan file, those are sent to the closing -- those are
15 prepared by Accredited and sent to the closing office.
16     Q. The borrower is required to sign the HUD,
17 isn't she?
18     A. Right. But the HUD-1 is not a lender
19 document.
20     Q. So Swafford prepared -- let me make sure I
21 understand it. You're saying that Swafford prepares a
22 completed HUD-1 based on information it gets over the
23 phone and based on information that it already has,
24 like its -- its own charges and provides that completed
25 HUD-1 back to Accredited, and Accredited approves it

Page 58

1  and sends out a loan package that does not include a
2  copy of the HUD-1 for execution?
3     A. That's correct. We couldn't. We e-mail
4  lender documents, and there's no way to capture a
5  HUD-1. It's not in our system.
6     Q. All right. So when Accredited gets the
7  completed HUD-1 that it approves, does it then run the
8  TILA Disclosure?
9     A. That's when they draw the final docs,
10  yes.
11     Q. So the TILA Disclosure is printed or
12  drawn, as you say, after Accredited has approved the
13  HUD-1 form?
14     A. They might have drawn the documents prior
15  to that, but if necessary, they would update the TILA
16  depending on what the HUD -- HUD said.
17     Q. You mean they might have created a TILA
18  Disclosure without the settlement service provider's
19  closing fee?
20     A. We would know what that is.
21     Q. You would know what that was?
22     A. Yes. There's correspondence and
23  communication going on with the loan processors and the
24  closing office. It's not a complete mystery.
25     Q. Flip over, if you will for me, please,

Page 60

1     A. -- and the computer does the
2  calculations.
3     Q. That's what I assumed, but I don't know
4  until I ask you the question.
5     A. Yeah.
6     Q. All right. So, who is the person there at
7  Accredited whose job it is to enter all the fees into
8  the Empower software?
9     A. Well, that would be an ongoing process
10  from the beginning of the processor, who would
11  understand some of the fees initially, and then as it
12  gets through all the way to the doc and funding
13  department, then they would verify that all the fees
14  were final before they -- to the best of their ability
15  before they drew the final docs.
16     Q. All right. Let me -- so at this time
17  they're inputting fees into the Empower software based
18  upon the completed HUD-1?
19     A. If the completed HUD-1 -- you know, I
20  don't like this word "completed HUD-1." The HUD --
21     Q. Well, the --
22     A. The HUD-1 is completed when the borrower
23  signs it, and it could always change. So I want you to
24  understand that. I'm not -- when we get the -- when
25  Accredited gets the HUD-1, it's not completed. It's

Page 59

1  sir, to page -31 of Exhibit 5.
2     A. Okay.
3     Q. Can you identify the document for us.
4     A. Yeah. Final Truth-In-Lending Disclosure
5  Statement.
6     Q. All right. How is the -- how is the
7  finance charge computed on this document?
8     A. Empower calculates that in the loan
9  origination system.
10     Q. Do you know what goes into it?
11     A. Yes.
12     Q. Can you tell me.
13     A. The calculations are the -- based on the
14  fees charged on the loan and the interest rate, and
15  there's a time factor and some other complicated
16  calculations in accordance with Reg Z.
17     Q. All right. When you say "Empower
18  calculates it," is there a screen print or -- you know,
19  a process that you have to go through to have Empower
20  calculate this document?
21     A. Well, yeah. The process to calculate it
22  would simply be to enter all the fees that are going to
23  be charged and then basically hitting the enter button
24  and --
25     Q. Okay.

Page 61

1  what the closing agent says at that time is -- what
2  it's going to be, so --
3     Q. Once Accredited approves it and sends it
4  back, it then -- they can't change it, can they?
5     A. Well, they're not supposed to change it
6  without notifying us, that's true. That's in our
7  closing instructions.
8     Q. All right. All right. So, looking at the
9  Final Truth-In-Lending Disclosure Statement, Document
10  No. -31, about halfway down do you see the blank for
11  Filing/Recording Fees?
12     A. Right.
13     Q. $170?
14     A. Correct.
15     Q. Do you know if that was the filing and
16  recording fees for the Hall loan?
17     A. I can tell you that's what the estimate
18  was at the time that we drew the documents, what we
19  thought it was going to be. But because I know --
20  understand the nature of the lawsuit, I know that that
21  turned out not to be the exact fee or fees.
22     Q. So that it is -- with respect to Swafford,
23  it has turned out not to be the exact fee every time in
24  connection with every loan?
25     A. I haven't --

MR. MANUEL: Object to the form.

You can answer.

THE WITNESS: I have not reviewed all the other Swafford loans.

BY MR. IRVINE:

Q. Okay. Does anybody check the recording fee at Accredited to see whether it is bona fide?

A. No, sir. That's not a lender function.

Q. Is there any policy or process that would cause -- in place with Accredited by which its employees would check the recording fee?

A. No, sir. That's not a lender function.

Q. On the -- did you know, looking at the Hall loan, where that 170 came from?

A. Yes.

Q. Where did it come from?

A. Well, that -- that was the sum if you -- if we had the print screens of -- or could look at the loan origination system, that would be actually -- yes, I can tell you, if you want to look at Bates No. -32.

Q. Yes, sir. Is it 120 plus 50?

A. Yeah. And I don't have -- let me kind of do something here. I can't hardly see this. Line 1201, which is the "Recording Fee. Deed/Mortgage" for 120.

Page 63

Q. Yes, sir.

A. And then go down to Line 1204 where it says "Miscellaneous Recording Fee."

Q. Yes, sir.

A. $50. That -- our loan origination system, LOIS, would calculate that -- that sum of those two figures and populate 170 into the Truth-in-Lending Disclosure Statement, Bates -31, that we're talking about.

Q. All right. Now, who prepares this Good Faith Estimate?

A. Accredited.

Q. And where did Accredited get $50 as a miscellaneous recording fee for use on this Good Faith Estimate?

A. Swafford.

Q. All right. Jump back with me back over to page -26.

A. Okay.

Q. Do you see in the 1200 box anything that would indicate a $50 miscellaneous recording fee?

A. No, I don't.

Q. And when you say "Swafford," does that mean Swafford called Accredited and said, "For purposes of your Good Faith Estimate, put $50 as a miscellaneous

recording fee on it"?

A. Well, that's probably what occurred. I wasn't there, of course, to hear the conversation, but that's --

Q. You don't know if Accredited maybe picked up the $50 off of Line 1111, Endorsements, and included it on the Good Faith Estimate as a miscellaneous recording fee?

A. No. I don't know that they did that, no.

Q. You don't know where that number actually came from really.

A. $50?

Q. Yes. I mean, you know it came from -- you believe it came from Swafford.

A. I believe it would have come from Swafford, yes.

Q. But you don't know that?

A. No.

Q. And is there any policy or process in place at Accredited by which the people reviewing these documents in closing this loan would look at this 120 recording fee and check it to make sure that it's bona fide?

A. No, we wouldn't know how to determine what the County Recorder charges, no. We rely on the

Page 64

settlement office to do that accurately.

Q. And if they saw 120 over and over and over with -- in different counties all over the state of Alabama and in other states, there's no policy in place to induce the Accredited people to check that number?

A. No. Our policy is to rely on the closing office to do it correctly.

Q. Okay.

A. That's part of their function.

Q. And that's a different policy from the policy that says you need to check the settlement service fee. If it looks like it's too big, you need to inquire into it?

A. No. You said bona fide fee. If we have a recording fee there of $800, that's unreasonable and would be investigated, I think.

Q. And there is a written policy to that effect -- I'm sorry. I'm trying to remember your prior testimony. There's no written policy to that effect, but there is something in some sort of training materials that says you have to check that fee, right?

A. Not that particular fee. Any fee would be checked to be -- make sure it's bona fide and reasonable.

Q. Including the recording fee.

A. Any fee, yes, sir.

Q. Okay. But Accredited doesn't check these fees, does it?

A. The recording fee?

Q. Yeah.

A. Do they actually call the County Recorder and verify that that fee is going to be exactly what the closing office says?

Q. It doesn't do anything to check the fee, does it?

A. No. We don't -- we have no way of verifying what a recording fee is. We don't have any kind of access to those types of charges at all.

Q. And so -- so Accredited doesn't, as a matter of policy, try to look behind the -- this fee to see whether it's been padded or marked up?

A. No. We rely on the closing office to do those things on our behalf.

Q. The same is true, I guess, of the title insurance premium?

A. That's correct.

Q. Accredited expects to get a title policy in connection with this closing, doesn't it?

A. I'm sorry?

Q. Accredited expects to get a title policy

Page 67

in connection with this closing, doesn't it?

A. Yes.

Q. Isn't that a requirement of Swafford in connection with closing this loan?

A. To deliver the policy to Accredited?

Q. Yes, sir.

A. Yes.

Q. And there's a commitment letter prepared and delivered to Accredited in connection with this?

A. Yes.

Q. Does Accredited ever -- and that commitment letter lets Accredited know who the carrier is going to be, doesn't it?

A. Yes.

Q. Is Accredited generally familiar with the requirement in a number of states, including Alabama, that title policies -- title -- I'm sorry. Let me back up.

Is Accredited familiar with the requirement in Alabama and other states that title insurance agents, when they issue policies, adhere to filed rates?

A. Accredited would rely on the settlement agent to do these things. And our processors and closers are not trained in insurance premiums, no.

Q. Okay. So then Accredited does not take

any action at all to determine whether this title insurance premium, for instance, shown here on Document -32, is bona fide?

A. Well, title insurance by label is bona fide, so that's pretty easy to determine.

Q. My question was the premium.

A. So the -- other than to view it from a general bona fide and reasonable fee, which they would be trained to do, they would not have details of what a -- or access to or be required to check title insurance premium per -- per unit charges or anything of that nature. So -- and this --

Q. I -- I'm sorry.

A. In this case, where the title insurance fee is $200 on Line 1108 of the HUD, if it were a little bit less or more than that, in reality, Accredited would not know that. We rely on the settlement office to do those things.

Q. And so as I understand it, there's no policy in place that would require any of the Accredited employees to check into this fee?

A. Not -- not to that detail, no.

Q. And you think, just as a matter of experience, if it looked really high, that's something that they would inquire into?

Page 69

A. Yes.

Q. But Accredited doesn't take -- make any effort to see if maybe this fee has been padded by $50, say?

A. No, sir. They would not be required to check that or even understand how to do it. It's not a lender -- not part of the lender process.

Q. And the same is true, isn't it, of the fees listed by Swafford and Hays in Line 1102 and 1103 for abstract or title search and title examination?

A. Correct.

Q. Does Accredited know that Swafford is hiring an independent abstracter to obtain that abstract or title search?

A. I don't know if Swafford did or not. And nor would the --

Q. You don't know whether Accredited knows that or not?

A. No. We would not know if -- some closing offices might have access to public records or themselves to be able to do an abstract or title search, for example. So I don't know if they're doing -- hiring a third-party vendor to do it.

Q. All right. So if Swafford, in fact, hired some third party to obtain an abstract or title search

1    and paid that third party $72 and listed a charge of
2    $200 here on the HUD. Accredited has no policy of
3    checking into that situation?
4        A. No.
5        Q. And Accredited wouldn't know whether
6    Swafford was padding that third-party charge or not?
7        A. No, we would not.
8        Q. And then the same is true for the title
9    examination? You know, if Swafford was already being
10   compensated for its services in reviewing a title
11   abstract by its commission and selling the title
12   insurance policy, Accredited wouldn't look into that
13   situation, would it?
14       A. No.
15       Q. Now, is it -- is it after the loan is --
16   let me ask it this way. Look over, if you will for me,
17   please, sir, to --
18       MR. MANUEL: Do you want to take a break?
19   BY MR. IRVINE:
20       Q. -- Document No. -78 and -79 and -80.
21       A. Okay. Hold on. -39. Bates number?
22       Q. Bates No. -78, -79 and -80.
23       A. I've got -80 -- I go from -39 to -80.
24   Oh, wait a minute. What the heck?
25       MR. IRVINE: Tell you what let's do, Will.

Page 71

1        MR. MANUEL: Yes, sir.
2        MR. IRVINE: Let's take about a five- or
3    ten-minute break. We've been going for a while.
4        MR. MANUEL: Okay.
5        MR. IRVINE: It sounds to me like maybe that
6    Exhibit -- Exhibit 5, maybe some of the Bates pages got
7    out of order somehow.
8        MR. MANUEL: Yes, sir.
9        MR. IRVINE: These should be sequential -1 to
10   -163.
11       MR. MANUEL: Okay. We'll check into it and
12   see if we're missing anything.
13       MR. IRVINE: All right. I'll be here. Just
14   call me back.
15       MR. MANUEL: Okay. All right. Bye.
16       THE VIDEOGRAPHER: Stand by, please.
17   This concludes Video Recording No. 1 of
18   today's deposition on June 25, 2008. The time is
19   10:49 a.m.
20   We're going off the video record.
21       (Recess.)
22       THE VIDEOGRAPHER: This begins Videotape No. 2
23   of today's deposition of Robert B. Dooley on June 25,
24   2008. The time is 11:02 a.m.
25   We are on the video record.

1        Proceed, Counsel.
2    BY MR. IRVINE:
3        Q. Mr. Dooley, before I get to those
4    documents that I asked you to find, I think I asked you
5    this. Let me make sure. Accredited requires there be
6    a title policy issued to it in connection with every
7    loan?
8        A. Yes.
9        Q. And Accredited requires that the mortgage
10   be recorded in connection with the closing of every
11   loan, doesn't it?
12       A. Yes.
13       Q. Okay. Look at Document No. -78.
14   Did you find it?
15       A. Yes.
16       Q. And Document -79?
17       A. Okay.
18       Q. Document -80?
19       A. Okay.
20       Q. All of Exhibit 5 -- I guess -- you know,
21   because I'm not looking at the original documents, and
22   since I'm here in Alabama, I don't know how Accredited
23   keeps these documents. Flip back to page -73 for me
24   real quick.
25       A. Okay.

Page 73

1        Q. What is this document?
2        A. That's -- in the electronic imaging
3    process of a file, this was generated for the -- as a
4    tab for the insurance section. It isn't a document
5    that Accredited would do, but the electronic imaging
6    process created this document.
7        Q. All right. And so I guess the stuff that
8    comes before -- some of the stuff that comes before
9    this document appears to be related to insurance.
10       A. Yes.
11       Q. Is Accredited paperless?
12       A. We try to be.
13       Q. Is there an actual physical loan file for
14   Ms. Frazier?
15       A. No longer, no.
16       Q. So to get her loan file, you had to call
17   it up off of the electronic storage system?
18       A. Yes, sir.
19       Q. Can you tell me what you call that
20   system.
21       A. Fastrieve, F-a-s-t-r-i-e-v-e.
22       Q. I guess, is there a mainframe or a -- you
23   know, a blade server or something located somewhere
24   that's got all the Accredited loans deposited in it?
25       A. Yes. Everybody -- or most employees have

Page 74

1  access to Fastrieve, and practically every loan that
2  Accredited has originated has been copied over as an
3  image to Fastrieve system.
4      Q. Okay. Look down, if you will for me, the
5  insurance -- what do you call that? What do you
6  call -- did you call it a -- not a header. What did
7  you call it?
8      MR. MANUEL: Tab.
9  BY MR. IRVINE:
10     Q. Tab.
11     A. Looks like some sort of tab that was
12  created by Fastrieve to identify what is behind it.
13     Q. Turn down to Document No. -83.
14     A. Okay.
15     Q. Is that another tab for the documents that
16  come above it?
17     A. Yes. It's a transmittal tab.
18     Q. What does that mean?
19     A. The documents we put in the transmittal
20  are some types of internal correspondence, audit
21  sheets, things of that nature.
22     Q. They're not really transmitted -- are they
23  transmitted to anybody?
24     A. Not necessarily.
25     Q. Is there some reason they're called

Page 75

1  "transmittal documents"?
2      A. Yeah, I don't know. It's been -- that --
3  when we had paper tabs or paper files, that transmittal
4  tab section goes back at least nine years when I first
5  started, so maybe in the old days things were
6  transmitted back and forth, and it just retained that
7  name, but I'm not positive.
8      Q. Okay. Let me take you up to Document
9  No. -74 real quick.
10     A. Okay.
11     Q. That document, is it headed "Closed Loan
12  Status"?
13     A. Yes.
14     Q. There's a large block with two smaller
15  blocks underneath it, and on the right it says, "For
16  Assistance Call."
17     Do you see that?
18     A. Right.
19     Q. Earlier I think I asked you about Kim
20  Stevenson and Kristopher Dillon, and I think you could
21  not remember what their functions were.
22     A. Yes.
23     Q. Does this refresh your recollection?
24     A. Yes.
25     Q. Can you tell me what their functions are.

Page 76

1      A. Well, as it says, Kim Stevenson was the
2  loan specialist, and Kristopher Dillon was the account
3  executive.
4      Q. What are the duties of a loan specialist
5  with respect to the closing of a loan like Ms. Hall's?
6      A. Loan specialist is the -- also known as a
7  loan processor, and the loan processor will coordinate
8  with the borrower and closing agents and other people
9  perhaps -- in an attempt to acquire the
10  documentation to underwrite and then close the loan,
11  and essentially their job is to document and verify
12  information in the file.
13     Q. All right. How about the account
14  executive, what is his job?
15     A. Account executive and retail, which is
16  what this is, is probably more of a -- called a loan
17  officer, but it defaults to account executive on this
18  form. His job is to originate originally -- initially
19  interview the borrower and identify the loan product
20  that Accredited might have to best suit the consumer's
21  needs and do all the basic evaluation of the
22  information and then give it a preapproval or
23  disapproval.
24     Q. Is Mrs. Stevenson the person who would
25  prepare the final TILA Disclosure?

Page 77

1      A. No.
2      Q. Who was that? Do you know?
3      A. It would be one of the dockers or
4  funders.
5      Q. Is their name going to be on it? Let's --
6      A. It may not be on any of these documents.
7  I don't know.
8      Q. Okay.
9      A. It would be in the loan origination
10  system.
11     Q. Look at No. -78 for me.
12     A. Okay.
13     Q. What is this document?
14     A. These -- this is a print screen from the
15  loan origination system, and I don't even know why it
16  was printed unless somebody wanted to look at
17  something. Probably was -- somebody was looking at
18  impounds, but it's just a print screen from the
19  system.
20     Q. Is this document lost? I mean, was this
21  something that was printed contemporaneously?
22     A. Yes.
23     Q. I see down at the bottom left-hand corner
24  there's a date/time stamp on it, Thursday, March 24,
25  2005. This isn't something that has been created out

Page 78

1   of the system, is it?
2          A.  This is a print screen -- print screen
3   from LOIS, and I couldn't tell you why it's even part
4   of the loan file.  It normally would not be.
5          Q.  Okay.  I saw -- your copy is probably as
6   hard to read as mine is.
7          A.  Mm-hmm.
8          Q.  But I see below the black line on what
9   looks like a - you know, a pop-up screen that's got
10  the little minimized buttons on the right, there's a
11  black line.  There's what looks like a button that says
12  "High Cost."
13         A.  Okay.
14         Q.  First I guess, does it say "High Cost"?
15         A.  I'm looking for the actual words.  Are we
16  still looking at Document -78?
17         Q.  Yes, sir.
18         A.  I see the little black lines.  Are you --
19  where are you -- oh, "High Cost" tab.  More toward the
20  top, yes.
21         Q.  Yes, sir.
22         A.  Yes.
23         Q.  Can you tell me what that is.
24         A.  That's a systems test that calculates fees
25  that are input to the system on each particular loan.

Page 79

1   And each state, if it has specific high-cost testing,
2   is programmed to alert the processors and the dockers
3   and funders that they may or may not have exceeded the
4   high-cost testing allowance in a particular state.  It
5   also would do Federal testing as well.
6          Q.  Would that be the Section 32 Test?
7          A.  Yes.
8          Q.  All right.  This -- is this a screen print
9   of somebody doing a Section 32 Test?
10         A.  No.
11         Q.  No.  Do you know what this is a screen
12  print of?
13         A.  It's a screen print of these HUD lines,
14  828 through 1008.  As you can see, that -- where it
15  says "Fees For" -- it's kind of hard to read, as you
16  know.  Where it says "Fees For," it's got the loan
17  number "05031729" something "Hall."
18         Q.  Yes, sir.
19         A.  That's a print screen that's over a
20  bigger screen.  So for some reason or another somebody
21  opened that up and printed it, and I don't know -- I
22  don't know why they would do that unless they wanted to
23  maybe take it and show it to somebody and ask them a
24  question or something.
25         Q.  All right.  So -- but this is sort of a

Page 80

1   visual representation of the way the fees are loaded,
2   or input into the system, for lack of a better word?
3          A.  Yes, it is.  That's -- it's a piece of
4   it, yes.
5          Q.  This one seems to stop -- let me put it
6   this way.  There are only certain fees that are here on
7   this screen.
8          A.  That's right.  It's only a piece of the
9   process.
10         Q.  Okay.  Is every fee loaded into LOIS?
11         A.  Well, yes.  That would be the procedure.
12         Q.  Okay.  Well, look over to the next sheet,
13  No. -79.
14         A.  Okay.
15         Q.  This is, I believe, entitled "Section 32
16  Calculation Summary."
17         A.  Yes.
18         Q.  And then underneath that block there's
19  something that says "Good Faith Estimate Summary."
20         A.  Yes.
21         Q.  And there are a number of fees over there
22  on the left.
23         A.  Yes.
24         Q.  But there are not all the fees shown on
25  the HUD listed there, are there?

Page 81

1          A.  That's right.
2          Q.  And out of the -- there's a space for the
3   closing agent fee, but there's no space for the
4   abstract or title search, the 1102, the 1103, the 1202
5   fees.  There's no line for any of those fees.
6          A.  That's correct.
7          Q.  Is that because those fees are not loaded
8   into the system in connection with the Section 32
9   Test?
10         A.  That's correct.  By fee label, the fees
11  that you just talked about, the title, abstract, et
12  cetera, those are not defined by Section 32 to be part
13  of the Section 32 calculations.  So that's why they
14  don't appear here.
15         Q.  Is there any -- I don't know how to ask
16  it -- let me -- is there any place in LOIS where you
17  can load those fees in to do that calculation?
18         A.  All of those fees are loaded into LOIS.
19  If not, then they would never appear on the Good Faith
20  Estimate.
21         Q.  So all of the fees that we just talked
22  about, say Line 1102, 1103, 1108, 1111, all of those
23  fees are actually loaded into LOIS?
24         A.  Correct.
25         Q.  And -- but when somebody does the

Page 82

```
 1  Section 32 calculation, are they -- does the software
 2  give them a choice to include those fees or not?
 3      A. No.
 4      Q. So they don't include those fees in the
 5  Section 32 calculation. There's no way to -- let me
 6  ask you: Is it fair to say there's no way to include
 7  those fees in the computerized Section 32 calculation?
 8      A. Which fee are you talking about?
 9      Q. The 1102, 1103, 1108.
10      A. No.
11      Q. 1201?
12      A. 1101 would be included, yes.
13      Q. Yeah, I didn't say 1101.
14      A. Okay. 1102 would not be included.
15      Q. And my question was, is that because
16  there's no way in the LOIS software to include 1102,
17  1103, 1108?
18      A. The way our system is programmed, that
19  would be correct.
20      Q. And that's the same for every loan; is it
21  not?
22      A. There might be some variations depending
23  on the state and depending on what a particular state
24  defines to be part of their high-cost test.
25      Q. Do you know which states that might be?
```

Page 83

```
 1      A. There's -- as you may well know, there's
 2  over 30 different high-cost states that have different
 3  testings, so no, I wouldn't have the particulars of
 4  it.
 5      Q. Is there another sort of, let me say,
 6  screen print calculation sheet that's done for
 7  different states?
 8      A. There would be if the state has a
 9  high-cost test, state-specific.
10      Q. Okay. So -- and let me -- trick
11  question. Go to -87, Document -87.
12      A. Okay.
13      Q. Right-hand column, right above "Texas
14  Supplement," there's a thing that says
15  "State-Specific."
16      A. Yes.
17      Q. And that indicates -- correct me if I read
18  it wrong -- "All required state-specific documents are
19  present and have been reviewed," right?
20      A. Okay.
21      Q. And that's because this is an Alabama
22  loan, and there's not one, right?
23      A. I don't understand the question.
24      Q. Well, there's a check mark here that
25  indicates "All required state-specific documents are
```

Page 84

```
 1  present and have been reviewed," right?
 2      A. Yes.
 3      Q. And so that would tend to indicate that a
 4  state-specific document is present and has been
 5  reviewed.
 6      A. Yes.
 7      Q. Right?
 8      A. Yes.
 9      Q. But there's not any document that is
10  state-specific that's present here for an Alabama loan,
11  is there?
12      A. Well, the requirement for the auditor in
13  this particular audit and at this point in the audit
14  would be to refer to another state summary-type
15  reference, and it would tell them if there were any
16  special documents we wanted -- that Accredited wanted
17  the borrower or the auditor to look for.
18      Q. And am I understanding you to say that
19  the LOIS software would prompt --
20      A. No.
21      Q. No.
22      A. We have a -- we have a paper document
23  that's called a "State Summary."
24      Q. Yes, sir.
25      A. And on that "State Summary" it tells loan
```

Page 85

```
 1  processors and the loan processing system people --
 2  that outline certain requirements in documents and
 3  things of that nature that Accredited considers to be
 4  very important, and they want to make sure that we
 5  comply with whatever those requirements are.
 6      Q. Okay. You didn't bring a copy of that
 7  with you today, did you?
 8      A. I did not.
 9      Q. Look at page -86.
10      A. Okay.
11      Q. Let me back up. Look at page -86, but --
12  what is this document?
13      A. Page -86?
14      Q. Yes, sir. -86 and -87.
15      A. That's a checklist for auditing a
16  refinance closed -- closed loan documents.
17      Q. And that's what Mrs. Hall's loan was.
18      A. Okay.
19      Q. Right? I mean --
20      A. Yes. Yes, as I recall.
21      Q. And is this document prepared in
22  connection with every loan?
23      A. Yes.
24      Q. When is it prepared?
25      A. Well, these are actually -- at the time
```

1  that this loan funded that we're talking about, this
2  was -- these refinance audit checklists were just
3  pieces of paper that people already had copies of in
4  blank. And when the -- when the closed -- or signed
5  documents came back to Accredited from the closing
6  office or settlement office, the auditor would then get
7  one of these checklists and then review the documents
8  according to the checklist here.
9      Q. Okay. Did that happen -- does that not
10 happen now?
11     A. Yes, it does happen now.
12     Q. Okay. So I think my question was, when is
13 this prepared?
14     A. After the loan closes.
15     Q. That's what I thought. I just didn't want
16 to suggest the answer to you.
17     At some point during the post-closing audit
18 process, this document is completed?
19     A. Yes.
20     Q. There's a lady who signed it, I believe
21 Rita Dickerson on the next page on page -87, and she's
22 listed in your response to Interrogatory No. 1.
23     Does this refresh your recollection about who
24 she is?
25     A. Yes. She would have been either a docker

1  or a funder or possibly both.
2      Q. Had she been the person to prepare the
3  TILA Disclosure Form?
4      A. Possibly.
5      Q. Do you know who prepared the -- the
6  Section 32 Form that we were looking at a minute ago,
7  page -79?
8      A. Well, I don't think their name appears on
9  this form, but one of the doc funders would be --
10 procedurally would do the final Section 32 calculation
11 summary.
12     Q. All right. And I don't want to -- this is
13 a two-page document, isn't it? -79 and -80 are both
14 parts of the same document, or am I wrong about that?
15     A. Yeah, it's a two-part document. One of
16 them is specific to Section 32, and the other one is
17 specific to a state. In this case, Alabama.
18     Q. I see.
19     A. Because, of course, they -- the
20 calculations might be different.
21     Q. I see. Okay.
22     I think I've asked this before, but let me
23 just make sure. The Line 1102 charge of $200 is not
24 included in any respect in the Section 32 high-cost
25 loan analysis?

1      A. No, it is not.
2      Q. The same is true in connection with
3  Mrs. Hall's loan for the charge shown on Line 1103 of
4  $250?
5      A. What was that fee label?
6      Q. "Title Examination," 1103.
7      A. No, sir, it would not be included in the
8  Section 32 test.
9      Q. The same is true of the $200 charge shown
10 on Line 1108, in any respect, in any part?
11     A. And 1108 was what fee label?
12     Q. "Title Insurance."
13     A. No, it would not be included.
14     Q. The same is true of the charge for $50
15 shown on Line 1111, which is labeled "Endorsements"?
16     A. Correct. Title endorsement would not be
17 included in the calculation.
18     Q. No part of the recording fee shown in
19 Line 1201 would be included?
20     A. Correct.
21     Q. And that's true for every loan that
22 Accredited closes; is that fair?
23     A. Well, it's true for Alabama, and I don't
24 know -- I can't recall any state that would require
25 those to be included in their high cost, but it's true

1  for any Alabama loan.
2      Q. And seeing as you can't recall a state
3  that would treat those -- would require those costs in
4  any part to be included?
5      A. No, not right offhand.
6      Q. Would it be fair to say that if those
7  charges were not bona fide, that they should be
8  included?
9      A. Yes.
10     Q. If you look on the Final Truth-in-Lending
11 Disclosure page statement, Document -31.
12     A. Okay. Hold on. Okay.
13     Q. Would it be fair to say that if some of
14 those charges were not bona fide and should have been
15 included in the Section 32 calculation, they also
16 should have included -- should have been included in
17 the calculation of the finance charge here on
18 Document -31?
19     MR. MANUEL: Object to the form.
20     But you can answer.
21     THE WITNESS: Can you restate the question,
22 sir.
23     MR. IRVINE: You know, it's going to be hard
24 for me to do, so let me ask the court reporter to read
25 it back, if she can.

Page 90

(The record was read by the reporter.)

THE WITNESS: If -- if a charge or a fee was not bona fide and reasonable, yes, it should have been included in the Truth-in-Lending Disclosure.

BY MR. IRVINE:

Q. And that would be true with respect to every loan closed by Swafford for Accredited.

A. Yes.

Q. And that would be true of every loan closed by Lenders First Choice for Accredited.

A. Yes.

Q. And every settlement service provider for Accredited?

A. Yes.

Q. If you hear me shuffling around, I'm going through my notes, which is a good sign.

Did you know anything about the relationship between Swafford and Hays and Accredited other than the fact that Swafford and Hays closed loans?

A. No, sir, I do not.

Q. I'm looking at the documents that y'all faxed over.

A. Okay.

MR. IRVINE: Let me go with mine and mark a copy there of this document as Exhibit 8.

Page 91

MR. MANUEL: Okay.

(Plaintiffs' Exhibit 8 was marked.)

THE WITNESS: All right, sir.

BY MR. IRVINE:

Q. Does Accredited normally have its closing agents execute applications?

A. I would say that's normally the procedure, yes.

Q. And then does this document form an agreement with Accredited?

MR. MANUEL: Object to the form.

But you can answer.

THE WITNESS: You know, I don't -- I can't answer that question.

BY MR. IRVINE:

Q. Well, let me tell you. The reason -- I'm a little confused, because y'all faxed over two pages, right?

A. Yes.

Q. The first page looks like the cover page of an application, and the second page looks like the signature page of an agreement.

A. Yes. I would agree.

Q. And, in fact, the second page picks up with a No. 6.

Page 92

A. Mm-hmm.

Q. And the first page leaves off with a No. 3.

A. Yes. And -- I'm sorry. Go ahead.

Q. Do you think it's reasonable to believe that there is actually an agreement between Accredited and Swafford, and we only have the last page of it?

A. Yeah, that's a reasonable thought.

MR. MANUEL: That we have the last page of whatever that document is?

THE WITNESS: And I think what might have happened here was, when these -- when these documents were uploaded to the imaging system, these were transferred over from a paper file to -- and then uploaded when we got the imaging system, and perhaps something went wrong there.

BY MR. IRVINE:

Q. Yeah.

A. But I can -- I can check to make sure that -- but yeah, obviously, there's -- the pages don't match up.

Q. Yeah. Would it -- did Accredited -- was it Accredited's policy to obtain contracts with the settlement service providers it was going to use?

A. No, I don't -- I don't -- to my knowledge,

Page 93

we did not have any contracts with settlement service providers.

Q. All right. Maybe I should call them "Approved Closing Agent Agreements."

Did Accredited typically obtain approved closing agent agreements with the settlement service providers it was going to utilize to close loans?

A. We had a department that managed that. It's called Broker Services Administration, and they would probably be the ones to have to answer that question.

Q. Okay. And -- so you don't know if, like, for instance, there ought to be one of these approved closing agent agreements between Accredited and LLC or Accredited and ATM or other settlement service providers that Accredited used?

A. I can tell you that I have seen the applications and the agreements with other settlement offices. Whether or not it was the mandatory requirement that a broker services admin obtain one, I don't know the answer to that.

Q. It looks like it's fair to say that Accredited had one with Swafford, though, wouldn't you say?

A. Well, we got page 2.

Page 94

1   Q. Or page whatever it is.
2   A. Yeah. The signed page, signature page.
3   Q. And we know that at least the -- the
4   contract we're looking at here that's executed by
5   Swafford requires Swafford to close the mortgage loan
6   in compliance with all applicable laws and
7   regulations.
8       MR. MANUEL: Object to the form.
9       But you can answer.
10      THE WITNESS: That's what the Closing Agent
11  Agreement says, yes, sir.
12  BY MR. IRVINE:
13      Q. And it requires Swafford to maintain E&O
14  coverage not less than $1,000 in a form issued by
15  carrier acceptable to Accredited.
16      A. Mine says $1 million.
17      Q. Yes, sir. What did I say?
18      A. A thousand.
19      Q. Oh, I'm sorry. One million.
20      A. All right. Yes, sir. One million,
21  that's correct.
22      Q. It's fair to say that, as a matter of
23  course, in connection with virtually all of the loan
24  closings that it had, that Accredited selected the
25  settlement service provider?

Page 95

1       A. Yes.
2       Q. Do you know of any communication --
3   specifically, do you know of any communication between
4   Swafford and Hays and Accredited on any of the loans
5   that it closed with regard to the fees that were going
6   to be charged?
7       A. No, sir, I do not know of any
8   communication like that.
9       Q. Does Accredited use e-mail?
10      A. Yes.
11      Q. Would it be unusual for Accredited's loan
12  closers, processors, dockers, to communicate with
13  Swafford by e-mail?
14      A. I don't know.
15      Q. Do you know if there was any
16  communication with Swafford with respect to proper
17  charging of fees in the context of RESPA or TILA?
18      A. Well, our closing instructions would
19  require that, but --
20      Q. Yes, sir.
21      A. -- if you're talking about any other
22  communication that may have occurred in verbal or
23  e-mail communication, I don't know.
24      Q. I'm specifically talking about e-mail. Do
25  you know if Accredited's e-mail is archived?

Page 96

1       A. It is.
2       Q. Does it go all the way back to 2005?
3       A. I'd have to confirm -- check with IT on
4   that.
5       Q. Has anyone done any sort of a search of
6   the e-mail of Accredited for any communications by and
7   between Accredited and Swafford?
8       MR. MANUEL: I'm going to object to the extent
9   that you're seeking any attorney-client privilege or
10  work product, but --
11  BY MR. IRVINE:
12      Q. I think with those objections made, you
13  can answer the question.
14      MR. MANUEL: If he individually has done any
15  searches?
16      MR. IRVINE: Sure.
17      Q. I think I said "Accredited." Did I say
18  "Accredited" or --
19      MR. MANUEL: You said "Accredited."
20  BY MR. IRVINE:
21      Q. I meant "Accredited." I'm not asking if
22  your lawyer has been over there looking for stuff.
23      MR. MANUEL: So you're asking if he has.
24      MR. IRVINE: Yes.
25      MR. MANUEL: You can answer that.

Page 97

1       THE WITNESS: I have not done any electronic
2   discovery on this particular case related to the
3   e-mail, no, sir.
4   BY MR. IRVINE:
5       Q. Okay. Is it fair to say that the fees
6   listed on Lines 1102, 1103, 1108, 1111 and 1201 of the
7   HUD are typically set by the settlement service
8   provider in connection with closings of loans for
9   Accredited?
10      A. Yes.
11      Q. Is it fair to say that those fees are
12  typically not included in the finance charge?
13      A. Yes.
14      Q. Is it fair to say that those fees
15  typically are not examined to determine whether they
16  are bona fide fees?
17      A. Yes.
18      Q. I think I lost one of my own exhibits
19  that my notes tell me to go look at. I'm trying to
20  find it.
21      Do you know if anybody at Accredited has ever
22  done a manual check of the TILA calculations? TILA
23  Disclosure calculations?
24      A. Yes. The Quality Control Department
25  sometimes does.

1    Q.  Before or after the loans close?
2    A.  After.
3    Q.  Do you know if there's ever a manual
4  calculation done of the TILA Disclosure before the
5  loans close?
6    A.  No, there is not.
7    Q.  Is there any system in place at Accredited
8  to correct a fee that's listed on the HUD as one of
9  Swafford's fees if it's wrong?
10    A.  You mean after a loan closing?
11    Q.  No.  Before.  Oh, did you say "add"?  I
12  thought you said "after."
13    A.  Yes, I did.  That's why I'm asking.
14    Q.  No.  If there's -- if a fee is wrong, you
15  know, there's a transposition of a number or it's just
16  wrong for some reason, is there any system in place to
17  catch and correct that there at Accredited?
18    A.  Yes.
19    Q.  What is that?
20    A.  Well, prior to sending the documents over
21  for the -- preparing the final closing documents and
22  after we've received an advance HUD to check,
23  everything is checked on the system.  If something is
24  not correct, then it could be caught then, and then it
25  would be corrected, yes.

1    Q.  When you say everything is checked on the
2  system, do you mean the Accredited system?
3    A.  Yes, LOIS.  Mm-hmm.
4    Q.  Okay.  But like, for instance, if -- if
5  Swafford made a mistake and said, you know, that
6  there -- that closing fees -- let's say the title --
7  title examination fee, instead of it being $250, they
8  transposed the number, and it was $520.  Is there any
9  system in place at Accredited to catch that error?
10    A.  Yes.  There's an audit process before
11  final documents are drawn.
12    Q.  Okay.  And is there a piece of paper in
13  the -- in the Exhibit 5 that reflects that audit
14  process?
15    A.  Yes.  There's one in there somewhere, but
16  it -- I'm not sure that it shows the title-type fees.
17  I'm looking for it here.
18    Q.  Take your time.
19    A.  Yeah, Document -84, Bates No. -84.
20    Q.  Yeah.
21    A.  Yeah.  At this point, LOIS is checked for
22  accuracy, right before everything from the borrower's
23  name and address and all those sorts of things, the
24  loan terms and certain fees.  The title-type fees would
25  not be indicated on this -- on this sheet.

1    Q.  The only fees that are checked for
2  accuracy are the fees that are the lender fees?
3    A.  Yeah, the fees that the lender would
4  normally consider to be TILA or Federal or State
5  applicable to Federal or high-cost State testing.
6    Q.  So there's no system to catch an error in
7  a settlement service agent fee?
8    A.  Not on an official audit, no.
9    Q.  It's sort of a qualification.  So does
10  that mean that there is one somewhere?
11    A.  Not on a check sheet, no.
12    Q.  Does that mean that there is one
13  somewhere?
14    A.  Well, if I were reviewing a loan, sir, I
15  would check them.  Whether or not this auditor did, I
16  don't know.
17    Q.  Okay.  There's no written policy that
18  provides for that, is there?
19    A.  To check -- to verify the accuracy of the
20  title fees?
21    Q.  Correct.
22    A.  Other than to a broad process to -- of
23  recognizing whether they're bona fide and reasonable in
24  price, no.
25    Q.  And that's the policy that you say that's

1  taught based on the classwork, but there's not a
2  written policy about that.
3    A.  I don't believe so, no.
4    Q.  On Exhibit No. 4, if you look at that real
5  quick, please.
6    A.  Okay.
7    Q.  Down at the bottom there's a name that's
8  not listed in the answer to Interrogatory No. 1,
9  "Audrey Williams."
10    MR. MANUEL:  You mean Bates No. -4 or Exhibit
11  No. 4?
12    MR. IRVINE:  Exhibit No. 4.
13    THE WITNESS:  Oh, okay.  Hold on.
14  BY MR. IRVINE:
15    Q.  It's a letter on Bradley Arant
16  letterhead.
17    A.  Okay.  I have it here.
18    Q.  Down at the bottom there's a name listed,
19  "Audrey Williams."
20    A.  Okay.
21    Q.  And that person is not listed on Exhibit 6
22  in the answer to Interrogatory No. 1, and so I was
23  wondering who that person is.
24    A.  I'll find -- maybe I can tell here real
25  quick.  Let me just look at some of these documents.

1    Q. Take your time.

2    A. She might be the review appraiser. Yeah.

3  Audrey Williams was Accredited's review appraiser.

4    Q. Did Accredited always review appraisals

5  done by third parties in connection with its loans?

6    A. Yes.

7    Q. So there's always a charge of -- it shows

8  up on the HUD for appraisal review fee?

9    A. If the State allows it, yes.

10    Q. And do you know what that lady does for

11  that $250 appraisal review fee?

12    A. She reviews the appraisal that the third

13  party did to verify that the market value of the

14  property is what the appraisal says it is. It's a

15  fraud prevention review, and they check other sites

16  and -- it's kind of an elaborate review, yes.

17    Q. All right. I was just curious about

18  that.

19    MR. IRVINE: I think that I am finished.

20    THE WITNESS: Okay.

21    MR. IRVINE: Let me -- before I actually quit,

22  let me say that I'd like to go on -- I know that I have

23  not used or talked about a couple of these exhibits,

24  but I don't know what I attached. Let me just attach

25  them all to the deposition.

1    MR. MANUEL: No problem.

2    (Plaintiff's Exhibits 2 through 7 were

3  marked.)

4    MR. IRVINE: And I don't think I need -- let

5  me -- why don't we take -- if you don't mind, let me

6  have about five minutes or so --

7    MR. MANUEL: Five seconds or minutes?

8    MR. IRVINE: Do what now?

9    MR. MANUEL: Five seconds or minutes? I

10  didn't hear what you said.

11    MR. IRVINE: About five minutes. Let me -- I

12  know that I did not go through the notice in its

13  entirety, but I think that I probably don't need to do

14  that.

15    MR. MANUEL: Okay.

16    MR. IRVINE: So let me have about five

17  minutes, and y'all call me back, and I think I'll be

18  done.

19    MR. MANUEL: All right. Thanks.

20    THE VIDEOGRAPHER: Stand by, please. The time

21  is 11:57 a.m.

22    We're going off the video record.

23    (Recess.)

24    THE VIDEOGRAPHER: The time is 12:03 p.m.

25    We are on the video record.

1  BY MR. IRVINE:

2    Q. Mr. Dooley, you testified earlier, I

3  think, that you had seen Exhibit No. 1, which was the

4  amended notice of taking this deposition.

5    A. Yes, I have.

6    Q. Did you see this -- the request on the

7  second to the last page that you bring with you today

8  four different categories of documents?

9    A. Yes, I see it.

10    Q. Did you bring with you today any and all

11  references, manuals and other writings, whether in

12  paper or electronic format, regarding compliance with

13  Federal law regulating consumer mortgage lending?

14    A. There's nothing for me to bring. The --

15  everything is programmed into the system to ensure that

16  the processors and funders comply with the laws.

17    Q. Didn't you tell me earlier that there's

18  some sort of training program, training manuals or

19  training documents that --

20    A. Not -- not when this loan funded, no,

21  sir.

22    Q. Not when this loan funded?

23    A. Right.

24    Q. When did all that training

25  documentation --

1    A. Second quarter '05. There was a training

2  course developed for Truth in Lending.

3    Q. And you didn't bring any of those

4  documents?

5    A. No, sir.

6    Q. You don't see any sort of limitation in

7  this to documents in existence back in the first

8  quarter of '05, do you?

9    A. Say that again.

10    MR. MANUEL: Let me -- I'll object to the

11  question. The notice speaks for itself, and he's

12  testified that he didn't bring anything today besides

13  Exhibit 8, and we mentioned the spreadsheet that we

14  want to discuss off the record. I mean we can -- but

15  he didn't bring anything else besides Exhibit 8.

16    MR. IRVINE: All right.

17    Q. And so you also didn't bring anything that

18  fit the description in No. 2, did you?

19    A. No.

20    Q. And such documents do exist, don't they?

21    A. When this -- when the --

22    MR. MANUEL: I'm going to object to the form

23  of the question. But he's testified as to what the

24  training materials were and when they were developed,

25  and pursuant to that time limitation, you know, we

1 brought what we thought was relevant to what was in the
2 notice. And as far as any written materials, I think
3 he's testified as to written materials.
4        MR. IRVINE: So I guess I need him to answer.
5        MR. MANUEL: Okay.
6 BY MR. IRVINE:
7        Q. That these references, manuals or other
8 writings as listed in No. 2, they do exist, don't
9 they?
10       A. At the time this loan funded, no, they did
11 not.
12       Q. And they do exist now?
13       A. No, they do not.
14       Q. Okay.
15       A. Other than the fact that the loan
16 origination system is programmed to make sure that the
17 loan processors and dockers and funders make sure -- it
18 does the calculations for them, so there's not a whole
19 lot of school-type training. I will correct myself.
20 There is -- there has been an online school
21 corporate-developed course in Truth in Lending that's
22 available today that was not available when this loan
23 funded.
24       Q. And that's the thing that became available
25 in the second quarter of '05?

Page 107

1        A. Yes, sir. I believe that's the time
2 frame, yes.
3        Q. All right. No. 3, you did bring with you
4 what you could find?
5        A. Yes.
6        Q. And No. 4, you didn't bring anything
7 related to No. 4, but I guess -- let me ask it this
8 way: Is there anything in -- that relates to the
9 request made of you by No. 4 that is different or in
10 addition to Exhibit No. 5?
11       A. No.
12       Q. To your knowledge, has Accredited ever
13 closed a loan using a settlement service provider
14 selected by the borrower?
15       A. Yes.
16       Q. Has that happened on many occasions or
17 only occasionally?
18       A. I -- it would not have happened in the
19 majority of cases, but I don't know how to define
20 "many." We've funded over a million loans since I've
21 been here, so I don't know what "many" is.
22       MR. IRVINE: Okay. Thank you very much.
23       THE WITNESS: Mm-hmm.
24       MR. MANUEL: Thanks, George.
25       MR. IRVINE: Yes, sir. I will call you, I

1 need to talk to you anyway -- tomorrow sometime.
2        MR. MANUEL: Let's go off the record first.
3        MR. IRVINE: I'm sorry. Off the record.
4        THE VIDEOGRAPHER: Stand by, please.
5        This concludes today's video deposition of
6 Robert B. Dooley on June 25, 2008. The total number of
7 recordings made was two.
8        We're now off the record at 12:10 p.m.
9        (Discussion held off the record.)
10       MR. MANUEL: George, is it fair to say that
11 in the conduct of this deposition, that we agreed to
12 the usual stipulations?
13       MR. IRVINE: This was my agreement.
14              - - -
15       (The deposition was concluded at 12:11 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 109

1
2        Declaration Under Penalty of Perjury
3
4
5        I, ROBERT B. DOOLEY, the witness herein,
6 declare under penalty of perjury that I have read the
7 foregoing in its entirety; and that the testimony
8 contained therein, as corrected by me, is a true and
9 accurate transcription of my testimony elicited at
10 said time and place.
11
12       Executed this _____ day of _____ 2008, at
13 _____, _____.
14       (city)                (state)
15
16
17
18       _____
19       ROBERT B. DOOLEY
20
21
22
23
24
25

**Hall-Frazier**
**Record - 001609**

REPORTER'S CERTIFICATION

I, Debbie L. Bloom, Certified
Shorthand Reporter, in and for the State of
California, Certificate No. 7731, do hereby certify:

That the witness named in the foregoing
deposition was, before the commencement of the
deposition, duly administered an oath in accordance
with the Code of Civil Procedure Section 2094; that the
testimony and proceedings were reported
stenographically by me and later transcribed into
typewriting under my direction; that the foregoing is a
true record of the testimony and proceedings taken at
that time.

IN WITNESS WHEREOF, I have subscribed my name
this _____ _ _ day of ____ _____ _____ ____, 2008.


_____ _____ _____

          Debbie L. Bloom, CSR No. 7731



*Barry L. Ferguson*
*251-978-0127*

*Sherri B. Ferguson*
*251-752-4611*

### *SAND DOLLAR TITLE RESEARCH*
**12246 Venice Blvd.**
**Foley, AL. 36535**
**251-955-2784 (Phone)**
**251-955-5276 (Fax)**
**blfsbf@gulftel.com**

TO: Earl P. Underwood, Jr., Esquire
RE: Subpoena Request for Documents
DATE: April 3, 2008

Dear Mr. Underwood:

    This letter is in regards to the Subpoena in the United States District Court, Southern District of Alabama, Jonathan Edwards, et al, V. Accredited Home Lenders, Inc., et al, Case Number 1:07-CV-00160-KD-C. The Subpoena requested copies of all invoices on work done for Lender's First Choice for the last 24 months.

    My procedures regarding billing to Lenders First Choice have always been conducted in the same manner since we began a working relationship. Lenders First Choice would fax an order request to Sand Dollar Title Research for completion. On their cover sheet, at the bottom of the first page, was a section that already contained the pre-agreed price for the particular search, along with a blank which required addition of the copy charges. This cover always accompanied the completed search report back to Lenders First Choice, and they paid according to the cover sheet price. There have never been any invoices generated by Sand Dollar Title Research to Lenders First Choice, as they paid automatically from the search request sheet upon its return. They were always very prompt with their payment. Sand Dollar Title Research kept a hard copy of each search request until payment was received and for a period of up to 30 days after payment in case of questions. After that date, the search and all accompanying documents were destroyed. Almost all of these searches were current owner requested searches and provided no long term benefit for Sand Dollar Title Research to retain. I cannot speak of the procedures of Lenders First Choice for closed files.

    I sincerely hope this is a satisfactory reply, even though it may not be exactly what you were looking for in your discovery request. I have disclosed all of my usual and customary business practices by and between Sand Dollar Title and Lenders First Choice. I have signed the Affidavit attached for verification of the procedures by and between Sand Dollar Title Research and Lenders First Choice. If I can be of further assistance to you please contact me.

Sincerely,

*Barry L. Ferguson*

Barry L. Ferguson
Sand Dollar Title

**Hall-Frazier**
**Record - 001611**

## DECLARATION BY CUSTODIAN OF RECORDS FOR

### Barry L. Ferguson d/b/a Sand Dollar Title Research

I declare that

1.  I am the duly authorized Custodian of Records for Barry L. Ferguson, d/b/a Sand Dollar Title Research;  I am familiar with the procedures and practices for the creation and matters set forth by, or from information transmitted by, a person with knowledge of those matters.

4.  I certify that the record(s) was (were) kept in the course of the regularly conducted activity.

5.  I certify that the record(s) was (were) made by the regularly conducted activity as a regular practice.

6.  The record(s) produced with this declaration is (are) a true duplicate(s) of domestic record(s) pertaining to the matters described in the subpoena. There are no other records described in the subpoena, copies of which have not been produced with this declaration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.
Executed this 2nd day of April , 2008, in Foley , Alabama
                                     City                 State

_Barry J. Ferguson_
Signature

_BARRY L. FERGUSON_
Printed Name

_12246 Venice Blvd._
Address

_Foley, AL. 36535_
Address

RE: Jonathan Edwards, et al. v. Accredited Home Lenders, Inc., et al.
S.D.Ala 1:07-cv-00160-KD-C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHERYL HALL FRAZIER,           )
                               )
          PLAINTIFF,           )
                               )
V.                             )          CIVIL ACTION NO.:
                               )          1:08-cv-11-MHT
ACCREDITED HOME LENDERS,       )
INC., d/b/a HOME FUNDS DIRECT  )
                               )
          DEFENDANT.           )

## AMENDED NOTICE OF TAKING RULE 30(b)(6) DEPOSITION

TO:    **James D. Minor, Jr.**
       **Bradley Arant Rose & White LLP**
       **Suite 450 One Jackson Pl**
       **188 East Capitol St**
       **PO Box 1789**
       **Jackson MS 39215-1789**

NOW COMES Plaintiff and notices the deposition of Accredited Home Lenders,

Inc. (referred to herein Accredited) and pursuant to the provision of FRCP 30(b)(6) said

corporation is requested to designate such person or persons as are competent to testify

with regard to the following subject matter(s):

1. The dates that Accredited has done business with the Swafford and Hays
   Settlement Service ("Swafford").

2. The contractual relationship between the Swafford and Accredited.

3. The services performed by Swafford as said services relate to loans originated
   by Accredited.

4. The manner and content of instructions from Accredited to Swafford related
   to such services.

5. The degree of control exercised over Swafford by Accredited regarding the
   time, place and manner Swafford performs any such services.

6. The number of loans originated by Accredited in which the Swafford performed some related settlement service.

7. The nature of settlement services performed by Swafford related all such loans.

8. The use by Swafford of third party providers of said services.

9. The geographical areas in which Accredited does business.

10. The goods and services provided and the charges for such goods and services regarding the real estate transactions of Cheryl Hall Frazier.

11. The amount paid by Swafford for and such goods and services relating to the named plaintiff, Cheryl Hall Frazier.

12. The identity of all third party service providers used by Swafford.

13. Accredited' compliance with all federal laws regulating consumer mortgage lending.

14. The calculation of "APR", "Amount Financed", and "Finance Charge" by Accredited on loans that it originates in general and specifically regarding the Cheryl Hall Frazier transaction.

## DEPOSITION SUBPOENA DUCES TECUM

On behalf of Requesting Party Accredited is directed to **BRING WITH YOU** and produce at the time and place and date aforestated - certain **ORIGINAL** records, books, papers, documents, tangible things, etc., and to permit inspection and copying of designated things to be used as evidence, to-wit:

## DEFINITIONS:

The term documents means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation records of serial numbers, books of account, books of records, bookkeeping records, ledgers, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations, telephone calls, meetings or other invoices, worksheets, and all drafts,

alternations, modifications, changes and amendments of any of the foregoing). The term document shall also include any and all other means by which information is recorded or transmitted, including but not limited to microfilms and other film records or impressions, tape recordings and other recordings used in data processing, together with the programming instructions and other written material necessary to understand or use such punch cards, computer cards or printouts, tapes or other recordings. Writings shall include, without limitation, printed, typed, or other readable papers, correspondence, memos, reports, including without limitation, contracts, drafts, both initial and subsequent, diaries, logbooks, minutes, notes, studies, surveys and forecasts.

1.    Any and all references, manuals and other writings whether in paper or electronic format regarding compliance with federal law regulating consumer mortgage lending.

2.    Any and all references, manuals and other writings whether in paper or electronic format regarding the disclosures required by the Federal Truth-in-Lending Act the calculation of. The "APR", "Amount Financed" and "Finance Charge."

3.    Any and all contracts between Lenders First Choice and Accredited.

4.    Any and all documents touching on or relating to the loan of March 25, 2005 to Cheryl Hall Frazier including but not limited to any instructions for closings, copies of cancelled checks, ledger entries, accounting, Truth-in-Lending disclosures and title insurance forms.

**PLEASE NOTE THAT WE ARE NOT SEEKING THE PRODUCTION OF ANY DOCUMENTS THAT ARE SUBJECT TO ATTORNEY CLIENT PRIVILEGE.**

The deposition shall be taken at the Law Offices of Earl P. Underwood, Jr. at a 9:00 a.m. C.D.T. on June 27th 2008 and shall continue to completion.

Earl P. Underwood, Jr. (UNDEE6591)
Attorney for Plaintiff
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969
251-990-5558
251-990-0626 (facsimile)
epunderwood@alalaw.com

Hall-Frazier
Record - 001615

## CERTIFICATE OF SERVICE

I hereby certify that a copy hereof has been personally hand-delivered or mailed, properly addressed, first class postage prepaid, to counsel of all parties or parties pro se to the addresses shown below, on this the 13th day of June, 2008.

Robert E. Poundstone, IV
Bradley Arant Rose & White, LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

James D. Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450 One Jackson Pl
188 East Capitol St
PO Box 1789
Jackson MS 39215-1789

Earl P. Underwood, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHERYL HALL FRAZIER, individually and on behalf of a class of similarly situated persons, ) ) ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO.: |
| V. ) | 1:08-cv-11-MHT |
| ) | |
| ACCREDITED HOME LENDERS, ) INC., d/b/a HOME FUNDS DIRECT ) | JURY TRIAL DEMANDED |
| ) | CLASS ACTION |
| Defendant. ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, CHERYL HALL FRAZIER and for complaint against Defendant asserts as follows:

## INTRODUCTION

1.      This complaint is filed under the Truth-In-Lending Act (TILA) 15 U.S.C. §§ 1601 et seq. ("TILA" and "HOEPA") to enforce the plaintiff's right to rescind a consumer credit transaction, to void the Defendant's security interest in the Plaintiff's home, and to recover statutory damages, enhanced HOEPA damages, reasonable attorney's fees and costs by reason of the Defendant's violations of the Act and Regulation Z, 12 C.F.R. § 226 (hereinafter called "Regulation Z"). This amended complaint also asserts the right of a class of similarly situated persons defined below.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court by 15 U.S.C. § 1640(e) and 28 U.S.C.  § 1331.

## PARTIES

3.     The Plaintiff, Cheryl H. Frazier, is a natural person, residing at 105 TV Road, Dothan, Alabama.

4.     The Defendant, Accredited Home Lenders, Inc. d/b/a Home Funds Direct, ("Accredited" or "Defendant") is a California corporation that does business in this district.

5.     Accredited is a "creditor" as that term is defined at 15 U.S.C. § 1602(f).

6.     The Defendant, Accredited Home Lenders, Inc. will be served by mailing a copy of the summons and complaint to their registered agent at Paracorp Incorporated, 2724 10th Ave., Huntsville, AL 35805.

7.     At all times relevant hereto, Accredited, in the ordinary course of business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or by written agreement which is payable in more than four installments.

## FACTUAL ALLEGATIONS

8.     On March 25th 2005, Plaintiff entered into a consumer transaction with Defendant in which it extended consumer credit that was subject to a finance charge and which was payable to Defendant.

9.     As part of this consumer credit transaction, the Defendant retained a security interest in 105 TV Road, Dothan AL 36301, which is used as the principal dwelling of the Plaintiff.

10.     Accredited is a sub-prime mortgage lender based in California which originates sub-prime mortgage loans in several states, including Alabama. Accredited uses various settlement agents to close its loans.

2

11.     At all times relevant herein the settlement agents were, on information and belief, acting at the direction of or were the agents of Accredited.

12.     The settlement agent performed a variety of settlement services for Accredited for which is was paid a closing fee by the Plaintiff. This fee is dictated by Accredited in its closing instructions and is passed along to the borrower as part of the closing costs. The closing fee is disclosed for TILA purposes as part of the "Finance Charge." The fee paid to the settlement agent for its services is disclosed, pursuant to federal law, on Line 1101 of the applicable HUD Settlement Statement. Additionally the settlement agent is a title insurance agent for Transnation. With regard to the Plaintiff's loan, the settlement agent sold title insurance on behalf of Transnation and was paid a commission on the same.

13.     For loans such as the Plaintiff's loan, the settlement agent does not hold closings in its office, or any other office traditionally used for closings. The closings are administered by a notary hired by the settlement agent whose only role is to deliver the necessary documents to the borrowers and obtain the appropriate signatures.

14.     Under applicable federal law, Defendant is allowed to pass along the fees paid to third parties who are hired to perform settlement services, provided those costs are *bona fide*, reasonable, necessary and clearly and conspicuously disclosed and itemized on the HUD Settlement Statement. Settlement costs associated with title services must be set out on Lines 1101 through 1113 of the Settlement Statement.

15.     Furthermore the settlement agent and Accredited are required by the Real Estate Services Act (RESPA) and TILA to separately list and itemize each of these charges including any commission earned for the sale of title insurance and services provided in connection therewith.

16.     For each loan, Accredited prepares and provides to the settlement agent "Closing Instructions" which set out the amounts to be included in the HUD-1 Settlement Statement for the various fees. Many of these fees are marked up or padded in violation of the RESPA. Each of the padded fees included on the Settlement Statement prepared by the settlement agent were dictated and required by the Closing Instructions promulgated by Accredited.

### Title Search and Abstracting

17.     The settlement agent and Accredited, through its Closing Instructions, as a matter of course charge borrowers fees for title searching, abstracting, and title examination in excess of the amounts actually paid to third parties for those services in violation of applicable federal law.

### Title Insurance Premiums and Recording Fees

18.     Pursuant to federal law, the amount paid by a borrower for title insurance required by the lender must be reflected on Line 1108 of the Settlement Statement.  The amount that may be charged in premium for title insurance, including any commission, is set by the Alabama Insurance Department and other agencies for non-Alabama loans. The charges for title insurance premiums can not exceed the filed rate. The amounts actually charged its customers for title insurance are dictated by Accredited in its Closing Instructions.

19.     The Plaintiff's settlement statement did not itemize all charges imposed on her or list or disclose the payment of a sales commission on the title insurance as required by 12 U.S.C. § 2603 and 24 C.F.R. § 3500, Appendix A.

20.     On information and belief, the amount charged for title insurance in the instant transaction exceeded the filed rate approved by the Alabama Insurance Department and is another illegal markup.

4

21.    Federal law allows the recording costs to be passed along to the borrower, provided those costs are clearly and conspicuously reflected in the Settlement Statement and do not exceed the amounts actually paid to the government entity for recording.  Those charges must be set out in Lines 1201 and 1202 of the HUD-1.

22.    The recording fee charge herein was excessive as shown below.

**The Plaintiff's' Loan**

23.    On March 25th 2005, Plaintiff's loan was closed and Plaintiff executed all those documents necessary to obtain the loan and refinance the debt then due and owing and secured by her home.

24.    In connection with Plaintiff's loan, the settlement agent obtained a title search and abstract from a separate company which upon information and belief rendered a full title report. The amount charged to Plaintiff for those services was $200.00 for "Abstract or Title Search" (Line 1102) plus $250.00 for "Title Examination" (Line 1103). Upon information and belief, the actual costs of these services did not exceed $125, but in any event were much lower than the $450 amount charged for those services.

25.    Plaintiff's Settlement Statement also reflected, in Line 1201, a charge of $120. The recording fee actually incurred was $55.50. Therefore, Plaintiff was charged $64.50 above what was actually paid to the probate court for recording fees.

26.    Plaintiff was charged $221.00 for title insurance, as reflected on Line 1108 of the Settlement Statement.  However, upon information and belief, the true cost of the insurance and the amount mandated by the Alabama Department of Insurance was $161.00

27.    Plaintiff was also charged, on Line 1111, $50.00 for "endorsements." Upon information and belief, this charge does not relate to any separate service, is completely

5

unearned, should have been included in the Settlement Fee reflected in Line 1101 and included in the "finance charge."

28.      The fee for "endorsements is also duplicative because the title insurance rate includes all of the standard residential endorsements at no extra charge.

29.      The fact that the charges reflected in Lines 1102, 1103, 1108, 1111, and 1201 exceeded the actual costs of the services actually provided was unknown to Plaintiff.  The fact that those charges were marked up, illegal, excessive and otherwise improper, was unknown to, and  unknowable by, Plaintiff because the actual costs for providing or obtaining the services were not available to or discoverable by her and Defendant actively deceived Plaintiff about who was providing these services and the fact that she was being defrauded. The unknown and inherently unknowable nature of the unlawful charges did not give Plaintiff any reason to inquire, investigate or discover the wrongdoing. As a practical reality, it was impossible for Plaintiff to detect Defendant's unlawful lending law violations.

30.      Plaintiff has acted with due diligence with respect to her rights. The facts that support her causes of action were not knowable to her until shortly before the filing of the Complaint in this action.

**TILA, and Reg. Z**

31.      As part of the documents which must be presented to borrowers before closings, Accredited is required by the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA") and its implementing regulations ("Reg. Z") to prepare certain written disclosures to be provided before closing. Under TILA and Reg. Z, Accredited is required to clearly and conspicuously disclose the "amount financed" and the "finance charge," among other things, in connection with each loan.

32.    Pursuant to TILA and Reg. Z, lenders may exclude from the disclosed finance charge fees paid for title examination, title abstracting and title insurance only if those charges are "*bona fide*" and "reasonable." Reg. Z, § 226.4(c)(7).

33.    TILA also allows lenders to exclude fees paid for the recording of mortgages and other instruments, but only if those fees are actually paid to the governmental offices for recording. 15 U.S.C. § 1605(d)(1).

34.    Accredited was required to include as part of the finance charge the charge listed on Line 1201 on Plaintiff's Settlement Statement because it exceeds the amount that is actually paid to the government entity. However, the finance charge disclosed by Accredited did not include any portion of the "recording fee" charge.

35.    The charges listed on Lines 1102, 1103 and 1111 were also not included as part of the finance charge disclosed by Accredited. This is in violation of TILA and Reg. Z. Those charges, purportedly for "Abstract or Title Search" and "Endorsements," were neither *bona fide* nor reasonable. Those charges were marked-up and/or split in violation of federal law. Therefore, those charges should have been included as part of the finance charge disclosed by Accredited.

36.    Likewise, the charge listed in Line 1108, purportedly for "Title Insurance" was not *bona fide* or reasonable because it exceeded the actual cost of the insurance and the amount allowed by state law. Therefore, Accredited was required by TILA and Reg. Z to include that charge as part of the disclosed finance charge but failed to do so.

37.    At all relevant times, Accredited, in the ordinary course of its business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

**POLICIES AND PRACTICES COMPLAINED OF**

38.     Plaintiff's loan was subject to TILA and RESPA and, on information and also qualified as a "high-cost" or HOEPA loan as specified under the qualification "triggers" at 15 U.S.C. § 1602(aa) and Regulation Z, at 12 C.F.R. § 226.32, by virtue of having met the fee and cost trigger or the annual percentage rate trigger or both.

39.     HOEPA imposes special disclosure requirements on creditors when either HOEPA trigger is satisfied. HOEPA requires a special *advance* notice (15 U.S.C. § 1639, Regulation Z § 226.32) to prospective borrowers that must be received at least three business days *before* closing that must contain, since October 1, 2002, an advance disclosure of the loan's APR, Finance Charges, Amount Financed, Total of Payments and Monthly Payments. These so-called "Section 32" pre-closing notices were never sent to the Plaintiff or class members.

40.     The specific claims made by Plaintiff are as follows:

(a)     *Violations of TILA and HOEPA for Inaccurate Finance Disclosures and Material Misstatements.* The predatory lending and mark-up scheme of Accredited violated TILA and HOEPA because of inaccurate disclosures of the APR, Finance Charges and the Amount Financed on the Plaintiff's loan and the loans of others. These inaccurate disclosures were material and give rise to actions for damages and loan rescission under TILA and HOEPA because the loan did not have the disclosures required by law. The loan violated TILA and gives rise to damages and rescission under TILA, HOEPA and Regulation Z.

(b)     *Violations of TILA and HOEPA for untimely or non-existent HOEPA notices.* HOEPA requires lenders to give certain notices at least three business days prior to the closing of the loan. On information and belief, Defendant failed to give any such notice on any HOEPA loans.

**EQUITABLE ESTOPPEL, EQUITABLE**

8

## TOLLING AND CLASS ACTION
## TOLLING OF LIMITATIONS PERIOD

41.     Defendant knowingly and actively misled the Plaintiff and the class from pursuing their claims by, among other things:

(a)     Engaging in a scheme that was by its nature and design "self-concealing";

(b)     Knowingly and actively mischaracterizing and misrepresenting, *inter alia*, actual amounts paid for abstracts, title search, title examinations, notary fees, endorsement fees, title insurance and recording charges such that such non-bona fide and illegal charges were wrongfully excluded from the Finance Charges and Amount Financed used to calculate the Annual Percentage Rate ("APR"), thereby materially misrepresenting these disclosures as well materially understating the APR;

(c)     Knowingly and actively misrepresenting the Finance Charges, the Amount Financed and APR's on the TILA Disclosure Statements provided to Plaintiff and all by, among other things, failing to include in its calculations all of the required disclosures (described above) that were not bona fide, reasonable, lawful and/or not paid to true third parties.

42.     Plaintiff and class members exercised reasonable consumer diligence during their loan transactions and dealings with Defendant and in reviewing of their loan documentation, they could not have, nor have been reasonably expected to, uncover the true facts.

## COUNT I

43.     Plaintiff realleges the relevant paragraphs above in support of this count.

44.     The consumer credit transaction complained of herein was subject to the Plaintiff's right of rescission as described by 15 U.S.C § 1635 and Regulation Z § 226.23 (12 C.F.R § 226.23).

45.     In the course of this consumer credit transaction, the Defendant failed to deliver all "material" disclosures required by the TILA and Regulation Z, including the by the following:

a.      failing to properly and accurately disclose the "amount financed" using that term in violation of Regulation Z §§226.18, 226.23(b) and 15 U.S.C § 1638;

b.      failing to clearly and accurately disclose the "finance charge" using that term in violation of Regulation Z § 226.4 and 226.18(d) and 15 U.S.C § 1638(a)(3);

c.      failing to clearly and accurately disclose the "annual percentage rate" using that term in violation of Regulation Z § 226.18(e) and 15 U.S.C § 1638(a)(4);

d.      failing to disclose that the loan was a high cost or HOEPA loan as defined by 15 U.S.C. § 1602(aa);

e.      failing to make the other disclosures required by HOEPA; and

f.      otherwise violating HOEPA by including in the mortgage terms prohibited by HOEPA.

46.     The Plaintiff has a continuing right to rescind the transaction pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

47.     On November $1^{st}$ 2006, the Plaintiff rescinded the transaction by sending to the Defendant at 15090 Avenue of Science, San Diego, CA 92128 and by U.S. Mail, postage prepaid, certified mail, return receipt requested, a notice of rescission.

48.     More than 20 calendar days have passed since the Defendant received a copy of the Plaintiff's notice of rescission.

49.     The Defendant has failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction, including the security interest

described in Paragraph 8, as required by 15 U.S.C. § 1635(b) and Regulation Z 226.23(d)(2).

50.    The Defendant has failed to return to the Plaintiff any money or property given by the Plaintiff to anyone, including the Defendant, as required by 15 U.S.C. § 1635(b) and Regulation Z 226.23(d)(2).

51.    As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a) and 1640(a), Defendant is liable to Plaintiff for:

a.    Rescission of this transaction,

b.    Termination of any security interest in Plaintiff's property created under the transaction,

c.    Return of any money or property given by the Plaintiff to anyone, including the Defendant, in connection with this transaction.

d.    Twice the finance charge in connection with this transaction, but not less than $200 nor more than $2000.00.

e.    The right to retain proceeds to vest in plaintiff.

f.    Actual damages in an amount to be determined at trial.

g.    A reasonable attorney's fee.

## **PRAYER FOR RELIEF**

**WHEREFORE**, it is respectfully prayed that this Court:

A.    Assume jurisdiction of this case;

B.    Rescind the transaction of March 25th 2005 between the Plaintiff and Defendant.

C.    Order Defendant to take all action necessary to terminate any security interest in Plaintiff's property created under the transaction and that the Court declare all such security interests void, including but not limited to the mortgage related to

the transaction of March 25$^{th}$ 2005 between the Plaintiff and Defendant;

D. Order the return to the Plaintiff of any money or property given by the Plaintiff to anyone, including the Defendant, in connection with the transaction;

E. Award the Plaintiff twice the finance charge in connection with this transaction, but not less than $200 or more than $2,000 and all other damages available as provided under 15 U.S.C. § 1640(a);

F. Order that the right to retain proceeds vests in plaintiff;

G. Award actual damages in an amount to be established at trial;

H. Award the Plaintiff costs and a reasonable attorney's fee as provided under 15 U.S.C. § 1640(a);

I. Award such other and further relief as the Court deems just and proper.

## <u>COUNT II</u>

## <u>HOEPA VIOLATIONS</u>

68.    Plaintiff realleges all the preceding allegations referenced as if set out here in full.

69.    As a consequence of the marking up and splitting of the charges reflected in Lines 1102, 1105, 1106, 1108, 1201, 1204 and/or 1301 those charges are "points and fees," by operation of Reg. Z, 24 C.F.R. 226.32(b), as defined under HOEPA.

70.    The Plaintiff's loan is a high cost mortgage within the meaning of HOEPA, 15 U.S.C. § 1602(aa), because the total points and fees charge in connection with that loan exceeded 8 percent of the total loan amount.

71.    Because Plaintiff's loan meets the HOEPA definition of a high rate mortgage, the transaction was subject to additional disclosure requirements that must be provided three days in advance of the consummation of the transaction. 15 U.S.C. § 1639(b).

72.    Defendant did not furnish the required HOEPA disclosures to Plaintiff three days prior to their settlement or at any other time.

73.    Defendant's failure to provide the required HOEPA disclosures was material.

74.    Defendant's failure to give Plaintiff the disclosures required by HOEPA three days prior to settlement violates 15 U.S.C. § 1639(a) and (b), entitling Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a).  In addition, such failure to provide those disclosures extends Plaintiff's right to rescind the transaction until up to three years after its consummation.

75.    Plaintiff's loan also includes a pre-payment penalty imposed by Defendant which is prohibited by operation of 15 U.S.C.§ 1639(c).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant rescinding the transaction, for damages and fees pursuant to 15 U.S.C. 1635(b) and (g); and, pursuant to 15 U.S.C. §§ 1639(j), and 1640(a), award statutory damages of as provided in 15 U.S.C. § 1640(a)(4) in the amount of all finance charges and fees paid by Plaintiff for each substantive HOEPA violation; reasonable attorney fees and costs and such other relief at law or equity as this Court may deem just and proper.

## COUNT III

## CLASS ALLEGATIONS - TILA VIOLATIONS

76.    Plaintiff realleges all the preceding allegations by reference as if set out here in full.

77.    The identities of the class members are readily identifiable through computer records and paper records, regularly maintained in Defendant's course of business.

78.    The Class is so numerous as to make it impracticable to bring all members of the Class before the Court.  It is believed that the Class includes thousands of members.  In all instances, such persons are unaware that claims exist on their behalf.

79.    The representative Plaintiff's claims are typical of, if not identical to, the claims of the Class.

80.    The representative Plaintiff will fairly and adequately represent the members of the Class and has no interests which are antagonistic to the claims of the Class.  The Plaintiff is aware that she cannot settle this action without Court approval.  The Plaintiff's interest in this action is antagonistic to the interest of the Defendant, and will vigorously pursue the claims of the Class.

81.    The representative Plaintiff has retained counsel who are competent and experienced in consumer class action litigation, and who have successfully represented consumers in complex class actions. Counsel has agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court.

82.    Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

83.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues.  These common questions of law and fact include:

a)    Is the TILA violation apparent on the face of the loan documents;

b)    Are the loans subject to HOEPA;

c)    What measure of damages is appropriate;

d)    What declaratory or injunctive relief is appropriate?

84.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy.  The substantive claims of the representative Plaintiff and the class are identical and will require evidentiary proof of the same kind and application of the same law.

85.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed class members to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

86.    Unless a class-wide injunction is issued, Defendant may continue to commit violations against residential mortgage borrowers.

87.    The representative Plaintiff will seek to identify all class members through discovery as may be appropriate and will provide to the class such notice of this action as the Court may direct.

## COUNT IV

## RESCISSION AND DECLARATORY JUDGMENT

88.    Plaintiff re-alleges and adopts by reference all of the foregoing facts and allegations as set forth herein above.

89.    Plaintiff and the Plaintiff's Class bring this action pursuant to Rules 23(b)(2) and 57 of the Federal Rules of Civil Procedure in that an actual controversy exists between the parties concerning their right to rescind their mortgage loans under 15 U.S.C. § 1635.

90.    As a result of the Defendant's aforesaid violations of TILA and HOEPA all

Plaintiff and Class Members have retained their right to rescind (as to loans that closed within three years *prior* to the filing of the complaint herein and as to properties not sold during such period) their loans under 15 U.S.C. § 1635. Accordingly, Plaintiff and Class Members pray for a declaratory judgment recognizing and authorizing rescission by Plaintiff and Class Members, this declaratory judgment count giving notice to Defendant and assignees of Plaintiff's and Class Members' demands for rescission, subject to the individual choice of withdrawing this notice of rescission after their rights are declared.

### Prayer for Relief

WHEREFORE, on all asserted causes of action against Defendant, Plaintiff prays for judgment against Defendant as follows:

a.    For an Order certifying that this action may be maintained as class action as under Fed. R. Civ. P. 23(b)(3);

b.    For an Order appointing the Plaintiff to act as a representative of the Class;

c.    For an Order appointing the undersigned counsel to act as interim Class Counsel pursuant to Fed. R. Civ. P. 23 to act on behalf of the putative Class before the determination of whether to certify the Class under Fed. R. Civ. P. 23(b)(3) is made;

d.    For an Order appointing the undersigned counsel as Class Counsel;

e.    For an Order directing that reasonable notice of this Class action be given to all members of the Class at the appropriate time;

f.    For violating the HOEPA and TILA, a declaration that Class Members whose loans were closed, within the three-year preceding the filing of this case, remain entitled to rescind their loans and by this complaint have given notice of rescission subject to withdrawal of same after determination of their rights, and that Defendant be prohibited from foreclosing on the

Plaintiffs' and Class Members' mortgages pending such declaration;

g.     For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, an Order finding Defendant liable as a matter of law, pursuant to §§ 1640 and 1641(d), and for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (5) an amount equal to five times the sum of all, finance charges and fees paid by the Class Members for five substantive violations of HOEPA, one disclosure violation under TILA,; plus pre-judgment interest; and attorney fees;

h.     For violating the TILA's disclosure requirements an Order finding Defendant liable as a matter of law, pursuant to §§ 1640 and 1641(a), to the Plaintiff and Class Members for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1640 and 1641(a), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; plus prejudgment interest and attorneys fees;

i.     For violations of the above laws a finding of assignee liability under the provisions of HOEPA and TILA pursuant to §§ 1641(d) and 1641(a);

j.     For a permanent injunction enjoining Defendant, together with their officers, directors, employees, agents, partners or representatives, successors and any and all persons acting in concert with them or by agreement with them from directly or indirectly engaging in the wrongful acts and practices described above, all for the benefit of the Class Members; and

k.     For reasonable attorneys' fees as provided by law and statute;

l.     For pre-and-post judgment interest as provided by law in amount according to proof at trial;

m.     For an award of costs and expenses incurred in this action; and

n.      For such other and further relief as the Court may deem necessary and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted April 29th 2008.

/s/ Earl P. Underwood, Jr.
EARL P. UNDERWOOD, JR. (UNDEE6591)
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969
Telephone:    251-990-5558
Facsimile:    251-990-0626
Email: epunderwood@alalaw.com

/s/ Kenneth J. Riemer
KENNETH J. RIEMER (RIEMK8712)
One of the Attorneys for Plaintiffs
Post Office Box 1206
Mobile, Alabama   36633-1206
Telephone:    (251)432-9212
Facsimile:    (251)    433-7172
Email:        kjr@consumerlaw

/s/ George R. Irvine, III
GEORGE R. IRVINE, III (IRVIG4725)
One of the Attorneys for Plaintiffs
STONE, GRANADE and CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama   36523
Telephone:   (251) 626-6696
Facsimile:   (251) 626-2617
Email:        gri@sgclaw.com

/s/ Steven L. Nicholas
STEVEN L. NICHOLAS (NICHS2021)
Cunningham, Bounds, LLC
1601 Dauphin Street
Mobile AL 36604
Telephone:   (251) 471-6191
Facsimile:   (251) 479-1031
Email:        sln@cbcbb.com

18

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29th 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert E. Poundstone, IV
Bradley, Arant Rose & White, LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

James D. Minor, Jr.
Bradley, Arant Rose & White LLP
Suite 450 One Jackson Pl
188 East Capitol St
PO Box 1789
Jackson MS 39215-1789

<div align="right">

/s/ Earl P. Underwood, Jr.
Earl P. Underwood, Jr.

</div>

## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

CHERYL H. FRAZIER,     )
                  )
    **Plaintiff,**    )
                  )
v.                )     **CIVIL ACTION NO:**
                  )     **1:08-cv-11-MHT**
ACCREDITED HOME LENDERS, INC.,)
                  )
    **Defendant.**    )

### ANSWER AND DEFENSES OF ACCREDITED HOME LENDERS, INC. TO PLAINTIFF'S AMENDED COMPLAINT

**COMES NOW** Defendant Accredited Home Lenders, Inc. ("AHL") by and through its counsel of record, and hereby answers each numbered paragraph of the Plaintiffs' First Amended Complaint ("Amended Complaint"). Except to the extent expressly, specifically and unambiguously admitted herein, AHL denies each and every allegation contained in the Amended Complaint and demands strict proof thereof. AHL answers the allegations of the Amended Complaint, paragraph by paragraph, as follows:

### FIRST DEFENSE

The Plaintiff's Amended Complaint has failed to state a claim upon which relief may be granted, and, therefore, these allegations should be dismissed with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### SECOND DEFENSE

AHL generally denies all of the averments contained in the Amended Complaint, and each paragraph and subparagraph thereof, except such designated averments, paragraphs, or

1/1700110.1

subparagraphs, as are expressly set forth to the contrary more fully herein below pursuant to Rule 8(b) of the Federal Rules of Civil Procedure.

## THIRD DEFENSE

AHL includes, alleges, and incorporates each and every defense available to it as set forth in Fed. R. Civ. P. 12(b)(1)-(7), and on account thereof demands that the action herein against it be dismissed.

## FOURTH DEFENSE

Without waiving any of the above-referenced or foregoing defenses, AHL denies each and every allegation contained in the Amended Complaint, unless specifically admitted hereafter, as follows, to-wit:

1.

AHL states that the nature of the allegations made and relief sought by Plaintiff does not require a response from AHL. AHL specifically denies that it has committed any of the violations alleged by Plaintiff in Paragraph 1 of the Amended Complaint and denies that Plaintiff is entitled to any of the relief she seeks.

## JURISDICTION AND VENUE

2.

AHL admits that jurisdiction is conferred by 28 U.S.C. § § 1331 and 1334, and denies the remaining allegations contained in Paragraph 2 of the Amended Complaint.

## PARTIES

3.

AHL is without sufficient information or knowledge to admit or deny the allegations regarding the Plaintiff's residence, and, therefore denies the same.

4.

AHL admits the allegations contained in Paragraph 4 of the Amended Complaint.

5.

AHL admits the allegations contained in Paragraph 5 of the Complaint.

6.

AHL lacks sufficient information to admit or deny how Plaintiff will serve it with the Amended Complaint and, therefore, denies Paragraph 6 of the Amended Complaint.

7.

AHL admits the allegations in Paragraph 7 of the Amended Complaint.

**FACTUAL ALLEGATIONS**

8.

AHL admits the allegations contained in Paragraph 8 of the Amended Complaint.

9.

AHL is without sufficient information or knowledge to admit or deny the allegations regarding whether 105 TV Road, Dothan AL 36301 is the Plaintiff's principal dwelling, and, therefore, denies the same. AHL admits the remaining allegations contained in Paragraph 9 of the Amended Complaint.

10.

AHL admits that it is a mortgage banker based in California which operates in several states including Alabama. AHL further admits that attorneys or settlement agents close its mortgage loans. Except as expressly admitted herein, AHL denies all remaining allegations in Paragraph 10 of the Amended Complaint.

11.

AHL denies the allegations contained in Paragraph 11 of the Amended Complaint.

12.

AHL admits upon information and belief that the settlement agent was paid a fee by the plaintiff, and that the fee is disclosed on Line 1101 of the HUD Settlement Statement. AHL further admits the allegations contained in the fifth and sixth sentences of Paragraph 11. Except to admit that it made the disclosures required by TILA, AHL denies the remaining allegations contained in Paragraph 12 of the Amended Complaint.

13.

AHL is without sufficient information or knowledge to admit or deny the allegations contained in Paragraph 13 of the Amended Complaint, and, therefore denies the same.

14.

AHL admits the allegations contained in Paragraph 14 of the Amended Complaint.

15.

Paragraph 15's reference to unspecified "charges" is vague and ambiguous. AHL is therefore unable to admit or deny the allegations contained in Paragraph 15 of the Amended Complaint, and therefore denies the same.

16.

Except to admit that it provides settlement agents and/or closing attorneys with "Lender's Instructions," AHL denies all remaining allegations contained in Paragraph 16 of the Amended Complaint.

### TITLE SEARCH AND ABSTRACTING

17.

AHL denies the allegations contained in Paragraph 17 of the Amended Complaint.

### TITLE INSURANCE PREMIUMS AND RECORDING FEES

18.

Except to admit that federal law and/or Alabama law relating to title insurance speaks for itself, AHL denies all remaining allegations contained in Paragraph 18 of the Amended Complaint.

19.

AHL denies the allegations contained in Paragraph 19 of the Amended Complaint.

20.

AHL denies the allegations contained in Paragraph 20 of the Amended Complaint.

21.

Except to admit that federal law relating to recording costs speaks for itself, AHL denies all remaining allegations contained in Paragraph 21 of the Amended Complaint.

22.

AHL denies the allegations contained in Paragraph 22 of the Amended Complaint.

### PLAINTIFF'S LOAN

23.

AHL is without sufficient information to admit or deny the allegations concerning the date on which the plaintiff executed the referenced documents, and, therefore, denies Paragraph 23 of the Amended Complaint.

24.

AHL admits the allegations contained in the first and second sentences of Paragraph 24, but denies all remaining allegations in Paragraph 24 of the Amended Complaint.

25.

AHL admits the allegations contained in the first sentence of Paragraph 25, but denies all remaining allegations in Paragraph 25 of the Amended Complaint.

26.

AHL admits the allegations contained in the first sentence of Paragraph 26, but denies all remaining allegations in Paragraph 26 of the Amended Complaint.

27.

AHL admits the allegations contained in the first sentence of Paragraph 27, but denies all remaining allegations in Paragraph 27 of the Amended Complaint.

28.

AHL denies the allegations contained in Paragraph 28 of the Amended Complaint.

29.

AHL denies the allegations contained in Paragraph 29 of the Amended Complaint.

30.

AHL denies the allegations contained in Paragraph 30 of the Amended Complaint.

**TILA, AND REG. Z**

31.

AHL admits the allegations contained in Paragraph 31 of the Amended Complaint.

32.

Except to admit that Reg. Z speaks for itself, AHL denies all remaining allegations contained in Paragraph 32 of the Amended Complaint.

33.

Except to admit that TILA speaks for itself, AHL denies all remaining allegations contained in Paragraph 33 of the Amended Complaint.

34.

AHL denies the allegations contained in Paragraph 34 of the Amended Complaint.

35.

AHL denies the allegations contained in Paragraph 35 of the Amended Complaint.

36.

AHL denies the allegations contained in Paragraph 36 of the Amended Complaint.

37.

AHL admits the allegations contained in Paragraph 37 of the Amended Complaint.

## POLICIES AND PRACTICES COMPLAINED OF

38.

Except to admit that aspects of the plaintiff's loan are governed by TILA and RESPA, AHL denies all remaining allegations contained in Paragraph 38 of the Amended Complaint.

39.

Except to admit that the provisions of 15 U.S.C. § 1639 and Regulation Z § 226.32 speak for themselves, AHL denies all remaining allegations contained in Paragraph 39 of the Amended Complaint.

40.

AHL denies the allegations contained in Paragraph 40 of the Amended Complaint, including subparagraphs (a) and (b), and specifically demands strict proof thereof.

## EQUITABLE ESTOPPEL, EQUITABLE TOLLING

41.

AHL denies the allegations contained in Paragraph 41 of the Amended Complaint, including subparagraphs (a) – (c), and specifically demands strict proof thereof.

42.

AHL denies the allegations contained in Paragraph 42 of the Amended Complaint.

## COUNT I

43.

AHL incorporates its denials and responses in the preceding paragraphs.

44.

Except to admit that 15 U.S.C. § 1635 and Regulation Z § 226.23 speak for themselves, AHL denies all remaining allegations contained in Paragraph 44 of the Amended Complaint.

45.

AHL denies the allegations contained in Paragraph 45 of the Amended Complaint, including subparagraphs (a) – (f), and demands strict proof thereof.

46.

AHL denies the allegations contained in Paragraph 46 of the Amended Complaint.

47.

AHL denies the allegations contained in Paragraph 47 of the Amended Complaint.

1/1700110.1                                        8

48.

AHL denies the allegations contained in Paragraph 48 of the Amended Complaint.

49.

AHL admits that it has not taken any action to terminate its security interest, but specifically denies that it has failed to satisfy any requirements set forth in 15 U.S.C § 1635(b) and/or Regulation Z 226.23(d)(2).  Accordingly, except as expressly admitted herein, AHL denies all remaining allegations in Paragraph 49 of the Amended Complaint.

50.

AHL admits it has not returned any money to the Plaintiff, but specifically denies that it has failed to satisfy any requirements set forth in 15 U.S.C § 1635(b) and/or Regulation Z 226.23(d)(2).  Accordingly, except as expressly admitted herein, AHL denies all remaining allegations in Paragraph 50 of the Amended Complaint.

51.

AHL denies the allegations contained in Paragraph 51 of the Amended Complaint, and specifically denies that has committed and/or is liable for any of the allegations in subparagraphs (a) – (g).

## PRAYER FOR RELIEF

AHL denies the allegations contained in the Paragraph of the Amended Complaint beginning "Prayer for Relief", and denies that the plaintiff is entitled to any relief whatsoever.

52-67

There are no Paragraphs numbered 52 through 67 in the Amended Complaint, and accordingly, no response is necessary from AHL.

## COUNT II – HOEPA VIOLATIONS

68.

AHL incorporates its denials and responses in the preceding Paragraphs.

69.

AHL denies the allegations contained in Paragraph 69 of the Amended Complaint.

70.

AHL denies the allegations contained in Paragraph 70 of the Amended Complaint.

71.

AHL denies the allegations contained in Paragraph 71 of the Amended Complaint.

72.

The allegations contained in Paragraph 72 do not specify or detail the disclosures the plaintiff contends were not provided to her.  AHL is therefore without sufficient information to admit or deny the allegation, and, therefore, denies Paragraph 72 of the Amended Complaint.

73.

The allegations contained in Paragraph 73 do not specify or detail the disclosures the plaintiff contends were not provided to her.  AHL is therefore without sufficient information to admit or deny the allegation, and, therefore, denies Paragraph 73 of the Amended Complaint.

74.

AHL denies the allegations contained in Paragraph 74 of the Amended Complaint.

75.

AHL denies the allegations contained in Paragraph 75 of the Amended Complaint. Further, AHL denies the allegations contained in the unnumbered Paragraph beginning "WHEREFORE", and specifically denies that the Plaintiff is entitled to any relief whatsoever.

## COUNT III

## CLASS ALLEGATIONS – TILA VIOLATIONS

76.

AHL incorporates its denials and responses in the preceding Paragraphs.

77.

AHL denies the allegations contained in Paragraph 77 of the Amended Complaint.

78.

AHL denies the allegations contained in Paragraph 78 of the Amended Complaint.

79.

AHL denies the allegations contained in Paragraph 79 of the Amended Complaint.

80.

AHL denies the allegations contained in Paragraph 80 of the Amended Complaint.

81.

AHL is without sufficient information to admit or deny Paragraph 81 of the Amended Complaint and, therefore, denies the same.

82.

AHL denies the allegations contained in Paragraph 82 of the Amended Complaint.

83.

AHL denies the allegations contained in Paragraph 83 of the Amended Complaint, including a specific denial of subparagraphs (a) through (d).

84.

AHL denies the allegations contained in Paragraph 84 of the Amended Complaint.

85.

AHL denies the allegations contained in Paragraph 85 of the Amended Complaint.

86.

AHL denies the allegations contained in Paragraph 86 of the Amended Complaint.

87.

AHL is without sufficient information to admit or deny Paragraph 87 of the Amended Complaint and, therefore, denies the same.

## COUNT IV

88.

AHL incorporates its denials and responses in the preceding Paragraphs.

89.

Except to admit that Rule 23 (b) (2) and 57 of the Federal Rules of Civil Procedure and 15 U.S.C. § 1635 speak for themselves, AHL denies all remaining allegations in Paragraph 89 of the Amended Complaint.

90.

AHL denies the allegations contained in Paragraph 90 of the Amended Complaint. Further, AHL denies the allegations contained in the unnumbered paragraph labeled "Prayer for Relief" and specifically denies subparagraphs (a) through (n) thereto. Further, AHL specifically

1/1700110.1                                                  12

denies that Plaintiff and the purported class she seeks to represent are entitled to any relief whatsoever.

### FIFTH DEFENSE

The damages allegedly suffered by Plaintiff, if any, were the result of the failure of Plaintiff to use reasonable diligence in performing acts and duties required of her.

### SIXTH DEFENSE

The facts not having been developed, AHL adopts the following affirmative defenses: accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge and bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, parole evidence, statute of limitations, waiver, ratification and any other matter constituting an avoidance or affirmative defense as may be shown by the facts in this cause.

### SEVENTH DEFENSE

AHL asserts that any alleged conduct or omission on its part was not the cause of any injury alleged by Plaintiff.

### EIGHTH DEFENSE

AHL asserts that any recovery by Plaintiff is barred or must be reduced as a result of Plaintiff's own fault.

### NINTH DEFENSE

AHL asserts that the Complaint fails to state a claim upon which exemplary or punitive damages may be awarded.

### TENTH DEFENSE

Plaintiff's claims against AHL are barred in whole or in part, because Plaintiff's injuries, if any, were caused by an independent intervening cause(s) which AHL did not control, have a right to control, or have any influence over.

### ELEVENTH DEFENSE

Plaintiff did not take action to mitigate her damages.

### TWELFTH DEFENSE

The care and treatment rendered by AHL to Plaintiff was at all times in conformity or exceeded the applicable minimally acceptable standard of care, whether fiduciary or otherwise, which would be rendered by a reasonably prudent lender providing services of the type rendered to the Plaintiff under the same or similar circumstances.

### THIRTEENTH DEFENSE

AHL denies any liability for the acts of other entities under a theory of respondeat superior, vicarious liability, agency, or otherwise.

### FOURTEENTH DEFENSE

Plaintiff's claims are barred because they are not ripe for adjudication or are otherwise nonjusticiable.

### FIFTEENTH DEFENSE

To the extent the Complaint seeks to make Defendants liable for punitive damages, AHL adopts by reference the defenses, criteria, limitations, standards and constitutional protections mandated or provided by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). *Cooper Indus., Inc. v. Leatherman Tool Group*, 532 U.S. 923 (2001), and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

## SIXTEENTH DEFENSE

To award punitive damages against AHL in this case would violate the Contracts Clause of Article I, Section 10 of the United States Constitution, as an award of punitive damages would impair the contractual obligations of any contracts involving Plaintiff and AHL.

## SEVENTEENTH DEFENSE

Any award of punitive damages in this case must comply with the Commerce Clause of the United States Constitution. Specifically, to award punitive damages against AHL in this case would violate the Commerce Clause by chilling and impeding AHL from engaging in interstate commerce. Any portion of a punitive damages award based on conduct outside the State of Mississippi would violate the Commerce Clause.

## EIGHTEENTH DEFENSE

Some or all of Plaintiff's claims may be barred by the applicable statute of limitations.

## NINETEENTH DEFENSE

AHL reserves the right to affirmatively plead any and all other defenses and affirmative defenses available to it which may become applicable through discovery and during the trial of this cause.

## TWENTIETH DEFENSE

AHL affirmatively pleads all right afforded to it pursuant to 15 U.S.C. 1605(f).

## TWENTY-FIRST DEFENSE

This action is not appropriate to proceed as a class action because the requirements for class certification are not satisfied.

### TWENTY-SECOND DEFENSE

Plaintiff's claims fail to satisfy the requirements for proceeding as a class action pursuant to the provisions of *Fed. R. Civ. P.* 23

### TWENTY-THIRD DEFENSE

Plaintiff's class claims are barred because rescission and declaratory relief are not available in a class action.

### TWENTY-FOURTH DEFENSE

This Court lacks subject matter and personal jurisdiction and venue over some or all of the persons and claims of the putative class.

### TWENTY-FIFTH DEFENSE

Some or all of the claims raised by the Plaintiffs or on behalf of the putative class are barred by principles of estoppel, *res judicata*, collateral estoppel, release, claim preclusion, waiver and/or similar doctrines or concepts.

### TWENTY-SIXTH DEFENSE

The claims of Plaintiffs and putative class members are barred under TILA's "tolerances for accuracy," 15 U.S.C. § 1605(f).

### TWENTY-SEVENTH DEFENSE

The claims of Plaintiffs or putative class members are barred, in whole or in part, to the extent that any arbitration agreements govern their loans with AHL.

### TWENTY-EIGHTH DEFENSE

Any injury or damage to Plaintiffs and/or putative class members is offset by amounts owed by them to AHL and/or its successors or assigns.

1/1700110.1                                    16

## TWENTY-NINTH DEFENSE

AHL hereby gives notice that it intends to and will rely upon all defenses that it may have as to any of the absent members of the putative class if a class is certified.

## THIRTIETH DEFENSE

AHL reserves the right to assert counterclaims against any of the absent members of the putative class if a class is certified in order to preserve its rights.

## THIRTY-FIRST DEFENSE

WHEREFORE, PREMISES CONSIDERED, AHL respectfully requests that this Answer be received and deemed sufficient and that a Judgment be entered in its favor denying the relief requested by Plaintiff and dismissing this action against AHL with prejudice with costs being assessed against Plaintiff. AHL also prays for any general relief which the Court may deem appropriate in the premises.

Because the Complaint is cast in conclusory terms, AHL cannot fully anticipate all affirmative defenses that may be applicable to this action. Accordingly, AHL reserves the right to assert additional affirmative defenses, if and to the extent that such defenses are applicable, and to otherwise supplement and/or amend its answer and defenses herein.

Respectfully submitted,

s/ Robert E. Poundstone, IV
Robert E. Poundstone, IV
One of the Attorneys for Defendant
Accredited Home Lenders Inc.

OF COUNSEL

Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780

1/1700110.1                                17

Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

J. Douglas Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Earl P. Underwood, Jr.
Law Offices of Earl P. Underwood, Jr.
P.O. Box 969
21 South Section Street
Fairhope, AL 36533-0969

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

None.

Respectfully submitted,

s/ Robert E. Poundstone, IV
Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: bpoundstone@bradleyarant.com



**Bradley Arant**
BRADLEY ARANT ROSE & WHITE LLP

ALABAMA CENTER FOR COMMERCE
401 ADAMS AVENUE, SUITE 780
MONTGOMERY, AL 36104
334.956.7700   FAX 334.956.7701
WWW.BRADLEYARANT.COM

Robert E. Poundstone IV

Direct Dial: 334.956.7645
Direct Fax: 334.956.7845
bpoundstone@bradleyarant.com

February 15, 2008


Earl Underwood, Esq.
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
21 South Section Street
Fairhope, Alabama 36533-0969

      RE:    Frazier v. Accredited Home Lenders

Dear Earl:

    I am writing to provide you with my clients' initial disclosures pursuant to the Federal Rules of Civil Procedure. Pursuant to Rule 26 (a) (1) (A), the following people may have discoverable information relevant to this lawsuit:

    Cheryl Frazier
    Plaintiff

    Diane Holson
    Notary Public

    Janet Shelley
    Settlement Agent for Swafford and Hays Settlement Services, Inc.

    James Swafford
    Closing Agent for Swafford and Hays Settlement Services, Inc.

    Jane Carcello
    Swafford and Hays Settlement Services, Inc.

    Verria Neal
    Home Funds Direct

    Clarence Wells
    Home Funds Direct

    Audrey Williams
    Accredited Home Lenders

**Hall-Frazier**
**Record - 001654**

Earl Underwood, Esq.
February 15, 2008
Page 2

       Brita Dickerson
       Home Funds Direct

       Ken Harper
       Home Funds Direct

       Kim Stephenson
       Home Funds Direct

       Kristopher Dillon
       Home Funds Direct

       Mike Thimsen
       Home Funds Direct

The contact information for the Swafford and Hayes employees, upon information and belief, is:

       Swafford and Hays Settlement Services, Inc.
       9041 Executive Park Drive
       Suite 400
       Knoxville, Tennessee 37923
       (865) 539-1450

Please let me know if you need to contact any of my clients' employees or former employees.

Further, pursuant to Rule 26 (a) (1) (B) of the Federal Rules of Civil Procedure, I am enclosing relevant documents. As you can see, the documents have been BATES numbered AHL Frazier 0001 through 0163. Finally there is no insurance policy which might satisfy part or all of any judgment rendered in this case.

As always, should you need any additional information or otherwise need to speak with me, please do not hesitate to call Doug Minor or me.

       Sincerely,

       Robert E. Poundstone IV

REPIV/jlm

cc:   Doug Minor, Esq.

1/1669806.1

## SIGNATURE / NAME AFFIDAVIT

DATE:    03/25/2005

LOAN #:  0503172917

BORROWER:  HALL, CHERYL

THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW.
(This signature must exactly match signatures on the Note and Mortgage or Deed of Trust.)

CHERYL HALL
_____
(Print or Type Name)                                    Signature

If applicable, complete the following:
I AM ALSO KNOWN AS:

CHERYL R. HALL
_____
(Print or Type Name)                                    Signature

CHERYL H. FRAZIER
_____
(Print or Type Name)                                    Signature

_____
(Print or Type Name)                                    Signature

_____
(Print or Type Name)                                    Signature

I FURTHER CERTIFY THAT ALL THE ABOVE LISTED NAMES ARE ONE AND THE SAME PERSON.

State of _Alabama_

County of _Houston_

Subscribed and sworn (affirmed) before me
this _25_ day of _March_ _2005_

_Diane L. Hilson_
Notary Public Name (printed)

Notary Public in and for
the State of _Alabama_
County of _Houston_
My Commission Expires:

**Diane L. Hilson
Alabama State
at Large**

MIN # 100178109031729174                    HALL
610007.UFF                                  Page 1 of 1

**Hall-Frazier**
**Record - 001656**

Return To:
Home Funds Direct
Attn: Post Closing Dept.
16550 West Bernardo Dr. Bldg 1
San Diego, CA 92127-1870

THIS IS A TRUE AND EXACT COPY
OF THE ORIGINAL DOCUMENT.

CERTIFIED BY
ACCREDITED HOME LENDERS
Y: _Anita Dickerson_  8/29/05

———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

MIN 100176105031729174

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March  25,  2005
together with all Riders to this document.
(B) "Borrower" is CHERYL HALL

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

                    100176105031729                              0503172917

ALABAMA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3001 1/01

-6A(AL) (0005).01
Page 1 of 15          Initials: _CH_

VMP MORTGAGE FORMS - (800)521-7291

FINAL CERTIFIED COPY
SWAFFORD ...

AHL/Frazier
0002

**Hall-Frazier**
**Record - 001657**

(D) "**Lender**" is Home Funds Direct

Lender is a **Corporation**
organized and existing under the laws of the **State of California**
Lender's address is **15090 Avenue of Science**
**San Diego, CA 92128**
(E) "**Note**" means the promissory note signed by Borrower and dated March 25, 2005
The Note states that Borrower owes Lender **fifty-six thousand and 00/100**

Dollars
(U.S. $56,000.00                 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **April 1, 2035**
(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider             ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                   ☐ Biweekly Payment Rider        ☐ Other(s) [specify]

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "**Escrow Items**" means those items that are described in Section 3.
(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.
(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

100176105031729                                              0503172917

-6A(AL) (0008).03                     Page 2 of 15                     Form 3001 1/01

AHL/Frazier
0003

Hall-Frazier
Record - 001658

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the
County                              of                  HOUSTON                       :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
See Legal Description Addendum Page Attached

Parcel ID Number: 10-09-31-4-003-001.007            which currently has the address of
105 TV ROAD                                                                        [Street]
DOTHAN                                          [City] , Alabama 36301          [Zip Code]
("Property Address"):
      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
      UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
      1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

100176105031729                              0503172917

-6A(AL) (0008).03                Page 3 of 18                          Form 3001 1/01

AHL/Frazier
0004

Hall-Frazier
Record - 001659

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

100176105031729                     0503172917

-6A(AL) (0005).03          Page 4 of 18                Form 3001 1/01

AHL/Frazier
0005

**Hall-Frazier**
**Record - 001660**

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

AHL/Frazier
0006

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

100176105031729                                      0503172917

-6A(AL) 00051.03                    Page 8 of 15          Initials          Form 3001 1/01

AHL/Frazier
0007

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspection of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

10017610503172                                      0503172917

-6A(AL) 0008.02                    Page 7 of 16              Initials          Form 3001 1/01

AHL/Frazier
0008

Hall-Frazier
Record - 001663

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

100176105031729                                    0503172917

-6A(AL) (0008.03)                    Page 8 of 15                    Form 3001 1/01

AHU/Frazier
0009

Hall-Frazier
Record - 001664

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

100176105031729                                      0503172917

-6A(AL) 0005.03              Page 9 of 15              Form 3001 1/01

AHL/Frazier
0010

Hall-Frazier
Record - 001665

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

100176105031729                                           0503172917

-6A(AL) (0005).03                    Page 10 of 16           Initials _____        Form 3001 1/01

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

100176105031729                                                    0503172917

-6A(AL) (0009).03                        Page 11 of 15        Initials: _ZH_        Form 3001 1/01

AHL/Frazier
0012

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

100176105031729                    0503172917

-6A(AL) (0008).03          Page 13 of 16          Form 3001 1/01

AHL/Frazier
0013

Hall-Frazier
Record - 001668

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in Section 15. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in HOUSTON
County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

25. Attorneys' Fees. Wherever this Security Instrument authorizes the Lender to collect reasonable attorneys' fees following default, such reasonable attorneys' fees shall not exceed fifteen percent (15%) of the unpaid debt after default and referral of the Security Instrument to an attorney who is not a salaried employee of Lender.

10017610503172917                          0503172917

-6A(AL) (0005).03              Page 13 of 15              Form 3001 1/01

AHL/Frazier
0014

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    ~~~~~~~~~~~~~~~~~~~~~~ (Seal)
                                           CHERYL HALL            -Borrower

_____                    _____ (Seal)
                                                                    -Borrower

_____ (Seal)             _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)             _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)             _____ (Seal)
                        -Borrower                                   -Borrower

100176105031729                            0503172917

-6A(AL) (0005).02          Page 14 of 15                Form 3001 1/01

AHL/Frazier
0015

STATE OF ALABAMA,    County ss: _Houst_

On this _25_ day of _March_, _2005_ , I,
_DIANE L. HILSON_
a Notary Public in and for said county and in said state, hereby certify that CHERYL HALL,

whose name(s) is/are signed to the foregoing conveyance, and who is/are known to me, acknowledged
before me that, being informed of the contents of the conveyance, he/she/they executed the same
voluntarily and as his/her/their act on the day the same bears date.
    Given under my hand and seal of office this _25_ day of _Mar_

My Commission Expires:

My Commission
Expires 3-06-06

Notary Public

Diane L. Hilson
Alabama State
at Large

Prepared By:
Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

100176105031729                    0503172917

-6A(AL) (0205).05        Page 15 of 15    Form 3001 1/01

## LEGAL DESCRIPTION ADDENDUM

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
|  | Loan #: 0503172917 |

Property Address:
105 TV ROAD
DOTHAN, AL 36301

Legal Description:
**SEE ATTACHED LEGAL DESCRIPTION**

Initial: _____

MIN # 100176105031729174

AHL 61010LUFF

HALL
Page 1 of 1

Loan #     0503172917

AHL/Frazier
0017

**EXHIBIT A**

Situated in Dothan, Houston County, State of AL and being described as follows:

Lot 2, Block "C", of the Third Addition to Television Heights Subdivision in the City of Dothan, Alabama, as found recorded in Plat book 7, Page 23, in the Office of the Judge of Probate, Houston County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

Parcel #10-09-31-4-003-001.007

BEING the same property conveyed to Louis E. Sowers and Fay Sowers, as joint tenants with express right of survivorship and to the survivor's heirs and assigns, by deed from Samuel R. Pierce, Jr., Secretary of Housing and Urban Development of Washington, D.C., acting by and through the Office of Assistant Secretary for Housing – Federal Housing Commissioner, dated 07-19-85, recorded 07-26-85, in Book 311, page 324, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Kevin Lorenzo Dixon, II, by deed from Louis E. Sowers and wife, Fay Sowers, dated 04-02-03, recorded 04-03-03, in Book 598, page 34, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Cheryl Hall, by deed from Kevin Lorenzo Dixon, II, a unmarried man, dated 03-02-05, recorded 03-11-05, in Book 622, page 443, in the Office of the Judge of Probate of Houston County, AL.

This Derivation Clause represents a 24 month Chain of Title.

The above information is to be used for reference purposes only and not to be relied on as evidence of title and/or encumbrances. Accordingly, said information is furnished at a reduced rate, and the Company's liability shall in no event exceed the amount paid for said information.

105 TV Road, Dothan, AL 36301



**★ N O T E S / D E E D S ★**





**★ N E W D O C ★**





**★ N E W D O C ★**



**★ N E W D O C ★**

AHL/Frazier
0019

Notes/Deeds

## HARDSHIP NOTICE

| Borrower Name(s): | Lender: |
|---|---|
| CHERYL HALL | Home Funds Direct |
| | 15090 Avenue of Science |
| | San Diego, CA 92128 |

| Property Address: | Date: |
|---|---|
| 105 TV ROAD | March 25, 2005 |
| DOTHAN, AL 36301 | |

I/We are aware that my/our first payment is due on May 1, 2005 and I/we will make a full payment on that date. I/We realize that my/our first payment is less than thirty (30) days from the date of funding and this does not create a financial hardship on me/us.

| _____ 3-25-05 | _____ |
|---|---|
| Borrower    Date | Borrower    Date |
| CHERYL HALL | |

| _____ | _____ |
|---|---|
| Borrower    Date | Borrower    Date |

| _____ | _____ |
|---|---|
| Borrower    Date | Borrower    Date |

| _____ | _____ |
|---|---|
| Borrower    Date | Borrower    Date |

MIN # 1001781050317 29174          HALL          Loan # 0503172917
HRDSHNTC.UFF          Page 1 of 1

AHL/Frazier
0020

# NOTE

March 25, 2005                          DOTHAN
[Date]                                  [City]

                                        105 TV ROAD
                                        DOTHAN, AL 36301
                                        [Property Address]



## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 56,000.00          (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is  Home Funds Direct

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of        7.299 %.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the 1st     day of each month beginning on May 1, 2005          . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on April 1, 2035       , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."
I will make my monthly payments at                       P.O. Box 502480 San Diego, CA  92150-2480
                                                         or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $ 383.89

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MIN# 100176105031723174                                          0503172917
MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-6N (0307).01                   Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                     Initials: [signature]

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees. Reasonable attorney fees shall not exceed 15% of the unpaid debt after default and referral of this Note to an attorney who is not a salaried employee of the Note Holder.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MIN# 100176105021729174         0503172917

-5N 92207.01       Page 2 of 3       Form 3200 1/01

AHU/Frazier
0022

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)         _____(Seal)
CHERYL HALL                      -Borrower                                       -Borrower

_____(Seal)         _____(Seal)
                                 -Borrower                                       -Borrower

_____(Seal)         _____(Seal)
                                 -Borrower                                       -Borrower

_____(Seal)         _____(Seal)
                                 -Borrower                                       -Borrower

*[Sign Original Only]*

MIN# 100176105031729174                          0503172917

-5N (0207).01                    Page 3 of 3                  Form 3200 1/01

AHL/Frazier
0023

Loan No:   0503172917

Mortgagee: CHERYL HALL

Address:   105 TV ROAD
           DOTHAN, AL 36301

Loan Amount:$ 56,000.00

## ALLONGE TO NOTE

PAY TO THE ORDER OF:

WITHOUT RECOURSE

Clarence M Wells
Assistant Secretary
Home Funds Direct

MIN # 100176195031729174          HALL          Loan # 0503172917
AHL 670017.UPP          Page 1 of 1

AHL/Frazier
0024

(printed on Mar 25, 2005 @ 16:19)

US Department of Housing and Urban Development

OB No. 2502-0265

## SETTLEMENT STATEMENT

| B. Type of Loan | | | |
|---|---|---|---|
| 1. [ ] FHA  2. [ ] FmHA  3. [ ] Conv. Unins.  4. [ ] VA  5. [X] Conv. Ins. | 6. File Number: 05-2813 | 7. Loan Number: 9503172917 | 8. Mortgage Ins. Case #: |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "POC" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

**D. NAME AND ADDRESS OF BORROWER/BUYER:**
Cheryl Hall 105 TV Road Dothan, AL 36301

**E. NAME AND ADDRESS OF SELLER:**

**F. NAME AND ADDRESS OF LENDER:**
Home Funds Direct 1130 Northchase Parkway, Suite 200 Marietta, GA 30067

**G. PROPERTY LOCATION (Brief Legal):**
105 TV Road Dothan, AL 36301

**H. SETTLEMENT AGENT:**
Swafford and Hays Settlement Services, Inc.  865-539-1450 Contact: Janet Shelley

**PLACE OF SETTLEMENT:**
9041 Executive Park Drive, Suite 400 Knoxville, TN 37923

**I. SETTLEMENT DATE:** 03/25/2005

**DISBURSEMENT DATE:** 03/30/2005

| J. SUMMARY OF BORROWER(S) TRANSACTION | | K. SUMMARY OF SELLER(S) TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER :** | | **400. GROSS AMOUNT DUE TO SELLER :** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 13,896.39 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by Seller in advance | | Adjustments for items paid by Seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 13,896.39 | **420. Gross Amount Due Seller** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER :** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER :** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 56,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by Seller in advance | | Adjustments for items unpaid by Seller in advance | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 56,000.00 | **520. Total Reduction Amount Due Seller** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER :** | | **600. CASH AT SETTLEMENT TO/FROM SELLER :** | |
| 301. Gross Amount due from borrower (line 120) | 13,896.39 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 56,000.00 | 602. Less reductions in amt. due seller (line 520) | |
| 303. Cash [ ] From [X]To Borrower | 42,103.61 | 603. Cash [X]To [ ] From Seller | 0.00 |

SUBSTITUTION FORM 1099 SELLER STATEMENT: The information contained in Blocks E,G,H and I on line 401(or if 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER, you are required by law to provide the settlement agent with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

Seller(s):

AHL/Frazier
0025

(Printed on Mar 23, 2005 @ 3641:9)       US Department of Housing and Urban Development        OMB No. 2502-0265

**SETTLEMENT CHARGES**

L.

| | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|
| **700. Total Sales/Broker's Commission based on price** | | |
| 701. Listing Realtor Commission | | |
| 702. Selling Realtor Commission | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee  To: Home Funds Direct | 1,960.00 | |
| 802. Loan Discount | | |
| 803. Appraisal Fee  To: Alabama Appraisal Service | 300.00 | |
| 804. Credit Report | | |
| 805. Lender's Inspection Fee | | |
| 806. Mortgage Insurance Application Fee | | |
| 807. Assumption Fee | | |
| 808. Processing Fee  To: Home Funds Direct | 500.00 | |
| 809. Underwriting fee  To: Home Funds Direct | 500.00 | |
| 810. Document Preparation Fee | | |
| 811. Zone Determination Fee  To: Home Funds Direct | 9.50 | |
| 812. Tax Service Fee  To: Home Funds Direct | 66.00 | |
| 813. Appraisal Review Fee  To: Home Funds Direct | 250.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest from Odd Days  To: Home Funds Direct | 22.40 | |
| 902. Mortgage Insurance Premium for | | |
| 903. Hazard Insurance Premium for: State Farm | 1,068.00 | |
| 904. | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard Insurance  To: Home Funds Direct | 356.00 | |
| 1002. Mortgage Insurance | | |
| 1003. City property taxes | | |
| 1004. County property taxes  To: Home Funds Direct | 313.25 | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Accounting Adjustment  To: Home Funds Direct | -134.25 | |
| **1100. TITLE CHARGES** | | |
| 1101. Settlement or closing fee  To: Swafford and Hays Settlement Services, Inc. | 275.00 | |
| 1102. Abstract or title search  To: Swafford and Hays Settlement Services, Inc. | 200.00 | |
| 1103. Title examination  To: Swafford and Hays Settlement Services, Inc. | 250.00 | |
| 1104. Title insurance binder | | |
| 1105. Document preparation | | |
| 1106. Notary Fees | | |
| 1107. Attorney's Fees | | |
| (includes above item number: ) | | |
| 1108. Title Insurance  To: Transnation Title Insurance Company | 200.00 | |
| (includes above item number: ) | | |
| 1109. Lender's coverage $67,500.00  @  $200.00 | | |
| 1110. Owner's coverage @ 0.00 | | |
| 1111. Endorsements  To: Swafford and Hays Settlement Services, Inc. | 50.00 | |
| 1112. | | |
| 1113. Overnight Courier & Handling Fees | | |
| **1200. GOVT. RECORDING, TRANSFER, AND SERVICE FEES** | | |
| 1201. Recording fees and Service fees:  To: Clerk of the Court | 120.00 | |
| 1202. City/county tax/stamps: | | |
| 1203. State tax/stamps:  Deed $0.00  Mortgage $84.00 To: Clerk of the Court | 84.00 | |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey | | |
| 1302. Pest Inspection | | |
| 1303. Payoff  To: Army Aviation Center F C U  good thru 4/24 | 4,594.49 | |
| 1304. | | |
| 1305. Payment  To: The CR STR/Providian | 785.00 | |
| 1306. Payment  To: Palisades | 694.00 | |
| 1307. Payment  To: Holloway Credit | 452.00 | |
| 1308. Payment  To: Small LNS | 399.00 | |
| 1309. Payment  To: Crdt MGT. | 182.00 | |
| 1310. Payment  To: Friedmans Jewelers | 400.00 | |
| 1311. | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | 13,896.39 | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

BORROWER(S):                           SELLER(S):

Cheryl Hall

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

AHL/Frazier
0026

Hall-Frazier
Record - 001681

_Jane Carcello_                    05/28/08

Buyer(s) and Keys Settlement Services, Inc.                    Date

NOTE: Taxes have been prorated based on taxes for the year. Any re-proration will be handled between the buyer and seller. All utility bills (water, sewer, electric, cable and maintenance fees) have been held or will be paid upon receipt of final bills.

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

AHL/Frazier
0027

**Hall-Frazier**
**Record - 001682**

# WIRE DETAILS

| | |
|---|---|
| Warehouse: IXIS | Target Funding Date: 03/30/2005 |
| Loan #: 0503172917 | Origination Type: AHL Retail |

| | |
|---|---|
| Borrower: CHERYL HALL | Region: 351 351 - ATL001 |
| Broker Name: | Broker ID #: 0 |
| Broker Address: | Status: |
| | Vendor ID #: |

| | | | |
|---|---|---|---|
| Loan Amount: | 56,000.00 | Impound Amount: | $669.25 |
| Broker Front Points: | $0.00 | Aggregate Adjustment: | $134.25 |
| Broker Process Fee: | $0.00 | Net Impound: | $535.00 |
| Broker Other Fees: | $0.00 | | |
| GA Per Loan Fee: | $0.00 | | |
| AHL Discount Points: | $1,960.00 | | |
| AHL Underwriting Fee: | $500.00 | | |
| AHL Rev Appraisal Fee: | $250.00 | | |
| AHL Doc Fee: | $0.00 | | |
| AHL Funding Fee: | $0.00 | Broker Fees: | $0.00 |
| AHL Other Fees: | $575.50 | Broker Rebate Points: | $0.00 |
| Prepaid Interest: | $22.40 | Wire To Broker: | $0.00 |
| days: | 2 | Broker Amt Withheld: No | $0.00 |
| $/Day: | $11.20 | Total AHL Lender Fees: | $3,285.50 |
| Wire To Title: | $52,157.10 | Tax Amount: | $0.00 |
| Total Wire: | $52,157.10 | | |

**Total Wire + Tax Amount:**          **$52,157.10**

Wire Approved By:

Wire Entered By: Ken Harper          Wire Released By: britad

Creation Date: 03/29/2005

Creation Time: 10:47AM

MIN # 100176105031729174          HALL          Loan # 0503172917
WIREDTLS.UFF          Page 1 of 1

AHL/Frazier
0028

Hall-Frazier
**Record - 001683**

## HUD AUDIT/CHECKLIST

BORROWER Cheryl Hall _____ LOAN NUMBER 0503172917

IF ORIGINAL – SIGNED BY BORROWERS    YES ✓ NO____

         - COMPLETE WITH ALL ATTACHMENTS YES ✓ NO____

IF COPY – CERTIFIED TRUE BY CLOSING AGENT YES ✓ NO____

         - CLEAR AND LEGIBLE  YES ✓ NO____

         - COMPLETE WITH ALL ATTACHMENTS YES ✓ NO____

PAYOFFS – DO PAYOFFS MATCH CLOSING INSTRUCTIONS YES ✓ NO___

FEES – DO FEES MATCH CLOSING INSTRUCTIONS  YES ✓ NO____

         - ARE ALL APPLICABLE APR RELATED BROKER/LENDER/ESCROW FEES/PREPAID INTEREST DISCLOSED IN THE TIL  YES ✓ NO ·

         - ARE ALL FEES DISBURSED OR HELD IN ESCROW ACCORDING TO OUR CLOSING INSTRUCTIONS  YES ✓ NO____

         - DO BROKER/LENDER FEES EQUAL WIRE SUMMARY YES ✓ NO____

         - DOES PREPAID INTEREST EQUAL WIRE SUMMARY YES___ NO ✓

         - IF YIELD SPREAD PREMIUM, IS IT DISCLOSED YES___ NO ✓

         - ARE THERE DUAL BROKER/LENDER FEES YES___ NO ✓

COMPLIANCE - ARE  SETTLEMENT AND DISBURSEMENT DATES CONSISTENT WITH DOC SIGNING AND APPLICABLE RESCISSION PERIOD YES____ NO_____

IMPOUNDS – IF IMPOUNDED, DOES IT EQUAL ESCROW IMPOUND DISCLOSURE WITH AGGREGATE ADJUSTMENT  YES ✓ NO___

         - IS ESCROW IMPOUND DISCLOSURE ATTACHED YES ✓ NO____

PURCHASE TRANSACTION – BOTH BUYER AND SELLER SIDE YES ✓ NO___

PURCHASE PRICE MATCHES PURCHASE AGREEMENT OR ESCROW INSTRUCTIONS YES ✓ NO____

LOAN AUDITOR NAME R Dickerson PHONE 770-541-5854

AHL/Frazier
0029

Hall-Frazier
Record - 001684

# COMPLIANCE AGREEMENT

| Borrower Name(s):<br>CHERYL HALL | Lender:<br><br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 25, 2005 |

The undersigned borrower(s), in consideration of lender disbursing loan proceeds for the purchase or refinance of, or construction of improvements on the aforementioned property, agree(s), if requested by the lender or someone acting on behalf of said lender, to fully co-operate in adjusting for clerical errors, mistakes by the lender or by the broker, and all loans closing documentation deemed necessary or desirable, in the reasonable discretion of lender, to enable lender to sell, convey its interest in, seek guaranty of, or market said loan to any entity, including but not limited to, a secondary investor, the Federal National Mortgage Association (FNMA), the Federal Home Loan Mortgage Corporation (FHLMC), Department of Housing and Urban Development (HUD), the Department of Veterans Affairs (VA), or any Municipal Bonding Authority.

The undersigned borrower(s) agree(s) to sign or initial any original or new document requested by lender to correctly reflect the terms of said loan. This shall be done within a reasonable time of request by the lender to do so and failure or refusal to sign or initial any documents requested is an event of default allowing lender to take any action necessary to collect said loan.

In order to assure that the loan documentation executed this date will conform and be acceptable in the market place in the instance of transfer, sale, or the conveyance by lender of its interest in and to the above mentioned property evidenced by said loan documentation, the undersigned borrower(s) do hereby so agree and covenant as aforesaid herein.

DATED effective this _25_ day _March_ , _2005_

| _(signature)_ _3-25-05_ | | |
|---|---|---|
| Borrower Date<br>CHERYL HALL | Borrower | Date |
| Borrower Date | Borrower | Date |
| Borrower Date | Borrower | Date |
| Borrower Date | Borrower | Date |

STATE OF _Alabama_ } SS
COUNTY OF _Houston_ }

On _3-25-2005_ before me, _DIANE L. Hilson_
Notary Public Name (printed)

personally appeared CHERYL HALL

☐ personally known to me -OR-    ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Diane L. Hilson
Alabama State
at Large

My Commission
Expires 3-06-06    Signature of Notary

MIN # 100176105631729174
CMPLAGRT.UFF
Page 1 of 1    Loan #:    05031729177
Rev. 10/04

AHU/Frazier
0030

# FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| | |
|---|---|
| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>16090 Avenue of Science<br>San Diego, CA 92128 |
| | Date: 03/25/2005    Loan #: 0503172917 |
| Borrower Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Loan Type: Conventional |

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.975 % | $85,772.51 | $ 52,417.10 | $ 138,189.61 |

### PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359<br>1 | $383.89<br>$373.10 | 05/01/2005<br>04/01/2035 | | | |

**DEMAND FEATURE:** [X] This loan does not have a Demand Feature.  [ ] This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:** [ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
105 TV ROAD
DOTHAN, AL 36301

**ASSUMPTION:** Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms [ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $170.00

**PROPERTY INSURANCE:** [X] Property hazard insurance in the amount of the lesser of the loan amount or replacement cost with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender.
Hazard insurance [ ] is [X] is not available through the lender at an estimated cost of N/A for N/A year term.

**LATE CHARGES:** If your payment is more than 10 days late, you will be charged a late charge of 5.000% of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
[ ] may  [X] will not  have to pay a penalty.
[ ] may  [X] will not  be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| | | |
|---|---|---|
| _(signature)_ 3-25-05 | | |
| Borrower    Date<br>CHERYL HALL | | Borrower    Date |
| Borrower    Date | | Borrower    Date |
| Borrower    Date | | Borrower    Date |
| Borrower    Date | | Borrower    Date |

MIN # 100178105031729174    HALL    Loan # 0503172917
TFTHLNO .UFF    Page 1 of 1    Rev 12/04

**Hall-Frazier**
**Record - 001686**

FINAL

Lender: Home Funds Direct
Address: 15090 Avenue of Science
San Diego, CA 92128
Applicant(s): CHERYL HALL

Property Address: 166 TV ROAD
DOTHAN, AL 36301

**GOOD FAITH ESTIMATE**

Loan Number: 0503172917
Sales Price: $0.00
Base Loan Amount: $6,000.00
Total Loan Amount: $356,000.00
Type of Loan: Conventional Fixed
DatePrepared: March 25, 2005
Rate: 7.399    %Term: 360/360 mos

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates–the actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 or HUD-1A    DESCRIPTION OF CHARGES | Lender | OTHER |
|---|---|---|
| 204 Lender Credit to Borr. | $ | $ |
| 801 Origination Fee | $ 1,960.00 | $ |
| 802 Discount Points | $ | $ |
| 803 Appraisal Fee | $ | $ 300.00 |
| 804 Credit Report Fee | $ | $ |
| 805 Final Inspection/442 Fee | $ | $ |
| 807 Application Fee | $ | $ |
| 809 Yield Spread Premium (POC) / Rebate to Broker(POC) $    0.00 | $ | $ |
| 810 Processing Fee | $ 500.00 | $ |
| 811 Underwriting Fee | $ 500.00 | $ |
| 812 Appraisal Review Fee | $ 250.00 | $ |
| 815 Escrow Holdback Fee | $ | $ |
| 816 Funding Fee | $ | $ |
| 818 Courier Fee | $ | $ |
| 825 Warehouse Fee | $ | $ |
| 827 Servcif Fee | $ | $ |
| 828 Flood Cert/Life of Loan Fee | $ 9.50 | $ |
| 829 Tax Service Fee | $ 66.00 | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| SUB-TOTALS | 3,285.50 | 300.00 |

| | Lender | OTHER CHARGES |
|---|---|---|
| 901 Interest for 2 days    @ @ 11.2 per day | $ 22.40 | $ |
| 903 Hazard Insurance Premium | $ | $ |
| 904 Flood Insurance Premium | $ | $ |
| 1001 Hazard Insurance 4 month(s) @    $89.00 | $ 356.00 | $ |
| 1003 City Property Tax 0 month(s) @    $0.00 | $ | $ |
| 1004 County Property Tax 7 month(s) @    $44.75 | $ 313.25 | $ |
| 1005 School Tax 0 month(s) @    $0.00 | $ | $ |
| 1006 Flood Insurance 0 month(s) @    $0.00 | $ | $ |
| 1008 Agg. Acctg. Adjustment | $ -134.25 | $ |
| 1101 Settlement / Closing Agent Fee | $ | $ 275.00 |
| 1102 Abstract/Title Search Fee | $ | $ 200.00 |
| 1103 Title Examination Fee | $ | $ 250.00 |
| 1104 Title Insurance Binder | $ | $ |
| 1105 Closing Agent/Attorney Doc Fee | $ | $ |
| 1106 Notary Fee | $ | $ |
| 1107 Demand Fee | $ | $ |
| 1108 Title Insurance Premium | $ | $ 200.00 |
| 1201 Recording Fee – Deed/Mortgage | $ | $ 120.00 |
| 1202 City/County Tax– Deed/Mortgage | $ | $ |
| 1203 State Tax – Deed/Mortgage | $ | $ 84.00 |
| 1204 Misc Recording Fee | $ | $ 50.00 |
| 1205 Transfer Tax | $ | $ |
| 1301 Survey Fee | $ | $ |
| 1302 Pest Inspection | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

Lenders CFL License #

| TOTAL ESTIMATED SETTLEMENT CHARGES | $ | 5,321.90 |
|---|---|---|

"P" designates – the Lender will require a particular provider from a lender-controlled or approved list. The specific provider and actual cost will appear on the HUD-1 or HUD-1A. These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property. The referenced nonmortgage] on the above section "Settlement Costs." and the Consumer Handbook on ARM Mortgages, if applicable.
[B] Use of a particular provider of service is required and the estimate is based on charges of the provider. Please see attached Addendum.

**THIS DOES NOT CONSTITUTE A LOAN COMMITMENT**

Borrower CHERYL HALL          Date 3-25-05          Borrower          Date

Borrower          Date          Borrower          Date

Borrower          Date          Borrower          Date

Borrower          Date          Borrower          Date

MIN # 100176105031729174          HALL          Loan # 0503172917
AHL GFE-C.UFF          Page 1 of 1

AHL/Frazier
0032

## Initial Escrow Account Disclosure Statement

Date: 03/25/2005    Loan Number: 0503172917    Case Number:

Servicer's Name and Address:
Accredited Home Lenders
Escrow Administration
15090 Avenue of Science 200
San Diego, CA 92128

Borrowers:
CHERYL HALL

Toll Free Number:  877-683-4466

Property Address:
105 TV ROAD
DOTHAN, AL 36301

Mailing Address:
105 TV ROAD
DOTHAN, AL 36301

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made from your account.

| Month (or Period) | Payments to Escrow Account | Payments from Escrow Account | Description | Escrow Account Balance |
|---|---|---|---|---|
| Initial Deposit: | | | | 535.00 |
| Jun 05 | 133.75 | 0.00 | | 668.75 |
| Jul 05 | 133.75 | 0.00 | | 802.50 |
| Aug 05 | 133.75 | 0.00 | | 936.25 |
| Sep 05 | 133.75 | 0.00 | | 1,070.00 |
| Oct 05 | 133.75 | 0.00 | | 1,203.75 |
| Nov 05 | 133.75 | 0.00 | | 1,337.50 |
| Dec 05 | 133.75 | 537.00 | County Prop. Tax | 934.25 |
| Jan 06 | 133.75 | 0.00 | | 1,068.00 |
| Feb 06 | 133.75 | 0.00 | | 1,201.75 |
| Mar 06 | 133.75 | 1,068.00 | Hazard Ins Impounds | 267.50 |
| Apr 06 | 133.75 | 0.00 | | 401.25 |
| May 06 | 133.75 | 0.00 | | 535.00 |

(PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE ESCROW ACCOUNTING COMPUTATION YEAR.) Cushion selected by servicer: $          267.50

[X] Your monthly                mortgage payment for the coming year will be $ 517.64            of which
$383.89            will be for principal and interest and $ 133.75            will go into your escrow account, and
$0.00            will be for discretionary items (such as life insurance, disability insurance) that you chose to be
included with your monthly payment.

[ ] Your first                mortgage payment for the coming year will be $                of
which $            will be for principal and interest and $            will go into your
escrow account, and $            will be for discretionary items (such as life insurance, disability
insurance) that you chose to be included with your monthly payment. The terms of your loan may result in changes
to the monthly principal and interest payments during the year.

1003-503X (0402).01    2/98
VMP MORTGAGE FORMS - (800)521-7291

Hall-Frazier
Record - 001688

OUR LOAN NO 0503172917

# LENDERS' INSTRUCTIONS

CLOSING DATE  March 25, 2005

ISSUE DATE March 25, 2005

IF THE LOAN DOES NOT CLOSE AS SCHEDULED PLEASE NOTIFY OUR OFFICE IMMEDIATELY (DO NOT USE OUR FUNDS IF YOU CANNOT COMPLY WITH ALL OF THE INSTRUCTIONS ON PAGES 2, 3, & 4 AND ADDITIONAL INSTRUCTIONS)
CLOSING AGENT    SWAFFORD & HAYES SETTLEMENT SERVICES INC    ATTENTION    JAMES W SWAFFORD
CLOSING AGENT ADDRESS    9041 EXECUTIVE PARK DRIVE, KNOXVILLE, TN 37923
CLOSING AGENT PHONE NUMBER    (865)934-0466    CLOSING AGENT FAX NUMBER   (865)934-0215
LOAN PURPOSE  Refi Cash Out              LIEN TYPE  1st              LOAN TYPE Fixed
MTGE AMT. $ 56,000.00    INTEREST RATE  7.299  % INITIAL RATE 7.299%   MARGIN  0.000   %
TERM   360/360    MUST CLOSE BY   04/05/2005    DOCUMENT EXPIRE ON  04/05/2005
MORTGAGOR(S) NAME(S)    CHERYL HALL
PROPERTY ADDRESS    105 TV ROAD, DOTHAN, AL 36301
TITLE COMPANY  SWAFFORD & HAYES SETTLEMENT SERVICES INC
TITLE NUMBER  05-2813              PHONE NUMBER  (865)934-0466

A. ENCLOSED ARE THE FOLLOWING DOCUMENTS PERTAINING TO THE MORTGAGE CLOSING:

( X ) DEED / MORTGAGE                              (  ) ORIGINAL POWER OF ATTORNEY - RETURN TO DESIGNEE

(  ) RIDER(S), ADDENDUM, ALLONGE #_____      ( X ) TAX FORM # 4506 OR 8821

( X ) NOTE                                         (  ) _____

( X ) RIDER(S) ATTATCHED SCHEDULES #_____      (  ) _____

( X ) TRUTH INLENDING FINAL (REG Z)               (  ) _____

( X ) W-9                                          (  ) _____

( X ) INFORMATIONAL DISCLOSURES                   (  ) _____

( X ) RIGHT TO CANCEL - 3 COPIES PER BORROWER     (  ) _____
      -RETURN 1 EACH

B. THE FOLLOWING LENDER ITEMS HAVE BEEN DEDUCTED FROM OUR CHECK/DRAFT TO YOU:

| FEE ITEMS:<br>HUD-1 # | LENDER<br>FEES | N/A | LENDER<br>POC | TOTAL<br>FEES |
|---|---|---|---|---|
| 801 Origination Fee | 1,960.00 | | | 1,960.00 |
| 802 Discount Points | | | | |
| 803 Appraisal Fee | | | | 300.00 |
| 804 Credit Report Fee | | | | |
| 805 Final Inspection/442 Fee | | | | |
| 807 Application Fee | | | | |
| 810 Processing Fee | 500.00 | | | 500.00 |
| 811 Underwriting Fee | 500.00 | | | 500.00 |
| 813 Appraisal Review Fee | 250.00 | | | 250.00 |
| 815 Escrow Holdback Fee | | | | |
| 816 Funding Fee | | | | |
| 818 Courier Fee | | | | |
| 825 Warehouse Fee | | | | |
| 827 Reverif Fee | | | | |
| 828 Flood Cert/Life of Loan Fee | 9.50 | | | 9.50 |
| 829 Tax Service Fee | 66.00 | | | 66.00 |
| 901 Interest for 2 days    @ $ 11.2 per day | 22.40 | | | |
| 1001 Hazard Insurance 4 month(s) @ $89.00 | 356.00 | | | 356.00 |
| 1003 City Property Tax 0 month(s) @    $0.00 | | | | |
| 1004 County Property Tax 7 month(s) @   $44.75 | 313.25 | | | 313.25 |
| 1005 School Tax 0 month(s) @    $0.00 | | | | |
| 1006 Flood Insurance 0 month(s) @    $0.00 | | | | |
| 1008 Agg. Acctg. Adjustment | -134.25 | | | -134.25 |
| 1301 Survey Fee | | | | |
| | | | | |
| | | | | |
| | | | | |

TOTALS  3,842.90          0.00          0.00    4,120.50

PAID BY LENDER
204  LENDER CREDIT TO BORROWER    $ 0.00
809  YIELD SPREAD TO BROKER (POC)  $ 0.00
1203 STATE TAX/STAMPS    $                      NET CHECK / DRAFT $  52,157.10

For all Dry-Funding States and Refinances in Wet-Funding States:
ALL DOCUMENTS MUST BE IN OUR OFFICE TWO (2) BUSINESS DAYS PRIOR TO DISBURSEMENT
OF LOAN FUNDS
C. POLICY OF THE TITLE INSURANCE REQUIREMENTS ARE SET FORTH ON PAGE 2 AND OUR LIEN MUST BE SUBJECT
ONLY TO EXCEPTION NUMBERS   B1)1-9 B2)1-7                                           AS
SHOWN ON THE PRELIMINARY REPORT /COMMITMENT DATED   March 18, 2005
                                    Initial_____

Page 1 of 4
AHL G635-AHL.UFF

AHL/Frazier
0034

## LENDERS' INSTRUCTIONS

**INITIAL CLOSING INSTRUCTIONS**

DO NOT CLOSE THIS LOAN IF:

1. We have not received and approved Preliminary Commitment for Title Insurance.
2. You are past the expiration date of our legal papers.
3. We have not received and approved an Estimated Closing Statement.
4. You have not given signed copy of these instructions plus any amendments to the borrowers.
5. If there has been any change to the original sales contract which we have not approved in writing.
6. If we have not received and accepted/approved:
   a. Security instruments conformed and certified plus two copies.
   b. Note plus two certified copies.
   c. Any other items sent for execution and/or notary in the numbers sent. We will not accept witnessed acknowledgments on notarized items.
7. We have not received an acceptable hazard insurance binder.
8. All conditions of our loan commitment have not been met.
9. SIGNATURES Please insure that the Borrowers sign ALL loan documents EXACTLY AS THEIR NAMES ARE TYPED ON THE DOCUMENTS, EVEN IF THIS IS NOT THEIR USUAL SIGNATURE. Please pay special attention to middle initials and middle names, and Junior and Senior. You should review the signature on each document CAREFULLY. IF THERE IS ANY QUESTION AS TO THE READABILITY OF THE SIGNATURE OF AN INDIVIDUAL, YOU SHOULD OBTAIN A NOTARIZED SIGNATURE AFFIDAVIT and return it with the other documents.
10. TAX CERTIFICATION This form must be completed and signed by YOU and have the LEGAL DESCRIPTION ATTACHED OR ENTERED AT THE BOTTOM OF THE FORM. Please be sure that ALL information is complete and correct and that you show an amount of taxes next due, even an estimated amount.
11. REVIEW All documents MUST be in our office for review PRIOR to recording. We request that documents be received a MINIMUM OF ONE DAY PRIOR TO THE DAY YOU WISH TO RECORD. Please include THREE (3) CERTIFIED COPIES EACH OF THE NOTE AND DEED OF TRUST and provide copies of all other executed documents for recording such as Warranty Deed, Excise Affidavit, Quit Claim Deed, Buyer or Seller Power of Attorney, etc. Please direct the title company to forward take-off copies of ALL pages of ALL recorded documents as soon as possible.
12. Sales price is other than $00.00

**TITLE POLICY REQUIREMENTS**

1. The title policy must insure the mortgage as a good and valid lien of the type shown on Page 1 in accordance with your Preliminary Commitment for Title Insurance. We must have the original and two copies of the policy.
2. THERE MUST BE NO OTHER LIENS AGAINST THE PROPERTY OTHER THAN THOSE SHOWN ON PAGE 1, unless approved by us in writing.
3. No past-due taxes or special assessments are to be shown as exceptions. The title policy must show current year's taxes "not yet due and payable," or current half paid.
4. In examining the title, if you find any violations of restrictions, easements, or encroachments, secure our approval prior to the closing.
5. Vestee name spelling(s) must be identical to mortgagee/deed of trust.
6. Marital status must be shown.
7. We require two copies of conditions, covenants, and restrictions and of any recorded exceptions not covered by FNMA/FNMA/FHLMC General Waivers.
8. The mortgage transaction must include the proper execution and recording of all necessary instruments to assure the issuance of a Mortgagee Title Policy, without exceptions except as shown on Page 1.
9. This Policy must be in the loan amount or maximum principal balance to be reached if negative amortization is involved (not to exceed 125%) insuring Home Funds Direct
   and its successors and/or assigns, and subject only to the following:
   Restrictions and building lines of record provided that the policy contains
   an endorsement covering any violation.
10. Any lien for financing subordinate to ours and approved by us must be listed on the title policy and the policy must expressly provide that such lien is subordinate to that of our mortgage lien.
11. Property address must be shown as a part of the policy or by endorsement in states where possible.
12. Plat or survey must show correct street name or road name in full; must show all reference points used in legal description.
13. Protection of insured must be provided in the case of any unlocated easements, rights of way, encroachments, etc.
14. Protection of improvements including landscaping, must be provided if water, oil, gas, or mineral reservations exist and allow the right of surface entry.
15. The following endorsements must be included in the Mortgagee policy: 100, 116, 8.1, 8.2 if ARM with no negative amortization, condominium or P.U.D., if applicable, and EPA.
16. Have title company forward owners policy to borrowers at property or mailing address.
17. Have Mortgagee policy delivered to lender's address on page 4 of these instructions within three days of closing.
18. Title policy to read as follows:
    Home Funds Direct
    Its successors and/or assigns
19. Lender does not accept limited coverage title policies for loans more than $50,000.00
20. Lender requires that the final title policy insure the lien shown on page 1 of the Closing Instructions independent of any other liens closed concurrently. A final title policy insuring a combination of multiple liens is unacceptable.

AHU/Frazier
0035

Hall-Frazier
Record - 001690

 

## LENDERS' INSTRUCTIONS

**CLOSING PACKAGE REQUIREMENTS**

1. HUD 1 & Addendum showing both buyer and seller sides and including addresses of all parties to the escrow - 3 certified copies.
2. Policy of title insurance - see Requirements.
3. Policy(s) of hazard insurance.
4. Copy of Conveyance Instrument(s) and Excise Affidavits.
5. Copy of your Closing Order to title company.
6. Copy of your Escrow Instructions - signed.

**HUD-1 REQUIREMENTS**

Comply with all provisions of RESPA, as amended, in preparing this form.
Must be typed.

**DOCUMENT REQUIREMENTS**

1. Be certain that all papers which were not dated when received are dated by the person(s) who are to sign them.
2. Be certain that if we send one or more copies of a document, that EACH is returned with original signature(s).
3. INTERIM INTEREST - It is REQUIRED that the HUD-1 be amended (if necessary) to show the correct date and amount, and it is also REQUIRED that all totals on the HUD-1 be amended to reflect the correct amount. DO NOT SIMPLY CROSS OUT THE AMOUNT AND WRITE A NEW ONE ABOVE IT!
4. DO NOT SHOW ANY CREDITS FROM SELLER TO BUYER WITHOUT CONSULTING OUR OFFICE.
5. Make NO changes on the papers without our permission. Call for instructions.
6. If we give permission to make changes on the papers, all changes MUST be initialed by ALL SIGNATORIES to the documents.
7. Do not use Power of Attorney unless prior approved by us.
8. If we allow the use of a Power of Attorney, the person using that authority must sign as, for example, "Jane Doe by John Doe, her attorney-in-fact."
9. If notice of Right to Rescind is enclosed, have it signed and dated, concurrently with the Note, by all borrowers.
10. We assume no liability as to the identity of any person executing or acknowledging any instruments or documents delivered to you in connection with this transaction.
11. ALL DOCUMENTS MUST BE SIGNED EXACTLY AS TYPED NAMES APPEAR.

**HAZARD INSURANCE**

A Hazard Insurance binder must be furnished at the time of closing in an amount not less than the loan amount, or replacement cost of the structure, whichever is less. (Combined Loan Amount)

1. The policy must meet the following requirements:
   a. Original policy or facsimile signed by an authorized agent.
   b. Minimum one year term with coverage equal at least to full replacement cost of the improvements, or loan amount, whichever is less. (Minimum remaining term of 6 months for Purchase or Refinance is acceptable.)
   c. Full, correct borrower(s) names.
   d. Full, correct property address.
   e. Premium amount must be indicated on the policy.
   f. Agent name and address.
   g. Our loan number MUST be indicated on the policy.
   h. Paid receipt for first year premium attached or shown on HUD-1 as paid in closing.
   i. Earthquake insurance (if required) use same, identifying criteria as for flood insurance.
   j. Insurer must have rating in Best's Insurance Guide of at least Class VI.
   k. FLOOD INSURANCE (if required): Standard policy issued by member of National Flood Insurers Association for not less than our loan amount or the maximum amount available under National Flood Insurance program, whichever is less. The name(s) of the buyer(s), legal description, street address, city, state, county and zip code of security property on these policies must be identical to those of the loan instruments.
   l. On condominiums, we must have an individual endorsement meeting the criteria above.
   m. Loss Payable Clause to: Home Funds Direct
      A Division of Accredited Home Lenders, Inc.
      A California Corporation,
      It's successors and/or assigns
      P.O. Box 10436
      Van Nuys, CA 91410-0436

**CLOSER REQUIREMENTS**

For all Dry-Funding States and Refinances in Wet-Funding States:
ALL DOCUMENTS MUST BE IN OUR OFFICE TWO (2) BUSINESS DAYS PRIOR TO DISBURSEMENT OF LOAN FUNDS
LENDER REQUIRES CONFIRMATION OF DISBURSEMENT OF FUNDS WITHIN 48 HOURS OF FUNDING.
DO NOT MAKE ANY CHANGES TO LOAN DOCUMENTS WITHOUT PRIOR LENDER AUTHORIZATION.
ALL FEES SHOWN ON THE HUD - 1 MUST MATCH EXACTLY THE FEES LISTED IN OUR CLOSING INSTRUCTIONS i. e. : FEE ITEMS - HUD DESCRIPTION AND DOLLAR AMOUNTS.
ALL PAYOFF CHECKS MUST BE SENT DIRECTLY TO THE CREDITOR. DO NOT GIVE ANY CHECKS TO THE BORROWER.

LENDERS' INSTRUCTIONS

AHL/Frazier
0036

# LENDERS' INSTRUCTIONS

**BUYER COST REQUIREMENTS**

1. DOWNPAYMENT IN CASH FROM BORROWER(S) MUST TOTAL AMOUNT SHOWN ON PAGE 1.
2. BORROWERS CANNOT PAY THE FOLLOWING:

**VA LOANS**

1. PHOTOS & INSPECTION FEE MORE THAN ALLOWED BY VA
2. MESSENGER SERVICE
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED/DEED OF TRUST AND ANY ATTACHMENTS THERETO
4. ESCROW FEES
5. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
6. TERMITE INSPECTION
7. TAX SERVICE FEE
8. SETTLEMENT OR CLOSING FEE

**FHA LOANS**

1. TAX SERVICE/REGISTRATION FEE
2. MESSENGER SERVICE UNLESS AUTHORIZED BY BORROWER IN WRITING
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED OF TRUST/DEED AND ANY ATTACHMENTS THERETO
4. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
5. INSPECTION FEES - NOT MORE THAN ALLOWED BY FHA
6. DOCUMENT PREPARATION

**DISBURSEMENT**

1. It shall be the responsibility of the Closing Agent to request proceeds from the lender at such time as the Closing Agent is prepared to comply with all the terms and conditions of the Purchase/Sale Agreement and /or our Escrow Instructions. SUCH A REQUEST, BY THE CLOSING AGENT, FOR FUNDS SHALL BE DEEMED TO BE A CERTIFICATION (LENDER) THAT ALL TERMS AND CONDITIONS HAVE BEEN MET AND THAT THE DOCUMENTS WILL BE PROPERLY RECORDED NOT LATER THAN THE NEXT BUSINESS DAY AFTER THE DAY THE CLOSING AGENT HAS RECEIVED THE PROCEEDS CHECK. In the event that the documents are not recorded within 24 hours, the Closing Agent will immediately return the funds to the sender in accordance with the sender's instructions.

2. HUD SETTLEMENT DATE
   GOVERNMENT LOANS: The HUD-1 settlement date MUST be the date on which the lender disburses proceeds to the Closing Agent and NOT the date on which proceeds are disbursed to the seller. These two dates may be the same day.
   CONVENTIONAL LOANS: The settlement date on the HUD-1 statement may reflect the date on which the closing Agent disburses the proceeds, which would usually be the day after the Agent received loan proceeds from the lender.

**ADDITIONAL INSTRUCTIONS:**

1. Undertaking to close this loan and acceptance of the lender's funds for disbursement shall constitute an undertaking to close this loan and disburse such funds in accordance with these Closing Instructions, whether or not these Instructions are executed or delivered by the Closing Agent. Closing Agent will be responsible for any losses incurred by lender as a result of Closing Agent's failure to comply fully with these Closing Instructions.

2. Lender reserves the right to cancel or amend the loan or these Instructions at any time prior to closing.

3. Closing Agent represents, warrants, and covenants that it is not an affiliate of or otherwise controlled by any party to this transaction.

4. From the time Closing Agent receives closing funds until the loan documents are sent to the lender, Closing Agent shall hold all loan documents for the benefit of the sender of the closing funds.

**E-MAIL:**

Handling of E-Mail and Closing Documents. If Closing Agent is willing to receive Closing Documents via e-mail, Closing Agent's e-mail address is set forth below, and Closing Agent shall be responsible for ensuring that all Closing documents received via e-mail are properly printed and otherwise handled in accordance with the Closing Documents handling requirements set forth above.
Closing Agent's Email Address: _____

---

THE UNDERSIGNED BORROWER(S)

1. DIRECT THAT THE LOAN PROCEEDS BE PAYABLE TO THE ORDER OF THE SETTLEMENT AGENT.
2. ACKNOWLEDGE 1ST PAYMENT DATE OF 05/01/2005
3. ACKNOWLEDGE THAT THE LENDER MAY CANCEL OR AMEND THESE INSTRUCTIONS WITHOUT MY/OUR APPROVAL.
4. ACKNOWLEDGE ESTIMATED MONTHLY PAYMENTS OF:

| | |
|---|---|
| PRINCIPAL & INTEREST $ | 393.89 |
| TAXES (BONDS) | 44.75 |
| INSURANCE | 89.00 |
| MTGE. INS. PREMIUM | |
| | |
| **TOTAL $** | **517.64** |

3-25-05 _____
DATE          CHERYL HALL

_____
DATE

_____
DATE

_____
DATE

10017610503172917A
635 03.04.01

HALL
Page 4 of 4

---

## PLEASE RETURN DOCS TO:

Home Funds Direct
1130 Northchase Parkway
Suite 200
Marietta, GA 30067-6420

Ken Harper
CLOSER/FUNDER NAME

(866) 539-7025
TELEPHONE NUMBER

THE UNDERSIGNED AGREES TO CLOSE THIS LOAN IN ACCORDANCE WITH ALL OF THE INSTRUCTIONS AND CONDITIONS CONTAINED IN THE CLOSING INSTRUCTIONS.

SWAFFORD & HAYES SETTLEMENT SERVICES
SETTLEMENT AGENT

BY: Jane Carcella
SIGNATURE

SWAFFORD & HAYES SETTLEMENT SERVICES
TYPED NAME

(865) 934-0466
TELEPHONE NUMBER

03/28/05
DATE

LENDERS' INSTRUCTIONS
Closing Instructions

AHL/Frazier
0037

# ADDENDUM TO LENDERS INSTRUCTIONS

BORROWER'S  CHERYL HALL

LOAN #    0503172917                                    ESCROW #  05-2813

**ATTENTION CLOSING AGENTS: BY DISBURSING THIS LOAN YOU ARE GUARANTEEING DELIVERY OF THE FINAL HUD-1 WITHIN 24 HOURS OF CLOSING TO Home Funds Direct. PLEASE REMEMBER TO INCLUDE THE ACTUAL "DISBURSEMENT DATE" ON THE HUD-1 AND FAX TO THE ASSIGNED FUNDER INDICATED ON THE LENDER'S INSTRUCTIONS.**

## ** WE MUST HAVE THESE ITEMS IN AND APPROVED BEFORE FUNDING **

1.  __X__  Home Funds Direct
    IN 1st    LIEN POSITION AT TIME OF FUNDS.

2.  __X__  INSURED CLOSING PROTECTION LETTER FROM TITLE AGENT OR COPY OF ERRORS AND OMISSION POLICY FROM CLOSING AGENT.

3.  _____  COPY OF SURVEY OF PROPERTY OR NON-IMPROVEMENT AFFIDAVIT.

4.  __X__  CERTIFIED COPY OF ESTIMATED AND/OR FINAL HUD-1.

5.  _____  CERTIFIED COPY OF ESCROW INSTRUCTIONS WITH CORRECT RATE, TERMS & LENDER SIGNED BY ALL PARTIES.

6.  __X__  COPY OF ALL BORROWER(S) PHOTO ID.

7.  __X__  COMPLETED CORRECT TYPED 1003 SIGNED BY BORROWER(S) AND INTERVIEWER.

8.  __X__  HAZARD INSURANCE POLICY & FLOOD INSURANCE POLICY (IF REQUIRED) WITH MINIMUM 6 MONTHS REMAINING & COVERAGE OF THE LESSER OF:
    A.  THE COMBINED LOAN AMOUNT(S) OR    $56,000.00        OR
    B.  GAURANTEED REPLACEMENT COST OR    $0.00             OR
    C.  TOTAL ESTIMATED NEW COST ON APPRAISAL.
    MORTGAGE / LOSS PAYEE CLAUSE:
    Home Funds Direct
    A Division of Accredited Home Lenders, Inc.
    A California Corporation,
    It's successors and/or assigns
    P.O. Box 10436
    Van Nuys, CA 91410-0436

9.  __X__  TITLE POLICY TO READ AS FOLLOWS:
    Home Funds Direct
    IT'S SUCCESSORS AND/OR ASSIGNS

10.  _____  BORROWER IS IN A SECTION 32 - MUST SIGN SECTION 32 NOTICE AND GO THROUGH 2 DAY RESCISSION PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

11.  _____  BORROWER TO PROVIDE ORIGINAL SECTION 32 NOTICE SIGNED AND DATED PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

12.  __X__  ALL LOAN DOCUMENTS MUST BE EXECUTED AT ESCROW OR CLOSING AGENT OFFICE.

13.  __X__  LENDER DOES NOT ACCEPT LIMITED COVERAGE TITLE POLICIES FOR LOANS GREATER THAN $50,000.00.

14.  __X__  COPY OF WIRE INSTRUCTIONS TO BE SUBMITTED WITHIN 24 HOURS OF FUNDING. FAX NUMBER(866) 539-7026

15.  _____  LENDER TO COLLECT AND PAY LIFE INSURANCE PREMIUM AT CLOSE OF ESCROW.

16.  __X__  POWER OF ATTORNEY IS PROHIBITED WITHOUT PRIOR AUTHORIZATION FROM LENDER.

17.  __X__  PROVIDE THREE CERTIFIED COPIES OF THE MORTGAGE/DEED OF TRUST WITH ALL RIDERS & THE NOTE WITH ALL RIDERS.



**Hall-Frazier**
**Record - 001693**

ADDENDUM TO LENDERS INSTRUCTIONS, Continued

18.   Hazard Insurance Policy - If not impounded, requires 6 mo. coverage from loan
      date for refinances and 12 mo. for purchases. Mortgagee Clause: Accredited
      Home Lenders, Inc., A California Corporation, ISAOA  P.O. Box 10436  Van Nuys,
      CA  91410-0436

19.   Pay the following in full at closing (payoff must show on est/final HUD1):

          Payoff Amount: THE CR STR/PROVIDIAN,    $785.00
          Payoff Amount: PALISADES,  $694.00
          Payoff Amount: HOLLOWAY CREDIT,       $452.00
          Payoff Amount: SMALL LNS,    $399.00
          Payoff Amount: CRDT MGT,    $182.00
          Payoff Amount: FRIEDMANS JEWELERS,    $400.00
          Payoff Amount: ARMY AVIATION CENTER FCU,  $4,594.49
          Payoff Amount: ALABAMA APPRAISAL SERVICES,    $300.00
          Payoff Amount: State Farm Insurance,  $1,058.00

          Total Amount: $8,874.49

20.   AHL to be insured in 1st lienhold position with clear title

21.   Corrected original 1003, pages 1-4, to be fully completed and signed by
      borrowers and broker.

22.   Certified copy of Final HUD1

23.   Funds to be wired to the title company only.

24.   Provide detailed cash-out letter from borrower.


              *** NO FURTHER CONDITIONS ON THIS LOAN

THE UNDERSIGNED BORROWER(S) AND CLOSING OFFICER ARE HEREBY AWARE AND UNDERSTAND THAT
THIS LOAN IS APPROVED SUBJECT TO THE APPROVAL OF THE CONDITIONS LISTED ON THIS ADDENDUM
PAGE.  THE CONDITIONS MUST BE REVIEWED AND APPROVED BY THE FUNDER AND/OR UNDERWRITER AT
Home Funds Direct,

THE BORROWER(S) ARE AWARE THAT IN THE EVENT ANY OF THE ABOVE CONDITIONS ARE NOT
ACCEPTABLE BY
Home Funds Direct,

THIS LOAN APPROVAL MAY BE RESCINDED AT THE SOLE DISCRETION AND OPTION OF
Home Funds Direct,

| | | | |
|---|---|---|---|
| Borrower  3-23-05 | Date | Borrower | Date |
| CHERYL HALL | | | |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

Closing Officer        Date   03/28/05

MIN # 100178105031729174                    HALL               Loan #   0503172917
AHL 010022-F.UFF                             Page 2

AHL/Frazier
0039

Hall-Frazier
Record - 001694

# ADDITIONAL REQUIREMENT FORM

| Borrower Name(s):<br>CHERYL HALL | Lender:<br><br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 25, 2005 |

**Fax all items per item 5 below
if original loan documents are not with lender**

1. Closing agent in receipt of original handwritten & typed 1003's with correct loan amount & interest rate. Government Monitoring & Interviewer section to be completed.

2. Insured Closing Protection Letter - if applicable to your state - (fax if possible)

3. HUD to be a certified copy of the true original, must show all pay offs & fees paid to correct parties and all fees must match our loan documents.

4. HUD to be a certified copy of the true original, must show all pay offs & fees paid to correct parties and all fees must match our loan documents.

5. The day of disbursement (if loan package is not returned to lender during the rescission period) please fax a copy of the following fully executed items to:
   **(866) 539-7026**

   A. TRUTH IN LENDING
   B. NOTICE OF RIGHT TO CANCEL - ONE FOR EACH BORROWER (IF APPLICABLE
   C. OUTSTANDING CONDITIONS THAT MAY BE REQUIRED TO MEET OUR LOAN APPROVAL
   D. CERTIFIED COPY OF FINAL HUD-1 EXECUTED BY ALL
   E. FIRST PAGE AND SIGNATURE PAGE OF MORTGAGE AND ALL RIDERS
   F. COMPLETE NOTE WITH ALL RIDERS

Upon receipt & approval of above items, we will provide you written authorization to release funds.

You may not release funds on this transaction until you are in receipt of written authorization from the lender.

| _Jane Cascello_ | _05/28/05_ |
|---|---|
| Closing Officer | Date of Transaction |
| _[signature]_ 3-25-05 | |
| Borrower                    Date<br>CHERYL HALL | Borrower                    Date |
| Borrower                    Date | Borrower                    Date |
| Borrower                    Date | Borrower                    Date |
| Borrower                    Date | Borrower                    Date |

MIN #  1001781050311729174                     HALL                     Loan #  0503172917
ADDLRQFM.UFF                                    Page 1 of 1

AHL/Frazier
0040

## NOTICE OF RIGHT TO CANCEL

Loan No: 0503172917
Borrower: CHERYL HALL

Date: March 25, 2005

Property Address: 105 TV ROAD
                  DOTHAN, AL 36301

**YOUR RIGHT TO CANCEL:**
You are entering into transaction that will result in a mortgage, lien, or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is        March 25, 2005        , or
2. the date you received your Truth-in-Lending disclosures; or
3. the date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money  or property we have given you until we have done the things mentioned above, but you must then offer to return the money or the property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing at:

Name of Creditor: Home Funds Direct
                  1130 Northchase Parkway, Suite 200
                  Marietta, GA 30067-6420

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or by telegram, you must send the notice no later than midnight of    March 29, 2005
                  (or midnight of the third business day following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____        _____
Consumer's Signature                    Date
CHERYL HALL

I THE UNDERSIGNED HEREBY ACKNOWLEDGE, THAT, ON THE DATE SET FORTH BELOW, I RECEIVED TWO (2) COPIES (IN ADDITION TO THIS COPY) OF THIS NOTICE OF RIGHT TO CANCEL, ADVISING ME OF MY RIGHT TO CANCEL THE TRANSACTION TO WHICH THIS NOTICE RELATES AND ONE COPY OF THE FEDERAL TRUTH IN LENDING DISCLOSURE STATEMENT.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective to all borrowers/owners.

_____        _____
Consumer's Signature                    Date
CHERYL HALL

610005.uff

AHL/Frazier
0041

Hall-Frazier
Record - 001696

# PRIVACY POLICY

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 36301 | Date:<br>March 25, 2005 |

The trust of our customers is very important to Home Funds Direct . Keeping non public personal information about our customers in a secure environment and using that information only in accordance with this Privacy Policy is our top priority.

This Privacy Policy includes examples of the types of non public personal information Home Funds Direct collects. The provisions of this Policy apply to all our customers and consumers.

Home Funds Direct collects non public personal information about you from the following sources:

* Information we receive from you on applications or other forms;
* Information about your transactions with us or others; and
* Information we receive from a consumer reporting agency.

We do not disclose any nonpublic personal information about you to anyone, except as permitted by law. If you decide to pay off your loans (s), we will adhere to the privacy policies and practices as described in this notice.

Home Funds Direct restricts access to your personal and account information to those employees who need to know that information to provide products or services to you. Home Funds Direct maintains electronic and procedural safeguards that comply with federal regulations to guard your nonpublic information.

We may disclose all of the information we collect, as described above, to companies that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements.

Home Funds Direct sells its mortgage loans into securitizations from time to time and, as permitted by law, disclosure of nonpublic information could result from such activity.

Home Funds Direct does not disclose nonpublic information about former customers or customers with inactive accounts, except in accordance with this privacy policy.

| | |
|---|---|
| _Cheryl Hall signature_ 3-25-05 | |
| Borrower          Date<br>CHERYL HALL | Borrower         Date |
| Borrower          Date | Borrower         Date |
| Borrower          Date | Borrower         Date |
| Borrower          Date | Borrower         Date |

AHL/Frazier
0042

Hall-Frazier
Record - 001697

## GENERAL AUTHORIZATION AND BORROWER'S CERTIFICATION

| Borrower Name(s):<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| Property Address:<br>105 TV ROAD<br>DOTHAN, AL 38301 | Date:<br>March 25, 2005 |

### CERTIFICATION

The Undersigned certify the following:

1. I/We have applied for a mortgage loan from Lender. In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information.

2. I/We understand and agree that in the event the loan is processed under a reduced documentation program, Lender reserves the right to change the mortgage loan review process to a full documentation program. This may include verifying the information provided on the application with the employer and/or the financial institution.

3. I/We fully understand that it is a Federal crime punishable by fine, or imprisonment, or both to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

### AUTHORIZATION TO RELEASE INFORMATION

To Whom It May Concern:

1. I/We have applied for a mortgage loan from Lender. As part of the application process, Lender may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2. I/We authorize you to provide to Lender, and to any investor to whom Lender may sell my mortgage, any and all information and documentation that they request. Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; and copies of income tax returns.

3. Lender or any investor that purchases the mortgage may address this authorization to any party named in the loan application.

4. A copy of this authorization may be accepted as an original.

5. Your prompt reply to Lender or the investor that purchased the mortgage is appreciated.

Privacy Act Notice: This information is to be used by the agency collecting it in determining whether you qualify as a prospective mortgagor under the program. It will not be disclosed outside the agency without your consent as required and permitted by law, you do not have to give us this information, but if you do not your approval as a prospective mortgagor may be delayed or rejected. The information requested in this form is authorized by Title 38, U.S.C. Chapter 37 (if VA); By 12 U.S.C., Section 1701 et., seq. if (HUD/FHA); and Title 42

| | | | |
|---|---|---|---|
| Borrower<br>CHERYL HALL | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

AHL/Frazier
0043

Hall-Frazier
Record - 001698

## RESPA SERVICING DISCLOSURE

0503172917

Lender: Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

**NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.**

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you about the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains these procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, *whether or not your loan servicing is transferred.* If you send a "qualified written request" to your servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day in which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates**

1. The following is the best estimate of what will happen to the servicing of your mortgage loan:

   [X] We may assign, sell or transfer the servicing of your loan while the loan is outstanding. [X] We are able to service your loan and we [ ] will [ ] will not [X] haven't decided whether to service your loan.

   OR

   [ ] We do not service mortgage loans, [ ] and we have not serviced mortgage loans in the past three years.

   [ ] We presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed about your servicer.

   [ ] We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors. For the program you have applied for, we expect to:

   [ ] sell all of the mortgage servicing    [ ] retain all of the mortgage servicing
   [ ] assign, sell or transfer _____ % of the mortgage servicing

2. For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of mortgage loans for which we will transfer servicing is between:

   _____ [0 to 25%] or [NONE]    _____ 26 to 50%    _____ 51 to 75%    x    [76 to 100%] or [ALL]

   This estimate [X] does [ ] does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may effect our future transferring decisions.

3. [X] We have previously assigned, sold or transferred the servicing of federally related mortgage loans.

   OR

   [ ] This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

   Year        Percentage of Loans Transferred    (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%)
   _____     _____ %
   _____     _____ %
   _____     _____ %

This information [X] does [ ] does not include assignments, sales or transfers to affiliates or subsidiaries.

March 25, 2005                                     Home Funds Direct
Date                                               Present Servicer or Lender

**ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT**

I/We have read this disclosure form and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.

Applicant  CHERYL HALL           3-26-05
                                  Date           Applicant                              Date

Applicant                        Date           Applicant                              Date

-552R (9808).01                  VMP MORTGAGE FORMS - (800)521-7291                    12/94

0503172917

AHL/Frazier
0044

## DISCLOSURE NOTICES

| Applicant(s)<br>CHERYL HALL | Lender:<br>Home Funds Direct<br>16090 Avenue of Science<br>San Diego, CA 92128 |
|---|---|
| | Date: March 25, 2005 |

Property Address
105 TV ROAD
DOTHAN, AL 36301

### AFFIDAVIT OF OCCUPANCY

The Applicant(s) hereby certify and acknowledge that, upon taking title to the real property described above, their occupancy status will be as follows:

O
C
C
U
P
A
N
C
Y

[X] Primary Residence - Occupied by Applicant(s) within 60 days of closing.

[ ] Secondary Residence - To be occupied by Applicant(s) at least 15 days yearly, as second home (vacation, etc.), while maintaining
principal residence elsewhere. (Please check this box if you plan to establish it as your primary residence at a future date (i.e., retirement)).

[ ] Investment Property - Not owner occupied. Purchased as an investment to be held or rented.

The Applicant(s) acknowledge it is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning this loan application as applicable under the provisions of Title 18, United States Code, Section 1014.

### FAIR CREDIT REPORTING ACT

F
C
R
A

An investigation will be made as to the credit standing of all individuals seeking credit in this application. The nature and scope of any investigation will be furnished to you upon written request made within a reasonable period of time. In the event of denied credit due to an unfavorable consumer report, you will be advised of the identity of the Consumer Reporting Agency making such report and of right to request within sixty (60) days the reason for the adverse action, pursuant to provisions of Section 615(b) of the Fair Credit Reporting Act. You have the right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency if an adverse action is taken on your loan application. Under Section 612 of the Fair Credit Reporting Act you have the right to obtain within 60 days of an adverse action a free copy of the report from the consumer reporting agency. You also have the right to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer reporting agency.

### EQUAL CREDIT OPPORTUNITY ACT

E
C
O
A

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on a basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Income which you receive as alimony, child support or separate maintenance need not be disclosed to this creditor unless you choose to rely on such sources to qualify for the loan. Income from these and other sources, including part-time or temporary employment, will not be discounted by this lender because of your sex or marital status. However, we will consider very carefully the stability and probable continuity of any income you disclose to us. The Federal Agency that administers compliance with this law concerning this creditor is:
FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY
ROOM 4037
WASHINGTON, D.C. 20580

MIN # 100176195031729174          HALL                    Loan #    0903172917
AHL.DISCNTC1.UFF                 Page 1 of 3                        Rev. 05/04

AHL/Frazier
0045