IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL HALL FRAZIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO.: |
| | ) | 1:08-cv-11-MHT |
| ACCREDITED HOME LENDERS, | ) | |
| INC., d/b/a HOME FUNDS DIRECT | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO ACCREDITED HOME LENDERS, INC.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff and in response and opposition to the Motion for Summary Judgment filed by Defendant Accredited Home Lenders, Inc., ("AHL") submits the following:

### STATEMENT OF FACTS

AHL was one of the nation's largest sub-prime lenders and originates loans in several states. AHL does not close the loans it originates with its own employees, instead it contracts out the closings to third party settlement service providers. AHL closed the Frazier loan through its closing agent, Swafford Settlement Services ("Swafford"). ( Ex. 1, Dooley Depo. at pp. 53-54,). AHL processes the loan application, gathers basic title information and designates a settlement agent for use as to that loan. The agent is selected by the AHL loan officer from a list of agents approved by AHL. AHL gathers amounts of the fees being charged from the designated settlement agent and uses those fees to generate the preliminary disclosures required by RESPA (i.e. the "good faith estimate" herein after "GFE"). (Ex. 2, Diaz Depo) at pp. 23-24). AHL does nothing to insure that the fees imposed by the settlement agent are accurate; it simply "trusts

1

what the company gives us."(*Id*. pp. 27-28, 39-40). The settlement agent determines the amount to be charged for recording fees and AHL takes no steps to make sure that those fees are the actual fees paid to record the mortgage. (*Id.* p. 52).

AHL never prepares the HUD Settlement Statement. The HUD-1 is prepared by the settlement agent which plugs in its own fees (Lines 1101 though 1205) as well as the fees imposed by AHL (Lines 800 through 811). (*Id.* pp. 39-40). On the other hand, the settlement agent, Swafford in this case, has nothing to do with the preparation of the TILA disclosure or the GFEs and takes no part in the calculation of the amounts disclosed in the TILA disclosures. (Ex. 1, Dooley Depo. pp. 54-56).

AHL does not include any portion of the recording fee or other "real estate related" fees in the calculation of the finance charge used in its TILA disclosures and did not include them in the calculation of the finance charge at issue herein. (Ex. 3 at ¶ 3).

For each AHL loan, a lender's title insurance policy is required to be purchased and the premium is charged to the borrower as a title insurance premium reflected on Line 1108 of the HUD Settlement Statement (Ex. 1, Dooley Depo. at p. 72). The amount charged for title insurance is calculated by the settlement agent, which also serves as the title insurance company's agent, and that amount is adopted by AHL without any scrutiny. (Ex. 2, Diaz Depo. at pp. 27-28, 39-40). AHL does not include any portion of the "title insurance" premium in the finance charge disclosed to its borrowers. This is consistent with AHL's practice of excluding these charges in its calculation of finance charge and other TILA disclosures. (Ex. 3 at ¶ 3).

AHL does not provide a separate itemization of the TILA disclosure but instead relies on the good faith estimate prepared in advance of closing (Ex. 1, Dooley Depo. at p. 53). Frazier's Disclosures were not labeled estimates. This is an affirmative misrepresentation. In fact her

HUD-1 falsely states right above her signature that the settlement statement is a true and accurate accounting of the transaction (Ex. 4). Also, the TILA disclosure (Ex. 5) states that it is the "FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT" When in actually it is based on estimated figure. Nothing in AHL's disclosures indicates that the fees shown are based on estimates as TILA requires when estimates are used.

AHL requires the use of a settlement company selected by AHL, and requires the borrower to pay certain fees to that settlement company. (Ex 1, Dooley Depo. at pp. 53-55, and Good Faith Estimate (Ex. 6) just above signature line.) All of the services performed by the settlement company are required by AHL, as well as all of the charges associated with the closing (Ex. 7 Swafford Depo. pp. 113-114).

### The Plaintiff's Loan Transaction

Plaintiff closed her mortgage transaction with AHL on March 25th 2005. Ms. Frazier already owned the home, which she uses as her principal residence, and the funds were not used for its purchase. (Ex. 15, Hall Depo. p. 14) Plaintiff's loan was a typical closing of an AHL loan. (Ex. 7, Swafford Depo. p. 114-115). At closing, Frazier was given a HUD Settlement Statement ("HUD-1") which must reflect all of the loan fees paid at or before closing. (Ex. 4).

AHL hired Swafford to close the loan at issue and not Ms. Frazier (Ex. 1, Dooley Dep. at 50). Swafford prepared the HUD settlement statement herein subject to the AHL's approval. (Ex. 7, Swafford Depo. p. 86). After the documents are finalized and approved by the lenders they are emailed to Swafford which forwards them, again by email, to a notary for closing. (Swafford Deposition Ex. 7 pp 86-87)

The recording fee paid by Plaintiff was padded, as were the other "real-estate related" fees. She was charged $120.00 for "recording fee" while the actual recording fee was only

$56.00. (Ex. 8, Recorded mortgage and Swafford Ledger Card, Ex. 9). Swafford retained the remaining $64.00. (Ex 7. Swafford Depo. p. 95).

Likewise, the title insurance fee paid by Frazier was padded and exceeded the legal maximum rate by $74.00. Not only was the title insurance premium padded, Ms. Frazier was also charged an additional $50.00 "title service fee/endorsement" even though no special endorsements were written. (Ex. 7, Swafford Depo. pp. 106-107) The maximum legal charge was $126.00, which is calculated by multiplying $2.25, the rate per thousand dollars of coverage, by 56. This equals $126.00, not $200.00 as Plaintiff was charged. The last paragraph on bates stamped page HALL00091 of the Rate Manual (Ex. 10) states that there is no charge for standard residential endorsements (Rate Manual, Ex 10).

The amount which Swafford could charge for title insurance (including commissions) is limited. Alabama regulates title insurance premiums by requiring a filed rate be charged. Thus, for the Frazier loan, Swafford was limited to charging the rates filed with and approved by the Alabama Department of Insurance ("DOI"). Ala. Code §§ 27-25-1 through 10. By operation of the filed-rates and the title insurance company's rate manual (Ex. 10) the premium amount depends on the amount of the loan. The higher the loan, the higher the premium. See TransNation Rate Manual (Ex. 10). Swafford uniformly charged more than the legal filed rate. (Ex. 7 Swafford Depo. pp. 100-101).

Finally, Ms. Frazier was charged for title related services that were not performed. As part of a scheme to collect hidden profits and hide finance charges, Swafford padded the title work it contracted out for others to perform. Swafford did not conduct its own title search or prepare an abstract of title. (Ex. 7 Swafford Depo. pp. 48-51). Swafford contracted with a third party to conduct the work required to create the abstract and title report, and then Swafford

4

padded or marked up the charge for the work to add another profit. (*Id*.). In connection with the Frazier loan, Swafford hired Southern Land & Title to prepare the abstract and title report, Southern charged Swafford only $72.00 (Ex. 12, Southern Response to subpoena) Swafford in turn billed Frazier $200.00 for the abstract and title report. On top of the profit from the abstract, Swafford added an additional $250.00 charge for title examination, although it performed no additional work for the fee.[1] (Ex. 4).

In connection with this loan, AHL provided Frazier with TILA disclosure documents. Those disclosure documents excluded from the pertinent calculations the charges for recording fees, title insurance and title examination. (Ex. 3 at ¶ 3). When the padded charges are included in the TILA calculations, as required by TILA and Reg. Z, the disclosures are rendered inaccurate and it becomes evident that the loan is a "high cost" or HOEPA loan.

## ARGUMENT

Under the provisions of Rule 56(c) Federal Rules Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See *Celotex v. Cattrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant "always bears the initial responsibility of informing the district court of the basis for its motion"... and ... must "demonstrate the absence of a genuine issue of material fact." *Id*.

After the movant has met its burden under Rule 56(c), the non-movant must set forth "specific facts showing that there is a genuine issue for trial" *Id*. In ruling, the Court "must believe the evidence of the non-movant and must draw all justifiable inferences from the

---

[1] A review of another party's work is not a compensable service. See HUD's 2001-*1 Statement of Policy* footnote 7.

evidence in the non-moving party's favor." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); cited in *Reeves v. Thigpen*, 879 F.Supp 1153, 1166 (M.D.Ala. 1995).

In entertaining a motion for summary judgment, the court should review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but the court may not make credibility judgments or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990). Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence supporting the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 299-300 (2d Ed. 1995); *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097 (2000).

I.    **None of Frazier's' Claims Are Barred the Statute Of Limitations**

TILA claims usually have a one year statute of limitations. 15 U.S.C. § 1640(e). Claims for rescission under TILA must be filed within three years. 15 U.S.C. § 1635(f). Plaintiff's loan was closed on March 25th 2005 and suit in this matter was filed on September 7, 2007. The statute has therefore not expired on Ms. Frazier's § 1635 or rescission claims and the doctrine of equitable tolling applies to her other TILA claims. Ms. Frazier has sufficiently plead facts supporting equitable tolling (See Doc. 20, Amended Comp. ¶¶ 41 and 42) and as shown there were several affirmative misrepresentations made in the closing documents by AHL.

Furthermore, it is undisputed that AHL made affirmative misrepresentations' about the fees it and Swafford collected, in the closing documents. For example the GFE states, "The

Lender will require a particular provider from a lender approved list. The <u>specific provider and actual cost</u> will appear on the HUD-1 or HUD-1A" (Emphasis added.) This statement is demonstrably false as shown by the calculations below. The HUD-1 settlement statement herein is replete with false statements. Lines 811 and 812 show fees paid to Home Funds Direct for "Zone Determination" and "Tax Service" Apparently an entity called "First American" performed services and was paid at least part of those charges although no payment to any such entity was disclosed. (See Ex. 3. ¶ 7) The amount shown on line 1101 for "settlement or closing fee" is false. Swafford collected amounts on other lines by the padding of those fees and by showing the fees as being paid to it self and thereby hiding the mark-up of services performed by others. Line 1108 shows a payment of $200.00 to TransNation Title Insurance Company when the legal charge was only $126.00. Frazier was charged $50.00 for "Endorsements" on line 1111 when standard endorsements are included in the regulated filed rate and no other endorsements were written. Finally line 1201 shows a fee of $120.00 paid to "Clerk of Court" when in fact the recording fee was only $56.00 was paid for recording.

Because of the false statements and representations none of Frazier's claims are barred by the statute of limitations. "[T]he doctrine of equitable tolling applies to all federal statutes unless the statute states otherwise. *Ellis v. General Motors Acceptance Corporation*, 160 F.3d 703, 708 (11th Cir. 1998). The *Ellis* court went on to specifically apply that doctrine to the Truth-in-Lending Act regulatory scheme.

"The Eleventh Circuit Court of Appeals, and every other Federal Court of Appeals, has recognized that TILA's statute of limitations is subject to equitable tolling when the violation of TILA is either self concealing or is fraudulently concealed by the defendant." *In re Consolidated "Non-Filing Insurance" Fee Litigation*, 195 F.R.D. 684, 694, n 7 (M.D. Ala. 2000). *Citing*

7

*Ellis*., supra.

> Despite TILA's clearly remedial purpose, if we were to read its time limit literally, consumers whose cause of action was fraudulently concealed from them until after a year had passed could not pursue a cause of action under TILA. That would lead to the anomalous result that a statute designed to remediate the effects of fraud would instead reward those perpetrators who concealed their fraud long enough to time-bar their victims' remedy. We cannot believe this was Congress' intent. Rather, in these circumstances we apply the general rule that equitable tolling applies to all federal statutes unless the statute states otherwise.

*Holmberg v. Armbrecht*, 327 U.S. 392 at 394-95,

TILA's yard stick, the Annual Percentage Rate (APR), is calculated using the figures that disclosed as finance charges in a covered transaction as shown below. Hiding finance charges by padding otherwise excludable real-estate related fees may make a sub-prime loan look more competitive but it is also a TILA violation. The padding of excludable charges results in the understatement of the finance charge and APR. "Understating the finance charge is a 'type of fraud that goes to the heart of the concerns that actuate the Truth in Lending Act." '*Edwards v. Your Credit, Inc.,* 148 F.3d 427, 432 (5th Cir.1998) (citation omitted). Thus, " '[t]o promote the Act's purpose of protecting consumers, our court has made clear that creditors must comply strictly with the mandates of the TILA and Regulation Z." '*Fairley,* 65 F.3d at 479; *see Smith v. Chapman,* 614 F.2d 968, 971 (5th Cir.1980)." *In re Consolidated "Non-Filing Insurance" Fee,* 2001 WL 35840127, 3 (M.D .Ala. 2001) There is also a new TILA violation here that gives rise to statutory damages.

   a.       **The Failure to Honor Frazier's Rescission Is A New TILA Violation**

A consumer may exercise her right to cancel a transaction by delivery of a written notification of the consumer's wish to cancel the transaction to the creditor's place of business. Notice is effective upon mailing. 12 C.F.R. § 226.23(a)(2). The lender's obligations upon

rescission are set out in TILA Section 1635(b) which provides as follows:

> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. § 1635(b); see also 12 C.F.R. § 226.23(d).

As this statutory language makes clear, the creditor is obligated to take "necessary appropriate" actions to reflect the cancellation of the mortgage upon receipt of the notice of the election to cancel. The creditor has 20 days in which to take those steps and it obligation to do so is not pre-conditioned on the borrower's duty to reasonably tender. *Ljepava v. M.L.S.C. Properties, Inc.*, 511 F.2d 935, 944 (9th Cir. 1975); *Palmer v. Wilson*, 502 F.2d 860, 861 (9th Cir. 1974); *Gerasta v. Hibernia National Bank*, 575 F.2d 580, 584 (5th Cir. 1978); *Fairbanks Capital Corp. v. Jenkins*, 225 F.Supp.2d 910 (N.D. Ill. 2002); *Brown v. National Permanent Federal Savings & Loan Ass'n*, 683 F.2d 444, 447 (D.C.Cir.1982) (creditor must tender before the borrower's obligation arises);*Mitchell v. Security Investment Corp. of Palm Beaches*, 464 F.Supp. 650 (S.D.Fla.1979); *Johnson v. Thomas*, 342 Ill. App. 3d 382, 794 N.E.2d 919, 931, 276 Ill. Dec. 669 (Ill. App. Ct. 2003) (consumer not required to tender until after the creditor cancels the mortgage).

Section 1635(b) places upon the creditor requirements separate and distinct from those which arise upon the consummation of the loan. The creditor's failure to comply with these requirements is a separate and new violation of TILA, entitling the consumer to damages provided under Section 1640(a). *Williamson*, 698 F.2d. at 768; *Mount*, 886 F. Supp. 650, 651. The violation arising from a failure to properly respond to a notice of rescission takes place 20 days after the date of consumer's notice of the rescission. *Ruiz*, 313 F.Supp.2d 48, 50-51. For purposes of TILA's one-year statute of limitations, a claim for relief based on this violation is timely if filed within a year after the end of the 20-day period provided in Section 1635(b). *Id.*

In the present case, the Plaintiff rescinded her loan within the allotted time under TILA. Under 12 CFR § 226.23(2), AHL had "20 calendar days" to "return any money" that "has been given to anyone" and to terminate the security interest.[2] The Seventh Circuit has summarized the borrower's remedies upon rescission as follows:

> Under TILA's civil liability provisions, a creditor that violates 15 U.S.C. § 1635 is liable for: "actual damage sustained" by the debtor, 15 U.S.C. § 1640(a)(1); "not less than $ 200 or greater than $ 2,000" in statutory damages, § 1640(a)(2)(A)(iii); and "the costs of the action, together with a reasonable attorney's fee," § 1640(a)(3). In addition, § 1635(b) itself provides that when a debtor rescinds she is "not liable for any finance or other charge"; "any security interest . . . becomes void"; and "[w]ithin 20 days after receipt of a notice of rescission," the creditor must "return to the [borrower] any money or property given as earnest money, down payment, or otherwise."

*Handy v. Anchor Mortg. Corp.*, 464 F.3d 760, 765 (7th Cir. 2006).

In *McIntosh v. Irwin Union Bank & Trust Co.*, 215 F.R.D. 26, 30 (D. Mass. 2003) the court held that when a consumer had an extended right to rescind because of a TILA violation,

---

[2] 12 CFR 226.23 provides: "(d) Effects of rescission. (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge. (2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest."

the statute of limitations for all the damages they seek, including statutory damages, extends to three years. *Id.* See, also, Mount *v. LaSalle Bank Lake View*, 886 F. Supp. 650, 651 (N.D. Ill. 1995); *Elliott v. ITT Corp.*, 764 F. Supp. 102, 106 (N.D. Ill. 1991); *Malfa v. Household Bank, F.S.B.*, 825 F. Supp. 1018, 1020 (S.D. Fla. 1993)); Washington *v. Ameriquest Mortg. Co.,* 2006 U.S. Dist. LEXIS 50804, 26-27 (D. Ill. 2006).

## II.    The Disclosures Required By TILA Were Not Made

The declared purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). "Accordingly, the [TILA] requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 412 (1998). Liability under TILA is strict. "The remedial goals of TILA are achieved by a system of strict liability in favor of consumers when mandated disclosures have not been made." *Madura v. Countrywide Home Loans, Inc.* 2008 WL 2856813, 6 (M.D. Fla. 2008) "[O]nce a court finds a violation, *no matter how technical,* it has no discretion with respect to the imposition of liability." *Grant v. Imperial Motors,* 539 F.2d 506, 510 (5th Cir.1976) *Fabricant v. Sears Roebuck* 202 F.R.D. 310, 318 (S.D. Fla. 2001)

TILA requires an accurate statement of the actual fees charged to borrowers. Section 1638 requires the lender to itemize each amount that "*is or will be* paid to third persons by the creditor on the consumer's behalf together with identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(A)(iii)(emphasis added). In real estate transactions such as the one here that are covered by the Real Estate settlement Procedures Act (RESPA), creditors may

11

use the "good faith estimate" required under RESPA as a substitute for the separate "itemization," provided that the creditor complies with RESPA's requirements. 15 U.S.C. § 1638(a)(2)(A)(iii); Reg. Z *Commentary* Section § 226.18(c)(4). RESPA's requirements were not met as shown above.

This option of using a HUD-1 instead of the disclosures required by 15 U.S.C. § 1638 does not allow a creditor, like AHL, to escape its responsibilities to accurately disclose fees to consumers. The RESPA requirements mirror the TILA disclosure requirements and require the creditor to "itemize all charges imposed upon the Borrower and the Seller by the Lender . . ., whether to be paid at settlement or outside of settlement, and any other charges which either the Borrower or the Seller will pay for at settlement." 24 C.F.R. § 3500, Appendix A.  There is no mention on the HUD-1 settlement statement of any payment to several parties that were paid out of the settlement funds as shown.

The TILA definition of "Finance Charge" begins with the premise that all charges related to a loan and paid by the consumer are "Finance Charges." The initial definition is found at Section 1605(a) and, in pertinent part, defines a finance charge as, "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).

The statute, Regulation Z and the Commentary expand on this definition and enumerate exceptions to the general rule. For example, in the case of a consumer mortgage transaction, such as we have here, if the creditor requires the use of a settlement agent, like Swafford, the settlement agent's fee for the services it provides must be <u>included</u> in the Finance Charge and therefore must be incorporated in the calculation of the applicable Annual Percentage Rate (APR). See Reg. Z § 226.4(a)(i).

12

Two exceptions to the general definition of finance charge applicable here. The first is found at § 1605(d)(1) which allows a lender to exclude mortgage recording fees only if such fees are actually paid to record the mortgage. The other exclusion concerns so-called "real-estate related fees," including title examination fees and title insurance premiums. These fees can be excluded from the calculation of the finance charge only if they are *bona fide* and reasonable. 15 U.S.C. § 1605(e); Reg. Z § 226.4(c)(7). Each of these exclusions is discussed below.

Each of the disputed charges, about which Ms. Frazier complains, and the corresponding effect on the accuracy of the disclosures is separately discussed below further but first AHL's agency argument is addressed.

### 1. Agency Is Not An Issue

AHL says that Swafford was not its agent and that it is not liable for padded charges made by Swafford. AHL is wrong. "TILA does not permit a creditor to delegate its disclosure responsibility but requires all pertinent disclosures to be made by a single creditor." *Vallies v. Sky Bank* 432 F.3d 493, 494 (3rd Cir. 2006) See also 15 U.S.C. §§ 1631(b) and 1638(a). The real issue is were the charges required by AHL.

Regulation Z § 226.4(a)(1) states:

Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor:

(i)     Requires the particular services for which the consumer is charged;

(ii)    Requires the imposition of the charge; or

(iii)   Retains a portion of the third-party charge, to the extent of the portion retained.

13

It is undisputed that AHL required all of the services performed by Swafford. The evidence in this case is abundant and clear that the use of Swafford as settlement agent and the imposition of each of the services for which the subject fees were imposed were required by AHL. In light of that evidence it is surprising that AHL would even attempt to argue otherwise.

In its deposition, Swafford unequivocally testified that all the services it performed were required by AHL:

> Q. Were you doing business as Swafford and Hays back then if it says so on here?
>
> A. Probably so, yes.
>
> Q. And that there were a number of services performed by Swafford and Hays Settlement Services including notary service for that charge on line 1101? That was your earlier testimony, right?
>
> A. That is correct.
>
> Q. And were each of those services required by Home Funds Direct?
>
> A. Everything that we would have done would have been something that they required, yes.
>
> Q. You didn't do anything on line 1101 that they didn't require, did you?
>
> A. No.
>
> Q. All right. I mean, a notary was required?
>
> A. Correct.
>
> Q. All right. Now, what about on line 1102, were those services also required by Home Funds Direct?
>
> A. Yes.

14

Q. And would the same be true of the services on line 1103?

A. Yes.

Q. And did they also require title insurance? When I say "they," I mean Home Funds Direct.

A. Yes, they did.

Q. And did they also require that the mortgage be recorded?

A. Yes, they did.

Q. And I believe you said this already, but did they require each of the charges that were rendered on the document, page 132?

A. Yes.

Ex. 7 Swafford Deposition at pp 112-113

The Good Faith Estimate prepared by AHL and provided to Ms. Hall lists each of these fees and includes the following statements:

> The Lender will require a particular provider from a lender approved list. The specific provider and actual cost will appear on the HUD 1 or HUD 1A. . . Use of a particular provider of services is required and the estimate is based on charges of the provider.

(See GFE, Exhibit 6).

Also, AHL's Closing Instructions direct Swafford to secure a lender's title insurance policy and to insure that all commitment requirements are met. (See Exhibit 14). This would necessarily include obtaining and reviewing an abstract. The instructions also require that AHL's agent record the mortgage and return the recorded mortgage to AHL. (Id.). Thus, all of the services relating to the subject fees are services required by AHL. Swafford's representative confirmed that its duties as AHL's closing agent included recording the mortgage, ordering abstract search and securing title insurance. (Ex. 7, Swafford Depo. pp. 86-90). It is clear that

15

under these circumstances, the fees charged by Swafford, other than the *bona fide* "real estate-related" fees, and the actual costs of recording the mortgage, were required to be included in the disclosed finance charge. "If the creditor required a third party to perform a service, is aware that the third party will perform the service, and imposes a separate charge on the consumer for the performance of the service, the fee is a disclosable finance charge." *O'Brien v. J.I. Kislak Mortg. Corp.* 934 F.Supp. 1348, 1357 (S.D. Fla. 1996).

On page 7 of its brief, AHL also cites *O'Brien* for the proposition that Swafford was not its agent. AHL is confusing agency with the question of whether or not certain charges were required. As stated above the relevant issue is not whether Swafford was AHL's agent. The issue, is whether AHL required the services.

AHL also cites *Cowen v. Bank United of Texas, FSB* 70 F.3d 937 (7th Cir. 1995) for the proposition that a fee of $14.00 charged for overnight delivery by "the title company" was not a finance charge. *Cowen* is inapposite. The undisputed evidence in *Cowen* was that the overnight delivery fee was <u>not</u> required by the creditor. "The title company was not required by Bank United to use an overnight courier." *Cowen* at 943. Such is not the case here. Quite the contrary the evidence here is that the disputed charges were required.

Furthermore the *Cowen* court, at page 942, held that a settlement agent <u>is</u> the agent of a lender saying, "The title company in this case was wearing two hats. Primarily it was an insurance company, with its own interest in removing the prior liens. In this respect it was a principal in the transaction. It was also the closing agent, which means that it was the agent of the bank. *Sibley v. Federal Land Bank,* 597 F.2d 459, 462-63 (5th Cir.1979)." *Sibley*, of course, is binding prescient. See *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 –1211 (11th Cir. 1981).

16

**Recording Fees**

As mentioned above two exceptions to TILA's general finance charge definition are applicable here. Because a mortgage would not be recorded in a "cash" transaction, a fee imposed for recording the lender's mortgage would obviously fall within the general definition of a "finance charge," in that the fee is "incident" to the extension of credit. However, a separate section of TILA states that a recording fee may be excluded, but only if that fee is the actual fee paid to record the instrument. 15 U.S.C. §1605(d)(1).

> Fees and charges prescribed by law, which *actually are* or will be paid to public officials for determining the existence of or for perfecting, releasing, or satisfying any security related to the credit transaction.

15 U.S.C. § 1605(d)(1)(emphasis added).

Thus, a "recording fee" that exceeds the actual fee paid to record the instrument is a finance charge. *Payton v. New Century Mortg. Corp.*, 2003 WL 22349118 (N.D.Ill.); *Brodo v. Bankers Trust Co.* 847 F.Supp. 353, 357 (E.D.Pa.,1994).

It is undisputed that Ms. Frazier was charged $120.00 as a "recording fee." (Ex. 4). It is likewise undisputed that the actual cost of recording the mortgage was $53. (See Recorded Mortgage, Ex. 8). Because it is undisputed that Ms. Frazier was charged an amount for recording fees which exceeded the amount "which actually are or will be paid to public officials," this practice falls within the plain language of Section 1605(d)(1). By operation of that provision AHL was required to include at least the padded portion in the finance charge. AHL failed to include these amounts in its disclosures of the finance charge, and in doing so, it has violated TILA. AHL never attempts to argue that TILA allows exclusion of these padded fees. Instead, it blames Swafford for the practice and explains that Swafford is not its agent.

2.    **Real-Estate Related Fees**

17

The second relevant exclusion relates to certain "real-estate related fees," including title insurance premiums and fees for performing and examining a title abstract. 15 U.S.C. § 1605(e); Reg. Z § 226.4(c)(7)." This section of Regulation Z allows an exclusion of real-estate related fees but only if they are "*bona fide* and reasonable in amount."

### a. Padded Title Insurance Premiums Are Finance Charges

A premium imposed for title insurance protecting the lender's interest is obviously a fee imposed "incident" to the extension of credit. This is one of the types of "real estate-related" fees permitted by 15 U.S.C. § 1605(e) to be excluded from the calculation of finance charge. In the instant transaction not only was Ms. Frazier charged a padded title insurance premium she was also charged $50.00 for "Endorsements" even though all standard residential endorsements are included in the filed rate and no additional were written. (Ex. 10, HALL00091 TransNation Rate Manual) This exclusion only applies, however, "if the fees are *bona fide* and reasonable in amount." Reg. Z § 226.4(c)(7). "I]f the fees listed in 12 C.F.R. § 226.4(c)(7) are not bona fide or reasonable, they must be disclosed." *Jefferies v. Ameriquest Mortg. Co*. 543 F.Supp.2d 368, 379 (E.D. Pa. 2008)

"Regulation Z lists charges associated with real estate transactions that are excluded from the definition of 'finance charges,' including fees for title insurance, as long as these fees are bona fide and reasonable." *Marquez v. New Century Mortg. Corp.*  2004 WL 742205, 2 (N.D.Ill. 2004) It is undisputed that the $200.00 fee charged to Ms. Frazier exceeded the rate required by state law as well as the rate required under the agreement between the title insurance company and its agent. As explained above, *bona fide* and reasonable title insurance premiums may be excluded from the finance charge. However, a title insurance fee, which exceeds the legal rate, is neither "bona fide" or reasonable and not subject to this exclusion. *Johnson v. Know Financial*,

18

2004 WL 1179335 (title insurance charge which exceeds the maximum amount allowed by state law is not reasonable or *bona fide*); *see, also*, *Strong v. Option One*, 2005 WL 1463245 (E.D. Pa. 2005)(same); *Stump v. WMC Mortg. Corp.,* 2005 WL 645238 (E.D. Pa. 2005); *Fields v. Option One Mortgage Corporation*, 2006 WL 2191342 (E.D. Pa. 2006)(title insurance fee unreasonable if plaintiff qualified for reissue rate mandated by filed-rate).

> The most comprehensive statement of the bounds of the "bona fide and reasonable" requirements as to charges passed through by lenders to borrowers in transactions secured by real estate appear to be articulated by Rohner, *supra,* ¶ 3.03[2][a], at 3-30 to 3-31, in the following passage:

> "To be excluded from the finance charge, the fees must not only be the right types, but they must also be "bona fide and reasonable in amount." They are bona fide even if the services for which the fees are imposed are performed by employees of the creditor rather than by a third party. However, a charge for required owner's title insurance would not be bona fide where the creditor's requirement that such insurance be purchased constitutes a violation of state law."

> *In re Grigsby* 119 B.R. 479, 488 (Bkrtcy.E.D.Pa.,1990)

Therefore, the title insurance premium, which is in excess of the applicable filed rate, is a finance charge and should have been disclosed as such by AHL.

### b.    Padded Abstracting Fees and Title Examination Fees.

It is undisputed that the $450 charge (200 + 250) imposed by AHL for "abstract or title" and "title examination" exceeded the actual amount paid for abstracting services performed by the third party contractor. The actual amount was $72. (Ex. 12) The $378.00 excess was pocketed by Swafford as additional profit. This service was required by Accredited. Fees for title abstracting which exceed the actual cost or the prevailing market rate for those services are not *bona fide* nor reasonable and must be included as part of the finance charge.

Put another way, because this $378.00 tacked-on fee was additional profit paid to the closing agent, it constitutes a "fee paid to closing agent" and, pursuant to Reg. Z § 226.4(a)(2),

was required to be included as part of the disclosed finance charge. The same is true with respect to the $120 padded title insurance fee pocketed by Swafford.

### c.    AHL's Retention Argument

Each of the contested charges arise from services required by the lender and, by operation of § 226.4(a)(2), those fees are finance charges. Whether the fees were "retained" by AHL is of no consequence. The undisputed evidence demonstrates that § 226.4(a)(2)(i) and/or (ii) are met (services and/or charges were required), Plaintiff need not show that (iii) - retention by the lender - is satisfied. However, one point should be made regarding AHL's insistence that it did not "retain" the fees. It is not at all accurate to conclude that the lender did not "retain" a fee simply because part of the fee was not sent directly to the lender by the agent. It must be remembered that unlike fees which are paid separately by the borrower to a third party - the fees challenged in this case were paid by the borrower as part of the amount she borrowed and is paying back, with interest. In a very real sense, the fees are being paid directly to the lender, with interest, each month as part of the monthly mortgage payment. Therefore, at least with respect to the fees that are included in the amount borrowed, it can hardly be said that the lender is not receiving or benefiting from the fees.

AHL also argues that TILA requires that it exclude Swafford's fees from the computation of finance charges and it cites Reg. Z, § 226.4(a)(2) for support. AHL argues that it can not be liable under TILA because the fees are calculated by its agent and it relies on its agent to accurately compute the actual costs of the services provided. AHL cites no authority for the proposition that it can escape TILA's strict liability by reliance on its closing agent.

Another problem with AHL's argument is that Reg Z. § 226.4(a)(2) allows exclusion only if the fee is for a service not required by the lender. This is consistent with the general definition of finance charge as fees imposed "incident" to the extension of credit. 15 U.S.C. § 1605.

Fees charged by a third party that conducts the loan closing ... *are finance charges* only if the creditor: (I) requires the particular services for which the consumer is charged; (ii) requires the imposition of the charge; or (iii) retains a portion of the third-party charge, to the extent of the portion retained. 12 C.F.R. § 226.4(a)(2). In other words, if the fee charged by the third party is for a service required by the lender, it is a finance charge. "[T]he definition of "finance charge" includes charges imposed on the consumer by someone other than the creditor for services required by the creditor even if the creditor does not retain the charges. *See Johnson v. Fleet Finance,* 4 F.3d 946, 949 (11th Cir.1993) (per curiam) (non-required broker's fees are not included in finance charge); *First Acadiana Bank v. Federal Deposit Ins. Corp.,* 833 F.2d 548, 550-51 (5th Cir.1987) (required lawyer's fees should be included in finance charge). Congress strictly requires creditors to disclose all finance charges to prohibit creditors from circumventing TILA's objectives and burying the cost of credit in the price of goods sold." *Mourning v. Family Publications Serv.,* 411 U.S. 356, 366, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318 (1973).

**d.     The "Tolerance" Is Met**

AHL argues that even assuming the fees attacked by Ms. Frazier should have been included in the disclosed finance charge, the understatement does not meet the ½ of 1% tolerance test set out in Section 1605(f)(2)(A). AHL claims that the Finance Charge that it disclosed to Ms. Frazier, is overstated by some $325.50. (AHL Br. at 17) AHL states in its brief, with out any factual support, that "Zone determination Fee" of $9.50, the "Tax Service Fee" of

$66.00 and the "Appraisal Review Fee" of $250.00, all of which were *included* in its original calculation of the "Finance Charge" in the disclosures given the plaintiff should now be excluded from that calculation. For the first time AHL has now stated in its motion for summary judgment that these fees were not correctly included in the calculation of the finance charge.

This "tolerance" argument fails because there is no evidence that fees that AHL originally *included* in the Finance Charge should now be *excluded* and AHL's analysis ignores amounts that are undisputedly padded and marked-up. These padded fees should have been part of the disclosed as part of the Finance Charge.

Plaintiff has alleged that AHL, failed to accurately disclose the Finance Charge, Amount Financed and APR in ¶ 45 of her amended complaint. The Plaintiff's HUD-1 (Ex. 4) lists these charges as being paid to "Home Funds Direct" the pseudonym under which AHL does business. With Plaintiff's allegation that the disclosures are inaccurate AHL must present evidence that these charges are "*bona fide* and reasonable." It has presented no such evidence.

With regard to the Tax Service Fee and Flood Zone Fee, AHL's representative, Alma Diaz, stated that these fees were paid to a third party. She did not know what the "Tax Service Fee" was for. (Diaz depo p. 49). AHL said, in its responses to interrogatories (Ex. 3, at ¶ 7) that an entity called "First American," "performed certain services in connection with" these fees. Plaintiff's HUD-1 does not disclose any payment to "First American." Thus there is no undisputed evidence that either of these this fees are *bona fide* or reasonable. Marking these fees up without performing additional services is a RESPA violation. "Applying HUD's reading of the statute, we conclude that the plaintiffs sufficiently alleged a cause of action when they asserted in their complaint that "[t]hird-party vendors charge Defendants fees to perform ... services. Without performing any additional services, Defendants then charge borrowers a mark-

up of these vendors' fees and pocket the difference as profit." *Kruse v. Wells Fargo Home Mortg., Inc.* 383 F.3d 49, 62 (2nd Cir. 2004)

Regarding the "Appraisal Review Fee," AHL was asked in plaintiff's second interrogatories who performed said review and to set out how the review was performed. Instead of fully answering the interrogatory, in a carefully worded response, it stated that the fee was "<u>collected</u> for an in-house appraiser's review" (emphasis added) and never stated that any review was actually done or who did the review. (Ex 3) Thus, there is no evidence before the court that this fee is *bona fide* or reasonable.

**e. TILA Calculations**

A truthful analysis of the finance charges actually imposed compared to the finance charges AHL disclosed reveals that the tolerance is met. The total prepaid finance charge disclosed by AHL was $3,582.90. This is easily calculated by subtracting the disclosed Amount Financed of $52,417.10 from the mortgage amount of $56,000.00. (See TILA Disclosure attached hereto Exhibit 5).

The actual prepaid finance charge imposed was $4,126.50. This actual finance charge, as calculated by Plaintiffs, includes the following.

| | | |
|---|---|---|
| Origination fee | 801 | $1,960.00 |
| Processing Fee | 808 | $500.00 |
| Underwriting Fee | 809 | $500.00 |
| Flood Zone Fee | 811 | $9.50 |
| Tax Service Fee | 812 | $66.00 |
| Appraisal Review Fee | 813 | $250.00 |
| Interest | 901 | $22.40 |
| Closing Fee | 1101 | $275.00 |
| | | |
| Subtotal | | $3,582.90 |

| Title Search | $128.00 |
|---|---|
| Title Examination | $250.00 |
| Title insurance | $74.00 |
| Endorsement | $50.00 |
| Recording Fee | $64.00 |
| | |
| Total Finance Charge Imposed | $4,126.50 |

The difference between the actual finance charge imposed as calculated above and the disclosed finance charge is $543 ($4,126.50 - $3,582.90 = $543.60). The tolerance is met.

### f. The Loan at Issue is a "High Cost" or HOEPA Loan

HOEPA, or the Home Ownership and Equity Protection Act, was passed almost unanimously by Congress in September of 1994 as part of the Riegle Community Development and Regulation Improvement Act, Pub. L. No. 103-325 (September 23, 1994). It is codified at 15 USC § 1639 "Requirements for certain mortgages." Shortly thereafter regulations implementing the Act were published at 60 Fed. Reg. 15463 (March 24, 1995). These regulations have been revised twice once in 1996[3] and again in 2001[4].

The purpose of HOEPA is to trigger specific discloses by the lender to the borrower on a home equity loan when the interest rate and other closing costs cross a threshold where the act deems the loan to be of "high costs."[5] It also regulates certain practices that increase the costs of loans and regulates disclosures, the timing of the disclosures, prepayment penalties, limitations after default, balloon payments, negative amortization, prepaid payments, extending credit without regard to the ability of the consumer to repay, requirements for payments under home employment contracts among other things.

---

[3]     61 Fed. Reg. 49237 (September 19, 1996)
[4]     66 Fed. Reg. 6504 (December 20, 2001)
[5] See report to Congress by the Commission on Affordable Housing and Health Facility Needs for Seniors in the 21st Century, July 28th 2002. http://govinfo.library.unt.edu/seniorscommission/pages/final_report/

HOEPA covers loans that are defined at 15 U.S.C. § 1602(aa) of the Truth and Lending Act. HOEPA applies only to Mortgage loans that are closed end, non-purchase money loans, secured by the consumer's principal dwelling. In addition there are two "triggers" that are used to determine HOEPA coverage. If either one of these triggers are met, the loan is covered First the loan must have an annual percentage rate (APR) of more than 8 percentage points over the yield of treasury securities having a comparable period of maturity on the 15th of the month immediately preceding the month in which the application for the credit was received by the creditor. This is called the APR trigger. The second trigger is the "points and fees" trigger. This is met if the total points and fees paid by the consumer at or before the closing exceeds the greater of 8% of the "Total Loan Amount" or $400.00, whichever is greater.

The "Total Loan Amount" is the "Amount Financed" minus prepaid interest (See § 226.32(b)(1)(i)), plus Mortgage Broker fees (§ 226.32(b)(1)(ii)) plus the "real-estate related fees," unless they are *bona fide* and reasonable and/or not paid in whole or in part to the creditor or an affiliate of the creditor (§ 226.32(b)(1)(iii)). The "total loan amount" is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 225.32(b)(1) and financed by the creditor." Official Staff Commentary, 12 C.F.R. Pt. 226, Supp. I, § 226.32(a)(1)(ii). *Jefferies v. Ameriquest Mortg. Co.* 543 F.Supp.2d 368, 383 (E.D.Pa.,2008)

AHL's brief exhibits great confusion in the how to properly calculate the "Amount Financed" pursuant to Regulation Z. (See AHL BR pp. 18-22.) Compare the arduous method of the calculation of the "amount financed" set out in its brief with the method stated in its response to Interrogatory number two (Ex 3):

AHL states that the amount financed disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL/Frazier 0031) was calculated by subtracting the Prepaid Finance Charge ($3,582.90) referenced in AHL's Response to Interrogatory No. 3 from the Principal Loan amount ($56.000.00).

The "Amount Financed" as defined by TILA is "the amount of credit of which the consumer has actual use." 15 U.S.C. § 1638(a)(2)(A). The following three sub-paragraphs of 15 U.S.C. § 1638 describe the calculation:

> (i) take the principal amount of the loan or the cash price less downpayment and trade-in;
> (ii) add any **charges which are not part of the finance charge or of the principal amount of the loan** and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and
> (iii) subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit. (Emphasis added.)

The problem with the calculation made by AHL in its brief, is that it includes "charges which are not part of the finance charge", twice because those charges are already included in "the principal amount of the loan."

Regulation Z § 226.18(b) is not a model of clarity in when its description of the method used for calculation of the "Amount Financed" for TILA disclosure purposes, it says in pertinent part:

> *Amount financed.* The "amount financed," using that term, and a brief description such as "the amount of credit provided to you or on your behalf." The amount financed is calculated by:
>   (1) Determining the principal loan amount or the cash price (subtracting any downpayment);
>   (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
>   (3) Subtracting any prepaid finance charge.

The calculation of the "Amount Financed" AHL uses in its brief is wrong in several

respects. The Commentary to Regulation Z makes it clear that charges "already accounted for under section 226.18(b)(1)" are not included in the "other amounts" to be added. See Commentary to § 226.18(b)(2)-1. Recall that § 226.18(b)(1) starts with the principal loan amount, here $56,000.00. Subtract from $56,000.00 the amount that AHL states is the prepaid finance charge, $3,257.40, yields an amount financed of $52,417.10, exactly what AHL listed in the disclosure it prepared in this matter. (Ex #). See also AHL's answers to interrogatories from Edwards (Ex # joint record #)

Still, for those confused, the Office of the Comptroller of the Currency publishes a Truth in Lending Comptroller's Handbook (Ex 13) On pages 29 and 30 the Handbook describes how the "Amount Financed" is calculated in a loan secured by real estate.  It says:

> A consumer signs a note secured by real property in the amount of $5,435. The note amount includes $5,000 in proceeds disbursed to the consumer, $400 in precomputed interest, $25 paid to a credit reporting agency for a credit report, and a $10 service charge. Additionally, the consumer pays a $50 loan fee separately in cash at consummation. The consumer has no other debt with the bank. The amount financed is $4,975.
>
> The amount financed may be calculated by first subtracting all finance charges included in the note amount ($5,435 - $400 - $10 = $5,025). The $25 credit report fee is not a finance charge because the loan is secured by real property. The $5,025 is further reduced by the amount of prepaid finance charges paid separately, for an amount financed of $5,025 - $50 = $4,975. The answer is the same if finance charges included in the obligation are considered prepaid or precomputed finance charges.

It is easy to calculate the maximum amount that can be charged for "points and fees" for HOEPA coverage. All one has to do is divide the Note amount of the loan by 1.08 and then subtract the answer from the Note Amount. Consider the instant transaction. Divide $56,000.00 by 1.08 = $51,851.85. Subtract $51,851.85 from $56,000.00 = $4148.15. This amount, $4148.15, less $.01, is the maximum amount that can be charged on a covered loan with a Note Amount of $56,000.00 and still avoid HOEPA coverage.

27

Checking, assume a $56,000.00 loan and $4,148.15 in "points and fees". The "Total Loan Amount" will be $51,851.85 ($56,000.00 - $4,148.15). To see if it is a HOEPA loan take 8% of that amount by multiplying $51,851.85 * .08 = $4,148.148.

According to Regulation Z 226.32(b) "Points and Fees" consist of the following:

i.  All finance charges as defined in § 226.4(a) and (b) except pre-paid interest;

ii.  All compensation paid to mortgage brokers;

iii.  All "real-estate related" fees listed in § 226.4(c)(7) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge and the charge is not paid the creditor's affiliate, and:

iv.  All premiums for credit insurance.

The charges included in the calculation of the Finance charge and "points and fees" differ in several respects. These differences applicable here are summarized in the chart below:

| Item | Finance Charge? | TILA Finance Charge Provision | Point and fee? | HOEPA Provision |
|---|---|---|---|---|
| Third Party Charges | Yes, if required | Reg Z. 226.4(a)(1) | Yes if required | Reg Z 226.32(b)(1)(i) |
| Settlement Agent Fee | Yes, if required | Reg Z. 226.4(a)(2) | Yes if required | Reg Z 226.32(b)(1)(i) |
| Pre-Paid Interest | Yes | Reg. Z 226.4(b)(1) | No | Reg Z 226.32(b)(1)(i) |
| Real-Estate Related fees | No, if *bona fide* and reasonable | Reg. Z 226.4(c)(7) | Yes, unless *bona fide* and reasonable, not paid to creditor in whole or in part and not paid to creditor's affiliate | Reg. Z 226.32(b)(iii) |
| Credit Insurance | No, if properly disclosed | Reg. Z 226.4(d) | Yes | Reg. Z 226.32(b)(iv) |

With the exception of pre-paid interest, the definition of "points and fees" is more inclusive than that of "Finance Charge." For example a fee for flood inspection paid to the

28

lender, if *bona fide* and reasonable, is excluded from the finance charge by 15 U.S.C. 1605(e) and § 226.4(c)(7)(iv) but will always be "point and fee" if the creditor retains even a portion of the charge. See § 226.32(b)(iii). Likewise fees for credit insurance are excluded from the finance charge if properly disclosed but are always considered "points and fees" by operation of § 226.32(b)(iv).

The Question arises when a fee is unreasonable how should it be treated? *Guise v. BWM Mortgage, LLC,* 377 F.3d 795 (7th Cir.2004), and the cases that follow it treat only the unreasonable portion of a fee as a finance charge. Likewise at lease two courts have treated only the unreasonable portion of a fee as a "point and fee." See, *In re Strong* 2005 WL 1463245, 5 (E.D.Pa.) (E.D.Pa.,2005) "I rule that the Bankruptcy Court properly included only the unreasonable portion of the title insurance premium in its HOEPA points and fees calculation[]" and *Johnson v. Know Financial Group, L.L.C.* 2004 WL 1179335, 7 (E.D.Pa.) (E.D.Pa.,2004) "For the following reasons, we find that only the portion of the charge which renders it not 'reasonable,' 12 C.F.R. § 226.32(b)(1)(iii), is to be included in the total points and fees calculation."

Several other courts have included entire fees found to be unreasonable. In *Morris v. Novastar Mortg., Inc.* 2006 WL 2707349, 4 (W.D. Mo. 2006) the court found that the entire unreasonable appraisal fee and not just the "unreasonable portion", was a "point and fee," saying, "the Court finds that the plaintiff has come forth with sufficient evidence, by affidavit, that the $575 charge was unreasonable. Accordingly, the appraisal fee of $575 is not exempted from TILA's regulations. The $575 appraisal fee should have been included in the total amount of points and fees to determine if the amount exceeded 8% of the loan amount."

29

An unreasonable title search fee was a "point and fee in *McMaster v. CIT Group/Consumer Finance Inc.* 2006 WL 1314379, 6 (E.D. Pa. 2006) "These fees included the $91.00 title examination fee. If the title examination fee is unreasonable, as McMaster alleges, it will be included in the finance charge. The total points and fees payable by the consumer at or before the closing will then exceed eight percent of the total loan amount, thus making it a high interest loan under HOEPA."

The court in *Bynum v. Equitable Mortg. Group* 2005 WL 818619, 8 (D.D.C. 2005) included an illegal insurance premium and an entire unreasonable judgment report fee as points and fees saying, "Accordingly, the $218.76 fee, imposed in violation of the MLBA, cannot be considered reasonable and must be included in the points and fees calculation," and "The judgment reports were thus duplicative, not *bona fide* and unreasonable. The $64 fee must be included in the HOEPA points and fees calculations."

The language of the relevant sections of the statute, regulations and commentary, if read carefully, answer this question. Section 1605(e) gives a blanket exception for "real-estate related fees" that is only qualified by Reg. Z 226.4(c)(7). "*Real-estate related fees.* The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount[.]" On the other hand Section 1602(aa)(4)(C)(i) states:

(4) For purposes of paragraph (1)(B), points and fees shall include—
    (A) all items included in the finance charge, except interest or the time-price differential;
    (B) all compensation paid to mortgage brokers;
    (C) each of the charges listed in section 1605 (e) of this title (except an escrow for future payment of taxes), unless—
        (i) the charge is reasonable;
        (ii) the creditor receives no direct or indirect compensation; and
        (iii) the charge is paid to a third party unaffiliated with the creditor; and
    (D) such other charges as the Board determines to be appropriate.

Regulation Z 226.32(b)(1)(i) uses similar language:

(b) *Definitions.* For purposes of this subpart, the following definitions apply:

(1) For purposes of paragraph (a)(1)(ii) of this section, *points and fees* mean:
    (i) All items required to be disclosed under § 226.4(a) and 226.4(b), except interest or the time-price differential;

    (ii)      All compensation paid to mortgage brokers; and

    (iii)     All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

    (iv)     Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

The use of the words in § 1602(aa)(4)(C) "each of the charges listed in section 1605 (e) … unless" and the language in §226.32(b)(1) "All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor[,]," indicate that both the drafters of the statute and the corresponding regulations intended the whole fees should be included in the point and fee calculation *unless* certain conditions are met.

This conclusion is supported by the commentary to § 226.32:

Section 226.32(b)(1)(iii) defines "points and fees" to include all items listed in §226.4(c)(7), other than amounts held for the future payment of taxes. An item listed in §226.4(c)(7) may be excluded from the "points and fees" calculation, however, if the charge is reasonable, the creditor receives no direct or indirect compensation from the charge, and the charge is not paid to an affiliate of the creditor. For example, a reasonable fee paid by the consumer to an independent, third-party appraiser may be excluded from the "points and fees" calculation (assuming no compensation is paid to the creditor). A fee paid by the consumer for an appraisal performed by the creditor must be included in the

31

calculation, even though the fee may be excluded from the finance charge if it is bona fide and reasonable in amount.

Several courts have agreed. "[T]he definition of "points and fees" in sections 226.4 and 226.32 of Regulation Z. 12 C.F.R. §§ 226.4, 226.32. Read together, these sections define "points and fees" as including "fees for title examination, abstract of title, [and] title insurance" *unless* "the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge[.] *Macheda v. Household Finance Realty Corp. of New York* 2008 WL 2562003, 5 (N.D.N.Y.,2008)(Emphasis in original.) See also *IN re Crisomia* 2002 WL 31202722, 9 (Bkrtcy.E.D.Pa.,2002) "Real Estate Charges are exempted from inclusion in the finance charge provided they are bona fide and reasonable, 15 U.S.C. § 1605(e); 12 C.F.R. 226.4(c)(7), § 1602(aa)(4)(C) brings these exempted Real Estate Charges back into the finance charge for the purpose of determining "points and fees" unless they are also: (1) reasonable, (2) the creditor receives no direct or indirect compensation, and (3) the charge is paid to an unaffiliated third party. *See also* 12 C.F.R. 226.32(b)(1)."

Finally let's take Ms. Frazier's actual loan figures and figure the "total loan amount" and check for HOEPA coverage.

| | |
|---|---|
| Principal loan or Note amount | $56,000.00 |
| Subtract pre-paid Finance charge | 3,585.90 |
| Add Pre-paid interest | 22.40 |
| Subtract Padded Recording fee | 120.00 |
| Subtract Padded Abstract fees | 450.00 |
| Subtract padded title Ins. Fee | 200.00 |
| Subtract "Endorsement" fee | 50.00 |

32

Total Loan Amount                  $51,619.50

The "points and fees" equal the sum of the above charges. $3,582.90 – 22.40 + 120.00 + 450.00 + 200.00 + 50.00 = $4,380.50. 8% of $51,619.50 = $4,128.56. The loan is covered by HOEPA.

## CONCLUSION

For all the reasons stated above, AHL's motion for summary judgment is due to be denied.

\s\Earl P. Underwood, Jr.
EARL P. UNDERWOOD, JR.  (UNDEE9591)
Post Office Box 969
Fairhope, Alabama  36533
251-990-5558
251-990-0626 (fax)
Attorney for Plaintiffs

KENNETH J. RIEMER  (RIEMK8712)
Post Office Box 1206
Mobile, Alabama  36633
251-432-9212
251-433-7172 (fax)
Attorney for Plaintiffs

GEORGE R. IRVINE, III  (IRVIG4725)
STONE, GRANADE & CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama  36526
251-626-6696
251-626-2617 (fax)
Attorneys for Plaintiffs

STEVEN L. NICHOLAS  (NICHS2021)
CUNNINGHAM, BOUNDS, CROWDER,
BROWN AND BREEDLOVE, LLC
Post Office Box 66705
Mobile, Alabama  36660
251-471-6191
251-479-1031 (fax)
Attorneys for Plaintiffs

33

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 15th day of August, 2008, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


\s\Earl P. Underwoods, Jr.
EARL P. UNDERWOOD, JR.

dooleyrobert062508.txt
0001
```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE MIDDLE DISTRICT OF ALABAMA
 3                     SOUTHERN DIVISION
 4
    CHERYL HALL FRAZIER,
 5
             Plaintiff,
 6
       vs.                          CIVIL ACTION NO.:
 7                                   1:08-cv-11-MHT
    ACCREDITED HOME LENDERS, INC.,
 8  d/b/a HOME FUNDS DIRECT,
 9           Defendant.
    _____/
10
11
12
13      VIDEOTAPED DEPOSITION OF ROBERT B. DOOLEY
14           Taken at San Diego, California
15              Wednesday, June 25, 2008
16
17
18
19
20
21
22
23      Reported by Debbie L. Bloom - CSR
24
25      Certificate No. 7731
0002
 1                     I N D E X
 2
    DEPOSITION OF:   ROBERT B. DOOLEY
 3  JUNE 25, 2008
 4
    EXAMINATION                            PAGE
 5
    BY MR. IRVINE                            5
 6
 7
 8              INDEX OF EXHIBITS
 9  FOR PLAINTIFF:                       MARKED
10   1     Photocopy of Amended Notice of Taking    8
             Rule 30(b)(6) Deposition
11
     2     Photocopy of First Amended Complaint    103
12
     3     Photocopy of Answer and Defenses of     103
13           Accredited Home Lenders, Inc.
14   4     Photocopy of February 15, 2008 letter   103
15   5     Photocopy of various mortgage documents 103
16   6     Photocopy of Defendant's Response to    103
             First Set of Interrogatories Propounded
17           by Plaintiff, Cheryl Frazier
18   7     Photocopy of Defendant's Response to    103
             Plaintiff's Second Set of Interrogatories
19           and Request for Production
20   8     Photocopy of Accredited document         91
             headed Closing Agent Application
21
22
```

dooleyrobert062508.txt

23
24  Witness signature page                        109
25  Certificate/Stipulation page                  110
0003
 1          On Wednesday, June 25, 2008, commencing at the
 2  hour of 9:14 a.m., at 15253 Avenue of Science,
 3  Building 1, in the City of San Diego, County of
 4  San Diego, State of California, before me, Debbie L.
 5  Bloom, Certified Shorthand Reporter, in and for the
 6  State of California, personally appeared:
 7                  ROBERT B. DOOLEY,
 8  called as a witness by the plaintiff, who, being
 9  by me first duly sworn, was thereupon examined and
10  testified in said cause.
11
12
13                  APPEARANCES
14      FOR PLAINTIFF:
15          STONE, GRANADE & CROSBY
            BY:  GEORGE IRVINE, ESQ.
16          7133 Stone Drive
            Daphne, Alabama  35626
17          (251) 433-7172
            gri@sgclaw.com
18
19      FOR DEFENDANTS:
20          BRADLEY ARANT ROSE & WHITE LLP
            BY:  J. WILL MANUEL, ESQ.
21          Suite 450 One Jackson Place
            188 East Capitol Street
22          Jackson, Mississippi  39215
            (601) 948-8000
23          wmanuel@bradleyarant.com
24
25
0004
 1      SAN DIEGO, CALIFORNIA; WEDNESDAY, JUNE 25, 2008
 2                  9:14 A.M.
 3
 4          THE VIDEOGRAPHER:  This begins Videotape
 5  No. 1 in the deposition of Robert B. Dooley, in the
 6  matter of Cheryl Hall Frazier versus Accredited Home
 7  Lenders, Incorporated, doing business as Home Funds
 8  Direct, Civil Action 1:08-cv-11-MHT, for the United
 9  States District Court, for the Middle District of
10  Alabama, Southern Division.
11          We're on the record at 9:15 a.m., on
12  Wednesday, June 25, 2008.  This deposition is taking
13  place at 15253 Avenue of Science, San Diego, California
14  92128.
15          My name is Kevin Montgomery, representing
16  Freedom Court Reporting.
17          Would all counsel please identify yourselves
18  and state whom you represent, starting with the
19  telephone.
20          MR. IRVINE:  "Starting with the telephone," is
21  that what you said?
22          THE VIDEOGRAPHER:  Yes, please.
23          MR. IRVINE:  This is George Irvine of Stone,
24  Granade & Crosby, and I represent the plaintiff, Cheryl
25  Hall Frazier, in this action.
0005
 1          MR. MANUEL:  My name is Will Manuel with
                        Page 2

dooleyrobert062508.txt
```
 2  Bradley Arant, and I represent Accredited Home
 3  Lenders.
 4              THE VIDEOGRAPHER:   The reporter today is
 5  Debbie Bloom, and she will now swear in the witness.
 6
 7                   ROBERT B. DOOLEY,
 8       having been sworn, testified as follows:
 9
10                   EXAMINATION
11  BY MR. IRVINE:
12         Q.  Thank you.
13         Mr. Dooley, as we just introduced ourselves
14  over the telephone, my name is George Irvine, and I
15  represent Mrs. Frazier in this case.
16         Have you ever had your deposition taken
17  before?
18         A.  Yes, I have.
19         Q.  How many times, please, sir?
20         A.  One.
21         Q.  Was it recent?
22         A.  About nine months ago.
23         Q.  Was it in connection with your work for
24  Accredited or something personal?
25         A.  My work for Accredited.
0006
 1         Q.  What was the nature of the deposition, if
 2  you wouldn't mind?
 3         A.  It was involving an alleged fraud case.
 4         Q.  Do you remember the plaintiff's name?
 5         A.  No, I do not.
 6         Q.  And were you the corporate representative
 7  of Accredited?
 8         A.  Yes, I was.
 9         Q.  Where was that case filed?
10         A.  I don't recall.
11         Q.  Do you remember the lawyer's name for the
12  plaintiff?
13         A.  No, I don't.
14         Q.  In connection with that deposition, they
15  probably told you the ground rules, which are a little
16  bit different, I guess, when you're on the telephone
17  with respect to having to answer out loud.  So since,
18  obviously, I can't see you, I can't tell if you're
19  nodding your head or shaking your head, but I'm going
20  to need "yeses" and "nos" and out-loud responses to my
21  questions.
22         Obviously, any time you need to take a break,
23  you've got your counsel there, and y'all just chime
24  right in.  It's not an endurance contest.
25         I will endeavor to be clear, but sometimes my
0007
 1  questions may not be clear to you.  And if they are not
 2  clear to you, I would appreciate it if you would tell
 3  me that they are not clear.  Otherwise, I will have to
 4  proceed on the understanding that my question was
 5  clear, and that you understood it.  Is that fair?
 6         A.  Yes.  That's fair.
 7         Q.  Now, also, I knew Mrs. Hall before she got
 8  married and became Mrs. Frazier, so I may say
 9  "Hall" a lot instead of "Frazier" when I'm referring to
10  her, so don't let that confuse you.
11         Also in this case, the defendant is Accredited
12  Home Lenders, dba Home Funds Direct, and so at times I
```
                            Page 3

dooleyrobert062508.txt
```
13    may say "Accredited," and at other times I may say
14    "Home Funds" or "Home Funds Direct," and at other times
15    I may just say "you."  And whenever I do that, will you
16    understand that I am referring to the defendant,
17    Accredited?
18              A.   Yes.   That's understood.
19              Q.   Okay.  And with all that, let me get
20    started.  There should be some exhibits there on the
21    table in front of you.
22              A.   Okay.
23              Q.   Do you see the first one, Exhibit No. 1?
24              MR. MANUEL:  Is it the Notice of Deposition,
25    George?
0008
1               THE WITNESS:  Now I have it, yes.
2               MR. IRVINE:  Yes.
3               Q.   Is that the Amended Notice of Taking Rule
4     30(b)(6) Deposition?
5               A.   Yes.
6               MR. IRVINE: Could y'all mark -- it's already
7     marked as Exhibit No. 1.  I'm going to attach this to
8     the deposition as Exhibit No. 1.
9               (Plaintiff's Exhibit 1 was marked.)
10    BY MR. IRVINE:
11              Q.   And you are the individual who has been
12    designated by Accredited to appear pursuant to this
13    notice?
14              A.   Yes.
15              Q.   In connection with appearing for this
16    notice of deposition today -- or for this deposition
17    today, have you seen this notice?
18              A.   Yes, I have.
19              Q.   All right.  Did you -- I'm not asking for
20    anything that was discussed, but did you spend some
21    time with your counsel getting ready for this
22    deposition today?
23              A.   Yes, I did.
24              Q.   About how long?
25              A.   About two hours.
0009
1               Q.   Did you review any documents?
2               A.   Yes, we did.
3               Q.   What documents did you review?
4               A.   Documents from the loan file.
5               Q.   Anything else?
6               A.   A spreadsheet of business transactions
7     that Accredited and Home Funds Direct has done with
8     Swafford.
9               MR. MANUEL:  And, George, let me just
10    interject for the record.  We've got this spreadsheet,
11    but we're going to have to redact the names because of
12    some concerns about privacy, but we can talk about
13    that.  He can talk about the number of loans that
14    they've done with Swafford, which I think you talked
15    about, but I think as far as the spreadsheet itself,
16    until we can get those names redacted and the privacy
17    information on it, we're going to need to produce that
18    after today.  But he can talk about the number of loans
19    and the states that they did loans in with Swafford,
20    but as far as -- I mean, we're not hiding anything from
21    you.  We don't want to violate any privacy concerns.
22              MR. IRVINE:  I hear you.  We can talk more
23    about that off the record.
```
                              Page 4

dooleyrobert062508.txt
```
24            MR. MANUEL:  Okay.
25    BY MR. IRVINE:
0010
 1            Q.  But suffice it to say, this is a document
 2    that you reviewed, but it's not a document that you
 3    brought today to produce?
 4            MR. MANUEL:  Correct.
 5            Oh, you're asking me or are you asking him?  I
 6    guess you're asking him.
 7            MR. IRVINE:  It doesn't matter.  But I got a
 8    "correct" to that question, so I'm satisfied.
 9            Q.  Anything else that you've reviewed?
10            A.  Well, just this Exhibit 1 that we're
11    looking at now, we went over that, and I believe that
12    was just about it.
13            Q.  Okay.  Well, let's talk a little bit about
14    the spreadsheet that you brought -- I'm sorry -- that
15    you reviewed.  Can you generally -- let me ask you, do
16    you have it there?
17            A.  No, sir.
18            Q.  Okay.  From your review of it, how is it
19    organized?  How is it structured?
20            A.  It's a list of loans with -- documenting
21    the loan number and the borrower's name.  I believe it
22    had the closing date on it and the closing agent, which
23    was Swafford and their address, and it would indicate
24    whether the loan was closed through a wholesale office
25    of Accredited or the retail office of Home Funds
0011
 1    Direct, and that's it.
 2            Q.  Did it have any information on it like,
 3    say, loan amount or any -- any information with respect
 4    to fees or charges incurred in connection with the
 5    closing of the loan?
 6            A.  I believe it had the loan amount, but
 7    there were no fees on it.
 8            Q.  Any other information on it at all that
 9    you can recall?
10            A.  No, sir, I don't think so.
11            Q.  How many loans were listed on it?
12            A.  I don't remember the exact number, but it
13    was over a thousand.
14            Q.  So would it be fair to say then that for
15    the period of time of the loans listed on that sheet,
16    that Swafford and Hays closed over a thousand loans for
17    Accredited?
18            A.  That's correct.
19            Q.  And did you tell me the period of time of
20    the loans listed on the sheet?
21            A.  No, I didn't.
22            Q.  Do you remember it?
23            A.  It was dating back to September 2004.
24            Q.  And what was the -- what through date, if
25    you will?
0012
 1            A.  Through probably last month or -- you
 2    know, maybe the month before.  That's when I originally
 3    requested the information.  It was current up to a
 4    couple months ago at least.
 5            Q.  Does Swafford still close loans for
 6    Accredited?
 7            A.  I don't know.
 8            Q.  Let's just -- you know, the last loan that
```

dooleyrobert062508.txt

```
 9   was listed on the sheet -- let me strike that.
10          These loans listed on the sheet are loans that
11   were only closed by Swafford?
12          A.   Yes.
13          Q.   So I know that other settlement service
14   providers closed loans for Accredited, right?
15          A.   Yes.
16          Q.   Like, for instance, Lenders First Choice,
17   who we have in another lawsuit?
18          A.   Yes.
19          Q.   So none of the loans closed for Accredited
20   by other service providers are listed on this sheet?
21          A.   That's correct.
22          Q.   All right.  So -- and the last loan that
23   you remember being on the sheet or the more -- the more
24   recent -- the most recent loan listed on the sheet that
25   was closed by Swafford was within the last couple
0013
 1   months?
 2          A.   Well, we went up to the last couple of
 3   months searching the system.
 4          Q.   Okay.
 5          A.   I don't recall what the last closing date
 6   was.  It could have been 2007.
 7          Q.   That's fine.  I'm just trying to
 8   understand, since I'm not looking at the sheet, whether
 9   the last loan was a couple of months ago or whether
10   the -- you've searched up through a couple of months
11   ago, and the last loan was somewhat further back in
12   time.
13          A.   That would be a correct thought about the
14   spreadsheet, yes.
15          Q.   All right.  Turning back to Exhibit No. 1,
16   there are a number of categories of information listed
17   on the first and second page of the deposition.  I want
18   to go through those with you briefly.
19          Now, have you done research with respect to
20   No. 1, the dates that Accredited has done business with
21   Swafford and Hays?
22          A.   Yes, I have.
23          Q.   So now are you the person most familiar at
24   Accredited with the information requested by No. 1
25   there?
0014
 1          A.   Yes.
 2          Q.   Can you tell me the dates that Swafford
 3   has done business -- I'm sorry -- that Accredited has
 4   done business with Swafford and Hays.
 5          A.   We started doing business with them in
 6   June of 2003.  Definitely 2003.  I believe the month
 7   was June.
 8          Q.   All right.  And through when?
 9          A.   2007 possibly.  I don't know if we've
10   closed any loans with them in 2008.
11          Q.   All right.  And did you look at it hard
12   enough to see whether there was any sort of frequency
13   information, an average number of loans closed per
14   month?
15          A.   No, I didn't -- I haven't broken it down
16   that way.
17          Q.   Would you be able to give me any sort of
18   an opinion or judgment about the number of loans
19   Swafford was closing for Accredited per month.
```

dooleyrobert062508.txt
```
20              A.   No, I would not know.
21              Q.   Now, the -- No. 2 was the contractual
22  relationship between Swafford and Accredited.
23              Have you looked into that?
24              A.   Yes, I have.
25              Q.   Are you the person most familiar with that?
0015
1               A.   Yes.
2               Q.   Is there a contractual relationship
3   between -- was there a contractual relationship between
4   Swafford and Accredited?
5               A.   No.  Accredited had no contractual
6   relationship with Swafford.
7               Q.   All right.  Now, apparently y'all found
8   and brought with you an application form?
9               A.   Yes, sir.
10              Q.   All right.  Let me just skip over that,
11  when they've brought that to me -- let me skip over
12  that, and I'll come back to that -- this line of
13  questioning.
14              A.   Okay.
15              Q.   Are you the person now most familiar with
16  the services performed by Swafford as said services
17  relate to loans originated by Accredited?
18              A.   Yes.
19              Q.   Is that because you've investigated
20  that?
21              A.   Well, I -- yes.
22              Q.   Were you involved -- let me -- you know,
23  when Accredited was having Swafford close loans, were
24  you involved in the day-to-day process of loan closings
25  at all?
0016
1               A.   No, I was not.
2               Q.   All right.  Let me back up now and do what
3   I probably should have done right before we got started
4   and ask you what your job title is and get your
5   background there at Accredited.
6               A.   My job title currently is paralegal.
7               Q.   All right.  And are you a trained,
8   certificated paralegal?
9               A.   I'm currently enrolled in night school to
10  get my certificate.
11              Q.   How long have you been employed by
12  Accredited?
13              A.   Nine years.
14              Q.   Can you tell me -- let's see.  So this is
15  2008.  When did you start?
16              A.   June 1999.
17              Q.   Did you start as a paralegal or did you
18  start in some other position?
19              A.   No, I started in Post-Closing Department,
20  working as an assistant to capital markets, reviewing
21  loans that were destined for investors.
22              Q.   Correct me if I'm wrong, but weren't just
23  about all the loans that Accredited did destined for
24  investors?
25              A.   Yes.
0017
1               Q.   So, you started in post-closing.  How
2   long did you stay in post-closing?
3               A.   Six years -- a little over six years.
4               Q.   Did you have different titles, I'll say,
```
Page 7

dooleyrobert062508.txt

```
 5  in post-closing?
 6       A.   I was a scratch and dent manager, and then
 7  later the title changed to investor sales support
 8  manager.
 9       Q.   You know, I have to ask what a scratch and
10  dent manager is.
11       A.   "Scratch and dent" is a common term in the
12  mortgage industry which would suggest that a loan
13  needed some type of maintenance or correction.
14       Q.   Can you give me an example.
15       A.   For example, if a loan was presented to an
16  investor and it was missing a document or if they
17  didn't understand something about it, it would be
18  rejected, and that would come to me, and I would review
19  it and either make any corrections that were necessary
20  or go to the investor and explain to them what their --
21  make them understand what their issue was all about.
22       Q.   I see.  All right.  So, you didn't start
23  in the Post-Closing Department as a scratch and dent
24  manager, did you?
25       A.   Yes, I did.
0018
 1       Q.   You did?
 2       A.   Yes.
 3       Q.   Where did you work before Accredited?
 4       A.   I worked for -- two years before
 5  Accredited I was with Advanta Mortgage.
 6       Q.   What did you do for Advanta?
 7       A.   I -- I've reviewed loans there, performed
 8  due diligence for Advanta in buying loans, and then we
 9  funded the loan pools if the loans were approved.
10       Q.   All right.  Before Advanta?
11       A.   Before Advanta I was with -- I was a
12  supervisor at -- a policy processing supervisor at an
13  insurance company for about 2 1/2 years, doing
14  homeowners insurance, workers' comp and business
15  policies.
16       Q.   And before that?
17       A.   Before that I was with Citizens National
18  Mortgage where I did insuring and guarantee work in
19  the -- for FHA and VA loans.  I was also a loan
20  processor.  I did a little bit of underwriting, and I
21  was a docker/funder as well.
22       Q.   And about how long --
23       A.   Oh, I'm sorry.  That was about two years.
24       Q.   Okay.  And before that?
25       A.   Before that I was -- it was my
0019
 1  introduction with the mortgage industry where I worked
 2  for a company named Bowest.  It was a big loan
 3  servicing company, and we -- I boarded loans onto their
 4  system, new loans that came into the company that
 5  needed servicing.
 6       Q.   How long there?
 7       A.   About a year and a half.
 8       Q.   Prior to that?
 9       A.   Prior to that, United States Navy for 21
10  years.
11       Q.   Okay.  What was your job in the Navy?
12       A.   I was a chief radioman, retired as a chief
13  radioman, naval communications.
14       Q.   Did you go into the Navy out of college or
15  high school or --
```

Page 8

dooleyrobert062508.txt
```
16              A.   College.
17              Q.   Let me ask you -- let me ask a better
18    question.  Could you tell me about your educational
19    background, please.
20              A.   I have -- went to college quite a number
21    of years ago at Indiana State University.  I completed
22    three years of general-type curriculum.  After I
23    graduated -- or retired from the Navy, I went to
24    community college and got an Associate's Degree in Real
25    Estate Services and Finance, and I've also completed
0020
1     quite a number of -- maybe nine or ten courses through
2     the mortgage banking association curriculum, and I have
3     a real estate license and things of that nature.  So I
4     have a good understanding of the real estate process.
5              Q.   All right.  Did -- and so you told me you
6     had three years of -- did you ever get your degree?
7              A.   I didn't get my bachelor's degree, no.
8              Q.   Then you went into the Navy and served in
9     the Navy for 21 years?
10             A.   That's correct.
11             Q.   And you retired, obviously, honorable
12    discharge from the Navy?
13             A.   Of course.
14             Q.   Can you tell me your personal address,
15    please, sir.
16             A.   My personal address is 329 Quinoa --
17    that's Q-u-i-n-o-a -- Quinoa Court, Chula Vista,
18    California.
19             Q.   Now, you -- you started with Accredited as
20    the scratch and dent manager, and you were that for
21    about six years, you said?
22             A.   Yes.
23             Q.   And then did you become a paralegal?
24             A.   No.  After six years I -- I changed
25    positions to -- my title was a loan fulfillment
0021
1     manager, with emphasis on docs and funding, and I
2     worked with, at that time, about 24 doc and funding
3     branches nationwide to assist them with training and
4     development and writing procedures that would help us
5     with our loan docking and funding systems.  I also --
6              Q.   You say you assisted in writing
7     procedures?
8              A.   No.  Assist -- no.  I would -- I wrote a
9     lot of procedures that would assist them in the docking
10    and funding procedures throughout the company.
11             Q.   I see.  All right.
12             A.   And I also worked -- actually throughout
13    the -- my time at Accredited with the regulatory
14    compliance counsel in the legal department to make sure
15    that our loans were funded within all the State and
16    Federal guidelines.
17             Q.   I was coming to that.  While you were
18    employed by Accredited, did you ever have any sort of
19    formalized training in compliance with consumer
20    protection laws, such as Truth in Lending or RESPA?
21             A.   "Formalized" meaning sitting in a
22    classroom with a teacher?
23             Q.   Yes, sir.
24             A.   No.
25             Q.   Anything like where you could show me a
0022
```

dooleyrobert062508.txt
```
 1   certificate or something like that?
 2        A.   I have a Regulatory Compliance Certificate
 3   issued by the Mortgage Banking Association for taking
 4   their course.
 5        Q.   How did you get that?
 6        A.   I completed their coursework.
 7        Q.   Was it sort of a -- was it like a
 8   correspondence course?
 9        A.   Yes.
10        Q.   And you still have that certificate
11   somewhere handy, I'm sure?
12        A.   I do.
13        Q.   When did you get that?
14        A.   Probably five, six years ago.
15        Q.   Any other -- and I guess I may have
16   defined that coursework out of my definition of
17   formalized training, and I didn't intend to do that.
18        Do you have any other training that you can
19   tell me about in regulatory compliance?
20        A.   Not formalized, no.
21        Q.   Okay.  How about informal?
22        A.   Well, I've read a lot of different State
23   codes and statutes and regulations and Federal --
24   Federal guidelines and read all the books myself.  And
25   when certain -- actually, when I was at Advanta
0023
 1   Mortgage, we did have some standup classroom training
 2   while I was there.  This would have been specific to
 3   Federal -- Federal high-cost testing and things of that
 4   nature.
 5        Q.   Okay.
 6        A.   But I -- I don't have a certificate or
 7   anything from that.  That was 12 years ago probably.
 8        Q.   All right.  Now, I think I got myself off
 9   the track a little bit.  That was -- I think I had
10   asked you if you stayed -- what you did -- if you
11   became a paralegal after the six years that you were
12   the scratch and dent manager, and I don't remember what
13   you told me, frankly.
14        A.   No, I was -- I moved to a position where I
15   was a loan fulfillment manager for docs and funding.
16        Q.   Yes, sir.
17        A.   Yes.
18        Q.   And how long did you do that?
19        A.   About one year and nine months.
20        Q.   And then did you move to a paralegal?
21        A.   Yes, sir.
22        Q.   What are your duties as paralegal?
23        A.   I assist the litigation attorney.
24        Q.   And who would that be?
25        A.   At Accredited, his name is Chase Bivin.
0024
 1        Q.   And does Accredited have a legal staff?
 2        A.   Yes.
 3        Q.   And I -- let me just ask you this, get to
 4   it.  Is -- can you tell me how Accredited is currently
 5   organized.
 6        A.   No, I cannot.
 7        Q.   Okay.  Is there some reason?
 8        A.   Well, we've -- we're doing a lot of
 9   reorganization at the moment due to new ownership, so a
10   lot of that's pending.
11        Q.   I see.  All right.
```
Page 10

dooleyrobert062508.txt

```
12              There is a legal department, however?
13         A.   Yes, sir, there is.
14         Q.   And you work for the legal department?
15         A.   Yes, sir.
16         Q.   Is Accredited still closing loans --
17   making loans?  I'm sorry.
18         A.   Yes, we are.
19         Q.   And what group or division of Accredited
20   does that?
21         A.   Well, we have a loan origination branch
22   here in San Diego, and we're doing wholesale loans and
23   retail loans.
24         Q.   Are there other loan origination branches
25   around the country?
0025
1          A.   Right now, I don't -- we just closed all
2    of them three weeks ago, so I don't think that they've
3    reopened anything except what's here in San Diego.
4          Q.   Was that San Diego branch closed and then
5    reopened?
6          A.   No.
7          Q.   So every branch other than the San Diego
8    branch got closed within the last three weeks?
9          A.   Yes.
10         Q.   When did -- did you tell me that
11   Accredited was under new ownership?
12         A.   Yes.
13         Q.   Who bought it?
14         A.   Lonestar.  It's a hedge fund out of
15   Dallas -- I believe they're out of Dallas, but I'm not
16   positive.
17         Q.   And did they -- did the new owners, I
18   guess, engage in some employee-reduction activities?
19         A.   Yes, they did.
20         Q.   Is that what happened to Mrs. Diaz?
21         A.   Yes.
22         Q.   Do you know?
23         A.   Yes.  Mrs. Diaz -- the branch that Alma
24   Diaz worked at closed about three to four weeks ago.
25         Q.   I see.  Are the post-closing activities of
0026
1    Accredited done in a division or organization or branch
2    separately from the loan origination branch?
3          A.   Yes.
4          Q.   What would you call that branch?
5          A.   Post-Closing Department.
6          Q.   Post-Closing Department.
7               Where is it physically located?
8          A.   It's physically located here in San Diego
9    at headquarters.
10         Q.   All right.  How many people work in
11   Post-Closing Department?
12         A.   Today?
13         Q.   Yes, sir.
14         A.   About five.
15         Q.   Can you tell me the duties of the people
16   in the Post-Closing Department.
17         A.   They receive trailing documents primarily
18   and send any trailing documents to any loan files or to
19   investors wherever they belong.  That's their primary
20   duty today.
21         Q.   Who does the -- there are some documents
22   that I got that I'll talk to you about at some point as
```

Page 11

dooleyrobert062508.txt
```
23   we go along, but for instance, there's a Refinance
24   Audit Checklist that's contained in the files for
25   Mrs. Hall that were produced.
0027
 1           A.   Okay.
 2           Q.   There's a Section 32, Calculation Summary
 3   document.  I was assuming that all of these documents
 4   were prepared in post-closing.
 5           A.   The Section 32, I -- the Section 32
 6   document that you're talking about would have been
 7   prepared in loan processing and then again in -- prior
 8   to funding the loan.  And then the -- there's two
 9   different types of audits, so I'm not sure which one
10   you're referring to.
11           Q.   Okay.  Well, we'll come back to that.  I'm
12   really trying to make sure I understand as best I can,
13   given the new ownership of Accredited, the
14   organization.
15                Was there a -- was there a loan processing
16   department or loan processing branch?
17           A.   Yes.
18           Q.   Was that part of the loan origination
19   branch?
20           A.   Yes.
21           Q.   So one of the functions of loan -- the
22   loan origination branch was loan processing?
23           A.   Yes.
24           Q.   There wasn't like a separate loan
25   processing division, was there?
0028
 1           A.   No.
 2           Q.   There is also on the table, I think in
 3   front of you, an Exhibit 6.  Can you find that please,
 4   sir.
 5           A.   Sure.  Hold on.
 6           Q.   Exhibit 5 is a loan file, a big fat thing,
 7   and Exhibit 6 ought to be right behind it.
 8           A.   I've got Exhibit 5.  It's farther down
 9   below or --
10           MR. MANUEL:  Yes.
11   BY MR. IRVINE:
12           Q.   Exhibit 5, if you'll look at Exhibit 5,
13   the bottom right-hand corner there's some Bates
14   labeling, AHL/Frazier 0001.
15                Do you see that on Exhibit 5?
16           A.   Yeah, hold on.  I'll find it, but I'm
17   going to have to go through a lot of documents in
18   Exhibit 5 to get to it.
19           Q.   There are 163 pages of Exhibit 5.
20           A.   Okay.  That helps.  Thank you.
21           Q.   And if you look at the bottom right-hand
22   corner of each page --
23           A.   Right.
24           Q.   -- those things are numbered.
25           A.   Okay.  So I'm at -- I'm at page -- or
0029
 1   Bates No. -163 for Exhibit 5.
 2           Q.   Yeah, the next document should be
 3   Exhibit 6.
 4           MR. MANUEL:  No.
 5           THE WITNESS:  I've got 7, so maybe -- wait.  I
 6   just saw it.  It's out of place here.  Hold on.  Okay.
 7   I've got No. 6.
```
                               Page 12

dooleyrobert062508.txt

```
 8   BY MR. IRVINE:
 9        Q.   All right.  Have you ever seen No. 6
10   before?
11        A.   I have.
12        Q.   In fact, as I look over, there's your
13   signature on it.
14        A.   Yes.
15        Q.   On page 11.
16        A.   Okay.
17        Q.   Let me make sure, is that your signature
18   on page 11 of that document?
19        A.   Yes, it is.
20        Q.   So you are the person that executed this
21   document on behalf of Accredited to verify the accuracy
22   of the responses to these interrogatories?
23        A.   Yes, I did.
24        Q.   Who is Kristopher Dillon?
25        A.   I don't remember his exact title.  He's an
0030
 1   employee at the Marietta branch that originated the
 2   Hall Frazier loan.
 3        Q.   And the Marietta branch is now closed?
 4        A.   Yes, sir.
 5        Q.   That was Marietta, Georgia?
 6        A.   Yes.
 7        Q.   And is he no longer employed?
 8        A.   He's no longer employed.
 9        Q.   Do you know if Accredited, as part of any
10   sort of out-processing procedure or otherwise, has
11   maintained addresses and phone numbers for its former
12   employees?
13        A.   Yes.  The Human Resources Department has
14   last known contact information at the time employees
15   were laid off.
16        Q.   All right.  Have you made any effort to
17   obtain the last known address for any of those
18   individuals listed in the response to Interrogatory
19   No. 1?
20        A.   I don't remember if I checked these or
21   not.  I don't remember if I was asked to.
22        Q.   Okay.  I guess the answer is, you have
23   not made any effort, have you?
24        A.   No, not on my own.
25        Q.   All right.  How about Kim Stevenson, who
0031
 1   is she?
 2        A.   Another employee that worked at the
 3   branch, and her name was on the loan.  I don't remember
 4   her exact function, what she had to do with the loan.
 5        Q.   All right.  You didn't remember
 6   Mr. Dillon -- Kristopher Dillon's function with respect
 7   to the loan either, do you?
 8        A.   No, I don't recall.
 9        Q.   Is Kim Stevenson still employed?
10        A.   No.  None of these people in the
11   Interrogatory No. 1 are still employed.  And they
12   probably all got laid off -- I believe they all got
13   laid off in September of '07.
14        Q.   How many employees does Accredited have
15   now?
16        A.   I don't know the exact number.  Maybe
17   around 4- to 500 Accredited/Home Funds Direct employees
18   are remaining on board.  And we merged with another
```

Page 13

dooleyrobert062508.txt
```
19   company, but I don't want to include those.
20         Q.   And that's down from how many?
21         A.   Between 3500 and 4,000, about.
22         Q.   Do you remember Clarence W. Wells?
23         A.   Yeah.  Clarence Wells was the
24   underwriter.  I'm familiar with the Clarence Wells
25   name.
0032
 1         Q.   Were all these people at the Marietta
 2   branch?
 3         A.   Yes.
 4         Q.   How about Mike Simpson?
 5         A.   Yeah, he was an employee there at the
 6   Marietta branch.  I don't recall his exact position.
 7         Q.   You don't know his role with respect to
 8   the Hall loan?
 9         A.   No.  I -- I don't have it in my memory
10   bank here, no.
11         Q.   All right.  Verria Neal?
12         A.   Same.
13         Q.   Okay.  Ken Harper?
14         A.   Same.
15         Q.   And Rita Dickerson?
16         A.   Same.  I know their names.  I put them in
17   the interrogatory, in the response, and that's because
18   they were -- their names were located either in the
19   loan origination system or on the documents
20   themselves.
21         Q.   All right.  Now, the loan origination
22   system, is that that -- let me ask you it this way:
23   Are you aware of the fact that we took the deposition
24   of Mrs. Diaz in connection with the -- in connection
25   with the Edwards versus LLC and Accredited case?
0033
 1         A.   Yes, sir, I am.
 2         Q.   Have you ever read her deposition?
 3         A.   Yes.
 4         Q.   How long ago did you read her deposition?
 5         A.   I read it yesterday.
 6         Q.   Did you read it in getting prepared for
 7   this deposition?
 8         A.   Yes.
 9         Q.   Was there anything else you reviewed in
10   getting ready for this deposition?
11         A.   You know what, wait a minute.  Let me back
12   up.  Maybe I read it a day before.  Within the last
13   couple of days I read it.
14         Q.   Okay.  You know, I asked that question
15   earlier --
16         A.   Well, let me explain that.  I did read
17   it.  When I met with the attorney here today and we
18   talked about the deposition today, we talked -- that's
19   when we talked about the documents and about deposition
20   procedures.  I had read the deposition of Ms. Diaz on
21   my own at my desk.
22         Q.   That's fine.
23         A.   So.
24         Q.   Was there anything else that you -- that
25   you read on your own to get prepared for the deposition
0034
 1   today?
 2         A.   The loan -- the loan documents.
 3         Q.   No, no.  You told me about those already.
```
                              Page 14

dooleyrobert062508.txt
```
 4              A.   Yeah.  No.
 5              Q.   But you didn't tell me about Ms. Diaz's
 6    deposition.  I'm just trying to jog your memory.
 7              A.   Yeah.  No, I don't recall anything else.
 8              Q.   All right.  Ms. Diaz testified in her
 9    deposition about some software or software program that
10    Accredited used called LOIS.
11              Do you remember that?
12              A.   Yes.  It's Loan Origination Information
13    System that we affectionately call "LOIS."
14              Q.   Was that -- do you know who the creator of
15    that was?
16              A.   It's -- Empower is the commercial name.
17    LOIS is a pet name that Accredited assigned to Empower.
18    The software is called Empower.  And the vendor, I
19    believe, is Fidelity National Title.
20              Q.   Did Accredited have an IT department?
21              A.   Yes, we do.
22              Q.   And still does?
23              A.   Yes.
24              Q.   Who is the head of the IT department?
25              A.   I don't know his name.  That's part of the
0035
 1    reorganization.
 2              Q.   Who -- what does that mean, he's part of
 3    the reorganization?  Did the old one get terminated and
 4    there's a new person that's been hired?
 5              A.   Yes.  That's correct.
 6              Q.   Okay.  And you don't know the new person's
 7    name?
 8              A.   That's correct.
 9              Q.   Do you ever have occasion to use the LOIS
10    software?
11              A.   I have, yes.
12              Q.   If it breaks, who would you call?
13              A.   We have a LOIS team, a team of programmers
14    and technicians that maintain LOIS.
15              Q.   Who is their -- who is their boss or
16    supervisor?
17              A.   Their boss was -- right now?
18              Q.   Sure.
19              A.   John Gisiger.
20              Q.   Can you spell that for the court reporter
21    and myself.
22              A.   Yes.  John, J-o-h-n, Gisiger,
23    G-i-s-i-g-e-r.
24              Q.   And that's currently, right?
25              A.   Yes.
0036
 1              Q.   Prior to the acquisition or
 2    reorganization, who was it?
 3              A.   Well, we could -- John would still be --
 4    John's been with the company for about ten years.
 5              Q.   Is he there in San Diego?
 6              A.   Yes.
 7              Q.   Let me go back to my notice for a
 8    minute.  Did -- did I -- did you investigate the
 9    notice -- the notice is No. 1, Exhibit No. 1.  Do you
10    have it?
11              A.   Exhibit No. 1?
12              Q.   Yes, sir.
13              A.   The one we were looking at before?
14              Q.   Yes, sir.
```
                              Page 15

dooleyrobert062508.txt

```
15              A.  Yes, I'm -- yes, I did.
16              Q.  No. 3 -- No. 3 on the notice asks for the
17      person who could talk to me about services performed by
18      Swafford and said services relate to loans originated
19      by Accredited.
20              A.  Okay.
21              Q.  Do you see that?
22              A.  Yes.
23              Q.  Are you the person with the most
24      knowledge about that at Accredited now?
25              A.  Yes.
0037
1               Q.  And have you had to obtain your knowledge
2       by investigating that?
3               A.  No.
4               Q.  No.  Then how did you obtain your
5       knowledge?
6               A.  Well, Swafford would perform the same
7       services as any other closing settlement office would
8       for -- there wouldn't be anything any different.
9               Q.  Okay.  That's fine.
10              So your knowledge about the services performed
11      by Swafford is based upon your knowledge of the typical
12      services provided by all settlement service providers;
13      is that fair?
14              A.  Yes.
15              Q.  And is it also fair that the services
16      provided by Swafford in connection with closing loans
17      would be the same services as provided by all
18      settlement service providers?
19              A.  Yes.
20              Q.  How about No. 4, the manner and content
21      of instructions from Accredited to Swafford related to
22      such services, are you the person most familiar with
23      that information?
24              A.  Yes.
25              Q.  Is that because you've investigated or
0038
1       because your knowledge is based upon your knowledge of
2       what the typical nature and content of instructions
3       from Accredited are to all settlement service
4       providers?
5               A.  I'm just familiar in general with the
6       process, and that would be it, yes.
7               Q.  Now, the process -- the process -- you
8       say "the process."  We're talking about the process of
9       originating and closing loans?
10              A.  Yes.
11              Q.  And is it fair to say that Accredited's
12      process of originating and closing loans is a
13      standardized process?
14              MR. MANUEL:  Object to the form.
15              But you can answer.  You can answer.  I'm
16      sorry.
17              THE WITNESS:  Yeah, I'm not sure what you mean
18      by "standardized."  It's --
19      BY MR. IRVINE:
20              Q.  Well, does Accredited use the same process
21      all the time in connection with a closing -- closing
22      its loans?
23              A.  Yes.
24              Q.  And is it Accredited's intent to have the
25      process be a standardized process so that it works the
```

Page 16

dooleyrobert062508.txt

```
0039
 1   same way every time?
 2            A.   Yes.
 3            Q.   Okay.  So in that regard, the manner and
 4   content of instructions from Accredited to Swafford
 5   ought to be the same as the manner and content of
 6   instructions to all settlement service providers who
 7   are closing loans for Accredited; is that right?
 8            A.   Yes.
 9            Q.   Are you the person -- No. 5, are you the
10   person with the -- most familiar with the degree of
11   control exercised over Swafford by Accredited regarding
12   time, place and manner Swafford performed any such
13   services?
14            A.   Yes.
15            Q.   Is that because you've investigated that
16   or because you just know based on your knowledge of the
17   process?
18            A.   I just know based on my knowledge of the
19   process.
20            Q.   No. 6, the number -- we already went over
21   the number of loans originated by Accredited in which
22   Swafford would perform some settlement-related service,
23   didn't we?
24            A.   Yes.
25            Q.   And that's that spreadsheet that you have,
0040
 1   right?
 2            A.   Yes.
 3            Q.   And there's over a thousand loans on that
 4   spreadsheet?
 5            A.   Yes, that's correct.
 6            Q.   Were there more than 2,000?
 7            A.   No.
 8            Q.   Somewhere between -- do you have a closer
 9   ballpark for me?
10            A.   I'm thinking 1400, but I don't know if
11   it's 1400 or 1,040, but I just remember somewhere
12   around there.  Close to 15-, say.
13            Q.   Okay.  And the services provided by
14   Swafford in closing those loans were the same for all
15   1400?
16            A.   Yes.
17            Q.   All right.  No. 7 says the nature of
18   settlement services performed by Swafford related to
19   all such loans.  You're the person most familiar with
20   that at Accredited?
21            A.   Yes.
22            Q.   Is that because you just know or because
23   you had to investigate it?
24            A.   I just know.
25            Q.   Is that because of the nature of the
0041
 1   settlement services performed by Swafford are the same
 2   as the settlement services provided by all other
 3   settlement service providers, like Lenders First Choice
 4   and others?
 5            A.   Yes.
 6            Q.   Are you the person most familiar with
 7   No. 8, the use by Swafford of third-party providers of
 8   said services?
 9            A.   Yes.
10            Q.   Is that because you just know or because
```

Page 17

dooleyrobert062508.txt
```
11    you had investigated it?
12        A.   Because I just know.
13        Q.   All right.  Let's talk about that for a
14    minute.  Do you know that Swafford uses third-party
15    providers for the services that it performs to get
16    Accredited's loans closed?
17        A.   I don't know if they do or not.
18        Q.   Okay.  So do you know if other settlement
19    service providers like Lenders First Choice or Inzura
20    or others use third-party providers?
21        A.   Here again, I don't know if they do or
22    not.  I should say that it's not uncommon for a
23    settlement office such as Swafford or Lenders First
24    Choice or Inzura, as you've mentioned to, on occasion,
25    use third-party providers.
0042
 1        Q.   Do you have any particularized knowledge
 2    about those third-party providers?
 3        A.   Well, no, but the question is too vague,
 4    Counselor.  What service are you talking about?
 5        Q.   That's fine.  That's fine.  Let's talk
 6    specifics, since we're here.
 7             If you would look at Exhibit 5, please, sir.
 8        A.   Okay.
 9        Q.   Now, remember how we talked about the
10    Bates label numbers on the bottom right-hand corner of
11    each page?
12        A.   Yes.
13        Q.   If you would look at page 0026.
14        A.   Okay.
15        Q.   Can you identify this document for me.
16        A.   Yeah.  It looks like page 2 of the HUD-1
17    settlement statement.
18        Q.   For Mrs. Frazier?
19        A.   Yes.  Correct.
20        Q.   You're familiar with this document, this
21    type of document; are you not?
22        A.   Yes, I am.
23        Q.   And I don't want to replow the sort of
24    ground that we plowed in the deposition of Mrs. Diaz,
25    but it's my understanding that the way this document
0043
 1    comes to be created is that Accredited sends the -- if
 2    I mischaracterize them, please correct me.  But the
 3    lender's instructions to Swafford and those lender's
 4    instructions have certain fees listed in them, and that
 5    Swafford puts those fees and other fees that will be
 6    charged to the borrower in connection with the loan
 7    closing on a HUD-1 like this form and sends it back to
 8    Accredited for Accredited to approve.
 9        A.   Yes.
10        Q.   Is that right?
11        A.   Yes.
12        Q.   And that happens every time, right?
13        A.   I don't know that it happens --
14    procedurally, yes, that would be what should happen.
15        Q.   Well, that's really my question.  That's
16    the standard procedure for the completion of the HUD-1
17    settlement statement in connection with the loans
18    closed by Swafford or any other settlement service
19    provider for Accredited.
20        A.   Yes.
21        Q.   And on this document, Number 26 on
```
Page 18

dooleyrobert062508.txt
22    page -- I'm sorry -- on this document on page -26,
23    there are a number of fees listed, correct?
24          A.   Yes.
25          Q.   Now, some of these fees come to Swafford
0044
1     from Lenders First Choice -- I'm sorry -- from
2     Accredited, right?
3          A.   Yes.
4          Q.   And, in fact, that is essentially all of
5     the fees listed in the 800 block, right?
6          A.   Yes.
7          Q.   And the 900 block?
8          A.   Yes.
9          Q.   And the 1000 block?
10         A.   Yes.
11         Q.   And then the fees listed in the 1100 block
12    and the 1200 block come from Swafford, right?
13         A.   Yes.
14         Q.   I don't know about the 1300 block.  Where
15    do those fees come from?
16         A.   Well, 1300 block comes from the title
17    company, or Swafford in this case would contact the
18    creditors that we're paying off to get updated payoff
19    statements.
20         Q.   So they come from Swafford also?
21         A.   Yes.
22         Q.   Now, when Accredited receives this form
23    from Swafford, it understands that Swafford is going to
24    list all of these charges and collect these funds from
25    the borrower at settlement, right?
0045
1          A.   Yes.
2          Q.   Now, it's my understanding, I think from
3     Mrs. Diaz's deposition, that Accredited doesn't inquire
4     into the amount of these fees in any regard.
5          A.   As long as they appear reasonable in cost,
6     no, we would not.
7          Q.   Okay.  Well, when you say "as long as they
8     appear reasonable in cost," what would prompt
9     Accredited to inquire about a particular fee?
10         A.   It would basically be the -- based on the
11    experience of the person closing the loan.  For
12    example, if Line 1101 on this Bates No. -026 was
13    $1,000, that would trigger a question to Accredited,
14    who's consistently closing loans in Alabama, that maybe
15    that -- you know, to ask, "Why is your closing fee so
16    much higher than it normally would be?"  Because they
17    would usually be $200 or $300, depending on the agent.
18         Q.   Do you know of that ever happening?
19         A.   Have I seen that happen?
20         Q.   Yes.
21         A.   On -- yes, I have.
22         Q.   Can you tell me about it.
23         A.   Well, I've seen it happen, but not
24    normally.
25         Q.   When have you seen it happen?
0046
1          A.   I've seen it happen over a period of time
2     for the last 17 years since I've been in the mortgage
3     business.
4          Q.   Well, at Accredited, do you recall that
5     ever happening?
6          A.   Yes.

Page 19

dooleyrobert062508.txt

```
 7              Q.   Can you give me the specifics of that
 8   instance.
 9              A.   Well, I don't know what else -- what I can
10   say, other than, yes, I have seen charges from closing
11   agents that seemed to be higher than what they normally
12   were.
13              Q.   Is there some sort of manual guideline,
14   written statement of policy, that relates to
15   questioning fees charged by a settlement service
16   provider in connection with a closing?
17              A.   No.  The policy is that people that review
18   the loans and the HUDs in particular should be alert to
19   any fee that would appear not to be reasonable in price
20   or a bona fide fee, depending on the state that you're
21   doing business in.
22              Q.   Is that a written or unwritten policy?
23              A.   Today it would be a written policy.
24              Q.   Do you have that written policy?
25              A.   Today?
0047
 1              Q.   Yes, sir.
 2              A.   Not in front of me, no.
 3              Q.   When you say today there would be a
 4   written policy, does that mean that that policy was
 5   recently written down?
 6              A.   Yes.  Well, it would have been -- some of
 7   the written policies would have been -- that I just
 8   referred to would have been after the Hall Frazier loan
 9   closed.
10              Q.   That was getting ready to be my next
11   question.  Was that a policy written down at the time
12   of Mrs. -- at the time Mrs. Hall's loan closed?
13              A.   I don't know if they -- well, it was not a
14   written policy and procedure, a corporate policy and
15   procedure, simply because they didn't have a lot of
16   those types of policies in a training development or
17   written at that time in the company's growth.  That
18   doesn't mean that -- I don't know what Marietta,
19   Georgia, might have had written.
20              Q.   Did each branch have its own separate set
21   of policies?
22              A.   No.  I don't know what each separate
23   branch had in 2005.
24              Q.   Okay.  When did this policy get written
25   down?
0048
 1              A.   Well, in 2003, second quarter.
 2              Q.   Okay.  I'm talking about your last
 3   answer.
 4              A.   I'm sorry.  2005, second quarter.
 5              Q.   Okay.
 6              A.   Correction, yeah.
 7              Q.   Okay.  What do you call that policy?
 8              A.   Well, the requirement to review fees
 9   for -- to make sure they're bona fide or reasonable
10   actually comes from Truth in Lending Code, and that's
11   how it's always been taught to people.  And we have
12   that specifically in an online training resource for
13   Truth in Lending Disclosure and HUD training.
14              Q.   So there is a written policy to review
15   those charges by the people at Accredited to make sure
16   that they are bona fide and reasonable.
17              A.   Yes.
```

Page 20

dooleyrobert062508.txt

```
18              Q.  And that policy was in writing in 2005?
19              A.  Yes.
20              Q.  And what --
21              A.  I believe they launched that course in the
22  second quarter.
23              Q.  All right.  That's part of some
24  coursework?
25              A.  Yes.
0049
1               Q.  Is there any written policy that's
2   provided to people at Accredited or available for
3   people at Accredited that says that people at
4   Accredited involved in the closings of these loans
5   should review those HUDs?
6               A.  Not to my knowledge, but it doesn't mean
7   that they weren't taught that.
8               Q.  That wasn't my question.
9               A.  Okay.
10              Q.  My question was, was there a written
11  policy?
12              A.  Not to my knowledge.
13              Q.  And your testimony is that there's -- that
14  that is taught to employees of Accredited; that process
15  is taught to them in connection with some regulatory
16  compliance training?
17              A.  Yes.
18              Q.  All right.
19              A.  And when they launch the course -- the
20  coursework, the people that were involved with
21  reviewing these loans were required to take that
22  course.
23              Q.  All right.  Is that coursework material
24  still available?
25              A.  Yes.
0050
1               Q.  What do you call it?
2               A.  "TILA Review," or words to that effect,
3   T-I-L-A.
4               Q.  So then let's say that the person at
5   Accredited -- what do you call the person who reviews
6   this HUD-1?
7               A.  It would be someone in the doc and funding
8   department.
9               Q.  Do they have a particular title?
10              A.  Well, they're either a docker, meaning
11  they draw documents, or a funder.  And in most of the
12  branches, those would be interchangeable.
13              Q.  So backing up a little bit, when Swafford
14  is engaged to close a loan, who engages Swafford to
15  close the loan?
16              A.  The loan processor would contact Swafford
17  to schedule a closing.
18              Q.  Okay.  And I think I understood from
19  Mrs. Diaz's deposition that that's up to the discretion
20  of the loan closer -- loan processor?
21              A.  Yes.
22              Q.  Do they pick whoever they want?
23              A.  Yes.
24              Q.  They don't have a list or anything like
25  that?
0051
1               A.  No.  You mean like a corporate list that
2   they go by?
```

Page 21

dooleyrobert062508.txt
```
 3            Q.  Yes, sir.
 4            A.  No.
 5            Q.  What is there -- do they have their own
 6   personal list?
 7            A.  I don't know that they have a list.  They
 8   do business with who they have -- have gotten good
 9   service from.
10            Q.  All right.  And then they select Swafford
11   as the closer for a particular loan.  And how do they
12   notify Swafford that there's getting ready to be a loan
13   closing?
14            A.  They would just simply call them.
15            Q.  All right.  And then -- and what is the
16   first document that Swafford gets?
17            A.  Well, I guess that could depend.  They're
18   going to -- Swafford might not get any documents until
19   the closing documents are sent to them.
20            Q.  Okay.
21            A.  I don't know why they would get any until
22   we send them the -- until we send them the closing docs
23   that we need the borrower to sign, unless there was
24   some particular question that they had and they needed
25   something.
0052
 1            Q.  Isn't it that Swafford -- doesn't Swafford
 2   get the lender's instructions?
 3            A.  Those -- those are -- those go in a
 4   closing doc package, along with all the other
 5   documents.
 6            Q.  How does Swafford know what fees to put on
 7   the HUD that are the lender fees?
 8            A.  That would be discussed in the phone.
 9            Q.  Let me show you a Document No. -34 of
10   Exhibit 5.
11            A.  Okay.
12            Q.  I think these are -- this is all the way
13   over to Document No. -39 or -40.
14            A.  Okay.
15            Q.  Is it your testimony that these lender's
16   instructions are not provided to Swafford until
17   Swafford is provided with a completed loan package
18   ready for execution to close?
19            A.  That's correct.
20            Q.  And it's your testimony that the -- that
21   Swafford is provided the lender fees orally in the
22   phone call?
23            A.  Yes.
24            Q.  Who sends out the Good Faith Estimate?
25            A.  The branch, the origination branch.
0053
 1            Q.  Look over to Document No. -32 of
 2   Exhibit 5.
 3            A.  Okay.
 4            Q.  Is that a copy of the Good Faith
 5   Estimate?
 6            A.  That's a copy of a Good Faith Estimate and
 7   format that is delivered to the closing office with the
 8   final document package for the borrower to sign.  The
 9   purpose of this particular form is to itemize the Truth
10   in Lending Disclosure Statement, which is Bates
11   No. -31.
12            Q.  And, in fact, this is -- this document
13   is -- this is a -- is this a copy of a document that's
```
Page 22

dooleyrobert062508.txt

14    previously been sent to the borrower?
15          A.   The -- what you would really define as a
16    Good Faith Estimate is sent to the borrower within
17    three days of their loan application.   So this may or
18    may not match identically to that.
19          Q.   Okay.   And at this point Accredited is
20    requiring the borrower to utilize the services of
21    Swafford as the closing agent?
22          A.   I'm sorry?
23          Q.   At this point Accredited is requiring the
24    borrower to utilize the services of Swafford and
25    Hays --
0054
1           A.   No.   We don't require the borrower to use
2     Swafford and Hays, no, sir.
3           Q.   Can you look down there at the bottom of
4     this form, right above the words, "This does not
5     constitute a loan commitment."
6                Do you see that, that language?
7           A.   On -32?
8           Q.   Yes, sir.
9           A.   Yes.
10          Q.   And would you agree with me that that
11    language says, "Use of a particular provider of service
12    is required, and the estimate is based on charges of
13    the provider"?
14          A.   Okay.   I can't read that.   This copy is
15    not that clear.
16          Q.   Sorry.   That's the copy y'all produced to
17    me.
18          A.   Okay.   Well, I think I see it.   "The
19    lender will require a particular provider from a lender
20    controlled or approved list."   Yes, it says that.
21          Q.   Okay.   And isn't that, in fact, true that
22    at this point Accredited is requiring the borrower to
23    utilize the services of Swafford to get this loan
24    closed?
25          A.   We would not require the borrower to use
0055
1     Swafford.   If the borrower had a different servicing or
2     closing agent that they wanted to use, we -- you know,
3     that's negotiable.
4           Q.   Do you know if this -- do you see right to
5     the left of that there's a little square with an X in
6     it?
7           A.   Yeah, very small.
8           Q.   Yes, sir.
9           A.   Yeah.
10          Q.   Is it usual and customary for Accredited
11    to send out a Good Faith Estimate form on every loan
12    that it closes that tells the borrower by checking that
13    block that the use of a particular provider of service
14    is required?
15          A.   Yes.   This is a standardized form, so it
16    would say the same thing.
17          Q.   Now, these -- this goes out from
18    Accredited, right?
19          A.   Yes.
20          Q.   Is this a document that Accredited uses to
21    prepare the TILA Disclosure?
22          A.   Yes.
23          Q.   So Accredited is not using the HUD page
24    that we were looking at earlier, page -26, to complete
Page 23

dooleyrobert062508.txt
25    the TILA Disclosure, right?
0056
1              A.   No.   Because the HUD is an itemization of
2    what actually occurred at closing, so that hasn't
3    happened when the TILA is prepared.
4              Q.   But you've got the completed HUD at the
5    time the TILA is prepared, don't you?
6              A.   No, sir.
7              Q.   You don't?
8              A.   No.
9              Q.   I don't mean executed HUD, I mean
10   completed HUD.
11             A.   We would have the estimated HUD, yes, that
12   would be the procedure.
13             Q.   And it would be completely filled out and
14   ready to send to Swafford to have executed, along with
15   all the other documents, right?
16             A.   No, sir.
17             Q.   That --
18             A.   Accredited does not send a HUD to the
19   closing office.   The HUD is prepared by the closing
20   office and sent to the loan origination branch.
21             Q.   And then what happens to it?
22             A.   It's reviewed.
23             Q.   And it doesn't go back to Swafford?
24             A.   No.
25             Q.   How does Swafford know that it's
0057
1    approved?
2              A.   It would be approved over the telephone.
3              Q.   And it's not included in the packet of
4    documents that Swafford gets to close the loan?
5              A.   No.
6              Q.   Do you know what is included in that
7    packet of documents?
8              A.   Exhibit 5 probably -- most of the
9    documents in Exhibit 5, not all of them.   The documents
10   that the borrower is required to sign, your -- you
11   know, your common -- your note and your mortgage and
12   Truth in Lending Disclosure and all the various
13   disclosures that are in the -- you know, common to a
14   loan file, those are sent to the closing -- those are
15   prepared by Accredited and sent to the closing office.
16             Q.   The borrower is required to sign the HUD,
17   isn't she?
18             A.   Right.   But the HUD-1 is not a lender
19   document.
20             Q.   So Swafford prepared -- let me make sure I
21   understand it.   You're saying that Swafford prepares a
22   completed HUD-1 based on information it gets over the
23   phone and based on information that it already has,
24   like its -- its own charges and provides that completed
25   HUD-1 back to Accredited, and Accredited approves it
0058
1    and sends out a loan package that does not include a
2    copy of the HUD-1 for execution?
3              A.   That's correct.   We couldn't.   We e-mail
4    lender documents, and there's no way to capture a
5    HUD-1.   It's not in our system.
6              Q.   All right.   So when Accredited gets the
7    completed HUD-1 that it approves, does it then run the
8    TILA Disclosure?
9              A.   That's when they draw the final docs,
                              Page 24

dooleyrobert062508.txt

10  yes.
11           Q.   So the TILA Disclosure is printed or
12  drawn, as you say, after Accredited has approved the
13  HUD-1 form?
14           A.   They might have drawn the documents prior
15  to that, but if necessary, they would update the TILA
16  depending on what the HUD -- HUD said.
17           Q.   You mean they might have created a TILA
18  Disclosure without the settlement service provider's
19  closing fee?
20           A.   We would know what that is.
21           Q.   You would know what that was?
22           A.   Yes.   There's correspondence and
23  communication going on with the loan processors and the
24  closing office.   It's not a complete mystery.
25           Q.   Flip over, if you will for me, please,
0059
1   sir, to page -31 of Exhibit 5.
2            A.   Okay.
3            Q.   Can you identify the document for us.
4            A.   Yeah.   Final Truth-In-Lending Disclosure
5   Statement.
6            Q.   All right.   How is the -- how is the
7   finance charge computed on this document?
8            A.   Empower calculates that in the loan
9   origination system.
10           Q.   Do you know what goes into it?
11           A.   Yes.
12           Q.   Can you tell me.
13           A.   The calculations are the -- based on the
14  fees charged on the loan and the interest rate, and
15  there's a time factor and some other complicated
16  calculations in accordance with Reg Z.
17           Q.   All right.   When you say "Empower
18  calculates it," is there a screen print or -- you know,
19  a process that you have to go through to have Empower
20  calculate this document?
21           A.   Well, yeah.   The process to calculate it
22  would simply be to enter all the fees that are going to
23  be charged and then basically hitting the enter button
24  and --
25           Q.   Okay.
0060
1            A.   -- and the computer does the
2   calculations.
3            Q.   That's what I assumed, but I don't know
4   until I ask you the question.
5            A.   Yeah.
6            Q.   All right.   So, who is the person there at
7   Accredited whose job it is to enter all the fees into
8   the Empower software?
9            A.   Well, that would be an ongoing process
10  from the beginning of the processor, who would
11  understand some of the fees initially, and then as it
12  gets through all the way to the doc and funding
13  department, then they would verify that all the fees
14  were final before they -- to the best of their ability
15  before they drew the final docs.
16           Q.   All right.   Let me -- so at this time
17  they're inputting fees into the Empower software based
18  upon the completed HUD-1?
19           A.   If the completed HUD-1 -- you know, I
20  don't like this word "completed HUD-1."   The HUD --
                          Page 25

dooleyrobert062508.txt
```
21           Q.  Well, the --
22           A.  The HUD-1 is completed when the borrower
23  signs it, and it could always change.  So I want you to
24  understand that.  I'm not -- when we get the -- when
25  Accredited gets the HUD-1, it's not completed.  It's
0061
1   what the closing agent says at that time is -- what
2   it's going to be, so --
3            Q.  Once Accredited approves it and sends it
4   back, it then -- they can't change it, can they?
5            A.  Well, they're not supposed to change it
6   without notifying us, that's true.  That's in our
7   closing instructions.
8            Q.  All right.  All right.  So, looking at the
9   Final Truth-In-Lending Disclosure Statement, Document
10  No. -31, about halfway down do you see the blank for
11  Filing/Recording Fees?
12           A.  Right.
13           Q.  $170?
14           A.  Correct.
15           Q.  Do you know if that was the filing and
16  recording fees for the Hall loan?
17           A.  I can tell you that's what the estimate
18  was at the time that we drew the documents, what we
19  thought it was going to be.  But because I know --
20  understand the nature of the lawsuit, I know that that
21  turned out not to be the exact fee or fees.
22           Q.  So that it is -- with respect to Swafford,
23  it has turned out not to be the exact fee every time in
24  connection with every loan?
25           A.  I haven't --
0062
1            MR. MANUEL:  Object to the form.
2            You can answer.
3            THE WITNESS:  I have not reviewed all the
4   other Swafford loans.
5   BY MR. IRVINE:
6            Q.  Okay.  Does anybody check the recording
7   fee at Accredited to see whether it is bona fide?
8            A.  No, sir.  That's not a lender function.
9            Q.  Is there any policy or process that would
10  cause -- in place with Accredited by which its
11  employees would check the recording fee?
12           A.  No, sir.  That's not a lender function.
13           Q.  On the -- did you know, looking at the
14  Hall loan, where that 170 came from?
15           A.  Yes.
16           Q.  Where did it come from?
17           A.  Well, that -- that was the sum if you --
18  if we had the print screens of -- or could look at the
19  loan origination system, that would be actually -- yes,
20  I can tell you, if you want to look at Bates No. -32.
21           Q.  Yes, sir.  Is it 120 plus 50?
22           A.  Yeah.  And I don't have -- let me kind of
23  do something here.  I can't hardly see this.  Line
24  1201, which is the "Recording Fee, Deed/Mortgage" for
25  120.
0063
1            Q.  Yes, sir.
2            A.  And then go down to Line 1204 where it
3   says "Miscellaneous Recording Fee."
4            Q.  Yes, sir.
5            A.  $50.  That -- our loan origination system,
```
Page 26

dooleyrobert062508.txt

```
 6    LOIS, would calculate that -- that sum of those two
 7    figures and populate 170 into the Truth-in-Lending
 8    Disclosure Statement, Bates -31, that we're talking
 9    about.
10         Q.   All right.  Now, who prepares this Good
11    Faith Estimate?
12         A.   Accredited.
13         Q.   And where did Accredited get $50 as a
14    miscellaneous recording fee for use on this Good Faith
15    Estimate?
16         A.   Swafford.
17         Q.   All right.  Jump back with me back over to
18    page -26.
19         A.   Okay.
20         Q.   Do you see in the 1200 box anything that
21    would indicate a $50 miscellaneous recording fee?
22         A.   No, I don't.
23         Q.   And when you say "Swafford," does that
24    mean Swafford called Accredited and said, "For purposes
25    of your Good Faith Estimate, put $50 as a miscellaneous
0064
 1    recording fee on it"?
 2         A.   Well, that's probably what occurred.  I
 3    wasn't there, of course, to hear the conversation, but
 4    that's --
 5         Q.   You don't know if Accredited maybe picked
 6    up the $50 off of Line 1111, Endorsements, and included
 7    it on the Good Faith Estimate as a miscellaneous
 8    recording fee?
 9         A.   No.  I don't know that they did that, no.
10         Q.   You don't know where that number actually
11    came from really.
12         A.   $50?
13         Q.   Yes.  I mean, you know it came from -- you
14    believe it came from Swafford.
15         A.   I believe it would have come from
16    Swafford, yes.
17         Q.   But you don't know that?
18         A.   No.
19         Q.   And is there any policy or process in
20    place at Accredited by which the people reviewing these
21    documents in closing this loan would look at this 120
22    recording fee and check it to make sure that it's bona
23    fide?
24         A.   No, we wouldn't know how to determine what
25    the County Recorder charges, no.  We rely on the
0065
 1    settlement office to do that accurately.
 2         Q.   And if they saw 120 over and over and over
 3    with -- in different counties all over the state of
 4    Alabama and in other states, there's no policy in place
 5    to induce the Accredited people to check that number?
 6         A.   No.  Our policy is to rely on the closing
 7    office to do it correctly.
 8         Q.   Okay.
 9         A.   That's part of their function.
10         Q.   And that's a different policy from the
11    policy that says you need to check the settlement
12    service fee.  If it looks like it's too big, you need
13    to inquire into it?
14         A.   No.  You said bona fide fee.  If we have a
15    recording fee there of $800, that's unreasonable and
16    would be investigated, I think.
```

Page 27

dooleyrobert062508.txt
17          Q.   And there is a written policy to that
18    effect -- I'm sorry.  I'm trying to remember your prior
19    testimony.  There's no written policy to that effect,
20    but there is something in some sort of training
21    materials that says you have to check that fee, right?
22          A.   Not that particular fee.  Any fee would be
23    checked to be -- make sure it's bona fide and
24    reasonable.
25          Q.   Including the recording fee.
0066
1           A.   Any fee, yes, sir.
2           Q.   Okay.  But Accredited doesn't check these
3     fees, does it?
4           A.   The recording fee?
5           Q.   Yeah.
6           A.   Do they actually call the County Recorder
7     and verify that that fee is going to be exactly what
8     the closing office says?
9           Q.   It doesn't do anything to check the fee,
10    does it?
11          A.   No.  We don't -- we have no way of
12    verifying what a recording fee is.  We don't have any
13    kind of access to those types of charges at all.
14          Q.   And so -- so Accredited doesn't, as a
15    matter of policy, try to look behind the -- this fee to
16    see whether it's been padded or marked up?
17          A.   No.  We rely on the closing office to do
18    those things on our behalf.
19          Q.   The same is true, I guess, of the title
20    insurance premium?
21          A.   That's correct.
22          Q.   Accredited expects to get a title policy
23    in connection with this closing, doesn't it?
24          A.   I'm sorry?
25          Q.   Accredited expects to get a title policy
0067
1     in connection with this closing, doesn't it?
2           A.   Yes.
3           Q.   Isn't that a requirement of Swafford in
4     connection with closing this loan?
5           A.   To deliver the policy to Accredited?
6           Q.   Yes, sir.
7           A.   Yes.
8           Q.   And there's a commitment letter prepared
9     and delivered to Accredited in connection with this?
10          A.   Yes.
11          Q.   Does Accredited ever -- and that
12    commitment letter lets Accredited know who the carrier
13    is going to be, doesn't it?
14          A.   Yes.
15          Q.   Is Accredited generally familiar with the
16    requirement in a number of states, including Alabama,
17    that title policies -- title -- I'm sorry.  Let me back
18    up.
19               Is Accredited familiar with the requirement in
20    Alabama and other states that title insurance agents,
21    when they issue policies, adhere to filed rates?
22          A.   Accredited would rely on the settlement
23    agent to do these things.  And our processors and
24    closers are not trained in insurance premiums, no.
25          Q.   Okay.  So then Accredited does not take
0068
1     any action at all to determine whether this title
                          Page 28

dooleyrobert062508.txt
```
 2  insurance premium, for instance, shown here on
 3  Document -32, is bona fide?
 4           A.  Well, title insurance by label is bona
 5  fide, so that's pretty easy to determine.
 6           Q.  My question was the premium.
 7           A.  So the -- other than to view it from a
 8  general bona fide and reasonable fee, which they would
 9  be trained to do, they would not have details of what
10  a -- or access to or be required to check title
11  insurance premium per -- per unit charges or anything
12  of that nature.  So -- and this --
13           Q.  I -- I'm sorry.
14           A.  In this case, where the title insurance
15  fee is $200 on Line 1108 of the HUD, if it were a
16  little bit less or more than that, in reality,
17  Accredited would not know that.  We rely on the
18  settlement office to do those things.
19           Q.  And so as I understand it, there's no
20  policy in place that would require any of the
21  Accredited employees to check into this fee?
22           A.  Not -- not to that detail, no.
23           Q.  And you think, just as a matter of
24  experience, if it looked really high, that's something
25  that they would inquire into?
0069
 1           A.  Yes.
 2           Q.  But Accredited doesn't take -- make any
 3  effort to see if maybe this fee has been padded by $50,
 4  say?
 5           A.  No, sir.  They would not be required to
 6  check that or even understand how to do it.  It's not a
 7  lender -- not part of the lender process.
 8           Q.  And the same is true, isn't it, of the
 9  fees listed by Swafford and Hays in Line 1102 and 1103
10  for abstract or title search and title examination?
11           A.  Correct.
12           Q.  Does Accredited know that Swafford is
13  hiring an independent abstracter to obtain that
14  abstract or title search?
15           A.  I don't know if Swafford did or not.  And
16  nor would the --
17           Q.  You don't know whether Accredited knows
18  that or not?
19           A.  No.  We would not know if -- some closing
20  offices might have access to public records or
21  themselves to be able to do an abstract or title
22  search, for example.  So I don't know if they're
23  doing -- hiring a third-party vendor to do it.
24           Q.  All right.  So if Swafford, in fact, hired
25  some third party to obtain an abstract or title search
0070
 1  and paid that third party $72 and listed a charge of
 2  $200 here on the HUD, Accredited has no policy of
 3  checking into that situation?
 4           A.  No.
 5           Q.  And Accredited wouldn't know whether
 6  Swafford was padding that third-party charge or not?
 7           A.  No, we would not.
 8           Q.  And then the same is true for the title
 9  examination?  You know, if Swafford was already being
10  compensated for its services in reviewing a title
11  abstract by its commission and selling the title
12  insurance policy, Accredited wouldn't look into that
```
Page 29

dooleyrobert062508.txt
```
13  situation, would it?
14          A.   No.
15          Q.   Now, is it -- is it after the loan is --
16  let me ask it this way.  Look over, if you will for me,
17  please, sir, to --
18          MR. MANUEL:  Do you want to take a break?
19  BY MR. IRVINE:
20          Q.   -- Document No. -78 and -79 and -80.
21          A.   Okay.  Hold on.  -39.  Bates number?
22          Q.   Bates No. -78, -79 and -80.
23          A.   I've got -80 -- I go from -39 to -80.
24          Oh, wait a minute.  What the heck?
25          MR. IRVINE:  Tell you what let's do, Will.
0071
1           MR. MANUEL:  Yes, sir.
2           MR. IRVINE:  Let's take about a five- or
3   ten-minute break.  We've been going for a while.
4           MR. MANUEL:  Okay.
5           MR. IRVINE:  It sounds to me like maybe that
6   Exhibit -- Exhibit 5, maybe some of the Bates pages got
7   out of order somehow.
8           MR. MANUEL:  Yes, sir.
9           MR. IRVINE:  These should be sequential -1 to
10  -163.
11          MR. MANUEL:  Okay.  We'll check into it and
12  see if we're missing anything.
13          MR. IRVINE:  All right.  I'll be here.  Just
14  call me back.
15          MR. MANUEL:  Okay.  All right.  Bye.
16          THE VIDEOGRAPHER:  Stand by, please.
17          This concludes Video Recording No. 1 of
18  today's deposition on June 25, 2008.  The time is
19  10:49 a.m.
20          We're going off the video record.
21          (Recess.)
22          THE VIDEOGRAPHER:  This begins Videotape No. 2
23  of today's deposition of Robert B. Dooley on June 25,
24  2008.  The time is 11:02 a.m.
25          We are on the video record.
0072
1           Proceed, Counsel.
2   BY MR. IRVINE:
3           Q.   Mr. Dooley, before I get to those
4   documents that I asked you to find, I think I asked you
5   this.  Let me make sure.  Accredited requires there be
6   a title policy issued to it in connection with every
7   loan?
8           A.   Yes.
9           Q.   And Accredited requires that the mortgage
10  be recorded in connection with the closing of every
11  loan, doesn't it?
12          A.   Yes.
13          Q.   Okay.  Look at Document No. -78.
14          Did you find it?
15          A.   Yes.
16          Q.   And Document -79?
17          A.   Okay.
18          Q.   Document -80?
19          A.   Okay.
20          Q.   All of Exhibit 5 -- I guess -- you know,
21  because I'm not looking at the original documents, and
22  since I'm here in Alabama, I don't know how Accredited
23  keeps these documents.  Flip back to page -73 for me
```
Page 30

dooleyrobert062508.txt
```
24  real quick.
25         A.   Okay.
0073
 1         Q.   What is this document?
 2         A.   That's -- in the electronic imaging
 3  process of a file, this was generated for the -- as a
 4  tab for the insurance section.  It isn't a document
 5  that Accredited would do, but the electronic imaging
 6  process created this document.
 7         Q.   All right.  And so I guess the stuff that
 8  comes before -- some of the stuff that comes before
 9  this document appears to be related to insurance.
10         A.   Yes.
11         Q.   Is Accredited paperless?
12         A.   We try to be.
13         Q.   Is there an actual physical loan file for
14  Ms. Frazier?
15         A.   No longer, no.
16         Q.   So to get her loan file, you had to call
17  it up off of the electronic storage system?
18         A.   Yes, sir.
19         Q.   Can you tell me what you call that
20  system.
21         A.   Fastrieve, F-a-s-t-r-i-e-v-e.
22         Q.   I guess, is there a mainframe or a -- you
23  know, a blade server or something located somewhere
24  that's got all the Accredited loans deposited in it?
25         A.   Yes.  Everybody -- or most employees have
0074
 1  access to Fastrieve, and practically every loan that
 2  Accredited has originated has been copied over as an
 3  image to Fastrieve system.
 4         Q.   Okay.  Look down, if you will for me, the
 5  insurance -- what do you call that?  What do you
 6  call -- did you call it a -- not a header.  What did
 7  you call it?
 8         MR. MANUEL:  Tab.
 9  BY MR. IRVINE:
10         Q.   Tab.
11         A.   Looks like some sort of tab that was
12  created by Fastrieve to identify what is behind it.
13         Q.   Turn down to Document No. -83.
14         A.   Okay.
15         Q.   Is that another tab for the documents that
16  come above it?
17         A.   Yes.  It's a transmittal tab.
18         Q.   What does that mean?
19         A.   The documents we put in the transmittal
20  are some types of internal correspondence, audit
21  sheets, things of that nature.
22         Q.   They're not really transmitted -- are they
23  transmitted to anybody?
24         A.   Not necessarily.
25         Q.   Is there some reason they're called
0075
 1  "transmittal documents"?
 2         A.   Yeah, I don't know.  It's been -- that --
 3  when we had paper tabs or paper files, that transmittal
 4  tab section goes back at least nine years when I first
 5  started, so maybe in the old days things were
 6  transmitted back and forth, and it just retained that
 7  name, but I'm not positive.
 8         Q.   Okay.  Let me take you up to Document
```
Page 31

dooleyrobert062508.txt

```
 9    No. -74 real quick.
10         A.   Okay.
11         Q.   That document, is it headed "Closed Loan
12    Status"?
13         A.   Yes.
14         Q.   There's a large block with two smaller
15    blocks underneath it, and on the right it says, "For
16    Assistance Call."
17              Do you see that?
18         A.   Right.
19         Q.   Earlier I think I asked you about Kim
20    Stevenson and Kristopher Dillon, and I think you could
21    not remember what their functions were.
22         A.   Yes.
23         Q.   Does this refresh your recollection?
24         A.   Yes.
25         Q.   Can you tell me what their functions are.
0076
 1         A.   Well, as it says, Kim Stevenson was the
 2    loan specialist, and Kristopher Dillon was the account
 3    executive.
 4         Q.   What are the duties of a loan specialist
 5    with respect to the closing of a loan like Ms. Hall's?
 6         A.   Loan specialist is the -- also known as a
 7    loan processor, and the loan processor will coordinate
 8    with the borrower and closing agents and other people
 9    perhaps and -- in an attempt to acquire the
10    documentation to underwrite and then close the loan,
11    and essentially their job is to document and verify
12    information in the file.
13         Q.   All right.  How about the account
14    executive, what is his job?
15         A.   Account executive and retail, which is
16    what this is, is probably more of a -- called a loan
17    officer, but it defaults to account executive on this
18    form.  His job is to originate originally -- initially
19    interview the borrower and identify the loan product
20    that Accredited might have to best suit the consumer's
21    needs and do all the basic evaluation of the
22    information and then give it a preapproval or
23    disapproval.
24         Q.   Is Mrs. Stevenson the person who would
25    prepare the final TILA Disclosure?
0077
 1         A.   No.
 2         Q.   Who was that?  Do you know?
 3         A.   It would be one of the dockers or
 4    funders.
 5         Q.   Is their name going to be on it?  Let's --
 6         A.   It may not be on any of these documents.
 7    I don't know.
 8         Q.   Okay.
 9         A.   It would be in the loan origination
10    system.
11         Q.   Look at No. -78 for me.
12         A.   Okay.
13         Q.   What is this document?
14         A.   These -- this is a print screen from the
15    loan origination system, and I don't even know why it
16    was printed unless somebody wanted to look at
17    something.  Probably was -- somebody was looking at
18    impounds, but it's just a print screen from the
19    system.
```

Page 32

dooleyrobert062508.txt
```
20          Q.   Is this document lost?  I mean, was this
21    something that was printed contemporaneously?
22          A.   Yes.
23          Q.   I see down at the bottom left-hand corner
24    there's a date/time stamp on it, Thursday, March 24,
25    2005.  This isn't something that has been created out
0078
1     of the system, is it?
2          A.   This is a print screen -- print screen
3     from LOIS, and I couldn't tell you why it's even part
4     of the loan file.  It normally would not be.
5          Q.   Okay.  I saw -- your copy is probably as
6     hard to read as mine is.
7          A.   Mm-hmm.
8          Q.   But I see below the black line on what
9     looks like a -- you know, a pop-up screen that's got
10    the little minimized buttons on the right, there's a
11    black line.  There's what looks like a button that says
12    "High Cost."
13          A.   Okay.
14          Q.   First I guess, does it say "High Cost"?
15          A.   I'm looking for the actual words.  Are we
16    still looking at Document -78?
17          Q.   Yes, sir.
18          A.   I see the little black lines.  Are you --
19    where are you -- oh, "High Cost" tab.  More toward the
20    top, yes.
21          Q.   Yes, sir.
22          A.   Yes.
23          Q.   Can you tell me what that is.
24          A.   That's a systems test that calculates fees
25    that are input to the system on each particular loan.
0079
1     And each state, if it has specific high-cost testing,
2     is programmed to alert the processors and the dockers
3     and funders that they may or may not have exceeded the
4     high-cost testing allowance in a particular state.  It
5     also would do Federal testing as well.
6          Q.   Would that be the Section 32 Test?
7          A.   Yes.
8          Q.   All right.  This -- is this a screen print
9     of somebody doing a Section 32 Test?
10          A.   No.
11          Q.   No.  Do you know what this is a screen
12    print of?
13          A.   It's a screen print of these HUD lines,
14    828 through 1008.  As you can see, that -- where it
15    says "Fees For" -- it's kind of hard to read, as you
16    know.  Where it says "Fees For," it's got the loan
17    number "05031729" something "Hall."
18          Q.   Yes, sir.
19          A.   That's a print screen that's over a
20    bigger screen.  So for some reason or another somebody
21    opened that up and printed it, and I don't know -- I
22    don't know why they would do that unless they wanted to
23    maybe take it and show it to somebody and ask them a
24    question or something.
25          Q.   All right.  So -- but this is sort of a
0080
1     visual representation of the way the fees are loaded,
2     or input into the system, for lack of a better word?
3          A.   Yes, it is.  That's -- it's a piece of
4     it, yes.
```
                              Page 33

dooleyrobert062508.txt

```
 5            Q.   This one seems to stop -- let me put it
 6   this way.  There are only certain fees that are here on
 7   this screen.
 8            A.   That's right.  It's only a piece of the
 9   process.
10            Q.   Okay.  Is every fee loaded into LOIS?
11            A.   Well, yes.  That would be the procedure.
12            Q.   Okay.  Well, look over to the next sheet,
13   No. -79.
14            A.   Okay.
15            Q.   This is, I believe, entitled "Section 32
16   Calculation Summary."
17            A.   Yes.
18            Q.   And then underneath that block there's
19   something that says "Good Faith Estimate Summary."
20            A.   Yes.
21            Q.   And there are a number of fees over there
22   on the left.
23            A.   Yes.
24            Q.   But there are not all the fees shown on
25   the HUD listed there, are there?
0081
 1            A.   That's right.
 2            Q.   And out of the -- there's a space for the
 3   closing agent fee, but there's no space for the
 4   abstract or title search, the 1102, the 1103, the 1202
 5   fees.  There's no line for any of those fees.
 6            A.   That's correct.
 7            Q.   Is that because those fees are not loaded
 8   into the system in connection with the Section 32
 9   Test?
10            A.   That's correct.  By fee label, the fees
11   that you just talked about, the title, abstract, et
12   cetera, those are not defined by Section 32 to be part
13   of the Section 32 calculations.  So that's why they
14   don't appear here.
15            Q.   Is there any -- I don't know how to ask
16   it -- let me -- is there any place in LOIS where you
17   can load those fees in to do that calculation?
18            A.   All of those fees are loaded into LOIS.
19   If not, then they would never appear on the Good Faith
20   Estimate.
21            Q.   So all of the fees that we just talked
22   about, say Line 1102, 1103, 1108, 1111, all of those
23   fees are actually loaded into LOIS?
24            A.   Correct.
25            Q.   And -- but when somebody does the
0082
 1   Section 32 calculation, are they -- does the software
 2   give them a choice to include those fees or not?
 3            A.   No.
 4            Q.   So they don't include those fees in the
 5   Section 32 calculation.  There's no way to -- let me
 6   ask you:  Is it fair to say there's no way to include
 7   those fees in the computerized Section 32 calculation?
 8            A.   Which fee are you talking about?
 9            Q.   The 1102, 1103, 1108.
10            A.   No.
11            Q.   1201?
12            A.   1101 would be included, yes.
13            Q.   Yeah, I didn't say 1101.
14            A.   Okay.  1102 would not be included.
15            Q.   And my question was, is that because
```

Page 34

dooleyrobert062508.txt
16    there's no way in the LOIS software to include 1102,
17    1103, 1108?
18              A.   The way our system is programmed, that
19    would be correct.
20              Q.   And that's the same for every loan; is it
21    not?
22              A.   There might be some variations depending
23    on the state and depending on what a particular state
24    defines to be part of their high-cost test.
25              Q.   Do you know which states that might be?
0083
1              A.   There's -- as you may well know, there's
2    over 30 different high-cost states that have different
3    testings, so no, I wouldn't have the particulars of
4    it.
5              Q.   Is there another sort of, let me say,
6    screen print calculation sheet that's done for
7    different states?
8              A.   There would be if the state has a
9    high-cost test, state-specific.
10              Q.   Okay.  So -- and let me -- trick
11    question.  Go to -87, Document -87.
12              A.   Okay.
13              Q.   Right-hand column, right above "Texas
14    Supplement," there's a thing that says
15    "State-Specific."
16              A.   Yes.
17              Q.   And that indicates -- correct me if I read
18    it wrong -- "All required state-specific documents are
19    present and have been reviewed," right?
20              A.   Okay.
21              Q.   And that's because this is an Alabama
22    loan, and there's not one, right?
23              A.   I don't understand the question.
24              Q.   Well, there's a check mark here that
25    indicates "All required state-specific documents are
0084
1    present and have been reviewed," right?
2              A.   Yes.
3              Q.   And so that would tend to indicate that a
4    state-specific document is present and has been
5    reviewed.
6              A.   Yes.
7              Q.   Right?
8              A.   Yes.
9              Q.   But there's not any document that is
10    state-specific that's present here for an Alabama loan,
11    is there?
12              A.   Well, the requirement for the auditor in
13    this particular audit and at this point in the audit
14    would be to refer to another state summary-type
15    reference, and it would tell them if there were any
16    special documents we wanted -- that Accredited wanted
17    the borrower or the auditor to look for.
18              Q.   And am I understanding you to say that
19    the LOIS software would prompt --
20              A.   No.
21              Q.   No.
22              A.   We have a -- we have a paper document
23    that's called a "State Summary."
24              Q.   Yes, sir.
25              A.   And on that "State Summary" it tells loan
0085

Page 35

dooleyrobert062508.txt
```
 1   processors and the loan processing system people --
 2   that outline certain requirements in documents and
 3   things of that nature that Accredited considers to be
 4   very important, and they want to make sure that we
 5   comply with whatever those requirements are.
 6          Q.   Okay.  You didn't bring a copy of that
 7   with you today, did you?
 8          A.   I did not.
 9          Q.   Look at page -86.
10          A.   Okay.
11          Q.   Let me back up.  Look at page -86, but --
12   what is this document?
13          A.   Page -86?
14          Q.   Yes, sir.  -86 and -87.
15          A.   That's a checklist for auditing a
16   refinance closed -- closed loan documents.
17          Q.   And that's what Mrs. Hall's loan was.
18          A.   Okay.
19          Q.   Right?  I mean --
20          A.   Yes.  Yes, as I recall.
21          Q.   And is this document prepared in
22   connection with every loan?
23          A.   Yes.
24          Q.   When is it prepared?
25          A.   Well, these are actually -- at the time
0086
 1   that this loan funded that we're talking about, this
 2   was -- these refinance audit checklists were just
 3   pieces of paper that people already had copies of in
 4   blank.  And when the -- when the closed -- or signed
 5   documents came back to Accredited from the closing
 6   office or settlement office, the auditor would then get
 7   one of these checklists and then review the documents
 8   according to the checklist here.
 9          Q.   Okay.  Did that happen -- does that not
10   happen now?
11          A.   Yes, it does happen now.
12          Q.   Okay.  So I think my question was, when is
13   this prepared?
14          A.   After the loan closes.
15          Q.   That's what I thought.  I just didn't want
16   to suggest the answer to you.
17               At some point during the post-closing audit
18   process, this document is completed?
19          A.   Yes.
20          Q.   There's a lady who signed it, I believe
21   Rita Dickerson on the next page on page -87, and she's
22   listed in your response to Interrogatory No. 1.
23               Does this refresh your recollection about who
24   she is?
25          A.   Yes.  She would have been either a docker
0087
 1   or a funder or possibly both.
 2          Q.   Had she been the person to prepare the
 3   TILA Disclosure Form?
 4          A.   Possibly.
 5          Q.   Do you know who prepared the -- the
 6   Section 32 Form that we were looking at a minute ago,
 7   page -79?
 8          A.   Well, I don't think their name appears on
 9   this form, but one of the doc funders would be --
10   procedurally would do the final Section 32 calculation
11   summary.
```
Page 36

dooleyrobert062508.txt
```
12          Q.  All right.  And I don't want to -- this is
13  a two-page document, isn't it?  -79 and -80 are both
14  parts of the same document, or am I wrong about that?
15          A.  Yeah, it's a two-part document.  One of
16  them is specific to Section 32, and the other one is
17  specific to a state.  In this case, Alabama.
18          Q.  I see.
19          A.  Because, of course, they -- the
20  calculations might be different.
21          Q.  I see.  Okay.
22          I think I've asked this before, but let me
23  just make sure.  The Line 1102 charge of $200 is not
24  included in any respect in the Section 32 high-cost
25  loan analysis?
0088
1          A.  No, it is not.
2          Q.  The same is true in connection with
3  Mrs. Hall's loan for the charge shown on Line 1103 of
4  $250?
5          A.  What was that fee label?
6          Q.  "Title Examination," 1103.
7          A.  No, sir, it would not be included in the
8  Section 32 test.
9          Q.  The same is true of the $200 charge shown
10  on Line 1108, in any respect, in any part?
11          A.  And 1108 was what fee label?
12          Q.  "Title Insurance."
13          A.  No, it would not be included.
14          Q.  The same is true of the charge for $50
15  shown on Line 1111, which is labeled "Endorsements"?
16          A.  Correct.  Title endorsement would not be
17  included in the calculation.
18          Q.  No part of the recording fee shown in
19  Line 1201 would be included?
20          A.  Correct.
21          Q.  And that's true for every loan that
22  Accredited closes; is that fair?
23          A.  Well, it's true for Alabama, and I don't
24  know -- I can't recall any state that would require
25  those to be included in their high cost, but it's true
0089
1  for any Alabama loan.
2          Q.  And seeing as you can't recall a state
3  that would treat those -- would require those costs in
4  any part to be included?
5          A.  No, not right offhand.
6          Q.  Would it be fair to say that if those
7  charges were not bona fide, that they should be
8  included?
9          A.  Yes.
10          Q.  If you look on the Final Truth-in-Lending
11  Disclosure page statement, Document -31.
12          A.  Okay.  Hold on.  Okay.
13          Q.  Would it be fair to say that if some of
14  those charges were not bona fide and should have been
15  included in the Section 32 calculation, they also
16  should have included -- should have been included in
17  the calculation of the finance charge here on
18  Document -31?
19          MR. MANUEL:  Object to the form.
20          But you can answer.
21          THE WITNESS:  Can you restate the question,
22  sir.
```
                              Page 37

dooleyrobert062508.txt
```
23            MR. IRVINE:  You know, it's going to be hard
24  for me to do, so let me ask the court reporter to read
25  it back, if she can.
0090
1            (The record was read by the reporter.)
2            THE WITNESS:  If -- if a charge or a fee was
3  not bona fide and reasonable, yes, it should have been
4  included in the Truth-in-Lending Disclosure.
5  BY MR. IRVINE:
6       Q.   And that would be true with respect to
7  every loan closed by Swafford for Accredited.
8       A.   Yes.
9       Q.   And that would be true of every loan
10  closed by Lenders First Choice for Accredited.
11      A.   Yes.
12      Q.   And every settlement service provider for
13  Accredited?
14      A.   Yes.
15      Q.   If you hear me shuffling around, I'm
16  going through my notes, which is a good sign.
17           Did you know anything about the relationship
18  between Swafford and Hays and Accredited other than the
19  fact that Swafford and Hays closed loans?
20      A.   No, sir, I do not.
21      Q.   I'm looking at the documents that y'all
22  faxed over.
23      A.   Okay.
24           MR. IRVINE:  Let me go with mine and mark a
25  copy there of this document as Exhibit 8.
0091
1            MR. MANUEL:  Okay.
2            (Plaintiffs' Exhibit 8 was marked.)
3            THE WITNESS:  All right, sir.
4  BY MR. IRVINE:
5       Q.   Does Accredited normally have its closing
6  agents execute applications?
7       A.   I would say that's normally the procedure,
8  yes.
9       Q.   And then does this document form an
10  agreement with Accredited?
11           MR. MANUEL:  Object to the form.
12           But you can answer.
13           THE WITNESS:  You know, I don't -- I can't
14  answer that question.
15  BY MR. IRVINE:
16      Q.   Well, let me tell you.  The reason -- I'm
17  a little confused, because y'all faxed over two pages,
18  right?
19      A.   Yes.
20      Q.   The first page looks like the cover page
21  of an application, and the second page looks like the
22  signature page of an agreement.
23      A.   Yes.  I would agree.
24      Q.   And, in fact, the second page picks up
25  with a No. 6.
0092
1       A.   Mm-hmm.
2       Q.   And the first page leaves off with a
3  No. 3.
4       A.   Yes.  And -- I'm sorry.  Go ahead.
5       Q.   Do you think it's reasonable to believe
6  that there is actually an agreement between Accredited
7  and Swafford, and we only have the last page of it?
```
Page 38

dooleyrobert062508.txt
```
 8          A.   Yeah, that's a reasonable thought.
 9          MR. MANUEL:  That we have the last page of
10    whatever that document is?
11          THE WITNESS:  And I think what might have
12    happened here was, when these -- when these documents
13    were uploaded to the imaging system, these were
14    transferred over from a paper file to -- and then
15    uploaded when we got the imaging system, and perhaps
16    something went wrong there.
17    BY MR. IRVINE:
18          Q.   Yeah.
19          A.   But I can -- I can check to make sure
20    that -- but yeah, obviously, there's -- the pages don't
21    match up.
22          Q.   Yeah.  Would it -- did Accredited -- was
23    it Accredited's policy to obtain contracts with the
24    settlement service providers it was going to use?
25          A.   No, I don't -- I don't -- to my knowledge,
0093
 1    we did not have any contracts with settlement service
 2    providers.
 3          Q.   All right.  Maybe I should call them
 4    "Approved Closing Agent Agreements."
 5          Did Accredited typically obtain approved
 6    closing agent agreements with the settlement service
 7    providers it was going to utilize to close loans?
 8          A.   We had a department that managed that.
 9    It's called Broker Services Administration, and they
10    would probably be the ones to have to answer that
11    question.
12          Q.   Okay.  And -- so you don't know if like,
13    for instance, there ought to be one of these approved
14    closing agent agreements between Accredited and LLC or
15    Accredited and ATM or other settlement service
16    providers that Accredited used?
17          A.   I can tell you that I have seen the
18    applications and the agreements with other settlement
19    offices.  Whether or not it was the mandatory
20    requirement that a broker services admin obtain one, I
21    don't know the answer to that.
22          Q.   It looks like it's fair to say that
23    Accredited had one with Swafford, though, wouldn't you
24    say?
25          A.   Well, we got page 2.
0094
 1          Q.   Or page whatever it is.
 2          A.   Yeah.  The signed page, signature page.
 3          Q.   And we know that at least the -- the
 4    contract we're looking at here that's executed by
 5    Swafford requires Swafford to close the mortgage loan
 6    in compliance with all applicable laws and
 7    regulations.
 8          MR. MANUEL:  Object to the form.
 9          But you can answer.
10          THE WITNESS:  That's what the Closing Agent
11    Agreement says, yes, sir.
12    BY MR. IRVINE:
13          Q.   And it requires Swafford to maintain E&O
14    coverage not less than $1,000 in a form issued by
15    carrier acceptable to Accredited.
16          A.   Mine says $1 million.
17          Q.   Yes, sir.  What did I say?
18          A.   A thousand.
```
                              Page 39

dooleyrobert062508.txt
```
19          Q.  Oh, I'm sorry.  One million.
20          A.  All right.  Yes, sir.  One million,
21    that's correct.
22          Q.  It's fair to say that, as a matter of
23    course, in connection with virtually all of the loan
24    closings that it had, that Accredited selected the
25    settlement service provider?
0095
 1          A.  Yes.
 2          Q.  Do you know of any communication --
 3    specifically, do you know of any communication between
 4    Swafford and Hays and Accredited on any of the loans
 5    that it closed with regard to the fees that were going
 6    to be charged?
 7          A.  No, sir, I do not know of any
 8    communication like that.
 9          Q.  Does Accredited use e-mail?
10          A.  Yes.
11          Q.  Would it be unusual for Accredited's loan
12    closers, processors, dockers, to communicate with
13    Swafford by e-mail?
14          A.  I don't know.
15          Q.  Do you know if there was any
16    communication with Swafford with respect to proper
17    charging of fees in the context of RESPA or TILA?
18          A.  Well, our closing instructions would
19    require that, but --
20          Q.  Yes, sir.
21          A.  -- if you're talking about any other
22    communication that may have occurred in verbal or
23    e-mail communication, I don't know.
24          Q.  I'm specifically talking about e-mail.  Do
25    you know if Accredited's e-mail is archived?
0096
 1          A.  It is.
 2          Q.  Does it go all the way back to 2005?
 3          A.  I'd have to confirm -- check with IT on
 4    that.
 5          Q.  Has anyone done any sort of a search of
 6    the e-mail of Accredited for any communications by and
 7    between Accredited and Swafford?
 8          MR. MANUEL:  I'm going to object to the extent
 9    that you're seeking any attorney-client privilege or
10    work product, but --
11    BY MR. IRVINE:
12          Q.  I think with those objections made, you
13    can answer the question.
14          MR. MANUEL:  If he individually has done any
15    searches?
16          MR. IRVINE:  Sure.
17          Q.  I think I said "Accredited."  Did I say
18    "Accredited" or --
19          MR. MANUEL:  You said "Accredited."
20    BY MR. IRVINE:
21          Q.  I meant "Accredited."  I'm not asking if
22    your lawyer has been over there looking for stuff.
23          MR. MANUEL:  So you're asking if he has.
24          MR. IRVINE:  Yes.
25          MR. MANUEL:  You can answer that.
0097
 1          THE WITNESS:  I have not done any electronic
 2    discovery on this particular case related to the
 3    e-mail, no, sir.
```
                          Page 40

dooleyrobert062508.txt
```
 4   BY MR. IRVINE:
 5           Q.   Okay.  Is it fair to say that the fees
 6   listed on Lines 1102, 1103, 1108, 1111 and 1201 of the
 7   HUD are typically set by the settlement service
 8   provider in connection with closings of loans for
 9   Accredited?
10           A.   Yes.
11           Q.   Is it fair to say that those fees are
12   typically not included in the finance charge?
13           A.   Yes.
14           Q.   Is it fair to say that those fees
15   typically are not examined to determine whether they
16   are bona fide fees?
17           A.   Yes.
18           Q.   I think I lost one of my own exhibits
19   that my notes tell me to go look at.  I'm trying to
20   find it.
21           Do you know if anybody at Accredited has ever
22   done a manual check of the TILA calculations?  TILA
23   Disclosure calculations?
24           A.   Yes.  The Quality Control Department
25   sometimes does.
0098
 1           Q.   Before or after the loans close?
 2           A.   After.
 3           Q.   Do you know if there's ever a manual
 4   calculation done of the TILA Disclosure before the
 5   loans close?
 6           A.   No, there is not.
 7           Q.   Is there any system in place at Accredited
 8   to correct a fee that's listed on the HUD as one of
 9   Swafford's fees if it's wrong?
10           A.   You mean after a loan closing?
11           Q.   No.  Before.  Oh, did you say "add"?  I
12   thought you said "after."
13           A.   Yes, I did.  That's why I'm asking.
14           Q.   No.  If there's -- if a fee is wrong, you
15   know, there's a transposition of a number or it's just
16   wrong for some reason, is there any system in place to
17   catch and correct that there at Accredited?
18           A.   Yes.
19           Q.   What is that?
20           A.   Well, prior to sending the documents over
21   for the -- preparing the final closing documents and
22   after we've received an advance HUD to check,
23   everything is checked on the system.  If something is
24   not correct, then it could be caught then, and then it
25   would be corrected, yes.
0099
 1           Q.   When you say everything is checked on the
 2   system, do you mean the Accredited system?
 3           A.   Yes, LOIS.  Mm-hmm.
 4           Q.   Okay.  But like, for instance, if -- if
 5   Swafford made a mistake and said, you know, that
 6   there -- that closing fees -- let's say the title --
 7   title examination fee, instead of it being $250, they
 8   transposed the number, and it was $520.  Is there any
 9   system in place at Accredited to catch that error?
10           A.   Yes.  There's an audit process before
11   final documents are drawn.
12           Q.   Okay.  And is there a piece of paper in
13   the -- in the Exhibit 5 that reflects that audit
14   process?
```
                        Page 41

dooleyrobert062508.txt
```
15          A.   Yes.  There's one in there somewhere, but
16  it -- I'm not sure that it shows the title-type fees.
17  I'm looking for it here.
18          Q.   Take your time.
19          A.   Yeah, Document -84, Bates No. -84.
20          Q.   Yeah.
21          A.   Yeah.  At this point, LOIS is checked for
22  accuracy, right before everything from the borrower's
23  name and address and all those sorts of things, the
24  loan terms and certain fees.  The title-type fees would
25  not be indicated on this -- on this sheet.
0100
 1          Q.   The only fees that are checked for
 2  accuracy are the fees that are the lender fees?
 3          A.   Yeah, the fees that the lender would
 4  normally consider to be TILA or Federal or State
 5  applicable to Federal or high-cost State testing.
 6          Q.   So there's no system to catch an error in
 7  a settlement service agent fee?
 8          A.   Not on an official audit, no.
 9          Q.   It's sort of a qualification.  So does
10  that mean that there is one somewhere?
11          A.   Not on a check sheet, no.
12          Q.   Does that mean that there is one
13  somewhere?
14          A.   Well, if I were reviewing a loan, sir, I
15  would check them.  Whether or not this auditor did, I
16  don't know.
17          Q.   Okay.  There's no written policy that
18  provides for that, is there?
19          A.   To check -- to verify the accuracy of the
20  title fees?
21          Q.   Correct.
22          A.   Other than to a broad process to -- of
23  recognizing whether they're bona fide and reasonable in
24  price, no.
25          Q.   And that's the policy that you say that's
0101
 1  taught based on the classwork, but there's not a
 2  written policy about that.
 3          A.   I don't believe so, no.
 4          Q.   On Exhibit No. 4, if you look at that real
 5  quick, please.
 6          A.   Okay.
 7          Q.   Down at the bottom there's a name that's
 8  not listed in the answer to Interrogatory No. 1,
 9  "Audrey Williams."
10          MR. MANUEL:  You mean Bates No. -4 or Exhibit
11  No. 4?
12          MR. IRVINE:  Exhibit No. 4.
13          THE WITNESS:  Oh, okay.  Hold on.
14  BY MR. IRVINE:
15          Q.   It's a letter on Bradley Arant
16  letterhead.
17          A.   Okay.  I have it here.
18          Q.   Down at the bottom there's a name listed,
19  "Audrey Williams."
20          A.   Okay.
21          Q.   And that person is not listed on Exhibit 6
22  in the answer to Interrogatory No. 1, and so I was
23  wondering who that person is.
24          A.   I'll find -- maybe I can tell here real
25  quick.  Let me just look at some of these documents.
```

dooleyrobert062508.txt

0102
```
 1          Q.   Take your time.
 2          A.   She might be the review appraiser.  Yeah,
 3    Audrey Williams was Accredited's review appraiser.
 4          Q.   Did Accredited always review appraisals
 5    done by third parties in connection with its loans?
 6          A.   Yes.
 7          Q.   So there's always a charge of -- it shows
 8    up on the HUD for appraisal review fee?
 9          A.   If the State allows it, yes.
10          Q.   And do you know what that lady does for
11    that $250 appraisal review fee?
12          A.   She reviews the appraisal that the third
13    party did to verify that the market value of the
14    property is what the appraisal says it is.  It's a
15    fraud prevention review, and they check other sites
16    and -- it's kind of an elaborate review, yes.
17          Q.   All right.  I was just curious about
18    that.
19          MR. IRVINE:  I think that I am finished.
20          THE WITNESS:  Okay.
21          MR. IRVINE:  Let me -- before I actually quit,
22    let me say that I'd like to go on -- I know that I have
23    not used or talked about a couple of these exhibits,
24    but I don't know what I attached.  Let me just attach
25    them all to the deposition.
```
0103
```
 1          MR. MANUEL:  No problem.
 2          (Plaintiff's Exhibits 2 through 7 were
 3    marked.)
 4          MR. IRVINE:  And I don't think I need -- let
 5    me -- why don't we take -- if you don't mind, let me
 6    have about five minutes or so --
 7          MR. MANUEL:  Five seconds or minutes?
 8          MR. IRVINE:  Do what now?
 9          MR. MANUEL:  Five seconds or minutes?  I
10    didn't hear what you said.
11          MR. IRVINE:  About five minutes.  Let me -- I
12    know that I did not go through the notice in its
13    entirety, but I think that I probably don't need to do
14    that.
15          MR. MANUEL:  Okay.
16          MR. IRVINE:  So let me have about five
17    minutes, and y'all call me back, and I think I'll be
18    done.
19          MR. MANUEL:  All right.  Thanks.
20          THE VIDEOGRAPHER:  Stand by, please.  The time
21    is 11:57 a.m.
22          We're going off the video record.
23          (Recess.)
24          THE VIDEOGRAPHER:  The time is 12:03 p.m.
25          We are on the video record.
```
0104
```
 1    BY MR. IRVINE:
 2          Q.   Mr. Dooley, you testified earlier, I
 3    think, that you had seen Exhibit No. 1, which was the
 4    amended notice of taking this deposition.
 5          A.   Yes, I have.
 6          Q.   Did you see this -- the request on the
 7    second to the last page that you bring with you today
 8    four different categories of documents?
 9          A.   Yes, I see it.
10          Q.   Did you bring with you today any and all
```
Page 43

dooleyrobert062508.txt
```
11  references, manuals and other writings, whether in
12  paper or electronic format, regarding compliance with
13  Federal law regulating consumer mortgage lending?
14          A.   There's nothing for me to bring.  The --
15  everything is programmed into the system to ensure that
16  the processors and funders comply with the laws.
17          Q.   Didn't you tell me earlier that there's
18  some sort of training program, training manuals or
19  training documents that --
20          A.   Not -- not when this loan funded, no,
21  sir.
22          Q.   Not when this loan funded?
23          A.   Right.
24          Q.   When did all that training
25  documentation --
0105
1          A.   Second quarter '05.  There was a training
2  course developed for Truth in Lending.
3          Q.   And you didn't bring any of those
4  documents?
5          A.   No, sir.
6          Q.   You don't see any sort of limitation in
7  this to documents in existence back in the first
8  quarter of '05, do you?
9          A.   Say that again.
10          MR. MANUEL:  Let me -- I'll object to the
11  question.  The notice speaks for itself, and he's
12  testified that he didn't bring anything today besides
13  Exhibit 8, and we mentioned the spreadsheet that we
14  want to discuss off the record.  I mean we can -- but
15  he didn't bring anything else besides Exhibit 8.
16          MR. IRVINE:  All right.
17          Q.   And so you also didn't bring anything that
18  fit the description in No. 2, did you?
19          A.   No.
20          Q.   And such documents do exist, don't they?
21          A.   When this -- when the --
22          MR. MANUEL:  I'm going to object to the form
23  of the question.  But he's testified as to what the
24  training materials were and when they were developed,
25  and pursuant to that time limitation, you know, we
0106
1  brought what we thought was relevant to what was in the
2  notice.  And as far as any written materials, I think
3  he's testified as to written materials.
4          MR. IRVINE:  So I guess I need him to answer.
5          MR. MANUEL:  Okay.
6  BY MR. IRVINE:
7          Q.   That these references, manuals or other
8  writings as listed in No. 2, they do exist, don't
9  they?
10          A.   At the time this loan funded, no, they did
11  not.
12          Q.   And they do exist now?
13          A.   No, they do not.
14          Q.   Okay.
15          A.   Other than the fact that the loan
16  origination system is programmed to make sure that the
17  loan processors and dockers and funders make sure -- it
18  does the calculations for them, so there's not a whole
19  lot of school-type training.  I will correct myself.
20  There is -- there has been an online school
21  corporate-developed course in Truth in Lending that's
```
Page 44

dooleyrobert062508.txt

```
22   available today that was not available when this loan
23   funded.
24             Q.   And that's the thing that became available
25   in the second quarter of '05?
0107
 1             A.   Yes, sir.  I believe that's the time
 2   frame, yes.
 3             Q.   All right.  No. 3, you did bring with you
 4   what you could find?
 5             A.   Yes.
 6             Q.   And No. 4, you didn't bring anything
 7   related to No. 4, but I guess -- let me ask it this
 8   way:  Is there anything in -- that relates to the
 9   request made of you by No. 4 that is different or in
10   addition to Exhibit No. 5?
11             A.   No.
12             Q.   To your knowledge, has Accredited ever
13   closed a loan using a settlement service provider
14   selected by the borrower?
15             A.   Yes.
16             Q.   Has that happened on many occasions or
17   only occasionally?
18             A.   I -- it would not have happened in the
19   majority of cases, but I don't know how to define
20   "many."  We've funded over a million loans since I've
21   been here, so I don't know what "many" is.
22             MR. IRVINE:   Okay.  Thank you very much.
23             THE WITNESS:   Mm-hmm.
24             MR. MANUEL:   Thanks, George.
25             MR. IRVINE:   Yes, sir.  I will call you.  I
0108
 1   need to talk to you anyway -- tomorrow sometime.
 2             MR. MANUEL:   Let's go off the record first.
 3             MR. IRVINE:   I'm sorry.  Off the record.
 4             THE VIDEOGRAPHER:   Stand by, please.
 5             This concludes today's video deposition of
 6   Robert B. Dooley on June 25, 2008.  The total number of
 7   recordings made was two.
 8             We're now off the record at 12:10 p.m.
 9             (Discussion held off the record.)
10             MR. MANUEL:   George, is it fair to say that
11   in the conduct of this deposition, that we agreed to
12   the usual stipulations?
13             MR. IRVINE:   This was my agreement.
14                              - - -
15             (The deposition was concluded at 12:11 p.m.)
16
17
18
19
20
21
22
23
24
25
0109
 1
 2             Declaration Under Penalty of Perjury
 3
 4
 5             I, ROBERT B. DOOLEY, the witness herein,
 6   declare under penalty of perjury that I have read the
                              Page 45
```

```
                        dooleyrobert062508.txt
 7  foregoing in its entirety; and that the testimony
 8  contained therein, as corrected by me, is a true and
 9  accurate transcription of my testimony elicited at
10  said time and place.
11
12          Executed this ____ day of _____ 2008, at
13  _____, _____.
14          (city)                    (state)
15
16
17          _____
18          ROBERT B. DOOLEY
19
20
21
22
23
24
25
0110
 1              REPORTER'S CERTIFICATION
 2
 3          I, Debbie L. Bloom, Certified
 4  Shorthand Reporter, in and for the State of
 5  California, Certificate No. 7731, do hereby certify:
 6
 7          That the witness named in the foregoing
 8  deposition was, before the commencement of the
 9  deposition, duly administered an oath in accordance
10  with the Code of Civil Procedure Section 2094; that the
11  testimony and proceedings were reported
12  stenographically by me and later transcribed into
13  typewriting under my direction; that the foregoing is a
14  true record of the testimony and proceedings taken at
15  that time.
16
17          IN WITNESS WHEREOF, I have subscribed my name
18  this _____ day of _____, 2008.
19
20
21          _____
22          Debbie L. Bloom, CSR No. 7731
23
24
25
```

diazalma050608.txt

```
0001
 1              IN THE U.S. DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF ALABAMA
 3                  SOUTHERN DIVISION
 4
 5   JONATHAN AND SHARRON EDWARDS,
     individually and on behalf of
 6   all similarly situated
 7   individuals,
 8
 9                   Plaintiffs,
10
11      vs.                         Case No.: 1:07-CV-00160-KD-C
12
13   ACCREDITED HOME LENDERS,
     INC., LENDER'S FIRST CHOICE
14   AGENCY, INC.; LENDER'S FIRST
     CHOICE AGENCY OF ALABAMA,
15   INC.,
16
17                   Defendants.
18   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
19
20            VIDEOTAPED DEPOSITION OF
                  ALMA LUZ DIAZ
21
                   May 6, 2008
22                  9:10 a.m.
23         600 West Broadway, Suite 2600
                San Diego, California
24
25      Reported by Elana Zucconi - CSR, RPR, CRR
0002
 1                APPEARANCES OF COUNSEL
 2
 3   FOR PLAINTIFFS:
 4        LAW OFFICES OF EARL P. UNDERWOOD, JR.
 5        EARL P. UNDERWOOD, JR., ESQ.  (Telephonically)
 6        21 South Section Street
 7        Fairhope, Alabama  36533
 8        (251) 990-5558  FAX (251) 990-0626
 9        Email:  Epunderwood@alalaw.com
10
11   FOR ACCREDITED HOME LENDERS, INC.:
12        BUCKLEY KOLAR
13        KIRK D. JENSEN, ESQ.
14        MATTHEW P. PREVIN, ESQ.
15        1250 24th Street, NW
16        Suite 700
          Washington, DC  20037
17        (202) 349-8048  FAX (202) 349-8080
          Email:  Kjensen@buckleykolar.com
18        Email:  Mprevin@buckleykolar.com
19
20   FOR ACCREDITED HOME LENDERS, INC.:
21        BRADLEY, ARANT, ROSE & WHITE
          J. DOUGLAS MINOR, JR., ESQ.
22        188 East Capitol Street
          Suite 450
23        Jackson, Mississippi  39215
          (601) 948-8000  FAX (601) 948-3000
24        Email:  Dminor@bradleyarant.com
25
```

Page 1

diazalma050608.txt

```
0003
 1              APPEARANCES OF COUNSEL (CONTINUED)
 2
 3     FOR LENDER'S FIRST CHOICE AGENCY, INC. AND
 4    LENDER'S FIRST CHOICE AGENCY OF ALABAMA, INC.:
 5         JENNIFER BLAIR HOOVER BALCH & BRINGHAM
 6         KELLY BRENNAN, ESQ.   (Telephonically)
 7         1710 Sixth Avenue North
 8         Birmingham, Alabama  35201
 9         (202) 251-8100
10
11
12    VIDEO OPERATOR:   DANA BACHMANN
13
14
15
16
17
18
19
20
21
22
23
24
25
0004
 1                       I N D E X
 2
 3    WITNESS:   ALMA LUZ DIAZ
 4
 5    EXAMINATION                               PAGE
 6    BY MR. UNDERWOOD                            7
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0005
 1                   INDEX OF EXHIBITS
 2    EXHIBITS                               MARKED
 3
 4       1     Re-Notice of Taking Rule 30(b)(6)     6
 5             Video Deposition
 6       2     Amended Class Action Complaint        6
 7       3     Defendant, Accredited Home Lenders,   6
 8             Inc.'s Answer to Amended Class Action
 9             Complaint
10       4     Defendant, Accredited Home Lenders,   6
                       Page 2
```

diazalma050608.txt

```
11          Inc.'s Responses to Plaintiffs' First
12          Set of Interrogatories and Request for
13          Production of Documents
14    5     Defendant Accredited HomeLenders,          6
15          Inc.'s Initial Disclosures
16    6     Loan documents                             6
17    7     Second Amended Class Action Complaint      6
18    8     Defendant Accredited Home Lenders,         6
19          Inc.'s Responses to Plaintiffs' Second
20          Set of Interrogatories and Request for
21          Production of Documents
22    9     Settlement Statement                       6
23
24
25
```

```
0006
 1          SAN DIEGO, CALIFORNIA; May 6, 2008; 9:10 A.M.
 2
 3          (Exhibits 1 through 9 marked)
 4
 5          VIDEO OPERATOR:  Good morning.  My name is Dana
 6    Bachmann, with Paulson Litigation and Reporting
 7    Services, located at 555 West Beech Street, Suite 111,
 8    San Diego, California 92101.  This is the deposition of
 9    Alma L. Diaz, in the matter of Jonathan and Sharron
10    Edwards versus Accredited Home Lenders, Incorporated, et
11    al., case No. 07160.  This deposition is taking place at
12    600 West Broadway, Suite 2600, San Diego, California
13    92101.  This deposition is being videotaped and
14    audiotaped at all times, unless specified to go off the
15    record.  We are now commencing at 9:10 a.m., on May 6th,
16    2008.
17          Would all present please identify themselves,
18    beginning with the witness.
19          THE WITNESS:  Alma L. Diaz.
20          VIDEO OPERATOR:  Counsel.
21          MR. JENSEN:  Kirk Jensen, with Buckley Kolar,
22    representing defendant Accredited Home Lenders.
23          MR. PREVIN:  Matthew Previn, also from Buckley
24    Kolar, on behalf of Accredited.
25          MR. MINOR:  Doug Minor, with Bradley, Arant,
0007
 1    Rose & White, on behalf of Accredited.
 2          VIDEO OPERATOR:  Counsel telephonically.
 3          MR. UNDERWOOD:  Earl Underwood, on behalf of
 4    the plaintiffs, Jonathan and Sharron Edwards.
 5          MS. BRENNAN:  And Kelly Brennan, on behalf of
 6    Lender's First Choice.
 7          VIDEO OPERATOR:  Thank you.  Madame Court
 8    Reporter, would you please swear in the witness.
 9
10                    ALMA LUZ DIAZ,
11    having been first duly sworn, testified as follows:
12
13                    EXAMINATION
14    BY MR. UNDERWOOD:
15      Q.   All right.  If you would, please, ma'am, just
16    state your name for the record.  Hello?
17      A.   Alma Luz Diaz.
18      Q.   Okay.  Can you hear me okay?
19      A.   Yes, I can.
20      Q.   Let me know if you can't.
21           Have you given a deposition before?
```

diazalma050608.txt
```
22      A.   No, I haven't.
23      Q.   All right.  Well, I am going to be asking some
24 questions, and of course I got the Southern draw and the
25 Southern accent in the mike that you may not be
0008
1  accustomed to, and I have been doing this for 20 years,
2  but sometimes I am not very good at asking a question.
3  I may ask you a question that doesn't make sense or you
4  may just not understand my question.  And if I do that,
5  if you would just ask me to repeat or restate the
6  question, and I will be happy to do that.  Now, on the
7  other hand, if you don't do that, I'm going to assume
8  that you understood the question and that you are
9  answering truthfully.  Is that fair?
10      A.   Yes.
11      Q.   Okay.  All right.  Now, do you understand that
12 you are appearing this morning as the corporate
13 representative of Accredited Home Lenders, Inc.?
14      A.   Yes, I do.
15      Q.   All right.  And -- all right.  Well, I am going
16 to start off by asking you just a few questions about
17 your job with Accredited and about your employment
18 history, and if you would just give us your full name
19 and home address again.
20      A.   Okay.  My full name is Alma Luz Diaz.  My home
21 address?
22      Q.   Yes, ma'am.
23      A.   Is 7500 Glencliff Drive, Downey, California
24 90240.
25      Q.   All right.  And Ms. Diaz, how long have you
0009
1  been employed by Accredited Home Lenders?
2       A.   Next month will be seven years.
3       Q.   All right.  And before going to work for
4  Accredited, what did you do?
5       A.   I worked for a credit union, as a teller.
6       Q.   All right.  What credit union was that, please,
7  ma'am?
8       A.   MWD.
9       Q.   NWD?
10      A.   MWD.
11      Q.   And where was that located?
12      A.   Downtown Los Angeles.
13      Q.   All right.  And how long did you work there?
14      A.   Four years.
15      Q.   And where did you work before MWD?
16      A.   I worked for a company called MoneyGram.  Um, I
17 worked there for two years.  It was in the City of
18 Huntington Park, and I was a cashier as well.
19      Q.   Four years?
20      A.   Two years there.
21      Q.   Two years.  Okay.
22      A.   Um-hum.
23      Q.   All right.  And before that?
24      A.   I think that's it.
25      Q.   All right.  And tell me about your schooling.
0010
1       A.   Okay.
2       Q.   Where did you go to high school?
3       A.   I went to Francisco Bravo Medical Magnet
4  School, in downtown Los Angeles.
5       Q.   All right.  And did you finish there?
6       A.   Yes.
```
                        Page 4

diazalma050608.txt
```
 7      Q.   When was that, please, ma'am?
 8      A.   Um, 2004.
 9      Q.   All right.
10      A.   I'm sorry, I mean, 1994.
11      Q.   1994.  Okay.
12      A.   Yeah.
13      Q.   All right.  And what did you do after finishing
14  school there in Los Angeles?
15      A.   I went for three years to UCLA.
16      Q.   And what did you study there?
17      A.   Just undergraduate work.  I didn't complete the
18  course.
19      Q.   And was your last year there 1987?
20      A.   Yes.
21      Q.   And what did you do in 1987?
22      A.   I worked.
23      Q.   All right.  And is that when you went to work
24  at --
25      A.   I worked at the school, actually.
0011
 1      Q.   Okay.
 2      A.   And probably a couple of months in a theater,
 3  before I went to MoneyGram.
 4      Q.   Okay.  What did you do at the school?
 5      A.   I worked at the dorms, for the -- the
 6  cafeteria.
 7      Q.   Okay.  All right.  And tell me -- I know you
 8  told me you were a cashier at MoneyGram, tell me, what
 9  does MoneyGram do, and describe your duties at
10  MoneyGram?
11      A.   It is a check cashing place and we just -- we
12  received -- people will come in and cash their checks
13  there.
14      Q.   All right.  And was it your job to cash the
15  checks for them and you take the checks in and give them
16  the cash, is that what -- just describe what you did at
17  MoneyGram.
18      A.   Okay.  Um, we would -- when a person first
19  started there -- I mean, the first time a customer would
20  come in, we would verify their employment.  We will call
21  their employer and make sure that they worked there.  We
22  looked at the check to make sure that it looked valid.
23  We called the bank to verify funds.  Once everything was
24  verified, we will go ahead and cash the check and give
25  the money to the borrower -- I mean, to the -- to the
0012
 1  customer.
 2      Q.   Okay.  All right.  And what was the reason for
 3  leaving MoneyGram?
 4      A.   I had a better opportunity with MWD.  I wanted
 5  to move up.
 6      Q.   Okay.  And tell me what you did at -- is that
 7  MWD?
 8      A.   Yes, Metropolitan Water District for short.
 9      Q.   Okay.  Tell me what you did when you first
10  started at MWD.
11      A.   I was a teller.
12      Q.   And if you would just describe that -- that
13  position for me, what your duties were.
14      A.   Well, same thing.  We would -- our customers
15  would come in and cash their checks as well, and make
16  deposits.  Make deposits and withdraws.  They would --
17  just did banking stuff.
```
                              Page 5

diazalma050608.txt
```
18       Q.   All right.  And was that -- did you hold the
19  same position the whole time you were there?
20       A.   Yes.
21       Q.   And what was the reason for leaving MWD?
22       A.   I was given the opportunity to go to the
23  mortgage industry, which was --
24       Q.   All right.  And is that when you went to work
25  for Accredited --
0013
1        A.   Yes.
2        Q.   -- or did you go to work for someone else?
3             And what Accredited office did you work at?
4        A.   I worked in the Anaheim office.  It was a
5   retail processing center.
6        Q.   And what was your job title when you went to
7   work for Accredited?
8        A.   Senior loan specialist.
9        Q.   All right.  That was your entry -- your entry
10  job title?
11       A.   Yes.
12       Q.   All right.  And tell me what you did as a
13  senior loan specialist when you first started working
14  for Accredited.
15       A.   Our duties there were to take a file from the
16  underwriting team -- um, the loan was approved by then
17  and it had conditions.  I would then coordinate with the
18  branch processor to get these conditions and satisfy
19  them.  Once everything was satisfied, it was moved on to
20  a doc and funding department.
21       Q.   And how long did you have that position?
22       A.   For 2-1/2 years.
23       Q.   2-1/2?
24       A.   Yes.
25       Q.   And what was your next position at Accredited?
0014
1        A.   As an ops manager, I was in charge of the
2   senior loan specialists, and that was in the middle of
3   2003.
4        Q.   All right.  Were you still at the Anaheim
5   office?
6        A.   Yes.
7        Q.   And describe your -- if you would, your duties
8   as office manager in 2003.
9        A.   I was just in charge of the senior loan
10  specialist, to make sure that they were completing the
11  work correctly.  If they had any questions, they would
12  come to me.  I was a branch manager, so if processors
13  had any concerns or questions, they would call me as
14  well.  I was just basic support for everybody, both
15  my --
16       Q.   Okay.  Back in 2003, how many people did you
17  supervise?
18       A.   It was about four or five.
19       Q.   And did you continue to review loan files
20  yourself?
21       A.   When needed to, yes.
22       Q.   All right.  And how long did you have that
23  position as office manager, like you described for me?
24       A.   That was until February of 2004.  So it was
25  about six, seven months.
0015
1        Q.   What did -- did you get a new position in
2   February of 2004?
```
                            Page 6

diazalma050608.txt
```
 3      A.    Yes, I became --
 4      Q.    What was that, please?
 5      A.    I became the doc funding manager.
 6      Q.    Okay.  Would you say that again for me though,
 7  you became what?
 8      A.    Doc funding manager.
 9      Q.    Doc funding manager?
10      A.    Yes.
11      Q.    And what did you do as the doc funding manager?
12      A.    I had about five people underneath me who drew
13  docs, closing documents, and did the post-closing once
14  the documents were executed, and we funded the loans.
15  And I supervised them, and if they had any questions,
16  they would come to me.  And any problems, people would
17  come to me as well.
18      Q.    Okay.  Now, let me ask you to say that one more
19  time.  You said you had five people under you, working
20  under you, who did what?
21      A.    Who draw docs, documents, closing documents.
22      Q.    Who drew them?
23      A.    Yes.
24      Q.    What do you mean by that?
25      A.    Um, well, um, after a loan has been given to
0016
 1  our department from the underwriting team, the documents
 2  for the closing, the loan documents, were prepared by my
 3  group, and they were sent to title companies.
 4      Q.    Okay.  Now, when you say "title companies," do
 5  you mean the companies that would close the loans,
 6  something like Lender's First Choice, for example?
 7      A.    Correct.
 8      Q.    Okay.  And how long did you have that job as
 9  doc funding manager?
10      A.    To the present.
11      Q.    Is that presently your job title with
12  Accredited?
13      A.    Yes.
14      Q.    And are you still in the Anaheim office?
15      A.    I am currently in the Orange office.  It's just
16  five minutes away.
17      Q.    And how long have you been at the Orange
18  office?
19      A.    Since August of 2007.
20      Q.    All right.  Now, let me ask you this -- well,
21  let's see, before I get into that, did you have any
22  training with regard to lending laws or regulations when
23  you worked for MoneyGram?
24      A.    No.
25      Q.    All right.  Did --
0017
 1      A.    Well, we had just training on -- on basic money
 2  transactions.
 3      Q.    Okay.
 4      A.    As --
 5      Q.    Would you describe that for me, what you mean
 6  by that, describe that for me.
 7      A.    Well, just recognizing checks and recognizing a
 8  fraudulent check.  Just basic training --
 9      Q.    Okay.
10      A.    -- dealing with the cash.
11      Q.    Okay.  And if you would, describe the training
12  that you had for me when you went to work for the Water
13  District Credit Union.
```
Page 7

diazalma050608.txt
```
14        A.    There I just had someone sit with me and teach
15   me their -- my job duties.  It was basically the same
16   kind of training as verifying checks and verifying
17   people's information.
18        Q.    All right.  Now, what about when you went to
19   work for Accredited as a senior loan specialist, what
20   sort of training did you have at that point?
21        A.    I also had someone sit with me for a month or
22   so, giving me training of -- looking at credit reports
23   and title reports and just a whole complete loan file,
24   at pay stubs, I mean, everything -- the pay stubs, I had
25   previous training in the MoneyGram and MWD, so it was
0018
1    similar.
2         Q.    All right.  Did you have any additional
3    training, when you went to work in 2003, as an office
4    manager?
5         A.    No.
6         Q.    What about in 2004, when you became the
7    document funding manager?
8               Am I saying that right?
9         A.    Yes, you are.
10        Q.    Okay.
11        A.    Um, well, um, throughout the years of credit
12   and doc and funding, you just look more closely into
13   title reports and -- and just state guidelines, um,
14   which are available to all of us in the company.  And I
15   did have training on how they -- they process and input
16   information to the system.  And I had close contact with
17   the company's legal department.
18        Q.    And if you would, describe for me what you had
19   with regard to guidelines.
20        A.    Well, we have underwriting guidelines.  We had,
21   um, state guidelines that was provided by the legal
22   department.  Um, it just tells us -- just state specific
23   guidelines, where either -- I don't know.  Each state is
24   different, and we work with all 50 states, so I don't
25   know what you really want me to specify on.
0019
1         Q.    Okay.  Well, are these printed manuals or are
2    they something that you would look at a computer to
3    consult, or what was the form of these -- the format of
4    these guidelines?
5         A.    We do have a printout, but they are available
6    in our company intranet, we can just view, to be
7    paperless.
8         Q.    Did you bring any documents with you today?
9         A.    No.
10        Q.    If you would, can you tell me the title of the
11   guidelines that you had?  You told me that you had
12   something for underwriting guidelines.  What's the title
13   of that file or manual?
14        A.    Those were just called underwriting guidelines,
15   and they are updated monthly.
16        Q.    Okay.
17        A.    As time changes, there are changes in the
18   underwriting guidelines.
19        Q.    And what about the guide to the states that you
20   described for me?
21        A.    Um, that changes monthly as well, if there are
22   any changes in the state laws, so it updates monthly as
23   well.  And it is called state summary guidelines.
24        Q.    And could you tell me what you would use
```
Page 8

diazalma050608.txt
```
25  underwriting guidelines for?
0020
 1      A.   My people wouldn't, but I would just -- I would
 2  use it, let's say -- depending on the type of loan.  If
 3  it was a refi, no cash out, it will tell me there you
 4  are only allowed a certain amount of money or you are
 5  allowed to have this type of loan, certain LTD, if you
 6  have this FICO score.  So I always had in hand, because
 7  I -- I used them as a senior loan specialist.
 8      Q.   I see, okay.  Now, do you have a big stack of
 9  documents in front of you there?
10      A.   Yes.
11      Q.   All right.  You know we are going to go through
12  every page of those?
13      A.   Okay.
14      Q.   Just kidding.  We are going to go through some
15  of them, but some of them we may or may not use.  But I
16  will direct your attention to the first one, Exhibit 1.
17      A.   Okay.
18      Q.   And before I go into that exhibit, let me ask
19  you what you did before your deposition today.
20      A.   I viewed these documents.  I met with the
21  lawyers here, and that's about it.
22      Q.   Okay.  I don't want you to tell me anything
23  that they told you or that you talked about with your
24  lawyers, but how much time did you spend with them?
25      A.   Like four hours.
0021
 1      Q.   This morning?
 2      A.   Um, no, yesterday.
 3      Q.   All right.  And what documents did you review?
 4      A.   All the exhibits provided here.
 5      Q.   Anything else?
 6      A.   That's it.
 7      Q.   All right.  The Exhibit No. 1, did you have a
 8  chance to read it?
 9      A.   Not word for word, but I did see it.
10      Q.   Okay.  Let me ask you if you would pick it up
11  and flip over to the third page of it.
12      A.   Okay.
13      Q.   And do you see the paragraph numbered No. 2,
14  down close to about -- about halfway down the page?
15      A.   Yes.
16      Q.   Okay.  It requests you to bring any manuals,
17  references or other documents, either in electronic or
18  paper format, that you would use in calculating the APR,
19  the amount financed and the amount charged.  Did you
20  bring anything with you?
21      A.   Um, well, this -- the APR, amount financed and
22  finance charge is -- well, we -- I think we have a -- it
23  is calculated by our LOIS system.
24      Q.   Yes, ma'am.
25      A.   And I think that was provided to you.
0022
 1           MR. JENSEN:  I think he is asking about whether
 2  you brought anything with you today.
 3           THE WITNESS:  With this, myself, no.  It is
 4  just the exhibits that are here.
 5  BY MR. UNDERWOOD:
 6      Q.   Okay.  All right.  Well, we are going to go
 7  through -- like I said, not all of those, but a lot of
 8  them.  But you did not bring anything with you today?
 9      A.   No.
```

diazalma050608.txt

```
10      Q.   Okay.  Are there any other documents that you
11   know of that would be compliant with Paragraph No. 4,
12   that asks about documents touching or relating to the
13   Edwards loan?
14      A.   I believe all of that was provided, so I didn't
15   bring anything.
16      Q.   All right.  Does Accredited maintain, for
17   example, copies of cancelled checks?
18      A.   Um, cancelled checks of what?  I'm sorry.
19      Q.   Well, cancelled checks regarding the Edwards
20   loan.
21      A.   All of that is given to the title company.
22      Q.   Okay.  All right.  I understand.  All right.
23   Well, let me get you, if you would, then, to flip over
24   to -- well, I will tell you what I think I want you to
25   do.  I want you to describe for me, if you would,
0023
1    please, the process for the intake and the completion of
2    the documents required for a loan.
3            And if you would, let me ask you this, how does
4    Accredited know that a person is interested in having a
5    loan through Accredited?
6       A.   Well, that's in the servicing -- in the front
7    end, and I don't really know much of the front end, but
8    I do know one part is that they do get referrals, leads,
9    that are bought, and that's how the loan officers call
10   the borrowers.
11      Q.   All right.  And once a -- once a borrower has
12   initiated an interest in a loan, what happens?
13      A.   Um, the loan officer takes the application and
14   gets the permission to run credit, they run credit, and
15   initial disclosures are mailed out to the borrower.  And
16   then once that's done, it's given to the branch
17   processor, who then opens title, orders appraisal,
18   contacts the borrower for income documentation, any
19   documentation they may need to put a package together.
20   Once that's done, it is submitted to the underwriting
21   processing team -- well, before it is sent there, they
22   call the title company to get their fees.
23      Q.   Okay.  Well, let's back up.
24      A.   Okay.
25      Q.   I want to make sure I got this process down
0024
1    right.  All right.
2            The first thing that happens is the loan
3    officer takes an application?
4       A.   Yes.
5       Q.   And then runs a credit check?
6       A.   Yes.
7       Q.   All right.  Now, suppose the person has a FICO
8    score of 200, or any other FICO score that wouldn't
9    qualify for a loan, what would happen at that point?
10      A.   At that point, if it doesn't qualify, they
11   decline the loan and process a declined form, which is
12   sent to the borrower and let them know they don't
13   qualify.
14      Q.   Sure.  Okay.  All right.  Now, the next thing
15   that would happen then, if they pass that test -- or I
16   guess it would happen anyway, you say disclosures are
17   mailed to the borrower.  Is that a good faith estimate?
18      A.   Yes.
19      Q.   Let me ask you this while I am thinking about
20   it.  This is done over the telephone; is that correct?
```

Page 10

diazalma050608.txt

```
21      A.    Yes.
22      Q.    And was Accredited -- or did Accredited ever
23  take loan applications, though, over the internet, or
24  was it all over the telephone?
25      A.    I am not sure.  Um, from what I know, they take
0025
 1  them over the phone.
 2      Q.    Okay.  All right.  So after the good faith
 3  estimate is mailed to them, what was the next step?
 4      A.    The file is given to the branch processor.
 5      Q.    Branch processor?
 6      A.    Yes.
 7      Q.    And what does a branch processor do?
 8      A.    They contact the borrower for their
 9  documentations that they will need to complete a file.
10  They open title work.  They call a title company and
11  open a title.  They call the appraiser to order
12  appraisal.
13      Q.    Now, let me ask you to stop right there, if you
14  would.
15      A.    Okay.
16      Q.    And let's talk about opening title work.  Did
17  you just say that the branch processor would call a
18  title company?
19      A.    Yes.
20      Q.    And that would be a company such as Lender's
21  First Choice?
22      A.    Correct.
23      Q.    And how would the branch processor know to call
24  a certain title company over another title company?
25      A.    They either have a relationship with that title
0026
 1  company or because of the state that they are lending in
 2  and if that title company provides that service in that
 3  certain state.
 4      Q.    All right.  Well, let's say, for example, a
 5  borrower was in the state of Alabama.  How would the
 6  branch processor go about selecting a title company to
 7  close a loan in Alabama?
 8      A.    I am not sure.  They have their own title
 9  companies that they have set up and they know what title
10  companies provide for whatever state.
11      Q.    All right.  And is this -- where is that
12  information stored?  Is it on a computer terminal or how
13  would they access that information?
14      A.    Um, I -- I don't know.  They just -- they work
15  in their office and they either have it in writing or
16  they have it in their computer.  I have no idea how they
17  organize themselves.
18      Q.    All right.  Who would know about that, please,
19  ma'am?
20      A.    A branch processor.
21      Q.    All right.  Do you know the name of one?
22      A.    Um, Millicent Vinarao.
23      Q.    Can you spell that for me.
24      A.    Her first name is M-i-l-l-i-c-e-n-t.
25      Q.    Okay.
0027
 1      A.    Her last name is V-i-n-a-r-a-o.
 2      Q.    Okay.  All right.  Thank you, ma'am.
 3      A.    Um-hum.
 4      Q.    All right.  So after the title company is
 5  chosen, then what happens?
```

                          Page 11

diazalma050608.txt
```
 6          A.    They get their settlement closing fees, title
 7    insurance fees, all the fees that the title company is
 8    going to charge, and they input them into the system,
 9    into our --
10          Q.    Okay.  Tell me how that's done.
11          A.    Over the phone.  They give them a call and
12    these fees are given to them and --
13          Q.    By whom?
14          A.    By the settlement closing agents.
15          Q.    Does -- or did Accredited, to your knowledge,
16    promulgate a price list for closing fees?
17          A.    Can you rephrase that question?
18          Q.    Okay.  Has or did Accredited ever, to your
19    knowledge, promulgate a price list for settlement or
20    closing fees?
21          A.    You said a processor list?
22          Q.    A price list, I'm sorry.
23          MR. JENSEN:  A price list.
24          THE WITNESS:  A price list.  Oh, sorry.  Did we
25    create a price list for settlement?  No, we didn't.  The
0028
 1    fees are just given by the settlement company on each
 2    individual loan.  Each individual loan is different.
 3    BY MR. UNDERWOOD:
 4          Q.    Well, let me ask the question this way, how
 5    would Accredited -- or would Accredited know if a
 6    settlement company was trying to overcharge or charge
 7    too much for their settlement or closing fee?
 8          A.    We would have no idea.  We trust what the
 9    company gives us.
10          Q.    Was there any competition between -- well, let
11    me ask it this way, can you describe for me any
12    competition between the settlement companies for
13    Accredited's business.  In other words, I guess I am
14    asking did some companies offer a better price on the
15    settlement as opposed to other companies?
16          A.    I would not know that.
17          Q.    All right.  Who would know about that sort of
18    thing?
19          A.    Maybe the branch processor would be able to
20    tell you that, since they are the ones that dealt with
21    different title companies.
22          Q.    All right.  And that would be Millicent again?
23          A.    Correct.
24          Q.    All right.  Was there someone there who was the
25    supervisor of the branch processors?
0029
 1          A.    Well, each branch had their own processors.
 2    Millicent currently was the branch processor -- manager,
 3    sorry.
 4          Q.    Okay.  Is Millicent still with Accredited?
 5          A.    Yes.
 6          Q.    Okay.  All right.  So what's now -- a call is
 7    made to the title company and fees are ascertained.
 8    Tell me what happens next.
 9          A.    Once the fees are given, the branch processor
10    enters them into our LOIS system, which then makes a
11    check.  It -- our system makes sure that it doesn't go
12    to Section 32, high-cost limitations.
13          Q.    Okay.  Now, will you tell me the name of that
14    system again.
15          A.    LOIS.
16          Q.    LOIS, okay.
```

diazalma050608.txt

17      A.    So once it passes, and the branch processor has
18  all of that information, moves on to the processing
19  unit, to the underwriting department.
20      Q.    All right.  Let me ask you this, did you ever
21  know of Accredited to make Section 32 loans?
22      A.    When I first started with the company --
23      Q.    Uh-huh.
24      A.    -- probably we -- I remember doing one or two,
25  where we had extra steps that we had to take.  I don't
0030
 1  remember clearly exactly what we did, but we did do
 2  them, and we just stopped.
 3      Q.    Do you know when that stopped, to your
 4  knowledge?
 5      A.    It was back in 2001.
 6      Q.    Okay.  All right.  Now, I interrupted you.  You
 7  were telling me -- you were describing to me what
 8  happened after the processor got the charges from the
 9  settling company.
10      A.    Okay.
11      Q.    They -- I believe you told me they were entered
12  into the LOIS system.  Then what happens after that?
13      A.    After everything happens, it goes to the
14  underwriting department, which then reviews and does a
15  risk analysis of the file, make sure that it qualifies
16  for the program that it was submitted for.  They also
17  review the fee screen in our LOIS system, where our
18  branch processor enters those fees.  It makes sure that
19  all the fees look good and that it did pass our system.
20            Once that's completed, it goes to our corporate
21  underwriting.  The corporate underwriter also does a
22  check, a thorough check, of the file, the credit file,
23  and they also review the fees.  Once it passes that
24  department, it goes to the doc and funding department.
25  The document processor verifies all of the borrower's
0031
 1  information, the borrower's name, the spelling, the
 2  borrower's property address, do some minor entries into
 3  the system and checks the fees, makes sure that
 4  everything looks good, and process the closing
 5  documents, and then e-mails them to the title company,
 6  to be executed.
 7            Once the loan is executed, the title company
 8  then returns it to the doc funding department, the
 9  funder -- who could be the same person as a docker, but
10  it could also be a different person -- does a
11  post-closing check.  They check all the closing
12  documents, make sure all the signatures that are there,
13  the dates, and they review the H.U.D., the final H.U.D.
14  that the borrowers sign, make sure all the fees are
15  there and that they didn't go over what was disclosed to
16  the borrower in the T.I.L., and prepare the file to
17  fund, once it is past the post-closing check.
18      Q.    Okay.  All right.  And then tell me what the
19  steps are with regard to funding the loan and how that's
20  done.
21      A.    Well, after the documents have been reviewed
22  and -- the documents are reviewed, the T.I.L.'s well is
23  disclosed, well, and the H.U.D. is in compliance.  We
24  set up -- do some minor entry into our system with
25  signing dates and just enter dates when the documents
0032
 1  were signed, when the rescission is over, we go ahead
                          Page 13

diazalma050608.txt
```
 2    and click a button in our system that's -- let's our
 3    cash management department know that it is ready to go
 4    ahead and disburse the money to a title company.
 5         Q.   And how is the money actually disbursed?
 6         A.   Well, that's a cash management function, and
 7    from what I know, it is wired to the title company.
 8         Q.   All right.  Can you tell me from what bank it
 9    is wired from?
10         A.   I believe it is from -- well, we have different
11    banks, so it depends what -- I don't -- I don't know how
12    they choose which bank they are going to send the money
13    from.  But I know a list can be provided.  I don't know.
14         Q.   All right.  Who would know about that?
15         A.   That's our cash management department.
16         Q.   Do you know someone's name who I can ask about
17    that if I wanted to?
18         A.   Well, the cash management manager would be
19    Helen Bonihevert.
20         Q.   How do you spell that?
21         A.   H-e-l-e-n.
22         Q.   Okay.
23         A.   Her last name, I believe, is
24    B-o-n-i-h-e-v-e-r-t.
25         Q.   Thank you, ma'am.
0033
 1         A.   Um-hum.
 2         Q.   All right.  And then what's the next thing that
 3    would happen?
 4         A.   Our file from our office is sent to our
 5    post-closing department, and that's the last we see of
 6    it.  The post-closing department then --
 7         Q.   Okay.  Do you know what happens to it after it
 8    gets there?
 9         A.   I believe they prepare for the investor, to
10    sell to the investor.
11         Q.   All right.  Yes, ma'am.  And who would know
12    about -- and who would have knowledge about how a file
13    is prepared and how the investors are dealt with?
14         A.   It would be the post-closing manager.
15         Q.   All right.  Do you know his or her name?
16         A.   Cynthia Walker -- I mean, Cynthia Pacheco,
17    sorry.
18         Q.   Could you spell that for me and the court
19    reporter?
20         A.   It's -- her first name, Cynthia.
21         Q.   Okay.
22         A.   C-y-n-t-h-i-a.
23         Q.   Okay.
24         A.   Last name is Pacheco, P-a-c-h-e-c-o.
25         Q.   Thank you.
0034
 1         A.   Um-hum.
 2         Q.   All right.  Now, if you would, just to save
 3    some time, let me get you to look at that stack of
 4    documents in front of you there.
 5         A.   Okay.
 6         Q.   And let's just skip most of the beginning
 7    exhibits and go down to the -- to Exhibit No. 6.  It has
 8    a number of AHL, No. 1.
 9         A.   Okay.
10         Q.   And we are going to go through some of these
11    documents, or most of them.  I probably -- it won't
12    take -- I will try to move along.  It won't take too
```
Page 14

diazalma050608.txt
```
13   long.  Do you see the first document there?
14        A.   Yes, it's the H.U.D.
15        Q.   Yes, ma'am.  And it looks like it's been signed
16   by the Edwards --
17        A.   Correct.
18        Q.   And by someone from Lender's First Choice?
19        A.   Right.
20        Q.   All right.  If you would, let me ask you,
21   now -- ask you about, up at the top, it says, "Certified
22   to be a true and correct copy."  Whose signature is
23   that?
24        A.   That would be the closing agent.
25        Q.   All right.  It would have been someone under
0035
 1   your supervision?
 2        A.   No.  That is in the title company.
 3        Q.   I see.  Okay.  And -- all right.  If you would,
 4   let me ask you to take a look at the next document, and
 5   that's document No. 2.
 6        A.   Right.
 7        Q.   And I want to ask you about some of these fees.
 8   Now, if you would look at line No. 1101 on document No.
 9   1, the H.U.D. settlement statement.
10        A.   Um-hum.
11        Q.   It says that the settlement of closing fee that
12   was paid to Lender's First Choice was $450.  Do you see
13   that?
14        A.   Right.  Yes.
15        Q.   And over on the good faith estimate, it has a
16   fee of $605.  Do you know why those are different?
17        A.   All I can say is it was probably a figure that
18   was given to the branch processor at the time that they
19   called, and this is an amount that we use to prepare the
20   closing documents.
21        Q.   Okay.  In other words, the amount on the good
22   faith estimate --
23        A.   Yeah.
24        Q.   -- was the amount used by Accredited?
25        A.   Yes.
0036
 1        Q.   All right.  The next charge on the H.U.D. 1,
 2   under the settlement of closing fees, is a fee for
 3   abstract or title search.
 4        A.   Um-hum.
 5        Q.   And that's the same, isn't it, on the H.U.D.
 6   1 -- I mean, on the good faith estimate, $175?
 7        A.   It looks like it.  It is a pretty bad copy, but
 8   it looks like it is.
 9        Q.   Yeah, I apologize for that.  These were
10   produced by your lawyers, so you can blame him for it.
11             All right.  The next fee is -- on the H.U.D. 1
12   is line 1105, for document preparation of $50.
13        A.   Um-hum.
14        Q.   And that is listed as $60 on the good faith
15   estimate.  Do you know why that's different?
16        A.   It was just an estimate that was given to the
17   branch processor.  But this figure is also the figure
18   that we use for the T.I.L.
19        Q.   Yes, ma'am.  Okay.  Now, if you would drop
20   down, the next figure, 1108, to Lender's First Choice,
21   for title insurance.  And that's the same on the good
22   faith estimate?
23        A.   Correct.
```
Page 15

diazalma050608.txt

```
24        Q.     Is that right?
25        A.     Yes.
0037
 1        Q.     Okay.   And the next line where there is a
 2   charge is Line 1111.
 3        A.     Um-hum.
 4        Q.     A wire fee.
 5        A.     Um-hum.
 6        Q.     And I don't see that charge on the good faith
 7   estimate.   Did you see it on there?
 8        A.     We don't have a H.U.D. line called wire fee, so
 9   sometimes these fees are lumped together with a
10   different one.
11        Q.     Yes, ma'am.   Well, would that be included in
12   the Line 1101, the settlement or closing fee?
13        A.     I could -- most likely, yes.
14        Q.     All right.   And what about the next fee?
15        A.     The same thing.
16        Q.     On 1112, the delivery fee, I didn't see a fee.
17        A.     Yeah, our system doesn't have a H.U.D. line for
18   that, so it would be lumped together with another fee.
19        Q.     All right.   And would that also be in the Line
20   1101, the settlement or closing fee?
21        A.     Yes.
22        Q.     All right.   Do you know physically how this --
23   how these fees get entered into this good faith
24   estimate?   Can you describe that for me?
25        A.     These fees are entered into our LOIS system.
0038
 1        Q.     Okay.
 2        A.     By our branch processor.
 3        Q.     All right.   And I believe you told me that they
 4   would get these numbers from the -- for example,
 5   Lender's First Choice, over the telephone, is that how
 6   it happens?
 7        A.     Yes.
 8        Q.     All right.   And would they -- was there a
 9   similar procedure -- let's say, for example, Accredited
10   was dealing with such -- for settlement services, would
11   the procedure be any different in that instance?
12        A.     No.
13        Q.     And did you tell me that the LOIS system did
14   not have a -- lines for these wire fees and delivery
15   fees?
16        A.     Correct.
17        Q.     All right.   Now, the next line is recording
18   fee, $88.
19        A.     Correct.
20        Q.     That's on Line 1201.
21        A.     Um-hum.
22        Q.     And that looks like that's the same on both
23   documents, is that --
24        A.     Yes.
25        Q.     Am I looking at that right?
0039
 1               Okay.   And then the next fee is for a recording
 2   tax or tax stamps.
 3        A.     Um-hum.
 4        Q.     And it looks like that is 97.50; is that right?
 5        A.     Yes.
 6        Q.     All right.   Now, what's -- there is another fee
 7   on here, it says, "Miscellaneous."   What -- do you know
 8   what that fee was for?   I am talking about now on the
```

Page 16

diazalma050608.txt

```
 9  good faith estimate.
10       A.    No.  I wouldn't be able to tell you what it's
11  for.  Just probably a miscellaneous fee that was given
12  to the processor.
13       Q.    Okay.
14       A.    And that's a non-APR fee, so it is probably --
15  I don't know.
16       Q.    Okay.  Now, with -- with regard to document No.
17  1, who prepares that document?
18       A.    The title company.
19       Q.    All right.  And is that always true?
20       A.    Yes.
21       Q.    H.U.D. 1s are never prepared by Accredited?
22       A.    Correct.
23       Q.    And I don't know, you may have told me this
24  already, but can you tell me how these figures get on
25  the H.U.D. 1?  How is that determined and how does --
0040
 1  well, just tell me how those fees are determined, as far
 2  as you know.
 3       A.    On the H.U.D. 1?
 4       Q.    Yes, ma'am.
 5       A.    Well, the title company gets our lender fees
 6  from our closing instructions, and that's how they input
 7  those fees.  The title company knows their title fees,
 8  so they would input those fees.  They would also input
 9  the payouts that are listed on our addendum to lender's
10  instructions.  And that basically covers all of the fees
11  listed here.
12       Q.    Okay.  All right.  We will get to the closing
13  instructions in a few minutes, but -- all right.  If you
14  would, let's jump over to the next -- this would be
15  document No. 3.
16       A.    Okay.
17       Q.    Can you tell us what that document is?
18       A.    This is a truth in lending.
19       Q.    All right.  And is it the final truth in
20  lending or is it a preliminary?
21       A.    This is the final truth in lending.
22       Q.    And do you see there in the middle of it where
23  it says a filing/recording fee?  Is that $183 or 163?
24       A.    It looks like 163 to me.
25       Q.    All right.  And do you know where that figure
0041
 1  came from?
 2       A.    It comes from the fees that we input into the
 3  system.  And by looking at these fees, it is the total
 4  of the $88 recording fee and the miscellaneous recording
 5  fee of $75, which equals to 163.
 6       Q.    All right.  And is this a document -- this
 7  document -- is this document prepared by Accredited?
 8       A.    Yes.
 9       Q.    Okay.  Okay.  Let me get you, if you would --
10  let's skip all the way over to document No. 27.
11       A.    Okay.
12       Q.    And can you tell me what this document is,
13  please, ma'am.
14       A.    This is a wire detail form that is printed when
15  we are ready to fund a loan, and it describes the fees
16  that we would withhold from our wire, so it gives you
17  the loan amount, minus our lender fees.
18       Q.    Okay.
19       A.    And the total wire amount is what's sent out to
```

Page 17

diazalma050608.txt
20  the title company.  So you can tell that we only held
21  the dis- -- the points and the AHL, other fees, which is
22  the $50 and the 7.80.
23       Q.    Yes, ma'am.  And was there a discount on this
24  loan?
25       A.    I believe there is an origination fee, but all
0042
1  discount points, origination points, are listed in that
2  H.U.D. line.  There's no discounts on this one.  Just an
3  origination fee.
4       Q.    All right.  Now, does it work this way, this
5  amount of -- down at the bottom, where it says total
6  wire, plus tax amount, 61,665.90.  Is that the amount
7  that actually goes to -- that actually went to Lender's
8  First Choice in this case?
9       A.    Correct.
10       Q.    All right.  And so let me ask you if this is
11  correct, Accredited -- the fees that Accredited charges,
12  it just retains them from the 65,000 loan amount, is
13  that the way it works?
14       A.    Yes.
15       Q.    In other words, a $65,000 check doesn't go out
16  to the closing --
17       A.    No.
18       Q.    -- agent and they write checks back to
19  Accredited.  Accredited just retains that --
20       A.    Right.
21       Q.    -- from the wire sent; is that right?
22       A.    That's correct.
23       Q.    And who is this lady down here, Delia Iniguez?
24  Is that someone that you knew?
25       A.    Delia Iniguez?
0043
1       Q.    Yes, ma'am.
2       A.    No, I don't know that person.
3       Q.    Okay.  Can you tell what loan -- what office
4  this loan originated from, by looking at this?
5       A.    It came from our Sacramento office.
6       Q.    How can you tell that?
7       A.    Where you see -- do you see where it says
8  region on the top, 322?
9       Q.    Yes, ma'am.
10       A.    And then -SCR, that's Sacramento.
11       Q.    Okay.  I see.
12            All right.  Thank you, ma'am.
13       A.    Um-hum.
14       Q.    All right.  Now, let's go over to document No.
15  29.
16       A.    Okay.
17       Q.    And if you would, tell us what that document
18  is, please, ma'am.
19       A.    These are their lender's instructions that
20  print what are our closing documents.
21       Q.    All right.  And down at the bottom, it says 1
22  of 4.  Do you see that at the bottom right-hand corner?
23       A.    Yes.
24       Q.    And is that the usual number of pages for the
25  closing instructions?
0044
1       A.    Yes.
2       Q.    All right.  Now, I believe you told me earlier
3  that Lender's First Choice got the figures to go on the
4  H.U.D. 1 from the closing instructions.  Is that what
                              Page 18

diazalma050608.txt
```
 5  you told me?
 6      A.   Yes.
 7      Q.   Now, at what point of the loan process does
 8  that -- does that happen that -- that the closing
 9  instructions will be sent to Lender's First Choice for
10  preparation of the H.U.D. 1?
11      A.   When the closing documents are sent, the
12  complete package is sent to the title company.  These
13  are sent along with them.  It is part of the package.
14      Q.   Okay.  Okay.  Now, if you would, I want you to
15  tell me a little bit more about what happens after the
16  title company gets the lend- -- the closing
17  instructions, and just describe for me that process in
18  detail a little more.
19      A.   Okay.
20      MR. JENSEN:  Objection to the form of the
21  question.
22      If you understand the question, you can answer.
23      THE WITNESS:  Well --
24      MR. JENSEN:  If you understand it.
25
0045
 1  BY MR. UNDERWOOD:
 2      Q.   Well, let me ask it this way, once this -- the
 3  instructions are -- well, strike that.
 4      I will just start right here.  How are these
 5  instructions sent to the title company?
 6      A.   They are part of the closing package.
 7      Q.   Okay.
 8      A.   So they are e-mailed to them.
 9      Q.   Okay.  E-mailed?
10      A.   Um-hum.
11      Q.   All right.  And after they are e-mailed to the
12  title company, what's the next thing that would happen
13  in a typical closing?
14      A.   Um, it's the title company's function to
15  execute these documents, coordinate a time with the
16  borrower to get these forms executed, and when they
17  receive this closing instructions, they prepare the
18  H.U.D. 1, to go along with the closing package.
19      Q.   All right.  And does the title company send a
20  copy or a draft of the H.U.D. 1 back to Lender's
21  First -- I mean, to Accredited to review?
22      A.   Yes, they do.
23      Q.   All right.  And tell me who reviews that and
24  how that process works.
25      A.   The person who drew the documents would review
0046
 1  the H.U.D. and make sure that the amount disclosed in
 2  the T.I.L. was not underdisclosed.  If it is the same
 3  figure, or a little bit overdisclosed, we are okay with
 4  it, we approve it, and they move on with the closing.
 5      Q.   And is this something that the LOIS software
 6  does as well, or how is that done?
 7      A.   The only thing the LOIS software does is make
 8  sure that the fees are -- are -- don't go over a high
 9  cost limitation or state limitations.  The person who
10  drew the docs is going to visually see that and manually
11  calculate all of the APR fees and make sure that what
12  was disclosed to the borrower is correct and not under.
13      Q.   Okay.  All right.  And how do they do that?  Do
14  they use a handheld calculator and a piece of paper, or
15  do they use some sort of software, or if you would, just
```

diazalma050608.txt
```
16   tell me how that's done.
17        A.    We use a handheld calculator.
18        Q.    And is there any record kept -- kept of that?
19        A.    No.  It's just adding our lender's fees and
20   title settlement closing fees, our APR fees, and if --
21   and if it's good, um, under the amount financed that we
22   disclosed, then we just approve it via a phone call,
23   e-mail, or however they contacted the title company.
24        Q.    Okay.  All right.  And so once it's approved,
25   what's the next thing that happens?
0047
 1        A.    The title company moves forward and executes
 2   the documents with the borrower.
 3        Q.    All right.  Now, let's look at document No. 29,
 4   and let's look at that first fee, the origination fee.
 5   And it's on the Line 801, originations to the discount
 6   points, on this document, isn't it?
 7        A.    Yes, it is an origination fee.
 8        Q.    Yes, ma'am.  And if there were discount points,
 9   would it be on the next line?
10        A.    Yes.
11        Q.    And this Line 803, appraisal fee, was that
12   something that was paid by Accredited?
13        A.    No.  It is paid by the borrower.  It could be
14   either paid by the lender or the borrower.
15        Q.    All right.  Can you tell me what happened with
16   regard to this loan?
17        A.    Let me look at the H.U.D. 1.  This tells me
18   that the -- I would -- well, in most cases -- I can't
19   tell you exactly on this loan, because it doesn't
20   specify on the H.U.D. if the borrower paid for it or the
21   lender, but it was paid outside of closing.
22        Q.    Okay.  All right.  Is that usually just paid by
23   the borrower?
24        A.    Yes.
25        Q.    And what about this Line 828, what does that
0048
 1   represent?
 2        A.    That's a flood certificate that was pulled on
 3   this loan.
 4        Q.    And tell me about what that means and how that
 5   process works, of obtaining a flood certificate.
 6        A.    It is ordered through Inzura Settlement
 7   Services, and we see a certificate that tells me the
 8   property is in a flood zone or not.
 9        Q.    Okay.  If you would, just tell me physically
10   how it is done.  Do you do it on a computer?  Do you --
11   someone call up Inzura and order a flood certificate?
12   If you would, tell me how that's done.
13        A.    It is ordered through the computer, through
14   the -- through their website.
15        Q.    Yes, ma'am.
16        A.    And it pulls all of the -- you just type in the
17   borrower's name and address, and it comes up in a matter
18   of minutes or seconds.
19        Q.    All right.  Well -- so in other words, let me
20   see if I can describe it right.  Would the loan
21   processor log into -- is there a website that you type
22   in that information that you just described for me, is
23   that how it's done?
24        A.    Well, I am not sure if in this year, 2006, they
25   either go into the flood -- well, for Inzura, our
0049
```
                              Page 20

diazalma050608.txt
```
 1   system, in our empower LOIS system, there is a --
 2        Q.    Yes, ma'am.
 3        A.    -- flood button that you click on and it takes
 4   you directly to their website, and it pulls
 5   automatically the borrower's information, so we don't
 6   have to do manual typing, and it prints this certificate
 7   right there and then.
 8        Q.    I see.  Okay.  So it is all done in one step,
 9   it sounds like?
10        A.    Yes.
11        Q.    And what about the next one, the tax service
12   fee?
13        A.    That's a fee that's provided by Inzura.
14        Q.    All right.  And what is done for that fee?
15        A.    I am not sure what Inzura does for this.
16        Q.    Okay.
17        A.    I think it is provided here somewhere, step by
18   step, what they do.
19        Q.    Okay.  All right.  And let's go to the next
20   line, 901, the interest for 15 days.  Is that something
21   that is calculated by the LOIS system?
22        A.    Yes.
23        Q.    And how do you know how many days -- does the
24   operator know how many days interest to put into the
25   system?
0050
 1        A.    They don't.  The system tells you how many
 2   days.  It depends -- it goes off the funding date.  So
 3   from the funding date, to the end of the month, the
 4   system automatically calculates the dates remaining.
 5        Q.    Okay.  All right.  Let's go up to the top of
 6   it, of the document.  Let me ask you a few questions
 7   about that.  For example, it says on there -- there is
 8   a -- one blank, it says, "Must close by 7-5-2006."  Do
 9   you see that?
10        A.    Yes.
11        Q.    All right.  And does it work this way, does the
12   operator put that date in, and then the interest on that
13   Line 901 is calculated and appears on that line, or how
14   does that work?
15        A.    No, it is not -- it doesn't go off that date.
16   That date only tells you that these documents that were
17   produced can -- will expire after July 5th, so they can
18   no longer use this set of documents.
19        Q.    All right.  What date does that go off then?
20        A.    The interest?
21        Q.    Yes, ma'am.
22        A.    It goes off from the funding date, till the
23   first of the following month.
24        Q.    Okay.
25        A.    To July 1st, in this case.
0051
 1        Q.    I see.  So it will go off this June 12th date
 2   that is up at the top?
 3        A.    That is the closing date.
 4        Q.    The closing date?
 5        A.    And then three days after that, the 13th, 14th,
 6   the 15th.  The loan funds on the 16th, I believe.
 7        Q.    Okay.  All right.  I understand.
 8        A.    So from the 16th, to the first of the month,
 9   those are 15 days.
10        Q.    I see.  Okay.  And the 801 origination fee, how
11   is that figure arrived at, do you know?
```
                              Page 21

diazalma050608.txt
```
12       A.   That is a figure that the loan officer inputs.
13       Q.   Okay.  Do you know how the loan officer arrives
14  at that fee?
15       A.   I don't.
16       Q.   Okay.  All right.  If you would, flip over to
17  the next page for me of the closing instructions.  And I
18  don't believe I have any questions about that page.  Go
19  ahead and flip over to Page 31.
20       A.   Okay.
21       Q.   Do you see the heading, it looks like the
22  second one down, it says H.U.D. 1 requirements?
23       A.   Um-hum.
24       Q.   Yes, ma'am.  It says, "Comply with all
25  provisions of RESPA, as amended, in preparing this
0052
1   form."  Is that what that says?
2        A.   Yes.
3        Q.   And what did -- I know you described a lot of
4   things that go on with the closing, and it goes to
5   different departments and they double check it and that
6   sort of thing.  If you will, I want to ask you
7   specifically what Accredited did at the time of the
8   Edwards loan to ensure that the settlement agent was
9   complying with the Real Estate Settlement Procedures
10  Act.
11       A.   Well, when we look at a H.U.D. 1, we just
12  looked at that, all of our fees are there and this --
13  that title fees don't go over what we disclose to the
14  borrower, and what we disclose to the borrower has
15  already been checked by our system.
16       Q.   Yes, ma'am.  All right.  Well, is there any
17  auditing or any check that goes beyond that?  Well, let
18  me ask -- that is not a very good question.  Let me ask
19  it this way, does Accredited ever check, for example, to
20  see if the recording fee on the H.U.D. 1 is actually
21  what's the recording fee should be?
22       A.   No.  We trust what the company tells us what
23  the fee is.
24       Q.   All right.  And does -- okay.  Never mind.
25            Whose job is it to check these H.U.D. 1s for
0053
1   compliance?
2        A.   Um, like I said, just -- all we check is that
3   our fees are there and that we -- it is not disclosing
4   more than what we disclose to the borrower, but that's
5   all we do on our side.
6        Q.   Okay.  And if you would, let me just look down
7   near the bottom of that page, on Page 31, there's a
8   statement, "All fees shown on the H.U.D. 1 must match
9   exactly the fee listed in our closing instructions."
10       A.   Okay.
11       Q.   Is that -- has that always been Accredited's
12  policy?
13       A.   To match our close -- our lender fees, yes.
14       Q.   Well --
15       A.   Because in our closing instructions, we are
16  telling them what our lender fees are.
17       Q.   Yes, ma'am.
18       A.   So that's all they are getting, and they have
19  to match our fees on their H.U.D.
20       Q.   Okay.  They don't have to match what's on the
21  good faith estimate?
22       A.   No.  Because this is telling them they have to
                          Page 22
```

diazalma050608.txt

```
23   match what's in the closing instructions, and the
24   closing instructions only has our lender's fees.
25        Q.   Now, if a change is necessary on the H.U.D.
0054
 1   settlement statement, tell me how that -- how that would
 2   happen.
 3        A.   What type of change?
 4        Q.   Well, let's say, for example, a payoff had to
 5   change on a debt, how would the -- a settlement company
 6   like Lender's First Choice, for example, handle that, if
 7   that sort of issue came up at a closing?
 8        A.   A payoff, they would normally -- they would
 9   require the addendum to lender's instructions, with new
10   instructions giving the corrected amounts.
11        Q.   Okay.   And then is the H.U.D. 1 -- how does
12   the -- is the H.U.D. 1 modified after that to reflect a
13   change, or if you would tell me how that would work --
14        A.   Yes.   They would have to modify it and send it
15   back to us for our approval.
16        Q.   All right.   Now, let's see, we have looked at
17   these closing instructions.   We have looked at a couple
18   of pages of them, but let me just go back to -- if you
19   would, to Page 29.   Let's see, we got closing
20   instructions.   We got 29, 30, 31 and 32.
21        A.   Okay.
22        Q.   All right.   Is there anything unusual about
23   these instructions?
24        A.   Not that I can see.
25        Q.   All right.   And is this the formal closing
0055
 1   instructions that Accredited always uses, to your
 2   knowledge?
 3        A.   Yes.
 4        Q.   Since you have been with Accredited, did it
 5   ever use a different form of closing instructions?
 6        A.   No.
 7        Q.   And are these instructions generated by some
 8   sort of software?
 9        A.   Yes.
10        Q.   And is it the LOIS program that you told me
11   about earlier?
12        A.   Yes.
13        Q.   All right.   Now, if you would, let's go over to
14   the next form.   It is 33, the next document.   And can
15   you tell me what that document is?
16        A.   It is the addendum to the lender's
17   instructions.   This tells them -- further tells the
18   title company what the open conditions are, what the
19   payoffs are, and things that they must do.
20        Q.   All right.   Now, in -- now, we were going
21   through a sequence of events that had to happen in order
22   to get one of these loans closed.   And where is this
23   form used with regard to the events you have been
24   describing for me?
25        A.   This is also pulled with the closing documents,
0056
 1   so --
 2        Q.   So it would have been sent with these documents
 3   that we just went through?
 4        A.   Yes.
 5        Q.   And there's a statement up at the top, it says,
 6   "We must have these documents" -- excuse me, "these
 7   items in and approved before funding."
```
                              Page 23

diazalma050608.txt

```
 8        A.    Um-hum.  Yes.
 9        Q.    Okay.  And I noticed that some of the -- some
10   of the blanks are not checked.  How -- who completes
11   this form and makes sure that the title company's work
12   conforms to these instructions?
13        A.    It's computer-generated and it has to go by
14   what the loan terms are.  We don't manually check these
15   boxes.
16        Q.    All right.  Well, for example, on this one, on
17   No. 3, it looks like a survey was not required; is that
18   correct?
19        A.    Correct.
20        Q.    And how would a person know that a survey was
21   not required?
22        A.    It's usually on, um, a per state.  Like Texas
23   would require a survey.  There's very few.
24        Q.    All right.  Who makes -- who made the Xes in
25   the boxes out here, I guess is one of the things I need
0057
 1   to know?
 2        A.    The computer.
 3        Q.    Okay.  And so when -- are those populated when
 4   the state then is entered into the -- does -- LOIS fills
 5   this format as well?
 6        A.    Yes, LOIS does this.
 7        Q.    For example, I think you said that Texas would
 8   require a survey.  If this were a loan in Texas, would
 9   an X automatically be put on that blank in the No. 3
10   there?
11        A.    Yes.
12        Q.    All right.  Now, if you would, I want to ask
13   you a question about No. 7.  It says, "Completed and
14   typed form 1033 signed by borrowers and interviewers."
15        A.    Um-hum.
16        Q.    Is that -- a 1033, is that a loan application?
17        A.    That's a loan application, correct.
18        Q.    All right.  And when does the borrower sign a
19   loan application?
20        A.    Um, along with the -- it is sent along with the
21   closing documents.
22        Q.    And we talked earlier about section 32.
23   What -- can you tell me what you understand a section 32
24   loan to be.
25        A.    My understanding is anything over 8 percent of
0058
 1   the loan amount would be section 32.
 2        Q.    All right.  Are you familiar with an APR that
 3   would require a section 32 disclosure?
 4        A.    No.  The -- I am not.  The system pulls the APR
 5   for us, so -- and the system would tell us.  If it is a
 6   section 32, it wouldn't allow us to print docs.
 7        Q.    Okay.  Now, what about No. 12, what does
 8   that mean, "All loan documents are supposed to be
 9   executed at escrow or closing agent's office"?
10        A.    This whole package that we are reviewing --
11        Q.    Yes, ma'am.
12        A.    -- is the closing package, and it needs to be
13   signed at the escrow or closing agent's office.
14        Q.    All right.  And are you aware that -- of loans
15   being closed at people's homes, a notary going out to
16   people's homes and closing the loan?
17        A.    Yeah, they do that too.
18        Q.    All right.  So is that -- is that a requirement
```

Page 24

diazalma050608.txt
19    that's not followed sometimes, to your knowledge?
20        A.    They would tell us if they set up a notary or
21    not.
22        Q.    All right.  Do you know if a notary was used in
23    this transaction?
24        A.    I do not know.
25        Q.    How would we know that?
0059
 1        A.    Well, I can check the seal of the person who
 2    notarized it, but, I mean, if it's not the closing
 3    officer's name, I wouldn't know.  Because I don't know
 4    who works at the title company or who -- or what notary
 5    was used.
 6        Q.    Okay.
 7        A.    We would have to -- that's something a title
 8    company would have to confirm.
 9        Q.    Okay.  All right.  Let's go over to the next
10    page, if you would, please, ma'am, Page 34.
11        A.    Okay.
12        Q.    I don't believe I have any questions about that
13    page.  Let's go to -- what's the next one, it says,
14    "Additional requirement form," Page 35?
15        A.    Um-hum.  This is the additional requirement
16    form.
17        Q.    Yes, ma'am.
18        A.    It is just a document telling them that we
19    don't -- to fax these items once they're signed, these
20    four -- six items.
21        Q.    Okay.  And what's the reason for that?
22        A.    Um, we use -- in my case particularly, we use
23    these for purchases, where they require the funds the
24    same day, so they wouldn't be able to give it -- the
25    executed documents that same day, FedEx them to us, so
0060
 1    they would have to fax these items to us so we can
 2    verify they were executed properly and --
 3        Q.    I see.  That wouldn't apply to a refinance --
 4        A.    No.
 5        Q.    -- would it?
 6              What about the next form, 35?
 7        A.    It's the same form.
 8        Q.    Okay.  All right.  And are those -- well, then
 9    those are not all the closing instructions.  We still
10    have a few more to look over.  We got Page 36 through --
11    well, I guess through 36, 37.  Can you tell us what
12    those are?
13        A.    Um, this is telling them how to complete a
14    right to cancel notice.
15        Q.    Okay.
16        A.    And it gives them a sample as how to complete
17    it.
18        Q.    All right.  38 is --
19        A.    The actual --
20        Q.    -- a cancelled form?
21        A.    Yes.
22        Q.    39 is one for Ms. Edwards, isn't it?
23        A.    Um-hum.
24        Q.    Okay.  Let's skip over to document No. 58.  I
25    told you I was going to skip some of these.
0061
 1        A.    Okay.  Good.
 2        Q.    We won't go through every page.
 3        A.    Thank you.
                          Page 25

diazalma050608.txt
```
 4      Q.    If you would tell us what that form is, please.
 5      A.    You said Page 58?
 6      Q.    Yes, ma'am.
 7      A.    This is a tax certification provided by the
 8  title company.
 9      Q.    All right.  Now, that was going to be my
10  question, was:  Who provided this?  And is this
11  something that was done by Lender's First Choice or
12  Inzura?
13      A.    This was done by Lender's First Choice.
14      Q.    And so -- and Inzura is not -- let me ask it
15  this way, is Inzura involved in verifying this type of
16  tax?
17      A.    This form itself, no.
18      Q.    Okay.  Well, what about property taxes in
19  general?
20      A.    I am not sure exactly what Inzura's function is
21  as to tax certifications.
22      Q.    Okay.  All right.  But this was done, as far as
23  you know, by Lender's First Choice and not Inzura?
24      A.    Correct.
25      Q.    Now, if you would flip over to the next
0062
 1  document, 59.
 2      A.    Okay.
 3      Q.    And I wanted to ask you what that document was.
 4      A.    It is an incomplete H.U.D. 1, an estimated
 5  settlement statement.
 6      Q.    All right.  And do you know what the purpose of
 7  it was and where it would fall in this chain of events
 8  that -- or steps that you have to go through to close
 9  one of those loans?
10      A.    No, I don't know why this would be in the file.
11      Q.    Okay.
12      A.    Or what point it was given to them, I don't
13  know.
14      Q.    All right.  And if you would, may I ask you to
15  look at the next document, document No. 60.
16      A.    Okay.
17      Q.    And just tell us what that one is, please.
18      A.    This is a title report, preliminary title
19  report, from Lender's First Choice.
20      Q.    All right.  And does it show that -- what
21  policy -- what's the amount of the policy that's
22  proposed?
23      A.    65,000.
24      Q.    All right.  And what -- at what -- do you know
25  the general title insurance company?
0063
 1      A.    Yeah.  It's from United Title Insurance
 2  Company, yes.
 3      Q.    All right.  And this was also -- was this also
 4  issued by Lender's First Choice?
 5      A.    It was provided to us by Lender's First Choice.
 6      Q.    And if you would, let me ask you to take a look
 7  at document No. 64.
 8      A.    Okay.
 9      Q.    And can you tell me what that document is?
10      A.    It looks like it's a recording information
11  that's part of the commitment.
12      Q.    All right.  And do you know why Accredited
13  would have that in its file?
14      A.    It's just part of the title commitment.
```
Page 26

diazalma050608.txt
```
15      Q.   Do you see, under the bold lines across almost
16  in the middle, it says, "Basic recording fees"?
17      A.   Yes.
18      Q.   And do you know what those -- what those fees
19  are for and what they reflect?
20      A.   Well, the deed of trust, mortgage, that's our
21  mortgage.  It is 15.50 for the first page.  Okay.
22      Q.   Yes, ma'am.
23      A.   Amendment and modification, I don't know why
24  they would use that or what it's for.  Assignment, I
25  don't know what that's for.  I mean, those are title
0064
1   terminology, which I don't know.
2       Q.   All right.  Well, do you know if that
3   information could be used to calculate what the
4   recording fees are for a mortgage in Mobile County,
5   Alabama?
6       A.   Well, this is -- tells us what the fees are.
7       Q.   Yes, ma'am.
8       A.   The total fee is given to us by the title
9   company.
10      Q.   All right.  And does anyone from Lender's --
11  from Accredited ever -- I believe you already told me
12  that they never checked the fees to see if they are --
13  what it actually takes to record the mortgage.  Was that
14  what you said?
15      A.   Right.
16      Q.   All right.  And as far as you know, no one ever
17  took this document to see if the Edwards' recording fee
18  was calculated correctly?
19      A.   Correct.  Because we don't know if they add any
20  other stuff, because we don't know that terminology.
21           VIDEO OPERATOR:  Counsel, I am sorry to
22  interrupt.  We are down to five minutes of video.
23           MR. UNDERWOOD:  Okay.  Do you guys want to take
24  a break?
25           MR. JENSEN:  Sure.
0065
1            THE WITNESS:  Okay.
2            MR. UNDERWOOD:  Why don't we take about a
3   ten-minute break and -- well, if you will just take 15
4   minutes and start back at a quarter till.
5            MR. JENSEN:  That sounds good.
6            MR. UNDERWOOD:  Okay.  All right.  I will call
7   you guys back at a quarter till -- what time is it out
8   there?
9            THE WITNESS:  10:30.
10           MR. PREVIN:  I don't know that we need 15
11  minutes.
12           MR. UNDERWOOD:  Okay.
13           MR. PREVIN:  How about just five minutes?  Five
14  minutes.
15           MR. UNDERWOOD:  Well, let's take ten.
16           MR. PREVIN:  All right.  We'll take ten.
17           MR. UNDERWOOD:  Okay.  I will call back at 20
18  till.
19           MR. PREVIN:  All right.
20           MR. UNDERWOOD:  Okay.  All right.  Bye.
21           MR. PREVIN:  Bye.
22           VIDEO OPERATOR:  Off the record at 10:32.  And
23  the end of video No. 1.
24           (Recess)
25           VIDEO OPERATOR:  On the record at 10:45 a.m.
```
Page 27

diazalma050608.txt
```
0066
 1    Beginning of video No. 2.
 2    BY MR. UNDERWOOD:
 3        Q.   Miss, if I can ask you, if you would, let me
 4    get you to go over to document No. 72 now.
 5        A.   Okay.
 6        Q.   And if you would, tell me what that is.
 7        A.   This is the flood certificate.
 8        Q.   And is that what you -- I believe you described
 9    that for me earlier.  That's provided by Inzura?
10        A.   Correct.
11        Q.   And is document No. 73, is that part of it, or
12    how is that document generated?
13        A.   It is the second page to this document.
14        Q.   And let's go down to document 76, if you would.
15    Tell me what that document is.
16        A.   This is the closed loan status.
17        Q.   And what is it used for?
18        A.   The underwriters is -- this is what they print
19    when they approve the loan.
20        Q.   Okay.  Is this document generated before or
21    after the closing?
22        A.   This one in particular was generated, it looks
23    like, after they satisfied all of the conditions.
24        Q.   Okay.  And let me get you now to skip over to
25    document No. 80.
0067
 1        A.   Okay.
 2        Q.   And what is that document, please, ma'am?
 3        A.   This is the risk analysis.
 4        Q.   All right.  Is this one of the steps you
 5    described for me earlier?
 6        A.   Yes.  This is something the underwriter
 7    provides.  This is something the underwriter prints out.
 8    It's an overview of the whole loan file.
 9        Q.   And what is it used for?
10        A.   Um, it's for underwriting.
11        Q.   And if you would, let's go over to document No.
12    82 now.
13        A.   Okay.
14        Q.   What is -- what's this document?
15        A.   This is a funding refinance audit checklist.
16    That's done after -- when doing the post-closing.
17        Q.   All right.  And what -- what is it exactly used
18    for?
19        A.   It is an audit to -- that the funder completes
20    as they are reviewing the documents, the signed closing
21    documents.
22        Q.   And if you would, tell me how the funder
23    completes this document.  Is it done on the computer, or
24    if you would just describe for me how that's done.
25        A.   They have the spreadsheet on their computer and
0068
 1    they man- -- manually check every box that applies to
 2    this loan.
 3        Q.   All right.  And let me ask you, if you would,
 4    to look on the column on the right, at the top.
 5        A.   Um-hum.
 6        Q.   The second box, it says, "Fees on H.U.D. match
 7    fees on final good faith estimate."  Can you tell me
 8    what that means?
 9        A.   It's -- when they do this, they make sure that
10    the lender fees match to what's in the final good faith
```
Page 28

diazalma050608.txt
```
11   estimate.
12        Q.    They don't check the other fees?
13        A.    The other fees, what they do -- what they check
14   is that they're not over what was disclosed to the
15   borrower.
16        Q.    All right.  And what about is the same, I
17   guess, true under the heading, "Final good faith
18   estimate/itemization"?
19        A.    Okay.
20        Q.    Is the same true in that regard, it says, "Fees
21   match H.U.D."?
22        A.    Correct.
23        Q.    And is there a document or a manual or
24   something of that nature that a person would use to --
25   so they could tell when to check one of these boxes or
0069
 1   not check one of them?
 2        A.    No.  It's just -- we just have this checklist.
 3        Q.    Yes, ma'am.  Say, for example, you just told me
 4   that fees on H.U.D. 1 match fees on good faith
 5   estimate/itemization, and you just told me that only the
 6   lender fees are checked.  How would a person know that?
 7        A.    What do you mean how -- how would a person know
 8   what?  Sorry.
 9        Q.    Well, to me, that would say that all the fees
10   should match the good faith estimate, but you tell me
11   that it doesn't mean that.  And now my question -- and I
12   am not doing a very good job of asking it, but my
13   question is, how would the person who is filling this
14   out know that that's what the -- that that only meant
15   the lender's fees?
16        A.    Well, the person -- when -- we know that when
17   we are checking the good faith and compare it to the
18   H.U.D., it is just making sure that whatever is in the
19   H.U.D. is not over what is disclosed on the good faith
20   and the T.I.L.
21        Q.    And is that policy written down somewhere?
22        A.    No.
23        Q.    And it is not in one of these manuals that you
24   told me about earlier?
25        A.    No.
0070
 1        Q.    So that's just something -- is that just
 2   something that someone would learn on the job then?
 3        A.    Yes.
 4        Q.    Okay.  And on document 83, it looks like this
 5   reviewer was a lady named Delia Iniguez; is that right?
 6        A.    Delia Iniguez, yes.
 7        Q.    Yes, ma'am.  Does she still work for
 8   Accredited?
 9        A.    No.
10        Q.    Do you know her?
11        A.    No.
12        Q.    What would her position, her job title to have
13   been if she was completing this form?
14        A.    Funder.  Doc funder or manager, it depends,
15   either one.
16        Q.    Yes, ma'am.  All right.  And document No. 84.
17        A.    Um-hum.
18        Q.    Is this the high cost check form that you told
19   me about earlier?
20        A.    Yes.  This is something the system pulls, and
21   it tells you there that it didn't fail the state test.
```
Page 29

diazalma050608.txt
22      Q.   Now, if you would look down at the heading that
23  says APR.
24      A.   Okay.
25      Q.   And right under there, it says, "T-bill rate."
0071
1      A.   Okay.
2      Q.   Do you know how that rate is calculated, where
3  it comes from?
4      A.   It has to come from our system, because we
5  don't input it.
6      Q.   Okay.  Is this figure by the LOIS software?
7      A.   Yes.
8      Q.   And if you would look at the next page, 85.
9      A.   Okay.
10     Q.   And what -- what's this document used for?
11     A.   This is the section 32 calculation, the final
12  one, and it tells you if it -- if you failed the section
13  32 or not.
14     Q.   Okay.  Let me ask you, if you would, to look at
15  document 87 now.
16     A.   Okay.
17     Q.   And what is that document, please, ma'am?
18     A.   This is the closing department document audit
19  sheet that's printed before the closing documents are
20  sent out.
21     Q.   And what's it used for?
22     A.   To audit all the information that was inputted
23  into the system, making sure everything is okay, the
24  spelling of the borrower's name, the vesting, the
25  property address, and that the fees are there, lender
0072
1  fees.
2      Q.   Okay.  Let me get you now -- let's move over to
3  document 92.
4      A.   Okay.
5      Q.   Is that the form 1003 I asked you about before?
6      A.   That is correct.
7      Q.   And I always wondered about this, maybe you can
8  enlighten me on it, why does a borrower sign a
9  residential loan application at the closing, instead of
10  at the beginning of the process?
11     A.   There -- well, this is the final residential
12  loan application, so they are agreeing to everything
13  that is on this 1003, after all the -- they have gone
14  through the whole process.
15     Q.   All right.  Do any of these documents that we
16  have been going through today, do they actually show the
17  date that the Edwards actually applied for the loan?
18     A.   Um, you can tell by the loan application
19  number.
20     Q.   Uh-huh.
21     A.   At the bottom left-hand corner.
22     Q.   Yes, ma'am.
23     A.   That will tell you the year, 2006.
24     Q.   Okay.
25     A.   05 is the month of May.
0073
1      Q.   All right.
2      A.   And the 30 is May 30th, is when they applied
3  for the loan.
4      Q.   I see.  Okay.  Now, let me ask you, if you
5  would, to look at document No. 159.
6      A.   Just give me one second.
                        Page 30

diazalma050608.txt
```
 7            Okay.  I'm there.
 8      Q.    And I want you to, if you would, compare it,
 9   for me, to a document that we looked at earlier.  I
10   believe it's going to be No. 3.  Yes, ma'am.  If you
11   would, just compare it to document No. 3.  And the
12   amount financed is a little different.  Do you know why
13   that would be?
14      A.    Um, I would have to look at the es- -- the good
15   faith estimate, to see what fee changed.  There might be
16   a slight difference somewhere.
17      Q.    All right.  And what is this -- what does this
18   document, 159, is this something that went out with the
19   good faith estimate?
20      A.    This is a preliminary one.  And it was given to
21   the borrower.  And yes, it did go out with the good
22   faith estimate.  It's an initial one.
23      Q.    Would it have gone out with the next document,
24   160?
25      A.    Yes.
0074
 1      Q.    And what is the next document, 161?
 2      A.    161, affiliated business arrangement
 3   disclosure, letting the borrower know that we are
 4   affiliated with Inzura.
 5      Q.    Does Inzura ever close loans for Accredited?
 6      A.    Yes.
 7      Q.    And are the disclosures done any different if
 8   Inzura is closing the loan, or is it the same process
 9   that you described apply to them as well?
10      A.    Same process.
11      Q.    Ma'am, if you would, let me get you to look at
12   document No. 185.
13      A.    Okay.
14      Q.    And what is that document, please, ma'am?
15      A.    This is the preliminary truth in lending
16   disclosure.
17      Q.    All right.  And it has yet another amount
18   financed, doesn't it?
19      A.    Yes.
20      Q.    And do you -- do you know why it is different
21   from the other two?
22      A.    This one is the first set of RESPAs,
23   preliminary truth in lending that was sent out when the
24   loan application was taken.
25      Q.    Yes, ma'am.
0075
 1      A.    So all the figures are estimate figures.  And
 2   you will see that on the next page.
 3      Q.    On 186?
 4      A.    Yes.
 5      Q.    All right.  Do you know what this Page 186,
 6   reflecting a settlement or closing fee of 450 --
 7      A.    It reflects 450, right.
 8      Q.    Yes, ma'am.  Do you know why it doesn't reflect
 9   the 600-some-odd dollars that the other one did?
10      A.    Well, at this point, it was just an estimate,
11   and I don't believe the loan officer knew what the fees
12   were going to be.  They are just estimates, and it's
13   what's -- what's defaulted in the system, I guess.  But
14   it is not the actual title fees given from the title
15   company.  It is just an initial estimate.
16      Q.    All right.  Let me get you now to look at
17   document No. 209.
```
Page 31

diazalma050608.txt
```
18        A.    Okay.
19        Q.    If you would, just tell us what this document
20   is, please, ma'am.
21        A.    This is a mortgage.
22        Q.    Do you notice, at the top, it has the recording
23   information?
24        A.    Okay.  I see that.
25        Q.    All right.  Can you tell me what step in this
0076
1    process we have been going through about closing a loan
2    that Accredited gets this document No. 209?
3         A.    This is -- this document, after it has been
4    recorded, it is way after the loan closes.  It is sent
5    to the post-closing department.  We never see this.  And
6    how far into the time, it depends on the county, how
7    long it takes them.  Each county is different.
8         Q.    All right.  Does Accredited always get a copy
9    of the recorded -- of the recorded mortgage like this?
10        A.    Yes.
11        Q.    So would it have a copy then with each of the
12   loans that it's made -- it has made, a copy of the
13   recorded mortgage?
14        A.    Um, Accredited should have them.
15        Q.    It is the policy of Accredited to obtain a copy
16   of the recorded mortgage, to document the consumer's
17   file, is that a fair statement?
18        A.    Can you repeat the question?  Sorry.
19        Q.    Sure.  Is it the policy of Accredited to try to
20   get a copy of the recorded mortgage for each loan that
21   it closes?
22        A.    Yes.
23        Q.    Okay.  Let's move on then to document No. 229.
24        A.    Okay.
25        Q.    And let's see, I believe that's several pages.
0077
1    I am not -- it looks like it is seven pages.  I just
2    want to know what that document is.  I don't think I
3    have any questions about it.
4         A.    This document is just showing the history of
5    the borrower's payments.
6         Q.    All right.  And on the next page, what are
7    those notations about?
8         A.    Let's see, I am not sure what this is.
9         Q.    Okay.  All right.  Well, let's go on to Page
10   237.
11        A.    Okay.
12        Q.    And can you tell me what that document is?
13        A.    It's a printout of the customer service --
14   servicing department, where they -- it tells you who
15   this loan was sold to and when.
16        Q.    All right.  And was it sold to Saxon Mortgage
17   Services?
18        A.    According to this, it looks like it.
19        Q.    All right.  Who could tell me more about that?
20        A.    It would be our servicing department.  And who,
21   I have no idea.
22        Q.    Okay.  Where is the servicing department
23   located?
24        A.    It is in our corporate office in San Diego.
25        Q.    In San Diego?
0078
1         A.    Um-hum.
2         Q.    Thank you, ma'am.  And what is the next
```
Page 32

diazalma050608.txt
```
 3  document?
 4      A.   238?
 5      Q.   Yes, ma'am.
 6      A.   Let me see, I don't know where this will come
 7  from.  It --
 8      Q.   Okay.  Let me get you then -- let's go on to
 9  document 243.
10      A.   Okay.
11      Q.   And I -- it looks like we have 13 pages there.
12  Are you familiar with this list of -- well, first off,
13  can you tell me what this 13-page document is?
14      A.   This is a list of settlement agents used from
15  the period 3-1-06 through 12-31-07.
16      Q.   All right.  And do you know what geographic
17  area that these agents were used in?
18      A.   Um, they were used for the Alabama loan.
19      Q.   All right.  Did you have a -- did you take part
20  in compiling this list?
21      A.   No.
22      Q.   All right.  Do you know who did?
23      A.   Someone in Accredited.  I believe it is -- I
24  have no idea, but someone in Accredited who provided
25  this list.
0079
 1      Q.   All right.  Do you know what it represents?
 2      A.   From what I can tell, it is the number of loans
 3  closed through each settlement agent from this time
 4  period in the state of Alabama.
 5      Q.   And with regard to this list of settlement
 6  agents, would the same general procedure have been used
 7  with each one of these that you have described for me
 8  that was used with Lender's First Choice and the Edwards
 9  loan?
10      A.   Yes.
11      Q.   All right.  Well, I believe I am through with
12  those documents.  I just want to ask you a few questions
13  about another one.
14      A.   Okay.
15      Q.   And let's go to Exhibit No. 4.
16      A.   Okay.
17      Q.   Have you seen this document before?
18      A.   Yes.
19      Q.   And did you take part in its preparation?
20      A.   I -- not in preparing it, but I did read it,
21  and I agreed with it.
22      Q.   All right.  You signed it on Page 21?
23      A.   Correct.
24      Q.   And what did you do to verify the information
25  that's in it?
0080
 1      A.   Well, most of the information is information
 2  that was provided by our -- by our company.
 3  Specifically, what question are you speaking about?
 4      Q.   Well, I am not -- I am just talking about in
 5  general.  I asked you what you -- you signed it under
 6  oath that it was accurate, so I am just asking you what
 7  you did to verify the accuracy of the information in it,
 8  if anything.
 9      A.   Well, as far as providing, um -- um, loans and
10  all of that, I know it is in our system, and I -- I know
11  the legal -- our legal department got all of this
12  information for us.
13      Q.   Yes, ma'am.  But did you personally do anything
```
Page 33

diazalma050608.txt

```
14    to verify the information?
15         A.    No.    Anything that pertained to my role or what
16    we do, I agree with it.
17         Q.    Let me ask you to take a look at Page 11.
18         A.    Okay.
19         Q.    In response to question No. 12, and there is a
20    list of people there, do you know if any of those people
21    are still employed at Accredited?
22         A.    None of them are.
23         Q.    Do you know any of them -- do you know where
24    any of them are employed?
25         A.    I do not know where they are currently
0081
1     employed.    All I know is that they work for the
2     Sacramento office, and I do not know any of these
3     people.
4          Q.    Do you know if Accredited has any insurance
5     that would cover any of the claims made in this lawsuit?
6          A.    No, I do not know.
7          Q.    Has anyone told you whether or not Accredited
8     has any insurance that would cover the claims?
9          A.    As far as I know, we don't.
10         Q.    Who would have knowledge about insurance that
11    Accredited would have?
12         A.    Um, someone in our corporate office.
13         Q.    Well, can you give me a name?
14         A.    You can ask Robert Duley (phonetic).
15         Q.    Robert Duley?
16         A.    Um-hum.
17         Q.    What's his job title?
18         A.    Currently, he's a paralegal.
19         Q.    Who is his supervisor?
20         A.    I don't know.    But, I mean, I am pretty sure he
21    can give you the right person to talk to.
22         Q.    Is all the information in Exhibit 4 accurate?
23         A.    Exhibit 4?
24         MR. JENSEN:    This document (indicating).
25
0082
1     BY MR. UNDERWOOD:
2          Q.    Yes, ma'am, the one we were just looking at.
3          A.    Yes.    Um-hum.
4          Q.    And are you relying on -- what are you relying
5     on when you tell me that it's accurate?
6          A.    Well, for example, the question that we just
7     went over --
8          Q.    Yes, ma'am.
9          A.    -- with the people listed, I verified that in
10    our system on this specific loan, and it does tell me
11    that Nick was the loan officer, Corina was the loan
12    specialist, and it tells me who underwrote the loan, so
13    I verified that information.
14         Q.    What about the remainder of the information?
15         A.    Let me see, the other information, I trusted
16    the legal department gathered all of the correct
17    information.    Um, let's see, department did that --
18    yeah, all of this is data that is stored in our system,
19    so I trust that all of this information was pulled
20    correctly.
21         Q.    All right.    Let me ask you now to take a look
22    at Exhibit No. 8.
23         A.    Okay.
24         Q.    And I want to ask you just a few questions
```

Page 34

diazalma050608.txt
25    about it.
0083
1        A.    Okay.  I have it.
2        Q.    And you see your signature, Ms. Diaz, on Page
3    8?
4        A.    Correct.
5        Q.    All right.  And I want to ask you the same
6    question about this.  What did you do to verify that
7    this information was accurate?
8        A.    Well, in this one, it is asking regarding the
9    amount financed and regarding the finance charge and the
10   APR.  All of this is recorded in our system, so I did
11   check that all of this was in our system.  It's pulled
12   by our system, so I know it is accurate.
13       Q.    All right.  Now, what about attached to that,
14   there is a document No. 3099.
15       A.    Yes.
16       Q.    All right.  Do you know what that document is?
17       A.    It's tax service escrow functions, the
18   functions that Inzura does to provide this service.
19   It's a list of things they do.
20            MR. UNDERWOOD:  Okay.  All right.  Guys, let's
21   take about ten minutes.  I might be just about finished.
22            MR. JENSEN:  Okay.
23            THE WITNESS:  Okay.
24            MR. UNDERWOOD:  Any problem with that?  And I
25   will call back in at 20 after.
0084
1            MR. PREVIN:  All right.
2            MR. JENSEN:  Great.
3            MR. PREVIN:  Thanks.
4            THE WITNESS:  Thank you.
5            VIDEO OPERATOR:  Off the record at 11:15 a.m.
6            (Recess)
7            VIDEO OPERATOR:  On the record at 11:26 a.m.
8    BY MR. UNDERWOOD:
9        Q.    All right.  Ms. Diaz?
10       A.    Yes.
11       Q.    I have just one or two more questions.  And my
12   first one is this:  How does a settlement agent get
13   approved to close loans for Accredited?
14       A.    They have this loan agreement form that they
15   sign.
16       Q.    Yes, ma'am.
17       A.    And it's given to our cash management
18   department, where they verify -- where -- they are the
19   ones that approve them and put them into our system.
20       Q.    All right.  And do you know who is in charge of
21   that?
22       A.    You can ask Helen Bonihevert.
23       Q.    All right.  And I think you told me that
24   they -- a title company or settlement agent is -- when I
25   use those terms, you know -- I am using those
0085
1    interchangeably.  Do you understand that?
2        A.    Yes.
3        Q.    When a title company is selected, did you tell
4    me that it depends on what state the loan is?
5        A.    Correct.
6        Q.    And does Accredited maintain a list of approved
7    title companies?
8        A.    Yes.
9        Q.    And are those selected under your supervision,
                         Page 35

diazalma050608.txt

```
10   the title companies?
11        A.   No.
12        Q.   Well, when I say that, I mean the title
13   companies used on a particular loan, are those selected
14   under your supervision?
15        A.   As far -- do you mean do we select the title
16   company for that particular loan, is that your question?
17        Q.   No, ma'am, just in general.  Who selects the
18   title company?  Let me ask it this way, well,
19   Accredited -- is Accredited making loans anymore?
20        A.   We are.
21        Q.   You are?
22        A.   Yes.
23        Q.   All right.  Let's suppose someone called up
24   today from Alabama and wanted a loan through Accredited.
25   How would the settlement agent or the title company be
0086
1    chosen?
2         A.   The branch processor would contact the title
3    company, and they would have their list of title
4    companies they use.  Each branch uses their own title
5    companies.
6         Q.   Okay.  And so it is the branch processor's
7    choice --
8         A.   Yes.
9         Q.   -- with regard to what title company is used?
10        A.   Yes.
11        Q.   All right.  And suppose a title company, for
12   example, said that they wanted to charge $2,000 for a
13   settlement or closing fee, would that -- would that
14   title company -- could it be chosen to close the loan?
15        A.   That would bring a red flag as being a high
16   fee.  A branch processor would probably call around to
17   get another title company.
18        Q.   All right.  And, you know, I had asked you a
19   little bit about that before.  Is there any sort of
20   price list or guidelines with regard to what should be
21   charged for a settlement or closing fee that a branch
22   processor would consult?
23        A.   No, there is no list.
24        Q.   Well, how would a branch processor know whether
25   a fee quoted by a title company was -- was reasonable or
0087
1    was excessive?
2         A.   Um, by -- by experience, I would say, dealing
3    with title companies.  They are usually not that high.
4    It's just using common sense, making -- you know, make
5    sure it is reasonable.  I am not sure if it is their
6    common practice to call a different title company and
7    compare.  I don't know.  You would have -- a branch
8    processor would have to answer that.
9         Q.   All right.  And do you know if there is someone
10   at Accredited who would be the supervisor for the branch
11   processors, that they would report to?
12        A.   Each branch had their own processors and --
13   well, right now, we only have one branch, so Millicent
14   was a processor and a -- the branch processor
15   supervisor, until recently.
16        Q.   Okay.  Did you tell me she was still with
17   Accredited?
18        A.   Yes.
19             MR. UNDERWOOD:  All right.  Well, thank you,
20   ma'am.  I believe those are all the questions I have
```

Page 36

diazalma050608.txt

```
21   then.
22              THE WITNESS:  Okay.  Well, then thank you.
23              MR. UNDERWOOD:  And we want to offer all of
24   these exhibits as exhibits to the deposition.
25              MR. PREVIN:  Earl, do you mean the ones you
0088
 1   discussed or all of the ones that were --
 2              MR. UNDERWOOD:  No, I would like to offer all
 3   of them.
 4              MR. PREVIN:  All of them.  Okay.
 5              MR. UNDERWOOD:  I believe I have eight of them.
 6              MR. JENSEN:  Nine.
 7              MR. PREVIN:  We have nine.
 8              MR. UNDERWOOD:  Nine, I'm sorry.
 9              MR. JENSEN:  All right.  Well, we have no
10   further questions.
11              VIDEO OPERATOR:  Off the record, Counsel?
12              MR. PREVIN:  Yes.
13              MR. UNDERWOOD:  All right.  Well, thanks guys.
14              THE WITNESS:  Thank you.
15              MR. UNDERWOOD:  All right.  Bye-bye.
16              VIDEO OPERATOR:  This concludes today's
17   deposition of Alma L. Diaz.  The master videotape will
18   be retained by Freedom Court Reporting.  We are off the
19   video record at 11:32 a.m.
20              (The deposition was concluded at 11:32 a.m.)
21
22
23
24
25
0089
 1              DECLARATION UNDER PENALTY OF PERJURY
 2
 3              I, ALMA LUZ DIAZ, the witness herein,
 4   declare under penalty of perjury that I have read the
 5   foregoing in its entirety; and that the testimony
 6   contained therein, as corrected by me, is a true and
 7   accurate transcription of my testimony elicited at said
 8   time and place.
 9
10              Executed this _____ day of _____ 2008, at
11   _____, _____.
12              (City)                  (State)
13
14
15
16
17
18                          _____
                                      ALMA LUZ DIAZ
19
20
21
22
23
24
25
0090
 1   STATE OF CALIFORNIA
 2   COUNTY OF SAN DIEGO
 3
 4              I, Elana Zucconi, Certified Shorthand
 5   Reporter, in and for the State of California,
                           Page 37
```

diazalma050608.txt

```
 6   Certificate No. 9651, Registered Professional Reporter
 7   and Certified Realtime Reporter, do hereby certify:
 8           That prior to being examined, the witness
 9   named in the foregoing deposition was by me first duly
10   sworn to testify to the truth, the whole truth, and
11   nothing but the truth;
12           That said deposition was taken before me
13   pursuant to notice, at the time and place therein set
14   forth, and taken down by me in shorthand and thereafter
15   transcribed into typewriting under my direction and
16   supervision;
17           I further certify that I am neither counsel
18   for, nor related to, any party to said action, nor in
19   any way interested in the outcome thereof.
20
21   Dated: _____
22
23
24                    _____
25                    Elana Zucconi, CSR No. 9651, RPR, CRR
0091
 1                   DEPOSITION ERRATA SHEET
 2
 3   RE:        Paulson Reporting & Litigation Services
 4   File No.12639
 5   Case Caption: JONATHAN AND SHARRON EDWARDS, et al.
 6   vs. ACCREDITED HOME LENDERS
 7   Deponent: ALMA LUZ DIAZ
 8   Deposition Date:  May 6, 2008
 9   To the Reporter:
10   I have read the entire transcript of my Deposition taken
11   in the captioned matter or the same has been read to me.
12   I request that the following changes be entered upon the
13   record for the reasons indicated.  I have signed my name to
14   the Errata Sheet and the appropriate Certificate and
15   authorize you to attach both to the original transcript.
16
17   Page No. _____Line No. _____Change to: _____
18                         _____
19   Reason for change: _____
20   Page No. _____Line No. _____Change to: _____
21                         _____
22   Reason for change: _____
23   Page No. _____Line No. _____Change to: _____
24                         _____
25   Reason for change: _____
0092
 1   Deposition of  ALMA LUZ DIAZ
 2
 3   Page No. _____Line No. _____Change to: _____
 4                         _____
 5   Reason for change: _____
 6   Page No. _____Line No. _____Change to: _____
 7                         _____
 8   Reason for change: _____
 9   Page No. _____Line No. _____Change to: _____
10                         _____
11   Reason for change: _____
12   Page No. _____Line No. _____Change to: _____
13                         _____
14   Reason for change: _____
15   Page No. _____Line No. _____Change to: _____
16                         _____
```

diazalma050608.txt

```
17    Reason for change: _____
18    Page No. _____Line No. _____Change to: _____
19    _____
20    Reason for change: _____
21
22
23
24    SIGNATURE: _____DATE: _____
25                        ALMA LUZ DIAZ
```

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL HALL FRAZIER | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO.: |
| | ) | 1:08CV11-MHT |
| ACCREDITED HOME LENDERS, INC. | ) | |
| | ) | |
| DEFENDANT. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION

**COMES NOW** Defendant Accredited Home Lenders, Inc. ("AHL") by and through its counsel of record, and hereby responds to Plaintiff's Second Set of Interrogatories and Request for Production as follows:

### GENERAL OBJECTIONS

1.     Defendant objects to the Interrogatories and the Requests for Production, and to the "Instructions" preceding them, as unduly burdensome to the extent that they purport to impose obligations in addition to those imposed by the Federal Rules of Civil Procedure and this Court's Local Rules.

2.     Defendant objects to the "Instructions" preceding the Interrogatories and Request for Production to the extent they include definitions that are overbroad, mischaracterized or inaccurately define certain terms, or require Defendant to make a legal conclusion.

3.    Defendant objects to each Interrogatory and Request for Production as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond the scope of this litigation.

4.    Defendant objects to each Interrogatory and Request for Production to the extent it expressly or impliedly seeks information protected by the attorney-client privilege, the work product doctrine, self-analysis privilege, joint defense or common interest privilege, or any other applicable privilege or similar reason for non-production. Inadvertent disclosure of privileged information is not intended to be, and may not be construed as, a waiver of any applicable privilege.

5.    Defendant objects to each Interrogatory and Request for Production to the extent it seeks information (i) that is not within Defendant's possession, custody, or control; or (ii) that is within the possession, custody, or control of corporate affiliates of Defendant that are not controlled by Defendant; or (iii) that is in the possession, custody, or control of Defendant's attorneys or former attorneys; or (iv) that is in the possession, custody, or control of or concern the activities of subservicers, of predecessor or successor servicers or subservicers, of master servicers for whom Defendant provided subservicing, or of investors on the loans at issue.

6.    By making these responses, Defendant does not concede that the information given is properly discoverable or admissible. To the contrary, Defendant reserves the right to object to further discovery regarding the subject matter of the Interrogatories and Request for Production and to object to the introduction into evidence of statements made and documents produced in response to these Interrogatories and Request for Production.

7.    Each response to these Interrogatories and Requests for Production is made to the best of Defendant's knowledge at the present time, based upon its investigation to date. Where

appropriate, Defendant's responses are made upon information and belief based on that investigation. Defendant states that its investigation is ongoing and Defendant specifically reserves the right to supplement and amend these responses when and if it becomes necessary.

8.      These General Objections are incorporated into each of the specific responses to these Interrogatories and Request for Production and shall be deemed continuing as to each Interrogatory and Request for Production, and are not waived, or in any way limited by the specific responses.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each person or persons participating in the preparation of these your answers to these interrogatories giving their full name address and job title.

### RESPONSE TO INTERROGATORY NO. 1:

AHL objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work product immunity doctrine. Subject to and without waiver of this objection and the General Objections, AHL states that various individuals in its Legal Department assisted with the preparation of these interrogatory responses.

### INTERROGATORY NO. 2

Identify each charge included in the calculation of the "amount financed" regarding the transaction at issue herein.

### RESPONSE TO INTERROGATORY NO. 2:

AHL objects to this Interrogatory on the grounds that it is ambiguous and inconsistent with the method prescribed by federal law for calculating the Amount Financed. Subject to and

without waiver of this objection and the General Objections, AHL states that the Amount

Financed disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL/Frazier

0031) was calculated by subtracting the Prepaid Finance Charge ($3,582.90) referenced in

AHL's Response to Interrogatory No. 3 from the Principal Loan Amount ($56,000.00).

**INTERROGATORY NO. 3:**

Identify charge included in the calculation of the "finance charge" regarding the

transaction at issue herein.

**RESPONSE TO INTERROGATORY NO. 3:**

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, and

inconsistent with the method prescribed by federal law for calculating the "finance charge."

Subject to and without waiver of this objection and the General Objections, AHL states that the

"finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement

(AHL/Frazier 0031) included the sum of (1) the Prepaid Finance Charge, which totaled

$3,582.90, consisting of the Origination Fee ($1,960.00), the  Processing Fee ($500.00), the

Underwriting Fee ($500.00), the Appraisal Review Fee ($250.00), Flood Zone Determination

Fee ($9.50), the Tax Service Fee ($66.00), the Per Diem interest fee ($22.40) and the

Settlement/Closing fee ($275.00), as disclosed on the Final Good Faith Estimate (AHL 0032);

plus (2) Interest during the term of the loan ($82,189.61), which is calculated by subtracting the

Principal Loan Amount ($56,000.00) from the Total of Payments ($138,189.61).

**INTERROGATORY NO. 4:**

Identify the methodology and describe the step by step process by which the APR

(Annual Percentage Rate) was calculated regarding the instant transaction.

## RESPONSE TO INTERROGATORY NO. 4:

AHL objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This interrogatory seeks information about calculations based on amounts that were included in the "finance charge" disclosure on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states that the APR was calculated by entering the loan amount, interest rate, and other charges into a software program called Empower® provided by Fidelity Information Services. The Empower software, which is a calculation tool used in good faith by AHL within the meaning of Regulation Z, 12 C.F.R. § 226.22(a)(1) n.45d, then used these amounts to calculate the APR, as provided in Appendix J to Regulation Z, 12 C.F.R. pt. 226 app. J.

## INTERROGATORY NO. 5:

Describe in detail each and every service performed, giving full names of the persons or entities performing such services, the regarding the transaction at issue in exchange for your "Origination Fee."

## RESPONSE TO INTERROGATORY NO. 5:

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The Origination Fee was included in the "finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states that the Origination Fee is revenue collected in exchange for originating a loan and covers

a wide variety of AHL's operational expenses, including employee compensation, facilities, overhead, etc.

## INTERROGATORY NO. 6:

Describe in detail each and every service performed, giving full names of the persons or entities performing such services, the regarding the transaction at issue in exchange for your "Processing Fee," "Underwriting Fee," "Flood Zone Determination Fee," "Tax Service Fee," "Tax Service Fee" and "Appraisal Review Fee."

## RESPONSE TO INTERROGATORY NO. 6:

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. The "Processing Fee," "Underwriting Fee," "Flood Zone Determination Fee," "Tax Service Fee" and "Appraisal Review Fee" fees were included in the "finance charge" disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and are, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states as follows:

- the "Processing Fee" is revenue collected for various processing functions, including but not limited to ordering and reviewing the borrower's credit report, documentation of the borrower's income, and assembling various components of the file for the purpose of data entry into the loan origination system;
- the "Underwriting Fee" is revenue collected for reviewing the file to determine compliance with company lending policies and procedures, identifying compensating factors that support the loan decision, reviewing the borrower's credit risk, evaluating the property for clear title, reviewing the file to identify and prevent fraud, validating data integrity and determining the salability of the loan in the secondary mortgage market;
- the "Flood Zone Determination Fee" is revenue collected for obtaining information regarding whether the property was in a Special Flood Hazard Area and for monitoring the property in the event map revisions result in the restructuring of the lender's insurance requirements;
- the "Tax Service Fee" is revenue collected for monitoring the property real estate taxes after loan closing; and

- the "Appraisal Review Fee" is revenue collected for an in-house appraiser's review of the appraisal report to verify the adequacy and completeness of the report, and to verify that the property value meets the minimum guidelines for the loan program.

## INTERROGATORY NO. 7:

For each service in referred to in interrogatories 5 and 6 above that was performed in whole or part by a third party, identify that third party, itemize all third party charges and describe the service(s) performed by such third party.

## RESPONSE TO INTERROGATORY NO. 7:

AHL objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This interrogatory seeks information about calculations based on amounts that were included in the "finance charge" disclosure on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL 0031) and is, therefore, beyond the scope of this litigation. Subject to and without waiver of this objection and the General Objections, AHL states that First American Flood Data Services and First American Tax Services performed certain functions in connection with the flood zone determination fee and the tax service fee. See Response to Interrogatory No. 6 above.

## REQUEST FOR PRODUCTION OF DOCUMENTS

## REQUEST NO. 1:

All documents identified in response to the foregoing interrogatories.

## RESPONSE TO REQUEST NO. 1:

Subject to and without waiving its general and specific objections, AHL states that it will produce all non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Interrogatories.

## REQUEST NO. 2

All documents, including any information stored in electronic form, regarding or in any way relating to the calculation of the terms of the TILA disclosure at issue herein.

**RESPONSE TO REQUEST NO. 2:**

AHL objects to this Request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of this objection and the General Objections, AHL states that it has already produced non-privileged, responsive documents in response to this Request. AHLfurther states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

**REQUEST NO. 3:**

Each and every document, including any information stored in electronic form, regarding the services performed in exchange for your charges reflected on the Plaintiff's HUD-1 settlement statement.

**RESPONSE TO INTERROGATORY NO. 3:**

AHL objects to this request on the grounds that it is overbroad and unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. This Request seeks documents regarding fees that were included in the finance charge" disclosure on the Edwards' Final Truth in Lending Disclosure Statement (AHL 00003) and is, therefore, beyond the scope of this litigation. AHL states that, subject to its general and specific objections, it will produce any additional non-privileged, responsive documents in its possession, custody or control that it can locate through reasonable diligence identified in response to the foregoing Request.

## VERIFICATION AS TO RESPONSES TO INTERROGATORIES

I, Alma Diaz, am duly authorized by Accredited Home Lenders, Inc. to execute the foregoing responses to interrogatories under oath on its behalf.  The information set forth in these responses was collected by others and such information is not necessarily within my personal knowledge.  However, on behalf of Accredited Home Lenders, Inc., I verify under penalty of perjury under the laws of the United States of America that the foregoing responses to interrogatories are true and correct to the best of my knowledge, information, and belief.

Dated: April _30_ , 2008.

_____

Alma Diaz

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served the foregoing Responses to Plaintiffs' First Set of Interrogatories on counsel of record by placing same in the United States mail, postage prepaid and properly addressed to:

> Earl P. Underwood, Jr.
> Law Offices of Earl P. Underwood, Jr.
> P.O. Box 969
> 21 South Section Street
> Fairhope, AL 36533-0969

on this the ___ day of May, 2008.

Respectfully submitted,

_____
J. DOUGLAS MINOR, JR. [MSB #10045]

AS TO OBJECTIONS:

_____

J. DOUGLAS MINOR, JR. [MSB #10045]
Attorney for Defendant Accredited Home
Lenders, Inc.

OF COUNSEL

J. Douglas Minor, Jr.
Bradley Arant Rose & White LLP
Suite 450, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Robert E. Poundstone, IV
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

(Printed on Mar 25, 2005 @ 16:19)

**A.**

US Department of Housing and Urban Development

OMB No. 2502-0265

## SETTLEMENT STATEMENT

| B. Type of Loan | | |
|---|---|---|
| 1. [ ] FHA  2. [ ] FmHA  3. [ ] Conv. Unins.<br>4. [ ] VA  5. [X] Conv. Ins. | 6. File Number:<br>05-2813 | 7. Loan Number:<br>0503172917 | 8. Mortgage Ins. Case #: |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked TOC were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME AND ADDRESS OF BORROWER/BUYER:**
Cheryl Hall 105 TV Road Dothan, AL 36301

**E. NAME AND ADDRESS OF SELLER:**

**F. NAME AND ADDRESS OF LENDER:**
Home Funds Direct 1130 Northchase Parkway, Suite 200 Marietta, GA 30067

**G. PROPERTY LOCATION (Brief Legal):**
105 TV Road Dothan, AL 36301

**H. SETTLEMENT AGENT:**
Swafford and Hays Settlement Services, Inc. 865-539-1450 Contact: Janet Shelley

**PLACE OF SETTLEMENT:**
9041 Executive Park Drive, Suite 400 Knoxville, TN 37923

**I. SETTLEMENT DATE:**
03/25/2005

**DISBURSEMENT DATE:**
03/30/2005

| J. SUMMARY OF BORROWER(S) TRANSACTION | | K. SUMMARY OF SELLER(S) TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER :** | | **400. GROSS AMOUNT DUE TO SELLER :** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 13,896.39 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by Seller in advance | | Adjustments for items paid by Seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 13,896.39 | **420. Gross Amount Due Seller** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER :** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER :** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 56,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by Seller in advance | | Adjustments for items unpaid by Seller in advance | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 56,000.00 | **520. Total Reduction Amount Due Seller** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER :** | | **600. CASH AT SETTLEMENT TO/FROM SELLER :** | |
| 301. Gross Amount due from borrower (line 120) | 13,896.39 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 56,000.00 | 602. Less reductions in amt. due seller (line 520) | |
| **303. Cash [ ]From [X]To Borrower** | 42,103.61 | **603. Cash [X]To [ ]From Seller** | 0.00 |

SUBSTITUTION FORM 1099 SELLER STATEMENT: The information contained in Blocks E,G,H and I on line 401(or if 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER, you are required by law to provide the settlement agent with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

**Seller(s):**

(Printed on May 25, 2008 @ 16:19)     US Department of Housing and Urban Development     OMB No. 2502-0265

**SETTLEMENT CHARGES**

L.

| | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | | |
| 701. Listing Realtor Commission | | | |
| 702. Selling Realtor Commission | | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee  To: Home Funds Direct | | 1,960.00 | |
| 802. Loan Discount | | | |
| 803. Appraisal Fee  To: Alabama Appraisal Service | | 300.00 | |
| 804. Credit Report | | - | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | | |
| 807. Assumption Fee | | | |
| 808. Processing Fee  To: Home Funds Direct | | 500.00 | |
| 809. Underwriting fee  To: Home Funds Direct | | 500.00 | |
| 810. Document Preparation Fee | | | |
| 811. Zone Determination Fee  To: Home Funds Direct | | 9.50 | |
| 812. Tax Service Fee  To: Home Funds Direct | | 66.00 | |
| 813. Appraisal Review Fee  To: Home Funds Direct | | 250.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest from Odd Days  To: Home Funds Direct | | 22.40 | |
| 902. Mortgage Insurance Premium for | | | |
| 903. Hazard Insurance Premium for  To: State Farm | | 1,068.00 | |
| 904. | | - | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard insurance  To: Home Funds Direct | | 356.00 | |
| 1002. Mortgage insurance | | | |
| 1003. City property taxes | | | |
| 1004. County property taxes  To: Home Funds Direct | | 313.25 | |
| 1005. Annual assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. Aggregate Accounting Adjustment  To: Home Funds Direct | | -134.25 | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee  To: Swafford and Hays Settlement Services, Inc. | | 275.00 | |
| 1102. Abstract or title search  To: Swafford and Hays Settlement Services, Inc. | | 200.00 | |
| 1103. Title examination  To: Swafford and Hays Settlement Services, Inc. | | 250.00 | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | | |
| 1106. Notary Fees | | - | |
| 1107. Attorney's Fees | | | |
| (Includes above item numbers: ) | | | |
| 1108. Title Insurance  To: Transnation Title Insurance Company | | 200.00 | |
| (Includes above item numbers: ) | | | |
| 1109. Lender's coverage $67,500.00  @  $200.00 | | | |
| 1110. Owner's coverage @ 0.00 | | | |
| 1111. Endorsements  To: Swafford and Hays Settlement Services, Inc. | | 50.00 | |
| 1112. | | | |
| 1113. Overnight Courier & Handling Fees | | | |
| **1200. GOVT. RECORDING, TRANSFER, AND SERVICE FEES** | | | |
| 1201. Recording fees and Service fees:  To: Clerk of the Court | | 120.00 | |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps:  Deed $0.00  Mortgage $84.00  To: Clerk of the Court | | 84.00 | |
| 1204. | | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey | | | |
| 1302. Pest inspection | | | |
| 1303. Payoff  To: Army Aviation Center F C U  good thru 4/24 | | 4,594.49 | |
| 1304. | | | |
| 1305. Payment  To: The CR STR/Providian | | 785.00 | |
| 1306. Payment  To: Palisades | | 694.00 | |
| 1307. Payment  To: Holloway Credit | | 452.00 | |
| 1308. Payment  To: Small LNS | | 399.00 | |
| 1309. Payment  To: Crdt MGT. | | 182.00 | |
| 1310. Payment  To: Friedmans Jewelers | | 400.00 | |
| 1311. | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | 13,896.39 | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

BORROWER(S):                                             SELLER(S):

Cheryl Hall

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_Jane Curtis_
_____
Swafford and Hays Settlement Services, Inc.

_08/28/08_
_____
Date

NOTE:  Taxes have been prorated based on taxes for the year.  Any re-proration will be handled between the buyer and seller.  All utility bills (water, sewer, electric, cable and maintenance fees) have been paid or will be paid upon receipt of final bills.

WARNING:  It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine or imprisonment.  For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

# FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| Borrower Name(s):<br>**CHERYL HALL** | Lender:<br>**Home Funds Direct**<br>**15090 Avenue of Science**<br>**San Diego, CA 92128** |
|---|---|
| | **Date: 03/25/2005**    Loan #: 0503172917 |
| | **Loan Type: Conventional** |

**Borrower Address:**
**105 TV ROAD**
**DOTHAN, AL 36301**

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.975 % | $85,772.51 | $ 52,417.10 | $ 138,189.61 |

### PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | $383.89 | 05/01/2005 | | | |
| 1 | $373.10 | 04/01/2035 | | | |

**DEMAND FEATURE:**    **X**  This loan does not have a Demand Feature.    This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**    This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
**105 TV ROAD**
**DOTHAN, AL 36301**

**ASSUMPTION:** Someone buying this property **X** cannot assume the remaining balance due under original mortgage terms    may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $170.00

**PROPERTY INSURANCE: X** Property hazard insurance in the amount of the lesser of the loan amount or replacement cost with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any company acceptable to the lender.
Hazard insurance    is **X** is not available through the lender at an estimated cost of N/A for N/A year term.

**LATE CHARGES:** If your payment is more than **10** days late, you will be charged a late charge of **5.000**% of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
    may  **X**  will not  have to pay a penalty.
    may  **X**  will not  be entitled to a refund of part of the finance charge.
**See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| _(signature)_  3-25-05 | |
|---|---|
| Borrower    Date<br>CHERYL HALL | Borrower    Date |
| Borrower    Date | Borrower    Date |
| Borrower    Date | Borrower    Date |
| Borrower    Date | Borrower    Date |

Lender: Home Funds Direct
Address: 15090 Avenue of Science
San Diego, CA 92128
Applicant(s): CHERYL HALL

Property Address: 105 TV ROAD
DOTHAN, AL 36301

Loan Number: 0503172917
Sales Price: $0.00
Base Loan Amount: 56,000.00
Total Loan Amount: $$56,000.00
Type of Loan: Conventional Fixed
DatePrepared: March 25, 2005
Rate: 7.299     %Term: 360/360 mos

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates-the actual charges may be more or less. Your transaction may not involve a fee for every item listed.
The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD 1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1 A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 or HUD-1A | DESCRIPTION OF CHARGES | Lender | OTHER |
|---|---|---|---|
| 204 Lender Credit to Borr. | | $ | $ |
| 801 Origination Fee | | $ 1,960.00 | $ |
| 802 Discount Points | | $ | $ |
| 803 Appraisal Fee | | $ | $ 300.00 |
| 804 Credit Report Fee | | $ | $ |
| 805 Final Inspection/442 Fee | | $ | $ |
| 807 Application Fee | | $ | $ |
| 808 Yield Spread Premium (POC) / Rebate to Broker(POC) $   0.00 | | $ | $ |
| 810 Processing Fee | | $ 500.00 | $ |
| 811 Underwriting Fee | | $ 500.00 | $ |
| 813 Appraisal Review Fee | | $ 250.00 | $ |
| 815 Escrow Holdback Fee | | $ | $ |
| 816 Funding Fee | | $ | $ |
| 818 Courier Fee | | $ | $ |
| 825 Warehouse Fee | | $ | $ |
| 827 Reverif Fee | | $ | $ |
| 828 Flood Cert/Life of Loan Fee | | $ 9.50 | $ |
| 829 Tax Service Fee | | $ 66.00 | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | SUB-TOTALS | 3,285.50 | 300.00 |

| | | OTHER CHARGES | |
|---|---|---|---|
| 901 Interest for 2 days     @ $ 11.2 per day | | $ 22.40 | $ |
| 903 Hazard Insurance Premium | | $ | $ |
| 904 Flood Insurance Premium | | $ | $ |
| 1001 Hazard Insurance 4 month(s) @   $89.00 | | $ 356.00 | $ |
| 1003 City Property Tax 0 month(s) @   $0.00 | | $ | $ |
| 1004 County Property Tax 7 month(s) @   $44.75 | | $ 313.25 | $ |
| 1005 School Tax 0 month(s) @   $0.00 | | $ | $ |
| 1006 Flood Insurance 0 month(s) @   $0.00 | | $ | $ |
| 1008 Agg. Acctg. Adjustment | | $ -134.25 | $ |
| 1101 Settlement / Closing Agent Fee | | $ | $ 275.00 |
| 1102 Abstract/Title Search Fee | | $ | $ 200.00 |
| 1103 Title Examination Fee | | $ | $ 250.00 |
| 1104 Title Insurance Binder | | $ | $ |
| 1105 Closing Agent/Attorney Doc Fee | | $ | $ |
| 1106 Notary Fee | | $ | $ |
| 1107 Demand Fee | | $ | $ |
| 1108 Title Insurance Premium | | $ | $ 200.00 |
| 1201 Recording Fee - Deed/Mortgage | | $ | $ 125.00 |
| 1202 City/County Tax- Deed/Mortgage | | $ | $ |
| 1203 State Tax - Deed/Mortgage | | $ | $ 84.00 |
| 1204 Misc Recording Fee | | $ | $ 50.00 |
| 1205 Transfer Tax | | $ | $ |
| 1301 Survey Fee | | $ | $ |
| 1302 Pest Inspection | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| Lenders CFL License # | | $ | |
| | TOTAL ESTIMATED SETTLEMENT CHARGES | | $ 5,321.90 |

"P" designates . The Lender will require a particular provider from a lender-controlled or approved item. The specific provider and actual cost will appear on the HUD-1 or HUD-1A.
These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the Lender will take a first lien on the property. The undersigned acknowledges receipt of the booklet "Settlement Costs." and the Consumer Handbook on ARM Mortgages, if applicable.

☒ Use of a particular provider of service is required and the estimate is based on charges of the provider. Please see attached Addendum.

### THIS DOES NOT CONSTITUTE A LOAN COMMITMENT

Borrower CHERYL HALL          3-25-05 Date     Borrower                               Date

Borrower                               Date     Borrower                               Date

Borrower                               Date     Borrower                               Date

Borrower                               Date     Borrower                               Date

Deposition of Gregory Swafford. O51908txt.txt

1

1       VIDEOTAPED DEPOSITION OF GREGORY A. SWAFFORD

2                    May 19, 2008

3            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
4                    SOUTHERN DIVISION

5       --------------------------------------
        CHERYL H. FRAZIER,                    )
6                                             )
                Plaintiff,                    )
7                                             )Case No.
        vs.                                   )2:O7mc3379-MHT
8                                             )
        ACCREDITED HOME LENDERS, INC., d/b/a  )
9       HOME FUNDS DIRECT,                    )
                                              )
10               Defendant.                   )
        --------------------------------------

11

12

13      APPEARANCES:

14                      FOR THE PLAINTIFF:

15                      EARL P. UNDERWOOD, JR., ESQ.
                        (VIA TELEPHONE)
16                      21 South Section Street
                        Fairhope, Alabama 36532

17

18                      FOR THE DEFENDANT:

19                      J. DOUGLAS MINOR, ESQ.
                        BRADLEY ARANT ROSE & WHITE LLP
20                      188 East Capital Street, Suite 450
                        Jackson, Mississippi 39215-1789

21

22      ALSO PRESENT:

23                      Ernie Tracy, Videographer

24

25

                                                           2

1                            I N D E X
        Examinations                              Page
                            Page 1

Deposition of Gregory Swafford. 051908txt.txt

2
GREGORY A. STAFFORD

3

4    EXAMINATION BY MR. MINOR:                        4
     EXAMINATION BY MR. UNDERWOOD:                    80
5    CONTINUED EXAMINATION BY MR. MINOR:             119
     CONTINUED EXAMINATION BY MR. UNDERWOOD:         121
6

7

E X H I B I T S

8
     No.                Description                   Page

9

10   Exhibit 1 - folders labeled Exhibits 1-36       4
     containing documents bearing Bates
     production numbers Frazier v AHL Swafford
11   0001-84.

12   Exhibit 2 - documents bearing Bates            97
     production numbers Swafford0001-183.

13

14   Exhibit 3 - document entitled Amendment No.    97
     2 Transnation Title Insurance Company Title
     Insurance Premium Charges Revised October
15   28, 2002.

16   Exhibit 4 - document entitled Re-Notice of    117
     Taking Rule 30(b)(6) Deposition.

17

18

19

20

21

22

23

24

25

3

1             S T I P U L A T I O N

2        The deposition of GREG SWAFFORD, called as a

3    witness at the instance of the Defendant, taken

4    pursuant to all rules applicable to the Federal Rules

Page 2

Deposition of Gregory Swafford. 051908txt.txt

5    of Civil Procedure by notice on the 19th day of May,

6    2008, at the law office of Hunton & Williams, 900 South

7    Gay Street, Suite 2000, Knoxville, Tennessee, before

8    Thomas J. Dorsey, Registered Professional Reporter and

9    Notary Public, pursuant to stipulation of counsel.

10           It being agreed that Thomas J. Dorsey,

11   Registered Professional Reporter and Notary Public, may

12   report the deposition in machine shorthand, afterwards

13   reducing the same to typewriting.

14           All objections except as to the form of the

15   questions are reserved to on or before the hearing.

16           It being further agreed that all formalities

17   as to notice, caption, certificate, transmission, et

18   cetera, including the reading of the completed

19   deposition by the witness and the signature of the

20   witness, are expressly waived.

21

22

23

24

25

                                                        4

1            THE VIDEOGRAPHER:   Okay.   We're on the

2        record.   You may swear the witness.

3                GREGORY A. STAFFORD,

4    having first been duly sworn, was examined and

5    testified as follows:

6    EXAMINATION BY MR. MINOR:

7                (Exhibit 1 - folders labeled Exhibits 1-36

                        Page 3

Deposition of Gregory Swafford. 051908txt.txt

8          containing documents bearing Bates production

9          numbers Frazier v AHL Swafford 0001-84.)

10         Q.         Mr. Swafford, my name is Doug Minor, and

11    I am counsel for Accredited Home Lenders, Inc. in a

12    lawsuit that's been filed against it by Cheryl Hall

13    Frazier.  Present on the speakerphone is Mr. Earl

14    Underwood who represents Ms. Frazier.  Also in the

15    action, Mr. Underwood has requested that he be

16    designated as the attorney for a class of individuals

17    who would be represented by Ms. Frazier in an action

18    that's been filed in the Middle District of Alabama.

19              First let me begin by saying -- by asking

20    you to give me your full name.

21         A.         Gregory Alan Swafford.

22         Q.         And, Mr. Swafford, it's correct that you

23    are not represented here by any attorney; is that

24    correct?

25         A.         That is correct.

5

1         Q.         Okay.  Have you been deposed before?

2         A.         I have.

3         Q.         Okay.  How many times have you been

4    deposed?

5         A.         Around four, I don't know the exact

6    number.

7         Q.         Okay.

8         A.         Probably about four.

9         Q.         Have you been deposed recently?

10        A.         I have.

Deposition of Gregory Swafford. 051908txt.txt

11    Q.    Okay.  So you're familiar with the

12  protocol?

13    A.    I am.

14    Q.    Okay.  Well, as you know, I'm going to

15  ask you a series of questions, Mr. Underwood will

16  likely ask you a series of questions.  The questions

17  are going to go to the claims and defenses in the

18  Frazier lawsuit.  You understand that you're not a

19  defendant in the lawsuit?

20    A.    I do.

21    Q.    The questions will be designed to get

22  information that you know about our lawsuit, but none

23  of them are designed in any way to place any sort of

24  blame on you with respect to this particular lawsuit.

25    A.    Okay.

6

1    Q.    Because Swafford and Hays acted as the

2  settlement agent, you obviously have some information

3  about the transaction that underlies this lawsuit, and

4  that's what we're trying to get some information about

5  here today.

6    A.    Okay.

7    Q.    I have looked back through the documents

8  that Swafford and Hays has produced.  I'm going to ask

9  you about some of those documents, not all of them.  If

10  I ask you an unclear question, please let me know, I'll

11  do my best to clarify it.  If I ask you a question that

12  assumes something that is inaccurate, please let me

13  know that there is an inaccurate premise in my

Page 5

Deposition of Gregory Swafford. 051908txt.txt

14    question.

15            A.      Okay.

16            Q.      If you think of anything after we move on

17    from a particular subject that you want to incorporate

18    in a previous answer or add to it, change it, this is

19    very informal, just let me know, and when we finish

20    that particular line of questioning that we're on, we

21    can go back to that particular issue.

22                    If you need to take a break, I don't

23    anticipate going all day long, so feel free to take a

24    break to stretch your legs or to use the bathroom or

25    anything of that nature.

                                                              7

1                     Do you have any questions about the

2     process here today?

3             A.      No.

4             Q.      Okay.  Tell me, have you done anything to

5     prepare for this deposition?

6             A.      I glanced over the file.

7             Q.      Okay.  Did you meet with any attorneys?

8     And I'm not asking you about what you said, but did you

9     meet with any attorneys in preparation for this

10    deposition?

11            A.      No.

12            Q.      Does the Baker Donelson firm serve as

13    counsel for you with respect to your service here

14    today?

15            A.      Not at this time.

16            Q.      Okay.  Tell me what your address is.

Deposition of Gregory Swafford. 051908txt.txt

17      A.      9530 Hickory Knoll Lane, Knoxville,

18  Tennessee 37931.

19      Q.      And how long have you lived there?

20      A.      Four and a half years.

21      Q.      Are you married?

22      A.      I am.

23      Q.      What's your wife's name?

24      A.      Shelly Swafford.

25      Q.      And do you have any children?

8

1       A.      I do.

2       Q.      And how many children do you have?

3       A.      Four.

4       Q.      Okay.  How long have you been married?

5       A.      15 years in June.

6       Q.      Okay.  What's your birth date?

7       A.      3/31/72.

8       Q.      Okay.  Now, where were you born?

9       A.      In Maryland, Prince George County.

10      Q.      Did you go to grade school in Maryland?

11      A.      I did not.  I moved to Tennessee when I

12  was four.

13      Q.      To Knoxville?

14      A.      Yeah.  Well, Oak Ridge.

15      Q.      Oak Ridge; okay.  Is that where you did

16  your grade schooling?

17      A.      Yes.

18      Q.      Did you graduate from high school there?

19      A.      Yes.

Deposition of Gregory Swafford. O51908txt.txt

20    Q.    And what year was that?

21    A.    1990.

22    Q.    You said Oak Ridge?

23    A.    Uh-huh.

24    Q.    Is that a suburb of Knoxville?

25    A.    It is not.


                                        9


1    Q.    How far from here is that?

2    A.    Probably about 20 minutes.

3    Q.    Okay.  Do you have any college?

4    A.    I do.

5    Q.    Where did you go?

6    A.    University of Tennessee.

7    Q.    And what years were you there?

8    A.    Well, from '90 through -- I think I

9    graduated in '96.

10    Q.    Okay.  What was your major?

11    A.    Majored in economics and minored in

12    accounting.

13    Q.    And did you continue your schooling or go

14    to work in '96?

15    A.    I worked through college and continued

16    after.

17    Q.    Okay.  Where were you working?

18    A.    In '96?

19    Q.    Yes.

20    A.    At Oak Ridge Associated Universities.

21    Q.    What's that?

22    A.    It's a government contractor.

Deposition of Gregory Swafford. 051908txt.txt

23        Q.        What kind of business did it do?

24        A.        Various things.  But I was in their

25    accounting department.


10


1         Q.        Okay.  Just kind of give me generally

2    what their business model was.

3         A.        Well, they're a government contractor for

4    the Department of Energy.  They did stipends which they

5    did research for labs, they did research overseas,

6    things of that nature.

7         Q.        Okay.  And what was your title there?

8         A.        I was in the pay master's office.  We did

9    auditing of payrolls, the stipend payrolls, all

10   accounts payable, accounts receivable.

11        Q.        Okay.  So was it your charge to make sure

12   that the disbursements from Oak Ridge were consistent

13   with all the federal guidelines that apply to federal

14   contractors?

15        A.        Correct.

16        Q.        Did you work at Oak Ridge Associated

17   while you were in college?

18        A.        I did.

19        Q.        Okay.  Do you know when you started

20   working with them?

21        A.        When I was 17 as a stipend -- as a co-op

22   student.

23        Q.        Okay.  So you pretty much worked for them

24   from '90 through '96?

25        A.        It was about eight years, yeah.

Page 9

Deposition of Gregory Swafford. 051908txt.txt

11

1     Q.      Did your title change there?

2     A.      It did.

3     Q.      To what?

4     A.      I don't remember all the titles.  I was

5     assistant pay master when I left.

6     Q.      Okay.  And what year did you leave?

7     A.      I think it would either have been later

8     in '96 or '97.

9     Q.      Okay.  Did you receive any on-the-job

10    training at Oak Ridge Associated outside of your

11    schooling, formal training?

12    A.      Formal training?  Nothing that would have

13    any type of certificate or degree or anything.

14    Q.      No classes outside of the workday or

15    anything?

16    A.      No.

17    Q.      And what did you do after you left

18    Oak Ridge Associated?

19    A.      I went to work for Ameriquest Mortgage.

20    Q.      Where?

21    A.      In Knoxville.

22    Q.      And what did you do there?

23    A.      I started as a loan officer.

24    Q.      And what were your job duties there?

25    A.      As a loan officer, I was to telemarket or

12

Deposition of Gregory Swafford. 051908txt.txt

1    bring in applications.

2        Q.        Primarily over the phone?

3        A.        Yes.

4        Q.        How did you find that job?

5        A.        Through the business day at UT where the

6    different companies come in and interview graduates.

7        Q.        Had you worked in any capacity in the

8    mortgage or lending industry prior to going to work at

9    Ameriquest?

10        A.        No, I had not.

11        Q.        How long did you stay at Ameriquest?

12        A.        About four or five years, I believe.

13        Q.        Did your title change there?

14        A.        It did.

15        Q.        To?

16        A.        I went from loan officer to account

17    executive.  From account executive to branch manager.

18    And from branch manager to area manager.

19        Q.        As branch manager, you were in charge of

20    a particular branch of Ameriquest?

21        A.        Yes.

22        Q.        And where was that branch?

23        A.        It was on North Peters in Knoxville.

24        Q.        And you had loan officers under you?

25        A.        I did.

                                                          13

1        Q.        How many?

2        A.        Typically eight, and two processors.

3        Q.        How long would you have worked as a loan

Deposition of Gregory Swafford. 051908txt.txt

4    officer before you became the branch manager?

5        A.      I'd say a year or so.

6        Q.      Okay.

7        A.      I might be incorrect on that.  That's an

8    estimate.

9        Q.      Okay.  And you received promotion of

10   branch manager?

11       A.      I did.

12       Q.      And going from branch manager to area

13   manager was a promotion as well?

14       A.      Correct.

15       Q.      And do you know what year you became area

16   manager?

17       A.      I do not.

18       Q.      As area manager, you had multiple

19   branches under you?

20       A.      I did.

21       Q.      How many?

22       A.      Five.

23       Q.      And what geographical area was covered by

24   those branches?

25       A.      Knoxville, two in Nashville, and two in

14

1    Louisville, Kentucky.

2        Q.      Okay.  How long did you serve as the area

3   manager?

4       A.      I would say less than a year.

5       Q.      Okay.  Why did you quit?

6       A.      I didn't quit, they closed down several

Deposition of Gregory Swafford. 051908txt.txt

7    branches in several states, and Tennessee and Kentucky

8    were two of the states they stopped doing business in.

9         Q.     I'm sorry, I may have already asked you

10   this.  What year was this that you stopped serving as

11   area manager?

12        A.     It would have been in early 2000 or late

13   '99.  But I think it was early 2000.

14        Q.     Okay.  Did you have any ownership

15   interest in Ameriquest when you were there?

16        A.     I did not.

17        Q.     Did you have any ownership interest in

18   Oak Ridge Associated while you were there?

19        A.     I did not.

20        Q.     Had you started any businesses prior to

21   leaving Ameriquest?

22        A.     No.

23        Q.     Did you own any business as an LLC or

24   sole proprietorship prior to that time?

25        A.     No.

                                                      15

1         Q.     Tell me what you did after you left

2    Ameriquest Mortgage.

3         A.     I worked for a title company called Title

4    Specialists out of Alabama for a short period of time,

5    or Title Services, excuse me.

6         Q.     What city in Alabama?

7         A.     Birmingham.

8         Q.     Did you move to Birmingham?

9         A.     No, I actually worked in Knoxville.
                          Page 13

Deposition of Gregory Swafford. 051908txt.txt

10      Q.      And what did you do for Title Services?

11      A.      I was hired as their operations manager

12   to try to clean up improper processes that were in

13   place, try to get it back in line.

14      Q.      Did you do that?

15      A.      I was not able to, no.

16      Q.      And why is that?

17      A.      They were so far behind on bank

18   reconciliations and things were in such disarray, there

19   was no possible way to clean it up.

20      Q.      Okay.  When did you leave there?

21      A.      In either November or December of --

22   probably November -- no, excuse me, I'm sorry.

23   Somewhere in the late 2000.

24      Q.      Okay.  And where did you go?

25      A.      That's when I started Swafford

16

1   Settlement -- or Swafford and Hays Settlement Services.

2      Q.      And tell me how you made the decision to

3   start Swafford and Hays?

4      A.      Well, basically I met my partner, which

5   was Gary Hays, he also, he was a marketer at Title

6   Services.  And I guess I was -- he mentioned it to me

7   and I liked the idea, and so I went with it.

8      Q.      He mentioned to you that he thought that

9   there was a need for a settlement agency in this area?

10      A.      Right.  He thought that we could do a

11   good job with starting our own.

12      Q.      Had he worked at a settlement agent or

Page 14

Deposition of Gregory Swafford. 051908txt.txt

13    worked as a settlement agent at any time prior to

14    starting a business?

15         A.    I don't believe he had ever been a

16    settlement agent, but he had worked in the title

17    business for a while as a marketer.

18         Q.    Okay.  Were you familiar with the title

19    business and the settlement agent business prior to

20    starting Swafford and Hays?

21         A.    Just through my knowledge of it as being

22    in the mortgage business.

23         Q.    Okay.  What was the -- well, let me first

24    make sure we're clear on our terminology.  When I say

25    "settlement agent," are you kind of viewing that as

17

1    part and parcel of title agent?

2         A.    I am.

3         Q.    Okay.  Who served as the settlement agent

4    or title agent for Ameriquest when you were the branch

5    manager and loan -- and area manager there?

6         A.    We used different title companies in

7    Knoxville.

8         Q.    Okay.  Do you remember the names of any

9    of them?

10         A.    I think Title Enterprises was one of the

11    primary ones.

12         Q.    Did you have a familiarity with their

13    operations in your capacity as branch manager and area

14    manager?

15         A.    I did, because we closed our own loans

Deposition of Gregory Swafford. 051908txt.txt

16    and processed our own loans once we got the title work.

17         Q.        I'm sorry, say that again?

18         A.        Well, meaning that I understood -- I had

19    that knowledge from the capacity that we did not ask

20    them to be a full service title company.  Once they

21    produced the title commitment, we cleaned up any

22    outstanding liens on the title commitment, got payoffs

23    from them, closed the actual loan closing, funded the

24    loan, et cetera.

25         Q.        Okay.  So what you're saying is you

                                                            18

1    actually or Ameriquest under your supervision actually

2    did some of the duties traditionally performed by a

3    settlement agent?

4         A.        Yes.

5         Q.        What was the breakdown in ownership

6    between Mr. Hays and you?

7         A.        I believe at the time we were 30 percent

8    and 30 percent.

9         Q.        And who owned the other 40?

10        A.        James Swafford owned 20 percent, and

11    there were two individuals that I cannot even recall

12    their name, it was relatives of Gary's that owned 10

13    percent and 10 percent.

14        Q.        And what's James Swafford's relationship

15    to you?

16        A.        It's my father.

17        Q.        Okay.  Did Mr. Hays' relatives or James

18    Swafford have any connection to the business other than

                            Page 16

Deposition of Gregory Swafford. 051908txt.txt

19   funding it?

20        A.      No.

21        Q.      Do you remember what the total amount of

22   money that was put forward to fund Swafford and Hays

23   was?

24        A.      It's -- I think it was 40,000.

25        Q.      Okay.  And it was funded by the

19

1   individuals you just mentioned based on the percentages

2   you just gave me?

3        A.      Correct.

4        Q.      What did you do when you funded it?  Tell

5   me what you purchased, where you were located, what

6   employees if any you hired.

7        A.      We started out with Gary as the marketer

8   and myself and another employee that we hired an

9   operations manager or branch manager.  So there was

10   just the three of us in the beginning.  And we worked

11   off of South Peters.  We rented the space.  We

12   purchased computers, printers, things of that nature,

13   and some office furniture and rented some office

14   furniture.

15        Q.      What did you do to advertise your new

16   business?

17        A.      Strictly marketing, word of mouth through

18   Gary.

19        Q.      And was he marketing to lenders?

20        A.      He was.  Well, either lenders or brokers

21   that funded their own loans, so they were lenders or

Deposition of Gregory Swafford. 051908txt.txt

22    brokers who referred loans out to lenders.

23        Q.    Okay.  Did you do any -- I guess you

24    didn't do any business with Ameriquest because they

25    were no longer here?

20

1         A.    Correct.  At that time.

2         Q.    Leading up until the formation of

3    Swafford and Hays, had you taken any classes, received

4    any certifications?  I'm just talking about from the

5    moment you graduated from Tennessee forward.

6         A.    I took classes, but nothing through

7    universities and nothing that received certifications.

8         Q.    Okay.  Well, just tell me generally what

9    kind of classes.

10        A.    I don't remember exactly what they were,

11    but I know when I worked for Ameriquest, we were

12    constantly being told to take different training

13    courses, but ones that they offered.

14        Q.    Okay.

15        A.    And, of course, I later became a title

16    agent myself.

17        Q.    And when did you do that?

18        A.    It's been a few years.  I don't remember

19    the exact year.

20        Q.    Do you think it would have been shortly

21    after the formation of Swafford and Hays?

22        A.    No.  It was at least probably three years

23    later if not four.

24        Q.    Okay.  Would you consider yourself

Deposition of Gregory Swafford. 051908txt.txt

25      familiar with the provisions of TILA and RESPA?


                                                                21


    1        A.      I'm sorry, repeat the question.

    2        Q.      Would you consider yourself to be

    3   familiar with the provisions of TILA and RESPA?

    4        A.      Some, yes.

    5        Q.      And would you have gained the knowledge

    6   that you have in your capacity as branch manager and

    7   area manager and loan officer at Ameriquest?

    8        A.      Some, yes.

    9        Q.      Okay.  Have you ever taken any classes

   10   involving any of those federal statutes?

   11        A.      Nothing formal, no.

   12        Q.      And did you study them when you were in

   13   school?

   14        A.      No, I did not.

   15        Q.      If someone were to ask you in 2000 what

   16   Swafford and Hays did, how would you have answered that

   17   question?

   18        A.      We were a full service title company.  We

   19   take the application from title from inception all the

   20   way through the final policy.

   21        Q.      Is Swafford and Hays still in existence?

   22        A.      They -- Swafford Settlement Services is

   23   in existence, which is the same company.

   24        Q.      Did you buy Mr. Hays out?

   25        A.      We did.


                            Page 19

Deposition of Gregory Swafford. O51908txt.txt
22

1        Q.        And when was that?

2        A.        I believe it was late 2003.

3        Q.        Okay.

4        A.        Or early 2003.

5        Q.        You said "we," was that you and your

6    father?

7        A.        Yes.

8        Q.        Okay.  At its peak, how many employees

9    did Swafford and Hays have?

10       A.        I believe the highest number was 65.

11       Q.        And how many employees does it have now?

12       A.        Three.

13       Q.        Okay.  Did it have any offices outside of

14   Knoxville at any time?

15       A.        There are some states that were licensed

16   and that required a physical address, but we are not

17   physically located there.

18       Q.        Okay.  Do you know how many states you

19   were licensed in at the height?

20       A.        I don't believe we ever topped the upper

21   20s.

22       Q.        Okay.  And when you say licensing, do you

23   mean registering to do business with like a Secretary

24   of State?

25       A.        Correct.

23

1        Q.        Did you have any additional licensure

Page 20

Deposition of Gregory Swafford. 051908txt.txt

2    responsibilities?

3         A.       I'm sorry?

4         Q.       I mean, do settlement agents have to

5    register with any other entity other than a Secretary

6    of State in a state?

7         A.       It varies per statement.  Typically not,

8    but it does vary per state.  And the requirements vary.

9    Some have, you have to be appointed by the underwriter,

10   some you have to register as the agent and agency, some

11   just the agency.  It varies.

12        Q.       And were you licensed to do business in

13   Alabama in 2005?

14        A.       Yes.

15        Q.       Would you say you were licensed to do

16   business in Alabama for the majority of the time that

17   Swafford's been in existence?

18        A.       Yes.  Oh, well, I say "yes," I don't know

19   when the actual beginning date was.

20        Q.       Okay.  Did you do a lot of business in

21   Alabama?

22        A.       I don't know the ratios.  I know we did

23   quite a few, yes.

24        Q.       Would you be able to estimate for me how

25   many different lenders you served as a settlement agent

                                                          24

1    for?

2         A.       Oh, wow.  Probably not.  I was more

3    familiar at the time with the brokers than I was the

4    actual lenders, but I don't know.  I would say ten to

Deposition of Gregory Swafford. O51908txt.txt

5    20, somewhere in that range probably.

6          Q.        Was there a particular broker or lender

7    that was a substantial portion of your business?

8          A.        Yes.

9          Q.        And who was that?

10         A.        Homeowners Loan.

11         Q.        Homeowners Loan?

12         A.        Uh-huh.

13         Q.        And where are they based out of?

14         A.        They were based out of Atlanta, Georgia.

15         Q.        Okay.  Did you have a legal agreement

16   with them?

17         A.        I did not.

18         Q.        Was it common for you not to have a legal

19   agreement with the lenders and mortgage brokers that

20   you did business with?

21         A.        That is correct.

22         Q.        You were able to agree on what

23   responsibilities you were to carry out orally with

24   them?

25         A.        Correct.

                                                          25

1          Q.        Did you regularly call on these lenders?

2    Did you make visits to their office for purposes of

3    marketing?

4          A.        Not myself personally, but, yes, our

5    company did.

6          Q.        Okay.  Did you have someone who was

7    charged to do that on a regular basis?

Page 22

Deposition of Gregory Swafford. O51908txt.txt

8        A.        Yes.

9        Q.        Did that person in the course of those

10   visits play a role in ensuring that you were doing what

11   these lenders and brokers wanted you to do?

12       A.        As far as if there was any concerns, they

13   brought them to their attention, yes.

14       Q.        The things that you did, were they pretty

15   standard across lenders and brokers?

16       A.        Yes.

17       Q.        Okay.  So if someone called you up and

18   asked you to perform a particular -- to be settlement

19   agent on a particular loan, I guess, I take it that

20   you're telling me a written agreement would not be

21   necessary because you would understand that everyone in

22   the industry would understand what it is you were to

23   do?

24       A.        Well, the primary reason for not having a

25   written agreement is most brokers and lenders do not

26

1    want to be obligated to use one title company, or if

2    they're not happy with your service, they want to be

3    able to use other title companies.  So there's --

4    contracts where they're locked into using you as a

5    title company are not that common in our industry.

6        Q.        Got you.

7                  I asked you a question a moment ago about

8    any other businesses you had started up until a

9    particular time, I believe the year 2000.

10                 Have you started any other businesses

Page 23

Deposition of Gregory Swafford. 051908txt.txt

11 since then?

12     A.    No.  We have the Swafford Settlement

13 Services, and we have Swafford Title Services which is

14 still basically the same company, but you have to have

15 an individual entity name for the State of Alabama.

16     Q.    Okay.  And does that sort of separate

17 company have any additional employees?

18     A.    No.

19     Q.    Does it have a physical office in

20 Alabama?

21     A.    It has a physical address with a

22 registered agent, I believe, yes.

23     Q.    Okay.  And I'm not trying to tie you to a

24 particular number, but as you sit here, do you have any

25 understanding of what percentage of your business was

27

1 through Home Funds Direct around the period of 2005?

2     A.    I don't know any percentages.  I know

3 that they were next to Homeowners one of our good --

4 one of our primary brokers.

5     Q.    Do you know about how many states you

6 would have worked for Home Funds in?

7     A.    No.  Because it would have depended on

8 whenever their fliers went out, what states they were

9 going to telemarket or market that at that time.

10 Because that's typically how we came to go in other

11 states.  When one of our brokers or lenders was going

12 to start doing business in another state, a lot of

13 times they would ask us if we were willing to get

Page 24

Deposition of Gregory Swafford. 051908txt.txt

14    licensed in that state so we could be their title

15    company.

16         Q.      Did you ever have any individual dealings

17    with anyone at Home Funds Direct?

18         A.      Me personally?

19         Q.      Yes.

20         A.      I'm sure I may have, I don't remember the

21    names or anything.

22         Q.      Okay.  If you did, in what capacity would

23    you have done it?  Would it have been in marketing or a

24    direct responsibility for a particular loan?

25         A.      Typically if I had any contact myself


                                                          28


1     with a broker or lender, it was over anything that they

2     would post closing or they go to apartments or what

3     have you, would want to make sure what we were doing

4     for them.

5          Q.      Do you ever recall any loans that Home

6     Funds Direct expressed disapproval of your company's

7     tasks with respect to that loan?

8          A.      Not offhand, no.

9          Q.      Was there a person at Swafford and Hays

10    that was assigned as a point person for Home Funds

11    Direct, someone who dealt with Home Funds calls?

12         A.      At our largest, we had particular

13    individuals in the offices that were -- or office that

14    was key contacts for different brokers and lenders, but

15    I don't know who would have been Home Funds.

16         Q.      Okay.  You had an employee named is it

                        Page 25

Deposition of Gregory Swafford. 051908txt.txt

17    Jane Carcello?

18         A.        Janey Carcello.

19         Q.        What was her job duty?

20         A.        I believe -- I know that she was in post

21    closing at one point.  I don't know if she worked at

22    any other departments.

23         Q.        Okay.  Have you had an opportunity at any

24    time to review the Swafford file for the Cheryl Frazier

25    loan?

29

1          A.        I have, yes.

2          Q.        Do you recall who at Swafford was

3     responsible for facilitating that loan at Swafford?

4          A.        No.

5          Q.        How many people would typically carry out

6     all the responsibilities inherent in being a settlement

7     agent at Swafford?

8          A.        It would be numerous.  Because there was

9     numerous departments and numerous people in each

10    department.

11         Q.        The method that you were paid as

12    settlement agent, was that standard across the brokers

13    and lenders that you dealt with?

14         A.        Yes.

15         Q.        And how were you paid?

16         A.        We were paid off of the HUD settlement

17    statement.  Is that what you mean?

18         Q.        Well, I guess that's kind of a broad

19    question.

Page 26

Deposition of Gregory Swafford. 051908txt.txt

20          The HUD settlement statement that you
21   just referenced has a line on it that says, is it
22   settlement agent fee?
23          A.     I believe so.
24          Q.     Just a moment, I'll see if I can find it.
25          A.     Fees and services or something to that

                                                              30

1    nature.
2                 MR. UNDERWOOD:  Doug, I think it's 131
3          and 132.
4                 MR. MINOR:  Okay.  Yeah, I see it here.
5          131, 132.
6                 Earl, it is also Exhibit 16 on my list
7          beginning Bates number page 68.  That's the
8          version that came from Swafford.
9                 MR. UNDERWOOD:  Okay.
10   BY MR. MINOR:
11          Q.     This is a document that will be marked as
12   Exhibit 16.  And I'm showing the witness Bates numbered
13   pages Frazier versus AHL Swafford 0068 to 0069.
14          A.     Okay.
15          Q.     And can you tell me, point to me the line
16   that shows how Swafford was paid?
17          A.     There are multiple lines.
18          Q.     Okay.  For purposes of this question, I
19   want to focus on -- let me ask it this way.
20          A.     Okay.
21          Q.     You both received payment directly and
22   you also received fees for particular tasks that you

                          Page 27

Deposition of Gregory Swafford. 051908txt.txt

23  performed, correct?

24      A.      I'm sorry, ask the question again.

25      Q.      Let me see this.

31

1       A.      It's the first part that I missed.

2       Q.      Okay.  All right.  I'm going to ask it

3   this way:  Line 1101 on the settlement statement, tell

4   me what that is.

5       A.      1101 says, "settlement or closing fee to

6   Swafford and Hays Settlement Services."

7       Q.      Okay.  And what is that fee?

8       A.      That would have been for us facilitating

9   the closing.  It would have been for the notary to go

10  out and do the closing.  And anything involved

11  basically in the closing.

12      Q.      Okay.  So is that -- that was

13  compensation that was paid directly to Swafford for the

14  tasks that Swafford completed?

15      A.      Correct.

16      Q.      Okay.  I'm going to get to some of the

17  other fees in a second.

18      A.      Okay.

19      Q.      Has Swafford ever had any investigations

20  against it by any state licensing entities, attorney

21  generals, secretaries of state?

22      A.      Well, we have our annual CRESPA audit

23  which the State of Virginia requires.  Besides that, I

24  don't remember anything that's ever been -- anything

25  like that, no.

Deposition of Gregory Swafford. O51908txt.txt

32

1    Q.    That was an annual audit, it wasn't -- or
2  was it the result of a particular finding?
3    A.    No, that's something that they require it
4  be done.  And then, of course, our underwriters do
5  annual audits.
6    Q.    Outside of audits, were there any
7  administrative investigations or criminal
8  investigations against Swafford at any time?
9    A.    No.
10    Q.    Did you advertise in any journals or
11  trade publications?
12    A.    Not to my knowledge, no.
13    Q.    Was Swafford a member of any trade
14  associations, national organizations of settlement
15  agents?
16    A.    No.  There is -- there was something we
17  were a member of in Nashville, and I can't even
18  remember what it was now, but it was not national.  And
19  I don't believe it was for the purpose of getting any
20  future business.
21    Q.    Can you tell me who your competitors were
22  in this area, your primary competitors?
23    A.    Well, we have not really done much local
24  business, ours is usually regional.  So our largest
25  competitor was Nations Title.

33

Deposition of Gregory Swafford. 051908txt.txt

1      Q.      Based in?

2      A.      I believe they're based in -- were based

3    in Baton Rouge, Louisiana, I believe.  That was one of

4    their offices.  They had offices in several locations.

5      Q.      Okay.  Did you bring any documents with

6    you today?

7      A.      I did not.

8      Q.      Outside of your attorney, have you spoken

9    to anyone about the Frazier lawsuit?

10     A.      I don't believe so, no.

11     Q.      Have you seen the complaint in the

12   Frazier lawsuit?

13     A.      I have.

14     Q.      Okay.  Was that given to you by your

15   attorney?

16     A.      I don't remember how I got it.  I

17   think -- I don't remember how I got it.

18     Q.      Have you looked at it recently?

19     A.      No.

20     Q.      Do you know whether you looked at the

21   amended complaint that was recently filed in the case

22   just in the last couple weeks?

23     A.      No, I don't know that.

24     Q.      You don't know if that's the one that you

25   saw?

                                                    34

1      A.      Right.

2      Q.      Have you ever met Mr. Underwood?

3      A.      I have.

                          Page 30

Deposition of Gregory Swafford. 051908txt.txt

4        Q.        Has he deposed you before?

5        A.        He has.

6        Q.        Would that have been in a case entitled

7    Dempsey?  Was the plaintiff Dempsey?

8        A.        I don't know which case it would have

9    been.

10       Q.        Has he deposed you more than once?

11       A.        I believe so, yes.

12       Q.        Okay.  The four depositions that I

13   believe you told me you had participated in, were they

14   all relating to lawsuits against Swafford and Hays?  I

15   want to separate out any personal.

16       A.        Right.  No, they were not.

17       Q.        They were not all related to that?

18       A.        No.

19       Q.        Some of them have to do with a car

20   accident or --

21       A.        Yeah, I had a personal, it was a car

22   accident.

23       Q.        Okay.  So you've been deposed three times

24   involving Swafford and Hays actions and various loans?

25       A.        Right.  Three or four.  I don't remember,

                                                    35

1    I think it's three.

2        Q.        Did Mr. Underwood depose you each time?

3        A.        No.

4        Q.        Okay.  Do you recall what other attorneys

5    deposed you?

6        A.        No, I do not.
                          Page 31

Deposition of Gregory Swafford. 051908txt.txt

7    Q.    Did all the depositions take place in
8 Knoxville?
9    A.    No.
10    Q.    Where were the other depositions taken?
11    A.    Somewhere in Alabama.  And one was in
12 Mississippi.
13    Q.    Have you reviewed your transcripts from
14 those, from those depositions?
15    A.    I did when I was having to sign off on
16 them.
17    Q.    Okay.  And you would have reviewed each
18 one of them?
19    A.    Yes.
20    Q.    Were you represented by counsel at those
21 depositions?
22    A.    I was.
23    Q.    And was that counsel the Baker Donelson
24 firm?
25    A.    Yes.

                                                    36

1    Q.    And was it Ms. Borden or Ms. Floyd that
2 was there?
3    A.    Not in all cases.
4    Q.    Okay.  Do you remember which Baker
5 Donelson attorneys were at which depositions?
6    A.    Eric Hospodore was at one in Mississippi.
7 Lisa Borden was at one, I believe, or two, I don't
8 remember.
9    Q.    Have all those actions been resolved?
                    Page 32

Deposition of Gregory Swafford. 051908txt.txt

```
10        A.        Most of them.

11        Q.        But not all?

12        A.        No.  Not a final, no.

13        Q.        Do you know when you first started doing

14   work with Home Funds Direct?

15        A.        I do not.

16        Q.        Do you know when you last did work with

17   Home Funds Direct?

18        A.        Not exactly.  I would guess it would have

19   been 2 -- I don't know, I'm sorry.

20        Q.        Okay.  Did Home Funds ever ask you to

21   deviate from your normal standard with respect to your

22   responsibilities and duties as a settlement agent?

23        A.        Not me personally.

24        Q.        Do you know if they ever asked anyone at

25   Swafford and Hays to do so?
```

                                                                 37

```
 1        A.        No, I don't.

 2        Q.        Did you have any personal involvement

 3   with the Frazier loan?

 4        A.        I don't believe so.

 5        Q.        You were telling me earlier the rationale

 6   for brokers or lenders not entering into settlement

 7   agreements with settlement agents.  Have you ever

 8   entered into an agreement with such a lender or broker?

 9        A.        Not a written agreement.

10        Q.        Were you ever asked to enter into one?

11        A.        By a --

12        Q.        By a broker or lender.
```
                            Page 33

Deposition of Gregory Swafford. 051908txt.txt

13       A.      For guaranteed business, you mean?

14       Q.      Or just to set out exactly what each

15  side's duties and responsibilities were?

16       A.      Yes.

17       Q.      And you refused to do so?

18       A.      No.  We have done that before.

19       Q.      Okay.  Yeah, putting aside the guaranteed

20  business component --

21       A.      Right.

22       Q.      -- was Swafford ever party to an

23  agreement with a broker or lender which delineated

24  terms such as compensation?

25       A.      What they expect.

                                                     38

1        Q.      And what they expected, yes.

2        A.      I don't believe compens -- and

3   compensation, but what they expected, yes.

4        Q.      And what broker or lenders can you

5   remember doing so with?

6        A.      Homeowners Loan.

7        Q.      Okay.  Was that a long agreement?

8        A.      I don't remember how lengthy it was.

9        Q.      Were you a signatory to the agreement?

10       A.      I believe so.

11       Q.      Did you have counsel advise you with

12  respect to the terms of that agreement, whether to sign

13  it, et cetera?

14       A.      I don't think so.

15       Q.      Okay.  Did you require -- I asked you

Deposition of Gregory Swafford. 051908txt.txt

16  about training that you've had, classes, et cetera.

17  Did you require that the employees of Swafford and Hays

18  attend any classes or obtain any certifications?

19      A.    We did have -- nothing for the

20  certifications, no.  We did have some classes, yes.

21      Q.    And where were those classes?

22      A.    We had some that were in our office.  We

23  had some that were offered by our underwriter, I

24  believe they were in Nashville.  And there may have

25  been a couple in Atlanta.

39

1       Q.    Okay.  What can you recall being the

2   subjects of those classes?

3       A.    I don't remember all the subjects.  I

4   know that the ones with the underwriters I believe

5   bankruptcy, some things of that nature were in one or

6   two of them, but I don't remember all the different

7   subjects.

8       Q.    Okay.  Do you recall whether any of the

9   subjects included TILA or RESPA?

10      A.    I do not.

11      Q.    Would you have any attorneys employed at

12  Swafford and Hays?

13      A.    We did at one time.

14      Q.    And who was that person?

15      A.    Holly Sayne.

16      Q.    And what were her job responsibilities?

17      A.    To review our file -- she actually had

18  anything that could be a potential claim or a claim

Page 35

Deposition of Gregory Swafford. 051908txt.txt

19    that would come in.  She also was to review various

20    processes to make sure that we were in compliance.  And

21    she also researched different state requirements to

22    make sure we were in state requirements.

23         Q.    Okay.

24              MR. MINOR:  Earl, can we take a

25         five-minute break?


                                                          40


1              MR. UNDERWOOD:  Yeah, sure.

2         (Recess taken.)

3              THE VIDEOGRAPHER:  We're back on the

4         record.

5              MR. MINOR:  Okay.  Are you there, Earl?

6         Ready?

7              MR. UNDERWOOD:  Yeah.  I'm ready if you

8         guys are.

9              MR. MINOR:  Okay.  Earl, I'm going to

10        hand Mr. Swafford my Exhibit 28 which begins at

11        Bates numbered page 98 and goes through 175.

12              MR. UNDERWOOD:  Okay.

13    BY MR. MINOR:

14         Q.    Okay.  Mr. Swafford, as I hand this to

15    you, I want to represent to you that it -- that the

16    first few pages are the lender's instructions, and the

17    remainder of it is a portion of the loan file.

18         A.    Okay.

19         Q.    I'd like for you to take a look at the

20    first few pages and confirm for me what those pages

21    are.

Deposition of Gregory Swafford. 051908txt.txt

22      A.      It's the lender's instructions of what

23  they require for the loan.

24      Q.      Okay.  Was it common for Swafford and

25  Hays to receive a set of lender's instructions from a

                                                              41

1  broker or lender for each loan?

2      A.      From the lender, yes.

3      Q.      Okay.  The provisions of the lender's

4  instructions, were they largely standard across

5  lenders?

6      A.      Typically, yes.

7      Q.      Sitting here, can you think of any

8  significant difference between or among the

9  instructions of the various brokers and lenders you did

10  business with?

11      A.      No, I can't think of any.

12      Q.      They all pretty much asked you to fill

13  out the paperwork the way that they requested, they

14  asked you not to change any of the fees without their

15  prior consent?  Is that standard?

16      A.      Yes, it does sound like that, yes.

17      Q.      Okay.  Do you know if you've ever seen

18  this particular set of instructions before?

19      A.      I may have when I glanced through the

20  file, yes.

21      Q.      Okay.  The -- we might have different

22  numbers.  No, we don't.  The top of the Bates numbered

23  page 100.

24      A.      Uh-huh.

                    Page 37

Deposition of Gregory Swafford. 051908txt.txt

25          Q.       That information there for Swafford and

                                                                    42

1       Hays and its address and telephone number, is all that

2       information accurate?

3               A.       No.   Not any longer, no.

4               Q.       Okay.   Was it accurate as of March 25,

5       2005?

6               A.       Yeah, I believe so, yes.

7               Q.       Okay.   And that James W. Swafford is your

8       father?

9               A.       I also had a James W. Swafford which was

10      my brother who was the marketer.

11              Q.       Okay.

12              A.       So it probably was his name.

13              Q.       Okay.   The fees that are listed here

14      under B beginning with origination fee, these are fees

15      that Home Funds Direct was directing you to collect and

16      indicate on the HUD-1 at the closing, correct?

17                       MR. UNDERWOOD:   I'm going to object to

18              the form of that question, Doug.

19                       MR. MINOR:   Okay.

20              Q.       Do you understand my question?

21              A.       Yes.

22              Q.       Can you tell me, what are the fees that

23      are listed here under B?

24              A.       Okay.   And, by the way, I was saying yes,

25      I understand the question.

Page 38

Deposition of Gregory Swafford. 051908txt.txt

43

1          Q.          Yes.  I'm going to try to fix Earl's
2     objection.
3          A.          Okay.  Now, what are you asking me?  I'm
4     sorry.
5          Q.          Just tell me what these fees are under
6     paragraph B.
7          A.          Just read them, is that what you mean?
8          Q.          No, tell me what -- can you characterize
9     what these fees are?
10          A.          These are lender fees.
11          Q.          And by "lender fees," these are fees that
12     are paid directly to the lender at closing?
13          A.          Correct.
14          Q.          Okay.  You receive the amount of these
15     fees from the lender?
16          A.          Unless they do a POC or they do a net
17     wire.
18          Q.          Okay.  Were either of those done in this
19     particular instance?
20          A.          I don't know.
21          Q.          Okay.  But you don't know what amount to
22     charge for these fees unless you get that information
23     from the lender, correct?
24          A.          Yes.
25                    MR. UNDERWOOD:  Doug, I'm going to object

44

1          to the form of that question as well.  You let the

Page 39

Deposition of Gregory Swafford. 051908txt.txt

2         one before that slip by me, but if you would try

3         not to lead him so I won't have to keep doing

4         that, Doug.

5         Q.      There would be no way for you to know

6    what amounts of money to put on the HUD-1 at closing

7    except for what you receive here from the lender,

8    correct?

9                 MR. UNDERWOOD:  Object to the form of

10        that question.

11                THE REPORTER:  Excuse me, I need to go

12        off the record.

13                MR. MINOR:  Okay.  Hold on just a second,

14        Earl, the court reporter needs to go off the

15        record.

16        (Recess taken.)

17                THE VIDEOGRAPHER:  We're back on the

18        record.

19   BY MR. MINOR:

20        Q.      Okay.  The document we've been looking at

21   Bates numbered page 100, paragraph B says, "The

22   following lender items have been deducted from our

23   check draft to you"; correct?

24        A.      Yes.  So that was net funded.

25        Q.      And by "net funded," you mean?

                                                          45

1         A.      They kept their fees when they sent the

2    money to us to disburse.

3         Q.      Okay.  And they determined those fees,

4    correct?

Deposition of Gregory Swafford. 051908txt.txt

5      A.      Yes.

6      Q.      All right.  Now, I want to direct your

7  attention back to Exhibit 16 that we looked at earlier.

8  Keep that there because we may look back at it.

9      A.      Okay.

10      Q.      What's the Bates numbered pages at the

11  bottom there?

12      A.      68.

13      Q.      Okay.  What is the document that begins

14  at Bates numbered page 68?

15      A.      The HUD settlement statement.

16      Q.      Okay.  On the second page of the

17  settlement statement, there are several fees that are

18  listed.

19      A.      Yes.

20      Q.      It is correct, is it not, that the fees

21  listed at 1102, 1103, 1108, 1111 and 1201 are fees that

22  Swafford and Hays charge?

23          MR. UNDERWOOD:  Object to the form of

24          that question.

25      Q.      You can answer.

46

1      A.      Those are fees that we put on the HUD

2  settlement statement, yes.

3      Q.      Okay.  Home Funds Direct had no role in

4  calculating those fees or charging those fees, correct?

5      A.      No.

6      Q.      In fact, you communicated to Home Funds

7  the amount of those fees, "you" as in Swafford and

Page 41

Deposition of Gregory Swafford. 051908txt.txt

8   Hays?

9       A.      Yes.

10      Q.      Okay.  I want to ask you some questions

11  about each of these fees.  I want to first ask you

12  about 1101.

13              1101 was money that was paid directly to

14  Swafford and Hays for the tasks that Swafford and Hays

15  performed, correct?

16      A.      Yes.

17      Q.      Those tasks except as otherwise set forth

18  below were all performed by Swafford and Hays?

19      A.      What do you mean by "set forth"?

20      Q.      Here's what I'm trying to ask:  I know

21  that there were some tasks that you received money for

22  as set forth here that other people performed some or

23  all of the task?

24      A.      1101 would have been at one of those

25  cases that you just mentioned.

                                                        47

1       Q.      It would have been one of those?

2       A.      Yes.  It's for fees -- it's for acts that

3   we performed and the notary.

4       Q.      Okay.  Any other acts?

5       A.      You mean any other third parties?

6       Q.      Any other third parties, I'm sorry.

7       A.      No.

8       Q.      And what was the notary's name?

9       A.      I'll have to see if it's in this, this

10  piece of paperwork I have.  I doubt it is.  I would

                            Page 42

Deposition of Gregory Swafford. 051908txt.txt

11  have to see the deed of trust or something like that.

12      Q.      Okay.  Let me take a moment here to see

13  if I can find it.

14      A.      Probably the next page.

15      Q.      Diane Hilson, does that sound familiar?

16      A.      Yes.

17      Q.      Okay.  And was Diane Hilson a Swafford

18  and Hays employee?

19      A.      No, she was not.

20      Q.      She's an independent contractor?

21      A.      Yes.

22      Q.      Did she receive a set amount of money for

23  each loan that she served as notary for?

24      A.      Yes, she would have.

25      Q.      Okay.  So looking at this $275, are you

                                                            48

1  able to tell me how much of that that went to

2  compensate her?

3      A.      No, because I don't know what her charge

4  was.

5      Q.      Okay.  All right.  So you've told me

6  about 1101.  Now I want to ask you about 1102.  What

7  fee is represented by 1102?

8      A.      1102 is when we access Swafford perform

9  when receiving an order and the abstractor themselves

10  when they go out, which is a third party.

11      Q.      Kind of in layman's terms if you were

12  just telling this to a jury, what is done in the course

13  of this abstract and title search?

                    Page 43

Deposition of Gregory Swafford. 051908txt.txt

14      A.      From the time we get -- you mean what do

15  we do, or what does the whole process involve?

16      Q.      The whole process.

17      A.      We receive the order, we confirm the

18  order with the loan officer who's sent it, we put it

19  into our database.  A lot of times they'll leave the

20  county and stuff off, we have to search to find out

21  what county it is in.  Then we find an abstractor in

22  that county and send them the order.  We monitor the

23  order to make sure it comes back within 48 hours,

24  because that's what most brokers and lenders require,

25  typically brokers, rather.  And once it comes back, it

49

1  would have then been handed over -- it would have been

2  reviewed to make sure that everything was there, all

3  copies of deeds, mortgages, legal description that was

4  legible, judgments, things of that nature.  It then

5  would have been handed over to the commitment

6  department.  But what I just told you would entail

7  1102.

8      Q.      Okay.  And were there third parties that

9  performed some of those tasks?

10      A.      Yes.

11      Q.      Do you know who those third parties were

12  for this loan?

13      A.      I think I just saw it in the paperwork,

14  if you'd like me to -- Southern Land & Title, SLNT I

15  think is what that stood for.

16                MR. UNDERWOOD:  What page are you looking

Page 44

Deposition of Gregory Swafford. 051908txt.txt

17    at?

18    Q.    What page were you looking at?

19    A.    I'm sorry, it's 79.  And I'm looking at

20    the fax header at the bottom that just says "SL&T."

21    Q.    Oh, I see.  And what's that stand for?

22    A.    Actually, if you look at 77, it's

23    Southern Land & Title.

24    Q.    Was that a company that you frequently

25    did business with?

50

1    A.    I believe so.

2    Q.    Any other third parties, would there have

3    been any other third parties that performed any of the

4    tasks represented by 1102?

5    A.    I don't believe so, no.

6    Q.    Sitting here now, can you tell me whether

7    the $200 figure that is indicated for 1102 was paid in

8    full to SLT?

9    A.    I don't believe so, no.

10    Q.    Okay.  Do you know how much of it was

11    paid to SLT?

12    A.    No, I do not.

13    Q.    Okay.  But do I understand from your

14    answer that some amount less than the full $200 was

15    paid to SLT?

16    A.    Yes.

17    Q.    I'm sorry, what is the settlement at the

18    bottom of the settlement statement?

19    A.    68.

Deposition of Gregory Swafford. 051908txt.txt

20          Q.          Are you aware that some plaintiffs have

21   made the allegation that it was improper for Swafford

22   and Hays to charge an amount of money for title search

23   and abstracting in excess of what it paid the third

24   party to perform it?

25          A.          I am now, yes.

                                                                  51

 1          Q.          From any source, have you learned how

 2   much the discrepancy is between the $200 and how much

 3   was paid to the third party?

 4          A.          On this file?

 5          Q.          Yes.

 6          A.          No, I do not know.

 7          Q.          Okay.  Did that fee change, or was it

 8   standard, the $200?

 9          A.          I believe it was standard.

10          Q.          Okay.  And when you say "standard," do

11   you mean across all Swafford and Hays, all loans for

12   which Swafford and Hays served as the settlement agent?

13          A.          Yes.

14          Q.          Okay.  All right.  I now want to ask you

15   about 1103.  Please tell me in as close to lay terms as

16   you can as though you were explaining it to people who

17   knew nothing about what you did.

18          A.          Okay.

19          Q.          What task is represented by 1103?

20          A.          Title examination would have been once

21   the abstractor sent the search back over, and like I

22   said before, once the abstracting department, our

Deposition of Gregory Swafford. 051908txt.txt
23    abstracting department made sure that everything was in

24    the search, it would have been given to the commitment

25    department.   And the commitment department would have

52

1    analyzed the information that came from the courthouse

2    and put it in the form of a commitment.

3               But basically when it says "title

4    examination," that could have also included the

5    processing department that we had, meaning that once

6    the commitment went over to the broker or lender, if

7    they stated that the borrower claimed that some of the

8    judgments showing or some of the liens showing were not

9    theirs or had been satisfied prior, our processing

10   department would have cleared that up for them.   They

11   would have called and verified that, gotten releases to

12   be recorded.   If it had been released, gotten proof of

13   social security numbers if it wasn't our borrower.

14   Things of that nature.

15        Q.    Okay.   The commitment department at

16   Swafford and Hays and the processing department at

17   Swafford and Hays?

18        A.    Primarily, yes.

19        Q.    Would any third parties have been paid

20   any of that $250?

21        A.    No.

22        Q.    Okay.

23        A.    I don't believe so.

24        Q.    Give me one second.

25              Do you know how you arrived at the $200

Deposition of Gregory Swafford. 051908txt.txt

53

1    figure for the -- excuse me, the $250 figure for the

2    title examination?

3          A.       Do I know how?  I believe it was a

4    standard fee.

5          Q.       And when you say "standard fee," tell me

6    what you mean.

7          A.       Fee that was typically charged for our

8    services to perform the acts I mentioned to you.

9          Q.       Okay.  So what you mean is it was

10   standard across loans?

11         A.       Correct.

12         Q.       That Swafford and Hays handled?

13         A.       Typically, I believe so.

14         Q.       Do you know who came up with that amount

15   of money to cover those particular tasks?

16         A.       Typically when we went to brokers, they

17   had standard fees that they were willing to pay title

18   companies.  And basically if we did more work than

19   that, we pretty much had to eat it.

20         Q.       Okay.  So is it your testimony that you

21   arrived at the $250 figure because you thought it was

22   the standard industry fee for title examinations?

23                  MR. UNDERWOOD:  Object to form of the

24         question.

25         A.       I'm sorry, repeat the question.

54

Page 48

Deposition of Gregory Swafford. 051908txt.txt

1      Q.      Sure.

2              I'm trying to see if I understand from

3      your answer that the $250 was your understanding of

4      what the standard fee for title examination fees were.

5              MR. UNDERWOOD:  The same objection.

6      A.      Yes.

7      Q.      Would you have had exposure to the fee

8      for that work in your capacities at Ameriquest?

9      A.      Yes.  But, like I said, we did a lot of

10     the work ourselves, so the title companies would not

11     have charged as much.

12     Q.      Okay.  And I just want to make sure I'm

13     clear.  I may have asked you this before.  But none of

14     that money was paid to anyone, to any entity outside of

15     Swafford and Hays?

16     A.      For title examination?

17     Q.      Yes.

18     A.      No, I don't believe so.

19     Q.      Okay.  I want to direct your attention to

20     line 1108.  And as before, tell me what fee is

21     represented there.

22     A.      It would be an insurance -- excuse me,

23     insurance premium for the lender's coverage.  Sorry.

24     Q.      And what's that?  What's an insurance

25     premium for the lender's coverage as though you're

                                                         55

1      explaining it to a layperson?

2      A.      Oh.  It's the -- well, we charge for the

3      commitment or the final policy.  And, you know, I

                        Page 49

Deposition of Gregory Swafford. 051908txt.txt

4   mentioned we issue a commitment.  A commitment tells

5   the lender what they have to do to be insured.  Once

6   the loan closes, if they've met those requirements,

7   then we issue a policy which is ensuring the lender

8   that they're in first lien position or whatever lien

9   position they've asked for.  And that's the insurance.

10          Q.      And did you have a relationship with a

11   particular insurance company?

12          A.      We've had a relationship with more than

13   one, yes.  On this one, it says "Transnation" which...

14          Q.      I want to direct your attention to --

15                  MR. MINOR:  Earl?

16                  MR. UNDERWOOD:  Yes.

17                  MR. MINOR:  In my documents, it's

18          Exhibit 30 and 31, they're separated, but

19          Exhibit 30 Bates numbered 177 is the first page,

20          and then the remainder of the document picks up at

21          Exhibit 31 and page 178.

22                  MR. UNDERWOOD:  Okay.

23   BY MR. MINOR:

24          Q.      Would you please look at that and tell me

25   what that is?

56

1          A.      It's the agreement between the

2   underwriter and Swafford and Hays Settlement Services.

3          Q.      Okay.  So is this the agreement that

4   would govern the title insurance that was provided

5   pursuant to line 1108?

6          A.      Yes.

Page 50

Deposition of Gregory Swafford. 051908txt.txt

7        Q.        You can put that back in there just to
8    keep up with it.
9        A.        Oh, okay.
10       Q.        The fee listed there for title insurance
11   on Bates numbered page 69 --
12       A.        Okay.
13       Q.        -- is $200?
14       A.        The fee listed there is $200, yes.
15       Q.        Yes.
16                 MR. MINOR:  Can we go off the record for
17       a second?
18                 THE VIDEOGRAPHER:  Sure.
19          (Discussion off the record.)
20                 THE VIDEOGRAPHER:  All right.  We're back
21       on the record.
22   BY MR. MINOR:
23       Q.        Mr. Swafford, how is that $200 figure
24   arrived at?
25       A.        We have charts that we use.


                                                        57


1        Q.        And where do you get those charts from?
2        A.        The underwriter.
3        Q.        And is that a chart that takes the loan
4    amount and applies some sort of percentage and arrives
5    at the premium?
6        A.        Correct.
7        Q.        Okay.  Would that chart be with the
8    agreement that we just looked at?
9        A.        No, it would not.
                     Page 51

Deposition of Gregory Swafford. 051908txt.txt

10        Q.        Okay.  Is that chart not something that

11    would be made a part of an individual borrower's file?

12        A.        No.   In fact, I believe that with this

13    underwriter, it's on line, it was something that our

14    closing department had to log into and get it through

15    the computer.

16        Q.        Okay.  Did Swafford and Hays add any

17    amount of money to the figure that was represented from

18    the chart that you just told me about?

19        A.        I don't know.  I don't believe so.  I

20    don't know.

21        Q.        Okay.  But you would know if there was

22    any sort of standard practice to add a set amount of

23    money to that premium?

24        A.        Right, right.

25        Q.        And, to your knowledge, was there?


                                                              58


1         A.        On this file, I don't believe so, no.

2         Q.        No, I don't mean on this file, I just

3     mean in general.

4         A.        No.   We don't have that practice.

5         Q.        Okay.  And the premium that -- would you

6     receive a premium from the sale of this particular

7     policy -- excuse me, would you receive a commission

8     from the sale of a policy like this?

9         A.        We received a percentage, yes.

10        Q.        Okay.  And that would be from the $200,

11    correct, not added to the $200?

12        A.        That is correct.

Deposition of Gregory Swafford. 051908txt.txt

13     Q.     Okay.  So the borrower would pay $200,
14  that premium was remitted to the title insurer, and
15  then your commission came subsequent to that from the
16  title insurer?
17     A.     No, we typically keep our percentage and
18  remit their portion to them.
19     Q.     Okay.  So some amount of money less than
20  $200 would go to the title insurer because you would
21  retain your commission?
22     A.     That is correct.
23     Q.     Would your commission be reflected on the
24  chart that you just told me about?
25     A.     Would my commission be -- no.

59

1      Q.     Okay.  The premium that you were to
2   charge would be reflected on the chart, but not your
3   commission?
4      A.     Correct.
5      Q.     So how would you know how much of a
6   commission to retain from what you remitted to the
7   insurer?
8      A.     Based upon my agreement with the insurer.
9      Q.     Okay.  And that would be a standard
10  percentage, or was it a set amount of money?
11     A.     A standard percentage.
12     Q.     Okay.  Do you recall what it would have
13  been for Transnation at this time in 2005?
14     A.     Different states could vary, but I
15  believe in Alabama, it was 30 percent.
                Page 53

Deposition of Gregory Swafford. O51908txt.txt

16          Q.      Okay.  So you would have retained about

17     $60, and $140 would have been remitted to the title

18     insurer?

19          A.      No, the 30 percent would have been to the

20     title insurer, I believe.

21          Q.      Oh, okay.

22          A.      I can look at the agreement and tell you

23     in a minute if you want me to.

24          Q.      Yes, please do.

25          A.      Okay.  Do you want me to tell you the

                                                              60

1      page?

2           Q.      Yes.

3           A.      Page 184 says that the agent shall retain

4      70 percent of the states that were listed unless

5      otherwise specifically shown, and Alabama doesn't show

6      anything different.

7           Q.      Okay.  Do you know whether the premium

8      rates for title insurance were set by the Alabama

9      Department of Insurance?

10          A.      Versus the underwriter -- versus the

11     insurer selecting them and then filing them with it?

12     Is that what you mean?

13          Q.      Yeah.  Let me rephrase that question.

14                  Is it your understanding that the title

15     insurer had to receive permission from a state

16     insurance department such as the Alabama Department of

17     Insurance to charge a particular premium?

18          A.      Yes.

                    Page 54

Deposition of Gregory Swafford. 051908txt.txt

19      Q.      Okay.  Did you rely on the title insurer

20  to reflect the approved premium rate in its chart

21  submitted to you, or did you go back and verify that

22  rate was in fact approved by the Alabama Department of

23  Insurance?

24      A.      I relied upon --

25              MR. UNDERWOOD:  Object to the form of the


61


1       question.

2       A.      We relied upon the underwriter.

3       Q.      Was that a standard practice for you to

4   do that, to rely on the underwriter to indicate rates

5   that had been approved by the state regulatory bodies?

6       A.      Yes.

7       Q.      Have you learned from any source that any

8   of the title insurance premiums that you charged the

9   borrowers you serviced were not approved by a state

10  insurance department?

11      A.      You mean did we use incorrect amounts at

12  times, or --

13      Q.      Have you learned from any source that you

14  used an amount that was not approved by a state

15  Department of Insurance?

16      A.      I do know that we have at times made

17  mistakes on the amounts, yes.

18      Q.      Okay.  And what's your understanding --

19  let me rephrase the question.

20              Was it a mistake on behalf of a title

21  insurer, or a mistake on behalf of Swafford?

Page 55

Deposition of Gregory Swafford. 051908txt.txt

22      A.      I don't know if they were all just

23  Swafford or if some of them were the title insurer, I

24  don't know that.

25      Q.      Okay.  And would you characterize this as

62

1  being an isolated instance, or across larger groups of

2  borrowers?

3      A.      I believe it was isolated, I'm just not

4  sure.

5      Q.      I just want to understand.  Are you

6  saying that someone typed in 15 instead of 17, or are

7  you saying --

8      A.      That -- I'm sorry.

9      Q.      -- or are you saying that -- or are you

10  saying that Swafford had a policy that resulted in an

11  inaccurate charge to numerous borrowers?

12      A.      More of a clerical type error.

13      Q.      Okay.  And from what source did you learn

14  of those errors?

15      A.      I don't remember now.

16      Q.      Did Swafford do anything to correct those

17  errors?

18      A.      For future loans?

19      Q.      Or for any loan.

20      A.      Yes, I believe we did.

21      Q.      For future loans you did?

22      A.      Yes.

23      Q.      All right.  I want to take you further

24  down on page 69 going back to the HUD-1.

Deposition of Gregory Swafford. 051908txt.txt

25             I'm sorry, but before we go off that, I

                                                              63

1    just want to make sure, absolutely sure, of the $200

2    for title insurance, outside of the amounts you just

3    told me you paid, that were paid as a commission and

4    the amounts that were remitted to the title insurance

5    company, no other entity received any of that money; is

6    that correct?

7          A.      That is correct.

8          Q.      Okay.  Next I want to direct you to

9    endorsements at line 1111.

10         A.      Uh-huh.  Correct.

11         Q.      Please tell me using simple terms for a

12   layperson what task was performed as represented by

13   that fee.

14         A.      The endorsement fee, there are specific

15   endorsements that are added to a policy usually

16   required by the lender, the list what they want, what

17   endorsements they want, and then there is a fee for

18   that.

19         Q.      When you say the policy, are you talking

20   about the title insurance policy?

21         A.      Yes.

22         Q.      Okay.  Are you able to look at a

23   particular loan file and determine what endorsements

24   are added?

25         A.      I might be able to.  That is not

Deposition of Gregory Swafford. 051908txt.txt
64

```
 1   something I typically do.
 2        Q.       Okay.   Where would that information be
 3   found?
 4        A.       It could be primarily on the instructions
 5   from the lender.
 6        Q.       Okay.   Do you have that still in front of
 7   you?
 8        A.       I do.   If I can remember which one it was
 9   in.
10        Q.       I think it was --
11        A.       It was this one.
12        Q.       What's the Bates numbered page here so I
13   can find it?
14        A.       100.
15        Q.       Do you see it?
16        A.       Uh-huh.
17        Q.       Okay.   Where?
18        A.       I'm sorry.
19        Q.       I'm sorry, I thought you were looking --
20        A.       No, page 101.
21        Q.       Okay.   Okay.   Where on 101?
22        A.       It would be under Title Policy
23   Requirements.
24        Q.       Uh-huh.
25        A.       I know that they would also look at the
```

65

```
 1   deed of trust or the mortgage and see if there was any
```

Deposition of Gregory Swafford. 051908txt.txt

2     riders attached.

3        Q.      Okay. So where in the title policy

4     requirements?

5        A.      Would it state if there was -- I don't

6     know, I'll have to look through them real fast. I

7     don't know if this was the case, but I know nine says

8     that restrictions and building lines of record provide

9     that the policy contains an endorsement covering any

10     violation, I don't know if that would have been the

11     case. The following endorsements, number 15, if that

12     applied.

13        Q.      When you say "if that applied," what do

14     you mean?

15        A.      It says, the following endorsement must

16     be included in the mortgage policy if there's an ARM

17     with no negative amortization or if there's a condo or

18     a P.U.D. and if applicable to EPA. I don't know if

19     this was an ARM or negative amortization or condo or

20     anything like that.

21        Q.      So I think I understand. There was

22     someone at Swafford who would take the lender's

23     instruction and in a particular loan determine whether

24     there was anything additional that needed to be

25     included in the title insurance policy?

66

1        A.      That is correct.

2        Q.      Do you know who that person was?

3        A.      Not at this time, no.

4        Q.      So there would be HUD-1s for borrowers

Deposition of Gregory Swafford. O51908txt.txt

5    that Swafford acted as settlement agent for that will

6    have no amount of money indicated in the endorsements

7    blank?

8         A.        Uh-huh.  I mean, yes.

9         Q.        Did any third party receive any of the

10   $50 that was charged for endorsements?

11        A.        The underwriter would have been, would

12   have received money.

13        Q.        And how would that have broken down?

14   Would they have received all of it?

15        A.        I believe it's based on the same

16   percentage as the insurance.

17        Q.        Okay.  Is there a language in the --

18        A.        Contract?

19        Q.        -- contract that sets out the procedure

20   for endorsements that you just described?

21        A.        I don't see one, no.

22        Q.        Okay.  So would that have been something

23   that was industry practice?

24        A.        It would have been something our

25   underwriter would have specifically told us.


                                                         67



1         Q.        Orally?

2         A.        Yes.  I assume so since I don't see it in

3    here.

4         Q.        Okay.  All right.  Looking back to the

5    HUD-1 statement, tell me again the page, 100?

6         A.        68.

7         Q.        68.  On 69, directing your attention to

                          Page 60

Deposition of Gregory Swafford. 051908txt.txt

8   the line 1201.

9        A.      Uh-huh.

10       Q.      Tell me in layman's terms what task is

11  represented by the fee that's charged there.

12       A.      The cost of us recording the mortgage

13  riders with anything that needed to be recorded at the

14  courthouse.

15       Q.      And this would be the courthouse

16  encompassing the district where the property was

17  located?

18       A.      Correct.

19       Q.      Okay.  How was that fee determined?

20       A.      I believe we had -- you know, I don't

21  know exactly how that one was determined.  I know we

22  used Ernst which is a company that's on line.

23       Q.      E-R-N-S-T?

24       A.      Uh-huh.  E-R-N-S-T, yes.  That would give

25  you up to date recorded information.  We didn't always

68

1  know how many pages the mortgage was going to have or

2  if there was going to be any riders included once we

3  got the package.  The HUD had to be done prior to that

4  in many cases.

5       Q.      So typically that charge at least in part

6  is tied to the number of pages in the deed?

7       A.      Yes.

8       Q.      Okay.  Do you know what else is typically

9  included in that charge?

10       A.      If there's a quitclaim deed, if there's a

Deposition of Gregory Swafford. 051908txt.txt

11  warranty deed, any riders that are with the mortgage.

12      Q.      So are you saying that the fee would be

13  different if there was a quitclaim versus a warranty

14  deed?

15      A.      Right, which we would have known that,

16  but we don't know how many riders are going to be with

17  the mortgage.   Unfortunately the mortgages are not

18  always standard as far as how many pages they are.

19      Q.      I see.

20              Is there any other third party besides

21  Ernst that would have received a portion of the $120

22  indicated for the recording?

23      A.      Ernst would not have received that.

24      Q.      Oh, I'm sorry, I thought you said that.

25      A.      No.   That's who we used, but we don't

69

1  actually pay them from the HUD.

2      Q.      Okay.   So who would have received that

3  money?

4      A.      Just Swafford or the courthouse.

5      Q.      Okay.   Did you hire someone to physically

6  go to the courthouse?

7      A.      At times.   Not with every loan.   And we

8  would use UPS to ship them if we did not hire someone

9  to physically go to the courthouse.

10      Q.      Okay.   So that $120, whatever ended up

11  being the exact amount charged by the Court was paid to

12  the Court, and any remainder was money that was

13  retained by Swafford and Hays?

Page 62

Deposition of Gregory Swafford. 051908txt.txt

14    A.      On this file, yes.

15    Q.      The information you just gave me about

16  these fees, 1102, 1103, 1108, 1111 and 1201, we've just

17  gone through each and you described to me how the fee

18  was determined and who may have received a portion of

19  the money.

20         The description you just gave me, that is

21  not reduced to writing in anywhere, is it?

22    A.      No.

23    Q.      And isn't it true that because it was not

24  reduced to writing, no one at Home Funds Direct would

25  have received any document detailing the summary you

70

1  just gave me?

2         MR. UNDERWOOD:  Object to the form of

3         that question.

4    A.      That is correct.

5    Q.      Okay.  Do you have any knowledge --

6    A.      Well, let me correct that.  I don't know

7  that when we first started doing business with Home

8  Funds that they didn't ask us to put it like in e-mail

9  writing, like, you know, correspondence, but I don't

10  know of any particular document that went to them, no.

11    Q.      And you don't have any specific

12  recollection of them asking for it?

13    A.      No.

14    Q.      Do you have any knowledge of anyone at

15  Swafford and Hays providing that information to anyone

16  at Home Funds in any form?

Page 63

Deposition of Gregory Swafford. 051908txt.txt

17        A.        I do not have specific knowledge of that,
18   no.
19        Q.        Okay.  There's no way for Home Funds to
20   know what third parties Swafford may have retained to
21   perform some of the tasks referenced by these fees,
22   correct?
23                  MR. UNDERWOOD:  Object to the form of
24        that question.
25        A.        Not without asking Swafford, no.

71

1         Q.        And it was not Swafford's practice to
2    provide any of the invoices or any of the checkstubs
3    that were paid to title insurers or SLT to the
4    particular lender involved in the transaction, was it?
5         A.        No.
6                   MR. UNDERWOOD:  The same objection.
7         Q.        And it's correct that Home Funds Direct
8    never received any of the money represented by these
9    fees, correct?
10                  MR. UNDERWOOD:  The same objection.
11        A.        Correct.
12        Q.        Home Funds Direct was not affiliated in
13   any way with you or Swafford and Hays Settlement
14   Services, was it?
15        A.        No.
16        Q.        And by "affiliated," I mean, it was not
17   an affiliated company, no common ownership, no
18   agreements --
19        A.        No.

Page 64

Deposition of Gregory Swafford. O51908txt.txt

20      Q.      -- that you haven't told me about?

21      A.      No.

22              MR. MINOR:  Go off the record for a

23      second.

24         (Discussion off the record.)

25         (Recess taken.)

72

1               THE VIDEOGRAPHER:  Okay.  We're back on

2         the record.

3   BY MR. MINOR:

4         Q.      Okay.  Let's wrap up a few things,

5   Mr. Swafford.

6         A.      Okay.

7         Q.      Looking back at Bates numbered pages 68

8   and 69, does Swafford and Hays receive any money at the

9   closing beyond the charges you and I just discussed?

10        A.      No.

11              THE VIDEOGRAPHER:  Mr. Minor, do you have

12        your microphone on?

13              MR. MINOR:  Do I need to repeat that, or

14        did you get it?

15              THE VIDEOGRAPHER:  You're okay.  Thank

16        you.

17   BY MR. MINOR:

18        Q.      And you reviewed the lender's

19   instructions a moment ago?

20        A.      Uh-huh.  I mean, yes.

21        Q.      I'd like to ask you to take a moment and

22   look through a composite set of all the exhibits and

Page 65

Deposition of Gregory Swafford. 051908txt.txt
23    tell me if you see any other lender's instructions

24    besides the instructions we just discussed beginning at

25    Bates numbered page --

73

1          A.      98.

2          Q.      Okay.

3          A.      So look through this and this, or just

4    this?

5          Q.      Just this.  This is a full set of all the

6    exhibits, and just take a moment to look through.  And

7    my question to you after you've looked through is

8    whether the lender's instructions beginning at 98 are

9    the only lender's instructions?

10          A.      In the file?

11          Q.      Yes, in the file that you produced to us.

12    If you want to take that clip off, you can.

13          A.      There are some on page 42.

14          Q.      Okay.

15          A.      But it's titled Loan Status.  I just

16    noticed while I was flipping through, it says,

17    "standard closing requirements" listed on that as well.

18          Q.      Okay.

19          A.      Do I need to wait until you get there, or

20    can I keep going?

21          Q.      No, keep going.

22          A.      Okay.  Same thing on page 53.  Same thing

23    on 95.

24          Q.      Okay.

25          A.      I don't know if it's the exact same set.

Deposition of Gregory Swafford. 051908txt.txt

74

1    I'm at a set on page 100, and it's actually lender's

2    instructions.  And it goes through 106.

3         Q.      I think that's the same set.

4         A.      Okay.  Sorry, it's a thick stack.

5         Q.      No, no, that's fine.  Take your time.

6         A.      Page 158 gives some instructions.

7         Q.      Okay.

8         A.      And I believe that is all.

9         Q.      Okay.  Pass those to me.  I just want to

10   glance at 95 and 158.

11        A.      Oh, okay.  Take that then.

12        Q.      Okay.  Now, Mr. Swafford, I'm going to

13   ask you a question about the plaintiff's claims in this

14   particular case.  I'm going to read from the complaint

15   in this particular case.  Paragraph 29 says:  "The fact

16   that the charges reflected in lines 1102, 1103, 1108,

17   1111 and 1201 exceeded the actual costs of the services

18   actually provided was unknown to plaintiff.  The fact

19   that these charges were marked up, illegal, excessive

20   and otherwise improper, was unknown to and unknowable

21   by plaintiff because the actual costs for providing or

22   obtaining the services were not available to or

23   discoverable by her.  And defendant actively deceived

24   plaintiff about who was providing these services and

25   the fact that she was being defrauded.  The unknown and

75

Page 67

Deposition of Gregory Swafford. 051908txt.txt

1   inherently unknowable nature of the unlawful charges

2   did not give plaintiff any reason to inquire,

3   investigate or discover the wrongdoing.  As a practical

4   reality, it was impossible for plaintiff to detect

5   defendant's unlawful lending law violations."

6            Now, my question to you is this:  Is

7   there any evidence in the file that you have reviewed

8   or in your recollection that Home Funds Direct was

9   provided any information about the charges on the HUD-1

10  that we've discussed --

11            MR. UNDERWOOD:  I'll object to the form

12       of that question.

13            MR. MINOR:  You hadn't even let me finish

14       it.  You've got to at least wait until I finish

15       before you object, Earl.

16            MR. UNDERWOOD:  Okay.  I thought you were

17       finished.  Sorry.

18  BY MR. MINOR:

19       Q.    Is there any evidence in the file that

20  you've reviewed or pursuant to your recollection of the

21  events that Home Funds Direct received any information

22  about the charges in 1102, 1103, 1108, 1111 and 1201

23  that was not provided to Ms. Frazier?

24            MR. UNDERWOOD:  I'll object to form of

25       that question.

76

1       Q.    Do you understand my question?

2       A.    I believe.

3       Q.    Okay.

Page 68

Deposition of Gregory Swafford. 051908txt.txt

4      A.     Are you asking -- are you asking me is

5   there anything that the lender would have known that

6   Mrs. Frazier did not know?

7      Q.     About those charges, correct.

8          MR. UNDERWOOD:  The same objection.

9      Q.     11 -- I'm sorry.

10     A.     I just want to make sure I'm correct

11  before I answer it.

12     Q.     No, absolutely, you should do that.  Go

13  ahead.

14     A.     Are you meaning did Swafford provide any

15  information from Swafford, or do you mean in general?

16     Q.     I mean from Swafford.

17         You have given me in this deposition

18  information about your charges in 1102, 1103, 1108,

19  1111 and 1201 including who may have received some of

20  the money, et cetera.  And my question to you is, was

21  any of that information -- any information provided to

22  Home Funds Direct relating to those charges that was

23  not provided by Swafford that was not provided to

24  Ms. Frazier?

25     A.     No, I don't believe so.

77

1     Q.     You told me earlier in this deposition

2  that some of the litigation against Swafford had been

3  settled but not all of it?

4     A.     Correct.

5     Q.     Do you know if the Dempsey matter has

6  been settled?

Deposition of Gregory Swafford. 051908txt.txt

7      A.      I know that sounds awful, but the names

8  run together.  I believe Dempsey may have.

9      Q.      Okay.  And Mr. Underwood is counsel in

10  the Dempsey matter, correct?

11      A.      Yes.

12      Q.      Have you signed any releases settling or

13  resolving any of your litigation against Swafford?

14      A.      I have signed settlements on some of the

15  litigation with Swafford.

16      Q.      Do you know how many releases you've

17  signed?

18      A.      I believe four.

19      Q.      Okay.  Has Swafford paid money to settle

20  these cases?

21      A.      Yes.

22      Q.      Was it paid by Swafford or by insurance

23  companies?

24      A.      By Swafford.

25      Q.      Okay.  And how much money has Swafford

78

1  paid?

2      A.      I don't know the grand total.  I'm still

3  making payments on some of them.

4      Q.      Okay.  Do you remember the total for any

5  particular case, any one case?

6      A.      I don't remember the names.  I believe

7  that a couple of them settled for like 15,000 or

8  something to that nature.

9      Q.      Would you say that the payments that have

Deposition of Gregory Swafford. 051908txt.txt

10    been made to date are more or less than a hundred

11    thousand dollars?

12        A.    Less.

13        Q.    Have you settled any cases that you

14    understood to be class actions?

15        A.    Those are the ones that I believe are

16    still in the process of settling.

17        Q.    Okay.  Did the releases that you sign --

18    in those releases, did you agree to provide any

19    assistance or help to the plaintiffs' counsel in any

20    other litigation?

21        A.    On behalf -- you -- meaning that I would

22    help him if he would agree to settle?

23        Q.    Yes.

24        A.    I don't believe so.

25        Q.    Do the terms of any of those releases

79

1    call for you to provide any more information to the

2    plaintiffs continuing past the resolution, the

3    settlement of the case?

4        A.    I don't believe so.

5        Q.    Do you know if you assigned any of your

6    rights in any of these releases that you signed?

7        A.    I don't know.  I don't think so.

8        Q.    Did the Baker Donelson firm represent

9    you --

10        A.    Yes.

11        Q.    Let me finish my question.

12        A.    I'm sorry.

Page 71

Deposition of Gregory Swafford. 051908txt.txt

13        Q.        Did they represent you in the course of

14    drafting and negotiating the terms of those releases?

15        A.        Yes.

16        Q.        Did Swafford admit any liability in any

17    of those releases?

18        A.        No.

19                  MR. MINOR:  Let me look back through my

20            notes.  I may be finished.

21            (Pause.)

22    BY MR. MINOR:

23        Q.        Have there been any judgments against

24    Swafford?  I'm not talking about settlements, but

25    rulings by a court or a jury that Swafford was liable

                                                        80

1    for any civil violation?

2        A.        No.

3                  MR. MINOR:  That's all the questions I

4            have at this time.

5                  MR. UNDERWOOD:  Okay.  Let me ask the

6            reporter a question.  I sent up a package of

7            exhibits.  Do you have them?

8                  THE REPORTER:  Yes.  They're right here.

9                  MR. UNDERWOOD:  Okay.  And there should

10            be a stack of documents numbered 1 through 183 and

11            also another document that's about four pages

12            long.  Is that what you have?  Let's see how many

13            pages.  Eight pages.

14                  THE REPORTER:  I've got two renotices of

15            taking deposition, amendment number 2,

Deposition of Gregory Swafford. 051908txt.txt

16          Transnational Title Insurance company, and then

17          I've got the Bates document you're talking about.

18                    MR. UNDERWOOD:  All right.  Great.

19                    Do you guys want to take a break, or get

20          started?

21                    MR. MINOR:  We're ready.

22                    MR. UNDERWOOD:  Okay.

23     EXAMINATION BY MR. UNDERWOOD:

24          Q.     Greg, I want you to do something -- may I

25     call you Greg?

                                                           81

1          A.     Sure.

2          Q.     I want you to do something.  I want you

3     to start with what you did in Birmingham and just walk

4     us through how everything that you guys do in one of

5     these transactions.

6                    And the first question I would ask you is

7     this:  How would Swafford and Hays know that Ms. Cheryl

8     Frazier in Dothan, Alabama needed a loan closed?

9          A.     The broker or lender would send us an

10     order asking for us to issue a commitment for insurance

11     on that loan.

12          Q.     And how would that be received by

13     Swafford now?

14          A.     Via e-mail or fax.

15          Q.     And what's the next thing that would

16     happen then?

17          A.     We would then order an abstract search by

18     an abstractor or third party to go to the courthouse

                              Page 73

Deposition of Gregory Swafford. 051908txt.txt

19    and search that property's records and that borrower's

20    records.

21         Q.       All right.  And who was the abstractor in

22    this transaction that we're here about today?

23         A.       It looks like it was Southern Land &

24    Title.

25         Q.       Now, Mr. Minor may have asked you this,

82

1     but do you know what their charge was in this

2     transaction?

3          A.       No, I do not.

4          Q.       Do you know what their typical charge

5     was?

6          A.       I'm sorry, no, I don't.

7          Q.       All right.  Where is that information

8     available?

9          A.       It would be in accounting records at my

10    office.

11         Q.       That was the typical charge and the

12    charge for Ms. Frazier's work?

13         A.       Yes.

14         Q.       You didn't bring that with you today?

15         A.       No, I did not.

16         Q.       What's the next thing that would happen

17    after receipt -- well, after order for the abstract?

18         A.       The abstract would come back, we would

19    make sure that all the documentation was there, copies

20    of all the judgements, legal description, deeds of

21    trust, mortgages.  We would then issue a commitment for

Deposition of Gregory Swafford. 051908txt.txt

22  insurance and send that to the broker or lender.

23        Q.      Now, physically, who would do that in

24  your office?

25        A.      There were departments that would do it.


                                                         83


1   It could have been -- varied number of people.

2         Q.      Can you look at this file and tell us who

3   it was?

4         A.      Not with the information I have, no.

5         Q.      And there were four that you received

6   from Southern Land Title, is that document -- first

7   off, has the reporter given you the documents I have

8   sent up there?

9         A.      He has not yet.

10              MR. UNDERWOOD:  Okay.  If you would hand

11        those documents to the witness, Mr. Reporter.  And

12        there should be a copy there for Mr. Minor as

13        well.

14              THE WITNESS:  Okay.  I have them.

15        Q.      Let me direct your attention to page 77.

16        A.      Okay.

17        Q.      What is that document, please, sir?

18        A.      It is the write-up sheet from the

19  abstractor on this property.

20        Q.      And what would your employee do when they

21  receive this write-up sheet?

22        A.      This is the sheet that they would have

23  used to make sure that all the appropriate copies and

24  backup documentation was attached.

                    Page 75

Deposition of Gregory Swafford. 051908txt.txt

25          Q.        All right.  And would they transfer this

84

1     information over to the title policy?

2          A.        Title commitment, yes, they would.

3          Q.        And then what's the next thing that would

4     happen?

5          A.        The commitment would be sent to the

6     broker or lender, and we would wait for instructions

7     from them.

8          Q.        And what would be the next instructions

9     you would typically receive?

10          A.        It varies per file, but typically they'll

11     let us know if there's any borrowers that need to be

12     removed, added via quitclaim or warranty deed.  They

13     would tell us if they did payoffs on any of the taxes

14     or any of the liens or judgments that we gave them

15     information for.  If there was anything that they

16     thought was improper on title, meaning that it wasn't

17     actually the borrower's lien or judgment or something

18     had been paid in the past, we would research that for

19     them.

20          Q.        All right.  And, of course, all that

21     information is included on page 78 and 79, isn't it?

22          A.        What do you mean by "all that information

23     is included"?

24          Q.        Well, whether or not there are judgments,

25     taxes owing and that type of thing.

Deposition of Gregory Swafford. 051908txt.txt

85

1        A.        Right.

2        Q.        And that's part of the abstractor's job,

3    was to get that information for you; is that a fair

4    statement?

5        A.        Yes, to get us copies of that

6    information.

7        Q.        All right.  And assume for me that the

8    lender wanted to go ahead with the loan.  What's the

9    next thing then that would happen?

10        A.        It varies per lender how it comes to us,

11    but they would send us over a HUD request or

12    instructions to close or sometimes they would just call

13    us and tell us they'd like us to go ahead and schedule

14    a closing on a certain date.  But they would let us

15    know at that point that they're ready to close.

16        Q.        All right.  Back in 2005, who was

17    Swafford Settlement Services' biggest customer?

18        A.        I believe it was Homeowners Loans still

19    in 2005.

20        Q.        All right.  And who would have been the

21    second largest customer?

22        A.        Home Funds very well may have been the

23    second, I'm not sure at that time.

24        Q.        Is it fair to say that Swafford

25    Settlement Services would have closed hundreds of loans

86

1    for Home Funds Direct?

Page 77

Deposition of Gregory Swafford. 051908txt.txt

2          MR. MINOR:   Object to the form.

3      A.        I'm not sure about hundreds, quite a few.

4      Q.        All right.  Let me ask it this way:  Do

5   you have an opinion about how many loans Swafford

6   Settlement Services has closed for Home Funds Direct?

7      A.        No, I do not.

8      Q.        Would it be more or less than a hundred?

9      A.        My guess would be more than a hundred.

10      Q.        Are you familiar with the -- well, let me

11   ask it this way.  All right.  I believe you told me

12   that when the broker or lender wanted to go ahead with

13   the transaction after receipt of the title commitment,

14   was the HUD-1 prepared, is that what you said?

15      A.        You mean if they wanted to proceed with

16   closing?  Yes, a HUD-1 statement was prepared.

17      Q.        All right.  And if you would, describe

18   the process for doing that with regard to Accredited

19   loans or Home Funds Direct loans.

20      A.        They would have instructed us as to what

21   their fees would be.  We would put those fees, our

22   fees, any payoffs of judgments, liens, et cetera, plus

23   any creditors that weren't on title that they wanted to

24   pay in addition, that they would instruct us to pay.

25   And then we would send the HUD over for approval.

87

1      Q.        And typically how was that done?

2      A.        Via e-mail.  Is that what you mean?

3      Q.        Yes.

4      A.        Okay.  Yeah, via e-mail.  And, you know,

Page 78

Deposition of Gregory Swafford. 051908txt.txt

5  depending on the company, it would either be their

6  closing department or underwriters that would approve

7  it.

8      Q.    And where would you get the fees that

9  Home Funds Direct would be charging?

10     A.    They would give them to us.

11     Q.    In what form?

12     A.    I believe Home Funds Direct had closing

13  instructions which was actually where they were listed.

14     Q.    All right.  Is that document 100?

15     A.    Yes, it is.

16     Q.    Once your fees are added to the HUD-1

17  settlement statement, what's the next step in the

18  process?

19     A.    Well, that's -- like I said before,

20  that's joined in with adding their fees, our fees,

21  everything that's supposed to be paid off, and we send

22  it for approval.

23     Q.    It's sent to Home Funds Direct for

24  approval?

25     A.    Yes.

                                                      88

1      Q.    And what happens after that?

2      A.    They either approve it and send over a

3  closing package that we can go ahead and send to the

4  notary or attorney, or someone on staff if it's a local

5  closing.  Or they tell us that they need us to amend

6  the fees or the payoffs in some way.

7      Q.    All right.  Let me ask you to assume that

                      Page 79

Deposition of Gregory Swafford. 051908txt.txt

8    it's approved.  What's the next step?

9        A.      We send the HUD and all of the documents

10   to the notary or attorney for closing.

11       Q.      And how is that done?

12       A.      Typically via e-mail.  If not e-mail,

13   fax.

14       Q.      And did you say it's not e-mailed back?

15       A.      No, I said if not e-mail, then we do it

16   via fax.

17       Q.      I see; okay.

18               All right.  And then after the -- well,

19   let me back up a little bit and let me ask you this:

20   How do you locate a notary in Dothan, Alabama?

21       A.      There would have been several different

22   options we would have had.  People we've used before in

23   Alabama.  Notary Rotary.  There's different websites

24   that you can go to to find notaries that are approved

25   in that area.

89

1        Q.      And I believe you already told us that

2    you don't know what the notary charged in this

3    transaction; was that right?

4        A.      That is correct.

5        Q.      All right.  And where is that information

6    available?

7        A.      We would have paid her, I believe, out of

8    QuickBooks.  It would be in our accounting records.

9        Q.      And is that information still available?

10       A.      From 2005?  It should be.

Page 80

Deposition of Gregory Swafford. 051908txt.txt

11          Q.          All right.  You didn't bring it with you

12     today, did you?

13          A.          No.

14          Q.          All right.  After the loan is closed by

15     the notary, what happens next?

16          A.          They overnight the loan package back to

17     us, and we put it in a specific order.  Each lender has

18     their own particular order that they prefer it to be

19     in.  We verify signatures, dates for accuracy.  We make

20     sure everything that needs to be notarized is

21     notarized.  There are things, forms that the lender has

22     in there that we have to follow step by step.  And then

23     we sign our own names to verifying accuracy, verifying

24     everything that's in the file.  And then we send it to

25     the lender for funding approval via overnight.


90


1          Q.          All right.  And what happens after that?

2          A.          They would give us the wire and a funding

3     approval to fund the loan.

4          Q.          Has the mortgage -- how is the mortgage

5     sent for recording?

6          A.          It's not sent for recording until the

7     loan funds and checks are disbursed, and then we would

8     send it for recording.  And there is usually someone on

9     staff that calls that courthouse and asks for specific

10    instructions to see if there's -- because each

11    courthouse is different to know what they require.

12         Q.          Someone on you staff calls the

13    courthouse?

Page 81

Deposition of Gregory Swafford. O51908txt.txt

14      A.      Yes.

15      Q.      Do they get the amount of the recording

16  fee from the courthouse?

17      A.      Either from the courthouse or from Ernst

18  Publishing.  It's usually verified with the courthouse

19  though.

20      Q.      And where is the -- physically the

21  original mortgage at the time that a person would call

22  the courthouse to verify the recording fees?

23      A.      It's in Swafford's possession.

24      Q.      All right.  And does someone count the

25  number of pages in the mortgage so that they can

91

1   accurately compute the recording fee for the mortgage?

2       A.      That is correct.

3       Q.      And how long has that been Swafford's

4   practice?

5       A.      To count the pages before we send it out

6   for recording?

7       Q.      Yes, sir.

8       A.      Since the day that we opened, I believe.

9       Q.      All right.  I thought you said earlier

10  that many times you didn't know how many pages were in

11  the mortgage when you sent it for recording.

12      A.      No, I said we don't -- when we do the HUD

13  settlement statement, we don't know how many pages are

14  in the mortgage.

15      Q.      Thank you.

16      A.      You're welcome.

Page 82

Deposition of Gregory Swafford. 051908txt.txt

17              MR. MINOR:  Is that all you have, Earl?

18              MR. UNDERWOOD:  No, no, it's not all I

19       have.

20              MR. MINOR:  Oh.

21              MR. UNDERWOOD:  Not by a long shot.

22              MR. MINOR:  Oh, okay.

23   BY MR. UNDERWOOD:

24       Q.      Mr. Swafford, was there a time that

25   Swafford and Hays or Swafford Settlement Services was


                                                        92


 1   losing money on recording fees?

 2       A.      Yes.

 3       Q.      And about when was that, please, sir?

 4       A.      I would guess 2001 through 2002, possibly

 5   2003.

 6       Q.      All right.  And was there some sort of

 7   change in the procedure for the determination of the

 8   recording fee at that time?

 9       A.      Yes.

10       Q.      And if you would, tell us about that.

11       A.      We started calculating the recording fee

12   with the maximum number of pages that could possibly be

13   sent to that courthouse, meaning that we allowed for

14   the largest deed of trust we had ever recorded,

15   endorsements -- not endorsements, but riders, things of

16   that nature.

17       Q.      And is it fair to say for Alabama loans

18   that that fee was $120 typically?

19       A.      Yes.  I believe so.

Deposition of Gregory Swafford. 051908txt.txt

20      Q.      And how long was that practice in place?

21      A.      I do not know the exact amount of time.

22   Maybe a couple years, three years, I'm not sure.

23      Q.      All right.  And during that time period,

24   were there occasions where Swafford would charge more

25   for the recording fee than was actually required for

93

1   the recording of the mortgage?

2      A.      Yes.

3      Q.      And what would happen to the difference

4   between the recording fee that was charged on the HUD-1

5   as opposed to what was actually charged by the

6   recording by the probate court?

7      A.      For a period of time it was retained by

8   Swafford.

9      Q.      And did that happen with regard to

10   Ms. Frazier's file?

11      A.      I believe so.

12      Q.      And do you know how much recording fee

13   was retained by Swafford with regard to Ms. Frazier?

14      A.      I do not know.  I do not know what the

15   original recording fee was, and I don't know what -- if

16   we had recorded any releases or anything afterwards, so

17   I'm not sure.

18      Q.      Now, your company keeps a ledger for each

19   file and that sort of thing; does it not?

20      A.      Yes, it does.

21      Q.      Okay.  And did you bring any of those

22   documents with you today?

Page 84

Deposition of Gregory Swafford. 051908txt.txt

23    A.    No. I thought the ledger was in here,

24  but I don't know if it is.

25    Q.    All right. Well, in any event, let me

94

1  ask you to look at page 31.

2    A.    Okay.

3    Q.    Okay. Do you see -- well, first off,

4  tell us what that is.

5    A.    It's a legal description, it's Exhibit A.

6    Q.    And there's some small print down toward

7  the bottom of the page. Do you know what that is?

8    A.    It looks like what their recording fee

9  and mortgage tax fee were for this file from the

10  courthouse.

11    Q.    Okay. And is there more than one

12  component of the total recording cost for a mortgage?

13    A.    It appears that in Alabama, yes, there's

14  a mortgage tax and the recording fee.

15    Q.    All right. And if you would, let me ask

16  you to look over to page 132.

17    A.    Okay.

18    Q.    And if you'd look at line 1201.

19    A.    Yes.

20    Q.    How much was Ms. Hall charged for

21  recording fee according to that HUD-1?

22    A.    $120.

23    Q.    And how much was that recording fee

24  according to document number 31?

25    A.    For mortgage, it was for $56.

Page 85

Deposition of Gregory Swafford. 051908txt.txt

95

1      Q.      And so did Swafford retain the $64
2  difference?
3      A.      Yes.
4      Q.      Now, let me ask you if you would to flip
5  over to page 3.
6      A.      Okay.
7      Q.      And what is that document, please, sir?
8      A.      It is a remittal form where we remit to
9  our underwriter.
10     Q.      It says "Commonwealth" at the top,
11 doesn't it?
12     A.      Yes.
13     Q.      Was that the underwriter that was used --
14 when you say "underwriter," do you mean the title
15 insurance company?
16     A.      Yes.
17     Q.      Was that the title insurance company that
18 was used in this transaction?
19     A.      Basically.  Commonwealth was like the
20 parent company.
21     Q.      All right.  And there's a -- well, first
22 off, it says the loan amount.  What is the loan amount?
23     A.      56,000.
24     Q.      And in the next column next to that, it
25 says "gross premium" --

96

Page 86

Deposition of Gregory Swafford. 051908txt.txt

1      A.      Right.

2      Q.      -- "$126"; is that right?

3      A.      That's correct.

4      Q.      Where does that figure come from?

5      A.      The person sending the final policy and

6    the remittal would have calculated that from sheets

7    that are provided or on line, rates that are provided

8    by the underwriter.

9      Q.      All right.  And let me ask you if you

10   would to take a look at the other --

11             MR. UNDERWOOD:  Reporter?

12             THE REPORTER:  Yes.

13             MR. UNDERWOOD:  Would you mark the other

14        document?  The Amendment No. 2, Transnation Title

15        Insurance Rates.  Let's go ahead and mark these.

16        Mark these Bates stamped ones, Plaintiff's

17        Exhibit 1 and mark this other one as Plaintiff's

18        Exhibit 2.

19             MR. MINOR:  Do you want to just do them

20        consecutively, Earl, or just do one -- make mine 1

21        and yours 2 and 3?

22             MR. UNDERWOOD:  That will be fine.

23             MR. MINOR:  Okay.

24             MR. UNDERWOOD:  Wait a minute, what are

25        we marking as 1?

                                                          97

1              MR. MINOR:  You know, I gave him at the

2         beginning of my deposition all of my exhibits, and

3         I just was going to do them a composite 1.

                          Page 87

Deposition of Gregory Swafford. 051908txt.txt

4          MR. UNDERWOOD:  Yeah, sure, that's the

5     easiest way to do it.  All right.  Just mark mine

6     2 and 3, that will be fine.

7          MR. MINOR:  Okay.

8        (Exhibit 2 - documents bearing Bates production

9          numbers Swafford0001-183.)

10       (Exhibit 3 - document entitled Amendment No. 2

11          Transnation Title Insurance Company Title

12          Insurance Premium Charges Revised October 28,

13          2002.)

14          THE REPORTER:  Okay.  They're marked.

15          MR. UNDERWOOD:  Give the witness Exhibit

16     No. 3, please.

17          THE WITNESS:  I have it.

18  BY MR. UNDERWOOD:

19       Q.     Have you seen a document like this

20  before?

21       A.     Yes.

22       Q.     Just tell us what it is.

23       A.     It appears to be the rates from

24  Transnation Title.

25       Q.     And is that the company that was used to

                                                           98

1   write title insurance for the transaction we're here

2   about this afternoon?

3        A.     It was.

4        Q.     And if you would, take a look and review

5   it for me.  You're familiar with these documents,

6   aren't you?

                          Page 88

Deposition of Gregory Swafford. 051908txt.txt

7       A.      Fairly familiar.

8       Q.      And take a look at it and tell us which

9   one of these rates would apply to Mrs. Frazier's

10  transaction.

11      A.      Okay.  It would have been number 3.

12      Q.      And if you would, Greg, tell us how you

13  would compute using number 3 the premium for

14  Mrs. Hall's transaction.

15      A.      Well, up to a hundred thousand, you would

16  have done $2.25 per thousand.  Anything else additional

17  in the loan amount above a hundred thousand up to

18  500,000 would have been $1.75 per thousand.

19      Q.      Okay.  How much was her loan?

20      A.      I think we said 56, so it would have been

21  56 times $2.25.

22      Q.      Well, I get $126.  Is that what you get?

23      A.      I don't have a calculator.

24      Q.      Okay.  Well, can you take a minute, and

25  maybe you can figure it out longhand and see what you

99

1   get.

2       A.      Sure.

3               MR. MINOR:  Do you want a piece?

4               THE WITNESS:  Yeah, if you don't care.

5               MR. MINOR:  Sure.

6       A.      In longhand, I came up with 136, but

7   maybe I made a mistake.

8       Q.      Well, if -- double-check it.

9       A.      Yeah, yeah.

Deposition of Gregory Swafford. 051908txt.txt

10      Q.      Okay.  Go ahead.  What did you get?

11      A.      126.

12      Q.      All right.  So if you flip back over to

13  page number 3, that was the charge on the Commonwealth

14  remittal form; is that right?

15      A.      Right.

16      Q.      Now, let me ask you, let's look back at

17  page 132.  And if you would look at line 1109.  And do

18  you see the figure there of $67,500?

19      A.      Yeah.

20      Q.      Do you know why that's there instead of

21  the 56,000 that we talked about earlier?

22      A.      I have no clue.

23      Q.      All right.  And this is the form that

24  went to Home Funds Direct, isn't it?

25      A.      Yes.


                                                    100


1       Q.      The one that they approved?

2       A.      Yes.

3       Q.      And on to line 1108, can you tell us

4   again why the charge was $200 instead of 126?

5       A.      I don't know.  It looks like -- I don't

6   know if this calculates up, but it looks like they were

7   using 67,500 in error.

8       Q.      Well, would you do that calculation for

9   me and tell me what you get?

10      A.      Sure.

11              THE WITNESS:  I gave you your pen back

12      already.  Sorry.

Deposition of Gregory Swafford. 051908txt.txt

13                     MR. MINOR:  Oh.

14        Q.        I get 151,750.  Is that what you get?

15        A.        750.    Yeah.

16        Q.        So you'd round that up to 152, wouldn't

17   you?

18        A.        Probably, yes.

19        Q.        So that's still $1300, isn't it?

20        A.        Yes.

21        Q.        All right.  And do you have any other

22   explanation for the difference?

23        A.        I do not.

24        Q.        Now, if you would, drop down to -- well,

25   let me ask you this:  Isn't it true that for a period


101


1    of time that Swafford and Hays and/or Swafford and Hays

2    Settlement Services had a minimum charge for title

3    insurance of $200?

4         A.        I don't know.  I believe we might have.

5    We didn't have any kind of policy about that, but I

6    believe that the closing department did do that.

7         Q.        For what time period did that take place?

8                     THE WITNESS:  Oh, I'm sorry.

9         A.        I don't know.

10        Q.        Was that policy in effect at the time of

11   Ms. Frazier's loan?

12        A.        I don't know for sure, but it appears

13   like it was.

14        Q.        All right.  Who would have that

15   information about when that policy was in effect?
                        Page 91

Deposition of Gregory Swafford. 051908txt.txt

16      A.      I don't think there would be anything
17  that I could produce for any time, specific period of
18  time.
19      Q.      All right.  Let me ask you about line
20  111.
21      A.      Uh-huh.
22      Q.      Or 1111, I'm sorry.  There's a $50 charge
23  in there for an endorsement; is that right?
24      A.      Yes.
25      Q.      Now, what endorsement was that for?


                                                        102


1       A.      I'm not sure.
2       Q.      Okay.  Well, you have the closing package
3   there, don't you?  Can you not look through it and tell
4   us what endorsement was required by the lender that
5   Ms. Hall was charged $50 for?
6       A.      Do you remember what page the lender's
7   instructions are?
8       Q.      Let's see.
9               MR. MINOR:  It might not be numbered the
10          same in his.
11              MR. UNDERWOOD:  I think they're the same
12          numbers.
13              MR. MINOR:  Okay.  Was it 98 or a
14          hundred?
15              THE WITNESS:  I found it.
16              MR. MINOR:  99.
17  BY MR. UNDERWOOD:
18      Q.      If you flip over to page 101, I believe
                        Page 92

Deposition of Gregory Swafford. 051908txt.txt

19  you said earlier that it had something to do with

20  number 15 on page 101 close to the bottom?

21      A.      Right.  It would have either been number

22  9 or number 15.

23      Q.      Okay.  Now, was this a standard

24  residential policy or commercial policy?

25      A.      This would have been residential.


                                                    103


1      Q.      If you would, let me get you to look at

2  Exhibit No. 3.

3      A.      Okay.

4      Q.      All right.  Flip over to the -- do this

5  for me, have the reporter do this on the record so

6  we'll be straight.  I need the pages for this exhibit

7  numbered.  I should have done that before I sent it to

8  you guys.  I've got eight pages.

9      A.      Okay.  He's done that and given it back

10  to me.

11      Q.      All right.  Let me ask you to look at

12  page 4.

13      A.      Okay.

14      Q.      All right.  And the last paragraph.  If

15  you would, start with the line endorsement charges and

16  read that sentence for me.

17      A.      The one that says, "all commercial

18  endorsements"?

19      Q.      No, the next sentence.

20      A.      Okay.

21      Q.      Starting with "endorsement charges."

Deposition of Gregory Swafford. 051908txt.txt

22      A.      "There will be no charge for the standard

23  residential endorsements."

24      Q.      Now, well, according to that then, there

25  shouldn't have been any charge for any other

104

1   endorsement on a standard residential policy; isn't

2   that right?

3       A.      You are correct.

4       Q.      Now, do you know that -- whether or not

5   Swafford ever adopted a policy of refunding some of

6   these recording fees that were charged on 1201?

7       A.      Yes, we did.

8       Q.      And do you know when that was?

9       A.      I don't know the specific date, no.

10      Q.      And do you remember why that was done?

11      A.      We felt like we should not be retaining

12  the recording fees if they were not used for the actual

13  recording of the mortgage or future releases, et

14  cetera.

15      Q.      Who is Bill Long?

16      A.      Bill Long is -- was an attorney that

17  worked for Homeowners Loan.

18      Q.      And did he bring it to your attention

19  that charging more than the recording fee might be a

20  RESPA violation?

21      A.      I believe he might have, yes.

22      Q.      And wasn't that when the policy changed?

23      A.      Probably so, yes, that sounds right.

24      Q.      And do you recall a series of e-mails

Deposition of Gregory Swafford. 051908txt.txt

25    between you and Bill Long regarding the charge on line

105

1    1111, the endorsement fee?

2         A.    I do not.

3         Q.    Well, do you have any knowledge of the

4    endorsement fee being charged in lieu of the additional

5    recording charge?

6         A.    An endorsement fee being charged in lieu

7    of what?

8         Q.    Of the additional recording charge.

9         A.    No, I do not.

10        Q.    Well, isn't this what happened, didn't

11   you start -- Swafford start refunding recording fees

12   after learning from Mr. Long that that might be a RESPA

13   violation and then just start charging the $50

14   endorsement fee to make up the difference?

15        A.    I think there was a fee that we did -- we

16   were charging, but I don't believe it was an

17   endorsement fee.

18        Q.    Now, if you would, Mr. Swafford, can you

19   look at the documents there in front of you and tell us

20   what service that Mrs. Frazier would have gotten for

21   this $50 on the endorsement fee on line 1111?

22        A.    On endorsement fee doesn't have any

23   service other than endorsements.

24        Q.    Okay.  And -- well, if she got an

25   endorsement, wouldn't it be -- would that be attached

Page 95

Deposition of Gregory Swafford. 051908txt.txt
106

1    to the title policy?

2         A.        To the title, the final policy, yes.

3         Q.        All right.  And is that -- look at

4    document number 5.

5         A.        Okay.

6         Q.        Is that the final policy?

7         A.        It appears to be, yes.

8         Q.        And can you look at it and tell me what

9    endorsements there were on the policy?

10        A.        Environmental protection lien endorsement

11   is the only one that I see.

12        Q.        And is that a standard residential

13   endorsement?

14        A.        I'm not sure.  I believe it probably is.

15        Q.        Show me what page, tell me what page that

16   you saw the environmental endorsement.

17        A.        Page 9.

18        Q.        And is that an endorsement form 8.1?

19        A.        Yes.

20        Q.        And what does ALTA stand for?

21        A.        American Land Title Association.

22        Q.        And let me direct your attention again

23   now to page 4 of Exhibit No. 3.

24        A.        Okay.  Okay.

25        Q.        All right.  Let me ask you if you would

107

1    to look at that last paragraph.  And I want you to

Deposition of Gregory Swafford. 051908txt.txt

2    come -- do you see the word "minerals" that would be

3    the last word on the left if you go down?

4         A.    Yes.

5         Q.    All right.  Do you see ALTA 8.1 right

6    above that?

7         A.    Yes.

8         Q.    Environmental lien?

9         A.    Yes.

10        Q.    This is the same form as is in this

11   endorsement that's on page 9, isn't it?

12        A.    Yes.

13        Q.    And it's already included in the base

14   premium according to the Alabama rate, isn't it?

15        A.    According to this page 4, yes.

16        Q.    So it would be -- is it true then

17   Mrs. Frazier would have already paid for it in the base

18   premium?

19        A.    Yes.

20        Q.    There wasn't any other endorsement or

21   anything else she could have received in exchange for

22   that $50 that she was charged on 1111?

23        A.    Not that I can see, no.

24        Q.    Let me ask you if you would to look at

25   page 13.

108

1         A.    Okay.

2         Q.    And if you would, tell us what that is,

3    please, sir.

4         A.    It's the on-line calculator for loan

Deposition of Gregory Swafford. 051908txt.txt

5   premiums.

6       Q.      And what was the occasion, or how was

7   this document generated?

8       A.      It doesn't have any reference to it, so

9   I'm assuming that it was generated for this loan.  I'm

10  not sure.

11      Q.      Is this something that's usually in your

12  closing file?

13      A.      I don't know if we always print it off,

14  but it would be standard, yeah, it would be something

15  that you would see in files.

16      Q.      Now, does Transnation ever audit Swafford

17  and Hays to make sure that they're getting the proper

18  amount of premium?

19      A.      Yes, all -- well, I shouldn't say "all,"

20  every underwriter we've ever had has had regular

21  audits.

22      Q.      Sure.  And how is it that they do that?

23      A.      They come into the office and look at

24  random -- they pull files at random and audit the

25  files.


                                                    109


1       Q.      And do you know how they -- what

2   calculations they go through to make sure that they're

3   getting paid what she should be receiving?

4       A.      No, I'm sorry, I don't.  I'm not sure

5   what -- what is entailed in their audits.

6       Q.      All right.  What other title insurance

7   companies have you done business with since Swafford

Deposition of Gregory Swafford. 051908txt.txt

8  and Hays or Swafford Settlement Services has been in

9  business?

10      A.      American Pioneer is what we originally

11  were with, which became Ticor.   And we've done business

12  with the Commonwealth family, which is Commonwealth,

13  Transnation and Lawyer's Title.

14      Q.      And do you still do business with Ticor

15  anymore?

16      A.      I do not.

17      Q.      Why is that?

18      A.      We went strictly with Commonwealth.

19      Q.      Didn't they terminate your agency?

20      A.      No, they did not.

21      Q.      Did you ever have any conversations with

22  anyone from Ticor about -- with regard to charging more

23  than the legal rate for title insurance?

24      A.      I don't remember.   No, I don't believe

25  so, but I don't remember.

110

1       Q.      Was that an issue with Ticor?

2       A.      I don't recall them ever bringing that to

3  my attention.

4       Q.      Now, Mr. Minor asked you some questions

5  about -- let me see, let me find the page.   Sorry,

6  guys, just a little clumsy doing this over the phone.

7       A.      That's fine.

8       Q.      If you would, let me get you to turn over

9  to page 131.   And we're in Exhibit 2.

10      A.      Okay.

Deposition of Gregory Swafford. 051908txt.txt

11          Q.          I think what I need is on the next page,

12     page 132.

13                      Now, this charge on line 801, where did

14     that come from?

15          A.          801 would be given to us from Home Funds

16     Direct.

17          Q.          And what about line 803?

18          A.          The same.

19          Q.          Was there an appraisal done in this file?

20          A.          I would not know.  We don't normally get

21     the appraisals.  We don't order them.

22          Q.          Did you order them for Homeowners Loan

23     Corporation?

24          A.          No, to my knowledge, we've never ordered

25     an appraisal for any lender.


                                                                 111


1          Q.          Let me ask you to look at line 903.

2     Do you know where that figure came from, hazard

3     insurance?

4          A.          It would -- it would be from the lender.

5          Q.          What about line 1004?

6          A.          That would be a calculation that -- it

7     can come from the lender, it can come from us, but

8     typically that's just to set up an escrow account for

9     the lender, and it's so many months' worth of property

10     tax.

11          Q.          How would we tell in this transaction if

12     it was something that was figured by Swafford

13     Settlement Services or if it came from the lender?

                              Page 100

Deposition of Gregory Swafford. 051908txt.txt

14    Would it be on the closing instructions?

15         A.      Yeah, let me flip there real fast.  It

16    appears that it was calculated by Home Funds, it's on

17    their closing instructions.

18         Q.      All right.  What line is that on?  I just

19    want to get there.

20         A.      It's on page 100, and it's line 1001,

21    hazard insurance, four months.

22         Q.      Okay, thank you.

23         A.      Oh, wait, wait, wait, I'm sorry.  Yes,

24    that's it.  Are we on -- yeah, are we talking about 101

25    still?  I'm sorry.


                                                      112


1          Q.      Yes, yes.

2          A.      Okay.

3          Q.      Now, did Home Funds Direct require the

4     use of Swafford Settlement Services to close this loan?

5          A.      The borrower?

6          Q.      Yes.

7          A.      Not my knowledge.  They had more than one

8     title company.

9          Q.      Well, do you know if they sent the loan

10    package to any other title company for closing?

11         A.      I wouldn't have any way of knowing that.

12         Q.      Okay.  Let's go back to page 132 if you

13    would.

14         A.      Okay.

15         Q.      I think you testified earlier that there

16    were a number of services done by, this says, "Swafford

Page 101

Deposition of Gregory Swafford. 051908txt.txt

17    and Hays Settlement Services."  Were you doing business

18    as Swafford and Hays back then if it says so on here?

19        A.        Probably so, yes.

20        Q.        And that there were a number of services

21    performed by Swafford and Hays Settlement Services

22    including notary service for that charge on line 1101?

23    That was your earlier testimony, right?

24        A.        That is correct.

25        Q.        And were each of those services required

113

1    by Home Funds Direct?

2        A.        Everything that we would have done would

3    have been something that they required, yes.

4        Q.        You didn't do anything on line 1101 that

5    they didn't require, did you?

6        A.        No.

7        Q.        All right.  I mean, a notary was

8    required?

9        A.        Correct.

10        Q.        All right.  Now, what about on line 1102,

11    were those services also required by Home Funds Direct?

12        A.        Yes.

13        Q.        And would the same be true of the

14    services on line 1103?

15        A.        Yes.

16        Q.        And did they also require title

17    insurance?  When I say "they," I mean Home Funds

18    Direct.

19        A.        Yes, they did.

Page 102

Deposition of Gregory Swafford. 051908txt.txt

20      Q.      And did they also require that the

21  mortgage be recorded?

22      A.      Yes, they did.

23      Q.      And I believe you said this already, but

24  did they require each of the charges that were rendered

25  on the document, page 132?

114

1       A.      Yes.

2       Q.      Let me ask you if you would to turn over

3   to page 134.

4       A.      Okay.

5       Q.      And are you familiar with that document?

6       A.      Truth in lending, yes.

7       Q.      Who prepares that document?

8       A.      The lender.

9       Q.      Do you know why it would have recording

10  fees, $170 on it?

11      A.      I do not.

12      Q.      Do you see that down in about the middle

13  of the page?

14      A.      I do.

15      Q.      Was there anything unusual about

16  Mrs. Frazier's loan?

17      A.      Not that I know of.

18      Q.      Was it typical of the loans that you had

19  closed for Home Funds Direct?

20      A.      I believe so, yes.

21              MR. UNDERWOOD:  You guys want to take

22              about ten minutes?  I don't have a whole lot more,

Deposition of Gregory Swafford. 051908txt.txt

23      I don't think.

24              MR. MINOR:  Okay.

25              MR. UNDERWOOD:  And are you going to call


                                 115


1      back, or do you want me to call?

2              MR. MINOR:  We'll call.

3              MR. UNDERWOOD:  Why don't you call then

4      at, I've got 11:20 right now, at 11:30.

5              MR. MINOR:  Okay.

6              MR. UNDERWOOD:  Okay.  All right.

7      Thanks.

8        (Recess taken.)

9              MR. UNDERWOOD:  I have just a few more

10     questions and I'll be finished.  Just let me know

11     when we're back on the record.

12            THE VIDEOGRAPHER:  We're back on the

13     record.

14            MR. UNDERWOOD:  All right.

15 BY MR. UNDERWOOD:

16      Q.    Greg, if you would, let me ask you to

17 take a look at page number 37 -- well, 36 and 37.

18      A.    Of Exhibit 2, right?

19      Q.    Yes, that's right, thank you.

20      A.    Okay.

21      Q.    And -- well, let's go back one more page

22 to page 35.

23      A.    Okay.

24      Q.    And if you would, tell me what that is.

25      A.    It's a fax from Home Funds Direct saying

Deposition of Gregory Swafford. O51908txt.txt

116

1    that our HUD was approved and giving -- and asking us

2    to get it signed along with a flood zone notice that

3    they must have included in the fax.

4         Q.     Okay.  And it says on there regarding

5    Hall.  Is that the same transaction we're here about?

6         A.     I think so.  I think -- I believe -- I

7    don't know if she had a maiden name or not, but I know

8    in our files at the office -- Cheryl Hall Frazier is

9    what it is.

10         Q.     Okay.  All right.  Thank you.

11              If you would, take a look at the next

12    page, number 36.

13         A.     Okay.

14         Q.     And up at the top, it has something

15    written in there in someone's handwriting.  Do you know

16    what that is?

17         A.     It says, "approved."

18         Q.     And who would have written that on there?

19         A.     It would have been someone at Home Funds

20    and their initials, but I don't know who that is.

21         Q.     Is this the process that you described

22    earlier where the figures on the HUD-1 are approved by

23    a lender?

24         A.     Yes.

25         Q.     And is this typical of the way that's

117

Deposition of Gregory Swafford. 051908txt.txt

1    done on the Home Funds loan?

2         A.    I believe so, yes.  It was either by fax

3    or e-mail, yes.

4         Q.    All right.  And what about the next page,

5    37?

6         A.    That's just a second page to the HUD that

7    she approved or he.

8         Q.    Okay.

9         A.    Oh, it appears to be Brita Dickerson, BD,

10   because that's who's on the fax cover sheet.

11        Q.    I'm sorry, say that one more time.

12        A.    You asked who did it, and I just realized

13   that the initials BD on page 36 are probably for Brita

14   Dickerson, because that's the name on page 35.

15        Q.    Okay.  All right.  Thank you very much.

16              MR. UNDERWOOD:  Let me ask the reporter

17         to mark the deposition notice from my office as

18         the next exhibit.  It would be Exhibit 4.

19         (Exhibit 4 - document entitled Re-Notice of

20         Taking Rule 30(b)(6) Deposition.)

21              THE WITNESS:  Okay.  I have it.

22   BY MR. UNDERWOOD:

23        Q.    All right.  And if you would,

24   Mr. Swafford, let me get you to turn over to the third

25   page.  They're not numbered.

                                                  118

1         A.    Okay.

2         Q.    And let me direct your attention to

3    numbered paragraph 4.

                        Page 106

Deposition of Gregory Swafford. 051908txt.txt

4          A.     Okay.

5          Q.     Before I ask this question, let me ask

6     you if you've seen this document before, this

7     deposition notice?

8          A.     I believe so, yes.

9          Q.     All right.  Did you receive it with a

10    subpoena?

11         A.     I believe so, yes.

12         Q.     All right.  And in paragraph 4, it asks

13    you to bring copies of canceled checks, ledger entries,

14    accounting, truth-in-lending disclosures, and title

15    insurance forms.  And we have some of those forms, but

16    did you bring any canceled checks?

17         A.     No.  We don't actually get canceled

18    checks back with our bank statements.

19         Q.     And did you bring any ledger entries or

20    accounting entries?

21         A.     No.

22         Q.     And are those available at your place of

23    business?

24         A.     Yes.

25         Q.     Where is your place of business address?

119

1          A.     It is 9530 Hickory Knoll Lane.

2          Q.     Is that your home?

3          A.     It is.

4                 MR. UNDERWOOD:  Okay.  I believe those

5          are all the questions I have right now.

6                 MR. MINOR:  All right.  I just have a few

Deposition of Gregory Swafford. 051908txt.txt

```
 7         followups.
 8    CONTINUED EXAMINATION BY MR. MINOR:
 9         Q.    Would you turn to page 132 on Exhibit 2?
10               THE VIDEOGRAPHER:  Mr. Minor, your
11         microphone, please.
12         Q.    Got it?
13         A.    Yes.
14         Q.    Mr. Underwood questioned you about line
15    1109.  Do you see that?
16         A.    Yes.
17         Q.    Isn't it true that there's no charge
18    listed under Paid from Borrower's Funds at Settlement
19    out from line 1109?
20         A.    That is true.
21         Q.    Mr. Underwood also asked you some
22    questions about Bill Long at Home --
23         A.    Homeowners Loan.
24         Q.    Homeowners Loan.  And the questioning he
25    asked you, the questioning was about communications
```

120

```
 1    from Mr. Long about refunding endorsement fees, your
 2    need to refund endorsement fees.  Do you recall that
 3    testimony?
 4         A.    Yeah, about title insurance, yes.
 5         Q.    Yes.
 6               Did you ever convey to anyone at Home
 7    Funds Direct Mr. Long's opinion about refunding those
 8    monies?
 9         A.    Not to my knowledge, no.
```
                          Page 108

Deposition of Gregory Swafford. 051908txt.txt

10      Q.      Do you recall what year you had that

11  conversation with Mr. Long?

12      A.      No, I don't.

13      Q.      Do you know one way or the other whether

14  it was before or after 2005?

15      A.      Actually, if I had to estimate, it would

16  be 2005, I just don't know when.

17      Q.      Okay.  Mr. Underwood also asked you

18  whether it was true that Home Funds Direct required the

19  fee charges listed on the HUD-1.  Do you recall that

20  testimony?

21      A.      Yes.

22      Q.      Isn't it true though that at no time did

23  Home Funds Direct require that any fees be marked up on

24  any amount?

25      A.      Yes.


                                                        121


1       Q.      Yes, that's a correct statement?

2       A.      That's a correct statement.

3               MR. MINOR:  That's all I have.

4               MR. UNDERWOOD:  I do just have one, maybe

5           one more, two more questions I should have asked a

6           while ago.

7   CONTINUED EXAMINATION BY MR. UNDERWOOD:

8       Q.      Mr. Minor had asked you, Mr. Swafford, if

9   there was any way that Home Funds Direct could have

10  looked at these figures, and they're on page 132, and

11  determined who they were paid for.  Do you remember

12  that question?

Deposition of Gregory Swafford. 051908txt.txt

13      A.      I do.

14              MR. MINOR:  I'm going to object to the

15      form.  But go ahead.

16      Q.      Do you remember what your answer was?

17      A.      I don't remember his exact question, but

18  I thought I remember -- excuse me.  I remember it as

19  being something to the effect of was there any way that

20  they could -- that they would have known what the

21  actual or what charges were from other third parties,

22  something to that effect, and I thought I said no.

23      Q.      Right.  And what was your answer?

24      A.      No.

25      Q.      All right.  Was there any way that

122

1   Mrs. Hall could have looked at these and known what the

2   third-party charges were?

3       A.      Well, in actuality, his question directed

4   it as far as did Swafford provide that information,

5   and, no, Swafford did not.  But recording fees and

6   things of that nature are public record, if that's what

7   you're asking.  So, I mean, there's ways that they all

8   could have known, but did Swafford provide that

9   information, no.

10      Q.      Let me ask it a little better.  I'm doing

11  a clumsy job asking the question.

12              Did Swafford provide any information to

13  Mrs. Hall about who was -- about what portions of these

14  fees were being paid to third parties?

15      A.      No, I don't believe so.

Page 110

Deposition of Gregory Swafford. O51908txt.txt

16                 MR. UNDERWOOD:  Okay.  That's all I have.

17                 THE WITNESS:  Okay.

18                 MR. MINOR:  No further questions.

19            FURTHER THIS DEPONENT SAITH NOT.

20

21

22

23

24

25

                                                      123

1                   C E R T I F I C A T E

2    STATE OF TENNESSEE

3

4    COUNTY OF KNOX

5            I, Thomas J. Dorsey, Registered Professional

6    Reporter and Notary Public, do hereby certify that I

7    reported in machine shorthand the deposition of GREGORY

8    A. SWAFFORD, called as a witness at the instance of the

9    Defendant, that the said witness was duly sworn by me;

10   that the reading and subscribing of the deposition by

11   the witness was waived; that the foregoing pages were

12   transcribed under my personal supervision and

13   constitute a true and accurate record of the deposition

14   of said witness.

15            I further certify that I am not an attorney or

16   counsel of any of the parties, nor an employee or

17   relative of any attorney or counsel connected with the

18   action, nor financially interested in the action.

Deposition of Gregory Swafford. 051908txt.txt

19          Witness my hand and seal this the 22nd day of

20   May, 2008.

21                    _____
                      Thomas J. Dorsey, RPR
22                    Certified Shorthand Reporter
                      and Notary Public
23                    My Commission Expires:
                      August 3, 2008

24

25

Home Funds Direct
Attn: Post Closing Dept.
16550 West Bernardo Dr. Bldg 1
San Diego, CA 92127-1870

*Prepared by: Kathleen Tubbs*
*Kathleen Tubbs*

MTG      1725      790
Recorded In Above Book and Page
04/01/2005 10:46:04 AM
Luke Cooley
Judge of Probate
Houston County, Alabama

———————————————————— [Space Above This Line For Recording Data] ————————————————————

## MORTGAGE

*Source of Title*
*Book 622*
*Page 443*

*PIN# 10-09-31-4-003-001.007*

MIN 100176105031729174

AFTER RECORDING RETURN TO:
SWAFFORD & HAYS SETTLEMENT SERVICES
9041 EXECUTIVE PARK DRIVE SUITE 400
KNOXVILLE, TN 37923

*05-2813*

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **March 25, 2005** , together with all Riders to this document.
**(B) "Borrower"** is CHERYL HALL , *UNMARRIED*

*105 TV Road, Dothan, AL 36301*

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

100176105031729                                    0503172917

ALABAMA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS       Form 3001 1/01

-6A(AL) (0005).03
Page 1 of 15            Initials *CJH*

VMP MORTGAGE FORMS - (800)521-7291

*17923*

MTG    1725    799

**(D) "Lender"** is **Home Funds Direct**

Lender is a **Corporation**
organized and existing under the laws of **the State of California**
Lender's address is **15090 Avenue of Science**
**San Diego, CA 92128**
**(E) "Note"** means the promissory note signed by Borrower and dated **March 25, 2005**
The Note states that Borrower owes Lender **fifty-six thousand and 00/100**

Dollars
(U.S. **$56,000.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **April 1, 2035**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                 ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.
**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

100176105031729                                    0503172917

Initials

-6A(AL) (0005).03          Page 2 of 15                              Form 3001 1/01

MTG    1725    800

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

|  **County** | of | **HOUSTON** |   |  : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

See Legal Description Addendum Page Attached

Parcel ID Number: 10-09-31-4-003-001.007                          which currently has the address of
105 TV ROAD                                                                                                            [Street]
DOTHAN                                          [City] , Alabama 36301            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

100176105031729                                                                      0503172917

-6A(AL) (0005).03                          Page 3 of 15                Initials                Form 3001 1/01

MTG    1725    811

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____(Seal)
CHERYL HALL                          -Borrower

_____(Seal)
                                     -Borrower

_____(Seal)          _____(Seal)
                  -Borrower                                       -Borrower

_____(Seal)          _____(Seal)
                  -Borrower                                       -Borrower

_____(Seal)          _____(Seal)
                  -Borrower                                       -Borrower

100176105031729                    0503172917

-6A(AL) (0005).03          Page 14 of 15          Form 3001 1/01

MTG    1725    812

**STATE OF ALABAMA,**                                    County ss: *Houston*

On this ___35___ day of *March*, *2005*                    , I,
*DIANE L. Hilson*
a Notary Public in and for said county and in said state, hereby certify that **CHERYL HALL**

whose name(s) is/are signed to the foregoing conveyance, and who is/are known to me, acknowledged before me that, being informed of the contents of the conveyance, he/she/they executed the same voluntarily and as his/her/their act on the day the same bears date.

Given under my hand and seal of office this ___25___ day of *March, 2005*

My Commission Expires:

**My Commission
Expires 3-06-06**

_____
Notary Public

**Diane L. Hilson**
Alabama State
at Large

Prepared By:
**Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128**

100176105031729                    0503172917

Initials

-6A(AL) (0005).03            Page 15 of 15                Form 3001 1/01

MTG    1725    813

## EXHIBIT A

Situated in Dothan, Houston County, State of AL and being described as follows:

Lot 2, Block "C", of the Third Addition to Television Heights Subdivision in the City of Dothan, Alabama, as found recorded in Plat book 7, Page 23, in the Office of the Judge of Probate, Houston County, Alabama.

The above legal description being the same as the last deed of record, no boundary survey having been made at the time of this conveyance.

Parcel #10-09-31-4-003-001.007

BEING the same property conveyed to Louis E. Sowers and Fay Sowers, as joint tenants with express right of survivorship and to the survivor's heirs and assigns, by deed from Samuel B. Pierce, Jr., Secretary of Housing and Urban Development of Washington, D.C., acting by and through the Office of Assistant Secretary for Housing - Federal Housing Commissioner, dated 07-19-85, recorded 07-26-85, in Book 311, page 324, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Kevin Lorenzo Dixon, II, by deed from Louis E. Sowers and wife, Fay Sowers, dated 04-02-03, recorded 04-03-03, in Book 598, page 34, in the Office of the Judge of Probate of Houston County, AL.

BEING the same property conveyed to Cheryl Hall, by deed from Kevin Lorenzo Dixon, II, a unmarried man, dated 03-02-05, recorded 03-11-05, in Book 622, page 443, in the Office of the Judge of Probate of Houston County, AL.

This Derivation Clause represents a 24 month Chain of Title.

The above information is to be used for reference purposes only and not to be relied on as evidence of title and/or encumbrances. Accordingly, said information is furnished at a reduced rate, and the Company's liability shall in no event exceed the amount paid for said information.

105 TV Road, Dothan, AL  36301

Mortgage Tax       84.00
Recording Fee      56.00
TOTAL             140.00

Date Printed: Wednesday, March 15, 2006  12:29:39 PM

# LEDGER CARD

Order #: 05-2813

Buyer/Borrower : Cheryl Hall
Seller :
Lender Name : Home Funds Direct
Loan Number : 0503172917
Property Address : 105 TV Road, Dothan, AL  36301

## POSTED ESCROWS

| ID# | Bank Name | Account # | Address | City | State | Balance |
|-----|-----------|-----------|---------|------|-------|---------|
| tn2 | Bank of America- TN (New) | 003786809771 | | | | 0.00 |

### DEPOSITS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 03/30/2005 | funding wire | alisonw | 03/31/2005 | Home Funds Direct | 52,157.10 |
| **\*TOTAL DEPOSITS** | | | | | **52,157.10** |

### CHECKS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 03/31/2005 | 00025440 | m.lay | 04/30/2005 | Swafford and Hays Settlement Services, Inc. | (64.00) |
| 03/31/2005 | 00025441 | m.lay | 04/30/2005 | HOUSTON COUNTY JUDGE OF PROBATE | (84.00) |
| 03/31/2005 | 00025442 | m.lay | 04/30/2005 | HOUSTON COUNTY JUDGE OF PROBATE | (56.00) |
| 03/30/2005 | 00025171v | m.lay | 03/31/2005 | Clerk of the Court | (204.00) |
| 03/30/2005 | 00025172 | m.jerger | 03/31/2005 | Swafford and Hays Settlement Services, Inc. | (715.00) |
| 03/30/2005 | 00025173 | m.jerger | 03/31/2005 | Swafford and Hays Settlement Services, Inc. | (200.00) |
| 03/30/2005 | 00025174 | m.jerger | 03/31/2005 | Swafford and Hays Settlement Services, Inc. | (60.00) |
| 03/30/2005 | 00025175v | alisonw | 03/31/2005 | Cheryl Hall | (42,103.61) |
| 03/30/2005 | 00025176 | m.jerger | 04/30/2005 | Alabama Appraisal Service | (300.00) |
| 03/30/2005 | 00025177 | m.jerger | 04/30/2005 | Army Aviation Center F C U  good thru 4/24 | (4,594.49) |
| 03/30/2005 | 00025178 | m.jerger | 04/30/2005 | The CR STR/Providian | (785.00) |
| 03/30/2005 | 00025179 | m.jerger | 04/30/2005 | Palisades | (694.00) |
| 03/30/2005 | 00025180 | m.jerger | 04/30/2005 | Holloway Credit | (452.00) |
| 03/30/2005 | 00025181 | m.jerger | 04/30/2005 | Small LNS | (399.00) |
| 03/30/2005 | 00025182 | m.jerger | 04/30/2005 | Crdt MGT. | (182.00) |
| 03/30/2005 | 00025183 | m.jerger | 04/30/2005 | Friedmans Jewelers | (400.00) |
| 03/30/2005 | 00025184 | m.jerger | 04/30/2005 | State Farm | (1,068.00) |
| 03/30/2005 | wire # 5312332 | alisonw | 03/31/2005 | Cheryl Hall | (42,103.61) |
| **\*TOTAL CHECKS** | | | | | **(94,464.71)** |

### VOIDS

| Date | Reference # | Updated By | Cleared | Payee | Amount |
|------|-------------|------------|---------|-------|--------|
| 03/30/2005 | 00025171 | m.lay | 03/31/2005 | Clerk of the Court | 204.00 |
| 03/30/2005 | 00025175 | alisonw | 03/31/2005 | Cheryl Hall | 42,103.61 |
| **\*TOTAL VOIDS** | | | | | **42,307.61** |

| **\*\*TOTALS FOR: tn2** | **0.00** |
|---|---|

**\*\*\*POSTED TOTAL**     **0.00**

## PENDING ESCROWS

**\*\*\*\*TOTAL(POSTED + PENDING)**     **0.00**

## AMENDMENT NO.2
## TRANSNATION TITLE INSURANCE COMPANY
## TITLE INSURANCE PREMIUM CHARGES
## REVISED OCTOBER 28, 2002

| | |
|---|---|
| 1.    OWNER'S/LEASEHOLD OWNER'S | |
|       POLICY ORIGINAL RATE | **PER THOUSAND** |
| Up to $100,000.00 of liability written | $3.25 |
| Over $100,000.00 and up to $5,000,000.00, add | 2.00 |
| Over $5,000,000.00 and up to $10,000,000.00, add | 1.50 |
| Over $10,000,000.00 | 1.00 |

| | |
|---|---|
| 2.    OWNER'S/LEASEHOLD OWNER'S | |
|       POLICY REISSUE RATE | |
| Up to $100,000.00 of liability written | $2.10 |
| Over $100,000.00 and up to $5,000,000.00, add | 1.20 |
| Over $5,000,000.00 and up to $10,000,000.00, add | .90 |
| Over $10,000,000.00 | .60 |

REISSUE RATES FOR OWNER'S/LEASEHOLD OWNER'S POLICY APPLY UP TO THE FACE AMOUNT OF THE PREVIOUS OWNER'S POLICY. WHERE A MORTGAGE POLICY IS OUTSTANDING AND AN OWNER'S POLICY IS ISSUED ON THE SAME PROPERTY, THE REISSUE RATE WILL APPLY UP TO THE AMOUNT OF THE BALANCE DUE ON THE INSURED MORTGAGE.

| | |
|---|---|
| 3.    MORTGAGE/LEASEHOLD MORTGAGE | |
|       POLICY ORIGINAL RATE | |
| Up to $100,000.00 of liability written | $2.25 |
| Over $100,000.00 and up to $500,000.00, add | 1.75 |
| Over $500,000.00 and up to $10,000,000.00, add | 1.25 |
| Over $10,000,000.00 | 1.00 |

| | |
|---|---|
| 4.    MORTGAGE/LEASEHOLD MORTGAGE | |
|       POLICY REISSUE RATE | |
| Up to $100,000.00 of liability written | $1.35 |
| Over $100,000.00 and up to $500,000.00, add | 1.05 |
| Over $500,000.00 and up to $10,000,000.00, add | 0.75 |
| Over $10,000,000.00 and | 0.60 |

REISSUE RATE FOR MORTGAGE/LEASEHOLD MORTGAGE POLICY IS APPLICABLE WHERE  PRIOR OWNER'S POLICY IS PRODUCED OR WHERE A PRIOR MORTGAGEE'S POLICY ON THE SAME PROPERTY IS PRODUCED, THE REISSUE RATES APPLY UP TO THE FACE AMOUNT OF THE PRIOR OWNER'S POLICY AND UP TO THE OUTSTANDING LOAN BALANCE IF A PRIOR MORTGAGEE'S POLICY IS PRODUCED.

APPROVED    EFFECTIVE

NOV 13 '02    NOV 13 '02

ALABAMA DEPT OF INSURANCE

HALL00088

PRIOR TO GIVING ANY REISSUE RATES, THE COMPANY MUST BE FURNISHED A COMPLETE COPY OF THE PRIOR TITLE POLICY, AS REQUIRED BY THE ALABAMA TITLE ACT, ISSUED BY ANY TITLE INSURER LICENSED TO WRITE TITLE INSURANCE IN THIS STATE.

5.    DEVELOPER'S RATE WILL BE AS FOLLOWS:          PER THOUSAND

      UP TO $100,000.00 OF LIABILITY WRITTEN          $2.10
      OVER $100,000.00 AND UP TO $1,000,000.00         1.20

THIS RATE IS AVAILABLE TO DEVELOPERS AND/OR BUILDERS OF CONDOMINIUM UNITS OR LOTS IN A SUBDIVISION " WHEN THE SUBDIVISION OR CONDOMINIUM CREATED CONTAINS 5 OR MORE LOTS OR CONDO UNITS AND THE DEVELOPER AND/OR BUILDER HAS OBTAINED OWNER'S TITLE INSURANCE ON THE TRACT BEING DEVELOPED. THE RATE IS APPLICABLE TO ALL LOTS SOLD BY THE ORIGINAL DEVELOPER AND/OR BUILDER, NOTWITHSTANDING THE FACT THAT THE TOTAL VALUE OF LOTS OR UNITS SOLD WILL GENERALLY EXCEED THE TOTAL AMOUNT OF THE PRIOR OWNER'S POLICY."

6.    CONSTRUCTION LOAN RATE: The Company will issue upon request, the Title Insurance Construction Loan Policy, good for a period not to exceed 2 years, in connection with a Construction Mortgage.

      The rate for this policy will be $1.00 per thousand. If at the end of the Construction period, the Lender may convert this policy to a permanent policy which will be charged at the applicable mortgage policy rates less the full charge for the Construction Policy which will be shown as a credit. If the permanent loan is placed with a different lender than the construction lender, the permanent loan will be insured charging the applicable mortgage rates with no credit for the construction loan policy charges.

7.    SUBSTITUTION RATES: When the insured physically produces the prior policy, including schedules associated therewith, and when the same borrower and the same lender are making a substitution loan on the same property which was insured by an insure licensed to do business in Alabama, the new mortgage policy will be entitled to the substitution loan rate up to the unpaid principal balance of the original loan (not to exceed the amount of coverage extended under the policy on the original loan). If the amount of insurance desired is in excess of the unpaid principal balance of the original loan, the excess coverage shall be computed at the Original Title Insurance Rate for Mortgagee Policies under the applicable bracket or brackets.

APPROVED          L FECTIVE

NOV 1 3 '02        NOV 1 3 '02

ALABAMA DEPT OF INSURANCE

| Age of Original Loan | Rate |
|---|---|
| 3 years or under | 30% of original rate |
| Over 3 years to 4 years | 40% of original rate |
| Over 4 years to 5 years | 50% of original rate |
| Over 5 years to 6 years | 60% of original rate |
| Over 6 years to 7 years | 70% of original rate |
| Over 7 years to 8 years | 80% of original rate |
| Over 8 years to 9 years | 90% of original rate |
| Over 9 years | 100% of original rate |

8. **TITLE INSURANCE RATE FOR OWNER'S POLICIES UPON ACQUISITION IN SATISFACTION OF DEBT:**

When the insured mortgagee policy issued by the Company acquires title by foreclosure, or by voluntary conveyance in extinguishment of the debt (deed in lieu of foreclosure), such insured, or the designee for the benefit of such insured, shall be entitled to the following rate on an owner's policy up to an amount equal to the face amount of the previous mortgagee policy:

Up to $100,000 of liability written, the rate shall be 60% of the original owner's rate.

On amounts in excess of $100,000 of liability written, the following rate shall apply:

| Age of Previous Loan Policy | Rate |
|---|---|
| 1 year and under | 20% of original owner's rate |
| 1 year to 2 years | 25% of original owner's rate |
| 2 years to 3 years | 30% of original owner's rate |
| 3 years to 4 years | 35% of original owner's rate |
| Over 4 years | 40% of original owner's rate |

9. **MINIMUM PREMIUM FOR ANY POLICY, EXCEPT THE RESIDENTIAL LIMITED COVERAGE JUNIOR LOAN POLICY AND THE SHORT FORM RESIDENTIAL LIMITED COVERAGE LOAN POLICY, DESCRIBED IN THIS RATE SCHEDULE SHALL BE $125.00.**

10. **SIMULTANEOUS ISSUANCE OF AN OWNER'S POLICY AND MORTGAGE POLICY WILL BE $75.00.**

11. **SIMULTANEOUS ISSUANCE FEE OF A LEASEHOLD POLICY WITH AN OWNER'S POLICY WILL BE 30% OF THE ORIGINAL OWNER'S RATE.**

APPROVED        EFFECTIVE

NOV 1 3 '02        NOV 1 3 '02

ALABAMA DEPT OF INSURANCE

HALL00090

12. EQUITY LINE MORTGAGE POLICY WILL BE CHARGED AT THE SAME RATE AS THE STANDARD MORTGAGE POLICY.

13. THE RATE FOR THE ADVANTAGE RESIDENTIAL OWNER'S POLICY AND MORTGAGE POLICY WILL BE AN ADDITIONAL 20% OF THE RATE CHARGED FOR THE STANDARD OWNER'S OR MORTGAGE POLICY.

14. THE RATE FOR THE RESIDENTIAL LIMITED COVERAGE JUNIOR LOAN POLICY AND THE SHORT FORM RESIDENTIAL LIMITED COVERAGE LOAN POLICY WILL BE $85.00 FOR POLICIES UP TO $200,000.00 OF COVERAGE. COVERAGE OVER $200,000.00 IS NOT AVAILABLE.

15. THE BALLOON LOAN MODIFICATION LIMITED POLICY WILL BE A FLAT FEE OF $125.00

ALL FRACTIONAL AMOUNTS OF INSURANCE SHALL BE ROUNDED UP TO THE NEXT THOUSAND BEFORE CALCULATING THE PREMIUM CHARGE.

ALL COMMERCIAL ENDORSEMENTS, EXCEPT FOR ALTA 13 AND 13.1 LEASEHOLD CONVERSION ENDORSEMENTS, SHALL BE CHARGED AS SHOWN ON THE ATTACHED FORM ENTITLED COMMERCIAL ENDORSEMENT CHARGES. THERE WILL BE NO CHARGE FOR THE STANDARD RESIDENTIAL ENDORSEMENTS( i.e. Residential Property is defined as 1 to 4 Single Family, and the Residential Endorsements are as follows: ALTA 4 and 4.1 Condominium; ALTA 5 and 5.1 Planned Unit Development; ALTA 6, 6.1 and 6.2, All Variable Rate Endorsements; ALTA 7, Manufactured Housing; ALTA 8.1 Environmental Lien; ALTA 9, Covenants, Conditions, Restrictions and Minerals), except for the Reverse Annuity Endorsement .

APPROVED          EFFECTIVE

NOV 1 3 '02       NOV 1 3 '02

ALABAMA DEPT OF INSURANCE

HALL00091

## COMMERCIAL ENDORSEMENT CHARGES
### TRANSNATION

| | | |
|---|---|---|
| ALTA 1 | STREET ASSESSMENT | $100.00 |
| ALTA 2 | TRUTH IN LENDING | $.10 PER THOUSAND |
| ALTA 3.0 | ZONING VACANT PROPERTY | $.10 PER THOUSAND |
| ALTA 3.1 | ZONING IMPROVED PROPERTY | $.15 per THOUSAND |
| ALTA 4.1 | CONDOMINIUM | N/C |
| ALTA 5.1 | PLANNED UNIT DEVELOPMENT | N/C |
| ALTA 6 | VARIABLE RATE | N/C |
| ALTA 6.1 | VARIABLE RATE | N/C |
| ALTA 6.2 | VARIABLE RATE NEGATIVE AMORIZATION | N/C |

| | | |
|---|---|---|
| ALTA 8.1 | ENVIRONMENTAL LIEN | N/C |
| ALTA 9 | RESTRICTIONS, ENCROACHMENT, MINERALS -MORTGAGE POLICY | $.10 PER THOUSAND |
| ALTA 9.1 | RESTRICTIONS, ENCROACHMENTS, MINERALS, VACANT-OWNER'S | $.10 PER THOUSAND |
| ALTA 9.2 | RESTRICTIONS, ENCROACHMENTS,MINERALS, IMPROVED-OWNERS | $.10 PER THOUSAND |
| ALTA 10 | ASSIGNMENT OF MORTGAGE | $100.00 |
| ALTA 10.1 | ASSIGNMENT OF MORTGAGE AND DATE DOWN | $100.00 |
| ALTA 11 | MORTGAGE MODIFICATION | $100.00 |
| ALTA 12 | AGGREGATION     (TIE END) | $.10 PER THOUSAND |
| ALTA 13 | LEASEHOLD OWNER'S CONVERSION ENDORSEMENT | N/C |
| ALTA 13.1 | LEASEHOLD MORTGAGE CONVERSION ENDORSEMENT | N/C |

| | | |
|---|---|---|
| CLTA 103.1 | LOSS OF RIGHT TO AN EASEMENT | $100.00 |
| CLTA 103.3 | REMOVAL OF IMPROVEMENTS IN EASEMENT | $100.00 |
| CLTA 103.4 | ACCESS BY EASEMENT | $100.00 |
| CLTA 103.5 | DEVELOPMENT OF WATER RIGHTS | $100.00 |
| CLTA 103.7 | ACCESS | $100.00 |
| CLTA 104 | ASSIGNMENT OF BENEFICIAL INTEREST | $.10 PER THOUSAND |
| CLTA 110.5 | MORTGAGE MODIFICATION | $100.00 |

| | |
|---|---|
| ADDITIONAL INSURANCE | $.10 PER THOUSAND |
| ALTERNATIVE POLICIES | $.05 PER THOUSAND |
| ANTI-TAINT | $.10 PER THOUSAND |
| ANTI DEFICIENCY | $.10 PER THOUSAND |
| ASSIGNMENT OF LEASE | $.10 PER THOUSAND |
| ASSIGNMENT OF POLICY | $150.00 |
| ASSIGNMENT OF RENTS | $.10 PER THOUSAND |
| BALLOON ENDORSEMENT | N/C |
| BLANKET RELEASE END | $.10 PER THOUSAND |
| CO-INSURANCE | $100.00 |
| COLLATERAL ASSIGNMENT | $.10 PER THOUSAND |
| CONVERSION ENDORSEMENT | $100.00 |
| CONTIGUITY ENDORSEMENT | $100.00 |

EFFECTIVE   MAY 1 3 '02

APPROVED   NOV 1 3 '02

ALABAMA DEPT OF INSURANCE

HALL00092

|  | DATE DOWN | $150.00 |
|--|--|--|
|  | DELETION OF ARBITRATION CLAUSE | N/C |
|  | DELETION OF CREDITOR'S RIGHTS | N/C |
|  | DOING BUSINESS | $.10 PER THOUSAND |
|  | EXECUTION END | $.10 PER THOUSAND |
|  | FAIRWAY | $.10 PER THOUSAND |
|  | FIRST LOSS | $.10 PER THOUSAND |
|  | FIRST TIER FAIRWAY | $.10 PER THOUSAND |
|  | FOUNDATION | $100.00 |
|  | FUTURE ADVANCE AND REVOLVING CREDIT | $100.00 |
|  | FUTURE INSURANCE | $.10 PER THOUSAND |
|  | GAP END | $.10 PER THOUSAND |
|  | JUNIOR LOAN POLICY ENDORSEMENT | $100.00 |
|  | LAST DOLLAR | $.10 PER THOUSAND |
|  | LETTER OF CREDIT | $.10 PER THOUSAND |
| CLTA 116 | LOCATION | $100.00 |
|  | MECHANIC'S LIEN | $.10 PER THOUSAND |
|  | MEZZANINE END SHORT FORM | $.10 PER THOUSAND |
|  | MEZZANINE END LONG FORM | $.30 PER THOUSAND |
| CLTA 100.29 | MINERAL COVERAGE | $100.00 |
|  | MORTGAGE TAX | $.10 PER THOUSAND |
|  | MULTIPLE FORECLOSURE ENDORSEMENT | $.10 PER THOUSAND |
|  | NAVIGATIONAL SERVITUDE | $.10 PER THOUSAND |
|  | NON-INPUTATION | $.10 PER THOUSAND |
|  | OPTION | $.10 PER THOUSAND |
|  | OWNER'S COMPREHENSIVE | $.10 PER THOUSAND |
|  | PENDING IMPROVEMENTS | $100.00 |
|  | PERMITTED TRANSACTIONS | $.10 PER THOUSAND |
|  | REVERSE ANNUNITY | $100.00 |
|  | REVOLVING CREDIT | $100.00 |
|  | SECONDARY INSURANCE ENDORSEMENT | 35% OF THE ORIGINAL MORTGAGE POLICY RATE |
|  | SHARED APPRECIATION | $.10 PER THOUSAND |
|  | SUBDIVISION | $100.00 |
|  | SAME AS SURVEY | $50.00 |
|  | SUCCESSOR INSURED | $150.00 |
|  | TAX BENEFIT | $.10 PER THOUSAND |
|  | TAX BENEFIT END. NO. 2 | $1.00 PER THOUSAND |
|  | TAX LOT | $100.00 |
|  | TAX PARCEL | $100.00 |
|  | USURY | $100.00 |
|  | UTILITY FACILITY | $.10 PER THOUSAND |

**NOTE ALL ENDORSEMENTS WILL HAVE A MINIMUM FEE OF $100.00 DEPENDING ON THE SIZE OF THE TRANSACTION BEING INSURED.**
**UNLESS THERE IS A FLAT RATE CHARGED.**

Transnation Title  Insurance Company's
Special Mineral Endorsement Rates as of April 7, 2004

| | | |
|---|---|---|
| Up to $1,000,000.00 | Charge | $4500.00 |
| Over $1,000,000.00 up to $10,000,000.00 | Add | $4.50 per thousand |
| Over $10,000,000.00 up to $50,000,000.00 | Add | $3.50 per thousand |
| Over $50,000,000.00 | Add | $2.50 per thousand |

APPROVED                   EFFECTIVE

AUG 2 7 '04            AUG 2 7 '04

ALABAMA DEPT OF INSURANCE

 **LandAmerica**

Commonwealth Land Title Insurance Company
Lawyers Title Insurance Corporation
Transnation Title Insurance Company
Tracking #2006-1191

Master Equity Line Loan Policy
Rate Schedule

- $50.00 on mortgages securing amounts from $0.00 to $250,000

- $120.00 on mortgages securing amounts from $250,001 to $500,000

APPROVED           EFFECTIVE

FEB 0 8 '06      MAR 0 1 '06

ALABAMA DEPT OF INSURANCE

HALL00095

swaffordgreg051906.txt

```
0001
 1   IN THE UNITED STATES DISTRICT COURT
 2   FOR THE SOUTHERN DISTRICT OF ALABAMA
 3            SOUTHERN DIVISION
 4
 5   CASE NUMBER:    CV-05-669
 6
 7   DAWN SAUCIDA and JOHNNY SAUCIDA,
 8   individually and on behalf of
 9   all similarly situated individuals,
10            Plaintiffs,
11   VS.
12
13   SWAFFORD & HAYS SETTLEMENT
14   SERVICES, INC.,
15            Defendants.
16            * * * * * * * * *
17
18         S T I P U L A T I O N
19
20        IT IS STIPULATED AND AGREED by and
21   between the parties, through their respective
22   counsel, that the deposition of GREG SWAFFORD
23   may be taken before Kelly Gray, CSR., at the law
0002
 1   offices of Baker, Donelson, Bearman, Caldwell &
 2   Berkowitz, P.C., 420 20th Street North, Suite
 3   1600, Birmingham, Alabama 35203, on the 19th day
 4   of May, 2006.
 5        IT IS FURTHER STIPULATED AND AGREED that
 6   the signature to and the reading of the
 7   deposition by the witness is hereby not waived,
 8   the deposition to have the same force and effect
 9   as if full compliance had been had with all laws
10   and rules of Court relating to the taking of
11   depositions.
12        IT IS FURTHER STIPULATED AND AGREED that
13   it shall not be necessary for any objections to
14   be made by counsel to any questions except as to
15   form or leading questions, and that counsel for
16   the parties may make objections and assign
17   grounds at the time of the trial, or at the time
18   said deposition is offered in evidence, or prior
19   thereto.
20        IT IS FURTHER STIPULATED AND AGREED that
21   the notice of filing of the deposition by the
22   Court Reporter is waived.
23
0003
 1              I N D E X
 2
 3   WITNESS:  GREG SWAFFORD
 4
 5   DIRECT EXAMINATION BY MR. UNDERWOOD...........7
 6
 7   CERTIFICATE PAGE.............................274
 8
 9
10            E X H I B I T S:
11
12   PLAINTIFF'S 1................................9
13   PLAINTIFF'S 2...............................26
14   PLAINTIFF'S 3..............................122
```

swaffordgreg051906.txt

15   PLAINTIFF'S 4.............................142
16   PLAINTIFF'S 5.............................155
17   PLAINTIFF'S 6.............................167
18   PLAINTIFF'S 7.............................181
19   PLAINTIFF'S 8.............................183
20   PLAINTIFF'S 9.............................185
21   PLAINTIFF'S 10............................186
22   PLAINTIFF'S 11............................195
23   PLAINTIFF'S 12............................197
0004
 1              E X H I B I T S:
 2
 3   PLAINTIFF'S 13............................199
 4   PLAINTIFF'S 14............................200
 5   PLAINTIFF'S 15............................201
 6   PLAINTIFF'S 16............................205
 7   PLAINTIFF'S 17............................212
 8   PLAINTIFF'S 18............................213
 9   PLAINTIFF'S 19............................214
10   PLAINTIFF'S 20............................214
11   PLAINTIFF'S 21............................215
12   PLAINTIFF'S 22............................216
13   PLAINTIFF'S 23............................216
14   PLAINTIFF'S 24............................218
15   PLAINTIFF'S 25............................221
16   PLAINTIFF'S 26............................223
17   PLAINTIFF'S 27............................224
18   PLAINTIFF'S 28............................224
19   PLAINTIFF'S 29............................225
20   PLAINTIFF'S 30............................226
21   PLAINTIFF'S 31............................227
22   PLAINTIFF'S 32............................231
23   PLAINTIFF'S 33............................233
0005
 1              E X H I B I T S:
 2
 3   PLAINTIFF'S 34............................239
 4   PLAINTIFF'S 35............................240
 5   PLAINTIFF'S 36............................243
 6   PLAINTIFF'S 37............................243
 7   PLAINTIFF'S 38............................244
 8   PLAINTIFF'S 39............................250
 9   PLAINTIFF'S 40............................251
10   PLAINTIFF'S 41............................256
11   PLAINTIFF'S 42............................256
12   PLAINTIFF'S 43............................257
13   PLAINTIFF'S 44............................257
14   PLAINTIFF'S 45............................258
15
16
17
18
19
20
21
22
23
0006
 1            A-P-P-E-A-R-A-N-C-E-S:
 2
 3   For the Plaintiff:   ATTORNEY AT LAW
 4                        By:  Mr. Earl Underwood, Jr.
 5                        21 South Section Street
                                   Page 2

swaffordgreg051906.txt
```
 6                  Fairhope, AL 36533
 7
 8  For the Plaintiff:  ATTORNEY AT LAW
 9                      By:  Mr. Kenneth J. Riemer
10                      166 Government Street
11                      Suite 100
12                      Mobile, AL 36602
13
14  For the Defendant:  BAKER, DONELSON, BEARMAN,
15                      CALDWELL & BERKOWITZ, P.C.
16                      By:  Ms. Patricia Clotfelter
17                      420 20th Street North
18                      Suite 1600
19                      Birmingham, AL 35203
20
21
22
23
0007
 1          I, KELLY GRAY, a Court Reporter of
 2  Birmingham, Alabama, acting as Commissioner,
 3  certify that on this date, as provided by the
 4  Alabama Rules of Civil Procedure and the
 5  foregoing stipulations of counsel, there came
 6  before me at the Law Offices of BAKER, DONELSON,
 7  BEARMAN, CALDWELL & BERKOWITZ, 420 20th Street
 8  North, Suite 1600, Birmingham, Alabama 35203,
 9  beginning at 9:00 a.m., GREG SWAFFORD, witness
10  in the above cause, for oral examination,
11  whereupon the following proceedings were had:
12
13              GREG SWAFFORD
14  a witness, being produced, sworn and examined on
15  behalf of the plaintiff, testified as follows:
16
17          BY THE REPORTER:  Usual stipulations?
18          BY MR. UNDERWOOD:  That's fine.
19          BY MS. CLOTFELTER:  We would like to read
20  and sign the transcript.
21
22          DIRECT EXAMINATION
23  BY MR. UNDERWOOD:
0008
 1  Q       If you would, state your name, please,
 2  sir.
 3  A       Greg Swafford.
 4  Q       And, Mr. Swafford, my name is Earl
 5  Underwood and I'm going to be asking you some
 6  questions today.  Of course, I represent the
 7  Saucidas in a case that we filed against
 8  Swafford & Hays Settlement Services,
 9  Incorporated.
10  A       Okay.
11  Q       Sometimes I'm not real good at asking
12  questions.  I've been doing this for twenty
13  years, but I'm still not real good at it, I'm
14  afraid, and I may ask you a question that
15  doesn't make any sense or I may ask you a
16  compound question or you just may not understand
17  my question.  And if I do that or you don't
18  understand the question, I would just ask you,
19  if you would, to just stop me and just say,
20  "Well, Mr. Underwood, can you rephrase that," or
```
Page 3

swaffordgreg051906.txt
```
21   "I don't understand the question," or something
22   like that, whatever's appropriate.
23   A      Okay.
0009
 1   Q      However, if you don't, I'm going to
 2   assume that you understood the question and that
 3   you're answering truthfully; is that fair?
 4   A      That is fair.
 5   Q      Okay.  Now, you understand that you're
 6   not -- you understand you're not here personally
 7   as --
 8   A      I do.
 9   Q      Well, tell me what you understand that
10   your capacity is testifying here this morning.
11   A      To tell the truth about the facts of the
12   company.
13          BY MS. CLOTFELTER:  He's here as a
14   30(b)(6) representative of Swafford.
15
16   REPORTER'S NOTE:  (At this point, instrument was
17   marked for identification by the Reporter as
18   Plaintiff's Exhibit Number 1, after which, the
19   deposition continued, as follows:)
20
21   Q      (continued by Mr. Underwood)  Okay.  And
22   let me show you what I've marked as Plaintiff's
23   Exhibit Number 1 and ask you if you've seen that
0010
 1   before.
 2   A      I have.
 3   Q      All right.  And when did you first see
 4   the Amended Deposition Notice?
 5   A      I'm not sure of the exact date.
 6   Q      All right.
 7   A      It's probably been a couple of weeks.
 8   Q      All right.  Did you bring any documents
 9   with you this morning?
10   A      No, sir, I did not.
11   Q      All right.  Well, let's talk about those
12   right quick.  If you would, turn over to page
13   number 3.  And does Swafford have any reference
14   manuals, writings or other papers that would be
15   compliant to our request number 1?
16          BY MS. CLOTFELTER:  Are you on page 2?
17          BY MR. UNDERWOOD:  Page 3 of the
18   Deposition Notice.
19          BY MS. CLOTFELTER:  Let me just state,
20   before you go through this with him, that on
21   behalf of the company, we have produced all of
22   the documents that have been requested thus far
23   that are responsive, and he doesn't have
0011
 1   anything additional with him today other than
 2   what we've already produced.  But we don't -- we
 3   didn't bring into the room today everything that
 4   we've already provided you and already produced.
 5          BY MR. UNDERWOOD:  Okay; all right.
 6   Q      (continued by Mr. Underwood)  You can
 7   still answer the question.
 8   A      Okay.  I'm sorry.  Can you repeat the
 9   question?
10   Q      All right.  Let me see if I can.  I asked
11   you if Swafford has any references -- reference
```
                        Page 4

swaffordgreg051906.txt
```
12  manuals, writings or other things electronic or
13  paper format regarding compliance with the Real
14  Estate Settlement Procedures Act.
15  A       We do have references and manuals in our
16  office.  They're provided by the underwriter.
17  They're state-specific.  We do have some that
18  we've gotten from the state specifically.  I do
19  not recall if they have sections about RESPA,
20  but that is what we rely upon is all of our
21  information from our underwriter.
22  Q       All right.  And where are those this
23  morning?
0012
 1  A       They're in my office.
 2  Q       And where is that?
 3  A       In Knoxville, Tennessee.
 4  Q       Okay.  And you saw this Notice before
 5  this morning; is that right?
 6  A       Correct.
 7  Q       Is there some reason why you didn't bring
 8  those things with you?
 9          BY MS. CLOTFELTER:  The reason for that
10  is -- and I think we've already responded to
11  this -- they are voluminous.  There are, you
12  know, numerous, numerous manuals.  You can go
13  there and look at them, if you want to, but
14  they're too voluminous to bring in here and, you
15  know, produce all of them for all of the states
16  and from different sources.  It's a library of
17  documents.
18          BY MR. UNDERWOOD:  Well, I understand
19  that, but there was no objection to the request.
20  And so, you know, perhaps if we had known that,
21  we could have gone up there and maybe taken the
22  deposition up there at his office so we could
23  have examined those things.  So I'm going to go
0013
 1  ahead.
 2  Q       (continued by Mr. Underwood)  What about
 3  with regard to number 2?  Is that --
 4  A       Once again, it would be the same answer.
 5  Q       It would be the same answer?
 6  A       Uh-huh.
 7  Q       All right.  Now, what about contracts
 8  between Swafford -- and I mean Swafford & Hays
 9  Settlement Service, Incorporated -- and any
10  third party service providers?
11  A       We do not have contracts with our --
12  actually, we do have contracts with our
13  notaries, but we do not have contracts with
14  our -- excuse me.  I'm sorry.  We have contracts
15  with our abstracters.  We do not have contracts
16  with the notaries.  The notaries receive a
17  document that tells them specifically what
18  they're required to do, but they're not
19  obligated to sign that document.
20  Q       Okay.  Is that -- is that also called
21  "closing instructions?"
22  A       No, it's not.  We do have closing
23  instructions, but that's not the document I'm
0014
 1  referring to.
 2  Q       Okay.  We'll go through some of the deals
```
Page 5

swaffordgreg051906.txt
```
 3   and maybe we'll get to some of those documents.
 4   All right.  What you've told me so far about
 5   manuals and references and the like, is that
 6   also true with regard to number 5?
 7   A      No.  We do not mark up filing or
 8   recording fees.
 9   Q      Okay.  And I skipped number 4
10   accidentally.  Do you have anything with regard
11   to number 4, any documents or manuals?
12   A      No, we do not.  And we do not actually
13   mark them up, but we do not have any manuals
14   about that.
15   Q      Okay.  Now, without me going through all
16   of them, let's look at the first page and start
17   with number 1.  And if you would, let's -- can
18   you tell me -- look at number 1 through number
19   18, and are you here and able to testify about
20   all those areas of inquiry this morning?
21   A      Yes.
22   Q      Okay; all right.  You've already told us
23   your name.  Where are you employed, please, sir?
0015
 1   A      At Swafford Settlement Services in
 2   Knoxville, Tennessee.
 3   Q      Okay.  And if you would, please, sir,
 4   just give me a brief rundown of your educational
 5   background and your work history up until you
 6   began --
 7   A      With Swafford?
 8   Q      -- with Swafford, yes.
 9   A      Okay.  I have a degree in economics and
10   accounting.  That's from the University of
11   Tennessee.  Prior to that degree, I was an
12   auditor for a government contractor in Oak
13   Ridge, Tennessee.  After that degree, I was
14   hired as a loan officer with a mortgage company
15   where I was then promoted to manager and was
16   there for five years.
17   Q      Okay.  Let me ask you to slow down a
18   little bit.
19   A      Okay.  I'm sorry.
20   Q      You got the degree in economics from
21   where?
22   A      Economics and accounting from the
23   University of Tennessee.
0016
 1   Q      What year was that?
 2   A      '96.
 3   Q      Okay.  Are you a CPA?
 4   A      No.
 5   Q      All right.  And you were an auditor for a
 6   government contractor?  Who was that?
 7   A      ORAU.  It's stands for Oak Ridge
 8   Associated Universities.
 9   Q      Okay.  And then --
10   A      And I was actually there for eight years.
11   I started out as a co-op student in high school.
12   Q      Okay.  And what did you do after ORAU?
13   A      I went into mortgage lending.
14   Q      Okay.
15   A      I was hired as a loan officer.  And after
16   several promotions, I was an area manager.
17   Q      And who were you with then?
```
                              Page 6

swaffordgreg051906.txt

```
18  A      Ameriquest Mortgage.
19  Q      How long were you with Ameriquest?
20  A      Approximately, five years.
21  Q      Okay.  I know you said you were an
22  auditor, but can you tell me a little bit more
23  about what your job entailed?
0017
 1  A      What types of things I audited?
 2  Q      Yes.
 3  A      Payrolls, stipend employees.  We had
 4  people coming from other countries to work for
 5  the government.  I audited their files and their
 6  pay.  It was more of accounting-type procedures,
 7  but I was auditing the accounting departments.
 8  Q      Okay; all right.  And tell me what you
 9  did as a loan officer in the mortgage lending
10  industry with Ameriquest.
11  A      As the loan officer, I actually talked to
12  different borrowers trying to solicit business.
13  As the account executive, which was my next
14  position, I helped approve those loans and put
15  together packages that would benefit the
16  borrower.  I was then promoted to branch
17  manager, and I managed the -- all the account
18  executives and loan officers in that branch and
19  processing team.  And then I was promoted to
20  area manager over several branches.
21  Q      Okay.  What branch were you the manager
22  over?
23  A      Knoxville, Tennessee.
0018
 1  Q      And does Ameriquest Mortgage, does it
 2  have a brick and mortar office there where
 3  borrowers could come in?
 4  A      I believe they just reopened.  We had an
 5  office there, yes.  But the reason I left there
 6  was because they downsized and they shut down
 7  their branches in several states and Tennessee
 8  was one of them.
 9  Q      All right.
10  A      But I've heard advertisements lately, so
11  I think they're back in Tennessee.
12  Q      All right.  And what did you do as a
13  branch manager?
14  A      Pretty much just helped train the account
15  executives and loan officers and oversaw their
16  production.  The chief role of the branch
17  manager was to oversee production.
18  Q      All right.  And then tell me what you did
19  as area manager.
20  A      Pretty much the same thing, but over all
21  the branches.
22  Q      Okay.  And what area -- what area were
23  you over?
0019
 1  A      Kentucky and Tennessee.  And just to make
 2  sure you understand, we did not actually have a
 3  final underwriting approval on those.  They went
 4  to our underwriting office in California for
 5  approval.
 6  Q      And that was the Ameriquest loans?
 7  A      Uh-huh.
 8  Q      Okay; all right.  Now, what I wanted to
```
                        Page 7

swaffordgreg051906.txt

```
 9    ask you was, did any of your time with
10    Ameriquest, was lending law compliance ever a
11    part of your duties?
12    A      That was in California.
13    Q      Okay; all right.
14    A      They actually sent all of our
15    truth-in-lending and everything from that
16    office.  So they complied with all regulations.
17    Q      All right.  And then did -- let's see
18    now.  We talked about loan officers and account
19    executives.  Which one of these persons would be
20    the person that would actually sit down and do a
21    closing with an Ameriquest customer?
22    A      It would be the account executive.
23    Q      The account executive.  What was the loan
0020
 1    officer's --
 2    A      Telemarketing, primarily.
 3    Q      Okay.  And did Ameriquest close its own
 4    loans?
 5    A      Uh-huh.  Well, some of them.  It depended
 6    on the location.  If it was a local to
 7    Knoxville, then the account executive would
 8    close it at the branch.  If it was outside of
 9    Knoxville, we would ask title companies to close
10    it.  We didn't travel.
11    Q      All right.  Fair enough.  And you closed
12    a number of those loans yourself, I assume?
13    A      I did.
14    Q      Okay.  And did you also close loans as a
15    branch manager?
16    A      Maybe once or twice.  It was rare.
17    Q      Okay.  And then -- okay.  While you were
18    with Ameriquest, did you have any training with
19    regard to lending law compliance?
20    A      No, I did not.
21    Q      Okay.  Where did you go to work after
22    Ameriquest?
23    A      Title Source America.
0021
 1    Q      All right.
 2    A      It was owned by Title Source, which is
 3    here and actually in Birmingham, and it was a
 4    Knoxville branch they were opening up.
 5    Q      Okay.  What did you do there?
 6    A      I was actually hired to try -- well, they
 7    hired me because of my mortgage lending
 8    background and because of my accounting
 9    background and my auditing experience.  They had
10    some issues in their -- with their bank
11    reconciliations and with their procedures and
12    they hired me to come in as an operations
13    manager to try to clean up their procedures.
14    Q      What was the nature of their business?
15    A      A title company.
16    Q      Okay.  And how long --
17    A      They offered full title services.
18    Q      Okay.  But did they close loans?
19    A      They did.
20    Q      Okay.  And so it was --
21    A      I, however, did not close any loans for
22    them.
23    Q      Okay.  But was it part of your job with
```

Page 8

swaffordgreg051906.txt

0022
1   them to audit their bank account records and
2   that sort of thing?
3   A       To try to catch up on their bank
4   reconciliations.  It was several months behind
5   when I was hired, but I was not able to do it.
6   After about six months, I realized that all the
7   things that they had problems with were not
8   rectifiable, and that's when I chose to start my
9   own title company.
10  Q       I see.  So were you with them about six
11  months?
12  A       About six months.
13  Q       All right.  And then did you start your
14  own title company after that?
15  A       I did.  I met Gary Hays, which is why it
16  was Swafford & Hays in the beginning --
17  Q       All right.
18  A       -- and we started a title company
19  together.  Gary Hays also worked for Title
20  Source and he was their marketer.
21  Q       Okay.  And where was Swafford & Hays's
22  office initially located?
23  A       In Knoxville.
0023
1   Q       All right
2   A       We were a Florida corporation, though,
3   and Gary Hays was located in Florida.  We were a
4   Florida corporation doing business in Tennessee
5   with its office located in Tennessee.
6   Q       Does it have more than one office?
7   A       No.
8   Q       All right.
9   A       We have an office located in Florida, but
10  with no employees there.  We have an agent there
11  solely, and his sole responsibility is to sign
12  policies and to keep a copy of all files there,
13  which is a state regulation.
14          BY MS. CLOTFELTER:  Let me just clarify,
15  were you asking about Swafford & Hays initially
16  or are you asking about now?
17          BY MR. UNDERWOOD:  Well, I was asking
18  about now.
19          BY MS. CLOTFELTER:  Okay.  I just wanted
20  to be sure it's clear.
21  A       This is two offices.
22  Q       (continued by Mr. Underwood)  Okay.
23  A       We're in multiple states.  So some states
0024
1   require you have an address, but you're able to
2   hire what they call a resident agent.  It's not
3   actually an employee of Swafford.  They're just
4   there to be served if there's ever -- if they
5   ever have that purpose.
6   Q       Okay; all right.  Well, I guess that gets
7   me to my next question.  I wanted to ask you
8   about what states Swafford & Hays does business
9   in.
10  A       It does fluctuate.  We have been licensed
11  in as many as twenty-eight to twenty-nine
12  states.  I'm not sure of the final number, I
13  apologize.  Right now we primarily do Tennessee
14  -- do you want me to actually list them for you?
                        Page 9

swaffordgreg051906.txt

15    Q        If you don't mind.
16    A        Okay.  Tennessee, Florida, Georgia,
17    Louisiana, Alabama, Arkansas, North and South
18    Carolina, New York, New Jersey, Massachusetts,
19    Missouri.  And now I'm starting to draw a blank.
20    Q        Michigan?
21    A        We do Michigan, yes.
22    Q        All right.
23    A        It's primarily east-based states.  But
0025
1    like I said, we fluctuate, because it depends on
2    each month what the lenders -- most of our
3    lenders actually send out fliers and
4    solicitations and they target different states
5    different months.  It's whatever the companies
6    they hire to do their marketing, wherever they
7    send the fliers that month.  But we're already
8    licensed in those states, so it varies what
9    state we're actually practicing in that month.
10    Q        I see.
11    A        That's just the most -- that's just the
12    most common states for us to do business in.
13    Q        Okay.  And I understand that there might
14    be more.
15    A        There might be others that we've done, a
16    couple of others, one here and there.
17    Q        And I wanted to ask you -- my next
18    question, I guess, is, can you tell me the
19    lenders that you've done business with?
20    A        Probably not all of them, no.
21    Q        Okay.
22    A        Primarily because Homeowner's Loan was
23    our primary lender, and when they chose to go
0026
1    out of business a few months ago, we started
2    looking for other business and we've landed
3    several different clients.  But I don't actually
4    do the marketing myself, so I don't know the
5    name of all the new clients.
6    Q        All right.
7
8    REPORTER'S NOTE:   (At this point, instrument was
9    marked for identification by the Reporter as
10    Plaintiff's Exhibit Number 2, after which, the
11    deposition continued, as follows:)
12
13           BY MR. UNDERWOOD:  Let me show
14    you that, Pat.  That's our next exhibit.  It
15    wasn't a trick question or anything.  I just
16    wanted to ask him --
17           BY MS. CLOTFELTER:   Here.
18    Q        (continued by Mr. Underwood)  Okay.
19    I've handed you a document that we've marked as
20    Plaintiff's Exhibit 2 and it's been produced in
21    one of the -- I believe the Gibbs' state court
22    case.  Is that an accurate list of the states
23    where you do business?
0027
1           BY MS. CLOTFELTER:  And you're referring
2    to page 2 of that exhibit?
3           BY MR. UNDERWOOD:  Right.
4           BY MS. CLOTFELTER:  It's in response to
5    question number 20.

Page 10

swaffordgreg051906.txt

```
 6   A      I would assume so.  I don't have anything
 7   in front of me.  I mean, all of our files are
 8   there, as far as what states.  It's like when I
 9   told you twenty-seven or twenty-eight, that's
10   the reason my number varied.  I don't know.  I
11   don't actually do the licensing; my father does.
12   Q      I understand.
13   A      But I'm sure if I signed this before that
14   it was accurate.
15   Q      Probably accurate at that time?
16   A      But I can't tell you just by looking at
17   the states.
18   Q      You may have added some or lost some
19   since that time?
20   A      Correct.
21   Q      I understand.  Okay.  No problem.  Is a
22   license required in each state?
23   A      No.  It depends.  Some states require
0028
 1   licensing, your agency be licensed.  Some states
 2   require the agency and the agent be licensed.
 3   Some are actually based on being an insurance
 4   agent.  Some are just as the corporation doing
 5   business in that state.  The requirements are
 6   drastically different in each state.
 7   Q      I see.  Okay.  Before we got off on that,
 8   you were telling me about lenders.  Did you tell
 9   me your primary lender was Homeowners?
10   A      Uh-huh.
11   Q      All right.  And I understand that
12   Homeowners has gone out of business.  Is that
13   what you understand as well?
14   A      Uh-huh.
15          BY MS. CLOTFELTER:  You need to answer
16   out loud.
17   A      I'm sorry.  Yes.
18   Q      (continued by Mr. Underwood)  Okay.  And
19   when did they notify you that they weren't
20   making any more loans, if they did?
21   A      I think the day they actually shut their
22   doors, which probably was -- as far as doing
23   business, I believe to be October or November of
0029
 1   last year.
 2   Q      All right.
 3   A      Or maybe it was January of this year.  I
 4   can't remember.  We started losing business from
 5   them and we kept asking them, but they didn't
 6   actually confirm that they were going out of
 7   business until several months later.
 8   Q      Okay.  Let me ask you this.  How did you
 9   first start doing business with Homeowners?
10   A      A mutual acquaintance of mine that also
11   Gary Hays knew.  He worked at Ameriquest with
12   me.  He was also a branch manager in Atlanta,
13   and I found out he had gone to Homeowners when
14   he left.  So I called him and he started sending
15   new business to us.
16   Q      I see.  Okay.  Now, can you tell me a few
17   other companies you do business with, other than
18   Homeowners?
19   A      Home Funds Direct, Nova Star.
20   Q      Okay.
```

Page 11

swaffordgreg051906.txt

```
21   A      A branch or two of Wells Fargo.
22   Q      Okay.
23   A      That's probably two or three of the
0030
 1   largest ones.  We have several small brokers and
 2   lenders, but I am not sure of all their
 3   different names.
 4   Q      I understand.  And there may even be some
 5   that maybe you've only done one loan for; is
 6   that --
 7   A      Right.  And actually there is several
 8   more than that that we've done several loans
 9   for.  It's just that we've done it in the last
10   couple of months and I don't know all the names.
11   Q      Okay; all right.
12   A      Those are just lenders we've had for a
13   while, in addition to Homeowners, prior to us
14   having to market other lenders.
15   Q      Okay.  The records regarding those, they
16   would be where?
17   A      In our office.
18   Q      In Knoxville?
19   A      Yes, sir.
20   Q      And these lenders, are they in various
21   states?
22   A      They are.
23   Q      I guess they are.
0031
 1   A      Uh-huh.  And most of them do business in
 2   various states, whether from that same location
 3   or different locations.
 4   Q      All right.  Now, is it fair to say that
 5   Swafford & Hays -- well, is Swafford & Hays
 6   Settlement Services still doing business?
 7   A      No.  Swafford Settlement Services is
 8   doing business.  It's the same corporation, but
 9   it was just a name change.
10   Q      Okay.  Did Mr. Hays leave the company?
11   A      He did.
12   Q      And can you tell me about when that
13   happened?
14   A      In late 2003 to early -- no, I'm sorry.
15   Late 2002 to early 2003, somewhere in that time
16   frame.
17   Q      Now, is the company, Swafford & Hays
18   Settlement Services, Inc., now, is it d/b/a
19   Swafford Settlement Service or --
20   A      Like I said, it's just a name change.  So
21   we actually -- there is no Swafford & Hays.
22   What we did is we changed our name, the
23   corporation name, and then we had to go into
0032
 1   each state and do a name change.  So actually
 2   every state sees us as Swafford Settlement
 3   Services now, but it's the same corporation that
 4   was Swafford & Hays.  It was just a name change.
 5   Q      I see.  So you've got the same tax ID
 6   number and --
 7   A      I believe so, yes.
 8   Q      Okay.  And I think I asked you the
 9   question about when Mr. Hays left.  When was the
10   name change done?
11   A      That was much more recent, and I don't
```

Page 12

swaffordgreg051906.txt
12  know what date to tell you on that.  Maybe late
13  2004, early 2005.
14  Q      Okay.  Now, was it -- would it be fair to
15  describe Swafford Settlement Services as a title
16  company?
17  A      Yes, as a title or settlement service
18  company, but we are a full service company.  We
19  provide several services.
20  Q      And that was going to be my next question
21  was -- if you would, just sort of outline for me
22  what it is that Swafford does and what services
23  it provides.
0033
1   A      Okay.  We accept title orders, orders for
2   resulting in a policy, an insurance policy.  We
3   will do anything from a current owner search to
4   a full thirty year search if it's a purchase.
5   It depends on what the lender requests or asks
6   us to do.  We, then, put it in the form of a
7   commitment for insurance.  After the lender
8   reviews the commitment, we will process -- what
9   we call process the commitment for them.  If
10  they say that there are mortgages on the
11  commitment that are no longer owing, we research
12  that for them.  Or with judgments, which entails
13  several different things.  It depends upon the
14  state and the requirements.  We will actually do
15  the settlement services for them, which means we
16  actually close it if it's in our office.  If
17  not, we hire a notary for them.  We actually
18  print out the package to get it to the closing
19  for them.  And then when it's returned, we check
20  it for valid signatures.  Am I going too fast
21  for you?
22  Q      Yeah, a little bit.
23  A      I'm sorry.
0034
1   Q      I meant to ask you to slow down.  Let me
2   make sure I hadn't missed anything.  You said
3   you take orders for title policies and title
4   insurance.
5   A      Uh-huh.
6   Q      You do title searches.
7   A      Correct.
8   Q      Commitments for title insurance.
9   A      Uh-huh.
10  Q      Process those commitments.  What does
11  that mean?
12  A      Processing -- like I said, the
13  commitment, a lot of times we're relaying to
14  them exactly what it shows at the courthouse
15  that's on record for that file or that person.
16  A lot of times a person will have judgments
17  against them, but, say, it's a John Smith, but
18  there's no such security number referenced.  We
19  have to list them because it's John Smith.  If
20  they come back and say that's not their John
21  Smith, we try to research it, call the attorneys
22  who are listed on the judgments, try to track
23  down whether it's our borrower or not.  If it's
0035
1   a lien, then we have to go back to the statutes
2   in that state.  We get all of those requirements
                        Page 13

swaffordgreg051906.txt
```
 3   from our underwriter.  We have manuals.  Then we
 4   try to find out if it's met its statutory
 5   period.  If not, we call the actual lender and
 6   find out if it's still owed, how much is owed,
 7   that kind of processing.  We also get payoffs on
 8   current liens that are actually owed, things of
 9   that nature.
10   Q      Okay.
11   A      Anything that their processing staff
12   doesn't have time to do, we become an extension
13   of them and we process it for them.
14   Q      When you say "their processing staff,"
15   you're referring to the lender?
16   A      Uh-huh.
17   Q      Okay.  So in other words, you help the
18   lender -- in that case, you help the lender make
19   sure it has a good title?
20   A      Correct.
21   Q      Okay.  Now -- all right, we got down to
22   settle services, and you said sometimes they
23   close in the office.
0036
 1   A      Rarely.  We don't have very many
 2   Knoxville, Tennessee loans.
 3   Q      Okay.
 4   A      But if they do, we do close them in the
 5   office with a notary that's in our office.  If
 6   not, we hire notaries.
 7   Q      Okay.  And where do those notaries close
 8   the loans?
 9   A      Just wherever the borrower -- if they
10   have an office in their office, if they can go
11   to the borrower's home, in a public place,
12   wherever they choose.  But it's basically what
13   also the lender's requirements are.  If the
14   lender prefers it not be closed in a home, it's
15   not closed in the home.  And in some states we
16   use attorneys.  It depends on what the state
17   regulations are for that.
18   Q      All right.  And tell me what
19   settlement -- what's entailed in settlement
20   services, that term that you used?
21   A      It varies from finding a notary for them
22   or an attorney for them, preparing a HUD
23   Settlement Statement for them.  Either preparing
0037
 1   or having an attorney prepare, depending on the
 2   state regulations, a warranty deed, a quitclaim
 3   deed, a subordination agreement.  Our
 4   underwriters don't allow us to prepare powers of
 5   attorney or things of that nature, but we will
 6   find attorneys that will prepare them for them.
 7   We offer to fund their loans for them, if they
 8   choose to have us do that, using their
 9   requirements and restrictions and regulations.
10   We also have -- we also put all of the fees on
11   the HUD based upon what they request, though.
12   They always dictate the fees to us, and then
13   that has to be approved by the lender.
14   Q      Okay.  Now, I didn't quite understand
15   what you meant by that.  You said they always
16   dictate the fees to us, and then it has to be
17   approved by the lender.
```
                              Page 14

swaffordgreg051906.txt
18  A      Right.  Their fees or -- they tell us
19  what fees they want to charge on the HUD.  They
20  tell us what loans they want to pay off on the
21  HUD.  And then, of course, our fees go on the
22  HUD.  But then after we've done it, it doesn't
23  go directly to closing, from the notary to the
0038
1   attorney.  It always goes back to the lending
2   company and they give us final approval prior to
3   closing.
4   Q      Okay.  So Swafford prepares the HUD-1?
5   A      Uh-huh.
6   Q      Totals everything up, and then sends that
7   back to the lender for approval; is that
8   correct?
9   A      Correct.
10  Q      And then after it's approved, then what
11  happens?
12  A      Then it actually goes to the notary or to
13  the attorney for closing.
14  Q      Okay.  Now, what about all the other
15  documents, the mortgage and title insurance and
16  all that business, who does all of that?
17  A      We don't prepare the actual closing
18  documents, except for the ones I listed, deeds
19  and the actual HUD.  We would prepare not deeds
20  of trust, but like warranty deeds, quitclaim
21  deeds.  Everything else comes from the lender.
22  Q      Okay.  So the only doc -- let me make
23  sure I'm clear on that.  The only documents
0039
1   actually prepared by Swafford would either be
2   like --
3   A      Settlement documents.
4   Q      Yeah.  Would be HUD-1 --
5   A      Uh-huh.
6   Q      -- and a deed.  Is that it?
7   A      Typically, yes.  I mean, like I said,
8   there's times for subordination agreements,
9   powers of attorney, things of that nature, and
10  we get all that information together for an
11  attorney to prepare, and then we send it to the
12  lender once it's done.
13  Q      Okay.  Now, when you say your underwriter
14  won't let you write powers of attorney, who do
15  you mean?
16  A      Ticor, our underwriter.
17  Q      All right.
18  A      We're actually an agent for the
19  underwriter.  We don't actually provide the
20  insurance.
21  Q      And when you say that Swafford will fund
22  loans, is that a table funding type of
23  arrangement?
0040
1   A      Typically, no, because the majority of
2   our business is refinances.  So it's not
3   actually done at the table.  It's done after the
4   right of cancel is -- the rescission period is
5   complete.  So typically on the fourth day after
6   the closing.  And they will wire the funds into
7   our bank as long as the loan officer did not --
8   I mean, the borrower did not cancel the loan,
Page 15

swaffordgreg051906.txt
```
 9   and then we will fund the loan.  But once again,
10   that's typically all within the closing
11   instructions or there's an additional document
12   sent to us, and then we fund from the HUD
13   Settlement Statement.
14   Q    Well, I'm not sure what -- what's the
15   definition of funding a loan?
16   A    Actually cutting the check or wiring the
17   funds to the borrower or the payoffs that are on
18   the HUD Settlement Statement.  And it can vary
19   from net funding to gross funding, which means
20   sometimes we actually get the lender's broker's
21   fees and we cut it back to the broker and
22   lender.  Sometimes they net fund, which means
23   they keep their fees, and we just disburse
0041
 1   everyone else's fees and payoffs and the
 2   borrower's funds, things of that nature.
 3   Q    All right.
 4   A    It's all at the discretion of the lender,
 5   and each lender varies.
 6   Q    Okay.  Now, I've been looking at ledger
 7   cards on a lot of these transactions, and would
 8   it be fair to say that in most of them that
 9   Swafford & Hays wrote the checks for the --
10   well, funded the loans?
11   A    Yes.
12   Q    Okay.
13   A    We have had two companies in our past
14   that funded their our loans, and then some
15   companies will get miscellaneous companies that
16   will fund their loans.  But the majority of
17   loans, yes, we do fund.
18   Q    Okay.  Now, let me ask you this now, with
19   regard to some of these settlement services,
20   you've already told me that Swafford hires a
21   person that you referred to as notaries.
22   A    Uh-huh.
23   Q    I've seen references in some of the
0042
 1   documents to persons referred to as "closers."
 2   Is that an interchangeable --
 3   A    Yes, a closing agent, a notary, attorney,
 4   depending on the -- yes, it is, depending on
 5   what the lender calls it, depending on the state
 6   if we have to use an attorney or a notary.
 7   Q    Sure; okay.  Probably would almost have
 8   to have a notary on any of these deals, wouldn't
 9   you?
10   A    Almost always a notary, but some states
11   require an attorney close the loan.
12   Q    Okay.  Well, let's see, I'm getting a
13   little ahead of myself.  I meant to ask you a
14   little earlier about how Swafford would
15   initially get a loan.  In other words, how would
16   you know that Ms. Jones in Birmingham needed a
17   loan closed?
18   A    Okay.  And before I answer that, did you
19   want me to finish the prior answer on the
20   services we provide?
21   Q    Oh, yes, please.
22   A    Okay.  We also offer the recording of the
23   mortgage or any legal document that they want
```
Page 16

swaffordgreg051906.txt
0043
1    recorded.  And we, of course, offer the final
2    policy itself.
3    Q       See, I told you I'm not too good at this.
4    I'm getting ahead of myself.  I thought we had
5    finished that question, but we were only about
6    halfway through.  Okay, the recording of the
7    mortgage, and then the --
8    A       Final policy.
9    Q       Final policy.
10   A       And then requesting and recording
11   releases.
12   Q       All right.
13   A       And recording of assignments if they sell
14   their loan, which the majority of lenders do
15   now.
16   Q       Okay.  Would it be fair to -- again, I've
17   reviewed several of these transactions.  Would
18   it be fair to say that Swafford has someone
19   record the majority of these mortgages?
20   A       What do you mean by "has someone record?"
21   Q       Well, I mean, someone actually has to
22   take it down to the courthouse.
23   A       It depends on the state and the
0044
1    courthouse.  Some -- some courthouses we
2    actually send it to a courier.  Typically an
3    abstract company or a notary, and they will
4    hand-walk it in.  Some states and counties are
5    so easy to get it recorded in and they're so
6    up-to-date that we will actually overnight it
7    directly to that registrar's office and they
8    record it.
9    Q       All right; okay.  I'm going to come back
10   to some of that in a minute, but I wanted to --
11           BY MS. CLOTFELTER:  Did you finish the
12   listing?
13           THE WITNESS:  I believe so.  We've jumped
14   around, so I --
15           BY MR. UNDERWOOD:  I'm sorry.
16           BY MS. CLOTFELTER:  I just wanted to be
17   sure.
18           BY MR. UNDERWOOD:  That's my fault.
19   A       I think I have.  I know we provide more
20   services than that, but they're all under the
21   umbrella of each category I've told you about.
22   Q       (continued by Mr. Underwood)  Okay.
23   We'll go through several transactions and you
0045
1    can describe them to me in a little more detail.
2    A       Okay.
3    Q       I'm just trying to get a general idea
4    about what you guys do.  And so I wanted to ask
5    you next was how do you know that Ms. Jones in
6    Birmingham needs a loan closed?
7    A       The lender will tell us when it's ready
8    to close.
9    Q       And how does Swafford receive that
10   notification, is it e-mailed, do they mail you a
11   package or do you call them up every day or --
12   A       A fax or an e-mail.  And that fax or
13   e-mail will contain a request for a HUD -- a
14   preliminary HUD Settlement Statement, and they
                            Page 17

swaffordgreg051906.txt
```
15   will tell us the date that they want to close
16   it, typically.
17   Q      Well, that brings another thing to mind.
18   Who prepares the good faith estimate?  Is that
19   done by the lender?
20   A      The lender does.
21   Q      And is that part of the notification?
22   A      No, we never see -- we don't see the
23   actual truth-in-lending until we actually get
0046
1    the final package, the loan documents that have
2    actually been signed.  We never see the
3    preliminary truth-in-lending, but we do see the
4    final one that goes out with the package.
5    Q      Okay.  Let me ask you about Homeowners,
6    for example.  How did you receive a notification
7    from them, was it by fax or e-mail or --
8    A      Theirs was always by fax or e-mail,
9    depending on the loan officer.  But it was
10   always what they called a HUD request.  It gave
11   us all the fees and the payoffs and things of
12   that nature.
13   Q      Okay.  Now, if you would, just sort of
14   walk me through the process of what happened.
15   Let's say you'd get a fax or an e-mail from
16   Homeowners -- well, first, let me ask you this
17   before we get into what you do with it.  Do you
18   get it from a loan officer, or what person would
19   you get that from Homeowners?
20   A      It varies.  Oh, from Homeowners
21   themselves?
22   Q      Yeah.
23   A      It came from the loan -- well, that
0047
1    varied, also.  It depended on the branch.  It
2    was either the loan officer or the processor,
3    depending on which branch it was.
4    Q      All right.
5    A      And that was only the original
6    preliminary HUD.  We sent the -- once we had it
7    complete, we sent it to their closing
8    department.  And if the closing department had
9    any issues or wanted corrections made, then it
10   came from the closing department to have the
11   change made.
12   Q      Okay.
13   A      Because they were the ones that gave the
14   final approval, not the loan officer or the
15   processor.  They just initiated the steps.
16   Q      Okay.  And who gave the final approval?
17   A      The closing department.
18   Q      And with regard to these other lenders
19   you've named and done business with, do they
20   have a similar type process?
21   A      Not really.  Each one's different.  There
22   are lenders who will send us just their fees and
23   they want a HUD with just their fees on it and
0048
1    that's the way they start the process.  Some
2    lenders request their fees, recording
3    fees, all the payoffs we listed on the HUD to
4    start the process.  It just varies.  And whether
5    it comes from the loan officer, the broker, the
```
Page 18

swaffordgreg051906.txt
```
 6   lender, closing department, it all varies by
 7   lender.
 8   Q      All right.  Well, we've got several of
 9   these.  Right now, I'm probably just going to
10   refer mostly to Homeowners, since that's who you
11   did the bulk of your business with.
12   A      Okay.
13   Q      All right.  So you get a HUD request from
14   Homeowners.  Tell me what happens next.
15   A      We just actually take the information off
16   of the HUD settlement request and put it in the
17   National HUD Settlement Statement.
18   Q      In the HUD request, tell me what
19   information is in that.
20   A      I have never actually done a closing, so
21   I'm going to tell you what I believe to be in
22   it.
23   Q      Okay.
0049
 1   A      I know that they list all the payoffs of
 2   who they want paid.  Whether it be liens on
 3   title or whether it be miscellaneous credit card
 4   debt or what have you.  It lists all of their
 5   basic fees.  It lists our fees.  The only thing
 6   it does not -- well, actually, it will list
 7   appraiser's fees, insurance finder fees.  The
 8   only -- tax payoffs for property taxes.  The
 9   only thing it will not list is the recording
10   fees, but they request that to be in our
11   preliminary HUD.  So we use Ernst Publishing to
12   get those fees.
13   Q      Okay; all right.  Now, what about --
14   well, would it be fair to say that it lists all
15   the lender's fees, and then Swafford would plug
16   in the fees for its services?
17   A      No, that's not right.
18   Q      Okay.
19   A      It actually lists our fees.  All of our
20   fees are listed on their preliminary HUD
21   Homeowners, except -- actually all the fees that
22   come to us are listed.  The only fees that they
23   don't list are, like I said, the recording fees.
0050
 1   Q      All right.  Well, how do they know what
 2   the fees are going to be in advance?
 3   A      Because they told us what we could and
 4   could not charge to each borrower.  The same
 5   fees were charged to each borrower.  The only
 6   time they varied is if they told us they wanted
 7   us to lower our fees.
 8   Q      I see.  So Homeowners would give you a
 9   schedule of fees?
10   A      Uh-huh.
11          BY MS. CLOTFELTER:  Is that "yes?"
12   A      Yes.  I'm sorry.
13   Q      (continued by Mr. Underwood)  Is that
14   true of the other lenders as well?
15   A      Almost every lender will ask us what our
16   fees are going to be to each borrower and we
17   charge the -- yes, I guess, is the easy answer.
18   Q      Okay.
19   A      Yes, as far as knowing the fees for each
20   borrower; no, as far as them being on their
```
Page 19

swaffordgreg051906.txt

```
21   preliminary HUD request.
22   Q       All right.
23   A       Not every lender list our fees for us.
0051
 1   Q       Okay.  I noticed, after reviewing some of
 2   the transactions, that it appeared that the fees
 3   on the Homeowners's loans were higher than some
 4   of the other lenders.  Is that your
 5   understanding?
 6   A       I guess so, yes.  I do know that they are
 7   higher than some lenders.  I don't know that
 8   they're the highest fees.
 9   Q       And when I say the fees, I mean --
10   A       Like our base fees --
11   Q       I noticed that Swafford's fees were
12   higher on the Homeowners' loans than some of the
13   other loans.  Is that your understanding?
14   A       Right.  Typically, a lot of times the
15   fees that -- yes, that is my understanding.
16   Q       Why were they higher?
17   A       Our fees a lot of times are based upon
18   how much work they ask us to do on their behalf.
19   A lot of lenders will process their own files.
20   Meaning that we will get the abstract done and
21   put it in the commitment and we never do
22   anything again for them until we actually do the
23   HUD Settlement Statement.  For Homeowners, we
0052
 1   were truly a full processing company.  We got
 2   all payoffs for them, tax payoffs for them.  We
 3   cleared all of their judgments, liens, anything
 4   that should not be on title but was still
 5   showing on title at the courthouse, we did all
 6   of that for them.
 7   Q       All right.  And also funded the loan?
 8   A       And also funded every loan.
 9   Q       All right.  Funded every loan for
10   Homeowners?
11   A       Uh-huh.
12   Q       All right.  So when you would get --
13   A       I'm sorry.  Yes.
14   Q       Okay.  Well, let me ask you with regard
15   to the fees that were charged.  What about fees
16   for third party services?  It's true that
17   sometimes you would not know ahead of time what
18   those fees were going to be; is that fair to
19   say?
20   A       Actually, part of doing the
21   preliminary -- yes, it is fair to say.  But part
22   of doing the preliminary HUD was to actually
23   call and book a notary and we would get an idea
0053
 1   of what that notary fee was going to be.  And it
 2   was also to get their preliminary recording
 3   fees.  But the notary fee, yes, we typically
 4   very rarely knew what the actual fee was going
 5   to turn out to be.  And we also very rarely knew
 6   what the actual recording fees were going to
 7   turn out to be.
 8   Q       All right.  I got a little ahead of
 9   myself, because what I really wanted to ask you
10   next, before I got into that was, I wanted you
11   to tell me about third parties that Swafford
```

Page 20

swaffordgreg051906.txt
```
12   would hire to perform these services.
13   A     Okay.
14   Q     And I guess we could start with notaries
15   or closers.  And tell me what -- how Swafford
16   would locate notaries and closers and what their
17   qualifications had to be.
18   A     Notaries -- for every notary that we
19   used, they had to provide a current bond and a
20   copy of their current notary license.  So they
21   had to be bonded notaries.
22   Q     Okay.  Any other requirements?
23   A     Like I said earlier in a prior question,
0054
1    we have a list of requirements.  Many of those
2    requirements come from the lenders, as far as
3    how they want the loans closed, because
4    basically we're just an extension of the lender
5    at that point.  But they didn't actually sign a
6    contract with us, no.
7    Q     Okay.  Did Homeowners have a list that
8    they would require notaries to meet?
9    A     They have an extensive list of what they
10   require and met at their closings.
11   Q     And would that be true of these other
12   lenders?
13   A     Some do, some don't.
14   Q     Some do and some don't.  Okay.  And would
15   you perform any kind of background check or
16   anything?
17   A     On notaries?  No.  And you asked me where
18   they came from.  They come from various
19   locations.  Sometimes you can actually go online
20   on the internet and find a list of the licensed
21   notaries in each county.  Sometimes we would
22   actually call a notary company, which is just a
23   company that has a listing of notaries in that
0055
1    county.  Sometimes we would call their
2    underwriter and got different agents that are --
3    that they were using as an underwriter as well
4    that had -- and we can ask for their names.  We
5    would call that agency and we ask what notaries
6    they use.
7    Q     Okay.
8    A     And sometimes the lender has used
9    notaries and attorneys before that they like to
10   use and they tell us those names.
11   Q     All right.  And that was going to be my
12   next question was, for example, if you wanted to
13   close a loan in Perdido, Alabama, how would you
14   locate someone to do that?
15   A     I don't know specifically.  Like I said,
16   I've never actually closed a loan, but my staff
17   knows where to find Perdido.
18   Q     So someone on your staff would get on the
19   internet or look it up --
20   A     Depending on -- yeah.  We've been open
21   long enough now that we have a pretty extensive
22   list of notaries that have always done a good
23   job, depending on the county and state.  So
0056
1    that's the first place we go to, because we know
2    that they're reputable and we know they've done
```
Page 21

swaffordgreg051906.txt
```
 3    a good job.  But if we can't find one in those
 4    areas, what I just told you is what we do.
 5    Q      All right.  What about persons who do
 6    some of the other services?  For example, title
 7    searches and abstracts.
 8    A      Abstracters have to have an E&O policy
 9    and they do sign a contract.  And the contract
10    basically states what they are required to list
11    in the abstract report, to either provide a
12    current owner -- like I said, the lender
13    dictates to us what they want.  If they want a
14    current owner search, which means they only
15    search the borrower who owns the property now,
16    they only go back to the most valid warranty
17    deed or last purchase loan.  Or if they want a
18    thirty year search, where they go back thirty
19    years.  It depends on what the lender wants.
20    Q      Okay.  Are there any other persons that
21    Swafford would hire to do a third party search
22    with regard to a closing, other than a notary
23    and the abstracter?
0057
 1    A      If we hire an attorney to prepare like a
 2    power of attorney or things of that nature,
 3    sometimes it will be affiliated through -- not
 4    affiliated, but handled through us.  The lender
 5    will actually ask us to send the information to
 6    the attorney, get it, and then they'll send us
 7    the bill and it's put on the HUD.  Sometimes
 8    they bill the lender directly.  It just depends
 9    per lender on how they like to handle it.  So
10    sometimes, yes, we do use an attorney directly
11    to get those documents and we're the ones
12    handling it.
13    Q      Okay; all right.  Let's see.  Now, I
14    think we got to the point where Swafford has
15    gotten a loan from Homeowners, and then you
16    walked me through the process of doing the
17    HUD-1.  Was there anything else that we need
18    to -- did we cover that?
19           BY MS. CLOTFELTER:  The preliminary HUD?
20           BY MR. UNDERWOOD:  Yeah.
21    A      I think so, because I told you about them
22    sending fees over, putting them on the HUD.
23    Q      (continued by Mr. Underwood)  Right.
0058
 1    A      That's when you're getting a preliminary
 2    fee from Ernst for recording.  And then I start
 3    trying to find a notary, but that doesn't change
 4    our fees later.
 5    Q      Okay.
 6    A      So that really -- at that point, we don't
 7    know what they're going to charge, but that
 8    doesn't change our fee later, anyway.
 9    Q      Okay.  Now, tell me what Ernst -- what
10    information you get from Ernst.
11    A      That is county-specific, but we always
12    get the cost to record the mortgage, the
13    warranty deed, the quitclaim deed, whatever's --
14    the subordination agreement, whatever documents
15    we're recording.  It's what tells us per page
16    what it's going to cost.  But depending on the
17    state, there's other things that tells you, too.
```
Page 22

swaffordgreg051906.txt
```
18  For instance, in New York, you pay school taxes.
19  In Florida, you pay intangible taxes.  Each
20  county, each state has different types of fees
21  and taxes that are affiliated with their
22  recording, and you have to send all of those
23  fees at once --
0059
1   Q      All right.
2   A      -- to get the mortgage recorded.
3   Q      Okay.  And Ernst has a database that's
4   current that keeps up with all those charges?
5   A      Uh-huh.
6          BY MS. CLOTFELTER:  Is that "yes?"
7   A      I'm sorry.  Yes.
8   Q      (continued by Mr. Underwood)  All right.
9   So you can get the information from Ernst, for
10  example -- well, first off, let me strike that
11  and ask the question this way.  Is it your
12  understanding that a recording fee, for example,
13  a mortgage -- let's use Alabama, because I'm
14  more familiar with Alabama.  There's several
15  components of that -- of the total costs for
16  recording a mortgage; is that fair to say?
17  A      Yes, there is.
18  Q      All right.  And would one of those be
19  just like, say, a flat fee, like $10.00 for
20  recording the first page?
21  A      Yes.
22  Q      And then is there also a per page charge;
23  is that correct, too?
0060
1   A      Typically, yes.
2   Q      All right.  And then on top of that,
3   there's a tax?
4   A      I don't know personally in Alabama,
5   because I don't actually do the recording fees
6   myself on Ernst.  But if that county and that
7   state has one, then, yes.
8   Q      All right.  So those are -- and that's --
9   is that typical of all states?
10  A      To have those specific things, yes.
11  Q      Yeah.  And some states call them deed tax
12  or mortgage stamps and things like that, but
13  it's a tax?
14  A      Correct.  And then there's additional
15  taxes, in addition to what you're mentioning, in
16  some states, also.
17  Q      Yeah, some states may have a school tax
18  or some other type --
19  A      In addition to the taxes you just
20  mentioned, yes.
21  Q      Okay.  But it's fair to say that they're
22  different in every -- in every state where
23  Swafford does business, is it fair to say that
0061
1   there are different components of the cost for
2   recording the mortgage?
3   A      Yes, that is fair to say.
4   Q      Okay.  And is it true that Ernst would --
5   you would be able to get all of that information
6   from Ernst?
7   A      Yes.  And Ernst is -- you asked me if it
8   was up-to-date.
```
                          Page 23

swaffordgreg051906.txt

```
 9   Q     Yes.
10   A     It is up-to-date, but it's always going
11   to be behind any changes.  I mean, you know,
12   they're not going to know the instant something
13   changes.  So there are times that a county
14   raises their fees.  Especially in January.
15   That's a typical month for that.  And when we
16   send the recording off, sometimes it's rejected
17   for a shortage and we have to add a fee.  You
18   know, an additional amount to get it recorded.
19   Q     Okay; all right.
20   A     And there are also times where they'll
21   change their document requirements.  Like New
22   York does that on a regular basis.  They'll
23   decide that they want to use a different
0062
 1   document.  Well, the document we used was two
 2   pages.  Now there's a new one that's got three
 3   pages, and that will change the cost of the
 4   recording.  So Ernst is up-to-date as any
 5   company can be considering the fact that there's
 6   always regular changes in courthouses.
 7   Q     Okay.  Thank you.  Now, let's see.  Let's
 8   see, I went down another rabbit trail.  Swafford
 9   has got -- has prepared a HUD-1 for Homeowners.
10   A     Yes.
11   Q     All right.  What happens to it then?
12   A     The preliminary HUD we send to the loan
13   officer or processor which forwards it to the
14   closing department for approval.
15   Q     All right.  It's approved.  Then what
16   happens?
17          BY MS. CLOTFELTER:  You're talking about
18   Homeowners?
19   A     You're talking about Homeowners
20   specifically?
21   Q     (continued by Mr. Underwood)  Yeah,
22   Homeowners.
23   A     And then they would send us the actual
0063
 1   package once it's approved.
 2   Q     Okay.  How is that -- physically, how is
 3   that done?
 4   A     Through e-mail.
 5   Q     It's e-mailed?
 6   A     Uh-huh.
 7   Q     All right.  And then what happens after
 8   that?
 9   A     They're sending it to us so that we can
10   forward it to the notary or to the attorney,
11   along with our HUD Settlement Statement, any
12   warranty deed or quitclaim that we had to
13   prepare, or any other legal document change, you
14   know, that handles vesting.  As you can tell
15   from the documents I told you earlier that we
16   prepare, they all involve vesting.  Meaning that
17   person who's vested on title.  So any documents
18   we prepare like that, plus the HUD, we send
19   along with that package to the notary.  We also
20   have some other documents our underwriter
21   required -- our underwriter requires to be
22   signed, and then we send those documents as
23   well.  That's why they don't send the package
```

Page 24

swaffordgreg051906.txt

0064
1   directly to the notary, because it would be
2   missing our documents.
3   Q       Okay.
4   A       But we don't actually open up the
5   package.
6   Q       Okay.  I guess preliminary drafts of
7   these documents, that's passed back and forth by
8   e-mail?
9   A       Preliminary draft of what document?
10  Q       Well, let's say like, for example, the
11  HUD-1, once you do a draft of the HUD-1, is that
12  then e-mailed to the lender for approval?
13  A       Typically.  I mean, there are companies
14  that still use faxes.  There are antiquated
15  companies, so it just depends.
16  Q       Okay; all right.  How does the package
17  then get from Swafford & Hays to the closer or
18  the notary?
19  A       E-mail.
20  Q       The notary then -- let me ask you this.
21  Does the notary have any checks?
22  A       No.  Notaries do not disburse.
23  Q       Okay.  Is all that done from Swafford's
0065
1   office?
2   A       Yes, it is.
3   Q       If it's one that's funded by Swafford?
4   A       Yes, it is.  There are rare cases where
5   the lender has, say, a land contract and they're
6   treating it as a refinance -- it's kind of hard
7   to explain this, but, say, it's a land contract,
8   the new owners have lived in there for a year,
9   so they've got vested interest, so Homeowners is
10  treating it as -- or any other lender -- is
11  treating it as a refinance, it still has a right
12  to cancel period.  But at the end of that
13  period, you're exchanging a final warranty deed
14  for a check, just like you would in a purchase.
15  That is one case we will use an attorney or a
16  notary to actually deliver the check, because we
17  won't let them release that check until they
18  have a signed and executed warranty deed.
19  Because we would be in trouble if we delivered
20  the funds without the title changing hands.
21  Q       Sure.
22  A       So there are times we use a notary to do
23  that for us, but that's one of the very few
0066
1   times they actually do the actual disbursement
2   of funds.  But they're actually not cutting the
3   check.  We do, and we deliver it to them to be
4   delivered to the borrower.
5   Q       Okay.  Now, that brings me up to this
6   question, and that's about the checks for
7   recording fees for the documents.
8   A       Uh-huh.
9   Q       Does the notary get those?
10  A       No.  Well, not unless we have a notary
11  that walks it in for us, but they don't get it
12  at the time of the closing.
13  Q       All right.  Tell me about how the --
14  well, first off, let me -- I'm getting ahead of
                          Page 25

swaffordgreg051906.txt

15  myself again.  Okay, after a loan is closed,
16  then what happens?
17  A     You mean once we get -- once the notary
18  or attorney actually closes the physical
19  package?
20  Q     Sure; yeah.
21  A     They send it back to our office, and the
22  lender always has their own specific what they
23  call stacking order of how they want the
0067
1  documents and we're just pretty much an
2  extension of them.  We stack the file as if
3  we're there in their office per their
4  instructions on how they want it, and then we
5  deliver -- at that point, we also do make sure
6  that the vesting is correct; that there's not
7  been any issues; that they're meeting all the
8  requirements on the commitment for insurance.
9  And then we ship that package back to the lender
10  overnight, and then at that point -- do you want
11  me to keep on going or did you just want to know
12  that one step?
13  Q     No.  Go ahead.
14  A     Okay.  At that point, then they review
15  the package, and then they send us the wire to
16  fund the loan as long as it meets all the
17  requirements.
18  Q     Okay.
19  A     The notary and the attorney are supposed
20  to make sure everything's signed accurately.
21  But there are times where, you know, a
22  signature, they add a middle initial or what
23  have you.
0068
1  Q     Sure.
2  A     And some lenders are very specific with
3  that and they don't -- even if it's what they
4  call a junk doc, not one that's a
5  truth-in-lending, not a right to cancel, not
6  anything important, they still don't want that
7  with a middle initial.  So that might delay
8  funding.  If it does, then we have to send out
9  another -- that extra document to be resigned or
10  what have you.  We facilitate all of that for
11  them, also.
12  Q     Okay; all right.  Now, how does the --
13  how do the signed documents get from the notary
14  back up to Homeowners to start that process you
15  just described?
16  A     The actual notary overnights it to us.
17  Q     Okay; all right.  And then they're
18  overnighted from Homeowners to the --
19  A     No, from us to Homeowners.
20  Q     I'm sorry.  Yeah, from Swafford to
21  Homeowners.  Okay.
22  A     Right.
23  Q     Okay.  And I guess there's a similar
0069
1  process with these other lenders?
2  A     Yes.
3  Q     Okay.
4  A     The processes vary, but the one thing
5  that is similar is that the packages always come
Page 26

swaffordgreg051906.txt

```
 6  to us prior to going to the lender.
 7  Q       Okay.  And how is the lender, then,
 8  protected from someone coming in with a judgment
 9  or a lien or another mortgage before its
10  mortgage gets recorded?
11  A       Well, there's a Gap coverage.  It's
12  automatically on every insurance policy.  The
13  underwriter covers the period between the
14  closing date and the date of recording.
15  Q       Okay.  Well, Homeowners doesn't run down
16  and have someone check the title before it's
17  funded or --
18  A       They don't ask for that, no.
19  Q       Okay.  That's one of the services you
20  provide?
21  A       If they ask for it, yes.
22  Q       If they ask for it, because I think you
23  told us about that other.  But in lieu of doing
0070
 1  that, there's an insurance coverage?
 2  A       Uh-huh.
 3  Q       Who pays for that?
 4  A       Gap coverage is actually -- there's not
 5  actually a charge for Gap coverage.  It's
 6  something that we actually -- it's all in our
 7  fees.
 8  Q       That's a coverage that Swafford has?
 9  A       What do you mean?  I guess I'm not
10  following you.  I apologize.
11  Q       All right.  You said there's a --
12  A       When I say "Gap coverage," it's an actual
13  coverage that covers them, but it's not an
14  actual insurance policy, per se, like a final
15  policy they're waiting to get to get to the
16  insured.  That's just something that the lender
17  is insured from.  It's basically like a line
18  that's stated somewhere within the commitment or
19  the body of the commitment.
20  Q       Oh, is it part of the title insurance?
21  A       Right.  It's all encompassed in one body.
22  Q       I see.
23  A       There's also an insured closing letter
0071
 1  that goes out to each lender when they ask us to
 2  close a file, and that insured closing letter
 3  tells them the responsibility of the underwriter
 4  and what they will cover.
 5  Q       Okay.
 6  A       So they automatically cover from the time
 7  of closing until the time it's recorded.
 8  Q       All right.  And how many days are they
 9  covered for?
10  A       Up to forty-five.  Over forty-five, we
11  have to do an update.
12  Q       Okay.  I think we got to the point where
13  the lender was going to fund the loan, and then
14  what happens after that?
15  A       The lender was going to fund the loan.
16  The lender sends us the wire.
17  Q       Okay.
18  A       Once we have received it in our account
19  and we verify that it's there, then we actually
20  have a funding department that funds the loan
```

Page 27

swaffordgreg051906.txt
```
21    and disburses the checks.
22    Q      All right.
23    A      Or wires the -- or wires them, depending
0072
 1    on what that lender wants.
 2    Q      All right.  And what the borrower needs,
 3    I guess, as well?
 4    A      Right.
 5    Q      And in the limited case that you
 6    described for me, you might send a check to the
 7    notary to --
 8    A      Not from there.  Our notaries are paid
 9    out of our operating account, not from the
10    actual escrow account that this wire comes into.
11    Q      All right.  And that's the -- is that the
12    account with Bank of America?
13    A      Uh-huh.
14           BY MS. CLOTFELTER:  Which account?  I'm
15    sorry.  Can you clarify?
16    A      I'm sorry.  I said, yes.
17           BY MR. UNDERWOOD:  The escrow account.
18           BY MS. CLOTFELTER:   The escrow account.
19    A      We have multiple escrow accounts.  But,
20    yes.
21    Q      (continued by Mr. Underwood)  As far as
22    the actual delivery of the documents to the
23    courthouse for recording, is that done by Fed-Ex
0073
 1    or --
 2    A      It can be UPS.  But like I said earlier,
 3    sometimes our UPS actually takes it to a courier
 4    who then turns and takes it to the courthouse.
 5    Q      And that's not something that notaries
 6    usually do?
 7    A      Typically, no.  We usually use
 8    abstracters, but we have had notaries that do
 9    both.  Some abstracters are also notaries.  So
10    it depends.
11    Q      I take it, though, it's the usual
12    practice of that to be sent by Fed-Ex or UPS or
13    some other carrier?
14    A      We always use UPS.
15    Q      From Swafford's office in Knoxville to
16    whatever --
17    A      Recordings never go directly.
18    Q      Okay.  But it goes to whatever courthouse
19    for recording from Swafford's office usually?
20    A      No.  Like I said, it usually goes
21    directly to the recording office or to the
22    courier who takes it to the recording office.
23    So to say directly would not be accurate.
0074
 1    Q      Okay.
 2    A      So if we have a courier hand-walk it in,
 3    it's not going to the recorder's office.  It's
 4    going to their office and they're hand-walking
 5    it in.
 6    Q      All right.  Let me see if I've got this
 7    straight now.  It comes from the notary -- once
 8    the document's assigned, they go back to
 9    Swafford's office in Knoxville?
10    A      Correct.
11    Q      All right.  And then from there --
```
Page 28

swaffordgreg051906.txt

```
12   A        Now, I'm sorry.  We were talking about a
13   package earlier.  Specifically if you're talking
14   about just the mortgage or any other vesting
15   document, those are not sent back to a lender.
16   A copy of them are sent to the lender.  They
17   don't leave our possession until the day of
18   funding, and then they go out to the courthouse
19   or to the courier.  When I say a package goes
20   back to the lender, I'm talking about the entire
21   loan package as a whole.  But vesting documents,
22   they never want sent to them, because we have to
23   have them in our possession on the funding day
0075
1    to send them to the recording office.
2    Q        To get them recorded?  Okay; all right
3    A        Does that clear it up?
4    Q        Yeah.  Thank you.  Yeah, I believe I've
5    got that straight now.  I meant to ask you
6    earlier -- you may have already told me when
7    Swafford & Hays started doing business.  Late
8    2002 and early 2003?  No, that's the name
9    change.  When did Swafford & Hays first start
10   doing business?
11   A        We were incorporated in December of 2000,
12   but we didn't actually open our doors until
13   January of 2001.
14   Q        Okay.
15            BY MS. CLOTFELTER:  Can we take just a
16   quick break?
17            BY MR. UNDERWOOD:  Sure.
18
19   REPORTER'S NOTE:  (At this point, a brief recess
20   was taken, after which, the deposition
21   continued, as follows:)
22
23   Q        (continued by Mr. Underwood) I think we
0076
1    got to the point where you were telling me about
2    how the documents finally get recorded.
3    A        Right.
4    Q        And I want to go into some of these
5    transactions, but I wanted to ask you a few more
6    preliminary questions before we got into that.
7    I believe I went over a little bit the founding
8    of Swafford & Hays Settlement Services, but I
9    never did ask you what your position is now with
10   the company and was.
11   A        Always has been President and CEO.
12   Q        Okay.  And tell me what you do on a
13   day-to-day basis with regard to Swafford & Hays.
14   A        Most of my job is in what I call the
15   legal department.  I typically handle claims
16   and I handle -- if there's a lien being removed
17   and it's not just plain black and white, there's
18   some gray area, we don't know exactly how to
19   remove it or what have you, I'll deal with the
20   underwriters in trying to get exceptions and
21   trying to get it approved.
22   Q        All right.  And tell me how you learned
23   to do that.  Is that something you learned at
0077
1    Ameriquest?
2    A        A lot of that was.  As far as removing
```
                           Page 29

swaffordgreg051906.txt
```
 3  liens and who to call and how to do that, yeah,
 4  I learned that at Ameriquest.
 5  Q      All right.  And did you have any training
 6  at Ameriquest specifically about --
 7  A      How to remove liens?  No, I had to learn
 8  on my own.
 9  Q      And did Ameriquest have any kind of
10  training program with regard to compliance or
11  anything of that nature?
12  A      No, not that I can recall.
13  Q      Okay.
14  A      The branch manager meetings I went to, I
15  don't remember ever going over any of that.
16  Q      All right.  Now, I had asked you
17  another -- I'm skipping around a little bit,
18  because I'm trying to ask you some stuff I
19  should have asked you earlier.  I had asked you
20  about the closing charges for Homeowners.
21  A      Uh-huh.
22  Q      And I had told you I had observed that
23  they appeared to be higher than most of the
0078
 1  other lenders, and you told me, I think, that
 2  more services were provided for Homeowners?
 3  A      That is true, yes.
 4  Q      Okay.  And can you tell me what those
 5  services are that are usually provided on a
 6  Homeowners' loan as opposed to one that has a
 7  lower fee on it.
 8  A      I think we talked about that already, but
 9  it's where we actually process everything for
10  them, gettings payoffs for them, getting payoffs
11  for taxes, clearing liens, things of that
12  nature.
13  Q      All right.
14  A      I mean, we do that for other lenders as
15  well, but not -- not usually as full of an
16  extent as we did for Homeowners.
17  Q      Okay.  And is there a schedule for these
18  services that Swafford would give to potential
19  lenders?  I mean, let's say a lender called up
20  and said --
21  A      Actually, no.  What we pretty much found
22  from lenders is they typically tell us what
23  they're used to getting charged and what we
0079
 1  charge.  Unfortunately, there's not a lot of
 2  room in the market or in the industry right now
 3  for us to actually go in and say, "This is what
 4  our fees are going to be."  In fact, towards the
 5  end, and I don't remember a specific date,
 6  Homeowners actually dictated to all of their
 7  title companies what the fees were going to be
 8  and they regulated us to where all of our fees
 9  were identical.  In the beginning that was
10  something that they told us to charge.  But in
11  the end evidently their title companies had
12  started charging different amounts, and we were
13  actually not the highest title company.
14  Q      Okay.  You mean in the beginning with
15  Homeowners?
16  A      In the beginning, yes, we were.  But then
17  afterwards, we're the same as other title
```
Page 30

swaffordgreg051906.txt

18  companies.
19  Q       Okay.
20  A       But now, we don't even do business with
21  them.
22  Q       All right.  And I didn't understand where
23  the Gap coverage came from.  You said, "It was
0080
1   included in our fee," I think you said.  Is that
2   actually included in the fee --
3   A       When I say it's included in our fee, it's
4   not like it's actually built-in and there's a
5   charge for it.  There's not a charge for Gap
6   coverage.  I just mean -- when I told you it was
7   included in our fee, I just mean there isn't an
8   additional fee anywhere for that.
9   Q       Okay.  Is it part of the title insurance
10  policy itself?
11  A       If they request it -- if they actually
12  ask for a Gap coverage document.  And that has
13  to be done if you go past the time lapse that
14  they allow for Gap coverage.
15  Q       You mean the forty-five days?
16  A       Right.  And that forty-five days is
17  actually what we -- that's not actually an
18  underwriting thing.  That's a Swafford
19  Settlement Services thing, because each state
20  and county can be specific and it can fluctuate
21  past that in other areas.  But it's easier for
22  our commitment department to just do an update
23  past forty-five days.
0081
1   Q       Okay.  Well, let me ask you this, then.
2   Let's say that --
3   A       And our abstracter will charge us -- I'm
4   sorry to interrupt you -- but our abstracter
5   will charge us if we have to do an update past
6   the forty-five days, but we don't add that into
7   the cost.  We absorb that.
8   Q       All right.  Well, let's say, for example,
9   a loan closed on Thursday, and then Friday a
10  judgment got recorded against the borrower.
11  A       That is not something a lender would have
12  to cover.
13          BY MS. CLOTFELTER:  Would have to what?
14  A       That is not something the lender would
15  have to cover.
16  Q       (continued by Mr. Underwood)  Okay.  And
17  then maybe a week later the mortgage got
18  recorded.  Now, how would the Gap coverage come
19  into effect in that scenario?
20  A       The only time it would actually matter
21  would be if our lender went to foreclose and
22  we're not in first lien position, because that
23  judgment was still there.  It may not even
0082
1   matter anyway, because our -- the underwriter
2   typically will not pay out something unless
3   they're actually at a loss.  So if the lender
4   gets recorded on the 5th of May and somebody
5   took a loan out after ours but got it recorded
6   prior to us on the first of May, no, they're not
7   in first lien position, but what we're simply
8   doing is insuring in our first lien position.

Page 31

swaffordgreg051906.txt

```
 9   Meaning if they ever need to collect upon that
10   insurance policy, then we would have to pay the
11   intervening lien off and allow them to be in
12   first lien position.
13   Q      Okay.  In other words, Homeowners would
14   have to pay, or does Homeowners have some
15   insurance that would pay?
16   A      No.  When I say "they," I mean, the
17   underwriter would actually have to pay it.
18   Q      And I'm saying "Homeowners."  I --
19   A      Ticor.
20   Q      I mean, Swafford?
21   A      No, not Swafford, but Ticor.
22   Q      Ticor would have to pay that?
23   A      Right.
0083
 1   Q      So that's part of the title insurance?
 2   A      Correct.  In that aspect, yes, it is.
 3   Q      Okay.  Or is that some overall insurance
 4   that Swafford has with Ticor?
 5   A      No.  That's part of what Ticor offers.
 6   It would be offered through any agent.
 7   Q      Okay.  Can you point --
 8   A      I don't know that I'm actually answering
 9   your questions.  I'm sorry.
10   Q      Well, I was going to ask you to --
11   A      I probably cannot answer it any better
12   than that, because I'm not in the commitment --
13          BY MS. CLOTFELTER:  Just let him ask
14   another question.
15   Q      (continued by Mr. Underwood)  I was going
16   to ask you if you could show me something to
17   that effect in some of these title policies
18   maybe when we're going through some of these
19   individual --
20   A      I will try, yes.
21   Q      Okay.  And do you get a manual from the
22   title insurance companies, too, that tell you
23   what to look out for with regard to the abstract
0084
 1   and title and that sort of thing?  Is that true?
 2   A      What do you mean to look out for?
 3   Q      Well, that probably wasn't a very good
 4   question.  Do you get any kind of manual from
 5   the title insurance companies that tell you how
 6   to issue a commitment for title insurance?
 7   A      I am not sure that we have an actual
 8   manual that tells you how to issue a commitment,
 9   no.  I know we have manuals that tell you how to
10   use their software system and how to actually do
11   a commitment.  And I know that they do full
12   audits.  So they see our commitments.  I don't
13   know that we have a manual that tells you that.
14   They offer services to come in and train your
15   staff, and we have had people come in and sit
16   with our staff.  Like I said, they do full
17   audits.  To be an agent of any underwriter, you
18   are always continually having full audits and
19   they go through every file with a fine-tooth
20   comb.  That's anywhere from finding to the
21   commitments, to the abstracts.  So we rely
22   heavily on an underwriter, because we're an
23   agent for them, to make sure that we are doing
```

Page 32

swaffordgreg051906.txt

```
0085
 1   things properly.
 2   Q     All right.  And they do supply you with
 3   some sort of list or something like that that
 4   you have to go by before you issue a commitment;
 5   isn't that true?
 6   A     A list of steps to take?
 7   Q     Sure.
 8   A     I don't know that I have a list of steps
 9   to take before I issue a commitment.  I'm sure
10   that's in their basic ones, but I can't tell you
11   that it is.
12   Q     All right.
13   A     I've never had to use it, because I knew
14   how to do that.  But I'm sure that it probably
15   is in there.
16   Q     Okay.
17   A     My staff has probably used it, if there
18   is.
19   Q     Okay.  I think you mentioned, too, that
20   occasionally you have to record a future
21   assignment?
22   A     Yes.
23   Q     Okay.  Tell me how that comes about.
0086
 1   A     We receive an assignment from the broker
 2   or the lender, who is then assigning it to
 3   another lender, and they ask us to record it for
 4   them.  And it's overnighted to the courthouse
 5   for recording.
 6   Q     All right.  And does that usually happen
 7   right after the loan is closed or do you --
 8   A     No.  Typically, it can be months out.
 9   Q     All right.  And is there an additional
10   charge for that?
11   A     There's an additional charge we have to
12   pay.  They don't send the recording fee when
13   they send that.  We have to pay that out of our
14   operating account.
15   Q     Would you have to pay that on the
16   lender's behalf?
17   A     Uh-huh.
18         BY MS. CLOTFELTER:  Is that "yes?"
19   A     Yes.  When you say "on the lender's
20   behalf," I don't ever get refunded from the
21   lender.
22   Q     (continued by Mr. Underwood)  All right.
23   A     I am paying it on their behalf to get it
0087
 1   recorded on their behalf, but I don't, in turn,
 2   invoice them at that point.  I don't ever
 3   receive funds from them for that.
 4   Q     Okay.  Can you give me some kind of --
 5   give me your best judgment on how many
 6   transactions you have recorded a future
 7   assignment?
 8   A     You want my best guess, because that's
 9   exactly what it would be.
10   Q     Sure, your best judgment or percentage of
11   the --
12         BY MS. CLOTFELTER:  If you have a
13   judgment, that's fine.  If you don't have a
14   judgment, don't just make a random guess.
```

swaffordgreg051906.txt

15  A    Okay.  Well, it actually would be a
16  guess, because that's all I have.  I'm sorry.  I
17  don't -- I don't approve recordings.  I have a
18  recording department.  So at this point in time,
19  I don't know how many assignments they receive.
20  I know they get them, because I see them coming
21  back recorded, because recorded documents come
22  back to us, but I don't know what percentage of
23  our files that would be.
0088
1   Q    (continued by Mr. Underwood)  All right.
2   You would have those records in your recording
3   department?
4   A    It would be scanned into each file.
5   There's not any kind of spreadsheet or any kind
6   of database you can go into and find out how
7   many files we recorded assignments on.  You
8   would have to go through every file we've ever
9   closed to see if it had one in it.
10  Q    Okay.  You told me that's an expense to
11  Swafford?
12  A    Yes, it is.
13  Q    All right.  And that's not something that
14  you could -- that you looked at and try to
15  control?
16  A    We haven't found a way to control that,
17  no.
18  Q    And what kind -- I meant to ask you
19  earlier, too.  Were there other -- are you a
20  shareholder of Swafford & Hays?
21  A    Yes, I am.
22  Q    Of Swafford Settlement Services?
23  A    Yes, I am.
0089
1   Q    Are there other shareholders?
2   A    Yes, there is.
3   Q    Who are they?
4   A    James Swafford, I; James Swafford, II;
5   and Dana Tampas.
6   Q    Dana Tampas?
7   A    Uh-huh.
8   Q    Okay.  Let's see.  It would be fair to
9   say, then, with regard to future assignments,
10  that there's not one on every loan; is that --
11  A    That is fair to say.
12  Q    All right.  Would it be as many as one
13  out of ten loans would have a future --
14  A    Actually, let me correct that.
15  Q    Okay.
16  A    It's probably not fair to say that
17  there's not one in every loan.  I don't know if
18  there's one in every loan.  I know that we are
19  not asked to record one on behalf of the lender
20  on every loan.
21  Q    Okay; all right.  That's fair enough.
22  A    Okay.
23  Q    Are you asked to record one in as many as
0090
1   one out of ten loans?
2   A    Like I said earlier, that would be a
3   guess if I told you that.  I don't know how many
4   we do that on.
5   Q    Okay.  Well, I think someone in your
Page 34

swaffordgreg051906.txt
```
 6   recording department would have that
 7   information.
 8   A      They wouldn't have a specific, but they
 9   would have a better idea as to the percentage.
10   Q      All right.  Who is that person?
11   A      Brenda Cooper.
12   Q      Swafford would write a check for that
13   recording fee?
14   A      Uh-huh.
15   Q      Is that "yes?"
16   A      Yes.  I'm sorry.
17   Q      And does Swafford use a software that
18   codes checks to certain expense accounts and
19   that sort of thing?
20   A      No.  We use Quick Books.  So our
21   accountant has to manually do it.  And it just
22   shows as a recording expense, but anything that
23   is paid for recording shows a recording expense.
0091
 1   Meaning if there's a recording shortage, we
 2   didn't collect enough, that shows a recording
 3   expense, also.
 4   Q      All right.
 5   A      If there's a release, it shows a
 6   recording expense, also.
 7   Q      Okay.
 8   A      So they're all lumped into one fee as a
 9   recording expense.
10   Q      All right.  Well, let me ask you this,
11   then.  Are they paid out of the escrow account?
12   A      For that, no.
13   Q      Okay.  And is it paid out of an operating
14   account?
15   A      Yes, it is.
16   Q      Now, is it true that the fees for
17   recording a mortgage would be paid out of the
18   escrow account; is that true?
19   A      Yes, it is.
20   Q      What other --
21   A      Actually, you just jogged my mind.  If we
22   still have -- we haven't gotten into this yet.
23   I'm sure you will go there -- but if we still
0092
 1   have the -- a check for any amount that wasn't
 2   used for recording, that we're holding to wait
 3   to send to the borrower when the mortgage comes
 4   back recorded, those funds would be used for the
 5   assignment or for the release or what have you,
 6   or for any shortage we get.  But if we've
 7   already returned it to the borrower, then it
 8   comes out of the operating account.
 9   Q      Okay.
10   A      And that is our current procedure.
11   Q      Okay.  Now, out -- well, we'll get to
12   that in a minute.  Okay.  Out of the operating
13   account, would there be any other recording, any
14   other checks written for recording fees, other
15   than for future assignments?
16   A      Out of the operating account?
17   Q      Yeah.
18   A      Like I said, if there's not -- if we
19   can't take it from the borrower's -- any funds
20   go back to the borrower, then it would be for
```
Page 35

swaffordgreg051906.txt
```
21  releases, assignments, any kind of shortage from
22  the recording.  But typically, that won't happen
23  anymore, because we have the funds for that.
0093
 1  But there are times where the shortage is so
 2  great, yes, it comes from that account.
 3  Q      Okay.  So could we look at the operating
 4  account and it would include as a subset of
 5  checks written for recording fees, a subset of
 6  that would be checks written for future
 7  assignments; is that an accurate statement?
 8  A      I don't know what you mean by "subset,"
 9  but it would show you what checks were cut and
10  what amounts they were cut for.  I don't know
11  that it would tell you if it was an assignment,
12  a release or a shortage.
13  Q      Yeah.  But out of the whole -- the whole
14  world of checks written out of the operating
15  account for recording fees, that's a set.  And
16  then a subset of that would be checks written
17  for recording of future assignments; is that an
18  accurate statement?
19          BY MS. CLOTFELTER:  Object to the form.
20  If you understand the question, go ahead and
21  answer.
22  A      A portion of that, yes, is for
23  assignments.  But if you're asking me can you
0094
 1  tell which ones are assignments, I don't know
 2  that you can know.
 3  Q      (continued by Mr. Underwood)  Okay.
 4  A      And that's not all assignments.  Because
 5  like I said, sometimes we still have the funds
 6  for the borrower for additional recording fees
 7  and that's what we take that from, because
 8  that's what that can be used for.
 9  Q      Okay.  And in that instance are they paid
10  out of the escrow account?
11  A      Yes, they are.  And that does not have
12  any kind of code or -- it's file-specific.
13  There's not any kind of report you can run on
14  that.
15  Q      Okay.  Well, I guess -- I was going to
16  get into that later, but since we're talking
17  about that now, how do you do your accounting on
18  monies in the escrow account that are held there
19  for the benefit of borrowers for paying future
20  assignments?
21  A      We only keep those funds until the actual
22  mortgage or quitclaim deed, warranty deed, that
23  basic group of legal documents that were signed
0095
 1  at closing, we only keep those additional funds
 2  until that comes back recorded.  Because those
 3  funds are used to pay for any assignments,
 4  releases or any recording shortages if it gets
 5  rejected from the courthouse.  Once those come
 6  back recorded, we actually refund the additional
 7  monies to the borrower at that time.  So if
 8  there's anything after that, unfortunately, it
 9  has to come from us.
10  Q      All right.
11  A      And we have not found a way to recoup
```
Page 36

swaffordgreg051906.txt

12  those funds, if that's --
13  Q     Okay. Well, I was going to ask you how
14  you did the accounting for that.
15  A     It's a loss.
16  Q     Well --
17  A     Oh, how do we actually keep up with the
18  borrower's funds?
19  Q     Sure.
20  A     At the time that we cut -- after the
21  closing, when we actually fund the loan, we cut
22  the check to the recorder's office then using
23  Ernst once again. Because at the time we did
0096
1   the preliminary Ernst -- remember when we talked
2   about pre-HUDs -- we didn't know how many pages
3   the mortgage would be, how many writers there
4   would be, et cetera. So once we get the actual
5   mortgage back signed with all the writings from
6   the borrower that was in the actual physical
7   package, then we know the actual number of
8   pages. So we go in and run Ernst again. And
9   that's the recording department that does that.
10  They cut the actual check and send it overnight
11  to either the courier or to the courthouse and
12  cut an additional check to the borrower which is
13  kept in a filing cabinet -- a locked filing
14  cabinet. Once the mortgage comes back recorded,
15  they go to that check and they physically pull
16  it out and send it to the borrower.
17  Q     All right. Now, I think you indicated
18  that there had been some change in that
19  procedure recently, and if you would --
20  A     That is the current procedure. But, yes,
21  there was a change.
22  Q     All right. What was the procedure before
23  the current procedure that you just described?
0097
1   A     If there was any overage at all of
2   recording at the time that was sent to the
3   recording office, it just went to the operating
4   account to cover future expenses.
5   Q     All right. And when was that procedure
6   changed?
7   A     It varies. Our largest lender,
8   Homeowners, we changed it first. And then we
9   ended up changing it for the rest of the lenders
10  later. Homeowners, to the best of my
11  recollection, was early 2005, maybe January.
12  Any then other miscellaneous lender, to the best
13  of my recollection, was August or September of
14  2005. I believe we've provided those dates
15  before, and I'm not -- so I'm not sure that I'm
16  giving you accurate dates now. I'm actually
17  trying to remember what we provided before and
18  we actually used our system to try to figure it
19  out.
20  Q     Okay; all right. Well, we'll go through
21  those documents in a minute.
22  A     Okay.
23  Q     And what was the reason for making that
0098
1   change?
2   A     We actually found that was the best way
Page 37

swaffordgreg051906.txt

```
 3   to handle the recordings.  Prior to that,
 4   unfortunately, we ate a lot more -- we changed
 5   the system twice.
 6   Q      Okay.
 7   A      That was the second change.
 8   Q      Okay.  Well, go back and tell me how it
 9   was done originally.
10   A      It's always been done -- prior to that,
11   it was always done through the operating
12   account.  But up until 2 -- I want to guess --
13   not guess, but estimate early 2004.
14   Q      Okay.
15   A      We never collected -- we hardly ever
16   collected enough.  We were paying shortages left
17   and right on recordings and it was -- in
18   thousands and thousands per year.
19   Q      All right.
20   A      We grew too rapidly is what happened, and
21   my father stepped in on the financial end and
22   he's the one that realized how much we were
23   losing on recordings, because we were eating it
0099
 1   ourselves.  So then we started --
 2   Q      Let me stop you right there and let me
 3   ask you this question, then.  I thought you told
 4   me earlier that there was no way you could track
 5   that.
 6   A      What do you mean?
 7   Q      Well, I had asked you about --
 8   A      I can track a grand total of what we lost
 9   in a year, but I don't know what it was derived
10   from, whether it was affidavits, releases or
11   shortages.  But the majority of that at that
12   point would have been shortages, because we had
13   shortages on files sometimes that were $1,000.00
14   apiece.
15   Q      Okay.
16   A      And affidavits and releases never -- or a
17   summons and releases never cost $1,000.00.
18   Q      All right.  So you didn't -- for example,
19   expense for recording future assignments, you
20   don't have an account in your Quick Books
21   accounting that would -- so you could look back
22   at the end of the year and say, "Well, heck, you
23   know, we lost $10,000.00 on recording future
0100
 1   assignments?"
 2   A      No.  I can tell you how much we lost in
 3   recordings.
 4   Q      Total?
 5   A      Total.
 6   Q      Okay.  I'm sorry.  I didn't mean to
 7   interrupt you.  You were telling me that prior
 8   to early 2004 that the company was losing
 9   $1,000.00 per year for recording fees,
10   showing --
11   A      Yeah, it was either late 2003 or early
12   2004.  I believe early 2004, but that's an
13   estimate.  When we began to -- we realized a lot
14   of it was because we were getting more writers
15   and larger mortgages than what we thought we
16   would have.  It turned out loan officers were
17   not typically aware of how many pages the
```

Page 38

swaffordgreg051906.txt

```
18    mortgages were going to have and how many
19    writers it would contain.  So that's when we
20    realized that we needed to take the largest
21    number of pages that we thought we could
22    possibly have and that would be what we would
23    use for the pre-HUD.  But at that point, when we
0101
 1    did the final on Ernst and we sent the check off
 2    for recording, if there was any additional
 3    funds, it was put in the operating account for
 4    future expenses.
 5    Q     Well, were they segregated in a balance
 6    in the operating account for future expenses or
 7    just put in the regular operating account?
 8    A     Put in the regular operating account.
 9    Q     Okay.  Let's use, for example, let's say
10    Ms. Gibbs, for example.  If there was an overage
11    on what Ms. Gibbs was charged for recording
12    fees, would there be any record?  In other
13    words, would Ms. Gibbs have a credit in that
14    operating account that she's owed $10.00 for
15    that, or is it just in the operating account and
16    commingled with other operating funds?
17    A     There is a way you could figure it out,
18    but not from the operating account.  You would
19    have to go into each file, particularly in the
20    escrow account.  So you could go into the escrow
21    side, where we actually have our database, and
22    look at Ms. Gibbs's file, see what the actual
23    charge ended up being for recording, and then
0102
 1    see if there was any type of overage on that or
 2    additional funds.  If there was -- well, at that
 3    point, I don't know that I could tell you if it
 4    was ever used for an assignment or a release.
 5    That was the problem at that point.
 6    Q     Okay.  Well, that leads me, I guess, to
 7    this question.  Quick Books -- and I've been
 8    using Quick Books for twenty -- ever since it's
 9    been out.  I'm kind of familiar with it, too.
10    A     Right.
11    Q     It lets you assign -- when you write a
12    check, it lets you assign that check as an
13    expense to a certain person or entity; isn't
14    that true?
15    A     Assign it to a certain person?  I'm
16    sorry, I don't use the quick book, so -- I have
17    an accountant that's on staff.
18    Q     Okay; all right.  You don't use the Quick
19    Books at all?
20    A     Just to be able to look up bank balances
21    and to look up very basics.
22    Q     Okay.
23    A     That is why we had to hire an accountant.
0103
 1    Q     Okay.  Well, I thought you told me you
 2    had an accounting degree.
 3    A     Well, having an accounting degree and
 4    using Quick Books can be two different things.
 5    Q     That's true.  Who is your accountant?
 6    A     Allison Witt.
 7    Q     Webb?
 8    A     Witt, W-I-T-T.
```

swaffordgreg051906.txt

```
 9   Q     Is she on staff there?
10   A     She's on staff.  And we also have a CPA
11   that does our returns who's off-site.
12   Q     Okay.  And have you always used Quick
13   Books at Swafford Settlement Services?
14   A     I believe so.  I believe we've always
15   used Quick Books, yes.
16   Q     Okay.  But as far as you know, there's no
17   way we could go back and look at your -- look at
18   your operating account and see if there was a
19   check written for a future assignment with
20   regard to Ms. Gibbs's loan?
21   A     I don't know that I -- I don't think we
22   can.
23   Q     Okay.
0104
 1   A     Now, she might be referencing -- and you
 2   said there's a way to reference a file or
 3   whatever.  Maybe she is doing that.  And if she
 4   is, then we could.
 5   Q     All right.  We would need to ask her
 6   about that?
 7   A     Right.
 8   Q     Okay.  Fair enough.  Now, can you give
 9   me -- I'm kind of shifting gears here again.
10   In your judgment -- I think you started your
11   business in 2001, and one of your biggest was
12   Homeowners?
13   A     Not when we started the business, but
14   they were.  When we started the business, we
15   were closing very few loans a month.
16   Q     All right.
17   A     And we actually started only in Tennessee
18   and Florida and I believe Arkansas.
19   Q     Okay.  When did you start -- when did
20   Homeowners become one of your best customers?
21   A     Well, actually when they came on board,
22   even closing just a few loans a month, they were
23   probably our best customer --
0105
 1   Q     All right.
 2   A     -- because we were so small.  But I don't
 3   recall when that was.  It was either late '01,
 4   early '02, I believe.
 5   Q     Okay.  Well, do you have a judgment about
 6   how many loans you would have closed during '01?
 7   A     I don't think we -- no.  I know we
 8   didn't -- it was less than a hundred.  But at
 9   some point, there was some months we closed five
10   to ten in the beginning.  It was just stair
11   steps throughout the years.  We didn't start
12   going backwards until '05 when they started
13   going downhill and started going out of
14   business, and then that was the first time we
15   actually started seeing leads and strides the
16   opposite direction.  But we -- every month it
17   fluctuated from '01 all the way through '05.
18   Q     Okay.  What about '02, did you do a lot
19   of business with Homeowners that year?
20   A     A lot more than '01, if we were even with
21   them in '01.  Like I say, it was either late '01
22   or early '02.  It was somewhere in that --
23   Q     All right.  Well, during the year of '02,
```

swaffordgreg051906.txt
0106
1   you know you were with them.
2   A     Yes, I do know that.
3   Q     All right.  And did you close more or
4   less than a hundred loans for Homeowners that
5   year?
6   A     I know that when we actually -- there was
7   a company we started using to find our notaries
8   at one point called Phath Signings.  They helped
9   us find notaries for a while.  And I don't know
10  if that was in '02 or '03, but I know when we
11  started actually asking them for help, it was
12  because we were overwhelmed with our staff level
13  and we were just crossing a hundred at that
14  point.  And that would have been either mid to
15  late '02 or early '03.
16  Q     Okay.
17  A     Actually I take that back.  It was
18  definitely early to mid '02.
19  Q     Okay?
20  A     I do know that.
21  Q     All right.  Now, what about in 2003, do
22  you have a --
23  A     I know in the beginning of '03, it was
0107
1   somewhere in the three hundred range.  Now, are
2   you asking for Homeowners specifically?
3   Q     Yeah.  And I'm going to go back and ask
4   you --
5   A     I'm sorry.  I was telling you what our
6   total monthly closings were.
7   Q     Well, let's just go through those first,
8   then.
9   A     We were starting to close over
10  three-hundred loans a month in early '03.
11  Q     Okay.  Per month.  All right.  And then
12  in '02, were you a closing about a hundred per
13  month?
14  A     We crossed a hundred at some point.
15  Q     Okay.  And then during '03, it would have
16  been less than a hundred per month?
17  A     Oh, no, not '03.  It would have been
18  somewhere around --
19  Q     I mean -- I'm sorry, '01.
20  A     '01 would have been less than a hundred,
21  yes.
22  Q     Okay.  And then '03 was greater than a
23  hundred per month?
0108
1   A     '02 was greater than a hundred per month.
2   '03 was greater than three-hundred a month.
3   Q     Three-hundred.  Okay.  And what about
4   '04?
5   A     '04 was probably -- probably from there
6   on, it's about another hundred, because we got
7   to the point that in '05, late '04, early '05,
8   we were closing over five-hundred loans a month
9   as a company until Homeowners went backwards.
10  Q     Okay.  And maybe this will be the easiest
11  way to do it.  In '01, do you have a judgment
12  about what your percentage of business with
13  Homeowners was?
14  A     No.  Actually from there on out, I can't
                         Page 41

swaffordgreg051906.txt
```
15  tell you percentages.  I can tell you that
16  Homeowners -- once we got Homeowners, they were
17  always between sixty and ninety percent of our
18  business.
19  Q      Okay.  Fair enough.  Let's see, I got off
20  down a rabbit trail about the number of
21  transactions that you would do in a month when I
22  had been asking you about how the records were
23  kept in the Quick Books.  And I meant to ask you
0109
1   this, do you know if they're kept on Quick
2   Books -- and when I say "they're kept," I'm
3   talking about the operating account as opposed
4   to the escrow account.  Were they kept on
5   separate companies?
6          BY MS. CLOTFELTER:  Separate companies?
7   A      Well, the escrow -- we don't actually
8   do -- use Quick Books for escrow.
9   Q      (continued by Mr. Underwood)  Okay.
10  A      That's out of our title software.
11  Q      Okay.  I see.  All right.  And so what
12  kind of title software do you use?
13  A      We used Aptitude, which is a software
14  provided by American Pioneer.  And then when
15  American Pioneer was bought by Ticor, they
16  discontinued -- discontinued that.  And so in
17  January of this year, we started using SoftPro.
18  Q      All right.  And does it generate the
19  HUD-1 and all that?
20  A      Yeah.
21  Q      It does?
22  A      Yeah.
23  Q      And writes the checks and the whole
0110
1   business?
2   A      Right.
3   Q      And keeps an accounting of it?
4   A      Yes, it does.
5   Q      Okay; all right.  And what was the name
6   of that again?
7   A      The one we use now is SoftPro, just like
8   it sounds.
9   Q      Okay.
10  A      And the one before that was Aptitude.
11  Q      Okay; all right.  So that's just
12  completely separate and apart from the
13  accounting that's done in Quick Books?
14  A      Uh-huh.
15  Q      All right.  Thank you.
16  A      Yeah.
17  Q      And that's also your accountant, Alicia
18  (sic)?
19  A      Allison.
20  Q      Allison.  I can't read my own writing.
21  A      I was trying to think of when she came,
22  but I think that was also in early '02 or early
23  '03, also, somewhere in that period of time.
0111
1   Q      All right.  And is that something she's
2   familiar with also?
3   A      She's also familiar with the -- she's
4   familiar with the escrow system and with Quick
5   Books.
```
                    Page 42

swaffordgreg051906.txt

```
 6   Q      Okay.
 7   A      And we actually use Quick Books
 8   Enterprise, I believe.  We got so large that the
 9   system could not even hold anything longer than
10   a year, so we had to go to a larger system.
11   Q      Okay; all right.  What does Swafford &
12   Hays do to make sure it's in compliance with
13   federal and state lending laws and regulations?
14   A      The largest thing -- well, there's
15   several things we do.  Like I said, we have our
16   underwriters that come in and do the audits, and
17   we use their underwriting manuals.  We -- they
18   have toll free numbers to different locations
19   around the United States, depending on where the
20   state we're lending at that time, and we can
21   call the underwriters actually in those
22   branches, attorneys in those branches, and ask
23   any questions that we have.
0112
 1   Q      Okay.
 2   A      The biggest thing it falls back on is the
 3   audits, because if there's anything we've missed
 4   that we're not in tuned to, that's why they do
 5   the full audits.  They audit files and
 6   everything.
 7   Q      Okay.
 8   A      And they actually do all of our bank
 9   reconciliations for us.
10   Q      Okay.  And is it -- bank reconciliations
11   on the --
12   A      Escrow side.
13   Q      -- escrow account?
14   A      Uh-huh.
15   Q      And is it Ticor that does that?
16   A      Uh-huh.
17   Q      All right.
18   A      But when they do bank reconciliation
19   audits, we also provide our operating accounts
20   to them as well.  They don't reconcile them, but
21   they audit -- they have to look through them.
22   Q      They also audit your Quick Books
23   operating accounts?
0113
 1   A      Uh-huh.
 2   Q      Okay.
 3   A      I know that they -- I'm almost
 4   ninety-nine percent sure they do.  There's two
 5   accounts I know they do.  And I believe they do
 6   them all.
 7   Q      Okay.  Now, tell me when quick -- well,
 8   excuse me -- when Ticor comes in to audit a
 9   file, tell me exactly what it is that they look
10   at and what it is that they do.
11   A      It depends on which audit they're doing.
12   If they do a bank reconciliation audit --
13   Q      Okay?
14   A      -- when they do that, they're looking
15   at -- I really don't know everything they do.
16   But I know that they request the file; they look
17   at the HUD request; they look at our final HUDs;
18   they look at our disbursement worksheets; they
19   look at the actual physical checks and the wire
20   report from the bank.  They basically track
```

swaffordgreg051906.txt
```
21    everything from the time they ask us to put on
22    the HUD, all of our fees, all their fees, all
23    the payoffs all the way through funding.  It's
0114
 1    all the financial standpoint of the audit.  And
 2    then when they do the other audit, they audit
 3    all of the documentation in the file, the
 4    abstracter report, the commitments; how we
 5    process the liens, if we remove them properly,
 6    if we didn't; how we handled it.  They do all of
 7    what I call a true title audit.
 8    Q      All right.  Now, what about in the other
 9    audits you referred to and the bank audit, do
10    they check for lending law and regulation
11    compliance?
12    A      I would assume so, since they -- since we
13    are an agent for them and they have to be
14    regulated by that.
15    Q      Okay.
16    A      I know that they do one particular audit
17    in Virginia called a CRESPA audit.
18    Q      Called a what?
19    A      CRESPA.
20    Q      How do you spell that?
21    A      It's RESPA with a "C" in the front.
22    Q      Okay.
23    A      And that's the only state that requires
0115
 1    that.
 2    Q      And what state requires that?
 3    A      Virginia.
 4    Q      Virginia.  All right.
 5    A      I guess my final answer, to sum it up,
 6    would be, since we're acting on their behalf as
 7    an agent, we rely heavily on them to audit us
 8    when they come in and do those audits, and
 9    that's why they provide us with the underwriting
10    manuals and why they provide us with toll free
11    numbers.
12    Q      All right.  Now, with regard to
13    truth-in-lending and stuff like that --
14    A      We don't actually --
15           BY MS. CLOTFELTER:  Object to the form.
16    Hang on just a minute.  First, ask your
17    question, and then let me make an objection.
18    Q      (continued by Mr. Underwood)  With regard
19    to -- with regard to truth-in-lending, I believe
20    you told me that the lender does all that, as
21    far as checking for compliance; is that true?
22           BY MS. CLOTFELTER:  No objection.
23    A      Yes.  We don't -- we don't prepare the
0116
 1    truth-in-lending statements, whether it be at
 2    the beginning of the application process,
 3    because we don't even know when they took the
 4    application.  We just know whenever it's with
 5    us.  Or whether it be the final truth-in-lending
 6    that goes out with the closing.
 7    Q      (continued by Mr. Underwood)  All right.
 8    And all that's done by the lender, the various
 9    lenders?
10    A      Uh-huh.
11    Q      Okay.  And the various lenders also
```

swaffordgreg051906.txt
```
12   approve the HUD-1 statement like you told me
13   earlier?
14   A       Yes, they do.
15   Q       Okay.
16   A       I believe there was one lender that we
17   did a set of purchases for.  I don't -- it would
18   have been, I think, in '05, maybe late '04, that
19   we typed documents, other than the HUD, and I
20   would have to -- I don't know exactly what
21   documents it was.  I think it was the note.  I
22   still don't think we did any truth-in-lending.
23   I think we completed the note.
0117
1    Q       Okay.
2    A       But I just wanted to say that, because
3    I'm not sure exactly what we typed for them.
4    But it was one lender that we don't even do
5    business with anymore.
6    Q       All right.  Now, one other thing I didn't
7    quite finish covering, too, that we were talking
8    about was about the procedures for handling
9    the -- the overage for the charge for recording
10   fees.
11   A       Uh-huh.
12   Q       And tell me what -- you told me -- I
13   believe you told me that early in 2004, I think
14   you said you guys were paying shortages left and
15   right.  I believe that's what you said.
16   Is that right?
17   A       Up to that point.  I mean, it was either
18   late 2003, early 2004.  Up to that point, we
19   were paying a lot of it.
20   Q       Okay.  Now, tell me what was going on in
21   late 2003, early 2004 that was causing you to
22   have to pay these shortages.
23   A       Well, up to that point, when Homeowners
0118
1    was growing rapidly, we were growing rapidly,
2    and I guess I didn't have proper accounting
3    procedures in place and our company started
4    losing money and we didn't -- and so my dad
5    stepped in, because he also had an accounting
6    background, but he actually has practiced
7    accounting, and he stepped in to find out
8    exactly where we were losing money.  That's when
9    we got CPAs involved and everything and we
10   realized on a regular basis we weren't charging
11   for enough pages to be recorded.  So we were
12   constantly having to pay those.
13   Q       Okay.  Now, I've noticed in a number of
14   these transactions that there's a flat $120.00
15   fee.  On some of them maybe it's $130.00 --
16   A       Yes.
17   Q       -- that's charged for recording fees.
18   A       That's where we went in after that and we
19   realized in addition -- we always had to do the
20   maximum number it could be.  So a lots of
21   we'll -- that's why they came up with those
22   figures in those states.
23   Q       Okay.  Now, who came up with the 120 or
0119
1    $130.00 figure?
2    A       I believe we relied pretty much on our
```

swaffordgreg051906.txt
```
 3   closing staff and our recording staff, because
 4   they are the ones that dealt with those fees and
 5   saw the rejected mortgages coming in and saw
 6   that we weren't collecting for it.  And they see
 7   the actual packages when they come back and they
 8   have to stamp them.
 9   Q     Okay.
10   A     So that's how they knew how many pages
11   there were.
12   Q     Okay.  But someone made the decision to
13   put the $120.00 or $130.00 charge on there, and
14   who was it that made that decision?
15   A     I don't know.  I think it was more of a
16   collective thought pattern.
17   Q     Okay.  But in any event, did that
18   practice start in late 2003 or early 2004?
19         BY MS. CLOTFELTER:  Object to the form.
20   What practice are you --
21         BY MR. UNDERWOOD:  The practice that we
22   were just talking about, the charge of the 120
23   or the $130.00 flat fee for the recording fee.
0120
 1   A     To the best of my knowledge, yes.  We may
 2   have -- I mean, maybe we started a little bit
 3   earlier than that, but I think it was late 2003
 4   or early 2004.
 5   Q     (continued by Mr. Underwood)  And I
 6   noticed on some of them it was $130.00, and on
 7   some of the transactions, it was $120.00.  Can
 8   you tell me the distinction between the two?
 9   A     I would think it would the recording cost
10   in those states.
11   Q     All right.  And are those the only two
12   figures that are entered on that line on the HUD
13   ones or --
14   A     Which line?
15   Q     Well, let me see.  The line 1201,
16   recording fees.
17   A     Can I see it?
18   Q     I'm sorry.  Probably the one attached is
19   not marked up.
20   A     You know, I don't know, because I've
21   never run Ernst myself.  So I don't know if
22   there's any states that have a basic fee or
23   anything on top of that.
0121
 1   Q     Okay.
 2   A     I don't know.  I'm sorry.
 3   Q     Okay.  I didn't mean to make that a trick
 4   question.  I notice on this one it says -- it's
 5   $225.00, and I wasn't -- I realize that it may
 6   be different on some of these other ones.
 7   A     I know that -- I do know that some states
 8   it's going to be higher than that, because
 9   there's other things involved.  But I don't
10   know -- I guess what I'm trying to say is, I
11   don't know when it comes to all these taxes and
12   these different fees that different states and
13   different counties charge, I'm not sure if some
14   of them fall on 1201 or if they all fall on
15   different lines.  That's why I don't know how to
16   answer that question,
17   Q     Okay.  I see.
```
                          Page 46

swaffordgreg051906.txt
```
18  A        I know that they're within the recording
19  fees box, but I don't know how they're broken
20  down by line.
21  Q        Okay.  While we're talking about it and
22  we've got this document out, let's --
23  let me just mark this as our next exhibit.
0122
1   REPORTER'S NOTE:  (At this point, instrument was
2   marked for identification by the Reporter as
3   Plaintiff's Exhibit Number 3, after which, the
4   deposition continued, as follows:)
5
6   Q        (continued by Mr. Underwood)  Let me show
7   you what I've marked as Plaintiff's Exhibit 3.
8   On this one, on line 1201, it shows a charge of
9   $225.00.  Do you know where that figure would
10  have came from?
11  A        Well, like I said, we use Ernst, but I
12  don't know how many pages or what would have
13  been put in there to get that figure.
14  Q        Okay.
15  A        And I believe that it -- I believe
16  it's -- I believe it's a higher number of pages
17  put in.  I don't believe there's a set amount on
18  top of that.
19  Q        Okay.  Well, this -- on the next line,
20  the line 1202, does that come from Ernst?
21  A        Everything in 1,200 comes from Ernst.
22  Q        Okay.  And does someone at Swafford make
23  a decision about what to put on this -- the
0123
1   line -- the line 1201?
2   A        Our closing department does.
3   Q        All right.  And do they have a list or
4   something that they go by so they know -- like,
5   for example, for Louisiana -- I believe this one
6   is from Louisiana -- to put on line 1201 for a
7   loan that's closed in Louisiana?
8   A        At some point there might have been a
9   list.  But at this point, I know it's the same
10  people that have been there for a while.  They
11  just know what to put in, depending on the
12  state.
13  Q        All right.  And who is it that knows what
14  to put on the line 1201?
15  A        The best person would be Betsy Johnson.
16  She's been in that department the longest.
17  Q        What's her job title?
18  A        It's actually changed several times since
19  she's been with us, but she's in the closing
20  department.  So probably Director of Closing at
21  this point, because she's over closing.
22  Q        All right.  Now with --
23  A        I want to add something, too, on the 1201
0124
1   question.
2   Q        All right.
3   A        At one point we realized we needed to use
4   a higher number of -- the reason I also wasn't
5   sure where they got that number was they always
6   used Ernst.  But as far as -- like I said, I
7   don't know if they use a number of pages or not.
8   At one point when we raised the amount, it was
```
Page 47

swaffordgreg051906.txt
```
 9   based upon the fact that we needed to get a
10   larger number of pages to make sure we didn't
11   ever have a shortage.  Now, over time, when they
12   got used to what state that amount was probably
13   going to be based on those number of pages, I
14   don't know if -- if there was more shortages
15   that came through for some reason or another,
16   they may have raised that amount, so --  and
17   that might not have been done by pages.  That
18   might have been done based upon shortages they
19   were trying to avoid.  That's where I -- it's a
20   gray area to me.  I don't know if it's still a
21   specific number of pages.
22   Q      Okay.  Well, would it be fair to say that
23   this figure that's on line 1201 is just an
0125
 1   estimate?
 2   A      Yes, that is fair to say.
 3   Q      Okay.  And on all of the loans it's just
 4   an estimate; is that also true?
 5   A      Yes.  I don't believe we ever know the
 6   actual number of pages at the time we do that.
 7   Q      Okay.  Fair enough.  And I think you told
 8   me that -- let's say, for example, on this
 9   Exhibit 3 that if the recording fee was only
10   $100.00 and the customer had been charged --
11   well, let me ask you this.  Who is your customer
12   when you're doing one of these closings?
13   A      Who is our customer?
14   Q      Yes.
15   A      Well, it depends on what terms you're
16   referring to.  The borrower is the customer of
17   the lender.
18   Q      Okay.
19   A      And we're working on behalf of the
20   lender.
21   Q      Okay.  So the lender's your customer --
22          BY MS. CLOTFELTER:  Object to the form.
23   Q      (continued by Mr. Underwood)  -- is that
0126
 1   true?
 2          BY MS. CLOTFELTER:  He just answered.  I
 3   mean, that's different from what he said.
 4   A      No.  The borrower is the customer.
 5   Q      (continued by Mr. Underwood)  Okay.
 6   A      The borrower has -- for instance, the
 7   borrower doesn't pick the title company, but
 8   every lender has more than one title company,
 9   and they utilize us and the borrower has the
10   right to ask for a different title company.  So
11   the borrower is the customer.
12   Q      All right.  I'll use the term "customer,"
13   then.  Let's say, for example, in this Exhibit 3
14   that the recording -- the actual recording fee
15   was only $100.00.  Now, I think you told me at
16   one time the additional $125.00 would just --
17   was just paid over into the operating account;
18   is that -- did I understand that testimony
19   correctly?
20   A      Yes.  When we -- at one time when we cut
21   the check for recording with the actual number
22   of pages, anything that was not needed to send
23   at that point was put in the operating account.
```
                    Page 48

swaffordgreg051906.txt

0127
1    Q      All right.  And you told me that the
2    procedure for that changed at some point.  I
3    believe you told me in early 2004, mid 2004?
4    A      Well, there was two changes.  We never --
5    we only covered one of the changes.
6    Q      Okay.  Well, I thought that we -- okay.
7    We got to the point where we -- I think you said
8    your father realized that you guys were losing a
9    lot of money for having to pay recording fee
10   shortages and you went -- what did you do at
11   that -- what change did you make at that point?
12   I think I've gotten myself --
13   A      Okay.  That's what we're talking about
14   now, when we realized we needed to do --
15   because, see, we had the point -- we had the
16   point where we were losing money.  That was the
17   first step.  Then the second step was where we
18   started doing this.  And then the third step is
19   where we are now, which is where the additional
20   funds go back to the borrower.
21   Q      Okay; all right.  And when you say "doing
22   this," let's --
23   A      That is when we started realizing we
0128
1    needed to estimate the original -- the higher
2    number of pages.
3    Q      Under line 1201?
4    A      I would assume it was just 1201, yes, but
5    it's all within the recording of 1200.
6    Q      All right.
7    A      I don't believe that the '03 and '04,
8    when you're talking about those, I think -- I
9    believe that is truly generated just by the loan
10   amount.  So I don't think those would vary.  I
11   don't believe they would.  I don't know.  I
12   don't run Ernst.
13   Q      Well, and I think you're right, and I've
14   looked at some -- looked at a number of these
15   transactions and it appears that '02 and '03 are
16   just --
17   A      What they are.
18   Q      -- what they are.
19   A      That's what I'm of the understanding of.
20   Q      And 1201 is just an estimate; is that
21   your --
22   A      Because of the pages, yes.
23   Q      Okay; all right.  Now, tell me again when
0129
1    you made the change of paying the balance back
2    to the borrower.
3    A      When?  I'm sorry.  You're asking me when?
4    Q      Yeah.
5    A      It was two different dates.
6    Q      Okay.
7    A      With Homeowners, it was -- like I said
8    earlier, I believe it was early '01, maybe
9    January.  I mean, '05.  Excuse me.
10   Q      Okay.
11   A      And then the rest of the lenders were, I
12   believe, September of '05.
13   Q      Okay.  And was there some reason why you
14   did it sooner with Homeowners than the other
                        Page 49

swaffordgreg051906.txt
```
15   lenders?
16   A      One of their on-staff attorneys said that
17   they would prefer to be able to track where
18   recording overages or billing -- or if there is
19   an overage or if there's a shortage or what have
20   you, so that was the only way we knew how to do
21   it.  And we still -- we still can't show all
22   shortages that are coming out of our operating
23   account, but at least they know everything that
0130
1    comes off of the HUD, where it's going.
2    Q      Okay.  And that was one of the attorneys
3    from Homeowners?
4    A      Uh-huh.
5    Q      Did he send you any kind of
6    correspondence about that?
7    A      It was a conference call.
8    Q      Were there any e-mails in that regard?
9    A      I don't recall.
10   Q      What was that attorney's name?
11   A      Bill Long.
12   Q      Bill long?
13   A      Bill Long.
14   Q      And is he in Atlanta?
15   A      Uh-huh.
16   Q      And was he on staff for Homeowners?
17   A      Uh-huh.
18   Q      Do you know his job title?
19   A      I know it has attorney in it.  I'm not
20   sure.
21   Q      Okay.  And let me be clear about this
22   now.  Was there any written correspondence or
23   memoranda at all about this, or you just
0131
1    don't --
2    A      I know there was no memorandum or a
3    letter or anything, but I'm -- I don't know if
4    there was any e-mails.  I don't know if he
5    called and requested a conference call or if he
6    put it in writing he wanted a conference call.
7    Q      All right.  And do you know what prompted
8    him to call and -- about that?  Did he tell you?
9    A      Well, his role there was like a
10   compliance for the lender, and anytime that they
11   wanted something changed, he would call me and
12   ask me to change it.  Typically, it involved
13   things that he wanted us to help him do for
14   their company.  In this particular instance, it
15   was something he wanted us to do for our
16   company.
17   Q      All right.  And when you got that call
18   from Mr. Long, did you create any memoranda or
19   e-mails to employees or closers or anything like
20   that about the change?
21   A      I would say that there probably would be
22   an e-mail.  I typically ninety-nine percent of
23   the time do e-mails.  I don't usually do
0132
1    memorandums or letters.
2    Q      All right.  And do those e-mails still
3    exist?
4    A      Hopefully so if they're in my sent items.
5    But I have an IT Director that after it gets so
```
Page 50

swaffordgreg051906.txt

```
 6   large, it cleans it out.  But I'm thinking if
 7   it's '05, then it should still be there.
 8   Q       Okay.  Who's your IT Director?
 9   A       Joe Filipowizz.
10   Q       Is he still with you?
11   A       Yes, he is.  That's F-I-L-I-P-O-W-I-Z-Z.
12   Q       Okay.  Thanks.  And then what was the
13   reason for changing that procedure with the
14   other lenders, other than Homeowners?
15   A       It was working very well with Homeowners,
16   so we decided to do it with other lenders as
17   well.  And we weren't -- I don't recall that
18   Bill ever told us the reasons for his concern
19   with that, but we felt if it was a concern with
20   him, then it was going to be a concern across
21   the board.  So we did that across the board.
22   Q       All right.  Well, did Bill express to you
23   that that might be a violation of any kind of
0133
 1   lending law or regulation?
 2   A       I don't believe so.
 3   Q       All right.  Did you learn at some point
 4   that that might be a violation of a lending law
 5   or --
 6   A       No.
 7   Q       And I'm not asking you anything that your
 8   lawyers have told you, but --
 9   A       No, I don't believe I ever did.
10   Q       All right.  Well --
11   A       I was -- no.  I mean, I was told at one
12   point by our underwriter that it was a gray
13   area, but I was never told that it was a legal
14   issue.
15   Q       Okay.  I was going to ask you -- that was
16   going to be one of the next things I was going
17   to ask you, if the underwriter ever brought that
18   up --
19   A       They thought it was a gray area, because
20   of whether it's payable to Swafford or didn't
21   say it, and some of our systems did.  But then
22   there was the AIM system that dropped it and it
23   stopped sending it again.  But they never told
0134
 1   us to stop doing it and they never told us that
 2   we were violating any kind of law.
 3   Q       All right.  And that was someone from
 4   Ticor?
 5   A       Ticor and actually any kind of -- any
 6   other underwriter.  We applied with two other
 7   underwriters.  Both did extensive audits of us.
 8   Q       All right.
 9   A       Neither one had an issue with it.  One of
10   the two we elected to go with, which was
11   Commonwealth, and they said pretty much the same
12   thing Ticor did, that it was a gray area that --
13   and it was pretty much just for disclosure
14   purposes as to where that money was going, as
15   far as whether it was going to be kept by
16   Swafford or not.  But they never said we were
17   violating any law.
18   Q       Okay.  Now, did Ticor give you any kind
19   of written memorandum, or is this -- I suppose
20   the audit results were in writing.
```

Page 51

swaffordgreg051906.txt
```
21   A      Right.  I don't know if that was one of
22   the findings.  Usually the things they looked at
23   is findings or things that they definitely want
0135
1    us to change.
2    Q      Uh-huh.
3    A      So I can't -- I don't know if it was in a
4    memorandum or not.
5    Q      Okay.
6    A      I doubt that it would be --
7    Q      Okay.
8    A      -- because it wasn't a finding that they
9    were requiring us to do something about.
10   Q      All right.
11   A      But if it was, it would be in the
12   memorandum.
13   Q      Well, how did you know they had any
14   concern about it at all?  I mean --
15   A      We always sit down with the auditors when
16   they're done with the audit and they go over the
17   findings that they require us to change, and
18   then any other things that they just want to
19   recommend and bear witness to.  And that was one
20   of the recommendations, was not to stop doing
21   it, but make it payable to Swafford.
22   Q      Okay.
23   A      When we chose to stop doing it in '05
0136
1    with Homeowners and other lenders, that was
2    because we chose to, not because our
3    underwriters dictated it.
4    Q      All right.  And who was the underwriter
5    that you sat down with and they told you that
6    that was a gray area?
7    A      Both did.  Commonwealth, when we applied
8    with them, and Ticor had -- had within that same
9    parameter of time when they did their audit.
10   But they were already our underwriter.  And mind
11   you when I say "Ticor," that encompasses
12   American Pioneer, because I'm not -- I don't
13   remember exactly when American Pioneer was
14   bought by Ticor.  We still deal with the same
15   staff, though.
16   Q      Now, we talked about your training and
17   on-the-job experience a little earlier, and I
18   wanted to ask you a little more about that.
19   Have you ever had any training with regard to
20   the Real Estate Settlement Procedures Act?
21   A      No, I've never actually taken any courses
22   or done any kind of training.
23   Q      All right?
0137
1    A      My training has only been from
2    underwriters coming in and making
3    recommendations and doing audits and sitting
4    down -- in other words, I don't remember -- I
5    know there was not a course in the beginning
6    when we were approved by Ticor, which was our
7    very first underwriter, and they came in and set
8    us up as an agency, which was American Pioneer
9    at that time.  But I do know we didn't have any
10   kind of written formal courses or anything.  It
11   was strictly them coming in and telling us how
```
Page 52

swaffordgreg051906.txt

12    to get things going.
13    Q    All right. And you don't have anyone on
14    staff, either, that's trained in these lending
15    laws and regulations, or do you?
16    A    No. Like I said, we rely on all the
17    attorneys that are on the underwriter staff.
18    Q    Okay. Now, at some point, did you become
19    aware of a complaint of Ms. Gibbs and Ms. Finch?
20    A    Yes, I did.
21    Q    Okay. When was that?
22    A    I don't remember the date when I first
23    received the notification that they were going
0138
1    to bring a complaint or a suit against us.
2    Q    All right. And you don't remember the
3    date that you received that paperwork?
4    A    No. I know it's been going on for a
5    while. I want to think it was probably two
6    years before the Saucida began, and I don't even
7    remember when Saucida began.
8    Q    Okay. And I guess my next question is
9    this, did the Gibbs and Finch complaint, did it
10    have anything to do with the change in your
11    procedure with regard to these charges for the
12    filing fees that we were just talking about?
13    A    No, I don't believe it did. If I
14    remember correctly, it was either Gibbs or Finch
15    didn't even have any type of extra funds or
16    overage left after the recording.
17    Q    All right.
18    A    And the other one did, but it was very,
19    very minimal.
20    Q    All right.
21    BY MR. UNDERWOOD:    Well, it's almost
22    11:30. Let's go off.
23
0139
1    REPORTER'S NOTE:  (At this point, a lunch recess
2    was taken, after which, the deposition
3    continued, as follows:)
4
5    Q    (continued by Mr. Underwood)  While we
6    were on lunch a question occurred to me about
7    the reason why these line 1201 charges are
8    estimated and that's this, why is it that when
9    you get the package from the lender, you can't
10    open that up and see what the number of pages
11    is, and then just put down the exact charge for
12    the filing fees?
13    A    Typically, the lenders we deal with are
14    sub-prime. Meaning B, C lending. It's not A,
15    paper lending. So everything they do is in a
16    hurry. They tend to always want everything done
17    tomorrow. They don't allow us to take the time,
18    like a lot of other banks do, where we can take
19    five to six weeks to close. So anyway, a lot of
20    their things from the time that they get an
21    application to the day they close only takes a
22    week to two weeks at the most. So a lot of
23    times when they send us a HUD request, the
0140
1    preliminary, it's the day of the closing. And
2    they don't actually send us the package a lot of
                    Page 53

swaffordgreg051906.txt

3   times until thirty minutes before the closing is
4   supposed to occur.  So if we took the time to
5   open it up and change the HUD, we would have to
6   get the HUD re-approved at that point and it
7   would completely ruin the cancellation and we
8   would have to reschedule it for the next day.
9   Not cancellation but closing, and we would have
10  to reschedule for the next day.  So they don't
11  allow us the time to go through the entire
12  procedure, because we can't make any changes on
13  our HUD prior to closing without them
14  re-approving the HUD.
15  Q      Okay.  What is it about the sub-prime
16  loans that causes them to be so urgent, I guess
17  is the term I could use?
18  A      I really don't know, to be quite honest.
19  It's not like there's a set reason.  It's just
20  that.  A lot of times sub-prime lending -- and I
21  shouldn't say it's all sub-prime lending,
22  because we do a lot of prime lending, too.  But
23  like for Homeowners, they were pretty much a
0141
1   sub-prime lender.  They're usually helping
2   people who have less than perfect credit.  A lot
3   of times they're already delinquent on their
4   mortgage.  So the borrower is going to someone
5   saying, "Look, I'm getting reminder notices.
6   I'm scared I'm going to go into Foreclosure.  I
7   need you to hurry up and refinance this mortgage
8   to save my house."  Even if it's not that
9   extreme, they're behind on credit cards.  Maybe
10  it doesn't even relate to the house, but they're
11  behind on credit cards or what have you.  Very
12  rarely does someone have perfect credit with
13  their sub-prime lender, because they have no
14  reason to.
15  Q      All right.
16  A      And there's no reason for them to have an
17  urgency.  They can take two months, if they need
18  to, to close their house loan, because all the
19  payments are current; they don't have any --
20  they're not worried about their credit, you
21  know, being ruined; they're not really worried
22  about their mortgage hurting or anything like
23  that.  The sub-prime lenders' borrowers are
0142
1   very -- typically very conscious of how long it
2   takes, and they're typically pushing their loan
3   officers so that they don't go to another
4   mortgage company who can close them faster.
5
6   REPORTER'S NOTE:  (At this point, instrument was
7   marked for identification by the Reporter as
8   Plaintiff's Exhibit Number 4, after which, the
9   deposition continued, as follows:)
10
11  Q      (continued by Mr. Underwood)  Let me show
12  you what I have marked now as Plaintiff's
13  Exhibit Number 4.
14  A      Okay.
15  Q      I would just ask if you could identify
16  that for the record for us?
17  A      It appears to be a Settlement Statement
                        Page 54

swaffordgreg051906.txt

```
18  for Johnny Saucida.
19  Q      All right.  And is it one that your
20  company prepared?
21  A      Prepared, yes.
22  Q      All right.  And how can you tell that?
23  A      It says "prepared by."
0143
 1  Q      All right.
 2  A      Oh, no.  It says "Settlement Agent."  I'm
 3  sorry.
 4  Q      Okay.  And the number up in the upper
 5  left-hand corner, what's the significance of
 6  that?
 7  A      That's my filing number.
 8  Q      Okay.  And I wanted to go through these
 9  charges on here and get you to tell me what you
10  know about them and what they're for.  And I
11  guess we'll start with line 980.
12  A      Okay.
13  Q      And it's called "origination fee."  Can
14  you tell us what that's for or your
15  understanding?
16  A      Actually, I'm going to jump ahead, but I
17  can tell you that the entire 800 section are
18  one-hundred percent the lender fees, the
19  mortgage lender.  So I don't know what they
20  represent on their side.  I just know that
21  that's the fees they charge to their borrowers.
22  Q      Okay.  And do you get -- in the 800
23  block, do you get all these figures -- did you
0144
 1  call it the initial HUD-1?
 2  A      Uh-huh.
 3  Q      Is that right?
 4  A      Some lenders are -- see, Homeowners is --
 5  they don't deal with a broker/lender.  They are
 6  the lender.  They sell all their loans, but they
 7  sell it after the time of closing.  So in this
 8  case, those fees are on the preliminary HUD.
 9  Q      All right.  And then let's drop down to
10  903.  Is that a figure that you have to supply?
11  A      Not unless they're asking us to figure
12  the escrows for them.  And Homeowners typically
13  doesn't even have an escrow account.  And if
14  they do, they calculate it themselves and ask us
15  just to put it on the HUD.
16  Q      Okay.
17  A      So we don't supply the number for
18  Homeowners.
19  Q      All right.  So this would be something
20  that they've already got from the borrower,
21  then?
22  A      Not from the borrower.  They've
23  calculated it.
0145
 1  Q      Okay; all right.
 2  A      The funds are still collected from us
 3  through the HUD, but we don't calculate that for
 4  Homeowners.
 5  Q      All right.
 6  A      I'm being very careful to say Homeowners,
 7  because every lender is different in almost
 8  every area that you're going to ask me about on
```

Page 55

swaffordgreg051906.txt
```
 9   this HUD.
10   Q      All right.  Fair enough.  Now, line 1101,
11   settlement or closing fee.  Now is that
12   something that's placed on the initial HUD-1 by
13   Homeowners?
14   A      Uh-huh.
15   Q      Is that right?
16   A      Well, it's on their doc request, their
17   HUD request, and it is put on their preliminary
18   HUD by us.
19   Q      Okay.
20   A      But our fees appear on their doc request
21   typically, yes.
22   Q      All right.  And is this the -- is that
23   the standard Homeowners' fee or is that -- or do
0146
 1   they all have $200.00 on them?
 2   A      No.  Like I said, they changed it at one
 3   point when they started telling us what we could
 4   charge in each state.  And it was by state, and
 5   all the title companies charge the exact amount
 6   in that state.  So I don't remember if this loan
 7   closed after or before, but it would be standard
 8   to all Homeowners' closings.  I don't know how
 9   to answer that.  There would be standard -- yes,
10   it is a standard fee, and yes, it would be
11   charged across the board.  But if it was prior
12   to Homeowners having us do that, all borrowers
13   had the same fee.  After Homeowners having us do
14   that, it would depend on the state.
15   Q      Okay; all right.  Now, what about -- is
16   that standard with other borrowers?  I mean,
17   excuse me, other lenders?
18   A      Whether it is on their preliminary --
19   Q      No, the $200.00.
20   A      Oh, the $200.00?
21   Q      Yeah.
22   A      Oh, I don't know.
23   Q      Okay; all right.
0147
 1   A      I'm sorry, I don't know.
 2   Q      Okay.  We'll look at some of these other
 3   ones and see, then.  All right.  What about this
 4   line 1102?
 5   A      The same thing, and 1103.  Those are
 6   three standard fees with Homeowners.
 7   Q      Okay; all right.
 8   A      Homeowners would not allow us to charge
 9   things such as a courier fee or abstract -- or
10   like an overnight fee.  They wanted all of the
11   fees all built into these three fees.
12   Q      Okay.
13   A      Our basic settlements.
14   Q      Okay.  Well, let's see, I'll get to that
15   in a minute, but -- on line 1102 -- well, first
16   off, on line 1101, Homeowners writes -- I mean,
17   Swafford & Hays writes itself a check for
18   $200.00?
19   A      We would collect our own fees, yes.  They
20   don't go to any other parties' hands.
21   Q      Okay.  And then with regard to line 1102,
22   the same thing is true?
23   A      Yes.  All fees within the 113 -- I mean,
```
                        Page 56

swaffordgreg051906.txt
0148
1    within the 1100 section, all fees in there would
2    be cut to Swafford.  Now, once the -- once the
3    policy is issued -- the reason we've got
4    American Title Insurance Company on Number 1108
5    is because they will receive a portion of that
6    fee, but not until we issue the final policy.
7    We don't -- they request -- we don't pay them
8    the premium until we issue the policy.
9    Q       Okay.  And what's line 111?
10           BY MS. CLOTFELTER:   1111?
11           BY MR. UNDERWOOD:    Yes, 1111.  I'm
12   sorry.
13   A       That is for any -- that's also basically
14   with Homeowners, and it's for any additional
15   service fees such as -- like that's where we
16   could put our courier fee, things of that
17   nature.
18   Q       (continued by Mr. Underwood)  Okay.  But
19   let's talk about this loan specifically, this
20   file number 0411332, the Saucida loan.  Can you
21   tell me what services were performed for --
22   let's start with line 1101?
23           BY MS. CLOTFELTER:  Object to the form of
0149
1    the question.  I'm not sure what you're asking.
2    Q       (continued by Mr. Underwood)  Okay.
3    Well, you can still answer the question, unless
4    you don't understand the question.
5    A       You asked me earlier in the deposition
6    what services we performed.
7    Q       Uh-huh.
8    A       Every service we perform, the expense of
9    what we do -- that we incur, whether it be in
10   salaries or what have you, are covered by 1101
11   through 1103.  And sometimes they overlap.  The
12   processors may work for final policy; they might
13   work for a closing.  It's very difficult to tell
14   you exactly -- our entire company's fees are
15   within those three fees.
16   Q       Okay.  Well, it's called settlement or
17   closing fee and --
18   A       So the settlement closing fee would --
19   Q       Well, let me ask -- let me finish asking
20   the question.  You described for me earlier what
21   you did for a closing with Homeowners.
22   A       Right.
23   Q       And are those the -- those things you
0150
1    described, is that what the $200.00 fee is for?
2    A       For a portion of those, yes.
3    Q       Okay.  Which ones?
4    A       Since it says "settlement or closing," it
5    would be anything to do with that.  So it would
6    be to book the notary.  The notary cost is
7    within that.  Preparing the HUD Settlement
8    Statement, quitclaims, warranty deeds, things of
9    that nature.
10   Q       Okay; all right.  And then the next
11   charge is title search.  Is that --
12   A       Well, it's abstract or title search.
13   Q       Okay.  That's line 1102, and what's --
14   what service is provided there?

Page 57

swaffordgreg051906.txt

15  A      That's receiving the order; farming it
16  out to the abstracter; paying the abstracter and
17  examining what the abstracter has sent back.
18  Q      All right.
19  A      And then doing any type of legal action
20  we need on that, such as requesting further
21  documentation, tax payoffs.  Because we actually
22  put the actual tax amounts owed on our
23  commitments and all that stuff.
0151
1   Q      But I'm talking about line 1102.  So all
2   that's covered by 1102, title -- abstract or
3   title search?
4   A      Yes.
5   Q      All right.  Well, then, what's done
6   for -- what services are performed for line
7   1103?
8   A      1103, title examination?  That's when we
9   examine the title, the commitment.  That's
10  processing.
11  Q      All right.
12  A      And then we also have to go back and
13  examine that title after the closing to make
14  sure that HUD meets the requirements on the
15  commitment to make sure a final policy can be
16  issued.
17  Q      Who is it that goes back and does the
18  title examination under 110 -- or who -- let me
19  ask it this way.  With regard to the Saucida
20  transaction, who was it that went back and
21  examined the title?
22  A      In every case, it's Swafford Settlement
23  Services.
0152
1   Q      Well, with all due respect, Swafford is
2   in Knoxville, Tennessee and this is down in
3   Mobile County, Alabama.  Someone had to go and
4   look at it and that's --
5   A      Well, you asked me who examines the
6   title.  It's us.  If you're asking me who goes
7   to the courthouse and actually finds what's on
8   the records, that's the abstracter.  That's two
9   different things.
10  Q      Okay; all right.  Thank you.  Now, was
11  there a charge from the abstracter for going
12  back to the courthouse again?
13  A      They don't typically go back to the
14  courthouse.
15  Q      Okay.  Well, what is it they typically do
16  for the charge on line 1103?
17  A      I told you 1102 encompassed the
18  abstracter.
19  Q      Okay; all right.  Well, I'm getting
20  myself mixed up then.  You told me that under --
21  I believe that under line 1103, that part of
22  that charge was for someone to go --
23  A      Was to examine -- go back and examine the
0153
1   commitment.  Not go back to the courthouse; go
2   back to our original commitment we issued for
3   insurance.
4   Q      Uh-huh.
5   A      And make sure that every requirement was
                              Page 58

swaffordgreg051906.txt

```
 6  fulfilled at the time of the settlement -- or by
 7  the settlement so a final policy can be issued.
 8  That's all done in-house.
 9  Q    Okay; all right.  I think I understand
10  now.  Do any of these lenders ever require you
11  to go back to the courthouse and make sure that
12  they've got a valid first lien, I guess?
13  A    No.  They just require the recorded
14  mortgage or quitclaim or warranty deed be sent
15  to them with the final policy.
16  Q    And they don't worry about it because of
17  this insurance that we were talking about?
18  A    Well, basically the insurance policy says
19  that they're insured in first lien position.  So
20  they don't worry about it, because if they find
21  out they're not, we have to rectify the issue.
22  Q    Okay.
23  A    Now, the forty-five day thing that we
0154
 1  talked about earlier, that's our requirement.
 2  So we'll send -- if they order a closing after
 3  forty-five days, we automatically send an
 4  abstracter back out that day and ask them to
 5  review it.
 6  Q    All right.
 7  A    But that -- we don't raise our fees
 8  because of that.
 9  Q    Now, the line 1201 on Exhibit 4 reflects
10  the $120.00.  That's a fee that's charged for
11  the -- to reflect the filing and the number of
12  pages of the mortgage.  That's the estimated fee
13  we were talking about, in general, earlier; is
14  that right?
15  A    Estimated recording fees, yes.
16  Q    Okay.  And then line 1203, that's the
17  actual tax --
18  A    In Alabama some counties have state tax
19  stamps, and that's what that is.
20  Q    All right.  And you get both of those
21  from Ernst?
22  A    Correct.
23  Q    Now, can you tell me whether or not on
0155
 1  all of the Alabama transactions there would be
 2  $120.00 charged on line 1201?
 3  A    No, I can't, because I don't know for
 4  sure that that is the amount that we originally
 5  came up with and it never changed the amount,
 6  uh, any of the time period that we've done
 7  business.
 8  Q    All right.  And that would be -- the
 9  person that could tell us that is that lady that
10  you mentioned earlier.  I don't recall her name
11  that's in your --
12  A    Brenda Cooper?
13  Q    I believe that's the name.
14  A    Betsy Johnson would have a good idea of
15  that.
16  Q    Okay.
17  A    Yes.
18
19  REPORTER'S NOTE:  (At this point, instrument was
20  marked for identification by the Reporter as
```
Page 59

swaffordgreg051906.txt
21    Plaintiff's Exhibit Number 5, after which, the
22    deposition continued, as follows:)
23
0156
1     Q       (continued by Mr. Underwood)  Let me show
2     you what I've marked as Exhibit 5.  If you
3     would, just identify that for the record for us.
4     A       Closing instructions from Homeowners Loan
5     Corp.
6     Q       Regarding the Saucida transaction that we
7     were just talking about, the HUD-1?
8     A       Yes, John Saucida.
9     Q       And is this the format that you get those
10    in?  You told me earlier that you got these in
11    an e-mail.
12    A       Actually, this comes with the closing
13    package.  This is not what we get for the
14    preliminary HUD.
15    Q       Okay; all right.  What do you get for the
16    preliminary HUD?  Do you just get like a HUD-1
17    form that's not completely filled out?
18    A       No.  It's called a "doc order."
19    Q       I think I've seen that.
20    A       Yeah, it was in all the files we sent to
21    you.
22    Q       We'll get to it.
23    A       We don't actually see this until the
0157
1     package comes across and it's on its way to the
2     notary.  This is something we have to make sure
3     has been fulfilled before the package goes back
4     into the Homeowners loan.
5     Q       All right.  But you don't look at any of
6     this before it goes to the notary, because --
7     A       Because the HUD has already been
8     approved.
9     Q       And because you're in a hurry like you
10    were talking --
11    A       No.  It's because the doc order is what
12    they want us to use their fees for, and the
13    HUD's already been approved.  This makes sure --
14    or we have a post-closing department that takes
15    the package and makes sure that --
16    Q       Well, this goes to the closer, doesn't
17    it, to the notary?
18    A       Yes.
19    Q       Okay.
20            BY MS. CLOTFELTER:  When you say "this,"
21    you're referring to Exhibit 5?
22    A       I'm sorry.  Are we referring to Exhibit
23    5?
0158
1     Q       (continued by Mr. Underwood)  Yes.  If
2     you would, look at the incomes page of that
3     exhibit.
4     A       Can I point something out real quick
5     before --
6     Q       Yeah, please do.
7     A       If you notice on "B" on the first page of
8     Exhibit 5, it said -- you had asked me this
9     earlier -- and it says, "The Settlement
10    Statements must be sent via e-mail and approved
11    by HLC's Closing Department before closing."  I
                        Page 60

swaffordgreg051906.txt
```
12  just wanted to point that out to you.
13  Q      All right.  Yeah.  Then it goes on to say
14  that if it's changed for any reason, you got to
15  resubmit it.  So --
16  A      Right.
17  Q      So that's the problem that you were
18  describing to me earlier about changing it when
19  you knew the actual number of the pages for the
20  mortgage?
21  A      They prefer us to handle it the way we're
22  handling it, which is where -- if there's any
23  change -- as long as it's not going to result in
0159
1   a shortage, then they know the borrower is going
2   to end up with any excess recording fees anyway.
3   Q      Okay; all right.  Now, what are these
4   figures about on the next page of that document?
5   It's Bates numbered 18.
6   A      It should just be the basics, I guess,
7   that are on the HUD's Homeowners statement.  It
8   almost looks like an addendum to a HUD, but it
9   doesn't say that.
10  Q      Okay.  Is that something that you usually
11  get from Homeowners Loan that's usually in the
12  package?
13  A      I don't recall seeing this one, but I'm
14  sure if it was in this one, it should be
15  standard.
16  Q      Okay.  It reflects a recording fee of, I
17  believe, $200.00.  Do you know --
18         BY MS. CLOTFELTER:  Where are you
19  looking?
20         BY MR. UNDERWOOD:  Under "Title
21  Insurance."  No.  Maybe I'm looking at that
22  wrong.
23  A      I don't see recording fees on here.  It
0160
1   stops at "Title Examination."  The city, county
2   tax stamps is not filled in.  And I don't see
3   even anything about a -- what's it called on
4   here?  Recording fees?  I don't even see
5   recording fees on here.
6   Q      (continued by Mr. Underwood)  Now, isn't
7   that under "closing fee?"  Or right under "Title
8   Insurance," rather?
9          BY MS. CLOTFELTER:  Let me object for a
10  moment.  I mean, I don't have any problem with
11  your asking him to look at something.  But he's
12  testified that he doesn't know what this is.  So
13  I object to you asking him to interpret it if he
14  doesn't know what it is.
15  Q      (continued by Mr. Underwood)  It says
16  "document," and I'm trying to get him to tell me
17  what -- here's what I'm looking at (indicating).
18  A      Closing fee?  I don't know what that is.
19  Q      Okay.  Next to the last thing there, it
20  says, "Discount fee percent of loan amount."  Do
21  you know what that -- what that means?
22  A      No.  A discount fee with many lenders is
23  almost like a -- I don't know, actually.
0161
1          BY MS. CLOTFELTER:  Well, don't guess, if
2   you don't know.
```
                       Page 61

swaffordgreg051906.txt

```
 3   A      Yeah, I don't know.  It's not one of
 4   Swafford's fees.
 5   Q      (continued by Mr. Underwood)  Well, one
 6   of the reasons I'm asking that is, this number 1
 7   on the first page of the exhibit, it says that
 8   the Settlement Statement has to have all those
 9   charges and disbursements and no others.  And
10   then it has this list over here and I didn't see
11   anything called "loan discount" on the HUD-1.
12   A      Well, that says "zero" anyway.  Discount
13   fee, it says "zero" next to it.  The title
14   service says 390.
15   Q      I see.  Well, I don't see that on HUD-1,
16   either.
17         BY MS. CLOTFELTER:  Well, you know, just
18   wait for a question.
19   Q      (continued by Mr. Underwood)  Is that on
20   the HUD-1, the 390, title service fee?
21   A      I see one that says "underwriting fee"
22   for 390.
23   Q      What line is that on?
0162
 1   A      808.
 2   Q      Okay; all right.  Let's go to the next
 3   page.  Now, what about with regard to
 4   instruction number 2?  It says that, "You are
 5   required to ensure that the amount of the
 6   recording fees and other assessments to perfect
 7   the lien is the exact amount required by the
 8   recorder, clerk or other appropriate government
 9   official."
10         BY MS. CLOTFELTER:  What's the question?
11   Hang on just a second.  What was the question?
12   Q      (continued by Mr. Underwood)  And I
13   thought you said earlier that Homeowners knew
14   that the fee on line 1201 was only an estimate,
15   and they wanted you to do it that way so you
16   could get the loans closed faster.  I think
17   that's what you said; is that correct?
18   A      Yes.
19   Q      All right.
20   A      However, this is for the entire loan in
21   its entirety.  And Saucida, if you look at the
22   disbursement sheet, which we have not gotten to,
23   got a refund for anything over the actual
0163
 1   recording cost.  So that was -- so we complied
 2   with number 2.
 3   Q      Okay.  I see.  And flip over, if you
 4   would, to, I guess, the next page, page 20.  And
 5   can you tell me who that --
 6   A      Jane Carcello?
 7   Q      Yeah.  Who is she?
 8   A      She was an employee in our closing
 9   department.
10   Q      All right.  And what is her role in this
11   transaction?
12   A      She was the one that reviewed these
13   closing procedures and the package to make sure
14   everything was kosher.
15   Q      All right.  Before it was sent back to
16   the lender?
17   A      Correct.
```

Page 62

swaffordgreg051906.txt
```
18   Q      Okay.  And is she still with you?
19   A      No, she's not.
20   Q      All right.  What happened -- why did she
21   leave your employ, if you know?
22   A      I don't know.  We had a few layoffs.  I
23   don't know if she was laid off or she resigned.
0164
1    I know she wasn't terminated.  So it's one of
2    the two.
3    Q      All right.  And then the next page, 21,
4    can you tell us what that is, what that
5    represents?
6    A      It says it's an "Addendum A (Payoffs).
7    So it should be the payoffs that are on the HUD
8    Settlement Statement.
9    Q      Okay.  And then you had mentioned -- the
10   next page, 22, you had mentioned "stacking
11   order."
12   A      Uh-huh.
13   Q      Is this what you were referring to?
14   A      Yes.
15   Q      And is this an instruction from
16   Homeowners that they want their package
17   presented back to them in that order?
18   A      Uh-huh.
19   Q      Is that correct?
20   A      Yes.  I'm sorry.
21   Q      And then was it Jane's job to go through
22   there and check off each one of these and make
23   sure that --
0165
1    A      It was more detailed than that.  That was
2    her basic job.
3    Q      Okay.
4    A      She also checked to make sure signatures
5    were accurate; every document was dated;
6    signatures matched vesting.  Because this is
7    just a basic thing that Homeowners requires.
8    There are other things that our underwriter
9    required; there's other things that we required
10   all compiled into that one department.
11   Q      I'm sorry?
12   A      All compiled into that one department.
13   Q      Okay.
14   A      But this is, yes, the order of the
15   documents.  That is one component.
16   Q      Okay; all right.  And is there -- so is
17   there some other checklist or something that
18   Jane was supposed to follow to make sure that
19   she met all the requirements?  Or is this the
20   only one?
21   A      From Homeowners?
22   Q      Well, just in doing her job with regard
23   to this file.
0166
1    A      We do not have a desktop procedure
2    manual, if that's what you're asking.
3    Q      Okay.  Well, you told me that she had to
4    do not only these things that are on this list
5    from Homeowners, but some other things.  So how
6    did she know what other things to do?
7    A      She was trained.  She had on-the-job
8    training.
```
                        Page 63

swaffordgreg051906.txt

```
 9   Q      All right.  But there's no checklist or
10   anything like that for her to go by; she just
11   has to know what to do?
12          BY MS. CLOTFELTER:  Other than the one
13   that --
14   A      Yeah.  I don't know that there was a
15   checklist.  I know that there's no procedures
16   manual.  So if there is a checklist, I am not
17   real familiar with it.
18   Q      (continued by Mr. Underwood)  Okay.  So
19   she just has to memorize these other things that
20   she's supposed to do with regard to --
21   A      Well, hopefully she was -- she was able
22   to take good notes and everything.  I mean, I'm
23   sure she -- you know, we require more of our
0167
 1   employees than just to memorize things.
 2   Q      Okay.
 3
 4   REPORTER'S NOTE:  (At this point, instrument was
 5   marked for identification by the Reporter as
 6   Plaintiff's Exhibit Number 6, after which, the
 7   deposition continued, as follows:)
 8
 9   Q      (continued by Mr. Underwood)  All right.
10   Let me show you Plaintiff's Exhibit Number 6.  I
11   think you had mentioned a ledger card earlier.
12   Let me see if you can identify that for us.
13   A      Do you want me to identify it?
14   Q      Yeah, please do.
15   A      It's a ledger card from the Saucida file.
16   Q      Okay.  I know it's a ledger card, but
17   tell me what -- what's the significance of it
18   and what does it reflect?
19   A      The significance of a ledger card is it
20   shows every -- it shows the entire wire amount
21   that we receive from the lender.
22   Q      Okay.  Where is that?
23   A      The $58,203.00.
0168
 1   Q      Okay.
 2   A      Under "deposits."
 3   Q      All right.  That's the first -- okay,
 4   first line on here.
 5   A      And then it shows every check that was
 6   ever cut on that file, which is the second group
 7   labeled "checks."
 8   Q      Okay.
 9   A      And then it shows under "voids" any of
10   those checks that were voided.  And then it
11   shows what the balance of the file is.
12   Q      All right.  Now, is this something that's
13   generated by that software from the title
14   company you were describing for us earlier?
15   A      Yes.
16   Q      I've looked at a number of these and all
17   or most of them seem to have checks that had
18   been voided.
19   A      Right.
20          BY MS. CLOTFELTER:  Well, let him ask his
21   question.
22   A      Sorry.
23   Q      (continued by Mr. Underwood)  Well, that
```

swaffordgreg051906.txt

0169
1    was going to be my question, why does it have --
2    why are there voided checks on almost all of
3    these transactions?
4    A        Every file will have a recorded -- a
5    voided recording check under the new procedure.
6    Q        All right.  And why is that?
7    A        Because the original -- when the funders
8    fund the loan -- we had different departments.
9    So once the file goes to funding and receives
10   the wire, they cut the check directly from the
11   HUD.  The system does it for them, the computer
12   system, the software system.  Then the mortgage,
13   the original mortgage, and every other legal
14   document that needs to be recorded, is given to
15   the recording department with that check.  I
16   know it sounds redundant, but that's how we do
17   it.  And then that person in recording then goes
18   into Ernst to see what the true and accurate
19   recording is.  Then at that point, they void the
20   check and cut it for the correct amount.  Plus,
21   the closing department doesn't always know the
22   exact -- like Clerk of Court, Judge of Probate
23   recorder, those are basic recordings for the
0170
1    payees for each county, but a lot of counties
2    get more specific.  Like I noticed this one was
3    Clerk of Court, but once they called Ernst, they
4    found out it was Mobile County, Judge of
5    Probate.  Then our recording department is
6    required to know in each county who to make the
7    check payable to.
8    Q        All right.  And these checks are -- does
9    the software generate these from the HUD-1?  The
10   information that's on the HUD-1 statement, is
11   that --
12   A        Yes.
13   Q        All right; okay.
14   A        Well, that's where these come from
15   (indicating).  We don't manually have to type
16   all of these, if that's what you're asking.
17            BY MS. CLOTFELTER:  "These" meaning what?
18            THE WITNESS:  The checks.  I mean, we
19   don't have to --
20            BY MS. CLOTFELTER:  You're indicating on
21   Exhibit 6?
22            BY MR. UNDERWOOD:  Yeah.
23   Q        (continued by Mr. Underwood)  And does
0171
1    the software work this way -- in other words,
2    you fill out this HUD-1.  And we've looked at
3    that.  I think that's Exhibit 4.
4    A        Yes.
5    Q        And you enter the figures in on the
6    HUD-1, and then it automatically generates these
7    checks based on this information that's in the
8    HUD-1; is that how it works?
9    A        They begin that way.
10   Q        Okay.  Well, tell me how it works, then.
11   A        The funder has to go into -- our funder
12   has to go into the system and make any changes
13   that have to be made.  For instance, I told you
14   that our underwriter receives a portion of
                        Page 65

swaffordgreg051906.txt

```
15  the -- what do they call them -- the title
16  insurance, line 1108.  So they go in and they --
17  that's what they call a split, the system offers
18  you to do a split.
19  Q      All right.
20  A      So they don't actually cut that in with
21  the primary check going to Swafford Settlement
22  Services, because it goes into a separate
23  Swafford account that we hold those funds in
0172
 1  until we disburse them to the underwriter.
 2  Q      In this case, Pioneer, American Pioneer?
 3  A      Correct.  The check is still made payable
 4  to Swafford, because it goes into a Swafford
 5  account, and we can't make it payable to
 6  American Pioneer.  But it's cut out of that
 7  account to American Pioneer.
 8  Q      Okay.  Now, these -- looking at the
 9  HUD-1, these sections in the 800 section, these
10  charges in the 800 section, Swafford never
11  received those funds; is that correct?
12  A      No.  Those are Homeowners' net funds.
13  Q      Okay.  In other words, Homeowners deducts
14  its charges from the check before it's ever sent
15  to Swafford; is that the way it works?
16  A      It deducts any checks payable to
17  Homeowners from the wire.
18  Q      Okay.  And that includes the insurance in
19  this case, the line 903?
20  A      Right.  It has us disburse all of its
21  agents' fees, such as ours, the appraiser,
22  things of that nature.
23  Q      All right.  And so those would start at
0173
 1  line 1101?
 2  A      Right.
 3  Q      All right.  And so should there be a
 4  check on here --
 5  A      What did you say, 1101?
 6         BY MS. CLOTFELTER:  What was started on
 7  1101?
 8  A      No, not necessarily, because the
 9  appraiser fee, I believe is higher.  The
10  appraisal fee is actually in the 800 section as
11  well.
12  Q      (continued by Mr. Underwood)  Okay.  And
13  that's something that's paid for by
14  Homeowners -- I mean, by Swafford?
15  A      No.
16  Q      Okay.  Well, let me start over, then.
17  A      Now, not paid for by Swafford, but
18  Swafford cuts the check to the appraiser.
19  Q      All right.
20  A      Yes.
21  Q      Okay.  So there are some in the 800 block
22  that would -- well, for example, 803, Dinkins
23  Appraisal Group, is there a check reflected on
0174
 1  the ledger card for $300.00 to Dinkins Appraisal
 2  Group?
 3  A      There is.
 4  Q      Which one is it?
 5  A      Check number 2912, reference number 2912.
```

Page 66

swaffordgreg051906.txt
```
 6   Q       Oh, I see.  Okay.  You're right.  There
 7   is also one to AllState reflected on line 903,
 8   wasn't there?
 9   A       Yes.
10   Q       Okay.  There's -- the first check is --
11   okay, that's -- I'm getting myself all mixed up.
12   scratch all that.  Let's look at the first one,
13   $213.75, check number 2906.
14   A       That was voided.
15   Q       That means it's voided?
16   A       Correct.
17   Q       Okay.  And it would have went through
18   that process that you described to me earlier;
19   is that --
20   A       That is correct.
21   Q       In other words, it would have gone to
22   your recording department; they would have
23   looked up the actual recording fees?
0175
 1   A       Right.
 2   Q       And then does the check go back to the
 3   bookkeeping department to be voided, or how does
 4   that take place?
 5   A       They can actually void it there.  They
 6   can't actually physically sign it.  They don't
 7   have signing capabilities.  It has to go to an
 8   authorized signer on the account.  I referred to
 9   Glenda Cooper, who's in the recording
10   department.  Now, she actually can physically
11   void the check and reissue it for the correct
12   amount.
13   Q       Okay.  And she --
14   A       And then she takes it to an authorized
15   signer who verifies that the amount of the check
16   voided and that they have the physical check in
17   their hand and that the new check's added to
18   that amount.  They sign off on it, and then she
19   takes the check to the borrower over to the
20   final policy department who holds it until the
21   mortgage comes back recorded, and she takes the
22   check to the recording clerk and either sends it
23   to a courier or to the recorder's office
0176
 1   directly.
 2   Q       Okay.
 3   A       And 2906 is voided, but 3471, 3472 and
 4   12254 add up for that amount.
 5   Q       Okay.  We'll get to those in just a
 6   minute.
 7   A       Okay.
 8   Q       What was the next one before the 2907 to
 9   Swafford & Hays for $740.00?
10   A       I believe that is the 808 -- not 808.
11   Excuse me.  That is 1101 through 1103, I
12   believe.
13   Q       Have you -- have you had a chance to look
14   at that (indicating)?
15   A       Well, I have.  I don't -- I don't recall
16   why we have the policy split this way, because
17   they're all payable to Swafford.  Our funding
18   department would know that.  But checks 2907, 08
19   and 09 add up to our 1100 fees.  And 2910 is
20   added in there also.  I'm sorry.
```
Page 67

swaffordgreg051906.txt
```
21   Q       Okay.  What did you say that Swafford was
22   paid in fees on this case, $1,100?
23   A       500, 700 -- there was a 100 -- $1,075.00
0177
 1   worth of funds that went to Swafford.
 2   Q       Okay.  And that's the sum of --
 3   A       All of the 1100 section.  And checks 2907
 4   through 2910 represent those.
 5   Q       Okay.  The next check number 2911, was
 6   that -- that was loan proceeds that went to the
 7   Saucidas; is that correct?
 8   A       Yes, sir.
 9   Q       We already talked about Dinkins Appraisal
10   Group and AllState.  And number 2914, that's --
11   that's the line 1502, isn't it, the property
12   taxes?
13   A       Yes, 1502.
14   Q       And then 2915 is the payoff of the
15   mortgage?
16   A       Correct.
17   Q       Then the next one, 12254 --
18   A       Uh-huh.
19   Q       -- is that the refund of the filing fee
20   to the Saucidas?
21   A       It is.
22   Q       All right.  And I noticed that it's dated
23   January 31 of '05, and all the -- or most of
0178
 1   the -- the check -- the actual check to the
 2   Clerk of the Court was written on November the
 3   30th.  Do you know why there's such a time gap
 4   between the two checks?
 5   A       Well, it's because it was staledated when
 6   it came back recorded, so we had to void the
 7   check we were holding for them and reissue it.
 8   Q       Say that again.
 9   A       Staledated.  Our escrow checks are only
10   good for so long.  If it's not cashed, we have
11   to reissue them, because the bank won't honor
12   them.
13   Q       Okay.  Well, why didn't you write a check
14   at the same time that the actual recording fee
15   was --
16   A       We did.
17   Q       Okay.
18   A       The date that shows up next to 3470 that
19   has the "V" next to it, that's the date it was
20   voided.
21   Q       Okay.
22   A       That clear date.  Over to the left, if
23   you notice, it was actually cut on November 2004
0179
 1   when all the recording fees were cut.
 2   Q       Okay.
 3   A       And it was reissued on January of 2005,
 4   because it was stale dated, so we had to void it
 5   and reissue it.
 6   Q       All right.
 7   A       The check was no longer good, because we
 8   were holding it that entire time waiting for the
 9   mortgage to come back recorded.
10   Q       Okay.  I understand now.  It shows a
11   clear date of 1/31 of '05 on that, but it was
```
Page 68

swaffordgreg051906.txt

```
12  cleared by being voided?
13  A      Correct.
14  Q      Okay.  So what happened in the Saucida's
15  transaction was that there was a difference
16  between the recording fee and the $120.00 that
17  they were charged?
18  A      Yes.
19  Q      The difference, though, was held by
20  Swafford & Hays until you got the final recorded
21  mortgage back; is that what you're telling me?
22  A      To ensure that there was no difference
23  once it got to the recorder's office.
0180
 1  Q      Well, were they paid any kind of interest
 2  during that period?
 3  A      Paid any kind of interest?
 4  Q      The Saucidas.
 5  A      By us, no.
 6  Q      And all these checks were written on the
 7  escrow account; is that correct?
 8  A      Correct.
 9  Q      Is the escrow account an interest drawing
10  account?
11  A      No, it's not.
12  Q      Is your escrow account, is it -- are
13  those funds ever swept offshore during the
14  evening times and back into the account?
15  A      We do not do that.
16  Q      Okay.  This check 3471, which is the next
17  one, that reflects the tax on the -- payment for
18  the tax on the mortgage, correct?
19  A      Yes, sir.
20  Q      All right.  And the next one, that's the
21  actual recording fee that the Saucidas were
22  charged the $120.00?
23  A      Per page, yes.
0181
 1  Q      Okay.
 2
 3  REPORTER'S NOTE:  (At this point, instrument was
 4  marked for identification by the Reporter as
 5  Plaintiff's Exhibit Number 7, after which, the
 6  deposition continued, as follows:)
 7
 8  Q      (continued by Mr. Underwood) Let me show
 9  you what I've marked as Plaintiff's Exhibit
10  Number 7.  If you would, just identify that for
11  the record for us.
12  A      It's a truth-in-lending disclosure from
13  the Saucidas file.
14  Q      All right.  Involving the same
15  transaction we've been talking about?
16  A      Yes, I would assume so.
17  Q      Let me ask you to look over on the second
18  page.  It would be Saucida page 83.  And if you
19  would, I would ask you to look at line 1201
20  under the heading "Prepaid Finance Charge."
21  A      Okay.
22  Q      And that reflects the $120.00, doesn't
23  it?
0182
 1  A      It does.
 2  Q      Okay.  That's really not accurate, is it?
```
                          Page 69

swaffordgreg051906.txt
```
 3   A      That is accurate as to what was charged
 4   on the HUD.
 5   Q      But it doesn't reflect the true recording
 6   fee; isn't that right?
 7   A      In this case, no, it does not.
 8   Q      All right.
 9   A      It was an estimate.  But the
10   truth-in-lending discloses the itemization of
11   what they financed.  And that full fee was
12   financed, because that is in their loan.
13   Q      Under line 1102, you would agree with me
14   that although it does reflect a $375.00 charge
15   for abstract or title search, it doesn't reveal
16   to who that's paid to; isn't that right?
17          BY MS. CLOTFELTER:  That form?
18   A      This form does not show who that is paid
19   to.
20   Q      (continued by Mr. Underwood)  All right.
21   And the same would be true with regard to title
22   examination?
23   A      Number 1103?
0183
 1   Q      Yes.
 2   A      They did not fill in who it was paid to.
 3   Q      I think you told me, though, that this is
 4   a form that really Swafford has very little, if
 5   anything, to do with?
 6   A      We have nothing to do with it.
 7   Q      All right.  And it comes to you like this
 8   from -- or came to you like this from
 9   Homeowners?
10   A      I noticed this is not a signed copy.  So
11   I would assume this is the one that came to us.
12   But, yes.
13
14   REPORTER'S NOTE:  (At this point, instrument was
15   marked for identification by the Reporter as
16   Plaintiff's Exhibit Number 8, after which, the
17   deposition continued, as follows:)
18
19   Q      (continued by Mr. Underwood)  And let me
20   show you what I have marked now as Exhibit
21   Number 8.  Again, is that another Homeowners'
22   document?
23   A      Yes, it is.
0184
 1   Q      With regard to this same loan that we're
 2   talking about?
 3   A      Yes, it is.
 4   Q      And is that the form that Homeowners
 5   always uses in these transactions?
 6   A      I'm not real familiar with all of the
 7   documents.  I know that this is a document that
 8   I've seen in their packages before.  But as far
 9   as if this is the exact body, I don't know.
10   Q      Okay; all right.  Who would be familiar
11   with that?
12   A      Bill Long.
13   Q      Bill Long?
14   A      Are you talking about with Homeowners?
15   Q      No, with Swafford.
16   A      This particular document is just one that
17   we have to make sure is there.  I don't believe
```
Page 70

swaffordgreg051906.txt
```
18  any Swafford employee has probably ever taken
19  the time to read it in its detail.
20  Q     Okay.
21  A     So Bill Long with Homeowners would be the
22  one that could tell you if it's in every package
23  relating to this.
0185
 1  Q     Okay.
 2
 3  REPORTER'S NOTE:  (At this point, instrument was
 4  marked for identification by the Reporter as
 5  Plaintiff's Exhibit Number 9, after which, the
 6  deposition continued, as follows:)
 7
 8  Q     (continued by Mr. Underwood)  Let me show
 9  you what I've marked as Plaintiff's Exhibit 9.
10  You may or may not have ever seen that document,
11  and you may or may not be familiar with it.  Are
12  you?
13  A     I don't know that I've ever seen it
14  before, but it appears to be an appraisal
15  invoice on their file.
16  Q     All right.  I think you told me earlier
17  that's really not something Homeowners is
18  involved in.  That's not paid by Homeowners,
19  correct?
20  A     No, not paid by Swafford you mean?
21  Q     Swafford.
22  A     Yes, Swafford does not contract out the
23  appraiser.
0186
 1  Q     All right.
 2  A     Homeowners does directly.
 3  Q     Swafford, however, did write the check
 4  for that, but it's based on the information that
 5  came from --
 6  A     Homeowners.
 7  Q     -- from Homeowners?
 8  A     Yes.
 9  Q     Okay.
10
11  REPORTER'S NOTE:  (At this point, instrument was
12  marked for identification by the Reporter as
13  Plaintiff's Exhibit Number 10, after which, the
14  deposition continued, as follows:)
15
16  Q     (continued by Mr. Underwood)  Let me show
17  you what I've marked as Exhibit Number 10.
18  A     Okay.
19  Q     You're familiar with those documents,
20  aren't you?
21  A     I am.
22  Q     All right.  And tell us what it is for
23  the record.
0187
 1  A     When we ask an abstracter to go and
 2  search a property at a courthouse, this is one
 3  example of what comes back from the abstracter.
 4  Every abstracter uses a different format.  But
 5  this is A&B's format.
 6  Q     All right.  You're talking about A&B
 7  Abstracts?
 8  A     Yes.
```
Page 71

swaffordgreg051906.txt

```
 9   Q     All right.  And Homeowners -- I mean,
10   Swafford uses them a lot; is that fair to say?
11   A     I don't know if they're in more than
12   Alabama.  I believe -- I know we've used them a
13   lot in Alabama.  I don't know if they cover more
14   than one state.  Some companies do.
15   Q     Okay.  And let me ask you, if you would,
16   to turn to the next page.  It's A&B 00004.  And
17   are you familiar with how A&B bills Swafford &
18   Hays for its services?
19   A     I'm familiar with how, yes.
20   Q     Okay.  Tell us how it is that they --
21   A     They send an invoice, such as this, to
22   our accountant, but all of -- our accountant
23   requires monthly statements from all of our
0188
 1   abstracters, and then she pays monthly.
 2   Q     Okay; all right.  Now, A&B provided the
 3   abstract for the Saucida closing; is that true?
 4   A     I would assume so, unless there was
 5   another one ordered, but I don't -- I have not
 6   seen another one.
 7   Q     Okay.  Well, can you look at any of the
 8   documents that are here today and tell us
 9   whether or not A&B did the only title search for
10   the Saucida closing?
11   A     Not unless you have an entire file with
12   you.
13   Q     All right.
14   A     But it's a rare occurrence that we use
15   more than one abstracter.
16   Q     Okay.  Well, would that be reflected on
17   the ledger card or disbursement sheet?
18   A     No, it would not.
19   Q     How would you tell if there were more
20   than one appraisal?  I mean, more than one title
21   search done on a file?
22   A     Well, we scan every single document that
23   we have in a file into our system.  So if there
0189
 1   was more than one report, it would be in the
 2   file.  But like I said, it's rare.  But you
 3   asked me can I, you know, assure you of that.  I
 4   can't assure you of that, but I feel very
 5   confident that, yes, this is the only abstracter
 6   that we used.  It's usually only if they have
 7   problems finding documents, and then we'll ask
 8   another abstracter to go out and look and
 9   sometimes they can find it.
10   Q     Okay.  Well, you would have to pay the
11   other abstracter, wouldn't you?
12   A     Yes, we would.
13   Q     All right.  So why wouldn't that be on --
14   reflected on the ledger card?
15   A     Because that's a cost of us doing
16   business.  If we choose -- if we use an
17   abstracter that can't fulfill their obligation
18   to us and we find another abstracter that can,
19   then we used a faulty abstracter and that's
20   something that we choose to pay out of our own
21   pocket.
22   Q     Okay.  And what was the charge for that
23   abstract in this file?
```

Page 72

swaffordgreg051906.txt

0190
1    A       $125.00.
2    Q       And is that a standard charge from A&B,
3    or do you know?
4    A       I do not know.  I noticed that it says,
5    "Back 2 owners to obtain 24 month chain."  So
6    that would definitely be more of a current owner
7    price.  That would not be what they would charge
8    for a full thirty year search.
9    Q       All right.  And do you have any sort of
10   price list from A&B Abstracts?
11   A       I'm sure the lady who handles our
12   abstracts would.
13   Q       What other abstracters do you use?
14   A       Multitudes.
15   Q       All right.
16   A       Because a lot of abstracters are
17   state-specific and county-specific.  So you
18   might have one abstracter in Alabama that covers
19   three counties and have to use another one for
20   another three counties and so on until you cover
21   all the states that we're in.
22   Q       And you have a price list from each of
23   those abstracters, I would assume; is that fair
0191
1    to say?
2    A       We have what we call a generic price
3    list.  It's their basic.  But they vary if
4    there's problems.  If there's additional copy
5    charges, if there's multitudes of things they
6    have to make copies of, it can vary.
7    Q       All right.  Now, let's go back and look
8    at the HUD-1 statement that we -- I believe it's
9    Exhibit 5.  It's Exhibit 4.  And I don't see any
10   payment on here for the -- to A&B Abstracts.
11   And can you tell us why that is?
12   A       We pay the abstracters out of our
13   operating account.
14   Q       Okay.  So on line 1201 where it says --
15   is that -- excuse me -- on line 1102, is that
16   reflected on line 1102?
17   A       Yes.
18   Q       Says, "Payment for abstract or title
19   search."
20   A       Yes.  It's within that cost.
21   Q       Okay; all right.  In other words, on line
22   1102, it says, "Abstract or title search," the
23   actual cost for the abstract or title search was
0192
1    only $125.00 in this transaction; isn't that
2    true?
3    A       The actual cost from A&B Abstracts was
4    $125.00.  The actual abstract or title search
5    was more than that, because our employees were
6    involved in it, too.
7    Q       All right.
8    A       A&B was the contract employee.  And I
9    have to cover costs of all my employees, whether
10   it be contract on-site.
11   Q       Okay.  In what way were your employees
12   involved in it?
13   A       They have to actually -- what comes over
14   from A&B has to be examined and put into our
Page 73

swaffordgreg051906.txt
15  system to issue a commitment. They actually
16  verify the -- they go through all the warranty
17  deeds and we will make copies of the most
18  current deed of trust, most current warranty
19  deeds, any assignments, things of that nature.
20  And our staff actually reviews them all to make
21  sure that they're -- they have all the legals
22  attached; that they've been recorded; that's
23  there's no deficiencies in the documents.
0193
1   Q     Okay. But you got paid for that under
2   line 1103, though, didn't you?
3   A     No.  Like I told you earlier, title
4   examination is from the -- it can be examining
5   the commitment to the HUDs, and making sure that
6   we've fulfilled all the requirements and issuing
7   the policy.
8   Q     All right.
9   A     Title refers to the entire -- title can
10  be anything in the entire process.
11  Q     All right.  Then tell me again what
12  Swafford did to earn the fees under line 1101.
13  A     1101 is settlement or closing fees.  So
14  that's preparing the HUD Settlement Statement,
15  booking the notary or the attorneys, sending the
16  package out, uh, if there's quitclaims involved,
17  warranty deeds involved.
18  Q     Were there quitclaim deeds or warranty
19  deeds involved in this transaction of the
20  Saucidas?
21  A     I don't believe so, because it says the
22  grantee is already Johnny Saucida and Dawn
23  Saucida, which is -- who our borrowers are.
0194
1   Q     All right.  And so then was -- under line
2   1101, then, was the only thing that was done was
3   the settlement package was mailed out?
4   A     Correct.  No.  1101?  No.  We had to do
5   the HUD Settlement Statements.  We had to stuff
6   the package; we had to send the package to the
7   notary.  All of the shipping overnight costs are
8   in that, too, for doing those processes.
9   Q     Okay.  Who performed those services at
10  Swafford & Hays under line 1101?
11  A     It would be our post-closing employees
12  and our closing employees.  And also the notary.
13  Q     Is there any way you can look at these
14  documents and tell who the employees were that
15  actually did the work on it?
16  A     No.  We saw where Jane Carcello signed
17  the one document.  So she obviously stacked the
18  package in post-closing.  As far as what closer,
19  I couldn't tell by these documents.  I couldn't
20  even tell you the notary, because these are not
21  the signed documents.
22  Q     Okay.
23
0195
1   REPORTER'S NOTE:  (At this point, instrument was
2   marked for identification by the Reporter as
3   Plaintiff's Exhibit Number 11, after which, the
4   deposition continued, as follows:)
5
                              Page 74

swaffordgreg051906.txt
```
 6    Q       (continued by Mr. Underwood)  Let me show
 7    you my Exhibit Number 11.  Let's go over it.
 8    A       Okay.
 9    Q       And what is it, for the record, please,
10    sir?
11    A       This is the disbursement worksheet on the
12    Johnny Saucida closing, and it's another format
13    of the ledger card.
14    Q       All right.
15    A       But it gives you more information as to
16    what each check contains.
17    Q       Let me ask you a question about the HUD-1
18    again.  Back on line 1106, it has a place for
19    notary fees, and I noticed that there wasn't
20    anything, and we know that there was a notary
21    used on this.  Why were there no notary fees on
22    line 1106?
23    A       When there's an attorney involved, we
0196
 1    have to list the attorney.  But when there's a
 2    notary involved, we can pay that through our
 3    settlement and closing fee.  And that's just per
 4    our underwriter.
 5    Q       Okay.  And is that the usual practice?
 6    A       Yes, it is.
 7    Q       That the notary's paid out of fees
 8    collected on line 1101?
 9    A       Yes.
10    Q       Okay.
11    A       I think that's been our -- always been
12    our practice.  But I know it's the typical
13    practice now, that's how we do it.
14    Q       Okay.  The typical practice on all of
15    your loans is that the notary -- if it's closed
16    by a notary, they're paid out of fees collected
17    on line 1101?
18    A       Right.
19    Q       How much did the notary charge in this
20    transaction; do you know?
21    A       No, I do not know.
22    Q       And do you have a schedule of fees that
23    you pay to notaries?
0197
 1    A       No.  It's whatever they charge us for
 2    that transaction, depending on how far they're
 3    driving, where the closing takes place.  It
 4    varies per file.
 5    Q       And this disbursement sheet, again, is
 6    that something that's generated by the software
 7    that prepares the closings for you?
 8    A       Yes.
 9    Q       Okay.
10
11    REPORTER'S NOTE:  (At this point, instrument was
12    marked for identification by the Reporter as
13    Plaintiff's Exhibit Number 12, after which, the
14    deposition continued, as follows:)
15
16    Q       (continued by Mr. Underwood) I'll just
17    ask you to identify Exhibit 12.
18    A       Exhibit 12 is a check to Mobile County
19    Judge of Probate, and it appears to be the
20    cleared check.
```
                            Page 75

swaffordgreg051906.txt

```
21   Q      Okay.
22   A      And it references our filing for the
23   Saucidas.
0198
 1   Q      All right.  And are those all the checks
 2   that were written for the Saucida's closing?
 3   A      All this (indicating)?
 4   Q      Yeah.  There are a number of them in
 5   there.
 6          BY MS. CLOTFELTER:  On Exhibit 12.
 7          BY MR. UNDERWOOD:  Yes.
 8   A      Let me see.  Yes, it appears -- yes.
 9   Q      (continued by Mr. Underwood)  All right.
10   Again, there's no check in there to an
11   abstracter or to a notary; isn't that right?
12   A      That is correct.
13   Q      Okay.
14          BY MR. UNDERWOOD:  Do you all want to
15   take a break for a minute?
16          BY MS. CLOTFELTER:  Sure.
17
18   REPORTER'S NOTE:  (At this point, a brief recess
19   was taken, after which, the deposition
20   continued, as follows:)
21
22   REPORTER'S NOTE:  (At this point, instrument was
23   marked for identification by the Reporter as
0199
 1   Plaintiff's Exhibit Number 13, after which, the
 2   deposition continued, as follows:)
 3
 4   Q      (continued by Mr. Underwood)  Okay.  Let
 5   me show you what I've marked now as Defendant's
 6   Exhibit 13.  Just identify that for the record
 7   for us.
 8   A      It's a Pearlie Finch Settlement
 9   Statement.
10   Q      All right.  And do you understand that to
11   be the same Pearlie Finch that filed the suit
12   down in Mobile County Circuit Court?
13   A      Yes.
14   Q      And let's go through it right quick.
15   Let's see, we've got the items in the 800 block.
16   And again, those are all supplied to you by
17   Homeowners in this case as well?
18   A      Right.
19   Q      And this is another Homeowners' loan; is
20   that right?
21   A      Yes, it is.
22   Q      Okay.  And lines 1101 through 1103,
23   they're the same as in the Saucida closing; is
0200
 1   that right?
 2   A      I assume.  I think they are.  Yes.
 3   Q      All right.  And same charge on line 1201;
 4   is that correct?
 5   A      Yes.
 6          BY MS. CLOTFELTER:  1201?  Okay.
 7   Q      (continued by Mr. Underwood)  And then
 8   line 1203, that's the actual tax on the deed; is
 9   that right?
10   A      Uh-huh.
11   Q      All right.
```

Page 76

swaffordgreg051906.txt

```
12
13   REPORTER'S NOTE:  (At this point, instrument was
14   marked for identification by the Reporter as
15   Plaintiff's Exhibit Number 14, after which, the
16   deposition continued, as follows:)
17
18   Q      (continued by Mr. Underwood)  Let me show
19   you what I've marked as Plaintiff's Exhibit 14.
20   It's headed "Closing Instructions."  Is that
21   with regard to the --
22   A      Pearlie Finch?
23   Q      Ms. Finch's loan?
0201
 1   A      Yes, it is.
 2   Q      All right.
 3
 4   REPORTER'S NOTE:  (At this point, instrument was
 5   marked for identification by the Reporter as
 6   Plaintiff's Exhibit Number 15, after which, the
 7   deposition continued, as follows:)
 8
 9   Q      (continued by Mr. Underwood)  I'm going
10   to go ahead and mark the next exhibit.  It's
11   something I'm curious about.  It looks like
12   there were two sets of closing instructions with
13   regard to that loan.  Do you know why there
14   would be two sets of closing instructions?
15   A      No.  It could be several situations.  It
16   could be that we attempted to close the loan and
17   something didn't occur.  It didn't occur for one
18   reason or another, so we rescheduled it for a
19   different day.  It could be that she objected to
20   fees and we had to redo fees.  Anything that
21   would cause it to change, it would cause a
22   different set to come through.
23   Q      Okay.  Well, can you -- can you look at
0202
 1   them and tell us what the problem was, if there
 2   was one?  They're in completely different
 3   formats, too.  Is there any significance to
 4   that?
 5   A      I don't know.
 6          BY MS. CLOTFELTER:  Don't guess, if you
 7   don't know.
 8   A      Yeah.  I just plain don't know, because
 9   neither one of these are the doc order that we
10   get.  So that's not the reason.  They're both
11   the same dates.  So I do not know, unless they
12   had two sets in this one.  But why they would
13   have two sets, I don't know.
14   Q      All right.
15   A      It would have had to have come over in
16   their closing package.  But why they had two
17   sets with two different sets of orders, I don't
18   know.
19   Q      All right.  Let's look at Exhibit 15.
20   Down there there's -- it says, "Loan Closer:
21   Kiva Hicks."  Do you know who that is?
22   A      "Loan closer:  Kiva Hicks."  You're on
23   15?
0203
 1   Q      Yeah, we're on Exhibit 15.
 2   A      That's the loan officer that works for
                       Page 77
```

swaffordgreg051906.txt

```
 3   Homeowners Loan.
 4   Q      Okay; all right.  That's not the notary?
 5   A      No, that is not the notary.
 6   Q      Okay.  And I meant to ask you a couple of
 7   questions about the -- if we could go back to
 8   Ms. Gibbs's HUD-1 form and I just wanted you to
 9   verify --
10   A      Did you mean to say Ms. Finch rather
11   than --
12   Q      Yeah, Ms. Finch's HUD-1 form.
13   A      Okay.
14   Q      I just wanted you to verify for me that
15   there's no charge on that form either for a
16   notary or for an abstracter; isn't that true?
17   A      There is no charge payable to the
18   abstracter or the notary on this HUD.
19   Q      Okay.  Did A&B do this abstract on this
20   transaction as well?
21   A      I don't know.
22   Q      Okay.  Look on, if you would, on Exhibit
23   15, page 43.  It's the next page.  And do you
0204
 1   know who that person is that signed as
 2   Settlement Officer?
 3   A      Eric Hart.
 4   Q      All right.  And who is she?
 5   A      She was also in our post-closing
 6   department.
 7   Q      Okay.  And what's the significance of her
 8   signing this document?
 9   A      That means that she was the one who
10   actually stacked it and checked on the
11   documents.  The same thing that Jane Carcello
12   did on the other file.
13   Q      I see.  And look at 14.  There are some
14   initials down here in the bottom corner.  Do you
15   know -- on 14.
16   A      Oh, Exhibit 14?
17   Q      Yeah.  Yeah, there's some initials down
18   there at the bottom.  Do you know whose those
19   are?
20   A      It looks like PF.  Pearlie Finch,
21   probably.
22   Q      All right.  And what about these over
23   here in the margin?
0205
 1   A      MD?
 2   Q      Yeah.
 3   A      That would -- that should be -- I don't
 4   know.  I guess that would be one of our
 5   employees.
 6   Q      I mean --
 7   A      But they didn't sign it as settlement
 8   agent, so I don't know who that would be.
 9   Q      Okay.  Well, the borrower usually doesn't
10   see these closing instructions, or do they?
11   A      It goes -- it's in the package that's
12   sent to the notary.  So if the notary allows
13   them to view it, then they initial it.
14   Q      I see.  Okay.
15   A      So I guess they did see it in this case.
16
17   REPORTER'S NOTE:  (At this point, instrument was
```

swaffordgreg051906.txt
```
18   marked for identification by the Reporter as
19   Plaintiff's Exhibit Number 16, after which, the
20   deposition continued, as follows:)
21
22   Q      (continued by Mr. Underwood)  Okay.
23   Exhibit 16, is that the ledger card for the
0206
1    Finch transaction?
2    A      Yes.
3    Q      And can you look at it and tell was it
4    generated by the same software that we've been
5    talking about, or was it the predecessor to the
6    one that you're using now?
7    A      It appears to be the same software.  When
8    was this closed?  Yes, in '04.  This was
9    Aptitude.
10         BY MS. CLOTFELTER:  It was Aptitude?
11         THE WITNESS:  Uh-huh.
12   Q      (continued by Mr. Underwood) All right.
13   And it has voided checks down at the bottom of
14   it as well, and would it have been subject to
15   the same procedure that you described for me
16   before with regard to the Saucida transaction?
17   A      What do you mean "subject to the same
18   procedure?"
19   Q      Well, where a check was written for the
20   filing fee, and then later voided in your
21   recording department?
22   A      The 37723 would be the same procedure
23   where we voided it in the recording department.
0207
1    It appears that the 37727 was because Ms. Finch
2    ended up asking us to wire her funds, because
3    you'll notice a wire at the bottom of the
4    checks.
5    Q      All right.
6    A      So we must have voided the physical check
7    and wired them.
8    Q      No, I don't see that.  Show me what
9    you're talking about.
10   A      Her check was voided, and then the very
11   last one up here, right under --
12   Q      I see.
13   A      It says "wire" instead of "check number."
14   Q      All right.  Those are the funds that were
15   paid to Ms. Finch at the closing?
16   A      Correct.
17   Q      Okay.  But now check number 37723 was
18   voided?
19   A      Uh-huh.
20         BY MS. CLOTFELTER:  Yes?
21         THE WITNESS:  Yes.  I'm sorry.
22   Q      (continued by Mr. Underwood)  And can you
23   look at the ledger card and tell us what was the
0208
1    actual recording fee, less the tax, for Ms.
2    Finch's transaction?
3         BY MS. CLOTFELTER:  Less the tax?
4    Q      (continued by Mr. Underwood)  Is it this
5    $33.00 that's reflected by check 38610?
6    A      I don't know, because there's a 3809 for
7    69 as well.
8    Q      All right.  But we can see that on the
```
Page 79

swaffordgreg051906.txt
```
 9   HUD-1.  That's for the tax, isn't it?
10   A      Yes.
11   Q      All right.
12   A      That should be for the tax, yes.
13   Q      All right.  So, in other words, is it
14   accurate to say that Ms. Finch was charged
15   $120.00 for a charge that was really on the 33?
16   A      Yes, it appears so.
17   Q      Okay.  And is it also true that this
18   is -- this happened before you changed your
19   policy and started refunding the difference back
20   to the borrowers; is that right?
21   A      Yes, sir.
22   Q      All right.  And there's been no refund to
23   Mrs. Finch?
0209
 1   A      Now, since this is prior, I can't tell
 2   you that, because if anybody -- we -- if
 3   someone -- if a borrower ever called and
 4   requested a refund, we did refund the funds to
 5   them if we saw that they were still on our
 6   account.  I don't know that she ever called and
 7   requested one.  But according to this, there
 8   wasn't one at this time.
 9   Q      All right.  Have you ever had a borrower
10   call and request a refund of overage on the
11   projected recording fee?
12   A      Yes, I have.
13   Q      How many times?
14   A      Very few.
15   Q      Less than ten?
16   A      Probably so.
17   Q      Now, you qualified that statement by
18   saying if you still had the funds, you would
19   refund them to the borrower, didn't you?
20   A      Yes, I did.
21   Q      All right.  And if you didn't still have
22   the funds, you would not refund the borrower;
23   isn't that right?
0210
 1   A      Well, actually, we always had the funds
 2   when they asked for it.  So I shouldn't have
 3   even said it that way.  But, yes.  I was
 4   thinking if we hadn't used them for assignments
 5   or releases.  But back then, we didn't even know
 6   when we had used those.  So it would have been,
 7   yes, we did that.
 8   Q      All right.  And you weren't -- and it's
 9   true, too, back at this point in time you were
10   not holding the funds in trust for the
11   borrowers; you would just put them in your
12   general operating account; isn't that right?
13   A      Yes, sir.
14   Q      And the same is true, too, with regard to
15   the charges from A&B Abstracts with the
16   Saucida's transaction, isn't it?
17          BY MS. CLOTFELTER:  Object to the form,
18   unless you specify what you're talking about.
19   Q      (continued by Mr. Underwood)  You can
20   answer, if you understood my question.  If you
21   didn't, I'll rephrase it.
22   A      Well, the way I understood your question,
23   the answer would be no.
```
Page 80

swaffordgreg051906.txt
0211
1           BY MS.  CLOTFELTER:  Well, state how you
2   understood it just so the record's clear.
3   A       We never held any funds for an abstracter
4   on behalf of the borrower.
5   Q       (continued by Mr. Underwood)  Okay.
6   Well, let me ask the question this way.  On line
7   1102 on the Saucida transaction, it reflects,
8   does it not, a fee for abstract or title search;
9   isn't that true?
10  A       Yes, it does.
11  Q       All right.  And we looked at the invoice
12  for that, and the actual charge for that from
13  A&B Abstracts was $125.00, correct?
14  A       Yes, it is.
15  Q       All right.  And the rest of those funds
16  were retained by Swafford?
17  A       For doing the abstract and title search,
18  yes.
19  Q       Well, the rest of those funds were
20  retained by Swafford; isn't that true?
21  A       Yes, it is, for doing the abstract and
22  title search.
23  Q       Okay.  But Swafford didn't do the title
0212
1   search, did it?  That was done by A&B.
2   A       We didn't actually physically go to the
3   courthouse, no.
4   Q       All right.
5   A       Well, our contract employee did.
6   Q       And the charges reflected on the HUD-1,
7   it's a markup of the charge made by the
8   contracting employee; isn't that true?
9   A       That is not true.  We don't mark up our
10  fees.
11  Q       Well --
12  A       That is the cost for us doing that.
13  Q       Yeah.  Well, you marked it up to cover
14  those costs; isn't that right?
15  A       There's no markup if that is the actual
16  cost.
17
18  REPORTER'S NOTE:  (At this point, instrument was
19  marked for identification by the Reporter as
20  Plaintiff's Exhibit Number 17, after which, the
21  deposition continued, as follows:)
22
23  Q       (continued by Mr. Underwood)  And if you
0213
1   would, just identify these for the record.  And
2   I would ask you, if you would, to just check
3   those off and make sure they're all there and
4   all written for the Finch transaction.
5   A       They're all of the actual physical checks
6   that are covered here, yes.
7   Q       All right.
8   A       The wire, of course, there's no
9   confirmation for that.
10  Q       Sure.  I understand.
11
12  REPORTER'S NOTE:  (At this point, instrument was
13  marked for identification by the Reporter as
14  Plaintiff's Exhibit Number 18, after which, the
                    Page 81

swaffordgreg051906.txt
```
15  deposition continued, as follows:)
16
17  Q      (continued by Mr. Underwood)  And this is
18  Exhibit 18.  Is that the disbursement sheet of
19  the Finch transaction?
20  A      Yes, it is.
21  Q      And that's generated by the same software
22  we've been talking about, correct?
23  A      Correct.
0214
 1  REPORTER'S NOTE:  (At this point, instrument was
 2  marked for identification by the Reporter as
 3  Plaintiff's Exhibit Number 19, after which, the
 4  deposition continued, as follows:)
 5
 6  Q      (continued by Mr. Underwood)  And just
 7  tell us, for the record, what Exhibit 19 is.
 8  A      It's a Homeowners' form.  It says "ECOA
 9  Notice."
10  Q      And that's with regard to Ms. Finch's
11  transaction also?
12  A      Yes, it is.
13  Q      And is it just like the one that was in
14  the Saucida transaction?  You don't have to read
15  it word-for-word.  Just compare them and see if
16  it looks like the same form, if you would, for
17  me.
18  A      It appears to be the same basic form,
19  yes.
20
21  REPORTER'S NOTE:  (At this point, instrument was
22  marked for identification by the Reporter as
23  Plaintiff's Exhibit Number 20, after which, the
0215
 1  deposition continued, as follows:)
 2
 3  Q      (continued by Mr. Underwood)  All right.
 4  Is this the HUD-1 from the Gibbs transaction?
 5          BY MS. CLOTFELTER:  Is that Exhibit 20?
 6          BY MR. UNDERWOOD:  Yes.
 7  A      Yes, it is.  It's from the Gibbs
 8  transaction.
 9  Q      (continued by Mr. Underwood)  And it
10  reflects the same 1101 through 1103 charges as
11  the other two transactions; is that right?
12  A      Yes, sir.
13  Q      And it's the same $120.00 recording fee
14  for the mortgage?
15  A      Oh, yes, sir.
16
17  REPORTER'S NOTE:  (At this point, instrument was
18  marked for identification by the Reporter as
19  Plaintiff's Exhibit Number 21, after which, the
20  deposition continued, as follows:)
21
22  Q      (continued by Mr. Underwood)  And Exhibit
23  21, are those the closing instructions?
0216
 1  A      These are closing instructions for this
 2  file, yes, for the Mary Gibbs file.
 3
 4  REPORTER'S NOTE:  (At this point, instruments
 5  were marked for identification by the Reporter
```
Page 82

swaffordgreg051906.txt
```
 6   as Plaintiff's Exhibits Numbered 22 & 23, after
 7   which, the deposition continued, as follows:)
 8
 9   Q     (continued by Mr. Underwood) Okay.
10   Exhibit 22, can you tell us what that is?
11   A     It is a file ledger for James Gibbs.
12   Q     All right.
13   A     This is not the same -- yes, it's a file
14   ledger for Gibbs.
15   Q     Okay.  Is that a different -- that's a
16   different format.  Was that the predecessor
17   software or --
18   A     It looks like it might be Aptitude.  I
19   mean, not Aptitude, but -- it was before
20   Aptitude.  We have three software systems.
21   Q     All right.  You can use that to check to
22   make sure these are all the cancelled checks
23   that ended up on that transaction.
0217
 1         BY MS. CLOTFELTER:  Exhibit 23 is the
 2   checks.
 3   A     Oh, yeah.  There's two checks missing in
 4   this one (indicating).
 5   Q     (continued by Mr. Underwood)  Which
 6   checks are missing?
 7   A     34080 and 34377.
 8   Q     And what are those checks for?
 9   A     Looks like the 26 -- Baldwin County Judge
10   of Probate was that one.  It looks like it's
11   probably the tax check.  I don't know what that
12   one's for.  Part of recording, obviously.  The
13   other one was to Swafford for fifteen cents.  I
14   don't know what that is.
15   Q     Well, let me ask you this now.  Can you
16   look at those and tell me what the actual
17   recording fee, less the tax, was in the Gibbs
18   transaction?
19   A     Oh, actually, yes, I can.  That's what
20   the fifteen cents was for.  The actual total
21   cost was $263.35.
22   Q     But which portion of that was for the --
23   was for the recording as opposed to the tax?
0218
 1   A     I can't tell by looking at this.
 2   Q     All right.
 3   A     It's not separated.
 4
 5   REPORTER'S NOTE:  (At this point, instrument was
 6   marked for identification by the Reporter as
 7   Plaintiff's Exhibit Number 24, after which, the
 8   deposition continued, as follows:)
 9
10   Q     (continued by Mr. Underwood)  Okay.  Let
11   me show you this Exhibit Number 24 and ask you
12   if you can tell me based on that.  Is that the
13   amount that it actually was, $86.00?
14   A     I don't know that.  I can't find where
15   the --
16   Q     Well, let me ask you --
17         BY MS. CLOTFELTER:  Take as long as you
18   need to look at it.
19   Q     (continued by Mr. Underwood)  Well, we'll
20   do it this way, we'll take that line 1201, which
```
Page 83

swaffordgreg051906.txt
```
21    is $120.00, and then we add the line 1203 and
22    that gives us $349.50.
23    A      Uh-huh.
0219
 1    Q      How much was the actual check written to
 2    the Baldwin County Probate Court?
 3    A      How much was the actual check written
 4    for?
 5    Q      Yes.
 6    A      $263.50.  What I do know about Gibbs and
 7    Finch, though, is that one of these two, the
 8    check -- these checks came back short and we had
 9    to pay it out of the operating account, and it
10    was for the exact amount we had charged on the
11    HUD to begin with.  And I do not know if that
12    was Gibbs or Finch, but it's in the
13    documentation we sent to you earlier.
14    Q      All right.
15    A      So when you asked me to tell you if
16    that's the actual amount of recording, that's
17    the actual amount we sent on Gibbs and that's
18    the actual amount we sent on Finch.  That
19    doesn't mean that was the actual amount that it
20    took to record those mortgages, because that was
21    prior to holding out the borrower's extra funds.
22    So it would have been taken from our operating
23    account.
0220
 1    Q      Okay.  Well, do you have some documents
 2    with you this afternoon that would reflect what
 3    you've just told me?
 4    A      No, but everything has been sent to you,
 5    because we printed out Ernst for you on both
 6    files and sent it to you to showing you what the
 7    actual costs were.
 8    Q      The actual costs would be something
 9    different than what's shown on the disbursement
10    sheet?
11    A      The actual cost is what was on the HUD.
12    Whoever funded that loan made a mistake.
13    Q      Well, why don't I -- let me ask you to do
14    this, let me give you this calculator and if you
15    would, just based on the disbursement sheet and
16    the HUD-1, I want to ask you if Swafford
17    retained any -- let me ask it this way.  Please
18    take the calculator and tell me based on the
19    HUD-1 disbursement sheets sitting in front of
20    you this afternoon, it appears that Swafford
21    retained any money out of that -- those monies
22    for recording fees.
23           BY MS. CLOTFELTER:  Object to the form as
0221
 1    to what it appears.  I think he's just explained
 2    to you what he believed actually happened.  I
 3    object to asking him to speculate about what it
 4    appears to be as opposed to what it is
 5           BY MR. UNDERWOOD:  Well, I'm not asking
 6    him to speculate.  I'm asking him to use a
 7    calculator and just add it up and tell us if --
 8    A      Swafford deposited some of the recording
 9    fees on both files into their operating account.
10    But in one of those cases those funds were used
11    later to pay the shortage, because it was done
```
Page 84

swaffordgreg051906.txt
```
12  as a mistake.
13  Q     (continued by Mr. Underwood)  All right.
14  Now, if you would, please, sir, please take the
15  documents in front of you and maybe you can tell
16  us how much Swafford retained in its account
17  with regard to the Gibbs transaction.
18  A     $86.00.
19  Q     Okay.
20
21  REPORTER'S NOTE:  (At this point, instrument was
22  marked for identification by the Reporter as
23  Plaintiff's Exhibit Number 25, after which, the
0222
 1  deposition continued, as follows:)
 2
 3  Q     (continued by Mr. Underwood)  And Exhibit
 4  25, is that the truth-in-lending disclosure with
 5  regard to the Gibbs transaction?
 6  A     Yes, it is.
 7  Q     All right.
 8  A     It is one of them.  I'm reluctant to tell
 9  you one-hundred percent sure on any of these
10  documents, because you're giving me the unsigned
11  copies instead of the signed copies.  And we may
12  get more than one version if the one doesn't
13  close the same day; if anything is changed
14  between the borrower and the lending company.
15  But based upon what you're giving to me, I see
16  no reason that these are not the ones that were
17  used at closing.
18        BY MR. UNDERWOOD:  Okay.  Let's take a
19  quick break.
20
21  REPORTER'S NOTE:  (At this point, a brief recess
22  was taken, after which, the deposition
23  continued, as follows:)
0223
 1  Q     (continued by Mr. Underwood)  We just
 2  took a break and I obtained some more copies of
 3  the Gibbs documents, and were you able to
 4  compare the unsigned HUD-1 that we already had
 5  with one of the signed copies?
 6  A     Yes, I have.
 7  Q     Do they appear to be the same thing?
 8  A     Yes, and so does the truth-in-lending.
 9  Q     All right.
10
11  REPORTER'S NOTE:  (At this point, instrument was
12  marked for identification by the Reporter as
13  Plaintiff's Exhibit Number 26, after which, the
14  deposition continued, as follows:)
15
16  Q     (continued by Mr. Underwood) And let me
17  show you what I've marked as Exhibit 26.  We may
18  have already talked about that.  Would you
19  identify that for the record for us?
20  A     This is the Gibbs ECOA Notice that comes
21  from Homeowners.
22  Q     Okay.
23
0224
 1  REPORTER'S NOTE:  (At this point, instrument was
 2  marked for identification by the Reporter as
```

swaffordgreg051906.txt
```
 3   Plaintiff's Exhibit Number 27, after which, the
 4   deposition continued, as follows:)
 5
 6   Q     (continued by Mr. Underwood) And we have
 7   another Exhibit, 27.  Would you identify that
 8   for the record for us?
 9   A       27 is the Defendant's Responses to
10   Discovery which has the Gibbs closing package in
11   it that's signed.
12   Q     All right.
13
14   REPORTER'S NOTE:  (At this point, instrument was
15   marked for identification by the Reporter as
16   Plaintiff's Exhibit Number 28, after which, the
17   deposition continued, as follows:)
18
19   Q     (continued by Mr. Underwood)  And let me
20   show you what I'm marking as Exhibit 28.  And if
21   you would, identify that for the record for us.
22   A       This is A&B's abstract invoice for Mary
23   Gibbs's file.
0225
 1   Q     All right.  And is the same thing true
 2   with regard to line 1102 on the Gibbs HUD-1?
 3   That's the line that says abstract or title
 4   search to Swafford & Hays, $375.00.  For the
 5   actual abstract or title search, $90.00 was paid
 6   to A&B by Swafford & Hays, and the remainder of
 7   the charges on that line were retained?
 8   A       All funds on that line were retained into
 9   Swafford's account, and Swafford paid A&B as one
10   of their expenses for that.
11   Q     Okay.  Thank you.
12
13   REPORTER'S NOTE:  (At this point, instrument was
14   marked for identification by the Reporter as
15   Plaintiff's Exhibit Number 29, after which, the
16   deposition continued, as follows:)
17
18   Q     (continued by Mr. Underwood)  And let me
19   show you what I've marked as Exhibit 29.  If you
20   would, just identify that for the record, if you
21   would.
22   A       Closing instruction for Mary Gibbs.
23
0226
 1   REPORTER'S NOTE:  (At this point, instrument was
 2   marked for identification by the Reporter as
 3   Plaintiff's Exhibit Number 30, after which, the
 4   deposition continued, as follows:)
 5
 6   Q     (continued by Mr. Underwood) Let me show
 7   you what I've marked as Exhibit 30 and ask you
 8   if you've ever seen that document.
 9   A       I don't believe I've ever seen that, but
10   it appears to be their basic price list.
11         BY MS. CLOTFELTER:  Whose basic price
12   list?
13   A       For A&B Abstracts.
14   Q     (continued by Mr. Underwood) All right.
15   And do you know if those are the charges that
16   A&B has charged Swafford & Hays for the
17   abstracts that it's done?
```
                        Page 86

swaffordgreg051906.txt
```
18   A      I don't know that, but --
19   Q      Who would know that?
20   A      Mazet Mattingley.
21   Q      All right.
22
23   REPORTER'S NOTE:  (At this point, instrument was
0227
1    marked for identification by the Reporter as
2    Plaintiff's Exhibit Number 31, after which, the
3    deposition continued, as follows:)
4
5    Q      (continued by Mr. Underwood) And let me
6    ask you to identify Exhibit 31.
7    A      This is the Abstracter Agreement that we
8    use with our abstracters.  This one is with A&B
9    Abstracts.
10   Q      And is there any other agreement or price
11   list between Swafford and A&B Abstracts, other
12   than Exhibits 30 and 31?
13          BY MS. CLOTFELTER:  Object to the form.
14   He hasn't identified 30 as being between him and
15   A&B Abstracts or as a relevant price list.
16   Q      (continued by Mr. Underwood)  Well, I'll
17   just repeat the question.  Is there any other
18   price list or contract between Swafford & Hays
19   and A&B Abstracts, other than what I've shown
20   you in 30 and 31?
21          BY MS. CLOTFELTER:  Object to the form of
22   the question.  It still misstates his testimony.
23          BY MR. UNDERWOOD:  I don't think it does.
0228
1    Q      (continued by Mr. Underwood)  You can go
2    ahead and answer.
3    A      The only agreement that I know of between
4    A&B Abstracts and myself is Number 31.
5    Q      Okay; all right.  And you don't have any
6    other price lists, other than the one that I
7    showed you?  And when I -- and I'm not asking --
8    I'm not implying that you have that price list.
9    Do you know of any other price lists in the
10   position of Swafford & Hays?
11   A      No.  But unfortunately, I didn't even
12   know about this one, so --
13   Q      All right; okay.  Let me show you what we
14   marked earlier as Plaintiff's Exhibit Number 3.
15   If you would, please, sir, I would like for you
16   to take Plaintiff's Exhibit Number 3 and see if
17   you can tell us if -- with regard to this file
18   number 051031 there were any monies retained by
19   Swafford & Hays with regard to the line 1201
20   recording fees.
21   A      No, there was not.
22   Q      I'm sorry, there was not?
23   A      No.
0229
1    Q      All right.  Can you tell me why there
2    appeared to me that there was?
3    A      If you look at line 1202, which is for
4    $294.00, that amount -- let me make sure I'm
5    looking at this right.  That amount was cut in
6    check number 25357.  If you look at line item
7    1203 for $514.50, that was cut in check number
8    25358.  If you look at the recording fees for
```
Page 87

swaffordgreg051906.txt
```
 9    1201, that was cut and voided.  The original
10    check was for 25319.  It was then voided and
11    $45.00 went to Traci Durrance, and the remaining
12    $180.00 went to Hillsborough County Clerk in
13    25359.
14    Q     Let me ask it this way.  Let me ask you
15    isn't this true, that the money was retained,
16    but then later refunded to Traci Durrance,
17    $45.00?
18    A     The $45.00 was never deposited into any
19    Swafford settlement account.  It was always cut
20    to Traci Durrance.
21    Q     All right.
22    A     Because -- well, the check was
23    immediately voided after it was cut for the
0230
 1    wrong amount to the Clerk's office, but it was
 2    never cut to Swafford.
 3    Q     Well, isn't this like the Saucida
 4    transaction where it was refunded?
 5    A     Was the Saucida -- it's like the Saucida
 6    transaction in that we cut a check to the
 7    borrowers, yes, and that was the refund.  But
 8    those funds to the Saucidas never went into the
 9    Swafford account, either.  It went into our
10    escrow account.
11    Q     Other than the escrow account --
12    A     But it never went into our operating
13    account.
14    Q     Right, right.  And in both the Saucida
15    transaction and this Durrance transaction, what
16    we've been talking about is true, isn't it, that
17    the 1201 -- line 1201 filing fees were only an
18    estimate?
19    A     Correct.
20    Q     All right.  Now, I'm going to run
21    through -- I'm going to run through just a
22    sample of these transactions and see if you can
23    tell me -- let's see.  And if you want to use
0231
 1    the calculator, there it is.
 2
 3    REPORTER'S NOTE:  (At this point, instrument was
 4    marked for identification by the Reporter as
 5    Plaintiff's Exhibit Number 31, after which, the
 6    deposition continued, as follows:)
 7
 8    Q     (continued by Mr. Underwood)  Let me show
 9    you what I've marked as Exhibit 32.  I would ask
10    you if Swafford retained any funds with regard
11    to that transaction?
12    A     Yes, we did.
13    Q     All right.  And how much was it?
14    A     It appears to be $85.50.
15    Q     And I'm sorry, was that the Franklin
16    transaction?
17    A     Jack Franklin.
18    Q     Yeah.  Okay.  I had another question.
19          BY MS. CLOTFELTER:  What's the date?
20          THE WITNESS:  July of '04.
21          BY MS. CLOTFELTER:  Okay.
22    Q     (continued by Mr. Underwood) And that
23    money just went over into -- the overage just
```
Page 88

swaffordgreg051906.txt

0232
```
 1  went over into Swafford's general operating
 2  account like you described for us before?
 3  A      Yes, sir.
 4  Q      Okay.  Would you tell me what line 1111
 5  represents on that Settlement Statement for that
 6  transaction?
 7  A      Endorsement -- there was some type of an
 8  endorsement, whether it be a mobile home
 9  endorsement.  It's an additional -- endorsements
10  are additional coverages that some lenders will
11  require up and above the normal coverage.  Such
12  as -- if it's a mobile home, they have to have
13  an additional one.  That's the one that's
14  popping into my head.
15  Q      Okay.  And the same is true with regard
16  to this transaction, too, with regard to the
17  payment for abstract or notary, that there are
18  no -- there are no payments disclosed directly
19  to an abstract or a notary on this transaction;
20  isn't that true?
21  A      Let me make sure.  Yes, there is no
22  notary and no abstracter listed on the HUD
23  Settlement Statement.
```
0233
```
 1  Q      Okay; all right.
 2
 3  REPORTER'S NOTE:  (At this point, instrument was
 4  marked for identification by the Reporter as
 5  Plaintiff's Exhibit Number 33, after which, the
 6  deposition continued, as follows:)
 7
 8  Q      (continued by Mr. Underwood)  Okay.  Let
 9  me show you Exhibit 33.  I believe it's the
10  Robert McDaniel transaction.  I would ask you if
11  there were any funds retained by Swafford with
12  regard to that transaction?
13  A      Yes, there were.
14  Q      And can you tell us how much?
15  A      Yeah.  In the amount of $66.50.
16  Q      All right.  Which line are you looking
17  at?
18  A      When I tell you the amount?
19  Q      Yes.
20  A      It's typically grouped.  If you look at
21  the checks on the ledger card and you look to
22  see what the correct payees and the amounts are,
23  it's almost always right above it, whether it be
```
0234
```
 1  the borrower or us.
 2  Q      Okay.  I see.
 3  A      Yeah.
 4  Q      The $66.50?
 5  A      Uh-huh.
 6  Q      All right.  And is the same true of this
 7  one, that there's no --
 8  A      Appraiser or notary?
 9  Q      There's no appraiser or notary paid on
10  this transaction?
11  BY MS. CLOTFELTER:  Object to the form.
12  Go ahead and answer the question.
13  A      There is no appraiser or notary listed on
14  the HUD Settlement Statement.
```
Page 89

swaffordgreg051906.txt
```
15   Q      All right.  Let me ask you this.  Maybe I
16   won't have to ask you on all of these.  Does
17   Swafford ever have a charge on any of these
18   HUD-1s for an appraiser or a notary that was
19   paid directly --
20   A      Oh, I said appraiser, too, and neither
21   one of us is saying the right thing.  The
22   abstracter and notary are not listed.
23   Q      You're right.  That's what I mean, the
0235
1    abstracter and notary.
2    A      Because the appraiser is listed.
3    Q      Right.
4    A      But we don't hire the appraiser.
5    Q      It's getting late in the afternoon.
6    A      Abstracter and notary, is there ever?
7    There should not be.  I can't give -- I don't
8    look at every package.  So if one of my
9    employees made a mistake and listed one, that's
10   not the typical policy, unless it's an attorney.
11   Q      Okay.  The typical policy is that the
12   lines 1101 and 1102 reflect just a gross payment
13   of those funds to Swafford & Hays, and then out
14   of those funds, Swafford & Hays pays the notary
15   and the abstracter?
16   A      Correct.
17   Q      Okay.
18   A      We pay off of the HUD any agent that they
19   hire.  They being the lender.  And if the
20   appraiser hires someone else or we hire someone
21   else or whatever, that's paid directly from the
22   appraiser and us.  It's not shown on the HUD.
23   Q      All right.  Well, then, that brings up
0236
1    this question.  Who hires the notary and the
2    abstracter?
3    A      We do.
4    Q      Okay.
5    A      We hire them, but they have the right to
6    refuse them.  And we have had plenty of notaries
7    that they don't like and they refused them.
8          BY MS. CLOTFELTER:  They who?
9    A      I'm sorry.  They being the lender.  The
10   lender dictates to us if we're not allowed to
11   use a notary.
12   Q      (continued by Mr. Underwood)  That brings
13   up something else I meant to ask you earlier.
14   With regard to the amount of control that
15   Homeowners has over your closings, does
16   Homeowners, do they dictate, other than what
17   you've just told me, who does the closing, when
18   and how it's done?
19   A      Yes, they do.
20   Q      Okay.  And tell me in what manner they do
21   that.
22   A      They tell us what day it's going to
23   close; what time it's going to close; where it's
0237
1    going to close.  And we choose the notary or
2    attorney, but if they don't like the one we've
3    chosen, they tell us that we can not use them.
4    Q      All right.  Well, do you have -- do you
5    have a list of notaries or attorneys that you
```
Page 90

swaffordgreg051906.txt

```
 6   use in, say, the Mobile, Alabama area; is that
 7   true?
 8   A     Yes.
 9   Q     All right.  And does Homeowners have any
10   influence over which of those --
11   A     Only if we tell them we're going to use
12   "X, Y, Z notary and they tell us, "No.  We've
13   used X, Y, Z before.  We prefer you not use
14   them," and we don't use them.
15   Q     All right.
16   A     Basically they always know -- our lenders
17   always know, prior to the closing, what notary
18   or attorney we've hired.  So they always have
19   the right to tell us they don't want to use that
20   one.
21   Q     All right.  Well, with regard to
22   Homeowners, I'm sure that Swafford has a list of
23   the attorneys and notaries that Homeowners will
0238
 1   approve of; is that true?
 2   A     We have a list of all attorneys and
 3   notaries, and what we do is, there's a -- if I'm
 4   correct, because I don't -- well, I know
 5   they've switched how they do it -- but we used
 6   to have a note section under each notary and
 7   attorney.  And, say, Home Funds doesn't like X,
 8   Y, Z, but Homeowners does, then we would never
 9   use X, Y, Z for Home Funds, but we would use it
10   for Homeowners.
11   Q     Sure.  That's what I mean.
12   A     Yes.
13   Q     But with regard to the ones that
14   Homeowners will use, it doesn't make any
15   difference to Homeowners, does it?  I mean,
16   Swafford can pick one out of the ones that
17   Homeowners does use?
18   A     Yes, we can.
19   Q     Okay.
20   A     I mean, like loan officers will at times
21   request specific notaries because they like
22   them.  But if they don't tell us we can't use
23   one and they don't specifically request one,
0239
 1   then anywhere in between we can pick it.
 2   Q     Right.  And the way it really works is
 3   you try to find one that can do it on the date
 4   that it needs to be done and that's how you --
 5   that's how they get picked; isn't that true?
 6   A     Yes.
 7   Q     Okay.
 8   A     And if we can't find one that they
 9   like --
10   Q     You try to get a different one approved?
11   A     Well, then we go back and we ask -- if we
12   go through the whole line and if there's nobody
13   that can do it that day, then we have to ask
14   Homeowners if they want us to -- if they have
15   some notaries that they know of or if they want
16   us to switch it to a different date.
17   Q     Okay.
18
19   REPORTER'S NOTE:  (At this point, instrument was
20   marked for identification by the Reporter as
```

Page 91

swaffordgreg051906.txt
```
21  Plaintiff's Exhibit Number 34, after which, the
22  deposition continued, as follows:)
23
0240
 1  Q       (continued by Mr. Underwood)  Okay.  Let
 2  me ask you with regard to Exhibit 34.  It's the
 3  Casey transaction.  How much, if any, funds were
 4  retained and how much?
 5  A       Looks to be $73.50 for recording fees.
 6  Q       It's not $83.50?
 7  A       There's a transfer tax noted.  I don't
 8  even know what that $10.00 is, but it does look
 9  like we kept $83.50.
10  Q       Okay.  So it's either $83.50 or $73.50?
11  A       Yeah, and I'm not sure which.  I'm not
12  sure what the $10.00 is.
13  Q       All right.  Fair enough.  And I won't ask
14  you about the abstracter or the --
15  A       Notary?
16  Q       -- notary, because we've already got that
17  straight, I think.
18
19  REPORTER'S NOTE:  (At this point, instrument was
20  marked for identification by the Reporter as
21  Plaintiff's Exhibit Number 35, after which, the
22  deposition continued, as follows:)
23
0241
 1  Q       (continued by Mr. Underwood)  Let me show
 2  you what I've marked as Plaintiff's Exhibit 35.
 3  It's the McDonald transaction.
 4  A       Are you asking me to do the same thing on
 5  35?
 6  Q       Right.  I was going to ask you if
 7  Swafford retained any funds with regard to that
 8  transaction.
 9  A       No, we did not.
10  Q       All right.  But it's another one like
11  Saucida and the Exhibit Number 3 that we looked
12  at where there was an estimated charge for the
13  recording fee, and it looks like $67.00 was
14  refunded; is that right?
15  A       Yes, sir.
16  Q       And this falls in that third tier of how
17  you handle that recording fee like we talked
18  about?
19  A       Yeah.  I've been watching the dates and,
20  yes, everyone that we've refunded has been after
21  the date.  And it looks like January of '05 must
22  have been the correct date for Homeowners,
23  because the two you gave me, I believe, were in
0242
 1  January and they both show refunds to Homeowners
 2  for customers.
 3  Q       Right.  There's another document in that
 4  transaction I want you to look at.  It's
 5  probably the last page.
 6  A       Okay.
 7  Q       And would you identify that page, for the
 8  record, for us?
 9  A       It's an A&B Abstracts invoice.
10  Q       All right.  And it reflects a charge of
11  $90.00; is that correct?
```
                              Page 92

swaffordgreg051906.txt

```
12  A      Yes, sir.
13  Q      All right.  And the same thing is true
14  that we've been talking about about the line
15  1202, that $375.00 was paid to Swafford and
16  $90.00 paid for the abstract or title search to
17  A&B, and the remainder of that was retained?
18  A      That is correct, but it's 1102, not 1202.
19  Q      I stand corrected.
20  A      Okay.
21
22  REPORTER'S NOTE:  (At this point, instrument was
23  marked for identification by the Reporter as
0243
 1  Plaintiff's Exhibit Number 36, after which, the
 2  deposition continued, as follows:)
 3
 4  Q      (continued by Mr. Underwood)  And let me
 5  show you Exhibit 36, the Linda Johnson
 6  transaction.
 7  A      Okay.
 8  Q      And was $98.00 retained by Swafford in
 9  that transaction?
10  A      It appears so, yes.
11  Q      Okay.
12
13  REPORTER'S NOTE:  (At this point, instrument was
14  marked for identification by the Reporter as
15  Plaintiff's Exhibit Number 37, after which, the
16  deposition continued, as follows:)
17
18  Q      (continued by Mr. Underwood)  All right.
19  We're on the Sterling transaction, Plaintiff's
20  Exhibit Number 37.  And was the retainage by
21  Swafford the $86.50 in that one?
22  A      It appears so.
23  Q      Okay.
0244
 1  REPORTER'S NOTE:  (At this point, instrument was
 2  marked for identification by the Reporter as
 3  Plaintiff's Exhibit Number 38, after which, the
 4  deposition continued, as follows:)
 5
 6  Q      (continued by Mr. Underwood)  Let me show
 7  you what I've marked as Exhibit 38.
 8  A      Okay.
 9  Q      I believe that's the Collins transaction.
10  And what was the retainage in that transaction?
11  A      It looks to be $73.00.
12  Q      All right.  Now, can you tell me --
13  that's a different -- that's not a Homeowners'
14  loan, is it?
15  A      It's Home Funds.
16  Q      All right.  And I noticed that the --
17  some of the fees are different.  Do you know why
18  the --
19  A      1101, 1102 and 1103 would once again be
20  fees that the lender tells us we can charge when
21  we start doing business with them.  Is that the
22  fees that you're referring to?
23  Q      Right.  Now, what's the difference
0245
 1  between the closing?  Was there less work or
 2  more work done for this closing than one of the
```

swaffordgreg051906.txt

3   Homeowners' closings?
4   A       I don't know how much work was done on
5   this particular file.
6   Q       All right.
7   A       So I don't know if more work was done or
8   less work was done.
9   Q       Okay.  Well, don't know if this lender
10  uses the full service like you described to me?
11  A       Home Funds does request some processing
12  be done for them, yes.
13  Q       And is the same amount of work done for
14  this lender as you were doing for --
15  A       In many cases, yes.  In some cases, no.
16  It's filed by file-specific.  Homeowners always
17  has us process their file.  And Home Funds, it
18  depends on the file at times.
19  Q       Okay.  But --
20  A       But once again, it's almost become like
21  an industry thing.  They tell us this is what we
22  can charge and what we can charge on each loan.
23  I mean, we don't -- they don't just charge --
0246
1   they don't just tell us we can charge 800 or 900
2   or a 1000.  They tell us you can charge this,
3   and you can't charge these fees if you have
4   overnight expenses or whatever.  It all has to
5   be built within these three keys, and this is
6   what is standard for us on our HUDs.  And we
7   have to either say, no, we can't afford to do
8   business with you or yes, we can.
9   Q       Well, look at the Sterling transaction,
10  the one that I handed you before that.
11  A       Okay.
12  Q       It shows an abstract or title search fee
13  of $375.00, right?
14  A       Uh-huh.
15  Q       And then this one shows an abstract or
16  title search fee of $200.00.  Can you tell me
17  why is the charge for abstract and title search
18  fee, the difference between the two of them?
19  A       Because Homeowners told us that we could
20  charge $375.00 there and Home Funds would have
21  told us that we could charge $200.00 here.  But
22  hopefully if we cannot recoup all our costs on
23  that line, then we would be able to in our total
0247
1   fees.  Because our cost of doing business per
2   file, a lot of times, can be very similar, but
3   it doesn't necessarily mean that it's going to
4   break down on the same lines, the same amounts.
5   And it's very hard to segregate exactly what we
6   spent on each line.  We use many of the same
7   employees for different functions.  Same office
8   equipment and everything.
9   Q       Okay.  Well, let me ask you this.  This
10  is something I've been wondering about since I
11  first looked at this file.  Why don't you just
12  have settlement or closing fee to Swafford &
13  Hays of $600.00, and then just reflect the
14  actual cost of what the abstract cost and the
15  title examination cost?  I'm sorry.  The notary
16  cost and what the abstract costs?
17  A       This is how -- I don't know.  That's --
                        Page 94

swaffordgreg051906.txt
18  how we do it is pretty much industry standard.
19  This is how typically the title company does it
20  and this is how the lenders require it.  We
21  can't just break down those fees however we want
22  to.
23  Q      Well, I'm not asking you to break them
0248
1   down the way you want to.  I'm asking --
2   A      No.  I mean --
3   Q      Wait just a minute now.
4          BY MS. CLOTFELTER:  Both of you are
5   talking at once.  Let him finish, then you
6   answer.
7   Q      (continued by Mr. Underwood)  Here's what
8   I'm trying to ask you.  Why don't you tell these
9   borrowers exactly what's being paid for these
10  fees?  In other words, why don't you -- why
11  isn't there a line on here that says "settlement
12  services from Swafford & Hays, $600.00," and
13  then abstracter or title search, ninety bucks,
14  or whatever it was, and et cetera?
15  A      Because we know on Home Funds that this
16  is what we can charge for our total fees.  We
17  know on average what we would spend on fees.
18  But if we go over that, that's something we have
19  to eat and we choose to do that.  I mean, if we
20  don't raise our fees for borrowers because we
21  spend more on their files.  We know what the
22  average cost of doing business is per file, and
23  it's very hard to break it down which file costs
0249
1   more.  We have to have a very intense system for
2   wages, for hour -- I mean, each employee would
3   have to go in every five to ten minutes and
4   implement what file they're working on, what
5   they've touched.  So we know overall what the
6   cost is per file.  If that file goes over, then
7   we have to eat it.
8   Q      Okay.  So in other words, instead of
9   putting on there just a lump sum charge of what
10  you need to charge to make money -- you're
11  trying to make money closing these loans, right?
12  A      We have to make a profit, because we're
13  not a nonprofit organization.
14  Q      Sure you do.
15  A      Right.
16  Q      And so is it -- let me ask you this.  Is
17  it the lenders won't let you put your actual
18  charges on there, what you -- in other words,
19  what you need to charge to make money on these
20  files?
21         BY MS. CLOTFELTER:  Object to the form.
22  Q      (continued by Mr. Underwood)  Is that --
23  is that true, a true statement?
0250
1   A      The lenders prefer to see our fees the
2   way you see them on the HUDs.
3   Q      All right.  In other words, the lenders
4   prefer you to mark up these other fees to
5   include enough money so you can make a profit on
6   them; isn't that right?
7          BY MS. CLOTFELTER:  Object to the form.
8   That totally misstates what he said before.
Page 95

swaffordgreg051906.txt
```
 9   Q       (continued by Mr. Underwood)  You can
10   answer.
11   A       We don't mark up our fees, just like I
12   stated before.
13   Q       Okay.
14   A       This is the cost of us doing business.
15   Q       Okay.  Well, let me ask it a different
16   way.  I think what you're telling me is that
17   the -- well, never mind.  I'll just go on to
18   something else.
19
20   REPORTER'S NOTE:  (At this point, instrument was
21   marked for identification by the Reporter as
22   Plaintiff's Exhibit Number 39, after which, the
23   deposition continued, as follows:)
0251
 1   Q       (continued by Mr. Underwood)  Let me show
 2   you what I've marked as Exhibit 39.  And that's
 3   the Hayden transaction.  I would ask you if
 4   there's any retainage on that transaction?
 5   A       Yes, there was.
 6   Q       And can you tell us how much it was?
 7   A       It appears to be $66.50.
 8   Q       Okay.
 9
10   REPORTER'S NOTE:  (At this point, instrument was
11   marked for identification by the Reporter as
12   Plaintiff's Exhibit Number 40, after which, the
13   deposition continued, as follows:)
14
15   Q       (continued by Mr. Underwood)  And Exhibit
16   40, is there any retainage on that transaction?
17   A       No.  It appears that $60.00 was refunded
18   to Alma Jones.
19   Q       Okay.  And this is another one.  It's in
20   your third method of handling the line 1201
21   filing?
22   A       Yes.
23   Q       Okay.  And you -- I meant to ask you
0252
 1   something earlier when we were talking about
 2   these 1100 series fees.  Did you say earlier,
 3   when we were talking earlier today, that you had
 4   relied on Ticor and their auditors and another
 5   title company -- I forgot -- was it
 6   Plantation --
 7   A       No.  Commonwealth is the one we were
 8   using.
 9   Q       -- with regard to whether or not those
10   were -- it was legal to charge the customers in
11   that fashion?
12           BY MS. CLOTFELTER:  Object to the form.
13   You can answer, if you can.
14   A       We relied on our -- we rely, as far as
15   whether we're doing business correctly, when our
16   underwriters come in and do our audits and they
17   give us all of our pamphlets, our binders and
18   everything.  We rely on all their information.
19   It derives from all of that to know if we're
20   doing things correctly.  When they come in and
21   they do an entire audit, an in-depth audit, if
22   they do not tell us our HUD Settlement
23   Statements are improper, we believe that they
```
Page 96

swaffordgreg051906.txt

0253
1   are proper, because we're acting on behalf of
2   them as an agent.
3   Q      Okay; all right.  Have you ever had any
4   training with regard to the Real Estate
5   Settlement Procedures Act?
6   A      I don't believe so.
7   Q      All right.  Have you ever read the RESPA
8   statute?
9   A      No, I don't believe I have.
10  Q      Have you ever read regulation "X", which
11  is the implementing HUD regulation for the RESPA
12  statute?
13  A      I don't know.  I don't believe I have.
14  Q      Okay.  Have you ever read the
15  instructions for filling out a HUD-1 statement
16  that's promulgated by HUD?
17  A      That, I may have.  Some of these I may
18  have read.  The course of mortgage and title
19  lending, I don't know specifically what I have
20  and have not read.
21  Q      Okay.  Well, now, did you take a course
22  in mortgage lending?
23  A      No.  I said in my history of mortgage
0254
1   lending.
2   Q      Oh, okay.  I see.  Yeah, I knew I had
3   asked you about it and you didn't -- you didn't
4   tell me you had any training.
5   A      No, I've had a separate course.
6   Q      Okay.  Well, have you had any course with
7   regard to mortgage --
8   A      Just to become a title agent.
9   Q      Okay.  Well, tell me about that.  I don't
10  think you mentioned that before.
11  A      I am a title agent.
12  Q      Okay.  I know that.  You told me that,
13  but you didn't tell me you had a course that
14  enabled you to --
15  A      Well, no.  I mean, you know we are a
16  title agent.  I'm an actual agent myself.
17  Q      Okay.
18  A      It varies per year.  In the State of
19  Tennessee you have to take a course every year
20  to renew your license to be an agent.
21  Q      All right.
22  A      Most states accept that, except for in
23  our case, Arkansas.  And we have to fly there
0255
1   each year to take an additional one to two hours
2   that they require, because they don't accept
3   Tennessee's credits.  But those tests can vary.
4   I mean, they -- you can renew your license every
5   year.  It's just an insurance license, and they
6   know what type of an agent you are, but
7   sometimes the test itself might not even cover
8   anything on real estate.
9   Q      Okay.  But you have to go every year and
10  take continuing education; is that what you're
11  telling me?
12  A      No, sir.  It's mailed to me.  I don't
13  actually go somewhere.  But, yeah.
14  Q      All right.  Does it ever touch on the

Page 97

swaffordgreg051906.txt
```
15  Real Estate Settlement Procedures Act or
16  mortgage lending?
17  A     I don't know if it ever has.
18  Q     All right.  Is it more about how to tell
19  if a title's recorded properly and --
20  A     No.  Even when it touches on real estate,
21  it's more like you can't do coercion; you can't
22  do things of that nature with insurance.  It's
23  more about how to sell the insurance properly.
0256
 1  Q     Okay.  The title insurance itself?
 2  A     Uh-huh.
 3  Q     All right.  We'll go through the rest of
 4  these transaction and --
 5
 6  REPORTER'S NOTE:  (At this point, instrument was
 7  marked for identification by the Reporter as
 8  Plaintiff's Exhibit Number 41, after which, the
 9  deposition continued, as follows:)
10
11  Q     (continued by Mr. Underwood)  See if you
12  can tell me about the retainage in that one, if
13  any.
14  A     Okay.  Looks like $47.00.
15  Q     All right.
16
17  REPORTER'S NOTE:  (At this point, instrument was
18  marked for identification by the Reporter as
19  Plaintiff's Exhibit Number 42, after which, the
20  deposition continued, as follows:)
21
22  Q     (continued by Mr. Underwood)  Here's
23  another one.
0257
 1  A     It looks like $80.00.
 2  Q     Okay.
 3
 4  REPORTER'S NOTE:  (At this point, instrument was
 5  marked for identification by the Reporter as
 6  Plaintiff's Exhibit Number 43, after which, the
 7  deposition continued, as follows:)
 8
 9  Q     (continued by Mr. Underwood)  All right.
10  This is Exhibit 43.
11  A     Looks like $90.00.
12
13  REPORTER'S NOTE:  (At this point, instrument was
14  marked for identification by the Reporter as
15  Plaintiff's Exhibit Number 44, after which, the
16  deposition continued, as follows:)
17
18  Q     (continued by Mr. Underwood)  Exhibit 44.
19  A     I see no money going back to Swafford for
20  recordings.  It went to the borrower for $87.00.
21  Q     And is that one that's in the new -- the
22  period where you're using your present --
23  A     Well, the period must have started
0258
 1  before.  I knew Homeowners was before the other
 2  lenders, but it must have been before January of
 3  '05, because this is an October settlement.
 4        BY MS. CLOTFELTER:  Of '04?
 5  A     I'm sorry.  Of '04.  But they may have
```
Page 98

swaffordgreg051906.txt
```
 6   just -- I don't know if this was one of those
 7   earlier ones that I told you about that the
 8   borrower might have requested it.  I don't know.
 9
10   REPORTER'S NOTE:  (At this point, instrument was
11   marked for identification by the Reporter as
12   Plaintiff's Exhibit Number 45, after which, the
13   deposition continued, as follows:)
14
15   Q      (continued by Mr. Underwood)  Okay.  I'll
16   show you Exhibit 45.
17   A      It actually wasn't cut until December of
18   '04.  I'm vague on the dates on that one.
19   Q      Let me see that one.
20   A      Looks like $62.00 went back to the
21   borrowers.
22   Q      Okay.  And then that's in your new --
23   your current procedure?
0259
 1   A      That's our current, yes, sir.
 2          BY MR. UNDERWOOD:  All right.  Let's take
 3   a quick break.  I don't have a whole lot more.
 4
 5   REPORTER'S NOTE:  (At this point, a brief recess
 6   was taken, after which, the deposition
 7   continued, as follows:)
 8
 9   Q      (continued by Mr. Underwood)  I want to
10   follow up on the changes in the procedure with
11   regard to the -- I believe it's the line 1201
12   fees.
13   A      Okay.
14   Q      And whose decision was it to change that
15   procedure?
16   A      As far as charging more money, that would
17   have been -- I would have been involved in that,
18   and so would my father.
19   Q      Okay.
20   A      Because we realized we were undercharging
21   in almost all recordings.
22   Q      Okay.
23   A      As far as how much to charge, it would
0260
 1   have been a collective thing, because we would
 2   have talked to the closing department and
 3   everybody else to figure out what's the most you
 4   ever see in this state or county so we don't
 5   keep on undercharging.
 6   Q      Okay.  Now, what about with regard to the
 7   procedure you're using now with refunding the
 8   overage back to the consumer?
 9   A      That would be me, because I talked to
10   Bill Long with Homeowners and he's the one that
11   asked me to do it with Homeowners.  And after
12   that, when it started working and we really
13   weren't seeing many, if any, shortages that
14   would occur after the mortgage was recorded,
15   meaning releases or affidavits or whatever,
16   that's when we decided to do it for all
17   companies, and I decided that.
18   Q      Okay.  Now, did you make any change at
19   all -- or did anyone make any change at all at
20   Swafford & Hays as a result of the Gibbs and
```
Page 99

swaffordgreg051906.txt

```
21  Finch lawsuit?
22  A     I don't believe so.
23  Q     All right.
0261
 1  A     I mean, I remember making the underwriter
 2  aware of it.
 3  Q     What did the underwriter tell you about
 4  the Gibbs and Finch lawsuit?
 5  A     They really haven't given me much of an
 6  opinion.  I mean, they haven't -- I guess they
 7  really haven't offered much of a defense,
 8  because we're -- we have to defend ourselves,
 9  so -- I don't recall making any changes due to
10  that.
11  Q     Okay.
12  A     I'm sure that when Homeowners suggested
13  it, that's probably one of the reasons between
14  Homeowners and that, they decided that this is
15  going to work this way anyway, why don't we just
16  go ahead and do it across the board.
17  Q     Right.
18        BY MS. CLOTFELTER:  Well, don't speculate
19  about what Homeowners is thinking or saying.
20  Q     (continued by Mr. Underwood)  Well, that
21  was going to be my next question.  Did
22  Homeowners know about the Gibbs and Finch
23  litigation?
0262
 1  A     I don't believe so, unless they were
 2  notified by the attorneys that notified me of
 3  the lawsuit.
 4  Q     Okay.  Did you have any discussion with
 5  Homeowners about the Gibbs and Finch litigation?
 6  A     No.  Well, I don't believe so prior to
 7  us.  I don't know if you all requested any
 8  documentation from them or --
 9        BY MS. CLOTFELTER:  Well, you don't have
10  to testify about anything your lawyers have told
11  you.
12  A     I'm sorry.  No, I haven't told them.
13  Q     (continued by Mr. Underwood)  Have you
14  had any conversations with Homeowners regarding
15  the --
16  A     Let me take a step back.
17  Q     Okay.
18  A     I think I do remember one time telling
19  Bill Long about that possibly.
20        BY MS. CLOTFELTER:  About what?
21  A     The Gibbs and Finch lawsuit in passing,
22  but I don't think it was any big to-do.
23  Q     (continued by Mr. Underwood)  But you did
0263
 1  discuss it with your underwriter?
 2  A     I believe so, yeah, at the time.
 3  Q     And did you discuss with them the fact
 4  that they had told you and you had relied on
 5  their information -- or information you had
 6  gotten from them in making the charges that you
 7  made in the Gibbs and Finch files?
 8  A     I don't believe -- no, I didn't get that
 9  forthright with them, no.
10  Q     All right.  But it's true, isn't it, that
11  you relied on information that you had gotten
```

Page 100

swaffordgreg051906.txt
```
12   from them during audits, et cetera?
13   A      That's a hundred percent true.
14   Q      Okay.  And in making those charges?
15   A      Because if it is point blank wrong to do,
16   I did rely on them to tell me, "Do not do this
17   anymore."  Because I did not know it was wrong.
18   Q      All right.  And as far as you know, you
19   had their expressed approval the way that the
20   Gibbs and Finch files were handled?
21   A      I'm sorry.  Repeat the question.
22   Q      It's late in the afternoon.
23   A      I just missed the first three words.
0264
 1   It's not like I didn't understand it.  I just
 2   missed part of the question.
 3   Q      Okay.  Is it true that the way that the
 4   line 1201 charges were handled with Gibbs and
 5   Finch at least had the past approval of your
 6   underwriter?
 7   A      The way -- that process the underwriters
 8   never told us to stop doing.  Now, whether they
 9   picked Gibbs's and Finch's files, obviously I
10   don't know.  But that process you see on Gibbs
11   and Finch that we seem to be doing on every
12   other file prior to our change date, they did
13   see other files, yes.
14   Q      All right.
15   A      And they didn't tell us to stop doing it.
16   They simply said, like I said earlier, that it
17   was suggested to make it payable to Swafford,
18   because it was a gray area, but that's all I was
19   told.
20   Q      All right.  Now, I wanted to ask you
21   another question, too, about the
22   truth-in-lending disclosure.  Now, you
23   realize -- well, you're familiar with
0265
 1   truth-in-lending, at least.  Well, tell me what
 2   your familiarity is with truth-in-lending
 3   disclosures.
 4   A      All I remember was -- truth-in-lending I
 5   mainly dealt with when I was in mortgage
 6   lending, which was years ago.  But when I did
 7   it, I remember that they required us to put our
 8   applications in immediately because
 9   truth-in-lending had to go out within, I believe
10   it was, three days, the preliminary one.
11   Q      Right.
12   A      And then, of course, it was under what
13   they called their legal five docs that we had to
14   have signed under no circumstances at closing.
15   It was not one that could be messed up on or
16   mismanaged or what have you.
17   Q      Right.
18   A      And the fees from the HUD derived the
19   truth-in-lending.
20   Q      And you've closed many of these loans
21   yourself and explained truth-in-lending
22   disclosures to consumers; isn't that true?
23   A      Yes.
0266
 1   Q      All right.  Does the consumer ever ask
 2   you why is my annual percentage rate different
```

swaffordgreg051906.txt

```
 3   from my rate on my note?
 4         BY MS. CLOTFELTER:  Object to the form.
 5   When?  I mean, are you talking about in his past
 6   history?
 7         BY MR. UNDERWOOD:  Yeah.
 8         BY MS. CLOTFELTER:  I don't understand
 9   what you're asking.
10         BY MR. UNDERWOOD:  Pat, I just asked
11   him -- I just asked him, "It's true you closed
12   plenty of these loans?  "Yes."  And then I asked
13   him, "Did the consumer ever ask you" --
14         BY MS. CLOTFELTER:  You said, "Does the
15   consumer."  That's what confused me.  You said,
16   "Does the consumer ever" --
17   Q     (continued by Mr. Underwood)  Let me just
18   ask it again.  It's true, isn't it, that you've
19   closed many of these loans and explained
20   truth-in-lending disclosures to consumers?
21   A     Yes.  I used to do that, yes.
22   Q     All right.  Did a consumer ever ask you
23   why is my note rate and my APR rate different?
0267
 1   A     Yes, they did.
 2   Q     All right.  And what would you tell the
 3   consumer in that case?
 4   A     If I remember correctly --
 5   Q     Yeah.
 6   A     -- the APR was the cost of doing business
 7   the first year and had your fees included in
 8   that.  It was built into the APR.  That was the
 9   cost of your interest rate, plus your fees
10   involved in it.  And that's a rough summary,
11   because it's been so long since I've closed one.
12   I would have to refresh myself before I could
13   actually explain it.
14   Q     Sure.  And the APR contains -- the APR
15   contains things other than just the interest
16   rate; isn't that true?
17   A     Yes, it does.
18   Q     All right.  As a matter of fact, it
19   contains all these items that are under this
20   prepaid -- or above this prepaid finance charge
21   total; isn't that true?
22   A     I don't know that, but I would assume so.
23         BY MS. CLOTFELTER:  Don't assume, if you
0268
 1   don't know.
 2   A     I don't know that.  I don't know what
 3   fees on there specifically derive the APR.
 4   Q     (continued by Mr. Underwood)  Okay.
 5   A     I don't actually close the loans for
 6   these lenders, and it's been a long time since
 7   I've done it myself.
 8   Q     Sure.  And so you don't recall or have
 9   any recollection of --
10   A     I just remember there were fees off the
11   HUD.  There were certain fees were not on the
12   HUD, were not in the APR, and certain fees were,
13   but I don't remember which ones.  I know that
14   the mortgage lenders were always in there.  I
15   mean, most of those funding fees were in there,
16   but that's all I can remember.
17   Q     Okay; all right.  Well, you don't know
```

Page 102

swaffordgreg051906.txt

18  whether or not the fees that are listed on this
19  discloser is a prepaid finance charge or part of
20  the APR or --
21  A       That's when I said I would assume so,
22  because they're on here with it.  So I would
23  assume so.  But like I said, I don't know -- I'm
0269
1   not going to tell you for sure I do know,
2   because I don't know.  I would have to read it
3   and understand it.
4   Q       All right.  Well, let me ask you this, if
5   you could look at these charges that are below
6   that line and tell me if that's in the amount
7   financed.  In other words, if these charges are
8   in the amount that are going to be paid by the
9   lender over the -- I mean, paid by the borrower
10  over the life of the loan.
11  A       The prepaid finance charges?
12  Q       No, the ones that are below that line.
13  A       Yes, some of them are.
14  Q       All right
15  A       Because the settlement, the abstract,
16  those fees are in the loan amount.
17  Q       Sure.  All the fees that are below that
18  line, it says, "Prepaid finance charge," right?
19  A       Except for the ones that were paid
20  outside of closing.  Then they say "paid."
21  Q       Sure.  Yeah, I would agree with that
22  statement.
23  A       That's why I said that.
0270
1   Q       All right.  And so all of these charges
2   that are out here in this -- in this column in
3   the Saucida truth-in-lending disclosure, all of
4   these are paid over the life of the loan; isn't
5   that correct?
6   A       Yes, I would assume so.
7   Q       All right.  And that's also true of the
8   $120.00 that they paid for the filing fee; isn't
9   that right?
10  A       Yes, that would be so, unless they got a
11  refund.
12  Q       Well, why wouldn't they -- what would be
13  the difference?  Why wouldn't that still be in
14  the amount financed?
15  A       Oh, it would be in the amount financed,
16  yes.
17  Q       Even if they did get a refund; isn't that
18  true?
19  A       Yes.
20  Q       All right.  Because the money wasn't paid
21  to the lender to reduce the amount financed, was
22  it?
23  A       No, it was not.
0271
1   Q       All right.  And so for whatever the
2   overage was on the Saucida transaction -- in
3   other words, whatever was refunded to them, it's
4   true that they'll pay interest on that amount
5   for the life of the loan, isn't it?
6   A       Yes, it is.  Unless they choose to pay
7   off the loan, yes.
8   Q       Right; okay.

Page 103

swaffordgreg051906.txt
```
 9   A      Which they have the right to do.
10   Q      Sure; yeah.  Does the borrower ever see
11   any of the checks that are written for any of
12   the closings, or are those retained at Swafford?
13   A      If we ever had a wet funding, which means
14   funds at the table, which would only be a
15   purchase, which is rare, and it would only be if
16   it was in Knoxville, because we would have to
17   fund it right then.
18   Q      Okay.
19   A      Typically, most of the lenders that we
20   deal with that are out-of-state and they're
21   asking us to close it outside of state, it would
22   have to be a dry closing, because it's going
23   to -- the funds aren't going to be there the day
0272
 1   of closing.
 2   Q      All right.  And the checks that are
 3   voided, are those checks actually ever signed?
 4   A      I don't know if they're stamped prior to
 5   voids being stamped on them or not.
 6          THE COURT??????  You mean signed prior to
 7   being stamped?
 8   A      Yes.  I'm sorry.
 9   Q      (continued by Mr. Underwood)  Yeah,
10   they're stamped signed.  Is that how they're
11   signed?
12   A      No, no.  It depends on the person.  We
13   have several authorized signers.  Some people
14   prefer a stamp, some people do not.
15   Q      Okay.
16   A      At this point, no one uses a stamp,
17   because I don't like stamps.
18   Q      All right.
19   A      Because I don't like the security of
20   them.
21   Q      Are the checks actually stamped or marked
22   void?
23   A      They should be stamped or marked, yes.
0273
 1   They're either written on it or stamped.
 2   Q      Okay.  Are they retained or are they
 3   shredded or --
 4   A      They're retained.
 5   Q      All right.  Do you keep copies of them?
 6   A      I believe so.  I know all of our checks
 7   now are on disc, but I think we also keep the
 8   hardcopy voided ones.  But once we scan them in
 9   the system -- in the files, since it was a
10   voided check, we may not.
11   Q      All right.  Who would know about that?
12   A      Our accountant, Allison Witt.
13          BY MR. UNDERWOOD:  I believe that's all I
14   have.
15
16                (END OF PROCEEDINGS)
17
18
19
20
21
22
23
```

Page 104

swaffordgreg051906.txt

```
0274
 1              C E R T I F I C A T E
 2
 3   STATE OF ALABAMA  )
 4                     )
 5   JEFFERSON COUNTY  )
 6
 7          I hereby certify that the above and
 8   foregoing deposition was taken down by me in
 9   stenotype and the questions and answers thereto
10   were transcribed by means of computer-aided
11   transcription, and that the foregoing represents
12   a true and correct transcript of the testimony
13   given by said witness upon said hearing.
14
15          I further certify that I am neither
16   counsel, nor of kin to the parties to the
17   action, nor am I in any way interested in the
18   result of said cause.
19
20
21
22                      Kelly J. Gray, C.S.R.
23
0275
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

# SOUTHERN LAND & TITLE, LLC
**1136 Forrest Avenue  Gadsden, AL  35901**
**P. O. Box 1665 Gadsden, AL  35902**
solandtitle@microxl.com

Jason E. Knowles, J.D.                                          Telephone 256-543-1361
Norman R. Dasinger, Jr.                                          Fax 256-543-1377

### May 28, 2008

Earl T. Underwood, Jr.
P.O. Box 969
Fairhope, Alabama 36533-0969

**Re: Cheryl H. Frazier v. Accredited Home Lenders, Inc.**
**United States District Court, Middle District of Alabama**
**Case #: 1:08-CV-00011-MHT-SRW**

Dear Earl:

I am co-owner of Southern Land & Title, LLC, and also an attorney (Knowles
Law Firm, LLC). I have executed the Declaration By Custodian Of Records for
Southern Land & Title, LLC, and provided copies of the documents requested in
your subpoena.

In March 2005, Southern Land & Title, LLC, performed a current owner
search on the subject property pursuant to an order received from Swafford & Hays
Services, Inc., for whom we did many searches from January 2005 until February
2008. We hired Cindy Barnes, an abstractor in Dothan, Alabama, to perform the
search for us. Mrs. Barnes performed a current owner search and provided a
handwritten title search report, along with copies of relevant documents. We sent the
title report and documents to Swafford and billed Swafford $72.00, for our work.

The documents enclosed and the information in this letter are the only
information we have about the closing of the property of Cheryl Hall Frazier at 105
TV Road, Dothan, Alabama, on March 25, 2005. I think a deposition of any
representative of Southern Land & Title, LLC, would be a gigantic waste of

everyone's time, but we will accommodate you as necessary.  Please let me know if you need anything further.  I appreciate your attention to this matter.

Sincerely,

Jason Knowles

## DECLARATION BY CUSTODIAN OF RECORDS FOR

### SOUTHERN LAND & TITLE, LLC

I declare that

1. I am the duly authorized Custodian of Records for **SOUTHERN LAND & TITLE, LLC**; I am familiar with the procedures and practices for the creation and maintenance of records by **SOUTHERN LAND & TITLE, LLC**, and that I have the authority to certify said records.

2. Concurrently produced with this declaration are a duplicate (or duplicates) of a domestic record(s) of **SOUTHERN LAND & TITLE, LLC**'s regularly conducted activity, more particularly described in the attached Schedule of **SOUTHERN LAND & TITLE, LLC**'s Authenticated Documents.

3. I certify that the record(s) was (were) made at or near the time of the occurrences of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

4. I certify that the record(s) was (were) kept in the course of the regularly conducted activity.

5. I certify that the record(s) was (were) made by the regularly conducted activity as a regular practice.

6. The record(s) produced with this declaration is (are) a true duplicate(s) of domestic record(s) pertaining to the matters described in the subpoena. There are no other records described in the subpoena, copies of which have not been produced with this declaration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of _May_, 2008, in _Gadsden_, _Alabama_.
City · State

Signature _Jason Knowles_

Printed Name _Jason Knowles_

Address _1136 Forrest Avenue_

Address _Gadsden AL 35901_

RE: Cheryl Hall Frazier v. Accredited Home Lenders, Inc., et al.
M.D.Ala 1:08-cv-00011-MHT-SRW

**Schedule of CUSTODIAN OF RECORDS**
**SOUTHERN LAND & TITLE, LLC**
**Authenticated Documents**

The following documents are being produced pursuant to the attached DECLARATION BY CUSTODIAN OF RECORDS FOR **SOUTHERN LAND & TITLE, LLC:**

1.  Document Name:   _Customer Balance Detail_

    Description of Document   _Statement of all invoices from Southern Land + Title LLC to Swafford Settlement Services from Jan. 5, 2005, through Feb. 18, 2008_

2.  Document Name:   _Order from Swafford + Hays Services, Inc._

    Description of Document   _Order from Swafford dated 3-18-05; also used as cover page for title report by Southern Land + Title to Swafford, dated 3-21-05_

3.  Document Name:   _Title Report + supporting documents_

    Description of Document   _Title report was completed by Cindy Barnes, an abstractor in Dothan, AL, hired by Southern Land + Title_

4.  Document Name:   _Fax cover sheet dated 3-23-05_

    Description of Document   _Fax cover sheet with deed copy and one page of a chain of title sheet, prepared by employee Jana Ferguson_

RE:Cheryl Hall Frazier v. Accredited Home Lenders, Inc., et al.  1:08-cv-11-MHT

5.    Document Name: _____

    Description of Document _____

    _____

    _____

    _____


6.    Document Name: _____

    Description of Document _____

    _____

    _____

    _____


7.    Document Name: _____

    Description of Document _____

    _____

    _____

    _____


8.    Document Name: _____

    Description of Document _____

    _____

_____

**RE:Cheryl Hall Frazier v. Accredited Home Lenders, Inc., et al.  1:08-cv-11-MHT**

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| **Swafford Settlement Services** | | | | | | | 37,644.00 |
| Invoice | 1/5/2005 | 7205 | 04-13505 | CO-Corey Marmaduke-Chambers | Alabama | 88.00 | 37,732.00 |
| Invoice | 1/5/2005 | 7207 | 0521 | CO -Alexis Benjamin-Rockdale | Georgia | 69.00 | 37,801.00 |
| Invoice | 1/7/2005 | 7263 | 05-138 | CO-Wright-Etowah | Alabama | 69.00 | 37,870.00 |
| Invoice | 1/7/2005 | 7267 | 05-28 | CO-Smith-Talladega | Alabama | 75.00 | 37,945.00 |
| Invoice | 1/7/2005 | 7273 | 05-68 | CO-Durocher-Shelby | Alabama | 69.00 | 38,014.00 |
| Invoice | 1/7/2005 | 7292 | 05-150 | CO-Barbour-Madison | Alabama | 70.00 | 38,084.00 |
| Invoice | 1/7/2005 | 7296 | 05-139 | Co-Pendergrass-DeKalb | Alabama | 70.00 | 38,154.00 |
| Invoice | 1/7/2005 | 7302 | 05-114 | 30yr-Tenpow-Clayton | Georgia | 125.00 | 38,279.00 |
| Invoice | 1/7/2005 | 7306 | 05-167 | co search-Jowers-Baldwin | Alabama | 68.00 | 38,347.00 |
| Invoice | 1/7/2005 | 7307 | 05-160 | co search-Tran-Mobile | Alabama | 68.00 | 38,415.00 |
| Invoice | 1/10/2005 | 7346 | 05-147 | CO-Mack Dillingham-Montgomer | Alabama | 65.00 | 38,480.00 |
| Invoice | 1/10/2005 | 7347 | 05-130 | CO-Martha Wise-Elmore | Alabama | 75.00 | 38,555.00 |
| Invoice | 1/10/2005 | 7348 | 05-60 | CO-Maxine Goodwin-Shelby | Tennessee | 69.00 | 38,624.00 |
| Invoice | 1/11/2005 | 7394 | 05-253 | CO-Hester Webb-Montgomery | Alabama | 77.00 | 38,701.00 |
| Invoice | 1/12/2005 | 7408 | 05-242 | Co-Kerry Crane-Cherokee | Alabama | 74.00 | 38,775.00 |
| Invoice | 1/12/2005 | 7410 | 05-193 | CO-Samuel Robinson-Jefferson | Alabama | 80.00 | 38,855.00 |
| Invoice | 1/12/2005 | 7428 | 05-210 | CO-Gertrde Guice-Lee | Alabama | 70.00 | 38,925.00 |
| Invoice | 1/13/2005 | 7449 | 05-259 | CO-Mary Vinson-Montgomery | Alabama | 70.00 | 38,995.00 |
| Invoice | 1/14/2005 | 7505 | 05-391 | CO search-Steven Gladden | Alabama | 72.00 | 39,067.00 |
| Invoice | 1/14/2005 | 7532 | 05-448 | CO-Prince Lewis-Bibb | Georgia | 69.00 | 39,136.00 |
| Invoice | 1/17/2005 | 7554 | 05-457 | CO-Jesse Reynolds-Randolph | Alabama | 90.00 | 39,226.00 |
| Invoice | 1/17/2005 | 7560 | 05-349 | CO-Donald Bulloch-Union | Georgia | 73.00 | 39,299.00 |
| Invoice | 1/17/2005 | 7561 | 05-316 | CO-David Letson-Lawrence | Alabama | 69.00 | 39,368.00 |
| Invoice | 1/18/2005 | 7580 | 05-422 | CO-David Wallace-Polk | Georgia | 73.00 | 39,441.00 |
| Invoice | 1/18/2005 | 7583 | 05-539 | CO search-Charles Claus-Shelby | Alabama | 71.00 | 39,512.00 |
| Invoice | 1/18/2005 | 7588 | 05-431 | CO-Billy Joe Delong-Lee | Alabama | 74.00 | 39,586.00 |
| Invoice | 1/19/2005 | 7620 | 05-553 | CO-Robert Watson-Troup | Georgia | 68.00 | 39,654.00 |
| Invoice | 1/19/2005 | 7628 | 04-7967 | update-Melvilla Noibi | Georgia | 31.00 | 39,685.00 |
| Invoice | 1/19/2005 | 7638 | 05-360 | CO-Walter Johnson | Alabama | 78.00 | 39,763.00 |
| Invoice | 1/19/2005 | 7655 | 05-611 | CO-Il Lee-Fulton | Georgia | 69.00 | 39,832.00 |
| Invoice | 1/20/2005 | 7695 | 05-523 | CO-Angela Smallwood-Marsh | Alabama | 71.00 | 39,903.00 |
| Invoice | 1/21/2005 | 7722 | 05-578 | CO-Edward Beers-Dallas | Alabama | 90.00 | 39,993.00 |
| Invoice | 1/21/2005 | 7739 | 05-590 | CO-George Castle-Lamar | Alabama | 73.00 | 40,066.00 |
| Invoice | 1/21/2005 | 7743 | 05-701 | CO-George Giles-Williamson | Tennessee | 69.00 | 40,135.00 |
| Invoice | 1/21/2005 | 7759 | 05-509 | CO-Glenn Freeman-Forsyth | Georgia | 68.00 | 40,203.00 |
| Invoice | 1/21/2005 | 7764 | 05-616 | CO-Sara Stovall-Franklin | Alabama | 69.00 | 40,272.00 |
| Invoice | 1/24/2005 | 7795 | 05-629 | CO-Clarice Reed Harper-Troup | Georgia | 67.00 | 40,339.00 |
| Invoice | 1/25/2005 | 7833 | 05-643 | CO-James Bignon-Douglas | Georgia | 71.00 | 40,410.00 |
| Invoice | 1/25/2005 | 7866 | 05-717 | CO search-Charles Moody-Gwinne | Georgia | 71.00 | 40,481.00 |
| Invoice | 1/25/2005 | 7870 | 05-696 | CO-Elaine Mirras-Fulton | Georgia | 70.00 | 40,551.00 |
| Invoice | 1/25/2005 | 7886 | | Update-Rachel Holt-Lee | Alabama | 30.00 | 40,581.00 |
| Invoice | 1/26/2005 | 7894 | 05-698 | 30 yr-Roger Scott-Lawrence | Alabama | 125.00 | 40,706.00 |
| Invoice | 1/26/2005 | 7900 | 04-11743 | Update-Rodger Williamson-Calho | Alabama | 25.00 | 40,731.00 |
| Invoice | 1/26/2005 | 7910 | 05-829 | CO-George McGlown-Henry | Alabama | 73.00 | 40,804.00 |
| Invoice | 1/26/2005 | 7929 | 05-888 | CO-Derrick Roberson-Chatham | Georgia | 68.00 | 40,872.00 |
| Invoice | 1/27/2005 | 7945 | 05-868 | CO-Voncille Myles-Mobile | Alabama | 74.00 | 40,946.00 |
| Invoice | 1/27/2005 | 7953 | 05-819 | CO-Fonta Campbell-Dekalb | Georgia | 71.00 | 41,017.00 |
| Invoice | 1/27/2005 | 7954 | 05-847 | 30 yr-Alisa Rodriguez-Gwinnet | Georgia | 125.00 | 41,142.00 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 1/27/2005 | 7969 | 05-778 | CO-Cole-Shelby | Tennessee | 67.00 | 41,209.00 |
| Invoice | 1/27/2005 | 7976 | 05-781 | CO-Shervington-Lee-Shelby | Tennessee | 69.00 | 41,278.00 |
| Invoice | 1/27/2005 | 7988 | 05-708 | 30 yr-Bradford-Walker | Alabama | 125.00 | 41,403.00 |
| Invoice | 1/28/2005 | 8016 | 05-890 | CO-Backelant-Dawson | Georgia | 71.00 | 41,474.00 |
| Invoice | 1/28/2005 | 8027 | 05-885 | CO-Houston-Coweta | Georgia | 68.00 | 41,542.00 |
| Invoice | 1/31/2005 | 8072 | 05-887 | CO-George-Chilton | Alabama | 65.00 | 41,607.00 |
| Invoice | 1/31/2005 | 8086 | 05-457 | update-Reynolds-Randolph | Alabama | 27.00 | 41,634.00 |
| Invoice | 2/2/2005 | 8175 | 05-953 | CO-Jarrett-Blount | Alabama | 68.00 | 41,702.00 |
| Invoice | 2/3/2005 | 8199 | 05-643 | update-Bignon-Douglas | Georgia | 35.00 | 41,737.00 |
| Invoice | 2/4/2005 | 8272 | 05-1034 | CO-Hess-Oglethorpe | Georgia | 66.00 | 41,803.00 |
| Invoice | 2/4/2005 | 8277 | 05-1130 | Tony Whitlow-CO-Lee | Alabama | 75.00 | 41,878.00 |
| Invoice | 2/10/2005 | 8439 | 05-1327 | CO-Thompson-Jefferson | Alabama | 125.00 | 42,003.00 |
| Invoice | 2/10/2005 | 8444 | 05-1417 | CO-Berendt-Calhoun | Alabama | 68.00 | 42,071.00 |
| Invoice | 2/10/2005 | 8453 | 05-1379 | CO-Crowe-Whitfield | Georgia | 68.00 | 42,139.00 |
| Invoice | 2/10/2005 | 8469 | 05-1381 | CO-Harper 3601-H-Dekalb | Georgia | 69.00 | 42,208.00 |
| Invoice | 2/10/2005 | 8472 | 05-1386 | CO-Harper 3595-H-Dekalb | Georgia | 70.00 | 42,278.00 |
| Invoice | 2/10/2005 | 8473 | 05-1384 | CO-Harper 3603-J-Dekalb | Georgia | 69.00 | 42,347.00 |
| Invoice | 2/10/2005 | 8481 | 05-1349 | CO-Kennedy-Lee | Alabama | 74.00 | 42,421.00 |
| Invoice | 2/10/2005 | 8489 | 05-1370 | CO-Prince(3609-D)-Dekalb | Georgia | 79.00 | 42,500.00 |
| Invoice | 2/10/2005 | 8492 | 05-1374 | CO-Merchant (3595-L)-Dekalb | Georgia | 78.00 | 42,578.00 |
| Invoice | 2/10/2005 | 8494 | 05-1371 | CO-Merchant (3595-N)-Dekalb | Georgia | 79.00 | 42,657.00 |
| Invoice | 2/10/2005 | 8496 | 05-1377 | CO-Prince (3607-J)-Dekalb | Georgia | 78.00 | 42,735.00 |
| Invoice | 2/10/2005 | 8498 | 05-1411 | CO-Byrd-Dekalb | Georgia | 72.00 | 42,807.00 |
| Invoice | 2/11/2005 | 8512 | 05-1440 | CO-Lyle-Randolph | Alabama | 69.00 | 42,876.00 |
| Invoice | 2/11/2005 | 8526 | 05-1455 | CO-Stokes-Pike | Georgia | 69.00 | 42,945.00 |
| Invoice | 2/11/2005 | 8527 | 05-1388 | CO-Park-Walker | Alabama | 75.00 | 43,020.00 |
| Invoice | 2/11/2005 | 8542 | 05-1223 | CO-Shorts-Clayton | Georgia | 68.00 | 43,088.00 |
| Invoice | 2/11/2005 | 8544 | 05-1497 | CO-Callahan-Fayette | Georgia | 65.00 | 43,153.00 |
| Invoice | 2/11/2005 | 8550 | 05-1463 | CO Osaseri-Gwinnett | Georgia | 69.00 | 43,222.00 |
| Invoice | 2/11/2005 | 8557 | 05-1408 | CO-Johnson-Long | Georgia | 69.00 | 43,291.00 |
| Invoice | 2/14/2005 | 8572 | 05-1451 | CO-Nash-Cherokee | Georgia | 68.00 | 43,359.00 |
| Invoice | 2/14/2005 | 8582 | 05-1510 | CO-Alexander-Calhoun | Alabama | 65.00 | 43,424.00 |
| Invoice | 2/14/2005 | 8587 | 05-1461 | CO-Johnson-Montgomery | Alabama | 75.00 | 43,499.00 |
| Invoice | 2/14/2005 | 8606 | 05-1429 | CO-Holmes-Lee | Alabama | 75.00 | 43,574.00 |
| Invoice | 2/15/2005 | 8639 | 05-1509 | CO-Wimberly-Muscogee | Georgia | 69.00 | 43,643.00 |
| Invoice | 2/15/2005 | 8640 | 05-1474 | CO-Stovall-Montgomery | Alabama | 78.00 | 43,721.00 |
| Invoice | 2/15/2005 | 8641 | 05-1416 | CO-Miley-Muscogee | Georgia | 72.00 | 43,793.00 |
| Invoice | 2/15/2005 | 8642 | 05-1443 | CO-Sims-Effingham | Georgia | 68.00 | 43,861.00 |
| Invoice | 2/15/2005 | 8643 | 05-1473 | CO-Cope-Effingham | Georgia | 71.00 | 43,932.00 |
| Invoice | 2/15/2005 | 8658 | 05-1538 | CO-Cagle-Elmore | Alabama | 73.00 | 44,005.00 |
| Invoice | 2/16/2005 | 8671 | 05-1458 | CO-Horn-Clay-Tallladega | Alabama | 137.00 | 44,142.00 |
| Invoice | 2/16/2005 | 8672 | 05-1383 | CO-Wells(3595-J)-Dekalb | Georgia | 73.00 | 44,215.00 |
| Invoice | 2/16/2005 | 8674 | 05-1375 | CO-Miles(3603-I)-Dekalb | Georgia | 73.00 | 44,288.00 |
| Invoice | 2/16/2005 | 8675 | 05-1380 | CO-Miles(3601-G)-Dekalb | Georgia | 74.00 | 44,362.00 |
| Invoice | 2/16/2005 | 8677 | 05-1382 | CO-Wells(3607-K)-Dekalb | Georgia | 74.00 | 44,436.00 |
| Invoice | 2/16/2005 | 8678 | 05-1404 | CO-Miles(3603-F)-Dekalb | Georgia | 75.00 | 44,511.00 |
| Invoice | 2/16/2005 | 8679 | 05-1373 | CO-Washington(3603-C)-Dekalb | Georgia | 75.00 | 44,586.00 |
| Invoice | 2/16/2005 | 8680 | 05-1403 | CO-Miles(3605-F)Dekalb | Georgia | 74.00 | 44,660.00 |
| Invoice | 2/16/2005 | 8681 | 05-1376 | CO-Washington(3601-D)Dekalb | Georgia | 76.00 | 44,736.00 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 2/16/2005 | 8693 | 05-1378 | CO-Washington(3603-E)Dekalb | Georgia | 74.00 | 44,810.00 |
| Invoice | 2/16/2005 | 8701 | 05-1574 | 30 yr-Reese-Wilson | Tennessee | 125.00 | 44,935.00 |
| Invoice | 2/16/2005 | 8709 | 05-1369 | CO-Washington(3604-D)Dekalb | Georgia | 74.00 | 45,009.00 |
| Invoice | 2/16/2005 | 8726 | 05-1552 | CO-Cole-Dekalb | Georgia | 70.00 | 45,079.00 |
| Invoice | 2/17/2005 | 8735 | 05-1483 | 30 yr-Teeter-Geneva | Alabama | 125.00 | 45,204.00 |
| Invoice | 2/18/2005 | 8829 | 05-1476 | CO-Todd-Richmond | Georgia | 72.00 | 45,276.00 |
| Invoice | 2/21/2005 | 8837 | 05-1697 | CO-White-Dallas | Alabama | 73.00 | 45,349.00 |
| Invoice | 2/22/2005 | 8902 | 05-1667 | CO-Ralston-Gordon | Georgia | 79.00 | 45,428.00 |
| Invoice | 2/22/2005 | 8915 | 05-1794 | CO-Lambert-Davidson | Tennessee | 71.00 | 45,499.00 |
| Invoice | 2/23/2005 | 8952 | 05-1688 | 30 yr-Jackson(A20)-Dekalb | Georgia | 125.00 | 45,624.00 |
| Invoice | 2/23/2005 | 8954 | 05-1687 | 30 yr-Jackson(A19)-Dekalb | Georgia | 125.00 | 45,749.00 |
| Invoice | 2/23/2005 | 8959 | 05-1707 | 30 yr-Jackson(A17)-Dekalb | Georgia | 125.00 | 45,874.00 |
| Invoice | 2/23/2005 | 8961 | 05-1706 | 30 yr-Jackson(K4)-Dekalb | Georgia | 125.00 | 45,999.00 |
| Invoice | 2/23/2005 | 8976 | 05-1801 | CO-McMillian-Escambia | Alabama | 73.00 | 46,072.00 |
| Invoice | 2/23/2005 | 8986 | 05-1682 | 30 yr-Ishmael(F8)-Dekalb | Georgia | 125.00 | 46,197.00 |
| Invoice | 2/23/2005 | 8996 | 05-1741 | CO-Awad-Whitfield | Georgia | 71.00 | 46,268.00 |
| Invoice | 2/23/2005 | 8997 | 05-1684 | 30 yr-Ishmael-Dekalb | Georgia | 125.00 | 46,393.00 |
| Invoice | 2/23/2005 | 8999 | 05-1825 | CO-Pettit-Dekalb | Alabama | 67.00 | 46,460.00 |
| Invoice | 2/23/2005 | 9001 | 05-1811 | update-Sasine-Fulton | Georgia | 28.00 | 46,488.00 |
| Invoice | 2/23/2005 | 9002 | 05-1809 | CO-Hall-Shelby | Tennessee | 69.00 | 46,557.00 |
| Invoice | 2/24/2005 | 9021 | 05-1835 | CO-Zahn-Blount | Tennessee | 76.00 | 46,633.00 |
| Invoice | 2/24/2005 | 9042 | 05-1858 | CO-Graham Sichra | Georgia | 72.00 | 46,705.00 |
| Invoice | 2/24/2005 | 9047 | 05-1784 | CO-Scoggins-Bradley | Tennessee | 71.00 | 46,776.00 |
| Invoice | 2/24/2005 | 9054 | 05-1431 | CO-Young-Cheatham | Tennessee | 71.00 | 46,847.00 |
| Invoice | 2/24/2005 | 9071 | 05-1833 | 30 yr-Sloan-Chatham | Georgia | 125.00 | 46,972.00 |
| Invoice | 2/25/2005 | 9075 | 05-1783 | CO-Catherine Jones-Mobile | Alabama | 75.00 | 47,047.00 |
| Invoice | 2/25/2005 | 9111 | 05-1831 | CO-Prince-Meigs | Tennessee | 82.00 | 47,129.00 |
| Invoice | 2/25/2005 | 9122 | 05-1385 | CO-Wells-Dekalb | Georgia | 81.00 | 47,210.00 |
| Invoice | 2/28/2005 | 9132 | 04-13272 | update-Dawson-Dale | Alabama | 25.00 | 47,235.00 |
| Invoice | 2/28/2005 | 9143 | 05-2004 | CO-Lounangphay-Davidson | Tennessee | 69.00 | 47,304.00 |
| Invoice | 2/28/2005 | 9156 | 05-1966 | CO-Johnson-Etowah | Alabama | 70.00 | 47,374.00 |
| Invoice | 3/1/2005 | 9165 | 05-1997 | CO-Cotton-Rockdale | Georgia | 67.00 | 47,441.00 |
| Invoice | 3/2/2005 | 9239 | 05-1979 | CO-Clauson-Jones | Georgia | 71.00 | 47,512.00 |
| Invoice | 3/2/2005 | 9251 | 05-2113 | CO-Burnham-Calhoun | Alabama | 71.00 | 47,583.00 |
| Invoice | 3/3/2005 | 9277 | 05-2094 | CO-Speer-Cullman | Alabama | 70.00 | 47,653.00 |
| Invoice | 3/3/2005 | 9278 | 05-2027 | CO-Phillips-Dallas | Alabama | 82.00 | 47,735.00 |
| Invoice | 3/3/2005 | 9296 | 05-2139 | CO-Crabb-Bibb | Georgia | 73.00 | 47,808.00 |
| Invoice | 3/3/2005 | 9297 | 05-12814 | update-Gandy-Baldwin | Alabama | 25.00 | 47,833.00 |
| Invoice | 3/3/2005 | 9309 | 05-2112 | CO-Colbert-Bibb | Georgia | 68.00 | 47,901.00 |
| Invoice | 3/3/2005 | 9316 | 05-2029 | CO-Phillips-Dekalb | Georgia | 70.00 | 47,971.00 |
| Invoice | 3/4/2005 | 9322 | 05-2159 | CO-Minter-Bibb | Georgia | 73.00 | 48,044.00 |
| Invoice | 3/4/2005 | 9334 | 05-2126 | CO-Brunson-Cobb | Georgia | 68.00 | 48,112.00 |
| Invoice | 3/4/2005 | 9349 | 04-12795 | update-Lawson-Murray | Georgia | 25.00 | 48,137.00 |
| Invoice | 3/4/2005 | 9358 | 05-572 | judment/lien-Griffin-Fulton | Georgia | 40.00 | 48,177.00 |
| Invoice | 3/4/2005 | 9366 | 05-2108 | CO-Dunsford-Winston | Alabama | 72.00 | 48,249.00 |
| Invoice | 3/7/2005 | 9386 | 05-2110 | CO-Taplin-Habersham | Georgia | 70.00 | 48,319.00 |
| Invoice | 3/7/2005 | 9396 | 05-2205 | CO-Luallen-Calhoun | Alabama | 68.00 | 48,387.00 |
| Invoice | 3/7/2005 | 9398 | 05-2229 | CO-Selvage-Shelby | Alabama | 65.00 | 48,452.00 |
| Invoice | 3/7/2005 | 9418 | 05-2219 | CO-Stewarat-Richmond | Georgia | 78.00 | 48,530.00 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 3/7/2005 | 9434 | 05-2198 | CO-Jett-Morgan | Alabama | 70.00 | 48,600.00 |
| Invoice | 3/8/2005 | 9504 | 05-2133 | CO-Talbor-Fulton | Georgia | 54.00 | 48,654.00 |
| Invoice | 3/9/2005 | 9529 | 05-2233 | CO-Woerner-Baldwin | Alabama | 73.00 | 48,727.00 |
| Invoice | 3/10/2005 | 9631 | 05-2271 | CO-Nicholson-Gilmer | Georgia | 68.00 | 48,795.00 |
| Invoice | 3/10/2005 | 9637 | 05-2165 | 30 yr-Arrington-Montgomery | Alabama | 125.00 | 48,920.00 |
| Invoice | 3/10/2005 | 9653 | 05-2121 | CO-Reeves-Morgan | Alabama | 48.75 | 48,968.75 |
| Invoice | 3/11/2005 | 9689 | 05-2294 | CO-Richardson-Dallas | Alabama | 67.00 | 49,035.75 |
| Invoice | 3/11/2005 | 9691 | 05-2363 | CO-Biddle-Whitfield | Georgia | 70.00 | 49,105.75 |
| Invoice | 3/11/2005 | 9697 | 05-2297 | CO-Hamrick-Heard | Georgia | 70.00 | 49,175.75 |
| Invoice | 3/11/2005 | 9708 | 05-2375 | CO-Dunn-Chambers | Alabama | 72.00 | 49,247.75 |
| Invoice | 3/11/2005 | 9709 | 05-2050 | 30 yr-Lawson-Tuscaloosa | Alabama | 125.00 | 49,372.75 |
| Invoice | 3/14/2005 | 9743 | 05-2388 | CO-Breland-Madison | Alabama | 70.00 | 49,442.75 |
| Invoice | 3/14/2005 | 9789 | 05-2349 | CO-Harris-Paulding | Georgia | 65.00 | 49,507.75 |
| Invoice | 3/15/2005 | 9805 | 05-2385 | CO-Collins-Gwinnett | Georgia | 68.00 | 49,575.75 |
| Invoice | 3/16/2005 | 9870 | 05-2446 | CO-Hitchcock-Carroll | Georgia | 71.00 | 49,646.75 |
| Invoice | 3/16/2005 | 9888 | 05-2444 | CO-Scales-Fulton | Georgia | 50.25 | 49,697.00 |
| Invoice | 3/17/2005 | 9890 | 05-2647 | CO-Greely-Dekalb | Georgia | 70.00 | 49,767.00 |
| Invoice | 3/17/2005 | 9904 | 05-2669 | CO-Baird-Henry | Georgia | 69.00 | 49,836.00 |
| Invoice | 3/18/2005 | 9953 | 05-2643 | CO-Galella-Coffee | Alabama | 71.00 | 49,907.00 |
| Invoice | 3/18/2005 | 9976 | 05-2729 | CO-Evans-Henry | Georgia | 66.00 | 49,973.00 |
| Invoice | 3/18/2005 | 9980 | 05-2758 | CO-Bourdon-CO-Lauderdale | Alabama | 68.00 | 50,041.00 |
| Invoice | 3/18/2005 | 9986 | 05-2746 | CO-Kitchens-Jones | Georgia | 68.00 | 50,109.00 |
| Invoice | 3/18/2005 | 9987 | 05-2743 | CO-Milton-Paulding | Georgia | 70.00 | 50,179.00 |
| Invoice | 3/21/2005 | 9993 | 05-2730 | CO-Gresham-Cobb | Georgia | 71.00 | 50,250.00 |
| Invoice | 3/21/2005 | 10004 | 05-2705 | CO-Bean-Pike | Alabama | 69.00 | 50,319.00 |
| Invoice | 3/21/2005 | 10025 | 05-2772 | CO-Washington-Dekalb | Georgia | 68.00 | 50,387.00 |
| Invoice | 3/21/2005 | 10026 | 05-2736 | CO-Willoughby-Dekalb | Alabama | 71.00 | 50,458.00 |
| Invoice | 3/21/2005 | 10027 | 05-2781 | CO-Willis-Baldwin | Alabama | 73.00 | 50,531.00 |
| Invoice | 3/21/2005 | 10028 | 05-2788 | CO-Durst-Lexington | South Ca... | 69.00 | 50,600.00 |
| Invoice | 3/21/2005 | 10029 | 05-2775 | CO-Donald Smith-Chilton | Alabama | 69.00 | 50,669.00 |
| Invoice | 3/22/2005 | 10050 | 05-2752 | CO-Brack-Paulding | Georgia | 69.00 | 50,738.00 |
| Invoice | 3/22/2005 | 10056 | 05-2813 | CO-Hall-Houston | Alabama | 72.00 | 50,810.00 |
| Invoice | 3/23/2005 | 10097 | 05-2865 | CO-Wheeler-Muscogee | Georgia | 73.00 | 50,883.00 |
| Invoice | 3/23/2005 | 10099 | 05-2817 | CO-Morrow-Wilson | Tennessee | 70.00 | 50,953.00 |
| Invoice | 3/23/2005 | 10103 | 05-2784 | CO-Collier-Lee | Alabama | 71.00 | 51,024.00 |
| Invoice | 3/23/2005 | 10112 | 05-2790 | CO-Roy Smith-Douglas | Georgia | 69.00 | 51,093.00 |
| Invoice | 3/23/2005 | 10139 | 05-2882 | CO-Griffin-Gwinnett | Georgia | 68.00 | 51,161.00 |
| Invoice | 3/24/2005 | 10164 | 05-2869 | CO-McDaniel-Montgomery | Alabama | 71.00 | 51,232.00 |
| Invoice | 3/24/2005 | 10173 | 05-2877 | CO-Hendrix-Gilmer | Georgia | 72.00 | 51,304.00 |
| Invoice | 3/24/2005 | 10209 | 04-13505 | update-Marmaduke-Chambers | Alabama | 29.00 | 51,333.00 |
| Invoice | 3/25/2005 | 10237 | 05-2952 | CO-Twilley-Mobile | Alabama | 72.00 | 51,405.00 |
| Invoice | 3/25/2005 | 10238 | 05-2897 | CO-West-Cherokee | Georgia | 73.00 | 51,478.00 |
| Invoice | 3/25/2005 | 10263 | 05-2989 | CO-Cheng-Chatham | Georgia | 70.00 | 51,548.00 |
| Invoice | 3/28/2005 | 10277 | 05-3026 | CO-Harrington-Clayton | Georgia | 68.00 | 51,616.00 |
| Invoice | 3/28/2005 | 10304 | 05-3055 | CO-Broughton-Dekalb | Georgia | 69.00 | 51,685.00 |
| Invoice | 3/29/2005 | 10347 | 05-3073 | CO-Spickard-Gwinnett | Georgia | 71.00 | 51,756.00 |
| Invoice | 3/29/2005 | 10348 | 05-3009 | CO-Shelton-Bibb | Alabama | 69.00 | 51,825.00 |
| Invoice | 3/29/2005 | 10349 | 05-3037 | CO-Coman-Gwinnett | Georgia | 69.00 | 51,894.00 |
| Invoice | 3/29/2005 | 10367 | 05-3067 | CO-Ennis-Effingham | Georgia | 67.00 | 51,961.00 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
# Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 3/29/2005 | 10375 | 05-3072 | CO-Edward-Chilton | Alabama | 69.00 | 52,030.00 |
| Invoice | 3/29/2005 | 10378 | 05-3068 | CO-Reeves-Jones | Georgia | 67.00 | 52,097.00 |
| Invoice | 3/29/2005 | 10385 | 05-3042 | CO-Bass-Jones | Georgia | 76.00 | 52,173.00 |
| Invoice | 3/30/2005 | 10434 | 05-3134 | CO-Daniel-Muscogee | Georgia | 70.00 | 52,243.00 |
| Invoice | 3/31/2005 | 10478 | 05-3155 | CO-Searey-Montgomery | Alabama | 73.00 | 52,316.00 |
| Invoice | 3/31/2005 | 10487 | 05-3169 | CO-Smitherman-CO-Coweta | Georgia | 67.00 | 52,383.00 |
| Invoice | 3/31/2005 | 10504 | 05-611 | update-Il Lee-Fulton | Georgia | 25.00 | 52,408.00 |
| Invoice | 4/1/2005 | 10529 | 05-3187 | CO-Leonard-Greenville | South Ca... | 73.00 | 52,481.00 |
| Invoice | 4/1/2005 | 10541 | 05-3179 | CO-Angie Smith-Escambia | Alabama | 72.00 | 52,553.00 |
| Invoice | 4/1/2005 | 10544 | 05-3289 | CO-Rinehart-Shelby | Tennessee | 70.00 | 52,623.00 |
| Invoice | 4/1/2005 | 10554 | 05-3233 | CO-Hamblin-Houston | Alabama | 72.00 | 52,695.00 |
| Invoice | 4/4/2005 | 10576 | 05-3205 | CO-Ricot-Cobb | Georgia | 68.00 | 52,763.00 |
| Invoice | 4/4/2005 | 10615 | 05-3274 | CO-Sheffield-Dekalb | Georgia | 70.00 | 52,833.00 |
| Invoice | 4/5/2005 | 10644 | 05-2989 | judg/tax lien-Cheng-Chatham | Georgia | 40.00 | 52,873.00 |
| Invoice | 4/5/2005 | 10657 | 05-3294 | CO-Webb-Henry | Georgia | 69.00 | 52,942.00 |
| Invoice | 4/6/2005 | 10728 | 05-3245 | CO-Crane-Blount | Alabama | 69.00 | 53,011.00 |
| Invoice | 4/6/2005 | 10730 | 05-3423 | CO-Tolbert-Blount | Alabama | 73.00 | 53,084.00 |
| Invoice | 4/7/2005 | 10742 | 05-3349 | update-Holmes-Lee | Alabama | 25.00 | 53,109.00 |
| Invoice | 4/8/2005 | 10817 | 05-3528 | CO-Hall-Chatham | Georgia | 65.00 | 53,174.00 |
| Invoice | 4/8/2005 | 10820 | 05-3036 | 30 yr-Stephens-Pike | Alabama | 125.00 | 53,299.00 |
| Invoice | 4/8/2005 | 10837 | 05-3559 | CO-Brown-Mobile | Alabama | 74.00 | 53,373.00 |
| Invoice | 4/11/2005 | 10870 | 05-3584 | CO-Domineck-Dekalb | Georgia | 69.00 | 53,442.00 |
| Invoice | 4/11/2005 | 10892 | 05-1463 | CO-Osaseri-Gwinnett | Georgia | 25.00 | 53,467.00 |
| Invoice | 4/12/2005 | 10923 | 05-3556 | CO-Huntley-Bennett-Montgomery | Alabama | 77.00 | 53,544.00 |
| Invoice | 4/13/2005 | 11018 | 05-3661 | CO-Burnette-Walker | Georgia | 69.00 | 53,613.00 |
| Invoice | 4/14/2005 | 11042 | 05-3774 | CO-Foshehe-Lee | Alabama | 77.00 | 53,690.00 |
| Invoice | 4/14/2005 | 11052 | 05-3533 | 30 yr-Kelly-Tallapoosa | Alabama | 125.00 | 53,815.00 |
| Invoice | 4/18/2005 | 11130 | 05-3887 | CO-Mitchell-Cobb | Georgia | 68.00 | 53,883.00 |
| Invoice | 4/18/2005 | 11169 | 05-3968 | CO-Debs-Oconee | Georgia | 70.00 | 53,953.00 |
| Invoice | 4/19/2005 | 11222 | 05-3922 | CO-Bruce-Pickens | Georgia | 69.00 | 54,022.00 |
| Invoice | 4/19/2005 | 11225 | 05-3874 | CO-Harris-Dekalb | Georgia | 74.00 | 54,096.00 |
| Invoice | 4/19/2005 | 11226 | 05-3958 | CO-Phillips-Dekalb | Georgia | 69.00 | 54,165.00 |
| Invoice | 4/20/2005 | 11257 | 05-3937 | CO-Millwood-Bartow | Georgia | 69.00 | 54,234.00 |
| Invoice | 4/20/2005 | 11283 | 05-4019 | CO-Ferrell-Clayton | Georgia | 66.00 | 54,300.00 |
| Invoice | 4/20/2005 | 11304 | 05-4051 | CO-Farrow-Elmore | Alabama | 73.00 | 54,373.00 |
| Invoice | 4/20/2005 | 11305 | | Il Lee-mtg. rec-Fulton | Georgia | 35.00 | 54,408.00 |
| Invoice | 4/21/2005 | 11340 | 05-3624 | CO-Mitchell-Chilton | Alabama | 71.00 | 54,479.00 |
| Invoice | 4/21/2005 | 11342 | 05-4117 | CO-Walmsley-Montgomery | Alabama | 69.00 | 54,548.00 |
| Invoice | 4/21/2005 | 11346 | 05-4180 | CO-Castald-Autauga | Alabama | 78.00 | 54,626.00 |
| Invoice | 4/21/2005 | 11348 | 05-4091 | CO-Moore-Dekalb | Georgia | 71.00 | 54,697.00 |
| Invoice | 4/21/2005 | 11363 | 05-4171 | CO-Brown-Richmond | Georgia | 72.00 | 54,769.00 |
| Invoice | 4/21/2005 | 11365 | 05-1831 | update-Prince-Meigs | Tennessee | 25.00 | 54,794.00 |
| Invoice | 4/21/2005 | 11367 | 05-4134 | CO-Barry-Clayton | Georgia | 68.00 | 54,862.00 |
| Invoice | 4/22/2005 | 11384 | 05-4106 | CO-Posada-Gwinnett | Georgia | 73.00 | 54,935.00 |
| Invoice | 4/22/2005 | 11385 | 05-4120 | CO-Jones-Gwinnett | Georgia | 65.00 | 55,000.00 |
| Invoice | 4/26/2005 | 11485 | 05-4308 | CO-Powell-Cobb | Georgia | 70.00 | 55,070.00 |
| Invoice | 4/26/2005 | 11489 | 05-2888 | Jesse Thomas-mtg. rec-Fulton | Georgia | 35.00 | 55,105.00 |
| Invoice | 4/26/2005 | 11493 | 05-4306 | CO-Angel-Morgan | Georgia | 79.00 | 55,184.00 |
| Invoice | 4/26/2005 | 11496 | 05-4280 | CO-Whitley-Fulton | Georgia | 69.00 | 55,253.00 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 4/27/2005 | 11541 | 05-4273 | CO-Whitley-Muscogee | Georgia | 71.00 | 55,324.00 |
| Invoice | 4/27/2005 | 11542 | 05-4289 | CO-Perez-Gwinnett | Georgia | 76.00 | 55,400.00 |
| Invoice | 4/27/2005 | 11560 | 05-4436 | CO-Agner-Cabarrus | North Ca... | 69.00 | 55,469.00 |
| Invoice | 4/28/2005 | 11579 | 05-4432 | CO-Graham-Paulding | Georgia | 67.00 | 55,536.00 |
| Invoice | 4/28/2005 | 11587 | 05-4370 | CO-Shannon-Dallas | Alabama | 82.00 | 55,618.00 |
| Invoice | 4/29/2005 | 11670 | 05-4557 | CO-Bivins-Bibb | Georgia | 69.00 | 55,687.00 |
| Invoice | 4/29/2005 | 11680 | 05-4450 | CO-Kennedy-Winston | Alabama | 74.00 | 55,761.00 |
| Invoice | 5/2/2005 | 11718 | 05-4542 | CO-Andrews-Mobile | Alabama | 72.00 | 55,833.00 |
| Invoice | 5/3/2005 | 11719 | 05-4576 | CO-Fish-Dale | Alabama | 70.00 | 55,903.00 |
| Invoice | 5/3/2005 | 11733 | 05-4120 | update-Roberson-Gwinnett | Georgia | 25.00 | 55,928.00 |
| Invoice | 5/3/2005 | 11748 | 05-44424 | 30 yr-Garrett-Mobile | Alabama | 125.00 | 56,053.00 |
| Invoice | 5/3/2005 | 11792 | | Smith-mtg. rec-Fulton | Georgia | 35.00 | 56,088.00 |
| Invoice | 5/4/2005 | 11794 | 05-4521 | CO-Sims-Haralson | Georgia | 65.00 | 56,153.00 |
| Invoice | 5/4/2005 | 11820 | 05-4599 | CO-Grandberry-Cobb | Georgia | 70.00 | 56,223.00 |
| Invoice | 5/4/2005 | 11826 | 053752 | mtg rec-Pearson-Fulton | Georgia | 35.00 | 56,258.00 |
| Invoice | 5/4/2005 | 11842 | 05-4681 | CO-Tennyson-Pickens | Alabama | 77.00 | 56,335.00 |
| Invoice | 5/5/2005 | 11861 | 05-4673 | CO-Hinkle-Blount | Alabama | 71.00 | 56,406.00 |
| Invoice | 5/5/2005 | 11870 | 05-4653 | CO-Dibenebetto-Cabbarrus | North Ca... | 70.00 | 56,476.00 |
| Invoice | 5/5/2005 | 11881 | 05-4667 | CO-Reeves-Henry | Georgia | 69.00 | 56,545.00 |
| Invoice | 5/5/2005 | 11892 | | mtg rec-Rebecca Cook-Fulton | Georgia | 35.00 | 56,580.00 |
| Invoice | 5/5/2005 | 11899 | 05-4602 | CO-Lynn-Morgan | Alabama | 69.00 | 56,649.00 |
| Invoice | 5/5/2005 | 11912 | 05-4718 | CO-Sheppard-Richmond | Georgia | 68.00 | 56,717.00 |
| Invoice | 5/5/2005 | 11913 | 05-4660 | CO-Lee-Forsyth | Georgia | 68.00 | 56,785.00 |
| Invoice | 5/6/2005 | 11937 | 05-4712 | CO-Fuller-Montgomery | Alabama | 72.00 | 56,857.00 |
| Invoice | 5/6/2005 | 11946 | 05-4754 | CO-Black-Escambia | Alabama | 80.00 | 56,937.00 |
| Invoice | 5/6/2005 | 11957 | 05-4690 | CO-Clark-Chatham | Georgia | 65.00 | 57,002.00 |
| Invoice | 5/6/2005 | 11970 | 05-4789 | CO-Boston-Meclenburg | North Ca... | 68.00 | 57,070.00 |
| Invoice | 5/6/2005 | 11974 | 05-4781 | CO-Hardy-Fulton | Georgia | 71.00 | 57,141.00 |
| Invoice | 5/9/2005 | 11994 | 05-4787 | CO-Gordon-Dale | Alabama | 69.00 | 57,210.00 |
| Invoice | 5/9/2005 | 12024 | 05-4631 | CO-Chung-Dade | Georgia | 68.00 | 57,278.00 |
| Invoice | 5/9/2005 | 12038 | 05-4817 | CO-Bell-Mobile | Alabama | 71.00 | 57,349.00 |
| Invoice | 5/10/2005 | 12055 | 05-4848 | CO-Glover-Cobb | Georgia | 70.00 | 57,419.00 |
| Invoice | 5/10/2005 | 12076 | 05-4890 | CO-Barrera-Cobb | Georgia | 76.00 | 57,495.00 |
| Invoice | 5/10/2005 | 12083 | 05-4825 | CO-Morris-Richmond | Georgia | 68.00 | 57,563.00 |
| Invoice | 5/10/2005 | 12085 | 05-2349 | update-Harris-Paulding | Georgia | 31.00 | 57,594.00 |
| Invoice | 5/10/2005 | 12087 | 05-4868 | CO-West-Escambia | Alabama | 77.00 | 57,671.00 |
| Invoice | 5/11/2005 | 12152 | 05-4793 | CO-Perkins-Gwinnett | Georgia | 69.00 | 57,740.00 |
| Invoice | 5/12/2005 | 12172 | 05-4877 | CO-Zayas-Gwinnett | Georgia | 68.00 | 57,808.00 |
| Invoice | 5/12/2005 | 12181 | 05-4898 | CO-Hardy-Speed-Clayton | Georgia | 68.00 | 57,876.00 |
| Invoice | 5/12/2005 | 12184 | 05-4888 | CO-Peart-Clayton | Georgia | 69.00 | 57,945.00 |
| Invoice | 5/12/2005 | 12199 | 05-4861 | CO-Williams-Richmond | Georgia | 67.00 | 58,012.00 |
| Invoice | 5/12/2005 | 12200 | 05-4833 | Co-Durand-Gwinnett | Georgia | 70.00 | 58,082.00 |
| Invoice | 5/12/2005 | 12212 | 05-4918 | CO-Robbins-Escambia | Alabama | 74.00 | 58,156.00 |
| Invoice | 5/12/2005 | 12219 | 05-4982 | CO-Campbell-Fayette | Georgia | 68.00 | 58,224.00 |
| Invoice | 5/12/2005 | 12224 | 05-4938 | CO-Horne-Muscogee | Georgia | 70.00 | 58,294.00 |
| Invoice | 5/12/2005 | 12231 | 05-3067 | update-Ennis-Effingham | Georgia | 30.00 | 58,324.00 |
| Invoice | 5/13/2005 | 12244 | 05-4958 | CO-Lane-Chatham | Georgia | 67.00 | 58,391.00 |
| Invoice | 5/13/2005 | 12294 | 05-4975 | CO-Fowler-Fulton | Georgia | 73.00 | 58,464.00 |
| Invoice | 5/13/2005 | 12295 | 05-4986 | CO-James-Clayton | Georgia | 68.00 | 58,532.00 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 5/13/2005 | 12296 | 05-4385 | CO-Jackson-Madison | Alabama | 69.00 | 58,601.00 |
| Invoice | 5/13/2005 | 12301 | 05-4952 | CO-Winters-Fulton | Georgia | 68.00 | 58,669.00 |
| Invoice | 5/13/2005 | 12314 | 05-4116 | mtg. rec-Daniels-Fulton | Georgia | 35.00 | 58,704.00 |
| Invoice | 5/13/2005 | 12315 | 05-4126 | mtg. rec-Hopper-Fulton | Georgia | 35.00 | 58,739.00 |
| Invoice | 5/16/2005 | 12349 | 05-5017 | Co-Brown-Richmond | Georgia | 77.00 | 58,816.00 |
| Invoice | 5/16/2005 | 12353 | | mtg. rec-TamaraWhitsett-Fulton | Georgia | 35.00 | 58,851.00 |
| Invoice | 5/16/2005 | 12356 | 05-5059 | CO-Fenley-Blount | Alabama | 68.00 | 58,919.00 |
| Invoice | 5/16/2005 | 12364 | 05-4973 | CO-Bynes-Cobb | Georgia | 70.00 | 58,989.00 |
| Invoice | 5/16/2005 | 12370 | 05-5009 | CO-Dennis-Cobb | Georgia | 69.00 | 59,058.00 |
| Invoice | 5/16/2005 | 12383 | 05-4998 | CO-Peoples-Jackson | Georgia | 68.00 | 59,126.00 |
| Invoice | 5/17/2005 | 12391 | 05-5006 | CO-Guice-Lee | Alabama | 70.00 | 59,196.00 |
| Invoice | 5/17/2005 | 12399 | 05-5098 | CO-Carr-Douglas | Georgia | 71.00 | 59,267.00 |
| Invoice | 5/17/2005 | 12422 | 05-5139 | CO-Albright-Calhoun | Alabama | 67.00 | 59,334.00 |
| Invoice | 5/17/2005 | 12444 | 05-5149 | CO-Williams-Richmond | Georgia | 34.00 | 59,368.00 |
| Invoice | 5/17/2005 | 12446 | 05-5031 | Co-Pruitt-Habersham | Georgia | 71.00 | 59,439.00 |
| Invoice | 5/17/2005 | 12462 | 05-5143 | CO-Swanson-Dekalb | Georgia | 72.00 | 59,511.00 |
| Invoice | 5/17/2005 | 12466 | 05-5151 | Co-Bosarge-Mobile | Alabama | 71.00 | 59,582.00 |
| Invoice | 5/18/2005 | 12474 | 05-5125 | CO-Evans-Newton | Georgia | 80.00 | 59,662.00 |
| Invoice | 5/18/2005 | 12521 | 05-5170 | CO-Walden-Dekalb | Georgia | 68.00 | 59,730.00 |
| Invoice | 5/19/2005 | 12530 | 05-5246 | CO-Thomas-Calhoun | Alabama | 69.00 | 59,799.00 |
| Invoice | 5/19/2005 | 12546 | 05-5104 | CO-Kiwanuka-Gwinnett | Georgia | 50.25 | 59,849.25 |
| Invoice | 5/19/2005 | 12553 | 05-5055 | CO-Vest-Cherokee | Georgia | 50.25 | 59,899.50 |
| Invoice | 5/19/2005 | 12574 | 05-5133 | CO-Daniels-Forsyth | Georgia | 70.00 | 59,969.50 |
| Invoice | 5/20/2005 | 12632 | 05-5245 | CO-Nelson-Richmon | Georgia | 73.00 | 60,042.50 |
| Invoice | 5/20/2005 | 12652 | 05-5156 | CO-Hare-White | Georgia | 52.50 | 60,095.00 |
| Invoice | 5/23/2005 | 12674 | 05-5320 | CO-Hammett-Morgan` | Alabama | 70.00 | 60,165.00 |
| Invoice | 5/23/2005 | 12676 | 05-5358 | CO-Taylor-Tuscaloosa | Alabama | 73.00 | 60,238.00 |
| Invoice | 5/24/2005 | 12739 | 05-5299 | CO-Jarrard-Floyd | Georgia | 71.00 | 60,309.00 |
| Invoice | 5/24/2005 | 12758 | 05-5287 | CO-Chumney-Houston | Alabama | 74.00 | 60,383.00 |
| Invoice | 5/25/2005 | 12800 | 05-2113 | update-Burnham-Calhoun | Alabama | 27.00 | 60,410.00 |
| Invoice | 5/25/2005 | 12803 | 05-5356 | CO-Cook-Russell | Alabama | 72.00 | 60,482.00 |
| Invoice | 5/25/2005 | 12840 | 05-4280 | mtg. rec-Whitley-Fulton | Georgia | 35.00 | 60,517.00 |
| Invoice | 5/27/2005 | 12984 | 04-40130 | Co-Samuels-Mobile | Alabama | 69.00 | 60,586.00 |
| Invoice | 5/30/2005 | 13040 | 05-5546 | CO-Viard-Whitfield | Georgia | 74.00 | 60,660.00 |
| Invoice | 5/31/2005 | 13012 | 05-5471 | CO-Bennett-Dallas | Alabama | 82.00 | 60,742.00 |
| Invoice | 5/31/2005 | 13018 | 05-5535 | CO-Derico-Montgomery | Alabama | 68.00 | 60,810.00 |
| Invoice | 6/1/2005 | 13066 | 05-5455 | CO-Thomas-Union | North Ca... | 67.00 | 60,877.00 |
| Invoice | 6/1/2005 | 13073 | 05-5533 | CO-Crum-Montgomery | Alabama | 69.00 | 60,946.00 |
| Invoice | 6/2/2005 | 13121 | 05-4848 | judg/lien-Glover-Cobb | Georgia | 25.00 | 60,971.00 |
| Invoice | 6/2/2005 | 13155 | 05-5547 | 30 yr-Cosper-Tallapoosa | Alabama | 125.00 | 61,096.00 |
| Invoice | 6/6/2005 | 13259 | 05-5609 | 30 yr-Robinson-Forsyth | Georgia | 151.00 | 61,247.00 |
| Invoice | 6/6/2005 | 13291 | 05-5680 | CO-Roberts-Clarke | Mississippi | 71.00 | 61,318.00 |
| Invoice | 6/6/2005 | 13300 | 05-5012 | mtg. rec-Mirras-Fulton | Georgia | 35.00 | 61,353.00 |
| Invoice | 6/6/2005 | 13303 | 05-5704 | CO-Carver-Harrison | Mississippi | 69.00 | 61,422.00 |
| Invoice | 6/6/2005 | 13308 | 05-5647 | CO-Morgan-Mobile | Alabama | 69.00 | 61,491.00 |
| Invoice | 6/7/2005 | 13368 | 05-3639/49... | mtg. rec-Barber-Fulton | Georgia | 70.00 | 61,561.00 |
| Invoice | 6/8/2005 | 13389 | 05-5689 | CO-Lawrence-Dallas | Alabama | 69.00 | 61,630.00 |
| Invoice | 6/8/2005 | 13407 | 05-5718 | CO-Malcolm-Etowah | Alabama | 72.00 | 61,702.00 |
| Invoice | 6/8/2005 | 13422 | 05-5670 | CO-Fields-Henry | Georgia | 70.00 | 61,772.00 |

9:11 AM

05/28/08

Accrual Basis

## Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 6/8/2005 | 13433 | 05-5681 | CO-Cheatham-Franklin | Alabama | 67.00 | 61,839.00 |
| Invoice | 6/8/2005 | 13438 | 05-5721 | CO-Allen-Colbert | Alabama | 69.00 | 61,908.00 |
| Invoice | 6/8/2005 | 13468 | 05-5647 | CO-Sylvester-Morgan-Mobile | Alabama | 72.00 | 61,980.00 |
| Invoice | 6/9/2005 | 13508 | 05-5635 | 30 yr-Robinson-Cobb | Georgia | 125.00 | 62,105.00 |
| Invoice | 6/9/2005 | 13517 | 05-5780 | CO-Newll-Lauderdale | Mississippi | 78.00 | 62,183.00 |
| Invoice | 6/9/2005 | 13550 | 05-5750 | CO-Watters-Montgomery | Alabama | 69.00 | 62,252.00 |
| Invoice | 6/9/2005 | 13559 | 05-5787 | 30 yr-Lambert-Baldwin | Alabama | 125.00 | 62,377.00 |
| Invoice | 6/10/2005 | 13571 | 05-2865 | CO-Wheeler,Dirk-Muscogee | Georgia | 73.00 | 62,450.00 |
| Invoice | 6/10/2005 | 13572 | 05-5784 | CO-Headley,Thomas-Chilton | Alabama | 70.00 | 62,520.00 |
| Invoice | 6/10/2005 | 13594 | 05-5864 | CO-Bullock,Wanda-Calhoun | Alabama | 69.00 | 62,589.00 |
| Invoice | 6/10/2005 | 13629 | 05-5786 | CO-Collins, Tommy-Montgomery | Alabama | 71.00 | 62,660.00 |
| Invoice | 6/10/2005 | 13648 | 05-5889 | CO-Coppock,Wayne-Calhoun | Alabama | 67.00 | 62,727.00 |
| Invoice | 6/10/2005 | 13653 | 05-5892 | CO-Hamoton,Paul-Union | North Ca... | 64.00 | 62,791.00 |
| Invoice | 6/10/2005 | 13654 | 05-5790 | CO-Wilson,Stacy-Colbert | Alabama | 75.00 | 62,866.00 |
| Invoice | 6/13/2005 | 13678 | 05-5885 | CO-Martin,Elizabeth-Hinds | Mississippi | 68.00 | 62,934.00 |
| Invoice | 6/13/2005 | 13688 | 05-5670 | Judg/Lien-Fields,Jackie-Henry | Georgia | 35.00 | 62,969.00 |
| Invoice | 6/13/2005 | 13707 | 05-5681 | CO-Cheatham,Joanne-Franklin | Alabama | 68.00 | 63,037.00 |
| Invoice | 6/13/2005 | 13708 | 05-5833 | CO-Lawshe,Larry-Mobile | Alabama | 73.00 | 63,110.00 |
| Invoice | 6/13/2005 | 13709 | 05-5895 | CO-Randolph,Florence-Franklin | Alabama | 73.00 | 63,183.00 |
| Invoice | 6/13/2005 | 13735 | 05-5852 | CO-Ford,Thomas-Marshall | Alabama | 68.00 | 63,251.00 |
| Invoice | 6/13/2005 | 13747 | 05-5830 | CO-Lamy,Stephen-Madison | Alabama | 72.00 | 63,323.00 |
| Invoice | 6/14/2005 | 13774 | 05-5930 | CO-Smith,Diane-Baldwin | Alabama | 70.00 | 63,393.00 |
| Invoice | 6/15/2005 | 13828 | 05-5971 | CO-Adams-Dale | Alabama | 70.00 | 63,463.00 |
| Invoice | 6/15/2005 | 13831 | 05-5951 | CO-Napier-Mobile | Alabama | 71.00 | 63,534.00 |
| Invoice | 6/15/2005 | 13855 | 05-5875 | CO-Thompson-Mobile | Alabama | 80.00 | 63,614.00 |
| Invoice | 6/15/2005 | 13861 | 05-5888 | CO-Crook-Baldwin | Alabama | 72.00 | 63,686.00 |
| Invoice | 6/15/2005 | 13869 | 05-5948 | CO-Faust-Elmore | Alabama | 72.00 | 63,758.00 |
| Invoice | 6/15/2005 | 13874 | 05-5952 | CO-Barnett-Jasper | Mississippi | 71.00 | 63,829.00 |
| Invoice | 6/16/2005 | 13897 | 05-5906 | CO-Cartwright-Madison | Alabama | 68.00 | 63,897.00 |
| Invoice | 6/16/2005 | 13901 | 05-5957 | CO-Greene-Union | North Ca... | 74.00 | 63,971.00 |
| Invoice | 6/16/2005 | 13950 | 05-5994 | CO-Whale-Cherokee | Alabama | 71.00 | 64,042.00 |
| Invoice | 6/16/2005 | 13976 | 05-5095 | mtg. rec-Garland-Fulton | Georgia | 35.00 | 64,077.00 |
| Invoice | 6/17/2005 | 14025 | 05-6010 | CO-Howard-Mobile | Alabama | 73.00 | 64,150.00 |
| Invoice | 6/21/2005 | 14124 | 05-4781 | update-Hardy-Fulton | Georgia | 25.00 | 64,175.00 |
| Invoice | 6/21/2005 | 14132 | 05-6127 | CO--McCrary-Rowan | North Ca... | 73.00 | 64,248.00 |
| Invoice | 6/21/2005 | 14167 | 05-6142 | CO-Manning-Rankin | Mississippi | 69.00 | 64,317.00 |
| Invoice | 6/22/2005 | 14243 | 05-6213 | Co-Akers-Chambers | Alabama | 78.00 | 64,395.00 |
| Invoice | 6/23/2005 | 14312 | 05-6288 | CO-Ballard-Marion | Alabama | 72.00 | 64,467.00 |
| Invoice | 6/24/2005 | 14314 | 05-6259 | CO-Taylor-Hinds | Mississippi | 66.00 | 64,533.00 |
| Invoice | 6/24/2005 | 14320 | 05-6145 | CO-Poindexter-Hinds | Mississippi | 74.00 | 64,607.00 |
| Invoice | 6/24/2005 | 14326 | 05-5490 | judg/lien-Waters-Murray | Georgia | 25.00 | 64,632.00 |
| Invoice | 6/24/2005 | 14336 | 05-6319 | CO-Smith-Madison | Mississippi | 87.00 | 64,719.00 |
| Invoice | 6/24/2005 | 14351 | 05-6350 | CO-2 parcelsBarham-Lauderdale | Mississippi | 135.00 | 64,854.00 |
| Invoice | 6/24/2005 | 14378 | 05-6237 | CO-Dixon-Hinds | Mississippi | 68.00 | 64,922.00 |
| Invoice | 6/28/2005 | 14471 | 05-6380 | Co-Anderson-Lee | Alabama | 72.00 | 64,994.00 |
| Invoice | 7/1/2005 | 14664 | 05-6464 | CO-Wilson-Elmore | Alabama | 73.50 | 65,067.50 |
| Invoice | 7/5/2005 | 14716 | 05-6383 | CO-Scott-Mobile | Alabama | 72.00 | 65,139.50 |
| Invoice | 7/5/2005 | 14723 | 05-4975 | update-Fowler-Fulton | Georgia | 25.00 | 65,164.50 |
| Invoice | 7/7/2005 | 14837 | 05-6515 | CO-Herring-Elmore | Alabama | 69.00 | 65,233.50 |

9:11 AM

05/28/08

Accrual Basis

## Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 7/7/2005 | 14888 | 05-6492 | CO-Shelton-Jefferson | Alabama | 72.00 | 65,305.50 |
| Invoice | 7/8/2005 | 14981 | 05-6548 | Co-Headley-Chilton | Alabama | 68.00 | 65,373.50 |
| Invoice | 7/12/2005 | 15040 | 05-6679 | CO-Wilson-Talladega | Alabama | 89.00 | 65,462.50 |
| Invoice | 7/12/2005 | 15043 | 05-6645 | CO-Steward-Copiah | Mississippi | 69.00 | 65,531.50 |
| Invoice | 7/12/2005 | 15046 | 05-6641 | CO-Matthews-Madison | Mississippi | 74.00 | 65,605.50 |
| Invoice | 7/13/2005 | 15072 | 05-4781 | mtg. rec-Hardy-Fulton | Georgia | 35.00 | 65,640.50 |
| Invoice | 7/13/2005 | 15073 | 05-5977 | mtg. rec-Cannon-Fulton | Georgia | 35.00 | 65,675.50 |
| Invoice | 7/13/2005 | 15074 | 05-5727 | mtg. rec-Peek-Fulton | Georgia | 35.00 | 65,710.50 |
| Invoice | 7/13/2005 | 15076 | 05-6721 | CO-Jefferson-Tuscaloosa | Alabama | 69.00 | 65,779.50 |
| Invoice | 7/13/2005 | 15077 | 05-6745 | CO-Boler-Tuscaloosa | Alabama | 69.00 | 65,848.50 |
| Invoice | 7/13/2005 | 15103 | 05-6693 | CO-Bracey-Hinds | Mississippi | 74.00 | 65,922.50 |
| Invoice | 7/14/2005 | 15153 | 05-6734 | CO-McMillian-Talladega | Alabama | 79.00 | 66,001.50 |
| Invoice | 7/15/2005 | 15212 | 05-6838 | CO-Beasley-Jones | Mississippi | 68.00 | 66,069.50 |
| Invoice | 7/15/2005 | 15217 | 05-6813 | CO-East-Madison | Alabama | 71.00 | 66,140.50 |
| Invoice | 7/15/2005 | 15223 | 05-6770 | CO-Mooneyham-Harrison | Mississippi | 71.00 | 66,211.50 |
| Invoice | 7/15/2005 | 15266 | | CO-Winborn-Lauderdale | Alabama | 70.00 | 66,281.50 |
| Invoice | 7/15/2005 | 15272 | 05-6893 | CO-Jones-Tuscaloosa | Alabama | 68.00 | 66,349.50 |
| Invoice | 7/18/2005 | 15283 | 05-6818 | Co-Owens-Dallas | Alabama | 73.00 | 66,422.50 |
| Invoice | 7/18/2005 | 15292 | 05-6629 | CO-Rogers-Lamar | Alabama | 83.00 | 66,505.50 |
| Invoice | 7/18/2005 | 15301 | 05-6839 | CO-Cooper-Clarke | Mississippi | 70.00 | 66,575.50 |
| Invoice | 7/18/2005 | 15302 | 05-6873 | CO-Gardner-Tuscaloosa | Alabama | 70.00 | 66,645.50 |
| Invoice | 7/18/2005 | 15317 | 05-6877 | CO-Finch-Houston | Alabama | 77.00 | 66,722.50 |
| Invoice | 7/19/2005 | 15369 | 05-6914 | CO-McDaniels-Iredell | North Ca... | 75.00 | 66,797.50 |
| Invoice | 7/19/2005 | 15371 | 05-6904 | Co-Harmon-Cabarrus | North Ca... | 69.00 | 66,866.50 |
| Invoice | 7/19/2005 | 15372 | 05-6090 | mtg. rec-Oliver-Fulton | Georgia | 35.00 | 66,901.50 |
| Invoice | 7/19/2005 | 15377 | 05-6955 | CO-Stewart-Hinds | Mississippi | 70.00 | 66,971.50 |
| Invoice | 7/20/2005 | 15391 | 05-6983 | CO-Bolden-Mecklenburg | North Ca... | 71.00 | 67,042.50 |
| Invoice | 7/20/2005 | 15409 | 05-5017 | update-Brown-Richmond | Georgia | 25.00 | 67,067.50 |
| Invoice | 7/20/2005 | 15412 | 05-4385 | CO-Jackson-Madison | Alabama | 47.00 | 67,114.50 |
| Invoice | 7/20/2005 | 15423 | 05-6515 | CO-Herring-Elmore | Alabama | 67.00 | 67,181.50 |
| Invoice | 7/20/2005 | 15429 | 05-6938 | CO-Harvey-Lauderdale | Mississippi | 72.00 | 67,253.50 |
| Invoice | 7/21/2005 | 15506 | 05-7004 | CO-King-Irdell | North Ca... | 72.00 | 67,325.50 |
| Invoice | 7/21/2005 | 15517 | 05-6964 | CO-Jones-Etowah | Alabama | 71.00 | 67,396.50 |
| Invoice | 7/22/2005 | 15583 | 05-7039 | CO-Davis-Calhoun | Alabama | 68.00 | 67,464.50 |
| Invoice | 7/25/2005 | 15614 | 05-7089 | CO-Jett-Walker | Alabama | 75.00 | 67,539.50 |
| Invoice | 7/25/2005 | 15617 | 05-7057 | CO-Gildersleeve-Mobile | Alabama | 67.00 | 67,606.50 |
| Invoice | 7/25/2005 | 15629 | 05-7052 | CO-Young-Tallapoosa | Alabama | 73.00 | 67,679.50 |
| Invoice | 7/25/2005 | 15632 | 05-7053 | CO-Copeland-Autauga | Alabama | 74.00 | 67,753.50 |
| Invoice | 7/25/2005 | 15663 | 05-7016 | Co-Glover-Scott | Mississippi | 70.00 | 67,823.50 |
| Invoice | 7/26/2005 | 15678 | 05-7075 | CO-Sako-Mecklenburg | North Ca... | 67.00 | 67,890.50 |
| Invoice | 7/26/2005 | 15719 | 05-7130 | CO-Martin-Autauga | Alabama | 75.00 | 67,965.50 |
| Invoice | 7/27/2005 | 15728 | 05-7131 | CO-Fernandez-Iredell | North Ca... | 72.00 | 68,037.50 |
| Invoice | 7/27/2005 | 15761 | 05-5833 | update-Lawshe-Mobile | Alabama | 25.00 | 68,062.50 |
| Invoice | 7/29/2005 | 15880 | 05-6515 | 4 part-Herring-Elmore | Alabama | 27.25 | 68,089.75 |
| Invoice | 8/1/2005 | 15930 | 05-7178 | CO-Parker-Montgomery | Alabama | 81.00 | 68,170.75 |
| Invoice | 8/1/2005 | 15933 | 05-5786 | update-Collins-Montgomery | Alabama | 27.00 | 68,197.75 |
| Invoice | 8/1/2005 | 15935 | 05-7179 | CO-Havranek-Baldwin | Alabama | 78.00 | 68,275.75 |
| Invoice | 8/1/2005 | 15957 | 05-7215 | CO-Jones-Etowah | Alabama | 70.00 | 68,345.75 |
| Invoice | 8/3/2005 | 16080 | 05-7276 | CO-Mangrum-Mecklenburg | North Ca... | 70.00 | 68,415.75 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 8/4/2005 | 16084 | 05-7240 | CO/24 mo-Bell-Dallas | Alabama | 74.00 | 68,489.75 |
| Invoice | 8/4/2005 | 16093 | 05-7302 | CO-24 mo. chain-Ware-Mobile | Alabama | 82.00 | 68,571.75 |
| Invoice | 8/8/2005 | 16202 | 05-5341 | mtg. rec-Johnson-Fulton | Georgia | 35.00 | 68,606.75 |
| Invoice | 8/8/2005 | 16247 | 05-7359 | CO-Williams-Mecklenburg | North Ca... | 70.00 | 68,676.75 |
| Invoice | 8/8/2005 | 16261 | 05-6864 | CO-Sage-Coffee | Alabama | 74.00 | 68,750.75 |
| Invoice | 8/9/2005 | 16305 | 05-7311 | CO-Sutton-Wake | North Ca... | 69.00 | 68,819.75 |
| Invoice | 8/10/2005 | 16344 | 05-7360 | CO-Clement-Buncombe- | North Ca... | 75.00 | 68,894.75 |
| Invoice | 8/10/2005 | 16360 | 05-4975 | mtg. rec-Johnson-Fulton | Georgia | 35.00 | 68,929.75 |
| Invoice | 8/11/2005 | 16422 | 05-7353 | CO-Barnett-Jasper | Mississippi | 83.00 | 69,012.75 |
| Invoice | 8/11/2005 | 16432 | 05-7398 | CO-Williams-Tuscaloosa | Alabama | 68.00 | 69,080.75 |
| Invoice | 8/11/2005 | 16435 | 05-5784 | update-Headley-Chilton | Alabama | 25.00 | 69,105.75 |
| Invoice | 8/11/2005 | 16455 | 05-7428 | 30 yr-Shoemake-Hancock | Mississippi | 125.00 | 69,230.75 |
| Invoice | 8/11/2005 | 16458 | 05-7372 | 30 yr-Swader-Morgan | Alabama | 125.00 | 69,355.75 |
| Invoice | 8/12/2005 | 16516 | 05-7362 | CO-Hill-Mobile | Alabama | 88.00 | 69,443.75 |
| Invoice | 8/12/2005 | 16558 | 05-7403 | CO-Hooper-Gaston | North Ca... | 71.00 | 69,514.75 |
| Invoice | 8/16/2005 | 16657 | 05-7494 | CO-Maye-Jasper | Mississippi | 74.00 | 69,588.75 |
| Invoice | 8/16/2005 | 16678 | 05-6703 | mtg. rec-Johnson-Fulton | Georgia | 35.00 | 69,623.75 |
| Invoice | 8/16/2005 | 16712 | 05-7444 | CO-McBee-Mecklenburg | North Ca... | 67.00 | 69,690.75 |
| Invoice | 8/17/2005 | 16779 | 05-7523 | CO-Newell-Hinds | Mississippi | 72.00 | 69,762.75 |
| Invoice | 8/18/2005 | 16788 | 05-7537 | CO-Lancaster-Hancock | Mississippi | 70.00 | 69,832.75 |
| Invoice | 8/18/2005 | 16830 | 05-7476 | Co-Woods-Mobile | Alabama | 71.00 | 69,903.75 |
| Invoice | 8/18/2005 | 16843 | 05-7480 | CO-Cosilow-Copiah | Mississippi | 69.00 | 69,972.75 |
| Invoice | 8/19/2005 | 16860 | 05-7551 | CO-Harper-Lee | Alabama | 72.00 | 70,044.75 |
| Invoice | 8/19/2005 | 16879 | 05-7483 | CO-Ward-Elmore | Alabama | 71.00 | 70,115.75 |
| Invoice | 8/19/2005 | 16891 | 05-7556 | CO-Wright-Dekalb | Alabama | 69.00 | 70,184.75 |
| Invoice | 8/23/2005 | 16995 | 05-7630 | CO-Arrington-Limestone | Alabama | 70.00 | 70,254.75 |
| Invoice | 8/23/2005 | 17007 | 05-7587 | CO-Reed-Madison | Mississippi | 74.00 | 70,328.75 |
| Invoice | 8/23/2005 | 17011 | 05-7668 | CO-Gunn-Etowah | Alabama | 69.00 | 70,397.75 |
| Invoice | 8/23/2005 | 17018 | 05-7676 | CO-Pourclau-Shelby | Alabama | 73.00 | 70,470.75 |
| Invoice | 8/24/2005 | 17097 | 05-7674 | CO-Fowler-Talladega | Alabama | 74.00 | 70,544.75 |
| Invoice | 8/25/2005 | 17120 | 05-7735 | CO-Lumpkin-Etowah | Alabama | 71.00 | 70,615.75 |
| Invoice | 8/25/2005 | 17182 | 05-7716 | CO-McMullan-Smith | Mississippi | 70.00 | 70,685.75 |
| Invoice | 8/31/2005 | 17360 | 05-7796 | CO-Dick-Calhoun | Alabama | 77.00 | 70,762.75 |
| Invoice | 8/31/2005 | 17369 | 05-7784 | CO-Ridgeway-Talladega | Alabama | 67.00 | 70,829.75 |
| Invoice | 8/31/2005 | 17396 | 05-7817 | Co-Blackman-Escambia | Alabama | 72.00 | 70,901.75 |
| Invoice | 9/1/2005 | 17413 | 05-7190 | mtg. rec-Oliver-Fulton | Georgia | 41.00 | 70,942.75 |
| Invoice | 9/1/2005 | 17414 | 05-5510 | mtg. rec-Johnson-Fulton | Georgia | 35.00 | 70,977.75 |
| Invoice | 9/2/2005 | 17491 | 05-7852 | CO-Vaughn-Surry | North Ca... | 71.00 | 71,048.75 |
| Invoice | 9/2/2005 | 17499 | 05-7879 | CO-Parker-Etowah | Alabama | 73.00 | 71,121.75 |
| Invoice | 9/2/2005 | 17520 | 05-7849 | CO-Brown-Calhoun | Alabama | 73.00 | 71,194.75 |
| Invoice | 9/8/2005 | 17643 | 05-7845 | CO-Hill-Walker | Alabama | 75.00 | 71,269.75 |
| Invoice | 9/8/2005 | 17664 | 05-6964 | Update-Jones-Etowah | Alabama | 25.00 | 71,294.75 |
| Invoice | 9/8/2005 | 17702 | 05-7761 | CO-Taylor-Mobile | Alabama | 74.00 | 71,368.75 |
| Invoice | 9/9/2005 | 17707 | 05-7786 | CO-Gordon-Mobile | Alabama | 84.00 | 71,452.75 |
| Invoice | 9/13/2005 | 17848 | 05-7901 | CO-Green-Montgomery | Alabama | 87.00 | 71,539.75 |
| Invoice | 9/14/2005 | 17902 | 05-8050 | CO-Kelly-Tuscaloosa | Alabama | 71.00 | 71,610.75 |
| Invoice | 9/14/2005 | 17937 | 05-8020 | CO-Sanderson-Colbert | Alabama | 68.00 | 71,678.75 |
| Invoice | 9/15/2005 | 17978 | 05-7956 | CO-Shelton-Jones | Mississippi | 67.00 | 71,745.75 |
| Invoice | 9/15/2005 | 17981 | 05-5341 | mtg. filing-Kelly-Fulton | Georgia | 35.00 | 71,780.75 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 9/15/2005 | 18011 | 05-8049 | Co-McDavid-Hinds | Mississippi | 70.00 | 71,850.75 |
| Invoice | 9/16/2005 | 18055 | 05-5830 | update-Lamy-Limestone | Alabama | 25.00 | 71,875.75 |
| Invoice | 9/19/2005 | 18115 | 05-8100 | CO-Chukwurah-Wake | North Ca... | 70.00 | 71,945.75 |
| Invoice | 9/19/2005 | 18124 | 05-8137 | Co-McGill-Mecklenburg | North Ca... | 69.00 | 72,014.75 |
| Invoice | 9/19/2005 | 18135 | 05-8127 | CO-Tedder-Houston | Alabama | 82.00 | 72,096.75 |
| Invoice | 9/20/2005 | 18190 | 05-8236 | Co-Brown-Colbert | Alabama | 72.00 | 72,168.75 |
| Invoice | 9/20/2005 | 18198 | 05-8181 | CO-Holloway-Randolph | Alabama | 84.00 | 72,252.75 |
| Invoice | 9/20/2005 | 18223 | 05-8051 | full search-Rogers-Montgomery | Alabama | 125.00 | 72,377.75 |
| Invoice | 9/22/2005 | 18360 | 05-8161 | CO-Wilbourn-Jackson | Alabama | 70.00 | 72,447.75 |
| Invoice | 9/23/2005 | 18456 | 05-8298 | CO-Harrison-Mecklenburg | North Ca... | 70.00 | 72,517.75 |
| Invoice | 9/23/2005 | 18458 | 05-8300 | CO-Martin-Mecklenburg | North Ca... | 70.00 | 72,587.75 |
| Invoice | 9/26/2005 | 18529 | 05-7178 | update-Parker-Montgomery | Alabama | 25.00 | 72,612.75 |
| Invoice | 9/27/2005 | 18536 | 05-8292 | CO-Upchurch-Durham | North Ca... | 70.00 | 72,682.75 |
| Invoice | 9/27/2005 | 18575 | 05-8321 | CO-Smith-Montgomery | Alabama | 72.00 | 72,754.75 |
| Invoice | 9/28/2005 | 18627 | 05-8345 | full search-Casey-Surry | North Ca... | 125.00 | 72,879.75 |
| Invoice | 9/29/2005 | 18697 | 05-8369 | CO-Davis-Cleveland | North Ca... | 72.00 | 72,951.75 |
| Invoice | 10/4/2005 | 18839 | 05-8420 | co-Hicks- Madison | Alabama | 69.00 | 73,020.75 |
| Invoice | 10/4/2005 | 18857 | 05-7053 | retrieval- Copland-Autauga | Alabama | 25.00 | 73,045.75 |
| Invoice | 10/5/2005 | 18916 | 058468 | co-Hoke-Catawba | North Ca... | 69.00 | 73,114.75 |
| Invoice | 10/5/2005 | 18921 | 05-523 | retrieval-Smallwood-Dekalb | Alabama | 25.00 | 73,139.75 |
| Invoice | 10/7/2005 | 19028 | 05-7556 | Update-Wright-Dekalb | Alabama | 25.00 | 73,164.75 |
| Invoice | 10/11/2005 | 19170 | 05-8526 | co-Lauderdale-Marion | Alabama | 90.00 | 73,254.75 |
| Invoice | 10/12/2005 | 19200 | 05-8528 | CO-Hopson-Lauderdale | Mississippi | 68.00 | 73,322.75 |
| Invoice | 10/14/2005 | 19334 | 05-8604 | co-Dimsdale-Buncombe | North Ca... | 71.00 | 73,393.75 |
| Invoice | 10/17/2005 | 19445 | 05-8688 | co-Digby-Calhoun | Alabama | 69.00 | 73,462.75 |
| Invoice | 10/18/2005 | 19456 | 05-8659 | co-McCarthy-Durham | North Ca... | 72.00 | 73,534.75 |
| Invoice | 10/19/2005 | 19510 | 05-7302 | update-Ware-Mobile | Alabama | 25.00 | 73,559.75 |
| Invoice | 10/19/2005 | 19518 | 05-8655 | CO-Huguley-Chambers | Alabama | 72.00 | 73,631.75 |
| Invoice | 10/19/2005 | 19522 | 05-7852 | update-Vaughn-Surry | North Ca... | 25.00 | 73,656.75 |
| Invoice | 10/20/2005 | 19574 | 05-8680 | co-Hatfield-Madison | Mississippi | 70.00 | 73,726.75 |
| Invoice | 10/21/2005 | 19625 | 05-8745 | CO-Laird-Baldwin | Alabama | 73.00 | 73,799.75 |
| Invoice | 10/21/2005 | 19688 | 05-8798 | CO-McCrary-Scott | Mississippi | 75.00 | 73,874.75 |
| Invoice | 10/24/2005 | 19698 | 05-8689 | Stevens-co-Dekalb | Alabama | 125.00 | 73,999.75 |
| Invoice | 10/24/2005 | 19718 | 05-7817 | update-Blackman-Escambia | Alabama | 25.00 | 74,024.75 |
| Invoice | 10/26/2005 | 19880 | 05-8860 | CO-Baty-Wake | North Ca... | 71.00 | 74,095.75 |
| Invoice | 10/26/2005 | 19895 | 05-8873 | CO-Reynolds-Hinds | Mississippi | 70.00 | 74,165.75 |
| Invoice | 10/26/2005 | 19902 | 05-8863 | CO-Pounders-Marion | Alabama | 77.00 | 74,242.75 |
| Invoice | 10/27/2005 | 19930 | 05-8875 | CO-Lewis,Tyler-Scott | Mississippi | 77.00 | 74,319.75 |
| Invoice | 10/27/2005 | 19945 | 05-8918 | CO-Freeman,Heather-Calhoun | Alabama | 68.00 | 74,387.75 |
| Invoice | 10/27/2005 | 19949 | 05-8857 | CO-Brock,Jimmy-Etowah | Alabama | 70.00 | 74,457.75 |
| Invoice | 10/27/2005 | 19973 | 05-8877 | CO-Eady-Morgan | Alabama | 74.00 | 74,531.75 |
| Invoice | 10/28/2005 | 20004 | 05-8858 | CO-Royster-Morgan | Alabama | 15.50 | 74,547.25 |
| Invoice | 11/7/2005 | 20246 | 05-8982 | CO-Ainsworth-Rankin | Mississippi | 73.00 | 74,620.25 |
| Invoice | 11/7/2005 | 20279 | 05-8960 | CO-Moncrief-Montgomery | Alabama | 71.00 | 74,691.25 |
| Invoice | 11/7/2005 | 20285 | 05-9000 | CO-Walker-Madison | Mississippi | 64.00 | 74,755.25 |
| Invoice | 11/8/2005 | 20396 | 05-9043 | CO-Jairam-Colbert | Alabama | 68.00 | 74,823.25 |
| Invoice | 11/8/2005 | 20423 | 05-9011 | CO-Howard-Montgomery | Alabama | 76.00 | 74,899.25 |
| Invoice | 11/9/2005 | 20478 | 05-9059 | CO-McBounds-Hinds | Mississippi | 72.00 | 74,971.25 |
| Invoice | 11/9/2005 | 20509 | 05-9079 | CO-Lee-Etowah | Alabama | 73.00 | 75,044.25 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 11/9/2005 | 20515 | 05-8200 | mtg. rec-Evans-Fulton | Georgia | 35.00 | 75,079.25 |
| Invoice | 11/9/2005 | 20516 | 05-9037 | CO-Jenkins-Tallapoosa | Alabama | 76.00 | 75,155.25 |
| Invoice | 11/9/2005 | 20530 | 05-9064 | CO-Nelson-Calhoun | Alabama | 67.00 | 75,222.25 |
| Invoice | 11/10/2005 | 20586 | 05-9073 | Co-Mohead-Rankin | Mississippi | 68.00 | 75,290.25 |
| Invoice | 11/10/2005 | 20591 | 05-9120 | CO-Lanham-Etowah | Alabama | 69.00 | 75,359.25 |
| Invoice | 11/10/2005 | 20626 | 05-9071 | CO-Jarell-Marshall | Alabama | 69.00 | 75,428.25 |
| Invoice | 11/10/2005 | 20628 | 05-9040 | CO-Haywood-Montgomery | Alabama | 82.00 | 75,510.25 |
| Invoice | 11/10/2005 | 20638 | 05-8963 | CO-Johnson-Mobile | Alabama | 70.00 | 75,580.25 |
| Invoice | 11/16/2005 | 20793 | 05-8963 | CO-Johnson-Mobile | Alabama | 81.00 | 75,661.25 |
| Invoice | 11/16/2005 | 20827 | 05-9168 | CO-Hallyburton-Elmore | Alabama | 69.00 | 75,730.25 |
| Invoice | 11/17/2005 | 20907 | 05-9169 | CO-Robinson-Madison | Alabama | 76.00 | 75,806.25 |
| Invoice | 11/21/2005 | 21000 | 05-7798 | mtg. rec-Henderson-Fulton | Georgia | 35.00 | 75,841.25 |
| Invoice | 11/21/2005 | 21007 | 05-7791 | mtg. rec-Toure-Fulton | Georgia | 35.00 | 75,876.25 |
| Invoice | 11/22/2005 | 21056 | 05-9299 | Co-Self-Etowah | Alabama | 68.00 | 75,944.25 |
| Invoice | 11/22/2005 | 21057 | 05-9214 | CO-Freeze-Rowan | North Ca... | 70.00 | 76,014.25 |
| Invoice | 11/22/2005 | 21094 | 05-9252 | Co-Cameron-Hinds | Mississippi | 69.00 | 76,083.25 |
| Invoice | 11/23/2005 | 21146 | | mtg. ret-Robinson-Dekalb | Georgia | 25.00 | 76,108.25 |
| Invoice | 11/30/2005 | 21336 | 05-8873 | copy of mtg-Matory-Hinds | Mississippi | 31.00 | 76,139.25 |
| Invoice | 11/30/2005 | 21352 | 05-9339 | CO-Canty-Montgomery | Alabama | 73.00 | 76,212.25 |
| Invoice | 12/2/2005 | 21433 | 05-7891 | mtg. rec-Watson-Fulton | Georgia | 35.00 | 76,247.25 |
| Invoice | 12/5/2005 | 21452 | 05-9343 | CO-Wells-Montgomery | Alabama | 71.00 | 76,318.25 |
| Invoice | 12/8/2005 | 21595 | 05-9423 | CO-Moss-Mecklenburg-Charlotte | North Ca... | 72.00 | 76,390.25 |
| Invoice | 12/8/2005 | 21623 | 05-9362 | CO-Lands-Blount | Alabama | 71.00 | 76,461.25 |
| Invoice | 12/10/2005 | 21679 | 05-9449 | CO-Riddle-Winston | Alabama | 67.00 | 76,528.25 |
| Invoice | 12/14/2005 | 21888 | 05-9494 | CO-Smith-Etowah | Alabama | 70.00 | 76,598.25 |
| Invoice | 12/14/2005 | 21905 | 05-9476 | CO-Carpenter-Buncombe | North Ca... | 68.00 | 76,666.25 |
| Invoice | 12/15/2005 | 21915 | 05-9429 | CO-Dula-Caldwell | North Ca... | 73.00 | 76,739.25 |
| Invoice | 12/15/2005 | 21920 | 05-9412 | CO-Lewis-Etowah | Alabama | 71.00 | 76,810.25 |
| Invoice | 12/15/2005 | 21923 | 05-9399 | CO-Harris-Mobile | Alabama | 73.00 | 76,883.25 |
| Invoice | 12/19/2005 | 22040 | 05-9536 | CO-Watts-Dekalb | Alabama | 74.00 | 76,957.25 |
| Invoice | 12/19/2005 | 22051 | 05-9552 | CO-Bartlett-Cullman | Alabama | 70.00 | 77,027.25 |
| Invoice | 12/20/2005 | 22060 | 05-9429 | CO-Dula-Caldwell | North Ca... | 73.00 | 77,100.25 |
| Invoice | 12/20/2005 | 22069 | 05-9505 | 30 yr-Upton-Pickens | Georgia | 135.00 | 77,235.25 |
| Invoice | 12/21/2005 | 22169 | 05-9571 | 30 yr-Crowley-Morgan | Alabama | 125.00 | 77,360.25 |
| Invoice | 12/28/2005 | 22319 | 05-9658 | CO-Hamilton-Davidson | North Ca... | 71.00 | 77,431.25 |
| Invoice | 12/29/2005 | 22379 | 05-9680 | CO-Johnson-Montgomery | Alabama | 87.00 | 77,518.25 |
| Invoice | 12/29/2005 | 22380 | 05-9676 | CO-Thompkins-Montgomery | Alabama | 72.00 | 77,590.25 |
| Invoice | 1/3/2006 | 22517 | 05-9683 | CO-Boyd-Morgan | Alabama | 67.00 | 77,657.25 |
| Invoice | 1/4/2006 | 22550 | 05-9710 | CO-Hardrick-Montgomery | Alabama | 72.00 | 77,729.25 |
| Invoice | 1/4/2006 | 22604 | 05-8976 | mtg. rec-Shepard-Fulton | Georgia | 35.00 | 77,764.25 |
| Invoice | 1/6/2006 | 22673 | 06-00099 | CO-Dula-Forsyth | North Ca... | 69.00 | 77,833.25 |
| Invoice | 1/6/2006 | 22677 | 06-00063 | Co-Jenkins-Baldwin | Alabama | 83.00 | 77,916.25 |
| Invoice | 1/10/2006 | 22785 | 06-00101 | CO-Sanders-Chambers | Alabama | 117.00 | 78,033.25 |
| Invoice | 1/10/2006 | 22791 | 06-00084 | CO-Bullie-Hinds | Mississippi | 71.00 | 78,104.25 |
| Invoice | 1/11/2006 | 22856 | 0600165 | CO-Halloway-Randolph | Alabama | 25.00 | 78,129.25 |
| Invoice | 1/12/2006 | 22881 | 06-00192 | CO-Sturgis-Hinds | Mississippi | 72.00 | 78,201.25 |
| Invoice | 1/15/2006 | 22988 | 06-00223 | CO-Burwell-Etowah | Alabama | 68.00 | 78,269.25 |
| Invoice | 1/17/2006 | 23031 | 06-00226 | CO-Simmons-Lauderdale | Mississippi | 68.00 | 78,337.25 |
| Invoice | 1/17/2006 | 23054 | 06-00254 | CO-Lindley-Marion | Alabama | 77.00 | 78,414.25 |

9:11 AM

05/28/08

Accrual Basis

## Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 1/20/2006 | 23196 | 06-00291 | CO-Handley-Madison | Alabama | 69.00 | 78,483.25 |
| Invoice | 1/20/2006 | 23211 | 06-00323 | CO-Reid-Escambia | Alabama | 72.00 | 78,555.25 |
| Invoice | 1/23/2006 | 23244 | 06-00337 | CO-Harris-Russell | Alabama | 75.00 | 78,630.25 |
| Invoice | 1/23/2006 | 23281 | 06-00335 | CO-Stovall-Tallapoosa | Alabama | 75.00 | 78,705.25 |
| Invoice | 1/25/2006 | 23315 | 06-00303 | CO-Ward-Madison | Alabama | 72.00 | 78,777.25 |
| Invoice | 1/25/2006 | 23317 | 06-00295 | CO-Wright-Autauga | Alabama | 70.00 | 78,847.25 |
| Invoice | 1/27/2006 | 23496 | 06-00426 | CO-Johnson-Morgan | Alabama | 51.00 | 78,898.25 |
| Invoice | 2/1/2006 | 23628 | 06-00446 | CO-Potter-Hinds | Mississippi | 69.00 | 78,967.25 |
| Invoice | 2/3/2006 | 23733 | 059536 | update-Watts-Dekalb | Alabama | 25.00 | 78,992.25 |
| Invoice | 2/7/2006 | 23816 | 06-00491 | CO-Daw-Lauderdale | Mississippi | 71.00 | 79,063.25 |
| Invoice | 2/9/2006 | 23958 | 06-00528 | CO-Byce-Blount | Alabama | 71.00 | 79,134.25 |
| Invoice | 2/13/2006 | 24050 | 06-00546 | CO-Avans-Elmore | Alabama | 74.00 | 79,208.25 |
| Invoice | 2/13/2006 | 24052 | 06-00545 | CO-Nixon-Baldwin | Alabama | 78.00 | 79,286.25 |
| Invoice | 2/14/2006 | 24091 | 06-00555 | update-Dimsdale-Buncombe | North Ca... | 25.00 | 79,311.25 |
| Invoice | 2/21/2006 | 24332 | 06-00595 | CO-Heath-Montgomery | Alabama | 80.00 | 79,391.25 |
| Invoice | 2/24/2006 | 24459 | 06-00640 | CO-Brewer-Hinds | Mississippi | 73.00 | 79,464.25 |
| Invoice | 2/27/2006 | 24538 | 06-00644 | CO-Strong-Montgomery | Alabama | 73.00 | 79,537.25 |
| Invoice | 2/28/2006 | 24583 | 06-00084 | update-Bullie-Hinds | Mississippi | 25.00 | 79,562.25 |
| Invoice | 3/2/2006 | 24651 | 06-00685 | CO-Tate-Montgomery | Alabama | 74.00 | 79,636.25 |
| Invoice | 3/3/2006 | 24726 | 06-00654 | CO-Scott-Autauga | Alabama | 82.00 | 79,718.25 |
| Invoice | 3/9/2006 | 24971 | 06-00735 | CO-Lee-Baldwin | Alabama | 72.00 | 79,790.25 |
| Invoice | 3/9/2006 | 25002 | 06-00728 | CO-Shearer-Cherokee | Georgia | 71.00 | 79,861.25 |
| Invoice | 3/17/2006 | 25358 | 06-00785 | CO-Pounders-Marion | Alabama | 76.00 | 79,937.25 |
| Invoice | 3/26/2006 | 25595 | 06-00063 | update-Jenkins-Baldwin | Alabama | 25.00 | 79,962.25 |
| Invoice | 3/26/2006 | 25602 | 06-00828 | CO-Hall-HInds | Mississippi | 71.00 | 80,033.25 |
| Invoice | 3/26/2006 | 25606 | 06-00491 | update-Daw-Lauderdale | Mississippi | 25.00 | 80,058.25 |
| Invoice | 3/31/2006 | 25930 | 06-00919 | CO-Clark-Madison | Alabama | 70.00 | 80,128.25 |
| Invoice | 3/31/2006 | 25944 | 06-00929 | CO-Hunter-Tuscaloosa | Alabama | 69.00 | 80,197.25 |
| Invoice | 4/4/2006 | 25978 | 06-00935 | CO-Wade-Hinds | Mississippi | 73.00 | 80,270.25 |
| Invoice | 4/4/2006 | 25987 | 06-00915 | CO-Hall-Cullman | Alabama | 75.00 | 80,345.25 |
| Invoice | 4/7/2006 | 26205 | 06-00961 | CO-Wilson-Colbert | Alabama | 71.00 | 80,416.25 |
| Invoice | 4/11/2006 | 26272 | 06-00968 | CO-Nelms-Lee | Alabama | 82.00 | 80,498.25 |
| Invoice | 4/12/2006 | 26447 | 06-01033 | Co-Hewett-Calhoun | Alabama | 68.00 | 80,566.25 |
| Invoice | 4/14/2006 | 26513 | 06-01036 | CO-Bush-Knox | Tennessee | 69.00 | 80,635.25 |
| Invoice | 4/21/2006 | 26742 | 06-01075 | CO-Henderson-Hinds | Mississippi | 71.00 | 80,706.25 |
| Invoice | 4/21/2006 | 26743 | 06-01067 | CO-Holmes-Hinds | Alabama | 69.00 | 80,775.25 |
| Invoice | 4/21/2006 | 26750 | 06-01055 | CO-Killingsworth-Hinds | Mississippi | 71.00 | 80,846.25 |
| Invoice | 4/21/2006 | 26774 | 06-01072 | CO-Garner-Jackson | Mississippi | 69.00 | 80,915.25 |
| Invoice | 4/21/2006 | 26831 | 06-01075 | CO-Henderson-Hinds | Mississippi | 71.00 | 80,986.25 |
| Invoice | 4/21/2006 | 26840 | 06-01057 | CO-Edwards-Hinds | Mississippi | 71.00 | 81,057.25 |
| Invoice | 4/26/2006 | 27010 | 06-01137 | CO-Dove-Lauderdale | Mississippi | 69.00 | 81,126.25 |
| Invoice | 4/27/2006 | 27094 | 04-11631 | CO-Harris-Rockdale | Georgia | 45.00 | 81,171.25 |
| Invoice | 4/28/2006 | 27155 | 04-01153 | CO-Snipes-Lee | Alabama | 84.00 | 81,255.25 |
| Invoice | 4/28/2006 | 27207 | 06-01157 | CO-Wilson-Warren | Mississippi | 82.00 | 81,337.25 |
| Invoice | 5/2/2006 | 27227 | 06-01173 | CO-Baylor-Lauderdale | Mississippi | 69.00 | 81,406.25 |
| Invoice | 5/2/2006 | 27286 | 06-01171 | CO-Bradley-Baldwin | Alabama | 70.00 | 81,476.25 |
| Invoice | 5/3/2006 | 27331 | 06-01159 | full search-Smith-Hinds | Mississippi | 125.00 | 81,601.25 |
| Invoice | 5/3/2006 | 27332 | 06-01186 | CO-Mallory-Hinds | Mississippi | 69.00 | 81,670.25 |
| Invoice | 5/3/2006 | 27343 | 06-01176 | CO-Benson-Montgomery | Alabama | 70.00 | 81,740.25 |

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 5/3/2006 | 27390 | 06-01170 | CO-Short-Hinds | Mississippi | 70.00 | 81,810.25 |
| Invoice | 5/4/2006 | 27408 | 06-01195 | CO-Dunnaway-St.Clair | Alabama | 69.00 | 81,879.25 |
| Invoice | 5/5/2006 | 27454 | 06-01193 | CO-Spriggs-Montgomery | Alabama | 74.00 | 81,953.25 |
| Invoice | 5/10/2006 | 27648 | 06-01243 | CO-Fick-Rankin | Mississippi | 78.00 | 82,031.25 |
| Invoice | 5/10/2006 | 27692 | 06-01247 | CO-Smitherman-Chilton | Alabama | 73.00 | 82,104.25 |
| Invoice | 5/11/2006 | 27747 | 06-01252 | CO-Barnett-St.Clair | Alabama | 78.00 | 82,182.25 |
| Invoice | 5/12/2006 | 27791 | 06-01255 | CO-Wilson-Hinds | Mississippi | 70.00 | 82,252.25 |
| Invoice | 5/18/2006 | 28005 | 06-00929 | CO-Hunter-Tuscaloosa | Alabama | 69.00 | 82,321.25 |
| Invoice | 5/19/2006 | 28138 | 06-01281 | CO-Smith-Madison | Mississippi | 79.00 | 82,400.25 |
| Invoice | 5/25/2006 | 28342 | 06-01315 | CO-Robinson-Jackson | Mississippi | 71.00 | 82,471.25 |
| Invoice | 6/6/2006 | 28761 | 06-01377 | CO-Strawn-St. Clair | Alabama | 74.00 | 82,545.25 |
| Invoice | 6/6/2006 | 28780 | 06-01369 | CO-McDonald-Lauderdale | Mississippi | 68.00 | 82,613.25 |
| Invoice | 6/6/2006 | 28801 | 06-01361 | CO-Calhoun-Jackson | Mississippi | 69.00 | 82,682.25 |
| Invoice | 6/7/2006 | 28859 | 06-01379 | CO-King-Mobile | Alabama | 72.00 | 82,754.25 |
| Invoice | 6/12/2006 | 29153 | 06-01417 | CO-Taylor-Anderson | Tennessee | 68.00 | 82,822.25 |
| Invoice | 6/15/2006 | 29406 | 06-01437 | CO-Williams-Hinds | Mississippi | 72.00 | 82,894.25 |
| Invoice | 6/16/2006 | 29470 | 06-01449 | CO-Patterson/Garrett-Talladega | Alabama | 74.00 | 82,968.25 |
| Invoice | 6/20/2006 | 29611 | 06-01467 | CO-Davidson-Baldwin | Alabama | 74.00 | 83,042.25 |
| Invoice | 6/26/2006 | 29913 | 06-01506 | CO-Long-Mobile | Alabama | 74.00 | 83,116.25 |
| Invoice | 7/11/2006 | 30500 | 06-01553 | Full-Ryan-Tuscaloosa | Alabama | 125.00 | 83,241.25 |
| Invoice | 7/17/2006 | 30820 | 06-01583 | CO-Kinsey-Baldwin | Alabama | 75.00 | 83,316.25 |
| Invoice | 7/17/2006 | 30886 | 06-01587 | CO-Harp-Hamilton | Tennessee | 71.00 | 83,387.25 |
| Invoice | 8/1/2006 | 31577 | 06-01684 | CO-Jones-Baldwin | Alabama | 78.00 | 83,465.25 |
| Invoice | 8/2/2006 | 31626 | 06-01697 | CO-Brown-Hinds | Mississippi | 69.00 | 83,534.25 |
| Invoice | 8/3/2006 | 31680 | 06-01721 | CO-North-Dale | Alabama | 83.00 | 83,617.25 |
| Invoice | 8/18/2006 | 32456 | 06-01799 | CO-Abraham-Rankin | Mississippi | 69.00 | 83,686.25 |
| Invoice | 8/31/2006 | 33040 | 06-01910 | CO-Tarver-Russell | Alabama | 72.00 | 83,758.25 |
| Invoice | 9/13/2006 | 33721 | 06-01995 | CO-White-Dale | Alabama | 75.00 | 83,833.25 |
| Invoice | 9/14/2006 | 33795 | 06-01996 | CO-Stephens-Limestone | Alabama | 74.00 | 83,907.25 |
| Invoice | 9/19/2006 | 33958 | 06-02041 | CO-Stephens-Tuscaloosa | Alabama | 73.00 | 83,980.25 |
| Invoice | 9/19/2006 | 33961 | 06-02019 | CO-Hudson-Chambers | Alabama | 75.00 | 84,055.25 |
| Invoice | 9/20/2006 | 34127 | 06-02076 | CO-Brown-Etowah | Alabama | 77.00 | 84,132.25 |
| Invoice | 9/20/2006 | 34155 | 06-02028 | CO-McGrath-Jackson | Mississippi | 71.00 | 84,203.25 |
| Invoice | 9/20/2006 | 34173 | 06-02027 | CO-Meaux-Hancock | Mississippi | 72.00 | 84,275.25 |
| Invoice | 9/21/2006 | 34232 | 06-02038 | CO-Williams-Madison | Alabama | 67.00 | 84,342.25 |
| Invoice | 9/25/2006 | 34473 | 06-02102 | CO-Johnson-Jefferson | Alabama | 75.00 | 84,417.25 |
| Invoice | 9/27/2006 | 34622 | 06-02069 | CO-Wallace-Harrison | Mississippi | 69.00 | 84,486.25 |
| Invoice | 9/29/2006 | 34721 | 06-02176 | CO-Glover-Mobile | Alabama | 85.00 | 84,571.25 |
| Invoice | 9/29/2006 | 34858 | 06-02135 | CO-Smith-Cherokee | Alabama | 51.00 | 84,622.25 |
| Invoice | 10/3/2006 | 34944 | 06-02173 | CO-Brown-Lee | Alabama | 81.00 | 84,703.25 |
| Invoice | 10/5/2006 | 35105 | 06-02230 | CO-Bye-Montgomery | | 75.00 | 84,778.25 |
| Invoice | 10/5/2006 | 35175 | 06-02194 | CO-Spohn-Gwinnett | Georgia | 68.00 | 84,846.25 |
| Invoice | 10/6/2006 | 35183 | 06-02190 | CO-Free-Elmore | Alabama | 75.00 | 84,921.25 |
| Invoice | 10/6/2006 | 35251 | 06-02245 | CO-Pham-Shelby | Alabama | 81.00 | 85,002.25 |
| Invoice | 10/6/2006 | 35270 | 06-02201 | CO-Gray-Hinds | Mississippi | 71.00 | 85,073.25 |
| Invoice | 10/9/2006 | 35294 | 06-02244 | CO-Ramsey-Lauderdale | Mississippi | 76.00 | 85,149.25 |
| Invoice | 10/9/2006 | 35360 | 06-02246 | 30yr-Davis-Cherokee | Alabama | 69.00 | 85,218.25 |
| Invoice | 10/9/2006 | 35361 | 06-02248 | CO-McQuarley-Jefferson | Alabama | 78.00 | 85,296.25 |
| Invoice | 10/13/2006 | 35571 | 06-02269 | CO-Bowers-Hardeman | Tennessee | 72.00 | 85,368.25 |

9:11 AM

05/28/08

Accrual Basis

## Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 10/16/2006 | 35692 | 06-02265 | CO-Johnson-Baldwin | Alabama | 79.00 | 85,447.25 |
| Invoice | 10/16/2006 | 35722 | 06-02288 | CO-Carter-Jackson | Mississippi | 71.00 | 85,518.25 |
| Invoice | 10/17/2006 | 35835 | 06-02311 | CO-Fore-Escambia | Alabama | 75.00 | 85,593.25 |
| Invoice | 10/20/2006 | 36028 | 06-02338 | CO-Carter-Warren | Mississippi | 68.00 | 85,661.25 |
| Invoice | 10/23/2006 | 36151 | 06-02376 | CO-Patterson-Lauderdale | Mississippi | 91.00 | 85,752.25 |
| Invoice | 10/24/2006 | 36167 | 06-02366 | CO-Corbett-Baldwin | Alabama | 82.00 | 85,834.25 |
| Invoice | 10/24/2006 | 36288 | 06-02409 | CO-Bilstein-Lauderdale | Alabama | 83.00 | 85,917.25 |
| Invoice | 10/25/2006 | 36326 | 06-02414 | CO-Wynn-Rankin | Mississippi | 73.00 | 85,990.25 |
| Invoice | 10/27/2006 | 36512 | 06-02465 | CO-Patterson-Harrison | Mississippi | 71.00 | 86,061.25 |
| Invoice | 10/31/2006 | 36685 | 06-02483 | CO-Ewing-Lauderdale | Mississippi | 91.00 | 86,152.25 |
| Invoice | 11/2/2006 | 36800 | 06-02505 | CO-Murray-Harrison | Mississippi | 72.00 | 86,224.25 |
| Invoice | 11/10/2006 | 37165 | 06-02570 | CO-Casey-Calhoun | Alabama | 68.00 | 86,292.25 |
| Invoice | 11/16/2006 | 37450 | 06-02611 | CO-Hays-Hinds | Mississippi | 71.00 | 86,363.25 |
| Invoice | 11/17/2006 | 37558 | 06-02626 | CO-Phillips-Hinds | Mississippi | 83.00 | 86,446.25 |
| Invoice | 11/20/2006 | 37605 | 06-02655 | CO-Tucker-Jones | | 72.00 | 86,518.25 |
| Invoice | 11/20/2006 | 37615 | 06-02677 | CO-Smith-Rankin | Mississippi | 71.00 | 86,589.25 |
| Invoice | 11/20/2006 | 37616 | 06-02675 | CO-Clark-Hinds | Mississippi | 70.00 | 86,659.25 |
| Invoice | 11/22/2006 | 37738 | 06-02679 | CO-Harper-Harrison | Mississippi | 69.00 | 86,728.25 |
| Invoice | 11/22/2006 | 37739 | 06-02696 | CO-Kelley-Harrison | Mississippi | 70.00 | 86,798.25 |
| Invoice | 11/22/2006 | 37740 | 06-02663 | CO-Ladner-Harrison | Mississippi | 70.00 | 86,868.25 |
| Invoice | 11/22/2006 | 37782 | 06-02682 | CO-Green-Hinds | Mississippi | 70.00 | 86,938.25 |
| Invoice | 11/22/2006 | 37783 | 06-02698 | CO-Tucker-Hinds | Mississippi | 70.00 | 87,008.25 |
| Invoice | 11/29/2006 | 37976 | 06-08729 | CO-Smith-Lauderdale | Mississippi | 96.00 | 87,104.25 |
| Invoice | 11/30/2006 | 38046 | 06-02743 | CO-McCain-Montgomery | Alabama | 75.00 | 87,179.25 |
| Invoice | 12/4/2006 | 38169 | 06-02736 | CO-Williams-Hinds | Mississippi | 71.00 | 87,250.25 |
| Invoice | 12/7/2006 | 38388 | 06-02749 | CO-Brock-Hancock | Mississippi | 69.00 | 87,319.25 |
| Invoice | 12/7/2006 | 38417 | 06-02793 | CO-Fraley-Gaston | North Ca... | 71.00 | 87,390.25 |
| Invoice | 12/8/2006 | 38452 | 06-02803 | CO-Bouldin-Dekalb | Alabama | 70.00 | 87,460.25 |
| Invoice | 12/8/2006 | 38511 | 06-02805 | CO-Taylor-St.Clair | Alabama | 71.00 | 87,531.25 |
| Invoice | 12/12/2006 | 38692 | 06-02028 | update-McGrath-Jackson | Mississippi | 25.00 | 87,556.25 |
| Invoice | 12/14/2006 | 38778 | 06-02863 | CO-Briggs-Harrison | Mississippi | 68.00 | 87,624.25 |
| Invoice | 12/21/2006 | 39137 | 06-02938 | CO-Ramsey-Lauderdale | Mississippi | 73.00 | 87,697.25 |
| Invoice | 12/21/2006 | 39187 | 06-02939 | CO--Strozier-Coweta | Georgia | 68.00 | 87,765.25 |
| Invoice | 12/22/2006 | 39356 | 06-02969 | CO-Scott-Warren | Mississippi | 62.00 | 87,827.25 |
| Invoice | 12/27/2006 | 39378 | 06-02976 | CO-Anderson-Rankin | Mississippi | 72.00 | 87,899.25 |
| Invoice | 12/28/2006 | 39414 | 06-03004 | CO-Tucker-Jones | Mississippi | 70.00 | 87,969.25 |
| Invoice | 12/28/2006 | 39436 | 06-02948 | CO-Short-Hinds | Mississippi | 75.00 | 88,044.25 |
| Invoice | 1/8/2007 | 39757 | 06-03035 | CO-Williams-Madison | Mississippi | 73.00 | 88,117.25 |
| Invoice | 1/8/2007 | 39810 | 06-02969 | 30 yr-Scott-Warren | Mississippi | 125.00 | 88,242.25 |
| Invoice | 1/10/2007 | 39861 | 06-02244 | update-Ramsey-Lauderdale | Mississippi | 25.00 | 88,267.25 |
| Invoice | 1/10/2007 | 39868 | 07-00032 | CO-Shiver-Jackson | Mississippi | 70.00 | 88,337.25 |
| Invoice | 1/10/2007 | 39889 | 07-00055 | CO-Richardson-Harrison | Mississippi | 68.00 | 88,405.25 |
| Invoice | 1/10/2007 | 39939 | 07-00059 | CO-Donaldson-Desoto | Mississippi | 71.00 | 88,476.25 |
| Invoice | 1/19/2007 | 40368 | 07-00155 | CO-White-Harrison | Mississippi | 69.00 | 88,545.25 |
| Invoice | 1/30/2007 | 40773 | 07-00278 | CO-Nelson-Desoto | Mississippi | 72.00 | 88,617.25 |
| Invoice | 2/5/2007 | 40941 | 07-00298 | CO-Lindsey-Rankin | Mississippi | 70.00 | 88,687.25 |
| Invoice | 2/5/2007 | 40971 | 07-00320 | CO-Kilgore-Rankin | Mississippi | 68.00 | 88,755.25 |
| Invoice | 2/7/2007 | 41079 | 07-00344 | CO-Hopson-Lauderdale | Mississippi | 73.00 | 88,828.25 |
| Invoice | 2/13/2007 | 41340 | 06-00089 | update-Bartlett-Cullman | Alabama | 28.00 | 88,856.25 |

Page 15

9:11 AM

05/28/08

Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 2/16/2007 | 41468 | 06-03004 | update-Tucker-Jones | Mississippi | 25.00 | 88,881.25 |
| Invoice | 2/16/2007 | 41477 | 07-00419 | CO-Owens-Hinds | Mississippi | 71.00 | 88,952.25 |
| Invoice | 2/20/2007 | 41676 | 07-00451 | Collins-CO-Harrison | Mississippi | 125.00 | 89,077.25 |
| Invoice | 3/2/2007 | 42082 | 07-00532 | CO-Howell-Rankin | Mississippi | 68.00 | 89,145.25 |
| Invoice | 3/7/2007 | 42162 | 07-00537 | CO-Brown-Lauderdale | Mississippi | 72.00 | 89,217.25 |
| Invoice | 3/7/2007 | 42163 | 07-00536 | CO-Odoms-Lauderdale | Mississippi | 71.00 | 89,288.25 |
| Invoice | 3/12/2007 | 42372 | 07-00559 | CO-Jackson-Harrison | Mississippi | 72.00 | 89,360.25 |
| Invoice | 3/14/2007 | 42489 | 07-00577 | CO-Butler-Harrison | Mississippi | 70.00 | 89,430.25 |
| Invoice | 3/26/2007 | 43180 | 07-00650 | CO-Ewing-Lauderdale | Mississippi | 69.00 | 89,499.25 |
| Invoice | 3/27/2007 | 43236 | 07-00660 | CO-Dodson-Harrison | Mississippi | 75.00 | 89,574.25 |
| Invoice | 4/10/2007 | 43840 | 07-00728 | Current Owner Search-Lane-Hind | Mississippi | 68.00 | 89,642.25 |
| Invoice | 4/10/2007 | 43847 | 07-00723 | CO-Smith-Jackson | Mississippi | 71.00 | 89,713.25 |
| Invoice | 4/11/2007 | 43890 | 07-00732 | CO-Keeton-Harrison | Mississippi | 71.00 | 89,784.25 |
| Invoice | 4/12/2007 | 44015 | 07-00755 | CO-Ashley-Pike | Mississippi | 70.00 | 89,854.25 |
| Invoice | 4/18/2007 | 44212 | 07-00766 | CO-Brown-Madison | Mississippi | 73.00 | 89,927.25 |
| Invoice | 4/21/2007 | 44333 | 07-00278 | CO-Nelson-Desoto | Mississippi | 25.00 | 89,952.25 |
| Invoice | 4/24/2007 | 44539 | 07-00808 | CO-Keeton-Hancock | Mississippi | 74.00 | 90,026.25 |
| Invoice | 5/3/2007 | 44865 | 07-00853 | CO-Brashear-Hinds | Mississippi | 73.00 | 90,099.25 |
| Invoice | 5/3/2007 | 44879 | 07-00855 | CO-Hollis-Jackson | Mississippi | 79.00 | 90,178.25 |
| Invoice | 5/9/2007 | 45111 | 07-00903 | CO-Boler-Clayton | Georgia | 75.00 | 90,253.25 |
| Invoice | 5/9/2007 | 45133 | 07-00917 | CO-Hesler-Harrison | Mississippi | 73.00 | 90,326.25 |
| Invoice | 5/9/2007 | 45134 | 07-00931 | CO-Horn-Harrison | Mississippi | 70.00 | 90,396.25 |
| Invoice | 5/10/2007 | 45206 | 07-00951 | CO-Rhodes-Columbia | Georgia | 70.00 | 90,466.25 |
| Invoice | 5/10/2007 | 45213 | 07-00949 | CO-Linge-Cobb | Georgia | 69.00 | 90,535.25 |
| Invoice | 5/15/2007 | 45324 | 07-00930 | CO-Dannecker-Clayton | Georgia | 68.00 | 90,603.25 |
| Invoice | 5/16/2007 | 45376 | 07-00967 | CO-Horton-Holmes | Mississippi | 71.00 | 90,674.25 |
| Invoice | 5/16/2007 | 45415 | 07-00940 | CO-Bower-Cherokee | Georgia | 70.00 | 90,744.25 |
| Invoice | 5/18/2007 | 45438 | 07-00936 | CO-Veney-Jackson | Mississippi | 69.00 | 90,813.25 |
| Invoice | 5/18/2007 | 45445 | 07-00559 | update-Jackson-Harrison | Mississippi | 25.00 | 90,838.25 |
| Invoice | 5/21/2007 | 45515 | 07-00962 | CO-Eugene-Dekalb | Georgia | 68.00 | 90,906.25 |
| Invoice | 5/22/2007 | 45546 | 07-01019 | CO-Cheny-Rankin | Mississippi | 72.00 | 90,978.25 |
| Invoice | 5/22/2007 | 45547 | 07-01017 | CO-Harris-Rankin | Mississippi | 75.00 | 91,053.25 |
| Invoice | 5/22/2007 | 45550 | 07-01024 | CO-Peterson-Hinds | Mississippi | 71.00 | 91,124.25 |
| Invoice | 5/29/2007 | 45682 | 07-01061 | CO-Allen-Desoto | Mississippi | 68.00 | 91,192.25 |
| Invoice | 5/31/2007 | 45827 | 07-01068 | CO-Hime-Lauderdale | Mississippi | 76.00 | 91,268.25 |
| Invoice | 6/5/2007 | 45895 | 07-01078 | CO-Fendlason-Hinds | Mississippi | 78.00 | 91,346.25 |
| Invoice | 6/12/2007 | 46079 | 07-01142 | CO-Triche-Harrison | Mississippi | 67.00 | 91,413.25 |
| Invoice | 6/15/2007 | 46176 | 07-00344 | CO-Hopson-Lauderdale | Mississippi | 25.00 | 91,438.25 |
| Invoice | 6/19/2007 | 46282 | 07-01174 | CO-McNeely-Harrison | Mississippi | 72.00 | 91,510.25 |
| Invoice | 6/26/2007 | 46550 | 07-01221 | CO-Evans-Hinds | Mississippi | 71.00 | 91,581.25 |
| Invoice | 6/29/2007 | 46715 | 07-01240 | 30yr-Pearson-Clarke | Mississippi | 125.00 | 91,706.25 |
| Invoice | 7/10/2007 | 46925 | 07-01256 | CO-Mudd-Harrison | Mississippi | 70.00 | 91,776.25 |
| Invoice | 7/20/2007 | 47338 | 07-01328 | CO-Hinton-Hinds | Mississippi | 71.00 | 91,847.25 |
| Invoice | 7/26/2007 | 47454 | 07-01347 | CO-Henderson-Harrison | Mississippi | 68.00 | 91,915.25 |
| Invoice | 7/26/2007 | 47502 | 07-01068 | CO-Hime-Lauderdale | Mississippi | 25.00 | 91,940.25 |
| Invoice | 7/30/2007 | 47593 | 07-01350 | CO-Sund-Jackson | Mississippi | 69.00 | 92,009.25 |
| Invoice | 7/30/2007 | 47606 | 07-01364 | CO-Eppert-Harrison | Mississippi | 71.00 | 92,080.25 |
| Invoice | 8/14/2007 | 48118 | 07-00931 | update-Horn-Harrison | Mississippi | 28.00 | 92,108.25 |
| Invoice | 8/23/2007 | 48429 | 07-00344 | CO-Hopson-Lauderdale | Mississippi | 25.00 | 92,133.25 |

9:11 AM

05/28/08
Accrual Basis

# Southern Land & Title, LLC
## Customer Balance Detail
### As of April 30, 2008

| Type | Date | Num | P. O. # | Descrip | Class | Amount | Balance |
|------|------|-----|---------|---------|-------|--------|---------|
| Invoice | 8/24/2007 | 48528 | 07-00949 | update-Linge-Cobb | Georgia | 25.00 | 92,158.25 |
| Invoice | 8/29/2007 | 48562 | 07-01489 | CO-Martin-Rankin | Mississippi | 69.00 | 92,227.25 |
| Invoice | 8/29/2007 | 48627 | 07-01483 | CO-Obrien-Harrison | Mississippi | 79.00 | 92,306.25 |
| Invoice | 9/21/2007 | 49489 | 07-01621 | CO-Pearson-Lauderdale | Mississippi | 68.00 | 92,374.25 |
| Invoice | 9/27/2007 | 49736 | 07-01652 | CO-Bibbs-Hinds | Mississippi | 74.00 | 92,448.25 |
| Invoice | 10/4/2007 | 50003 | 07-01682 | CO-Johnson-Lauderdale | Mississippi | 69.00 | 92,517.25 |
| Invoice | 11/8/2007 | 51575 | 07-01483 | update-OBrien-Harrison | Mississippi | 25.00 | 92,542.25 |
| Invoice | 12/6/2007 | 52842 | 07-01621 | update-Pearscon-Lauderdale | Mississippi | 25.00 | 92,567.25 |
| Invoice | 2/18/2008 | 56359 | 08-00078 | CO-Farris-Rankin | Mississippi | 74.00 | 92,641.25 |
| Total Swafford Settlement Services | | | | | | 54,997.25 | 92,641.25 |
| **TOTAL** | | | | | | 54,997.25 | 92,641.25 |

**Swafford & Hays Services, Inc**
*"Professionalism With Integrity"*
*9041 Executive Park Dr. / Suite 400/ Knoxville, TN 37923*
*Phone: 1-888-272-2915  Fax: 1-865-539-1483*
*Toll Free Fax : 1-888-272-2916*

**File Number:** 05-2813

**Date:** 3/18/2005

**SHSS Contact:** Abstract Department

**Abstractor:** Southern Land & Title     **Phone:** 256-543-1361     **Fax:** 256-543-1377

**Please do Current Owner Search on the following: MUST INCLUDE A 24 MONTH CHAIN OF TITLE (If borrower has not been vested on title for 24 months, MUST include a copy of previous deed).**

**Borrower:** Cheryl R. Hall     **S.S. #:** 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

**Co-Borrower:**     **S.S. #:**

**Address:** 105 TV Road

**City:** Dothan     **State:** AL   **Zip:** 36301

**County:** Houston

**Comments:**

*The Following is required on each order:*

- Signature at the bottom confirming receipt of order within 2 hours along with fee that will be charged.
- Search to be **COMPLETED**  within 48 hours or call placed to SHSS contact listed above with status.
- Weekly statements **MUST** be sent via U.S. Mail, ATTN: Accounting

*DOCUMENTS NEEDED WITH SEARCH:*

- Need *COMPLETE* Copies of Current Vesting Deed ( see above for 24 month requirement), ALL Open Mortgages, ALL Judgments, ALL Liens, Easements, Rights of Ways, Agreements, Assignments, etc. [*MUST INCLUDE FIRST TWO PAGES AND LAST TWO PAGES OF MORTGAGES, AND ALL COPIES OF RELEVANT OTHER DOCUMENTS*].
- Copies of Probates, Wills, Bankruptcies and Final Judgments of Divorce, if found.
- Copies of Trust if found , especially in Vesting
- Tax Bill and *ALL* amounts of Taxes and Dates they are Due. ALL delinquent taxwes must also be included.
- Effective date *MUST* be on the abstractors write-up report.
- **(NO EXCEPTIONS)**

**THE SEARCH MUST BE TO US IN 48 HOURS OR A CALL PLACED.  ALL TAX INFORMATION AND COPIES OF LIENS MUST BE PROVIDED. IF NOT WE WILL DOC THE INVOICE BY 50% (Per Contract).**

Received by: _____     Date / Time: 3-21-05 _____

Fee for Search: $65.

$7.

$72

11 pages

Thanks!

# Southern Land & Title, L.L.C.

Through Date: 3-18-05

Name: Cheryl B. Hall     Address: 105 TV Rd

City: Dothan     County: Houston     State: Al     Zip: 36301

## Vesting Deed
### (Always Need Out-of-Family Warranty Deed)

Grantee (Current Owner): Cheryl Hall

Grantor: Kevin Lorenzo Dixon II, an unmarried man

Dated Date: 3-2-05     Recorded Date: 3-11-05     Consideration (Amt.): 10⁰⁰

Book: 622     Page: 443     Instrument No.

## PUD/Condominium/Waterfront Information Circle Below
PUD     Y  N          Condo  Y  N          Waterfront     Y  N

Name

Recorded Date          Book          Page

## Tax Information

Parcel I.D. No: 10-09-31-4-003-001.007     Tax Year: 04     Amount$: 496.62     due plus late fees

Date Paid          Are There Delinquent Taxes? No     Yes ✓     Amount$ 89,800⁰⁰

Appraised Value  Land: 7,100     Improvements: 82,700     Total: 89,800⁰⁰

## Mortgage Number 1
### (If no open mortgage - report satisfied mortgage to institutional Lender)

Exact Name(s) of Borrower(s): (None)  I did not find a mortgage.

Lender          MERS as Nominee? Yes     No

Book     Page     Dated Date          Recorded Date

Amount $     Maturity Date          Open Ended? Yes     No

Last Assignment To          MERS As Nominee? Yes     No

Dated Date     Recorded Date          Book     Page

## Mortgage number 2

Exact Name(s) of Borrower(s) _____

Lender _____    MERS as Nominee? Yes _____ No _____

Book _____ Page _____ Dated Date _____    Recorded Date _____

Amount $ _____ Maturity Date _____    Open Ended? Yes _____ No _____

Last Assignment To _____    MERS as Nominee? Yes _____ No _____

Dated Date _____ Recorded Date _____    Book _____ Page _____

## Mortgage number 3

Exact Name(s) of Borrower(s) _____

Lender _____    MERS as Nominee? Yes _____ No _____

Book _____ Page _____ Dated Date _____    Recorded Date _____

Amount $ _____ Maturity Date _____    Open Ended? Yes _____ No _____

Last Assignment To _____    MRRS As Nominee? Yes _____ No _____

Dated Date _____ Recorded Date _____    Book _____ Page _____

✳ 4 jud

### Judgment/Tax Lien/UCC

① Type Judgment Debtor Cheryl R Hall Creditor Army Aviation Center FCU
Date 6-15-98 Recorded Date 7-2-98 Book 89 Page 185 Amount $ 3,558.26
Case or File No. DV 98 000128

② Type Judgment Debtor Cheryl Ann Hall Creditor Michael T. Mesirew DBA Wholesale Auto
Date 12-16-03 Recorded Date 1-7-04 Book 103 Page 278 Amount $ 3,000.00
Case or File No. SM 2003 00 1994

③ Judgment Debtor: Kevin Dixon DBA Eisah's Creditor: Inland Southern Management
dated 10-7-04    Attach Additional Sheets As Needed
Filed 11-12-04 Amt 154,172.47
→ Book 106/420 — see copy

④ Department of Revenue
dated 12-13-04    -US- Kevin Dixon
filed 12-14-04 Amt 431.65    Book 106/581

## Chain of Title Sheet

Volume: _598_ Page: _34_      Type of Deed: _Warranty Deed_

Grantee: _Kevin Lorenzo Dixon, II_

Grantor: _Louis E. Sowers + wife, Fay Sowers_

Date: _4-2-03_          Date Recorded: _4-3-03_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Volume: _____ Page: _____      Type of Deed: _____

Grantee: _____

Grantor: _____

Date: _____          Date Recorded: _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Volume: _____ Page: _____      Type of Deed: _____

Grantee: _____

Grantor: _____

Date: _____          Date Recorded: _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Volume: _____ Page: _____      Type of Deed: _____

Grantee: _____

Grantor: _____

Date: _____          Date Recorded: _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### Use Additional Chain Sheet(s) As Needed

### Easements/Restrictions

_____

_____

_____

# WARRANTY DEED

DEED    622    443
Recorded in Above Book and Page
03/11/2005 01:05:18 PM
Luke Cooley
Judge of Probate
Houston County, Alabama

This Deed prepared without benefit of Title Opinion or Survey

STATE OF ALABAMA    }
HOUSTON COUNTY    }    KNOW ALL MEN BY THESE PRESENTS

That in consideration of ***Ten Dollars*** and other good and valuable consideration to the undersigned GRANTOR, in hand paid by the GRANTEE herein, the receipt whereof is acknowledged, I,

**KEVIN LORENZO DIXON, II, a unmarried man**
whose address is 105 Melissa Lane, Headland, AL 36345

(herein referred to as GRANTOR), grants, bargains, sells and conveys unto:

**Cheryl Hall,**
whose address is 105 TV Road, Dothan, AL 36301

(herein referred to as GRANTEE), his heirs and assigns, all of my interest in the following described real estate situated in Houston County, Alabama, to-wit:

> Lot 2, Block "C", of the Third Addition to Television Heights Subdivision in the City of Dothan, Alabama, as found recorded in Plat Book 7, Page 23, in the Office of the Judge of Probate, Houston County, Alabama.

Subject to:
1. Ad valorem taxes which may be due now or subsequent hereto;
2. Any applicable zoning ordinances;
3. Easements, restrictions, reservations, right of way and set back lines of record;
4. Mineral and mining rights not owned by Grantor(s).

THE ABOVE REFERENCED PROPERTY IS NOT THE HOMESTEAD OF THE GRANTOR(S).
TO HAVE AND TO HOLD to the said GRANTEE, to his heirs and assigns forever.

And I do, for myself and for my heirs, executors and administrators, covenant with said GRANTEE, his heirs and assigns, that I am lawfully seized in fee simple of said premises; that it is free from all encumbrances, unless otherwise stated above; that I have a good right to sell and convey the same as aforesaid; that I will, and my heirs, executors and administrators shall warrant and defend the same to the said grantee, his heirs and assigns forever, against the lawful claims of all persons.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2nd day of March, 2005.

_____
KEVIN LORENZO DIXON, II

STATE OF ALABAMA

HOUSTON COUNTY

I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that KEVIN LORENZO DIXON, II, whose name is signed to the foregoing document and who is known to me, acknowledged before me this date, that being informed of the conveyance, he has executed the same voluntarily on the date the same bears date.

Given under my hand and seal this 2nd day of March, 2005.

_____
Notary Public
My Commission Expires: 9-15-2008

This Instrument Prepared By:

J. Christopher Capps
Capps & Gartlan, P. C.
170 S. Oates St., Suite 2, Dothan, AL 36301
(334)678-7994

Send Tax Notice To:

Cheryl Hall
105 TV Road
Dothan, AL 36301

| | |
|---|---|
| Deed Tax | 90.00 |
| Recording Fee | 11.00 |
| TOTAL | 101.00 |

This instrument was prepared by:

HALL, SMITH & JONES
Attorneys at Law
P. O. Box 1748
Dothan, Alabama 36302

DEED    598    34
Recorded In Above Book and Page
04/03/2003 03:14:40 PM
Luke Cooley
Judge of Probate
Houston County, Alabama

### WARRANTY DEED

STATE OF ALABAMA,
HOUSTON COUNTY.

KNOW ALL MEN BY THESE PRESENTS; That in consideration of Ten Dollars and other valuable consideration to the undersigned Grantor, in hand paid by the Grantee herein, the receipt whereof is acknowledged, **LOUIS E. SOWERS** and wife, **FAY SOWERS**, (herein referred to as Grantor, whether one or more), grant, bargain, sell and convey unto **KEVIN LORENZO DIXON, II**, whose mailing address is: **105 TV ROAD, DOTHAN, AL 36301**, (herein referred to as Grantee, whether one or more), the following described real estate situated in Houston County, Alabama, to-wit:

Lot 2, Block "C", of the Third Addition to Television Heights Subdivision in the City of Dothan, Alabama, as found recorded in Plat Book 7, Page 23, in the Office of the Judge of Probate of Houston County, Alabama. Together with all improvements thereon.

THIS CONVEYANCE IS SUBJECT TO THE FOLLOWING:

1.  AD VALOREM TAXES WHICH MAY BE DUE NOW OR SUBSEQUENT HERETO;
2.  ANY APPLICABLE ZONING ORDINANCES;
3.  EASEMENTS, RESTRICTIONS, RESERVATIONS, RIGHT OF WAY AND SET BACK LINES OF RECORD;
4.  MINERAL AND MINING RIGHTS NOT OWNED BY GRANTOR.

TO HAVE AND TO HOLD to the said Grantee, his, her or their heirs and assigns forever.

And I (we) do, for myself (ourselves) and for my (our) heirs, executors and administrators, covenant with said grantee, his, her or their heirs and assigns, that I am (we are) lawfully seized in fee simple of said premises; that they are free from all encumbrances, unless otherwise stated above; that I (we) have a good right to sell and convey the same as aforesaid; that I (we) will, and my (our) heirs, executors and administrators shall warrant and defend the same to the said grantee, his, her or their heirs and assigns forever, against the lawful claims of all persons.

DEED    598    35

IN WITNESS WHEREOF, I (we) have hereunto set my (our) hand(s) and seal(s) this 2nd day of April, 2003.

_Louis E. Sowers_
LOUIS E. SOWERS

_Fay Sowers_
FAY SOWERS

STATE OF ALABAMA,
HOUSTON COUNTY.

I, the undersigned authority, a Notary Public in and for said County, in said State, hereby certify that LOUIS E. SOWERS and FAY SOWERS, whose name(s) is/are signed to the foregoing conveyance and who is/are known to me, acknowledged before me on this day, that, being informed of the contents of the conveyance, he/she/they executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this 2nd day of April, 2003.

NOTARY PUBLIC
My Commission Expires: 7/24/05

| Deed Tax | 80.00 |
| Recording Fee | 14.00 |
| TOTAL | 94.00 |

CVL0312

ALABAMA JUDICIAL DATA CENTER
HOUSTON    COUNTY
CERTIFICATE OF JUDGEMENT

DV 98 000128. 00
M. JOHN STEENSLAND

IN THE DISTRICT COURT OF  HOUSTON  .  COUNTY

ARMY AVIATION CENTER F C U VS CHERYL R HALL

DEFENDANT                                  PARTY'S ATTORNEY:

HALL CHERYL R
295 MALIBU ST

KINSEY        , AL  36303-0000

I, JUDY BYRD           , CLERK OF THE ABOVE NAMED COURT HEREBY
CERTIFY THAT ON 06/15/98 PLAINTIFF, ARMY AVIATION CENTER F C U   RECOVERED
OF DEFENDANT IN SAID COURT A JUDGEMENT WITHOUT WAIVER OF EXEMPTIONS FOR THE
SUM OF     $3,558.26 DOLLARS PLUS        $88.00 DOLLARS COURT COSTS, AND
THAT THE  PLAINTIFF'S  ATTORNEY(S) OF RECORD WAS:  MATH, LEONARD N

GIVEN UNDER MY HAND THIS DATE 06/15/98

CLERK JUDY BYRD
114 N OATES PO DRAWR 6406
DOTHAN, AL  36302
(334) 677-4867

OPERATOR: JOS
PREPARED: 06/15/98

JUDGE  89   185
Recorded In Above Book and Page
07/02/1998 10:27AM
Luke Cooley
Judge of Probate
Houston County, Alabama

PLAINTIFF'S ATTORNEY:

| | |
|---|---|
| SPI Fee | 5.00 |
| Recording Fee | 3.50 |
| TOTAL | 8.50 |

MATH, LEONARD N
P O BOX 230759
1800-311-4061
MONTGOMERY  AL   36123

AVS0312

**ALABAMA JUDICIAL DATA CENTER**
**HOUSTON    COUNTY**
**CERTIFICATE OF JUDGEMENT**

SM 2003 001994.00
M. JOHN STEENSLAND

IN THE DISTRICT COURT OF HOUSTON    COUNTY

MICHAEL T MEGIVERN DBA WHOLESALE AUTO VS CHERYL ANN HALL AKA ETAL

DEFENDANT                                    PARTY'S ATTORNEY:

HALL CHERYL ANN AKA
CHERYL A HALL DUNN ETAL
386 E SAUNDERS RD #B-104
DOTHAN        ,AL  36301-0000

I, JUDY BYRD                , CLERK OF THE ABOVE NAMED COURT HEREBY

CERTIFY THAT ON 12/15/2003 PLAINTIFF, MEGIVERN MICHAEL T        RECOVERED

OF DEFENDANT IN SAID COURT A JUDGEMENT FOR THE

SUM OF    $3,000.00 DOLLARS PLUS    $113.00 DOLLARS COURT COSTS, AND

THAT THE PLAINTIFF'S ATTORNEY(S) OF RECORD WAS:  *** PRO SE ***

GIVEN UNDER MY HAND THIS DATE 12/16/2003

CLERK: JUDY BYRD
RD DR 6406,114 N.OATES ST
DOTHAN  AL  36302
(334)677-4867

OPERATOR: JOS
PREPARED: 12/16/2003

PLAINTIFF'S ATTORNEY:

JUDGE  103 278
Recorded in Above Book and Page
01/07/2004 02:25:30 PM
Luke Cooley
Judge of Probate
Houston County, Alabama

Recording Fee        11.00
TOTAL                11.00

MEGIVERN MICHAEL T
DBA WHOLESALE AUTO
3894 CO RD 203
DOTHAN        ,AL  36301-0000

AVS0312

ALABAMA JUDICIAL DATA CENTER
HOUSTON        COUNTY
CERTIFICATE OF JUDGEMENT

CV 2004 000216.00
JERRY M. WHITE

```
-----------------------------------------------------------------------
|           IN THE CIRCUIT  COURT OF  HOUSTON      COUNTY             |
| INLAND SOUTHERN MANAGEMENT CORP VS KEVIN DIXON DBA EISAH'S          |
|                                                                     |
|    DEFENDANT                           PARTY'S ATTORNEY:            |
|                                                                     |
|    DIXON KEVIN AN INDIVIDUAL DB                                     |
|    105 MELISSA LANE                                                 |
|    HEADLAND        ,AL  36345-0000                                  |
|                                                                     |
|    I, JUDY BYRD         , CLERK OF THE ABOVE NAMED COURT HEREBY     |
|  CERTIFY THAT ON 10/05/2004 PLAINTIFF, INLAND SOUTHERN MANAGEMENT RECOVERED |
|  OF DEFENDANT IN SAID COURT A JUDGEMENT WITHOUT WAIVER OF EXEMPTIONS FOR THE |
|  SUM OF   $154,172.47 DOLLARS PLUS      $199.00 DOLLARS COURT COSTS, AND |
|  THAT THE  PLAINTIFF'S  ATTORNEY(S) OF RECORD WAS: LEE HEATHER ANN  |
|                                                                     |
|                                                                     |
|                                                                     |
|  GIVEN UNDER MY HAND THIS DATE 10/07/2004                           |
|                                                                     |
|                                    Judy Byrd                        |
|                           CLERK:JUDY BYRD                           |
|                           PO DRAWER 6406                            |
|                           DOTHAN AL  36302                          |
-----------------------------------------------------------------------
```

OPERATOR: LIL
PREPARED: 10/07/2004

JUDGE    106   420
Recorded In Above Book and Page
11/12/2004 02:14:44 PM
Luke Cooley
Judge of Probate
Houston County, Alabama

PLAINTIFF'S ATTORNEY:

Recording Fee          11.00
TOTAL                  11.00

LEE HEATHER ANN
3100 SOUTHTRUST TOWER
420 NORTH 20TH STREET
BIRMINGHAM  AL  35203



**G. THOMAS SURTEES**
Commissioner

# STATE OF ALABAMA
# DEPARTMENT OF REVENUE
Montgomery, Alabama 36132
(www.ador.state.al.us)

CYNTHIA UNDERWOOD
Assistant Commissioner

LEWIS A. EASTERLY
Secretary

## NOTICE OF LIEN FOR TAXES

STATE OF ALABAMA
—VS—

DIXON KEVIN
EISAHS
105 MELISSA LN
HEADLAND, AL  36345-2210

JUDGE  106    587
Recorded In Above Book and Page
12/14/2004 09:24:32 AM
Luke Cooley
Judge of Probate
Houston County, Alabama

REFERENCE #: 0000094521
KIND OF TAX: SALES TAX
ACCOUNT NUMBER: 3500 63376
COUNTY: HOUSTON
AMOUNT OF LIEN: 431.65
TAX PERIOD: OCTOBER 2003 - JANUARY 2004

As provided by Sections 40-1-2 and 40-29-20, et seq., Code of Alabama 1975, the Alabama Department of Revenue certifies that the above named Taxpayer is indebted to the Department of Revenue in the above amount.  The State claims a lien upon all property and rights to property belonging to said Taxpayer.

Please record this notice in the real property records and return it to the address shown below with endorsement and recording data.
ENTERED: 12-13-2004  (TDC)

_James H. Browder_
ASSESSMENT OFFICER

ALABAMA DEPARTMENT OF REVENUE
ASSESSMENT SECTION SALES AND USE TAX
P.O. BOX 327720
MONTGOMERY, ALABAMA 36132-7720
TELEPHONE (334)242-1340

Recording Fee
TOTAL

0.00
0.00

RVNT14 (02-23-2004)          "AN AFFIRMATIVE ACTION/EQUAL OPPORTUNITY EMPLOYER"

# SOUTHERN LAND & TITLE, L.L.C.

406 South 2nd Street Gadsden, AL 35901
P. O. Box 1665 Gadsden, AL 35902

Norman R. Dasinger, Ed.D.
Jason E. Knowles, J.D.

Telephone 256-543-1361
Fax 256-543-1377
solandtitle@microxl.com

## FACSIMILE COVER SHEET

TO: _Marette_

FAX NO: _888-272-2916_

DATE: _3.23.05_

RE: _Cheryl R. Hall_    _# 05-2813_
_Houston County, AL_

TOTAL PAGES: _3_

COMMENTS:

_Chain of Title ÷ deed to make_

_24 months_

_Thanks!_
_Jana_



Warranty Deed: 011-2212A9-285

BOOK 0311 PAGE 324
State of Alabama
County of JEFFERSON

KNOW ALL MEN BY THESE PRESENTS, that Samuel R. Pierce, Jr., Secretary of Housing and Urban Development, of Washington, D. C., acting by and through the Office of Assistant Secretary for Housing - Federal Housing Commissioner, for and in consideration of TEN DOLLARS ($10.00), the receipt whereof is hereby acknowledged, does grant, bargain, sell, and convey unto Louis E. Sowers and Fay Sowers                    as joint tenants with express right of survivorship and to the survivor's heirs and assigns the following described real property situated in the County of Houston           State of Alabama:

One House and Lot located in the City of Dothan, Houston County, Alabama, being more particularly described as follows: Lot 2, Block "C" of the Third Addition to Television Heights Subdivision, a subdivision located in the City of Dothan, Houston County, Alabama, per map or plat of same recorded in the Office of the Judge of Probate of Houston County, Alabama, in Plat Book 7, Page 23.

Subject to Statutory period of redemption which expires one year from January 23, 1985.

SUBJECT however, to all covenants, restrictions, reservations, easements, conditions, liens and other rights of whatever nature appearing of record; and further Subject to any state of facts an accurate survey would show.

IN WITNESS WHEREOF the undersigned on this 19th day of July 1985 has set his hand as the duly authorized representative of the Secretary of Housing and Urban Development.

BEING the same property acquired by the Secretary of Housing and Urban Development pursuant to the provisions of the National Housing Act, as amended (42 USC 1441, et seq.)

TO HAVE AND TO HOLD, to the said Louis E. Sowers and Fay Sowers, as joint tenants with express right of survivorship and to the survivor's heirs and assigns forever.

                    Secretary of Housing and Urban Development
                    By:  SAMUEL R. PIERCE, Jr.
                         ASSISTANT SECRETARY FOR HOUSING
                         FEDERAL HOUSING COMMISSION
                    By:  R. E. Gunter
                         Birmingham Office
                         Dept. of Housing and Urban Development
                         Birmingham, Alabama

(STATE OF ALABAMA)
(COUNTY OF JEFFERSON)

I, the undersigned, a Notary Public in and for said County in said State, do hereby certify that R. E. Gunter                    who is personally well known to me to be the duly authorized representative of the Secretary of Housing and Urban Development, and the person who executed the foregoing instrument bearing date  July 19, 1985          by virtue of the authority vested in him by the Code of Federal Regulations, Title 24, Chapter II, and acknowledged before me on this day that, being informed of the contents of this conveyance, he executed the same voluntarily for and on behalf of Samuel R. Pierce, Jr., Secretary of Housing and Urban Development, on the day and year above stated.

Given under my hand and official seal this    19th    day of  July 1985

                         Notary Public
                         My commission expires

This instrument was prepared by R. E. Gunter
Department of Housing and Urban Development
15 South 20th Street
Birmingham, AL

6797

## Chain of Title Sheet

Volume: 598  Page: 34  Type of Deed: Warranty Deed

Grantee: Kevin Lorenzo Dixon, II

Grantor: Louis E. Sowers + wife Fay Sowers

Date: 4-2-03  Date Recorded: 4-3-03

**********************************************

Volume: 311  Page: 324  Type of Deed: Survivorship

Grantor: Louis E. Sowers + Fay Sowers

Grantor: Secretary of Housing + Urban Development

Date: 7-19-85  Date Recorded: 7-26-85

**********************************************

Volume: _____  Page: _____  Type of Deed: _____

Grantee: _____

Grantor: _____

Date: _____  Date Recorded: _____

**********************************************

Volume: _____  Page: _____  Type of Deed: _____

Grantee: _____

Grantor: _____

Date: _____  Date Recorded: _____

**********************************************

*Use Additional Chain Sheet(s) As Needed*

### Easements/Restrictions

_____

_____

_____



CCE-TIL

Comptroller of the Currency
Administrator of National Banks

# Truth in Lending

## Comptroller's Handbook

### December 2006

# CCE



Consumer Compliance Examination

# Truth in Lending

# Table of Contents

**Introduction**
Background and Summary                                                    1
Format of Regulation Z                                                   2
Subpart A – General                                                      4
  Purpose of the TILA and Regulation Z                                   4
  Summary of Coverage [226.1 & 226.2]                                    4
  Exempt Transactions [226.3]                                            5
  Determination of Finance Charge and APR                                7
    Finance Charge (Open-End and Closed-End Credit) [226.4]              7
    Accuracy Tolerances (Closed-End Credit) [226.18(d) & 226.23(h)]      8
    Calculating the Finance Charge (Closed-End Credit)                   9
    Prepaid Finance Charges [226.2(23)]                                  10
    Precomputed Finance Charges                                          10
    APR Definition & Disclosure [226.18(a) & 226.22 – (Closed-End Credit)]  10
    Special Requirements for Calculating the Finance Charge and APR      13
Subpart B – Open-End Credit                                              14
  Finance Charge (Open-end Credit) [226.6(a)]                            14
  Determining the Balance and Computing the Finance Charge               15
  Finance Charge Resulting from Two or More Periodic Rates               17
  Annual Percentage Rate (Open-End Credit)                               17
    Accuracy Tolerance [226.14]                                          17
    Determination of APR                                                 17
Subpart C – Closed-End Credit                                            21
  Finance Charge (Closed-End Credit) [226.17(a)]                         21
  Annual Percentage Rate (Closed-End Credit) [226.22]                    21
    Accuracy Tolerances                                                  21
    Construction Loans [226.17(c)(6) & Appendix D]                       22
    Calculating the Annual Percentage Rate [226.22]                      24
    360-Day and 365-Day Years [226.17(c)(3)]                             24
    Variable Rate Information [226.18(f)]                                26
    Payment Schedule [226.18(g)]                                         27
  Amount Financed [226.18(b)]                                            28
    Definition                                                           28
  Required Deposit [226.18(r)]                                           29
  Calculating the Amount Financed                                        29
  Other Calculations                                                     30
  Closed-End Credit APR and Finance Charge Tolerance Charts              30
  Refinancings [226.20]                                                  31
Subpart D – Miscellaneous                                                32
  Civil Liability [130]                                                  32

Criminal Liability [112]                                                33
Administrative Actions [108]                                           33
Relationship to State Law [111]                                       34
Subpart E – Special Rules for Certain Home Mortgage Transactions       37
General Rules [226.31]                                                37
Certain Closed-End Home Mortgages [226.32]                            37
Reverse Mortgages [226.33]                                            38
Specific Defenses [108 & 130]                                         39
Defense Against Civil, Criminal and Administrative Actions            39
Additional Defenses Against Civil Actions                             40
Statute of Limitations [108 & 130]                                    40
Rescission Rights (Open-End and Closed-End Credit) [226.15 & 226.23]  41
Interagency Administrative Enforcement Policy                         42
Enforcement Policy Applicability to Indirect Paper                    43
Adjustable Rate Mortgages                                             43
OCC's ARM Regulation                                                 43
History and Requirements                                             44

**Examination Objectives**                                           47

**Examination Procedures**                                           48

**Appendix**                                                         55
Summary of the TILA Worksheets by Transaction Type                   55
Closed-End Credit Advertising Worksheet #1                           56
Open-End/Home Equity Line of Credit Advertising Worksheet #2         58
Closed-End Credit Forms Review Worksheet #3                          60
Closed-End Credit Adjustable Rate Mortgage Forms Review Worksheet #4 63
Closed-End Credit File Review Worksheet #5                           65
Closed-End Credit Adjustable Rate Mortgage File Review Worksheet #6  68
Right of Rescission File Review Worksheet #7                         70
Open-End Credit Forms Review Worksheet #8                            72
Home-Equity Line of Credit Forms Review Worksheet #9                 76
Credit Card Forms Review Worksheet #10                              81
Open-End Credit File Review Worksheet #11                            83
Home Equity Line of Credit File Review Worksheet #12                 85
Special Rules for Certain Home Mortgage Transactions File Review
   Worksheet #13                                                    87
Periodic Billing Statements Worksheet #14                           90
High-Cost Mortgages Worksheet #15                                   92
Coverage Considerations under Regulation Z                          95
Finance Charge Chart                                                96
Finance Charge Tolerances                                        99-103
Summary of Coverage Rules for ARMs                                 104

Joint Policy Statement – Restitution (Policy Guide)          105
Questions and Answers – Interagency Guidance          112

**References**          131

# Truth in Lending                    Introduction

This booklet provides background information and optional expanded examination procedures for the Truth in Lending Act (TILA) and Regulation Z.

Examiners will select from the procedures those that are necessary, if any, after first completing a compliance core assessment. For guidance in completing a core assessment, refer to the "Community Bank Supervision" and "Internal and External Audits" booklets in the *Comptroller's Handbook* and the "Compliance Management System" booklet in the *Comptroller's Handbook for Consumer Compliance*. Complaint information received by the Office of the Ombudsman, Customer Assistance Group, may also be useful in completing the assessment.

## Background and Summary

The TILA, 15 USC 1601 *et seq.,* was enacted on May 29, 1968, as title I of the Consumer Credit Protection Act (Public Law 90-321). The TILA, implemented by Regulation Z (12 CFR 226), became effective July 1, 1969.

The TILA was first amended in 1970 to prohibit unsolicited credit cards. Additional major amendments to the TILA and Regulation Z were made by the Fair Credit Billing Act of 1974, the Consumer Leasing Act of 1976, the Truth in Lending Simplification and Reform Act of 1980, the Fair Credit and Charge Card Disclosure Act of 1988, the Home Equity Loan Consumer Protection Act of 1988, the Home Ownership and Equity Protection Act of 1994, the TILA Amendments of 1995, and the Economic Growth and Regulatory Paperwork Reduction Act of 1996 (EGRPRA).

Regulation Z also was amended to implement section 1204 of the Competitive Equality Banking Act of 1987, and in 1988, to include adjustable rate mortgage (ARM) loan disclosure requirements. All consumer leasing provisions were deleted from Regulation Z in 1981 and transferred to Regulation M (12 CFR 213).

The Home Ownership and Equity Protection Act of 1994 imposed new disclosure requirements and substantive limitations on certain closed-end mortgage loans bearing rates or fees above a certain percentage or amount. The law also included new disclosure requirements to assist consumers in comparing the costs and other material considerations of a reverse mortgage transaction and authorized the Board of Governors of the Federal Reserve System (Board) to prohibit specific acts and practices in connection with mortgage transactions. Regulation Z was amended in 2001 to implement these legislative changes to TILA.

The TILA Amendments of 1995 dealt primarily with tolerances for real estate secured credit. Regulation Z was amended on September 14, 1996 to incorporate changes to the TILA that limit lenders' liability for disclosure errors in loans secured by real estate consummated after September 30, 1995. The EGRPRA amendments were made to simplify and improve disclosures related to credit transactions.

## Format of Regulation Z

The disclosure rules creditors must follow differ depending on whether or not the creditor is offering open-end credit, such as credit cards or home-equity lines of credit, or closed-end credit, such as car loans or mortgages.

Subpart A [sections 226.1 through 226.4] provides general information that applies to open-end and closed-end credit transactions. It sets forth definitions and stipulates which transactions are covered and which are exempt from the regulation. It also contains the rules for determining which fees are finance charges.

Subpart B [sections 226.5 through 226.16] contains disclosure rules for home-equity lines of credit, credit and charge card accounts, and other open-end credit. It also covers rules for resolving billing errors, calculating the annual percentage rate (APR), credit balances, and advertising open-end credit. Special rules apply to credit card transactions only, such as certain prohibitions on the issuance of credit cards and restrictions on the right to offset a cardholder's indebtedness. Additional special rules apply to home-

equity lines of credit, such as certain prohibitions against closing accounts or changing account terms.

Subpart C [sections 226.17 through 226.24] includes provisions for closed-end credit. Residential mortgage transactions, demand loans, and installment credit contracts, including direct loans by banks and purchased dealer paper, are included in the closed-end credit category. It also contains disclosure rules for regular and variable rate loans, refinancings and assumptions, credit balances, calculating the APR, and advertising closed-end credit.

Subpart D [sections 226.25 through 226.30] applies to both open-end and closed-end credit and sets forth a creditor's duty to retain evidence of compliance with the regulation. It also clarifies the relationship between the regulation and state law, and requires creditors to set a cap for variable rate transactions secured by a consumer's dwelling.

Subpart E [sections 226.31 through 226.34] applies to certain home mortgage transactions including high-cost, closed-end mortgages and reverse mortgages. It requires additional disclosures and provides limitations for certain home mortgage transactions having rates or fees above a certain percentage or amount; it prohibits specific acts and practices in connection with those loans; and it includes disclosure requirements for reverse mortgage transactions (open-end and closed-end credit).

The appendixes to the regulation set forth model forms and clauses that creditors may use when providing open-end and closed-end disclosures. The appendixes contain detailed rules for calculating the APR for open-end credit (appendix F) and closed-end credit (appendixes D and J). The last two appendixes (appendixes K and L) provide total annual loan cost rate computations and assumed loan periods for reverse mortgage transactions.

Official staff interpretations of the regulation are published in a commentary that is normally updated annually in March. Good faith compliance with the commentary protects creditors from civil liability under the act. In addition, the commentary includes mandates, which are not necessarily explicit in Regulation Z, on disclosures or other actions required of creditors. In order to comply with the Regulation Z, it is critical to reference and rely on the commentary.

**NOTE: The following narrative does not discuss every section of Regulation Z, but rather highlights areas that have caused the most problems for banks, including finance charge and APR calculations.**

## Subpart A – General

## Purpose of the TILA and Regulation Z

The TILA is intended to ensure that credit terms are disclosed in a meaningful way so consumers can compare credit terms more readily and knowledgeably. Before its enactment, consumers were faced with a bewildering array of credit terms and rates. It was difficult to compare loans because they were seldom presented in the same format. Now, all creditors must use the same credit terminology and expressions of rates. In addition to providing a uniform system for disclosures, the act:

- Protects consumers against inaccurate and unfair credit billing and credit card practices;

- Provides consumers with rescission rights;

- Provides for rate caps on certain dwelling-secured variable rate loans; and

- Imposes limits on home equity lines of credit and certain closed-end home mortgages.

The TILA and Regulation Z do not, however, tell banks how much interest they may charge or if they must grant a consumer a loan.

## Summary of Coverage [Sections 226.1 & 226.2]

Lenders must carefully consider several factors when deciding if a loan requires Truth in Lending disclosures or is subject to other Regulation Z requirements. A chart in the appendix of this booklet, "Coverage Considerations under Regulation Z," helps lenders make such decisions.

Regulation Z and its commentary address the factors included in the chart in more detail. For example, section 226.1(c) of the regulation specifies what kinds of institutions and borrowers are covered, and relevant definitions appear in section 226.2.

## Exempt Transactions [Section 226.3]

The following transactions are exempt from Regulation Z:

- Credit extended primarily for a business, commercial, or agricultural purpose;

- Credit extended to other than a natural person (including credit to government agencies or instrumentalities);

- Credit in excess of $25,000 not secured by real property or personal property used or expected to be used as the consumer's principal dwelling;

- Public utility credit;

- Credit extended by a broker-dealer registered with the Securities and Exchange Commission (SEC) or the Commodity Futures Trading Commission (CFTC), involving securities or commodities accounts;

- Home fuel budget plans; and

- Certain student loan programs.

However, when a credit card is involved, generally exempt credit (e.g., business purpose credit) is subject to the requirements that govern the issuance of credit cards and liability for their unauthorized use. Credit cards must not be issued on an unsolicited basis and, if a credit card is lost or stolen, the cardholder must not be held liable for more than $50 for the unauthorized use of the card (Regulation Z, footnote 4).

When determining if credit is for consumer purposes, the creditor must evaluate all of the following:

- Any statement obtained from the consumer describing the purpose of the proceeds:

    – For example, a statement that the proceeds will be used for a vacation trip would indicate a consumer purpose.
    – If the loan has a mixed-purpose (e.g., proceeds will be used to buy a car that will be used for personal and business purposes), the lender must look to the **primary** purpose of the loan to decide if disclosures are necessary. A statement of purpose from the consumer will help the lender make that decision.
    – A checked box indicating that the loan is for a business purpose, absent any documentation showing the intended use of the proceeds, could be insufficient evidence that the loan did not have a consumer purpose.

- The consumer's primary occupation and how it relates to the use of the proceeds. The higher the correlation between the consumer's occupation and the property purchased from the loan proceeds, the greater the likelihood that the loan has a business purpose. For example, proceeds used to purchase dental supplies for a dentist would indicate a business purpose.

- Personal management of the assets purchased from proceeds. The less the borrower is personally involved in managing the investment or enterprise purchased by the loan proceeds, the less likely the loan will have a business purpose. For example, money borrowed to purchase stock in an automobile company by an individual who does not work for that company would indicate a personal investment and a consumer purpose.

- The size of the transaction. The larger the size of the transaction, the more likely the loan will have a business purpose. For example, if the loan is for a $5,000,000 real estate transaction, that might indicate a business purpose.

- The relative amount of income derived from the property acquired by the loan proceeds. The less the income derived from the acquired property relative to the borrower's total income, the more likely the loan will have a consumer purpose. For example, if the borrower has an annual salary of $100,000 and receives about $500 in annual dividends from the acquired property, that would indicate a consumer purpose.

All five factors must be evaluated before the lender can conclude that disclosures are not necessary. Normally, no one factor by itself is sufficient to determine the applicability of Regulation Z. In any event, the bank may routinely furnish disclosures to the borrower. Disclosure under such circumstances does not determine that the transaction is covered under the Regulation Z but can assure protection to the bank and compliance with the law.

## Determination of Finance Charge and APR

### Finance Charge (Open-End and Closed-End Credit) [Section 226.4]

The finance charge is a measure of the cost of consumer credit represented in dollars and cents. Along with APR disclosures, the disclosure of the finance charge is central to the uniform credit cost disclosure envisioned by the TILA.

Finance charges include any charges or fees payable directly or indirectly by the consumer and imposed directly or indirectly by the financial institution either as an incident to or as a condition of an extension of consumer credit. The finance charge on a loan always includes any interest charges and often, other charges. Regulation Z includes examples, applicable both to open-end and closed-end credit transactions, of what must, must not, or need not be included in the disclosed finance charge [section 226.4(b)].

The finance charge does not include any charge of a type payable in a comparable cash transaction. Examples of charges payable in a comparable cash transaction may include taxes, title, license fees, or registration fees paid in connection with an automobile purchase.

**Accuracy Tolerances (Closed-End Credit)  [Sections 226.18(d) & 226.23(h)]**

Regulation Z provides finance charge tolerances for legal accuracy that should not be confused with those provided in the TILA for reimbursement under regulatory agency orders. As with disclosed APRs, if a disclosed finance charge were legally accurate, it would not be subject to reimbursement.

Under the TILA and Regulation Z, finance charge disclosures for open-end credit must be accurate since there is no tolerance for finance charge errors. However, both the TILA and Regulation Z permit various finance charge accuracy tolerances for closed-end credit.

Tolerances for the finance charge in a closed-end transaction, other than a mortgage loan, are generally $5 if the amount financed is less than or equal to $1,000 and $10 if the amount financed exceeds $1,000. The finance charge in a closed-end mortgage transaction consummated on or after September 30, 1995 is considered accurate:

- If the disclosed finance charge does not vary from the actual finance charge by more than $100, or

- If the disclosed finance charge is greater than the actual finance charge.

Tolerances for the finance charge in rescindable mortgage transactions are different.  After the three-business-day rescission period is over, the finance charge in the **closed-end credit transaction** is considered accurate if:

- Except as otherwise provided, the disclosed finance charge does not vary from the actual finance charge by more than one-half of 1 percent of the credit extended or $100, whichever is greater.

- The disclosed finance charge does not vary from the actual finance charge by more than 1 percent of the credit extended or $100, whichever is greater, for the initial and subsequent refinancings of residential mortgage transactions when the new loan is made by a different financial institution. (This does not apply to high cost

mortgage loans subject to section 226.32, transactions in which there are new advances and new consolidations.)

Special rules apply to the finance charge tolerances if the (**closed-end credit**) rescindable mortgage transaction is involved in foreclosure action.

- The disclosed finance charge is considered accurate if it does not vary from the actual finance charge by more than $35.

- Overstatements are not considered violations.

- The consumer can rescind if a mortgage broker fee that should have been included in the finance charge was not included.

**NOTE:** Normally, the finance charge tolerance for a rescindable transaction is either 0.5 percent of the credit transaction or, for certain refinancings, 1 percent of the credit transaction. However, in the event of a foreclosure, the consumer may exercise the right of rescission if the disclosed finance charge is understated by more than $35.

**Calculating the Finance Charge (Closed-End Credit)**

One of the more complex tasks under Regulation Z is determining if a charge associated with an extension of credit must be included in, or excluded from, the disclosed finance charge. The finance charge initially includes any charge that is, or will be, connected with a specific loan.  Charges imposed by third parties are finance charges if the bank requires use of the third party. Charges imposed by settlement or closing agents are finance charges if the bank requires the specific service that gave rise to the charge and the charge is not otherwise excluded.

See the "Finance Charge" chart in the appendix of this booklet for a brief summary of the rules that must be considered when determining what is a finance charge.

**Prepaid Finance Charges [Section 226.2(23)]**

A "prepaid" finance charge is any finance charge paid separately to the bank or to a third party, in cash or by check before or at closing, settlement, or consummation of a transaction, or withheld from the proceeds of the credit at any time. Prepaid finance charges effectively reduce the amount of funds available for the consumer's use.

Examples of finance charges frequently prepaid by consumers are borrower's points, loan origination fees, real estate construction inspection fees, odd days' interest (interest attributable to part of the first payment period when that period is longer than a regular payment period), mortgage guarantee insurance fees paid to the Federal Housing Administration, private mortgage insurance (PMI) paid to such companies as the Mortgage Guaranty Insurance Company (MGIC), and, in non-real-estate transactions, credit report fees.

**Precomputed Finance Charges**

A "precomputed" finance charge includes, for example, interest added to the note amount that is computed by the add-on, discount, or simple interest methods. If reflected in the face amount of the debt instrument as part of the consumer's obligation, finance charges that are not viewed as prepaid finance charges are treated as precomputed finance charges that are earned over the life of the loan.

**APR Definition and Disclosure [Sections 226.18(a) & 226.22 (Closed-End Credit)]**

Credit costs may vary depending on the interest rate, the amount of the loan and other charges, the timing and amounts of advances, and the repayment schedule. The APR, which must be disclosed in nearly all consumer credit transactions, is designed to take into account all relevant factors and to provide a uniform measure for comparing the cost of various credit transactions.

The APR is a measure of the cost of credit, expressed as a nominal yearly rate. It relates the amount and timing of value received by the consumer to the amount and timing of payments made. The disclosure of the APR is central to the uniform credit cost disclosure envisioned by the TILA.

The value of a closed-end credit APR must be disclosed as a single rate only, if the loan has a single interest rate, a variable interest rate, a discounted variable interest rate, or graduated payments based on separate interest rates (step rates), and it must appear with the segregated disclosures. Segregated disclosures are grouped together and do not contain any information not directly related to the disclosures required under section 226.18.

Since an APR measures the total cost of credit, including costs such as transaction charges or premiums for credit guarantee insurance, it is not an "interest" rate, as that term is generally used. APR calculations do not rely on definitions of interest in state law and often include charges, such as a commitment fee paid by the consumer, that are not viewed by some state usury statutes as interest. Conversely, an APR might not include a charge, such as a credit report fee in a real property transaction, which some state laws might view as interest for usury purposes. Furthermore, measuring the timing of value received and of payments made is essential if APR calculations are to be accurate, and in accordance with the Regulation Z parameters.

The APR is often considered to be the finance charge expressed as a percentage. However, two loans could require the same finance charge and still have different APRs because of differing values of the amount financed or of payment schedules. For example, two loans could each have a finance charge of $978.52, but the APR on loan one is 12 percent and the APR on loan two is 13.26 percent. The APRs differ because the amount financed in loan one is $5,000 and the borrower makes 36 equal monthly payments of $166.07 each, and the amount financed in loan two is $4,500 and the borrower makes 35 equal monthly payments of $152.18 each and a final payment of $152.22. The APRs on these loans are not the same because an APR reflects not only the finance charge but also the amount and timing of value received by the consumer in relation to the amount and timing of payments made.

The APR is a function of:

- The *amount financed*, which is not necessarily equivalent to the loan amount. If the consumer must pay at closing a separate 1 percent loan origination fee (prepaid finance charge) on a $100,000 residential mortgage loan, the loan amount is $100,000, but the amount financed would be $100,000 less the $1,000 loan fee, or $99,000.

- The *finance charge*, which is not necessarily equivalent to the total interest amount. Interest, which is defined by state or other federal law, is not defined by Regulation Z. Charges may or may not be considered a finance charge because of exemptions or conditions.  For example, if the consumer must pay a $25 credit report fee for an auto loan, the fee must be included in the finance charge. The finance charge in that case is the sum of the interest on the loan (i.e., interest generated by the application of a percentage rate against the loan amount) plus the $25 credit report fee. If the consumer must pay a $25 credit report fee for a loan secured by real property, the credit report fee must be excluded from the finance charge.  Assuming there are no additional fees or charges assessed in the connection with the mortgage loan, the finance charge would be only the interest on the loan.   Refer to the section on finance charge for clarification.

- The *payment schedule*, which does not necessarily include only principal and interest (P + I) payments. If the consumer borrows $2,500 for a vacation trip at 14 percent simple interest per annum and repays that amount with 25 equal monthly payments beginning one month from consummation of the transaction, the monthly P + I payment will be $115.87, if all months are considered equal, and the amount financed would be $2,500. If the consumer's payments are increased by $2.00 a month to pay a non-financed (for illustrative purpose, there is no interest component) $50 loan fee over the life of the loan, the amount financed would remain at $2,500 but the payment schedule would be increased to $117.87 a month, the finance charge would increase by $50, and there would be a corresponding increase in the APR. This would be the case whether or not state law defines the $50 loan fee as interest.

If the loan above has 55 days to the first payment and the consumer prepays interest at consummation ($24.31 to cover the first 25 days), the amount financed would be $2,500 minus $24.31, or $2,475.69. Although the amount financed has been reduced to reflect the consumer's reduced use of available funds at consummation, the time interval during which the consumer has use of the $2,475.69, 55 days to the first payment, has not changed. Since the first payment period exceeds the limits of the regulation's minor irregularities provisions (see section 226.17(c)(4)), it may not be treated as regular. In calculating the APR, the first payment period must include the additional 25 days (i.e., the first payment period may not be treated as one month).

Banks may, if permitted by state or other law, precompute interest by applying a rate against a loan balance using a simple interest, add-on, discount or some other method, and may earn interest using a simple interest accrual system, the "rule of 78's" (if permitted by law) or some other method. Even if the bank's internal interest earnings and accrual methods involve a simple interest rate based on a 360-day year that is applied over 365 actual days (that fact is important only for determining the accuracy of the payment schedule), it is not relevant in calculating an APR, since an APR is not an interest rate (as that term is commonly used under state or other law). Since the APR normally need not rely on the internal accrual systems of a bank, it can be computed after the loan terms have been agreed upon (as long as it is disclosed before consummation of the transaction).

**Special Requirements for Calculating the Finance Charge and APR**

The finance charge and APR, more than any other disclosures, enable consumers to understand the cost of credit and to comparison shop for credit. Therefore, proper calculation of the finance charge and APR are of primary importance. Additionally, section 226.17(a)(2) requires that the terms "finance charge" and "annual percentage rate" be disclosed more conspicuously than any other required disclosure. A creditor's failure to disclose those values accurately can result in significant monetary damages to the creditor, either from a class action lawsuit or from a regulatory agency's order to reimburse consumers for violations of law.

Footnote 45d to section 226.22 of regulation Z provides that if an APR or finance charge is disclosed incorrectly, the error is not, in itself, a violation of the regulation if:

- The error resulted from a corresponding error in a calculation tool used in good faith by the bank;

- Upon discovery of the error, the bank promptly discontinues use of that calculation tool for disclosure purposes; and

- The bank notifies the Federal Reserve Board in writing of the error in the calculation tool.

When a bank claims it used a calculation tool in good faith, it assumes a reasonable degree of responsibility for ensuring that the tool in question provides the accuracy the regulation requires. For example, the bank might verify the results obtained using the tool by comparing those results to the figures obtained by using another calculation tool. The bank might also verify that the tool, if it is designed to operate under the actuarial method, produces figures similar to those provided by the examples in appendix J to the regulation. The calculation tool should be checked for accuracy before it is first used and periodically thereafter.

## Subpart B — Open-End Credit

The following is not a complete discussion of the TILA's requirements for open-end credit. Instead, the information provided below is offered to clarify otherwise confusing terms and requirements. Refer to sections 226.5 through 226.16 and related commentary for a more thorough understanding of the act.

## Finance Charge (Open-End Credit) [Section 226.6(a)]

Each finance charge imposed must be individually itemized. The aggregate total amount of the finance charge need not be disclosed.

## Determining the Balance and Computing the Finance Charge

The examiner must know how to compute the balance to which the periodic rate is applied. Common methods used are the previous balance method, the daily balance method, and the average daily balance method:

- *Previous balance method.* The balance on which the periodic finance charge is computed is based on the balance outstanding at the start of the billing cycle. The periodic rate is multiplied by this balance to compute the finance charge.

- *Daily balance method.* A daily periodic rate is applied to either the balance on each day in the cycle or the sum of the balances on each of the days in the cycle. If a daily periodic rate is multiplied by the balance on each day in the billing cycle, the finance charge is the sum of the products. If the daily periodic rate is multiplied by the sum of all the daily balances, the result is the finance charge.

- *Average daily balance method.* The average daily balance is the sum of the daily balances (either including or excluding current transactions) divided by the number of days in the billing cycle. A periodic rate is then multiplied by the average daily balance to determine the finance charge. If the periodic rate is a daily one, the product of the rate multiplied by the average balance is multiplied by the number of days in the cycle.

In addition to those common methods, banks have other ways of calculating the balance to which the periodic rate is applied. By reading the bank's explanation, the examiner should be able to calculate the balance to which the periodic rate was applied. In some cases, the examiner may need to obtain additional information from the bank to verify the explanation disclosed. Any inability to understand the disclosed explanation should be discussed with management, who should be reminded of Regulation Z's requirement that disclosures be clear and conspicuous.

If a balance is determined without first deducting all credits and payments made during the billing cycle, that fact and the amount of the credits and payments must be disclosed.

If the bank uses the daily balance method and applies a single daily periodic rate, disclosure of the balance to which the rate was applied may be stated as any of the following:

- A balance for each day in the billing cycle. The daily periodic rate is multiplied by the balance on each day and the sum is the finance charge.

- A balance for each day in the billing cycle on which the balance in the account changes. The finance charge is figured by the same method as discussed previously, but the statement shows the balance only for those days on which the balance changed.

- The sum of the daily balances during the billing cycle. The balance on which the finance charge is computed is the sum of all the daily balances in the billing cycle. The daily periodic rate is multiplied by that balance to determine the finance charge.

- The average daily balance during the billing cycle. If this is stated, however, the bank must explain somewhere on the periodic statement or in an accompanying document that the finance charge is or may be determined by multiplying the average daily balance by the number of days in the billing cycle, rather than by multiplying the product by the daily periodic rate.

If the bank uses the daily balance method, but applies two or more daily periodic rates, the sum of the daily balances may not be used. Acceptable ways of disclosing the balances include:

- A balance for each day in the billing cycle;

- A balance for each day in the billing cycle on which the balance in the account changes; or

- Two or more average daily balances. If the average daily balances are stated, the bank shall indicate on the periodic statement or in an

---

accompanying document that the finance charge is or may be determined by multiplying each of the average daily balances by the number of days in the billing cycle (or if the daily rate varies, by multiplying the number of days that the applicable rate was in effect), multiplying each of the results by the applicable daily periodic rate, and adding the products together.

In explaining the method used to find the balance on which the finance charge is computed, the bank need not reveal how it allocates payments or credits. That information may be disclosed as additional information, but all required information must be clear and conspicuous.

## Finance Charge Resulting from Two or More Periodic Rates

Some banks use more than one periodic rate in computing the finance charge. For example, one rate may apply to balances up to a certain amount and another rate to balances more than that amount. If two or more periodic rates apply, the bank must disclose all rates and conditions. The range of balances to which each rate applies also must be disclosed. It is not necessary, however, to break the finance charge into separate components based on the different rates.

## Annual Percentage Rate (Open-End Credit)

### Accuracy Tolerance [Section 226.14]

The disclosed APR on an open-end credit account is accurate if it is within one-eighth of 1 percentage point of the APR calculated under Regulation Z.

### Determination of APR

The regulation states two basic methods for determining the APR in open-end credit transactions. The first involves multiplying each periodic rate by the number of periods in a year. This method is used for disclosing:

- The corresponding APR in the initial disclosures;

- The corresponding APR on periodic statements;

- The APR in application or solicitation disclosures for credit card accounts;

- The APR in early disclosures for home-equity plans;

- The APR in advertising; and

- The APR in oral disclosures.

The corresponding APR is prospective. In other words, it does not involve any particular finance charge or periodic balance.

The second method is the quotient method, used in computing the APR for periodic statements. The quotient method reflects the annualized equivalent of the rate that was actually applied during a cycle. This rate, also known as the historical rate, will differ from the corresponding APR if the creditor applies minimum, fixed, or transaction charges to the account during the cycle.

If the finance charge is determined by applying one or more periodic rates to a balance, and does not include any of the charges just mentioned, the bank may compute the historical rate using the quotient method. Using that method, the bank divides the total finance charge for the cycle by the sum of the balances to which the periodic rates were applied and multiplies the quotient (expressed as a percentage) by the number of cycles in a year.

Alternatively, the bank may use the quotient method for computing the corresponding APR by multiplying each periodic rate by the number of periods in one year. If the finance charge includes a minimum, fixed, or transaction charge, then the bank must use the appropriate variation of the quotient method (see section 226.14(c) for more details). When transaction charges are imposed, the bank should refer to appendix F of Regulation Z for computational examples.

The regulation also contains a computation rule for small finance charges. If the finance charge includes a minimum, fixed, or transaction charge, and the total finance charge for the cycle does not exceed 50 cents, the bank may

multiply each applicable periodic rate by the number of periods in a year to compute the corresponding APR.

Optional calculation methods also are provided for accounts involving daily periodic rates. [section 226.14(d)]

**Brief Outline for Open-End Credit APR Calculations on Periodic Statements**

**NOTE:** Assume monthly billing cycles for each of the calculations below.

I.  APR when finance charge is determined solely by applying one or more periodic rates.

   A.  Monthly periodic rates:

      1.  Monthly rate x 12  =  APR

      or

      2.  (Total finance charge / Sum of the balances [1]) x 12  =  APR
      **This calculation also can be used when different rates apply to different balances.**

   B.  Daily periodic rates [section 226.14(d)]:

      1.  Daily rate x 365  =  APR

      or

      2.  (Total finance charge / average daily balance[1]) x 12  =  APR

      or

      3.  (Total finance charge / sum of balances[1]) x 365  =  APR

---

[1] If zero, no APR can be determined. The amount of applicable balance is determined by the balance calculation method and may include the average daily balance, adjusted balance, or previous balance method.

---

II. APR when finance charge includes a minimum, fixed, or other charge that is not calculated using a periodic rate (and does not include charges related to a specific transaction, like cash advance fees).

    A.  Monthly periodic rates [section 226.14(c)(2)]:

        1.    (Total finance charge / amount of applicable balance[1]) x 12 = APR[2]

    C.  Daily periodic rates [section 226.14(c)]:

        1.  (Total finance charge / amount of applicable balance[1]) x 365 = APR[2]

        2.  The following may be used if at least a **portion** of the finance charge is determined by the application of a daily periodic rate.  If not, use the formula above.

            a.  (Total finance charge / average daily balance[1]) x 12 = APR[2]

            or

            b.  (Total finance charge / sum of balances[1]) x 365 = APR[2]

    C.  Monthly and daily periodic rates:

        If the finance charge imposed during the billing cycle does not exceed $0.50 for a monthly or longer billing cycle (or pro rata part of $0.50 for a billing cycle shorter than monthly), the APR may be calculated by multiplying the monthly rate by 12 or the daily rate by 365.

III. If the total finance charge includes a charge related to a specific transaction (such as a cash advance fee), even if the total finance charge also includes any other minimum, fixed, or other charge not calculated

---

[2] Loan fees, points, or similar finance charges that relate to the opening of the account must not be included in the calculation of the APR.

using a periodic rate, then the monthly and daily APRs are calculated as follows: total finance charge divided by the greater of the transaction amounts that created the transaction fees or the sum of the balances and other amounts on which a finance charge was imposed during the billing cycle[3] times number of billing cycles in a year (12) equals APR.[4]

# Subpart C — Closed-End Credit

What follows is not a complete discussion of the TILA's requirements for closed-end credit. The information provided here merely clarifies confusing terms and requirements. Refer to sections 226.17 through 226.24 and related commentary for a more thorough understanding of the act.

## Finance Charge (Closed-End Credit) [Section 226.17(a)]

The aggregate total amount of the finance charge must be disclosed.  Each finance charge imposed need not be individually itemized and must not be itemized with the segregated disclosures.

## Annual Percentage Rate (Closed-End Credit) [Section 226.22]

### Accuracy Tolerances

The disclosed APR on a closed-end transaction is accurate for:

- Regular transactions (which include any single advance transaction with equal payments and equal payment periods, or an irregular first payment period or a first or last irregular payment), if it is within one-eighth of 1 percentage point of the APR calculated under Regulation Z (section 226.22(a)(2)).

- Irregular transactions (which include multiple advance transactions and other transactions not considered regular), if it is within one-quarter of 1

---

[3] The sum of the balances may include the average daily balance, adjusted balance, or previous balance method. Where a portion of the finance charge is determined by application of one or more daily periodic rates, sum of the balances also means the average of daily balance.

[4] Cannot be less than the highest periodic rate applied, expressed as an APR.

percentage point of the APR calculated under Regulation Z (section 226.22(a)(3)).

- Mortgage transactions, if it is within one-eighth of 1 percentage point for regular transactions or one-quarter of 1 percentage point for irregular transactions **and**

    i. The rate results from the disclosed finance charge; **and**

    ii. The disclosed finance charge would be considered accurate under section 226.18(d)(1) or section 226.23(g) or (h)(section 226.22(a)(4)).

    **NOTE**: There is an additional tolerance for mortgage loans when the disclosed finance charge is calculated incorrectly but is considered accurate under section 226.18(d)(1) or section 226.23(g) or (h) (section 226.22(a)(5)).

### Construction Loans [Section 226.17(c)(6) & Appendix D]

Construction and certain other multiple advance loans pose special problems in computing the finance charge and APR. In many instances, the amount and dates of advances are not predictable with certainty since they depend on the progress of the work. Regulation Z provides that the APR and finance charge for such loans may be estimated for disclosure.

At its option, the bank may rely on the representations of other parties to acquire necessary information (for example, it might look to the consumer for the dates of advances). In addition, if either the amounts or dates of advances are unknown (even if some of them are known), the bank may, at its option, use appendix D to the regulation to make calculations and disclosures. The finance charge and payment schedule obtained through appendix D may be used with volume one of the Federal Reserve Board's APR tables or with any other appropriate computation tool to determine the APR. If the bank elects not to use appendix D, or if appendix D cannot be applied to a loan (e.g., appendix D does not apply to a combined construction-permanent loan if the payments for the permanent loan begin during the construction period), the

bank must make its estimates under section 226.17(c)(2) and calculate the APR using multiple advance formulas.

On loans involving a series of advances under an agreement to extend credit up to a certain amount, a bank may treat all of the advances as a single transaction or disclose each advance as a separate transaction. If advances are disclosed separately, disclosures must be provided before each advance occurs, with the disclosures for the first advance provided before consummation.

In a transaction that finances the construction of a dwelling that may or will be permanently financed by the same bank, the construction and permanent financing phases may be disclosed in any of three ways:

• As a single transaction, with one disclosure combining both phases.

• As two separate transactions, with one disclosure for each phase. If the consumer is obligated for both construction and permanent phases at the outset, both sets of disclosures must be given to the consumer initially, before consummation of each transaction occurs.

• As more than two transactions, with one disclosure for each advance and one for the permanent financing phase.

If two or more disclosures are furnished, buyer's points or similar amounts imposed on the consumer may be allocated among the transactions in any manner the bank chooses, as long as the charges are not applied more than once.

If the creditor requires interest reserves for construction loans, special appendix D rules apply that can make the disclosure calculations quite complicated. The amount of interest reserves included in the commitment amount must not be treated as a prepaid finance charge.

If the lender uses appendix D for construction-only loans with required interest reserves, the lender must estimate construction interest using the interest reserve formula in appendix D. The lender's own interest reserve values must be completely disregarded for disclosure purposes.

If the lender uses appendix D for combination construction-permanent loans, the calculations can be much more complex. Appendix D is used to estimate the construction interest, which is then measured against the lender's contractual interest reserves.

If the interest reserve portion of the lender's contractual commitment amount exceeds the amount of construction interest estimated under appendix D, the excess value is considered part of the amount financed if the lender has contracted to disburse those amounts whether or not they ultimately are needed to pay for accrued construction interest. If the lender will not disburse the excess amount when it is not needed to pay for accrued construction interest, the excess amount must be ignored for disclosure purposes.

## Calculating the Annual Percentage Rate [Section 226.22]

The APR must be determined using either of the following methods:

- The actuarial method, which is defined by Regulation Z and explained in appendix J to the regulation, or

- The U.S. Rule, which is permitted by Regulation Z and briefly explained in appendix J to the regulation. The U.S. Rule is an accrual method that surfaced in an early nineteenth century United States Supreme Court case, *Story v. Livingston* (38 U.S. 359).

Whichever method the bank uses, the rate calculated will be accurate if the institution is able to "amortize" the amount financed while it generates the finance charge under the accrual method selected. Banks also may rely on minor irregularities and accuracy tolerances in the regulation, both of which permit somewhat imprecise, but still legal, APRs to be disclosed.

## 360-Day and 365-Day Years [Section 226.17(c)(3)]

Confusion often arises over the use of the 360-day or 365-day year in computing interest, particularly when the finance charge is computed by applying a daily rate to an unpaid balance. The method to apply should be

explained clearly in the legal obligation. Many single payment loans or loans payable on demand are in this category. There are also loans in this category that call for periodic installment payments.

Regulation Z does not require one method of interest computation over another (although state law may). It permits banks to disregard the fact that months have different numbers of days when calculating and making disclosures. This means banks may base their disclosures on calculation tools that assume all months have an equal number of days, even if their practice is to take account of the variations in months to collect interest.

For example, a bank may calculate disclosures using a financial calculator based on a 360-day year with 30-day months, when, in fact, it collects interest by applying a factor of 1/365 of the annual interest rate to actual days. Disclosure violations may occur, however, when a bank applies a daily interest factor based on a 360-day year to the actual number of days between payments. In those situations, the bank must disclose the higher values of the finance charge, the APR, and the payment schedule resulting from this practice.

For example, a 12 percent simple interest rate divided by 360 days results in a daily rate of .033333 percent. If no charges are imposed except interest, and the amount financed is the same as the loan amount, applying the daily rate on a daily basis for a 365-day year on a $10,000 one-year, single-payment, unsecured loan results in an APR of 12.17 percent (.033333% x 365 = 12.17%), and a finance charge of $1,216.67. There would be a violation if the APR were disclosed as 12 percent or if the finance charge were disclosed as $1,200 (12% x $10,000).

However, if there is no other charge except interest, the application of a 360-day-year daily rate over 365 days on a regular loan would not result in an APR in excess of the one-eighth of 1 percentage point APR tolerance unless the nominal interest rate is greater than 9 percent. For irregular loans, with one-quarter of 1 percentage point APR tolerance, the nominal interest rate would have to be greater than 18 percent to exceed the tolerance.

**Variable Rate Information [Section 226.18(f)]**

If the terms of the legal obligation allow the bank, after consummation of the transaction, to increase the APR, the bank must furnish the consumer with certain information on variable rates. Graduated payment mortgages and step-rate transactions without a variable rate feature are not considered variable rate transactions. In addition, variable rate disclosures are not applicable to rate increases resulting from delinquency, default, assumption, acceleration, or transfer of the collateral.

Some of the more important transaction-specific variable rate disclosure requirements under section 226.18 follow:

- Disclosures for variable rate loans must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation.

- If the variable rate transaction includes either a seller buydown that is reflected in a contract or a consumer buydown, the disclosed APR should be a composite rate based on the lower rate for the buydown period and the rate that is the basis for the variable rate feature for the remainder of the term.

- If the initial rate is not determined by the index or formula used to make later interest rate adjustments, as in a discounted variable rate transaction, he disclosed APR must reflect a composite rate based on the initial rate for as long as it is applied and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation (i.e., the fully indexed rate).

  - If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the adjustment, from changing to the fully indexed rate, the effect of that rate or payment cap must be reflected in the disclosures.
  - The index at consummation need not be used if the contract allows the lender to delay implementation of changes in an index value (e.g., the

contract indicates that future rate changes are based on the index value in effect for some specified period, such as 45 days before the change date). Instead, the bank may use any rate from the date of consummation back to the beginning of the specified period (e.g., during the previous 45-day period).

- If the initial interest rate is set according to the index or formula used for later adjustments, but is set at a value as of a date before consummation, disclosures should be based on the initial interest rate, even though the index may have changed by the consummation date.

For variable-rate loans that are <u>not</u> secured by the consumer's principal dwelling or that are secured by the consumer's principal dwelling but have a term of one year or less, creditors must disclose the circumstances under which the rate may increase, any limits on the increase, the effect of an increase, and an example of the payment terms that would result from an increase [section 226.18(f)(1)].

For variable-rate consumer loans secured by the consumer's principal dwelling and having a maturity of more than one year, creditors must state that the loan has a variable-rate feature and that disclosures were previously provided [section 226.18(f)(2)]. Extensive disclosures about the loan program are provided when consumers apply for such a loan [section 226.19(b)], and throughout the loan term when the rate or payment amount is changed [section 226.20(c)].

**Payment Schedule [Section 226.18(g)]**

The disclosed payment schedule must reflect all components of the finance charge. It includes all payments scheduled to repay loan principal, interest on the loan, and any other finance charge payable by the consumer after consummation of the transaction.

However, any finance charge paid separately before or at consummation (e.g., odd days' interest) is not part of the payment schedule. It is a prepaid finance charge that must reduce the value of the amount financed.

At the creditor's option, the payment schedule may include amounts beyond the amount financed and finance charge (e.g., certain insurance premiums or real estate escrow amounts such as taxes added to payments). However, when calculating the APR, the creditor must disregard such amounts.

If the obligation is a renewable balloon payment instrument that unconditionally obligates the bank to renew the short-term loan at the consumer's option or to renew the loan subject to conditions within the consumer's control, the payment schedule must be disclosed using the longer term of the renewal period or periods. The long-term loan must be disclosed with a variable rate feature.

If there are no renewal conditions or if the bank guarantees to renew the obligation in a refinancing, the payment schedule must be disclosed using the shorter balloon payment term. The short-term loan must be disclosed as a fixed rate loan, unless it contains a variable rate feature during the initial loan term.

## Amount Financed [Section 226.18(b)]

### Definition

The "amount financed" is the net amount of credit extended for the consumer's use. It should not be assumed that the amount financed under the regulation is equivalent to the note amount, proceeds, or principal amount of the loan. The amount financed normally equals the total of payments less the finance charge.

To calculate the amount financed, all amounts and charges connected with the transaction, either paid separately or included in the note amount, must first be identified. Any prepaid, precomputed, or other finance charge must then be determined.

**The amount financed must not include any finance charges**. If finance charges have been included in the obligation (either prepaid or precomputed), they must be subtracted from the face amount of the

---

obligation when determining the amount financed. The resulting value must be reduced further by an amount equal to any prepaid finance charge paid separately. The final resulting value is the amount financed.

When calculating the amount financed, finance charges (if in the note amount or paid separately) should not be subtracted more than once from the total amount of an obligation. Charges not in the note amount and not included in the finance charge (e.g., an appraisal fee paid separately in cash on a real estate loan) are not required to be disclosed under Regulation Z and must not be included in the amount financed.

In a multiple advance construction loan, proceeds placed in a temporary escrow account and awaiting disbursement in draws to the developer are not considered part of the amount financed until actually disbursed. Thus, if the entire commitment amount is disbursed into the lender's escrow account, the lender must not base disclosures on the assumption that all funds were disbursed immediately, even if the lender pays interest on the escrowed funds.

## Required Deposit [Section 226.18(r)]

A "required deposit," with certain exceptions, is one that the bank requires the consumer to maintain as a condition of the specific credit transaction. It can include a compensating balance or a deposit balance that secures the loan. The effect of a required deposit is not reflected in the APR. Also, a required deposit is not a finance charge since it is eventually released to the consumer. A deposit that earns at least 5 percent per year need not be considered a required deposit.

## Calculating the Amount Financed

A consumer signs a note secured by real property in the amount of $5,435. The note amount includes $5,000 in proceeds disbursed to the consumer, $400 in precomputed interest, $25 paid to a credit reporting agency for a credit report, and a $10 service charge. Additionally, the consumer pays a $50 loan fee separately in cash at consummation. The consumer has no other debt with the bank. The amount financed is $4,975.

The amount financed may be calculated by first subtracting all finance charges included in the note amount ($5,435 - $400 - $10 = $5,025). The $25 credit report fee is not a finance charge because the loan is secured by real property. The $5,025 is further reduced by the amount of prepaid finance charges paid separately, for an amount financed of $5,025 - $50 = $4,975. The answer is the same if finance charges included in the obligation are considered prepaid or precomputed finance charges.

The bank may treat the $10 service charge as an addition to the loan amount and not as a prepaid finance charge. If it does, the loan principal would be $5,000. The $5,000 loan principal does not include either the $400 or the $10 precomputed finance charge in the note. The loan principal is increased by other amounts that are financed which are not part of the finance charge (the $25 credit report fee) and reduced by any prepaid finance charges (the $50 loan fee, not the $10 service charge) to arrive at the amount financed: $5,000 + $25 - $50 = $4,975.

## Other Calculations

The bank may treat the $10 service charge as a prepaid finance charge. If it does, the loan principal would be $5,010. The $5,010 loan principal does not include the $400 precomputed finance charge. The loan principal is increased by other amounts that are financed which are not part of the finance charge (the $25 credit report fee) and reduced by any prepaid finance charges (the $50 loan fee and the $10 service charge withheld from loan proceeds) to arrive at the same amount financed: $5,010 + $25 - $50 - $10 = $4,975.

## Closed-End Credit APR and Finance Charge Tolerance Charts

The appendix of this booklet contains five charts that show how accuracy tolerances apply to finance charges and APRs for disclosure and reimbursement purposes. These charts are:

- "Closed-End Credit: Finance Charge Accuracy Tolerances"

- "Closed-End Credit: Accuracy and Reimbursement Tolerances for Understated Finance Charges"

- "Closed-End Credit: Accuracy Tolerances for Overstated Finance Charges"

- "Closed-End Credit: Accuracy Tolerances for Overstated APRs"

- "Closed-End Credit: Accuracy and Reimbursement Tolerances for Understated APRs"

## Refinancings [Section 226.20]

When an obligation is satisfied and replaced by a new obligation to the original bank (or a holder or servicer of the original obligation) and is undertaken by the same consumer, it must be treated as a refinancing for which a complete set of new disclosures must be furnished. A refinancing may involve the consolidation of several existing obligations, disbursement of new money to the consumer, or the rescheduling of payments under an existing obligation. In any form, the new obligation must completely replace the earlier one to be considered a refinancing under the regulation. The finance charge on the new disclosure must include any unearned portion of the old finance charge that is not credited to the existing obligation [section 226.20(a)].

The following transactions are not considered refinancings even if the existing obligation is satisfied and replaced by a new obligation undertaken by the same consumer:

- A renewal of an obligation with a single payment of principal and interest or with periodic interest payments and a final payment of principal with no change in the original terms.

- An APR reduction with a corresponding change in the payment schedule.

- An agreement involving a court proceeding.

- Changes in credit terms arising from the consumer's default or delinquency.

- The renewal of optional insurance purchased by the consumer and added to an existing transaction if required disclosures were provided for the initial purchase of the insurance.

However, even if the old obligation is not canceled and a new one created, a new transaction subject to new disclosures results if the bank:

- Increases the rate based on a variable rate feature that was not previously disclosed; or

- Adds a variable rate feature to the obligation.

If, at the time a loan is renewed, the rate is increased, the increase is not considered a variable rate feature. It is the cost of renewal, similar to a flat fee, as long as the new rate remains fixed during the remaining life of the loan. If the original debt is not canceled in connection with such a renewal, the regulation does not require new disclosures. Also, changing the index of a variable rate transaction to a comparable index is not considered adding a variable rate feature to the obligation.

## Subpart D — Miscellaneous

## Civil Liability [Section 130]

If a creditor fails to comply with any requirements of the TILA, other than with the advertising provisions of chapter 3, it may be held liable to the consumer for:

- Actual damage, and

- The cost of any legal action together with reasonable attorney's fees in a successful action.

If it violates certain requirements of the TILA, the creditor also may be held liable for either of the following:

- In an individual action, twice the amount of the finance charge involved, but not less than $100 or more than $1,000.  Exception: in an individual action relating to a closed-end credit transaction secured by real property or a dwelling, twice the amount of the finance charge involved, but not less than $200 or more than $2,000.

- In a class action, such amount as the court may allow. The total amount of recovery, however, cannot be more than $500,000 or 1 percent of the creditor's net worth, whichever is less.

Civil actions that may be brought against a creditor also may be maintained against any assignee of the creditor if the violation is apparent on the face of the disclosure statement or other documents assigned, except where the assignment was involuntary.

A creditor that fails to comply with TILA's requirements for high-cost mortgage loans may be held liable to the consumer for all finance charges and fees paid by the consumer. Any subsequent assignee is subject to all claims and defenses that the consumer could assert against the creditor, unless the assignee demonstrates that it could not reasonably have determined that the loan was subject to section 226.32.

## Criminal Liability [Section 112]

Anyone who willingly and knowingly fails to comply with any requirement of the TILA will be fined not more than $5,000 or imprisoned for not more than one year, or both.

## Administrative Actions [Section 108]

The TILA authorizes federal regulatory agencies to require banks to make monetary and other adjustments to the consumers' accounts when the true finance charge or APR exceeds the disclosed finance charge or APR by more than a specified accuracy tolerance. That authorization extends to unintentional errors, including isolated violations (e.g., an error that occurred

only once or errors, often without a common cause, that occurred infrequently and randomly).

Under certain circumstances, the TILA requires federal regulatory agencies to order banks to reimburse consumers when understatement of the APR or finance charge involves:

- Patterns or practices of violations (e.g., errors that occurred, often with a common cause, consistently or frequently, reflecting a pattern with a specific type or types of consumer credit).

- Gross negligence.

- Willful noncompliance intended to mislead the person to whom the credit was extended.

Any proceeding that may be brought by a regulatory agency against a creditor may be maintained against any assignee of the creditor if the violation is apparent on the face of the disclosure statement or other documents assigned, except where the assignment was involuntary [section 131].

## Relationship to State Law [Section 111]

State laws that impose responsibilities on banks offering consumer credit, or that require such institutions or consumers to follow certain procedures, or that grant rights to consumers or banks in consumer credit contracts:

- May be preempted by the TILA;

- May not be preempted by the TILA; or

- May be substituted for the TILA and Regulation Z requirements.  The TILA does not preclude preemption of state law by other federal statues, such as the National Bank Act.

State law provisions are preempted to the extent that they contradict the requirements in the following chapters of the TILA and the implementing sections of Regulation Z:

- Chapter 1, "General Provisions," which contains definitions and acceptable methods for determining finance charges and APRs. For example, a state law would be preempted if it required a bank to include in the finance charge any fees that the TILA excludes, such as seller's points.

- Chapter 2, "Credit Transactions," which contains disclosure requirements, rescission rights, and certain credit card provisions. For example, a state law would be preempted if it required a bank to use the terms "nominal annual interest rate" in lieu of "APR."

- Chapter 3, "Credit Advertising," which contains consumer credit advertising rules and APR oral disclosure requirements.

Conversely, state law provisions may be appropriate and are not preempted under the TILA if they call for, without contradicting chapters 1, 2, or 3 of the TILA or the implementing sections of Regulation Z, either of the following:

- Disclosure of information not otherwise required. A state law that requires disclosure of the minimum periodic payment for open-end credit, for example, would not be preempted by the TILA.

- Disclosures more detailed than those required. A state law that requires itemization of the amount financed, for example, would not be preempted, unless it contradicts the TILA by requiring the itemization to appear with the disclosure of the amount financed in the segregated closed-end credit disclosures.

The relationship between state law and chapter 4 of the TILA ("Credit Billing") involves two parts. The first part is concerned with sections 161 (correction of billing errors) and 162 (regulation of credit reports) of the act; the second part addresses the remaining sections of chapter 4.

State law provisions are preempted if they differ from the rights, responsibilities, or procedures in sections 161 or 162. An exception is made, however, for state law that allows a consumer to inquire about an account and requires the bank to respond to such inquiry beyond the time limits provided by the TILA. Such a state law would not be preempted for the extra time period.

State law provisions are preempted if they result in violations of sections 163 through 171 of chapter 4. For example, a state law that allows the card issuer to offset the consumer's credit-card indebtedness against funds held by the card issuer would be preempted, since it would violate 12 CFR 226.12(d). Conversely, a state law that requires periodic statements to be sent more than 14 days before the end of a free-ride period would not be preempted, since no violation of the TILA is involved.

A bank, state, or other interested party may ask the Federal Reserve Board to determine if state law contradicts chapters 1 through 3 of the TILA or Regulation Z. They also may ask if the state law is different from, or would result in violations of, chapter 4 of the TILA and the implementing provisions of Regulation Z. If the Board determines that a disclosure required by state law (other than a requirement relating to the finance charge, APR, or the disclosures required under section 226.32) is substantially the same in meaning as a disclosure required under the act or Regulation Z, generally creditors in that state may make the state disclosure in lieu of the federal disclosure.

# Subpart E — Special Rules for Certain Home Mortgage Transactions

## General Rules [Section 226.31]

The requirements and limits of this subpart are in addition to and not in lieu of those in other subparts of Regulation Z. The disclosures for high-cost and reverse mortgage transactions must be made clearly and conspicuously in writing, in a form that the consumer may keep.

## Certain Closed-End Home Mortgages [Section 226.32]

This section's requirements apply to a consumer credit transaction secured by the consumer's principal dwelling, in which either:

- The APR at consummation will exceed by more than 8 percentage points for first-lien mortgage loans, or by more than 10 percentage points for subordinate-lien mortgage loans, the yield on Treasury securities having comparable periods of maturity to the loan's maturity (as of the 15th day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor); or

- The total points and fees (see definition below) payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total loan amount or $547 for the calendar year 2007. (This dollar amount is adjusted annually based on changes in the Consumer Price Index. See staff commentary to section 32(a)(1)(ii) for a historical list of dollar amount adjustments.) [section 226.32(a)(1)]

**Exemptions**

The following transactions are exempted from compliance with section 226.32:

- Residential mortgage transactions (generally purchase money mortgages),

- Reverse mortgage transactions subject to section 226.33, and

- Open-end credit plans subject to Subpart B of Regulation Z.

**Points and Fees**

Points and fees include the following:

- All items required to be disclosed under section 226.4(a) and (b), except interest or the time-price differential.

- All compensation paid to mortgage brokers.

- All items listed in section 226.4(c)(7), other than amounts held for future taxes, <u>unless all of the following conditions are met</u>:

  – The charge is reasonable,
  – The creditor receives no direct or indirect compensation in connection with the charge, and
  – The charge is not paid to an affiliate of the creditor.

- Premiums or other charges, paid at or before closing if paid in cash or financed, for optional credit life, accident, health, or loss-of-income insurance, and other debt-protection or debt cancellation products written in connection with the credit transaction (section 226.32(b)(1)).

## Reverse Mortgages [Section 226.33]

A reverse mortgage is a nonrecourse transaction secured by the consumer's principal dwelling; unless the consumer defaults, a reverse mortgage loan repays only after the consumer dies, the dwelling is transferred, or the consumer ceases to occupy the dwelling as a principal dwelling.

## Specific Defenses [Sections 108 & 130]

## Defense Against Civil, Criminal, and Administrative Actions

A bank in violation of TILA may avoid liability by doing all of the following:

- Discovering the error before an action is brought against the bank, or before the consumer notifies the bank, in writing, of the error.

- Notifying the consumer of the error within 60 days of discovery.

- Making the necessary adjustments to the consumer's account, also within 60 days of discovery. (The consumer will pay no more than the lesser of the finance charge actually disclosed or the dollar equivalent of the APR actually disclosed.)

The above three actions also may allow the bank to avoid a regulatory order to reimburse the customer.

An error is "discovered" if it is:

- Discussed in a final, written report of examination.

- Identified through the bank's own procedures.

- An inaccurately disclosed APR or finance charge included in a regulatory agency notification to the bank.

When a disclosure error occurs, the bank is not required to re-disclose after a loan has been consummated or an account has been opened. If the bank corrects a disclosure error by merely re-disclosing required information accurately, without adjusting the consumer's account, the bank may still be subject to civil liability and an order to reimburse from its regulator.

The circumstances under which a bank may avoid liability under the TILA do not apply to violations of the Fair Credit Billing Act (chapter 4 of the TILA).

## Additional Defenses Against Civil Actions

The bank may avoid liability in a civil action if it shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error that occurred despite the maintenance of procedures to avoid the error.

Examples of a bona fide error include clerical, calculation, computer malfunction, programming, or printing errors.  It does not include an error of legal judgment.

A violation that occurred unintentionally could be difficult to prove if the bank is unable to produce explicit evidence that it has an internal controls program designed to ensure compliance. A bank can strengthen its defense if it has demonstrated a commitment to compliance and it has adopted policies and procedures to detect errors before disclosures are furnished to consumers.

## Statute of Limitations [Sections 108 & 130]

Civil actions may be brought within one year after the violation occurred. After that time, and if allowed by state law, the consumer may still assert the violation as a defense if a bank were to bring an action to collect the consumer's debt.

Neither criminal actions nor regulatory administrative enforcement actions are subject to the TILA one-year statute of limitations. However, enforcement actions under the interagency policy guide for erroneously disclosed APRs and finance charges are subject to TILA time limitations. Those limitations range from the date of the bank's last regulatory examination, to as far back as 1969, depending on when loans were made, when violations were identified, whether or not the violations were repeat violations, and other factors.

There is no time limit on willful violations intended to mislead the consumer.

A summary of the primary time limitations follows:

- For open-end credit, reimbursement applies to violations not older than two years.

- For closed-end credit, the OCC directs reimbursement for loans with violations occurring since the immediately preceding examination of any type.

## Rescission Rights  (Open-End and Closed-End Credit) [Sections 226.15 & 226.23]

The TILA provides that for certain transactions secured by the consumer's principal dwelling, a consumer has three business days after becoming obligated on the debt to rescind the transaction. The right of rescission allows consumers time to reexamine their credit agreements and cost disclosures and to reconsider if they want to place their homes at risk as security for the credit. Transactions exempt from the right of rescission include residential mortgage transactions [section 226.2(a)(24)] and refinancings or consolidations with the original creditor where no "new money" is advanced.

If a transaction is rescindable, consumers must be given a notice explaining that the creditor has a security interest in the consumer's home, that the consumer may rescind, how the consumer may rescind, the effects of rescission, and the date the rescission period expires.

To rescind a transaction, a consumer must notify the creditor in writing by midnight of the third business day after the latest of three events: (1) consummation of the transaction, (2) delivery of material TILA disclosures, or (3) receipt of the required notice of the right to rescind. For purposes of rescission, business day means every calendar day except Sundays and the legal public holidays (section 226.2(a)(6)). The term "material disclosures" is defined in section 226.23(a)(3) to mean the required disclosures of the APR, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in section 226.32(c) and (d).

The creditor may not disburse any monies (except into an escrow account) and may not provide services or materials until the three-day rescission period has elapsed and the creditor is reasonably satisfied that the consumer has not rescinded. If the consumer rescinds the transaction, the creditor must refund all amounts paid by the consumer (even amounts disbursed to third parties) and terminate its security interest in the consumer's home.

A consumer may waive the three-day rescission period and receive immediate access to loan proceeds if the consumer has a "bona fide personal financial emergency." The consumer must give the creditor a signed and dated waiver statement that describes the emergency, specifically waives the right, and bears the signatures of all consumers entitled to rescind the transaction. The consumer provides the explanation for the bona fide personal financial emergency, but the creditor decides the sufficiency of the emergency.

If the required rescission notice or material TILA disclosures are not delivered or if they are inaccurate, the consumer's right to rescind may be extended from three days to as much as three years.  On certain loans in foreclosure and in conjunction with recent case law, the consumer's right to rescind can be extended for a period of greater than three years when a consumer files bankruptcy, and the consumer used that as a defense to a foreclosure action.

## Interagency Administrative Enforcement Policy

On September 8, 1998, the federal financial regulatory agencies issued a revised "Joint Statement of Policy on the Administrative Enforcement of the TILA - Restitution." (See the appendix of this booklet for this document and related guidance in question-and-answer form.) The policy summarizes and explains how the agencies interpret the reimbursement provisions of section 108(e) of the TILA. It also describes corrective actions the financial regulatory agencies believe appropriate.

The regulatory agencies anticipate that most banks will comply voluntarily with the reimbursement provisions of the TILA. However, if a bank does not act voluntarily to correct violations, the agencies generally are required by law to use their cease and desist authority to order correction of a clear and

consistent pattern or practice of violations, gross negligence, or a willful violation that was intended to mislead the person to whom the credit was extended.

## Enforcement Policy Applicability to Indirect Paper

Even if a third party rather than the bank makes an improper disclosure on a loan for which the bank is the creditor (i.e., if the bank is the entity to which the obligation is initially payable), the bank is cited for the violation and may be required to reimburse affected consumers under the enforcement policy.

If the third party is the creditor, a bank's acceptance of the third party's disclosures containing reimbursable violations normally reflects only a need for improved internal controls. However, if affected consumers have not been reimbursed, the OCC will report such third-party violations (consistent with the requirements of the Right to Financial Privacy Act of 1978) to the national headquarters of the regulatory agency supervising the creditor.

## Adjustable Rate Mortgages

### OCC's ARM Regulation

The OCC's ARM regulation (12 CFR 34) is intended to encourage national bank participation in the residential mortgage market. It provides a flexible framework within which banks may design ARMs that best meet their needs and those of their borrowers. National banks may make long-term mortgage loans with interest rates that can be adjusted to reflect changes in their cost of funds. At the same time, the regulation protects consumers by requiring national banks, for certain consumer ARMs, to link interest rates to an independent index.

The OCC's ARM regulation permits national banks to design their own ARM loan programs, subject to certain rules. Banks may offer more than one ARM loan program as long as the various programs are offered to all borrowers in a manner that does not discriminate on any prohibited basis. Banks may impose limitations that are more restrictive than those provided in the regulation. Also, banks may continue to offer fixed rate mortgages.

While providing the flexibility desired by national banks, the OCC's ARM regulation helps protect the interests of borrowers. Subsequent notifications aid ARM borrowers in monitoring the pay down of their loans and determining if changes in installment payment amounts or rates of amortization best serve their needs. Because the regulation protects consumers primarily by ensuring proper disclosure rather than restricting ARM terms, the OCC views failure to provide timely and substantively complete disclosures as a serious violation of the regulation.

## History and Requirements

National bank ARM loans may be subject to the OCC's ARM regulation, to special provisions on variable rate loans in the Regulation Z, or to both. The OCC's ARM regulation was issued originally in March 1981, as 12 CFR 29, and amended significantly on March 7, 1983.

To achieve greater uniformity among the ARM regulations of several financial regulatory agencies, the OCC's regulation was rewritten completely, effective March 11, 1988 with optional compliance until October 1, 1988. The revised regulation was incorporated into 12 CFR 34, which is the OCC's regulation governing real estate lending activity of national banks, as Subpart B. The original Part 29 continued to be available until October 1, 1988.

The revised OCC ARM regulation modified the definition of an ARM, reduced the circumstances under which independent indexes are required, and deferred all ARM disclosure requirements to Regulation Z, as amended December 29, 1987. Subpart B was again modified and simplified effective April 19, 1996.

The OCC's ARM regulation covers any extension of credit made by a national bank with an interest rate subject to adjustment and for the purpose of purchasing or refinancing the purchase of a one-to-four family dwelling and secured by that dwelling. OCC ARMs may either be open-end or closed-end credit.

Under the OCC ARM regulation, ARMs that are subject both to 12 CFR 34 and 12 CFR 226.19(b) must be tied to an independent index. Regulation Z

requires ARMs subject to 12 CFR 226.19(b) to have early and comprehensive initial shopping disclosures, as well as notifications of interest rate changes. Disclosure requirements reflect the belief that the marketplace operates efficiently only if both buyers and sellers are well informed about the transaction. Consumers must be equipped to evaluate a variety of complex mortgage instruments, including ARMs. Initial shopping disclosures serve the dual purpose of educating consumers about the nature of ARMs and equipping them to shop for the appropriate one.

Loans subject to the ARM requirements of Regulation Z are closed-end consumer credit transactions secured by the consumer's **principal** dwelling with a maturity greater than one year and an APR that may increase. Regulation Z ARMs include purchase-money mortgage loans, as well as closed-end credit extended for other reasons (e.g., for home improvement). See the "Summary of Coverage Rules for ARMs" in the appendix of this booklet for a comparison of ARM coverage requirements between the OCC's ARM regulation and the closed-end ARM requirements of Regulation Z.

The Board's changes to Regulation Z, effective on December 18, 1987, required creditors to provide comprehensive information about the variable rate features of closed-end ARMs. National bank and other creditor compliance with the Regulation Z ARM amendments became mandatory on October 1, 1988.

With the regulatory changes that became mandatory October 1, 1988, the only national bank federal disclosure requirements that remained for open-end ARMs were the regular open-end credit disclosures required by Regulation Z. However, in November 1988, the Home Equity Loan Consumer Protection Act became law. That statute required the FRB to amend Regulation Z to include special disclosure requirements for any open-end consumer credit plan secured by the consumer's dwelling. Additional comprehensive disclosure requirements were also included for variable rate plans.

Credit subject to the variable rate disclosure provisions of the Home Equity Loan Consumer Protection Act are open-end consumer credit transactions with variable rates of interest that are secured by the consumer's dwelling.

Such disclosure requirements would apply both to open-end credit consumer ARMs, as defined by the OCC, as well as to any other consumer home equity line of credit (HELOC) secured by the consumer's dwelling. Also, the statute applies to both variable and fixed rate HELOCs.

# Truth in Lending                    Examination Objectives

1. To evaluate the quality of the bank's compliance management system for the TILA and Regulation Z.

2. To determine the reliance that can be placed on the bank's compliance management system, including internal controls and procedures performed by the person(s) responsible for monitoring the bank's compliance review function for the TILA and Regulation Z.

3. To determine the bank's compliance with the TILA and Regulation Z.

4. To initiate corrective action when policies or internal controls are deficient, or when violations of law or regulation are identified.

5. To determine if the institution will be required to reimburse consumers under the restitution provisions of the act.

# Truth in Lending               Examination Procedures

## General Instructions and Worksheet Guidance

From the examiner who completed the compliance risk assessment of the bank, obtain information pertinent to the area of examination.  Review the conclusions of the assessment, the compliance review, audit work papers, and complaints reported to the Office of the Ombudsman, Customer Assistance Group to determine the examination procedures that will address the regulatory concerns.  For guidance, refer to the "Community Bank Supervision" and "Internal and External Audits" booklets of the *Comptroller's Handbook* and the "Compliance Management System" booklet of the *Comptroller's Handbook for Consumer Compliance*.

The worksheets in the appendix contain all the detailed requirements of the TILA and ARM regulations. There are worksheets to help examiners review advertising, the accuracy of preprinted disclosure forms, and the accuracy of account files, including any Internet loan activity. Each worksheet contains general guidance for its use. There may be cases in which multiple worksheets will be completed for a particular review. For example, if you are reviewing a sample of variable rate home improvement loans secured by a second deed lien, three worksheets (#5, 6, and 7) must be completed.

Objective #1: To determine the bank's level of compliance with the TILA and the OCC's ARM regulation.

**Disclosure Forms**

1. If the bank has changed any preprinted TILA disclosure forms or if there are forms that have not been previously reviewed for accuracy, verify the accuracy of each preprinted disclosure by completing worksheets #3, 4, 8, 9, and 10.  Include in the review:

   – Note or contract forms, including those furnished to dealers.
   – Standard closed-end credit disclosures [226.17(a) and 226.18].

– High cost mortgage disclosures [226.32(c)].
– Credit card application and solicitation disclosures [226.5a(b)-(e)].
– Home equity line of credit (HELOC) disclosures [226.5b(d)-(e)].
– Initial disclosures [226.6(a)-(d)] and, if applicable, additional HELOC disclosures [226.6(e)].
– Statement of billing rights [226.9(a)].
– ARM disclosures [226.19(b)].
– Reverse mortgage disclosures [226.33(b)].

Note: Forms that include or involve current transactions, such as change-in-terms notices, periodic billing statements, rescission notices, and billing error communications, are verified for accuracy when the file review worksheets are completed.

**Timing of Disclosures**

2. When completing the file review worksheets, determine if the following disclosures are furnished when required by Regulation Z (includes closed-end or open-end accounts that are fixed or variable rate):

– Credit card application and solicitation disclosures [226.5a(a)].
– HELOC disclosures [226.5b(b)].
– Initial disclosures [226.5(b)(1)].
– Periodic disclosures [226.5(b)(2)].
– Statement of billing rights [226.9(a)].
– Supplemental credit devices [226.9(b)].
– Change in terms [226.9(c) & 226.31(c)(1)(i)].
– Finance charge imposed at time of transaction [226.9(d)].
– Disclosures upon renewal of credit or charge card [226.9(e)].
– Change in credit account insurance provider [226.9(f)].
– Closed-end credit disclosures [226.17(b)].
– Disclosures for certain closed-end home mortgages [226.31(c)(1)].
– Disclosures for reverse mortgages [226.31(c)(2)].

**Electronic Disclosures**

3. If the bank makes its disclosures available to consumers electronically, determine that they are in a form the consumer can keep as you complete the appropriate worksheets [226.5(a)(1) & 226.17(a)(1)] and determine that the bank complies with the electronic communication requirements, when applicable [226.36].

**Advertising**

4. Sample advertising copy for closed-end credit, including any Internet advertising, from the last 12 months and complete worksheet #1.

5. Sample advertising copy for HELOC and other open-end credit, including any Internet advertising, from the last 12 months and complete worksheet #2.

Note: Examiners may decide to coordinate efforts and have one examiner review advertising copy for all related lending sections (e.g., fair housing, TILA, ECOA, leasing, etc.).

**Record Retention**

6. Test the bank's record retention practices (for other than the advertising requirements) to determine if evidence of compliance is retained for at least two years after the disclosures were required to be made or other action was required to be taken [226.25].

**Closed-end Credit**

7. For each type of closed-end loan product being tested, complete worksheet #5. When completing the worksheet, determine the accuracy of the disclosures by comparing the disclosures to the contract and other bank documents.

Note: When verifying APR accuracy, use the OCC's APRWIN program located in the applications section of your computer software.

---

8. For each type of closed-end rescindable loan product being tested, complete worksheet #7. If applicable, test rescission waivers.

9. For each type of ARM being tested, complete worksheet #6. For applicability, determine that the loans:

   – Are subject to Regulation Z.
   – Are secured by the borrower's one- to four-unit principal dwelling.
   – Have a maturity of more than one year.
   – Have a variable rate feature.

## Open-end Credit

10. Determine if the bank provides appropriate disclosures for creditor-initiated direct mail applications and solicitations to open charge card accounts, telephone applications and solicitations to open charge card accounts, and applications and solicitations made available to the general public to open charge card accounts, as appropriate. [226.5a(c), (d) and (e)]

11. For each type of open-end credit account being tested, including HELOC's, complete worksheets #7 and #11. When completing the worksheets, determine the accuracy of the disclosures by comparing the disclosure with the contract and other bank documents. Also, review a sample of billing error resolution files and a sample of consumers who have asserted a claim or defense against the bank for a credit card dispute regarding property or services [226.12(c)] [226.13].

12. Review two consecutive periodic billing statements for each major type of open-end credit activity offered (e.g., overdraft and home-equity lines of credit, credit card programs, etc.) and complete worksheet #14. Determine if disclosures were calculated accurately and are consistent with the initial disclosure statement furnished in connection with the accounts (or any subsequent change in terms notice) and the underlying contractual terms governing the plan(s).

13. For each type of open-end HELOC subject to section 226.5b, complete worksheet #12.

**Additional Variable Rate Testing**

14. Verify that, when accounts were opened or loans were consummated, loan contract terms were recorded correctly in the bank's calculation systems (e.g., its computer). Determine the accuracy of the:

   – Index value.
   – Margin and method of calculating rate changes.
   – Rounding method.
   – Adjustment caps (periodic and lifetime).
   – Draw period/payback period.

15. Using a sample of periodic disclosures for open-end variable rate accounts (e.g., home equity lines of credit) and closed-end rate change notices for ARM loans, and using the appropriate worksheets, determine that:

   – The rate-change date and rate on the credit obligation equals the actual rate-change date and rate imposed. The index disclosed and imposed is based on the terms of the contract (e.g., the weekly average of one-year Treasury constant maturities, taken as of 45 days before the change date) [226.7(g) and 226.20(c)(2)].
   – The new interest rate is correctly disclosed by adding the correct index value with the margin stated in the note, plus or minus any contractual fractional adjustment [226.7(g) and 226.20(c)(1)].
   – The new payment disclosed was based on an interest rate and loan balance in effect at least 25 days before the payment change date (consistent with the contract) [226.20(c)].

**Certain Home Mortgage Transactions**

16. Select a sample of high-cost and reverse mortgage loans and complete worksheet #13.  Worksheet #15 may be used to determine whether or not particular loans are high cost mortgages.

---

Objective #2: To determine if there is noncompliance involving understated finance charges or understated APRs subject to reimbursement under the *FFIEC Policy Guide on Reimbursement* (Policy Guide).

1. Document the date on which the administrative enforcement of the TILA Policy Guide would apply to closed-end credit for reimbursement purposes by determining the date of the preceding examination of any type.

2. If the noncompliance involves indirect (third-party paper) disclosure errors and affected consumers have not been reimbursed, prepare comments on the need for improved internal controls, for inclusion in the report of examination. Also, notify your supervisory office for follow-up with the regulator that has primary responsibility for the original creditor.

3. If the noncompliance involves direct credit, make an initial determination if the disclosure error resulted from a clear and consistent pattern or practice of violations, gross negligence, or a willful violation that was intended to mislead the consumer. Consider:

   – If the conduct appears to be grounded in a written or unwritten policy or established practice.
   – If there is evidence of similar conduct by the bank in more than one transaction. (Note: more than one does not necessarily constitute a pattern or practice.) If there is a common source or cause within the bank's control.
   – The relationship of the instances of noncompliance to one another (i.e., if they all occurred in the same area of the bank, in the same product line, or by one employee).
   – The relationship of the number of instances of noncompliance to the bank's total activity. (Note: depending on the circumstances, violations that involve only a small percentage of a bank's total activity could constitute a pattern or practice.)

4. For violations determined to be a pattern or practice, gross negligence, or willful, perform the following steps:

- Calculate the reimbursement for the loans or accounts in an expanded sample of the identified population.
- Estimate the total impact on the population based on the expanded sample.
- Inform management that reimbursement may be necessary under the law and the Policy Guide, and discuss all substantive facts, including the sample loans and calculations.
- Inform management of the bank's options under section 130 of the TILA for avoiding an OCC order to reimburse affected borrowers.

# Truth in Lending                    Appendix

## Summary of the TILA Worksheets by Transaction Type

| Loan Type | Worksheets |
|---|---|
| Closed-End Consumer (Not Secured by Real Estate) | Worksheet 3 – Closed-End Forms Review |
| | Worksheet 5 – Closed-End File Review |
| Closed-End Consumer (Secured by Real Estate) | Worksheet 3 – Closed-End Forms Review |
| | Worksheet 5 – Closed-End File Review |
| | Worksheet 7 – Right of Rescission File Review |
| | Worksheet 13 – Special Rules for Certain Home Mortgage Transactions File Review |
| | Worksheet 15 – High-Cost Mortgages |
| Closed-End Residential Mortgage | Worksheet 3 – Closed-End Forms Review |
| | Worksheet 5 – Closed-End File Review |
| | Worksheet 7 – Right of Rescission File Review |
| | Worksheet 15 – High-Cost Mortgages |
| Adjustable Rate Mortgage | Worksheet 4 – ARM Forms |
| | Worksheet 6 – ARM File Review |
| | Worksheet 7 – Right of Rescission File Review |
| | Worksheet 13 – Special Rules for Certain Home Mortgage Transactions File Review |
| | Worksheet 15 – High-Cost Mortgages |
| Home Equity Loan | Worksheet 3 – Closed-End Forms Review |
| | Worksheet 5 – Closed-End File Review |
| | Worksheet 7 – Right of Rescission File Review |
| | Worksheet 13 – Special Rules for Certain Home Mortgage Transactions File Review |
| | Worksheet 15 – High-Cost Mortgages |
| Home Equity Line of Credit | Worksheet 7 – Right of Rescission File Review |
| | Worksheet 8 – Open-End Forms Review |
| | Worksheet 9 – HELOC Forms Review |
| | Worksheet 12 – HELOC File Review |
| | Worksheet 14 – Periodic Billing Statement |
| Credit Card | Worksheet 8 – Open-End Forms Review |
| | Worksheet 10 – Credit Card Forms Review |
| | Worksheet 11 – Open-End File Review |
| | Worksheet 14 – Periodic Billing Statements Review |
| Advertising – Closed-End Credit | Worksheet 1 – Closed-End Credit Advertising |
| Advertising – Open-End/HELOC | Worksheet 2 – Open-End/Home Equity Line of Credit Advertising |

# Worksheet #1
# Closed-End Credit Advertising

Use this worksheet when reviewing closed-end advertisements. To complete, review advertising files and place a check in each applicable box. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated, or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit                    Bank Policies                    Expanded Procedures

| Closed-End Credit Advertising Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Identify Advertisement: | | | | | | | | | | |
| Advertisement Type: | | | | | | | | | | |
| Date or Period Run: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. If credit terms are specific, are terms stated that actually are or will be arranged or offered by the creditor? [226.24(a)] | | | | | | | | | | |
| 2. If the advertisement states a rate of finance charge, is it stated as an "APR"? [226.24(b)] | | | | | | | | | | |
| 3. Is the APR stated more conspicuously than the simple interest rate (if stated)? [226.24(b)] | | | | | | | | | | |
| 4. If the APR is stated and may be increased after consummation, does the advertisement state that fact? [226.24(b)] | | | | | | | | | | |
| 5. If triggering terms were used [226.24(c)(1)], did the ad include, as applicable:<br><br>a. The down payment (credit sales only)? [226.24(c)(2)(i)]<br><br>b. The repayment terms? [226.24(c)(2)(ii)]<br><br>c. The APR? [226.24(c)(2)(iii)] | | | | | | | | | | |

| Closed-End Credit Advertising Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Identify Advertisement: | | | | | | | | | | |
| Advertisement Type: | | | | | | | | | | |
| Date or Period Run: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| d.  The fact that the APR may be increased after consummation, if applicable?  [226.24(c)(2)(iii)] | | | | | | | | | | |

## Worksheet #2
## Open-End/Home Equity Line of Credit Advertising

Use this worksheet when reviewing open-end and HELOC advertisements. To complete, review advertising files and place a check in each applicable box. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:        Audit                Bank Policies                Expanded Procedures

| Open-End/Home Equity Line of Credit Advertising Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Identify Advertisement: | | | | | | | | | | |
| Advertisement Type: | | | | | | | | | | |
| Date of Period Run: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. If terms are specific, are terms stated that actually are or will be arranged or offered by the creditor? [226.16(a)] | | | | | | | | | | |
| 2. If triggering terms were used on any open-end plan advertisement [226.6(a) & (b)], did the advertisement also clearly and conspicuously include: | | | | | | | | | | |
| a. Any minimum, fixed, transaction, activity or similar fee that could be imposed? [226.16(b)(1)] | | | | | | | | | | |
| b. Any periodic rates stated as an APR? [226.16(b)(2)] | | | | | | | | | | |
| c. The fact that the plan provides for a variable periodic rate, if applicable? [226.16(b)(2)] | | | | | | | | | | |
| d. Any membership or participation fee that could be imposed? [226.16(b)(3)] | | | | | | | | | | |

| Open-End/Home Equity Line of Credit Advertising Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Identify Advertisement: | | | | | | | | | | |
| Advertisement Type: | | | | | | | | | | |
| Date of Period Run: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| **Additional Requirements for Home Equity Lines of Credit [226.5b]** | | | | | | | | | | |
| 3. If triggering terms were used [226.6(a) & (b)], or the payment terms were set forth for a HELOC did the advertisement also include:<br><br>a. Any loan fee that is a percentage of the credit limit? [226.16(d)(1)(i)]<br><br>b. An estimate of any other fees for opening the plan stated as a single dollar amount or reasonable range? [226.16(d)(1)(i)]<br><br>c. Any periodic rate stated as an APR? [226.16(d)(1)(ii)]<br><br>d. The highest APR that may be imposed for a variable-rate plan? [226.16(d)(1)(iii)] | | | | | | | | | | |
| 4. If a discounted or premium rate plan, does the ad state how long the initial APR will be in effect and provide a reasonably current, fully indexed APR with equal prominence? [226.16(d)(2)] | | | | | | | | | | |
| 5. If a minimum periodic payment is disclosed, does the ad disclose, if applicable, that a balloon payment may result? [226.16(d)(3)] | | | | | | | | | | |
| 6. If there is a reference to tax deductibility, does the reference refrain from misleading language? [226.16(d)(4)] | | | | | | | | | | |
| 7. Does the ad refrain from misleading terms, such as referring to the HELOC as "free money"? [226.16(d)(5)] | | | | | | | | | | |

# Worksheet #3
# Closed-End Credit Forms Review

Use this worksheet when reviewing closed-end credit forms **other than** those secured by the customer's principal dwelling for a term of more than one year. To complete, review the forms and place a check in each applicable box. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:         Audit                 Bank Policies                 Expanded Procedures

| Closed-End Credit Forms Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | |
|  | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. Are disclosures clear, conspicuous, grouped, segregated, and in writing in a form the consumer can keep? [226.17(a)(1)] | | | | | | | | | | |
| 2. Are terms "finance charge" and "APR" more conspicuous? [226.17(a)(2)] | | | | | | | | | | |
| 3. Is the creditor identified (may be apart from other disclosures)? [226.18(a)] | | | | | | | | | | |
| 4. Is there a brief description of the Amount Financed? [226.18(b)] | | | | | | | | | | |
| 5. Is there a separate itemization of the Amount Financed or a statement that the consumer may request and receive a written itemization? [226.18(c)] | | | | | | | | | | |
| 6. Is there a brief description of the finance charge? [226.18(d)] | | | | | | | | | | |
| 7. Is there a brief description of the APR? [226.18(e)] | | | | | | | | | | |

| Closed-End Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 8. Do the disclosures for variable rate loans that are not secured by the customer's principal dwelling or, if secured by the consumer's principal dwelling, that have a term of one year or less include: | | | | | | | | | | | |
| a. Circumstances that permit rate increases? [226.18(f)(1)(i)] | | | | | | | | | | | |
| b. Limits on the increase: Periodic? [226.18(f)(1)(ii)] Lifetime? [226.18(f)(1)(ii)] | | | | | | | | | | | |
| c. Effects of increase? [226.18(f)(1)(iii)] | | | | | | | | | | | |
| d. Hypothetical example of new payment terms? [226.18(f)(1)(iv)] | | | | | | | | | | | |
| 9. Is the payment schedule included? [226.18(g)] | | | | | | | | | | | |
| 10. Is there a description of the "Total of Payments," unless it's a single payment loan? [226.18(h)] | | | | | | | | | | | |
| 11. Is a demand feature disclosed, if applicable? [226.18(i)] | | | | | | | | | | | |
| 12. Is the total sales price included and described (if a credit sale)? [226.18(j)] | | | | | | | | | | | |
| 13. Does the disclosure include whether or not a penalty/rebate is imposed for prepayment? [226.18(k)] | | | | | | | | | | | |
| 14. Is a late payment charge (dollar amount or percent) disclosed, if applicable? [226.18(l)] | | | | | | | | | | | |
| 15. Is there a security interest disclosure, if applicable? [226.18(m)] | | | | | | | | | | | |
| 16. If credit life insurance and debt cancellation premiums have been excluded from the finance charge, has the bank: | | | | | | | | | | | |
| a. Disclosed that insurance coverage is not required? | | | | | | | | | | | |
| b. Disclosed the premium for initial term? | | | | | | | | | | | |

| Closed-End Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | |
| c. Obtained the customer's signature or initials as an affirmative request for the insurance? [226.18(n) and 226.4(d)] | | | | | | | | | | | |
| 17. If the property insurance premium has been excluded from finance charge, has the bank:<br><br>a. Disclosed that the consumer may choose the insurance company?<br><br>b. Disclosed the cost of the insurance for the initial term if obtained from or through the bank? [226.18(n) and 226.4(d)] | | | | | | | | | | | |
| 18. Are the disclosures required under 226.4(e) to exclude certain fees required by law, such as a filing fee or certain insurance premiums from the finance charge provided? [226.18(o)] | | | | | | | | | | | |
| 19. Is there a statement referring to the contract document for specified information? [226.18(p)] | | | | | | | | | | | |
| 20. Is there an appropriate assumption disclosure for residential mortgage transactions? [226.18(q)] | | | | | | | | | | | |
| 21. If a deposit is required as a condition of the transaction, has the bank disclosed that the APR does not reflect its effect? [226.18(r)] | | | | | | | | | | | |

# Worksheet #4
## Closed-End Credit – Adjustable Rate Mortgage Forms Review

Use this worksheet when reviewing variable rate loans or ARMs with a maturity greater than one year secured by the principal dwelling of the borrower. To complete, review the forms and place a check in each applicable box. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit                    Bank Policies                Expanded Procedures

| Closed-End Credit Adjustable Rate Mortgage Forms Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. Is the fact that the note contains a variable rate feature disclosed? [226.18(f)(2)(i)] | | | | | | | | | | |
| 2. Is there a statement that variable rate disclosures were provided earlier? [226.18(f)(2)(ii)] | | | | | | | | | | |
| **Disclosure At Time Of Application (one for each program in which the consumer expresses an interest) [226.19(b)(2)]** | | | | | | | | | | |
| 3. Are disclosures provided either at time of application or before consumer pays any nonrefundable fee or, if the application is received from a mortgage broker or over the telephone, mailed within three business days following receipt of the application?  [226.19(b) & footnote 45b] | | | | | | | | | | |
| 4. Do variable rate program disclosures provide:<br><br>a. The booklet entitled "Consumer Handbook on ARMs," or a suitable substitute? [226.19(b)(1)]<br><br>b. A statement that interest rate, payment or the term can change? [226.19(b)(2)(i)]<br><br>c. The index/formula with source of | | | | | | | | | | |

| Closed-End Credit Adjustable Rate Mortgage Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| information disclosed? [226.19(b)(2)(ii)] | | | | | | | | | | | |
| d. An explanation of the interest rate/payment determination and margin? [226.19(b)(2)(iii)] | | | | | | | | | | | |
| e. A statement that consumer should ask for the current margin and interest rate? [226.19(b)(2)(iv)] | | | | | | | | | | | |
| f. The fact that interest rate is discounted, if applicable, and a statement that the consumer should ask about the amount of discount? [226.19(b)(2)(v)] | | | | | | | | | | | |
| g. The frequency of interest rate and payment changes? [226.19(b)(2)(vi)] | | | | | | | | | | | |
| h. The rules relating to changes? [226.19(b)(2)(vii)] | | | | | | | | | | | |
| i. An historical example or the maximum interest rate and payment? [226.19(b)(2)(viii)] | | | | | | | | | | | |
| j. An explanation of how the loan payment can be calculated based on example? [226.19(b)(2)(ix)] | | | | | | | | | | | |
| k. The fact that the loan program contains a demand feature? [226.19(b)(2)(x)] | | | | | | | | | | | |
| l. Information on, and timing of, adjustment notices? [226.19(b)(2)(xi)] | | | | | | | | | | | |
| m. A statement that disclosures for other variable rate loan programs are available? [226.19(b)(2)(xii)] | | | | | | | | | | | |

# Worksheet #5
## Closed-End Credit File Review

Use this worksheet when reviewing closed-end credit loans. The worksheet contains all the standard closed-end credit disclosure requirements and should be used with the other closed-end worksheets. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**. To complete, review loan files and place a check in each applicable box.

This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit               Bank Policies               Expanded Procedures

| Closed-End Credit File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type:<br><br>Name of Borrower:<br><br>Account Number: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1.  Are disclosures furnished before consummation? [226.17(b)] | | | | | | | | | | |
| 2.  Is the amount financed disclosed and accurate? [226.18(b)] | | | | | | | | | | |
| 3.  Is there a separate itemization of the amount financed (RESPA-GFE, if applicable, may be substituted)? [226.18(c)] | | | | | | | | | | |
| 4.  Is the finance charge disclosed and accurate? [226.4, 226.18(d) & footnote 41] | | | | | | | | | | |
| 5.  Is the APR disclosed and accurate? [226.18(e), footnote 42 & 226.22(a)] | | | | | | | | | | |
| 6.  Are the following required disclosures on variable rate loans (other than those secured by the consumer's principal dwelling with a term of more than one year) provided?<br><br>a.  Circumstances that permit rate increase? [226.18(f)(1)(i)]<br><br>b.  Limits on the increase: | | | | | | | | | | |

| Closed-End Credit File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type:<br><br>Name of Borrower:<br><br>Account Number: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| Periodic? [226.18(f)(1)(ii)]<br>Lifetime? [226.18(f)(1)(ii)]<br><br>c.  Effects of increase? [226.18(f)(1)(iii)]<br><br>d.  Hypothetical example of new payment terms? [226.18(f)(1)(iv)] | | | | | | | | | | |
| 7.  Are the following required disclosures provided if the annual percentage rate may increase after consummation on variable rate loan transaction secured by the consumer's principal dwelling with a term greater than one year:<br><br>a.  The fact that the transaction contains a variable-rate feature?<br><br>b.  A statement that variable-rate disclosures have been provided earlier? [226.18(f)(2)] | | | | | | | | | | |
| 8.  Is the payment schedule (amount, timing, and number of payments) provided and accurate? [226.18(g)] | | | | | | | | | | |
| 9.  Is the total of payments provided and accurate?  [226.18(h)] | | | | | | | | | | |
| 10. a. If the obligation has a demand feature, is that fact disclosed?<br><br>b. If the disclosures are based on an assumption of one year as provided in section 226.17(c)(5), is that fact disclosed? [226.18(i)] | | | | | | | | | | |
| 11. If a credit sale, is the total sale price accurate? [226.18(j)] | | | | | | | | | | |
| 12. Is the security interest described accurately, if applicable? [226.18(m)] | | | | | | | | | | |
| 13. Is the credit life insurance premium or debt cancellation fee for the initial term | | | | | | | | | | |

| Closed-End Credit File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type:<br><br>Name of Borrower:<br><br>Account Number: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| accurately disclosed, if applicable? [226.18(n) & 226.4(d)] | | | | | | | | | | |
| 14. Is the cost of insurance for the initial term accurately disclosed if from or through the creditor? [226.18(n) and 226.4(d)] | | | | | | | | | | |
| 15. Are deposits required for credit transactions disclosed accurately? [226.18(r)] | | | | | | | | | | |
| 16. Are REM closing fees that are excluded from the disclosed finance charge bona fide and reasonable? [226.4(c)(7)] | | | | | | | | | | |
| 17. Is the maximum interest rate in the contract (variable rate mortgage) disclosed? [226.30(a)] | | | | | | | | | | |

# Worksheet #6
## Closed-End Credit – Adjustable Rate Mortgage File Review

Use this worksheet when reviewing variable rate loans or ARMs with maturity greater than one year secured by the principal dwelling of the borrower. To complete, review applicable loan files and place a check in each applicable box. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:    Audit    Bank Policies    Expanded Procedures

| Closed-End Credit – Adjustable Rate Mortgage File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name of Borrower:<br><br>Account Number: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. Did the bank provide timely early disclosures for residential mortgage transactions subject to RESPA? [226.19(a)(1)] | | | | | | | | | | |
| 2. Was the booklet entitled "Consumer Handbook on ARMs" or a substitute provided? [226.19(b)(1)] | | | | | | | | | | |
| 3. Does the contract contain an independent index [12 CFR 34.22] if the transaction is an ARM under 12 CFR 34.20 or an ARM under 226.19(b)? | | | | | | | | | | |
| **Subsequent Disclosures** | | | | | | | | | | |
| 4. Were subsequent disclosures mailed in accordance with timing requirements? [226.20(c)] and do they provide the:<br><br>a. Current and prior interest rates (verify accuracy of rates used)? [226.20(c)(1)]<br><br>b. Index values on which interest rates are based (verify accuracy of indexes used)? [226.20(c)(2)]<br><br>c. Extent to which the creditor has foregone an interest rate increase (only if carryover exists)? [226.20(c)(3)]<br><br>d. Contractual effects of the adjustment, including | | | | | | | | | | |

| Closed-End Credit – Adjustable Rate Mortgage File Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of Borrower:<br><br>Account Number: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| the new payment amount and a statement of the loan balance? [226.20(c)(4)]<br><br>e.  Payment required to avoid negative amortization? [226.20(c)(5)] | | | | | | | | | | |

# Worksheet #7
## Right of Rescission File Review

Use this worksheet when reviewing the right to rescission for both closed- and open-end loans subject to Regulation Z that are secured by the consumer's principal dwelling. Requirements for closed- and open-end loans are found in 12 CFR 226.23 and 12 CFR 226.15, respectively. (Note: Loans not subject to rescission include business purpose credit, refinancings in which no new money is advanced, and residential mortgage transactions.). To complete, review applicable loan files and place a check in each applicable box

This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated, or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit                    Bank Policies                    Expanded Procedures

| Right of Rescission File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type:<br><br>Name of Borrower:<br><br>Loan/Account #:<br><br>Type of Credit (closed or open): | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. Were two copies furnished to each person entitled to rescind? [226.23(b)(1)/226.15(b)] | | | | | | | | | | |
| 2. Does the rescission notice identify the transaction? [226.23(b)(1)/226.15(b)] | | | | | | | | | | |
| 3. Does the rescission notice disclose:<br><br>  a. The retention or acquisition of a security interest in the consumer's principal dwelling? [226.23(b)(1)(i)/226.15(b)(1)]<br><br>  b. The consumer's right to rescind? [226.23(b)(1)(ii)/226.15(b)(2)]<br><br>  c. How to exercise the right to rescind? [226.15(b)(1)(iii)/226.23(b)(3)]<br><br>  d. The effects of rescission? [226.23(b)(1)(iv)/226.15(b)(4)]<br><br>  e. The date the rescission period expires? [226.23(b)(1)(v)/226.15(b)(5)] | | | | | | | | | | |

| Right of Rescission File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type:<br><br>Name of Borrower:<br><br>Loan/Account #:<br><br>Type of Credit (closed or open): | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 4. Was funding delayed (except into escrow) until the rescission period expired? [226.23(c)/226.15(c)] | | | | | | | | | | |
| 5. Are waivers of the right to rescind appropriate? [226.23(e)/226.15(e)] | | | | | | | | | | |
| 6. **Internal controls**: Does the consumer sign and date the notice to acknowledge receipt? [A no answer is not a violation of law.] | | | | | | | | | | |

# Worksheet #8
# Open-End Credit Forms Review

Use this worksheet when reviewing all open-end credit forms. To complete, review the forms and place a check in each applicable box. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:            Audit            Bank Policies            Expanded Procedures

| Open-End Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| Initial Disclosures | | | | | | | | | | | |
| 1. Is there a statement of when the finance charge begins to accrue and if a grace period exists? [226.6(a)(1)] | | | | | | | | | | | |
| 2. a. Is each periodic rate, the range of balances and corresponding APR disclosed?<br><br>   b. Are finance charge and APR more conspicuous? [226.6(a)(2)] | | | | | | | | | | | |
| 3. Is the method to determine the balance provided and explained? [226.6(a)(3)] | | | | | | | | | | | |
| 4. Is the method to determine any finance charge(s) provided and explained? [226.6(a)(4)] | | | | | | | | | | | |
| 5. Is there a statement of the amount of other charges? [226.6(b)] | | | | | | | | | | | |
| 6. Has the fact that the creditor has or will acquire a security interest in the property purchased or other property identified by item or type been disclosed? [226.6(c)] | | | | | | | | | | | |
| 7. Is there a statement detailing consumer-billing rights? [226.6(d)] | | | | | | | | | | | |
| 8. Are conditions for terminating the HELOC plan, for prohibiting additional credit, for | | | | | | | | | | | |

| Open-End Credit Forms Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| reducing the credit limit, and for implementing changes provided? [226.6(e)(1)] | | | | | | | | | | |
| 9. Are the payment terms for the HELOC plan provided (if terms for draw and repayment period are different, the terms for each must be disclosed, as applicable), including:<br><br>a. The length of the draw period and any repayment period?<br><br>b. An explanation of how the minimum periodic payment will be computed?<br><br>c. The timing of periodic payments?<br><br>d. If the periodic payment repays less than the balance or does not reduce principal (e.g., interest only payments), a statement of that fact and that a balloon payment may or will result, as applicable?<br><br>e. An example, based on a $10M outstanding balance and a recent APR. [226.6(e)(2)] | | | | | | | | | | |
| 10. For the HELOC, is there a statement, if applicable, that negative amortization might occur, and that it increases the principal balance and reduces the consumer's equity in the dwelling? [226.6(e)(3)] | | | | | | | | | | |
| 11. Is there a statement of transaction requirements for the HELOC? [226.6(e)(4)] | | | | | | | | | | |
| 12. Is there a statement about tax implication and consulting a tax advisor for the HELOC? [226.6(e)(5)] | | | | | | | | | | |
| 13. Is there a statement that the APR does not include costs other than interest for the HELOC?  [226.6(e)(6)] | | | | | | | | | | |
| 14. Are the following disclosures provided for variable rate HELOCs [226.6(e)(7)]: | | | | | | | | | | |

| Open-End Credit Forms Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| a.  The rules relating to changes to the index, APR, and payment amount, including information on payment limitations and carryover? | | | | | | | | | | |
| b.  The minimum payment required (for both the draw and repayment periods) when the maximum APR is in effect for a $10,000 balance and the earliest date the maximum APR may be imposed? | | | | | | | | | | |
| c.  An example based on a $10,000 balance, reflecting all significant plan terms and showing how the APR and the minimum periodic payment amount would have been affected during the most recent 15 years by changes in the index? | | | | | | | | | | |
| d.  A statement that rate information will be provided on or with each periodic statement? | | | | | | | | | | |
| e.  An example based on a $10,000 balance and a recent APR showing the minimum periodic payment, any balloon payment, and the time it would take to repay the $10,000 balance making only the minimum payment while obtaining no additional credit. | | | | | | | | | | |
| **Note:** The redisclosure of the variable rate disclosures in step 14 may not be necessary if they were provided with the application in a form the consumer could keep and included a representative payment example for the category of payment option chosen by the consumer. [226.6(e)(7)] | | | | | | | | | | |
| 15.  Is the maximum interest rate disclosed (variable rate)? [226.30(b)] | | | | | | | | | | |

| Open-End Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| Subsequent Disclosure Requirements [226.9] | | | | | | | | | | | |
| 16. Does the bank furnish the annual statement of billing rights?  [226.9(a)(1)] Or is an alternative summary statement provided with each periodic statement? [226.9(a)(2)] | | | | | | | | | | | |
| 17. Are the 226.6(a) disclosures for an added feature or credit device with different finance charge terms provided before the consumer uses the feature or device? [226.9(b)(2)]. | | | | | | | | | | | |
| 18. Are changes in terms disclosed 15 days prior to effective change date if required? [226.9(c)] | | | | | | | | | | | |

# Worksheet #9
## Home Equity Line of Credit Forms Review

Use this worksheet when reviewing HELOC forms for disclosures at time of application and initial disclosures. To complete, review the forms and place a check in each applicable box. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit                    Bank Policies                Expanded Procedures

| Home Equity Line of Credit Forms Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. Are disclosures segregated, clear, and conspicuous, and do the required disclosures of paragraph (d)(1) through (4)(ii) precede the other disclosures? [226.5b(a)(1)] | | | | | | | | | | |
| 2. Is a home equity brochure provided? [226.5b(e)] | | | | | | | | | | |
| 3. Does the disclosure state: | | | | | | | | | | |
| a. That the consumer should retain a copy of the disclosures? [226.5b(d)(1)] | | | | | | | | | | |
| b. The time by which to apply to obtain the specific terms disclosed? [226.5b(d)(2)(i)] | | | | | | | | | | |
| c. That terms are subject to change before the plan opens, if applicable? [226.5b(d)(2)(i)] | | | | | | | | | | |
| d. That the consumer may receive a refund of all application fees if terms change prior to opening? [226.5b(d)(2)(ii)] | | | | | | | | | | |
| e. That the consumer's dwelling secures the HELOC and that the loss of the | | | | | | | | | | |

| Home Equity Line of Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | |
|     dwelling may occur? [226.5b(d)(3)] | | | | | | | | | | | |
| f.  The creditor's right to change, freeze, or terminate the account? [226.5b(d)(4)(i)] | | | | | | | | | | | |
| g.  That information about conditions for adverse action is available on request? [226.5b(d)(4)(ii)] | | | | | | | | | | | |
| h.  Payment terms? [226.5b(d)(5)] | | | | | | | | | | | |
| i.  A recent APR and that the APR does not include costs other than interest for fixed rate plans? [226.5b(d)(6)] | | | | | | | | | | | |
| j.  An itemization of fees to open, use, or maintain the plan and when such fees are payable? [226.5b(d)(7)] | | | | | | | | | | | |
| k.  An estimate of total fees imposed by third parties to open the account? [226.5b(d)(8)] | | | | | | | | | | | |
| l.  That the consumer may receive a good faith itemization of third-party fees? [226.5b(d)(8)] | | | | | | | | | | | |
| m.  That negative amortization may occur and could increase the principal balance and reduce the consumer's equity? [226.5b(d)(9)] | | | | | | | | | | | |
| n.  Transaction requirements under the plan? [226.5b(d)(10)] | | | | | | | | | | | |
| o.  That a tax advisor should be consulted? [226.5b(d)(11)] | | | | | | | | | | | |
| Variable Rate HELOC Disclosure Requirements – [226.5b(d)(12)(i)-(xii)] | | | | | | | | | | | |
| 4.  Does the disclosure state, as applicable: | | | | | | | | | | | |
| a.  That the APR, payment, or term may change? [226.5b(d)(12)(i)] | | | | | | | | | | | |

| Home Equity Line of Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | |
| b. That the APR excludes costs other than interest? [226.5b(d)(12)(ii)] | | | | | | | | | | | |
| c. The index and its source? [226.5b(d)(12)(iii)] | | | | | | | | | | | |
| d. How the APR will be determined? [226.5b(d)(12)(iv)] | | | | | | | | | | | |
| e. That the consumer should request information on the current index value, margin, discount or premium, and APR? [226.5b(d)(12)(v)] | | | | | | | | | | | |
| f. That the initial APR is discounted and the duration of the discount, if applicable? [226.5b(d)(12)(vi)] | | | | | | | | | | | |
| g. The frequency of APR changes? [226.5b(d)(12)(vii)] | | | | | | | | | | | |
| h. The rules relating to changes in the index, APR, and payment amount? [226.5b(d)(12)(viii)] | | | | | | | | | | | |
| i. The lifetime rate cap and any annual (or more frequent) caps, or a statement that there is no annual limitation and a statement of the maximum APR that may be imposed under each payment option? [226.5b(d)(12)(ix)] | | | | | | | | | | | |
| j. The minimum payment requirement, using the maximum APR, and the earliest date the maximum APR may be imposed? [226.5b(d)(12)(x)] | | | | | | | | | | | |
| k. A historical example, based on a $10,000 balance, reflecting all significant plan terms? [226.5b(d)(12)(xi)] | | | | | | | | | | | |

| Home Equity Line of Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| l.  That rate information will be provided on or with each periodic statement? [226.5b(d)(12)(xii)] | | | | | | | | | | |
| **Limitations On Home Equity Plans** | | | | | | | | | | | |
| 5.  Is the APR based on an independent index for variable rate accounts? [226.5b(f)(1)(i)] | | | | | | | | | | |
| 6.  Is the index available to the public? [226.5b(f)(1)(ii)] | | | | | | | | | | |
| 7.  Are accounts terminated and repayment of the entire balance due only under the following conditions:<br><br>a.  There is fraud or material misrepresentation by the **consumer** in connection with the plan at any time, including during the application process, the draw period, or any repayment period?<br><br>b.  The **consumer** fails to meet the plan's repayment terms?<br><br>c.  The **consumer** takes action or fails to act in a manner that adversely affects the bank's security for the plan or any right in the security? [226.5b(f)(2)(iii)]<br><br>Note: Regulation O requires, and Regulation Z permits, a demand feature in executive officer plans. | | | | | | | | | | |
| 8.  Are the terms of an account only changed under the following circumstances:<br><br>a.  A specified change occurs when a specific event takes place, as provided for in the initial agreement?<br><br>b.  The index or margin is changed because the original index is no longer available?<br><br>c.  The consumer specifically agrees to a | | | | | | | | | | |

| Home Equity Line of Credit Forms Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Type: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | |
| specified change in writing at the time of the change? | | | | | | | | | | | |
| d. Any change unequivocally will benefit the consumer? | | | | | | | | | | | |
| e. Changes made to the terms are insignificant? [226.5b(f)(3)(i)-(v)] | | | | | | | | | | | |
| 9. Is the credit limit reduced, or are additional extensions of credit prohibited, only under the following circumstances: | | | | | | | | | | | |
| a. The value of the dwelling securing the plan declines significantly? | | | | | | | | | | | |
| b. The consumer's financial circumstances change materially? | | | | | | | | | | | |
| c. The consumer defaults on any material obligation under the agreement? | | | | | | | | | | | |
| d. Government action restricts an APR increase? | | | | | | | | | | | |
| e. The bank's security interest is adversely affected because of government action to the extent that the security value is less than 120 percent of the credit line? | | | | | | | | | | | |
| f. The bank is notified by a regulatory agency that continued advances constitute an unsafe and unsound practice? [226.5b(f)(3)(vi)] | | | | | | | | | | | |

# Worksheet #10
# Credit Card Forms Review

Use this worksheet when reviewing credit card forms for general applications as well as creditor initiated direct mail applications and preapproved solicitations. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**.  To complete, review the forms and place a check in each applicable box. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit            Bank Policies            Expanded Procedures

| Credit Card Forms Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Identification:<br><br>Product Type: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1.  Are the disclosures provided on or with the application or solicitation? [226.5a(b) & (c)] | | | | | | | | | | |
| 2.  Are the disclosures in 226.5a(b)(1)-(7) in a prominent location, and in the form of a table with headings, content, and format substantially similar to applicable tables in Appendix G? [226.5a(a)(2)(i)] | | | | | | | | | | |
| 3.  Are the disclosures in 226.5a(b)(8)-(11) provided either in the table or clearly and conspicuously elsewhere on the application or solicitation? [226.5a(A)(2)(ii)] | | | | | | | | | | |
| 4.  Is the terminology used in the application or solicitation consistent with that used in the initial and periodic disclosures? [226.5a(a)(2)(iv)] | | | | | | | | | | |
| 5.  a.  Is each APR for purchases, cash advances, or a balance transfer in the table? [226.5a(b)(1)]<br><br>  b.  If the rate may vary, is that fact disclosed? [226.5a(b)(1)(i)] | | | | | | | | | | |
| 6.  Is any fee for issuance or availability of a card in the table? [226.5a(b)(2)] | | | | | | | | | | |
| 7.  Is any minimum or fixed finance charge in the table? [226.5a(b)(3)] | | | | | | | | | | |
| 8.  Are transaction fees for purchases in the table, if applicable?  [226.5a(b)(4)] | | | | | | | | | | |
| 9.  Is the length of the "grace period," using that term, in the table? [226.5a(b)(5)] | | | | | | | | | | |

| Credit Card Forms Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Identification:<br><br>Product Type: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 10. Is the name (or explanation) of the balance computation method in the table? [226.5a(b)(6)] | | | | | | | | | | |
| 11. Is there a statement that charges are due when the statement is received (charge cards only)? [226.5a(b)(7)] | | | | | | | | | | |
| 12. Is the amount of any cash advance fees included? [226.5a(b)(8)] | | | | | | | | | | |
| 13. Are any late payment charges included, if applicable? [226.5a(b)(9)] | | | | | | | | | | |
| 14. Are any fees for exceeding the credit limit included? [226.5a(b)(10)] | | | | | | | | | | |
| 15. Are balance transfer fees included? [226.5a(b)(11)] | | | | | | | | | | |
| 16. Are disclosures for creditor-initiated telephone applications and preapproved solicitations to open credit card accounts provided orally or in writing, as permitted? [226.5a(d)] | | | | | | | | | | |
| 17. Does the bank make one of the disclosures required in the case of applications or solicitations made available to the general public? [226.5a(e)] | | | | | | | | | | |
| 18. Are renewal disclosures provided at least 30 days or one billing cycle, whichever is less, before the mailing or delivery of the periodic statement on which the renewal fee is initially charged to the account? [226.9(e)(1)] | | | | | | | | | | |
| 19. Are credit insurance disclosures provided when the insurance provider is changed within 30 days before the change in provider occurs? [226.9(f)] | | | | | | | | | | |

# Worksheet #11
## Open-End Credit File Review

Use this worksheet when reviewing all open-end credit. To complete, review loan files and place a check in each applicable box. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents.** This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit          Bank Policies          Expanded Procedures

| Open-End Credit File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name of Borrower:<br><br>Account #:<br><br> | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1.  Is the timing of disclosures provided in accordance with all sections of 226.5(b)? | | | | | | | | | | |
| 2.  Does the bank indicate, for an added credit feature or credit device, that the feature or device is for use in obtaining credit under the terms previously disclosed? [226.9(b)(1)] | | | | | | | | | | |
| 3.  Are the 226.6(a) disclosures for an added feature or credit device with different finance charge terms provided before the consumer uses the feature or device? [226.9(b)(2)] | | | | | | | | | | |
| 4.  Are periodic statements provided for each billing cycle in which the account has a debit or credit balance of more than $1 or a finance charge was imposed? [226.5(b)(2)(i)] | | | | | | | | | | |
| 5.  Are periodic statements mailed or delivered at least 14 days prior to any date disclosed under 226.7(j) for the consumer to avoid an additional finance charge or other charge? [226.5(b)(2)(ii)] | | | | | | | | | | |
| 6.  Are payments promptly credited? [226.10] | | | | | | | | | | |
| 7.  Is the treatment of credit balances appropriate? [226.11] | | | | | | | | | | |
| 8.  Are credit cards issued only upon request | | | | | | | | | | |

| Open-End Credit File Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of Borrower:<br><br>Account #: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | |
| or as a renewal or substitute for an accepted credit card? [226.12(a)] | | | | | | | | | | | |
| 9.  Is liability for unauthorized credit card use limited to a maximum of $50? [226.12(b)(1)] | | | | | | | | | | | |
| 10. Are disputes handled properly?  Also, determine if the bank reports the disputed amount withheld by the consumer as delinquent only if the disputed amount remains unpaid after the dispute has been settled or judgment has been rendered against the consumer. [226.12(c)] | | | | | | | | | | | |
| 11. Is offsetting credit card indebtedness prohibited? [226.12(d)(1)] | | | | | | | | | | | |
| 12. Are billing errors resolved within two complete billing cycles (in no event more than 90 days)? [226.13(c)(2)] | | | | | | | | | | | |
| 13. Does the bank wait until the billing error is resolved to: collect the amount in error; report the account as delinquent; or make, or threaten to make, an adverse credit report? [226.13(d)(1) and (2)] | | | | | | | | | | | |

# Worksheet #12
## Home Equity Line of Credit File Review

Use this worksheet when reviewing HELOCs. To complete, review loan files and place a check in each applicable box. **Determine the accuracy of the disclosures by comparing them to the contract and other bank documents**. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:          Audit          Bank Policies          Expanded Procedures

| Home Equity Line of Credit File Review Worksheet | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name:<br>Loan #: | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 1. Are the disclosures and brochure given at the time an application is provided to the consumer or within three business days if the application is received through a broker or by telephone? [226.5b(b)] | | | | | | | | | | |
| 2. Does the bank indicate, for an added credit feature or credit device, that the feature or device is for use in obtaining credit under the terms previously disclosed? [226.9(b)(1)] | | | | | | | | | | |
| 3. Are the 226.6(a) disclosures for an added feature or credit device with different finance charge terms provided before the consumer uses the feature or device? [226.9(b)(2)] | | | | | | | | | | |
| 4. Is a written notice of adverse change in specified terms provided within three business days? [226.9(c)(3)] | | | | | | | | | | |
| 5. Are all fees refunded when the consumer rejects the plan because a disclosed term changes before the plan is opened? [226.5b(g)] | | | | | | | | | | |
| 6. Does the bank collect only refundable fees, if any, from the consumer before the end of three business days from delivering the disclosures (six days from the date of mailing, if mailed)? [226.5b(h)] | | | | | | | | | | |

| Home Equity Line of Credit File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name:<br>Loan #: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 7. Has the bank refunded any fees that it collected from the consumer before it delivered the required disclosures if the consumer rejected the plan within three business days after receiving the disclosures (even if there is no change in the disclosed terms)? [226.5b(h)] | | | | | | | | | | |

# Worksheet #13
# Special Rules for Certain Home Mortgage Transactions (High Cost and Reverse Mortgages) File Review

Use this worksheet when reviewing high cost and reverse mortgage loans. To complete, review loan files and place a check in each applicable box. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

Underline the applicable use:         Audit              Bank Policies                    Expanded Procedures

| Special Rules for Certain Home Mortgage Transactions File Review Worksheet | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Product Type: Name of Borrower: Loan # or Account #: | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| Certain Closed-End Home Mortgages [226.32] | | | | | | | | | |
| 1. Are disclosures clear, conspicuous, in writing and in a form the consumer may keep? [226.31(b)(1)] | | | | | | | | | |
| 2. Are disclosures provided at least 3 business days prior to consummation? [226.31(c)(1)] | | | | | | | | | |
| 3. Are new disclosures provided when terms change prior to consummation? [226.31(c)(1)(i)] | | | | | | | | | |
| 4. Does the bank disclose:  a. Notices? [226.32(c)(1)]  b. APR? [226.32(c)(2)]  c. Regular payment and any balloon payment? [226.32(c)(3)]  d. Variable rate? [226.32(c)(4)]  e. Amount borrowed? [226.32(c)(5)] | | | | | | | | | |
| 5. Are these terms absent from the mortgage transaction:  a. Balloon payment (if term is less than | | | | | | | | | |

| Special Rules for Certain Home Mortgage Transactions File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type:<br>Name of Borrower:<br>Loan # or Account #: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| five years) other than bridge loans of less than one year? [226.32(d)(1)] | | | | | | | | | | |
| b. Negative amortization? [226.32(d)(2)] | | | | | | | | | | |
| c. Advance payments of more than two periodic payments? [226.32(d)(3)] | | | | | | | | | | |
| d. Increased interest rate after default? [226.32(d)(4)] | | | | | | | | | | |
| e. Refund calculation by method less favorable than the actuarial method for rebates of interest arising from loan acceleration due to default? [226.32(d)(5)] | | | | | | | | | | |
| f. Prepayment penalties (unless conditions are met)? [226.32(d)(6)] | | | | | | | | | | |
| g. Due-on-demand clause (unless conditions are met)? [226.32(d)(8)] | | | | | | | | | | |
| 6. Does the bank: | | | | | | | | | | |
| a. Pay a contractor under a home improvement contract from mortgage proceeds only as allowed in 226.34(a)(1)? | | | | | | | | | | |
| b. Sell or assign a mortgage only when furnishing the required notice to assignee? [226.34(a)(2)] | | | | | | | | | | |
| c. Refinance a loan subject to section 32 or an original refinance of a loan subject to section 32 only after one-year? [226.34(a)(3) | | | | | | | | | | |
| d. Only make loans to consumers with the ability to repay based on the consumer's income, obligations, and employment? [226.34(a)(4)] | | | | | | | | | | |
| 7. Are waivers of the waiting period | | | | | | | | | | |

| Special Rules for Certain Home Mortgage Transactions File Review Worksheet | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type:<br>Name of Borrower:<br>Loan # or Account #: | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| appropriate, and do they reflect the signature of all the consumers entitled to the waiting period? [226.31(c)(1)(iii)] | | | | | | | | | | |
| **Reverse Mortgages (Open- and Closed-End) [226.33]** | | | | | | | | | | |
| 8. Are disclosures clear, conspicuous, in writing and in a form the consumer may keep? [226.31(b)(1)] | | | | | | | | | | |
| 9. Are disclosures provided at least three business days prior to:<br><br>a. Consummation for closed-end loans? [226.31(c)(2)(i)]<br><br>b. First transaction under an open-end credit plan? [226.31(c)(2)(ii)] | | | | | | | | | | |
| 10. Are disclosures substantially similar to the Appendix K model form, and include:<br><br>a. Notice? [226.33(b)(1)]<br><br>b. Total annual loan cost rates? [226.33(c)(1) - (6)]<br><br>c. Itemization of pertinent information? [226.33(b)(3)]<br><br>d. Explanation of table? [226.33(b)(4)] | | | | | | | | | | |

# Worksheet #14
## Periodic Billing Statements

Use for all open-end credit products; forms review by product type and sample review by loan name. To complete, review applicable forms and place a check in each applicable box. This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

When reviewing audit or evaluating bank policies, a "No" answer indicates a possible exception/deficiency and should be explained in the work papers. When performing expanded procedures, a "No" answer indicates a possible violation and should be explained in the work papers. If a line item is not applicable within the area you are reviewing, indicate "NA."

| Underline the applicable use: Audit   Bank Policies   Expanded Procedures | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Product Type/Borrower's Name: <br><br> Account Number: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| **Periodic Billing Statements Worksheet** | | | | | | | | | | |
| 1. Does the periodic statement include the address for notice of billing errors? [226.7(k)] | | | | | | | | | | |
| 2. Is the beginning outstanding balance provided? [226.7(a) | | | | | | | | | | |
| 3. Are transactions identified and accurate? [226.7(b) & 226.8] | | | | | | | | | | |
| 4. Are the dates and amounts of credits to account disclosed accurately? [226.7(c)] | | | | | | | | | | |
| 5. Are the periodic rate(s) and APR(s) stated and accurate? If it is a variable rate plan, is the fact that the periodic rate may vary disclosed? [226.7(d)/FN15] | | | | | | | | | | |
| 6. If different rates apply to different types of transactions, are the types of transactions to which the periodic rates apply disclosed? [226.7(d) | | | | | | | | | | |
| 7. Is the amount of balance subject to the periodic rate and an explanation of how the balance is determined disclosed? [226.7(e)] | | | | | | | | | | |
| 8. Is any "finance charge" amount (using that term) disclosed and accurate? [226.7(f)] | | | | | | | | | | |
| 9. Are the components of the finance charge imposed during the billing cycle individually itemized and identified? [226.7(f)] | | | | | | | | | | |
| 10. Is the APR (using that term) disclosed and accurate? [226.7(g)] | | | | | | | | | | |
| 11. Are the amounts of any other charges debited to the account itemized, identified by type, and accurately disclosed? [226.7(h)] | | | | | | | | | | |

| Product Type/Borrower's Name:<br><br>Account Number: | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|
| 12. Is the account balance and closing date disclosed and accurate? [226.7(i)] | | | | | | | | | | |
| 13. Is the payment date or period within which payment must be made disclosed if there is a "free ride" period? [226.7(j)] | | | | | | | | | | |
| **Billing Rights Statement** | | | | | | | | | | |
| 14. Is the billing rights statement provided at least once each calendar year, or with each periodic statement in a form similar to that in appendix G? [226.9(a)] | | | | | | | | | | |

## Worksheet #15
## High-Cost Mortgages [226.32]

Use this worksheet when you want to determine whether certain mortgage loans are subject to section 226.32. To complete, review applicable loan files and place a check in each applicable box. For loans that are subject to section 226.32, use Worksheet #13 to document that disclosures were provided appropriately. You can insert an "N/A" if the line item is not applicable. If used, this worksheet should be completed and made part of the work papers.

This worksheet can be used for reviewing audit work papers, evaluating bank policies, performing expanded procedures, and training as appropriate. Only complete those sections of the worksheet that specifically relate to the issue being reviewed, evaluated or tested, and retain those completed sections in the work papers.

Underline the applicable use:          Audit          Bank Policies          Expanded Procedures

| HIGH-COST MORTGAGE WORKSHEET | | |
|---|---|---|
| Borrower Name:                          Loan Number: | | |
| **Coverage** | | |
| | Yes | No |
| 1. Does the consumer's principal dwelling secure the loan? [226.2(a)(19) & 226.32(a)(1)] | | |
| **If No, Stop here** | | |
| 2. Is the loan for the following: | | |
| a.  Residential Mortgage Transaction? [226.2(a)(24)] | | |
| b.  Reverse Mortgage Transaction? [226.33] | | |
| c.  Open-end Credit Plan – Subpart B [Note prohibition against structuring loans as open-end plans to evade 226.32 & 226.34(b)] | | |
| **If the answer is Yes to Box a, b, or c, STOP HERE.  If No, continue to Test 1.** | | |
| **TEST 1 – CALCULATION OF APR** | | |
| 1.  Disclosed APR | | |
| 2.  Treasury Security Yield of Comparable Maturity | | |
| Obtain the Treasury Constant Maturities Yield from the FRB's Statistical Release, H-15 – "Selected Interest Rates" (the "Business" links will display daily yields). Use the yield that has the most comparable maturity to the loan term and is from the 15th day of the month that immediately precedes the month of the application. If the 15th is not a business day, use the yield for the business day immediately preceding the 15th. If the loan term is exactly halfway between two published security maturities, use the lower of the two yields. Note: Creditors may use the FRB's Selected Interest Rates or the actual auction results.  See Staff Commentary to Regulation Z for further details. [section 226.32(a)(1)(i)]  Visit the Web site for the yield:  http://www.federalreserve.gov/releases/H15/data.htm | | |

## HIGH-COST MORTGAGE WORKSHEET

| Borrower Name: | | Loan Number: | | | |
|---|---|---|---|---|---|
| 3.  Treasury Security Yield of Comparable Maturity (Box 2)<br>    <u>Plus</u>:    8 percentage points for first-lien loan; or<br>              10 percentage points for subordinate-lien loan | | | | | |
| | | | | Yes | No |
| **Is Box 1 greater than Box 3?** | | | | | |
| **If  Yes, the transaction is a high-cost mortgage. If  No, continue to Test 2, points and fees.** | | | | | |
| **Test 2 – CALULATION OF POINTS AND FEES** | | | | | |
| **Step 1: Identify all Charges Paid by the Consumer at or before Loan Closing** | | | | | |
| **A.  Finance Charges – section 226.4(a) and (b)**  (Interest, including per-diem interest, and time price differential are excluded from these amounts.) | | | | | |

| | Fee | Subtotals |
|---|---|---|
| Loan Points | | |
| Mortgage Broker Fees | | |
| Loan Service Fees | | |
| Required Closing Agent/Third-Party Fees | | |
| Required Credit Insurance | | |
| Private Mortgage Insurance | | |
| Life of Loan Charges (flood, taxes, etc.) | | |
| Any Other Fees Considered Finance Charges | | |
| **Subtotal** | | |
| B.  Certain Non-Finance Charges Under Section 226.4(c)(7) – Include fees paid by consumers <u>only</u> if the amount of the fee is unreasonable or if the creditor receives direct or indirect compensation from the charge or the charge is paid to an affiliate of the bank. (See the examples under section 226.32(b)(1)(ii) of the commentary for further explanation.) | | |
| Title Examination | | |
| Title Insurance | | |
| Property Survey | | |
| Document Preparation Charge | | |
| Credit Report | | |
| Appraisal | | |
| Fee for "Initial" Flood Hazard Determination | | |
| Pest Inspection | | |
| Any Other Fees Not Considered Finance Charges | | |
| **Subtotal** | | |
| **C. Premiums or Other Charges for Optional Credit Life, Accident, Health, or Loss-of-Income Insurance, or Debt Cancellation Coverage** | | |
| **D. Total Points & Fees:**  Add Subtotals for A, B, and C | | |
| **Step 2: Determine the Total Loan Amount for Cost Calculation** [226.32(a)(1)(ii)] | | |
| **A. Determine the Amount Financed** [226.18(b)]<br>    <u>Principal Loan Amount</u> | | |

| HIGH-COST MORTGAGE WORKSHEET | | |
|---|---|---|
| Borrower Name: | Loan Number: | |
| <u>Plus</u>:  Other Amounts Financed by the Lender (not already included in the principal and not part of the finance charge) | | |
| <u>Less</u>:  Prepaid Finance Charges [section 226.2(a)(23)] | | |
| <u>Equals</u>:  Amount Financed | | |
| **B.  Deduct costs included in the points and fees under section 226.32(b)(1)(iii) and (iv) (Step 1, Box B and Box C) that are financed by the creditor.** | | |
| **C.  Total Loan Amount (Step 2, Box A minus Box B)** | | |
| **Step 3: Perform High-Fee Cost Calculation** | | |
| A. Eight Percent of the Total Loan Amount (Step 2, Box C) | | |
| B. Annual Adjustment Amount – [section 226.32(a)(1)(ii)] *(use the dollar amount corresponding to the year of the loan's origination)* | | |
| C.  Total Points & Fees  (Step 1, Box D) | | |
| | Yes | No |
| In Step 3, does Box C exceed the greater of Box A or Box B? | | |
| **If Yes, the transaction is a high-cost mortgage. If No, the transaction is not a high-cost mortgage under Test 2, "Points and Fees."** | | |

# Coverage Considerations Under Regulation Z



# Finance Charge Chart

**Finance Charge = Dollar Cost of Consumer Credit**: It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as a condition of or incident to the extension of credit.

| **Charges always Included** | **Charges Included Unless Conditions are met** | **Conditions (Any Loan)** | **Charges Not Included** (residential mortgage transactions and loans secured by real estate) | **Charges Never Included** |
|---|---|---|---|---|
| Interest | Premiums for credit life, A&H or loss of income insurance | Insurance not required, disclosures made, and consumer authorizes | Fees for title insurance, title examination, property survey, etc. | Charges payable in a comparable cash transaction |
| Transaction fees | | | | Unanticipated late fees |
| Loan origination fees, Consumer points | Debt cancellation fees | Coverage not required, disclosures made, and consumer authorizes | Fees for preparing loan documents, mortgages, and other settlement documents | Overdraft fees not agreed to in writing, or that are equal in amount to fees charged if a check is returned |
| Credit guarantee insurance premiums | Premiums for property or liability insurance | Consumer selects insurance company and disclosures made | Amounts required to be paid into escrow, if not otherwise included in the finance charge | Seller's points |
| Charges imposed on a creditor for purchasing a loan that are passed on to the consumer | Premiums for vendor's single interest (VS) insurance | Security interest charges (filing fees), insurance in lieu of filing fees and certain notary fees | Notary fees | Participation or membership fees |
| Discounts for including payment by means other than credit | Charges imposed by third parties | Use of the third party is not required to obtain loan and creditor does not retain any of the charge | Pre-consummation flood and pest inspection fees | Discount offered by the seller to induce payment by cash or other means not involving the use of a credit card |
| Mortgage broker fees | Charges imposed by third party closing agents | Creditor does not require and does not retain any of the fee for the particular service | Appraisal and credit report fees | Interest forfeited as a result of interest reduction required by law |
| Other examples: Fee for preparing TILA disclosure; real estate construction loan inspection fees; fees for post-consummation tax or flood service policy; required credit life insurance charges | Appraisal and credit report fees | Application fees, if charged to all applicants, are not finance charges. Application fees may include appraisal or credit report fees. | | Charges absorbed by the creditor as a cost of doing business |

# Instructions for the Finance Charge Chart

The finance charge initially includes any charge that is, or will be, connected with a specific loan. Charges imposed by third parties are finance charges if the creditor requires use of the third party or to the extent the creditor retains a portion of the charge. Charges imposed on the consumer by a settlement agent are finance charges only if the creditor requires the particular services for which the settlement agent is charging the borrower and the charge is not otherwise excluded from the finance charge or to the extent the creditor retains a portion of the charge. Immediately below the finance charge definition, the chart presents five captions applicable to determining if a loan-related charge is a finance charge.

The first caption is "charges always included." This category focuses on specific charges given in the regulation or commentary as examples of finance charges.

The second caption, "charges included unless conditions are met," focuses on charges that must be included in the finance charge unless the creditor meets specific disclosure or other conditions to exclude the charges from the finance charge.

The third caption, "conditions," focuses on the conditions that need to be met if the charges identified to the left of the conditions are permitted to be excluded from the finance charge. Although most charges under the second caption may be included in the finance charge at the creditor's option, third party charges and application fees (listed last under the third caption) must be excluded from the finance charge if the relevant conditions are met. However, inclusion of appraisal and credit report charges as part of an application fee that is charged to all applicants is optional.

The fourth caption, "charges not included," identifies fees or charges that are not included in the finance charge under conditions identified by the caption. If the credit transaction is secured by real property or the loan is a residential mortgage transaction, the charges identified in the column, if they are bona fide and reasonable in amount, must be excluded from the finance charge. For example, if a vacant lot or commercial real estate secures a consumer loan, any appraisal fees connected with the loan must not be included in the finance charge.

The fifth caption, "charges never included," lists specific charges provided by the regulation as examples of those that automatically are not finance charges (e.g., fees for unanticipated late payments).

**NOTE:** In the first column for the charges always included, transaction fees refer to transaction fees imposed in connection with the credit feature. In the third column for conditions, the condition for both the premiums for credit life, A&H, or loss of income and debt cancellation fees must include affirmative consumer authority. Finally, in the last column of charges never included, overlimit fees can be considered as an excludable charge.

## Closed-End Credit: Finance Charge Accuracy Tolerances



## Closed-End Credit: Accuracy and Reimbursement Tolerances for Understated Finance Charges



## Closed-End Credit: Accuracy Tolerances for
## Overstated Finance Charges



NOTE: While an overstated Finance Charge is a Regulation Z violation, it is not reimbursable.

## Closed-End Credit: Accuracy Tolerances for Overstated APRs



## Closed-End Credit: Accuracy and Reimbursement Tolerances for Understated APRs



## Summary of Coverage Rules for ARMs

| *OCC ARMs* *12 CFR 34.20* | *Regulation Z ARMs* *12 CFR 226.19(b)* |
|---|---|

Variable rate loans to purchase or refinance a one- to four-family dwelling and secured by a lien on such a dwelling.

Includes:

—— Open-end credit.
—— Closed-end credit.
—— Consumer-purchase loans.
—— Loans to consumers.
—— Loans with a business purpose.
—— Loans to businesses.
—— Loans for second and vacation homes.

Excludes:

—— Short-term, fixed rate, nonamortizing loans, even if the creditor is committed to renew (unless the renewal is for the full amortization period).
—— Fixed rate demand loans

Variable rate loans secured by the consumer's principal dwelling.

Includes:

—— Loans subject to closed-end credit provisions of Regulation Z.
—— Short-term, fixed rate loans, if creditor is committed to renew.
—— Loans with maturity greater than one year.

Excludes:

—— Business purpose loans.
—— Open-end credit (separate open-end HELOC provisions apply).
—— Any loans not subject to Regulation Z.
—— Loans with maturity of one year or less (unless creditor is committed to renew and total period surpasses one year).
—— Second home loans, vacation home loans, short-term bridge loans, short-term construction loans.

# Joint Policy Statement on Administrative Enforcement of the Truth in Lending Act – Restitution

The Depository Institutions Deregulation and Monetary Control Act of 1980 (Pub. L. 96-221) was enacted on March 31, 1980. Title VI of that Act, the Truth in Lending Simplification and Reform Act, amends the Truth in Lending Act, 15 U.S.C. 1601, et seq. Section 608 of Title VI, effective March 31, 1980, authorizes the federal Truth in Lending enforcement agencies to order creditors to make monetary and other adjustments to the accounts of consumers where an annual percentage rate (APR) or finance charge was inaccurately disclosed. It generally requires the agencies to order restitution when such disclosure errors resulted from a clear and consistent pattern or practice of violations, gross negligence, or a willful violation which was intended to mislead the person to whom the credit was extended. However, the Act does not preclude the agencies from ordering restitution for isolated disclosure errors.

This policy guide summarizes and explains the restitution provisions of the Truth in Lending Act (Act), as amended. The material also explains corrective actions the financial regulatory agencies believe will be appropriate and generally intend to take in those situations in which the Act gives the agencies the authority to take equitable remedial action.

The agencies anticipate that most financial institutions will voluntarily comply with the restitution provisions of the Act as part of the normal regulatory process. If a creditor does not voluntarily act to correct violations, the agencies will use their cease and desist authority to require correction pursuant to: 15 U.S.C. 1607 and 12 U.S.C. 1818(b) in the cases of the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision; and 15 U.S.C. 1607 and 12 U.S.C. 1786(e)(1) in the case of the National Credit Union Administration.

## Restitution Provisions

*Definitions*

Except as provided below, all definitions are those found in the Act and Regulation Z, 12 CFR 226.

1. "Current examination" means the most recent examination begun on or after March 31, 1980, in which compliance with Regulation Z was reviewed.

2. "Lump sum method" means a method of reimbursement in which a cash payment equal to the total adjustment will be made to a consumer.

3. "Lump sum/payment reduction method" means a method of reimbursement in which the total adjustment to a consumer will be made in two stages:

   a. A cash payment that fully adjusts the consumer's account up to the time of the cash payment; and

   b. A reduction of the remaining payment amounts on the loan.

4. "Understated APR" means a disclosed APR that is understated by more than the reimbursement tolerance provided in the Act[1] as follows:

   - For loans[2] with an amortization schedule of 10 years or less, a disclosed APR which, when increased by the greater of the APR tolerance specified in the Act[3] and Regulation Z[4] or one-quarter of 1 percent, is less than the actual APR calculated under the Act.[5]

---

[1] 15 U.S.C. 1607(e)
[2] For loans consummated after March 31, 1982. For loans consummated prior to that date refer to the Policy Guide dated July 21, 1980 (45 FR 48712) for additional guidance.
[3] 15 U.S.C. 1606(c)
[4] 12 CFR 226.14(a) and 226.22(a)
[5] If, however, the loan is closed-end credit secured by real estate or a dwelling and the APR is understated by more than one-quarter of 1 percent, the APR will be considered accurate and not subject to reimbursement if: (1) The finance charge is understated but considered accurate in accordance with the Act and Regulation (i.e.,

- For loans with an amortization schedule of more than 10 years, a disclosed APR which, when increased by the APR tolerance specified in the Act and Regulation Z (i.e., one-quarter of 1 percent for irregular loans, one-eighth of 1 percent for all other closed-end loans) is less than the actual APR.[6]

5. "Understated finance charge" means a disclosed finance charge which, when increased by the greater of the finance charge dollar tolerance specified in the Act and Regulation Z or a dollar tolerance that is generated by the corresponding APR reimbursement tolerance[7] is less than the finance charge calculated under the Act.

*De Minimis Rule*

If the amount of adjustment on an account is less than $1.00, no restitution will be ordered. However, the agencies may require a creditor to make any adjustments of less than $1.00 by paying into the United States Treasury, if more than one year has elapsed since the date of the violation.

---

the finance charge is not understated by more than $100 on loans made on or after 9/30/95, or $200 for loans made before that date); and (2) the APR is not understated by more than the dollar equivalent of the finance charge error and the understated APR resulted from the understated finance charge that is considered accurate.

[6] If, however, the loan is closed-end credit secured by real estate or a dwelling and the APR is understated by more than one-eighth of one percent if the transaction is not considered to be an irregular transaction as defined by the Regulation (12 CFR 226.22(a)(3)) or one quarter of one percent if the transaction is irregular according to the definition, the APR will be considered accurate and not subject to reimbursement if: (1) The finance charge is understated but considered accurate according to the Actual Regulation (i.e., the finance charge is understated but considered accurate according to the Act and Regulation i.e., the finance charge is not understated by more than $100 on loans made on or after 9/30/95, or $200 for loans made before that date); and (2) the APR is not understated by more than the dollar equivalent of the finance charge error and the understated APR resulted from the understated finance charge that is considered accurate.

[7] The finance charge tolerance for each loan will be generated by the corresponding APR tolerance applicable to that loan. For example, consider a single-payment loan with a one-year maturity that is subject to a one-quarter of 1 percent APR tolerance. If the amount financed is $5,000 and the finance charge is $912.50, the actual APR will be 18.25%. The finance charge generated by an APR of 18% (applying the one-quarter of one percent APR tolerance to 18.25%) for that loan would be $900. The difference between $912.50 and $900 produces a numerical finance charge tolerance of $12.50. If the disclosed finance charge is not understated by more than $12.50, reimbursement would not be ordered.

---

*Corrective Action Period*

1. Open-end credit transactions will be subject to an adjustment if the violation occurred within the two-year period preceding the date of the current examination.

2. Closed-end credit transactions will be subject to an adjustment if the violation resulted from a clear and consistent pattern or practice or gross negligence where:

   a. There is an understated APR on a loan which originated between January 1, 1977 and March 31, 1980.

   b. There is an understated APR or understated finance charge, and the practice giving rise to the violation is identified during the current examination. Loans containing the violation which were consummated since the date of the immediately preceding examination are subject to an adjustment.

   c. There is an understated APR or understated finance charge, the practice giving rise to the violation was identified during a prior examination and the practice is not corrected by the date of the current examination. Loans containing the violation which were consummated since the creditor was first notified in writing of the violation are subject to an adjustment. (Prior examinations include any examinations conducted since July 1, 1969).

3. Each closed-end credit transaction, consummated since July 1, 1969, and containing a willful violation intended to mislead the consumer is subject to an adjustment.

4. For terminated loans subject to 2 above, an adjustment will not be ordered if the violation occurred in a transaction consummated more than two years prior to the date of the current examination.

*Calculating the Adjustment*

Consumers will not be required to pay any amount in excess of the finance charge or dollar equivalent of the APR actually disclosed on transactions involving:

1. Understated APR violations on transactions consummated between January 1, 1977 and March 31, 1980, or

2. Willful violations which were intended to mislead the consumer.

On all other transactions, applicable tolerances provided in the definitions of understated APR and understated finance charge may be applied in calculating the amount of adjustment to the consumer's account.

*Methods of Adjustment*

The consumer's account will be adjusted using the lump sum method or the lump sum/payment reduction method, at the discretion of the creditor.

*Violations Involving the Non-Disclosure of the APR or Finance Charge*

1. In cases where an APR was required to be disclosed but was not, the disclosed APR shall be considered to be the contract rate, if disclosed on the note or the Truth in Lending disclosure statement.

2. In cases where an APR was required to be disclosed but was not, and no contract rate was disclosed, consumers will not be required to pay an amount greater than the actual APR reduced by one-quarter of 1 percentage point, in the case of first lien mortgage transactions, and by 1 percentage point in all other transactions.

3. In cases where a finance charge was not disclosed, no adjustment will be ordered.

*Violations Involving the Improper Disclosure of Credit Life, Accident, Health, or Loss of Income Insurance*

1. If the creditor has not disclosed to the consumer in writing that credit life, accident, health, or loss of income insurance is optional, the insurance shall be treated as having been required and improperly excluded from the finance charge. An adjustment will be ordered if it results in an understated APR or finance charge. The insurance will remain in effect for the remainder of its term.

2. If the creditor has disclosed to the consumer in writing that credit life, accident, health, or loss of income insurance is optional, but there is either no signed insurance option or no disclosure of the cost of the insurance, the insurance shall be treated as having been required and improperly excluded from the finance charge. An adjustment will be ordered if it results in an understated APR or finance charge. The insurance will remain in effect for the remainder of its term.

*Special Disclosures*

Adjustments will not be required for violations involving the disclosures required by sections 106(c) and (d) of the Act, (15 U.S.C. 1605(c) and (d)).

*Obvious Errors*

If an APR was disclosed correctly, but the finance charge required to be disclosed was understated, or if the finance charge was disclosed correctly, but the APR required to be disclosed was understated, no adjustment will be required if the error involved a disclosed value which was 10 percent or less of the amount that should have been disclosed.

*Agency Discretion*

Adjustments will not be required if the agency determines that the disclosure error resulted from any unique circumstances involving a clearly technical and non-substantive disclosure violation which did not adversely affect information provided to the consumer and which did not mislead or otherwise deceive the consumer.

*Safety and Soundness*

In some cases, an agency may order, in place of an immediate, full adjustment, either a partial adjustment, or a full adjustment in partial payments over an extended time period that the agency considers reasonable. The agency may do so if it determines that (1) the full, immediate adjustment would have a significantly adverse impact upon the safety and soundness of the creditor, and (2) a partial adjustment, or making partial payments over an extended period of time, is necessary to avoid causing the creditor to become undercapitalized.[8]

*Exemption from Restitution Orders*

A creditor will not be subject to an order to make an adjustment if within 60 days after discovering a disclosure error, whether pursuant to a final written examination report or through the creditor's own procedures, the creditor notifies the person concerned of the error and adjusts the account to ensure that such person will not be required to pay a finance charge in excess of that actually disclosed or the dollar equivalent of the APR disclosed, whichever is lower. This 60-day period for correction of disclosure errors is unrelated to the provisions of the civil liability section of the Act.

---

[8] The term "undercapitalized" will have the meaning as defined in section 38 of the Federal Deposit Insurance Act (12 U.S.C. 1831o).

**Questions and Answers Regarding Joint Interagency Statement of Policy for Administrative Enforcement of the Truth in Lending Act – Reimbursement Issued by the FFIEC on July 11, 1980, and Revised October 1998 (Approved July 22, 1999)**

## General

1. **Q**. Do the enforcement standards and accuracy tolerances in the Policy Guide supersede the requirements of the Truth in Lending Act and Regulation Z?

   **A**. No. The policy guide applies to agency enforcement procedures only. It does not alter a creditor's responsibility to comply fully with all the requirements of the Act and Regulation Z, including finance charge and annual percentage rate (APR) accuracy requirements.

2. **Q**. When violations are discovered in purchased or assigned loans that are initially payable to an entity other than the financial institution, will the financial institution be ordered to make the necessary adjustments to the accounts of affected consumers?

   **A**. No, the financial institution is not the creditor, even if the obligation by its terms is payable initially to a third party and simultaneously assigned to the financial institution. The violations will be referred to the creditor's enforcing agency.

3. **Q**. If the creditor must itemize the amount financed, but fails to disclose or understates the prepaid finance charge, will reimbursement be required?

   **A**. No, this violation of Regulation Z will require prospective corrective action only, assuming the prepaid finance charges are properly included in the computation of the APR and finance charge.

4. **Q**. If APR or finance charge disclosures not required by Regulation Z have been made, will reimbursement be required when such optional disclosures are understated?

**A**. No, however, errors in disclosures not required by Regulation Z for a particular transaction are violations of either 12 CFR 226.5(a)(1) or 12 CFR

226.17(a)(1), both of which require that credit disclosures be made clearly and conspicuously.

## Definitions

### "Current examination"

1. **Q**. How should the Policy Guide apply to a situation where an examiner, in an examination in progress discovers that reimbursement had not been undertaken as requested by the enforcement agency following the prior examination? What if the institution states that this examination is the "current examination" thereby requiring it to only make adjustments to those loans found to be in violation and consummated since the prior examination?

   **A**. TILA does not limit the agencies' authority to require correction of violations detected in earlier examinations and that have not been corrected as of the date of the current examination [see section 108(e)(3)(C)(i) of the Act, found at 15 USC 1607(e)(3)(c)(i)]. In addition, if the practice giving rise to the violations identified in the earlier examination has not been corrected, the institution will be required to make adjustments on any loans containing the violation that were consummated since the date it was first notified in writing of the violation and comply with the corrective action already ordered.

### "Understated APR"

1. **Q**. What is meant by "actual APR" and "annual percentage rate calculated in accordance with the Act," as used in the Policy Guide?

   **A**. Those terms mean the lowest permissible APR that can be computed, applying all applicable provisions of Regulation Z.

## De Minimis Rule

1. **Q**. How should the de minimis rule be applied in closed-end credit transactions?

**A**. The de minimis rule should always be applied to the amount of the adjustment calculated under the "lump sum method" of reimbursement as of the maturity date of the transaction, regardless of which reimbursement method is ultimately used by the creditor.

2. **Q**. How should the de minimis rule be applied in open-end credit transactions?

**A**. The de minimis rule should be applied to the total amount of the adjustment calculated for each consumer's account under the "lump sum method" for the period of time from the date of the current examination back to the date of the first occurrence of the violation. However, the total time period may not exceed the two-year period prior to the date of the current examination.

## Corrective Action Period

1. **Q**. Have the agencies changed their position on the time period required for taking corrective action for violations involving closed-end credit?

**A**. Yes. Prior to 1997, the agencies took the position that the statutory phrase "immediately preceding examination" (which serves as the cutoff date for retroactive application of a reimbursement requirement) referred to the most recent examination (prior to the current examination) in which compliance with Regulation Z and the Act was reviewed. Because of decisions reached by the Eighth and Eleventh Circuits of the United States Courts of Appeals, the agencies have adopted a new policy. The agencies by policy now interpret the phrase "immediately preceding examination" to mean an examination of any type conducted for any purpose by a federal regulatory agency with designated administrative enforcement responsibility under the TILA. However, supervisory visitations, inspections, or other reviews that are not considered examinations by the agencies are not considered examinations for purposes of applying the retroactivity limitation. In addition, an examination of an affiliated entity, such as an operating subsidiary or an institution's holding company, is not considered an examination for purposes of determining the corrective action time period under the Act.

2. **Q**. What is the effective date of the new policy change regarding the time period for corrective action for violations involving closed-end credit?

   **A**. The policy change regarding the corrective action timer period was effective as of August 7, 1997.

3. **Q**. Can an institution terminate the remainder of its restitution obligation to a borrower in light of this change in policy?

   **A**. No. The policy change applies to future and pending cases as of the effective date. There will be no change in reimbursement obligations arising in connection with restitution cases that have been previously resolved. Once the institution makes its decision about the restitution method that it will pursue. It is expected to complete its obligations to affected borrowers as agreed.

   For example, under the "Lump Sum/Payment Reduction" method of reimbursement, an institution remits to the borrower a lump sum covering excess money paid to the point that restitution is made, and then reduces future payments to cover the remaining restitution obligation. Under the new policy, the agencies will not permit the institution to terminate its remaining restitution obligation by increasing the borrower's payments to the level that were prior to the restitution action.

4. **Q**. How will the agencies apply the policy change when "concurrent" examinations are being conducted at a financial institution?

   **A**. Concurrent examinations occur when several different types of examinations begin on the same day or when examinations begin in succession. Concurrent examinations may also begin several weeks or months apart but within the same examination cycle, based on factors such as the availability of working space for the examination teams, or the expressed preferences of the institution's management.

   For purposes of applying the policy change regarding the corrective action time period, the agencies consider a concurrent examination to be one event. Assume, for example, the situation where a safety and soundness examination begins on Monday, a trust examination begins on Tuesday, and the compliance examination starts on Wednesday. Assume further that the compliance team identifies a pattern or practice of violations triggering the restitution provisions of

the Act. The agencies will consider the immediately preceding examination to be the last completed examination, not the trust examination that begins on Tuesday, or the safety and soundness examination that began on Monday.

Similarly, assume an institution's examination is to be conducted in succession, meaning that the compliance examination would begin after the safety and soundness and/or trust examination on site work in the institution is completed, which could be several months after the start date of the concurrent examination. The agencies will consider those concurrent examinations to be part of the same examination cycle for purposes of the policy.

5. **Q**. Does the policy change limit or otherwise affect the corrective action time period where a practice identified at a prior examination is not covered by the date of the current examination?

    **A**. No. The Policy Guide and statute provide that if a practice is identified during a current examination and the examiner determines that the practice was identified during a prior examination but is not corrected by the date of the current examination, the corrective action time period is retroactive to the date of the prior examination in which the violation was identified. This will be true even if there have been intervening examinations that did not review for compliance with the Act and Regulation Z. [see section 108(e)(3)(c)(l) found at 15 USC 1107(e)(3)(c)(l)]

6. **Q**. Are there any differences in application of the policy change when restitution situations involve open-end credit rather than closed-end credit?

    **A**. Yes. The Act provides different corrective action time periods for open-end and closed-end credit. The policy change applies to restitution situations involving closed-end credit. The corrective action time period for open-end credit covers the 24-month period preceding the date of the current examination, regardless of whether another examination intervenes during that period.

7. **Q**. What is the corrective action period with respect to terminated closed-end loans if an institution elects to comply voluntarily with the restitution provisions of the Policy Guide, absent a current examination?

**A**. The Policy Guide states that "for terminated loans … an adjustment will not be ordered if the violation occurred in a transaction consummated more than two years prior to the date of the current examination." If an institution elects to comply voluntarily with the Policy Guide absent a current examination, the financial institution will have the option of either:

(1) Deferring reimbursement on any terminated loans until its regulatory agency conducts a current examination, or (2) Reimbursing on any terminated loans falling within the period prior to the discovery of the violation up to the date of the immediately preceding examination. If that time frame is in excess of two years, then reimbursement may be limited to the two-year period prior to the date of discovery of the violation.

8. **Q**. How will the Policy Guide apply when loans subject to reimbursement are acquired through a merger, consolidation, or in exchange for the assumption of deposit liabilities?

**A**. In the case of a merger or consolidation, the receiving institution or the consolidated institution is liable for all liabilities of the merged or consolidating institutions, and the Policy Guide will apply.

In the case of loans acquired in exchange for the assumption of deposit liabilities, the Policy Guide will apply to the original creditor.

## Calculating the Adjustment

1. **Q**. How will disclosures containing information properly estimated under 12 CFR 226.5(c), 12 CFR 226.17(c), and appendix D be treated for reimbursement determinations and computations?

**A**. If an APR or finance charge is in error for any reason other than a properly made estimate, the determination of whether the error constitutes a reimbursable overcharge should be made using the estimated information as disclosed. At the creditor's option, reimbursement should be based on either:

(1) The actual amount of loan advances, with consideration given to the amount and the dates payments were made by the borrower, or;

(2) The disclosed amounts or time intervals between advances and between payments.

The basis selected shall be applied, using the lump sum or lump sum/payment reduction method (at the creditor's discretion), to all loans of the same type subject to reimbursement.

2. **Q**. If a creditor has failed to reflect private mortgage insurance premiums in the APR or finance charge disclosures, may the institution cancel the insurance after it first reimburses the consumer with a lump sum payment to cover the period up to the date of the reimbursement?

   **A**. The creditor may elect to cancel the insurance if applicable laws and regulations are not violated. The effect of canceling the insurance will be to reduce the amount of the consumer's future payments, as permitted by the "lump sum payment reduction" method of reimbursement.

3. **Q**. If a creditor has failed to reflect private mortgage insurance premiums in the APR or finance charge disclosures and restitution is required, but the loan has been sold into the secondary market, how should reimbursement be made?

   **A**. The creditor is responsible for reimbursement, even if the loan has been sold. If its ability to cancel the insurance is limited by terms of the loan sales agreement, the creditor may make payments either to the consumer directly or (if it is agreeable to all parties) to the new owner of the loan. The new owner of the loan would make appropriate adjustments to the account so that the consumer receives the full benefit of the reimbursement.

4. **Q**. If the creditor failed to include any component of the finance charge (e.g., a loan origination fee) in the APR or finance charge disclosures, may the amount of reimbursement be reduced to account for fees excludable from the finance charge under 12 CFR 226.4(c), which are paid for by such finance charge components?

   **A**. If the borrower has not otherwise paid such excludable fees (e.g., title insurance fees) to the creditor or to a third party, reimbursement may be

computed after first deducting from the finance charge those fees qualifying under 12 CFR 226.4(c).

5. **Q**. A transaction involves a loan with a term of 36 months, a payment schedule where the first 35 payments are calculated using a 30-year amortization and a balloon amount for the final payment. What tolerance should be used when applying the Policy Guide? One-eighth of 1 percent or one-quarter of 1 percent?

   **A.** The application tolerance is based on the amortization of the loan. Since the loan is completely amortized within a three-year period (i.e., the 36-month payment schedule), a tolerance of one-quarter of 1 percent should be used because the amortization period is less than 10 years (15 USC 1607(e)(1)).

6. **Q**. How will the policy guide apply if a credit transaction has an interest rate or APR subject to increase and the variable rate feature was not provided on the disclosure statement?

   **A.** If the disclosure statement did not state that the rate would be subject to change, the borrower may be charged only the original APR disclosed. Reimbursement under the policy guide will apply only to the period of time in which the borrower made payments at an increased rate.

7. **Q**. How will the policy guide apply if a creditor disclosed that a rate will be prospectively subject to increase, but the APR or the finance charge disclosed or both were originally understated?

   **A.** The policy guide will apply as follows:

   (1) If only the APR is understated, reimbursement will be required only for the period of time before the first scheduled change in rate under the variable rate feature in the contract. The term "the first scheduled change in rate" refers to a date on which the rate will change to a level that is unknown or unpredictable at consummation. It does not include changes, such as step rates, that are agreed upon before consummation.

   For example, if the loan terms provide for a 9 percent rate for the first year and a 10 percent rate for the second year, followed by a variable rate feature to be invoked at the beginning of the third year, reimbursement will apply only to the initial 24-month period. The lump sum payment reduction adjustment method

may be used, using two payment streams for the initial two-year period. Payments after the 24th month would not be affected by the adjustment.

(2) If only the finance charge is understated, reimbursement generally will be required for a period covering the entire life of the loan, consistent with the following:

- If a prepaid finance charge was not included in the disclosed finance charge (such as a loan origination fee paid separately by the consumer at loan closing), the entire loan fee (less the applicable dollar tolerance) must be refunded as a "lump sum" payment.

- If, however, the loan fee was financed (included in the loan amount), the finance charge reimbursement may be prorated on a straight-line basis over the life of the loan and refunded under the lump sum/payment reduction method.

However, a finance charge adjustment will be required only for the period of time before the first scheduled change in rate if the error occurred solely because the interest component of the disclosed finance charge was based on either:

(a) The interest to be earned before the first scheduled change in rate, or

(b) The interest to be earned assuming an initial discounted rate over the life of the loan.

For example, the interest component of the disclosed finance charge might incorrectly reflect only loan interest for the first year on a transaction with variable rate changes scheduled annually. Alternatively, it might incorrectly reflect interest calculated only at an initial discounted variable rate for the full term of the loan.  In either case, if the loan terms in the example provide that the variable interest rate is subject to change annually, the finance charge reimbursement will apply only to the initial 12-month period.

The adjustment may be prorated on a straight-line basis over the life of the loan. Reimbursement of prorated amounts covering the period of time after the first scheduled change in rate (after month 12 in this example) would not be required. (3) If both the APR and finance charge are understated, normally the lump sum finance charge adjustment is compared with the lump sum APR adjustment as of the loan maturity date and the larger adjustment determines which disclosure error is subject to reimbursement. In the case of variable rate transactions, however, the lump sum APR adjustment used for comparison is calculated for the period of time before the first scheduled change in rate in the manner indicated by (1) above and the finance charge adjustment is calculated in the manner indicated by (2) above.

For example, assume a loan in which both the APR and finance charge are understated on a 30-year, variable rate loan that calls for rate changes annually. If both understatements were caused by the same failure to take into account a prepaid loan origination fee:

- The APR reimbursement amount is the lump sum value for a 12-month period, which is determined by using the lump sum/payment reduction method and appropriate reimbursement tolerances.

- The finance charge reimbursement amount is the lump sum value for a 360-month period, which is determined by subtracting the appropriate reimbursement tolerance from the amount of the loan fee.

The APR adjustment is compared to the finance charge adjustment to determine the larger of the two. In the example, the finance charge adjustment (and not the APR adjustment) would be reimbursable.

8. **Q**. If a creditor uses a simple interest rate, which is disclosed as the APR, to compute a monthly payment schedule, and the time interval from the date the finance charge begins to be earned to the date of the first payment is treated as if it were one month, even though that period is greater than one month and is not a "minor irregularity" under 12 CFR 226.17(c)(4), is enforcement action necessary if the resulting application of the simple interest rate generates a higher finance charge than the one disclosed?

**A**. The policy guide will apply if:

---

(1) The creditor's method of computing the payment schedule, as previously described, is used to compute the disclosed finance charge (i.e., the total of payments less the amount financed).

(2) The final payment collected or scheduled under the contract (as generated by the application of the simple interest rate to the unpaid principal balance over the life of the loan) is greater than the one disclosed.

(3) The finance charge resulting from the first two conditions is understated.

9. **Q**. Will reimbursement be required for demand loans with disclosures based on a one-year maturity when the demand loan contract calls for periodic payments that will amortize the loan over a definite time period?

**A**. Yes. A formal amortization schedule recorded in the demand loan contract is, under 12 CFR 226.17(c)(5), equivalent to an alternative maturity date, and disclosures based on the amortization schedule should be made, as opposed to the one-year disclosures.

10. **Q**. Will reimbursement be required on demand loans when:

(1) An alternate maturity date is disclosed and reflected in the contract, but the finance charge disclosure is based on the year?

(2) There is no alternate maturity date disclosed or reflected in the contract, but the finance charge disclosure is based on a period of time less than one year?

**A**. In the first case, since there is an alternative maturity date in the contract, which is disclosed, the finance charge disclosure should have been based on that alternate maturity date, as required under 12 CFR 226.17(c)(5), not on the disclosure period to be used when the instrument has no alternate maturity date.

In the second case, the actual finance charge disclosure should have been based on a one-year period as required by 12 CFR 226.17(c)(5), not on some period less than that required when the instrument has no alternate maturity date.

After considering appropriate tolerances, reimbursement will be required in both cases if:

(1) The disclosed finance charge is less than the actual finance charge for the initial required disclosure period.

(2) The demand loan has been on the bank's books past the period for which finance charge disclosures were made.

Reimbursement will be calculated for the required disclosure period only. The amount reimbursed to the consumer is the difference between the finance charge actually paid and the finance charge disclosed (which may be increased by the applicable finance charge reimbursement tolerance).

If the demand loan has not been on the bank's books past the period for which finance charge disclosures were made (e.g., the finance charge was disclosed for a one-year period, but should have been disclosed for a five-year period, and only 10 months have elapsed), no reimbursement is required. However, if the bank takes no prospective corrective action (i.e., if it does not at least disclose in writing a refinancing of the original loan) and the loan remains on the bank's books past the period for which the original finance charge disclosures were made, reimbursement will be required as previously indicated.

Those concepts apply both to straight and variable rate demand loans whenever the disclosed finance charge is less than the actual finance charge after considering appropriate tolerances.

11.**Q**. How will the policy guide apply to violations of the early disclosure rules under Regulation Z?

**A**. As a general rule, the Policy Guide will not apply to violations involving early truth-in-lending disclosures, but will apply to violations of the pre-consummation disclosures required by section 226.17. However, if the creditor has provided erroneous early disclosures and has not made pre-consummation disclosures, the Policy Guide will apply to the erroneous early disclosures.

## Methods of Adjustment

1. **Q**. Must reimbursements resulting from understated finance charges always be made as a single "lump sum" amount?

   **A**. No. Reimbursements resulting from the creditor's failure to include prepaid finance charges in the total finance charge must always be refunded as a "lump sum" payment, but reimbursements resulting from failure to include finance charge components that accrue over time may be prorated on a straight-line basis (no time value) over the life of the loan and refunded under the lump sum/payment reduction method.

2. **Q**. Must a creditor use one reimbursement method consistently on all affected loans?

   **A**. No. The creditor's right to choose between the two methods applies to each transaction.

3. **Q**. May a creditor apply a lump sum reimbursement to the consumer's loan balance on a loan requiring reimbursement instead of making a cash payment to the consumer?

   **A**. If the loan is closed-end, the creditor must make a cash payment or a deposit into an existing unrestricted consumer asset account, such as an unrestricted savings, NOW account, or demand deposit account. However, if the loan is delinquent, in default, or has been charged off, the creditor may apply all or part of the reimbursement to the amount past due, if permissible under law.

   If the reimbursement involves an open-end account, the creditor must make a cash payment or a deposit into an existing unrestricted consumer asset account such as an unrestricted savings, NOW, or demand deposit account. However, on a case-by-case basis, the agencies may permit the creditor to credit the consumer's open account by the amount of the reimbursement if the consumer consents. Creditors should be aware that crediting open-end accounts might create credit balances subject to the requirements of 12 CFR 226.11. In addition,

if the open-end account is delinquent, in default, or has been charged off, the creditor may apply all or part of the reimbursement to the amount past due, if permissible under law.

4. **Q**. If a transaction involves more than one consumer, to whom must reimbursement be made?

   **A**. The reimbursement is the property of, and is to be made to, the primary obligor in the credit transaction. If there is more than one primary obligor, reimbursement must be made jointly. If the primary obligor(s) is deceased, the payment should be made pursuant to the estate and escheat laws of the state. If the creditor is unable to locate the primary obligor(s), after having at least mailed the reimbursement amount to the consumer's last known address, the amount of the reimbursement is subject to the escheat laws of the state.

5. **Q**. How will the policy guide apply to residential mortgage transactions that have been assumed by a third party?

   **A**. Reimbursement will be made only to the original borrower and only to the extent of overcharges that occurred before the assumption if:

   (1) A reimbursable violation is found on the original borrower's disclosure statement; and

   (2) The original borrower is not released from liability on the loan. The original transaction will be considered terminated with respect to the original borrower on the date of the assumption and the rules for application of the Policy Guide to terminated loans will apply.

   Reimbursement will be made to the original borrower for the period before the assumption occurred if:

   (1) A reimbursable violation is found on the original borrower's disclosure statement.

   (2) The original borrower is not released from liability on the loan. However, in the event the subsequent borrower defaults and the original borrower must again assume payments on the loan, such payments will be based on the payment

amount that would have been calculated under the lump sum payment reduction method at the time of reimbursement, had no assumption occurred.

If a required disclosure to a subsequent borrower contains reimbursable violations, that borrower shall be reimbursed for the period after the assumption occurred, based on the new disclosure.

## Non-Disclosure of the APR or Finance Charge

1. **Q**. How will the policy guide apply to loans for which no disclosure statements are on file?

   **A**. If there is no evidence that the creditor furnished disclosures or if there is a preponderance of evidence that disclosures containing violations subject to reimbursement were destroyed before the record retention period expired, either violation is treated as a failure to disclose the APR. The creditor will be given the opportunity to substantiate the claim that an accurate disclosure was made before final action is taken. The absence of compliance documentation should be viewed relative to known practices of the creditor for record retention and Regulation Z compliance.

2. **Q**. How will the policy guide apply if a creditor did not provide required disclosures to the consumer before consummation, but did supply them after consummation?

   **A**. If required disclosures were not provided before consummation of the transaction, the transaction will be viewed as having no APR disclosed, and enforcement action is in order. If the creditor's failure to provide disclosures included the credit life and accident and health insurance disclosures, the insurance premiums must be treated as finance charges.

3. **Q**. Will the policy guide apply when a creditor has disclosed the APR as "2% OP" to mean a fluctuating rate of 2 percent over the prime rate, or has disclosed similar prime rate terminology instead of the APR?

**A**. If the disclosure statement (not the note) clearly provides the numerical value of the prime rate as it pertains to the credit transaction, as of the time disclosures are given to the consumer, that rate (the prime rate or 2% OP) will be considered to be the disclosed APR under the Policy Guide. If the prime rate is not provided on the disclosure statement, the transaction will be viewed under the policy guide as if no APR had been disclosed.

4. **Q**. Will reimbursement be required on demand loans when the variable rate feature has not been disclosed and the rate is increased?

    **A**. Yes. If the consumer has not been notified in writing of the rate change on or before the date of the change, reimbursement will be required if the bank has not made the variable rate disclosures.

    Each time the rate is changed and the customer is not given written notification of the new rate, the rate-change period(s) will be treated as if no APR had been disclosed, and the policy guide will apply. The rate on the most recent notification will serve as the contract rate.

## Improper Disclosure of Credit Life, Accident, Health, or Loss of Income Insurance

1. **Q**. Are the credit insurance provisions of the Policy Guide applicable to terminated loans?

    **A**. Yes. The credit insurance provisions apply if such loans originated within the policy guide's corrective action period for terminated loans.

2. **Q**. How will the policy guide apply if the cost of credit insurance premiums is disclosed as a rate (e.g., as a percentage or in dollars and cents per hundred per month) in a closed-end transaction?

    **A**. Regulation Z permits creditors to disclose credit insurance premiums on a unit-cost basis in closed-end transactions by mail or telephone under 12 CFR 226.17(g), and in certain closed-end transactions involving an insurance plan that limits the total amount of indebtedness subject to coverage.

    In all other closed-end credit transactions, however, the dollar amount of insurance premiums must be disclosed. If the premium cost in those cases is disclosed as dollars or cents per hundred or as a percentage, it will be treated as

if no disclosure of the cost has been made and the policy guide will apply accordingly.

3. **Q**. How will the policy guide apply if:

(1) The creditor does the not include premiums for credit life, accident, and health insurance in the APR or finance charge disclosures; and

(2) The creditor fails to disclose the optional nature of the insurance; but

(3) The creditor has afforded the borrower the option of taking or refusing the insurance by checking a block or initialing a line opposite statements similar to the following, both of which are disclosed in writing to the borrower: "I desire credit life, accident, and health insurance" and "I do not desire credit life, accident, and health insurance?

**A**. In those cases, the policy guide will apply because the creditor has not disclosed to the customer in writing, as required by section 226.4(d)(1)(i) of Regulation Z, that the credit life insurance or accident and health insurance are optional.

4. **Q**. How will the policy guide apply if:

(1) The consumer is charged for credit life, accident, or health insurance premiums; and

(2) The creditor did not include the premiums in the APR or finance charge disclosures; and

(3) The creditor disclosed the optional nature and cost of credit life insurance to the consumer in writing and the customer signed or initialed close to those disclosures; and

(4) Either no affirmative statement indicating a desire to obtain the insurance was provided or the appropriate box or line was not checked or otherwise marked to indicate whether the customer did or did not desire the insurance?

**A**. If the disclosure provided a choice to the customer through statements, such as "I desire the insurance" and "I do not desire the insurance," and neither choice has been marked by the customer, enforcement action is in order because the creditor did not meet the requirements of 12 CFR 226.4(d)(1)(iii).

If no affirmative statement indicating a desire to purchase the insurance has been provided, and the customer has only signed or initialed near the optional nature statements or cost disclosures, the Policy Guide will apply because the creditor did not meet the requirements of 12 CFR 226.4(d)(1)(iii).

5. **Q**. How will the policy guide apply if:

(1) The creditor does not include premiums for credit life, accident, and health insurance in the APR or finance charge disclosures; and

(2) The creditor provides disclosures stating that the insurance is not required; and

(3) The creditor provides the cost of each type of insurance, with a statement that the customer's signature will indicate a desire to purchase the insurance and the customer signs once, below the cost disclosures, but does not initial each type of insurance desired?

**A**. If the disclosures clearly indicate that the customer, by signing where indicated, elects to purchase each type of insurance for which the cost has been provided, the Policy Guide will not apply. However, prospectively the creditor shall clarify such disclosures by obtaining the customer's initials for each type of insurance selected, or by changing the manner in which the customer signs for credit insurance when more than one type is offered.

6. **Q**. If vendor's single interest (VSI) insurance is written in connection with a credit transaction, the insurance premiums are not included in the finance charge, and the creditor does not obtain a waiver of the right of subrogation from the insurer, is the resulting finance charge understatement subject to reimbursement under the Policy Guide?

---

**A**. Yes. However, if the insurer has not exercised such rights of subrogation and agrees to prospectively waive that right for outstanding loans, the Policy Guide will not apply to those loans.

## Obvious Errors

1. **Q**. What are examples of obvious errors described in the Policy Guide?

   **A.**  Consider a situation where the APR is disclosed correctly and the correct finance charge is $600, no adjustment would be required if the amount of the disclosed finance charge is shown as $60 or less.  Likewise, if the finance charge is correctly disclosed and the correct APR is 18.568 percent, no adjustment would be required if the disclosed APR is shown as 1.8568 percent or less.

# Truth In Lending                    References

**Laws**

    15 USC 1601 *et seq.*, Truth in Lending Act (TILA)
    15 USC 1666, Fair Credit Billing Act

**Regulations**

    12 CFR 226, Truth-in-Lending Regulation
    12 CFR 34, Subpart B, Adjustable Rate Mortgage Regulation

**OCC Handbook Booklets**

    Community Bank Supervision
    Compliance Management System
    Internal and External Audits
    Large Bank Supervision

**Software**

    APRWIN Program http://www.occ.treas.gov/aprwin.htm

# LENDERS' INSTRUCTIONS

**INITIAL
CLOSING
INSTRUCTIONS**

DO NOT CLOSE THIS LOAN IF:

1. We have not received and approved Preliminary Commitment for Title Insurance.
2. You are past the expiration date of our legal papers.
3. We have not received and approved an Estimated Closing Statement.
4. You have not given signed copy of these instructions plus any amendments to the borrowers.
5. If there has been any change to the original sales contract which we have not approved in writing.
6. If we have not received and accepted/approved:
   a. Security instruments conformed and certified plus two copies.
   b. Note plus two certified copies.
   c. Any other items sent for execution and/or notary in the numbers sent. We will not accept witnessed acknowledgments on notarized items.
7. We have not received an acceptable hazard insurance binder.
8. All conditions of our loan commitment have not been met.
9. **SIGNATURES** Please insure that the Borrowers sign ALL loan documents **EXACTLY AS THEIR NAMES ARE TYPED ON THE DOCUMENTS, EVEN IF THIS IS NOT THEIR USUAL SIGNATURE**. Please pay special attention to middle initials and middle names, and Junior and Senior. You should review the signature on each document **CAREFULLY. IF THERE IS ANY QUESTION AS TO THE READABILITY OF THE SIGNATURE OF AN INDIVIDUAL, YOU SHOULD OBTAIN A NOTARIZED SIGNATURE AFFIDAVIT** and return it with the other documents.
10. **TAX CERTIFICATION** This form must be completed and signed by YOU and have the LEGAL DESCRIPTION ATTACHED OR ENTERED AT THE BOTTOM OF THE FORM. Please be **sure** that ALL information is complete and correct and that you show an amount of taxes next due, even an estimated amount.
11. **REVIEW** All documents **MUST** be in our office for review PRIOR to recording. We request that documents be received a **MINIMUM** of ONE DAY PRIOR TO THE DAY YOU WISH TO RECORD. Please include THREE (3) CERTIFIED COPIES EACH OF THE NOTE AND DEED OF TRUST and provide copies of all other executed documents for recording such as Warranty Deed, Excise Affidavit, Quit Claim Deed, Buyer or Seller Power of Attorney, etc. Please direct the title company to forward take-off copies of ALL pages of ALL recorded documents as soon as possible.
12. Sales price is other than $00.00

**TITLE
POLICY
REQUIREMENTS**

1. The title policy must insure the mortgage as a good and valid lien of the type shown on Page 1 in accordance with your Preliminary Commitment for Title Insurance. We must have the original and two copies of the policy.
2. THERE MUST BE NO OTHER LIENS AGAINST THE PROPERTY OTHER THAN THOSE SHOWN ON PAGE 1, unless approved by us in writing.
3. No past-due taxes or special assessments are to be shown as exceptions. The title policy must show current year's taxes "not yet due and payable," or current half paid.
4. In examining the title, if you find any violations of restrictions, easements, or encroachments, secure our approval prior to the closing.
5. Vestee name spelling(s) must be identical to mortgage/deed of trust.
6. Marital status must be shown.
7. We require two copies of conditions, covenants, and restrictions and of any recorded exceptions not covered by FHA/VA/FNMA/FHLMC General Waivers.
8. The mortgage transaction must include the proper execution and recording of all necessary instruments to assure the issuance of a Mortgagee Title Policy, without exceptions except as shown on Page 1.
9. This Policy must be in the loan amount or maximum principal balance to be reached if negative amortization is involved (not to exceed 125%) insuring **Home Funds Direct** and its successors and/or assigns, and subject only to the following:
   Restrictions and building lines of record provided that the policy contains
   an Endorsement covering any violation.
10. Any lien for financing subordinate to ours and approved by us must be listed on the title policy and the policy must expressly provide that such lien is subordinate to that of our mortgage lien.
11. Property address must be shown as a part of the policy or by endorsement in states where possible.
12. Plat or survey must show correct street name or road name in full; must show all reference points used in legal description.
13. Protection of insured must be provided in the case of any unlocated easements, rights of way, encroachments, etc.
14. Protection of improvements including landscaping, must be provided if water, oil, gas, or mineral reservations exist and allow the right of surface entry.
15. The following endorsements must be included in the Mortgagees policy: 100, 116, 8.1, 6.2 if ARM with no negative amortization, condominium or P.U.D., if applicable, and **EPA**
16. Have title company forward owners policy to borrowers at property or mailing address.
17. Have Mortgagees policy delivered to lender's address on page 4 of these instructions within three days of closing.
18. Title Policy to read as follows:
    Home Funds Direct
    Its Successors and/or assigns
19. Lender does not accept limited coverage title policies for loans more than $50,000.00
20. Lender requires that the final title policy insure the lien shown on page 1 of the Closing Instructions independent of any other lien closed concurrently. A final title policy insuring a combination of multiple liens is unacceptable.

**LENDERS' INSTRUCTIONS**

-635 (0208).01

Initials: _____

# LENDERS' INSTRUCTIONS

**BUYER COST**
**REQUIREMENTS**

1. DOWNPAYMENT IN CASH FROM BORROWER(S) <u>MUST</u> TOTAL AMOUNT SHOWN ON PAGE 1.
2. BORROWERS CANNOT PAY THE FOLLOWING:

**VA LOANS**

1. PHOTOS & INSPECTION FEE MORE THAN ALLOWED BY VA
2. MESSENGER SERVICE
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED/DEED OF TRUST AND ANY ATTACHMENTS THERETO
4. ESCROW FEES
5. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
6. TERMITE INSPECTION
7. TAX SERVICE FEE
8. SETTLEMENT OR CLOSING FEE

**FHA LOANS**

1. TAX SERVICE/REGISTRATION FEE
2. MESSENGER SERVICE UNLESS AUTHORIZED BY BORROWER IN WRITING
3. RECORDING OF ANY DOCUMENTS OTHER THAN DEED OF TRUST/DEED AND ANY ATTACHMENTS THERETO
4. MORE THAN 2 MONTHS INSURANCE INTO ESCROW ACCOUNT
5. INSPECTION FEES - NOT MORE THAN ALLOWED BY FHA
6. DOCUMENT PREPARATION

**DISBURSEMENT**

1. It shall be the responsibility of the Closing Agent to request proceeds from the lender at such time as the Closing Agent is prepared to comply with all the terms and conditions of the Purchase/Sale Agreement and /or our Escrow Instructions. **SUCH A REQUEST, BY THE CLOSING AGENT, FOR FUNDS SHALL BE DEEMED TO BE A CERTIFICATION (LENDER) THAT ALL TERMS AND CONDITIONS HAVE BEEN MET AND THAT THE DOCUMENTS WILL BE PROPERLY RECORDED NOT LATER THAN <u>THE NEXT BUSINESS DAY</u> AFTER THE DAY THE CLOSING AGENT HAS RECEIVED THE PROCEEDS CHECK.** In the event that the documents are not recorded within 24 hours, the Closing Agent will immediately return the funds to the sender in accordance with the sender's instructions.

**2. HUD SETTLEMENT DATE**

    GOVERNMENT LOANS: The HUD-1 settlement date **MUST** be the <u>date on which the lender disburses proceeds to the Closing Agent</u> and **NOT** the date on which proceeds are disbursed to the seller. These two dates may be the same day.

    CONVENTIONAL LOANS: The settlement date on the HUD-1 statement may reflect the date on which the closing Agent disburses the proceeds, which would usually be the day <u>after</u> the Agent received loan proceeds from the lender.

**ADDITIONAL**
**INSTRUCTIONS:**

1. Undertaking to close this loan and acceptance of the lender's funds for disbursement shall constitute an undertaking to close this loan and disburse such funds in accordance with these Closing Instructions, whether or not these instructions are executed or delivered by the Closing Agent. Closing Agent will be responsible for any losses incurred by lender as a result of Closing Agent's failure to comply fully with these Closing Instructions.

2. Lender reserves the right to cancel or amend the loan or these instructions at any time prior to closing.

3. Closing Agent represents, warrants, and covenants that it is not an affiliate of or otherwise controlled by any party to this transaction.

4. From the time Closing Agent receives closing funds until the loan documents are sent to the lender, Closing Agent shall hold all loan documents for the benefit of the sender of the closing funds.

**E-MAIL:**

Handling of E-Mail and Closing Documents. If Closing Agent is willing to receive Closing Documents via e-mail, Closing Agent's e-mail address is set forth below, and Closing Agent shall be responsible for ensuring that all Closing documents received via e-mail are properly printed and otherwise handled in accordance with the Closing Documents handling requirements set forth above.
Closing Agent's Email Address: kimc@shssincorporated.com

---

THE UNDERSIGNED BORROWER(S)
1. DIRECT THAT THE LOAN PROCEEDS BE PAYABLE TO THE ORDER OF THE SETTLEMENT AGENT.
2. ACKNOWLEDGE 1ST PAYMENT DATE OF <u>05/01/2005</u>
3. ACKNOWLEDGE THAT THE LENDER MAY CANCEL OR AMEND THESE INSTRUCTIONS WITHOUT MY/OUR APPROVAL.
4. ACKNOWLEDGE <u>ESTIMATED</u> MONTHLY PAYMENTS OF:

| | | |
|---|---|---|
| PRINCIPAL & INTEREST | $ | 383.89 |
| TAXES (BONDS) | | 44.75 |
| INSURANCE | | 89.00 |
| MTGE. INS. PREMIUM | | |
| | | |
| **TOTAL** | $ | 517.64 |

_____    _____
DATE                       CHERYL HALL

_____    _____
DATE

_____    _____
DATE

_____
DATE

---

## PLEASE RETURN DOCS TO:

**Home Funds Direct**
**1130 Northchase Parkway**
**Suite 200**
**Marietta, GA 30067-6420**

**Ken Harper**
CLOSER/FUNDER NAME

**(866) 539-7025**
TELEPHONE NUMBER

THE UNDERSIGNED AGREES TO CLOSE THIS LOAN IN ACCORDANCE WITH ALL OF THE INSTRUCTIONS AND CONDITIONS CONTAINED IN THE CLOSING INSTRUCTIONS.

<u>**SWAFFORD & HAYES SETTLEMENT SERVICES**</u>
SETTLEMENT AGENT

BY: _____
    SIGNATURE

<u>**SWAFFORD & HAYES SETTLEMENT SERVICES**</u>
TYPED NAME

<u>**(865) 934-0466**</u>
TELEPHONE NUMBER

_____
DATE

**LENDERS' INSTRUCTIONS**

Closing Instructions



# SIGNATURE / NAME AFFIDAVIT

DATE:        03/25/2005

LOAN #:      0503172917

BORROWER:  HALL, CHERYL

THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW.
(This signature must exactly match signatures on the Note and Mortgage or Deed of Trust.)

CHERYL HALL
_____          _____
(Print or Type Name)                      Signature

If applicable, complete the following:
**I AM ALSO KNOWN AS:**

CHERYL R. HALL
_____          _____
(Print or Type Name)                      Signature

CHERYL H. FRAZIER
_____          _____
(Print or Type Name)                      Signature

_____          _____
(Print or Type Name)                      Signature

_____          _____
(Print or Type Name)                      Signature

I FURTHER CERTIFY THAT ALL THE ABOVE LISTED NAMES ARE ONE AND THE SAME PERSON.

State of _____

County of _____

Subscribed and sworn (affirmed) before me
this _____ day of _____

_____
Notary Public Name (printed)

Notary Public in and for
the State of _____
County of _____
My Commission Expires: _____

# PRIVACY POLICY

| Borrower Name(s):<br>**CHERYL HALL** | Lender:<br><br>**Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128** |
|---|---|
| Property Address:<br>**105 TV ROAD<br>DOTHAN, AL 36301** | Date:<br>**March 25, 2005** |

The trust of our customers is very important to **Home Funds Direct**. Keeping non public personal information about our customers in a secure environment and using that information only in accordance with this Privacy Policy is our top priority.

This Privacy Policy includes examples of the types on non public personal information **Home Funds Direct** collects. The provisions of this Policy apply to all our customers and consumers.

**Home Funds Direct** collects non public personal information about you from the following sources:

* Information we receive from you on applications or other forms;
* Information about your transactions with us or others; and
* Information we receive from a consumer reporting agency.

We do not disclose any nonpublic personal information about you to anyone, except as permitted by law. If you decide to pay off your loans (s), we will adhere to the privacy policies and practices as described in this notice.

**Home Funds Direct** restricts access to your personal and account information to those employees who need to know that information to provide products or services to you. **Home Funds Direct** maintains electronic and procedural safeguards that comply with federal regulations to guard your nonpublic information.

We may disclose all of the information we collect, as described above, to companies that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements.

**Home Funds Direct** sells its mortgage loans into securitizations from time to time and, as permitted by law, disclosure of nonpublic information could result from such activity.

**Home Funds Direct** does not disclose nonpublic information about former customers or customers with inactive accounts, except in accordance with this privacy policy.

| | | | |
|---|---|---|---|
| Borrower<br>**CHERYL HALL** | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

# LENDERS' INSTRUCTIONS

**CLOSING PACKAGE REQUIREMENTS**

1. HUD 1 & Addendum showing both buyer and seller sides and including addresses of all parties to the escrow - 3 certified copies.
2. Policy of title insurance - see Requirements.
3. Policy(s) of hazard insurance.
4. Copy of Conveyance Instrument(s) and Excise Affidavits.
5. Copy of your Closing Order to title company.
6. Copy of your Escrow Instructions - signed.

**HUD-1 REQUIREMENTS**

Comply with all provisions of RESPA, as amended, in preparing this form.
Must be typed.

**DOCUMENT REQUIREMENTS**

1. Be certain that all papers which were not dated when received are dated by the person(s) who are to sign them.
2. Be certain that if we send one or more copies of a document, that EACH is returned with original signature(s).
3. INTERIM INTEREST - It is REQUIRED that the HUD-1 be amended (if necessary) to show the correct date and amount, and it is also REQUIRED that all totals on the HUD-1 be amended to reflect the correct amount. DO NOT SIMPLY CROSS OUT THE AMOUNT AND WRITE A NEW ONE ABOVE IT!
4. DO NOT SHOW ANY CREDITS FROM SELLER TO BUYER WITHOUT CONSULTING OUR OFFICE.
5. Make NO changes on the papers without our permission. Call for instructions.
6. If we give permission to make changes on the papers, all changes MUST be initialed by ALL SIGNATORIES to the documents.
7. Do not use Power of Attorney unless prior approved by us.
8. If we allow the use of a Power of Attorney, the person using that authority must sign as, for example, "Jane Doe by John Doe, her attorney-in-fact."
9. If notice of Right to Rescind is enclosed, have it signed and dated, concurrently with the Note, by all borrowers.
10. We assume no liability as to the identity of any person executing or acknowledging any instruments or documents delivered to you in connection with this transaction.
11. ALL DOCUMENTS MUST BE SIGNED EXACTLY AS TYPED NAMES APPEAR.

**HAZARD INSURANCE**

A Hazard Insurance binder must be furnished at the time of closing in an amount not less than the loan amount, or replacement cost of the structure, whichever is less.  (Combined Loan Amount)

1. The policy must meet the following requirements:
   a. Original policy or facsimile signed by an authorized agent.
   b. Minimum one year term with coverage equal at least to full replacement cost of the improvements, or loan amount, whichever is less. (Minimum remaining term of 6 months for Purchase or Refinance is acceptable.)
   c. Full, correct borrower(s) names.
   d. Full, correct property address.
   e. Premium amount must be indicated on the policy.
   f. Agent name and address.
   g. Our loan number MUST be indicated on the policy.
   h. Paid receipt for first year premium attached or shown on HUD-1 as paid in closing.
   i. Earthquake Insurance (if required) use same, identifying criteria as for Flood Insurance.
   j. Insurer must have rating in Best's Insurance Guide of at least Class VI.
   k. FLOOD INSURANCE (if required): Standard policy issued by member of National Flood Insurers Association for not less than our loan amount or the maximum amount available under National Flood Insurance program, whichever is less. The name(s) of the buyer(s), legal description, street address, city, state, county and zip code of security property on these policies must be identical to those of the loan instruments.
   l. On condominiums, we must have an individual endorsement meeting the criteria above.
   m. Loss Payable Clause to: Home Funds Direct
      A Division of Accredited Home Lenders, Inc.
      A California Corporation,
      It's successors and/or assigns
      P.O. Box 10436
      Van Nuys, CA 91410-0436

**CLOSER REQUIREMENTS**

**For all Dry-Funding States and Refinances in Wet-Funding States:**
ALL DOCUMENTS MUST BE IN OUR OFFICE <u>TWO (2) BUSINESS DAYS</u> PRIOR TO DISBURSEMENT OF LOAN FUNDS
LENDER REQUIRES CONFIRMATION OF DISBURSEMENT OF FUNDS WITHIN <u>48 HOURS</u> OF FUNDING.
DO NOT MAKE ANY CHANGES TO LOAN DOCUMENTS WITHOUT PRIOR LENDER AUTHORIZATION.
ALL FEES SHOWN ON THE HUD - 1  MUST MATCH EXACTLY THE FEES LISTED IN OUR CLOSING INSTRUCTIONS i. e. : <u>FEE ITEMS</u> - HUD DESCRIPTION AND DOLLAR AMOUNTS.
ALL PAYOFF CHECKS MUST BE SENT DIRECTLY TO THE CREDITOR.  DO NOT GIVE ANY CHECKS TO THE BORROWER.

**LENDERS' INSTRUCTIONS**



Return To:
Home Funds Direct
Attn: Post Closing Dept.
16550 West Bernardo Dr. Bldg 1
San Diego, CA 92127-1870

———————————————————[Space Above This Line For Recording Data]————————————————————

# MORTGAGE

MIN 100176105031729174

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **March 25, 2005**                    , together with all Riders to this document.
**(B) "Borrower"** is **CHERYL HALL**

.

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

100176105031729                           0503172917

**ALABAMA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**          Form 3001 1/01

-6A(AL) (0005).03
Page 1 of 15                    Initials:_____

VMP MORTGAGE FORMS - (800)521-7291

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
CHERYL HALL                     -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                      -Borrower

*[Sign Original Only]*

MIN# 100176108031729174                         0503172917

 -5N (0207).01                Page 3 of 3               Form 3200 1/01

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **10**                  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be                  **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees. Reasonable attorneys' fees shall not exceed 15% of the unpaid debt after default and referral of this Note to an attorney who is not a salaried employee of the Note Holder.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

MIN# **10017610503172** 9174                                                      0503172917

Form 3200 1/01

VMP®-5N (0207).01                                    Page 2 of 3                                    Initials: _____

# NOTE

March 25, 2005                    DOTHAN                            AL
        [Date]                      [City]                         [State]

105 TV ROAD
DOTHAN, AL 36301
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 56,000.00        (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is **Home Funds Direct**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of            **7.299** %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st**        day of each month beginning on **May 1, 2005**          . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **April 1, 2035**        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at              **P.O. Box 502480 San Diego, CA  92150-2480**
                                        or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ **383.89**          .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP-5N (0207).01        **Form 3200 1/01**
VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3                        Initials: _____

# CLOSING AGENT RIDER NOTICE

## <u>ATTENTION CLOSING AGENT:</u>

## PLEASE

## DO NOT SEPARATE ANY RIDERS

## THAT ARE ATTACHED TO THIS NOTE

## THANK YOU.

MIN # 100176105031729174                    HALL                         Loan #  0503172917
AHL 610086.UFF                              Page 1 of 1

# ADDENDUM TO LENDERS INSTRUCTIONS

BORROWER'S **CHERYL HALL**

LOAN # **0503172917**                                    ESCROW # **05-2813**

**ATTENTION CLOSING AGENTS: BY DISBURSING THIS LOAN YOU ARE GUARANTEEING DELIVERY OF THE FINAL HUD-1 WITHIN 24 HOURS OF CLOSING TO Home Funds Direct. PLEASE REMEMBER TO INCLUDE THE ACTUAL "DISBURSEMENT DATE" ON THE HUD-1 AND FAX TO THE ASSIGNED FUNDER INDICATED ON THE LENDER'S INSTRUCTIONS.**

## ** WE MUST HAVE THESE ITEMS IN AND APPROVED BEFORE FUNDING **

1. __X__ **Home Funds Direct**
   IN **1st**      LIEN POSITION AT TIME OF FUNDS.

2. __X__ INSURED CLOSING PROTECTION LETTER FROM TITLE AGENT OR COPY OF ERRORS AND OMISSION POLICY FROM CLOSING AGENT.

3. _____ COPY OF SURVEY OF PROPERTY OR NON-IMPROVEMENT AFFIDAVIT.

4. __X__ CERTIFIED COPY OF ESTIMATED AND/OR FINAL HUD-1.

5. _____ CERTIFIED COPY OF ESCROW INSTRUCTIONS WITH CORRECT RATE, TERMS & LENDER SIGNED BY ALL PARTIES.

6. __X__ COPY OF ALL BORROWER(S) PHOTO ID.

7. __X__ COMPLETED CORRECT TYPED 1003 SIGNED BY BORROWER(S) AND INTERVIEWER.

8. __X__ HAZARD INSURANCE POLICY & FLOOD INSURANCE POLICY (IF REQUIRED) WITH MINIMUM 6 MONTHS REMAINING & COVERAGE OF THE LESSER OF:
   A. THE COMBINED LOAN AMOUNT(S) OR    **$56,000.00**        OR
   B. GUARANTEED REPLACEMENT COST OR    **$0.00**          OR
   C. TOTAL ESTIMATED NEW COST ON APPRAISAL.
   **MORTGAGE / LOSS PAYEE CLAUSE:**
   **Home Funds Direct**
   **A Division of Accredited Home Lenders, Inc.**
   **A California Corporation,**
   **It's successors and/or assigns**
   **P.O. Box 10436**
   **Van Nuys, CA 91410-0436**

9. __X__ TITLE POLICY TO READ AS FOLLOWS:
   **Home Funds Direct**
   **IT'S SUCCESSORS AND/OR ASSIGNS**

10. _____ BORROWER IS IN A SECTION 32 - MUST SIGN SECTION 32 NOTICE AND GO THROUGH 2 DAY RESCISSION PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

11. _____ BORROWER TO PROVIDE ORIGINAL SECTION 32 NOTICE SIGNED AND DATED PRIOR TO SIGNING FINAL LOAN DOCUMENTS.

12. __X__ ALL LOAN DOCUMENTS MUST BE EXECUTED AT ESCROW OR CLOSING AGENT OFFICE.

13. __X__ LENDER DOES NOT ACCEPT LIMITED COVERAGE TITLE POLICIES FOR LOANS GREATER THAN $50,000.00.

14. __X__ COPY OF WIRE INSTRUCTIONS TO BE SUBMITTED WITHIN 24 HOURS OF FUNDING.
    FAX NUMBER **(866) 539-7026**

15. _____ LENDER TO COLLECT AND PAY LIFE INSURANCE PREMIUM AT CLOSE OF ESCROW.

16. __X__ POWER OF ATTORNEY IS PROHIBITED WITHOUT PRIOR AUTHORIZATION FROM LENDER.

17. __X__ PROVIDE THREE CERTIFIED COPIES OF THE MORTGAGE/DEED OF TRUST WITH ALL RIDERS & THE NOTE WITH ALL RIDERS.

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

File No: 05-2813

# AFFIDAVIT AS TO LIENS AND ENCUMBRANCES

On this, before me personally appeared Cheryl Hall, Owner of property and/or General Contractor, to me personally known, who, being duly sworn on (his/their) oath(s), did say that all of the persons, firms and corporations, including the general contractor and all subcontractors who have furnished services, labor or materials according to the plans and specifications, or extra items, used in the constructions or repair of buildings and improvements on the real estate hereinafter described, have been paid in full and that such work has been fully completed and accepted by the owner.

Affiant further says that no proceedings in bankruptcy or receivership have been instituted by or against him/them.

Affiant further says that no claims have been made to affiant by, nor is any suit now pending on behalf of any contractor, subcontractor , laborer or materialism, and further that not chattel mortgages, conditional bills of sale, retention of title agreements, security agreements, financing statements, or personal property leases have been given or are outstanding as to any fixtures, appliances, or equipment which are now installed in or upon said real property, or in the improvements thereon.

Affiant further says that there are no outstanding deeds of trusts, mortgages, judgement liens, mechanic's or materialmen's liens filed of record or unfilled claims or any other liens or encumbrances or any form of taxes, (including, property, real property, county, city, village, township or water/sewer) of any kind expect as follows:

Affiant on behalf of said Owner of Property and/or General Contractor does for a valuable consideration hereby agree and guarantee to hold None (by reason of the fact that it has issued its title insurance policies), harmless against any liens, claims or suit of or by any general contractor, subcontractor, mechanic or materialman,  and against chattel mortgages, conditional bills of sales, retention of title agreements, security agreements, financing statements, or personal property leases in connection with the construction, repair or sale of such building or improvements on said real estate.

The real estate and improvements referred to herein are situated in the County of Houston, State of AL, and are described as follows, to-wit:

105 TV Road, Dothan, AL  36301

_____
Date

_____
Cheryl Hall

_____

_____

STATE OF AL
COUNTY OF Houston

Sworn to and subscribed before me this .

_____
Notary Public

My Commission expires:

Loan No:  0503172917

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

100176105031729    0503172917

Initials: _____

 -6A(AL) (0005).03    Page 6 of 15    Form 3001 1/01

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

(D) "Lender" is **Home Funds Direct**

Lender is a **Corporation**
organized and existing under the laws of **the State of California**
Lender's address is **15090 Avenue of Science**
                        **San Diego, CA 92128**
(E) "Note" means the promissory note signed by Borrower and dated **March 25, 2005**
The Note states that Borrower owes Lender **fifty-six thousand and 00/100**
                                                                                      Dollars
(U.S. $ **56,000.00**          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **April 1, 2035**                         .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.
(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

| County | of | HOUSTON | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**See Legal Description Addendum Page Attached**

Parcel ID Number: **10-09-31-4-003-001.007**                    which currently has the address of
**105 TV ROAD**                                                                                              [Street]
**DOTHAN**                                                          [City] , Alabama **36301**                    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

100176105031729                                                        0503172917

Initials: _____

-6A(AL) (0005).03                    Page 3 of 15                                        Form 3001 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full,  and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

100176105031729

Initials:_____

0503172917

 -6A(AL) (0005).03

Page 8 of 15

Form 3001 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

100176105031729

Initials:_____

0503172917

 -6A(AL) (0005).03                Page 9 of 15                Form 3001 1/01

# RESPA SERVICING DISCLOSURE

0503172917

Lender: **Home Funds Direct**
**15090 Avenue of Science**
**San Diego, CA 92128**

**NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.**

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business requirements.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, *whether or not your loan servicing is transferred.* If you send a "qualified written request" to your servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day in which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates**

1.  The following is the best estimate of what will happen to the servicing of your mortgage loan:

    [x] We may assign, sell or transfer the servicing of your loan while the loan is outstanding.   [x] We are able to service your loan and we  [ ] will      [ ] will not      [x] haven't decided whether to service your loan.

    **OR**

    [ ] We do not service mortgage loans,  [ ] and we have not serviced mortgage loans in the past three years.
    [ ] We presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed about your servicer.

    [ ] We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors. For the program you have applied for, we expect to:
    [ ] sell all of the mortgage servicing      [ ] retain all of the mortgage servicing
    [ ] assign, sell or transfer _____ % of the mortgage servicing

2.  For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of mortgage loans for which we will transfer servicing is between:

    _____ [0 to 25%] or [NONE]   _____ 26 to 50%   _____ 51 to 75%   __X__ [76 to 100%] or [ALL]

    This estimate [x] does  [ ] does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3.  [x] We have previously assigned, sold or transferred the servicing of federally related mortgage loans.

    **OR**

    [ ] This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

    | Year | Percentage of Loans Transferred | (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
    |------|------|------|
    | _____ | _____ % | |
    | _____ | _____ % | |
    | _____ | _____ % | |

This information [x] does  [ ] does not include assignments, sales or transfers to affiliates or subsidiaries.

**March 25, 2005**                              **Home Funds Direct**
_____        _____
Date                                                                    Present Servicer or Lender

**ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT**
**I/We have read this disclosure form and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.**

| | | | |
|---|---|---|---|
| _____ | | _____ | |
| Applicant  **CHERYL HALL** | Date | Applicant | Date |
| | | | |
| _____ | | _____ | |
| Applicant | Date | Applicant | Date |

## DISCLOSURE NOTICES

### GOVERNMENT LOANS ONLY

**L O A N S**

**RIGHT TO FINANCIAL PRIVACY ACT OF 1978** - This is notice to you as required by the Right to Financial Privacy Act of 1978 that the Department of Housing and Urban Development or Department of Veterans Affairs has a right of access to financial records held by a financial institution in connection with the consideration of administration of assistance to you. Financial records involving your transaction will be available to the Department of Housing and Urban Development or Department of Veterans Affairs without further notice or authorization but will not be disclosed or released to another Government agency or Department without your consent except as required or permitted by law.

### EMPLOYMENT CERTIFICATION

**E M P L O Y**

An approval for a loan is based upon employment , income and obligations as shown on the loan application. At closing, the applicant and co-applicant/spouse, if applicable, are required to execute a sworn statement affirming that they are currently working as previously reported, have not received notice of layoff nor have knowledge of pending layoff, and that outstanding obligations are substantially the same as reported on the application. Should a change occur in your employment or financial status prior to loan closing, immediately notify your loan officer, as it will be necessary to obtain approval of any changes.

### ☐ ANTI-COERCION STATEMENT

**I N S U R A N C E**

**S T A T E M E N T**

The lender may not require the applicant to take insurance through any particular insurance agent or company to protect the mortgaged property. The applicant, has the right to have the insurance placed with an insurance agent or company of his choice, provided the company meets the requirements of the lender. The lender has the right to designate reasonable financial requirements as to the company and the adequacy of the coverage.

I have read the foregoing statement , and understand my rights and privileges and those of the lender relative to the placing of such insurance.

I have selected the following agencies to write the insurance covering the property described above:

**EUGENE MCGRIFF-STATE FARM FIRE AND**

| Insurance Company Name | Agent |
|---|---|

**PO BOX 1185, DOTHAN AL, 36302**

| Agent's Address | Agent's Telephone Number |
|---|---|

### ☐ FLOOD INSURANCE NOTIFICATION

Federal regulations require us to inform you that the property used as security for this loan is located in an area identified by the Federal Emergency Management Agency (FEMA) as having special flood hazards and that in the event of damage to the property caused by flooding in a Federally-declared disaster, Federal disaster relief assistance, if authorized, will be available for the property.
At the closing you will be asked to acknowledge your receipt of this information. If you have any questions concerning this notice, kindly contact your loan officer.
IMPORTANT: Please notify your insurance agent that the "loss payable" clause for the mortgagee on both the hazard and flood insurance must read as follows, unless otherwise advised:

# DISCLOSURE NOTICES

| Applicant(s)<br>**CHERYL HALL** | Lender:<br>**Home Funds Direct**<br>**15090 Avenue of Science**<br>**San Diego, CA 92128** |
|---|---|
| | Date:**March 25, 2005** |

Property Address
**105 TV ROAD**
**DOTHAN, AL 36301**

## AFFIDAVIT OF OCCUPANCY

The Applicant(s) hereby certify and acknowledge that, upon taking title to the real property described above, their occupancy status will be as follows:

[X]  Primary Residence - Occupied by Applicant(s) within 60 days of closing.

[ ]  Secondary Residence - To be occupied by Applicant(s) at least 15 days yearly, as second home (vacation. etc.), while maintaining
  principal residence elsewhere. (Please check this box if you plan to establish it as your primary residence at a future date (i.e., retirement)).

[ ]  Investment Property - Not owner occupied. Purchased as an investment to be held or rented.

The Applicant(s) acknowledge it is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning this loan application as applicable under the provisions of Title 18, United States Code, Section 1014.

## FAIR CREDIT REPORTING ACT

An investigation will be made as to the credit standing of all individuals seeking credit in this application. The nature and scope of any investigation will be furnished to you upon written request made within a reasonable period of time. In the event of denied credit due to an unfavorable consumer report, you will be advised of the identity of the Consumer Reporting Agency making such report and of right to request within sixty (60) days the reason for the adverse action, pursuant to provisions of Section 615(b) of the Fair Credit Reporting Act. You have the right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency if an adverse action is taken on your loan application. Under Section 612 of the Fair Credit Reporting Act you have the right to obtain within 60 days of an adverse action a free copy of the report from the consumer reporting agency. You also have the right to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

## EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on a basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act . Income which you receive as alimony, child support or separate maintenance need not be disclosed to this creditor unless you choose to rely on such sources to qualify for the loan. Income from these and other sources, including part-time or temporary employment, will not be discounted by this lender because of your sex or marital status. However, we will consider very carefully the stability and probable continuity of any income you disclose to us. The Federal Agency that administers compliance with this law concerning this creditor is:
**FEDERAL TRADE COMMISSION, EQUAL CREDIT OPPORTUNITY**
**ROOM 4037**
**WASHINGTON, D.C. 20580**

## DISCLOSURE NOTICES

I/We hereby certify that I/we have read the Notices set forth above and fully understand all of the above. In addition to these Notices, I/we the applicant(s) certify that I/we have received the "Settlement Cost Booklet" and the "Consumer Handbook on Adjustable Rate Mortgages" (CHARM booklet), if applicable.

N
O
T
I
F
I
C
A
T
I
O
N

Borrower                                    Date    Borrower                                    Date
**CHERYL HALL**

Borrower                                    Date    Borrower                                    Date

Borrower                                    Date    Borrower                                    Date

Borrower                                    Date    Borrower                                    Date

MIN # 100176105031729174          HALL          Loan #    0503172917
AHL DISCNTC3.UFF                  Page 3 of 3              Rev. 05/04

# ALABAMA
## Choice of Insurance Notice

| Loan Number<br>0503172917 | Date<br>March 25, 2005 |
|---|---|

Borrower
**CHERYL HALL**

| Property Address<br>105 TV ROAD<br>DOTHAN, AL 36301 | Lender<br>**Home Funds Direct**<br>**15090 Avenue of Science**<br>**San Diego, CA 92128** |
|---|---|

The AL Code Section 5-19-20(e) requires that you receive written notification of your right to select insurance of your choice, when hazard insurance is required by the lender as a condition of the loan.

**Home Funds Direct**
shall not require that you, upon financing the purchase of real property or lending money on the security of real property, as a condition precedent, concurrent or subsequent to financing the purchase of such property or renewal or extension to lending money upon the security of a mortgage thereon, negotiate any policy of insurance or renewal thereof through a particular insurer, agent, solicitor or broker.

The lender reserves the right to approve or disapprove an insurer selected based on reasonable standards, such as financial soundness, services of insurer and required coverage.

Your acknowledgment below signifies that written notice was provided to you pursuant to the state statute.

_____          _____

**CHERYL HALL**

_____          _____

_____          _____

_____          _____

Form W-9 (Rev. 1-2003)

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a **nonresident alien or a foreign entity** not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 30% of such payments (29% **after** December 31, 2003; 28% **after** December 31, 2005). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will **not** be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate **Instructions for the Requester of Form W-9.**

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your social security card. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your **individual** name as shown on your social security card on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, **enter the owner's name on the "Name" line.** Enter the LLC's name on the "Business name" line.

**Other entities.** Enter your business name as shown on required Federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note:** *You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).*

### Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note:** *If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.*

**Exempt payees.** Backup withholding is **not** required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2);

2. The United States or any of its agencies or instrumentalities;

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities;

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities; or

5. An international organization or any of its agencies or instrumentalities.

Other payees that **may be exempt** from backup withholding include:

6. A corporation;

7. A foreign central bank of issue;

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States;

10017610503172917 4

0503172917

 **9030** (0306).01

Page 2 of 4

## GENERAL AUTHORIZATION AND BORROWER'S CERTIFICATION

| Borrower Name(s):<br>**CHERYL HALL** | Lender:<br><br>**Home Funds Direct<br>15090 Avenue of Science<br>San Diego, CA 92128** |
|---|---|
| Property Address:<br>**105 TV ROAD<br>DOTHAN, AL 36301** | Date:<br>**March 25, 2005** |

### CERTIFICATION

The Undersigned certify the following:

1. I/We have applied for a mortgage loan from Lender. In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information.

2. I/We understand and agree that in the event the loan is processed under a reduced documentation program, Lender reserves the right to change the mortgage loan review process to a full documentation program. This may include verifying the information provided on the application with the employer and/or the financial institution.

3. I/We fully understand that it is a Federal crime punishable by fine, or imprisonment, or both to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

### AUTHORIZATION TO RELEASE INFORMATION

To Whom It May Concern:

1. I/We have applied for a mortgage loan from Lender. As part of the application process, Lender may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2. I/We authorize you to provide to Lender, and to any investor to whom Lender may sell my mortgage, any and all information and documentation that they request. Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; and copies of income tax returns.

3. Lender or any investor that purchases the mortgage may address this authorization to any party named in the loan application.

4. A copy of this authorization may be accepted as an original.

5. Your prompt reply to Lender or the investor that purchased the mortgage is appreciated.

Privacy Act Notice: This information is to be used by the agency collecting it in determining whether you qualify as a prospective mortgagor under the program. It will not be disclosed outside the agency without your consent as required and permitted by law, you do not have to give us this information, but if you do not your approval as a prospective mortgagor may be delayed or rejected. The information requested in this form is authorized by Title 38, U.S.C. Chapter 37 (if VA); By 12 U.S.C., Section 1701 et., seq. if (HUD/FHA); and Title 42

| Borrower<br>**CHERYL HALL** | Date | Borrower | Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

## HAZARD INSURANCE AUTHORIZATION & REQUIREMENTS

Lender: **Home Funds Direct**

Date: **March 25, 2005**
Loan Number: **0503172917**
Escrow Company: SWAFFORD & HAYES SETTLEMENT SERVICES INC     Escrow Number: **05-2813**
9041 EXECUTIVE PARK DRIVE, KNOXVILLE, TN, 37923

Borrower Name(s): CHERYL HALL

Property Address: 105 TV ROAD
DOTHAN, AL 36301

**AN ACCEPTABLE HAZARD INSURANCE POLICY, WITH ENDORSEMENTS AND/OR ASSIGNMENTS, MUST BE IN LENDER'S OFFICE BEFORE THIS LOAN CAN BE FUNDED; OTHERWISE, LENDER MAY BE FORCED TO PLACE INTERIM COVERAGE ON THE PROPERTY AT AN ADDITIONAL COST TO THE BORROWER(S).**

Your Lender may require that you or your Insurance Agency provide the "ORIGINAL POLICY", but generally, a "Binder" or a "Certificate of Evidence of Insurance" is acceptable. Ask your Lender which they will accept.  Please forward all policies, assignments and/or endorsements to Lender at the above address, "ATTENTION: LOAN PROCESSING."

Listed below are your Lender's policies and procedures, and minimum requirements, for Hazard Insurance coverage.

1.   The amount of coverage provided by the policy must be no less than the lesser of: 1) the replacement value of the improvements on the above referenced property as established by the insurance company providing coverage, or 2) an amount equal to the sum of this loan amount plus the balances of all other existing liens.
2.   The insurance company providing coverage must have a "B+" rating or better in the latest edition of "Best's Insurance Guide",  must be licensed to do business in the state in which property is located, and must be licensed to transact the lines of insurance  required.
3.   The Policy must provide at least "Broad Form" coverage on properties of one to four units, and at least "Vandalism & Malicious Mischief" on properties with over four units, WITH NO DEVIATION.  Home owners policies must provide coverage equal to "HO3" form.
4.   Deductibles may not be greater than the lesser of 1) $1,000.00 or 2) one percent (1.0%) of the coverage amounts determined using the guidelines in Requirement #1 above (This limit applies for loans secured by residential properties of 1 to 4 units which may be sold to or originated for either.  Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, FHA or VA).  Your Lender's deductible requirements may be more stringent; if so, you will be notified of your Lender's requirements prior to funding.
5.   The Policy must provide coverage for a term of at least one year.  Premiums may be paid on an annual installment basis only if the policy provides that the Lender will be notified in writing of cancellation 30 days prior to expiration of coverage, for any cause.
6.   If a policy of coverage is already "in force" (typical in refinance transactions) which expires within six months from the date of the recording of this loan, Lender may require renewal of said policy for a term as required in #5 above.
7.   All forms and endorsements pertaining to the Lender's requirements must appear on the "Declaration Page" of policy.
8.   For loans which have Hazard Insurance premiums impounded by the Lender, when notifying Lender of any new policy or changes of Insurance Carrier, said notification must be accompanied by a signed "Broker of Record Authorization".
9.   Verification of renewal of insurance policies must be in lender's office at least thirty days prior to the expiration date of the
policy.  If this requirement is not met, LENDER OR ITS SUCCESSORS AND/OR ASSIGNS MAY AT THEIR OPTION, BUT WITHOUT THE OBLIGATION TO DO SO, PROVIDE COVERAGE TO REPLACE ANY EXPIRING POLICIES WHICH HAVE NOT BEEN PROPERTY RENEWED.  Premiums for such coverage shall be remitted promptly by the undersigned, or Lender may charge borrower's account for the cost thereof.
10.  Lender's Loss Payable Endorsement 438 BFU for the 1st     Trust Deed to be affixed to policy in favor of:   Home Funds Direct
A Division of Accredited Home Lenders, Inc.
A California Corporation,
It's successors and/or assigns
P.O. Box 10436
Van Nuys, CA 91410-0436

RE: LOAN NO: 0503172917
11.  The property address and the insured's names must be designated on the policy exactly as on the ALTA Title Policy.
12.  The Lender's loan number must appear on the policy and on any subsequent endorsements.
13.  The effective date of new policies, endorsements, and/or assignments shall be as of, or prior to, the date of recording of this loan.
14.  Please notify your agent to forward future premium notices directly to you.
15.  If the security property is a condominium, the Master Policy must contain a minimum of $1,000,000.00 coverage for "Directors & Officers" liability.  A copy of the Master Policy, or a certificate showing proof of coverage for both the Homeowners Association and the Condominium unit owner, must be submitted to the Lender prior to funding.

**BY SIGNING BELOW**, each of the undersigned acknowledges that he or she has read, understands and accepts the foregoing provisions and insurance requirements.  This authorization shall remain irrevocable for the undersigned as owner(s) of the property, and for any assignee(s), for as long as this loan remains on the subject property.

_____          _____
Borrower CHERYL HALL                          Borrower

_____          _____
Borrower                                      Borrower

_____          _____
Borrower                                      Borrower

_____          _____
Borrower                                      Borrower

610030.UFF

| Form **W-9**<br>(Rev. January 2003)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | **Give form to the requester.<br>Do not send to the IRS.** |
|---|---|---|

**Print or type<br>See Specific Instructions on page 2.**

Name
CHERYL HALL

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor ☐ Corporation ☐ Partnership ☐ Other ▶ _____ ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
105 TV ROAD, ,

City, state, and ZIP code
DOTHAN, AL 36301

Requester's name and address (optional)
Home Funds Direct
15090 Avenue of Science
San Diego, CA 92128

List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Social security number
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

or

Employer identification number

**Note:** *If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**

2. I am not subject to backup withholding because: **(a)** I am exempt from backup withholding, or **(b)** I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or **(c)** the IRS has notified me that I am no longer subject to backup withholding, **and**

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

| **Sign<br>Here** | Signature of<br>U.S. person ▶ | Date ▶ 03/25/05 |
|---|---|---|

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**Note:** *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**Foreign person.** If you are a foreign person, use the appropriate Form W-8 (see **Pub. 515,** Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

100176105031729174                                                 0503172917

VMP-9030 (0306).01      Form **W-9**    (Rev. 1-2003)
VMP Mortgage Solutions (800)521-7291

Page 1 of 4

Form W-9 (Rev. 1-2003)

**9.** A futures commission merchant registered with the Commodity Futures Trading Commission;

**10.** A real estate investment trust;

**11.** An entity registered at all times during the tax year under the Investment Company Act of 1940;

**12.** A common trust fund operated by a bank under section 584(a);

**13.** A financial institution;

**14.** A middleman known in the investment community as a nominee or custodian; or

**15.** A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through **15.**

| If the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt recipients except for **9** |
| Broker transactions | Exempt recipients **1 through 13.** Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients **1 through 5** |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt recipients **1 through 7** [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a Federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a **resident alien** and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see **How to get a TIN** below.

If you are a **sole proprietor** and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see **Limited liability company (LLC)** on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

**Note:** *See the chart on page 4 for further clarification of name and TIN combinations.*

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get **Form SS-5,** Application for a Social Security Card, from your local Social Security Administration office or get this form on-line at **www.ssa.gov/online/ss5.html.** You may also get this form by calling 1-800-772-1213. Use **Form W-7,** Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or **Form SS-4,** Application for Employer Identification Number, to apply for an EIN. You can get Forms W-7 and SS-4 from the IRS by calling 1-800-TAX-FORM (1-800-829-3676) or from the IRS Web Site at **www.irs.gov.**

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** *Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.*

**Caution:** *A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

100176105031729174                                      0503172917

VMP-9030 (0306).01                    Page 3 of 4

Form W-9 (Rev. 1-2003)

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 3, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see **Exempt from backup withholding** on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA or Archer MSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The Individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] **You must show your individual name,** but you may also enter your business or "DBA" name. You may use either your SSN or EIN (if you have one).

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

**Note:** *If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.*

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA or Archer MSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, and the District of Columbia to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, or to Federal and state agencies to enforce Federal nontax criminal laws and to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 30% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

100176105031729174                                                              0503172917

-9030 (0306).01                          Page 4 of 4

# NOTICE OF RIGHT TO CANCEL

Loan No:  0503172917                                    Date: March 25, 2005
Borrower: CHERYL HALL


Property Address: **105 TV ROAD**
                  **DOTHAN, AL 36301**

---

YOUR RIGHT TO CANCEL:
You are entering into transaction that will result in a mortgage, lien, or security
interest on/in your home.  You have a legal right under federal law to cancel this
transaction, without cost, within three business days from whichever of the following
events occurs last:

1.  the date of the transaction, which is          **March 25, 2005**          ; or
2.  the date you received your Truth-in-Lending disclosures; or
3.  the date you received this notice of your right to cancel.


If you cancel the transaction, the mortgage, lien, or security interest is also
cancelled.  Within 20 calendar days after we receive your notice, we must take the
steps necessary to reflect the fact that the mortgage, lien, or security interest
on/in your home has been cancelled, and we must return to you any money or property
you have given to us or to anyone else in connection with this transaction.

You may keep any money  or property we have given you until we have done the things
mentioned above, but you must then offer to return the money or the property.  If it
is impractical or unfair for you to return the property, you must offer its reasonable
value.  You may offer to return the property at your home or at the location of the
property.  Money must be returned to the address below.  If we do not take possession
of the money or property within 20 calendar days of your offer, you may keep it
without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing at:

Name of Creditor: **Home Funds Direct**
                  **1130 Northchase Parkway, Suite 200**
                  **Marietta, GA 30067-6420**



You may use any written statement that is signed and dated by you and states your
intention to cancel, or you may use this notice by dating and signing below.  Keep one
copy of this notice because it contains important information about your rights.

If you cancel by mail or by telegram, you must send the notice no later than midnight
of   **March 29, 2005**
                    (or midnight of the third business day following the latest of the
three events listed above.)  If you send or deliver your written notice to cancel some
other way, it must be delivered to the above address no later than that time.


**I WISH TO CANCEL**

_____     3-25-05_____
Consumer's Signature              Date
CHERYL HALL

---

I THE UNDERSIGNED HEREBY ACKNOWLEDGE, THAT, ON THE DATE SET FORTH BELOW, I RECEIVED TWO
(2) COPIES (IN ADDITION TO THIS COPY) OF THIS NOTICE OF RIGHT TO CANCEL, ADVISING ME OF
MY RIGHT TO CANCEL THE TRANSACTION TO WHICH THIS NOTICE RELATES AND ONE COPY OF THE
FEDERAL TRUTH IN LENDING DISCLOSURE STATEMENT.

Each borrower/owner in this transaction has the right to cancel.  The exercise of this
right by one borrower/owner shall be effective to all borrowers/owners.


_____     _____
Consumer's Signature              Date
CHERYL HALL

610005.uff

cheryl frazier.txt

1

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
2                      SOUTHERN DIVISION

3      * * * * * * * * * * * * * *

4      CHERYL HALL FRAZIER,
       individually and on behalf of a
5      class of similarly situated
       persons,
6                                        CIVIL ACTION NO.:
            Plaintiff,
7                                        1:08-CV-11-MHT
       VS.
8                                        JURY TRIAL DEMANDED
       ACCREDITED HOME LENDERS, INC.,
9      d/b/a HOME FUNDS DIRECT,
                                         CLASS ACTION
10
            Defendant.
11
       * * * * * * * * * * * * * * *
12

13

14              The deposition of CHERYL HALL FRAZIER,

15              taken at the law offices of Earl P.

16              Underwood, Jr., 21 South Section Street,

17              Fairhope, Alabama, on June 9, 2008,

18              commencing at approximately 1:05 p.m.

19

20

21

22

23
```

2

```
1                    A P P E A R A N C E S

2      FOR THE PLAINTIFF:
                    JAMES D. PATTERSON, ESQUIRE
3                   EARL P. UNDERWOOD, JR. LAW FIRM
                    ATTORNEYS AT LAW
```
                    Page 1

```
                        cheryl frazier.txt
4               21 SOUTH SECTION STREET
                FAIRHOPE, ALABAMA 36532
5               251-990-5558

6

7       FOR THE DEFENDANT:
                ROBERT E. POUNDSTONE, IV, ESQUIRE
8               BRADLEY, ARANT, ROSE & WHITE, LLP
                ATTORNEYS AT LAW
9               ALABAMA CENTER FOR COMMERCE
                401 ADAMS AVENUE, SUITE 780
10              MONTGOMERY, ALABAMA 36104
                334-956-7700

11

12
        COURT REPORTER:
13              KAREN T. McDONALD, CCR

14

15

16

17

18

19

20

21

22

23
```

3

```
1                   I N D E X

2       EXAMINATION

3       By Mr. Poundstone - page 6

4

5

6

7

8               INDEX OF EXHIBITS
```

Page 2

cherylfrazier.txt

9    Defendant's Exhibit Number 1 - page 36
        Lenders Instructions
10
     Defendant's Exhibit Number 2 - page 37
11      Addendum to Lenders Instructions

12   Defendant's Exhibit Number 3 - page 38
        NOTE, dated March 25, 2005
13
     Defendant's Exhibit Number 4 - page 39
14      MORTGAGE

15   Defendant's Exhibit Number 5 - page 40
        SETTLEMENT STATEMENT
16
     Defendant's Exhibit Number 6 - page 47
17      FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

18   Defendant's Exhibit Number 7 - page 49
        NOTICE OF RIGHT TO CANCEL
19
     Defendant's Exhibit Number 8 - page 50
20      HIGH COST LOAN SUMMARY

21   Defendant's Exhibit Number 9 - page 52
        DISBURSEMENT SHEET
22

23

4

1            S T I P U L A T I O N

2            It is stipulated and agreed by and

3    between the parties hereto, through their

4    respective counsel, that the deposition of

5    CHERYL HALL FRAZIER may be taken before Karen

6    T. McDonald, Notary Public for the State at Large,

7    at the law offices of Earl P. Underwood, Jr., 21

8    South Section Street, Fairhope, Alabama, on June 9,

9    2008.

10           It is further stipulated and agreed that

11   this deposition is taken pursuant to the Federal

12   Rules of Civil Procedure.  The provisions of Rule

13   32(d)(3) dealing with waiver of errors and

                    Page 3

cherylfrazier.txt

14    irregularities as to the taking of the deposition

15    apply fully to this deposition.

16         Notice of the deposition and any errors

17    or irregularities therein [Rule 32(d)(1)] and any

18    objections to the qualifications of the officer

19    before whom this deposition is taken [Rule 32(d)

20    (2)] are waived.

21         The submission of the deposition to the

22    witness for reading to or by her and the signing of

23    the deposition by her [Rule 30(e)] is waived.

5

1         Filing of the original of the transcript

2    of this deposition [Rule 30(f)(1)] is waived.

3         Any other technicality or defect in the

4    taking of this deposition not otherwise covered by

5    the terms of this stipulation is waived.

6

7              * * * * * * * *

8

9

10

11         I, Karen T. McDonald, Commissioner and

12    Court Reporter, certify that on this date, as

13    provided by the Federal Rules of Civil Procedure

14    and the foregoing stipulation of counsel, there

15    came before me at the law offices of Earl P.

16    Underwood, Jr., 21 South Section Street,

17    Fairhope, Alabama, on June 9, 2008,

18    commencing at approximately 1:05 p.m.

cheryl frazier.txt

19    CHERYL HALL FRAZIER, witness in the above cause,

20    for oral examination, whereupon the following

21    proceedings were had:

22

23

                                                              6

1                    CHERYL HALL FRAZIER

2                    was sworn and testified as follows:

3         THE WITNESS:  I do.

4                         EXAMINATION

5    BY MR. POUNDSTONE:

6         Q    Would you state your full name for the

7    record, please?

8         A    My name is Cheryl Hall Frazier.

9         Q    Mrs. Frazier, what's your date of birth?

10        A    7/5/59.

11        Q    What is your current address?

12        A    105 TV Road, Dothan, Alabama.  The zip

13   code is 36301.

14        Q    Okay.  Is that the residence that is the

15   subject of the mortgage --

16        A    Yes, sir.

17        Q    -- that is the subject of this lawsuit?

18        A    Yes, sir.

19        Q    Have you ever had your deposition taken

20   before?

21        A    No.

22        Q    I'll just give you a few ground rules

23   that will help us move through this process today.

cheryl frazier.txt

7

1          As you see, there's a court reporter here
2    taking your testimony.
3          A    Yes.
4          Q    She has a hard time dealing with nods of
5    the head yes and no or uh-huhs and huh-uhs --
6          A    Right.
7          Q    -- and also us talking at the same time.
8    I have to work on things, but if you could, try to
9    remember to answer your questions in words rather
10   than in gestures or nods of the head.  And also try
11   to remember to wait until I get through asking a
12   question before you provide me with an answer.
13         A    Understood.
14         Q    Is there any reason sitting here today
15   that you can't understand my questions and answer
16   them truthfully?
17         A    No.
18         Q    You're not on any kind of medication that
19   would affect your ability to understand my
20   questions?
21         A    No.
22         Q    Would you agree for me today to only
23   answer questions that you understand?

8

1          A    Yes.
2          Q    If you don't understand a question, would

cherylfrazier.txt

3      you agree to ask me to repeat it so that you do

4      understand it?

5          A     Yes.

6          Q     Okay.  Would you tell me a little bit

7      about your educational history?

8          A     I'm a high school graduate.

9          Q     Where did you go to high school?

10         A     Barringer High School in Newark,

11     New Jersey.

12         Q     What town is that?

13         A     Newark.

14         Q     Newark?

15         A     Uh-huh (positive response).

16         Q     Did you have any post-high school

17     education?

18         A     No.

19         Q     Now, how did you get in Dothan?

20         A     My husband was dying of cancer.  He was

21     an only child and he wanted to be put to rest in

22     Dothan.  We decided to come here; that's what made

23     us move here.

9

1          Q     Okay.  Your deceased husband was from

2      Dothan?

3          A     Right.

4          Q     Do you have any blood relatives in

5      Dothan?

6          A     Yes.

7          Q     What blood relatives do you have in

cheryl frazier.txt

8  Dothan?

9      A    My three children.

10     Q    What are their names?

11     A    Her first name is Kevina, K-E-V-I-N-A,

12  her brother, Kevin, and my baby son is Michael.

13     Q    Are those your only blood relatives in

14  Dothan?

15     A    I have two nephews also that are there.

16     Q    What are their names?

17     A    Steven and Douglas.

18     Q    What is Steven and Douglas's last name?

19     A    Hall.

20     Q    Hall.  How about your children's last

21  name?

22     A    Dixon, D-I-X-O-N.

23     Q    Was your late husband's last name Dixon?

10

1      A    His last name was Jones.  My three

2  children are from my first marriage.

3      Q    Okay.  Any other blood relatives that you

4  have in Dothan?

5      A    No.

6      Q    How about anywhere else in Alabama?

7      A    No.

8      Q    How many times have you been married?

9      A    Three.

10     Q    Okay.  Are you currently married?

11     A    Yes.

12     Q    What's your husband's name?

Page 8

cheryl frazier.txt

```
13      A    Vincent Frazier.

14      Q    How long have you been married to

15  Mr. Frazier?

16      A    Five years.

17      Q    Were you married to Mr. Frazier at the

18  time you took out the loan at issue?

19      A    No.

20      Q    What does Mr. Frazier do for a living?

21      A    He's a counselor at a behavioral center.

22      Q    What's the name of the behavioral center?

23      A    Laurel Oaks.
```

                                                        11

```
 1      Q    Is that in Dothan?

 2      A    Yes.  I just want to correct myself on

 3  one of the questions.

 4      Q    Sure.

 5      A    That loan was taken out in 2005, so I was

 6  married at that time.

 7      Q    You were married?

 8      A    Yes.

 9      Q    Okay.

10      A    But I purchased the house before marrying

11  him.

12      Q    Is your husband a co-owner of the home

13  today?

14      A    No.

15      Q    Are you employed?

16      A    No, I'm disabled.

17      Q    How long has it been since you worked?
```

cheryl frazier.txt

18      A     1997.

19      Q     What did you do prior to 1997?

20      A     I was working at a company called General

21  Cigar, and I was a machine operator there.

22      Q     Where was that located?

23      A     It's in Dothan.

                                                         12

1       Q     Okay.  What do they do?

2       A     Actually they're a company that makes

3   cigars, Phillies Blunt cigars, all types of cigars.

4       Q     How long did you work there?

5       A     Two years before becoming disabled.

6       Q     So in '95 or so is when you started

7   working there?

8       A     Yes.

9       Q     Where did you work before that?

10      A     Before that I was a housewife.

11      Q     I'm sorry, you may have already said

12  this. What year did you move to Dothan?

13      A     I moved to Dothan in '95.

14      Q     Have you ever been convicted of a crime?

15      A     No.

16      Q     Any arrests?

17      A     No.   Maybe a speeding ticket or something

18  like that.

19      Q     Okay.  Have you ever been involved in any

20  other lawsuits?

21      A     No.

22      Q     Just so we're clear, you've never sued

cheryl frazier.txt

23    anyone else before?

                                                                    13


1       A    Let me go back.  I had a lawsuit
2    against the highrise where I stayed at in East
3    Newark, New Jersey.  Someone had left something on
4    the steps and I had just had my son, Michael, and I
5    slipped down the stairs.
6       Q    Okay.
7       A    So I do remember that, but it was many
8    years ago.
9       Q    Any other lawsuits that you've brought?
10      A    No.
11      Q    Have you ever been sued before?
12      A    No.
13      Q    My understanding is you filed for
14   bankruptcy, though; right?
15      A    Yes.
16      Q    When did you file for bankruptcy?
17      A    2007.
18      Q    Do you know what chapter it was?
19      A    13.
20      Q    What is the status of that bankruptcy?
21      A    It's dismissed.
22      Q    Tell me how you came to take out a loan
23   with Accredited Home Lenders.  Home Funds Direct

                                                                    14


                            Page 11

cheryl frazier.txt

1  may be the phrase you know them as.

2      A    Okay.  Well, my house was bought in cash.

3  My son bought the house for me as a gift.  And I

4  decided to do some things to help out my niece; she

5  has Down Syndrome.

6           My sister passed away of cancer in 2003,

7  so I just wanted to make the house more comfortable

8  and convenient for her condition.  We're both

9  disabled.

10     Q    And you wanted to, I take it, use the funds

11 to make improvements to the home?

12     A    For her, yes.

13     Q    How did you specifically come to take out

14 the loan with Home Funds Direct as opposed to

15 somebody else?

16     A    My son went online for me to seek out

17 someone to do my refinancing and they responded.

18     Q    Do you know what web site it was?

19     A    No, I don't.

20     Q    Okay.  Which son helped you?

21     A    Kevin.

22     Q    Kevin.  Did you ever speak with anyone at

23 Home Funds Direct?

                                                    15

1      A    Yes, I spoke with a gentleman by the name

2  of Chris.  I believe his name was Chris.  He's the

3  one that walked me through this mortgage.

4      Q    You don't remember Chris's last name?

5      A    No.

cheryl frazier.txt

6       Q      What do you remember about your

7   conversation with Chris?

8       A      Well, I was trying to explain to him what

9   I was trying to do, and he was there to help me.

10      Q      Do you remember any specifics of the

11  conversation?

12      A      No, none other than him asking me

13  questions about what type of loan I was looking for

14  and telling me about the type of interest rates he

15  could probably get for me.  And I told him the

16  house was already paid for in full; I wasn't

17  looking to get into any serious debt.

18      Q      How many times did you speak with Chris?

19      A      Probably about four times.

20      Q      Were all those times that you spoke with

21  him prior to closing?

22      A      Yes.

23      Q      Is there anybody else at Home Funds

16

1   Direct that you recall speaking with?

2       A      No, just him, because he was the one that

3   was handing the loan.

4       Q      Do you know specifically who Chris worked

5   for?

6       A      Home Funds.

7       Q      Did he tell you that he was with Home

8   Funds?

9       A      Yes, because every time he called, that's

10  what came up on my I.D. also.

Page 13

cheryl frazier.txt

11      Q      How about the closing company, Swafford

12   and Hays, did you have any communications with

13   anyone from that company?

14      A      Not until my closing.

15      Q      Who did you speak with at Swafford and

16   Hays at your closing?

17      A      I'm not sure of the lady's name; she came

18   up to my home.

19      Q      Do you know if that was actually an

20   employee of Swafford, or could it have been a

21   notary that they obtained?

22      A      She was a notary.

23      Q      Was her name Diane Hilson?

                                                          17

1       A      I'm not sure.

2       Q      Was she only the one that was present for

3    your closing?

4       A      Yes.

5       Q      There wasn't anyone from Home Funds

6    Direct at your closing?

7       A      Nobody else but her.

8       Q      Do you remember the substance of any

9    communications that you had with the notary?

10      A      No, none other than her explaining each

11   section of my closing and me signing.

12      Q      And you said the closing took place at

13   your home?

14      A      Yes.

15      Q      I know you said that the notary and you

                             Page 14

cheryl frazier.txt

16    were the only people present.  Did anybody attend

17    the closing via telephone?

18        A    No.

19        Q    If you would -- and this is kind of in

20    your words kind of thing -- tell me what you

21    remember taking place at the closing.

22        A    Well, she called my home the day before.

23    I also spoke with the gentleman who did my loan,

18

1    and he had informed me what time she was coming

2    over there the next day for my closing.

3        Q    What do you recall happening when she got

4    there?

5        A    Well, when she got there, I made her

6    comfortable because she had a lot of papers and

7    things with her.  We sat down and she started going

8    over my closing.

9        Q    She went over the documents?

10        A    Right.

11        Q    And then had you sign them?

12        A    Right.  She was basically just telling me

13    what each paper was for and then asking for my

14    signature.

15        Q    You said the gentleman on the phone told

16    you what time she was coming or what time the

17    closing would be?

18        A    Well, actually what he did was tell me

19    that he gave her the phone number.  He gave her my

20    phone number and said she would be contacting me

cheryl frazier.txt

21  and letting me know exactly what time she would be

22  available.

23       Q    Okay.  Was that Chris or somebody else?

19

1        A    It was the guy that -- it was Chris, the

2   guy that did the loan.  It was him calling me every

3   time.

4        Q    And Chris said, I've given this lady your

5   phone number; she's going to contact you?

6        A    Right, she's going to come and do the

7   closing.  But he did mention the company, Swafford

8   and Hays, that that's where she would be coming

9   from, through that company.

10       Q    Did you have an opportunity to read the

11  documents that were being presented at the closing?

12       A    Yes.

13       Q    And did you get a copy of the documents

14  at the closing?

15       A    Yes.

16       Q    Do you have any personal knowledge of the

17  instructions that Home Funds Direct provided to

18  Swafford and Hays concerning your loan and its

19  closing?

20       A    Could you repeat that question?

21       Q    Yes.  Do you have any personal knowledge

22  of what closing instructions, if any, Home Funds

23  Direct provided to Swafford and Hays?

20

cherylfrazier.txt

```
 1       A    No.  I'm still not understanding your
 2  question.
 3       Q    Okay.  And all I want to know is do you
 4  have any personal knowledge of any communications
 5  that took place between Home Funds Direct and --
 6       A    And Swafford, no.
 7       Q    -- Swafford as to how they ought to go
 8  about closing the loan?
 9       A    No.  All I know is that he called me and
10  told me it was Swafford and Hays that was going to
11  be doing the settlement.
12       Q    I assume -- and just so we're clear on
13  the record -- you never participated in any
14  discussions between Home Funds Direct and Swafford
15  and Hays?
16       A    No.
17       Q    Are you personally aware of any evidence
18  that would show that Home Funds Direct had
19  knowledge of what you were charged for title
20  insurance?
21       A    Well, I guess they would have had
22  knowledge of what was charged.  She did the closing
23  and all the fees were there.
```

                                                    21

```
 1       Q    Right.  But my question is:  Do you
 2  personally have any evidence that Home Funds Direct
 3  had knowledge of what you were charged for title
 4  insurance?
```
                        Page 17

cheryl frazier.txt

5      A    No.

6      Q    Are you personally aware of any evidence

7   that would show that Home Funds Direct ever

8   received any commission or other funds from the

9   title insurance on the loan?

10     A    No.

11     Q    Do you know what the TILA is?

12     A    That's for home lending.

13     Q    Okay.  Do you understand that TILA is the

14  Truth-in-Lending Act?

15     A    Yes, it's the lending act.  Yes, I do.

16     Q    Okay.  Do you personally know how it is

17  that you're alleging that Home Funds Direct

18  violated TILA?

19     A    Well, they violated TILA by overcharging

20  me some fees.

21     Q    Do you know what fees?

22     A    Well, I'm not quite sure about all of

23  them because there's more than one.


                                                        22


1      Q    Do you know what the HOEPA is?

2      A    No.

3      Q    I assume then that you don't personally

4   know how it is in this lawsuit you're alleging that

5   Home Funds Direct violated HOEPA?

6      A    Well, the only way I -- are you asking me

7   about my lawsuit?

8      Q    Yes.

9      A    Well, it came through Swafford and Hays,

cherylfrazier.txt

10     that's how I found out.

11          Q     Tell me what you mean by it came through

12     Swafford and Hays.

13          A     Well, Swafford and Hays is the one that

14     did the settlement.  That's how I got in touch with

15     my attorney because my name came up.  I sent them

16     the packet of my closing and that's when we came up

17     with I was overcharged.

18          Q     Okay.  You said your name came up.  What

19     do you mean by that?

20          A     On Swafford and Hays, they had something

21     against Swafford and Hays and my name came into

22     play with that.  That's how my attorney got in

23     touch with me.

                                                              23

1          Q     Okay.  Did you get some kind of class

2     action notice or something like that?

3          A     Yes.

4          Q     And just so we're clear, you don't

5     personally know -- just you sitting here today

6     personally know -- how it is you're alleging that

7     Home Funds Direct violated HOEPA?

8          A     No.

9          Q     Are you aware that you're seeking

10     rescission in this lawsuit?

11          A     Yes.

12          Q     Do you know what rescission is?

13          A     Rescinding the loan.

14          Q     In layman's terms, do you understand that

cheryl frazier.txt

15    that means the loan would be undone?

16        A    I understand that.

17        Q    Okay.  And do you understand that the

18    purpose of rescission is to return parties to the

19    status quo?

20        A    Uh-huh (positive response). 4:51 PM 6/19/2008

21              MR. PATTERSON:  Was that a yes?

22              THE WITNESS:  That was a yes, I'm

23        sorry.

                                                    24

1              MR. PATTERSON:  Just so I know.

2         That's fine.

3    BY MR. POUNDSTONE:

4         Q    And you understand that if you do

5    rescission, then the borrower would be responsible

6    for returning the principal and the lender would be

7    responsible for returning any financing fees or

8    anything like that; correct?

9         A    Yes.

10        Q    Now, my understanding is that your loan

11    is paid off; correct?

12        A    Yes.

13        Q    Do you recognize that if you pursue

14    rescission claims on behalf of the class that some

15    of the members of the class will not have paid off

16    their loan?

17        A    Yes.

18        Q    Would you also acknowledge that some of

19    those class members then are going to have to go

cherylfrazier.txt

20    out and find alternative financing if they're

21    required to return the loan proceeds through

22    rescission?

23         A    Yes.

25

1         Q    Would you agree that that might not

2    necessarily be in somebody's best interest?

3              MR. PATTERSON:  I'm going to object

4         to the form of that question.  That's a legal

5         conclusion, but you can go ahead and answer it

6         if you can.

7         A    Oh, yes.

8    BY MR. POUNDSTONE:

9         Q    For instance, someone's credit may have

10   changed and they may no longer be able to get

11   financing?

12        A    Understood.

13        Q    And that's a possibility you would

14   recognize?

15        A    Yes.

16        Q    You mentioned that there was a previous

17   lawsuit against Swafford and Hays.

18        A    Yes.  They had sent me something in the

19   mail about the class action of some years before.

20        Q    Okay.  And this is all I'm going to ask;

21   were you a named plaintiff in the class action

22   against Swafford and Hays, or were you just a

23   member of the class?

cherylfrazier.txt

1      A    Just a member of the class.

2      Q    Tell me what if anything you've done to

3  personally investigate your claims in this lawsuit?

4      A    Well, me investigate, no.  I haven't done

5  anything.  I hired an attorney, and that's what I

6  did.

7      Q    So any investigation that's been done

8  wouldn't have been done by you?

9      A    No.

10      Q    It would have been done by your

11  attorneys?

12      A    Yes, sir.

13      Q    And to follow up on that, what if

14  anything have you personally done to investigate

15  the claims of the class members you seek to

16  represent?

17      A    None.  The attorneys are taking care of

18  that.

19      Q    Okay.  Any investigation into the class

20  members' claims would have been done by the

21  attorneys?

22      A    That's right.

23      Q    Do you recall when you paid off the Home

1  Funds Direct loan?

2      A    I believe it was somewhere in '06, but I

cheryl frazier.txt

3  don't know the exact date.

4      Q    Okay.  Are you aware that there are

5  several attorneys from several different law firms

6  representing you in this case?

7      A    Yes.

8      Q    Have you met all of your attorneys?

9      A    No, sir.

10     Q    Which of your attorneys have you met?

11     A    My attorney to my right and Mr.

12  Underwood.

13     Q    So the only attorneys that you've

14  personally met are the attorneys in Mr. Underwood's

15  office?

16     A    Yes.

17     Q    As a follow-up, have you ever used any of

18  the attorneys representing you for other legal

19  matters?

20     A    Never.

21     Q    Did you have any personal involvement in

22  the decision to bring other plaintiffs' attorneys

23  into this case?

                                                    28

1      A    No.

2      Q    Do you have any knowledge of your

3  attorneys' experience in handling class actions?

4      A    None other than what I've read online.

5      Q    Where have you been to read online?

6      A    I had my niece look it up for me.

7      Q    What's your niece's name?

                    Page 23

cheryl frazier.txt

```
 8        A     Her name is Kim, K-I-M, last name is

 9   Hall.

10        Q     Okay.  Do you know where on the internet

11   Kim went?

12        A     No, I don't.

13        Q     Tell me what she told you she saw on the

14   internet.

15        A     I was asking her to look up Earl

16   Underwood.

17        Q     When did that take place?

18        A     Over two years ago.

19        Q     Do you remember what information she

20   relayed to you?

21        A     She was telling me -- informed me -- what

22   type of an attorney he was.

23        Q     What type of work he did?
```

                                                29

```
 1        A     Right.

 2        Q     How about any of the other attorneys,

 3   have you ever looked into their experience --

 4        A     No.

 5        Q     -- in handling class actions?

 6        A     No, I haven't.

 7        Q     How about any of your attorneys'

 8   experience handling TILA claims, have you looked

 9   into that?

10        A     No, I haven't.

11        Q     Have you looked into that the addition of

12   additional attorneys representing you in this case
```

cheryl frazier.txt

13    might cost more attorneys' fees in this matter?

14         A    Yes.

15         Q    Okay.  Tell me what, if anything, you

16    know about that.

17         A    Well, like I said I have not met the

18    other attorneys and I haven't heard anything from

19    them, so I really don't know.

20         Q    You don't know whether more attorneys

21    being involved --

22         A    Right.

23         Q    -- will lead to more or less attorneys'


                                                      30


1    fees?

2         A    Correct.

3         Q    Have you spent any of your personal money

4    in pursuing this case?

5         A    None other than coming here.

6         Q    Just the price of gas to get here?

7         A    Yes.

8         Q    Do you plan to spend any of your personal

9    money in pursuing this case?

10         A    No.

11         Q    Would you be willing to spend personal

12    money if you needed to in pursuing this case?

13         A    Yes.

14         Q    Do you have an idea of how much you'd be

15    willing to spend?

16         A    Well, I couldn't answer that.  I am

17    disabled, so I'm on a fixed income.

cherylfrazier.txt

18      Q      Would it be fair to say it would be a

19  fairly nominal amount; it wouldn't be very much?

20      A      Right, it wouldn't be very much.

21      Q      When did you decide to pursue this case

22  as a class action?

23      A      About -- well, at least two years ago.

31

1       Q      Do you recognize that you didn't

2   initially file this as a class action?

3       A      Yes, understood.

4       Q      But if I understand your testimony

5   correctly, even though you didn't initially file it

6   as a class action, at least two years ago you

7   contemplated this as a class action?

8       A      Yes.

9       Q      What made you decide to become a class

10  representative?

11      A      Because I wanted everybody to be

12  recovered that's been damaged by this action just

13  as well as myself.

14      Q      Did you receive any settlement proceeds

15  from Swafford and Hays?

16      A      No.

17      Q      You never received anything from Swafford

18  and Hays?

19      A      No, not except for the settlement, when

20  they settled my closing.

21      Q      Okay.  What I'm asking is, you said that

22  you were a member of the class in a lawsuit against

cheryl frazier.txt

23    Swafford and Hays?

32

1        A    Yes.

2        Q    Have you ever received any recovery --

3        A    No.

4        Q    -- from that lawsuit?

5        A    No.

6        Q    And she's trying to keep up, so let's

7    make sure that we don't talk over each other.

8        A    Okay.

9        Q    Do you intend to make any personal

10   decisions concerning how this case is prosecuted?

11       A    No.

12       Q    Are you going to leave it all up to your

13   lawyers?

14       A    Yes.

15       Q    Did you have any involvement in deciding

16   how the class you seek to represent would be

17   defined?

18       A    No.

19       Q    Do you know what the definition is of the

20   class you seek to represent?

21       A    Somewhat.  Repeat the question.

22       Q    Do you know what class you seek to

23   represent, who is included in that class?

33

1        A    It's a lot of the homeowners like myself.

cheryl frazier.txt

2      Q     Do you know precisely what the definition
3  of the class is?
4      A     No.
5      Q     Were you involved in coming up with that
6  definition?
7      A     No.
8      Q     Do you personally know how many people
9  are in the class you seek to represent?
10     A     No, I don't.
11     Q     Do you know how the members of the class
12 would be notified?
13     A     No, I don't.
14     Q     If there are costs associated with
15 notifying the class, do you know who is going to
16 pay for that?
17     A     No.
18     Q     Do you plan to pay for that?
19     A     No.
20     Q     Are you aware that TILA provides for
21 limitations on amounts that can be recovered for a
22 class action?
23     A     Yes.

                                                      34

1      Q     Are you personally willing to take less
2  than you could receive if you were pursuing your
3  case individually if TILA's damage cap makes you
4  recover an amount less under a class action?
5      A     No.
6      Q     You're not willing to take less?

cheryl frazier.txt

```
 7      A     No.
 8      Q     Have you talked to any members of the
 9  class you seek to represent?
10      A     No.
11      Q     Are you expecting to receive any extra
12  recovery because you are serving as a class rep?
13      A     Yes.
14      Q     That's something you expect?
15      A     Sure.
16      Q     What is your understanding as to what
17  your responsibilities as a class rep are?
18      A     That part right there we have to do some
19  research on.
20      Q     Okay.  Sitting here today you don't have
21  any feeling personally as to what your duties as a
22  class rep are?
23      A     Right.
```

                                                           35

```
 1      Q     Have you reviewed any of the filings in
 2  this case?
 3      A     No.
 4      Q     Did you review the complaint?
 5      A     Yes.
 6      Q     Have you reviewed the amended complaint?
 7      A     Yes.
 8      Q     Other than the complaints, are there any
 9  other filings you've reviewed in this case?
10      A     No.
11      Q     Are you prepared to sit through the trial
```

cheryl frazier.txt

```
12   of this matter?
13        A    Yes.
14        Q    Even if it takes three weeks?
15        A    Yes.
16        Q    Do you personally know any details
17   concerning loans that potential class members took
18   out with Home Funds Direct?
19        A    No.
20             MR. POUNDSTONE:   Any time you want a
21        break, just let me know.
22             THE WITNESS:   I'd like to have one,
23        just a little one.
```

36

```
 1             MR. POUNDSTONE:   Absolutely.
 2                  (Brief recess.)
 3        A    On one question that you asked me about
 4   if I would take less money, the answer is yes to
 5   that question.
 6   BY MR. POUNDSTONE:
 7        Q    Okay.
 8        A    And to the other question as
 9   understanding my position as a rep for the class
10   action, I do understand some of my duties, such as
11   doing depositions and the trial, so the answer is
12   yes.
13             (Defendant's Exhibit Number 1 was received
14             and marked for identification.)
15   BY MR. POUNDSTONE:
16        Q    Okay.  I'm going to show you what I've
```

cherylfrazier.txt

17    marked as Exhibit 1.  I'll give you some time to
18    take a look at each page of that and let me know
19    when you're ready.
20        A    Some of these numbers are very blurry; I
21    don't have my glasses.  I think I'm ready.
22        Q    Okay.  Have you seen that document
23    before?

                                                        37

1        A    Yes.
2        Q    It's your understanding that these are
3    the closing instructions that Accredited Home
4    Lenders or Home Funds Direct provided to Swafford
5    and Hays?
6        A    Yes.
7        Q    And if you'd look just at the last page,
8    does that contain your signature?
9        A    Yes.
10       Q    And if you look on the pages before that,
11   there are initials on each of those pages down at
12   the bottom?
13       A    Yes.
14       Q    Are those your initials, CH?
15       A    Yes.
16       Q    You received and signed this document at
17   closing?
18       A    Yes, I did.
19            (Defendant's Exhibit Number 2 was received
20            and marked for identification.)
21   BY MR. POUNDSTONE:
                        Page 31

cheryl frazier.txt

22      Q    Hold that just a second.  I'm going to

23   show you what I'm going to mark as Exhibit 2.  I'll

                                                      38

1    let you take a look at that document.

2       A    Okay.

3       Q    Have you seen that document before?

4       A    Yes.

5       Q    And do you understand that it is the

6    Addendum to Accredited Home Lenders, Home Funds

7    Direct's instructions to Swafford and Hays?

8       A    Yes.

9       Q    Did you receive this at closing?

10      A    Yes.

11      Q    And does it contain you signature?

12      A    Yes.

13      Q    Other than what I've marked as Exhibit 1

14   and Exhibit 2, are you aware of any other closing

15   instructions that Accredited Home Lenders or Home

16   Funds Direct provided to Swafford and Hays?

17      A    No.

18           (Defendant's Exhibit Number 3 was received

19           and marked for identification.)

20   BY MR. POUNDSTONE:

21      Q    I'll show you what I've marked as Exhibit

22   3.

23      A    Okay.

                                                      39

cheryl frazier.txt

1    Q    Have you seen that document before?

2    A    Yes.

3    Q    Is that a copy of the note for the loan

4    at issue in this lawsuit?

5    A    Yes.

6    Q    Does it contain your signature on the

7    last page?

8    A    Yes.

9    Q    And does it also contain your initials on

10   the two pages before that?

11   A    Yes.

12   Q    Did you sign this document at closing?

13   A    Yes.

14   Q    And you were given a copy of it at

15   closing; correct?

16   A    Yes.

17       (Defendant's Exhibit Number 4 was received

18       and marked for identification.)

19   BY MR. POUNDSTONE:

20   Q    I'm going to show you what I've marked as

21   Exhibit 4.  Have you seen this document before?

22   A    Yes.

23   Q    Is that the mortgage for the loan that's

                                                    40

1    the subject of this lawsuit?

2    A    Yes.

3    Q    Does it contain your signature on the

4    second to last page?

cherylfrazier.txt

5      A    Yes.

6      Q    Okay.  Do your initials appear on the

7    remaining pages?

8      A    Yes.

9      Q    Did you sign this document at closing?

10     A    Yes.

11     Q    I assume you received a copy of it at

12   closing.

13     A    Yes.

14          (Defendant's Exhibit Number 5 was received

15          and marked for identification.)

16   BY MR. POUNDSTONE:

17     Q    I'm going to show you what I've marked as

18   Exhibit 5.  Take a look at that and just let me

19   know when you're ready.

20     A    Okay.

21     Q    Have you seen that document before?

22     A    Yes.

23     Q    Is that a copy of your Hud 1 Settlement

                                                    41

1    Statement?

2      A    Yes.

3      Q    Does it contain your signature on the

4    second page?

5      A    Yes.

6      Q    And do you acknowledge receiving this at

7    your closing?

8      A    Yes.

9      Q    In your complaint you indicated that

                        Page 34

cheryl frazier.txt

10  Swafford and Hays obtained a title search and

11  abstract from another company.  Do you know what

12  company they obtained that from?

13       A    No.

14       Q    Do you acknowledge that Accredited Home

15  Lenders or Home Funds Direct were not responsible

16  for performing the title search and abstract?

17       A    Yes, understood.

18       Q    If you would, look on the second page,

19  line 1102.

20       A    Uh-huh, I see it.

21       Q    It says, "Abstract or Title Search."  You

22  were charged $200 for an abstract or title search;

23  correct?

42

1        A    Yes.

2        Q    And if you look at the next line down,

3   line number 1103, you were charged $250 for title

4   examination; correct?

5        A    Yes.

6        Q    And the Hud 1 indicates that both of

7   these fees went to Swafford and Hays; correct?

8        A    I don't know.  Yes.

9        Q    Do you see that where it says to Swafford

10  and Hays Settlement Services?

11       A    Yes.

12       Q    And you don't dispute that's where those

13  funds went, do you?

14       A    No, I don't.

cheryl frazier.txt

15    Q   And you don't have evidence that

16  Accredited Home Lenders or Home Funds Direct

17  received any of those fees?

18    A   No, I don't.

19    Q   Are you personally aware of any evidence

20  that Home Funds Direct or Accredited Home Lenders

21  had any involvement in determining the amount that

22  would be charged for those fees?

23    A   No.

43

1    Q   Are you personally aware of any evidence

2  that Home Funds Direct or Accredited Home Lenders

3  knew how much Swafford and Hays had actually paid

4  the company who performed those services?

5    A   No, I don't.

6    Q   In your complaint, you indicated the

7  actual cost for the title and abstract was less

8  than $125.  What evidence do you have to support

9  that contention?

10    A   None.

11    Q   If you look on line 1201, do you see the

12  Recording fees and Service fees?

13    A   Yes.

14    Q   You were charged $120 for the recording

15  fee; correct?

16    A   Yes.

17    Q   The Hud 1 indicates that that fee went to

18  Swafford and Hays; correct?

19    A   Yes.

cheryl frazier.txt
20                    MR. PATTERSON:   Are you talking
21        about 1201?
22                    MR. POUNDSTONE:   1201.  I'm sorry,
23        it went to the clerk of court.  Strike that

                                                          44

 1        question.
 2   BY MR. POUNDSTONE:
 3        Q     The Hud 1 indicates that the $120 went to
 4   the clerk of court; correct?
 5        A     Correct.
 6        Q     You don't have any evidence that Home
 7   Funds Direct or Accredited Home Lenders had any
 8   involvement in determining how much was charged for
 9   that fee, do you?
10        A     No, I don't.
11        Q     Are you aware personally of any evidence
12   that would show that Home Funds Direct or
13   Accredited Home Lenders knew how much Swafford and
14   Hays actually paid for recording?
15        A     No, I don't.
16        Q     Do you contend that any of the recording
17   fees went to Accredited Home Lenders or Home Funds
18   Direct?
19        A     I don't know.
20        Q     You don't have any evidence to show that
21   it went there, do you?
22        A     No.
23        Q     You allege in your complaint that you were

cheryl frazier.txt

45

1    charged $221 for title insurance.  But if you would
2    look on line 1108, the Hud 1 shows that you were
3    charged $200 for title insurance?
4         A    I see it.
5         Q    Correct?
6         A    I see it, yes.
7         Q    That's what the Hud 1 says?
8         A    Yes.
9         Q    Do you have any evidence or are you aware
10   of any evidence that would show you were actually
11   charged $221 for title insurance?
12        A    No.
13        Q    The Hud 1 indicates that the title
14   insurance fee went to Transnation Title Insurance
15   Company; correct?
16        A    I don't know.
17        Q    If you look on line 1108, the Hud 1
18   indicates that it went to Transnation Title
19   Insurance Company; correct?
20        A    Correct, yes.
21        Q    Do you have any knowledge of who chose
22   Transnation as the title insurance company?
23        A    No.

46

1         Q    I assume that you don't have any evidence
2    that Accredited Home Lenders or Home Funds Direct
3    made the decision to use Transnation?

Page 38

cheryl frazier.txt

4       A    No.

5       Q    And I assume also that you're not aware

6  of any evidence that shows Home Funds Direct or

7  Accredited Home Lenders had any involvement in

8  determining the amount that would be charged for

9  title insurance?

10      A    No.

11      Q    Are you personally aware of any evidence

12  that shows that Accredited Home Lenders or Home

13  Funds Direct knew how much Transnation actually

14  charged for title insurance?

15      A    No.

16      Q    Are you contending that any of the title

17  insurance funds went to Home Funds Direct or

18  Accredited Home Lenders?

19      A    No.

20      Q    Have you personally had any discussions

21  with anyone at the Alabama Department of Insurance

22  concerning the amount of title insurance you were

23  charged?

47

1       A    No.

2       Q    If you look on line 1111, that indicates

3  that you were charged $50 for Endorsements;

4  correct?

5       A    Correct.

6       Q    And the Hud 1 indicates that that fee

7  went to Swafford and Hays; correct?

8       A    Correct.

Page 39

cheryl frazier.txt

9      Q     Are you personally aware of any evidence

10    that either Home Funds Direct or Accredited Home

11    Lenders had any involvement in determining the

12    amount that would be charged for endorsements?

13     A     No.

14     Q     Do you have any personal knowledge of any

15    evidence to suggest that Accredited Home Lenders or

16    Home Funds Direct received the fees for

17    endorsements?

18     A     No.

19        (Defendant's Exhibit Number 6 was received

20        and marked for identification.)

21    BY MR. POUNDSTONE:

22     Q     I'm going to show you what I'm going to

23    mark as Exhibit 6.  I'll give you a chance to take

48

1     a look at that.

2      A     Okay.

3      Q     Have you seen that document before?

4      A     Yes, I have.

5      Q     Is it your understanding that that is the

6     Final Truth-in-Lending Disclosure Statement in

7     connection with your loan?

8      A     Correct.

9      Q     Does your signature appear on that

10    document?

11     A     Yes.

12     Q     And do you acknowledge receiving this at

13    closing?

Page 40

cheryl frazier.txt

14      A    Yes.

15      Q    If you would, look in the box that says,

16  "Prepayment."

17      A    Yes.

18      Q    Now, the disclosure statement indicates

19  that there is no prepayment penalty; correct?

20      A    Yes.

21      Q    Your complaint on the other hand alleges

22  that there was a prepayment penalty.  Are you aware

23  of any prepayment penalty?


                                                        49


1       A    No.

2       Q    Are you contending that there was a

3   prepayment penalty?

4       A    No.

5       Q    Do you have any idea why your complaint

6   contended there was a prepayment penalty?

7       A    I'm not sure.

8           (Defendant's Exhibit Number 7 was received

9           and marked for identification.)

10  BY MR. POUNDSTONE:

11      Q    I'm showing you what I'm going to mark as

12  Exhibit 7.

13              MR. POUNDSTONE:  Somehow I'm short a

14          copy of that.

15              MR. PATTERSON:  That's okay.

16  BY MR. POUNDSTONE:

17      Q    Have you seen that document before?

18      A    Yes, I have.

Page 41

cherylfrazier.txt

19      Q     Is that the Notice of Right to Cancel

20   that you received in connection with your loan?

21      A     Yes.

22      Q     And is that your signature on that

23   document?

50

1        A     Yes, it is.

2        Q     Do you acknowledge receiving that at

3    closing?

4        A     Yes.

5        Q     And just so we're clear, you also

6    acknowledge receiving the Truth-in-Lending

7    Disclosure Statement and the Hud 1 at closing?

8        A     Yes.

9        Q     And would you acknowledge that you did

10   not cancel this loan within three days of March 25,

11   2005?

12       A     Yes.

13       Q     You did not do that; correct?

14       A     I did not do it.

15          (Defendant's Exhibit Number 8 was received

16          and marked for identification.)

17   BY MR. POUNDSTONE:

18       Q     I'm showing you what I'm going to mark as

19   Exhibit 8.  Have you seen that document before?

20       A     I'm not sure.

21       Q     You don't recall one way or the other?

22       A     Right.

23       Q     Do you understand that your attorneys

Page 42

cheryl frazier.txt

51

1   produced this to us in the course of this

2   litigation?

3        A    Yes.

4        Q    Are you aware of them getting documents

5   concerning your loan from any other source than

6   you?

7        A    Excuse me?

8        Q    Do you know if they obtained documents

9   concerning your loan from any other source other

10  than you?

11       A    No.

12       Q    Do you dispute that you received this?

13       A    No.

14       Q    You just don't remember or recall one way

15  or the other?

16       A    Right.

17       Q    And sitting here I know you said you

18  don't recall seeing that before, but you recognize

19  sitting here that it's a High Cost Loan Summary for

20  your loan; correct?

21       A    Yes.

22       Q    If you would, look at the line right

23  there that says, "Prepayment Penalty."

52

1        A    Yes.

cherylfrazier.txt

2      Q    Would you acknowledge that this document

3  also indicates there was no prepayment penalty for

4  your loan?

5      A    Yes, I see it.

6          (Defendant's Exhibit Number 9 was received

7          and marked for identification.)

8  BY MR. POUNDSTONE:

9      Q    I'm showing you what I'm going to mark as

10  Exhibit 9.  I'll give you a chance to take a look

11  at that.

12              MR. PATTERSON:  Can we go off the

13          record for just a second?

14              MR. POUNDSTONE:  Sure.

15              (Off-the-record discussion.)

16  BY MR. POUNDSTONE:

17      Q    Have you seen that document before?

18      A    Yes.

19      Q    Tell me where you've seen it.

20      A    I believe this sheet might have been at

21  my closing, but I'm not sure.

22      Q    Okay.  You think it might have been in

23  your closing packet, but you don't know for certain

                                                        53

1  one way or the other?

2      A    I'm not sure.  I just don't remember

3  sheet by sheet, you know.

4      Q    Sure.  Do you recall whether you had that

5  in your possession before you turned over documents

6  to your attorney?

Page 44

cheryl frazier.txt

 7        A    I believe it was, but, again, I'm not

 8   sure.

 9        Q    You're not certain one way or the other

10   of where it came from?

11        A    Right.

12        Q    Sitting here today and looking at that

13   document, you understand that it shows the parties

14   who actually received loan proceeds?

15        A    Yes.

16        Q    Okay.

17        A    I'm sorry.  After carefully looking, I

18   believe that it was in my packet.

19        Q    You think it was in the packet that you

20   received at closing?

21        A    Yes, I believe so.

22        Q    Okay.  If you would, look on the line

23   that corresponds with Hud 1 line 1103, and it says,

                                                      54

 1   "Title Examination."

 2        A    Yes.

 3        Q    $250; correct?

 4        A    Yes.

 5        Q    This Disbursement Sheet shows that that

 6   $250 went to Swafford and Hays; correct?

 7        A    Yes.

 8        Q    And you don't dispute that that's where

 9   it went?

10        A    No.

11        Q    If you'll look at the next entry down, it

                          Page 45

cheryl frazier.txt

12    corresponds to Hud 1 line 1111, "Endorsements?"

13        A    Yes.

14        Q    $50.   The Disbursement Sheet also shows

15    that those funds went to Swafford and Hays;

16    correct?

17        A    Correct.

18        Q    And you don't dispute that that's where

19    they went?

20        A    No.

21        Q    If you look at the next line, there's an

22    entry that corresponds to Hud 1 line 1108, and it

23    says, "Title Insurance."  It shows $140; correct?

                                                          55

1        A    Correct.

2        Q    And that shows that that money went to

3    Swafford and Hays; correct?

4        A    Correct.

5        Q    And you don't dispute that they received

6    that?

7        A    No.

8        Q    If you'll look two sections down --

9        A    Recording fee?

10        Q    -- there's another line for title

11    insurance that corresponds with Hud 1 line 1108,

12    and it's $60; correct?

13        A    Correct.

14        Q    And the Disbursement Sheet shows that

15    those funds also went to Swafford and Hays.  You

16    don't dispute that, do you?

                    Page 46

cheryl frazier.txt

17    A    No.

18    Q    In looking at this Disbursement Sheet,

19  there's no indication on here how much of the $200

20  that went towards title insurance was actually paid

21  to Transnation, is there?

22    A    No.

23    Q    Are you aware of any evidence that would

56

1   show that Accredited Home Lenders or Home Funds

2   Direct ever knew how much of that $200 was paid by

3   Swafford and Hays to Transnation?

4     A    No.

5     Q    If you look right here, the second

6   grouping down, the second column, the fee that

7   corresponds to line 1102 in the Hud 1, "Abstract or

8   Title Search" --

9     A    Yes.

10    Q    -- and you see $200; correct?

11    A    Correct.

12    Q    And it indicates that that money went to

13  Swafford and Hays; correct?

14    A    Correct.

15    Q    And you don't dispute that that's where

16  it went?

17    A    No.

18    Q    If you look at the last column where it

19  says, "Recording fees and Service fees, $56," do

20  you see that?

21    A    Yes.

cheryl frazier.txt

22    Q    It indicates that those funds went to the

23    Houston County Judge of Probate; correct?

57

1    A    Correct.

2    Q    And you don't dispute that that's where

3    those funds went, do you?

4    A    No, I don't.

5    Q    There's another entry that corresponds

6    with that same Hud 1 line.  It's one, two, three,

7    four columns down, where it says, "Recording fees

8    and Service fee, $64."

9    A    Yes.

10    Q    And that indicates that those funds went

11    to Swafford and Hays; correct?

12    A    Correct.

13    Q    And you don't dispute that that's where

14    those funds went?

15    A    No, I don't.

16          MR. POUNDSTONE:  We can take about

17        five minutes, and I may be done.

18            (Brief recess.)

19    BY MR. POUNDSTONE:

20    Q    I have just two sort of catch-all

21    questions I want to ask you that have already been

22    specifically dealt with, but just so we're clear.

23          You don't have any personal knowledge of

58

cherylfrazier.txt

1    any evidence that Accredited Home Lenders or Home

2    Funds Direct knew anything about the overcharges

3    that are alleged in your complaint, do you?

4          A    No, I don't.

5          Q    And you don't have any personal knowledge

6    of any evidence that would show that they received

7    any funds from those overcharges, do you?

8          A    No, I don't.

9                    MR. PATTERSON:  And I'll just object

10         to those two, asked and answered.

11                   MR. POUNDSTONE:  Sure.  We're done.

12         Thank you.

13    (The deposition concluded at 2:23 p.m.)

14

15

16

17

18

19

20

21

22

23

                                              59

1              C E R T I F I C A T E

2

3    STATE OF ALABAMA)

4    COUNTY OF BALDWIN)

5

cherylfrazier.txt

6           I do hereby certify that the above and

7    foregoing transcript of proceedings in the matter

8    aforementioned was taken down by me in machine

9    shorthand and the questions and answers thereto

10   were reduced to writing under my personal

11   supervision, and that the foregoing represents

12   a true and correct transcript of the proceedings

13   given by said witness upon said hearing.

14          I further certify that I am neither of

15   counsel nor of kin to the parties to the action,

16   nor am I in anywise interested in the result of

17   said cause.

18

19

20                    _____
                      KAREN T. McDONALD, AL-CCR-4O
21                    COURT REPORTER, NOTARY PUBLIC
                      STATE OF ALABAMA AT LARGE
22
      My Commission expires: 4/28/2012
23

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHERYL HALL FRAZIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **CIVIL ACTION NO.:** |
| | ) | **1:08-cv-11-MHT** |
| **ACCREDITED HOME LENDERS,** | ) | |
| **INC., d/b/a HOME FUNDS DIRECT** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS**</u>

COMES NOW Plaintiff, Cheryl Hall Frazier, by and through the undersigned attorney, and in response to the statement of facts filed by the Defendant in support of its motion for summary judgment says as follows:

1.      Plaintiff Cheryl Hall Frazier obtained from Accredited a $56,000 loan secured by a mortgage on her home on March 25, 2005.

**RESPONSE: Admitted.  See Ex. 4, HUD-1.**

2.      While Accredited funded the loan, the loan was actually closed by Swafford, who is not a party to this suit.

**RESPONSE**: **Admitted.  See Ex. 4, HUD-1.**

3.      As part of the loan transaction, Plaintiff was provided a Truth in Lending Disclosure Statement, Good Faith Estimate, and a HUD Settlement Statement, which listed various amounts charged in conjunction with Plaintiff's loan and which were all signed by Plaintiff.

**RESPONSE:  Admitted. See Ex. 5, Truth in Lending Disclosure Statement, Ex. 6 Good Faith Estimate, and Ex. 4, HUD-1.**

4.     Both the Truth in Lending Disclosure and the Good Faith Estimate were prepared by Accredited, and the Settlement Statement was prepared by Swafford.

**RESPONSE:  Admitted.  See Ex. 1, Deposition of Robert Dooley as representative for Accredited, attached without exhibits at 43, 5-7; 55, 20-21; 63, 10-11.**

5.     Plaintiff insists in her First Amended Complaint ("Complaint") that Accredited violated various provisions of TILA by failing to properly disclose as finance charges certain fees imposed for recording the mortgage, abstract/title search, title examination, title insurance, and endorsements (collectively, "settlement fees"). Complaint at ¶¶ 34-36.

**RESPONSE:  Admitted.  See Amended Complaint at ¶¶ 34-36.**

6.     Implicit in Plaintiff's allegations is an assertion that in closing the loan, Swafford acted on behalf of and as agent for Accredited, and therefore Accredited must be liable for Swafford's alleged marking up of these particular fees. Complaint at ¶ 11.

**RESPONSE:  Admitted.  See Amended Complaint at ¶ 11.**

7.     To the contrary, Swafford acted independently of Accredited in imposing the settlement fees charged to Plaintiff.

**RESPONSE:  Denied.  See Deposition of Greg Swafford, attached without exhibits at 45, 20-25; 46, 1-5 (Hall v. AHL 05/19/2008) ; See also Ex. 6, Deposition of Cheryl Hall Frazier, attached without exhibits at 42, 19-22; 44, 6-10; See also Ex. 4, at 97, 5-10. See also discussion in Plaintiff's opposition.**

8.     Accordingly, these settlement fees were properly excluded from the finance charge pursuant to TILA.

**RESPONSE: Denied. These fees were padded rendering them neither *bona fide* nor reasonable as shown in Plaintiffs opposition to summary judgment. Therefore they should have been included in the finance charge.**

9.      Plaintiff also alleges that her loan was subject to protections afforded by HOEPA because the points and fees associated with her loan exceeded 8% of the total loan amount. Complaint at ¶ 70.

**RESPONSE:  Admitted.**

10.      Furthermore, because Accredited allegedly failed to provide Plaintiff with certain disclosures at least three days in advance of the loan closing in accordance with HOEPA, Plaintiff asserts that she is entitled to damages and rescission of the loan. Complaint, at ¶¶ 71-75.

**RESPONSE:  Admitted.**

11.      However, as demonstrated below, Plaintiff's loan was not a "high cost" loan by HOEPA standards, and Plaintiff is not entitled to rescind her loan or collect any amount of damages from Accredited.

**RESPONSE:  Denied.   See reasons set out in the Plaintiff's response to Defendants motion for summary judgment.**

Respectfully Submitted this 15th day of August, 2008.

/s/ Earl P. Underwood, Jr.
Earl P. Underwood, Jr. (UNDEE6591)
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969
Telephone: 251-990-5558
Facsimile: 251-990-0626
epunderwood@alalaw.com

CERTIFICATE OF SERVICE

I hereby certify that on August 15th 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert E. Poundstone, IV
Bradley, Arant Rose & White, LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

James D. Minor, Jr.
Bradley, Arant Rose & White LLP
Suite 450 One Jackson Pl
188 East Capitol St
PO Box 1789
Jackson MS 39215-1789

/s/ Earl P. Underwood, Jr.
Earl P. Underwood, Jr.