IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHERYL HALL FRAZIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO.: |
| | ) | 1:08-cv-11-MHT |
| ACCREDITED HOME LENDERS, | ) | |
| INC., d/b/a HOME FUNDS DIRECT | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S CORRECTED MEMORANDUM IN RESPONSE TO ACCREDITED HOME LENDERS, INC.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff and in response and opposition to the Motion for Summary Judgment filed by Defendant Accredited Home Lenders, Inc., ("AHL") submits the following:

### STATEMENT OF FACTS

AHL was one of the nation's largest sub-prime lenders and originates loans in several states. AHL does not close the loans it originates with its own employees, instead it contracts out the closings to third party settlement service providers. AHL closed the Frazier loan through its closing agent, Swafford Settlement Services ("Swafford"). (Ex. 1, Dooley Depo. at pp. 53-54). AHL processes the loan application, gathers basic title information and designates a settlement agent for use as to that loan. The agent is selected by the AHL loan officer from a list of agents approved by AHL. AHL gathers amounts of the fees being charged from the designated settlement agent and uses those fees to generate the preliminary disclosures required by RESPA (i.e. the "good faith estimate" herein after "GFE"). (Ex. 2, Diaz Depo) at pp. 23-24). AHL does nothing to insure that the fees imposed by the settlement agent are accurate; it simply "trusts

what the company gives us."(*Id.* pp. 27-28, 39-40). The settlement agent determines the amount to be charged for recording fees and AHL takes no steps to make sure that those fees are the actual fees paid to record the mortgage. (*Id.* p. 52).

AHL never prepares the HUD Settlement Statement. The HUD-1 is prepared by the settlement agent which plugs in its own fees (Lines 1101 though 1205) as well as the fees imposed by AHL (Lines 800 through 811). (*Id.* pp. 39-40). On the other hand, the settlement agent, Swafford in this case, has nothing to do with the preparation of the TILA disclosure or the GFEs and takes no part in the calculation of the amounts disclosed in the TILA disclosures. (Ex. 1, Dooley Depo. pp. 54-56).

AHL does not include any portion of the recording fee or other "real-estate related" fees in the calculation of the finance charge used in its TILA disclosures and did not include them in the calculation of the finance charge at issue herein. (Ex. 3 at ¶ 3).

For each AHL loan, a lender's title insurance policy is required to be purchased and the premium is charged to the borrower as a title insurance premium reflected on Line 1108 of the HUD Settlement Statement (Ex. 1, Dooley Depo. at p. 72). The amount charged for title insurance is calculated by the settlement agent, which also serves as the title insurance company's agent, and that amount is adopted by AHL without any scrutiny. (Ex. 2, Diaz Depo. at pp. 27-28, 39-40). AHL does not include any portion of the "title insurance" premium in the finance charge disclosed to its borrowers. This is consistent with AHL's practice of excluding these charges in its calculation of finance charge and other TILA disclosures. (Ex. 3 at ¶ 3).

AHL does not provide a separate itemization of the TILA disclosure but instead relies on the good faith estimate prepared in advance of closing (Ex. 1, Dooley Depo. at p. 53). Frazier's

Disclosures were not labeled estimates. This is an affirmative misrepresentation. In fact her HUD-1 falsely states right above her signature that the settlement statement is a true and accurate accounting of the transaction (Ex. 4). Also, the TILA disclosure (Ex. 5) states that it is the "FINAL TRUTH-IN-LENDING DISCLOSURE STATEMENT," when actually it is based on an estimated figure. Nothing in AHL's disclosures indicates that the fees shown are based on estimates as TILA requires when estimates are used.

AHL requires the use of a settlement company selected by AHL, and requires the borrower to pay certain fees to that settlement company. (Ex 1, Dooley Depo. at pp. 53-55, and Good Faith Estimate (Ex. 6)  just above signature line.) All of the services performed by the settlement company are required by AHL, as well as all of the charges associated with the closing (Ex. 7, Swafford Depo. pp. 113-114).

### **The Plaintiff's Loan Transaction**

Plaintiff closed her mortgage transaction with AHL on March 25th 2005. Ms. Frazier already owned the home, which she uses as her principal residence, and the funds were not used for its purchase. (Ex. 15, Hall Depo. p. 14) Plaintiff's loan was a typical closing of an AHL loan. (Ex. 7, Swafford Depo. p. 114-115). At closing, Frazier was given a HUD Settlement Statement ("HUD-1") which must reflect all of the loan fees paid at or before closing. (Ex. 4).

AHL hired Swafford to close the loan at issue and not Ms. Frazier (Ex. 1, Dooley Dep. at 50). Swafford prepared the HUD settlement statement herein subject to the AHL's approval. (Ex. 7, Swafford Depo. p. 86). After the documents are finalized and approved by the lenders they are emailed to Swafford which forwards them, again by email, to a notary for closing. (Swafford Deposition Ex. 7, pp 86-87).

The recording fee paid by Plaintiff was padded, as were the other "real-estate related" fees. She was charged $120.00 for "recording fee" while the actual recording fee was only $56.00. (Ex. 8, Recorded mortgage and Swafford Ledger Card, Ex. 9). Swafford retained the remaining $64.00. (Ex 7, Swafford Depo. p. 95).

Likewise, the title insurance fee paid by Frazier was padded and exceeded the legal maximum rate by $74.00. Not only was the title insurance premium padded, Ms. Frazier was also charged an additional $50.00 "title service fee/endorsement" even though no special endorsements were written. (Ex. 7, Swafford Depo. pp. 106-107) The maximum legal charge was $126.00, which is calculated by multiplying $2.25, the rate per thousand dollars of coverage, by 56. This equals $126.00, not $200.00 as Plaintiff was charged. The last paragraph on bates stamped page HALL00091 of the Rate Manual (Ex. 10) states that there is no charge for standard residential endorsements (Rate Manual, Ex 10).

The amount which Swafford could charge for title insurance (including commissions) is limited. Alabama regulates title insurance premiums by requiring a filed rate be charged. Thus, for the Frazier loan, Swafford was limited to charging the rates filed with and approved by the Alabama Department of Insurance ("DOI"). Ala. Code §§ 27-25-1 through 10. By operation of the filed-rates and the title insurance company's rate manual (Ex. 10) the premium amount depends on the amount of the loan. The higher the loan, the higher the premium. See TransNation Rate Manual (Ex. 10). Swafford uniformly charged more than the legal filed rate. (Ex. 7 Swafford Depo. pp. 100-101).

Finally, Ms. Frazier was charged for title related services that were not performed. As part of a scheme to collect hidden profits and hide finance charges, Swafford padded the title

work it contracted out for others to perform. Swafford did not conduct its own title search or prepare an abstract of title. (Ex. 7 Swafford Depo. pp. 48-51). Swafford contracted with a third party to conduct the work required to create the abstract and title report, and then Swafford padded or marked up the charge for the work to add another profit. (*Id*.). In connection with the Frazier loan, Swafford hired Southern Land & Title to prepare the abstract and title report, Southern charged Swafford only $72.00. (Ex. 12, Southern Response to subpoena) Swafford in turn billed Frazier $200.00 for the abstract and title report. On top of the profit from the abstract, Swafford added an additional $250.00 charge for title examination, although it performed no additional work for the fee.[1] (Ex. 4).

In connection with this loan, AHL provided Frazier with TILA disclosure documents. Those disclosure documents excluded from the pertinent calculations the charges for recording fees, title insurance and title examination. (Ex. 3 at ¶ 3). When the padded charges are included in the TILA calculations, as required by TILA and Reg. Z, the disclosures are rendered inaccurate and it becomes evident that the loan is a "high cost" or HOEPA loan.

## ARGUMENT

Under the provisions of Rule 56(c) Federal Rules Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See *Celotex v. Cattrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant "always bears the initial responsibility of informing the district court of the basis for its motion"... and ... must "demonstrate the absence of a genuine issue of material fact." *Id*.

---

[1] A review of another party's work is not a compensable service. See HUD's 2001-1 *Statement of Policy* footnote 7.

After the movant has met its burden under Rule 56(c), the non-movant must set forth "specific facts showing that there is a genuine issue for trial." *Id.* In ruling, the Court "must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); cited in *Reeves v. Thigpen*, 879 F.Supp 1153, 1166 (M.D.Ala. 1995).

In entertaining a motion for summary judgment, the court should review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but the court may not make credibility judgments or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990). Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence supporting the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 299-300 (2d Ed. 1995); *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097 (2000).

### I.    None of Frazier's' Claims Are Barred By the Statute Of Limitations

TILA claims usually have a one year statute of limitations. 15 U.S.C. § 1640(e). Claims for rescission under TILA must be filed within three years. 15 U.S.C. § 1635(f). Plaintiff's loan was closed on March 25th 2005, and suit in this matter was filed on September 7, 2007. The statute has therefore not expired on Ms. Frazier's § 1635 or rescission claims and the doctrine of equitable tolling applies to her other TILA claims. Ms. Frazier has sufficiently plead facts

supporting equitable tolling (See Doc. 20, Amended Comp. ¶¶ 41 and 42) and, as shown, there were several affirmative misrepresentations made in the closing documents by AHL.

Furthermore, it is undisputed that AHL made affirmative misrepresentations about the fees it and Swafford collected, in the closing documents. For example the GFE states, "The Lender will require a particular provider from a lender approved list. The specific provider and actual cost will appear on the HUD-1 or HUD-1A" (Emphasis added.) This statement is demonstrably false as shown by the calculations below. The HUD-1 settlement statement herein is replete with false statements. Lines 811 and 812 show fees paid to Home Funds Direct for "Zone Determination" and "Tax Service." Apparently an entity called "First American" performed services and was paid at least part of those charges although no payment to any such entity was disclosed. (See Ex. 3. ¶ 7) The amount shown on line 1101 for "settlement or closing fee" is false. Swafford collected amounts on other lines by the padding of those fees and by showing the fees as being paid to itself and thereby hiding the padding and mark-up of services performed by others. Line 1108 shows a payment of $200.00 to TransNation Title Insurance Company when the legal charge was only $126.00. Frazier was charged $50.00 for "Endorsements" on line 1111 when standard endorsements are included in the regulated filed rate and no other endorsements were written. Finally, line 1201 shows a fee of $120.00 paid to "Clerk of Court" when in fact only $56.00 was paid for recording.

Because of these false statements and representations none of Frazier's claims are barred by the statute of limitations. "[T]he doctrine of equitable tolling applies to all federal statutes unless the statute states otherwise. *Ellis v. General Motors Acceptance Corporation*, 160 F.3d 703, 708 (11th Cir. 1998). The *Ellis* court went on to specifically apply that doctrine to the Truth-

7

in-Lending Act regulatory scheme.

"The Eleventh Circuit Court of Appeals, and every other Federal Court of Appeals, has recognized that TILA's statute of limitations is subject to equitable tolling when the violation of TILA is either self concealing or is fraudulently concealed by the defendant." *In re Consolidated "Non-Filing Insurance" Fee Litigation*, 195 F.R.D. 684, 694, n 7 (M.D. Ala. 2000). *Citing Ellis*., *supra*.

> Despite TILA's clearly remedial purpose, if we were to read its time limit literally, consumers whose cause of action was fraudulently concealed from them until after a year had passed could not pursue a cause of action under TILA. That would lead to the anomalous result that a statute designed to remediate the effects of fraud would instead reward those perpetrators who concealed their fraud long enough to time-bar their victims' remedy. We cannot believe this was Congress' intent. Rather, in these circumstances we apply the general rule that equitable tolling applies to all federal statutes unless the statute states otherwise.

*Holmberg v. Armbrecht*, 327 U.S. 392 at 394-95.

TILA's yard stick, the Annual Percentage Rate (APR), is calculated using the figures that are disclosed as finance charges in a covered transaction as shown below. Hiding finance charges by padding otherwise excludable real-estate related fees may make a sub-prime loan look more competitive but it also violates TILA. The padding of excludable charges results in the understatement of the finance charge and APR. "Understating the finance charge is a 'type of fraud that goes to the heart of the concerns that actuate the Truth in Lending Act." *Edwards v. Your Credit, Inc.,* 148 F.3d 427, 432 (5th Cir.1998) (citation omitted). Thus, " '[t]o promote the Act's purpose of protecting consumers, our court has made clear that creditors must comply strictly with the mandates of the TILA and Regulation Z.' *Fairley,* 65 F.3d at 479; see *Smith v. Chapman,* 614 F.2d 968, 971 (5th Cir.1980)." *In re Consolidated "Non-Filing Insurance" Fee,* 2001 WL 35840127, 3 (M.D. Ala. 2001) There is also a new TILA violation here that gives rise

to statutory damages.

>   **a.    The Failure to Honor Frazier's Rescission Is A New TILA Violation**

A consumer may exercise her right to cancel a transaction by delivery of a written notification of the consumer's wish to cancel the transaction to the creditor's place of business. Notice is effective upon mailing. 12 C.F.R. § 226.23(a)(2). The lender's obligations upon rescission are set out in TILA Section 1635(b) which provides as follows:

> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. § 1635(b); see also 12 C.F.R. § 226.23(d).

As this statutory language makes clear, the creditor is obligated to take "necessary appropriate" actions to reflect the cancellation of the mortgage upon receipt of the notice of the election to cancel.  The creditor has 20 days in which to take those steps and it obligation to do so is not pre-conditioned on the borrower's duty to reasonably tender. *Ljepava v. M.L.S.C. Properties, Inc.*, 511 F.2d 935, 944 (9th Cir. 1975); *Palmer v. Wilson*, 502 F.2d 860, 861 (9th Cir. 1974); *Gerasta v. Hibernia National Bank*, 575 F.2d 580, 584 (5th Cir. 1978); *Fairbanks*

*Capital Corp. v. Jenkins*, 225 F.Supp.2d 910 (N.D. Ill. 2002); *Brown v. National Permanent Federal Savings & Loan Ass'n*, 683 F.2d 444, 447 (D.C.Cir.1982) (creditor must tender before the borrower's obligation arises); *Mitchell v. Security Investment Corp. of Palm Beaches*, 464 F.Supp. 650 (S.D.Fla.1979); *Johnson v. Thomas*, 342 Ill. App. 3d 382, 794 N.E.2d 919, 931, 276 Ill. Dec. 669 (Ill. App. Ct. 2003) (consumer not required to tender until after the creditor cancels the mortgage).

Section 1635(b) places upon the creditor requirements separate and distinct from those which arise upon the consummation of the loan. The creditor's failure to comply with these requirements is a separate and new violation of TILA, entitling the consumer to damages provided under Section 1640(a). *Williamson*, 698 F.2d. at 768; *Mount*, 886 F. Supp. 650, 651. The violation arising from a failure to properly respond to a notice of rescission takes place 20 days after the date of consumer's notice of the rescission. *Ruiz*, 313 F.Supp.2d 48, 50-51. For purposes of TILA's one-year statute of limitations, a claim for relief based on this violation is timely if filed within a year after the end of the 20-day period provided in Section 1635(b). *Id*.

In the present case, the Plaintiff rescinded her loan within the allotted time under TILA. Under 12 CFR § 226.23(2), AHL had "20 calendar days" to "return any money" that "has been given to anyone" and to terminate the security interest.[2] The Seventh Circuit has summarized the borrower's remedies upon rescission as follows:

> Under TILA's civil liability provisions, a creditor that violates 15 U.S.C. § 1635 is liable for: "actual damage sustained" by the debtor, 15 U.S.C. § 1640(a)(1); "not less than $ 200 or greater than $ 2,000" in statutory damages, §

---

[2] 12 CFR 226.23 provides: "(d) Effects of rescission. (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge. (2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest."

> 1640(a)(2)(A)(iii); and "the costs of the action, together with a reasonable attorney's fee," § 1640(a)(3). In addition, § 1635(b) itself provides that when a debtor rescinds she is "not liable for any finance or other charge"; "any security interest . . . becomes void"; and "[w]ithin 20 days after receipt of a notice of rescission," the creditor must "return to the [borrower] any money or property given as earnest money, down payment, or otherwise."

*Handy v. Anchor Mortg. Corp.*, 464 F.3d 760, 765 (7th Cir. 2006).

In *McIntosh v. Irwin Union Bank & Trust Co.*, 215 F.R.D. 26, 30 (D. Mass. 2003) the court held that when a consumer had an extended right to rescind because of a TILA violation, the statute of limitations for all the damages they seek, including statutory damages, extends to three years. *Id.* See, also, *Mount v. LaSalle Bank Lake View*, 886 F. Supp. 650, 651 (N.D. Ill. 1995); *Elliott v. ITT Corp.*, 764 F. Supp. 102, 106 (N.D. Ill. 1991); *Malfa v. Household Bank, F.S.B.*, 825 F. Supp. 1018, 1020 (S.D. Fla. 1993)); Washington *v. Ameriquest Mortg. Co.,* 2006 U.S. Dist. LEXIS 50804, 26-27 (D. Ill. 2006).

## II.    The Disclosures Required By TILA Were Not Made

The declared purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). "Accordingly, the [TILA] requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 412 (1998). Liability under TILA is strict. "The remedial goals of TILA are achieved by a system of strict liability in favor of consumers when mandated disclosures have not been made." *Madura v. Countrywide Home Loans, Inc.* 2008 WL 2856813, 6 (M.D. Fla. 2008) "[O]nce a court finds a violation, *no matter how technical,* it has no

11

discretion with respect to the imposition of liability." *Grant v. Imperial Motors,* 539 F.2d 506, 510 (5th Cir.1976) *Fabricant v. Sears Roebuck* 202 F.R.D. 310, 318 (S.D. Fla. 2001)

TILA requires an accurate statement of the actual fees charged to borrowers. Section 1638 requires the lender to itemize each amount that "*is or will be* paid to third persons by the creditor on the consumer's behalf together with identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(A)(iii)(emphasis added). In real estate transactions such as the one here that are covered by the Real Estate Settlement Procedures Act (RESPA), creditors may use the "good faith estimate" required under RESPA as a substitute for the separate "itemization," provided that the creditor complies with RESPA's requirements. 15 U.S.C. § 1638(a)(2)(A)(iii); Reg. Z *Commentary* Section § 226.18(c)(4). RESPA's requirements were not met as shown above.

This option of using a HUD-1 instead of the disclosures required by 15 U.S.C. § 1638 does not allow a creditor, like AHL, to escape its responsibilities to accurately disclose fees to consumers. The RESPA requirements mirror the TILA disclosure requirements and require the creditor to "itemize all charges imposed upon the Borrower and the Seller by the Lender . . ., whether to be paid at settlement or outside of settlement, and any other charges which either the Borrower or the Seller will pay for at settlement." 24 C.F.R. § 3500, Appendix A. There is no mention on the HUD-1 settlement statement of any payment to several parties that were paid out of the settlement funds as shown.

The TILA definition of "Finance Charge" begins with the premise that all charges related to a loan and paid by the consumer are "Finance Charges." The initial definition is found at Section 1605(a) and, in pertinent part, defines a finance charge as, "the sum of all charges,

12

payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).

The statute, Regulation Z and the Commentary expand on this definition and enumerate exceptions to the general rule. For example, in the case of a consumer mortgage transaction, such as we have here, if the creditor requires the use of a settlement agent, like Swafford, the settlement agent's fee for the services it provides must be <u>included</u> in the Finance Charge and therefore must be incorporated in the calculation of the applicable Annual Percentage Rate (APR). See Reg. Z § 226.4(a)(i).

Two exceptions to the general definition of finance charge are applicable here. The first is found at § 1605(d)(1) which allows a lender to exclude mortgage recording fees only if such fees are actually paid to record the mortgage. The other exclusion concerns so-called "real-estate related fees," including title examination fees and title insurance premiums. These fees can be excluded from the calculation of the finance charge only if they are *bona fide* and reasonable. 15 U.S.C. § 1605(e); Reg. Z § 226.4(c)(7). Each of these exclusions is discussed below.

Each of the disputed charges, about which Ms. Frazier complains, and the corresponding effect on the accuracy of the disclosures is separately discussed below, but first AHL's agency argument is addressed.

**1.    Agency Is Not An Issue**

AHL says that Swafford was not its agent and that it is not liable for padded charges made by Swafford. AHL is wrong. "TILA does not permit a creditor to delegate its disclosure responsibility but requires all pertinent disclosures to be made by a single creditor." *Vallies v.*

*Sky Bank* 432 F.3d 493, 494 (3rd Cir. 2006) See also 15 U.S.C. §§ 1631(b) and 1638(a). The real issue is were the charges required by AHL.

Regulation Z § 226.4(a)(1) states:

Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor:

(i)    Requires the particular services for which the consumer is charged;

(ii)    Requires the imposition of the charge; or

(iii)    Retains a portion of the third-party charge, to the extent of the portion retained.

It is undisputed that AHL required all of the services performed by Swafford. The evidence in this case is abundant and clear that the use of Swafford as settlement agent and the imposition of each of the services for which the subject fees were imposed were required by AHL.  In light of that evidence it is surprising that AHL would even attempt to argue otherwise.

In its deposition, Swafford unequivocally testified that all the services it performed were required by AHL:

Q. Were you doing business as Swafford and Hays back then

if it says so on here?

A. Probably so, yes.

Q. And that there were a number of services performed by

Swafford and Hays Settlement Services including notary

service for that charge on line 1101? That was your earlier

testimony, right?

A. That is correct.

14

Q. And were each of those services required by Home Funds
Direct?

A. Everything that we would have done would have been
something that they required, yes.

Q. You didn't do anything on line 1101 that they didn't
require, did you?

A. No.

Q. All right. I mean, a notary was required?

A. Correct.

Q. All right. Now, what about on line 1102, were those
services also required by Home Funds Direct?

A. Yes.

Q. And would the same be true of the services on line 1103?

A. Yes.

Q. And did they also require title insurance? When I say
"they," I mean Home Funds Direct.

A. Yes, they did.

Q. And did they also require that the mortgage be recorded?

A. Yes, they did.

Q. And I believe you said this already, but did they
require each of the charges that were rendered on the
document, page 132?

A. Yes.

Ex. 7 Swafford Deposition at pp 112-113.

The Good Faith Estimate prepared by AHL and provided to Ms. Hall lists each of these fees and includes the following statements:

> The Lender will require a particular provider from a lender approved list. The specific provider and actual cost will appear on the HUD 1 or HUD 1A. . . Use of a particular provider of services is required and the estimate is based on charges of the provider.

(See GFE, Ex. 6).

Also, AHL's Closing Instructions direct Swafford to secure a lender's title insurance policy and to insure that all commitment requirements are met. (See Ex. 14). This would necessarily include obtaining and reviewing an abstract. The instructions also require that AHL's agent record the mortgage and return the recorded mortgage to AHL. (*Id.*). Thus, all of the services relating to the subject fees are services required by AHL. Swafford's representative confirmed that its duties as AHL's closing agent included recording the mortgage, ordering abstract search and securing title insurance. (Ex. 7, Swafford Depo. pp. 86-90). It is clear that under these circumstances, the fees charged by Swafford, other than the *bona fide* "real estate-related" fees, and the actual costs of recording the mortgage, were required to be included in the disclosed finance charge. "If the creditor required a third party to perform a service, is aware that the third party will perform the service, and imposes a separate charge on the consumer for the performance of the service, the fee is a disclosable finance charge." *O'Brien v. J.I. Kislak Mortg. Corp.* 934 F.Supp. 1348, 1357 (S.D. Fla. 1996).

On page 7 of its brief, AHL also cites *O'Brien* for the proposition that Swafford was not its agent. AHL is confusing agency with the question of whether or not certain charges were required. As stated above the relevant issue is not whether Swafford was AHL's agent. The issue, is whether or not AHL required the services.

AHL also cites *Cowen v. Bank United of Texas, FSB* 70 F.3d 937 (7th Cir. 1995) for the proposition that a fee of $14.00 charged for overnight delivery by "the title company" was not a finance charge. *Cowen* is inapposite. The undisputed evidence in *Cowen* was that the overnight delivery fee was <u>not</u> required by the creditor. "The title company was not required by Bank United to use an overnight courier." *Cowen* at 943. Such is not the case here. Quite the contrary, the abundant evidence here is that the disputed charges were required.

Furthermore the *Cowen* court, at page 942, held that a settlement agent <u>is</u> the agent of a lender saying, "The title company in this case was wearing two hats. Primarily it was an insurance company, with its own interest in removing the prior liens. In this respect it was a principal in the transaction. It was also the closing agent, which means that it was the agent of the bank. *Sibley v. Federal Land Bank,* 597 F.2d 459, 462-63 (5th Cir.1979)." *Sibley*, of course, is binding prescient. See *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 –1211 (11th Cir. 1981).

### <u>Recording Fees</u>

As mentioned above, two exceptions to TILA's general finance charge definition are applicable here. Because a mortgage would not be recorded in a "cash" transaction, a fee imposed for  recording the lender's mortgage would obviously fall within the general definition of a "finance charge," in that the fee is "incident" to the extension of credit. However, a separate section of TILA states that a recording fee may be excluded, but only if that fee is the actual fee paid to record the instrument. 15 U.S.C. §1605(d)(1).

> Fees and charges prescribed by law, which *actually are* or will be paid to public officials for determining the existence of or for perfecting, releasing, or satisfying any security related to the credit transaction.

15 U.S.C. § 1605(d)(1)(emphasis added).

Thus, a "recording fee" that exceeds the actual fee paid to record the instrument is a finance charge. *Payton v. New Century Mortg. Corp.*, 2003 WL 22349118 (N.D.Ill.); *Brodo v. Bankers Trust Co.* 847 F.Supp. 353, 357 (E.D.Pa.,1994).

It is undisputed that Ms. Frazier was charged $120.00 as a "recording fee." (Ex. 4). It is likewise undisputed that the actual cost of recording the mortgage was $53. (See Recorded Mortgage, Ex. 8). Because it is undisputed that Ms. Frazier was charged an amount for recording fees which exceeded the amount "which actually are or will be paid to public officials," this practice falls within the plain language of Section 1605(d)(1). By operation of that provision AHL was required to include at least the padded portion in the finance charge. AHL failed to include these amounts in its disclosures of the finance charge, and in doing so, it has violated TILA. AHL never attempts to argue that TILA allows exclusion of these padded fees. Instead, it blames Swafford for the practice and explains that Swafford is not its agent.

## 2. __Real-Estate Related Fees__

The second relevant exclusion relates to certain "real-estate related fees," including title insurance premiums and fees for performing and examining a title abstract. 15 U.S.C. § 1605(e); Reg. Z § 226.4(c)(7)." This section of Regulation Z allows an exclusion of real-estate related fees but only if they are "*bona fide* and reasonable in amount."

### a. Padded Title Insurance Premiums Are Finance Charges

A premium imposed for title insurance protecting the lender's interest is obviously a fee imposed "incident" to the extension of credit. This is one of the types of "real estate-related" fees permitted by 15 U.S.C. § 1605(e) to be excluded from the calculation of finance charge. In the instant transaction not only was Ms. Frazier charged a padded title insurance premium she was

also charged $50.00 for "Endorsements" even though all standard residential endorsements are included in the filed rate and no additional were written. (Ex. 10, HALL00091 TransNation Rate Manual) This exclusion only applies, however, "if the fees are *bona fide* and reasonable in amount." Reg. Z § 226.4(c)(7). "[I]f the fees listed in 12 C.F.R. § 226.4(c)(7) are not bona fide or reasonable, they must be disclosed." *Jefferies v. Ameriquest Mortg. Co*. 543 F.Supp.2d 368, 379 (E.D. Pa. 2008)

"Regulation Z lists charges associated with real estate transactions that are excluded from the definition of 'finance charges,' including fees for title insurance, as long as these fees are bona fide and reasonable." *Marquez v. New Century Mortg. Corp.* 2004 WL 742205, 2 (N.D .Ill. 2004) It is undisputed that the $200.00 fee charged to Ms. Frazier exceeded the rate required by state law as well as the rate required under the agreement between the title insurance company and its agent. As explained above, *bona fide* and reasonable title insurance premiums may be excluded from the finance charge. However, a title insurance fee, which exceeds the legal rate, is neither "bona fide" or reasonable and not subject to this exclusion. *Johnson v. Know Financial*, 2004 WL 1179335 (title insurance charge which exceeds the maximum amount allowed by state law is not reasonable or *bona fide*); *see, also*, *Strong v. Option One*, 2005 WL 1463245 (E.D. Pa. 2005)(same); *Stump v. WMC Mortg. Corp.,* 2005 WL 645238 (E.D. Pa. 2005); *Fields v. Option One Mortgage Corporation*, 2006 WL 2191342 (E.D. Pa. 2006)(title insurance fee unreasonable if plaintiff qualified for reissue rate mandated by filed-rate).

> The most comprehensive statement of the bounds of the "bona fide and reasonable" requirements as to charges passed through by lenders to borrowers in transactions secured by real estate appear to be articulated by Rohner, *supra*, ¶ 3.03[2][a], at 3-30 to 3-31, in the following passage:

"To be excluded from the finance charge, the fees must not only be the right types, but they must also be "bona fide and reasonable in amount." They are bona fide even if the services for which the fees are imposed are performed by employees of the creditor rather than by a third party. However, a charge for required owner's title insurance would not be bona fide where the creditor's requirement that such insurance be purchased constitutes a violation of state law."

*In re Grigsby* 119 B.R. 479, 488 (Bkrtcy.E.D.Pa.,1990)

Therefore, the title insurance premium, which is in excess of the applicable filed rate, is a finance charge and should have been disclosed as such by AHL.

**b.    Padded Abstracting Fees and Title Examination Fees.**

It is undisputed that the $450 charge (200 + 250) imposed by AHL for "abstract or title" and "title examination" exceeded the actual amount paid for abstracting services performed by the third party contractor. The actual amount was $72. (Ex. 12) The $378.00 excess was pocketed by Swafford as additional profit. This service was required by Accredited. Fees for title abstracting which exceed the actual cost or the prevailing market rate for those services are not *bona fide* nor reasonable and must be included as part of the finance charge.

Put another way, because this $378.00 tacked-on fee was additional profit paid to the closing agent, it constitutes a "fee paid to closing agent" and, pursuant to Reg. Z § 226.4(a)(2), was required to be included as part of the disclosed finance charge.  The same is true with respect to the $120 padded title insurance fee pocketed by Swafford.

**c.    AHL's Retention Argument**

Each of the contested charges arises from services required by the lender and, by operation of § 226.4(a)(2), those fees are finance charges. Whether the fees were "retained" by AHL is of no consequence. The undisputed evidence demonstrates that § 226.4(a)(2)(i) and/or (ii) are met (services and/or charges were required), Plaintiff need not show that (iii) - retention

by the lender - is satisfied. However, one point should be made regarding AHL's insistence that it did not "retain" the fees. It is not at all accurate to conclude that the lender did not "retain" a fee simply because part of the fee was not sent directly to the lender by the agent. It must be remembered that, unlike fees which are paid separately by the borrower to a third party, the fees challenged in this case were paid by the borrower as part of the amount she borrowed and is paying back, with interest. In a very real sense, the fees are being paid directly to the lender, with interest, each month as part of the monthly mortgage payment. Therefore, at least with respect to the fees that are included in the amount borrowed, it can hardly be said that the lender is not receiving or benefiting from the fees.

AHL also argues that TILA requires that it exclude Swafford's fees from the computation of finance charges and it cites Reg. Z, § 226.4(a)(2) for support. AHL argues that it can not be liable under TILA because the fees are calculated by its agent and it relies on its agent to accurately compute the actual costs of the services provided. AHL cites no authority for the proposition that it can escape TILA's strict liability by reliance on its closing agent.

Another problem with AHL's argument is that Reg Z. § 226.4(a)(2) allows exclusion only if the fee is for a service not required by the lender. This is consistent with the general definition of finance charge as fees imposed "incident" to the extension of credit. 15 U.S.C. § 1605.

Fees charged by a third party that conducts the loan closing ... *are finance charges* only if the creditor: (i) requires the particular services for which the consumer is charged; (ii) requires the imposition of the charge; or (iii) retains a portion of the third-party charge, to the extent of the portion retained. 12 C.F.R. § 226.4(a)(2). In other words, if the fee charged by the third party

is for a service required by the lender, it is a finance charge. "[T]he definition of "finance charge" includes charges imposed on the consumer by someone other than the creditor for services required by the creditor even if the creditor does not retain the charges. *See Johnson v. Fleet Finance,* 4 F.3d 946, 949 (11th Cir.1993) (per curiam) (non-required broker's fees are not included in finance charge); *First Acadiana Bank v. Federal Deposit Ins. Corp.,* 833 F.2d 548, 550-51 (5th Cir.1987) (required lawyer's fees should be included in finance charge). Congress strictly requires creditors to disclose all finance charges to prohibit creditors from circumventing TILA's objectives and burying the cost of credit in the price of goods sold." *Mourning v. Family Publications Serv.,* 411 U.S. 356, 366, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318 (1973).

### d. The "Tolerance" Is Met

AHL argues that even assuming the fees attacked by Ms. Frazier should have been included in the disclosed finance charge, the understatement does not meet the ½ of 1% tolerance test set out in Section 1605(f)(2)(A). AHL claims that the Finance Charge that it disclosed to Ms. Frazier, is overstated by some $325.50. (AHL Br. at 17) AHL states in its brief, with out any factual support, that "Zone Determination Fee" of $9.50, the "Tax Service Fee" of $66.00 and the "Appraisal Review Fee" of $250.00, all of which were *included* in its original calculation of the "Finance Charge" in the disclosures given the plaintiff should now be excluded from that calculation. For the first time AHL has now stated in its motion for summary judgment that these fees were not correctly included in the calculation of the finance charge.

One reason this "tolerance" argument fails is because there is no evidence that fees that AHL originally *included* in the Finance Charge should now be *excluded* and AHL's analysis

ignores amounts that are undisputedly padded and marked-up. These padded fees should have been disclosed as part of the Finance Charge.

Plaintiff has alleged that AHL, failed to accurately disclose the Finance Charge, Amount Financed and APR in ¶ 45 of her amended complaint. The Plaintiff's HUD-1 (Ex. 4) lists these charges as being paid to "Home Funds Direct" the pseudonym under which AHL does business. With Plaintiff's allegation that the disclosures are inaccurate AHL must present evidence that these charges are "*bona fide* and reasonable." It has presented no such evidence.

With regard to the Tax Service Fee and Flood Zone Fee, AHL's representative, Alma Diaz, stated that these fees were paid to a third party. She did not know what the "Tax Service Fee" was for. (Diaz Depo. p. 49). AHL said, in its responses to interrogatories (Ex. 3, at ¶ 7) that an entity called "First American," "performed certain services in connection with" these fees. Plaintiff's HUD-1 does not disclose any payment to "First American." Thus there is no undisputed evidence that either of these this fees are *bona fide* or reasonable. Marking these fees up without performing additional services is a RESPA violation. "Applying HUD's reading of the statute, we conclude that the plaintiffs sufficiently alleged a cause of action when they asserted in their complaint that '[t]hird-party vendors charge Defendants fees to perform ... services. Without performing any additional services, Defendants then charge borrowers a mark-up of these vendors' fees and pocket the difference as profit.'" *Kruse v. Wells Fargo Home Mortg., Inc.* 383 F.3d 49, 62 (2nd Cir. 2004)

Regarding the "Appraisal Review Fee," AHL was asked in Plaintiff's second interrogatories who performed said review and it was asked to set out how the review was performed. Instead of fully answering the interrogatory, in a carefully worded response, it stated

that the fee was "<u>collected</u> for an in-house appraiser's review" (emphasis added) and never stated that any review was actually done or who did the review. (Ex 3) Thus, there is no evidence before the court that this fee is *bona fide* or reasonable.

**e. TILA Calculations**

A truthful analysis of the finance charges actually imposed compared to the finance charges AHL disclosed reveals that the tolerance is met. The total prepaid finance charge disclosed by AHL was $3,582.90. The disclosed prepaid finance charge is easily calculated by subtracting the disclosed Amount Financed of $52,417.10 from the mortgage amount of $56,000.00. (See TILA Disclosure attached hereto Exhibit 5, $56,000.00 - $52417.10 = $3,582.90).

The actual prepaid finance charge imposed was $4,126.50. This actual finance charge, as calculated by Plaintiff, includes the following.

| | | |
|---|---|---|
| Origination fee | 801 | $1,960.00 |
| Processing Fee | 808 | $500.00 |
| Underwriting Fee | 809 | $500.00 |
| Flood Zone Fee | 811 | $9.50 |
| Tax Service Fee | 812 | $66.00 |
| Appraisal Review Fee | 813 | $250.00 |
| Interest | 901 | $22.40 |
| Closing Fee | 1101 | $275.00 |
| | | |
| Subtotal | | $3,582.90 |
| | | |
| Title Search | | $128.00 |
| Title Examination | | $250.00 |
| Title insurance | | $74.00 |
| Endorsement | | $50.00 |
| Recording Fee | | $64.00 |
| | | |
| Total Finance Charge Imposed | | $4,126.50 |

The difference between the actual finance charge imposed as calculated above and the disclosed finance charge is $543 ($4,126.50 - $3,582.90 = $543.60). The tolerance is met.

**f. The Loan at Issue is a "High Cost" or HOEPA Loan**

HOEPA, or the Home Ownership and Equity Protection Act, was passed almost unanimously by Congress in September of 1994 as part of the Riegle Community Development and Regulation Improvement Act, Pub. L. No. 103-325 (September 23, 1994). It is codified at 15 U.S.C. § 1639 "Requirements for certain mortgages." Shortly thereafter regulations implementing the Act were published at 60 Fed. Reg. 15463 (March 24, 1995). These regulations have been revised twice, once in 1996[3] and again in 2001[4].

The purpose of HOEPA is to trigger specific disclosures by the lender to the borrower on a home equity loan when the interest rate and other closing costs cross a threshold where the act deems the loan to be of "high costs."[5] It also regulates certain practices that increase the costs of loans and regulates disclosures, the timing of the disclosures, prepayment penalties, limitations after default, balloon payments, negative amortization, prepaid payments, extending credit without regard to the ability of the consumer to repay, requirements for payments under home employment contracts among other things.

HOEPA covers loans that are defined at 15 U.S.C. § 1602(aa) of the Truth and Lending Act. HOEPA applies only to Mortgage loans that are closed end, non-purchase money loans, secured by the consumer's principal dwelling. There are two "triggers" that are used to determine HOEPA coverage. If either one of these triggers are met, the loan is covered. First the

---

[3]      61 Fed. Reg. 49237 (September 19, 1996)
[4]      66 Fed. Reg. 6504 (December 20, 2001)
[5] See report to Congress by the Commission on Affordable Housing and Health Facility Needs for Seniors in the 21st Century, July 28th 2002. http://govinfo.library.unt.edu/seniorscommission/pages/final_report/

loan must have an annual percentage rate (APR) of more than 8 percentage points over the yield of treasury securities having a comparable period of maturity on the 15th of the month immediately preceding the month in which the application for the credit was received by the creditor. This is called the APR trigger. The second trigger, relevant here, is the "points and fees" trigger. This is met if the total "points and fees" paid by the consumer at or before the closing exceeds the greater of 8% of the "Total Loan Amount" or $400.00.

The "Total Loan Amount" is the "Amount Financed" plus prepaid interest (See § 226.32(b)(1)(i)), minus Mortgage Broker fees (§ 226.32(b)(1)(ii)), minus the "real-estate related fees," unless they are *bona fide* and reasonable and/or not paid in whole or in part to the creditor or an affiliate of the creditor (§ 226.32(b)(1)(iii)) and minus charges for credit insurance (§ 226.32(b)(iv)). The "total loan amount" is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 225.32(b)(1) and financed by the creditor." Official Staff Commentary, 12 C.F.R. Pt. 226, Supp. I, § 226.32(a)(1)(ii). *Jefferies v. Ameriquest Mortg. Co.* 543 F.Supp.2d 368, 383 (E.D. Pa. 2008)

AHL's brief exhibits great confusion in how to properly calculate the "Amount Financed" pursuant to Regulation Z. (See AHL BR pp. 18-22.) Compare the arduous method of the calculation of the "amount financed" set out in its brief with the method stated in its response to Interrogatory number two (Ex 3):

> AHL states that the amount financed disclosed on Ms. Frazier's Final Truth in Lending Disclosure Statement (AHL/Frazier 0031) was calculated by subtracting the Prepaid Finance Charge ($3,582.90) referenced in AHL's Response to Interrogatory No. 3 from the Principal Loan amount ($56.000.00).

The "Amount Financed" as defined by TILA is "the amount of credit of which the

consumer has actual use." 15 U.S.C. § 1638(a)(2)(A). The following three sub-paragraphs of 15

U.S.C. § 1638 describe the calculation:

> (i) take the principal amount of the loan or the cash price less downpayment and trade-in;
> (ii) add any **charges which are not part of the finance charge or of the principal amount of the loan** and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and
> (iii) subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit. (Emphasis added.)

The problem with the calculation made by AHL in its brief, is that it includes "charges

which are not part of the finance charge" twice because those charges are already included in

"the principal amount of the loan."

In fairness Regulation Z § 226.18(b) is not a model of clarity in its description of the

method used for calculation of the "Amount Financed" for TILA disclosure purposes. It says in

pertinent part:

> *Amount financed.* The "amount financed," using that term, and a brief description such as "the amount of credit provided to you or on your behalf." The amount financed is calculated by:
> (1) Determining the principal loan amount or the cash price (subtracting any downpayment);
> (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
> (3) Subtracting any prepaid finance charge.

The calculation of the "Amount Financed" AHL uses in its brief is wrong in several

respects. The Commentary to Regulation Z makes it clear that charges "already accounted for

under section 226.18(b)(1)" are not included in the "other amounts" to be added. See

Commentary to § 226.18(b)(2)-1. Recall that § 226.18(b)(1) starts with the principal loan

amount, here $56,000.00. Subtract from $56,000.00 the amount that AHL states is the prepaid finance charge, $3,257.40, yields an amount financed of $52,417.10, exactly what AHL listed in the disclosure it prepared in this matter. (Ex 5). See also AHL's answers to Second Interrogatories from (Ex 3).

Still, for those confused, the Office of the Comptroller of the Currency publishes a Truth in Lending Comptroller's Handbook (Ex 13). On pages 29 and 30 the Handbook describes how the "Amount Financed" is calculated in a loan secured by real estate saying:

> A consumer signs a note secured by real property in the amount of $5,435. The note amount includes $5,000 in proceeds disbursed to the consumer, $400 in precomputed interest, $25 paid to a credit reporting agency for a credit report, and a $10 service charge. Additionally, the consumer pays a $50 loan fee separately in cash at consummation. The consumer has no other debt with the bank. The amount financed is $4,975.
> The amount financed may be calculated by first subtracting all finance charges included in the note amount ($5,435 - $400 - $10 = $5,025). The $25 credit report fee is not a finance charge because the loan is secured by real property. The $5,025 is further reduced by the amount of prepaid finance charges paid separately, for an amount financed of $5,025 - $50 = $4,975. The answer is the same if finance charges included in the obligation are considered prepaid or precomputed finance charges.

It is easy to calculate the maximum amount that can be charged for "points and fees" for HOEPA coverage. All one has to do is divide the Note amount of the loan by 1.08 and then subtract the answer from the Note Amount. Consider the instant transaction. Divide $56,000.00 by 1.08 = $51,851.85. Subtract $51,851.85 from $56,000.00 = $4148.15. This amount, $4148.15, less $.01, is the maximum amount that can be charged on a covered loan with a Note Amount of $56,000.00 and still avoid HOEPA coverage.

Checking, assume a $56,000.00 loan and $4,148.15 in "points and fees". The "Total Loan Amount" will be $51,851.85 ($56,000.00 - $4,148.15). To see if it is a HOEPA loan take 8% of

28

that amount by multiplying $51,851.85 * .08 = $4,148.148.

According to Regulation Z 226.32(b) "Points and Fees" consist of the following:

    i.     All finance charges as defined in § 226.4(a) and (b) except pre-paid interest;

    ii.    All compensation paid to mortgage brokers;

    iii.   All "real-estate related" fees listed in § 226.4(c)(7) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge and the charge is not paid the creditor's affiliate, and:

    iv.   All premiums for credit insurance.

The charges included in the calculation of the Finance charge and "points and fees" differ in several respects. These differences applicable here are summarized in the chart below:

| Item | Finance Charge? | TILA Finance Charge Provision | Point and fee? | HOEPA Provision |
|---|---|---|---|---|
| Third Party Charges | Yes, if required | Reg Z 226.4(a)(1) | Yes if required | Reg Z 226.32(b)(1)(i) |
| Settlement Agent Fee | Yes, if required | Reg Z 226.4(a)(2) | Yes if required | Reg Z 226.32(b)(1)(i) |
| Pre-Paid Interest | Yes | Reg. Z 226.4(b)(1) | No | Reg Z 226.32(b)(1)(i) |
| Real-Estate Related fees | No, if *bona fide* and reasonable | Reg. Z 226.4(c)(7) | Yes, unless *bona fide* and reasonable, not paid to creditor in whole or in part and not paid to creditor's affiliate | Reg. Z 226.32(b)(iii) |
| Credit Insurance | No, if properly disclosed | Reg. Z 226.4(d) | Yes | Reg. Z 226.32(b)(iv) |

With the exception of pre-paid interest, the definition of "points and fees" is more inclusive than that of "Finance Charge." For example, a fee for flood inspection paid to the lender, if *bona fide* and reasonable, is excluded from the finance charge by 15 U.S.C. 1605(e) and § 226.4(c)(7)(iv) but will always be "point and fee" if the creditor retains even a portion of

the charge. See § 226.32(b)(iii). Likewise fees for credit insurance are excluded from the finance charge if properly disclosed but are always considered "points and fees" by operation of § 226.32(b)(iv).

The question arises, when a fee is unreasonable how should it be treated? *Guise v. BWM Mortgage, LLC,* 377 F.3d 795 (7th Cir.2004), and the cases that follow it treat only the unreasonable portion of a fee as a finance charge. Likewise at lease two courts have treated only the unreasonable portion of a fee as a "point and fee." See, *In re Strong* 2005 WL 1463245, 5 (E.D. Pa. 2005) "I rule that the Bankruptcy Court properly included only the unreasonable portion of the title insurance premium in its HOEPA points and fees calculation[.]" and *Johnson v. Know Financial Group, L.L.C.* 2004 WL 1179335, 7 (E.D. Pa. 2004) "For the following reasons, we find that only the portion of the charge which renders it not 'reasonable,' 12 C.F.R. § 226.32(b)(1)(iii), is to be included in the total points and fees calculation."

Several other courts have included entire fees found to be unreasonable. In *Morris v. Novastar Mortg., Inc*. 2006 WL 2707349, 4 (W.D. Mo. 2006) the court found that the entire unreasonable appraisal fee and not just the "unreasonable portion", was a "point and fee," saying, "the Court finds that the plaintiff has come forth with sufficient evidence, by affidavit, that the $575 charge was unreasonable. Accordingly, the appraisal fee of $575 is not exempted from TILA's regulations. The $575 appraisal fee should have been included in the total amount of points and fees to determine if the amount exceeded 8% of the loan amount."

An unreasonable title search fee was a "point and fee" in *McMaster v. CIT Group/Consumer Finance Inc.* 2006 WL 1314379, 6 (E.D. Pa. 2006) "These fees included the $91.00 title examination fee. If the title examination fee is unreasonable, as McMaster alleges, it

will be included in the finance charge. The total points and fees payable by the consumer at or before the closing will then exceed eight percent of the total loan amount, thus making it a high interest loan under HOEPA."

The court in *Bynum v. Equitable Mortg. Group* 2005 WL 818619, 8 (D.D.C. 2005) included an illegal insurance premium and an entire unreasonable judgment report fee as points and fees saying, "Accordingly, the $218.76 fee, imposed in violation of the MLBA, cannot be considered reasonable and must be included in the points and fees calculation," and "The judgment reports were thus duplicative, not *bona fide* and unreasonable. The $64 fee must be included in the HOEPA points and fees calculations."

The language of the relevant sections of the statute, regulations and commentary, if read carefully, answers this question. Section 1605(e) gives a blanket exception, from the finance charge calculation, for "real-estate related fees" that is only qualified by Reg. Z 226.4(c)(7), "'*Real-estate related fees,*' The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount[.]" On the other hand 15 U.S.C. § 1602(aa)(4)(C)(i) states:

(4) For purposes of paragraph (1)(B), points and fees shall include—
    (A) all items included in the finance charge, except interest or the time-price differential;
    (B) all compensation paid to mortgage brokers;
    (C) each of the charges listed in section 1605 (e) of this title (except an escrow for future payment of taxes), unless—
        (i) the charge is reasonable;
        (ii) the creditor receives no direct or indirect compensation; and
        (iii) the charge is paid to a third party unaffiliated with the creditor; and
    (D) such other charges as the Board determines to be appropriate.


Regulation Z 226.32(b)(1)(i) uses similar language:

(b) *Definitions.* For purposes of this subpart, the following definitions apply:

(1) For purposes of paragraph (a)(1)(ii) of this section, *points and fees* mean:
   (i) All items required to be disclosed under § 226.4(a) and 226.4(b), except interest or the time-price differential;

    (ii)    All compensation paid to mortgage brokers; and

    (iii)   All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

    (iv)   Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

The use of the words in § 1602(aa)(4)(C) "each of the charges listed in section 1605 (e) … unless" and the language in §226.32(b)(1) "All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor[,]," indicate that both the drafters of the statute and the corresponding regulations intended the whole fees should be included in the point and fee calculation *unless* certain conditions are met.

This conclusion is supported by the Commentary to § 226.32:

    Section 226.32(b)(1)(iii) defines "points and fees" to include all items listed in §226.4(c)(7), other than amounts held for the future payment of taxes. An item listed in §226.4(c)(7) may be excluded from the "points and fees" calculation, however, if the charge is reasonable, the creditor receives no direct or indirect compensation from the charge, and the charge is not paid to an affiliate of the creditor. For example, a reasonable fee paid by the consumer to an independent, third-party appraiser may be excluded from the "points and fees" calculation (assuming no compensation is paid to the creditor). A fee paid by the consumer for an appraisal performed by the creditor must be included in the calculation, even though the fee may be excluded from the finance charge if it is bona fide and reasonable in amount.

Several courts have agreed. "[T]he definition of "points and fees" in sections 226.4 and 226.32 of Regulation Z. 12 C.F.R. §§ 226.4, 226.32. Read together, these sections define 'points and fees' as including 'fees for title examination, abstract of title, [and] title insurance' *unless* 'the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge[.]'"*Macheda v. Household Finance Realty Corp. of New York* 2008 WL 2562003, 5 (N.D.N.Y. 2008)(Emphasis in original.) See also *IN re Crisomia* 2002 WL 31202722, 9 (Bkrtcy. E.D. Pa. 2002) "Real Estate Charges are exempted from inclusion in the finance charge provided they are bona fide and reasonable, 15 U.S.C. § 1605(e); 12 C.F.R. 226.4(c)(7), § 1602(aa)(4)(C) brings these exempted Real Estate Charges back into the finance charge for the purpose of determining "points and fees" unless they are also: (1) reasonable, (2) the creditor receives no direct or indirect compensation, and (3) the charge is paid to an unaffiliated third party. *See also* 12 C.F.R. 226.32(b)(1)."

Finally let's take Ms. Frazier's actual loan figures and figure the "total loan amount" and check for HOEPA coverage.

| | |
|---|---|
| Principal loan or Note amount | $56,000.00 |
| Subtract pre-paid Finance charge | 3,582.90 |
| Add Pre-paid interest | 22.40 |
| Subtract Padded Recording fee | 120.00 |
| Subtract Padded Abstract fees | 450.00 |
| Subtract padded title Ins. Fee | 200.00 |
| Subtract "Endorsement" fee | 50.00 |
| Total Loan Amount | $51,619.50 |

The "points and fees" equal the sum of the above charges. $3,582.90 − 22.40 + 120.00 + 450.00 + 200.00 + 50.00 = $4,380.50. 8% of $51,619.50 = $4,128.56. The loan is covered by HOEPA.

## CONCLUSION

For all the reasons stated above, AHL's motion for summary judgment is due to be denied.

\s\Earl P. Underwood, Jr.
EARL P. UNDERWOOD, JR.  (UNDEE6591)
Post Office Box 969
Fairhope, Alabama  36533
251-990-5558
251-990-0626 (fax)
Attorney for Plaintiffs

KENNETH J. RIEMER  (RIEMK8712)
Post Office Box 1206
Mobile, Alabama  36633
251-432-9212
251-433-7172 (fax)
Attorney for Plaintiffs

GEORGE R. IRVINE, III  (IRVIG4725)
STONE, GRANADE & CROSBY, P.C.
7133 Stone Drive
Daphne, Alabama  36526
251-626-6696
251-626-2617 (fax)
Attorneys for Plaintiffs

STEVEN L. NICHOLAS  (NICHS2021)
CUNNINGHAM, BOUNDS, CROWDER,
BROWN AND BREEDLOVE, LLC
Post Office Box 66705
Mobile, Alabama  36660
251-471-6191
251-479-1031 (fax)
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 18th day of August, 2008, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

   \s\Earl P. Underwood, Jr.
EARL P. UNDERWOOD, JR.